IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

**FILED UNDER SEAL**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO.: 2:15-CR-472 |
| | ) | |
| DYLANN STORM ROOF | ) | |

**MOTION FOR PROTECTIVE ORDER REGARDING
CONFIDENTIAL DEFENSE INFORMATION IN THE POSSESSION
OF THE CHARLESTON COUNTY DETENTION CENTER**

Defendant, Dylann Storm Roof, through counsel, moves for a protective order to prevent the United States Attorney's Office, the Ninth Circuit Solicitor's Office, and all investigative law enforcement agencies from obtaining, maintaining, and using defense confidential materials and information such as visitors' log-in sheets and related documents pertaining to both defense and personal that have been or will be created or available only because the defendant is in the custody of the Charleston County Detention Center. This motion is based upon the defendant's constitutional rights of access to the courts and to prepare a defense, the Fourth, Fifth, Sixth, and Eighth Amendments to the United States Constitution, the attorney client privilege, the work-product doctrine, Federal Rules of Criminal Procedure 12.2(d) and 16(d)(1), and other applicable provisions of federal and state law.

BACKGROUND

1. The defendant has been indicted on thirty-three counts which include alleged violations of 18 USC §§ 247, 249(a) and 924(j). In combination, these charges carry potential sentences of death or life imprisonment without release. The indictment also includes a series of

1

Special Findings which are apparently intended to render the defendant liable to be sentenced to death. The Department of Justice has not yet made a decision as to whether the death penalty will be sought.[1] When a defendant's life is at stake, a court must be "particularly sensitive to insure that every safeguard is observed." *Gregg v. Georgia*, 428 U.S. 153, 187 (1976).

2. The Defendant has been incarcerated as a pretrial detainee in the Charleston County Detention Center since his arrest on June 18, 2015.

3. The Detention Center requires that all visitors identify themselves and sign a registration log when visiting a detainee at the jail.

4. Since the defendant's arrest, state and federal prosecutors have enlisted the Detention Center staff as participants in the investigation and gathering of evidence against him. For example, normal jail policy has the lobby staff review all mail that comes in to and out from inmates in the Detention Center. However, Mr. Roof's mail incoming and outgoing mail is being screened and copied by the Intelligence Unit at the Detention Center, and is being forwarded to investigators working on the criminal case against him. This has been done from the time of his arrest and is documented in email exchanges beginning at least by June 22, 2015. This departure from normal policy was not disclosed to the defendant or to his attorneys until more than two months after his arrest.[2]

5. The defendant's cell has already been searched and private, attorney-client privileged documents and all of his outgoing and incoming mail have been seized, copied and

---

[1] The State of South Carolina has already announced its intention to seek the death penalty against the defendant in a parallel prosecution arising from the same factual allegations.

[2] It is also worthy of note that the Security Threat Group policies were revised on July 21, 2015, and apparently again sometime in August. It is unclear to defense counsel at this time whether the policies were revised specifically to authorize the extraordinary treatment being accorded this defendant's case.

provided to the government. In sum, the defendant is confined in an environment which has been rendered almost entirely transparent to the prosecution as it gathers evidence and builds its case against him.

THE GOVERNMENT'S SUBPOENA FOR VISITATION LOGS

6. The Detention Center has received a federal subpoena, dated August 14, 2015, issued at the request of an Assistant United States Attorney prosecuting this case, for the defendant's jail records for the time period of June 18, 2015 to August 14, 2015. The subpoena requires production of:

a. Inmate visitor's log;

b. A copy of the concessions and/or canteen account fund to include contributor name, address and amount of money contributed;

c. A copy of the mail log to include incoming and outgoing mail excluding privileged communications with attorney(s) and/or other identified privileged communications;

d. A copy of any documents administratively seized and/or seized from the inmate via adherence with the Detention Center's policy; and

e. Any reports generated by the Charleston County Sheriff's Office and/or the Detention Center that documents the seizure of material from the listed inmate.

Even prior to receipt of this subpoena, Detention Center employees had provided portions of the defendant's records to the prosecution and investigating agencies.

