IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO.: 2:15-CR-472 |
| | ) | |
| DYLANN STORM ROOF | ) | |

**DEFENDANT'S RESPONSE TO**
**GOVERNMENT'S PROPOSED RULE 12.2 PROCEDURES**

In light of the Court's June 30 interim order regarding procedures to govern notice and a possible government rebuttal mental health evaluation under Rule 12.2 of the Federal Rules of Criminal Procedure, Dkt. No. 226, there remain four main issues to be resolved.  They are:

1.  Whether the government's "firewalled" prosecutor may receive results and preliminary reports from the government's examining mental health expert prior to and during trial, despite Rule 12.2(c)(2)'s requirement that "[t]he results and reports of any examination . . . must be sealed and must not be disclosed *to any attorney for the government* . . . ."

2.  Whether the defendant should be required to produce for the government's expert, in addition to the notice and disclosures already set forth in the Court's interim order, "a report summarizing the defense mental health expert's diagnoses, opinions, bases and reasons for those opinions, test results and raw data, and copies of all information reviewed by the defendant's experts."  Government's Motion to Establish Rule 12.2 Procedures [hereinafter Govt. 12.2 Mot.], Dkt. No. 213, at 3-4, 11-12.

3.  Whether the defense is entitled to advance notice of the government experts' proposed tests.  Compare *Fulks & Basham* Rule 12.2 Order at 7, ¶ 3, Dkt. No. 208-1 with Government's Response to Defendant's Proposed Rule 12.2 Procedures, Dkt. No. 230 [hereinafter Govt. 12.2 Resp.] at 2-3.

4.  Whether defense counsel should be permitted to attend the government's mental health examination, and to audiotape or videotape the evaluation.

These issues are discussed below. But first, the government's aggressive proposals for

virtually unlimited access to both the defendant and the results of the defense's own mental health and background investigations warrant a brief discussion of the history and purpose of the 2002 amendments to Rule 12.2 that the Court is being asked to apply. We believe this discussion will demonstrate that the goal of whatever procedures the Court adopts under Rule 12.2 is not to make the government's evaluation easier, more convenient, or even more reliable, but rather to provide what is *necessary* – consistent with the Fifth Amendment – to permit a fair response to the defendant's case in mitigation.

> **I.** **The capital sentencing provisions of Rule 12.2 are designed solely to permit fair rebuttal to defense expert mental health testimony, and do not provide the government with an opportunity to compel the defendant's cooperation in buttressing its case for death.**

Before Congress enacted the first modern death penalty sentencing statute in 1988, Pub. L. 100-690, 102 Stat. 4181 (Nov. 18, 1988), the Supreme Court had recognized the serious Fifth and Sixth Amendment concerns implicated by the prosecution's adverse use of evidence derived from pretrial psychiatric or psychological evaluations in capital sentencing proceedings. *Estelle v. Smith*, 451 U.S. 454 (1981); *Satterwhite v. Texas,* 486 U.S. 249 (1988). In *Smith* and *Satterwhite*, the Court ruled that the prosecution could not use mental health evaluations as affirmative evidence against a capital defendant. The Court did, however, leave room for limited adverse use of pretrial interviews or evaluations by a prosecution mental health expert in rebuttal where the defendant had first placed his own mental condition in issue by introducing expert testimony. *Buchanan v. Kentucky*, 483 U.S. 402, 423-424 (1987), *and see Kansas v. Cheever*, ___ U.S. ___, 134 S. Ct. 596 (2013). When the defendant grants a diagnostic interview to his own expert

about which the expert then testifies, the government is entitled to similar access and testimony. *See Smith*, 451 U.S. at 468-469; *Battie v. Estelle*, 655 F.2d 692, 702 & n.22 (5th Cir. 1981); *see also United States v. McSherry*, 226 F.3d 153, 156 (2d Cir. 2000); *United States v. Byers*, 740 F.2d 1104, 1113-14 (D.C. Cir. 1984).[1]

The bifurcated structure of post-*Gregg* capital sentencing statutes gave rise to special challenges in implementing these constitutional rules. This was and remains so because any pretrial prosecution psychological evaluation respecting sentencing-related issues amounts to the taking of a pretrial deposition of the accused in a criminal case -- at a stage of the proceedings when he enjoys a right against self-incrimination with respect to both his guilt or innocence, and, if convicted, to his legal and factual eligibility for a death sentence. The problem, in short, was how to accommodate the prosecution's need for a fair opportunity to respond to whatever mental health evidence a capital defendant might offer in mitigation of punishment, while ensuring that the government's access to the defendant would neither help it prove his guilt at trial, nor bolster its affirmative case for the death penalty at sentencing.

