IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

|  |  |  |
|---|---|---|
| | ) | |
| UNITED STATES OF AMERICA | ) | Criminal No. 2:15-CR-00472-RMG |
| | ) | |
| v. | ) | |
| | ) | |
| DYLANN STORM ROOF | ) | |
| | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO DISMISS INDICTMENT**

BETH DRAKE
Acting United States Attorney

JULIUS N. RICHARDSON
NATHAN WILLIAMS
Assistant United States Attorney
1441 Main Street, Suite 500
Columbia, SC 29201
(803) 929-3000

VANITA GUPTA
Principal Deputy Assistant Attorney General

STEPHEN J. CURRAN
Special Litigation Counsel
U.S. Department of Justice
Civil Rights Division
Criminal Section
601 D Street NW, Rm 5200
Washington, DC 20579
(202) 514-3204

July 25, 2016

# TABLE OF CONTENTS

I.    FACTUAL AND PROCEDURAL SUMMARY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

II.   STANDARD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  SECTION 247(A)(2) IS CONSTITUTIONAL UNDER THE COMMERCE CLAUSE . . . . . . . . . . . 3

      A.  Section 247(a)(2) is Facially Constitutional Under the Commerce Clause . . . . . . . . 3

          1.  Congress has broad authority under the commerce clause. . . . . . . . . . . . . . . . . 5

          2.  Section 247(a)(2) exercises Congress's full Commerce Clause authority
              and requires proof of a sufficient nexus to interstate commerce . . . . . . . . . . . . 6

          3.  None of Defendant's arguments warrants invalidating Section 247(a)(2). . . . . . . 9

              a.  Congress may criminalize conduct that is not inherently economic
                  through a jurisdictional element requiring a nexus to commerce. . . . . . . . . . 9

              b.  Section 247(a)(2) is a valid exercise of Congress's power to regulate
                  the channels and instrumentalities of interstate commerce . . . . . . . . . . . . . 13

              c.  Section 247(a)(2) is a valid exercise of Congress's power to penalize
                  conduct that substantially affects interstate commerce . . . . . . . . . . . . . . . . . .17

      B.  Section 247(a)(2) Is Constitutional As Applied to Defendant's Offenses . . . . . . . . . 20

      C.  The Jurisdictional Element of Section 247 is Not Unconstitutionally Vague . . . . . . 24

IV.   SECTION 249(A)(1) IS CONSTITUTIONAL UNDER THE THIRTEENTH AMENDMENT . . . . . . .27

      A.  Section 249(a)(1) is Constitutional Under the Thirteenth Amendment . . . . . . . . . . . 28

          1.  The Thirteenth Amendment grants Congress broad enforcement authority  . . . . 28

          2.  Congress rationally determined that § 249(a)(1) was appropriate legislation to
              address race-motivated violence as a badge and incident of slavery . . . . . . . . . . 30

      B.  Defendant's Federalism-Related Arguments Lack Merit  . . . . . . . . . . . . . . . . . . . . . .32

      C.  The Attorney General's Certification is Unreviewable and Facially Valid . . . . . . . . 40

V.    SECTIONS 247 AND 249 ARE CRIMES OF VIOLENCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

      A.  Defendant's Section 249 Charges Satisfy the Force Clause
          (Section 924(c)(3)(A)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .44

i

1. Supreme Court decisions addressing crimes of violence under a force clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .45

2. Section 249 necessarily involves the intentional use of violent force. . . . . . . . . .47

3. Section 249 criminalizes violent conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .51

4. Defendant's reliance on *Torres-Miguel* is misplaced. . . . . . . . . . . . . . . . . . . . . . 53

    a. *Torres-Miguel* is limited to its holding and is distinguishable . . . . . . . . . . . 54

    b. The Supreme Court's more recent guidance in *Castleman* rejects *Torres-Miguel* as interpreted by Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . .55

5. Defendant's interpretation of the force clause would undermine the purpose of Sections 924(c) and 249, and lead to illogical results . . . . . . . . . . . . . 58

B. Defendant's Section 247 Charges Satisfy the Force Clause (Section 924(c)(3)(A)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

C. Defendant's Civil Rights Charges Satisfy the Residual Clause (Section 924(c)(3)(B)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

1. Defendant's civil rights offenses satisfy § 924(c)'s residual clause . . . . . . . . . . 65

2. Section 924(c)'s residual clause is not vague as applied to Defendant  . . . . . . . . 66

3. Section 924(c)'s residual clause is not unconstitutionally vague . . . . . . . . . . . . . 68

    a. The *Johnson* decision rested on a combination of factors unique to the ACCA's residual clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

    b. *Johnson* does not apply to Section 924(3)(c)(B). . . . . . . . . . . . . . . . . . . . . . . 70

        i. The ordinary case inquiry is not *per se* invalid . . . . . . . . . . . . . . . . . . . . . 71

        ii. Section 924(c)(3)(B)'s definition of the ordinary case is substantially more determinate than the ACCA . . . . . . . . . . . . . . . . . . . . 72

        iii. Section 924(c)'s approach to estimating the amount of risk is more determinate than the ACCA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

        iv. Section 924(c)(3)(B) has not resulted in judicial confusion . . . . . . . . . . .74

VI.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

The United States hereby responds to Defendant Roof's Motion to Dismiss Indictment and Memorandum in Support ("Motion"). (Docket Entry (DE) 233). The United States opposes Defendant's motion and requests the Court deny it in its entirety.

Defendant's motion challenges Congress's authority to enact the civil rights offenses with which he has been charged and also contends his offenses were not crimes of violence. None of these challenges has merit. The constitutional foundations of his civil rights charges are sound, as every court that has considered similar arguments has concluded. Moreover, those charges satisfy both of the crime of violence definitions that Congress adopted in enacting the firearms-related offenses with which he has been charged. Consequently, Defendant's motion should be denied, and he should be required to appear before a jury of his peers.

## I.   Factual and Procedural Summary

The grand jury returned a 33-count indictment against Defendant on July 22, 2015. (Indictment, DE 2). The Indictment charges that on the evening of June 17, 2015, Defendant drove from Columbia to the Emanuel African Methodist Episcopal (AME) Church in Charleston, with the intent of killing African Americans. *Id.* at 2. He entered the church, carrying a Glock .45 caliber pistol and eight magazines loaded with hollow point bullets, while 12 parishioners, all of them African Americans, were participating in a Bible study class. *Id.* at 3-4. Defendant sat with the parishioners as they worshiped, and then, as the class was concluding, he pulled out his gun and repeatedly shot the parishioners, killing nine people. *Id.* at 4.

The Indictment alleges Defendant decided to carry out a race-motivated attack on African Americans months before this attack. *Id.* at 1. He also created a website on which he posted pictures of himself with white supremacist symbols and a manuscript that decried integration and expressed his belief that "white" people are superior to African Americans. *Id.* at 1-2. To

maximize the impact of his attack, Defendant specifically selected Emanuel AME because its congregation is predominantly African-American and because Emanuel AME has historical significance to Charleston, South Carolina, and the nation. *Id.* at 2.

Defendant is charged with twelve hate crime counts under 18 U.S.C. § 249(a)(1) for willfully causing, or attempting to cause, bodily injury (i.e., death), to the parishioners because of their race and color. *Id.* Counts 1-12. Defendant also is charged with 12 additional hate crime counts under 18 U.S.C. § 247(a)(2) for using force to obstruct the parishioners while they were engaged in the free exercise of their religious beliefs. *Id.* Counts 13-24. He also is charged with nine counts of violating 18 U.S.C. §§ 924(c) and 924(j) for using a firearm to commit murder during and in relation to a crime of violence (i.e., the civil rights offenses). *Id.* Counts 25-33.

## II. STANDARD

"A district court may dismiss an indictment under Rule 12 where there is an infirmity of law in the prosecution; a court may not dismiss an indictment, however, on a determination of facts that should have been developed at trial." *United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012) (internal quotation and citation omitted). The Court may rely on the allegations in the Indictment, *id.*, as well as facts proffered by the United States, *United States* v. *Terry*, 257 F.3d 366, 367 (4th Cir. 2001).

Facial challenges to statutes are "discouraged," *Sabri v. United States*, 541 U.S. 600, 609 (2004), and "are the most difficult challenge to mount successfully," *United States v. Salerno*, 481 U.S. 739, 745 (1987), because they "run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied," *Wash. State Grange v. Wash. State Republican Party*,

552 U.S. 442, 450 (2008) (internal quotation omitted). Thus, the proponent of a facial challenge must establish "'that no set of circumstances exist under which the Act would be valid,' i.e., that the law is unconstitutional in all of its applications." *Id.* at 449 (quoting *Salerno*, 481 U.S. at 745). The Court may strike down an act of Congress only if "the lack of constitutional authority to pass the act in question is clearly demonstrated." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2579 (2012) (alteration and quotation omitted).

### III. SECTION 247(A)(2) IS CONSTITUTIONAL UNDER THE COMMERCE CLAUSE

Defendant's first challenge is to Counts 13-24 of the Indictment, which allege his attack violated the Church Arson Prevention Act of 1996, 18 U.S.C. § 247(a)(2), by forcefully obstructing the victims in the free exercise of their religion. Defendant argues that these charges should be dismissed because Congress did not have authority to enact § 247(a)(2) under the Constitution's Commerce Clause. He also argues these charges are unconstitutional as applied to his actions. Well-settled precedent establishes that these arguments are unfounded.

### A. Section 247(a)(2) is Facially Constitutional Under the Commerce Clause

Defendant's principal challenge is a facial attack on the constitutionality of § 247(a)(2). Congress amended § 247 in 1996 to ensure that its terms were sufficiently broad to legislate to the fullest extent of its authority under the Commerce Clause, but narrow enough to track only those powers recognized by well-settled Commerce Clause jurisprudence. Specifically, Congress included a "jurisdictional element" requiring the government to prove that Defendant's offense was "in or affecting interstate commerce." 18 U.S.C. § 247(b). By requiring that the government prove a sufficient nexus to interstate commerce on a case-by-case basis, Congress ensured that § 247(a) was a facially valid exercise of its Commerce Clause powers.

The two federal courts of appeals to consider this issue both have concluded that § 247(a) is a valid exercise of Congress's Commerce Clause authority. *See United States v. Ballinger*, 395 F.3d 1218 (11th Cir. 2005) (en banc); *United States v. Grassie*, 237 F.3d 1199, 1211 (10th Cir. 2001). The reasoning of these decisions is consistent with longstanding Fourth Circuit precedent establishing that a statute with a jurisdictional element, like § 247(a)(2), is a valid exercise of Congress's authority under the Commerce Clause. *See, e.g.*, *United States v. Wells*, 98 F.3d 808, 810-11 (4th Cir. 1996) (recognizing the jurisdictional element of 18 U.S.C. § 922(g) "satisfies the minimal nexus required for the Commerce Clause").

Defendant acknowledges that § 247(a)(2)'s jurisdictional element should end this Court's inquiry. (Motion at 7) (recognizing that "since *Lopez*, lower courts have tended automatically to accept that any statute containing a jurisdictional element is constitutional"). Defendant nevertheless suggests that this Court should ignore binding precedent and take the extraordinary step of invalidating § 247(a)(2) on its face because it criminalizes conduct that is not inherently economic. Defendant cites no authority that warrants such radical relief. Defendant also ignores the many cases that have upheld Congress's authority to criminalize offenses under its powers to regulate the channels and instrumentalities of commerce, as well as Fourth Circuit precedent recognizing that churches engage in activities that affect interstate commerce.

"Due respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds." *United States v. Morrison*, 529 U.S. 598, 607 (2000). Defendant has failed to make that showing.

4

### 1.  Congress has broad authority under the commerce clause

In *United States v. Lopez*, the Supreme Court recognized that Congress has broad Commerce Clause authority to legislate in three general areas. 514 U.S. 549, 558 (1995). First, Congress may regulate the use of the channels of interstate commerce. *Id.* Channels of interstate commerce are the "interstate transportation routes through which persons and goods move." *Morrison*, 529 U.S. at 613 n.5. Second, "Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce." *Lopez*, 514 U.S. at 558. These include highways, interstate roads, tolls roads connecting interstate roads, the internet and telephone systems, as well as the objects that actually move through interstate commerce. *See United States v. Cobb*, 144 F.3d 319, 322 (4th Cir. 1998); *United States v. Runyon*, 707 F.3d 475, 489-90 (4th Cir. 2013); *United States v. Ochoa*, 2009 WL 3878520, *3 (D.N.M. Nov.12, 2009); *see also Ballinger*, 395 F.3d at 1225-26 & n.3.

Third, "Congress's commerce authority includes the power to regulate those activities . . . that substantially affect interstate commerce." *Lopez*, 514 U.S. at 558-59. This power can be "expansive" and authorizes federal regulation of "seemingly local matters." *Nat'l Fed. of Indep. Bus.*, 132 S. Ct. at 2578-79. Under the "substantially affects" prong of Congress's Commerce Clause authority, a court "need not determine whether respondents' activities, taken in the aggregate, substantially affect interstate commerce *in fact*, but only whether a 'rational basis' exists for so concluding." *Gonzales v. Raich*, 545 U.S. 1, 22 (2005) (emphasis added).

The Supreme Court has made clear that Congress is authorized to regulate the first two *Lopez* categories of commerce "even though the threat may come from only intrastate activities." *Lopez*, 514 U.S. at 558. This is so because "when Congress regulates activity based upon its power to regulate channels and instrumentalities of interstate commerce federal jurisdiction is

supplied by the nature of the instrumentality or facility used, not by separate proof of interstate movement." *United States v. Photogrammetric Data Servs., Inc.*, 259 F.3d 229, 250 (4th Cir. 2001), *abrogated on other grounds by Crawford v. Washington*, 541 U.S. 36, 63 (2004) (internal quotation omitted); *see also United States v. Mandel*, 647 F.3d 710, 722 (7th Cir. 2011).

The Supreme Court has identified four factors relevant to a court's consideration of a statute under the third *Lopez* category: whether Congress had a rational basis to conclude that a regulated activity substantially affects interstate commerce. *Morrison*, 529 U.S. at 610-12. These factors are (1) whether Congress made findings regarding the regulated activity's impact on interstate commerce; (2) whether the statute contains an "express jurisdictional element"; (3) whether the regulated activity is commercial/economic in nature; and (4) whether the link between the prohibited activity and the effect on interstate commerce is attenuated. *Id.* Importantly, this test applies only to the third *Lopez* category and does not apply where Congress acts pursuant to its plenary power to regulate the channels, instrumentalities, or goods involved in interstate commerce. *See Morrison*, 529 U.S. at 609, 618; *United States v. Nathan*, 202 F.3d 230, 234 (4th Cir. 2000) (holding substantially affects does not apply where Congress exercises authority under *Lopez* 1 and 2 authority).

**2. Section 247(a)(2) exercises Congress's full Commerce Clause authority and requires proof of a sufficient nexus to interstate commerce**

Section 247(a)(2) prohibits, in relevant part, any person from "intentionally obstruct[ing], by force or threat of force, any person in the enjoyment of that person's free exercise of religious beliefs." Section 247(a)(2) specifically requires the government to prove that "the offense is in or affects interstate or foreign commerce." 18 U.S.C. § 247(a)(2), (b).

Section 247(a)'s jurisdictional element makes clear that Congress intended to invoke its Commerce Clause authority to its fullest extent.[1] *Grassie*, 237 F.3d at 1208-09. "In interstate commerce" refers to the channels and instrumentalities of commerce, and the things and persons that move in interstate commerce. *Ballinger*, 395 F.3d at 1234-35. "Affects commerce" refers to activities that "substantially affect" commerce. *Id.*; *Grassie*, 237 F.3d at 1208-09.

The legislative history of § 247 confirms that Congress relied on its full Commerce Clause authority. In 1996, Congress amended § 247 to broaden the statute's jurisdictional element, which previously had required that "in committing the offense, the defendant travels in interstate or foreign commerce, or uses a facility or instrumentality of interstate or foreign commerce in interstate or foreign commerce . . . ." Pub. L. No. 100-346, § 1, 102 Stat 644 (1988). In the House Report discussing the 1996 amendments, Congress explained that the new version broadened the jurisdictional scope of the statute "to any conduct which falls within the interstate commerce clause of the Constitution." H.R. Rep. No. 104-621, at 4, 7 (1996) ("House Report"). Congress declared that the amended § 247 would continue to cover offenses where the defendant travels in interstate commerce or uses the channels or instrumentalities of commerce "in committing, planning, or preparing to commit the offense." *House Report* at 7.

Although Congress extended the scope of § 247(a) to its fullest authority, Congress also was acutely aware of the limits to that power. Congress deliberately tailored the language of § 247(b) to mirror its Commerce Clause authority as interpreted by the Supreme Court in *Lopez* and required the government prove, on a case-by-case basis, that the particular criminal conduct at issue was in or affected interstate commerce. *Id.* ("[I]f in prosecuting a particular case, the

---

[1] Defendant acknowledges that § 247(b) covers Congress's full Commerce Clause authority. *See* (Motion at 7) ("[Section 247] identifies *all* the ways in which Congress may exercise its Commerce Clause power: over activities 'in' (channels and instrumentalities) or 'affecting' (having substantial effect on) interstate commerce.")

government is unable to establish this interstate commerce connection to the act, section 247 will not apply to the offense."); *see also Ballinger*, 395 F.3d at 1235.

The only federal courts of appeals to review the reach of § 247(b) both have rejected facial commerce clause challenges. *Ballinger*, 395 F.3d at 1230-31; *Grassie*, 237 F.3d at 1211. Together, these decisions establish that § 247(a) is constitutional under both the "in commerce" and "affects commerce" prongs of the jurisdictional element. In *Ballinger*, the Eleventh Circuit explained that Congress's authority to regulate the channels and instrumentalities of commerce and things in interstate commerce encompasses the authority to "impose relevant conditions and requirements on those who use the channels of interstate commerce in order that those channels will not become the *means* of promoting or spreading evil, whether of a physical, moral, or economic nature." 395 F.3d at 1227-28. Thus, the Eleventh Circuit concluded that Congress appropriately prohibited a defendant from using the channels and instrumentalities of commerce to violate § 247(a).[2] *Id.* at 1229.

In *Grassie*, the Tenth Circuit rejected a challenge to the constitutionality of § 247(a), relying on the "affects commerce" portion of the jurisdictional element. The Tenth Circuit noted that churches may be "major participants in interstate markets for goods and services, use of interstate communications and transportation, raising and distributing revenues (including voluntary revenues) interstate, and so on." *Grassie*, 237 F.3d at 1209; *see also id.* at 1203-04. Thus, the Tenth Circuit concluded, § 247(b) satisfies the Commerce Clause because it allows the government to prove that a defendant's violent conduct disrupted the interstate commerce activities in which a church is participating. *Id.* at 1210-11.

---

[2] The *Ballinger* court did not, as Defendant claims, concede that the government could not satisfy the "substantially affects" prong of Congress's Commerce Clause authority. (Motion at 13). The *Ballinger* court did not need to address the "substantially affects" prong because the defendant's conduct – using interstate highways– fell squarely within Congress's authority to regulate channels and instrumentalities. 395 F.3d at 1222, 1227.

Because the jurisdictional element in § 247(b) directly tracks Congress's authority under the Commerce Clause, the link between the prohibited activity and the effect on commerce is direct. Although the specific links to interstate commerce will depend on the facts of the particular case, § 247(a)(2) has a direct and rational relationship to the Commerce Clause as interpreted by *Lopez* and, thus, is a valid exercise of Congress's authority.

