IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | Criminal No. 2:15-CR-00472-RMG |
| | ) | |
| **v.** | ) | |
| | ) | **UNDER SEAL** |
| **DYLANN STORM ROOF** | ) | |
| | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS THE
CONFESSION AND RESULTS OF TWO SEARCHES**

I.   Factual Background .................................................................................................... 1

 A.  Defendant's Pattern of Voluntarily Communicating his Ideology ..................................... 1

  1.  Defendant voluntarily posted his ideology online before the shootings. ...................... 1

  2.  Defendant voluntarily detailed his crimes and ideology in a notebook before the
     shootings. ................................................................................................................ 2

  3.  During the massacre, the defendant detailed his motives ............................................ 3

  4.  Defendant voluntarily detailed his crimes and motives in a jailhouse manifesto
     after the shootings. ................................................................................................... 3

 B.  Defendant's Arrest and Voluntary Statement to the FBI. ................................................. 4

 C.  Search of Roof's Car and 10428 Garners Ferry Rd. ........................................................ 7

II.  Roof's Confession and Items Seized Should not be Suppressed ........................................ 9

 A.  Roof's Mirandized and Recorded Confession Was Obtained Voluntarily, Knowingly,
    and Intelligently ......................................................................................................... 9

  1.  Defendant's claims of involuntariness fail ............................................................... 12

  2.  Defendant's claims of unknowing and unintelligent waiver fail ............................... 16

 B.  Items Seized During Searches Should not be Suppressed ............................................... 17

  1.  Items seized from Roof's car should not be suppressed ............................................ 17

  2.  Items seized from 10428 Garners Ferry Rd should not be suppressed ....................... 21

On July 20, 2016, Defendant moved to suppress his *Mirandized*, recorded confession and evidence obtained from two searches. Motion, DE 266. Defendant's statement should be admitted because when it was given Defendant was fully informed of his rights, waived his rights, and chose to speak with FBI agents freely and not as a result of any coercive police conduct. The evidence seized from the two searches should not be suppressed as law enforcement had legal authority to seize it.

## I.  Factual Background

### A.  Defendant's Pattern of Voluntarily Communicating his Ideology

On June 17, 2015, Defendant shot and killed nine parishioners, and attempted to kill three others, at Mother Emanuel African Methodist Episcopalian Church (Mother Emanuel or Emanuel AME) in Charleston. Defendant committed his crimes, in part, as an effort to draw attention to his racist ideology. This one theme, Defendant's effort to draw attention to his racist ideology, is prevalent throughout the planning and commission of his crime, and in his statement and writing after his crime. He posted his ideology online and wrote it out in a journal prior to the shootings, announced it to the victims as he massacred them, and afterwards detailed his acts and motives to agents and in a written jailhouse manifesto. These efforts show not just that Defendant voluntarily communicated his ideology, including in his statement to the FBI, but that he was driven and dedicated to do so, contrary to his claims otherwise.

*1.  Defendant voluntarily posted his ideology online before the shootings.*

Before walking into the Mother Emanuel on the evening of June 17, 2015, and murdering nine innocent people as they worshipped, the defendant felt it important to share with the world the motivations behind his actions. The defendant disseminated his "manifesto" via a personal web page, www.lastrhodesian.com that he had set up months before, but where he posted his

message just hours prior to the shootings. Along with the manifesto, the website contained photographs of the defendant with firearms and wearing clothing containing various symbols associated with white supremacy. The website's manifesto starts with an introduction, followed by a lengthy section titled "Blacks." Short paragraphs discussing "Jews," "Hispanics," and "East Asians" followed. The manifesto concluded with short paragraphs on "Patriotism" and, ominously, "An Explanation," where Roof explained that he had no choice, that someone had to have the bravery to "take it to the real world," and that he chose Charleston for its historic significance. The lengthy writing concludes with what, in the mind of the defendant, is the only negative consequence of his actions – that his complete message will never be communicated: "Unfortunately at the time of writing I am in a great hurry and some of my best thoughts, actually many of them have been to be [sic] left out and lost forever. But I believe enough great white minds are out there already."[1]

       2.   *Defendant voluntarily detailed his crimes and ideology in a notebook before the shootings.*

Defendant took a second step to ensure that his message got out. After his arrest on June 18, 2015, a journal was found in his car, containing a hand-written version of essentially the same manifesto that was posted online. The writing begins with a short personal history of how the defendant became, in his words, "racially aware," and continues to address various perceived racial issues under subheadings titled "Blacks," "Jews," "Hispanics," "East Asians," and "Patriotism." It ends under the subheading "An Explanation," wherein he describes his perverse justifications for the unspeakable actions he is about to undertake, stating "I have no choice. I am not in the position to, alone, go into the ghetto and fight."

---

[1] The Defendant also asks, "Please forgive any typos, I didnt [sic] have time to check it." Defendant expressed to victims and investigators that he planned to kill himself after the shooting.

###### 3.   *During the massacre, the defendant detailed his motives.*

After Roof began methodically executing the Bible-study participants, he explained that he had to kill them because African Americans were raping white women and taking over the world. Defendant also told one of the survivors, Polly Sheppard, that he was going to let her live so that she could tell the story of what had occurred because he planned to kill himself afterwards.

