IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CASE NO.: 2:15-CR-472 |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| DYLAN STORM ROOF | ) | |

**DEFENDANT'S MEMORANDUM OF LAW RESPECTING
SCREENING OF PROSPECTIVE JURORS
<u>REGARDING DEATH-PENALTY VIEWS</u>**

The defendant respectfully files this Memorandum of Law on issues that are likely to arise as prospective jurors are questioned – both in writing beginning on September 26, and on voir dire examination starting on November 7 – regarding their ability to give meaningful consideration to any sentence less than death in this case. The defense has proposed that the Case-Specific Jury Questionnaire include questions to uncover juror bias in favor of the death penalty, *see* Joint Proposed Case Specific Questionnaire, Questions 43, 46, and 49-52 (all color-coded in "red" indicating that the question is requested by the defense and objected to by the government), but the government has objected to almost all such questions, and the Court must therefore resolve the parties' disagreement over whether to include written questions designed to explore jurors' pro-death penalty attitudes, consistent with *Morgan v. Illinois,* 504 U.S. 719 (1993).

In *Morgan*, the Supreme Court held that any juror who would automatically impose the death penalty upon conviction of the charged capital offense must be

1

disqualified for cause, and that capital defendants are constitutionally entitled to examine prospective jurors with enough specificity to identify and challenge any juror holding such views. While objecting to the defendant's proposed questions designed to illuminate the jurors' views on the death penalty and life imprisonment without release, the government has proposed a series of questions that instead inquire simply whether the jurors can be fair and impartial in considering both penalties. The Court in *Morgan* recognized that, in a capital case, such questions standing alone are inadequate:

> As to general questions of fairness and impartiality, such jurors could in all truth and candor respond affirmatively, personally confident that such dogmatic views are fair and impartial, while leaving the specific concern unprobed. More importantly, however, the belief that death should be imposed *ipso facto* upon conviction of a capital offense reflects directly on that individual's inability to follow the law. . . . Any juror who would impose death regardless of the facts and circumstances of conviction cannot follow the dictates of law. See *Turner v. Murray*, 476 U.S., at 34-35-106 S. Ct., at 1687-1688 (plurality opinion). It may be that a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so. A defendant on trial for his life must be permitted on *voir dire* to ascertain whether his prospective jurors function under such misconception.

*Morgan*, 504 U.S. at 735.

This Due Process requirement that capital jurors be "life-qualified" parallels the converse proposition that the prosecution may challenge for cause those jurors whose *opposition* to the death penalty would prevent or substantially impair their ability to impose it regardless of the evidence presented at trial. *Uttecht v. Brown*, 551 U.S. 1 (2007). But despite the superficial symmetry between "death-qualifying" and "life-qualifying" prospective jurors, experience has shown that identifying those jurors who

would *always* impose the death penalty is far harder than identifying those who would *never* impose it.  This memorandum explains why this is so, and also why the Court should include in its Case-Specific Juror Questionnaire a short series of questions that are tailored to uncover possible disqualifying biases in favor of capital punishment for later exploration on voir dire.

To be sure, there will be occasional easy cases: "eye-for-an-eye" jurors who forthrightly declare that they would automatically impose the death penalty in every murder case, without regard to any mitigating evidence that might be adduced.  The defense proposed Question No. 46, which invites disclosure of categorical support for the death penalty based on religious doctrine, is designed to reveal such consciously rigid beliefs.  But both judicial experience and social science research have shown that jurors who hold such explicit "eye-for-an-eye" beliefs are only a small subset of the much larger group whose attitudes in favor of capital punishment would "substantially impair the performance of [their] duties as . . . juror[s] in accordance with [their] instructions and [their] oath." *Uttecht v. Brown, supra,* 551 U.S. at 7 (*quoting Wainwright v. Witt*, 469 U. S. 412, 424 (1985) (internal quotation marks omitted)).  This is so because "life-qualification" under *Morgan* requires that each juror have the capacity to weigh mitigating factors and to consider a sentence other than death *in the case to be tried*.  And that is where much potential for confusion lies.

