IN THE DISTRICT COURT OF THE UNITED STATES
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | Crim. No. 2:15-cr-00472-RMG |
| | ) | |
| **v.** | ) | |
| | ) | Government's Notice |
| **DYLANN STORM ROOF** | ) | Pursuant To Rule 16(a)(1)(G), |
| | ) | F.R.Cr. P. Concerning Expert |
| | ) | Witnesses |
| | ) | |

The United States of America, by and through its undersigned Assistant United States Attorneys, files this Notice of Expert Witness pursuant to Rule16 (a)(1)(G) of the Federal Rules of Criminal Procedure. The following written summary sets forth a summary of expected expert testimony for each of the expert witnesses the government intends to present in its case-in-chief at trial, describes the witness's opinions, the bases and the reasons for those opinions, and the expert witness's qualifications.

1. **Farand Wasiak, South Carolina Law Enforcement Division (SLED), in the area of computer and digital media forensics.**

    Special Agent (SA) Wasiak will testify to his analysis of an image copied from a digital memory card removed from a Kodak camera. SA Wasiak was provided with the evidence as a result of the Kodak digital camera being recovered during a consent search at 10428 Garners Ferry Rd., Eastover, SC, and an image being produced by other investigators. A search warrant was obtained for the device's contents, and pursuant to that warrant SA Wasiak conducted a forensic examination of the image and obtained digital images (photographs and videos) from the evidence. In order to obtain this evidence SA Wasiak utilized software, "Forensic Tool Kit" (FTK), that he is trained to use and that he has used on multiple occasions. He has prepared a report that has been turned over to the defense, located in discovery at SAW 226 and SAW 227. SA Wasiak transferred the files he recovered from the evidence to a DVD so that they could be viewed, and those files been provided to the defense in discovery at US-001660 to US-012309; US-VID-002 to 011. The image was examined using FTK, and a report based on the use of that kit was provided to the defense in discovery at US-013474 to US-016739. SA Wasiak's activity was also noted in reports generated by other agents.

    SA Wasiak has extensive training and experience in computer forensic analysis, which is represented on his CV, provided to the defense at the time this notice was file.

**2. FBI Special Agent Mark Granger in the area of computer and electronic media forensics.**

FBI SA Mark Granger will testify that he inspected three items, an Apple iPod belonging to Tywanza Sanders, a Nokia Cell phone belonging to Tywanza Sanders and a Samsung Galaxy S5 mobile phone belonging to Keon Gordon. SA Granger will testify that he recovered a Snapchat video from the phone of Keon Gordon. SA Granger will testify that he used government software to download and preserve the video, located in discovery at US-VID-020. SA Granger will testify that he conducted his analysis pursuant to a consent search. He will testify that he used certain procedures to ensure the integrity of the evidence, and then conducted a computer forensic examination on the below listed digital evidence in accordance with Computer Analysis Response Team (CART) policies and procedures:

1. Samsung Galaxy S5 cellular phone, model: SM-G900V, IMEI: 990004923251254
2. 16GB MicroSD Card contained within (QC016) Samsung Galaxy S5 cellular phone, model: SM-G900V, IMEI: 990004923251254
3. Nokia Cellular Phone, Model: 521, IMEI: 35591305540967
4. 16GB MicroSD Card contained within (QC014) Nokia Cellular Phone, Model: 521, IMEI: 35591305540967
5. iPod Touch, Model: A1367, 5/N: C3TGCL76DCP7

In conducting his exam, SA Granger used the following processes on the Nokia cellular phone and Samsung cellular phone:

1. A staging drive was forensically wiped, partitioned, and formatted for use.
2. A physical inventory/examination of the submitted evidence item was competed.
3. Documented manufacturer information and any unusual markings.
4. Radio frequency shielding applied to the items to isolate from incoming transmissions.
5. Applied power to the items as appropriate.
6. Made sure wireless communication features were turned off by placing device in airplane mode.
7. Conducted a physical observation for documented relevant system and owner information.

In conducting his exam, SA Granger used the following processes on the MicroSD cards located in the Nokia and Samsung cellular phones:

1. A staging drive was forensically wiped, partitioned, and formatted for use.
2. Removed the cards from the phones.
3. A physical inventory/examination of the submitted evidence item was competed.
4. Documented manufacturer information and any unusual markings.
5. Write-protected / evidence preservation.
6. Using approved software tools, obtained an image copy of the item data.
7. A pre-examination MDS Hash verification was conducted.
8. Image copy archived to a hard drive.
9. Hardware geometry information obtained.

