IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 2:15-CR-00472-RMG |
| | ) | |
| v. | ) | |
| | ) | **UNDER SEAL** |
| DYLANN STORM ROOF | ) | |
| | ) | |

**RESPONSE TO DEFENDANT'S MOTION TO STRIKE THE DEATH PENALTY
AS A POSSIBLE PUNISHMENT IN THIS CASE**

I.   The Death Penalty is Constitutional ........................................................................ 1

II.  The Federal Death Penalty Act is Constitutional ................................................... 1

III. Capital Jury Voir Dire is Constitutional ................................................................. 4

  A. Ensuring the Impartiality of the Jury for Both Sides is Required by Supreme Court
     Precedent ............................................................................................................ 6

  B. The Defendant's "Statutory" Argument Fails ................................................... 9

  C. The Defendant's First Amendment Argument Fails ....................................... 11

IV. Seeking the Death Penalty in Counts 25-33 Does Not Violate Separation of Powers .......... 12

V.  The Nonstatutory Aggravators Are Appropriate and Constitutional .................... 18

  A. The FDPA's Scheme and the Role of Nonstatutory Aggravating Factors ...... 18

  B. Nonstatutory Aggravators that Reflect Aspects of the Defendant's Crimes Are
     Appropriate ....................................................................................................... 20

  C. The Nonstatutory Aggravators Are Not Impermissibly Duplicative of Each Other ....... 24

VI. The Petit Jury's Weighing of Aggravating and Mitigating Factors is Not a Fact that
    Must be Found Beyond a Reasonable Doubt and the Grand Jury Need Not Find
    Nonstatutory Aggravating Factors ......................................................................... 27

In his Motion to Strike the Death Penalty as a Possible Punishment in this Case, the defendant advances a number of claims challenging the constitutionality of the death penalty generally and the Federal Death Penalty Act, 18 U.S.C. § 3591, *et. seq*., in particular. Each of his claims should be denied as contrary to the law.

## I.      The Death Penalty is Constitutional

The defendant's first claim is that the death penalty, in and of itself, is unconstitutional. His claim is foreclosed by binding Supreme Court precedent. "We begin with the principle, settled by *Gregg*, that capital punishment is constitutional." *Baze v. Rees*, 553 U.S. 35, 47 (2008); *see also Gregg v. Georgia*, 428 U.S. 153, 181-87 (1976) (holding, in light of "contemporary values" that "the death penalty is not a form of punishment that may never be imposed"). Since *Gregg*, the Supreme Court has considered many death penalty cases, but has never wavered from *Gregg's* core holding. Indeed, while the defendant's motion devotes significant attention to Justice Breyer's dissent in *Glossip v. Gross*, 135 S.Ct. 2726 (2015), it entirely ignores the majority opinion, which acknowledges that "it is settled that capital punishment is constitutional." *Id.* at 2732 (emphasis added).[1]

In sum, this Court should follow the binding Supreme Court precedent that capital punishment is constitutional.

## II.     The Federal Death Penalty Act is Constitutional

The defendant next launches a *facial* challenge to the FDPA, which has never succeeded. *Cf. United States v. Salerno*, 481 U.S. 739, 745 (1987) (defendant "must establish that no set of circumstances exists under which the Act would be valid."). Contrary to the defendant's claim,

---

[1] The defendant's motion cites the first Federal Death Penalty Act (FDPA) opinion to be issued post-*Glossip*, *United States v. Sampson*, 2015 WL 7962394 (D. Mass. Dec. 2, 2015), but the fact remains, as the defendant's motion acknowledges, that the *Sampson* court still denied the defendant's multiple challenges to the FDPA.

the FDPA provides a structure that permits the jury to make a reasoned choice – based on findings and weighing factors – about whether to impose the death penalty. Thus, federal courts have rejected these claims across the board. *See*, *e.g.*, *United States v. Runyon*, No. 08-cr-16-3, 2009 WL 87506, *2 (E.D. Va. Jan. 9, 2009); *United States v. Regan*, 228 F. Supp.2d 742, 746 (E.D. Va. 2002).[2]

The statute guides the jury's discretion to impose a death sentence by requiring the finding of a section 3591(a)(2) gateway intent factor and a section 3592(c) statutory aggravating factor to establish the defendant's eligibility for capital punishment. The statute then allows for individualized sentencing by allowing the broad presentation of information to be considered as part of the jury's mandated weighing of aggravating and mitigating factors. *See* 18 U.S.C. § 3592(a) (providing for broad admissibility of mitigating factors), § 3593(c) (allowing for relaxed rules of evidence at the sentencing hearing).

Despite this structure that constrains and guides the jury's decision, the defendant argues that the Court should invalidate the FDPA on the grounds that the Court is not able to provide

---

[2] *See, e.g., United States v. Sanders*, Cr. 10-351, 2014 WL 3122418 at *6-*7 (W.D. La. Jul. 3, 2104) (rejecting "claim that the FDPA is unconstitutional because of an incomprehensible sentencing scheme"); *United States v. Coonce*, Case No. 10-cr-3029, 2014 WL 1018081, *22(W.D.M.O. MaR. 14, 2014) ("The Court...joins with other district courts in concluding that the submissions fall short of the mark in establishing that the FDPA is unconstitutional."); *United States v. Sablan*, Case No. 08-cr-259, 2014 WL 172543, *4 (E.D. Cal. Jan. 15, 2014) ("This Court agrees with the other courts that have addressed and rejected the position taken by Defendant [ ] on whether the FDPA is incomprehensible."). *See also United States v. Williams*, Case No. 08-cr-00070, 2013 WL 1335599, *17-*18 (M.D. Pa. Mar. 29, 2013) *United States v. Jacques*, 2011 WL 1674517, *11-*13 (D. Vt. May 4, 2011); *United States v. Taylor*, 635 F. Supp.2d 1243, 1247 (D.N.M. 2009); *United States v. Green*, Case No. 06-cr-19, 2008 WL 400901, *2 (W.D. Ky. Aug. 26, 2008) (holding empirical studies, including the Capital Jury Project, "provide[] no basis for undermining the constitutionality of the FDPA, a statute that has withstood innumerable attacks since its passage in 1994"); *United States v. Mikos*, Case No. 02-cr-137, 2003 WL 22110948, *17-*19 (N.D. Ill. Sept. 11, 2003) ("There is no justification prior to trial for this court to hold that the sentencing jury will be unable to comprehend the provisions of the FDPA or the instructions provided by the court or counsel."); *United States v. Regan*, 228 F. Supp.2d 742, 746 (E.D. Va. 2002) (holding same); *United States v. Llera Plaza*, 179 F. Supp.2d 444, 450 (E.D. Pa. 2001) (holding studies cited "do not establish that the concepts of aggravating and mitigating factors as used in the FDPA bear such a degree of intrinsic incomprehensibility as to render them incapable of clarification through adequate jury instructions").

adequate instructions to the jury. In doing so, the defendant asks the court to reject the underpinning of the Sixth Amendment's trial by jury system (and the central purpose of voir dire): a properly instructed jury will follow those instructions. *See Richardson v. Marsh*, 481 U.S. 200, 206, 211 (1987); *Zafiro v. United States*, 506 U.S. 534, 540-41 (1993). Such a broad conclusion that no federal trial judge could provide adequate instructions on the FDPA's procedures would effectively overturn an array of binding precedent. *See Boyde v. California*, 494 U.S. 370, 380 (1990) (instructions are constitutionally defective only if there is a "reasonable likelihood" that they misled the jury into sentencing the defendant to death); *Tuilaepa v. California,* 512 U.S. 967, 975-76 (1994) (holding instructions in penalty phase of capital case were constitutional because they were "phrased in conventional and understandable terms" and had a "commonsense core of meaning")[3]

Notably, in *Gregg v. Georgia*, 428 U.S. 153 (1976), the Supreme Court upheld a Georgia statute with a weighing sentencing scheme much like that of the FDPA. In so ruling, the Court recognized that:

> Juries are invariably given careful instructions on the law and how to apply it
> before they are authorized to decide the merits of a lawsuit. It would be virtually

---

[3] Roof relies heavily upon the suggested conclusions drawn by the Capital Jury Project (CJP). Even at its most generous, CJP "shows only that some capital jurors, well after the trial, might fail to remember certain legal principles, hold certain beliefs that may or may not have impacted their deliberations, and have certain recollections of the process that may or may not be accurate." *United States v. Sampson*, No. CR 01-10384-MLW, 2015 WL 7962394, at *23 (D. Mass. Dec. 2, 2015). Given the focus on state penalty schemes, rather than the FDPA or federal capital jury instructions, there is no legitimate reason to accept that CJP's alleged findings can be generalized to apply to a jury in this case. *See United States v. Mikos*, No. 02-cr-137, 2003 WL 22110948, at *17 (N.D. Ill. Sept. 11, 2003).

