```
1                    IN THE DISTRICT COURT OF THE UNITED STATES
                            DISTRICT OF SOUTH CAROLINA
2                              CHARLESTON DIVISION

3

4      UNITED STATES OF AMERICA,      )         2:15-CR-472
                                      )
5                 Plaintiff,          )
                                      )
6      VS                             )
                                      )         Charleston,
7      DYLANN STORM ROOF,             )         South Carolina
                                      )         September 1, 2016
8                 Defendant.          )

9

10                       TRANSCRIPT OF HEARING
                 BEFORE THE HONORABLE RICHARD M. GERGEL,
11                 UNITED STATES DISTRICT JUDGE

12     APPEARANCES:

13     For the Plaintiff:     JULIUS NESS RICHARDSON
                              Assistant U.S. Attorney
14                            U.S. Attorneys Office
                              1441 Main Street, Suite 500
15                            Columbia, South Carolina 29201

16                            MARY J. HAHN
                              Assistant U.S. Attorney
17                            U.S. Department of Justice
                              601 D Street NW, Room 5200
18                            Washington, DC 20003

19                            NATHAN STUART WILLIAMS
                              Assistant U.S. Attorney
20                            U.S. Attorneys Office
                              P.O. Box 876
21                            Charleston, South Carolina

22                            RICHARD E. BURNS
                              Assistant U.S. Attorney
23                            U.S. Department of Justice
                              1331 F Street NW, Suite 625
24                            Washington, DC 20530

25     (appearances cont'd)
```

```
 1                                  STEPHEN CURRAN
                                    Assistant U.S. Attorney
 2                                  U.S. Department of Justice
                                    601 D Street NW, Room 5808
 3                                  Washington, DC 20004

 4

       For the Defendant:          SARAH S. GANNETT
 5                                  Assistant Federal Public Defender
                                    Arizona Federal Public Defenders Office
 6                                  850 West Adams Street, Suite 201
                                    Phoenix, Arizona 85007
 7
                                    DAVID I. BRUCK, ESQ.
 8                                  Virginia Capital Case Clearinghouse
                                    Washington and Lee School of Law
 9                                  Lexington, Virginia 24450

10                                  EMILY PAAVOLA, ESQ.
                                    Justice 360
11                                  900 Elmwood Avenue, Suite 101
                                    Columbia, South Carolina 292015
12

13                                         *   *   *

14

15

16

17

18

19

20

21

22
       Court Reporter:             Amy C. Diaz, RPR, CRR
23                                 P.O. Box 835
                                   Charleston, South Carolina 29402
24

25              Proceedings recorded by mechanical shorthand,
            transcript produced by computer-aided transcription
```

**INDEX TO EXAMINATIONS**

**WITNESS**                                                              **PAGE**


LAUREN MICHELLE KNAPP
    Direct Examination by Ms. Gannett                            15
    Cross-Examination  by Mr. Curran                            59
    Redirect Examination by Ms. Gannett                         85

ELIZABETH LEONARD
    Direct Examination by Ms. Gannett                          113
    Cross-Examination by Mr. Curran                            119
    Redirect Examination by Ms. Gannett                        123

LISA MARIE BLOODWORTH
    Direct Examination by Ms. Gannett                          125
    Cross-Examination by Mr. Curran                            145
    Redirect Examination by Ms. Gannett                        167
    Recross-Examination by Mr. Curran                          172

WILLIS L. BEATTY
    Direct Examination  by Ms. Gannett                         178
    Cross-Examination by Mr. Curran                            186
    Redirect Examination by Ms. Gannett                        200



**EXHIBITS**


**PLAINTIFF'S NUMBER**                                                  **REC'D**

11                                                                 76
12                                                                198


**DEFENDANT'S NUMBER**                                                  **REC'D**

4                                                                 193
6                                                                  59
18                                                                177
19                                                                 45
24                                                                 43
25                                                                 43
27                                                                 54

1            THE COURT:  We are here in *United States vs. Roof*,

2    2:15-472.  We had pending a -- to address in the hearing

3    today a motion for suppression, Docket Number 268.

4            Could counsel identify themselves, beginning with

5    the Government.

6            MR. RICHARDSON:  Thank you, Your Honor.  Jay

7    Richardson along with Steve Curran, Nathan Williams, Mary

8    Hahn, and Rich Burns.

9            THE COURT:  Good morning.

10            MS. GANNETT:  Sarah Gannett along with Emily Paavola

11    and David Bruck.

12            THE COURT:  Good to see everyone here today.  And

13    for the record we have -- this isn't a secret anywhere in the

14    world that we have closed this hearing, and I will say that

15    it's the Court's intention that should the Court not suppress

16    the information, to make the transcript public.  I intend to

17    do it -- my own plan is to do it after the completion of jury

18    selection because I anticipate, and maybe I've got something

19    wrong here, is that even were I to deny the motion to

20    suppress, there might well still be a motion in limine on the

21    calendar, and until that is resolved, I don't think it's

22    appropriate to expose information that might not be

23    appropriate to the jury.

24            And I want to just tell y'all what I'm thinking

25    about just a bit in terms of the start of the trial in this

```
1     case.  We will -- you know, in September we will obviously
2     summon the jury and have these questionnaires completed,
3     processed by counsel.  We'll go through all that.  That is
4     well set forth in the scheduling order.  And then we will
5     start individual voir dire, and when we have qualified 70, we
6     will stop, and I believe that's a number that we ultimately
7     resolved.  And we will then summon those 70 to the
8     courthouse.  I think we have a few extra because it was
9     suggested perhaps there may be illness or whatever, people
10    not showing.  So I think our actual number we need is 66.
11    I'm doing this off the top of my head.  Whatever the number
12    is.
13           And we are going to strike, and when we strike the
14    jury, we are going to have 12 jurors and six alternates.  We
15    are going to put them in the jury box.  I'm going to -- my --
16    Ms. Ravenel will swear them in as jurors.  I will admonish
17    them about not considering any sources of any type, and
18    opening statements will begin.  So that strike day is going
19    to be followed right then by opening.  We are going to
20    have -- when I have that jury, I don't want to send them
21    home.  I want them to start, and then I can admonish them all
22    throughout the day and every day thereafter about their need
23    not to be exposed to other sources.  That is the greatest
24    control.
25           And assuming that the question of evidence is -- the
```

```
 1      motion to suppress and any motion in limine has not been
 2      granted, I would anticipate at the end of that first day I
 3      would publicly release -- I would place it on ECF, that
 4      evidence.  And I think that is, you know, to me the way in
 5      which I honor to narrowly tailor any sealing to as limited as
 6      possible.  I would anticipate that there will be some
 7      discussion in opening statement to some or all that evidence
 8      anyway, and I don't want it being discussed, and people say,
 9      you know, "What's going on with the hearing?"  Does anybody
10      have any problem with that approach?
11              MR. RICHARDSON:  No problem at all, Your Honor.
12      Perhaps when we get closer -- we totally leave this up to the
13      Court.  We think that is a reasonable approach.  I think
14      there is some likelihood that it would not be discussed in
15      the opening statements.
16              THE COURT:  Well, whether it is or not, that's your
17      call.
18              MR. RICHARDSON:  Right.
19              THE COURT:  I just feel like I've got my -- I've got
20      to narrowly tailor any sealing, any closing, and I feel like
21      that's the appropriate spot, because if I was worried about
22      consulting other sources, I should sequester them.  Okay?
23      And I'm going to tell them, by the way, that I don't want to
24      sequester you, but if I have indications that you are
25      considering extraneous sources, I'm going to remove people
```

1    who have done that, and then I'm going to sequester them.  I

2    don't want to do that, but I will do that.

3         So I'm trying to balance these very important values

4    here, and I, you know, really did not want to put counsel for

5    either side in the position where they had to stand up

6    yesterday and stand in the face of the team of the press,

7    which has their own agenda here.  I understand it.  They are

8    doing their job; we've got to do ours.  I would be glad to

9    take the hit on whatever it was there.  But they have a

10   point, and that is this is the public's business.  So we've

11   got to balance this, and I think the way we balance it is --

12   and I'll be glad to hear from you later about that.

13        But my own inclination now is that that marks the

14   beginning of the trial, and at that point, matters that --

15   now, obviously, I don't know what is coming today, for

16   instance.  I don't know what is coming at other times, and I

17   may modify that at some point, but that's currently my

18   thinking.

19             MR. RICHARDSON:  Thank you, Your Honor.

20             THE COURT:  The defense is chattering amongst

21   themselves.  Anything you want to add without locking

22   yourself in one way or the other?

23             MR. BRUCK:  No, Your Honor.

24             THE COURT:  Mr. Bruck was struck by that suggestion

25   that you should not make motions to suppress.

```
1              MR. BRUCK:  Well, we learn something every day.
2              THE COURT:  I was just almost speechless, you know,
3    that, you know, that that would be -- so why not release it
4    because anybody can make a motion to suppress, doesn't know
5    who's doing anyway.  Well --
6              MR. BRUCK:  That is a lawyer who, if he ever lost a
7    case, his client would have plenty to work with.
8              THE COURT:  I was about to say that that would be
9    one great 2255, you know, or 2254, that it would be.
10             Okay.  Let me address an issue that was
11   understandably, I'm sure, of concern to all of us here, and
12   that was the release of a witness summary by the Government,
13   which set forth a reference to a personal statement.  Thank
14   God he didn't mention the substance of it, but I was very
15   unhappy because that was a pending matter.  Mr. Bruck had
16   filed a motion asking me to order that nothing would be
17   released.  And I said, I don't need to do that because nobody
18   would do that.  And then it happened.
19             So, Mr. Richardson, give me some explanation for
20   what happened.
21             MR. RICHARDSON:  We apologize for it, accept
22   responsibility for it.  We did not catch it.  It was not
23   intentional, and I've got no good explanation or no good
24   excuse, Your Honor.
25             THE COURT:  Well, you know, it's just -- I just
```

1     don't want to think that the Government was attempting --
2     anticipating some ruling by the Government in trying to go
3     around me to inform my jury venire of something that wouldn't
4     be admissible.
5              MR. RICHARDSON:  Most certainly not, Your Honor.
6              THE COURT:  You can understand my concern about
7     that.
8              MR. RICHARDSON:  Absolutely, Your Honor.  I can tell
9     you that as soon as I learned about it, I immediately called
10    Mr. Bruck and apologized for it being released.  It is
11    certainly not something -- it's in our interests just as it's
12    in their interests that we are able to draw a fair and
13    impartial jury.  We had no interest --
14             THE COURT:  Nobody has a stake in messing up the due
15    process rights for the defendant.  And I said this yesterday,
16    talking about the victims, of course, I have great sympathy
17    for the victims, but they don't have a dog in legal error
18    either.  Everybody's interest is having justice done here and
19    following proper proceedings.  Well, you know, I did not
20    genuinely believe it was intentional, Mr. Richardson.
21             MR. RICHARDSON:  Thank you, Your Honor.
22             THE COURT:  I figured it was an error.  But, you
23    know, yesterday before we filed the order and did the
24    redacted order, I sent my senior clerk personally into the
25    clerks' office to personally supervise the filing because

```
1    we're just so meticulous.  Errors will be made from time to
2    time.  We don't need to make this one.  Okay?
3              MR. RICHARDSON:  We certainly understand, Your
4    Honor, and we will do our have best to double- and
5    triple-check going forward.
6              THE COURT:  Okay.  Thank you very much.
7              The -- Mr. Bruck, I don't know if it needs to be
8    addressed further.  I did get your e-mail yesterday
9    requesting additional people, and, you know, I don't -- of
10   course, anybody who is going to be a witness can come into
11   the courtroom and testify, but I'm -- it's going to be court
12   personnel and counsel of record.  That is basically -- unless
13   you can demonstrate to me some extraordinary need.  I have
14   great confidence you can handle such matters.  I have been
15   most impressed with your staff and all your team.  I don't
16   think you need other people present, and I think we are
17   better off just -- you know, when we are sealing something
18   that is so controversial, that we have a very bright line
19   about what we are sealing.
20             MR. BRUCK:  If you will bear with me for a moment.
21             THE COURT:  Yes.
22             MR. BRUCK:  We do have a paralegal who we are
23   somewhat relying on.
24             THE COURT:  I was going to ask.  I have a note here.
25   What is the role of the paralegal in the presentation of your
```

```
1    case today?
2              MR. BRUCK:  Do you want to --
3              MS. GANNETT:  Your Honor, we have relied heavily on
4    Ms. Newman to prepare the exhibits and to help us line up the
5    exhibits.
6              THE COURT:  And you would use her during your
7    presentation?
8              MS. GANNETT:  We would use her to assist.
9              THE COURT:  I will allow her in.  And that is
10   Ms. Newman; is that correct?  I would allow Ms. Newman in to
11   assist you in your presentation.
12             MS. GANNETT:  Thank you, Your Honor.
13             THE COURT:  Okay.  We have the motion, as I
14   mentioned, Docket Number 268, which seeks to suppress -- I'll
15   refer to it as the personal statement, if you don't mind.
16   Y'all know what I'm talking about here, there are actually
17   two personal statements for today, since we are not dealing
18   with Docket Number 266, which deals with the statement of the
19   automobile.  We'll just refer to it as personal statement.
20   And I do agree with the defendant that calling it a manifesto
21   is a little ahead of the game.  We are not there yet.  And
22   whether we get there or not is another question.  But right
23   this moment it's a personal statement.
24             And there are issues that have been raised.  First
25   that -- the Fourth Amendment seizure issues, and then the
```

1      Sixth Amendment, and going to attorney-client privilege.  And

2      it's the -- the defendant's motion carries the burden of

3      proof, so I'm going to turn to you to offer whatever

4      witnesses and argument you wish to make in supporting your

5      motion.

6              Ms. Gannett, are you ready?  Who is going to be

7      doing this?

8              MS. GANNETT:  I am, Your Honor.  Thank you.  If we

9      could have a moment just to get Ms. Newman back into the

10     courtroom and situated, we would appreciate that.

11             THE COURT:  Absolutely.

12             MR. RICHARDSON:  Your Honor --

13             MR. CURRAN:  Your Honor, I'm going to be handling

14     this portion of the hearing for the Government.  And we have

15     prepared our witnesses -- we have prepared witnesses on the

16     Fourth Amendment issue, and we are prepared to present them

17     to establish the facts that have been described in our

18     response to the motion.

19             THE COURT:  Well, I think probably the best way to

20     do it is just let the defendant put up its evidence.  It's

21     me.  I can kind of keep the issue separate.  We'll put up the

22     evidence.  Y'all do whatever cross-examination you need to

23     do, and to the extent I need to, I'll question witnesses on

24     things that need to be addressed, and then the Government

25     will be able to go forward and offer its witnesses on those

```
1    issues as well.  And then I'll hear argument from you at the
2    end on both issues.
3              MR. CURRAN:  That is fine, Your Honor.  I think you
4    will find the witnesses are essentially the same witnesses,
5    and the parties have prepared -- I presume, have prepared in
6    the anticipation that the Government would go first.  I just
7    want to represent that we are happy to do that.  We've heard
8    the Court.
9              THE COURT:  Well, you know -- you know, my simple
10   mind -- I'll hear you out on this.  My simple mind is, you
11   know, somebody makes the motion, they go forward.  I don't
12   usually have the party defending go forward on a motion.  So
13   tell me what you are thinking about doing it in a different
14   way.  I mean, just --
15             MR. CURRAN:  Nothing else to be heard on, Your
16   Honor.
17             THE COURT:  And, of course, the defense can call any
18   witnesses it wishes, even those the Government intended to
19   offer.  And -- but it's the defendant's case to present, and
20   so I'm going to have the defendant go first.
21             MR. CURRAN:  We understand.  If I may make one other
22   point just for the record, Your Honor, it's the Government's
23   position that there isn't actually any need to call any
24   witnesses on the Fourth Amendment issue because the law of
25   the Fourth Circuit is such that even if the facts are as they
```

1    allege, this would be a lawful Fourth Amendment search.

2            THE COURT:  You know, I understand that argument.

3    I'm going to let the --

4            MR. CURRAN:  I understand.

5            THE COURT:  -- the defendant make its case, because

6    it has an argument about Second Circuit authority, and I

7    think they ought to be able to make a record on that because

8    one day, you know, that may be a subject that I think they

9    are entitled to make a record.  I will -- you know, I don't

10    think we should interpret my allowing them to make a record

11    to be a dispositive whether *U.S. vs. Cohen* would be applied

12    here, or whether *Jeffus* controls.  All that we'll address

13    that later.  The defendant is entitled to make its record.

14            MR. CURRAN:  We understand, Your Honor.

15            MS. GANNETT:  Your Honor, if I may?  I have not

16    prepared the case law on this issue, but my belief is on the

17    Fourth Amendment issue, we do not have the burden of proof to

18    proceed.  It's the Government's burden to prove that these

19    documents were seized legally.  And we presented sufficient

20    facts to cause them to have --

21            THE COURT:  Let's not get into burden of proof.  You

22    made the motion.  In my simple way of doing this, you made

23    the motion; you made certain challenges.  We'll sort out the

24    burden of proof.

25            MS. GANNETT:  Very well, Your Honor.  So in the

LAUREN KNAPP - DIRECT                    15

1    order that they were presented in the motion that the --

2    we'll deal with the Fourth Amendment issues first, and I

3    would suggest, I suppose, that the first witness should be

4    Officer -- I believe it's now Knapp.

5              MR. RICHARDSON:  I'll get him.

6              MS. GANNETT:  Your Honor, may I examine from counsel

7    table, or do you prefer me to be at the podium?

8              THE COURT:  I'm going to let you do it -- I have a

9    great respect for the litigators, and where their comfort

10   zone is is good enough for me.

11             MR. RICHARDSON:  When you are finished with that,

12   you are going to sit in that chair.

13             THE CLERK:  Please place your left hand on the

14   Bible, raise your right.

15             State your full name for the record, please.

16             THE WITNESS:  Lauren Michelle Knapp.

17             THE CLERK:  Can you spell your last name for the

18   record.

19             THE WITNESS:  K-n-a-p-p.

20   THEREUPON:

21                     LAUREN MICHELLE KNAPP,

22   called in these proceedings and being first duly sworn

23   testifies as follows:

24             THE CLERK:  You may be seated.

25                     DIRECT EXAMINATION

```
 1    BY MS. GANNETT:
 2     Q. Good morning, Ms. Knapp.
 3     A. Good morning.
 4     Q. My name is Sarah Gannett.  I'm one of the lawyers for
 5    Dylann Roof.
 6     A. Okay.
 7     Q. And forgive me if I get your name wrong.  I understood
 8    you as Ms. Mosher.  I only learned yesterday that you have a
 9    new name, so congratulations?
10     A. Yes, thank you.
11     Q. You are an intelligence analyst --
12     A. Yes, ma'am.
13     Q. -- is that correct?
14          And you are affiliated with the Charleston County
15    Sheriff's Department --
16     A. Yes, ma'am.
17     Q. -- correct?  And I would like to show you what we have
18    marked as Defendant's Exhibits 24 and 25.
19          MS. GANNETT:  Can you provide copies of those to the
20    Government and the clerk for me, please?
21    BY MS. GANNETT:
22     Q. And would you take a look at those, please?
23          THE COURT:  Hand it to Ms. Ravenel there.
24    BY MS. GANNETT:
25     Q. And let me know if you recognize those documents?
```

1          A. I do, ma'am.

2          Q. And would you identify Exhibit 24 for me, please?

3          A. 24 is my résumé.

4          Q. And Exhibit 25?

5          A. Is my job description.

6          Q. Okay.  So turning to your job description, Exhibit 25, is

7     that job description a current job description?

8          A. Yes, ma'am.

9          Q. And it identifies you as an intelligence analyst which is

10    what you said your job position is now.  Do I understand

11    correctly that you are situated in the Charleston County

12    Detention Center?

13         A. I have a desk there.

14         Q. You have a desk there.  Do you have a desk somewhere

15    else?

16         A. Yes, ma'am, I do.

17         Q. Is that at the sheriff's department?

18         A. I have one at the sheriff's department and one at the

19    Seahawk Interagency Operation Center.

20         Q. The Seahawk is a joint state/federal task force; is that

21    correct?

22         A. It's not a task force anymore.  It's an operation center.

23         Q. What is the difference of a task force and an operations

24    center?

25         A. We are a group of analysts who work on cases.

```
 1        Q. But they comprise state and federal?

 2        A. Correct.  But the task force back in the day was more

 3   officers, sworn officers.

 4        Q. And now it includes sworn officers and other types of --

 5        A. Civilians.

 6        Q. Okay.  But it still includes sworn officers?

 7        A. Yes, ma'am.

 8        Q. Are you a sworn officer?

 9        A. No, ma'am.

10        Q. But you used to be a sworn officer; is that correct?

11        A. Yes, ma'am.

12        Q. And you -- according to Exhibit 24, you were a crime

13   intelligence officer for the City of Charleston?

14        A. Yes, ma'am.

15        Q. And you were also a probation parole officer for the City

16   of Charleston?

17        A. For the County of Charleston, yes, ma'am.

18        Q. For the County of Charleston.  And so currently you are

19   not a sworn officer, but you still have the duties, according

20   to Exhibit 25, of collecting, evaluating and analyzing raw

21   data and disseminating information to prevent crime.  Is that

22   correct?

23        A. Yes, ma'am.

24        Q. And to detect or deter criminal acts from occurring?

25        A. Yes, ma'am.
```

                     LAUREN KNAPP - DIRECT        19

1        Q. And to establish effective working relationships in order

2    to promote those goals?

3        A. Yes, ma'am.

4        Q. Turning to the second page of that document, there are

5    examples of your essential work responsibilities?

6        A. Yes, ma'am.

7        Q. And if you look toward the middle of the page, it's the

8    one, two, three, four, five -- sixth bullet point, and it's

9    one of your responsibilities to act as a liaison to provide

10   assistance, collect and/or disseminate intelligence data, and

11   share information?

12       A. Yes, ma'am.

13       Q. And skipping two down, to assist in the coordination of

14   major case investigations by sharing information?

15       A. Yes, ma'am.

16       Q. Okay.  Returning to Exhibit 24 for a moment, please.  You

17   have listed as your objective on your résumé to utilize your

18   experience to advance the practice of criminal intelligence

19   in the private and public sector?

20       A. Yes, ma'am.

21       Q. And I suppose in that regard, you list your job

22   description in your own words as "currently implementing and

23   executing the development of a secure jail intelligence

24   collection team with a repository for all source collection,

25   analysis, and dissemination within the corrections and law

LAUREN KNAPP - DIRECT                    20

1    enforcement environment?"

2     A. Yes, ma'am.

3     Q. Okay.  Thank you.  You report directly to Lieutenant

4    Fletcher King at the sheriff's criminal intelligence unit?

5     A. Yes, ma'am.

6     Q. Which is outside of the jail; is that right?

7     A. Yes, ma'am.

8     Q. So I understand that the jail -- your funding for your

9    position comes out of the jail, but you report to the

10   sheriff's department; is that correct?

11    A. Yes, ma'am.

12    Q. And you are on call with the sheriff's office for

13   criminal investigations?

14    A. Yes, ma'am.

15    Q. And you were, in fact, called in to help locate and

16   arrest the church shooting suspect at the time of the

17   incident; is that right?

18    A. Yes, ma'am.  I was asked to relieve another analyst.

19    Q. Okay.  And after that time, you maintained contact with

20   the FBI and to the solicitor's office with regard to that

21   case --

22    A. No, ma'am.

23    Q. -- is that correct?

24         Well, let me ask you about -- is it not correct that

25   after the -- after the time that the defendant, Dylann Roof,

```
 1      was brought to the Charleston County Detention Center, that
 2      you contacted the FBI to let them know that you were
 3      reviewing his mail and could make that available to them as a
 4      part of their investigation?
 5       A. I could.
 6       Q. Okay.  Did you do that, though?
 7       A. At that time they did not ask for any of it.
 8       Q. But did you contact them?
 9       A. Yes.
10       Q. In fact, you sent an e-mail to the FBI advising them that
11      you would do that if they wished, correct?
12       A. Yes, ma'am.
13       Q. That was on June 22nd of 2015.  Does that sound right?
14       A. Yes, ma'am.
15       Q. And that communication went to Agent Hamski --
16       A. Yes, ma'am.
17       Q. -- at the FBI?
18            MS. GANNETT:  I'm having trouble putting my fingers
19      on that e-mail right now.
20            THE COURT:  It doesn't sound like it's contested,
21      Ms. Gannett.
22      BY MS. GANNETT:
23       Q. If I were to say that you sent that e-mail, you would not
24      contest that, correct?
25       A. No, ma'am.
```

LAUREN KNAPP - DIRECT                 22

1    Q. Thank you.  And after that time, you maintained contact
2    with the FBI about the case?
3    A. Not about the case specifically, no, ma'am, just my daily
4    tasks of keeping track of all of the mail at the jail.
5    Q. The mail at the jail.  Okay.  Did you also keep in touch
6    with SLED and the state prosecutors about the mail at the
7    jail?
8    A. No, ma'am.
9    Q. Okay.  You supervised the intelligence unit staff
10   members; is that correct?
11   A. No, ma'am.
12   Q. Do you train them?
13   A. I am teaching them on an intelligence collection, but I
14   do not supervise them.
15   Q. Do you coordinate any of their activities?
16   A. They are on their own, but I can coordinate as well.  I
17   don't do it 100 percent of the time.  They are on their own.
18   They have a sergeant they report to.
19   Q. Okay.  But you do sometimes give them coordination?
20   A. Yes, ma'am, at times.
21   Q. Okay.  And so is that on an ad hoc basis?  Is that what
22   you are saying?
23   A. Yes, ma'am.
24   Q. And in a high profile case, you would be more likely to
25   be doing coordination with the intelligence unit.  Would that

 1    be fair to say?

 2     A. If I was ordered to do so, yes, ma'am.

 3     Q. If you were ordered to do so.  Okay.  And that would be

 4    by Lieutenant King or by other officials?

 5     A. Yes, ma'am.

 6     Q. Okay.  So you mentioned that you -- that would be in

 7    connection with your duties reviewing materials coming in and

 8    out of the jail.  The Charleston County Detention Center does

 9    review incoming and outgoing inmate mail; is that correct?

10     A. Yes, ma'am, they do.

11     Q. They do not review all mail?

12     A. They review all mail.

13     Q. At this time they do.  At the time that -- of August 3rd,

14    2015, were they reviewing all the mail at that time?

15     A. I do not know.

16     Q. Were you familiar with the jail's policies for reviewing

17    incoming and outgoing mail at that time?

18     A. I would say that they reviewed it.  They did not look at

19    legal documents.  They opened them to make sure there was no

20    contraband, but nothing was read.  That was my understanding.

21     Q. Did they -- did they also review reading materials that

22    came into the jail?

23     A. Yes, ma'am.

24     Q. And did they approve reading material that came into the

25    jail for inmates?

1    A. The jail staff does, yes, ma'am.

2    Q. And are you -- you are aware, are you not, that they

3    approved the book *The Sorrows of Young Werther* for delivery

4    to the defendant Dylann Roof in this case?

5    A. I was aware after the fact.

6    Q. But it was approved?

7    A. Yes, ma'am, by jail staff.

8    Q. As a part of your responsibilities in reviewing mail --

9    well, let's back up.  You took it upon yourself to review the

10   mail of the defendant in this case --

11   A. Yes, ma'am.

12   Q. -- is that correct?  And your view was that because he

13   was a high profile inmate that you should review his mail; is

14   that correct?

15   A. No, ma'am.  He was reviewed because of the issue we had

16   with a letter being sent outbound to another individual that

17   was up for sale on the Internet.  So that started everything.

18   Q. Well, so that incident took place in July of --

19   A. Correct.

20   Q. -- 2015; is that correct?

21   A. Correct.

22   Q. But --

23   A. And at that time, I was not reviewing outbound mail.  I

24   was only reviewing inbound mail.

25   Q. So the inbound -- the e-mail that you sent to Agent

1     Hamski related only to inbound mail, not outbound?

2      A. Yes, ma'am.

3      Q. Okay.  And so it was at the July -- I believe it was the

4     9th, but July 9th, 2015, or thereabouts that you began

5     reviewing outbound mail?

6      A. Yes, ma'am.

7      Q. Because of that incident?

8      A. Yes, ma'am.  I was ordered by Major Watson to start

9     monitoring everything, to include social media, mail,

10    visitors, everything.

11     Q. By whom were you ordered?

12     A. Major Eric Watson.

13     Q. Eric Watson.  And how is that order documented?

14     A. I believe he sent an e-mail.

15     Q. And -- do you have that e-mail available?

16          MR. CURRAN:  You can subpoena that.

17    BY MS. GANNETT:

18     Q. So you did produce your e-mails, according to a subpoena

19    that was issued by Mr. Pennington's office, to the State's

20    defense team; is that correct?

