IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | Criminal No. 2:15-CR-00472-RMG |
| | ) | |
| **v.** | ) | |
| | ) | **UNDER SEAL** |
| **DYLANN STORM ROOF** | ) | |
| | ) | |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION IN LIMINE

With his pretrial motion in limine (DE 358) (hereinafter "Def. Mot."), Defendant seeks to exclude evidence that goes directly to establishing several core issues in the guilt and penalty phases of this case, including Defendant's racial motive for his attack, his lack of remorse, his premeditation and substantial planning leading up to the attack, his selection of victims to magnify the societal impact of his actions, and the crime scene itself. *See generally* Indictment (DE 2); Notice of Intent to Seek the Death Penalty (DE 164). As further discussed below, Defendant's motion in limine rests on factual inaccuracies and would inappropriately displace the jury's function in considering the weight of the evidence and the credibility of witnesses. The government requests that Defendant's motion be denied.[1]

---

[1] The government does not oppose Defendant's reservation of his objections to the use of specific crime scene photographs, autopsy photographs, digital media items, and jail recordings. (Def. Mot. at 2.) The government requests that any decision be deferred on two other aspects of Defendant's motion: (1) Defendant's motion to exclude the testimony of Carl Stroebel (Def. Mot. at 17-19); and (2) Defendant's motion to exclude evidence of GPS data showing that he traveled in the vicinity of churches other than Emanuel AME Church and Branch AME Church (Mot. 7.) The government does not anticipate either using Mr. Stroebel as a witness or introducing the GPS data showing that Defendant traveled to churches other than Emanuel AME Church and Branch AME Church. If its intentions change, the government will timely inform this Court and Defendant's counsel.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

**A.      The Indictment and Notice to Seek the Death Penalty**

The grand jury returned a 33-count indictment against Defendant on July 22, 2015. (Indictment, DE 2.)  The Indictment charges that on the evening of June 17, 2015, Defendant drove from Columbia to the Emanuel African Methodist Episcopal (AME) Church in Charleston, South Carolina, with the intent to kill African Americans. *Id.* at 2.  Defendant entered the church, where 12 parishioners, all of them African Americans, were participating in a Bible study class. *Id.* at 3-4. Defendant sat with the parishioners as they worshiped, and then, as the class was concluding, pulled out his gun and repeatedly shot the parishioners, killing nine people. *Id.* at 4.

The Indictment alleges Defendant decided to carry out a race-motivated attack on African Americans months before this attack. *Id.* at 1. He created a website on which he posted pictures of himself with white supremacist symbols.  Defendant also authored a manuscript that decried integration and expressed his belief that "white" people are superior to African Americans. *Id.* at 1-2. To maximize the impact of his attack, Defendant specifically selected Emanuel AME Church because its congregation is predominantly African-American and because Emanuel AME has historical significance to Charleston, South Carolina, and the nation. *Id.* at 2.

Defendant is charged with 12 hate crime counts under 18 U.S.C. § 249(a)(1) for willfully causing, or attempting to cause, bodily injury (*i.e.*, death), to the parishioners because of their race and color. *Id.*, at Counts 1-12. Defendant also is charged with 12 additional civil rights offenses under 18 U.S.C. § 247(a)(2) for using force to obstruct the parishioners while they were engaged in the free exercise of their religious beliefs. *Id.*, at Counts 13-24. In addition, Defendant is charged with nine counts of violating 18 U.S.C. §§ 924(c) and 924(j) for using a firearm to

2

commit murder during and in relation to a crime of violence (*i.e.*, the civil rights offenses). *Id.*, at Counts 25-33.

On May 24, 2016, the government filed a Notice of Intent to Seek the Death Penalty for Defendant's actions related to Counts 13-21 and 25-33 of the Indictment.  (DE 164.)  The government identified the factors it intends to prove during the penalty phase to justify the sentence of death, including: (1) Defendant committed these offenses after substantial planning and premeditation; (2) Defendant attempted to incite violence through his actions; (3) Defendant has expressed hatred towards African Americans and other groups and this animosity played a role in the murders; (4) Defendant targeted parishioners at Emanuel AME Church to magnify the societal impact of his actions; and (5) Defendant has shown a lack of remorse.

On August 24, 2016, Defendant filed a disclosure of non-mental health factors that he believes mitigates against the death penalty, including (1) Defendant did not have a significant prior history of other criminal conduct; and (2) Defendant has no prior history of violent behavior.  (DE 325.)

**B.    Events Leading Up to and After the Attack That Show Racial Motive, Substantial Planning of the Crime, and Selection of Victims**

At trial, the government will prove that Defendant began to plan his attack on Emanuel AME Church during the months leading up to the shooting.[2]  Among other things, Defendant began to research slavery, apartheid states, and white supremacist ideology.  Defendant has admitted that he researched various targets, including other African-American churches and a

---

[2] The government provides this summary of evidence that is relevant to Defendant's motion in limine.  In this brief, the government is proffering some of the ways in which this evidence is relevant and not unduly prejudicial, and this summary is not intended to be a full preview of all of the evidence the government intends to introduce at trial or how it intends to put on its case.  Nor has the government addressed every factual inaccuracy contained in Defendant's motion.

"black festival" before settling on Emanuel AME Church as the site of his attack. (Confession, DE 266-4, attached as Ex. 4 to Def. Mot. to Suppress, at 12-13, 23.)

Prior to his attack on the parishioners at Emanuel AME Church, Defendant spoke to his friends and co-workers about his racist views and his trips to Charleston. For example, in 2015, Defendant told a co-worker, Brock Pack, about his trips to Charleston and described himself as a racist. (J. Pack 302, attached as Exhibit 1, at US-017180-81.)

In late May 2015, just weeks before the attack, Defendant started visiting two brothers, Jacob and Joey Meek, and Joey's girlfriend, Lindsey Fry. (Jacob Meek Tr., attached as Exhibit 2, at US-020293.) During the weeks leading up to the attack, Jacob Meek overheard Defendant speaking positively about Hitler on more than four occasions. (Jacob Meek 302, attached as Exhibit 3, at US-017277.) Defendant stated that he was "mad" and disappointed that Hitler lost power and that white people had lost power as a result. (Ex. 2, Jacob Meek Tr. at US-020297; Ex. 3, Jacob Meek 302, at US-017277.) Defendant also told Jacob Meek that his favorite number is "88." (Ex. 2, Jacob Meek Tr. at US-020300.) Defendant stated that he wanted to do "something" to get South Carolina in the news, like the September 11 tragedy did for New York and an unidentified massacre had done for Texas. (Ex. 2, Jacob Meek Tr. at US-020297-98.)

During this same timeframe, Defendant made statements to Lindsey Fry and Joey Meek about taking regular trips to Charleston. Defendant told Joey Meek and Ms. Fry that that he had met a man there and that he intended to rob him. (L. Fry 302, attached as Exhibit 4, at US-019180.) About one week before the shooting, Defendant told Joey Meek that he intended to shoot people at the AME Church. (Joey Meek 302, attached as Exhibit 5, at US-019216.)

After the attack, Defendant drove from Emanuel AME Church and was ultimately arrested in Shelby, North Carolina. Law enforcement officers obtained a GPS device from

Defendant's car.  The data on the GPS device demonstrates that when Defendant left Emanuel AME Church, he went onto highway I-26 and drove for about twenty miles.  He exited the highway at the Jedburg Road exit and drove towards Branch AME Church, another church with a predominantly African-American congregation and a sign showing a scheduled Wednesday night Bible study.  The GPS data also shows that as he approached Branch AME Church, Defendant slowed down and then his GPS device deactivated for approximately two to three minutes, which is consistent with Defendant stopping the car.

After his arrest, law enforcement officers searched Defendant's car.  A number of documents were recovered from the car, including a handwritten list of six churches that included Emanuel AME Church (Def. Mot. Ex. 2, DE 358-2).  Law enforcement officers also recovered another handwritten list that identified four churches (List of four churches, attached as Exhibit 6, at US-012769); a journal in which Defendant expressed his white supremacist ideology and drew symbols with swastikas and references to "14" and "88" (Car journal, DE 299-2, Ex. 2 to Govt.'s Response to Motion to Suppress);[3] and other documents that referred to his research into slavery and the antebellum South.

