IN THE DISTRICT COURT OF THE UNITED STATES
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff | ) | 2:15-CR-472 |
| VS | ) | Charleston, South Carolina |
| DYLANN STORM ROOF, Defendant | ) | July 18, 2006 |

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE RICHARD M. GERGEL,
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:
MR. JULIUS NESS RICHARDSON
Assistant United States Attorney
1441 Main Street
Suite 500
Columbia, SC 29201

MR. STEPHEN CURRAN
U.S. Department of Justice
Civil Rights Division
601 D Street NW
Patrick Henry Building
Room 5808
Washington DC 20004

For the Defendant:
MR. DAVID I. BRUCK
Virginia Capital Case Clearinghouse
Washington and Lee School of Law
Charleston, SC 29402

MS. KIMBERLY STEVENS
1070 I Tunnel Road
Suite 10-215
Asheville, NC 28805

MS. SARAH GANNETT
Arizona Federal Public Defender's Office
850 West Adams Street
Suite 201
Phoenix, AZ 85007

* * *

Court Reporter: Amy C. Diaz, RPR, CRR
P.O. Box 835
Charleston, SC 29402

Proceedings recorded by mechanical shorthand, Transcript produced by computer-aided transcription.

THE COURT: This is a chambers conference in *United States vs. Roof*, 2:15-472. Could counsel identify themselves for the record.

MR. RICHARDSON: Jay Richardson from the District of South Carolina.

MR. CURRAN: Stephen Curran from the civil rights division.

MR. BRUCK: I'm David Bruck, and with me is Kim Stevens and Sarah Gannett.

THE COURT: Very good.

Folks, I wanted to have a little bit of a discussion where I was not in public giving a primer for prospective jurors and how to get out of jury service. So I wanted to talk a little bit about these things and tell you a little bit about where our thinking is. Jeff Cargil, our court jury administrator, has been having lots of consultations around the country with colleagues trying to sort out a way to make this thing work. Let me say to you the one thing that cannot happen, we cannot summon a certain number of people and by the time we go through all the disqualifying work we don't have enough jurors. That is not an option that is acceptable, okay? And the chances are we are going to get exactly the number is also highly improbable. So what's likely is we are going to summon a lot more than we need, and that's okay, but we've got to have ways to address

that because we don't want to be processing 3,000 or 2,000 juror questionnaires. Y'all will all have a nervous breakdown trying to do case-specific questionnaires.

How do we do this? Let me just say a couple of things. When we are trying to estimate from our prior experience how many people will actually kind of get through the gauntlet, it is almost unknowable to us. Why is that? Because, number one, we don't have a lot of six- to eight-week trials in this district. Secondly, we don't have a lot of six- to eight-week trials during Thanksgiving and Christmas, and we don't have a lot of trials which have the massive pretrial publicity. So we are in a little ways flying blind here. And, David, you've got a little bit of experience in Boston, but whether that actually -- whatever experience they had actually tells us anything about here, we'll find out after the fact. So that's the problem.

So I have been trying in my own head to figure out a way in which we predictability oversummon jurors, but we have ways to which we trim them down and a way that is random, etcetera, and which guarantees us an adequate pool. After a lot of discussion, I've determined I want 700 case-specific questionnaires completed because we are trying to get a pool of 70 people. I want -- I feel a high degree of confidence that having 700 will allow us to do that. I'll talk to you in a minute how we deal with it when it's probably too many,

but that's okay, too.

We will begin in late September. Under our plan, we'll begin summoning people to this courthouse to complete those questionnaires. And we don't know exactly how -- we have all -- it's very complicated in terms of how many people we can bring to the capacity, it's not just the capacity of the courtroom, security, getting people through the door, it's complicated. And talking to my marshals, talking to my clerks, we figured all -- that we probably here in this courthouse cannot process more than like 320 people a day. That is like 80 at 9:00, 80 at 1 and 80 at 3:00. And, you know, there would be a brief exchange between the Court and this group, pool of veniremen and women, and we would then have them do the case-specific questionnaire. When we hit 700 completed questionnaires, we are going to stop. So that's going to be the first break. We don't know how long that will take, but we'll get to 700. They are going to be summoned by juror number. Number 1 gets called first, and we are going to do it in order, a random system consistently applied. When we get to 700 we are going to stop. Individual voir dire later. When we hit 70 for a strike list, we stop. We are going to create the strike list. That's it. We are done. We've got 70 qualified people, we've got a strike list, we quit. And will we leave a lot of people out? You are darn right we will, because -- so

I've said to Jeff Cargil I need 700 people, he says I need to summons for 1,000 people, is what he tells me. I need to summons 3,000. I told him underestimating is not an option. We cannot have that happen, okay?

