```
              UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF MASSACHUSETTS


                                )
UNITED STATES OF AMERICA,        )
                                )
         Plaintiff,              )
                                )    Criminal Action
v.                               )    No. 13-10200-GAO
                                )
DZHOKHAR A. TSARNAEV, also       )
known as Jahar Tsarni,           )
                                )
         Defendant.              )
                                )



       BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
             UNITED STATES DISTRICT JUDGE
```

### JURY TRIAL - DAY SIX

```
        John J. Moakley United States Courthouse
                 Courtroom No. 9
                 One Courthouse Way
              Boston, Massachusetts  02210
              Tuesday, January 20, 2015
                    8:37 a.m.



            Marcia G. Patrisso, RMR, CRR
             Cheryl Dahlstrom, RMR, CRR
             Official Court Reporters
          John J. Moakley U.S. Courthouse
          One Courthouse Way, Room 3510
            Boston, Massachusetts  02210
                 (617) 737-8728

        Mechanical Steno - Computer-Aided Transcript
```

1    APPEARANCES:

2            OFFICE OF THE UNITED STATES ATTORNEY
             By:  William D. Weinreb, Aloke Chakravarty and
3            Nadine Pellegrini, Assistant U.S. Attorneys
             John Joseph Moakley Federal Courthouse
4            Suite 9200
             Boston, Massachusetts  02210
5            - and -
             UNITED STATES DEPARTMENT OF JUSTICE
6            By:  Steven D. Mellin, Assistant U.S. Attorney
             Capital Case Section
7            1331 F Street, N.W.
             Washington, D.C.  20530
8            On Behalf of the Government

9            FEDERAL PUBLIC DEFENDER OFFICE
             By:  Miriam Conrad, Federal Public Defender
10           51 Sleeper Street
             Fifth Floor
11           Boston, Massachusetts  02210
             - and -
12           CLARKE & RICE, APC
             By:  Judy Clarke, Esq.
13           1010 Second Avenue
             Suite 1800
14           San Diego, California  92101
             - and -
15           LAW OFFICE OF DAVID I. BRUCK
             By:  David I. Bruck, Esq.
16           220 Sydney Lewis Hall
             Lexington, Virginia  24450
17           On Behalf of the Defendant

18

19

20

21

22

23

24

25

1                                 P R O C E E D I N G S

2

3

4

5

6

7

8

9

00:12  10

11

12

13

14

15

16

17

18

19

00:13  20

21

22

23

24

25

```
         1

         2

         3

         4

         5

         6

         7

         8

         9

00:14   10

        11

        12

        13

        14

        15

        16

        17

        18

        19

00:14   20

        21

        22

        23

        24

        25
```



1

2

3

4

5

6

7

8

9

00:17 10

11

12

13

14

15

16

17

18

19

00:18 20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

00:19 10

11                                                                          t

12

13

14

15

16

17                                                                          f

18

19

00:19 20

21                                                                          s

22

23

24

25

1

2

3

4

5

6

7

8

9

00:20 10

11

12    (The Court and the venire entered the room at 9:10 a.m.)

13         THE COURT:  Good morning, everyone.

14         THE VENIRE:  Good morning.

15         THE COURT:  Welcome back to the United States District

16    Court for the District of Massachusetts.  Thank you for being

17    here.  We're continuing the process of selecting a jury for the

18    case of the United States vs. Dzhokhar Tsarnaev.  As you know,

19    Mr. Tsarnaev is charged in connection with the bombing that

00:47 20    occurred near the finish line of the Boston Marathon on April

21    15, 2013, and that resulted in the deaths of three people.

22    He's also charged in the death of an MIT police officer and

23    other crimes that occurred on April 18 and 19, 2013.  Some, but

24    not all, of the crimes charged are, by statute, potentially

25    punishable by death.

1          You will recall from my prior instructions that the

2     jury will first consider and decide whether the government has

3     proved Mr. Tsarnaev's guilt of any or all of the charges

4     against him.  If he is convicted of any of the capital crimes,

5     that is, crimes potentially punishable by death, the jury will

6     then consider and decide whether he will be sentenced to death

7     for any such crime or to life in prison without possibility of

8     release.

9          Some of you may have wondered why the death penalty

00:48 10     could be a possibility in this case in view of the fact that

11     the laws of Massachusetts do not provide the death penalty for

12     murder or any other violation of Massachusetts law.  The reason

13     is that this is a federal case involving violations of the laws

14     of the United States rather than a state case involving

15     violations of the laws of Massachusetts.

16          If the jury convicts Mr. Tsarnaev of any of the

17     capital crimes charged in the Indictment, the same jury will

18     hear additional evidence and decide whether to sentence him to

19     death or to life in prison without possibility of release.  So

00:49 20     because the jury that is selected first to decide the question

21     of guilt or innocence will also decide the punishment if the

22     defendant is convicted, it is necessary to question you then in

23     this process about your feelings and beliefs about the death

24     penalty as part of the process.

25          So let me explain briefly the procedures that are

1    followed in a case in which the death penalty is or may be an

2    issue.  As in any criminal trial, initially the government will

3    have the burden of proving that Mr. Tsarnaev is, in fact,

4    guilty of any of the crimes with which he is charged.  If he is

5    convicted of a crime for which the death penalty may be

6    imposed, then we will proceed to the second phase of the trial,

7    sometimes referred to in shorthand as the penalty phase.

8         In that phase, the government will introduce -- that

9    seeks to prove beyond a reasonable doubt, first, that Mr.

00:50 10   Tsarnaev acted with the required intent or sufficient intent to

11   be subject to the death penalty; and, second, that aggravating

12   factors about the killings or about the defendant justify

13   sentencing him to death.  Aggravating factors are circumstances

14   that, if proven, make the crimes particularly serious or

15   blameworthy and, therefore, under the law, may justify imposing

16   a more severe sentence on this defendant compared to other

17   persons convicted of intentional killing or murder.  The

18   government bears the burden of proving any alleged aggravating

19   factors to every juror beyond a reasonable doubt.

00:51 20   The defense will also have the opportunity to present

21   evidence of what it will argue are mitigating factors in the

22   case.  Mitigating factors are usually circumstances about the

23   crime or about the defendant's background or character that

24   would suggest the death penalty is not the appropriate sentence

25   for the case or that life imprisonment without possibility of

1    release is adequate to punish the defendant.  Unlike the proof

2    of aggravating factors, a mitigating factor need only be proven

3    by the greater weight of the evidence.  That is a less

4    demanding standard of proof than proof beyond a reasonable

5    doubt.  Again, unlike the proof of aggravating factors,

6    mitigating factors do not have to be proven to the satisfaction

7    of all 12 jurors.  Any juror who find or determines a

8    mitigating factor to have been proven by a greater weight of

9    the evidence may consider that factor in deciding the

00:52 10    appropriate sentence in the case regardless of whether any or

11    all of the other jurors agree that the mitigating factor has

12    been proven.

13        After the parties have made their presentations during

14    the penalty phase, the jury will weigh all the evidence.

15    Before a jury could vote to impose the death penalty, every

16    juror would have to be persuaded that certain threshold factors

17    that make the defendant potentially subject to the death

18    penalty have been proven beyond a reasonable doubt.  In

19    addition, every juror would have to be persuaded that any

00:52 20    proven aggravating factors sufficiently outweigh any mitigating

21    factors found by any juror or jurors to justify a sentence of

22    death.  Even if the jury did not find any mitigating factors in

23    the case, it would still have to be unanimously persuaded that

24    any proven aggravating factors were themselves sufficient to

25    justify a death sentence.

1        You should understand that a jury is never required to

2   find that a sentence of death is justified.  The decision

3   whether the government has proven that a defendant should be

4   sentenced to death must ultimately be made by each juror

5   himself or herself.  If, however, every juror is persuaded that

6   the death penalty should be imposed, I would be required, as

7   the judge, to sentence the defendant to death.  In other words,

8   I cannot change the jury's decision.  The jury, and not the

9   judge, is responsible for determining whether a defendant who

00:53 10   is convicted of a capital crime will live or die.

11        What I've just described is an overview of the law

12   applicable to the jury's consideration of the death penalty.

13   If you are selected to serve on the jury and if you find the

14   defendant guilty of a crime or crimes punishable by death, I

15   will give you very detailed instructions concerning your duties

16   in deciding whether to impose the death penalty or life

17   imprisonment without possibility of release, and the law that

18   pertains to the making of that decision.

19        As I told you when you were filling out your

00:54 20   questionnaires, there are no right or wrong answers to any of

21   the questions that you have been asked or that you will be

22   asked today in furtherance of the process.  We're asking them

23   because both the government and Mr. Tsarnaev are entitled to a

24   jury that does not have its mind firmly made up one way or

25   another before hearing the evidence and a detailed explanation

1    of the law.  That applies both to whether the defendant is

2    guilty or not guilty of the specific crimes charged in the

3    Indictment and, if he is convicted of a capital crime, whether

4    he should be sentenced to death or to life imprisonment without

5    possibility of release.

6          So today I'm going to question each of you

7    individually about some issues that are relevant to the process

8    of selecting a jury.  We're going to call you into the

9    courtroom one by one to ask you some questions.  You'll see

00:55 10   there are other people here in addition, mostly the lawyers and

11   their staff, but there will be perhaps others in the back.  The

12   proceedings are also being simultaneously transmitted by audio

13   and video to overflow courtrooms.  We will not identify you by

14   name but rather by number.  And you will be seated so that the

15   video camera will be behind you, shooting over your head

16   basically.  Your answers will generally be public, but if you

17   believe a truthful answer would require you to reveal some

18   sensitive personal information, we will temporarily stop the

19   audio transmission to those courtrooms so that people observing

00:56 20   there will not hear your answer.

21          Again, we do not expect or want any particular answer

22   to any of the questions.  All we want and what the law expects

23   is that you provide accurate and truthful answers to the

24   questions you are asked.  If you do that, you will be doing

25   your duty as a citizen and as a juror no matter what the

1    answers may be.

2        I want to remind you about some of my prior

3    instructions.  As I told you before, a jury's verdict must be

4    based on the evidence produced at trial and must be free of

5    outside influence.  Therefore, I remind you again that it is

6    extremely important that you do not discuss the case, including

7    this selection process, with your family, friends, each other,

8    or any other person, until you have been excused or, if

9    selected as a juror, until the case has been concluded.  Again,

00:57 10    you are to refrain from any online research or otherwise

11    reading, watching or listening to any reports about the case

12    that may appear in the media.

13        When you signed your questionnaires, you signed under

14    the penalties of perjury.  It's a solemn occasion.  And we now

15    will ask each of you to take an oath to tell the truth when you

16    answer my questions.  And so we will ask the clerk -- the clerk

17    will ask you to rise and administer that oath to you.

18    (Venire sworn.)

19        THE COURT:  All right.  You might as well remain

00:57 20    standing because you're going to go back into the jury room.

21    Thank you.  We'll recess this part of the matter and begin our

22    questioning of the individual jurors.

23    (The venire left the courtroom.)

24        THE COURT:  We're beginning with No. 48, who was

25    deferred from a prior day.  I may say that this is -- and, I

1   guess, more for the public than for those here who know the

2   answer -- that sometimes occurs.  There's some anomalies and

3   people have been shifted.  They may be expected one day, and

4   we, for various reasons, shift them to another day.  And this

5   is one of those.

6           MS. CLARKE:  Your Honor, there may be an issue for the

7   Court to address with this juror privately.

8           THE COURT:  Okay.

9           THE JURY CLERK:  Juror 48.

01:01 10           THE CLERK:  Juror 48 right here, please.

11           THE JUROR:  Good morning.

12           THE COURT:  So your questionnaire that you previously

13   filled out is there in front of you if you want to look at it.

14   I would like to start by drawing your attention to Question 9.

15   It's on Page 5.  You listed some medications and things that

16   you take there.  Would any of those affect your ability to

17   participate in this case as a juror?

18           THE JUROR:  Friday I was excused for a cardiology

19   appointment.  I've since been diagnosed with a heart arrythmia.

01:02 20           THE COURT:  I think this is medical information.  I

21   think we'll cut the audio on this.

22   (SIDEBAR CONFERENCE AS FOLLOWS:

23

24

25



1

2

3

4

5

6

7

8

9

01:04 10

11

12

13

14

15

16

17

18

19

01:05 20

21

22

23

24

25

6-18

1

2

3

4

5

6

7

8

9

01:06  10

11

12

13

14

15

16

17

18

19

01:06  20

21

22

23

24

25

1    . . . END OF SIDEBAR CONFERENCE.)

2        THE COURT:  I reminded the jurors this morning about

3    not talking with anybody about the case and not following the

4    media and everything.  Since you were here to fill out the

5    questionnaire, have you been able to follow that?

6        THE JUROR:  Yes.

7        THE COURT:  We asked some questions about attitudes,

8    including attitudes toward prosecution, lawyers, defense

9    lawyers, and so on and so forth.  You had some reservations --

01:08 10    if you look at Paragraphs 44 through 46, I guess.  You seemed

11    to say, both as to prosecutors and defenders, that you've yet

12    to be in a court proceeding where they did a good job.

13        THE JUROR:  Yeah.  The last jury duty I was on in

14    district court in Brockton, they -- we spent a week, and the

15    prosecutor never asked the right question.  Even the judge, at

16    the end of the trial, said the prosecutor did a poor job.  They

17    brought in very expensive witnesses, DEA, FBI, and it cost a

18    lot of money.  And it was -- just went out the window because

19    they never asked -- they never asked the right question.  It

01:09 20    was one simple question.  And there was -- the defense lawyer,

21    it was her first time and she was brilliant, you know.  And it

22    was sad that the seasoned prosecutor did such a poor job versus

23    the first-time defense lawyer.

24        THE COURT:  In 46, you said -- concerning law

25    enforcement officers, most seem overly aggressive.

6-20

1          THE JUROR:  That's for sure.

2          THE COURT:  Tend to get carried away with their

3     powers.

4          THE JUROR:  Just from my own experience, my local

5     town, seeing how they pick on the kids and --

6          THE COURT:  If you want to turn back to Page 12,

7     earlier we asked a question about law enforcement persons as

8     witnesses and asked whether you'd give greater or lesser weight

9     to their testimony based on their status as a law enforcement

01:10 10   officer.

11          In light of what you've just said in Question 46,

12    would that affect your assessment of a law enforcement witness?

13    Would you tend to be harder on them than others, or would you

14    treat them as any other witness to be evaluated on the

15    testimony?

16          THE JUROR:  Treat them as any other witness.

17          THE COURT:  Even though you had some --

18          THE JUROR:  Like I say, I think they overpower

19    themselves with the younger crowd.  I mean, it was different

01:10 20   when I was a kid.  They treated us different.

21          THE COURT:  Let me turn to Page 20, Paragraph 77.  In

22    this question we're asking, as a result of things you've seen

23    in the media, you've formed an opinion about certain matters,

24    including whether the defendant is guilty or not and whether --

25    how he should be punished and so on.

1          Part A, you said that you had formed an opinion that

2     he was guilty.

3          THE JUROR:  Yes.

4          THE COURT:  And then Part B and C, you didn't answer.

5     But as to Part D, which said should he -- whether he should not

6     receive the death penalty, you said you're unsure.  So let me

7     just ask about those questions.

8          Do you understand that in any criminal case a

9     defendant is presumed to be innocent at the outset, and it's to

01:12 10   be found guilty only if the government proves that he's guilty

11    beyond a reasonable doubt by the evidence at trial.  Do you

12    understand that that's the principle on which we operate?

13         THE JUROR:  Yup.

14         THE COURT:  You say you formed an impression or an

15    opinion about his guilt.  Would you be able to, nonetheless,

16    focus on the evidence presuming him to be innocent and convict

17    him only if you were convinced by the evidence at trial, or

18    would you be so affected by your --

19         THE JUROR:  I just see the way that the government has

01:12 20   felt -- he failed -- you didn't offer any bail, even if it was

21    $200 million, something that was unreachable, I mean, showing

22    the face that you have -- you've already convicted him.  The

23    government's convicted him because they've failed to show a

24    bail.  There's no plea agreement.

25         THE COURT:  What I'm getting at --

1          THE JUROR:  There's no opportunity by the federal

2     government to show that he's innocent.

3          THE COURT:  Right, right.

4          THE JUROR:  I mean, maybe I'm wrong.  You're in the

5     business.  I'm not.

6          THE COURT:  So the question is -- because of the media

7     attention, it's understandable people have impressions such as

8     you've described.  The question is:  Will you insist that the

9     government fulfill its burden of proof at trial, or have you

01:13 10   already skipped to the next phase of the case in your head?

11          THE JUROR:  Well, I've already skipped to the next

12     phase, but I'm open to suggestion.  I probably could be --

13          THE COURT:  Let me skip over to Question 82.  You said

14     -- you have some Boston Strong T-shirts and jackets, you said,

15     through Teamsters Local 25.

16          THE JUROR:  I do.

17          THE COURT:  Tell me what that phrase mean, "through

18     the Teamsters union."  Did they distribute them to people?

19          THE JUROR:  They distributed them.

01:13 20        THE COURT:  When was that?

21          THE JUROR:  Since the incident and continuous.  They

22     still provide them.

23          THE COURT:  I gather you're a member of the union?

24          THE JUROR:  Local 25, yes.

25          THE COURT:  Beginning with Question 88, we asked some

6-23

1    questions about the death penalty.  88 was a general question:

2    What are your general views?  You said, "Unable to answer."

3    The next question we asked you to express, on a scale from 1 to

4    10, what your views were.  And you were on the -- at a 3 on

5    sort of the opposed side of the death penalty.  Then if you go

6    to the next page, Question 90, we asked you to select a

7    statement which was close to you -- closest to you or your

8    views, and you said you're opposed to the death penalty and

9    would have a difficult time voting to impose it even if the

01:14 10  facts supported it.  Does that accurately summarize your view?

11         THE JUROR:  Yeah, I would say so.  I mean, I use that

12   from the same fact that I was in the service during the Vietnam

13   era.  I was opposed to the death -- you know, to pulling the

14   trigger, going into war.

15         THE COURT:  Were you in combat in Vietnam?

16         THE JUROR:  No, I wasn't.  I was stateside.  That was

17   part of the reason why I was stateside, because -- I also was

18   generally discharged with an inhonorable (ph) discharge for

19   part of that reason and fraudulently enlisted.

01:15 20        THE COURT:  Okay.  Let's go back to the statement in

21   Question 90.  You say you're opposed and would have a difficult

22   time voting to impose it.  The question is whether you could,

23   on the basis of the evidence presented in the trial and

24   particularly in the -- perhaps the penalty phase, would you be

25   able to give careful consideration of that evidence and in --

1   is it foreseeable that the evidence could be such that you

2   would consider --

3          THE JUROR:  No.

4          THE COURT:  -- imposing the death penalty?

5          THE JUROR:  No.

6          THE COURT:  Are there any circumstances you can think

7   of that would lead you to vote in favor of the death penalty?

8          THE JUROR:  I don't believe in it.  I'm pro choice.

9          THE COURT:  Any follow-up?

01:16 10        MR. WEINREB:  Just one.  Going back to what you said

11   about it being a hardship to serve on the jury, you said to us

12   you earn $1,500 a week as truck driver and will earn 600 a week

13   on disability.  If you're not on disability, in other words, if

14   the -- because of your medical situation they take you off

15   disability and you are selected to work on the jury -- to serve

16   on the jury, what kind of a financial hardship will that be?

17          THE JUROR:  It would be $40 a day.

18          MR. WEINREB:  Yeah.

19          THE JUROR:  I won't be able to pay my mortgage and my

01:17 20   car payments.

21          MR. WEINREB:  You would not be able to?

22          THE JUROR:  No.  I have bank statements showing you

23   what it costs for me to live on a monthly basis.

24          MR. WEINREB:  Thank you.  That's all.

25          THE COURT:  No?  All right, sir.  Thank you.

```
 1              THE JUROR:  Leave this here?

 2              THE COURT:  Yes.  Leave that there.  Thank you.

 3              This next juror, Juror No. 58, I think by some

 4    Scribner's error, some of the pages in the questionnaire were

 5    misnumbered.  But I've think we've inquired and it is her

 6    questionnaire.

 7              THE JURY CLERK:  Juror 58.

 8              THE CLERK:  Juror 58.  Have a seat, please.

 9              THE COURT:  Good morning.

10              THE JUROR:  Good morning.

11              THE COURT:  You filled out the questionnaire earlier.

12    It's in front of you.  We may look at it as I follow up on some

13    things.

14              I want to start with Question 10 on Page 5.  You said

15    you're the sole employee at your place of employment.

16              THE JUROR:  Correct.

17              THE COURT:  Can you tell us about that?

18              THE JUROR:  I have a letter from my employer.

19              THE COURT:  Just tell us about it.

20              THE JUROR:  I work for a very small company, and I am

21    the only employee.  It's the owner and myself.  It's a tiny

22    paint company in the city.  So when I'm not there, he has to be

23    there.  And he would not pay me for any time out of work.

24              THE COURT:  How long have you worked for them?

25              THE JUROR:  Fifteen and a half years.
```

1         THE COURT:  How long has the business been there

2    approximately?

3         THE JUROR:  About 120, forever, forever.

4         THE COURT:  You also say you have a planned vacation.

5         THE JUROR:  I do, February school vacation.  It's a

6    destination wedding.  It's been paid for prior to this.

7         THE COURT:  Okay.  I don't think we need to have

8    anything further.  Thank you.

9         THE JUROR:  Thank you very much.

01:20 10        THE JURY CLERK:  Juror No. 59.

11        THE CLERK:  Number 59, have a seat, please.

12        THE COURT:  Good morning.

13        THE JUROR:  Good morning.

14        THE COURT:  As I reminded everybody again this

15   morning, we asked potential jurors to refrain from discussing

16   the case with anyone and also from being exposed to media

17   reports on TV or in the paper and so on.  Have you been able to

18   follow those instructions?

19        THE JUROR:  I have.

01:21 20        THE COURT:  That's the questionnaire you filled out

21   when you were here before.  I'm just going to follow up on some

22   of the answers you gave in that questionnaire.

23        THE JUROR:  Okay.

24        THE COURT:  First of all, if you want to look at it,

25   it's Page 5, Question 10.  You had some concern because you had

6-27

1    just -- have just started a new job.

2                THE JUROR:  Uh-huh.

3                THE COURT:  Can you tell us whether that continues to

4    be an issue?

5                THE JUROR:  Right now I'm just, you know, going

6    through orientation.  They might need me to travel within the

7    next couple weeks.  So, you know, I just don't want to -- I

8    don't want to put that in jeopardy.  I know I can't lose my job

9    from serving here, but it's still, you know, a cause of concern

01:22 10   to my coworkers and my boss.

11                THE COURT:  Tell us a little bit about the employer.

12   How big a company is it and so on?

13                THE JUROR:  It's an international company.  It's about

14   2,000 employees.

15                THE COURT:  Locally, in the office that you would be

16   working in, about how many employees?

17                THE JUROR:  About 200, I believe.

18                THE COURT:  How many people in your job category?

19                THE JUROR:  I think about ten.  So we do have other

01:22 20   people that can, you know --

21                THE COURT:  You're working for a new employer, but

22   you've been doing the kind of work you do for a while, is that

23   right?

24                THE JUROR:  Correct, about four years.

25                THE COURT:  We asked a little bit about people's use

1     of social media in a couple of questions.  In 29, you said that

2     you sometimes post opinions about events on Facebook.  Have you

3     posted opinions about the subject matter of this case?

4          THE JUROR:  I posted my opinion about Dzhokhar being

5     on the cover of -- I believe it was *Time Magazine*.

6          THE COURT:  *Rolling Stone*?

7          THE JUROR:  *Rolling Stone*.  And I thought it was very

8     wrong.  I just said it was wrong, and it's not the kind of

9     person you want on the cover of *Rolling Stone*.  That's all.

01:23 10          THE COURT:  Anything other than that about the case?

11          THE JUROR:  No, nothing else about the case really.

12          THE COURT:  In Question 30, you say you use Facebook

13     and Instagram about once a day.  So you're a pretty regular

14     user?

15          THE JUROR:  Yeah.  I take a lot of pictures.

16          THE COURT:  Are they generally about personal matters?

17          THE JUROR:  No.  It's more like travel pictures,

18     nature pictures, things like that.

19          THE COURT:  We've asked about different experiences

01:24 20     you may have had with the justice system including whether

21     you've served as a juror.  I guess you have not served as a

22     juror, but you had some experience with a civil court trial in

23     which you were involved.

24          THE JUROR:  That's correct.

25          THE COURT:  Does that experience give you any positive

1    or negative feelings about court trials or anything that would

2    interfere with your ability to be a fair juror in this case?

3             THE JUROR:  No.  It was very neutral.

4             THE COURT:  Was that a jury trial?

5             THE JUROR:  No.  It was a -- I don't know what you

6    call a nonjury trial.

7             THE COURT:  Nonjury trial.

8             THE JUROR:  Nonjury trial.

9             THE COURT:  Okay.  Would you look at Question 59 on

01:25 10   Page 17 and, actually, together with that, 64 on the next page?

11            THE JUROR:  I'm sorry.  What was the second question?

12            THE COURT:  59 and 64.

13            THE JUROR:  64.

14            THE COURT:  Those are about your attitudes towards

15   Muslims in the community generally and particularly immigrant

16   Muslims.

17            THE JUROR:  Uh-huh.

18            THE COURT:  You seem to have some relatively strong

19   views about that.

01:26 20           THE JUROR:  Yeah.  I just -- you know, I feel like a

21   lot of terrorist attacks have been by people who are Muslim.

22   And I'm not saying overall as a religion it's bad, but it seems

23   like the radical part of the religion is not good.  So it's

24   hard for me to be unbiased about Muslims in that way, having

25   radical Muslims here.  So I don't know how they -- if they ask

1     questions about that when people come into the country, but I

2     think they should.  That was my feeling about it.

3            THE COURT:  Would those feelings, in your judgment,

4     interfere with your fair-mindedness or your ability to judge

5     the evidence in this case fairly and impartially?

6            THE JUROR:  Yes, I believe so.

7            THE COURT:  You think it would.

8            If you look at Question 77, we ask a series of

9     questions about whether you formed an opinion about whether the

01:27 10     defendant is guilty or not and, if so, what penalty might be

11     imposed.  And you've said, yes, you have formed an opinion that

12     he's guilty.

13            As I think you've heard in my instructions, in a

14     criminal case, the government has the responsibility of proving

15     somebody guilty of what they're charged with in the case, in

16     the trial.  That's -- the defendant starts presumed not to be

17     guilty, and the burden is on the government by evidence

18     produced at trial to prove beyond a reasonable doubt that he is

19     guilty of what he's charged with.

01:28 20            It's not surprising that people might have impressions

21     or opinions going into that, but the question is whether a

22     juror can set those preconceived ideas aside and pay attention

23     to the case that -- the trial and the evidence produced in the

24     trial and, on the basis of that, make a decision whether the

25     government has proved the defendant guilty or not.  So I guess

1    the question is:  Would you be able to hold the burden -- hold

2    the government to its burden of proof, or are your feelings

3    about this strong enough that you think that they would

4    override that ability?

5          THE JUROR:  I feel like, even if I was shown evidence

6    and heard it, I mean, I would like to be there, but I already

7    feel that he's guilty and that he should have the death

8    penalty.

9          MS. CLARKE:  Your Honor.

01:29 10          THE COURT:  Okay.  Thank you.

11          THE JUROR:  Thank you.

12          THE COURT:  Just leave the questionnaire there.

13          THE JUROR:  Okay.

14          THE JURY CLERK:  Juror No. 60.

15          THE CLERK:  Juror No. 60, over here, please.  Have a

16    seat.

17          THE COURT:  Good morning.

18          THE JUROR:  Good morning.

19          THE COURT:  As I reminded everybody again this

01:30 20    morning, I've asked jurors to avoid any discussion of the case

21    or the process as well as avoid any media reports about the

22    case.  Have you been able to do that between the questionnaire

23    and now?

24          THE JUROR:  Yes.

25          THE COURT:  So that's the questionnaire you filled out

1    when we were last here.  I'm going to follow up with some

2    questions about some of your answers.  I'd like to start with

3    No. 13, which is just basic about your family, I guess.  We

4    asked about your spouse, and you say -- in terms of occupation,

5    you say "retired."  Could you tell us what your spouse is

6    retired from?

7         THE JUROR:  Sure.  He worked on the ambulance for the

8    Fall River Fire Department, and he currently works as a starter

9    at a golf course.

01:31 10        THE COURT:  That's a nice retirement.

11        THE JUROR:  Yeah, it is.

12        THE COURT:  How long was he with the fire department?

13        THE JUROR:  I would say 20 years.

14        THE COURT:  You say he worked on the ambulance.  Was

15   he an emergency medical technician?

16        THE JUROR:  He was.

17        THE COURT:  And before he did that, did he have --

18   before he went to the fire department, what did he do?

19        THE JUROR:  He started very young on the fire

01:31 20   department.  He retired because of a back injury, so he was

21   relatively young when he retired.

22        THE COURT:  Okay.  So when was that?  When was his

23   retirement?

24        THE JUROR:  Probably close to 20 years now.

25        THE COURT:  Okay.  Your own employment is as a manager

1      of social work and interpreter services at a health center.

2               THE JUROR:  South Coast Health, yes.

3               THE COURT:  Tell us what your daily activities are

4      like.

5               THE JUROR:  I manage roughly 30 social workers for a

6      three-hospital site system and probably 15 interpreters.  So

7      the social workers deal with any barriers to discharge, any

8      psychosocial issues that patients may have, and the

9      interpreters provide interpreting services for patients within

01:32 10     the hospital system.

11              THE COURT:  We asked some questions about whether

12     there was any connection in the family with law enforcement,

13     including prosecutors' offices and so on.  Interpreting the

14     answers -- this is Question 33 on Page 11 -- that your daughter

15     was, I gather, something like an intern in a DA's office while

16     she was a law student?

17              THE JUROR:  Correct.

18              THE COURT:  Has she had any regular employment in a

19     prosecutor's office?

01:33 20              THE JUROR:  No.  She works for the City of Fall River

21     in their economic development.

22              THE COURT:  You had prior jury experience, I guess, in

23     this court?

24              THE JUROR:  Yes.

25              THE COURT:  You said about ten years ago or so?

1          THE JUROR:  Actually, I think it was longer than that,

2     probably closer to 15 or 20.

3          THE COURT:  You said it was a difficult process.  Can

4     you tell us why you described it that way?

5          THE JUROR:  Actually, the court process was not.  It

6     was very enlightening.  But the deliberation was difficult in

7     that, for some reason though the majority of people felt the

8     individual was guilty, the people who didn't, chose to focus on

9     me to change my mind, and I'm not sure why that happened, but

01:34 10    -- so it just felt difficult.

11          THE COURT:  Because you thought you were kind of being

12     a focus of something?

13          THE JUROR:  Uh-huh.

14          THE COURT:  What was the ultimate verdict?

15          THE JUROR:  Guilty.

16          THE COURT:  Let me ask you to look at Page 20 and

17     Paragraph -- excuse me, Question No. 77.  We ask whether you've

18     formed an opinion about whether the defendant is guilty and, if

19     so, what the penalty should be.  You say that you have formed

01:34 20    an opinion that he's guilty based on media reports and other

21     things.

22          THE JUROR:  Uh-huh.

23          THE COURT:  As I've instructed the jury generally, in

24     a criminal trial, every defendant is, at the outset, presumed

25     to be not guilty unless and until proved guilty by the

1    evidence.  And the government has that burden to prove a person

2    guilty beyond a reasonable doubt.  It's not surprising that

3    people might have some ideas coming in.  What we ask jurors to

4    do is to put aside those ideas in favor of the process and

5    listen to the evidence and, on the basis of that, decide

6    whether the government has, in fact, proven the person guilty

7    or not as it has the burden to do.  Would you be able to do

8    that?

9            THE JUROR:  I think so.

01:35 10           THE COURT:  You also have a -- say you have an opinion

11   about whether the death penalty should be imposed, although in

12   the next question to whether he should not receive it, you're

13   saying you're unsure.  Let's turn to the questions that focus

14   on that, and that starts at Page 88 -- I'm sorry, Question 88

15   on Page 23.

16            We ask there generally what your views of the death

17   penalty might be, and you say, "Certain crimes should be

18   punishable by death."  Is that your general view?

19            THE JUROR:  Yup.  Theoretically, I believe in the

01:36 20   death penalty, but it became very different, when you were

21   looking at it, that you would be making that decision.  So,

22   theoretically, yes, I do believe in it.

23            THE COURT:  In the next question, we ask you to put it

24   on a scale from 1 to 10 where your views where, how strong they

25   were.  You put it kind of in the middle with a 6.

1          Then on the next page, we asked you to select a

2    statement that was closest to your view.  And you said, "I am

3    in favor of the death penalty, but I could vote for a sentence

4    of life imprisonment without possibility of release if I

5    believe that sentence was called for by the facts and the law

6    in the case."  Does that fairly and accurately summarize your

7    view of the matters?

8               THE JUROR:  Yes.

9               THE COURT:  So in this case, would you be open,

01:37 10   depending on the evidence, to a judgment that was -- assuming,

11    obviously, conviction of a qualifying capital crime, you could

12    -- could you vote for, on the one hand, the possibility of a

13    death penalty but also, on the other hand, the possibility of

14    life without release?

15               THE JUROR:  Yeah.

16               THE COURT:  If you look at the -- I guess Page 25,

17    Question 95, at the very bottom, we asked, "If you decided the

18    death penalty was the appropriate punishment, could you

19    conscientiously vote for it?"  You said you're not sure.  Then

01:37 20   on the next page, we asked the same question about life

21    imprisonment and you said yes.

22               THE JUROR:  Struggling a little bit with that.  It's

23    very different when you're just giving an opinion versus making

24    a decision.

25               THE COURT:  Of course.  You're trying to predict what

1    you might think on some unknown body of facts, right?  But we

2    are asking about dispositions and -- actually, the real issue

3    is:  Are you open to consideration of the evidence so that you

4    would possibly, depending on that evidence and how you assessed

5    it, be persuaded to vote to impose the penalty of death or,

6    alternatively, persuaded that life imprisonment should be the

7    penalty?

8            THE JUROR:  Uh-huh, yes.

9            THE COURT:  Is that fair?

01:38 10        THE JUROR:  Yes.

11           THE COURT:  Question 94 expresses a rather harsh

12   opinion by your husband.

13           THE JUROR:  Uh-huh.

14           THE COURT:  Would you feel pressured by him in making

15   your decision?

16           THE JUROR:  No.

17           THE COURT:  Or his views if he were to say that again

18   sometime?

19           THE JUROR:  No.

01:39 20        THE COURT:  Okay.  Follow-up?  Mr. Weinreb, anything?

21           MR. MELLIN:  Your Honor, may I ask a few questions?

22           THE COURT:  Go ahead, Mr. Mellin.

23           MR. MELLIN:  Ma'am, I'd like to go back --

24           THE COURT:  Just identify yourself.

25           MR. MELLIN:  I'm sorry.  I'm Steve Mellin.  I'm one of

6-38

1    the prosecutors along with the people at this end of the table.

2         You indicated that, theoretically, you support the

3    death penalty, but then you were making a distinction.  It's

4    one thing to have an opinion about the death penalty.  It's

5    another thing to be in that position, right?

6         THE JUROR:  Uh-huh.

7         MR. MELLIN:  Do you believe that -- if you found that

8    the evidence in this case would support the imposition of the

9    death penalty, do you believe you would actually be able to

01:39 10    vote to impose the death penalty?

11         THE JUROR:  I think I could, yes.

12         MR. MELLIN:  Okay.  All right.  Thank you.

13         THE COURT:  Any questions?

14         MS. CLARKE:  Yes, your Honor.  My name is Judy Clarke.

15    I'm one of the lawyers for Mr. Tsarnaev.  Good morning.

16         THE JUROR:  Good morning.

17         MS. CLARKE:  You mentioned that your husband retired

18    from the fire department as an EMT 20 years ago.  Do you still

19    have connections to people that work in the business?

01:40 20         THE JUROR:  No.

21         MS. CLARKE:  Twenty years is a pretty long time?

22         THE JUROR:  Yeah.

23         MS. CLARKE:  On Question 73, that asks about how much

24    media coverage you had followed and you marked "a lot."  Can

25    you tell us what you remember -- what stands out most in your

1    mind about what you read or heard?

2            THE JUROR:  Probably the boat incident, when it was

3    covered by world news --

4            MS. CLARKE:  Can you tell us what you remember about

5    that?

6            THE JUROR:  -- live.  Just kind of the chase

7    situation.

8            MS. CLARKE:  Where were you that night?

9            THE JUROR:  Home watching television.

01:41 10            MS. CLARKE:  Very far away?

11            THE JUROR:  Somerset, Massachusetts.

12            MS. CLARKE:  Okay.  Anything else come to mind, stand

13    out in your mind?

14            THE JUROR:  You know, just the scenes.  Obviously, I

15    work in healthcare, so I think every hospital learned or became

16    more aware of emergent needs in situations like that.  So,

17    yeah, as part of my work, I think I became more aware as well.

18            MS. CLARKE:  Okay.  Did you have anything to do with

19    any healthcare for people that were involved?

01:41 20            THE JUROR:  No, no, no.

21            MS. CLARKE:  It was interesting.  I don't know whether

22    you've told your husband you wouldn't feel pressured by him.

23            THE JUROR:  He knows I wouldn't feel pressured by him.

24            MS. CLARKE:  The question -- I don't know whether most

25    of us could confess that.

1          The Question 94 that the judge asked you about, that

2     was in response to, Would somebody be critical of you,

3     remember?

4          THE JUROR:  94, yes.

5          MS. CLARKE:  That's when you wrote that your spouse

6     believes some rather harsh things, that he should have been

7     shot in the boat.  Was that a conversation that night?

8          THE JUROR:  No.  Actually, that was a conversation

9     that resulted from me coming here.

