IN THE DISTRICT COURT OF THE UNITED STATES
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff | ) | 2:15-CR-472 |
| VS | ) | Charleston, South Carolina |
| DYLANN ROOF, Defendant | ) | November 7, 2016 |

TRANSCRIPT OF SEALED EX PARTE HEARING
BEFORE THE HONORABLE RICHARD M. GERGEL,
UNITED STATES DISTRICT JUDGE

APPEARANCES:

MR. DAVID I. BRUCK, ESQ.
Virginia Capital Case Clearinghouse
Washington and Lee School of Law
Lexington, Virginia 24450

MS. KIMBERLY STEVENS, ESQ.
1070-1 Tunnel Road
Suite 215
Asheville, North Carolina 28805

MS. SARAH GANNETT
Arizona Federal Public
Defender's Office
850 West Adams Street
Suite 201
Phoenix, AZ 85007

MS. EMILY PAAVOLA
Justice 360
900 Elmwood Avenue
Suite 101
Columbia, SC 29201

Court Reporter:

Amy C. Diaz, RPR, CRR
P.O. Box 835
Charleston, SC 29402

THE COURT: I want to confirm, first of all, with the matter of *United States vs. Roof*, I want to confirm that all persons present are either defense counsel, the defendant or court personnel.

MR. BRUCK: Yes, sir, Your Honor, also members of the defense team that are not technically counsel but are here on our request.

THE COURT: You know, I've closed this proceeding, Mr. Bruck, and basically we are going to have those permitted to stay are counsel of record. So anyone who is not counsel of record in this case must leave.

MR. BRUCK: If I may, Your Honor? We have two research counsel who are in close consulting relationship who have been assisting us.

THE COURT: Mr. Bruck, there is a very narrow limited group here. I've closed the proceedings. This is a very serious matter. Anyone who is not counsel of record must leave.

MR. BRUCK: If you would note our objection.

THE COURT: I note your objection.

MR. BRUCK: We need some help on this, but thank you.

THE COURT: How many counsel are here, Mr. Bruck?

MR. BRUCK: I'm sorry?

THE COURT: How many counsel are left? Why don't

you identify -- why don't counsel that are here identify themselves for the record.

MS. STEVENS: Kimberly Stevens for the defendant.

MS. PAAVOLA: Emily Paavola.

MS. GANNETT: Sarah Gannett.

THE COURT: Okay. This is occasioned by a letter the defendant wrote to the prosecutors which the Court was provided a copy of over the weekend, and I need to question the defendant.

Mr. Roof, would you mind coming to the podium? Let's just you and I talk from there.

And Ms. Ravenel, will you swear the defendant, please?

THE CLERK: Please place your left hand on the Bible, raise your right.

THE COURT: Do we have a Bible there? Right here. Just hand him the Bible there.

Thank you.

THEREUPON:

MR. DYLANN STORM ROOF,

Called in these proceedings and after having been first duly sworn testifies as follows:

THE COURT: Good morning, Mr. Roof. I'm going to ask you some questions about this letter and matters raised by the letter. If I ask you a question you don't understand,

would you ask me to rephrase it?

THE DEFENDANT: Yes, sir.

THE COURT: And we want to take all the time it takes, so don't feel rushed in any of your answers.

The -- do you have a copy of the letter with you?

THE DEFENDANT: Yes.

THE COURT: Okay. I'm going to be referring to it and I want to make sure you have access to it.

First of all, an obvious question, you were the author of that letter?

THE DEFENDANT: Yes, I was.

THE COURT: And you begin the letter by indicating that you do not consent or endorse the defense of your counsel.

First of all, what is that defense that you are referring?

THE DEFENDANT: Okay. Well, maybe it's not a defense, but it's the mitigation, right?

THE COURT: Right. Whatever that language is, what specifically regarding the mitigation evidence do you object?

THE DEFENDANT: The mental health stuff.

THE COURT: And when you say "mental health stuff," what is that?

THE DEFENDANT: From what I understand they are going to say that there is something wrong with me.

THE COURT: Okay.

THE DEFENDANT: Mentally.

THE COURT: Do you know what they are going to say?

THE DEFENDANT: Yeah, but I don't even want to acknowledge it.

THE COURT: By telling me what you understand they are going to say is not a recognition that it is true -- see, I don't know -- you see, Mr. Roof, it's not -- I'm not aware of what the defense is here. It hasn't been offered to me. So I need your explanation concerning what is that mental health defense and why you object to it?

THE DEFENDANT: They are going to say I have autism --

THE COURT: Okay.

THE DEFENDANT: -- but I don't.

THE COURT: Okay. And first of all, is there any other part of the mental health defense other than the autism issue?

THE DEFENDANT: Um, I think that's it.

THE COURT: Okay. And what about the claim you have autism do you object? I mean, do you know anything about autism?

THE DEFENDANT: Yeah.

THE COURT: Tell me what you know about it.

THE DEFENDANT: Oh, my gosh, it's -- I know what it

is.

THE COURT: Well, I need some help, because see, we are going to talk about what your understanding is and then you get to explain to me why that doesn't apply to you. And I need to understand what you believe autism is and then you can explain to me why you don't think you have that.

THE DEFENDANT: Okay. What I think autism is is when somebody can't recognize social cues.

THE COURT: Okay.

THE DEFENDANT: And, I mean, that is --

THE COURT: And is there any other aspect you understand about autism, other than a person does not recognize social cues?

THE DEFENDANT: I can't think of --

THE COURT: Well, I know you are a movie lover, as I am. Did you ever see the movie *Imitation Game* about the gentleman who had been to the computer, didn't really use the term autism in that --

THE DEFENDANT: What is the guy's name?

THE COURT: I can't remember his name now, but he was a British guy.

THE DEFENDANT: I didn't watch it.

THE COURT: Okay. It suggests some of the social cues that doesn't actually call it autism. Do you -- and you believe that that is not a valid diagnosis for you?

THE DEFENDANT: No. It's not.

THE COURT: And why is that?

THE DEFENDANT: Because what I think is happening is that they are getting -- they are getting -- they're mistaking my personality traits for autism, you see what I'm saying? But I don't -- I don't have autism. Because I know, I recognize everything, you see what I'm saying? And I don't want them to say that because it's not true.

THE COURT: Okay. And have you shared that view that you don't believe you have autism?

THE DEFENDANT: Yes.

THE COURT: Have you had a chance to talk to the doctors who evaluated you to know why they believe you have autism?

THE DEFENDANT: Um, I've talked to one of them.

THE COURT: Okay. And was that an autism expert?

THE DEFENDANT: Yes.

THE COURT: Okay. And did you share with him your belief you did not have autism?

THE DEFENDANT: Yes. It's a woman.

THE COURT: It's a woman. Okay.

What was her response to that?

THE DEFENDANT: She says I'm wrong.

THE COURT: It's her opinion you didn't?

THE DEFENDANT: Right. But she told me herself that

if she hadn't had the information from when I was a kid that she wouldn't have been able to diagnose me. So if she was judging me now, she wouldn't have been able to say I have autism.

THE COURT: Okay.

