IN THE DISTRICT COURT OF THE UNITED STATES
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff | ) | 2:15-CR-472 |
| VS | ) | Charleston, South Carolina November 2, 2016 |
| DYLANN ROOF, Defendant | ) | |

TRANSCRIPT OF SEALED EX PARTE HEARING
BEFORE THE HONORABLE RICHARD M. GERGEL,
UNITED STATES DISTRICT JUDGE

APPEARANCES: MR. DAVID I. BRUCK, ESQ.
Virginia Capital Case Clearinghouse
Washington and Lee School of Law
Lexington, Virginia 24450

MS. KIMBERLY STEVENS, ESQ.
1070-1 Tunnel Road
Suite 215
Asheville, North Carolina 28805

Court Reporter: Amy C. Diaz, RPR, CRR
P.O. Box 835
Charleston, SC 29402

THE COURT: We are gathered here at the request of defense counsel for an ex parte discussion regarding a matter, presumably about the defendant.

I'll be glad to hear from you, Mr. Bruck.

MR. BRUCK: Thank you, Your Honor. I appreciate your making this time for us.

As I indicated in my message to the Court, we do not have a current emergency, but there was enough happening that was potentially significant that I didn't think we should just keep it to ourselves and let you be surprised next week if things develop further.

Essentially, the client -- by way of background, I think I mentioned last time we were on the record we have a diagnosis of autism spectrum disorder, a diagnosis of anxiety disorder, and our experts are both convinced that our client has some symptoms of psychosis. There is a good deal of mental, according to our read of the situation, of substantial mental impairment that is affecting his behavior; and most certainly, we think his interaction with us. This has been going on for a long time from the very beginning of the representation, but as the case comes up to trial and as we have finalized our assessment and disclosed to the client --

THE COURT: Your trial plan.

MR. BRUCK: -- in more detail our trial plan, things

have become more acute. The precipitating -- he this week became very oppositional with us. He has told us, in fact he has shown us or read for us, a letter that he intends to send to the prosecution, basically complaining that we have mistreated him and our --

THE COURT: On what basis?

MR. BRUCK: Well, I maybe should back up and tell you the precipitating event was the evaluation with Dr. Dietz. And --

THE COURT: Remind me. That's the fellow who --

MR. BRUCK: That is the prosecution's --

THE COURT: 12.2, right.

MR. BRUCK: Who is a nationally renowned --

THE COURT: I know who he is. But didn't use the guy you were worried about.

MR. BRUCK: He's the other guy. There are two. And this is the other one.

Dr. Dietz's evaluation -- and we are having of course to reconstruct it through our client, so consider the source -- but there are some things that are unmistakably true. He informed us that he had gone through with our client not only the Government's exhibits that have been -- of which we have been given notice, photographs and so forth.

THE COURT: He went through with the defendant?

MR. BRUCK: With the client, yes, with the

defendant. But he also went through the exhibits and photographs that we have provided to the Government in accordance with the Court's order to disclose on October 17th, our initial exhibit list. And as Dr. Dietz told Mr. Roof such things as that he interpreted the fact that we had provided the Government with a series of photographs that we took during an inspection of the defendant's car, and he theorized for Mr. Roof that what we are trying to do is to depict him as a homeless crazy person. That was Dr. Dietz's interpretation of our choice of photographs.

THE COURT: I'll be honest with you, now, I don't know Dr. Dietz, but it almost sounds like your client's interpretation of what Dr. Dietz was trying to accomplish.

MR. BRUCK: We'll never know.

THE COURT: Because we didn't --

MR. BRUCK: One of the things that our client is --

THE COURT: You can thank Mr. Roof for that. I was with you on videotaping it.

MR. BRUCK: But that is -- he told us that towards the end of the evaluation Dr. Dietz informed him, and I quote, "I cannot find anything wrong with you."

