```
                   IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF SOUTH CAROLINA
                           CHARLESTON DIVISION


UNITED STATES OF AMERICA          :
                                  :
         vs.                      :
                                  :
DYLANN STORM ROOF                 :      2:15 – CR – 472
```

Ex Parte conference in the above matter held Wednesday, November 16, 2016, commencing at 12:30 a.m., before the Hon. Richard M. Gergel, in chambers, United States Courthouse, 83 Meeting St., Charleston, South Carolina, 29401.

APPEARED ON BEHALF OF THE DEFENSE:

DAVID I. BRUCK, ESQ., Washington & Lee School of Law, Lexington, VA.

KIMBERLY C. STEVENS, ESQ., 1070-1 Tunnel Rd., Asheville, NC.

SARAH S. GANNETT, ESQ., 850 W. Adams St., Phoenix, AZ.

```
               REPORTED BY DEBRA L. POTOCKI, RMR, RDR, CRR
            Official Court Reporter for the U.S. District Court
                              P.O. Box 835
                          Charleston, SC  29402
                             843/723-2208
```

1          THE COURT: Okay. Folks, Mr. Bruck, let me raise a
2     question which I ask as a neutral and not as an advocate,
3     okay, but it's a fair question. Has the defendant's vehement
4     opposition to the mental health defense caused you to
5     reconsider the strategy, in light of your client's unequivocal
6     opposition and apparent intent to disrupt the presentation of
7     such evidence.
8          MR. BRUCK: No. We don't think -- I mean we do not
9     think that he is -- has the capacity to make that decision
10    rationally. We think his vehement opposition is related to
11    his mental disabilities. And so it's not, you know -- We
12    really do.
13         THE COURT: Well, one thing I'm going to ask y'all to
14    do, and I need it -- another issue, I'm sure you have a brief
15    sitting right there -- who controls the mental health defense?
16    I've been looking for cases about mitigation in capital cases
17    about who controls it, and I have not found anything directly
18    on point. There's a Law Review article, University of
19    Michigan, but other than that, I can't find any case on point.
20    I certainly -- there are different issues, but I've never -- I
21    certainly -- 2255s where the lawyer deferred to the client,
22    I've seen those cases, but I haven't found one where, in the
23    face of the opposition from the client, the lawyer nonetheless
24    went forward and insisted on that mitigation.
25         MR. BRUCK: Well, there will be no cases where the

1  strategy is successful, because there will be no appeal from
2  it.  So you're not going to find cases where --
3              THE COURT:  How about cases where later that issue
4  was addressed?  I can't find it.
5              MR. BRUCK:  I mean, it's not a plausible
6  postconviction claim that the lawyer should have done nothing,
7  and the client would have been better off.
8              THE COURT:  Well, the client might claim you asserted
9  something contrary to my interests, and it was ineffective
10 assistance of counsel.  So I could imagine.  It's hard to
11 imagine any issue that hasn't been litigated in capital
12 litigation, but that seems to be one I haven't seen raised.
13             MR. BRUCK:  Well, I should say -- of course we have
14 briefed the issue of who controls which decision, and I think
15 the evidence we place before the Court --
16             THE COURT:  I can't remember, when did that happen?
17             MR. BRUCK:  About a week ago?
18             MS. GANNETT:  The weekend before this past one.
19             MR. BRUCK:  Just before the 7th.
20             MS. GANNETT:  Right after the letter was --
21             THE COURT:  Okay.  Then don't worry about briefing
22 that.  I'm just concerned, I mean, the client has certain
23 unquestioned authority under the ABA standards.  He can change
24 his -- he can do a plea, whatever he wants.
25             MR. BRUCK:  That's right.

