IN THE DISTRICT COURT OF THE UNITED STATES
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

UNITED STATES OF AMERICA, ) 2:15-cr-00472-RMG
)
Plaintiff, )
)
VS )
) Charleston,
DYLANN STORM ROOF, ) South Carolina
) November 22, 2016
Defendant. ) Volume II

TRANSCRIPT OF COMPETENCY HEARING
BEFORE THE HONORABLE RICHARD M. GERGEL,
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff: JULIUS NESS RICHARDSON
Assistant U.S. Attorney
U.S. Attorney's Office
1441 Main Street, Suite 500
Columbia, South Carolina 29201

MARY J. HAHN
Assistant U.S. Attorney
U.S. Department of Justice
601 D Street NW, Room 5200
Washington, DC 20003

NATHAN STUART WILLIAMS
Assistant U.S. Attorney
U.S. Attorney's Office
P.O. Box 876
Charleston, South Carolina

RICHARD E. BURNS
Assistant U.S. Attorney
U.S. Department of Justice
1331 F Street NW, Suite 625
Washington, DC 20530

STEPHEN CURRAN
Assistant U.S. Attorney
U.S. Department of Justice
601 D Street NW, Room 5808
Washington, DC 20004

For the Defendant

SARAH S. GANNETT
Assistant Federal Public Defender
Arizona Federal Public Defender's Office
850 West Adams Street, Suite 201
Phoenix, Arizona 85007

DAVID I. BRUCK, ESQ.
Virginia Capital Case Clearinghouse
Washington and Lee School of Law
Lexington, Virginia 24450

EMILY PAAVOLA, ESQ.
Justice 360
900 Elmwood Avenue, Suite 101
Columbia, South Carolina 29201

KIMBERLY C. STEVENS, ESQ.
1070-1 Tunnel Road, Suite 10-215
Asheville, North Carolina 28805

* * *

Court Reporter:

Amy C. Diaz, RPR, CRR
P.O. Box 835
Charleston, South Carolina 29402

Proceedings recorded by mechanical shorthand, transcript produced by computer-aided transcription

## INDEX TO EXAMINATIONS


| WITNESS | PAGE |
|---|---|
| DONNA SCHWARTZ MADDOX | |
| Direct Examination by Ms. Stevens | 17 |
| Cross-Examination by Mr. Richardson | 109 |
| Redirect Examination by Ms. Stevens | 138 |
| LAURA CARPENTER | |
| Direct Examination by Ms. Gannett | 147 |
| Cross-Examination by Mr. Richardson | 182 |
| Redirect Examination by Mr. Bruck | 198 |
| WILLIAM JOSEPH STEJSKAL | |
| Direct Examination by MR. BRUCK: | 199 |
| Cross-Examination by Mr. Burns | 248 |
| DYLANN ROOF | |
| Examination by the Court | 257 |


## EXHIBITS


| DEFENDANT'S NUMBER | REC'D |
|---|---|
| 9 | 5 |
| 11 | 244 |
| 12 | 10 |
| 14 | 13 |
| 15 | 13 |
| 16 | 21 |
| 17 | 30 |
| 18 | 256 |
| 19 | 61 |
| 20 | 65 |
| 21 | 156 |
| 22 | 200 |
| 23 | 256 |

THE COURT: As we ended yesterday, there was some -- I wanted to make sure that all of the exhibits the -- which the defense had intended to offer and which were not objected to by the Government had been admitted. What's the status of that, Mr. Bruck?

MR. BRUCK: I think we are ready to move those in.

THE COURT: Okay.

MR. BRUCK: And so move.

THE COURT: What numbers are those, sir?

MR. BRUCK: I think the only outstanding objection, if I'm not mistaken, was --

THE COURT: I keep up with everything that is in, so tell me the ones you are moving in so I can make note of those.

MR. BRUCK: Oh, um . . .

THE COURT: Do you need help?

MR. BRUCK: I think I do. Maybe I should approach.

THE COURT: Ms. Ravenel is the keeper of all such matters.

THE CLERK: All are in except Number 6. The Government objected to Number 6. And I think we didn't move Number 9 in if you wanted Number 9 in.

MR. BRUCK: Number 6 is which?

THE CLERK: I don't have 6 because it wasn't in.

MR. BRUCK: 6 was the Hiers document. We -- in the

crush of everything we had to be doing tonight -- last night, have not found the substitute document. We will take care of that during the day today.

THE COURT: How about Number 9?

MR. BRUCK: Number 9 is simply the documents that the defense provided to Dr. Ballenger, and we simply --

THE COURT: I thought that was the disk.

MR. BRUCK: The disk?

THE COURT: I thought that was 10?

THE CLERK: They had the number switched, and that's why we need to get that straight.

MR. BRUCK: Okay.

THE COURT: There is not a 9.

MR. BRUCK: Excuse me. Doctor 9 -- Exhibit 9 was the -- the second of two sets of jail records, and these are --

THE COURT: Stop for a second. Is there any objection?

MR. RICHARDSON: None.

THE COURT: Defendant's 9 is admitted without objection.

(Thereupon, Defendant's Exhibit 9 introduced into evidence.)

MR. BRUCK: Thank you.

Exhibit 10 is simply the set of materials that the

defense provided to Dr. Ballenger, and also included one video file --

THE COURT: Correct.

MR. BRUCK: -- that the Government provided.

THE COURT: And I admitted it only for the purpose of documents that Dr. Ballenger received.

MR. BRUCK: So --

THE COURT: It's admitted for that purpose only.

MR. BRUCK: So we so move.

THE COURT: I think we've already admitted that, have we not, Ms. Ravenel?

THE CLERK: Yes, sir, Number 10, yes, sir.

MR. BRUCK: So I think we are taken care of.

In that connection, while I'm on that subject, we intend to offer, or we now offer Defendant's 11. Which is another thumb drive containing three video files. Now, there is a little bit of duplication. We are doing it this way for the Court's convenience. The three video files include the one video file from a visit with the defendant's mother, which was on Defendant's 10, and which was offered primarily to document the issue about the fixation of clothing. The other two video files we have just received. They depict a visit from the defendant's mother and father just this past Saturday. And we received it yesterday, and I was viewing it at 4:00 this morning. So this is the quickest --

THE COURT: Has the defense seen it -- I mean has the Government seen it?

MR. BRUCK: We just this morning provided the file to the Government.

THE COURT: Why don't you withhold it, and over today, why don't you have --

MR. RICHARDSON: We are trying to look at it. We do generally object to those, Your Honor. We don't think they are, you know, necessary or pertinent here unless he's going to tie it to ultimately the two questions that are asked. If he's got an expert that is going to tie those to these questions, then I think it's worthwhile. But just as a general matter --

THE COURT: Here is what we are going to do: We are not going to rule on Number 11 at this point, but, Mr. Bruck, hold that in your pocket, and then to the extent you have a witness, let's deal with it in the context of that sort of testimony. Okay?

MR. BRUCK: Very well. Thank you.

A few matters just to let the Court know what we are going to do and a couple of things we need to put on the record. We worked with the Government last night to see how much we could streamline the evidence today.

THE COURT: Yes.

MR. BRUCK: And as I think the Court is aware from

some affidavits that we sent you last night, we have had some success in that Dr. Loftin will testify by affidavit. We do not have to do a phone --

THE COURT: Let me get this. Affidavit agreements, let me get this.

MR. BRUCK: And I think the affidavit will be introduced through Dr. Wagner's testimony.

THE COURT: I don't believe I've seen that affidavit. Is that correct? I don't think y'all -- I haven't seen it. I earlier got Dr. Carpenter, and then last night I received Robinson and Edens. Is that correct?

MR. BRUCK: Dr. Loftin is extremely short.

THE COURT: Okay. Is there a Government objection to receiving Dr. Loftin's testimony by affidavit?

MR. RICHARDSON: There are no objections to Dr. Loftin being received by affidavit. We think that the Court can evaluate that. We don't accept it on its face as being true.

THE COURT: I do not interpret when reading this that you are admitting the truthfulness of it, but the question is are you willing to waive your right to cross-examination?

MR. RICHARDSON: Yes, Your Honor, we are willing to waive it in light of where we are.

THE COURT: Okay. Do we have that Loftin affidavit

because I want to mark it. While you are doing that, let's go to the next one.

MR. BRUCK: Yes. We are going to be short --

THE COURT: Thank you, Ms. Stevens.

Ms. Ravenel, and that will be Number 12?

THE CLERK: Yes, sir.

THE COURT: Defense 12. Is there any objection to Defendant's Exhibit 12?

MR. RICHARDSON: I don't believe so, Your Honor. We've had quite a few of these versions going back and forth. If I might just have a moment to have counsel ensure that we've got the right one.

THE COURT: Okay. Why don't we move on to the next one. We'll come back to that.

MR. BRUCK: Well, while we are doing that, with respect to Dr. Edens, the -- Dr. Edens can be available by telephone later today, but what we propose to do, and I think the Government has agreed to this, is to offer his quite detailed affidavit as our direct examination, and then if the Government decides after evaluating the state of the record a little later today that they wish to cross-examine him, we will tender him by telephone for cross-examination.

THE COURT: What's the Government's view?

MR. RICHARDSON: We are okay with that, Your Honor. We think we'll know a lot more. We've got Dr. Maddox here

this morning. I anticipate when we finish with her testimony, we'll have a better ability to evaluate whether there is any necessity of doing anything more than formally admitting the affidavit, and understanding that that doesn't mean that we agree with it, but that we accept that as his testimony.

THE COURT: Okay. So at this point, is there any objection to Dr. Edens' affidavit?

MR. RICHARDSON: No objection to the affidavit, reserving the right to cross-examine him.

THE COURT: No problem. I'm just trying to keep this record straight.

MR. RICHARDSON: As are we.

THE COURT: Okay. So have you looked -- has somebody looked at Dr. Loftin's?

MR. RICHARDSON: We have, and we have no objection to Defendant's 12.

THE COURT: Defendant's 12 is admitted without objection.

(Thereupon, Defendant's Exhibit 12 introduced into evidence.)

THE COURT: Dr. Edens is Defendant's 13; is that correct?

MR. BRUCK: Yes, sir.

THE COURT: Is there any objection, with the caveat?

MR. RICHARDSON: I haven't looked at it yet, but assuming the same one we looked at, if it was filed, no objection to the one that was filed.

THE COURT: Very good. Mr. Bruck, that is -- the one filed is the one being submitted?

MR. BRUCK: Yes. I think it might be helpful to have a paper copy for Ms. Ravenel to mark it.

THE COURT: Don't worry. We are not going to go any further without -- if you don't give her a piece of paper.

MR. BRUCK: Right. The only remaining questions, and this is -- we intend to call Dr. Carpenter with the hope to shorten her testimony by being able to rely on her affidavit and only developing evidence that is not contained in her affidavit. The Government has expressed that they are not comfortable with our offering the affidavit since she will be a live witness. We propose that as a way of streamlining the testimony, but there is an objection.

THE COURT: Tell me. I've read the affidavit.

MR. RICHARDSON: Your Honor, I think we want her to testify.

THE COURT: That would be fine. Okay. Yes. Hand it to Ms. Ravenel.

THE CLERK: Let me ask you about this Exhibit Number 12.

MR. BRUCK: If I may clarify the point with

Dr. Carpenter -- Your Honor, if I may clarify the -- the narrow disagreement about Dr. Carpenter, we are going to call her. She is going to testify as a live witness and be cross-examined. All we are proposing is to streamline her testimony by putting in the affidavit and shortening --

THE COURT: I've read her affidavit. I really don't need to have it repeated to me.

MR. BRUCK: Okay.

THE COURT: I'll leave it to you, Mr. Richardson. It's your prerogative to do it. You are not going to be prevented from cross-examining her, and I will give you wide berth on it.

MR. RICHARDSON: If that is your preference, we are completely fine.

THE COURT: You know, I read what you -- despite what y'all believe, I actually read what you all give me, and I have read all of these. I read this morning the two affidavits that came in. And, you know, folks, this is not foreign stuff to me. I'm very familiar. As a lawyer, I litigated extensively in this area. I'm just -- I'm very familiar with the science here. Okay. So Dr. Carpenter.

MR. BRUCK: So that will be an exhibit.

THE COURT: Okay. We need that as Defendant's 14.

MR. BRUCK: The --

THE COURT: That is accepted with the right of the

Government to cross.

(Thereupon, Defendant's Exhibit 14 introduced into evidence.)

MR. BRUCK: Very well.

THE COURT: Hand it to Ms. Ravenel.

How about Mr. Robinson?

MR. BRUCK: That would be Defendant's 15. It's my understanding there is no objection.

MR. RICHARDSON: We don't object, obviously with the same caveats that we made previously.

THE COURT: Will Mr. Robinson be testifying?

MR. RICHARDSON: No, Your Honor.

THE COURT: So we are accepting -- so Defendant's 15 is admitted without objection.

(Thereupon, Defendant's Exhibit 15 introduced into evidence.)

THE COURT: Any others?

MR. BRUCK: No.

THE COURT: Okay.

MR. BRUCK: So that you know where we are going this morning, we propose to call Dr. Maddox. She will be our most lengthy witness. After that, we will be calling Dr. Carpenter and Dr. Stejskal, followed by Mr. O'Brien, and the status of Dr. Edens, as you know, we -- is uncertain, may or may not be tendered for cross-examination. That's the

Government's decision. The -- I regret that we spent all of yesterday on a single witness, and I appreciate the at times frustration that the Court expressed. I would like to say that a competency evaluation requires obviously a reliable and accurate assessment of the defendant's mental condition, including diagnosis. And an assessment of mental condition and diagnosis are only as good as the history on which the expert relies.

THE COURT: Yeah, Mr. Bruck. Let me explain this: I tell my juries when they are evaluating credibility that they should consider, among other factors, whether the matter challenged is significant or insignificant. And it just seemed to me at times you were questioning about things that did not seem particularly significant. I have over the years reviewed I don't know how many competency reports, in the hundreds. They appear -- they are almost -- not all, but the the majority are from the Bureau of Prisons.

Dr. Ballenger's assessment was so vastly superior to what I normally get -- I know you were critical. You thought I should send him to the Bureau of Prisons. Just in terms of the quality, the substance, the thoroughness, his report -- you know, I take your criticism that he didn't do this a lot. He is obviously one of the world's experts on anxiety disorder and on schizophrenia and areas which are highly relevant.

And psychiatrists are highly relevant to the consideration, not just for this competency hearing. So I did have the impression that there were disputes that weren't -- some of them were not, and I was trying to get you more focused on things that seemed to me more important. And I know, having litigated a lot of complicated cases, it's easy for the judge to sit here and say that doesn't seem that important because to you, you are in the middle of it, and sometimes one's perspective is not as clear as it might be when you are not in the middle of it. And you may be going somewhere I don't appreciate. I understand that.

It was long, and it was at times frankly unfocused. And in the end, we finally, after lunch, started getting to things which I thought were important to the aspects of the testimony. So I'm not trying to cut you off. I'm -- I'll go as long as I need to go. But I just want to to be focused. That's why I did these questions. I want us to know what the issue is and what the issue is not.

And to the extent that the psychiatric evidence may be probative at mitigation, that is fine. But it's not identical to competency. So in any regard, I want to afford you the -- I appreciate your comments, and we will try to move along. Dr. Maddox's testimony is important. I think that is an important piece here. The little bit of it that has been forecast to me, I'm aware from approving her work

that she has evaluated the defendant multiple times -- Mr. Bruck, is that correct? That she has examined him?

MR. BRUCK: Yes.

THE COURT: So you know, I'm -- I was trying -- I wanted to get on to these other materials that I thought were -- I kind of felt like I knew what Dr. Ballenger's opinions were, and -- now, let me -- before we go into anything else, let me just mention one other matter.

Yesterday an issue came up that the Government indicated that it desired to have its say on the scope of the defendant -- defense counsel's authority regarding the calling of witnesses and the assertion of certain defenses. And I casually said if you want to do something, that would be fine. Let me restate that: That is outside the lane of the Government. That is not the role of the Government to determine the matter of the defense counsel's authority. The Court does not need the Government's assistance. This is not a matter which I think is appropriate to be involved, and I don't wish to receive anything from the Government. I have thoroughly -- my chambers has thoroughly investigated this matter; defense counsel has briefed it. I feel I have a good grasp of the issues.

MS. STEVENS: The defense calls Dr. Donna Maddox.

THE CLERK: Place your left hand on the Bible, state your full name for the record, please.

THE WITNESS: Donna Schwartz Maddox.

THEREUPON:

DONNA SCHWARTZ MADDOX,

called in these proceedings and being first duly sworn testifies as follows:

THE CLERK: Thank you. You may be seated.

THE COURT: Ms. Stevens, have you provided Dr. Maddox a copy of the questions?

MS. STEVENS: I have, Your Honor, and they are the first page.

THE COURT: Good to see you, Dr. Maddox.

THE WITNESS: Thank you, sir.

MS. STEVENS: May it please the Court.

DIRECT EXAMINATION

BY MS. STEVENS:

Q. Please introduce yourself to the Court.

A. Donna Schwartz Maddox.

Q. And you are a psychiatrist?

A. A physician licensed to practice medicine in South Carolina, general psychiatrist and forensic psychiatrist.

Q. Can you start with giving us a brief picture of your educational background, and we'll move quickly through your employment over the years.

A. Sure. I graduated from Furman University in 1985 with a bachelor of arts degree in psychology. And I graduated from

medical school at the University of South Carolina School of Medicine in Columbia, and I graduated in 1989 with a doctorate in medicine. I completed a four-year residency in general psychiatry at the South Carolina Department of Mental Health, and at that time it was also affiliated with the University of South Carolina. And then I -- and I completed that in 1993. And then in 1994 I completed a fellowship in forensic psychiatry; that was also at the department of mental health and the University of South Carolina School of Medicine.
Q. And so at that time in 1994, were you board-certified in forensic psychiatry?
A. No, not at that point. I was board-eligible. To be eligible for forensic boards, you had to pass your general boards in psychiatry, and after one year, I became board-eligible, and I took my forensic boards and passed them.
Q. So that would be 1995?
A. Yes.
Q. Where did you go to work from there?
A. I worked at first at the department of mental health, and actually for, I believe about a year and a half, I conducted competency to stand trial and personal responsibilities evaluations. That was the role of department of mental health at that time. And then there was a brief period of

time where I worked in the sanity unit in South Carolina that -- the state government has an insanity unit.

Q. What were your duties there in the insanity unit?

A. I treated patients, and I also performed when -- South Carolina at the state level, when someone's adjudicated not guilty by reason of insanity, they have a 120-day evaluation that is prepared for the circuit court. I would do those evaluations on the patients that were assigned to me and would also testify at release hearings.

Q. And you had mentioned you were also doing competency evaluations?

A. That's correct. For outpatients. That's correct.

Q. And to be clear, is the scope of your evaluation here for purposes of today with regard to competency only?

A. Yes.

Q. All right. And where did you go from there, Dr. Maddox?

A. Approximately -- I believe it was 1997 I went to the University of South Carolina School of Medicine. And I went there full-time from 1997 until about seven or eight years ago. And I finally -- I did a number of things there. I mainly practiced forensic psychiatry. There was a period of time that I directed the forensic fellowship in forensic psychiatry. There was a period of time I did research, I taught. I performed forensic evaluations for a number of years. When I left the university, my title there was

director of forensic services, and I was a professor of clinical psychiatry there.

Q. And for the past seven or eight years, what have you been doing since?

A. I went to work at the department of mental health, and for the first four years, I actually was treating patients. I was working in an acute psychiatric unit. It's Bryan Psychiatric Hospital. And that hospital -- there's two state hospitals in South Carolina to treat acutely mentally ill, and I worked in Columbia at the Bryan Psychiatric Hospital for four years. And then I got married, and I moved to Anderson, South Carolina, and for the past three years, I continued working for the department of mental health at the sister hospital, which is known as Patrick B. Harris Psychiatric Hospital.

Q. And do you presently treat patients with psychiatric issues?

A. I do. I actually served my 28 years. I officially retired from the State in August, but I still am a contract psychiatrist there. There are a lack of psychiatrists in the Upstate, so I continued to work there daily on a part-time basis.

Q. Dr. Maddox, have you prepared a curriculum vitae which sets forth your education, training, experience, and scholarly articles?

A. Yes.

MS. STEVENS: May I approach, Your Honor?

THE COURT: You may.

MS. STEVENS: I believe this is Defendant's 16.

THE COURT: Is there any objection to Dr. Maddox's CV coming in?

MR. RICHARDSON: No, Your Honor.

THE COURT: Defendant's 16 admitted without objection.

(Thereupon, Defendant's Exhibit 16 introduced into evidence.)

BY MS. STEVENS:

Q. Is that a copy of your current curriculum vitae?

A. Actually no.

THE COURT: Maybe I should consider my ruling.

MR. RICHARDSON: I take it back.

BY MS. STEVENS:

Q. Has it been updated since this version?

A. I don't know if I have or not. This was very recent, but I retired. On August 5th I started drawing my state pension. There would be a few minor changes, so I am no longer a psychiatric service director.

Q. So it does not reflect your current retirement status?

A. That's correct.

Q. Other than that, does it accurately reflect your career

and the basics of it?
A. Other than there is -- I've also had one more publication very recently that has not been added.
Q. Okay. What was that publication?
A. It was in the *Journal of Sexual Aggression* on Internet predators. I wrote -- I have a position at the Medical University of South Carolina. I'm a professor there in the department of forensic psychiatry, and we have been collaborating on a number of years on Internet predators, and one of our papers was recently published.
MS. STEVENS: With those corrections, would the Court accept Exhibit 16?
THE COURT: Absolutely. It's already in. Thank you.
MS. STEVENS: Thank you.
BY MS. STEVENS:
Q. Dr. Maddox, how many -- in the course of your career -- I'm not asking for an exact number, but could you estimate how many competency evaluations you have undertaken as a psychiatrist?
A. Hundreds.
Q. Have you been qualified to testify as an expert witness in various federal courts?
A. I have.
Q. And can you name those courts?

A. Yes. Tucson, Arizona; Richmond, Virginia; Augusta, Georgia; and South Carolina, that would be Columbia, Charleston, Florence, and I believe that would cover it.
Q. Yes, ma'am. And have you testified in various state courts in capital cases in particular?
A. Yes.
Q. And in approximately how many capital cases have you been accepted as an expert and offered expert testimony?
A. An estimate, 29.
MS. STEVENS: Your Honor, with that, we do tender Dr. Donna Maddox as an expert in general and forensic psychiatry.
THE COURT: She is admitted. Please proceed.
MS. STEVENS: Thank you, Your Honor.
BY MS. STEVENS:
Q. Now, the Court has submitted two questions for us to answer, and then -- I would like to ask you these questions and then we'll explain the basis for your opinions in this area. All right, Dr. Maddox?
A. Yes, ma'am.
Q. The first is, do you have an opinion within a reasonable degree of medical or scientific certainty that the defendant suffers from a mental disease or defect? Let's start there and answer that.
A. I do.

Q. And if so, state with specificity what the mental disease or defect is?

A. The three diagnoses that were germane to these proceedings, I diagnosed him with -- Mr. Roof with autism spectrum disorder, and it has some qualifiers. I've also diagnosed him -- we now have the DSM-5, which has changed the nomenclature; some of the language is different than what was formerly testified to. But it is specifically called "other specified schizophrenia spectrum" and "other psychotic disorder." And then I've also diagnosed Mr. Roof with other anxiety disorder, other specified anxiety disorder.

Q. And second question, Dr. Maddox, do you have an opinion within a reasonable degree of medical or scientific certainty that due to a mental disease or defect, the defendant does not have the sufficient present capacity to understand the proceedings and/or to assist counsel?

A. Yes.

Q. And if so, in what specific ways does the defendant not understand the proceedings and/or cannot consult with his attorneys? -- let me back you up before you get to the ways. You said, "Yes, I have an opinion the defendant does not have the sufficient present capacity to understand the proceedings and/or to assist counsel." What is that opinion?

A. There is only one area -- generally there is one area where I have some concern about his rational understanding of

the proceedings.

Q. And/or --

THE COURT: What is that?

THE WITNESS: Yes, sir. Your Honor, specifically Mr. Roof has expressed on a number of occasions and in different contexts that even if he were to be sentenced to death, he does not believe it's likely that he would be executed.

THE COURT: Okay.

BY MS. STEVENS:

Q. Has he expressed other statements like that that contribute to your opinion?

A. Yes.

Q. And what are those?

A. For example, he has specifically told me that even if he were to get the death penalty, he believes that at some point that there are corrections officers and other people that would perhaps rescue him should there be a race war; in his actual words to me that there would be a coup and that he would perhaps be rescued and exonerated eventually for his charges.

Q. And we will move through in greater specificity for the basis for your opinions and the interviews you have conducted with the defendant and the defendant in the presence of counsel. If we could briefly answer the second half of the

Court's question too: In what specific ways does the defendant not understand the proceedings and/or cannot consult with his attorneys or otherwise not properly assist in his defense. Is it your opinion that Mr. Roof does understand the basic proceedings and the players in this courtroom?

A. Absolutely.

Q. Please talk about that with His Honor.

A. Yes. Your Honor, Mr. Roof is very intelligent. He understands that this is an adversarial system. He understands his charges. He understands the roles of the various court officials, although at some times, I think there is some confusion for him. For example, although he knows persons' jobs actual, for example, he told me on my visit with him a view that you would not sentence him to death if you had been able to be the trier of fact in this case because you liked him and you smiled at him. So sometimes he has some issues that are more probably germane to the rational understanding. But generally he does understand.

He understands he's charged. He understands the nature of these charges. He understands that this is a trial that eventually will determine whether he's guilty of those charges, and then that he would have a sentencing phase afterwards. He does understand all of those things. He

understands your role is to defend him. He understands the United States Attorney's role as well.

Q. All right. And the second half of the question, "and/or cannot" -- and there is key word "cannot" -- "consult with his attorneys or otherwise not assist properly in his defense," do you have an opinion about that?

A. I do.

Q. And what is that?

A. At this time he is -- he cannot assist you in his defense.

THE COURT: Because?

THE WITNESS: Your Honor, more recently -- I've seen Mr. Roof over a period of time, and it's only been very recently in the month of November that he has reported some statements to me that he believes his attorneys are trying to kill him.

THE COURT: Trying to?

THE WITNESS: Kill him. Discredit him. He has -- of course, in the letter that was written to the prosecution the words he used were very powerful, at least in my opinion, that his lawyers were using scare tactics, that they were threatening him, and dealing with him in an aggressive manner. That is a clear departure from his normal thinking, the normal statements he's voiced to me in the past.

BY MS. STEVENS:
Q. And in your most --
THE COURT: Let me just ask this: When is the last time you have examined him?
THE WITNESS: November 15th.
THE COURT: Before then?
THE WITNESS: November 8th.
MS. STEVENS: And we'll move through all of those for the Court.
THE COURT: Thank you.
MS. STEVENS: Yes, sir.
BY MS. STEVENS:
Q. But in your most recent visit with Mr. Roof, did he ask you to take any specific action?
A. Yes.
Q. With regard to counsel?
A. Yes.
Q. And what was that?
A. During the evaluation, a number of things came up that were somewhat new for Mr. Roof. He was very upset with the possibility that I would have to testify, and he had told me that -- first of all that he would consider killing himself, and if he did it, it would be all my fault. And then he also expressed to me that Mr. Bruck is a demon, that Ms. Stevens is evil, and me, and he asked me on two occasions to kill

Mr. Bruck.

Q. All right, Dr. Maddox. In your undertaking of review of this case, have various materials been provided to you for your review and to assist in your overall preparation for the penalty phase of this case?

A. Yes.

Q. And were you complete with your review of those materials?

A. Not at this point. I'm still in the process. There is a lot of discovery, and I'm still in that process. I have -- I understand that I'm going to have a deadline at some point for a report, and I'm beginning to put those pieces together. But I by no means have completely reviewed everything nor finished.

Q. But have you a sufficient basis of information at this point with regard to the issue of competency itself?

A. Absolutely. It's a present state of functioning, and I have had a number of interviews with Mr. Roof since April, and I've had the luxury of seeing him over time.

MS. STEVENS: May I approach the witness, Your Honor?

THE COURT: You may.

BY MS. STEVENS:

Q. Dr. Maddox, I'm going to hand you Defendant's Exhibit --

MS. STEVENS: I believe it's 17?

THE CLERK: Yes, ma'am.
MS. STEVENS: Thank you.
BY MS. STEVENS:
Q. -- this list of materials and ask you to quickly review that. Are those the materials that the defense has, in fact, provided you for your overall review in this case at this time?
A. Yes, I'm familiar with these. Yes, this list is --
Q. And they have been provided?
A. Yes.
MS. STEVENS: The defense moves Exhibit Number 17.
THE COURT: Any objection?
MR. RICHARDSON: None, Your Honor.
THE COURT: Defendant's 17 is admitted without objection.
(Thereupon, Defendant's Exhibit 17 introduced into evidence.)
MS. STEVENS: Thank you, Your Honor.
BY MS. STEVENS:
Q. Now, in addition to review of basic materials, Dr. Maddox, how do you start your evaluation in a criminal capital case with regard to issues pertinent both to competency and to ultimately the penalty phase?
A. Well, the methodology over the course is there is always record review, and there is specific record reviews: the

Government's indictments; the charges, the nature of those charges; the behaviors; and any witness statements and any discovery is certainly reviewed. And there is medical history, medical records I look at for Mr. Roof specifically. He's had some. The methodology would be to review the records, evaluate the person, and obtain collateral information, and perhaps consultations when necessary.

Q. And is collateral background written information, such as prior mental health records, prior school records, prior medical records, are those an important part of your materials that you reviewed?

A. They are.

Q. And did you ask us to gather those for you?

A. Yes.

Q. All right. And did you also interview with Mr. Roof?

A. Yes.

Q. How many times and on what dates, if you can let us know, have you met with Mr. Roof?

A. I've seen Mr. Roof nine times.

Q. Starting with the first date?

A. April 22nd, 2016.

Q. And again?

A. April 30th, 2016.

Q. And when did you next see him?

A. June 4th, 2016.

Q. And again?
A. June 19th, 2016.
Q. What was the next date?
A. July 23rd, 2016.
Q. And then?
A. August 20th, 2016.
Q. Next?
A. August 31st, 2016.
Q. All right. And then your last two visits have been since the slated date that trial was to begin in this case; is that right?
A. Correct.
Q. All right. And the first of those?
A. November 8th, 2016.
Q. And then the last visit that you had with him?
A. Yes, that would be last Tuesday, November 15th, 2016.
Q. And how many hours total would you estimate that your interviews -- your psychiatric interviews with Mr. Roof took?
A. Well, typically three hours, and sometimes they have gone over, and sometimes they have been less. And so approximately 25 hours.
Q. Have you also interviewed pertinent members of Mr. Roof's family or people from his life in order to help you evaluate this case?
A. I have.

Q. Who have you interviewed?
A. I interviewed Mr. Roof's paternal grandparents. I have interviewed his father. I have interviewed his mother. I have been in the homes of his paternal grandparents. I have been in the home of his father, and I have been in the home of his mother.
Q. And did you specifically see Mr. Roof's room in the home of his mother?
A. I have.
Q. And did you see where he occasionally stayed in the home of his father?
A. I did.
Q. Was that important to you?
A. Yes.
Q. Tell us why.
A. Well, a picture is always worth a thousand words, but to see the different environments where he was. And I would be glad to be specific about those things. After getting to know Mr. Roof over the period of time, he's a very clean, very tidy young man, very organized, and to see the different environments where he was living gave me some idea of what level of functioning he would have or what adaptations.
THE COURT: What did you see?
THE WITNESS: His room at his mother's house is meticulous, incredibly neat as I would expect. Everything in

order. He has collections of books that -- he's very well read. All different sorts of collections of books. Some that are covered -- some that are not to have air exposed to them; some that are meticulously covered. Things that are interesting: The pages of the books, none of them are worn. None of them look like they have ever been folded over, tabbed, or things like that. They were in excellent condition. That is one extreme.

The other extreme would be his father's home, where I understood he slept on the couch. There are dogs, animals everywhere, not very organized, dusty, dirty. I was not comfortable sitting in the couch area.

Q. And did you review the videotape where Dylann Roof spoke with law enforcement officers about the crime -- and we are not going to talk about the crime, the events of the crime, unless it's pertinent to your competency evaluation. But did you watch those videos?

A. I did.

Q. And did something stand out to you that was important in your psychiatric review of the materials?

A. There were many things, yes.

Q. Specifically with regard to his demeanor or his speech?

A. Yes. Very early on, Your Honor -- of course I had seen the tapes before I saw Mr. Roof, and one of the things that I noticed is what is called -- I term it "pedantic speech" --

that his speech is very matter of fact, almost -- in clinical we call it "professorial." He's very intelligent. He doesn't have a lot of intonations in his speech. When people speak, you look at the prosody, rhythm and tone and things like that. His speech is -- I characterize it as pedantic.
Q. And Dr. Maddox --
THE COURT: Let me stop you. What is the significance of that, the potential significance of that?
THE WITNESS: That is consistent with autism spectrum disorder.
THE COURT: Ms. Stevens, I know I'm interrupting you, but I'm trying to get clarification.
MS. STEVENS: I welcome the clarification. If you have questions, please jump in.
BY MS. STEVENS:
Q. In your clinical interviews that you conduct with Mr. Roof as you form your opinions, do you generally conduct what is called "a mental status evaluation"?
A. Yes.
Q. Why is that important to you, and is that something you do just for Mr. Roof, or do you do it with patients across a broad variety of your interactions?
A. I do it with each patient. That's part of the methodology psychiatrists use. It's the equivalent of a physical exam each time that you went to your physician. The

mental status, you are looking at the person's thinking, how they connect thoughts. You are evaluating judgment. You are looking overall at their behavior, their thought processes, and their expressions of their mood.

Q. Can you describe his typical presentation to you when you first began meeting with him?

A. Yes. Mr. Roof is always very neat, very tidy, always somewhat concerned about his appearance. Typically his hair is always in place, and there may be periods of time where he might tidy his hair. Very typical with Mr. Roof with me, he would enter a room and have a smile. He would come into the room with a smile and -- typical gesture each time that you would see him, and then before he would sit in his chair, he would not make any eye contact. He would look off to the right.

He eventually, as the interview would progress, would develop eye contact with me. He would have some of what I called "mannerisms" that are pretty typical for him. He would look up. He would look around the room. He would look down, and then he would begin to establish eye contact. That is very typical for him.

