IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

**FILED UNDER SEAL**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO.: 2:15-CR-472 |
| | ) | |
| DYLANN STORM ROOF | ) | |

**MOTION OF STANDBY COUNSEL FOR A DETERMINATION OF THE DEFENDANT'S CURRENT COMPETENCY TO PROCEED, OR, IN THE ALTERNATIVE, OF HIS CURRENT CAPACITY TO SELF-REPRESENT AT THE PENALTY PHASE OF HIS CAPITAL TRIAL**

In this motion, standby counsel present facts developed since the competency hearing on November 21-22, 2016, which we believe support a finding that the defendant is presently incompetent to stand trial, or – at a minimum – lacks the capacity, pursuant to *Indiana v. Edwards*, 554 U.S. 164 (2008), to represent himself at the penalty phase. Standby counsel are obligated to notify the Court of their good-faith concerns and observations regarding the defendant's present competency, both to assist the Court in assuring that the defendant's right to a fair trial is protected, and in compliance with our own ethical duties to the defendant and the integrity of the judicial system. Lead standby counsel notified the defendant that he would be filing this motion immediately following the December 28 pretrial conference.

The following information supports our belief that the defendant is incompetent or should be required to proceed with counsel under *Edwards*:

1

(1)     The defendant has advised standby counsel – and substantially reaffirmed in open court on December 28 – that he plans to call no witnesses, present no evidence, cross-examine no government witnesses, and do nothing otherwise to defend himself against the government's case for the death penalty.  To the extent he plans to communicate at all during the penalty phase, it will simply be to state that he has no mental disorders.  His primary concern at this time is not whether he will be sentenced to death, but whether and when the Court plans to unseal the record of his competency evaluation (and how to prevent release of additional information about his mental health).

(2)     In order to place the defendant's intentions and in-court behavior in their proper context, we attach as Exhibits 1-3 reports by the defense mental health evaluators, Rachel Loftin, Ph.D., Paul J. Moberg, Ph.D., ABPP, and Donna Maddox, M.D.  These experts have diagnosed the defendant with autism spectrum disorder, other specified schizophrenia spectrum disorder and other psychotic disorder (attenuated psychosis), and other specified anxiety disorder, as well as other conditions.[1]  Dr. Moberg also detected frontal system dysfunction and craniofacial dysmorphology consistent with schizophrenic spectrum disorders.  A fourth attached report by autism expert John Robison supports the autism spectrum disorder diagnosis and further explains its significance.  *See* Exhibit 4.  In light of the defendant's self-destructive and irrational plans regarding the sentencing phase of his trial, the Court should consider these reports, which did not yet exist at the

---

[1] The Court's competency evaluator, Dr. James Ballenger, concluded that the defendant "meets the criteria for Social Anxiety Disorder, probably Generalized Anxiety Disorder, possible Autistic Spectrum Disorder, a Mixed Substance Abuse Disorder, depression by history and a Schizoid Personality Disorder."  Court's Competency Hearing Exhibit 2 at 55.

time of the competency proceedings in November, before allowing the sentencing proceeding to commence, or the defendant to represent himself.

(3) Examples of counsel's observations during jury selection and the guilt-innocence phase of trial further show the defendant's incompetence to stand trial or to represent himself. *See infra* at 12-15.

This request is timely because it is based on new facts – the defendant's disclosure of his irrational plans for the sentencing phase of his trial and his recent behavior during jury selection and the guilt-innocence phase of his trial. Moreover, as we observed in November, a defendant's competence may vary during the course of trial. *See Ryan v. Gonzales*, 133 S. Ct. 696, 703 n. 4 (2013) (quoting 4 W. Blackstone, Commentaries on the Laws of England 24–25 (1769)); *see also Indiana v. Edwards*, 554 U.S. 164, 175 (2008) ("Mental illness itself is not a unitary concept. It varies in degree. It can vary over time. It interferes with an individual's functioning at different times in different ways."). If a defendant becomes incompetent at any point of the trial for any period of time, any ensuing conviction violates due process. *Ryan*, *supra*. *Cf. Pate v. Robinson*, 383 U.S. 375, 384 (1966) (finding that defendant's demeanor at trial did not justify ignoring evidence of incompetence). Accordingly, though we are of course bound by and must respect the Court's pretrial competency determination, Dkt. Nos. 656, 657, that ruling does not relieve us of our obligation to bring new facts or materially changed circumstances to the Court's attention. We do so now.

