```
 1                IN THE DISTRICT COURT OF THE UNITED STATES
                      DISTRICT OF SOUTH CAROLINA
 2                        CHARLESTON DIVISION

 3

 4     UNITED STATES OF AMERICA,     )        2:15-cr-00472-RMG
                                     )
 5            Plaintiff,             )
                                     )
 6     VS                            )
                                     )        Charleston,
 7     DYLANN STORM ROOF,            )        South Carolina
                                     )        November 21, 2016
 8            Defendant.             )        Volume I

 9

10               TRANSCRIPT OF COMPETENCY HEARING
             BEFORE THE HONORABLE RICHARD M. GERGEL,
11               UNITED STATES DISTRICT JUDGE

12     APPEARANCES:

13     For the Plaintiff:      JULIUS NESS RICHARDSON
                               Assistant U.S. Attorney
14                             U.S. Attorneys Office
                               1441 Main Street, Suite 500
15                             Columbia, South Carolina 29201

16                             MARY J. HAHN
                               Assistant U.S. Attorney
17                             U.S. Department of Justice
                               601 D Street NW, Room 5200
18                             Washington, DC 20003

19                             NATHAN STUART WILLIAMS
                               Assistant U.S. Attorney
20                             U.S. Attorneys Office
                               P.O. Box 876
21                             Charleston, South Carolina

22                             RICHARD E. BURNS
                               Assistant U.S. Attorney
23                             U.S. Department of Justice
                               1331 F Street NW, Suite 625
24                             Washington, DC 20530

25
```

```
 1                                    STEPHEN CURRAN
                                      Assistant U.S. Attorney
 2                                    U.S. Department of Justice
                                      601 D Street NW, Room 5808
 3                                    Washington, DC 20004

 4

       For the Defendant            SARAH S. GANNETT
 5                                    Assistant Federal Public Defender
                                      Arizona Federal Public Defenders Office
 6                                    850 West Adams Street, Suite 201
                                      Phoenix, Arizona 85007
 7
                                      DAVID I. BRUCK, ESQ.
 8                                    Virginia Capital Case Clearinghouse
                                      Washington and Lee School of Law
 9                                    Lexington, Virginia 24450

10                                    EMILY PAAVOLA, ESQ.
                                      Justice 360
11                                    900 Elmwood Avenue, Suite 101
                                      Columbia, South Carolina 29201
12
                                      KIMBERLY C. STEVENS, ESQ.
13                                    1070-1 Tunnel Road, Suite 10-215
                                      Asheville, North Carolina 28805
14

15                                          *   *   *

16

17

18

19

20

21

22
       Court Reporter:               Amy C. Diaz, RPR, CRR
23                                    P.O. Box 835
                                      Charleston, South Carolina 29402
24

25              Proceedings recorded by mechanical shorthand,
            transcript produced by computer-aided transcription
```

1

                                 **INDEX TO EXAMINATIONS**

**WITNESS**                                                      **PAGE**

2

JAMES C. BALLENGER, M.D.
  Examination by the Court                        19
  Examination by Mr. Bruck                        31
  Examination by Mr. Richardson                  169

3

4

5

6

                                    **EXHIBITS**

7

**PLAINTIFF'S NUMBER**                         **REC'D**

  1                                              187

8

9

10

**DEFENDANT'S NUMBER**                         **REC'D**

1                                               35
2                                               45
3                                               47
4                                               55
5                                               59
7                                              101
8                                              101
10                                             129

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Good morning.  We are about to begin the
 2     competency hearing in 18-421 regarding the defendant in this
 3     matter.  May I just inquire who is in the room, so, yes, sir?
 4              MR. RICHARDSON:  Thank you, Your Honor.  Jay
 5     Richardson, along with Rich Burns, Mary Hahn, Nathan
 6     Williams, Steve Curran, all with the Department of Justice,
 7     Joseph Hamski, who is our lead investigator with the FBI.
 8              THE COURT:  Okay.  Mr. Bruck?
 9              MR. BRUCK:  Good morning, Your Honor.  David Bruck
10     for the defendant.  With me around the table is Brandi
11     Newman, our paralegal; Lindsey Van, our investigator; Sarah
12     Gannett, my cocounsel; Emily Paavola; the defendant; and Kim
13     Stevens.  In the courtroom are two of our witnesses, expert
14     witnesses, Mr. Sean O'Brien, and Dr. William Stejskal, both
15     of whom we would like to hear the testimony because it is
16     relevant to their own testimony.  Also in the courtroom is
17     the court evaluator, James Ballenger.  And the Court has
18     previously authorized Ms. Greenman to be present, and she is
19     dealing with two health emergencies concerning both of her
20     parents by telephone, but will be in momentarily.
21              THE COURT:  What's the Government's view on
22     sequestering witnesses?
23              MR. RICHARDSON:  It's a little bit of an unusual
24     scenario.
25              THE COURT:  I mean, it's a closed proceeding.  If
```

1    you have a motion to sequester, I will grant it.

2              MR. RICHARDSON:  I think it's appropriate to

3    sequester.

4              THE COURT:  The motion is granted.  So other than

5    Dr. Ballenger, the other witnesses should leave the

6    courtroom.

7              MR. BRUCK:  May I be heard?  The reason I think it

8    would expedite matters is Dr. Stejskal, for example, a good

9    deal of his testimony is going to be commenting on and

10   reviewing and evaluating Dr. Ballenger's evaluation.  I think

11   it would -- he would be able to cut to the chase much more

12   effectively if he knew what had already been covered and in

13   what depth.

14             THE COURT:  I will take that risk.  I would ask

15   those folks other than Dr. Ballenger to leave, please.

16             MR. RICHARDSON:  Your Honor, just so we are clear on

17   the scope of sequestration, that also means counsel can't

18   then discuss what occurred during the hearing with the

19   witness who has not yet been called.

20             THE COURT:  That is correct.  These witnesses are

21   free to talk about Dr. Ballenger's report.  That is fine, but

22   we are not now going to be commenting on the testimony.  I

23   mean, we are here about competency.  There is a risk here

24   that we are far -- we are going to wander far afield from

25   competency, and I'm going to do everything I can to give a

1    full and complete competency hearing.  But we are not chasing

2    rabbits not related to competency.

3         Now, let me just start, and I want to make a brief

4    statement, that I think will help us define a bit the scope

5    of what we are going to be doing here today.  We have now

6    commenced a competency hearing under 18 USC 4241.  It is

7    important at the outset to define what this hearing is

8    designed to address and what it is not designed to address.

9         The question before the Court is whether the

10   defendant has a mental -- let me make sure I quote the

11   statute correctly here.  "Whether the defendant has a mental

12   disease or defect that is, one" -- "that he is, one, unable

13   to understand the nature and consequences" -- let me --

14   that -- yeah, that -- let me state that again so we will be

15   clear what the standard is.

16        "That he has a mental disease or defect which

17   renders him mentally incompetent to the extent that, one, he

18   is unable to understand the nature and consequences of the

19   proceeding and/or unable to assist properly in his defense."

20        The United States Supreme Court in *Dusky vs. United*

21   *States* says, quote, "Whether the defendant has sufficient

22   present ability to consult with his lawyer with a reasonable

23   degree of rational understanding, and whether he has a

24   rational as well as factual understanding of the proceedings

25   against him."

1          The Supreme Court further summarized the Court's

2     inquiry into competency in *Godinez vs. Moran* as follows:

3     "Requiring that a criminal defendant be competent has a

4     modest aim.  It seeks to ensure that he has the capacity to

5     understand the proceedings and to assist counsel.  While

6     psychiatrists and scholars may find it useful to classify

7     various kinds of degrees of competence, the due process

8     clause does not impose these additional requirements."

9          Now, let us talk about what a competency hearing is

10    not designed to do.  It is not a back door around an insanity

11    defense with a watered-down standard of insanity.  No

12    insanity defense has been noticed by the defendant, and that

13    issue is not on the table.  Further, this is not an

14    opportunity to submit to the Court the anticipated mental

15    health mitigation evidence in toto in the hope that some

16    portion of this may have a passing relevance to the issue of

17    competence.  There is obviously a potential of overlap

18    between competency evidence and Rule 12.2 evidence, and that

19    portion relevant to competency may be presented.

20          In an effort to focus the evidence on competency

21    standards, the Court will require any expert offering

22    opinions to the Court after establishing his or her

23    qualifications to initially address the following two

24    questions -- and I have these questions at the witness chair

25    for them to address -- number one, do you have an opinion

1    within a reasonable degree of medical or scientific certainty

2    that the defendant suffers from a mental disease or a defect;

3    and if so, state with specificity what that mental disease or

4    defect is.

5         Number two, do you have an opinion within a

6    reasonable degree of medical or scientific certainty that due

7    to a mental disease or defect, the defendant does not have

8    the sufficient present capacity to understand the proceedings

9    and/or to assist counsel; and if so, in what specific ways

10   does the defendant not understand the proceedings and/or

11   cannot consult with his attorneys or otherwise not assist

12   properly in his defense.

13        Once the expert has answered those specific

14   questions, he or she should feel free to explain the bases of

15   those opinions.  After the expert has answered those two

16   questions, he or she may provide additional expert testimony

17   and opinions so long as they are relevant to the issue of

18   competency.

19        I would also like to explain briefly the procedures

20   and legal rights of the parties in this matter.  Number one,

21   the hearing is conducted pursuant to 18 United States

22   Code 4241 and 4247.  The defendant bears the burden of

23   proving incompetence by a preponderance of the evidence.

24        Number two, the defendant is entitled to testify if

25   he chooses to do so.  The defendant has no obligation to

testify, and no inference or suggestion relating to

competence will be drawn from the decision not to testify.

The decision to testify or not to testify is entirely his

decision.  If the defendant elects to testify in the

competency hearing, it does not waive his right to silence in

his criminal trial.

Number three, a competency hearing is an adversarial

proceeding, and each party has the right to call witnesses,

offer evidence, and cross-examine witnesses called by other

parties or the Court.

Number four, I will open the hearing by calling

Dr. Ballenger, the Court-appointed examiner, one, to provide

a brief statement of his education, training, and experience;

two, to place his examiner's report into evidence; and,

three, to provide a brief summary of his opinions set forth

in the report.  Dr. Ballenger, like all of the experts, will

be asked to address the two questions previously mentioned.

With that brief introduction, his background and

opinions, the defendant and then the Government will be

allowed to examine him.  Thereafter, the defendant may call

its witnesses, and the Government may call and examine them.

If the defendant has not testified upon the completion of the

defendant's case, I will advise him again of his right to

testify and the right not to testify and allow him to make a

decision regarding what he elects -- whether he elects to

1    testify at his competency hearing.  The Government will then

2    call its witnesses, and the defendant may cross-examine them.

3         Okay.  Those are the basic parameters.  I'm going to

4    hand -- I'm going to ask and I'm going to direct

5    Dr. Ballenger to take the oath and take the stand.

6         MR. BRUCK:  We have a couple of matters to place on

7    the record before we have the testimony.

8         THE COURT:  What are those?  Yes, sir, Mr. Bruck?

9         MR. BRUCK:  The -- I did want to advise the Court as

10   to the availability of some of our witnesses when we

11   anticipate calling them during the course of today and

12   tomorrow.

13        I also wanted to renew our request that this hearing

14   be continued until next Monday.  I understand the Court has

15   ruled, but I wanted to place on the record now that we have

16   done everything we can to prepare for today's hearing after

17   receiving Dr. Ballenger's report at 7:30 last Tuesday,

18   November 15th.  We feel we are unprepared to proceed.  The --

19   I can assure the Court that we have worked around the clock

20   to prepare for Dr. Ballenger's testimony and this hearing as

21   a whole.  Nevertheless, we feel that we have not had an

22   adequate opportunity to review the relevant psychological

23   literature, to study the test results, and to analyze the

24   issues concerning competency.  Several of the witnesses who

25   we wish to call are unavailable, and are, therefore, having

1    to be proffered by affidavit.

2              THE COURT:  I have not agreed to allow you to do it

3    by affidavit.  This is an adversarial hearing.

4              MR. BRUCK:  Well, then we may -- all I can say --

5              THE COURT:  I offered as to Dr. Maddox, and I'm

6    going to -- Mr. Bruck, there is a theme -- let's be frank

7    about it.  Everything is a delay.  And I'm going to give you

8    all the time you need.  We had a conference in my chambers,

9    and you asked me to not schedule Friday, to do it on Monday.

10   I did that.  Now you are telling me you don't have time.

11   I've gone through this material.  You've represented this

12   defendant for 14, 15 months.  You are fully aware of these

13   matters.  You have hired countless experts.  You have had

14   more than adequate time.  And I find it not credible that you

15   are not prepared.  And I think that is simply another method

16   to delay these proceedings.  You've had adequate time, I'm

17   satisfied you do, and we are going to proceed today.

18             MR. BRUCK:  I would like to take up the question of

19   offering some of our testimony by affidavit witness by

20   witness.  One of our witness, he's in Cyprus at the present

21   time.

22             THE COURT:  Who is in Cyprus?

23             MR. BRUCK:  Dr. Loftin who is our autism evaluator.

24   We have a brief affidavit from her that we have obtained from

25   Cyprus indicating her findings, and the --

```
 1            THE COURT:  Has she evaluated the defendant?
 2            MR. BRUCK:  Yes, she has, not on the issue of
 3    competency, on the question of autism.
 4            We have an expert from MUSC who is a person who
 5    referred us to Dr. Loftin who is present to testify early
 6    this afternoon or Tuesday afternoon about the general
 7    requirements and the relevance of autism on the issue of
 8    competency to stand trial.  So between the two of them, we
 9    will be able to make our presentation, but the length of the
10    testimony is through Dr. Loftin who is at an international
11    conference on autism in Cyprus.
12            THE COURT:  Well, I may be mistaken, but I believe
13    they have telephones in Cyprus.  I have a son living in
14    Nigeria; I talk to him every three days.  There is not a
15    problem communicating.  So I urge you, if you want to
16    offer -- an adversarial hearing is examination and
17    cross-examination, and, you know, not the idea that you can
18    simply submit by affidavit.  Now, if the Government says that
19    is satisfactory --
20            MR. RICHARDSON:  You are safe in assuming that is
21    not true, Your Honor.
22            THE COURT:  Okay.  Then I'm going to accommodate you
23    by allowing you to do it by telephone in our court
24    facilities -- Ms. Ravenel is ready to take phone calls -- and
25    to do an examination in the courtroom over the telephone.
```

1    But the idea that you get to file an affidavit and no one

2    gets to cross-examine in an adversarial proceeding, no.  And

3    I understand in the shortness of time there may be a

4    difficulty getting someone here in the courtroom.  I respect

5    that.  That's why I have accommodated you by allowing it to

6    be by telephone.  This is an adversarial proceeding.  So as

7    to Dr. Loftin, I would get on the phone and arrange a time

8    for her to participate, to get on the telephone to be

9    examined and cross-examined.

10    MR. BRUCK:  Um, our other experts are -- one is in

11    Springfield, Massachusetts.

12    THE COURT:  Who is that?

13    MR. BRUCK:  That is Mr. John Robison, Professor

14    Robison, and the other is in Texas, Dr. Edens.  They have

15    both provided, and we have provided the Government affidavits

16    from each of these experts.

17    In our discussions with the Government, I have --

18    they have not agreed as to any particular affidavit, but the

19    tenor of the discussion was for witnesses who are less

20    central to the presentation in a sense, it has been suggested

21    to us that the Government might agree to present their

22    testimony to -- allow us to present their testimony by

23    affidavit, and that is what we are attempting to do.  We

24    received Dr. Edens's affidavit at shortly --

25    THE COURT:  Dr. Edens is where in Texas?

```
 1              MR. BRUCK:  Um, College Station, Texas.

 2              THE COURT:  Where is Mr. Robison?

 3              MR. BRUCK:  Springfield, Massachusetts.

 4         I'm going to ask the Government, how do you feel

 5    about taking -- I don't know the substance of that testimony.

 6              MR. RICHARDSON:  We don't think that they are

 7    relevant to what is going on here.  I don't think either of

 8    those people offer an opinion about competence.  One of them

 9    in Massachusetts is someone who is on the autism spectrum

10    themselves, and they generally talk about autism and his

11    conversations with Mr. Roof and opined without apparent

12    medical training or background that Mr. Roof is severely

13    autistic and has a variety of problems.

14              THE COURT:  Do you want to -- do you need to

15    cross-examine him?  Or is the affidavit sufficient for -- are

16    you going to argue?  You tell me.

17              MR. RICHARDSON:  I think with him, he is so wholly

18    irrelevant, we are happy for them to put that affidavit in.

19              THE COURT:  I'm going to allow Mr. Robison by

20    affidavit.

21              What about Dr. Edens?

22              MR. BRUCK:  Dr. Edens, I should explain, he is a

23    nationally recognized expert of MPI and PAI.  We received in

24    the middle of the week, maybe Thursday, the actual raw data

25    from these tests.  So this is not something we could possibly
```

1    have been prepared to meet until we had the actual

2    material -- test materials.  We have gotten it from Dr. Edens

3    who has responded with blinding speed, but I think its only

4    reason -- it is certainly relevant to Dr. Ballenger's

5    analysis on his test results.

6        THE COURT:  And what is your feeling about

7    cross-examining Dr. Edens?

8        MR. RICHARDSON:  We do not agree to have them

9    introduced.  All he is doing, just so the Court is clear,

10   he's just saying, "Well, Dr. Ballenger, you know, he made

11   this mistake."  He refers to the wrong doctor.  It's

12   cross-examination -- it's cross-examination of Dr. Ballenger

13   by affidavit.  It doesn't say that Dr. Ballenger is wrong.

14   It doesn't offer an opinion whatsoever with respect to

15   competency.  But he has not interviewed or talked to him.

16   All it is is an effort to talk about a variety of things that

17   he claims are possible.  He doesn't even say that they are

18   wrong.  He says there are possible other explanations for

19   Dr. Ballenger's evaluation and expert opinion.

20       THE COURT:  This is why I wanted at the beginning to

21   require the expert to say what their opinions are, and if

22   their opinions address neither question, it may be some

23   background information that the defense has every right to

24   provide me, and I'm okay with that.  But I'm going to be very

25   clear about what the issues are here and I want us to stay

1     focused on it.  And the idea that we may sit there and bring

2     an expert who wants to nitpick Dr. Ballenger's report in an

3     affidavit and not be cross-examined, that is not what due

4     process is.  So I would simply tell Dr. Edens we would be

5     glad to have him participate.  We will hook it up by

6     telephone.

7          Ms. Ravenel, we can do that from Texas?

8          THE CLERK:  Yes, sir.

9          THE COURT:  Good.  Okay.  We'll be delighted to have

10    him participate by telephone.

11         MR. RICHARDSON:  We also think that he is

12    irrelevant.  He is subject to cross-examination.

13    Dr. Ballenger can talk about his reliance on the PAI, his

14    understanding of the validity scales.

15         THE COURT:  Mr. Richardson, I don't have enough

16    information to know if it's relevant or not at this point, so

17    I don't want to make a ruling about that.  I may ultimately

18    reach that same conclusion.  The defense has a right to put

19    up its case, and I don't expect y'all to agree with it, but

20    we are going to put the case up they have, as long as it's

21    relevant to competency.  So Dr. Edens needs to be advised

22    that he needs to be available by telephone.

23         MR. BRUCK:  Very well.

24         THE COURT:  Mr. Bruck, you know, one of my fusses

25    with lawyers is that we don't do enough of this technology

1    that we have all over the United States in here, sometimes

2    for a five-minute hearing where they could offer it to my

3    juries, just by video or audio, and we don't do enough of it.

4    So I am delighted to accommodate you, so we don't disrupt the

5    lives of these people and incur a great deal of expense.

6    That's not necessary, but they need to participate.

7         MR. BRUCK:  I do not know about the availability of

8    either Dr. Loftin in Cyprus and how quickly we can reach her

9    and schedule a hearing, nor Dr. Edens.  All I can say is we

10   are going to start working on it immediately.

11        THE COURT:  You have plenty of folks.  Anyone can

12   leave the room and get in contact with them.

13        MR. BRUCK:  Yes, sir.  The -- excuse me, if you bear

14   with me.  I don't mean to beat a dead horse, but we are

15   severely disadvantaged by the problem of sequestration.  This

16   is -- the reason for sealing the hearing, of course, was to

17   avoid prejudicing the jury.  The presence of -- Dr. Stejskal

18   is not going to opine that the defendant is or is not

19   competent.  He is going to provide -- he is going to describe

20   the extent of the evaluation that he has been able to conduct

21   so far.

22        THE COURT:  16 minutes.

23        MR. BRUCK:  I'm sorry?

24        THE COURT:  I understood he did 16 minutes.

25        MR. BRUCK:  No, and then an hour and a half --

```
1              THE COURT:  Okay.  Good.

2              MR. BRUCK: -- after that next day.  He is going to

3    explain why all of the evidence that he has reviewed -- the

4    Court's evaluator's reports do not resolve the issue of

5    competency, and he will testify based on a lifetime of

6    experience.

7              THE COURT:  And let me say this:  I'm glad to hear

8    that.  What I don't need to hear testimony about is his

9    opinion on what the witness says from the witness stand.

10   That is -- this -- we are getting far afield from what this

11   issue is.  Listen, I have kept out the family victims who

12   strenuously objected not being here to keep this matter

13   closed.  And it is closed.  And I see no reason by making

14   these exceptions.

15             MS. GANNETT:  Just for the record, I would like to

16   cite the United States vs. Rhynes, 218 F.3d 310, a Fourth

17   Circuit -- it's 2000.  It is not a sealed proceeding, but

18   it's a proceeding in which the Court held that sequestration

19   orders that prevented attorneys from performing their duties

20   as counsel may violate a defendant's Sixth Amendment rights.

21   And I think that under Rule 615(c) and note 3 to that rule of

22   the Federal Rule of Evidence, that experts are entitled to be

23   in the proceedings, in particular to hear the testimony of

24   other experts.