WHY A PROTECTIVE ORDER SHOULD ISSUE

7. The defendant is represented by court-appointed lawyers in both state and federal court. His defense is also being assisted by two staff members from the South Carolina Death Penalty Resource and Defense Center who are serving as defense investigators. In preparing for trial, defense counsel has been and will continue to send civilian and professional personnel to the Detention Center to visit the defendant.

3

8.    The government would not have access to names of people with whom the defendant is meeting or communicating in preparation for trial but for his pretrial incarceration in the Detention Center. While Fourth Amendment protections are far narrower in a jail setting than elsewhere, *see Hudson v. Palmer*, 468 U.S. 517 (1984), and some "provisions of the Constitution that are applicable in general to all citizens must be accommodated to institutional needs and objectives, no wall separates the constitution from prison inmates." *United States v. Cohen*, 796 F.2d 20, 22 (2d Cir. 1986); *Wolff v. McDonnell*, 418 U.S. 539, 555-556 (1974).

> Thus, prisoners have been held to retain right of access to the courts, see *Johnson v. Avery*, 393 U.S. 483, 485, (1969); *Ex parte Hull*, 312 U.S. 546, 548-49 (1941); the Equal Protection Clause of the Fourteenth Amendment protects them against invidious discrimination on the basis of race, except as may be essential to prison security, see *Cruz v. Beto*, 405 U.S. at 321; *Lee v. Washington*, 390 U.S. 333, 334 (1968) (per curiam); and the Eighth Amendment safeguards inmates from "deliberate indifference to [their] serious medical needs . . . ." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). From these cases there emerges a rule that when a prison restriction infringes upon a specific constitutional guarantee, it should be evaluated in light of institutional security. Security is the main objective of prison administration; prison officials must have broad latitude to adopt rules that protect the safety of inmates and corrections personnel and prevent escape or unlawful entry. *Bell v. Wolfish*, 441 U.S. 520 (1979).

*Cohen*, *supra,* 796 F.2d at 22.

9.    With respect to expert witness visitors, federal law recognizes that a defendant is entitled to conduct investigation and have access to expert assistance without the government's knowledge. Title 18 U.S.C. 3006A(e)(1) provides in applicable part that "[c]ounsel for a person who is financially unable to obtain investigative, expert, or other services necessary for adequate representation may request them in an *ex parte* application. Upon finding, after appropriate inquiry in an *ex parte* proceeding, that the services are necessary and the person is financially unable to obtain them, the court …..shall authorize counsel to obtain the services." (emphasis added). *Ex parte* applications are also specifically authorized by 18 U.S.C. § 3599(f), which governs applications for expert and investigative services in potentially capital cases such as this

one. These confidentiality provisions will be at least partially vitiated if the names of experts or investigators who visit the defendant at the Detention Center during the course of preparing his case for trial are routinely provided to the prosecution.

10.     Disclosing to the prosecution the names of any defense-retained mental health experts who may visit the defendant at the Detention Center would be particularly inappropriate because it would largely nullify the special protections surrounding such information created by Rule 12.2(c)(2) of the Federal Rules of Criminal Procedure. That Rule requires that defense expert mental health evaluations conducted for mitigation purposes in capital cases must be sealed and not disclosed to the prosecution until after renewed defense notice of intent to introduce such evidence following conviction. *See also Ake v. Oklahoma*, 470 U.S. 68 (1984). Indeed, the very fact of such evaluations need not be disclosed at all unless and until the defendant provides notice of his intent to *introduce* such evidence at sentencing, and even then, the defendant is not required to inform the government of the name of the expert or expert, the dates and duration of any examinations that the experts may have conducted, or any of the results obtained. Such details need not be disclosed to the prosecution until after the defendant is convicted of a death-eligible offense, and after he has re-confirmed his intention to offer expert mental health evidence in mitigation.[3]     *United States v. Johnson*, 362 F. Supp. 2d 1043, 1079-80, 1081 (D. Iowa 2005); *United States v. Sampson*, 335 F. Supp. 2d 166, 242, 243 (D. Mass. 2004). It would be fundamentally unfair to allow the government to evade these carefully-

---

[3] Rule 12.2(c)(2) provides:

> The results and reports of any examination conducted solely under Rule 12.2(c)(1) after notice under Rule 12.2(b)(2) must be sealed and must not be disclosed to any attorney for the government or the defendant unless the defendant is found guilty of one or more capital crimes and the defendant confirms an intent to offer during sentencing proceedings expert evidence on mental condition.