---

[1] In this setting, the defense expert's testimony is like constructive testimony by the defendant himself. Thus the rules surrounding government expert rebuttal are comparable to the familiar rules restricting cross-examination to those topics addressed on direct. *See Brown v. United States*, 356 U.S. 148, 155-56 (1958) (a defendant "determines the area of disclosure and therefore of inquiry"). Put simply, because the defendant has not waived his Fifth Amendment privilege on matters about which he has not adduced evidence, the government may not inquire about them. *Id.* at 154-155. *Cf. Mitchell v. United States*, 526 U.S. 314, 325 (1999) (noting, in holding that Fifth Amendment privilege persists at sentencing, that "criminal proceedings rely on accusations proved by the Government, not on inquisitions conducted to enhance its own prosecutorial power").

Federal courts first addressed this problem on a case-by-case basis, fashioning procedures to limit the scope of the government's pretrial rebuttal evaluation, and to prevent the government from having access to the results of its expert's evaluation prior to a capital conviction. *United States v. Beckford*, 962 F. Supp.748 (E.D. Va. 1997); *United States v. Haworth*, 942 F. Supp. 1406 (D.N.M. 1996); *United States v. Vest*, 905 F. Supp. 651 (W.D. Mo. 1995). In due course, the Advisory Committee on Rules of Criminal Procedure substantially adopted these procedures in a series of 2002 amendments to Rule 12.2. The Advisory Committee's comments on the 2002 amendments reflect in particular the influence of Judge Robert E. Payne's *Beckford* opinion, which is repeatedly cited and which the amendments substantially codify. In sum, the *Beckford* procedures provided that (1) a defendant wishing to present mental health evidence in mitigation would be required to provide pretrial notice, (2) such notice would trigger a government expert evaluation, and (3) any results of the government's evaluation would be sealed and not disclosed to any government lawyer until the defendant was found guilty and thereafter confirmed his intent to present mental health evidence at sentencing. 962 F. Supp. at 763-74. In adopting these procedures, the drafters of the Rule 12.2 amendments further clarified that only a defendant's intent to offer "expert" mental health evidence would trigger a government evaluation,[2] and – most importantly for present purposes – that the govern-

---

[2] Rule 12.2(b) provides, "[i]f a defendant intends to introduce *expert evidence* relating to a mental disease or defect or any other mental condition of the defendant bearing . . . the issue of punishment in a capital case . . . the defendant must . . . notify an attorney for the government in writing of this intention." (Emphasis added)

ment would be permitted to use its expert's access to the defendant only "on an issue regarding mental condition on which the defendant . . . has introduced expert evidence in a capital sentencing . . . ."  Rule 12.2(c)(4)(B).

Here, the government complains that the defendant's Rule 12.2 proposals would "unduly constrain the government's ability to evaluate and respond to Defendant's mental health evidence," Govt. 12.2 Resp. at 1, and urges the Court to adopt procedures designed to maximize the value of the government's pretrial access to the defendant in developing its own case against him.  The key to resolving the disagreement between the defense and the government is to keep in mind the modest purpose of the government's evaluation under Rule 12.2.  It is *a rebuttal* evaluation, and only that.  It has no permissible purpose beyond providing the government with a reasonable opportunity to rebut the conclusions of the defense's experts.  It is *not* an opportunity for the government to develop and unleash the most devastating case it can as to why the defendant should suffer death.  And it follows from this limited purpose that the question now before the Court is not whether the conditions for the government's rebuttal evaluation will be optimal, but rather whether they will be adequate.

The government provides the most benign examples to justify its demands for relatively unconstrained discovery and pretrial access to the accused.  Thus, it argues against restricting the scope of the government's rebuttal evaluation by pointing out if "a defense expert were to diagnose the defendant with a depressive disorder, the government's expert might properly rebut that diagnosis by finding the defendant experiences manic episodes in conjunction with depressive episodes, such that a diagnosis of bipolar

disorder is more appropriate." Govt. 12.2 Resp. at 2. But citing such a run-of-the-mill

diagnostic disagreement conceals rather than illuminates the constitutional danger against

which Rule 12.2 was designed to guard. To understand what is really at stake here, the

Court would do well to consider the actual performance of "rebuttal" experts on whom

the government has frequently relied in federal capital cases.