### 3. None of Defendant's arguments warrants invalidating Section 247(a)(2)

#### a. Congress may criminalize conduct that is not inherently economic through a jurisdictional element requiring a nexus to commerce

At its core, Defendant's facial challenge rests on his claim that Congress may not regulate any intrastate crime unless those crimes are "economic in nature." (Motion at 9); *see also id.* at 4-6. This is, of course, incorrect. The Supreme Court, the Fourth Circuit, and other federal circuit courts of appeals repeatedly have upheld the constitutionality of statutes penalizing a diverse array of conduct – possession of a firearm, murder, kidnapping, carjacking, registration of sex offenders, bomb threats, extortion – that is non-commercial in nature, so long as the statute contains a jurisdictional element that requires, on a case-by-case basis, proof of a sufficient nexus to interstate commerce.[3] *See United States v. Gould*, 568 F.3d 459, 470 (4th Cir. 2009) (citing statutes); *Ballinger*, 395 F.3d at 1229 (collecting cases); *United States v. Coleman*, 675 F.3d 615, 619 (6th Cir. 2012) ("[W]here a statute lacks a clear economic purpose, the inclusion of an explicit jurisdictional element suffices to ensure, through case-by-case inquiry, that the violation in question affects interstate commerce."). Indeed, the Supreme Court has recognized that "Congress routinely exercises its authority to enact criminal laws in

---

[3] *See, e.g.*, *United States v. Runyon*, 707 F.3d 475, 489-90 (4th Cir. 2013) (murder for hire); *United States v. Cobb*, 144 F.3d 319, 321 (4th Cir. 1998) (carjacking); *United States v. Bailey*, 112 F.3d 758, 767 (4th Cir. 1997) (domestic violence); *United States v. Wells*, 98 F.3d 808 (4th Cir. 1996) (firearms possession); *United States v. Baker*, 82 F.3d 273, 275 (8th Cir. 1996) (extortion); *United States v. Gilbert*, 181 F.3d 152, 158 (1st Cir. 1999) (bomb threat); *see also Scarborough v. United State*s, 431 U.S. 563, 571-72 (1977) (noting that Congress lawfully enacted a firearms possession statute that was directed at keeping guns out of the hands of dangerous classes of people).

furtherance of, for example, its enumerated powers to regulate interstate . . . commerce [and] to enforce civil rights." *United States v. Comstock*, 560 U.S. 126, 136 (2010).[4]

In arguing that Congress may not criminalize non-economic activity, Defendant relies almost exclusively on the Supreme Court's decisions in *Lopez* and *Morrison*, which he mistakenly contends involved statutes "analogous" to § 247(a)(2). (Motion at 5). The statutes in *Lopez* (firearms possession) and *Morrison* (violence against women) involved activity that the Supreme Court described as having "nothing to do with 'commerce.'" *Lopez*, 514 U.S. at 561. This was in large part because neither statute included a jurisdictional element. *See id.* at 561-62 (observing that a firearms possession statute, 18 U.S.C. § 922(q), "contains no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce"); *Morrison*, 529 U.S. at 613 (observing that Violence Against Women Act civil remedy at issue "contains no jurisdictional element establishing that the federal cause of action is in pursuance of Congress' power to regulate interstate commerce"). Absent such a jurisdictional element, the government was not required to prove that the defendant's conduct had a "concrete tie to interstate commerce." *Lopez*, 514 U.S. at 567.

In clear contrast, § 247(a) requires an offense be "in or affecting interstate commerce." As the Tenth and Eleventh Circuits have recognized, this jurisdictional element distinguishes § 247 from the statutes at issue in *Lopez* and *Morrison. See Ballinger*, 395 F.3d at 1235 ("Section 247 differs significantly from the statute invalidated in *Lopez*, which did not contain any clarifying jurisdictional element . . . ."); *Grassie*, 237 F.3d at 1211 ("[B]y making interstate

---

[4] Moreover, Congress's Commerce Clause power must be coupled with its power under the Necessary and Proper Clause, which "makes clear that the Constitution's grants of specific federal legislative authority are accompanied by broad power to enact laws that are convenient, or useful or conducive to the authority's beneficial exercise." *Comstock*, 560 U.S. at 133-34 (citation and internal quotation omitted). Under the Necessary and Proper Clause, the Court looks only to "whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power." *Id.* at 134; *see also Raich*, 545 U.S. at 36 (Scalia, J., concurring) ("Congress's authority to enact laws necessary and proper for the regulation of interstate commerce is not limited to laws directed against economic activities that have a substantial effect on interstate commerce.").

commerce an element of the crime under both § 247 and § 844(i) [the federal arson statute], to be decided on a case-by-case basis, constitutional problems are avoided.").

Although the Fourth Circuit has not yet addressed the constitutionality of § 247(a)(2), its decisions in other contexts are consistent with both the Tenth and Eleventh Circuit's analysis of § 247(a). Shortly after *Lopez* was decided, the Fourth Circuit rejected a constitutional challenge to § 922(g), which prohibits certain classes of people from possessing a firearm "in or affecting interstate commerce." *Wells*, 98 F.3d at 810-11; *see also United States v. Bostic*, 168 F.3d 718, 723 (4th Cir. 1999). The jurisdictional element of § 922(g) – which is worded almost identically to the jurisdictional element in § 247(a)(2) – was the only relevant distinguishing feature between the firearms possession statutes at issue in *Lopez* and *Wells.* The Fourth Circuit held that this jurisdictional element "distinguishes *Lopez* and satisfies the minimal nexus required for the Commerce Clause." *Id.* at 811. In other words, under binding Fourth Circuit precedent, the jurisdictional element "in or affecting interstate commerce" created a sufficient nexus between Congress's Commerce Clause authority and the act of firearms possession, which the *Lopez* Court had described as having "nothing to do with 'commerce.'" *Lopez*, 514 U.S. at 561.

Since *Wells*, the Fourth Circuit has repeatedly held that jurisdictional elements in other statutes provide the necessary link between Congress's Commerce Clause authority and criminal conduct that the Supreme Court in *Lopez* and *Morrison* found lacking in statutes that had no jurisdictional element. For example, in *Runyon*, the Fourth Circuit upheld the constitutionality of the federal murder-for-hire statute, 18 U.S.C. § 1958, as a valid exercise of Congress's authority because it contains a jurisdictional element requiring the government to prove that the defendant used "any facility of interstate or foreign commerce" with the intent that murder be committed. 707 F.3d at 489-90; *see also United States v. Umana*, 750 F.3d 320, 337 (4th Cir. 2014)

(jurisdictional element in 18 U.S.C. § 1959 "distinguishes § 1959 from the Violence Against Women Act struck down in *Morrison*"); *Cobb*, 144 F.3d at 321 (federal carjacking statute's jurisdictional element "satisfies the minimal nexus required for the Commerce Clause"). In each of these statutes, the targeted harm is not inherently economic, but the Fourth Circuit has nevertheless held that jurisdictional elements allow the government to prove, on a case-by-case basis, the constitutionally required nexus to commerce.

The cases cited by Defendant – none of which analyzes § 247(a) – do not require a different result. The government agrees that courts regularly conclude that Congress acts within its Commerce Clause authority when regulating intrastate conduct that is commercial in nature and has a substantial aggregate effect on commerce.[5] Simply because courts have upheld the constitutionality of inherently economic crimes does not imply, much less require, the converse, i.e., that Congress is prohibited from regulating crimes that are not inherently economic.

To the contrary, the Fourth Circuit has held that, where Congress has included a jurisdictional element in the statute, the government is not limited to proving a substantial effect on commerce. In *Nathan*, for example, the defendant argued that, by not telling the jury it had to find "a substantial effect on interstate commerce" as an element of the crime, the district court erred in instructing the jury on the jurisdictional element of § 922(g). 202 F.3d at 234. The Fourth Circuit rejected this argument, noting that the defendant "fails to appreciate . . . that the holding in *Lopez* did not address statutes containing a jurisdictional element that requires a case-by-case inquiry into the connection with commerce. . . . [T]he existence of the jurisdictional

---

[5] *See, e.g.*, *Raich*, 545 U.S. at 31-33; *Taylor v. United States*, 136 S. Ct. 2074, 2080 (2016); *United States v. Gibert*, 677 F.3d 613 (4th Cir. 2012); *United States v. Buculei*, 262 F.3d 322 (4th Cir. 2001). Defendant suggests that *Taylor* pertains to Congress's Commerce Clause authority generally. (Motion at 9). In *Taylor*, the Supreme Court limited its statement to its decisions applying only the third "substantially affects" prong of Congress's power. *Taylor*, 136 S. Ct. at 2079-81. The Court did not address Congress's authority to regulate intrastate crime under the first two *Lopez* categories or otherwise disturb the Fourth Circuit's longstanding jurisdictional element precedents.

element . . . requiring that the government show a nexus between the firearm and interstate commerce, distinguishes *Lopez* and satisfies the nexus required for the Commerce Clause." *Id.*

Indeed, Defendant acknowledges that Fourth Circuit precedents establish that a jurisdictional element in § 247(b) provides a sufficient link between the criminal conduct and commerce. (Motion at 7). Nevertheless, he argues § 247(b) should be rejected because it invokes Congress's full authority. *Id*. Defendant cites no authority for the remarkable proposition that Congress is required to enact statutes that are narrower in scope than its authority allows. *See Morrison*, 529 U.S. at 607 (noting that a court may not invalidate a statute absent "a plain showing that Congress has exceeded its constitutional bounds").[6] Indeed, Fourth Circuit case law flatly contradicts Defendant's argument. *See, e.g*., *Wells*, 98 F.3d at 810-11 (upholding constitutional validity of jurisdictional element in firearms-possession statute).

The Fourth Circuit has repeatedly held that the existence of similar jurisdictional elements in other statutes distinguishes them from *Lopez* and *Morrison* and ensures that Congress appropriately acted within its Commerce Clause authority. Tellingly, Defendant cites no decision in which the Fourth Circuit has found that Congress acted outside of its Commerce Clause authority when enacting statutes that, like § 247(a)(2), include a jurisdictional element.

### b. Section 247(a)(2) is a valid exercise of Congress's power to regulate the channels and instrumentalities of interstate commerce

Defendant's argument assumes that § 247(a)(2) should be analyzed exclusively under the facet of Congress's Commerce Clause authority that allows it to regulate conduct that "substantially affects" interstate commerce. (Motion at 4-5). Defendant is entirely silent with

---

[6] Notably, the authorities on which Defendant relies for this argument suggest he would be satisfied if Congress had simply reworded § 247(b) to state, for example, that the statute covers offenses "involving [a weapon] that has been transported, shipped or received in interstate commerce" or that the attack was on a church "engaged in, or the activities of which affect, interstate or foreign commerce" or that explicitly used the words "travel" and "facilities." (Motion at 7). Congress, of course, is not required to draft statutes in a particular way, and Defendant cites no authority suggesting it is improper for Congress to rely on the term of art "in or affecting commerce" that has been approved by courts as covering the exact same connections to commerce. *Ballinger*, 395 F.3d at 1235.

respect to Congress's authority to enact § 247(a)(2) under its power to regulate the channels and instrumentalities of commerce, and things that have traveled in commerce (i.e., the *Lopez* 1 and 2 categories), and thereby reach, for example, interstate travel and the use of the instrumentalities of interstate commerce in "committing, planning, or preparing to commit" the offense. *House Report* at 7; *Ballinger*, 395 F.3d at 1226-28. Instead, Defendant relies solely on cases that analyze statutes under the third *Lopez* category, and his motion focuses exclusively on whether § 247(b) satisfies the four factors of that category's "substantially affects" test.[7]

The "substantially affects" test, however, does not apply to Congress's authority to regulate the channels and instrumentalities of commerce, and the things that move in commerce. *See Nathan*, 202 F.3d at 234; *see also Wells*, 98 F.3d at 810-11; *United States v. Corum*, 362 F.3d 489, 494-95 (8th Cir. 2004). For example, as the Third Circuit has recognized in analyzing the constitutionality of the firearms possession statute, the jurisdictional element in § 922(g) limits the scope of the statute to firearms that traveled in interstate commerce, i.e., things that move in interstate commerce, and thus "an analysis of the kind utilized in *Lopez* or *Morrison* is neither appropriate nor needed." *United States v. Singletary*, 268 F.3d 196, 204 (3rd Cir. 2001). By only addressing the substantially affects test, Defendant ignores Congress's authority to enact § 247(a)(2) pursuant to its *Lopez* 1 and 2 categories of Commerce Clause power.

It is well established that Congress may use its authority to regulate channels or instrumentalities of interstate commerce and the persons and things that travel in interstate commerce to address harms (murder, kidnapping, domestic violence or stalking, bomb threats, registration of sex offenders, possession of firearms) that are facilitated by the use of those

---

[7] *See Lopez*, 514 U.S. at 559; *Morrison*, 529 U.S. at 609 ("Petitioners do not contend that these cases fall within either of the first two . . . categories of Commerce Clause regulation."); *Taylor*, 136 S. Ct. at 2079-81 (analyzing Hobbs Act, which makes it a federal crime to commit robbery that "affects commerce"); *United States v. Malloy*, 568 F.3d 166, 180 (4th Cir. 2009); *Buculei*, 262 F.3d at 328 (stating that because defendant's conduct satisfied the third prong of *Lopez*, "we need only address that facet of the *Lopez* analysis").

channels or instrumentalities or things. *See United States v. Horton*, 321 F.3d 476, 479 (4th Cir. 2003); *see also* cases cited at *supra* n.3. This power exists independent of whether that activity substantially affects commerce. *See Nathan*, 202 F.3d at 234; *Ballinger*, 395 F.3d at 1226; *see also United States v. Gil*, 297 F.3d 93, 100 (2d Cir. 2002) ("A showing that a regulated activity substantially affects interstate commerce (as required for the third category) is not needed when Congress regulates activity in the first two categories."); *United States v. Turner*, No. 4:08CR00034, 2009 WL 1650885, at * 8 (W.D. Va. June 12, 2009) (same).

Defendant suggests, instead, that this Court should find that the connection between § 247(a)(2) and interstate commerce to be too attenuated because many intrastate crimes involve the use of the channels and instrumentalities of commerce. (Motion at 9-10). The Fourth Circuit has squarely rejected this line of reasoning. For example, the Fourth Circuit rejected a Commerce Clause challenge to the murder-for-hire statute, 18 U.S.C. § 1958(a), which prohibits any contract killing involving the use of a facility of interstate commerce. *Runyon*, 707 F.3d at 488-89. Like Defendant here, the defendant in *Runyon* argued that the "mere use" of a facility of interstate commerce was too attenuated to fall within Congress's Commerce Clause authority because the statute would cover "virtually every murder-for-hire including, for instance, a contract killing in which all of the parties were neighbors and the defendant made a single phone call to the victim's residence." *Id.* at 489 (internal quotation omitted). The Fourth Circuit dismissed this argument as "fail[ing] by a wide margin," reasoning that Congress may regulate and protect instrumentalities of interstate commerce, or persons or things in interstate commerce, even if the threat comes from only intrastate activities. *Id.*; *see also Gould*, 568 F.3d at 474-75 (finding regulatory scheme requiring sex offender registration a valid exercise of Commerce Clause authority even though it "may implicate a sex offender who does not cross state lines");

*Photogrammetric Data Servs.*, 259 F.3d at 249-52 (holding that "federal jurisdiction based on *intra* state use of *inter* state facilities is an appropriate exercise of the commerce power").

Other circuits have agreed. The Eighth Circuit, for example, rejected a Commerce Clause challenge to a conviction under the Travel Act, 18 U.S.C. § 1952, which prohibits, inter alia, extortion by using a facility of interstate commerce even though the use of the facility was "entirely intrastate." *United States v. Baker*, 82 F.3d 273, 275 (8th Cir. 1996). Similarly, the First Circuit rejected a defendant's argument that her conviction for making a telephone bomb threat under 18 U.S.C. § 844(e) should be overturned because there was "no evidence that the telephone system used was more than an intrastate system." *Gilbert*, 181 F.3d at 157 (holding that "a telephone is an instrumentality of interstate commerce and this alone is a sufficient basis for jurisdiction"); *see also Corum*, 362 F.3d at 494-95 (holding that use of telephone to convey threat to a synagogue provides a sufficient nexus to interstate commerce to satisfy the Commerce Clause; *Ochoa,* 2009 WL 3878520, at *3 (denying defendant's motion to dismiss kidnapping charge where telephones and the internet were used to facilitate the crime).

In addition, Congress's power to protect the channels and instrumentalities of interstate commerce extends to defendants who misuse those instrumentalities, even where the misuse did not directly harm the instrumentality itself. For example, in *Ballinger*, the Eleventh Circuit upheld § 247(a)(1) based on a defendant's use of highways to reach churches that he burned, holding that "[a]n act that promotes harm, not the harm itself, is all that must occur in commerce to permit congressional regulation." 395 F.3d at 1227; *accord United States v. Ambert*, 561 F.3d 1202, 1210-11 (11th Cir. 2009). The Fourth Circuit has likewise upheld the murder-for-hire statute under Congress's power to regulate instrumentalities, despite the fact that Congress was targeting the harm that was facilitated by the use of the telephones, not a harm to the telephone

system network. *Runyon*, 707 F.3d at 489. Similarly, the Fourth Circuit upheld the mail fraud statute, which is targeted at eliminating fraud and not any destruction or harm to the mail system itself. *See Photogrammetric Data Servs.*, 259 F.3d at 249-52.

In requiring proof that a violation of § 247(a) was "in commerce," Congress appropriately exercised its Commerce Clause authority to directly regulate the use of the channels and instrumentalities of commerce, and things in commerce, to ensure that they are not misused to facilitate attacks or threats to worshipers and their places of worship. Defendant offers no meaningful distinction to explain why Congress is authorized under the Commerce Clause to prohibit, for example, the use of a telephone to convey a threat under § 844(e) or set up a contract killing under § 1958(a), but is prohibited from similarly exercising its *Lopez* 1 and 2 authority with respect to § 247(a)(2).

In sum, § 247(a)(2) "falls squarely within Congress's power under the first two *Lopez* prongs to regulate the *channels* and *instrumentalities* of commerce." *Ballinger*, 395 F.3d at 1227.

### c.  Section 247(a)(2) is a valid exercise of Congress's power to penalize conduct that substantially affects interstate commerce

Finally, Defendant's facial challenge must fail under the third *Lopez* category of commerce, i.e., those activities that substantially affect commerce. As noted above, the factors considered under the "substantially affects" test are (1) whether the statute contains an "express jurisdictional element" that limits its reach; (2) whether the regulated activity is commercial/economic in nature; (3) whether Congress made findings regarding the regulated activity's impact on interstate commerce; and (4) whether the link between the prohibited activity and the effect on interstate commerce is attenuated.

These factors weigh in favor of finding that § 247(a)(2) satisfies the substantially affects test. With respect to the first two factors, although the conduct proscribed by § 247(a)(2) is not

inherently commercial, Fourth Circuit precedent establishes that the jurisdictional element

provides the required nexus between the offense and commerce. *See* Section III.A.2.

Section 247 also satisfies the third factor. Congress amended § 247 "in response to a

national epidemic of burnings of predominantly African-American churches, particularly in the

southeastern United States." *Ballinger*, 395 F.3d at 1239. Congress's legislative findings

identified specific ways in which attacks on churches affect interstate commerce and the

resulting impact on the services provided by those places of worship:

> As the record makes clear, the churches, synagogues, and mosques that have been
> the targets of arson and vandalism, serve many purposes. On Saturdays or
> Sundays, they are places of worship. During the rest of the week, they are centers
> of activity. A wide array of social services, such as inoculations, day care, aid to
> the homeless, are performed at these places of worship. People often register to
> vote, and vote at the neighborhood church or synagogue. Activities that attract
> people from a regional, interstate area often take place at these places of worship.
> There is ample evidence to establish that Congress is regulating an activity that
> has a "substantial effect" upon interstate commerce.

142 Cong. Rec. S6517-04, S6522 (1996) (Sen. Kennedy); *see also* 142 Cong. Rec. S7908-04,

S7908 ("[A] number of places of worship provide day care services, or a variety of other social

services."); *id.* at S7909 (statement of floor managers); Pub. L. No. 104-155, § 2, 110 Stat. 1392,

1392 (1996) (additional findings); *see also Grassie*, 237 F.3d at 1209 (discussing § 247's

legislative history). While the Court in *Lopez* acknowledged that "Congress normally is not

required to make formal findings as to the substantial burdens that an activity has on interstate

commerce," it explained that such findings "would enable us to evaluate the legislative judgment

that the activity in question substantially affected interstate commerce." 514 U.S. at 562-63.