###### 4.   *Defendant voluntarily detailed his crimes and motives in a jailhouse manifesto after the shootings.*

Consistent with his earlier actions, soon after his arrest Defendant set about expounding on and clarifying his initial manifesto, voluntarily setting forth his views in a notebook that was eventually seized from his jail cell. Again, Defendant demonstrates urgency in communicating his message, stating "I would like to finish writing my opinions. I was unable to finish before because I was in a hurry to get to Charleston. I would also like to make some clarifications." The jailhouse manifesto then tracks an identical format as the first manifesto, with many of the same subheadings and directly expressing his intent that this document be a continuation of the first manifesto - "I feel like I stated my opinions [on this subject] in the text I put on my website, but I can't remember so I will put it here anyways." He blithely addressed how he continued to believe his attack was "worth it," that he was "not sorry."

What is evident from Defendant's messages – apart from their content showing a lack of remorse, a call to action for white supremacists, a continued elaboration on his racial ideology, and some clarifications from the media accounts – is the devotion, commitment, and urgency Defendant placed on communicating his message. He committed horrific crimes in part to draw attention to his message, and put forth considerable efforts to ensure his message was

communicated. It is no surprise, then, that he willingly volunteered this same information to FBI agents subsequent to his arrest.

**B.      Defendant's Arrest and Voluntary Statement to the FBI**

After Defendant committed his crimes he took a circuitous route from Charleston to Shelby, North Carolina, where he was ultimately arrested around 10:40 am the morning after his attack. That morning, Defendant was recognized by another driver near Shelby, and the other driver contacted the police.  Shelby Police Department (SPD) officers then located defendant's car, and recognized it as similar to what Defendant drove to and from the shootings.   Once defendant's car was recognized, SPD officers coordinated the stop of Defendant's car between several officers. Officers activated their blue lights to pull Defendant over, and he quickly complied, pulling his car just off the road. The dash cam video from two patrol cars (DE 266, Exhibits 1, 2) captured what happened from the time Defendant was pulled over to the time he left the area, when he was transported to the police department.

When Defendant's car pulled over two officers approached. Officer Bernat approached Defendant on the driver's side, and Officer Burris approached the passenger side. Three other officers stood at the back of Defendant's car. When Officer Bernat arrived at the driver's side of the car, he asked Defendant his name, and Defendant said he was Dylann Roof.  This confirmed for Officer Bernat that Defendant had committed the shootings in Charleston, so he had Defendant get out of the car and conducted a cursory, initial frisk of Defendant just outside Defendant's driver's side door. Officer Bernat then placed Defendant in handcuffs behind his back. Defendant was moved to the back of the car, where Sgt. Mike Myers asked if defendant had anything on him, and Defendant said he did. Sgt. Myers checked Defendant's pockets and located an ID, which he retrieved. At the same time, Sgt. Myers asked Defendant where he was

coming from, and Defendant said Charleston. Sgt. Myers asked Defendant if he was involved in the incident down there, and Defendant said he was.

Officers then moved Defendant to a nearby patrol car so he could be transported to the police department. In order to place Defendant in the back of the patrol car Officers Myers and Burris frisked Defendant more thoroughly. As seen in DE 266, Exhibit 2 (starting at 2:53), although this second frisk was more thorough than the initial pat down at the side of Defendant's car, it was not aggressive and no more so then necessary to ensure Defendant did not possess anything he could take into the patrol car. Defendant also was asked if there were any weapons in his vehicle, and Defendant told officers that there was a gun on the back seat, under a pillow. Sgt. Myers asked, to be clear, asked, "a gun?" Roof responded, "the gun." Officers then located the gun where Defendant described it, though they did not retrieve it at that time.

After the second pat down, Defendant was placed in the back of Sgt. Myers' patrol car and transported to the police department, where he was placed in an interview room. Det. Matt Styres waited with Defendant in the interview room for approximately three hours (apart from a ten minute break where another officer arrived) until FBI agents arrived. The below chart summarizes the activity that occurred in the interview room, as depicted in DE 266, Exhibit 3:

| Approximate Time | Description of Event |
|---|---|
| 10:58:29 | Defendant enters the room; three other individuals are in room with Defendant. Defendant enters with his legs shackled and his hands cuffed behind his back. Defendant's legs are shackled soon after he enters the room. |
| 10:59:20 | Defendant is given bottled water. Defendant's handcuffs are removed, his hands are moved to the front of his body, and the cuffs are reapplied there. |
| 10:59:45 | Defendant is asked if he is hungry and if he wants a burger. Defendant indicates that he was a little hungry and would like a burger. |
| 11:00:00 | Two individuals leave room, so only Defendant and Det. Styres remain in room. |

| 11:13:11 | Food is brought into room for Defendant and Defendant calmly eats. |
| 11:24:58 | Det. Styres asks if sandwich was good and Defendant responds it was ok. |
| 11:53:03 | Det. Styres has lunch dropped off to him, and Det. Styres eats. |
| 11:59:12 | Det. Styres talks briefly to Defendant about whether he needs anything and tells Defendant to let him know. Defendant responds that he could use a shower. |
| 12:00:00 | Another officer comes in, replacing Det. Styres. |
| 12:07:58 | Det. Styres returns. |
| 13:38:10 | FBI Special Agents (SA) Stansbury and Januchowski enter, Det. Styres leaves. Lunch wrappers are cleared off table. Defendant is given two bottles of water. Defendant has handcuffs removed completely. Januchowski and Stansbury begin interview. |
| 13:36:40 | FBI SA Stansbury and Januchowski advise the Defendant of his rights, orally and in writing. The Defendant initials each right to indicate he understands, reads the written waiver out loud before agreeing to speak and signing the form. |
| 15:39:40 | Interview is complete; handcuffs are reapplied to Defendant, Defendant and SA's leave room. |