The Supreme Court has long held that a mandatory death penalty scheme – one requiring a death sentence without allowing for consideration of reasons why  death

3

should not be imposed – violates the Eighth Amendment, no matter how egregious or narrowly-defined the capital crime. *Sumner v. Shuman,* 483 U.S. 66 (1987) ( invalidating mandatory death-sentencing statute applicable only to prison inmates who commit murder while serving life sentences). Even in the most highly aggravated murder cases, every constitutional death-sentencing scheme – including the Federal Death Penalty Act – requires each juror to weigh all relevant mitigating factors, and to fairly consider imposition of a sentence less than death.

In this case, the defendant is not charged with "murder," but with multiple counts of obstruction of religious exercise resulting in death (18 U.S.C. § 247(a)(2)), hate crimes resulting in death (18 U.S.C. § 249(a)(1)), and firearms violations resulting in death (18 U.S.C. § 924(j)). Upon conviction, therefore, he is entitled to twelve jurors who could consider imposing life imprisonment rather than the death penalty for *these kinds of capital crimes*. And that is the relevant question that *Morgan v. Illinois* entitles him to put to each prospective juror.[1]

Nor is that all. The statutory offenses alleged in the indictment are not, standing alone, capital crimes. Those statutory offenses do not become death-eligible unless and until the jury finds both intentionality and at least one statutory aggravating factor. For this reason, the mental state gateway factors and statutory

---

[1] The defense does not seek improper "stake-out" questions that jurors how they would vote in light of certain aggravating evidence. Rather, the defense seeks inquiry solely into whether, under relevant circumstances, jurors could consider both life imprisonment without release and the death penalty – which is exactly what is required of them in order to be qualified to serve. *See United States v. Fell*, 372 F. Supp. 2d at 771.

4

aggravating factors set forth in 18 U.S.C. §§ 3591(a)(2) and 3592(b) – factors that the government has charged here both by way of special findings in the indictment, Dkt. No. 2, ¶ 22(a)-(h), and in the Notice of Intent to Seek the Death Penalty, Dkt. 164 at 2-5 – are the "functional equivalent" of elements of a greater offense than "'murder' *simpliciter*." *Sattazahn v. Pennsylvania*, 537 U.S. 101, 112 (2003) (plurality opinion); *see also Ring v. Arizona*, 536 U.S. 584, 592-93 (2002) (holding that "[b]ecause Arizona's enumerated aggravating factors operate as "the functional equivalent of an element of a greater offense, [*Apprendi v. New Jersey*, 530 U.S. 466, 494, n. 19 (2000)], the Sixth Amendment requires that they be found by a jury").

This means that the capital crimes charged in this case include, for example, that the defendant:

1. intentionally killed the victims (18 U.S.C. § 3591(a)(2)(A));

2. committed the offenses after substantial planning and premeditation (18 U.S.C. § 3592(c)(9));

3. committed the offenses against at least three victims who were particularly vulnerable due to old age (18 U.S.C. § 3592(c)(11)); and

4. intentionally killed more than one person in a single criminal episode (18 U.S.C. § 3592(c)(16)).

Both the Federal Death Penalty Act and the jurors' oaths will require them to find these offenses and statutory intent and aggravating factors proved beyond a reasonable doubt before considering mitigating factors and weighing *both* possible punishments of death and life imprisonment. It will therefore be essential to frame "life-qualifying" questions to each prospective juror in terms of the capital crimes alleged by the government in

5

this case. *See United States v. Fulks*, 454 F.3d 410, 430 n.7 (4th Cir. 2006) (finding voir dire adequate when jurors were questioned about whether they would automatically vote for the death penalty upon conviction for, specifically, double murder).[2]

Failing to do so risks qualifying jurors whose ability to consider a life sentence in the case before them will be substantially impaired by their belief that the death penalty should be imposed in every case involving hate crimes, or obstruction of religion, or intentional killings, or premeditated killings, or killings of the elderly, or other specific types of statutorily death-eligible murders, without regard to mitigating factors. Abstract or general questions risk eliciting answers that obscure disqualifying bias rather than expose it. For example, an affirmative answer to the question, "Could you weigh all of the aggravating and mitigating evidence and return either a death sentence or a sentence of life imprisonment, depending on the evidence presented?" could mean easily that the juror could vote against the death penalty so long as:

1. the evidence did not conclusively establish guilt;
2. the killing was accidental or committed in sudden heat and passion;
3. the killing was not intentional;
4. the defendant was insane;

---

[2] In other capital cases, the government asks prospective jurors whether they would *refuse* to consider the death penalty for the particular kind of crime or defendant at hand – *e.g.*, a victim involved in drug crimes, a defendant who was the non-triggerman accomplice, or the hirer in a contract-killing case – and successfully challenges for cause jurors who say they could not. *See, e.g., United States v. Flores*, 63 F.3d 1342, 1356 (5th Cir. 1995); *Green v. Johnson*, 160 F.3d 1029, 1036-37 (5th Cir. 1998); *People v. Ervin*, 990 P.2d 506, 515 (Cal. 2000). If that is permissible, then surely a capital defendant is entitled to ask venire members whether they would consider a life sentence for the offense charged.

5. the defendant acted in self-defense or was otherwise provoked;
6. the victim was engaged in criminal conduct at the time of his or her death;
7. only a single victim was killed;
8. the victim was not especially vulnerable due to old age; or
9. the crime did not involve racial motivation.

This list could be extended indefinitely. *See* John Blume, Sheri Lynn Johnson, A. Bryan Threkhold, *Probing "Life Qualification" Through Expanded Voir Dire*, 29 HOFSTRA L. REV. 1209, 1244-45 (Summer 2001) (finding that jurors who say the appropriate punishment would "depend on the circumstances" are "thinking of 'circumstances' that would … make the crime not a murder at all, let alone a capital murder."). The point is simply that a "yes" response to such a question is virtually meaningless unless the juror first understands that the question presupposes the defendant's guilt of both the charged offenses and the statutory aggravating factors *that the government has actually alleged in the case to be tried.* Otherwise a seemingly qualifying response is likely to mean only that the juror might not favor the death penalty in cases where it is legally unavailable in any event, or in categories of cases far removed from the one about to be tried.

The government has submitted no questions for the Case-Specific Jury Questionnaire that address this important point, and objects to every defense-proposed question. The government has agreed to include the following three alternatives, among others, within Question 45:

  e.  I am in favor of the death penalty, but I could vote for or against the death penalty depending upon the facts and the law in the case.

  f.  I am in favor of the death penalty, and my views would make it very hard for me to vote for any other sentence.

  g.  I am in favor of the death penalty, and I would always vote to impose it, no matter what the facts or legal instruction.

But "qualifying" answers such as (e) – "I could vote for or against the death penalty depending upon the facts and the law in the case" – are ambiguous for exactly the reasons explained in the preceding paragraph, and so this question falls short of what is needed to ensure meaningful compliance with *Morgan.*

  The concern expressed here is more than theoretical. In fact, such juror confusion is a common and recurring problem. In a thorough discussion of the propriety of "case-specific" voir dire questions as part of the death- and life-qualification process in capital cases, in *United States v. Johnson*, 366 F.Supp.2d 822 (N.D. Iowa 2005), Judge Mark Bennett wrote about another case over which he presided, in which jurors claimed in response to a general "life-qualifying" question that they could be impartial, but admitted in later, more specific questioning, that they could not.

> [T]his court's own experience with jury selection in the . . . federal death-penalty case against Dustin Honken, *United States v. Honken*, No. CR 01–3047–MWB (N.D. Iowa) . . . suggests the insufficiency of purely "abstract" questions to determine the ability of jurors to perform their duties. In *Honken*, there were numerous examples of the phenomenon of jurors who agreed that they could "fairly consider" both life and death sentences in the abstract, but quickly acknowledged that they could only consider one penalty in a case involving certain facts. For example, in *Honken*, several potential jurors readily agreed that they could "fairly consider" both life and death sentences in the case if they found the defendant guilty.

8

> However, several of those same potential jurors stated that they were either doubtful that they could consider, or stated expressly that they could not consider, a life sentence if they found the defendant guilty of the murder of children. These responses highlight the ineffectiveness of purely ''abstract'' questions to probe, in these cases, whether or not a juror would be able to fulfill his or her duty to give fair consideration to both life and death sentences no matter what the facts are. *See Morgan*, 504 U.S. at 728.