10. Analyzed imaged copy of data.
11. Recorded a directory / file listing.
12. Conducted a post-examination MDS Hash verification.
13. Forensic examination results saved to a hard drive for case agent review.

SA Granger will testify regarding the tools and processes he used to obtain evidence from the above devices. SA Granger provided the above information in three four-page reports, as well as providing the results of his work in information removed from the above listed items and provided to the defense.

Agent Granger has extensive experience and training that qualify him as an expert in the area of computer and electronic forensic analysis. A copy of his CV reflecting his qualifications was provided to the defense at the time this notice was filed.

3. **Former FBI Agent Amanda Simmons in the area of computer and electronic media forensics.**

Ms. Simmons will testify that she conducted an analysis of electronic devices pursuant to a consent search at a residence on Cedar St. in Columbia, South Carolina, and pursuant to a search warrant for specific devices held in the FBI lab, all in an effort to obtain evidence relating to the death investigation at Emanuel AME Church. Ms. Simmons obtained evidence during the search at Cedar St. by mirroring a computer on site. She conducted her analysis away from the site of the search in an FBI computer lab. She will testify that she used certain procedures to ensure the integrity of the evidence, and then provided the results of her analysis to the case agents.

Ms. Simmons conducted a computer forensic examination on the below listed digital evidence items in accordance with Computer Analysis Response Team (CART) policies and procedures:

One Western Digital HOD, SN WXC1E33JAEF1(Onsite Gateway Image Set); One LG VK810 Tablet, SN ZWFVK810; One USB Drive--Yellow/Black in Color; One USB Drive--Black in Color, SN 0965MSET18011; One Adata USB Drive--Black in Color, SN1305093649G64C; Six CDs/DVDs; One Dell Dimension 2350,SN FZYMQ21; One Hitachi Deskstar HOD, SN VNVA02G1C3P7VV; Two Floppy Diskettes; Eight Floppy Diskettes; One Kyocera Loft Cell Device, SN F0000037569719 20- A6503-01-051610; Two CDs/DVDs; One Dell Latitude E5400 Computer (no hard drive), SN 5LXX5Ll; One Gateway Desktop Computer SN 0016364427; One Quantum HDD,SN 133926724515 DGZXX; One Western Digital HOD, SN WXC1E33JAEF1(Onsite Gateway Image Set).

In conducting her exam, Ms. Simmons used the following processes:

1. The staging drives were wiped, partitioned, and formatted for use.

3

2. A physical inventory/examination of the submitted evidence was completed. Original evidence items were write protected for evidence preservation purposes. A drive survey/geometry of the original media was conducted.
3. A pre examination MD5 hash verifications was completed. A directory and file listing was created.
4. Forensic images were searched and indexed as outlined in the case agent's request.
5. A post examination MD5 hash verification was completed showing that the images were not altered during examination.
6. Several items were imaged to derivative evidence drives. Items were indexed and provided review and examination purposes.

Ms. Simmons will testify regarding the tools and processes she uses to obtain evidence from the above devices. Ms. Simmons provided the above information in a four-page report located in discovery at US-060457 – 060460, as well as providing the results of her work in information removed from the above listed items and provided to the defense. Ms. Simmons has extensive experience and training that qualify her as an expert in the area of computer and electronic forensic analysis. A copy of her CV reflecting her qualifications was provided to the defense at the time this notice was filed.

4. **FBI Special Agent Bob Bianco in the area of computer and electronic media forensics.**

SA Bianco will testify that he conducted an analysis of electronic devices seeking evidence relating to the death investigation at Emanuel AME Church. SA Bianco conducted a CART computer forensic examination on the following digital evidence items in accordance with CART policies and procedures:

1. One LG VK810 Tablet, SN: ZWFVK810 with SD Card.
2. One HUA WEI Cell Phone, Model: H881 C.
3. One GARMIN NUVI GPS, Model: 205, SN: 1SB545472.
4. One DELL mini tower CPU, SN: C5PNL51.