More importantly, the CJP process is deeply flawed. For example, the voluntary juror interviews on which CJP is based took place long after the trial. *See* William J. Bowers et al., *Jurors' Failure to Understand or Comport with Constitutional Standards in Capital Sentencing: Strength of the Evidence*, 46 No. 6 Crim. L. Bull. Art. 2, 14 (2010) (median length of 2.22 years). At the time they were interviewed, the jurors did not have a written copy of the jury instructions, lacked access to fellow jurors who could refresh their recollection and who would have been able to assist in understanding the instructions during actual deliberations, and were not able to ask the Court for clarification as they would be able to do during deliberations. *See Sampson*, No. CR 01-10384-MLW, 2015 WL 7962394, at *24 (noting a non-exhaustive set of issues that render the CJP unpersuasive).

> unthinkable to follow any other course in a legal system that has traditionally operated by following prior precedents and fixed rules of law.

*Id.* at 193. The Court and parties in this case, as well as any other federal capital case, are capable of carefully fashioning instructions to the jury that explain the evidence the jury may consider, the various findings that must be made, and the burdens corresponding to those various findings. *See United States v. Sanders*, Case No. 10-cr-351, 2014 WL 3122418, *7 (W.D. La. 2014) ("[W]e believe that the jury can be adequately instructed so it will understand and appropriately apply the FDPA's provisions. Counsel for both parties will be given the opportunity to review and object to the Court's jury instructions.").

This Court should follow the well-reasoned opinions cited above rejecting similar claims to those included in defendant's motion.

## III.     Capital Jury Voir Dire is Constitutional

In his third claim, the defendant raises several objections to the settled practice of using voir dire to determine if jurors can follow the Court's instructions regarding the death penalty. Colloquially referred to as "death qualifying," the jury, capital voir dire identifies and excuses potential jurors based on their inability to be "impartial," *see* United States Constitution, Amendment VI (providing for an "impartial jury"). *See Wainwright v. Witt*, 469 U.S. 412, 423 (1985) ("[T]he quest is for jurors who will conscientiously apply the law and find the facts.  That is what an 'impartial' jury consists of, and we do not think, simply because a defendant is being tried for a capital crime, that he is entitled to a legal presumption or standard that allows jurors to be seated who quite likely will be biased in his favor."). Courts properly exclude those jurors who cannot set aside their personal views about the death penalty where those views would prevent or substantially impair the performance of their duties as jurors in accordance with their instructions and their oath. *Buchanan v. Kentucky*, 483 U.S. 402, 407 n. 6 (1987). An array of Supreme Court cases

recognize that the process is routinely, and appropriately, followed in capital cases to strike jurors who would never impose death just like those jurors that would always do so. *Morgan v. Illinois*, 504 U.S. 719, at 733-344 & n.7 (1992) (discussing, *inter alia*, "the State's right . . . to strike those [jurors] who would never" impose death along with a defendant's right to strike those who would always impose death); *see also Uttecht v. Brown*, 551 U.S. 1, 9 (2007) ("the State has a strong interest in having jurors who are able to apply capital punishment within the framework"); *Lockhart v. McCree*, 476 U.S. 162, 165, 170, 180 & n. 7 (1987) (discussing the process and holding it does not violate the fair cross-section requirement for a jury).

The defendant cites no federal death penalty case in which a district court refused to determine if potential jurors could follow the instructions and impose the death penalty if it was called for by the facts and circumstances of the case.[4] Such a conclusion that would eviscerate the government's "legitimate interest in administering [a] constitutional capital sentencing scheme[]."*Witt*, 469 U.S. at 423. Notably, however, the arguments the defendant raises here were wholly rejected in a capital case in the District of New Mexico, in which these same arguments were directly raised. *See United States v. McCluskey*, No. 10-2734-JCH, memorandum op. and order, CR 746 (D.N.M. Nov. 30, 2012) (attached as Exhibit 1). Based upon the reasons set forth below, and the persuasive opinion from *McCluskey*, this Court should deny defendant's motion.

The process by which the district court conducts voir dire to identify those jurors who are unwilling or unable to apply the law impartially is left, ultimately, to the discretion of the Court. *See Morgan v. Illinois*, 504 U.S. 719, 729 (1992); *Ristaino v. Ross*, 424 U.S. 589, 594-95 (1976); *see also Mu'Min v. Virginia*, 500 U.S. 415, 431 (1991) (voir dire "enabl[es] the court to select an

---

[4] Though not ruling on the direct question, several Fourth Circuit cases at least tacitly approved the process of ensuring the selection of jurors who are not incapable of imposing death as a punishment. *See United States v. Umana*, 750 F.3d 320, 342-43 (4th Cir. 2014); *United States v. Caro*, 597 F.3d 608, 613-16 (4th Cir. 2010); *United States v. Fulks*, 454 F.3d 410, 427-30 (4th Cir. 2006).

impartial jury and assist[s] counsel in exercising peremptory challenges"); *see also Rosalez-Lopez v. United States*, 451 U.S. 182, 188 (1981) (plurality opinion) (observing that voir dire is the means by which prospective jurors who are unwilling or unable to apply the law impartially may be disqualified from jury service). Despite this discretion, the Fourth Circuit has advised that a direct question best identifies those who cannot be impartial without creating a risk of creating an improper impression, overemphasizing the possible importance, or diverting focus. See United States v. Tipton, 90 F.3d 861, 877-88 (4th Cir. 1996); see also United States v. Caro, 597 F.3d 608, 615 (4th Cir. 2010). Moreover, in fashioning those questions, the Could should account for the Government's well-recognized interest in a fair trial that permits striking jurors who are unable to follow the Court's instructions to consider capital punishment in light of the facts and legal instructions. *Morgan*, 504 U.S. at 733-344 & n.7; *Uttecht*, 551 U.S. at 9; *Lockhart*, 476 U.S. at 165, 170, 180 & n. 7. Accordingly, the restrictions proposed by defendant on this Court's ability to conduct voir dire in this case simply do not follow many years of Supreme Court jurisprudence.

### A. Ensuring the Impartiality of the Jury for Both Sides is Required by Supreme Court Precedent

The defendant suggests that this Court should not determine if each juror could follow the law and impose the death penalty in an appropriate case because the process is not provided for by statute and is not "required" by the Constitution. While the Federal Death Penalty Act does not provide procedures for jury selection, the process of ensuring jurors can impartially decide capital cases – in favor and against imposing death – has long been accepted in capital cases. *See, e.g., Witherspoon v. Illinois*, 391 U.S. 510 (1968) (setting limits on a state's challenges to jurors opposed to capital punishment); *Witt*, 469 U.S. 412 (establishing the standard for strikes for cause during death qualification); *Adams v. Texas*, 448 U.S. 38, 45 (1980); *Lockhart*, 479

U.S. at 173-79 (rejecting claims that death qualification violates Sixth Amendment's "fair cross-section" and "impartial jury" rights);[5] *Buchanan*, 483 U.S. 402 (holding that death qualification did not violate Sixth Amendment right to impartial jury even in a joint trial where one defendant was not death eligible); *Morgan*, 504 U.S. at 729 (clarifying requirements for death qualification and holding that a trial court must, upon request, inquire as to automatic death penalty jurors).

In *Witt,* the Supreme Court established the "proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment." 469 U.S. at 424. The operative standard "is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Id*. Applying this standard, the government may exclude those prospective jurors who would "frustrate the [government's] legitimate interest in administering constitutional capital sentencing schemes by not following their oaths." *Id*, at 423; *see also United States v. Mitchell*, 502 F.3d 931, 954 (9th Cir. 2007) ("The question is whether a juror is able to follow the law and apply the facts in an impartial way, which *is* a compelling government interest."). Under this standard, "it is clear . . . that a juror who in no case would vote for capital punishment, regardless of his or her instructions, is not an impartial juror and *must* be removed for cause." *Morgan*, 504 U.S. at 728 (emphasis added). The mandatory language used by the Court in *Morgan*, (*i.e*., "must") indicates that death qualification is a required process. Thus, defendant's claim must fail.

---

[5] The defendant raises a fair-cross section claim and seeks to avoid the binding precedent of *Lockhart* by citing articles published since *Lockhart* indicating that women and racial minorities are excluded because of their opposition to the death penalty. DE 291, at 16. Even if these studies were accurate, they do nothing to show that women and racial minorities are excluded because of their membership in a protected class versus having an opinion on the death penalty that prevents or substantially impairs their ability to follow the law. Nor has he presented any evidence to suggest that women and minorities would be disproportionately excluded given the demographics of the venire and the facts of this particular case.