21     A. Yes, ma'am.

22     Q. And was that e-mail included in the subpoena?

23     A. It should have been, yes, ma'am.

24     Q. It should have been, but was it?

25     A. At this time I don't know.

```
 1        Q. Okay.  But you did review your -- the materials that you
 2     submitted in response to that subpoena?
 3        A. Correct.
 4        Q. You just don't remember?
 5        A. It could have been a verbal order and me affirming
 6     through e-mail to do so.
 7        Q. When you spoke to the FBI in this matter about the letter
 8     that you reviewed, you described the process that you were
 9     undertaking with respect to Mr. Roof's mail.  Is that
10     correct?
11        A. Which letter, ma'am?
12        Q. The letter that causes us all to be in court today.
13        A. Yes, ma'am.  I'm sorry.
14              MR. CURRAN:  Your Honor?
15              THE COURT:  Yes.
16              MR. CURRAN:  This is a suppression hearing.  The
17     Rules of Evidence are relaxed.  And we have not made this
18     objection during the lead up on the background material.  As
19     we get into the matter, we would ask that counsel ask
20     questions via -- as appropriate on direct, rather than
21     through cross-examination.  It's their witness.  They have
22     called her.  And we are not asking that for -- for all --
23              THE COURT:  She hasn't yet attempted to establish
24     that she potentially would be an adverse witness.  But, you
25     know, it hadn't bothered me, and we are relaxed here, and I
```

LAUREN KNAPP - DIRECT                27

1    haven't considered her questioning overbearing.  I do think

2    the fact that the defendant is incarcerated in the detention

3    center, a government agent, and she's had, you know, some

4    involvement with that, that I would probably give her some

5    leeway on leading questions.  I haven't found anything

6    particularly overbearing here.  This seems to be a very

7    competent witness who can handle herself.  And I haven't seen

8    any problem with her handling or being pushed around by

9    Ms. Gannett.

10             MR. CURRAN:  No.

11             THE COURT:  And I would certainly intervene in that.

12             MR. CURRAN:  We understand, Your Honor.  We wanted

13   to make the point as we are going forward that we think that

14   that would be appropriate, as I said.

15             THE COURT:  But you are welcome to make objections.

16   There is nothing I've heard so far.  I've heard a capable

17   attorney questioning a bright witness.  That's all I've

18   heard.

19             MR. CURRAN:  It's not so much -- and I'm going to

20   sit down after this, Your Honor.  I have no desire to delay

21   the issue.  It's not so much that -- that there's been any

22   improper questioning.  It's just that the substance is coming

23   from the defense.  It's not actually coming from the witness.

24   But --

25             THE COURT:  Well, you know, I have seen a couple of

LAUREN KNAPP - DIRECT          28

1     times Ms. Gannett ask the question, and the witness say, "No,

2     that's not right.  Let me correct you on what this is."

3     She's handling herself just fine.

4              MR. CURRAN:  Thank you.

5              THE COURT:  If it continues to be a problem, you are

6     welcome to object again.

7              MR. CURRAN:  Thank you.

8              THE COURT:  Please proceed.

9              MS. GANNETT:  Thank you, Your Honor.

10    BY MS. GANNETT:

11     Q. I'm going to try to ask the question that the Government

12    is looking for.  Did you -- what did -- what did you tell the

13    FBI when they interviewed you about why you were reviewing

14    mail?

15     A. Safety and security in the jail with regard to threats

16    against inmates, visitors, jail staff, nurses, and employees.

17     Q. Okay.  So you did not explain to them this rationale

18    about the auctioned letter; is that correct?

19     A. That was a part of it.  We considered media and things of

20    that nature threats.  We didn't want to be blind-sided by

21    things like that.

22     Q. But you did not specifically mention the auction --

23     A. No, ma'am.

24     Q. -- to the FBI; is that correct?

25     A. No, ma'am.  They were aware of it.

1     Q. How were they aware of it?

2     A. It was in the news.

3     Q. Right.  But they were not aware that that was a reason

4     that --

5     A. Right.  Correct.

6     Q. -- you were examining the defendant's outgoing mail?

7     A. Correct.

8     Q. Thank you.  I'm going to show you what's been marked as

9     Defendant's Exhibit 19.  Do you recognize that document?

10    A. I do.

11    Q. And what is that document?

12    A. This is an outbound letter that was sent by Mr. Roof to

13    his sister.

14    Q. And it's not the original, but it's a fair and accurate

15    representation of that letter; is that correct?

16    A. Yes, ma'am.

17    Q. And can you please describe where your knowledge of that

18    letter comes from.  How did you become aware of that letter?

19    A. I was sent over the mail for the day with regards to

20    Mr. Roof.  Other pieces were in there as well.  This one was

21    of interest because it was the first outbound letter by him

22    in a month since the letter that was sold to auction.

23    Q. So is it fair to say that he did not send a lot of

24    outgoing mail during that time period from his arrest through

25    the search of his cell that is at issue here today?

1    A. Yes, ma'am.

2    Q. So this was the first letter that had gone out in a

3    month, and this was on what date that you reviewed that

4    letter?

5    A. August 3rd, 2015.

6    Q. And what -- do you recall approximately what time of day

7    that was?

8    A. It was the first thing in the morning before 9:00, if I

9    remember correctly.

10    Q. And so you received some mail.  In what form do you

11    receive the mail?

12    A. It is scanned in and sent to me via e-mail in one giant

13    PDF.

14    Q. And when you read the letter, I understand that you found

15    it -- well, what did you think when you read the letter?

16    A. My first instance was the font stuck out to me.  It was

17    very blocked and very organized, not like typical letters

18    outbound at the jail with really bad handwriting.  So the

19    handwriting piqued my interest.

20    Q. And is that what -- is that the sum and total of what

21    piqued your interest, or were there other things?

22    A. That is what got me to read the -- start reading the full

23    letter, and I realized that the verbiage was not like a

24    letter from an inmate from a jail describing his first month

25    in jail.

1    Q. Okay.

2    A. It was more of a sonnet or poem, something of not first

3    person.

4    Q. What else?

5    A. Um, I took the first line and I Googled it to find out if

6    it was from a book or a sonnet or a phrase or something like

7    that, and it was.

8    Q. Okay.  So it was not the content.  There was nothing

9    about the content of the document that raised your concern

10   about the well-being of the defendant?

11   A. Other than being a little weird, no.

12   Q. Nothing about the content of the document that indicated

13   suicide intent --

14   A. Not at that time.

15   Q. -- ideation?

16   A. Not at that time.

17   Q. Okay.  So you Googled the document, and you found what?

18   A. I found that it came from a book, *The Sorrows of Young*

19   *Werther*.  I took that title and threw it back into Google

20   again to get an overview and a summary of what the book was

21   about.

22   Q. When you Googled it, it was clear to you at that point

23   upon Googling that this was text that was directly copied

24   from the book; is that correct?

25   A. Yes, ma'am, or at least the first line was.

```
 1        Q. Well, did you check to see whether the rest of it was
 2     copied?
 3        A. Later, yes, but not initially.
 4        Q. And it was, in fact, directly copied --
 5        A. Yes, ma'am.
 6        Q. -- is that correct?  And so you then -- I'm sorry.  I cut
 7     you off with that question, and I apologize.
 8             So you were saying that you identified it as coming
 9     from this book?
10        A. Yes, ma'am.
11        Q. And what else did you -- what else did you want to say
12     about that?
13        A. That I accessed the summary of what the book was about.
14        Q. Okay.  And what did you find in your summary?
15        A. Um, I found out that the book was about a love triangle
16     about a younger man involved in a young love triangle, and in
17     the end, he committed suicide.  Upon further reading of the
18     summary, the book is known to possibly lead to the first
19     instance of copycat suicide, and "the Werther fever" effect
20     also was noted in there about people dressing the same.
21        Q. So what you -- what you found is that the book concludes
22     with a suicide, but the passage does not reference the
23     conclusion of the book, the passage that was copied, correct?
24        A. Correct.
25        Q. Okay.  And the -- the Werther effect that you were
```

```
 1     talking about, this copycat suicide situation, all of that

 2     dated from the time the book was published.  Is that correct

 3     that this copycat suicide --

 4     A. Correct.  The time period, yes.

 5     Q. And which was in the 18th century --

 6     A. Correct.

 7     Q. -- is that right?  And you had no -- you had no

 8     indication at the time that you were reviewing this letter

 9     outside of that open source search that you did of any

10     suicidal ideation by the defendant; is that right?

11     A. Correct.

12     Q. You have read the jail's suicide prevention policy?

13     A. I have read it, yes.

14     Q. And you are familiar --

15               MS. GANNETT:  And for the Court's information, that

16     policy is located in the Government's pleading at Exhibit 5.

17               THE COURT:  I have reviewed it.

18     BY MS. GANNETT:

19     Q. And that policy identifies warning signs and symptoms of

20     suicidal behavior?

21     A. Correct.

22     Q. Did you have contact with the defendant, Dylann Roof?

23     A. Never had contact with him.

24     Q. Okay.  Were any of the symptoms that are reported in the

25     policy ever reported to you with respect to Mr. Roof?
```

1    A. No.

2    Q. When you -- when you saw this open source summary, what

3    action did you take next?

4    A. I printed it out and I took it directly to my captain,

5    Captain Thomas Robertson.

6    Q. And from Captain Robertson, you went to the command

7    meeting; is that correct?

8    A. He called several command staff members for a -- a

9    meeting about that document that was found, yes.

10   Q. Well, so again, did you describe that to the FBI in your

11   302 -- in your interview back in -- I believe it was August

12   or September of 2015?

13   A. Yes.  I made them aware that I took it to my chain of

14   command who then had the meeting.

15   Q. Okay.  So am I incorrect that that is a regular command

16   meeting that occurs on a daily or weekly basis that you

17   attended to discuss this matter?

18   A. No.

19   Q. It's not the regular meeting?

20   A. No, ma'am.

21   Q. Okay.  So you -- so a meeting was convened to discuss

22   what to do, and what kind of staff were present at that

23   meeting?

24   A. The sheriff was there.  The assistant sheriff was there.

25   My captain was there.  Major Watson was present, and Deputy

 1    Chief Clark was present.  Those are the people I remember.

 2     Q. How many of those people are jail staff and how many of

 3    those people are intelligence or other law enforcement staff?

 4     A. I'm the only intelligence member who was present, and the

 5    sheriff and assistant sheriffs are over both sides.

 6     Q. And Chief Beatty was present at that meeting as well, was

 7    he not?

 8     A. I believe that he was, yes.

 9     Q. And the outcome of that meeting was that Chief Beatty

10    ordered that the defendant be checked every 15 minutes to

11    make sure he was alive and okay; is that correct?

12     A. I don't know what order was given.  There was a

13    discussion between the assistant sheriff, the sheriff, and

14    the chief that the mental health and suicide protocols needed

15    to be done.  This needed to be done correctly.

16     Q. So when did you learn of any orders that were given?

17     A. It was understood before I left the room that they were

18    activating the measures.  I was not directly ordered to do

19    so.

20     Q. When you say, "It was understood that they were

21    activating measures," what -- how do you understand that?

22     A. All three were in agreement that we needed to do the

23    mental health and suicide protocol based on what I presented

24    to them.

25     Q. And by "protocol," are you referring to the suicide

LAUREN KNAPP - DIRECT                36

1    prevention policy?

2     A. I am.

3     Q. And it was your understanding, then, that Chief Beatty

4    would take the appropriate actions as the person in charge at

5    the detention center?

6     A. Yes, ma'am.

7     Q. And did he do that through -- he did that through your

8    office because of the high profile nature of the detainee?

9     A. No, ma'am.  I was not involved.  I was asked to leave the

10   room and stand outside while they talked about other matters,

11   and I went back to my office at Seahawk with my captain.  I

12   rode with him.

13    Q. So they were discussing other matters that day beyond

14   this particular --

15    A. Other matters that I wasn't involved in, so I don't know.

16    Q. When -- so when did you learn of the search that was

17   conducted?

18    A. I was notified about an hour, hour and a half later after

19   returning back to my office at Seahawk that a search had been

20   done and items had been found.

21    Q. Let me ask you about the timing of that.  Are you

22   familiar with the jail's incident report system?

23    A. I am not.

24    Q. You are not.  You don't have access to those documents on

25   the jail's computer system?

LAUREN KNAPP - DIRECT                    37

1        A. I do at the jail, but I do not have them at my other

2     offices.  I operate mostly off of a laptop.

3        Q. Do you use them at the jail, though?

4        A. No, I do not.

5        Q. And you don't have -- you don't -- they are not a part of

6     your --

7        A. I have a login, but I don't use them daily.

8        Q. But you are familiar with them and you know how the jail

9     uses them, correct?

10       A. I'm sure it's an incident report system.  I don't know.

11    It's a DOS-based system.  That's all I know.

12       Q. So you said -- do you know what time it was that you

13    first became aware of these events, according to you?

14       A. I would say somewhere around 10, 10:30.

15       Q. 10, 10:30.  And you then reached out to the solicitor and

16    the FBI as early as 11:29 on that day; is that correct?

17       A. That's correct.

18       Q. To let them know that this letter had been read and that

19    you were investigating?

20       A. I was not investigating.  I just passed the letter and

21    the information.

22       Q. So you were not in touch with the other jail officials

23    who were conducting the search?

24       A. Not until after the search.

25       Q. Well, did -- it's -- so my understanding is that the

1    documents recovered from the defendant's cell were brought

2    directly to you.

3     A. At the jail office.  I was at my Seahawk office, which is

4    about 15 minutes away.

5            THE COURT:  Okay.  I'm confused.  Let me understand

6    this.

7            THE WITNESS:  Yes, sir.

8            THE COURT:  You are -- at around 10:30, you learned

9    there was -- there was certain items found in the defendant's

10   cell; is that correct?

11           THE WITNESS:  Yes, sir.

12           THE COURT:  Was that original document or a copy of

13   it immediately delivered to you?

14           THE WITNESS:  No.  I had to drive to the jail.

15           THE COURT:  And when did you do that?

16           THE WITNESS:  Right after the phone call.

17           THE COURT:  You went to the jail, and did you

18   inspect a copy or the original?

19           THE WITNESS:  I inspected the originals.

20           THE COURT:  Okay.  And is that before the 11 -- what

21   was it?  11:30?

22           MS. GANNETT:  11:29.

23           THE COURT:  11:29 contact with the FBI and SLED?

24           THE WITNESS:  Yes.

25           THE COURT:  Thank you.  Please continue.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

LAUREN KNAPP - DIRECT                    39

```
 1                    MS. GANNETT:  Thank you, Your Honor, I appreciate
 2        that.
 3        BY MS. GANNETT:
 4         Q. So you inspected the original, and you said it was at
 5        that point that you asked the jail to photograph the
 6        document?
 7         A. I photographed the document.
 8         Q. You photographed the document?
 9         A. I copied.  "Photograph" is not the right word.
10         Q. Well, so the images show a hand in the picture.  Is that
11        yours?
12         A. That's my hand, yes, ma'am.
13         Q. On the copy machine?
14         A. Yes, ma'am.
15         Q. Okay.  And so you made the decision to make the copies?
16         A. Yes, ma'am.
17         Q. Okay.  And you did that because you felt there was
18        potential evidentiary value --
19         A. Yes, ma'am.
20         Q. -- to this document?
21         A. Yes, ma'am.
22         Q. You notified your supervisor, Lieutenant King at the
23        sheriff's office because of the potential evidentiary value
24        of the document?
25         A. Yes, ma'am.
```

LAUREN KNAPP - DIRECT                    40

1    Q. And he communicated to you that he was not interested in

2    the document?

3    A. That the actual sheriff's office did not have any

4    interest in pursuing the document.

5    Q. Right.  And then after that you notified the FBI?

6    A. Of which document?

7    Q. Of the --

8    A. Yes.

9    Q. -- the copy?

10   A. Yes, I was -- I notified -- I was instructed to notify

11   the FBI, SLED, the solicitor's office, the case agent, Rich

12   Burkhardt, about the initial letter and the search being done

13   at 11:30 -- 11:22.

14              THE COURT:  Who directed you to do that?

15              THE WITNESS:  Thomas Robertson.

16              THE COURT:  Thank you.

17   BY MS. GANNETT:

18   Q. When you were interviewed by the FBI, you did not tell

19   them that you had been instructed by anyone to notify the

20   FBI, SLED, the solicitor's office, or any of those other

21   personnel about the document, did you?

22   A. No, I wasn't asked to.

23   Q. In fact, you didn't identify -- is it Captain Roberts?

24   A. Robertson.

25   Q. You didn't identify Captain Robertson to them at all in

1    the course of that interview, did you?

2     A. I did not.

3     Q. And you met with Ashley Pennington and Art Giovanna of

4    the public defender's office and discussed this matter, and

5    you did not identify Captain Robertson as being involved in

6    this?

7     A. I had to lay out my chain of command, so --

8     Q. But you did not identify him as giving you orders about

9    what to do on that day?

10    A. No, I was not asked.

11    Q. But you were asked what happened that day and to describe

12   what happened that day?

13    A. Correct.

14    Q. Okay.  But you did not mention Captain Robertson's

15   involvement?

16    A. No.

17    Q. You -- after notifying the -- well, let me ask you, after

18   you copied this document, you instructed the jail officer --

19   who -- it was Officer Bloodworth who brought the document to

20   you?

21    A. She brought a stack of documents, but yes.

22    Q. She brought a stack of documents.  And did you record

23   what all the documents were that were brought to you?

24    A. I got a case of -- through the incident management.  They

25   printed out what was found, and the summary because there

LAUREN KNAPP - DIRECT                    42

1    were books also found.  I also copied the documents, yes.

2     Q. So she brought you books and documents?

3     A. I never saw the books.  They had already done a summary

4    of what books.

5     Q. Okay.  So you just saw the documents.  Did you copy all

6    of the documents or just selected documents?

7     A. Just selected documents as well as drawings.

8     Q. Okay.  And were there other documents besides --

9         MS. GANNETT:  I'm going to show the witness a copy

10   of Defendant's Exhibit 1 to the motion.

11   BY MS. GANNETT:

12    Q. I'm going to show you a copy of what I believe to be the

13   photocopy that you sent and just ask you first to confirm

14   that that is the document that you photocopied?

15        THE COURT:  Does that have an exhibit number?

16        MS. GANNETT:  We are calling it Exhibit 1 to the

17   motion.  We can renumber it for the hearing if the Court

18   prefers.  It seems simpler --

19        THE COURT:  You have used but not placed into the

20   record these various documents, which I think you probably

21   ought to.

22        MS. GANNETT:  We will.

23        THE COURT:  I don't want to slow you up, but I want

24   to make sure to clean it up and make sure all of this is part

25   of the record.

1              MS. GANNETT:  Thank you, Your Honor.  I can do that

2        now or at the end, whichever.

3              THE COURT:  Well, we've had Exhibits 24 and 25

4        offered by the defense.  Is there any objection from the

5        Government?

6              MR. CURRAN:  No objection, Your Honor.

7              THE COURT:  Defendant's 24 and 25 are admitted.

8              (Thereupon, Defendant's Exhibits 24 and 25

9        introduced into evidence.)

10             MS. GANNETT:  Thank you, Your Honor.

11       BY MS. GANNETT:

12        Q. So that is the document that you photocopied?

13        A. Yes, ma'am.  This is the darkened one, yes, ma'am.

14        Q. Thank you.  And were there other documents that you

15       copied besides this document?

16        A. The first time I copied the documents, there were

17       drawings also included in that.  However, upon being picked

18       up the next morning, the -- I was instructed that the script,

19       because he wrote in pencil, was not dark enough to be

20       legible, so I recopied just the memo pad script, not the

21       pictures.

22        Q. Not the pictures?

23        A. They came out dark enough.

24        Q. But there were no other writings -- you know, words that

25       you copied besides this Exhibit 1, and the rest were --

1    A. I also copied a letter that was found that had no postage

2    from his mother to him.  There was some question as to how

3    that letter got into the jail because it hadn't gone through

4    the mail system.  We believed that it had been passed by his

5    attorney.

6    Q. Now, after you copied this document, you instructed --

7    was it Bloodworth who brought it to you?

8    A. I did.

9    Q. And it was also Bloodworth who brought you that -- those

10   documents, correct?

11   A. The documents out of the cell?

12   Q. Uh-huh.

13   A. Yes, ma'am.

14   Q. Excuse me.

15   A. No problem.

16   Q. And so you then instructed Officer Bloodworth to take

17   them back -- to take the writings that were on the notepad,

18   the actual notepad back to the cell; is that correct?

19   A. I instructed her to take the entire stack back to them,

20   and they decided what was going to be considered contraband

21   or not.

22   Q. Okay.

23   A. That was their call.

24   Q. Okay.  And you instructed them to take the documents back

25   to the cell because that was their decision to determine what

1     is contraband and what's not in the jail?

2      A. Yes, ma'am.

3      Q. And you had the evidence that you needed in and you

4     photocopied?

5      A. I had the intelligence, yes, ma'am.

6      Q. I'm going to show you --

7          THE COURT:  Ms. Gannett, you had handed up an

8     Exhibit Number 19, which is the letter to the sister.  Are

9     you offering that document into evidence?

10          MS. GANNETT:  Yes, Your Honor.

11          THE COURT:  Any objection from the Government?

12          MR. CURRAN:  I'm sorry, Your Honor.  I was

13     conferring with counsel.

14          THE COURT:  This was a letter to the sister.

15          MR. CURRAN:  No objection, Your Honor.

16          THE COURT:  All right.  Defendant's Exhibit 19 is

17     admitted.

18          (Thereupon, Defendant's Exhibit 19 introduced into

19     evidence.)

20          MS. GANNETT:  Thank you, Your Honor.  I'm used to

21     offering everything at the end, but I see the Court prefers

22     for me to do it along the way, and I'll try to adjust my

23     practice.

24          THE COURT:  I don't really -- I'm not concerned.  I

25     just don't want you at the end of the day to discover you

1    didn't put something in that you needed to.

2              MS. GANNETT:  Yes, sir.  Thank you.

3    BY MS. GANNETT:

4     Q. I'm going to show you what's been marked as Defendant's

5    Exhibit 27 --

6              MS. GANNETT:  Which, Your Honor, the Government has

7    already had an opportunity to --

8              THE COURT:  Okay.

9              MS. GANNETT:  -- to review.

10   BY MS. GANNETT:

11    Q. And just for identification purposes only, do you

12   recognize this document?

13    A. I do.

14    Q. And that is the original notepad that you copied on

15   August 3rd; is that correct?

16    A. Yes, ma'am.

17    Q. And do you recognize that notepad as the type of notepad

18   that is sold in the commissary at the jail?

19    A. I'm not familiar with what type of notepad is sold at the

20   commissary.

21    Q. And this is a notepad that was -- that you instructed

22   Officer Bloodworth to return to the defendant?

23    A. Correct, along with all the other documents.

24    Q. Along with the other documents?

25              THE COURT:  Ms. Gannett, let's talk about how we are

LAUREN KNAPP - DIRECT                    47

1    going to make that particular document -- it's the original,

2    and I don't want to take it out of your possession.  Who has

3    possession of that document?

4                MS. GANNETT:  We do, Your Honor.

5                THE COURT:  Okay.  And obviously if you make it an

6    exhibit, Ms. Ravenel becomes the custodian of that.  So how

7    do you want to handle that?

8                MS. GANNETT:  That's why we've offered it for

9    identification.

10               THE COURT:  That's fine.

11               MS. GANNETT:  We really want it just for the Court

12   to look at and to be able to see what it looks like.  And I

13   suppose if the Court would need a depiction to refer to, we

14   could take a photograph of it.

15               THE COURT:  Well, I really don't.  I believe it was

16   offered.  It was an attachment.  Either one of you attached

17   it to your motion.  Who did that?

18               MS. GANNETT:  We did, Your Honor.

19               THE COURT:  And that was Exhibit 1?

20               MS. GANNETT:  Yes, Your Honor.

21               THE COURT:  And without repetition, can we stipulate

22   that Exhibit 1 to the defendant's motion 268 is part of this

23   record?  Any objection from the Government?

24               MR. CURRAN:  Exhibit 1 is, but Exhibit 1 is not a

25   full and accurate copy of that.

LAUREN KNAPP - DIRECT                48

1          THE COURT:  Okay.  And what would be a full and
2    accurate copy?  Do you have -- could you provide that to us?
3          MR. CURRAN:  The only full and accurate copy, Your
4    Honor, is the actual exhibit.
5          THE COURT:  Is there anything in it between that --
6    anything material that the Government believes between the
7    original and the copy that is Exhibit 1?
8          MR. CURRAN:  There is additional writing in that
9    exhibit, Your Honor, and we believe also the actual nature of
10   the document -- the public pages are in the document, the
11   order in which the pages are, all of those are important and
12   are relevant evidence; and, Your Honor, the Government's
13   position is the document should be in evidence and the Court
14   should retain it.
15         MS. GANNETT:  I think that is incorrect for a couple
16   of reasons.  The first reason is that the depiction that
17   the -- that was made by Ms. Mosher, the copy that was made by
18   Ms. Mosher shows the document as it existed at that time, or
19   at least as they knew it.
20         THE COURT:  She said she made a partial copy -- what
21   she said she couldn't copy.  I thought she indicated parts of
22   it were not copied.
23         MS. GANNETT:  She said she copied it.  She had to
24   darken the copy because it was difficult to read.
25         THE COURT:  I understood -- maybe the Government can

LAUREN KNAPP - DIRECT                    49

1    clarify this for me.  Was it -- is Exhibit 1 a complete copy

2    of what they have marked as Defendant's 27; and if not, what

3    is missing?

4             MR. CURRAN:  There is one page that the Government

5    added as an exhibit.

6             THE COURT:  What number was that?

7             MR. CURRAN:  It is in the response.

8             THE COURT:  Government's 3, something like that?

9             MS. GANNETT:  Yes.

10            MR. CURRAN:  Yes, Government's 3, Your Honor.

11            But our position also is, and consistent with the

12   Best Evidence Rule, that the actual document itself, the

13   order in which -- if you compare the different copies of the

14   document, pages are in different order.  You cannot tell what

15   the actual document is and the order in which the writings

16   are and how one page flows to the other.  You can try to

17   piece that together, but the best evidence for that is the

18   original document.  And the parties --

19            THE COURT:  Hand it to me, Ms. Ravenel, please.  I

20   need to look at it.

21            MS. GANNETT:  Yes, Your Honor.

22            That might be true, Your Honor, if the document had

23   been received and maintained in its condition at the time of

24   the search, but it was not.

25            THE COURT:  And is there any change to it?  Have you

LAUREN KNAPP - DIRECT                    50

1    inspected and compared it to the copy made by Ms. Knapp?

2             MS. GANNETT:  There -- it appears -- it appears that

3    there may be changes to it.

4             THE COURT:  Not "may."  Are there changes?

5             MS. GANNETT:  I think -- well, there are

6    differences.  I don't know if there are changes.  I don't

7    know if the copy that was made was accurate at the time of --

8             THE COURT:  Assuming it was accurate at the time,

9    are there differences in the present one I have before me?

10            MS. GANNETT:  There appears to be additional

11   material that was written -- assuming that the copy was

12   accurate at the time it was made --

13            THE COURT:  Yes, I understand.

14            MS. GANNETT:  -- there appears to be additional

15   material that was written after that time.

16            THE COURT:  Later.

17            MS. GANNETT:  Later.  Which is not relevant to this

18   motion.  And --

19            THE COURT:  You know, I'm not worried about

20   relevance to this motion.  I'm going to accept what is

21   Exhibit 1 for that purpose.

22            Folks, let's just appreciate something:  We are

23   dealing with evidence that is potentially downright, right?

24   I mean, that's what we are dealing with here, and we are all

25   focusing on this because of its importance -- potential

LAUREN KNAPP - DIRECT                51

1          importance to the case.  And it is -- well, that's why I
2          asked the question who was in possession of this because I
3          was frankly, Ms. Gannett, a little uncomfortable with either
4          party sort of possessing what is a critical document.
5                  Now, what Ms. Ravenel does is she puts it in a safe.
6          Okay?  And we know where it is.  And I just -- as critical as
7          this piece of evidence is, I just think Ms. Ravenel ought to
8          possess it.  And to the extent the parties need to inspect it
9          personally, they can come to court, and we'll make it
10         available for each party to handle, but this is just sort of
11         too important to be sort of floating out there.  And I have
12         immense respect for the defense.  I think that is where it
13         ought to be.
14                 And, Ms. Ravenel, there is no problem in terms of
15         bringing that out of the safe; is that correct?
16                 THE CLERK:  No problem.
17                 THE COURT:  I think that's the better approach here.
18         So now I -- I share your view that in terms of what might be
19         relevant to this motion.  If he wrote something later, that
20         might be relevant for admissibility or something later, 403,
21         all those issues, but in the case in chief.  But for right
22         now, I think what she copied is the document we ought to work
23         on.
24                 Let's go back to this where I started.  Will the
25         Government -- does the Government object to making

1    Defendant's Exhibit 1 to its motion an exhibit in this

2    hearing, for whatever it represents, is a copy of what

3    Ms. Knapp made at that time?

4          MR. CURRAN:  We don't object to that.

5          THE COURT:  Exhibit 1 is incorporated into the

6    record.  It's made a part of the record.