**C.        Defendant's Statements to** ███████████████

After his arrest, Defendant was detained in the Sheriff J. Al Cannon Detention Center ("Charleston jail").  Jail staff placed Defendant on suicide watch when he arrived at the Charleston jail.  On June 19, 2015, ████████████████████████████, talked to Defendant to determine whether he needed to remain on suicide watch.  After talking to Defendant, ██████████ kept him on mental health observation.  ████████████ took notes of ██ June 19th interview with Defendant.  (Def. Mot. Ex. 5, DE 358-5.)

---

[3] Defendant has admitted that he understood that "14" refers to a 14-word slogan used by white supremacists and that "88" refers to "Heil Hitler."  (Confession, DE 266-4, attached as Ex. 4 to Def. Mot. to Suppress, at 40-41.)

On August 3, 2015, Defendant was placed on suicide watch after he wrote his sister a letter that contained odd handwriting and syntax. (████████, attached as Exhibit 7, at 3-4.) ████████ determined that the letter contained a transcription of a passage from a book that ended with the protagonist's suicide. To evaluate whether Defendant needed to continue to be on suicide watch, ████████ met with Defendant to discuss the contents of his letter to his sister. Per her practice, ████████ told Defendant that he did not need to speak with ██. *Id.* at 2. Defendant chose to speak to ████████████████████████████████ ████████████████ During this suicide evaluation, ████████████████████ ████████████████████████ removed Defendant from suicide watch after he denied having suicidal thoughts and affirmed that he would seek mental health assistance if he had such thoughts in the future. (*Id.*; *see also* Ex. 7, ████████, at 3 (noting that individuals are typically taken off suicide watch if they "contract for safety" and confirm they will not hurt themselves).)

## II.   ARGUMENT

### A.   Standard

The threshold for the admission of relevant evidence is "low," and motions in limine should not be used as vehicles to resolve factual disputes or to take away the fact-finding role of the jury. *Eclipse Packaging, Inc. v. Stewarts of Am. Inc.*, 5:14cv-00195, 2016 WL 1724360, at *1 (W.D.N.C. Apr. 29, 2016). The better practice is "to deal with questions of admissibility as they arise in actual trial as opposed to tackling the matter in a vacuum on a motion in limine." *Eclipse Packaging, Inc.*, 2016 WL 1724360, at *1; *United States v. Verges*, No. 1:13cr222, 2014 WL 559573, at * 3 (E.D.Va. Feb. 12, 2014) (same).

**B.      Evidence of Defendant's Motive, Planning, and Choice of Victims Is Highly Probative in the Guilt and Penalty Phases and Is Not Unduly Prejudicial**

Defendant seeks to exclude evidence that he researched other predominantly African-American churches as potential targets before his attack on Emanuel AME Church.  He also seeks to exclude evidence from which a reasonable jury could infer that, as he fled from Charleston on the night of the attack, he stopped at another predominantly African-American church, Branch AME Church.  Specifically, Defendant seeks to exclude two categories of evidence: (1) a handwritten list (hereinafter "Church List') that identifies the names, addresses, and locations of six predominantly African-American churches – including Emanuel AME Church; and (2) the "Branch AME Evidence", which includes two photographs of Branch AME Church and GPS data showing that Defendant drove to Branch AME Church on the night of his attack on Emanuel AME Church.  Both categories of evidence are highly relevant to both the guilt and penalty phases of this case, and, although inculpatory, are not unduly prejudicial.

The Branch AME Evidence and the Church List Evidence are admissible as intrinsic evidence of the offenses charged in the Indictment.  Evidence of uncharged conduct is intrinsic to the charged crime if it "is part of a single criminal episode or the other acts were necessary preliminaries to the crime charged."  *United States v. Chin*, 83 F.3d 83, 88 (4th Cir. 1996). Intrinsic evidence also includes conduct that provides the context for the crime or "arose out of the same series of transactions as the charged offense or if evidence of the uncharged conduct is necessary to complete the story of the crime on trial." *United States v. Siegel*, 536 U.S. F.3d 306, 316 (4th Cir. 2008) (internal quotation omitted) (reversing, on interlocutory appeal, district court's exclusion of prior crimes that provided context and motive for murders); *United States v. Kennedy*, 32 F.3d 876, 885-86 (4th Cir. 1994) (holding uncharged conduct that shows the "preparatory stages" of the crime is admissible as intrinsic evidence).

7

This evidence, which demonstrates Defendant's planning of and motive for the charged offenses, is plainly intrinsic and therefore not subject to Rule 404(b). While Defendant merges his analysis of intrinsic and FRE 404(b) evidence, the Fourth Circuit has repeatedly made clear that FRE 404(b) does not apply to intrinsic evidence, even when that intrinsic evidence includes bad acts. *Siegel*, 536 F.3d at 316; *United States v. Lipford*, 203 F.3d 259, 268 (4th Cir. 2000); *Kennedy*, 32 F.3d at 885.

However, even if this evidence were considered extrinsic, this evidence squarely fulfills the requirements of Rule 404(b).[4] Under Rule 404(b), evidence of other crimes or acts is admissible to prove, *inter alia*, motive, intent, preparation or plan. To be admissible under Rule 404(b), the evidence must be "(1) relevant to an issue other than character; (2) necessary; and (3) reliable." *United States v. Basham*, 561 F.3d 302, 326 (4th Cir. 2009) (internal quotation and citation omitted). The Fourth Circuit has emphasized that Rule 404(b) is "an inclusive rule, admitting *all* evidence of other crimes or acts except that which tends to prove *only* criminal disposition." *Id.* (emphasis added) (internal quotation omitted); *United States v. Mark*, 943 F.2d 444, 447-48 (4th Cir. 1991) (same). For the purposes of Rule 404(b), evidence is "necessary" if it is an "essential part of the crimes on trial, or where it provides context of the crime." *Siegel*, 536 F.3d at 317. Evidence should be deemed "reliable" unless "it is so preposterous that it could not be believed by a rational and properly instructed juror." *Id.* at 319 (internal quotation omitted).

Both intrinsic evidence and 404(b) evidence must satisfy Federal Rule of Evidence 403, which requires that the probative value of the evidence not be "substantially outweighed" by the danger of "unfair prejudice, confusion . . . or undue delay." The Fourth Circuit has emphasized

---

[4] If this Court finds that this evidence to be extrinsic, the government will provide notice that it seeks to use it pursuant to Rule 404(b).

that to be excluded under FRE 403, "the evidence must be *unfairly* prejudicial and, even then, only if the unfair prejudice *substantially* outweighs the probative value of the offered evidence." *Siegel*, 536 F.3d at 319 (emphasis in original). Of course, all inculpatory evidence is inherently prejudicial; evidence is excludable under Rule 403 only if it is unduly prejudicial. *Lipford*, 203 F.3d at 269 (holding that even though other acts evidence at issue was "highly incriminating, being prejudicial in this manner is not unfair"); *United States v. Sanchez*, 118 F.3d 192, 196 (4th Cir. 1997) (holding other acts evidence "is undeniably 'prejudicial' in the way that all inculpatory evidence is" but is nevertheless admissible where its probative value is not "substantially outweighed" by its prejudicial effect). Evidence should not be excluded under Rule 403 unless "there is a genuine risk that the emotions of the jury will be excited to irrational behavior, and this risk is disproportionate to the probative value of the offered evidence." *Siegel*, 536 F.3d at 319 (quoting *United States v. Williams*, 445 F.3d 724, 730 (4th Cir. 2006)); *see also Basham*, 561 F.3d at 327 (same); *United States v. Kapp*, 419 F.3d 666, 677 (7th Cir. 2005) (holding that where "evidence is probative of an issue relevant to an element of the offense, it must be admitted in all but the most extreme cases," even where the probative evidence is "revolting").