So I just wanted to tell you that it's not a conclusion I particularly like, but the one thing we cannot have is to go through all this crazy selection process and end up without a pool to strike. I mean, that's not acceptable. So I wanted to tell you that we are -- and then the question is, how do we in a reasonable way, consistent with the statutes and our jury plan, how do we trim that list back a little bit? And I have been thinking about it.

First of all, we are going to get the standard questionnaire. There are always people who basically disqualify themselves on that and they disqualify themselves because they will say, like in a gun case, "I can't be fair regarding a gun." I don't think we ought to have a question that that person should not sit on our jury, okay? Or "I can't be fair to law enforcement," or here is the one I never accept, "I won't listen to the Judge," okay? Runaway jury, okay? So it's a pretty light touch, but there will be some that go away. And I'm building into the process where y'all will confer and produce a strike list. Sometimes it is so obvious that the lawyers on both sides, they come up with a strike list that's completely the same. The people just

obviously shouldn't go any further.

Sometimes I have prosecutors -- Jay, you are not going to believe this -- who think someone who sounds incredibly unfair to a defendant would still be -- should still be on the jury, and I strike those. But generally, so I will have y'all do single -- to notice me if you think somebody ought to be struck. I will probably be pretty reluctant to strike them, but I would certainly look at it. I'm hoping y'all can get together so we get those people out of the way who we know aren't sitting.

Now, when we come in for the case-specific questionnaire, I always start my jury selection with a series of basic questions about their availability and qualification. I don't want people who are ill, death, can't sit through something, who are having surgery at that time, all -- we go ahead -- and they haven't already asserted that; and surprisingly, a lot of people don't take advantage of that. They come to court and they tell me that. I want to screen them out because I don't want them to complete a case-specific questionnaire if we know they cannot serve.

Now, folks, we've got a real -- a real challenge here, and that is undue burden for the length of time. I'm worried about people who we are asking them around Thanksgiving and Christmas not to work, and I'm conscious of the fact there are -- I mean, let me tell you, commonly even

for a one- or two-week trial, say, "I'm a commissioned salesman, I'll just go broke if I can't work for that long." Or, "I own my own business and I make 80 percent of my income during Christmas, I can't be gone," okay?

So we'll -- I'm going to put them -- it's going to be -- y'all are going to be present. We are going to do individual, but I will ask those questions, because I don't want to put those people through doing a case-specific questionnaire, it doesn't accomplish anything. And again, I think we don't have to have too heavy a hand on disqualifying people, but I think it's just impractical to be having people processed and y'all spend all of your time getting ready and people that couldn't serve anyway.

I'm going to do some initial screening. And then those who I have not removed usually are going to have to ask me to be exempt. I'm not going to invite them to be exempt. If they ask to be exempted and I determine there is undue burden or for some reason that they can't be fair, then I'm going to -- then we will not have them fill out the case-specific questionnaire. So that 700 we'll get will be real people. They are not people who a bunch of them are going to go away.

What I need to think through is -- and I think we'll, you know, we'll do more of this later, obviously, is on the individual voir dire about their ability to be fair in

this particular case. But I do -- y'all tell me, how do you feel about me raising anything at that point before the case-specific questionnaire or would we rather do it at the individual voir dire basis?

MR. BRUCK: This is when they are physically here before they fill out the questionnaire?

THE COURT: Correct. Is there anybody -- do we want to let the case-specific questionnaire do its job and then we will strike them or do we want to ask anything beforehand?

MR. BRUCK: Of course, how do you -- people are going to know this is a big deal.