01:42 10          MS. CLARKE:  After you got your jury summons?

11          THE JUROR:  Yeah.

12          MS. CLARKE:  And your husband expressed that opinion?

13          THE JUROR:  Yeah.

14          MS. CLARKE:  Your husband expressed the opinion

15     regarding guilt?

16          MR. WEINREB:  Objection, your Honor.

17          THE COURT:  Sustained.

18          MS. CLARKE:  Did you talk to your husband -- I think,

19     if you look at 77 -- I don't mean to go too fast.  77 and 78,

01:43 20     you discussed your opinion with your spouse.  We've gotten so

21     used to reading these questions.

22          THE JUROR:  It's hard to remember, and it feels like

23     you go back and forth with the answers.  I did anyway.  So I'm

24     sorry.  What was your question again?

25          MS. CLARKE:  You discussed your opinion with your

6-41

1    spouse.

2         THE JUROR:  About the guilt?

3         MS. CLARKE:  Yes.

4         THE JUROR:  Probably -- that piece of it was probably

5    watching television.

6         MS. CLARKE:  Number 78.  In 77, if I'm reading it

7    correctly, you've concluded that your opinion is that Mr.

8    Tsarnaev is guilty.

9         THE JUROR:  Uh-huh.

01:43 10        MS. CLARKE:  And that he should receive the death

11   penalty.  And you were unsure whether you would be able to set

12   aside your opinion.  Right?

13        THE JUROR:  Uh-huh.

14        MR. WEINREB:  Your Honor.

15        MS. CLARKE:  I'm going to ask.  Is that correct?

16   You're unsure about setting aside your opinion.  About guilt or

17   punishment?  Which one?

18        THE JUROR:  I was -- from the way I'm reading it now,

19   I was unsure about the death penalty.

01:44 20        MS. CLARKE:  Okay.  The judge asked you a little bit

21   about whether you could presume Mr. Tsarnaev not guilty and

22   force the government to prove his guilt.

23        THE JUROR:  Uh-huh.

24        MS. CLARKE:  In reality, the first presumption is that

25   he is presumed to be innocent.

1          THE JUROR:  Uh-huh.

2          MS. CLARKE:  How do you feel about that?

3          THE JUROR:  I think that's more difficult because of

4     the media coverage.

5          MS. CLARKE:  So as you sit here today, you can or

6     cannot presume him to be innocent?

7          THE JUROR:  I don't think I can presume him to be

8     innocent.

9          MS. CLARKE:  When you answered Question 88, your

01:45 10    answer was that certain crimes should be punishable by death.

11    Can you help us know what you were thinking?

12         THE JUROR:  Sure.  The one that always comes to mind

13    -- and I don't know a lot of the details of the location and

14    things like that, but the doctor whose daughter and wife were

15    killed by escaped convicts, I believe it was, who invaded their

16    home.  That's --

17         MS. CLARKE:  That's what was in your mind?

18         THE JUROR:  Absolutely.

19         MS. CLARKE:  Okay.  Thank you very much.

01:46 20    THE JUROR:  You're welcome.

21         MR. WEINREB:  Your Honor, if I might, just one

22    follow-up on that.

23         THE JUROR:  Sure.

24         MR. WEINREB:  In asking you whether, sitting here

25    today, you can presume him to be innocent, the question isn't

1     whether you can presume him innocent based on what you've heard

2     in the media or other things.  In fact, the question that I

3     would like to ask you is not whether, based on what you've

4     heard before, you presume him to be innocent; but when you sit

5     in the jury box and it's your job to evaluate the case on the

6     evidence and only convict him if the government proves him

7     guilty beyond a reasonable doubt, can you set aside what you've

8     heard before and at that point presume him to be innocent

9     unless and until the government meets its burden?

01:46 10          THE JUROR:  I think I can.

11          THE COURT:  All right.  Thank you very much.

12          THE JUROR:  You're welcome.

13          MR. WEINREB:  Your Honor, can we pause for a moment?

14          THE COURT:  Yes.  Hold off.

15          MR. WEINREB:  This is on the record.  So the

16     government objects in general to witnesses being asked if they

17     can presume the defendant innocent without it being made clear

18     that they're not -- whether they're being asked whether, based

19     on what they've heard in the media, they believe him to be

01:47 20     innocent or guilty versus whether they can sit in the jury box

21     with the proper frame of mind, which is a presumption of

22     innocence.  I think it's going to -- asking it in that --

23     without making that distinction is going to muddy the record

24     with answers that don't truly affect the juror's ability to be

25     fair and impartial.

1          MS. CLARKE:  Judge, there are two things going on

2     here.  I think it was very muddled by Mr. Weinreb's final

3     question.  There is the presumption of innocence, and then

4     there is the government's burden of proof.

5          THE COURT:  Right.  But the presumption of -- I agree

6     with Mr. Weinreb on this and was having the same -- it's -- the

7     difference between a lay understanding of the term "presumption

8     of innocence" and our specific understanding of it for these

9     purposes, and it really is a duty to put your mind in a

01:48 10   condition at the trial.  And I think it is that distinction

11    between the lay understanding and the legal understanding is

12    lost on most people, and it produces an ambiguity.

13         I would have concluded, notwithstanding her answer to

14    Miss Clarke's question, based on her answer to my question

15    earlier, that she was able to do that.  But I do think we

16    should stay -- it will confuse the record if the -- if the

17    jurors are confused about the manner in which the proposition

18    is put to them.  As I say, it is a term of art.  It's fair to

19    ask about whether previously formed impressions or conclusions

01:49 20   about factual matters based on media reports, that's one thing.

21    But to ask whether a juror -- we ask it of jurors in every

22    case.  And they have to answer that question, and it's a

23    question that requires them to get into a role that they're not

24    on a daily basis familiar with.  But it is -- it's really a

25    question of good faith.  Will the juror be able, in good faith,

1    to assume the duties of being a juror and follow the

2    instructions, which are, to put your mind in a condition where

3    the burden is entirely on the government to prove the

4    propositions.  And all we can do is try to gauge from the

5    answer the demeanor of the witness -- of the juror, I mean, and

6    other circumstances, whether an answer like this is a reliable

7    one or not.  But it's not simply on the face of it kind of

8    proposition.  So I think we can continue.

9              THE CLERK:  Number 61.

01:50 10              THE JURY CLERK:  Juror No. 61.

11              THE CLERK:  Sir, come up here, please.

12              THE COURT:  Good morning.

13              THE JUROR:  Good morning.

14              THE COURT:  Have you been able to abide by my

15    instructions when you were last here to avoid any discussion of

16    the case or any exposure to the media reports about it?

17              THE JUROR:  As best I can, yes.

18              THE COURT:  You have your questionnaire in front of

19    you, and I may refer to it as I follow up on some of the

01:51 20    answers you gave.  I want to first address something you wrote

21    in answer to Question 10, which is on Page 5 of the

22    questionnaire.

23              THE JUROR:  Yes.

24              THE COURT:  You said you're due to go to work outside

25    the country shortly.

1          THE JUROR:  Starting January 28th.

2          THE COURT:  Tell us about that.

3          THE JUROR:  Starting January 28th, I will be out of

4     state.  Starting February 5th, I will be out of the country.

5          THE COURT:  For how long?

6          THE JUROR:  Second week of April.

7          THE COURT:  And this is for Levi Strauss?

8          THE JUROR:  Excuse me?

9          THE COURT:  Your employer, you say, is Levi Strauss &

01:51 10   Company?

11          THE JUROR:  No.  The current employment that I will be

12    outside of the country with is All Time Low Touring, Inc.  I'm

13    a touring musician.

14          THE COURT:  What's your role with that?  One of the

15    musicians?

16          THE JUROR:  Play guitar and sing.

17          THE COURT:  This is a concert tour for your group?  Is

18    that the idea?

19          THE JUROR:  Yes.

01:52 20         THE COURT:  Thank you.

21          THE JUROR:  Thank you.

22          MS. CONRAD:  Judge, this next juror should be heard

23    off the record.

24          THE COURT:  Now?

25          MS. CONRAD:  Well.

1          THE COURT:  Hold off, and we'll -- it's not off the

2     record but it is sidebar, so we'll cut the audio.

3     (SIDEBAR CONFERENCE AS FOLLOWS:

1

2

3

4

5

6

7

8

9

01:55 10

11    .   .   .   END OF SIDEBAR CONFERENCE.)

12              THE JURY CLERK:  This is Juror No. 62.

13              THE CLERK:  Number 62, have a seat, please.

14              THE COURT:  Good morning.

15              THE JUROR:  Good morning.

16              THE COURT:  Since the day you were here to fill out

17    the questionnaire, have you been able to follow my instructions

18    to avoid any discussion of the case or any exposure to media

19    reports about it?

01:56 20              THE JUROR:  Yes, sir.

21              THE COURT:  Tell us what you do.

22              THE JUROR:  Postal worker.

23              THE COURT:  In a --

24              THE JUROR:  Clerk.

25              THE COURT:  In a --

1          THE JUROR:  In an area office, yes, station.

2          THE COURT:  You have, I guess, a son and a brother who

3     are both involved in the correctional --

4          THE JUROR:  My brother is; my son was.  While he was

5     going to school, he did it during the summertime.

6          THE COURT:  Tell me about your brother.  How long has

7     he been a correction officer?

8          THE JUROR:  Probably, I'm going to say about 15 years.

9     He works up in Woburn.

01:57 10          THE COURT:  In what -- is this a county facility -- or

11     is this a court officer?

12          THE JUROR:  Court officer.

13          THE COURT:  Not a correction officer?

14          THE JUROR:  Not a correction officer, no.

15          THE COURT:  I see.  Let me cut the sound for a minute.

16     (SIDEBAR CONFERENCE AS FOLLOWS:

17

18

19

01:58 20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

01:59 10

11

12

13

14    .   .   .   END OF SIDEBAR CONFERENCE.)

15          THE COURT:  Would you look at Page 15.  We asked about

16    prior jury experience, and you said you had a case back in

17    1979, I guess.

18          THE JUROR:  Yeah.

19          THE COURT:  Then you said -- the next answer is what

02:00 20    I'm interested in.  You could not serve, I guess, in that case;

21    is that what you meant?  You had a hard time being impartial.

22          THE JUROR:  No.  I did serve in that case.  I was

23    talking about this case.

24          THE COURT:  Oh, in this case?

25          THE JUROR:  Yes.  I misunderstood the question.

1           THE COURT:  Maybe you didn't.  Do you think, because

2     of your -- something in your prior jury experience leads you to

3     think that you would have trouble being impartial?

4           THE JUROR:  No.  I'm thinking it's just my knowledge

5     of the case right now and how I feel in my beliefs.

6           THE COURT:  Okay.  We'll talk about that again in a

7     minute.

8           We asked some questions about Islam and Muslims as

9     well as people from other countries, including Russia,

02:01 10   Kyrgyzstan, Chechnya, and so on.  Maybe you could just review

11    your answers.  This is a series of questions beginning on Page

12    17 and going over to 18.

13          THE JUROR:  You want me to start with --

14          THE COURT:  Just review it because I just want to ask

15    you generally about --

16          THE JUROR:  Okay.

17          THE COURT:  The questions I'm principally interested

18    in are 59 and 65.

19          THE JUROR:  Okay.

02:02 20         THE COURT:  Any of your attitudes about people that

21    you've expressed there, do you think they would have an impact

22    on your ability to be an impartial juror in this case?

23          THE JUROR:  I would have to say yes, your Honor, to

24    be, you know, completely honest with you.  I mean, I just feel,

25    you know, they seem to be to me -- not knowing any of them

1    individually or anything like that, but they just feel like

2    they're quite mixed up in their beliefs or the way they act in

3    America.

4             THE COURT:  Let me ask you about -- on Page 20,

5    Question 80, you said your wife was at the Pru at the time of

6    the events?

7             THE JUROR:  Yes.

8             THE COURT:  And she participated in helping some of

9    the victims?

02:03 10             THE JUROR:  Yes.

11             THE COURT:  Has she talked with you about that

12    extensively?

13             THE JUROR:  Yeah.  Of course, when it happened that

14    day and everything, I mean, I had to drive over to the

15    Stockyard Restaurant and pick her up because basically the city

16    became locked down.  She couldn't get her car or anything.  And

17    the T was locked down.  We talked, you know -- I don't want to

18    say extensively, but we talked about the whole situation and

19    everything, you know.

02:03 20             THE COURT:  I assume that that may have been an

21    emotional experience for her?

22             THE JUROR:  Oh, definitely was, yes.

23             THE COURT:  Did she convey that to you?

24             THE JUROR:  Yes.  It was quite upsetting to her to see

25    all those people and the whole chaos and everything that

1   happened about the situation, you know.

2           THE COURT:  Would that affect your ability to be a

3   fair, impartial juror in this case, the way she feels about it?

4           THE JUROR:  No.

5           THE COURT:  You don't think so?

6           THE JUROR:  No, I don't think so.

7           THE COURT:  Let me ask you, on Page 23, Question 88,

8   we asked about your general views of the death penalty.  You

9   said you believe in it.

02:04 10         THE JUROR:  Strongly.

11          THE COURT:  Strongly.  Then we asked you to put that

12  on a scale of 1 to 10, and you put 10, very strong, right?  The

13  next page we asked you to select a formulation that came

14  closest to your view, and you selected F, which was you're

15  strongly in favor, which is consistent with what you said on

16  the other question, and would have a difficult time of voting

17  for life imprisonment without the possibility of release

18  regardless of the facts.

19          We want to understand whether that is a -- your view

02:05 20  of the death penalty is so strong that you would find it very

21  difficult, as you say, to vote otherwise no matter what the

22  facts were.  The question is:  Would you be open to revising

23  that opinion you have of yourself if the facts of the case

24  suggested to you that in this case a death penalty was not

25  appropriate, that the better penalty was life imprisonment

1    without parole -- without release?

2         THE JUROR:  Life without parole.

3         THE COURT:  Would you be able, if you heard facts that

4    suggested that, to be able to follow that and conclude that

5    life imprisonment was a satisfactory penalty in this case as

6    opposed to the death penalty, or are your views about the death

7    penalty so strong that virtually no set of facts could be

8    proved that would lead you to think of a sentence other than

9    the death penalty?

02:06 10        THE JUROR:  That's a mouthful.

11        THE COURT:  Could you meaningfully consider,

12   conscientiously, after -- assuming appropriate facts,

13   obviously, that you could come to the conclusion that, in this

14   specific circumstance life imprisonment was an adequate

15   punishment and the death penalty was unnecessary, or are your

16   views about the death penalty so strong that you think you

17   would in the end --

18        THE JUROR:  I think my views right now in this case,

19   your Honor, is the death penalty is in order.

02:07 20        THE COURT:  And I guess my question is:  Is that so

21   firm an opinion that you could not move off it?  That might be

22   the case.  Or is it possible, if you heard evidence that led

23   you that way, you could think, No, despite what I generally

24   think, this is not a case for it?  Could you think that?

25        THE JUROR:  I don't think I could sway my judgment.

1    It would take an awful, awful lot in this case.

2              THE COURT:  Okay.

3              MR. WEINREB:  We have no questions.

4              THE COURT:  No questions.  Thank you.  Just leave that

5    there.  Thanks.

6              THE JURY CLERK:  Juror No. 63.

7              THE CLERK:  Number 63, have a seat, please.

8              THE COURT:  Good morning.

9              THE JUROR:  Good morning.

02:09 10              THE COURT:  Since you were here to fill out the

11    questionnaire, have you been able to abide by my instructions

12    not to discuss the case with other people or to get exposed to

13    media reports about the case?

14              THE JUROR:  Yes.

15              THE COURT:  That's the questionnaire you filled out.

16    And I'll have some questions about some of the answers you

17    gave.  Tell me about -- if you'd look at Page 5, your answer to

18    Question 10.

19              THE JUROR:  Yeah.  So my husband was a fisherman, and

02:10 20    he was laid off about a year and a half ago due to regulations.

21    So I've had to start working to pick up where we lack.  And

22    we're already two months behind in our mortgage, so we really

23    wouldn't be able to sustain if I wasn't working.

24              THE COURT:  And what is it that you do?

25              THE JUROR:  I'm a bookkeeper.  So I'm not a salaried

1    -- I'm not salaried.  I work, like, consulting.

2             THE COURT:  Is this in addition -- I'm just reading

3    what's in 26.

4             THE JUROR:  What page?

5             THE COURT:  They seem to be all kind of at the same

6    time.

7             THE JUROR:  Yes.  Those are some of my clients.

8             THE COURT:  So those are accounts that you have?

9             THE JUROR:  Yes.

02:10 10         THE COURT:  Is it basically that you're self-employed?

11            THE JUROR:  Pretty much, yes.

12            THE COURT:  Okay.  Okay.  Enough?  Okay.  Thank you.

13            THE JUROR:  Thank you.

14            THE JURY CLERK:  This is Juror No. 64.

15            THE CLERK:  Juror No. 64.

16            THE COURT:  Morning.

17            THE JUROR:  Good morning.

18            THE COURT:  Since you were last here when you filled

19   out your questionnaire, have you been able to abide by my

02:12 20  instructions to avoid any discussion of the case?

21            THE JUROR:  Yes.

22            THE COURT:  Or avoid any media reports and so on?

23            THE JUROR:  Yes.

24            THE COURT:  Good.  I'm going to follow up on some of

25   the answers you gave in your -- when you filled out the

1    questionnaire.  Your husband is a teacher?

2              THE JUROR:  Yes.

3              THE COURT:  Where does he teach?

4              THE JUROR:  The middle school at Marshfield.

5              THE COURT:  And he's done that for how long?

6              THE JUROR:  About 13 or 14 years.  It was, like, a

7    change-of-life thing.

8              THE COURT:  You yourself are a lab manager?

9              THE JUROR:  Yes.

02:13 10              THE COURT:  What does that involve generally?

11              THE JUROR:  I oversee a lab in a hospital.  So there's

12    about 50 or 60 people, from phlebotomists to the different

13    departments that serve for all kinds of specimens in the

14    hospital.

15              THE COURT:  Is your work principally management as

16    opposed to clinical, you yourself?

17              THE JUROR:  I do both.

18              THE COURT:  You do both.  How about your use of

19    Facebook, how do you use it and how often?

02:13 20              THE JUROR:  I set it up when my daughter was in

21    college so I could see her friends but she's graduated.  So

22    it's there, but I don't even know my password.

23              THE COURT:  We asked some questions about feelings

24    about things we might call international events and so on and

25    so forth, feelings toward Islam and Muslims, towards our -- the

1    government of the United States and so on and so forth.  You

2    answered those all.  Have any of those -- mostly you said that

3    you had no strong feelings about those matters.  There's been a

4    lot of news lately about events in Europe.  Has that had any

5    effect on your views about any of those matters?

6              THE JUROR:  Not really.

7              THE COURT:  Have you been following that closely?

8              THE JUROR:  No.  My mom had emergency surgery, so I've

9    kind of been involved with her care.

02:14 10              THE COURT:  So distracted from --

11              THE JUROR:  So between work and her.

12              THE COURT:  Okay.  I'd like you to look at Page 20.

13              THE JUROR:  Uh-huh, yes.

14              THE COURT:  Question 77.

15              THE JUROR:  Yes.

16              THE COURT:  We asked whether you formed any opinions

17    based on news media and so on about whether the defendant is

18    guilty or not and what punishment he should get if he is.  As

19    to the question whether he's guilty or not, you said, no, you

02:15 20    hadn't formed any opinion.  As to the penalty part of the

21    question, you said you're unsure.

22              THE JUROR:  I just don't understand.  I heard a little

23    bit better today, mitigating, aggravating.  But honest and

24    truly, law isn't my specialty.

25              THE COURT:  Okay.  So in any criminal case, including

```
 1    this one --
 2              THE JUROR:  Yes.
 3              THE COURT:  -- a defendant who's charged with a crime
 4    is presumed to be innocent of that crime --
 5              THE JUROR:  Yes.
 6              THE COURT:  -- unless and until the government proves
 7    that he's guilty by evidence at the trial that is convincing
 8    enough so that the jurors have no reasonable doubt about the
 9    judgment that he's guilty.  Okay?
02:16 10         THE JUROR:  Yes.
11              THE COURT:  If you were a juror in this case, would
12    you be able to apply those principles faithfully, that is,
13    start out presuming that he is not guilty of what he is charged
14    with unless the government proves otherwise by the evidence?
15              THE JUROR:  Yes.
16              THE COURT:  I think you had served as a juror before,
17    did you?
18              THE JUROR:  Last year.
19              THE COURT:  Was that a criminal case?  I forgot to
02:16 20    look.
21              THE JUROR:  In Hingham.  It was driving under the
22    influence.
23              THE COURT:  You were a standby, so you didn't
24    participate in the --
25              THE JUROR:  No, sir.
```

1          THE COURT:  You're confident that you could fulfill

2      that duty faithfully?

3          THE JUROR:  Yes.

4          THE COURT:  Now would you turn to Page 23?

5          THE JUROR:  Yes.

6          THE COURT:  You're asked a series of questions about

7      your attitude about the death penalty generally.  The first one

8      was a general question.  What are your general views?  And you

9      said, "None at this time.  It depends on the case."

02:17 10         Is that an accurate representation of your view?

11          THE JUROR:  Yeah.  It just depends on what I learn

12     from this whole process.

13          THE COURT:  Then we asked you to put it on a scale

14     from strongly opposed to strongly favor, and you circled 6,

15     which is somewhere in the middle.  Is that --

16          THE JUROR:  You know, I don't know.  I imagine this is

17     going to be an educational process from all sides, and at that

18     point, I'm sure I'll make an educated decision.  It's a tough

19     decision to make, but it's one that I will do.

02:17 20         THE COURT:  Look at the next question.

21          THE JUROR:  Yes, sir.  Next page?

22          THE COURT:  Next page, 90.  Instead of putting it on a

23     numerical scale, we asked you to select the statement that was

24     closest to your view and you selected D, which was that you are

25     not for or against.  You could vote either way depending on how

1    you assess the facts in light of the --

2          THE JUROR:  If I had to do it, I would, but I would

3    need some serious information.  That's nothing I would take

4    lightly.

5          THE COURT:  But you're -- correct me if I'm wrong, but

6    what I'm understanding you to say is that you would be prepared

7    to listen to the evidence and make a judgment on that.  And in

8    the end, you would be prepared, on the one hand, to impose a

9    death penalty if that was what you felt was right?

02:18 10          THE JUROR:  If I felt -- absolutely.

11          THE COURT:  On the other hand, to vote for a life

12    imprisonment if you thought that was an adequate punishment?

13          THE JUROR:  Yes, sir.

14          THE COURT:  Any follow-up?

15          MR. WEINREB:  No.

16          THE COURT:  Follow-up?

17          MR. BRUCK:  Just a couple things.  Ma'am, you

18    mentioned --

19          THE COURT:  This is Mr. Bruck.

02:19 20          MR. BRUCK:  I'm sorry.  I'm David Bruck.  I'm one of

21    the lawyers for Mr. Tsarnaev.

22          THE JUROR:  Hi.

23          MR. BRUCK:  You mentioned your daughter works or

24    worked in a law office.

25          THE JUROR:  When she graduated from college, she

1    thought she was going to go to law school.  And she did

2    administrative, like, paperwork, I guess.

3            MR. BRUCK:  What sort of a law firm, if you remember?

4            THE JUROR:  It was housing, like, people that needed,

5    like, evictions and things like that, stuff like that.

6            MR. BRUCK:  She never worked for a prosecutor or a

7    defense attorney?

8            THE JUROR:  No, no.

9            MR. BRUCK:  Ma'am, how do you feel about being on this

02:19 10    jury?

11            THE JUROR:  A little nervous.

12            MR. BRUCK:  Are you hoping you will be excused or

13    hoping you will be selected?

14            MR. WEINREB:  I object to that.  That's not a

15    follow-up question.

16            THE COURT:  Go ahead.  You can answer that.

17            THE JUROR:  I feel that I'm going to go through the

18    process honestly and whatever happens, happens.

19            MR. BRUCK:  I guess all I'm asking, if it was up to

02:20 20    you, how you would feel.  Which would you prefer to do?

21            MR. WEINREB:  I object.  That's irrelevant.

22            THE COURT:  Go ahead.  Answer it if you're able to.

23            THE JUROR:  I don't know.  I -- I don't know.

24            MR. BRUCK:  Okay.  As far as knowing what case we're

25    here for --

6-63

1          THE JUROR:  Yes, sir.

2          MR. BRUCK:  -- you know something about the Boston

3    Marathon bombing.

4          MR. WEINREB:  Objection again.  That's --

5          THE JUROR:  It happened.

6          MR. BRUCK:  My question is:  Do you lean one way or

7    the other as far as the death penalty for this case if you

8    found Mr. Tsarnaev guilty beyond a reasonable doubt right now?

9          THE JUROR:  No.

02:20 10          MR. BRUCK:  Okay.

11          THE COURT:  Okay.  Thank you.

12          THE JURY CLERK:  Juror No. 65.

13          THE CLERK:  Number 65, step this way, please.  Have a

14    seat right here.

15          THE COURT:  Good morning.

16          THE JUROR:  Good morning.

17          THE COURT:  Since you were here to fill out the

18    questionnaire, have you been able to abide by my instructions

19    then to avoid any discussion of the case and any exposure to

02:22 20    media?

21          THE JUROR:  Yes.

22          THE COURT:  So we have given you the questionnaire you

23    filled out.  I'm going to follow up on some of the things

24    you've said in the course of it.  I'd like you to look first at

25    Page 5.

1           THE JUROR:  Uh-huh.

2           THE COURT:  Question 9, you have some concern about

3    winter driving.

4           THE JUROR:  Yes.

5           THE COURT:  Perfectly rational concern.  You come some

6    distance.  There is bus service, but what do you know about it?

7           THE JUROR:  I've taken it both times.  Both times that

8    I've been here, I've taken the bus.

9           THE COURT:  Has that worked out?

02:22 10          THE JUROR:  It's worked out, yeah.

11          THE COURT:  And the schedule works?

12          THE JUROR:  Yes.

13          THE COURT:  Now, let's look at the next question.

14   You're concerned about the impact of your serving on finances,

15   I guess?

16          THE JUROR:  Yes.

17          THE COURT:  Tell us a little bit about that.

18          THE JUROR:  Well, I'm single.  I don't have a

19   roommate.  Don't have a husband.  I don't have another income

02:23 20   that I can depend on.  I haven't had this conversation with my

21   bosses yet, so I'm just a little bit worried about how I'm

22   going to pay my bills.

23          THE COURT:  You don't know whether they'll continue to

24   pay you?

25          THE JUROR:  I don't know.

```
 1            THE COURT:  Are you paid on a salary basis?

 2            THE JUROR:  Yes.

 3            THE COURT:  Rather than an hourly wage?

 4            THE JUROR:  Yes.

 5            THE COURT:  Commission at all?

 6            THE JUROR:  No.

 7            THE COURT:  How big is the work force where you are?

 8            THE JUROR:  Well, we're a small company.  There's

 9   probably under 30 of us.  It's a lumber company.  So with the

10   office, the yard, the store.  I work in the showroom, so

11   there's probably about -- I'm just going to count real quick.

12   There's possibly about ten of us in the showroom.

13            THE COURT:  Doing basically the same work or --

14            THE JUROR:  Well, some of the same work.  I don't know

15   how descriptive you want me to be, but, I mean, there's -- for

16   instance, there -- I work for a lumber company, so there's a

17   Windows program that we use that four of us can use.  Three of

18   the guys that can use it are road salesmen.  I'm the only one

19   that stays on the inside.  You know, not a big deal, but, I

20   mean, the schedule can be adjusted so that someone is always

21   covering in the showroom to be able to do that if I'm not

22   around.

23            THE COURT:  So in terms of social media, you use

24   Facebook a little bit but not much?

25            THE JUROR:  Not much.  I have an account, but I'm not
```

1    on it all that much.

2            THE COURT:  You did use it when you were involved in a

3    town issue a little bit to express opinions about that?

4            THE JUROR:  No, no.  Actually, I got an account when I

5    became unemployed because I thought it would help with

6    networking, and I just didn't like using it so I didn't stay

7    using it.  But I do go on it from time to time because my

8    company has a website, and sometimes they post, you know, job

9    photos.  So I'll go on that from time to time for that.

02:26 10          THE COURT:  But you don't use it to express opinions

11    about things or read other people's opinions?

12            THE JUROR:  You know what?  I did once.  I apologize.

13    I did once when that whole town issue started just to let

14    people know that there was going to be a vote happening but

15    after that, nothing.  Just -- I'm sorry.  If I can add, there

16    were a couple of blogs that I did respond on but it wasn't

17    Facebook.  It was a couple of people that were involved, had

18    their own blogs, so I did respond on those blogs.

19            THE COURT:  That was about the town issue?

02:26 20          THE JUROR:  Yes.

21            THE COURT:  Your sister works for a law firm?

22            THE JUROR:  She does.  I wrote the first name down

23    wrong.  It's Madoff, and I didn't write Madoff because I

24    thought I was thinking of Bernie Madoff.  So it's Madoff &

25    Khoury is the law firm.

1          THE COURT:  Is she a lawyer?

2          THE JUROR:  No.  She's a legal secretary.

3          THE COURT:  What's the nature of the practice or the

4     firm, do you know?

5          THE JUROR:  Real estate, bankruptcy.

6          THE COURT:  Coming back to the controversy, I guess,

7     in the town that you were involved in.  There were a couple of

8     sides, I guess.  You were on one, and people were on the other.

9     You thought that the police chief in particular was siding with

02:27 10    the powers that be and was unfair in some way?

11          THE JUROR:  Well, he's employed by the town council,

12    so his demeanor towards us was pretty apparent.  He's basically

13    a pretty nice guy, but I think because we were in opposition

14    and our opposition was mostly vocal.  We weren't all that

15    disruptive except at town council meetings.  But his -- I don't

16    know how to describe it.  It was just his manner towards us was

17    very disrespectful and very apparent.

18          I mean, we had -- we were trying to get signatures

19    regarding this issue, and we were standing at the town hall.

02:28 20    And we had to stand a certain number of feet back away from the

21    entrance.  And when someone else from the opposition was doing

22    that, too, they weren't -- they were a little bit closer, so,

23    you know -- so the other side was allowed to do things that we

24    weren't allowed to do.

25          THE COURT:  We asked if you had any negative

1     experiences like that, and you told us about it.  Then we asked

2     whether that was going to affect you in any way if you were a

3     juror in this case, say in an attitude towards law enforcement

4     witnesses or something like that.

5          THE JUROR:  Right.

6          THE COURT:  You told us that, despite your answer to

7     the other question, you had no hard feelings, is that fair?

8          THE JUROR:  That's correct.

9          THE COURT:  There would be no effect on you here from

02:29 10    that unpleasant experience?

11          THE JUROR:  Oh, that's true.  I wouldn't hold -- I'm

12     not resentful about it, yeah.

13          THE COURT:  Let me just ask the parties whether they

14     are interested in a follow-up to Question 52.

15          THE JUROR:  What page is that?

16          THE COURT:  60.

17          MR. WEINREB:  No, your Honor.

18          MS. CLARKE:  No, your Honor.

19          THE COURT:  No.  I don't -- I agree with that.  We

02:30 20    asked, on Pages 17 and 18, some general questions about

21     attitudes towards Islam and perhaps the War on Terror and

22     things like that.

23          THE JUROR:  Right.

24          THE COURT:  You gave us answers to those, except I

25     think you may have skipped one probably unintentionally, No.

```
 1    62.  Do you believe the War on Terror is overblown or
 2    exaggerated?
 3              THE JUROR:  No, I do not.
 4              THE COURT:  Since you filled out the questionnaire,
 5    gave those answers, there's been a lot of press about events in
 6    Europe and so on, other terrorism attacks and things.  Would
 7    that -- have you followed that at all or --
 8              THE JUROR:  Are you talking about in France, what
 9    happened in France?
10              THE COURT:  Yeah, France.
11              THE JUROR:  Just what's on the news.  I haven't gone
12    online to look anything up but just what I listened to on the
13    news.
14              THE COURT:  Would that change any of your answers to
15    any of these questions?
16              THE JUROR:  No.
17              THE COURT:  Or affect you any other particular way?
18    Would it have any effect on your view of this case?
19              THE JUROR:  Oh, no, no.
20              THE COURT:  I asked about talk radio.  It looks like
21    you listen to a local program.  Is that about local affairs?
22              THE JUROR:  It is, yes.
23              THE COURT:  It doesn't get into international affairs
24    or even national -- would it touch on subjects like the
25    Marathon case?
```

02:30 (line 10)
02:31 (line 20)

1          THE JUROR:  Yeah, it will.  He doesn't do that

2     consistently.  It's pretty much what's going on daily.  When

3     the presidential election was going on, he'll talk about that.

4          THE COURT:  If the case came up, you would be able

5     to --

6          THE JUROR:  I can turn it off, yeah.

7          THE COURT:  On Page 20, if you'd look at Question 77,

8     we asked whether you formed some opinions about whether the

9     defendant is guilty and, if so, what the punishment might be.

02:32 10    And you said yes to the question you'd formed an opinion about

11    whether he's guilty.  But as to the penalty, you checked both

12    boxes and said you were unsure.

13         Let me ask you about the first one.  It's not

14    surprising that people have some ideas about what they think

15    happened.  The question is:  Whenever a person is charged by

16    the government with a crime, the person is, at the outset,

17    presumed to be innocent -- that is, that's sort of the default

18    position -- unless and until the government proves otherwise,

19    proves that he's guilty by proof at trial with the evidence and

02:33 20    proof that is beyond a reasonable doubt.  Notwithstanding the

21    impression you have from what you've learned about the case

22    informally, would you be able to conscientiously insist that

23    the government prove its case by the evidence beyond a

24    reasonable doubt even if that turned out -- even if it caused

25    you to change your opinion?

1          THE JUROR:  I think so.  I think I understand what

2     you're asking, but, I mean, I'd like to think I'm open-minded.

3     I think I can listen to the evidence, but I know how I feel.

4     You know, I do feel pretty strongly about that.  I'm just --

5     you know, I can listen to it.  I don't know that it would

6     change my mind.

7          THE COURT:  Well, I'm not quite asking whether it

8     would change your mind.  I'm asking whether you could start

9     with -- sitting as a juror, with the proposition -- the

02:34 10    government puts the proposition, the defendant is guilty of

11     this crime.  At the outset you say, Prove it.  I'm not -- I am

12     now prepared to say, No, unless you prove it.  That's what we

13     ask jurors to put the frame of mind.  Then listen to the

14     evidence and decide, after you've heard the evidence, whether

15     the government has or has not proved it.

16          THE JUROR:  Okay.

17          THE COURT:  Part of the instructions we give in any

18     criminal case is that, as I say, the defendant has no burden to

19     prove that he's not guilty.  It's up to the government to have

02:34 20    the burden to prove that he is guilty and to prove that beyond

21     a reasonable doubt.  And the question is:  Do you think you

22     could fulfill that obligation as a juror, or, alternately, do

23     you think that your impressions are so strong that it would

24     interfere with your ability to insist on the government's

25     satisfaction of its burden of proof at trial?

1          THE JUROR:  I think I could listen to it and make a

2     decision after I've listened to the evidence.

3          THE COURT:  Let me ask you about Question 81.  This is

4     a couple of family steps, I guess.  Your brother-in-law's

5     cousin is married to one of the victims.  Do you have a

6     connection with that person?

7          THE JUROR:  No, no.  I've never met them.

8          THE COURT:  Does the fact that your brother-in-law's

9     cousin is married to one of the victims -- would that have an

02:36 10    effect on your ability to be a fair-minded, impartial juror?

11          THE JUROR:  No.

12          THE COURT:  Let me ask you -- we asked a series of

13     questions about the death penalty.  Let me ask you to turn to

14     Page 23, beginning with Question 88.  And this is a general

15     question:  How do you feel about it?  You said you're generally

16     opposed but could vote for it in this case.

17          THE JUROR:  I could.

18          THE COURT:  The next question, we asked you to select

19     where, on a scale from 1 to 10, you were in terms of favoring

02:37 20    or disfavoring death penalty, and you've selected 7, which is a

21     little bit on the favor side.

22          And then on the next page, Question 90, we asked you

23     not to pick a number but to pick the statement that came

24     closest to what you thought about it.  And you picked C, which

25     is that you're opposed to it but could vote to impose it if you

1      thought the particular facts of the case called for it.  Those

2      are all kind of variations on a way of expressing it.

3             Maybe you could put it in words for us now.  What is

4      your attitude toward the death penalty generally and what do

5      you think your attitude would be if you were a juror having to

6      make that decision in this case?

7             THE JUROR:  Well, I think, more often than not, I am

8      opposed to the death penalty.  I think it -- for me it would be

9      -- I would have more difficulty voting for it, but I believe I

02:38 10    could do it.

11            THE COURT:  Would you look at the bottom of 25 and top

12     of 26.  95, at the bottom, we asked, if you found him guilty

13     and you decided the death penalty was appropriate, could you

14     conscientiously vote for it, and you said you're not sure.

15            THE JUROR:  Yes.

16            THE COURT:  Then if you look at the next question, we

17     asked sort of the other side of it.  If you find him guilty and

18     decided life imprisonment was the appropriate punishment, could

19     you vote for that, you said yes.  You're a little more sure

02:38 20    about that.

21            THE JUROR:  Right.

22            THE COURT:  The question is:  Would you be able to

23     consider -- give consideration to both possibilities, and if

24     you found the facts to be supportive of either one of those,

25     you could make that choice, or are your attitudes against the

1    death penalty such that it's unlikely that you would vote for

2    it?  I'm just trying to guess where --

3          THE JUROR:  Yeah.  It's not that I'm not likely to

4    vote for it.  I just think I would -- I would have difficulty,

5    but I don't think I wouldn't be able to vote for it.  I think

6    that, if the facts supported it, that I could do it.