THE DEFENDANT: So --

THE COURT: Usually mental health diagnoses are based on the entire life, not just on the immediate information. Do you -- have you advised your lawyers that you do not wish to have the autism defense asserted?

THE DEFENDANT: Yes.

THE COURT: And what has been their response?

THE DEFENDANT: They are going to do it anyway.

THE COURT: Well, did they listen to your concerns about it?

THE DEFENDANT: Yes, they listened.

THE COURT: Okay. And did they tell you why they wanted to do it?

THE DEFENDANT: Yes, because they think it would help me.

THE COURT: Okay. Do they appear themselves to believe it?

THE DEFENDANT: Um, yeah, I think they do.

THE COURT: Okay. And they think -- they tell you it will be beneficial to you in your case, correct?

THE DEFENDANT: Correct.

THE COURT: And you mentioned in the letter that the defense is a lie and is fraudulent.

THE DEFENDANT: Right.

THE COURT: Would it also be fair to say it could be just a difference of opinion?

THE DEFENDANT: No, because I don't think -- I think that they are doing this -- the point I was trying to make is that I think -- I don't know how to say this -- I don't really think they believe I have autism.

THE COURT: Okay.

THE DEFENDANT: I think they are just taking whatever they can and using whatever they can, you see what I'm saying? Because they don't have anything else to use.

THE COURT: Well, you mentioned that there is no defense. I think you used the term "I have no real defense."

THE DEFENDANT: Right.

THE COURT: And no defense, by that I mean a defense by the lawyers or the Court. What would be your defense, Mr. Roof? If you could control the defense, what would you want -- what would you want to have said?

THE DEFENDANT: I don't want any defense.

THE COURT: Tell me what you mean by that.

THE DEFENDANT: Okay. If I could -- if I had the choice, what I would do is let the prosecution present their

evidence and that's it.

THE COURT: Well, there are two stages of this, one of them is guilt or innocence and then there is the sentence, correct? You understand there are two proceedings?

THE DEFENDANT: Right.

THE COURT: What do you want Mr. Bruck to do or your counsel to do regarding that first phase? Innocence or guilt?

THE DEFENDANT: Um, you mean what do I want to plead?

THE COURT: Right.

THE DEFENDANT: Guilty.

THE COURT: Well, have you told defense counsel that you wish to plead guilty?

THE DEFENDANT: Yes. I think they -- I think I have to be guilty.

THE COURT: Well, no. The defense -- up to this point the plea is not guilty.

THE DEFENDANT: Oh, I think I have to plead not guilty because it's a death penalty case, right?

THE COURT: Well, regardless of whether you plead guilty or not guilty, Mr. Roof, we have to have a trial regarding the sentencing.

THE DEFENDANT: Right.

THE COURT: Your lawyers, I'm sure, have given you

advice why they believe you should plead not guilty, but that is ultimately your decision, Mr. Roof.

THE DEFENDANT: But I was under the impression that I had to plead not guilty because you can't plead guilty to a death penalty, you see what I'm saying?

THE COURT: You would only plead guilty to the crime. The death penalty would have to be imposed by the jury decision after a trial. There are two phases. So there is no requirement you plead guilty. Your lawyers have given you advice, maybe very good advice, to plead not guilty. They may have very good reasons for that, but it is your decision. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: And it is not uncommon in cases where there is not really a contest about whether the defendant is guilty or not, that he does not plead guilty.

MR. BRUCK: If Your Honor please, we need to note an objection. We think at this point the Court may be invading an area that is -- that only counsel should be discussing.

THE COURT: You may say that, but it's raised by this letter, Mr. Bruck. That's the concern I have.

MR. BRUCK: If you will note our objection.

THE COURT: I will note your objection.

So it is -- so if you controlled your situation, if

you did not have to defer to the advice of your lawyers, what would you want to do?

THE DEFENDANT: Okay. I want -- in the sentencing, I would want the prosecution to present all their evidence and then not present any mitigating evidence.

THE COURT: Well, let me say this, your letter probably accurately describes the law, that your lawyers have the right to offer mitigating evidence that they think is best because that is a strategic decision we allow, the Courts allow defense counsel to make. So that is why I think it's important for them to know what you would prefer.

But you understand if only the Government offered evidence and you offered no mitigation evidence, there would be a high degree of probability that you would have the death penalty imposed? Your lawyers are trying to help you, Mr. Roof. They are trying to marshal a defense for you.

THE DEFENDANT: I get that. But the problem is what is the -- in other words, if the price is that people think I'm autistic, then it's not worth it. You see what I'm saying?

THE COURT: Well, whether people think you are autistic or not, what does that have to do with whether you would get the death penalty? I mean, if in fact -- I have no opinion about this, Mr. Roof, you and I are having the first conversation we've had here, I have no opinion about this --

but if, in fact, your autism experts are right, that your lawyers are right, wouldn't you want the jury to have that information to make the best decision?

THE DEFENDANT: No. No. No.

THE COURT: Why is that?

THE DEFENDANT: Because I don't want them to think I'm autistic.

THE COURT: Well, if they -- would you rather die than be labeled autistic?

THE DEFENDANT: Yes.

THE COURT: And can you explain why that is so?

THE DEFENDANT: Because it's -- I have to be careful what I say -- but it's just not good for me if I'm labeled autistic. That's all.

THE COURT: But I'm not understanding why that would be so.

THE DEFENDANT: If I tell you why, I might get myself in trouble.

THE COURT: Well, I'm not sure I understand that. I need an explanation of why you believe being labeled autistic would get you in trouble. You need to explain that to me, Mr. Roof.

THE DEFENDANT: What I'm saying is if I told you why I don't want to be labeled autistic, it might get me in trouble.

THE COURT: In what way? You are in a lot of trouble right now, Mr. Roof.

THE DEFENDANT: Yeah, I know, but -- I can't say.

THE COURT: Well, I need an explanation because I have to evaluate this issue and I need to understand -- I know --

THE DEFENDANT: If they say I have autism, it's like they are trying to discredit me.

THE COURT: Well, having a diagnosis would discredit you?

THE DEFENDANT: Yes.

THE COURT: In what way? What are you worried about being discredited for?

THE DEFENDANT: That's what I'm saying. I can't talk about it. I can't say.

THE COURT: But I don't understand, and I need your help in understanding. We did this private here so you would not have to be speaking publically about this, Mr. Roof, but you need to help me understand why being labeled autistic would be -- would discredit you.

THE DEFENDANT: I just really don't think it's a good idea for me to say why.

THE COURT: I want to direct you to tell me why because I need to evaluate this in terms of this -- what's been raised here.

THE DEFENDANT: Because if they say -- if -- if people think I have autism, you see what I'm saying? It discredits the reason why I did the crime. You see what I'm saying?

THE COURT: Okay. It makes the -- I've obviously read your writings, the three writings, I have read them. And I take it you don't want to think -- you don't want others to think that you did these things because there was something wrong with you?

THE DEFENDANT: Exactly.

THE COURT: And you are willing to have the case tried before a jury with essentially no defense so people won't think that?

THE DEFENDANT: Yes.

THE COURT: And you are prepared to face the death penalty to avoid anyone thinking that?