THE COURT: Right. I can tell you that Dr. Dietz didn't say that. I mean, so -- but that's okay. Because what is important is not what Dr. Dietz said, but your

client's perception of what Dr. Dietz --

MR. BRUCK: I have to say, based on my familiarity with Dr. Dietz's work, I am not at all confident that he did not say that, but --

THE COURT: Fair enough.

MR. BRUCK: -- but the important thing is that Mr. Roof is 100 percent certain that Dr. Dietz has given him a clean bill of health. Dr. Dietz did inform him, and we know this because there is no other possible source, that we intended to call an expert who would testify about living with autism. He is -- one of our experts is a person with autism, a very --

THE COURT: I remember that, yes.

MR. BRUCK: -- celebrated, widely-published author and expert teacher and consultant. And we had not informed our client of a number of these things precisely because we didn't want it to interfere with or affect the Government's evaluation and his willingness to cooperate with the Government's evaluation. We thought that the more information we disclosed ahead of the Government's evaluation, the less likelihood that our client would cooperate with the Government.

THE COURT: If he didn't cooperate, potentially blow up the defense.

MR. BRUCK: Create problems for everybody.

As a result, Dr. Dietz was the person to unveil much of what we intend to do in our case in mitigation.

THE COURT: Is your client aware that you intend to have this autism spectrum defense and there is something wrong with him?

MR. BRUCK: He is now. I mean, he knew that -- there have been discussions about this over several months.

THE COURT: Well, you know, Mr. Bruck, anybody can read his various writings to know how much he holds in contempt this approach to evaluating himself, okay?

MR. BRUCK: Right.

THE COURT: That he personally believes there is nothing wrong with himself, and that the world is at fault, not himself. So I have wondered how he was going to sit there and listen to a defense which he likely has complete contempt for.

And here is the other great question: What happens when -- you asked me to colloquy him about whether he's going to testify or not?

MR. BRUCK: He -- that -- I think there is a very deceptive picture of this man's condition that comes from his writings. He is like a precocious ten-year-old child. He is in court paralyzed with anxiety. He will not testify. He will not want to testify. He is afraid to look up during the proceedings.

When we were in court to discuss the trial schedule on June 17th, when the proceedings were over, he asked me what the prosecutor looked like. And I said, "Well, you were right there." He said, "I didn't turn my head to look at Mr. Richardson during those proceedings." He was following them with great care because he was very upset that I did not answer your questions as quickly as Mr. Richardson did about my ability to be ready. This is autism. It is all over. He is a geyser of autistic symptoms, and it is masked and was largely for a long time. It was masked for us by the fact that he is verbally adept. He is like a precocious 10-year-old.

THE COURT: Is he verbally adept orally or only in writing?

MR. BRUCK: He can speak fairly fluently. He has repetitive patterns, and some of them are -- you can detect them. I just did a word search for the phrase, "You know what I'm saying?" In his confession to the FBI he used it 38 times. So he has patterns of speech which are repetitive in a way that is a sort of soft side of his autism spectrum disorder. But he speaks fluently.

THE COURT: I take it you are here because you are worried that your client may be rebelling against the defense your team has sought to advance?

MR. BRUCK: Yes. And in a way that -- I mean,

rebelling isn't -- he is forming an alliance in his own mind with the prosecution. I think that would be the way to describe it.

THE COURT: Does he view himself as being the person they are describing? As an intentional killer who set out on a racial mission to create a crazy war? That is their view.

MR. BRUCK: Well, I mean, you have his writings. I don't -- he is -- his fundamental motivation -- it's so hard to convey. We have -- it would misstate what he's like for me to say -- answer that question yes.

What he -- when he explains why he doesn't want an autism spectrum disorder case in mitigation or his anxiety disorder or his psychosis -- and he has these schematic delusions about his body and that one half of his body is developed more than the other because all of the hormones have pooled on one side. This is documented for four or five years. He -- the reason he is upset about it is that it will be put on his Wikipedia page. It's not a question of a political agenda, of a belief that, you know, history will look at him different, it is that concrete, his Wikipedia page will have something about autism and that is embarrassing; not undermining, not politically adverse, embarrassing.