1         THE COURT: He can testify. He can get on the stand
2    and say what's in the letter. Right?
3         MR. BRUCK: Yes.
4         THE COURT: He can do that. I would anticipate he
5    would do that. You might differ on that, because of social
6    anxiety, but I think he could well get on the stand and do
7    that, and that would be part of what the jury would hear. He
8    has a right to that. And in the face of that, you know,
9    that's why I raised with you, without trying to advocate one
10   position or the other, that, you know, it's -- have you, you
11   know, even if you have the authority, is it, under these
12   extraordinary circumstances, a good idea?
13        MR. BRUCK: The alternative is worse. And we are
14   also -- I mean, there's no disentangling this from the
15   client's capacity to stand trial, because we do not think that
16   he is going to simply have the capacity to do the sorts of
17   things you're talking about.
18        THE COURT: I don't want to get into that, because
19   that's a matter we're going to discuss Monday.
20        MR. BRUCK: Well, but all I can tell you is as we
21   project further into what is likely to happen in this trial,
22   we don't have reason to believe that the best course would be
23   to give up his only sentencing defense, so no. We are
24   constantly looking at everything. Is the question are we
25   thinking about it? Yes. Is the question have we come to a

1    different decision?  No.

2         THE COURT:  I mean, he says, in Dr. Ballenger's

3    report he says that he would continue his efforts to undermine

4    your effort, your -- he would continue his own activities to

5    undermine your efforts to assert that defense.  And he only

6    offers one specific act which concerned me, when he said he

7    would stab you.  That's, I'm sure, noted by everybody.  This

8    has a way of getting one's attention.  But one could only

9    imagine what he might do.  Maybe the next letter's to the Post

10   and Courier, you know, who knows.  Perish the thought of who

11   he could send it to or what he could say; stand up in the

12   middle of a public hearing and say.

13      I just, you know, you've previously stated to me that you

14   thought his social anxiety would prevent that.  I'm not so

15   sure.  I wouldn't go to the bank on that one, Mr. Bruck.

16        MR. BRUCK:  Well, he tells us, I mean, he thinks it

17   will.  Now, maybe it won't.

18        THE COURT:  He was -- listen, you watched him

19   interact with me.

20        MR. BRUCK:  That was with a sealed courtroom and --

21        THE COURT:  Back to everybody, but I brought him

22   right there and he interacted with me.

23        MR. BRUCK:  I mean, he says that he doesn't think he

24   can do many of these things with the Government in the room,

25   let alone the public and the victims.

1        THE COURT: Which raises the question about
2   self-representation, right? He'd be the center of everything.
3        MR. BRUCK: Yes.
4        THE COURT: So he'd have to resolve -- I mean, I
5   would have to question him on his willingness to be the center
6   of attention, because that's exactly what he would be.
7        MR. BRUCK: When he says -- you said, well, what do
8   you want to do at your trial, and he says, nothing, that means
9   more than met the eye. He is saying, as we understand it, and
10  this is from really trying to go down deep with him about
11  this, that he really wants to do nothing. Not that he doesn't
12  want to present any evidence, which he may not, or that he
13  doesn't want to present any argument, he wants to not have to
14  speak. He is afraid. And he doesn't want to do anything. It
15  is as though he wishes he could disappear.
16       THE COURT: He doesn't want you, on his behalf, to
17  speak.
18       MR. BRUCK: That's also true. But --
19       THE COURT: And, you know, you chalk it up to one
20  reason, and Dr. Ballenger offers, in the report, another
21  alternative explanation, and we need to explore all that.
22  That's part of this hearing. I'm going to invite him to speak
23  at his competency hearing, it's his right to speak and not to
24  speak, and I will advise him of that. I'm sure you will also
25  advise it's his constitutional right to do that. And he can