Q. And if a person walks by the room when you are meeting with him, either in front or behind and there is a reflection in the glass perhaps, can you describe what happens?

A. Oh, yes. He's very -- that's the only time that he is

typically very distractible. He can be in the content of any kind of discussion, and if there is any movement in front of him or behind him, he will stop and turn around and physically look either way, either ahead or behind me, and ahead of himself or turn around and look directly behind him.

THE COURT: What is the potential significance of that?

THE WITNESS: I think that is protective. I think he's in an environment where he may not be safe. He's aware of movement. I also think during those periods of times, he's looking to see if it's a corrections officer behind him and those sort of things.

BY MS. STEVENS:

Q. Tell us about his thought processes that you observed, with regard whether they tend to be goal directed or not. What is your observation in your early interviews with Mr. Roof?

A. They have been consistent, and they still remain consistent. If you ask Mr. Roof very specific questions, he's goal directed, and he will answer questions. But if you leave him unstructured, which is typically what I would do in the three-hour period of time, he can discuss a variety of topics; sometimes they are related and sometimes they are not. Sometimes he will begin to shift gears, and it's difficult to understand what the thought process was that

connected it. Sometimes he does that out of excitement when he's talking about something that he's very interested in or something that -- something factual that he enjoys discussing, and then he can suddenly switch gears and that is called "a disorganized thinking."

Q. Did you tend to interview him in a structured or unstructured fashion?

A. Both.

Q. Why is that?

A. Just for those reasons. First of all sometimes if I went in to evaluate him, there were specific things that I needed to accomplish during that day. Perhaps I was trying to explore anxiety or looking for diagnoses, or sometimes it may be for further down the line to look at mitigating factors. So sometimes there would be information that I would need in order to complete an evaluation. But then other times, I would let Mr. Roof just talk because I was looking at his thought processes and those sort of things.

Q. Now, we heard mention of the term "affect" in these proceedings. What generally is one's affect?

A. An affect basically is taking a picture of your emotional state.

Q. And is that something a psychiatrist looks at or looks for?

A. Yes.

Q. Describe Mr. Roof's affect to the situation and in the course of your interviews with him?

A. He has two predominant affects, Your Honor. One is called "inappropriate." And what Mr. Roof does is he will smile, and it's a social smile. It's -- his smile doesn't always reflect that he's happy. So, for example, you can be discussing something that is even upsetting to him, or something he's anxious about, sometimes it's a self-deprecating smile, but many times a smile is not appropriate for his thought content or what the situation is.

And then other times I describe his affect as "constricted." He does demonstrate -- you can see different emotions in him, but they are much more constricted than the typical person would show.

Q. And how is that important to you?

A. Again, those are signs -- those are not necessarily normal affective disorders, so they can be associated with different things. They are symptoms or observations that need to be further --

THE COURT: I take it, Dr. Maddox, a lot of these observations, there is a broad differential on each one of them individually. Then you try to reach your conclusion when you consider all of them collectively. Is that correct?

THE WITNESS: That's exactly right.

BY MS. STEVENS:

Q. With regard to your discussions, if you have them, about mood disturbances, is that something you questioned Mr. Roof about?

A. Yes.

Q. In your early interactions with him, what is your experience when questioning him about mood disturbances?

A. He denies any.

Q. And what was your thought about that?

A. Well, there is -- certainly along the road, there have been some indications that perhaps he had had some depression. But each time that I've asked Mr. Roof about that, he adamantly denies that he has been depressed.

Q. Has he spoken with you about feeling anxious at times?

A. Yes.

Q. What has he told you about that?

A. He does admit to periods of time where he has anxiety, and that has been the one area that I think that he has been a little less guarded and more forthcoming in symptoms. He has reported in the past he used to bite his nails and was interested in showing me his nails, that that has been an issue for him. He's very anxious about his appearance. And he's been very good about reporting those symptoms. He's very anxious about his hair and how his hair looks. And even on one occasion, he showed me how he grooms his hair and

those sorts of things. He's able to disclose some of those symptoms and the things that make him anxious. Most specifically, and I think the most uncomfortable area for Mr. Roof that he has anxiety about is what he calls "blushing attacks." When he becomes embarrassed about something, that is very uncomfortable for him. And he's been able to discuss that with me.

He reported that when he had those symptoms, typically he would retreat to his room later and then try to feel the symptoms in private.

Q. And we will go forward in a moment and talk about various specific things that you have noted at the conclusion of these visits, but with regard to impulsivity, in your early visits, what were your observations then?

A. Mr. Roof is not impulsive. He is careful. He's deliberate. For example, if you asked him a question, and he would certainly not blurt out answers. He was thoughtful about how he would answer questions. He has not -- I have not seen any kind of behavior where I thought he was reacting. He is --

THE COURT: He was? I'm sorry?

THE WITNESS: Reacting, reacted to a situation. He has not been impulsive by nature.

BY MS. STEVENS:

Q. His demeanor, do you have observations in general about

the nature of his demeanor?

A. Yes.

Q. What is that?

A. I consider him very pleasant. He's been as cordial under the circumstances as he could be to me. He's attempted to be cooperative. There have been times where if I ask him a question, he might say -- for example, Your Honor, there is times where there's certain words that he won't say, and he'll say, "I can't say that word," but will give you ideas or clues about what the words might be. But generally he has been cooperative.

Q. Does he appear to be his stated age when you are in the room with him?

A. He is childlike at times. With his -- he looks much younger in stature and his physical appearance for his stated age.

Q. Now, is insight something you evaluate in these early visits with the client?

A. Yes.

Q. Tell us about that.

A. Mr. Roof -- Your Honor, the only area that I consider that he has some insight into would be his anxiety disorder. He has no other insight. He does not have insight into the -- my opinion is that I think he has a developmental disorder. He does not have any insight that he has a

psychotic thought process.

Q. With regard to comprehending and expressing comprehension of the effects of his behavior on others, what is your observation about that?

A. It's my opinion severely impaired.

Q. So we have now outlined your typical mental status findings from your early visits with Mr. Roof. Is that a fair statement?

A. Yes.

Q. All right. Can you please share with the Court some of your observations specifically with various somatic -- or beliefs about Mr. Roof's body that you have obtained in your psychiatric interviews?

A. Yes. Mr. Roof, even prior to my evaluating him, he's had -- if you look at his medical records as well, there is a period of time where he has been very concerned about his bodily functions, and some absolutely understandable and called for. He was diagnosed with Hashimoto's Thyroiditis. He was having some symptoms, and something was going on with him. But what's happened over the period of time and since early on in his evaluations, he has a number of ideas about his body, perhaps looking dysmorphic, and he has been very preoccupied with that -- with a number of body parts.

Q. All right. Well, let's start with his head. What does he believe?

A. He's reported to me that his head is lopsided.
Q. And the right versus the left side of his body?
A. Yes. He's got very specific preoccupations and concerns. He believes that the -- let me get this correct -- that the right side of his rib cage is smaller than the left side of his rib cage. He reported that the right side of his body, specifically his jaw line, is less developed than the left side. He actually, Your Honor -- one of the descriptive terms he used to me early on is the right side of his body was immunic (ph). He has issues with his legs, leg height. He believes that his right leg is shorter than his left leg. He believes that his left foot is flat, and he also -- I'm sorry. I don't mean to jump around, but also on the right chest, he believes that his right side of his chest is smaller and has less muscle, but that his right arm is bigger and his left arm is smaller.
Q. Does he have beliefs about one side of his face over the other?
A. Yes. Again, the right side is less developed. He has called that his "feminine side." He has expressed a belief to me that his belief was all the testosterone pulled on one side of the body. He thought perhaps the testosterone was on the left side of his body, and the right side it was not.
Q. Now, especially with regard to the length of his legs, is his left leg smaller than his right in fact?

A. No.
Q. And that has been measured in the course of your working with Mr. Roof?
A. That's correct.
Q. And what happens when, or if, you confront him and say, "Mr. Roof, your left leg is not a different size than the right"?
A. I have not -- I have not confronted him about that.
Q. You are trying to get information from him in these interviews?
A. Correct. I know he has been given that data and that he did not believe that data.
Q. Okay.
MR. RICHARDSON: Objection, Your Honor, hearsay. She just said she didn't ask him about it; she didn't talk about it.
THE COURT: Overruled.
MS. STEVENS: Thank you, Your Honor.
BY MS. STEVENS:
Q. With regard to his forehead and the specific haircut that he wears, can you tell us his beliefs about that?
A. Yes. Mr. Roof feels very uncomfortable when his forehead is exposed. His words to me were he looks "crummy." He's very concerned about that.
THE COURT: I'm sorry. What was the word?

THE WITNESS: Crummy.

THE COURT: Crummy. Okay.

THE WITNESS: And that he goes to lengths to cover, conceal his forehead.

BY MS. STEVENS:

Q. Did he begin to demonstrate or express statements that he was losing his hair there in the jail at the Charleston County Detention Center?

A. Yes. That has been a very strong preoccupation and concern for him much earlier on in the earlier interviews, and then there was a period of time midsummer where that did not seem to be on the front burner. But then more recently those -- that preoccupation has returned, and it's quite strong.

Q. And has that expressed itself in your more recent two visits with Mr. Roof?

A. Yes.

Q. Does he say what will happen if he loses -- is he worried that he will lose all of his hair between now and the end of this trial?

A. His concern has been, and remains, that if he were to become bald, and especially if he were televised, that he would kill himself.

Q. And you mentioned earlier his thyroid. Can you share with us his beliefs about his thyroid and the extent to which

they occupy your visits with him?

A. And on Mr. Roof's behalf, he does have Hashimoto's thyroiditis, and he has had an abnormal stimulating hormone. That is the hormone that innervates -- your hormone is not functioning, and there is some impairment. There is validity to some of his concerns. What has happened is in the laboratory tests over the time, there have been periods of time where the thyroid had been -- TFH level has been elevated more than others. But his preoccupation remains that he believes that when he has iodized salt -- he has been monitoring his salt intake quite carefully and sometimes experiments. He would try some salt, and he would notice that his thyroid was more full.

So he has been very conscientious on that, very focused on that. For example, on the 15th he told me he had eaten a bag of some kind of chips or some kind of snack from the canteen, and he was concerned because the ingredients said iodized salt, and he had not had foods before that had iodized salt, and perhaps that is related to his hair falling out.

Q. Now, has he expressed concerns -- you mentioned earlier his belief about the impending race war?

A. Yes.

Q. Has he in some way tied taking medication for his thyroid to that belief system?

A. Yes.
Q. How did he do that?
A. What his concern is, if that he were to take thyroid medicine -- Your Honor, he has a number of concerns about taking thyroid medicine, but the specific one that Ms. Stevens asked is he's concerned if there were a race war and he had been started on this medication by the Bureau of Prisons or any other practitioner, that if a race war occurred, and he was not able to continue taking the medication, he's concerned that it would have -- it could either speed up the Hashimoto's thyroiditis or somehow harm him.
Q. Now, with regard to other significant beliefs that were important to you as a psychiatrist in your meetings with Mr. Roof, you have mentioned to me that he holds some grandiose-type beliefs. Can you explain that?
A. Yes, he does. Grandiose beliefs, there are ideas that he has about himself, or he holds himself in higher esteem.
Q. And describe some of those. How about the federal prosecutors here seated behind me?
A. Yes. There were some specific ones, federal prosecutors, as much as the State prosecutor who he mentioned by name. But he has a belief that if people met him and talked with him, they would like him and not give him the death penalty.
Q. And we have already spoken about his beliefs that Judge

Gergel is nice and smiles at him.
A. He's called Judge Gergel his friend.
Q. Okay. And his belief about what will happen if he's incarcerated when the race war happens?
A. Yes. He believes -- what he told me specifically is that there would be corrections officers there who would be sympathetic and understand, and when the race war occurred, there would be a coup and that he would be freed.
Q. Has he expressed the belief about the odds that he will be sentenced to death by a jury in this courtroom?
A. Yes.
Q. And what has he said about that?
A. He told me there was a 30 percent chance.
Q. Does he have some beliefs surrounding his Wikipedia page?
A. Yes.
Q. Tell us about that.
A. Your Honor, he has a number of concerns about that. One of them, somewhat autistic and childlike, is that other persons may have more Wikipedia hits than him. And he's very concerned about the number of hits he has compared to other high-profile offenders.
THE COURT: Does he have access to the Internet?
THE WITNESS: Not that I know of -- not that I know of.

BY MS. STEVENS:
Q. And in speaking of Judge Gergel's point, with no access to the Internet, has he expressed beliefs to you about the level of violence out there in society and what is happening with it right now?
A. Yes.
Q. And what is that?
A. He's typically relied on the Internet for a lot of his information, Your Honor, and he believes that the rates are increasing now and that things have definitely escalated since the period he has been confined.
Q. Can he tell you why he believes that?
A. He believes it. I know that he listens to radio shows each day, but it's just his belief system.
Q. Is it not something he's documented or verified without Internet access at this point in time?
A. That's correct. He normally would do research and look at that information, but that's correct. He's not had access to the Internet.
THE COURT: Is his news source primarily -- I've heard NPR. He listens to NPR.
THE WITNESS: He listens to NPR. I'm not from Charleston. Michael Savage -- I may have the first name wrong, but there is a radio station as well, and I think there is a talk show that he listens to later in the

afternoons.

BY MS. STEVENS:

Q. Do you listen to either of those?

A. No.

Q. With regard to that comment about the level of violence increasing out there in the world, and in your attorney visits -- you have been present in the visit with Mr. Bruck and myself and Mr. Roof, correct?

A. Yes.

Q. In one of those visits, did he express something with regard to me and what would happen when this impending race war happens?

A. Yes.

Q. What did he say?

A. Well, the context of that was, Your Honor, there have been previous times, I think Mr. Roof had made a statement to Ms. Stevens. I was unaware of that, and I specifically wanted to ask him about that because I had a concern. And his belief that he reported to me is that at the time of the race war, when this happens, he wants us to understand that people are going to be harmed, and it is going to be very violent, and specifically reported that Ms. Stevens would have bleach poured down her throat.

Q. And have you observed prominent thoughts related to paranoia and suspicions, especially in your more recent

interactions with Mr. Roof, and even in the early ones as well?

A. Yes. And that is what has changed, Your Honor. Some of the -- some of the grandiose beliefs have been there. Certainly some of the autistic features that I have seen have been there. What has dramatically changed has been the paranoid beliefs that he has specifically related to his counsel.

Q. Has he mentioned something to you about him being stabbed?

A. Yes.

Q. And what is significant about that? Tell us what he said?

A. And that is paranoid drawn. It has a basis in reality. What makes it significant to me is the descriptions he uses. On two occasions he's told me specifically that he would be stabbed 150 times and that he would be stabbed in certain areas. He would describe his face, but he's both occasions described it as being stabbed 150 times.

Q. And you've made brief mention of it, but in these more recent interviews with Mr. Roof, does he express paranoid and suspicious beliefs, specifically with regard to all of the attorneys that are defending him?

A. Yes.

Q. Tell us what he's said.

A. Well, there are a number of beliefs, but it's been that -- specifically that the attorneys had already decided that they were going to diagnose him with autism and had convinced all of the experts that he had an autistic spectrum disorder before the experts were able to interview him, that there was somehow a hidden agenda.

Number two, and now much more prominent, is that you all are not only trying to defend him. You are trying to discredit him and ultimately have him killed.

Q. In your review of past records and grand jury transcript, have you seen a reference to paranoid schizophrenia?

A. Yes.

MS. STEVENS: May I approach the witness, Your Honor?

THE COURT: You may.

MS. STEVENS: I believe we are on Defendant's --

THE CLERK: 18.

MS. STEVENS: 18. Thank you.

BY MS. STEVENS:

Q. Dr. Maddox, I'm handing you what's been marked Defendant's Exhibit 18. Do you recognize that to be the grand jury transcript of Joe Roof Sr., who is Dylann Roof's grandfather?

A. Yes.

Q. And in the interest of time, I'll direct you to page --

if you could look at on the bottom, U.S. page 020382?

A. Yes.

Q. And he states that Dylann Roof came to him and said, "'Papa, did you know that I'm a paranoid schizophrenic?' And I said, 'No. How did you know this?' He said, 'I saw it online. I found it online.' And I said, 'Self-diagnosis?' 'It's right. I can tell. I've checked. I have all the symptoms, and I am paranoid schizophrenic.' I said, 'You need to go to the doctor.'"

Dr. Maddox, is this an example of paranoia and the relevant example for you in your review of the materials in this case?

A. Well, I think what it's an example of is that at some point, Mr. Roof had some concerns about his mental state and was trying to understand perhaps what was going on with him. And that, indeed, he took a test and had a belief that might explain some of the mental status, the things he was feeling, the things he was thinking or how he was behaving.

Q. And did you speak with Mr. Roof about that test?

A. Mr. Roof Sr.?

Q. Mr. Dylann Roof.

A. No.

Q. Okay. But it's the testimony from the grand jury where we've seen the indication of paranoid schizophrenia checks?

A. Yes.

THE COURT: It is that the defendant took a test on the Internet, his validity we have no knowledge about, that he interpreted that test to his grandfather who related it to the grand jury? Is that what we are saying?

THE WITNESS: Yes, sir.

BY MS. STEVENS:

Q. And we are not speaking to the which test it was or the results, right, Dr. Maddox, because we don't know?

A. That's correct. What is important there is that he was taking -- he recognized at some point perhaps something wasn't quite correct, and he took a test.

THE COURT: The preliminary question, was there in the record paranoid schizophrenia, and I was expecting to hear that some doctor had made that diagnosis.

THE WITNESS: No, there is no -- there has been no prior diagnosis of a psychotic disorder.

THE COURT: That was my understanding. I was confused by that question.

MS. STEVENS: If I asked that question, I apologize. There has not been a prior diagnosis. This is just an indication in the records that she has reviewed.

THE COURT: And I believe the grandfather is a real estate lawyer, not -- a retired real estate lawyer, not a psychiatrist, correct?

THE WITNESS: That is correct.

BY MS. STEVENS:

Q. And grandfather offered no diagnosis. The fact is just significant to you that he thought to take such a test. Is that your testimony?

A. Correct.

Q. Now, in the course of your review in this case, did you undertake examination of some background records that we had mentioned before, mental health record, medical records?

A. Yes. His pediatric records, his school records, and his mental health records.

Q. Now, understanding that we are not in the penalty phase of this case, and we are just limiting our inquiry to issues pertinent to your three diagnoses that you have rendered here. May we offer some brief background facts that you have told me are relevant in this case?

A. Yes.

MS. STEVENS: Your Honor, I'm referring to what's already been admitted as Defendant's Exhibit 5. If I may approach the witness?

THE COURT: You may.

BY MS. STEVENS:

Q. Now, Dr. Maddox, have you reviewed those records with me, the Lexington area mental health record?

A. I have.

Q. And turning to the bottom says D00147.

A. I don't have those numbers.

Q. I see that.

THE COURT: Why don't you go to the pages related, if you could, Ms. Stevens.

MS. STEVENS: Yes, Your Honor, I was on the next set of records. I'm on the same page now.

BY MS. STEVENS:

Q. D0757?

A. Yes.

Q. Okay. And tell us about what was significant here to you. In the upper part of the page, small print, but what has happened that has brought him to the Lexington area mental health center?

A. Yes. And, Your Honor, this is the typical EMR that the mental health centers use.

THE COURT: I'm familiar, actually, with the form.

THE WITNESS: Okay. And so the top is where the history of present illness would be presented. And it states, "Client told mom this morning that he was going to run away and kill himself.

THE COURT: This is 2009. Is that correct?

THE WITNESS: Yes, sir. March 26th, 2009. And the source of the data was the client and his mother.

BY MS. STEVENS:

Q. So this is just shy of his 15th birthday. Would that be

right, Dr. Maddox?
A. Yes.
Q. And down below in the "adjustment to problems" section, can you tell us about that?
A. Yes. "Client also reports that he has anxiety about being around people, people looking at him. He doesn't like to go anywhere where there is a crowd, and he worries all the time about it. Client admits to avoiding social settings, places with crowds because of the anxiety."
Q. And on page 5766, moving forward, can you tell us what is significant in the upper part of that page?
A. Yes, and this would be May 7th, 2009, Your Honor. And the chief complaint is "I've got anxiety."
Q. Okay. And below that what is the description given?
A. "Dylann is a 14-year-old white male who presents with mother for initial PMA" -- and that would be a -- I think a physical -- can't remember what the P -- psychometric assessment -- I'm sorry. I don't remember the initials. "Engaged with individual therapy, with Jamie Washburn. The mother/patient described a longstanding history of anxiety within multiple settings with resistance to going out into public with me, per the mother; going to restaurants or settings with unknown others, patient. However, comfortable with peers he has known for a while. He describes possible one panic attack in the past. He denies obsessive compulsive

disorder symptoms or depressive symptoms. Patient typically spends time in his room while at home. No behavioral problems, yet grades have slipped to failing this year. Patient denies significant sleep problems. He does report marijuana use beginning about a year ago."

Q. Okay. And turning to page 5770, toward the bottom of the length of your description, do you see a sentence that you have mentioned to us as being important to you about anxiety and the therapist's belief that at that age he is self-medicating?

A. Yes.

Q. And why is that important, Dr. Maddox?

A. Well, for a number of reasons. First of all, any teenager using drugs would be a source of concern. It's an illegal substance. It's a mind-altering substance, and there's different reasons people use drugs. And so in this case, the therapist is concerned that he might be trying to treat his anxiety or his feelings with drugs to calm down and to help himself.

Q. And at page 5771, now, earlier you had mentioned something about OCD symptoms in a comment made by the client. If you could tell us about the sentence "client reports more severe" about halfway down?

A. Yes. And, Your Honor, this looks like this was from March 26, 2009.

THE COURT: And midway it says, "The client reports more severe symptoms of obsessive compulsive disorder in the past such as repeated behaviors of locking and checking front door, washing hands, urinating at night." And then it says, in parenthesis, "not having to urinate, but getting up to try more than once due to his thought that he may not have gotten it all out the first time."

BY MS. STEVENS:

Q. And, Dr. Maddox, going back to page 5756 from this same record, it's a discharge plan and summary sheet.

A. Sorry. Yes.

Q. All right. And what -- was he given a diagnosis?

A. Yes, he was.

Q. And what is that?

A. And this would have been, I think, Your Honor, the DSM -- it might have been the DSM-4 or the TR, but it was consistent -- anxiety disorder not otherwise specified.

Q. Okay. Turning now to the medical records of Dr. Mubarak, did you review those?

A. I did.

MS. STEVENS: May I approach, Your Honor?

THE COURT: You may.

MS. STEVENS: 19.

BY MS. STEVENS:

Q. Dr. Maddox, I'm handing you what's been marked as

Defendant's Exhibit 19 and ask you to look at that. Do you recognize these to be Dylann Roof's pediatric records?
A. I do.
MS. STEVENS: The defense moves the admission of Defendant's 19.
THE COURT: Any objection?
MR. RICHARDSON: No objection.
THE COURT: Defendant's 19 admitted without objection.
(Thereupon, Defendant's Exhibit 19 introduced into evidence.)
BY MS. STEVENS:
Q. I apologize. These are the page numbers I was trying to read before, Dr. Maddox. If you could turn to D00147. And this print is tinier than the last. Do you see the section marked "History of Present Illness"?
A. Yes.
Q. And is that an important piece of your review of the background medical history in this case?
A. Yes.
Q. As it relates to mental health as well?
A. Yes.
Q. Please describe what's important to you there.
A. Under "History of Present Illness," on about the third line down, he -- doctor marked "anxiety" -- and put an

asterisk -- "sleep disturbances, does not sleep. Sleep disturbance. Being oppositional. Good school performance, no problem with peer group. Eight hours a day using electronics."

Q. Now, although that sentence just said "no problem with peer group" under personal history, what does the first line say?

A. "Problem with one's peer group, does not go outside the home."

Q. Is that significant to you that there is an 18-year-old young man with problems with his peer group who will not go outside the home?

A. Yes. And also spending eight hours a day using electronics.

Q. And tell us about that.

A. Again, that is a -- that is a third of a day, a third of a day not even counting the time being asleep, using electronics.

Q. Do you see records at the bottom of the page to weight and height?

A. Yes.

Q. And what is that?

A. He weighed 118 pounds on November 20th, 2012.

Q. Okay. Turning to page D00149. And under the section "Marked Assessment," what is significant there to you? Just

below the labs about a third of the way down.
A. Yes. At that time he reported normal routine history and physical; anxiety disorder not otherwise specified; acne, and deviated nasal septum.
Q. So here in the medical doctor record, is that a diagnosis of anxiety disorder NOS?
A. Yes.
Q. And on page 150, the next page, and a similar-type section, could you tell us about that history of present illness? Although it's a page later in the record, now he appears to be 17 years old in this record.
A. Yes. This is October 5th, 2011.
Q. Tell us about that.
A. It was a 17-year-old well check, a routine physical examination.
Q. What was noted with regard to his sleeping?
A. "Insomnia, unreasonable, irrational fears, afraid to go outside the house."
Q. So the unreasonable or irrational fears, afraid to go outside of the house, is that an important piece of information for your review?
A. Yes.
Q. And again under "Personal History"?
A. "Problem with one's peer group, does not socialize with his peers and spends all his time at home."

Q. Toward the bottom of the page, his height and weight at age 17?
A. His weight was 110 pounds.
Q. On page 152 -- we forgot his height?
A. His height was 67.5 inches.
Q. 5-7 1/2 and 110 pounds at 17?
A. Yes.
Q. At page 152, do you see the section marked "Plan"?
A. Yes.
Q. And does it make reference to psych counseling?
A. Yes.
Q. Tell us about that, Dr. Maddox.
A. His plan says, "Recommend psych counseling to help him with his social skills and getting him out of the house more often. He does not seem to be interested in counseling. Mom will talk to him and let me know if he agrees to it."
Q. And so the approach reflected there at least is that the mom would ask Dylann Roof and then let the doctor know?
A. Yes.
Q. And on page 153, again, at the "History of Present Illness" section, what do we see there?
A. Very similar to the form. Keep in mind that the electronic medical records a lot of times have problems. I think it's a computer program, and they remain stable.
"Dylann Roof is an 18-year-old male, source of

information was the patient and his mother." And again it notes the problem of anxiety, sleep disturbances, does not sleep.

THE COURT: Ms. Stevens, I get the issue that there are longstanding reports of anxiety. I don't think we need to go through every record to demonstrate that.

MS. STEVENS: Yes, Your Honor. That is all from that set. I just have one more set of records that is quicker than these two if I may? May I approach?

THE COURT: I'm sorry?

MS. STEVENS: May I approach?

THE COURT: Absolutely.

BY MS. STEVENS:

Q. Dr. Maddox, I'm approaching you with Defendant's Exhibit 20 and ask you if you recognize these to be the Laurel Endocrine Thyroid Specialist records for Dylann Roof.

A. Yes.

MS. STEVENS: The defense moves the admission of Defendant's Exhibit 20.

THE COURT: Any objection? Without objection, Defendant's 20 is admitted.

(Thereupon, Defendant's Exhibit 20 introduced into evidence.)

BY MS. STEVENS:

Q. And Dr. Maddox, do you see page U.S. 056767?

A. Ms. Stevens, those numbers are so small, even eyeglasses can't --

MS. STEVENS: May I approach her? I have handwritten --

THE COURT: That would be great.

MS. STEVENS: -- in larger numbers because they are tiny. And we'll go through these quickly.

THE WITNESS: Thank you.

BY MS. STEVENS:

Q. Can you see documented there at page 1 -- give us the date of that record?

A. Yes. This is -- he was seen on March 14th, 2014, but then it has that it's amended on December 31st, 2013.

Q. But it's a 2014 record?

A. Correct.

Q. Can you tell us what is significant there at the top?

A. Yes. He is concerned about some asymmetry in his body, noting that the left side seems a little larger, especially in the pectoral area, than the right. He reports that he shaves the upper lip only, and rarely, and shaves peach fuzz across his face. He has "does not recall being -- being particularly taller or shorter than his peers at any time. Mr. Roof believes that he has developed much more slowly than his peers, and that he is, quote, a late bloomer, end quote."

Q. And on page U.S. 56771, again I know it's too small to

read, but if you could talk about this record for us and its importance.

A. Sure. If I may -- still going back to the other record as well, there is another area there I think is clinically significant. It states, "Dylann also has a social anxiety." And "completed the 11th grade -- or attended the 11th grade." This is from Dr. Brennan on April the 4th, 2014. What is significant, it's a work-in, meaning it was not a scheduled appointment. And in this -- it's on page 2 -- Dr Brandon is noting, "He has tremendous anxiety regarding his thyroid, the potential growth of the thyroid, and is concerned that many of his back fillings could be related to underactivity of the thyroid. I advised him that this is a minimal elevation in his TSH. It's not associated with symptoms or with growth of the thyroid gland itself, and that delaying treatment would actually offer him the possibility of avoiding treatment if the TSH returned to normal. He remained concerned but agreed to wait. I reviewed testosterone with him. I explained to him that he has completely normal testosterone and normal pubertal progression. No further evaluation or treatment is needed in that regard."

Q. Thank you, Dr. Maddox.

So let's talk about your diagnoses. This -- certainly the information we presented here today is nowhere close to your full review of the records and your interview

data set in this case. Is that --

A. That's right. This is very specific to these proceedings.

Q. Okay. To the competency issues?

A. Yes.

Q. And your diagnosis of autism spectrum disorder, tell us, Dr. Maddox, do you -- do you approach -- diagnosing autism, is there anything unique or complex about this particular diagnosis?

A. Oh, yes. And especially over the years. As I'm sure the Court knows, Asperger's diagnosis wasn't even codified until 1994. It's one of the newer areas compared to some of the other mental illnesses or developmental disorders. It is certainly recognized in the DSM. It's -- because it's not an anxiety disorder, it's not a mood disorder, it's a neurobehavioral disorder, the diagnosis, the methodology is different. You have to have a clinical suspicion, but this is the one diagnosis where you have to have a history from the person's development. You have to look at school records if they are available. You have to talk to the parents. You have to get a developmental history. But most importantly, you have to seek -- I've made that diagnosis without the assistance of consultants. In my methodology I have consulted with neurologists, neuropsychologists, and now there is so much that has progressed in the field in the last

ten years that there is actually -- there is groups of psychologists with specialty that that is what they do. They administer -- there is some testing that is very specific to developmental disorders, and it's -- my methodology routinely is to always have a consultant, someone that has experience diagnosing, treating, assessing someone with an autistic spectrum disorder.

Q. Have you reviewed in preparation for your testimony today, the declarations of Dr. Laura Carpenter, Mr. John Elder Robison, and two declarations from Rachel Loftin?

A. I have.

MS. STEVENS: May I approach?

THE COURT: You may.

MS. STEVENS: Your Honor, we are going to limit our review to the Dr. Loftin affidavit.

THE COURT: Very good.

BY MS. STEVENS:

Q. Now, Dr. Maddox, we are not going to read these to the Court. The Court has them in evidence. But if you would please -- let's start with John Elder Robison's deposition. In your review of that particular -- that is a declaration, wouldn't you say?

A. Yes.

Q. Tell us what is significant to you from reading the materials by John Elder Robison?

A. I was familiar with Mr. Robison. I have not met him, but I certainly read his book. I had an interest. I treated persons with autistic spectrum disorders. I have made that diagnoses sometimes the first time in court. It has been an area of interest. I had read his book as soon as it was published. I was familiar and know that he has been diagnosed previously with Asperger disorder. So what strikes me is the attention to detail, the attention to fact. It's called "concrete thinking," things in his declaration that we probably all know, but with not being the thoughtful enough, like his description of the room where he evaluated Mr. Roof. He just came up with this opinion.

Q. And you have been in that same room?

A. Yes.

Q. And what did he relate that was important to you? Without reading it to the Court, what was important to you about the interaction described between Mr. Bruck, myself, and Dylann Roof?

A. To me the -- I thought what was helpful in his declaration is his observation of your interactions with Mr. Roof. He -- I'll just give you my opinion of what he's written. He said he appears to think that you all hate him; that a lot of time's spent discussing things, and that Mr. Bruck is more of a father-like figure in terms of getting him to the give-and-take in a relationship: "If I get these

clothes for you, if I work with this, will you work with us?" And so I think there was a very accurate observation about the way that you all had to deal with Mr. Roof in your approach to having a relationship with him.

And then I think what was very significant was the amount of detail that Mr. Roof has to pay to his clothing and how that has been a real preoccupation for him. So a lot of times as you all are trying to deal with issues about jury selection -- and I have been in the room with you all when you have been dealing with those issues with him -- that he's more focused on other factors than perhaps the things that you are focused on that you think are important for his proceedings. And I think Mr. Robison very clearly identified that.

Q. All right. Now, the declarations of Dr. Carpenter and Dr. Loftin, you had mentioned to us just now that this is a multi-disciplinary approach in the diagnosis of autism?

A. Yes.

Q. And what is important about Dr. Carpenter's affidavit to you?

A. Well, first of all, I didn't -- I'm glad to know she's in South Carolina. I wasn't aware of what a tremendous resource we have here.

I think the things that are important and that I'm certainly in agreement with in that it furthered my opinion

is the fact that there are many people with autistic spectrum disorders -- and that has been my experience as well -- that they are not diagnosed until later in life. It's not until the demands of society, the demands of functioning that sometimes they come into -- have an opportunity to even be evaluated. And that is very consistent with the experience I've had, especially in the persons where perhaps the first diagnosis of autistic spectrum disorder is made in a legal context. That has been very consistent with my experience over the years.

And I think that the most important part is what the elements of the competence evaluation include, and that is cognitive and adaptive testing, the developmental history, the direct assessment, interviewing, the history of the patient, the parents, the caregivers, using the DSM-5 in conjunction with that, and also assessing comorbid condition. I'm in agreement with all of those.

Q. Now, turning to the work of Dr. Rachel Loftin in this case, have you read her declaration as well?

A. I have.

Q. And in addition have you consulted with Dr. Loftin specifically about Dylann Roof and his diagnosis?

A. I have.

Q. All right. And are you familiar at least in a general sense -- though you didn't administer it, you are a

psychiatrist -- the testing that was administered by Dr. Loftin?
A. Yes. I was not aware of previously there had been other tests, so this is one of the newer and absolutely the gold standard, the ADOS. I have a very rudimentary understanding of it, but am very aware of that testing and it encompasses all of those areas.
Q. And you referred to the ADOS as the gold standard test in the diagnosis of autism spectrum disorder?
A. It's -- it's the Autistic Diagnostic Observation Schedule, the second edition.
Q. Is there anything else of importance to you there?
A. Yes. There has been some -- Dr. Loftin reports that -- I don't know if this is the new one. There has been two affidavits I reviewed from her, but the one I believe from this morning is the -- what is particularly important is her number 7 opinion. And she states, "During one of my sessions with Mr. Roof, he told me that he was not afraid of receiving a death sentence because it would never be carried out. He anticipates that he will be rescued by white nationalists after they take over the government, and for this reason the outcome of his trial does not matter."
Q. Now, and that dovetails with some of your other diagnoses as well, but specifically with regard to autism spectrum disorder, is that diagnosis -- well, tell us what is that

diagnosis for you based on?