**I.     Standby counsel are legally and ethically obligated to present concerns about the defendant's competency to the Court.**

The Supreme Court has "repeatedly and consistently recognized that 'the criminal trial of an incompetent defendant violates due process.'" *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996) (internal citations omitted). Because "[c]ompetence to stand trial is rudimentary" to criminal justice, *see Riggins v. Nevada*, 504 U.S. 127, 139-140 (1992) (Kennedy, J., concurring in judgment), "even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change …." *Drope v. Missouri*, 420 U.S. 162, 181 (1975). "[A]n expressed doubt in that regard by one with 'the closest contact with the defendant,' *Pate v. Robinson*, 383 U.S. 375, 391 (1966) (Harlan, J., dissenting), is unquestionably a factor which should be considered." *Drope*, 420 U.S. at 178 n.13.

The Court has a duty to order a hearing if it has information causing it to doubt the defendant's competency. *See* 18 U.S.C. § 4241(a) ("The court shall grant the motion [for a hearing by the defendant or the government], or shall order such a hearing on its own motion, if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent …."). Given its role, however, the Court cannot be privy to all of the information bearing on the defendant's competence. The Supreme Court has recognized that counsel have "the best-informed view." *See Medina v. California*, 505 U.S. 437, 450 (1992). That has not changed since the defendant's decision to proceed *pro se*, since, in our standby role, counsel remain in close contact with the defendant.

4

In any event, courts do not distinguish between counsel of record and standby counsel when it comes to questions of a defendant's competency. *Cf. Panetti v. Quarterman*, 551 U.S. 930, 936-37 (2007) (relying on standby counsel's testimony about *pro se* defendant's strange behavior during trial in assessing whether defendant may be incompetent for execution). We are aware of no closely analogous Fourth Circuit case, but note that in *United States v. Bernard*, 708 F.3d 583, 586 (4th Cir.2013), the court seems to have tacitly approved of defendant's former attorney's participation, as standby counsel, in a bench conference on the subject of the defendant's competency. *Id. See also, e.g., United States v. Arenburg*, 605 F.3d 164, 170 n.4, 171 (2d Cir. 2010) (remanding because even though standby counsel raised issue of defendant's competence to stand trial and court had observed signs of mental illness, court did not inquire further into competence of *pro se* defendant); *State v. Rich*, 484 S.E.2d 394, 400 (N.C. 1997) (noting that standby counsel questioned defendant's competence and asked court to review mental health records).

In fact, some courts insist on appointment of counsel to assure protection of *pro se* defendants' due process rights when questions of competency are raised. *See United States v. Klat,* 156 F.3d 1258, 1262-63 (D.C. Cir. 1998); *United States v. Purnett*, 910 F.2d 51, 56 (2d Cir. 1990). Other courts insist at least on active participation by standby counsel. *See United States v. Ross*, 703 F.3d 856, 869-70, 873-74 (6th 2012) (remanding for fact-finding regarding possible failure of adversarial testing due to standby counsel's lack of participation in competency hearing). These courts agree, however, that whatever the implications for a defendant's constitutional right to self-representation, "[r]equiring a

defendant to proceed with counsel through a competency proceeding is no greater a denial of a defendant's right to self-representation than that of any other defendant whose waiver has been found not to be knowing and intelligent." *Purnett*, 910 F.2d at 56.

The South Carolina Rules of Professional Conduct also support standby counsel's authority and obligation to offer this evidence to the Court.

- Rule 1.14(b) (*Client with Diminished Capacity*) allows an attorney who, "reasonably believes that the client has diminished capacity, is at risk of substantial . . . harm unless action is taken[,] and cannot adequately act in the client's own interest, [to] take reasonably necessary protective action, including consulting with individuals or entities that have the ability to take action to protect the client…."
- Model Rule 8.4 prohibits an attorney from engaging "in conduct that is prejudicial to the administration of justice."

The South Carolina Rules of Professional Conduct are in these respects materially identical to the American Bar Association's Model Rules of Professional Conduct. Although the ABA Model Rules do not distinguish generally between death penalty and non-death penalty cases, the ABA has stated that attorneys are subject to heightened professional standards when the client is facing the death penalty. *See* American Bar Ass'n, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913, 920-21 (2003 rev.). We have therefore concluded that we would be neglecting our ethical responsibilities if we did not provide this information regarding competency to the Court.