25             THE COURT:  You see, you are getting far afield
```

1    here.  The question is not their opinion of Dr. Ballenger's

2    testimony.  It is of his evaluation and whether the defendant

3    is or is not competent.  Motion's overruled.  Thank you very

4    much.  I'm delighted to hear what this witness has to say

5    regarding the defendant's competence, and if he has a

6    critique of Dr. Ballenger's report, I'm glad to hear it.

7            Anything further?

8            MR. BRUCK:  No, sir.

9            THE COURT:  Very good.  Dr. Ballenger, if you could

10   come forward, please, sir.

11           THE CLERK:  Dr. Ballenger, place your left hand on

12   the Bible, raise your right.  State your full name for the

13   record.

14           THE WITNESS:  James C. Ballenger, M.D.

15   THEREUPON:

16               JAMES C. BALLENGER, M.D.,

17   called in these proceedings and being first duly sworn

18   testifies as follows:

19           THE CLERK:  You may be seated.

20           THE COURT:  Before we proceed, I'm looking at

21   615(c), it says that the witness is essential to the party's

22   presentation.  He is not essential -- I find he is not

23   essential.

24           Okay.  Dr. Ballenger, if you could state your full

25   name for the record, please, sir.

1          THE WITNESS:  James C. Ballenger M.D.

2          THE COURT:  And, Doctor, if you could briefly

3    summarize your education, training, and experience.

4          THE WITNESS:  I did an undergraduate degree from the

5    University of North Carolina in Chapel Hill, an M.D. from

6    Duke University.  I did my psychiatry training at Harvard at

7    the Massachusetts General Hospital.  After that I was at the

8    National Naval Medical Center as faculty for two years and

9    The National Institute of Mental Health for three years, and

10   on the affective disorders research unit.  And then I was

11   director of research and inpatient psychiatry at the

12   University of Virginia.

13          And I came here as the chairman of psychiatry, and

14   ultimately the director of the Institute of Psychiatry and

15   the executive director of the center.

16          THE COURT:  This is at the Medical University of

17   South Carolina?

18          THE WITNESS:  Yes.

19          THE COURT:  How long did you serve as chair of the

20   department of psychiatry at the Medical University?

21          THE WITNESS:  17 years.

22          THE COURT:  Have you now retired from the medical

23   university?

24          THE WITNESS:  I retired from full-time academics in

25   2002.

1          THE COURT:  And are you now in private practice?

2          THE WITNESS:  Yes, sir, I am.  I have a private

3     practice several blocks from here, where I spend two-thirds

4     of my time, and about one-third of my time I do forensic

5     psychiatry primarily -- at this point primarily civil.

6          THE COURT:  And, Ms. Ravenel, we previously placed

7     as court exhibits, I believe, Dr. Ballenger's report and his

8     CV; is that correct?

9          THE CLERK:  Yes, sir.

10          THE COURT:  Okay.  Let me first hand you -- you've

11     got Dr. Wagner's report there?  First of all, I'm going to

12     hand you the -- is that your examiner's report?

13          THE WITNESS:  Yes, sir.

14          THE COURT:  And is that an accurate copy of your

15     curriculum vitae?

16          THE WITNESS:  Yes, sir.

17          THE COURT:  Okay.  And in conjunction with your

18     report -- I believe your examination, you requested the

19     assistance of a psychologist to assist you?

20          THE WITNESS:  Yes, I routinely do that for various

21     reasons.

22          THE COURT:  And who did you request to assist you?

23          THE WITNESS:  Dr. Mark Wagner, who is director of

24     neuropsychology at MUSC here in Charleston.

25          THE COURT:  And he conducted various tests and

1    diagnostic procedures?

2              THE WITNESS:  Yes, he did.

3              THE COURT:  And did he issue a report?

4              THE WITNESS:  Yes, he did.

5              THE COURT:  Did you attach that report to your

6    report?

7              THE WITNESS:  I did.

8              THE COURT:  And I'm going to hand you that report,

9    Court's Exhibit 3.  Is that Dr. Wagner's report?

10             THE WITNESS:  Yes, it is.

11             THE COURT:  Now, I believe you were -- when were you

12   first appointed to serve as the Court's examiner?  Do you

13   recall?

14             THE WITNESS:  It was Monday afternoon, I think the

15   7th.

16             THE COURT:  And did you thereafter have the occasion

17   to meet with the defendant, Mr. Roof?

18             THE WITNESS:  I met with Mr. Roof three times,

19   approximately three hours each of the three times.

20             THE COURT:  And did you also have the opportunity to

21   review the materials that Dr. Wagner had prepared, the

22   testing that he had done?

23             THE WITNESS:  Yes.  I did review it for its

24   pertinence.  We discussed it on two or three occasions, its

25   meaning and pertinence.

1          THE COURT:  And having undergone those evaluations

2    and having considered that information, did you then issue an

3    examiner's report?

4          THE WITNESS:  Yes, I did.

5          THE COURT:  And could you -- let me hand you, as we

6    are discussing this, allow you to do it a bit more

7    specifically, but provide some structure to this hearing.

8    Let me just ask the first question:  Do you have an opinion

9    within a reasonable degree of medical or scientific certainty

10   that the defendant suffers from a mental disease or defect;

11   and if so, state with specificity what that mental disease or

12   defect is?

13         THE WITNESS:  Yes, I do have an opinion within a

14   reasonable degree of medical or scientific certainty.

15         Mr. Roof in my opinion does not suffer from a

16   psychotic process, schizophrenic or otherwise, in my opinion.

17   And that's the one that is most critical to his understanding

18   of the proceedings and consequences.  It is my opinion that

19   he probably suffers from social anxiety disorder.

20         THE COURT:  Okay.

21         THE WITNESS:  And again probably schizoid

22   personality disorder.

23         THE COURT:  Okay.

24         THE WITNESS:  He may have some autistic spectrum

25   traits of a -- in my examination, he displayed none, but the

1    defense has made me aware in their opinion that he has

2    certain traits which may either be autistic spectrum or

3    social anxiety spectrum, which may have some relevance to his

4    competence.

5            THE COURT:  And do you have any other diagnoses that

6    you would make other than those?

7            THE WITNESS:  He allegedly has a history of

8    depression, but I'm really unable to determine whether that

9    is right or not.  It is conflicting evidence that is

10   available to me.  By his report he's never suffered from a

11   serious depression.

12           THE COURT:  Now, going to the second question, do

13   you have an opinion within a reasonable degree of medical or

14   scientific certainty that due to a mental disease or defect

15   the defendant does not have the sufficient present capacity

16   to understand the proceedings and/or to assist counsel; and

17   if so, what specific ways does the defendant not understand

18   the proceedings and/or cannot consult with his attorneys or

19   otherwise not assist properly in his defense?

20           THE WITNESS:  I do have an opinion within a

21   reasonable degree of medical and scientific certainty:  On

22   the first prong of this question that he does not have any of

23   the problems -- that he does not have difficulty in

24   understanding the procedures that he is involved in; and, in

25   fact, has better than average, seemingly, understanding of

BALLENGER - EXAMINATION BY THE COURT   25

1    courtroom procedures, the procedures he's facing, the

2    consequences, his choices.  So on that he does not have a

3    problem.

4           On the second prong, whether he can or cannot assist

5    counsel, and I note in your question it does not have a

6    qualifier as to whether he can or cannot assist counsel,

7    there is evidence that he can.  He's been, by defense

8    counsel's report, cooperative and -- to an extent, and until

9    recently, cooperative in doing things that they ask him to

10   do, to read material, to listen to their summaries of witness

11   statements.  And has only refused two activities in the last

12   year and a half, and that was they have a facial morphology

13   expert who is going to work with him and not produce a photo,

14   which he has apparently allegedly some difficulty with, and

15   he without explanation refused to see that person.  And a

16   handwriting expert, which, again without explanation, he

17   refused to do.  But otherwise he had been cooperative in the

18   work in the last 18 months.

19          On the other hand, defense counsel's had an

20   opportunity to talk with him for an hour and 45 minutes on

21   the phone, and they believed that both -- he had a covert,

22   widespread psychosis that was behind everything, both his

23   thinking before the act, the act, his writings, and his

24   comments and testimony since.  And as I said, I don't agree

25   with that.

1              They also raised more subtle difficulties in their

2      working with him.  And that includes that he -- that they

3      feel he often sits in a rigid, inflexible position which

4      would be off-putting to a jury; that he so dislikes being

5      looked at in public that it has prevented them from talking

6      to him in the courtroom, he talking to them, even the passing

7      notes in the courtroom, and at one point he said, "Don't look

8      at me" in the courtroom.

9              They also cite that he gets flustered when things

10     don't go quite exactly how he would like them.  For instance,

11     if his lead attorney -- give you an example -- where he did

12     not respond as quickly as the prosecutor did, and that

13     apparently upset the defendant.  That -- one time when there

14     were multiple juries, and it wasn't clear which way the

15     attorneys and Mr. Roof should face, that that bothered him.

16     And he couldn't decide which way to face, and then that

17     bothered him.  And that they noticed -- he asked afterwards

18     what the prosecutor looked like, because as it turned out,

19     he -- they said he was always looking absolutely

20     straightforward and, therefore, he never looked at the

21     prosecutor.  Those kind of difficulties of working with him.

22              THE COURT:  In the courtroom, they are talking

23     about?

24              THE WITNESS:  In the courtroom specifically.  That

25     makes sense from a social anxiety disorder situation.  A good

1    example of that was in my working with him for almost nine

2    hours, he was extremely functional, easy to talk to, in a

3    good mood, humorous, almost warm in various ways.  Didn't

4    have any disruption of his thought processes as he was doing

5    it.  But I asked him -- and he acknowledged that when I asked

6    him, "How can you be so comfortable doing this?"  He nods

7    that he was comfortable to me.  And I said, "What if there

8    were 20 people watching us?"  He said, "Of course not.  I

9    couldn't do that.  Nobody can do that."

10            A clear illustration of the kind of difficulties

11   that social anxiety people have.  The not willing to be

12   talked to or to talk if people are watching, as in a

13   courtroom, that is also consistent with social anxiety

14   disorder.  Potentially consistent with autism as well.

15            One of the things that they reported that is if he

16   gets a feeling of being overwhelmed, he gets a blushing

17   attack where he turns red in all visible skin areas.  Now,

18   this is also consistent with one of the things that gives

19   external validity to social anxiety.  Is it -- so social

20   anxiety and panic disorder are two areas that I work in in my

21   career.  They are very similar, except social anxiety

22   patients actually do blush, visibly turn quite red, again,

23   giving some validity to his -- to these issues.

24            The other obvious problem that the defense has had

25   working with him is the issues of cooperativity.  As I said,

1    he was mostly cooperative for 18 months.  They've had an

2    ongoing tussle about what he would wear in the courtroom,

3    saying that he one time got too flustered in the courtroom,

4    and afterwards when they offered clothes, he couldn't change.

5             By his report, he wants to -- they have offered a

6    sweater, which by his report hasn't been washed, and he

7    doesn't want to wear it.  Their report that he's concerned

8    about the weave of the clothes, whether they touch his shoes

9    or not.  And these are issues for the autism spectrum

10   disorder-type of complaints.  But the cooperativity rose to a

11   head and precipitated this hearing essentially when he sent a

12   letter to the prosecution.  Those issues of courtroom

13   behavior, I, of course, have no ability or evidence that is

14   independent about whether that occurs or not.

15             THE COURT:  Or the significance of it?

16             THE WITNESS:  True.  That is true as well.  And so

17   in some ways in my report, I had to leave it.

18             THE COURT:  You reached no opinion on that issue?

19             THE WITNESS:  That is true on the issue of what I

20   would say are potentially important, subtle interaction

21   issues, and in my experience have not risen to the Court's

22   notice.  I was actually involved in a trial in New York where

23   a very severely-hampered, panic disorder patient was spending

24   all of his time in a full-time panic.  It is my opinion that,

25   in fact, he had significant problems with competence to

1    follow a comparably complex trial.  But the Court did not

2    take note of that.

3         So the psychosis really interferes potentially,

4    although, as you know, some psychotic individuals have been

5    deemed competent to assist in their defense and understand

6    the proceedings, and so the trial has proceeded.  That, in my

7    opinion, is not present in this case.  Whether or not there

8    are these other issues is --

9         THE COURT:  Did you find in your ability -- in your

10    interaction with him any difficulty in attempting to

11    communicate with you?

12         THE WITNESS:  None whatsoever, again, with the note

13    that it was quite private, and no one was watching.

14         THE COURT:  And in terms of the issue of cooperation

15    regarding the letter, did you have the opportunity to discuss

16    that with the defendant?

17         THE WITNESS:  I did.  And as was present throughout

18    his examination and for many of the -- including many of the

19    things I just mentioned about his subtle interactions, he had

20    a completely logical -- seeming logical explanation.

21         His explanation for the lack of cooperation with his

22    attorneys, with Your Honor, and with me at the various

23    junctures where he would say, "I can't talk about that," his

24    explanation for those ultimately came down to he -- he does

25    not want, one, his act to be misinterpreted, diluted, or

1    derailed, the message and -- his message that white people

2    need to wake up and defend themselves against the nonwhite

3    population, and that that is his mission.  And it was a

4    purely racist act.  He doesn't want any of that blurred by

5    somebody saying he is either autistic or has a mental

6    disease.

7           And so that is his -- oft repeated in his writings

8    and his examination to me -- explanation of why he does not

9    want any of that evidence presented.  He explained quite

10   logically, reasonably, to me that he couldn't find any way he

11   could get his lawyers to not do that.  And he's aware that in

12   a death penalty case, if his lawyers think that the defense

13   is in his best interests, even if he disagrees, they can

14   present it.  His dilemma was what does he do about that?  And

15   he decided that he would send a letter to the prosecution,

16   reasoning that the prosecution would make definite use of the

17   scenario, he said, where the prosecution would take his

18   letter, put it on the scanner and show it to the jury, and be

19   able to say, "The defendant gave me this, and he instructs

20   you to not believe anything his attorneys say."  And that is

21   why he did it.  He could think of no other act that would get

22   his wishes to be what happened as opposed to this battle with

23   his attorneys and that difficulty with the cooperation, and

24   how they move forward at this point seemed to me a genuine

25   conundrum for the defense team.  And --

1          THE COURT:  Let me ask you this:  Did you find he

2     had the ability -- the capacity to cooperate if he wished to?

3          THE WITNESS:  It seemed to me very clear that he

4     does have the ability to understand, cooperate, if he wants

5     to.  And he told me he would cooperate in areas where he did

6     want to, but as I said in my report, in moving forward, his

7     strategy he said would be -- he would be mostly quiet and not

8     talk and that that would be how he would get along with his

9     attorneys.  Which he also told me that he does believe his

10    attorneys have his best interests at heart, that they are

11    working hard for him, that they are trying to keep him from

12    the death penalty.  He understands all that.  But that he

13    would rather die than lose either one of the two reasons

14    that -- the first being his mission being blurred; the second

15    being his reputation in the war he thinks has already begun

16    and is going to result in a conflict that the white

17    nationalists will win, and he wants to have a spotless record

18    in that world.

19          THE COURT:  Okay.  Thank you, Dr. Ballenger.  I

20    think that is a fine summary.  And I'm going to allow

21    Mr. Bruck to begin his examination of the court-appointed

22    examiner.

23          Mr. Bruck?

24          MR. BRUCK:  Thank you very much, Your Honor.

25                         EXAMINATION

1   BY MR. BRUCK:

2    Q. Good morning, Dr. Ballenger.

3    A. Good morning, Mr. Bruck.

4    Q. How are you today?

5    A. I'm okay.

6    Q. What I would like to do is first talk with you a little

7   bit about your background, experience, and qualifications,

8   and then I would like to work through the report with you and

9   focus on some issues, if I may?

10    A. Yes.

11    Q. You have been a medical doctor for 46 years; is that

12   correct?

13    A. Yes.

14    Q. And your résumé lists 26 different positions and jobs

15   that you've held over the course of that long career?

16    A. I'll trust that's correct.  Sounds reasonably correct.

17   It seems a lot more than I would have thought.

18    Q. I'm sorry?

19    A. That seems more than I would have thought, but, yes,

20   probably.

21    Q. All right.  You were board-certified in forensic

22   psychiatry in 1999?

23    A. Yes.

24    Q. Prior to 1999, did you have any forensic experience at

25   all?

BALLENGER - EXAMINATION BY MR. BRUCK

1    A. Yes.  I had forensic experience in a spotted fashion in

2    areas where I was an expert, a scientific expert in those

3    areas, and was called for that expertise, not really forensic

4    expertise in that case, and then a few with my patients.  I

5    did not have a forensic fellowship.  I was grandfathered in

6    like so many older forensic psychiatrists for that

7    requirement.  Subsequently forensic psychiatrists to be

8    boarded have to have a fellowship, which I did not have.

9    Q. Okay.  And I noticed you have -- how many times did you

10   take the forensic -- there is a board exam, correct?

11   A. Correct.

12   Q. Did you pass it on the first administration?

13   A. Yes.

14   Q. You have edited, according to your résumé, 25 books?

15   A. Again, you probably read it correctly.

16   Q. And you list 351 articles?

17   A. Yes.

18   Q. How many of them concerned forensic issues in criminal

19   cases?

20   A. I think there would be none.

21   Q. None.  So, obviously, none of them concerned the issues

22   surrounding competency to stand trial in criminal cases?

23   A. I have not written on that.

24   Q. All right.  You list 671 abstracts and presentations

25   through May 25, 2014 on your résumé, correct?

BALLENGER - EXAMINATION BY MR. BRUCK

1    A. Again, I assume that is correct.

2    Q. And is it also true that not one of those 671 abstracts

3    and presentations concern criminal forensic cases or issues?

4    A. No.  I have given a small number of forensic talks, in

5    the five to ten range.

6    Q. Excuse me.  To be clear so we are on the same page, I'm

7    asking you about criminal forensic issues, not forensic

8    issues in general.

9    A. One or two touched on issues which are also pertinent in

10   criminal trials like malingering.  But only that.

11   Q. All right.  Is it fair to say that your forensic practice

12   is civil?

13   A. At this point it's probably 90 percent.  For a while it

14   was 25 percent criminal.

15   Q. For how long was it 25 percent criminal?

16   A. Five or six years.

17   Q. Did I ask you to, by e-mail dated Friday the 18th, last

18   Friday, come to court with a list of all the criminal cases

19   in which you have appeared as an expert witness?

20   A. Well, you showed me that when I walked into the

21   courtroom.  I'm not aware of having received the second half

22   of that e-mail.  The first half you asked for test reports,

23   test data, raw data, any recordings or notes.  And the only

24   one of that grouping that I had was my notes, and I made

25   those available to you.  I wasn't aware of the second part,

BALLENGER - EXAMINATION BY MR. BRUCK

1    and I apologize for that.  You did send it to the right

2    address, it appears, but I looked at the e-mail multiple

3    times for other purposes and have not seen it.  I'm sorry.

4            MR. BRUCK:  Just for the record, I would like to

5    have this marked as Defendant's 1, which is the e-mail

6    exchange with Dr. Ballenger, two e-mails, and then I'll ask

7    the witness to confirm that it was sent to the correct e-mail

8    address.

9            THE COURT:  Are you offering that into evidence,

10   Mr. Bruck?

11           MR. BRUCK:  Yes.

12           THE COURT:  Any objection from the Government?

13           MR. RICHARDSON:  None, Your Honor.

14           THE COURT:  That is Number 1, Ms. Ravenel?

15           THE CLERK:  Yes, sir.

16           THE COURT:  Defense 1 admitted without objection.

17           (Thereupon, Defendant's Exhibit 1 introduced into

18   evidence.)

19           MR. BRUCK:  May I approach?

20   BY MR. BRUCK:

21    Q. Dr. Ballenger?

22    A. I'm sorry that is not the correct address.

23    Q. I'm sorry?

24    A. That is not the correct address.

25    Q. May I see it?

BALLENGER - EXAMINATION BY MR. BRUCK

1    A. That -- I have two addresses.  The first part of that one

2    is at Gmail, not AOL.  The other -- my other one is an AOL

3    account.  And this explains why, from my perspective -- and I

4    told your clerk I had not heard from the defense on Friday.

5    I had heard from the prosecution, and I think I said that to

6    the prosecution when he called that I had not yet heard from

7    you.  I had heard from him, and I had heard from the Judge,

8    but I had not yet heard specifically from you.  But I knew

9    you wanted my notes, and so I got the --

10   Q. Dr. Ballenger, do you recall sending me your e-mail

11   address back when you requested the MMPI results and/or the

12   PAI results?

13   A. Sending you an e-mail request?

14   Q. You texted me your e-mail address and said please use

15   that?

16   A. I'm not aware of that.

17   Q. In any event, if I could get the document back, please?

18   A. Sure.

19   Q. What I'm coming around to, Dr. Ballenger, whether you

20   have noticed the list or not, can you tell me if you have

21   ever been appointed by a court before this case to conduct an

22   assessment of competency to stand trial in a criminal case?

23   A. I think the answer is no.  I was asked by the Court in a

24   criminal case to assess the psychiatric status of a

25   defendant, but not competence.  I was asked in my -- my

BALLENGER - EXAMINATION BY MR. BRUCK

1    experience in competency evaluations is small, two or three.

2     Q. Okay.  Well, let's break that down.  The first answer --

3    you actually answered my question, have you ever been

4    appointed by a court to conduct an assessment of a

5    defendant's competency to stand trial, is no?

6     A. I think no to that question.

7     Q. So this case is the first in your 46-year career,

8    correct?

9     A. Yes.  All that started at the top.

10     Q. And the other -- you referred to a couple other cases,

11    and I think you already mentioned one, and I would like to

12    talk very briefly about those two.  One of them is the Jared

13    Loughner case, correct?

14     A. Yes.

15     Q. And which you cite on your résumé?

16     A. Yes.

17     Q. Very high profile case?

18     A. Yes.

19     Q. Involved the shooting of Congresswoman Giffords and the

20    murder of six people by a defendant in Arizona?

21     A. Yes.

22     Q. And in that case, your role was to review records and

23    conduct a couple of telephone interviews in order to opine on

24    the likelihood that a defendant who was being forcibly

25    medicated would continue to make progress towards restoration

BALLENGER - EXAMINATION BY MR. BRUCK

1    of competency if the medication were continued.  Is that a

2    fair statement of your role?

3     A. The second half is exactly right.  I'm not sure which

4    phone conversations you are referring to.

5     Q. All right.  Well, maybe a little too much detail in the

6    question, and I'll rephrase it.  You never met Jared

7    Loughner, other than seeing him in the courtroom?

8     A. That's correct.

9     Q. You have never spoken to him in your entire life?

10     A. That's right.

11     Q. And you didn't speak to him before your testimony,

12    obviously?

13     A. Right.

14     Q. You reviewed the records and opined based on your record

15    review about the likely efficacy -- record review and other

16    investigation about the likely efficacy of a continued course

17    of medication to -- on the restoration of competency,

18    correct?

19     A. Yes.  The other things you referred to were very

20    important in that case, and that is what the scientific

21    literature says on that question.

22     Q. Right.  And presumably the reason you were consulted in

23    that case is that you are a world famous expert on

24    psychopharmacology, correct?

25     A. I think the answer to that -- both parts is probably

BALLENGER - EXAMINATION BY MR. BRUCK

1    correct.

2    Q. All right.  That is your field?

3    A. That is one of my fields, yes.

4    Q. The second case you referred to a case in New York in

5    which you opined on a defendant's competency to stand trial,

6    correct?

7    A. Yes.

8    Q. And that is a case of the *United States vs. David H.*

9    *Brooks*?

10   A. Yes.

11   Q. Who was famous in the news media as the man who had the

12   $10 million bat mitzvah party for his daughter in 2007?

13   A. Yes.

14   Q. Correct?

15   A. Correct.

16   Q. And shortly thereafter was indicted for a $200 million

17   fraudulent scheme in connection with the sale of his Body

18   Armor company and was sentenced eventually to 17 years in

19   prison, and died in prison two and a half weeks ago, correct?

20   A. Correct.  I was unaware of his death.

21   Q. And your involvement in the case came after the trial?

22   A. That's correct.

23   Q. And you and Dr. Park Dietz provided affidavits to

24   successor counsel, new counsel who replaced the trial lawyers

25   in that case after the trial, correct?

BALLENGER - EXAMINATION BY MR. BRUCK

1    A. Correct.

2    Q. And it was your opinion and Dr. Dietz's opinion that

3    Mr. Brooks was incompetent during some part of his trial and

4    that this incompetence had been apparently missed by his own

5    lawyers, by the federal judge trying the case, and by his own

6    treating psychiatrist, but it was your post-trial opinion

7    that he was, in fact, incompetent, correct?

8    A. No.  His own treating psychiatrist agreed with my

9    clinical findings.

10    Q. Well, what I mean is that no one alleged that he was

11    incompetent during the trial, including his treating

12    psychiatrist.  It was only after the trial that a new set of

13    lawyers came in, and you produced the opinion that I've

14    described, correct?

15    A. Again, I think his treating psychiatrist did insert

16    himself into the process and make comments about his being

17    the most severe he had ever seen in his 46-year career.

18    Q. But the treating psychiatrist didn't do that during the

19    trial.  He did that afterwards, correct?

20    A. I think you are probably correct.

21    Q. All right.  What were you paid by the hour in that case?

22    A. I don't know exactly.

23    Q. Estimate?

24    A. Probably $740 an hour.

25    Q. 700 and?

BALLENGER - EXAMINATION BY MR. BRUCK

1    A. 40.

2    Q. 40?

3    A. Um-hum.

4    Q. What is your standard rate now in civil cases in which

5    you are retained as an expert?

6    A. In South Carolina, it's 680.

7    Q. 680?

8    A. Yes.

9    Q. And is it a special rate in New York, or why was it more

10   in that case?

11   A. In out-of-state and national cases, which I sometimes am

12   involved in, it's 740, but in South Carolina, it's 680.

13   Q. I see.  And --

14   A. Our poor state.

15   Q. Your involvement in the *Brooks* case was about four years

16   ago.  Is it still $740 per hour?

17   A. Yes.

18   Q. Well, we talked about two prior criminal cases in which

19   you had some involvement on the issue of some kind of

20   competency, either before trial or after trial.  Were there

21   any others?

22   A. I remember a defendant who was also mentally retarded and

23   the question was whether he was competent to stand trial, and

24   that's about all I remember of that case.

25   Q. Did you testify in court as to whether he was competent

BALLENGER - EXAMINATION BY MR. BRUCK

1    to stand trial?

2    A. I don't think so.

3    Q. Okay.  And you were brought in by which, the prosecution

4    or the defense?

5    A. I frankly don't remember.

6    Q. Do you remember the defendant's name?

7    A. No.

8    Q. Or when the trial was?

9    A. I was still at MUSC, so it was prior to 2002.

10   Q. Okay.  Now, you list -- I mentioned -- let's see.  You

11   list having gone to trainings at SEAK.  And that is a program

12   run by lawyers for expert witnesses, correct?

13   A. Yes, I think they are all lawyers, yes.

14   Q. Okay.  And that teaches expert witnesses to be effective

15   and build their practice in expert consulting and testimony?

16   A. In multiple different areas, how to evaluate an elderly

17   patient and someone in a malpractice case, and so forth.

18   Q. Now, how many times have you testified at a sentencing

19   hearing in a capital case?

20   A. Once.

21   Q. And that was a case of Quincy Allen in Columbia, South

22   Carolina, correct?

23   A. I think that's correct, yes.

24   Q. And that was a judge sentencing?

25   A. Yes.

BALLENGER - EXAMINATION BY MR. BRUCK

1    Q. And in that case, you testified before the sentencing

2    judge at the sentencing hearing about the defendant without

3    ever having examined him, correct?

4    A. Yes.  I was very cleverly blocked from examining.

5    Q. You were very cleverly blocked from examining him?

6    A. Yes.  They found out when I was going to be in California

7    for four days and said he was only available those four days.

8    Q. You were appointed six weeks before the sentencing

9    hearing, correct?

10   A. I don't think that is true.  My understanding is I was

11   appointed 10 to 14 days, I was approached 10 to 14 days

12   before.  That is what I remember.

13   Q. Okay.  And the judge, of course, was aware of the

14   circumstances surrounding your testimony and your failure to

15   examine the defendant?

16   A. My inability to examine him, yes.

17   Q. All right.  And judge -- and it's your testimony that you

18   couldn't examine Mr. Allen before your testimony?

19   A. I was not allowed to.  I tried very hard to be allowed

20   to.

21   Q. All right.  And Judge Cooper, Thomas Cooper, who was the

22   presiding judge, sentenced Mr. Allen to death, did he not?

23   A. Yes, that's my understanding.

24   Q. And he issued a written order, did he not?

25   A. I'm not -- I'm not sure about that.

BALLENGER - EXAMINATION BY MR. BRUCK

1    Q. You've never seen his order?

2    A. No.

3    Q. Are you unaware that Judge Cooper made the following

4    statements in his written sentencing order concerning you,

5    and I quote:  "And let me add a comment about Dr. Ballenger's

6    testimony.  I found it to be contrived and unreliable.  His

7    serial killer analysis was little more than an extraction of

8    the words "mass murderer" or "serial killer" from the

9    numerous records in this case, and concluding from that alone

10   that Mr. Allen has serial killer tendencies.  His failure to

11   have examined Mr. Allen convinces me to give little weight,

12   if any, to his testimony."

13   A. I am aware that the judge said that.  The prosecutor said

14   that, with many apologies, to me.

15   Q. I see.  So the prosecutors apologized for the judge

16   having reached that conclusion?

17   A. No.  They apologized for both involving me so late --

18   they asked me at the tail end of another trial about the

19   trial they had coming up in two weeks.  They apologized for

20   not getting me to see Mr. Allen.

21   Q. I see.

22        MR. BRUCK:  The -- if there are no objections, or if

23   there is, I would like to enter the complete sentencing order

24   in the *Allen* case as Defendant's 2.

25        THE COURT:  Any objection?

BALLENGER - EXAMINATION BY MR. BRUCK

1          MR. RICHARDSON:  We object, Your Honor.  Hearsay.

2     He's asked him the question.

3          THE COURT:  For whatever it's worth, overruled.

4          (Thereupon, Defendant's Exhibit 2 introduced into

5     evidence.)

6     BY MR. BRUCK:

7      Q. And that was the first and last appearance in a capital

8     sentencing case, correct?

9      A. That was my first.

10     Q. And what you did in that case, as Judge Cooper summarized

11    in his sentencing order, was to examine the evidence

12    supporting the diagnosis of schizophrenia and to pull out

13    from the records that you reviewed of the case, evidence that

14    supported your view that the defendant was -- or I should say

15    that supported the view that the defendant was a serial

16    killer, using the definition of your own creation, and then

17    opining that Mr. Allen was not schizophrenic, but was rather

18    instead a serial killer.  Is that a fair summary of what you

19    did?

20     A. Absolutely not.

21     Q. All right.

22     A. What I did was examine voluminous records, evaluations,

23    and observations in jail.  Mr. Allen wore a T-shirt that said

24    "serial killer."  He had it tattooed on his body and killed,

25    I think, four people in rapid succession.  And I raised the

BALLENGER - EXAMINATION BY MR. BRUCK

1   issue that he fancied himself a serial killer.  And part of

2   what you are trying to emphasize is that -- is that I

3   diagnosed him as a serial killer, and I did not.  The

4   evidence suggested from examiners who had the opportunity to

5   examine him after his arrest and in jail was that he was not

6   schizophrenic and that he was malingering, and they had

7   testing that he was malingering.  There was some evidence

8   that he was, in fact, schizophrenic.  It was my opinion that

9   the evidence favored that -- that he did not and was, in

10  fact, malingering, and that was what I presented to the

11  Court.

12   Q. I see.  The -- when did it come to your attention that

13  Dr. Dietz was the Government's evaluating mental health

14  expert in this case?

15   A. I think when I -- in my second interview with the

16  defendant, or third interview.  The defendant told me.

17   Q. Okay.  The defendant never mentioned Dr. Dietz in his

18  interviews with you?

19   A. He did mention.

20   Q. Okay.  And is that when you found out?

21   A. Yes.

22   Q. Not from us, but from the defendant?

23   A. Only from the defendant.  I have not spoken to Dr. Dietz.

24   Q. And are you -- Dr. Dietz runs a company called Dietz &

25  Associates?

BALLENGER - EXAMINATION BY MR. BRUCK

1    A. Yes.

2    Q. And --

3        MR. BRUCK:  May I approach?

4        THE COURT:  You may.

5    BY MR. BRUCK:

6    Q. I'm going to ask if you know what that is.

7    A. It's some sort of thing from Dietz & Associates, and it

8    lists me as an associate, and that is correct.

9        MR. BRUCK:  We offer this as Defendant's 3.

10       THE COURT:  Any objection?

11       MR. RICHARDSON:  No, Your Honor.

12       THE COURT:  Defendant's 3 is admitted without

13   objection.

14       (Thereupon, Defendant's Exhibit 3 introduced into

15   evidence.)

16   BY MR. BRUCK:

17   Q. And so what is Dietz  & Associates?

18   A. To my understanding, it is a group of forensic experts,

19   founded and run by Dr. Dietz, experts across many areas of

20   forensic work.

21   Q. All right.  And the website, as the exhibit indicates,

22   has a caption "Our Experts," and then you are the first name

23   under Dr. Dietz's name, correct?

24   A. The same was all the way through elementary school.

25   That's because I'm B-A.

BALLENGER - EXAMINATION BY MR. BRUCK

1    Q. Because of the alphabet?

2    A. Yes.

3    Q. I didn't mean to suggest that you were ranked first.

4    A. That's right.

5    Q. My point was simply that you are listed as one of, quote,

6    "our experts" by Dietz & Associates?

7    A. Yes, and what that means is that every once in a while I

8    get a call about whether I could -- would like to work in a

9    case and would like to talk to either whoever is calling.

10   Q. Okay.  So that is a marketing arrangement in effect that

11   helps you get forensic referrals?

12   A. Yes, and a consulting -- a bilateral consulting.  He

13   sometimes, if I ask, consults and vice versa.

14   Q. Okay.  And where that website works, if someone were to

15   click on your name, the e-mail would go to Dietz &

16   Associates, and then they might refer the case to you?

17   A. That's correct.

18   Q. All right.

19        MR. BRUCK:  Bear with me just a moment.

20        Thank you for bearing with me.

21   BY MR. BRUCK:

22   Q. I would like to now begin looking through conditions on

23   which you conducted this evaluation and addressing your

24   report with you.  This was a rather rushed job, wasn't it?

25   A. Um, it was a big job and a surprise to be inserted into

BALLENGER - EXAMINATION BY MR. BRUCK

1   my schedule.  I do feel like I had enough time to do it, as I

2   told you, and --

3   Q. I'm sorry?

4   A. I do feel like I had sufficient time to do it well,

5   and -- but it was a lot of work in a short -- I think eight

6   days, eight or nine days.

7   Q. The -- you were contacted, you say, on the 7th?

8   A. I think that is right.  It was a Monday midafternoon.

9   Q. By Judge Gergel?

10  A. Yes.

11  Q. And your report was due the following Monday.  You asked

12  for an extension and filed it one day later --

13  A. Yes.

14  Q. -- on the 15th.  And after I called you -- after the

15  report had been filed, I called you asking if you would meet

16  with me so that I could ask you some questions about the

17  report?

18  A. Yes.

19  Q. And you told me you didn't have time?

20  A. I told you I was trying to deal with everything I put on

21  the back burner --

22  Q. Right.

23  A. -- during this nine-day period and respectfully begged

24  off.

25  Q. And you said, in fact, that I could ask my questions in