5

constructed pretrial protections by the simple expedient of issuing subpoenas for the defendant's Detention Center visitation log.

11.     Additionally, the government is entitled to disclosure of defense information only under the provisions of Rule 16(b) Fed.R.Crim.P which does not require the defendant to disclose to the government persons with whom he meets, with whom he corresponds, the experts with whom he and his lawyers consult or the identity of persons who provide him money.

12.     Even apart from the specific statutory protections embodied in the Federal Rules of Criminal Procedure, defense strategies have long been protected from disclosure as attorney work-product.

> [A] lawyer is an officer of the court and is bound to work for the advancement of justice while faithfully protecting the rightful interests of his clients. In performing his various duties, however, it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel.  Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. That is the historical and the necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and to protect their clients' interests. This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways—aptly though roughly termed by the Circuit Court of Appeals in this case (153 F.2d 212, 223) as the "Work product of the lawyer."  Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own.  Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial.  The effect on the legal profession would be demoralizing.  And the interests of the clients and the cause of justice would be poorly served.

*Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947).  *See also Upjohn Co. v. United States*, 449 U.S. 383, 397-402 (1981).

13. The work product doctrine applies in criminal cases, as well as in civil cases, and it protects not only the attorney's work product, but that of counsel's agents. *United States v. Nobles*, 422 U.S. 225, 236 (1975).

> At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case. But the doctrine is an intensely practical one, grounded in the realities of litigation in our adversary system. One of those realities is that attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial. It is therefore necessary that the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself. Moreover, the concerns reflected in the work-product doctrine do not disappear once trial has begun. Disclosure of an attorney's efforts at trial, as surely as disclosure during pretrial discovery, could disrupt the orderly development and presentation of his case.

*Id.* at 238-39. Clearly, permitting the prosecution and law enforcement access to the identity of experts and various other core members of the defense team retained by defense counsel who visit the defendant at the Detention Center would improperly reveal counsel's thinking, lines of investigation and defense strategies, and would violate the work product doctrine.

14. Security is solely the province of the jail administration. Allowing the prosecution access to the names of the defendant's visitors, his correspondence and even those who provide him with canteen money is irrelevant to any security issues at the jail. Rather, furnishing this information to the government simply provides the government with improper discovery and infringes on the defendant's right to prepare for trial and capital sentencing. For example, by tracking the identity of routine visitors, the prosecution and law enforcement can more readily determine who is close to the defendant and likely to be potential mitigation witnesses without even interviewing those persons. Likewise, by being able to identify family members and associates who do not visit, the prosecution and law enforcement can more readily

7

identify potential witnesses who may not have favorable opinions, or may even be potential aggravation witnesses.

15. Providing access to the defendant's visitor list and those with whom he corresponds would also potentially give the prosecution an unfair advantage during trial, particularly should this case proceed to a capital sentencing. Specifically, if the defendant's counsel in the federal prosecution were to present mitigating character evidence through a particular witness, the prosecution could potentially impeach the witness with information that the witness did not think enough of the defendant to visit him or correspond with him. Thus, there can be a detrimental impact on the defense preparations and strategies concerning witnesses and evidence to present.

16. While the government may deny the value of such information, the very fact that the it has subpoenaed the defendant's visitor list indicates that the government believes the material will be of evidentiary value (e.g. who is or who is not visiting the defendant), or will provide insight into the mental processes of defense counsel based on the identity of mental health experts who may visit the defendant. If the defendant were not incarcerated, none of this information would be available to the government.