The federal government's most often-retained evaluator in recent capital cases has

been Michael Welner, M.D., a controversial New York forensic psychiatrist who appears

frequently as a network news commentator on high-profile crimes (including this one, *see*

Fox News, "What was going on in the head of Dylann Roof?"

https://www.youtube.com/watch?v=uKvrhFnKzfI June 19, 2015), and who has spent

nearly two decades attempting to "operationaliz[e] an evidence-driven distinction for le-

gal terms such as 'heinous,' 'atrocious,' 'evil' and 'depraved.'" Michael Welner, "The

Depravity Standard," available at https://depravitystandard.org/about_the_research.html.

Welner is also the creator and Chairman of the Forensic Panel, an expert-services market-

ing operation that purports to offer "peer review" validation of its own members' work.[3]

---

[3] In one recent federal capital case, a district court found it necessary to disqualify three members
of The Forensic Panel from serving as the government's Rule 12.2 rebuttal experts after concluding
– partly on the basis of testimony from Dr. Welner about the group's operating procedures -- that
the government had improperly arranged for its rebuttal evaluation to be conducted collaboratively
by three experts, and had misled the Court on this point in *ex parte* proceedings. *United States v.
Richardson,* 1:08-cr-00139-CC-CCH, Dkt. No. 903 (Order Granting Defendant's Motion to Ex-
clude the Government's Experts Based on Ex Parte Communications by the Government That Un-
fairly Misled Defendant on Critical Issues Related to the Government's Mental Health Evaluation)
(April 10, 2012). Another federal court has found that, "[c]ontrary to the assertion of the Govern-
ment's experts that [a Forensic Panel psychologist's] report qualifies [as] a 'peer reviewed' assess-
ment, the Court finds that The Forensic Panel's use of that term is misleading and that there was
no 'peer review' performed that would be consistent with the generally accepted understanding of

http://www.forensicpanel.com/selected_cases.html.  Courtroom testimony and press re-
ports have revealed that Welner's so-called peer reviewers bill the government at an
hourly rate commensurate with his, but then repay a substantial portion of what they earn
back to Welner.[4]

The hallmark of a Welner "rebuttal" evaluation is that it does not merely rebut the
defense mental health case, but seizes on the access afforded to the defendant to affirma-
tively recharacterize him, whenever possible, as remorseless, manipulative, and depraved.
For example, as the Supreme Court recently noted, Welner deployed a rebuttal evaluation
ordered by a federal court under Rule 12.2(b) on the issue of the defendant's voluntary-
intoxication defense to provide a state court jury with this interior monologue, suppos-
edly reflecting *the defendant's own thoughts* just before he killed a police officer during a
drug arrest:

> "I don't jump out of the window the way my confederate later does. And
> when I do shoot, I don't shoot before Matthew Samuels walks through the
> curtain in such a way that I might scare him, the way my later shots fright-
> ened the deputies that came to pull him away, but I shoot him at a point in

---

that term."  *United States v. Shields*, No. 2:04cr20254, Dkt. No. 557, at 7 n. 3 (W.D.Tenn. May
11, 2009).

[4] See Rankin, B., *Costs questioned in failed death-penalty case*, The Atlanta Journal Constitution,
Aug. 13, 2012, available at http://www.ajc.com/news/news/local/costs-questioned-in-failed-
death-penalty-case-1/nRBbs/ ("The Forensic Panel billed more than $150,000 to the government
[in the federal death penalty case of *United States v. Richardson*], [the United States Attorney]
estimated. Welner charged $475 an hour for his time and for the time of each of his peer-review
panel experts. This meant that when Welner and his three experts had a conference call, it cost
$1,900 an hour, although Welner said this happened on very few occasions and was a small per-
centage of his overall billings. Court records show The Forensic Panel paid $275 an hour to Mor-
gan and Trestman and $250 an hour to Marcopulos for the work they did on the Richardson case.
Yates, the U.S. attorney, said she had been unaware of the $200-$225 difference in how much
Welner billed for his experts' work and how much he paid them until it was disclosed during a
hearing during the trial.")

> which he is very much within my range, has passed through that curtain,
> and I know that he is coming upstairs, and that is when I shoot."