Defendant concedes that Congress made these legislative findings when enacting § 247

and does not contest that these findings are sufficient to support § 247(a)(1), which prohibits the

destruction of religious property. (Motion at 8). Instead, Defendant argues that these legislative

findings relate solely to attacks on the real property of places of worship under § 247(a)(1), and thus do not provide support for § 247(a)(2), which penalizes attacks on the congregants who use those places of worship when exercising their religious beliefs. Defendant provides no justification for distinguishing between attacks that interfere with the exercise of religious beliefs and attacks on the places in which those beliefs are exercised. *See United States v. Corum*, No. 01-236, 2002 WL 1285078, at * 3 (D. Minn. June 5, 2002) (denying motion to dismiss indictment and holding that interstate activities of synagogue are relevant to analysis of interstate commerce under § 247(a)(2)), *aff'd* at 362 F.3d 489, 497 (8th Cir. 2004). The interstate activities identified by Congress involve social and commercial activities, which are conducted by people, not the buildings in which they exercise their religious beliefs. Attacking people at a place of worship disrupts those same activities. Moreover, the effect of an attack on a house of worship cannot easily be divorced from the effect it has on the ability of its members to practice their religion there. In fact, many of the crimes that may be prosecuted under § 247(a)(1) may also be charged under § 247(a)(2) because of the effect attacking a place of worship has on its members' ability to exercise their religious beliefs. If Congress may criminalize attacks on a place of worship under § 247(a)(1), it may penalize the obstruction of the exercise of religious belief that flows from attacks on worshippers in their place of worship.

Finally, § 247(a)(2) also satisfies the fourth "substantially affects" factor. As the Tenth Circuit recognized in upholding § 247(a) under Congress's "substantially affects" authority, places of worship may, and frequently do, engage in activities that are directly connected to interstate commerce. *See Grassie*, 237 F.3d at 1210; *Corum*, 01-236, 2002 WL 1285078, at * 3. The Fourth Circuit and other circuits have likewise held that the activities of a church may be sufficiently connected to interstate commerce to satisfy 18 U.S.C. § 844(i), the federal arson

statute that requires proof that the building at issue was "used in" interstate commerce.[8] *See United States v. Terry*, 257 F.3d 366, 369 (4th Cir. 2001) (holding that church's operation of daycare facility satisfies the statutory requirement that the church be "used" in interstate commerce); *see also, e.g.*, *United States v. Renteria*, 557 F.3d 1003, 1009-10 (9th Cir. 2009); *United States v. Gillespie*, 452 F.3d 1183, 1188 (10th Cir. 2006); *United States v. Rayborn*, 312 F.3d 229, 234 (6th Cir. 2002). Such activities unquestionably may be sufficiently tied to interstate commerce to satisfy the Commerce Clause. *See United States v. Aman*, 480 F. App'x 221, 223 (4th Cir. 2012) (noting that satisfaction of § 844(i)'s jurisdictional element "is substantial enough to quell any *Lopez*-based concerns about the propriety of the prosecution").

Thus, Defendant's facial challenge must be denied for he has failed to establish that "no set of circumstances exist" under which § 247(a)(2) would be valid under the "substantially affects" prong of Congress's Commerce Clause authority. *See Salerno*, 481 U.S. at 745.

## B. Section 247(a)(2) Is Constitutional As Applied to Defendant's Offenses

Defendant's claim that § 247(a)(2) is unconstitutional as applied to him essentially restates the same arguments as his facial challenge. In addition, Defendant's as-applied challenge to § 247(a)(2) is premature. *See, e.g.*, *United States v. Vanderhorst*, 2 F. Supp. 3d 792, 804 (D.S.C. 2014) (noting that "because the facts of Defendant's case have not been fully developed at this preliminary stage, the Court may not resolve Defendant's as-applied challenge to the statutes at issue"); *United States v. Sherman*, 797 F. Supp. 2d 709, 711 (W.D. Va. 2011) (same).

---

[8] Unlike § 247(b), the jurisdictional element in § 844(i) is qualified, signaling that Congress did not invoke its full Commerce Clause authority. *United States v. Jones*, 529 U.S. 848, 854-55 (2000); *see also Terry*, 257 F.3d at 368. For this reason, neither of the two § 844(i) cases cited by Defendant – *United States v. Carr* and *United States v. Odom* – requires a different result. These cases dealt only with whether the specific facts before the court satisfied the jurisdictional element of § 844(i). In *Carr*, for example, the Fourth Circuit held only that it was unclear whether a plea colloquy included a factual stipulation to the jurisdictional element. 271 F.3d at 172, 180 & n.7. The Fourth Circuit did not hold, as Defendant claims, that places of worship are categorically not engaged in activities that substantially affect interstate commerce.

Although Defendant's as-applied challenge should be deferred until his trial or later, the government anticipates it will present more than sufficient evidence that his actions both were in commerce and substantially affected commerce. The Defendant used several channels and instrumentalities of commerce, as well as things that traveled through interstate commerce – specifically, interstate highways, the internet, telephone and GPS systems, and a gun and ammunition– in planning and committing his attack. His actions also substantially affected commerce by disrupting the activities of Emanuel AME Church.

The government expects that the evidence at trial will include, but may not be limited to, the following:[9] For several months before the murders, Defendant started planning to attack worshipers in an African-American church. During the weeks leading up to the attack, Defendant purchased a Glock pistol and ammunition, both of which passed through interstate commerce. These alone are sufficient to sustain the Indictment against this as-applied challenge. *See United States v. Mason*, 993 F. Supp. 2d 1308, 1316-17 (D. Or. 2014) (rejecting as-applied commerce clause challenge to 18 U.S.C. § 249 because the defendant used a weapon that traveled through interstate commerce); *United States v. Mullet*, 868 F. Supp. 2d 618, 622-23 (N.D. Ohio 2012) (same), *rev'd on other grounds*, *United States v. Miller*, 767 F.3d 585 (6th Cir. 2014).

No relevant distinction exists between Defendant's purchase and use of a gun and ammunition to attack parishioners here and the Fourth Circuit's precedents rejecting as-applied challenges to other statutes that are satisfied by a showing that the defendant's conduct related to a firearm or other item that traveled through interstate or foreign commerce. Indeed, in one of the cases cited by Defendant (Motion at 7), *United States v. Kline*, the Fourth Circuit rejected an as-applied challenge to a felon-in-possession conviction in which the defendant argued that all of

---

[9] For the purposes of this motion to dismiss, this Court should construe all facts in the light most favorable to the government and may consider facts proffered by the government. *Terry*, 257 F.3d at 367; *United States v. Valle*, No. l:14–cr–135, 2015 WL 4994502, at *4 n.3 (Aug. 18, 2015).

his conduct occurred intrastate. The Fourth Circuit held that the evidence at trial proving that the firearm passed through interstate and foreign commerce established a sufficient nexus to interstate commerce to sustain his conviction for possession of a firearm "in or affecting commerce." *See* 494 F. App'x 323, 325 (4th Cir. 2012); *see also United States v. Gallimore*, 247 F.3d 134, 138 (4th Cir. 2001). If Congress can prohibit the mere possession of a firearm that has traveled in or affecting commerce, it certainly can penalize Defendant's purchase and use of a firearm and ammunition that have traveled "in commerce" to violate § 247(a)(2).

In addition to the use of firearms and ammunition that traveled in interstate commerce, Defendant used several channels and instrumentalities while planning these attacks. Defendant used the internet both to post his manifesto shortly before committing his attacks and to research various subjects, including Emanuel AME and other historically black churches and potential targets in Charleston. Defendant also used a telephone to call Emmanuel AME. Defendant, guided by GPS, drove on an interstate highway from Columbia to carry out his attack, and then fled afterward on an interstate highway to North Carolina. The internet, telephone, GPS, and interstate highways – Defendant used each of these channels and instrumentalities in planning and executing his attack, and each falls squarely within Congress's Commerce Clause authority. *Ballinger*, 395 F.3d at 1229 (highways); *Cobb*, 144 F.3d at 322 (highways, interstate roads and drawbridges connecting interstate roads); *Overstreet v. North Shore Corp.*, 318 U.S. 125, 129-30 (1943) (intrastate bridge); *Corum*, 362 F.3d at 494-95 (intrastate use of phone); *Ochoa*, 2009 WL 3878520, at *3 (telephone and internet).[10]

---

[10] Moreover, contrary to Defendant's assertions that the link between his activities and interstate commerce is more attenuated than that of the defendant in *Ballinger*, Defendant engaged in conduct – highway travel, internet research, purchase of the gun and ammunition, call to Emmanuel AME – that was deeply enmeshed with his planning and commission of this crime and directly linked to interstate commerce.

The government also expects to prove at trial that Emmanuel AME engaged in the types of activities that courts have held show a sufficient connection to interstate commerce. Such activities include being part of an international religious organization with out-of-state financial headquarters; paying dues to, and receiving goods and services from, the national organization; providing religious and social services; renting its space to church members and the public; fundraising both for the church and other non-profit endeavors; paying staff salaries; collecting donations; and using out-of-state vendors. *See* Section III.A.3.c (citing relevant decisions). Emanuel AME also provides tours to, and has received donations from, out-of-state tourists vacationing in Charleston, thereby placing it directly in one of the main streams of commerce within the City of Charleston's economy. *See Gibbs v. Babbitt*, 214 F.3d 483, 493 (4th Cir. 2000) (holding Congress has Commerce Clause authority to regulate activities that have impact on tourism-related activities). Indeed, Defendant specifically targeted Emanuel AME because of its significance to Charleston, South Carolina, and the nation.

Defendant's as-applied challenge rests exclusively on the dissents in the Eleventh Circuit's decision in *Ballinger*, in which three out of thirteen judges sitting en banc disagreed with the majority panel decision that § 247(a) was a valid exercise of Congress's Commerce Clause authority. The dissents primarily focused on arguments about whether the statute was valid on its face, not as applied. *See* 395 F.3d at 1248 (Birch, J., dissenting) (discussing general federalism principles); *id.* at 1253 (Hill, J. dissenting) (same). Specifically, the dissenters would have held that, after *Lopez* and *Morrison*, Congress is categorically prohibited from regulating non-economic crimes and would have invalidated § 247(a) because they considered the harm Congress intended to prevent – church arsons – to be a local crime.

23

For the reasons stated above, the majority panel's opinion in *Ballinger* was correctly decided, and the logic of the dissents cannot be squared with binding Fourth Circuit precedent upholding the constitutionality of statutes like § 247(a)(2) because they contain a jurisdictional element that provides a sufficient nexus between non-economic activity and interstate commerce. *See also Ballinger*, 395 F.3d at 1240-41 ("Plainly, congressional power to regulate the channels and instrumentalities of commerce includes the power to prohibit their use for harmful purposes, even if the targeted harm itself occurs outside the flow of commerce and is purely local in nature."); *United States v. Bishop*, 66 F.3d 569, 587-88 (3rd Cir. 1995) (stating that the Supreme Court has "found it sufficient for Commerce Clause purposes for Congress to require the government to establish the nexus with interstate commerce by proving a jurisdictional element *unrelated* to the culpable behavior").

In sum, in planning and committing the offense, Defendant used a firearm, ammunition, interstate highway, GPS, a telephone, and the internet – the use of each of which courts have held Congress may regulate under its Commerce Clause authority. The activities of Emanuel AME likewise track the types of activities that Congress identified and that the courts have held are sufficient to substantially affect commerce. Therefore, § 247(a)(2) is a constitutional exercise of Congress's Commerce Clause authority as applied to the facts of this case.

## C.  The Jurisdictional Element of Section 247 is Not Unconstitutionally Vague

In his final challenge to § 247(a)(2), Defendant claims that its jurisdictional element is unconstitutionally vague, citing *United States v. Johnson*, 135 S. Ct. 2551 (2015), in which the Supreme Court invalidated the Armed Career Criminal Act (ACCA)'s residual clause, 18 U.S.C. § 924(e)(2)(B). That decision, which deals with a statutory clause that has nothing to do with

§ 247(a)(2) or interstate commerce – has no bearing on § 247. *See* Section V.C.3 (discussing vagueness doctrine and *Johnson* more fully).

The vagueness doctrine is rooted in the Fifth Amendment's Due Process Clause, which invalidates a federal statute only where it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008) (citation omitted). The jurisdictional element "in or affecting interstate commerce" is neither vague nor standardless. It is a well-established term of art under longstanding Supreme Court precedent. *Ballinger*, 395 F.3d at 1234-35. Similarly worded jurisdictional elements are found in a variety of laws, and courts have had no trouble discerning the meaning of, or applying, these statutes. *See, e.g.*, *Wells*, 98 F.3d at 810-11; *United States v. Cordero*, 166 F.3d 334 (4th Cir. 1998) (per curiam) (rejecting vagueness challenge to Hobbs Act jurisdictional element). Indeed, Defendant offers no authority for the proposition that the meaning of "in" interstate commerce, which refers to the channels and instrumentalities of commerce, is vague. (Motion at 15).

Defendant's sole objection is that the phrase "substantially affects" is vague. According to Defendant, it "suffers from the same deficiencies as the ACCA residual clause" because one must "estimate the effect of the criminal act on interstate commerce" and then determine "if the effect is enough (i.e., is it substantial)." (Motion at 15). This argument misunderstands the "substantially affects" analysis as set forth by the Supreme Court. Under the "substantially affects" test, courts do not decide whether an activity actually has a substantial effect on commerce. *Raich*, 545 U.S. at 22. Rather, the court's inquiry is limited to whether Congress had a "rational basis" for finding that the class of activity had such an effect in the aggregate. *Id.* If Congress had such a rational basis, Congress may regulate the activities "even if their individual

impact on interstate commerce is minimal." *Taylor v. United States*, 136 S. Ct. 2074, 2080 (2016). Thus, if Congress regulates a class of activities under its "substantially affects" authority, the government must prove that the defendant's actions fell within that class of activities, but is not required to prove that a particular defendant's individual activity had more than a minimal impact on commerce. As a result, Defendant's hypotheticals do not apply.

Moreover, the Supreme Court's *Johnson* decision is wholly inapposite in this context. In *Johnson*, the Supreme Court found that a combination of factors unique to the ACCA's residual clause definition of "violent felony" rendered that provision unconstitutionally vague. None of those factors apply to § 247(b). Section 247(b) does not require courts to assess the level of risk of harm from "a judicially imagined 'ordinary case' of a crime." *Johnson*, 135 S. Ct. at 2557-58. This "ordinary case" analysis is wholly inapplicable to jurisdictional elements, like § 247(b), which require the government to prove, on a case-by-case basis, that a defendant's conduct fell within the class of activity proscribed by Congress. *Id.* at 2561 ("As a general matter, we do not doubt the constitutionality of laws that call for the application of a qualitative standard such as 'substantial risk' to real-world conduct.").

Section 247(b) also does not contain a confusing list of crimes, which the *Johnson* Court held created uncertainty about the degree of risk required by the ACCA. *Id.* at 2561. Additionally, as the cases cited by Defendant make clear, courts since *Lopez* have addressed whether a diverse array of crimes satisfy the substantially affects commerce requirement without significant difficulty, and Defendant has pointed to no cases in which courts have disagreed about the meaning of "affects commerce" in § 247. *Id.* at 2560 (identifying confusion among lower courts as a factor in determining the ACCA residual clause is vague). Absent any of these factors, Defendant's *Johnson*-based void-for-vagueness challenge to § 247 is unfounded.

Indeed, in order to convict Defendant under § 247(a)(2), the government is required only to prove that Defendant's actions satisfy the jurisdictional element; the government is not required to prove that the defendant knew that his actions were in or affected commerce. *United States v. Darby*, 37 F.3d 1059, 1067 (4th Cir. 1994). In other words, the only fair notice required by the Due Process Clause is notice that his conduct, not the jurisdictional element, was prohibited. Defendant cannot, and does not, argue that he was unaware that it was unlawful for him to obstruct the parishioners in the exercise of their religion at Emmanuel AME Church by attacking them during a Bible study at their place of worship.

## IV. SECTION 249(A)(1) IS CONSTITUTIONAL UNDER THE THIRTEENTH AMENDMENT

Defendant's motion also asks the Court to dismiss Counts 1-12 of the Indictment, which allege violations of the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act of 2009 (Shepard-Byrd Act), Pub. L. No 111-84, Div. E, 123 Stat. 2836 (codified at 18 U.S.C. § 249). More specifically, Defendant argues that Congress exceeded its constitutional authority when it enacted § 249(a)(1)'s prohibition of race-motivated violence. As Defendant acknowledges, § 249(a)(1) is founded on Congress's power to enact laws enforcing the Thirteenth Amendment. Defendant's argument is based on his reinterpretation of long-standing, binding precedent recognizing Congress's broad Thirteenth Amendment authority to eradicate race-motivated violence. The government urges this Court reject that argument and join every other court that has considered this issue and concluded that § 249(a)(1) is an appropriate exercise of Congress's Thirteenth Amendment power to abolish the vestiges of slavery.[11]

---

[11] *See United States v. Cannon*, 750 F.3d 492 (5th Cir. 2014); *United States v. Hatch* 722 F.3d 1193 (10th Cir. 2013); *United States v. Maybee*, 687 F.3d 1026 (8th Cir 2012); *United States v. Metcalf*, No. 15-CR-1032-LRR, 2016 WL 827763 (N.D. Iowa March 2, 2016); *United States v. Henery*, 60 F. Supp. 3d 1126 (D. Idaho 2014). Courts also have uniformly rejected Thirteenth Amendment challenges to other federal hate crime laws prohibiting race-motivated violence. *See United States v. Allen*, 341 F.3d 870 (9th Cir. 2003) (18 U.S.C. 245(b)(2)); *United States v. Nelson*, 277 F.3d 164 (2d Cir. 2002) (same); *United States v. Bledsoe*, 728 F.2d 1094 (8th Cir. 1984) (same); *United States v. Franklin*, 104 F. App'x. 150 (11th Cir. 2004) (18 U.S.C. § 247(c)).

### A.  Section 249(a)(1) is Constitutional Under the Thirteenth Amendment

Section 249(a)(1) makes it a crime to willfully cause bodily injury "because of the actual or perceived race, color, religion, or national origin of any person." This statute is a valid exercise of Congress's well-established broad Thirteenth Amendment power to eradicate the vestiges of slavery, including race-based violence.

### 1.  The Thirteenth Amendment grants Congress broad enforcement authority

Section 1 of the Thirteenth Amendment states: "Neither slavery nor involuntary servitude, except as punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." The Supreme Court has long recognized that the Thirteenth Amendment is not limited to abolishing slavery and includes eradicating the societal vestiges of slavery. *Bailey v. Alabama*, 219 U.S. 219, 240-41 (1911).

Section 2 of the Thirteenth Amendment grants Congress the "power to enforce this article by appropriate legislation." A well-established body of binding Supreme Court decisions recognizes that this enforcement power must be interpreted broadly. For example, in the Supreme Court's watershed decision, *Jones v. Alfred H. Mayer, Co.*, the Court explained that Section 2 empowered Congress to do "much more" than abolish slavery; it "clothed Congress with power to pass *all laws necessary and proper for abolishing all **badges** and **incidents** of slavery.*"[12] 392 U.S. 409, 439 (1968) (emphasis added) (internal quotation omitted).

---

[12] The term "badges and incidents of slavery" is a legal term of art that stems from the Supreme Court's *Civil Rights Cases* decision. 109 U.S. 3, 20 (1883). The Court originally interpreted this phrase narrowly, *Civil Rights Cases*, 109 U.S. at 23-25, but, later repudiated that interpretation in *Jones* and adopted a far more expansive view of the phrase, 392 U.S. at 441-43 & n.78. At a minimum, the phrase "badges and incidents of slavery" recognizes slavery and its vestiges as a complex system that Congress is empowered to rationally identify and proscribe. *See Cannon*, 750 F.3d at 498-502 (discussing evolution and meaning of the phrase "badges and incidents"); *Hatch*, 722 F.3d at 1197-1200 (same); *Maybee*, 687 F.3d at 1030 n.2 (addressing "badges and incidents of slavery" as a term of art).