A review of the interview room video shows that Defendant was treated well by everyone he came into contact with, was provided food and water, and was given an opportunity to use the bathroom. When FBI Agents Stansbury and Januchowski began talking to Defendant, they thoroughly reviewed his rights with him, and had him read and sign a waiver of his rights. Exhibit 1. During the interview, SA's Stansbury and Januchowski were polite, thorough and clear with Defendant. A review of the video-recorded interview and transcript provided as Exhibits 3 and 4 to DE 266 shows that Defendant willingly provided a statement, and did not hesitate to expound on the same message he had communicated earlier, both online and in a notebook, and that he would later return to in the jailhouse manifesto. The video demonstrates that throughout the interview the defendant was responsive, detailed and cooperative with SA's Stansbury and Januchowski, and there was no coercive police conduct that led to Defendant's *Miranda* waiver or statement.

6

### C.     Search of Roof's Car and 10428 Garners Ferry Rd.

Once Defendant was transported to the Shelby Police Department, his car was moved to the police station. Though not necessary given the applicability of exceptions to the warrant requirement, an abundance of caution in this high-profile matter led state law enforcement to obtain car search warrants in both North Carolina (Exhibit 2) and in South Carolina (DE 266, Exhibits 5, 6). The South Carolina warrant was signed on June 18, 2015, by Circuit Court Judge R. Hood. The warrant authorized the search of Defendant's car for "[a]ny and all evidence to include, but not limited to, latent prints, hairs, DNA, fibers, fluids, blood, or other biological evidence; weapons, weapon components, ammunition, projectiles; and/or any photographs, cellular devices, contraband, narcotics, U.S. currency, and/or documents, clothing, and articles of identification that could aid in the criminal investigation of <u>Murder</u>." DE 266, Exhibit 5. The warrant and relevant affidavit set forth facts that established Defendant had committed the shootings at Mother Emanuel, that he had driven the subject car to and from the shootings, and that Defendant had been driving the car when arrested by Shelby police. The affidavit set forth Defendant's racist motivations, that he "drove a car with a confederate tag that says 'South will rise again', ROOF visited Charleston a lot and always talked about segregation and another Civil War," and the affidavit set forth the fact that Defendant owned a gun. *Id.*

When investigators conducted the search of Defendant's car, they found extensive evidence of Defendant's involvement in the shootings at Mother Emanuel. DE 266, Exhibit 6 (search warrant return). Notable evidence included a Glock handgun and paperwork relating to the gun's purchase, ammunition, empty ammunition boxes, handwritten notes to family, a journal, clothing later identified to the shooting, flash drives, a Garmin GPS, handwritten notes including lists of predominantly African-American churches, a cell phone, a computer, brochures

from destinations in the Charleston area, packaging for Glock magazines consistent with magazines located at Mother Emanuel, packaging for a tactical belt consistent with a tactical belt located at Mother Emanuel, and a laser mount for a handgun. *See* DE 266, Exhibit 6. Agents did not collect everything from the car, however, leaving items such as a suitcase, which were deemed not related to the investigation.

In addition to Defendant's car, investigators conducted searches at 10428 Garners Ferry Rd., Eastover, SC, and 1020 Cedar St., Columbia, SC. The Garners Ferry address was where Defendant's mother, Amy Roof, and her boyfriend, Danny Beard, lived. Danny Beard owned the home, and Defendant stayed there regularly, though he had not been staying there in the days prior to the search. The Cedar St. address was where Defendant's father, Ben Roof, lived. Defendant stayed there on occasion.

The residents of both locations consented to their homes being searched. Exhibit 3, 4. During the consent searches of both locations, extensive evidence of Defendant's motive was collected, including evidence located on several media devices. *See* DE 266, Exhibit 8. For instance, at the Garners Ferry residence a Kodak camera was recovered, which contained photographs of Defendant in a bedroom with a handgun, confederate flag and with a computer and flash drives sitting on the bed, and on a dresser in the background. Photographs were taken during the consent searches, and an examination of these photographs also showed electronic items in the home, such as computers. However, since the items providing this information were largely collected during the consent searches, investigators did not know that such items might be located at the homes. Likewise, the fact that Defendant was communicating his motives electronically, on websites such as www.lastrhodesian.com, was not known at the time of the consent searches. Accordingly, once investigators reviewed the items collected from the consent

searches, and understood Defendant was posting motive evidence online, they sought a search warrant to seize items from 10428 Garners Ferry that they had not realized were relevant earlier.

Investigators explained all of this in an affidavit supporting a federal search warrant, DE 266, Exhibit 7. The affidavit explained that the Kodak camera contained photographs of electronic items that not been located, or had been located and not seized, during the consent search. DE 266, Exhibit 7, ¶ 17. The affidavit explained that the defendant used a computer to post his motives for his crimes; that he shared devices with others, like his mother who lived at the residence; that USB drives were depicted in the photos, near a computer resembling the one found in Defendant's car; and that electronic items depicted in photographs taken during the consent search had not been seized. The affidavit contained photographs obtained from the Kodak camera and the consent search, showing the specific items that the government sought. DE 266, Exhibit 7.