*Id.* at 847-48. *See also United States v. Fell,* 372 F. Supp. 2d 766 (D. Vt. 2005) (explaining why *Morgan* requires questioning concerning jurors' ability to consider both life and death as possible punishments in the context of the actual case before them).

Attached as Exhibit 1 to this memorandum is an excerpt from the transcript of jury selection in a Virginia federal capital case, *United States v. Beckford et al.,* No. 3:96 CR 66 (E.D.Va. 1997), that further exemplifies the problem Judge Bennett described in *Johnson*. *Beckford* shows just one of the many ways that a juror's death penalty views can "prevent or substantially impair" her ability to serve, and yet pass undetected. In this example, the juror responded affirmatively to both the trial judge's and prosecutor's questions about to her ability and willingness to consider aggravating and mitigating factors and her ability to follow the court's instructions, stating, "I think I would have to consider them, yes." She further stated that she would not impose death automatically, but "would consider both options, both sides," and could be "a fair and impartial juror." *Beckford,* Tr. 1273-1276. But she responded very differently when defense counsel listed for her the elements of the specific capital crime charged in the indictment:

> BY [Defense Counsel]: If the jury found one of the defendants, one or more of them, guilty of the following crime: A knowing, intentional, and unlawful murder in furtherance of a conspiracy to distribute crack cocaine . . . would you then, regardless of the

9

> aggravating or mitigating circumstances, believe that the death penalty was the only appropriate punishment for that crime?
>
> VENIREMAN: I think I would have to vote for the death penalty if it was a knowing crime, based on my religious beliefs, yes."
>
> Q. Okay. That is based on religious beliefs?
>
> VENIREMAN: Right.
>
> Q. So that the crime that is at issue here you would believe that that would be the only appropriate punishment, am I correct?
>
> VENIREMAN: Right.
>
> * * *
>
> BY [Government Counsel]: Ma'am, I think -- I want to understand, because I think your answer to my question and answer --
>
> VENIREMAN: He explained it to me I think a little better. He read the whole thing there, and I understood more about what the question was when he read it. I am having a little problem with aggravating and mitigating here, so I what he said, the whole time I can answer my question from that,
>
> Q. That is fine . . . .

At this juncture, the prosecutor described aggravating and mitigating factors, and told the juror that he had earlier described the crime to her as defense counsel had, "that is, of an intentional, knowingly, unlawfully killing someone in furtherance of a drug punishment (sic). . . . Tr. 1279. But the transcript actually shows that he had simply described the crime as "murder in furtherance of the drug trafficking offense." Tr. 1276. The prosecutor presumably knew the mental elements implied by his use of "murder," but it was a mistake to assume this juror did, or that any other juror would. And once this juror was clearly informed that she was being asked about the appropriate range of punishment

10

*for intentional murder*, she restated her views in terms that persuaded even government counsel of her inability to serve:

> VENIREMAN: Based on my religious beliefs, if it was a knowing crime, committed by someone who knew what they were doing, I would vote for the death penalty.
>
> * * *
>
> BY [counsel for the government]: Move to strike. Tr. 1277-1279.

The findings of the Capital Jury Project (CJP) show that the type of juror misunderstanding that surfaced in *Johnson* and *Beckford* is not rare but pervasive, and that it often goes undetected.[3] CJP interviews with capital-case jurors revealed that very large numbers of such jurors had been found qualified to serve – and actually rendered life-or-death decisions – despite views that should have caused their disqualification under *Morgan.* William J. Bowers, Marla Sandys & Benjamin Steiner, *Foreclosed Impartiality in Capital Sentencing: Jurors' Predispositions, Attitudes and Premature Decision-Making,* 83 CORNELL L. REV. 1476, 1504 (1998). For example, 912 former capital trial jurors were asked whether the death penalty was "the only acceptable punishment" for seven types of murder, as well as two other serious violent crimes.