In conducting his exam, SA Bianco performed the following processes:

1. The staging drives were wiped, partitioned, and formatted for use.
2. A physical inventory/examination of the submitted evidence was completed. Original evidence items were write protected for evidence preservation purposes. A drive survey/geometry of the original media was conducted.
3. A pre examination MD5 hash verifications was completed. A directory and file listing was created.
4. Forensic images were searched and indexed as outlined in the case agent's request.
5. A post examination MD5 hash verification was completed showing that the images were not altered during examination.
6. Several items were imaged to derivative evidence drives. Items were indexed and provided review and examination purposes.

4

Agent Bianco will testify to how he conducted his analysis and which tools and software he used to extract information from these devices. A report on the information obtained from these devices, that is, copies of the information obtained, has been provided to the defense in this case.

Agent Bianco has extensive experience and training that qualify him as an expert in the area of computer forensic analysis. A copy of his CV reflecting his qualifications was provided to the defense at the time this notice was filed.

5. **SLED Special Agent James Green in the area of firearms identification**.

SA Green will testify in the area of firearms identification. He will testify to his examination of items collected from the crime scene at the Emanuel AME Church, collected from defendant's vehicle, and collected from autopsies performed on the victims at the Medical University of South Carolina. His findings are contained in an extensive report provided in discovery at US-020854 to US-0020879. SA Green will testify that he examined the items provided to him to determine whether they were sufficient for comparison, and if the items were sufficient, that he made comparisons of those items. He will also testify that he examined the Glock firearm to determine whether it functioned, which included test firing the gun and measuring the "weight" of the trigger pull. He will testify that the gun was fully functioning and that hat the weight of the trigger pull was approximately 5.75 lbs. He will testify that he test fired the gun using both agency ammunition, as well as unfired ammunition recovered in the investigation, to produce known samples for comparison to other items recovered in the investigation. He will testify he compared the known, test-fired samples with recovered casings, projectiles, fragments and jackets, and that he also compared these items with each other. He will testify to the process he uses for comparison, including use of a comparison microscope, and the use of microscopic verification completed by a second reviewer. He will testify to other quality control measures he utilizes, as well as to the types of markings he considers for comparison. For instance, the rifling of a gun barrel creates particular marks on a fired projectile that can be used for comparison to other projectiles and for identification with a known firearm. Also, an ejected spent shell casing will have unique marks created on it through the firing process that allows the spent shell casing to be compared with other casings and to be identified with a particular, known firearm. In conducting his analysis, SA Green found that several items were related to each other, and detailed those findings in a report, US-020854 to US-0020879, provided to the defense. These findings, generally, were that several items, such as spent shell casings, bullets and jackets were fired by the gun found in defendant's car, and/or had characteristics consistent with rounds that could be fired from the gun found in defendant's car. Further, some bullets and jackets he examined were consistent with being hollow-point rounds. He also found, for various reasons, including the condition of some items, that comparisons were inconclusive for certain items.

SA Green has extensive experience and training that qualify him as an expert in the area of firearms identification. A copy of his Statement of Qualifications was provided to the defense at the time this notice was filed.

6. **SLED Forensic Scientist Lilly S. Gallman in the area of DNA analysis.**

Ms. Gallman will testify in the area of DNA analysis. She will testify that she was provided with several swabs collected from various locations and items, including: swabs from a bag and belt located at the Emanuel AME church; swabs from the Emanuel AME Church door handle; swabs from several Glock magazines seized from the Emanuel AME church; several swabs from multiple locations on defendant's boots; swabs from multiple shell casings; and standards taken from the shooting victims and from defendant. She will testify to the process used to analyze this evidence, STR PCR DNA analysis, and to the results that have been listed in her reports and provided to the defense in discovery. She will testify that her process involves the extraction of DNA, amplification of the DNA, and then developing a DNA profile from the extracted, amplified DNA. This profile is then compared to known standards which have been similarly processed.

She will testify that she was able to develop a DNA profile from some items of evidence, but for others either no DNA profile was developed or a partial DNA profile was developed but was insufficient for interpretation.