A rather long excerpt from the heart of the *Morgan* opinion fully underscores the

necessity for conducting death qualification in capital cases. The Court stated:

> It is true that voir dire is conducted under the supervision of the court, and a great
> deal must, of necessity, be left to its sound discretion. The Constitution, after all,
> does not dictate a catechism for voir dire, but only that the defendant be afforded
> an impartial jury. . . .
> The adequacy of voir dire is not easily the subject of appellate review, but we
> have not hesitated, particularly in capital cases, to find that certain inquiries *must*
> be made to effectuate constitutional protections. [Citing cases requiring voir dire
> inquiry into potential racial biases].
> We have also come to recognize that the principles first propounded in
> *Witherspoon v. Illinois*, [ ], the reverse of which are at issue here, *demand inquiry*
> *into whether the views of prospective jurors on the death penalty would disqualify*
> *them from sitting.* At its inception, *Witherspoon* conferred no right on a State, but
> was in reality a limitation of a State's making unlimited challenges for cause to
> exclude those jurors who might hesitate to return a verdict imposing death. . . .
> *Witherspoon* limited a State's power broadly to exclude jurors hesitant in their
> ability to sentence a defendant to death, but nothing in that decision questioned
> the power of a State to execute a defendant sentenced to death by a jury from
> which the only veniremen who were in fact excluded for cause were those who
> make unmistakably clear . . . that they would automatically vote against the
> imposition of capital punishment without regard to any evidence that might be
> developed at the trial of the case before them.
> In *Wainwright v. Witt*, [ ], we revisited footnote 21 of *Witherspoon*, and *held*
> *affirmatively* that the State may exclude from capital sentencing juries that class
> of veniremen whose views would prevent or substantially impair the performance
> of their duties in accordance with their instructions or their oaths. Indeed, in
> *Lockhart v. McCree*, we thereafter spoke in terms of *Witherspoon*-excludables,
> whose removal for cause serves the State's entirely proper interest in obtaining a
> single jury that could impartially decide all of the issues in a capital case. From
> *Witt*, moreover, it was but a very short step to observe as well in *Lockhart*:
>> [T]he State may challenge for cause prospective jurors whose
>> opposition to the death penalty is so strong that it would prevent
>> them from impartially determining a capital defendant's guilt or
>> innocence. *Ipso facto, the State must be given the opportunity to*
>> *identify such prospective jurors by questioning them at voir dire*
>> *about their views of the death penalty.*
> This passage in *Lockhart*, expanded but briefly upon what we had already
> recognized in *Witt*: As with any other trial situation where an adversary wishes to
> exclude a juror because of bias, then, it is the adversary seeking exclusion who
> must demonstrate, *through questioning*, that the potential juror lacks impartiality.
> It is then the trial judge's duty to determine whether the challenge is proper.

504 U.S. at 729-34 (internal citations and quotations omitted) (emphasis added). Thus, *Morgan*

clearly indicates that the Government has a legitimate interest in conducting death qualification

and that the process is required. *See also Witt*, 469 U.S. at 823.

## B. The Defendant's "Statutory" Argument Fails

The defendant argues that the FDPA's statutory terms prevent the Government from disqualifying a juror who opposes the death penalty based on a belief that "human life is sacred." His argument is premised on one phrase in 18 U.S.C. § 3592(a), which states that jurors shall consider "any mitigating factor." His argument then posits that a belief that "human life is sacred" is a mitigating factor, and so a juror who holds such a belief (and thereby opposes the death penalty) cannot be disqualified without violating § 3592(a). Because the refusal to follow the law serves as a valid basis to strike a juror, the defendant's claim must fail.

His argument further fails for two reasons: (1) mitigation is not unlimited, (2) the idea that "human life is sacred" is a pre-existing *personal belief* of the juror regarding punishment, not a relevant mitigating *factor* derived from evidence related to the case or the defendant . The core underpinning for the defendant's argument is that § 3592(a)'s use of "any" in connection with "mitigating factor" means that Congress intended to permit defendants to present unlimited evidence in mitigation. But courts in federal capital cases have long recognized that mitigation, under both the Constitution and the FDPA, must relate to the defendant's background, record, or character, or the circumstances of the offense. *See e.g., United States v. Hager,* 721 F.3d 167, 194-98 (4th Cir. 2013) (rejecting "execution impact" evidence as a mitigating factor because it did not relate to defendant's character, record or background, or the circumstances of the offense); *United States v. Lighty,* 616 F.3d 321, 363 (4th Cir. 2010) ("The district court has the authority to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense"); *United States v. Gabrion,* 719 F.3d 511, 522 (6th Cir. 2013) (*en banc*) (in concluding that the unavailability of the death penalty under Michigan law did not constitute a mitigating factor in a federal capital case, the Court stated that

"[m]itigation evidence . . . is not an empty concept to be filled by whatever a lawyer or court thinks might persuade a single juror in a particular case"). Similarly, the Second Circuit has held that the broad standards for admissibility of mitigating evidence do "not mean that the defense has carte blanche to introduce any and all evidence that it wishes." *United States v. Fell*, 531 F.3d 197, 219 (2d Cir. 2008) (affirming exclusion of defendant's rejected plea agreement as mitigation, which would have created a "confusing and unproductive inquiry"). A juror's belief that "human life is sacred" does not fit any category of relevant mitigation.

The most thorough statutory construction analysis of this claim is found in *United States v. Taylor*, 583 F. Supp. 2d 923, 935 (E.D.Tenn. Oct. 15, 2003), in which the court rejected the same expansive interpretation urged by the defendant in the instant case, holding that "any" mitigating factor means any "relevant" mitigating factor consistent with constitutional requirements. *Id*. ("[T]he FDPA's use of the word "any" does not indicate Congress intended to greatly expand the definition of mitigating factors over that required by the Constitution."). *See also United States v. Williams*, 18 F. Supp. 3d 1065, 1074-75 (D. Hawaii May 7, 2014) (accord). And in *United States v. Milburn*, 2008 WL 3892133, *3 (N.D. Cal. Aug. 20, 2008), the court rejected the precise claim made in the instant case, holding that § 3592(a) does not preclude the court from disqualifying jurors who hold a "reverence for life" that would prevent them from following the law and imposing a death sentence if justified.

This Court should reject the defendant's invitation for a ruling bordering on the absurd: that per the FDPA, federal death penalty trials must include jurors who will never impose a death sentence regardless of the facts and the law.

## C. The Defendant's First Amendment Argument Fails

The defendant also seeks to uphold prospective jurors' First Amendment rights to sit on capital cases, arguing that excluding a juror who opposes the death penalty on religious grounds violates the First Amendment's Free Exercise and Establishment clauses. Without arguing his standing to raise this claim,[6] it should be rejected on its merits.

Stated simply, jurors are not excluded from service on capital cases because of their affiliation with any religion – jurors of any (and no) religion are excluded if they state that they hold a belief that prevents or substantially impairs their ability to impartially decide a case because they cannot follow the court's instructions. Thus, for example, a Catholic or a Quaker who informs the court that, although his religious beliefs oppose the death penalty, he can set aside those beliefs and impose the death penalty in an appropriate case would not be disqualified.

The defendant fails to make a threshold showing of a First Amendment free-exercise violation. *See Tilton v. Richardson*, 403 U.S. 672, 678 (1971) (explaining four questions courts must consider when posed with free-exercise claims: 1) Does the government action reflect a secular purpose?; 2) Is the primary effect of the action to advance or inhibit religion?; 3) Does the action foster excessive government entanglement with religion?; and 4) Does the implementation of the action inhibit the free exercise of religion?)). Death qualification serves a legitimate secular objective of identifying jurors who would be unable to follow their oaths as jurors to make a sentencing decision based only on the facts and law presented in court. What is

---

[6] The defendant's motion cites *Powers v. Ohio*, 499 U.S. 400, 413-16 (1991) for the proposition that he has standing to raise a third-party claim in the jury selection process, but *Powers* related to peremptory strikes based on the protected class of race, not cause strikes based on religious beliefs that prevent a juror from following the law. While the Supreme Court has yet to rule on the propriety of peremptory strikes based on religious affiliation, *see Miller-El v. Dretke*, 545 U.S. 231 (2005) (Justice Breyer, in his concurring opinion, noted that "[s]ome lower courts have extended *Batson's* rule to religious affiliation . . ."), the government is not aware of any case that had extended standing to cover claims that a juror's beliefs prevent them from following the law as provided by the Court.

more, it does not inhibit the free exercise of religion. Jurors are not removed because of their religious beliefs. Rather, they are only removed if they state they are unable to decide a case based on the facts and law, without regard to the source of that conviction. *See McCluskey, supra*, No. 10-2734-JCH (denying First Amendment claims). For similar reasons, defendant's Article IV argument fails. A prospective juror's religion or religious beliefs do not potentially disqualify the juror from service; only his inability to apply the law does so.[7]

For all the stated reasons, the defendant's request to preclude the Court from determining if a juror could be "impartial" in a death penalty case should be rejected.