7          Now, Document Number 27, I will leave it to y'all

8    whether you want to make it part of the record.  But the

9    Court is going to take custody of this, and it's going to be

10   in the custody of Ms. Ravenel.  I think it's better to mark

11   it as Defendant's Exhibit 27, and it's an exhibit to this

12   hearing, and everybody knows where it is.

13         MS. GANNETT:  Your Honor, if I may?  We would not

14   object to that with the proviso that we believe the portion

15   at the end that is an additional writing should not be -- no

16   one else should be permitted to view that because it is

17   additional writing that was made by the defendant that was

18   provided to defense counsel.  And there --

19         THE COURT:  You hadn't gotten there yet.  Which --

20   well, when we get to at a later point about whether the whole

21   thing is protected, right?

22         MS. GANNETT:  Well, that specific portion -- so just

23   to explain that other stuff, there is like a page and a half

24   at the end, Your Honor, which has nothing to do with the

25   writings at issue here.  It's additional writing --

LAUREN KNAPP - DIRECT                53

1              THE COURT:  Made subsequent to.

2              MS. GANNETT:  -- made subsequent to the copy.  And

3    it was -- this whole memo pad was handed to defense counsel

4    in the context of a jail visit.  And so it has never been --

5    never before been shared to the Government other than we

6    allowed a physical inspection today in court of the document.

7              THE COURT:  Now, whether -- simply because the

8    defendant handed it to counsel does not automatically make it

9    subject to attorney-client privilege.  It's got to be for

10   what purpose was it prepared.  But it's an issue, and I'm not

11   going to allow anybody else to see this until we address and

12   dispose of this issue.  That's a fair question to raise, and

13   we are not going to allow anyone else to inspect it at this

14   time.

15             To the extent the Government attempts to offer that

16   page and a half or seek to access to that, I'll address that

17   issue then.  It's not -- right now, I've got this issue, and

18   that's a new one before us, and by having the Court taking

19   custody of this, the Court is not addressing whether this is

20   protected or privileged.

21             MS. GANNETT:  Very well, Your Honor.  We -- we

22   appreciate that the Court will not permit them to see it

23   before we are able to litigate the issue.

24             THE COURT:  To the extent that the Government seeks

25   access to it, you need to make a motion, and we'll have the

1    defendant respond, and we'll have -- we'll address that

2    issue.  And how that is consistent or not consistent with how

3    we deal with this motion, we'll have to address later.  What

4    I feel uncomfortable about is I don't think this document

5    ought to just be in possession of either party.  It should be

6    in the possession of the Court.  Okay.  I have -- Defendant's

7    Number 27 is to be made an exhibit to this proceeding.

8              Is there an objection from the defense?

9              MS. GANNETT:  No, Your Honor.

10             THE COURT:  From the Government?

11             MR. CURRAN:  No, Your Honor.

12             THE COURT:  Very good.  Ms. Ravenel, I'll hand this

13   to you.  And they've already got Defendant's 27 written on

14   that.  And let me just for a moment, make a note about this

15   exchange here.

16             (Thereupon, Defendant's Exhibit 27 introduced into

17   evidence.)

18             THE COURT:  Okay.  Ms. Gannett, please continue.

19             MS. GANNETT:  Thank you.  So I apologize for not

20   remembering whether I asked this question, Your Honor.

21             THE COURT:  You can ask it twice.  It's okay.  It's

22   just me.

23   BY MS. GANNETT:

24    Q. Officer Knapp -- is that correct, "officer"?

25    A. No, ma'am.

1    Q. Analyst?

2    A. Yes, ma'am.

3    Q. Sorry.  Analyst Knapp, you provided a copy of the

4    document that you copied, which I think we are calling "the

5    personal statement."  Is that --

6          THE COURT:  Yes, we are calling it a personal

7    statement.

8    BY MS. GANNETT:

9    Q. Personal statements of the defendant to FBI Agent Pierce

10   on August 4th --

11   A. Yes, ma'am.

12   Q. -- of 2015; is that correct?

13          And when did you first provide it to the solicitor's

14   office?

15   A. I did not provide it to them until around Christmastime.

16   Q. The FBI later provided you a subpoena for the same

17   document which you had already provided them?

18   A. Correct.  That and all other mail.

19   Q. And other material -- and several other things at the

20   same time?

21   A. Yes, ma'am.

22   Q. But in particular, they asked for this document by

23   subpoena.  And that was on August 19th --

24   A. Yes, ma'am.

25   Q. -- is that correct?

LAUREN KNAPP - DIRECT                56

1            And I'm going to show you what's been marked as
2    Defendant's Exhibit 6.  Do you recognize this document?
3    A. Yes, ma'am.
4    Q. Okay.  And this is an e-mail from you to Shelly Green and
5    Lisa Bloodworth?
6    A. Yes, ma'am.
7    Q. Who -- now, Shelly Green and Lisa Bloodworth are the two
8    officers who conducted the search on August 3rd; is that
9    right?
10   A. I do not know if they conducted it themselves or they
11   were present.  I don't know.
12   Q. Okay.  But Officer Bloodworth is the one who brought you
13   the personal statement documents and the other documents --
14   A. Yes, ma'am.
15   Q. -- that day.  And she's the one that you returned the
16   documents to be taken back to the cell or identified as
17   contraband?
18   A. Yes, ma'am.
19   Q. Okay.  So you are e-mailing these same people who are a
20   part of your intel -- of your intelligence unit at the jail,
21   right?
22   A. They are -- they do not report to me.
23   Q. They are a part of the intelligence unit?
24   A. At the jail, yes, ma'am.
25   Q. So you are e-mailing them, and you are telling them it's

1    time to start knocking out the response to the subpoena,

2    correct?

3    A. Yes, ma'am.

4    Q. Okay.  And attaching the subpoena so that they know what

5    needs to be delivered to the FBI?

6    A. Correct.

7    Q. And telling them what you are going to do in response to

8    the subpoena?

9    A. Yes, ma'am.

10   Q. And you instructed them that everything has to be done

11   carefully, take your time, and it must be right?

12   A. Yes, ma'am.

13   Q. And then you say, "If we need to toss his cell again, so

14   be it"?

15   A. Yes, ma'am.

16   Q. Okay.

17           THE COURT:  Can somebody explain that to me?  Maybe

18   everybody here but me knows what that means but --

19   BY MS. GANNETT:

20   Q. What does it mean to "toss a cell"?

21   A. Um, from what I have been told from them is to go through

22   and search it to make sure there is no contraband.

23   Q. That means really to go through it and search; is that

24   right?

25   A. I don't know what their terminology is for it.  I've

1    never searched a cell.

2    Q. You used the terminology?

3    A. Correct.

4           THE COURT:  What did you mean by it?  Not what

5    others meant, what did you mean?

6           THE WITNESS:  My intent was I was worried we had

7    missed letters early on in the process that had come through

8    the mail that we had missed.

9           THE COURT:  Here is the important question:  Did

10    they give you anything that you didn't already have?  Did

11    they go back and search the cell again?

12           THE WITNESS:  I do not know if they did.

13           THE COURT:  You have no information if they did

14    that?

15           THE WITNESS:  I do not know.

16    BY MS. GANNETT:

17    Q. How long have you been an intelligence analyst?

18    A. You mean with this agency or --

19    Q. At all.

20    A. Since 2010.

21    Q. And how long have you been involved in law enforcement

22    generally?

23    A. Since 2003 and '4.

24    Q. And it's your testimony that you are not really sure what

25    tossing a cell means?

LAUREN KNAPP - CROSS                59

1       A. Not in the jail setting, no, ma'am.

2       Q. Okay.

3               MS. GANNETT:  Your Honor, we would move into

4       evidence this exhibit.

5               THE COURT:  Any objection to Defendant's 6?

6               MR. CURRAN:  No objection, Your Honor.

7               THE COURT:  Defendant's 6 is admitted without

8       objection.

9               (Thereupon, Defendant's Exhibit 6 introduced into

10      evidence.)

11              MS. GANNETT:  That's all at this time, Your Honor.

12              THE COURT:  Cross-examination.

13              MR. CURRAN:  Your Honor, the Government has also

14      subpoenaed Ms. Knapp.  So with the Court's indulgence, we may

15      go beyond the scope --

16              THE COURT:  That would be fine.

17              MR. CURRAN:  -- of the direct.

18              THE COURT:  So we don't need to bring her back,

19      right?

20              MR. CURRAN:  Exactly.

21                          CROSS-EXAMINATION

22      BY MR. CURRAN:

23       Q. And, Ms. Knapp, I apologize if I go over some matters

24      that you've already testified about, but -- I think you've

25      already stated this.  Where do you work?

LAUREN KNAPP - CROSS                60

1      A. Charleston County Sheriff's Office.

2      Q. And does the sheriff's office have multiple divisions?

3      A. Yes, sir.

4      Q. Which division do you work in?

5      A. I work in the Security Threat Analysis Division on the

6      law enforcement side.

7      Q. And what does that mean to say you work on "the law

8      enforcement side"?

9      A. I do not work in the detention center.

10     Q. Okay.  The -- are you employed by any other law

11     enforcement organizations?

12     A. No, sir.

13     Q. All right.  And your specific title you told us is

14     intelligence analyst?

15     A. Yes, sir.

16     Q. And, generally, what are your duties?  You discussed this

17     in some detail, but generally what are your duties as an

18     intelligence officer?

19     A. My main job is to deal with the threats, both inside --

20     internally and externally with regards to the jail, to make

21     sure the inmates, staff, detention officers are safe; also

22     connecting crime that goes on inside the jail to outside

23     crime; coordinating information, sharing information.

24     Q. Okay.  So is it accurate to say a fair portion of the job

25     relates to things that are going on in the jail?

LAUREN KNAPP - CROSS                61

1     A. Yes, sir.

2     Q. And with whom do you coordinate in the jail?

3     A. Shelly Green and Lisa Bloodworth, detention officers.

4     Q. All right.  And where do they work in the jail?

5     A. They work in the security threat group within the jail.

6     Q. All right.  What -- what type of information do you

7     receive from the jail generally?

8     A. Usually it's -- I deal with mail, jail calls, as well as

9     next of kin, associates, enemies within the jail,

10    codefendants, things of that nature.

11    Q. Is that sometimes case-related information?

12    A. It is.

13    Q. What do you do with the information you receive from the

14    jail?

15    A. It depends on the request.  A lot of times I'm asked for

16    enemies in the jail.  If there is a shooting in the outside

17    world, detectives will ask for a list of enemies so that we

18    can see if maybe that is why the shooting occurred.

19    Q. All right.  So does that include asking for information

20    sometimes related to a case?

21    A. Sometimes, yes.

22    Q. And do you consider that to be part of your job --

23    A. Yes, sir.

24    Q. -- part of your duties.

25          Have you ever asked anyone at the jail to search a

1    cell for evidence related to an inmate's case other than

2    pursuant to a legal process such as a subpoena or a warrant?

3    A. I have not.

4    Q. All right.  Have you ever -- has anyone ever asked you to

5    search a cell at the jail other than pursuant to a subpoena

6    or a warrant?

7    A. They have not.

8    Q. All right.  Do you have any authority to ask anyone to

9    search a cell in the jail?

10   A. I do not.

11   Q. Do you work at the jail?

12   A. I do not.

13   Q. All right.  Are you a jail employee?

14   A. I am not.

15   Q. The jail -- to be accurate, the jail actually pays?

16   A. Pays my paycheck, correct, but my chain of command is on

17   the other side.

18   Q. Do you know who Dylann Roof is?

19   A. I do.

20   Q. And in July and August last year -- you've already talked

21   about this -- some of your intelligence duties related to

22   Mr. Roof, correct?

23   A. Yes, sir.

24   Q. Why don't you describe generally what your duties

25   involved in July and August of last year with respect to

LAUREN KNAPP - CROSS              63

1          Mr. Roof.

2          A. I was instructed to monitor social media as well as

3     security threats both inside and outside with regards to both

4     high profile inmates, along with the daily mail summary and

5     looking at that as well as my normal duties.

6          Q. And I believe you testified on direct that it was Major

7     Watson that ordered you to do that.

8          A. Correct, with regards to the two high profile, yes, sir.

9          Q. Did you do that on your own, screen his mail?

10         A. I started on my own, yes, sir.

11         Q. You started on your own, and eventually it was ordered by

12    Major Watson?

13         A. Yes, sir.

14         Q. All right.  The day in question, August 3rd, was that

15    after Major Watson had told you to screen his mail?

16         A. Yes, sir.

17         Q. How did that screening process normally work?

18         A. The mail comes in usually about 2 or 3:00 in the

19    afternoon.  Jail staff reviews all mail with regards to --

20    they pulled it aside, and it is scanned to me.  I then

21    receive it on my end.  I read through all of the mail, both

22    inbound and outbound at that time.  I save a copy for that

23    day as well as I log it in a spreadsheet of who the sender

24    was, the address, and if there is some interesting content

25    that might be of a threat to the outside world, I note that.

LAUREN KNAPP - CROSS                    64

1     Q. So let's turn to August 3rd of last year.  You've already

2     testified in some detail about that, and I'm not going to ask

3     you to repeat all of that.  I believe you testified, correct,

4     that this first started when you were forwarded a letter from

5     the jail?

6     A. Correct.

7     Q. And you believe that letter was unusual for the reasons

8     you described already to the Court, correct?

9     A. Yes, sir.

10     Q. All right.  And then after you received that letter, you

11     did some additional research, and that is where you

12     determined that it -- the writing from which it was taken

13     potentially had some connection to suicide?

14     A. Yes, sir.

15     Q. What was your reaction when you learned that?

16     A. It was a matter that needed to be taken to a higher pay

17     level.

18     Q. And what did you do?

19     A. I took it to my captain.

20     Q. And what's his name?

21     A. Captain Thomas Robertson.

22     Q. I believe you already testified to this, with Captain

23     Robertson, you then went to the meeting with the senior

24     staff?

25     A. Correct.

LAUREN KNAPP - CROSS                65

1     Q. All right.  And you've already talked about that.  When
2     you were at that meeting, was there any discussion whatsoever
3     of a need to search Mr. Roof's cell for evidence?
4     A. No.
5     Q. And there was a discussion of an e-mail to the solicitor.
6     Do you recall that discussion?
7     A. That discussion was with me and my captain on the ride
8     back to my office.
9     Q. That e-mail was this -- that went to the solicitor, did
10    it go to any other addressees?
11    A. It did.
12    Q. To whom else did you send that?
13    A. Captain O'Neil with the state law enforcement division,
14    Rich Burkhardt, Clint Pierce with the FBI, and the solicitor,
15    and cc'd on it was my captain and my lieutenant.
16    Q. All right.  And the subject of that e-mail was the fact
17    that you had this letter?
18    A. Correct.
19    Q. And it also discussed the suicide-related aspects of
20    that, correct?
21    A. Correct.
22    Q. Did they --
23        THE COURT:  "This letter" is referring to the letter
24    to the sister from the defendant?  Is that what we are
25    talking about?

1          MR. CURRAN:  Yes, Your Honor.  For the Court's

2    reference, it's already been admitted into evidence as

3    Defendant's Exhibit 19.

4          THE COURT:  I just want to make sure we are talking

5    about that.  Thank you.

6    BY MR. CURRAN:

7    Q. So that letter was the subject of your e-mail?

8    A. Correct.

9    Q. All right.  In response to that e-mail, did anybody ask

10   you to search his cell?

11   A. No.

12   Q. In response to that e-mail, did anybody ask you to review

13   any of his writings?

14   A. No.

15   Q. In response to that letter, was -- in that -- excuse me.

16   I'm calling it a letter.

17          In that e-mail was -- was there any discussion

18   whatsoever of searching Mr. Roof's cell?

19   A. No.

20   Q. Did anybody but the solicitor respond to you on that

21   e-mail?

22   A. Captain O'Neil responded.

23   Q. And where does Captain O'Neil work?

24   A. He's with the State Law Enforcement Division.

25   Q. What was his response?

LAUREN KNAPP - CROSS                67

1      A. Thanks for the information.

2      Q. And what did you do after that meeting with the senior

3      staff?

4      A. I was asked to wait outside until my captain was allowed

5      to leave, and I went back to my office at the Seahawk IFC.

6      Q. And you testified you were back in your office when you

7      learned that his cell had been searched?

8      A. Yes, sir.

9      Q. Did you ask or order anyone to search Mr. Roof's cell?

10     A. I did not.

11     Q. Did you ask or order anyone to take anything from his

12     cell?

13     A. I did not.

14     Q. Did you ask and order anyone to look through his

15     writings?

16     A. I did not.

17     Q. Would you have the authority to ask or order anyone at

18     the jail to do those things?

19     A. I do not.

20     Q. When you -- when you got to the jail, I believe you

21     testified Officer Bloodworth had already obtained Mr. Roof's

22     writings?

23     A. Correct.

24     Q. And where did you go?  Where in the jail did you go?

25     A. I went to the security threat office.

LAUREN KNAPP - CROSS                68

1       Q. And you reviewed some of the writings there?

2       A. Yes, sir.

3       Q. Did you review all of them?

4       A. I reviewed everything that was on my desk.

5       Q. Did you review any letters other than the one that you

6       mentioned from the defendant's mother?

7       A. No.

8       Q. All right.  Did any of the materials that you reviewed

9       appear to you to be legal materials?

10      A. No, sir.

11      Q. Did any of the materials that you reviewed, were any of

12      them marked?

13              MS. GANNETT:  Objection, Your Honor.

14              THE COURT:  Yes?

15              MS. GANNETT:  I don't know that this witness is

16      qualified to --

17              THE COURT:  She can say did it appear to her to be

18      legal mail.  I think that is a reasonable question.

19              Please proceed.  Overruled.

20      BY MR. CURRAN:

21      Q. Your job is to review the mail that comes in?

22      A. Yes, sir.

23      Q. Occasionally do you see items that are clear to you that

24      they are legal related?

25      A. Yes, sir.

1        Q. Do you review those?

2        A. No.

3        Q. On the documents reviewed, was anything marked "legal"?

4        A. No.

5        Q. Were any markings on anything reviewed indicating that

6     they were to or from lawyers?

7        A. No.

8        Q. Was anything in the materials reviewed that mentioned his

9     lawyers at all?

10       A. No, sir.

11               MS. GANNETT:  Stipulate that the document --

12               THE COURT:  I'm going to allow him to cross-examine.

13               Please continue.  Objection overruled.

14               MR. CURRAN:  And for the record, we are referring to

15     all of the materials.

16               THE COURT:  Yes, sir.

17     BY MR. CURRAN:

18       Q. And you've described what you -- you described what you

19     reviewed, and you described that you copied some of the

20     materials that you reviewed, correct?

21       A. Correct.

22       Q. And did you in fact copy -- how many -- how many

23     different copies did you make?

24       A. Two.

25       Q. All right.  And why did you make the second copy?

LAUREN KNAPP - CROSS                    70

1        A. The first copy did not come out very well.  It was

2    written in pencil, so I needed to darken it.

3        Q. All right.  And was the second copy that you made, was

4    that just of the notepad?

5        A. It was.

6        Q. And is that the same as the document that you were shown

7    by the defendant earlier as Government's Exhibit -- excuse

8    me -- Defense's Exhibit 1 to their motion?

9        A. Yes, sir.

10       Q. That's the second document that you copied?

11       A. Correct.

12       Q. You copied that because the first copy was not

13   sufficiently legible in your opinion?

14       A. Correct, as well as FBI Agent Pierce.

15       Q. And did you copy any additional materials in that first

16   copy of documents?

17       A. I did.

18           MR. CURRAN:  If I may approach the witness?

19           THE COURT:  You may.

20           MR. CURRAN:  And I'm handing the witness what has

21   been marked as Government's Exhibit 1 for purposes of this

22   hearing.

23           MS. GANNETT:  Your Honor, I would be tempted to make

24   an objection about the lack of foundation for a portion of

25   this document, and I'm told that the Government will

LAUREN KNAPP - CROSS                71

1    establish that later, but I want to note the potential

2    objection to --

3              THE COURT:  What is it that -- is it the content of

4    the writing, or what do you question?

5              MS. GANNETT:  So we were -- we were just notified

6    last night of some of the drawings that are contained in this

7    exhibit, and we do not know where this came from in

8    connection -- in comparison to the writings that are at issue

9    in this motion, and so I'm not sure what the relevance of

10   them is or what the foundation for admitting them in

11   connection with this --

12             MR. CURRAN:  One correction, Your Honor, we e-mailed

13   a copy of this document to counsel when we filed our response

14   to their motion to suppress.

15             THE COURT:  I see it has Bates stamp numbers.

16             MR. CURRAN:  It's been provided in discovery.

17             MS. GANNETT:  I'm not challenging the disclosures.

18   I'm just say we don't have information about how they are

19   connected to this document.

20             THE COURT:  So let me just say --

21             MR. CURRAN:  Your Honor, may I?  I believe we can do

22   that with this witness.

23             THE COURT:  I'm just asking -- I'm trying to

24   understand what is and what not is being raised.  The written

25   part, which is beginning on Bates stamp numbers 060661 and

LAUREN KNAPP - CROSS                72

1    extending to 60689 -- I'm sorry -- 690 appears to be that

2    what we have been referring to as the personal statement.  Is

3    the defense arguing about any of that?  That written --

4    handwritten portion?

5                MS. GANNETT:  I don't believe so, Your Honor.

6    Although it looks like the drawings may have been -- the

7    drawing -- you said 661, Your Honor?

8                THE COURT:  Yes.

9                MS. GANNETT:  No.

10               THE COURT:  I'm just trying to figure out -- so now

11   we are talking about -- just so the record is clear on this,

12   beginning on 060652 to 060660 are these drawings.  That's

13   what we are -- what the Government is getting ready to lay --

14   attempt to lay a foundation.  Am I correct about that?

15               MS. GANNETT:  They are going to lay the foundation

16   through another witness later, and I just want to --

17               THE COURT:  I got you.  I just want to make sure I

18   knew what we were talking about.

19               MR. CURRAN:  We may as well do it through this

20   witness, too, Your Honor.

21               THE COURT:  Very good.  Please proceed.  I'm just

22   trying to make the record clear.

23   BY MR. CURRAN:

24    Q. Ms. Knapp, are you familiar with this document?

25    A. I am.

LAUREN KNAPP - CROSS                    73

1    Q. Have you seen this document before?

2    A. Yes, sir.

3    Q. Did you see this document on August 3rd, 2015?

4    A. Yes, sir.  This document and the drawings.

5    Q. And where did you see this document and these drawings?

6    A. In the security threat office.

7    Q. Was the -- what was -- it already existed in the security

8    threat office when you arrived?

9    A. Yes, sir.

10   Q. What were you told about the origins of this document?

11   A. I was told these were the items that were found within

12   the cell, and that there were some items of question with

13   regards to contraband and some other items.

14   Q. Okay.  And were there other documents there that you

15   didn't copy?

16   A. Yes, sir.

17   Q. Is this essentially your first selection of what you

18   thought should be copied?

19   A. Yes, sir.

20   Q. And who was present with you when you were doing this?

21   A. Lisa Bloodworth and Shelly Green.

22   Q. Who are Lisa Bloodworth and Shelly Green?

23   A. They are detention officers in the jail.

24   Q. So when you were referring to the other one as being a

25   second copy because the initial copy was too light, is this

LAUREN KNAPP - CROSS                    74

1    the first copy that you were talking about?

2     A. Yes, sir.

3     Q. And just possibly to beat a dead horse, what's the

4    difference between this copy and the second copy that has

5    already been admitted into evidence?

6     A. I was asked to recopy the text portion of the tablet

7    because it had come out too light.  The drawings were okay.

8     Q. This isn't everything that was involved with Mr. Roof's

9    writings, correct?

10    A. Oh, no, it was not.

11    Q. This is a selection of what was in there, and then the

12   subsequent document is just the notepad that the Court now

13   has in its possession, correct?

14    A. Yes, sir.

15    Q. All right.

16         MR. CURRAN:  Your Honor, we would offer this as

17   Government's Exhibit 1.

18         THE COURT:  Government's 1.  Is there an objection?

19         MS. GANNETT:  Subject to the foundation that --

20         THE COURT:  I think she laid the foundation that she

21   saw it at the time.  I think that would -- she's identified

22   these drawings.  So are you objecting?  Because I believe the

23   Government has offered a foundation for the document.

24         MS. GANNETT:  Well, the -- the objection is to the

25   Court considering the drawing in connection with the writings

LAUREN KNAPP - CROSS                    75

1    because we don't know if they were found in the same spot

2    with the actual tablet.

3            THE COURT:  Ms. Knapp.

4            THE WITNESS:  Yes, sir.

5            THE COURT:  When it was delivered to you,

6    Ms. Bloodworth delivered to you a group of documents,

7    correct?

8            THE WITNESS:  Correct.

9            THE COURT:  And were these drawings among those

10   documents delivered to you?

11           THE WITNESS:  Yes, sir.

12           THE COURT:  And they are -- they were in existence

13   at the time on August 3rd when it was delivered to you; is

14   that correct?

15           THE WITNESS:  Yes, sir.

16           THE COURT:  I find that the foundation is

17   established.  Government's Exhibit 1 is admitted over the

18   objections of the defense.

19           MS. GANNETT:  Your Honor, would it be possible to

20   label it something different, because I think, or to

21   somehow -- or could we identify the exhibits to the pleadings

22   according to their -- according to their docket numbers or --

23   so that we don't have duplicate Government 1 and

24   Government --

25           THE COURT:  Well, I don't know.  This is -- this is

1    Government 1.  Ms. Ravenel will do a Government Number 1 to

2    this hearing.  And that will be the document.

3              MS. GANNETT:  When we refer to the Government's

4    exhibits to the pleadings, we'll refer to them as according

5    to the docket numbers.

6              THE COURT:  If you want to do that.  I'm just trying

7    to make a record that somebody -- as little as possible,

8    somebody reviewing this doesn't have to go on an Easter egg

9    hunt to figure out what we are talking about.

10             MR. CURRAN:  Your Honor, if it would assist in that

11   regard, we could mark this as Government's Exhibit 11, which

12   starts off where we ended up with the --

13             THE COURT:  Very good.  We can mark this, just to

14   keep it straight, Government Exhibit 11.  And it is admitted

15   over the objections of the defense.  Thank you.  Go ahead.

16             (Thereupon, Government's Exhibit 11 introduced into

17   evidence.)

18   BY MS. GANNETT:

19    Q. Just to be clear, Ms. Knapp, the drawings that are in

20   this, were they part of the notepad itself?

21    A. No, sir.

22    Q. What -- how did you find them when you were given these

23   materials?

24    A. They were loose pieces of paper.

25    Q. Thank you.  And what, if anything, did you do after you

LAUREN KNAPP - CROSS                77

1    copied these documents?

2    A. I scanned them in and e-mailed them to myself.

3    Q. All right.  And did you contact anybody back in your

4    office about them?

5    A. I contacted my lieutenant as well as my captain.

6    Q. And did -- what, if anything, did they tell you to do

7    after you contacted them?

8    A. They told me to contact the FBI.

9    Q. So that came from your supervisors?

10   A. Yes, sir.

11           THE COURT:  Who were they again, Ms. Knapp?

12           THE WITNESS:  The supervisors?

13           THE COURT:  Yes.

14           THE WITNESS:  Captain Thomas Robertson and

15   Lieutenant Fletcher King.

16   BY MR. CURRAN:

17   Q. Is it a violation of any sheriff's office policy that you

18   are aware of to share information taken from an inmate's cell

19   with the FBI or any other law enforcement investigation?

20   A. No, sir.

21   Q. Do you consider that to be a part of your job duties as

22   an intelligence officer?

23   A. Yes, sir.

24   Q. Excuse me.  An intelligence analyst?

25   A. Yes, sir.

```
1      Q. Have you had any direct interaction with Mr. Roof?

2      A. I have not.

3      Q. Have you ever met him?

4      A. I have not.

5      Q. Are you still reviewing his social media and his incoming

6      and outgoing mail?

7      A. Yes, sir.

8      Q. All right.  Are you reviewing his other interactions with

9      the outside world?

10     A. His visitors list as well.

11     Q. You are not reviewing anything relating to his counsel,

12     correct?

13     A. No.

14     Q. What do you review generally?  Mail, I think you said

15     that.  Visitation logs?

16     A. Yes, sir.

17     Q. Calls?

18     A. Yes, sir.

19     Q. Any calls that are made in and out.  What do his

20     communications focus on?

21     A. Of recent he has been writing outbound letters.

22     Q. What topics does he discuss?  For example, does he ever

23     discuss books?

24     A. He does.

25     Q. Is that a common topic of discussion for him?
```

1    A. It is.

2    Q. What types of books?

3    A. Usually general history, Roman-Empire-type items.

4    Q. Has he ever discussed current events?

5    A. He has.

6    Q. What types of -- how do you know that?

7    A. He wrote a letter to an individual stating that he could

8    listen to NPR.