Finally, the evidence Defendant seeks to exclude is relevant to proving the aggravating factors that the government intends to present during the penalty phase, including Defendant's lack of remorse, his intent to magnify the societal impact of his crime, and his substantial planning of the attack. In the penalty phase, the Federal Rules of Evidence do not apply, and the Fourth Circuit has noted that the Federal Death Penalty Act "erects very low barriers of admissibility given the need to regulate the scope or testimony is less at the penalty phase than at the guilt phase." *Basham*, 561 F.3d at 331 (internal quotation omitted); *see also id.* (noting that

9

courts have found reversible error when trial courts have applied the Federal Rules of Evidence to exclude evidence in the penalty phase).[5]

### 1. The Branch AME Church Evidence is Admissible

The Branch AME Evidence is admissible because it is relevant and intrinsic to completing the narrative of Defendant's flight from Emanuel AME. In addition, this evidence provides a basis from which the jury could infer that Defendant intended to continue his race-motivated assaults by attacking additional African-American congregants on the night of the attack. Defendant's argument that this evidence should be excluded as "irrelevant, unnecessary, and unfairly prejudicial" rests primarily on the factually incorrect assertion that Defendant simply "drove past" Branch AME Church. (Def. Mot. at 7.) The Branch AME Evidence establishes more than that. The GPS data shows that in the immediate aftermath of the attack, Defendant drove away from Emanuel AME Church, went onto highway I-26, continued driving on the highway for over twenty miles, and then turned off the highway using the exit that leads directly to the road on which Branch AME Church is located. The GPS data indicates that Defendant slowed down as he approached Branch AME Church, and the GPS device then went inactive for about two minutes, which is consistent with Defendant stopping his vehicle at or near Branch AME Church.[6]

---

[5] Defendant suggests that a more stringent standard applies to evidentiary rulings during the guilt phase of capital cases (Def. Mot. 6). None of the cases cited by Defendant stands for this proposition. Rather, these cases address certain procedural safeguards, and none address the standards to be applied to evidentiary rulings in the guilt phase of a capital case. *See* cases cited by Defendant: *Caspari v. Bolden*, 510 U.S. 383 (1994) (double jeopardy); *Strickland v. Washington*, 446 U.S. 668 (1984) (ineffective assistance of counsel); *Beck v. Alabama*, 447 U.S. 625 (1980) (requirement to allow juries to consider lesser-included offenses); and *Gardner v. Florida*, 430 U.S. 349 (1977) (use of confidential information during capital sentencing). Instead, the Fourth Circuit has applied the same evidentiary standards under Rules 401 and 403 during the guilt phase in capital and non-capital cases. *See, e.g.*, *Basham*, 561 F.3d at 326-27 (in a capital case, citing non-capital cases in discussing the applicability of Rules 401 and 403 in the guilt phase).

[6] As indicated in the government's Expert Notice (DE 319), the government expects that Jay Dee Krull, a representative of Garmin, will explain how the GPS device works, what kinds of data it stores, and how the data can be collected from the device and applied to mapping devices. FBI Special Agent Bob Bianco will testify that he

The GPS data also demonstrates that the night of his attack on Emmanuel AME Church was not the first time Defendant had driven near Branch AME Church.  The GPS data shows that Defendant drove past the Branch AME Church on February 27, 2015.  The evidence at trial will show that this trip occurred in the midst of his ongoing preparation for his offense.  For example, the February 2015 trip took place just a few weeks after Defendant purchased the web domain that became known as "The Last Rhodesian," on which he posted a manuscript with his white supremacist ideology, and just couple of days after he called Emanuel AME Church.

The photographs Defendant seeks to exclude show that Branch AME Church, like Emanuel AME Church, advertised that it held its Bible study class on Wednesday nights, the night of Defendant's attack.  As Defendant concedes (Def. Mot. at 6), there is no commercial activity on the road where Branch AME is located that would otherwise have prompted Defendant to stop at that location.

This evidence, which shows Defendant traveling directly from the site of the attack at Emanuel AME Church to Branch AME Church, is admissible as evidence intrinsic to and probative of the charged offenses.  This evidence provides clearly relevant context for telling the complete story of that night, including Defendant's travel as he fled from Emanuel AME Church. *Basham*, 561 F.3d at 327 (evidence providing context is intrinsic to the crime); *United States v. Ellis*, 121 F.3d 908, 926 (4th Cir. 1997) (holding evidence of travel during and after the crime is admissible as intrinsic to crime).

---

extracted the data and provided the FBI case agent with the data and mapping software on which to load the data. The FBI case agent will testify that he uploaded the GPS data into mapping software and will testify about the results produced by the mapping software to explain Defendant's travel during his trips to Charleston and his flight from Emanuel AME Church.  As their motion in limine makes clear, Defendant's counsel have been able to use the GPS data to reconstruct Defendant's travel on the night of the attack.  Although the government's disclosure satisfies the requirements of Rule 16, this issue is now pending before the court in a separate motion, and the government will respond more fully in its response to that motion.  (Def. R. 16 Mot., DE 418.)

The evidence is also probative because the jury may infer that Defendant planned to attack congregants at another predominantly African-American church shortly after he attacked Emanuel AME Church. The similarities between the two churches – both are AME churches, both have predominantly African-American congregations, and both had scheduled Bible study classes on the night of the attack – coupled with the fact that Defendant, who was still armed, drove over twenty miles directly to Branch AME Church immediately after attacking parishioners at Emanuel AME Church, supports the inference that Defendant intended to continue his racially-motivated violence at Branch AME Church that night and, more specifically, that his intended targets were African-American congregants at a church. *See* 18 U.S.C. §§ 247(a)(2), 249(a); *see generally, e.g., Byers*, 649 F.3d at 208; *Siegel*, 536 F.3d at 318 (noting that the more similar the other acts are to the crime charged, the more relevant those other acts become) (citing *United States v. Queen*, 132 F.3d 991, 997 (4th Cir. 1997)); *see generally United States v. McBride*, 676 F.3d 385, 397 (4th Cir. 2012) ("The more closely that the prior act is related to the charged conduct in time, pattern, or state of mind, the greater the potential relevance of the prior act.").[7]

In addition, the Branch AME Evidence underscores Defendant's racial motive in attacking Emanuel AME Church, as a jury could infer that he intended to target churches with

---

[7] Defendant repeatedly – and wrongly – claims that "no evidence" exists that he targeted other churches. Defendant admitted to law enforcement that he researched other targets, including other African-American churches. (Confession, DE 266-4, attached as Ex. 4 to Def.'s Mot. to Suppress, at 12-13, 23.) Further, as explained in the next section, other evidence corroborates that he researched other churches as potential targets. Defendant asks this Court to rule, without the benefit of a more fully developed trial record, that his travel to Branch AME Church was a mere coincidence. (Def. Mot. at 3.) Defendant, for example, suggests that he would have arrived after the Branch AME Church's Bible study was scheduled to end. Yet Defendant arrived about two hours after the scheduled start time for the Bible study at Emanuel AME Church. This tardiness, however, did nothing to stop Defendant from proceeding into the church and, upon finding congregants still present, executing his attack. The jury should be permitted to review the totality of the circumstances – Defendant's research into several churches as potential targets, his prior trip past Branch AME Church, and his decision to drive directly to and then stop near another predominantly African-American church in the immediate aftermath of his attack on Emanuel AME – and to reach its own conclusion about the inferences it should draw from that evidence.

predominantly African-American congregations.  Such racial motive is an essential element of 18 U.S.C. § 249, which makes this evidence highly probative to the charged crime.  *See United States v. Miller*, 767 F.3d 585 (6th Cir. 2014) (holding that the government must prove that defendant acted because of race to establish a violation of § 249); *United States v. Pierkarsy*, 3:09–CR–396, 2010 WL 3211700, at *6 (D. Vt. Apr. 10. 2008) (holding that other acts showing racial animus is intrinsic motive evidence to race-motivated crime); *see also Siegel*, 536 F.3d at 316 (holding evidence providing context for motive is intrinsic); *United States v. Price*,  155 F.3d 563, No. 96-4905, 1998 WL 390572, at * 5 (4th Cir. 1998) (holding that evidence of prior assault that provided context and motive for charged offense was admissible as intrinsic evidence).