THE COURT: Obvious, yeah.

MR. BRUCK: How do you avoid it sort of inviting people to come up and say, "I have a work-related" --

THE COURT: I mean, I intended to tell them this is *United States vs. Roof*. I intend to tell them a little bit about -- we'll talk about dates, but I -- to keep them from being completely spooked, I'm going to tell them there are certain dates around Thanksgiving and around Christmas and New Years we will not be holding court, because otherwise I'll lose everybody. So we'll work out among ourselves about what I will say; but otherwise, I'm going to lose everybody. But I do have to tell them that, David, and --

MR. BRUCK: Yeah.

THE COURT: I would like the questionnaire to help us guide people who can't be fair, but will I be getting people who just say, "I think they ought to let you execute the SOB," this kind of stuff, I never let them do in front, I make them come forward to tell me that. But I wasn't really planning, unless y'all want me to. I think the questionnaire will help us get to that. Don't you figure?

MR. BRUCK: This is only hardship.

THE COURT: Hardship. And they have a right under our plan, if they are over 70 -- I have never had anyone over 70 ask for that exemption -- they have a right to it. People who have served on a petty or federal grand jury in the last two years, I've never had anybody assert that one. The vacation thing is going to be problematic. And we'll -- people who have nonrefundable tickets, that is kind of easy. But do we really want on our jury people who say, "I have been saving money for two years to take my kid to Disney World at Christmas and you are going to make me take off," I'm going to tell them you are going to get a couple days off for Christmas, we won't come back until January. I'm saying do we want people like that on the jury? Maybe we'll save that for individual voir dire.

I have a standard question about personal hardship that includes travel plans that cannot be changed. Have you bought a nonrefundable ticket? A lot of people say, "I have

bought a ticket, "We bought them three months ago and we are going to," so and so. And, you know, I would not require people to eat their holiday ticket to be on this jury. So again, we are having enough where I don't think we are going to lose -- but there will be some people. I am going to do some level of screening on personal hardship, basically, and then we'll have them fill out the questionnaire, we'll have 700 and then we'll come back and do individual.

MR. BRUCK: If I understand, the reason you are thinking about doing a preliminary hardship screening is to try to get a more solid group.

THE COURT: I think a real list. I think you are wasting your time to have to pour over all of these and a third of them are going to be let out anyway. Just doesn't accomplish anything. It's just one of those things where I think we all want to use the most efficient way of doing that.

So now let me talk to you about Area C versus the state-wide venire. The way I read the rule, we are supposed to, of course, follow the jury plan, unless there is a really good reason not to. So, yes, if the defendant says, I want Area C, that's fine, okay?

Now, here is the question: Do you really want Area C? Because if we end up and can't draw a jury out of our pool -- and it will take us months to restart this process --

to get this process back in, need I say more.

MR. BRUCK: To whom do you refer?

THE COURT: So I just say to you, recognizing that the plan builds in a deference to the local venire, do you really want that, Mr. Bruck?

MR. BRUCK: We are confident we will get a jury.

THE COURT: I'm fine. I just want to give you that one last way to change your mind if that's what you want.

Now let's talk about 12.2 procedures for just a minute. I've spent a fair amount of time thinking about this. You know, a typical district judge doesn't deal with 12.2, right? Who has ever read this thing? Jay might read it for entertainment. Who bothers to read this stuff?

MR. RICHARDSON: My five-year-old is really engaged in it.

THE COURT: And then the interplay with Rule 16 is so interesting. And just, what does it mean? But I have -- I read with interest the defense's argument about concern about firewall counsel.

And here is sort of -- and I've spent a lot of time reading the history, and this is sort of where I've sort of come down with this, is that 12.2 is a very sort of careful, maybe not perfect balancing between the interests of the Government and having its right to rebut a mental health claim of a defendant, and the defendant's right not to have

his Fifth Amendment rights basically testifying against himself. It's a tough balance. And this is the way it has sort of come out. And the process is nobody gets it until guilt. The defendant says, "Yes, I want to do mental health," and then you get the -- everybody then gets to see the Government's examination. That's the process. And so in some ways the defendant drives the train a little bit, both in timing and whether anyone ever gets to it anyway. They say, "Hey, I'm not going to pursue mental health." Well, that kind of informs me in a couple of ways.