7          THE COURT:  Any follow-up?

8          MS. CONRAD:  I have some.  Good morning, ma'am.  My

9    name is Miriam Conrad.  I'm one of Mr. Tsarnaev's lawyers.

02:40 10        The judge asked you some questions about your

11   brother-in-law and his cousin.  Is that a first cousin?

12         THE JUROR:  You know what?  I don't know.

13         MS. CONRAD:  Do you know if your brother-in-law went

14   to the wedding?

15         THE JUROR:  He did.

16         MS. CONRAD:  What did he tell you about that, about

17   either the relationship or about the wedding?

18         THE JUROR:  Well, they didn't really talk about the

19   relationship.  It was my sister and my brother-in-law went to

02:40 20   the wedding.  They talked more about the wedding, how beautiful

21   it was.  My sister has spoken to me more about who we're

22   speaking about.  And she told me about what has -- what he's

23   going through, how he got harmed and what he has to face.  So

24   that's what I know about that.

25         MS. CONRAD:  You say you haven't met that person.

1           THE JUROR:  I haven't.

2           MS. CONRAD:  Do you think that that's someone you

3    might meet in the future at a family gathering at your sister's

4    home?

5           THE JUROR:  I could, but I think it's a stretch that I

6    would.  Mostly, when we gather, it's closer family.  So I can't

7    tell you positively if I would ever meet him or not.

8           MS. CONRAD:  Does your sister know that you received a

9    summons as a juror in this case?

02:41 10          THE JUROR:  She does.

11          MS. CONRAD:  Did she make any comment to you about

12   that?

13          THE JUROR:  About?

14          MS. CONRAD:  About you possibly serving as a juror in

15   this case.

16          THE JUROR:  We have talked about it because I didn't

17   know when I first got the summons that it would be for this

18   case.  And then, you know, again, because I watch the news

19   quite a bit, I deduced that it might be for this.  So we did

02:42 20   talk about it a little bit, yes.

21          MS. CONRAD:  What did she say?

22          THE JUROR:  About?

23          MS. CONRAD:  Your being --

24          THE JUROR:  Me serving?

25          MS. CONRAD:  Yes.

1          THE JUROR:  She just kept saying, I'm so sorry,

2     because she knew how difficult it was going to be for me.

3          MS. CONRAD:  In answer to the question about how you

4     felt when you got the summons, you indicated you didn't realize

5     it was for this case.  When you realized it was for this case,

6     how did you feel?

7          THE JUROR:  Devastated.

8          MS. CONRAD:  Can you tell me more about that?

9          THE JUROR:  Well, it's the distance.  I've got this

02:42 10    driving anxiety, but, you know, I've been able to work around

11    it, so I can get myself in here if I had to.  And then it's

12    just the time frame involved.  I work for a really small

13    company.  It's just -- I mean, you know, when I complain about

14    this, you know, I just -- I feel horrible about it because I

15    didn't get harmed.  You know what I mean?  It's just three or

16    four months or five months, however long, out of my life.  But

17    it's still -- I'm still feeling kind of miserable about maybe

18    being on the jury, frankly.

19         MS. CONRAD:  We appreciate your candor, and that's all

02:43 20    we ask, that you answer the questions as honestly as you

21    possibly can.

22         Do you think that those concerns about work or about

23    the travel back and forth will make it difficult for you to

24    focus, say, you know, a month, two months, three months into

25    the trial?

1          THE JUROR:  I'm not sure.  I mean, I'm worried about

2    finances.  That's the No. 1 thing I'm worried about.  I don't

3    think I'm going to lose my job over this, but, you know, I just

4    -- it's going to be difficult because of my boss's reaction to

5    it, too.  He's not real happy about it, but we all get it.  We

6    all understand the responsibility and the obligation.  But it's

7    just -- it's not going to be easy.

8          MS. CLARKE:  Your Honor.

9          MR. WEINREB:  I think we have concurred.

02:44 10          THE COURT:  I think that's all the questions.  Just

11    leave the questionnaire there.

12          I think we'll take the break now.  We'll probably

13    change reporters.

14    (Recess taken at 11:10 a.m.)

15          (After the recess:)

16          (The Court enters the courtroom at 11:37 a.m.)

17          THE COURT:  Okay?

18          MR. DOREAU:  Okay.

19          THE COURT:  Let's proceed with the next juror.

03:10 20          THE CLERK:  Juror No. 67, over here, please.  Have a

21    seat.

22          THE COURT:  Good morning.

23          THE JUROR:  Good morning.

24          THE CLERK:  Talk into the mic so the reporter can hear

25    you, okay?

```
 1              THE COURT:  Have you been able to abide by the
 2    instructions I gave when we were last here to avoid any
 3    discussion of the case?
 4              THE JUROR:  For the most part.
 5              THE COURT:  How much is that?
 6              THE JUROR:  Well, the news comes on, and I ride to
 7    work every day with WBZ Traffic on the 3s, so it does pop up
 8    occasionally.
 9              THE COURT:  Are you able to put it aside?
10              THE JUROR:  Uh-huh.  Yes.
11              THE COURT:  Let's look at Question 10 on page 5.
12              THE JUROR:  Question 10?
13              THE COURT:  It's the next page.
14              You have some concern on how this will impact your
15    employment?
16              THE JUROR:  Yes, I do.
17              THE COURT:  Tell us about that.
18              THE JUROR:  I'm a licensed administrator of a 170-bed
19    rehabilitation and nursing center.  It's not-for-profit,
20    freestanding, no corporate support.  I am the only licensed
21    administrator.
22              THE COURT:  What does that mean?  What is the
23    significance of a licensed administrator for a nursing home?
24              THE JUROR:  Well, every facility has to have a
25    licensed administrator.
```

1          THE COURT:  Onsite or --

2          THE JUROR:  Onsite, yes.  Not from the phone.  I mean,

3     I do some things from the phone, but I'm there all the time,

4     five days a week.  And I have 24/7 responsibility for the --

5          THE COURT:  Licensing is State of --

6          THE JUROR:  State of Massachusetts, yes.

7          THE COURT:  And what are the kinds of considerations

8     that go into licensing of an administrator?

9          THE JUROR:  I provide direction to all the department

03:13 10     heads.  I'm responsible for following the regulations, federal

11     and state regulations.  All the department heads report to me.

12     I don't really have any backup as a freestanding facility.

13     It's not like a corporate, you know, large company.

14          THE COURT:  And it's the only one?

15          THE JUROR:  It's freestanding, yes, by itself.

16          THE COURT:  Could we go off the audio for a minute?

17          (Discussion at sidebar and out of the hearing of the

18     public:)

19

03:14 20

21

22

23

24

25

1

2

3

4

5

6

7          (In open court:)

8          THE COURT:  Do we need to go further?

9          MR. WEINREB:  I don't believe so.

03:15 10          MS. CLARKE:  Not on the lawyer.

11          THE COURT:  No, in general.

12          MS. CLARKE:  Yes.  I mean -- would you just -- could

13     you stop from confusing me?

14          (Laughter.)

15          THE COURT:  Yes, Question 10.

16          MS. CLARKE:  Can we ask a follow-up on the hardship

17     issue?

18          THE COURT:  Yes, go ahead.

19          MS. CLARKE:  Hi.  My name's Judy Clarke.  I'm one of

03:15 20     the defense counsel.  And I really sort of felt for you as

21     you're explaining the hardship with the facility.

22          What happens when you're away on vacation?

23          THE JUROR:  Vacation?

24          MS. CLARKE:  Yes.  You don't get those?

25          THE JUROR:  Well, I don't think in this day and age

1    anybody is really away on vacation when you have your cell

2    phones and your computers with you and you're on the phone.  I

3    get calls when I'm on vacation.

4         MS. CLARKE:  Yeah, I kind of feel that way too.

5         THE JUROR:  Yeah.  I was on vacation once when we had

6    a Department of Public Health survey and we had to file a

7    deficiency report, so I had to do that while I was on vacation.

8    I mean, I'm always pretty much on call.  There is someone -- a

9    director of nursing who is the next person in line, but she's

03:16 10    not a licensed administrator.

11         MS. CLARKE:  So nobody's able to fill in for you and

12    take on those responsibilities?

13         THE JUROR:  The paperwork, you know, signing off on

14    things, there's people to do that, but not the overall job

15    responsibilities, the big picture.

16         MS. CLARKE:  So I hear it would be a big distraction

17    for you sitting on this jury?

18         THE JUROR:  It would be very difficult to be away for

19    such a long period of time, four months or more.

03:16 20         MS. CLARKE:  Okay.  Thank you.

21         THE JUROR:  It would be.

22         MS. CLARKE:  Thank you.

23         THE COURT:  Anything further?

24         MS. CLARKE:  No.

25         MR. WEINREB:  No.

1           THE COURT:  All right.  Thank you.

2           THE JUROR:  Thank you.

3           (The juror is excused.)

4           THE CLERK:  Juror No. 69.

5           Juror 69, have a seat, please.

6           THE COURT:  Good morning.

7           THE JUROR:  Hi.

8           THE COURT:  It's still morning.

9           Since you were last here, have you been able to abide

03:18 10   by my instructions to avoid any discussion of the case or the

11   selection process or -- and avoid any exposure to media stories

12   in depth or anything about the case?

13           THE JUROR:  Yes.

14           THE COURT:  That's the questionnaire you filled out

15   when we were here.  I'm going to follow up on some of the

16   information you put in there, which is to clarify everything

17   and perhaps expand on some of the answers you gave.

18           You are the director of medical coding --

19           THE JUROR:  Uh-huh.  Yes.

03:19 20           THE COURT:  C-O-D-I-N-G.

21           -- for the Mass. General Physicians Organization?

22           THE JUROR:  Yes.

23           THE COURT:  Tell us first what the Mass. General

24   Physicians Organization is.

25           THE JUROR:  It's an organization of physicians that

1    treat patients at Mass. General Hospital primarily.  There are

2    other hospitals that we do billing for, including

3    Newton-Wellesley Hospital.

4         THE COURT:  So is it the organization that sort of

5    handles the economics of patient care?  Is that what it is?

6         THE JUROR:  Well, I work for the billing office, which

7    is a portion of the Mass. General Physicians Organization, or

8    otherwise known as the MGPO.  The billing office is just one

9    part of that.  It's called the Professional Billing Office of

03:19 10   the MGPO.

11         THE COURT:  Okay.

12         THE JUROR:  So I work for the billing office, but I'm

13   officially an employee of the Mass. General Hospital.

14         THE COURT:  So when one of the physicians in the

15   organization sees a patient, there's some paperwork that gets

16   generated in order to have the visit paid for?

17         THE JUROR:  Yeah, it's primarily electronic at this

18   point.

19         THE COURT:  I use "paperwork" in the generic sense.

03:20 20        But it's the way that health insurance, Medicare,

21   things like that, pay for the services, tests, clinical service

22   and so on and so forth?

23         THE JUROR:  Yes.

24         THE COURT:  All right.  And the coding is the

25   elaborate regulations to decide how much gets paid for how

1    many -- for what service?

2         THE JUROR:  The coding is the translation of the

3    medical record into alphanumeric codes which are transmitted to

4    the insurance company.  And based and those codes, the

5    insurance company determines whether they're going to pay for

6    the claim or not.

7         THE COURT:  You were previously at the Lahey Clinic?

8         THE JUROR:  Yes, sir.

9         THE COURT:  Were you doing similar things there?

03:21 10      THE JUROR:  Yes, sir.

11        THE COURT:  Okay.  Tell us to what extent you use

12   social media, how frequently and whether it's personal or

13   business-oriented.

14        THE JUROR:  Most often personal.  Facebook:  family

15   and friends, mostly to look at pictures of my grandchildren and

16   things like that.  Oh, and you asked how often?  I'm pretty

17   much on Facebook daily.

18        THE COURT:  How about other media, Twitter, Instagram?

19        THE JUROR:  I don't use Twitter or Instagram.  I think

03:21 20   I may have accounts, but since I signed up I don't think I've

21   ever really gone on them.  I am also on LinkedIn, which is my

22   professional social media.  I don't use it very often, but I

23   have an account on there.  I can't think of any others.

24        THE COURT:  Could we cut the audio, please?

25             (Discussion at sidebar and out of the hearing of the

1    public:)

2

3

4

5

6

7

8

9

03:23 10

11

12

13

14

15

16

17

18

19

03:24 20

21

22

23

24

25

1

2

3

4

5

6

7

8                                                                      h

9

03:24 10

11

12

13

14

15

16

17

18

19

03:25 20

21

22

23

24

25

```
 1
 2              (In open court:)
 3              THE COURT:  We ask some general questions about
 4    attitudes of things that might affect current affairs or
 5    international events and so on, attitudes about Islam, Muslims,
 6    attitudes about the war on terror, so-called, and various
 7    things.  You answered those -- you remember some of those
 8    questions from the questionnaire?
 9              THE JUROR:  Yes.
03:26 10         THE COURT:  Since you gave those answers, there have
11    been some incidents in Paris and some other places in Europe
12    that have brought things to the news.  Have you followed that
13    news at all?
14              THE JUROR:  No, I haven't.
15              THE COURT:  You haven't.  Do you know what happened?
16              THE JUROR:  Not really.  I've particularly stayed away
17    from any of that.
18              THE COURT:  Even those things?
19              THE JUROR:  Yes, sir.
03:26 20         THE COURT:  My question was going to be would that
21    have affected any of your answers, but I guess if you hadn't
22    heard it --
23              THE JUROR:  I really don't know what the situation is.
24              THE COURT:  All right.
25              On page 20 we asked -- in Question 77 we asked whether
```

1    you had formed any opinions about, you know, sort of the big

2    issues in the case, whether the defendant is guilty and, if so,

3    what might be the penalty, and you indicated no, you had not

4    formed an opinion about those matters.

5         Could you tell us about that; amplify on that,

6    perhaps?

7         THE JUROR:  I don't know that I -- I mean, I just

8    don't think -- I haven't really decided.  I haven't really

9    formed an opinion myself.  I believe that -- I do believe in

03:27 10   the justice system, and I believe that it's up to the justice

11   system to make that determination, so -- that's the only thing

12   I can...

13         THE COURT:  Okay.  In any criminal case, under the law

14   the defendant who is accused of a crime is presumed to be

15   innocent of that crime unless and until the government proves

16   that he's guilty and proves it by the evidence at trial,

17   convincing the jury that the defendant's guilty beyond a

18   reasonable doubt.  Those principles of the presumption of

19   innocence and proof beyond a reasonable doubt are fundamental

03:28 20   to our system.

21         THE JUROR:  Right.

22         THE COURT:  Would you have any difficulty in applying

23   those principles in this case if you were a juror?

24         THE JUROR:  No.

25         THE COURT:  Was my summary of those responsibilities

1    more or less what you were trying to say?

2            THE JUROR:  I believe so, yes.

3            THE COURT:  I was getting that impression, that's

4    why -- I don't want to put words in your mouth, but I want

5    to -- your mind is in suspension until you're at the point of

6    hearing the evidence and deciding.  Is that fair?

7            THE JUROR:  Yes, that's fair.

8            THE COURT:  In Question 79 you said you may have

9    posted a Boston Strong picture on Facebook.  Can you

03:29 10    remember --

11            THE JUROR:  At the time.

12            THE COURT:  At the time of the events?

13            THE JUROR:  Yes.  I mean, everybody was posting

14    pictures of Boston Strong.  And, you know, I'm sure -- I don't

15    know if I could go back and find that on Facebook, but I'm

16    pretty sure I may have posted a picture.

17            THE COURT:  Since then, since the sort of immediate

18    aftermath of events, have you had any postings like that?

19            THE JUROR:  No, not that I -- not that I can recall at

03:29 20    all.

21            THE COURT:  Let me just come back to your employment.

22    Of course Mass. General was the scene of the treatment of a lot

23    of victims.

24            THE JUROR:  Yes.

25            THE COURT:  Is there anything that concerns you about

1    your being in the environment of the hospital generally and

2    your role that might have an effect on your service as a juror?

3          THE JUROR:  Not really.  I'm not located in the

4    hospital.  I work in the Charlestown Navy Yard.  And, you know,

5    as I was thinking about this since I came in originally, if I

6    had access to the medical -- I mean, I do have access to the

7    medical records.

8          THE COURT:  Because you have access to all of them.

9          THE JUROR:  Because of my job.

03:30 10          Pardon me.

11          THE COURT:  Because you have access to all of them.

12          THE JUROR:  Yes.  But we do, obviously, sign

13    confidentialities and all of that.

14          But I was thinking of my role there as it relates to

15    what could potentially be here.  And I'm a director, I have

16    four operations managers who report to me and then about nine

17    managers who report to them, and under them are team leaders

18    and staff.  It's my team leaders and staff who actually do the

19    coding of the services, and so if there were any individuals

03:31 20    that were treated by our physicians or the hospital, we could

21    potentially do the coding for those cases.  But I don't

22    really have -- I mean, I have access, but I don't really see

23    them.  I'm so far removed from the day-to-day actual coding of

24    those cases that I haven't seen anything.  You know, in the

25    future I don't know what I would see.

           1           THE COURT:  That's fine.  And I also was getting at

           2      maybe the general atmospherics.

           3           THE JUROR:  Oh.

           4           THE COURT:  I mean, the fact that Mass. General was

           5      involved in some way and you're connected with the Mass.

           6      General, would there be any spillover from things like that?

           7           THE JUROR:  Not that I can think of.  I mean, we just

           8      do our jobs.  We go about our business.  And, I mean, there

           9      hasn't been anything that I can think of really.

    03:32 10           THE COURT:  Okay.  Okay.

          11           Let me ask you to look at page 23.  We asked a series

          12      of questions to gauge jurors' thoughts about the death penalty

          13      and whether the individual juror would be in a position to vote

          14      in favor of or against the death penalty.  So on Question 88 we

          15      ask for general views, and you said that you didn't really have

          16      any general views.  The next question, we asked you to put on a

          17      scale from 1 to 10 what your views were about it, whether

          18      you're opposed or in favor, and you selected 5, which is sort

          19      of in the middle.

    03:32 20           THE JUROR:  Yes, sir.

          21           THE COURT:  And then on the next page, Question 90, we

          22      asked you to select a statement of a number of statements that

          23      were put there that most matched your attitude towards the

          24      death penalty, or thoughts about it.

          25           THE JUROR:  Yes.

1          THE COURT:  And you selected D, saying you are neither

2     for it nor against it but could vote to impose it or could vote

3     to impose a sentence of life imprisonment, whichever you

4     thought was called for by the facts in the case?

5          THE JUROR:  Yes, sir.

6          THE COURT:  Do those answers fairly represent your

7     views about the death penalty --

8          THE JUROR:  Yes.

9          THE COURT:  -- and about your disposition to impose it

03:33 10    or not impose it?

11         THE JUROR:  Yes.

12         THE COURT:  So to restate it, you could consider the

13    evidence about what the penalty should be and you're open to

14    being convinced that it should be the death penalty and you're

15    open to being convinced that it should not be and should be

16    life imprisonment.  Is that fair?

17         THE JUROR:  Yes.

18         THE COURT:  Do you want to qualify that in any way?

19         THE JUROR:  No.

03:33 20    THE COURT:  Follow-up?

21         MR. WEINREB:  Not from me.

22         MR. BRUCK:  A couple of things, if I might.

23         Ma'am, I'm David Bruck.  I'm one of Jahar Tsarnaev's

24    attorneys.  And I just have a few things I'd like to follow up

25    on, if I could.

 1          THE JUROR:  Okay.

 2          MR. BRUCK:  It would not be a hardship for you to

 3     leave your job for four months?

 4          THE JUROR:  Well, as I mentioned before, I have a

 5     number of management staff who report to me, so...  I mean,

 6     it's a long time, you know, but I think Mass. General would

 7     support that.  And, you know, I think I have enough of a strong

 8     team that could manage the staff.

 9          MR. BRUCK:  The judge asked you about Mass. General's

03:34 10     role in treating wounded.  Do you recall anything else out of

11     the ordinary that involved Mass. General in the week of the

12     immediate aftermath of the bombing?  I guess I should be

13     clearer.  You said you read a moderate amount -- you checked

14     the box -- about this in the news media.

15          THE JUROR:  At the time, you mean?

16          MR. BRUCK:  At the time, right.

17          What does that mean?  Can you tell us what stands out

18     about what you saw or read about the marathon?

19          THE JUROR:  I know I was watching the news during that

03:35 20     time.  As far as what I saw or -- I don't recall reading

21     anything because I don't really read newspapers.

22          MR. BRUCK:  Okay.

23          THE JUROR:  I don't know.  Just really what was --

24          MR. BRUCK:  As far as Mass. General.

25          THE JUROR:  Oh, as far as Mass. General?

```
 1              MR. BRUCK:  I mean, that's just as an example.  Do you
 2      remember hearing anything --
 3              THE JUROR:  The only thing I remember hearing about
 4      Mass. General was that it seemed like -- I remember that either
 5      there were people being brought to Mass. General or thought to
 6      be brought to Mass. General, but I'm not even sure -- I'm not
 7      even sure, like, who that was.
 8              MR. BRUCK:  Do you remember that the President of the
 9      United States visited Mass. General?
10              THE JUROR:  I did not remember that.
11              MR. BRUCK:  That was not something that you recall?
12              THE JUROR:  No.  Now that you're saying it, I vaguely,
13      maybe, remember that, but I did not remember it.
14              MR. BRUCK:  Okay.  And you didn't recognize the names
15      of any doctors from Mass. General on the witness list?
16              THE JUROR:  No, I did not.  We have a lot of doctors
17      there.
18              MR. BRUCK:  I understand.
19              How did you feel when you found out -- I don't know
20      whether it was when you got your summons or later, but when you
21      found out that you were being summoned for this case, what was
22      your --
23              THE JUROR:  In general -- I didn't really find out
24      that it was this case until I got here.
25              MR. BRUCK:  Right.
```

1          THE JUROR:  I mean, I thought it could potentially be,

2     but I just didn't really know what other cases might be here,

3     and I really didn't know.  And my whole thought about coming

4     into this when I got my summons was that, as I mentioned, I do

5     believe in the justice system, and I'm grateful that we have

6     this in our country.  And so I looked at it as my duty, and

7     even as a privilege, should I be asked to be a part of this.

8          MR. BRUCK:  My last question is:  If it was up to you

9     whether to serve or to be excused, entirely up to you, you

03:37 10   could choose on the jury or off, which would you choose?

11         MR. WEINREB:  Your Honor, I object.  There's nothing

12    about that that could lead to a for-cause strike.

13         THE COURT:  Yeah, I agree.  You don't have to answer

14    that question.

15         MR. MELLIN:  Your Honor, may I ask just a few

16    questions?

17         THE COURT:  I want to be sure -- you did say it was

18    your last question.

19         MR. BRUCK:  Well --

03:38 20   MR. MELLIN:  I didn't mean to hold Mr. Bruck to it.

21         THE COURT:  I've learned that that's not always the

22    last word.

23         MR. BRUCK:  Well, if you'll bear with me just a

24    moment, I asked you about Mass. General.  From the moderate

25    amount of publicity, do you remember anything about -- hearing

1    about the defendant or about his family?

2            MR. WEINREB:  I object.

3            THE COURT:  Yeah, sustained.

4            MR. BRUCK:  Lastly, you mentioned WBZ.  Have you

5    heard -- I understand not since you got your summons, but

6    during the time have you heard very much discussion about this

7    case or about the defendant or what ought to happen on the

8    radio?

9            THE COURT:  I think that was the last juror.  Did you

03:39 10   mention WBZ?

11           THE JUROR:  No.  I don't know if I did in my

12   paperwork.

13           MR. BRUCK:  I think in the paperwork.

14           THE COURT:  Oh, in the paper?  I'm sorry.

15           MR. BRUCK:  In the questionnaire.

16           THE JUROR:  In the questionnaire.  Because I do I

17   listen to WBZ radio sometimes.  So you said --

18           MR. BRUCK:  Has there been a lot of talk that you've

19   heard about this case or about this defendant on the radio?

03:39 20           THE JUROR:  And you also asked about the family.  I

21   don't recall hearing anything about the family.  About the

22   defendant?  I mean, I've -- you know, just heard the name, that

23   sort of thing, but I haven't -- in particular I can't think of

24   what I've heard in particular.

25           MR. BRUCK:  That's all I'm asking.  Okay.  Thank you

1    very much.

2                MR. MELLIN:  Your Honor, if I may?

3                Good afternoon, ma'am.  I'm Steve Mellin, one of the

4    prosecutors on the case along with this team right here.

5                You put yourself right in the middle of the road, kind

6    of, when it comes to the issue of the death penalty in your

7    questionnaire and even your answers here today.  Maybe if we

8    could step back, though.

9                Theoretically I get that you are kind of in the middle

03:40 10    of the road.  At some point, though, in this case you may come

11    to a point where it's not really a theoretical question; it's

12    really an actual question.  Do you believe that you would be

13    able to impose the death penalty if you found that the evidence

14    supported that?

15                THE JUROR:  Yes, sir.

16                MR. MELLIN:  Thank you.

17                Thank you, your Honor.

18                THE COURT:  All right.  Thank you.

19                (The juror is excused.)

03:40 20                MR. WEINREB:  Your Honor, before we call the next

21    juror, I again want to interpose a general objection to asking

22    about the specifics of what the jurors -- potential jurors may

23    or may not have heard in the news.  I think that's not really a

24    follow-up question; that is an additional question that was

25    proposed and rejected.  And I'm not saying that there wouldn't

1    necessarily be cases where follow-up about specific things

2    might not be called for; I'm just saying it seems to now be a

3    general question that's being asked of every juror in every

4    case, regardless of whether there's any special reason for it.

5        And I don't think that's appropriate, given both the

6    law, which says that it makes no difference as long as the

7    juror is not going to be influenced -- have a juror impartial

8    by it, and also given the process that led to the formulation

9    of this questionnaire and litigation over various questions.

03:41 10    MR. BRUCK:  I don't know if the Court needs to hear

11   me.  I would like to be heard.

12       THE COURT:  Go ahead.

13       MR. BRUCK:  Our understanding, and the discussion

14   about the questionnaire, was that those questions would not be

15   on the questionnaire but that content questions about publicity

16   would be fair game, or might be in the Court's discretion at

17   this stage.  And especially for -- we think that there are some

18   jurors that one cannot really gauge their impartiality without

19   some probing.  There are a couple of jurors who seem very eager

03:42 20   to be on the jury, and some of those jurors may be completely

21   sincere and some of them may actually be harboring biases that

22   they're not disclosing.

23       This was a juror who works for Mass. General, albeit

24   not in the building, and didn't recall that the President of

25   the United States visited Mass. General a few days after the

1    bombing.  Now, that's not impossible, but it's a little bit of

2    a red flag that she is trying to make it seem that she is a

3    complete blank slate.  She is a highly educated, very

4    responsible lady, and there's an issue, that's all.

5        THE COURT:  Okay.  We're getting a little too specific

6    to the juror.  I think the objection is a little broader than

7    the juror.

8        There's no hard, clear line here.  The purpose of the

9    person-to-person voir dire is essentially to follow up on

03:43 10    questions from the questionnaire.  So I agree to that extent,

11    that it should generally be in the realm of follow-up, but

12    follow-up can be expansively understood as well.

13        I do think that some of the questions are too leading.

14    I'm interested in what the jurors say in their own

15    formulations.  I have -- I'm trying to avoid it myself.  I

16    sometimes summarize just to make sure I'm not misunderstanding

17    them, which I guess restates their evidence, but I want -- in

18    the first instance it should be from them without the answer

19    being presented to them in the question.  So I just make that

03:44 20    comment as well.

21        MR. BRUCK:  The last thing I'd like to say for the

22    record is that the question about what stands out was a

23    question that was included in the *Skilling* questionnaire and

24    cited with approval by the United States Supreme Court,

25    excluded from our questionnaire, and we think that's all the

         1   more reason why it should be asked.

         2          THE COURT:  Okay.  Next juror, Juror No. 70.

         3          THE CLERK:  70.  Have a seat.

         4          THE COURT:  Good afternoon.

         5          THE JUROR:  Hello.

         6          THE COURT:  Since you were here to fill out the

         7   questionnaire, have you been able to abide by my instruction to

         8   avoid any discussion of the case or any exposure to the media

         9   reports?

03:45  10          THE JUROR:  I heard one thing.  I turned off the radio

        11   quickly.

        12          THE COURT:  All right.

        13          THE JUROR:  Some people did say some things to me but

        14   nothing like other -- nothing major, so...

        15          THE COURT:  Okay.  You avoided any discussion with

        16   people --

        17          THE JUROR:  Yeah.  Yeah, I mean, I would tell people,

        18   "No, I can't really talk about that."

        19          THE COURT:  Fair enough.  That's what we ask you to

03:45  20   do.

        21          You're at home with your children right now?

        22          THE JUROR:  Yes.

        23          THE COURT:  And you -- you've thought about it and you

        24   don't think your family situation presents a hardship that

        25   would --

1          THE JUROR:  Well, I do, but, you know -- but I know

2     everyone thinks that.  Do you know what I mean?  I think

3     everyone thinks that being out of our life for that length of

4     time is difficult.  But I -- but my husband is available and

5     would be able to do some things.  I think it would be difficult

6     for them but not an undue hardship, I guess.

7          THE COURT:  Okay.  All right.

8          You -- we asked some questions about social media, and

9     you say you use Facebook.  And what you said was you read it

03:46 10     daily and you post every few weeks.  Is that accurate?

11          THE JUROR:  Yeah.  Yeah.

12          THE COURT:  And what kinds of things do you put up?

13          THE JUROR:  I would say -- I don't know, mostly

14     personal things.  Sometimes links to articles that interest me,

15     so various stuff.  It's hard to say.

16          THE COURT:  Nothing about --

17          THE JUROR:  I did post something about this saying I

18     was called to jury duty on the day that this was starting.  But

19     it wasn't expressing an opinion about it, just saying, "Uh-oh,

03:47 20     it looks like I'm having to do this."

21          THE COURT:  When was that, in the November --

22          THE JUROR:  The week leading up to -- December.

23          THE COURT:  December?

24          Have you posted anything since then?

25          THE JUROR:  No.  But -- and then I do participate, I'd

1    say, some political kind of things, commenting on, you know,

2    blogs, I guess, but...

3              THE COURT:  On Facebook or directly on the blogs?

4              THE JUROR:  Well, that's related.  It seems

5    to be -- see, if someone posts an article and then you comment

6    on that article, it will have your Facebook profile having

7    commented on that article.  Does that make sense?  So, for

8    instance, Talking Points Memo --

9              THE COURT:  So somebody posts an article that has a

03:47 10   comment stream after it?

11              THE JUROR:  Yes.  So I'd --

12              THE COURT:  You would be in the comment stream?

13              THE JUROR:  Yes.

14              THE COURT:  And it would have your Facebook --

15              THE JUROR:  It would have my Facebook profile.

16              THE COURT:  How common is that for you?

17              THE JUROR:  Somewhat -- a few times -- it's hard to

18   give specifics.  I mean, it's not a daily thing, but I guess I

19   am a little opinionated.

03:48 20              THE COURT:  Are there particular topics that you focus

21   on?

22              THE JUROR:  Well, that was one of the things -- the

23   recent things were like the Ferguson kind of -- in the media,

24   that stuff.  And also when Ebola, when they quarantined

25   somebody for that, I definitely -- I remember engaging in a

1    couple on that.  So it's various things.  I couldn't give you a

2    summary of, like, for the year, everything I've said.

3            THE COURT:  You have a -- both an undergraduate and a

4    graduate degree in psychology?

5            THE JUROR:  Yes.

6            THE COURT:  And have you worked in that field?

7            THE JUROR:  Yes.

8            THE COURT:  Before you had the family?

9            THE JUROR:  Yes, before I had children.

03:49 10         THE COURT:  Can you tell us a little bit about that

11   and what you did and where?

12           THE JUROR:  The job I had previous to having kids was

13   a school psychologist.  I worked at Manchester Middle-High

14   School.  So it's a 7-through-12 school.  And the primary

15   responsibility is doing testing, evaluations for cognitive and

16   psychological profiles.  And like I say, I worked with from

17   12-year-olds to 18-year-olds at that time.  That was for about

18   five years.  So it was right after I graduated from my master's

19   program.

03:49 20         THE COURT:  So --

21           THE JUROR:  Should I go previous to that also?

22           THE COURT:  No.  Give us the years when that was.

23           THE JUROR:  Oh --

24           THE COURT:  Roughly.  Just give us --

25           THE JUROR:  -- I think '97 or '98 is when I started,

1    and my son was born in 2001, and so that was --

2           THE COURT:  So since then you've been home?

3           THE JUROR:  Yeah.  Yeah, a long time.

4           Should I -- any previous jobs?

5           THE COURT:  No, that's fine.

6           THE JUROR:  Because one was vaguely psychology

7    related, I guess.

8           THE COURT:  If you want.

9           THE JUROR:  I don't know.  I worked for Child

03:50 10   Protective Services in the past, previous to graduate school.

11          THE COURT:  Okay.

12          THE JUROR:  For two years in upstate New York.

13          THE COURT:  In the questionnaire we had asked some

14   questions about attitudes towards broader issues in the world,

15   like attitudes towards Islam or Muslims, attitudes towards the

16   war on terror, for example, so-called and so on.  Do you

17   remember those questions?

18          THE JUROR:  Yeah, somewhat.

19          THE COURT:  Since you filled out the questionnaire and

03:50 20   you gave us those answers, there have been some events in

21   Europe and Paris, for example, that have occurred.  Have you

22   followed those matters?

23          THE JUROR:  Yes.

24          THE COURT:  How closely, not closely?  How would you

25   say?

1          THE JUROR:  Well, I've certainly read articles about

2     them and remained aware.  Not, like -- not continuous

3     moment-by-moment what was going on, but just a general -- I was

4     keeping track of, I guess, I mean.

5          THE COURT:  Would anything you saw about that or those

6     incidents have changed any of the answers you gave about the

7     attitudes towards --

8          THE JUROR:  I don't believe so, no.

9          THE COURT:  -- Islam or Muslims, for example?

03:51 10          THE JUROR:  No, because they're separate things, I

11     think, you know, to me.

12          THE COURT:  If you'd look at page 20.

13          THE JUROR:  Okay.

14          THE COURT:  Question 77 we asked some questions about

15     whether you had an opinion -- had formed an opinion about

16     whether the defendant was guilty and, if so, what the penalty

17     might be.

18          THE JUROR:  Yes.

19          THE COURT:  Do you see that?  It's a

03:52 20     four-part -- actually, a five-part question if you take the

21     paragraph below it.

22          So you said that you had formed an opinion about his

23     being guilty of the offenses.

24          THE JUROR:  Yes.

25          THE COURT:  And that's based on things you saw and

1   heard, read about in the media, for example?

2           THE JUROR:  Yeah.

3           THE COURT:  What we ask jurors in any criminal trial

4   to do is at the outset -- this is -- I may have said it.  Let

5   me just start the question again.

6           In any criminal trial we ask jurors to follow the law,

7   which is that when somebody's accused of a crime, the person is

8   presumed to be innocent, or not guilty, of the crime unless and

9   until the government proves that he's guilty by evidence at the

03:53 10   trial --

11           THE JUROR:  Yeah.

12           THE COURT:  -- and proves it beyond a reasonable

13   doubt.

14           Does the fact that you have formed an opinion on the

15   basis of reports you've seen and heard preclude you from being

16   in that condition that you could presume that he's innocent

17   unless the government proves his guilt by the evidence at

18   trial?

19           THE JUROR:  I think it's hard, you know, because if

03:53 20   you have a belief in your head or if you already have heard so

21   much about something that you're like -- that you believe

22   something to be true, it's hard to set that aside.  How do I

23   put it?  So, you know, I would try to.  I don't know that I can

24   say that that wouldn't influence my thinking at all, you know?

25   Because it's hard to say that, like, "Oh, I can put all this

1    information out of my head," you know, and just pretend I don't

2    know it.  I don't know if the brain works that way.

3         THE COURT:  Right.  In part perhaps it's a question of

4    focus; in other words, what you focus on is what has been

5    produced during the course of the trial and you test that

6    evidence to see how convincing it is.

7         Do you think you'd be able to do that?

8         THE JUROR:  I can say that I certainly would try to do

9    that.

03:54 10         THE COURT:  So that was the first two parts of the

11   question.  The second two parts were:  Do you think he should

12   receive the death penalty, and you said no, and then the next

13   one was that he should not, and you said yes.  So the same sort

14   of thought about that.  I mean, you have that thought at this

15   point?

16        THE JUROR:  See, that one's even harder because it's

17   not based on something that I've heard in the media; it's based

18   on my personal beliefs about the death penalty.  And so that's

19   a harder thing to imagine setting aside because it's not just

03:55 20   from what has the media told me; it's what have my lifelong

21   beliefs been.

22        THE COURT:  Okay.  Let's turn to page 23.

23        THE JUROR:  Okay.

24        THE COURT:  And we ask at the beginning of 88 a series

25   of questions to get your views about the death penalty.

1          THE JUROR:  Yes.

2          THE COURT:  The first one was sort of a -- in Question

3     88 was a general question about what your views are, and you

4     wrote that you're opposed.

5          THE JUROR:  Uh-huh.

6          THE COURT:  The next question we asked you to tell us

7     the strength of your conviction on that matter.

8          THE JUROR:  Yeah.

9          THE COURT:  And you selected 1 on the scale of -- 1

03:55 10   being strongly opposed.

11         THE JUROR:  Yeah.

12         THE COURT:  And then the next page, instead of using

13    numbers, we tried to get you to express it in a proposition

14    that you would agree with or disagree with, and you selected

15    the first two and said it's somewhere between those two?