THE DEFENDANT: Yes.

THE COURT: Mr. Roof, you might understand that I am troubled -- I'm trying to figure out why being labeled something would be worse than death. Could you explain that to me, being labeled autistic is worse than death?

THE DEFENDANT: Because once you've got that label, there is no point in living anyway. You see what I'm saying?

THE COURT: Well, there are many people with autism who are high-functioning, well-adjusted people. I don't know

if you have it or not, Mr. Roof.

THE DEFENDANT: That is what my lawyers tell me, what you just said.

THE COURT: I'm sorry?

THE DEFENDANT: What you just said is what my lawyers are trying to tell me in order to get me to accept it.

THE COURT: Okay. I mean, there are -- there are just, you know, obviously a number of people who have autism who are highly successful people. I understand one of them has been retained by your attorneys, one of the most renowned experts in the field.

THE DEFENDANT: Yeah. They brought him to talk to me.

THE COURT: Did they? Okay.

THE DEFENDANT: But I didn't talk to him.

THE COURT: I mean, obviously -- how old are you now, sir?

THE DEFENDANT: Twenty-two.

THE COURT: You are 22 years old. You are both young and you don't have any specific training in these areas. Is it possible that the people with training might actually have an insight into something you don't have? They might know something that you don't even know about yourself?

THE DEFENDANT: You mean the experts?

THE COURT: The experts. I mean, is that possible?
THE DEFENDANT: It's possible in theory, but not -- not in this case.
THE COURT: What motivated you to write the prosecutors? I must say, I have been 40 years in this business and I've never heard anybody doing that. What possessed you to do that?
THE DEFENDANT: Okay. My motivation was for them to present the evidence.
THE COURT: You don't want them presented as evidence, you don't want the lawyers -- your lawyers to present the autism defense?
THE DEFENDANT: No. No. No. When I wrote the letter --
THE COURT: You want the prosecutors to be able to use your letter?
THE DEFENDANT: I want the prosecution to present my letter as evidence.
THE COURT: So to defeat any autism mitigation evidence?
THE DEFENDANT: Right.
THE COURT: Because you would rather face the death penalty than be called autistic?
THE DEFENDANT: Right. And that's why I wrote to the prosecution and not to the Court, or to you. You see

what I'm saying?

THE COURT: Sure. You weren't sure I would give it to anybody?

THE DEFENDANT: Right.

THE COURT: So your view of what your lawyers should be doing is you would go through the trial with no defense and no mitigation evidence and then the jury would simply make a decision?

THE DEFENDANT: Right. But I mean, I just have a hard time with the idea that I don't get to make the decisions. You see what I'm saying? I think that they should do whatever I tell them to do.

THE COURT: You know, there is a whole body of law out there on capital cases and about the right of the defendant to control certain defenses. It won't be surprising to you that there is some people who have been tried, who have been charged with capital offenses who actually have mental disorders and they are embarrassed about having those disclosed at trials. You can understand that. So the law has developed that in those areas the defense lawyer, that's called a strategic decision and it's left to the lawyer and not to the client. I mean, that is just what the law is.

So your letter is in that way correct that they can offer it. And what you have now tried to do is undermine

that offering of that evidence by writing the prosecutors and saying that it's all a lie.

THE DEFENDANT: Exactly.

THE COURT: Well, do you want the jury to impose the death penalty?

THE DEFENDANT: Um, I really don't have a preference.

THE COURT: Well, these lawyers are sworn to defend you. Have they been courteous to you?

THE DEFENDANT: Yeah, but I think that they are just doing it so I don't get upset.

THE COURT: You mean they are trying -- they are being nice to keep you from complaining?

THE DEFENDANT: Yeah. And sometimes they just tell me what I want to hear.

THE COURT: Okay. And do they -- are they working hard for you?

THE DEFENDANT: They say they are.

THE COURT: Let me just say, I've seen a lot of the filings, they are working pretty hard, Mr. Roof. They are working a lot harder to keep you alive than you may be willing to have them do, but they are working really hard for you, and they are very devoted to your case. So, you know, I'm -- and I want the jury, this is me, I want a fair trial, and I want the jury to hear all evidence that might be

important to consider before it makes the decision. And if we undermine that evidence by having them not hear whatever mental health evidence there is, which I haven't heard yet either, we are just not allowing the jury to get all the information they need to make a fair decision.

So my concern is to get them -- I understand you don't believe that to be, but if there are people who are experts who think it is potentially important information, don't you think the jury should receive all the information so they can make the best decision?

THE DEFENDANT: Yeah, but like I said in my letter, there were other experts that, as far as I know, they are not going to, um, have testify.

THE COURT: That's not uncommon in these cases. They have a variety of theories and they have the evaluations and then they pick one that makes the most sense.

THE DEFENDANT: That's what I'm saying, they are picking the one that said I had autism.

THE COURT: Because perhaps they believe -- I mean, Mr. Bruck has told you, or others have told you, they believe that defense, haven't they? They didn't think there --

THE DEFENDANT: Yes.

THE COURT: I mean, there could be just an honest disagreement, correct? Between you and your lawyers on this?

THE DEFENDANT: Right.

THE COURT: I mean, so I'm just -- I'm just -- I just, you know, I just want the best information to get to the jury. And even though you might not think it right, don't you think it's good for the jury to hear if other people, who have expertise in this area, don't you think they should hear that evidence -- and believe me, the Government may offer evidence against it -- and then they can have all the information to make the best decision?

THE DEFENDANT: No, I don't think that's a good idea.

THE COURT: Okay. So your preference would be simply to put up no defense. Is there a defense? You are saying that there was no defense which the Court or the lawyers would want you to -- what would be the defense you would assert, Mr. Roof?

THE DEFENDANT: I can't talk about it. I have no defense that anyone would present.

THE COURT: Well, you are entitled to assert your defense. I mean, what would be the defense you would want to assert? If you could control it, what would you want to say?

THE DEFENDANT: I wouldn't be able to say it anyway.

THE COURT: Why is that?

THE DEFENDANT: Because I just can't do it.

THE COURT: I don't understand that response. Why can't you say what the defense is you would like to assert?

Why can't you say it to me?

THE DEFENDANT: Well, I haven't really thought about it.

THE COURT: Well, surely you have thought about what you wrote when you said, "I'm not" -- you say here, "I have no defense that my lawyers would present or that would be acceptable to the Court." What would be the defense that is not acceptable to the Court?

THE DEFENDANT: I can't say.

THE COURT: You don't know or you just don't want to say?

THE DEFENDANT: Well, I mean, both. I would have to think about it. I would have to -- I would have to -- if I was going to -- in other words, if I was going to make my own defense, I would have to think about it.

THE COURT: Well, is there -- do you have a thought about what -- if you don't want the autism defense, is there something you would want them to say instead? I'm not asking for the full defense, but what would you want to say?

THE DEFENDANT: It would be counterproductive for them to say anything. That would just make it worse.

THE COURT: You think the explanation would be worse than -- your real explanation would be worse than any defense, than saying anything at all?

THE DEFENDANT: My -- my idea of a defense -- well,

what -- the defense that I would present would just make it worse. That's what I'm saying.