His greatest fear that he keeps repeating over and over again is that he will have blushing attacks in the

courtroom. And when I say, Well, what is so bad about that? He can't answer it, but it is obvious that it is self-evidently intolerable that he would have what are, in fact, very severe blushing attacks in court.

So what he -- what he may be doing is sending a letter to the prosecution which will accuse us of misconduct, which may also accuse our autism specialist of being coached by us, or told what her opinions should be by us. Whether he would then ask for some relief from the Court, I have no idea.

I just want the Court to know that ever since Dr. Dietz' evaluation he has had a very substantial mood change, and is intermittently oppositional with us, defiant. Then he goes back to being rather childlike. Then he goes back to a long discussion of the clothes that he wants to wear. He has this preoccupation with these physical sensations of how things feel on his skin and his waist and whether his pants touch his shoes. So that is the client we are dealing with. And I simply --

THE COURT: Let me say this: I have wondered from the first reading of these various writings of his whether he would ever tolerate a defense you would assert. I have wondered in my own mind that the obvious defense would be fundamentally reprehensible to him. And that he did this, in his own words -- this is in writing at least --

intentionally, willfully. He sheds no tear for anybody. He's proud of what he did. And this defense suggests there is something wrong with him, okay?

MR. BRUCK: Yes.

THE COURT: And whether Dr. Dietz was going to tell him that, Mr. Bruck, he was going to hear it in the courtroom.

MR. BRUCK: No, he was going going to hear it from us.

THE COURT: So I wouldn't fixate on Dietz because this crisis was coming from the moment you personally first read those documents.

MR. BRUCK: Well --

THE COURT: And you knew the defense you and your team would mount, okay?

MR. BRUCK: Yes. Now, I don't mean to suggest that we are surprised by this. This is a stage of the case for which we have been planning and thinking and seeking expert assistance for many months. We knew that when the evaluation was done we were going to have to discuss with him what our expert's findings were. We knew that he would be very upset about it --

THE COURT: That might be an understatement.

MR. BRUCK: -- for the reasons that I have described. This is a person with such severe anxiety and

social phobia, and it's -- we always knew this would be difficult to tolerate. What -- what we are concerned about now, other than -- is not only that he may, you know -- I think if he writes a letter to the Government or even if he writes a letter to the Court, that may not amount to that much in terms -- I don't know that he would do very much after that in terms of, you know, attempting to fire us, or I certainly don't see that he has the capacity to be defiant in court or to in some way try to disrupt the proceedings. We do think that he could -- the basic conundrum is that the very facts about his mental condition that are mitigating may have already impeded and may continue to impede the ability -- his ability to have those facts considered.

THE COURT: You are not the first defense lawyer in a case where, with a client with issues, for the client having no insight of those issues, to be deeply offended by the defense. I would dare say you've had other clients yourself --

MR. BRUCK: Yes, I have.

THE COURT: -- who have had that very same situation. This may be the most complex of those you've ever confronted.

MR. BRUCK: It most certainly is, and the hardest to figure out, and the one that has taken me the longest.

There is -- as I said when Ms. Stevens and I were

here with you last time -- there is nothing about him that is intuitive. What you see is not what you get with this young man, and that's vague, but it is something for us all to keep in mind.

THE COURT: Well, here is sort of the scenario. At some point he writes the Government. I would presume the Government would promptly file something with me containing that document. When I have situations arise where a defendant is unhappy with his or her lawyer, I hold a hearing in camera. I send the prosecutor out and I have a hearing, and I allow the defendant to voice concerns, and I hear from counsel, and I make a decision about whether I should remove counsel, if that's his request. You know, he is supposed to be the master of his case, right? It's a little complicated, but that generally is the concept, one is the master of his case. So he could attempt to fire you and try to self-represent. You tell me his social anxiety would probably prevent him from doing that, and I would have to make an evaluation whether he has the competency to self-represent.