1    do it without waiving his right against self-incrimination.
2    So he, you know, I will let him do it, we have had obviously
3    the benefit of this prior encounter in which, frankly, some of
4    these same issues were discussed that would overlap here.
5        Now, and that moves us to the next issue, Mr. Bruck, is I
6    have just got to address this issue of what he wants to do
7    regarding his plea status.  Because he has said to us on the
8    record that he wanted to plead guilty.  I wasn't going to
9    pursue it right then.  I told you the other day that I was
10   going to give you a chance to counsel him.  But if I determine
11   he's competent, that's the next issue I just have got to
12   address this issue with him.  And if he says no, I'm happy
13   with my plea status, that's fine.  But if he says to me, no, I
14   want to plead guilty, that's exactly what I want to do, yeah,
15   I've talked to my lawyer and that's exactly what I want to do,
16   well, obviously that's not how you take a plea, right?  I
17   mean, there's a very elaborate process I have to go through,
18   and it would be particularly in a case with 33 counts, right?
19   But I would have to do that.  And so my intention is to do
20   that, if I determine that he's competent, that will be -- I
21   will send the Government out of the room, and I will then
22   address that with him.  Okay?  So you need --
23            MR. BRUCK:  Yes.  We have been aware of that and we
24   have been acting accordingly.
25            THE COURT:  And I'm going to confirm with him that he

1     has talked to y'all, that he has been told the up side and
2     down side of his options, and that he has thoroughly
3     considered them, and that it's entirely his decision, and then
4     he'll let us know, okay?
5              MR. BRUCK:  Yes.
6              MS. STEVENS:  Your Honor, we have advised him of
7     that, and it's our opinion right now that he might need time,
8     after this hearing, to calm down a bit before he is questioned
9     on other substantive issues.  He is quite worked up at the
10    moment.
11             THE COURT:  Well, I understand that, and let me
12    evaluate that when I talk to him, okay?
13             MS. STEVENS:  Yes, sir.
14             THE COURT:  And one of the things I'm -- if he says
15    to me, I need some time to think about it, I'm all for that.
16    Okay?  But here is my concern.  In the first arraignment, at
17    the arraignment, Mr. Bruck said he wanted to plead guilty.  I
18    never noticed, I never saw the transcript, I wasn't aware of
19    that, it just -- something I wasn't aware of.  I read it
20    recently.  So then I asked him about it.  And he said to me,
21    when it came to my attention, yes, I want to plead guilty, and
22    he misstated the standard.  He said my lawyer -- forget
23    whether the lawyer told him or not, that was his understanding
24    of his options.  He needs to be aware what his options are,
25    and that he needs to make an informed, knowing, intelligent

1   decision.  And I just think that's an important part.  And,
2   you know, we've questioned whether the mitigation defense is a
3   fundamental or strategic call; there is no question the plea
4   is a fundamental right.
5               MS. STEVENS:  Correct.
6               MR. BRUCK:  We have covered that, and at the end of
7   our last conversation about it, his position was not the one
8   that he expressed about wishing to plead guilty.  Now, that,
9   for reasons that are about to be gone into, who knows what
10  it's going to be next week, but I did want you to know that we
11  were mindful of the Court's request to clarify things with
12  him.
13              THE COURT:  And again, that's one of those things I
14  am a complete neutral, I don't have any dog in this, I've just
15  got to get it clarified.
16      Finally, I am concerned about security issues, and
17  specifically security issues regarding y'all with your client.
18  Okay?  He's told us things and then he does things after he
19  tells us.  So let us be forewarned.  I'm going to keep him in
20  leg irons and handcuffs during the competency hearing.  I'm
21  not going to -- I've talked to my marshals; they are
22  concerned.
23      I've got to tell you, Mr. Bruck, we mostly keep our
24  criminal defendants restrained in things not in front of the
25  jury.  That is very common for us.  In fact, the fact that he

1       was not restrained the other day was unusual in our practice.

2            So I think that's a prudent thing to do.  I've got to --

3       my marshals feel it's prudent.  Also, at the end of our

4       meeting I'm going to have one of our marshals come up and chat

5       with y'all about security at your table, about what you have

6       out and available.  That would be a no no, right?

7       (indicating)  You may have had that discussion before in

8       y'all's experiences.  I've had a couple defense lawyers having

9       to be given this discussion.