A. For me a totality of, importantly, his childhood pediatric records. There's a number of things in those records that are important to me, as a physician. Secondly, based on the interviews with his parents and his upbringing, developmental records, certainly his mental health history, and then the consultants with all the testing that Mr. Roof has had done, and my own opinion, of course, my own experience. I have patients in the hospital -- I can think of two in the last year that I have treated that have autism spectrum disorder.

Q. In your experience and based on your education and training, do persons with autism spectrum disorder generally have a higher incidence of or are at risk for comorbid mental disorders?

A. They do. The DSM-5 specifically states that 40 percent have one -- excuse me -- I believe it may be 70 percent have one comorbid disorder and 40 percent have two. So very high rates.

Q. Turning to your second diagnosis that you relayed earlier to the Court, tell us the name of that diagnosis?

A. It's other specified schizophrenia spectrum and other psychotic disorder.

Q. And how do you come to that diagnosis in this case? What does that mean to you?

A. Yes. And if I may, Your Honor, I know that time is an issue, but this used to be called "psychosis not otherwise specified." The DSM-5, they don't have axial diagnoses anymore. They have changed a lot of the nomenclature that we use. But what -- there is a --

THE COURT: Psychosis NOS is now --

THE WITNESS: There's two psychoses. One is called "other specified," and the other one is called "unspecified." Other specified, which is the diagnosis I have made, you are supposed to put in parenthesis which form of the illness -- perhaps they lack some of the criteria, but what you are specifically looking at, and that is the one that I have diagnosed him with. And the DSM-5 has an area that's called "attenuated psychosis."

BY MS. STEVENS:

Q. What does that mean?

A. That would be the qualifier. It means that they are transient symptoms of psychosis that can become very apparent at periods of time, and other periods of time they may not be as prominent. And, also, Mr. Roof, he has another area, too, where I -- some of his beliefs that I have discussed earlier, I call that is what would be called a somatic delusion. He also has a delusion as well.

Q. Okay. The somatic delusions, are they impacting him is any way that you see based on your interviews with him right

now?

A. Yes. And there have been periods of time -- that's why I didn't diagnose it as a delusional disorder because there have been periods of time, Your Honor, where those somatic concerns were not as apparent for him. They have come and gone. Back in July, there were some concerns about the hair falling out and the suicidal ideation. Those are the ones that concern me the most. He threatens harm to himself. They were very important in July.

The order of trial, he was concerned that the State hearing would be first and there would be a television there, and if he were to have lost his hair by January, he would kill himself. Those preoccupations went away, and then they came back again in the last two visits. They are very prominent again, the belief that his hair is falling out, and if it were to fall out, he would kill himself.

Q. Specifically did we report to you that he wanted to see you because he was saying his hair was falling out again?

A. Yes. He's concerned, and this is -- and he is very anxious about this. This is not just him -- again, it's become a prominent preoccupation again.

Q. And these preoccupations were reflected in some of the prior medical records we went through, such as the asymmetry in the body, the beliefs about thyroid and the testosterone?

A. Yes.

Q. Now, the Court has expressed that the Court is aware of the other specified anxiety disorder. Don't think we need to belabor that, but your third diagnosis, can you tell us how you've come to that diagnosis, and do you hold it to a reasonable degree of --

THE COURT: Which is that diagnosis?

MS. STEVENS: Yes, Your Honor, other specified anxiety disorder.

THE COURT: Okay.

THE WITNESS: Yes, and I hold that opinion to a reasonable degree of medical certainty. That diagnosis is the easiest one. It is based on his history. We have records going back through mental health and also through his pediatrician that is clearly preexisting. And then Mr. Roof -- that is the one area where I think even he has some insight into understanding that he becomes extremely anxious at times. I think the record's replete with information that he doesn't like being in public. He doesn't like being looked at. He doesn't like attention being drawn to him. Very concerned about those things, and they make him quite anxious.

BY MS. STEVENS:

Q. Now, Dr. Maddox, we went through this in the beginning, and I'll return now to your opinion that you stated to a reasonable degree of psychiatric certainty, that Dylann Roof

cannot rationally assist his counsel at present time in this capital proceeding. Is that your opinion?

A. Yes.

Q. Is it that he will not assist us, or that he cannot assist us?

A. He cannot at this time. He has assisted you in the past. I have observed him do those things. But this is very -- it's changed.

Your Honor, I think one thing to bring up, November 8th, I was originally scheduled to see Mr. Roof anyway, and this is before the letter was written to the prosecution, and I had an appointment because at that point I was going to discuss the diagnosis. He had asked, and I had not finished my diagnostic formulation at that point. I was waiting for Dr. Loftin's findings. And Mr. Roof -- in fairness to him, he would ask me what was my opinion going to be.

So on that date, I was originally scheduled, and I was going to go over the results with him. And then in the interim, I believe that over that weekend you all -- or he had written a letter to the prosecution. So when I saw him on the 8th, I was with Ms. Stevens and Mr. Bruck. We had gone in together, and so I observed his interactions with them. And there was a marked change. There was a change in the way that he was relating to you all.

He said he hated all of us, and then he backtracked. He stated that he hated us all and then he backtracked and stated that he hated you and Mr. Bruck. He did not hate me at that point in time. He had never verbalized things like that. Mr. Roof has always been somewhat pleasant. The only time I ever heard him use the word "hate" before, he said he hated people that didn't smile, and he would talk about that in the military that he had difficulty because they weren't allowed to smile, and that some of the corrections officers in the room would not smile. That's the first time I had ever heard him say that.

He was very unhappy to see you. As soon as he walked in, he did -- he did attempt to greet me, and then he -- he had not done that before, and he was very unhappy that you were there and asked what you were doing there.

THE COURT: Just a second. I understand the chronology. What is the last time before November 8th you had seen him?

THE WITNESS: August 31st, and at that point I did begin -- in looking in preparation for today, Your Honor, I tried to go over the mental status exams since April, and I had made a note on August 31st. I noted some paranoid ideation then and specifically about what would be presented. So looking back now in retrospect, which is always easier to do, there are probably -- the beginnings of what I consider

this psychotic episode were probably in August.

THE COURT: But what happened in there? As I understand it, and I gleaned a little bit of this from the letter, is that he had not yet learned until immediately before this that his attorneys were going to mount a mental health mitigation defense.

THE WITNESS: Correct.

THE COURT: And he was very upset because he disagreed and opposed that.

THE WITNESS: That's correct. And he's always been on the record as not wanting that.

THE COURT: Right. I mean, I think you can read his writings of his contempt for psychiatry. That's why he doesn't have a high opinion of your discipline. And so this encounter you perceived with his change of attitude is the first -- is he is now encountering the lawyers who he believes, according to his letter, had tricked him and kept him in the dark. These are the things I read in that letter.

THE WITNESS: Yes, sir.

THE COURT: And he seems very alienated from them, and you walked in, and you saw that change.

THE WITNESS: Yes.

THE COURT: Since August, correct?

THE WITNESS: Yes, sir.

THE COURT: And that one significant event that I'm

aware of is that he discovered a defense which he loathes and which he does oppose, and which his lawyers have insisted they will present over objections, correct?

THE WITNESS: Yes, that is one thing. And then the other thing that I consider stressful is that the trial is actually beginning.

THE COURT: Right. But he -- as he says in the letter, he feels like they sort of jammed him on this thing, that they waited until he couldn't do anything about it, or he thought he couldn't do anything about it, and they did not disclose it to him earlier. So you were looking -- I'm just making sure I've got the sort of factual scenario. So you are looking -- he is very angry about this.

THE WITNESS: Yes.

THE COURT: And so the question I have to ask is -- which seems to me I've got to address -- is he capable of evaluating -- but this is a form of protest he has to a defense he opposes, or is he unable, even if he wanted to, could not assist, because as you -- I don't know if you are aware of this, it's the capacity, the ability, not the inclination or willingness to do it.

THE WITNESS: Correct.

THE COURT: So I'm looking at very specific evidence that he -- that he believes his lawyer -- his lawyers, this is -- you know, you characterize this as paranoia, but he has

set forth facts that give rise to his belief that these lawyers are not acting in what he perceives to be his personal interests?

THE WITNESS: That's correct.

THE COURT: And so -- and he -- you know, he told the court examiner that he had -- he could -- he could assist if he wanted to, but this is his form of being heard is he is unwilling as a protest --

THE WITNESS: Yes.

THE COURT: -- because he disagrees with the strategy.

Now, the question I would have is, in his world view, which is that he committed certain acts that he's not ashamed of, he's -- he feels like he did it for a -- what he believes to be a great cause, and he doesn't want it to be diminished by a view that he has a psychiatric -- that this arose out of a psychiatric condition. Wouldn't that be fair that was his view?

THE WITNESS: Yes, but not because of the stigma of mental illness, Your Honor. It's because he believes if the defense presents a mental illness defense that he will be seen as defective and that he will not be rescued from death row. So the issue is his rational understanding of why he doesn't want that defense presented. That is what is preventing him from cooperating with his attorney. It's not

a choice.

THE COURT: Well, he also described to this Court and to Dr. Ballenger that he would feel discredited and his act would be discredited, and he told Dr. Ballenger that he -- if he were to die, he would want his reputation intact that he had done this for this cause.

THE WITNESS: Yes, and that -- that is part of it, yes, sir, and I agree. And for the record, everything I read and talked in Dr. Ballenger's report, Mr. Roof is very consistent in what he discloses.

THE COURT: I see the same consistency through your testimony, frankly, and the jail writings.

THE WITNESS: Yes.

THE COURT: You don't have a lot of change here. The one change that has occurred is his passionate opposition to this defense, which, frankly, I -- the first time I got a wind of what the defense was because I have to approve experts, including you, which I was glad to approve.

THE WITNESS: Thank you.

THE COURT: I anticipated this very problem. I thought we were heading to this problem, and I don't fault the defense counsel the slightest for asserting the defense. But I -- I anticipated that the defendant in his own world view would resent it, oppose it in every way he could.

THE WITNESS: Yes, sir. If I may?

THE COURT: Yes.

THE WITNESS: The difference is he has now developed another paranoid level to it. I agree 100 percent with all of those assertions. The difference is now he believes that his attorneys -- the words he used are very different, and to me they brought us to a new level. When I met with Mr. Roof on the 15th, I specifically wanted to address what he had written to the prosecution. What had happened before in Mr. Roof's defense, you know, I think he suspected all along I would be a mitigation witness.

THE COURT: He knew what you were there visiting for -- because you were friends.

THE WITNESS: Probably. That would --

THE COURT: He knew you were there for a purpose.

THE WITNESS: Right. That's correct. And I think originally the idea I would have been testifying in a mitigation -- the sentencing phase of this trial. So for me to be here today was unexpected. And I did -- on the 15th, I did tell him that I was subpoenaed, and that I would most likely be testifying in his competency evaluation. So what I try to do is very specifically address the letter because knowing Mr. Roof since April, there were words used in that letter that caused me concern. And the words were "scare tactics"; the words were "threatening," that his lawyers were threatening him, and I believe on the second page of the

letter, and you all -- I'll be glad to stand to be corrected -- something about them dealing with him in an aggressive manner, which has not been prior descriptions that Mr. Roof has ever given about his counsel. He has not liked them at times. He has been in disagreements with them at times. But these are different words.

THE COURT: I want you to know that I questioned Mr. Roof did he believe that Mr. Bruck and Ms. Stevens and others had his best interests at heart, that they were not trying to harm him, and what he told the Court was, "I believe that I just disagree with them. In everything I have, I disagree with their approach." And so I did not detect -- and I don't have any doubt that he was very agitated and very upset meeting with the lawyers in that situation.

I don't doubt it at all, but what he expressed to me was that he, you know -- and I was saying to him, "Come on. Mr. Bruck is not trying to hurt you."

And he said, "I recognize it, but that's not what I want, and it harms me."

And so you interpret words like, you know, being aggressive, well, if Mr. Bruck who has avoided -- understandably not disclosing fully the defense, says, "This is the way it is," that's aggressive, it is aggressive. You and I both know Mr. Bruck. His personality is not to be an

angry, aggressive person. That is a fairly aggressive thing to say. Probably the most aggressive thing these lawyers have said to him is "We are going to do it even if you don't want us to do it," which is different from the relationship.

THE WITNESS: It could be, Your Honor, but this is the difference: In the past if I asked Mr. Roof to explain that this is what happened -- I asked him to explain this to me, and he would have. And he says, "I can't do that." He has stopped communicating.

Normally because when -- Mr. Roof having an autism spectrum disorder, words mean different things to him. I have made mistakes along the way, and I think his defense team has -- I won't speak for them, but many times when we would make a statement, there might be a logical reason that we would do that, but not always Mr. Roof's reasons. It's very imperative, and he uses words like that that I have not seen before and have not been in his vocabulary. I tried to very specifically address those words with him, and for the first time he told me, "I can't tell you." Mr. Roof does not --

THE COURT: Let me say this: This has been a pretty stressful time. We have a lot of things going on. But I did have the opportunity to question him, and for an extended length of time. I hope you've had an opportunity to read --

THE WITNESS: Yes, sir, I did.

THE COURT: And he -- once you sort of see his world view, I don't see his response as irrational. I just don't. I see -- I see if that is his goal, he is accused of committing these heinous acts, by his own account, trying to do the most horrible thing you could imagine doing, going into a church and assassinating innocent people, and "I hope to start a race war." And he's not ashamed of that.

THE WITNESS: Correct.

THE COURT: He doesn't want to be viewed as having mental health problems. Once you sort of see that view and his attorneys' understandable desire to try to dig deep into this in the mental health area, I see a collision of forces here and not an incapacity to assist, but an understandable unwillingness to.

Now, some people would say if you are facing potential death, surely he will listen to your lawyers because they might save your skin, right? I mean, that might be irrational. But they -- but what Mr. Roof has made clear is that he has a higher priority -- a different priority than merely surviving this trial. He wants to have his reputation held intact for whatever reasons he may have.

THE WITNESS: Correct.

THE COURT: So that is the struggle I'm having, and, you know, we spent a lot of time on the disease or defect part of this, and though you and Dr. Ballenger have some

differences, they are not vastly different. I'm going to tell you that. And what we are really down to is this issue of capacity.

THE WITNESS: Yes, sir. And what he's doing now, he is withholding information. He has not done that before. He is now --

THE COURT: But he's doing it -- let me say this: He answered a lot of my questions, and frankly when Dr. Ballenger did this break-through -- I had already pretty much gotten, understood him in more depth, but I had already figured it out from his answers to me. So it looks as if he is withholding it from everybody. He is withholding it as a form of protest to his lawyers.

THE WITNESS: Your Honor. I would beg to differ. I think he's withholding information from you. I think he withheld information from Dr. Ballenger, and now he is withholding --

THE COURT: What specifically is that information?

THE WITNESS: Usually the areas where it deals with his paranoid ideation, the grandiosity, and very specifically about his beliefs of what will happen to him once he's on death row. This is new. I spent a lot of time thinking about it too. Mr. Roof always thought he would die.

THE COURT: Yes, he thought he was going to walk out that church, and he said he wasn't going to survive, and he

thought he was going to die. The note in the car is a suicide note.

THE WITNESS: Correct. This is a new area he had not thought about before this offense. He didn't think he would be here. But I see it as an evolution. I believe that he -- you are very correct. I think at one level, he does not -- first of all, he doesn't think he's mentally ill. He thinks we are wrong. He thinks we are lying and trying to mount a defense to save him, but I think that the difference is -- is, number two, he doesn't think he will be executed. He thinks he will be freed at some point. So he's --

THE COURT: I'm going to tell you, though, that he has not said that to me or Dr. Ballenger, and he has expressed a different view.

THE WITNESS: Yes.

THE COURT: That -- about that outcome, and, you know, he will have an opportunity -- it's his choice to speak, but I've already written notes you asked him those questions because you have highlighted the point which I would like to explore further, but I want you to know that when he met with Dr. Ballenger, he did -- you saw the report -- he thought that there was a -- that he understood that this -- that he certainly hopes that he would be saved by the white nationalists, but he understands that that was a problematic issue.

THE WITNESS: Yes.

THE COURT: And that he would rather die than have this other defense, and he would face the death penalty. And I'm going to ask that more specifically to make sure my understanding --

THE WITNESS: Your Honor, when he withholds information, there are a number of reasons. Some of the things he will say "I can't tell you" about. What he's told me specifically, he tries to be very honest. If he's asked a question --

THE COURT: He's apparently uncomfortable not telling the truth.

THE WITNESS: That's correct. And he will try to give an honest answer, and if he can't, he would rather answer and say, "I can't answer that" instead of say something. He told me specifically when he has a tendency that he would not want to be critical, he would rather not answer and says, "I can't answer."

THE COURT: Let me ask you this: If you determined that his answer ultimately was, "I do understand that I can -- that there is a substantial risk of me dying from the death penalty," if he said -- he came and said, "I realize that" --

THE WITNESS: He told me 30 percent.

THE COURT: Let's say whatever that number is --

THE WITNESS: Yes.

THE COURT: -- he came to that conclusion, and he -- and he -- and you determined that, in fact, he could assist in that defense if that was his desire, but he would rather die than do that --

THE WITNESS: Yes.

THE COURT: -- then you would agree with me, he would have the capacity to assist.

THE WITNESS: Absolutely.

THE COURT: Okay. Ms. Stevens, I'm sorry. I've got to make some difficult decisions here and I have a lot of respect for Dr. Maddox, so --

MS. STEVENS: I understand, Your Honor.

BY MS. STEVENS:

Q. And, Dr. Maddox, we were talking about whether he can assist or is he just angry with us. Right?

A. Yes.

Q. And you said he cannot. Now, let's talk about it, your diagnoses, how longstanding the conditions have been, and how they impact him as to whether he can -- whether he has the capacity right now to rationally assist us given the gravity of the penalty he faces.

A. Yes. That was a question? I'm sorry. It's more like a statement to me, but I --

Q. Tell us how you --

MR. RICHARDSON: No objection from the Government, Your Honor.

THE COURT: Yes.

BY MS. STEVENS:

Q. Tell us how, first of all, your diagnosis, how longstanding are these conditions?

A. Yes. The autistic spectrum disorder has been since early childhood, and that is, I guess, a discussion for another day, but in my opinion and looking back at the records, there is some -- early on in his pediatric records, there's some things that caused me concern that were red flags to me. So that tends to be a disorder that develops early in childhood. As an adolescent, it is clear that he's having problems with social relationships that has been longstanding.

In my opinion, the other specified psychotic disorder, which is technically called "attenuated psychosis," that is much more recent. That begins to have its origins in 2014 with the records where he's having some concerns about his body. At first he believed he had lymph node cancers, and while he was having that work done, he believed he was actually diagnosed with a thyroid condition. And it's in these medical records that you begin to see the somatic concerns. And he says in the records he knows something is wrong, and he's trying to figure out what it is.

Now, those symptoms of -- there have been periods of

time, as I mentioned, where early on in April when I met with Mr. Roof, those somatic symptoms were prominent for him. And he's even counted numbers of eyelashes that have fallen out and reported them to me. He has been very specific. He's reported the number of pubic hairs that have fallen out to me, reported those numbers to me. There have been periods of time he has been focused and specific.

Q. You take it back to as early as documentation and records from 2014?

A. Yes.

THE COURT: Ms. Stevens, let me -- we have been -- we are beating up this how long the mental disease or defect. How long has been his lack of capacity to assist his attorneys?

THE WITNESS: November 8th, as far as I can tell, Your Honor, and I think the early seeds, again going back to retrospect, I probably should have picked up on August 31st there were the beginnings then, but I think it definitely --

THE COURT: The first time you came to the conclusion was after he had written the letter and you went into a meeting. That's when you saw -- you reached the conclusion he lacked capacity?

THE WITNESS: Yes.

THE COURT: Thank you.

BY MS. STEVENS:
Q. You are familiar with how a capital trial is conducted?
A. Yes.
Q. And the stressors of the capital trial?
A. Yes.
Q. And I imagine even on you today sitting in the witness stand?
A. Yes.
Q. Let's talk about the things that are required for a person to participate rationally in the courtroom in their defense in a capital trial?
MR. RICHARDSON: Your Honor, objection. I think this is beyond the scope of her expertise and certainly is far afield from where we are trying to get.
THE COURT: You know, Dr. Maddox, I think she testified 29 times she has been involved in some of these capital cases. She's not a lawyer. You know, obviously, I have the ability to observe as well, but I would like to hear what she has got to say.
BY MS. STEVENS:
Q. So with regard to communicating with counsel in real time in the courtroom, tell us about that, and tell us how his disabilities that you diagnosed would impact him in that process.
A. Well, the main disabling feature I think Mr. Roof was

going to have to deal with during this trial proceeding is his anxiety level. And that before he developed the paranoia, that was -- that would have been an issue you all would have had to deal with every day, but you had enough of a relationship with him, it was my opinion, that you would be able to help him deal with his anxieties.

But for some examples, Mr. Roof is always afraid that people are looking at him and that he didn't know who to make eye contact with during court. I always told him to -- he was worried about people looking at the back of his head. He's very concerned about how the back of his head looks. He's showed me on one occasion. He's refused ever since. He's concerned when he sits there that people are staring at the back of his head. He's afraid to have eye contact with other persons. He's afraid that he will blush in front of people. He very specifically told you that in a jury panel you are not to pick an attractive young female, because he would not be able to pay attention, and he would be very uncomfortable during those proceedings.

Q. And so in that --

THE COURT: I'm sorry. I missed the last part. Say that again.

THE WITNESS: He told the attorneys when I was visiting on the 8th that they were not to pick an attractive young female.

THE COURT: That would distract him?

THE WITNESS: That he would be very uncomfortable.

BY MS. STEVENS:

Q. Did we explain to him or attempt to explain to him that she might hold appropriate views for the case?

A. Yes.

Q. She might hold appropriate views with regard to the death penalty, and she might be a juror that we would recommend that we keep in the jury panel?

A. Yes.

THE COURT: Ms. Stevens, that's your call regardless.

MS. STEVENS: I understand, Your Honor.

BY MS. STEVENS:

Q. But what was influencing his decision-making in our ability to secure his cooperation in this endeavor that is coming up?

A. The fear that people would be looking at him.

Q. And that overrode legal advice with regard to him helping us to select appropriate jurors?

A. Yes.

Q. And how about deciding what witnesses to be called? I understand His Honor says, and we appreciate, that calling the witnesses is our decision. But in seeking input from the client, how would his disabilities impact him with regard to

weighing consequences of presenting or not presenting evidence and what it is that we are doing in the courtroom?

A. Yes. His wish is that you do nothing. He wants you to present no defense, and he wants you to be quiet. So whenever any witnesses have been discussed, he again will always go back to the rhetoric he doesn't want anything presented.

Q. With regard to the ability to rationally weigh consequences of doing things like that, what is factoring in this -- Mr. Roof's scale right now, disabilities or rational decision-making?

A. Disabilities, absolutely. For example, Your Honor, one of the things he was very upset with Dr. Ballenger is that a picture of his forehead was shown. And his concern to me is "If they -- if the defense presents any kind of mental illness defenses that things are going to -- people are going to begin paying attention to me. And now that that photograph has been introduced, people are going to be looking at my forehead."

THE COURT: Let me say this: That's given his anxiety issues --

THE WITNESS: Yes.

THE COURT: -- and his -- how we characterize his preoccupation with his body as an anxiety or psychosis, whatever it is. That is a given in here. We are talking

about his ability to assist his attorneys.

THE WITNESS: Yes.

THE COURT: Okay? And I have been told through Dr. Ballenger's report that he was very engaged and cooperative --

THE WITNESS: He is.

THE COURT: -- through all of this, and that that has stopped now because he's concerned -- he's upset about the defense.

THE WITNESS: Correct.

THE COURT: And the lawyers have heard him out. It's not like he couldn't communicate with them. He told them he was opposed to it, and they told him sort of "I'm sorry, but that's what we are going to do." So we --

THE WITNESS: Correct.

THE COURT: -- we have opposite -- so we now have trial coming up, and there have been a lot mentioned to me about his conduct in the courtroom --

THE WITNESS: Yes.

THE COURT: -- about how -- his ability to interact with his lawyers in the courtroom. And the issue was he would not be able to send notes or to whisper to them.

THE WITNESS: Correct.

THE COURT: And I'm going to just share with you an observation I have had, and I shared this with Dr. Ballenger

yesterday, that when we had our first set of -- we brought our jurors in the three -- we had over 700 jurors come into the courtroom in groups of 80 or so over three successive days, and 85 people, all of them looking at the defendant.

THE WITNESS: Yes.

THE COURT: He seemed pretty rigid in his sitting, staring, not doing a lot of interacting with anyone. On several occasions I saw him looking at me, but mostly he was looking away.

THE WITNESS: Yes.

THE COURT: He was obviously uncomfortable. I mean it was apparent to me that he was uncomfortable in this setting. A lot of people -- I was a young lawyer one day, I was uncomfortable sitting in a courtroom. He -- my next major encounter with him was November 7th, the day -- we have the transcript of that. He was very cogent and articulate and calm --

THE WITNESS: Yes.

THE COURT: -- talking to me. Much more relaxed in the setting.

THE WITNESS: Yes.

THE COURT: It was a closed proceeding. It was not the crowd of people. But he was very -- he was -- he had acquired greater familiarity with the space he was in, and he interacted with me, and he spoke up, spoke for himself in a

way that would not have surprised me that he would have been silent because of the anxiety. Then yesterday he was extremely engaged, alert, throughout Dr. Ballenger's testimony. I doubt that that would surprise you, as I think he has been very alert regarding yours, and he was interacting with counsel. He asked Ms. Stevens if he could speak, and she relayed that to me, and then he spoke, objecting to something that was getting ready to happen.

THE WITNESS: Yes.

THE COURT: And again in a cogent, practical, relaxed way. And it appeared to me that some of his symptoms -- anxiety-related symptoms had dissipated to some degree, that he was -- that -- and Dr. Ballenger, he says, "You know, that is the way we will sometimes treat anxiety disorders. We will take the people to the thing that makes them anxious" --

THE WITNESS: Correct.

THE COURT: -- "and it will help us -- people make progress by confronting their fears and anxieties, and that's just the way we do that." So --

THE WITNESS: Correct.

THE COURT: So the idea that he cannot -- then he talked about a doctor, "Sure I could give them medicine, sure I could talk to them, I'm mad at them. I don't want to assist them in that." And that to me at least sounds more

like the capacity to do it, but not the willingness to do it.

So what does that -- that -- at least assuming my observations are correct, that he has that evolving comfort in the courtroom, what does that tell us about his capacity, his ability, if he wished to communicate with counsel during the trial?

THE WITNESS: A few things, Your Honor. And that is a terrific question. But you have to remember in my view there is more than anxiety going on, and anxiety would decrease with familiarity. But in the past, his team was aware of his anxiety, and they did things to decrease his anxiety to make him comfortable in court, allowing him to pick clothes and doing things in trying to work with him in his limitations. The difference is they cannot comfort him anymore. He does not have a relationship with them anymore. They are not going to be able to do things to calm his anxiety.

THE COURT: I think any competent counsel would insist on asserting a mental health defense in this case.

THE WITNESS: Absolutely.

THE COURT: Okay. So there is no solution to this.

THE WITNESS: That's correct.

THE COURT: Mr. Roof is going to oppose any effort to present what I think a competent lawyer should do. I think it's kind of baked into this situation, and it's an

imperfect situation, but I think it's baked in, but it's just -- I mean, it doesn't surprise you either that he may over a period of time be less stressed in a setting he's more familiar with.

THE WITNESS: I don't -- that would not be my observation nor my prediction. I think he's going to become incredibly more uncomfortable as these proceedings progress, especially if his family members were to testify.

THE COURT: I think they will. I would anticipate they will testify.

THE WITNESS: Yes.

THE COURT: And, again, that is a question we have about should the attorneys have this decision, and I believe that the law provides them to do this, and I've said this to Mr. Roof. I think the jury should hear this information so they can make the best decision.

THE WITNESS: I've done the same thing. I told him it's imperative; he has a lot of more realistic beliefs, he has the ideas that it's the truth, and it's not fair to withhold the truth if there's things about him, about his medical records, and I've also said this.

THE COURT: Juries have great abilities to figure all this out. And to the extent there is a conflict, so be it. I mean -- but I think it would be a terrible mistake for the jury not to hear from you and others at a mitigation

hearing. That needs to be made, and the jury can weigh the aggregating and mitigating situations and make an informed decision. We don't want to deprive the jury of any information that they should have in that important decision.

Ms. Stevens, I keep interrupting you. I have got to work through this, and I am finding this very helpful.

MS. STEVENS: Thank you, Your Honor.

BY MS. STEVENS:

Q. With regard to rationally weighing consequences, can you explain for us how the three disabilities you diagnosed will impact him now and as we move forward into an adversarial proceeding where the Government begins presenting evidence?

A. Yes. Again, and I think His Honor did a great job.

Some of the anxiety disorder, some of that will decrease with familiarity each day. Even though he has some idiosyncratic ideas about dressing himself, each day he had practice doing that, those sorts of tasks would become easier. What is happening now in my opinion with the paranoia especially, that has grown. I'm concerned. He's threatened that he might kill himself, and he's threatened to harm -- well, not threatened, harm. He asked me to harm Mr. Bruck. And I'm concerned. I think as the -- even though his affect is inappropriate, and that's part of his autistic spectrum disorder, that he may smile. He still hears it. He may not process it the way we do, but he's going to hear some

very powerful testimony. He's also going to feel a sense of great betrayal, not only from his team, but I think his family members, especially his mother. If she were to testify, he would, in my opinion, greatly decompensate. Nothing compared to what we have seen with the team here and them presenting a defense.

THE COURT: I've got to evaluate his present capacity.

THE WITNESS: Yes, sir.

BY MS. STEVENS:

Q. And that is the nature of my question. Does he presently have the capacity to rationally assist counsel in this proceeding?

A. Not at this time. He has, but in my opinion, not at this time.

Q. Now, if I could backtrack just a little bit. In your meetings with Mr. Roof, you discussed history. You discussed things of a general mitigating nature in the various visits that you have, have you not?

A. Yes.

Q. So you have discussed things other than medical conditions with Mr. Roof all along?

A. Yes.

Q. And you've taken family history?

A. Yes.

Q. You've met with family members in preparation for the penalty phase of this trial?
A. Yes.
Q. You've discussed that with Mr. Roof?
A. Um, he only knew, I believe, again because on the 8th when originally those things were going to be discussed. I think at that point he had only known prior to that I had talked with his mother, and he was quite upset about that.
Q. And he was upset with you for talking to his mother, and that was relating to an earlier visit?
A. Yes.
Q. And also you watched various family visitation videos with me?
A. Yes.
Q. You are aware on July 2nd of 2016, his father, Ben, told Dylann Roof that the defense team members were saying he had autism?
A. Yes.
Q. And so that was an issue that was relayed well prior to November and these symptoms that you are seeing now?
A. Yes.
MS. STEVENS: May I have a moment, Your Honor?
THE COURT: You may.
MS. STEVENS: Your Honor, might it be an appropriate time for a brief courtroom break. We can gather our

thoughts.

THE COURT: I think that would be an excellent idea. Thank you, Ms. Stevens. We'll take about a 15-minute break.

MS. STEVENS: We will not speak to Dr. Maddox.

THE COURT: I don't have to worry about saying that to Dr. Maddox.

(Thereupon, there was a brief recess.)

THE COURT: Yes, ma'am?

MS. STEVENS: Yes, sir.

THE COURT: Further questioning from the defense.

BY MS. STEVENS:

Q. Dr. Maddox, I want to thank you for being here today. Where have you been these past few days?

A. New York.

Q. For what circumstances?

A. My Godmother, my aunt, my paternal aunt, she died on Friday morning.

Q. And you traveled to New York for the services?

A. Yes.

Q. What time did you arrive last night?

A. My flight got in at 11:40, and I believe I checked into the hotel room a little before 2 a.m. -- sometime after 1 a.m. and before 2 a.m.

Q. And were you gracious enough during the trip to allow certain phone calls from me so we could prepare for today?

A. I did.
Q. Thank you, Dr. Maddox.

MS. STEVENS: Thank you, Your Honor. That's all I have.

THE COURT: Very good. Let me ask one question, and then I'm going to let the Government cross. If the defendant had not opposed -- had not written the letter to the prosecutor and did not oppose the defense, would you still regard him as competent?

THE WITNESS: That's a great question. I probably would not have been aware of this agenda. I think the letter was what prompted that.

THE COURT: Specifically, if he had not opposed the defense and had not written the letter, you would still regard him as competent for trial?

THE WITNESS: I think that is a very good and fair question. Yes to a degree and no. It has two answers. Yes in terms of me not being aware of that agenda. Had he expressed his typical, you know, some of the statements that he has before that he didn't want that sort of defense -- I think where it's crossed the line now -- when I saw him on the 15th, he had never asked me to harm his attorney. So had he said those -- if I had the metastatic exams from November 15th, I -- out of context without having that letter, I would have been quite concerned.

THE COURT: But you have seen him seven times before the letter?

THE WITNESS: That's correct, and I did not have an issue.

THE COURT: And you did not think -- until that time, the seven interviews, about three hours each --

THE WITNESS: Yes.

THE COURT: -- you did not believe he was incompetent.

THE WITNESS: That's correct.

THE COURT: And only after he wrote the letter and you had encountered it, did you come to the conclusion he was incompetent.

THE WITNESS: That's correct.

THE COURT: Thank you.

MS. STEVENS: Just a brief follow-up to His Honor's questions.

BY MS. STEVENS:

Q. The first time you noticed the paranoia and suspicions, though, you related from the August 31st visit that you had with him?

A. That's correct.

Q. And those paranoid symptoms began in the clinical interviews back at that point?

A. Yes.

MS. STEVENS: Thank you, Your Honor.

THE COURT: Thank you. Cross-examination, Mr. Richardson.