## II. Against all the evidence, the defendant maintains that he is neither developmentally disabled nor mentally ill, and seeks to use the penalty phase of his trial solely to dispel any suggestion that he may be, rather than to save his life.

The defendant maintains that he is neither developmentally disabled nor mentally ill. He does this in the face of strong and mounting evidence to the contrary, including from the Court's competency evaluator. The defense experts, on the other hand, have diagnosed him as suffering from autism spectrum disorder, psychosis, and severe anxiety, and also have expressed the opinion that these disorders so control his decision-making as to compromise his ability to assist his counsel and to represent himself. *See* Exhibits 1-3. The defendant's "plan" for the penalty phase, as expressed to standby counsel and now to the Court, supports the experts' opinion. Despite available legal challenges to the government's case and an array of possible mitigating evidence pertaining to mental health and non-mental health issues, the defendant plans to file almost no motions, make no objections, cross-examine no witnesses, and present no evidence during the penalty phase.[2] Rather, he plans to use the penalty phase solely as an opportunity to dispel any question about his mental health. He remains unable to explain why disclaiming any mental impairment bears any relation to his stated goal of securing a life sentence. And he cannot describe what he thinks his former defense counsel should have done instead of investigating his mental health – other than nothing – to defend him.

---

[2] We are prepared to proffer a list of challenges and a detailed summary of mitigating evidence to the Court *ex parte*.

Although he has now been convicted of 18 capital counts, the defendant appears to have little concern about the possibility of receiving a death sentence. Instead, he is almost entirely focused on whether and when the Court will unseal the transcripts of the November competency proceeding and the associated pleadings, and on what he can do to prevent introduction of mental health evidence in the penalty phase. His only other preoccupation is his clothing for the trial – whether it is the right color, texture, thickness and fit; who purchased it; and if it has been cleaned with the correct type and amount of detergent, and pressed correctly.[3] In our combined experience, counsel have not represented a competent defendant who has been so disconnected from the reality of an impending death sentence as he proceeded to the penalty phase of trial.

The reasons underlying the defendant's extremely peculiar and self-destructive behaviors and his inability to focus on what is truly salient are complex and interwoven. Counsel and the mental health evaluators who have devoted many hours over many months to observing and evaluating him believe it is wrong to view his course as deriving simply from his undeniable strongly-held and deeply offensive political views. Significantly, this motion asks the Court only to acknowledge, not resolve, the doubts raised by the evidence presented in the competency proceeding and in the reports attached here concerning the

---

[3] In a conference with standby counsel moments after the December 28 pretrial conference, the defendant repeatedly interrupted his own and counsel's discussion of the impending sentencing trial with flurries of questions, requests and demands about the pants he would wear in courtroom, whether they were short enough to not touch the tops of his shoes, and whether they could be laundered and pressed in a particular way. This naïve fixation on his clothing – to the exclusion of his actual legal peril – has become, if anything, even more all-consuming since it was witnessed and described by autism expert John Robison on November 5. *See* Defense Competency Ex. 15 at 3-5; Exhibit 4, *supra*, at 15-17.

defendant's mental capacity. Because this evidence involves the interaction of the defendant's developmental disability (autism, a diagnosis which, significantly, Dr. Ballenger neither confirmed nor refuted) and his co-morbid psychiatric disorders, identifying the manifestations of his incapacity is easier than pinpointing (and differentiating among) its causes. It can be difficult, for example, to distinguish between symptoms of autism and those of psychotic disorders. Ultimately, what matters is that these symptoms are present. Whether their cause is autism spectrum disorder or some other mental condition, or, as the defense experts suggest, the interaction of both, the result is that the defendant is neither capable of assisting his counsel nor of representing himself in these proceedings.