BALLENGER - EXAMINATION BY MR. BRUCK

1    court on Monday, today as we are now doing?

2     A. In effect, yes.

3     Q. Okay.  And in the course of explaining why you could not

4    meet with me, you said that you didn't have time because of

5    the schedule is ridiculous.  That is to say that the schedule

6    of this entire process?

7     A. I don't remember saying that, but my schedule -- my

8    personal schedule was ridiculous at that point.  All of the

9    patients I had pushed off, all of the other work, the other

10   legal work, and my life had been pushed to the side.

11    Q. Very well.  Do you have your report with you?

12    A. Yes, sir.

13    Q. Could you pick it up?

14    A. Um-hum.

15    Q. If you turn to page 9, please.

16    A. Yes.

17    Q. The -- there is a heading at the top of page 9, "Social

18   History"?

19    A. Yes.

20    Q. Which is four and a half lines long?

21    A. Yes.

22    Q. And gives no sources for the information?

23    A. That is true.

24    Q. In fact, other than the defendant and the description of

25   your interview with defense counsel, there are no sources

BALLENGER - EXAMINATION BY MR. BRUCK

1    given throughout the report, correct?

2    A. No, there are specific line sources for things that I

3    took from the previous hearing, and there are some Bates

4    number sources for some of the comments.

5    Q. Okay.

6    A. I was not -- I did not give sources for every fact.

7    Q. All right.  Well, the first line of the report, "lived

8    with his mother until recently, his sister and half sister,"

9    what was the source for that?

10   A. I think a medical record somewhere.

11   Q. A medical record dated when?

12   A. I don't know.

13   Q. Would it surprise you to know that his sister moved out

14   of the home when he was 11 years old?

15   A. Um, yes, I did not know that.

16   Q. Okay.  So the very first line of the social history may

17   not be accurate?

18   A. Sounds like it's not.

19   Q. Okay.  You stated the father is undergoing a second

20   divorce?

21   A. That's what I say.

22   Q. When did he get divorced, if you know, or is he not

23   divorced yet?

24   A. He is divorced, and my impression is it's four or five

25   years ago, but that's an impression that I don't know for a

BALLENGER - EXAMINATION BY MR. BRUCK

1    fact.

2    Q. Okay.  So he's not undergoing a second divorce.  He

3    was -- he underwent a second divorce several -- four or five

4    years ago, correct?

5    A. Correct.

6    Q. And that information is wrong?

7    A. Yes.

8    Q. ████████████████████████████████████ where did

9    that information come from?

10   A. Multiple sources of witnesses described ███████████, and

11   that's why I put the word "possibly" in there.  Multiple

12   people stated █████████████████████████████████████████

13   ████████████████████████████████████████████.

14   Q. Isn't it true that the multiple people is actually the

15   second wife who he divorced after a very, very bitter breakup

16   that ████████████████████████████████████

17   ████████████████████████████, or don't you know about

18   any of that?

19   A. I do know that some of the testimony in -- the negative

20   testimony about him came from ███████

21   Q. ██████████████████████████████████████████████

22   ████████████████████████████████████████████

23   ███████████████

24   A. It certainly came from that.  It's my impression that

25   some of the other people in the FBI interviewed kind of knew

BALLENGER - EXAMINATION BY MR. BRUCK

1    about the father.

2     Q. And where did you get this impression?

3     A. I said from the other -- some of the other FBI

4    interviews, but I'm not sure.

5     Q. Can you tell me which interviews?

6     A. No.

7     Q. All right. Now, the next item is that ▇▇▇▇▇▇▇

8    ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

9    ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

10   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

11   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

12   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

13   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

14   ▇▇▇▇▇▇▇▇▇▇▇▇

15   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

16   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

17   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

18   ▇▇▇▇▇▇▇▇

19   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

20   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

21   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

22   ▇▇▇

23    Q. Okay. And --

24          MS. STEVENS: Your Honor, I hate to interrupt, but

25   if the Court could note that the defendant has been smiling

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

BALLENGER - EXAMINATION BY MR. BRUCK

1       through this testimony.

2                THE COURT:  I don't know why that --

3                MR. RICHARDSON:  Objection, Your Honor.  I don't

4       think it's true.

5                THE COURT:  Ms. Stevens, let's just -- I'm sitting

6       here watching.  I don't need your assistance on that.

7                Please proceed.

8                MS. STEVENS:  Thank you, Your Honor.

9       BY MR. BRUCK:

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BALLENGER - EXAMINATION BY MR. BRUCK

BALLENGER - EXAMINATION BY MR. BRUCK

BALLENGER - EXAMINATION BY MR. BRUCK

BALLENGER – EXAMINATION BY MR. BRUCK



1

2

3

4

5

6

7

8

9

10

11

12

13  A. I really don't know.  I don't have anywhere near enough

14  information.

15  Q. Right.  But you included it in the social history?

16  A.

17

18  it seemed pertinent to me to be in there without any

19  speculations.

20  Q. All right.  It might have been helpful to you to have

21  read that testimony in assessing the importance of that

22  experience                    .  Would it not have been?

23  A. It might have been.  I might have put it in differently,

24  or I might have put it in there the same.  I might have

25  said -- qualified it differently.

BALLENGER - EXAMINATION BY MR. BRUCK

1    Q. You then on page 9 begin a section entitled "Drug Use."

2    And that discussion -- bear with me -- recites a very

3    detailed accounting of Mr. Roof's drug use in his middle

4    school years, 13-year -- or age 13 and so forth.  Where does

5    that information come from?

6    A. It comes from the records from 2009 when he was seen as

7    an outpatient in a department of mental health.

8    Q. Lexington area mental health, correct?

9    A. Yes.

10   Q. And it would include information that his counsel -- he

11   and his counselors felt he was addicted to marijuana and

12   received a diagnosis of cannabis dependence.  The records --

13   bear with me just a moment.

14           You received a set of records from Lexington area

15   mental health?

16   A. Yes.

17   Q. And are these the records?

18   A. They look like them, yes.

19           MR. BRUCK:  We offer these as Defendant's 5.

20           MR. RICHARDSON:  No objection.

21           THE COURT:  Defendant's 5 is admitted without

22   objection.

23           (Thereupon, Defendant's Exhibit 5 introduced into

24   evidence.)

25           MR. RICHARDSON:  Your Honor, just for the record, we

BALLENGER - EXAMINATION BY MR. BRUCK

1    are not objecting in the sense that they are what they are,

2    and for whatever worth, they are offered.

3         THE COURT:  Very good.

4    BY MR. BRUCK:

5    Q. Handing the witness Defendant's 5.  Now, you included

6    the -- in your report that Mr. Roof recited all of these

7    different drugs.  I ask you to turn to D05760, which is a

8    progress report.  Do you see the page number I'm referring

9    to?

10   A. Are you referring to a Bates number at the bottom?

11   Q. Yes.  That's correct.

12   A. So 760 --

13   Q. 05760.

14   A. Yes, I'm there.

15   Q. Looking at the middle of that one paragraph, do you see

16   the notation "Client also reports anxiety symptoms and

17   self-medicating behaviors?"

18   A. Yes.

19   Q. And self-medicating behaviors were referenced?

20   A. I would -- I would assume that as well.

21   Q. All right.  But that never found its way into your

22   report?

23   A. The part about self-medicating?

24   Q. Right.  The characterization by the treating mental

25   health therapist that the defendant suffered from anxiety and

BALLENGER - EXAMINATION BY MR. BRUCK

1    was self-medicating with the drugs that you provided such a

2    detailed listing of?

3    A. The intent of the detailed listing is to add on his

4    earliest use.  A lot of reports scientifically when you

5    start and what you start with, I did not put the idea of

6    self-medication in reporting his behavior in these notes from

7    2009.

8    Q. All right.  And would you turn to D0577O, which is a

9    subsequent note.  Tell me when you are there.

10   A. I'm there.

11   Q. Third line from the bottom of that note do you see talked

12   about client's anxiety, and therapist's belief that he is

13   self-medicating.  That is in the record, correct?

14   A. Yes.

15   Q. And that, the therapist's belief that he is

16   self-medicating for anxiety, is not present in your report?

17   A. That is true.

18   Q. And it's not only not present in your report in the part

19   of the report that summarizes his drug use, but it's not

20   present in your report anywhere, correct?

21   A. I did not -- certainly didn't emphasize it.  I don't

22   think I mentioned this notion of self-medicating.

23   Q. Right.  Anywhere in your report?

24   A. Um-hum.  Correct.

25   Q. Okay.  The description of his drug use you say was used

62

BALLENGER - EXAMINATION BY MR. BRUCK

1    as a diagnosis for cannabis dependence.  This is the middle

2    of page 9.  And the next line is "He was arrested once for

3    the possession of one pill of Suboxone, although in his IME,

4    he claims that he did not take it" and so forth.  What is the

5    relationship in time between those two sentences, if you

6    know?

7     A. I'm sorry.  I got lost.  The point in time later he told

8    me he hadn't taken it next to the event, he had taken it

9    earlier in the day?  The first half of your comment or

10    question?

11     Q. What I'm trying to get is the chronology of all this.

12    When was he addicted to cannabis according to the records

13    reviewed, and when did he take one -- when was he arrested in

14    possession of one pill of Suboxone?

15     A. They were very far apart, and I thought it was obvious.

16    He was addicted to cannabis in their opinion in 2009.  He was

17    arrested in 2015 with the remaining Suboxone in his pocket.

18     Q. I'm just wondering, when you write a report, a normal

19    report, I should state, when you -- in your forensic

20    practice, when you write a report, do you usually jumble a

21    narrative like this so that it's so difficult to follow what

22    date you are talking about, or is this a function of the

23    limited time you had?

24         MR. RICHARDSON:  Objection, Your Honor.

25    Argumentative.

BALLENGER - EXAMINATION BY MR. BRUCK

1          THE COURT:  Mr. Bruck, it's cross-examination.

2     Let's not sit here -- and I want to remind you, the

3     importance here is the opinions on competence and not going

4     line -- no one will master, like you and your team, the vast

5     amount of medical records you delivered to Dr. Ballenger, and

6     I anticipate you are going to give him a quiz line by line,

7     and I'm going to tell you it's fine, but it's not really

8     getting to the issue we are here about today.  I assure you

9     no one knows this record as well as you do.  Whether that's

10    necessary to get to the issue of whether this defendant is

11    competent is a wholly different issue.

12         So, you know, you can continue your line of

13    questioning, but the issue is, is there validity to his

14    opinions about competence, and whether he put the chronology

15    set forth in detail between when cannabis was consumed and

16    when Suboxone was consumed seems pretty far afield from this

17    question.

18         I sustain that objection to that question.

19    BY MR. BRUCK:

20    Q. I noticed that there was no early developmental history

21    in your report.  You knew when you were working on this case

22    that -- let me back up.

23         Autism spectrum disorder is a neurodevelopmental

24    condition, correct?

25    A. Correct.

BALLENGER - EXAMINATION BY MR. BRUCK

1    Q. With origins of it at or before birth?

2    A. Yes.

3    Q. And signs and symptoms of the disorder appear over the

4    life course, including in childhood?

5    A. Yes.

6    Q. Did you think it important to include in your report

7    developmental -- history of the development to that question?

8    A. I did consider it.  I did not pursue it for time

9    considerations --

10    Q. Right.

11    A. -- because his present state -- the pertinence of

12    potential autism I thought was captured by the opinions I

13    wrote in the -- in my report because his present state --

14    ability to interact, for instance, off camera with you seems

15    competent.  And then leaving -- if this is related to autism

16    or not, and I don't have an opinion of that of -- whether, as

17    I said to the Judge earlier, the behaviors you described to

18    me, you and your team, could be related to social anxiety of

19    a fairly severe nature or autism or both --

20    Q. If I could interrupt you there.  "Or both."

21    A. Yes.

22    Q. And, in fact, anxiety disorders are a common comorbid

23    condition with autism spectrum disorder, correct?

24    A. Correct.

25    Q. And people with autism spectrum disorder are at higher

BALLENGER - EXAMINATION BY MR. BRUCK

1     risk in the general population for a large number of other

2     comorbid disorders, correct?

3      A. Yes.

4      Q. Including psychosis?

5      A. Yes.

6      Q. Now -- and is it your -- did I understand you to say that

7     you did not make a determination whether he has autism

8     spectrum disorder or not?

9      A. That is correct.

10      Q. Thank you.  Now, you questioned him about a document that

11     the defense provided from Dr. Thomas Hiers, correct?

12      A. I don't -- I assume that came from you, but, yes, I saw

13     that.

14      Q. All right.  And you -- you are aware Dr. Hiers is the

15     former director of the Charleston area mental health,

16     correct?

17      A. That's correct.

18      Q. Let me -- and is this the document that I asked about?

19      A. Yes.

20           MR. BRUCK:  This is Defendant's 6.

21           THE COURT:  What is that, Mr. Bruck?

22           MR. BRUCK:  This is a document -- you can hand that

23     to the Court -- a document provided to Dr. Ballenger that

24     consists of --

25           MR. RICHARDSON:  Just one moment.  This is different

BALLENGER - EXAMINATION BY MR. BRUCK

1    from what you previously provided the Government, correct?

2              MR. BRUCK:  Oh, yes, it is.  This is --

3              MR. RICHARDSON:  We object to this, Your Honor.

4              THE COURT:  Okay.  Slow down.  Y'all are ahead of

5    me.  What is going on?

6              MR. RICHARDSON:  We object to its introduction.

7              MR. BRUCK:  It's a -- the Government has this --

8              THE COURT:  One at a time.  Let me hear from

9    Mr. Bruck first.  Let me just hear what his view is.

10             MR. BRUCK:  It's a little complicated, but what --

11   this is what happened, and we may just have to drop back and

12   provide another version of the same document.  But

13   Mr. Hiers -- Dr. Hiers provided us with a copy of a

14   correspondence that began on -- in response to a craigslist

15   posting by Mr. Roof which attracted Dr. Hiers' attention to

16   try to reach out.  They had an e-mail exchange.  He then

17   pasted this into the document that he sent to a colleague,

18   another mental health professional in Columbia, with the

19   request that Mr. -- that this colleague meet with doctor --

20   with Mr. Roof.  Mr. Roof did not respond.  But in the course

21   of that, Mr. Roof left some -- sent some e-mail messages that

22   were drafted.  This has -- we provided to the Government in

23   discovery, the Government then followed up.  Both doctors

24   were interviewed, and the e-mail exchange has been obtained

25   by the FBI.  I think this may -- this may be the version that

BALLENGER - EXAMINATION BY MR. BRUCK

1      we received directly or indirectly from Mr. Hiers rather than

2      the identical e-mail string that the FBI got.  I guess we can

3      back up and make --

4              THE COURT:  I'm trying to keep y'all on competency.

5      So tell me how this is relevant so we can keep going, and

6      whether the Government and you have different versions of

7      e-mails seems largely not important.  So what is the point

8      regarding Dr. Ballenger?

9              MR. BRUCK:  The significance of this document is

10     that it indicates Mr. Roof in February of 2015, just a few

11     months before the crime, was expressing that he was suffering

12     from depression, or words that certainly looked that way to

13     Dr. Hiers, and that was why he could not respond to

14     Dr. Hiers' attempts to reach out to him.  That is number one.

15     There has been testimony that there has been no evidence of

16     depression in the materials that the doctor reviewed.

17              And, secondly, we wish to point out that

18     Dr. Ballenger took from this document only the fact that

19     Mr. Roof made racist comments to Dr. Hiers and not his

20     expressions of extreme distress and expressions that appear

21     to be a layperson's self-description of depression, which we

22     think goes to the impartiality of the entire evaluation, and

23     that is why it is relevant.

24              THE COURT:  Well, why don't you more directly ask

25     him those questions rather than spend time about which

BALLENGER - EXAMINATION BY MR. BRUCK

1    version of the e-mail.  Why don't you --

2              First of all, Dr. Ballenger, do you see this e-mail?

3              THE WITNESS:  Absolutely, sir.

4              THE COURT:  And why don't you respond to the --

5              THE WITNESS:  I would object to the

6    mischaracterization of what I did with this.  I saw very much

7    that Dr. Hiers -- that the defendant's response to Dr. Hiers

8    included a description that "I have been in bed and can't get

9    out."  It was part of what -- and I think it's reflected in

10   my report that is part of why I asked the defendant multiple

11   questions about his history of depression.  My comment about

12   that there is no -- I don't have clear evidence that he has

13   been depressed.  This is the most clear that I have.  He

14   denies pointedly that he's ever been depressed.  When asked

15   about this particular reference to -- in his own words in an

16   e-mail to Dr. Hiers, was he depressed, and he not only denied

17   being depressed, he denied the existence and truth of all of

18   this e-mail.

19             And so I took the two things from this because I

20   know Dr. Hiers to be true -- that he told Dr. Hiers that he

21   was depressed.  And he told Dr. Hiers a diatribe about -- a

22   racist diatribe that Dr. Hiers commented took his breath

23   away.  Those are the two things that I took from this and

24   followed up on both of them.

25

BALLENGER - EXAMINATION BY MR. BRUCK

1   BY MR. BRUCK:

2    Q. Okay.  And one of those things found its way into your

3   report.  Let me explain what I mean and ask you this -- the

4   report on page 10 begins the relevant portion.  Can you look

5   at that, please.

6    A. Yes.

7    Q. "On 2-26-15, the psychologist, former head of the

8   Charleston area mental health, responded to the defendant's

9   craigslist ad asking to meet someone who would enjoy

10   accompanying him on a date in Charleston."  And he responded

11   to that because there was some racist and homophobic content

12   in the ad itself which concerned you?

13    A. I have never seen the ad, so I don't know that.

14    Q. All right.  "Dr. Hiers and his colleague John Connery

15   briefly reached out to defendant in an attempt to help him

16   get psychological treatment.  Dr. Hiers got to know the

17   defendant well enough to describe his racist feelings about

18   niggers, queers, and homosexuals, which were so severe,

19   they" -- quote -- "took Dr. Hiers' breath away" -- close

20   quote.  That is the description, right?

21    A. Yes.

22    Q. You included in your report --

23    A. At this point I included in my report that I asked him

24   about depression and this report of depression, that he

25   denied it.

BALLENGER - EXAMINATION BY MR. BRUCK

1    Q. Okay.  And where in the report and anywhere did you quote

2    what he actually wrote in this e-mail to Dr. Hiers which

3    was -- and this is quoting Dr. Hiers' e-mail now:  "Here are

4    his responses to me.  One" -- and this is a quote now pasted

5    in through Mr. Roof's e-mail -- "I'm sorry, I just can't do

6    it.  I'm very depressed right now, and I feel sick.  Thank

7    you very much.  I'm sorry I haven't replied."  That was one,

8    right --

9    A. Yes.

10   Q. -- in the document?

11   A. Correct.

12   Q. And then there was a second one, another follow-up

13   response to Mr. Roof as follows:  "I know.  I believe you,

14   but I'm so depressed right now all I can do is sleep.

15   Everybody rejects me, and I have no friends, even though I'm

16   cool.  I'm just being wasted, and I can't take it.  I'm

17   sorry.  I'm going back to sleep now."  Correct?

18   A. Correct.

19   Q. Those were Mr. Roof's words in an e-mail according to

20   Dr. Thomas Hiers, correct?

21   A. Yes.

22   Q. And that appears nowhere in the report?

23   A. That's correct.  Obviously this is a long report.  I made

24   choices about what to put in and how much to put in about the

25   apparent difficulty with depressive feelings that he has had

BALLENGER - EXAMINATION BY MR. BRUCK

1    off and on.  At one point the -- and I can't remember whether

2    I put it this way in my report -- that it was a series of

3    diagnoses I think from 2009.  It was to rule out depression.

4    And that is when -- my sense of the depressive issues is that

5    he had a lot of problematic feelings.

6         The diagnosis of schizoid personality means he

7    doesn't do well with friends, didn't have many friends.  That

8    is clearly true about him.  That does not -- except for the

9    schizoid personality, does not rise to the level of a

10   diagnosis of depression.  I didn't think it was any more

11   pertinent to put in my report about his comment about being

12   depressed at the time Dr. Hiers contacted him and interacted

13   with him, except that I asked him in his IME, and I recorded

14   it there, that he frankly denied it.

15        In trying to -- depression also is not, in my

16   opinion, terribly pertinent to the competency evaluation, and

17   that's why I didn't --

18        THE COURT:  Could you explain that?

19        THE WITNESS:  Well, if you are depressed, it colors

20   your view of the world and of your future.  That's where it

21   might be pertinent.  But that you are in the -- in bed and

22   not able to get out in the six months prior to the crime --

23   crimes, um -- depression doesn't interfere with thinking to a

24   level where it interferes with your competence hardly ever.

25        And then we talk about competence to do what?  To

BALLENGER - EXAMINATION BY MR. BRUCK

1    stay on top of your business or to stay on top of your

2    studies, it does interfere with that.  But not competence to

3    stand trial.  And I had more than enough evidence in my IME

4    with him that he was not currently depressed.  And so the

5    pertinence of a past history of questionable undiagnosed

6    depression was not terribly pertinent, and so it didn't rise

7    to getting in the report any more than it did.

8              THE COURT:  Did you see symptoms of depression in

9    your three examinations with him?

10             THE WITNESS:  None at all.  In fact, I saw

11   evidence -- a lot of evidence that depression was not there.

12   He's sleeping well.  He's eating well.  He is able to

13   interact in a very affable way for three hours on three

14   different occasions.  I saw zero evidence of depression.

15             THE COURT:  Very good.

16             Please continue, Mr. Bruck.

17   BY MR. BRUCK:

18    Q. The date on this e-mail was February 26th.  Is that

19   correct?  The date on which Mr. --

20    A. I remember this.  Yes, it is -- I remember February, but

21   it's the 26th.

22    Q. Okay.  So it was not six months, but less than four

23   months before the crime, correct?

24    A. That's however many months it was.

25    Q. Okay.  And whether or not -- of course, the defendant is

BALLENGER - EXAMINATION BY MR. BRUCK

1    not a mental health professional.  If he is describing

2    himself as depressed, that could encompass a number of

3    different types of mental states which are distressing to

4    him.  Is that a fair statement?

5     A. Absolutely.  It's part of why the credence that you give

6    to his description that "I'm so depressed I'm in bed" could

7    be from multiple different causes, and so you have to take it

8    with the proverbial grain of salt.

9     Q. And some people who experience quite severe and serious

10   mental disorders could describe themselves in those terms if

11   they had no other information to go on, other than their own

12   term mental state?

13    A. Oh, absolutely.  Ranging from schizophrenia to a

14   hangover.

15    Q. Right.

16         THE COURT:  Mr. Bruck, we have been going now a

17   couple of hours.  Why don't we not have a marathon contest

18   here and take about a 15-minute break and give the witness

19   and the lawyers a little break.  And we'll be back in about

20   15 minutes.

21         MR. BRUCK:  Thank you so much.

22         THE COURT:  Thank you.

23         (Thereupon, there was a brief recess.)

24         THE COURT:  Dr. Ballenger, you can return to the

25   witness chair.

BALLENGER - EXAMINATION BY MR. BRUCK

1          MR. BRUCK:  It's okay.

2          THE COURT:  Okay.  Thank you.

3    BY MR. BRUCK:

4     Q. A couple of matters, Dr. Ballenger, that I would just

5    like to clear up before we proceed.  You -- I showed you our

6    e-mail exchange from earlier from last week, and you informed

7    me that I had sent the e-mail to the wrong address with an

8    aol.com address that you did not receive; is that correct?

9     A. It's the wrong address, and I -- on Friday I did not

10   receive any correspondence from you to my knowledge.

11    Q. Okay.  And I asked you whether that address was not the

12   one that you had texted to me earlier in the week to use to

13   get to you the -- any personality inventory testing that we

14   might be in possession of, and you said you didn't remember

15   that, or that you had not?

16    A. Well, the thing that caught my attention, you said that I

17   texted you.

18    Q. Right.

19    A. That's possible there could be a mistake in there.

20    Q. I'm going to hand you a document and ask you if that

21   refreshes your memory as to whether you sent to me that

22   e-mail address as the one to use for you.

23    A. Yes, I did.  As soon as I did, and I believe that, and

24   that is incorrect.  I am very sorry.

25    Q. Okay.

BALLENGER - EXAMINATION BY MR. BRUCK

1    A. I am very sorry.

2    Q. Very well.  I just wanted to make sure that --

3         THE COURT:  It was really a critical moment,

4    Mr. Bruck.  I wish we would focus on the issue of competency

5    here.

6         MR. BRUCK:  Your Honor, I am focusing on that, but

7    we are doing it through the lens of a report by this expert,

8    and everything that is relevant to his thoroughness, the care

9    in which he undertook this entire project, his bias, his

10   impartiality --

11        THE COURT:  I agree with all of that.  But get him

12   talking about the wrong e-mail address seems a little afield

13   to me, but go ahead.

14        MR. BRUCK:  Very well.  I'm done with that, Your

15   Honor.

16   BY MR. BRUCK:

17    Q. One other matter, you testified before the break with

18   respect to the Quincy Allen case, which you said is the only

19   time you have ever testified for a sentencing in a death

20   penalty case, correct?

21    A. I think that's correct.

22    Q. And the judge, as we've heard, criticized you for not

23   having -- for having done so without examining the defendant,

24   correct?

25    A. Yes.

BALLENGER - EXAMINATION BY MR. BRUCK

1    Q. And you explained before the break that the reason you

2    didn't do that is, and I quote, you were "very cleverly

3    blocked from examining" -- "Question:  You were very clearly

4    blocked from examining him?

5            "Answer.  Yes.  They found out when I was going to

6    be in California for four days and said he was only available

7    those four days."

8            That was your testimony?

9    A. Yes.  I would be glad to expand on that.

10           THE WITNESS:  May I explain, Judge?

11           THE COURT:  You may.

12           THE WITNESS:  The reason I didn't get to examine

13   Mr. Allen, I lost a friend over -- a friend of mine

14   questioned me about my up -- she had asked me to join the

15   defense team to try to help with that case, and I said, "I'm

16   sorry.  The prosecution just asked me a minute ago," and over

17   the course of the next ten days, or seven days, she asked me

18   when I was going to see the defendant, and I said I didn't

19   know.  It was going to be sometime I hoped in the next seven

20   to ten days.  "The only time I can't see him is I'm going to

21   California, and I can't get out of it for these four days."

22           I have -- the reason I lost my friend over this is

23   that I have no -- they would have had no way to know that

24   fact had she not told them, and then when I -- when the

25   prosecutor pushed for me to see Mr. Allen, the reply was from

BALLENGER - EXAMINATION BY MR. BRUCK

1    his defense team that I was only able to see him during the

2    period that I was in California, and that is --

3    BY MR. BRUCK:

4    Q. Memory about that better today or in 2005 when you were

5    on the witness stand in that case?

6    A. I don't know.

7    Q. You don't know?

8    A. I know the -- what happened, and I would be incredibly

9    shocked if I talked about that then and said anything

10   different.

11   Q. Well, I don't mean to shock you, but let's look at

12   this --

13   A. Okay.

14   Q. Does this appear to be the transcript of your testimony

15   in the Quincy Allen case?

16   A. Yes.

17   Q. Turn to page 2174 of the record, and if you would follow

18   along with me, and I would like to ask you if these were the

19   questions put to you on cross-examination in that case and if

20   those were your answers.

21           At the bottom of the page:

22           "Question:  All right" -- well, no.  Let me back up.

23   Line 16.

24           "Question:  Had you ever represented that you were

25   standing by on the phone waiting for the court to order the

BALLENGER - EXAMINATION BY MR. BRUCK

1    evaluation of Mr. Allen?  I mean, were you ready to do an
2    evaluation that week from Wednesday to Sunday at that time?
3            "Answer:  I told him I would do it as soon as I
4    possibly could.
5            "Question:  Did you tell them that you were going to
6    California Wednesday through Sunday?
7            "Answer:  I think so.
8            "Question:  All right.  Now, do you recall getting a
9    message from me that" --
10           That is Romanak, the defense attorney, who was
11   cross-examining you, correct?
12    A. I trust that is correct.
13    Q. All right.
14           -- "from me on February 23rd, the day after the
15   Court ordered that you be allowed to see Mr. Allen?
16           "Answer:  Refresh my memory a little bit if you
17   will, please.
18           "Question:  Do you recall getting a message from me
19   asking if there were any materials you wanted us to give you,
20   and also do you recall getting a message -- getting a message
21   that I was willing to help schedule a meeting with Mr. Allen
22   when you came down that week or the weekend?
23           "Answer:  Yes.  I do remember that.
24           "Question:  Yes, and did you ever call back in
25   response to that message?

BALLENGER - EXAMINATION BY MR. BRUCK

1       "Answer:  I did not.

2       "Question:  Did you have your secretary call back?

3       "Answer:  No.  My memory is not perfectly clear

4   about that, but I asked about seeing Mr. Allen to Mr. Nevers

5   and was unclear about scheduling that, and I could do it both

6   with my schedule and the implication up here as well, but

7   it's not entirely clear.  It was not entirely clear to me

8   from you that I could do it any time.  If I misunderstood the

9   message, that is my misunderstanding.

10      "Question:  And you didn't call back.  Is that

11  correct?

12      "Answer:  That is true.

13      "Question:  Now --

14      "Answer:  I was very busy."

15      Now, is that your testimony on cross-examination in

16  2005 in the trial of the *State of South Carolina vs. Quincy*

17  *Allen*?

18   A. That is part of it, yes.

19   Q. Right.  That is the part about your being -- about the

20  defense attempting to schedule with you a time to see

21  Mr. Allen?

22   A. Um, yes.  My understanding from the prosecutors were that

23  the only time I could see him were those four -- those four

24  days.

25   Q. All right.  One last thing very quickly about that, and I

BALLENGER - EXAMINATION BY MR. BRUCK

1    will move on.  Will you turn to page 2172 -- I'm sorry --

2    2171.  You may not be able to see the page, but -- page

3    number --

4     A. I think I've located it.

5     Q. Down -- two-quarters of the way down.  Question line 19,

6    were you asked and then you answered as follows:

7             "Question:  When were you first contacted about this

8    case?

9             "Answer:  About four or five weeks ago.

10            "Question:  So today is March 16th, so mid-February?

11            "Answer:  It may have been the very end of February.

12            "Question:  So as long as six weeks ago possible?

13            "Answer:  Yes."

14            Was that your testimony on that occasion?

15    A. It was.

16    Q. Very well.

17    A. It's entirely possible that I was contacted and then was

18    involved in the Christopher Pittman trial and then became

19    free, and I had two weeks to help with this case.  That's how

20    the two memories could jibe, could fit together.

21            MR. BRUCK:  If you will give me just a moment, Your

22    Honor.

23    BY MR. BRUCK:

24    Q. One last question or two about the e-mail with Dr. Hiers.

25    You say in your report that Mr. Roof denies that this entire

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

BALLENGER - EXAMINATION BY MR. BRUCK

1    episode ever took place, correct?

2     A. Correct.

3     Q. He says that Dr. Hiers -- did you say you know Dr. Hiers?

4     A. Yes.

5     Q. That Dr. Hiers must have invented the whole thing,

6    correct?

7     A. The defendant said that, yes.

8     Q. Yes.  That is his explanation for how this document --

9    this e-mail exchange existed, correct?

10     A. Yes.  He said a bit more, that maybe he did it and gave

11    it to the prosecution to use against him or something like

12    that.

13     Q. Maybe he did it and gave it to the prosecution to use

14    against him?

15     A. Or -- yeah.  That Hiers did that.  I think it's in my

16    report.

17     Q. Right.

18     A. The exchange.

19     Q. And do you find that credible?

20     A. No.

21     Q. So it's your conclusion him not telling the truth about

22    that?

23     A. That is the truth, and in part because of the picture

24    makes it clear.

25     Q. Right.  That if Dr. Hiers was sending his colleague an

BALLENGER - EXAMINATION BY MR. BRUCK

1    e-mail exchange that included Dylann Roof's photograph in

2    February of 2015, we can be very certain that it was for

3    real, correct?

4     A. I think so, yes.

5     Q. Correct.  And so what you are telling us is that in

6    denying this exchange that includes, as you have told us,

7    statements, expressions of mental, emotional, psychological

8    distress, Mr. Roof was falsely denying evidence that he

9    expressed?

10    A. I think he was doing what he was doing whole scale, which

11    is denying any evidence that he has any psychiatric

12    difficulty at all.  So there are two things in this e-mail

13    exchange:  One by his own admission he says, "I'm depressed

14    and in bed."  I don't think he wants that to go anywhere.

15    And then the other comments about -- the racism comments.

16    Q. Right.  And you were just saying -- did you use the word

17    "whole scale"?  He was denying this whole scale, evidence of

18    psychiatric distress or symptoms?

19    A. I did say that, and I sort of -- I mean that -- that

20    anything that he sees that would be indicative that he's

21    defective in any way is something he does not want to see the

22    light of day.

23    Q. Right.  And to a very great extent, a psychiatrist

24    depends on the honesty or forthrightness of a patient or a

25    client or interview subject to know what the person's

BALLENGER - EXAMINATION BY MR. BRUCK

1    internal mental state is, right?

2     A. Yes, but as you can see in this interchange, the

3    psychiatrist also has to deal with the fact that patients

4    don't always -- individuals don't always fully represent the

5    truth to the psychiatrist.

6     Q. Exactly.  So to a large extent, you have to depend on

7    Dylann Roof's willingness to share whatever symptomology or

8    distress he might be experiencing, but in this instance, you

9    have documentary evidence that he was expressing distress

10   anonymously to someone else in February of 2015, correct?

11    A. Yes.  The significance of that distress and what it was

12   is poorly captured by his few words.  It suggests he was

13   distressed.  I'm glad you are using the word "distressed"

14   rather than a clinical word like "depression."

15    Q. And even when you had documentary proof, you still deny

16   it?

17    A. Yes.

18    Q. And said that Dr. Hiers had made up or falsified the

19   whole thing?

20    A. Yes.

21    Q. Rather than, yes, he had sent these three e-mails?

22    A. Yes.  And it's in my opinion in my report that he's doing

23   that a lot, that he's denying your efforts to help him --

24   help him with mental health defenses.  Autism defenses, he's

25   denying that too.  More of the same.

BALLENGER - EXAMINATION BY MR. BRUCK

1    Q. Right.  Okay.  Now, also on page 10 --

2    A. Of?

3    Q. I'm sorry.  Of your -- excuse me.  Not there.  Bear with

4    me.

5         Now, I would like to ask you to turn to page 20,

6    please.

7    A. Of?  My report?

8    Q. Yes, sir.  I'm sorry.  Are you there?

9    A. Yes.

10    Q. And this is -- it's the end of the discussion that begins

11    on page 19.  I'm sorry -- it begins on page 17 of

12    "Interpretations of Psychological Testing," right?

13    A. Yes.

14    Q. And you are describing the results of two personality

15    assessment inventories, PAIs, and one of the MMPI, correct?

16    A. MMPI-2, yes.

17    Q. Now, this is not your department, is it?

18    A. No.  I'm not -- I have an undergraduate degree in

19    psychology, but I'm not a psychologist, and so that is why I

20    rely on Dr. Wagner.

21    Q. And that is why you asked that a psychologist come in to

22    both administer this testing and to interpret it, correct?

23    A. Correct.

24    Q. The -- and you relied on the interpretation that you were

25    given, correct?

BALLENGER - EXAMINATION BY MR. BRUCK

1        A. Yes.  And to some extent, my experience in that area and

2        the interactions we had back and forth about that.  But I

3        primarily rely on Dr. Wagner, and, secondarily, to the -- the

4        psychologist that Dr. Dietz used, Leslie Morey, and the

5        computer diagnoses and assessments that these tests generate.