17. In any case in which the death penalty may be sought, family members of the defendant, mitigation investigators hired by the defense, mental health professionals hired by the defense, and fact investigators hired by the defense are all potential witnesses because they have information which is relevant to the trial or penalty phase of any such case. The Government is clearly not entitled to the requested information identifying these persons and, indeed, as explained below, disclosure of that information is prohibited by state law.

18.     Production or disclosure of the defendant's visitor log is expressly forbidden by S.C. Code § 16-3-1525(C), provides, in relevant part:  "The names, addresses and telephone numbers of victims *and witnesses* contained in the files of a jail, prison, or detention or holding facility are confidential and must not be disclosed, directly or indirectly, except as necessary to provide notification."  (Emphasis added).  The word "witness" is defined in S.C. Code § 16-3-1510(4) as "a person who has been or is expected to be summoned to testify for either the prosecution or the defense or who by reason of having relevant information is subject to be called or likely to be called as a witness for the prosecution or defense for criminal offenses. . . ." The fact that the names of potential defense witnesses are exempt from disclosure by the Detention Center under South Carolina state law is a circumstance that weighs heavily in favor of granting the relief requested here, and eliminates any countervailing federalism concerns.

19.     As addressed above, the Detention Center's practice of sharing documentation and information about the Defendant with prosecutors and investigating law enforcement agencies has already impeded upon attorney-client privileges and compromised the confidentiality of certain attorney work product of the defense team.

20.     Such breaches of confidentiality will likely continue if this practice is left unchecked. Although the Detention Center may have legitimate security needs for requiring written documentation of inmate visits, including legal visits, that does not mean that the prosecutors should be allowed to learn who is visiting the defendant, or when, how often, and for how long.  In our adversary system of criminal justice, it is unfair and a violation of due process, the work product doctrine, and the right to prepare a defense for prosecutors to learn the defense team's confidential preparation of the defense.

21.     Attached are unpublished orders from the District of Idaho, *United States v.*

9

*Watland*, CR No. 07-023-N-EJL (July 19, 2007), and the District of Colorado, *United States v. Duncan,* 1:11-cr-00038-JLK-CBS (April 15, 2011), which are instructive here. Both cases were federal death penalty prosecutions in which the trial courts faced the same issue raised by this motion; *i.e.*, prosecution access to the defendants' visitors logs.  In each case, the district court recognized that giving the prosecution such access would at the very least potentially reveal confidential defense strategy to the prosecution.  The courts therefore granted the defendants' requests that visitors' list not be routinely given to the government.

## RELIEF REQUESTED

The defendant respectfully asks the Court, pursuant to Federal Rule of Criminal Procedure 16(d)(1), for a protective order to safeguard the defendant's rights addressed above.  Specifically, the defendant asks the Court to order the following relief:

1)     The Detention Center should be prohibited from providing to prosecutors and investigative law enforcement agencies the originals and/or copies of any materials in the defendant's Detention Center visitor's log, or any other material or information identifying visitors to the defendant.

2)     Any federal prosecutors and investigative agencies that have already received copies of or information from the Detention Center visitors' log, or material otherwise identifying the defendant's visitors or requests for visitation, should be required to purge their files of all documents and information.  Each prosecuting attorney and designee of each law enforcement office should certify that they and their employees have destroyed all originals and copies of such materials, including without limitation paper and electronic copies, and should file such certifications with the Court;

10

3)     The government and all investigative agencies should be barred from using information obtained from Detention Center visitors' logs and related documents in prosecuting or investigating the defendant.

>Respectfully submitted,
>
>s/ *Michael P. O'Connell*
>
>David I. Bruck
>Washington & Lee School of Law
>Lexington VA 24450
>540-458-8188
>bruckd@wlu.edu
>
>Michael P. O'Connell
>Stirling & O'Connell
>PO Box 828
>Mt. Pleasant, SC 29464
>843-577-9890
>moconnell@stirlingoconnell.com
>
>Attorneys for Dylann S. Roof