*Kansas v. Cheever,* ___ *U.S.* ___, 134 S.Ct. 596, 603 n. 3 (2013). While the Supreme

Court left it for the Kansas courts on remand to decide in the first instance whether such

broad-ranging "rebuttal" testimony violated Cheever's Fifth Amendment rights, it point-

edly took the opportunity to summarize the constitutional limitations on prosecution re-

buttal evaluations:

> We have held that testimony based on a court-ordered psychiatric evalua-
> tion is admissible only for a "limited rebuttal purpose." *Buchanan,* [supra],
> 483 U.S., at 424. In *Buchanan,* for example, although the prosecution had
> used a psychiatric report to rebut the defendant's evidence of extreme emo-
> tional disturbance, we noted that the trial court had redacted the report so as
> to avoid exposing the jury to "the very different issue" of the defendant's
> competency to stand trial. *Id.,* at 423, n. 20. Two years later, we explained
> in dictum that "[n]othing" in our precedents "suggests that a defendant
> opens the door to the admission of psychiatric evidence on future danger-
> ousness by raising an insanity defense at the guilt stage of the trial." *Powell
> v. Texas*, 492 U.S. 680, 685-686, n. 3 (1989) (per curiam).

134 S.Ct at 603.

Such "pushing of the envelope" of permissible rebuttal under Rule 12.2 is a com-

mon occurrence in such evaluations. In *United States v. Fell,* 531 F.3d 197 (2d Cir.

2008)*, sentence vacated on other grounds,* 2014 WL 3697810 (D. Vt. July 24, 2014), the

court denied the government's effort to add Dr. Welner as a third rebuttal evaluator under

Rule 12.2. The government then proposed to have Welner testify (based on his analysis

of the other government experts' assessment, his administration of risk-assessment instru-

ments including the Psychopathy Checklist-Revised (PCL-R), and his own investigation),

that Fell was a "psychopath" who "emerged in his teens as a stimulation-seeking, drug-

seeking hedonist who did not take to limit setting," and that "Fell's sadism and blood lust are unusual and rarely studied." Mot. to Exclude Report & Test of Michael Welner, *United States v. Donald Fell*, No. 01-cr-12 (D. Vt. July 6, 2005), Dkt. No. 182 at 4; Report of Michael Welner, 2014 WL 4254820, Dkt. No. 304, Ex. 11 &12, pages 00000647, -688. Although the defense argued that these inflammatory opinions were unresponsive to any issue raised by the defendant's mental health experts, their inability to secure an advance ruling on whether Fell's mental health evidence would open the door to Welner's devastatingly prejudicial testimony eventually forced counsel to withdraw Fell's Rule 12.2 notice, 531 F.3d at 226-227, and with it all of Fell's expert mental health testimony concerning the effects of a childhood filled with trauma, violence, sexual abuse and abandonment.

    *Fell* is not the only case in which the government has used its access to the defendant under Rule 12.2 to depict him as a "psychopath," despite the fact that the psychiatric profession does not recognize such a diagnosis. In *United States v. Barnette*, 211 F.3d 803 (4th Cir. 2000), the Fourth Circuit reversed a death sentence because the district court had refused to allow the defense to recall its own mental health expert in surrebuttal to a prosecution psychologist who testified in "exquisite detail," 211 F.3d at 822, and ostensibly in rebuttal, that the defendant was a psychopath. The Fourth Circuit's opinion in *Barnette* includes these excerpts from the government expert's rebuttal testimony:

    Q. Let me turn your attention back to the conclusion you drew that the defendant was a psychopath based upon the PCL–R?

    * * * *

Q. Before you tell us how you came to that conclusion, will you describe for the jury what a psychopath is?

A. Certainly. In general, a psychopath is an individual who lacks the ability to feel at the same level and have the intensity of what feelings are as compared to nonpsychopathic individuals. Typically they are very callous, manipulative, calculating, individuals that will often exploit other people. There is research to suggest that biologically, they do not respond to what nonpsychopaths view as fear and anxiety which are two emotions that make up what we refer to as remorse or guilt. The pyschopath is an individual that has little if any ability to feel remorse or guilt for behavior they engage in.

Q. Now, did you come to the conclusion in your report and as you testified today that the defendant is a psychopath?

A. That was based on the behavior that we saw during our interviews of the defendant, also based on a review of the material that I had cited earlier and based on how he eventually scored on the Hare Psychopathy Checklist Revised.