28

Since *Jones*, the Supreme Court has repeatedly reaffirmed Congress's broad legislative power under the Thirteenth Amendment. For example, in upholding the constitutionality of 42 U.S.C. § 1985(3) in *Griffin v. Breckenridge*, the Court reaffirmed *Jones*'s recognition that "Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and the incidents of slavery, and the authority to translate that determination into effective legislation." 403 U.S. 88, 105 (1971) (quoting *Jones*, 392 U.S. at 440). The Court reached a similar conclusion in *Runyon v. McCrary*, in which it relied on *Jones* to uphold 42 U.S.C. § 1981's prohibition of racial discrimination in private contracts. 427 U.S. 160, 169, 179 (1976); *see also United States v. Kozminski*, 487 U.S. 931, 949 (1988) (recognizing that determining what constitutes a badge or incident of slavery is an "inherently legislative task").[13]

Under these controlling precedents, Congress's determination that a law is appropriate under Section 2 must be given effect so long as it is not "irrational." *Jones*, 392 U.S. at 440-41; *see also United States v. Cannon*, 750 F.3d 492, 501 (5th Cir. 2014) ("[W]e must respect Congress's determination unless it lacks a rational basis."); *United States v. Hatch*, 722 F.3d 1193, 1201 (10th Cir. 2013) ("[I]f Congress rationally determines that something is a badge or incident of slavery, it may broadly legislate against it through Section 2 of the Thirteenth Amendment."). The Supreme Court's Thirteenth Amendment decisions control the outcome of this challenge, as each of the circuit courts that have considered similar arguments have concluded. *Cannon*, 750 F.3d at 505; *Hatch*, 722 F.3d at 1204-05; *see also McCrary v. Runyon*,

---

[13] *See also*, *e.g.*, *City of Memphis v. Greene*, 451 U.S. 100, 119, 125 n.39 (1981) (quoting *Jones* for proposition that "Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and incidents of slavery, and the authority to translate that determination into effective legislation"); *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 302 n.41 (1978) (opinion of Powell, J.) (citing *Jones* and noting "the special competence of Congress to make findings with respect to the effects of identified past discrimination and its discretionary authority to take appropriate remedial measures"); *Palmer v. Thompson*, 403 U.S. 217, 227 (1971) (noting that under *Jones*, Congress has broad power to outlaw the "badges of slavery"); *Oregon v. Mitchell*, 400 U.S. 112, 127-28 (1970) (opinion of Black, J.) (citing *Jones* for proposition that Thirteenth Amendment grants Congress the "power to pass all laws necessary and proper for abolishing all badges and incidents of slavery in the United States").

515 F.2d 1082, 1086-87 (4th Cir. 1975) (discussing *Jones* and observing its reasoning "for us, is firmly established"). The Supreme Court has not overruled *Jones* or the rational determination standard, and Defendant has cited no decision that holds otherwise. As explained more fully below, § 249 is patently rational under this standard.

### 2. Congress rationally determined that § 249(a)(1) was appropriate legislation to address race-motivated violence as a badge and incident of slavery

Congress enacted § 249(a)(1) after considering extensive evidence of the need to combat racially motivated violence. Congress found, for example, that racial violence was an intrinsic feature of slavery. Shepard-Byrd Act, § 4702(7). This finding was amply supported by historical evidence. *See Cannon*, 750 F.3d at 501-02 (discussing history of race-motivated violence); *Hatch,* 722 F.3d at 1206 (same); *United States v. Nelson*, 277 F.3d 164, 189-91 (2d Cir. 2002) (same). Violence permeated the institution of slavery, which was characterized by "compulsion through physical coercion." *Kozminski*, 487 U.S. at 942. This violence continued after the passage of the Thirteenth Amendment, when "a wave of brutal, racially motivated violence against African Americans swept the South" in an effort "to perpetuate African American slavery." Douglas L. Colbert, *Liberating the Thirteenth Amendment*, 30 Harv. C.R.-C.L. Rev. 1, 11-12 (Winter 1995) (footnotes omitted). This "post-Civil War violence," together with establishment of the Black Codes, "reflected whites' determined resistance to the establishment of freedom for African Americans." *Id.* at 12; *see generally* Eric Foner, *Reconstruction: America's Unfinished Revolution, 1863-1877*, at 119-123 (1988).

Racially motivated violence against African Americans continued into the twentieth century and intensified during the 1950s and 1960s. As the Supreme Court explained in *Virginia v. Black*, the Ku Klux Klan instituted a "reign of terror" in the South to thwart Reconstruction and maintain white supremacy. 538 U.S. 343, 353 (2003). The Court emphasized that "[v]iolence

30

was . . . an elemental part" of the Klan, describing its "tactics such as whipping, threatening to burn people at the stake, and murder." *Id.* at 353-355. The Court further observed that its decision in *Brown v. Board of Education*, 347 U.S. 483 (1954), and the Civil Rights Movement of the 1950s and 1960s, "sparked another outbreak of Klan violence," including "bombings, beatings, shootings, stabbings, and mutilations." *Black*, 538 U.S. at 355.

While considering the Shepard-Byrd Act, Congress weighed extensive evidence concerning the continuing problem of race-motivated violence. The House Report, for example, noted that "[s]ince 1991, the FBI has identified over 118,000 reported violent hate crimes," and that in 2007 alone the FBI documented more than 7600 hate crimes, including nearly 4900 (64 percent) motivated by bias based on race or national origin. H.R. Rep. No. 111-86, pt. 1, at 5 (2009); *see also id.* ("Bias crimes are disturbingly prevalent and pose a significant threat to the full participation of all Americans in our democratic society."). Further, a 2002 Senate Report, addressing proposed legislation that ultimately became § 249, noted that "the number of reported hate crimes has grown by almost 90 percent over the past decade," averaging "20 hate crimes per day for 10 years straight." S. Rep. No. 107-147, at 2 (2002). The Senate Report also noted that "[r]ecent hate-motivated killings in Virginia, Texas, Wyoming, California, Illinois, and Indiana have demonstrated the destructive and devastating impact the [hate] crimes have on individual victims and entire communities." *Id.* at 2.

The record firmly establishes that, following the approach mandated by *Jones* and *Griffin*, Congress considered ample historical and contemporary evidence to rationally determine that race-motivated violence is a historic and continuing vestige of slavery and that § 249(a)(1) was appropriate legislation to address that problem. *Cannon*, 750 F.3d at 501-02, 505; *Hatch*, 722 F.3d at 1205; *see also United States v. Beebe*, 807 F. Supp. 2d 1045, 1052 (D.N.M. 2011)

31

("A cursory review of the history of slavery in America demonstrates that Congress' conclusion is not merely rational but inescapable."). The tragic facts of this case affirm the reasonableness of Congress's determination that a criminal law specifically targeting racially motivated violence was an appropriate means of combating race-motivated violence. Congress acted well within its authority in enacting § 249(a)(1), and therefore it is constitutional on its face.

## B. Defendant's Federalism-Related Arguments Lack Merit

Defendant argues that § 249(a)(1) is not "appropriate legislation" as that phrase is used in Section 2 of the Thirteenth Amendment. (Motion at 15-20). Defendant appears to argue that, in light of the historic respect accorded to the States' police powers, enactment of § 249(a)(1) was neither necessary nor sufficiently tailored under standards applied in recent Supreme Court decisions addressing constitutional provisions other than the Thirteenth Amendment. *Id.*

Defendant's argument lacks merit for multiple reasons. First, Defendant's conclusory arguments provide no basis for concluding that the legal standards he cites either supplanted or modified the Supreme Court's longstanding precedents requiring courts to uphold Thirteenth Amendment enforcement legislation if it is rational. None of the decisions cited by Defendant addresses the Thirteenth Amendment, and none of these decisions cites *Jones* or otherwise purports to interpret or apply its rational determination standard. Consequently, Defendant's argument should be rejected outright. *See Rodriguez de Quijas* v. *Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."); *Dickerson v. United States*, 530 U.S. 428, 443 (2000) (precedent should be overruled only if there is a "special justification" for doing so). Further, every court that has

considered similar arguments challenging the constitutionality of § 249(a)(1) has rejected those

arguments and ruled that it is constitutional under *Jones* and the Supreme Court's other

longstanding Thirteenth Amendment precedents. *Cannon*, 750 F.3d at 505; *Hatch*, 722 F.3d at

1204-05; *United States v. Metcalf*, No. 15-CR-1032-LRR, 2016 WL 827763, at *1-5 (N.D. Iowa

March 2, 2016); *United States v. Henery*, 60 F. Supp. 3d 1126, 1128-31 (D. Idaho 2014).

Second, Defendant's argument that § 249 fails to respect the States' police powers

misunderstands the principles of federalism, the concept of police powers, and the scope and

purpose of § 249(a)(1).[14] (Motion at 17-18). A federal law does not interfere with the police

powers simply because the States also have the authority to prosecute the same conduct. Federal

laws often criminalize conduct within traditional areas of state law, regardless of whether States

also have criminalized the same conduct. Such laws "are of course commonplace under the dual-

sovereign concept and involve no infringement *per se* of states' sovereignty in the administration

of their criminal laws." *United States v. Johnson*, 114 F.3d 476, 481 (4th Cir. 1997); *see also*

*United States v. Bostic*, 168 F.3d 718, 723–24 (4th Cir. 1999) (recognizing federal firearms

statute does not violate the Tenth Amendment); *cf. Cleveland v. United States*, 329 U.S. 14, 19

(1946) ("fact that the regulation of marriage is a state matter does not, of course, make the Mann

Act an unconstitutional interference by Congress with the police powers of the States").

Moreover, § 249 was intended to *supplement*, not replace, state authority. The Findings

---

[14] To the extent Defendant argues that § 249(a)(1) is a violation of the Tenth Amendment itself, that argument is unfounded. "If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States." *New York v. United States*, 505 U.S. 144, 156 (1992); *see also Hatch*, 722 F.3d at 1202 ("[W]hen the Constitution explicitly grants Congress authority to act, the Tenth Amendment gives way . . . ."). The Civil War Amendments were an expansion of federal law at the expense of the states, *City of Rome v. United States*, 446 U.S. 156, 179 (1980); *Fitzpatrick v. Bitzer*, 427 U.S. 445, 455 (1976), and it is difficult to conceive of a more quintessential *federal* interest than ensuring the vestiges of slavery no longer exist. *See e.g.*, *Griffin v. Breckenridge*, 403 U.S. 88, 105 (1971). The fact that Congress acted pursuant to its Thirteenth Amendment power compels the conclusion that § 249(a)(1) does not impermissibly intrude on a power reserved to the States. *See, e.g.*, *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 292 (1981) (Tenth Amendment does not "prohibit[] Congress from displacing state police power laws regulating private activity.").

section of the Shepard-Byrd Act notes, for example, that state and local governments will "continue to be responsible for prosecuting the overwhelming majority" of hate crimes." Shepard-Byrd Act, § 4702(3). The Findings further state that federal jurisdiction over hate crimes "enables Federal, State, and local authorities to work together as partners in the investigation and prosecution of such crimes," and the problem of hate crimes is sufficiently serious and widespread "to warrant Federal assistance to States, local jurisdictions, and Indian tribes." *Id.* § 4702(9) & (10); *see also* H.R. Rep. No. 111-86, pt. 1, at 8 (2009) ("By expanding the reach of Federal criminal law, this bill will similarly expand the ability of the FBI and other Federal law enforcement entities to provide assistance to State law enforcement authorities. It is expected that this cooperation will result in an increase in the number of hate crimes solved by arrests and successful prosecutions."). This kind of "cooperative" federalism is fully consistent with the notion that, as a general matter, States take the lead in addressing ordinary crime.

Third, to the extent Defendant argues that more recent decisions clarify, rather than supplant, the Supreme Court's *Jones* standard or that *Jones* must be read to require a more exacting inquiry than simple rationality, he is mistaken. Defendant appears to seek to graft onto the *Jones* rationality test the "current needs" and "congruence and proportionality" tests articulated in later cases. *See* (Motion at 17-18). Defendant cites no support for conflating these distinct standards, each of which was crafted by the Supreme Court at different times, for different statutes involving different constitutional provisions, and for different purposes. Moreover, the Supreme Court's subsequent adoption of these non-Thirteenth Amendment standards rested on concerns about the federal government's intrusion on state powers that were raised by the specific laws and constitutional provisions at issue in those cases. Those concerns have no relevance to § 249(a)(1), which proscribes private, race-motivated violent conduct

34

pursuant to Congress's broad Thirteenth Amendment authority. Section 249 does not displace

state law, prevent States from enforcing their laws, or otherwise intrude on State sovereignty or

separation of powers in the manner described in the decisions on which Defendant relies.

Defendant, for example, appears to argue that all enforcement legislation must be based

on sufficient contemporary evidence of a need for congressional action, citing two recent cases

addressing Sections 4(b) and 5 of the Voting Rights Act. *See Shelby Cty. v. Holder,* 133 S. Ct.

2612, 2619 (2013); *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009).

Neither decision supports his position. *Shelby County* and *Northwest Austin* did not involve

Congress's exercise of its Thirteenth Amendment authority and do not even mention, let alone

revisit or disturb, *Jones* or other binding Thirteenth Amendment precedents. Indeed, *Northwest*

*Austin* was not even decided on constitutional grounds. 557 U.S. at 197. Nor did the Court

announce a blanket rule – even for the Fifteenth Amendment – that enforcement legislation must

be based on "current conditions." Rather, in *Shelby County*, the Court addressed the narrow

question of whether Congress could continue to use § 4(b) of the Voting Rights Act to impose

§ 5 preclearance on States and political subdivisions, especially in light of federalism concerns

specific to the preclearance requirement. 133 S. Ct. at 2623-24; *accord Nw. Austin*, 557 at 202-

04. Here, the Shepard-Byrd Act – which neither impinges on state prosecutorial authority nor

imposes different burdens on States – does not implicate similar concerns.

Nor, as Defendant contends, is the analytic underpinning of *Jones* undermined or affected

by the Supreme Court's adoption of a "congruence and proportionality" standard with regard to

Congress's Fourteenth Amendment enforcement authority in *City of Boerne v. Flores*, 521 U.S.

507 (1997). The Court's analysis in *Jones* relied principally on its analysis of Congressional

debates surrounding the enactment of the Thirteenth Amendment and the Civil Rights Act of

1866. 392 U.S. at 439-444. The Court placed particular emphasis on statements by Senator

Lyman Trumbull, the Chairman of the Senate Judiciary Committee who was the sponsor, chief

spokesman, and floor leader for the Thirteenth Amendment, *id.* at 439-440, that the purpose of

the Amendment was to empower *Congress* "to decide" what legislation would be "appropriate"

to achieve its broad ends, and "to adopt such appropriate legislation as it may think proper." *Id.*

at 440. In contrast, *City of Boerne*'s review of the Religious Freedom Restoration Act (RFRA)

relied on the quite different history surrounding the later passage of the Fourteenth Amendment,

including: (1) rejection of a proposal to grant Congress "plenary" legislative authority; and

(2) substitution of new language that was understood to restrain Congress's ability to intrude on

States' rights or the traditional power of the Judiciary to determine the scope of substantive

constitutional rights. 521 U.S. at 520-524. Defendant's cursory citation of *City of Boerne*

provides no basis for concluding that its Fourteenth Amendment-specific analysis undermines

*Jones*'s foundation on the more expansive original understanding of the Thirteenth Amendment.

Important differences between the Thirteenth and Fourteenth Amendments confirm that

*City of Boerne* does not supplant or otherwise affect *Jones*'s rational determination standard.

While the enforcement provisions in each Amendment authorize Congress to pass "appropriate"

enforcement legislation, their substantive provisions are fundamentally different in nature. The

Thirteenth Amendment's substantive ban on slavery has long been understood to allow Congress

to legislate against "the badges and incidents of slavery" – a flexible category that requires fact-

specific determinations that are inherently legislative. By contrast, the Fourteenth Amendment's

substantive protections against state action all involve legal rights that have always been the

province of the Judiciary. *City of Boerne*, 521 U.S. at 520-524. Nothing in *City of Boerne*'s

recognition that that Congress's Fourteenth Amendment authority extends only to preventive or

36

remedial measures that are congruent and proportional to those rights as interpreted by the courts is inconsistent with *Jones*'s recognition that Congress has a broader role in eliminating the "badges and incidents of slavery" for purposes of the Thirteenth Amendment. *See, e.g.*, *Nelson*, 277 F.3d at 185 n.20 (recognizing that *City of Boerne* does not apply to the Thirteenth Amendment given the "crucial disanalogy" between the enforcement powers of the Thirteenth and Fourteenth Amendments); *Henery*, 60 F. Supp. 3d at 1128 (same).

Additionally, the federalism concerns raised by the Thirteenth and Fourteenth Amendments are quite different. The Fourteenth Amendment applies only to state action, and its enforcement legislation often has a clear and direct impact on state sovereignty. *See, e.g.*, *City of Boerne*, 521 U.S. at 534 (recognizing that that RFRA exacted "substantial costs" on States). By contrast, Congress typically relies on the Thirteenth Amendment to regulate private action. *See City of Memphis v. Greene*, 451 U.S. 100, 125 n.38 (1981) (listing statutes enacted under Thirteenth Amendment). For example, unlike RFRA, the Shepard-Byrd Act does not subject the States to suit or otherwise directly interfere with their regulatory power. *City of Boerne* addressed federalism only in the context of laws passed under the Fourteenth Amendment and directed at States; it had no occasion to address any "separate" federalism issue arising from the United States' exercises of its concurrent police power over individuals under the Thirteenth Amendment. Accordingly, nothing in its analysis undermines or affects *Jones*.[15]

Finally, even under Defendant's standards, § 249(a)(1) is a constitutional exercise of Congress's authority to enforce the Thirteenth Amendment. Defendant argues there was no "need" for Congress to enact § 249(a)(1) because many states have enacted hate crimes laws and

---

[15] Defendant also cites the standard set forth in *McCulloch v. Maryland*, 17 U.S. 316 (1819). In *McCulloch* and the related cases cited by Defendant, the Supreme Court considered Congress's enforcement authority with regard to the enumerated powers in the original articles of the Constitution, not the extent of Congress's authority under the significantly broader grant of legislative authority in the Thirteenth Amendment. Moreover, the Supreme Court made clear in *Jones* that the standard it was applying was consistent with *McCulloch*. 392 U.S. at 443-444. At any rate, as discussed *supra*, § 249(a)(1) readily satisfies Defendant's standards.

he believes the legislative record offered insufficient evidence that states were failing to prosecute these offenses. As already noted, this argument is premised on a fundamental misunderstanding of the nature of the police power and its relationship to the concept of dual sovereignty and the broad power that the Thirteenth Amendment granted Congress to eliminate such vestiges of slavery as racial violence. This argument also fails to take into account the extensive historical and contemporary evidence available to Congress when it determined that race-motivated violence was an ongoing badge and incident of slavery that required congressional action. *See* Section IV.A.2, *supra*. Congress concluded, for example, that bias crimes continue to be "disturbingly prevalent," noting, for example, that, in 2007 alone, the FBI documented more than 3800 race-based hate crimes. H.R. Rep. No. 111-86, pt. 1, at 5. It is readily apparent from this extensive record that Congress determined not just that there was a need to combat racially motivated violence, but that the need was based on "current conditions." Thus, the enactment of § 249 is "'rational in both practice and theory.'" *Shelby Cty.*, 133 S. Ct. at 2625 (quoting *South Carolina v. Katzenbach*, 383 U.S. 301 (1966)).