Once the search warrant was obtained, investigators seized several items, including electronic items, from 10428 Garners Ferry. *See* DE 266, Ex. 8. A separate federal search warrant was obtained to search the contents of the seized electronic items, as well as for other electronic items that had been seized in the case. Exhibit 5.

## II.     Roof's Confession and Items Seized Should not be Suppressed

### A.   Roof's *Mirandized* and Recorded Confession Was Obtained Voluntarily, Knowingly, and Intelligently

Prior to questioning the FBI agents properly provided *Miranda* warnings to Roof, including explaining those rights and having Roof execute a written waiver. During this process, government agents did not engage in misconduct resulting in any improper government coercion that would invalidate the knowing and intelligent waiver and subsequent confession.

A confession is admissible where the defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights and gave statements. *United States v. Cardwell*, 433 F.3d 378, 389-90 n.4 (4th Cir. 2005) (waiver valid based on totality of circumstances, despite defendant being handcuffed in patrol car for hours, because defendant was fully informed of his *Miranda* rights, indicated understanding of those rights, and willingly answered questions).

Whether the waiver and statements were "voluntary" first requires determining whether "coercive governmental misconduct" occurred. *Colorado v. Connelly*, 479 U.S. 157, 170 (1986) (voluntariness "has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word"); *see also United States v. Cristobal*, 293 F.3d 134, 140-41 (4th Cir. 2002) ("coercive police activity is ... a necessary predicate to a finding that a waiver of *Miranda* rights is not voluntary"). Only if such improper governmental coercion occurred does the Court determine whether this coercion overbore the will of the defendant or critically impaired the defendant's capacity for self-determination. *Connelly*, 479 U.S. at 169-71; *Cristobal*, 293 F.3d at 141.[2] Thus, without coercive police misconduct, a confession will be deemed voluntary regardless of the psychological or mental characteristics of the defendant. *See Connelly*, 479 U.S. at 170-71 (confession voluntary despite defendant's mental psychosis that interfered with his "free will" because no coercion);[3] *United States v. Holmes*, 670 F.3d 586, 592

---

[2] The standard for voluntariness of a waiver is the same as the standard for voluntariness of a confession. *Colorado v. Connelly*, 479 U.S. 157, 169-70 (1986).

[3] In *Connelly*, the defendant, who informed officers of his stays in mental health hospitals and was subsequently diagnosed as mentally ill, approached a police officer and confessed to a murder. *Id.* at 160. The Court held that, despite testimony that the defendant's mental illness interfered with his "free will," the confession was voluntary because there was no evidence of improper coercion on the part of the police officer. *Id.* at 167. The Court noted that "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Id.* at 164. *See also Moran v. Burbine*, 475 U.S. 412, 421 (1986) (finding waiver "voluntary" where "the record is devoid of any suggestion that police resorted to physical or psychological pressure"); *Oregon v. Elstad*, 470 U.S. 298, 304-05, 310 (1985) (The Fifth Amendment is not "concerned with moral and psychological pressures to confess emanating from sources other than

(4th Cir. 2012) (even a "diminished mental state" does not render a confession involuntary absent coercive police activity that took advantage of incapacitation).[4] Absent threats, injury, promises, or imposed fear, a defendant cannot show coercion. *Berghuis v. Thompkins*, 560 U.S. 370, 386-87 (2010); *see United States v. Abu Ali*, 528 F.3d 210, 233-34 (4th Cir. 2008) (finding a confession voluntary when defendant who made confession in Saudi Arabia to Saudi officials was not tortured or threatened). Where, as here, there was no improper coercion through threats, physical injury, or imposition of fear by law enforcement, a waiver and subsequent statements are voluntary regardless of any other circumstances. *Connelly*, 479 U.S. at 169-71; *Holmes*, 670 F.3d at 592; *Cristobal*, 293 F.3d at 141.[5]

In addition to being made "voluntarily," the waiver must be made knowingly and intelligently, that is, with an awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Given the signed waiver form (Exhibit 1) and the discussion with agents about his rights (DE 266 Exhibit 3 (starting around 13.38)), it is apparent that Roof acted knowingly and intelligently. *See id.*; *Cristobal*, 293 F.3d at 140, 142. As the Supreme Court has explained, where a defendant is provided written and verbal warnings, "it follows that he knew what he gave up when he spoke."

---

official coercion.").

[4] A specific defendant's psychological problems are not relevant in determining whether a confession was involuntary in the absence of any official coercion. *See, e.g.*, *United States v. Hughes*, 640 F.3d 428, 439 (1st Cir. 2011) (confession voluntary despite defendant's vulnerability to panic attacks because no evidence that troopers attempted to exploit defendant's vulnerability); *Murphy v. Ohio*, 551 F.3d 485, 510, 514 (6th Cir. 2009) (confession voluntary despite defendant's "severe psychological problems and certain mental deficiencies" because no police coercion); *United States v. Lawal*, 231 F.3d 1045, 1048-49 (7th Cir. 2000) (confession voluntary despite defendant's paranoia because no evidence of police coercion).

[5] Even if some intimidation, coercion, or deception was found to have been used, nothing came close to overbearing the will of the defendant or critically impairing the defendant's capacity for self-determination. *Connelly*, 479 U.S. at 169-71; *Cristobal*, 293 F.3d at 140.