> Astonishingly, more than half of the jurors said that they believed that death was the only acceptable punishment for three of the seven kinds of murder: repeat murder, premeditated murder, and multiple murder. Nearly half of the jurors identified death as the only acceptable punishment for the killing of either a police officer or prison guard or for a murder by a drug dealer. Almost a quarter of the jurors said that death was the only acceptable punishment for three of the remaining four crimes-- including rape without

---

[3] The CJP is a federally-funded research project involving in-depth interviews with hundreds of jurors who actually served on capital juries. *See generally*, Valerie P. Hans, How Juries Decide Death: The Contributions of the Capital Jury Project, 70 IND. L. J. 1233 (1995).

11

> murder, for which the imposition of the death penalty would be unconstitutional. Only for a planned murder in which the victim survives did decidedly fewer than one in four jurors (15.7%) say that death was the only acceptable punishment.

*Id.* at 504-505 (footnotes omitted).

These large cohorts of jurors who believed only death to be an acceptable punishment were not "balanced out" by jurors at the other end of the spectrum – that is, by jurors who were allowed to serve despite believing that *life imprisonment* was the only acceptable punishment. Rather, the CJP researchers found that number of jurors who held such hard-and-fast pro-life views was vanishingly small – between 2.2% and 7.6% for each of the seven categories of murders. *Id.* at 1505. This indicates that the capital jury selection process has been much more effective at identifying and removing jurors who are biased in favor of life than at identifying jurors with disqualifying pro-death biases under *Morgan.*

It is sobering, to say the least, that so many capital trial jurors entertained disqualifying beliefs in favor of the death penalty, despite having undergone voir dire examination and having sat through trial, jury instructions, and sentencing deliberations. Worse, these undetected biases have been shown to line up with the actual sentencing rationales offered by many jurors. In a follow-up analysis of interviews with 240 jurors in six states who had actually imposed death sentences, more than 40 percent told CJP researchers that they regarded the death penalty in the cases on which they served to be *required by law* once the prosecution had proved one or another aggravating factor. Ursula Bentele & William J. Bowers, *How Jurors Decide On Death: Guilt Is*

12

*Overwhelming; Aggravation Requires Death; And Mitigation Is No Excuse,* 66 BROOK. L. REV. 1011, 1071-1073 (2001). Such evidence – and the CJP findings have been replicated in state after state – underscores the necessity for probing written and oral questioning to ensure that no juror is seated despite a categorical belief that only one of the two statutorily-authorized punishments is ever acceptable for the crimes charged in this case.

A written questionnaire is not the primary means by which the Court will safeguard the defendant's due process rights under *Morgan.* But the questionnaire provides a useful screening device to flag death-penalty views that warrant careful exploration during individual voir dire examination. That is why the defense requests that the questionnaire be designed to probe for juror attitudes that would make the death penalty a foregone conclusion upon conviction for the crimes charged in this case. Specifically, the defense requests that the questionnaire ask whether "anyone who" commits one of the crimes charged in the indictment "should get the death penalty," Q. 49, or whether the juror personally believed that that "death was the only appropriate punishment regardless of other mitigating circumstances" for such offenses. Q. 50-52. While affirmative written answers to such questions would not automatically require a juror's disqualification, they would provide important information about a juror's actual state of mind that the government's much more ambiguous, isolated and unilluminating question does not.

For the foregoing reasons, defense counsel request that the Court include the defense's requested Questions 43, 46, and 49-52 of the Joint Questionnaire, after having

informed the prospective jurors, as requested by the defense, that "[n]o matter what the evidence or the facts of a case, the law never requires a jury to sentence a defendant to death." *See* Joint Questionnaire at 15.

        Respectfully submitted,

        *s/ David I. Bruck*
        David I. Bruck
        Washington & Lee School of Law
        Lexington VA 24450
        540-458-8188
        bruckd@wlu.edu

        Kimberly C. Stevens
        Capital Resource Counsel
        Assistant Federal Public Defender, District of Oregon
        1070-1 Tunnel Road, Suite 10-215
        Asheville, NC 28805
        (336) 788-3779
        kim_stevens@fd.org

        Sarah S. Gannett
        Assistant Federal Public Defender
        Federal Public Defender for the District of Arizona
        850 W. Adams Street, Suite 201
        Phoenix, AZ 85007
        602-382-2862
        sarah_gannett@fd.org

        Attorneys for Dylann S. Roof