She will testify that on some items she was able to find DNA profile mixtures, with one contributor being the defendant, but that because of the incompleteness of the profiles or weakness of mixtures, or in one case the complexity of mixtures, a match beyond the defendant could not be identified. She will testify that swabs taken from a belt located at the Emanuel AME crime scene identified a mixture of DNA from at least two individuals. She will testify that she identified defendant as a major contributor to this mixture, and will testify to the frequency of matching the major contributor to this DNA sample, with the probability of randomly selecting an unrelated individual having a DNA profile that matches the major contributor to the mixture being approximately 1 in 30 trillion. She will also testify to the sufficiency of items recovered and the limited information that could be obtained from them, such that no conclusive statement could be made regarding several items, and that for some items there was no ability to estimate the number of DNA contributors. She will also testify that multiple cartridge cases were swabbed for DNA and analyzed, but either no DNA profile was developed from the items or a partial DNA profile was developed but was insufficient for interpretation.

Ms. Gallman provided the results of her analysis in three separate reports that have been provided to the defense, with the first located at SAW 367-369, and two that have not received index numbers at the time of filing.

Ms. Gallman has extensive experience and training that qualify her as an expert in the area of DNA analysis. A copy of her statement of qualifications reflecting her experience was provided to the defense at the time this notice was filed.

**7. SLED Forensic Scientist Kimberly Mears in the area of latent fingerprint examination.**

Ms. Mears will testify in the area of latent fingerprint examination. She will testify to the processing of multiple items for latent prints. These include several Glock magazines and the impressions obtained from them; defendant's major case prints; two boxes of Winchester ammunition and the contents of those boxes; five Glock magazine packages; five Glock magazine packaging inserts; a Glock magazine cover; two letters; a Glock handgun with magazine containing a total of eleven cartridges; a brown leather journal; two pieces of yellow, lined paper; a Winchester ammunition box with an empty tray; and sets of post-mortem major prints from the deceased victims.

She will testify to the process she uses for developing and analyzing prints, which involves placing various chemicals on the items in an attempt to develop latent prints. She will testify as to the process she uses for print comparison which involves ACE-V methodology (Analysis, Comparison, Evaluation, Verification). This includes an analysis of the similarities between known and submitted prints. She will testify as to whether potential prints had value for purposes of comparison and whether evidence could be developed from provided items.

She will testify and that a latent finger print was developed from a Glock magazine found in the Emanuel AME church. She will testify that approximately twenty-one fingerprints were developed from other items, such as the Winchester ammunition boxes, the trigger of the Glock handgun, from other areas of the handgun, from the journal found in defendant's car, and from a church list found in defendant's car.

She will testify that the recovered prints were compared to known finger print standards obtained from defendant, and that approximately twenty-two total recovered prints were matched to known prints of defendant. She will testify that at least one latent print was inconclusive based on its quality. Ms. Mears's expected testimony is located in reports provided to defendant in discovery, with one located at SAW 364-366, and a second that has not received index numbers at the time of filing.

Ms. Mears has extensive experience and training that qualify her as an expert in the area of latent finger print processing and comparison. A copy of her statement of qualifications reflecting her qualifications was provided to the defense at the time this notice was filed.

**8. SLED Forensic Scientist Whitney Berry or Jennifer Nates in the area of gunshot residue.**

Ms. Berry will testify as an expert in the area gunshot residue (GSR). Ms. Berry will testify that she is familiar with GSR particles and will explain what they are. She will testify to how GSR is created, the process by which it adheres to items, and what it can say about the proximity of a firearm to an item. She will testify to what can affect the likelihood of recovering GSR, and the techniques used to locate GSR. She will testify as to the quality controls involved in the collection of GSR, and to the equipment used to obtain GSR samples. She will testify that she processed a t-shirt located in defendant's car that was believed to be worn during the shooting for GSR, and to the techniques she used to process the item, including the use of a

scanning electron microscope to examine the item. She will testify that she located particles consistent with GSR on the t-shirt. This information is contained in a report prepared by Ms. Berry, located at US-056716 to 056717. Jennifer Nates reviewed and validated the work done by Ms. Berry, and will testify should Ms. Berry be unavailable, since Ms. Berry is currently pregnant with an expected delivery date near the time of her anticipated testimony.

Ms. Berry has extensive experience and training that qualify her as an expert in the area of gunshot residue. A copy of her statement of qualifications reflecting her qualifications was provided to the defense at the time this notice was filed, and Ms. Nates' will be provided when received.