## IV. Seeking the Death Penalty in Counts 25-33 Does Not Violate Separation of Powers

In his fourth claim, the defendant contends that the government has usurped Congress's legislative powers by charging him with a capital crime, to wit: violating 18 U.S.C. § 924(j) by using a firearm to commit murder during and in relation to a federal crime of violence, where the predicate crime of violence is a violation of 18 U.S.C. § 249.[8] The defendant also argues that racial motivation should not be permitted as a nonstatutory aggravating factor for the purposes of determining his sentence under the Federal Death Penalty Act. In essence, the defendant asks this Court to carve out a judicial exemption from § 924(j) for § 249 crimes of violence and also impose a blanket prohibition of the consideration of a defendant's racial motivation for his offenses in the punishment phase of a death penalty case. The defendant cites no authority that

---

[7] Courts considering peremptory strikes based on religion in non-capital cases have reached the same conclusion: that, even assuming striking a juror peremptorily based on his religious affiliation was unconstitutional, such a strike is permitted if based on religious beliefs that might interfere with their ability to follow the law, rather than mere affiliation. *See, e.g.*, *United States v. DeJesus*, 347 F.3d 500, 510-11 (3d Cir. 2003), and cases cited therein.

[8] Defendant's heading for this section of his motion asks the Court to strike the notice of intention to seek the death penalty in its entirety with regard to the § 924(j) counts. To the extent that this accurately reflect Defendant's request, it fails to acknowledge that the § 924(j) counts are predicated on two separate civil rights crimes of violence, one of which expressly includes the death penalty as a potential punishment. (Indictment (DE 2), ¶ 20); 18 U.S.C. § 247(d)(1).

suggests such an extraordinary decision is warranted and disregards settled Supreme Court and Fourth Circuit precedent regarding the executive branch's broad discretion in carrying out its constitutional duty to enforce the laws enacted by Congress and the presentation of nonstatutory aggravating factors to assist the jury in making the individualized determination whether a death-eligible defendant should receive the maximum penalty.

Contrary to the defendant's central argument, the charges in this case adhere directly to the intentions Congress expressed in enacting the underlying criminal statutes. Congress, as the defendant observes, did not include death as a punishment for violations of 18 U.S.C. § 249. *Id.* § 249(a)(1)(B). Consistent with that decision, the § 249 charges in the Indictment are not charged as death-eligible counts. (Indictment (DE 2), Counts 1-12). Congress also determined, however, that the death penalty should be a potential punishment for federal crimes of violence if, in the course of their commission, the defendant used a firearm to commit murder (as defined in 18 U.S.C. § 1111) and embodied that intent in § 924(j). As the Supreme Court has acknowledged, Congress's focus in enacting § 924 was, broadly speaking, an attempt to curb the use of firearms during the commission of a crime of violence. *Cf. Muscarello v. United States*, 524 U.S. 125, 133 (1998) (quoting from legislative history of § 924(c)). Consistent with that intent, the § 924(j) charges in the Indictment are charged as death-eligible counts. (Indictment, Counts 24-33). Thus, the defendant's charges conform precisely with Congress's intentions as they pertain to the § 249 and § 924(j) charges he faces in this case.

The defendant's argument ignores the distinctions between § 249 and § 924 and attempts a feat of legal sleight of mind by contending that Congress's intent regarding the appropriate punishment for § 249 offenses should countermand its express statement of intent regarding the appropriate punishment for murder-by-firearm charges under § 924(j). This is, of course, not the

appropriate inquiry and, unsurprisingly, the defendant cites no precedent in support of this counterintuitive approach to construing congressional intent and the express language of § 924. This lack of precedent is particularly instructive given that there are numerous criminal offenses that, like § 249, are not themselves punishable by death, but are crimes of violence or drug trafficking offenses that may result in death-eligible charges under § 924(j) if their commission involves murder-by-firearm. *E.g.,* 18 U.S.C. § 1951(a) (Hobbs Act, including penalty provision); *United States v. McDaniels*, 147 F. Supp. 3d 427 (E.D. Va. 2015) (holding that Hobbs Act robbery is a crime of violence under § 924). Also instructive is the lack of any indication in § 924 itself that Congress intended to exclude from § 924(j) crimes of violence or drug trafficking offenses that did not themselves incorporate the death penalty as a possible punishment for the underlying offense. To the contrary, if the scope of § 924(j) were limited to only death-eligible offenses, as the defendant suggests, its inclusion in the U.S. Code would be surplusage.

Similarly, there is no indication that in enacting § 249, Congress considered and rejected the possibility of death as a punishment where the § 249 offense was coupled with the additional elements required by § 924(j). For example, in enacting § 249, Congress included statutory findings and rules of construction expressly setting forth its views on the nature and scope of § 249 and how it should be interpreted. *See* Pub. L. No. 111–84, Div. E §§ 4702 & 4710. While these provisions demonstrate that Congress intended that § 249 address bias-motivated crimes of violence, these provisions contain no language that would directly or indirectly support the conclusion that Congress considered and rejected the possibility that § 249 could be used as a predicate for a death-eligible § 924(j) charge.

Moreover, no separation of powers issue exists where a defendant's conduct could be prosecuted under different statutes that have different sentencing provisions, regardless of whether the prosecutors choose to charge under the statute that provides the more severe punishment. In *United States v. Batchelder*, 442 U.S. 114 (1979), the defendant was a felon who received a firearm that had traveled in interstate commerce. His conduct violated two separate federal statutes in existence at that time, 18 U.S.C. § 922(h) and § 1202(a). The substantive elements of both crimes were identical for someone in the defendant's position, but the maximum penalty differed: § 922(h) was punishable by up to five years' imprisonment, while § 1202(a) was limited to only two years' imprisonment. Batchelder was convicted under § 922(h) and sentenced (under § 924(a)) to the maximum five years in prison. Batchelder advanced the same arguments as Defendant Roof does in the instant case regarding an alleged separation of powers violation.

A unanimous Court rejected the defendant's argument that the statutes violated his equal protection and/or due process rights on the theory that they allowed the prosecutor unfettered discretion in selecting which of two penalties to apply; and rejected his claim that the statutes impermissibly delegated to the Executive Branch the Legislature's responsibility to fix criminal penalties.[9] "So long as overlapping criminal provisions clearly define the conduct prohibited and the punishment authorized, the notice requirements of the Due Process Clause are satisfied." *Id.*

---

[9] The Court also rejected an argument not raised here, that in passing § 1202(a) after § 922(h), Congress implicitly repealed the punishment provisions applicable to § 922(h). *Batchelder*, 442 U.S. at 122 (noting it is "not enough to show that two statutes produce differing results when applied to the same factual situation…[r]ather, the legislative intent to repeal must be manifest in the 'positive repugnancy between the provisions'")(internal citations omitted). In the instant case, not only is there no "repugnancy" between § 924(j) and § 249(a), but § 924(j) as charged is fulfilling its precise purpose by making another federal crime of violence punishable by death because it involved the use of a firearm to commit murder.

at 123. "[W]hen an act violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against any class of defendants." *Id*. at 123-24.

> The prosecutor may be influenced by the penalties available upon conviction, but this fact, standing alone, does not give rise to a violation of the Equal Protection or Due Process Clause. Just as a defendant has no constitutional right to elect which of two applicable federal statutes shall be the basis of his indictment and prosecution, neither is he entitled to choose the penalty scheme under which he will be sentenced.

*Id.* at 125 (internal citations omitted).

The Court then explicitly rejected the precise claim raised in the instant case: that the statutes might impermissibly delegate to the Executive Branch the Legislature's responsibility to fix criminal penalties:

> The provisions at issue plainly demarcate the range of penalties that prosecutors and judges may seek and impose. In light of that specificity, the power that Congress has delegated to those officials is no broader than the authority they routinely exercise in enforcing criminal laws. Having informed the courts, prosecutors, and defendants of the permissible punishment alternatives available under each Title, Congress has fulfilled its duty.

*Id.* at 126.

Finally, the defendant argues that one of the nonstatutory aggravating factors alleged by the Government, *i.e.*, the defendant's race-based motive for his crimes, somehow implicates the separation of powers doctrine by "invoking the underpinnings of the HCPA in the death penalty selection process." DE 291, at 21. The defendant cites no authority for this proposition, and the legal basis for his claim is unclear. Instead, the defendant's argument is based on an attempt to conflate § 249 with the distinct offense of murder-by-firearm contained in § 924(j). A nonstatutory aggravating factor is simply an aspect of the crime for the jury to consider in selecting the appropriate punishment if the jury convicts the defendant of a death-eligible charge. Here, the government alleges that the defendant's race motivation should be a factor for the jury

to consider in determining whether this particular murder-by-firearm warrants the death penalty. This is no different than if racial motivation played a factor in any other type of crime that is not, standing alone, death-eligible but serves as a predicate crime of violence for a § 924(j) charge.