9    Q. So he expressly noted that he listens to NPR?

10    A. Correct.

11    Q. How would he listen to NPR?

12    A. With the radio.

13    Q. And are radios available to inmates?

14    A. They are.

15    Q. Do you know whether he has a radio?

16    A. Yes, he does.

17    Q. And how do you know that?

18    A. He purchased one in early July of 2015, and he purchased

19    another one on August 15th of this year.

20    Q. All right.  And how do you know that?

21    A. Through the canteen system, through his commissary

22    receipts.

23    Q. All right.  So you reviewed a receipt for his purchase of

24    a radio?

25    A. Correct.

LAUREN KNAPP - CROSS                80

1    Q. And it sounds like two?

2    A. Correct.

3    Q. And the first one was when again?

4    A. Early July 2015.

5    Q. Apart from his family and his attorneys, is there anybody

6    in particular that he corresponds with?

7    A. He does.

8              MS. GANNETT:  Objection, Your Honor.

9              THE COURT:  Why is this relevant to this hearing?

10             MR. CURRAN:  Well, we believe that some of the

11   people he corresponds to are relevant to some of the

12   arguments that relate to -- to the Sixth Amendment issue.

13             THE COURT:  Very good.  Proceed.

14             MS. GANNETT:  Your Honor, I think it's only relevant

15   to his corresponding with those people at the time period of

16   the seizure.

17             MR. CURRAN:  The Government's position, as is laid

18   out in its papers, Your Honor, is that this young man has a

19   penchant for communicating with people about his views on

20   particular topics, and the people he chooses to --

21             THE COURT:  I don't know.  We haven't decided the

22   merit of it yet, but is that he -- he seeks to engage and

23   express his ideas publicly, and it occurred before the

24   tragedy at Emanuel AME, and it allegedly was continuing at

25   the time this thing was prepared.  I reached that, so if, in

1     fact, something continued along the same lines subsequent, I
2     can see how it's relevant.  Folks, it's just me.  Okay?  I'm
3     sitting here right now, and it may be later that if I
4     determine that it's unduly based and not particularly
5     probative, I could redact it before we issue a statement.  I
6     think at this point we ought to allow the Government to make
7     its record.
8                 Please proceed.
9                 MR. CURRAN:  I'm almost done, Your Honor, although I
10    clearly lost track of where I was.
11                THE COURT:  Those troubling judges that get you off
12    track.
13    BY MS. GANNETT:
14     Q. Apart from his family and his counsel, is there anybody
15    in particular that he corresponds with?
16     A. Yes, sir.
17     Q. And who?
18     A. Stefan Luff.
19     Q. Who is Mr. Luff?
20     A. Mr. Luff is a neo-Nazi who lives in Sussex, England.
21     Q. And when has he been corresponding with Mr. Luff?
22     A. In the last 30 to 45 days.
23     Q. All right.  So to this day, he is communicating with
24    individuals who identified themselves as white supremacists?
25     A. Yes, sir.

LAUREN KNAPP - CROSS                    82

1              THE COURT:  I'm more interested, at the time of

2    August 3rd, was he communicating with others in which he was

3    attempting to express his philosophy?

4              THE WITNESS:  I cannot answer that, sir.

5              THE COURT:  Okay.  Because I think we know that for

6    the month preceding, you said there were no outgoing --

7              THE WITNESS:  There was one letter.

8              THE COURT:  One letter.  And who was that to?

9              THE WITNESS:  It was to a gentleman out in

10   Washington State.

11             THE COURT:  Do we know anything about him?

12             THE WITNESS:  No, sir.

13   BY MS. GANNETT:

14    Q. Is that the individual -- that first outgoing letter, is

15   that the individual who subsequently put up for auction

16   Mr. Roof's letter?

17    A. Yes, sir.

18    Q. And is that something that you discussed on your direct

19   as one of the reasons why you were reviewing his mail?

20    A. Yes, sir.

21    Q. And that may not have come up on direct.  Is that one of

22   the reasons you were reviewing his mail?

23             THE COURT:  Do we have a copy of that letter?

24             MR. CURRAN:  A copy exists, but we do not have one

25   with us.  I believe it's available on the Internet.

```
 1                    MR. RICHARDSON:  I think I can get you one, Your

 2       Honor.

 3       BY MR. CURRAN:

 4        Q. Some final questions, and then I'm going to touch on a

 5       few things from the direct examination.  To your knowledge,

 6       did anybody outside of the jail ask or order that Mr. Roof's

 7       cell be searched?

 8        A. No, sir.

 9        Q. To your knowledge, did anybody from the state solicitor's

10       office ask that Mr. Roof's cell be searched on August 3rd

11       last year?

12        A. No, sir.

13        Q. To your knowledge, did anybody from the FBI ask or order

14       that Mr. Roof's cell be searched?

15        A. No, sir.

16        Q. To your knowledge, did anybody from the U.S. Attorney's

17       Office or the U.S. Department of Justice --

18        A. No, sir.

19        Q. -- ask that his cell be searched last August?

20        A. No, sir.

21        Q. To your knowledge, did anybody outside of the sheriff's

22       office ask you or any jail personnel to review the materials

23       taken from Mr. Roof's cell?

24        A. No, sir.

25        Q. And I'm going to -- I'm not going to ask those three
```

 1    questions again, but when I say "anybody," I include the

 2    solicitor's office, the FBI, the U.S. Attorneys, the U.S.

 3    Department of Justice, any of those groups or individuals

 4    from those groups ask you or any jail personnel to review the

 5    materials taken from Mr. Roof's cell?

 6    A. No, sir.

 7         MR. CURRAN:  One final question, Your Honor.

 8    Q. You mentioned that you copied a letter from the

 9    defendant's mother?

10    A. Correct.

11    Q. Why did you copy that?  Why was that of concern to you?

12    A. We thought we had missed it in the mail, and it was not

13    marked through postage mail.

14    Q. And you were shown an e-mail in which you were

15    communicating with Ms. Bloodworth and Ms. Green with respect

16    to the subpoena that you eventually got for the federal case,

17    correct?

18    A. Correct.

19    Q. Why was your -- why -- tell us again why were you

20    concerned that you might have missed something in that -- in

21    that search?

22    A. Because of the discovery of that letter that hadn't gone

23    through the normal process of getting information to the --

24    to an inmate.

25    Q. And was that the source of your concern and of your

1    comment to your colleagues over at the jail that there may be

2    a need to toss his cell?

3    A. Correct.

4              MR. CURRAN:  Nothing further, Your Honor.

5              THE COURT:  Thank you.  Redirect?

6                      REDIRECT EXAMINATION

7    BY MS. GANNETT:

8    Q. At the risk of me treading grounds, at the command staff

9    meeting, Beatty was there?

10    A. I believe he was, yes.

11    Q. And Lieutenant King was there?

12    A. No, he was not.

13    Q. Can you please remind me who was there?

14    A. Captain Thomas Robertson.

15    Q. Okay.  Robertson was there.

16    A. Major Eric Watson, Deputy Chief Clark, the sheriff, and

17    the assistant sheriff.

18    Q. And are those -- are the sheriff and the assistant

19    sheriff the same people who are in those positions today?

20    A. Yes, ma'am.

21              THE COURT:  What's the assistant sheriff's name?

22              THE WITNESS:  Sheriff Mitch Lucas.

23              THE COURT:  And Sheriff Cannon?

24              THE WITNESS:  Yes, sir.

25              THE COURT:  Okay.

```
1       BY MS. GANNETT:
2        Q. Did you get the date of the correspondence with Mr. Luff?
3        A. Which correspondence?  He's had two or three.
4        Q. Well, did you get the dates?
5        A. I did not give the dates.  I can have them for you.
6        Q. They postdated August 3rd, though; is that correct?  They
7       were after August 3rd?
8        A. They were after August 3rd, yes, of 2015, yes.
9               MS. GANNETT:  Thank you.
10              THE COURT:  Very good.  Ms. Knapp, you may step
11      down.
12              MR. CURRAN:  Would you like her to identify this?
13      I'm about to have it pulled up, the letter that you asked
14      about.
15              THE COURT:  Why don't you during -- when we take our
16      break, you can forward it to Ms. Ravenel.  She'll give you
17      her e-mail address, and she can then print it, and we'll mark
18      it a part of the record?  Okay.  Since it was referenced, I
19      think it should be there.
20              And Ms. Knapp, you may step down and you may leave.
21              THE WITNESS:  Thank you.
22              THE COURT:  Okay.  It's five minutes to 12.  Tell me
23      what we are planning for our next witness, Ms. Gannett.
24              MS. GANNETT:  I beg your pardon, Your Honor?
25              THE COURT:  Your next witness.
```

```
 1              MS. GANNETT:  Our next witness would be, I think,
 2    Ms. Bloodworth.
 3              THE COURT:  And how long do you think she will be?
 4              MS. GANNETT:  Could we do a shorter witness?  Is
 5    that your question?
 6              THE COURT:  Yeah, I'm trying to not --
 7              MS. GANNETT:  When would the Court like to take a
 8    break?
 9              THE COURT:  That is -- you are a step ahead of me.
10    It's about noon.  You know, my court reporter collapses at
11    some point.  Even though she has a very good personality,
12    sometimes we just knock her out.  So we go about two hours --
13    one hour and a half to two hours, normally about two hours.
14    And it's noon.  So a normal situation, I would break for
15    lunch right now and try to get us back by 1:00 if that is
16    possible, and to crank it up then.  Does that suit everybody?
17              MR. CURRAN:  No objection from the Government, Your
18    Honor.
19              MR. RICHARDSON:  My only question, Your Honor, is we
20    have two individuals that were asked to be brought down from
21    Columbia.  It is not looking likely at this rate that we are
22    going to get to them today.
23              THE COURT:  Oh, I'm going to try my best to get this
24    finished today.  If not, we can't do it, then so be it, but
25    that's going to be my goal.
```

1          MR. RICHARDSON:  At some point, I may ask if we can

2     go ahead and do those --

3          THE COURT:  And we'll accommodate you.

4          Yes, Ms. Gannett?

5          MS. GANNETT:  There is one brief, sort of

6     preliminary matter that -- sort of legal matter that I wonder

7     if we could get out of the way.

8          THE COURT:  Sure.  Go right ahead.

9          MS. GANNETT:  So it's our intent to call

10     Mr. Pennington to testify on the Sixth Amendment issue.

11          THE COURT:  Yes.

12          MS. GANNETT:  But that does raise some concerns for

13     us that are along the lines of *Simmons vs. United States*

14     regarding the defendant who testifies during the suppression

15     hearing and the Fifth Amendment rights that pertain to that

16     testimony.  And we assume that Mr. Pennington's testimony

17     would be according to the same treatment, in that it would

18     not be used against Mr. Roof at trial.  But before we would

19     put him on the stand, we would like to clarify that.  There

20     is case law supporting that position.

21          THE COURT:  What's the Government's view?

22          MR. CURRAN:  We would love to hear what their

23     authority to that proposition is, Your Honor.

24          THE COURT:  Take the view of allowing the defendant

25     to take the stand, we try to -- you know, we were trying to

1    get to the -- to factual matters that may be very probative

2    of the claim without making them waive his right against

3    self-incrimination to establish that.  I have not had the

4    issue come up before about a lawyer in another proceeding.

5         Ms. Gannett, I've got to say that no matter what I

6    determine, I can't make you any representation of what is

7    going to be treated in state court and how that would be

8    applied.  If you've got authority, I wish you would give it

9    to us.  My clerks and I will look at it over lunch.

10        Let me hear from the Government.  I would like to

11   have a chance to review this.  The issue is this:  That if

12   the -- if the defendant's counsel testifies that his

13   statements could not subsequently be used against the

14   defendant in a -- in a criminal proceeding, correct?

15        MS. GANNETT:  Correct, Your Honor.

16        THE COURT:  I'm just saying, no matter what I do, I

17   can't make a representation out of how the state court will

18   treat that, and Mr. Pennington needs to appreciate that,

19   regardless of what I do.

20        Does the Government have any additional thoughts?

21   Do you want to review the cases?

22        MR. CURRAN:  I think we need to review the cases,

23   Your Honor.  We are familiar with *Simmons*.  *Simmons* relates

24   to a defendant getting on the stand and rights that are

25   personal to them that the defendant can only vindicate by

1      testifying in the context of a suppression hearing.  So, for

2      example, had Mr. Roof chosen to testify here today, then that

3      argument might apply.  But in terms of whether it extends

4      beyond that to third parties --

5                THE COURT:  You know, do any of these cases address

6      specifically an attorney getting up and addressing --

7                MS. GANNETT:  Yes, they do.

8                THE COURT:  What I have discovered is there is

9      almost no situation that is unique.  Okay?  That everything

10     has been addressed somewhere.  In the miracle of Westlaw, we

11     can now find them.  Okay?  But that there is almost nothing

12     new under the sun.  Let's everybody take a look.  Take a deep

13     breath.  We'll take a look at this, and we'll come back,

14     let's talk about this.  But, Ms. Gannett, I've got to say

15     that no matter what I do, I don't control how the Judge

16     across the street may interpret this, and -- yes?

17               MR. CURRAN:  I would also point out that they've

18     given us a copy of two cases, neither of which are binding on

19     this Court or controlling.

20               THE COURT:  I understand that.  Let's see what they

21     say, and we'll -- we'll see the logic and reasoning of it,

22     and just because I say there is nothing new under the sun,

23     sometimes it's not every -- all of the circuits haven't dealt

24     with it yet.  So sometimes we can get guidance from other

25     circuits.

```
 1              MS. GANNETT:  I know the Court appreciates what a
 2     difficult position the defense is in in this situation.  It
 3     sounds like a simple matter:  You just put your client up
 4     instead of his counsel and then you are protected.  But the
 5     point here is that from our position, there has been an
 6     intrusion of our client's rights already, and the Government
 7     is seeking here through this motion to intrude further by
 8     forcing us to put him on the stand, and we are --
 9              THE COURT:  Forcing him, being?
10              MS. GANNETT:  Mr. Roof.
11              THE COURT:  You know, y'all --
12              MS. GANNETT:  To protect his own rights, when he has
13     a pending death penalty prosecution in which at the penalty
14     phase all kinds of issues will be -- will be raised.
15              THE COURT:  But would he testify that --
16              MS. GANNETT:  Your Honor, putting him --
17              THE COURT:  Let me say this.  Okay?  You filed a
18     waiver, both the motion that was submitted by counsel and
19     then by the defendant.  I want you to know it gave me a
20     little pause for him not to be here.  But I ultimately
21     resolved that I wasn't going to interfere with counsels'
22     judgment on that, that they had their own reasons, and I
23     respect the ability of counsel to manage their own case.  So
24     I did not go any further on that.  But you are now seeking to
25     have someone else testify in a way that can't be used.
```

1     Normally, you know, the old common law backs up the law is

2     entitled that every man's evidence -- excuse the sexist

3     reference -- that every person's evidence, and so we've got

4     to see here whether there is something that would extend this

5     to this particular situation.  I haven't had it come up.  I'm

6     going to study it over lunch.

7              MS. GANNETT:  I understand.

8              THE COURT:  And -- but, you know, you always have

9     the right to bring the defendant here, and not withstanding

10    the fact that he may have indicated a desire not to be here,

11    that you have every right to bring him here and let him

12    speak.  And, of course, under *Simmons*, I will protect that --

13    that right and not allow it to be used against him.  So let

14    me -- let me think about this.

15             I just got to say, I've got a little bit of angst.

16    No matter what I do, you really cannot represent, and

17    Mr. Pennington can't be fully confident that some other court

18    won't take a different view, another court in which a capital

19    offense is pending.  You know?  I'm just saying that is a

20    potential issue here.

21             MS. GANNETT:  I think that is a fair concern, Your

22    Honor.  As the Court considers this issue, I think the point

23    that I want to make is not just that the -- it's not just

24    about the Court protecting the substance of whatever our

25    client might say if he were brought into court, but there are

1     ramifications for him and his relationship with counsel and

2     his ability to participate in his defense of having to

3     testify in this matter at all, and that it is the fact of the

4     intrusion that places us in this position of having to make a

5     very tricky decision.

6          THE COURT:  It's a little complicated.  You have a

7     document that makes no reference to counsel that you assert

8     was written for counsel.  And, you know, by asserting that,

9     you put, you know, what his intent is at issue; and, you

10    know, there are going to be limits on what Mr. Pennington,

11    even if he chooses to testify, that he can testify under

12    hearsay rules on something offered for the truth of the

13    matter.  So you don't have to -- you know, I don't know if

14    you are intending to try to have him offer something Mr. Roof

15    said to him, or is he intending to testify what he said to

16    Mr. Roof?

17         MS. GANNETT:  The hearsay rules don't apply in this

18    hearing, so that shouldn't be an obstacle.  But my point is

19    just that there are a lot of -- the question is the

20    reliability of the evidence at this hearing.  But my point is

21    that it's a tricky balancing that the defendant has to

22    undertake here about the -- what is the best evidentiary

23    approach, and what is the best approach for our client as he

24    proceeds in a capital prosecution where his mental health and

25    well-being are necessary to both our preparation for trial

1    and to the process of trial in the penalty phase.  And so

2    it's not just what is the best substance from my perspective.

3    It's more complicated than that.  And in considering what the

4    right ruling is about how we present our evidence and what

5    protections are, we ask that the Court consider the immediate

6    concerns.

7         THE COURT:  If the Government wants to --

8         MR. CURRAN:  Just for the Court and counsel's

9    consideration, it would be the Government's position that

10   although the Rules of Evidence are relaxed at a suppression

11   hearing, that when a party is purposefully made unavailable

12   for that hearing, the Court should not then allow a third

13   party to testify regarding the unavailable declarant's

14   statements when the declarant has voluntarily and purposely

15   made himself unavailable.

16        MS. GANNETT:  On that point, Your Honor, I would

17   just note that the Government frequently in a run-of-the-mill

18   Government possession case will bring one police officer

19   instead of another police officer.  It's a common occurrence.

20        THE COURT:  Well, I think the touchstone is, is it

21   reliable, right?  I mean, is it a reliable form of evidence?

22   And that's something I will have to resolve.  Let me -- it's

23   now 7 after 12.  Let's return at 1:15, and we'll address this

24   issue when we return.  How about that?  Okay.

25             (Thereupon, there was a lunch recess.)

1          THE COURT:  I hope everyone had a pleasant lunch.

2     I'm sure everybody is scrambling to read these cases, and you

3     just couldn't have a relaxing afternoon.

4          Mr. Curran, have you had a chance to look at those

5     cases?  What's your view about whether counsel waives his

6     privilege by testifying at the suppression hearing?

7          MR. CURRAN:  Mr. Richardson is going to handle that.

8          MR. RICHARDSON:  Thank you, Your Honor.

9          We did have a chance to look at these, but I think

10    the stages here is that this is an issue that obviously the

11    defense has known about.  They raised it at lunchtime in the

12    middle of the hearing, and they are asking the Court for an

13    advisory opinion based on information you don't know; that

14    is, what information is going to come out.  Is he going to

15    testify about the advice that he gave?  Is he going to

16    testify about the communications from Roof to the client?  Is

17    he going to testify about communications among counsel?  Is

18    it work product?  Frankly, obviously, we don't know any of

19    that information.

20         THE COURT:  Well, let's make it simple.  Who wants

21    to provide me basically a summary of what counsel would

22    testify to?

23         MS. GANNETT:  I will, Your Honor.

24         THE COURT:  Thank you, Ms. Gannett.

25         MS. GANNETT:  Mr. Pennington would testify about the

1     visits that counsel made to Mr. Roof, about the general

2     content of the conversations between counsel and the client,

3     about Mr. Roof's expressed intent in preparing the documents,

4     and I think that is a general summary of what the testimony

5     will be.

6          THE COURT:  Okay.  Mr. Richardson?

7          MS. GANNETT:  Your Honor, um, I would add, if this

8     wasn't covered by the second comment, that the general area

9     is covered by counsel in questioning.

10          THE COURT:  Okay.

11          MR. RICHARDSON:  So given that scope, which I think

12    I understand to mean that they are doing all of the above,

13    right?  That they are including information about the

14    attorney's questioning and advice.  They are including

15    hearsay statements that are made back to him, that in doing

16    so, I don't think the Court ought to issue an advisory

17    opinion at this point as to what effect that would have.  And

18    there are a couple of reasons why I think that is not an

19    appropriate thing for the Court to do.  First and foremost, I

20    think that is at some degree, and we can talk about what

21    degree it is, but it is a waiver of the privilege, and

22    neither Mr. Pennington nor Ms. Gannett has the ability to

23    waive that privilege.  And so we think there is a serious

24    question raised as to whether that is an appropriate or a

25    permissible avenue for them to go down, whether they can

1     waive that privilege without Mr. Roof doing so.

2            And then I think there is a substantial question,

3     and this is raised in the cases, and obviously I -- you know,

4     the time that you had to read some of those -- but I think

5     there is a very tricky issue about how the Court, if it is

6     inclined to do so at all, limits the scope of that waiver.

7            I think the second part of that, when we get to the

8     question about *Simmons*, which is talking about the scope of

9     the waiver, is another way of thinking about that, right? --

10    there is a Fifth Amendment and attorney-client privilege

11    issue -- that the scope of that, they are seeking to have

12    this Court expand *Simmons*, right?  Take *Simmons* from a Fifth

13    Amendment context --

14            THE COURT:  To attorney-client.

15            MR. RICHARDSON:  -- to a third party offering

16    attorney-client privilege.

17            THE COURT:  Correct.

18            MR. RICHARDSON:  There is a debate about that.

19            THE COURT:  There is.

20            MR. RICHARDSON:  Obviously between the Fifth

21    Circuit -- and I know I'm repeating things that you're aware

22    of -- but between the Fifth Circuit and the Eleventh Circuit,

23    that I suspect the Court pulled up, which comes to the

24    opposite conclusion of that.  We think in light of the Fourth

25    Circuit's rulings, as Your Honor hit on before we left, that

1    this is a narrow privilege.

2         THE COURT:  You know, the danger is that access to

3    everyman's evidence cuts both ways.  That is, the Court -- I

4    mean, to the extent that the document was prepared for the

5    purpose of attorney-client communication and that there is

6    actually evidence to that effect, the Court wants to hear it.

7    So, you know, when you talk about everyman's evidence, I want

8    that evidence too.  Okay?  So there is consequences.

9         Let me just sort of tell you my reading of this,

10   and, obviously, I didn't have a long time, either.  I have a

11   great respect for Judge Brinkema who wrote the *Kahn* case.  I

12   know her and have a great respect for her.  She sort of

13   reasons out the sort of dispute there, and I think reaches a

14   logical conclusion.

15        Now, what I've got to tell you, Mr. Richardson, what

16   worries me is because this is not settled.  We are not

17   talking about settled law within this circuit, how about

18   within the state of South Carolina and how the South Carolina

19   law would be in a state court proceeding?  Okay?  I didn't

20   bother to get there.  Okay?  And it worries me that the --

21   this would be something I think a client would have to decide

22   if he would risk this.  I kind of find the *Simmons* reasoning

23   and applicability to attorney-client kind of makes sense.  I

24   thought Judge Brinkema got that right that you are trying to

25   protect the privilege, and if you waive the privilege -- it

1    just kind of made a little sense to me.

2          But you are right.  It's conflicted.  There is not a

3    lot of authority out there.  How the State would do it, who

4    knows.  I don't know if counsel has consulted with their

5    client about the potential risk here because -- I'm prepared

6    to say that I would not allow the Government to use it in

7    this case if it's confined the way Ms. Gannett just confined

8    it.  I wouldn't have a problem with that.  How Judge

9    Nicholson might do it in state court is anybody's guess.  And

10   that concerns me.

11         Has anybody spoken to Mr. Roof about this and

12   obtained his expressed authority to put his privilege at

13   risk?

14         MS. GANNETT:  Your Honor, I think one proposed

15   solution might be, since this looks like sort of a long day

16   anyway, and since we have -- we haven't discussed this with

17   the Court yet, but there is at least one witness who is not

18   available today through no fault of the parties, but just

19   simply is out of town.  And since Ms. Mosher -- I'm sorry --

20   Ms. Knapp, Analyst Knapp, identified the series of witnesses

21   we weren't aware of prior to today, that maybe we get a more

22   detailed waiver that might satisfy the Government from

23   Mr. Roof, and that we could --

24         THE COURT:  My suggestion to you -- I'll be honest

25   with you.  I think y'all ought to go over and have a hearing

1    with Judge Nicholson before you do this.  I mean, I just sort

2    of -- you know, I'm concerned that -- I mean, I -- I just

3    don't have any idea on an issue as unsettled as this.  I'm

4    going to be honest with you.  My tendency is, because it's

5    kind of a close question in a capital case, I kind of give

6    the close questions to the defendant.  I just -- frankly, I

7    think that is -- the Court ought to do that.  Okay?  And

8    there is actually some law out there that would support the

9    defendant's view here.  It's probably, I'm guessing, no law

10   in the state of South Carolina.  Okay?  None, okay?

11          And then you are left with arguing Fifth versus

12   Eleventh Circuit to a state judge.  Who knows?  And that is

13   something that would give me, if I were in your shoes, a

14   great deal of pause.  I'll be honest.  I think you ought to

15   be able here to come offer this testimony.  The Government

16   gets to cross-examine the witness.  I'll ask questions.  I'm

17   not worried about that.  And my momentary lapse in saying the

18   hearsay rule, clearly I've ultimately got to make a decision

19   under *U.S. versus Matlock* about whether it's reliable.  And

20   I've got to make that determination.  But, you know, I put

21   y'all on a pretty aggressive schedule here, and I think you

22   will thank me for that one day but at the moment it's rather

23   arduous, and we could do a full day today and maybe come

24   back, not necessarily tomorrow, but maybe some time when you

25   would have a chance to think about the implication of this,

1    consult with your client, maybe going to see Judge Nicholson

2    and seeing -- getting a little bit of an indication, are you

3    putting your client's -- and I don't mind you telling him

4    that I'm prepared to hear it, but that I warned you that you

5    need to -- you know, there may be consequences.  And this is

6    not an issue which we have to decide tomorrow.  Okay?  I

7    mean, my own plan is that it's not really final until I deal

8    with the motions in limine anyway.  So I'm going to get this

9    right.

10         This is an important -- this document is an

11   important issue in the case.  And, you know, obviously I know

12   y'all well enough that you -- in your brief you say that Ms.

13   Mosher had no known supervising authority.  That was your

14   understanding of the facts.  Well, she's now come in and

15   testified that multiple people authorized, even directed her

16   to do certain things.  That's fair enough.  You might want to

17   go -- now that you know that -- I like to have the record

18   complete myself.  She made reference to an e-mail I hadn't

19   seen.  There were things that I would like to have the record

20   complete that.

21         So I think we ought to work hard today.  We ought to

22   go to 5:45 today, catch people that are here today from out

23   of town.  Let's get everything up that we need to get up and

24   pull out this very difficult calendar.  I want to thank y'all

25   for that.  I've crammed about six months of trials to the end

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1    of October so I would have time to devote myself exclusively

2    to this case.  But we'll figure out some time to resume.  And

3    we want to -- you know, we want to square the corners.  These

4    are important issues, and let's get it right.  Let's get the

5    record right.

6             And if y'all would like me to speak to Judge

7    Nicholson, I will be glad to as well, if that would be of any

8    benefit, to explain to him where I think we are here.  But I

9    do think y'all need to go -- my own advice to you is I think

10   that Mr. Pennington ought to go to him before he gets on the

11   stand and understand the potential consequences.  I will tell

12   you now that, assuming for the purposes of our discussion is

13   what Ms. Gannett explained to be the confines of the

14   testimony, I would not find that as a waiver of the

15   attorney-client privilege for him to try to protect the

16   privilege in this motion to suppress hearing.  So I'm

17   comfortable with that.  I basically would follow *United*

18   *States versus Kahn*.  By the way, it went up to the U.S.

19   Supreme Court, was affirmed.  I know that direct issue didn't

20   get up -- it's like one of the most serious District Judges

21   in the country, and she is no softy, you know,

22   Mr. Richardson.

23             MR. RICHARDSON:  I'm aware of that.

24             THE COURT:  The former justice department official,

25   and she's a tough cookie, and I thought her reasoning was

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1    pretty solid in the case.  You know, it was a terrorist case.