Even if it were not intrinsic evidence, the Branch AME Evidence would be admissible under Federal Rule 404(b) for similar reasons.  The jury could reasonably infer that Defendant intended to choose African Americans as his victims and, more specifically, African Americans worshiping in a church.  As such, the Branch AME Evidence is probative of the Defendant's racial motive, intent, and planning of charged offenses, and it serves as necessary context to describe Defendant's travels the night of the attack.  *See United States v. Torrez*, No. 1:11–CR–115, 2013 WL 204727, at * 3 (E.D. Va. Jan. 17, 2013) (holding that "subsequent conduct may be highly probative of prior intent" and admitting subsequent conduct that shows similar intent as charged offense) (internal quotation omitted); *see generally Byers*, 649 F.3d at 609.

Given the significant relevance of this evidence in providing context, planning, and motive evidence, its probative value substantially outweighs the risk of unfair prejudice under Rule 403.  As the Fourth Circuit has held, "[g]enerally speaking, 'bad acts' evidence . . . is not barred by Rule 403 where such evidence did not involve conduct any more sensational or

13

disturbing than the crimes with which the defendant was charged." *Byers*, 649 F.3d at 210 (internal quotation and revisions omitted); *see also United States v. Reigle*, 228 Fed. App'x 353, 356 (4th Cir. 2007) (upholding district court's decision that defendant's molestation of other children was not unduly prejudicial in child pornography case); *Lipford*, 203 F.3d at 269 (holding that uncharged crime of shooting at police was not unduly prejudicial in drug conspiracy case); *United States v. Ventura*, 10-cr-0770, 2013 WL 14555278, at * 27 (D. Md. Apr. 8, 2013) (holding that evidence that defendant took credit for an uncharged murder was not unduly prejudicial, where defendant used murder to intimidate those involved in his prostitution business). The photographs and the GPS data showing that Defendant stopped at Branch AME Church, where no one was shot or hurt, is far less disturbing than the charged offenses – the brutal, race-motivated murders and attempted murders of twelve parishioners at Emanuel AME Church.

## 2. Defendant's "Church List" is Highly Probative of his Racial Motive, Planning, and Selection of Victims

Defendant seeks to exclude a handwritten list of 6 Charleston churches recovered from his car after his arrest. (Def. Mot. Ex. 2, DE 358-2) (hereinafter "Church List"). The Church List – which includes the names, telephone numbers, and addresses of six predominantly African-American churches, with Emanuel AME Church, at the top of the list – is admissible to show that Defendant deliberately chose Emanuel AME Church as the site of his attack.

Defendant concedes, as he must, that the Church List is relevant because it contains the name and location of the target of his attack. (Def. Mot. at 7.) Defendant argues, however, that the list's relevance is limited only to "confirming the defendant targeted Emanuel AME." The Church List is highly relevant to other aspects of this case, and this Court should not accept Defendant's unduly restrictive view of its relevance. In the guilt phase, the government may use

14

the Church List to show that Defendant targeted Emanuel AME Church with premeditation and because of the race of its congregants. *See* 18 U.S.C. §§ 249 and 1111. In the penalty phase, this evidence is relevant to proving that the Defendant engaged in substantial planning and specifically chose Emanuel AME Church to magnify the societal impact of his crimes.

To prove a violation of 18 U.S.C. § 249, the government must prove more than Defendant targeted Emanuel AME Church; the government must also prove that he did so because of the race of its congregants. The Church List, standing alone and in the context of other evidence, demonstrates that Defendant targeted Emanuel AME Church because of the race of its members. The six churches on the Church List all have predominantly African-American congregations, and several have "AME" in their names. Defendant has admitted that he researched several African-American churches on the internet before the attack and that he knew that "AME" stood for African Methodist Episcopal. (Confession, DE 266-4, attached as Ex. 4 to Def. Mot. to Suppress, at 11-13.) The jury should be permitted to make the reasonable inference that Defendant created the Church List to identify targets for a racially-motivated crime.

Moreover, the Church List cannot be viewed in isolation. It is just one of a number of documents found in Defendant's car, which also contained a handwritten journal outlining his racial ideology, other lists of churches, and lists of the addresses of other locations related to race and slavery. Defendant's car also contained documents referencing the antebellum South and slavery, subjects that Defendant has admitted he researched in the period before the charged offenses. Based on this evidence, the jury could reasonably find that, as Defendant developed a white supremacist ideology, he researched potential targets for a racially-motivated attack and, ultimately, chose African-American parishioners to target for his attack. The Church List is one

such list of targets and should be considered in the broader context of the materials found in his car.

For example, Defendant confessed that he initially considered attacking other sites, including "a black festival," before ultimately selecting Emanuel AME Church.  (Confession, DE 266-4, attached as Ex. 4 to Defendant's Motion to Suppress, at 23.)  One of the lists found in Defendant's car contains a notation "Good hope, Picnic, Elloree," which is a secular festival that is attended primarily by African Americans.  (Handwritten note, attached as Exhibit 8, US-012742.)

Another list contains the names and addresses of four churches.  (Ex. 6, US-012769.)  One of the churches, Trinity Episcopal Cathedral, has a predominantly white congregation.  Under the name of this church, Defendant included the notation, "Just to tour."  Defendant's annotation of "just to tour" a church with a predominantly white congregation indicates that he used race to narrow his list of potential targets from the various lists of churches he compiled, including the Church List.  *See*, *e.g.*, *Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 719 (4th Cir. 2013) (noting that comparator evidence is "a particularly probative means" of proving discriminatory motive); *see also Siegel*, 536 F.3d at 316 (reversing as error the exclusion of other acts that provided context for proving motive, noting "[i]ntent is often a difficult element to prove").

In addition to his racial motive, the Church List is also highly probative of his substantial planning and premeditation, as well as his selection of victims.  As the Fourth Circuit has made clear, evidence establishing the steps taken by a defendant leading up to the crime is admissible as relevant intrinsic evidence.  *Kennedy*, 32 F.3d at 875.  In this case, the probative value of Defendant's planning is even greater because premeditation is an element of Counts 25-33 of the Indictment, *see* 28 U.S.C. §§ 924(j), 1111, and two of the aggravating factors in the penalty

16

phase require the government to prove that the Defendant selected parishioners at Emanuel AME Church to magnify the societal impact of his crime and engaged in "substantial planning before committing the offense." (DE 164, at 6); *see also United States v. Jackson*, 327 F.3d 273, 301 (4th Cir. 2003) (holding that "substantial planning" under the FDPA requires a higher degree of planning than premeditation or planning alone).

The lists from Defendant's car, including the Church List, memorialized Defendant's research and, in so doing, illustrate the steps Defendant took to identify certain churches and other potential targets for his attack. This evidence also will assist the jury in understanding how and why Defendant ultimately chose to attack the parishioners at the Bible study at Emanuel AME Church, as opposed to individuals at other sites. This evidence, which goes to the essential elements of motive, selection of victims, and substantial planning and premeditation, is intrinsically linked to and highly probative of the attack on Emanuel AME Church.

Even if this evidence were considered "extrinsic" to the crime, it squarely meets the requirements of FRE 404(b) as evidence of his motive, planning, and preparation. *Siegel*, 536 F.3d at 316-17 (reversing district court's exclusion of evidence of uncharged crimes under Rule 404(b) that provided background context and motive for charged crime).