I know that there are a bunch of cases that have firewall counsel. There is much to recommend, as a practical matter, firewall counsel. And many defense lawyers in capital cases, able, competent lawyers have waived the 12.2 procedures because they want the report early themselves. Not only does the Government want it, they want it because it helps them plan their case. They know the case is not about guilt, it's about sentencing, and they do that with their eyes open and -- but it's their call because the rule really allows that. And to be honest, I've gone back and read that rule over and over, and it says no government lawyer gets it. And I think no government -- in a capital case you read that literally. And that means in every case I found, and Mr. Bruck really focuses us, no one has done firewall counsel where I can find that it wasn't consented

to.

MR. BRUCK: The Government did find one case out of the hundreds.

THE COURT: So I'm just sort of -- I just think that -- and no, nothing on the defense, their job in tough cases is to make everybody square the corner and not round the corner, right? You've got to do it. And I'm just not going to walk in when the rule says one thing and do something else. I think it would be -- frankly, to be honest, David, I think it would be prudent for you to get it early and prudent to do what other folks have done, but I can see it's a judgment call on your part. And if you want to insist on your 12.2 rights, your client has the right to that, okay? End of discussion. So no firewall counsel if that's the way you wish it.

And then that raises the whole Rule 16 summary. How does -- how do we do this summary of the expert of the defendant? Because under Rule 12.2, that is not given until the Government has produced its report do you get the examining report of the defendant's expert. If you get the summary, you just get the crib notes of the expert opinion. And I know Rule 16 does not give us a specific timeframe. There is this whole debate in a number of cases that 16 -- 12.2 trumps 16 and all this stuff. Let me tell you where I'm coming down. The Rule 16 summary will be required to be

produced after the guilt phase, after the guilt. So the defendant is found guilty, you get the report and a summary to the extent -- I just think that's just the way it is. So you would not have to disclose -- the defendant would not have to disclose his expert summary until he were found guilty of -- regarding the mental health testimony until after.

Mr. Bruck, you seem concerned.

MR. BRUCK: That's a new one. I think the general -- I mean, I don't want to argue with the Court after you've ruled -- but the general rule has been that 12.2 does trump Rule 16 on mental health. There is no Rule 16 summary.

THE COURT: I'm not sure it matters. Does it matter? Because if you give it in the report --

MR. BRUCK: Once we reconfirm, once we reconfirm.

THE COURT: That's it. Only then.

MR. BRUCK: Okay. So it's just -- the report is accompanied by a summary, for whatever that is worth.

THE COURT: Whatever it's worth.

MR. BRUCK: I'm sorry.

THE COURT: I was wondering why you were arguing with me.

MR. RICHARDSON: Keep talking. Keep talking.

MR. BRUCK: Okay.

THE COURT: Does that make sense?

MR. BRUCK: Yes.

THE COURT: And I'm just -- I sort of see where everybody is coming from. And I have a lot of sympathy for the Government's position about the need to prepare its defense, but I didn't strike that balance, whoever -- you know, the rules strike that balance. And I see why at times everybody has reached the conclusion, everybody getting it earlier is in the common interests. If it's not in the case here, fine. That also gets us to the whole issue about the mitigation notice. I buy it that the defendant ought to at some point disclose his mitigation notice. If you do it before the guilt is determined, it's just a backdoor way of getting the opinion of the expert. I mean, that's all you are doing. It's form over substance. And I read 12.2, the balance struck is that's after guilt.

So the answer to all that roundabout way is is that y'all are going to get a lot of notice after the guilt phase and y'all are going to have to be quick on your feet. But think about bankruptcy lawyers, they do $100 billion worth of stuff in such a short period of time. They get notice and have to try it the next day. I wouldn't have personally written the rules that way, but that's the way they are written, and that's the way I'm going to enforce it. Those are the things I really wanted to talk -- many other

issues -- but I'm going to do them in open court. Those are the things I didn't particularly want. The question here, Mr. Buck -- and let me put it to you -- are you sure, in light of what I have said, you do not wish to follow the track of agreeing to an earlier disclosure with everybody getting it earlier than the guilt phase? Is that something you do not wish to do?