16         THE JUROR:  Yeah.

17         THE COURT:  Perhaps now could you just tell us in your

18    own words what your feelings about the death penalty are in a

19    case where someone has been -- the premise is, of course, you

03:56 20   don't get to the penalty unless someone has been convicted of

21    an intentional murder.  So on that premise that the person has

22    been convicted of an intentional murder --

23         THE JUROR:  Okay.  Well, my feelings are that I'm

24    opposed to the death penalty even in that case because I think

25    the government shouldn't impose the ultimate penalty.  You

1    know, let me put this -- you know, I don't believe in an

2    eye-for-an-eye justice because I think it puts us on an equal

3    playing field, and I don't believe that when someone -- you

4    know, if someone commits this heinous crime, I don't think you

5    do the same thing back.  I think we need to stay -- I don't

6    know.  I believe in life imprisonment and not in the death

7    penalty.

8              THE COURT:  Could you envision that there could be

9    circumstances about a crime, details of the crime, that would

03:57 10   lead you to think it was so serious or so shocking that your

11   ordinary position against the death penalty would be overridden

12   and you could vote to impose the death penalty?

13             THE JUROR:  I don't -- no, because my ordinary

14   position would be that there really is no case that it would be

15   the right thing, if you know what I -- like it isn't a matter

16   of how bad is the crime that's been committed whether somebody

17   should die; it's only if it's in stopping a crime that -- do

18   you know what I mean?  Self-defense.

19             If somebody -- if something's going to stop another

03:57 20   crime from occurring, then I can imagine it.  But if it's like

21   life in prison or death penalty, then there is in my mind no

22   reason to choose the death penalty, in my belief system.  I

23   guess that's what we're saying, right?

24             THE COURT:  So if you were a juror in this case, it

25   wouldn't matter what the circumstances were, you would not be

```
 1    able to vote for the death penalty?  Is that --
 2            THE JUROR:  That's my belief in terms of, you know,
 3    where I stand on the death penalty, yes.
 4            THE COURT:  Okay.
 5            THE JUROR:  I guess is the way to put it.
 6            THE COURT:  Any follow-up?
 7            MS. CONRAD:  Yes.  Good morning.  No, good afternoon.
 8    My name is Miriam Conrad.  I'm one of the lawyers representing
 9    Mr. Tsarnaev.
03:58 10           If you could just turn to page 24 of your
11    questionnaire, please.
12            THE JUROR:  Yeah, I am there.
13            MS. CONRAD:  And you circled on Question 90 both A and
14    B, and you wrote "somewhere between these two."
15            THE JUROR:  Yeah.
16            MS. CONRAD:  Could you tell us a little bit more about
17    that?
18            THE JUROR:  About why?  I guess -- honestly, I guess I
19    have a hard time with giving absolute responses sometimes.  I
03:58 20   think in terms of -- so I think I was caught between them quite
21    a bit.  Do you know what I -- like how do I say this?  That in
22    terms of what my beliefs actually are, then I would say A.  Do
23    you know what I mean?  And then if we get into a case of can I
24    imagine?  Well, okay, there's 99 percent of the chance you
25    could never vote for this.  Is there anything possible -- you
```

1    know, and I feel, like, well, it's hard to say there's nothing

2    in the world that could influence me to change over that

3    last -- and I guess that's why.  It was, how do I say this,

4    equivocation?

5         MS. CONRAD:  So if -- I understand your beliefs and

6    how you explain them, but if you were selected to be on this

7    jury and you were instructed -- if the jury found the defendant

8    guilty and then you were instructed on the penalty phase on

9    considering aggravating and mitigating factors, would you be

03:59 10    able to consider those in deciding whether or not to impose the

11    death penalty?

12         THE JUROR:  See, I think that's very hard because it's

13    kind of asking me to go against a core belief system, you know?

14    So I don't --

15         MS. CONRAD:  I'm not asking you to go against a

16    core --

17         THE JUROR:  No, but it would be, wouldn't it?  I mean,

18    if I were sitting there and having to make that decision at the

19    end, it would be asking me to go -- be able to, you know, set

04:00 20    aside a core belief and examine it from a different perspective

21    of then what I believe.  I don't know if I'm being clear there.

22         MS. CONRAD:  I understand.  Thank you.

23         THE COURT:  Okay.  Thank you.

24         THE JUROR:  Okay.

25         THE COURT:  Just leave the questionnaire there.

1     That's fine.  Thank you.

2              (The juror is excused.)

3              THE CLERK:  Juror 71, have a seat, please.

4              THE COURT:  Good afternoon.

5              THE JUROR:  Hi.

6              THE COURT:  That's the questionnaire you filled out

7     before when you were here.

8              THE JUROR:  Yup.

9              THE COURT:  We're going to follow up with some

04:02 10     questions about it.  Since you filled it out, have you been

11     able to follow my instructions about avoiding any discussion of

12     the case with anyone, or any exposure --

13              THE JUROR:  Pretty much.  I mean, the people I work

14     with know -- I told them I can't really say anything.

15              THE COURT:  Right.  And the same thing for media

16     reports.  If you see a story, you turn away from it?

17              THE JUROR:  The news in the morning don't really talk

18     too much about it, just the process of jury selection.  But

19     it's only on for a couple of minutes.

04:02 20              THE COURT:  You're concerned -- tell us what you do

21     for a living.

22              THE JUROR:  I work in a warehouse, a foreign company,

23     warehouse worker shipping and receiving in Wilmington.

24              THE COURT:  So you're doing the shipping and

25     receiving?

1          THE JUROR:  Yeah, shipping and receiving.  It's a

2     two-person department.

3          THE COURT:  Uh-huh.  How long have you been doing

4     that?

5          THE JUROR:  Five years.

6          THE COURT:  Question 10 on page 5 you said you had

7     some concern about the loss of income from that?

8          THE JUROR:  Yeah, I mean, the employee handbook, the

9     company only pays for a certain amount of jury duty time.  I've

04:03 10     already put on three days of state duty.  And also, they have a

11     pension plan, which I have to work 1,000 hours this year to

12     fully vest in it.  So I kind of want to get those hours as fast

13     as possible without delay or interruption.

14          THE COURT:  Let's take the last point first.  Is this

15     something that you're newly eligible for or do you have to

16     fulfill 1,000 hours every year?

17          THE JUROR:  I have to fulfill 1,000 hours to be 100

18     percent, fully vested for my 12 -- 14 -- I'm sorry -- after 12

19     I have to put in 1,000 hours, which is 25 weeks.

04:03 20          MS. CLARKE:  Your Honor...

21          (Pause.)

22          THE COURT:  Are you paid on an hourly basis?

23          THE JUROR:  Yes.  Uh-huh.

24          THE COURT:  Okay.  Satisfied?

25          MR. WEINREB:  Yes, sir.

```
 1              THE COURT:  All right.  Thank you.

 2              THE JUROR:  Okay.

 3              (The juror is excused.)

 4              THE CLERK:  Juror No. 73, have a seat here, please.

 5              THE COURT:  Good afternoon.

 6              THE JUROR:  Good afternoon.

 7              THE COURT:  That's the questionnaire you filled out

 8      when you were here before.

 9              THE JUROR:  Yup.

04:05 10              THE COURT:  You may refer to it.  Since you filled it

11      out, have you been able to abide by my instructions to avoid

12      any discussion of the case or the process and avoid any media

13      accounts that may bear on --

14              THE JUROR:  To the best of my abilities, yeah.

15              THE COURT:  Okay.  Tell us about your employment.

16              THE JUROR:  I work at Polcari's in Saugus,

17      Massachusetts.

18              THE COURT:  In Massachusetts?

19              THE JUROR:  Yeah.  I'm a busboy.

04:05 20              THE COURT:  How long have you done that?

21              THE JUROR:  Coming up on two years now.

22              THE COURT:  Okay.  You graduated from community

23      college?

24              THE JUROR:  Not yet.  I'm --

25              THE COURT:  You're in the process?
```

 1            THE JUROR:  I'm a full-time student right now.

 2            THE COURT:  Oh, you are?

 3            THE JUROR:  Yeah.

 4            THE COURT:  So you work in addition to your being a

 5     student?

 6            THE JUROR:  Yeah.

 7            THE COURT:  Okay.  Are you in school now?

 8            THE JUROR:  I am, yeah.  Today was actually the first

 9     day.  I missed today.

04:06 10            THE COURT:  And you say it is full time.  What does

11     that entail?

12            THE JUROR:  Four classes, which is --

13            THE COURT:  How many times a week?

14            THE JUROR:  I go Monday through Thursday.

15            THE COURT:  Okay.  It would be a burden to be here,

16     then, instead of in school?

17            THE JUROR:  It would be.  I didn't put that in my

18     questionnaire.

19            THE COURT:  All right.  Thank you.  That's all.

04:06 20            THE JUROR:  No problem.

21            All right.

22            (The juror is excused.)

23            THE CLERK:  Juror No. 74, have a seat over here,

24     please.

25            THE COURT:  Good afternoon.

1          THE JUROR:  Good afternoon.

2          THE COURT:  We're going to just follow up on some of

3    the questions you answered in your questionnaire, and that's it

4    right there, so you may refer to it from time to time.

5          THE JUROR:  All right.  Thank you.

6          THE COURT:  Since you were here to fill that out, have

7    you been able to abide by my instructions not to talk about the

8    case or the jury selection process or --

9          THE JUROR:  Yes, sir.  As much as possible.

04:07 10          THE COURT:  Right.  I mean, in general terms to tell

11    people you were coming and so on and so forth, but not the

12    details of the case or anything like that.

13          THE JUROR:  Correct.  Yes, sir.

14          THE COURT:  And is the same true for avoiding any

15    media reports about the case?

16          THE JUROR:  As much as possible, yes.

17          THE COURT:  Right.  I know they sometimes hit you

18    without you --

19          THE JUROR:  Yeah, you know.

04:08 20          THE COURT:  But when that happens, do you turn from

21    them?

22          THE JUROR:  I change the channel, yes, sir.

23          THE COURT:  That's what we ask you to do.

24          Just sort of background questions, we had asked

25    whether you had ever lived in another country, and you said

1    Scotland for six months?

2              THE JUROR:  Yeah.

3              THE COURT:  Was that a student matter?

4              THE JUROR:  Yeah, I studied abroad.

5              THE COURT:  When was that?

6              THE JUROR:  My junior year of college, so 2006.

7              THE COURT:  Okay.  You have two brothers who are both

8    in the Marines?

9              THE JUROR:  Yes, sir.

04:08 10              THE COURT:  And one actually went to the Naval

11   Academy?

12              THE JUROR:  Yes, sir.

13              THE COURT:  And I guess one served both in Afghanistan

14   and Iraq?

15              THE JUROR:  Yes, sir.

16              THE COURT:  Do their -- would their service as Marines

17   have any effect on your impartiality or fair-mindedness in a

18   case like this?

19              THE JUROR:  I don't think so.

04:09 20              THE COURT:  Was the brother who was in Afghanistan and

21   Iraq -- was he engaged in combat?

22              THE JUROR:  Yes, sir.

23              THE COURT:  Is he still -- is anybody still there?

24   No?

25              THE JUROR:  No, neither -- neither are deployed at

1    this time.

2         THE COURT:  So again -- I actually was looking forward

3    so I didn't hear your answer to the question whether it would

4    affect you.

5         THE JUROR:  I don't think so, no.

6         THE COURT:  Have you talked to them about their

7    experiences, particularly the one who was in combat?

8         THE JUROR:  Yes, sir.

9         THE COURT:  Were they both in combat or just --

04:09 10      THE JUROR:  Just my older brother, yeah.

11        THE COURT:  Okay.

12        THE JUROR:  As much as he would talk about it.

13        THE COURT:  Uh-huh.  Does the fact that he won't talk

14   about it affect you?

15        THE JUROR:  No.  I don't -- I think he just -- he's

16   pretty private.

17        THE COURT:  I see you went to UMass Dartmouth?

18        THE JUROR:  Yes, sir.

19        THE COURT:  You'll probably hear something about UMass

04:10 20   Dartmouth in the course of the case.  You probably already know

21   that.

22        THE JUROR:  Yes, yeah.

23        THE COURT:  Would that have any effect on your

24   impartiality or fair-mindedness?

25        THE JUROR:  No.

1          THE COURT:  To the extent you've seen any names about

2     people involved with UMass Dartmouth, have you recognized them

3     as people you know?

4          THE JUROR:  They interviewed one of my

5     professors -- one of my history professors after --

6          THE COURT:  Who's "they"?

7          THE JUROR:  The media.

8          THE COURT:  The media --

9          THE JUROR:  I'm sorry.  I saw one of --

04:11 10          THE COURT:  -- as opposed to government investigators?

11          THE JUROR:  No.  No, no, at least that I know of.  One

12     of my history professors was on the news after the -- they

13     figured out -- it was on the news.

14          THE COURT:  This was around the time events were

15     unfolding?

16          THE JUROR:  Yes, sir.

17          THE COURT:  Close to the time of the --

18          THE JUROR:  Yes, sir.  Yeah.

19          THE COURT:  And you saw that or you just know it

04:11 20     happened?

21          THE JUROR:  I saw it.

22          THE COURT:  Okay.  Any continuing impact of that on

23     your ability to be a fair juror?

24          THE JUROR:  No.

25          THE COURT:  What did the history professor have to

1    say?

2              THE JUROR:  He was -- he was -- he taught a class on

3    Chechnya, and I think that it had some relation to the

4    defendant.  And so they were interviewing him about that.

5              THE COURT:  You may recall in the questionnaire we

6    asked some questions about general attitudes towards things,

7    including Islam and Muslims, the war on terror --

8              THE JUROR:  Yes.

9              THE COURT:  -- and so on and so forth, and you

04:12 10   answered those.

11             THE JUROR:  Uh-huh.

12             THE COURT:  Since you filled out the questionnaire,

13   there have been other incidents that could be called terrorism

14   incidents in Paris and perhaps other places.  Have you followed

15   those -- news reports about those things?

16             THE JUROR:  Some, yes.

17             THE COURT:  Give us an idea of "some."

18             THE JUROR:  I watch the nightly news, so I saw those

19   reports.

04:13 20             THE COURT:  Okay.  Would they cause you to change any

21   of the answers you gave previously?

22             THE JUROR:  No.

23             THE COURT:  If you want to look at them, they're on

24   page 17 and 18.

25             THE JUROR:  Page 17?  It was a while ago.

6-121

1          (Pause.)

2          THE JUROR:  No, I don't think my answers would change.

3          THE COURT:  Would the reports have any other -- apart

4     from the answers, would they affect you in any way that would

5     affect your service as an impartial juror?

6          THE JUROR:  No.

7          THE COURT:  If you'd look at page 20, in Question 77

8     we asked whether -- on the basis of things you'd seen in the

9     media, whether you formed an opinion about whether the

04:14 10     defendant was guilty and, if so, what punishment might be

11     imposed.

12          To the question about whether he was guilty, you said

13     "unsure," and then to the question -- sort of paired question,

14     whether he was not guilty, you said "no."  Those might be

15     inconsistent in some way.  I mean, one was more absolute than

16     the other.

17          Can you just tell us what you think your mental

18     condition is about that -- or impression you have based on

19     media reports?  I mean --

04:14 20          THE JUROR:  I mean, you're supposed to assume

21     somebody's innocent until proven guilty, right?  So I think

22     that's where maybe my "unsure" answer came from.  And then --

23     yeah, they do contradict each other, don't they, my two

24     answers?

25          THE COURT:  I'm not sure they contradict, but they're

1    a little inconsistent.

2         THE JUROR:  Yeah.

3         THE COURT:  Let me just ask you the question that you

4    raised.  In any criminal case, the defendant who is accused of

5    a crime is presumed to be innocent of it unless and until the

6    government proves he's guilty.  The government must prove that

7    by evidence produced at trial, not what might be in the ether,

8    and they must prove it to the jury beyond a reasonable doubt.

9         Would you have any difficulty in applying those

04:15 10   principles, the presumption of innocence and proof by the

11   evidence beyond a reasonable doubt, if you were a juror in this

12   case?  Would you have any difficulty in faithfully applying

13   those?

14        THE JUROR:  No.

15        THE COURT:  With respect to the second part of the

16   question, about the penalty, you said you were unsure about

17   whether he should or should not receive the death penalty if

18   convicted, right?

19        THE JUROR:  Right.

04:15 20        THE COURT:  C and D.

21        THE JUROR:  Yes, sir.

22        THE COURT:  And what was the reason you checked those

23   boxes?

24        THE JUROR:  I mean, I think you'd need to see all the

25   evidence and all the proof before you can say that about -- you

1     know, make that decision.  That's a big decision to make.

2              THE COURT:  On the next page, you said your friends

3     and boyfriend all live in Watertown and sheltered in place, but

4     you were out of town and didn't, but you would have had to if

5     you were there?

6              THE JUROR:  Yes.

7              THE COURT:  Does the fact that they went through that

8     experience and that you might have, and sort of, I guess, have

9     some empathy for them for having done it -- would that be

04:16 10     something that would interfere with your impartiality in a case

11     like this?  In other words, would you take this in some way

12     personally that would affect your ability to be a fair juror?

13              THE JUROR:  No, I wouldn't take it personally.  It was

14     scary for them, but I don't take it personally.

15              THE COURT:  And do you -- in the next question, you

16     participated in an anniversary race?

17              THE JUROR:  Yes, sir.

18              THE COURT:  And the anniversary is of the marathon

19     itself.  Is that the anniversary you're talking about?

04:17 20              THE JUROR:  I think this one was actually of the

21     events -- no, it was before the marathon, so it was just --

22              THE COURT:  So it was approximate, is that what --

23              THE JUROR:  Yeah.

24              THE COURT:  It was for the week-long events?  Is that

25     what --

1         THE JUROR:  Yeah, that kind of thing.

2         THE COURT:  And you own a Boston Strong T-shirt?

3         THE JUROR:  Yes, sir.

4         THE COURT:  Did you acquire that yourself?  Did

5    somebody give it to you?

6         THE JUROR:  Another teacher at the school that I work

7    at bought it for me.

8         THE COURT:  When?

9         THE JUROR:  Probably the week after the bombing.  We

04:17 10   had a Boston Strong Day at school.

11        THE COURT:  If you'd turn to page 23, beginning with

12   Question 88, we asked -- asked a series of questions about your

13   attitudes -- attitude or attitudes toward the death penalty.

14   88 is a general question, and you said it's necessary but

15   should be used only when a crime truly warrants it.

16        THE JUROR:  Yes, sir.

17        THE COURT:  And then the next question, we asked you

18   to give us a sense of how strongly you had that view or favored

19   the death penalty, and you circled 8 on a scale of 1 to 10,

04:18 20   with 10 being strongly favor.

21        THE JUROR:  Uh-huh.

22        THE COURT:  Is that a good estimate of the strength of

23   your belief on this?

24        THE JUROR:  Yes, I think if they've done something

25   that warrants the death penalty, then that's something that

1    they deserve.

2        THE COURT:  If you could look at the next page, rather

3    than a numerical scale, we asked you to tell us in a

4    formulation of words what came closest to your view, and you

5    selected E, which is that you're in favor of the death penalty

6    but could vote for a sentence of life imprisonment without the

7    possibility of release if you believed that sentence was called

8    for by the facts and the law in the case.  Is that your view?

9        THE JUROR:  Yeah.

04:19 10        THE COURT:  So would you -- based on the full

11    presentation, aggravating, mitigating, all that, would you be

12    in a condition where you could be persuaded to vote in favor of

13    the death penalty but also could be persuaded to vote in favor

14    of life imprisonment?  In other words, do you have any -- let

15    me just ask that question.

16        THE JUROR:  I mean, I think if the evidence warranted

17    the death penalty, then I could vote for that.  But if it

18    didn't, life in prison -- yeah, I could be persuaded either

19    way.

04:20 20        THE COURT:  So you could consciously evaluate either

21    possibility --

22        THE JUROR:  Yes.

23        THE COURT:  -- based on the evidence you heard?

24        THE JUROR:  Yes.

25        MR. BRUCK:  If I may?

 1              THE COURT:  Go ahead.

 2              MR. BRUCK:  Ma'am, I'm David Bruck.  I'm one of Jahar

 3    Tsarnaev's attorneys, and I've got a few things to ask you, if

 4    I may.

 5              THE JUROR:  Yeah.

 6              MR. BRUCK:  Thank you.  I want to ask you about the

 7    T-shirt.

 8              THE JUROR:  Okay.

 9              MR. BRUCK:  Why did the teacher buy you a Boston

04:20 10    Strong T-shirt?

11              THE JUROR:  She's the leader of the team that I'm on.

12    We work on teams in the school.  And so she bought everybody on

13    our team -- so the five teachers, she bought us all Boston

14    Strong T-shirts so we could participate in the Boston Strong

15    Day.

16              MR. BRUCK:  On the Boston Strong Day?

17              THE JUROR:  The spirit day that our school had for

18    Boston Strong.

19              MR. BRUCK:  Can you tell me a little bit more about

04:21 20    that.

21              THE JUROR:  The spirit day?

22              MR. BRUCK:  Yeah.

23              THE JUROR:  We have spirit days throughout the school

24    year.  Last Friday was Patriots Day-AFC Championship Day, so

25    you got to wear your Patriots sweatshirt instead of your

 1    teacher clothes.  So we had a Boston Strong one after the

 2    bombing.

 3            MR. BRUCK:  And how long after?

 4            THE JUROR:  We were on April vacation when it

 5    happened, so I think it was the week after.

 6            MR. BRUCK:  And how often have you worn the shirt

 7    since then?

 8            THE JUROR:  It's one of my gym shirts, so probably on

 9    a biweekly basis, maybe.

04:21 10        MR. BRUCK:  I can never remember.  "Biweekly" means

11    twice a week or every two weeks?

12            THE JUROR:  Every two weeks.  I think that's what it

13    means.

14            MR. BRUCK:  Your guess is better than mine.

15            And you also ran in the Watertown Strong race.

16            THE JUROR:  Uh-huh.

17            MR. BRUCK:  And at that time you lived in Watertown?

18            THE JUROR:  I lived in Newton, right on, like, the

19    Newton/Watertown line kind of, but I -- I would say I used to

04:22 20    live in Watertown.  I would say I did more things in Watertown

21    than in Newton.

22            MR. BRUCK:  Now, maybe this is a silly question, but

23    what does "Boston Strong" and "Watertown Strong" mean, if you

24    could explain it to someone that didn't know anything that's

25    been going on?

1        THE JUROR:  I think it was just sort of the spirit of

2   resilience that the city felt after the bombings.  I mean, I

3   really honestly think the Watertown Strong was a little silly,

4   but the Boston Strong, you know, sort of all of us coming

5   together as a city.  And that was sort of the feeling -- that's

6   how I would explain it, at least.  I don't know if I'm being

7   very articulate.

8        MR. BRUCK:  No, you're being very articulate.  Thanks.

9        Do you think -- and there's no right answer to this.

04:23 10   I just want to know what you think.  Do you think that being

11   part of this trial is some of the -- also part of the community

12   coming together or expressing resilience?

13        MR. WEINREB:  Objection.  That's a leading question.

14        THE COURT:  No, go ahead.  You can answer that.

15        THE JUROR:  Okay.  Maybe?  I'm not -- yes?

16        MR. BRUCK:  Is it to you?

17        THE JUROR:  Of the community coming together?  No.  I

18   mean, I view this as a sad thing, like we shouldn't have to be

19   doing this.

04:23 20        MR. BRUCK:  What do you mean?

21        THE JUROR:  I think bad things shouldn't happen.  We

22   shouldn't -- I don't know.  Yeah.  That's not a good answer.

23        MR. BRUCK:  No, it's fine.  Whatever -- as the judge

24   told you, whatever you really feel is a good answer --

25        THE JUROR:  Okay.

1          MR. BRUCK:  -- so...

2          Do you listen to Kiss 108?

3          THE JUROR:  I do.

4          MR. BRUCK:  Is there a lot of talk about this case on

5     that?

6          THE JUROR:  Not -- I mean, like I said, I try to

7     change the channel if they bring it up.

8          MR. BRUCK:  But I mean before you -- I mean in the

9     year and a half --

04:24 10          THE JUROR:  Oh, so before I got a jury summons?

11          MR. BRUCK:  Yeah.

12          THE JUROR:  Not any more than -- not that it, like,

13     stood out to me really.

14          MR. BRUCK:  Now, there might be evidence -- there

15     probably will be evidence that the government presents in this

16     case that the bombings were committed for reasons having to do

17     against our involvement in Afghanistan and Iraq.

18          THE JUROR:  Uh-huh.

19          MR. BRUCK:  And you've said you have two brothers who

04:25 20     are Marines officers and one brother has fought in both places.

21          THE JUROR:  Uh-huh.

22          MR. BRUCK:  Now, as you know, once you're on the jury

23     if that begins to affect you in a personal way, it's too late,

24     or it could be, so now's the only time we can ask you:  Do you

25     think the fact that your brother served in combat in both of

1    those theaters could affect the way you look at this case in a

2    way might affect your jury service?

3              THE JUROR:  I really don't think so.

4              MR. BRUCK:  How sure are you?

5              THE JUROR:  I feel like when -- when you asked me the

6    question I felt pretty sure about it.  When you asked me the

7    question now, I'm not so sure about it.

8              (Laughter.)

9              THE JUROR:  I mean, I'm proud of the service that my

04:25 10   brother did, and I'm proud of, you know, the military, but

11   it's -- you know, it's just something that he had to do.  It's

12   not something that he necessarily felt strong about what he was

13   doing over there.

14             MR. BRUCK:  Well, I guess what I'm coming down to.

15   You listed an awful lot of ways in which your life has

16   intersected with this story.

17             THE JUROR:  Yes.

18             MR. BRUCK:  You went to Dartmouth.  You talked to us

19   about your professor.

04:26 20            MR. WEINREB:  Objection, your Honor.

21             THE COURT:  Yeah, I think this is argument.

22             MR. BRUCK:  Well, just to remember all the --

23   Watertown and what you told us about your brothers, if you put

24   all that together --

25             MR. WEINREB:  This is -- objection, your Honor.

1          MR. BRUCK:  -- how sure are you?

2          THE COURT:  Yeah, sustained.  Never mind.

3          THE JUROR:  Okay.

4          MR. BRUCK:  I guess my last question is:  Just

5     thinking over everything you've told us, are you confident that

6     you could be a fair and impartial juror in this case or do you

7     have some doubt?

8          THE JUROR:  I'm confident.

9          MR. BRUCK:  Okay.  Thank you.

04:26 10          THE JUROR:  You're welcome.

11          THE COURT:  Thank you.

12          THE JUROR:  No problem.  Thank you.

13          THE COURT:  Number 74.

14          (The juror is excused.)

15          THE COURT:  I think we'll break here for lunch.  We've

16     only got about five more to go, so...

17          MR. WEINREB:  Can we hold for a second?  Can we

18     actually hold that juror for one second?

19          THE COURT:  Okay.  Would you just keep her here for a

04:27 20     minute.

21          MR. CHAKRAVARTY:  Your Honor, there was a -- I'm

22     sorry.

23          THE COURT:  I don't know.

24          MR. CHAKRAVARTY:  It -- I don't think it has to be

25     sidebar.  There was an individual that she was talking about

1    who was a history professor at UMass Dartmouth.  We didn't ask

2    for the name.  On the government's witness list there is a

3    professor from UMass Dartmouth who, based on my understanding,

4    teaches a course about Chechnya.  It's unclear whether that

5    witness will be called for sure, but it's on the list.

6              It may be prudent just to inquire --

7              THE COURT:  Okay.  Does someone have the list?  I

8    don't have it handy.  I think I have it in my other papers.

9              MS. CLARKE:  Or just ask her the name of the

04:28 10   professor.

11             MR. WEINREB:  Yeah, we would recognize it.

12             THE COURT:  Oh, you'll recognize it?  Okay.

13             (The juror is re-called.)

14             MR. McALEAR:  Juror No. 74.

15             THE CLERK:  Have a seat.

16             THE COURT:  This will be quick.

17             THE JUROR:  Okay.

18             THE COURT:  You told us you saw an interview with a

19   history professor from UMass Dartmouth.

04:29 20             THE JUROR:  Yes.

21             THE COURT:  What was his name?

22             THE JUROR:  Brian Williams.

23             THE COURT:  Okay.  Thank you.

24             THE JUROR:  You're welcome.  That's it?

25             THE CLERK:  That's it.

```
1                    (The juror is excused.)

2                    THE COURT:  Since we made pretty good progress and we

3         have about five left, instead of just taking a half-hour for

4         lunch, take 45 minutes, shoot for quarter to two, roughly.  Is

5         that reasonable?

6                    (There is a recess in the proceedings at 12:56 p.m.)

7         (The Court entered the room at 1:47 p.m.)

8                    THE COURT:  We're going to take a juror out of order,

9         No. 79.  He is the landlord in a landlord/tenant relationship,

05:22 10   and his tenant is having trouble, and he wants to go help.

11        We'll take him out of order to get him out.  That's my

12        understanding.  I haven't talked to him.  That's what I was

13        told.

14                   THE CLERK:  79.

15        (SIDEBAR CONFERENCE AS FOLLOWS:

16                   MS. CONRAD:  On Question 40, this juror said he was

17        charged with marijuana -- on Question 40, he indicated he was

18        charged with marijuana offenses in 1995 in Massachusetts and

19        pleaded guilty.  We did not receive a CORI from the government

05:24 20   for this jury.  Instead, their spreadsheet simply showed

21        "negative" written in.  So that was puzzling.

22                   MR. CHAKRAVARTY:  So that's -- we gave them what we

23        have in terms of -- if something was -- if something had been

24        sealed or was out of state -- although this sounds like it was

25        in state.  I have no explanation for why we don't have that.
```

1          MS. CONRAD:  We would just like the printout itself

2     which would indicate that there was a sealed record.  We did

3     not get a printout at all.  We got the handwritten notation,

4     "negative" --

5          MR. CHAKRAVARTY:  That means that we did not get -- it

6     did not that even show that that was sealed.

7          THE COURT:  We can ask him about it and find out.

8          MS. CONRAD:  If the government could provide it again

9     and provide us with the actual printout, we could still get a

05:25 10    printout even though there's no record.  It's not a Scribner's

11    error in recording it.  Not by him, by the government.

12         THE COURT:  Let's see what he says about it.  Maybe

13    that will help us understand the anomaly if it is one.

14         MS. CONRAD:  Thank you.

15         THE CLERK:  79.

16    .  .  .  END OF SIDEBAR CONFERENCE.)

17         THE JURY CLERK:  Juror 79.

18         THE CLERK:  Juror 79.  Have a seat, please.

19         THE COURT:  Good afternoon.

05:25 20         THE JUROR:  Good afternoon.

21         THE COURT:  Since you were here last to fill out the

22    questionnaire, have you been able to abide by my instructions

23    to avoid discussing the case?

24         THE JUROR:  Only I got stuck on a bus, and there was

25    someone listening to talk radio, and suddenly five people

1      around me were all discussing it.  So I tried --

2              THE COURT:  Tried to ignore it?

3              THE JUROR:  Tried to but it was 20 minutes of Mass.

4      Pike trapped on a bus.

5              THE COURT:  Anything that you would be unable to

6      discharge from your consideration, anything anybody said that

7      would be -- interfere with your --

8              THE JUROR:  There were a couple things that kind of

9      stuck in my head.

05:26 10              THE COURT:  Like what?

11              THE JUROR:  Just talking about the procedural parts of

12      this week and the case, what was going on, that kind of thing.

13              THE COURT:  How would that affect you?

14              THE JUROR:  Only in the sense I thought we were not

15      supposed to know any of those things.

16              THE COURT:  The substance of it, having unfortunately

17      heard it, does what they were saying have any -- lead you to

18      think differently about the matter than you used to?

19              THE JUROR:  I think it strengthened my opinion that I

05:26 20      already had.

21              THE COURT:  About the case?

22              THE JUROR:  About the defendant being guilty.

23              THE COURT:  We'll come to that again when we get to

24      those points.

25              Your form says that you are a self-employed consultant

1    to the construction industry.  What does that involve?

2          THE JUROR:  So I do project management for commercial

3    construction essentially on a consulting basis.  So I work for

4    myself, not for a big company.

5          THE COURT:  As somebody who's self-employed, how would

6    you be impacted, if at all, by serving on a jury for three or

7    four months?

8          THE JUROR:  It would be devastating being.  I'm a

9    single dad.  I have a nine-year-old child who I'm the single

05:27 10   breadwinner in the house and that's -- if I don't work, I don't

11   get paid.  So it would be a massive decrease in pay for me.

12         THE COURT:  That's not something I don't think I found

13   in the questionnaire.

14         THE JUROR:  Maybe I should have answered it.

15         THE COURT:  We did ask to the degree it would be a

16   hardship for you on the schedule we put out so -- nothing wrong

17   if you didn't.

18         THE JUROR:  I apologize.

19         THE COURT:  It just comes as a surprise.  Tell us --

05:28 20   it really -- you depend on your own labor to get money in the

21   door?

22         THE JUROR:  Right.

23         THE COURT:  Okay.

24         THE JUROR:  Yeah, absolutely.

25         THE COURT:  All right.  Thank you.

1           THE JUROR:  All set?

2           THE JURY CLERK:  Right this way, sir.

3           THE CLERK:  75.

4           THE JURY CLERK:  Juror 75.

5           THE CLERK:  Juror 75, have a seat here, please.

6           THE JUROR:  Thank you.

7           THE COURT:  Hi.

8           THE JUROR:  Hi.  How you doing?

9           THE COURT:  Have you been able to abide by my

05:29 10   instructions last time to avoid discussion of the case with

11   anybody?

12           THE JUROR:  Yes.

13           THE COURT:  And to the best of your ability to avoid

14   any media reports about it?

15           THE JUROR:  I have.

16           THE COURT:  Thank you.  That's the questionnaire you

17   filled out in front of you.

18           THE JUROR:  Yup.

19           THE COURT:  I'm going to ask you some questions --

05:29 20   some follow-up questions on some of the things you've answered

21   in the questionnaire.

22           Let's start with what you do.  You said -- it says

23   you're a management consultant, and I'm not sure I'm reading

24   the name.

25           THE JUROR:  Business Breakthroughs International.

1           THE COURT:  What is that?

2           THE JUROR:  Business Breakthroughs International is a

3  management consulting company.  Tony Robinson is part of it.

4  Chet Holmes is part of it.  I work with companies to help them

5  grow revenue from wherever to increase revenue.

6           THE COURT:  What's your daily or weekly routine like?

7           THE JUROR:  I have an office in my house, and so

8  sometimes I'm in my house, working, you know, with clients,

9  doing conference calls, webinars, things like that.  And then

05:30 10  sometimes I'm at different clients' sites.

11           THE COURT:  We asked a question about whether the

12  schedule of the case was going to be difficult for people.  You

13  said no hardship to that.

14           THE JUROR:  It is a little bit of a hardship because

15  I'll be -- I potentially could lose a lot of clients, so that's

16  the answer.  If it's a three- or four-month trial, I could lose

17  a lot of clients.

18           THE COURT:  Well, it's hard for us to assess the

19  degree of the impact.  Everybody has some impact from serving.

05:31 20  Is it the kind of impact that is manageable, or is it something

21  that would be very difficult?  I guess that's what we can't

22  assess.

23           THE JUROR:  I guess it would be manageable.

24           THE COURT:  Because you can move your hours around and

25  things like that?

1          THE JUROR:  I hope.  It depends on the case.

2          THE COURT:  We will take Fridays away from the case.

3          THE JUROR:  Okay.  I didn't know that.

4          THE COURT:  Part of the idea was to let people get

5   back to the --

6          THE JUROR:  I forgot that.  Hopefully, it will be

7   manageable.

8          THE COURT:  In terms of social media, the only thing

9   you referenced was LinkedIn.

05:31 10          THE JUROR:  Right, correct.  I'm not on Facebook.

11          THE COURT:  Twitter?

12          THE JUROR:  No, none of that stuff.  LinkedIn, I am,

13   but none of the other stuff, I'm not.  I don't have time for

14   that stuff.

15          THE COURT:  We asked, in the questionnaires, a series

16   of questions about attitudes towards current events and world

17   affairs and things like that, attitudes about Islam or Muslims,

18   attitudes about the War on Terror and so on.  You answered all

19   of them.

05:32 20          Since you answered them, there have been some events

21   in Europe and Paris.  There have been other instances of

22   terrorist activity.  Have you followed that?

23          THE JUROR:  Not really.  I know what happened but not

24   to the nth degree.  I haven't followed it that much.  More the

25   Patriots.

1        THE COURT:  Fair enough.  I guess my question would

2   be:  To the extent you followed it, would you change any of

3   your answers?

4        THE JUROR:  No, not really.  I haven't followed it.

5   I've been very, very busy with work.  That's the honest truth.

6   And I haven't been watching the news very much because I'm so

7   busy.

8        THE COURT:  So if you'd turn to Page 20 in the

9   questionnaire, Question 77, we asked about whether you had

05:33 10   already formed some opinions based on the media or whatever

11   else you may have heard about the events in the case, each of

12   the subparts of that question you answered "unsure."

13        THE JUROR:  Right.

14        THE COURT:  Can you explain or amplify on that?

15        THE JUROR:  Well, I think that if I am a juror in this

16   case, I would listen to the case, both sides, the defense, the

17   prosecution, and form an opinion based on what I would hear and

18   subject to what's going on in the court.  So that's what I

19   think a juror is supposed to do.  And I think I'm able to do

05:34 20   that.

21        THE COURT:  Okay.  You're right.  We do ask jurors to

22   put themselves in that condition.

23        THE JUROR:  Right.

24        THE COURT:  That they presume, at the outset, that the

25   defendant is innocent or not guilty of what he's charged with.

1     It's up to the government to present evidence that proves to

2     the jury beyond a reasonable doubt that he is guilty.

3                THE JUROR:  Right.

4                THE COURT:  If they do that, then the jurors can

5     return a verdict of guilty.  If the government doesn't convince

6     them, then the verdict would be not guilty.  You don't have any

7     problem with those principles?