THE COURT: And how would it -- explain how that would make it worse.

THE DEFENDANT: Because it would aggravate things.

THE COURT: Because?

THE DEFENDANT: I can't say.

THE COURT: Well, let me ask it this way: I've read your jail writings, would it be along the lines what you wrote in jail?

THE DEFENDANT: No, those don't really tell. Nobody was supposed to see that.

THE COURT: How about "The Last Rhodesian," would it be along the lines of what you posted there?

THE DEFENDANT: That's even worse than the jail writings. I mean, it's not the idea, it's just the writing is really bad.

THE COURT: Well, I'm -- one of the important issues I have to evaluate is an issue regarding whether there is another defense that you are not being allowed to present. I need to know that.

You see, Mr. Roof, I'm struggling with you don't like the defense of the lawyers and that I have to evaluate all this. Is there a defense out there that is not being asserted? And I know you don't think I would think much of

that defense, but at least I knew it, to know the general nature of it, so I can evaluate this matter.

THE DEFENDANT: No. There isn't any other defense.

THE COURT: Okay. Mr. Roof, you have been charged with the murder of nine persons resulting in the death of nine persons and the intent to murder three others. Do you feel like that the charges against you -- I'm not asking you if they are true or not -- do you understand that if they were true, that would be wrong to do?

THE DEFENDANT: Yes.

THE COURT: Do you feel like you understand -- when you were communicating with your counsel, do you feel like you understand their position, that you have sort of an understanding of why they want to do what they are doing?

THE DEFENDANT: Yes, I understand completely.

THE COURT: You just don't agree with it, but you understand it?

THE DEFENDANT: Right. I understand.

THE COURT: And you are able to communicate with counsel and y'all are able to talk to each other, correct?

THE DEFENDANT: Correct.

THE COURT: And you understand, when I just talked to you about these proceedings, you, you know, the different phases. You understand what we are doing in these court proceedings? You understand what we are doing, correct?

THE DEFENDANT: Right.

THE COURT: Okay. That's sufficient questioning.

Mr. Bruck, is there any followup you would like to -- anything anybody from your team would like to ask Mr. Roof?

MR. BRUCK: No, sir.

THE COURT: Okay. I'm going to have the marshals remove Mr. Roof and take him back.

Thank you, Mr. Roof.

THE DEFENDANT: Thank you.

(Proceedings heard outside the presence of the defendant.)

THE COURT: Mr. Bruck? Are you going to speak for the defense?

MR. BRUCK: Yes, sir.

THE COURT: Okay. Let's start with the letter then. I'm going to move to the issue of competency after that.

Have you shared with the defendant your defense?

MR. BRUCK: Yes.

THE COURT: And the mitigation experts?

MR. BRUCK: Yes. I should say that we are in the process of having him meet with our experts now, so that process is not completed. We waited until the prosecution evaluation was over to do that, but we have let him know as we came closer to trial in a general way what we were going

to present. We have also shown him every exhibit and told him about every witness, and we have shared with him a very large number of memos, summaries of witness testimony for the defense.

THE COURT: He has shared with you his resistance to a defense -- a mitigation evidence on autism; is that correct?

MR. BRUCK: Yes.

THE COURT: And you have heard him out fully?

MR. BRUCK: Yes.

THE COURT: And you have nonetheless resolved that it is in his best interests to assert that defense; is that correct?

MR. BRUCK: Yes. And I should clarify that we have talked to him much more about autism than about the other mental health aspects of his defense, partly simply because of the scheduling it is, and was until today, our plan for him to meet with our forensic psychiatrist tomorrow morning at 8:30, in which at that meeting she was going to fully explain to him what her anticipated testimony --

THE COURT: What would be the nature of that testimony? Obviously I only have had brief glimpses of the defense. So share with me what the forensic psychiatrist would say.

MR. BRUCK: Her report is not complete, but in a

very general way, it is our expectation that her testimony will be to confirm the diagnosis of autism, to testify that Mr. Roof suffers from a severe and crippling anxiety disorder and suffers from delusions; that is to say he is psychotic in various respects. The -- in other words, he has comorbid mental illnesses. I could go on in greater detail about this, but an overall outline, those are -- that there is also evidence in his history of depression. So I think we are looking at four different diagnostic --

THE COURT: Psychosis, depression, autism, what is the fourth?

MR. BRUCK: Um, severe anxiety.

THE COURT: Okay.

MR. BRUCK: And the psychosis takes the form of nonbizarre delusions. He does not appear to have a thought disorder, and that is why there is nothing at all that is bizarre, or very little --

THE COURT: Well, what exactly is the nature of this psychosis?

MR. BRUCK: Delusions. Delusion is a fixed false belief.

THE COURT: Can you give me an example?

MR. BRUCK: Um, in his own -- yes. His delusions include a whole series of somatic delusions; that is to say fixed false beliefs about his body. These include that he

has a -- that his body is developed more on his left side than his right because of the testosterone in his body has all pooled on the left side. This -- it has been explained to him by both a medical doctor and a neuropsychologist in readily understandable terms that this is impossible because the circulatory system of the body does not allow hormones to reside on one side and not the other. This has no impact whatsoever on his thinking. He continues to adhere to his delusion; however, as he has begun to perceive that we see this as a sign of mental illness, he has become increasingly guarded. And what Your Honor did this morning is more and more what we have encountered, which is he says, "I can't talk about that."

Now, we are hoping that this will wax and wane to some degree, he will find it necessary to disclose these thoughts, because these are a window into what we think is a serious mental illness. So that is one somatic delusion.

He has had a long-standing somatic delusion that his face is malformed and his forehead is unsightly. This is the reason for the bowled haircut. He is afraid that anyone will see his forehead.

To give some examples of this: He was assaulted in the jail last August, and the jail staff took photographs of his face with his hair pulled back so his entire forehead can be seen. He looks perfectly normal except for the cuts and

bruises inflicted by his assailant, but he is extremely upset that he allowed his photograph to be taken of his forehead. He refused to cooperate with the investigation or to press charges against his assailant because of the fact that it would require or allow those photographs, he thinks, to become public, or at least be disseminated. And he became very irate and upset when we indicated that we wished to offer those photographs as part of his case in mitigation.

This -- other somatic delusions involve his belief, which has been quite long-standing, that his hair is falling out and he will soon be bald. This is related to a very mild thyroid disorder, which he actually does have, but to which he has attached irrational significance for quite some time, along the lines of about two years, and medical records that show that he was convinced that he had this serious thyroid disorder.

THE COURT: Mr. Bruck, if you had this information, why have you not made an earlier motion? I mean, are you claiming he was not criminally responsible for what he did?

MR. BRUCK: No.

THE COURT: Are you claiming he's not competent to go to trial? What are you claiming?

MR. BRUCK: In light of the most recent developments, we think that his mental disorder has crossed the line into incompetence to stand trial. We also most

certainly think that he has decision incompetence, that is he lacks the capacity to make self-protective decisions to overrule counsel about the evidence if that were something he could do.

THE COURT: So is it because he disagrees with your mitigation defense he's now incompetent?