MR. BRUCK: I think his *Faretta* right has probably about run its course, it's probably too late.

THE COURT: Even if it hadn't, whether he would have the personal capacity to self-represent.

So, you know, I appreciate you mentioning it. I'm

hardly surprised. I frankly thought that you hadn't fully disclosed all that to him because of him blowing up, hoping to kind of do it in small pieces. And I wasn't going to be surprised in the middle of trial that he starts raising cane with you about why are these people saying I'm crazy, right? Because I know who your experts are, okay? I know what their defense is, and that is completely contrary to his view, which is that psychiatry is a bunch of bunk, right? And it undermines what he thinks are important values in civilization. Having a psychiatric breakdown and analyze people and making brave men seem weak. I mean, I sort of took that all from his own writings. Yeah. You kind of walked right into it, Mr. Bruck.

MR. BRUCK: Well, yes. I mean, you know, if we have to sort all of this out in the course of a blowup over our representation, that will be the time to do it. But I really do want to emphasize that we are quite convinced that what are being described as his views are better understood as his symptoms. I mean, they are views. They are things he believes.

THE COURT: I hear you. I know exactly what you are saying. And at one point I might have to address that issue; but, you know, I'm sure client management is a lot of things you teach young lawyers in handling capital cases. It's one of the most challenging parts of this work.

MR. BRUCK: We mentioned the last time we were here, thinking about accommodations for his issues, and I said then, or Ms. Stevens said then, we weren't ready to ask you for anything yet, and we are still not, because it remains to be seen how he does on the first day of jury selection.

THE COURT: May I just ask -- and I don't, by voicing this, don't seek to suggest to you one way or the other on this -- but if, in fact, his presence in court causes extreme anxiety, doesn't -- is it really necessary for him to sit there for two-and-a-half weeks during individual voir dire?

MR. BRUCK: Well, as with the filling out of the questionnaires, we felt that the jurors are going to take it a lot more seriously if they see there is a real person there.

THE COURT: They are going to see him during trial.

MR. BRUCK: Yes.

THE COURT: I'm just saying to you that this process is going to be very tedious, right? I mean, that is going to be --

MR. BRUCK: Right.

THE COURT: And it's going to be as if he's not in the room, right? We are going to be asking questions that, as if he is not sitting there in terms of the juror's ability

to respond, you know, attitudes on different things. So I just wonder, you know, whether you might, in light of your client management problems now, whether having him there, sitting there, which is not required, is something that, you know, on balance now that you are having this. I suggest it's something you consider.

MR. BRUCK: I can assure you that we are considering it. And we -- and we certainly considered whether or not to tell him that we needed him to be in the courtroom for the questionnaires. On balance, we think that was a very good decision on our part that --

THE COURT: They've all looked at him now, sat there for several hours looking at him. They are going to have him during, you know, the case in chief, and then the sentencing phase. So they are going to get plenty of looking at him. Either way is fine with me. I don't have a dog in it. I'm just saying that if you have a lot of social anxiety, you are now essentially doubling his court time by doing this.

MR. BRUCK: Well --

MS. STEVENS: If I may briefly? He is anxious whether he's in the jail right now or whether he's in the courtroom with us. And we do believe that it will affect the quality of the jurors' responses to your questioning on the death penalty and some of their -- the candor and the honesty of the responses when he's in the room.

THE COURT: Listen, my view is if y'all think it's a good thing, suits me fine. I just raise it because -- I mean, I could observe his stress of just being there for routine matters.

MS. STEVENS: We may change that position.

MR. BRUCK: There is also -- part of the reason we think it was very good to have him there before is that he is beginning to have some sense of what it is to be in court, and that he may be more able to tolerate and manage his anxiety with practice. So, but I --

THE COURT: Whatever y'all do suits me fine.

MR. BRUCK: I completely hear what you are saying.

THE COURT: It's going to be pretty tedious.

MS. STEVENS: As you pointed out before, Your Honor, it is the most structured part of the trial and allows him to acclimate somewhat in a structured way. That may not be our experience when we get in there, but --

THE COURT: We'll see.