10               MR. BRUCK:  I have to say that I appreciate

11      everything the Court has said, I certainly understand the

12      marshal's perspective.  We are not afraid of our client

13      physically, period, no matter what he says.  It is not a real

14      issue.  It is -- and, you know, I hope -- I understand that

15      the Court is going to be conservative in making judgments

16      about this or being cautious, but we really hope that we can

17      assume whatever risk there is, because we think it is

18      nonexistent.  He is trying to get attention.  He's like --

19               THE COURT:  Well, it worked.  It worked.  And he's

20      not trying to get attention for attention's sake, Mr. Bruck,

21      in every fiber of his body he opposes your defense.  Now,

22      whether that's prudent or wise or good or in his interest or

23      not in his interests, I'm not commenting.  I'm just telling

24      you that he's exercising the limited options he has to

25      overturn what he believes is a wrong decision on your part.

1    And he doesn't have a lot of options.  And among those options

2    is to disrupt the Court proceeding in some way or to assault

3    his lawyer.  And I frankly, as much as you have a confidence

4    in him, you would not have predicted some of his behavior so

5    far, and I'm telling you he -- I'm going to assume when he

6    tells me something, that it's true.

7              MR. BRUCK:  Something else I should say, for what

8    it's worth, is that he has narrowed this threat, such as it

9    is, I don't take it seriously for anybody, but he has made

10   absolutely clear that he would never try to stab girls, which

11   is -- by which he means all the lawyers in the case except for

12   me.

13             THE COURT:  That's not that much of a comfort for me.

14   I'm glad that he has taken that view.  But, Mr. Bruck, let's

15   just be realistic.  This is a man who stands accused of

16   walking into a church and killing nine people.  And he told

17   people before he did it, that's what he was going to do.

18   That's alleged.  Okay?  So when he tells a psychiatrist that

19   he's going to stab you, I'm going to kind of assume that

20   that's not hyperbole, though most of the time it would be

21   hyperbole, and it hopefully is hyperbole.

22             MS. STEVENS:  Your Honor, in the last hearing I did

23   hand Mr. Roof a pen.  I did ask the marshal permission first.

24   He had his legal papers on the table.

25             THE COURT:  By the way, they will not grant the

1     permission this time.
2             MS. STEVENS:  And I just wanted the Court to know
3     that I did signal them and say is this okay, we gave him a
4     pen.
5             THE COURT:  We did not have that concern before.
6             MS. STEVENS:  Right.  Nor did we at that time.
7             MR. BRUCK:  All I can say --
8             THE COURT:  And we do have ways to give little
9     pencils, we have ways in which they can have writing
10    implements that are not weapons, potential weapons.
11            MS. STEVENS:  He really was actively looking at his
12    papers and making notes before the Court brought him up there,
13    so --
14            THE COURT:  I'm fine.  And listen, we would continue,
15    we just are going to not be a potential weapon, right?  And
16    you're going to receive instructions about where y'all leave
17    your pens and where you put things that could be a potential
18    weapon.  And just be cautious, there's no harm in it.  The
19    harm is if he actually acts out.
20            MR. BRUCK:  Well, we've told you how we feel; I
21    appreciate the Court's concern.
22            THE COURT:  Okay.  Any other matters y'all need to
23    address with me now?
24            MR. BRUCK:  No, sir.
25            THE COURT:  Okay.  Well, I will enter some orders

1  today that will kind of keep all these deadlines straight for
2  everybody, and we will see you on Monday.
3          MR. BRUCK:  Very well.  Thank you.
4
5      (Conference concluded at 12:47 p.m.)

```
 1                    REPORTER'S CERTIFICATION

 2

 3          I, Debra L. Potocki, RMR, RDR, CRR, Official Court

 4   Reporter for the United States District Court for the District

 5   of South Carolina, hereby certify that the foregoing is a true

 6   and correct transcript of the stenographically recorded above

 7   proceedings.

 8

 9

10
     S/Debra L. Potocki
11   _____

12   Debra L. Potocki, RMR, RDR, CRR
```