MR. RICHARDSON: Thank you, Your Honor. I think we will be relatively brief, not rehash some of the ground --

THE COURT: Thank you.

MR. RICHARDSON: -- that you've gone over.

CROSS-EXAMINATION

BY MR. RICHARDSON:

Q. The judge talked to you about this November 8th meeting. When did you schedule to be meeting with Mr. Roof on November the 8th? How long in advance was that?

A. It was probably about the week before. I was due for a visit, and I knew -- actually just for the record, most of the time I had actually been working with the State defense team, and so as these proceedings were coming, my goal, I think I met the week before I --

Q. And when were you scheduled to meet with Mr. Roof on the 8th?

A. That morning.

Q. That morning?

A. Yes.

Q. And generally you do about three hours?

A. Yes.

Q. Right? So when you had scheduled that, you planned to

spend about three hours Mr. Roof on the morning of November the 8th?
A. Yes, sir.
Q. That's Tuesday?
A. Yes.
Q. Right? That's the second day of jury selection?
A. Yes.
Q. Right? When Mr. Roof was going to be in this courtroom?
A. Yes. That part I wasn't aware of. I just picked that date because I knew it was Election Day and you all would not have a proceeding, so there would be time in the jail to be able to evaluate him.
Q. And you arranged to do that with counsel to meet with him on November the 8th in the morning?
A. It may have been through the State counsel. I can't remember. I think it was the State counsel I made that arrangement with, but I was aware that, I think November 8th, he would be in the jail.
Q. Okay. Do you know whether counsel -- at the time that that was arranged with you, whether counsel knew about the existence of a letter at the time they asked for that?
A. At the time of the original evaluation, no, they did not know. That happened intervening, so I was routinely scheduled to go there anyway and the letter came.
Q. You met with the defendant seven times, right?

A. Yes, sir.
Q. On a number of those occasions, we talked about State counsel. We are talking about Ashley Pennington?
A. Yes.
Q. There are others, but he's been the primary contact that you've had?
A. Yes.
Q. For the federal side Ms. Paavola, and Mr. Pennington primarily on the State side?
A. Yes, he is.
Q. And so in a number of the meetings you had with him, counsel was there?
A. Yes.
Q. Right? Sort of facilitating your exam and communications?
A. Yes.
Q. All right.
A. And also I could observe the interactions.
Q. So you could observe the interactions. In particular I want to talk to you a little bit about June the 4th when you met with Mr. Pennington.
A. Yes.
Q. And you have up there with you a number of things. Just tell us what do you have with you.
A. Sure. You are welcome to look.

Q. I don't want to.

A. The same copy of records.

Q. A copy of your notes?

A. And what I have been referring to most frequently throughout this hearing, this was the affidavit that -- I was going to prepare a declaration before I knew that I would be required to testify. So these -- this eventually would have been the declaration I would have provided had I not been here today. So it was a draft statement that I had worked on.

Q. Typically when you provide opinions, do you prepare a report and provide that?

A. Absolutely.

Q. Okay. Didn't do so here, though, right?

A. No, I haven't had a chance. And this probably would have served as my report, other than me being here today, and that is correct, my methodology would always be -- and I apologize. I just -- I didn't have time.

Q. On June the 4th, in the meeting we had -- you are welcome to refer back to your notes --

A. Thank you.

Q. -- if it will help you refresh your recollection. Mr. Roof explained to you that Ashley Pennington knew him better than his family knew him.

A. Yes.

Q. Right? And that Mr. Pennington had gotten extremely close with him?
A. I'm not sure he used "close," but I do recall him saying Mr. Pennington knew him better than his family members, and I know he felt close to Mr. Pennington.
Q. Although to make the record clear, he then backtracked and said, "Maybe my mom knows me better," right?
A. Correct.
Q. I don't want to overstate. Certainly felt like Mr. Pennington, who had met with him on multiple occasions, was very close with -- or had a close relationship?
A. Yes.
Q. And Mr. Roof expressed concern that Mr. Pennington was there on the 4th of June, which was a Saturday?
A. Yes.
Q. Because it was his day off?
A. Correct.
Q. Right? Mr. Roof's concerned that Mr. Pennington is having to come in and spend his day off with Mr. Roof?
A. Correct.
Q. And they talked about -- during that meeting and others, they talked about the books and movies and all of the variety of topics that Mr. Pennington and Mr. Roof had discussed?
A. Yes.
Q. All right. And, in fact, whether that meeting or in

others, you are aware that Mr. Pennington has described their conversations in engaging in a variety of topics?

A. Absolutely.

Q. They were comprehensive?

A. Yes.

Q. Right? That they included the defendant's background?

A. Yes.

Q. Right. Or that they went through and talked about court proceedings, for example?

A. Yes.

Q. Right? That he explained what was happening?

A. Yes.

Q. Right? And Mr. Pennington understood that the defendant understood what was happening?

A. Yes.

Q. Right? That to the extent that the defendant had questions, Mr. Pennington had provided those answers?

A. Yes.

Q. Right?

A. And even in private, Mr. Pennington -- one of the reasons I had Mr. Pennington there for one is it was to go over the evidence, and I've watched him go over the evidence together in some of these proceedings as well.

Q. Right. And one of those examples, I believe from your notes -- confess, you do not have the best handwriting?

A. I have the worst handwriting.
Q. It's virtually indecipherable.
A. Even to me, which is on some of those occasions when it was fresh I attempted to type them so I could read them as well.
Q. One of the things you did is went through the crime scene photos?
A. Yes.
Q. With him. Where Mr. Pennington was there?
A. I don't think -- we didn't look at the photos together. Mr. Pennington discussed the crime scene photos. I only saw those just a few weeks ago.
Q. You saw the crime scene, you all discussed the crime scene, and you discussed with Mr. Roof that Mr. Pennington had gone over with him a vast array of the evidence in the case?
A. Yes.
Q. Okay. And that according to Mr. Pennington, in your conversations and observing and talking to him, Mr. Roof would raise conversations and issues that he thought Mr. Pennington might be interested in?
A. Yes.
Q. Right? That he was sort of aware of what Mr. Pennington might have interest in, and he would steer the conversation to him?

A. Um, well, I think more that the way I would probably characterize it is that Mr. Roof -- Mr. Pennington knows Mr. Roof's interests in some of the books he reads, and I think it's fair to say they share a lot of history and literature, which are typically the areas of Mr. Roof, especially history. I don't think that it was -- I think it was more Mr. Pennington trying to engage in Mr. Roof that they share interests.
Q. You wouldn't be surprised that Mr. Pennington has said that Dylann raised topics that he knew Mr. Pennington would be interested in?
A. Oh, absolutely.
Q. Right? And that you had conversations as well that initially Mr. Roof would not discuss with Mr. Pennington his drug use?
A. Correct.
Q. Said "I refuse to talk about it"?
A. I didn't know that. He discussed it with me, but I would not be surprised.
Q. Right. I think in the -- well, regardless, you are not surprised by that. And consistent with the confession that Dylann gave where he wouldn't talk to the FBI agents about his drug use?
A. Yes.
Q. Right? But in that June 4th discussion -- may not have

been June 4th -- regardless, you are aware that Mr. Pennington has described how he eventually won Mr. Roof over and Mr. Roof was willing to talk about his drug use with him?

A. I wasn't privy to that, but that would certainly be consistent. That is what has happened to me as well. There were periods of time where eventually Mr. Roof did discuss some of his drug use. That would be consistent with my interactions. I don't know if there was a proceeding or something that -- I'm not aware of some of those things.

Q. But there is a conversation where, as you warm up, as you develop a rapport with Mr. Roof, he provides you more information?

A. I think that is fair to say, sure.

Q. And in your sort of observations with Mr. Pennington in particular, Mr. Pennington describes Mr. Roof as being a very obedient client?

A. Yes.

Q. Right? That he was compliant with instructions that Mr. Pennington provided him?

A. Yes.

Q. Right? And Mr. Pennington described him as being very verbal?

A. Yes.

Q. Right? Which is something which is consistent with what

you say. You light up and smile when you say that, but he's quite verbal, right?
A. Yes.
Q. Have you reviewed his IQ testing, for example?
A. Yes.
Q. Okay. And I know there may be at least two different sets of them, but some have suggested his verbal IQ may be in the 99th percentile?
A. In fact, when I saw -- I had not had the recent IQ results yet, but on the 15th, Mr. Roof told me that he was a genius, and then we were discussing IQs and where they fall in standard deviations, and I did say that I believe his verbal IQ was 141.
Q. And I don't want to belabor this. Mr. Roof is familiar with the concept of standard deviations?
A. No, he was not.
Q. You were explaining that to him?
A. Yes.
Q. And you've had a chance to review quite a number of writings that Mr. Roof has made?
A. Yes.
Q. Right? And it's fair to describe them as clear and coherent?
A. Yes.
Q. Maybe misguided, but clear and coherent?

A. Yes.

Q. In your observations of Mr. Pennington and Mr. Roof, is it fair to say they were free flowing in expressing opinions and ideas?

A. To a point. There was one time I remember in particular -- I believe it was June 4th -- that we were talking, and then all of a sudden Dylann stood up and did get very paranoid -- I put a notation in there -- wanted the interview to end. And as soon as he did that, sat back down and met with him for another 30 minutes. Even with Mr. Pennington I can observe that it was something that could be redirected. They would get back and get focused and work again.

Q. That's not something wholly uncommon in your experience with defense lawyers dealing with their clients, that they don't always see eye to eye?

A. That's correct.

Q. Right?

A. And Mr. Roof has done that with me too. There have been occasions where I saw him alone that after a period of time -- we were talking -- he stood up and said, "Why are we doing this?" And he wanted to end the interview, and then he would sit back down and probably talk for another 40 minutes.

Q. And you are also familiar -- I think the issue came up in the *Inman* case that you worked on -- that some clients like

some lawyers better than others?

A. Absolutely.

Q. Mr. Inman was a capital case -- or a potential capital case in the upstate, right?

A. Yes, sir.

Q. And Mr. Inman -- I won't use the names of the lawyers so that we don't -- but one of the lawyers Mr. Inman wasn't too keen on.

MS. STEVENS: Objection, Your Honor.

THE COURT: Overruled.

BY MR. RICHARDSON:

Q. The other lawyer in that particular case, Mr. Inman was quite keen -- much more comfortable cooperating with.

A. He trusted him, yes.

Q. And as part of -- you did a competency eval in that case --

A. Yes.

Q. -- the *Inman* case. And in that particular case, you found that Mr. Inman was capable of working with the counsel he was close with?

A. Yes.

Q. Right? Even though it was apparent to you that he was not willing to work with the other lawyer?

A. Correct.

Q. And it's fair to say, based on your experience in dealing

with Mr. Roof and both the State defense lawyers and the State, and the federal defense lawyers, that the defendant doesn't have the same relationship with Mr. Pennington as he does with some of the other lawyers.

MS. STEVENS: Objection.

THE COURT: Overruled.

THE WITNESS: I think that is fair historically. I have not seen them recently. My assessment now would probably be very similar to the relationship he's had. But I have not -- again, I have not seen Mr. Roof with Mr. Pennington, but I can tell you the August 31st evaluation, Mr. Roof was talking about Mr. Pennington in terms of --

BY MR. RICHARDSON:

Q. In a positive light, right?

A. No. They may have similar issues.

Q. They may have gotten off the rails is what you are saying?

THE COURT: Let me understand this. And was it over the same issue, which is --

THE WITNESS: Yes.

THE COURT: -- the defense?

THE WITNESS: Yes.

THE COURT: And you anticipate that difficulty with any lawyer who tells him he or she is going to present a

mental health defense?

THE WITNESS: Yes, but with the caveat that I -- in my opinion, and, again, I can't, you know, predict the future, I don't think he would threaten Mr. Pennington with death. I think he's more connected to Mr. Pennington. I would imagine he may be not communicating with him, but I'm not sure that it would go to the level that he would ask for him to be killed.

BY MR. RICHARDSON:

Q. And part of that, Mr. Pennington from, you know, the very day after this event has been meeting often multiple times a week with the defendant?

A. Early on. I don't know. I've not been in contact with counsel probably in about a month.

Q. We've talked a little bit about -- just mentioned Mr. Inman, and I want to come back and talk about a few others briefly. The reason you were doing an eval of Mr. Inman is you have to be competent in order to plead guilty?

A. That's correct, I was retained in that case because he was waiving his defense and wanted to be executed, and in my opinion, he was competent to do that.

Q. That was a case where Mr. Inman wanted to waive his defense and plead guilty and get the death penalty?

A. Correct.

Q. And the Court and you found him to be competent to do so?
A. Yes.
Q. You are also required to be competent to waive other rights? You are familiar with that. You've been involved in other cases where the waiver of other rights require a competency evaluation?
A. Yes, sir.
Q. Particularly in capital cases?
A. Yes, sir.
Q. So as, an example of William Downs?
A. Yes.
Q. You remember Mr. Downs?
A. Yes.
Q. Where you did a competency evaluation for him and found that he was competent?
A. To be executed, yes, he was waiving his --
Q. Appellate rights?
A. And asked to be executed.
Q. Right. And you found there was -- that he could communicate with counsel even though he chose not to because he disagreed fundamentally with their strategic approach?
A. That's correct.
Q. That -- that was in your view, he was competent to waive those appellate rights?
A. Yes, and what the issue was in that case, there were some

concern that he had a depression and that his depression was making him not self-protective, and that he was waiving his rights because he was depressed, and it was my opinion that that, his depression, was not the reason he was waiving his rights and that he was competent.

Q. And here it is. Sorry. The other thing about Mr. -- the other thing that you indicated was a suggestion that he was delusional because he wanted to be executed and get a better life in -- what you said, the afterlife?

A. Okay. I don't recall that, but that sounds consistent with what I would say. But I would characterize that delusional, I don't recall in that context.

Q. No. I'm sorry. You considered that. You actually -- you are exactly right. You found -- and the language, I'm not going to -- it's not a history or a memory test. You found that his hopes of receiving something better in the afterlife was not a delusional fault for him?

A. That's correct.

Q. That it was a rational choice to, you know, seek higher glory, if you will?

A. Yes, for him specifically. He thought there was a chance he could go to heaven, and he had some spiritual beliefs. That's correct.

Q. Okay. You've done a number of these evals in the waiver of appellate rights in execution cases or capital cases?

A. Yes, sir.
Q. Right? Like David Hill?
A. Yes.
Q. You remember Hill. James Earl Reed?
A. Yes.
Q. And a couple of those, like Mr. Reed for example, you found that he was paranoid?
A. Yes.
Q. Right? But fully competent to waive his rights?
A. Yes.
Q. And one of the things about -- I'll withdraw that.
In your evaluation of Mr. Roof's competence, did you take into account the various waivers of important rights that he's made in this case? Let me give you some examples just to ask --
A. Yes.
Q. I'm not trying to trick you. Don't worry. Right, the August 20th, he waived certain rights on the record in a handwritten or a written waiver?
A. Okay. I wasn't aware of that, but --
Q. On September 15th, he made an extensive waiver of various rights, including attorney-client privilege and right to appearance and various things. That's September the 15th.
A. I was not aware of that. Okay.
Q. The judgment of whether he was capable or competent to

waive those rights, you hadn't conveyed to anybody at that point that he was incompetent?
A. Not at all.
Q. Not at all, right?
A. Not at all.
Q. The several meetings you had had, you hadn't gotten to that conclusion at all?
A. That's correct.
Q. Let me talk to you just a second about -- the judge sort of talked about this. I'm trying to decide whether I can just leave it. Let me ask you just a minute. You talked a little bit about anxiety?
A. Yes.
Q. And Mr. Roof, despite what is reported as an unwillingness to describe his own shortcomings, social anxiety, and anxiety is something he is forthcoming about?
A. Yes. And I beg to differ. I think it's a lack of insight. It's not that he doesn't describe it. He doesn't think he has the other conditions. But he recognizes that he does have some anxiety, although he minimizes it. It's more a level of insight, that he's aware of it.
Q. In your perspective, it's not that he's trying to hide any mental problems that he has?
A. I think he is now. I think --
Q. Well --

MS. STEVENS: Objection. She wasn't finished.

THE COURT: Let her finish the answer.

THE WITNESS: This is new, and this has only been November the 8th.

THE COURT: What precisely is new?

THE WITNESS: That he is withholding information, things that he used to talk about before that I consider to be paranoid and grandiose he has stopped discussing.

THE COURT: Such as?

THE WITNESS: For example, when His Honor asked him why did he not want those things presented, he said, "I can't tell you. I don't want to talk about it."

THE COURT: But he ultimately told Dr. Ballenger that. He told me some of that. What else?

THE WITNESS: He told you some, but again --

THE COURT: He gave a full account to Dr. Ballenger. What else is he withholding?

THE WITNESS: For me, again when I specifically asked him about the letter and to please explain those words to me, what they mean, he would not do that.

THE COURT: Okay. Anything else?

THE WITNESS: I'll be glad to --

THE COURT: I'm talking about the thing he's now withholding information. This is a very important issue about things that have happened around November 7th.

THE WITNESS: And, Your Honor, I would need a copy, but there were also some things in Dr. Ballenger's report where he -- the best example I can give you is everything he told Dr. Ballenger is absolutely consistent with what he's told me. The only issue I have is he stopped communicating. There were things that he has formerly talked about and was very open about discussing, and it's my opinion now he has figured out, he --

THE COURT: What are those things?

THE WITNESS: If I could have a copy of Dr. Ballenger's report, I would --

MR. RICHARDSON: I'll be happy to provide it.

THE WITNESS: And I have also been provided the transcript, Your Honor.

MR. RICHARDSON: The transcript, we would also like a copy of that, but I don't know how inclined you are to hand that to me.

THE COURT: I'm sort of -- I don't think it's necessary. I will tell you this: You've got it fully in Ballenger's report. There is nothing in Dr. Ballenger's report that isn't in that transcript.

MR. RICHARDSON: I'm just going to grab this.

THE COURT: Mr. Richardson, don't feel like you being starved.

MR. RICHARDSON: I hadn't requested it for good

reasons.

THE COURT: One reason I'm asking you, Dr. Maddox, is I want to ask -- if Mr. Roof elects to testify, I want to ask him about those things.

THE WITNESS: Yes, sir, I understand, and I'll try to be specific to help you.

For example, in one area on page 21 of Dr. Ballenger's report, near the bottom, it's -- he stated Dr. Ballenger's asking about the attorneys' strategy, and he reported that he disagreed with them because they are trying to get him life in prison as opposed to the death penalty. He described that he was apathetic about which outcome occurs. He said that it is clearly, quote, worth it, and that he would rather die than use such a defense. He reasons that "It would ruin me to present the autism defense because then everybody would think I am a weirdo." And that is what -- that is in one level consistent with what Mr. Roof has expressed, but there is another prong to it, and, again -- and it's the prong where he believes that he's -- somehow some white nationalists will rescue him.

THE COURT: That's in Dr. Ballenger's report, and also is this whole issue of his general reputation, and Dr. Ballenger elaborated on that in his testimony yesterday.

THE WITNESS: Let me be more specific. Those were the early on -- this is what happens. One of the other

instances which I'm not sure if he told Dr. Ballenger, and I stand corrected if he did, he said what you did was illegal in the proceeding with him, that you didn't allow him to be there in your interaction and your colloquy with Mr. --

THE COURT: I allowed Mr. Bruck to speak without him being present.

THE WITNESS: Yes.

BY MR. RICHARDSON:

Q. You are not offering an opinion, I assume, whether that was -- whether there is a rational belief that that is not an appropriate course?

A. No, not at all. My point is not -- what I'll try to do, if you bear with me.

THE COURT: Frankly, I understand his feelings. It was very important for me just to state for the record because that has been raised, that I have counsel's full report of that because I had to make a determination whether there was a reasonable basis to do an evaluation. I had the duty to assume the correctness of the information, but I had to hear the information, and I was concerned that I would not get it fully from Mr. Bruck. So that is why I excused him, and I understand from Dr. Ballenger's report that Mr. Roof did not appreciate that, and, frankly, I understand why he doesn't appreciate it.

MR. RICHARDSON: The Government was, of course, not

challenging the correctness of it.

THE COURT: I just think that's been raised. And I consider that that Mr. Roof's response is rational, frankly.

THE WITNESS: Okay. For example on page 27, this is clearly in contradiction to things that he's disclosed to me. When Dr. Ballenger was confronting him about some of the somatic concerns that he's had, he said he couldn't talk about that. Now, that is something that historically Mr. Roof has been really open about, was very concerned about, and that is evidence to me that he is now learning -- he has learned to perceive what questions may perceive him as mentally ill, and he doesn't answer them. Before he would.

So that is -- it's not that he is saying new things necessarily, although he has done that. It's more that he is omitting what he is telling people now, and that is a change for him. And that is the concern that I have.

I'll be glad to give you more.

THE COURT: Yes.

THE WITNESS: For example, on page 27, again, when asked about his fear that his hair was falling out, he gave a very logical answer that no one would like it and everyone likes a full, attractive head of hair. But for him, he did not mention suicidal ideation, which he mentioned to me again on November the 15th.

THE COURT: And let me just say, Dr. Ballenger

testified that he understood there was a substantial amount to these body image things he didn't --

THE WITNESS: Yes.

THE COURT: And he understood that he did not hear fully from the defendant, but he did know about it because he had reviewed other records.

THE WITNESS: Yes. Then on page 29, when asked about whether or not he believed the idea that he would not be executed because he believes there is a chance of a white nationalist uprising, he again is minimizing. He's told me at the end there was a 30 percent chance that he would be executed. I see him again withholding, not being as forthcoming as he has been in the past. He doesn't want people -- there's three reasons for that. One is the anxiety that he's discussed. He doesn't want people paying attention to things they weren't paying attention to before because he doesn't want that level of attention paid to him because he's uncomfortable socially.

But the other thing now is, again, he perceives those things as attempts -- his attorneys' attempts to discredit him, so that would --

THE COURT: Well, this actually directs another issue is that the chance of a white nationalist he attributes to less than a half of a percent. I don't see him addressing what are the chances of him getting the death penalty. That

is a different issue.

THE WITNESS: Correct.

BY MR. RICHARDSON:

Q. Earlier you testified as well what he told you -- I want to make sure I understand what your testimony is. Earlier you said he has a 30 percent chance of getting the death penalty?

A. Yes.

Q. And then you said he had a 30 percent chance of getting executed. Those are obviously different?

A. I stand corrected. It would be -- I will look -- I think it was the death penalty.

Q. 30 percent chance, he's talking about what he believes the chances of a jury giving him the death penalty, which is a straight, separate question from what the chances of being executed are?

A. Absolutely.

Q. Just to be clear, that is not actually -- what Dr. Ballenger is saying is not inconsistent with what your testimony is?

A. That's correct.

THE COURT: Did he ever give you an estimate of what he thought the chances were that the white nationalists would take over the country and for him not to be executed and free him?

THE WITNESS: As I recall it would be a number of years. I believe what he's quoting to me was six or seven years.

THE COURT: I understand. But the question is, did he tell you what are the chances of that happening? Because when we he talked to Dr. Ballenger, when confronted with it, he said, "I've got to recognize that is very low." I was wondering if he had given you a higher percentage.

THE WITNESS: No percentage at all. And, again, with me he didn't even go in as much to the white nationalist, telling me it might be a sympathetic corrections officer, and there would be a coup. Those were his exact words to me.

THE COURT: Dr. Maddox, you have obviously had more contact -- as much contact with people sitting on death row in your experience, I'm sure you have such a record. But folks facing capital punishment, it's not unusual to have a mix of emotions, right?

THE WITNESS: Not at all.

THE COURT: A great deal of stress.

THE WITNESS: Correct. Not at all.

THE COURT: And it is literally a life-and-death decision, right?

THE WITNESS: Correct, yes.

THE COURT: And there are some people who actually

said, "I make the conscious choice to die" and you concluded they were competent to make that choice.

THE WITNESS: Absolutely. And, again, the -- I'm sorry if I just haven't made clear. The difference is I've never had that opinion about Mr. Roof before until -- and I recognize he's in disagreement with his attorneys, but the difference is now he's threatening to harm them. He believes, he tells me, he wants people to think he's a sociopath. I don't know of anyone that has diagnosed him -- I don't have all the data, but that is not --

THE COURT: I haven't seen that. But he has been charged with killing nine people and attempting to kill three others. I mean, that is the charge.

THE WITNESS: Most horrible crime I've seen in 20 years.

THE COURT: And he -- it's his desire that he would like to have those facts just stand on their own merits.

THE WITNESS: Absolutely.

THE COURT: And his own belief was that he had -- he was trying to commit the worst crime he could imagine.

THE WITNESS: Yes.

THE COURT: And he apparently accomplished that.

THE WITNESS: Yes.

THE COURT: So once you accept that premise, and he's now confronting what do I do with my lawyers who won't

do what I want them to do: I believe stabbing the lawyer, like you mentioned, but he's really got very few options here. He exercised one of them, write a letter to the prosecutor.

THE WITNESS: Yes, sir.

THE COURT: Trying to scuttle this, but he doesn't have a lot of good options.

THE WITNESS: He named some others. He threatened to write the newspaper. He asked me were there a number of things he could do perhaps to discredit me, or other sources he could write. He threatened to write about a handicapped friend of mine -- he thought it was my husband -- and publish information about that, would that stop me. And I told him that I was under subpoena, and I would have to answer any questions.

THE COURT: The point of all this is he's threatened some things, but it's all related to this passionate opposition to a mental health defense.

THE WITNESS: Yes.

THE COURT: Mr. Richardson, please continue.

MR. RICHARDSON: Just one more question or set of questions.

BY MR. RICHARDSON:

Q. You sort of focused, as I understood it, with Ms. Stevens on the new words, right? These are new phrases that he used,

and I wrote down "scare tactics, threaten, aggressive." Those are new words?

A. Those are the only things. Everything else in the letter is consistent, and I would expect it from him, but those took on a new meaning.

Q. And you also indicated that in your meeting on November the 8th, you heard another new word, right, "hate"?

A. No. He said hate before. But the way he qualified hate before was he hated people that didn't smile, he --

Q. In other words --

A. That was the first time that I've ever heard him say he hated a specific person, and at first he said, "I hate all of you," and then he went back and pointed to Ms. Stevens and Mr. Bruck and said, "I hate you," and at that point he did not --

Q. From your perspective, the only other people he described hating are the people that don't smile. Now wait a minute. He did say that he hated people that did not smile?

A. Right.

Q. That was the conversation about the military?

A. Yes.

Q. Did you have conversations with Mr. Roof about hating African-Americans?

A. Yes.

Q. Have you had conversations with Mr. Roof about hating

Jews?
A. Yes.
Q. Have you had conversations with him about hating homosexuals? That is not a new word for him at all?
THE COURT: I'm sorry?
MS. STEVENS: He's interrupting her answer.
THE COURT: I think it's fine. Overruled. Go ahead.
THE WITNESS: He's never used those words "hate" in that context with me.
MR. RICHARDSON: I don't have anything else, Your Honor.
THE COURT: Redirect.
MS. STEVENS: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MS. STEVENS:
Q. Dr. Maddox, the June 4th visit, if I might return to where Mr. Richardson -- I believe you have some typed notes from the June 4th visit. What did you note in the first two lines about Mr. Roof's entry into the room?
A. I'm sorry. Bear with me. I'm trying to find them.
Q. It was typed, and I would say about two-thirds through the packet. They start with June 4th.
MS. STEVENS: May I approach with the page?
THE COURT: You may.

MS. STEVENS: They match.

BY MS. STEVENS:

Q. I know you have a lot of papers up there. That June 4th and the first two lines?

A. Very bright smile when he enters. I -- he says he feels terrible, and I put parenthesis "social gesture."

Q. And later in your notes, did he have discussions about his somatic issues?

A. Yes.

Q. And what does he say about that?

A. On that day he shows me his rib cage, showing me his shoes. There was -- he had some specific shoes that he was using that proved -- that would show that his foot was flatter. He was looking at the arch of the shoes.

Q. Did you make a reference to genomes?

A. Yes.

Q. And that is in preparation for your penalty phase workup?

A. Yes.

Q. And so he knew about that type of evidence being developed in this case at that time?

A. Yes. He and Mr. Pennington had quite a discussion about that. The issue was he was also aware that his parents would be having their genomes mapped as well.

Q. Now, the waivers that Mr. Richardson talked about, would it surprise you to learn that they were waivers signed so

that he wouldn't have to come to court proceedings?

A. That would certainly be consistent with my observations of Mr. Roof. If he could avoid being looked at or being the center of attention, that would be consistent with his mental status.

Q. Now, you talked about the three words, the aggression?

A. Yes.

Q. Scare tactics?

A. Yes.

Q. In your experience of me and with Mr. Bruck and in the meeting that you had with Dylann Roof, is that your observation of our treatment of our client?

A. Not at all.

Q. Is that your observation of our treatment of Mr. Roof?

A. No.

Q. Dr. Ballenger's report -- and we were talking about some of it, and I know you were reading through it on the stand there. And you pointed out on page 27 some of the points where he couldn't talk about that --

A. Yes.

Q. At the top of page 27 of Dr. Ballenger's report, it says, "When asked about his ideas about something being wrong with his left side, he laughed and stated he couldn't talk about that. When pressed several times, he stated he can't give clues either."

Are issues and beliefs and somatic concerns with his left side something that he had previously talked about with you?
A. Yes.
Q. And did he say to you, "I can't talk about that"?
A. No.
Q. And on page -- further down on page 27, there is a line, when asked about his fear that his hair was falling out, he gave a very logical answer -- I think you pointed this out -- "that no one would like it, and everyone likes a full, attractive head of hair, and then minimized anxiety." Has he discussed with you his fear that his hair was falling out?
THE COURT: We've already been through that.
MS. STEVENS: All right.
BY MS. STEVENS:
Q. Now, on the top of page 28, second full paragraph, "When asked again to talk about his ideas about his body, face, and forehead, he stated several times he won't talk about that. He started out that he can't, but then ultimately pointedly changed to "he won't"?
A. Correct.
Q. Has he spoken openly with you about his somatic beliefs about his body, face, and forehead in the past?
A. Yes.
Q. And is that the type of information you were referring to

that he has become suspicious and guarded about?

A. Yes.

MS. STEVENS: That's all I have. Thank you.

THE COURT: Thank you, Ms. Stevens.

Doctor, let me ask you a question. You had met, I think, April or August, seven times.

THE WITNESS: Yes.

THE COURT: And as a result of those meetings, did you ever recommend any psychotherapeutic or other medications to treat any condition for Mr. Roof?

THE WITNESS: They were asked. At one point I actually would have advocated for him starting, but Mr. Roof did not want to do that. I did have some concerns about him being so young and having an autoimmune disorder. There was a period of time, I know he was being prescribed hydroxyzine after he was assaulted. I noticed --

THE COURT: What is the nature of hydroxyzine?

THE WITNESS: It's antihistamine. It's a little bit stronger than Benadryl. I use it very commonly in the hospital. It's a nonnarcotic, benzodiazepine sedative. Usually safe to prescribe in corrections.

THE COURT: You never recommended a psychotherapeutic drug for him?

THE WITNESS: No.

THE COURT: Nothing to treat delusions?

THE WITNESS: No.
THE COURT: Never anything to treat paranoia?
THE WITNESS: No.
THE COURT: And did you ever recommend any treatments?
THE WITNESS: That certainly would have been -- had I been asked, I would think that was a good idea. And I talked to Mr. Roof about that.
THE COURT: You were there seven times, and you don't recommend to the lawyers --
THE WITNESS: No. It wasn't -- even though he was anxious and had those symptoms, it wasn't interfering with his functioning.
THE COURT: Thank you.
MS. STEVENS: If I may just on that?
THE COURT: Let me look over my notes, and then I'm going to give you every chance.
That's all. Go ahead.
BY MS. STEVENS:
Q. Your role in this case is as a forensic evaluator, not a treating physician; is that correct?
A. Correct.
Q. And in a forensic setting, that's an important distinction that you have rules that govern that?
A. Not only rules, it would ruin your objectivity. When you

are doing an evaluation, you normally -- there have been cases where you have to be a dual agent. You might have other people around. I had orders before asking me to medicate someone. That is something routinely in my methodology if I'm doing the evaluation, I certainly would.

THE COURT: You would recommend somebody else treat?

THE WITNESS: Yes, sir.

MS. STEVENS: Thank you, Your Honor.

BY MS. STEVENS:

Q. Now, today with the level of issues that Mr. Roof is having, the psychological, psychiatric problems he's manifesting, do you have thoughts about -- I'm not asking you for a recommendation, but thoughts about whether medication might assist Mr. Roof?

A. Actually, Mr. Roof and I talked about that on the 15th.

Q. And what are your thoughts about what an appropriate medication might be for Mr. Roof's psychiatric manifestations at the moment? Dr. Maddox, if you are uncomfortable rendering an opinion in that dual capacity, it's okay.

A. It's not -- it's very complicated. It's a complicated answer. I have tried to think about his condition over the last 24 hours. Especially when you medicate somebody for a diagnosis of psychotic disorder, you are looking to improve their anxiety. You are looking to organize their thinking, to keep them directed, etcetera. Some of his beliefs I don't

think would change. I don't think medications would help. They certainly aren't going to change any of the preexisting thoughts he's had. I think those are with him, and they are part of who he is. I absolutely believe that. I do think medicines would decrease the paranoia he has right now. I think he would be more comfortable.

I don't think he would take them. He mentioned to me on the 15th that Dr. Ballenger had recommended Paxil, and we had a very long discussion about Paxil, and he was very concerned that SSRIs would make him suicidal and change the way he thinks. I think he would be very resistant to any kind of medication. When you asked that question, I have to look at his mental illness, what are the chance that the medications would help, and what the patients would be willing to take. And then that limits the medicines you are on. There are some medicines you can, but there is medications that can be forced. So that is why the hesitancy. I think it's got a lot of levels. But do I think today he could benefit from antipsychotic medication that was mild, that wasn't a major tranquilizer, that was -- yes.

MS. STEVENS: Thank you, Doctor.

THE COURT: Very good. Doctor, you may step down. Thank you.

THE WITNESS: Thank you, Your Honor. May I be excused?

THE COURT: You are excused.

THE WITNESS: Thank you.

MS. STEVENS: Thank you, Dr. Maddox.

THE COURT: Call your next witness.

MR. BRUCK: If it please the Court, Your Honor, I think this will be a time we would request to take our lunch break now and come back at about 1:30. This would allow us to get organized and streamline the rest of our presentation. We have a witness here. I really need to confer with him in light of the issues as they have been narrowed, and I just think it would be very helpful if we would adjust our schedule.