Should the Court be concerned, however, with pinpointing the causes and extent of the defendant's questionable competency, we suggest that further inpatient evaluation in the custody of the Bureau of Prisons is warranted. *See* 18 U.S.C. §§ 4241(b), 4247(b)-(c). Relying on the defendant's denial of any impairment would be wrong. He is not a reliable reporter. Indeed, his lack of insight is better understood as *anosognosia* – a symptom of his impairment. *See* http://www.nami.org/Learn-More/Mental-Health-Conditions/Related-Conditions/Anosognosia. This is a common symptom of psychosis. While the term is not associated with autism, is not uncommon for people with autism to reject the diagnosis. Dr. Maddox and Mr. Robison discuss this phenomenon in their reports. *See* Exhibit 3 at 9, 18; Exhibit 4 at 2.[4]

---

[4] Dr. Maddox also discussed this in her November testimony.

9

### III.    The defendant is foregoing a substantial mitigation case, including lay and expert testimony on both mental health and non-mental health-related issues.

Even conceding *arguendo* that foregoing a mental health mitigation case might be perceived as "rational,"[5] the mental health evidence described in Exhibits 1-3 is far from the only mitigation available.  By electing to present no case for life, the defendant is also foregoing significant non-mental health mitigation.  This evidence would have included:

- testimony from family and others who have known the defendant all or most of his life, and who describe him as a shy and extremely reclusive youth who displayed no violent inclinations or behavior before his apparently solitary and relatively sudden online radicalization;

- expert testimony regarding the defendant's good behavior during pretrial detention, his likely future as a nonviolent and compliant life-term prisoner if he is not sentenced to death, and the state and federal governments' ability to safely manage him in the future;[6]

---

[5] We acknowledge the Court's expressed view that the defendant is acting "rationally" in trying to hide his mental health impairment in order to protect his reputation.  We believe, however, that this interpretation is no longer sustainable in view of the defendant's overall behavior, and given his apparent disinterest in using the platform provided by this highly-publicized trial to advance any political agenda.

[6] *See Skipper v. South Carolina*, 476 U.S. 1, 7 (1986).  We would also, but for the Court's order in Dkt. No. 475, proffer expert testimony of the conditions of confinement the defendant would face in either state or federal custody, by one of the authors of the government-sponsored report: CNA Analysis, Inc., Federal Bureau of Prisons:  Special Housing Unit Review and Assessment (Dec. 2014), *available at* https://www.bop.gov/resources/news/pdfs/CNA-SHUReportFinal_123014_2.pdf.

- testimony by a member of the clergy about the clergyman's intense and prolonged interaction with the defendant since the offense, and the basis for his conclusion that the defendant shows potential for change and rehabilitation;

- testimony regarding an assault suffered by the defendant in the jail, including his passive and nonviolent response;

- expert testimony from a prominent and widely-respected researcher on violent hate groups and the internet that would have highlighted the defendant's atypical youthfulness and social isolation compared to other hate-motivated violent offenders;[7] and

- evidence of the defendant's longstanding offer to plead guilty as charged in exchange for a life sentence without the possibility of release.[8]

## IV.     During trial, the defendant was dissociated, paranoid, and seemingly under the influence of delusions.

During jury selection and the guilt-innocence phase of the trial, the defendant's autism and mental illness interfered substantially in his ability to participate in his

---

[7] *See* Dkt. No. 321 (providing notice of defense Rule 16 expert disclosure).

[8] *See* Dkt. No. 475 (denying government motion *in limine* to preclude, as mitigating evidence, proof of the defendant's offer to plead guilty). In light of the Court's colloquy with the government concerning a stipulation to the defendant's plea offer at the December 28 pretrial conference (during which the defendant said nothing), it appears possible that the jury will ultimately be able to consider this isolated fact in mitigation despite the defendant's refusal to do anything further in his own defense. Our point, of course, is not to how badly the defendant's incompetency will actually prejudice him, but simply to note the irrationality of the passive course to which he is adhering.

defense and our ability to present his case. He alternated between dissociating completely, so that his attention could not be drawn to important issues, and perseverating on paranoid or delusional ideas that were irrelevant to the proceedings. He was also unable to communicate in a consistently effective manner, either inside or outside of the courtroom.

We offer the following observations, by way of example:

- The defendant repeatedly told us not to speak to him in court. When we wrote him notes, he frequently ignored them or misinterpreted them.

- When we spoke to him outside of court, he sometimes did not remember what had occurred in court. When he did remember, he was often upset about something that had occurred, but about which he had been unable to communicate in the courtroom.

- Rather than discussing issues of substance, the defendant often wanted to discuss whether the Court, a prosecutor, or a witness "liked" him (usually based on whether the person smiled in court), what would make him or her "like" him (*e.g.*, whether he wore a particular color), and how that would affect his case ("the judge smiled at me; if he were the sentencer, I would not get the death penalty").