6        Q. You write on page 20, "Similarly, the results of his two

7        PAIs" -- and you give the dates -- "were as to competence and

8        validity, also that the two PAIs were so similar to each

9        other, and to the MMPI-2, my not finding any evidence of

10       psychosis gives great confidence to the result."  That is in

11       your report, correct?

12        A. Yes, I would emphasize the words I said, that I would say

13       that the evidence of psychosis -- that my not finding any

14       evidence of psychosis gives great confidence in that result.

15        Q. Now, I appreciate that you are not a psychologist and

16       that this is not your field of expertise.  But are you aware

17       that many psychotic patients produce results that are within

18       normal limits on both the PAI and the MMPI?

19        A. I'm not familiar with that.

20        Q. You did not know that, or are not familiar with that?

21        A. I'm not familiar with that literature.

22        Q. All right.  Do you consider these test findings to be --

23       to eliminate the possibility that Mr. Roof has an emerging

24       schizophrenic spectrum disorder?

25        A. Well, nothing can block the possibility that something is

BALLENGER - EXAMINATION BY MR. BRUCK

1    emerging next year, can't do that at all.  I have confidence,

2    as does Dr. Wagner, and that's why I used the pronoun "our."

3    This paragraph comes directly from a conversation with him

4    that the confluence of the test being so similar on two

5    different occasions separated in time, both -- they are very

6    similar in that they have similar findings of no psychosis.

7            And then, secondarily, me as well, I'm confident

8    that there is no test evidence.  I found, as I said in my

9    report, absolutely no evidence of psychosis currently in the

10    defendant, nor any evidence of psychosis in his writings as

11    well.  The testing was so critical and part of why I asked

12    you if you had done it, is that the converse of what you said

13    a minute ago, that there are people who say they do not have

14    psychosis which is uncovered in psychological testing.  I'm

15    less aware of the converse, although I can imagine some

16    people can fake it, but it's difficult on two different

17    occasions on three tests to do that, and so it leads me to

18    use words like the overwhelming evidence is that he does not

19    have a current psychosis.  He has odd behavior as a child.

20    He has schizoid behavior prior to these events.  He had

21    difficulty making friends.  All of that is consistent with

22    the early history that people who subsequently have psychotic

23    problems, but it's just consistent.  There are lots of people

24    who have that history who aren't psychotic.

25            MR. BRUCK:  Very well.  If I may approach?

BALLENGER - EXAMINATION BY MR. BRUCK

1             THE COURT:  You may.

2    BY MR. BRUCK:

3    Q. I'm showing you a page from the DSM-5, which I assume you

4    recognize as an authoritative source in the field of

5    psychiatry?

6    A. I recognize it as an important source, yes.

7    Q. Do you agree or disagree with the statement that I have

8    highlighted:  "In some instances schizoid personality

9    disorder may appear as the premorbid antecedent of delusional

10   disorder or schizophrenia"?

11   A. I certainly don't disagree with that, and that is

12   essentially what I was saying a moment ago.

13   Q. Which is that if you -- schizoid personality in this case

14   could be the premorbid antecedent of either delusional

15   disorder or schizophrenia in Mr. Roof?

16   A. It could be.  It is of course more likely that it will be

17   the precedent of schizoid personality going forward; that it

18   will stay that way.  That's what it does in most instances.

19   This is -- the critical phrase pertinent to your point is

20   that this says "in some instances."  It does that, and that

21   is what I was saying people who have lonely, odd childhoods

22   and have difficulty forming friendships and so forth is a

23   very common prehistory of schizophrenia.

24             It is also possible, again, say, in one of the

25   teaching examples I use in teaching about schizophrenia, it's

BALLENGER - EXAMINATION BY MR. BRUCK

1    also true -- the example I use is someone who is so popular

2    he was president of a well-known university student body,

3    well-known university, immensely popular, very socially

4    skilled, and had a schizophrenic break in his senior year in

5    college.  So both histories are consistent with.  But, yes,

6    this is a true statement as I said before I showed it to you.

7     Q. Very well.  I would like to ask you some questions about

8    your interviews with Mr. Roof.  Do you consider recording

9    either by videotape or by audiotape the interviews that you

10   conduct?

11    A. I did and did not do that.

12    Q. And would you tell me why you did not do that?

13    A. It is not my practice to do that routinely.  It is a

14   consideration here.  Getting the ability to do that in the

15   time course that I had was somewhat challenging.  I had to

16   see him through a glass thing because he was up to -- and I

17   understand still refusing to see anybody in a room with a

18   table where you are literally in the same space.

19    Q. Let me ask you about that.  Why did he refuse that?  Do

20   you know?

21    A. I know what he told me which is that to be interviewed in

22   that room requires a strip search, which he didn't like, and

23   that during the strip search, they turned away but turned on

24   a camera, and he has concerns about where that camera's feed

25   might go and how far it might go.

BALLENGER - EXAMINATION BY MR. BRUCK

1    Q. And what are his concerns about where it might go and how

2    far it might go?

3    A. I don't know.  Just that he didn't want to be in his

4    skivvies broadcast to the larger world.  I left it at that.

5    Q. You left it at that.  You didn't ask him?

6    A. No.

7    Q. And as a result of whatever his rationale was, your

8    understanding was that he would not agree to a contact visit

9    because of the camera that is published?

10   A. That's my understanding, yes, and he had refused

11   everybody.

12   Q. Right.  Including defense counsel?

13   A. That's right.

14   Q. And we have to meet with him through the same screen that

15   you do?

16   A. Yes.

17   Q. And that is not an optimal setting for any sort of

18   interview, be it with counsel or with a mental health

19   professional, is it?

20   A. It's not optimal.  I find it to be better than I thought

21   it was going to be, but it's not optimal.

22   Q. It's hard to hear?

23   A. Yes.

24   Q. And Mr. Roof is very soft-spoken most of the time?

25   A. Yes.  He was accommodating, but if I couldn't hear

BALLENGER - EXAMINATION BY MR. BRUCK

1    something, he could come closer to the window and make it

2    clear what he had said, and that I would have to come closer

3    to the window on multiple occasions as well.

4    Q. Okay.  And do you know -- had you been made aware about

5    any issues he had with videotaping a mental health interview

6    in the past or with you?

7    A. No.

8    Q. And what issues did he have with that, if you know, and

9    how did you learn about these?

10   A. I just said I don't know.

11   Q. Oh, you don't know?

12   A. No.

13   Q. I understand.  Quite apart from Mr. Roof's preference,

14   you said that you don't normally audiotape or videotape

15   psychiatric interviews?

16   A. That's correct.  More at this point do I get audio or

17   videotape them.

18   Q. Is this the first court-ordered psychiatric interview you

19   have ever conducted?

20   A. No.

21   Q. How many others have you conducted?

22   A. Court-ordered by the judge, one.

23   Q. I should clarify.  I should narrow that.  Is this the

24   first court-ordered psychiatric interview you have ever

25   conducted in a criminal case?

BALLENGER - EXAMINATION BY MR. BRUCK

1    A. No.

2    Q. How many others have you conducted?

3    A. I think -- let me qualify.  I have done one other for a

4    judge that was ordered in that sense.

5    Q. For a judge.  So the defendant was ordered -- a criminal

6    defendant was ordered to submit to an evaluation by you by a

7    judge.  The order came from a judge?

8    A. Yes.  The judge had two opposite -- totally opposite

9    opinions from differing experts and requested some help with

10   a third.

11   Q. And the issue -- that was a criminal case?

12   A. Yes.

13   Q. And the issue on which the opposite expert -- opposite

14   opinions was what?

15   A. Was whether the criminal act was a product of a

16   psychiatric problem.

17   Q. Okay.  And how many years ago was that, if you remember?

18   A. I don't remember, but seven or eight, at least.

19   Q. In South Carolina?

20   A. Yes.

21   Q. All right.  And then this is the second such occasion?

22   A. I think so, where a judge specifically -- just a judge

23   hired me, yes.

24   Q. Now, you are a forensic -- board-certified forensic

25   psychiatrist?

BALLENGER - EXAMINATION BY MR. BRUCK

1    A. Yes.

2    Q. And that involves learning legal aspects of -- of mental

3    health evaluations as well as psychiatric.  Is that a fair

4    statement?

5    A. That is fair, I think.

6    Q. Are you aware that the American Bar Association mental

7    health standards for criminal cases recommends that any

8    court-ordered evaluation of a defendant be audio or

9    video-recorded for protection of the defendant?  Did you know

10   that?

11   A. I did not know that.  And part of my decision --

12   obviously, I was taking legal counsel from the judge, and he

13   did not suggest that or require that.

14   Q. Did you discuss that with Judge Gergel?

15   A. No.

16   Q. Okay.  So it never came up?

17   A. That's right.

18        THE COURT:  Mr. Bruck, let's be very candid about

19   this.  We know we had an episode of a prior expert, and the

20   defendant refused to proceed with audio or videotape.  We

21   conferred with counsel, and your client was quite adamant

22   about that, and you withdrew your request that it be audio

23   and videotaped.  And it was clear that that will be an

24   obstacle of getting an evaluation done.  That's the history.

25   Let's not mislead the examiner on this issue.

BALLENGER - EXAMINATION BY MR. BRUCK

1          MR. BRUCK:  That was not my intention, I wanted to

2     know whether -- the examiner's information about this, and

3     what his preferences were.  Thank you.

4     BY MR. BRUCK:

5      Q. Now, at many points in your report -- or some points in

6     your report, you noted the defendant, Mr. Roof, told you in

7     response to questions, "I can't talk about that," correct?

8      A. Correct.

9      Q. Did you write down or did you note in the report every

10    time that he said "I can't talk about that" in response to a

11    question?

12     A. I think probably so.  My way of doing these exams are to

13    take notes as we go along, take quotes as we go along, and

14    try to capture the flow of every sentence or every topic we

15    talked about.  And since this was such an important issue,

16    the "I don't know" or "I can't answer that," then I paid

17    particular attention in my interview and in my report to

18    that.  So I think I probably captured them all.

19     Q. Well, your report starts with the narrative of the

20    interview -- of the three interviews that you had with

21    Mr. Roof on page 20.  And the narrative -- does it not?

22     A. Yes.

23     Q. And ends on page 43.  So that is 23 pages.  They are not

24    single-spaced; they are not double-spaced.  I guess they are

25    somewhat in between, correct?

BALLENGER - EXAMINATION BY MR. BRUCK

1    A. They are literally one and a half spaces, and I'm

2    surprised my assistant didn't convert it.  This is what we

3    had when I was still writing, but . . .

4    Q. I see.  So 23 one and a half spaces would be roughly

5    somewhere around -- I don't know -- 14, maybe, single-spaced

6    pages?

7    A. I don't know.

8    Q. And is it your testimony that that summary includes

9    everything that Mr. Roof told you in nine hours of

10   interviews?

11   A. Of course not.  What I said was given the importance of

12   the "I don't know" response or "I can't talk about that" or

13   "I won't talk about that," I think I captured most, if not

14   all, of the things he said and what he was saying it in

15   response to.

16   Q. Okay.  And you note on -- and, of course, when he would

17   say, "I can't talk about that," would you engage him about

18   that?

19   A. Yes.  I would ask him in a nonconfrontive, not irritating

20   way through the first two and a half interviews.  He

21   commented in the third interview that he didn't like it quite

22   as much because I questioned a little harder, and it was

23   about this issue.  And I had told him in each of the three

24   IMEs that that was an important issue, and that he really

25   needed to talk to me about why he would not answer those

BALLENGER - EXAMINATION BY MR. BRUCK

1    questions.  And we returned to it again and again, but it was

2    in the third that I was about to no longer have the

3    opportunity to ask him, and so I asked him a little more

4    vigorously.

5    Q. So the first interview and the second interview and the

6    first half of the final interview, he -- when he would say,

7    "I can't talk about that."  He would stick to his guns,

8    correct?

9    A. Yes.

10   Q. And you, for those two and a half interviews, were not

11   able to get him to yield on things that he said, "I can't

12   talk about."  Is that -- that is my understanding of what you

13   are saying?

14   A. I would have to check when it was that he, in your terms,

15   yielded, when he actually finally explained why he was not.

16   Q. Now, your report reveals that Mr. Roof has a full scale

17   IQ of 125, and a verbal IQ of 141.  99.7 percent of the

18   population has lower than him.  Very bright young man?

19   A. Yes.

20   Q. He was capable of understanding that if he was trying to

21   present as psychologically healthy and normal, that

22   constantly saying "I can't talk about that" in response to

23   questions was working against that.  It raised suspicions?

24   A. Working against?

25   Q. That answering questions with "I can't talk about that"

BALLENGER - EXAMINATION BY MR. BRUCK

1  raised suspicions about his mental condition with you?

2   A. Well, if he didn't know that ahead of time, which I

3  suspect he did, I made it very clear that that was the

4  biggest problem about -- in my mind, after talking to him a

5  lot, is the biggest issue about whether or not he was in fact

6  psychotic.  Didn't use that word, but that he was --

7  potentially had some psychiatric problems.  That if he wanted

8  to convince me that he didn't, that he needed to tell me

9  that, and I even mentioned that that was one of the issues in

10  this hearing, that when he said the same thing to Judge

11  Gergel, that it raised issues for Judge Gergel.  Why would he

12  not answer it?  And it was even raised late in the hearing, I

13  think by you, that it was evidence that he was perhaps highly

14  delusional, or something like that, and so he knew well that

15  I really needed for him to tell me why he was saying that.

16  He ultimately smiled and said, after we had been back and

17  forth multiple times, "I'm just not -- I won't.  I will not

18  tell you."  That's the long and the short of it.

19   Q. Okay.  Some things -- let's see.  Page 27 the --

20   A. Give me a second, please.

21   Q. I'm sorry.

22   A. Thank you.  I'm there.

23   Q. Page 27, he tells you that, at the top of the page, that

24  he couldn't talk about something being wrong with his left

25  side.

BALLENGER - EXAMINATION BY MR. BRUCK

1    A. That's correct.

2    Q. And you pressed him several times.  And he said, "I can't

3    give clues either"?

4    A. Yes.

5    Q. He didn't deny that there was anything wrong with his

6    left side; he said he couldn't talk about it?

7    A. At another time he did deny that there was anything wrong

8    with his left side.

9    Q. And then he denied that he had ever said there was

10   anything wrong with his left side, correct?

11   A. I think that's right.

12   Q. And, in fact, you have documentary evidence that he told

13   many people that something was wrong with his left side.  The

14   testosterone had pooled on one side of his body and developed

15   his body?

16   A. I confronted him about that probably in the third

17   interview, that his doctor -- part of his doctor's visits to

18   his pediatrician, that it was an anxiety he had that he

19   reported years before.  And he still said -- and he made

20   light of it.  He was humorous about it.  But said, "No, there

21   is nothing" -- "I don't think there is anything wrong about

22   my left side."

23   Q. Even though you had a record that shows he did -- he had

24   had this idea in his mind two years before?

25   A. Yes.

BALLENGER - EXAMINATION BY MR. BRUCK

1    Q. Following on, on that same page, he, when asked about his

2    fear that his hair was falling out, he gave a very logical

3    answer that no one would like it, and, quote, "Everyone likes

4    a full, attractive head of hair," close quote.  That is the

5    answer to your question about whether he thought his hair was

6    falling out?

7    A. Well, I asked several questions, but, yes, that was his

8    answer.

9    Q. And did he deny that he had a fear that he was losing all

10   of his hair or going bald?

11   A. I saw that in the record.  I don't think I asked him that

12   question directly because he had said this before.  He said

13   this early on in our interaction.

14   Q. Said what?

15   A. That he said anybody would be concerned, that they were

16   worried about their hair.  Everybody likes to have pretty

17   hair or attractive hair.  And so as you know in your

18   experience with him, keeping him cooperative with you and not

19   refusing to talk further requires some subtlety and some

20   being careful about how you say things and what you say.

21   So --

22   Q. And what you say, you have to be careful about what you

23   say, right?

24   A. Yes, I think -- yes, that's true.

25   Q. And there might be topics that he would find so adversive

BALLENGER - EXAMINATION BY MR. BRUCK

1    that if you pressed him, he would stop talking to you, too,

2    right?  That was a concern?

3    A. That was a concern.

4    Q. So you had to be careful, not only how you asked him, but

5    what you asked him, right?

6    A. Yes, as I do in every psychiatric interview, but, yes,

7    and particularly with him, because I understand he has at

8    times refused to both answer questions and refused to

9    continue talking.

10    Q. Okay.  But you knew from the jail records that he had

11    expressed concern to the jail over and over and over again

12    that his hair was falling out to the medical staff at the

13    jail, correct?

14    A. I saw some reference to that.

15    Q. I'm handing you what will be marked -- what we will offer

16    as Defendant's 7, and ask you if these are the jail records

17    that you --

18    A. They are jail records.  I obviously get thousands of

19    pages.  Not jail records, I mean from all.  But I can't

20    confirm that I've seen these.

21    Q. Well, let me just walk you through --

22    A. Okay.

23    Q. If you could hand that back to me, please.

24            MR. BRUCK:  We offer this as Defendant's 7.

25    Q. Doctor, if you could turn to D03962?

BALLENGER - EXAMINATION BY MR. BRUCK

1    A. 962?  Yes, I'm there and reading what you are referring

2    to.

3    Q. Okay.  Bottom of the page, tell me if the record reflects

4    the following assessment note to the medical staff:  "Patient

5    is requesting his thyroid levels to be checked.  Patient

6    reports being diagnosed with Hashimoto's disease

7    approximately one year ago.  Patient states his hair has been

8    falling out more than usual, and he washes it one time a

9    month.  Patient states that he may be stressed."  That was on

10   the record 9-27-2015?

11   A. Yes, and there was no obvious bald spots or hair loss.

12   Q. Then we go on to three, four pages.  Please look at

13   D03967.  Note that 10-6-2015 --

14   A. "Patient notes that the hair started falling out."

15   Q. Yes.

16   A. "Lost weight.  Dehydrated."

17   Q. And then on -- it's a little hard to read.  4231?

18   A. 4231?

19   Q. It's 04231.  Yes.

20   A. Mr. Bruck, I don't have anything that is in the 4s.

21   Q. It -- oh, okay.  Excuse me.  This is another divider.

22         I'm going to ask you if you would -- also saw this

23   record from Carolina Center for Occupational Health.  What's

24   the date of that?

25   Q. The date is October -- on November --

BALLENGER - EXAMINATION BY MR. BRUCK

1      A. 2015?

2              MR. BRUCK:  Yes, and I'm going to offer this as

3      Defendant's 8.

4              THE COURT:  First of all, you are offering

5      Exhibit 7.  Is there any objection?

6              MR. RICHARDSON:  No objection.

7              THE COURT:  Defendant's 7 is admitted without

8      objection.

9              (Thereupon, Defendant's Exhibit 7 introduced into

10     evidence.)

11             THE COURT:  The defendant is offering Exhibit 8.  Is

12     there any objection?

13             MR. RICHARDSON:  We haven't seen these.  Just give

14     me one second.

15             THE COURT:  Okay.

16             MR. RICHARDSON:  No objection, Your Honor.

17             THE COURT:  Defendant 8 admitted without objection.

18             (Thereupon, Defendant's Exhibit 8 introduced into

19     evidence.)

20     BY MR. BRUCK:

21      Q. Can you find now 0404231 in that -- what is now marked as

22     Defendant's 8?

23      A. Yes, sir.

24      Q. Okay.  The impression plan at the bottom of the page

25     includes the statement "Patient notes continuously that his

BALLENGER - EXAMINATION BY MR. BRUCK

1    hair is falling out when he washes his hair, says that the

2    sink is full of his hair.  Upon exam today, including

3    vigorous combing with lice comb, there is absolutely no hair

4    loss, exclamation point."  And the word "no" is capitalized,

5    right?

6    A. Yes, I did see this.

7    Q. And that "no," of course, was written by the medical

8    professional to whom the complaint was being made, correct?

9    A. Correct.

10   Q. All right.  So just to -- the jail records do contain

11   statements that he was continually complaining that his hair

12   was -- that he was losing his hair?

13   A. Yes.

14   Q. And -- but you did not -- and you asked him about his

15   fear of -- his concern about losing his hair, and he said,

16   "Anybody would like to have a full head of hair," right?

17   A. Yeah.

18   Q. And you described that as -- on page 27, about one-third

19   of the way down, a very logical answer?

20   A. Which it was a logical answer.

21   Q. Right.  Okay.  And the follow-up question would have

22   been, "Do you think that your hair is all falling out?"

23   A. I already knew he thinks his hair is falling out because

24   I had read this.

25   Q. You knew that?

BALLENGER - EXAMINATION BY MR. BRUCK

1    A. Yes.

2    Q. Okay.

3    A. So his was a characteristically humorous, logical answer

4    of could be translated "I'm not going to tell you about that

5    either."

6    Q. So he was -- now, what is a somatic delusion?

7    A. It's a delusion about some part of one's body, or the

8    functioning of one's body.

9    Q. A false belief, correct?

10   A. Yes.

11   Q. Focused on one's own body?

12   A. Yes.

13   Q. And somatic delusions can be symptoms of schizophrenia

14   spectrum disorders among other disorders, correct?

15   A. Among other disorders, yes.

16   Q. Okay.  So it's an important thing to explore?

17   A. Yes.  And I certainly did.

18   Q. You certainly did.  How did you explore the question of

19   whether his hair was falling out?  First of all, did you see

20   any evidence yourself of hair loss?

21   A. Absolutely not.

22   Q. All right.  And you had jail records that said that the

23   jail had looked for it, too, and very emphatically found that

24   he was not losing his hair?

25   A. Yes.

BALLENGER - EXAMINATION BY MR. BRUCK

1    Q. And yet he complained month after month that he was?

2    A. Yes.

3    Q. What did he say to you about losing his hair, or did you

4    ask him whether he was still losing his hair?

5    A. I did not specifically ask him, push him after he made so

6    clear "I don't want to talk about that" and did it in the

7    particular way that I have characterized in the report.  I

8    did not ask, as you can imagine, "You mean you are denying

9    this?"  You mean that, you know, that is great.  You can

10   imagine what would have happened after that.  And you are

11   well aware of that.  I didn't leave it there, though, and I

12   in the third interview pushed him about, when he did allow us

13   to talk about his social anxiety and did admit that he was

14   anxious and then considered treatment, and that he even asked

15   me would treatment work for a social anxiety.  And I told him

16   it would probably.  And then I went back to the issue about

17   these somatic delusions or strongly-held incorrect feelings

18   about one's appearance.

19        And there is a whole diagnostic criteria called

20   "body dysmorphic disorder."  Classically people think their

21   nose is too big, and they get surgery as many times as they

22   can.  It's really a strongly held belief or a delusion, but

23   it's the only thing that they are deluded or very, very

24   incorrect about.  It's an anxiety-related obsession, an

25   OCD-related-type disorder.

BALLENGER - EXAMINATION BY MR. BRUCK

1    And I told him since he was admitting that he was

2    anxious, I said, "A lot of my anxious patients tell me about

3    distortions that they believe about their nose or their

4    forehead, and this sounds like that to me."  An invitation --

5    a confrontation, but an invitation to tell me about that.

6    And he essentially said, "No, that is not me.  That

7    doesn't have anything to do with me."

8    Q. And you had a wealth of information, or did you, that he

9    has had a belief that his forehead is unsightly and has to be

10   covered up and people mustn't see it?

11   A. I had that -- a lot of information from you and your

12   team.  I also had the things in his records about his anxiety

13   about his left side, his anxiety about his hair falling out.

14   And so I was aware certainly, and that -- that is an

15   important issue because if there is somatic delusions, as you

16   said, that has implications that maybe he's going to become

17   schizophrenic.  Maybe he is secretly now.  And it has those

18   implications.  That was part of why I had to deal with this.

19   And it was the -- the two things that are most

20   suggestive of psychosis in my opinion of the defendant are

21   these body distortions and his refusal to answer questions

22   about these kinds of things, about his mental health issues.

23   And I satisfied myself when he made it clear that the

24   reason -- finally made it clear that the reason he didn't

25   want to admit to anything of a mental health nature or autism

BALLENGER - EXAMINATION BY MR. BRUCK

1    was that he in the post-revolution white nationalist war,

2    that he did not want to have any negative opinions out there

3    about him that would lead him to people -- people to conclude

4    that he was defective in any way because he would not do

5    well, he believes, in that universe, which is what he

6    believes is going to happen, what he certainly hopes is going

7    to happen, and he wants his reputation to be of a hero who

8    started it.  And is not somebody who did it because of the

9    mental disorder or had any suggestion or was written anywhere

10   that he did.  He finally made that very clear.

11    Q. Okay.  So have you determined through your own

12   evaluation, from whatever source, that Mr. Roof has, in fact,

13   had a somatic delusion about the appearance of his forehead?

14    A. It is my working hypothesis that he does have these

15   phenomena, whether they are extreme health anxiety, which is

16   my favorite hypothesis, or are they delusions, or is it a

17   body dysmorphic kind of distortion.  The reason I put that

18   it's a health-related anxiety is his consistency with the

19   other anxiety disorders that he has, and he has the same

20   behavior about his thyroid problem.  He went again and again

21   and again to the doctor saying, you know, do this.  He got

22   lots of different -- got the doctor to order lots of normal

23   thyroid function tests.  It is an obsessionally anxious thing

24   that he kept asking the doctor about, about my left side,

25   about my thyroid, about my hair falling out.  It is in the --

BALLENGER - EXAMINATION BY MR. BRUCK

1    one of the diagnostic possibilities is that it's a

2    health-related anxiety related to the social anxiety that he

3    clearly has.  And he himself says, "I have a lot of anxiety."

4    So he's also been given the sort of nonspecific anxiety

5    disorder of anxiety disorder NOS, not otherwise specified.

6    Q. Did you ever ask him about photographs of his face they

7    were taking at the jail, and whether he was -- whether he had

8    any concern about those being admitted into evidence?

9    A. Quite pointedly.  I asked him about them.  I said,

10   "People say that you didn't press charges because you don't

11   want those photographs used, that -- did you mind it when the

12   correctional officers made you pull your hair up to expose

13   all the cuts on your forehead?  And would you have any

14   problem with them being shown in court?"

15           And he said, "No, no, no, no, no.  I have no problem

16   at all.  That's not why I didn't press charges.  And I don't

17   have any problem with photos being shown of me."

18           Now, I'm skeptical of that.  But that's what he

19   said.

20   Q. Why are you skeptical?

21   A. Because of all of the smoke that he is, in fact,

22   reluctant to be photographed.

23   Q. Did you pursue that -- you have the photographs in

24   question, don't you?  We provided you --

25   A. Yes.

BALLENGER - EXAMINATION BY MR. BRUCK

1    Q. Did you show him these photographs and said -- and ask

2    him, "Would you mind if I made these an exhibit in court for

3    the judge to see?"

4    A. No.  His answer would be, "Absolutely not.  Go ahead."

5    That's what I believe he would say.  And, no, it was way too

6    confrontational for me to do that.

7    Q. You had to back off?

8    A. Yes.

9    Q. And know your limits there?

10    A. Know his limits.

11    Q. Know his limits.  Exactly.  And when you back off of

12    necessity, you are giving up information -- or a chance to

13    get information that you would like to have, that you may not

14    be able to get, right?

15    A. Yeah.  If I ran roughshod over him, I would get less

16    information than I did.  So --

17    Q. Of course.

18    A. -- the technique I used was to get the maximum that I

19    believed I could, increasing the vigor with my pursuit in the

20    third interview.

21    Q. A little like walking on eggshells?

22    A. It's like juggling eggs, I think.

23    Q. You have to be very careful?

24    A. Yes, you have to be smart about who you are talking to.

25    Q. Okay.  By the way, he described himself as a sociopath,

BALLENGER - EXAMINATION BY MR. BRUCK

1    right?

2    A. That he might be.

3    Q. And --

4    A. His evidence was just that he uses people, and he doesn't

5    really care about them.  That was his sum total of -- I asked

6    him, "Have you ever been arrested?"

7         He said, "Well, yeah, for one trespassing, and one

8    Suboxone."  He doesn't have the history of a sociopath.

9    Q. He falls very, very far from DSM definition of antisocial

10   personality?

11   A. There is no evidence.

12   Q. No evidence of --

13   A. Except for the crimes he's charged in this.

14   Q. And you don't diagnose antisocial personality disorder on

15   the basis of one crime, no matter how terrible?

16   A. No.  It is a pattern.

17   Q. It is a pattern.  And he does not have a pattern?

18   A. He has not shown that pattern.

19   Q. He told you the Judge liked him?

20   A. Yes, he did, that he thought the Judge liked him.

21   Q. Okay.  And he based that on?

22   A. Because he was nice to him, I think.

23   Q. Because the Judge was nice to --

24   A. To the defendant.

25   Q. To Dylann.  You said that he was laughing and smiling

BALLENGER - EXAMINATION BY MR. BRUCK

1    throughout the interview?

2     A. All three.

3     Q. All three.

4     A. All through them?  In all three --

5     Q. All three, I'm sorry.

6     A. -- interviews, his approach was affable, frequently

7    humorous, genuinely humorous, and he laughed on multiple

8    occasions, chuckled, laughed.  He was friendly.

9     Q. Okay.  You asked him about whether he had obsessions with

10   his clothing, and he completely denied that?

11    A. He did.

12    Q. And that was something that his defense team had

13   described to you in some detail?

14    A. Yes.

15    Q. You were given seven videotapes by the prosecution to

16   review, correct?

17    A. Um, those from the jail interviews?

18    Q. The jail interviews.

19    A. Those were also -- I was not able to get through all of

20   those.

21    Q. How many did you review?

22    A. The first half of the first one.  We had technical

23   difficulties also with the audio.  We couldn't do those,

24   either.

25    Q. Did you credit his statement that he did not have

BALLENGER - EXAMINATION BY MR. BRUCK

1  obsessive fixations about his clothing?

2   A. I'm not sure what you mean by "credit."

3   Q. Did you believe him, his denial?

4   A. I really couldn't, um, decide for sure.  My suspicion was

5  that -- you had reported in great depth.  What was evident to

6  me was that he favored coming to court in his jail suit.  We

7  talked about that.  And that was about as far as the

8  confrontation about that went after he frankly denied it and

9  blamed it on you for not letting him -- not cleaning his

10  sweater.  He had a nice fantasy of what he would like to wear

11  to court, which is a blue suit with a white shirt and a white

12  tie, but said nobody would buy that for him, and it probably

13  wouldn't fit anyway.  But he liked the idea.

14   Q. And do you know whether his -- by the way, what is he

15  wearing in court today?

16   A. He's wearing his jail suit.

17   Q. Wearing?

18   A. His jail suit.

19   Q. And did he tell you that he likes his jail jumpsuit?

20   A. I don't know that he did.

21   Q. He didn't tell you that?

22   A. He may have said it's comfortable.  But he didn't make a

23  big deal of that.

24   Q. And did he tell you that he initially wore his jail

25  jumpsuit to the beginning of jury selection and then later

BALLENGER - EXAMINATION BY MR. BRUCK

1    changed into civilian clothes and then the following day

2    during another day of jury selection came back in the jail

3    jumpsuit all against the advice of his lawyers?

4     A. I think you guys told me that.

5     Q. We told you that?

6     A. Yeah, I think so.

7     Q. Did you ask him about that?

8     A. No.  One other thing that I learned, that I put in my

9    report is that in the back-and-forth about trying to figure

10   out about whether or not he, in fact, has issues about

11   clothing beyond what I knew, at one point he settled on that

12   he liked or favored wearing his jail suit, smiled, and

13   made -- left me with the impression that it was a conscious

14   decision he was making.  Just that, an impression, but I was

15   left with his frank refusal to admit to any difficulties with

16   clothes, except he liked clean clothes and couldn't get

17   beyond that.

18    Q. Now, on page 32 of your evaluation, if you will turn to

19   that, the end of the first paragraph on that page -- tell me

20   when you are there.

21    A. I'm there.

22    Q. You write that Mr. Roof, quote, "feels he has been

23   tricked by his attorneys because he shouldn't have trusted

24   them and probably said too much to previous experts.  And

25   wonders if he should trust me."  He told you that?

BALLENGER - EXAMINATION BY MR. BRUCK

1    A. Yes.

2    Q. Did you ask what he said to previous experts that he now

3    thinks he shouldn't have said?

4    A. No, I didn't pursue that line.

5    Q. Wouldn't it be interesting to know?

6    A. There a lot of things that might be interesting, but I

7    didn't pursue that.

8    Q. Did he ever suggest that the things he told previous

9    experts that he shouldn't have said were untrue?

10   A. No.

11   Q. I mean, tell me if I'm wrong, but the implication of this

12   statement is that he is telling you that he acknowledged too

13   much about what was really going on with him in the previous

14   experts and wishes now that he hadn't, right?

15   A. Well, yes, but I don't draw any inferences or

16   speculations about what it was he said that he shouldn't.

17   Q. Right.  And the only way you can find that out would have

18   been to ask him, right?

19   A. Right.

20   Q. He may have told you, and he might not?

21   A. That's right.

22   Q. One thing is for sure, if you don't ask, he's not going

23   to tell you.

24        MR. RICHARDSON:  Objection.  At least let him answer

25   the question.

BALLENGER - EXAMINATION BY MR. BRUCK

1          THE COURT:  Mr. Bruck, give him a question.

2          THE WITNESS:  It's obvious that I had to make

3    hundreds, if not thousands, of choices of what roads I was

4    going to go down.  And I chose the ones that I thought were

5    the most efficient to get my task done, which was to try to

6    help the Court about whether or not he's competent to stand

7    trial at this point.  That was not -- you know, that seemed

8    much more trial issues, not my issues.

9    BY MR. BRUCK:

10    Q. So you've told us about the issues that you probed on and

11    got the response "I can't talk about that" during the two and

12    a half sessions, and you've told us about the issues that you

13    avoided raising with him or pressing because of your

14    professional judgment that it might backfire or shut him

15    down, right?

16    A. Some of them.

17    Q. Some of them.  Tell me about some others.  Do you recall

18    any other issues that you felt you had to tiptoe around --

19    not tiptoe around, but avoid?

20    A. None come to mind right this minute, because -- none come

21    to mind right now.  We talked about the big ones.  Pushing

22    him on whether or not there was any evidence of mental health

23    problems was the big one.  Pushing him too hard -- too hard

24    on his somatic delusions, pushing -- or pushing him too hard

25    on his defense of saying, "I'm sorry.  I don't want to," or

BALLENGER - EXAMINATION BY MR. BRUCK

1     "I'm not going to talk about that."

2      Q. Now, many mentally ill people who have delusions really

3     cling to those delusions, don't they?

4      A. Well, you know that delusions are fixed, which means no

5     evidence to the contrary, they believe it no matter what

6     evidence you might present to them.  They believe it in that

7     they are right and you are wrong.

8      Q. Right.  But they believe it in a -- in a way that can be

9     almost desperate in its intensity.  Is that something that --

10     A. I wouldn't use that word.

11     Q. Well, let me -- I mean, you know, some people believe

12     that the Cubs were a better baseball team than the Cleveland

13     Indians.

14     A. They have proof.

15     Q. They believe it strongly -- I'm sorry?

16     A. They have proof.

17     Q. And they believe it strongly, but it's not a delusion,

18     and even if they had lost the World Series in the fifth game,

19     it wouldn't have been a delusion that people think that.

20     Delusions are things that are held that the mind creates in

21     order to hold someone together against distress that would

22     otherwise be unbearable.  Is that a fair lay description of