Q. Is psychopathy a formal diagnosis?

A. No, sir, it is not a diagnosis formally listed in the DSM–4.

Q. Why is it important to establish whether or not a defendant is a psychopath?

A. Well, psychopaths are—criminal psychopaths are twice as likely to engage in future criminal behavior when compared to noncriminal psychopaths. . . .

 Q. Now, do psychopaths look any different than other people?

A. No, sir. The psychopath, probably one of their best assets and probably one of the greatest fears of nonpsychopaths is their ability to look normal. We would all like to be able to think that we can pick out the psychopaths from the nonpsychopaths in the community, but none of us are immune to that . . . .   The psychopath, as I say, has the ability to look very normal. However, if you know what you are looking for, it is kind of like seeing a [bowl] of fruit, and you say to yourself, gosh that bowl of fruit looks wonderful, it looks very good. But when you get close to the [bowl] of fruit and pick it up you realize that it's fake fruit. And the psychopath is a lot that

> way. And they look very, very normal, but when you know what to look
> for, you can see things in their behavior, not their appearance necessarily as
> much as things in their behavior, which identify them as psychopaths.

211 F.3d at 822-823. The expert also bolstered his testimony, which the Fourth Circuit characterized as "as damning as it could be," *id.*, at 825, by citing Barnette's "race, age, and poverty" as factors tending to support the inference that he would be dangerous in the future. *Id.,* at 816.

Of course, each of these cases is different, and defense counsel do not suggest that all of the problems they exemplify are likely to recur here. But cases like *Cheever*, *Fell,* and *Barnette* underscore the most important point to be made about government mental health evaluations in capital cases, which is that *they are limited to rebuttal.* Such evaluations must never provide an opportunity for the government to make a second affirmative case for death just before the trial's end, using evidence from the defendant's own mouth to incite the jury to exclude him from the human community. The government is entitled to a fair opportunity to meet the defense mental health case. Rule 12.2 requires and the constitution permits no more.

The procedures in Rule 12.2 were expressly and carefully designed to balance the defendant's Fifth Amendment rights with the government's entitlement to fair rebuttal. With that fundamental principle in mind, we turn to the remaining areas of disagreement between the parties.

**II.     Absent consent, Rule 12.2(c)(2) does not allow use of a "firewall" procedure to provide broad pretrial government access to the defendant and to confidential defense material.**

The Court has provisionally authorized the appointment of a firewall Assistant

U.S. Attorney from outside the District of South Carolina "to handle all pretrial matters relating to mental health issues." Interim order respecting Rule 12.2 procedures, Dkt. No. 226 at 2 (June 30, 2016). The government now urges the Court to allow it to deploy this firewall procedure to allow the firewalled government lawyers virtually unlimited access to all of the results and disclosures that will flow from the government's 12.2 rebuttal evaluation. The government correctly notes that some courts "have authorized the government to rely on 'firewalled' attorneys to receive pretrial defense disclosures that may contain information subject to constitutional or other protections," Govt. 12.2 Mot. at 6, and cites six cases as examples. But in every one of these cases, the defense had either moved for or consented to use of the firewall procedure.

The point is an important one, because Rule 12.2(c)(2) squarely prohibits such access to the results of any government rebuttal evaluations:

> (2) **Disclosing Results and Reports of Capital Sentencing Examination.** The results and reports of any examination conducted solely under Rule 12.2(c)(1) after notice under Rule 12.2(b)(2) must be sealed *and must not be disclosed to any attorney for the government* or the defendant unless the defendant is found guilty of one or more capital crimes and the defendant confirms an intent to offer during sentencing proceedings expert evidence on mental condition.

The government appears to argue that the Court should read "any attorney for the government" to mean "any attorney for the government who is currently actively participating in the prosecution of the defendant at trial," and in a footnote, flatly asserts that the phrase "'attorney for the government' . . . applies only to the prosecution's trial team and not firewalled counsel. *United States v. Johnson*, 383 F. Supp. 2d 1145, 1166 (N.D. Iowa, 2005); *United States v. Johnson*, 362 F. Supp. 2d 1043, 1082-83 (N.D. Iowa 2005)." But