Congress's determination that § 249(a)(1) was "appropriate legislation" also was sufficiently tailored to meet that need. Section 249 is a narrowly drawn statute that targets only the problem that Congress rationally determined required action: race-motivated violence. Section 249(a)(1) prohibits only violence that involves (1) the "willful" causation of "bodily injury"; (2) attempts to cause such injury using "fire, a firearm, a dangerous weapon, or an explosive or incendiary device"; (3) when such conduct is undertaken "because of the actual or perceived race, color, religion or national origin of any person." This focus readily meets the congruence and proportionality and other standards Defendant cites. *See Hatch*, 722 F.3d at

1205-06 (considering similar aspects of § 249(a)(1) as sufficiently limiting Congress's exercise of its authority) ; *Henery*, 60 F. Supp. 3d at 1130 (finding § 249 sufficiently tailored).

Contrary to Defendant's assertions, the government also does not have "unchecked discretion" under § 249(a)(1). As already noted, § 249(a)(1) is a narrowly drawn statute that incorporates specific elements of proof that inherently confine the government's prosecutorial authority to the types of crimes Congress rationally determined were continuing badges and incidents of slavery. Moreover, § 249(b)'s certification requirement provides exactly the type of check Defendant erroneously contends is constitutionally required. He provides no direct authority for the proposition that such a provision is constitutionally required or that § 249(b) is insufficient. *See, e.g.*, *Hatch*, 722 F.3d at 1207 ("We see no constitutional significance in the certification requirement."). Instead, he merely complains that the filing of state murder charges failed to shield him from a federal hate crimes prosecution for his alleged offenses. That, of course, is hardly surprising given the nature of his offenses and their clear relationship to the harm Congress is authorized to address under the Thirteenth Amendment, particularly where, as here, there is no state hate crime law that covers race-motivated violence.

In short, § 249(a)(1) is more than rational when "judged with reference to the historical experience it reflects." *Tennessee v. Lane*, 541 U.S. 509, 523 (2004). Indeed, it compares favorably with the types of legislation the Supreme Court has upheld under *City of Boerne*'s analysis in other cases. *See, e.g.*, *Lane*, 544 U.S. at 533-534 (upholding Title II of the Americans with Disabilities Act as appropriate enforcement of the Due Process Clause's protection against discrimination); *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 739 (2003) (upholding the Family and Medical Leave Act as appropriate enforcement of the Equal Protection Clause's

39

protection against gender discrimination). Defendant's inability to prevail under even his own legal standards is fatal to his arguments.

## C. The Attorney General's Certification is Unreviewable and Facially Valid

To the extent that Defendant separately challenges the Attorney General's certification decision in this case, his arguments fare no better. (Motion at 20-22; *see also* (Indictment at 14) (attaching certification). The substance of a determination to certify a matter for prosecution under § 249 is an unreviewable discretionary decision that goes to the core of the Executive Branch's constitutionally delegated authority to prosecute violations of federal law. Additionally, the Attorney General's certification, on its face, complies with § 249(b).

The U.S. Attorney General and the United States Attorneys retain "broad discretion" to enforce the Nation's criminal laws. *Wayte v. United States*, 470 U.S. 598, 607 (1985). Prosecutors "have this latitude because they are designated by statute as the President's delegates to help him discharge his constitutional responsibility to 'take Care that the Laws be faithfully executed.'" *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting U.S. CONST., art. II, § 3); s*ee also Greenlaw v. United States*, 554 U.S. 237, 246 (2008) (recognizing, as matter of separation of powers, "the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case"). Additionally, the judiciary has long exercised restraint in this area because prosecutorial judgments are "particularly ill-suited to judicial review." *Wayte*, 470 U.S. at 607; *see also United States v. Adam*, 788 F.3d 115, 116 (4th Cir. 2015) (Davis, J., concurring). These principles "prohibit [courts] from reviewing a prosecutor's charging decisions absent a *prima facie* showing that it rested on an impermissible basis, such as gender,

race or denial of a constitutional right." *United States v. Palmer,* 3 F.3d 300, 305 (9th Cir. 1993); *accord United States v. Richardson*, 856 F.2d 644, 647 (4th Cir. 1988).[16]

Disregarding this well-settled precedent, Defendant relies on the Fourth Circuit's decision in *United States v. Juvenile Male #1*, which upheld judicial review of the certification requirement of the juvenile transfer statute, 18 U.S.C. § 5032. 86 F.3d 1314 (4th Cir. 1996). In *Juvenile Male #1*, however, the Fourth Circuit premised its decision on the unique nature of § 5032's certification requirement and expressly recognized that its decision was an exception to the presumption that prosecutorial decisions are immune from judicial review.[17] 86 F.3d at 1319-20. Additionally, the certification provision in the juvenile transfer statute is materially different from § 249(b) in that § 5032 expressly requires that the required certification be made to "to the appropriate district court of the United States," while § 249(b) contains no such requirement.

---

[16] Numerous courts have declined to substantively review the certification provisions of other federal statutes. *See*, *e.g.*, *Ullmann v. United States,* 350 U.S. 422, 431-34 (1956) (holding that a court may not substantively review the executive branch's determination under 18 U.S.C. § 6003 that immunity was "necessary to the public interest" in seeking a court order to compel a witness to testify in the grand jury); *United States v. Carter*, 493 F.2d 704 (2d Cir. 1974) (holding trial court improperly reviewed a certification issued pursuant to 18 U.S.C. § 3503); *United States v. Comiskey*, 460 F.2d 1293, 1297-98 (7th Cir. 1972) (holding that the certification requirement of 18 U.S.C. § 3731, requiring the United States Attorney to certify that interlocutory appeal is not being taken for purposes of delay, is satisfied by a one-sentence certification that so asserts); *United States v. Kepner*, 843 F.2d 755, 761 (3d Cir. 1988) (same); *United States v. Tucker*, 78 F.3d 1313, 1316 (8th Cir. 1996) (holding that the Attorney General's decision under 28 U.S.C. § 594(e) to refer jurisdiction over a matter to an independent counsel is not reviewable); *Delay v. United States*, 602 F.2d 173, 178-79 (8th Cir. 1979) (a United States Attorney's *Petite* Policy decision to prosecute a defendant in federal court after the defendant has faced state charges is not subject to judicial review); *United States v. Ng*, 699 F.2d 63, 71 (2d Cir. 1983) (same); *United States v. Ricketson*, 498 F.2d 367, 374 (7th Cir. 1974) (the Attorney General's certification under 18 U.S.C. § 3503(a) that the subject of a deposition to preserve testimony is believed to have participated in organized crime not judicially reviewable absent a showing of bad faith).

[17] The Fourth Circuit is the only circuit court that has found the Attorney General's certification of a "substantial federal interest" under § 5032 is subject to full judicial review. *See Unites States v. Smith,* 178 F.3d 22 (1st Cir.1999) (holding that certifications of "substantial federal interest" are judicially unreviewable); *United States v. Vancier*, 515 F.2d 1378, 1380-81 (2d Cir. 1975) (certifications under juvenile transfer statute are judicially unreviewable; *Impounded*, 117 F.3d 730, 736 (3rd Cir.1997) (holding that certifications can be reviewed only for "technical defects, for whether a crime is one of violence, and whether the certification was made in bad faith or for an improper purpose …."); *United States v. Juvenile No. 1*, 118 F.3d 298 (5th Cir.1997) (holding that certifications of "substantial federal interest" are judicially unreviewable; *United States v. Doe*, 226 F.3d 672 (6th Cir.2000) (same); *United States v. Jarrett*, 133 F.3d 519 (7th Cir.1998) (same); *United States v. Juvenile Male J.A.J.,* 134 F.3d 905 (8th Cir.1998) (same); *United States v. F.S.J.,* 265 F.3d 764 (9th Cir. 2001) (same); *United States v. Wellington*, 102 F.3d 499 (11th Cir.1996) (holding that absent allegations of bad faith or facial non-compliance with the statute, judicial review of a "substantial federal interest" is unreviewable); *In re Sealed Case*, 131 F.3d 208, 211-14 (D.C. Cir. 1997) (holding that courts may only review certifications facially).

*Compare* 18 U.S.C. § 5032 *with* 18 U.S.C. § 249(b)(1). Moreover, none of the unique and sensitive considerations that attend the decision to prosecute a juvenile in federal court are implicated by the far more routine decision to prosecute an adult accused of a violent crime.

Executive branch certifications under statutory provisions similar to § 249 generally have been deemed to be outside of the scope of judicial review. For example, 18 U.S.C. § 245 also requires prior certification that a hate crime prosecution is in the public interest. 18 U.S.C. § 245(a)(1). The certification issue has been challenged in § 245 prosecutions on procedural grounds, but no court has suggested it may review the substance of an Assistant Attorney General's certification. *See, e.g.*, *United States v. McGee*, 173 F.3d 952, 956 (6th Cir. 1999) (holding "acting" official possessed authority to certify prosecution); s*ee also United States v. Corum*, No. CR. 01-236, 2002 WL 1285078, *7 (D. Minn. 2002) (denying defendant's challenge under 18 U.S.C. § 247(e)). Indeed, the only court to find such a provision reviewable is a recent district court decision regarding a separate provision of § 249. *See United States v. Hill*, No. 3:16-CR-00009-JAG, 2016 WL 1650767, at *2-4 (E.D. Va. Apr. 22, 2016) (applying and following *Juvenile Male I*); *but see Hatch*, 722 F.3d at 1207 ("We see no constitutional significance in the certification requirement."); *United States v. Jenkins*, 909 F. Supp. 2d 758, 774 (E.D. Ky. 2012) (concluding review of § 249 certification was "inappropriate.").

The Attorney General's certification decision in this case also is valid on its face. The Attorney General concluded both that the prosecution of this matter was in the public interest and necessary to secure substantial justice, and that it was justified by the fact that the State of South Carolina lacked jurisdiction to bring a hate crimes prosecution. (Indictment at 14). Consequently there are two independent bases for prosecution in this case. *See* 18 U.S.C. § 249(b)(1)(A) & (b)(1)(D). The allegations of this case – an unprecedented, race-motivated

2:15-cr-00472-RMG     Date Filed 07/25/16     Entry Number 279     Page 46 of 79

violent and fatal attack on twelve innocents by an avowed white supremacist – and the fact that

the State of South Carolina does not have a hate crimes law that covers racially motivated

violence, provided an ample basis for the Attorney General's certification of this case for federal

prosecution. *See Hill*, 2016 WL 1650767, at *4 (finding certification justified by fact that state

did not have a hate crimes statute that covered the underlying crime).

### V. SECTIONS 247 AND 249 ARE CRIMES OF VIOLENCE

Defendant also requests that this Court dismiss Counts 25-33 of the Indictment, which

charge him with the knowing use and discharge of a firearm during and in relation to a "crime of

violence" in violation of 18 U.S.C. § 924(c), (j). (Indictment ¶ 20). The predicate "crimes of

violence" are "violations of 18 U.S.C. § 249 as charged in Counts 1 to 9, and violations of 18

U.S.C. § 247 as charged in Counts 13 to 21." *Id.* Section 924(c)(3) defines "crime of violence" in

two complementary definitions commonly referred to as the "force" and "residual" clauses.[18]

Defendant argues that his civil rights offenses are not "crimes of violence." (Motion at

22-33). Defendant's motion is based on an interpretation of § 924(c) that would fundamentally

thwart Congress's efforts to combat race-motivated violence and the use of firearms to commit

violent crimes. The extraordinary scope and unreasonableness of this argument is apparent in the

result it urges this Court to adopt – holding that it is not a crime of violence to intentionally kill

nine innocents during a Bible study class because of their race and the color of their skin.

Congress did not intend such a result when it enacted § 924(c) and the civil rights crimes with

---

[18] In full, § 924(c)(3)'s definition of crime of violence states:

> (3) For purposes of this subsection the term "crime of violence" means an offense that is a felony and
>     (A) has as an element the use, attempted use, or threatened use of physical force against the
>     person or property of another, or
>     (B) that by its nature, involves a substantial risk that physical force against the person or
>     property of another may be used in the course of committing the offense.

which Defendant has been charged. Moreover, as discussed more fully below, Defendant's civil rights offenses are crimes of violence under § 924(c)'s force and residual clauses.

## A. Defendant's Section 249 Charges Satisfy the Force Clause (Section 924(c)(3)(A))

The charged violations of the Shepard-Byrd Act satisfy § 924(c)(3)'s force clause definition, because proof of the elements of the charged offenses requires "the use . . . of physical force against the person or property of another." § 924(c)(3)(A). The § 249(a)(1) offenses with which Defendant has been charged in Counts 1-9 prohibit (1) "willfully caus[ing]" (2) "bodily injury" (3) "because of the actual and perceived race and color . . . of any person" (4) when "death results."[19] Satisfying these elements necessarily requires the intentional use of force, rendering § 249 a crime of violence.

---

[19] The § 249 offenses charged in Counts 1-9 include an element – death results – that must be alleged and proved beyond a reasonable doubt. *See United States v. Royal*, 731 F.3d 333, 341 (4th Cir. 2013) (explaining that "elements," under *Descamps*' evaluation of what constitutes a violent felony, means any factual circumstance of the offense that the jury must find unanimously and beyond a reasonable doubt") (internal citation and quotation omitted); *United States v. Gardner*, No. 14-4533, 2016 WL 2893881, at *6 (4th Cir. May 18, 2016) (noting that "alternative elements create distinct crimes" and that "[a]lternative elements of a crime . . . are factual circumstances of the offense that the jury must find unanimously and beyond a reasonable doubt," and that the court considers how juries are instructed in determining whether certain facts are elements or means) (citation and internal quotation omitted); *see also United States v. Rafidi*, No. 15-4095, 2016 WL 3670273, at *5 (6th Cir. July 11, 2016) (recognizing that injury and weapon-based enhanced penalty provision of 18 U.S.C. § 111(b) is an offense element that defines a distinct offense); *cf. Castillo v. United States*, 530 U.S. 120 (2000) (holding as a matter of statutory interpretation that use of a machine gun constituted an offense element); *Jones v. United States*, 526 U.S. 227 (1999) (holding as a matter of statutory interpretation that "serious bodily injury," which increased the defendant's penalty, constituted an offense element under the federal carjacking statute).

In this sense, Defendant's § 249(a)(1) charges are unlike the offense at issue in *Mathis v. United States*, which is cited by Defendant for the proposition that the attempts-related provisions of § 249 are means of committing a § 249 offense. *See* 136 S. Ct. 2243, 2249 (2016) (recognizing that different types of premises were the "means" of proving a single element of the burglary offense at issue). The § 249 offense with which Defendant has been charged requires proof of an additional factual circumstance (whether death resulted) with enhanced penalty consequences. § 249(a)(1)(B). Just as with the Supreme Court's decision in *Jones*, causing a certain degree of injury – here death and in *Jones* bodily injury – that increases the penalty for an underlying offense is "an element defining an aggravated form of the crime" that must be charged and proven to the jury. *Jones*, 526 U.S. at 236.

Defendant's reference to differing "means" of committing a § 249(a) offense (i.e., attempts to cause bodily injury that include the use of a fire, firearm, or explosive/incendiary device), effectively demonstrates the difference between "means" and "elements" because in that context, unlike § 249(a)(1)'s death resulting element, the jury may not be required to find unanimously and beyond a reasonable doubt which type of weapon is used. (Motion at 28).

### 1. Supreme Court decisions addressing crimes of violence under a force clause

In a series of recent cases, the Supreme Court has given meaning to various force-clause definitions of crimes of violence. In doing so, it has provided substantial guidance on what it means to "use" physical force; what constitutes "physical force"; and what "degree" of physical force is sufficient to meet the standard under § 924(c)'s force clause.

First, the Supreme Court has held that *use* must be given its plain meaning, which it has described as "the 'act of employing' something." *United States v. Castleman*, 134 S. Ct. 1405, 1415 (2014); *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004). This "use" by active employment is satisfied by a knowing and intentional use of force, but does not extend to negligent or accidental use of force. *Castleman*, 134 S. Ct. at 1415; *Leocal*, 543 U.S. at 9. Whether "the harm occurs indirectly, rather than directly (as with a kick or punch), does not matter." *Castleman*, 134 S. Ct. at 1415.

Second, the Supreme Court also has interpreted the meaning of "physical force." In *Johnson v. United States*, 559 U.S. 133 (2010), for example, the Court explained that the adjective *physical*'s modification of force "is clear in meaning … [i]t … refers to force exerted by and through concrete bodies" as opposed to "intellectual force or emotional force." *Id.* at 138; *see also Castleman*, 134 S. Ct. at 1414 (quoting *Johnson*); *Mbea*, 482 F.3d. 276, 280 (4th Cir. 2007) (broadly defining "physical force" as "an influence acting within the physical world, a force of nature") (internal quotation omitted).

Third, the Supreme Court, in the context of defining "violent felony," has explained that "physical force" applies only when the degree of force is "*violent* force." *Johnson*, 559 U.S. at 140. The Court further defined *violent* force as "force capable of causing physical pain or injury to another person." *Id.* at 140. While the Court concluded that some levels of force, such as the

"merest touch" were too de minimis to qualify as physical force under this standard, it explained that force that inflicts even slight pain or physical injury, such as a slap, is enough. *Id.* at 143.

Applying these principles, the Supreme Court has found that a statute requiring intentionally causing bodily injury necessarily involves the use of physical force. *Castleman*, 134 S. Ct. at 1414. In *Castleman*, the Court addressed whether a state domestic violence statute satisfied the force clause of 18 U.S.C. § 921(a)(33)'s definition of "misdemeanor crime of domestic violence." The Court first found that the context of misdemeanor domestic violence, unlike felony crimes of violence, did not require the heightened degree of *violent* force described in *Johnson*. The Court then held that the domestic violence statute's prohibition of the "knowing or intentional causation of bodily injury *necessarily involves the use of physical force*." *Id.* at 1414 (emphasis added). The Court reasoned that "bodily injury" must result from "physical force" under the state laws at issue, which defined bodily injury to include a "cut, abrasion, bruise, burn or disfigurement; physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." *Id.*

In so concluding, the Supreme Court squarely rejected the argument that "one can cause bodily injury without the use of physical force." *Id.* (internal quotation omitted). As the Court explained, "'use' conveys the idea that the 'physical force' has been made the user's instrument, and it is of no consequence that the "harm occurs indirectly, rather than directly (as with a kick or punch)." *Id.* at 1415. Thus, a poisoning, for example, involves the use of physical force because the "use" is the "act of employing poison knowingly as a device to cause physical harm." *Id*. To find otherwise would mean that pulling a trigger on a gun is not a "use of force" because "the bullet, not the trigger, actually strikes the victim."[20] *Id*.

---

[20] Although Justice Scalia, the author of the *Johnson* decision interpreting the meaning of the term "physical force," did not join the majority in *Castleman*, he expressly agreed with its equation of causation of bodily injury with the

46

The Court in *Castleman* left open the narrow question of whether intentionally causing the level of bodily injury required by the misdemeanor at issue necessarily involved the use of *violent* force necessary to qualify as a "violent felony" under *Johnson*. *Id.* at 1414 (noting that Justice Scalia's concurrence stated that bodily injury as defined under the state law necessitated violent force under *Johnson*, but declining to decide that issue). It is worth noting however, the precise question that *Castleman* left undecided: whether the state law's definition of bodily injury necessarily required the degree of force necessary under *Johnson*.[21] *Id.* What *Castleman* did not leave open was the determination that intentional causation of bodily injury necessarily involves the *use* of some degree of force. *See id.* at 1415 (finding its reasoning consistent with *Leocal* because a person who causes harm indirectly has made physical force the user's instrument); *see also United States v. Waters*, 15-2728, 2016 WL 3003352, at * 3 (7th Cir. May 24, 2016) (*Castleman* "confirmed that the 'act of employing poison knowingly as a device to cause physical harm,'" like other indirect means of causing physical harm, is "a use of force").