*Berghuis*, 560 U.S. at 385 (finding a defendant understood his rights when he received a written copy, could read and understand English, was given time to read the warnings, and was read the warnings aloud); *United States v. Robinson*, 404 F.3d 850, 860-61 (4th Cir. 2005) (finding juvenile with an IQ of 70 knowingly and intelligently waivered his *Miranda* rights because he "indicated that he understood his rights as they were recited"). [6]

### 1. *Defendant's claims of involuntariness fail.*

Despite all of this, Roof's counsel claims that the statements and waiver were not voluntary because of the "coercive tactics" used by law enforcement in light of Defendant's unspecified mental condition. While acknowledging the necessity of coercive police conduct, Defendant fails – beyond mere conclusory statements – to point to police actions that were actually coercive leading to Defendant's statement. Defendant's basis for claiming coercive police conduct relies only upon the claims that (a) at arrest he was he was surrounded by five larger officers, (b) that he was ordered out of his car and frisked twice (once "aggressively"), (c) that officers "celebrated" after Defendant was placed in the patrol car; (d) that officers came in and out of the interview room without providing information; and (e) agents used long, leading questions. Motion at 4-5.

---

[6] Despite demanding that the strictures of Rule 12.2 be followed to the letter in other contexts (*e.g.*, the use of firewall counsel), the Defendant seeks to use Rule 12.2's narrow protection for the "result and reports" that may be introduced only at sentencing as an overbroad shield to permit the non-disclosure of any mental health information relevant to his motion to suppress his confession at this time. Rule 12.2, by its letter, only protects the disclosure of mental health information that may be presented *only* at the sentencing phase. *See* Rule 12.2(b)(2), 12.2(c)(2), 12.2(c)(3). If the Defendant intends to introduce mental health evidence for purposes beyond sentencing, such as the voluntariness or knowingness of Defendant's statements, then that information must be timely disclosed in accord with the deadlines proposed by the defendant in his effort to have this case tried starting on November 7, 2016. Even were such a disclosure to provide indirect insight into what may be a part of the Rule 12.2 sentencing disclosure, nothing in Rule 12.2 permits the defendant to withhold that information in this context. Having demanded the precise letter of Rule 12.2 in other contexts, this Court should accordingly limit the protection of Rule 12.2 to its precise letter.

Accordingly, the government requests that this Court reject the defendant's request to preserve this issue absent disclosure of the mental health information.

Not only do Defendant's arguments fail to accurately reflect the police conduct depicted in their own exhibits, all of the actions taken by officers were more than reasonable given the situation. After pulling over an individual suspected of committing a mass murder, several officers approached Defendant's vehicle to ensure officer safety. As soon as they realized that Defendant did not appear to pose a threat, they holstered their weapons, and only one officer initially dealt with Defendant. Contrary to his assertions, the video clearly shows that Defendant was not surrounded - three officers stood at the back of defendant's car, casually observing Defendant while he spoke with one officer. The remaining officer was on the other side of Defendant's car.

The arrest video also belies Defendant's claim that the second frisk search was aggressive. Defendant was going to be placed in the back of a patrol car after he admitted to committing the church shooting, and after a gun was located in his car concealed on the back seat. In these circumstances, the limited pat down search that is reflected in the arrest video was a standard and reasonable arrest procedure.

Defendant also complains that officers "celebrated" after his arrest. While officers mildly expressed their excitement over the arrest of the Defendant, *see* DE266, Exhibit 1 (around 4:22); DE 266, Exhibit 2 (around 4:35), it is not clear how the officer's actions were in any respect coercive, much less that they forced Roof to subsequently waive his *Miranda* rights or to give a statement (assuming that Roof even saw these actions). Nothing about this interaction could be considered unduly coercive. Even if the officers' actions could in any way be considered aggressive, the actions were isolated, and Defendant exhibited a calm demeanor with the investigators he later dealt with after being moved to the police station, demonstrating that the arresting officers' conduct was not linked to Defendant's statement or *Miranda* waiver. *See*

*United States v. Blake*, 571 F.3d 331, 342 (4th Cir. 2009) (prospect of coercion from taunting or aggressive tone by detective greatly minimized by calm demeanor of defendant and isolated nature of taunting remark); *United States v. Elie*, 111 F.3d 1135, 1144 (4th Cir. 1997) (finding that moving defendant to a location apart from the location of the complained of conduct was a factor in whether statement was involuntary).

There also was nothing coercive about the setting of the interview or the details of the interrogation. Defendant was not handcuffed during the interview, was provided food and water, was given an opportunity to use the bathroom, and was given every opportunity to explain his answers. Defendant claims coercion simply because he was under the watch of an armed guard and the officers entering the room did not provide him with unspecified information. A review of the video for the time preceding Defendant's interview shows that individuals entered the room to speak with Det. Styer or to give him a short break. It shows that Det. Styer checked on Defendant to see if he needed anything. And it reveals that Det. Styer, though armed, was in plain clothes, seated and largely worked from his phone while with Defendant. This is far from Defendant's claim that the mere existence of an armed guard led to his will being overborne.