9. **SLED Special Agent Kevin Kulbacki in the area of document examination and specifically handwriting analysis.**

    SA Kulbacki will testify in the area of handwriting analysis. He will testify that he examined several questioned documents including letters, a list of churches and two manifestos – one found in defendant's car and one in his jail cell. He will testify to the processes he uses to identify handwriting and the associations he determined to exist between known and unknown writings to make his determinations. He will testify that, based on his examination, the writer of the jailhouse manifesto is identified as the same writer as the other examined items. SA Kulbacki provided this information in a report provided to the defense in discovery at US-60461 to US-60465.

    SA Kulbacki has extensive experience and training that qualify him as an expert in the area of handwriting analysis. A copy of his statement of qualifications reflecting his qualifications was provided to the defense at the time this notice was filed.

10. **S. Erin Presnell, M.D., in the area of Forensic Pathology.**

    Dr. Presnell will testify to the information contained in autopsy reports provided to the defense. This will include the diagnosis, manner of death and cause of death of all nine victims, as well as an analysis of the type of injuries sustained, how such injuries would lead to death, and the degree to which any specific injury would have contributed to death. Dr. Presnell will testify to what the injuries indicate regarding range and/or distance of gunshots. She will testify to the number of projectiles recovered from each of the victims. She will testify to bullet trajectory, and how trajectory would be consistent with the likely position or posture of the victims and defendant at the time they were shot. Her testimony will include what she found upon an external and internal examination of each victim, as well as results of testing done on tissue and blood samples obtained during the autopsy process. She will testify regarding evidence collected during the autopsy, and how it was released to law enforcement officers for investigation. Dr. Presnell's opinions are contained in the discovery provided to the defense in bates stamp numbers SAW 505-801 and photographs are contained on discs 470-478.

Dr. Presnell has extensive experience and training as a medical examiner that qualifies her as a forensic pathologist. A copy of her CV reflecting her qualifications was provided to the defense at the time this notice was filed.

**11. ATF Special Agent Mark Kelly in the area of firearms identification.**

Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Special Agent Mark Kelly will testify that he reviewed the firearm, ammunition and magazines seized in this case then provided to him for review. He will testify that the firearm and magazines were manufactured by Glock, and that they were manufactured in Austria. He will testify that the ammunition was stamped Winchester, which is a brand manufactured in Illinois or Mississippi. SA Kelly would further testify that these items travelled in interstate commerce in order to arrive in South Carolina, as well as to the items affect on interstate commerce. SA Kelly provided this information in a report provided to defense counsel in US-016906 to 16907.

Agent Kelly has extensive experience and training that qualify him as an expert in the area of firearms identification. A copy of his CV reflecting his qualifications was provided to the defense at the time this notice was filed.

**12. Jay Dee Krull; Director, Software Excellence, Consumer Engineering for Garmin, Inc., in the area of Garmin GPS functioning and records.**

Jay Dee Krull will testify to the functioning, capabilities and record keeping of the Garmin Nuvi GPS device. He will testify regarding the development of GPS technology, the state of GPS technology at the time of the indicted offenses, and how GPS technology functioned at the time leading up to and at the time of the offenses. Mr. Krull will testify as to the specific Garmin device seized from defendant's car and the technology it utilizes. He will testify regarding the track log data the device stored, and which was obtained from the device. He will testify as to how different software, such as Base Camp, can be used to interpret the records made by the Garmin device, how the software interacts with device records such as those obtained in this case, and how that software can be used to present information obtained from the device. He will testify as to how the GPS interacts with satellites and other technology to determine location. He will testify to how the device communicates location and how it stores location internally. He will testify to how information about the devices location is stored and how it can be retrieved. He will testify as to the types of records the device keeps, and will explain the records obtained by the FBI from the device in this case. He will explain how software can be used to obtain records from the device, and how those records can be interpreted and plotted to determine device location at a particular time. He will testify to how the device functions, how it stores information in its memory, the software and hardware contained on the device, and how the operation of the device is reflected in records kept on the device. He will testify as to how the device acts and what records are kept when the device is active or in "sleep" mode, and how the device "wakes" when activated after being stopped. The witness will testify to the records obtained from Garmin regarding the GPS located in defendant's car, and the content of that device obtained through a search warrant. The witness will testify to what the records mean relative to the specific device and the hardware and software contained on the device. He will

9

testify to what the records indicate as to when the device would have been actively moving and when it would have been stationary. These opinions are based on the experience of the witness and his familiarity with the device and the hardware and software contained in it, as well as the type of records produced and maintained for the device. The witness's qualifications to provide this testimony were provided to the defense at the time this notice was filed.