Moreover, the defendant's implicit suggestion that § 249 evinces a congressional intent that a defendant's racial motivation is an inappropriate factor in determining whether an offense warrants a punishment of death is flatly contradicted by the fact that Congress has enacted multiple criminal statutes in which race-motivated offenses are potentially subject to the death penalty if those offenses result in death. *E.g.*, 18 U.S.C. § 245(b)(2), (b)(3) & b(5) (race-motivated interference with federally protected rights); 18 U.S.C. § 247(c) (race-motivated destruction of religious real property); *see also* 18 U.S.C. § 241 (conspiracy against federally protected rights); 18 U.S.C. § 242 (deprivation of federal rights under color of law).

The defendant's motion acknowledges that controlling precedent (*United States v. Higgs*, 353 F.3d 281, 321-22 (4th Cir. 2003)), permits the Government to allege nonstatutory aggravating factors without falling afoul of the non-delegation doctrine. And, as addressed below, a nonstatutory aggravating factor is not an element, or the functional equivalent of an element, of the crime alleged, so it has no role in defining the crime or setting the maximum sentence, and thus plays no part in any analysis of the defendant's separation of powers claim relating to § 924(j) and § 249(a).

In sum, Congress enacted two distinct statutes, each defining a crime and each setting the penalties for that crime. Even if both of those crimes contained identical elements, no separation of powers issue would exist by virtue of the prosecutors charging the one that carried the more severe punishment. Still less can it be argued that a separation of powers issue exists in this case, where the very purpose of § 924(j) is to make other federal crimes (involving violence

or drug trafficking), such as § 249(a), eligible for the death penalty when the defendant's conduct includes using a firearm to commit murder.

## V.     The Nonstatutory Aggravators Are Appropriate and Constitutional

In his fifth claim, the defendant moves the Court to strike certain nonstatutory aggravating factors: that he attempted to incite violence by others, that his murders caused victim impact, that in committing the murders he endangered safety of others who were not killed, that he was motivated to commit his crimes by racial animus, and that he selected victims who were participating in a Bible study group in their church in order to magnify the societal impact of his crime. DE 291, at 22-23.

The defendant claims first that the nonstatutory aggravators are improper because they duplicate elements of the charged offenses, violating the separation of powers doctrine and the Eighth Amendment. This argument ignores the role of nonstatutory aggravating factors under the FDPA and is contrary to Fourth Circuit and Supreme Court precedent. Second, the defendant claims that the nonstatutory factors should be stricken because they are duplicative of each other. This argument fails as well because the factors are not duplicative but instead address different aspects of aggravation.

### A.     The FDPA's Scheme and the Role of Nonstatutory Aggravating Factors

The FDPA's penalty phase process requires the jury to first determine the defendant's *eligibility* for a death sentence and then *select* the appropriate sentence. *See Jones v. United States,* 527 U.S. 373, 376-79 (1999) (summarizing FDPA sentencing process); *United States v. Runyon*, 707 F.3d 475, 486-87 (4th Cir. 2013) (same). The eligibility determination involves finding at least one threshold intent factor set forth in 18 U.S.C. § 3591(a)(2) and at least one of the sixteen statutory aggravating factors enumerated in 18 U.S.C. § 3592(c). Because these

factors render a defendant *eligible* to receive a greater sentence than the jury's guilty verdict alone would permit, they act as functional equivalents of an element of the offense and must be presented to the grand jury for inclusion in the indictment and found by the jury at trial unanimously and beyond a reasonable doubt. *Higgs*, 353 F.3d at 298.

Once a defendant is deemed *eligible* for a death sentence (*i.e.*, once the jury finds a requisite intent factor and at least one statutory aggravating factor), the jury then engages in wide-ranging process of selecting the appropriate sentence. "The FDPA reflects this broad conception of capital sentencing, permitting the jury to consider not only a number of expressly enumerated [*i.e.*, statutory] aggravating factors, but 'any other aggravating factor for which notice has been given [*i.e.*, nonstatutory aggravators].'" *Runyon*, 707 F.3d at 491 (quoting 18 U.S.C. § 3592(c)); *see also* 18 U.S.C. § 3593(d).[10] As the Court in *Higgs* explained, "the use of nonstatutory aggravating factors serves only to individualize the sentencing determination." *Higgs*, 353 F.3d at 320 (citing *Zant*, 462 U.S. at 878-79; *United States v. McCullah*, 76 F.3d 1087, 1106-07 (10th Cir. 1996)). The jury then weighs both types of aggravating factors – statutory and nonstatutory – against the defense's proposed mitigating factors under 18 U.S.C. § 3592(a), in order to make the moral judgment as to the appropriate sentence pursuant to 18 U.S.C. § 3593(e).

---

[10] The federal courts of appeals, including the Fourth Circuit, are in agreement that nonstatutory aggravating factors are not required to be alleged in a capital indictment. *See United States v. Lighty*, 616 F.3d 321, 367-68 (4th Cir. 2010); *United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003); *see also United States v. Lawrence*, 735 F.3d 385, 420 (6th Cir. 2013); *United States v. Fell*, 531 F.3d 197, 237-38 (2d Cir. 2008); *United States v. Mitchell*, 502 F.3d 931, 979 (9th Cir. 2007); *United States v. Brown*, 441 F.3d 1330, 1368 (11th Cir. 2006); *United States v. Purkey*, 428 F.3d 738, 749-50 (8th Cir. 2005); *United States v. Bourgeois*, 423 F.3d 501, 507-08 (5th Cir. 2005). These courts all recognize the important distinction between statutory aggravating factors, which are eligibility factors that must be included in the indictment and at least one of which must be found as a prerequisite to imposing death, and nonstatutory aggravating factors, which are selection factors that need not be included in the indictment and are relevant only to the individualization of the sentence.

"[A]s envisioned by the FDPA, capital sentencing proceedings are not only wide-ranging, they are in important respects even-handed." *Id.* at 492. "Just as the defendant may introduce evidence on a myriad of mitigating factors, so the prosecution may try to prove an equally varied range of aggravating factors." *Id.* Here, as the Fourth Circuit has instructed, this Court "must avoid constraining unduly the prosecutor's ability to paint a complete picture of the defendant's crime and character, less the jury be less than fully and amply informed." *Id.*

## B. Nonstatutory Aggravators that Reflect Aspects of the Defendant's Crimes Are Appropriate

As the FDPA and the Fourth Circuit has made clear, the government is entitled to present aggravating circumstances that address aspects of both the defendant's crime and the defendant's character. *See Runyon*, 707 F.3d at 491-92 (noting the need to permit aggravating factors that "paint a complete picture of the defendant's crime and character" instead of artificially limiting the prosecution to "but a narrow subset of the available aggravating evidence"); *Zant v. Stephens*, 462 U.S. 862, 879 (1983) ("What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and *the circumstances of the crime*.") (emphasis added). Thus, aspects of the crime – *e.g.*, that Roof attempted to incite violence by others, that in committing the murders he endangered safety of others who were not killed, that he was motivated to commit his crimes by racial animus, and that he selected victims who were participating in a Bible study group in their church in order to magnify the societal impact of his crime – are properly used as nonstatutory aggravating factors.[11] The defendant

---

[11] While the defendant's argument fails on the legal basis that an aggravating factor may reflect aspects of the crime, it would also fail factually even if his legal argument was valid. That is because in this instance the nonstatutory aggravators are not actually duplicative of the elements of each of the death-eligible offenses. For example, while racial motive is a relevant element of the Section 249 offenses, the defendant's racial motive is not an element of the Section 247 offenses. More generally, while racial motive may be part of an element of the Section 249 offense, the aggravators alleged here go beyond the mere elements of Section 249 (*e.g.*, a defendant is guilty of Section 249 regardless of whether he incited

attempts to overcome this core principle and suggest that permitting the Government to allege nonstatutory aggravators that address aspects of the crime violate separation of powers and the Eighth Amendment.

First, *Higgs* "reject[ed] the "argument" that "affording prosecutors virtually unlimited discretion in identifying and defining nonstatutory aggravating factors" somehow violated the "separation-of-powers doctrine." *Higgs*, 353 F.3d at 321 (internal citations omitted). The Court reasoned that there was no improper delegation of legislative authority because the FDPA fully defined what was a death-eligible offense through the eligibility process, which required "that the jury unanimously find at least one intent factor and one statutory aggravating factor before the defendant becomes death eligible." *Id.* Only after those findings makes the defendant eligible, is "the prosecutor afforded discretion to argue that additional nonstatutory aggravators combine with the statutory aggravators to outweigh any mitigating factors that have been submitted for consideration, thus assisting the jury in its task of determining whether a death-eligible defendant should indeed receive the maximum sentence." *Id.* Even if this was deemed a delegation, the Court concluded that it was a constitutionally permissible delegation. *Id.* (citing, *inter alia*, *Tipton*, 90 F.3d at 895).