2    She's tried a lot of those over there.  She's the designated

3    judge in the Eastern District of Virginia doing that, and she

4    does a great job, and I'm comfortable with the position that

5    she took.  And though it's not Fourth Circuit authority, when

6    it's in my circuit, I tend to pay attention to my colleagues

7    in my circuit.

8        So let's proceed with the other things, and when we

9    take the next break, let's all put our heads together, and

10   Ms. Tapscott is here, and she will pull out my incredibly

11   ridiculous calendar, and we will try to figure out some time

12   that we can resume and finish this.

13       MR. RICHARDSON:  Can I just mention two side points

14   that I think -- we just want to put in the Court's mind so it

15   can consider them?  We didn't really focus on arguing against

16   *Kahn*.  And I -- appropriately, I said, I think there is a

17   split.  We think it's a difficult issue to raise, but I think

18   there is a second question that *Kahn* does not address, and

19   that is what is the scope of *Simmons*?  And even if *Simmons*

20   applies, what *Simmons* says, of course, and is the quote that

21   it cannot be used on the issue of guilt -- on the question of

22   guilt or innocence.  And the courts, to my knowledge -- and

23   now I'm looking at this over lunch, but the courts to my

24   knowledge have been unanimous in saying that it does not

25   apply to sentencing.  As the Court is well aware, the Court

1    takes into account testimony from a defendant at a

2    suppression hearing in determining whether obstruction

3    applies under the Guidelines.  The reason is because *Simmons*

4    does not extend to sentencing questions.  What I don't know,

5    and frankly, I just was not able to find over lunch, is that

6    there is a reason to think about that differently.  Frankly,

7    I don't think there is, but I don't know the answer to that.

8             THE COURT:  Here is what I want you to do,

9    Mr. Richardson -- obviously, it was not an ideal situation to

10   have to face this matter over lunch, correct?  We would have

11   all liked to have anticipated it.  I've given you my

12   impression of how I'm going to rule.  If the Government

13   wishes to brief the issue and have us look at it in a more

14   in-depth way, think about a schedule we might set up in which

15   you would brief and let the Government and the defendant

16   could reply.  And I'm glad you're thinking about, you know,

17   in a more -- you know, a more methodical way.  The way we

18   mostly deal with questions that are complicated is that we

19   brief them, think about them, and if necessary argue them

20   again.

21            I will just tell you that in a death penalty case,

22   where someone asserts something that is as important as this,

23   subject to attorney-client privilege, I want to make sure

24   that the defendant gets the full opportunity to put up its

25   best evidence for me to make that decision.  And I think it's

1     a mistake to -- when there are close questions not to hear

2     evidence.  If later I'm wrong, somebody can correct me, but

3     if I don't make the record, if I don't consider it fully,

4     then there are things like -- we can't -- you know, we can't

5     fix that.  So I would welcome further briefing on this issue.

6          I had the entire -- the entire hour to -- as my

7     clerks diligently looked themselves, you know, I read the

8     cases.  I, you know, looked at all of the opinions that cited

9     it.  Y'all did, right?  And there is not much out there.  And

10    a lot of times you've got to apply commonsense.  And my

11    commonsense is if, in fact -- in fact there was a plan to

12    prepare this for the attorneys, and I think there is evidence

13    in the document itself that suggests that's not true, but if

14    that is, in fact, what happened, I want to know that.  Okay?

15    Because I need to consider that.  Because -- and I will just

16    tell the defense that the structure of the document mirrors

17    prior statements that clearly aren't privileged.  And if --

18    but that is not the only piece of evidence.  Okay?  And if

19    there is further evidence, my desire is to get it right.

20         And if I'm going to keep Mr. Pennington off the

21    stand because of his fear of waiving the privilege, sometimes

22    that doesn't feel right to me.  Do you understand?  It just

23    does not feel right to me.  And I feel like I'm not doing my

24    Appellate Court any favor of sort of not giving that Court

25    reviewing what I do.  And everything we do is going to be

1    reviewed.  Okay?  And we want to create the best record.  The

2    best advice I got from my colleague Joe Anderson, who has

3    tried two of the best capital cases, is to make the best

4    record you can.  And I think that is for all of us to do, is

5    to document what we do and why we do it.  And I'll just tell

6    you that my own bias here is I want to get the best -- I want

7    to have the best information to make the fairest decision.

8    That's all I'm trying to do.

9             MR. RICHARDSON:  And, Your Honor, we don't -- we are

10   not asking for briefing on it.  We are not trying to change

11   your mind.  I was merely making the Court aware of what we

12   thought this case was about.

13            THE COURT:  If you go back to your office and say,

14   "I think we want to brief this," I'm open to communicating

15   with opposing counsel and coming back to me with a briefing

16   schedule, and I will read what you file, and if -- and if

17   there are cases y'all missed, since we went on the fly, and I

18   welcome that.  If there is a better answer that we come up

19   with on this quick search, I want to get that right too.

20            Yes, Ms. Gannett?

21            MS. GANNETT:  If I may just apologize for the

22   lunchtime stress that this issue -- the scheduling has

23   been --

24            THE COURT:  All I can say is, is that there are a

25   lot of complicated issues here, and I know y'all are doing a

1    great job.  Your briefs are just first class.  I appreciate

2    everything y'all are doing.  Both sides are just doing great

3    work.  But on issues like this, we are better served by not

4    doing it, you know, in a -- you know, over lunch.  That is

5    just not the best way to do it.  We don't get to marshal the

6    best arguments, and had I known earlier this issue, I would

7    have sorted it out before the hearing.

8              MS. GANNETT:  I think we can all agree on that.

9              THE COURT:  Because it's really important, and it's

10    not only just important -- I know y'all are good lawyers in

11    this case, but your client is in another case, and for all of

12    the experience of all the lawyers here, no one has been in a

13    case like this.  Okay?  We are all -- we are all in a case

14    unlike any in our experience has ever provided to us.  We

15    have got to take it carefully.  We've got to be deliberate

16    and anticipate these issues and get to think about them.  So

17    at this point, I've kind of told you my thinking.  If on

18    reflection everybody goes back and says, "Hey, I think that

19    is maybe not right," I'm very open to revisiting this,

20    briefing it, having argument on it, considering what the best

21    answer is.  Okay.

22              With that, Ms. Gannett, who's your next witness?

23              MS. GANNETT:  May I ask one other question?

24              THE COURT:  You can ask two.

25              MS. GANNETT:  Right.  Could I just ask one?  That's

1    true.  The question is, we had some confusion over lunch

2    about what the sealed hearing means in the context of our

3    team and with whom we can discuss what about the proceedings

4    here, and especially if the proceedings are going to be

5    continued, with whom we can consult about what is happening,

6    and we thought we should ask for the Court's --

7          THE COURT:  What would you like the ruling to be?

8    Tell me that.

9          MS. GANNETT:  We would like to be able to discuss

10   with our team, our whole team, including resource counsel and

11   the State's counsel, and with the exception of we would not

12   discuss testimony with anyone who is expected to testify, but

13   we --

14         THE COURT:  I had to bring Mr. Pennington somewhat

15   into this discussion since he has a pretty important decision

16   he has to make himself.

17         What's the Government's thought about the scope of

18   sealing?

19         MR. RICHARDSON:  Your Honor, we -- I think that if

20   they are comfortable speaking with their defense counsel, as

21   long as we can speak to the, you know --

22         THE COURT:  FBI agents and so forth.

23         MR. RICHARDSON:  FBI, but also the State

24   prosecutors, you know, we have worked closely with them.

25         THE COURT:  You know, the one thing that I am

1    worried about is the bigger the circle, the more chances for

2    leaking, right?  And we've already seen inadvertent leakage,

3    and we do not want this leaked.  Right?  I mean, the

4    substance of this we do not want leaked.  So I would just

5    say -- I haven't had any problem with defense counsel having

6    things leaked to the press, so I just said to you,

7    Ms. Gannett, use your best judgment.  My concern is not that

8    you are talking to people, but that somehow your client's

9    interests are not prejudiced by someone going and talking to

10   the press.

11            You know, we just had here a bunch of reporters

12   hanging out in the hall.  We've just got all kinds of

13   interests, and I don't fault them.  If I was a young

14   reporter, I would be out trying to figure out what I could

15   get too.  We've got some important rights here we've got to

16   protect.

17            MS. GANNETT:  We are, of course, very sensitive to

18   those issues.

19            THE COURT:  Mr. Richardson?  Anything further?

20            MR. RICHARDSON:  Nothing.

21            THE COURT:  Okay.  Ms. Gannett?

22            MR. RICHARDSON:  And I guess I didn't get an answer

23   from you with respect to may we discuss it with our FBI

24   agents and using our best judgment.

25            THE COURT:  Using your best judgment, because we are

```
 1    trying to prevent the public disclosure of the substance of

 2    this document.

 3              MR. RICHARDSON:  Thank you, Your Honor.

 4              THE COURT:  Mr. Curran?

 5              MR. CURRAN:  One administrative issue:  I believe we

 6    have an agreement with the defense that there is no longer

 7    any need for Ms. Knapp today.  She's still here.

 8              THE COURT:  She's welcome to go.  Y'all don't need

 9    her, that's fine.

10              MR. CURRAN:  Okay.

11              THE COURT:  And let me just say that if your

12    subsequent investigation involves you wanting to recall her,

13    if should you develop new evidence, you know, again, I'm a

14    little informal here at these motions to suppress.  I want to

15    get the best information.

16              MR. CURRAN:  To respond to a comment that Your Honor

17    made during the earlier colloquy, you mentioned an e-mail

18    that had not -- that you have not seen.  We have a copy of

19    that.  We quite frankly intended to offer it with our

20    witness.

21              THE COURT:  This is an e-mail where I think she was

22    saying she got the authority or was directed to do something.

23    Is that what the e-mail was?

24              MR. CURRAN:  The e-mail that I'm referring to, I'm

25    not sure it's the same e-mail you are referring to.  I'm
```

1    referring to the e-mail exchange from her to the solicitor.

2    But I think now that --

3             THE COURT:  What I was focusing on was what

4    Ms. Knapp was talking about, "You know, you didn't produce

5    the e-mail."

6             And she responded, "I can't remember if I got an

7    oral order and I responded by e-mail, or whether both of them

8    were e-mails."

9             But the volume of stuff here, I can understand how

10   somebody could miss it.  It was just to me something that I

11   was hoping somebody was going to put it up if there was such

12   a document.

13            MR. CURRAN:  We don't have that for you today.

14            THE COURT:  Not the end of the world, just one of

15   those pieces of trying to make sure we just dot all the I's

16   and cross all the T's.

17            Okay, Ms. Gannett, call your next witness.

18            MS. GANNETT:  It's Dr. Leonard, Your Honor.  This is

19   a little bit out of order, but she should be a brief witness,

20   and we wanted to get her on her way this afternoon.

21            THE COURT:  Very good.  And at some point today, I

22   want to make sure that the Government witnesses who have come

23   from out of town, if we can accommodate them.  I'm not so

24   worried about the order of things.

25            Mr. Curran, you know, which ones do we have here?

1          MR. CURRAN:  I believe, and Mr. Richardson is going

2     to be handling this part of the hearing, but counsel has

3     raised some issues with respect to the tape review process

4     that was done once the discovery came into the federal

5     agent's possession.  In response to that, it's the

6     Government's intention to put on at least one witness who was

7     involved in that tape review process.  This witness has come

8     from Columbia.

9          THE COURT:  Well, why don't you talk to Ms. Gannett

10     about whether that's an issue or not.

11          MS. GANNETT:  We agreed yesterday afternoon that it

12     was not necessary to call those witnesses, and I understood

13     that Mr. Richardson wanted to call them anyway.

14          THE COURT:  He has a right to do that.

15          MR. RICHARDSON:  It's obviously a different

16     question, Your Honor.

17          THE COURT:  Yes.

18          THE CLERK:  Please place your left hand on the

19     Bible, raise your right.  State your full name for the

20     record.

21          THE WITNESS:  Elizabeth Leonard.

22          THE CLERK:  Spell your last name.

23          THE WITNESS:  L-e-o-n-a-r-d.

24     THEREUPON:

25                              ELIZABETH LEONARD

1    called in these proceedings and being first duly sworn

2    testifies as follows:

3                          DIRECT EXAMINATION

4    BY MS. GANNETT:

5     Q. Good afternoon, Dr. Leonard.

6     A. Hello.

7     Q. Hi.  My name is Sarah Gannett, and I'm one of the lawyers

8    for Dylann Roof.

9            Could you please describe for the Court where you

10   are employed?

11    A. I'm employed with the Charleston -- Sheriff Al Cannon

12   Detention Center, the county jail.

13    Q. Okay.  And how long have you been employed there?

14    A. Part-time 20 hours a week since May 2014, in May 2016 I

15   started 40 hours a week full-time.

16    Q. Okay.  And are you actually employed by the jail, or are

17   you employed by another organization?

18    A. I'm employed by the medical contract group California

19   (sic) Center for Occupational Health, which contracts with

20   the County to provide care services -- medical services.

21    Q. Did you say "California" or "Carolina"?

22    A. Carolina.

23    Q. Carolina.  And so you are essentially contract employees

24   to the County?

25    A. Yes.

ELIZABETH LEONARD - DIRECT        114

1    Q. What is your previous work experience just generally?

2    A. Well, I've done a variety of jobs.  I, um, completed

3    my -- the medical school training in '84.  Completed

4    psychiatric residency here, Medical University of South

5    Carolina, in '88.  I have worked at Charleston Dorchester

6    Mental Health Centers; the federal hospital, I was active

7    medical director.  Ran as medical director a couple of

8    substance abuse units in Bay City, Michigan, and then moved

9    to California in 2098, (sic), and worked primarily at the

10   state mental health organization there.  And then moved back

11   here to Charleston in 2010, where I started back with

12   Charleston Dorchester Mental Health, and then I continued on

13   part-time with CCOH in May of '14.

14   Q. You are board-certified in general psychiatry; is that

15   right?

16   A. Yes.

17   Q. And so it sounds like your practice is a clinical

18   psychiatry practice --

19   A. Yes.

20   Q. -- is that accurate?

21        And what are your current job duties at the jail?

22   A. I -- if need arises in an emergency or in processing and

23   intake someone has an acute disorder or is voicing suicidal

24   feelings, if I'm there, I would go and evaluate them

25   immediately.  And then we have a licensed hospital unit, so

ELIZABETH LEONARD - DIRECT          115

1    we have people on -- in medical services, some beds there in

2    the jail, and then also there is five mental health

3    counselors that do assessments on the intakes every day.  And

4    then I follow-up with those people for assessment for

5    psychiatric medications, the need and diagnosis.

6    Q. Okay.  Did you have an interaction with Dylann Roof on

7    August 3rd of 2015?

8    A. I'm not sure of the date, but yes.

9    Q. About a year ago?

10   A. Yes.

11   Q. And just to -- just to clarify, have you had many

12   interactions with Mr. Roof?

13   A. I think there have been three.

14   Q. Okay.  When I say -- when I talk about the one about a

15   year ago, do you have an idea of what I'm talking about?

16   A. I assume that's when he first came in to the jail here.

17   Q. And so I'm talking about actually the next one, when you

18   were shown a letter that he had written.

19   A. Yes.

20   Q. Do you know what I'm talking about now?  Okay.  Do you

21   remember about what time of day that occurred?

22   A. Was that July or August?

23   Q. It was August.  August 3rd, but it was early in August?

24   A. Okay.  Um, I worked -- my work schedule then would have

25   been Monday and Wednesday and -- all day, and Friday

1    afternoons.  I think it was approximately 11 to 1 in the

2    noontime area that an officer brought in the letter --

3    Q. Okay.

4    A. -- to our mental health office.

5    Q. Okay.  Do you recall meeting with -- well, one moment --

6    just one moment, please.  Let me move on from that for a

7    minute.

8           So you -- you were -- somebody brought him to the

9    office.  Do you recall who that was?

10   A. No.  They brought a copy of the letter to the office.

11   Q. Oh, they just brought the letter to you?

12   A. He was still in his cell.

13   Q. I'm going to show you what's been marked as Defense

14   Exhibit 19.  Do you recognize this document?

15   A. Yes.  I saw the envelope, and I did see -- this was the

16   letter presented to me.

17   Q. Okay.  And did they explain to you anything about the

18   letter?

19   A. I was told, and I don't remember the name of the officer,

20   that it was a letter that was intercepted that Mr. Roof was

21   sending to his sister.

22   Q. And that's all you were told?

23   A. Yes.

24   Q. Okay.  And what did you do after you received the letter

25   and were told that information?

1    A. I, um, I don't fully recall if they said he was on

2    suicide watch or not, but I read the letter.  It -- and I

3    asked if there were any books in his cell because the

4    language seemed different than I was used to from him.

5    Q. Would you mind repeating that, please?

6    A. I asked if there were any books in his cell that he was

7    reading, because I was unsure if they were allowed to have

8    books in their cell, and he was in a special management unit,

9    and they said they would get a list of books he had.  And the

10   writings looked unique and atypical of what I would expect,

11   so I read it closely.

12   Q. Why did you ask about the books?

13   A. My feeling was the language in the letter was not

14   consistent with what I would expect from him, Mr. Roof.  And

15   I thought if he had been reading a book, possibly it was

16   something from the book that inspired that.

17   Q. Okay.  Did the officer explain to you -- you said you

18   don't remember whether they told you he was on a suicide

19   watch or not?

20   A. I do not recall.

21   Q. Okay.  And so they didn't describe to you anything about

22   the letter that was of concern to them?

23   A. I -- they said that they were concerned about expressions

24   in the letter and wanted to make sure he was safe, wanted me

25   to see him immediately.

ELIZABETH LEONARD - DIRECT         118

1       Q. To make sure that he was safe?

2       A. I'm paraphrasing the feeling I got.  I'm not sure exactly

3       what they said.

4       Q. Okay.  And so did you then speak with the defendant,

5       Mr. Roof?

6       A. Yes, I did speak with him.  I went down to his cell and

7       talked with him.

8       Q. Okay.  Before you went to the cell, did you do anything?

9       A. They brought me a list of the books, which was just a few

10      books he had in his cell, and I Googled the names.  And when

11      I looked at the one book, the phrasing and the flowery

12      language, and like that was -- looked familiar to the letter,

13      and so I skimmed over that, started that part, and I found

14      the writing.  And I read on to the end of that chapter.  It

15      was a short story.

16      Q. And so --

17      A. And then I went down to talk to him.

18      Q. And then you went down to talk to him.  And the

19      assessment that you did lasted about 20 or 30 minutes?

20      A. Yes.

21      Q. And during that time, did you find any justification for

22      keeping him on suicide watch?

23      A. No.  He explained his purpose in the letter, and I did

24      not feel he was thinking of harming himself or anyone else.

25      Q. And so did you make a recommendation at that time?

ELIZABETH LEONARD - CROSS         119

1        A. Yes.  I removed him from suicide watch.

2               MS. GANNETT:  Thank you very much.

3               THE COURT:  Cross-examination.

4               MR. CURRAN:  Your Honor, Dr. Leonard is under

5        subpoena from us, so we may with your indulgence --

6               THE COURT:  Absolutely.

7               MR. CURRAN:  -- address some issues that weren't

8        specifically addressed by the direct examination.  I think it

9        will be pretty brief.

10               THE COURT:  Absolutely.

11                         CROSS-EXAMINATION

12        BY MR. CURRAN:

13        Q. Hello, Dr. Leonard.

14        A. Hello.

15        Q. Good afternoon.  So when you saw this letter that they

16        brought to you from Mr. Roof, your reaction to that is that

17        it was unusual, correct?

18        A. Yes.

19        Q. You thought it was atypical?

20        A. Yes.

21        Q. You had met with him before?

22        A. Yes.

23        Q. And when you looked at it and you compared it in your

24        mind with what you knew from meeting him before, something

25        about this didn't seem quite right, correct?

ELIZABETH LEONARD - CROSS            120

1    A. Correct.

2    Q. All right.  So you asked for a list of books?

3    A. Yes.

4    Q. Because you wanted to find out more?

5    A. Yes.

6    Q. And then you actually Googled --

7    A. Yes.

8    Q. -- on the letter, and you found what you believe was the

9    story or the book that related to the letter, correct?

10   A. Correct.

11   Q. And you read through to find out what that story was

12   about?

13   A. Correct.

14   Q. And what was that story about?

15   A. To the best of my recall, it was like in Puritan-type

16   times, and it was a story of a young peasant boy that was

17   laying by the riverbank thinking of his unrequited love of a

18   woman that returned back to her husband after they had been

19   in a relationship, and he was very sad and mourning the loss

20   of that relationship.

21   Q. What did -- the protagonist in the book, how did things

22   end for him?

23   A. What I read in the book was that he then had said he had

24   periods of madness, and that he was -- he shot himself with a

25   gun.

ELIZABETH LEONARD - CROSS                121

1      Q. He committed suicide?

2      A. Yes.

3      Q. All right.  So you've had the -- you have a letter

4   from -- that the guards brought to you, and you think it's

5   unusual, and you think it's atypical, right?

6      A. Yes.

7      Q. And I believe you testified on direct examination that

8   the guards expressed to you that they were concerned for his

9   safety?

10     A. I don't recall if they said "safety," but they were of

11  concern that they wanted me to see him immediately.

12     Q. They were concerned about him, and they wanted you to

13  evaluate him --

14     A. Yes.

15     Q. -- correct, when they came to you?

16     A. Correct.

17     Q. And you evaluated him, and based on your -- what he told

18  you about all of that, you felt like, "Okay.  I can take him

19  off suicide watch," right?

20     A. Yes.

21     Q. Is that unusual?

22     A. No.  Frequently they are either -- either the comments

23  about -- he denied making any suicidal comments first of all.

24  And frequently, we even have people making suicide comments

25  to request change of rooms.  Um, they were misunderstood.

ELIZABETH LEONARD - CROSS            122

1    They were kidding.  They were, you know, misheard.  And they

2    have an explanation for what really was going on.  And he

3    explained the motivation for his letter, where he had copied

4    it from, and so the looks of it and the language of it, he

5    identified was not his.

6    Q. But in your experience at the jail, is it unusual for the

7    guards to be -- based on the information they have, think

8    that someone might be a suicide risk and then ask for your

9    opinion, and then when you actually meet with them and have a

10   full interaction with them, decide that they are, in fact,

11   not a suicide risk, is that atypical?

12   A. No, that's not unusual at all.

13   Q. Is that pretty normal?

14   A. Yes.  We encourage them to err on the side of caution.

15   Q. Are you involved in the training at the jail on suicide

16   prevention?

17   A. Yes, our department is, either the counseling supervisor

18   or myself.

19   Q. And is that something you teach them, err on the side of

20   caution when it comes to suicide prevention?

21   A. Yes.

22   Q. And given the information you had, the information about

23   the letter and the information that you Googled, did you

24   think it was inappropriate for them to put him on suicide

25   watch?

1    A. No.

2          MR. CURRAN:  No further questions, Your Honor.  Beg

3    the Court's indulgence, Your Honor.

4          THE COURT:  Yes.

5                      REDIRECT EXAMINATION

6    BY MS. GANNETT:

7    Q. Dr. Leonard, had you ever had a -- had you ever had a

8    jail staff member bring you a letter from an inmate before in

9    regard to an inquiry like this?

10   A. The only letters we have obtained at the mental health

11   office have been letters written to us about their status or

12   their wants, requests.  I've never had an intercepted letter

13   brought to me in any other case.

14         MS. GANNETT:  Thank you very much.

15         THE COURT:  Dr. Leonard, let me ask you a couple of

16   questions here if I might.

17         These jail officials came to you.  They were guards?

18   Is that who came to you?  And they requested that you

19   immediately assess the defendant, correct?

20         THE WITNESS:  Correct.

21         THE COURT:  And did you have any doubt that they

22   were acting in good faith and responsibly when they asked you

23   to do that?

24         THE WITNESS:  No, I didn't.

25         THE COURT:  Did you -- and when you viewed the

1    letter, did you have your own concerns about what this was

2    all about?

3        THE WITNESS:  Yes, because the letter, the excerpt

4    that was in the writing, the story went on further, and that

5    was where I think the suicide talk happened.  It didn't state

6    that in the letter, as I recall.

7        THE COURT:  If, in fact, an inmate -- the jail

8    personnel had come across information like that and withheld

9    it, just ignored it, and the inmate went on to commit

10    suicide, would that have been a concern to you?

11        THE WITNESS:  Oh, extremely.

12        THE COURT:  And, in fact, that would have been

13    contrary to what you would have expected them to do?

14        THE WITNESS:  Yes.

15        THE COURT:  They did what you expected them to do.

16        THE WITNESS:  Yes.

17        THE COURT:  Any questions occasioned by the Court's

18    questions?

19        MR. CURRAN:  You asked it better than we did, Your

20    Honor.

21        MS. GANNETT:  No, thank you, Your Honor.

22        Your Honor, I would move into evidence Defendant's

23    Exhibit -- no.  It's already in evidence.

24        THE COURT:  It's already in evidence.  You are more

25    efficient than you know.

LISA MARIE BLOOKWORTH - DIRECT    125

1                    MS. GANNETT:  I am.

2                    THE COURT:  Yes.  You may step down.  Thank you,

3         Dr. Leonard.

4                    Call your next witness.

5                    MS. GANNETT:  It will be Officer Bloodworth, Your

6         Honor, I believe the Government is in the process of getting

7         her here.

8                    THE COURT:  Good.

9                    THE CLERK:  Officer, please place your left hand on

10        the Bible, state your full name for the record.

11                   THE WITNESS:  Lisa Marie Bloodworth.

12                   THE CLERK:  And spell your last name for the record.

13                   THE WITNESS:  B-l-o-o-d-w-o-r-t-h.

14        THEREUPON:

15                            LISA MARIE BLOODWORTH

16        called in these proceedings and being first duly sworn

17        testifies as follows:

18                   THE CLERK:  You may be seated.

19                            DIRECT EXAMINATION

20        BY MS. GANNETT:

21         Q. Good afternoon, Officer Bloodworth.

22         A. Hi.

23         Q. My name is Sarah Gannett, and I'm one of the attorneys

24        for Dylann Roof.

25         A. All right.

LISA MARIE BLOOKWORTH - DIRECT     126

1     Q. I understand you are an intelligence unit member; is that

2     correct?

3     A. Yes, ma'am.

4     Q. Can you describe what that means, please?

5     A. Um, our unit is -- we gather information within our

6     facility for the safety and security of our facility.

7     Q. And how do you gather that information?

8     A. Um, we do it in different ways.  Mail, inmate phone

9     calls, video visits, we look through our JMS for -- we

10    validate gang members.

11    Q. Okay.  Your intelligence unit, is that a division of the

12    sheriff's department or a division of the jail?

13    A. A division of the jail.

14    Q. Okay.  But you are trained -- you receive training from

15    now Analyst Knapp; is that right?  Do you receive training

16    from Analyst Knapp?

17    A. No.

18    Q. You've never received any training from her?

19    A. No.

20    Q. Okay.  Do you receive any instruction from her about how

21    to do your job?

22    A. Yes.

23    Q. Okay.  And what kind of instructions do you receive from

24    her?

25    A. Um, it just really depends on what it is that they are

LISA MARIE BLOOKWORTH - DIRECT      127

1    doing at the time.

2    Q. Does she instruct you in your intelligence gathering?  Is

3    that fair to say?

4    A. Um, no.

5    Q. No?  So can you give an example of the kind of

6    instructions she might give you?

7    A. Um, it's not really like instructions.  We communicate.

8    If we have something that, you know, we come across that we

9    are not sure exactly what it is that -- you know, the next

10   level that would need to be done with it, then we would

11   consult with her.

12   Q. Okay.  You were assigned to monitor the defendant in this

13   case, Dylann Roof; is that right?

14   A. Yes, ma'am.

15   Q. And so you reviewed his mail?

16   A. Yes, ma'am.

17   Q. And you established a relationship with him?

18   A. Um, yes.

19   Q. Okay.  And you communicated with Analyst Knapp about his

20   mail and what he did in the jail and other things that you

21   observed?

22   A. Yes, ma'am.

23   Q. And you understood that she was sharing that information

24   outside of the jail?

25   A. Yes, ma'am.

LISA MARIE BLOOKWORTH - DIRECT    128

1        Q. You are familiar with the protocols of the detention

2    center -- the policies and protocols of the detention center,

3    correct?

4        A. Correct.

5        Q. And so you are familiar with a policy on searches and

6    contraband, correct?

7        A. Correct.

8        Q. And that policy --

9              MS. GANNETT:  Your Honor, this is Government's

10   Exhibit 7.

11             THE COURT:  Okay.

12   BY MS. GANNETT:

13       Q. I'm showing you what's been marked as Government's

14   Exhibit 7.  Can you tell me if you recognize this document?

15       A. Yes.

16       Q. Okay.  And so that's one of the policies with which you

17   are familiar.  The point -- so you conduct searches as a part

18   of your responsibilities at the jail, searches of inmate

19   cells?