Defendant argues that this evidence should be excluded under Rule 403 because it is "unnecessary and cumulative" of other evidence that he targeted Emanuel AME Church, *i.e.*, he had visited and called the church before the attack.[8] (Def. Mot. at 7). However, it should go without saying that it is not for a defendant to decide how the government should prosecute its case. As demonstrated above, the evidence is probative of more than his targeting Emanuel AME Church; it is also probative of his racial motive, premeditation and substantial planning,

---

[8] Defendant also cites his own confession as evidence that makes the Church List cumulative and unnecessary. At the same time, however, Defendant has moved to suppress his confession. (Mot. to Suppress, DE 266.)

and selection of victims to magnify the societal impact of his crime.  Defendant's planning for the attack encompassed more than a visit and call to Emanuel AME Church; in fact, it included substantial research into a set of potential (and similar) targets.  The government is entitled to provide the jury with the highly relevant context about how and why Defendant ultimately chose Emanuel AME for his attack.  *See Siegel*, 536 F.3d at 320 (noting that the government has "broad discretion" in how it chooses to prosecute crimes and should be afforded "sufficient latitude to carry its burden of proof"); *Byers*, 649 F.3d at 209 (stating that evidence is "necessary" if it furnishes part of the context of the crime); *Kennedy*, 32 F.3d at 886  (holding that district court acted "well within its discretion" by admitting evidence that permitted the government to present "the true scope and magnitude of the unlawful activities involved").

## C.      The FARO Scan is Admissible as an Accurate Depiction of the Crime Scene

To properly document the crime scene, the government utilized a FARO system, which uses photographs and laser measurements to accurately depict a crime scene. The government will lay an appropriate foundation – similar to that used for individual photographs – to show that the FARO crime scene is a fair and accurate reflection of the crime scene. *Cf. United States v. Patterson*, 277 F.3d 709, 713 (4th Cir. 2002) (holding that authentication may take many forms and noting that "[t]he necessary foundation for the introduction of a photograph is most commonly established through eyewitness testimony that the picture accurately depicts the scene in question or expert testimony that the picture was generated by a reliable imaging process"); *Colley v. Standard Oil Co.*, 157 F2d 1007 (4th Cir 1946) (affirming admission of altered photograph because the alteration made the photograph a more accurate representation than an unaltered photograph would have been under the peculiar circumstances). As a result, the FARO scan of the crime scene should be admissible.

Defendant moves to exclude a FARO scan that he characterizes as three computer-generated "simulations" of the Emanuel AME Church crime scene. (Mot. at 8-17.) The government provided Defendant with two discs containing FARO scan information, marked as SAW 1414 and SAW 1415, during discovery. Defendant has moved only to exclude the files contained on SAW 1414, which contains video overviews of the crime scene. While the government believes that this evidence is admissible, it does not intend to offer these videos at trial. Instead, the government intends to offer the FARO scan evidence contained in the disk marked as SAW 1415, which contains a full scan of the crime scene. *See* (Faro Scan, SAW 1415 (submitted to the Court on disk as Exhibit 9).) Defendant has not moved to exclude the FARO scan information contained on SAW 1415, and, as such, Defendant's motion to preclude the FARO evidence contained on SAW 1414 should be deemed moot.

Although Defendant has not objected to the FARO evidence the government intends to present at trial, the government wants to clarify that the FARO evidence contained in SAW 1415 is *not* a "simulation." There is a clear distinction in the law between simulations or reconstructions and traditional crime scene documentation. Unlike the FARO evidence on which the government intends to rely, simulations and reconstructions require expert testimony and the application of specialized knowledge. *See United States v. Nevels*, 490 F.3d 800, 805 (10th Cir. 2007) (crime scene reconstruction required expert testimony). Such expertise is required because the witness draws conclusions from the evidence. *See Lee v. City of Richmond, Va.*, 2014 WL 5092715 (E.D.Va. 2014).

In contrast, a FARO scanner does not require a witness to draw any conclusions from its recordings – the recordings themselves are the evidence. Here, the FARO software matches up the different parts of the crime scene and combines scans without input from the operator. The

FARO scanner is most similar to a "total station," equipment that has long been used to survey and photograph crime scenes. Such equipment "simply represents the physical data collected by the total station and do(es) not involve any external human input." *Jensen ex rel. Jensen v. Cashin*, 2008 WL 1439899, at *3 (D.Vt. Apr. 10, 2008). Like a total station, video camera, television camera, or complex digital camera, the FARO scanner collects data and does not involve any external human input apart from the operation of the equipment. Accordingly, the presentation of such evidence does not require expert testimony.[9] The FARO scanner may be a relatively new device in the field of recording, but apart from the technology involved, the information it presents is nearly the same as a video camera, digital camera, x-ray or other standard device used to record information.

As a result, Defendant's objections to the use of the FARO scan video simulations – which focus on specific effects in the FARO videos – do not apply to the FARO scans that the government intends to use. (Def. Mot. at 11-17 (arguing that FARO scan video simulations are unduly prejudicial because, according to Defendant, certain objects appear transparent and the videos give the viewer the sense of flying through the scene).) The FARO scans that the government intends to use, just like traditional crime scene photographs, portray the scene as it existed. *See* (Def. Mot. at 12 (acknowledging that crime scene photographs are probative because they portray "how the scene actually appeared")). To the extent that there are differences between what is depicted through the use of the FARO cameras and lasers and the actual crime scene, such differences should go to the weight of the evidence and not its admissibility. *Reed v. Tiffin Motor Homes, Inc.*, 697 F.2d 1192, 1199 (4th Cir. 1982) (upholding admissibility of photographs, finding that any difference in the photographs "goes to the weight of the evidence

---

[9] Although the government's position is that this type of evidence does not require an expert opinion, it is able to qualify an expert witness, Tre Tallon, to present the FARO scans.

and not its admissibility"). The probative value of the FARO scan of the crime scene is not substantially outweighed by any unfair prejudice as required by Rule 403. *Lipford*, 203 F.3d at 269.

At trial, the government will present testimony by SLED Special Agent Tre Tallon regarding the operation of the FARO scanner, his training on the device as a crime scene officer, and how the FARO was used at the crime scene. Special Agent Tallon will then walk through the crime scene as depicted in the FARO scan. Former SLED Agent Brittany Burke will use the FARO scans as well, and walk the jury through the crime scene to identify relevant evidence, in conjunction with crime scene photographs and other evidence, including diagrams she created. She will use the FARO scan to pan the crime scene, and to zoom in and out, from various FARO scan points as well as focusing on specific aspects of the crime scene. The use of the FARO scan in this case will be typical of the use of other technologies to assist the jury in understanding the crime scene.

**D.    Defendant's Statements to Friends and Co-Worker Are Admissible**

Defendant has moved to exclude three statements he made to the following individuals: (1) Brock Pack, a former co-worker who has stated that Defendant described himself as a racist; (2) Jacob Meek, a friend who testified that Defendant told him that he was disappointed by the fall of Hitler and white people's subsequent loss of power, and that he heard Defendant speak positively about Hitler on at least four occasions; and (3) Lindsey Fry, who has testified that Defendant talked to her about his trips to Charleston and his plan to rob a man he met there. Defendant's motion to exclude the testimony is premature and, more importantly, lacks merit.

As an initial matter, this motion is premature. The admissibility of these statements is best evaluated at trial, where their relevance can be viewed in context with the witnesses'

21

testimony and other evidence.  *Eclipse Packaging, Inc.*, 2016 WL 1724360, at *1 (noting that

better practice is to decide admissibility decisions in the context of trial); *see also Verges*, 2014

WL 559573, at *3 (same).

Moreover, there is no basis for Defendant's objections to the admission of the statements

that he made to these three individuals.  Defendant's admissions that he is a racist and that he

admired Hitler go to a central issue in this case – namely, Defendant's racial motive.

Defendant's self-identification as a racist and his laudatory remarks about Hitler are probative

evidence of his motive for attacking the parishioners at Emanuel AME Church.