MR. BRUCK: We do not wish to do that.

THE COURT: That's fine. Everybody has got to exercise their judgment about what works best in that case, and I think they are right to do that. Now, having discussed those, is there anyone that has any particular concerns about what I said?

MR. RICHARDSON: I hate to be particularly like, you know, unimportant and sort of, you know, picky, but it strikes me, if we are going to do the full analysis about undue burden and availability for the groups of 80, that trying to do four groups of 80 in a single day is an aggressive schedule. To do that questioning and then fill out the case-specific questionnaire in a --

THE COURT: Now remember now, remember, we will -- I'm sorry. Leaving one little piece out. Once I do my pieces when -- I do this to a group of about 80 all the time. We move them to another room and --

MR. RICHARDSON: I didn't understand that piece.

THE COURT: They are in another room.

MR. RICHARDSON: We don't have to wait for them to finish.

THE COURT: Does that --

MR. RICHARDSON: That answers that question.

THE COURT: And I think we are doing -- I think the way we -- Lena can tell me this, but we -- I think we've got them in Courtroom V and they do it from VI to V, so they go to another room to do the questionnaire. And I wanted to do that because they wanted to put out more space and be a little more comfortable for people as they are filling them out. And we thought about, one point about the jury selection room, I'm going to tell you we've got victims we are trying to accommodate. We've got limited space that we are trying to figure out exactly how that goes.

But, Jay, the shorthand is they leave the -- they leave my presence to go to a place to fill out the questionnaire.

MR. RICHARDSON: I think that makes perfect sense.

THE COURT: I'm going to be basically going -- you didn't express concern about the Court going for like 320, doing this all day.

MR. RICHARDSON: I have great confidence in the Court's ability to do whatever it is it wants. I'm more concerned about this side of the table than that one.

THE COURT: Well, I think that -- and folks, listen, I know we are going to produce a lot more jurors than we need, okay? So be it. But we are going to draw a jury and we are going to have one ready to go. And let's talk a second about how long we are expecting trial to take. Guilt phase. I'm not going to ask y'all about jury selection because who knows, right? We'll figure that one out. But guilt phase, how long do we anticipate that to take, and then sentencing phase, how long do we anticipate that to take?

MR. RICHARDSON: I think when we talk about guilt phase -- and we've had some conversations about this, but to say that it's -- buckle down is obviously a gross overstatement -- I think we are fairly confident we are going to do it in less than two weeks. Can we do it in a single week? That seems pretty aggressive.

THE COURT: By the way, these questions are not designed to rush you, and I'm not trying to rush my jury. And I want to make sure that whatever setting, my jury doesn't feel rushed. So we are going to set up a schedule that -- I'm not trying to press anyone. Let me just say, Jay, for those who have not tried cases in front of me, I expect the next witness to be in the queue ready to go. I cannot tell you how much time is lost by people waiting 15 minutes while they are going to find the witness at the Starbucks. We are not doing that. They are going to be

out there, the next witness. And to the extent the evidence is uncontested, I urge people to go ahead and premark them and get them in by stipulation. That saves a tremendous amount of time. But the answer is, I'm going to give you all the time you need and nothing else. But there are things I'm going to insist upon in terms of respecting the jury, and that is that we are ready to go, one witness after another.

And I've got to get a feel from a jury about how much they can take. That's going to be another issue when something is particularly emotional, it may be difficult. Some courts have gone four days instead of five. They said it was too much for the jury to go five days. I think we've got to watch the jury and make our own judgments about that. My preference is to get as much -- to do this at a regular pace, but if we can't, if the jury can't tolerate it, we are going to respect that. And I will ask them -- I always say, you know, we would like to start -- usually the first thing, I bring them in at 10, how does everybody feel getting here at 9? Sometimes people say, can it be 9:30, but they generally want -- they know that accumulated over a week or two that starts really mattering, that time matters. And so I will, you know, we'll have a better feel of predicting how long to go.