8                THE JUROR:  No, I don't.

9                THE COURT:  And you didn't have any personal impact of

05:34 10    the events of --

11               THE JUROR:  I did not.

12               THE COURT:  Beginning on Page 23, at Question 88, we

13    ask a series of questions to try to gauge your thinking about

14    the possibility of imposing a death penalty.  Question 88 asks

15    you, in general, what your views about the death penalty may

16    be.  And you say you are open to it in certain situations.

17               THE JUROR:  Right.

18               THE COURT:  In the next question, we asked you to tell

19    us the strength of your opposition or favor of the death

05:35 20    penalty, and you're pretty far over on the opposition scale,

21    just one up from strongly.

22               THE JUROR:  Yeah.  Maybe --

23               THE COURT:  It does show you had some indecision about

24    that perhaps.

25               THE JUROR:  Maybe 3 would be the right choice if I had

1    to say it now.  In general, you know, it would be for

2    extraordinary cases, would I -- if I was a juror, would I say

3    that the person should be put to death.  So I hope I'm

4    answering your question.

5         THE COURT:  You are.  Could you perhaps flesh out a

6    little what you mean by "extraordinary" to the extent you've --

7         THE JUROR:  Well, it would have to be -- it would have

8    to be something horrendous.  It would have to be catastrophic.

9    It would have to be something where the person maybe didn't

05:36 10  have remorse, things like that.

11         THE COURT:  Okay.  The next page, we asked if you

12    could tell us which of the several possible statements best

13    reflected your feelings about the death penalty in a case where

14    someone had been proved guilty of an intentional murder.

15         THE JUROR:  I think I answered this -- I think I chose

16    C, and I answered that.  That is my honest answer.  So, in

17    general, I am opposed to the death penalty, but in certain

18    circumstances, I could -- I could -- you know, could say that

19    the person should be put to death.

05:37 20       THE COURT:  And then if you go to 25 and the top of

21    26, we asked questions that kind of paired together.  Question

22    95 is, if you found this defendant guilty and decided that the

23    death penalty was the appropriate punishment, could you

24    conscientiously vote for the death penalty?

25         THE JUROR:  Yes.

1          THE COURT:  You said yes.  Then the other side of the

2     equation, in a sense, in Question 96, if you found him guilty

3     and decided life imprisonment without possibility of release

4     was the appropriate punishment, could you conscientiously vote

5     for that as the penalty?

6          THE JUROR:  Yes, I could.  So it depends on the facts

7     of the case.

8          THE COURT:  Any follow-up?

9          MR. MELLIN:  Your Honor, just a couple.  Good

05:37 10   afternoon, sir.  I'm Steve Mellin.  I'm one of the prosecutors

11     on the case.

12          You were just describing for the judge kind of what

13     you mean by "extraordinary," and you said "horrendous" or

14     "catastrophic."  Can you elaborate on that a little bit?  What

15     do you mean by "horrendous" or "catastrophic"?

16          THE JUROR:  I would say multiple deaths, multiple

17     deaths.  Can I think about it for a moment?

18          MR. MELLIN:  Sure, sure.

19          THE JUROR:  Terror, you know, world terror, I think

05:38 20   things like that.

21          MR. MELLIN:  When you say "world terror," you mean

22     something like Adolph Hitler?

23          THE JUROR:  No, on a smaller scale.

24          MR. MELLIN:  All right.  Thank you.  Thank you, your

25     Honor.

1          MS. CONRAD:  If I may?

2          THE COURT:  Sure.

3          MS. CONRAD:  Good afternoon, sir.  My name is Miriam

4    Conrad.  I'm one of Mr. Tsarnaev's lawyers.

5          THE JUROR:  Yes, hi.

6          MS. CONRAD:  The judge asked you some questions about

7    your response to Question 77, which is on Page 20, if you

8    wouldn't mind turning to that?  Sure, take your time.

9          THE JUROR:  77?  On Page 20, okay.  Yes.

05:39 10          MS. CONRAD:  And you told the judge that what you

11   meant there is that, if you were selected for this jury, you

12   could keep an open mind and listen to the evidence.

13          THE JUROR:  I could.

14          MS. CONRAD:  But this question, if I could just maybe

15   frame it a little bit differently, as I read it, is, as you sit

16   here now or as you sat there while you filled out this

17   questionnaire, had you formed any opinion, leaving aside any

18   instructions you might get in the case -- had you formed an

19   opinion -- in other words, did you or do you believe that Mr.

05:39 20   Tsarnaev is guilty?

21          THE JUROR:  No.  I have not formed an opinion on that

22   at this point.

23          MS. CONRAD:  Okay.  The same thing as far as the

24   appropriate punishment?

25          THE JUROR:  Appropriate punishment would be -- I mean,

1    aside from affecting my business, I think I would be a fair

2    juror because I think I would listen to both sides of the case,

3    and I could make a decision of innocent or guilt based on the

4    facts of the case, and I could make a decision on the death

5    penalty or life in prison.  But aside from the time commitments

6    and affecting my business, I think I'm open to the facts of the

7    case.

8              MS. CONRAD:  I understand that, sir.

9              THE JUROR:  Did I not answer your question?

05:40 10              MS. CONRAD:  My question is a little different.  My

11    question is --

12              THE JUROR:  Okay.

13              MS. CONRAD:  -- putting aside whatever instructions

14    you might get, have you formed an opinion as to whether or not,

15    if Mr. Tsarnaev is found guilty, he should receive the death

16    penalty?

17              THE JUROR:  No.  I have not formed an opinion about

18    that.

19              MS. CONRAD:  And when you were responding to Mr.

05:41 20    Mellin's questions about the types of cases that you think

21    would warrant the death penalty, is this one of them?

22              MR. WEINREB:  Well, objection.

23              THE COURT:  Well, yeah.

24              MR. WEINREB:  I think -- reworded, I think it would be

25    okay.

1          THE COURT:  Let me try to reword it.  You know what
2     this case is about.
3          THE JUROR:  Sure.
4          THE COURT:  Generally, that is.  You know that there
5     were bombings in which people were killed?
6          THE JUROR:  Yup.
7          THE COURT:  Can you tell us whether that is within or
8     without your definition of extraordinary?
9          THE JUROR:  Based on not being -- the trial didn't
05:41 10    start yet, yes, it is within my opinion that the death penalty
11    should be implemented in this type of case without having the
12    trial first to form an opinion.  Did that answer your question?
13          MS. CONRAD:  So just to follow up on that for one
14    minute, if the defendant were found guilty of the charges
15    against him, would you believe that he should get the death
16    penalty?
17          MR. WEINREB:  Objection, your Honor.
18          THE JUROR:  I don't know at this point.
19          THE COURT:  I think he answered.
05:42 20          MS. CONRAD:  One other thing.  You said, aside from
21    your business, you think you could be a good juror or you could
22    be a fair juror in this case.  Can you explain what you mean by
23    "aside from your business"?
24          THE JUROR:  Aside from my business, that I believe
25    that this case could last three to four months or possibly

1    longer, and that's a long time for me to be without my clients

2    or my clients to be without me.  And my business could

3    potentially fall apart.  So that's what I meant.

4         MS. CONRAD:  Would that be something that would be a

5    distraction or a concern to you as you sat on the case if you

6    were to be selected?

7         THE JUROR:  It could be.  It could be, you know.

8    That's my only reservation.  That's the only reservation I

9    have.

05:43 10         MS. CONRAD:  Would you have an income while you were

11   sitting as a juror?

12        THE JUROR:  I would not.

13        MS. CONRAD:  You wouldn't have any income?

14        THE JUROR:  No.

15        MS. CONRAD:  Would that impose a financial hardship on

16   you?

17        THE JUROR:  Yes.

18        THE COURT:  Let me just follow up on that.  You had

19   indicated earlier that you could do --

05:43 20         THE JUROR:  Catch up on Fridays.

21        THE COURT:  Fridays, evenings, weekends.

22        THE JUROR:  I could.

23        THE COURT:  Zero income?

24        THE JUROR:  No.  It would be some income.

25        THE COURT:  How do you bill, just generally speaking?

1           THE JUROR:  I bill by the project.  So it's a hundred

2   percent commissions, and it really is by the project.  So if

3   I'm working with -- can I mention a company's name?  It doesn't

4   matter, right?  If I'm working with Fidelity, for instance, I

5   would have to do work with Fidelity, with their salespeople, in

6   order to get paid.  So if I don't -- if I don't do that work, I

7   wouldn't get paid.  I could do some of that work in the

8   evenings.  I could do some of that work on the weekends.  I

9   could do some of that work on Fridays.  So that's what I'm

05:44 10   trying to say.

11           THE COURT:  All right.  Thank you.

12           THE JUROR:  All set?

13           THE COURT:  Yeah.  Leave that there.

14           THE CLERK:  76.

15           THE JURY CLERK:  Juror 76.

16           THE CLERK:  Sir, over here, please.  Juror 76, have a

17   seat, please.

18           THE COURT:  Good afternoon.

19           THE JUROR:  Hello.

05:45 20           THE COURT:  Since you were here last, have you been

21   able to abide by my instructions to avoid any discussion of the

22   case substance and avoid media as best you could about the

23   case?

24           THE JUROR:  Yes.

25           THE COURT:  Tell me a little bit about your

```
 1    professional employment.

 2              THE JUROR:  I'm an architect.

 3              THE COURT:  You're employed by a company Payette?

 4              THE JUROR:  Payette, yes.

 5              THE COURT:  Tell us about that.  How big a company?

 6    What do you do for the company?

 7              THE JUROR:  I've been there ten years.  It's probably

 8    140 large, maybe 150 by now.

 9              THE COURT:  Multiple locations?

10              THE JUROR:  We do research labs.  Singular location.

11    Lots of work on college and university campuses.

12              THE COURT:  You work on a project-by-project basis?

13    Is that --

14              THE JUROR:  I do, yes.

15              THE COURT:  At any given time, how many projects would

16    you have going?  Say, now, for example.

17              THE JUROR:  Let's say one and a half.  You have a

18    primary and there's always one cooking.

19              THE COURT:  When you're doing it, you're kind of

20    focused on one?

21              THE JUROR:  Oh, yeah, for the most part.

22              THE COURT:  Other than the company's website, it

23    appears from your answers to the questionnaire you don't really

24    use social media?

25              THE JUROR:  Correct.
```

05:45 (line 10)
05:46 (line 20)

1            THE COURT:  You had one experience with jury service.

2            THE JUROR:  Yes.

3            THE COURT:  When was that, do you remember?

4            THE JUROR:  I may not have this right, but I'll say

5      seven years ago.

6            THE COURT:  Close enough.  What court?

7            THE JUROR:  Suffolk.

8            THE COURT:  Do you remember?

9            And it was a civil case?

05:47 10            THE JUROR:  Correct.

11            THE COURT:  Anything about that service that would

12      have any affect on your ability to serve as a juror in this

13      case?

14            THE JUROR:  No.

15            THE COURT:  We asked some general questions about

16      possible attitudes towards some wider issues, exposure to

17      Muslims, thoughts about Islam or Muslims, thoughts about the

18      War on Terror and so on.  Do you remember answering those in

19      the form?  If you don't, you can look at it.  It's Page 17 and

05:48 20      a few on the top of the next page as well.

21            THE JUROR:  Okay.

22            THE COURT:  Since you've answered all those questions,

23      there have been some world events, including the attacks in

24      Paris.  Have you followed those at all?

25            THE JUROR:  I have not followed them.  I did hear

1       brief mention in passing.

2              THE COURT:  You're not really familiar with what

3       happened?

4              THE JUROR:  I am aware of what happened.  I didn't

5       follow it.  I stayed away from the media like I'm supposed to.

6              THE COURT:  All right.  Good for you.

7              So there's nothing about that that you've heard about

8       that would change anything you've answered in these questions?

9              THE JUROR:  Correct.

05:48 10              THE COURT:  That's what I was getting to.  If you'd go

11      to Page 20, Question 17 asked whether, on the basis of things

12      you had heard, prior to filling out the questionnaire, from the

13      media or otherwise, that you had formed -- whether you had

14      formed an opinion about whether the defendant was guilty or not

15      and, if so, what penalty he might receive.  And in this you

16      indicated that you had an opinion from those sources that he

17      was guilty; and then in Part C, you answered, yes, you had an

18      opinion about the death penalty in this case.  Is that right?

19              Let's take the first part of that first.  I think I've

05:50 20      already said at least once to the jury that in a criminal case,

21      under the law, every defendant accused of a crime is presumed

22      not guilty, or innocent, unless and until the government proves

23      otherwise by the evidence at trial, proves it to that jury by

24      the evidence beyond a reasonable doubt.  Understanding that you

25      have what I might call an informal opinion about the matter,

1    would you be able to fulfill that duty that we impose on jurors

2    to regard the matter as unproven until the government has

3    proved it by the evidence beyond a reasonable doubt?

4         THE JUROR:  Yes.

5         THE COURT:  With respect to the second part, I want to

6    -- actually, before we get to that, I'd like to look at

7    Question 80.  Some -- I guess one friend and a daughter and

8    that friend's daughter and then the daughter of another friend

9    -- so I gather there were three people -- the friend, her

05:51 10   daughter -- was it a he or she, the friend?

11        THE JUROR:  Female, she.

12        THE COURT:  Her daughter and the daughter of another

13   friend of yours.

14        THE JUROR:  Correct.

15        THE COURT:  They were near the finish line at the time

16   of the events?

17        THE JUROR:  Yes.

18        THE COURT:  Have you talked with those friends about

19   their experience in that respect, or do you just know what

05:51 20   happened?

21        THE JUROR:  I know what happened.

22        THE COURT:  Have they told you about what their

23   feelings were or what they saw, didn't see, and so on?

24        THE JUROR:  No.

25        THE COURT:  In addition, you say the friend -- the

1    wife of a friend and coworker is a surgeon that was called in

2    to help with the victims.

3          THE JUROR:  Correct.

4          THE COURT:  Do you know the wife?

5          THE JUROR:  Yes.

6          THE COURT:  Who was the -- that is, do you know the

7    surgeon?

8          THE JUROR:  The surgeon, yes.

9          THE COURT:  Have you talked to her about her

05:52 10   experience?

11         THE JUROR:  No.

12         THE COURT:  Are these -- give us some idea of what

13   degree of friendship.  You say they're friends.  That's

14   covering a range of possibilities.  Are these people you see a

15   lot, once in a while?

16         THE JUROR:  The three that were at the Marathon, I see

17   a lot.  The coworker's wife, I don't see a lot.

18         THE COURT:  Those who were there, are they sort of

19   neighbors?  Are they friends from the community where you live?

05:52 20        THE JUROR:  Yeah.  Some of them go to school together.

21         THE COURT:  Does any of that give you any concern

22   about how you might be affected by that if you were a juror on

23   the case?

24         THE JUROR:  To some degree.  That's why I wrote it as

25   being relevant.

1          THE COURT:  How powerful, I guess, an influence might

2    it be if it's an influence?

3          THE JUROR:  I can keep my head about me.

4          MS. CLARKE:  I'm sorry, your Honor.

5          THE COURT:  Would you repeat that?

6          THE JUROR:  I could keep my head about me.

7          THE COURT:  I guess you were -- 81 on the next page,

8    you were affected by the shelter in place.

9          THE JUROR:  Correct.

05:53 10         THE COURT:  I can't quite read the last sentence.  "I

11   witnessed" -- I'm looking -- what's under the line there?

12         THE JUROR:  "I witnessed the increased law enforcement

13   activity on the way home."

14         THE COURT:  Similar question for that.  Would that

15   have any appreciable effect on your thoughts about the evidence

16   in the case as you heard it and deliberated on it?

17         THE JUROR:  It contributed to it feeling close to

18   home, so to that extent, yes.

19         THE COURT:  Would it -- I guess that question is how

05:54 20   strong an influence might it be on the way you evaluated

21   evidence or thought about the issues in the case.

22         THE JUROR:  I can be objective.

23         THE COURT:  Turn to Page 23.  Beginning with Question

24   88 and some of the following questions, we asked various

25   questions about your views about the death penalty in general

1    and otherwise, I guess.  And with respect to the question for

2    your general views, you wrote that, "If the law indicates the

3    death penalty applies to a case and the verdict of a fair trial

4    is guilty, then I am in favor of the death penalty."  Is

5    that --

6              THE JUROR:  Yes.

7              THE COURT:  -- a summary?  Anything you want to add to

8    that or qualify or amplify?

9              THE JUROR:  No.

05:55 10         THE COURT:  The next question, we asked you to tell us

11    sort of the strength of your views, and you circled 10 on the

12    1-to-10 scale, strongly favor.  That seems a little stronger

13    than the careful answer in the previous one.  Maybe you didn't

14    -- maybe you intended it.  Maybe you didn't intend it.  Maybe

15    I'm misreading that.

16              THE JUROR:  It's 10.  I can be objective, watching for

17    the evidence I'm supposed to watch for for guilty or not

18    guilty.  But if it's a subjective opinion about how the penalty

19    is carried out, then it should be the most of what the law

05:56 20   allows, in my opinion.

21              THE COURT:  So turn to the next page.  We asked which

22    statement came closest to your view, and there was a range,

23    obviously, from opposed unalterably and in favor strongly and

24    would vote for it in every case.  That's G.  You selected E,

25    that you are in favor of it, as you've told us, but could vote

1    for a sentence of life imprisonment without the possibility of

2    release if you believe that sentence was called for by the

3    facts and the law in the case.  That's an accurate --

4         THE JUROR:  Yes.  I think that's our responsibility.

5         THE COURT:  So the question is:  Can you think of the

6    kinds of considerations that might lead you, in a given case --

7    maybe some general categories of factors that would lead you,

8    on the one hand, perhaps to say this is an appropriate case for

9    the death penalty and I will vote for it, or perhaps, in

05:57 10   another case, to say this is not an appropriate case for the

11   death penalty, although I generally favor it; and, therefore, I

12   will vote for life imprisonment.  What are the kinds of things

13   you would think about in making that discrimination?

14        THE JUROR:  My son is ten and my daughter is six.

15   When what happened involves kids of that age, it's hard for me

16   not to not make strong associations with my own children.

17        THE COURT:  So would you find it difficult to vote for

18   a penalty that was not the death penalty, that was life

19   imprisonment, in a case that involved the intentional murder of

05:58 20   a child?

21        THE JUROR:  Yes.

22        THE COURT:  You know that that may be involved in this

23   case, right?

24        THE JUROR:  Understood.

25        THE COURT:  So do you think it would be -- this would

1    not be a case where you would be open to life imprisonment as a

2    penalty?

3        THE JUROR:  It's more difficult to remain so.

4        THE COURT:  Is it something you could in good

5    conscience evaluate and think about with an open mind?

6        THE JUROR:  Yes.

7        THE COURT:  Or would you be, by your paternal

8    extincts, compelled to go in the other direction, towards the

9    death penalty?

05:59 10        THE JUROR:  Right now, I understand my paternal

11    instincts a lot better than I understand whatever facts may or

12    may not come out of the case.

13        THE COURT:  So are you suggesting that you could learn

14    something in the course of the case that would override that

15    instinct in this --

16        THE JUROR:  I suppose anything is possible.

17        THE COURT:  Just two more of the questions, 95 and 96.

18    95 asks, if you found the defendant guilty and you decided the

19    death penalty was appropriate, could you conscientiously vote

06:00 20    for it?  And your answer was yes.  The next question was sort

21    of the reciprocal of that.  If you found the defendant guilty

22    and you decided that life imprisonment without possibility of

23    release was the appropriate punishment, could you

24    conscientiously vote for that?  And you said yes.  Do you have

25    any -- well, I'll just leave it at that.

1          THE JUROR:  I don't see these as exclusives to each

2     other.

3          THE COURT:  Okay.

4          MR. WEINREB:  I have a few.  Good afternoon.  My name

5     is Bill Weinreb.  I'm one of the prosecutors in the case.  I

6     just want to ask a few questions to make sure I understand your

7     answers.

8          Putting aside anything you may have heard about this

9     case, just on your view of the death penalty in general, what

06:01 10     is your view on whether all murderers deserve the death penalty

11     regardless of the facts of the particular case?

12          THE JUROR:  I don't have an opinion about that.  I

13     would want to know the case.

14          MR. WEINREB:  So, again, putting aside the facts of

15     this case, as the judge instructed you earlier, in a capital

16     case, in federal court, if a defendant is found guilty of a

17     capital crime and he's found guilty of an intentional murder,

18     then the jury hears evidence of aggravating factors, factors

19     that the government believes make it an especially bad case or

06:01 20     a case worthy of the death penalty, and you may -- you may also

21     hear evidence of mitigating factors, factors that would suggest

22     that the death penalty was not an appropriate punishment

23     because of the circumstances of the offense or because of

24     something having to do with the defendant.  Would you be able

25     to consider both aggravating factors and mitigating factors in

1    determining an appropriate punishment?

2        THE JUROR:  Yes.  I heard that explanation for the

3    first time this morning.  I might have previously thought that

4    evidence is all presented for guilty or innocence.  I didn't

5    really understand that there might be further evidence after

6    that.  Beyond that, it's hard to comment on without remotely

7    knowing what that evidence might be or not.

8        MR. WEINREB:  Okay.  So, now, you indicated you've

9    heard some things in the media about this case and about what

06:02 10    some of the aggravating factors in this case might be.  And

11    based on that, you formed an opinion.  At the actual trial, if

12    the jury were to find the defendant in this case guilty, the

13    same thing would happen.  If they were to find him guilty of a

14    capital offense involving intentional murder, you would hear

15    evidence of aggravating circumstances and evidence of

16    mitigating circumstances.  In this case, would you able to

17    consider both the aggravating circumstances and mitigating

18    circumstances, genuinely consider them, and weigh them in

19    determining what would be the appropriate penalty in this case?

06:03 20        THE JUROR:  Yes.

21        MR. WEINREB:  I have nothing further.

22        MS. CLARKE:  Yes.  I was going to call you Mr. 76.  My

23    name is Judy Clarke.  I'm one of the lawyers for Mr. Tsarnaev.

24    I just had a few questions if that's okay.

25        I get a little sense that you're very uncomfortable

1    about perhaps serving in this case, is that right?

2              THE JUROR:  Yes.

3              MS. CLARKE:  Could you tell us why?

4              THE JUROR:  Well, I expressed an inquiry that I have

5    -- well, a concern about personal and career schedule issues,

6    but I'm sure that's not your interest.

7              And I also -- I am concerned about how to go about

8    impartiality given the circumstances of the case.

9              MS. CLARKE:  Certainly.  And the career and family

06:04 10   scheduling coordination, I don't think we've heard much about

11   whether that's a real hardship for you.  Could you tell us?

12             THE JUROR:  Sure.  At a family level, my -- well,

13   perhaps it's shorter to say that things are manageable if the

14   process did not go to sequester.  If it did, I would have no

15   idea how to manage a few things.

16             And on a professional level, I have most of the

17   imbedded knowledge personally for a very significant part of a

18   project that means a lot to me that I also would not know how

19   to deal with next steps.

06:05 20             MS. CLARKE:  How would that affect you if you were in

21   this trial for the next three or four months?

22             THE JUROR:  That's what I'm saying.  I don't know.

23   For me personally, it would be upsetting.  How things play out,

24   I don't know.  I suppose I would have lots of follow-up

25   questions how things work.

1          MS. CLARKE:  Would there be a financial hardship to

2    you?  Would you lose income?

3          THE JUROR:  To some degree, sure.

4          MS. CLARKE:  Could you tell us about that?

5          THE JUROR:  I make more than the amount that was

6    noted.  That one isn't as high a priority than the others.

7    It's not insignificant.

8          MS. CLARKE:  I don't think anybody in the room is

9    trying to create hardships, extraordinary hardships for folks.

06:06 10   And I think that's what we really want to know about, is how

11   much of a hardship that is for you.

12          THE JUROR:  I'm much, much, much more concerned about

13   schedule issues than financial.

14          MS. CLARKE:  Than financial.  Could you tell us a

15   little bit more about the second thing that you mentioned a

16   moment ago, that you're concerned about your ability to be

17   impartial.

18          THE JUROR:  Yes.  I think I could say that for

19   evaluating facts of the case to judge guilty or innocence, I

06:06 20   understand how I could do that just fine and be objective.

21          If I'm asked to give a subjective opinion about

22   whether one form of a penalty gets performed or not and it's

23   truly my opinion as opposed to being governed by a set of rules

24   that I'm expected to follow, then I have a real hard time with

25   the -- with what I know of this case and how close it hits to

6-162

1    home.

2              MS. CLARKE:  In reality, in this case, it would be

3    very difficult for you to consider life as opposed to death?

4              THE JUROR:  From what I know now.

5              MS. CLARKE:  From what you know now.  And that's based

6    on what you've read in the paper?  Heard on the news?

7              THE JUROR:  Probably several sources I followed.

8              MS. CLARKE:  Could you help us understand what

9    sources?

06:07 10              THE JUROR:  Sure.  At the time of the bombing and the

11    days following, I was as attached to several different media

12    sources as probably lots of people:  television, internet,

13    newspaper.

14              MS. CLARKE:  And it sounds like, from a couple of the

15    answers, that you've even discussed with your wife that you

16    felt like the death penalty would be appropriate after a fair

17    determination of it.

18              THE JUROR:  I discussed schedule concerns with my

19    wife.  I thought that was -- to some degree, I think we were

06:08 20    asked to go and find out work, home, otherwise, what the

21    implications of possibly being seated would be.

22              MS. CLARKE:  Nobody is suggesting you did anything

23    wrong there.  I was just looking at Question 75 on Page 19.  "I

24    discussed with" --

25              THE JUROR:  I don't disagree with what that says.

6-163

1          MS. CLARKE:  So, in part, your opinion is formed and

2    solidified maybe by the discussions with your wife?

3          THE JUROR:  Sure.

4          MS. CLARKE:  Do you think you could really ever

5    realistically step back from that opinion?  You know, you know

6    what the case is about.  You know that it involves the death of

7    a child.  You know that it involves multiple deaths.  You know

8    that it involves bombing.  You know -- you've written down your

9    connections and how you were affected by it.

06:09 10          MR. WEINREB:  Your Honor, I object.  He doesn't know

11    what the case is about.  He doesn't know any evidence in the

12    case yet.

13          THE COURT:  I think in general terms, not in detail.

14          MR. WEINREB:  -- any evidence of mitigating factors.

15          THE COURT:  That's certainly true.  The selection -- I

16    think the selection -- the selective selection of

17    considerations is probably not appropriate so it's sustained.

18          MS. CLARKE:  In Question 77, if I could go to it

19    because I'm really concerned -- I don't think anybody in the

06:10 20    room wants you to feel like you have to give a correct

21    response.  You're a dad.  You're concerned about this case

22    involving the death of a child.  You've expressed that.  You've

23    expressed concerns about impartiality.  I'm trying to get at,

24    you know, the depth of the opinion that you hold on the death

25    penalty in this case.  Do you --

1         MR. WEINREB:  That's not an appropriate question

2    because he doesn't know anything about all the facts --

3         THE COURT:  The question is really more about

4    predisposition and whatever tendency you might have now, the

5    realistic possibility that you could evaluate the evidence,

6    having heard it all, and have a view that would lead you to

7    vote for life imprisonment rather than the death penalty.

8         THE JUROR:  Yes.  But I'm not quite sure I understand

9    the difference between which evidence is presented when.  I

06:11 10   thought all evidence would be presented at the time of deciding

11   guilty or innocence.

12        THE COURT:  Not quite.  So in the penalty phase, as

13   you heard, each side has an opportunity to present evidence

14   that might not be particularly germane to the central question

15   in the first phase, which is, is the defendant guilty of this

16   specified crime or not?  Did he do the things that have to be

17   done in order for there to be a crime of this sort?  That's the

18   first question.

19            The second question is, if that answer is yes and it

06:11 20   was -- and the crime was a capital crime, such as intentional

21   murder, then the question is:  Okay.  We have someone convicted

22   of intentional murder.  Now we have to decide what is an

23   appropriate punishment between two available alternatives.  One

24   side will argue that there are things that make this worse than

25   the average case and so that this defendant deserves a

1    punishment greater than what some other person convicted of

2    murder would otherwise get.

3            THE JUROR:  That would deliberately not be presented

4    in the first part?

5            THE COURT:  Correct.  And then after that

6    presentation, there would be a presentation:  But you should

7    think about these things, which mean death penalty isn't

8    appropriate, that the interests of justice are adequately

9    served or properly served by the imposition of a penalty of

06:12 10  life imprisonment without release.  Both sides would be making

11   their presentation.  The jury will evaluate all those factors

12   and come to some conclusions.  So that's the second -- that's

13   the penalty phase process.

14           THE JUROR:  Understood.

15           THE COURT:  And so what everybody is trying to get a

16   handle on -- and maybe you're trying to get a handle on it

17   yourself in your own mind -- in a penalty phase under those

18   circumstances, not knowing what the evidence is going to be in

19   any detail or even any identification in a sense, is your

06:13 20  tendency to be in favor of the death penalty and perhaps even

21   for this case, is that tendency strong enough that it would

22   realistically exclude the possibility of you giving meaningful

23   consideration to an alternative sentence of life in prison?

24           THE JUROR:  I consider myself capable of looking -- of

25   evaluating evidence and applying the laws that I am educated

1    about in the courtroom in the way you're supposed to do it.

2    When that becomes a subjective opinion, I think in this case I

3    do have a predisposition.  Of course, the first thing I said is

4    I will be capable of listening to evidence.

5         THE COURT:  Not just listening to but acting contrary

6    to your predisposition.

7         THE JUROR:  Oh, sure, if the evidence suggests

8    otherwise.

9         MR. WEINREB:  All right.  You said -- I'm sorry.  I

06:14 10    thought you were done but go on.

11         MS. CLARKE:  No.  It was my turn but it's okay.

12         Could I follow up on that just a bit?  And I have one

13    other question I wanted to follow up on.

14         I don't think we want to leave you with the impression

15    that there's a checklist you can go through in the second phase

16    of this case.  Like in the first phase, the presumption of

17    innocence, proof beyond a reasonable doubt, sort of an

18    evaluation of facts and coming to an objective conclusion.  It

19    is a subjective conclusion for a juror to make in the penalty

06:15 20    phase that aren't rules that govern the decision.  There are

21    rules that govern the process of --

22         MR. WEINREB:  Your Honor, I object to this.

23         THE COURT:  I'm not sure that's an accurate statement

24    of the law.  I'm not sure it is really in the sense subjective.

25    It's a judgment each juror makes.  There will be objective

1    criteria.  There will be proof of circumstances that could be

2    characterized as aggravating, proof of circumstances that could

3    be --

4              MS. CLARKE:  Sure.

5              THE COURT:  Those are just as objective as other

6    matters of proof in a --

7              MS. CLARKE:  I don't want to mislead.

8              THE COURT:  It's not just a choice by any juror.  It's

9    an evaluation of the evidence in a similar way to other

06:15 10    fact-finding.

11              MS. CLARKE:  Sure.  I don't want to mislead you by any

12    means that way.  There's presentation of aggravation,

13    presentation of mitigation.  The jurors are supposed to find

14    aggravation if it exists beyond a reasonable doubt; mitigation,

15    there is a preponderance of the evidence.  It gets very

16    complicated.  There's a weighing.  But then it's an

17    individualized determination of whether or not that justifies a

18    sentence of death.  Nobody can tell you how to make that

19    individualized determination once the weighing is done.

06:16 20              And in a case that we're talking about, are you going

21    to be able to weigh and make an individual determination of

22    either sentence, or are you going to go to the death penalty?

23              THE JUROR:  I can objectively evaluate evidence

24    presented to me.  When it's a subjective opinion, I understand

25    my current tendency more than I understand where I'm going to

1    be -- if I were to hear lots and lots of evidence, where I

2    would be on the other end of that.

3        MS. CLARKE:  After hearing all of these questions and

4    us shooting some legal principles at you, are you still

5    concerned about your ability to be impartial?

6        THE JUROR:  Yes, on things that are subjective in

7    nature.

8        MS. CLARKE:  Judge, if I could follow up on one last

9    question?  Number 80.

06:17 10    Your friend, her daughter, and the friend's daughter

11    witnessed the explosions.  How did you learn about that?

12        THE JUROR:  They told us.

13        MS. CLARKE:  They told you.

14        THE JUROR:  The parents told you.

15        MS. CLARKE:  Did you talk about what that meant?

16        THE JUROR:  With the parents, not with the children.

17        MS. CLARKE:  What was the discussion?

18        THE JUROR:  That they were there to see the husband of

19    the friend run the Marathon.  They were near the finish line.

06:17 20    They saw and heard the explosions.  They ran to safety.  And I

21    was told that everybody was okay, and they got back together

22    with their dad.  That's about it.

23        MS. CLARKE:  I imagine -- or maybe you can tell us.

24    Did that discussion make you put yourself in those shoes and

25    worry about your child, yourself or your family?

1          THE JUROR:  Sure.  I happened to be at baseball

2     practice with my son that day.  Otherwise, we would go watch

3     the Marathon.

4          MS. CLARKE:  Because your family goes to the Marathon

5     to watch?

6          THE JUROR:  Sometimes, yes.

7          MS. CLARKE:  So you worried at that time --

8          MR. WEINREB:  Objection to the leading.

9          THE COURT:  Leading, yeah.

06:18 10          MS. CLARKE:  Were you worried, following that

11     discussion, that that could have been you?  I mean, were you

12     trying to put yourself in their shoes and had an emotional

13     reaction?

14          MR. WEINREB:  Objection.

15          THE JUROR:  I wasn't with them.  I felt sympathy and

16     concern when I learned that they were there.  I didn't even

17     know they were there.

18          MS. CLARKE:  Thank you.

19          THE COURT:  Did you have something else?

06:18 20          MR. WEINREB:  I have literally two questions.

21          Would you be able to -- assuming this case went to a

22     penalty phase, so the penalty phase begins.  Would you be able

23     to keep an open mind while listening to the aggravating

24     evidence and the mitigating evidence and not make a decision

25     until you've heard all the evidence?

1      THE JUROR:  I will try because I understand that's the

2  duty of a juror.

3      MR. WEINREB:  Second question is:  If I were to tell

4  you that the jury won't be sequestered and that you will have

5  Fridays off so that, except on school vacation weeks when

6  you'll have Mondays off, but basically that the jury will only

7  sit four days a week and will not be sequestered, does that

8  have any impact on the hardship that this would be?

9      THE JUROR:  Half of it.  It relieves some of my

06:19 10  concerns about the family side of issues.  On the professional

11  side, I would still be at a loss how to handle that.

12      MR. WEINREB:  Thank you.

13      THE COURT:  Can I come back to that last point?  How

14  are you compensated?  Salary, commission?

15      THE JUROR:  Salary.

16      THE COURT:  Thank you.  That's it.

17      THE CLERK:  77.

18      MR. CHAKRAVARTY:  Your Honor, I think there was an

19  issue with this juror.

06:21 20      THE COURT:  He's not here?  I'm told by the jury clerk

21  this juror didn't show up today.

22      MS. CLARKE:  That makes that easy.

23      THE COURT:  I had heard earlier that there was one

24  juror.  I didn't know who it was.  I understand that our staff

25  has made some attempts to contact him.  Last I heard they had

1    been unsuccessful; but if they do, we'll plug him in some other

2    place as we have with others.

3         MS. CONRAD:  Should we provide the Court with the

4    information at this point?

5         THE COURT:  I think I just -- I'll get a copy of that.

6         Okay.  I think that then brings us to No. 80.  We

7    already did 79.

8         MR. CHAKRAVARTY:  Your Honor, this juror also has

9    something --

06:23 10         THE COURT:  I guess the way they were summonsed, she's

11   first thing tomorrow.  She's the first one tomorrow.  She's not

12   here either.  So we've run out.

13        So I think, as we did the other day, we'll take about

14   a half an hour, and you can go over your notes and so on.  Then

15   we'll come back and have a discussion, which will be in sidebar

16   mode.

17   (Recess taken at 2:50 p.m.)

18

19

07:06 20

21

22

23

24

25

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,        )
                                 )
        Plaintiff,               )
                                 )   Criminal Action
v.                               )   No. 13-10200-GAO
                                 )
DZHOKHAR A. TSARNAEV, also       )
known as Jahar Tsarni,           )
                                 )
        Defendant.               )
                                 )

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

**JURY TRIAL - DAY SEVEN**

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Wednesday, January 21, 2015
9:22 a.m.

Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2        OFFICE OF THE UNITED STATES ATTORNEY
          By: William D. Weinreb, Aloke Chakravarty and
 3            Nadine Pellegrini, Assistant U.S. Attorneys
          John Joseph Moakley Federal Courthouse
 4        Suite 9200
          Boston, Massachusetts  02210
 5        - and -
          UNITED STATES DEPARTMENT OF JUSTICE
 6        By: Steven D. Mellin, Assistant U.S. Attorney
          Capital Case Section
 7        1331 F Street, N.W.
          Washington, D.C.  20530
 8        On Behalf of the Government

 9        FEDERAL PUBLIC DEFENDER OFFICE
          By: Miriam Conrad, Federal Public Defender
10        51 Sleeper Street
          Fifth Floor
11        Boston, Massachusetts  02210
          - and -
12        CLARKE & RICE, APC
          By: Judy Clarke, Esq.
13        1010 Second Avenue
          Suite 1800
14        San Diego, California  92101
          - and -
15        LAW OFFICE OF DAVID I. BRUCK
          By: David I. Bruck, Esq.
16        220 Sydney Lewis Hall
          Lexington, Virginia  24450
17        On Behalf of the Defendant

18

19

20

21

22

23

24

25
```

1                         P R O C E E D I N G S

2          (The Court enters the courtroom at 9:22 a.m.)

3          (Discussion at sidebar and out of the hearing of the

4     public:)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11          (There is a recess in the proceedings at 9:29 a.m.)

12          (In open court:)

13          THE CLERK:  All rise for the Honorable Court.

14          (The Court enters the courtroom at 10:24 a.m.)

15          THE CLERK:  Be seated.

16          THE COURT:  All right.  For the benefit of observers,

17   press and the public, let me just tell you what has taken the

18   time this morning.  Both the parties and I have, in order to

19   expedite the voir dire process, taken a second to look at the

20   questionnaires and tried to determine where voir dire is really

21   necessary and where it may not be necessary, and we've reduced

22   the number of voir dire jurors as a result of our review of the

23   questionnaires themselves.  This is something that perhaps we

24   can do to, as I say, expedite things.  I just wanted to explain

25   that to people who may be wondering why we're slow getting

1    started this morning.

2        We're going to call the remaining people who will be

3    questioned into the box now and I'll give them the preliminary

4    instructions, so...

5        (Pause.)

6        THE CLERK:  All rise for the jury.

7        (The venire enters the courtroom.)

8        THE COURT:  All right.  You may all be seated.

9        Good morning, ladies and gentlemen.

10        THE VENIRE:  Good morning.

11        THE COURT:  Thank you for your patience.  We want to

12    welcome you back to the United States District Court for the

13    District of Massachusetts and thank you for being here.

14        We're continuing the process of selecting a jury for

15    the case of the United States versus Dzhokhar Tsarnaev.  As you

16    know, Mr. Tsarnaev is charged in connection with the bombing

17    that occurred near the finish line of the Boston Marathon in

18    April 2013 that resulted in the deaths of three people.  He's

19    also charged in the death of an MIT police officer and other

20    crimes that occurred on April 18 and 19, 2013.

21        Some, but not all, of the crimes charged in the

22    indictment are, by statute, potentially punishable by death.

23    You will recall from my prior instructions when you filled out

24    your questionnaires that the jury will first consider and

25    decide whether the government has proved that Mr. Tsarnaev is

1    guilty of any of the charges -- any or all of the charges

2    against him.  If he is convicted of any of the capital

3    crimes -- that is, crimes for which the death penalty is a

4    potential punishment -- then the jury will consider and decide

5    whether he will be sentenced to death for any such crime or to

6    life in prison without the possibility of release.

7         Some of you may have wondered why the death penalty

8    could be a possibility in this case in view of the fact that

9    the laws of Massachusetts do not provide the death penalty as a

10   punishment for murder or any other violation of Massachusetts

11   law.  The reason is that this is a federal case involving the

12   alleged violations of the laws of the United States rather than

13   a state case involving the violations of the laws of

14   Massachusetts.

15        If the jury convicts the defendant of any of the

16   capital crimes charged in the indictment, the same jury will

17   then hear additional evidence and decide whether to sentence

18   him to death or to life in prison without the possibility of

19   release.  Because the jury that is selected first to consider

20   whether he's guilty or not of the crimes charged will also

21   decide the punishment if he is convicted, it is necessary to

22   question prospective jurors about your feelings and beliefs

23   about the death penalty as part of the process of jury

24   selection.

25        So let me briefly explain the procedures that must be

1    followed in a case in which the death penalty is or may be an

2    issue.  As in any criminal case, initially the government has

3    the burden of proving the defendant is guilty of any crime with

4    which he is charged.  And as I say, if he's convicted by the

5    jury of a crime for which the death penalty may lawfully be

6    imposed, then there will be a second phase in the trial, and

7    the second phase is usually referred to, in shorthand, as the

8    penalty phase.

9         In that phase the government will introduce evidence

10   that seeks to prove beyond a reasonable doubt:  first, that

11   Mr. Tsarnaev acted with sufficient intent or intention to be

12   subject to the death penalty; and if, so, second, that certain

13   aggravated -- aggravating factors about the events, the crimes

14   or the defendant himself justify sentencing him to death.

15        Aggravating circumstances -- aggravating factors are

16   circumstances that if proven would tend to make the crimes

17   particularly serious or blameworthy and, therefore, under the

18   law may justify imposing a more severe sentence on Mr. Tsarnaev

19   compared to other persons who have been convicted of

20   intentional killing or murder.

21        The government will bear the burden of proving any

22   alleged aggravating factors to every juror beyond a reasonable

23   doubt.  The defense will have an opportunity to present

24   evidence of what it will argue are mitigating factors in the

25   case.  Mitigating factors are usually circumstances about the

crimes or events or about Mr. Tsarnaev's background or
character that would suggest that the death penalty is not the
appropriate sentence in the case or that life imprisonment
without possibility of release is adequate to punish the
defendant.

Unlike the proof of aggravating factors by the
government, a mitigating factor must be proven by the defendant
only by the greater weight of the evidence.  That is a less
demanding standard of proof than proof beyond a reasonable
doubt, which applies to the aggravating factors.

Again, unlike the proof of aggravating factors,
mitigating factors do not have to be proven to the satisfaction
of all the jurors.  Any juror who finds or determines a
mitigating factor to have been proved by a greater weight of
the evidence may consider that factor in deciding the
appropriate sentence in the case regardless of whether any or
all of the other jurors agree that the mitigating factor has
been proven.

After the parties have made their presentations
concerning aggravating and mitigating factors, the jury will
weigh all the evidence.  Before a jury could vote to impose the
death penalty, every juror would have to be persuaded that
certain factors that make the defendant potentially subject to
the death penalty have been proven beyond a reasonable doubt.
In addition, in order to impose the death penalty, every juror

1    would have to be convinced beyond a reasonable doubt that any

2    proven aggravating factors sufficiently -- they would have to

3    find the aggravating factors beyond a reasonable doubt, and

4    they would have to be persuaded that the aggravating factors

5    sufficiently outweigh any mitigating factors found by any juror

6    or jurors to justify a sentence of death.

7            Even if the jury did not find any mitigating factors

8    in the case, it would still have to be unanimously persuaded

9    that any proven aggravating factors were themselves sufficient

10   to justify a death sentence.  You should understand that a jury

11   is never required to find that a sentence of death is

12   justified.

13           The decision whether the government has proven that a

14   defendant should be sentenced to death must ultimately be made

15   by each juror himself or herself.  If, however, every juror is

16   persuaded that the death penalty should be imposed, I would be

17   required as the trial judge to sentence the defendant to death;

18   in other words, I could not change the jury's decision.  The

19   jury, and not the judge, is responsible for determining whether

20   a defendant who is convicted of a capital crime will live or

21   die.

22           I've just given you an overview of the applicable law

23   pertaining to the jury's consideration of the death penalty.

24   If you are selected to serve on the jury and if you have found

25   the defendant guilty of a crime punishable by death, I will

1    give you very detailed instructions concerning your duties in

2    deciding whether to impose the death penalty or life

3    imprisonment without possibility of release, and I will

4    instruct you in the law that must be followed in making that

5    decision.

6           Now, when you filled out your questionnaires we told

7    you there were no right or wrong answers to any of the

8    questions that you have been asked, and that's true of any

9    questions you'll be asked in this voir dire process.  We ask

10    them because both the government and Mr. Tsarnaev are entitled

11    to a jury that does not have its mind firmly made up one way or

12    the other before hearing the evidence and a detailed

13    explanation of the law.  That applies both to whether the

14    defendant is guilty or not guilty of the specific crimes

15    charged in the indictment, and also, if he is convicted of a

16    capital crime, whether he should be sentenced to death or life

17    in prison without the possibility of release.

18           So we're going to question each of you about some

19    issues that are relevant to the selection of a jury.  We're

20    going to have you in the room you've been sitting in, and call

21    you into the courtroom one by one to ask you some questions.

22    There will be a few people in the room besides the lawyers and

23    their staffs, and the proceedings will be simultaneously and

24    are being now transmitted by video and audio to overflow

25    courtrooms.  We will not identify you by name, but rather by

1    number, and you'll be seated so that the video camera will be

2    generally behind you.

3         Your answers will generally be public in the

4    way -- because they're being made in a way that is available to

5    the public, but if you believe that a truthful answer would

6    require you to reveal sensitive personal information, we'll

7    temporarily stop the audio transmission to those courtrooms so

8    that people observing there will not hear your answer.

9         Again, we don't expect any particular answer to the

10   questions; all we want and what the law expects is that you

11   provide accurate and truthful answers to the questions you are

12   asked.  If you do that, you will be doing your duty as a

13   citizen and as a juror no matter what the answers may be.

14        I want to remind you about my prior instructions.  As

15   I've told you before, the jury's verdict must ultimately be

16   based on the evidence produced at trial.  It must be free of

17   outside influence.  So, again, I remind you it is extremely

18   important that you do not discuss the case, including this jury

19   selection process, in detail with your family, friends, each

20   other or other persons until either you have been excused or,

21   if selected as a juror, until the case concludes.  And again,

22   of course, you're not to conduct any online or -- research or

23   otherwise read, watch or listen to reports about the case in

24   the media or elsewhere.

25        When you prepared your questionnaires, you were asked

```
 1    at the end to sign affirming that the answers were true under
 2    the pains and penalties of perjury.  Similarly, the oral
 3    examination, the questioning that we'll conduct today, must be
 4    done under oath, and this means that you will swear to answer
 5    the questions truthfully, completely and to the best of your
 6    ability.
 7              The clerk will now administer the oath.
 8              THE CLERK:  Will the jurors please rise and raise your
 9    right hand.
10              (The venire is duly sworn.)
11              THE COURT:  All right.  The jurors will be excused now
12    and we'll proceed with the voir dire.
13              (The venire exits the courtroom.)
14              MS. CLARKE:  Your Honor, could we get a list of those
15    that are remaining?  We counted ten should be remaining, and
16    nine appear.
17              THE COURT:  Oh, one is ill.
18              MS. CLARKE:  And that would be number --
19              THE COURT:  Which one is -- I think it's 109.
20              MR. BRUCK:  Before the first juror comes out --
21              THE COURT:  She'll be rescheduled.
22              MR. BRUCK:  Before the first juror comes out, your
23    Honor, we do have a matter to -- for the Court.
24              MS. CLARKE:  Could I finish up?
25              Otherwise, the entire list that we provided the
```

1    Court --

2              THE COURT:  Yes.  Yeah.

3              MS. CLARKE:  Thank you.

4              THE COURT:  Is this a sidebar matter or not?

5              MR. BRUCK:  No.

6              We filed this morning a third request for follow-up

7    voir dire questions, and I just wanted to very briefly explain

8    what that is.  We have re-filed publicity *Morgan* and

9    *Witherspoon* questions, some of which are the same as the ones

10   we filed before and some of which were different.  It seemed

11   better to file a complete new list each time we made

12   substantial changes rather than asking the Court and asking the

13   record to keep track of various discrete additional requests.

14   So basically, this is everything.  We don't mean to withdraw

15   anything that's been asked before, but this is, going forward,

16   the requests we're making.  We also have some requests

17   concerning the way voir dire is being conducted.

18             First, we would ask that the Court explore the facts

19   before instructing the juror; that is to say, to find out what

20   the juror thinks, what the juror knows, what the juror has

21   heard, the basis of the juror's opinions, if they have any,

22   before telling the juror what the law is and their obligation,

23   if they can, to put those opinions aside.

24             We think that it's important to understand the

25   underlying facts behind the juror's opinion in order to assess

1    its strength, and that's why we're asking that it be done in

2    that order.  The particular questions that probe for the facts

3    are listed on the second page of our request.

4         We appreciate the latitude the Court has given us, and

5    to the extent the Court does not itself ask these questions, we

6    would -- we will seek to ask them ourselves, but we think it's

7    better for the Court on the initial round to ask probing

8    questions of the jurors because the Court has greater authority

9    and greater prestige with each juror, and we just think we're

10   going to get better results if that is done.

11        Second, the Court called me out more than once for

12   asking leading questions over the last few days.  It's not my

13   place to critique something that I have never done and you have

14   done for many, many years, but the fact is that when the Court

15   has explained the legal principles to the jurors, we think the

16   record reflects that it has done so in a leading manner, that

17   is, a manner which conveys in the way the -- in both the

18   quickness with which the Court goes to the legal matters after

19   the opinion is expressed by the juror and the way the question

20   is asked, we think it conveys very powerfully to the juror what

21   the juror should say; that is to say, that the Court wishes the

22   juror to be able to say, or to say, that he or she can put his

23   opinions or her opinions aside and follow the law.

24        There is great social pressure for someone to say,

25   "Yes, I can follow the law."  It's hard for someone to say,

1    "No, I can't follow the law.  If you tell me to do something, I

2    won't do it.  I can't do it."  That is hard to do.  And it's

3    harder to do it if the questions are posed in a way that invite

4    that pro-social response of, "Yes, I could put my feelings

5    aside."

6           So we're asking the Court to be mindful of that

7    problem so we could get to where the jurors really are given

8    the exposure -- extraordinary exposure not only to publicity

9    but to direct personal experience of the Boston Marathon

10   bombing and its aftermath.

11          Then as to the questions that we're asking for, as I

12   say, some of them are the same.  We have added the question

13   which we have attempted to ask of some jurors about, "How did

14   you find out about the bombing?" that is Number 2, "Where were

15   you?  How did the news make you feel?  And what, if anything,

16   did you do?"  And then Number 3 is, "Where were you and what

17   did you do on April 19th?"  That gets to shelter in place and

18   is particularly appropriate for jurors who say they had no

19   personal contact with the bombing or its aftermath even though

20   they lived in an area where there was a general shelter in

21   place in effect.

22          We continue to believe that Number 6 is a very

23   appropriate question in some cases, for jurors who seem to be

24   especially non-forthcoming, and raises the question of whether

25   they are curtailing their responses or changing their responses

1    in order to be picked to serve.

2         And then we have rewritten *Morgan* questions to take

3    into account the government's objection that we don't talk

4    about mitigation before asking jurors whether they could ever

5    vote for a sentence other than death.  So we actually give

6    examples of mitigation and then ask the juror whether they

7    could consider mitigating factors and ever meaningfully

8    consider a sentence of less than death in a case involving

9    terrorism with multiple victims, in a case involving the death

10   of a child.  Our *Witherspoon* questions are unchanged.

11        So again, our overall request is that we prefer the

12   Court to do the bulk of these questions with our being able to

13   follow up, but we appreciate the latitude to ask these

14   questions ourselves should the Court feel that is more

15   appropriate.

16        THE COURT:  Mr. Weinreb?

17        MR. WEINREB:  Your Honor, as a general matter the

18   government objects to these requests.  And I say "as a general

19   matter" because I think if the Court were to determine in a

20   particular case that asking one or more of these questions made

21   sense, we wouldn't necessarily object to it.  But as a general

22   matter, asking jurors the basis of their opinions I would

23   suggest starts off voir dire in the wrong direction.  It gives

24   the jury -- it would suggest to the jurors that all the things

25   that they have heard and seen in the press and the things that

1    they have -- the opinions they formed based on that is the

2    important thing in this case, the important thing going

3    forward, when they're not.  The important thing is the jurors'

4    ability to put aside what they have heard and what they might

5    believe based on what happened outside the courtroom and decide

6    the case based on the evidence inside the courtroom.

7           And I think that that same consideration counsels

8    against asking in detail how you first heard about it, how did

9    the news make you feel and so on.  It suggests -- it will

10   suggest to the jurors that all of those things are the

11   essential considerations for them when, in fact, they are not.

12          And that leads to the third request which I think

13   also -- I think we disagree with the premise of it, which is

14   that the Court has asked leading questions about the jurors'

15   ability to be fair and impartial.  A leading question would be,

16   "Now, you can set all that aside and decide the case based on

17   the evidence, can't you?"  And "You can apply the presumption

18   of innocence, can't you?"

19          That's not what the Court has been doing.  The Court

20   has been simply asking -- instructing them what the law

21   requires them to do and asking them whether they can follow the

22   law and do it.  That is the key question.  That is where the

23   jurors' minds should be focused.

24          They need to begin the process today of putting aside

25   everything they have heard or might have thought about the case

1     and focusing on their duty, their obligation to decide the case

2     based solely on the evidence applying all the legal principles.

3     And we would suggest that the best way to begin the process of

4     encouraging and helping jurors to do that and making sure that

5     they can do it is by approaching the task of questioning them

6     in that way, in a way that is consistent with that goal.

7          As for the *Morgan* questions that are proposed, we have

8     the same objections to them that we've had all along.  They're

9     very specific about particular factors that will be essentially

10    aggravating factors in this case.  They are extremely general

11    and non-suggestive, nonspecific about mitigating factors.  The

12    jurors are almost certainly going to hear, if this case

13    proceeds to a penalty phase, a very in-depth, vigorous

14    presentation of mitigating evidence along with lots of argument

15    about why these factors are important and should make a

16    difference.  These questions do not even begin to convey any of

17    that.

18         The jurors know virtually nothing about this defendant

19    or anything that might mitigate the crimes.  They may -- you

20    know, the facts of the case themselves tell them a great deal

21    about what might aggravate the crime, and it's simply

22    misleading to ask the questions in this way because it suggests

23    to them that is where they will be at the end of the process

24    rather than, you know, where they are just coming into the

25    process.

1          So again, we don't think *Morgan* requires that.  It's

2     not about that; it's about predisposition based on general

3     views about the death penalty.  And so this would both be

4     unrequired legally and unwise.

5          MR. BRUCK:  If I may respond very briefly, I don't

6     want to prolong this unduly, but I do ask that the Court be

7     mindful of the fact that if to the extent that the voir dire

8     fails to plumb what the jurors are really thinking, the

9     government is advantaged and the defendant is disadvantaged.

10    We do not have an equal stake in this voir dire; and thus, it

11    is unsurprising that the government asks for relatively

12    formulaic probing whereas we are asking for something more.

13         I hope the Court will be mindful of the fact that we

14    are sailing in unchartered seas.  By that I mean that so far as

15    we are aware, there has never been a court that has attempted

16    to seat a jury in a community that has had an experience of the

17    type of the Boston Marathon bombing.  If it happened before, we

18    don't know about it.  And that means I think the Court must

19    look with particular care at this process of eliciting the

20    biases, the experiences, the opinions, the feelings, the

21    emotions of these jurors.  And that is the basis of our

22    request.

23         THE COURT:  Okay.  I have your requests in mind.  I

24    think by and large the manner in which we've conducted the voir

25    dire has been successful, and I don't think I intend to make

1    major changes in it.  We've had the discussion about how to ask

2    the questions about Question 77.  I agree with the government

3    with respect to that, that detailed questioning about what the

4    juror thinks he or she knows about the events and the sources

5    places the wrong emphasis for the juror.  Many, obviously, have

6    views about this because of the extensive publicity.  That's

7    far from limited to the local community.  And to emphasize

8    them, I think, misdirects things a little bit.

9            It's been my experience over the years that jurors

10   take their responsibilities very seriously, including

11   particularly the obligation to hold the government to its

12   proof.  I think reminding them of that is not -- and getting

13   their reaction to that task that they will have, knowing what

14   they know, I think is a way of determining whether the juror is

15   prepared to undertake the service that we might ask of him or

16   her.

17           Jurors tell me from time to time that they can't do

18   that, so it's not an automatic answer, and it's one, of course,

19   that we make observations of the juror as well when he or she

20   is answering that question and can form some judgments about

21   whether that's a rogue answer or a sincere one and a commitment

22   to look forward to the presentation of evidence rather than

23   look backward to the exposure to the events.

24           So in general I'm satisfied with the course we've been

25   following and, again, subject to adjustment as necessary for

```
 1    each witness -- sometimes we do have to get more specific
 2    because of what the juror says.  But generally, I think as I
 3    say, I'm satisfied with the method we've been using.
 4              So let's call in the first.
 5              THE CLERK:  Juror 83.
 6              MR. McALEAR:  Juror 83.
 7              THE CLERK:  Sir, over here, please.  Have a seat, if
 8    you would.
 9              THE COURT:  Hello.  Since you filled out the
10    questionnaire and we're here, have you been able to abide by my
11    instruction to avoid any discussion of the case?
12              THE JUROR:  Yes, sir.
13              THE COURT:  And any unnecessary avoidable exposure to
14    the media reports?
15              THE JUROR:  Yes.
16              THE COURT:  So that's the questionnaire, and we may
17    ask you to look at a couple of things as we follow up on some
18    of the questions you gave.
19              THE JUROR:  Sure.
20              THE COURT:  It appears from your questionnaire that
21    you are a student interrupted.  Is that --
22              THE JUROR:  Yeah.  I was going to end up taking a
23    break this semester anyways because my financial aid fell
24    through, so...
25              THE COURT:  So what are you doing?
```

```
 1              THE JUROR:  Well, I'm not employed right now because I
 2    lost my job.  I was working seasonally at Best Buy.  So right
 3    now I'm just at home.
 4              THE COURT:  Okay.  What course were you pursuing at
 5    school?
 6              THE JUROR:  Psychology and a minor in neuroscience.
 7              THE COURT:  Neuroscience?
 8              THE JUROR:  Yes, sir.
 9              THE COURT:  Tell us about your social media use.
10              THE JUROR:  Well, I mean, Facebook.  I use Facebook,
11    but I don't really put anything personal on there, and I
12    definitely try to avoid political things for the most part.
13    Usually I just -- you know, I used to be a personal trainer, so
14    I put like training things or health-related fitness things
15    and, you know, some funny memes every now and then.
16              I mean, I saw the movie "American Sniper" over the
17    weekend and I did post something like that, but I didn't really
18    get into the politics or anything.
19              THE COURT:  So anything beyond Facebook?  Twitter or
20    Instagram or anything like that?
21              THE JUROR:  No, I'm not a Twitter person.  I have
22    Instagram, but I don't use it.
23              THE COURT:  Let me ask you to look at page 15, I
24    guess, Question No. 50.
25              THE JUROR:  Yes?
```

1          THE COURT:  That asks what court cases you may have

2     followed with interest and what interested you about them.

3          THE JUROR:  Sure.

4          THE COURT:  And you talk about the Michael Brown case.

5          THE JUROR:  Yes.

6          THE COURT:  That's the Ferguson, Missouri, incident?

7          THE JUROR:  Yes.

8          THE COURT:  What was it about that that interested

9     you?

10         THE JUROR:  It was more just the people's reaction to

11    the case, the outcome of the grand jury choosing not to indict

12    the officer who was charged with the shooting.  I mean, there

13    were mixed emotions.  Some people said that was the right

14    decision, and some people said that they were somewhat

15    disappointed with how the case was handled.

16         Personally, I didn't -- it didn't really affect me too

17    much because I don't like to dabble in those things, but, you

18    know, there's just such a volume of people that, you know, post

19    things on Facebook, it's kind of hard to avoid that at times.

20    And I just thought there was a lot of charged emotion that kind

21    of factored into people's view on the case, and that takes away

22    from the legitimacy of, like, their views, actually, like,

23    because they're speaking emotionally as opposed to logically.

24         So I thought due process was followed in that case and

25    I thought the grand jury made the right decision.

```
 1            THE COURT:  Did you post anything about your own
 2    opinions about it?
 3            THE JUROR:  No.
 4            THE COURT:  On Facebook or anything?
 5            THE JUROR:  No.
 6            THE COURT:  Any other cases that -- I think that may
 7    be the one you particularly mentioned.  Were there others --
 8            THE JUROR:  Yeah, that's really the only one that I
 9    remember.  There was the Casey Anthony case a few years back as
10    well, but, like, to be honest, all of the details have escaped
11    my mind.
12            THE COURT:  We asked a series of questions about
13    attitudes to various potential issues including attitudes
14    towards Islam and Muslims and the war on terror and so on.
15            THE JUROR:  Yes.
16            THE COURT:  And you tell us that your mother is a
17    native of Iran.  Is that right?
18            THE JUROR:  Yes.  Yes, she is.
19            THE COURT:  And she is a -- just casually, I guess, a
20    former Muslim who has changed to a different faith?
21            THE JUROR:  Yes, that's correct.
22            THE COURT:  How long has she lived in the U.S.?
23            THE JUROR:  She came in '78, I believe, just before
24    the Iranian Revolution.
25            THE COURT:  Do you have family there now?
```

```
 1                THE JUROR:  Not anybody that I know.

 2                THE COURT:  In the region at all?

 3                THE JUROR:  No.

 4                THE COURT:  You answered these questions when you

 5     filled out the questionnaire, obviously.  Since then there have

 6     been some attacks in Paris and events in Europe.  Do you follow

 7     those, the news about those?

 8                THE JUROR:  Just vaguely.  The first day it kind of

 9     happened, just to see what was happening, but after that --

10                THE COURT:  No?

11                THE JUROR:  -- I didn't really follow through.

12                THE COURT:  Would -- did you have any reaction to

13     those events that would have led you to change any of the

14     answers you've put down in these matters?

15                THE JUROR:  Not really.  It obviously was not a good

16     thing that happened at the time, but my views, from what I

17     remember that I filled out, since then have not changed.

18                THE COURT:  Okay.  Looking at Question -- oh, Question

19     67.  You know a little bit of Arabic?

20                THE JUROR:  A little bit of Farsi.

21                THE COURT:  Farsi?

22                THE JUROR:  Yes.

23                THE COURT:  Okay.  Is that close to Arabic?  I don't

24     know the answer to that.

25                THE JUROR:  The writing is somewhat similar.  A lot of
```

1    the -- there are some Arabic roots.  There are some French

2    roots as well.  I mean, Iranians are Caucasian in origin, so

3    they're not Aramaic or Arabic, from my understanding.

4            THE COURT:  Have you studied your heritage?

5            THE JUROR:  A little bit.  When I was a kid I took

6    some, you know, like Farsi language classes, but it escapes me

7    for the most part.  Now I just know a few phrases and some very

8    basic conversational things or, you know, words and phrases,

9    like if I speak with relatives.

10            In terms of my culture or the culture that, you know,

11    my mom is from and I share half my heritage with, there are

12    some things that interest me, but it's more like -- like

13    there's this thing called the Pahlevan, which is a house of

14    strength in Iran, and they do like the Indian club swinging.

15    Again, going back to the fitness, that's kind of what I was

16    more interested in more than anything else.

17            THE COURT:  Looking at Question 71, you seem to have

18    sort of an international taste in news.

19            THE JUROR:  Yes.

20            THE COURT:  You pay attention to BBC America, Al

21    Jazeera America?

22            THE JUROR:  Every now and then.  And, I mean, I

23    probably watch like a little -- you know, the 30-minute news

24    broadcast maybe once every other week or so.

25            THE COURT:  Do that on the Internet?

```
 1              THE JUROR:  No, usually on the TV.  If it just happens
 2     to be on.  If it's not on, I don't really go out of my way.
 3              THE COURT:  Let me ask you to look at page 20,
 4     Question 77.
 5              THE JUROR:  Yes.
 6              THE COURT:  In that question we asked whether, based
 7     on things you'd seen or read, learned from any source, whether
 8     you had an opinion about whether this defendant is guilty or
 9     not and whether -- how he should be punished, if he is.  And to
10     each of the four parts of that question you answered that you
11     were unsure.
12              THE JUROR:  Yes.
13              THE COURT:  Can you tell us about that answer.
14              THE JUROR:  Sure.  If I just may reread the --
15              THE COURT:  Yeah.  Go ahead.  Take your time.
16              THE JUROR:  Okay.
17              (There is a pause.)
18              THE JUROR:  Okay.  So I believe at the time my logic
19     in saying "unsure" -- I'll start at the bottom.  In regards to
20     should he receive the death penalty or not receive the death
21     penalty, I'm not sure because I don't really know much about
22     the case outside of what I saw a couple of years ago and what
23     we read in the brief, so I just felt that -- I didn't feel at
24     the time that that was conclusive enough to be able to say
25     whether I should -- whether I believe he should get that or not
```

1  get that, that penalty.

2          In regards to him being guilty or not guilty,

3  obviously he was involved in something, but as it is my

4  understanding that you're not guilty until proven -- you're

5  innocent until proven guilty, I just thought it would be best

6  to say "unsure."

7          THE COURT:  Understanding you probably have things

8  from the media and so on, recollections, you've referred to the

9  presumption of innocence and proof beyond a reasonable doubt --

10          THE JUROR:  Yes.

11          THE COURT:  -- of guilt.

12          Do you have any concern or reservations about your own

13  ability to apply that -- those principles?

14          THE JUROR:  No, I don't.

15          THE COURT:  Specifically to require the government to

16  convince you beyond a reasonable doubt by its evidence at

17  trial?

18          THE JUROR:  Right.  Wait.  Could you repeat that one

19  more time?

20          THE COURT:  Well, as I think you've recognized, the

21  government -- when someone is accused of a crime, the person

22  doesn't have any obligation to prove he's not guilty of the

23  crime; the government has to prove he is.

24          THE JUROR:  Yes.

25          THE COURT:  And that's done by evidence at trial to a

1      jury.

2                THE JUROR:  Right.

3                THE COURT:  And it's the obligation of the government

4      to produce evidence that convinces the jury beyond a reasonable

5      doubt; otherwise, the jury is required by law to find the

6      person not guilty.

7                THE JUROR:  Correct.

8                THE COURT:  Is that something you'd be able to do?

9                THE JUROR:  Yes, I would be able to do it.

10               THE COURT:  I guess specifically what I want to know

11     is how would you handle whatever ideas you've had from before

12     the trial?

13               THE JUROR:  Sure.  Well, based on the evidence

14     presented and -- you know, I do have a knack to listening to

15     people and what they say.  You know, you guys have to do a fair

16     job in presenting the facts the best you can.  Based on that,

17     that's probably when I would -- that's definitely when I would

18     make my decision because I think it would be wrong to do -- or

19     to have any preconceived notion as to what he deserves or

20     doesn't deserve otherwise until that happens.

21               THE COURT:  You and your family, as far as you know,

22     were not personally involved or affected by the events?

23               THE JUROR:  No, nobody that I know in my immediate

24     family was involved or affected.

25               THE COURT:  Let me ask you to turn to page 23.

1    Beginning with Question 88, we ask people about some ideas they

2    may have about the death penalty.  And in 88 we asked in

3    general terms what -- if you have any views about the death

4    penalty, what they are.  I have to confess I had a little

5    trouble reading your writing.  Maybe you can tell us what you

6    wrote there.

7             THE JUROR:  Yes.  So I said that in certain cases, if

8    the evidence and reason's fair and the punishment deemed as the

9    death penalty, then I hope that it's given in the hope that it

10   serves the purpose of justice as -- I guess as outlined by what

11   your objective or idea of justice in terms of what he deserves

12   as -- so, yeah, the standard -- whatever standard --

13            THE COURT:  I'm trying to read the last phrase.  "In

14   fairness and equity of all involved"?

15            THE JUROR:  Yes.  To say that people weren't affected,

16   obviously somebody or -- or something has to be held

17   accountable in some regard for what happened during that time

18   that he was accused of carrying out the things that you had

19   mentioned.  So, you know, it didn't just happen on its own.

20            THE COURT:  Well, okay.  So the question was asking

21   about -- your general views about the death penalty.  And now

22   that you've read the answer -- but I mean apart from the

23   answer, can you tell me in general terms what your view is?

24            THE JUROR:  I think the death penalty is valid in

25   terms of being a good punishment, but, again, it all depends on

1    the severity of what he did and how people around him -- or

2    that were affected by his decisions were affected.  So, you

3    know, I think it would be merciful at times if you believe in

4    an afterlife for the justice system to give someone the death

5    penalty.  Maybe it takes away some of the burden of the

6    person's soul.  But then again, I think that in certain cases,

7    say, life in prison can also be an opening -- or eye-opening

8    experience for a person as well.  Maybe they'll change before

9    the time that they naturally die.

10            And I also think that the death penalty is fair, you

11   know?  There has to be an appropriate punishment for certain

12   crimes out there, and to not have that as an option on the

13   table would be wrong.  Not that I think it should always be

14   pushed on people, but I think it is a valid punishment.

15            THE COURT:  So you -- we asked you in Question 89 --

16   if you want to go back to that page.

17            THE JUROR:  Sure.

18            THE COURT:  -- if you could sort of give us where on a

19   scale of 1 to 10 -- where you thought you were with respect to

20   the death penalty, and you picked 6.

21            THE JUROR:  Yes.

22            THE COURT:  Which is sort of in the middle.

23            THE JUROR:  Yeah.  And I still feel that way.  I mean,

24   if you guys had, you know, like a 6-1/2 or a 7, I probably

25   would have done a half of some sort.

```
 1              THE COURT:  On the next page, Question 90, we ask you
 2     to tell us not by a numerical scale but in words which
 3     statement came closest to your view, and you circled letter D.
 4              THE JUROR:  Yes.
 5              THE COURT:  That says you're not for or against the
 6     death penalty; you could vote to impose it or to impose a
 7     sentence of life imprisonment, whichever you thought you
 8     believe was called for by the facts and the law in the case.
 9              THE JUROR:  Yes.
10              THE COURT:  Is that a fair summary of your view?
11              THE JUROR:  Yes, I think that was the most accurate
12     statement that reflected my views and does reflect my views
13     currently.
14              THE COURT:  So in this case after hearing the evidence
15     would you be able to conscientiously consider a penalty of
16     death?
17              THE JUROR:  I believe I could.
18              THE COURT:  And similarly, would you be able to
19     conscientiously consider a life imprisonment?
20              THE JUROR:  Yes.
21              THE COURT:  Are you open to either depending on the
22     evidence?
23              THE JUROR:  I definitely am open to either.
24              THE COURT:  So you wouldn't automatically vote for one
25     or the other regardless of the facts in the case.  Is that what
```

1   you're saying?

2           THE JUROR:  Yeah, I couldn't do that.  It would go

3   against my principle, to be honest.

4           THE COURT:  Mr. Weinreb?

5           MR. WEINREB:  No questions, your Honor.

6           MR. BRUCK:  Good morning.  I've been calling you

7   Mr. 83, of course trying to protect everyone's privacy by not

8   using their name.  I don't mean to be rude.  My name is David

9   Bruck, and I'm one of the attorneys for Jahar Tsarnaev, and I

10  do have a couple of questions I would like to ask you, if I

11  could.

12          THE JUROR:  Sure.

13          MR. BRUCK:  You mentioned that -- I think the words

14  you used were "obviously he was involved in something."

15          THE JUROR:  Yes.

16          MR. BRUCK:  Tell us about that.

17          THE JUROR:  I mean, just from media reports, I do

18  remember his name being mentioned as well as -- I believe his

19  brother's name being mentioned as well.  So I mean, I don't

20  know if this is a case of mistaken -- I don't know -- I don't

21  think this would be a case of mistaken identity, so obviously

22  he was involved in something.  Just exactly what and how, I

23  don't know.

24          MR. BRUCK:  Well, do you know -- I mean, why he's the

25  one charged rather than anyone else?

1          THE JUROR:  No.

2          MR. BRUCK:  Well, just based on what you've heard.

3          THE JUROR:  Sure, based on what I've heard.

4          MR. BRUCK:  Sure.

5          MR. WEINREB:  Objection, your Honor.

6          THE COURT:  Yeah, I think sustained.  I think this

7    goes beyond what we've outlined, so...

8          MR. BRUCK:  All right.

9          You mentioned your mom changed her religious faith to

10   Bahá'í.

11         THE JUROR:  Yes.

12         MR. BRUCK:  And I'm -- are you aware of the treatment

13   of Bahá'í's in Iran?

14         THE JUROR:  Yes.  Yes, I am.

15         MR. BRUCK:  It's extremely cruel.

16         THE JUROR:  It is.

17         MR. BRUCK:  And, of course, Iran is a -- styles itself

18   as an Islamic Republic.

19         THE JUROR:  Yes.

20         MR. BRUCK:  If there was a great deal of information,

21   of evidence about Islam and the defendant's Islamic faith and

22   beliefs -- you see where the question is --

23         THE JUROR:  Yes, I could see where that's leading.

24         MR. BRUCK:  Can you answer it?

25         THE JUROR:  Yes, I can.  To be honest, I personally

 1    have nothing against Islam, as well as I know that many

 2    Bahá'í's do not.  You know, we are taught to respect all

 3    religions.  And, you know, what the Iranian government decides

 4    to do against Bahá'í's in terms of human rights violations or

 5    the like, you know, that's a shame that they do that.  But the

 6    governing body of the Bahá'í faith also say that Bahá'í's are

 7    supposed to follow the laws of the country and to respect the

 8    government and the rights and to help people regardless of

 9    whether they're Islamic or Bahá'í or Christian or whatever

10    else.  So I have nothing against Islam or the people of Islam.

11         MR. BRUCK:  Okay.  Well, thank you.

12         You said in response to the judge's question about the

13    punishment that -- in this case you -- that what you know is

14    not conclusive enough to base an opinion.  I just wonder -- I

15    guess I want to probe a little bit about that.

16         THE JUROR:  Okay.

17         MR. BRUCK:  As you sit here today, knowing that this

18    case is the Boston Marathon bombing and its aftermath, and

19    assuming now just for my question that he has been convicted --

20    let's picture that.

21         THE JUROR:  Okay.

22         MR. BRUCK:  -- proof beyond a reasonable doubt, the

23    whole jury has agreed, so we're now in the sentencing phase.

24    Do you lean one way or another regarding death penalty or life

25    imprisonment?

```
 1              MR. WEINREB:  I object.

 2              THE COURT:  No, you can answer that.

 3              THE JUROR:  Do I lean one way or the other?

 4              MR. BRUCK:  Yes.

 5              THE JUROR:  If he's proven guilty, you said, correct?

 6              MR. BRUCK:  That's the assumption, right.  Because you

 7    wouldn't have a decision to make until he was first proven

 8    guilty.

 9              THE JUROR:  I still -- I don't know.  There's

10    just -- I don't know enough.  I mean, I would say definitely

11    life in prison at this point, I mean, if I had to make a

12    decision based on what you said, but in terms of the death

13    penalty, I couldn't -- I couldn't say that right now.

14              MR. BRUCK:  I see.

15              So I take it that there could be circumstances under

16    which life imprisonment could be a sufficient punishment for

17    this type of crime in your mind?

18              THE JUROR:  I could see that as being an appropriate

19    punishment, yes.

20              MR. BRUCK:  Okay.  And do you appreciate in the end

21    it's up to the jury, not up to the law and up to the Court?