MR. BRUCK: Not at all. It's the reasons that he --

THE COURT: Well, he told me he would rather die than be called autistic. Is that a sign of some mental disorder?

MR. BRUCK: In his case, we think it is. Standing alone that is something that someone might, under some circumstances think, although it's rather irrational or self-defeating --

THE COURT: Does it go to his competence? That's my question. I mean, I asked him the direct question, "Would you rather die than be called autistic?" And he said yes, right?

MR. BRUCK: Yes.

THE COURT: Is that a sign of some mental disorder?

MR. BRUCK: Yes, it is. It -- his reason -- he is subject to -- I mean, he has told us over and over again that his greatest fear, his greatest concern is a crippling, he refers to it as embarrassment. He just told us his entire

life is one timeline of embarrassment. He is talking about severe anxiety. This is anxiety so severe that he essentially spent all of the time since he dropped out of high school in the ninth grade in the bedroom of his mother's home with the rarest forays out. He has failed -- his fear -- and I was going to get to this on my list -- you were asking me about mental health symptoms, but he is a person who is really unable to endure the anxiety that comes with social interaction.

THE COURT: But, see, Mr. Bruck, you can understand the Court's skepticism when you have been representing him for months now and suddenly on the eve -- you don't raise this until literally the first day of jury selection. I mean, there is -- at least the Court ought to have some skepticism about that, about the timing of it.

MR. BRUCK: The problem that has arisen is that two days before jury selection he, for the first time, wrote a letter, not to the Court, but to the prosecution, and accused us of all sorts of misconduct and said we should be disbarred. We felt at this point that this was -- it was impossible for us to simply proceed to trial. Prior to that time, we were on a tight rope where we felt that any hope of maintaining an attorney-client relationship depended on the greatest discretion --

THE COURT: I think y'all have -- I mean, he isn't

asking -- he did not ask to fire you. He might have wanted you disbarred, but he did not ask to fire you, he simply doesn't want you to assert a mental health defense. I don't know if he's aware that you also want to talk about depression or psychosis. I mean, he didn't mention it to me. He probably won't be crazy about those defenses, either.

MR. BRUCK: He probably -- he probably won't.

Perhaps I should complete the list. And of the things we have observed -- but the reason, you know, it -- he is a -- he exhibits conflicting traits, some of which is a tendency to submit to, or to give in to anxiety, which we had hoped would allow us enough latitude to present the case we wanted to present.

Something else that has happened that has brought this to a head is that while we waited to inform him of the full breadth and detail of the mental health case so as not to interfere with the Government's evaluation, the Government's evaluator took a completely different tact and became the person who informed him in the greatest detail, and we think in a pejorative way, of what we intended to introduce in his defense. I noticed the Court had some skepticism that Dr. Dietz did this, but we think that he did.

THE COURT: The defendant wouldn't let us videotape the proceeding.

MR. BRUCK: We wanted it recorded, but that is

exactly right.

THE COURT: But whether he did or didn't might be kind of a false repeat here because at some point Mr. Roof was going to learn that you think he has severe mental disorders, something he likely will not appreciate.

MR. BRUCK: Yes. But what happened in Dr. Dietz's evals, he informed the defendant, or so the defendant tells us -- and I believe it's true because there were other indicia of reliability here -- that -- and I quote, "I can't find anything wrong with you." What he did -- now, he was -- he had not completed his evaluation. He had not had the psychological testing that he went in and had Mr. Roof conduct. He had not evaluated and assessed the clinical interview. So that was either a false statement or an irresponsible one if it was true. But he indicated to our client, knowing that after a day and a half that Mr. Roof did not want to be depicted as mentally ill, that he thought Dietz was the champion of this view. And when we saw him immediately after the evaluation, he informed us that Dr. Dietz is my friend. He has formed an alliance with Dr. Dietz.

THE COURT: Certainly they have a common view of the mental health diagnosis apparently.

MR. BRUCK: Dr. Dietz led him to believe that they have a common belief. We don't know.

The problem that that created was that rather than our being able to work with our client, it -- the relationship was blown up by the Government's evaluator.

THE COURT: I'm less persuaded by that.

Let me ask you this: You recognize that if I -- I think you are asking me to send the defendant off about his competency to be evaluated. Is that what you are asking me to do?

MR. BRUCK: Yes, we are.

THE COURT: And you understand that may affect the order of the trial?

MR. BRUCK: That's conceivable. It, um -- I would be surprised if the state court wanted to -- without knowing the results of a federal competency evaluation, to just barge straight ahead and put Mr. Roof on trial while that evaluation is pending. I also don't know quite how we would physically do that while the federal evaluation was taking place or immediately afterwards.

THE COURT: They could simply schedule the trial the moment he returned.

MR. BRUCK: I suppose anything is possible. It would be an unseemly spectacle.

THE COURT: There are no ground rules here. The only reason we went first was because you asked for a speedy trial and the state trial was some months away. Had it

already been scheduled, I wouldn't have set it aside, tried to set it aside, I would have deferred to the State. So this, I'm sure you agree, what you may be asking for may be -- may affect the order of the trial. I have no idea.

MR. BRUCK: You asked me about evidence of delusions, and I had gotten as far as somatic delusions, he has others, and they are directly relevant to the colloquy.

THE COURT: Tell me about that.

MR. BRUCK: The -- what he couldn't tell you about his reasons -- about his reasons, the Court noted, repeatedly said, "I can't tell you. I'll get in trouble if I told you."

THE COURT: I was going to ask you, do you have any idea what that defense he wishes to assert is?

MR. BRUCK: No. The --

THE COURT: I mean, he hasn't said to you, "I want you to say X," and you won't do it? He hasn't raised this alternative defense with you?

MR. BRUCK: Recently he has said he doesn't want us to do anything. There was a time when he had some idea of presenting some sort of -- I should back up. Mr. Roof has a set of beliefs that he -- that stemmed from material that he saw on racist sites on the Internet, which boiled down to -- their essence are that black people are engaged in a violent assault and war to the death against white people, that this is evidenced by black-on-white violent crime. And that the

reason we don't all know about this is that there is a conspiracy to suppress the news of this black-on-white crime. It extends through all U.S. news media except for a handful of racist and white nationalist websites.

He has recently, for example, told my cocounsel, Ms. Stevens, that she should be very afraid because black people are going to burn tires around her neck, as used to happen in South Africa in times of unrest. And he cannot bring himself to why she is not as afraid of this as he is. There were times he thought if he could just convey the danger that white people face to the jury, everything would become clear to everybody, and he would be --

THE COURT: I thought. That's why I made reference to the writings.

MR. BRUCK: Yes, sir.

THE COURT: It would be -- do you understand that what he wants to do, if he could control the situation, would be to justify his actions, try to justify his actions?

MR. BRUCK: Yes. But that gives it too much rational credit. What we are talking about is a paranoid delusional belief system that he thinks is immediately understandable. Once it is sent out to people, that they would get it. The jury would get it, the Court would get it, everybody would get it. And part of this --

THE COURT: Is he asking to assert that defense?

MR. BRUCK: I'm sorry?

THE COURT: Has he asked you to assert that defense?