MS. STEVENS: More predictable.

THE COURT: It's simpler. Nobody -- I'm the only one really talking, right? But I want you to think about this, Mr. Bruck, you know, we -- part of our procedure is I send the prospective juror out, are there any followup questions? You start talking about something that kind of goes to your defense. You may have client management

problems of your client being offended by what you are asking me to ask the jurors.

MR. BRUCK: Well, these are things that have to be broached if we are going to have a trial, and --

THE COURT: So maybe a little anecdote, having a little, you know, exposure as a way to immunize him from it. I'm just saying to you, you know, I don't want it interfering with your ability --

MR. BRUCK: I appreciate that.

THE COURT: -- to have followup questions. Because he may say, "Why do you need to ask that question," or, "Why do you want that?" So just whatever it is suits me. I'm kind of agnostic about it. I just observe it as a -- and I get the idea that the more the pool sees him, they may, you know, view him as a person, right? That's the thinking.

MR. BRUCK: Well, because we have been listing all the reasons to have him in court, please don't think that we are not giving very serious consideration, obviously, to leave him at the jail or to doing a little of each.

THE COURT: You are free -- he can come one afternoon and not come back a couple of days. Whatever he wants to do. I think it is a non-issue in my view. He's free to come and go as he wishes.

MR. BRUCK: Well, thank you.

The -- when talking about accommodations, we may

find that what he needs is less time in court, and I don't mean for jury selection, I mean period, the shorter days, a day off for Friday, we'll see. And we are not asking for anything now, but we do hope -- and I'll admit that if that is what he needs, we would be more than happy to ask for it, because we are working at a pace ourselves that exceeds our capacity, and are exhausted and the trial hasn't already even started, and --

THE COURT: It doesn't show in your work.

MR. BRUCK: Well, it will, I'm sure. We are dragging.

But in any event, it -- and part of the -- you know, part of what had been so stressful for us is the amount of time and work and consultation and thought that goes into dealing with this quite impaired client. It's not -- these are things that are obviously invisible to the Court, but they take up most of our time. And what you see above the surface is --

THE COURT: You know I have not second guessed your time.

MR. BRUCK: I know.

THE COURT: I have not second guessed it.

MR. BRUCK: I appreciate that.

But in any event, it -- these are -- you know, I sort of wanted the Court to have some sense of that, you

know, if we find that he needs more time to unwind, to be by himself, to not be looked at -- which is really his obsession, people looking at him -- there will be testimony about, you know -- I think I've mentioned to you about his delusions about his face is deformed and that he can't bear for people to look at his face or to see photographs of his face. He was not able to allow the neuropsychologist to take, you know --

THE COURT: Let's stop you right there. If he -- if you have a witness testifying to that, to those what you just shared with me, it would hardly surprise me that you would have that --

MR. BRUCK: Yes.

THE COURT: I would think he would have a great deal of difficulty processing that sitting in the courtroom with everybody turning and looking at him.

MR. BRUCK: He may.

THE COURT: I'm just saying those are deeply personal things they are saying.

MR. BRUCK: His mother is going to say this. It's going to be very hard for him.

THE COURT: I mean, it just -- I mean, this is why I said get off the Dietz thing. This thing is coming. You are going to have to deal with it. You are going to have the people who he knows best, who I presume are going to come in

and talk about him and his behaviors, and that he did this because there is something wrong with him as opposed to something right about that, okay?

MR. BRUCK: Yes.

THE COURT: That seems very different from his moral order, as he's written it, right? How things ought to be organized in the world. So, you know, I've got a feeling we are going to be revisiting this throughout the trial. And I don't fault your defense, I can understand it, the defense he would want would be not very effective. I did it and I'm proud of it, right?