THE COURT: We will break at 12:30 and start at 1:30 sharp.

MR. BRUCK: Yes, sir.

THE COURT: Okay.

(Thereupon, there was a lunch recess.)

THE COURT: Okay. Ms. Stevens, Mr. Bruck?

MS. GANNETT: Your Honor, Ms. Gannett.

THE COURT: Yes, Ms. Gannett, delighted to have you join the team.

MS. GANNETT: We call Dr. Laura Carpenter.

THE COURT: Very good.

THE CLERK: Please come here to be sworn. Place your left hand on the Bible, raise your right, state your

full name for the record, please.

THE WITNESS: Laura Carpenter.

THEREUPON:

LAURA CARPENTER,

called in these proceedings and being first duly sworn testifies as follows:

DIRECT EXAMINATION

BY MS. GANNETT:

Q. Good afternoon, Dr. Carpenter.

A. Good afternoon.

Q. Would you please introduce yourself to the Court.

A. I'm Laura Carpenter. I'm a clinical psychologist at the Medical University of South Carolina.

Q. I'm going to start this in an unorthodox way.

MS. GANNETT: May I approach?

THE COURT: You may.

BY MS. GANNETT:

Q. I'm showing you what's been marked as Defendant's Exhibit 14. Do you recognize that document?

A. Yes. This is the affidavit that I gave your team on Friday morning.

Q. And if you would turn toward the back of that affidavit, does it include a description of your qualifications?

A. Yes, ma'am. My CV is included in the back.

Q. Would you very briefly describe your professional

experience and your education.

A. Sure. So I have been working with individuals with autism for over 20 years. I did an undergraduate honor thesis in autism at the University of California at San Diego, and then I went on to the State University of New York at Binghamton, where I did a master's and dissertation also on autism. I came here in 2002 for some post-doctoral training focused on pediatric assessment and specifically autism, and I was hired as faculty in 2004 at MUSC, the medical university here in South Carolina, to expand our autism diagnostic clinic.

Q. And do you continue to do research in the field of autism?

A. Yes, I do. So I am involved in a number of studies right now. We just wrapped up a large study looking at the epidemiology of autism here in South Carolina as well as another study looking at smartphone screening for autism. And I right now have a study that is funded by the Department of Defense to look at longitudinal outcome in a population of children at the age 8 with ASD and then reaching the age group from 15 to 24. We are looking at what kind of services they are getting, what kind of educational outcomes they have, what kind of insurance they have, whether they are driving, and sort of a general description of longitudinal outcomes.

Q. I notice on your curriculum vitae that the word "pediatric" appears frequently. Could you explain the use of that word as it relates to your experience and education?

A. So I think most autism specialists are going to be developmentally trained. Autism is a neurodevelopmental disorder that first manifests in early childhood and causes life-long impairments. So even the very few folks who focus solely on adults with autism usually are pediatric trained, and autism services at most medical universities are run through the department of pediatrics, even for adults.

Q. And in your personal experience, is there a particular age range in which you focused?

A. I see kids of all ages. So, you know, the youngest we can diagnose autism is about 15 months, and I do see toddlers that young, and then we get referrals for autism evaluations all the way through adolescence and into adulthood.

Q. Is there any particular age cutoff that is relevant in pediatric autism treatments?

A. No. So the longer that, you know, our division has existed at MUSC, our patients just keep growing up, and there is nowhere to transition their care to, so we continue to care for young adults as well.

Q. I also noticed on your curriculum vitae that you single out training on a diagnostic tool called "the ADOS." Could you explain why that is so important that you feature on your

curriculum vitae?

A. So the Autism Diagnostic Observation Schedule, or ADOS, is the gold standard assessment tool that we use in diagnosing autism. And it's really important that people using the ADOS for a particularly research or forensic purposes that they have this research level of reliability, meaning that they have reached a certain standard of reliability on this instrument in order to be able to diagnose autism.

Q. And what kind of training is involved in order to obtain that certification?

A. So the individual has to go through a week-long classroom intensive training, and then they have to submit a series of videotapes that are co-scored by one of the lead trainers, and they have to reach a level of reliability on those videotapes.

MS. GANNETT: Your Honor, based on her curriculum vitae and the affidavit and the testimony just presented, I move to qualify Dr. Carpenter as an expert in the area of clinical psychology with specialty in autism spectrum disorders.

THE COURT: Any objection from the Government?

MR. CURRAN: No objection, Judge.

THE COURT: Please continue.

MS. GANNETT: Before I reach the Court's questions,

I would like to ask just a couple of preliminary background questions that relate to those.

THE COURT: Why don't you ask her -- I don't have a reason, but normally I have experts that give me reports ahead of time so I can understand the scope of her --

MS. GANNETT: She can explain in that context.

THE COURT: Yes.

BY MS. GANNETT:

Q. Dr. Carpenter, we talked a few moments ago about some initial questions that the Court wanted experts to address in this hearing. So I'll ask you those questions, and when you give your response, please explain why you are giving your response that you are giving.

A. Sure.

Q. The first question is do you have an opinion within a reasonable degree of medical or scientific certainty that the defendant suffers from a mental disease or defect, and if so, state with specificity what the mental disease or defect is.

A. So I have not had the opportunity to evaluate Mr. Roof, so I wouldn't be able to make any kind of diagnosis.

Q. And so the second question flows from the first, which is do you have an opinion within a reasonable degree of medical or scientific certainty that due to a mental disease or defect, the defendant does not have the sufficient present capacity to understand the proceedings and/or to assist

counsel, and if so, in what specific ways does the defendant not understand the proceedings and/or cannot consult his attorneys or otherwise not assist properly in his defense.

A. I can't answer that question for the same reason.

Q. Thank you. So the foundational questions I wanted to ask you were, how did you first become involved in this case?

A. I was approached last spring, and I was asked to actually do an autism evaluation with Mr. Roof, and for a variety of reasons, I didn't want to do that. And so I felt like it was really important as an advocate in the autism community I make sure if an evaluation was going to be done that it be done well by someone that is reputable.

So I did some research and found four people who were willing to do these types of forensic evaluations, and I submitted those. And then the person who was chosen, her name is Dr. Loftin, and she contacted me several weeks ago and didn't give me the outcome of her assessment, but asked if it would be unusual if someone were to reach the age of 22 without being diagnosed in this community, and I gave her my answer. And then --

Q. Could I stop you there for a moment? When you say "this community," did she have something in mind?

A. I think she meant in South Carolina in general because there is really only three diagnostic centers in South Carolina, and I run one of them here at MUSC.

Q. And your answer was it's not unusual for someone to reach the age of 22 in South Carolina without being diagnosed with autism?
A. It's not. Do you want me to expand on that?
Q. Sure.
A. So, you know, over the last about 10 to 15 years, we've had this huge explosion in awareness of autism spectrum disorder. There has been all these public health campaigns, and there has also at the same time been real changes in services and therapies available and the payment for those services. So when you have this combination of available services and awareness, you see a lot more diagnosis. So we know that people that are just being born now are more likely to be diagnosed than those born in the '90s or earlier. I just finished a study focusing on specifically in South Carolina on children born in 2004, and we found that over 30 percent of those identified by the study had not received a prior clinical diagnosis.
And that is true nationally as well, so the Centers for Disease Control and Prevention has been tracking the prevalence of autism for many years, and in the most recent published study in 2016, they found that 25 percent of those identified with autism had not been diagnosed formally as such. So you can imagine that kids born in 2004, we are still looking at about 25 to 30 percent not being diagnosed

by age eight to ten, you can imagine if the people born in the '90s or even earlier that is at least 25 to 30 percent, probably greater.

Q. Okay. So I'm going to show you what has been marked as Defendant's Exhibit 12. Do you recognize that document?

A. Yes. This is the definition from Dr. Loftin about her evaluation.

Q. And you've reviewed that document?

A. I have.

Q. What was the conclusion from that document?

A. So after her testing, she concluded that Mr. Roof has autism spectrum disorder as well as some additional comorbid psychiatric problems.

Q. And you reviewed the basis for her diagnosis?

A. Um, so not all of the -- or none of the actual testing that she's done or the history that she's collected is contained here, so it really just goes through what her diagnostic impression is, but no background unfortunately.

Q. And let me ask you, when were you first contacted about preparing your affidavit in this case?

A. On Thursday morning, and I submitted it Friday morning, and then Friday afternoon, your team asked me to come testify, and I agreed to do it.

Q. Okay. And by "Thursday morning," you mean Thursday morning of last week?

A. Yes.
Q. That was November 17th?
A. Yes.
Q. Okay. So I'm going to show you now what I will have marked as Defendant's Exhibit 21, I think.
THE CLERK: Yes.
MS. GANNETT: Is that right, Ms. Ravenel?
THE CLERK: Right.
THE COURT: What is that?
MS. GANNETT: Which is the curriculum vitae of Rachel Loftin.
THE COURT: I thought you had Ms. Loftin to testify?
MS. GANNETT: No, Your Honor. She's the one who is in Cypress.
THE COURT: Okay. This witness doesn't know Ms. Loftin's CV, does she?
MS. GANNETT: Well --
THE COURT: The accuracy of -- I mean, I think we'll stipulate. We don't need to go through a witness.
Do you stipulate that this is the CV of Dr. Loftin?
MR. CURRAN: I do.
THE COURT: Defendant's 21?
MS. GANNETT: Defendant's 21.
THE COURT: Defendant's 21 is admitted without objection.

(Thereupon, Defendant's Exhibit 21 introduced into evidence.)

BY MS. GANNETT:

Q. So would you -- so Rachel Loftin is one of the experts whom you recommended --

A. Yes.

Q. -- to the defense team --

A. Yes.

Q. -- based on your research --

A. Right.

Q. -- to locate an appropriate expert --

A. Yes.

Q. -- since you were not able to do the evaluation of Mr. Roof, correct?

A. That's right.

Q. Okay. Thank you.

One of the things that you discussed in your -- in your comments about your qualifications was the longitudinal study that followed patients through young adulthood -- or to young adulthood at least. Could you explain why that research is important and what some of the findings to date have been in that research?

A. So we actually don't have outcomes for that particular study, but one of the questions we have is what happens to people once they reach adulthood. We know a lot about young

people with autism. We don't know a lot about adults with autism, and a big reason is many of them have not actually been diagnosed with autism. So still frequently in my clinic I have parents who will say -- you know, once I diagnose their child, they will say, "I might have autism" or "My husband might have autism."

So this is really an amazing opportunity to figure out what -- what becomes of these young people as they transition from sort of pediatric systems of care, support, education, insurance, into the adult world. And we think that there is probably a huge drop-off in services.

Q. Okay. Your affidavit describes the elements of a reliable assessment of autism spectrum disorder, and one of those is the diagnostic criteria that are defined in the DSM-5, and you list those in your affidavit. But I'm wondering if you could elaborate for the Court on the meaning of some of those criteria and how they are assessed in patients.

A. Sure. So the DSM-5 has two main categories of concern. So we look at social communication abilities, so that is -- is give-and-take in social interaction, being able to initiate appropriate interaction and respond appropriately to others. It's also nonverbal communication. So people with autism often have difficulty making eye contact, using gestures and facial expressions to communicate. They might

appear to be flat or have inappropriate facial expressions. And at the same time, they also have a lot of difficulty interpreting other people's facial expressions, so understanding the contact that goes when someone makes a statement. You know, what the tone of voice is, what the gesture is, what the situational context is, and adjusting their behavior to match that context.

And then, finally, people with autism have difficulty forming relationships, understanding social rules. The social rules come so easily to the rest of us. You don't have -- nobody had to tell me how to behave in court today. I just picked up on it, even though it's my first time.

THE COURT: Rather unique in that.

THE WITNESS: But, you know, for people with autism, you have to often teach them, or they have to study very carefully how to behave in different situations. The rest of us also shift gears very easily, so you all are going to go home and behave quite differently with your family than you are behaving here today, and it's easy for you to shift gears. That might be hard for someone with an autism spectrum disorder.

The other things we look at are restrictive or repetitive behaviors, repetitive motor movements or repetitive use of language. There is a lot of stickiness in autism, so getting stuck on certain topics, certain

interests, which can create problems because if you are only focused on one interest or one topic, you are missing a lot of information in the world.

People with autism also tend to be stuck on routine and become very upset, even at small changes, either in the environment or in their routine. You know, somebody -- if they have a different bus driver or their mom wears their hair up instead of down, those small changes can cause a lot of stress.

And then many people with autism often have sensory differences. Those can take the form of sensory-seeking behavior, wanting to touch fabrics, hear certain sounds, or see certain visual inputs, and it can also take the form of sensory aversions, being really upset by loud noises, bright lights, the feeling of certain fabrics. So when you hear all these individual symptoms, you might think, I know someone that doesn't like certain fabrics or doesn't want tags in their clothes, but in autism we are looking at the whole constellation of these symptoms, all of these symptoms co -- occurring together.

And then we are also looking for functional impairment. So you can be a very high-functioning, non-impaired person that has a few quirks, and that probably does not mean you have a psychiatric impairment. What we are looking at here is people that are not achieving in a manner

that is commensurate with their potential. So they are still needing tons of assistance in daily life, even though their IQ might be quite high. That would be the definition of that functional impairment.

And finally we look for these symptoms to have some basis in early childhood. So we think of autism as being this neurodevelopmental disorder. It's usually first manifest in the early years of life. Symptoms are often apparent by age four or five. But what sometimes happens is that people will be able to compensate until the social demands exceed their limited capacity, and at that point, the symptoms become actually functionally impairing. So that is particularly the case in folks that have very high IQs or are very bright, as you might not see that breakdown happen real early, but you might see some evidence of it when you look back at the developmental history.

BY MS. GANNETT:

Q. So there is a lot to unpack in your answer, but thank you for it.

Let me start with in diagnosing under the DSM-5. You referenced the constellation, and you are looking for that constellation. Does someone with autism have every single one of those things that you mentioned?

A. So there are seven diagnostic criteria, and the individual with autism has to have five out of those seven.

So three are social criteria and then four are restrictive, repetitive behaviors, and the individual only has to have two out of four restrictive, repetitive behavior samples in order to meet criteria for autism.

Q. What does it mean to have an appropriate response in initiation in communication?

A. So it can take a lot of forms. So for people that have very severe autism, they may not respond at all. You call their name and they don't look up. You greet them and they don't say anything back. But for people who don't have cognitive impairments, it's often inappropriate responses. So not matching the tone of the greeter, or not saying the right thing at the right time. Maybe not picking up on the social cues of the situation and understanding the appropriate way to behave.

Q. You mentioned shifting gears, and you mentioned the idea that some of us might have trouble shifting gears at the end of the day, like home -- work to home. Is it also a phenomenon that someone could have trouble shifting gears in smaller chunks of their day?

A. Even something as small as moving from one task to another, moving from, you know, school to home, or moving from one task at school to another task can be really, really difficult. And when I say "shifting gears," that can be very in a concrete manner, so literally moving from one task to

another, or it can be in a more subtle manner. So all of us are constantly shifting gears. We are constantly taking information that we get from our environment and sort of using it.

So, for example, when I came up here, y'all probably formed an impression of me, and that impression is probably constantly being revised based on what I'm saying. But for people who have autism, they often become very stuck in a certain viewpoint, and they have a lot of trouble shifting gears based on new information that's provided.

Q. And this may be related, but the stickiness concept that you discussed, does that also relate to shifting in the sense of -- and can you describe how stickiness and shifting relate when you are talking about topics? For instance, if I were having a conversation with you about -- with an autistic person about something, and I wanted to change the subject, is that shifting or stickiness, that could potentially get in the way there?

A. Absolutely. So conversational breakdowns are a big problem for people with autism. So sometimes they will jump into the conversation without giving you appropriate background information so that you sort of feel lost, and you don't know what is going on. But at other times, they might go off into their own -- because they are very sticky, they might go off on to their own topic of conversation rather

than sticking with what you are trying to talk about. Or when you try to shift gears to talk about something different, they will be stuck on that small aspect of the conversation that you have tried to move on from. So that is -- you know, the stickiness is kind of a layman's term, but I think it really describes all aspects of cognitive functioning for people with autism.

Q. I know people in my own life who do something that resembles that. How is it different for an autistic person than it is for my neighbor or my kid or my mom?

A. Right. So I mean, if you take any example of a psychiatric disorder, we can probably find small examples in any of us. You know, some of us have obsessive compulsive traits, and some of us have depressive traits, and some of us have maybe small aspects of posttraumatic stress even though we don't have the same full-blown disorder. That is true for autism. Many of us have autistic traits, one or two of them, but again what we are looking for is that full constellation of symptoms. Do you have severe social impairments? Do you have multiple examples of restrictive, repetitive behaviors? Are they causing you functional impairment? Are you having difficulty in school or difficulty in your social relationships? And then, finally, do those behaviors pervade all of your development? So do they just pop up at 10 or 11? Probably not autism. Or can you find examples of those -- of

those concerns dating back to early childhood.

Q. Two things I want to follow up from that answer: You mentioned autistic traits which is something I've heard before. Is that a term of art, and how is that used by people in the psychiatric or psychological professions?

A. Is that -- you're asking is that term of what?

Q. Is that a term of art that's used by people in your profession in the diagnostic process?

A. Yes.

Q. And how is it used?

A. So, you know, it would be really easy if all medical disorders were either present or absent, so either you have cancer or you don't have cancer. But with psychiatric disorders, they don't work that way. What we -- what we find are with most psychiatric disorders is that they exist on a continuum. So there's some people that have zero percent of autistic symptoms, and there are some people that have 100 percent of autistic symptoms, but most of us are sort of floating somewhere on that continuum. And we think of those autistic traits as sort of lining up. At some point on that continuum, we do draw an arbitrary line and say, "You fall on that side of that arbitrary line because you have so many autistic traits; therefore, we are giving you the diagnosis of autism," and you don't.

But what we know now is that these traits are

distributed throughout the population. And I think the term itself comes from these very large family of pedigree studies where they're looking at the hypothesis that family members of people with autism have more autistic traits than the general population, even when they don't have the full syndrome of autism.

Q. So I hope this question isn't too obvious. If you notice autistic traits in a person, what would be the next steps in the diagnostic process?

A. So you would want to send them to a qualified diagnostician to have a full workup. Do you want me to go into detail on that?

Q. Can you just take off what the workup would involve?

A. Okay. So --

THE COURT: I don't think I really want to get to how these -- there is not a lot of dispute here there may be autistic traits, but the issue here is how, if those traits are present, how they are interfering, if they are, in the defendant's competence. So I really would -- that would be -- I've read Dr. Carpenter's affidavit twice, so I have a good feel for where her opinions are. So I'm interested in what she may have to say about competency.

BY MS. GANNETT:

Q. One of the areas we had asked you to comment on is the challenges that clients -- your clients may face in settings

with which you are familiar, like their homes or school or in social settings because you said that you were not familiar with the courtroom setting. And you described in your affidavit what some of those are, and I wondered if you could give us some examples of how those manifest.

A. Sure. So in the social domain, if you are -- if you are missing social contact, if you are missing social cues, it's going to cause you to be making constant social blunders. All of us take in the words that we hear from someone, but it's always in context. You are listening to the tone of their voice. You are looking at their body cues. You are taking into account what you know about that person from other settings. These are really complicated types of calculations that we are all making all the time without any training or assistance. And so if you are missing those kinds of cues, you miss a lot of really important information. It can lead to a lot of misunderstandings.

And at the same time, if you are not good at expressing yourself well to other people in a way that they can understand, they might be missing a lot of important information coming from you. So if you are not making eye contact or if you have a flat facial expression at a time where it's expected that you would look excited or upset, it's going to make your behavior look really bizarre and make other people have difficulty understanding what you are

trying to communicate.

THE COURT: Let me ask you to stop there. And I thought you were very candid in saying, "The courtroom is not my format, but I have some background knowledge that you may apply." I understand and appreciate that.

There's been some discussion about the courtroom itself and the ability of a -- a person with autistic traits to communicate with their counsel. First of all, being able to quietly whisper with their counsel, is there anything about autism to say that if they wanted to communicate something and -- that they wouldn't be able to do that? Is there anything about autism that would prevent them from leaning over and saying, "What do you think about this idea?"

THE WITNESS: So let me give a qualified response. So anytime that you do an evaluation for autism with someone, you are getting information. You are looking to make a diagnosis, but you are also getting lots of information about what things are easy for them and what things are hard for them, and you are making recommendations based on that. It's hard to make generalizations about any one --

THE COURT: It's very individualized thing.

THE WITNESS: That being said, I have -- I have quite a bit of experience with professionals with autism. I was recently at a professional meeting with a colleague that has autism, and she had a lot of difficulty conforming her

behavior to match the expectations of the situation. So, for example, when everybody else is sitting in chairs, listening to a speaker, she was sitting on the ground leaning against the wall. And then from her position on the ground leaning against the wall, she kept trying to comment on things that the speaker was saying in a way that I think the rest of us would know that you are not supposed to do, and maybe not being aware that the folks around us were getting frustrated.

THE COURT: That would be sort of missing the cues. I'm trying to focus on we have a situation where a defendant sits quietly in a courtroom when other things are going on, and observes, so perhaps may wish to bring something to the attention of his lawyer, and is there anything about autism that would say, "No, you can't make those kind of communications. You can't write a note." Is there anything like that that you would associate with just being cooperative or communicating if you wanted to communicate, you have the capacity to communicate?

THE WITNESS: So I guess some of the things that come to mind would be is the person able to think quickly in that courtroom situation.

THE COURT: First of all, you are not suggesting that people that have autism should be immune from criminal prosecutions.

THE WITNESS: I am not, and I think that there are

probably many people with autism who can participate in their own defense. And --

THE COURT: It's fairly rare to be declared incompetent and to be immune from prosecution because you happen to be autistic. Are you familiar in your career -- have you ever had anyone that that occurred? I'm not suggesting there are none. I think that is a very rare thing. Is it not?

THE WITNESS: I mean, there is also a much greater intellectual disability in autism. You would have that whole issue going on.

THE COURT: This defendant has an extremely high IQ. There is not a cognitive impairment, and I have observed him communicating with his lawyers, and -- communicate. And I'm just wondering am I missing a cue here, because I'm watching him. He doesn't look much different than most defendants I have in my courtroom. So is there something I'm missing, or is this something just baked into autism that they just -- that somehow they can't function in a courtroom?

THE WITNESS: So I think you would need to look at that particular individual -- sorry.

Me as an evaluator would really need to look at that individual. So, no, I would never say a blanket statement of all people with autism cannot be prosecuted or can't participate in their own defense. I don't know what

individual difficulties Mr. Roof is having.

THE COURT: You don't presume to come here and tell us that.

THE WITNESS: Right.

THE COURT: Okay. Continue.

BY MS. GANNETT:

Q. Following up on that point, are there symptoms of autism and the processing that someone with autism is capable of doing in a setting like a school or perhaps a courtroom that are not obvious to the naked eye?

A. Sure. So we have a lot of difficulty -- we see a lot of difficulty with abstract reasoning and thinking. And so sometimes you will see people that do very, very well with rote learning and, you know, with sort of memorization-type of achievement, but then when it comes to abstract thinking or abstract-type communication, that becomes more difficult for them.

Q. What about the separation on nonessential details. Can you give some examples of how that might manifest in classroom or a work setting?

A. So if a person gets stuck on something that is not important and they are missing the rest of the context of what is going on, that can cause a lot of problems because they are only focusing on one aspect of that situation or one aspect of that communication.

Q. So that could manifest in communication as well.
A. Um-hum.
Q. Can you describe that in a little more detail?
A. So can you just clarify your question a little bit?
Q. Maybe. The judge is rolling his eyes at me.

THE COURT: You know, I've read the affidavit, and I understand. I'm just -- I'm trying to be practical. I'm trying to apply -- and Dr. Carpenter is an evaluator. She's got a limited amount of information, and maybe you've already given to me, Ms. Gannett, what she has, which is interesting. I find it interesting. She writes well, she writes cogently and clearly, and I got it, you know.

MS. GANNETT: Very well, Your Honor. Let me go to one piece that I think is not obvious.

BY MS. GANNETT:

Q. I think we've already covered shifting gears in schools and work settings, unless you have more that you want to add by way of examples there, Dr. Carpenter?
A. I'm not sure what you are looking for.
Q. If there are any other examples of difficulty in shifting gears or topics or activities in school or work setting that you would like to add. You gave some earlier.
A. Um-hum. Yeah. You know, just any type of -- any type of requirement to move from one topic to the next, or to integrate new information can be really difficult.

Q. Does that change if there are a number of different speakers involved --
A. Um-hum.
Q. -- at once? Potentially?
A. Yeah. So, you know, if you think about for any of us, there are skills that come very easy to us and skills that are harder for us. If we have a skill that is harder for us, but we are able to accomplish it in certain settings, when there is more demands, that skill might be the one that sort of drops out. So I like to give the example of your -- you know, most of us have a smartphone that has our schedule on it, right? And on any given day, you probably know your schedule without having to consult your smartphone, right? But if it's a day where you've got a ton going on and you are not feeling well, or you've got something going on at home that is on your mind, then you are probably going to rely on your smartphone more. You are not going to remember your schedule as well.
The same thing is true for someone with autism. If somebody with autism, let's say, has difficulty with emotion regulation, but can sometimes hold it together, or difficulty with, you know, sort of processing speech and can sometimes keep up, on a difficult day that's going to be particularly difficult for that individual. And you have to remember that what makes a difficult day for someone with autism is

probably going to be different than the rest of us. And, again, it's so idiosyncratic. Is that person bothered by lots of people, crowded noises; the lights in the room; small beeping noises in the background; the feeling of the tags in their clothing; the fact that the person who prepared their meal normally wasn't there and it was a substitute? Any of these things can cause stress for that individual. And so skills that they are sometimes able to show are not going to be shown as clearly.

Does that fit with what you are looking for?

Q. That is fine. I think that is very helpful.

So turning to the judge's specific question, I'm going to show you what's been marked as Defendant's Exhibit 15. Do you recognize this document?

A. Right. So this is the declaration that came from John Elder Robison who has written extensively about the experience of being an adult with autism spectrum disorder.

Q. And you have reviewed that document?

A. I have.

Q. And you are familiar with Dr. Robison?

A. I have read his books, I have heard him speak, and he served on sort of a community advisory board for one of my studies.

Q. So having reviewed that affidavit, recognizing that he's not a qualified diagnostician, are there things that he

observed, just facts that he observed that speak to you as an expert?

THE COURT: Ms. Gannett, you now have a nonexpert writing down things to ask a person who has not evaluated the defendant to offer opinions about something -- this is really not our standards for expert testimony.

MS. GANNETT: Your Honor, I'm asking her to rely on the facts reported, not the opinions. And I think she -- she'll tell us if she feels that it's --

THE COURT: Yes, Mr. Curran?

MR. CURRAN: We would object. She's cogently stated in her declaration what would be required for her to be able to opine.

THE COURT: Listen, I read Mr. Robison's -- I found it very interesting. I read it closely. But simply we are now in steps. This is not what we do for expert testimony.

MS. GANNETT: The question is not whether she would diagnose autism or find autistic traits, just whether there are facts that are -- that demonstrate the kinds of difficulties that we have been discussing. That's all.

THE COURT: Well, let's do it -- let's not just -- I mean, having one witness comment on other witness's declaration, we are just piling hearsay on top of hearsay here.

MS. GANNETT: I know Your Honor recognizes that

under the time constraints, we weren't able to get all the witnesses we wanted into the courtroom.

THE COURT: Listen, I know all this is, Ms. Gannett, you are trying to set up an issue that clearly you have given me everything I need to know. But just sitting here and having one witness on top of another witness speculating about something that she's already told me she can't offer an opinion, I just -- you know, it's just not that valuable.

But I don't want to hold you up. If there is something you want to point out -- I've read it. I recognize reading what she said. I recognize how his statements are relevant to that. I get it. But if you feel like there is something particular you want to point out, go ahead.

MS. GANNETT: Thank you, Your Honor.

THE WITNESS: So I think the things that stood out to me the most were the sensory difficulties relating to the clothing. So that is -- I can talk about that more if you want. That is something we see very frequently in our patients. And then the preservation on things that aren't important and neglecting things that are very important and maybe not recognizing the relative importance of those. And then, you know, there was some observations that he made that were not necessarily consistent with autism and were also very concerning.

So some of the irrational beliefs that he observed,

you know, that Mr. Roof thought that he was going to be pardoned, I believe was really concerning. And those types of irrational beliefs are not necessarily just due to autism and might suggest that something else was going on here as well.

BY MS. GANNETT:

Q. So on that latter point, you note in your affidavit some information about comorbidities with autism, and I understand that you have additional information today that is not presented in the affidavit about comorbidities. You said that -- I think you said that you did some additional research regarding --

A. So we were talking -- sorry. So we were talking about the presence of high IQ and autism.

Q. I'm sorry. Is there anything else that you want to add to your affidavit on comorbidities?

A. No. I could just emphasize that evaluation of comorbidities in autism is extremely difficult because of the poor insight and poor communication. We frequently have patients that, on self-report forms, when they ask them about relationships with parents, relationships at school, internal experiences of anxiety, will give us completely flat responses, no concerns at all. And yet if you look at objective evidence of their lives, they have incredible conflict with peers, incredible conflict in school. They

can't stay in school, meltdowns every day. As an objective observer, you would say all of these things are a big problem for this person, and they don't seem to have insight at all.

I should say on the self-report-type questionnaires, usually there is validity scales. You can see if someone is faking good or faking bad. In my experience with patients, they are not faking good. It's just that they don't have insight.

THE COURT: Will that show up on some of these personality tests?

THE WITNESS: I don't use those type of personality tests in autism.

THE COURT: Okay. Good. Thank you.

BY MS. GANNETT:

Q. So your last point about how well someone does in their life, does bring me back to that question of high IQ.

A. Right.

Q. And I would like to ask you to talk a little bit about the differences between autism spectrum disorder without intellectual disability, but distinguished from with intellectual disability, focusing on without.

A. So, you know, we know that about 50 percent of people on the autism spectrum have intellectual disabilities; that means that the other 50 percent don't. In my own research looking at a pretty large epidemiological sample, I found

that about 8 percent of people with ASD have IQs over 115. So --

THE COURT: What was that?

THE WITNESS: 8 percent have IQs over 115. So if you -- you know, I'm sure you all have a pretty good idea that most of us have IQs falling between 85 and 115; that is about 66 percent of us. It's a very small percentage of people that have IQs falling above 130. It's about 2 percent of people. So it's very small percentage overall, and it certainly is small percentage in autism. So in autism we see a shift in sort of the average intellectual functioning, that the average intellectual functioning is lower, but we definitely still have folks that have very high cognitive skills.

Now, the difference that we see in autism is often that their achievement in everyday life is much lower. So, in fact, when I'm looking at diagnosing autism in both gifted people as well as people that are very impaired, a lot of what I'm looking at is the split between their abilities and what they are actually able to do in their everyday life. For someone that is gifted, I would be looking at are you able to plan a healthy meal for yourself and go to the store and purchase the ingredients and cook that meal. Are you able to bathe yourself regularly without reminders, and are you able to choose clothing that is appropriate for any given

setting without help; that sort of everyday functional ability compared to their IQ.

And the same thing holds true at the low end. If we have someone that is just impaired across the board, that is not autism. That is developmental delay or intellectual disability. What I'm looking for are social problems and behavioral problems that go above and beyond what would be predicted by their IQ.

BY MS. GANNETT:

Q. Would it surprise you to learn that someone with autism would read books by Dostoyevsky or Goethe?

A. No. People with autism can read all kinds of material, and I -- I would argue that we don't know when any of us read any book what the person is getting out of it. So I have patients with hyperlexia that can decode anything, but they don't get any meaning out of it at all. And I have other patients that will read extensively, you know, on a particular subject that they are interested in, but they might not get the same experience out of reading that book that somebody else might. You know, maybe they are not getting the emotional experience or the same message from the book that a neuro-typical person would get.

Q. Does autism mean that you don't have emotions?

A. Not at all. In fact, poor emotion regulation is one of the hallmark features. I think where people with autism

struggle is in identifying their own emotions. So you might observe that the person looks extremely upset. It might take the person with autism a while to recognize that they are upset, and then to distinguish what type of upset emotion do I have. Am I embarrassed, ashamed, angry? Am I sad? And then from there even more difficulty trying to figure out what caused that feeling. So, you know, we all have the experience where we feel anxious and we don't exactly know why, and we sort of look back on our day, and we are like, "Oh, wow, this is probably what caused me to feel anxious."

Well, for someone with autism, we are talking about lots of jumps there: Identifying your feeling, identifying even more specifically what that feeling is, and then identifying what the precursor was for that feeling. So in our kids what we often see is, you know, major behavioral outbursts that the parents will say, "It comes out of nowhere. There is no trigger at all." And they start to look for things like seizures or other causes for the outburst. And after a while, once you have worked with the kid and you take data, you might find that there is a very clear trigger. Maybe they have meltdowns every time their mom is taking them to Walmart because that situation is just overwhelming to them. But unless you are really taking data and carefully assessing what is causing the upset or bad feeling, the person can never express it to you because they

don't know themselves.

Q. Does autism always manifest in that outburst behavior?

A. No. So I think the kids that are most likely to be picked up are the ones that have aggression and outbursts because people are concerned about those behaviors. Those are often the things that bring them into my clinic for evaluations. The quiet kids, the ones that just sit in the back of the class and don't cause any problems and don't have any friends, those kids often get passed over, unless someone is looking at them real closely.

Q. And is it possible for people with autism to sometimes show a skill and sometimes not show a skill?

A. Right. Just like the rest of us, right? Like, you know, there are things that we are better at and things that are harder for us, and on a good day, I might be able to run an eight-minute mile. But most of the time I run a ten-minute mile, and that could be the same for someone with autism. On a really good day, they can hold it together and get through an entire birthday party and be appropriate and give the gift to the person and then have a conversation. But on a bad day, they can't do any of that.

Q. And is there any way to predict that?

A. What is going to be a good day and a bad day? Maybe if you knew the individual really well, and you knew what triggered bad days. That would probably be a careful

assessment.

MS. GANNETT: Thank you.

THE COURT: Cross-examination, Mr. Curran.

MR. CURRAN: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. CURRAN:

Q. Good afternoon, Dr. Carpenter.

The headline here is that you were not asked to evaluate Dylann Roof, were you?

A. Um, initially and I declined.

Q. You declined. You declined to evaluate him. Consequently -- and you've talked in your declaration about what the best practices are, what's required to do a competent evaluation, correct?