- The defendant's extreme anxiety, and fear of displeasing the Court or being required to answer the Court's questions, made it impossible for him to follow most of standby counsel's advice regarding objections or different or additional voir dire questions during jury selection. Only after becoming

comfortable with a few formulaic requests was the defendant able to repeat them on his own.

- The defendant was preoccupied with certain minor pieces of evidence and urged irrational tradeoffs in order to avoid presentation of this evidence. For example, while he was representing himself during jury selection, he offered to withdraw a motion regarding penalty phase evidence if the government would agree not to use a demonstrative exhibit (an SD card from a Kodak camera) with the jury. The SD card itself had no evidentiary significance other than to lay a foundation to which the defendant agreed to stipulate. However, he was obsessed with the possibility that deleted photographs of himself that had been found on the SD card would somehow become publicly available on-line if the SD card were physically displayed to the jury. The deleted photographs were largely indistinguishable from others that he had himself posted on-line, but appeared to him to exemplify some imagined bodily defect (which is why he deleted them in the first place).
- The defendant focused obsessively on a handful of defense photographs depicting facewash, shampoo and two pillows that were found in his car at the time of his arrest, and ultimately extracted promises from defense counsel that they would not offer the photos in evidence.
- The defendant displayed inappropriate affect, smiling when he was upset or during particularly emotional testimony.

13

- The defendant spent the majority of the guilt-innocence phase sitting still and staring impassively down at the table, even during critical testimony and argument (a fact on which the press and witnesses commented).

- The defendant insists that the jury will sentence him to life if its members will only understand why – for reasons having to do with a supposed war being waged by black people against whites – he "had to" commit the crimes at Emanuel AME Church. He insists this would take him only an hour to explain, but – as he said at the December 28 status conference – he will decline to do so, even at the cost of his life.

This list is not exhaustive, but illustrates the sorts of problems counsel have encountered due to the defendant's developmental disability and mental illness during the first two phases of the trial, and which we believe render him incompetent to proceed. Given the defendant's all-consuming focus on irrelevant and objectively trivial details – his clothes, his deleted selfies, his body-dysmorphic delusions, and his fixation on not being identified as autistic or mentally impaired – it is even questionable whether he can be fairly described as representing himself. It would be more accurate to say that no one is representing him. Because this state of affairs is caused by a lifelong developmental disability and co-morbid mental disorders that he does not understand and cannot control, the Court should intervene to afford him the protections that the Constitution guarantees.

### V.  These circumstances demonstrate the defendant's incompetence, or – at a minimum – his incapacity to represent himself at the sentencing phase of his trial.

The standard for competence, as the Court well knows, is a finding by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.  *See* 18 U.S.C. § 4241(d); *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam) ("The 'test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational as well as factual understanding of the proceedings against him.'"). The burden of establishing incompetence by a preponderance of the evidence is not a heavy one. *See Cooper v. Oklahoma*, 517 U.S. 348, 362 (1996) (citing 18 U.S.C. § 4241); *United States v. Robinson*, 404 F.3d 850, 856 (4th Cir. 2005) (same).  It is surely met here, where the defendant's behavior has been consistently and observably driven by his developmental disability and mental illness.

But even if a defendant is competent, he may not be capable of representing himself. *See Indiana v. Edwards*, 554 U.S. 164, 177-78 (2008).  The Supreme Court authorizes trial courts to *require* a mentally ill defendant to proceed with counsel in order to avoid raising the question: "[H]ow in the world can our legal system allow an insane man to defend himself?" *Id.* at 177 (internal quotation marks and citation omitted).  That is, to avoid "a spectacle", to prevent the risk of "improper conviction or sentencing", or to ensure that the proceedings "appear fair to all who observe them". *Id.* at 176-177 (internal quotation marks and citations omitted).  This case – particularly the penalty

phase as planned by the defendant – presents the *Edwards* archetype. Questions already abound among the press and the public about why (and how) the defendant is being permitted to proceed *pro se*. The information presented here validates those concerns. Contrary to *Edwards*, "a right of self-representation at trial will not 'affirm the dignity' of [the] defendant" here, because he "lacks the mental capacity to conduct his defense without the assistance of counsel." *Id.* at 176.