23     the function of a delusion, or can it be?

24     A. Well, yeah, when you start to try to say the function of

25     a delusion, you are on thin ice.  Delusions are certainly the

BALLENGER - EXAMINATION BY MR. BRUCK

1    product of a psychiatric condition.

2     Q. Yes.

3     A. True delusions, as are body dysmorphic, we haven't really

4    quite settled on the right word because delusion has so many

5    connotations of psychosis, but the beliefs that people have

6    that their body part is distorted are held with the same

7    stubbornness, rigor.  Yes.

8     Q. Now, you've told us that at the end of in the last half

9    of your final interview, he finally explained why he couldn't

10   answer what question?  You said there was this sort of

11   break-through, as you've described it, and tell us about that

12   again.

13    A. Well, the focus of the previous two to three of our

14   interviews, the main was about his oft repeated "I can't" --

15   when the inquiry by me, you, the Judge, anybody got to a

16   point where he didn't want to answer, he would say, "I don't

17   know" or -- what he finally explained to me -- partially

18   explained before when he said, "I get to that point, and I

19   might have to lie to answer it, to not answer it was the

20   conclusion I probably drew." Why are you not answering the

21   question.  He would have to lie and he didn't like to do

22   that.  That makes him uncomfortable.  So he doesn't want to

23   do that.

24         That was a partial introduction to his then

25   explanation that he really just doesn't want to admit

BALLENGER - EXAMINATION BY MR. BRUCK

1    anything that is of a mental health nature, autism, a defect,

2    something where he's not pure kind of idea.  And so he says

3    he's just -- and he doesn't -- and reaching back to some of

4    the other interviews, it made sort of clear why he doesn't

5    want anything written down, why he was concerned about what I

6    would say in my report.  That -- but the answer to "Why do

7    you many times say, 'I don't know?'" which I went after

8    because I thought it might be that he had a psychotic

9    delusion behind that, that -- but, no, was he wanted to keep

10   his reputation in the new post-war pure so that he could be

11   well thought of.  He frankly, very cleverly, joked about the

12   notion that -- that -- about those kind of things, the things

13   that -- proposed reasons why he wouldn't fully answer various

14   things.

15   Q. Okay.  And so your discovery after almost nine hours of

16   interviewing was that if he was depicted in court as having

17   autism, autism spectrum disorder, or psychosis, or even

18   severe anxiety disorder, that that would have implications --

19   adverse implications for his standing in a post-revolutionary

20   white nationalist society that he expects to come to pass

21   very soon?

22   A. That was his revelation, yes.

23   Q. That was his revelation.  And let me ask you a little bit

24   about this revolutionary movement.  Who, according to him, is

25   in this revolutionary movement?

BALLENGER - EXAMINATION BY MR. BRUCK

1    A. I don't -- I don't know the answer to what he thinks
2    about who is in it.  He believes in this white nationalist
3    across the globe.
4    Q. Okay.  And did you ask him who the people are that are
5    going to take over the government under this white
6    nationalist revolution?
7    A. He told me -- to the extent he told me that it will be
8    the leaders of that armed revolution that will be the
9    leaders.
10    Q. Right.  But my question is, who are they according to
11    him?
12    A. I don't know the answer to that.
13    Q. You didn't ask him?
14    A. No.
15    Q. Did you ask him how many of these people he's ever met in
16    his life?
17    A. I had had collateral information about that, that from
18    various friends and testimony in various different ways that
19    he really had not had any contact with the white nationalists
20    movement; that he actually reached out to a friend and asked
21    him if he knew any skinheads because he wanted to meet some
22    and he wanted to join a group.  His father commented that he
23    asked his father to watch a TV show about skinheads and to
24    watch it together.  But it seemed to me pretty clear that he
25    did not have any contact with anybody, from multiple sources.

BALLENGER - EXAMINATION BY MR. BRUCK

1    Q. Okay.  As a matter of fact, the friend that he reached

2    out to was somebody he hadn't seen -- who he knew from middle

3    school.  He and his mother moved back to Columbia, right?  A

4    guy named Nolan Byrd, do you recall?

5    A. I remember that name.

6    Q. Right.  And Nolan Byrd had not heard from Dylann Roof for

7    years until he received a message on Facebook out of the

8    blue?

9    A. Yes, that's my understanding too.

10   Q. Asking him if -- a bunch of questions that Mr. Byrd found

11   extremely weird, including where could he meet up with

12   some -- with skinheads, and of course --

13   A. I don't know about that.

14   Q. -- he says he didn't.

15   A. He says it was out of the blue.  He hadn't seen him for

16   years.

17   Q. And he found the entire exchange very, very odd, correct?

18   A. Yes.

19   Q. All right.  Did -- okay.  So Mr. Roof's friends have said

20   that as far as they could tell, he didn't know any of these

21   people that were wanting to bring about the white nationalist

22   armed revolution.  Did -- is there any evidence that he ever

23   communicated with any such people? -- I mean, communicated in

24   a two-way communication online?

25   A. I'm not aware of that.  All I'm aware is the one way off

BALLENGER - EXAMINATION BY MR. BRUCK

1    the Internet, that Daily Stormer report, and some radio guy

2    that he listens to, and then the broad Internet and so forth.

3    But, no, that's part of why all of that cumulative evidence

4    is really the basis of my diagnosis of a schizoid disorder.

5    He's had very few relationships that -- has an odd aspect to

6    certain of those relationships.

7     Q. Okay.  Is it a feature of schizoid personality disorder

8    that someone would sacrifice their welfare and, indeed,

9    possibly their life in service of a revolutionary movement

10   that he has no actual evidence exists?

11    A. Well, you distracted me by your last comment.  He has

12   to -- his belief plenty evidence that it exists, that the

13   radio -- that this whole rhetoric --

14    Q. And the radio is --

15          MR. RICHARDSON:  Objection, Your Honor.  Just ask

16   that the doctor be allowed to finish his answer.

17          THE COURT:  Absolutely.

18          MR. BRUCK:  It's now 1:00.  I don't know what the

19   Court's pleasure is.

20          THE COURT:  I'm going to go another 15 minutes if

21   that's okay.

22          MR. BRUCK:  I didn't want to keep going as I had

23   before without noting the time.

24          THE WITNESS:  So the first part of that question

25   again is?

BALLENGER - EXAMINATION BY MR. BRUCK

1    BY MR. BRUCK:

2     Q. Is it a symptom or a characteristic feature of schizoid

3    personality disorder that somebody would risk their future

4    and possibly their life in service of an armed revolutionary

5    movement of which he has no actual contact or direct

6    knowledge?

7     A. Again, the direct knowledge, he's listening every day.

8    He's following this.  To my knowledge it's not inconsistent,

9    but it's not a regular feature of a schizoid personality.

10     Q. The radio program, that's Michael Savage?

11     A. That sounds familiar.

12     Q. He named the radio program as one he listens to in jail,

13    correct?

14     A. I think that is right.

15     Q. And that is a nationally syndicated, very conservative,

16    top radio program.  It's heard all over the country?

17     A. I assume that is right.  I have been told that.

18     Q. Do you know whether Mr. Savage advocates the armed

19    takeover of the United States by revolutionary white

20    nationalists?

21     A. I do not know.

22     Q. You don't.  You state at page 47 -- let me make sure.

23    Page 43, please.  This is the beginning of your analysis of

24    the evidence concerning competency.

25     A. I'm there.

BALLENGER - EXAMINATION BY MR. BRUCK

1    Q. Middle of the page, "In the analysis of whether the

2    defendant has a mental disease or defect, it appears that

3    there are two possibilities:  The first possibility is that

4    he has a quiet psychotic disorder without a formal thought

5    disorder, which is exceedingly greater."  The term "quiet

6    psychotic disorder," is that a term that is found in the DSM?

7    A. No.

8    Q. That's a term that you use?

9    A. Yes.  It seemed appropriate to the discourse of the

10   questions that swirl in this case.  I'm sorry.

11   Q. And by -- so it's not a psychiatric term?

12   A. No.  What I -- what I meant, I could have better used an

13   "unobserved" or "unrecognized, almost unseen."  Nobody in the

14   proceeding so far has seen overt evidence of psychosis.

15   Q. Unless he has psychotic delusions of the -- such that we

16   have been discussing most of the morning, and they are, in

17   fact, delusions and -- that we have observed?

18   A. Yes, but you go to the DSM and the schizophrenia, and

19   don't look in the criteria.  Look for just somatic delusions,

20   and you will see they are a small part of the diagnosis of

21   schizophrenia.  So they are consistent with, but don't prove

22   schizophrenia, as your own experts you tell me say he does

23   not currently have schizophrenia; that he might develop it in

24   the future.

25        You also told me that he doesn't have a formal

BALLENGER - EXAMINATION BY MR. BRUCK

1    thought disorder, and I agree with that. You sit with him,

2    you don't see or feel any of the psychotic -- any evidence of

3    psychosis.

4    Q. Let's slow down for a minute, if we could.

5            MR. RICHARDSON: Your Honor, again, can he please

6    finish his answer?

7            THE COURT: Yeah. Mr. Bruck, you really are -- I

8    know you are trying to get moving to get a certain answer,

9    but let the doctor finish because it's an important part of

10    his testimony.

11            MR. BRUCK: I'm sorry.

12            THE COURT: Go ahead.

13            MR. BRUCK: Proceed.

14            MR. RICHARDSON: Your Honor, I ask the court

15    reporter to read back where he was in his answer. It's an

16    attempt to interrupt his thought process.

17            THE COURT: I don't think that is right, Mr.

18    Richardson. Let's see. If the doctor needs it, I'll be glad

19    to have that.

20            THE WITNESS: It did interrupt my thought process.

21    I'm sorry. It would be useful to me.

22            THE COURT: Okay.

23            MR. BRUCK: I apologize, I should say in my own

24    defense that the doctor was using terms that I thought would

25    be helpful to define.

BALLENGER - EXAMINATION BY MR. BRUCK

1        (The last question was read.)

2        THE WITNESS:  And so as I remember your question, it

3    has to do -- but wait a minute.  The somatic delusions, don't

4    they prove a psychotic process is going on?  And my answer

5    is, no, they do not.  They are consistent with a psychotic

6    process, or even a schizophrenic process if they are, in

7    fact, delusions instead of anxious health concerns or body

8    dysmorphic-type distortions, and to my mind we don't know

9    which of the three of those they are.  And I don't favor the

10   delusion of the three possibilities.  That's my third

11   possibility.

12   BY MR. BRUCK:

13    Q. All right.  And I take it that you have dismissed the

14   idea that there could be a delusional quality to Mr. Roof's

15   belief in the impending white nationalist violent

16   revolutionary takeover of the United States?

17    A. I don't dismiss it, but I think it's very unlikely.

18    Q. Okay.  You said on page 45 --

19    A. I'm there.

20    Q. Are you there?

21    A. Yes.

22    Q. Near the top of the page, "Perhaps most importantly, this

23   examiner and Dr. Wagner experienced none of the so-called

24   praecos feeling" -- am I pronouncing that correctly?

25    A. Yes.

BALLENGER - EXAMINATION BY MR. BRUCK

1    Q. "The first description of schizophrenia is dementia

2    praecos."  Tell me about this and why is it most important?

3    A. The defendant's demeanor and presence and way of relating

4    to me and Dr. Wagner is so opposite to the praecos feeling,

5    that kind of signs of schizophrenia which are present when

6    you are with a person with schizophrenia.  There are

7    symptoms, say, I hallucinate, I see people.  Those are

8    symptoms.  Signs are thought, present many times, but not

9    every time, where there is just little to no thought.

10   It's the -- kind of what we call negativity of symptoms of

11   schizophrenia.  They are absent.  It's possible that there

12   are delusions and hallucinations, things like thought that

13   are absent, like eye contact not being there.  Those kind of

14   negative symptoms are all wrapped up.

15        The phrase "most importantly" was -- came from my

16   experience and Dr. Wagner's experience that he is as opposite

17   to what it's like to be with a person with schizophrenia as

18   you can get.  How different it is.  The praecos feeling is

19   a -- a thing that -- well, and almost has been relegated to a

20   teaching point to young psychiatrists.

21   Q. I'm sorry.  It's been relegated to a what?

22   A. A teaching point.

23   Q. Okay.

24   A. So, for instance, we have for many years in psychiatry

25   suggested that you can sit with somebody with that disorder,

BALLENGER - EXAMINATION BY MR. BRUCK

1    and it will feel very different than you've ever felt with

2    anybody else.  You will feel that you are not talking to a

3    human, that it's -- part of what -- one of the ideas I use

4    when I teach about schizophrenia is that that disorder goes

5    in and presumably destroys parts of the brain that make us

6    most human:  Eye contact, friendliness, ease in relating,

7    trust, not paranoia.  And so that feeling makes us feel kind

8    of odd, kind of creepy, uncomfortable, the opposite of what

9    you feel when you -- when I sat with the defendant, that he

10   was humorous, engaging, complete 100 percent eye contact

11   every second I was with him.  Humorous, self-effacing

12   sometimes, clever.  Goes way beyond he's just smart, which he

13   is.  But all the human-relatedness, and that's an attempt to

14   try to capture that idea.

15    Q. Did he like you?

16    A. Yes.  Just like he thinks -- just like he thinks I like

17   him, which in some ways I do.  Dr. Wagner -- it was striking

18   to him how likeable he was.  We had no idea that it would be

19   like that, given the situation.

20    Q. He has a childlike quality about him, does he not?

21    A. Somewhat.  He described it as he has a goofy smile that

22   people like, and he can't help it.  He's just born with a

23   goofy smile.

24    Q. Quite apart from how he describes himself, didn't he

25   strike you as rather immature and childlike in his

BALLENGER - EXAMINATION BY MR. BRUCK

1    presentation?

2    A. I would not go that far.  He struck me as very

3    intelligent and absolutely paying attention to every second

4    of what was happening in our interviews, all nine hours of

5    them.  And is he naive?  That seems a better description of

6    why he believes some of the things that he believes and some

7    of the things he pursues.  But childlike, except in his

8    infectious good humor, I wouldn't use that word.

9    Q. Extremely across nine hours?

10   A. Extremely.

11   Q. And guarded?

12   A. Guarded, yes.  On top of aware, planning, protecting

13   himself every second of the way.

14          THE COURT:  Why don't we -- this is a good point to

15   stop.  And it's 1:15.  Let's try to get back at 2:15.  I know

16   sometimes that's a little bit of a challenge around the

17   courthouse, but as soon as people return, we'll resume.

18   Okay?

19          (Thereupon, there was a lunch recess.)

20          THE COURT:  Let me mention a couple of things.

21          Mr. Bruck, I don't want to do anything to interfere

22   with your examination, but this is slow as molasses, and pick

23   it up.  I'm following.  I've read all these reports.  I'm not

24   unfamiliar with these concepts.  And, you know, we've just

25   now gotten to competency.  We need to move this on.  And I --

BALLENGER - EXAMINATION BY MR. BRUCK

1    of course, we will -- we obviously have to go to tomorrow

2    because Dr. Maddox is going to be here tomorrow no matter

3    what.

4           But I want to make it very clear that I will keep

5    the courthouse open Wednesday and Friday.  If there is

6    something that is going to slow this process down, I will

7    continue to hold court as long as it takes over the holidays.

8    I don't want to do that, but I want us to proceed and get to

9    the meat of this issue, competency.  That's why I started

10   this hearing off with very specific statements about the

11   standards, and I would hope we would focus on those.

12          With that, please continue your examination.

13          MR. BRUCK: Before we proceed, Your Honor, and I

14   don't think I'll have an enormously longer cross-examination

15   of this witness.  I think we are coming --

16          THE COURT:  Mr. Bruck, you know, I have enormous

17   respect for your abilities, but, you know, we've got to --

18   we've got to focus on what is important here, and, you know,

19   the idea that you were unprepared that you raised, I doubted,

20   and having watched you raise all these very remote issues and

21   having these skillful lawyers and assistants handing you

22   stuff.  You are prepared for this.  But let's think about

23   what is important in a competency hearing and is this

24   defendant competent.  Look at the standard and question this

25   witness.  If you have evidence to the contrary, let's put

BALLENGER - EXAMINATION BY MR. BRUCK

1    those up.  I want to hear them, but whether he put a date on

2    when the man last used marijuana or something, it's just in

3    my view largely unimportant.  Please proceed.

4           MR. BRUCK: Very well, Your Honor.  A housekeeping

5    matter:  This disk, which I would like to offer as Exhibit 10

6    for the record, contains all of the evidence that we

7    provided, "we" the defense provided to Dr. Ballenger so that

8    we simply have this in the record as to -- so that the record

9    will be complete.

10          THE COURT:  I did not give the Government access to

11   that.  You know that?

12          MR. BRUCK: Right.

13          THE COURT:  How does the Government feel about

14   having it in just for the purpose of -- for the issue of what

15   Dr. Ballenger received and for no other purpose?

16          MR. RICHARDSON: I think that is fine, Your Honor.

17          THE COURT:  Very good.  I'm going to admit

18   Exhibit 10 without objection.

19          (Thereupon, Defendant's Exhibit 10 introduced into

20   evidence.)

21          MR. BRUCK: I should clarify it contains one other

22   video that the Government provided that we didn't because I

23   would like to play about ten minutes of that video -- or five

24   minutes of it right now, so we put it all in one drive.

25          THE COURT:  Again, with the exception of the single

BALLENGER - EXAMINATION BY MR. BRUCK

1     video, everything else is what you provided Dr. Ballenger?

2          MR. BRUCK: Yes, and Dr. Ballenger was provided

3     several videos by the Government, which this is one.

4          MR. RICHARDSON: Say that again?  This is not what

5     you provided?  It's -- I'm not sure I understand.

6          MR. BRUCK: It is what we provided, plus one video

7     that you provided to Dr. Ballenger.

8          One organizational question, Your Honor, which is

9     whether you intend -- the Court intends to call Dr. Wagner

10    because it affects scheduling for the next witness.

11         THE COURT:  I'm going to leave that to you.

12    Dr. Ballenger relied on the report.  He did mention that he

13    spoke to him as well.  I wasn't planning to call him, but I

14    will allow you to if that's what you would like to do.  Of

15    course, I'm going to allow you to call anybody that is

16    relevant.  So do you want him?

17         MR. BRUCK: I don't think so, not at this juncture.

18         THE COURT:  How about the Government?

19         MR. RICHARDSON: I think we do, and I know the Court

20    indicated he was only available today.

21         THE COURT:  Listen, we have ruined Dr. Ballenger and

22    Dr. Wagner's schedule so completely in the month of November,

23    I'm not sure that there is any further crime to do any more

24    damage than we've already done.  What I would simply say,

25    Mr. Richardson, at our first break -- I presume Dr. Wagner is

BALLENGER - EXAMINATION BY MR. BRUCK

1   here.

2          MR. RICHARDSON: I believe he's in one of the witness

3   rooms somewhere in the vicinity.

4          THE COURT:  One idea is this, to me, this is not a

5   jury.  Maybe when we finish, you could put -- if Mr. Bruck

6   wasn't planning to call him, you could put him up for what

7   your purpose would be so we don't any further disrupt his

8   schedule.

9          MR. RICHARDSON: We are fine with that if Mr. Bruck

10  anticipates finishing before nightfall.

11         THE COURT:  He just made the observation that he

12  didn't have that much more.  Now, I understand Mr. Bruck and

13  his propensity for thoroughness.  That may not be a rush job,

14  but let's see where we are.

15         MR. BRUCK: Ms. Stevens has informed me that my

16  client has requested that you be aware that he wishes to

17  object before I do anything else.  We have advised him, and

18  he heard Your Honor say that he would have his opportunity to

19  speak at the end of the evidence.  We are placing this before

20  you.

21         THE COURT:  Let me address this, Mr. Roof.  I

22  appreciate you letting Ms. Stevens know that and relaying

23  that, but the orderly process here is I want Mr. Bruck to be

24  able to put up everything he wants to put up, and then I want

25  to give you a chance to be heard, but I want to have the best

BALLENGER - EXAMINATION BY MR. BRUCK

1    information to make the competency decision.

2            THE DEFENDANT:  He's about to play a video between

3    me and my mom, and I don't want him to play it.

4            THE COURT:  Mr. Bruck, is there a video between he

5    and his --

6            MR. BRUCK: Yes.  It's a -- we are going to play just

7    a few minutes of Mr. Roof visiting with his mother at the

8    jail.

9            THE COURT:  And why is it relevant?

10           MR. BRUCK: For two reasons:  One is it is very good

11   evidence of Mr. Roof's fixation and obsession with clothes,

12   which is an autistic, and we think, mental health symptom

13   which has been difficult to establish through this witness,

14   and Mr. Roof --

15           THE COURT:  You know, to the contrary, I thought

16   that he recognized that there were -- I mean, maybe I'm

17   reading the report differently than you did, but I didn't see

18   him denying that there were sensitivities about this, and he

19   didn't confront Mr. Roof about that.  But I have -- I

20   understood it to be one of those issues -- that he has an

21   issue about clothes, I would characterize it.  Is it a

22   delusion?  Is it an obsession?  Is it a symptom of anxiety

23   disorder is the question.  I don't really doubt that he has

24   it.  Mr. Bruck, I have watched the defendant come in in

25   different clothes.  I mean, I'm aware of that.  So if you are

BALLENGER - EXAMINATION BY MR. BRUCK

1    offering it simply for the purpose of trying to persuade me

2    that he has a sensitivity about that, I'm fully aware of

3    that.  I believe it.  I didn't hear Dr. Ballenger deny you

4    that.  He didn't feel it was productive to confront him with

5    it.

6              If there is something else about that video -- it's

7    obviously upsetting to your client, and I'm just -- if that

8    is the only purpose, I just raise the question of whether

9    it's necessary because you can count me already persuaded

10   that it's an issue.

11             MR. BRUCK: Well, it also presents the defendant's

12   manner and demeanor when he is much less guarded and

13   hypervigilant or vigilant than he was with Dr. Ballenger.  On

14   the other hand, I do want to be sensitive to my client's

15   feelings.  At this point, we will wait on that.

16             THE COURT:  To the extent you still have a need,

17   let's have another discussion about that.  Let's proceed on

18   that.

19             Yes, sir, Mr. Roof?

20             THE DEFENDANT:  I want to say one more thing about

21   it.  At the jail you are not allowed to visit with your

22   family members except on video, and it's recorded, so I think

23   it's just wrong anyway.

24             THE COURT:  I have this a lot where people will --

25   more with telephone calls, people will make confessions over

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

BALLENGER - EXAMINATION BY MR. BRUCK

1    a telephone, and then they would be surprised.  It's just --

2    it is just one of those things, Mr. Roof, so I think that --

3    I understand your sensitivity, and I think right now let's

4    move on beyond that, and let's discuss it again to the extent

5    Mr. Bruck still feels there is some other secondary purpose.

6         But, Mr. Bruck, for the -- I recognize there is an

7    issue here that he feels about the clothes.  Just what is it

8    is another issue.

9         Thank you, Mr. Roof.

10        MR. BRUCK: Before we move on, I would just like to

11   say that we feel exactly the same way Mr. Roof does about the

12   unfairness of being unable to visit with one's family without

13   having it recorded on videotape and furnished to the

14   prosecution automatically as a matter of course.  We have

15   hours and hours and hours that we've gotten from the

16   Government and from the jail of where the only contacts this

17   man can have with his family is in a fishbowl.  It is unfair,

18   but it nevertheless is part of the case the Government has.

19   We felt duty bound to use it in his defense.

20        THE COURT:  Very good.

21        Dr. Ballenger, did I mischaracterize you that you

22   were not eliminating that the defendant has a sensitivity

23   about his clothes and what he wears?

24        THE WITNESS:  I did not eliminate that.  I think

25   it's a possibility, and the fact that he denies it so

BALLENGER - EXAMINATION BY MR. BRUCK

1    vigorously adds to the level that it is there.

2            THE COURT:  Okay.  Mr. Bruck, please continue.

3            MR. BRUCK: Thank you, Your Honor.

4    BY MR. BRUCK:

5     Q. Dr. Ballenger, before lunch you referred to the fact

6    that -- or I should say you stated that Mr. Roof has

7    cooperated with his defense and that there were only two

8    things that we had asked him to do that he had not done.  Is

9    that your testimony?

10     A. That is my testimony, that what you told me was that he

11    has cooperated to doing a lot of things, and you enumerated

12    them somewhere in writing.  And then you told me that two

13    things that he didn't do were those two that I cited.  And

14    that was in the portion of my report that was -- that there

15    is some evidence that he cooperates -- is cooperating with

16    you guys and then evidence that he's not that you provided.

17     Q. So those two things were not given to you as a list of

18    everything he had done that was uncooperative?

19            MR. RICHARDSON: Objection, Your Honor.  Mr. Bruck is

20    not testifying here.

21            THE COURT:  Mr. Bruck, let's assume this:  I think

22    the doctor just said those were the two things that you

23    mentioned to him.  I didn't understand him to say that was

24    exclusive, but that he had extensively cooperated and

25    reviewed documents, cooperated with you; and very frankly, I

BALLENGER - EXAMINATION BY MR. BRUCK

1    don't think we are disclosing anything that is really

2    confidential here in the ex parte communication you mentioned

3    to me that he -- that the issue of the letter was a sort of

4    seminal moment about the lack of cooperation that you thought

5    was this critical moment, and so I took it that -- not that

6    he had been uniformly cooperative.

7         I know you -- I mean, for instance, I'm aware of the

8    situation when Dr. Dietz went over there, and he wouldn't do

9    the video.  I'm aware there are other situations where the

10   defendant may not have entirely been cooperative with you.

11   The question is his capacity to cooperate, not whether -- his

12   willingness to cooperate.  If he's unable to cooperate, that

13   is another issue.  But if he's unwilling, that is still

14   another question.  So I wish you would -- I did not take

15   Dr. Ballenger's earlier statement to be exclusive, and I was

16   myself aware of other isolated episodes.  But please

17   continue.

18        MR. BRUCK: Thank you.

19   BY MR. BRUCK:

20    Q. Dr. Ballenger, didn't I also tell you during your

21   interview with me and my cocounsel that Mr. Roof had gone to

22   great lengths to try to persuade his family not to talk to

23   us, his mother in particular?

24    A. Like I say, I don't remember that.  You did make clear,

25   you and your cocounsel, that one other area that hasn't just

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

BALLENGER - EXAMINATION BY MR. BRUCK

1    been mentioned, but it's in the report, and that is that he

2    would often spend a lot of time talking about what were felt

3    to be obsessions, fixations, and irrelevant details; and,

4    therefore, most of your time was spent doing that versus work

5    that you would have preferred.

6    Q. Very well.  Now, you have mentioned -- in a lot of your

7    testimony this morning, you have explained the reasons why

8    you do not believe that Mr. Roof suffers from schizophrenia.

9    Correct?

10   A. Correct.

11   Q. Now, schizophrenia is only one of a number of disorders

12   that are listed in the DSM under schizophrenia spectrum

13   disorders, correct?

14   A. Correct.

15   Q. And others include schizotypal personality disorder?

16   A. Um-hum.

17   Q. Delusional disorder?

18   A. Yes.

19   Q. Schizophreniform disorder?

20   A. Yes.

21   Q. Schizoaffective disorder?

22   A. Yes.

23   Q. Right?

24   A. Correct.

25   Q. And other specified schizophrenia spectrum and other

BALLENGER - EXAMINATION BY MR. BRUCK

1    psychotic disorders, that's another diagnostic category,

2    correct?

3    A. Yes, and now there are others.  Psychosis occurs in manic

4    depressive illness, in depression -- severe depression.  So

5    yes.  But my comments were that that is my professional

6    opinion that he does not have schizophrenia nor any other

7    broad psychotic disorder.

8    Q. Now, you referred to the term "a broad psychotic

9    disorder."  What does "broad" mean?  Is that a term that is

10    found in the DSM?

11    A. I don't know whether it is or isn't.  What my meaning in

12    it is that a psychotic disorder, which is -- two things,

13    broad implying that it is across the board.  It is involving

14    multiple areas, to contrast it to somebody who might, for

15    instance, have a single delusion.  That -- for the purpose of

16    the competency evaluation, that single delusion or even

17    three, the question would then be how does it interact or

18    impact on the competence.  And the totality of my opinion is

19    even if he has those, it does not impact in my opinion on his

20    competency to stand trial.  Even in my report, I even stated

21    that if the trier of fact determines that I'm wrong about

22    that, that he does have a broad schizophrenic-like or

23    delusional disorder, psychotic disorder, that he still is

24    seemingly competent in many, many ways to stand trial, and

25    he's competent enough to stand trial.

BALLENGER - EXAMINATION BY MR. BRUCK

1    Q. Okay.  But I take it from your answer that it is possible

2    for someone to have a delusional disorder, it does not meet

3    the criteria for schizophrenia, but would render the person

4    incompetent to stand trial if his delusions affected an area

5    that was critical to either his understanding of the

6    proceedings or his ability to assist counsel in his defense.

7    A. Yes.  With the emphasis on if they were critical to

8    either of those two prongs, yes, I do agree with that.

9    Q. And would you consider the ability of counsel to present

10   mitigating evidence in a death penalty case to be a critical

11   function of the defense?

12        MR. RICHARDSON: Objection, Your Honor.  I think that

13   is a legal question and one of which there is some debate

14   about whether the defendant actually continues to have the

15   control over that over the objection --

16        THE COURT:  Let me just say to clarify that, because

17   it's a valid point there, and I intend to author an opinion

18   on this.  What are the spheres of control between a client

19   and the attorney in a case such as this.  And in reliance

20   upon the ABA standards in which the courts have shown a great

21   deal of deference, and to the case law that those spheres of

22   control by the client are fairly limited, and they include

23   the decision whether or not to plead guilty, whether to

24   testify, whether to appeal, whether to accept a plea

25   agreement; and that other areas, including what witnesses to

BALLENGER - EXAMINATION BY MR. BRUCK

1    call and what substance to present, under the ABA standards

2    are within the province of the defense counsel.

3         And so the defendant does not have the ability to

4    prevent Mr. Bruck from presenting that evidence because he

5    has the authority, and I will -- I've said that before -- and

6    I will enter an order saying that, that Mr. Bruck has the

7    authority to present the mitigating evidence.  The defendant

8    has the authority to speak at his trial, and if he wishes to

9    voice opposition to that, that is his constitutional right to

10   be heard.

11        But so to the question about whether the ability of

12   defense counsel is something that is essential, Mr. Bruck,

13   you are going to have -- that's not a fair question to the

14   doctor, because as a matter of law, you have that authority.

15        MR. BRUCK: I think I have -- I think I have raised a

16   question that really isn't in --

17        THE COURT:  Maybe it's a different question.

18        MR. BRUCK: It is very much a different question.

19        THE COURT:  I don't think you really disagree with

20   me about your authority there.

21        MR. BRUCK: No.  All I was attempting to ask the

22   doctor was a fairly self-evident question about whether or

23   not a delusion that interfered with counsel's ability to

24   present mitigation in a capital case would be a delusion that

25   rendered -- assume that is the facts -- that that would be a

BALLENGER - EXAMINATION BY MR. BRUCK

1    delusion that would render the defendant incompetent to stand

2    trial.

3              MR. RICHARDSON: We object to that.  To go back to

4    the earlier --

5              THE COURT:  I'm going to sustain that objection.

6    That is not a proper question.  The question is more

7    precisely, would the fact that the defendant might speak at

8    his trial and voice to the jury his disbelief as to the

9    defense, would that render him incompetent because he would

10   be -- he was unwilling to accede to the defense proposed by

11   his lawyer.

12             MR. BRUCK: Well, even more broadly than that.  I

13   mean, all I'm asking is whether or not -- I want to make sure

14   that the doctor's understanding of a competent defendant

15   includes the ability to make rational decisions that are not

16   dictated by delusions about the presentation.

17             THE COURT:  Why don't you ask him from his

18   evaluation is the defendant capable of making rational

19   decisions and what is the basis of that opinion?  That is the

20   more direct question.

21             MR. RICHARDSON: Can I also take a step back?  That

22   the Government would request, and I understand how unlikely

23   it is we are to change your mind, but the ex parte briefing

24   about whatever, whoever has that authority, I think the

25   Government ought to have the opportunity to respond to that

BALLENGER - EXAMINATION BY MR. BRUCK

1    and provide information to the Court addressing that legal

2    standard.  That's something we have looked at briefly.  I'm

3    surprised to hear that that is the result that's already been

4    reached.  But I certainly --

5            THE COURT:  That's not a matter between the

6    Government -- the Government is not normally involved in

7    those kinds of decisions.  If you want to file something, I

8    will be glad to receive it.  We have extensively researched

9    that issue, and I believe Mr. Bruck is correct.  And I have

10   so told Mr. Roof that because it is a concern to him.

11           So let's go back to the issue, which is, Mr. Bruck,

12   I don't want you to ask the question which is not a correct

13   statement of the law because Mr. Roof cannot prevent you from

14   presenting it.  He can affect the effectiveness of that

15   presentation by telling the jury that he doesn't believe it,

16   which is his constitutional right to do that.  But does that

17   reflect incompetency?  Does that reflect some level of

18   incompetence?  And I think the doctor addressed some of those

19   issues in his report.

20   BY MR. BRUCK:

21    Q. In my hypothetical is to assume this decision, this

22   action by a defendant is controlled by a delusion, and if

23   that were so, would the defendant be incompetent?  Now, I

24   understand the doctor has said that he does not believe it

25   is.  But we have been exploring how reliable or how certain

BALLENGER - EXAMINATION BY MR. BRUCK

1    that opinion is, and now I would like you to assume for the

2    sake of the question that the defendant does have one or more

3    delusions which affects -- substantially affects his

4    decision-making.  With regard to the presentation, whether by

5    him or whether he undermines counsel's presentation, doesn't

6    matter with regard to what the jury hears about his case in

7    mitigation.  Would the defendant --

8               MR. RICHARDSON: We object to that question, because

9    we think it's a false question.  What he's trying to do is

10   interject into the ability to consult an ability to make good

11   decisions which is not the standard.  The standard is, does

12   he have an ability to consult with counsel; not does he have

13   an ability to make lies and well thought-out decisions.  And

14   so what he's trying to do is turn the competency standard

15   into an is the defendant making the best possible decision

16   that he can?  And that is not what the standard is.  And we

17   think it's an inappropriate question that is based on a false

18   legal premise.  So we object to it.

19              THE COURT:  I'm trying to get around -- because I

20   think Mr. Bruck is asking a question which the doctor can

21   answer, and I think he should answer, and let me see if I can

22   help with this.

23              Doctor, Mr. Bruck -- Mr. Roof explained to you that

24   he did not want a mental health defense, correct?

25              THE WITNESS:  Correct.

BALLENGER - EXAMINATION BY MR. BRUCK

1          THE COURT:  And he explained to you that he sent a

2     letter as an effort -- to the prosecutors as an effort to

3     sabotage that defense.

4          THE WITNESS:  Yes.

5          THE COURT:  And did you -- were you able from your

6     discussion with him to determine whether that decision was --

7     had a rational basis in terms of his view of the facts?  Was

8     that a rational decision on his part?

9          THE WITNESS:  Yes.  In my opinion it is rational on

10    his part and not tainted by psychosis at all.

11         THE COURT:  You described it as potentially even a