once again, the government fails to acknowledge that the firewall arrangement at issue in *Johnson* had been created at the urging of the defense, and so the court's interpretation of Rule 12.2(c)(2) occurred only after the fundamental issue-- whether Rule 12.2(c)(2) entitles any government attorney to obtain and review confidential defense materials prior to the penalty phase--had been obviated by the defendant's own actions. *See also United States v. Sampson*, 335 F.Supp.2d 166 (D.Mass.2004) (same). This case, by contrast, presents the issue of whether an entire "taint team" arrangement may be imposed on an unwilling defendant at the behest of the prosecution. The government's Motion cites no case where this has occurred,[5] and the plain language of Rule 12.2(c)(2) suggests why. If a designated firewall attorney, working to facilitate a government rebuttal evaluation to be used solely to help secure a sentence of death, is not an "attorney for the government," then just whom is he or she an attorney for? The defendant? The Court? Some other party? The question answers itself.

The government extols the practical utility of its proposed extension of the firewall arrangement, Govt. Mot. at 6-8, but the drafters of Rule 12.2(c)(2) did not provide for any such procedure, and powerful reasons support that decision. First, by greatly expanding the amount of constitutionally-privileged and extremely confidential defense information to which government lawyers receive pretrial and mid-trial access, such arrangements in-

---

[5] To be sure, the government's latest filing did include such an order, *United States v. Montgomery,* No. 2:11-cr-20044-JPM-1, Dkt. No. 369 (March 27, 2014), which happens to have involved yet another recent 12.2 rebuttal evaluation by Dr. Welner.

crease the potential harm that would flow from a breach of the firewall, whether deliberate or accidental. Secondly, and more fundamentally, the government's proposal would provide an unfair advantage to the government by giving it months to prepare its mental health case in full awareness of the other side's social history evidence, its testing, and its experts' conclusions, while defense counsel and the defense experts remain in the dark about the government's developing rebuttal case.

According one side but not the other the advantage of such transparency is especially unwarranted in this context for two reasons. First, it is the *defendant*, not the government, to whom the Fifth Amendment provides a constitutional shield of confidentiality. *Estelle v. Smith*, 451 U.S. 454, 462 (1981) ("Just as the Fifth Amendment prevents a criminal defendant from being made 'the deluded instrument of his own conviction,' *Culombe v. Connecticut*, 367 U.S. 568, 581 (1961), quoting 2 Hawkins, Pleas of the Crown 595 (8th ed. 1824), it protects him as well from being made the 'deluded instrument' of his own execution"). Unilaterally turning his own mental health assessment into an open book for the government's experts and firewalled lawyers reverses this humane protection in a way that is at odds with the Fifth Amendment's spirit and purpose. And second, the government exaggerates its interest in optimizing the conditions under which its rebuttal evaluation will be conducted. The question is not whether such access might facilitate the government's evaluation, but whether it is *necessary* to permit a fair response to the defendant's case in mitigation. Innumerable Rule 12.2 rebuttal evaluations have been successfully conducted without such special access and prosecution involvement, and this one can be too.

**III.    The defendant is not required to furnish the government's expert, prior to trial, with "a report summarizing the defense mental health expert's diagnoses, opinions, bases and reasons for those opinions, test results and raw data, and copies of all information reviewed by the defendant's experts."**

Seeking to convert its firewall procedure from a protection for the defendant into a discovery device for the prosecution, the government proposes that Court require the defense to turn over its experts' entire file to the firewalled attorney and the government's expert.  Federal prosecutors have routinely made such requests in federal capital litigation, and federal courts have generally rejected them, including in cases involving firewalled government attorneys. *United States v. Lujan*, 530 F. Supp. 2d 1224, 1239 (D.N.M. 2008) (denying government's motion to require defense to provide names or qualifications of experts or a summary of the information they will provide); *United States v. Sampson,* 335 F. Supp. 2d 166, 243 (D. Mass. 2004*)*.  In Judge Payne's seminal *Beckford* opinion, the court dismissed such a request in a footnote:

> The Government's Motion is DENIED with respect to its request that the defense be ordered "to provide the government with any and all materials supplied to the defense expert that form the basis of his or her opinion." An order of that scope would violate the defendants' Sixth Amendment right to effective assistance of counsel in that defense planning and strategy would necessarily be revealed through the production of "any and all materials supplied to the defense expert."