### 2. Section 249 necessarily involves the intentional use of violent force

The § 249 offense with which Defendant has been charged prohibits violence that involves (1) the "willful" causation of; (2) "bodily injury"; (3) when such conduct is undertaken "because of the actual or perceived race, color, religion or national origin of any person"; and (4) death results. § 249(a)(1). Section 249(a)(1)'s requirement of willful causation of bodily injury necessitates the use of at least some degree of force under *Castleman*. Additionally, given

---

use of physical force. *Id.* at 1416 ("[I]ntentionally or knowingly causing bodily injury . . . 'has , as an element, the use … of physical force."); *see also id.* at 1416-17 ("[I]t is impossible to cause bodily injury without using force 'capable of' producing that result."); *id* at 1417 ("[I]ntentionally or knowingly causing bodily injury, categorically involves the use of force capable of causing physical pain or injury to another person.") (internal quotation and citation omitted).

[21] Although the Court declined to decide the issue, nothing in its *Castleman* analysis indicates the state bodily injury definition was inconsistent with its prior determination that force that inflicts even slight pain or physical injury, such as a slap, qualifies as violent force. *Johnson*, 553 U.S. at 143.

the willfulness element of § 249, that use of force must be knowing or intentional. Finally, the use of force sufficient to satisfy the charged § 249 offense – that is, sufficient to cause bodily injury and result in death – is force "capable of causing physical pain or injury to another person" as required by *Johnson*. 559 U.S. at 140.

As in *Castleman*, the operative elements of the § 249 charges – willfully causing bodily injury resulting in death – necessarily involve the knowing or intentional use of some degree of force. Indeed, four months after *Castleman*, the Fourth Circuit held that a South Carolina domestic violence statute that prohibits "caus[ing] harm or injury" to a household member was a "crime of violence" under the U.S. Sentencing Guidelines' force clause definition. *United States v. Chisolm*, 579 F. App'x 187, 193-196 (4th Cir. 2014). Similarly, even before *Castleman*, the Fourth Circuit had concluded that statutes that incorporate a similar causation of bodily injury element are categorically crimes of violence. For example, the Fourth Circuit has repeatedly held that the Virginia offense of unlawful wounding, which prohibits causing bodily injury with the intent to maim, disfigure, disable or kill, is categorically a crime of violence under the ACCA. *United States v. Etheridge*, 932 F.2d 318, 323 (4th Cir. 1991); *United States v. Candiloro*, 322 F. App'x 332, 333 (4th Cir. 2009) (per curiam); *United States v. Joyner*, 199 F.3d 1329 (4th Cir. 1999). Additionally, in *Hernandez v. Lynch*, the Fourth Circuit affirmed that a conviction under a North Carolina assault statute that prohibits "[i]nflicting serious injury upon another person or using a deadly weapon" constituted a "crime of domestic violence" under 18 U.S.C. § 16's definition of "crime of violence." 806 F.3d 259, 263 (2015) (stating that "there is no dispute in this case that [the alien's] North Carolina assault conviction constitutes a 'crime of violence' under 18 U.S.C. § 16").[22]

---

[22] Multiple other circuits also have held that statutes with an injury causation element satisfy the force clause's "use … physical force" standard. In a case involving a statute that prohibits "knowingly… [c]aus[ing] serious physical

Additionally, Defendant's § 249 offenses meet the *Leocal* requirement that the "use" not be negligent or accidental because they require that Defendant have "willfully" caused the bodily injury from which death results. "Willfully" requires that a defendant act intentionally and purposely and with the intent to do something the law forbids, that is, with the bad purpose to disobey or to disregard the law. *United States v. Bryan*, 524 U.S. 184, 191-93 (1998); Eric Wm. Ruschky, *Pattern Jury Instructions for Federal Criminal Cases, District of South Carolina* § V.FF (Emily Deck Harrill, ed., 2015 Online Edition).

Finally, the only question that remains is whether Counts 1-9 necessarily require that the degree of force intentionally used is *violent*, that is, "force capable of causing physical pain or injury to another person." *Johnson*, 559 U.S. at 140. Here, by the very terms of § 249, the degree of force used must cause "bodily injury" and result in death. Willfully causing actual bodily injury and death necessarily mean the force is "capable" of causing "bodily injury." As the Fourth Circuit recently explained, finding it "clear" that "caus[ing] physical harm or injury to a person" "falls within the force clause [as explained by *Johnson*'s requirement of violent force] if he *actually* causes physical harm." *Chisolm*, 579 F. App'x at 194 (emphasis added). And, since bodily injury resulting in death here is encompassed by *Johnson*'s explanation of "physical pain

---

harm to another," the Sixth Circuit has held that this "necessarily requires proof that the defendant used 'force capable of causing physical pain or injury.'" *United States v. Anderson*, 695 F.3d 390, 400 (6th Cir. 2012). Similarly, the Eighth Circuit has held that a battery conviction for "intentionally or knowingly . . . caus[ing] physical injury" to a person  he knows to be a law enforcement officer satisfies the force clause of the Sentencing Guidelines. *United States v. Rice*, 813 F.3d 704, 705–06 (8th Cir. 2016), *petition for cert. filed*, No. 15-9255 (May 2, 2016). The Seventh, Ninth and Eleventh Circuits also have reached similar conclusions in their application of force clause definitions of crime of violence. *See United States v. Waters*, No. 15-2728, 2016 WL 3003352, at *2 (7th Cir. May 24, 2016) (holding that "intentional causation of bodily harm 'unambiguously requires proving physical force'" (internal quotation omitted); *De Leon Castellanos v. Holder*, 652 F.3d 762, 764–67 (7th Cir. 2011) (holding that conviction for "causing bodily harm" is a crime of violence under the force clause of 18 U.S.C. § 16(a) because "[b]attery causing bodily harm entails physical force because some sort of physical pain or damage to the body . . . is required to convict"); *United States v. Juvenile Female*, 566 F.3d 943, 948 (9th Cir. 2009) (holding that offense requiring intent to assault and bodily injury "necessarily must have committed an act of force in causing the injury"); *see also United States v. Diaz-Calderone*, 76 F.3d 1345, 1347-48 (11th Cir. 2013) (noting that portion of state offense that required proof of "striking" or "intentionally causing bodily harm" would be a crime of violence).

or injury to another person," the degree of force is sufficiently violent to qualify Defendant's §

249 offenses as crimes of violence.

Section 249 also defines "bodily injury" in a manner that, on its own, satisfies the degree

of force required to be violent physical force under *Johnson*. Section 249 defines "bodily injury"

by incorporating the definition of 18 USC §1365(h)(3). § 249(c)(1). Like *Johnson*, this definition

expressly excludes emotional or psychological harm. *Compare* 18 U.S.C. § 249(c)(1) (excluding

from bodily injury "solely emotional or psychological harm to the victim") *with Johnson*, 559

U.S. at 138 (distinguishing physical force from "intellectual force or emotional force"). Thus, as

applicable here, the types of "bodily injury" that must be willfully caused to violate § 249 all are

physical in nature. *See* §1365(h)(3) ("(A) a cut, abrasion, bruise, burn, or disfigurement;

(B) physical pain; (C) illness; (D) impairment of the function of a bodily member, organ, or

mental faculty; or (E) any other injury to the body, no matter how temporary."). Each aspect of

this definition therefore satisfies the threshold of "physical pain or injury" as the Supreme Court

understood that term in *Johnson*. *See*, *e.g.*, *United States v. Jenkins*, 909 F. Supp. 2d 758, 777

(E.D. Ky. 2012) ("[Section 249's] definitions are clear that 'bodily injury' must be an actual

physical injury, with emotional or psychological harm being insufficient.") (internal citation

omitted). Moreover, the level of injury needed to satisfy *Johnson* is not high, as the force need

only be "'capable of causing physical pain or injury.' . . . Not <u>agony</u> – just pain. Not <u>mutilation</u> –

just injury." *United States v. Moore*, No. 13-330, 2016 WL 858168, at * 4 (D.D.C. March 4,

2016) (quoting *Johnson*, 559 U.S. at 140); *see also Johnson* 559 U.S. at 143 (explaining that

violent "physical force . . . might consist, for example, of only that degree of force necessary to

inflict pain – a slap in the face, for example"). Finally, as already noted, there can be no

argument that mere offensive touching or de minimis force would be sufficient to satisfy the

elements of Defendant's § 249 offenses given that the jury also must find unanimously and beyond a reasonable doubt that *death resulted*.

### 3. Section 249 criminalizes violent conduct

This understanding of § 249(a)(1) is consistent with Congress's intent. In enacting § 249, Congress sought to address bias-motivated violent crime, including such acts as the murders of Matthew Shepard and James Byrd, Jr., for whom the statute was named. These were brutal attacks that clearly fall under any definition of a crime of violence. Indeed, in contending that his own alleged offenses were not crimes of violence, Defendant does not cite a single § 249 case that did *not* involve force or violence.

The Rules of Construction that Congress included as part of the Shepard-Byrd Act ensured that § 249(a)(1) would be construed to criminalize only violent conduct.[23] *See* Pub. L. No. 111–84, Div. E § 4710(2), 123 Stat. 2842 ("*Violent Acts.* [§ 249] applies to *violent acts* motivated by actual or perceived race, color . . . .") (emphasis added); *id.* §4710(3) (stating that § 249 should not be construed to cover First Amendment activity that was not intended to "plan or prepare for an act of *physical violence*" or "incite an imminent act of *physical violence* against another") (emphasis added); §4711(5) ("The Constitution of the United States does not protect speech, conduct or activities consisting of planning for, conspiring to commit, or committing an *act of violence*.") (emphasis added). As courts interpreting § 249 have recognized, these Rules of Construction make clear that Congress's focus was eliminating acts of bias-motivated violence. *See Glenn v. Holder*, 690 F.3d 417, 419 (6th Cir. 2012); *Jenkins*, 909 F. Supp. 2d at 777. Furthermore, this is textually apparent in Congress's inclusion of the bodily injury requirement and its express limitation of that requirement to physical injury and pain.

---

[23] The Act's findings and rules of construction are part of the statutes-at-large and thus have the force of law. *See* 1 U.S.C. § 112; *Glenn v. Holder*, 690 F.3d 417, 419 & n.2 (6th Cir. 2012) (holding that § 249's rules of construction should be read to "work together" with the codified text of § 249).

Congress also issued a series of "Findings" that repeatedly refer to the impact of bias-motivated violence and the need to address such violence. *See, e.g.*, Pub. L. No. 111–84, Div. E, § 4702(1) ("The incidence of *violence* motivated by the actual or perceived race . . . poses a serious national problem.") (emphasis added); § 4702(2) ("Such *violence* disrupts the tranquility and safety of communities and is deeply divisive.") (emphasis added); § 4702(5) ("A prominent characteristic of a *violent crime* motivated by bias is that it devastates not just the actual victim and the family and friends of the victim, but frequently savages the community sharing the traits that caused the victim to be selected.") (emphasis added); § 4702(9) ("Federal jurisdiction over certain *violent crimes* motivated by bias" allows for federal, state, and local authorities to coordinate their efforts) (emphasis added). Of particular significance, as already discussed, Congress enacted § 249(a)(1) pursuant to its authority under the Thirteenth Amendment. In enacting this provision, Congress relied on its Finding that "[s]lavery and involuntary servitude were enforced . . . through widespread public and private violence directed at persons because of their race" and concluded that "eliminating racially motivated violence is an important means of eliminating, to the extent possible, the badges, incidents, and relics of slavery and involuntary servitude." *Id.* § 4702(7).

Finally, the Act's legislative history is replete with references to Congress's intent to address the problem of bias-motivated violent crimes. For, example, the report of the House Committee on the Judiciary explains:

> The bill is designed only to punish violent acts. . . . The bill only covers violent actions that result in death or bodily injury committed because the victim has one of the specified actual or perceived characteristics.

H.R. Rep. No. 111–86, at 16 (2009) ("House Report"). Congress also understood that the bodily injury requirement "will confine Federal cases to truly serious offenses." House Report at 14.

In sum, the Supreme Court precedents holding that the intentional and knowing causation of bodily injury constitutes the "use . . . of physical force" is wholly consistent with the purpose of § 249, which Congress expressly indicated was intended to address the problem of bias-motivated violent crime. Defendant's attempt to read "crime of violence" so narrowly as to exclude the § 249 is fundamentally inconsistent with that intent.

### 4. Defendant's reliance on *Torres-Miguel* is misplaced

Defendant argues that § 249(a)(1) does not satisfy § 924(c)'s force clause because, in his view, willfully causing bodily injury does not expressly require the *use* of physical force. Defendant notes that the Fourth Circuit suggested in a different context that a threat to commit a crime resulting in injury did not necessarily involve the threatened *use* of force. *See Torres-Miguel*, 701 F.3d 165, 169 (4th Cir. 2012).

Defendant's challenge is premised not on the holding of *Torres-Miguel*, but on his understanding of its reasoning. In *Torres-Miguel*, the Fourth Circuit reasoned that a statute criminalizing a threat to commit a crime that will result in bodily injury did not necessarily involve the *use* of force. 701 F.3d at 168 ("a crime [that] may *result* in death or serious injury without involving *use* of physical force" does not satisfy the force clause of U.S.S.G. § 2L1.2(b)(1)(A)(ii)). Defendant now urges the Court to extend this reasoning, despite the Supreme Court's decision in *Castleman*, to limit § 924(c)'s force clause.

The Court should reject this argument. First, *Torres-Miguel* should be limited to its holding – that is, a *threat* to commit a crime that will result in injury is not a crime of violence under the Sentencing Guidelines. The statute in *Torres-Miguel* is readily distinguishable from Defendant's § 249 offenses given that § 249 does not prohibit threats and his offenses require willfully causing bodily injury with death resulting,. Second, to the extent that this Court

53

believes *Torres-Miguel* necessitates finding § 249(a)(1) is not a crime of violence, its reasoning is overruled by *Castleman*.

### a.  *Torres-Miguel* is limited to its holding and is distinguishable

*Torres-Miguel*, applying the Sentencing Guidelines, addressed a California threat statute that punished anyone who "willfully threatens to commit a crime" where the crime "will result in death or great bodily injury to another person." Cal. Penal Code §422(a). Thus, under the California Code a defendant need only intentionally make a statement – that is, a threat to commit a crime. The offense included no requirement that the offender intend to cause death or bodily injury and, thus, could include injury caused by negligent or accidental conduct. Consequently, the crime at issue in *Torres-Miguel* did not require the intentional causation of bodily injury that the Supreme Court determined necessarily requires the use of physical force in *Castleman*. As such, the holding of *Torres-Miguel* – an intentional threat to commit a crime that will result in bodily injury is not a crime of violence – may remain undisturbed because the offense at issue could occur without a defendant having the requisite mens rea to cause bodily injury that qualifies as a "use" of physical force. *Compare Leocal*, 543 U.S. at 9 (rejecting DUI as a crime of violence because the term "use of physical force" "most naturally suggests a higher degree of intent than negligent or merely accidental conduct").

A close review of *Torres-Miguel* itself supports the reading that its holding reflects the understanding that the threatened crime need not involve intentional or knowing causation of injury, thereby precluding it from being a crime of violence. First, the Court cited other "threat" cases where the mens rea addressed only the intentionality of the threat and did not require intentional causation of injury. *See United States v. Cruz-Rodriguez*, 625 F.3d 274, 276 (5th Cir. 2010) (concluding that terroristic threats were not crimes of violence, but also holding that

"willful infliction of corporal injury is a crime of violence"). Second, the Court relied heavily on the Second Circuit's decision in *Dalton v. Ashcroft*, 257 F.3d 200 (2001). *See, e.g.*, *Torres-Miguel*, 701 F.3d at 169 (quoting *Dalton*: "Crimes of *gross negligence* or reckless endangerment, such as leaving an infant near a pool, involve a risk of injury without the use of force.") (emphasis added).[24] *Dalton* itself relied upon the fact that a crime – there, drunk driving – may not involve *intentional* conduct. 257 F.3d 200. Thus, properly read – particularly in light of *Castleman* – *Torres-Miguel* should be limited to the context of a threat statute that does not require intent to injure.

In contrast with the threat statute in *Torres-Miguel*, which did not require intent to cause bodily injury, § 249(a)(1) as charged in Counts 1-9 requires intentional conduct that causes bodily injury and results in death ("willfully causes bodily injury" and "death results"). *See Bryan*, 524 U.S. at 191-93; Section V.A.2, *supra.*

     **b. The Supreme Court's more recent guidance in *Castleman* rejects *Torres-Miguel* as interpreted by Defendant**

If, instead of adopting a narrow interpretation of *Torres-Miguel*, this Court accepts Defendant's proposed expansive reading, then the Court should find that *Castleman* overruled that rationale offered by *Torres-Miguel*. Defendant proposes that *Torres-Miguel* stands for the broad proposition that any statute involving "causing" injury is "insufficient to establish violent physical force." (Motion at 27). According to Defendant, *Torres-Miguel* concluded that death or bodily injury may result from something less than the threshold *use* of force based on the rationale that *indirect* action, such as poisoning, does not involve the use of physical force. *Id.*

---

[24] Similarly, *United States v. Perez-Vargas*, 414 F.3d 1282 (10th Cir. 2005), which was also relied upon by *Torres-Miguel*, discussed offenses that need not involve intentional conduct, such as recklessly shooting a gun in the air.

In *Castleman,* the Supreme Court rejected such distinctions between direct and indirect action as a misinterpretation of "use." *Id*. at 1415. More specifically, in *Castleman,* the Supreme Court explained:

> [T]he knowing or intentional application of force is a "use" of force. . . . [Defendant] errs in arguing that although "[p]oison may have 'forceful physical properties' as a matter of organic chemistry, no one would say a poisoner 'employs' force or 'carries out a purpose by means of force' when he or she sprinkles poison in a victim's drink," *ibid*. The "use of force" in [defendant's] example is not the act of "sprinkl[ing] the poison; it is the act of employing poison knowingly as a device to cause physical harm. That the harm [from poisoning] occurs indirectly, rather than directly (as with a kick or punch), does not matter. Under [defendant's] logic, after all, one could say that pulling the trigger on a gun is not a 'use of force' because it is the bullet, not the trigger, that actually strikes the victim.

*Id.* at 1415; *see also e.g.*, *Rice*, 813 F.3d at 706 ("The circuit courts that have considered whether a person uses physical force in causing an injury through indirect means such as poisoning have reached differing conclusions. . . . We believe that *Castleman* resolves the question . . . because there the Court held that even though the act of poisoning a drink does not involve physical force, 'the act of employing poison knowingly as a device to cause physical harm' does.") (internal citation omitted); *Waters*, 2016 WL 3003352, at * 3 ("[T]he U.S. Supreme Court recently confirmed that "the act of employing poison knowingly as a device to cause physical harm" is a use of force, [citing *Castleman*]. Likewise, withholding medicine causes physical harm, albeit indirectly, and thus qualifies as the use of force under *Castleman.*"); *United States v. McGuire*, 706 F.3d 1333, 1337 (11th Cir. 2013) (O'Connor, J.) (rejecting defendant's argument that disabling controls of an aircraft with people on board does not constitute a crime of violence under § 924(c) because "[i]t involves an 'active crime' done 'intentionally' . . .. It makes little difference that the physical act, in isolation from the crime, can be done with a minimum of force"); *United States v. Tsarnaev*, No. 13-10200-GAO, 2016 WL 184389, at *15 & n.24 (D. Mass. Jan. 15, 2016) (citing *Castleman* in rejecting multiple § 924(c)(3)(A) challenges premised

on *Torres-Miguel* as "a mix of ingenuity and sophistry" because it would require "swallowing the proposition that killing a person by poison or radiation does not necessarily have as an element the use of violent physical force against that person").