Defendant also mentions that investigators used long, leading questions, though it is not clear why he believes this was coercive. A review of the video shows that the agents were cordial, polite and clear with Defendant. Moreover, the video confession actually shows the agents initially asking "what happened last night" at approximately 13:44 pm, to which Roof explained, "I went to that church in Charleston and uh, you, I, I did it. … I killed them, I guess."[7]

---

[7] The substance of the interview began as follows (DE 266, Exhibit 4 at page 5):

MS (Stansbury):        … can you tell us about what happened last night?

DR (Roof):        Umm, yeah, I mean, I just, I went to that church in Charleston and uh, you, I, I did it

The subsequent questioning, however characterized, was an effort to provide clarification, not to intimidate or coerce.

The defendant fails to show any improper coercive police conduct and, thus, Defendant's argument that his statement was involuntary fails. Even if the Court thought that the conduct at issue was somehow improperly coercive, the defendant failed to show his will was overborne by the police actions based on the totality of the circumstances. *Dickerson v. United States*, 530 U.S.

---

| MS: | Did what? |
|---|---|
| DR: | (laughs) |
| MS: | I mean, you got to. I know it's tough sometimes to uh, to say it |
| DR: | It's not that I don't want to say it because I don't want to make myself seem guilty, I just don't really like saying it |
| MS: | I know, sometimes we have to face those things, the realities, you know |
| CJ (Januchowski): | We don't what to put any words in your mouth |
| DR: | Right |
| CJ: | That's why Agent Stansbury just, is asking you what exactly it is that, that you did do |
| DR: | Well, I did, I killed them, I guess, I mean I don't really know |
| MS: | Well, well, what, what |
| DR: | I mean, I don't know how many people or anything like that |
| MS: | So did you shoot them? |
| DR: | Yes |
| MS: | What kind of gun did you use? |
| DR: | (laughs) A Glock .45 |
| MS: | Okay, okay was that your gun or |
| DR: | Yes, I bought it from the gun store |

428, 434 (2000); *Arizona v. Fulminante*, 499 U.S. 279, 285-89 (1991); *Rogers v. Richmond*, 365 U.S. 534, 544 (1961).

To the extent relevant given the lack of coercive police action, the defendant's personal characteristics do not support his claim. While the defendant dropped out of high school, he did obtain his GED. A review of the video-taped confession demonstrates that he did not appear to be under the influence of any drugs or alcohol, and he was able to carry on a conversation with the interviewing agents that included responsive answers, an understanding of his circumstances, and an ability to recall and relate detail. Defendant was able to recount his activities at the time of his offense and details about how he committed the crimes, and was able to diagram the room in Mother Emanuel where he committed the shootings. Although Defendant argues he "nodded off" prior to the interview, the video does not support this claim as Defendant only appears to be looking down at his hands at the moment when his counsel now claims Defendant "nodded off." Defendant was also twenty-one years old at the time of the interview and presented himself as mature and intelligent. Although Defendant alleges there are possible mental health issues that constitute part of his personal characteristics, he fails to provide support for this allegation (which could only possibly be relevant if coercive police conduct existed).

    2.  *Defendant's claims of unknowing and unintelligent waiver fail.*

While attempting to reserve any development of the argument, the defendant also claims his waiver was not "knowing and intelligent" in light of the defendant's unspecified mental condition. Such a claim fails because Roof was provided both verbal and written warnings, indicated he understood those rights, and affirmatively waived them in writing. Nothing more is required. *See Berghuis*, 560 U.S. at 385; *Robinson*, 404 F.3d at 860-61.

**B.    Items Seized During Searches Should not be Suppressed**

Defendant argues that two seizures were improper – one from Defendant's car and another from the residence at 10428 Garners Ferry Rd. [8]

*1.  Items seized from Roof's car should not be suppressed.*

Defendant argues that items seized from his car were outside the scope of the search warrant authorizing the search. Specifically, Defendant argues electronic devices, such as flash drives, a laptop computer, a GPS device, and DVD's/CD's were not contemplated by the warrant. Motion, DE 266, at 8. First, the scope of the warrant itself encompasses the seizure of the items as evidence that could aid in the investigation of murder. However, even if the Court rejected the common-sense reading of the warrant, the seizure of the items from the vehicle is also justified under the automobile, search incident to arrest, and the plain view exceptions to the warrant requirement.

The last clause of the Fourth Amendment contains a "particularity requirement," which "is fulfilled when the warrant identifies the items to be seized by their relation to designated crimes and when the description of the items leaves nothing to the discretion of the officer

---

[8] Of course, a "judicial officer's determination of probable cause generally is accorded 'great deference' by reviewing courts." *United States v. Henry*, 673 F.3d 285, 289-90 (4th Cir. 2012) (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)). In granting such deference to the magistrate's decision, the reviewing court should uphold the warrant if "there was a 'substantial basis for determining the existence of probable cause.'" *United States v. Montieth*, 662 F.3d 660, 664 (4th Cir. 2011) (quoting *Gates*, 462 U.S. at 239). "[T]he task of a reviewing court is not to conduct a de novo determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant." *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984).

Even if a reviewing court determines that a warrant was unsupported by probable cause, the court should not suppress the fruits of the search unless law enforcement operated in bad faith; that is "unless a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Perez*, 393 F.3d 457, 460-61 (4th Cir. 2004) (citation omitted). In other words, evidence recovered under an invalidated search warrant should not be suppressed unless the officers' reliance on the warrant was "objectively unreasonable." *Id.* at 461 (quoting *United States v. Leon*, 468 U.S. 897, 922 (1984)). "Usually, searches conducted pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." *Id.*

17

executing the warrant." *United States v. Dargan*, 738 F.3d 643, 647 (4th Cir. 2013). As the Fourth Circuit has explained, however, the particularity requirement is not intended to impose a "constitutional straight jacket" on officers, requiring courts to "refrain from interpreting warrant terms in a hypertechnical manner, and should instead employ a commonsense and realistic approach." *Id.* (citations and quotation marks omitted).