13. **Eric Sorensen and/or Jacquelyn K. Hamelryck in the area of White Supremacy Extremism.**

The government intends to call one or more experts who have specialized expertise in the area of white supremacy extremism. If the government calls more than one such witness, their testimony will not substantially overlap.

As a result of the experience described in their statements of qualification, the government's expert witnesses have developed specialized knowledge and analytical expertise regarding white supremacy extremism that qualify them to testify and render the opinions discussed below. Specifically, these witnesses have specialized knowledge and analytical expertise regarding the methods, operation, structure, symbols, jargon, and practices of white supremacy extremists. The opinions that the government intends to introduce through the testimony of these witnesses are not based on the statements of any single white supremacy extremist, law enforcement witness, recording, seminar, article, surveillance, search warrant or other singular piece of evidence. Furthermore, they are not merely a recitation of information provided by others. Instead, the opinions are the product of these witnesses' methodology, which analyzes and synthesizes information obtained from the sources described in their statements of qualification. This methodology is analogous to that of an anthropologist who understands the cultural mores of a particular group by self-education and fieldwork. This methodology allows these witnesses to evaluate the information they have obtained from different sources and either confirm or disregard that information based on the entirety of their knowledge and expertise. In doing so, they consider, *inter alia*, the source(s) of the information (considering both quantity and quality), whether the particular factual assertion is supported by sources of different types, whether the factual assertion would logically serve the goals of the source, whether a particular factual assertion is supported by sources spanning both time and geographic location and whether similar practices are employed by similar groups and individuals. By applying this methodology to the evidence in this case, these witnesses have reached certain studied conclusions regarding white supremacy extremism and the writings, statements, and other expressions and actions of the defendant that they will present to the jury. These witnesses' expertise goes well beyond the ken of the average juror and will aid the jury in its fact-finding.

These witnesses will be presented to assist the jury in understanding white supremacy extremism as it applies to the evidence and facts in this case. This testimony will assist the jury in understanding the defendant's motive in committing the crimes charged in the Indictment as well as his statements, writings, readings and viewings, other expressions and conduct relating to and leading up to his crimes. This testimony will describe the ideology and cultures of groups and individuals who believe that people of white/European descent are superior to and should be socially and politically dominant over people of other racial and

ethnic heritages. This testimony also will discuss specific beliefs, concepts, manifestations and expressions associated with groups and individuals who share these beliefs, including those who also believe in the need for violence to establish dominance of "white" people over "non-white" people. These witnesses' testimony also will discuss the meaning and significance of specific symbols, images, and terminology relevant to this case. These witnesses also will testify that the defendant's statements, writings, reading and viewing materials, other expressions, actions, and other evidence in this case are consistent with the adoption of a white supremacy extremist ideology, including a belief in the need to use violence to achieve white supremacy. These witnesses will also testify that the sequence of and patterns of the defendant's expressions and actions, including his statements, writings, travel, personal interests and dress, are consistent with the adoption of white supremacist beliefs through self-radicalization.

More specifically, the government anticipates the witnesses will offer the following opinions at trial:

    A number of U.S.-based groups and individuals express the belief that race and ethnicity should play a central role in American government, society and culture. Race-motivated extremism is the advocacy or use of violence to further this belief.

    Many of the groups and individuals who believe that race should play a central role in American government, society, and culture espouse white nationalism, white separatism, or white supremacy. White nationalism is the belief that national and cultural identity should be based on race, and that white people should advocate for the interests of the white race. Many white nationalists also express beliefs consistent with white separatism and white supremacy. White separatism is the belief that people of different races should be organized politically and geographically into separate political entities or states. White supremacy is the belief that a white state or people should be dominant over non-white states and non-white peoples. Individuals who espouse one or more of these beliefs often use the terms white nationalism, separatism and supremacism interchangeably to describe their beliefs.

    Although some differences exist among groups and individuals who espouse white nationalism, separatism and supremacy, these groups and individuals share a common core ideology as well as common expressions of that ideology. Central to that ideology is the belief that race is the defining element of human identity, traits and character, and therefore, of a society's culture. An element of that ideology is the belief that people belong to different "races" based on certain heredity-based characteristics, with a related emphasis on heredity and racial purity.