Despite this plain rejection of the separation of powers argument, the defendant seeks to argue that *Higgs* somehow narrowed the FDPA's wide-ranging consideration of "the defendant's crime and character," *Runyon*, 707 F.3d at 491-92, when it referred to the discretion to choose "*additional* nonstatutory aggravators." Contrary to the contrived reading of *Higgs* proposed by the defendant, the Court's use of "additional" plainly was intended to convey only that prosecutors can allege nonstatutory aggravators in addition to the statutory aggravating factors.

others to violence or sought to select victims that would magnify the societal impact of his attack). Even more plainly, the alleged aggravators are in no manner covered by the elements of Sections 247 and 924(j).

The term "additional," in this context, does not require nonstatutory aggravating factors address facts unrelated to the defendant's crime of conviction. *See Runyon*, 707 F.3d at 491-92 (noting the need to permit aggravating factors that "paint a complete picture of the defendant's crime and character").[12]

The defendant next argues that the Eighth Amendment is violated by the use of these nonstatutory aggravating factors because they do not distinguish the defendant from others found guilty of murder. As an initial matter, the Eighth Amendment merely requires the sentencing scheme to distinguish between the defendant and others found guilty of murder – it does not require distinguishing between the defendant and others found guilty of crimes similar or identical to the defendant's crimes. *See Runyon*, 707 F.3d at 503 (finding an aggravating factor distinguished the defendant from the "'mine-run' of murder defendants). Thus, aspects of the offense of conviction can well serve as the means of distinguishing between the defendant and others found guilty of murder.

This Eighth Amendment argument further fails because nonstatutory aggravators are not required to narrow the class of murderers eligible for the death penalty – that function is performed by the "eligibility" factors (the requisite intent and statutory aggravating factors). Nonstatutory aggravators individualize the selection of the appropriate sentence by calling the jury's attention to the individualized circumstances of the crime and character of the defendant. *Zant v. Stephens*, 462 U.S. 862 (1963):

---

[12] The defendant also cites *United States v. Johnson*, 915 F. Supp. 2d, 958, 1019 (ND. Iowa 2013). In *Johnson*, the court dismissed a nonstatutory aggravating factor alleging the defendant engaged in an uncharged distribution of a controlled substance because, *inter alia*, the FDPA already provided for a statutory aggravator involving two or more convictions for distributing controlled substances. This, *Johnson* held, constituted an "end run" around the statute. But the Fourth Circuit rejected this same argument in *Runyon*, 707 F.3d at 505, so *Johnson* is without value here. *See also United States v. Llera Plaza*, 179 F. Supp. 2d 464, 489-90 (E.D. Pa. 2001) (government did not engage in an "end run around the requirements of the 'previous conviction' statutory factor'" by alleging as a nonstatutory aggravator the defendant's contemporaneous conviction for a single drug-trafficking crime).

> Our cases indicate, then, that statutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty. But the Constitution does not require the jury to ignore other possible aggravating factors in the process of selecting, from among that class, those defendants who will actually be sentenced to death. What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime.

*Id.* at 878; *Runyon*, 707 F.3d at 491 ("Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, … the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment.") (quoting *Tuilaepa v. California*, 512 U.S. 967, 979-80 (1994)). The nonstatutory aggravators alleged – *e.g.*, racial motivation, selection of victims, and endangering the safety of others – all serve to call the jury's attention to particular circumstances of the offenses for the jury to weigh in deciding whether to select a death sentence once Roof is determined to be eligible. While in this case the nonstatutory factors do distinguish Roof from the run of the mill murderer, there is no Eighth Amendment requirement that they do so.

Moreover, the Fourth Circuit has been clear that even statutory aggravating circumstances can duplicate elements of the offense in distinguishing the defendant from other murderers. In *Lighty*, 616 F.3d at 368, n. 44, the Fourth Circuit rejected the defendant's Eighth Amendment claim that the only statutory aggravating factor alleged (death during the commission of another crime) merely duplicated the underlying crime and, therefore, failed to constitutionally narrow the class. And in *Higgs*, the Court found that the Eighth Amendment "does not prohibit the use of an aggravating factor during the sentencing phase that duplicates one or more elements of the offense of the crime found at the guilt phase." *Higgs*, 353 F.3d at 315 (citing, *inter alia*, *Lowenfield v. Phelps*, 484 U.S. 231, 246 (1988)). Notably, both *Lighty* and

*Higgs* relied on *Lowenfield*, the precise case Roof suggests is inapposite. DE 291, at 25.[13] The

defendant mistakenly cites *Llera Plaza*, 179 F. Supp. 2d at 483, as support for his argument that

aggravators cannot duplicate elements of the offenses, but the portion of that opinion quoted by

the defendant was included by *Llera Plaza* in order to show why it was wrong. After conducting

a thorough review of the precise claim raised here, *Llera Plaza* held that "the government would

not be barred from pleading and proving as aggravating factors elements of criminal offenses

which have been proved beyond a reasonable doubt during the guilt phase." *Id*. at 484-85;

*accord United States v. Bin Laden,* 126 F. Supp. 2d 290, 301 (S.D.N.Y. 2001); *United States v.

Johnson*, 136 F. Supp. 2d 553, 559 (W.D. Va. 2001); *United States v. Cooper*, 91 F. Supp. 2d 90,

108-09 (D.D.C. 2000); *United States v. Frank*, 8 F. Supp. 2d 253, 276 (S.D.N.Y. 1998).[14]

 For the foregoing reasons, the Court should reject the defendant's claim that nonstatutory

aggravating factors cannot address aspects of the crimes.

### C. The Nonstatutory Aggravators Are Not Impermissibly Duplicative of Each Other

 The defendant next argues that if aggravating factors duplicate each other, the jury's

weighing process becomes skewed. The Supreme Court has never decided this viability of this

type of claim. *Jones v. United States*, 527 U.S. 373, 398 (1999)("We have never before held that

aggravating factors could be duplicative so as to render them constitutionally invalid."). The

---

[13] *See also United States v. Umana*, 707 F. Supp. 2d 621, 637 (W.D.N.C. Apr. 19, 2010) ("Federal courts, including the Fourth Circuit, have uniformly applied the *Lowenfield* holding to aggravating factors that duplicate elements of federal homicide statutes.").

[14] Likewise, in death penalty cases previously decided under the Anti-Drug Abuse Act, 21 U.S.C. § 848(e), *et seq.,* courts uniformly have held that *Lowenfield* permits juries to consider as a statutory aggravating factor a mental culpability element (that the offender intentionally killed) which duplicates an element of the capital murder offense. *See United States v. Flores,* 63 F.3d 1342, 1370-72 & n. 31 (5th Cir. 1995); *United States v. Chandler,* 996 F.2d 1073, 1093 (11th Cir. 1993); *United States v. Edelin,* 134 F. Supp. 2d 59, 78 (D.D.C. 2001); *United States v. Walker,* 910 F. Supp. 837, 851 (N.D.N.Y. 1995); *United States v. Bradley,* 880 F. Supp. 271, 287-89 (M.D. Pa. 1994); *United States v. Pitera,* 795 F. Supp. 546, 556-557 (E.D.N.Y. 1992); *United States v. Pretlow,* 779 F. Supp. 758, 771-73 (D.N.J. 1991); *United States v. Cooper,* 754 F. Supp. 617, 621-22 (N.D. Ill. 1990).

*Jones* Court did then accept, for the sake of argument, the "double counting" theory – *i.e.*, duplicative aggravating factors skew the weighing process – before rejecting the claim that two aggravators were duplicative. *Id.* at 398. Illustrating that evidence could be relevant to different aggravating factors without rendering those factors duplicative, the Court found that the victim's "personal characteristics" was not duplicative of a separate aggravator addressing specifically the victim's "young age, her slight stature, her background, and her unfamiliarity with San Angelo" because the latter went to a different area of aggravation (victim vulnerability) while the former addressed the victim's individual uniqueness. Instead, "at best, certain evidence was relevant to two different aggravating factors." *Id.* at 399-400. The Court also noted that "any risk that the weighing process would be skewed was eliminated by the District Court's instruction" to the jury that it should weigh the value of each factor rather than counting the number of factors on each side. *Id.*

Prior to *Jones*, the Fourth Circuit did signal that certain aggravators could be in appropriately duplicative. *See United States v. Tipton*, 90 F.3d 861, 899 (4th Cir. 1996). [15] Regardless of whether the "double counting" theory is legally valid, the aggravating factors alleged in the instant case do not duplicate each other and so do not implicate the "double counting" problem. Here, rather than duplicate each other, the nonstatutory aggravators cited by the defendant call the jury's attention to differing aspects of his crime and mind-set. As alleged, it is clear that the nonstatutory aggravators address different areas of aggravation. "Racial motivation" describes the defendant's state of mind and odious racial-animus motive for murdering the victims. "Selection of victims" describes the defendant's decision making and specific choice to target

---

[15] In *Tipton*, the Court's review related to an allegation of multiple threshold intent factors under Title 21's capital sentencing scheme (21 U.S.C. § 848(n)(1)), which differs from the FDPA's (Title 18) structure, in which threshold intent factors are not deemed to be aggravating factors. *See United States v. Jackson*, 327 F.3d 273, 300 (4th Cir. 2003) (distinguishing *Tipton* on this basis).

churchgoers attending Bible study in order to magnify the societal impact of his crimes. "Attempt to incite violence" describes the defendant's goal and professed desire to prompt others into similar acts of violence. "Endangering the safety of others" describes how the defendant, by shooting so many rounds in an enclosed space, endangered the lives of others in addition to those he killed and attempted to kill (e.g., , at least one shot penetrated a wall and entered an adjoining room in which two people were hiding). And "victim impact" describes the harm done to the victims of the shooting and their families, friends and co-workers.