20       A. Yes, ma'am.

21       Q. Okay.  The point when you are searching an inmate's space

22   is to see where the inmate might be hiding contraband; is

23   that right?

24       A. Yes.

25       Q. And that's -- and in the case of a potentially suicidal

```
1    inmate, you would be looking at items that are a threat to
2    the inmate's safety.  Is that fair to say?
3    A. Yes.
4    Q. And you are familiar with the suicide screening
5    prevention and intervention policies at the jail as well?
6    A. Yes, ma'am.
7    Q. So I'm showing you what's been marked as Government's
8    Exhibit 5.
9          MS. GANNETT:  This is Exhibit 5 to the Government's
10   response, Your Honor.
11   BY MS. GANNETT:
12   Q. That's the suicide prevention policy.  Are you familiar
13   with that document?
14   A. Yes, I am.
15   Q. You conducted a search of the defendant Dylann Roof's
16   cell on August 3rd of 2015; is that correct?
17   A. Yes, it is.
18   Q. And Shelly Green conducted that search with you?
19   A. Yes, ma'am.
20   Q. Were there any other officers involved in that search?
21   A. No.
22   Q. And you prepared an incident report in connection with
23   that search; is that right?
24   A. Yes.
25   Q. Okay.  And in that incident report -- not the one.  It's
```

1      on page -- it's on a different page.  Okay.

2              MS. GANNETT:  Your Honor, I think these were

3      produced to us in one packet, even though there is more than

4      one exhibit here, so I'm going to -- this is marked as

5      Defendant's Exhibit 18.

6      BY MS. GANNETT:

7       Q. I'm going to show you page 2 of this document.  And is

8      that an incident report that you prepared?

9       A. Yes, it is.

10      Q. Okay.  And in that report you talk about the search of

11      the cell, and you do not discuss any relationship to a

12      suicide watch or suicide protocol or a suicide precaution in

13      that report --

14      A. Correct.

15      Q. -- correct?  It just says that you searched his box for

16      contraband; is that right?

17      A. Yes.

18      Q. Now, a search under the policies of the jail is supposed

19      to be conducted consistent with the inmate's Fourth Amendment

20      rights; is that correct?  That's in the policy?

21              MR. CURRAN:  Objection, Your Honor.

22              THE COURT:  Sustained.  She's --

23              MS. GANNETT:  It's the language related in the

24      policy, Your Honor.

25              THE COURT:  When you start talking to her about the

1       Fourth Amendment --

2              MS. GANNETT:  That's the only question I plan to

3       ask.

4              THE COURT:  Okay.  Why don't you re-ask the question

5       and not ask her for basically a legal opinion.  Just ask

6       her --

7       BY MS. GANNETT:

8        Q. Well, so turning to page 18 of the search protocol, which

9       is Defendant's Exhibit 7 --

10       A. Page 18?

11       Q. Page 18.  Towards the bottom of that page.

12       A. I'm sorry.  Yeah.

13       Q. Page 18, the bottom of that page, it says -- do you see

14       the language that says -- that says that searches are to be

15       conducted in accordance with the Fourth Amendment?

16       A. I see it.

17       Q. And did you receive any training on the meaning of that?

18       A. No.

19       Q. Okay.  But the protocol does describe for you the areas

20       that you should search when you are searching an inmate's

21       cell, correct?

22       A. Can you re -- one more time.

23       Q. I was wondering if you knew that without me directing

24       you, but I will direct you.  Do you know that it describes

25       that?

LISA MARIE BLOOKWORTH - DIRECT       132

1       A. It describes what?

2       Q. The areas to search when you are searching an inmate's

3       cell.

4       A. We search all areas.

5       Q. Okay.  So directing you to page 13 --

6              THE COURT:  This is Exhibit 7 to the defendant's

7       motion which is Docket Number 299-7.

8              MS. GANNETT:  No.  It's not attached -- oh, yes,

9       it's attached to the Government's response.  It's not

10      attached to the defendant's motion.

11             THE COURT:  I'm sorry.  299 -- yes, 299-7.

12             MS. GANNETT:  Yes, Your Honor.

13             THE COURT:  What page are you referring to?  13?

14             MS. GANNETT:  Now referring to page 13.

15             THE COURT:  Which unfortunately is one page

16      different from the one numbered at the top.  But go ahead.

17             MS. GANNETT:  Yes, I apologize.  Would you prefer me

18      to refer to those pages?

19             THE COURT:  When you look through a document, use

20      the page again --

21             MS. GANNETT:  On the docket number.

22             THE COURT:  The docket, so a reviewing court can

23      follow it.

24             MS. GANNETT:  Sure.  It's page 14 of the docketed

25      exhibit and page 15 of the docketed exhibit.

1    BY MS. GANNETT:

2    Q. And it tells you the areas to be searched and how to

3    search them, correct?

4    A. Correct.

5    Q. Okay.  And it -- on page 15 in the small subsection (b),

6    it discusses books, newspapers, and magazines, correct?

7    A. Um --

8    Q. It might help if I -- it might help if I show you.  I'm

9    sorry.  You are at a little bit of a disadvantage here.

10    Right here.  Books, newspapers --

11    A. Oh, okay.

12    Q. And it tells you to visually scan the page, right?

13    A. Um-hum.

14    Q. So when you are looking for something and you're looking

15    for contraband, there is only so much you can hide in the

16    pages of a document, right?

17    A. Correct.

18    Q. So when you are looking through a document, you can look

19    for contraband by paging through it without -- without having

20    to do much more than flip the pages, correct?

21    A. Correct.

22    Q. And particularly, if you are looking for something that

23    can be a danger to a suicidal inmate, you can do that when it

24    comes to papers without having to examine the papers closely,

25    correct?

LISA MARIE BLOOKWORTH - DIRECT      134

1     A. Correct.

2     Q. Okay.  You reported in Exhibit 18 that you seized a book

3     from the defendant and he had ten books?

4     A. Yes.

5     Q. What is the limit on the number of books?

6     A. He can have two magazines, two religious books, and two

7     regular reading books.

8     Q. But you only confiscated one book; is that right?

9     A. Yes.

10    Q. Okay.  And this -- this incident report that you compiled

11    does not report the seizure of a notepad?

12    A. Correct.

13    Q. And it does not report the seizure of drawings?

14    A. That would go under gang-related material.

15    Q. Okay.  According to the policy, you should -- and now I'm

16    referring to this same Government's Exhibit 7 at page 19 in

17    subsection (n) at the very bottom of the page -- I'm sorry.

18    It's not 19.  It's 16 at the bottom of the page.  Still on

19    the contraband policy, Number 7.

20         In subsection (n) you are supposed to document all

21    items removed from the cell, correct?

22    A. Correct.

23    Q. Okay.  But you didn't do that in this case?

24    A. Correct.

25    Q. Because you removed -- you removed a notepad from the

1    cell that contained some writings; is that correct?

2     A. Yes.

3     Q. I'm showing you what's been marked as Defense Exhibit 1.

4    Can you take a look at that, please, and let me know if you

5    recognize that item.

6         MS. GANNETT:  Can I see Defendant's 27, please?

7    BY MS. GANNETT:

8     Q. I'm also going to show you Defendant's Exhibit 27.  Do

9    you recognize 27?

10     A. Yes.

11     Q. Is that the notepad that you seized from the cell?

12     A. It looks like it.

13     Q. And does Defendant's Exhibit 1 look like the photocopy of

14    that document?

15     A. Yes.

16     Q. And you've seen that photocopy since -- I'm going to

17    retrieve 27 from you.  You can hold on to one.

18         You've seen a copy of the photocopy Defendant's 1.

19    You've seen a copy of that document since August 3rd,

20    correct?

21     A. Yes.

22     Q. You keep a copy of that in your file on Mr. Roof at the

23    jail; is that right?

24     A. Correct.

25     Q. What is that file that you keep on Mr. Roof at the jail?

LISA MARIE BLOOKWORTH - DIRECT       136

1    A. It's a -- a gang file, a gang validation file.

2    Q. And you interviewed Mr. Roof about his supposed gang

3    affiliation at some point, correct?

4    A. Correct.

5    Q. And he -- he -- he told you that he did not consider

6    himself to be affiliated with any group; is that right?

7    A. Correct.

8    Q. But you had some concerns about his -- what you perceived

9    to be his hate positions; is that accurate?

10    A. Yes.

11    Q. Okay.  When you seize -- when you -- why don't you tell

12    us about what happened during the search of Mr. Roof's cell.

13    A. Um, I didn't actually search his cell.

14    Q. What did you do?

15    A. I searched the boxes that came out of his cell.

16    Q. How did the boxes come out of his cell?

17    A. Um, I was not there when they were taken out.

18    Q. Do you know who took them out?

19    A. I do not.

20    Q. Okay.  So were you called in specially to search the

21    boxes because of your role as an intelligence unit member?

22    A. Yes.

23    Q. Okay.  Why don't you describe the search that you did of

24    the boxes.

25    A. Um, my partner and I had taken -- he had two boxes, and

LISA MARIE BLOOKWORTH - DIRECT    137

1    we had taken them into -- we were still in the unit.  And

2    there is a -- like a shelf in the back of the unit.  And we

3    had both of the boxes on the shelf, and we stood there, and

4    we looked through them at that point.

5    Q. So there were two boxes?

6    A. Um-hum.  Yes, ma'am.

7    Q. And what were -- what were the boxes?  Were they boxes

8    that belonged to Mr. Roof, or were they boxes that someone

9    had put the materials into from his cell, or how did -- what

10    were the boxes?

11    A. Every inmate within the -- or that is in the jail in the

12    old part of the jail is issued a box when they are booked

13    into jail.  The box contains various items, bedding,

14    toiletries and such, so it was assigned to him.  So it was

15    his box that he was assigned.

16    Q. But you said there were two boxes?

17    A. When he went on suicide watch, they -- they put his

18    clothing and such into an extra box.

19    Q. So there was one box assigned to him, and then there was

20    another box in which somebody, we don't know who --

21    A. Correct.

22    Q. -- had put his personal effects and brought them out into

23    that common area?

24    A. Correct.

25    Q. Okay.  And which box did you examine?

LISA MARIE BLOOKWORTH - DIRECT        138

1    A. Both of them.

2    Q. So did you both examine both of them, or --

3    A. Yes.

4    Q. Can you describe how that worked?

5    A. We had both boxes in front of us, and we were both

6    standing in front of the boxes.

7    Q. But which one of you was pulling things out of the box?

8    Both of you?

9    A. Both of us.

10    Q. At the same time?

11    A. Again, I don't recall.

12    Q. Okay.  Did you keep track of how the items in the boxes

13    were arranged?

14    A. Um, in one box.

15    Q. In which box?

16    A. The box that had the most stuff in it, that did not have

17    his clothing and such.

18    Q. Okay.  And where is the documentation of how the

19    materials were arranged in that box?

20    A. There is not any.

21    Q. So when you say that you kept track, how did you do that?

22    A. Well, I kept track like I could see what was in there.

23    So, I mean, I kept track -- I didn't, like, disturb all of

24    his stuff.  I kept track of it in the sense of everything was

25    on one side.  I didn't mess it all up.  So I tried to keep it

LISA MARIE BLOOKWORTH - DIRECT      139

1    neat.

2    Q. Okay.  Can you describe how the documents were placed --

3    the papers were placed in the cell -- in the box in

4    comparison to other materials that were in the box?

5    A. They were just thrown in there.  There was no

6    organization.

7    Q. Were they on the top?  Were they on the bottom?  Were

8    they on the side?  Do you remember?

9    A. I don't recall.

10   Q. According to the jail policy, contraband includes

11   gang-affiliated symbols or related items; is that right?

12   A. Correct.

13   Q. And you have said before that drawings and the notepad

14   got your attention?

15   A. Correct.

16   Q. How did you come across those drawings?

17   A. Which drawings?

18   Q. The drawings in the notepad.

19   A. Because I -- we had gone through it to see if there was

20   any contraband in there.

21   Q. Okay.  The drawings were not on the front of the notepad,

22   though?

23   A. No.

24   Q. And there was no other contraband in the notepad besides

25   the drawings; is that right?

LISA MARIE BLOOKWORTH - DIRECT        140

1    A. Correct.

2    Q. Okay.  So after you found the notepad with the drawings

3    in it, what did you do?

4    A. I set it to the side.

5    Q. Okay.  And then what?

6    A. Continued to look through the contents of the box.

7    Q. Okay.  And did you identify other contraband?

8    A. Yes.

9    Q. What?

10   A. Different drawings that were in there.

11   Q. Okay.  And where were those in relationship to the

12   notebook?

13   A. I don't recall.

14   Q. Okay.

15          MS. GANNETT:  Excuse me one moment.

16          (Pause in proceedings.)

17   BY MS. GANNETT:

18   Q. When -- did you identify any other contraband besides the

19   drawings?

20   A. No, I did not.

21   Q. Okay.  Once you had finished going through the boxes,

22   what did you do?

23   A. Everything that we had taken out that we were not

24   keeping, we put back in.

25   Q. Okay.  And then?

LISA MARIE BLOOKWORTH - DIRECT    141

1    A. We put the lids on them and stacked them and left them on

2    the shelf.

3    Q. Okay.  So you can get more than one thing at a time if

4    you want to, to move it along.  So after that, your next step

5    was to?

6    A. We -- after we had set them there, we gathered what we

7    were taking with us, and we took them up to our office.

8    Q. To the intelligence unit office?

9    A. Correct.

10    Q. Okay.  And you did that for what -- and what were you

11    taking with you?

12    A. I took the notepad, and I took drawings, and then I also

13    had taken a letter that he had written to somebody, but was

14    yet -- that was not mailed off yet.

15    Q. Okay.  And you took it to your office, and what did you

16    do with that material in your office?

17    A. I made copies.

18    Q. Okay.

19    A. And then I had forwarded a copy to Ms. Knapp.

20    Q. You forwarded a copy to Ms. Knapp.  And your purpose in

21    forwarding it to Ms. Knapp was in case she found any

22    evidentiary value in it?

23    A. Correct.

24    Q. And did you have instructions from her to forward

25    evidence to her when you came across it?

LISA MARIE BLOOKWORTH - DIRECT     142

1     A. No.

2     Q. How did you know to forward evidence to her?

3     A. I at that point did not realize it was evidence.  I

4     wasn't -- I wasn't sure.

5     Q. Well, you just said that you forwarded it to her in case

6     it was of evidentiary value.  How did you know --

7     A. In case.  I didn't know.  That's why I forwarded it to

8     her.

9     Q. Okay.  How did you know that she was the person to whom

10    to give potential evidence?

11    A. She is on a liaison between us and the law side.

12    Q. Had you been instructed by members of the intelligence

13    unit to be alert to evidence that could be helpful in this

14    case?

15    A. No.

16    Q. But you knew that it was a high profile case?

17    A. Correct.

18    Q. And you knew that it was getting special attention in the

19    jail?

20    A. Correct.

21    Q. And you were -- the jail was treating it differently from

22    other cases in that it was getting extra mail review?

23    A. Correct.

24    Q. And other kinds of special attention in the jail?

25    A. Correct.

LISA MARIE BLOOKWORTH - DIRECT       143

1    Q. You kept -- it was discussed how you kept a copy in your

2    office, and then what did you do with the notebook after you

3    gave a copy to --

4    A. I put it back in his property.

5    Q. And when you say you "put it back in his property," what

6    does that mean?  You put it back in the box?

7    A. Correct.

8    Q. And how did you do that?

9    A. I walked down and opened the box and put it in, put the

10   lid back on it.

11   Q. Did you -- but you made an effort to make it look like

12   his property had not been disturbed; is that right?

13   A. I don't like to be disrespectful when I search people's

14   property.  I don't throw it all around, and I try to be

15   respectful when you search anybody's property, not -- just

16   anybody.

17   Q. You didn't tell him that you had taken the document and

18   made a copy of it, did you?

19   A. No.

20   Q. And you didn't write up any kind of infraction for the

21   documents that you had seized?

22   A. No.

23   Q. You, um -- you took a copy of the letter, Defendant's 19.

24   Have I showed you that yet?  I might not have.  I'm going to

25   show you what's been marked as Defendant's 19.  Have you seen

LISA MARIE BLOOKWORTH - DIRECT        144

1       this document before?

2        A. Yeah.  If I don't need it, you can have it.

3        Q. Have you seen that before?

4        A. Yes, I have.

5        Q. And when was the first time you saw that?

6        A. That day.

7        Q. That day.  What -- at what point in that day, though?

8        A. I believe it was sometime in the morning.

9        Q. In the morning.  And who showed it to you?

10       A. I believe it was given to me -- it was given to me by the

11      unit officer.

12       Q. By the unit officer?  And for what purpose?

13       A. Because his mail is being watched.

14       Q. Because his mail was being watched.  Okay.  And then what

15      did you do with the letter?

16       A. I took it up to my office and made a copy.

17       Q. Okay.  And then what did you do after you made the copy?

18       A. Forwarded it to Ms. Mosher -- or Ms. Knapp.

19       Q. Okay.  And at some point later, were you given a copy of

20      that letter to take to Dr. Leonard, or did you take it, your

21      own copy, to Dr. Leonard?

22       A. No.

23       Q. Okay.  Are you aware that Dr. Leonard later evaluated

24      Mr. Roof on that day?

25       A. I believe so.

1    Q. In fact, are you aware that she evaluated him at about

2    2:00 in the afternoon that day?

3    A. No.

4    Q. No?  Do you recall being interviewed by members of the

5    public defender's office on September 17th, 2015?

6    A. Yes.

7    Q. And do you recall telling them that by 2:00 on

8    August 3rd, the jail's mental health department had cleared

9    Mr. Roof to return to his cell with his belongings?

10    A. I do not.

11         MS. GANNETT:  I think that's all I have at this

12    time.  Thank you.

13         THE COURT:  Cross-examination.

14         MR. CURRAN:  Thank you, Your Honor.

15                    CROSS-EXAMINATION

16    BY MR. CURRAN:

17    Q. Good afternoon, Officer Bloodworth.

18    A. Hi.

19    Q. I'm going to ask you some questions starting with the

20    things you were just asked by Mr. Roof's attorney.  You were

21    shown a copy of the search policy for the jail.  First of

22    all, you work at the jail, right?  I'm not sure we ever

23    established that.  Right?

24    A. Yes, I do.

25    Q. You work at the jail.  You work in the jail in the

1    security group?

2     A. Correct.

3     Q. What is the mission of the security group?

4     A. For safety and security of everybody within our facility.

5     Q. And part of that job is to collect information that might

6    relate to safety or threats within the jail, correct?

7     A. Correct.

8     Q. Part of that job relates to gangs and people associated

9    with gangs, correct?

10    A. Correct.

11    Q. And at the jail, the definition of gangs includes people

12    associated with white supremacy, correct?

13    A. Correct.

14    Q. And you had met with Mr. Roof.  You had a conversation

15    with Mr. Roof.  You knew about his offense?

16    A. Correct.

17    Q. And as a result of that meeting, you designated and had

18    him associated with a gang?

19    A. Correct.

20    Q. And in doing that, what you really were indicating that

21    he was associated with white supremacy, correct?

22    A. Correct.

23    Q. Does the jail make any distinction between the two?

24    Between like a formal gang like the Crips and white

25    supremacy?

1    A. Do we make any -- one more time?

2    Q. It's a terrible question.  Let me try it again.  At the

3    jail do -- are you -- as someone doing the gang-related work,

4    do you treat them as the same thing, white supremacy and gang

5    affiliation?

6    A. Yes.

7    Q. All right.  When you search cells -- and we've already

8    established you did not search Dylann Roof's cell that day,

9    correct?

10   A. Correct.

11   Q. Who searched his cell that day?

12   A. Um, our officers of our SOG team.

13   Q. And I'm going to give you a copy of Defendant's

14   Exhibit 18.  Would you look at the first page of that

15   exhibit, please, and let us know when you are familiar with

16   it?

17   A. The first page?

18   Q. Yes.

19   A. Uh-huh.

20   Q. And is that the report from where the SOG officers

21   documenting that they actually searched Mr. Roof's cell?

22   A. Yes.

23   Q. And according to their documentation, why were they

24   searching his cell?

25   A. He was being placed on suicide.

LISA MARIE BLOOKWORTH - CROSS     148

1     Q. So the SOG operators believed that they were doing a

2     search pursuant to the suicide protocol; is that correct?

3     A. Correct.

4     Q. Now, when you do a search in a cell, are you limited to

5     just searching for things that are a threat to the inmate?

6     A. No.

7     Q. Are you also allowed to search for contraband?

8     A. Yes.

9     Q. Does contraband at the jail also include gang symbols?

10    A. Yes.

11    Q. White supremacist symbols?

12    A. Yes.

13    Q. When you look at an inmate's writings, is that one of the

14    things you are looking for?

15    A. Yes.

16    Q. In your incident report, which you've already seen, and

17    I'll happy to show it to you again, you referenced

18    gang-related material.  What were you referring to?

19    A. Some drawings that were found --

20    Q. All right.

21    A. -- in his box.

22    Q. And when you said "confiscated," what did you mean by

23    "confiscated"?

24    A. That I took them out of the box.

25    Q. Does that mean you didn't return them?

1        A. Correct.

2        Q. All right.  So confiscated as you are using it here is

3    not things that you took out of his box, but things that you

4    took out and you didn't return?

5        A. Correct.

6        Q. So when you brought things back to him that day, and when

7    he received his box back that day, it didn't have things in

8    there that were in there at the beginning of the day,

9    correct?

10        A. Correct.

11        Q. How many books did he have in there?  Do you recall?

12        A. Um-hum.  Ten.

13        Q. All right.  How many books did he get back?

14        A. Four.

15        Q. Four?  What's the -- what's the limit at the jail?

16        A. Well, he had -- some were religious and some were -- so

17    he had the two religious and the two regular books.

18        Q. Two religious, two nonreligious, he was allowed to get

19    four back.

20        A. Correct.

21        Q. He was missing six books, right?

22        A. Correct.

23        Q. And when he received that box back, were the drawings --

24    the white supremacist or the drawings that you confiscated,

25    would they have been in there?

LISA MARIE BLOOKWORTH - CROSS        150

1    A. No.

2    Q. So if he went through that box, he should have known he

3    was missing things, correct?

4    A. Correct.

5    Q. He should have known his box had been searched?

6    A. Correct.

7    Q. All right.  And, in fact, when you went to the unit, you

8    went to the same unit Mr. Roof was in, correct?

9    A. Correct.

10    Q. And Mr. Roof was in his cell at that time?

11    A. Correct.

12    Q. And you were in the unit at the same time.  Where was his

13    box?

14    A. When we first got there?

15    Q. When you first arrived there.

16    A. They were right outside his door of his cell.

17    Q. How did you get the box?  Did you go over to the cell?

18    A. No.  One of the SOG operators brought them over to us.

19    Q. So Mr. Roof in his cell easily could have seen the SOG

20    operators taking his box away and giving it to you, correct?

21    A. Correct.

22    Q. You took a book.  That was the book that related to the

23    writing, correct?

24    A. Correct.

25    Q. And you referenced that in your -- because you didn't

1    give it back?

2     A. Correct.

3     Q. The other books that you took and you did not return,

4    what did you do with them?

5     A. They were put -- they were locked into our JMS system,

6    and they were put into his personal property down in dress

7    out.

8     Q. So they weren't confiscated.  They were just put into his

9    personal property?

10    A. Correct.

11    Q. He wasn't allowed to have them in the cell?

12    A. Correct.

13    Q. They didn't come back to him in his box?

14    A. Correct.

15    Q. But he still had access to them?

16    A. Correct.

17    Q. And could he have gotten them from his personal property

18    if he wanted?

19    A. Yes.

20    Q. So why did you confiscate the drawings?

21    A. They were -- they had -- they were gang-related.

22    Q. And how did you determine that?

23    A. Um, generally a lot of white supremacists, they have "SS"

24    for the lightning bolts.  They have "88," which is HH for

25    "Heil Hitler."  So they just have -- the different drawings

LISA MARIE BLOOKWORTH - CROSS     152

1    are -- you know, reference white supremacy.

2              MR. CURRAN:  The Court's indulgence, Your Honor.

3              (Pause in proceedings.)

4              MR. CURRAN:  Your Honor, if I may approach?  Next

5    Government's Exhibit 7.

6              THE COURT:  You may.

7    BY MR. CURRAN:

8    Q. Which you've already viewed.  Take a look at it again.

9    A. Contraband policy, yes.

10   Q. And that's the search policy, correct?

11   A. Correct.

12   Q. And you were asked some questions about the search

13   policy?

14   A. Yes.

15   Q. You were asked particularly about searches of cells,

16   correct?

17   A. Correct.

18   Q. And what you are authorized and what you are not

19   authorized to search?

20   A. Correct.

21   Q. And if you look at, I believe it would be page 13 of that

22   document at the bottom, and you should see a paragraph C, if

23   I'm doing my math right, because I don't have the same

24   exhibit that you do.

25   A. We are off on pages.  Oh, okay.

LISA MARIE BLOOKWORTH - CROSS          153

1     Q. We are looking at the page numbers on the top, not the
2     page numbers on the bottom.
3     A. Okay.  Yes.
4     Q. The bottom of page 12?
5     A. Okay.
6     Q. What does it tell you with respect to cell searches you
7     should search in paragraph 10 sub (c)?
8     A. "Ensure all areas are searched, including but not limited
9     to the following."
10    Q. So when the jail officer does a search, they have to
11    search all areas of the cell, correct?
12    A. Correct.
13    Q. And then it goes on a long list of what that includes,
14    but it's not limited to that, is it?
15    A. No, it's not.
16    Q. And if you look at page 14 -- actually 15 on the top, 14
17    on the bottom, it talks about articles inside the room and
18    cell, and it gives some examples, correct?
19    A. Correct.
20    Q. And that includes letters, envelopes, various writings,
21    such as books, newspapers, and magazines, and it tells you to
22    visually scan the pages.
23    A. Correct.
24    Q. Why do you scan the pages?
25    A. You just scan them to ensure that they are not -- you

LISA MARIE BLOOKWORTH - CROSS    154

1    know, if it's not -- like we look at it from a gang point of

2    view.  If they are like -- they have books of knowledge, and

3    sometimes so if they are trying to recruit in the unit, we

4    look to see if they are trying to write any recruiting stuff

5    down.  It's a general scan to ensure that they are not

6    communicating with other gang members, or if they are not

7    writing stuff that we feel could be, you know, hurtful to

8    themselves, just different.

9    Q. So particularly in the context of a suicide watch, you

10   might be looking for some indication that there is something

11   in there that might reflect on suicide intentions?

12   A. Correct.

13   Q. Were you doing that that day with Mr. Roof?

14   A. Yes.

15   Q. So that was one of the reasons that you were looking at

16   his pages?

17   A. Correct.

18   Q. Were you also looking for contraband?

19   A. Yes.

20   Q. Did you find contraband?

21   A. Yes.

22   Q. And you confiscated it, right?

23   A. Yes.

24   Q. And that's in your report?

25   A. Yes.

LISA MARIE BLOOKWORTH - CROSS        155

1        Q. And if you look on the top of page -- bottom of page 16

2        on the top -- it's 15 on the bottom -- it talks about what

3        your obligation to document items removed, correct?

4        A. Is it page 16 at the top?

5        Q. 16 at the top, 15 at the bottom, yes.

6        A. Okay.

7        Q. And in your incident report, you documented what you

8        actually confiscated and you didn't return, correct?

9        A. Correct.

10        Q. The books actually were returned.  They just had to go to

11        his property because he had too many?

12        A. Correct.

13        Q. The thing that you actually seized and confiscated, the

14        gang symbols and the book that related to the letter, those

15        you documented in your report, correct?

16        A. Yes.

17        Q. All right.  So you actually did the search of his box in

18        the housing unit?

19        A. Yes.

20        Q. The same housing unit in which Mr. Roof was being

21        placed -- was still placed?

22        A. Yes.

23        Q. He wasn't removed from his cell that day, was he?

24        A. No.

25        Q. And let me rephrase that question.  He wasn't permanently

LISA MARIE BLOOKWORTH - CROSS      156

1    removed as part of a suicide watch, correct?

2     A. Correct.

3     Q. He was taken out.  Suicide procedures were done; then he

4    went back into the same cell, correct?

5     A. Correct.

6     Q. How many times have you been involved in a suicide watch

7    at the jail?

8     A. Um, multiple times.

9     Q. How many times -- can you clarify a little bit more?  How

10   many times have you been involved in a search related to a

11   suicide watch of the cell at the jail?