These statements also provide context for Defendant's decision to engage in racially-

motivated violence.  *Siegel*, 536 F.3d at 318-19 (holding that prior crimes that provide

explanation for why a previously non-violent defendant committed murder is relevant and

admissible).  In particular, Defendant's statements to Jacob Meek lauding Hitler provide greater

context for his racial motive in committing in the crime, his white supremacist ideology, his

desire for racial violence, and his intent to incite others to violence.  (Text of the Last Rhodesian,

DE 299-1, attached as Ex. 1 to Govt.'s Response to Defendant's Motion to Suppress (discussing

need for violent action and decrying the inaction of "skinheads" and others); car journal, DE

299-2, Ex. 2 to Govt.'s Response to Motion to Suppress Confession, at US-01645 ("I would love

for there to be a race war."), Confession, DE 266-4, attached as Ex. 4 to Defendant's Motion to

Suppress, at 40 (indicating support for Hitler); Jail writing, DE 268-1, attached as Ex. 1 to

Defendant's Motion to Suppress Writings, at US-019536 ("Well unless we take real, possibly

violent, action, we have no future, literally."), US-019548 (discussing the possibility of

implementing a eugenics program); *see also* (DE 164, Death Penalty Notice (listing aggravating

factors)).  They would also provide greater context for Defendant's writings, including the

violent underpinnings of his references to his perceived diminishment of white culture and power, his use of the swastika in his drawings, and his preference for the number "88" (a reference to "Heil Hitler"). (Jail writing, DE 268-1, attached as Ex. 1 to Defendant's Motion to Suppress Writings, US-019543 (drawings including swastika and 88), US-019546 (decrying white nationalists for failing to act), US-019547 (stating that he believes that Adolf Hitler will be "inducted as a Saint").)

These statements, made during the time period leading up to the attacks and in the same time period that Defendant told others that he planned to shoot the AME Church, are part and parcel of the Defendant's preparation and motive for the attack itself and his related desire to incite others to engage in similar acts of violence. *See United States v. Marfo*, 572 Fed App'x 215, 226 (4th Cir. 2014) (statements that reveal motive are admissible).

Defendant's statement to Lindsey Fry, in which he stated his intent to rob an individual he had met in Charleston, is likewise relevant. The government may use this statement as penalty-phase evidence to rebut the mitigating factors that Defendant intends to offer, such as Defendant's lack of a criminal record and lack of a prior history of violence.

Defendant has also failed to show that the probative value of these relevant statements is substantially outweighed by any unfair prejudice. Although Defendant's statements are prejudicial in the way all inculpatory evidence is, they are not unfairly prejudicial. For the reasons described above, these statements are relevant in both the guilt and penalty phases to establish racial motive and incitement of others to violence, and to rebut potential mitigating factors. Defendant suggests that they should be excluded because these three witnesses did not identify specific dates on which the statements were made or provide any corroborating details when they were interviewed by the FBI or testified before the grand jury. Such issues are the

23

ordinary grist of cross-examination, but do not serve as the basis to exclude this highly probative evidence in a pretrial motion in limine.[10]

**E.     Defendant's Statements Showing Lack of Remorse Are Admissible**

    **1.     The Government Does Not Intend to Rely on Defendant's Silence to Establish Lack of Remorse**

Defendant asserts that the government would violate his Fifth Amendment privilege against self-incrimination if it relies upon his mere silence (*i.e.*, Defendant's failure to volunteer remorse) to establish the "lack of remorse" non-statutory aggravating factor.  The government does not intend to rely on Defendant's silence alone and will instead establish his lack of remorse with evidence relating to his statements and conduct.

Although it has not definitively ruled on the issue, the Fourth Circuit has discussed whether silence can be used to establish a defendant's lack of remorse in a capital penalty hearing.  In *United States v. Caro*, 597 F.3d 608, 627-31 (4th Cir. 2010), the Fourth Circuit reviewed whether a prosecutor's reference to a defendant's silence was reversible error.  After analyzing several Supreme Court opinions, the Fourth Circuit stated, without deciding, that "the Fifth Amendment may well prohibit considering a defendant's silence regarding the non-statutory aggravating factor of lack of remorse."  *Caro*, 597 F.3d at 631; *see also United States v. Umana*, 707 F.Supp.2d 621, 636 (W.D.N.C. 2010) (holding that *Caro* precludes use of the defendant's silence to establish lack of remorse); *but see generally White v. Woodall*, 134 S. Ct. 1697, 1703-04 (2014) (recognizing that prior Supreme Court precedent did not categorically preclude consideration of silence at sentencing as indicative of a lack of remorse).  Because the

---

[10] Defendant cites no authority for his request that the government identify each of the Defendant's statements that it intends to present at trial.  Indeed, there is authority that provides a basis for rejecting such a request by the defense. *See, e.g.*, *United States v. Higgs*, 353 F.3d 281, 325 (4th Cir. 2003) (noting that FDPA does not require the government to provide notice of the evidence it intends to use).  In this instance, the government has timely provided Defendant with discovery of the written summaries of interviews and grand jury transcripts of potential witness testimony, and will continue to fulfill its discovery obligations through trial.  The government will submit its witness list in accordance with this Court's pretrial deadlines.

trial court in *Caro* instructed the jury that mere silence, alone, should not be considered as proof of lack of remorse, and because the government introduced affirmative evidence relating to lack of remorse, the Court ultimately concluded that if the prosecutor's reference to the defendant's silence were error, such error would be harmless. *Caro*, at 630-31. Although *Caro* did not resolve the issue of whether the jury may consider a defendant's silence, the government nevertheless intends to admit affirmative evidence to establish his lack of remorse.

Defendant requests that this Court order the government to give notice of the evidence it intends to introduce to establish Defendant's lack of remorse, but fails to cite any authority to support that request. (Def. Mot. at 21.) As courts have recognized, the government fulfils its disclosure obligations by providing Defendant with notice of the aggravating factors, and Defendant is not entitled to a pretrial preview of the government's evidence. *United States v. Higgs*, 353 F.3d 281, 325 (4th Cir. 2003) ("The FDPA and the Constitution require that the defendant receive adequate notice of the aggravating factor . . . not notice of the specific evidence that will be used to support it"); *United States v. Battle*, 173 F.3d 1343, 1347 (11th Cir. 1999) (notice given to a defendant of the applicable aggravating factors in a death penalty case is not the same as notice of the specific evidence that the government intends to present at a sentencing hearing); *cf. Gray v. Netherland,* 518 U.S. 152, 167–68, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996) (noting that there is no constitutional right to advance notice of the government's evidence in aggravation at a capital sentencing hearing).

The government has provided Defendant with voluminous, regularly supplemented discovery that includes the known actions and statements made by Defendant (including, as examples, his confession and jailhouse personal writing). Defendant is not entitled to additional notice of the specific evidence the government will present to establish any aggravating factor,

25

and this Court should deny his request for a detailed pre-trial summary of the government's trial evidence.

### 2. Admitting Defendant's Statements to ██████ Will Not Cause Undue Delay and Will Not Implicate the Fifth or Sixth Amendments

Defendant seeks to exclude two statements in which he expressed ██████████████ ███████████████████████████, during examinations in which he voluntarily participated and that were conducted to his evaluate his potential suicidal ideations. Defendant argues that this evidence should be excluded for two reasons. First, Defendant argues that admitting the statements, ████████████████████████████████, would cause undue delay and confusion at trial, and thus should be excluded under Federal Rule of Evidence 403. (Def. Mot. at 21.) Second, Defendant refers to his rights under the Fifth and Sixth Amendments. (Mot. at 22.) Defendant does not explain the basis of his constitutional argument, but the government presumes that Defendant's claim is that he should have been provided a *Miranda* warning and access to counsel before ████████ spoke to him about his potential suicidal ideations. Neither of these defense arguments has merit.