One question is if we feel like we are making progress and the jury can tolerate, could you consider a

Saturday or two just as a way of getting the case finished. Again, I wouldn't want to prejudge that because I would want to watch my jury and raise it with them and see how they will feel. It may be very inconvenient for them.

MR. BRUCK: The lawyers.

THE COURT: Kill the lawyers.

MR. RICHARDSON: I think if we know that, the challenge for us is only the scheduling of witnesses and bringing them in.

THE COURT: Listen, and --

MR. RICHARDSON: On a Friday afternoon, we would like to have court on Saturday is going to be a challenging endeavor, but --

THE COURT: I understand that. And my hunch is the jury won't be able to take it. It's not -- but I do want to -- so how about sentencing?

MR. RICHARDSON: I think, I suspect -- and I'm not trying to speak for David -- but I suspect the guilt phase is simpler because it's more going to be a one-sided story, at least my estimation in using those dates, those frames is there is not an extensive defense case and there is not extensive day-long cross-examinations. I think the sentencing phase is much more difficult to anticipate. I think, from the Government's side, you know, I think it's the same kind of timeframe for us.

THE COURT: Two weeks.

MR. RICHARDSON: Two weeks. We hope to do the guilt phase in less than that time, but I think we are probably two weeks on the sentencing.

MR. BRUCK: It's early to say, but I think two weeks is ballpark.

THE COURT: Is that your presentation?

MR. BRUCK: Yeah.

THE COURT: So we are talking basically six weeks for trial, is that what we are talking about? Two weeks, four weeks, six weeks. Does that sound -- so --

MR. BRUCK: Plus a break in between, right?

THE COURT: And the question sort of is when we do that, you know, I don't know how long jury selection is going to start, is going to take, but it seems --

MR. BRUCK: You haven't asked for our estimate on that. We think the Government is being optimistic.

THE COURT: What's the Government's estimate?

MR. BRUCK: Two, maybe one.

MR. RICHARDSON: Two to three weeks.

MR. BRUCK: Now we are getting closer.

MR. RICHARDSON: I'm listening to you guys. Y'all are telling me it's going to be six weeks.

THE COURT: By the way, guys, whatever it is, it is.

MR. BRUCK: You are trying to estimate.

THE COURT: It's not like we are all going fishing when it's over, the boat is waiting for us.

MR. RICHARDSON: I might be, Judge.

THE COURT: You might be.

So it sounds like to me we are probably talking about jury selection allowing us to sort of basically, hopefully be finished before Thanksgiving, we start November 7th, that would be about two and a half weeks.

MR. BRUCK: Around Thanksgiving. Maybe a little bit more to do afterwards.

THE COURT: And then whatever it is we might think about doing the guilt phase before Christmas, and come back in January and do -- I don't -- I'm not crazy -- I'm going to break about two days before Christmas and I'm not coming back until after January. You cannot get a jury if you don't do that. Does that make sense?

MR. BRUCK: By the way, it sounds like the ship has sailed on our preference for strike as you go, but -- because you've indicated --

THE COURT: You know, you want to go and change everything we do, David. We just do it a certain way, and it may not be the greatest way, but it works for us, we are familiar with it. And you are asking us to go -- you are like change our skates right before the Olympics.

MR. BRUCK: That's what you get from appointing a

lawyer from out of town, but I mean --

THE COURT: Let me say, I've done it both ways myself as a lawyer, okay? And what I never liked as a practitioner was I was using up my peremptories and I had no idea what the rest of the pool looked like.

MR. BRUCK: It's the same for both sides.

THE COURT: It is, but --

MR. BRUCK: We might be done sooner.

THE COURT: Your client is fighting for his life, the other guys are prosecuting the case, okay? So it's a lot to be -- it's a lot to be in the blind about.

MR. BRUCK: Right.

THE COURT: So I personally think it's fairer to know the pool. It is a little more work to do, but at least you can -- you can knowingly utilize your peremptories.

MR. BRUCK: I only mention it because it may well affect how long jury selection takes.