22              THE JUROR:  I do.

23              MR. WEINREB:  Objection, your Honor.

24              THE COURT:  Well, the answer's given, so...

25              THE JUROR:  I apologize.
```

```
 1              THE COURT:  No, that's fine.
 2              MR. BRUCK:  Do you remember -- you may have answered
 3    this already.  Did you have any -- did you do any Facebook
 4    postings about this case?
 5              THE JUROR:  No.
 6              MR. BRUCK:  Or any friends' postings come up on your
 7    Facebook page?
 8              THE JUROR:  No.
 9              MR. BRUCK:  Would you like to be on the jury?
10              MR. WEINREB:  Objection.
11              THE COURT:  Sustained.
12              MR. BRUCK:  Bear with me just a moment.
13              (Pause.)
14              MR. BRUCK:  Thank you so much.  That's all I have.
15              MR. WEINREB:  Your Honor, I have one question, if I
16    may, please.
17              Good morning.
18              THE JUROR:  Good morning.
19              MR. WEINREB:  My name is Bill Weinreb.  I'm one of the
20    prosecutors in the case.  I just have one question which is
21    you've talked about that you're open to the possibility that
22    the death penalty would be an appropriate penalty and also open
23    to the possibility that life imprisonment would be appropriate.
24              THE JUROR:  Yes.
25              MR. WEINREB:  My question is:  If you determined after
```

1  hearing all the evidence --

2          THE JUROR:  Yes.

3          MR. WEINREB:  -- if the defendant were found guilty

4  and you had heard evidence in the penalty phase and you had

5  actually come to the belief that a death sentence was the

6  appropriate sentence, would you be able to actually impose it,

7  vote that somebody be put to death for a crime?

8          THE JUROR:  Yes.

9          MR. WEINREB:  Thank you.

10          THE COURT:  Okay.  Thank you, sir.

11          THE JUROR:  All right.

12          (The juror is excused.)

13          MR. BRUCK:  Before the next juror comes out, please,

14  just for the point of view of the record, of course the

15  government objected to a couple of the questions on our list.

16  The Court sustained some.  When the Court sustains an

17  objection, do -- is the record complete or in -- or will it be

18  necessary for me to -- or for the questioner, when the juror

19  has been excused, to note our objection or --

20          THE COURT:  I think asking the question makes your

21  point.

22          MR. BRUCK:  Very well.

23          THE COURT:  I don't think it's necessary to take an

24  exception --

25          MR. BRUCK:  Well --

```
 1              THE COURT:  -- as we used to do.
 2              MR. BRUCK:  Right.  You see that our issue --
 3              THE COURT:  I think your record is fine.
 4              MR. BRUCK:  Fine.  Thank you.  That's all we need.
 5              THE CLERK:  Juror No. 84.
 6              MR. McALEAR:  Juror No. 84.
 7              THE CLERK:  Ma'am, if you'd come over here and have a
 8       seat.
 9              THE COURT:  Good morning.
10              THE JUROR:  Good morning.
11              THE COURT:  Welcome back.
12              THE JUROR:  Thank you.
13              THE COURT:  Since you filled out the questionnaire,
14       have you been able to abide by my instructions to avoid any
15       discussion of the details of the case or any unnecessary
16       exposure to media accounts or anything?
17              THE JUROR:  Yeah, for -- I mean, I've talked just in
18       general terms with my husband, but for the most part, yeah.
19              THE COURT:  Oh, about that you're in this process?
20              THE JUROR:  Right.
21              THE COURT:  But not the details of the subject matter
22       of the case?
23              THE JUROR:  No.
24              THE COURT:  One of the questions we asked on the
25       questionnaire was about whether it would be a particular
```

```
 1    hardship for the potential juror.  You've noted that there
 2    might be an impact on -- you're a teacher?
 3             THE JUROR:  Uh-huh.
 4             THE COURT:  It might be an impact on your students,
 5    but as far as -- I want to make sure I'm understanding it.  As
 6    far as you personally, it would not be a hardship?
 7             THE JUROR:  No, it would not.
 8             THE COURT:  And as you say, you assume that the school
 9    would find a substitute to fill in?
10             THE JUROR:  Right.
11             THE COURT:  Tell us about your use of social media.
12    What is it and how much and so on?  What do you do, if
13    anything?
14             THE JUROR:  I text -- ever since my kids were
15    teenagers and I would need to know where they are, I text.  And
16    I'm also on Instagram with just family members.
17             THE COURT:  No Facebook --
18             THE JUROR:  No.
19             THE COURT:  -- or Twitter or anything else like that?
20             THE JUROR:  No.
21             THE COURT:  We asked a series of questions in the
22    middle of the questionnaire about attitudes towards some
23    international issues, the war on terror, for example, attitudes
24    towards Islam and Muslims and so on.  Do you remember answering
25    those?
```

```
1              THE JUROR:  Yes.
2              THE COURT:  Since you filled out the questionnaire
3    there's been some events elsewhere in the world -- Paris, for
4    example -- involving terrorist attacks.  Would any of your
5    answers that you gave change as a result of what you've seen or
6    observed about those events?
7              THE JUROR:  No, I don't believe so.
8              THE COURT:  If you're uncertain, you could look at it.
9    I'm not saying you have to or I'm not saying that you are
10   uncertain, but it's -- the questions I'm referring to are pages
11   17 and 18 on the questionnaire.
12             (Pause.)
13             THE JUROR:  No, my answers wouldn't change.
14             THE COURT:  Okay.  To what degree have you followed
15   those news accounts of what's been happening in Europe or
16   elsewhere, actually?
17             THE JUROR:  Pretty closely.
18             THE COURT:  You generally follow the news pretty
19   closely?
20             THE JUROR:  Uh-huh.
21             THE COURT:  I'd like you to look at page 20, Question
22   77.
23             THE JUROR:  Uh-huh.
24             THE COURT:  We asked whether you had, on the basis of
25   things you'd seen or heard or read about, formed an opinion
```

1     about certain issues, particularly whether the defendant's

2     guilty of what he's charged with or not and what the penalty

3     should be if he is guilty.  And you answered that you do have

4     an opinion about whether he's guilty.

5          THE JUROR:  Uh-huh.

6          THE COURT:  And that comes from things you've read and

7     seen on TV or whatever?

8          THE JUROR:  Yes.

9          THE COURT:  The obligation of a juror would be

10    to -- in a trial, to understand that the -- any defendant, any

11    criminal defendant, is presumed innocent of any charge against

12    him unless and until the government proves otherwise by the

13    evidence at trial and proves it to a level of persuasion that

14    the jury is convinced beyond a reasonable doubt that he is

15    guilty.

16          Do you understand that that would be the obligation of

17    a juror?

18          THE JUROR:  Uh-huh.  Yes.

19          THE COURT:  As someone who has some impressions about

20    whether he's guilty or not already, what would your

21    self-assessment be about your ability to presume him innocent

22    according to the law and require the government to prove him

23    guilty by the evidence at trial?

24          THE JUROR:  I'd like to think that ideally I could

25    fulfill that role, but I can't say that I don't have an idea in

1    my head of my belief over his guilt or innocence.

2         THE COURT:  And the question is whether you could

3    evaluate the evidence and if it was consistent with that

4    notion, act one way, but if the evidence, for example, was

5    inconsistent with that preconceived idea, would you stick with

6    the preconceived idea or would you amend it by reaction to

7    something else you might learn?

8         THE JUROR:  If I'm receiving new information and it

9    changes what I think, I would amend.  I would go with B.

10        THE COURT:  Tell me about the -- you've said if he

11   were to be convicted you were unsure about the death penalty or

12   not.  Tell us about what you were thinking about that.

13        THE JUROR:  It's funny because you might think one way

14   in your life how you believe about things and then when you're

15   actually forced to act on those beliefs, things might change a

16   little bit.  But upon reflection, even I think since filling

17   out -- filling this out, I strongly oppose the death penalty

18   and I think -- I think my answer for D would be that he should

19   not receive the death penalty.

20        THE COURT:  Let's turn to page 23.  We asked a series

21   of questions about the death penalty at this stage, and the

22   first one was Question 88, which was a general question, asks

23   you about your general views.

24        THE JUROR:  Yup.

25        THE COURT:  And I guess you continue the answer at the

1    bottom of that page.

2              THE JUROR:  Uh-huh.

3              THE COURT:  Rereading that, does that still represent

4    your views or have you changed your views as you thought about

5    things?

6              THE JUROR:  Just ultimately I -- I don't believe that

7    you respond to killing by killing, and I don't feel that that

8    would -- I don't feel like I would want to be responsible for

9    somebody else's death.

10             THE COURT:  On the scale -- in Question 89 we gave you

11    a scale of how strong your views were, and you indicated it was

12    pretty strong --

13             THE JUROR:  Yes.

14             THE COURT:  -- by selecting 1.

15             If you would turn the page to Question 90, instead of

16    a numerical scale, here we ask you to select the statement that

17    came closest to your view.  You selected B.  It said you were

18    opposed to the death penalty and would have a difficult time

19    voting to impose it even if the facts supported it.  The

20    question is whether you would automatically vote against the

21    death penalty firmly, that is, without consideration of the

22    facts -- in other words, it's not a question of whether the

23    facts support it or not, you're against it -- or whether you

24    could in some case imagine a case that -- although you're

25    pretty much opposed to it, there could be some circumstances

1    you'd hear about that would be so awful that you would decide

2    to vote for a death penalty.

3            So I guess I'm trying to gauge what you were thinking

4    when you selected "difficult time."  I mean, is a "difficult

5    time" "might be difficult but I maybe could if the right

6    circumstances were there" or is "difficult time" "I could never

7    do it"?  Do you see the difference?

8            THE JUROR:  Yes.  This was tricky because I've

9    never -- I have no background, knowledge, nothing.  I've never

10   been in this situation.  I've never been on a jury before, and

11   I have never been on a jury that would consider the death

12   penalty before.  So it's very -- I'm very opposed to the death

13   penalty.  But I didn't want to say that there was never, ever,

14   ever a case that I would not consider using it.  So I --

15           THE COURT:  Can you put some content into that?  Can

16   you think what kind of a case it might be that that would be

17   the circumstance?  In other words, is it just hypothetical or

18   can you actually think of some circumstances where, "Yeah, this

19   would be an exception to my general opposition, I would do it

20   under these circumstances" or is it just that anything is

21   possible?

22           THE JUROR:  I think it's just that anything is

23   possible.  I didn't want to rule out that it could somehow

24   sometime somewhere be possible, but I -- I can't think of a

25   specific thing where I would say, "Yes, this person deserves

1    the death penalty."

2         THE COURT:  Look at Question 92 and just take a minute

3    to read your answer there.

4         THE JUROR:  There's a grammatical error.  Yup.

5         THE COURT:  So that seems to indicate that you think

6    that for what -- whatever you think these crimes were, you

7    would not be able to vote for the death penalty for these

8    crimes.

9         THE JUROR:  Correct.

10        THE COURT:  That's all I have.

11        MR. WEINREB:  Nothing from the government, your Honor.

12        MS. CONRAD:  Good morning, ma'am.

13        THE JUROR:  Good morning.

14        MS. CONRAD:  Thank you.  My name is Miriam Conrad.

15   I'm one of Mr. Tsarnaev's lawyers.

16        If you were selected for this jury, would you be able

17   to listen to the evidence -- assume for a moment Mr. Tsarnaev

18   is found guilty and you are convinced beyond a reasonable doubt

19   of his guilt.  Would you be able to listen to the evidence

20   during the penalty phase that the judge described and listen to

21   the law and consider the death penalty as an alternative to

22   life without parole?

23        THE JUROR:  Can you ask that one more time?

24        MS. CONRAD:  Sure.  I'm not sure if I can.  I'll try

25   it one more time.

```
 1              THE JUROR:  Yes.
 2              MS. CONRAD:  If you were on the jury and you -- and
 3     Mr. Tsarnaev were convicted and you were convinced beyond a
 4     reasonable doubt of his guilt and then asked to consider the
 5     penalty phase that Judge O'Toole described earlier, would you
 6     be able to listen to the facts and listen to the law and
 7     meaningfully consider the option of either the death penalty or
 8     life without parole?
 9              THE JUROR:  I would like to think I could, yes.
10              MS. CONRAD:  Thank you.
11              MR. WEINREB:  Your Honor, can I follow up?
12              MR. MELLIN:  Can I follow up on that?
13              THE COURT:  Do you want to fight about it?
14              MR. MELLIN:  I don't really want to fight Mr. Weinreb,
15     but, ma'am, just -- you were just asked if you can meaningfully
16     consider --
17              And for the record, I've Steve Mellin.  I'm one of the
18     prosecutors in the case along with everyone else right here.
19              -- and you said that you would like to think that you
20     could meaningfully consider.
21              Going a step beyond that, though, is at some point the
22     jury's going to have to deliberate and go back into the jury
23     room and to decide what the appropriate punishment is.  And if
24     you believed that the aggravating factors sufficiently outweigh
25     the mitigating factors to justify a sentence of death, would
```

1    you ever be able to vote to sentence someone to death?

2            THE JUROR:  No.

3            MR. MELLIN:  Thank you.

4            THE COURT:  Okay.  Thank you.

5            (The juror is excused.)

6            THE CLERK:  Juror No. 85.

7            JURY CLERK:  Juror No. 85.

8            THE CLERK:  Over here, sir, please.  Have a seat.

9            THE COURT:  Good morning.

10           THE JUROR:  Good morning.

11           THE CLERK:  Speak into the mic so everyone can hear

12   you.

13           THE JUROR:  Okay.

14           THE COURT:  Before you is the questionnaire you filled

15   out when you were here the last time.  We may refer to it.

16           Since that time have you been able to abide by my

17   instructions to avoid any discussion of the details of the case

18   or to avoid any --

19           THE JUROR:  Yes.

20           THE COURT:  -- exposure to media accounts that you

21   could avoid?

22           THE JUROR:  Yes.

23           THE COURT:  Yeah?  So we're going to just follow up on

24   some of the things you told us.  If you look at page 5, we

25   asked in Question 10 -- we asked whether -- we explained what

1    the schedule was going to be and what the likelihood of -- what

2    it would mean for a juror to be here and so on, and then we

3    asked if it was a special hardship of some kind, and you just

4    said yes without explaining what the hardship would be.

5            So could you tell us why you think it would be a

6    hardship for you to serve?

7            THE JUROR:  Yeah, I got to bring the kid to school in

8    the morning.

9            THE COURT:  One?

10           THE JUROR:  Hmm?

11           THE COURT:  Just one child?

12           THE JUROR:  Two child.

13           THE COURT:  Two?  How old are they?  I guess it's in

14   here someplace.

15           THE JUROR:  Five and 12.

16           THE COURT:  And what time do they go to school?

17           THE JUROR:  One is 7:15 and the other is 7:30.

18           THE COURT:  When was the first?

19           THE JUROR:  7:15.

20           THE COURT:  7:15 and 7:30?

21           THE JUROR:  Yeah.

22           THE COURT:  You live in Lowell?

23           THE JUROR:  Yes, Lowell.

24           THE COURT:  Would you be able to get here by nine

25   o'clock?

1              THE JUROR:  Yeah, I got to leave earlier.

2              THE COURT:  I'm sorry?

3              THE JUROR:  By nine o'clock?

4              THE COURT:  Yeah.  After dropping someone off by

5      seven-thirty.

6              THE JUROR:  With traffic.

7              THE COURT:  We all know traffic.  But assuming no

8      major traffic problems --

9              THE JUROR:  Yeah, I guess.

10             THE COURT:  Was there anything else or was it just

11     that, that you were concerned about the morning -- getting the

12     kids to school?

13             THE JUROR:  Yeah.

14             THE COURT:  So tell me what you -- you say you're a

15     staff accountant?

16             THE JUROR:  Yes.

17             THE COURT:  What kind of business is it?

18             THE JUROR:  Web-posting company.  A web-posting.

19             THE COURT:  Web-posting?

20             THE JUROR:  Web-posting.

21             THE COURT:  Okay.  And you've been doing that for

22     about ten years or more?

23             THE JUROR:  Yes.

24             THE COURT:  I guess a little more than ten years.

25             THE JUROR:  More than ten years.

```
 1              THE COURT:  Okay.  Are you a salaried employee?

 2              THE JUROR:  Yes, I am.

 3              THE COURT:  Do you use -- I guess you say you use

 4    Facebook and Google Plus?

 5              THE JUROR:  Yes.

 6              THE COURT:  And do you make postings yourself?

 7              THE JUROR:  Yes.

 8              THE COURT:  What kinds of things do you talk about?

 9              THE JUROR:  Holiday, birthday, vacation photos.

10    Sometimes I read the news.

11              THE COURT:  I'm sorry?

12              THE JUROR:  News sometimes.

13              THE COURT:  Have you done any posting about this case?

14              THE JUROR:  No, not at all.

15              THE COURT:  I don't mean just since you've been a

16    juror, but even back when things were happening?

17              THE JUROR:  A little, yeah.

18              THE COURT:  You did?

19              THE JUROR:  A little.

20              THE COURT:  Do you remember what kinds of things you

21    might have posted?

22              THE JUROR:  Some comment to, like, a friend's Facebook

23    page, something like that.

24              THE COURT:  And what were you commenting?  Was it your

25    feelings about the case, or what was your --
```

1          THE JUROR:  Yeah, like how could anybody do that or do

2     this?  Do you know about this case, about the news, something

3     like that.

4          THE COURT:  Okay.  So one of the questions we asked

5     was whether in the past you had followed court cases with

6     interest.  Court, I guess, probably -- I guess it could be any

7     court case.  And you said not particularly but the Hernandez

8     case is one that you hear a great deal about.

9          THE JUROR:  Yes.

10         THE COURT:  Is that something you have a particular

11    interest in for some reason?

12         THE JUROR:  Yeah, I like football, so I kind of follow

13    that.

14         THE COURT:  If you look at page 17 and 18 we ask some

15    general questions about things that may be international

16    affairs, sort of, the war on terror, attitudes towards Islam or

17    Muslims and so on and so forth.  Since you filled out the

18    questionnaire there's been some incidents in Europe and Paris,

19    for example, a shooting.  Are you aware of that?

20         THE JUROR:  Yes, I am.

21         THE COURT:  Have you followed it closely or not

22    closely or --

23         THE JUROR:  Some quite closely.  Not that much.

24         THE COURT:  Okay.  Do those events or things like

25    them -- would they have any effect on how you would answer

1    these questions?  Would you change any of your answers to these

2    questions in light of those things?

3              THE JUROR:  Maybe a little, yeah.

4              THE COURT:  What would you change, do you think?  And

5    feel free to look at the answers you gave so you know what...

6              THE JUROR:  What sort of question you ask?

7              THE COURT:  Well, because we're asking about, you

8    know, things like the so-called war on terror, your attitude

9    towards Islam or Muslims and so on.  Would any of those

10   questions -- do you have anything that's been prompted by

11   things recently that might change your -- alter what you've

12   written here?

13             THE JUROR:  Not quite so much, no.

14             THE COURT:  Your reaction when you received the

15   summons, and you thought it was for this case, was "OMG.  Don't

16   pick me."  Was that really your reaction?

17             THE JUROR:  Yeah.

18             THE COURT:  Okay.  Why was that?  Why did you react

19   that way, do you think?

20             THE JUROR:  Because I know -- I've been following the

21   news that the trial was starting this January, so when I got

22   the summons I was like, "Oh, my God."

23             THE COURT:  But was it the length of the trial --

24             THE JUROR:  Yes.

25             THE COURT:  -- or the subject matter of the trial?

1          THE JUROR:  The length of the trial and the big

2     decision that has to be made at the end of the trial, so...

3          THE COURT:  Okay.  So let me ask you about the big

4     decision that has to be made at the end of the trial, as you

5     put it.  Turn to page 20, Question 77.  We tried to gauge -- we

6     asked jurors here whether as a result of what they've seen or

7     read in the news they'd formed an opinion about whether he's

8     guilty or not, and if so, what the penalty would be.  There's a

9     four-part question.  You answered only the first part which you

10    said you had formed an opinion that he's guilty.

11          If you were a juror in the case would you be able to

12    presume that he is not guilty or innocent unless and until the

13    government proves by the evidence at trial that he is guilty

14    and proves it beyond a reasonable doubt?  In other words,

15    that's -- that's the requirement that -- the burden that is

16    placed on the government in a criminal case is to present

17    evidence to a jury that convinces the jury beyond a reasonable

18    doubt of the defendant's guilt of the crime charged, or fails

19    to do that, and jurors not being convinced by the evidence

20    would be required to find the person not guilty.

21          Would you be able to fulfill that duty in light of the

22    fact that you have some preconceived idea about whether he's

23    guilty or not?

24          THE JUROR:  No, I don't think so.  I think he's still

25    guilty.

```
 1              THE COURT:  No matter what you heard at trial.  Is
 2      that it?
 3              THE JUROR:  Yeah.
 4              MR. WEINREB:  Your Honor, I think we've pretty much --
 5              THE COURT:  Let me just look through...
 6              You were -- your company was shut down?
 7              THE JUROR:  Yes.
 8              THE COURT:  And that affected you personally?
 9              THE JUROR:  Yes.
10              THE COURT:  Yeah.  Where's -- what's the town?
11              THE JUROR:  Burlington.
12              THE COURT:  Burlington?  Okay.  Thank you.  That's it.
13      Thank you.
14              (The juror is excused.)
15              THE CLERK:  Juror No. 90.
16              JURY CLERK:  Juror No. 90.
17              THE CLERK:  Ma'am, have a seat right here, if you
18      would.  Also, make sure you speak into the mic so everyone can
19      hear you.
20              THE JUROR:  Okay.
21              THE COURT:  Good morning.
22              THE JUROR:  Good morning.
23              THE COURT:  There's a little bit of morning left.
24              THE JUROR:  Yeah.
25              THE COURT:  Since you were last here, have you been
```

1    able to abide by my instructions to avoid any discussion of the

2    case in detail or any --

3              THE JUROR:  As best as I can.

4              THE COURT:  -- exposure to media reports or anything?

5              THE JUROR:  Certainly NPR, you know, listening to the

6    radio in the morning and things like that.  But otherwise, no.

7              THE COURT:  Have you been listening to reports about

8    the case?

9              THE JUROR:  They'll come on every once in a while.  I

10   try and turn it off.

11             THE COURT:  So there's the questionnaire you filled

12   out.

13             THE JUROR:  Yes.

14             THE COURT:  And we'll follow up on some of the

15   questions you have -- you've answered there.  Let me start, if

16   you would look on page 5, Question 9, you have a chronic back

17   problem that affects --

18             THE JUROR:  Question 9?

19             THE COURT:  Question 9, page 5.

20             THE JUROR:  Yes.

21             THE COURT:  -- that affects you if you sit for long

22   periods of time?

23             THE JUROR:  Long periods.  Like just in the jury room,

24   you know, I was standing up, walking around a lot.  I try to do

25   that as much as I can.

1          THE COURT:  How frequently will you have to do that?

2          THE JUROR:  Probably every hour, every two hours.

3          THE COURT:  Okay.  And you have to -- for another

4     condition you have to have something regularly to eat too?

5          THE JUROR:  Yeah.

6          THE COURT:  But that's also roughly on a two-hour

7     cycle?

8          THE JUROR:  Yup.

9          THE COURT:  So if you were sitting as a juror and

10    there were breaks in the hour-and-a-half-to-two-hour range,

11    that would be okay?

12         THE JUROR:  I think so.

13         THE COURT:  Tell us about your work.

14         THE JUROR:  I'm a social worker at Mass. General.  I

15    work in pediatrics and cover a number of clinics, predominantly

16    transplant.

17         THE COURT:  I'm sorry.  "Transplant," is that what you

18    said?

19         THE JUROR:  Yeah.

20         THE COURT:  And generally what are your -- what's your

21    daily activity, I guess?

22         THE JUROR:  I work a lot with our team and the

23    families.  So if there's any psychosocial issues that are in

24    the way of these kids and/or their families qualifying for

25    transplant, we have to -- I, first of all, identify them and

1    then work it out.  We have to help them figure out how to move

2    forward, because otherwise they don't get listed for a

3    transplant and these kids will die.  So a lot of times -- and

4    we're also mandated by Medicare to make sure that certain

5    things are not in the way.  So I tell families that it's not

6    no; it's just not yet.

7         THE COURT:  Okay.  I skipped over something I wanted

8    to ask you.  We ask about people's spouses as well, and you say

9    your spouse is retired?

10        THE JUROR:  Yes.

11        THE COURT:  From what?

12        THE JUROR:  Let's see.  She's -- well, I think she'd

13   like to be retired from motherhood, but I hear you never do.

14   She -- and then she worked -- she worked in youth ministry for

15   a while, and then she most recently retired from North Shore

16   Elder Services.

17        THE COURT:  Is she a social worker?

18        THE JUROR:  No, she -- she's unlicensed, but she was

19   working as an ombudsman in a -- like for nursing homes and

20   things like that.

21        THE COURT:  Okay.  Your own use of social media?

22        THE JUROR:  Not much.  I'm not on Facebook.  I don't

23   do Twitter or anything like that.

24        THE COURT:  Okay.  We asked -- and if you want to look

25   at it, it's on pages 17 and 18, we asked some questions about

1  what you might call international affairs and so on, about the

2  war on terror, attitudes towards Islam or Muslims and so on.

3  Do you see those answers?

4          THE JUROR:  Uh-huh.  Uh-huh.

5          THE COURT:  I just wanted to sort of update them.

6  Since filling out some of these things, there's been some

7  possibly relevant events occurring in Paris, for example.  Are

8  you aware of the shootings in Paris?

9          THE JUROR:  Uh-huh.  Uh-huh.

10         THE COURT:  Did you follow that closely or not

11 closely?

12         THE JUROR:  Not closely but I know about it.

13         THE COURT:  Would that affect any of the answers you

14 gave here?

15         THE JUROR:  No.

16         THE COURT:  So if you'd turn to page 20, I want to

17 focus on Question 77, which is where we asked about whether you

18 have -- based on news reports or other sources of information,

19 you have an opinion about whether the defendant's guilty or

20 not, and if so, whether he should receive the death penalty or

21 not.

22         THE JUROR:  Uh-huh.

23         THE COURT:  And let's take the first part, A and B.

24 You checked that you had an opinion that he's guilty, and I

25 guess you did not have an opinion that he was not guilty.  They

1    go together, I guess.  So in a criminal trial such as this, any

2    defendant charged with a crime is presumed to be innocent

3    unless and until the government proves he's guilty by the

4    evidence at trial and proves it to the jury beyond a reasonable

5    doubt.

6              If you were a juror, would you be able to discipline

7    your mind so that you could make a judgment based on the

8    evidence produced at trial rather than emotions you came into

9    trial with, or would those pretrial ideas be so strong that

10   they would control your thinking throughout the trial?  Now,

11   this is obviously a question about what you might think in the

12   future.

13             THE JUROR:  Sure.

14             THE COURT:  So it's hard to answer in that sense.

15             THE JUROR:  Yes.

16             THE COURT:  But you know yourself, I guess, and you

17   tell us what you think your best assessment would be.

18             THE JUROR:  Honestly, I'd have to say that, you know,

19   anyone who lives in the world, anyone who is -- lives in this

20   area, anyone who works where I work, which is Mass. General, it

21   would be -- it's a given that you're going to think that he's

22   guilty.  And, you know, whether I could put that aside or not,

23   honestly, I don't actually think so.  I think that I would be

24   pretty still convinced that he was guilty, honestly.

25             THE COURT:  Even if the evidence was unconvincing to

1    that effect at trial?

2            THE JUROR:  If the evidence was unconvincing?

3            THE COURT:  Yeah.

4            THE JUROR:  To the --

5            THE COURT:  In other words, if you were not convinced

6    by the evidence but -- you would remain convinced by what you

7    thought before you heard the evidence?

8            THE JUROR:  If the evidence was not convincing?

9    Where's the prosecution?  You're killing me.

10            (Laughter.)

11            THE COURT:  Well, I mean, that's the issue.  People

12    obviously know things about this because there's so much

13    publicity about it.

14            THE JUROR:  Yeah.  Yeah.

15            THE COURT:  But the jury as a whole will be asked to

16    assess what is actually presented to them in the formal

17    proceedings of the trial.

18            THE JUROR:  Yeah.

19            THE COURT:  And if they are convinced by it,

20    consistent with what they've already thought, they will act

21    accordingly.  The question is if they're not convinced by the

22    evidence -- and this is really about you now, you're not

23    convinced by the evidence -- would you adhere to the prior

24    notions realizing you're not convinced by the evidence?

25            THE JUROR:  If I was not convinced by the evidence?

1    Maybe.

2         THE COURT:  Okay.

3         THE JUROR:  But I can't imagine not being convinced by

4    the evidence.

5         MS. CLARKE:  Your Honor, I think --

6         THE COURT:  I understand that makes it difficult.

7         Let me just ask you about Mass. General.

8         THE JUROR:  Yeah.

9         THE COURT:  Did you get involved -- obviously, some

10   people affected by this were treated at Mass. General.  Were

11   you involved in that at all?

12        THE JUROR:  I wasn't in the ED that day.  My

13   colleagues who work directly in the ED were.  I had to cover

14   for them the following weekend in the ED because they were very

15   traumatized, and understandably so.  And so they needed to, you

16   know, get some help in terms of coverage.  And so I think being

17   there that soon after and also having talked with them and just

18   being a part of the hospital on a daily basis where we'd get

19   bulletins and, you know, you'd just see the presence of so many

20   officials and medical personnel and just the news media and

21   everything like that, it was a very tough time.

22        THE COURT:  Yeah.  Okay.  Thank you very much.

23        (The juror is excused.)

24        THE CLERK:  Juror No. 92.

25        JURY CLERK:  Juror No. 92.

```
 1              THE CLERK:  Ma'am, over here, please.  Have a seat
 2    right here, if you would.  Make sure you speak into the mic so
 3    everyone can hear you, okay?
 4              THE JUROR:  Okay.
 5              THE COURT:  Good afternoon.
 6              THE JUROR:  Good afternoon.
 7              THE COURT:  That's the questionnaire you filled out
 8    when you were here before.
 9              THE JUROR:  Yes.
10              THE COURT:  And we may refer to it as we follow up on
11    some of the answers you gave there.
12              Since the time when you were here and filled that out,
13    have you abided by my instruction to avoid discussion of the
14    case?
15              THE JUROR:  Yes, I have.
16              THE COURT:  And tried to avoid any exposure to media
17    accounts of the proceedings?
18              THE JUROR:  Yes.
19              THE COURT:  Tell us what you do for work.
20              THE JUROR:  I work for a private equity firm in
21    Providence.  I'm an executive assistant.
22              THE COURT:  Providence, Rhode Island?
23              THE JUROR:  Yes.
24              THE COURT:  And you've been there --
25              THE JUROR:  Fifteen years.
```

```
 1                THE COURT:  -- it looks like 15 years.

 2                THE JUROR:  Uh-huh.

 3                THE COURT:  Throughout -- the same job, basically,

 4      throughout --

 5                THE JUROR:  Yes.

 6                THE COURT:  You're -- it looks like from your answers

 7      that you don't really use social media?

 8                THE JUROR:  I can't stand it.  Sorry.

 9                THE COURT:  That's a good reason.  LinkedIn for

10      professional connections?

11                THE JUROR:  Yes, for my job.

12                THE COURT:  At page 17 and 18 we asked some questions

13      about what might loosely be called international issues, or the

14      war on terror, attitudes potentially towards Muslims or Islam,

15      and you answered all of those?

16                THE JUROR:  Yes.

17                THE COURT:  I just want to follow up on that.  After

18      you gave these answers, perhaps you've seen news reports about

19      events in Paris, a shooting?

20                THE JUROR:  I heard of it.  I haven't watched the

21      news.

22                THE COURT:  You haven't really followed that, do you

23      know?

24                THE JUROR:  You said not to, so I haven't.

25                THE COURT:  Fair enough.
```

```
1              So you don't have in-depth knowledge of what was going
2      on over there?
3              THE JUROR:  No.
4              THE COURT:  I was going to ask whether it affected any
5      of your answers, but if you don't know it --
6              THE JUROR:  I know what happened, but other than
7      that...
8              THE COURT:  Okay.  Would knowing what happened
9      generally change any of your answers?
10             THE JUROR:  No.
11             THE COURT:  Now, we asked a couple of questions about
12     your reaction when you got the response for the case.  You said
13     you were excited and interested?
14             THE JUROR:  Yes.
15             THE COURT:  And tell us about that.
16             THE JUROR:  I just feel that -- I'm not in the
17     military; I never served in the military.  This is a way to do
18     something for my country.  I find certain things in life and
19     different trials very interesting.  I always have.  No more
20     really than that, other than I thought it was a great
21     opportunity and something to be honored by.
22             THE COURT:  Something -- is that an attitude you would
23     have about any jury service, or is there something particular
24     about this case?
25             THE JUROR:  I've gotten excited when I've gotten jury
```

1    duty down in the local area just because I felt it was

2    something different and out of the norm and interesting.

3         THE COURT:  So you've been summoned before, but I

4    think from the answers you gave you've never served?

5         THE JUROR:  No, I've never served.

6         THE COURT:  But you've been summoned before?

7         THE JUROR:  Yes.

8         THE COURT:  And I'm just trying to understand you.

9    Did you have the same feeling then, is that it?

10        THE JUROR:  Yes.

11        THE COURT:  If you'd look at page 20, Question 77, we

12   asked here if you've formed any opinion about whether the

13   defendant's guilty or not, and if so, what the punishment might

14   be.  You indicated "unsure" throughout.  Can you tell us why

15   you selected "unsure"?

16        THE JUROR:  When the incident first happened I paid

17   attention for the fist few days and then I didn't pay attention

18   after that.  I, you know, from casual conversation with people

19   in the last couple of years, that's been about all the

20   information.  I didn't pay attention to it in great detail.  I

21   mean, I know what happened and I can't say otherwise.  I don't

22   know all the information.  I don't know who or what transpired

23   as far as -- you know, there's a question in here someone

24   asked -- that was asked about siblings.  I mean, I'm an only

25   child, so I don't know how other siblings affect other siblings

1     and...

2          THE COURT:  So I want to be sure we understand what

3     you're saying.  You paid some attention when the events were

4     happening?

5          THE JUROR:  Some, yes.

6          THE COURT:  You haven't paid much attention since

7     then.  Is that what you're saying?

8          THE JUROR:  No.

9          THE COURT:  And is it because you think you don't have

10    enough information to have one that you don't have one, or is

11    it that the information that you do have is ambiguous about

12    these issues?  I'm trying to understand why you said you don't

13    have an opinion.

14         THE JUROR:  Well, it's the information that I have.

15    Obviously, I don't know all the facts.  I haven't paid close

16    attention to it.  Yes, I certainly know of it and I

17    have -- like I said, I paid attention to it in the first couple

18    of days.  I don't know the relationship between him and his

19    brother.  I know that was spoke [*sic*] about.  I'm not sure.

20         THE COURT:  Do you remember that Friday when the law

21    enforcement people were searching for the people who had done

22    the bombing?

23         THE JUROR:  I do.

24         THE COURT:  Where were you then?

25         THE JUROR:  In my office.

1          THE COURT:  Was that in Providence?

2          THE JUROR:  Providence, yes.

3          THE COURT:  You told me that.  So you weren't in the

4     Boston area when it happened?

5          THE JUROR:  No.

6          THE COURT:  So you weren't affected by that.

7          Did you follow that?  I mean, a lot of people, whether

8     at home or in the office, I imagine, were kind of glued to the

9     TV watching things unfold.

10         THE JUROR:  We don't have TVs or radios in our office.

11    The Internet isn't really something we should be using during

12    work hours on that Friday.

13         THE COURT:  Well, apart from the shouldn'ts and so on,

14    were you following it?

15         THE JUROR:  I paid a little bit of attention to it,

16    not --

17         THE COURT:  How --

18         THE JUROR:  Just through casual conversation.  I

19    wasn't glued to the TV.  I don't watch a lot of TV.

20         THE COURT:  You were also asked some questions about

21    attitudes towards the death penalty, which is, as you have

22    heard, a possibility on certain conditions in this case.

23         THE JUROR:  Yes.

24         THE COURT:  So turn to page 23, Question 88.  We asked

25    in that question if you had any general views about the death

1    penalty, and you said you were neither for nor against it.

2         THE JUROR:  I feel if someone is found guilty and that

3    is what their punishment is to be and it fits the crime, then I

4    am for it; if they are not found guilty and that's not what

5    they deserve, then I would not go for that.

6         THE COURT:  So I explained this morning, generally

7    speaking, the process in a penalty phase.  If you assume that

8    someone is guilty of an intentional murder, you get to the

9    phase where the government would seek to convince the jury that

10   there were certain aggravating factors that made this worse

11   than your average murder; for example, that there's something

12   special about this case that makes it worse.  The defense might

13   present evidence to show that there's something special about

14   the case that would argue in this circumstance for something

15   less than the death penalty, specifically, life imprisonment,

16   and the jury would decide subject to some rules of law that I

17   would provide whether one penalty was better or more

18   appropriate than the other penalty.

19        Depending on the evidence you heard in that phase of

20   the case, would you think that you are prepared to vote for the

21   death penalty if you think it is warranted?

22        THE JUROR:  Yes.

23        THE COURT:  And on the other hand, to vote against the

24   death penalty and for life imprisonment if you thought that was

25   warranted?

1           THE JUROR:  Yes.

2           THE COURT:  Mr. Weinreb?  Or Mr. Mellin?

3           MR. MELLIN:  Your Honor, may I?

4           Good morning.  I've Steve Mellin.  I'm one of the

5    prosecutors, along with everybody over here.

6           THE JUROR:  Hi.

7           MR. MELLIN:  I just want to make sure -- you gave an

8    answer, and I just want to make sure we're all on the same

9    page.  Do you understand there would first be a phase where it

10   would be called the guilt phase, where the jury would decide if

11   the defendant was guilty or not guilty?  Do you understand

12   that?

13          THE JUROR:  Yes.

14          MR. MELLIN:  Okay.  So if the jury does find him

15   guilty, we would then go to the second phase.  Do you

16   understand that?

17          THE JUROR:  Yes, I do.

18          MR. MELLIN:  Okay.  And it's at that phase where the

19   question is:  Is it going to be life imprisonment or would it

20   be the death penalty?  Do you understand that?

21          THE JUROR:  Yes.

22          MR. MELLIN:  Going into that phase, given the fact

23   that you've already found him guilty -- all right, do you

24   understand that -- would you go into that phase with an open

25   mind and consider all of the evidence before you decided

1    between life or death?

2              THE JUROR:  Yes, sir.

3              MR. MELLIN:  Okay.  Thanks a lot.

4              MS. CONRAD:  Good morning, ma'am.  My name is Miriam

5    Conrad.  I'm one of Mr. Tsarnaev's lawyers.

6              THE JUROR:  Good morning.

7              MS. CONRAD:  The judge asked you some questions about

8    your experiences on April 19th, the day -- of 2013.  And you

9    said you were at work that day?

10             THE JUROR:  Yes.

11             MS. CONRAD:  So was this something that people were

12   following on the Internet, other workers in your workplace?

13             THE JUROR:  One of the higher-ups, the owner of the

14   company, had mentioned it to us.  Like I said, we don't usually

15   go on the Internet that often.  The owners obviously have the

16   ability to do so, but as an employee, the Internet's not the

17   one thing we should be on unless it's for business purposes.

18             MS. CONRAD:  So was it something that people were

19   talking about at work that day?

20             THE JUROR:  Yes.

21             MS. CONRAD:  And do you remember any of the things

22   that were said?

23             THE JUROR:  Just that there was a lot of stuff going

24   on in the town that it was in and -- the higher-ups have their

25   own offices.  They carry their own meetings.  I'm an executive

1   assistant.  I don't sit directly near them.  We don't, you

2   know, have meetings in their office unless it's business

3   related.  But there was chatter.

4          MS. CONRAD:  What about on April 15th, 2013, Marathon

5   Monday; were you at work that day?

6          THE JUROR:  No, I was not.

7          MS. CONRAD:  Where were you?

8          THE JUROR:  Las Vegas.

9          MS. CONRAD:  And do you remember hearing about the

10  bombing?

11         THE JUROR:  Not when we were there.  We were on a

12  plane on the way home that day.

13         MS. CONRAD:  So you didn't find out about it until you

14  got home?

15         THE JUROR:  Yes.

16         MS. CONRAD:  And what was your reaction when you heard

17  about it?

18         THE JUROR:  Shocked, sad that it happened so close to

19  home.

20         MS. CONRAD:  And you said that you didn't know anybody

21  who had -- this is your answer to Questions 81 and 82, that

22  anyone was -- anyone who was personally affected or who

23  participated in any Boston Strong-type activities?

24         THE JUROR:  No, I don't know anyone.

25         MS. CONRAD:  You don't know anybody who, for example,

1    has a Boston Strong bumper sticker or T-shirt?

2            THE JUROR:  I do not.

3            MS. CONRAD:  Now, you said on Question 13, I believe

4    that's on page 6 --

5            THE JUROR:  Yes.

6            MS. CONRAD:  -- that your ex-husband is or was a

7    firefighter?

8            THE JUROR:  Yes.

9            MS. CONRAD:  And so would that affect your reaction to

10    testimony from witnesses who were first responders?

11            THE JUROR:  No.  We've been divorced for over six

12    years now.  It has no effect.

13            MS. CONRAD:  And where was he a firefighter?

14            THE JUROR:  Fall River, Massachusetts.

15            MS. CONRAD:  Is he still a firefighter there?

16            THE JUROR:  I believe so.  I'm not sure.

17            MS. CONRAD:  With respect to Question 77 -- I'm sorry

18    I'm jumping around a little -- page 20 --

19            THE JUROR:  Yes.

20            MS. CONRAD:  -- you said -- certainly that's perfectly

21    appropriate, that you don't have all the information.  But

22    based on the information that you do have right now, do you

23    have an opinion -- not a final opinion but just an opinion, as

24    to whether Mr. Tsarnaev is guilty?

25            THE JUROR:  I really -- I don't know everything that

```
 1    is involved in the case.  I mean, I'm not -- I couldn't sit
 2    here and say, "Yes, I feel this way" or, "No, I feel that way."
 3    I don't know if he's guilty.  I don't know.  I can't say that I
 4    know he's innocent.  I don't know that either.
 5           MS. CONRAD:  I just want to make sure we're
 6    understanding each other.
 7           THE JUROR:  Uh-huh.
 8           MS. CONRAD:  I'm not asking what kind of verdict you
 9    would return if you sat on the jury.
10           THE JUROR:  Okay.
11           MS. CONRAD:  Obviously, you would, we hope, listen to
12    all the evidence and make a decision based on that.
13           THE JUROR:  All right.
14           MS. CONRAD:  But just based on what you've heard so
15    far, just from the news media, from friends, neighbors,
16    relatives, do you have an opinion --
17           MR. WEINREB:  I object.
18           MS. CONRAD:  -- one way or the other?
19           THE COURT:  Yeah, I'll sustain the objection on that
20    question.  You don't have to answer that question.  It's too
21    specific.  Too direct.
22           MS. CONRAD:  And do you have an opinion based on what
23    you've heard, read, seen, discussed whether if Mr. Tsarnaev was
24    found guilty beyond a reasonable doubt of the crimes with which
25    he's charged --
```

```
 1              THE JUROR:  I don't think I understand your question

 2     because -- is it the same question?  I'm confused.