MR. BRUCK: Some months ago he asked, "Why can't we present evidence of black-on-white crime?" And we consulted with a criminologist --

THE COURT: Found out it was all untrue.

MR. BRUCK: And it's all untrue. But the very idea that there is a higher rate of victimization of white women by black men in rape cases and vice versa, and all of this does not -- racist myths. So there was a time when he thought this could be done. And I haven't heard really any concrete ideas.

THE COURT: Is that what you understood that he didn't want to tell me, that's what he was talking about?

MR. BRUCK: At this point I don't understand. I no longer know what his thinking is. He has become much more guarded about this. His beliefs about the future are that it -- he does not believe he's going to get executed, no matter what sentence is imposed or what court, because he firmly believes that there will be a white nationalist takeover of the United States within roughly six, seven, eight years, and when that happens, he will be pardoned. And he also believes it probable, although not certain, that he will be given a high position, such as the governorship of South Carolina.

THE COURT: Is that one of his delusions?

MR. BRUCK: Yes. The -- we think it is. And it's something again --

THE COURT: How do you know that? Has he shared that with you?

MR. BRUCK: Yes.

THE COURT: He has shared that?

MR. BRUCK: He has told us that early on in representation. I think he has gradually picked up on our skepticism about that. And it tends now to be more in the category of things he can't talk about. "I can't talk about that."

THE COURT: How does all of this affect the crime to which he is alleged to have committed?

MR. BRUCK: Well --

THE COURT: What is the relevance to it?

MR. BRUCK: The relevance is that he appears to have been motivated by -- by a paranoid belief system that -- that explains, although in no sense does it legally justify his what appears to be the irrationality of attacking --

THE COURT: You would wish to assert that in mitigation?

MR. BRUCK: Absolutely, yes. And clearly it is a mitigating factor. He is -- without understanding what is going on inside of this young man's mind, it is the most

natural thing in the world for people to say, This is simply the face of evil. And --

THE COURT: Here is my -- here is what I'm struggling with. I understand his -- his desire not to have certain mitigation evidence offered.

MR. BRUCK: Any.

THE COURT: And I'm not -- I'm going to -- I regard mitigation evidence to be a strategic call by counsel, defense counsel, so that is not an issue here. You have a duty to listen to him, which you tell me you have, and he told me that you have, and you all have an honest disagreement. So that defense will be offered.

Now, he has sought to torpedo that defense by delivering a letter to the prosecutor. Rather than mental illness, it suggests to me pretty shrewd thinking. If he didn't want that defense to be asserted effectively, as you would, another way would be he could testify at trial, which would be his prerogative at some point if he wishes to say that; of course, he may be the worst judge of whether he has that condition, and that is for all the jury to evaluate.

But I haven't -- you know, I need to consider whether it goes to his competency regarding, you know, the competence for trial. Because he has been able to communicate with you and consult with you and understand and assist in that he has, you know, offered his views, which

happen to be different from yours, but -- and he doesn't -- he says I understand the proceedings and I understand rationally their position and mine, I just disagree with them. I have got to figure out why he's not competent. Do you hear what I'm saying? Is that -- and I'm not saying that it doesn't go to mitigate the crime, but does it render him -- you know, at this point is he not capable of assisting -- to communicate with counsel, to offer his views, and to understand the proceedings around him?

MR. BRUCK: If he is incapable of cooperating with counsel, if the decisions that he is making are affected by delusions, by fixed false beliefs, if they are the product of mental illness, and for that reason he is attempting to sabotage his defense, the mere fact that he has figured out how to sabotage his defense doesn't mean that he's competent. It is an illustration of why it is so terrible to try an incompetent defendant.

THE COURT: It's not an IQ test.

MR. BRUCK: Exactly. And it is hard to see what is happening here because this is not a thought disorder. It's a little like it covers such a range of different types of disability, and so do the other mental disorders, including the psychotic symptoms that we think we are seeing. Now, it could be that our expert is wrong about psychosis and delusions and the severity of --

THE COURT: That is what jury trials are about.

MR. BRUCK: I'm sorry?

THE COURT: That is what a jury trial is all about. You have the right to offer the evidence and the Government has a right to contest it, and the jury gets all the information and makes the best judgment it can. That's what we need.

MR. BRUCK: Yes. But we haven't gotten to that point yet. If he is allowed to sabotage his case in the way he wants to do as a result of mental illness would actually, if it didn't successfully prevent the jury from hearing the evidence, it might interfere with the jury's ability to credit what is, in fact, true and that would be --

THE COURT: He's written the letter now. It's a statement by a party. Obviously we don't have the Rules of Evidence, other than some lesser version of 403 during sentencing. We haven't gotten to that issue yet as to whether that statement is -- is admissible against him.

MR. BRUCK: I have to tell you, if that letter were to go into evidence we would all have to withdraw. We would have to have new counsel. I mean, we cannot proceed as his lawyer with a letter or a document or an admission in the hands of the Government that the jury would see that basically accuses his lawyers of --

THE COURT: There are two parts of this letter: One

of them is he rejects the defense and the other part is he attacks the lawyers. You can redact the part attacking the lawyers. It is not really arguably relevant.

MR. BRUCK: We think that letter is evidence, given his actual mental condition of incompetency.

Now, the point I was about to make is that I am not the person to make that determination, and with all respect, I don't think that the Court has the expertise to make it either. He needs an evaluation. We have reached that point.

I could -- I have not yet --

THE COURT: You can imagine my skepticism of the timing. I mean, I understand what happened this weekend preceding that motion; but, you know, I have to add, am I being played? I mean, I think it's a fair question. And I'm not saying necessarily played by you, Mr. Bruck, I mean, is the defendant playing us to disrupt the trial?

MR. BRUCK: The answer to both questions is no. We have thought about the question of competency and have made the judgment all the way along until this point that he had not crossed the line.

THE COURT: But one could -- devil's advocate for a moment -- until he attacked you, you thought he was competent. As soon as he criticized you, he is incompetent. I'm not saying I endorse that, I'm just --

MR. BRUCK: I understand. It wasn't that he

attacked us, it was that, among other things, he has formed an alliance with the prosecution and has decided that Dr. Dietz is his friend. And all of this has made us realize that his anxiety, his -- he also -- I mean, there is so much here -- Doctor -- he really had convinced himself that when Dr. Dietz shared his white nationalist beliefs and that it was all part of -- and he was asking Dr. Dietz about his ancestry, and the answer that Dr. Dietz gave fed into this improbable schema which showed that Dr. Dietz was actually a white nationalist himself. So the sort of paranoid beliefs are all turning into this enormous --

THE COURT: So what do we do if he comes back -- let's just game this out for a moment. I send him off to the Bureau of Prisons and he comes back and he's competent. Where do we go from there?

MR. BRUCK: We do the best we can. At least we will then know -- I mean, there will be a hearing, we will --

THE COURT: The trial may not be in this Court, Mr. Bruck. You understand that?

MR. BRUCK: That's possible.

Now, I have to say that that would stress the defendant enormously. And I would like to tell you why: The reason it would be so distressing for the defendant to be tried in state court is television cameras. They have TV in state court and they don't have TV in Federal Court. The

reason television cameras --

THE COURT: He's going to be -- at some point going to be on TV, just like one day somebody is going to assert a mental health defense. I mean, these things are just inevitable, right?