MR. BRUCK: Yes. He may also say, just to sort of fill out what his -- what may be coming, he may say that he wants the death penalty; but if he says that, it's not in the way that it sounds. He does not want the death penalty in State Court, he only wants the death penalty, if he decides he does, and it varies from day-to-day, in Federal Court. Because he thinks the only important issue is what prison he's held in when these proceedings are over. He doesn't really seem to grasp that he will be executed if he gets the death penalty. He believes that there will be some change which will result in his being released and possibly given a high position of authority like Governor of South Carolina. And this is why, you know, we think we have a whole complexity of psychological issues. But this --

THE COURT: You are the expert on this. You know that many executions occur because the client directs the dismissal of appeals, right?

MR. BRUCK: Yes.

THE COURT: That is a well-known phenomena.

MR. BRUCK: Yes. He has no intention of waiving his appeals because this will give enough time for the world to turn upside down. And he has -- he has been informed that it took Timothy McVeigh six years from his crime to his execution. And like most information, this then becomes a fixed immovable belief that he is guaranteed six years minimum no matter what happens.

THE COURT: Didn't McVeigh request --

MR. BRUCK: Only in the end. Probably shortened the process by about a year. But so it's like this is how everything works in his mind. It's a six-year fixed period of time minimum, maybe longer, which will allow all kinds of miraculous events to occur in the meantime.

So this is all in the background of the things that he and, you know, thinks about Dr. Dietz and about the Government, the prosecutors, who he now, I think, more and more feels are really his lawyers, and the people on his side, and so forth.

THE COURT: Is he free to mail letters? I mean, would they, from the detention center if he asked to mail a

letter, would they mail it to the prosecutor?

MR. BRUCK: They would mail it to the prosecutor, yes, or he would give it to one of the jail officers. The jail officer who sees -- he refers to Dr. Dietz as his friend constantly.

THE COURT: He does.

MR. BRUCK: He calls him "my friend."

THE COURT: Dr. Dietz.

MS. STEVENS: Our client.

MR. BRUCK: Our client calls Dr. Dietz "my friend". His other friend -- this is what I mean about he comes across like a ten-year-old.

MS. STEVENS: He came in and said, "He's my friend and you two are not."

MR. BRUCK: And the other person that he continually insists is his friend is Lisa Bloodworth, the analyst at the sheriff's department who testified.

THE COURT: I remember her.

MR. BRUCK: So he -- if he decides to send a letter to the Government, I think what he will do is give it to Ms. Bloodworth.

THE COURT: We can assure her that she will forward it to the Government.

MR. BRUCK: Well, but she would not do anything to harm him, he says, because she is nice to him, she brings him

things, she smiles at him. This is the level of comprehension. It --

THE COURT: Just to clarify, do you mean the Officer Bloodworth who I believe is a CO, not the analyst?

MR. BRUCK: I'm sorry. Ms. Bloodworth is not an analyst, she is an officer. Lisa Bloodworth who testified at the suppression hearing. His way of evaluating whether people are friends or not, other than this wrinkle, is whether they smile. He is a person who -- I mean, the best way of describing it is that other people are a language that he neither understands nor speaks. That is autism and that is what we are seeing.

THE COURT: You have a right to mount your defense until you are removed, you know. And if he objects, I'll have a hearing and determine what we do about that.

MR. BRUCK: Right.

THE COURT: You may resolve at some point for some of this testimony he need not be in the courtroom.

MR. BRUCK: Right.

THE COURT: You have a right to do that. I would have a hearing before we did it, but it may be -- you know, if he's agreeable not to be present, that may be another option. You know, you believe it's a meritorious defense the jury should hear, and if that is, in fact, so then we want to make sure the jury hears it, right? I mean --

MR. BRUCK: Yes. Well, I appreciate that. And that's another thing we have thought about whether he would be able to tolerate things if he wasn't there; on the other hand, that carries a cost.