A. Correct.

Q. And consequently, because you haven't done any of those things, you don't have an opinion --

A. That's right.

Q. -- on whether Mr. Roof has autism spectrum disorder?

A. That's right.

Q. You don't have an opinion on whether he even exhibits autism spectrum disorder traits?

A. No, I couldn't comment on that, that's right.

Q. Because you've not done what you told us in your affidavit you have to do to be able to offer those types of

opinions?
A. That's right.
Q. And, consequently, you also then don't have an opinion on whether that disorder or traits might affect his competency to stand trial?
A. That's right.
Q. Let's talk about autism spectrum disorder for a while. That's your area of expertise. It's not a rare disorder, is it?
A. Right. We used to think it was rare. Now we think that about one in 68 individuals are affected.
Q. And then there are different variations on it. The DSM-5 says about 1 percent?
A. Right.
Q. You said one in 68. That is a little higher.
A. That's right.
Q. Anywhere from 3 to 4 million Americans have autism spectrum disorder?
A. I'll trust that you did the math right.
Q. A little more than 300 million Americans, if you do the math?
A. Okay.
THE COURT: Psychologists, they went into it because they didn't want math.
MR. CURRAN: I was a psych major too. I know a

little bit of math.
BY MR. CURRAN:
Q. And I think you've already told us that it doesn't present the same way in everybody, does it?
A. That's right.
Q. It's a spectrum -- it's a spectrum disorder?
A. That's right.
Q. Right?
A. That's right.
Q. It's not a narrowly defined set of deficits -- deficits and behaviors. The DSM gives you criteria that you have to find, but it's not so narrow that it can't be considered as a spectrum, correct?
A. Absolutely. There is a huge range in presentation. You know, I'm sure you've heard the saying if you've seen one person with autism, you've seen one person with autism. And the idea is that each person is so unique.
Q. That's reflected in the DSM-5, right, which has multiple examples of how someone might qualify under those criteria?
A. That's right.
Q. It's not you have to meet this. That gives you a number of illustrative examples --
A. Yes.
Q. -- that might meet those criteria.
A. Um-hum.

Q. So there's multiple examples of how someone's social communication skills might be affected?

A. Right.

Q. And also --

A. But just to clarify, they do have to have fundamental deficits in social communication abilities. It just might manifest in different ways in different people.

Q. Right. And as part of that spectrum, DSM-5 also tells you that there are varying levels of severity for autism spectrum disorder?

A. That's right.

Q. It lists three levels from those, all of which have to have the impairment you talk about, but some of which are extremely severe, and some are not as severe, correct?

A. Right. So you rate the individual's social communication deficit as well as their restricted, repetitive behaviors on a scale of 1 to 3, with 1 being more mild impairment and the 3 being more severe. And the idea is that any individual might be able to fluctuate over time, hopefully get better from, you know, 3 to 2 to 1 to no functional impairment.

Q. So then a diagnosis that someone has autism spectrum disorder -- has autism spectrum disorder doesn't -- that alone doesn't really tell you where on the spectrum they are, does it?

A. Right. So are you -- what you are saying is it would be

more helpful to have that severity specifiers.

Q. Exactly. If I'm a clinical diagnostician and I've done everything you said, and I was evaluating someone, and I tell you that someone has autism spectrum disorder, that doesn't tell -- what I have communicated to you does not communicate to you a level of severity. It doesn't communicate to you how it manifests itself.

A. That's right.

Q. Correct?

A. Yes.

Q. And that is all Dr. Loftin's diagnosis tells you in the declaration, correct?

A. Yes, sir.

Q. In your -- you talked a little bit today and you talk about it in your affidavit -- excuse me -- your declaration, that one of the autism spectrum disorder associated behaviors -- that is an awfully awkward thing to keep saying. Do you refer to it as ASD?

A. Yes.

Q. So ASD-associated behaviors that you described in there, one relates to both, correct?

A. Say that again.

Q. One of the ASD-related behaviors that you comment on in your declaration and your testimony today relates to clothing?

A. Clothing, yes. Yes, sir.
Q. And for some -- some people with ASD, they get very focused on their clothing, focused on, for example, how it feels?
A. Right.
Q. But not everyone with ASD exhibits that, correct?
A. Exactly. Yes.
Q. And not everybody who is very particular about their clothing has ASD. That's right?
A. Um-hum.
Q. There's whole industries that have been built on the fact that many people are particular about their clothing, correct?
A. That's right. So, you know, this gets back to the issue that we talked about a little bit earlier that lots of us, you know, probably have one or two symptoms of autism, and there is really the full constellation of symptoms, along with the functional impairment and the history that you are going to use to make the formal diagnosis. So the issue with clothing is just one.
Q. So you are not saying that being particular about your clothing is necessarily an ASD trait, are you?
A. That's right.
Q. Because many people are particular about their clothing, particularly, for example, they are about to participate in a

high-profile event where a lot of people are going to look at them.
A. I would think so.
Q. You today are sitting in a courtroom. I suspect you paid a little more attention to what you wear today than you normally would?
A. I would think so. Being particular about how you look or wanting to look nice is a little bit different than some of the things that I talked about in my affidavit where it's wanting to literally wear the exact same shirt over and over, or wanting to wear the exact same style of clothing over and over, or being very sensitive to tags in your clothing or to the fabric, to the denim feel, or only wanting to wear certain fabrics like Dri-Fit. So I think it's not so much the behavior as the reason behind the behavior.
Q. And you've not evaluated Mr. Roof, so you don't know if he exhibits any of those behaviors, correct?
A. I don't, sir.
Q. If you look around and notice all the men here, with the exception of one, maybe two -- I can't tell what the Judge has on under his robe -- are wearing suits, correct?
A. Yes, sir.
Q. And it would not be unusual in this setting to want to wear a suit, would it?
A. Right.

Q. And many people choose their clothing or use their clothing as a means of expressing themselves, don't they?
A. That's right.
Q. And you work in the pediatric field, so you work with young people. Many young people --
A. Um-hum.
Q. -- particularly are focused on their clothing, correct?
A. I think people in general, yeah.
Q. People in general, and they use it to express themselves.
A. Yeah, I would agree.
Q. And some people, for example, use their clothing as a form of protest, don't they?
A. Seems fair.
Q. And particularly if they want to protest against an authoritarian figure or authoritarian system sometimes that would be expressed in the clothing that they choose, correct?
A. You are getting outside of my area of expertise, but I would guess so.
Q. You wouldn't say that that is an autistic character sort of trait, would you?
A. So you are saying that, for example, a student that wore ripped jeans to school, even though that was against the dress code, as a statement that that would not be necessarily a symptom of autism?
Q. Yes, exactly something along those lines. Someone who

chooses their clothing as a means to express protest, does that fit the DSM-5 criteria for ASD traits?
A. I'm thinking. So it's not a sensory interest. I guess if their obsession was -- if it had something to do with their obsession, it could be. So, again, I guess you are -- you are asking me to say "yes" or "no" to a question that I'm not -- is not really a "yes" or "no" question.
Q. It's not necessarily.
A. Of course. Not necessarily. We would really need to know the function of that behavior. Why was the individual insisting on wearing a certain outfit on a certain day.
Q. You are a clinical psychologist. You look at many people, and you look at that, and that doesn't say to you, "Well, this person must be suffering from an autism spectrum disorder," correct?
A. Look at what?
Q. Someone who uses their clothing as a means of protest.
A. It would depend on the function of the behavior and why they were doing it, and I guess the -- the -- you know, how pervasive this issue is for this individual across multiple settings and time.
Q. How pervasive it is and how it relates to the other criteria. That alone and using the ability to express yourself is not a basis for concluding that someone has ASD?
A. Sure. Right. You would never make a diagnosis based on

just clothing issues.
Q. And you've told us the criteria for diagnosing ASD are much more involved than that, right?
A. That's right.
Q. You've told us it should involve a clinical diagnostician, correct?
A. The diagnostician, is that what you are asking?
Q. Yes.
A. So you want a diagnostician that is not only qualified in terms of having experience in standardized assessment, but you want one that has extensive experience in the various ways that autism can present.
Q. You need more than that, right? You need more than a clinical psychologist or a diagnostic -- I'm having trouble with that -- diagnostician with experience in ASD. You want them to do cognitive and adaptive testing?
A. Or be able to review cognitive and adaptive testing.
Q. You want them to review adult mental history?
A. That's right.
Q. You want them to do something like ADOS because that is objective and valid, right?
A. Right.
Q. And you want them to refer to the DSM-5 criteria?
A. That's right.
Q. So anybody -- you've already told us you didn't do any of

that for Mr. Roof?
A. That's right.
Q. Therefore you don't consider yourself able to evaluate?
A. That's right.
Q. And you would be suspect of any evaluation that did not follow those criteria or criteria similar to that, correct?
A. Right. If they didn't go through a careful history, do a direct assessment -- I'm trying to think of -- try to interview, you know, family members to the extent possible. It's very hard to do autism diagnosis in adolescents and adults because a lot of it relies on with someone remembering history well, which none of us are very good at.
Q. So no matter how experienced someone was with ASD, you would be suspect if they attempted to offer an opinion about whether someone has ASD based on a single meeting with a person who was uncooperative in that evaluation?
A. Right. You would never make your diagnosis based on one piece of data. So you are talking about one piece of data being one single meeting. I mean, you would definitely still need the review of history, the understanding of the symptoms of autism as well as the results of direct testing.
Q. And you've told us that -- I'm going to shift a little bit. We are going to talk about the courtroom experience. You talked about that in your declaration. You talked a little bit about that today, and you frankly admitted that

you don't have much experience in a courtroom setting.
A. Zero.
Q. This is your first?
A. This is my first.
Q. This is your first time testifying?
A. Yup.
Q. First time testifying in criminal case, first time testifying in a case that has anything to do with competence to stand trial, correct?
A. That's right.
Q. So you are extrapolating from your experiences in other settings, and essentially you are speculating in your extrapolation about what it would be like for a generic ASD person in a courtroom setting?
A. I'm not even sure I would go so far as to say I'm extrapolating. I mean, you know, all I can do is give you examples of things that have been hard for my patients and have caused them problems in life in general in the community.
THE COURT: I don't think she's trying to tell us things about what -- she's given us the background for us to apply in the courtroom to our knowledge of the courtroom, and she's giving us those things. I don't think she's trying to do more than that.

BY MR. CURRAN:

Q. All right. But part of my question was that what you are -- what you were doing there is you were explaining that from a perspective of a generic ASD person, correct?

A. Or things that -- things that cause problems for some people with autism. So no one person is going to have all of those areas of difficulty, and there's probably lots of areas of difficulty that I haven't mentioned that -- you know, that occur in lots of people. And, again, you know, in a typical setting, a person would do a thorough evaluation of the individual and would base their recommendations and conclusions based on that thorough evaluation.

Q. The problems you talked about before, and the problems that you talk about in your declaration, you are not telling us that they would affect everybody who has ASD?

A. That's right.

Q. That's because it's a spectrum, varying types of presentation, varying levels of severity, correct?

A. That's right.

Q. And some you mentioned have above average cognitive skills, right?

A. That's right.

Q. And so under that circumstance, even though they have ASD, would be unlikely to have problems understanding the nature of the proceedings involved in a courtroom setting,

correct?
A. I could not speak to that.
Q. Some people with ASD have above average ability to communicate more with others, also correct?
A. Work with others?
Q. Yes.
A. So that might be hard for someone on the spectrum to do, you know, group work. They might be able to do it in some limited circumstances --
Q. Well -- I'm sorry.
A. -- if you think about social communication problems speaks to the core of the disorder, working with others, you would expect it to be difficult for that person.
Q. Right. And in a generic context, for some people it would not be difficult, correct? For Professor Robison for example?
A. I think he has a lot of difficulty working with people.
Q. But he's able to do it, isn't he? He's a published author. He is a member of numerous boards, groups, participates in many agency proceedings. He's been interviewed numerous times on radio, TV, and the *New York Times*. He maintains not one, but two separate docs. He's not someone who has difficulty communicating with others, is he?
A. Can -- I would like to give an example of Mr. Robison,

what some of his difficulties are, and I say this with a great deal of respect for him. He was a member of a community advisory board for a study that I did here, and we had a big phone call with lots of people, autism experts from all over the country, very famous people. It was intimidating to me. I'm sure it was intimidating for him. And at the beginning of this call, we talked a little bit about -- about rewards a participant should get for participating this in study, and he made a comment about it, and then we talked a little bit about that, and then we moved on.

And one of the things that I noticed was that he had a lot of trouble moving on, and so this group of, you know, very famous people who are on the phone together, and he's interrupting other people to bring it back to the point that he had made which was a pretty small point and not really the goal of the phone call. Goal of the phone call was to talk about the study as a whole.

So he is an amazing contributor. That is why I wanted him on the call as a, you know, mouthpiece for the autism community, but his symptoms of autism definitely caused problems in his ability to work with the group.

Q. I didn't mean to suggest that he didn't have challenges.

THE COURT: Mr. Curran, let's move on. Whether that raised problems on the telephone --

BY MR. CURRAN:
Q. I think my point was he's a very successful person in a field that requires communication in working with others despite the challenges, correct?
A. I would say that is the truth. I would guess that, you know, he has set up his world in such a way that it minimizes those requirements of having to work with other people.
Q. That brings it back to you have to look at every individual person --
A. That's right.
Q. -- when you do the evaluation. And you have to assess that person to determine what their specific problems are.
A. That's right.
Q. And you were not able to do that --
A. Right.
Q. -- for Mr. Roof?
A. That's right.
Q. You were not able to assess him for ASD, not even able to determine whether he had autistic traits based on your review of Mr. Robison's declaration, correct?
A. That's right.
Q. And you looked at that, and you also thought that there may be some other issues, but you weren't able to determine whether those are traits or diagnosis or disorders or anything. You wouldn't be able to do that.

A. That's right. I'm here to solely educate you all about autism.

Q. I have been dually educated, and with that, that's all I have.

A. Thank you.

REDIRECT EXAMINATION

BY MS. GANNETT:

Q. Just one question, Dr. Carpenter, to clarify: Am I correct that it was the State that called you first to conduct an evaluation of Mr. Roof?

A. So, um, in the late spring, the State set -- tried to set up a meeting with several people from my division who specialized in autism, and I didn't know if it was about Mr. Roof or not. They then subsequently canceled that meeting because what I was told is that they didn't have permission from the judge to have the meeting, and I have not heard from them since.

THE COURT: When you say "the State," the defense lawyers or the prosecution?

THE WITNESS: The prosecution.

THE COURT: Okay.

BY MS. GANNETT:

Q. And is that --

A. So I assumed that it was about Mr. Roof, but -- based on who it was, but I was not sure. And it was then the defense

that contacted me next.

MS. GANNETT: Thank you.

THE COURT: You may step down, and you are excused. Thank you so much for coming, Dr. Carpenter.

MS. GANNETT: I'll return those. Thank you.

MR. BRUCK: We call Dr. Stejskal.

THE CLERK: Sir, come forward to be sworn.

Place your left hand on the Bible, raise your right. State your full name for the record, please.

THE WITNESS: William Joseph Stejskal.

THEREUPON:

WILLIAM JOSEPH STEJSKAL,

called in these proceedings and being first duly sworn testifies as follows:

THE CLERK: You may be seated.

DIRECT EXAMINATION

BY MR. BRUCK:

Q. Good afternoon, Dr. Stejskal.

A. Good afternoon, Mr. Bruck.

Q. I'm going to ask you to state your full name, and as you have been asked before, to spell your last name.

A. Of course. William J. Stejskal, S-t-e-j-s-k-a-l.

Q. And I'm not sure if it's my being hard of hearing, or your being very soft-spoken, if you could make sure that the microphone is close to you or you close to it so that

everyone can hear you.
A. Of course.
Q. Maybe a little more. Okay.
And, Dr. Stejskal, if you can try to keep your voice up, I will do the same, and we'll try to get through it.
Dr. Stejskal, can you tell me what you do for a living?
A. I'm a clinical and forensic psychologist in the Commonwealth of Virginia.
Q. Northern Virginia?
A. Yes.
Q. And what did we ask you to do in this case?
A. I was contacted by you towards the end of the first week of November of the possibility of doing a competency evaluation of your client.
Q. Very well. And you said that you are a clinical psychologist. I'm going to hand you what will be marked as Defendant's 22.
THE COURT: Is that the CV?
MR. BRUCK: Yes.
THE COURT: Any objection?
MR. RICHARDSON: No objection, Your Honor.
THE COURT: Very good. Defendant 22 is admitted without objection.
(Thereupon, Defendant's Exhibit 22 introduced into

evidence.)

BY MR. BRUCK:

Q. Give you a copy.

A. Thank you.

Q. And I would like to -- the CV, of course, will speak for itself, but I would like to have you briefly touch on those aspects of your training and experience that particularly relate to the subject evaluations of competency to stand trial in criminal defendants.

A. After I completed my doctorate degree at Colorado State University, along with my internship in Washington, D.C., I was hired as a forensic psychologist at the maximum security forensic division of St. Elizabeth's Hospital.

Q. What year was that, please?

A. That was in 1984. And I worked there for a total of four years. The first three years I served as a clinical psychologist on a pretrial admission unit where there were 30 male patients admitted there primarily for evaluation and treatment of competency to stand trial, some for evaluation of sanity at the time of the offense. And my role was to conduct psychological and neuropsychological evaluations and to be part of the evaluation team evaluating competency to stand trial and other issues.

My last year at St. Elizabeth's Hospital, I served as the clinical administrator for that very same pretrial

unit where I oversaw the evaluation and treatment services of the men on the unit.
Q. And after leaving St. Elizabeth's Hospital, could you briefly outline your professional experience again with a particular focus on the extent to which you are engaged in the assessment and evaluation of the competency to stand trial?
A. After I left St. Elizabeth's in 1988, I became the director of psychology at the community hospital in Woodbridge, Virginia, and also became a part-time private practice in clinical and forensic psychology.  After I completed the training that's required in the Commonwealth of Virginia to be able to do court-appointed competency evaluations, I began a private practice in forensic evaluation in Virginia as well as the District of Columbia in 1990.
Q. Let me stop you.  I should have gotten you to clarify, that during your four years at St. Elizabeth, did you have occasion to conduct competency to stand trial evaluations?
A. I did.
Q. Was that a large part of your work?
A. It was, yes.
Q. Very well and please proceed.  During the time after you established your private practice, did you continue to be appointed by the courts, or did you come to be appointed by

the courts on a frequent basis to perform competency evaluations for criminal defendants?

A. Yes, on a regular and frequent basis in Virginia. I also conducted competency evaluations in the District of Columbia.

Q. Can you estimate over the course of your career beginning in 1984 roughly how many criminal defendants have you evaluated for competency to stand trial?

A. Between three and four hundred where competency was the primary issue.

Q. Very well. Now, did there come a time when you assumed an academic post in addition to your private psychological practice?

A. Yes. After ten years or so of practice in Virginia, I was invited to join the faculty of the Institute of Law, Psychiatry and Public Policy at the University of Virginia to serve as the director of psychology and also the director of the forensic psychiatry clinic and served from 2000 to 2006.

Q. Does Virginia have any special qualifications imposed by law to permit a psychologist or a psychiatrist to perform assessments of competency to stand trial for the courts?

A. Yes.

Q. And do those requirements involve a training component?

A. Yes, they do. In order to be appointed by the court to do an evaluation of a defendant's competency to stand, the evaluator has to have completed training that has been

authorized by the Office of the Attorney General, and since the late 1980s, the Institute of Law, Psychiatry and Public Policy has been the training entity to prepare psychologists and psychiatrists around the Commonwealth to be able to transition from clinical practices and forensic practice so they are available to courts as outpatient forensic evaluators.

Q. And did you participate in the administration and in the teaching of those legally-required courses to qualify mental health professionals to be competency evaluators?

A. Over the six and a half years I was there, I was a member of the faculty that participated several times during the year in providing training to psychiatrists and psychologists in conducting forensic mental health evaluations, including competency, sanity, and other issues.

Q. Can you estimate how many trainees you assisted in -- how many people you trained; that is -- and I should ask, was this only psychologists or also psychiatrists?

A. Psychiatrists as well.

Q. So you are a psychologist, but you were training psychiatrists to perform competency and other criminal court mental health evaluations?

A. Yes, both in these trainings and people I supervised.

Q. Can you estimate how many students you had go through the process at the end of your time in the institute?

A. I would say upwards of 300 all together through the formal trainings, and then a dozen psychiatric trainings of psychiatric trainees.
Q. All right. And when did you leave the Institute of Law, Psychiatry and Public Policy in the University of Virginia?
A. At the end of the spring term in 2006.
Q. And returned to private practice at Woodbridge?
A. And returned to full-time private practice.
Q. And since you went back to full-time private practice, have you continued to perform evaluations for the courts, including evaluations of competency to stand trial?
A. Yes.
Q. Do you also have a -- any governmental responsibilities involving the assessment of persons in the courts, in the criminal area?
A. Well, in the courts, not in the criminal area. I'm a member of a judicial commission in the Superior Court of the District of Columbia, and since 1994 have co-presided with a magistrate judge and a psychiatrist on a rotating basis acting as fact finder in civil commitment proceedings of individuals who were under emergency hospitalization.
Q. So that -- could that fairly be described to be a quasi-judicial function that you and two other members of the panel --
A. The magistrate judge would resist the idea, but, yes, the

psychiatrist and I serve in a quasi-judicial function.

Q. The -- now, I am required by Court order to ask you the following two questions, and I will do so: Number one, do you have an opinion within a reasonable degree of medical or scientific certainty that the defendant, that is Dylann Roof, suffers from a mental disease or a defect, and if so, state with specificity what the mental disease or defect is.

A. Yes, I do have such an opinion.

Q. And are you able to state at this time with specificity whether -- what the mental disease or defect is?

A. Yes. My primary working diagnosis for Mr. Roof is unspecified schizophrenia spectrum disorder or psychotic disorder.

Q. And at this time, have you reached that opinion with a reasonable degree of medical or scientific certainty based on the evidence that you have been able to review?

A. That's a fairly nonspecific diagnosis. And, yes, I reached that conclusion to a reasonable degree of professional certainty.

Q. And I asked you the second question, do you have an opinion within a reasonable degree of medical or scientific certainty that due to a mental disease or defect the defendant does not have the present mental -- present capacity to understand the proceedings and/or to assist counsel, and if so, in what specific ways does the defendant

not understand the proceedings and/or cannot consult his attorneys or otherwise not assist properly in his defense -- maybe I should go back to the beginning of the question.

Do you have an opinion on all of that or any of it, within a reasonable degree of medical or scientific certainty?

A. Framed in that way, I would have to say no, not yet.

Q. Very well. Now, with that understanding, there are three things that I would like to review with you in a fairly brief manner. First I would like you to describe your efforts to conduct a competency evaluation and the observations that you have made and your comments upon materials and information that you have received.

Secondly, I would like you to describe certain aspects of the videotape or a tape-recording of the defendant's interactions with his family last Saturday during a visit, and I'm going to ask you to comment on -- make observations about that.

And, finally, I would like you to comment on the whether or not the personality inventory testing, that is the PAI and the MMPI that have been administered by two different mental health professionals who have been serving as court evaluators and in a sense prosecution evaluator, do or do not rule out the possibility of a psychotic illness.

That's what we are going to cover, and I would like

to march through it very quickly?

THE COURT: Mr. Bruck, let me say, I don't think there is any question you can rule in or rule out a psychotic disorder on a single test.

MR. BRUCK: Well, I think I want him to go a little more in --

THE COURT: I'm saying that question, you don't have a problem selling me on that.

MR. BRUCK: Okay.

BY MR. BRUCK:

Q. If you would describe -- have you -- the test that I -- I had called you and asked you to conduct a competency to stand trial evaluation, and I've asked you to explain in summary fashion how you go about a competency evaluation, and how you attempted to go about such an evaluation in this case.

A. Of course. And I'm trying to be efficient and still as clear as possible.

After we came to an understanding that I wouldn't be able to do the evaluation on this timeline, you and your colleagues sent to me a great deal of records, a great deal of information pertaining to the defendant, pertaining to the allegations against him, and pertaining to his developmental period. I believe these are the same materials that had been provided to the Court's evaluator as well. So I won't delineate them in detail here. I have also --

Q. I'm handing you what is Defendant's Exhibit --

THE CLERK: 23.

BY MR. BRUCK:

Q. 23, and ask you if that is a printout of all of the materials that you reviewed except for a number of videotapes that you will also discuss.

A. Give me just a moment to review this.

Q. Sure.

A. Yes, I recognize everything on here. There were two additional videos that I reviewed that aren't listed here.

Q. I mentioned the videos. Other than those videos which we'll get to, is that the list of materials which you were provided?

A. On this quick review, it appears to be.

MR. BRUCK: We move that be admitted.

Q. Why -- now, did you review these materials before you attempted to schedule a meeting with Mr. Roof?

A. Yes.

Q. And did you also discuss with me and other defense counsel the issues that we were having working with Mr. Roof?

A. Yes, I had that conversation before I reviewed any of these materials.

Q. And why was the conversation with the defense the first thing you did? Is that unusual?

A. No. Well, not in my practice or the practice of the

people I have trained and supervised.

Q. Why is that that you would start with the defense counsel?

A. In my experience most competency evaluations arise as a function of defense counsel making the Court aware of some sort of difficulty with their client with respect to consultation or understanding of the proceedings against them. And in order to be able to do a focused and relevant evaluation, relevant in the sense that it's addressing the issues that are of concern, it's important at the outset to have a conversation with defense counsel to begin to get a sense of what is the nature of the difficulty that they are having with their client.

Q. And in addition to the conversations you had with us, you also had the opportunity to review the in-court statement that I made to Judge Gergel, a transcript of such a statement on November 7th of this year?

A. At the ex parte hearing, yes.

Q. And after informing yourself about the difficulties that defense counsel were having as we expressed them to you, you reviewed the materials with which you were provided?

A. I began to review the materials. They are quite voluminous, but yes.

Q. And you had to prioritize. It's an enormous amount of material.

A. Of course.
Q. Did you begin -- what is among the priority of materials from Mr. Roof's family, his mother, developmental information?
A. Yes, along with medical records from his childhood and adolescent years.
Q. And did there come a time when you arranged to travel to Charleston to see Mr. Roof?
A. Yes. I arrived in Charleston on the 12th of November.
Q. By the way, you mentioned some videotapes that are not listed there. If you know, how did those particular videotapes come to be selected for this competency evaluation?
A. I believe that they were in the packet of materials that the Government provided to the Court's evaluator.
Q. That the Government provided -- selected and provided to Dr. Ballenger?
A. That's how it was raised to me, yes.
Q. And did you view all seven -- how many were there?
A. There were seven.
Q. And how many of those did you review?
A. All seven.
Q. Have you since reviewed one or two additional videotapes of a -- of one additional family visit at the jail?
A. Yes.

Q. And when did that visit occur?
A. That visit occurred this past Saturday, the 19th.
Q. Very well. So you've now reviewed eight visits -- nine videotapes involving eight visits; is that correct?
A. Well, nine videotapes involving somewhat smaller increments because there were two videotapes of a visit that occurred on September 25th.
Q. I see. Okay. Would you describe what happened -- did you request of me to make certain arrangements about the physical conditions under which you would see Mr. Roof?
A. Yes. I asked as I always ask that arrangements be made for me to have a contact visit with the individual so that the two of us would be in a private setting across a tabletop ideally.
Q. And what did you learn about that?
A. I learned that such arrangements would not be able to be made because of the defendant's objections to certain conditions that are involved in accomplishing an actual contact visit.
Q. And do you recall what those objections were? -- just if you know?
A. The objections involving being subjected to a strip search under the use of a video camera.
Q. And what was the concern about the camera?
A. The concern as I recall it being described was that there

might be a video-recording made of him in a state of undress and it would be broadcast somewhere.

Q. Very well. Now, what day did you ultimately first meet Mr. Roof?

A. I met Mr. Roof on the morning of Sunday, November 13th.

Q. And did anyone go with you to the jail to see him?

A. Yes. You went with me, and Ms. Stevens went with me.

Q. All right. And can you describe the course of that visit? What happened?

A. Yes. It might be useful for me to be able to refresh my recollection by looking at my notes. I have to run my device.

MR. BRUCK: Sure. And let the record reflect that we have provided hard copies of Dr. Stejskal's notes to the Government.

THE WITNESS: According to a prearranged plan, you and/or Ms. Stevens went into the visiting booth before me to speak with Mr. Roof, and some minutes later -- excuse me, I'm conflating that with my -- the three of us went into the visiting booth together and waited for Mr. Roof to be brought to the visiting booth. He entered the visiting booth wanting to know who I was. You and Ms. Stevens explained and then engaged him in a conversation -- attempted to engage him in a conversation regarding plea issues.

BY MR. BRUCK:
Q. Can you describe how Mr. Roof appeared to you during that interaction?
A. He appeared restless, somewhat agitated, and not yelling, but speaking forcefully, sometimes over you, as you attempted to explain our purpose in being there that morning, indicating that he couldn't talk to you or shouldn't talk to you because you are his enemy.
Q. He said that me, that is Ms. Stevens and I, were his enemy.
A. I believe he was speaking directly to you.
Q. To me?
A. Yes, Mr. Bruck.
Q. And what, by the way, was Ms. Stevens and my demeanor towards Mr. Roof?
A. You were calm and clear.  You were both in your own way somewhat solicitous and gentle with him as you attempted to focus his attention on the reason for our visit.
Q. At some point did -- was I able to engage Mr. Roof's interest in you?
A. Yes.
Q. And how did I do that?
A. You -- you explained the background of my family name. You explained to him that you had originally thought that my family was Danish because of the sign of "J" in my name; that

I had corrected you to let you know that most of my relatives were from the part of Europe that is now the Czech Republic, and he seemed interested in this and expressed an interest in hearing more about that.

Q. And did I also pass along what I learned about your mother's ethnic ancestry?

A. Yes. That that part of her family came from Moravia.

Q. And when I explained that to Mr. Roof, did you notice any change in his -- in his style of interaction as far as you?

A. He -- he calmed down a bit, perked up, and became interested in having some sort of interaction with me.

Q. And at that point, you pulled up to the --

A. Small hole in the wall.

Q. The hole in the glass.

A. Yes.

Q. And what did Mr. Roof do in terms of turning his body or adjusting himself?

A. He oriented his head so that his ear was in front of the opening in the glass.

Q. All right. And you talked to him for a little while?

A. Yes.

Q. About what?

A. The sequence in which my grandparents came to this country, their purpose -- well, the age at which they came to this country. He asked why they came to this country, and I

explained that they came to this country for the reasons that many immigrants do, for better opportunities that they didn't have in their native country.

Q. How did Mr. Roof respond to that statement of yours?

A. Fairly vehemently stating that is not the reason people come to this country, that people -- he used the example of the Hispanic -- come to this country to kill us or try to take over.

Q. To kill us?

A. Yes.

Q. The -- and how long did this meeting last, this first interaction you had?

A. My first interaction with him?

Q. Yes.

A. Approximately 16 minutes.

Q. After which time what happened?

A. Mr. Roof indicated that he would only continue to speak with you and Ms. Stevens if I left the booth.

Q. And you left the room?

A. I did.

Q. And we stayed in the room for a while?

A. Yes.

Q. Did you -- what else -- what did you do next in your evaluation?

A. I continued to review materials. I had an opportunity

the next day to interview Dr. Maddox about her recent interactions and observations of Mr. Roof.

Q. All right. And did there come a time when you went back to the jail?

A. Indeed. I went back to the jail on November 15th in the afternoon.

Q. And who, if anyone, went with you on that occasion?

A. Ms. Paavola and I went.

Q. Emily Paavola, one of Mr. Roof's other attorneys?

A. Yes.

Q. And what happened then?

A. This was the occasion where the plan was for the attorney to go in first while I waited in the jail's lobby, and she would attempt to engage him to meet with me.

Q. And how did that go?

A. After about 50 minutes, I received a text message from the attorney indicating to come into the booth.

Q. Okay. And what happened when you went in the booth?

A. Well, I came into the booth, and there was a bit of a pregnant silence in -- Ms. Paavola was attempting to engage Mr. Roof to respond to her requests about meeting with me, and he sat there silently.

I joined in the effort to persuade him to engage with me in a discussion, explaining that I was willing to let him in this initial interview set the conditions for our

discussion. I gave the example that we would avoid topic A, and not ask follow-up questions about topic B, and he was unresponsive during this period.

And I'm getting my notes in front of me so I don't take things out of order or that are inaccurate.

There came a point when -- well, his silence persisted. The attorney and I agreed that she would leave the booth, and I continued to attempt to engage Mr. Roof and began this attempt to comment that it must be difficult having so many doctors to come in and to evaluate him, that I can appreciate how tedious that must be, and there was a pause, and I asked -- I said to him, "I'm interested in knowing what you want to have happen here."

And he spoke, and indicated that he can't -- he can't talk about that, and then pivoted to say, "But I did learn that I'm a genius almost." And we had a brief exchange about the testing that he recently completed with Dr. Wagner, and his -- he didn't use the word, but I sensed a sense of pride in the performance that he obtained on that test.

Q. Just so we are clear on the chronology, 11-15 was a Tuesday, correct?

A. Yes.

Q. And this was the Tuesday after the completion of the court-appointed evaluation on Friday and Saturday, right?

A. Yes, I believe -- I forget which day, but I think it was

Saturday was the last day.

Q. Saturday was the last day. Okay. And Dr. Wagner had been part of that process along with Dr. Ballenger?

A. Yes.

Q. So Mr. Roof had had well over 9 hours, probably about 12 hours, including Dr. Wagner's evaluation in the preceding week, and now you were at the following Tuesday here to see him again, and that is what you were referring to about the tiredness?

A. Yes.

Q. Okay. Proceed.

A. I asked him again that I'm interested in understanding what he wants to have happen in his case, that I was aware of the conflict that had emerged over the preceding week and a half or two weeks and that I wanted to understand that. He made some comments about -- and I should say this -- his way of interjecting his comments was rather abrupt and was not necessarily responsive to questions that I had been asking him. He observed that he wanted to waive putting on a defense. I asked him to explain that or what he meant. And he responded, "Whatever happens, I can't let there be a trial." And his demeanor as he said that seemed anxious and concerned. And when I asked him to explain, he paused and indicated that he couldn't talk about that.

Q. And in a general way summarize -- how long did you remain

engaged with Mr. Roof on that day?