## VI. Permitting the defendant to self-represent under these circumstances raises serious constitutional concerns that the Court should address.

The Court previously denied our motion under the Fifth, Sixth, and Eighth Amendments to prevent the defendant from proceeding *pro se* at the penalty phase or to authorize a more significant role for standby counsel. *See* Dkt. No. 741. The Court also denied our motion to prevent the *pro se* defendant from waiving mitigation. It remains undeniable, however, that permitting the defendant to go forward at this stage and in this manner raises serious constitutional concerns. We have cited in several pleadings precedent establishing that the Court, the government, and the community share an interest in assuring the defendant receives a fair and reliable sentencing proceeding. *See, e.g.*, Dkt. Nos. 544-1, 704. *See also Martinez v. Court of Appeal of Cal.*, 528 U.S. 152, 162 (2000) ("Even at the trial level ... the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer"); *Sell v. United States*, 539 U.S. 166, 180 (2003) ("[T]he Government has a concomitant, constitutionally essential interest in assuring that the defendant's trial is a

16

fair one"). In view of the information presented here, the Court should reconsider its rulings.

The Court should also consider appointing independent counsel, or approve another procedure, to permit the jury to receive mitigating evidence, despite the defendant's expressed intent to sit out the penalty phase. We acknowledge the Court's citation, in Dkt. No. 741 at 11, to *United States v. Davis*, 285 F.3d 378, 384 (5th Cir. 2002), in which a divided panel of the Fifth Circuit ruled the appointment of independent counsel to be unauthorized. We note, however, that the New Jersey Supreme Court has appears to take a different view, having indicated that standby counsel should be permitted to present mitigating evidence over the *pro se* defendant's objection because, "the failure of a *pro se* defendant to present mitigating evidence has constitutional ramifications. Imposing a sentence of death requires that mitigating evidence be presented to the sentencers so that they may make an individualized determination that the defendant indeed deserves death." *State v. Reddish*, 859 A.2d 1173, 1203 (2004). *See also id.* at 1204 (explicitly disagreeing with *Davis* and suggesting increased role for standby counsel). We urge the Court to adopt a similar procedure.

We also urge the Court to consider the other Eighth Amendment implications of the defendant's age, developmental disability and mental illness. As discussed in the reports of our evaluators, *see* Exhibits 1-3, these characteristics closely resemble those the Supreme Court recognized as categorically barring the death penalty in *Roper v. Simmons*, 543 U.S. 551 (2005), and *Atkins v. Virginia*, 536 U.S. 304 (2002. At a minimum, given the presence of those characteristics – including, among other things,

17

diminished moral culpability – capital punishment is a disproportionate penalty as applied to this defendant. *Cf. Enmund v. Florida*, 458 U.S. 782, 798-800 (1982). Whether in connection with the competency hearing or separately, the Court should hear the evidence on these issues, as well. We attach further authority at Exhibit 5.

## CONCLUSION

Without the Court's intervention, the defendant is at risk of becoming "the deluded instrument of his own execution." *See Estelle v. Smith*, 451 U.S. 454, 462 (1981) (internal citation and quotation marks omitted). We therefore request that the Court conduct a hearing after which it reconsider:

(1) the defendant's competency to stand trial;

(2) the defendant's capacity to represent himself;

(3) the constitutionality of permitting *pro se* representation that waives mitigation;

(4) the role of standby counsel under these circumstances; and

(5) the defendant's eligibility for the death penalty.

Respectfully submitted,

s/ *David I. Bruck*
David I. Bruck
Washington & Lee School of Law
Lexington VA 24450
540-458-8188
bruckd@wlu.edu

Sarah S. Gannett
Assistant Federal Public Defender
Federal Public Defender for the District of Arizona
850 W. Adams Street, Suite 201
Phoenix, AZ 85007
602-382-2862

sarah_gannett@fd.org

Kimberly C. Stevens
Capital Resource Counsel
Assistant Federal Public Defender for the
District of Oregon
1070-1 Tunnel Road, Suite 10-215
Asheville, NC 28805
336-788-3779
kim_stevens@fd.org

Emily C. Paavola
900 Elmwood Ave., Suite 200
Columbia, SC 29201
803-765-1044
Emily@justice360sc.org

Standby counsel for Dylann S. Roof