12    brilliant move.  Why was that?

13         THE WITNESS:  Well, as I understood, to my limited

14    nonlegal understanding, the situation he was in, his analysis

15    seemed correct to me that he really had no choices.  He knows

16    you have already told him that he has no way to control the

17    defense that his attorneys put forward, and of the options

18    available to him, he could not see any except to do the

19    sabotaging move, which seemed to me, as a nonlawyer, somewhat

20    clever to somehow surprise everybody and get into a position

21    where he's, in his mind, talking to the jury over the

22    protestations of both defense and prosecution.  And it does

23    seem clever, if not brilliant.

24    BY MR. BRUCK:

25     Q. So you found that to be a logical explanation for his

BALLENGER - EXAMINATION BY MR. BRUCK

1    writing the letter?

2    A. Yes.

3    Q. Does that --

4    A. A preponderance of the evidence suggests to me that it is

5    logical.

6    Q. Okay.  Does that necessarily make it a rational decision?

7    A. A rational decision?

8    Q. Yes.

9    A. Does -- I really don't understand the question.

10   Q. I'll try to -- let me give you a different hypothetical.

11   You have explained that underlying his overarching strategy

12   about eliminating any testimony about mental disorder or

13   neurodevelopmental disability in this trial, is his desire --

14   is his sense that he is being watched, or that there is some

15   audience of revolutionary white nationalists who he expects

16   to take over the government, and that if he is devalued or he

17   is given a label of mental illness or autism or some other

18   disability, that will affect his status and the way he is

19   viewed by that group and will affect his fate in some way

20   once they take over power.  Is that --

21        MR. RICHARDSON: Objection, Your Honor.  It's not

22   only compound, I think it includes several incorrect

23   statements, and it's impossible for him to answer.

24        THE COURT:  Let's see if we can give it a try.

25        Dr. Ballenger, let's see if you can answer the

BALLENGER - EXAMINATION BY MR. BRUCK

1    question.  If it's a problem, you will tell us that.

2         THE WITNESS:  There are several problems with it.

3    But the thing that needs to be added to the convoluted,

4    compounded hypothetical is it doesn't matter whether he's

5    watched, being observed now or 10, 20, 30 years in the

6    future.  He's concerned about his enduring legacy.  He even

7    said to me that even if nothing -- that he's not around

8    anymore, he would like to be remembered as the hero that in

9    many ways started this.  I don't know if that helps.

10   BY MR. BRUCK:

11   Q. Okay.  He also told you -- and I'm looking at page 44 of

12   your report --

13   A. I'm there.

14   Q. At the top of the page -- I'm sorry.  I should have begun

15   a little earlier.  Page 41.

16   A. I've got it.

17   Q. Bottom quarter of the page, "However, for the first time

18   in all three interviews, he agreed that he did not want any

19   evidence in his record that he was defective in any way and

20   he had social anxiety or took psychiatric medicines.  He

21   admitted that this was related to his belief that after the

22   white nationalist revolution occurred and was successful, he

23   has to maintain his reputation as a perfect specimen."

24        Now, this refers at least in part, does it not, to

25   his hope that he would be alive when this occurred?

BALLENGER - EXAMINATION BY MR. BRUCK

1    A. I think I just spoke to that.  He spoke both sides of

2    that.  He would like to be alive, but he has realistic

3    thoughts that given the distance, given the fact that he

4    might have a death penalty that might be carried out between

5    now and then, that it's in that context.

6    Q. Okay.  And then getting back to page 54 --

7              THE COURT:  54, Mr. Bruck?

8              THE WITNESS:  44 is what you said before.

9    BY MR. BRUCK:

10   Q. No.  53 and 54.  Bottom of page 53.  Tell me when you are

11   there.

12   A. Okay.  I'm there.

13   Q. "He finally explained that he could not admit or have

14   introduced as evidence that he had any mental health or

15   autistic disorder" --

16   A. I'm sorry.  That's not 53.  That's --

17   Q. It's paragraph 29, numbered paragraph.

18   A. I'm sorry.

19   Q. 53?

20   A. Yes, you are correct.  I'm sorry.

21   Q. "He finally explained that he could not admit or have

22   introduced as evidence that he had any mental health or

23   autistic disorder because of his worries about how he would

24   be regarded in a post-revolutionary, white nationalist

25   controlled world.  In that world he believes that white

BALLENGER - EXAMINATION BY MR. BRUCK

1    nationalists would, like the Nazis, favor the elimination of

2    defectors and elimination of nonwhite populations and

3    particularly those with mental health problems and

4    homosexuals."

5         So that was a concern he expressed to you?

6    A. Yes.

7    Q. Okay.  Now, let me just change the hypothetical a little

8    bit.  Suppose -- it is possible, is it not, that a delusion

9    can have political content?

10   A. Of course.

11   Q. And suppose Mr. Roof had told you his belief is that 20

12   panzer divisions loyal to the German Nazi regime have been

13   biding their time in the Black Forest of Bavaria since World

14   War II, waiting for the opportunity to resume the fight, and

15   he believed that one of these days soon, within the next few

16   years, that would occur, and he would then be vindicated and

17   freed.  Now, I know that is not what he told you, but let's

18   say that he did.  And he explained his strategy for the

19   conduct of this trial in terms of that expectation.  Would

20   you find his explanation for why he sent the letter, if that

21   was the -- if that was his long-term plan, would you find

22   that to be rational or not?

23   A. I'm sorry.  If that were his long-range plan.  What is

24   the long-range plan?

25   Q. That this hibernating Nazi Army that had been waiting

BALLENGER - EXAMINATION BY MR. BRUCK

1   since 1945 to swing back into action was about to do so, and

2   when it did, it would conquer the world and free him, and

3   that was very important to him for his reputation as a pure

4   specimen be maintained, and that was the rationale that was

5   driving his decisions about cooperating with his counsel and

6   planning for his defense, assuming that.

7    A. The psychiatry involved in that hypothetical is if

8   somebody said Nazis in the forest, it would raise an eyebrow

9   secretly, and I would think that is bordering on bizarre,

10  which is one of the characteristics of true delusions.  And I

11  would ask in exploring that possible delusion, 10, 12, 15

12  more questions to get him to try to pull out, tease out

13  whether it is, in fact, a delusion when -- I mean, the

14  reality would be strained by the hidden panzers, but if it

15  became more and more and more illogical, irrational, meaning

16  based on things that are almost certainly not true, then if

17  that.  Which extends your hypothetical a great deal -- then I

18  would have a different opinion about this than I do have.

19          This seems, if I can come back to this case, his

20  belief that hopefully, probably sometime over the next 10,

21  20, 30, 40, 50 years, the white people will finally wake up

22  and do something, and he says, "You know, maybe just a little

23  something, try to do this.  I mean, just do something to

24  begin the long fight," that has gone in the direction that is

25  about a belief and a political stance which is more logical,

BALLENGER - EXAMINATION BY MR. BRUCK

1    less bizarre and consonant with what he has been reading on

2    the Internet and hearing.

3            It is not made up of the whole cloth himself and is

4    quite bizarre and impossible.  It is fairly in the middle of

5    this type of ultraconservative white nationalist rhetoric.

6    Q. Did you do any research on the Daily Stormer website to

7    find out what is being said there?

8    A. I did not.

9    Q. Okay.  And you -- you didn't listen to Mr. -- you've

10   already said you didn't listen to Mr. Savage's radio show?

11   A. Correct.

12   Q. Those are the sources that he gave you?

13   A. Yes, but he also said the broad Internet, writings,

14   newspapers, television, the news reports of riots all over

15   the place, and so forth.  So I mean, you know, he was not

16   exclusive to those, that those were just some that he listens

17   to on a daily basis.

18   Q. Okay.  On page 47 of your report -- I may have already

19   asked you this -- I don't think I have.  You used the term

20   "comprehensive psychosis" --

21           MR. RICHARDSON: What page?

22           MR. BRUCK: 47.  I may be wrong about that.

23           THE WITNESS:  It is B2 of -- the last sentence of

24   B2.

25           MR. BRUCK: Yes.  Thank you.

BALLENGER - EXAMINATION BY MR. BRUCK

1    BY MR. BRUCK:

2    Q. "Somatic delusions do not prove that there is a

3    comprehensive psychosis present."  Is "comprehensive

4    psychosis" a term found in the DSM?

5    A. No.  This is an attempt to go from the DSM, go from a

6    pure psychiatry, pure science of psychiatry into a broader

7    context of people who are not psychiatrists to describe what

8    is alleged here.  And again this is in the section that says,

9    "There is some evidence consistent with the possibility that

10    he has a psychosis."  But in that particular point I'm making

11    is that even if he has somatic delusions that his face is

12    malformed, his forehead unsightly, and that he's afraid of

13    anyone to see that forehead, that it is consistent with, but

14    not proof that there is a broader psychosis, a more

15    comprehensive psychosis, meaning not just his forehead, but

16    psychotic about the world, about him, his life, what he's

17    doing, how he works with you, and so forth.  And, again, turn

18    around that idea that I don't see any evidence either that

19    there is a broader psychosis present.

20    Q. How broad does a psychosis have to be before it could

21    prevent a defendant to be incompetent to stand trial?  I have

22    some follow-up, but as a general matter?

23    A. I can't answer that question.

24    Q. A delusion, for example, could be very narrow and render

25    a defendant incompetent so long as the delusion's affecting

BALLENGER - EXAMINATION BY MR. BRUCK

1    something that was critical to the conduct that -- the

2    defendant's conduct in the courtroom.

3     A. That is in the ballpark of anything is possible under

4    God's heavens.  Yes, conceivably a single delusion, but not

5    one that is as narrow as my forehead is misshapen.  A

6    delusion that the current president-elect is crazy and is a

7    Nazi and he's going to do this and -- you know, which you

8    might be able to get on the street out there, but it would

9    have to be broad enough and damaging enough to his competency

10   at trial that -- to be able to answer your question in the

11   affirmative.

12    Q. I want to ask you a little bit about your description of

13   the -- your interaction in the jail with Mr. Roof.  You would

14   agree with me that the conversation you were having was a

15   very sheltered one in the sense that there were only two of

16   you, right?

17    A. Yes.

18    Q. It was quiet?

19    A. Yes.

20    Q. No one else in the room besides you and him through the

21   glass, right?

22    A. Correct.

23    Q. No one was watching him except you?

24    A. Correct.

25    Q. There was nothing else or very little else going on in

BALLENGER - EXAMINATION BY MR. BRUCK

1    his range of vision, correct?

2     A. Just the people behind me that would distract him.

3     Q. He was very distractible about that, wasn't he?

4     A. Yes.  Meaning that he would look and come back to my

5    question.

6     Q. He wasn't very good about tuning out that there were

7    people walking back and forth behind you who could be seen in

8    the glass in the door behind you, correct?

9     A. I will admit every time a correctional officer walked

10   behind him, I looked, and then I came back to the

11   conversation.  So I didn't find it abnormal in any particular

12   way.

13    Q. All right.  And, of course, no one was asking him to do

14   anything other than talk to you.  He could focus on a single

15   task, right?

16    A. He did a good job of staying with me, yes.

17    Q. Okay.  Compare to that what he would be required to do in

18   the courtroom.  It would be very different, wouldn't it?

19    A. Yes.

20    Q. There would be a lot more going on?

21    A. Yes.

22    Q. There would be close to 100 people in the audience or

23   more, right, in this courtroom?

24    A. Yes.

25    Q. There would be a jury looking at him, looking at his

BALLENGER - EXAMINATION BY MR. BRUCK

1     face, right?

2      A. Yes.

3      Q. Watching his demeanor and his reactions to things, and in

4     effect judging him, correct?

5      A. Yes.

6      Q. That's what a trial is, right?

7      A. That's what it involves.

8      Q. I'm sorry?

9      A. That's what it involves, yes.

10     Q. Yes.  Okay.  Is it fair to say that his ability to

11    tolerate -- and, of course, he would be, in order for him to

12    assist his counsel, ask us to do things, tell us the

13    testimony wasn't true.  He would have to be following the

14    testimony, right?

15     A. Yes.

16     Q. And to some degree filtering out the fact that people

17    were looking at him and if there was any other actors in

18    the -- participants in the process, right?

19     A. Yes.

20     Q. None of which, of course, even have the capacity to

21    evaluate him because that was not the setting in which you

22    saw him?

23     A. Beyond my question to him, what if there were 20 people

24    watching us.

25     Q. Okay.

BALLENGER - EXAMINATION BY MR. BRUCK

1    A. And he said that that would be very hard.

2    Q. And he said that that would be very hard?

3    A. Yes.

4    Q. All right.

5    A. Another thing that is pertinent in trying to help the

6    Court, it's in my record -- report, but it's different from

7    the assumption I think you are making.  And I think the most

8    likely reason for his discomfort in the courtroom and working

9    with you is a social anxiety disorder.  That should get

10   better, not worse, as the trial proceeds as he has experience

11   and what we call "in the field exposure."

12    Q. Do you need some water?

13    A. Yeah.  See if it works.

14        The treatment of social anxiety disorder is we get

15   people's cooperation, and we put them in with one person, two

16   person, three person, a hundred people, and ask them to do

17   the things that they are afraid of.  It seems a little bit

18   crazy, and sometimes patients say that back to me.  But when

19   they do it, they get more and more comfortable, as I suspect

20   he is already getting more comfortable.  But, yes, that is

21   the -- what I left in my report is what I'm not sure of.  I

22   don't have evidence because I haven't been sitting here

23   watching him in court.

24    Q. Okay.  So the presentation could be quite different than

25   it was in the jail setting where you saw him?

BALLENGER - EXAMINATION BY MR. BRUCK

1    A. Yes.

2    Q. You said that you think he would get better, or he might

3    get better in terms of his -- with respect to his anxiety

4    disorder as the trial proceeds, right?

5    A. Yes.

6    Q. I take it that at the beginning of the trial, it would be

7    that he would be worse?

8    A. That is your prediction.  I'm trying to say as a

9    psychiatrist, my prediction is it will get better.

10   Q. No, I'm sorry.  I wasn't clear.  If he's going to get

11   better, that means that previously he was worse, and he got

12   better?

13   A. Yes.

14   Q. So you would assume that he -- there would be -- the

15   beginning of the trial, he would likely have a difficult time

16   because of his anxiety?

17        MR. RICHARDSON: Objection, Your Honor.  That is not

18   a fair question.

19        MR. BRUCK: I'll rephrase the question.

20        THE COURT:  Sustained.

21        Mr. Bruck, he was relying on what you told him, and

22   then you are saying that he's adopted what you told him.  He

23   said assuming you are telling me the truth, I would predict

24   it would improve.

25

BALLENGER - EXAMINATION BY MR. BRUCK

1    BY MR. BRUCK:

2     Q. I asked you and you talked to me about -- told us a

3    little about medication, which is very much the core of your

4    expertise.  Do you think that if -- you diagnosed Mr. Roof

5    with anxiety -- social anxiety disorder, so that's not me

6    telling you, correct?

7     A. Correct.

8     Q. And do you think that he would benefit from medication?

9     A. Yes.

10     Q. What sort of medication?

11     A. He could.  It is probable that he could.

12     Q. And what sort of medication -- I realize you are not his

13    treating physician, but to the extent you can?

14     A. From my clinical research and scientific knowledge base,

15    people with social anxiety disorder benefit best from an

16    SSRI-type antidepressant, the first of which was Prozac.

17    What we've demonstrated worked really well in social anxiety

18    disorder is Paxil, and about a third, roughly, had a

19    remarkable response, another third had a response, and then

20    maybe a third didn't benefit very much.

21     Q. Is it possible that Mr. Roof's views about his defense

22    would change if he was on medication?

23     A. That is, again, anything is possible.  Everything else

24    that I learned about him suggests the answer is no, that he

25    might be a more formidable, less cooperative person for you.

BALLENGER - EXAMINATION BY MR. BRUCK

1    In that he would be more comfortable -- would be more

2    comfortable in court.  But it -- the evidence -- the totality

3    of the evidence almost without exception says that he would

4    have the exact same feeling because of it's based, as I

5    believe it is, that he doesn't want his mission besmirched by

6    somebody saying he only did it because he's -- has a

7    disorder, or his own reputation similarly ruined.  I think he

8    would still have that.  That's what my report says.  He would

9    still have that same stance, perhaps more comfortably held,

10   but the same.

11    Q. The very first document you examined is the so-called

12   manifesto that was posted -- or I should say the very first

13   document that you cite is the document that begins "I was

14   raised in a nonracist home," or words to that effect?

15    A. Yes.

16    Q. Did you uncover any evidence that Mr. Roof's social

17   network, that is to say his nuclear family, close friends,

18   relatives, anybody was themselves -- or themselves harbored

19   extreme racist views?

20         MR. RICHARDSON: Objection, Your Honor.  I don't know

21   what the relevance the competency is to the question of about

22   whether his family is racist or not.

23         THE COURT:  I'm going to overrule it.  Go ahead.

24         THE WITNESS:  Um, the only evidence that I'm aware

25   of comes from the statement that we referred to earlier from

BALLENGER - EXAMINATION BY MR. BRUCK

1    his father's second wife ████ in which she said two things:

2    First, that the defendant was egged on by his father to give

3    a rap in which he was -- she found it so offensive, and the

4    use of the N-word so frequent that it offended her.

5            The other thing she also testified to the FBI was

6    that his father had told her he thought a race war was

7    coming, and he had bought a gun, and it was the motivation

8    for him getting a concealed weapons permit.  Otherwise, I'm

9    not aware of anything except that isolated testimony.

10   Q. Now, so nothing about a coming revolution, white

11   nationalists, or any of this racial ideology that Mr. Roof

12   expressed.

13   A. I'm reminded of his father's comment when he asked him to

14   watch a skinhead show on TV that his father found it so

15   offensive he turned it off.

16   Q. To say the least, there is conflicting evidence?

17   A. Yes.

18   Q. And beyond that, no other family member that, so far as

19   you are aware, appears to have been a source of racist

20   indoctrination of this young man?

21   A. So far as I'm aware.

22   Q. Okay.  And you are aware that the father was not the

23   custodial parent after about age four?

24   A. Yeah.  My understanding is that they divorced when he was

25   five; so, yes, four would make sense.

BALLENGER - EXAMINATION BY MR. BRUCK

1    Q. Okay.  He lived with his mother?

2    A. Yes.

3    Q. And there is no evidence that she harbors any unusual

4    racist views?

5    A. No.

6    Q. Okay.

7         MR. BRUCK: Bear with me just a moment, Your Honor.

8    BY MR. BRUCK:

9    Q. You indicated a moment ago when we were discussing your

10   sources of information about anxiety, that you were relying

11   at least to some degree on things that the defense told you,

12   correct?

13   A. Correct.  Particularly about his difficulties in the

14   courtroom.

15   Q. But, of course, the defendant himself has endorsed

16   anxiety in his interviews with you?

17   A. Yes.  And, of course, there were the diagnoses made when

18   he was -- in 2009.

19   Q. When he was 14 and 15?

20   A. Yes, sir.

21   Q. And generally anxiety is a theme that runs through his --

22   A. Yes.

23   Q. You mentioned Paxil.  That is also antipsychotic?

24   A. No, absolutely not.  It's an antidepressant.

25   Q. Antidepressant, excuse me.  And how much time does Paxil

BALLENGER - EXAMINATION BY MR. BRUCK

1    take to -- in most cases to have an affect?

2     A. One or two, two and a half months.

3     Q. Months?

4     A. Ballpark.  Maybe three to have the maximum effect that

5    it's going to have.

6     Q. I discussed with you -- I had my rather long-winded

7    hypothetical about a political delusion, and you said, well,

8    that would be a somewhat bizarre delusion, right?

9     A. I'm not sure I can agree with that.

10    Q. Well --

11    A. Please --

12    Q. The delusions are categorized as bizarre and nonbizarre?

13    A. Yes, that's one of the ways we categorized them.

14    Q. An example of a bizarre delusion given in the DSM -- and

15    I'm quoting from page 87 -- is a -- the belief that an

16    outside force has removed a person's internal organs and

17    replaced them with somebody else's organs.  This is a bizarre

18    delusion?

19    A. Yes, or putting a radio in a tooth that gets messages

20    from Mars.

21    Q. An example of a nonbizarre delusion is the belief one is

22    under surveillance by police, despite a lack of convincing

23    evidence?

24    A. Yes.

25    Q. So delusions of a sort that are found in schizophrenia

BALLENGER - EXAMINATION BY MR. BRUCK

1    spectrum disorders don't have to be bizarre in order for them

2    to be classified as delusions?

3     A. Yes.  But what is missing in that hypothetical is the

4    swallows fly in a flock.  So if there is such a delusion,

5    there is multiple other evidence of psychosis, other

6    delusions, hallucinations, negative symptoms of

7    schizophrenia, odd behavior, and so forth.

8     Q. That is with schizophrenia?

9     A. And most delusional disorders.

10     Q. But there are delusional disorders that do not involve

11    negative symptoms and hallucinations and other symptoms of

12    negative and positive or schizophrenia?

13     A. Yes.  The part that is important for me and for this

14    assessment of competency is that it is those other symptoms

15    which would speak most loudly about competence and

16    incompetence.  It's those positive thoughts, positive speech,

17    and a disorganization, inability to talk in a logical way

18    that people can understand.  It would be those things that

19    would make such a person incompetent.  Again, your

20    hypothetical climbs way out an a limb that, yes, there are

21    single delusion difficulties that somebody somewhere has.

22    The real issue for me is that 99.9 percent of people with

23    even one delusion also have other signs of psychosis and

24    can't do the certain -- the things that the defendant did in

25    this very in-depth evaluation.

BALLENGER - EXAMINATION BY MR. BRUCK

1          For instance, to make clever jokes about his

2    so-called delusions.  Just doesn't happen in psychotic

3    people.  They don't have a sense of humor -- let me finish,

4    please.

5          They can't have a sense of humor about that, but

6    then also don't relate in a warm, open way.  Can't fake three

7    different tests about their -- whether or not they are

8    psychotic.  Can't do them exactly the same, which is two PAIs

9    which are almost the same.  And that is the problem with your

10   hypothetical in my opinion, and it's pertinent to this

11   evaluation, is that even if I accepted that the defendant had

12   a single somatic delusion or three, that nothing else is

13   there of a psychotic nature, and it's those things that could

14   have made him incompetent to stand trial.

15         But then the second prong is ability to

16   satisfactorily understand how this process works takes care

17   of that problem.  So even if he had three somatic delusions,

18   it's my professional opinion from the totality of the

19   evidence that even if he did, they do not make him

20   incompetent to stand trial.

21   Q. So, in effect, are you telling me that if you have a

22   strong enough understanding of how the courtroom process

23   works, the function of the judge or the prosecutor, the

24   lawyers and the jury, and so on and so forth, that proves

25   that a person has the capacity to consult with a rational

BALLENGER - EXAMINATION BY MR. BRUCK

1    degree of understanding with their counsel?

2    A. No.  It takes care of everything except that.  And that

3    is the way my report was structured.  It leaves us in this

4    space where the kind of issues that you and your team have

5    raised are really what the trier of fact has to pay attention

6    to in my mind.  The other questions are in my opinion easier.

7    There is massive evidence that my opinion is correct.

8        It's just in this small area for which I have little

9    evidence that it is possible that his level of cooperation

10   and noncooperation with you, not from a voluntary point of

11   view, but from an ability point of view, that any inabilities

12   he has to work with you and the team, that is what is at

13   question, and from my perspective only that.  Legally how you

14   deal with the fact of a conscious refusal to cooperate with

15   counsel is thankfully not my job, I don't think.

16   Q. Before lunch we talked a little bit about prodrome of

17   schizophrenia.  And prodrome, of course, is the period that

18   precedes the full flowering of the disease.  It's correct

19   that a prodrome manifests through symptoms, correct?  It's

20   not simply a period of latency?

21   A. Yes.  Although technically, say, if nobody had symptoms

22   until they were ten, whatever is going on is going on.  We

23   just can't see it at all.  But so, yes, the prodrome becomes

24   offered in retrospect frequently -- almost always in

25   retrospect.  Evidence that we can look back and say, you

BALLENGER - EXAMINATION BY MR. BRUCK

1    know, that was the prodromal period because he, in fact,

2    wasn't able to make friends, seemed to be odd in his youth.

3    So that's what generally allows us to in retrospect after the

4    psychosis, unfortunately, becomes manifest for us to go back

5    and call that the prodrome.

6    Q. Right.  But there are quite a lot of -- characterized by

7    an array of symptoms?

8    A. Correct.  And signs.

9    Q. And signs.  And Mr. Roof now, and at all relevant

10   periods, say, from the two-year period as he was thinking

11   about this, or thinking about racial -- let me begin again.

12         During the two-year period when he describes himself

13   as having become racially aware, up until the crime and until

14   now, which I guess is three years, he is in the period of

15   stage of life that is classic for the onset of schizophrenia.

16   Is that a fair statement?  This is when it most often appears

17   when it does?

18   A. That is correct.

19   Q. And you have a history which is characterized by doing

20   quite well in elementary school and then early middle school,

21   and then a very sharp drop off at age around 14, 15, leaves

22   school at age 16 in the ninth grade, and then essentially

23   becomes an -- isolated in his room, a recluse, on the

24   Internet, very little social contact until the time of the

25   crime, with only a few periods out of his room and two-month

166

BALLENGER - EXAMINATION BY MR. BRUCK

1  periods of employment.  That is pretty much his life course,

2  correct?

3   A. He had a bit more friends, acquaintances, compatriots

4  than that.  At one point he described the people that he used

5  drugs with, those kind of friends.  But, yes, that is a fair

6  characterization.

7        MR. BRUCK: Bear with me just a moment.  I think I

8  may be done, Your Honor.

9  BY MR. BRUCK:

10   Q. On the subject of jokes, page 39 of your report, bottom

11  of the page.

12   A. Yes.

13   Q. "He agreed that he told the victims, 'I have to do this,'

14  and he still feels that he had no choice about that," by

15  which you apparently mean the murders.  "When asked why, he

16  stated with a smile, 'Well, people will kill my family if I

17  didn't do it.  Or by, So you see I had to do it.'  After that

18  he paused, and then burst out laughing, and said, 'No, that's

19  just a joke.  I did it because I have to call attention to

20  what's going on.'  He went on to say, 'I'm just messing with

21  you.'  This joke was very believable and humorous."

22   A. Yes.

23   Q. You found his joke believable and humorous?

24   A. Given that he knew that I knew that you had said that to

25  me, that that delusion had been relayed to me that the reason

BALLENGER - EXAMINATION BY MR. BRUCK

1  he was doing this was because he had to because he might be
2  killed if he didn't.
3   Q. Who told you that?
4   A. I think you did, or your team, that that was one of the
5  delusions, that he was already involved in that kind of
6  thinking.
7   Q. Did you make a note of any such statement that we told
8  you that?
9   A. If it's not in the notes that you have of mine, then, no.
10  But it was my clear memory that it came as an idea from you
11  guys that he -- that the reason he was not talking about this
12  is that the white nationalists are watching him and could
13  hurt him if he backed down or didn't do it or what -- now,
14  the reason it was humorous is both his knowing that, the way
15  he delivered it, the pause of that that he did it, and just
16  how many hours we had talked about these kind of things, him
17  knowing that I was trying to find behind the "Well, I can't
18  talk about that, I don't know," knowing that I was trying to
19  find a psychotic kind of reason, that he then turned the
20  tables on me and -- because he likes to mess with people.  He
21  told me that multiple times.  And messed with me by setting
22  me up for a joke, which he delivered with Jack Benny
23  capabilities.
24   Q. Did he tell you that he was messing with people at the
25  mall when he got himself arrested on February 28th?

BALLENGER - EXAMINATION BY MR. BRUCK

1    A. Yes.

2    Q. He was trying to make jokes, right?

3    A. I don't know.  He said he was messing with them, that he

4    was -- what he conveyed was that he was asking them a lot of

5    questions, but he was just messing with them.  He described

6    that -- I can't remember the exact -- that he was messing

7    with his sister when he played a sort of small joke on her.

8    But at various times in the three interviews, he would return

9    to this notion that "I'm messing with you.  I'm just playing

10   sort of a joke on you.  I'm joking with you" kind of an idea.

11   Q. Okay.  And among the jokes that he played on his sister

12   was that when she informed him that she was going to have a

13   baby, he asked if it was too late for an abortion and that

14   was a joke?

15   A. I don't know whether that was a joke or not.  I saw that

16   one the first half of that interview with his sister.

17   Q. You saw that.

18   A. Right up literally to that kind of thing, talking about

19   why she is moving to Pennsylvania, but so I don't have enough

20   information to know whether that was a joke, a bad joke, or

21   whatever.

22   Q. You didn't ask him?

23   A. No.  This was a humorous joke.

24   Q. This was a humorous joke?

25   A. Yes.

BALLENGER - CROSS-EXAMINATION BY GOVERNMENT

1    Q. So I'm clear, you told him that we told you that he had

2    stated to us that the reason he felt he had to go through

3    with this crime was that his family would be killed if he

4    didn't?

5    A. Yes.  But he then -- right after it said that he had

6    never said that to anyone, including his parents.

7    Q. Okay.  And you don't remember whether you wrote that in

8    your notes of our conversation with you that we told you any

9    such thing?

10   A. No, I don't remember that, frankly.

11            MR. BRUCK: That's all I have.  Thank you so much, I

12   appreciate your patience.

13            THE COURT:  Examination by the Government.

14            MR. RICHARDSON: Thank you, Your Honor.

15                        CROSS-EXAMINATION

16   BY MR. RICHARDSON:

17   Q. Dr. Ballenger, we'll try to be a little briefer.

18            You feel competent -- or you feel confident that you

19   are fully competent to perform this evaluation?

20   A. Yes.

21   Q. Okay.  And you feel like you've got the requisite

22   education, training, and experience to do so?

23   A. Yes, otherwise I wouldn't have taken the job.

24   Q. All right.  And we are not going to go through it, you

25   will feel good to know, but you put your entire CV, had to

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    come in three parts, it was so big, right?

2     A. I'm not aware of that, but there are always jokes about

3    how many pounds it weighs and things like that.

4     Q. Just tell us a little bit -- I don't want to go through

5    each and every detail, but tell us a little bit about the

6    education, training, and experience you have as it relates to

7    anxiety and anxiety-type disorders.

8     A. Well, the first research project I ever did in my life

9    was in 1971 at Harvard, and --

10    Q. I'm sorry to say I wasn't born yet.

11    A. Yes, I know.

12         THE COURT:  And you weren't at Harvard at any time.

13         MR. RICHARDSON: Nor did I get close to Harvard,

14    except to go see it a couple of years ago, just to walk

15    around the yard.

16         THE WITNESS:  It's pretty, isn't it?

17         That was my first study, and I chose -- people have

18    asked me why did I choose panic disorder with agoraphobia,

19    and I chose it because it was an appropriately tiny area for

20    a tiny little resident to be studying.  Ten years later I

21    went to the American Psychiatric Association meeting, and I

22    asked a lady on the bus what was this meeting about, and she

23    said, "As best I can tell, it's all about panic disorder."

24    So I went from tiny to this is now the most common disorder

25    that takes people to see psychiatrists, outpatient

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    psychiatrists.

2         So I've had this long history with panic disorder as

3    a researcher, as developing treatments for it, as a long-time

4    member of the Anxiety Disorders Association of America,

5    holding multiple positions.  They are running the annual

6    meetings twice, a head of the research group on the board.

7         I have then been the head of the consensus on

8    anxiety and depression, which a worldwide group that we met

9    for four years, and we brought in the world's experts on

10   various anxiety disorders together in various places, and we

11   talked and argued for three or four days, that I wrote a

12   consensus of what we decided, and then we published their

13   articles.

14        And so in that kind of context, I've gone on to be a

15   member of the steering committee to study in a similar way

16   social anxiety disorder and to some extent PTSD and to some

17   extent generalized anxiety disorder and OCD.  Those are the

18   five disorders, and so there is a lot.  And I --

19   Q. That's probably just a summary of what you've done in

20   that area?

21   A. It is.  So I get patients now who look me up on the

22   Internet and come see me.

23   Q. And without going through it, the other things that we've

24   talked about here, depression that you've mentioned,

25   discussions about delusions, various schizoid-based

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    disorders, all that you talked about, fair to say you've got

2    extensive experience in diagnosing and treating those types

3    of patients?

4     A. Yeah.  And actually it's worth me telling you a little

5    bit about that.

6     Q. Please do.

7     A. In that I have state hospital experience where, you know,

8    60 to 80 percent of the people there have that one disorder.

9    It was the -- I ran an inpatient enlisted men in the Navy

10   where 80 percent of the people admitted there had acute

11   schizophrenia.  I was head of inpatient psychiatry at the

12   University of Virginia where most people do that.  I have

13   published in that area.  And for many years, I taught both

14   the medical students whatever they learned about

15   schizophrenia, and I taught the residents whatever they

16   learned about schizophrenia in a seminar setting where we --

17   you know, for a period of time, we would study schizophrenia,

18   and we would talk back and forth.  And I was the faculty

19   member who taught them about that.

20    Q. So fair to say that you are a subject matter expert in

21   anxiety and related disorders as well as schizophrenia and

22   related disorders?

23    A. Yes.

24    Q. In doing your work, you obviously use clinical

25   evaluations a fair bit.  Do you consider yourself an expert

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    based on your education, training, and experience in

2    conducting those clinical evaluations in order to get the

3    best and most useful information that you can have?

4    A. I would have a hard time doing this for 46 years if I

5    weren't.  But I also have some validation.  I have been

6    around the world teaching people how to evaluate people.  So,

7    yes.

8    Q. Talk to me a little bit about sort of context of -- in

9    which -- you have used the term several times, "totality of

10   circumstances," which I think we use in the law, but I think

11   you used here.  In talking about the totality of

12   circumstances, I think you talked about the tests that

13   Dr. Wagner ran.  You talked about the records.  You talked

14   about the clinical interviews, and obviously your extensive

15   training, experience, and background, but tell me a little

16   bit about what piece each of those play in ultimately

17   reaching your conclusion.

18   A. Well, let me also point out that the psychiatrist,

19   Dr. Leonard in the jail, saw him right after he came in and

20   then --

21   Q. Why don't we go ahead and talk about her.  That is

22   Defendant's Exhibit 7.  We are going to talk about her while

23   we are on the topic.

24   A. Well, what is important is that she saw him right after

25   the event.  She saw him several months later.  She

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    specifically said, one, that he was anxious, but there was no

2    evidence of psychosis.  She said that he denied now or ever

3    any signs or symptoms of schizophrenia.  And so we do the

4    diagnoses.  Axis I is the main one, that that's where you

5    would put schizophrenia, and you put personality disorders in

6    II.  But she left that and said no diagnosis.  When she saw

7    him several months later, two months at least, she said no