*United States v. Beckford,* 962 F. Supp. 748, 764 n. 16 (1997).  *Beckford's* restrictions on defense disclosure is mirrored in Rule 12.2(b)(2)'s limited notice requirement, and for the reasons set forth in Section II above, the involvement of a firewalled attorney should not, in fairness, entitle the government's experts to anything more than the Court has already ordered the defense to provide.

IV.     **The government should be required to provide the defense with advance notice of the government experts' proposed tests.**

Judge Anderson's Rule 12.2 order in *Basham & Fulks* provided,

> The government must provide defense counsel with a list of tests to be conducted on the defendants. The defendants will have an opportunity to be heard prior to any mental health test being conducted, and the parties will attempt to reach agreement to avoid test overlap and the so-called "practice effect."

*U.S. v. Roof* Dkt. No. 208-1, at 7, ¶ 7. This agreed-upon procedure does not appear to have produced any difficulties, and numerous other courts have adopted it before and since. *See e.g. United States v. O'Reilly,* 2010 WL 653188, at *5, ¶¶ 17, 18 (E.D. Mich. May 10, 2010) (requiring government to provide at least five days advance notice of any tests the government's experts intend to administer, and providing procedures to resolve disputes); *United States v. Johnson*, 362 F. Supp. 2d 1043, 1085 (D. Iowa 2005) (rejecting defendant's argument that advance notice was necessary to provide defense with an opportunity to challenge any testing of dubious validity, but agreeing that such notice facilitated defense counsel's advice to client, permitted coordination to avoid overlapping tests and practice effects, and paralleled defense notice requirements); *United States v. Sampson*, 335 F. Supp. 2d 166, 246 (D. Mass. 2004) (same); *United States v. Taylor*, 320 F. Supp. 2d 790 (N.D. Ind. 2004)

*Taylor* and *United States v. Williams,* 731 F. Supp. 2d 1012 (D. Haw. 2010), are examples of cases in which courts efficiently resolved disputes concerning the scope of government rebuttal evaluations at an early stage of the process.  In *Taylor,* the trial court considered a pre-test dispute as to whether a government rebuttal evaluator could utilize the Psychopathy Checklist and several personality inventories to rebut defendant

Thomas's expert mental health case that was limited to his "developmental history and mental condition relating to substance abuse." 320 F. Supp. At 791.  Agreeing with the defendant's contention that "the Government must be limited to a parallel testing of substance abuse rather than allowing the Government to use Thomas' limited notice as an open door for any type of mental testing," the court disallowed the PCL-R entirely, and permitted use of the personality inventories only to the extent that they contained scales for substance abuse.  *Id.* at 794.  In *Williams*, the defendant filed a notice under Rule 12.2(b) (1) that was limited to expert evidence concerning the effect of his Borderline Intellectual Functioning [BIF] on his capacity to form the motive and intent required for the capital offenses charged.  731 F.Supp.2d at 1016.  The government then requested permission not only to determine whether the defendant suffered from BIF, but to conduct a full mental status exam, *id.,* at 1017, as well as to administer the PCL-R to establish whether he should be classified as a psychopath.  *Id.,* at 1021-24.  Recognizing that the defendant's qualified waiver of his Fifth Amendment privilege extended only so far as the issues about which he proposed to introduce expert testimony, the court rejected the government's request for a broad-ranging assessment:

> To allow the Government experts to go beyond rebutting Defendant's expert testimony that he has BIF and affirmatively assert that Defendant suffers from psychosis or Anti–Social Personality Disorder and that either of those conditions actually caused him to commit the alleged acts, is tantamount to using Defendant's own statements, for which he has not waived his Fifth Amendment rights, against him in a criminal proceeding. The Government may rebut Defendant's mental status defense, not prosecute based upon Defendant's mental health. Accordingly, the Court finds that the Government's rebuttal expert testimony must be limited in scope to that which directly rebuts Defendant's assertion of BIF and which is based upon expert examinations that parallel the exploration of the examinations conducted by defense experts.

*Id.,* at 1020.