Moreover, since *Castleman*, every district court in the Fourth Circuit that has considered the reasoning on which Defendant relies has either rejected this argument outright or has questioned *Torres-Miguel*'s continuing viability.[25] *See, e.g.*, *United States v. Bennett*, 3:15cr-134, 2016 WL 354753, at *4 (E.D. Va. Jan. 27, 2016) (relying on *Castleman* and rejecting arguments that Hobbs Act robbery is not a crime of violence because it may be accomplished by threats of poisoning or exposure to hazardous materials); *United States v. Walker*, 2016 WL 153088, at *6 & n.15 (E.D. Va. Jan. 12, 2016) (relying on *Castleman*); *United States v. Evans*, 5:15cr-57, 2015 WL 6673182, at ** 4-6 & n.2 (E.D.N.C. Oct. 20, 2015) (holding that "[i]n light of compelling clarification of the definition of 'physical force' from the Supreme Court after *Torres-Miguel*," carjacking and Hobbs Act robbery are categorically crimes of violence under the force clause); *United States v. McDaniels*, 147 F. Supp. 3d 427, 433 (E.D. Va. 2015) (holding that "the Supreme Court [in *Castleman*] rejected the rationale of *Torres-Miguel*"); *see also, e.g.*, *United States v. Clarke*, 15cr-503, 2016 WL 1110306, at *6 (D. Md. Mar. 22, 2016) ("In light of *Castleman*, and particularly in light of Justice Scalia's concurrence, the reasoning of *Torres–*

---

[25] For cases outside of the Fourth Circuit that similarly find *Torres-Miguel* overruled by *Castleman, see United States v. Cruz-Rivera*, 3:15cr-486, 2015 WL 6394416, at *3-4 (D.P.R. Oct. 21, 2015) (noting that *Torres-Miguel* is "no longer good law" and holding that defendant "was thus flatly wrong to argue that a carjacker does not use or threaten physical force" when he threatens to poison them); *United States v. McCallister*, 15cr-171, 2016 WL 3072237, at *10 n.11 (D.D.C. May 31, 2016) (noting that the "validity of *Torres-Miguel* and its poisoning example has been cast into doubt" by *Castleman*); *United States v. Wheeler*, 15-cr-216, 2016 WL 783412, at * 4 (E.D. Wis. Jan. 6, 2016) (holding that "*Torres-Miguel* has been overruled [by *Castleman*] to the extent that it held that a crime may result in death or serious injury without the use of physical force"); *United States v. Williams*, 2:15cr69, 2016 WL 1555696, at *8 (D. Me. Apr. 15, 2016) ("In *Castleman*, the Supreme Court rejected the reasoning applied in *Torres-Miguel* . . . ."); *see also United States v. Moore*, 15cr-20552, 2016 WL 2591874, at **4-5 (E.D. Mich. May 5, 2016); *United States v. Moore*, 13cr-330, 2016 WL 868168, at * 4 (D.D.C. Mar. 4, 2016); *United States v. Morgan*, 14-20610, 2015 WL 9463975, at *2 n. 3 (E.D. Mich. Dec. 18, 2015); *United States v. Davis*, 15-20564, 2015 WL 8311538, at **2-3 (E.D. Mich. Dec. 9, 2015); *United States v. Pena*, 2016 WL 3208913, at * 4 (E.D.N.Y. June 3, 2016); *United States v. Wells*, 2:14cr280, 2015 WL 10352877, at *5 (D. Nev. Dec. 30, 2015).

*Miguel* . . . is seemingly on thin ice"); *United States v. Hancock*, GJH-13-0274, 2016 WL

899239, at *4 n.4 (D. Md. Mar. 2, 2016) (noting that "[i]t is not entirely unreasonable to question

the future of [the *Torres-Miguel*] holding" in light of *Castleman*); *United States v. Standberry*,

139 F. Supp. 3d 734, 739 (E.D. Va. 2015) (citing *Castleman*). *But see United States v. McNeal*,

818 F.3d 141, 156 n.10 (4th Cir. 2016) (expressing, in dicta, doubt that *Castleman* abrogated

*Torres-Miguel*'s reasoning, observing that the *Castleman* majority "expressly reserved the

question of whether causation of bodily injury 'necessarily entails violent force,'" but also

rejecting the argument that bank robbery is not a crime of violence because one could,

theoretically, rob a bank using the threat of poison).[26]

     In short, the interpretation of the reasoning of *Torres-Miguel* that Defendant would have

this Court adopt cannot survive *Castleman*.

### 5. Defendant's interpretation of the force clause would undermine the purpose of Sections 924(c) and 249, and lead to illogical results

     Defendant's restrictive reading of the "use of physical force" to exclude willfully causing

bodily injury also yields illogical results that would significantly undermine §§ 249 and 924(c)

and a number of other federal criminal statutes. *See*, *e.g.*, Section V.A.3, *supra* (recognizing

§ 249 was intended to criminalize bias-motivated violent conduct). The Supreme Court has

repeatedly warned against adopting statutory interpretations that lead to absurdities. *See, e.g.*,

*Taylor v. United States*, 495 U.S. 575, 594 (1990) ("[W]e shall not read into the statute a

definition . . . so obviously ill-suited to its purposes"); *Johnson*, 559 U.S. at 139-40 (noting that

"context determines meaning" and the "we do not force term-of-art definitions into contexts

where they plainly do not fit and produce nonsense" (internal quotation omitted)); *United States

v. Katz*, 271 U.S. 354, 357 (1926) ("All laws are to be given a sensible construction; and a literal

---

[26] *McNeal* had no need to rule on the continuing validity of *Torres-Miguel* directly as the *McNeal* court found *Torres-Miguel* to be distinguishable.

application of a statute, which would lead to absurd consequences, should be avoided whenever a reasonable application can be given to it, consistent with the legislative purpose.").

The basic purpose of § 924(c) is to "persuad[e] a criminal to leave his gun at home." *Muscarello v. United States*, 524 U.S. 125, 132 (1998) (internal quotation omitted); *see also Abbott v. United States*, 562 U.S. 8, 20 (2010) (describing the goal of § 924(c) as to "discourage bearing arms in furtherance of crime"). The principal means Congress adopted to achieve its purpose was to impose a series of escalating penalties based on how the firearm was used and the consequences of the underlying offense. *See* 18 U.S.C. §§ 924(c)(1)(A)(i)-(iii) and 924(j); *Abbott*, 562 U.S. at 20. Defendant's unduly narrow reading of the phrase "use of force" would eviscerate this sentencing scheme and Congress's purpose. *See Mbea*, 482 F.3d at 280 ("To adopt petitioners view therefore would strip the congressional enactment of [§16 "crime of violence provision] of any substance or meaning.").

Adopting Defendant's interpretation of § 924(c) would mean that any crime that could hypothetically be committed by indirect means, such as poison or radiation, would be categorically exempt from the force clause. This would exclude a large number of crimes that are paradigmatic examples of violent crime, including first degree murder. *See* 18 U.S.C. § 1111 (defining first degree murder, in part, as "[e]very murder perpetrated by *poison*, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing") (emphasis added); *see also James v. United States*, 550 U.S. 192, 208 (2007) (describing attempted murder as "a prototypically violent crime"); *Madsen v. Kinsella*, 343 U.S. 341, 355 (1952) (referring to "murder and other crimes of violence"). Under Defendant's interpretation of § 924(c), all premeditated murder, whether or not committed by poison, would categorically fail to qualify as a crime of violence under its force clause – a position rejected by the Fourth Circuit. *Mbea*, 482

F.3d at 280 (noting that murder is a paradigmatic crime of violence). It is impossible to square the central purpose of § 924(c) with a categorical exemption for defendants who commit premeditated murder with a firearm simply because one of the alternative means they might have chosen included poison or any one of a myriad of hypothetical means by which premeditated murder might be committed. Congress, of course, did not intend such an illogical result. *United States v. Pena*, No. 14-CR-553-3, 2016 WL 3208913, at *4 (E.D.N.Y. Jun. 3, 2016) (holding that it would be "absurd" for intentional murder by poison to be exempt from § 924(c)(3)(A)); *United States v. Checora*, No. 2:14cr457DAK, 2015 WL 9305672, at *4 (D. Utah Dec. 21, 2015) ("In a murder case, the defendant is charged with some physical conduct that actually kills another person. It is hard to imagine conduct that can cause another to die that does not involve physical force against the body of the person killed."); *see also Abbott*, 562 U.S. at 20 (rejecting an interpretation of § 924(c) that would exempt the most serious drug trafficking offenders from its penalties). And, as the Fourth Circuit held in *Mbea*, it is clear that premeditated murder, even when committed by poison, is a crime of violence. 482 F.3d at 280 & n.4.

Defendant's reasoning would further undermine the congressional purpose underlying § 924(c) by creating disturbing inequities between the seriousness of certain offenses and their consequences. For example, the Supreme Court has stated that "a person would 'use . . . physical force against' another when pushing him," *Leocal*, 543 U.S. at 9, and that a slap in the face is sufficient to qualify as physical force under *Johnson*, 559 U.S. at 143. Therefore, under Defendant's reasoning, an assault statute limited solely to assault by pushing or slapping would involve a use of physical force sufficient to constitute a crime of violence, while first degree murder would not. Moreover, courts in this Circuit have held that a diverse array of crimes – domestic assault, burglary, armed bank robbery, Hobbs Act robbery, carjacking, *inter alia*– are

crimes of violence under the force clause. *See, e.g., Chisolm*, 579 F. App'x at 193; *McNeal*, 818 F.3d at 151-57 (armed bank robbery). A defendant who carried or brandished a firearm during one of these crimes would be subject to the enhanced sentencing penalties contained in § 924(c), even if no one was harmed by the presence of firearm. Yet a defendant who commits premeditated murder by shooting his victims would not, in Defendant's view, be covered by the sentencing enhancement specifically designed to punish the discharge of a firearm. Congress surely never intended such inequitable results. *See Abbott,* 562 U.S. at 21; *see also Torres v. Lynch*, 136 S. Ct. 1619, 1628-30 (2016) (rejecting "peculiarly perverse" and "utterly random" interpretation of statute that lead to "'haphazard' – indeed, upside-down – coverage" of imposing harsher consequences for minor offenses while exempting the most serious offenses).

"[A] court should not interpret each word in a statute with blinders on, refusing to look at the word's function within the broader statutory context." *Abramski v. United States*, 134 S. Ct. 2259, 2267 n.6 (2014). These "tools of divining meaning—not to mention common sense, which is a fortunate (though not inevitable) side benefit of construing statutory terms fairly" counsel heavily against adopting Defendant's unduly narrow interpretation of the phrase "use of physical force" under § 924(c)(3)(A). *Id.* at 2267.

**B.  Defendant's Section 247 Charges Satisfy the Force Clause (Section 924(c)(3)(A))**

Defendant's force clause challenge also has no merit with respect to the charges alleging he "intentionally obstructed by force" the victims' enjoyment of the free exercise of their religious beliefs resulting in the death of nine of the victims. As Defendant acknowledges, the hate crime with which he has been charged expressly includes use or attempted use of force as an element of the offense. *See* 18 U.S.C. § 247(a)(2). Although the two provisions are not identical, § 247(a)(2) closely tracks § 924(3)(A). *Compare* § 247(a)(2) (requiring proof that the defendant

obstructs "by force or threat of force . . . or attempts to do so") *with* § 924(c)(3)(A) (requiring

"the use, attempted use, or threatened use of physical force").[27] Moreover, similar to Defendant's

§ 249(a)(1) offenses, his § 247(a)(2) offenses require the jury to find unanimously and beyond a

reasonable doubt that the use of force actually resulted in death.

Defendant's argument attempts to impart to the term *force* a meaning that falls outside of

§ 924(c)'s force clause. More specifically, he asserts that force, as it is used in § 247(a)(2), is a

term of art that can be committed by a de minimis level of force, such as mere touching, that fails

to satisfy the definition of violent physical force adopted by the Supreme Court in *Johnson*.

Defendant provides no direct support for these assertions, and he acknowledges there is none.

Section 247(a)(2) does not define force in this manner, and no court has interpreted § 247's use

of "force" in this manner.

Defendant argues that his definition of force may be inferred from § 247's legislative

history and Fourth Circuit case law. Neither of these approaches is persuasive. Defendant's

legislative history argument cites no direct evidence of a definition of the term force.

Consequently, Defendant premises his argument on a committee report that he contends cites as

examples of "religious obstruction" conduct that can be accomplished without the use of force,

such as defacing building or religious texts, and assault.

This argument has multiple flaws. First, the references Defendant cites are descriptions of

the types of religiously motivated violence that prompted Congress to create three distinct

offenses, only one of which is codified as § 247(a)(2). *See* H.R. Rep. No. 100-337, at 2 (1987);

---

[27] The only potentially relevant distinction is § 247(a)(2) omits the adjective "physical" that precedes the term force in § 924(c)(3)(A). This distinction is not material, and Defendant does not argue that it is. Moreover, as the Supreme Court explained in the context of the ACCA's force clause, "[t]he adjective 'physical' is clear in meaning but not of much help" in establishing the meaning of "force" because it "plainly refers to force exerted by and through concrete bodies" rather than such other types of force as "intellectual force or emotional force." *Johnson*, 559 U.S. at 138; *cf., United States v. Ingle*, 454 F.3d 1082, 1086 (10th Cir. 2006) (recognizing that *economic* crimes generally do not require the use of physical force). Additionally, Defendant's § 247 offenses include an element requiring that death result from the force used, thereby requiring that the force be physical and substantial.

Pub. L. 100-346, § 1, 102 Stat. 644 (1988). Nothing in these references or any other portion of the relevant legislative history indicates they were intended to refer specifically and exclusively to § 247(a)(2). *See* H.R. Rep. No. 100-337; S. Rep. No. 100-324 (1988). It also is far from surprising that the legislative history would include references to defacement and other types of property damage given that the other two offenses codified in § 247 deal expressly with attacks on religious real property, including defacement. *See* §§ 247(a)(1) & 247(c). These references to property damage also are entirely consistent with the force clause of § 924(c), which, unlike the ACCA force clause at issue in *Johnson*, expressly contemplates the use of force against property. § 924(c)(3). Finally, while the legislative history for § 247 contains no mention of mere touching as an example of force sufficient to satisfy § 247(a)(2), it expressly cites violent crimes that involve much greater uses of force, including robbery, murder, and bombings. H.R. Rep. No. 100-337, at 3 (citing murder, bombings, and armed robbery); *cf.* S. Rep. No. 100-324, at 2 ("The purpose of S. 794 is to make [religious] violence a Federal offense.").

Defendant also argues that the Court should read into § 247(a)(2) a definition of force that he infers from decisions in which the Fourth Circuit considered whether certain state assault statutes qualified as crimes of violence under the ACCA's force clause. This argument is equally unfounded. None of the cases cited by Defendant purports to interpret the term force either in isolation or in the context of a federal statute. Further, these cases do not suggest "force" possesses a term of art meaning that includes mere touching. What these precedents actually establish is that determining the meaning of a crime requires an inquiry into how the courts of that jurisdiction have defined that crime. *See United States v. Gardner*, No. 14-4533, 2016 WL 2893881, at *7-8 (4th Cir. May 18, 2016) (recognizing that determining whether a state crime qualifies as a crime of violence requires a jurisdiction-specific inquiry, and that the Fourth

Circuit had reached the opposite conclusion with respect to similar crimes in different states); *see also id*. at *6-7 (holding North Carolina crime of common law robbery was not a crime of violence based on authoritative North Carolina decisions stating it could be committed by de minimis uses of force); *United States v. Royal*, 731 F.3d 333, 340-42, 340 n.1 (2013) (basing decision on authoritative Maryland judicial decisions interpreting "assault" as including proof a defendant "caused offensive physical contact"); *see generally Johnson*, 559 U.S. at 136-37 (basing interpretation of Florida crime of "simple battery" on Florida law establishing offense could be satisfied by "touching"). As Defendant acknowledges, there is no similar federal decision adopting his interpretation of the term force as it is used in § 247(a)(2).

Defendant's reliance on *Torres-Miguel* is even more misplaced here than in his challenge to § 249(a)(1). Defendant proposes that *Torres-Miguel* should be read for the improper conclusion that, in the context of force clause law generally, causing injury does not necessitate the use of force. Here the issue is whether "force," as it used in § 247, means something different from "force" under § 924(c). Nothing in *Torres-Miguel* sheds any light on this. While, as discussed above, *Torres-Miguel* should be read narrowly or even abrogated in light of *Castleman*, the charged § 247(a)(2) offense expressly requires "force."

Moreover, the fact that the charged offenses require that the "force" used actually "result in death" as an offense element serves to further ensure that the degree of force required to be used for Counts 13-21 is sufficient. *See Johnson*, 559 U.S. at 140 ("force capable of causing physical pain or injury to another person"); *Chisolm*, 579 F. App'x at 194. It would strain any credulity to assert that such an offense reasonably could be accomplished by the mere touching that Defendant argues § 247(a)(2) contemplates. *Cf. Gardner*, 2016 WL 2893881, at *6

(recognizing that in determining whether a crime requires the use of force requires a "realistic probability, not a theoretical possibility," the law would be applied to the conduct at issue).

In sum, Defendant is unable to demonstrate that the term force, as it is used in § 247, has any meaning relevant to this case other than the meaning the Supreme Court gave to the same term in *Johnson*: "force capable of causing physical pain or injury to another person." 559 U.S. at 140. Absent any evidence that Congress intended some other meaning, the Court should reject Defendant's speculative assertion that "force" as it is used in § 247(a)(2) is somehow a term of art that falls outside § 924(c)'s force clause.

### C. Defendant's Civil Rights Charges Satisfy the Residual Clause (Section 924(c)(3)(B))

Defendant also contends that his civil rights offenses do not qualify as crimes of violence under § 924(c)'s broader "residual clause" definition, which looks to whether a felony, "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 924(c)(3)(B). Defendant asks the Court to strike this entire definition from § 924(c) because the Supreme Court recently found a similar, but distinctly worded, provision unduly vague.[28] The government urges the Court to reject this argument because § 924(c)(3)'s residual clause is not unconstitutionally vague on its face or as applied to Defendant, and his offenses, by their nature, are crimes of violence.

#### 1. Defendant's civil rights offenses satisfy § 924(c)'s residual clause

Defendant does not argue that his civil rights offenses are not crimes of violence by their nature under § 924(c)(3)(B). A cursory review demonstrates why. Section 247(a)2) readily qualifies for it is axiomatic that a crime that requires that force be used involves a substantial risk that force will be used during the crime. Section 249(a)(1) also easily qualifies as a crime of

---

[28] The Due Process Clause bars enforcement of a criminal statute on vagueness grounds only if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008) (citation omitted).

violence under § 924(c)'s residual clause. Courts have long recognized that crimes that require the causation of bodily injury inherently involve a substantial risk that the defendant will use physical force in the commission of the crime. As the Second Circuit has explained:

> Whatever other means a person might conceive to commit first-degree manslaughter, when his intent is to take a life, . . . inherent in the nature of the crime is a substantial *risk* that the perpetrator *may* intentionally use physical force to achieve his criminal objective.

*Vargas-Sarmiento v. United States*, 448 F.3d 159, 173 (2d Cir. 2006). Additionally, as argued in Section V.A.3, *supra*, Congress contemplated that there was a substantial risk that defendants committing hate crimes would use physical force. As this case amply demonstrates, that recognition is mirrored in the type of violent conduct prosecuted under § 249. *See, e.g.*, *United States v. Cannon*, 750 F.3d 492, 496 (5th Cir. 2014) (punching and stomping); *United States v. Hatch*, 722 F.3d 1193, 1195-96 (10th Cir. 2013) (branding); *United States v. Maybee*, 687 F.3d 1026, 1029 (8th Cir 2012) (causing a crash by intentionally striking victim's car with a truck); *United States v. Hill*, No. 3:16-CR-00009-JAG, 2016 WL 1650767, at *1 (E.D. Va. April 22, 2016) (punching); *United States v. Mason*, 993 F. Supp. 2d 1308, 1310 (D. Or. 2014) (physical assault); *United States v. Jenkins*, 120 F. Supp. 3d 650, 651 (E.D. Ky 2013) (physical assault); *United States v. Mason*, 993 F. Supp. 2d 1308, 1310 (D. Ore. 2014) (striking with metal tool).