A warrant authorizing the seizure of evidence associated with a particular type of crime satisfies this requirement. In *United States v. Dickerson*, 166 F.3d 667, 693 (4th Cir. 1999), *reversed in other part*, 530 U.S. 428 (2000), the Court found a warrant authorizing search for evidence relating to "bank robbery" sufficiently particular because it involved "specific illegal activity" that "generates quite distinctive evidence." *See also Andresen v. Maryland.*, 427 U.S. 463, 479-82 (1976) (warrant authorizing seizure of "fruits, instrumentalities and evidence of crime at this [time] unknown" sufficiently particular because, when read in context, warrant authorized only seizure of evidence relevant to the particular crime). "The test for the necessary particularity of a search warrant is 'a pragmatic one: The degree of specificity required when describing the goods to be seized may necessarily vary according to the circumstances and type of items involved.'" *Dickerson*, 166 F.3d at 693 (citing *United States v. Torch*, 609 F.2d 1088, 1090 (4th Cir. 1979)).

Here, the warrant set forth that it covered any and all evidence that could aid in the criminal investigation of murder, while encompassing a list of examples (identified as "including but not limited to"). *See United States v. Pindell*, 336 F.3d 1049, 1053-54 (D.C. Cir. 2003) (warrant authorizing seizure of "any other evidence of a violation of Title 18 U.S.C. § 242" sufficiently particular because preceding list of specific items limited meaning of phrase). This general description – evidence that could aid in the criminal investigation of murder – along with

specific examples such as biological evidence, weapons, documents, photographs, identification, provides more specificity than the description "evidence of the crime of bank robbery" found adequate in *Dickerson*. The inclusion of examples helps explain the appropriate type of specificity without straight jacketing agents that did not know in advance what evidence would be found. For example, the affidavit sets forth that the defendant drove the seized car to Mother Emanuel, though he was from the Columbia area, and that Defendant was located in the car at the time of his arrest. This makes evidence such as a GPS relevant. Along with the GPS, other seized items, such as the flash drives and DVD/CD's, had a variety of potential relevance (including identity, motive, planning, etc), justifying their seizure. Moreover, out of an abundance of caution, the Government obtained a subsequent warrant to search the contents of the GPS and other electronic items. Because it is hard for investigators to anticipate exactly what evidence of a crime to expect in a given instance (for instance, a laptop computer or flash drives in a car) a warrant limiting agents to a search for evidence related to particular crime, such as was the case here, is appropriate, and the law allows for it. *See United States v. Fawole*, 785 F.2d 1141, 1144 (4th Cir. 1986); *United States v. Ladd*, 704 F.2d 134 (4th Cir. 1983). Here, investigators seized only items related to Defendant's criminal activity, so the warrant was adequate with regards to the particularity required.[9]

Setting aside Defendant's issues with the search warrant executed on his car, the search and resulting seizures were permissible under exceptions to the warrant requirement and, therefore, may not be suppressed. First, the car was properly searched and items seized under the motor vehicle exception to the warrant requirement. Agents had probable cause based on Roof's

---

[9] Additionally, the evidence should not be suppressed based on the officers' objectively reasonable, and good faith, belief that the items seized were within the scope of the warrant (*i.e.*, all evidence that could aid in the criminal investigation of murder). *See United States v. Patterson*, 278 F.3d 315, 317-18 (4th Cir. 2004) (citing *Maryland v. Garrison*, 480 U.S. 79 (1987)).

identification as matching the photograph of the Charleston shooter not to mention Roof's confirmation that he was involved in the shooting in Charleston and that there was a gun in the car.[10] As police had probable cause to search the vehicle and containers in it, the search and seizure of items from it was permissible. *California v. Acevedo*, 500 U.S. 565, 580 (1991); *see also United States v. Kelly*, 592 F.3d 586, 590, 592 (4th Cir. 2010); *United States v. Patterson*, 150 F.3d 382, 387 (4th Cir. 1998); *United States v. Gastiaburo*, 16 F.3d 582, 586-87 (4th Cir. 1994).[11]

Moreover, the seizure of various items was permissible under the plain view doctrine. *See Texas v. Brown*, 460 U.S. 730, 742 (1983); *Horton v. California*, 496 U.S. 128, 136–37 (1990); *United States v. Green*, 599 F.3d 360 (4th Cir. 2010). First, agents had the right to be in the vehicle pursuant to the warrant, the automobile exception, and the search incident to arrest doctrine. Second, based on the information known to officers at the time of the search, *see United States v. Wells*, 98 F.3d 808, 810 (4th Cir. 1996) (discussing collective knowledge doctrine), probable cause existed to associate the property with criminal activity, *see United States v. Green*, 599 F.3d 360 (4th Cir. 2010); *United States v. Waldrop*, 404 F.3d 365, 369 (5th Cir. 2005) ("The incriminating nature of an item is 'immediately apparent' if the officers have 'probable cause' to believe that the item is either evidence of a crime or contraband.").