    Groups and individuals who espouse white supremacy generally regard people as falling into two principal racial categories: "white" and "non-white." The definitions of "white" and "non-white" vary among groups and individuals, but generally "whites" are defined as non-Jewish people of European descent, and "non-whites" are everyone else, including the peoples of Africa and Asia; the indigenous peoples of the Americas, Asia, Australia and the Pacific islands; non-European people of Latino/Hispanic heritage; and Jews and Muslims, among others.

Groups and individuals who espouse white supremacy generally share a common set of beliefs regarding the putative race-based characteristics of individuals and groups they define as non-white. For example, one commonly held belief is that Jewish people have undue influence in society, particularly in government and in the media and entertainment industries. Commonly held white supremacist views regarding African Americans include: 1) African Americans possess subnormal intelligence and a violence-prone temperament; 2) black-on-white crime, particularly rape, is a significant social problem that is not sufficiently addressed by the news media and law enforcement groups; 3) slavery and segregation were appropriate and one or both should be reinstated; and, 4) disapproval of the "mixing" of whites and African Americans through marriage, cohabitation, sexual relations and, particularly, procreation.

A central belief of white supremacists is that white people should be politically, economically and socially dominant over people of other races. The reasons for this belief vary, but generally include one or more of the following rationales: 1) white people are hereditarily endowed with characteristics that make them intellectually, culturally and morally superior to people of other races, and, therefore, white dominance reflects a natural or divine order; 2) white supremacy is necessary for the preservation of the white race because it is endangered and losing power and influence to non-white peoples, including in terms of its share of the total population; and, 3) racial conflict will lead to a reordering of whites and non-whites into separate political entities or nations and to domination of whites over blacks such as existed in apartheid states or during the slavery and de jure segregation eras in the United States, or to the annihilation of non-white peoples.

A common attribute of groups and individuals who espouse white supremacy is a focus on and glorification of governments, organizations and eras that are or were based on, or promoted, white-dominant racial hierarchy, including: 1) the National Socialism (Nazi)/Aryan movement as it existed in Germany prior to and during World War II generally, and particularly under the leadership of Adolph Hitler; 2) white-dominant African governments, such as apartheid era South Africa, Rhodesia and other former apartheid nations; 3) the Confederate States of America and antebellum pro-slavery states; and 4) the de jure segregation era in the United States. A common expression of white supremacist beliefs is association with these systems of government, social organization and eras as well as with perceived traditional aspects of white European culture (e.g., neo-Odinism), and a rejection or disapproval of governments, organizations and eras that they perceive as promoting racial equality or multi-culturalism. This association often is expressed through the adoption of the writings, symbols, images, common phrases, concepts, and other manifestations of these systems, organizations and eras. Common examples of this type of association include adoption of slogans associated with white supremacy, such as the "14 words" slogan coined by David Lane; the use of references and symbols associated with Nazism and Adolph Hitler, such as swastikas and other Nazi-related symbols and the use of "88" as a shorthand reference to Hitler; other symbols that have been adopted by white supremacists, such as certain runes and types of crosses; as well as flags and other symbols associated with the Confederate States of America, slavery and former apartheid nations and groups promoting white supremacy.

White supremacism overlaps with and is reflected in a variety of sub-cultures and related groups. These sub-cultures and groups include, among others: 1) Neo-Nazis (i.e., groups or individuals who adhere to and promote views they believe characterize the race-oriented ideology and doctrine of the National Socialism/Nazi movement) 2) racist skinheads (a subset of the countercultural working-class "skinhead" movement that has adopted a white power/supremacy ideology); and 3) the Ku Klux Klan (a white supremacist movement that originated as an organized post-Civil War effort to weaken the power of freed slaves and their supporters and more recently has focused on opposition to the end of segregation and the recognition of legal and social equality for African Americans).

Many individuals who believe in the principles underlying white supremacy do not advocate the use of violence in pursuit of its goals. Some white supremacists (white supremacy extremists), however, advocate violent means to achieve dominance of white people over non-white people. These individuals generally believe that violent action is necessary to preserve the white race; that a violent racial conflict either has begun, is imminent, or is inevitable; or that violence is an appropriate means of retribution against non-white peoples for perceived wrongs they have committed against the white race. White supremacist extremists also believe that taking violent action, particularly in a manner that draws widespread public attention, will help unite white people generally and, more particularly, will foster the core objective of white dominance over non-white peoples. Certain phrases, images, symbols, and concepts, such as references to the "14 words" slogan and the use of "88" as a reference to Adolf Hitler are more commonly used by white supremacy extremist groups and individuals who advocate violence to achieve white dominance.