The defendant argues that the implication of the same evidence constitutes double counting. DE 291, p. 27. This argument ignores the distinction between evidence and the factors to which that evidence may relate. Particular items of evidence can, of course, be relevant to more than one aggravating factor. *Jones*, 527 U.S. at 399; *United States v. Fell*, 531 F.3d 197, 236 (2d Cir. 2008) ("Two factors are *not* duplicative merely because they are supported by the same evidence"); *Patton v. Mullin*, 425 F.3d 788, 809 (10th Cir. 2005) (aggravating factors of prior violent felony conviction and current status as parolee not duplicative simply because factors rely on same evidence). Contrary to defendant's argument, any theoretical issue with double counting would not concern the underlying evidence involved, but whether an aggravating factor itself is duplicative. Each of these alleged nonstatutory aggravators the defendant cites may in some way address overlapping parts of the evidence, but they also highlight different aspects of the defendant's crimes and so are not duplicative. *See Runyon*, 707 F.3d at 506 ("The whole purpose of the aggravator/mitigator structure is to provide a broad umbrella under which each party may advance its most compelling arguments, leaving the jury as the ultimate arbiter of their weight."). Because the factors are not actually duplicative, they do not implicate the "double counting" problem.

Additionally, the FDPA contemplates a wide-ranging sentencing hearing, where both parties have broad leeway to present information relevant to the jury's sentencing decision. "Whereas [the defendant] may wish to severely cabin the jury's sentencing discretion by restricting the evidence it may hear and the inferences it may draw, the FDPA anticipates that the jury will confront a broad array of information and enjoy considerable leeway in assessing it." *Runyon*, 707 F.3d at 491 (rejecting defendant's challenges to aggravating factors).

For the foregoing reasons, the Court should reject the defendant's attempt to curtail the Government's use of nonstatutory aggravating factors.

## VI.    The Petit Jury's Weighing of Aggravating and Mitigating Factors is Not a Fact that Must be Found Beyond a Reasonable Doubt and the Grand Jury Need Not Find Nonstatutory Aggravating Factors

It is firmly established in the Fourth Circuit that the petit jury's selection of the appropriate punishment after the defendant is determined to be eligible for the death penalty is not a fact that must be found beyond a reasonable doubt. *Runyon*, 707 F.3d at 515-16.[16] For similar reasons, the Fourth Circuit has repeatedly determined that the grand jury need not be found by the grand jury before presentation to the petit jury. *Lighty*, 616 F.3d at 367-68; *Higgs*, 353 F.3d at 298-99. Despite this well-settled law, the defendant seeks to have this Court take a "fresh look" at these questions based on the Supreme Court's recent decision invalidating Florida's capital punishment scheme that vested ultimate authority to find the facts rendering a defendant eligible for the death penalty with the judge. *Hurst v. Florida*, 136 S.Ct. 616 (2016) (applying *Ring v. Arizona*, 536 U.S. 584 (2002) to the Florida capital sentencing scheme). Nothing in *Hurst* purports to address the reasoning underlying the Fourth Circuit's FDPA

---

[16] The FDPA sets forth the weighing standard in 18 U.S.C. § 3593(e): "the jury . . . shall consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death . . ." Absent from the definition is any reference to the "beyond a reasonable doubt" standard. *Compare* 18 U.S.C. §3593(c) (the government bears "[t]he burden of establishing the existence of any aggravating factor … beyond a reasonable doubt").

holding that only facts that make a defendant eligible for an increased sentence must be found

beyond a reasonable doubt by a petit jury after having been found by a grand jury.

In 2013, the Fourth Circuit rejected the argument that *Ring* applies to the jury's weighing

decision, finding that such a decision is not a finding of fact but rather a reasoned moral

judgment about the appropriate sentence:

> Runyon's argument, however, is belied by the plain text of the FDPA. Under the statute, although the government bears "[t]he burden of establishing the existence of any aggravating factor ... beyond a reasonable doubt," the jury must ultimately determine "whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death" in order to recommend that punishment. 18 U.S.C. § 3593(c), (e). Contra Runyon, the FDPA does not require the jury to find that the aggravating factors outweigh the mitigating factors beyond a reasonable doubt, and the jury therefore need not be so instructed.

> To be sure, the Supreme Court has held that the Sixth Amendment requires juries to find aggravating factors necessary for the imposition of the death penalty beyond a reasonable doubt, *see Ring v. Arizona,* 536 U.S. 584 (2002), but it has never extended this requirement to juries' weighing of aggravating and mitigating factors. The only appellate decision to make that leap is one by a panel of the Sixth Circuit that has since been vacated pending rehearing en banc. *See United States v. Gabrion,* 648 F.3d 307, 325–28 (6th Cir. 2011), *reh'g en banc granted, opinion vacated,* 648 F.3d 307 (6th Cir. 2011).[17] In contrast to this outlier, at least four other circuits have held that the reasonable-doubt standard does not apply to the weighing of aggravating and mitigating factors, reasoning that that process constitutes not a factual determination, but a complex moral judgment. *See United States v. Fields,* 516 F.3d 923, 950 (10th Cir. 2008); *United States v. Mitchell,* 502 F.3d 931, 993–94 (9th Cir. 2007); *United States v. Sampson,* 486 F.3d 13, 31–32 (1st Cir. 2007); *United States v. Fields,* 483 F.3d 313, 345–46 (5th Cir. 2007). We find this reasoning persuasive and accordingly join the broad consensus of authority.

*Runyon*, 707 F.3d at 516.

---

[17] Of note, the en banc Sixth Circuit ultimately ruled, consistent with every other federal circuit to address the issue, that the FDPA's weighing standard is not a "fact" that must be found beyond a reasonable doubt. *United States v. Gabrion*, 719 F.3d 511, 531-33 (6th Cir. 2013) ("Every circuit to have addressed the argument that Gabrion makes here – six circuits so far – has rejected it. Today we become the seventh. Gabrion's argument is meritless.") (internal citations omitted).

Recognizing that his arguments are foreclosed by Fourth Circuit precedent, the defendant's claim turns on an extraordinarily broad interpretation of *Hurst* as significantly expanding the rule of *Apprendi* and *Ring* through implication to include the selection of punishment by weighing of aggravating and mitigating factors as a finding of fact and not a "complex moral judgment." Under that interpretation, *Hurst* nullified the rationale underlying the decisions of seven federal circuit courts without so much as mentioning them and effectively invalidated the FDPA without discussion, argument or reasoning. But a careful reading of *Hurst* makes clear that the Court simply applied *Ring* to Florida's capital sentencing scheme. It did not expand *Ring* in any way and did not hold that the weighing consideration is a finding of fact.

The Court defined the issue it was deciding in *Hurst* as follows: "We granted certiorari to resolve whether Florida's capital sentencing scheme violates the Sixth Amendment in light of *Ring* . . ." *Hurst*, 136 S.Ct. at 621. *Hurst's* holding is stated at the beginning of the opinion as follows: "We hold [Florida's] sentencing scheme unconstitutional. The Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death." *Id*. at 619. The holding is restated at the end of the opinion: "Florida's sentencing scheme, which required the judge alone to find the existence of an aggravating circumstance, is therefore unconstitutional." *Id*. at 624; *see also id.* (overruling prior decisions "to the extent they allow a sentencing judge to find an aggravating circumstance … that is necessary for the imposition of the death penalty"). Nothing in either statement of the Court's holding extends beyond a simple application of *Apprendi* and *Ring*: that any fact (*i.e*., an aggravating circumstance) that exposes a defendant to greater punishment than that authorized by the jury's guilty verdict must be submitted to a jury. *Hurst* in no way purports to define, contrary to the holdings of *Runyon* and

six other circuit opinions, that the jury's weighing of aggravating and mitigating factors is a "fact" that must be found beyond a reasonable doubt.