12    A. Multiple times.

13    Q. More than ten?

14    A. Yes.

15    Q. More than 50?

16    A. Yes.

17    Q. Less than a hundred?

18    A. Probably.

19    Q. All right.  So between 50 and 100?

20    A. Yes.

21    Q. When an inmate is being placed back into the same cell

22   that they are normally housed in, is it unusual for all of

23   his items to be removed from the cell?

24    A. No.

25    Q. When an inmate's personal effects are taken from his cell

1    or her cell during a suicide watch-related search, is it

2    unusual to search their personal effects?

3    A. No.

4    Q. Is it unusual in those circumstances to search through

5    their writings?

6    A. No.

7    Q. And you've already told us that's because you are looking

8    for contraband?

9    A. Yes.

10   Q. You are also looking for any indication that might tell

11   you one thing or the other about the suicidal intent,

12   correct?

13   A. Correct.

14   Q. Is that what you did with Mr. Roof that day?

15   A. Yes.

16   Q. And with his personal effects?

17   A. Yes.

18   Q. And you found some things?

19   A. Yes.

20   Q. Correct?

21   A. Correct.

22   Q. Some of which were contraband, some of which piqued your

23   interest, and you thought might have value to Ms. Knapp?

24   A. Correct.

25   Q. That's part of your liaison with Ms. Knapp, who is also a

LISA MARIE BLOOKWORTH - CROSS        158

1    sheriff's office employee, correct?

2     A. That is correct.

3     Q. All right.  Is that an unusual thing for you to do in

4    your capacity as a jail intelligence officer?

5     A. No.

6     Q. And I think you told us no one before you were in there

7    gave you any alert to look out for anything in particular.

8    Correct?

9     A. That is correct.

10     Q. And you didn't tell Mr. Roof you had taken anything from

11    his box, did you?

12     A. No, I did not.

13     Q. Did you have any conversations with him at all that day?

14     A. I did not.

15     Q. He was in his cell when you went down to the unit,

16    correct?

17     A. Correct.

18     Q. And when you brought the things back, did you personally

19    have any personal interaction with Mr. Roof?

20     A. No.

21     Q. Was he still in his cell?

22     A. Yes.

23     Q. Where was his box of effects?

24     A. Still on the counter.

25     Q. Still on the counter in his housing unit?

1      A. Correct.

2      Q. And you put them back into the box from which you had

3      taken them?

4      A. Correct.

5      Q. You did not issue Mr. Roof with a disciplinary infraction

6      for the drawings --

7      A. No.

8      Q. -- correct?  Is that unusual when you seize drawings?

9      A. No.

10     Q. Is that unusual when you see gang-related -- gang-related

11     symbols?

12     A. No.

13     Q. How often do you seize that sort of thing in the jail?

14     A. Almost daily.

15     Q. All right.  And you don't write up the inmates every time

16     you seize something like that.

17     A. No.

18     Q. So that's not unusual, was it?

19     A. No.

20     Q. There was some questions about your interactions with

21     Dr. Leonard and Dr. Leonard clearing Mr. Roof from the

22     suicide watch, and there was reference to an interview that

23     you may have had with the public defenders last year.  The --

24     in terms of -- and you learned that he had been cleared from

25     the suicide watch by Dr. Leonard, correct?

1    A. I don't recall.

2    Q. You learned that he had been cleared from the suicide

3    watch, correct?

4    A. Correct.

5    Q. Did you learn that before or after you reviewed -- you

6    searched his box?

7    A. After.

8    Q. You learned that before or after you reviewed his

9    writings?

10    A. After.

11        MR. CURRAN: Your Honor, with your indulgence, I'm

12    going to briefly review my other notes to see if there is

13    anything that we need to touch on.

14        THE COURT: Very good.

15        (Pause in proceedings.)

16    BY MR. CURRAN:

17    Q. Do you work for Ms. Knapp?

18    A. No.

19    Q. Does she work for you?

20    A. No.

21    Q. Is she a jail employee?

22    A. No.

23    Q. Does she have any authority over you?

24    A. No.

25    Q. You coordinate with her, correct?

LISA MARIE BLOOKWORTH - CROSS    161

1    A. Correct.

2    Q. You give each other advice and guidance and things of

3    that nature, but she has no formal authority over you, does

4    she?

5    A. No, she does not.

6    Q. She doesn't even work in the jail, does she?

7    A. No.

8    Q. And you provide information to her generally?

9    A. Yes.

10   Q. And sometimes that information relates to an inmate's

11   case, correct?

12   A. Correct.

13   Q. Is that unique to Mr. Roof?

14   A. No.

15   Q. Is that something that is a normal part of your

16   functioning in the jail intelligence unit?

17   A. Yes.

18   Q. Does she also provide you with information?

19   A. Yes.

20   Q. Two-way street?

21   A. Correct.

22   Q. Apart from a subpoena or warrant, has anybody asked you

23   to have a cell searched and it's relating to an inmate's

24   case?

25   A. Yes.

LISA MARIE BLOOKWORTH - CROSS     162

1     Q. Apart from -- apart from a subpoena or a warrant, has
2     anybody ever asked you to search a cell for evidence related
3     to an inmate's case?
4     A. Yes.
5     Q. Okay.  Explain when that has happened.
6     A. Well, I just tell them I have to have a subpoena.
7     Q. Pardon?
8     A. I tell them you have to have a subpoena.  Sorry.
9     Q. People have asked you and you said what?
10    A. "I need a subpoena."
11    Q. So people have asked?
12    A. They have asked.
13    Q. Has Lauren Knapp ever asked you to do that?
14    A. No.
15    Q. All right.  Have you ever done that without having a
16    warrant or a subpoena?
17    A. No.
18    Q. All right.  When you met Mr. Roof for the first time, you
19    were meeting with him to determine whether he should be
20    designated as associated with a gang, correct?
21    A. Correct.
22    Q. You met with him.  You interviewed him, correct?  Did you
23    explain to him who you were?
24    A. Yes.
25    Q. Did you explain to him that you were a member of the

1       security and threats group?

2        A. Yes.

3        Q. Does he know who you are?

4        A. Yes.

5        Q. Do you screen the mail for other inmates at the jail?

6        A. Yes.

7        Q. Is that unique to Mr. Roof?

8        A. No.

9        Q. What was your reaction when you first saw the letter that

10      I think you still have in front of you, Defendant's

11      Exhibit 19?

12       A. It seemed a little weird.

13       Q. Why did you think it was weird?

14       A. Um, the writing is very neat, and it just -- it just --

15      just seemed different than normal jail writings that we see.

16       Q. What did you do with that letter?

17       A. I made a copy and sent it to Ms. Knapp.

18       Q. All right.  And did you and Ms. Knapp discuss it that

19      morning?

20       A. I just had sent it to her and said, "What do you think?"

21       Q. And what did she say?

22       A. She just, um, she just read it, and she had -- she just

23      said, "Let me look into it further."

24       Q. And did she get back to you with the results of looking

25      into it further?

1    A. She did.

2    Q. What did she tell you?

3    A. She said that she had seen the way that it read, it

4    seemed like there was maybe some suicidal undertones to it,

5    and it looked like it came from a book, that it was just

6    copied.

7    Q. Did she express any interest in that letter and in

8    Mr. Roof at that point other than the potential suicide

9    issue?

10    A. No.

11    Q. Did she at that point say anything about a need to search

12    his cell for evidence?

13    A. No.

14    Q. Anything related to that at all?

15    A. No.

16    Q. Was the conversation solely about the possibility of that

17    it reflected concerns with respect to suicide?

18    A. Yes.

19    Q. You've already said that Shelly Green was with you when

20    you went down to Mr. Roof's unit to review his box?

21    A. Yes.

22    Q. Was Ms. Knapp also at the jail at some point that day?

23    A. At some point that day, yes.

24    Q. Was she present when you were doing the copying of the

25    materials that you had taken from the box?

LISA MARIE BLOOKWORTH - CROSS    165

1    A. Yes.

2    Q. All right.  Did she help you copy some of those

3    materials?

4    A. Yes.

5    Q. When you were looking through his box, and particularly

6    with respect to the notepad that you were shown -- you were

7    shown the actual notepad a short while ago, correct?

8    A. Correct.

9    Q. Did you see anything on that notepad that indicated it

10   was marked legal?

11   A. No.

12   Q. And you reviewed -- you flipped through the notepad,

13   correct?

14   A. Correct.

15   Q. Did you see anything in it that indicated it was from an

16   attorney?

17   A. No.

18   Q. Did you see anything in there that indicated it was for

19   an attorney?

20   A. No.

21   Q. Did you see any markings -- legal markings at all, any

22   markings at all, other than the drawings that you've

23   testified about?

24   A. No.

25   Q. Why did you return the notepad?

1      A. It wasn't contraband.

2      Q. Why wasn't it contraband?

3      A. There wasn't anything written in it that -- you know,

4      there wasn't any type of gang references.  It just -- it was

5      just drawings, just writings.

6      Q. So the writings you didn't consider to be sufficiently

7      gang-related to seize, but you did seize the drawings?

8      A. Correct.

9      Q. And that's why you returned the notepad?

10     A. Correct.

11     Q. And Mr. Roof was still on suicide watch when you returned

12     the notepad to his box?

13     A. Yes.

14     Q. Some final questions.  To your knowledge did anyone

15     outside of the jail ask or order that Mr. Roof's cell be

16     searched that day?

17     A. No.

18     Q. By "anybody," I mean anybody.  I mean anybody from the

19     solicitor's office, from the FBI, from the South Carolina

20     enforcement division, any of the prosecutors that you see

21     here before you, anybody associated with Federal Government.

22     Did any -- to your knowledge, did anybody outside of the jail

23     ask or order that Roof's cell be searched?

24     A. No.

25     Q. To your knowledge, did anybody out of the sheriff's

1    office ask you or any jail personnel to review Mr. Roof's

2    writings --

3    A. No.

4    Q. -- that day?

5         MR. CURRAN:  No further questions, Your Honor.

6         THE COURT:  Redirect.

7         MS. GANNETT:  Excuse me one moment, Your Honor.

8         THE COURT:  Take your time.

9         (Pause in proceedings.)

10         MS. GANNETT:  Thank you, Your Honor.

11                    REDIRECT EXAMINATION

12    BY MS. GANNETT:

13    Q. So it's your testimony that rather than taking Mr. Roof

14    to another cell to make him safe during the suicide watch,

15    which is what the protocol calls for, instead they emptied

16    his cell and put him back in his cell?

17    A. Correct.

18    Q. Okay.  So -- and it's your testimony that the SOG

19    officers searched his cell and made it safe and put him back

20    in there?

21    A. Correct.

22    Q. So anything that was potentially unsafe for Mr. Roof was

23    outside his cell at that point --

24    A. Correct.

25    Q. -- because he had been put back in.

LISA MARIE BLOOKWORTH - REDIRECT    168

1    A. Correct.

2    Q. Okay.  Can you clarify, please, where the counter is

3    where the -- where you were reviewing the boxes?

4    A. Like where it's situated at?

5    Q. Um-hum.  Yes, please.

6    A. Like if you walk in the unit from like the sally port, to

7    the immediate right, it's a long counter.  There is a sink

8    there.  And then there is the officer's desk, so it's right

9    there to the right as you walk into the unit.

10    Q. Was it on the officer's desk or to the right of the

11    officer's desk?  I'm trying to place where the boxes were in

12    comparison to these other markers.

13    A. Just as soon as you walk in, there is -- you can see the

14    officer's desk when you walk in.  It's right there, and then

15    off to the, right kind of set back a little bit, there is a

16    long counter.

17    Q. And where on the long counter were the boxes?

18    A. Right at the very end, like up to the very end, right

19    against the wall.

20    Q. Against the wall.  So to the right or to the left as you

21    are looking at the counter?

22    A. So if you are looking at the counter, it was to the

23    extreme left.

24    Q. To the extreme left as you are looking at the counter.

25              THE COURT:  Excuse me, Ms. Gannett.

1              Could you see Mr. Roof from that spot?  Could you

2      see him in his cell?

3              THE WITNESS:  No.

4      BY MS. GANNETT:

5       Q. And so he couldn't see the box from his cell?

6       A. I don't believe so.

7       Q. Okay.  So all of the materials were taken out of his cell

8      as a part of the suicide watch, so he wouldn't have had any

9      way to object to the materials being taken out of the cell;

10     is that right?

11      A. Correct.

12      Q. Where was he during the time that the boxes were

13     searched?

14      A. In his cell.

15      Q. In his cell?

16              THE COURT:  Excuse me, Ms. Gannett.

17              When you came in and you took things out of the

18     cell, where was he then?  Was he still sitting in the cell?

19              THE WITNESS:  I wasn't in there when they took --

20     that was already done by the time I had gone in there.

21              THE COURT:  Normally he would be removed from the

22     cell while they did the search?

23              THE WITNESS:  Um, it depends.  I don't --

24              THE COURT:  Fair enough.

25              THE WITNESS:  I would have thought, yeah, but it

1    varies.

2    BY MS. GANNETT:

3    Q. I think I might have missed this in your answer.  I was

4    confused about the books because your report seems to

5    identify that one book was confiscated, but I heard you say

6    that he was only given four books back.  So could you explain

7    that, please?

8    A. That we confiscated the one book that I noted, and then

9    he was -- four books were given back, his allotted amount.

10    The rest were put into his personal property.

11    Q. You explained to him that the others were being put in

12    his personal property?

13    A. I don't think that was explained to him.  I do not

14    recall.

15    Q. You don't remember?

16    A. Hum-um.

17    Q. Okay.  He -- that had happened -- that has happened more

18    than once where his books were placed in his personal

19    property; is that right?

20    A. Yes.

21    Q. Okay.  The -- did you say that you read the document in

22    order to see whether it reflected suicidal intent?

23    A. I did not read it.

24    Q. You did not read it?

25    A. I just thumbed through it.

1      Q. Okay.  Did he -- you saw him on the unit on a regular

2      basis, right?

3      A. I saw him?

4      Q. Um-hum.

5      A. Or I see him?

6      Q. Well, at the time that this was going on in late July,

7      early August, did you see him during that time period on a

8      regular basis on the unit?

9      A. No.

10     Q. Okay.  Had you seen him on or about August 3rd prior to

11     going down to conduct this search of the boxes?

12     A. No.

13     Q. Okay.  Did you -- were you aware of anyone reporting any

14     suicidal symptoms on his behalf around that time?

15     A. No.

16     Q. The notebook was the only thing copied that was not --

17     that was returned to his box, correct?

18     A. No.

19     Q. What else was returned besides the notebook?

20     A. The letter.

21     Q. And so he -- when he received the box back with the

22     notebook and the other -- and the letter, he was receiving

23     all of his property back that had been taken out of the cell.

24     Would that be correct?

25     A. Yes.

1    Q. Do you take to -- did -- I'm sorry.

2         Did Analyst Knapp -- I don't know why I'm struggling

3    with her name so much today -- Analyst Knapp tell you about

4    the meeting that she was going to have with the command staff

5    regarding the letter?

6    A. I don't recall.

7    Q. You don't remember.  Okay.  Did she tell you about her

8    e-mail exchange with her supervisor regarding the letter?

9    A. No, I don't recall.

10   Q. Okay.

11        MS. GANNETT:  That's all.  Thank you very much.

12        MR. CURRAN:  Just one brief question, Your Honor.

13                     RECROSS-EXAMINATION

14   BY MR. CURRAN:

15   Q. You mentioned that Mr. Roof went back into his cell.

16   What unit was he in?

17   A. He is in the SMU.

18   Q. What's the SMU?

19   A. It's our special management unit.

20   Q. And what does that mean for those of us who are not jail

21   junkies?

22   A. Obviously, he is housed alone, so individuals that are in

23   there are generally high profile, protective custody,

24   whether, you know, they just can't -- they have enemies at

25   other places of the jail, so people that just generally can't

1    be around others.

2     Q. So is that unusual for someone who is being housed in SMU

3    when they are on suicide watch to be put back into their own

4    cell?

5     A. No.

6     Q. Is that pretty normal?

7     A. Yes.

8              MR. CURRAN:  That's it, Your Honor.

9              THE COURT:  Thank you.  Officer, you may step down.

10             MR. CURRAN:  May she be excused, Your Honor?

11             THE COURT:  She may be excused.

12             Folks, probably a good time to take an afternoon

13    break.  And we are -- when I go back up to chambers, I'm

14    going to try to look and see what potential dates we could

15    have to reconvene.

16             How many witnesses, Mr. Richardson, do you have that

17    could not return?  How many?

18             MR. RICHARDSON:  Could not return is not fair.  We

19    have --

20             THE COURT:  Come from out of town.

21             MR. RICHARDSON:  We have one, Your Honor, and it's

22    sort of up to Your Honor whether you want to hear about it.

23    The defense raised concerns yesterday with the Government in

24    the manner in which we conducted the taint review, and so we

25    brought, as they initially requested, both the taint agent

1    and the taint attorney down as they had previously requested

2    to be here.  I have AUSA Bob Daly, who is here.  I was going

3    to let him talk for ten minutes about the process so that

4    there is no ambiguity about what was done, the procedures

5    that were taken in order to do that.  If Your Honor does not

6    want to hear that, that's fine.  But they raised concerns

7    about it.  I don't want there to be any ambiguity.

8             THE COURT:  We don't need to raise any more issues

9    that we need to raise in this case.

10            Ms. Gannett?

11            MS. GANNETT:  I don't want to fuss about this, Your

12   Honor, but so our concern was that there were these

13   representations in the Government's response that it's not

14   just the Government that thinks this is not attorney-client

15   material, but they had an FBI taint agent, other people.

16            THE COURT:  It has no effect with the FBI tainting

17   things as to whether it was attorney-client privilege.

18            MS. GANNETT:  Our position as of yesterday afternoon

19   was why don't we forget about all of this and tell the Judge

20   it shouldn't matter what other people's opinions are.

21            THE COURT:  It doesn't matter.

22            MS. GANNETT:  And not --

23            THE COURT:  Whatever the FBI thought it was or was

24   not is largely irrelevant to me.  What is relevant is, is it

25   in fact protected?  They have laid a foundation that it

```
1     doesn't appear to people that were inspecting that it was
2     related.  And, you know, I just -- how they concluded what
3     they did doesn't really have any relevance to my analysis of
4     this thing.
5              MR. RICHARDSON:  That's fine, Your Honor.
6              THE COURT:  Okay.  So let's take -- let's take about
7     a ten-minute break, and I'm going to try to assess dates, and
8     you'll be looking at your calendars.  I've got one or two
9     criminal cases that may be going to pleas that I had
10    calendared.  Ms. Tapscott knows those.  I'm not sure I've got
11    my arms around it right this second.  I'm going to try to
12    figure those out, and perhaps even if we don't for sure, a
13    lot of times I'll have -- you know, until they plead, it's
14    not -- I don't give up the slot on the calendar, but we may
15    sort of double-book it with the -- it's likely that the
16    criminal case will go away, and we'll have that time.  So
17    we'll be back in about -- about 3:30.  Okay?
18              (Thereupon, there was a brief recess.)
19              THE COURT:  Okay, folks, in consulting my schedule,
20    it looks like in this month, the only potential time I have
21    is a -- I have a criminal trial that begins on September 19th
22    that we think will likely plead.  We have a plea scheduled,
23    but it ain't over till it's over.  That is Monday,
24    September 19th.  Does that present a problem for any counsel?
25              MS. GANNETT:  That date, the 19th, Your Honor?
```

1          THE COURT:  Yes.  That affords y'all some time to

2     kind of deal with some of these issues we've raised.  I

3     will -- y'all stay in touch with Ms. Tapscott, because -- but

4     I think we -- we have a guilty plea in that case, I think

5     like the 9th or something, so we will know fairly quickly

6     whether that is worked out or not.  And if not, we'll just

7     start figuring it out from there.  Right now that seems like

8     the most promising day.

9          Okay.  How many more witnesses?  I saw some folks

10    sitting in the hall here.  Who have we got?  What other

11    witnesses have we got?

12          MS. GANNETT:  One more witness, Your Honor, for

13    today.  That will be Chief Beatty.

14          THE COURT:  Okay.  And does the -- let me just ask:

15    After that, the Government, what witnesses do you have for

16    today?

17          MR. CURRAN:  The same witnesses, Your Honor.

18          THE COURT:  Just the chief.

19          MR. CURRAN:  We have nobody after the chief.

20          THE COURT:  Okay.  And then in the future, you may

21    have people occasioned by today that you may want to add,

22    but, Ms. Gannett, it's basically in terms of the Sixth

23    Amendment issue or the attorney-client issue, it is -- the

24    state court lawyer, is that the only one we've got?

25          MS. GANNETT:  Yes, Your Honor.

1              THE COURT:  Okay.  Very good.  Let's go get the next

2      witness, then.

3              MR. CURRAN:  Your Honor, while he's doing that, we

4      have conferred, and the defense offered Exhibit 18.

5              THE COURT:  That was on my list.  You hadn't put it

6      in yet.

7              MR. CURRAN:  And the parties agree that it should be

8      admitted.

9              THE COURT:  Defendant's 18 admitted without

10     objection.

11             (Thereupon, Defendant's Exhibit 18 introduced into

12     evidence.)

13             MR. CURRAN:  Page 2 was already part of the

14     Government's response.  The other two pages are other reports

15     related.

16             THE COURT:  Yes.  I understood that.

17             THE CLERK:  Place your left hand on the Bible, raise

18     your right.  State your full name for the record, please.

19             THE WITNESS:  Willis L. Beatty.

20             THE CLERK:  Spell your last name for the record.

21             THE WITNESS:  B-e-a-t-t-y.

22     THEREUPON:

23                           WILLIS L. BEATTY

24     called in these proceedings and being first duly sworn

25     testifies as follows:

WILLIS BEATTY - DIRECT          178

1                    THE CLERK:  Thank you.  You may be seated.

2                         DIRECT EXAMINATION

3     BY MS. GANNETT:

4      Q. Good afternoon, Chief.  My name is Sarah Gannett, and I'm

5     one of the lawyers for Mr. Roof.

6      A. Okay.

7      Q. I understand that you hold a position of authority at the

8     detention center.  Could you please explain what it is that

9     you do there?

10     A. I'm the jail administrator; I run the facility.

11     Q. And the appropriate title for you is chief?

12     A. Chief deputy.

13     Q. Chief deputy?

14     A. Yes.

15     Q. And could you please describe your responsibilities as

16    the administrator.

17     A. I oversee the day-to-day operations of the entire

18    facility.

19     Q. Does that mean you are the most senior?

20     A. Except for the assistant sheriff and the sheriff.

21     Q. Are the assistant sheriff and the sheriff at the

22    facility?

23     A. No.

24     Q. They are somewhere else?

25     A. Yes.

1     Q. So at the facility, you would be the most senior person?

2     A. Yes.

3     Q. Okay.  And on the morning of August 3rd, 2015, do you

4     recall being notified about an issue relating to Dylann Roof?

5     A. Yes.

6     Q. And it was then Ms. Knapp who brought that to your

7     attention?

8     A. I'm not sure.  Somebody in my STG group from the jail,

9     one of the three of them did.

10    Q. The three of them being?

11    A. Either Ms. Knapp, Ms. Bloodworth, or Ms. Green.

12    Q. Or Ms. Green?

13    A. Ms. Green.

14    Q. Yes.  And did all of them operate as one unit at the

15    jail, or did they have separate functions?  How did they --

16    A. Two operate at the jail; one operates at the sheriff's

17    office.

18    Q. Out of the sheriff's office, that would be Ms. Knapp?

19    A. Yes.

20    Q. And did she also have an office at the jail?

21    A. She had an office there, yes.

22    Q. Okay.  Did Ms. Knapp show you a letter that she -- that

23    had been written by Mr. Roof?

24         MR. CURRAN:  Object, Your Honor.  He said he didn't

25    know what she --

1                MS. GANNETT:  I'm sorry.

2      BY MS. GANNETT:

3      Q. Did one of the three of them show you a letter?

4      A. Yes.

5      Q. I'm going to show you what's been marked as Defendant's

6      Exhibit 19.  Let me know if you recognize that document.

7      A. It looks like the document from that day, yes.

8      Q. And the person who brought that to your attention, could

9      you describe the conversation that you had with that person?

10     A. We talked a little bit about what was in it, some of the

11     things that they had looked up on the web about the letter --

12     contents of the letter itself.

13     Q. Do you recall the discussion in any more specifics?

14     A. Talked about that it referenced and talked about, ended

15     in suicide.

16     Q. Okay.  And what did you all decide to do in response to

17     that conversation?

18     A. I instructed my staff to put Mr. Roof on suicide watch

19     and to search his cell.

20     Q. Okay.  Backing up a little bit, was there a meeting that

21     occurred at the command staff regarding the letter?

22     A. What command staff are we talking about?  There is two

23     different levels at the sheriff's office.

24     Q. Well, can you tell me, was there a meeting?

25

WILLIS BEATTY - DIRECT          181

1               THE COURT:  Who was at the meeting?

2        Q. Was there a meeting?

3               THE COURT:  And was there a meeting?

4               THE WITNESS:  Not that I'm aware of, no.

5    BY MS. GANNETT:

6        Q. No?  Okay.  Okay.  So you said that you instructed your

7    staff to initiate a suicide watch and then to search his

8    cell?

9        A. Correct.

10       Q. Let me back up for a moment.  Do you recall speaking with

11   members of the state public defender's office about this

12   incident?

13       A. Sometime after the incident, yes.

14       Q. Sometime after the incident?

15       A. Yes.

16       Q. Right.  And do you remember giving them a description of

17   how the suicide prevention policies at the jail operate --

18       A. We talked.

19       Q. -- or the practices?

20       A. We talked about the practices, yes.

21       Q. Yes.  And that there is three tiers of suicide prevention

22   or suicide response practices?

23       A. Yes.  If I remember the policy correctly, I think that is

24   true.

25       Q. Could you describe for the Court what those tiers of --

WILLIS BEATTY - DIRECT                    182

1        A. It would be easier if I had the document in front of me

2        for the policies, but I would be guessing.

3        Q. Well --

4              THE COURT:  I don't want him guessing.  Have you got

5        the document?

6              MS. GANNETT:  I can get the document for you.

7        Q. But as you described it --

8              THE COURT:  Hand him the document.

9              MS. GANNETT:  I will, Your Honor.

10       BY MS. GANNETT:

11       Q. This is Government's Exhibit 5.  It's the suicide policy.

12       Do you -- do you recall describing to them something called

13       "suicide check" where you just go looking on the defendants

14       or the inmate and to see if they are alive and okay every so

15       often periodically?

16       A. A suicide check?  No.

17       Q. You don't recall saying that?

18       A. No.

19       Q. Do you -- do you recall describing to them a -- the

20       difference between a suicide watch that takes place in the

21       unit and one that takes place in a hospital?

22       A. No.  We don't send people to the hospital for suicide

23       watch.

24       Q. Well, in the medical portion of the jail?

25       A. Yes.

WILLIS BEATTY - DIRECT          183

1     Q. Okay.  But not just to check in with the inmates?

2     A. No.

3     Q. Okay.  You have -- do you recall that you told the

4     investigators that you did not authorize a search of the

5     cell?

6     A. No, I don't remember telling them that.

7     Q. Okay.  And that the staff misinterpreted your directive

8     to them?

9     A. No, I do not remember telling them that.

10    Q. Are you familiar with the -- as the administrator of the

11    jail, I assume you are familiar with the other jail policies

12    besides the suicide prevention policy?

13    A. Yes.

14    Q. Are you familiar with the inmate correspondence policy?

15    A. Yes.

16         MS. GANNETT:  Your Honor, that has been marked as

17    Government's Exhibit 9 to their response, and this is the

18    policy on correspondence.

19    BY MS. GANNETT:

20    Q. Do you recognize that document?

21    A. Yes.

22    Q. At the time of this incident back in August of 2015, was

23    there any -- anything in that policy that required inmates to

24    mark their -- the materials that they kept in their cell as

25    attorney-client privilege?

WILLIS BEATTY - DIRECT          184

1     A. No, not that I recall.  I can look closer if you want me

2     to.  I'll take the time to read it.

3     Q. Well, I think the document can probably speak for itself.

4     But I was curious if you could point me to something that I

5     hadn't read.

6     A. Yeah.

7     Q. The inmate orientation handbook is also something that

8     you are familiar with?

9     A. Yes.

10    Q. I'm going to show you what's marked as Defense Exhibit 4.

11    I just would like for you to look at that document and tell

12    me if that's the policy or the orientation handbook.

13    A. Yes.

14    Q. And does that provide any instruction to inmates about

15    how to keep their legal materials?

16    A. It may.  Again, I would have to go through it and look to

17    see exactly what it is, but it may.

18    Q. Okay.  But you don't recall?

19    A. No.

20    Q. Okay.  Are you aware of any instructions that are

21    provided to inmates about how to maintain their legal

22    materials at the jail?

23    A. Most of the stuff that is contained for legal purposes is

24    marked when it comes in from the facility from attorneys.