First, presenting ████████ testimony would neither unduly delay the trial nor confuse the jury.[11] ████████ can lay the foundation for Defendant's statement and testify about the statements themselves. ████████ can provide a short summary of what led to ██ conversation with Defendant – i.e., jail staff provided her with a suspicious-looking letter; ██ researched the source of the letter and determined that Defendant had copied it from a book that ended in the protagonist's suicide, so ██ went to talk to him to determine whether he needed to

---

[11] Defendant has not provided any reason to believe that testimony about his June 19, 2015 statements would cause any delay at trial.

remain on suicide watch. ██████████████████████████████████████

████████████████████████████████████

Contrary to Defendant's suggestion (Def. Mot. at 21), admitting his statements to ██

████ would not require testimony by the vast majority of witnesses who have testified during

the recent hearing on Defendant's motion to suppress his jailhouse writing.  Defendant called

those witnesses in an attempt to establish that his placement on suicide watch was motivated by

an investigatory purpose and was a pretext to justify the search of his cell.  These claims would

not need to be addressed at trial, however.  There is no evidence that ██████████ was involved

in the search of his cell or that ███ talked to Defendant for any purpose other than assessing him

for potential suicidal ideation.  ████████████ testified at the suppression hearing that ██

independently researched the book that Defendant quoted in his letter and concluded that there

was cause to be concerned about his safety after ███ learned that the book ended in the

protagonist's suicide.  As such, Defendant's fear of delay is unwarranted.

Second, Defendant's conversations with ████████ do not implicate the Fifth or Sixth

Amendments.  *See*, *e.g.*, *United States v. Loughner*, 782 F. Supp. 2d 829, 833 (D. Az. 2011)

(describing defendant's claim that his statements to BOP psychologists should be suppressed

under the Fifth and Sixth Amendments as a "non-starter").  It is well-established that *Miranda* is

triggered only by "custodial interrogations."  *Miranda v. Arizona*, 384 U.S. 436, 444 (1966);

*United States v. Payne*, 954 F.2d 199, 201 (4th Cir. 1992).  As the *Miranda* Court emphasized,

"[v]olunteered statements of any kind are not barred by the Fifth Amendment and their

admissibility is not affected by our holding today."  440 U.S. at 478.  Defendant was neither in

custody nor interrogated during ████████ brief assessment of his potential suicidal

ideations, and thus the Fifth Amendment does not apply.

27

Although Defendant made this statement while in jail, the Fourth Circuit has squarely held that a defendant is not "in custody" simply by virtue of his being in a jail. *United States v. Conley*, 779 F.2d 970, 972 (4th Cir. 1985). In the jail context, the potential for intimidation that may normally be presumed by a custodial environment is significantly diminished for people in custody "where, by definition, the entire population is under restraint of free movement." *Id.* As such, "custody" in the prison context "necessarily implies a change in the surroundings of the prisoner which results in an added imposition on his freedom of movement." *Id.* at 973.

In determining whether a person is "in custody," the Fourth Circuit has instructed courts to review the circumstances in which the statement was made, including the purpose of the conversation, the duration of the conversation, the relationship between the detainee and the officer, and the voluntariness of the statement. *Id.* at 973-74; *see also Howe v. Fields*, 132 S. Ct. 1181, 1189-90 (2012) (holding that courts should look at circumstances of interrogation to determine whether the "relevant environment" presents "a serious danger of coercion"); *United States v. Jones*, 367 Fed. App'x 482, 485 (4th Cir. 2010) ("In determining whether an inmate was in custody during an interrogation, the district court should look to the language used to summon the individual, the physical surroundings of the interrogation, the extent to which he is confronted with evidence of his guilt, and the additional pressure exerted on him." (internal quotation omitted)); *United States v. Jamison*, 509 F.3d 623, 628 (4th Cir. 2007) (noting that appropriate inquiry is whether a "reasonable person would feel free to decline officers' requests or otherwise terminate the encounter).

Under these standards, it is clear that Defendant was not "in custody" for purposes of the Fifth Amendment. Defendant was kept in his cell, he was not handcuffed or otherwise shackled, and the cell door remained open. *See United States v. Cooper*, 800 F.2d 412, 414 (4th Cir. 1986)

(noting that lack of handcuffs is indicia that inmates were not in custody); *Conley*, 779 F.2d at 972-73 (holding inmate was not in custody even though he was in "handcuffs and, at some points, in full restraints"). Here, Defendant's "freedom of movement" was not affected in any way. *See Conley*, at 973.

Moreover, there was nothing coercive or custodial about Defendant's conversations with ████████. As Defendant's motion makes clear, ████████ only "briefly assessed the defendant for suicidality." (Def. Mot. at 21.) ████████ informed Defendant that he did not have to speak with ██, and Defendant has not alleged in his motion that she coerced him to speak to her in any way. (████████, Ex. 7, at 2); *see Conley*, 779 F.2d at 974; *see also United States v. Blake*, 571 F.3d 331, 341 (4th Cir. 2009) (noting that officer's calm demeanor reduced potential for intimidation). In fact, ██ notes indicate that they were engaged in a "casual discussion." (Suicide Watch Notes, Def. Mot. Ex. 5.)

████████ is a medical doctor, not a criminal investigator, a factor that also weighs against finding that ██ conversation with Defendant constituted a "custodial" interrogation. *See Cooper*, 800 F.2d at 414 (noting that interrogation by correctional treatment specialist is "arguably less intimidating" than questioning by correctional officers); *Conley*, 779 F.2d at 973 (noting that inmate's friendly relationship with the officers was a factor to consider when determining whether an inmate was in custody); *Wilson v. Cain*, 641 F.3d 96, 103 (5th Cir. 2011) (in concluding that inmate was not subject to interrogation, "[o]ne fact having particular importance is that [inmate's] questioning was conducted by a guard employed at the prison in which he was incarcerated, rather than by an outside state official"). Finally, as ████████ has testified, ██ went to Defendant's cell to discuss the meaning of the letter he wrote to his sister, not to confront him about the attack on Emanuel AME Church. *See Cooper*, 800 F.2d at 414

29

(noting inmates were not moved for purposes of interrogation and finding they were not in custody for purposes of analysis under *Miranda*); *Conley*, 779 F.2d at 973 (noting inmate was not in custody for purposes of *Miranda* where inmate was moved to conference room for the purpose of medical treatment, not interrogation). Under the Fourth Circuit's standards, Defendant's conversations with ████████ were not custodial, and therefore no *Miranda* warning was required.[12]

Nor was ████████ conversation with Defendant an "interrogation" for purposes of *Miranda*. An interrogation "must reflect a measure of compulsion above and beyond that inherent in custody itself" and must be directed at eliciting inculpatory information. *Rhode Island v. Innis*, 446 U.S. 291, 300 (1979). ████████ went to Defendant's cell to discuss a letter he had written to his sister, not the crime with which he has been charged. Defendant has not alleged, and there is nothing in ████████ notes to suggest, that ██ questioned him about the crime or otherwise sought to elicit inculpatory statements from Defendant. Instead, their discussion was intended to determine whether he should be required to remain on suicide watch because of his letter to his sister. *See, e.g.*, *United States v. Lester*, 201 F.3d 441, 1999 WL 1204806, at *4 (6th Cir. Dec. 8, 1999) (holding that examinations to assist psychologist in planning treatment for prisoner were not conducted to elicit incriminating statements, and that such information could be used at sentencing); *United States v. Scalf*, 725 F.2d 1272, 1276 (10th Cir. 1984) (prison guard questioning inmate in his cell is not an interrogation); *Loughner*, 782 F.

---

[12] Defendant contends that suicide watch is an "onerous condition," (Def. Mot. at 22 n.10.), but this change in status required only that items be removed from his cell and he be placed in a suicide gown. For purposes of the analysis here, Defendant's circumstances did not change. Further, these changes were done for medical reasons and, as a result,should not be considered in determining whether his conversation with ████████ was custodial in nature. *See Jamison*, 509 F.3d at 630 (noting that "we must be careful to separate restrictions on his freedom arising from police interrogation and those incident to his background circumstances" and holding that restraints based on medical treatment should not be considered when assessing whether interrogation was custodial). Finally, Defendant suggests that he may have said anything to get removed from suicide watch. (Mot. at 22, n.10.) It is unclear whether Defendant has any basis to suggest to the jury that he lied to ████████ to get off of suicide watch. Regardless, such arguments go to the weight, not the admissibility, of these statements.

Supp. 2d at 833 (holding that reports from prison psychiatrists and psychologists were not custodial interrogations for the purposes of the Fifth or Sixth Amendments, and that they were therefore admissible).