THE COURT: I get it. But I think this is -- you know, unless -- I'm continuously rethinking things, but we do it this way, and I just sort of -- I'm used to getting it done, and I think that's what we are going to do.

Now, one thing you will see in our order we'll issue is I noticed that somebody wanted to put -- we would need like 64 on the strike list, and then somebody wanted -- I think somebody said they wanted up to 70; is that right?

MR. RICHARDSON: We suggested including a few extra just --

THE COURT: I don't have a problem with that.

MR. RICHARDSON: Unknown.

THE COURT: The way it works, and we do it routinely here is -- because we'll have a strike list that will be the right number, but then the Government will stand up and say, I've used up all my peremptories and we have no more strikes, okay? And what we do is we tell them if there are like three still on the list, the bottom three on the list are the ones on the strike list that are the ones that go. We go from the top and we go -- take out everything that is struck. When we get to here will be 12 plus six. When we hit 18, that's the jury, okay? And I tell people that because sometimes you might not want to waste -- see, they don't really know that. Nobody knows until the Government stands up and says, I'm not striking anymore. But it might suggest not bothering to be striking people at the very bottom. You might in terms of strategic, everybody knows that that's the way the game is going to be played.

Anything y'all want to tell me about or talk to me about?

MR. RICHARDSON: One question on the strike list. David had suggested keeping the jurors on the strike list in their juror number order. And that is not -- typically

speaking, my experience has been that judges do a random reshuffle.

THE COURT: We do a random -- the computer does a random and will produce the names and that's just -- so we have the pool and then we understand our obligation is to randomly pull from that pool. So we don't do it -- so we randomly do it. What you are suggesting is, after we do that, is to put them in some kind of juror --

MR. BRUCK: No. What we were assuming that this would be done in the 3,000 would be in an order from one to 3,000, and that will be the juror number and that will be the order in which they will be voir dired. Many will be missing.

THE COURT: We'll continue voir dire and we are going to be bringing them in in order of the jury. So --

MR. BRUCK: The order is fixed.

THE COURT: At the end of 3,000 you --

MR. BRUCK: The order is fixed from the beginning.

THE COURT: Correct. The 70 gets randomized. At the end they get -- that last 70 gets randomized because you would go -- the normal way and the way traditionally was you go into a box, a blind guy would pull and that would be the list.

MR. BRUCK: Okay. It was not done that way in Boston. We kept the order and that allowed -- I mean, you

are talking about having an understanding of sort of --

MR. RICHARDSON: Seventy. Once you get it to 70, if you randomize it at 70, I don't think that --

THE COURT: What's the big deal? This is your strike list. You get the list. I don't think --

MR. RICHARDSON: It's just knowing, I don't have a position.

THE COURT: It's a randomized list, because if you don't randomize it, then you are kind of predetermining the last on the list. And I understand our obligation is to keep it random. And the other reason is that the jurors get a new number. Y'all strike off of a random number.

MR. RICHARDSON: Random number 7 which corresponds with 30.

THE COURT: Juror number 7 always thinks he got struck. I was struck, I heard my name struck. No, you weren't struck. That was a different list.

MS. STEVENS: Once you get to 70, you randomize that and then we get a new list with random numbers?

THE COURT: Correct.

MS. GANNETT: And when is that new list generated?

THE COURT: When we finally get to 70. That's your strike list.

MS. GANNETT: How far in advance of the final strikes is that prepared?

THE COURT: Actually, we form -- we have to think about that. We normally give them 15 minutes.

MR. RICHARDSON: Sometimes they will give us 25 minutes.

THE COURT: Go in another room for just a minute. We'll work out something.

MR. RICHARDSON: Government two, will that new list reference back to their old number?

THE COURT: Yes. Actually, the list has two numbers on it. So the far left is the new random number, to the right is the juror number.

MR. RICHARDSON: I'll send everybody an example of one. They are in every case we do. I'll send you one we've used.

THE COURT: What we'll do is give y'all some more than I normally do, give a little more time for people to go through and process that; and, you know, we allow y'all overnight. We won't do it the same day. And then we'll bring y'all to court and we'll strike, okay? Does that make sense?