 3              MS. CONRAD:  No, I'm just getting to it.

 4              THE JUROR:  Okay.

 5              MS. CONRAD:  If he were found guilty, do you have an

 6     opinion sitting here now as to whether or not he should receive

 7     the death penalty?

 8              THE JUROR:  If he were found guilty right now and

 9     that's what the decision needed to be made, based upon life or

10     death penalty?  Life in prison --

11              MS. CONRAD:  As the judge explained, if he were found

12     guilty, then there would be a penalty phase.

13              THE JUROR:  Yes.

14              MS. CONRAD:  I'm not asking you what you

15     might -- putting aside what you might hear during the penalty

16     phase, based on what you know right now --

17              THE JUROR:  Yes.

18              MS. CONRAD:  -- do you have a belief as to whether or

19     not he should receive the death penalty?

20              MR. WEINREB:  I object.  There's no foundation.

21              THE COURT:  Yeah, I think -- sustained.  You don't

22     have to answer the question.

23              MS. CONRAD:  I have nothing further.  Thank you.

24              THE COURT:  Let me just ask -- there were some

25     questions about your ex-husband.  I see there's another person
```

1    in your life.  You say business owner?

2              THE JUROR:  Yes.

3              THE COURT:  What kind of business?

4              THE JUROR:  He does home security systems.

5              THE COURT:  Okay.  All right.  Thank you.  Thank you.

6              THE JUROR:  Thank you.

7              (The juror is excused.)

8              THE CLERK:  Juror No. 98.

9              JURY CLERK:  Juror No. 98.

10             THE CLERK:  Sir, this way, please.  Have a seat, if

11   you would.  Speak into the mic so everyone can hear you.

12             THE JUROR:  Okay.

13             THE CLERK:  Thanks.

14             THE COURT:  Hi.

15             THE JUROR:  Hi.

16             THE COURT:  We put before you the questionnaire you

17   filled out when you were here the last time.  Since that time

18   have you been able to follow my instructions to avoid any

19   discussion of the case or try to limit your exposure to media

20   accounts of anything connected to the case?

21             THE JUROR:  Yes, I have.

22             THE COURT:  Tell us about your employment.

23             THE JUROR:  I currently am a senior software engineer

24   for Safari Books Online where I'm working on a custom

25   publishing software platform that is servicing Oxford

1    Encyclopedia, Wiley Reference, and a number of publishers in

2    education.

3              THE COURT:  And how long have you been working for --

4              THE JUROR:  I've been working with Safari for about

5    five months.

6              THE COURT:  Would extended service on this jury, if

7    you were selected, be a problem for you at work?

8              THE JUROR:  I've already confirmed with work it would

9    not be.

10             THE COURT:  Okay.  What prompted that was you're

11   relatively new there, and seniority may have an effect on

12   things.

13             And you've done similar software engineering work for

14   other companies?

15             THE JUROR:  I've primarily been in the field of

16   educational technology and publishing, and I had a small stint

17   in advertising technology.

18             THE COURT:  Okay.  You have a degree from MIT?

19             THE JUROR:  Yes, I do.

20             THE COURT:  One of the persons killed in the events

21   that lead us to this trial was an MIT police officer.

22             THE JUROR:  I understand.

23             THE COURT:  Does your connection with MIT give you any

24   concern about an emotional reaction to evidence about that that

25   would affect adversely your ability to serve as a juror?

1          THE JUROR:  I graduated in 1996 and really haven't had
2     much connection with MIT since then.
3          THE COURT:  So --
4          THE JUROR:  So no.
5          THE COURT:  -- the answer would be no?
6          THE JUROR:  Correct.
7          THE COURT:  Regarding -- we asked about posting
8     messages or blogging on websites.  And I guess you say you
9     don't do any of that?
10         THE JUROR:  Not generally.
11         THE COURT:  Is there anything for the company -- it's
12    an online company.  Are there company websites or anything that
13    you --
14         THE JUROR:  Apparently I will be required to do at
15    least one blog a year for Safari, usually based on some sort of
16    technical concept, but I have not yet done one.
17         THE COURT:  And then personally you use -- you use
18    Facebook on a daily basis?
19         THE JUROR:  Yes, I do.
20         THE COURT:  Anything else?  Twitter, Instagram or
21    anything else like that?
22         THE JUROR:  No, just Facebook and email.
23         THE COURT:  At pages 17 and 18, if you want to look at
24    it to refresh your memory, we asked some questions that dealt
25    with sort of what you might call international affairs issues,

1    questions about the war on terror, perhaps attitudes towards

2    Islam or Muslims and so on.  Do you remember answering those?

3            THE JUROR:  Yes.

4            THE COURT:  Since you filled out those answers there

5    have been some events in Europe, particularly Paris, that might

6    be characterized as terrorist events.

7            THE JUROR:  Uh-huh.

8            THE COURT:  Are you familiar with those?  Have you

9    followed those at all?

10            THE JUROR:  I am aware of the headlines, but I have

11    not actually read those articles.

12            THE COURT:  Okay.  Whatever you do know about it,

13    would any of that affect any of the answers you gave to these

14    questions?  Would you change anything as a result of knowing

15    about those things?

16            THE JUROR:  No.

17            THE COURT:  Let me ask you to turn to page 20.  In

18    Question 77 we ask if, based on what you've seen or read or

19    learned from anyplace else, had you formed an opinion -- have

20    you formed an opinion whether the defendant's guilty or not,

21    and if so, whether he should receive the death penalty or not,

22    and you indicated yes to both of the questions about whether

23    he's guilty or not and whether he should receive the death

24    penalty.

25            We then asked whether you -- in the next paragraph, if

1  you had answered yes, whether you would be able to set aside

2  that existing opinion and base your decision about guilt and

3  punishment based solely on the evidence that would be presented

4  in court.  You said you would be able to.

5           THE JUROR:  Yes.

6           THE COURT:  Can you explain those answers for us?

7           THE JUROR:  Sure.  During the events that occurred I

8  generally did no research, did not read into any of the

9  evidence or any of the aspects of the case other than abiding

10  by the lockdown, you know, don't go out, stay at home, that

11  sort of stuff.  Popular opinion and all media said this is --

12  the defendant's guilty, and so I just sort of accepted that at

13  that time.

14           Since then I have not actually done -- I have obeyed

15  what you ordered us to do, so...  And so my thoughts are:  I

16  understand as an engineer the need for evidence, logic and

17  following laws, and I also understand based on your

18  instructions that if I were to be in this case, I must only

19  accept whatever evidence is presented within the court.  And

20  logically I can do that, or at least I believe I can.

21           THE COURT:  You mentioned sheltering in place.  In

22  Question 80 we asked people if they had been affected,

23  including in that way.  It indicates N/A, which I assume means

24  "not applicable."  So is that correct or were you affected?

25  Did you shelter in place on that Friday?

```
 1              THE JUROR:  That particular Friday I happened to be
 2     working from home, so it didn't actually disrupt my work.
 3              THE COURT:  And so you continued working?
 4              THE JUROR:  Yeah.
 5              THE COURT:  Did you follow the events as they were
 6     unfolding?
 7              THE JUROR:  Not in particular.
 8              THE COURT:  The law enforcement pursuit and so on and
 9     so forth?
10              THE JUROR:  No.
11              THE COURT:  If you'd turn to page 23.
12              THE JUROR:  Sure.
13              THE COURT:  Beginning with Question 88, we asked a
14     series of questions to gauge potential jurors' thinking about
15     the death penalty, both generally and perhaps more
16     specifically.  So 88 was a general question, what are your
17     general views, and you said you're in favor of it as allowed by
18     law, especially for heinous crimes.
19              THE JUROR:  Yes.
20              THE COURT:  And then we asked in the next question if
21     you could give us the strength of that view, and you circled 9
22     out of 10, again strongly in favor.
23              Then the next question on the next page we asked you
24     to select which of the possible several statements that are
25     presented, which best expressed your view, and you selected E
```

1    that says you're in favor of the death penalty but could vote

2    for a sentence of imprisonment without the possibility of

3    release if you believed that sentence was called for by the

4    facts in the case.

5           THE JUROR:  Uh-huh.

6           THE COURT:  Is that accurate?

7           THE JUROR:  Yes, it is.

8           THE COURT:  Is that true about this case?

9           THE JUROR:  Yes, it is.

10          MR. WEINREB:  No questions, your Honor.

11          MR. BRUCK:  Good afternoon.

12          THE JUROR:  Good afternoon.

13          MR. BRUCK:  My name is David Bruck.  I'm one of Jahar

14   Tsarnaev's lawyers.  I won't keep you too long.  I just have a

15   couple of questions, if that's okay.

16          THE JUROR:  Sure.

17          MR. BRUCK:  You checked the box on Question No. 77, D,

18   about -- I'm sorry -- 77, C.

19          THE JUROR:  May I ask for a page number?

20          THE COURT:  Twenty.  Page 20.

21          THE JUROR:  Thank you.

22          MR. BRUCK:  You said it was your opinion when you

23   filled this out that Mr. Tsarnaev should receive the death

24   penalty.  You checked yes.  Can you tell me a little bit more

25   about that?  Why did you check "yes"?

```
 1              THE JUROR:  My understanding of what I believe
 2    happened, which obviously is just my opinion --
 3              MR. BRUCK:  That's what I'm asking you for.
 4              THE JUROR:  -- is it was a willful act of trying to
 5    harm as many innocent people as possible, including trying to
 6    kill them.
 7              MR. BRUCK:  And --
 8              THE JUROR:  And that, for me, qualifies as a heinous
 9    crime.
10              MR. BRUCK:  Okay.  Thanks, because you've answered my
11    next question about heinousness, which is a term you used on
12    your form.
13              The judge has explained to you this is a two-part
14    trial.
15              THE JUROR:  Yes.
16              MR. BRUCK:  And at the -- if the jury finds beyond a
17    reasonable doubt that the defendant is guilty and you go to the
18    second part in which the aggravating evidence, circumstances of
19    the crime, might be things about the defendant are presented by
20    the prosecution --
21              THE JUROR:  Uh-huh.
22              MR. BRUCK:  -- in favor of a death sentence -- are you
23    with me?
24              THE JUROR:  Yeah, I'm following.  And then the
25    mitigations would be presented by the defense.
```

 1          MR. BRUCK:  Exactly.  And that can involve things

 2    about the defendant or things about the crime that might weigh

 3    in favor of life.  Given what you know about this case already,

 4    are there any circumstances that could ever be shown by the

 5    defense that would cause you to believe that life is the

 6    appropriate sentence in this case?

 7          MR. WEINREB:  Objection.  That's mixing two issues.

 8    He hasn't heard any evidence in this case at all.  He said he

 9    doesn't know anything about it other than what he's read in the

10    news.

11          THE COURT:  Go ahead.  You can answer it.

12          I'll let you follow up.

13          THE JUROR:  Okay.  Based on the answers I gave in this

14    questionnaire, my ability to be a juror is such that if the

15    evidence is presented, I can be persuaded.

16          MR. BRUCK:  Okay.  Could there ever be a case

17    involving an intentional act of terrorism that was intended to

18    and did kill multiple people in which you could be persuaded by

19    anything that the death penalty was not the appropriate

20    punishment?

21          MR. WEINREB:  Objection.

22          THE COURT:  I will sustain the objection to that

23    question, so you don't have to answer that.

24          MR. BRUCK:  You've told us a little bit about -- or

25    you've said that you followed some media and heard some facts.

1    Can you tell me what stands out?  You've mentioned a couple of

2    things.  Can you tell me what stands out about this case in

3    your mind based on everything you've heard or read or seen on

4    the Internet?

5              MR. WEINREB:  Objection to that too.

6              THE COURT:  Sustained.

7              MR. BRUCK:  Thank you so much.  That's all I have.

8              THE JUROR:  You're welcome.

9              THE COURT:  Anything else?

10             MR. WEINREB:  No, sir.

11             THE COURT:  All right.  Thank you, sir.

12             THE JUROR:  Thank you very much.

13             (The juror is excused.)

14             THE CLERK:  Juror No. 100.

15             JURY CLERK:  Juror No. 100.

16             THE CLERK:  Sir, over here, please.  Have a seat right

17   here.  Thanks.

18             Also, make sure you talk into the mic so everyone can

19   hear you, okay?

20             THE COURT:  Good afternoon.

21             THE JUROR:  How you doing?  Good afternoon.

22             THE COURT:  That's the questionnaire you filled out

23   when you were last here.  We may refer to it --

24             THE JUROR:  Okay.

25             THE COURT:  -- to follow up on some of the answers.

1          Since that time have you been able to follow my
2     instructions about avoiding any discussion of the case or any
3     exposure to the media accounts?
4          THE JUROR:  Yes.  It's not very easy, but I have done
5     it.
6          THE COURT:  Okay.  You're employed as a glazier?
7          THE JUROR:  Yes.
8          THE COURT:  What does that involve?
9          THE JUROR:  Glass work.  I work mostly --
10         THE COURT:  In detail, what do you do?
11         THE JUROR:  Put glass in buildings, interior or
12    exterior, all around this area basically.
13         THE COURT:  So construction?
14         THE JUROR:  Yeah.
15         THE COURT:  Is this a union position?
16         THE JUROR:  Yes.
17         THE COURT:  And this could be an extended trial, as I
18    think you know.
19         THE JUROR:  Yeah, that causes me some conflict, mostly
20    on insurance.
21         THE COURT:  That's what I want to get at.  Given the
22    nature of your job -- are you an hourly-wage employee?
23         THE JUROR:  Yes.
24         THE COURT:  What would the impact on your work be if
25    you're here?

1          THE JUROR:  I wouldn't lose my job because I'm hourly

2    and they always need help, but my biggest impact would be

3    getting my insurance hours to carry on my healthcare.  If I

4    don't maintain 600 hours a half year -- at least 600, then I

5    lose that.  And I've never lost healthcare in 32 years I've

6    been doing this.  But it's a potential if it's that many months

7    of the trial.

8          THE COURT:  Yeah.  I'm just trying to do the quick

9    math, how many months 600 hours is.

10          THE JUROR:  Well, you get 40 hours a week typically,

11   so three months would wipe me out of like 12 weeks, you know?

12   And so that's quite a few hours.  I usually average about 200

13   to 220 a month in hours, just ballpark, with holidays and that.

14          THE COURT:  Okay.  And is that counting overtime

15   hours?  Do they count?

16          THE JUROR:  Overtime hours count too.

17          THE COURT:  And that, I guess, depends on the ebb and

18   flow of work?

19          THE JUROR:  Right.  The last half of year I only got

20   650 hours from July to December, but that was a bad time, when

21   it was slow.  Normally I would get close to 900 for a half

22   year.  So that presents a problem.

23          THE COURT:  I think that's all we need to know.  Thank

24   you.

25          THE JUROR:  That's it?

```
 1            THE COURT:  Yeah.

 2            THE JUROR:  Okay.

 3            (The juror is excused.)

 4            THE CLERK:  Juror No. 102.

 5            JURY CLERK:  Juror No. 102.

 6            THE CLERK:  Ma'am, have a seat right over here, if you

 7   would, please.

 8            THE COURT:  Good afternoon.

 9            THE JUROR:  Hi.

10            THE CLERK:  Make sure you speak into the mic so

11   everyone can hear you, okay?

12            THE JUROR:  Okay.

13            THE CLERK:  Thanks.

14            THE COURT:  That's the questionnaire you filled out

15   when you were here last.  We may refer to it as we follow up on

16   some of the questions you gave.

17            THE JUROR:  Okay.

18            THE COURT:  Since that time have you been able to

19   follow my instruction to avoid any discussion of the process,

20   the case?

21            THE JUROR:  Yeah.

22            THE COURT:  And tried to limit your exposure to any

23   news accounts about things?

24            THE JUROR:  Yeah.

25            THE COURT:  So looking at your questionnaire, you were
```

1    until recently employed as an R.N. at the Good Samaritan

2    Medical Center?

3            THE JUROR:  Yes.

4            THE COURT:  Where is that?

5            THE JUROR:  In Brockton.

6            THE COURT:  And it says that you left late December

7    and are currently unemployed?

8            THE JUROR:  Yes.

9            THE COURT:  That's when you filled this out.  Is that

10   still the case?

11           THE JUROR:  Yes.

12           THE COURT:  Are you planning to reemploy or are you

13   taking some time off or --

14           THE JUROR:  I'm actually taking time off.  I was --

15   well, we're planning on going cross-country.  We were going to

16   start in April when our lease was up, and just travel.

17           THE COURT:  When you say "we" --

18           THE JUROR:  My boyfriend and I.

19           THE COURT:  You had that idea.  Had you made specific

20   plans for a particular time for your trip?

21           THE JUROR:  Well, our lease is up.  We have an RV.  We

22   were planning on going cross-country in the RV.  And if I was

23   called, we were just going to stay in the RV around here.

24           THE COURT:  That was my question, if you were called

25   and if the case continued beyond April, what would the impact

1  be on you.  And you're saying you could adjust?

2          THE JUROR:  Yes, definitely.  We had already planned

3  on making adjustments if I was chosen to sit, so...

4          THE COURT:  Okay.  Tell me just a little bit about

5  your training and work as a nurse.  Do you have any specialty?

6          THE JUROR:  Yes; for the last ten years I've been in

7  the emergency room.

8          THE COURT:  Emergency room?

9          THE JUROR:  Yup.  Before that I was an LPN and worked

10 for an agency, so I basically staffed nursing homes, rehabs,

11 transitional care units, things like that.

12         THE COURT:  Okay.  But throughout your time at Good

13 Samaritan, you've been in the ER?

14         THE JUROR:  Yes.

15         THE COURT:  Some but no extensive use of Facebook.  Is

16 that --

17         THE JUROR:  Hardly any.

18         THE COURT:  Okay.

19         THE JUROR:  Basically, family, friends.  I'm a cake

20 artist, so I post cake pictures.

21         THE COURT:  If you want to refresh your recollection,

22 at pages 18 and 19 we ask jurors some questions about what

23 might broadly be called international affairs issues, things

24 about the war on terror, so-called, and perhaps attitudes about

25 Islam and Muslims and so on and so forth.  Since you filled out

1    the questionnaire and gave those answers, there have been some

2    events in Europe involving some terrorist attacks.  Have you

3    followed those at all?

4           THE JUROR:  I don't really know much about it.

5           THE COURT:  You don't know what or where?

6           THE JUROR:  I think France.

7           THE COURT:  Right.  Well, my question was going to be

8    if what you knew about those things would affect any of the

9    answers you gave here.

10           THE JUROR:  No, I don't believe so.

11           THE COURT:  Let me ask you to turn to page 20 and

12    direct your attention to Question 77.

13           THE JUROR:  Uh-huh.

14           THE COURT:  That's a multiple-part question in which

15    we asked whether you'd formed an opinion from things you'd seen

16    in the media or heard otherwise about whether this defendant

17    was guilty or not, and if so, whether he should be punished by

18    the death penalty or not.

19           THE JUROR:  Right.

20           THE COURT:  And to each of those you indicated -- you

21    checked the box that said "unsure."

22           THE JUROR:  Right.

23           THE COURT:  Would you explain that for us?

24           THE JUROR:  I can't make a decision whether he's

25    guilty or not until I hear evidence.  I don't know really much

1   about it, so I can't tell you one way or the other if I think

2   he's guilty now or not guilty.  I don't know.

3           THE COURT:  You probably heard some things about the

4   case, right?

5           THE JUROR:  Yes.  I mean, I read what was -- the

6   beginning of this that told facts.

7           THE COURT:  That's on the next page, if you want

8   to -- I think that's what you're referring to, the bottom of

9   page 21?

10          THE JUROR:  The facts.  Yeah, so I read that.

11          At the time, bits of pieces of what was going on, but,

12   still, I really could not tell you what the accounts of what

13   happened.  So I really don't know.  I don't have enough

14   information.

15          THE COURT:  Do you remember following any of it as it

16   unfolded at the time?

17          THE JUROR:  I believe I was working at the time, so I

18   really couldn't follow it step by step after the fact.

19          THE COURT:  You're talking about the day of the

20   marathon itself?

21          THE JUROR:  Right.

22          THE COURT:  Of course it continued into the end of the

23   week, Thursday and Friday, as people were trying to --

24          THE JUROR:  Yeah.  I've worked nights for ten years,

25   so having that shift, I really don't have much access to news.

1    I'm either sleeping during the day or working during the night.

2          THE COURT:  All right.  Now if you'd go to page 23, we

3    asked a series of questions beginning with Number 88 about

4    attitudes or beliefs, convictions about the death penalty and

5    so on.  And 88 is a general question, it says generally what

6    your views are, and you said you didn't have any.  Is that --

7          THE JUROR:  I really don't.  I -- I don't know.  I

8    would have to see what the charges were.  I'd have to -- I'd

9    have to weigh everything in order to have an opinion on that.

10          THE COURT:  The next question was sort of asking you

11    to put it on a scale where you were between strongly oppose and

12    strongly favor, and you chose number 5.

13          THE JUROR:  Right.  I'm not either.

14          THE COURT:  In the middle, is that it?

15          THE JUROR:  Yeah.

16          THE COURT:  The next question, Number 90, we ask you

17    to select the statement that was closest to what your beliefs

18    were about the death penalty.  You selected D?

19          THE JUROR:  Right.

20          THE COURT:  It says you're not for it or against it

21    and could vote to impose it or vote to impose, instead, a life

22    imprisonment, whichever you thought was called for by the facts

23    and the law in the case.

24          THE JUROR:  Right.

25          THE COURT:  Is that an accurate summary?

1          THE JUROR:  Completely.

2          THE COURT:  Do you feel confident that -- of course

3    you don't know what the evidence is you're going to hear --

4          THE JUROR:  Right.

5          THE COURT:  -- but can you envision evidence that

6    would lead you to feel that the death penalty was the right

7    decision --

8          THE JUROR:  If there was --

9          THE COURT:  -- and vote for it?

10          THE JUROR:  If there was evidence and if that was

11    called for, then, yes, I guess I could.

12          THE COURT:  And can you envision that there was

13    evidence that you could consider that might lead you to

14    conclude that the death penalty was inappropriate and that life

15    imprisonment was the appropriate sentence?

16          THE JUROR:  Definitely.  I have no, like I said, views

17    either way.  I am really in the middle.  I would have to hear

18    everything and make an educated decision.

19          MR. WEINREB:  Good morning.

20          THE JUROR:  Hi.

21          MR. WEINREB:  My name is Bill -- good afternoon.

22          THE JUROR:  Oh, yes.

23          MR. WEINREB:  Just so the record is clear.

24          My name is Bill Weinreb.  I'm one of the prosecutors

25    in the case.  I just wanted to ask you a few questions about

1     the death penalty.

2          THE JUROR:  Sure.

3          MR. WEINREB:  Have you given a lot of thought to the

4     idea of the death penalty in general?

5          THE JUROR:  I have.  You know, it's part of this case,

6     so, you know, I've thought about it.  And, again, I would have

7     to make an educated decision about that.

8          MR. WEINREB:  Okay.  So you've told us that you could

9     consider the evidence and you could consider both

10    possibilities, but I want to ask you a slightly different

11    question --

12         THE JUROR:  Okay.

13         MR. WEINREB:  -- which is, as you know, because the

14    judge instructed you earlier, the jury -- if the defendant in

15    this case is found guilty --

16         THE JUROR:  Uh-huh.

17         MR. WEINREB:  -- of one of the crimes that carries a

18    potential penalty of death, then it will be up to the jury to

19    decide whether he lives or dies.

20         THE JUROR:  Right.

21         MR. WEINREB:  You'll be one of those people who will

22    have to make that decision --

23         THE JUROR:  Right.

24         MR. WEINREB:  -- on another human being.

25         My question is simply:  Can you imagine yourself on

1    the jury thinking about whether this person sitting at the

2    table should live or die?  Would you be able to -- if you

3    thought it was the appropriate punishment, would you be able to

4    sentence him to death?

5            THE JUROR:  If I felt it was appropriate.

6            MR. WEINREB:  Okay.  Thank you.

7            MR. BRUCK:  Good afternoon.

8            THE JUROR:  Hi.

9            MR. BRUCK:  My name is David Bruck.  I'm one of the

10   attorneys for Jahar Tsarnaev, and I just have a few things I

11   want to talk to you about.

12           THE JUROR:  Sure.

13           MR. BRUCK:  You live in Massachusetts now.  Have you

14   ever lived in other places?

15           THE JUROR:  No.

16           MR. BRUCK:  Okay.  Understanding that you didn't

17   follow all of the facts or that you weren't glued to the TV set

18   the whole time when this was first happening, I'd like to ask

19   you what stands out in your mind, if anything, about this case

20   from anything you've heard, seen.

21           THE JUROR:  The only thing that I definitely can

22   remember from that time is probably after the fact when they

23   showed the finish line.  That's about it really.

24           MR. BRUCK:  And did you have any feelings about what

25   you remember of that scene?

 1           THE JUROR:  It was scary.  There was a lot of

 2    confusion.

 3           MR. BRUCK:  Anything about the defendant?

 4           THE JUROR:  I honestly didn't even know the defendant

 5    until -- I didn't know what his name was until the court

 6    summoned me here.

 7           MR. BRUCK:  Okay.  Anything else that you recall

 8    about any aspect of this case at all?

 9           THE JUROR:  No.  Just personally I thought, my

10    goodness, the ERs are going to be overloaded, how are they

11    going to deal with that.  It was just a work perspective.

12           MR. BRUCK:  You've been asked a bunch of questions

13    just now about the death penalty, mostly by the judge.  I want

14    to ask you something about it but in a slightly different way.

15    Massachusetts doesn't have the death penalty, as the judge told

16    you.

17           THE JUROR:  Right.

18           MR. BRUCK:  Some states used to have it and recently

19    abolished it.  If you were in the legislature and the issue

20    came up should we have it on the books in the state, would you

21    be in favor of having it as an option or would you think it

22    would be just as well, or better, not to have it as an option?

23           THE JUROR:  I don't know.  I would need more

24    information.  I'm glad I don't have to make those kinds of

25    decisions.  And I was surprised when told that the death

1    penalty was on the table because I knew that Massachusetts

2    didn't have it.  Whether or not I would vote for it, I don't

3    know.  I'd have to think about that even more.

4         MR. BRUCK:  How do you feel about serving on this

5    jury?

6         MR. WEINREB:  Objection.

7         THE JUROR:  How do I feel?

8         THE COURT:  No, you can answer that.

9         THE JUROR:  Well, I feel as though I, you know, bring

10   an honest and impartial view.  I really, you know, have no

11   opinion at this point.  I would definitely need more

12   information and facts before I could make any decisions on

13   anything.  I feel I'm a fair person.  So I don't know if, you

14   know, a feeling is a correct question.  I'm not sure if I have

15   a feeling.

16        MR. BRUCK:  Let me ask it this way:  Some people may

17   get their jury summons and know it's for this case and say,

18   "Oh, boy, I hope I don't get picked."

19        THE JUROR:  No, I didn't know my summons was for this

20   case.  I had no idea at all.

21        MR. BRUCK:  Would you have had that reaction?

22        THE JUROR:  I don't think so.  It's a case like any

23   other case.

24        MR. BRUCK:  Bear with me just a moment.

25             (Pause.)

```
 1              MR. BRUCK:  Thank you so much.

 2              THE JUROR:  Thanks.

 3              THE COURT:  Is that it?  All right.  Thank you.

 4              THE JUROR:  All set?

 5              (The juror is excused.)

 6              THE CLERK:  Juror No. 108.

 7              Ma'am, over here, please.  Have a seat, if you would,

 8     please.  Speak into the mic so everyone can be sure to hear

 9     you.

10              THE JUROR:  Okay.

11              THE COURT:  Good afternoon.

12              THE JUROR:  Good afternoon.

13              THE COURT:  That's the questionnaire you filled out

14     when you were here last.  We may refer to it, so we put it in

15     front of you so you can look at if you want.  We're going to

16     follow up on some of the things that you wrote in the

17     questionnaire.

18              THE JUROR:  Okay.

19              THE COURT:  Since you were here last and filled out

20     the questionnaire, have you been able to live up to my

21     instructions to avoid discussing the case or getting exposed to

22     media accounts about the case?

23              THE JUROR:  I think so.  As far --

24              THE COURT:  Okay.  Let me just ask if you'd look at

25     page 5, Question 10.  You wrote -- and before I get into it
```

1    substantively, let me ask, because this is perhaps a personal

2    matter, would you prefer that this not be public or do you not

3    care?

4            THE JUROR:  No, it's okay.

5            THE COURT:  Okay.

6            THE JUROR:  This is fine.

7            THE COURT:  So when we asked would you have difficulty

8    serving as a juror, you said you have a disabled daughter and

9    sometimes have to go to meetings for her.  Tell us what you

10   were thinking about that.

11           THE JUROR:  Should I tell you about my daughter,

12   because that's what it has to do with.

13           THE COURT:  I want to understand what the issue is.

14           THE JUROR:  The issue is she just came out of the

15   hospital about six months ago.  She also -- she has cerebral

16   palsy and she's mildly mentally retarded, and she has a mental

17   illness on top of it.  And she speaks very little.  So I'm

18   really the one that speaks for her, and that's the reason I

19   said about the meetings.  I have to go -- I'm her legal

20   guardian, and I have to go to most of them.

21           THE COURT:  What kinds of meetings are they?  Are they

22   medical meetings or --

23           THE JUROR:  They're both.  They're medical, what she

24   will do for the -- you know, they have ISPs, and it tells

25   them -- tells us what we're going to work on and what she needs

1   help with.

2          THE COURT:  So therapy kind of things are you talking

3   about?

4          THE JUROR:  Yes.  Yes.

5          THE COURT:  And some of this sort of -- I don't

6   know -- for lack of a better word -- you probably know the

7   words better than I do -- but educational or something like

8   that?  I mean, activity-related or --

9          THE JUROR:  She does do some activities, but for the

10  past six months -- before that, a year before that, she did

11  nothing.  I used to have to bathe her.  That's how bad it was.

12  Then when she went to this program by the state, she really --

13  they took her off all her medications, and that really helped a

14  bit.  So, but like I said, she really doesn't explain herself

15  well, so I'm there to help.

16         THE COURT:  Can you give us some idea of how much on a

17  weekly basis you're involved in these kinds of meetings?

18         THE JUROR:  Well, the meetings take place sometimes

19  once a month or once every six months.  But if she has

20  problems, then I see a doctor more often.  I'll see a

21  neurologist.  There's a bunch of them.  A psychiatrist.  And it

22  depends on what's going on with her at that time.

23         THE COURT:  So it's somewhat unpredictable?

24         THE JUROR:  It is.  And she's a cutter.  She cuts

25  herself when she's under stress, so...

```
 1              THE COURT:  She's living at home with you?
 2              THE JUROR:  No, no, she lives in a group home.  She
 3     lives like ten minutes from my house, yeah.
 4              THE COURT:  All right.  Okay.  Thanks.
 5              THE JUROR:  Oh, okay.  You're welcome.
 6              THE COURT:  That's it.
 7              THE JUROR:  That's it?  Okay.  Thank you.
 8              (The juror is excused.)
 9              THE COURT:  Okay.  I'd suggest we take a break for
10     lunch, perhaps come back at two.  That will be a sidebar
11     conference at that point; it will not be broadcast.
12              MR. MELLIN:  Your Honor, can I raise one point before
13     we do that?
14              Mr. Bruck asked the question of not this juror but the
15     juror before about if she was aware that other states had
16     abolished the death penalty recently and if she was on the
17     legislature how would she vote.  I think that's a completely
18     objectionable question and I think it's completely
19     inappropriate for Mr. Bruck to be trying to indicate to one of
20     these jurors that there's some trend out there about the
21     abolition of the death penalty or anything like that.  And I
22     think asking whether or not the juror would vote for or against
23     the death penalty if they were hypothetically in the
24     legislature is completely inappropriate.
25              THE COURT:  Noted.
```

1                    C E R T I F I C A T E

2

3          We, Marcia G. Patrisso, RMR, CRR, and Cheryl

4    Dahlstrom, RMR, CRR, Official Reporters of the United States

5    District Court, do hereby certify that the foregoing transcript

6    constitutes, to the best of our skill and ability, a true and

7    accurate transcription of our stenotype notes taken in the

8    matter of Criminal Action No. 13-10200-GAO, United States of

9    America v. Dzhokhar A. Tsarnaev.

10

11   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
12   Official Court Reporter

13

14   /s/ Cheryl Dahlstrom
     CHERYL DAHLSTROM, RMR, CRR
15   Official Court Reporter

16

17   Date:  January 21, 2015

18

19

20

21

22

23

24

25