MR. BRUCK: I'm trying to tell you why -- the one thing we have done right by him is to take steps to increase the likelihood that this case would be tried first in Federal Court. And the reason it mattered to him was that he did not want the television camera trained on his face and his forehead for the public and the world to see. He could not tolerate the anxiety and distress that that causes. He is on a different planet from the rest of us.

And finally it has reached the breaking point, in the aftermath of Dr. Dietz's evaluation, where we had to confront the fact that -- and with the letter that he finally sent, we have had to confront the fact that our efforts to keep him competent, to make him competent, to support and encourage him so that he would be able to tolerate the stress of this trial and he would be able to have a fair trial had not been successful. And that is the answer to the question why now, why not earlier. Had we raised this earlier, we would have been running the risk that we could have made it work if we hadn't, in effect, disclosed all of our doubts about his mental condition early on. So we were

darned if we do and darned if we didn't. And I suppose we are now darned, but this is the situation in which we find ourselves. We are most certainly not playing the Court. And I have to say that Mr. Roof most certainly wasn't. This is the last -- you know, if it were up to him, there would be no discussion of his mental condition in any setting to anybody ever. And he would -- and that would be --

THE COURT: Well, he indicated to me that he -- I asked him, you know, I mean, he wants a trial. He did not say, "I want the death penalty." He did not say that to me. But he would rather get the death penalty than be called autistic.

MR. BRUCK: Yes, sir. And I think it's very important to note that he does not want to be executed. He does not want the death penalty. That is to say he has selected the goal of the representation and it is the same goal that we have been working toward.

There were a couple of other things I should mention. Part of the reason that this has arisen as quite as late in the process as it has, is that over the two-month period in which the Government could have sent in Dr. Dietz to do an eval, they waited until 13 days --

THE COURT: I think you are kind of obsessed with Dr. Dietz. Leave that one alone. His day of reckoning was coming.

MR. BRUCK: Whether he did anything wrong or not, this was an event which delayed --

THE COURT: I understand. But I'm saying to you, this reckoning with the defense counsel's defense and his self perception, I mean, from those -- from those writings, I knew he had contempt for psychiatry, and reading them would know he would be against a mental health defense.

Does he even know you are going to call him psychotic and delusional?

MR. BRUCK: He knows that we -- I mean, we were going to fully lay out the details.

THE COURT: So the answer is he doesn't know yet.

MR. BRUCK: He knows that we have concerns about his mental condition. We have not spelled it out in detail.

The -- I'm trying to review whether there is other --

THE COURT: I take it the reason which you have not done that is client management?

MR. BRUCK: Yes, sir.

THE COURT: And your good faith belief that because of his mental condition, that this approach was necessary to allow the best defense to be asserted that was possible?

MR. BRUCK: I think that is a fair statement, yes.

THE COURT: I asked him, Did it appear that you appeared to believe the defense? And he told me that his

lawyers did appear to credit the defense. And I take it, Mr. Bruck, you are not presuming to author what you would regard as a fraudulent defense?

MR. BRUCK: Absolutely not.

THE COURT: You believe there is merit to this defense?

MR. BRUCK: Yes.

THE COURT: This mitigation evidence?

MR. BRUCK: Yes.

THE COURT: And you would not offer it if you did not?

MR. BRUCK: That's correct.

THE COURT: So your motion is what?

MR. BRUCK: Our motion is that on grounds of a reasonable, constant belief that the client may be incompetent, that he be committed to the Bureau of Prisons for an evaluation of his competency to stand trial.

I --

THE COURT: You know, there is a state -- I just want to say to you there is a state trial set in January. He may be returned and found competent by then.

MR. BRUCK: We realize that.

THE COURT: Okay. Anything further?

MR. BRUCK: I have not completed my listing of all the --

THE COURT: Psychiatric --

MR. BRUCK: -- of all the indicia and evidence. I could do this in writing, I just want to be absolutely sure.

THE COURT: You go ahead. I didn't mean to cut you off.

MR. BRUCK: You didn't cut me off, we were just engaged in dialogue.

THE COURT: I want to save one more tree.

MR. BRUCK: The -- I haven't talked very much about his predefense medical history referred to the fact that the somatic goes way back.

THE COURT: You've got to remember, that goes to you knew this all along and never raised it. You see what I'm saying? This earlier information, I understand it somewhat builds on itself, but I'm just saying to you, you have known about all of this for a protracted period of time and never within the deadlines filed a motion relating to this.

MR. BRUCK: We did not -- I mean, I can explain why this was -- every -- all the evidence of mental illness does not suggest incompetency.

THE COURT: That's absolutely true.

MR. BRUCK: And it needs to rise to a certain level.

THE COURT: So what precisely tipped the bounds?

MR. BRUCK: We think his alliance with the

prosecution, his belief that we were lying to him and committing fraud, that we should have -- that we should be disbarred, all of this -- his -- and coming with that a -- a belief that -- or our perception that we no longer could count on his cooperation or could have his cooperation in his defense; that he, in effect, was adversary.

THE COURT: How much cooperation do you need? You are already launching into an area that you don't need him.

MR. BRUCK: Well, for example, if, for reasons having to do with mental illness and mental disability, he sets out to sabotage his defense over and over again, or even as much as he's already done, that is a fairly good example of a person who cannot assist his counsel.

THE COURT: Or he simply disagrees.

MR. BRUCK: It could be. That's the differential diagnosis; and, you know, none of us --

THE COURT: I had anticipated -- I've told you this -- I had anticipated that he was going to rebel against your defense. I mean, I didn't know how it was going to manifest itself. I can't say I would have guessed it through a letter to the prosecutor, but I wouldn't have been surprised if he stood up in the proceeding, or when I had the colloquy if he wished to testify, and he say, Yes, I would like to take the stand, I wouldn't be surprised that he was going to voice some disagreement.

And I think you are not really surprised. You've had more encounters than I have. And I have been limited to these writings, but he has never kept any secret that he has complete contempt for psychiatry or any diagnosis that he didn't do it out of a principle, it was the principle decision, that's what he wants to assert.

MR. BRUCK: I don't think it can be --

THE COURT: Rationally stated.

MR. BRUCK: I don't think it can be that rationally stated. I know that's the way it appears.

THE COURT: The writing appears to project a person who is proud of what he did.

MR. BRUCK: I'm not sure that that accurately describes how he feels about it now. He is -- there were also, glimmering through your dialogue with him, some sort of interesting clues. He said -- you asked him did he want to -- how the defense has tracked the jailhouse writing, and he said --

THE COURT: No.

MR. BRUCK: "No, that was terrible." And well, what about the online? "No, that was awful, too." This has to do with fixations on things that have nothing to do with anything that makes sense. The reason those writings were terrible is not the ideas expressed in them, but the most minute concerns about a misspelling here and sort of -- he

has -- he has fixations on the most trivial, and I would have to say irrational concerns. And they peek out as they did during that colloquy.