THE COURT: Yeah. I had -- I had a defendant who had a great deal of anxiety being in court, and every morning and every day after lunch I brought him into the courtroom -- he was in my cell downstairs, he watched it on TV. He could handle that, he just couldn't handle being in the courtroom. And I would say, you are welcome to come back in at any time. He was making comments. If you could just not make comments, I'll let you back in. And for about eight days I did it twice a day during the trial. He never wanted to come in. We can do that. I mean, and his lawyer mounted as good a defense as he possibly could have, but better than the one that the client wanted, okay? He was convicted, but I'm just saying to you, I just have -- I can see a conflict with you offering his mother to say there is something wrong with him, right?

MR. BRUCK: Yes.

MS. STEVENS: I think one thing I observed the week of the 26th sitting with him, the predictable days, the predictable time that it took for each session we were doing, the shorter days, and the two-and-a-half day week, I think was a really good thing. Not that we can continue on that.

THE COURT: We can't do that.

MS. STEVENS: But the --

THE COURT: Jurors' lives.

MS. STEVENS: It's the predictability of the break you have mentioned that we would take, those things are helpful.

THE COURT: Just to remind y'all, we start hopefully at 9:00 in the morning. We take a break in an hour and a half. We come back after about a 20-minute break. We come back for an hour and a half, an hour and a half for lunch. I try to be as predictable as I can. My jurors need to know. And so there will be -- I will try to maintain a pretty consistent regularity that ought to make him feel like he is kind of in the groove in terms of what the day is like. I can't do two-and-a-half day weeks. I can't do half a day trials. We are tying jurors up for enough of their lives. We just can't do it.

But let's sort of feel, you know, I think this -- we have got to see how the jurors react to what they can tolerate, right? I mean, you have been through a number of these cases. They are pretty emotional experiences for the jury, right?

MR. BRUCK: This one sure will be.

THE COURT: So we'll just have to pace it. I don't want to prejudge it. I watch my jury. You know, you guys

have a client, the Government has a client, my client is the jury, okay? I want a fair trial and I want my jurors to be in a state of mind that they can render a fair and just decision. So I'm going to watch out for them.

MR. BRUCK: Okay. Well, thank you for hearing us.

There are a couple of housekeeping issues. We got the response about the possibility of a feed to the jury room, that that is something that you don't think is practical.

THE COURT: Correct.

MR. BRUCK: We -- in the nature of -- I mean, maybe it just plain is totally impossible.

THE COURT: We've explored it. Drop it. It's through the server, security, can't be done.

MR. BRUCK: The wrinkle is because there is so much public interest in this case and such a mob that will be in the courtroom, the normal ability to have people that are helping the defense see what is going on.

THE COURT: Between the overflow room and the courtroom, your people should be able to monitor what's going on. I know they would rather be -- by the way, I got y'all this room, the sort of work room.

MR. BRUCK: We appreciate that.

THE COURT: I got that for y'all. And now, you know, you want to plug into my server, we are not doing that;

and, I mean, the AO would have, like -- Administrative Office would have a heart attack if I did that.

MS. STEVENS: That room is wonderful. Thank you.

THE COURT: Your people will have to go into the overflow room. There are other issues in terms of I've not let the state prosecutors be on the front row, I'll put them in the back. I didn't want them cowering over the jury. There are things we've tried to do to balance these interests. I do have a lot of victims. You know, you are accused of killing nine people, you get lots of victims, right? Can't complain too much about the number of victims here. And we don't have a lot of slots. And I have fought hard to preserve as many public slots as possible.

And to the extent your defense team is in line early, they will be in the primary courtroom. I mean, they have a right to wait in line with everybody else, and they have a right to be in the overflow room. And it should -- that should work out fine. And you are getting daily transcripts. So another thing I have allowed, okay?

MR. BRUCK: I appreciate that, as well.

MS. STEVENS: Daily transcripts are wonderful for trial.

THE COURT: Anything else as far as mechanics that we need to get covered?

MR. BRUCK: Well, thank you very much for making

this time for us.

THE COURT: Glad to do it. Appreciate your efforts.

***** ***** *****

I certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.

---------------------------

Amy C. Diaz, RPR, CRR November 15, 2016

S/ Amy Diaz