A. A little under an hour and a half.

Q. All right. And can you summarize the general course of that interview?

A. Well, it was not linear.

THE COURT: Not linear?

THE WITNESS: Yes, not linear. Mr. Roof made it clear at various points when I attempted to begin an inquiry into a substantive area concerning his case or his thinking about his case, he either responded with "I can't talk about that," or he gave an initial vague or ambiguous response. And when I followed up on that, indicated that he could not talk about that. I tried to clarify whether he was meaning that he could not or would not, and he said essentially both, that it was -- that he was not intending to discuss those matters with me.

And our discussion over that approximately an hour and a half was fairly elliptical in that we would have fairly superficial but fluent back-and-forth about relatively trivial topics unrelated to this case, and as I sensed that there was a bit of relaxation in his demeanor, I would again attempt to ask -- interject questions about his case which for the most part he resisted.

There were a couple of things that he commented on. He specifically did not like the evaluation with Dr.

Ballenger. He would not say why.

BY MR. BRUCK:

Q. So did you get a sense of whether he liked Dr. Ballenger or whether he doesn't? Did he express himself about that?

A. He clearly expressed that he did not like Dr. Ballenger; very much liked Dr. Dietz who he regards as a friend.

Q. As a friend?

A. Yes.

Q. Okay. Go on.

A. He began to respond to some of my substantive questions, but then would not go further when I asked follow-up questions. He explained that he's essentially not concerned about these proceedings or the prosecution against him because he has discerned that the Court likes him. And I asked, "How do you know that?"

And he said, "Because Judge Gergel smiled at me." He says, "Well" -- so he makes something from that.

"Well, what was the significance that you attach to it?"

And he said, "Well, he -- he likes me," and he began to try to explain that his reasons for feeling reassured by the nature of the Judge's smile to appeal to something that he referred to as "global consciousness," which is a paranormal sort of concept that I have some familiarity with from other --

THE COURT: Global consciousness?

THE WITNESS: Global consciousness. As I understand it from what I've seen on the Internet and talking to -- evaluating other defendants, it's sometimes referred to as "global consciousness," sometimes "unity consciousness," all beings are commingled so there is an awareness of what the other is thinking. And that he was accounting for his sense of reassurance about the judge liking him and not sentencing him to death based on some sort of connection.

He denied -- when I asked him, he denied having any kind of telepathic communication with the judge. But, again, his response when I asked him to account for why he felt confident that the judge liked him and that he was going to be -- he didn't use the word "sympathetic," but that was the tone of his comments -- his only response to that was to describe global consciousness was having a role in that.

BY MR. BRUCK:

Q. After about an hour and a half, did the interview end, and what were the circumstances of that, if you recall?

A. I do recall. I'm glancing at my notes to refresh my recollection so that I get the sequence correct.

The back-and-forth continued between superficial and somewhat lower case, less substantive matters. He commented that he did not want to be diagnosed with autism spectrum disorder. I asked him why, and he said, "Because they are

losers," and believed that his attorneys had coached the experts into coming up with those diagnoses. I asked him whether it's possible that someone could have autism spectrum disorder and not recognize it, and he said theoretically that is possible, that he's not so afflicted.

We talked about our cats and whether they were obese or not. On the heels of discussing possible diagnoses, he asserted that he believes that he is a psychopath and that if not a psychopath a narcissist, and I played the devil's advocate with him and asked him to explain his basis for concluding that he's a psychopath or a narcissist, and he provided fairly mundane criteria, such as a selfish perspective and a willingness to get money from one's parents and so forth as a basis for concluding that he's a psychopath.

THE COURT: Sociopath or psychopath?

THE WITNESS: They are different concepts, Your Honor --

THE COURT: I'm aware of that.

THE WITNESS: He has used both.

THE COURT: Did he use them interchangeably?

THE WITNESS: He has not used "sociopath" with me. I'm aware he's used it with other.

THE COURT: He used psychopath with you? Okay.

BY MR. BRUCK:

Q. And at the end of the hour and a half, what caused the interview to end?

A. He indicated that he didn't want to continue any longer. We were able to sustain a bit more engagement before he finally made it clear that he didn't want to continue. I asked whether I could come back the next day to see him again. He initially said no, and then he said, "Well, if you put money in my canteen, I'll speak with you tomorrow." He had earlier in the interview asked if I was willing to put money in his canteen.

And I asked him, "Do you have a way of knowing the money has been added to your canteen immediately?" And he said yes. I said, "Very well then. I'll put money in your canteen and look forward to meeting with you tomorrow," and he became agitated and pleaded with me not to put money in his canteen because he really did not want to meet with me again. I told him again that I would put money in his canteen; I'd look forward to seeing him the next day.

Q. All right.

A. And we concluded on that note.

Q. By the way, were you able to take contemporaneous notes during this interview?

A. No. Mr. Roof made it clear during the first meeting with him that he was very skittish. Even when he noticed that I

was paying attention, he interrupted you and Ms. Stevens to point at me and say, "He" -- referring to me -- "is making mental notes of what I'm saying" as though he objected to it. And the physical conditions of having to have one's ear to the hole in the glass made it impossible, and I thought also ill-advised to be obviously taking notes of what he said.

Q. Okay. So your notes were something you did after, are somewhat sketchy?

A. Yes, to both. Yes.

THE COURT: Mr. Bruck, we have been going about two hours. I'm going to kill my court reporter if I don't give her a break.

MR. BRUCK: Don't want to do that.

THE COURT: Take about a 10-minute break, and we'll come back. Thank you, Doctor.

(Thereupon, there was a brief recess.)

MR. BRUCK: I realized that I should have pointed out yesterday when Your Honor mentioned the Fourth Circuit's decision in the *Bennett* case that the actual lawyer in that case was not my former partner, Mr. Bloom, but our so-called investigator, who did the briefing and all the heavy lifting and deserves the credit in the result of the case, and I would be remiss by not letting the Court know.

THE COURT: Mr. Bryant pointed that out to me.

MR. BRUCK: I should also tell the Court -- I know

this will be disappointing -- that Dr. Stejskal is our last witness, and after that point, I think that might be an appropriate time for Mr. Roof to address --

THE COURT: If he wishes to.

MS. STEVENS: Your Honor, Mr. Roof and I just had a discussion about that, and I'll relay to the Court what he said and allow the Court time to think about it. He would like to speak with you, Your Honor, but he does not wish to be cross-examined, and that is a request that he's making, so I thought I would alert the Court to that.

MR. RICHARDSON: We don't have any objection to that, Your Honor.

THE COURT: And I frankly anticipated that, and what I would anticipate doing is bringing Mr. Roof to the podium, just like we did the last time, and he and I will just basically have a conversation.

MR. BRUCK: Very well. Just in terms of the schedule, the Government advises that they do not intend to cross-examine Dr. Edens by telephone, so this is truly our last witness, it looks like, in this case. If I may proceed?

THE COURT: You may. Please do.

BY MR. BRUCK:

Q. Dr. Stejskal, I think we had got to the end of your second attempted interview. Did you attempt to see Mr. Roof again, and describe what you did to do that.

A. Yes. The next morning on November 16th, Mr. Bruck and I traveled to the jail in an attempt to meet with Mr. Roof again. Mr. Bruck went into the visiting booth first to speak briefly with him. I waited in the lobby, and Mr. Bruck came out not ten minutes later to say that Mr. Roof had refused the visit. There was a brief interval while we left the jail, and then I came back to the jail about an hour after the first attempt and attempted to meet with Mr. Roof again, just myself, and waited in the lobby because there was a backup of people waiting in the lobby.

And finally one opened up. Some minutes later, a correctional officer came to me and told me that Mr. Roof had refused to visit. And I should say that in attempting to enter the jail the second time, I explained to the correctional officer that it would be important that whoever went to get Mr. Roof would explain to him that the doctor was here to go over the test results with him, which he had expressed interest in the day before.

THE COURT: But he did not -- but -- but that approach did not --

THE WITNESS: That did not work. There was an issue of execution, apparently. Mr. Roof had only been told that the doctor was here to see him. There was no mention of the test results.

THE COURT: Okay.

BY MR. BRUCK:
Q. And that was your last attempt to interview Mr. Roof?
A. Yes.
Q. Given everything you knew about this case and all the materials you have reviewed and the information you have received in the limited interactions with Mr. Roof, do you feel that those two interviews that you had, the 16-minute one and the roughly hour-and-a-half one, were adequate for you to perform a competency to stand trial evaluation and to form an opinion within a reasonable degree of medical or scientific certainty?
A. No.
Q. And as a result, are you unable to reach a conclusion as to Mr. Roof's competency to stand trial at this time?
A. I certainly have concerns, but correct, I have not been able to reach a settled conclusion about that.
Q. All right. Can you summarize your concerns in terms of competing hypotheses or serial hypotheses about Mr. Roof's competency?
A. Yes, and I guess I think of them as perhaps alternative hypotheses or domains that are relevant to competency. And one is my concern based on reviewing records and observing videos and speaking with the attorneys, that Mr. Roof is in the prodromal phase of an emerging schizophrenic spectrum disorder. But he's not yet fully schizophrenic, and he's not

yet fully possessed of a delusional disorder. There are a number of schizophrenic spectrum disorders. His development since early adolescence, and behaviors and verbalizations that have been described by family members, friends, and by the attorneys are consistent with the pattern of distorted thinking, perhaps distorted perception, and deteriorating social and occupational behavior that characterizes the emerging schizophrenia spectrum disorder in a young adult.

Q. Another domain of concern is what?

THE COURT: Stop for a minute. You say it's a possible emerging schizophrenic spectrum disorder that is a possibility?

THE WITNESS: Yes, in my diagnosis, Your Honor, I am convinced that there is an emerging at least, and perhaps some other conditions in emerging schizophrenic spectrum disorder. That's the meaning of my diagnosis of unspecified schizophrenic spectrum disorder.

THE COURT: Okay. But does he have -- you say "emerging." Does he have a schizophrenia spectrum disorder at this point in your opinion?

THE WITNESS: An unspecified one, which means it is one which does not yet meet the full criteria of one of the full syndromes such as schizophrenia, but there's significant components of it that are already in place sufficient to reach that provisional unspecified diagnosis. My expectation

is that --

THE COURT: That's all I'm saying. I'm trying to understand the language here. I know we've got medicine and law. Sometimes we are different. You had that opinion that he has schizophrenia spectrum disorder to a reasonable degree of medical certainty?

THE WITNESS: Yes, Your Honor.

THE COURT: Okay. And he has it now?

THE WITNESS: Yes.

THE COURT: Okay. And -- and that is based upon your one-hour-and-16-minute combined two evaluations, plus your review of the records.

THE WITNESS: Primarily my review of the records and the reports of other people who have been dealing with him recently and over the years.

THE COURT: Okay. Very good.

Please continue, Mr. Bruck.

BY MR. BRUCK:

Q. The second domain of concern is?

A. Well, it has to do with the fact that Mr. Roof has been diagnosed with an autism spectrum disorder, and my review of the records and in speaking with the attorneys and their concerns about certain aspects of his behavior and the psychological functioning, I certainly feel there is a basis for that. I did not do my own evaluation of autism. I'm not

an expert in autism, but that certainly is a demonstrated area of concern.

THE COURT: Again, do you have an opinion within a reasonable degree of medical certainty that he has autism spectrum disorder?

THE WITNESS: I don't at this point, Your Honor. There is a great deal of overlap between features of a prodromal schizophrenia spectrum disorder and autism spectrum disorder, and I'm persuaded that -- of the presence of the schizophrenia spectrum disorder, but don't have enough of a basis in my own mind to additionally diagnose him with the autism spectrum disorder. For my money, for the aspects of his thinking and behavior that are most problematic, that is the schizophrenia spectrum disorder.

THE COURT: I think I know this, but let me make sure I do. You are not saying with a reasonable degree of medical certainty that he has schizophrenia?

THE WITNESS: Not at this time, Your Honor, no.

THE COURT: Very good.

BY MR. BRUCK:

Q. And to be clear about the interplay or the alternate domain of schizophrenia spectrum disorder and autism, a person can have both?

A. Yes.

Q. And is it your opinion that Mr. Roof may have both

disorders? -- not that he does, because you said --

A. Certainly I wouldn't say it's my opinion. I think that is a reasonable hypothesis, and, you know, in part time will tell, and in part additional evaluation would tell.

Q. And do you agree with the evidence we've heard that a diagnosis of autism in a 22-year-old man should be performed by an autism specialist? That is to say, someone with specialized training in autism?

A. Yes, I agree with that.

Q. And if you had such a patient to evaluate in your practice, would you refer that case to be evaluated by someone with training in the ADOS, for example, and other specialized measures?

A. If we narrow that hypothetical to someone such as Mr. Roof, I would pursue essentially parallel evaluation procedures. I would want my colleague to evaluate the proposition that he has autism. I would also want to do additional evaluation on the question of the length and bread of what appears to be the schizophrenic condition. The earlier statement is true; the person can have ticks and fleas.

Q. And getting back to the issue I know you have not been able to form an opinion about, but can the -- if a person had both an autism spectrum disorder and autism, could the affects on his capacity to assist counsel be cumulative?

A. Perhaps you meant to say schizophrenia spectrum disorder and autism?
Q. Yes. I thought I did say it, but apparently not. Yes.
A. Yes. Cumulative and synergistic.
Q. So each disorder could impair the person in different ways that, of course, would be impairing him at the same time?
A. Well, yes, and that goes to this being perhaps the most complex and ambiguous competence evaluation I have undertaken in 32 years of practice because of that complexity.
Q. Thank you. By the way, there has been testimony and there have been reports which you have reviewed about Mr. Roof's IQ testing?
A. Yes.
Q. And which include a very substantial spread or difference between his verbal comprehension score and his processing score?
A. Yes.
Q. One being very superior range, 99.7th percentile?
A. Yes.
Q. And the other being absolutely average at 100 processing speed?
A. Significantly lower, yes.
Q. Do you recognize that IQ profile as consistent with any of the disorders that we have been discussing here today?

A. Well, yes, and I should say -- hope to not unnecessarily make it more complex, but the intervening scales, the perceptual reasoning index and the working memory index are incrementally lower -- significantly lower than the verbal comprehension index and significantly higher than the processing speed, so they are intermediate values. And that array of performance on the score has been identified as the characteristic pattern of performance on the WAIS for schizophrenic individuals and adults on the autism spectrum.

THE COURT: What else would be a differential?

THE WITNESS: Barring some unusual sort of brain injury, Your Honor, or metabolic condition that differentially compromise the right hemisphere and certain subcortical structures, there aren't any other psychiatric conditions that would track that slow of performance on the WAIS score. There is some similarities in cases of severely depressed individuals, but they show the difference primarily between the verbal comprehension and significantly lower processing speed, and the two other indexes are not significantly lower than the verbal comprehension. So that characteristic ratcheting down of performance on those four indices is, I would not say pathognomic, but consistent with, descriptive of the cognitive deficits of young adults with schizophrenia and young adults with autism.

THE COURT: Could be either.

THE WITNESS: Yes, or could be both.

THE COURT: Or could be neither.

THE WITNESS: Theoretically, Your Honor, I would say that that would be correct, but then one would be left assuming it's valid performance with what else would cause that particular array of deficits.

THE COURT: The spread you are talking about.

THE WITNESS: The spread. The differential performance across those four indices.

BY MR. BRUCK:

Q. By the way, and I may be getting slightly ahead of myself, but isn't there an MMPI profile for autism?

A. No.

Q. Is there a scale on either the PAI or the MMPI for autism?

A. No.

Q. Would it be fair to describe autism is essentially invisible in the results in those, or at least not as -- they are not picked up?

A. There's no norms for autistic individuals for the PAI or the MMPI. There is no scales that have been developed to differentiate, identify them as opposed to other clinical groups. There is a very limited number of studies that have looked at how young adults perform on instruments like the PAI and MMPI. And they tend to show a pattern of performance

that reflects the social isolation, passivity, the lack of interest in relationships. And so it is one study that's been done that looked at the MMPIs of young adults, and they did not identify a single profile, but, again, these elevations on some of the scales, they were consistent with the behavioral characteristics of autism.

Q. There has -- I'm going to move on and ask you -- you described -- well, I should say first of all, you say you have been unable to draw a conclusion only with the limited amount of time you have been able to evaluate Mr. Roof. Do you believe -- you described this as very complex competency assessment, correct?

A. Yes.

Q. Do you think that viewing the record as a whole and you reviewed the competency reports, the Court's evaluator, have you not?

A. I have.

Q. That further study is required?

A. Yes.

Q. And why do you say that?

A. Well, the concerns that I have come to have about Mr. Roof's competency I don't believe have been addressed sufficiently by Dr. Ballenger's evaluation. Information from the record, information from his attorneys that describe things that Mr. Roof has said in the past that suggest that

in addition to his racist perspective on the world that he has beliefs and ideas and expectations specifically about this case and the aftermath of this case that depart from what I've come to understand as mainstream racist views and stray to the domain of potentially delusional beliefs.

Q. Now, you have described two domains of concern, one involving your signs and symptoms of delusional processes; another concerning autism. And I would like to engage the third which is simply the idea that Mr. Roof and his counsel have a conflict over the strategy of presenting his case in court; that he is only gradually becoming fully aware of what his counsel's intended strategy was, and when he became fully apprised of it, he became very upset because he has a rational, political, ideological world view which dictates that if we depicted him the way we are fixing to do, he would be undermined, his image would be compromised, and the reason for his crime would be negated. In other words, I'm describing a rational, if not well-advised, course of action.

Did you consider that as an explanatory hypothesis that would account for all of the evidence or most of the evidence in this case?

A. I did consider that. I have evaluated a number of individuals over the years who were operating with that sort of political agenda. Sometimes in connection with racist views, sometimes jihadist views, and other extreme views,

political in nature.

Q. And if you can summarize why you are not satisfied that that understanding of Mr. Roof accounts for the evidence that you have seen and the other evaluators have seen in this case?

A. Well, my concern has to do in large part with information that gives me reason to be concerned that Mr. Roof has an erroneous delusional belief that he does not need to be concerned about the death penalty because at some point after the conclusion of this process of adjudicating him on these charges that he will be liberated, that he will be rescued; that there will occur some sort of revolutionary event, perhaps a race war, that will liberate him from conditions of confinement before being executed; and that he will then, under the new order in society that would have been established, will be elevated to a position of some significance in government, but also significance in terms of being a sort of figure or figurehead within the new world order; and that his analysis of these proceedings, his choices here and his priorities here are being undertaken under the umbrella of that overarching, irrational, unrealistic belief.

Q. Now, if there is evidence in Dr. Ballenger's report that Mr. Roof attempted to dispel that by saying that he knows he might very well be sentenced to death and executed, why

doesn't that solve that problem for you?

A. Well, he's certainly able to say the words, intellectually in that context can acknowledge it, but it's also clear -- or nevertheless clear that Mr. Roof is motivated at this point to misrepresent his fears and minimize anything that smacks of psychopathology, anything that smacks of anything crazy or irrational, and is possessed of enough intelligence to see these questions coming and be able to provide a nonpathological response in order to deflect attention from what is going on in his interior life.

THE COURT: Doctor, that's a hypothesis. You don't know for sure.

THE WITNESS: Of course, Your Honor, it's a hypothesis.

THE COURT: Dr. Ballenger questioned him over three sessions over nine hours with a conclusion.

THE WITNESS: I do recognize that.

THE COURT: And as you began your testimony, you do not have an opinion within a reasonable degree of medical certainty as to competency at this point, correct?

THE WITNESS: Not of competency, Your Honor, no.

THE COURT: Okay. Please continue, Mr. Bruck.

MR. BRUCK: Thank you.

BY MR. BRUCK:

Q. In your 32 years -- I think it is of -- 32 years of

forensic psychological experience, is it unusual or is it unheard of -- is it unusual for a person with a psychotic disorder to categorically deny and attempt to hide symptoms of that disorder during an evaluation like this one?

A. I don't say it's unusual, because having somebody that is bright enough, and yet still psychotic and paranoid is an unusual defendant. But, yes, I have had defendants in my practice over the years who were paranoid, had an underlying active schizophrenic condition, but were, A, concerned enough about having whatever their delusional agenda was and concerned enough about having that be undermined, and cognizant enough of the competency evaluation process being the things that could undermine their delusional ambitions, and so responded to questions about their competency in a way that concealed the underlying delusional agenda. I didn't evaluate him, but the defendant Ted Kaczynski is one person who comes to mind who fits that description.

Q. Very well. I would like to move on now to the question of the tape recording. Did you review a tape recording that we just received, I think yesterday, of the defendant's meeting with his mother and father at the jail this past Saturday, which would have been November the 19th?

A. I did review those videos.

Q. And do those videotapes depict the defendant's affect, verbal output, interaction with his family, and so forth?

A. Yes.
Q. And was there any -- was any member of his legal team involved in those meetings?
A. No.
Q. Just his mother and father?
A. Yes.
Q. All right. Now, the defendant -- if I told you that the defendant has been described in the following terms as extremely functional, easy to talk to, in a good mood, humorous, comfortable, and almost warm in various ways, is -- would those adjectives adequately describe the presentation on this one-hour videotape with his parents from last Saturday?
A. No.
Q. Would any of those adjectives apply?
A. By the end of the interview, there were a couple of occasions where he made humorous comments.
Q. Are you talking about on the tape?
A. Yes.
Q. All right. But you would not summarize his appearance in those terms?
A. No.
Q. How would you describe the way Dylann Roof appears in those -- in that -- I guess they are two 30-minute --
THE COURT: They are separate, Mr. Bruck? Are they

separate --

MR. BRUCK: They are at the same time. What happened was the jail agreed to give them a second visit right after the first one, so they --

THE COURT: His mother and the father are together?

MR. BRUCK: Are together. They are two 30-minute sessions, and one comes and goes at various times. But that's it.

THE COURT: Very good.

THE WITNESS: His demeanor and his affect fluctuate over the course of that little over an hour. But the things that stand out as being very different from how he had appeared in the other visits that I -- videotapes that I viewed or from my direct contact with him were that he appeared in significant distress. He appeared apprehensive and anxious and internally preoccupied, which -- by which I mean he was focused inwardly, and his parents had a very difficult time initially drawing him out. And he was also preoccupied in his interactions with his parents about things that he had not commented on in the other videotaped visits that I had observed.

BY MR. BRUCK:

Q. All right. Now, are you telling us that he appears to be fluidly psychotic in these interviews?

A. I wouldn't say he appears to be fluidly psychotic. He

appears to be in a distressed state. There's things about the first several minutes as his parents attempt to draw him out where he appears confused and disoriented. And he makes several statements that sound irrational and unrealistic, particularly about his case and about his attorneys.

Q. Okay.

A. He sounds prepsychotic or on his way to becoming fully psychotic.

Q. In your judgment?

A. After 32 years of practice in clinical psychology, yes.

MR. BRUCK: Your Honor, we previously offered these videos. I think we have now laid a foundation that they might assist the Court in this assessment. I would respect our client's feelings and also for what time it is, I'm not proposing to play them. I simply want to offer them.

THE COURT: What exhibit number would that be?

MR. BURNS: May we have a moment, Your Honor?

THE COURT: Sure.

MR. RICHARDSON: Just so we understand, is this the video that we just discussed that is the only thing that is on this defense exhibit alone?

MR. BRUCK: That video and also the video that is already in from the meeting with just Mr. Roof's mother that really focused on his clothes.

THE COURT: Any objection?

MR. BURNS: No objection, Your Honor.

THE COURT: Very good. I do want to see it. What number?

THE CLERK: 11.

THE COURT: Defendant's 11 is already in, or we had not put it in?

MR. BRUCK: It had already been offered and objected to, and it is now in.

THE COURT: Okay. Very good. Defendant's 11 is admitted without objection.

(Thereupon, Defendant's Exhibit 11 introduced into evidence.)

MR. BRUCK: Thank you.

BY MR. BRUCK:

Q. The last thing -- I can cover this very briefly because we have handled it in another matter. I wanted to ask you as a practicing forensic psychologist a few questions about the MMPI and PAI. The -- as you know from the Court's examiner's reports, there was a discussion of the significance of the personality inventory, the PAI and the MMPI, that the evaluators obtained and reviewed. And I would like to ask you whether or not you -- well, you have expressed an opinion that the defendant has -- has schizophrenia spectrum disorder or has an illness within the schizophrenia spectrum. Does the -- do the results -- you have reviewed the PAI and the

MMPI, I take it?
A. I have.
Q. It's two administrations of the PAI and MMPI. Do you have an opinion as to whether those test results are consistent or inconsistent with the defendant having a psychotic disorder in a schizophrenia spectrum?
A. It's -- it's difficult to answer the question the way you have put it because while there are certain patterns of performance on those tests that are generated by certain individuals with schizophrenia spectrum disorder, there is also a significant minority of people with documented schizophrenia who generate profiles within normal limits. So.
I would say that his performance on those two instruments is not consistent with some of the profiles that have been identified as being associated with those conditions. But the reality is virtually any profile could be generated by somebody with a schizophrenia spectrum disorder.
Q. And an MMPI profile, for example, within normal limits is a common finding with people with schizophrenia or schizophrenia spectrum disorder?
A. Yes, there is a number of studies that have looked at this a 1977 study; Bob Archer's 2008 study looked at the large numbers of psychiatric inpatients, most of whom are

schizophrenic. Under the Archer 2008 study, almost 20 percent of the people with schizophrenia generated valid profiles that were within normal limits.

THE COURT: Let me make sure I can untangle that. Number one, the test, you can't rule or rule out schizophrenia or schizophrenia spectrum disorder on one --

THE WITNESS: Any of them.

THE COURT: And there is certain patterns that you see that they have been previously identified that suggest the presence of schizophrenia or schizophrenia spectrum disorder that are not present in the defendant's results; is that correct?

THE WITNESS: Correct.

THE COURT: But what you are saying is you interpret that with caution because about 20 percent of the people with schizophrenia have normal results.

THE WITNESS: Correct.

THE COURT: I understand. Good. Thank you.

BY MR. BRUCK:

Q. And, of course, these tests, both the PAI and the MMPI, require the -- require the test-taker to endorse or deny symptoms?

A. Correct.

Q. And would a person with a verbal comprehension IQ of 141, it would not be very difficult to recognize symptoms that

suggest serious psychopathology.

A. A great many of the items on the scales that pertain to the psychotic conditions have what's called "high face validity" meaning they are obviously relating to something in the domain of abnormal experience or abnormal behavior.

Q. And the tests are designed to pick up on whether or not the respondent, the test-taker is responding to items in a guarded or defensive manner, correct?

A. Correct.

Q. And the profile that emerges in all of these tests is that that is the kind of test-taker that Mr. Roof was?

A. He clearly is described that way by the pattern of performance on the validity scales in the first PAI and very much so on the MMPI, less so on the second PAI. There's responses on that items that he answered differently on that iteration of the PAI than he had on the first one. That suggests that he was selectively responding in a way that went to a lower level of psycho -- of -- lower level of abnormal experience, but a higher level of antisocial features. He was trying to look bad.

Q. He was trying to look bad?

A. Well, bad in a criminal sense.

Q. Okay. But there is no test in which he would have -- he could have -- if you assumed from all the other evidence in the case that Mr. Roof is motivated to deny psychopathology,

none of these tests -- he appears to be denying psychopathology in all of them?

A. Yes.

Q. Or items which appear to have face validity to a reasonably bright person?

A. And relative to that is that these tests are far from perfect with respect to their signal-to-noise-detection rate in terms of being able to identify something, and they are also imperfect with respect to identifying defensiveness or exaggeration. And they have to be understood in the context of the individual presents themself.

Q. Very well. Have you had the occasion to review the declaration of Professor John Edens that has been admitted as Defense Exhibit 13?

A. I have.

Q. And without going through it line by line, do you agree with Dr. Edens' view of the testing generally and of the test interpretation in this case?

A. Yes. His views are mainstream, conventional ways of understanding these tests, and, yes, I understand them the same way.

MR. BRUCK: Very well. That's all I have, Dr. Stejskal.

THE COURT: Cross-examination.

CROSS-EXAMINATION

BY MR. BURNS:
Q. Good afternoon, Doctor.
A. Good afternoon.
Q. You were called by the defense to become involved in this case about November 9th, correct?
A. Mr. Bruck generated his initial e-mail to me on the evening of November 7th, and I replied on November 8th.
Q. In any event, at the time that you became involved in the case, the defendant had already sent a letter to his counsel expressing his dismay about their performance and their intentions and strategy to put in mental health evidence at trial; is that right?
A. I believe the letter was received November 3rd.
Q. So you were aware of that at the time you became involved in the case?
A. Yes.
Q. The first time you went to meet with the defendant was on November 13th, correct?
A. Correct.
Q. And you did that in the company of two of the defense attorneys?
A. Yes, with a plan being that we would transition to a private interview with me and Mr. Roof.
Q. But you were introduced to Mr. Roof in the company of his defense attorneys, correct?

A. Yes.
Q. And after about 15 minutes of being in the room and listening to his attorneys and him speak, he asked you to leave?
A. He and I spoke as well. After 16 minutes he asked me to leave.
Q. You came back to meet with him again on November 15th, and this time it was a different attorney who went and met with him first, right?
A. Correct.
Q. Eventually you were able to get in and speak with Mr. Roof, and I'm not really clear exactly how long you had with him individually.
A. A little bit less -- about an hour and 25 minutes.
Q. When you were left alone to speak with him after Attorney Paavola had left the room, did you tell Mr. Roof that you were there to conduct a competency evaluation?
A. Yes.
Q. Did you tell him that anything that he said to you at that time was going to be open to the Court and for the Court's consideration and not held private?
A. We were never able to get that far in our discussion.
Q. But he understood that you were there on the behest of his defense counsel to perform a competency evaluation relating to his mental health?

A. I was there when that was explained to him, and it was my understanding that that was his understanding.
Q. Would you consider the hour, 25 minutes, whatever it was that you had with him individually that day, to be a -- what you would consider a thorough and complete clinical interview?
A. For this purpose?
Q. Correct.
A. No.
Q. During the time that you did meet with him, though, he spoke to you about wanting to waive his defense, right?
A. Yes.
Q. He -- he told you about his theory of whites being -- he notes that "hobbled by their superiority complex"?
A. Yes, and I neglected to mention that during direct, but we had an interaction about some of his views.
Q. He was able to explain to you in this meeting that he harbors racist views about his beliefs?
A. Yes.
Q. Correct?
A. We had a -- part of our conversation addressed that.
Q. And then the next day, November 16th, you came back again, and this time he refused any visit with you at all?
A. Correct.
Q. You did, however, also interview Dr. Maddox in this case,

right?
A. I did.
Q. Would you say that to be a fairly lengthy, involved interview?
A. Say that again.
Q. Would you consider that to be a fairly lengthy and involved interview?
A. I think she and I were discussing Mr. Roof for approximately 35 or 40 minutes.
Q. Much of the information that you received about this case came from her?
A. No, I wouldn't characterize it in that way. She describes to me her recent observations of him. She had interviewed him earlier that morning.
Q. Did she talk to you about her previous interactions with him?
A. In general terms. The main thing that we were focused on -- that I was interested in are ways in which his mental state was different now than it had been earlier in the course of her overall evaluation.
Q. Did she say anything to you about her diagnostic impressions?
A. No, because I didn't ask, and I was -- intentionally did not ask. I was interested in her observations, not her conclusions.

Q. You said during your direct examination that you did read Dr. Ballenger's report, correct?
A. I did.
Q. You understand that Dr. Ballenger had nine hours with the defendant who was cooperative during that period of time, right?
A. It depends on how you define "cooperative." It's my understanding he responded to Dr. Ballenger's questions and did not ask Dr. Ballenger to leave, nor did Mr. Roof leave during those. It's clear from certain portions of the report that Mr. Roof was misrepresenting certain things to Dr. Ballenger. So in that sense, his cooperation was not a fulsome cooperation.
Q. Dr. Ballenger had introduced himself to Mr. Roof as being a court-appointed psychologist, correct?
A. I believe Dr. Ballenger is a psychiatrist, but --
Q. Psychiatrist?
A. It would be my assumption that he correctly identified how he came to be involved in the case.
Q. The defendant would have understood that Dr. Ballenger was there at the behest of the Court and not his defense counsel?
A. I can assume that because I believe there were portions of the report that at least implied that that was the case.
Q. Whereas he did know that you conversely were associated

with his defense team?

A. Yes.

Q. Turning to your most recent testimony relating to the MMPI and the PAI, can you please describe the -- what's called the "PIM" or "PIM scale" and what that measures?

A. The Positive Impression Management Scale?

Q. Yes.

A. It's one of the validity scales on the PAI that attempts to detect whether the person is approaching the test with a response style that has to do with portraying themselves in an overly and perhaps unrealistically positive way and as someone who is relatively free of certain kinds of problems.

Q. What is the purpose generally of a validity scale on one of these psychometric tests?

A. It's to be able to give the evaluator some information about the likely validity of the elevations on the clinical scales so that the evaluator can gauge their degree of confidence when it comes to interpreting validations on the other scales.

Q. Is the PAI a relatively widely used instrument in the field of psychology?

A. Yes.

Q. Did you take note on the two PAIs that were administered to the defendant, one by Dr. Wagner and one that was scored by Dr. Martel, that the PIM scores were 50 and 54 on the

respective tests?
A. I don't have them in front of me.
Q. What is the normal range for a PIM score, if there is such a thing as a normal range?
A. Well, all of the things that are in scales, whether the clinical scales or the validity scales, are understood as being dimensions, meaning the higher the score on the scale, the more relevant and potentially applicable the things that are being measured by that scale. The convention on the PAI with respect to clinical significance -- I don't want to misspeak -- it's either 65 or 70.
Q. So what does a 50 mean?
A. A 50?
Q. Yes.
A. A T-score of 50 on any of the scales, including the validity scales, would indicate that the person obtained a score that falls in the average range.
Q. Okay.
MR. BURNS: May I have one moment, Your Honor, please?
THE COURT: Yes.
MR. BURNS: Thank you, Your Honor. No further questions.
THE COURT: Very good. Thank you, Doctor. You may step down. You are excused to leave. Thank you, sir. I've

closed the hearing, other than the parties.

MR. BRUCK: That's all the evidence we have to present, Your Honor.

THE COURT: Very good. Mr. Bruck, Exhibits 23 and 18 have not been formally admitted. One is the list of materials the doctor reviewed -- Dr. Stejskal reviewed, and the other one is a transcript of the grand jury number three on July 9, 2015. Are there any objections to these two defense exhibits?

MR. BURNS: No objection, Your Honor.