8    diagnosis there.

9         His pediatrician, you know, said he was a very nice

10   young man, and that he was anxious.  When he then saw me and

11   saw Dr. Wagner, Dr. Wagner saw nothing clinically.  He's a

12   good clinician.  He saw nothing that suggested schizophrenia

13   or a psychosis or any partial psychosis.  And he knew that

14   was his task, to test to see sort of underneath the edge of

15   the tent is there something hidden in there that the person

16   is by not answering questions or saying "I'm wrong," or is

17   hiding a psychotic process of little proportion, big

18   proportion, and the testing that he did said no.  Also said

19   that he was very bright.

20        And third -- the third question I asked him to

21   explore, is there any evidence that he's malingering, because

22   we see that a lot.  And he said no.  In fact, what he found

23   was contrary to all three of those.  He found positive

24   evidence that he was very bright; there was absolutely no

25   malingering; and that he had the kind of diagnoses that we

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    are talking about, anxiety disorder, schizoid kind of
2    personality, that that is what is there, and the others were
3    not there.
4          And then if you look through all of the writings,
5    you know, there is no bizarre except this white nationalist
6    revolution kind of idea, but I don't think that is bizarre,
7    not in a psychiatric sense.  Bizarre is martians and very
8    improbable things.  That's why we call them bizarre.  They
9    just couldn't possibly be true.  That there is a racist
10   underbelly to many societies, that is certainly true.  So
11   when I look at all of the evidence, it seems clear that is
12   what my opinion is based on.
13         And I will tell you one other thing that may sound a
14   little -- whatever.  And I apologize if it does --
15   Q. No, we just want to hear it.
16   A. That's right.  That people who are psychotic -- I also
17   want to make this point that they are malingering.  They
18   can't help themselves sooner or later, in a long, prolonged
19   process, and that's why we do it.  That's why I told the
20   Judge that I needed to be able to see him three times.
21   Sooner or later they slip.  So if somebody is hiding a
22   psychosis, and they hide it for hours from me, I just don't
23   believe that.
24         Now, is that possible under God's sky?  Yeah, I
25   guess.  I just absolutely, absolutely don't believe it.

BALLENGER EXAMINATION - BY MR. RICHARDSON

1     Q. In talking about that, you talk about sort of under or
2     over reporting of symptoms, sort of malingering or hiding a
3     psychosis.  Tell me whether that's part of what you are doing
4     during your clinical evaluation.  Are you trying to determine
5     that fact, and how are you going about identifying whether
6     someone is being sufficiently candid for you to perform your
7     evaluation?
8     A. From beginning to end.  Now, one of the points I made
9     more than once in court is when somebody's clinician comes
10    and testifies, that -- I say that is really not fair.  A
11    clinician is always on the person's side.  They have an oath,
12    a Hippocratic oath not to hurt them.  If you come to court as
13    a forensic expert, it's a different thing.  Our ethical canon
14    says we are after the objective truth as best we can figure
15    it out -- more elegant language than that, but objective
16    truth requiring sufficient skepticism about the whole thing
17    that the person you are examining has to say.  So I am
18    skeptical from day one.  I mean, this is somebody who is in a
19    very serious situation, a very serious set of crimes and
20    charges.  So, for instance, is he malingering psychosis.
21    That would actually be what you might expect, that he would
22    try to look like he was psychotic to me.  And, you know, we
23    have ways of picking that up, including psychological
24    testing.  But that kind of thing, or is he trying to hide it
25    for some other reason?  And I listen to every single thing he

BALLENGER EXAMINATION - BY MR. RICHARDSON

1   says, writes, or does with that ear, because that's my job as

2   a forensic psychiatrist, and I'm pretty clear about that.

3        Q. And is it fair to say you took into account his refusals

4   to answer or false denials that you talked about with

5   Mr. Bruck, you took all that into account in reaching the

6   conclusion you came to?

7        A. From day one, when Judge Gergel called me, I said that's

8   the thing that bothers me -- it was the second day, I guess,

9   because I had the hearing.  Yes, that that was a -- and as I

10   said in my testimony that I said that to the defendant, that,

11   "You know, before I leave here on Saturday, I've got to

12   understand why you are doing that.  I need to understand it

13   for me and for you and for the process."  And so it was front

14   and center all three times I met with him and in my thinking

15   from the beginning to end.

16        Q. And are you confident that the answer he ultimately gave

17   up on that, the desire to protect his message and to maintain

18   his standing when he's alive or after he's dead, that that is

19   the true rationale for why he didn't want to answer some of

20   those questions?

21        A. Yes.  He has convinced me that that is -- and I have

22   convinced myself that that is far and away the most likely

23   explanation.  It is number one, and the next likely thing is

24   number 15, everything in between being number one.

25        Q. In sort of starting this process and going through it,

BALLENGER EXAMINATION - BY MR. RICHARDSON

1   you sat down with defense counsel or on the phone about an

2   hour and 45 minutes to talk about what information they

3   wanted to provide to you.

4    A. Yes.

5    Q. Is that fair?  And among the things that they claim that

6   he had that they thought was problematic was these somatic

7   delusions that we've talked a lot about?

8    A. Yes.

9    Q. And as I understand your -- the most likely outcome in

10  your mind is that his concerns about his head or sides of his

11  body are anxiety-related health concerns, not delusionary?

12   A. That is my number one possibility.  I'm not saying that

13  that is definitely the only one.  But that actually holds

14  together, is consistent with the rest of his clinical

15  picture, the fact he has been anxious since he was 14,

16  seriously anxious, and in those years afterwards, he was

17  going to doctors again and again with health-related anxiety.

18  You know, is my left side abnormal?  Do I have thyroid

19  disease?  Test it again.  Test it again.  Test it again.  My

20  hair is falling out when it's not.

21       Now, you can take that to be supportive of the

22  psychotic delusion, or you can take it that it's yet another

23  evidence of his being anxious about health concerns.  And I

24  will tell you within my clinical practice, as soon as I walk

25  outside this room and turn my phone on, I'm going to get a

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    call from a patient of mine who has so much health anxiety

2    that he calls me two or three times a day.

3      Q. And we talked about health anxiety as sort of being a

4    hypochondriac, a layman's term?

5      A. It's far more than that.  People who are convinced they

6    have cancer, in the old days; then it was for many years that

7    they had HIV, tested normal.  Well, a month later, test me

8    again and so forth.  It's an overwhelming anxiety, narrowly

9    focused on health and bodily concerns.  The fact that he has

10   serious anxiety problems, at least social and probably

11   broader than that, makes that this is -- that makes this my

12   first -- my first understanding or hypothesize -- hypothesis

13   of what this is about rather than put that this is a

14   malignant somatic delusion because he's gone from seven or

15   eight years having a lot of anxiety about his health and

16   about these delusions -- delusions, whatever we want to call

17   them, but he hadn't gotten any worse.  And he's in the period

18   of risk for schizophrenia.  He stayed anxious, but he has not

19   become schizophrenic.  That is, again, evidence that it's an

20   anxiety issue.

21     Q. And one of the reasons -- and excuse me if I butcher your

22   language here -- we talk about anxiety disorder as being

23   clustered.  When you see one, you tend to see multiple?

24     A. Yes, that is true.

25     Q. So one of the pieces of evidence that you look at, if

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    somebody is anxious in one area, it is more likely they will

2    be anxious in other areas?

3     A. Yes, several different anxiety problems.  He had some

4    obsession with issues of washing his hands too much, not

5    being sure that his bladder was empty, so going repeatedly.

6    That's another kind of anxiety problem that he also has.  The

7    formal term for it is his comorbid anxiety.  But that is the

8    way they come.  The average anxious patient has pieces or a

9    lot of one, two, or three -- two or three anxiety disorders.

10     Q. You talked about this idea that he -- where this began,

11    this health concern to not put a label on it, and in

12    reviewing the records, did you recognize he first became

13    concerned about having lymph node cancer because his mom's

14    boyfriend was diagnosed with lymph node cancer, and that

15    caused him to believe he had lymph node cancer, too?

16     A. I had forgotten that.  That is a great example.  When I

17    started studying panic disorder and nobody knew what it was,

18    and we didn't have much money, so we would meet with them in

19    group to -- and there was the problem of contagion.  So one

20    person who came in didn't have a problem with X.  You know,

21    someone over here talked about I've got trouble doing this;

22    suddenly they would have it, too.  So that is the way anxiety

23    is contagious to people who have anxiety disorders.  But that

24    is a great idea.  I don't know where the thyroid came from.

25    Maybe he did have some --

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    Q. Did you see after he went to the oncology group and they

2    tested him and said he didn't have cancer that he next

3    fixated on that he had a thyroid problem, and that followed

4    directly from his concern about lymph node cancer?

5    A. And probably somebody felt his throat, and it would be

6    logical -- I don't know that that is what happened, but it

7    would be entirely logical he would go from lymph node to

8    thyroid.

9    Q. In your review of all the records, prior to Amy's

10   boyfriend getting lymph node cancer and these issues arising

11   with his health concerns, did you see any of those types of

12   health anxiety or health concerns that existed?

13   A. No.  The pediatric records I saw before that were all

14   entirely normal.  Colds and allergies and stuff like that.

15   Q. And one of the things that, if you look it up on the

16   Internet, that you learned about thyroid disorders is that

17   they can cause your hair to fall out, right?

18   A. Yes.  And he knows that connection.

19   Q. Right.  And how do you know that he knows that

20   connection?

21   A. I'm not sure exactly how I learned that.  From the

22   records, from the records somewhere.

23   Q. He mentioned in fact that his thyroid was causing his

24   hair to fall out?

25   A. Yes.

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    Q. Something to that effect --

2    A. Yes.

3    Q. -- I'm not trying to quote it, right?

4    A. I think -- yes.

5    Q. And that is consistent in your mind with someone who has

6    anxiety about health-related issues?

7    A. Absolutely.

8    Q. Mr. Bruck talked to you a little bit about the

9    information that had been provided to the defense's group of

10   mental health experts.  Do you remember discussing that with

11   Mr. Bruck?

12   A. I think so, yeah.

13   Q. And this is where Mr. Roof indicated he wished he hadn't

14   maybe told those experts quite as much?

15   A. Yes.

16   Q. All right.  And you understood that all of those experts

17   were mitigation experts at that time, right?

18   A. Yes.

19   Q. Okay.  They weren't hired to be doing competency

20   evaluations, right?

21   A. Yes.

22   Q. Okay.  And Mr. Roof understood that the information he

23   had provided to them was going to be presented as mitigation

24   evidence, right?

25   A. That's what I understood first, that he might have told

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    them more about his mental problems than he now wishes he had

2    done.

3     Q. Because he didn't want it presented in court for

4    mitigation?

5     A. Yeah.  That was my first understanding.  I wasn't quite

6    clear that he might not also have said that that might relate

7    to the prosecution witnesses, but he most loved what

8    Dr. Dietz did.  So I don't think that is really what he

9    meant.

10    Q. Prior to your getting involved, and all the records --

11    and the defense provided an enormous number of documents to

12    you --

13    A. Yes.

14    Q. Right?  And in that group of documents, prior to November

15    the 7th of this month, did you see any indication of anybody

16    who questioned the competence of Mr. Roof?

17    A. Let me just tell you when.  It was first raised for me,

18    and I never heard anything prior to that, the afternoon of --

19    Q. November 7th?

20    A. November 7th.

21    Q. All of the stuff they provided to you, there is no

22    indication in any of that material that any person had

23    questioned the legal competence of the defendant prior to

24    that time?

25    A. I'm sorry.  I did not understand your question.  I do

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    now.  No, I didn't see any evidence of that.

2     Q. You are aware -- and I think we talked about this.  You

3    know Dr. Dietz apparently?

4     A. Yes, I do, I've known him for 35 years.

5     Q. And based on the test results that were provided to you

6    that he had done, you can tell he did his exam on and around

7    October the 25th or 26th of this year?

8     A. Yes.  But all I got from him was the psychological

9    testing.

10     Q. I understand.  But it includes an examination date.  I

11    can't remember what it says, the 25th or the 26th, but it's

12    one of the two.

13     A. That seems right.

14     Q. And you also understand based on the information provided

15    to you that at some time between that and post November 3rd

16    he sent the letter to the prosecution team?

17     A. Yes.

18     Q. And that's the letter in which Mr. Roof in essence

19    rejects the advice of defense counsel?

20     A. Among other things.

21     Q. I'm getting there.  And rejecting the opinions of the

22    mental health experts that his defense counsel had hired?

23     A. Yes.

24     Q. All right.  And said, "Not only are they wrong, but they

25    would undermine my message," right?

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    A. Yes.

2    Q. And he does not want them used?

3    A. Correct.

4    Q. I'm going to hand you what's been marked as I think for

5    this hearing Government's Exhibit 1.  Do you recognize that?

6         THE COURT:  Mr. Richardson, are you going to be much

7    longer?  I'm thinking we maybe ought to take a break.  We

8    have been going quite a while.

9         MR. RICHARDSON: I'm happy to take a break, and I am

10   going to be a bit longer.

11        THE COURT:  Let's take about a ten-minute break.

12   We'll be at ease.

13        MR. RICHARDSON: Thank you, Your Honor.  For purposes

14   of Dr. Wagner -- I hate for him to be sitting and waiting.

15   That's why I was trying to rush through this.

16        THE COURT:  I don't want you rushing.  We'll do our

17   best.

18        MR. RICHARDSON: How late does the Court intend to go

19   and/or --

20        THE COURT:  I'll stay as long as we need to stay.

21        MR. RICHARDSON: To do both of them?

22        THE COURT:  Yes.

23        MR. RICHARDSON: Thank you, Your Honor.

24        THE COURT:  But talk to Dr. Wagner before we sort of

25   inconvenience him about whether tomorrow --

BALLENGER EXAMINATION - BY MR. RICHARDSON

1            MR. RICHARDSON: This evening or tomorrow morning

2    would be better?

3            THE COURT:  That's right.

4            MR. RICHARDSON: We'll find that out, Your Honor.

5            THE COURT:  Mr. Bruck needs to have an opportunity

6    to cross-examine him, and I don't want to rush that.

7            MR. RICHARDSON: That is my only concern.  I suspect

8    he may have redirect of Dr. Ballenger after I finish as well.

9    So thank you, Your Honor.

10           THE COURT:  He'll have to persuade me how much more

11   we need of that.

12               (Thereupon, there was a brief recess.)

13           THE COURT:  Mr. Richardson, you may proceed.

14           MR. RICHARDSON: Just for the Court's information, we

15   did speak with Dr. Wagner, and Dr. Wagner indicates, given

16   his very full schedule tomorrow, he would appreciate an

17   opportunity to stay and finish this evening if that is

18   possible.

19           THE COURT:  We will find a way to accommodate him.

20   Thank you.

21           MR. RICHARDSON: Thank you, Your Honor.

22    Q. When we finished, Dr. Ballenger, we were talking about

23   the letter Government's Exhibit 1.  Do you recognize that?

24    A. Yes.

25           MR. RICHARDSON: Okay.  We move the admission of

BALLENGER EXAMINATION - BY MR. RICHARDSON

1      Government's Exhibit 1 as part of the record.

2                    THE COURT:  Any objection?

3                    MR. BRUCK: For the purposes of this hearing only.

4                    THE COURT:  Let me just say, Mr. Bruck, for

5      everything here is for this hearing only.  And so I

6      appreciate you making the point.  Government's Exhibit 1 is

7      admitted without objection.

8                    (Thereupon, Government's Exhibit 1 introduced into

9      evidence.)

10     BY MR. RICHARDSON:

11      Q. And -- are you all right?

12      A. Just a minute.

13      Q. The -- I'm going to try to avoid repeating what you said

14      earlier, but you indicated that in your opinion that was a

15      rational, strategic choice by the defendant --

16      A. Yes.

17      Q. Right?  In fact, maybe a brilliant strategic choice?

18      A. Yes.

19      Q. And it manages, in your opinion, to very cogently convey

20      his thoughts?

21      A. Yes.

22      Q. And in that writing, nothing about that writing suggested

23      to you any kind of disorganized thought or inability to

24      communicate?

25      A. Let me be clear that the maneuver itself showed logical

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    thought, perhaps very smart thought.  The letter itself is

2    tight, logical, reasonable, nothing odd about it or the kind

3    of disorganized illogical thought that you would see from

4    somebody who had a broad psychotic property.

5    Q. And, in fact, in that letter, you also -- part of the

6    strategy about it was he envisioned that I would put it up on

7    a screen, right?

8    A. Yes.

9    Q. Right?  That I'd put it on the screen so the jury could

10    see it, right?

11    A. Yes.

12    Q. So that they would be able to understand his own words?

13    A. He said to me that you could then say, "The defendant

14    told me to say you can't believe what the other side -- my

15    side is presenting."

16    Q. Right.  He -- in essence, he wanted the jury to judge him

17    based on his own words, not the words of his defense counsel?

18    A. That is true again and again and again in talking to him.

19    Q. You talked a minute ago about Dr. Leonard and the sort of

20    relevance that -- you know, yet again, one piece of the

21    puzzle that led to your conclusion with respect to Mr. Roof.

22    I would like to show you Defendant's Exhibit 7

23    that's already introduced, and rather than trying to make you

24    find it, I'm going to hand you what is marked page D03947.

25    And you mentioned this Axis I, no diagnosis.  Do you see

BALLENGER EXAMINATION - BY MR. RICHARDSON

1  here?

2   A. Yes.

3   Q. And that is where you are referring to where Dr. Leonard

4  would have indicated any indications of the type of psychosis

5  or true psychotic diagnoses that she found to be the case.

6  That's where that would be indicated?

7   A. That is exactly right.

8   Q. On the Axis II, tell us what she indicated as a possible

9  Axis II disorder?

10   A. She puts "antisocial traits."

11   Q. And based on your evaluation, you find that he doesn't

12  have antisocial disorder.  Is that fair?

13   A. Yes.

14   Q. But it's also fair to say that June 17th was an

15  antisocial activity?

16   A. Yes.  You know, I mean, I think that's a very reasonable

17  opinion that Dr. Leonard had that there are traits, and I

18  would agree with that.  And essentially the defendant does

19  too.

20   Q. And this is back on August the 3rd of 2015.  And just a

21  couple of things that I want to point out consistent with

22  what you've talked about before.  The defendant told

23  Dr. Leonard that he traced the page of a book to mess with

24  his sister?

25   A. Yes.

190

BALLENGER EXAMINATION - BY MR. RICHARDSON

1   Q. Right?  And that's the story you were talking about

2   earlier.  He traced *The Sorrows of Young Werther* to insinuate

3   he's going to commit suicide?

4   A. That's exactly where it came from.

5   Q. But then he didn't go on to deny any suicide ideations?

6   A. That's correct.

7   Q. He also goes on to explain, as we see repeatedly, that "I

8   have no regrets for anything I've done."

9   A. Correct.

10  Q. And Dr. Leonard put that in quotes directly from the

11  defendant?

12  A. Correct.

13  Q. It goes to talk about how even at this point in August of

14  2015, he denied having any psychotic symptoms?

15  A. And she adds the word "ever" having any psychotic

16  symptoms.

17  Q. Thank you for correcting me.  It indicates here that he

18  does hope for a life sentence, that he doesn't want to die,

19  right?

20  A. Yes.

21  Q. Okay.  And then he makes a joke with Dr. Leonard about

22  how he needed these pain pills for his, quote, chronic low

23  back pain, and smiles and chuckles?

24  A. Yes.

25  Q. Why is that a joke?  Why is that -- and you smile as soon

BALLENGER EXAMINATION - BY MR. RICHARDSON

1   as I started talking about it.  What is funny about that?

2    A. Well, I smile because there it is again.  He's messing

3   with her.  He enjoys messing with his sister, messing with

4   Dr. Leonard, messing with me, probably other people as well.

5   He is playing with the circumstance and sort of pretending

6   that he's trying to trick Dr. Leonard into giving him pain

7   medicines, which he knows he can't get in jail.  But he's

8   asking her for it.  And it's a joke.

9    Q. And he indicates that by smiling and chuckling after he

10   asks the joke, right?

11   A. Yes.  She indicates that.

12   Q. Right.

13   A. That he smiled and therefore concluded it was a joke.

14   Q. And then the final thing here, "Inmate denies symptoms of

15   depression, anxiety, and states that 'I was in a pretty good

16   mood after court last week'"?

17   A. Yes.

18   Q. And that court last week was his federal arraignment,

19   right?

20   A. Yes.

21   Q. All that information again is sort of consistent with the

22   medical opinions that you arrived at in this case?

23   A. Absolutely.  It was when she completed the group, that

24   every single, to my knowledge, mental-health-trained person,

25   me, Dr. Wagner, Dr. Leonard, allegedly Dr. Dietz, I don't

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    know what his opinion is, the other psychologists that saw

2    him, and everybody fails to find psychosis.

3     Q. The Court handed you as Court's Exhibit 1 your report.

4    And you don't have to pick it back up now, but just for the

5    record say you stand by everything that you said in that

6    report is true and accurate and fully reflects your own

7    opinions?

8     A. Yes.

9     Q. Okay.  And that continues to be true even after Mr. Bruck

10   asked you the day's worth of questions?

11    A. Yes.

12    Q. When -- on page 43 of it -- you are welcome to look at

13   it, but you probably need not.  These are not going to be too

14   specific, I don't believe.  You indicate that it's your

15   medical opinion to a reasonable degree of medical certainty

16   that he does not have a psychotic process.  You sort of

17   elaborated on that fairly extensively.  Anything that you

18   want to add to why you think this is not a psychotic

19   defendant?

20    A. In my opinion, there is absolutely no evidence that he

21   is, separate from what his defense team relates and thinks of

22   his sort of psychotic -- the delusions that we went through

23   with Mr. Bruck.

24    Q. Okay.  But let me just focus for just a second on the

25   notion that he has a future prediction that there was going

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    to be a white revolution, and I think that is the phrasing

2    you have used to sort of -- post-revolutionary war,

3    post-revolution timeframe.

4              In addition to sort of holding that view, did he

5    provide you examples, both in his clinical interview, but

6    also in his writings, of that being the case, like South

7    Africa and Rhodesia, apartheid states in the heart of Africa,

8    that he had talked about how powerful those were for him as

9    an example?

10   A. Yes, particularly Rhodesia, but also South Africa, just

11   examples of whites even in the minority dominating the

12   majority of nonwhite.

13   Q. Did he also talk about the control that someone like

14   Putin and Assad are exercising over their countries?

15   A. Yes.  They are both heros, and he said that Assad is a

16   hero, even -- really sort of because he's just a pure racist.

17   I mean, that's his strong suit.

18   Q. Right.  That's what makes, to the defendant, Assad a

19   powerful figure, an example to be modeled after?

20   A. Yes, that's why he likes Assad.

21   Q. And it provides support for such a belief that such a

22   ruler could come to the United States or could arise in the

23   United States?

24   A. Yes, that people -- like-minded people could rule the

25   United States.

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    Q. When he talks with these sort of racist views and this

2    idea of a white uprising, did he talk to you about statistics

3    that he had pulled off the Internet?

4    A. Um, some, and in particular one that comes to mind, the

5    obvious statistic that the minority population in the United

6    States, soon it will be the majority of America -- the

7    majority will be nonwhite, and that that will be when whites

8    start getting openly even more killed.

9    Q. And talking about whites getting killed, did he provide

10   you statistics on black-on-white crime that he had found on

11   the Internet?

12   A. Yes, the statistic -- what he says is a fact of two white

13   women get raped every day in each of the 50 states.

14   Q. And we are not going to have it out here.  There are lots

15   of reasons why we might question that statistic?

16   A. Yes.

17   Q. Right?  But it is a statistic that is published by the

18   Bureau of Justice Statistics, right?  An arm of the United

19   States Government; is that right?

20   A. Yes.

21   Q. Okay.

22   A. Okay.

23   Q. Did he talk to you about the Internet information that he

24   described reading about white supremacists and white

25   nationalists?

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    A. Yes.  That is, in all fairness, I think where he told me

2    that he gets the majority of his rhetoric and even ideas.

3    Q. And including the idea that there will be a white rising,

4    that white nationalist power will ultimately prevail?

5    A. Yes.

6    Q. And you talk a little bit about the Daily Stormer, a

7    white nationalist and white supremacy website where people

8    talk about this white power and white rising?

9    A. Okay.  I have never seen it.

10   Q. But you have seen in the records that that is what it is?

11   A. Yes.  Yes.

12   Q. Okay.  And he also talked to you about listening to the

13   news.  He hates NPR, but he listens to it?

14   A. Yes.

15   Q. Listens to Michael Savage and other talk show hosts as

16   well?

17   A. Yes.

18   Q. And --

19   A. He gave multiple examples of it, where there was a riot

20   in Charlotte, the post-Trump riots, and so forth.  You know,

21   he had right at his fingertips things he had pulled from the

22   news which is consistent with his belief.

23   Q. Right.  And did he talk to you about the riot that

24   occurred when the white nationalists held a convention in

25   Washington, D.C. this weekend -- or a week ago.  My days have

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    run together.  I apologize.

2     A. I don't remember that.

3     Q. In spite of the evidence -- and I'm not trying to go

4    through all of it, but in spite of that evidence that he

5    points to to support his belief, did he express a view of

6    what he thought the likelihood of such an uprising or

7    revolution actually occurring was?

8     A. Not directly, but there would be an uprising, and as I

9    remember imperfectly from my report, I ask him -- one of the

10   ideas that had been proposed that he -- the reason why he

11   doesn't need a defense is because there will be an uprising

12   and he'll be freed by his guards, and I asked him how likely

13   it was.  And I think he said extremely unlikely.

14    Q. A half a percent?

15    A. A half a percent.

16    Q. Or maybe even less?

17    A. Maybe even less.

18    Q. And did he also talk about -- and I think you tried to --

19   just to make it clear, in that discussion that you had with

20   him about this white revolution, he acknowledged that he

21   hoped it would happen while he was alive?

22    A. Yes.

23    Q. But it may well also be after he was dead?

24    A. Absolutely.

25    Q. I think he talked about it being in textbooks, that

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    Dylann Roof was the fountainhead, if you would, of that

2    uprising?

3     A. Yes.  That he wanted to preserve that even if he were

4    long dead, that when this movement is successful, they will

5    look back at Dylann Roof as having done an important thing to

6    start it off, get it going.

7     Q. We talk about now or we talk about South Carolina in the

8    1950s or '60s, has anybody concluded that profoundly racist

9    people are inherently delusional?

10    A. I'm sorry.

11    Q. It's meant to be --

12    A. It's a silly joke, and no.

13    Q. I'm not messing with you, though.  I just want an answer.

14    A. No.  To my knowledge I have never heard of that idea

15    before.

16    Q. Let me talk to you a little --

17    A. To go further, I have lived in the South almost -- a lot

18    of my life, and I have seen in the South, and especially in

19    Boston, amazing racism that is out and about in people who

20    are not psychotic.

21    Q. Let me talk to you just a second about delusions, and I'm

22    going to try not to belabor this point, but you happened to

23    go both to Carolina and Duke.  So are you a Tar Heel or --

24    which one do you go?

25    A. That is really a preposterous question.

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    Q. Undergrad Tar Heel, right?

2    A. Yes.

3    Q. I'm hesitant to use it given our judge, but I'm going to

4    use the Tar Heels an as an example.  We talk about delusions,

5    and sometimes people talk about having delusional beliefs in

6    their athletic teams.  And so one might, is it fair to say,

7    have very strong, fixed beliefs about the overall superiority

8    of the Tar Heel basketball program to the Blue Devil

9    basketball program.

10   A. Yes.

11   Q. And part of that strongly held belief is the willingness

12   to disregard evidence to the contrary.

13   A. Yes.

14   Q. Right?  Sort of confirmation bias, if you would?

15   A. Yes.

16   Q. Right?  To sort of choose the metrics that sort of

17   support your position, right?

18   A. Yes.

19   Q. That, and one way of doing that -- I don't want to

20   belabor too far, but you have a strong -- I'm not saying you

21   personally -- but if someone has a strongly-held belief about

22   the superiority of Tar Heel basketball, they do look at

23   certain evidence through that lens, correct?

24   A. Yes.

25   Q. Fair to say that every Tar Heel basketball fan in your

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    mind is not delusional?

2     A. No.

3     Q. Why is that not a psychotic delusion that rejects, you

4    know, metric evidence to the contrary, statistics to the

5    contrary, but instead stands steadfastly by, the baby

6    boomers?

7     A. Because they are not -- they are not -- nothing else

8    about them is psychotic.  Work every day, they pay their

9    taxes, they contribute to the university.  What they are are

10   zealots, maybe even true believers.  They strongly have --

11   when they say, we were a better team than Duke that year,

12   Duke cheated.  I mean, they make up rationalizations.

13    Q. Blame it on the referees, right?

14    A. Right.  Right.  Make many jokes about it.

15    Q. But that is a distinction -- just to help us that is a

16   distinction between being a zealot and being delusional?

17    A. Yes.

18    Q. And in your opinion that you reached here, is it fair to

19   describe that Mr. Roof is a zealot for his racist ideology?

20    A. That is my opinion, yes.

21    Q. He's not delusional about his racist ideology; he's a

22   zealot for it?

23    A. That's what I believe.

24    Q. Similar to the North Carolina fan might be almost

25   irrationally attached to their basketball team, right?

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    A. Yes.

2    Q. And it doesn't change that fact for a basketball fan that

3    they don't have a personal relationship with the 18-, 19-,

4    20-year-old basketball players, right?

5    A. Right.

6    Q. It doesn't affect -- the information they have about the

7    basketball team is from the Internet, or watching it from

8    afar, right?

9    A. Exactly.

10    Q. That doesn't make that belief about Tar Heel basketball

11    delusional?

12    A. Absolutely not.

13    Q. You talked a little bit about your ability to sort of

14    coax information out of a subject, sort of the ability to do

15    a clinical interview.  And Mr. Bruck seemed to suggest that

16    you should have run more rough over Mr. Roof.  Why is it that

17    you don't run roughshod over a patient that you are trying to

18    interview and talk to?

19    A. Well, and you have to establish rapport and some reason

20    that the person you're talking to believes they should talk

21    to you as opposed to the opposite, which is "I'm not talking

22    to you.  You don't speak that way to me, I'm not talking to

23    you and this interview is concluded."  That -- in fact at one

24    point -- I had forgotten this.  At one point either the first

25    or the second interview, Mr. Roof stood up and said, "I'm not

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    participating anymore."  And I was fortunately able to get

2    him to sit back down and continue.

3         You -- you run the risk of the person literally

4    walking out.  You run the risk of them messing with you

5    entirely, just lying to you, really trying to lead you down

6    an incorrect path.  But you just lose the ability to get what

7    you need to get, and it's a delicate process.  You know, I

8    teach young psychiatrists that you do that and you don't lie;

9    you don't trick the person.  On the other hand, if you are

10    smart, if they are starting to stiffen on something, it's a

11    good time to change the subject and to talk about something

12    else and come back to that.  Mark that subject as important,

13    but come back to it when the person is in a better place to

14    talk to you about it.

15    Q. Is that also consistent when you are dealing with

16    nonforensic patients, that you are trying to not turn them

17    off and close down and get up and walk out of your office?

18    A. Well, it is absolutely what I do all day long in my

19    office.  I mean, patients don't have to come back.  They

20    don't even have to finish the first session.  And certainly I

21    do the same thing in my forensic practice.  I catch myself

22    doing it when somebody won't do what I want them to do like

23    giving me an airline ticket.  You know -- but so -- yeah,

24    it's just simple, obvious, trying to elicit cooperation from

25    people who might not be interested in that.

BALLENGER EXAMINATION - BY MR. RICHARDSON

1          For instance in an adverse hearing, I from the first

2     sentence said, "I'm here because Judge Gergel sent me to help

3     determine whether you are competent to stand trial."  I

4     didn't say, "I came at your behest" or -- it would be worse

5     if I said I came for his own team's behest.  I mean, he did

6     say to me that he wouldn't see anybody else that his team

7     sent.

8     Q. Were you able -- are you comfortable and confident that

9     you were able to get from the defendant all the information

10    you needed during the course of those three, three-hour

11    independent medical exams?

12    A. One of the tests is how much I did get.  So, yes, I am,

13    and I got a lot of information.  I was not stopped at any

14    particular point, except repeatedly I was, "And what do you

15    mean you can't tell me?"  But then he finally did tell me

16    about why he was saying, "I can't, I can't tell you that."

17    So, yes, I feel like I got -- I didn't feel like I needed

18    more interviews.  I didn't feel like he didn't tell me some

19    fact or group of facts that is really important to my job.

20    No, I felt like I was able to do my job and complete my job.

21    Q. We didn't spend very much time today talking about the

22    defendant's ability to understand the proceedings, right? --

23    the first prong, if you would, of the competency standard,

24    and I'm not going to spend much time on it either.  But

25    suffice it to say that you found he was fully competent and

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    fully able to understand the nature of these proceedings?

2    A. To make a long story short, he not only knew the basics,

3    he knew the nuances, potential biases from various people.

4    Q. Tell me that.  What do you mean he understood the biases

5    from various people?  What do you mean by that?

6    A. He talked about his own team's mind-set and the nuances

7    that their strong beliefs about the death penalty might lead

8    them to be more on that team than his team; that there are

9    jurors who can deny all day long the questions you guys ask

10   them and sit down on the jury and have -- already convinced

11   that he was guilty.

12   Q. And sort of illustrating an ability not just to

13   understand his own world, or his own mind, but understand

14   what might be going on in the minds of others around him?

15   A. He gave the example that his best jury from his point of

16   view, his best jury would be all black.

17   Q. And why would that be the best jury?

18   A. Because it would quickly get to saying, "This is a

19   heinous act and he's guilty."  He said, though, that it's

20   okay, and it could also be a white guy who would also reach

21   the right conclusion, meaning his conclusion that he's

22   guilty, because white people often feel guilty and worry

23   about being judged as being racist when they secretly are,

24   and that white person might also lean over backwards.  So

25   those kind of nuances.

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    Q. People sometimes talk about the theory of the mind.  Does

2    that term ring a bell?

3    A. Yeah.  I don't have any idea what you are going to say

4    about what the theory of the mind is.