The government responds with some indignation to the defendant's proposal that the Court employ this fairly commonplace procedural protection, imputing to defense counsel "the goal of limiting the government's evaluation of the defendant to those tests defense counsel claims are necessary to assess whether defendant has the precise disorder Defendant's expert found to exist." Govt. 12.2 Resp. at 2 (Dkt. No. 320). This is not the goal of the defense. It is not clear why the government expects defense counsel in this case to adopt such an unreasonable approach, but if we did, the Court would hardly be bound to accept it. The real issue is simply whether, recognizing the constitutional constraints within which pretrial government mental health evaluations must be conducted in death penalty cases, and the well-documented and recurring mischief that can occur in the course of such evaluations, the Court wishes to be in a position to exercise some control of the process. Given that the government's expert or experts will surely know in advance what tests they intend to administer, there is no good reason for withholding that information from counsel for the defense, and the Court should require reasonable advance notice as did Judge Anderson in *Basham & Fulks.*

**V.    Defense counsel should be permitted to monitor the evaluation, whether in person or electronically, and should be provided with an audio recording of the entire evaluation.**

As already noted, Judge Anderson's Rule 12.2 order in *Basham and Fulks* included an agreed-upon provision that "[d]efense counsel is entitled to be present during the Rule 12.2(c) mental examination." Dkt. No. 208-1, at 7 ¶ 2. The government objects

to this provision, though it does not contend that counsel's presence in *Fulks* had any adverse effect.  Govt. Rule 12.2 Resp., at 3 (Dkt. No. 230).  The government agrees to the defendant's additional proposal that the rebuttal evaluation be videotaped, but would require that the recordation be done by the government's expert, and that the recordings be furnished to both parties if and when the government's penalty-phase mental health evaluation reports are unsealed. Govt. Rule 12.2 Mot. at 11, n. 7 (Dkt. No. 213).

The government correctly points out that some courts have rejected defendants' request to have counsel present during prosecutions mental health evaluations, but others have allowed it or have fashioned equivalent procedures such as permitting counsel to observe the evaluation by live electronic transmission.  *See e.g.*, *United States v. Fell*, 372 F. Supp. 2d 753, 761 (D. Vt. 2005) (rejecting defense request to be present at government testing upon government's agreement to provide adequate notice to defense of proposed testing and to tape-record its interview with defendant and provide defense counsel the option of a simultaneous audio-feed).  A live audio-feed in this case would obviate the need for counsel's physical presence in the examination room, while ensuring that counsel would still be able to  effectively monitor the questioning and protect the defendant's rights at this critical stage of the proceedings.  *Cf. United States v. Ash*, 413 U.S. 300, 313 (1973) (Sixth Amendment right to counsel implicated when "the accused required aid in coping with legal problems or assistance in meeting his adversary").

The government's insistence that it have access to any electronic recording of the evaluation, regardless of whether the defense attempts to use the recording at sentencing, misconceives the purpose of recordation.  As reflected in Standard 7-3.6(d) of the ABA

Criminal Justice Standards, electronic recordation of government-sponsored mental health evaluations is a protection *for the accused*, not an aid or a convenience for the prosecution.  ("If the defense intends to use the recording at trial, it should notify the court. Upon receiving notice, the court should promptly provide to the prosecution a copy of the recording").  While obviously not binding authority, Standard  7-3.6(d) strikes the proper balance between ensuring the proper working of the adversarial system and limiting the risk that the prosecution will unfairly use inflammatory and out-of-context snippets taken from hours-long interviews with the defendant, or take unfair advantage of his demeanor and physical appearance, to help it secure a death sentence.

Having further considered the issue of recordation in light of the government's position, defense counsel will amend their proposal to seek audio-recording only, and not video-recording.   Audio-recording will adequately serve the primary purpose of creating an electronic record, which is to enable the defendant to challenge and correct any errors or mischaracterizations on the part of the government's evaluators.  *See generally, United States v. Byers,* 740 F.2d 1104, 1162-71 (D.C. Cir. 1984) (Bazelon, J., dissenting).  Of course, should the defense use such a recording at sentencing to challenge or impeach a government expert or in any other way, the government will be entitled to receive its own copy of the tape.  Such an arrangement adequately protects the legitimate interests of both sides, and the defense requests that the Court adopt it.

Respectfully submitted,

s/ *David I. Bruck*

20

David I. Bruck
Washington & Lee School of Law
Lexington, VA 24450
540-458-8188
bruckd@wlu.edu

Michael P. O'Connell
PO Box 828
Mt. Pleasant, SC 29464
843-577-9890
moconnell@stirlingoconnell.com

Sarah S. Gannett
Assistant Federal Public Defender
Federal Public Defender for the District of Arizona
850 W. Adams St., Suite 201
Phoenix, AZ 85007
(602) 382-2862
sarah_gannett@fd.org

Attorneys for Dylann S. Roof