### 2.  Section 924(c)'s residual clause is not vague as applied to Defendant

As a threshold matter, the Court should decline to consider Defendant's argument that § 924(c)(3)(B) is facially unconstitutional because he has not shown it is vague as applied to him. In cases that, like here, do not involve a First Amendment challenge, the Fifth Amendment bars enforcement of a criminal statute on vagueness grounds only if it is vague as applied. *United States v. Williams*, 553 U.S. 285, 304 (2008); *Chapman v. United States*, 500 U.S. 453, 467 (1991); *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988); *United States v. Powell*, 423 U.S. 87,

66

92 (1975); *United States v. Jaensch*, 665 F.3d 83, 89 (4th Cir. 2011); *United States v. Sun*, 278 F.3d 302, 309 (4th Cir. 2002); *see also United States v. Hunter*, No. 2:12CR124, 2015 WL 6443084, at *2 (E.D. Va. Oct. 23, 2015) (rejecting vagueness challenge to § 924(c)(3)(B)).

Defendant fails even to argue that § 924(c)'s residual clause is vague as applied to him. Of course, Defendant cannot reasonably assert he could not have realized that his conduct involved "a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." This failure (and inability) to demonstrate that he could not have understood that his crimes were crimes of violence under § 924(c)(3)(B) is fatal to the fair notice aspect of his challenge.

Defendant's challenge also fails under the "arbitrary standard" aspect of vagueness doctrine. In *Johnson v. United States*, the Supreme Court held that a residual clause may be vague if it is "so standardless that it invites arbitrary enforcement." 135 S. Ct. 2551, 2556 (2015).[29] In *Johnson*, the Supreme Court concluded that the ACCA's residual clause definition of "violent felony" was unconstitutionally vague because it was fundamentally unable to produce "evenhanded, predictable, or consistent" applications in the context of the categorical approach, as evidenced by the demonstrated inability of the courts to "craft a principled and objective standard" from the clause. *Id.* at 2558-61, 2563; *see also United States v. Taylor*, 814 F.3d 340, 375-78 (6th Cir. 2016) (discussing *Johnson*'s ACCA analysis). For provisions that apply without question to certain activities, however, a vagueness challenge requires a violation of the "hard core" of the statute. *Smith v. Goguen*, 415 U.S. 566, 577-78 (1974). This type of facial vagueness challenge is reserved for laws that "simply ha[ve] no core." *Id.* at 578.

---

[29] All references to *United States v. Johnson*, in the residual clause section of this response, refer only to the Supreme Court's 2015 decision regarding the ACCA's residual clause.

Section 924(c)'s residual clause is not a provision that "simply has no core." This is amply evidenced by the fact that, unlike the ACCA's residual clause, the Supreme Court and lower courts have readily identified offenses that fall within the textually similar residual clause definitions contained in § 924(c)(3)(B) and § 16(b) without any indication of the judicial confusion that concerned the Court in *Johnson*. *See Leocal v. Ashcroft*, 543 U.S. 1, 10 (2004) (describing burglary as a "classic example" of a crime that satisfies the residual clause). Indeed, the Supreme Court recently discussed the crime of violence definition included in § 16 without expressing any concern regarding its continued viability in light of *Johnson*. *See Torres v. Lynch*, 136 S. Ct. 1619, 1629-30, 1637 (2016) (identifying offenses that fell within and beyond § 16, including offenses that likely qualify only under § 16(b)).

### 3. Section 924(c)'s residual clause is not unconstitutionally vague

Should the Court determine that it is appropriate to reach Defendant's facial challenge to § 924(c)(3)(B), that challenge should be denied. Defendant urges the Court to read the residual clause definition out of § 924(c)(3) because, in his view, it is materially indistinguishable from the ACCA's residual clause definition of "violent felony" that the *Johnson* Court held to be unconstitutionally vague. This argument misconstrues and misapplies the scope and reach of the *Johnson* decision. As detailed below, material distinctions between these two residual clauses and the contexts in which they apply make the reasoning of *Johnson* inapplicable to § 924(c).

Defendant correctly observes that the Supreme Court identified the ordinary-case analysis as one of the features of the ACCA's residual clause that contributed to its vagueness. *Johnson*, 135 S. Ct. at 2557-58, 2561. Contrary to Defendant's contentions, however, *Johnson* did not turn solely on the Court's critique of the clause's ordinary-case inquiry. Rather, the Supreme Court focused on multiple aspects of the ACCA's residual clause and its application and expressly

stated that it was the "sum" of the clause's multiple "uncertainties" that rendered it

unconstitutionally vague. 135 S. Ct. at 2560. As discussed below, § 924(c)'s residual clause does

not present anywhere near the same uncertainties as the ACCA's residual clause.

### a. The *Johnson* decision rested on a combination of factors unique to the ACCA's residual clause

In *Johnson*, a combination of factors convinced the Supreme Court that the portion of the

ACCA residual clause that defines a "violent felony" was unconstitutionally vague. 135 S. Ct. at

2563; 18 U.S.C. § 924(e)(2)(B)(ii).[30] First, the Court observed that the ACCA's approach

required a method of assessing whether "a judicially imagined 'ordinary case' of a crime" was a

violent felony that was flawed because it left "grave uncertainty about how to estimate the risk

posed by a crime." 135 S. Ct. at 2557. The Court found the ACCA's specific type of ordinary

case analysis wanting because it "goes beyond evaluating the chances that the physical acts that

make up the crime will injure someone" and requires a court to determine whether a "risk of

injury arises because the [offender] might engage in violence *after*" completing the offense. *Id.*

The Court described this evaluation of the risk for injury as "remote from the criminal act,"

"indetermina[te]" and "wide-ranging." *Id.* at 2559.

Second, the Court found that the ACCA's residual clause "leaves uncertainty about how

much risk it takes for a crime to qualify as a violent felony," *id*. at 2558, because it linked its risk

inquiry to four enumerated crimes that "are far from clear in respect to the degree of risk each

poses," *id.* (citation and internal quotation omitted). The Court contrasted "dozens of federal and

state criminal laws [that] use terms like 'substantial risk,' 'grave risk,' and 'unreasonable risk,'"

noting that "[a]lmost none of the cited laws links a phrase such as 'substantial risk' to a

confusing list of examples." *Id.* at 2561. The Court colorfully analogized the confusion instilled

---

[30] Section 924(e)(2)(B)(ii) states that "violent felony" is any felony that "is burglary, arson, or extortion, involves
use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another."

by this set of examples as follows, "[t]he phrase 'shades of red,' standing alone, does not

generate confusion or unpredictability; but the phrase 'fire-engine red, light pink, maroon, *navy*

*blue*, or colors that otherwise involve shades of red' assuredly does so." *Id.* (citation omitted).

Third, the Court recognized that additional evidence of vagueness came from its own

"failure of persistent efforts . . . to establish a . . . principled and objective standard" for applying

the residual clause. *Id.* at 2558 (citation and internal quotation omitted). The Court also cited

"numerous splits among the lower federal courts, where [the residual clause] has proved nearly

impossible to apply consistently." *Id.* at 2559-60.

The Court concluded that "[e]ach of the uncertainties in the residual clause may be

tolerable in isolation, but their sum makes a task for us which at best could be only guesswork."

*Id.* at 2560 (citation and internal quotation omitted). As a result, the Court determined that "the

residual clause produce[d] more unpredictability and arbitrariness than the Due Process Clause

tolerates." *Id.* at 2558.

### b. *Johnson* does not apply to Section 924(3)(c)(B)

The only circuit court to address the constitutionality of § 924(c)'s residual clause in light

of *Johnson* has upheld the constitutionality of § 924(c)(3)(B).[31] *Taylor*, 814 F.3d at 375-79. The

Fourth Circuit, meanwhile, has not yet decided whether to extend *Johnson* beyond the confines

of the ACCA. *See, e.g.*, *United States v. Hare*, 820 F.3d 93, 105-06 (4th Cir. 2016) (declining to

decide whether residual clause in § 924(c)'s residual clause is constitutional). The Fourth Circuit

---

[31] The Sixth Circuit has distinguished § 924(c)(3)(B) from § 16(b), which it found unconstitutionally vague in the immigration context. *Shuti v. Lynch*, No. 15-3835, 2016 WL 3632539, at *8 (6th Cir. July 7, 2016). Additionally, although the Ninth Circuit has held in a divided opinion that § 16(b) is unconstitutionally vague in the immigration context, *Dimaya v. Lynch*, 803 F.3d 1110 (9th Cir. 2015), *petition for cert. filed*, No. 15-1498 (June 10, 2016), and the Seventh Circuit has agreed, *United States v. Vivas-Ceja*, 808 F.3d 719 (7th Cir. 2015), the Fifth Circuit has granted rehearing en banc in the sentencing context, *United States v. Gonzalez-Longoria*, 815 F.3d 189 (5th Cir. 2016). Moreover, as already noted, the Court recently discussed § 16 in *Torres* without suggesting that § 16(b) was invalid. 136 S. Ct. at 1629-30 (majority); at 1637 & n.1 (dissent). Additionally, § 924(c)(3)(B) is distinguishable from § 16(b) because § 924(c)(3)(B) is necessarily limited in its application to offenses that can be accomplished through possessing a firearm in furtherance of the offense and is further limited by applying only to felonies.

has expressly observed, however, that in *Johnson*, the Supreme Court "had no occasion to review the version of the residual clause set forth at 18 U.S.C. § 924(c)(3)(B)," and that the ACCA's residual clause was "similarly worded but not identically so" to § 924(c)(3)(B). *United States v. Fuertes*, 805 F.3d 485, 499 n.5 (4th Cir. 2015).

At the trial level, most courts in this Circuit have held there are material differences between the ACCA's residual clause and § 924(c)(3)(B) that provide the clarity in § 924(c) that the Supreme Court found lacking in the ACCA. *See United States v. Green*, 2016 WL 277982 (D. Md. Jan. 22, 2016); *United States v. Walker*, 3:15cr49, 2016 WL 153088 (E.D. Va. Jan. 12, 2016); *United States v. Hunter*, No. 2:12CR124, 2015 WL 6443084 (E.D. Va. Oct. 23, 2015); *United States v. McDaniels*, 147 F. Supp. 3d 427 (E.D. Va. 2015). *But see United States v. Edmundson*, 13cr-15, 2015 WL 9311983 (D. Md. Dec. 30, 2015). The same is true of district courts outside of the Fourth Circuit. *E.g.*, *United States v. Dervishaj*, 13cr-668, 2016 WL 1019357, at * 8 (E.D.N.Y. Mar. 14, 2016); *United States v. Tsarnaev*, 13cr-10200, 2016 WL 184389, at *11-14 (D. Mass. Jan. 15, 2016).

Should the Court determine that Defendant's facial challenge is properly before it, the government urges the Court to follow this authority in concluding that it is not unconstitutionally vague for Congress to recognize that violent crimes include crimes that by their nature present a substantial risk of the use of physical force.

### i.    The ordinary case inquiry is not *per se* invalid

Defendant's core argument is that *Johnson* expressly invalidated the ordinary case approach and, by implication, § 924(c)(3)(B) and any other crime of violence definition that incorporates the approach. This contention broadly overstates the scope and nature of the Supreme Court's reasoning in *Johnson.* The Court premised its vagueness holding on multiple

features of the ACCA's residual clause that included, but was not limited to, the ordinary case approach. 135 S. Ct. at 2557, 2560; *see also Taylor*, 814 F.3d at 378 (recognizing the Court "explicitly refrained from flatly invalidating [the ordinary case] type of analysis.").

> ii.    **Section 924(c)(3)(B)'s definition of the ordinary case is substantially more determinate than the ACCA**

The Supreme Court's concerns in *Johnson* stemmed from the breadth of the ordinary case inquiry required under the ACCA's residual clause. 135 S. Ct. at 2557, 2561; *Taylor,* 814 F.3d at 378. One of the Court's central concerns was that the "potential injury" aspect of the ACCA's approach required courts go beyond the conduct that comprises the offense to evaluate the risks for injury that might arise "*after*" the completion of the offense. 135 S. Ct. at 2557, 2559. This consideration of post-offense risk of injury was one of multiple bases for the Court's conclusion that the ACCA's residual clause's approach involved an ordinary case inquiry that was "remote from the criminal act," "indetermina[te]" and "wide-ranging." *Id.* at 2559.

The ordinary case analysis under Section 924(c)(3)(B) is significantly more definite in this respect than under the ACCA. Whether an offense qualifies as a "crime of violence" under § 924(c)(3)(B) depends on whether the risk of force occurs "'in the course of committing the offense." This textual requirement, which is absent from the ACCA residual clause, eliminates one of the central concerns that troubled the Supreme Court in *Johnson*: the necessity for courts to evaluate the risk of injury even "after" completion of the offense. *Taylor*, 814 F.3d at 377. Section 924(3)(c)(B), unlike the ACCA, does not permit a court to consider risks that arise only after the physical acts constituting the crime have been completed.

Additionally, § 924(c)'s residual clause focuses on the risk that *force* will be used in the crime, while the ACCA's broadly framed inquiry focuses on the risk that *injury*, including

unintentional injury, might result.[32] This distinction restricts § 924(c)(3)(B) to a narrower

category of conduct – i.e., conduct that is the product of the willful use of force. This risk

analysis is far less speculative than the ACCA standard and is consistent with *Johnson*.

Section 924(c)(3)(B) also serves a different, and substantially more focused, function

than the ACCA. The ACCA focuses on predicate *prior* state and federal convictions for the

purpose of a sentencing enhancement for recidivist offenders. In contrast, "a crime of violence"

under § 924(c) creates a federal offense that must involve a firearm. That significantly narrows

the types of offenses that can be charged to only those *federal* crimes of violence that are

committed with a sufficient nexus to the use or threatened use of force in the form of a firearm.

### iii.    Section 924(c)'s approach to estimating the amount of risk is more determinate than the ACCA

Section 924(c)(3)(B)'s structure also differs materially from the ACCA because it does

not link the assessment of the degree of risk to any list of enumerated crimes, much less the

confusing list that the Supreme Court found made the ACCA's risk assessment indeterminate.

*Taylor*, 814 F.3d at 377-78. As the Supreme Court observed of the enumerated crimes in the

ACCA's residual clause, "[t]hese offenses are far from clear in respect to the degree of risk each

poses" and, as such, created substantial uncertainty about how much risk it takes for a crime to

qualify as a violent felony. *Johnson*, 135 S. Ct. at 2558, 2561 (internal citation and quotation

omitted). The confusion these exemplars created pervaded the Court's analysis in *Johnson*. *See*

135 S. Ct. at 2557 ("the inclusion of burglary and extortion . . . confirms that the court's task also

goes beyond evaluating the chances that the physical acts that make up the crime will injure

someone"); *id.* at 2559 (common sense could not produce a consistent conception of the degree

---

[32] Because the ACCA required only the risk of injury, without any mens rea limitation, its coverage was
substantially broader than the intentional and knowing causation of injury that the Supreme Court has explained
necessarily requires the use of physical force. *United States v. Castleman*, 134 S. Ct. 1405, 1408, 1415 (2014).

of risk for the four enumerated crimes or for non-enumerated crimes); *id.* (inclusion of burglary and extortion posed additional problem of suggesting a crime may qualify "even if the physical injury is remote from the criminal act" without indicating "how remote is too remote"). Moreover, the presence of this list of offenses had repeatedly troubled members of the Court before *Johnson* was decided. *See, e.g.*, *Begay v. United States,* 553 U.S. 137, 143 (2008) (stating that "the examples are . . . far from clear with respect to the degree of risk each poses."); *James*, 550 U.S. at 215-16, 230 n.7 (Scalia, J., dissenting). Critically for this Court's analysis of § 924(c)(3)(B), the Supreme Court specifically distinguished other statutes requiring risk-based assessments in part because they do *not* "link[] a phrase such as 'substantial risk' to a confusing list of examples." *Johnson*, 135 S. Ct. at 2561; *Taylor*, 814 F.3d at 378.

### iv.     Section 924(c)(3)(B) has not resulted in judicial confusion

*Johnson* also emphasized its own "repeated attempts and repeated failures to craft a principled and objective standard out of the residual clause" of the ACCA, 135 S. Ct. at 2558, as well as the corresponding failures of the lower courts, *id.* at 2560. This concern was critical to the Court's determination that the ACCA's residual clause was irremediably vague. *See id.* at 2559 (noting Johnson was the Court's fifth residual clause case); *see also Sykes v. United States*, 131 S. Ct. 2267, 2287 (2011) (Scalia, J., dissenting) (stating the Court's repeated failure in addressing ACCA is "[w]hat sets ACCA apart" and "confirms" its vagueness).

In contrast, § 924(c)(3)(B) and the textually similar residual clause of 18 U.S.C. § 16(b) have not produced such "hopeless indeterminacy." *Johnson*, 135 S. Ct. at 2558; *see also Taylor*, 814 F.3d at 378 ("By contrast, the Supreme Court has not unsuccessfully attempted on multiple occasions to articulate the standard applicable to the § 924(c)(3)(B) analysis."). In one of its only decisions involving the application of § 924(c)'s residual clause, *United States v. Rodriguez-*

*Moreno*, 526 U.S. 275 (1999), the Supreme Court deemed it self-evident that kidnapping qualifies as a "crime of violence" under that clause, *id.* at 280. The Supreme Court has not been called upon to resolve any concerns regarding the application of § 924(c)(3)(B), and has rendered only one significant decision, *Leocal*, with regard to § 16(b). *See Leocal*, 543 U.S. at 1. That decision caused no controversy among the justices, with a unanimous Court expressing no uncertainty or difficulty in adopting an interpretive framework that identified one offense (burglary) as the "classic example" of a qualifying offense, and rejecting another (DUI). *Leocal*, 543 U.S. at 10; *see also Torres*, 136 S. Ct. at 1629-30, 1637 (discussing § 16's crime of violence definition and expressing no concerns regarding its continued viability in light of *Johnson*).

The lack of any indication of confusion over the meaning of § 924(c)(3)(B) and the Court's analysis of § 16(b) in *Leocal* (which was joined by Justice Scalia, the author of *Johnson* and the principal critic of the ACCA's vagueness leading up to *Johnson*) belie any contentions that § 924(c)(3)(B) is too uncertain to be readily applied and to permit evenhanded application. While the *Johnson* Court observed that there were numerous lower court splits about "the nature of the inquiry" that a court should conduct under the ACCA, *Johnson*, 135 S. Ct. at 2560, Defendant has failed to identify any substantial disagreements among the lower courts about the meaning of § 924(c)(3)(B).

Acts of Congress enjoy a strong presumption of validity, *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963), and a court's duty is to construe, rather than to condemn, a statute, *Skilling v. United States*, 561 U.S. 358, 403 (2010). In *Johnson*, the Supreme Court was convinced by "[n]ine years' experience," and by multiple prior decisions, that the ACCA's residual clause was not subject to principled construction. 135 S. Ct. at 2560. There is no basis to conclude that § 924(c)(3)(B) is subject to a similar risk of arbitrary enforcement or lack of fair

notice. Section 924(c)(3)(B) differs textually from the ACCA's residual clause in ways that were central to the Court's decision in *Johnson*, and it has not been the subject of the type of judicial confusion that attended the courts' application of the ACCA's approach. Accordingly, should the Court reach this issue, it should hold that § 924(c)(3)(B) is not unconstitutionally vague.

## VI. CONCLUSION

The government requests that the Court deny Defendant's Motion to Dismiss the Indictment. Congress acted well within its constitutional authority in enacting both of the civil rights offenses with which Defendant has been charged. Those crimes also qualify as crimes of violence under both of the definitions of that term that are contained in 18 U.S.C. § 924(c). Consequently, Defendant should be required to appear before a jury of his peers on the charges that the grand jury duly considered and returned in this case.

Respectfully submitted,

BETH DRAKE
ACTING UNITED STATES ATTORNEY

VANITA GUPTA
Principal Deputy Assistant Attorney General
U.S. Department of Justice

By  s/Stephen J. Curran

Julius N. Richardson                         Stephen J. Curran
Nathan Williams                               Special Litigation Counsel
Assistant United States Attorney        U.S. Department of Justice
1441 Main Street, Suite 500             Civil Rights Division
Columbia, SC 29201                        601 D Street NW, Rm 5200
(803) 929-3000                               Washington, DC 20579
                                                     (202) 514-3204

July 25, 2016