---

[10] While that information alone is more than sufficient to establish probable cause, the Court may look at the collective knowledge doctrine to determine at the time of the search whether probable cause existed to search the car and seize certain items. The car was properly seized and impounded incident to Roof's arrest. Thus, at the time of its search, law enforcement had already obtained the confession of Roof detailing not only his involvement but his extensive planning and preparation for the event.

[11] Additionally, the search was permissible as incident to Roof's arrest, *see Arizona v. Gant*, 129 S. Ct. 1710, 1714 (2009) (holding that a search incident to arrest would be appropriate when "reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle"); *Chambers v. Maroney*, 399 U.S. 42, 52 n.10 (1970).

### 2. *Items seized from 10428 Garners Ferry Rd should not be suppressed.*

Defendant argues that the search warrant for 10428 Garners Ferry Rd. did not contain reason to believe that additional electronic items would be located at the residence. Defendant states that the affidavit should have said why law enforcement expected to find additional evidence there. The affidavit did explain this. The affidavit stated that a camera recovered from the initial consent search had photographs of the defendant on it, and the photographs showed electronic items in the residence that were not obtained during the consent search. DE 266, Exhibit 7, affidavit ¶ 17. The affidavit also set forth that the defendant used a computer to post his motives for his crimes, *id.*, that defendant shared devices with his mother who lived at the residence, *id.*, ¶ 13, that USB drives were depicted in the photos and lying on a bed next to a computer resembling the one found in Defendant's car, *id.*, ¶ 15, and that electronic items were depicted in photographs taken during the consent search but were not seized during the consent search, *id.*, ¶ 17. The affidavit contained photographs of the items that the government sought, as depicted in the photographs on Defendant's camera as well as in photographs taken during the consent search. *Id.* Finally, the affidavit stated that Defendant used electronic devices, such as his father's computer to store, load and post his racist motives, as he did on lastrhodesian.com, *id.* ¶ 22, to document his motives, like the photos located on the Kodak camera, and that he used electronic devices to communicate with others, *id.*, ¶ 19. Defendant argues that the existence of additional electronic media in the home does not automatically mean that additional evidence of crime would be contained on it. But Defendant's history of using electronic devices to document and communicate his motive certainly provides probable cause to believe that evidence may be located on the electronic items seized.[12]

---

[12] Additionally, even if the court disagreed under the appropriate deferential review, the evidence should not be suppressed because the officers acted in good faith and their reliance on the warrant was

Defendant alleges that Attachment B to the 10428 Garners Ferry Rd. search warrant is "boilerplate". Motion, DE 266, at 10. However, a review of Attachment B shows that it was tailored to the affidavit – listing "[b]lack desktop computers" as opposed to all computers; listing gaming systems or consoles, as opposed to all electronic communication devices; listing items only relevant to defendant's racial motivation, as opposed to all items that might be relevant to his crimes; and listing evidence relative to racist websites like lastrhodesian.com, and not all website related evidence. Defendant cites to *United States v. Weber*, 923 F.2d 1338, 1344 (9th Cir. 1990) as a case where boilerplate allegations were rejected. In *Weber*, the Court considered an individual who had ordered child pornography to be delivered to his home two years prior to the search, and had ordered materials that were to be delivered just prior to the search warrant execution. The Court first found that the description of materials to be seized was sufficiently particularized before determining that the affidavit simply did not provide probable cause. *Id.* at 1344-45. The Court contrasted *United States v. Rabe*, 848 F.2d 994, 995 (9th Cir. 1988), where the facts were similar to *Weber*, but where there was concrete evidence of illegal materials in defendant's home shortly before the warrant was executed, there was expert testimony that defendant was a pedophile, and there was enough information to determine that the defendant was a pedophile. *Id.* In short, *Weber* addressed whether an *affidavit* showed probable cause based on reasonable inferences of whether the sought items were actually in the house. In this case, abundant evidence was presented to establish that Defendant used electronic devices to store and communicate his racist motives and that he possessed electronic devices, such as computers and USB drives, in the premises to be searched. Because the affidavit provided sufficient probable cause, the items seized from 10428 Garners Ferry Rd. should not be suppressed.[13]

---

objectively reasonable. *See*, *supra*, n. 8.

    [13] With respect to the claim regarding the breadth of the media searches, Defendant

## CONCLUSION

Defendant's statement should be admitted because he was fully informed of his rights, waived them, and chose to speak with investigators out of his own free will, and not as the result of any coercive police conduct. The evidence obtained from the two search warrants Defendant seeks to suppress should also be admitted, since the warrants provided legally sufficient particularity and probable cause.

Respectfully submitted,

BETH DRAKE
ACTING UNITED STATES ATTORNEY

BY:   s/Nathan Williams
      JULIUS N. RICHARDSON (ID #9823)
      NATHAN WILLIAMS (ID #10400)
      Assistant United States Attorney
      1441 Main Street, Suite 500
      Columbia, SC 29201
      (803) 929-3000

August 10, 2016

---

acknowledges, and the government agrees, that binding Fourth Circuit caselaw forecloses any claim that the scope of the electronic media searches was unreasonably overbroad. Moreover, in this particular case the scope of the government's search was reasonable given the defendant's substantial use of electronic media, including photographs, creating electronic texts, internet searches, to plan this crime and promote his ideology to the world.