Many white supremacist groups and individuals, including extremists who advocate violence, openly espouse their race-related beliefs through publications, social media and internet websites. Individuals who act on their belief that violence is an appropriate means of achieving ideologically driven goals, including white supremacy extremists, often publicly express the goals and motivations for their actions, including through public statements and writings.

An increasing number of individuals who adopt white supremacist beliefs self-radicalize through their exposure to white supremacist-related websites and media, without ever formally joining or participating in any groups. In recent years, white supremacist extremists have advocated the concept of leaderless violent resistance, which calls for small groups or individuals, including self-radicalized individuals with no connections to or control by established white supremacist groups, to engage in violent action as a means of achieving white supremacy over non-white people.

Individuals who act on the belief that violence is an appropriate means of achieving ideologically driven goals often choose targets that have symbolic significance. The concept of martyrdom, whether by death or imprisonment, is a consistent theme among violent white supremacist groups and individuals.

The evidence in this case relating to Defendant Roof, including his readings, writings, statements, use of symbols and other expressions, as well as his criminal and related actions,

are consistent with the adoption of many of the central tenets of white supremacy extremist ideology, including the belief that violent action is necessary to further the goal of white supremacy over non-white peoples, particularly African Americans. More specifically, the evidence relating to Defendant Roof is consistent with the adoption of the belief that "white" people are superior to "non-white" people, particularly African Americans, and therefore should be dominant over non-white people, particularly African Americans. The evidence in this case relating to Defendant Roof also is consistent with his adoption of a white supremacist ideology regarding the perceived traits and characteristics of non-white people, including African Americans. The evidence also demonstrates that Defendant Roof adopted expressions of white supremacist ideology in his statements, writings and other expressions and actions, including by expressly associating himself with racially hierarchical governments, organizations and eras through direct association and adoption of writings, statements, symbols and other manifestations of these systems and eras, as well as by decrying the perceived failure of the U.S. government to promote the interests of white people. The evidence relating to Defendant Roof also is consistent with adoption of the beliefs that violent action is necessary to fight for white people and achieve white supremacy, that individual violent action is necessary, and that the choice of targets and execution of violent action should be conducted in a manner that promotes these objectives, to include publicizing the reasons for those actions to inspire others to engage in violent action to further white supremacy. The evidence in this case also demonstrates that Defendant Roof was self-radicalized and that he adopted his violent white supremacist beliefs principally from self-teaching from internet-based media and other sources, rather through his personal associations or experiences with white supremacist groups or individuals or others. The evidence also demonstrates that while Defendant Roof adopted many of the central concepts of white supremacy (e.g., his views on African Americans) through his self-learning process, his views on other "non-white" groups (e.g., aspects of his views on people of Jewish and Asian heritage) indicate he adopted personal variations of, or rejected, other aspects of white supremacist ideology. The evidence in this case also demonstrates that Defendant Roof's identification with white supremacy increased in the months leading up to his crimes, including travel to such race-relevant destinations as the site of his crimes and locations that have connections to the antebellum and Confederate eras. The evidence in this case also demonstrates that Defendant Roof's actions were consistent with the concept of leaderless resistance and martyrdom advocated by white supremacy extremist groups and self-radicalization leading to violence.

A copy of the witnesses' qualifications were provided to the defense at the time this notice was filed.

Respectfully submitted,

BETH DRAKE
ACTING UNITED STATES ATTORNEY

By:  s/Nathan Williams
Nathan Williams (#10400)
Assistant United States Attorney
151 Meeting Street, Suite 200
Charleston, SC 29401
(843) 266-1671

VANITA GUPTA
Principal Deputy Assistant Attorney General
U.S. Department of Justice

By:  s/Stephen J. Curran
Stephen J. Curran
Special Litigation Counsel
U.S. Department of Justice
Civil Rights Division
601 D Street NW, Rm 5200
Washington, DC 20579
(202) 514-3204

August 22, 2016