The defendant's attempt to find such a definition in *Hurst* relies solely on the Court's quotation of the Florida statute, which refers to the weighing as a "fact." *See* DE 291, at 30 (claiming that a block quote from *Hurst*, which was largely quoting Fla Stat. §§775.082(1), 921.141(3),[18] "demonstrates that the Court viewed the trial judge's weighing determination as a finding of fact"). In essence, the defendant would have this Court accept that a Florida statute's use of the term "fact" to describe the trial court's weighing as announcing a new constitutional rule – which overrules seven federal circuit courts, including the Fourth – requiring the selection of punishment to be found by a jury beyond a reasonable doubt. Moreover, that conclusion would run in the face of the stated holding by the Court.

Contrary to this extraordinarily broad interpretation of *Hurst*, the Court's decision is replete with more limited references to "fact" findings that are entirely consistent with how every federal circuit court has understood "fact" to be defined by *Ring*, *i.e.*, "facts" that render a defendant eligible for a death sentence. "[T]he jury renders an 'advisory sentence' of life or death without specifying **the factual basis** of its recommendation." *Hurst*, 136 S.Ct. at 620. "[T]he sentencing order must 'reflect the trial judge's independent judgment about **the existence of aggravating and mitigating factors**.'" *Ibid*. "[T]he judge based the sentence in part on her independent determination that both **the heinous-murder and robbery aggravators existed**."

---

[18] After *Hurst*, the Florida statutes were amended, but the Supreme Court is quoting the versions applicable from October 1, 2010 through March 6, 2016, available on Westlaw. As quoted in *Hurst* and now given paramount weight by the defendant, Fla Stat. §921.141(3) uses the term "facts" to be found by the trial judge to describe "[t]hat sufficient aggravating circumstances exist" and "[t]hat there are insufficient mitigating circumstances to outweigh the aggravating circumstances." That the Florida statute, quoted by *Hurst* to describe the Florida scheme, uses the term "fact" to describe both the existence of aggravating circumstances and the weighing of aggravating and mitigating circumstances cannot be read to infer that the Court in *Hurst* somehow determined that the weighing process is a "fact" for purposes of its extensive Sixth Amendment jurisprudence.

*Ibid.* "*Ring*, the court recognized, 'held that capital defendants are entitled to a jury determination of **any fact** on which the legislature conditions an increase in the maximum punishment.'" *Ibid.* "In *Ring*, we concluded that Arizona's capital sentencing scheme violated *Apprendi's* rule because the State allowed a judge to **find the facts** necessary to sentence a defendant to death." *Id.* at 621. "Had Ring's judge not engaged in any **factfinding**, Ring would have received a life sentence." *Ibid.* "Ring's death sentence therefore violated his right to have a jury **find the facts** behind his punishment." *Ibid.* "The analysis the *Ring* Court applied to Arizona's sentencing scheme applies equally to Florida's." *Id.* at 621-22. "As with Ring, a judge increased Hurst's authorized punishment based on her own **factfinding**." *Id.* at 622.

These quotes, along with the plain statements of the Court's holding referenced above, demonstrate that the Court in *Hurst* was simply applying *Ring's* rule – that a jury find the facts that expose the defendant to the death penalty – to Florida's sentencing scheme, which permitted the judge to independently find such facts. They do not support the defendant's claim that *Hurst* expanded the definition of "fact" or "factfinding" to include the jury's selection of the sentence through weighing of aggravating and mitigating factors.[19] Nothing in *Hurst* purports to invalidate the decisions of seven federal circuits that, under *Ring*, the FDPA's weighing process

---

[19] Moreover, Section 3593(e) in requiring the jury to select the punishment justified by aggravating and mitigating factors, is no different from what this Court does under Section 3553 in every other criminal sentencing: "consider" various "factors" and then determine that a sentence is "sufficient, but not greater than necessary" to comply with the purposes set forth in Section 3553(a)(2). The Court's determination is just as necessary to the selection of the sentence under Section 3553 as the jury's weighing determination under Section 3593(e). Thus, for *Apprendi* purposes, the judge's traditional sentencing role and the capital jury's selection determination are indistinguishable, meaning that the defendant would have this Court read *Hurst* as requiring a jury to find beyond a reasonable doubt that a particular sentence is sufficient but no greater than necessary without involvement by the district judge. *See Gabrion*, 719 F.3d at 533.

is not a "fact" to be "found" by the jury, but is instead a process whereby juries make a reasoned moral judgment about the appropriate sentence.[20]

The defendant's motion also hastens to dismiss the Court's decision in *Kansas v. Carr*, 136 S.Ct. 633 (2016). While the holding is not directly applicable, the Court's discussion in *Carr* about value/weight judgments versus findings of fact effectively rejects the defendant's argument here:

> Approaching the question in the abstract, and without reference to our capital-sentencing case law, we doubt whether it is even possible to apply a standard of proof to the mitigating-factor determination (the so-called "selection phase" of a capital-sentencing proceeding). It is possible to do so for the aggravating-factor determination (the so-called "eligibility phase"), because that is a purely factual determination. The facts justifying death set forth in the Kansas statute either did or did not exist—and one can require the finding that they did exist to be made beyond a reasonable doubt. Whether mitigation exists, however, is largely a judgment call (or perhaps a value call); what one juror might consider mitigating another might not. And of course the ultimate question whether mitigating circumstances outweigh aggravating circumstances is mostly a question of mercy—the quality of which, as we know, is not strained. It would mean nothing, we think, to tell the jury that the defendants must deserve mercy beyond a reasonable doubt; or must more-likely-than-not deserve it.

*Id*. at 642.

*Hurst* was decided on January 12, 2016, and *Carr* was decided on January 20, 2016. It strains credulity to believe that the same Court that plainly recognized in *Carr* the distinction between findings of fact for the eligibility phase versus the value-laden process in the selection phase would have, a mere eight days earlier in *Hurst*, effectively overturned the Fourth Circuit's

---

[20] Defendant's motion included an exhibit showing that Delaware's Supreme Court agreed to consider the impact of *Hurst* on Delaware's capital sentencing scheme. That court has since issued a divided opinion finding that the Delaware sentencing scheme – which left sentencing to the judge with only an advisory recommendation from the jury – was unconstitutional after *Hurst*. *See Rauf v. State*, 2016 WL 4224252 (Del. Aug. 2, 2016). However, two other state courts rejected the claim that *Hurst* expanded *Ring*. *See People v. Rangel*, 62 Cal.4th 1192, 1235, 367 P.3d 649 (Supreme Court of California, March 28, 2016); *Ex Parte State*, 2016 WL 3364689, *6 (Ala. Ct Crim. App. June 17, 2016) ("The Court in *Hurst* did nothing more than apply its previous holdings in *Apprendi* and *Ring* to Florida's capital-sentencing scheme. The Court did not announce a new rule of constitutional law, nor did it expand its holdings in *Apprendi* and *Ring*.").

holding that weighing aggravators and mitigators in the selection phase is a complex moral judgment and not a finding of fact. *See Runyon*, 707 F.3d at 516.

The defendant's motion appends an argument that *Hurst*, by expanding the definition of a "fact that exposes the defendant to a greater maximum punishment" to include the FDPA's weighing process, by implication incorporated nonstatutory aggravating factors into the same category. He claims that both – the weighing process and the nonstatutory aggravators – act as the functional equivalent of elements of the offense and so both must also be presented to the grand jury. That argument, too, is foreclosed by binding Fourth Circuit precedent and can only be undone if this Court concludes that *Hurst* expanded *Ring* in the manner argued by the defendant. *See Higgs*, 353 F.3d at 298 (rejecting claim that Indictment Clause requires submission of nonstatutory aggravating factors to grand jury because such factors do not increase the maximum punishment and so do not act as elements of a greater offense); *see also*, *supra*, n.10 (collecting cases).

For the reasons stated above, *Hurst* merely applied the rule of *Ring* to Florida's capital sentencing scheme; it did not expand *Ring/Apprendi* to encompass the "complex moral judgment" involved in selecting the appropriate punishment. As described above, nonstatutory aggravating factors do not establish eligibility for the death sentence, so they do not function as the equivalent of elements of the offense and need not be presented to the grand jury. The defendant's claim should be denied.

## Conclusion

The final section of the defendant's motion merely seeks to preserve certain claims while recognizing they are foreclosed by binding precedent. Because his motion does not advance any new arguments on those foreclosed issues, or otherwise argue why the precedents should not be

followed, the Government will not respond to the merits of the claims and will instead request that this Court deny them based on the precedent cited by the defendant.

For all the foregoing reasons, the defendant's Motion to Strike the Death Penalty as a Possible Punishment in this Case should be denied in its entirety.

Respectfully submitted,

BETH DRAKE
ACTING UNITED STATES ATTORNEY
DISTRICT OF SOUTH CAROLINA

BY: s/*Julius N. Richardson*
JULIUS N. RICHARDSON (ID #9823)
NATHAN WILLIAMS
Assistant United States Attorneys
1441 Main Street, Suite 500
Columbia, SC 29201
August 22, 2016                    Tel. (803) 929-3000