25    Q. The attorneys mark it on its way in?

1    A. Yes.  Yes.

2    Q. But what about stuff that the defendants prepare for

3    themselves in the jail?  Are they instructed how to prepare

4    that?  Is there any written instruction to them --

5    A. Not that I can recall.

6    Q. -- how to maintain that?

7    A. No, not that I can recall.

8    Q. Thank you.  When -- were you aware that the intelligence

9    unit was sharing materials seized from Mr. Roof's room

10   outside of the jail?

11   A. Um, what happened with the intelligence group, if it's

12   outside the jail, I'm not part of.  I'm not sure what their

13   policies are, no.

14   Q. But the jail's policy is to require the Government to

15   issue a subpoena --

16   A. Correct.

17   Q. -- to obtain materials from the jail --

18   A. Correct.

19   Q. -- is that correct?

20        MS. GANNETT:  I think that's all we have for right

21   now, Your Honor.  Thank you.

22        THE COURT:  Cross-examination.

23        MR. CURRAN:  Thank you, Your Honor.

24

25

                              CROSS-EXAMINATION

1    BY MR. CURRAN:

2     Q. Good afternoon, Chief Beatty.

3     A. Good afternoon.

4     Q. I'm going to ask you some questions relating to what

5    you've just been asked by counsel for Mr. Roof.  You stated

6    that someone came to you with information about Mr. Roof, and

7    they described to you concerns about suicide, and you ordered

8    that he be put on suicide watch, correct?

9     A. Correct.

10    Q. Did you order that he be put on some sort of just observe

11   him, but not do a full suicide watch protocol?

12    A. No.  I ordered him to be put on a suicide watch and his

13   cell be searched.

14    Q. Any doubt in your mind?

15    A. No.

16    Q. And you ordered that his cell be searched?

17    A. Yes.

18    Q. Why do you search his cell?

19    A. Because of the type of inmate that Roof is, we could not

20   take him to other portions of the jail.  We had to keep him

21   secure from other areas where other inmates were at, so we

22   kept him in the room where he was housed at.

23    Q. Is that standard procedure when you put a potentially

24   suicidal inmate back into their own cell, that you search the

25

1    cell?

2     A. Yes.

3     Q. The -- you were shown a copy of the inmate orientation

4    handbook, and we are going to show you that and ask you some

5    questions about that in a second.  You were also asked about

6    your correspondence policies, and there is nothing in there

7    that specifically instructs inmates on how to mark legal

8    materials, correct?

9     A. Not that I recall.  I would have to go through it.

10     Q. In your experience, is it unusual for inmates at the jail

11    to mark their personal documents as legal materials?

12     A. No.

13     Q. Where do they get that guidance?

14     A. I would expect from their attorneys.

15     Q. Right.  So when it happens, it's their attorneys that

16    tell them to do it?

17     A. I would assume so, yes.

18     Q. Is that uncommon?

19     A. No.

20     Q. All right.  I'm going to ask you just some more general

21    questions relating to your involvement here, and if you just

22    bear with me, we don't need to ask you all of them, because

23    some of them have already been -- some of them have already

24    been asked and resolved.  And I will try to tailor this to

25    save everybody a little bit of time here.

                            WILLIS BEATTY - CROSS              188

1                    How big is the jail, by the way?  How big is the

2         jail?

3          A. Square footage or number of inmates?

4          Q. How about employees?

5          A. Employees, approximately 465.

6          Q. How about inmates?

7          A. Um, roughly around 1,130.

8          Q. And you house people who are awaiting trial in Charleston

9         County courts?

10         A. About 80 percent of my inmates are that way.

11         Q. Like Mr. Roof?

12         A. Yes.

13         Q. For example, you've housed Mr. Roof since shortly after

14        his arrest, correct?

15         A. Correct.

16         Q. All right.  And you've talked about some of your

17        employees.  You have a group that's known as a security and

18        threats group, correct?

19         A. Yes.

20         Q. Is that also colloquially known as the jail intelligence

21        unit?

22         A. Yes.

23         Q. How many employees are in that?

24         A. Three.

25         Q. Who are they?

1      A. Shelly Green, Lisa Bloodworth, and Sergeant Luke.

2      Q. And Sergeant Luke's the supervisor of that organization?

3      A. Yes.

4      Q. That group?

5      A. Yes.

6      Q. And are Ms. Green and Ms. Bloodworth the analysts in that

7      group?

8      A. Correct.

9      Q. All right.  And in July and August of 2015, were they

10     reviewing Mr. Roof's mail?

11     A. Yes.

12     Q. Why?

13     A. Because it was high profile and threats that we got

14     coming in, we were trying to take extra precautions to make

15     sure that nothing happened to him.

16     Q. Was there also an incident where one of his letters was

17     put up for auction?

18     A. Yes.

19     Q. Did that play a role in that decision at all?

20     A. Yes, it did.

21     Q. Please describe that.

22     A. Because we were concerned that somebody else was either

23     getting stuff of his and getting it out to the public, or

24     somehow something was getting out that shouldn't have been.

25     Q. Who made the determination that his mail should be

1    reviewed by the security threats group?

2    A. I did.

3    Q. And was that what you just described one of the

4    considerations you took into account?

5    A. Yes.

6    Q. And at the jail, is Roof designated as someone who is

7    associated with a gang?

8    A. Yes.

9    Q. And in doing that, does it actually reflect that he's

10   associated with white supremacy as opposed to a street gang?

11   A. According to our intel group, yes.

12   Q. Is there any difference in the jail in terms of -- well,

13   in the jail, do you treat someone who is associated with

14   white supremacy as being an affiliate of a gang?

15   A. Yes.

16   Q. And you know Ms. Knapp, formerly Ms. Mosher?

17   A. Yes.

18   Q. Is she one of your employees?

19   A. She's a sheriff's office employee.

20   Q. Is she a jail employee?

21   A. No.

22   Q. All right.  Does she technically occupy a jail --

23   A. FTD.

24   Q. Whatever your --

25   A. Yes.

1    Q. -- accounting term is.

2    A. Yes.

3    Q. But she does not work for you?

4    A. No.

5    Q. She does not -- does she have any supervisory authority

6    over Shelly Green?

7    A. No.

8    Q. Does she have any supervisory authority over Lisa

9    Bloodworth?

10   A. No.

11   Q. Who is their supervisor?

12   A. Sergeant Luke.

13   Q. Does she have authority to -- does she have authority to

14   order any of your officers to search a cell?

15   A. She's a civilian.  She's not a corrections officer.

16   Q. So she doesn't, then, have authority to order someone to

17   review Mr. Roof's writings?

18   A. No.

19   Q. Have you ever heard that she actually ordered that cell

20   search or the review of his writings that day?

21   A. No, I have not.

22   Q. Who ordered the cell search?

23   A. I did.

24   Q. All right.  You have in front of you the jail handbook.

25   I think it's marked Defendant's Exhibit 4.  Would you turn to

WILLIS BEATTY - CROSS            192

1     page 15 of the jail handbook -- well, let me use the correct

2     title, "Inmate Orientation Handbook."  When an inmate comes

3     into the jail, are they briefed on the contents of this

4     document?

5      A. Yes.

6      Q. All right.  And do they have access to it when they are

7     in the jail?

8      A. Yes.

9      Q. How do they have access to it?

10     A. Through a kiosk in every unit.

11     Q. Direct your attention to page 15 of that document --

12            THE COURT:  Let me make sure I know which document

13     you are looking at.  Has it been premarked?

14            MR. CURRAN:  Defense exhibit, Your Honor.

15            THE COURT:  Have you offered it in here, because I

16     don't believe I have a copy of it.  Any objection?

17            MS. GANNETT:  I think we handed --

18            THE COURT:  Oh, I'm sorry.  It might be on top

19     there.  I see it there.  Right there.  Thank you.

20            MR. CURRAN:  We will jointly move it in at this

21     time, Your Honor.

22            THE COURT:  Okay.  Defendant's Exhibit 4 is offered.

23     Is there any objection?

24            MS. GANNETT:  No, Your Honor.

25            THE COURT:  Very good.  Defendant's Exhibit 4 is

1      admitted without objection.

2                    (Thereupon, Defendant's Exhibit 4 introduced into

3      evidence.)

4      BY MR. CURRAN:

5       Q. If I turn your attention to page 15.  Midway down the

6      page, is there is a section that says "inspection of persons

7      and property"?

8       A. Yes.

9       Q. And what does that say in that first sentence?

10      A. "Searches or inspections of inmate cells, property,

11     personal property, etcetera, may be conducted at any time for

12     health, safety, or security reasons.  All inmates must

13     cooperate during these searches and/or inspections."

14      Q. So it's in the handbook when they come into the jail,

15     when they are briefed, they are told their cell can be

16     searched at any time?

17      A. Yes.

18      Q. Is that correct?

19      A. Yes.

20      Q. Direct your attention to page 28, please.  At the bottom

21     of page 28, does it contain a definition of contraband?

22      A. Yes.

23      Q. And number 3 in that definition?

24      A. "Gang symbols or related items, such as drawings,

25     literature, signs, etcetera, which relate to gangs."

WILLIS BEATTY - CROSS                    194

1    Q. And, again, that is something they are briefed on when
2    they come to the jail?
3    A. Yes.
4    Q. And they have access to this document through the kiosk
5    when they are in the jail?
6    A. Yes.
7    Q. Does Defendant Roof have access to the kiosk?
8    A. Yes.
9    Q. Is that how he orders his items from the canteen, for
10   example?
11   A. Yes.
12   Q. What is the canteen, for those who are not up on jail
13   terminology?
14   A. It's -- a lot of them get extra things, such as sodas,
15   chips, sandwiches, magazines, extra clothing, things like
16   that.
17   Q. And is that where you would also be able to order a
18   radio?
19   A. Yes.
20   Q. All right.  Does the jail provide suicide prevention
21   training?
22   A. Yes.
23   Q. Who provides it?
24   A. Our mental health and medical departments come down and
25   do it.

1     Q. Who is required to attend?

2     A. All staff.

3     Q. Everybody?

4     A. Everybody.

5     Q. How often is that training?

6     A. At least yearly, sometimes every other.  There is no

7     standard that says we have to have it every year, but we

8     update it, but it's usually yearly.

9     Q. And does the training also include warning signs for

10    someone who might be at a risk for suicide?

11    A. Yes.

12    Q. Is that also discussed in your policy?

13    A. Yes.

14    Q. I think you were probably already asked this in another

15    form:  Does Lauren Knapp have the authority to put someone on

16    suicide watch?

17    A. No.

18    Q. Why did you order that he be put on suicide watch that

19    day, Chief?

20    A. If I remember correctly, partly because of the letter

21    that had come in and the way it referred back to that book

22    and how it ended, and he had just returned from court, if I

23    remember correctly.

24    Q. Did any consideration other than concern for his state of

25    mind and potential suicide risk factor into your decision?

1    A. No.

2    Q. For example, was a desire to gather evidence from his

3    cell, did that play any factor in your decision?

4    A. The detention center doesn't gather evidence for criminal

5    cases.

6    Q. Why did you order that his cell be searched?

7    A. Because we were going to leave him in the cell to ensure

8    there was nothing in there that he could hurt himself with.

9    Q. How long did Mr. Roof remain on suicide watch that day?

10   Do you recall?

11   A. No, I do not.

12         MR. CURRAN:  Your Honor, I'm handing the defendant

13   what's been marked as Government's Exhibit 12.  This has not

14   been previously -- I don't believe this is previously been

15   admitted in any of the pleadings.

16   BY MR. CURRAN:

17   Q. Can you take a look at the document and familiarize

18   yourself with it?  Let us know when you are ready.

19   A. Okay.

20   Q. Are you familiar with that document?

21   A. Yes.

22   Q. Have you seen it before?

23   A. Yes.

24   Q. What is it?

25   A. It's an observation log for people on suicide watch.

1    Q. Is it for any particular suicide watch?

2    A. This is for Dylann Roof on 8-3 of 2015.

3    Q. Is that one of the records from your jail?

4    A. Yes.

5    Q. And that's maintained as part of your normal

6    recordkeeping, correct?

7    A. Yes.

8    Q. According to the observation log, when does the suicide

9    watch start?

10   A. 11:15 a.m.

11   Q. And what time did it end?

12   A. 1630.

13   Q. And at the bottom, there appears to be a signature on the

14   document and a notation.  Can you read that?

15   A. It says, "Remove from suicide, E Leonard, M.D., 8-3-15."

16   Q. Who is E Leonard M.D.?

17   A. The psychiatrist.

18   Q. Does she have authority to take someone off suicide

19   watch?

20   A. Yes.

21            MR. CURRAN:  We would offer.

22            THE COURT:  Any objection?

23            MS. GANNETT:  No objection.

24            THE COURT:  Government 12 admitted without

25   objection.

 1                    (Thereupon, Government's Exhibit 12 introduced into

 2        evidence.)

 3        BY MR. CURRAN:

 4        Q. So did you take him off suicide watch that day?

 5        A. No.

 6        Q. It was Dr. Leonard?

 7        A. Yes.

 8        Q. She's the only person that did that?

 9        A. Yes.

10        Q. And I'm going to hand you, Chief, with the Court's

11        permission, Defendant's Exhibit 18.  You have reviewed those

12        documents -- three separate documents there, Chief?

13        A. Okay.

14        Q. Okay.  The first document that you see there, what is

15        that?

16        A. It's an incident report from an officer that worked that

17        unit that day.

18        Q. And according to that report, what does the report relate

19        to?

20        A. Me placing Roof on suicide watch.

21        Q. So according to the report -- who is the report writer?

22        A. Zach Wolfe.

23        Q. And was he one of the officers at the time?

24        A. Yes.

25        Q. And according to Mr. Wolfe's report, it was his

1     understanding that you had placed Mr. Roof on suicide watch?

2       A. Correct.

3       Q. And on actual suicide watch, not some lesser event,

4     correct?

5       A. Correct.

6       Q. And what does he go on to describe?

7       A. "Subject was placed in suicide.  All materials were

8     cleared from subject.  Inmate was given a suicide mattress as

9     well.  Started at 1115 hours and observations to be logged

10    every 15 minutes."

11      Q. Is that consistent with your standard suicide procedures?

12      A. Yes.

13      Q. If you would look at the final document, please.  And

14    what is the final document?

15      A. I enter a SOG accident (sic) report.

16      Q. And what does that relate to?

17      A. Our SOG team putting him on suicide watch.

18      Q. So that document also reflects that he was put on suicide

19    watch?

20      A. Correct.

21      Q. And does that actually document the actual physical

22    search of the cell?

23      A. Yes.

24      Q. Okay.

25              MR. CURRAN:  Nothing further with those documents,

WILLIS BEATTY - REDIRECT          200

1      Your Honor.

2              THE COURT:  Thank you.

3      BY MR. CURRAN:

4       Q. Chief, some final questions.  Did anybody ask you or

5      order you to have Roof's cell searched?

6       A. No.

7       Q. Anybody from the solicitor's office ask you to do

8      anything with Mr. Roof's cell that day?

9       A. No.

10      Q. Anybody from the Federal Government, from the FBI, or the

11     prosecutors in this case?

12      A. No.

13      Q. Whose decision was that?

14      A. It was mine.

15      Q. And that was based on the information you had that you've

16     already testified about?

17      A. Yes.

18              MR. CURRAN:  That's all we have, Your Honor.

19              THE COURT:  Very good.  Redirect.

20                         REDIRECT EXAMINATION

21     BY MS. GANNETT:

22      Q. Chief, you expressed some familiarity with the canteen.

23     Do you know what kinds of items they stock in the canteen?

24      A. It can be anything from chips and soda; they have radios,

25     some magazines, some personal items, shoes, things like that,

WILLIS BEATTY - REDIRECT          201

1    that they can order.

2     Q. I'm going to show you what's been marked as

3    Defendant's 27.  Does this look like a notepad that is sold

4    in the canteen?

5     A. Yes, it could be.

6     Q. We talked a little bit earlier about an interview that

7    you had with -- the interview with the state public

8    defender's office.  Do you remember the date of that

9    interview?

10    A. No, I do not.

11    Q. Would it help to refresh your recollection if I showed

12    you a memorandum written by members of the state public

13    defender's office reflecting the date of the interview?

14    A. Sure.

15    Q. Showing you what's been marked as Defendant's Exhibit 23.

16    You can see on that document that it's dated September 17th

17    of 2015, correct?

18    A. Correct.

19    Q. And that in the first paragraph it --

20         MR. CURRAN:  My understanding this was to refresh

21    recollection.

22         THE COURT:  I'm a little confused.  Let me

23    understand what this is.  This is -- who prepared this?

24         MS. GANNETT:  I was about to say that.

25         THE COURT:  Who prepared this?

WILLIS BEATTY - REDIRECT          202

1              MS. GANNETT:  It's prepared by Mr. Pennington.

2              THE COURT:  It's not prepared by this witness.

3              MS. GANNETT:  No.

4              THE COURT:  Okay.  And you are going to -- you want

5       to examine him on what Mr. Pennington wrote about what he

6       said?

7              MS. GANNETT:  I'm going to ask him if he reads that

8       first paragraph if it's going to refresh his recollection

9       about the date that he had the interview.

10              MR. CURRAN:  I think we've already established the

11      date.

12              THE COURT:  Okay.  What else?

13              MS. GANNETT:  Um, well, the next question -- my next

14      question is going to be about his 302.  I wanted to establish

15      the date.

16              THE COURT:  Okay.  Why don't we do this:

17      Mr. Beatty, could you look at the first sentence of that

18      document and see if that date helps assist in refreshing your

19      recollection.

20              THE WITNESS:  I had a meeting with him, yes.

21              THE COURT:  Okay.  But whether that day is correct,

22      we do not know.

23              THE WITNESS:  Not 100 percent, no.  I know I had a

24      meeting with him.

25              THE COURT:  Okay.  Next question.

WILLIS BEATTY - REDIRECT          203

1    BY MS. GANNETT:

2    Q. Do you -- well, I'm going to show you, then, what was

3    admitted as Government's Exhibit 4 to their response to our

4    suppression motion.  And that is the FBI report on their

5    interview with you.

6              THE COURT:  Did he sign this?

7              MS. GANNETT:  Pardon me?

8              THE COURT:  Did he sign this?

9              MS. GANNETT:  He did not sign it.  I just want to

10   establish the date of the interview.

11             THE COURT:  Okay.

12   Q. Do you remember the date of the interview with the FBI?

13   A. No, I do not.

14   Q. Okay.  Would it refresh your recollection to look at the

15   FBI's report?

16   A. Again, I would have to go by what the date says.  I

17   wouldn't know.  I don't remember the date specifically, no.

18             MR. CURRAN:  We are happy to stipulate to all of

19   these dates, Your Honor.

20             THE COURT:  Okay.  Stipulation is that it was

21   September 15th Mr. Beatty met with the representative from

22   the public defender's office, and on September 30th, is that

23   the date we are saying here?  Or is it the 28th that he met

24   with someone from the FBI?

25             MS. GANNETT:  It is on September 28th.

 1                      THE COURT:  It's a telephone interview on the 28th

 2        is what it says.  Are you willing to stipulate to those?

 3                      MR. CURRAN:  We are willing to stipulate to the

 4        telephone interview on the 28th, Your Honor.

 5                      MS. GANNETT:  To establish the precise facts, it's

 6        September 15th and 17th that he was interviewed by the

 7        defense investigators.

 8                      THE COURT:  15th.

 9                      MS. GANNETT:  There are two dates.

10                      THE COURT:  There are two dates.

11                      MS. GANNETT:  If you turn to page --

12                      MR. CURRAN:  We're not able to stipulate to that,

13        Your Honor.  That obviously is not within our knowledge.  We

14        will stipulate to --

15                      MS. GANNETT:  On page --

16                      MR. CURRAN:  -- 302.

17                      MS. GANNETT:  -- page 2 of the document.

18                      THE COURT:  He says he doesn't remember.

19                      MS. GANNETT:  Well, if we are stipulating to the

20        documents, then we are stipulating to the documents.

21                      THE COURT:  Somebody stipulates.

22                      MR. CURRAN:  We are more than willing to stipulate

23        to the date and the manner of the FBI interview.  What is in

24        Mr. Pennington's memo is not something that is within our

25        knowledge to be able to stipulate to one way or the other.

WILLIS BEATTY - REDIRECT          205

1                    THE COURT:  Okay.  Keep proceeding.

2                    MS. GANNETT:  Very well.

3       BY MS. GANNETT:

4        Q. Do you recall the order in which you were interviewed?

5       Did the FBI interview you first, or did the public defender's

6       office interview you first?

7        A. To the best of my knowledge, the public defender did.

8        Q. Thank you.  Does it -- would it refresh your recollection

9       of the content of your interview with the public defender's

10      office to read the memorandum that they wrote about the

11      interview?

12       A. It might.  I don't know exactly.

13       Q. Okay.  Would you like to take a moment to read that

14      memorandum and see if it refreshes your recollection?

15       A. I can.

16       Q. Let me direct your attention to the portion that I would

17      like to discuss with you, so we don't waste time reading

18      stuff you don't need to read.  If you would read this first

19      paragraph on page 1.

20       A. I've read it.

21       Q. Does that refresh your recollection about what you told

22      the public defender's office about the suicide check or

23      suicide watch?

24       A. Suicide check and suicide watch are basically the same

25      thing.

WILLIS BEATTY - REDIRECT          206

1    Q. Did you tell them that the staff misinterpreted your

2    orders?

3    A. Not that I could concur; I do not remember saying that.

4    Q. Okay.  Could you look at page 3, please, the second full

5    paragraph.

6    A. Second full paragraph?

7    Q. Second full paragraph, please, and let me know whether

8    that refreshes your recollection.

9    A. No.

10   Q. Okay.  That's fine.  Thank you.

11         I would like to show you what's been marked as

12   Defendant's Exhibit 66, please.  And this is an e-mail.  Are

13   you familiar with that particular e-mail?

14   A. No, I'm not.

15   Q. Okay.  But you testified a few minutes ago that

16   Officer -- or Analyst Knapp, then Analyst Mosher, was not a

17   jail employee, and that the supervisor of employees Green and

18   Bloodworth was Mr. Luke --

19   A. Yes.

20   Q. -- is that right?  Thank you.

21         This e-mail appears to involve a directive from

22   Ms. Bloodworth -- I'm sorry -- from Ms. Knapp, then Mosher,

23   to the same employees.  Can you explain that?

24   A. No, because Ms. Mosher or Ms. Knapp is a civilian.  She

25   has no authority over corrections staff.

1    Q. But she appears to be exercising authority there, does

2    she not?

3    A. Exercising or asking them to do -- I don't know.  I don't

4    know what the e-mail is intended for.  I wasn't part of it.

5    Q. How many years of experience do you have in corrections?

6    A. 26 1/2 years.

7    Q. Do you see the phrase in that message which says, "If we

8    need to toss the cell again, so be it"?  Something to that

9    effect.  I believe it's in the -- actually I don't know which

10   part of it's in.

11   A. It's the last sentence in the first paragraph.

12   Q. You see that?

13   A. Yes.

14   Q. What does that mean to you, to toss a cell?

15   A. To do a search.

16   Q. To do a search?

17          MS. GANNETT:  I think that's all I have, sir.  Thank

18   you.

19          THE COURT:  You may step down.  Thank you, sir.

20          MR. CURRAN:  May he be excused, Your Honor?

21          THE COURT:  He may be excused.

22          MS. GANNETT:  Your Honor, I think that's all the

23   evidence that we have for today.

24          THE COURT:  The Government have any additional

25   evidence?

WILLIS BEATTY - REDIRECT          208

1          MR. CURRAN:  No additional evidence, Your Honor.

2          THE COURT:  Let's talk about, again, just a bit

3    about the potential testimony of Mr. Pennington.  And I do

4    think you should fully advise your client of this issue, and

5    that to the extent he, Mr. Pennington, is authorized to

6    testify by Mr. Roof, I think you ought to get a written

7    authorization of that.  I talked earlier about all of us

8    should have well-documented files, and I think that there are

9    issues there that -- and I think you need to, again, revisit

10   with him his right to testify and not waive his Fifth

11   Amendment right.

12         Because where it may or may not be any doubt as to

13   the consequence of waiver as to Mr. Pennington speaking,

14   there is no doubt as to him testifying.  But whether he

15   wishes or not, it's his call, after proper advice from

16   counsel.  I just want to make sure he is fully apprised of

17   his rights and the potential consequences so that he can make

18   an informed decision on his own behalf.  Okay?

19         Are there other matters to come before the Court at

20   this point?  From the defense?

21         MS. GANNETT:  No, Your Honor, thank you.

22         THE COURT:  From the Government?

23         MR. CURRAN:  We think the Court has an ample record

24   to rule on the Fourth Amendment, and in the interest to move

25   things along.  We would be happy to argue it right now.

WILLIS BEATTY - REDIRECT         209

1           THE COURT:  Thank you.  You know, if you want to

2     argue it, I'm glad to hear it.  I don't really need it.  I've

3     obviously read your briefs.  I know the law.  I understand

4     the issues.  If you wish to do it, I would rather just do it

5     all over by the finish.  That would be easier.  It's going to

6     be closer in time; but Mr. Curran, I'll do it the way you

7     want to.

8           MR. CURRAN:  That's fine, Your Honor.  I think part

9     of what I was suggesting here is that we submit this issue,

10    move on to the Sixth Amendment issue, so that we can all

11    focus on the things that matter in this case.

12          THE COURT:  Well, there were issues raised that

13    Ms. Gannett mentioned that she might want to check a few

14    things.  There are a few documents, and I just think it's

15    just -- as I said, let's square the corners here, and if

16    there are other things to be offered -- I don't consider that

17    a particularly complicated question to be answered, to be

18    honest with you.  And I think the -- I suspect everybody read

19    a little something about the evidence offered here today and

20    the exact roles of all these folks, and to the extent there

21    is some argument, I'm sure we'll hear all about that.  We'll

22    do it all at one time at the end.

23          With that, I think we are rescheduled for the 19th.

24          MR. RICHARDSON:  I'm hesitant to do this, but it

25    would save me some time, so I'm going to at least ask if I

WILLIS BEATTY - REDIRECT          210

1    can do that.  Your chambers was so kind to produce perhaps

2    the most organized excuse-strike list that I've ever seen,

3    color coded and all.  Is there any chance that we could get a

4    copy of that in Excel, because it would allow us to merge

5    that with our own Excel document, rather than recreating it?

6    I don't want to create a problem.  I'm just asking whether

7    that is feasible.  I'm happy to do the work if necessary.

8              THE COURT:  Listen, I'm told that Mr. Barber does

9    have such a document, and I -- I don't see a reason why we

10   should not provide it to you.  So we'll provide both sides

11   that document to the extent it helps.  I do not envy any of

12   y'all trying to work through what you've got to work through.

13   And if we can do something to help you with that.

14             MR. RICHARDSON:  Just to simplify --

15             THE COURT:  You know, we have been trying to make it

16   in a way that is manageable for everybody.  Let me just ask,

17   Defendant's 23 was identified.  Is there a desire to offer

18   that into evidence?

19             MS. GANNETT:  I think we would do that, Your Honor.

20             THE COURT:  Any objection to Defendant's 23?  That's

21   the --

22             MR. CURRAN:  We object, Your Honor.

23             THE COURT:  It's the Pennington --

24             MR. CURRAN:  It was used to refresh recollection,

25   not for any affirmative --

1              THE COURT:  You know, that is exactly right.  It was

2    not offered for that, and so I think that is -- I'm going to

3    sustain that objection.  I don't think -- it wasn't offered

4    for the substance.  Of course, Mr. Pennington could come in

5    and testify if he wishes, if he chooses to testify, and can

6    offer whatever he wishes on that.

7              Okay.  Anything further?

8              MR. CURRAN:  The only other thing, Your Honor -- I

9    don't think we need to do this, but everything that the

10   parties submitted as part of their motions we are treating as

11   if that has been -- those exhibits have been admitted.

12             THE COURT:  Yeah.  I think can we -- does the

13   defense have any objection that all of the attached exhibits

14   are made part of this record?

15             MS. GANNETT:  Yes, please.

16             THE COURT:  They are made part of the record.  So we

17   need not reproduce those.  I do want us to continue our

18   efforts that when we refer to things we try to keep

19   referencing the docket numbers to those documents, or the

20   page numbers that when we are referring to things that are in

21   evidence for someone who may be reviewing this.  Very good.

22             We'll see you if not sooner on the 19th.  Thank you

23   very much.

24

25                    *****     *****     *****

WILLIS BEATTY - REDIRECT          212

1

2

3          I certify that the foregoing is a correct transcript

4     from the record of proceedings in the above-titled matter.

5

6

7     _____

8     Amy C. Diaz, RPR,                    September 16, 2016

9

10    /S Amy Diaz

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25