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████ It is well established that, where a defendant makes voluntary, spontaneous statements, the statements are not considered the products of an interrogation for the purposes of *Miranda*. *Oregon v. Elstad*, 470 U.S. 298, 309, 318 (1985); *Innis*, 446 U.S. at 301-302 ("[S]ince the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response"); *Giarratano v. Procunier*, 891 F.2d 483, 488 (4th Cir. 1989) (holding that a "spontaneous and voluntary" threat against medical staff made by defendant during a pretrial mental health examination was admissible at the penalty phase in a capital case because it was not made as part of an interrogation); *United States v. Asar*, No. 7:10cr-00429, 2010 WL 2902500, at * 2 (D.S.C. July 21, 2010) (holding that officer's general conversation with inmate did not constitute interrogation).[13] Indeed, even where officers inform a suspect that they have incriminating evidence against him, those officers have not engaged in the functional equivalent of an interrogation that would trigger the Fifth Amendment. *See, e.g.*, *United States v. Payne*, 954 F.2d 199 (4th Cir.1992).

---

[13] *See also Kemp v. Ryan*, 638 F.3d 1245, 1252 (9th Cir. 2011) (holding that defendant's inculpatory response to guard's general questions did not constitute an interrogation that would trigger *Miranda*); *United States v. Voice*, 627 F.2d 138, 145 (8th Cir. 1980) (holding that general statements by officer about defendant's anxiety and another officer's conversations were not interrogations given that neither had the "motive or likely effect of interrogation); *United States v. Platt*, 2:06cr-214, 2007 WL 1034958, at * (M.D. Ala. Mar. 29, 2007) (holding that confession made to officer who responded to a suicide call and who asked general questions at the scene was admissible).

As Defendant concedes, ███████ briefly talked to Defendant to determine whether he had suicidal ideation.  Defendant had previously talked to ████████ in ██ capacity as a mental health doctor, and thus he was aware that ███ was not a jailer or criminal investigator, and the letter that triggered the suicide watch was wholly unrelated to his crime.  Where conversations are directed at an entirely different topic and for a purpose other than eliciting inculpatory information, no interrogation has occurred.  *Saranchak v. Beard*, 616 F.3d 292 (3rd Cir. 2010) (holding that defendant's conversation with child services employee about child visitation proceedings was not an interrogation and holding defendant's confession to be admissible); *United States v. Rodriguez*, 356 F.3d 254 (2d Cir. 2004) (holding that inculpatory statements made during administrative interview are admissible in later criminal proceeding).

Similarly, the Sixth Amendment right to counsel is inapplicable in this context.  The Sixth Amendment right to counsel guarantees the assistance of counsel at a "critical stage of the prosecution."  *United States v. Johnson*, 935 F.2d 47, 49 (4th Cir. 1991) (internal quotation marks omitted).  However, this right only applies to events that are part of the adversarial process.  *See*, *e.g.*, *id.* (holding that "the sixth amendment right to counsel guarantees the assistance of counsel to a defendant confronted by 'prosecutorial forces'").  Here, ███████████ conversation with Defendant was not part of the adversarial process, nor was it intended to elicit inculpatory information in the absence of his attorneys.  *Kemp*, 638 F.3d at 1256 (holding no Sixth Amendment violation where no evidence that the questions were "designed deliberately to elicit incriminating remarks" in the absence of counsel) (internal quotation omitted); *Loughner*, 782 F. Supp. 2d at 833 (holding inmate's statements to psychiatrist does not implicate the Sixth Amendment right to counsel).

Defendant does not explain why he believes that the Fifth or Sixth Amendments apply here, but instead simply cites to two cases: (1) *Estelle v. Smith*, 451 U.S. 454, 462 (1981), where the Supreme Court held that statements made during a comprehensive, court-ordered psychological examination could not be used against a defendant who did not raise any mental health defenses, and (2) a Tenth Circuit decision, *United States v. Dennison*, 937 F.2d 559, 566 (10th Cir. 1996), that addresses discovery obligations under Federal Rule of Criminal Procedure 16.  Both cases are inapposite to the facts in this case.

In *Estelle*, the trial court ordered the defendant to undergo a competency examination that included specific questioning about the details of the crime and an assessment of the defendant's future dangerousness.  451 U.S. at 464-65.  Importantly, because the trial court ordered the examination in *Estelle*, the mental health examination was an involuntary, custodial interrogation.  *Id.* at 469.  The *Estelle* Court reaffirmed that "[v]olunteered statements are not barred by the Fifth Amendment . . . ."  *Id.*  Further, the Supreme Court has subsequently limited *Estelle*'s Fifth Amendment holding to the "distinct circumstances" of that case and has "never extended [that] holding beyond its particular facts."  *Penry v. Johnson*, 532 U.S. 782, 795 (2001).

Here, in contrast to *Estelle*, no custodial interrogation took place.  ▮▮▮▮▮ informed Defendant that he was on a suicide watch because of the letter he had written to his sister, and that he was free to refuse to speak with ▮▮▮  Under these circumstances, he was not compelled to speak to ▮▮▮▮▮ and certainly not compelled to offer his views on any subject related to his crime.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮.

Moreover, unlike the defendant in *Estelle*, this Defendant has indicated his intention at sentencing to put on evidence about his mental health.  As the Fourth Circuit has repeatedly held,

Defendant's reliance on a mental health defense distinguishes his case from *Estelle*. *See, e.g.*, *Giarratano*, 891 F.2d at 489; *McWee v. Weldon*, 283 F.3d 179, 190 (4th Cir. 2002).

Defendant's reliance on the Sixth Amendment analysis in *Estelle* is similarly misplaced. The court-ordered psychiatric exam in *Estelle* was designed to elicit answers related to the defendant's future dangerousness at sentencing, which implicated a "critical stage" of the adversarial proceeding for which the Defendant should have had the opportunity to consult with counsel. 451 U.S. at 470-71. Again, however, because ███████ examination was intended only to address Defendant's suicidal ideations, and not any sentencing factor or, indeed, any part of this prosecution, ██ examination is not part of the adversarial process and thus no right to counsel existed.

The Tenth Circuit's decision in *Dennison* does not analyze the Fifth or Sixth Amendments and is thus inapposite. *Dennison* involved whether, under Federal Rule of Criminal Procedure 16(b), the district court erred in ordering the defense to disclose the underlying notes taken by defendant's retained medical expert. *Dennison*, 937 F.2d at 565-66. The Tenth Circuit relied, in part, on the fact that the expert had been hired to be the defendant's "agent in connection with his defense," and thus disclosure of his notes was not required by Rule 16(b). *Dennison*, 937 F.2d at 566. Here, in contrast, the government obtained ████████ assessment of Defendant by subpoena, and, unlike the doctor in *Dennison*, ███████ is employed by the Charleston jail and thus does not serve as Defendant's agent.

Given the absence of any indicia that Defendant made these statements during a custodial interrogation or as part of the adversarial process, Defendant's statements to ███████ are admissible, affirmative evidence of his lack of remorse.

34

### III.     <u>CONCLUSION</u>

The government requests that this Court deny Defendant's Motion In Limine.  The evidence Defendant seeks to exclude is relevant and intrinsic to core issues raised in this case.  Further, it is not unduly prejudicial and does not any implicate any constitutional privileges or rights.  The jury should be permitted to consider this evidence in the guilt and penalty phases of this case.

Respectfully submitted,

Julius N. Richardson
Nathan Williams
Assistant United States Attorney
1441 Main Street, Suite 500
Columbia, SC 29201
(803) 929-3000

Richard Burns
Deputy Chief
U.S. Department of Justice
Criminal Division
1331 F. Street NW, Suite 625
Washington, DC 20530
Tel. (202) 353-1911

September 22, 2016

By  <u>s/Mary J. Hahn</u>
Mary J. Hahn
Trial Attorney
Stephen J. Curran
Special Litigation Counsel
U.S. Department of Justice
Civil Rights Division
601 D Street NW, Rm 5200
Washington, DC 20579
(202) 305-0921