MR. RICHARDSON: One small housekeeping matter with respect to the brief sizes, can we ask the Court to not require us to file motions for oversized briefs?

THE COURT: I have no problem -- I have no problem with y'all filing briefs whatever length you want, I just

quit reading at page 35.

MR. RICHARDSON: Fair. As long as you know that on the front end.

THE COURT: The important stuff, it's like the jurors at the end of the --

MR. CURRAN: We file multiple 35 pages.

THE COURT: That's right, or 35-page replies, right? But you do not need to file motions.

MR. RICHARDSON: I didn't think so. I just -- that's out of an abundance of caution.

THE COURT: Anything else?

MR. BRUCK: I have a couple of small things like that. When is -- we may have some exhibits that are privileged discovery that we would like to submit along with the suppression motions. Do we need to file a motion to seal?

THE COURT: Yes. We've got to -- when you say "privilege," you are trying to keep them from the Government or are you trying to keep them from the --

MR. BRUCK: No. This is government discovery.

THE COURT: Let me tell you something, there is a process for sealing, a motion to seal. Eunice, you have -- is it a rule or how do we --

MR. RICHARDSON: The local rule.

THE COURT: And you just file a motion and I grant

it. I mean -- and I will tell you all, obviously the things that by statute are confidential, right? But the things that I'm sealing, things beyond that, because you think it affects the defendant's right to a fair trial, the day after whatever verdict there is in this, I'm going to unseal everything. I mean, I think the public has a right to know. So if there is something -- y'all might want to think ahead of time -- that you really don't want, any circumstances it's not covered by the statute, like compensation and so forth, y'all need to let me know that and I'll consider it. But sealing anything is sort of -- I have an intuitive hesitancy to do that in any regard.

MR. BRUCK: Well, to be clear, there are two -- one is we have a motion that we are proposing to be under seal, that's an investigation motion having to do with confession, the video of the confession itself.

THE COURT: We are going to seal that.

MR. BRUCK: I'm sorry?

THE COURT: We are going to seal that. We don't have to go through hoops about that.

But let me just say this because the press -- I mean, the Fourth Circuit has issued these decisions on the press's right to access, so you need to go through the formalities of doing it and having me authorize the sealing.

MR. BRUCK: And the second matter is that we would

like to have the entire motion to suppress some writings that were found in the jail completely under seal. The very fact of the motion itself would disclose very prejudicial information.

THE COURT: Let me ask you this: What's the Government's -- I know a little bit, I frankly know it from Judge Nicholson told me about it, but what is y'all's position on that, on the stuff --

MR. RICHARDSON: With respect to the sealing or respect to the --

THE COURT: To some writing in the --

MR. RICHARDSON: We think it's plainly admissible.

THE COURT: Is it allegedly -- what I had heard was it had -- it was written for the lawyers, is that what --

MR. RICHARDSON: We think there is strong support that that is not the case. I think that will be what we are litigating.

THE COURT: That's the issues.

MR. BRUCK: That is one of the issues. There is also a Fourth Amendment, a residual Fourth Amendment issue.

THE COURT: That's why -- if I had all the easy questions -- I want to thank y'all for that. That is another one of those great --

MR. RICHARDSON: We don't have any problem with respect to the sealing of it. I think it's probably prudent

and we are happy to consent to it being filed under seal. I think for jury selection, even in our scenario, I think we would rather it be under seal. We think it would likely affect jury selection given the information that is contained in it.

MR. BRUCK: Okay. Well, we will file a motion.

The last item is that we have determined that we really need two more days to get these in. They are due today.

THE COURT: You have them.

MR. BRUCK: Thank you. Okay. I hadn't had a chance to check with the Government.

MR. RICHARDSON: We are fine.

THE COURT: Adair, would you do something about that? We had a motion for two additional days. The motion is granted.

Do I have a motion to seal this?

MR. RICHARDSON: You do from the Government.

THE COURT: Is there a consent? Mr. Bruck, do you join in that?

MR. BRUCK: Yes.

THE COURT: That motion is granted.

***** ***** *****

I certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.

---------------------------

Amy C. Diaz, RPR, CRR                    October 25, 2016

S/  Amy Diaz