If you have not had the benefit of my experience trying to work with this young man and working with him for quite a long time, you would have no reason to have realized what that unexpected response portrayed. At the same time he now knows that the more he talks, the crazier he sounds to people; and therefore, we get a lot of, "I can't talk."

THE COURT: We could send him to the Bureau of Prisons and he could refuse to talk to the psychiatrist.

MR. BRUCK: I think he may be okay because it's the Government. So we'll see. But the -- I just think it would be an enormous leap at this point, and an unwise one. And in the end the -- in the end it really would not serve anybody's interests, including the community and all of the people that want this case to be tried right the first time. When we are dealing with a mental disorder or a mentally-inflicted defendant, it's always hard, and this illustrates that.

And Ms. Gannett has just pointed me to *Indiana vs. Edwards*, which makes the point that, and I quote: "Mental illness is itself not a unitary concept. It can vary in degree. It can vary over time. It interferes with an individual's functioning at different times in different ways."

This is complicated, and it varies over time. There were times when our relationship was less fraught than it is now. There were times when the issue of competency receded far into the background. But it has come -- it has come forward now and we -- you know, I knew when we raised it that you were going to have exactly the question, Well, you know, it's a little late now, isn't it? And, you know, we had to respond to that. But I've explained why we have -- why we have this delay we have up until now and why we felt that it would be our responsibility, not only to our client, but to the Court if we had not raised the issue. The -- I have been trying to briefly summarize the history. This has to do, some of this we knew recently, some of it we've known for a long while.

I should say that Mr. Roof has succeeded in interfering with our ability for a while to gather information from his family because his distress about being labeled as mentally ill. Eventually we were able to work through that. It took time. And then we began to gather the new evidence, the -- the information about his facial or his dimorphic delusions about his face. This turns out to be much older than we thought. When he was in middle school, his mother now tells us that -- and that he -- she used to have -- he used to tell her to speed up the car so the person in the next car wouldn't pull up alongside and be able to see

his face.

We also heard from peers that he used to wear a hoodie to disguise his face. He began to self-medicate at age 14 and 15 with all sorts of drugs, mostly seemed to allay anxiety. Others have said about him that he would hear voices when he smoked marijuana. We've heard from experts on schizophrenia, that is a symptom which is consistent with the the early stages. We have to deal with the fact that we are dealing with a young man who is at the stage where people who are going to develop schizophrenia most often begin to exhibit more fully --

THE COURT: Do you have an expert who says he's schizophrenic?

MR. BRUCK: No. We have an expert who says time will tell. There is reason to believe --

THE COURT: Obviously that would be evaluated at the time of any competency exam.

How do you feel about -- what is your recommendation regarding this letter? Obviously I'm not going to publically release it. What is your view in regard to the prosecutors having it since it was mailed to them?

MR. BRUCK: Well, we think nothing should be done with the letter until the issue of competency is resolved. We have -- for the reasons I've explained, the letter would create an insurmountable conflict with counsel, which it

would destroy our ability with the Court and with the jury and --

THE COURT: How about redacting or removing, only raising the issues about the defense? I mean, I don't know why his feelings about you would be relevant in the case, frankly. I mean, I don't know why that would be relevant at sentencing. So what about just the information about that he considers the defense a lie?

MR. BRUCK: Well, we don't think the letter can be assessed without the craziness part of it. And calling us liars and manipulators --

THE COURT: I'm not going to keep it away from the evaluator, I'm just saying at some point we are going to have to grapple with this issue. I don't need to do it yet, but he has written a letter to the party opponent --

MR. BRUCK: Yes.

THE COURT: -- attacking his lawyers' defense.

MR. BRUCK: Ms. Stevens points out if you look at this letter carefully, there is no paragraph in it that doesn't connect the lawyers with the defense. So it is not redactable. I think we should really leave this for another day. I don't think --

THE COURT: I think you are right.

MR. BRUCK: I'm not prepared to brief it now.

The -- but in any event, we --

THE COURT: I would be deeply reluctant to remove counsel after the exhaustive work that has been done. That would be, in the experience acquired by doing that, that would be, I think, very contrary to the defendant's interests. That doesn't mean that if he has made statements which are potentially relevant to the sentencing that they somehow should be excluded because of that.

MR. BRUCK: I would be surprised if the prosecution doesn't have gracious plenty along these lines from their own evaluation.

THE COURT: I would think that that is probably so. I'm not sure how much they can use, frankly, in some of -- I'm not sure that it's usable in that way. But this might be, by taking it outside that evaluation, I'm talking about the 1202 evaluation, it's only a limited use, right to rebut. So I'm not sure if they could use it. You might suggest that in some ways his writings inferentially do the same thing, they reject any mental health defense and it's all nonsense. I think that is for another day.

I'm going to think about it. I'm not sure sitting here I know what I'm going to do. I want to think about it and consider all the standards.

MR. BRUCK: There are a couple of points I would like to put on the record.

THE COURT: Go right ahead. I'm sorry.

MR. BRUCK: The record should reflect that Mr. Roof wore a jail jumpsuit today to court, rather than dressing out into his civilian clothes. This is after untold hours of discussions with us and an enormous amount of effort to provide clothing that meets his -- that is satisfactory. And this is another one of those seemingly trivial issues that occupies, seems to us, almost the majority of his concern about these proceedings is how the -- how his sweaters feel, the texture and color and how whether his pants touch his shoes and exactly how they feel around his waist. There is a great deal of autistic symptomatology we are told by our experts. But after all of that, apparently the stress left him, we can only surmise, unable to function and deal with the simple act of changing into his court clothes today because he appeared, and he thought, for jury selection in a jail jumpsuit.

Again, I think I put on the record previously the experience we had when he became so distressed over whether or not he had done something wrong by turning his chair 180 degrees to face the Court as I had done, rather than 90 degrees to sit sideways.

THE COURT: Well, see, that may be an argument in favor of the autism mitigation evidence, it may have nothing to do with whether he's competent or not. It may have nothing to do -- I mean, it's just -- it may merely buttress

your defense. I'm just struggling to whether this goes to competence or not.

MR. BRUCK: I think the critical word on all of that is may. This is a very complex psychiatric picture with evidence of delusions, evidence of severe anxiety.

THE COURT: But you have known this from -- you've known these delusions, you've known these neuroses, you've known these obsessions for months and have never made an objection, never made a motion regarding competence.

MR. BRUCK: I've explained --

THE COURT: I understand. But I'm struggling and I've got to work through it in my mind. And the only change that differs is this letter, and is that evidence of competence or maybe evidence of a very shrewd move to further his own desire that the defense not be used.

MR. BRUCK: Excuse me.

(Pause in proceedings.)

MR. BRUCK: If the Court -- not to do more briefing than is required -- but if the Court does not come to, on its own, to the view that we are urging, would you receive a brief on a very short timeline?

THE COURT: 9 AM tomorrow morning.

MR. BRUCK: Okay. We'll have it.

THE COURT: Anything further?

MR. BRUCK: No. Thank you, Your Honor. I

appreciate your time.

THE COURT: Thank you.

***** ***** *****

I certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.

---------------------------

Amy C. Diaz, RPR, CRR November 7, 2016

S/ Amy Diaz