THE COURT: 23 and 18 are admitted without objection.

(Thereupon, Defendant's Exhibits 18 and 23 introduced into evidence.)

MS. STEVENS: Your Honor, we move its admission. I believe I must have neglected to do that.

THE COURT: It's okay. We just want to make sure it's all in the record. That's all.

MS. STEVENS: Thank you.

THE COURT: I've tried a hundred cases and I'll tell you it just comes down to you just lose the thread. We are trying to keep up with that to make the record complete.

Mr. Roof, would you like to come to the podium like you did last time, and Ms. Ravenel will put you under oath.

THE CLERK: Place your left hand on the Bible, raise

your right. Thank you.

THEREUPON:

DYLANN ROOF,

called in these proceedings and being first duly sworn testifies as follows:

THE COURT: Mr. Roof, I have some questions for you, but I'm going to give you an opportunity to speak first, and then I will ask you some questions.

THE DEFENDANT: I have so much stuff that I need to say, I don't even know really where to start.

THE COURT: Let's get the microphone. Could we pick it up? I just want to make sure I hear everything.

THE DEFENDANT: I will comment on what everyone has said, you know.

THE COURT: Okay.

THE DEFENDANT: First of all, I just want to say that if I had to listen to them saying these things about me much longer, it would probably drive me crazy.

First of all, I want to say something about all the visit, the videos. I told you before that at the jail you are not allowed a visit with your parents except on video, or anybody, so, you know, the fact that my attorneys want to present these videos, I just -- I have a real issue with that because there is no way to visit them at all. I mean, I can understand a phone call because then you would still be able

to have a visit. But the only problem with this is I haven't been able to talk to my parents about my crime openly or anything like that since I have been arrested, and it's a pretty, you know, serious thing, you know, and I haven't been able to really explain it to them. And it's -- I'm sure it's left them with a lot of questions.

The other thing I want to say about that is that my lawyers are trying to make it out to seem like my behavior in these videos, like the ones they just gave to you, is my natural behavior. It isn't. I know I'm being watched.

THE COURT: Is that affecting your behavior?

THE DEFENDANT: Absolutely. In a different way.

THE COURT: Mr. Roof, I will tell you that after this, I'm going to explore to some degree what we can do so that you can have meetings with your parents without you being videotaped if you would like that. Let us know through counsel that you would like that, and I will explore how we can make it happen.

THE DEFENDANT: Okay. But my point is that it's not my natural behavior because I know it's being recorded. I know who it's being given to. I know -- in other words, I can't act completely open with them, and that is going to make me seem more whatever they want.

THE COURT: Guarded, defensive.

THE DEFENDANT: Even psychopathic, if you want to

say that. It's hard for me to say what I want to say here.

Whatever his name is, Stejskal, I can't really say it, he said that -- you asked him about the test, and he said the only other thing that could -- my IQ test, the only other thing that could have that spread would be if there was something -- if I had a brain injury, and he said -- or something about the compromise of the right hemisphere. I had a brain scan that my lawyers got me, and there was something wrong with the right side of my brain.

THE COURT: Okay.

THE DEFENDANT: I wanted to mention that.

THE COURT: Okay. Thank you.

THE DEFENDANT: It was smaller than the others, or just a certain part, but it was on the right side.

THE COURT: Okay.

THE DEFENDANT: He said something about global consciousness.

THE COURT: That wasn't a term I was familiar with.

THE DEFENDANT: I did say that, but I was messing with him. I don't really believe in global consciousness. A lot of things that I say to people, they are choosing what to take seriously and what not to.

THE COURT: Did Dr. Ballenger get it right, from time to time you would would be kind of playing with the evaluator, and then you would reveal that you were playing

with them?

THE DEFENDANT: I was especially playing with him because I didn't want to talk to him anyway. I told them to come get me from the room; they didn't come. So I was -- and they weren't leaving. So I just -- it was very awkward to sit there in silence, especially when they kept trying to talk to me. So I just -- I sort of gave in. But I still didn't want to talk to him about what he wanted to talk about, so I sort of just played with him. Somebody said that I didn't like Ballenger. I do like Ballenger. I just wanted to say that.

THE COURT: What did you like about him?

THE DEFENDANT: He's nice. Loftin, the expert --

THE COURT: I'm sorry, the?

THE DEFENDANT: Loftin, the autism expert, she told me when I asked her -- I asked her, um, "If you didn't have any background information about me, if you didn't know anything about my childhood, could you still have diagnosed me with autism?" And then I asked her -- I said, "If you were just judging me now without anything else, just through our meetings" -- and I met with her multiple times -- and she admitted that she couldn't, and that she wouldn't be able to, and that it was unclear. You see what I'm saying? And all of this stuff about my childhood is coming from other people, what they are saying about me. And they are asking -- and

I'm sure that the experts who are asking them questions -- it's going to in a way prompt them to make -- I don't know how to explain, but you see what I'm saying?

THE COURT: I do.

THE DEFENDANT: I don't have any sensory problems with my clothes or the texture of my clothes. I wanted to say that. I told you last time I talked to you that I don't have any problems with social cues. I recognize all social cues, even if they don't think that I do. Somebody said something about a visit in July where my dad told me something about my lawyer saying that I had autism. When I asked my lawyers about that, they denied it, so I trusted them. I shouldn't have, but I did. And that is why I continued to cooperate with them after July. Because somebody brought that up, I can't remember when.

THE COURT: Well, Dr. Ballenger talked about that this -- that once you discovered -- that you had reported to him that once you discovered the true nature of mitigation defense, that caused you considerable distress. Is that correct?

THE DEFENDANT: Right.

THE COURT: And it caused a rift between you and your lawyers.

THE DEFENDANT: Yes.

THE COURT: And that prior to that time, you had

cooperated or attempted to cooperate to the best of your ability with your lawyers?

THE DEFENDANT: Yes. And I want to say that for them to try to make it seem like I'm in any way uncooperative is just -- it's ridiculous. I feel like I'm the most cooperative person in the whole world. It's just ridiculous for them to even say that. Even now, even now when I'm not cooperating, I'm still not as uncooperative as I could be. They take advantage of me. They take advantage of the fact that I'm cooperative. That -- that is what they have been doing this whole time.

When you -- when you were talking to Ms. Maddox, and you were making all -- I can't really remember the conversation, but you were making all these great points to her, and she kept denying it, or kept saying that, you know, well, this or, well, that, right? It's just -- to me it's so obvious that she's talked to my lawyers, that they have discussed -- that she should stick to her guns about saying that I'm incompetent, you know, because everything that you said proves that I'm competent when you were talking to her. I just wanted to say that.

This is something that was given, I think, to the Court from Mr. Robison. You know, he has autism, and I met with him and probably spoke to him for about five minutes. And he says all kinds of things. I just read it while I was

sitting over there. I think it's funny that somebody who can't -- somebody who is autistic themselves and can't recognize social cues themselves, how they would be able to say -- how they would be able to tell somebody else can't, if they wouldn't be able to do so themselves. I think that is funny.

THE COURT: I'm trying to think about the context of that conversation. He came in within a couple of days of you discovering the nature of the defense.

THE DEFENDANT: Yes.

THE COURT: And you were upset with the lawyers.

THE DEFENDANT: Yes.

THE COURT: And they were trying to work with you and get you to cooperate with them; is that right?

THE DEFENDANT: That's right.

THE COURT: So there was this whole history that he might not have been cued in to that he was observing.

THE DEFENDANT: Right. Um, that leads me to something else. I also wanted to tell you that I actually found out first about the autism from Dr. Dietz, not my lawyers. He's the one that told me about Robison, that he was on the witness list. He's the one that told me about other things that had to do with autism. I did not even know that Loftin was an autism expert until she came to tell me that I had autism.

THE COURT: What did you think she was?

THE DEFENDANT: Some kind of -- I don't really know. She just -- like I said in my letter, I know it seems strange, but my lawyers are telling me that they were trying to help me with my thyroid. But all of these -- all of these experts, that they would help me collect evidence so I could get on medicine for my thyroid. And I really did believe them. I shouldn't have, but I did. And, you know, and Maddox in particular, at the end when she was about to leave, I think the prosecution said something about her asking -- TSH, something about medication, and then my lawyer said something that -- something about how she wasn't there to give medication; she was a forensic evaluator. But she was introduced to me under the pretext of helping me get medicine for my thyroid. And we've talked about medicine for my thyroid repeatedly.

An e-mail from Dr. Hiers, I wanted to point out about this e-mail that there is no e-mail from me. There is an e-mail from him to another doctor. He has quotations that are allegedly from an e-mail from me, but there is no e-mail from me. I don't know who this guy is. I've never talked to him. I've never --

THE COURT: How does he get a picture of you?

THE DEFENDANT: I have an explanation for that too. He says there is a craigslist ad, right? That that is how he

e-mailed me, right? I'm not saying it wasn't a craigslist ad, but if there was and there was a picture on it, he could have gotten a picture from the craigslist ad. That still doesn't mean I talked to him.

THE COURT: Was there a craigslist ad?

THE DEFENDANT: No, but there could have been.

THE COURT: You are saying there could have been. What does that mean?

THE DEFENDANT: That picture --

THE COURT: I know what the picture is. It's the African-American monument in Columbia.

THE DEFENDANT: That picture is not on the "Last Rhodesian." It's not -- it's not on the -- my lawyers are saying that that is evidence that it's genuine is because it's not on the "Last Rhodesian." That doesn't mean that I couldn't post it somewhere else, whether craigslist or even somewhere else.

THE COURT: Do you recognize the picture?

THE DEFENDANT: Yes.

THE COURT: Do you know where you may have posted it?

THE DEFENDANT: (Nodding.)

THE COURT: Let the record show that the defendant is shaking his head no.

THE DEFENDANT: Um, the other thing, Ballenger,

somebody asked him what autistic -- because he mentioned something about autistic traits, and somebody asked him, um, what autistic traits -- I can't remember who it was -- did you see when you met him, and he said none whatsoever or something like that. Again, I'm just saying that the only place this is coming from is from my childhood, and he didn't see it in my visit.

My lawyers are trying to say that I'm not making rational decisions. I don't know who decides what is rational or what isn't. I think it's subjective. And it's sort of like if -- if -- if -- if a lawyer and the defendant disagree, and he can just say that "Well, he's not rational." I mean, it's --

THE COURT: Well, Mr. Roof, this gets to some of questions I wanted to ask you. So let's get into that. Let's -- first of all, let me ask you this question: Do you understand that if you were found guilty of certain charges in Federal Court that you could face the death penalty? Do you understand that?

THE DEFENDANT: Yes.

THE COURT: And do you understand that if the jury returns a death sentence that you may one day have that death sentence carried out? Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Do you currently believe that the -- if

a death sentence is returned by the jury that it will be never be carried out because you will be rescued by white nationalists? Do you believe that?

THE DEFENDANT: Anything is possible.

THE COURT: Do you see it as a possibility? Is it a probability in your view?

THE DEFENDANT: No.

THE COURT: What type of chance would you associate with the chance that you may be rescued?

THE DEFENDANT: Actually being rescued? Less than half a percent.

THE COURT: Less than a half a percent. Same thing you told Dr. Ballenger.

THE DEFENDANT: (Nodding.)

THE COURT: Would it be fair to say you would like that to happen?

THE DEFENDANT: Sure.

THE COURT: That would be something you would like to happen?

THE DEFENDANT: Sure.

THE COURT: How about the idea that you may be rescued by friendly prison guard? Do you consider that something that is likely to happen?

THE DEFENDANT: It's the same, same likely.

THE COURT: You would like it to happen, but you

don't think it would happen?
THE DEFENDANT: It's extremely unlikely.
THE COURT: And do you understand that any sentence would be imposed by a jury and not by me? Do you understand that?
THE DEFENDANT: Yes.
THE COURT: And you understand that regardless of what feelings I may have towards you will not affect what the jury does? You understand that?
THE DEFENDANT: Yes.
THE COURT: Let me ask you a little bit about this issue of unwillingness to cooperate versus inability to cooperate. If you desire to communicate with your attorneys by writing them a note, do you feel comfortable doing that? If you wanted to tell them something, do you feel comfortable in the courtroom writing them a note?
THE DEFENDANT: Yes, sir.
THE COURT: Do you have the ability to do that if you desire to do it?
THE DEFENDANT: Yes.
THE COURT: If you needed to whisper something to them, if you desire to do it in the courtroom, do you feel that you could do that? You have the ability to do that.
THE DEFENDANT: Yes.
THE COURT: Dr. Ballenger stated in his report that

you were limiting your communications with your lawyers because you opposed their mental health defense. Is that correct?

THE DEFENDANT: Yes.

THE COURT: Are you able to speak -- will you be able to speak more freely to your lawyers if they would assume the defense that you wanted them to assume.

THE DEFENDANT: Yes.

THE COURT: So to the -- the question I have to ask, you know, there has been a great deal of focus, Mr. Roof, today, on whether you have a mental defect or disease. Frankly, the more important issue is whether you have the capacity and understanding of the procedures, and the ability -- the capacity to assist your lawyers. That is really the issue which, unfortunately, we haven't spent as much time on as I would have liked.

First of all, do you feel like you understand the proceedings?

THE DEFENDANT: Yes.

THE COURT: You feel like you understand that there is a judge and a prosecutor and defense lawyers and all that? You understand that?

THE DEFENDANT: Yes.

THE COURT: Dr. Ballenger went through in his report in some detail about your understanding. Is that an accurate

reflection of your understanding?

THE DEFENDANT: Yes.

THE COURT: And I believe in some of the evaluations, you even understood that the attorney general had a role in whether to pursue the death penalty, correct?

THE DEFENDANT: Correct.

THE COURT: And in terms of your lawyers -- you and I had this exchange before, but let me go through it again. I asked you, you understand that you and your lawyers may have an honest disagreement. You understand that they may in good faith believe that this is in your interests, the defense. You understand that?

THE DEFENDANT: Right.

THE COURT: And I know you oppose that, but you understand that they may believe that honestly it's in your best interests. You understand that?

THE DEFENDANT: Yes.

THE COURT: And I've shared with you already that my belief is I think the jury should have the opportunity to hear that. Now, you also want to let them know how you feel, that it is your right to do that. You understand what I'm saying to you, that the jury should have the best information to make the most fair and just decision?

THE DEFENDANT: Yes.

THE COURT: Do you feel like you are competent to

stand trial?

THE DEFENDANT: Yes.

THE COURT: Do you feel like you understand the proceedings?

THE DEFENDANT: Yes.

THE COURT: Do you feel like you have the capacity to assist your lawyers if you desire to do that?

THE DEFENDANT: Yes.

THE COURT: Okay. Anything else you wish to share with me? And I'm here to listen.

THE DEFENDANT: Yes, I still have so much stuff.

THE COURT: Come on. Let's go. We've got time.

THE DEFENDANT: Okay. Okay. I guess one of the major things here is that in Ballenger's report, he makes -- I think his main point is that I worried about my reputation, and I'm worried about my reputation in a post-revolutionary, white nationalist world. He even -- yesterday he said something about me wanting to be seen as the hero who started it. Okay? I never said that. I have never -- I said -- the only time I ever called myself a hero was to Dr. Wagner when I said I was my own hero. I am nobody else's hero. The people -- other white nationalists don't even like me. They don't like what I did in any way, and I would never be considered a hero at any time in the future. Now, what I did say was that they might look back and say, "Maybe that wasn't

as bad as we thought it was." But they are still not going to think that I'm a hero.

You know, Bruck said something -- he used an example when he was trying to say that I had delusions of some kind of bringing a Nazi army in a Bavarian forest. The prosecutor said something about a basketball team. And he said, "Well, if you've never had -- if a fan has never had contact with the basketball team, that doesn't mean that the basketball team doesn't exist," or something like that. Both of them are wrong. Both examples are wrong because there are no white nationalists. You see what I'm saying?

It exists as an idea, but at this period in time, there are no white nationalists. They talk about the Daily Stormer. It's an extremely racist website, but it's a bunch of people on the Internet. That is all it is. They are posting comments on the Internet. That doesn't make them white nationalists.

THE COURT: What makes them a white nationalist?

THE DEFENDANT: I don't know. It's an idea. I mean, I don't even believe that it's a -- that they exist to save me at this point anyway.

THE COURT: The question would be -- is why do you wish to maintain -- do you wish to maintain some type of reputation that you had because of your beliefs as opposed to a mental disorder?

THE DEFENDANT: Yes. And that was the --

THE COURT: Explain that to us. What is -- what -- explain that to us.

THE DEFENDANT: Okay. So the other point he made was I didn't want my act to be discredited, right? And that is --

THE COURT: You told me that.

THE DEFENDANT: And that part is true. And that is -- the main thing is that I don't want -- like has already been said, I don't want anybody to think that I did it because I have some kind of mental problem. That's much more important than my reputation because I don't even have a reputation to preserve in the first place. But I also don't want to make it worse than it already is. You see?

THE COURT: Whom do you not want your act discredited to?

THE DEFENDANT: Anyone. And that is the other thing: I don't want anyone to think I'm autistic. I don't care who they are. I don't care if they are black or white or if they are white nationalists or a leftist. I don't care. I don't want anybody to think that I have any mental problems because I don't. And that is -- that is the basic issue is that with these things, these disorders, they are so -- it's all unclear. And especially for autism. I mean, you could even question whether autism is even a real thing.

And there is no test; there is no medical test for it. It's all based on nonconcrete things.

THE COURT: To say you don't want to be discredited, what do you want to be credited with? If you don't want to be discredited with, what do you wish to be credited with?

THE DEFENDANT: Um, just what I did.

THE COURT: And why would you want to be credited with what you did?

THE DEFENDANT: Because I did something that's -- I'm not sure.

THE COURT: You did something. Finish the sentence.

THE DEFENDANT: That is the end of the sentence.

THE COURT: Okay. But you did something for what reason? What were you seeking to accomplish?

THE DEFENDANT: I wanted to increase racial tension.

THE COURT: To what end?

THE DEFENDANT: Well, eventually there would be a conflict, but -- you know, I don't know if I said this before, but I don't think that just one thing like what I did can cause that, you know. It all adds up. That being said, I don't think that what I did -- what I've done has had any effect whatsoever at all, but I tried. That's all I can say.

THE COURT: What were you -- what were you trying to do?

THE DEFENDANT: Well, you know, I guess you -- I

mean, I just -- just trying to increase racial tension.

THE COURT: But to what end? To create a potential white nationalist revolution?

THE DEFENDANT: If you want to put it like that.

THE COURT: That's a reasonable description?

THE DEFENDANT: Right, but again, I don't think -- even before I did it, I didn't think that just what I did could cause that all by itself.

THE COURT: You hoped to contribute to it?

THE DEFENDANT: Right. And even if I couldn't contribute to it, the point is that I had to at least try to do something, even if it didn't have any effect. I wanted to say that, you know, them throwing all these labels, all these terms, schizophrenic, trying to say that I'm a premorbid schizophrenic, or I'm originally schizophrenic, I have somatic delusions, you know, it's irresponsible to throw all these -- all these words around because it affects a real person, you know, when you do that. And you can't just -- you can't just throw these things around. It's dangerous because I mean, if we followed -- if you followed it out, right? And Bruck was able to get whatever he wanted.

He admitted to Ballenger that he wanted me to get sent to Butner. I can't believe he didn't bring that up. And he admitted that he would like it to be delayed. You know, what would happen if I got sent to Butner? I get

forcibly medicated? Is that what would happen? Because if it is, like I said, that's dangerous, you know, to have somebody forcibly --

THE COURT: Do you wish to be medicated?

THE DEFENDANT: Absolutely not.

THE COURT: You would refuse to be medicated?

THE DEFENDANT: Yes. Okay. I wanted to bring up something else that I think my lawyer -- something else I think my lawyers did was unethical. My jail writings, they tried to get them suppressed. They failed. They tried to get them suppressed, and then that I didn't write that for them. I didn't write it to gather my thoughts to talk with them about it. They knew this. If we didn't discuss completely openly, they still discussed it. They made it clear that I shouldn't say that, and I did want it to be suppressed. Nobody was supposed to see it. I was just writing to myself. So I went along with it. I think that is unethical because they knew it.

THE COURT: You see, Mr. Roof, in a capital case, the lawyers have to be very diligent to raise every potential issue, and have you seen my order in the case in that issue? Have you seen my order in the suppression on the -- relating to the suppression of the jail writings?

THE DEFENDANT: Where is -- saying they are going to be suppressed?

THE COURT: I said it was not going to be suppressed. You have seen that order?

THE DEFENDANT: Yes.

THE COURT: I didn't agree that it was written for the lawyers, but I didn't fault the lawyers for doing everything that they could to try to suppress. That is what lawyers do. They try to do their best to keep damaging evidence out, and, you know, we had a hearing, and I ruled. What you regard as sort of untruthful may be an honest disagreement that others may say, "I think he wrote that for me." That was what was asserted by Mr. Pennington at the hearing. I heard him out. I just reached a different conclusion. I'm trying to -- and, you know, I've done this before with you. I've said to you, "You may not be on the same page with your lawyers regarding strategy, but it is my impression they are trying to help you." I know that you don't feel that way, but as a disinterested person -- you know, I don't have a dog in that fight between you and your lawyer -- it just seems to me they are working very hard for you, and I know it's not an end you desire. I understand that. But it's been my impression they have been incredibly hardworking and diligent and devoted to you. It's just for whatever that is worth.

THE DEFENDANT: Right, but they are serial liars. They lie over and over and over again to me, to everyone.

They lie to my family about who is going to be testifying. They try to make them think that they are not really going to have to testify. Trying to do the same thing they do to me. All of this is my lawyer's fault. I mean, not the crime, but I'm saying what is happening now, this competency hearing, all of it is my lawyer's fault. You know, it's not -- you could say it's because I wrote the letter, but they are the ones that made me write the letter. And I am not trying to be difficult at all.

THE COURT: We had an exchange earlier about the letter, and I asked you why didn't you write me the letter, and what was your response? Do you remember?

THE DEFENDANT: Yes, to try to discredit my lawyers.

THE COURT: Right. You didn't send it to me because you didn't think I would disclose it to others.

THE DEFENDANT: Right.

THE COURT: You sent it to the prosecutors because you wanted to get the information out.

THE DEFENDANT: Right.

THE COURT: And you thought you had limited options?

THE DEFENDANT: Right.

THE COURT: And you realize you had a rational reason to write the letter?

THE DEFENDANT: Yes.

THE COURT: And did Dr. Ballenger get it right in

the report when he said -- explained why you did that?

THE DEFENDANT: Yes.

Just a couple of last things. And Ballenger didn't say this, but when we had our visit, he brought up the idea, and it was very -- it was -- it was almost the same thing where he was talking about me wanting to preserve my reputation, and he has it in quotation marks in his report, things like perfect specimen, pure. I didn't say either one of those things or anything like it. He said something to me. He said -- this was his idea, and he said -- um, in other words, he was trying to ask me if I thought I would be the target of eugenics. That is pretty much what he was asking me because of mental problems, and I told him that that I had never thought of until he said it. And I was being honest. And I said that that was a good point. Then he said -- but then I told him -- I said, "I don't think that they would target autistic people anyway because there is too many of them." And he agreed with me. I just wanted to say that.

Okay. Is there any way that someone could write a document that would take away all responsibility from my lawyers, but still keep them as my lawyers, and then they could do whatever I say, but they wouldn't have any responsibility, and then I could sign it?

THE COURT: No. I briefly explained this to you

last time we met. Let me go into a little more depth about it because I think you deserve an explanation for this. The issue about who controls certain aspects of the case, you're not the first case in which this issue has come up. And some years ago, the American Bar Association adopted guidelines to provide courts and parties and attorneys some guidance on who would control what.

And what those guidelines say is that the client controls whether he pleads innocent or pleads not guilty or guilty; controls whether he accepts a plea agreement; controls whether he testifies; controls whether he appeals. The remaining decisions are within the discretion of the attorneys after consulting with the client.

So if Mr. Bruck views that it is in your interests to assert this defense, I believe -- and I intend to enter an order on this -- that he has the authority to do that after he consults with you. You have certain rights yourself. You could speak up. You have a right to speak at your trial. It's up to you. You would, if you spoke at your trial, be subject to cross-examination, and I would disclose that to you.

So you -- those are just a way the division -- divisions of responsibility in a case. So Mr. Bruck is not free under those standards, which the courts have basically said are our standards. You are not free -- he is not free

to simply say, "Okay. I won't present that evidence because you don't want me to" because that is not your decision to make. It's his decision to make.

I understand your concern about that. I've tried to be candid with you, but I think the respective spheres of control -- and that is what they are. So he can't do that. He can't simply -- if he believes that that is not in your interest -- best interests, he simply can't do what you would like him to do.

THE DEFENDANT: Right. But that's why I said if we could write a document that would take away responsibility --

THE COURT: It can't be done. He can't write away that duty. That duty exists. And we can't can't, what we call it, waiving that right, he can't waive that responsibility.

THE DEFENDANT: Okay. But I also have a right to represent myself.

THE COURT: Well, you have a right to make a motion to represent yourself, and I would have to make a determination if you wished to do that, whether you have the capacity to do that. I would have -- I would have to take that up if a motion were made.

THE DEFENDANT: If you were to represent yourself, are you allowed to not cross-examine witnesses and not do anything?

THE COURT: Yes. I must say to you that I would have a great deal of concern that if your plan was to do nothing, which you told me is your preferred defense. I would probably rule you do not have the capacity to self-represent, because that is not, I believe, a proper defense in a situation like this, basically to let the Government present its case and the jury then decide. So that would be very difficult. I'll be glad to hear you out, but I want to forecast to you that that would cause me a great deal of concern, that to have no defense. Because, again, I want my jury to have the very best information to make a fair and just decision. And I feel like though you dispute the information, and you are welcome at trial to dispute the information, that the jury should have the benefit of hearing that evidence.

THE DEFENDANT: And it wouldn't have anything to do with -- I mean, if -- if -- if you were to deny my right to represent myself, it wouldn't have anything to do with the fact that it's so late?

THE COURT: That would also be a factor I would consider. There are multiple factors I would consider. The lateness of it is definitely one of them. We are literally on the eve of jury selection.

THE DEFENDANT: Exactly. And the reason I brought that up is because I wanted to point out that if that is part

of the problem, again, it's my lawyer's fault, you see, because I didn't find out about the autism.

THE COURT: I did not raise the timing issue because of that. I would have to weigh that. The more important factor in my mind and my concern, Mr. Roof, relates to the issue that what you have shared with me to be your desired defense is in a sense no defense. And I would think that would weigh heavily against you having the capacity to provide yourself a defense. That is the difficulty.

THE DEFENDANT: I -- I guess the last thing I wanted to say is yesterday you used the word "afield."

THE COURT: I'm sorry?

THE DEFENDANT: You used the word "afield," and you said that we didn't want to get afield. I think that all of this is afield. I think that everything Bruck says is afield. I think everything they do is afield. You know, it would be impressive. I don't deny he's probably a good lawyer, and if he had something to go with, when he was -- when he had this binder, and he was talking to Ballenger going through all these things, scrutinizing his history, I smiled. That's when somebody said, "Can you note that he smiled." That's why I was smiling because I was impressed with him. But it's -- he doesn't have anything to go on. And it's just --

THE COURT: He does. You see, you wrote in the

letter "I have no defense," you know, and he feels like you do. And he believes that, and Ms. Paavola, Ms. Stevens, they believe that. Now, you don't, and I can understand -- I understand both of your views on that. But I don't regard them as insincere, Mr. Roof, and I know that sometimes you have said to me you don't think they really believe them, and other times you've said to me, "You know, I kind of recognize they probably are trying to do the best for me."

THE DEFENDANT: I do think to a certain extent that they might believe that I have autism. But all this other stuff that they brought up today about emergent schizophrenia, I don't think that they believe that for a minute. I think it's so ridiculous. Just -- but I think autism is ridiculous too.

THE COURT: Well, the part I talked about being afield is the key issue. It is -- whether there is certain conditions, that's a relevant consideration, but the key here is do you have the capacity, do you understand the proceedings, and can you -- do you have the capacity to assist your attorneys. That's really what competence is all about.

THE DEFENDANT: Okay. Just one last thing is that I don't know how in the world I'm going to cooperate with my lawyers now after today, after all the other things that they have said about me. The other allegations of different

mental problems, it's just -- it's not going to happen. I mean, if I hated them before, I really hate them now. And it's --

THE COURT: See, here is the problem I have with that: I don't doubt -- I mean, you have substantially cooperated with them, and I want to be real honest with you. In terms of putting up their autism defense, they don't -- or whatever their mental health defense may be, they don't -- they are not looking for you to testify to put that up. So it would be desirable for you to be communicative with them and to support their efforts. The -- I'm persuaded that no lawyer -- if I were to replace them today and bring another set of lawyers, we would be in exactly the same position. Any competent lawyer is not going to do what you want Mr. Bruck to do, which is simply say, "I have no defense." They just won't do that. That's not the way lawyers in capital cases handle these situations. So I don't think giving you another lawyer is a solution. I don't think letting you self-represent is a solution, though I'm willing to take that up. If that is something you make that motion, I will consider that. But I want to be candid with you of my concerns.

And, you know, I would urge you to cooperate with them and to assist them to the extent you feel like you are able to do that. I think you should, and I urge you even in

your disagreement with them to be courteous and to respond to their questions. I know it's difficult. But in some ways -- I'm sure there are times your parents said to you, "I'm doing this because it's in your best interests though it doesn't seem that way to you right now." And I'm going to suggest to you that that is the way your lawyers are. They are trying to do something to help you. So I would urge you to do your best to communicate with them, to respond to their questions, though I think a lot of this has already occurred. You have already been -- as I understand, been through the exhibits and given them all the information and sat for many evaluations and so forth.

THE DEFENDANT: Yes. Um, I have one last thing to say and then I have a question, and I'm done.

THE COURT: Sure.

THE DEFENDANT: This is going to seem really petty, but yesterday -- Ballenger said yesterday that I said Assad was a bigoted racist. I didn't say that, and I don't even know how Assad could be a racist. I wanted to say that, and then my question is, what's going to happen to my letter?

THE COURT: That will be a matter that we will have to take up at some point. I presume the Government will try to admit that, and the defense -- your defense lawyers will try to keep it out, and it will be a matter I have to rule on. I haven't heard the argument yet, but like every other

issue, it will be one of those evidentiary issues, Mr. Roof, I'll just have to take up. I don't have an answer.

THE DEFENDANT: Okay. I'm finished.

THE COURT: Are you sure?

THE DEFENDANT: I'm finished.

THE COURT: Very good. You can return to your seat.

THE DEFENDANT: Thank you.

THE COURT: Okay. Anything further from counsel? First from the defense?

MR. BRUCK: There is one matter with respect to the competency evaluation: Based on the totality of the evidence regarding autism and the fact that there has not been a specialized autism assessment on the question of competence, and since our expert was out of the country and not able to respond to this sudden problem that has arisen of this matter, we request that a competency determination -- a competency assessment focused on the question of autism and performed by a qualified court examiner with expertise in autism be ordered.

THE COURT: That motion is denied. I feel I have an adequate record here to evaluate competency.

MR. BRUCK: We have nothing further.

THE COURT: Anything from the Government?

MR. RICHARDSON: Nothing from the Government.

THE COURT: I'm going to take this matter under

advisement. I would anticipate entering an order within the next several days. The -- there is a matter of I need to take up ex parte with the defendant and his counsel, so if there is nothing further in this matter, I need to excuse the Government lawyers to take that single matter.

MR. RICHARDSON: Your Honor, can I just ask just one question? I know it may be a difficult one. Lots of people have plans for the weekend, and I know that you have plans that are primarily involving writing, but if there is a point in which you could provide information just to counsel that we could plan as to whether we were starting jury selection on Monday morning.

THE COURT: I think you should anticipate until you hear otherwise that jury selection will be Monday morning.

MR. RICHARDSON: Thank you, Your Honor.

It's going to take just a moment.

THE COURT: Take your time.

Mr. Roof, I'm going to ask you to come to the podium for just a moment. I want to have a conversation with you, if I could, sir.

Mr. Roof, you stated to me when we had a conversation on November 7th that it was your desire to plead guilty, but you understood you were not allowed to plead guilty if you were charged with a potential death penalty offense. I take no position whether -- regarding whether you

plead guilty -- you should plead guilty or not guilty, but I want to make sure you understand your legal rights and make a knowing and intelligent decision regarding the exercise of those rights.

So with that I want to explain to you that as a defendant in a criminal case, you have the right to plead guilty, and you have the right to plead not guilty to any charge. You are not prohibited from pleading guilty because one or more of the charges carries a potential sentence of death. The decision to plead guilty or the decision to plead not guilty is a decision of the defendant and not his attorney. However, I urge you to consider carefully the advice of your attorneys regarding your plea because there are many consequences which flow from pleading guilty, and your attorneys have considerable experience in this area.

Also want you to understand that if you plead guilty, there will be a jury trial regarding the proper sentence to be imposed. If you plead not guilty and are convicted by the jury on one or more charges that carries a death penalty, there will be a jury trial regarding your sentence as well. In other words, a plea of guilty does not avoid a jury trial on whether the death penalty will be imposed.

Now that I've provided you that information, let me ask you a few questions. Number one, do you understand that

you have presently pled not guilty to the charges against you? Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Do you understand that you have the right to plead not guilty and the right to plead guilty? Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Do you understand that the decision regarding what plea will be entered is your decision to make?

THE DEFENDANT: Yes.

THE COURT: Have you had a chance to consult with your lawyers regarding your plea?

THE DEFENDANT: Yes.

THE COURT: Have you given your attorneys' advice careful consideration?

THE DEFENDANT: No.

THE COURT: And why is that?

THE DEFENDANT: I haven't really been thinking about it.

THE COURT: Okay.

THE DEFENDANT: They did talk to me about it sometime recently.

THE COURT: Okay. Do you understand that if you plead guilty, you will -- you will still have a jury trial on whether the death penalty will be imposed? You understand

that?

THE DEFENDANT: Yes.

THE COURT: Knowing all of these factors, do you have a present desire to maintain your plea of not guilty or to change your plea?

THE DEFENDANT: Maintain it.

THE COURT: I'm sorry?

THE DEFENDANT: Maintain it.

THE COURT: You would like to maintain your plea of not guilty?

THE DEFENDANT: Yes.

THE COURT: Very good. Okay. With that, you may return to your seat.

With that, the matter will be adjourned.

***** ***** *****

I certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.

_________________________

Amy C. Diaz, RPR, CRR December 1, 2016

/S Amy Diaz