5    Q. It makes you nervous?

6    A. It does make me nervous.

7    Q. It just occurred to me as you are talking.  It's just

8    whether in your conversations you saw the defendant have a

9    developed theory of the mind.  It's an ability to understand

10   in the context of the theory of mind things.

11   A. I don't think I can answer that.

12   Q. Fair enough.  When we talk about his understanding, one

13   of the things that you talked a little bit about here is

14   Dostoyevsky and the array of books that he was reading.  Did

15   it appear to you that he had a fairly diverse interest in

16   fairly sophisticated writing?

17   A. Absolutely.  I found that -- I even asked him, "What is a

18   guy with a GED doing reading -- reading Goethe?"  You know,

19   very -- you know, I really challenged him, and he was very

20   comfortable with the question and the answer, finds it

21   interesting.  He actually -- I'm really kind of astounded

22   that he bounced ideas from different novels of Dostoyevksy,

23   and it was just sort of astounding that -- but when I got his

24   IQ test back, it made a whole lot more sense.  Those are the

25   kind of books that he would logically read.

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    Q. And he talked about a variety of different interests that

2    he's currently engaged in, the books, ranging from

3    Dostoyevksy to Goethe to Thomas Paine and otherwise?

4    A. Yes.

5    Q. And he talked about the engagement he's got to NPR.  We

6    talked a little bit already about his interests in politics,

7    both European politics and American politics.  He talked to

8    you about how he hoped that Hillary Clinton was going to win?

9    A. Yes.

10    Q. And had an explanation of why he was pulling for Hillary.

11    What was that?

12    A. I'm not sure.  What I remember is he thought Hillary

13    might pull us into a war.  But he thought --

14    Q. That the Trump -- yeah, that the Trump supporters might

15    have an uprising if Hillary won, right?

16    A. Yes.

17    Q. That might help him move toward his cause?

18    A. They might get mad and do something.

19    Q. He believed the Trump supporters included a contingent

20    that he believed of white nationalists?

21    A. He didn't say that, but he's smart enough to have figured

22    that out, yes.

23    Q. You talked about a number of sort of, you know,

24    conspiracy -- quote/unquote, conspiracy ideas, and he talked

25    particularly about the idea that vaccines cause autism or

BALLENGER EXAMINATION - BY MR. RICHARDSON

1   might cause autism.  And -- but he indicated that idea had

2   been debunked?

3    A. By the drug companies.

4    Q. What is your take out of that, both the understanding of

5   the conspiracy, that it had been debunked as well as the sort

6   of motive for that?

7    A. I took a couple of things out of that.  I went down that

8   road with him because those kind of thoughts would be a door

9   that I might go through in finding the other side of that

10   psychotic thinking.  I mean, those kind of commonplace,

11   dime-store beliefs that there is a government conspiracy with

12   the vaccines.  What I found was absolutely no.  And he

13   said -- and he made a joke about it, as was typical.  He said

14   it was debunked by the drug companies who profited by

15   debunking it, which is, you know, a moderately humorous way

16   of doing it.  But he said, "But that's the one conspiracy I

17   believe in."  Now, he actually believes in more than that.

18   Because he believes in the media coverup conspiracy, it would

19   seem to me to fit into that kind of thing.  But that's what

20   he said.

21    Q. Cautious to do this too far.  There would be some people

22   who would say the media coverup is not a conspiracy.  There

23   is a large portion of our country, for better or worse, that

24   believes the mainstream media story, narrative, if you would.

25    A. Absolutely.  You remember, also, I went from that

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    discussion to raising -- I threw out a trap by saying, "You
2    know, there is mercury in the fish we eat and that is killing
3    it."
4            And he didn't bite at all.  It was bait, and he
5    didn't bite at all.  He said, "Yeah, but that's true.  That's
6    not a conspiracy."
7    Q. What do you mean by you set a trap for him there and he
8    didn't bite?  Explain what you were trying to do and what his
9    answer conveyed to you?
10   A. Well, at that point -- I think it was in the third
11   interview, he had -- of the enumerable dozens, if not more
12   than that, attempts to find psychosis behind things -- he is
13   presenting that he's not psychotic to everybody, looks that
14   way, so I was really trying to get under that to pick up the
15   corner of the tent and see if there is anything in there, and
16   that is an area -- government conspiracies is an area where
17   both prejudice and psychosis both hide.  And I was sort of
18   seeing if he would bite and tell me some crazy idea about
19   vaccines because I had heard that he argued with his mother
20   that they shouldn't vaccinate their cat.  So I was on guard
21   and skeptical.  But that came up dry, and so then I did the
22   sort of intelligent conspiracy that I think that there is
23   mercury in the fish that we eat, and -- but he didn't take
24   that and go with any psychotic direction or even irrational,
25   or even prejudice direction.  He just said yeah.

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    Q. Mr. Bruck wanted to talk to you just briefly -- talk to

2    you a little bit about whether the family had racist views,

3    right?  Do you remember that discussion about --

4    A. I do.

5    Q. And you brought up ███████████ discussion about racism

6    in the family.  And Mr. Bruck suggested that, you know, Paige

7    Mann had a bias and an interest.  And in the course of your

8    review, did you review where Ben Roof confirmed that his son

9    Dylann was engaged in these racist rants or raps using the

10   N-word and talking about killing people that he made up?

11   A. Well, my understanding is that his father asked him to

12   perform this in front of ██████

13   Q. And that's been reported not just by ██████ but also by

14   Ben Roof himself?

15   A. Yes.  Right.

16   Q. You mentioned that -- during your testimony that the

17   importance of trying to identify when someone starts using

18   narcotics and for what reason, what that tells you about

19   them, and that Dylann Roof started when he was around the age

20   of 12 and had friends that he was using marijuana with.  From

21   your perspective, is there any significance in that, both the

22   early age and the friends that he was doing it with?

23   A. The particular significance is the age, the 12, 13.  When

24   we work with adult addicts, invariably they started when they

25   were 12 or 13.  It reflects a propensity and vulnerability to

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    drug use primarily.

2     Q. Let's talk just for a minute about the social anxiety

3    disorder that you spent a significant part of the morning

4    talking about, and just so that we understand, or at least I

5    hope I understand it, that basically social anxiety disorder

6    under the DSM is the fear of being judged by others.  Is that

7    a fair description?

8     A. Yeah.  You know, for many years it was called "social

9    phobia," and it was thought to be a very rare disorder, less

10   than 2 percent.  And that was the fear of eating in front of

11   other people, signing a check in front of other people, or

12   using a public lavatory where there might be somebody

13   watching.  So that seemed like a rare thing.  Some years ago

14   when I was involved in this, it became clear that there was a

15   group of people that was not presenting for treatment, that

16   in fact in our society and in Germany replicated --

17   represents 13 percent of the population.  It's not great.

18   And they have anxiety not at home, but in social situations

19   where if they are the center of attention, they are anxious

20   that they are going to be judged negatively.  And so they

21   have tremendous difficulty at parties, at going to interview

22   for a job, calling somebody of the opposite gender on the

23   phone for a date.  So their social anxiety is in multiple

24   social arenas, so they tend to not get married, to not do

25   well in jobs.

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    Q. Do you find social anxiety disorder that is limited to a

2    single circumstance, manifests itself only in a job interview

3    for example, one of the examples you gave, that they don't

4    have social anxiety in any other social setting, but it's a

5    disorder that solely focused on that single, narrow

6    manifestation, just job interviews?  Would that constitute a

7    disorder or just pure nervousness about getting a job?

8    A. Let me answer it several ways.  That would be a rare

9    being to start with because 75 percent of us have four or

10   more social anxieties, like sitting in a witness chair, like

11   doing your job.  Four or more, that's 75 percent of the

12   population.  So the 13 percent to 18 percent who have social

13   anxiety disorder have it in multiple arenas.  So just to have

14   one, probably anybody in this courtroom who just has one.

15   Does that make sense?

16   Q. Let me ask, one of the things in the DSM where it talks

17   about the social anxiety disorder, and I can -- I'm not --

18   this isn't supposed to be a memory test, so I'm going to hand

19   it to you so that you've got it.  This is the DSM-5, which is

20   the current version -- at least I believe it to be.

21   A. It is.

22   Q. And criteria E?

23        MS. GANNETT: What page?

24        THE WITNESS:  203, at the top of the page.

25

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    BY MR. RICHARDSON:

2     Q. In the DSM, the criteria E, in order for it to be a

3    disorder, the anxiety has to be out of proportion to the

4    actual threat posed by the situation in context?

5     A. Correct.

6     Q. And so that is where if I am totally incapable of

7    speaking in my Sunday School class, right?  I break out into

8    sweats.  I can't do anything, right?  The anxiety I feel

9    about speaking in Sunday School is out of proportion to the

10    threat posed by my, you know, fellow Sunday School-goers?

11     A. Absolutely.

12     Q. That doesn't constitute a social anxiety disorder?

13     A. Fear.

14     Q. Fear?

15     A. If you had all the rest of this --

16     Q. Assuming if -- I just want to focus on this one criteria,

17    just E.  Assuming everything else is met, but that would

18    be -- that would be something that would qualify for E.  By

19    contrast, if I was a Roman gladiator and I am entering the

20    coliseum to fight a lion, and I'm pretty anxious about the

21    fact that all I've got is a small stick, right?  The fact

22    that I might be very anxious about it doesn't qualify under

23    section E because the potential of what is going to happen

24    there is fairly extreme.  Is that a fair way of thinking

25    about it?

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    A. Yeah.  So your anxiety would not at all be out of

2    proportion.

3    Q. Right.  Because, in fact, I'm entering a coliseum to face

4    a lion with a pen?

5    A. Right.

6    Q. And so one of the things when we look at social anxiety

7    disorder is we are trying to evaluate the relative anxiety to

8    the circumstance that it's being placed?

9    A. Yes.

10    Q. Fair?  And so someone, for example, who had extreme

11    anxiety -- even assuming that's the case, that had extreme

12    anxiety about facing a jury of his peers who might impose the

13    death penalty on him -- right? -- that isn't qualifying

14    category E of the diagnostic manual because he's facing

15    extreme consequences for which a significant level of

16    anxiety, even if it existed, would be expected, right?

17    A. Well, absolutely.  Anybody who is not anxious,

18    apprehensive, and worried about their fate and the potential

19    death penalty situation is not paying attention.  But on the

20    other hand, social anxiety disorder, you would have to

21    diagnose it.  You would have to see the other swallows in

22    the --

23    Q. Absolutely.  But my point is just a narrow one.  I'm

24    absolutely with you.  In order to diagnose someone in the

25    DSM, you've got to meet each of the criteria there listed?

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    A. Yes, and it's not just one.

2    Q. Not just one incident, you've got to have multiple

3    observations of that?

4    A. Yes.

5    Q. But even to sort of be considered as part of a social

6    anxiety disorder diagnosis, someone who had significant

7    anxiety about facing a jury of his peers in a death penalty

8    context, that is not out of proportion to the circumstances

9    that are being presented?

10    A. Not in the way you described it, no.

11    Q. The same way that, you know -- I'll move --

12        THE COURT:  I get it.

13        MR. RICHARDSON: I know.  I almost did it twice.  I

14    didn't mean to.

15    BY MR. RICHARDSON:

16    Q. We didn't talk about, briefly with Mr. Bruck, about

17    though he denies a number of things to you, he self-reports

18    that he has anxiety.

19    A. Yes.

20    Q. Right?  And he admits that he has both, you know,

21    generalized and social anxiety.

22    A. Yes.

23    Q. Right?  And we see that show up in some degrees in a

24    number of different contexts.

25    A. Yes.

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    Q. Right?  And we talked earlier about how anxiety disorders

2    come in clusters, that you don't get one without having

3    something come around it.  Fair?

4    A. Yes.

5    Q. Okay.  During the discussions that you had with him about

6    the trial, did he ever state to you that he was not capable

7    of writing notes to his counsel while he was in the

8    courtroom?

9    A. Well, the only discussion we had about it, I had to -- I

10    had to ask him about that issue.  He didn't bring it up

11    spontaneously.  I had to ask him, and he denied that he had

12    any problem with that.

13    Q. You were sitting in this courtroom earlier today, right?

14    A. Yes.

15    Q. And you heard Ms. Stevens indicate that Mr. Roof had

16    spoken to her during the course of the hearing and said that

17    he wanted to raise an objection?

18    A. Yes.

19    Q. Okay.  And then following that, the Court inquired of

20    Mr. Roof what he -- what objection it was.  And you heard

21    Mr. Roof speak in court with the 23 or so of us that I think

22    were here at that time?

23    A. Um-hum.

24    Q. In observing his demeanor and ability to communicate a

25    discussion in that context, was it consistent with the way he

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    talked to you during the course of your evaluation of him?

2     A. Um, yes.  It was devoid of the humor.

3     Q. These are serious settings, right?

4     A. Yeah.  My observation was that he seemed relatively calm.

5    He seemed focused and not distracted by anxious thought that

6    would make him not be able to follow because he was

7    responsive to the several-way conversation.  And he did not

8    have a flushing, blushing attack.

9     Q. All suggestive to you, at least in that instance, that he

10   was not having some severe social anxiety disorder problem?

11    A. Yeah.  And I would go a little bit beyond suggestive.  I

12   would say sort of indicating at least in that piece of

13   behavior that he did not.

14    Q. Okay.  You mentioned -- we talked a second ago that

15   Mr. Roof indicated that he was able to communicate with his

16   counsel.  In contrast, did he indicate to you an

17   unwillingness to communicate with his counsel?

18    A. Yes.

19    Q. Okay.  And was that a believable -- did you credit that

20   representation that he did not want to cooperate or

21   communicate with his counsel any further?

22    A. Yeah.  I found it very credible that, his statement that

23   he would not say much with his attorneys, but I said, "If you

24   had a good idea that you thought was a good idea, would you

25   share it?"  And he said yes.

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    Q. Other than the reports from defense counsel -- I'm just

2    sort of cabining what Mr. Bruck and his team told you.

3    Independent of that, did you develop information that

4    Mr. Roof had such severe social anxiety that he would be

5    unable to communicate with his counsel during the trial?

6    A. The only evidence that -- there is sort of on two sides.

7    One I saw none of it.  Now, it really was just me and him.

8    So it's not -- but I'm a stranger.  I even asked him, "Are

9    you not anxious with me?  You don't know me.  We just met a

10   moment ago."  And he said no.

11   Q. Did you explain to him that you would be presenting the

12   findings about him in court to the Judge?

13   A. He knew that already.  I mean, I said, "I'm sitting here

14   for the Judge to try to help the Court and the Judge make a

15   decision."  He didn't seem to have any trouble with

16   understanding that.

17   Q. So he knew what he was telling you was going to be

18   broadcast in court?

19   A. Yes.  He was worried that I might say something that he

20   didn't want me to say, but he realized he couldn't really

21   control that.

22   Q. Let me ask you this about one other strategy that he

23   talked to you about:  Would it be consistent with someone

24   with a severe social anxiety disorder to express a desire to

25   represent themself in court?

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    A. Well, that's a very interesting question.  I mean, he

2    brought it up clearly growing out of his sort of conclusion

3    that -- and that this was -- I guess it was at the end of our

4    second session -- that that would be a way where what he

5    wanted to be presented and only that could be done.  Now, I

6    don't know whether he thought about "Will I have to stand up"

7    and all that.  In part maybe, because what he said when I

8    said, "How would you do that?" he said, "When it got to me, I

9    would say no defense," or "the defense rests" or something

10   like that.

11    Q. Did he also talk to you -- in that sort of context, did

12   he talk to you about wanting to speak -- and I think it's on

13   page 38, where it indicates that he stated he would want to

14   talk to the Judge about doing that when he had a chance?

15    A. Absolutely.  I mean, he said it again here today, he

16   wants to talk to the Judge --

17    Q. Which is --

18    A. -- and express his ideas, that he didn't get to do that

19   at the hearing anywhere near as much as he wanted to.

20    Q. And that's not consistent with someone who has a

21   debilitating social anxiety disorder in a courtroom, right?

22    A. Well, the way I would say is it doesn't sound like

23   somebody who is definitely afraid of that.

24    Q. What about -- do you think it's consistent with someone

25   who has severe social anxiety disorder to wear clothes that

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    draw attention to themselves, like a jumpsuit?

2     A. No, it's inconsistent.  It's actually the opposite of

3    what you would predict.

4     Q. Do you think it's consistent that someone with a social

5    anxiety disorder to walk into a Bible study meeting of 12

6    individuals, sit with them during the Bible study meeting,

7    and then get up, and while in the course of executing them

8    one after another, announce his racist ideology and views?

9     A. Well, part of what he told me about that is when he

10   walked in the room, he thought they would tell him, "No, you

11   are not welcome here," and he would start shooting then.  He

12   was flummoxed a bit, and then didn't quite know what to do by

13   being invited in, and so he sat down, and he had to think

14   through what he was doing, and he even had some doubts at

15   that point.  And he had an internal dialogue of, you know,

16   "This is -- do it now or you will never do it again.  You

17   really should do it now."  And described some anxiety, not

18   paralyzing anxiety that many social anxiety patients have,

19   not the blushing attack that he has described to have.

20    Q. Described to have by his counsel?

21    A. Yes.

22    Q. And is it consistent that during -- once he decides that

23   he, quote, has to do it, that while walking around the room

24   executing people, he is spouting his racist ideology?  He's

25   public speaking to them about the beliefs that he has.  Is

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    that consistent with someone with severe social anxiety that

2    prohibits their ability to communicate in social settings?

3     A. No.  Also one of the two people he did not shoot, or

4    three, looked at him and made eye contact, and he decided not

5    to kill that person.  Now, he didn't say anything to me then

6    that would give me any more information.  He didn't say

7    anything like, you know, "I felt terrible.  She was looking

8    at me, made me feel anxious."  He didn't tell me any of that.

9    He just said, "I just moved on."

10    Q. In fact, you read in the documents you were provided that

11    he actually told her, "I'm going to leave you alive so that

12    you can tell my story to the world"?

13    A. Yes.

14    Q. Right?

15    A. Surprisingly calm from any perspective you take of that

16    event.

17    Q. In reviewing -- is it inconsistent with someone who has

18    severe social anxiety, debilitating type, that they would

19    engage with groups of friends and parties and trips to the

20    lake just days before committing this type of offense?

21    A. That raises real doubts about that, particularly going to

22    things like the lake.  And -- although he was described that

23    he didn't get in the water.  And, you know, in gathering with

24    friends, multiple times they have been using drugs, so that

25    sort of blurs -- muddies the water about the clarity of that.

BALLENGER EXAMINATION - BY MR. RICHARDSON

1          But, yes, one of the things that doesn't seem

2    consistent is the number of people he hangs out with, that he

3    gets together with.  That -- so for instance in my mind, this

4    is all more consistent with a schizoid personality that he

5    is -- if he is locked away in his room, not seeing anybody,

6    then it is social anxiety disorder.  But, again, it

7    absolutely doesn't completely answer it.

8     Q. But what it does provide some insight into is the

9    severity, to the extent he has either of those, the severity

10   for which it inhibits his ability to communicate and provides

11   some insight into that question, right?

12    A. It does.  And whether it paralyzes his ability to do

13   that.  And that is a word that anxious patients often get to

14   if their anxiety is really severe, just paralyzed to speak.

15   They are paralyzed to take a test.

16    Q. What about is it consistent with someone with severe,

17   debilitating social anxiety disorder to go to a strip club

18   and go up to the stage and engage in the activities of

19   patrons in strip clubs?  Is that consistent with someone who

20   has debilitating severe social anxiety?

21    A. No.  I was surprised by that as well.

22    Q. Why were you surprised by that?

23    A. It's just not what socially anxious people do.

24    Q. They don't approach a stage where there are bright lights

25   and lots of people moving and a woman engaged in dancing

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    behaviors?

2     A. And lap dances.  No.  You know, in my experience,

3    socially anxious patients, that whole thing is hard for them.

4    Now, in all fairness, the defendant has also said that the

5    whole girl thing is hard for him too.  So that -- you know,

6    so it's a mixed kind of thing.

7     Q. What about in your mind is it inconsistent for someone

8    with severe social anxiety to draw attention to oneself by

9    publishing photographs of themselves all over the Internet?

10    A. No, that is not consistent.

11    Q. Is it consistent with someone with severe social anxiety

12    to sort of -- that doesn't want to be judged by anybody to

13    publish his manifesto expressing his racist ideology?

14    A. In general, I would still say no to that as well.

15    Q. It's not consistent with someone with severe debilitating

16    social anxiety?

17    A. That is right.  They are frequently, particularly severe,

18    paralyzed in things related to other people, social

19    situations, the opposite gender, just completely stay away

20    from it.

21    Q. And we are not going to show you any, but you had a

22    chance to watch a little bit of the video meeting that Dylann

23    had with his sisters Amber and ███████

24    A. Yes.

25    Q. Right?  And in that you were able to see how he

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    repeatedly talked about the fact that those videos were being

2    provided to the Government, and he couldn't say anything

3    incriminating on there?

4     A. Yes.  And what I did see was the two from the

5    thrill-seeker woman who called in, and --

6     Q. The woman -- the woman who sort of courted Mr. Roof to be

7    his long-distance girlfriend now that he's in prison, that's

8    who you are talking about?

9     A. Exactly.  And in that interview, he handled that well,

10    including telling her again and again and again, "I can't

11    talk to you.  These videos are part of the -- will be part of

12    my trial.  I can't do that.  You have to go away."

13     Q. Right.  And each of those -- and I understand you didn't

14    look at the more than 20 of those that exist, or all of

15    them -- but would it be consistent with someone with severe

16    social anxiety to understand that they are going to be part

17    of his trial, they are going to be shown on a screen, and

18    still engage in those types of discussions and communications

19    knowing that they were going to be used in that manner?

20     A. Perhaps not.

21     Q. Let me ask instead if there is another explanation for

22    any refusal to speak with his lawyers.  Did you see evidence,

23    for example, of his distrust, dislike, and disagreement with

24    his attorneys?  Is that something that came out to you during

25    the course of your discussions with him?

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    A. Yes, it did.  And to really -- the heart of your

2    question, an alternative explanation for that is that he's

3    just saying, "I'm not going to do it.  I'm not going to help

4    them.  I'm not going to participate with them" because he

5    denied that he was too anxious to.  Now, I don't know whether

6    I can believe that denial.  He denied a lot things that I

7    don't believe are correct.  But it is another explanation

8    that he doesn't want to cooperate.  He doesn't want to huddle

9    and pass notes and say, "The way you should cross-examine

10   that person so that you can try to get me off" -- because

11   that's the logic of it -- you know, he simply says, "I'm

12   guilty, period."

13   Q. And he understands your communications.  He understands,

14   well, there are only two outcomes for him.  Right?  That is

15   life imprisonment or the death penalty.

16   A. Yes.

17   Q. Right?  There is no third option for him?

18   A. With the exception of some notion of a hung jury.

19   Q. And in which case, he would be retried yet again and then

20   have the option of life or death.

21   A. Yes.

22   Q. Right?  And so understanding those two options, did he

23   talk about an ambivalence to you as between those two

24   options?

25   A. Yes.  Ambivalence, he does have some ambivalence.  And he

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    doesn't care.  How many more times he said, "I don't really

2    care either way."

3    Q. Because he viewed life imprisonment as a bad option as

4    well?

5    A. Well, he said, "I really don't have the information which

6    is worse."  He says -- and I said, "Have you asked your

7    attorneys?"

8          And he said, "Yeah.  And they can't tell me which

9    would be worse.  So I sort of don't care."  Coming back to

10   his basic point is, "My job is done.  I have no control over

11   what happens after this.  But my job is done.  What comes out

12   of it, I don't have any ability to influence it.  But I don't

13   want to put up a defense.  I don't want any mental health.  I

14   don't want to cooperate with my lawyers."

15   Q. Right.  So unlike this ambivalence about the outcome of

16   the trial, is he ambivalent about his message of hatred and

17   agitation?

18   A. Not in the least.

19   Q. Right.

20   A. Not a tenth of one percent.

21   Q. So one thing he cares deeply about is that message?

22   A. Absolutely.  It would be hard to find what is in second

23   place what he cares about.

24   Q. And so is it surprising to you that someone who is

25   ambivalent about an outcome in a trial, but has a strong view

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    about diluting the message, that they would make a very

2    rational decision to not pursue a mitigation strategy

3    proposed by the defense lawyers?

4     A. Well, and I think you -- you know, you have seen my

5    report.  I mean that is -- the unquestioned conclusion that I

6    reached from the overwhelming amount of data is that he's

7    very clear about that.  He does -- sort of doesn't care about

8    much else, but he cares about that greatly.  It's the only

9    issue in his mind, his -- his message and his future

10   reputation.  I mean, he said, "I would rather not have a

11   trial.  Go straight to life imprisonment or the death

12   penalty.  I would rather not have a trial."  If he gets the

13   chance to represent himself, he'll say when he gets to

14   defense, "I don't have any defense."

15           MR. RICHARDSON: I beg the Court's indulgence, Your

16   Honor.

17           Dr. Ballenger, I thank you very much for a long day

18   with us.  I will graciously turn you over to the Judge who

19   can decide how long you have to stay.

20           THE WITNESS:  Thank you.

21           THE COURT:  Mr. Bruck, redirect?

22           MR. BRUCK: No, sir.

23           THE COURT:  None.

24           Doctor, let me ask you a question and see if you can

25   give me some guidance on this.  I want you to assume the

BALLENGER EXAMINATION - BY MR. RICHARDSON

1    following:  And the defendant originally appeared in this

2    courtroom for the initial phase of jury selection where large

3    numbers of people were in the room for an initial -- they

4    came out here and filled out a questionnaire, but I asked

5    them about seven questions, and Mr. Roof sat through three

6    days of that.  And we did -- we did multiple proceedings -- I

7    think four every day, and groups of people -- eventually 785

8    people came through my court in three days.

9            And Mr. Roof was very stiff and very rigid in his

10   appearance in the courtroom.  He tended to stare into sort of

11   middle space.  He did not engage much with anyone in the

12   courtroom.  He mostly sat there.

13           Then you have a proceeding on November 7th in

14   which -- you've seen the transcript -- in which Mr. Roof came

15   to the podium and spoke to me for a considerable period of

16   time.  You've read that discussion.  He was, frankly, more

17   relaxed than some young lawyers who argue at that very same

18   spot.

19           Today you have been able to observe him as you

20   testify.  He has appeared to me to be alert, attentive,

21   engaged.  He has followed the proceeding.  He's been

22   respectful when he spoke to me.  He has interacted with his

23   counsel.  He went through his counsel to ask permission

24   before he rose to speak, and then he spoke to me from the

25   table.

BALLENGER EXAMINATION - BY MR. RICHARDSON

1          What does that progression tell you about what may

2     be going on with his anxiety disorder and whether the

3     exposure to the courtroom may be ameliorating some of those

4     symptoms?

5          THE WITNESS:  As you point out, this is my first

6     opportunity to see him in the courtroom, and I would agree

7     with your characterization of his behavior and the important

8     aspects you placed on the various parts of that.

9          I think it is most consistent with what I was saying

10    that my expectation is that his anxiety after exposure and

11    experience here, that it will go down and down.  And your

12    description over just three phases seem to confirm that that

13    is already happening.  That --

14         THE COURT:  Is that what you would expect to see?

15         THE WITNESS:  Yes, that's what I predicted.

16         THE COURT:  Okay.  Any questions occasioned by the

17    Court's question, first from the defense?

18         MR. BRUCK: Um, no, Your Honor.  I should say,

19    though, that from closeup our observations have been very

20    different.  I can't cross-examine this witness.  What we

21    would propose to do is submit a list of our observations here

22    at the counsel -- at counsel table at the close of the

23    proceedings.

24         THE COURT:  I would frankly welcome that, Mr. Bruck.

25         MR. BRUCK: Thank you very much.

BALLENGER EXAMINATION - BY MR. RICHARDSON

1              THE COURT:  From the Government?

2              MR. RICHARDSON: No questions, Your Honor.  I only

3     raise a question of whether that list ought to come into an

4     adversarial process or not.

5              THE COURT:  You know, this is this whole thing:  I

6     don't really relish the examination, cross-examination of

7     counsel here.  And what they are providing me is their

8     impression, and I'm not sure how valuable cross-examination

9     of that is going to be to me.  Frankly, that's their

10    observations.  You've had a team of folks observing.  And I

11    would welcome your observations.  We are all observing this.

12    I thought Dr. Ballenger was very astute in his report when he

13    says, you know, "The behavior in the courtroom, I'm not

14    really -- I can't observe that; and, secondly, that the Court

15    is really better at observing that."  And so I have --

16    frankly, with that response, I obviously sit here.  I can see

17    everybody.  I do routinely watch the courtroom and the

18    parties in the courtroom.  But so let me just in the same way

19    I sort of persuaded Mr. Bruck not to play that tape, I think

20    I don't want to see you cross-examine Mr. Bruck.

21             MR. RICHARDSON:  I only ask the question.

22             THE COURT:  I would find it personally worthwhile to

23    hear from any observers about what they observed.  I asked

24    Dr. Ballenger without knowing what his response was going to

25    be.  I'm not looking -- I'm not fishing for confirmation.

BALLENGER EXAMINATION - BY MR. RICHARDSON

1      I'm fishing for information.  And I think it would be helpful

2      to hear not just Mr. Bruck, but the other members of the team

3      that have been sitting there, what they have observed.  And

4      I'm going to afford Mr. Roof at a point to speak to that.  He

5      can share with me if he has observations.  So I'm going to

6      not have counsel cross-examine each other.

7              MR. RICHARDSON: That's fine, Your Honor.

8              MR. BRUCK: I should clarify, too, that our plan --

9      we designated one member of the team to be collecting this

10     information, and we will have -- I expect we will have simply

11     one affidavit.

12             THE COURT:  You know, that would be fine.

13             Mr. Roof, you have been trying to speak.  Is there

14     something you would like to say, sir?

15             THE DEFENDANT:  I have a few things to say about his

16     report.

17             THE COURT:  I want to give you -- there will be a

18     point later in the proceedings.  Keep your notes because we

19     are going to be back here tomorrow, and I'm going to give you

20     a full opportunity to speak.  Okay, sir?

21             THE DEFENDANT:  Okay.

22             THE COURT:  Okay?  With that, Dr. Ballenger, you may

23     step down.

24             Now, let me tell you my concern -- thank you so

25     much.

1          When we -- I agreed to have Dr. Wagner testify, that

2     was about 4:15, and I assumed that Mr. Richardson was going

3     to speak just a minute more, and then we were going to have

4     Dr. Wagner on the stand.  And I don't criticize either of

5     y'all for doing the questioning.  It's just my concern I've

6     got.  You know, keeping a courthouse open is not just me

7     sitting here.  I've got my very devoted staff who have been

8     here all day.  They were here before 8:00 this morning.  I

9     have got to have marshals and court security officers and a

10    whole range of people.  We have federal protective services

11    around the courthouse.  It's a very big team of people to

12    keep things open.  So I'm going to just have to say that

13    unless this is going to be very brief, I am very reluctant to

14    keep this process going that could go for many more hours.

15         MR. BURNS:  May we have a moment to consult, Your

16    Honor?

17         THE COURT:  Yes.

18         MR. RICHARDSON:  Your Honor, what we'll do is we'll

19    not call him now.  And certainly the last thing I want to do

20    is be the person that keeps Ms. Eunice here after 5:30.

21         THE COURT:  Ms. Amy is working pretty hard as court

22    reporter.  Both of them are working very hard.  And it's

23    demanding.  She's trying to do y'all daily transcripts, which

24    means she's going to be way up into the night trying to do

25    this for you.  And I'm just saying that there is a

1    practical -- these are the hardest working people I've ever

2    worked around, but just -- I don't want to break them.

3              MR. RICHARDSON: I'm not about to be the one to do

4    that by any stretch, Your Honor.  What we'll do is we'll not

5    call him now.  We will reconsider whether he is fully

6    necessary, you know, after the defense finishes their case.

7    He probably is not necessary at all.  And so if we get to

8    that point and we are comfortable where we are, then we will

9    just not do so.  If we need him for some reason, we'll try to

10   have a conversation with him that perhaps he could do a

11   telephone conference with us, you know, later, at some point.

12   That would allow that to be back on Wednesday morning or --

13             THE COURT:  I want to get it done tomorrow if I can.

14   I want to get this done tomorrow, if it's possible.  I'm

15   asking a lot of my people.  Wednesday is a holiday.  We will

16   open the courthouse if we need it.  But I would like to avoid

17   it unless it's absolutely essential.

18             MR. RICHARDSON: We'll try to do just that.

19             THE COURT:  Okay.  With that, 9:00 tomorrow morning

20   we will reconvene.  The hearing is adjourned.

21             Mr. Bruck.  Mr. Bruck.  I want you to come look at

22   your exhibits.  I'm scared there are a couple of them that

23   you didn't ask to be put into evidence, and I want you to

24   talk to Ms. Eunice, and then tomorrow if we could move them

25   in, I just want to make sure the record is complete.  I think

1    particularly Exhibit 6.

2            MR. RICHARDSON: We objected to it.  I think he never

3    introduced it.

4            THE COURT:  I just want to make sure that we didn't

5    do it from inadvertence.  And 7 and 8.

6            (Thereupon, the Court was in recess.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          *****      *****      *****

2

3

4          I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-titled matter.

6

7

8     _____

9     Amy C. Diaz, RPR, CRR                    DATE, 2016

10

11    /S Amy Diaz

12

13

14

15

16

17

18

19

20

21

22

23

24

25