```
1                IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF SOUTH CAROLINA
2                     CHARLESTON DIVISION

3   UNITED STATES OF AMERICA      :      VOLUME IV
                                  :
4            vs.                  :
                                  :
5   DYLANN STORM ROOF             :      2:15 - CR - 472

6

7           Trial continues in the above matter on Monday,

8   December 12, 2016, commencing at 9:41 a.m., before the

9   Hon. Richard M. Gergel, in the United States Courthouse,

10  Courtroom VI, 85 Broad St., Charleston, South Carolina,

11  29401.

12  APPEARED ON BEHALF OF THE UNITED STATES:

13    JAY N. RICHARDSON, ESQ., 1441 Main St., Columbia, SC.

14    NATHAN WILLIAMS, ESQ., P.O. Box 978, Charleston, SC.

15    STEPHEN J. CURRAN, ESQ., 601 D Street, NW, Washington, DC.

16  APPEARED ON BEHALF OF THE DEFENSE:

17    DAVID I. BRUCK, ESQ., Washington & Lee School of Law,
18    Lexington, VA.

19    KIMBERLY C. STEVENS, ESQ., 1070-1 Tunnel Rd., Asheville, NC.

20    EMILY PAAVOLA, ESQ., 900 Elmwood Ave., Columbia, SC.

21

22

23          REPORTED BY DEBRA L. POTOCKI, RMR, RDR, CRR
          Official Court Reporter for the U.S. District Court
24                        P.O. Box 835
                      Charleston, SC  29402
25                       843/723-2208
```

1                                    I N D E X

2

         WITNESS:  BRITTANY BURKE
3
         Direct Examination by Mr. Williams........................ 602
4        Cross-Examination by Ms. Paavola......................... 644

5        WITNESS:  RONALD THRILLKILL

6        Direct Examination by Mr. Richardson..................... 655
         Cross-Examination by Mr. Bruck.......................... 675
7        Redirect Examination by Mr. Richardson.................. 685

8        WITNESS:  MARK KELLY

9        Direct Examination by Mr. Richardson.................... 686
         Cross-Examination by Mr. Bruck.......................... 698
10
         WITNESS:  JAMES GREEN
11
         Direct Examination by Mr. Williams...................... 701
12
         WITNESS: KIMBERLY MEARS
13
         Direct Examination by Mr. Williams......................
14       Cross-Examination by Ms. Paavola........................ 734
         Redirect Examination by Mr. Williams.................... 736
15
         WITNESS:  KEVIN CONROY
16
         Direct Examination by Mr. Richardson.................... 736
17       Cross-Examination by Ms. Paavola........................ 743

18       WITNESS:  TRACY SICKS

19       Direct Examination by Mr. Curran........................ 749
         Cross-Examination by Ms. Stevens........................ 777
20
         WITNESS:  AMANDA SIMMONS
21
         Direct Examination by Mr. Williams...................... 781
22       Cross-Examination by Mr. Bruck.......................... 815

23

24

25

```
1
     EXHIBITS:                                      Received in Evidence
2
     Government Exhibits 158-175 and 177            604
3    Government Exhibit 417                         608
     Government Exhibit 260                         610
4    Government Exhibit 179 and 180                 612
     Government Exhibits 178, 181, 183, 184, 186    616
5    Government Exhibit 186A                        618
     Government Exhibits 185, 187, 188, 189A,
6    190, 191, 192A                                 619
     Government Exhibits 189 and 192                621
7    Government Exhibits 193-195, 196A, 197, 198    622
     Government Exhibits 202, 203, 206, 210, 211    623
8    Government Exhibits 209A, 212-215, 217         625
     Government Exhibits 223, 224, 227-234          627
9    Government Exhibits 182, 196, 199, 204, 205    641
     Defendant's Exhibits 37-39                     647
10   Defendant's Exhibits 19-21, 29, 30, 32         651
     Government Exhibits 235, 235A, 235B, 236-238,
11   240, 242                                       657
     Defendant's Exhibit 239                        684
12   Government Exhibit 256                         732
     Government Exhibit 254                         735
13   Government Exhibits 300-305                    740
     Government Exhibit 306                         742
14   Government Exhibits 307-309                    743
     Government Exhibits 344                        760
15   Government Exhibit 3                           763
     Government Exhibit 4                           776
16   Government Exhibits 331-333, 335, 336          794
     Government Exhibits 343, 340                   809
17

18

19

20

21

22

23

24

25
```

BRITTANY BURKE – DIRECT EXAMINATION

1      (Jury not present.)

2           THE COURT:  Are all our jurors here.

3           THE CLERK:  Yes, sir.

4           THE COURT:  Bring in the jury.

5      (Jury present.)

6           THE COURT:  It's amazing what a weekend of rest can

7      do for you.  Thank y'all so much again.  I have been watching

8      the jury, you've been incredibly attentive, I want to thank

9      each of you for your devoted service.

10     Government, call your next witness.

11          MR. WILLIAMS:  Actually I believe Miss Burke was

12     testifying.

13          THE COURT:  Yes, please return her to the stand.

14     Miss Burke, you are still under oath.

15     A.  Yes, sir.

16     BRITTANY BURKE, a witness called by the Government, having

17     been previously sworn, testified further as follows:

18                     DIRECT EXAMINATION

19     BY MR. WILLIAMS:

20     Q.  Morning.

21     A.  Good morning.

22     Q.  I believe when we broke on Friday you were testifying

23     about the processing of the defendant's car?

24     A.  Yes, I was.

25     Q.  And if you could explain to the jury again sort of what

BRITTANY BURKE – DIRECT EXAMINATION

1  the process was you used, I think you said you started in the

2  front seat, went around to the back seat, then moved to the

3  back of the car?

4  A.  Yes, after we finished our external exam of the car or

5  outside of the car, we then started at the front driver's side

6  seat, moving to the rear driver's side seat, around the

7  quarter rear passenger's side, front passenger's side, then

8  upon completion of that, we did the trunk, since it's a

9  separate unit.

10 Q.  And I believe when we left off Friday, you were at the

11 point in the car where you had located the gun on the back

12 seat, and that had been admitted into evidence?

13 A.  Yes, that is correct.

14 Q.  I want to pick up on where we were in the car.  I'm going

15 to hand you a series of exhibits, if you could look at those.

16        MR. WILLIAMS:  Your Honor, for the record, that's 158

17 to 177.  All those numbers except for 176.

18        THE COURT:  Okay.

19 Q.  Are those all photos you took while processing the car?

20 A.  Yes, they are.

21 Q.  Do they accurately reflect the way the car appeared when

22 you processed it?

23 A.  Yes, they do.

24        MR. WILLIAMS:  I show these to defense counsel.

25        MS. PAAVOLA:  No objection.

BRITTANY BURKE – DIRECT EXAMINATION

1          THE COURT:  Very good.  Government Exhibits 158 to

2     175 and 176 (sic) are admitted without objection.

3          (Government Exhibits 158 through 175 and 177 received.)

4     BY MR. WILLIAMS:

5     Q.  Miss Burke, what I want to do is go through the processing

6     of the vehicle, starting with Exhibit 158.  Can you tell the

7     jury what that depicts and where it was located?

8     A.  This is a picture showing the gun, a glove and a torn

9     piece of black fabric that would have been in the rear

10    passenger side seat.

11    Q.  I believe earlier there were some items on top of this.

12    Would this have been on the bottom layer of that seat?

13    A.  Yes, this would be after the layers that were on top of it

14    have been removed.

15    Q.  I want to go to Exhibit 159.  Can you tell the jury what

16    that depicts?

17    A.  This depicts the magazine that was taken out of the gun,

18    and it shows the back side, so that you can see how many

19    cartridges are in the magazine there.

20    Q.  How many do you recall were in the magazine?

21    A.  I believe there were ten in the magazine.

22    Q.  Was there another round found in the chamber of the gun?

23    A.  Yes, there was a round from the chamber as well.

24    Q.  I'm going to go to 160.  Can you tell the jury what that

25    shows?

BRITTANY BURKE - DIRECT EXAMINATION

1    A.  The -- this is a pair of underwear that was removed from

2    the passenger side compartment of the vehicle.

3    Q.  161?

4    A.  This is a towel that was also removed from the rear of the

5    vehicle.

6    Q.  These were on the floor or on the passenger's seat?

7    A.  Yes, that is correct.

8    Q.  Go to 162.  What does that show?

9    A.  This shows the rear passenger side floorboard of the

10   vehicle, and part of the rear driver's side floorboard as

11   well.

12   Q.  And that was after those fabric items or clothing was

13   taken off the floor?

14   A.  Correct, this is after those items had been removed so you

15   can see what's underneath them.

16   Q.  Go to 163.  That's what the -- I guess something was

17   removed?

18   A.  Yes, this is after the container containing the soda was

19   removed so you could see what was underneath and behind it.

20   Q.  Go to 164.  What does that show?

21   A.  This shows the box of ammunition that was in the floor of

22   the tray that was taken out of it, showing that it is empty.

23   Q.  I believe last week you had testified about two other

24   boxes of ammo that were located in the car; do you recall

25   that?

BRITTANY BURKE - DIRECT EXAMINATION

1    A.  Yes, I do.

2    Q.  Where were those located?

3    A.  Those were located in the rear driver's side floorboard.

4    Q.  And were those packages or those boxes consistent with

5    this box?

6    A.  Yes, they were of the same manufacture and the same

7    caliber.

8    Q.  But this box was empty?

9    A.  That is correct.

10   Q.  And the others had some rounds in them?

11   A.  Yes, they did.

12   Q.  Go to 165.  That just shows the items that were on the

13   floor up on the seat in the car?

14   A.  Yes, it's just moving the -- after we moved them so you

15   could better see what the items were.

16   Q.  And do you recall what that little piece of paper was?

17   Like a lighter pamphlet or something?

18   A.  I do not recall.

19   Q.  I'm going to go to 166.  What does that show?

20   A.  This shows the underneath of the seat just showing that

21   there was nothing else underneath that seat that had not been

22   removed.

23   Q.  I'll go to 167.  What does 167 depict?

24   A.  This is the floorboard in the rear of the vehicle, the

25   picture's taken from the passenger side looking towards the

BRITTANY BURKE – DIRECT EXAMINATION

1   driver's side, showing the center of the floorboard over into

2   the driver's side.

3   Q.  And I'll put up 168.  What does 168 depict?

4   A.  These were the flags that were located in the rear

5   driver's side floorboard, they were rolled together, and this

6   is them after they've been removed and unrolled so that you

7   can see what the flags are.

8   Q.  The ones that were on the floor in 167, that's just you

9   taking them out and photographing them?

10  A.  That is correct.

11  Q.  Finally I'll go to 169.  Tell the jury what that shows.

12  A.  This is the underside of the driver's side seat, again,

13  just showing the -- everything had been removed from

14  underneath it.

15  Q.  And does that basically cover anything that was found in

16  the back seat of the car?

17  A.  Yes, it does.

18  Q.  What I want to do then is move up to the front seat.  Can

19  you go to -- explain to the jury what Exhibit 170 shows?

20  A.  This picture shows what the front passenger side

21  compartment of the vehicle looked like when we opened the door

22  to examine that side of the vehicle.

23  Q.  I know you can't see underneath the backpack there; was it

24  fair to say there was a lot of paperwork underneath the

25  backpack?

BRITTANY BURKE – DIRECT EXAMINATION

1   A.  Yes, there was a lot of paperwork throughout the front

2   passenger side compartment.

3   Q.  Could you explain the way you proceeded to process that

4   area?

5   A.  So what we would do to process this area is photograph

6   everything as it is, and then start, like we did in the back

7   seat, removing items and photographing them.  And if something

8   needed to be searched as we removed it, we would then search

9   it at that point.

10  Q.  I'm going to hand you Government's proposed Exhibit 417.

11          THE COURT:  417?

12          MR. WILLIAMS:  Yes, Your Honor.

13  Q.  Do you recognize that item?

14  A.  Yes, I do.

15  Q.  Is that seized from the vehicle?

16  A.  Yes, it is.

17  Q.  What is it?

18  A.  It's the GPS that was in the front passenger side seat.

19          MR. WILLIAMS:  I show this to defense counsel.

20          MS. PAAVOLA:  No objection.

21          THE COURT:  Very good.  Government's Exhibit 417

22  admitted without objection.

23      (Government Exhibit 417 received.)

24  Q.  And these are two parts there, one item is the actual GPS?

25  A.  Correct.

BRITTANY BURKE - DIRECT EXAMINATION

1  Q.  Was that sent for processing to be examined by the FBI?

2  A.  Yes, it was.

3  Q.  There's a second part that goes with it; do you know what

4  this item is?

5  A.  It's to plug in the GPS so that it can be charged.

6  Q.  So you would have seized that item for processing

7  otherwise?

8  A.  Yes, I would have.

9  Q.  If we can go to 171.  Just briefly explain to jury what

10 that shows or what was found in the car.

11 A.  This shows some chargers in the front passenger side seat,

12 a Crown Royal bag, deodorant, package of American Spirit

13 cigarettes, as well as an additional charger.  And these are

14 items that would have been in that front passenger side seat

15 area.  It's just showing them laid out so that you can see all

16 of them.

17 Q.  And I'm going to go to 172.  This is that same area with

18 some of those items removed so you can see what was underneath

19 them?

20 A.  That is correct.

21 Q.  Go to 173.  Can you explain to the jury what that shows?

22 A.  This shows the front center console between the driver and

23 passenger side seat.  The area where the emergency brake is

24 that you can see there.  And it just allows you to see the

25 area between the two seats.

BRITTANY BURKE – DIRECT EXAMINATION

1  Q.  Was there an item found in between those two seats?  I

2  think you talked earlier about the inserts.  Was there another

3  item found between those two seats?

4  A.  Yes, there was a laser sight for a gun, a laser attachment

5  that was found between two seats.

6  Q.  I show you Government's proposed 260.  Do you recognize

7  that?

8  A.  I do.

9  Q.  Is that the laser you found?

10  A.  Yes, it is.

11        MR. WILLIAMS:  Show this to defense counsel.

12        MS. PAAVOLA:  No objection.

13        THE COURT:  Government's 260 admitted without

14  objection.

15     (Government Exhibit 260 received.)

16  BY MR. WILLIAMS:

17  Q.  Can you explain to the jury what a laser sight is, if you

18  know?

19  A.  From my understanding with that one, it hooks on the gun

20  and it helps you be more accurate.  When you aim, it shoots a

21  little laser out to show where it's pointing.

22  Q.  So it attaches to the firearm?

23  A.  That is correct.

24  Q.  Now go to Exhibit 174.  What does that show?

25  A.  This is that center console once you opened it up.  This

BRITTANY BURKE - DIRECT EXAMINATION

1   is showing the contents of that console.

2   Q.  And I'll go to 175.  What does that show?

3   A.  This is items that were removed from the console, just

4   showing what was in there, laying them out so you can see.

5   Q.  So you had taken that out of the console, put them on the

6   seat and then photographed them?

7   A.  That is correct.

8        MR. WILLIAMS:  Your Honor, I believe that I had

9   skipped 176.  I think showing her 177, we'll go to 177.

10       THE COURT:  Very good.

11  BY MR. WILLIAMS:

12  Q.  Does that cover all of the items that were sort of on the

13  seat and on the console?

14  A.  Yes, it does.

15  Q.  Let's go to 177.  Can you tell the jury what that showed?

16  A.  This shows the front driver's side door and the door

17  pocket with items that were located within that door pocket.

18  Q.  Do you recall what was found generally in that door

19  pocket?

20  A.  Yes, this door pocket held brochures to different

21  locations.

22  Q.  I'm going to hand you several photos, Government's

23  proposed 179, 180.  First of all let me hand you Government's

24  proposed 179, Exhibit 180, take a look at those.  Do you

25  recognize those two photos?

BRITTANY BURKE – DIRECT EXAMINATION

1   A.  Yes, I do.

2   Q.  Are those photos you took at the time?

3   A.  Yes, they were.

4           MR. WILLIAMS:  Show these to defense counsel.

5           MS. PAAVOLA:  No objection.

6           THE COURT:  Government Exhibits 179 and 180 admitted

7   without objection.

8       (Government Exhibits 179 and 180 received.)

9   BY MR. WILLIAMS:

10  Q.  I'm going to put up on the screen 179.  Can you tell the

11  jury what that item was?

12  A.  This is the backpack that was located in the front

13  passenger side floorboard.

14  Q.  And I'll put up Government's 180.  What does that show?

15  A.  This shows the front pockets of the backpack, and you can

16  see some CDs and a USB or thumb drive located in the pockets

17  there.

18  Q.  Would you explain to the jury how you went about

19  processing that backpack; did you remove items from it?

20  A.  Yes, we took pictures of each individual pocket or

21  compartment, showing what was in them, and then removed items

22  from the backpack to collect them.  Or removed items and then

23  photographed what was underneath them, just like -- in layers,

24  just like we did with the back seat of the car.  And collected

25  any items that we needed to collect from there.

BRITTANY BURKE - DIRECT EXAMINATION

1   Q.  I'm going to show you several items, 183, 184, 186.

2   First, that's Government's proposed 183, 184, 186.  I'm going

3   to show you 178 and 181.  Are these items you seized from the

4   backpack or from the car?

5   A.  Yes, they are.

6           MR. WILLIAMS:  Show these to defense counsel.

7           MS. PAAVOLA:  Your Honor, may we approach?

8       (Following discussion held at side bar.)

9           THE COURT:  Yes, ma'am.

10          MS. PAAVOLA:  We have two objections, Your Honor.

11          THE COURT:  Okay.

12          MS. PAAVOLA:  We previously objected to 186.

13          THE COURT:  What is 186?

14          MS. PAAVOLA:  That is a list of churches.  The Court

15   has overruled that objection in docket No. 358, I believe.

16          THE COURT:  Yes.

17          MS. PAAVOLA:  We want to maintain that objection.

18          THE COURT:  Sure.  You don't need do that.  You

19   maintain it.

20          MS. PAAVOLA:  But we also would like to request an

21   instruction regarding this piece of evidence.  That it is not

22   evidence that the defendant planned to attack these locations,

23   it is offered only in an attempt to demonstrate the

24   defendant's plannings for the crime at Emanuel AME, and that

25   the jury is not to infer, based on this evidence, that the

BRITTANY BURKE - DIRECT EXAMINATION

1    defendant planned or intended to commit additional crimes.

2         THE COURT:  Government's response?

3         MR. WILLIAMS:  I think it's the exact opposite, Your

4    Honor.  I think it does show that he intended to attack other

5    churches, or at least looked at those churches as a

6    possibility.  I mean, these lists show that he was scouting

7    out locations to commit crime.  He said in his confession --

8         THE COURT:  He's asking the question about whether he

9    actually intended.  Do you think he potentially intended?

10        MR. WILLIAMS:  I think what he was doing is looking

11   at the different locations, assessing them as possible

12   targets, and selected this church amongst his list of other

13   possibilities.  And I think he said as much at different

14   times.

15        THE COURT:  She's asking the instruction, I'm not

16   endorsing, I'm just trying to clarify, she's asking an

17   instruction that this is not offered to show that he actually

18   intended to attack these churches.

19        MR. WILLIAMS:  I think what I'm saying is he intended

20   to attack a church, and in essence all of these, and then

21   selected the one, Mother Emanuel.  So to say he didn't intend

22   is not accurate.

23        THE COURT:  It's far more a comment on the evidence

24   than I would give.  I'm not going to give that instruction.

25        MS. PAAVOLA:  Thank you, Your Honor.  We have an

BRITTANY BURKE - DIRECT EXAMINATION

1     objection to 183.  These are -- appear to be music CDs from

2     the defendant's car.  I don't see what relevance those have.

3          THE COURT:  What's the relevance?

4          MR. WILLIAMS:  Your Honor, I think the jury has to

5     know what was in his car.

6          MS. PAAVOLA:  I think the fact that they're rap CDs

7     is not relevant to elements of the crime.

8          THE COURT:  Why is that relevant?  You know,

9     thoroughness is one thing --

10          MR. WILLIAMS:  The jury has to hear what's in the

11     car.  I don't want the jury wondering what was on those CDs

12     they saw in his car.

13          THE COURT:  Did they see any CDs?

14          MR. WILLIAMS:  Yeah, they're in the picture.  All I

15     intend to do is have the agent say there was nothing of value

16     on those CDs, they were just music.

17          THE COURT:  Okay.  What harm is that, music CDs?

18          MS. PAAVOLA:  I think if the agent is going to say

19     they don't have any relevance to the case, then they don't

20     need to put them in.

21          MR. WILLIAMS:  He has to exclude them so the jury

22     doesn't wonder what was on them.  In order to show --

23          THE COURT:  I just think it's -- we've shown pictures

24     of them, I just don't think -- it's making much about nothing.

25     I'm going to allow it, but I -- I think just to say they're

BRITTANY BURKE – DIRECT EXAMINATION

1   music CDs is all you need to say.

2              MR. WILLIAMS:  We're just going to exclude them so it

3   shows the agents investigated the case and that's the extent

4   of it.

5              THE COURT:  Anything further?

6              MS. PAAVOLA:  That's all.

7              THE COURT:  So 183 and 186, the Court overrules your

8   objections.  Do you have objections to any of the others?

9              MS. PAAVOLA:  No, sir.

10             THE COURT:  Very good.

11      (Side bar discussion concluded.)

12             THE COURT:  Exhibits 184, 178 and 181 are admitted

13  without objection; 186 and 183 are admitted.

14      (Government Exhibits 178, 181, 183, 184 and 186 received.)

15             THE COURT:  Please proceed.

16  BY MR. WILLIAMS:

17  Q.  I want to go through those items quickly.  178, those are

18  the brochures you talked about being in the door panel?

19  A.  Yes, they are.

20  Q.  181, do you recall what this item is?

21  A.  That is the flash drive that was collected from the

22  backpack.

23  Q.  This was also sent for processing?

24  A.  Yes, it was.

25  Q.  184, was this located in the backpack as well?

BRITTANY BURKE – DIRECT EXAMINATION

1   A.  Yes, it was.

2   Q.  What is it?

3   A.  It is a book, if I could see it.

4   Q.  A catechism book?

5   A.  Yes, it is.

6   Q.  That was located inside the backpack as well?

7   A.  Correct.

8   Q.  183 was the photo, showed CDs?

9   A.  Yes.

10  Q.  You would have seized those and turned those over to

11  investigating agents for review?

12  A.  Correct.  I would have.

13  Q.  I'm going to ask you about 186, some yellow pages; were

14  those found in the car as well?

15  A.  Yes, they were.

16  Q.  And looks like those were also processed for fingerprints?

17  A.  Yes, they were.

18  Q.  I'm going to find a picture of that, if I can.  I'm going

19  to show you Government's 186A.  Do you recognize that?

20  A.  Yes.

21  Q.  Is that a picture of that document before it had the

22  fingerprint dust on it?

23  A.  Correct, it is.

24          MR. WILLIAMS:  I show this to defense counsel.

25          MS. PAAVOLA:  Your Honor, subject to the same

BRITTANY BURKE – DIRECT EXAMINATION

1     objection, nothing further.

2          THE COURT:  Government's Exhibit 186A is admitted.

3          (Government Exhibit 186A received.)

4          MR. WILLIAMS:  I'm going to publish 186A.

5     BY MR. WILLIAMS:

6     Q.  Miss Burke, could you read for the jury what was written

7     and the order it's written on that piece of paper?

8     A.  I can.  The first at the top says Emanuel AME, 110 Calhoun

9     Street, Charleston, 29401.  Then has the phone number

10    (843)722-2561.

11         The next listed is Morris Brown AME, 13 Morris Street,

12    Charleston, (843)723-1961.

13         Next is Calgary Episcopal, 106 Line Street, Charleston,

14    (843)723-3878.

15         There's then something that's marked out.  It then says

16    Central Baptist, 26 Radcliffe Street, (843)577-4543.

17         The next says Ebonezer AME, 44 Nassau Street, Charleston.

18    (843)72 -- and then the rest of the numbering there looks like

19    it has been wet and is blurred.

20         Same with the last says, Saint something Catholic, located

21    at Philip Street in Charleston, and the only numbers I can

22    make out there are 6066.

23    Q.  I'm going to show you Government's 185, 187, 188, 189,

24    190, 191 and 192.  Take a look at those.

25          MR. WILLIAMS:  For the record, that's 189A and 192A.

BRITTANY BURKE - DIRECT EXAMINATION

1          THE COURT:  Let's do it again.

2          MR. WILLIAMS:  185, 187, 188, 189A, 190, 191 and

3    192A.

4          MS. PAAVOLA:  No objection.

5          THE COURT:  Government 185, 187, 188, 189A, 190, 191

6    and 192A admitted without objection.

7       (Government Exhibits 185, 187, 188, 189A, 190, 191 and

8    192A received.)

9    BY MR. WILLIAMS:

10   Q.  I want to put up 185.  You had just talked about the

11   church list and the physical items.  Does this show where that

12   list of churches was found?

13   A.  Yes, it does.

14   Q.  Where was it found?

15   A.  In the pocket of the backpack.

16   Q.  Then go to 187.  What does that show?

17   A.  This shows a different pocket of the backpack with some

18   electronic items located in the bottom of it.

19   Q.  I'm going to go to 188.  What does that show?

20   A.  These are the items that were in that pocket of the

21   backpack after they've been pulled out.  It's a cell phone and

22   some headphones.

23   Q.  And 189A, I believe, is a similar photo, if not almost the

24   same, but those same items?

25   A.  Correct, but those have just been flipped over and this

BRITTANY BURKE - DIRECT EXAMINATION

1  photo shows the back of it.

2  Q.  Go to 190.  What does that show?

3  A.  This is again the backpack, just showing what's in the

4  bottom of that pocket there.

5  Q.  Were those all the items that were found inside backpack?

6  A.  Yes.

7  Q.  Looks like in 190 there's a broken CD at the bottom?

8  A.  Yes.

9  Q.  All the items that were in the backpack would have been

10 taken out and processed and electronic items given to agents

11 for processing?

12 A.  That is correct.

13 Q.  I'm going to go to 191.  Can you tell the jury what that

14 shows at this point in the search of the car?

15 A.  This is the front passenger side floorboard after the

16 backpack had been removed, so that you can see all the items

17 that were located underneath it on the floorboard there.

18 Q.  What is that item that's prominently on top?

19 A.  That would be a laptop.

20 Q.  I'm going to go to 192A.  What does that show?

21 A.  This is the laptop after it had been removed from the

22 vehicle.

23 Q.  I'm going to show you Government's 192 and 189.  What are

24 those two items?

25 A.  That is the cell phone and laptop that were collected from

BRITTANY BURKE - DIRECT EXAMINATION

1   the vehicle.

2   Q.  Would those have been given to agents to process?

3   A.  Yes, they would have been.

4        MR. WILLIAMS:  Show these to defense counsel.

5        MS. PAAVOLA:  No objection.

6        THE COURT:  Government 192 and 189 admitted without

7   objection.

8        (Government Exhibits 189 and 192 received.)

9   BY MR. WILLIAMS:

10  Q.  So that covered the items that were found on the seat and

11  some of the items that were at the top level of the

12  floorboard?

13  A.  Yes, it does.

14  Q.  I want to ask you a little bit more about items that were

15  found on the floor there.  Is it safe to say there was a lot

16  of paperwork that lie underneath that area?

17  A.  Yes, it is.

18  Q.  I'm going to show you Government's proposed 193, 194 and

19  195.  I show you 196A, 197, 198 as well.  Are those photos you

20  took as you processed the car?

21  A.  Yes.

22        MR. WILLIAMS:  Show this to defense counsel.

23        MS. PAAVOLA:  No objection.

24        THE COURT:  Government Exhibits 193, 194, 195, 196A,

25  197 and 198 admitted without objection.

BRITTANY BURKE - DIRECT EXAMINATION

1          (Government Exhibits 193, 194, 195, 196A, 197 and 198

2     received.)

3     BY MR. WILLIAMS:

4     Q.  What I want to do is save the actual paper to look at, the

5     physical items, until the end, but if we can, let's go through

6     the photos of what was found on that floor.  I want to start

7     with 193.  Is this consistent with you taking items off, for

8     instance, the earlier exhibit showed the laptop computer on

9     top, this would show what it appeared like with the laptop

10    removed?

11    A.  Yes, it does.

12    Q.  You would have collected any of these documents that have

13    writing or otherwise in evidence?

14    A.  Yes.

15    Q.  Let me go to 194.  Is that an item that was located on the

16    floor of the car?

17    A.  Yes, it is.

18    Q.  Go to 195.  This is a photo of the floor with those items

19    removed, another layer?

20    A.  Yes.

21    Q.  Go to Exhibit 196.  Sorry, 196A.  Looks like there was

22    some banking paperwork found on the floor?

23    A.  Yes, there was.

24    Q.  We go to 197.  That shows the floor again with those items

25    removed?

BRITTANY BURKE – DIRECT EXAMINATION

1  A.  Yes, it does.

2  Q.  I'm going to go to 198.  Again, more papers on the floor?

3  A.  Yes.

4  Q.  So that pretty much covers, at least through photos, the

5  paperwork that was on the floor.  Were there items found on

6  the seat as well?

7  A.  On the passenger -- the front passenger side seat?

8  Q.  Correct.

9  A.  Yes.

10  Q.  I'm going to show you Government's 202, 203, 206, 210,

11  211.  Does that show further processing in the areas in the

12  front of the car?

13  A.  Yes, it does.

14       MR. WILLIAMS:  I show these to defense counsel.

15       MS. PAAVOLA:  No objection.

16       THE COURT:  Government's 202, 203, 206, 210 and 211

17  admitted without objection.

18     (Government Exhibits 202, 203, 206, 210 and 211 received.)

19  BY MR. WILLIAMS:

20  Q.  Just so we can make sure, Miss Burke, that we get through

21  all the items that were on the floor of the car and in the

22  front seat, I'm going to go to 202.  Could you tell the jury

23  what that was?

24  A.  This is a Smirnoff Ice bottle that was found in the front

25  passenger's side of the vehicle.

BRITTANY BURKE - DIRECT EXAMINATION

1    Q.   203?

2    A.   This is a brochure for Explore Columbia, South Carolina, a

3    tourist brochure that was located in the vehicle.

4    Q.   Go to 206.  Looks like this shows almost at the bottom of

5    the floorboard the last remaining items?

6    A.   Yes, it does.

7    Q.   Go to 210.  Is that an item found on the floor as well?

8    A.   Yes, it is.

9    Q.   And finally 211, does that show the remaining items that

10   were on the floor after everything had more or less been

11   removed?

12   A.   Yes, this shows those last final few items that were under

13   everything on the floorboard, as well as allows you to see the

14   floorboard and what -- that we searched all the way to the

15   bottom of it.

16   Q.   Once you had checked through the front passenger area, did

17   you look inside the glove box?

18   A.   Yes, we did.

19   Q.   Would you have photographed that as well?

20   A.   Yes, it would have been photographed and the items removed

21   and photographed from there.

22   Q.   And also gone through the trunk of the car?

23   A.   Correct.

24   Q.   I'm going to show you Government 209A, 212, 213, take a

25   look at those.  I show you 214, 215 and 217.  Does that show

BRITTANY BURKE - DIRECT EXAMINATION

1    processing of the glove compartment of the car?

2    A.  Yes, it does.

3         MR. WILLIAMS:  Show these to defense counsel.

4         MS. PAAVOLA:  No objection.

5         THE COURT:  Government's Exhibits 209A, 212, 213,

6    214, 215 and 217 admitted without objection.

7         (Government Exhibits 209A, 212 through 215 and 217

8    received.)

9    BY MR. WILLIAMS:

10   Q.  Let's briefly go through that part of the car.  I want to

11   draw your attention first of all to the 209A.  Do you recall

12   this item being located inside the car?

13   A.  Yes, I do.

14   Q.  What was it?

15   A.  It was a gun box that was located in the car and was empty

16   upon opening it.

17   Q.  Was that on the floorboard as well?

18   A.  Yes, it was.

19   Q.  I'm going to go to 212.  That just shows the glove box

20   open?

21   A.  Correct, it does.

22   Q.  Go to 213.  Does that show paperwork from the glove box

23   removed?

24   A.  Yes.

25   Q.  214, again, other items and maps found in the glove box?

BRITTANY BURKE - DIRECT EXAMINATION

1  A.  Correct.

2  Q.  Go to 215.  This is back to items that were located on the

3  seats or between the seats?

4  A.  Yes, these are those Glock magazine packaging inserts that

5  were located between the front driver's side seat and the

6  center console.  This is just them pulled out so you can see

7  them.

8  Q.  And finally, 217.  Does that show the items removed from

9  the glove box?

10  A.  Yes, it does.

11  Q.  You said that you had looked through the glove box of the

12  vehicle.  Did you also look into the trunk of the car?

13  A.  Yes, we did.

14  Q.  I'm going to give you a set of photos, 223, 224, 227, then

15  228 through 234.

16         THE COURT:  Through 234?

17         MR. WILLIAMS:  Correct, Your Honor.

18  BY MR. WILLIAMS:

19  Q.  Would you take a look at those and see if you recognize

20  them.  Do you recognize those items?

21  A.  Yes, I do.

22  Q.  These were located in the trunk area of the vehicle?

23  A.  Correct, they were.

24         MR. WILLIAMS:  Show these the defense counsel.

25         THE COURT:  Mr. Williams, your first one was what

BRITTANY BURKE - DIRECT EXAMINATION

1  number?

2          MR. WILLIAMS:  231 -- 223.

3          MS. PAAVOLA:  No objection.

4          THE COURT:  That first one, lowest number.

5          MR. WILLIAMS:  223.

6          THE COURT:  Thank you.  The Government's Exhibits

7  223, 224, 227, 228, 229, 230, 231, 232, 233 and 234 admitted

8  without objection.

9      (Government Exhibits 223, 224, 227 through 234 received.)

10 BY MR. WILLIAMS:

11 Q.  Let's talk about what was photographed or found in the

12 trunk of the vehicle quickly.  I'll put up the first

13 Exhibit 223.  What does that show?

14 A.  This is the trunk of the vehicle after it had been opened,

15 showing what was in the vehicle.

16 Q.  224.  Explain what 224 shows?

17 A.  224 again shows the trunk of the vehicle.  It shows the

18 items in a little bit closer up where you can see an American

19 flag, some clothing, a yellow note pad and part of a suitcase.

20 Q.  Was the flag burned?

21 A.  Yes, it was.

22 Q.  Go to 227.  That just shows other items, are the items in

23 the trunk once those other items were removed?

24 A.  Correct, it does.

25 Q.  Looks like there was a suitcase in the back?

BRITTANY BURKE - DIRECT EXAMINATION

1    A.  Yes, there was.

2    Q.  Go to 228.  Is that an item of clothing that was located

3    in the car?

4    A.  Yes, it is.

5    Q.  And 229, same thing, another item of clothing located in

6    the car?

7    A.  Yes.

8    Q.  Go to 230.  A photo of other items located in the back

9    seat?

10   A.  In the trunk.

11   Q.  I'm sorry, in the trunk, as you were taking other things

12   out?

13   A.  Yes.

14   Q.  231?  Is that the suitcase opened up?

15   A.  Yes, this was just after we had opened the suitcase so you

16   could see what was located inside of it.

17   Q.  Go to 232.  The items inside the -- inside the suitcase,

18   with the clothing removed?

19   A.  Yes, it is.

20   Q.  Looks like one of those items is a 511 pouch?

21   A.  Correct, it is --

22   Q.  At least packaging for it?

23   A.  The packaging for a 511 pouch.

24   Q.  Go to 233.  That's a close-up of that same pouch and looks

25   like some empty ammunition boxes?

BRITTANY BURKE - DIRECT EXAMINATION

1   A.   Correct, this is the packaging and then ammunition boxes

2   that were empty in -- with the trays pulled out.

3   Q.   And finally 234, that's another brochure that was found

4   somewhere in the vehicle?

5   A.   Correct.

6   Q.   What I want to ask you next about are the -- is all the

7   paperwork that was located inside the vehicle.

8        MR. WILLIAMS:   Your Honor, is it a good time for

9   break?

10        THE COURT:   Actually we're not that far into it.  You

11   need a break?

12        MR. WILLIAMS:   Might help organization, but I'm happy

13   to --

14        THE COURT:   Let's just keep trying to go for it.

15   We've only been going about 45 minutes.

16        MR. WILLIAMS:   Thank you.

17   BY MR. WILLIAMS:

18   Q.   I want to ask you, you said there were multiple papers

19   located inside the vehicle, is that right?

20   A.   Yes, there were.

21   Q.   I want to ask you about several of them at this time.  And

22   let me find -- Can you explain to the jury just briefly sort

23   of how you located the paperwork in the car and documented it?

24   A.   While we were searching the vehicle, any time we located

25   any papers throughout our search, we looked to see what it

BRITTANY BURKE - DIRECT EXAMINATION

1    was, they would have all been documented with photographs, and

2    then they would have been collected.  If it was something that

3    seemed like it was something that was going to need processed

4    or something at a later time, it was packaged by itself.

5    Otherwise, the papers were just placed in a package together

6    and labeled miscellaneous papers from that portion of the

7    vehicle.

8    Q.  I'm going to hand you several items.  Can you tell me if

9    you recognize them as papers you would have seized from the

10   vehicle?  I'm going to hand you Government's 199.  Look at

11   Government's 205.  Next is Government's 182, and that's

12   attached to this item, as well as 218.

13       At this point those are all items that were located on the

14   passenger's side floorboard of the car?

15   A.  Correct.

16   Q.  Hand you 204.  I'm going to hand you a bag that has

17   several items, and that bag is labeled miscellaneous

18   paperwork?

19   A.  Okay.

20   Q.  I want to hand you items from within that bag.  Just 201,

21   208, 207 and 196.  Those items would have all come off of the

22   floorboard as indicated?

23   A.  Yes.

24   Q.  And finally I hand you 226.  Items from the trunk?

25   A.  Correct.

BRITTANY BURKE - DIRECT EXAMINATION

1   Q.  Did you see 204?

2   A.  Yes.  Yes.  We saw 204.

3   Q.  Are those items all items that you collected, paperwork

4   either from the floorboard of the car or the trunk of the car?

5   A.  Yes, they are.

6   Q.  That's the paperwork you discussed earlier, depicted in

7   the photos?

8   A.  Correct.

9        MR. WILLIAMS:  I'm going to show these to defense

10  counsel.

11       MS. PAAVOLA:  Your Honor, we're going to have several

12  objections.  Should we approach or --

13       THE COURT:  Yes, you can approach.

14     (Following discussion held at side bar.)

15       MS. PAAVOLA:  Okay.  199 and 205.

16       THE COURT:  They're together?

17       MS. PAAVOLA:  Yes, those -- we have no objection to

18  those.  I just want to be clear, because we're not in the

19  right order.  So --

20       THE COURT:  Okay.

21       MS. PAAVOLA:  Those are the Shooter's Choice items.

22  182 is another list of churches, the same objection but

23  nothing new.

24       THE COURT:  Okay.  Is it also handwritten?

25       MS. PAAVOLA:  Yes.

BRITTANY BURKE - DIRECT EXAMINATION

1          THE COURT:  Is it the same list?

2          MR. WILLIAMS:  No.

3          THE COURT:  Different list?

4          MS. PAAVOLA:  May I see it briefly?  Yes, I'm sorry,

5    there are several items together.  We do have objections to --

6    there are other places on these lists that are not churches.

7    They're like in some cases tourist locations, maybe places to

8    visit.  We don't think it's appropriate to suggest that he may

9    have planned attacks on other types of places.

10         THE COURT:  It's just in the car.  Now, what

11   relevance it will have is all in the car.  What's it offered

12   for?

13         MR. WILLIAMS:  Your Honor, I think it explains in

14   some ways some of the photos that were taken mean -- Judge, I

15   think it shows that he visited certain locations and was

16   writing down places he visited.  I don't know that we're

17   suggesting that he attacked or was planning to attack.  I

18   think it just shows that he was writing out lists of places he

19   went, which is if he writes down a bunch of plantations that

20   we know he visited them, it's relevant to the fact that he

21   wrote other churches.  So for different reasons, but our

22   argument will not be that he was planning to attack them per

23   se.  It has its own relevance.

24         MS. PAAVOLA:  Our concern, Your Honor, is that that

25   is their argument with regard to the other lists, and there

BRITTANY BURKE - DIRECT EXAMINATION

1    are places on these lists, such as library, a high school,

2    there's -- those are not places that there's any evidence he

3    planned to attack.

4          MR. WILLIAMS:  I think it has its own weight, Your

5    Honor.

6          THE COURT:  Its weight goes to photographs you're

7    going to offer?

8          MR. WILLIAMS:  Some of it does.  Obviously Wando High

9    School we don't think he photographed, but I think the jury

10   can draw their own conclusions about why he had that listed.

11         THE COURT:  I just think it creates a certain

12   confusion here.  It's not a 401 issue, it's a 403 issue, just

13   substantially outweighed.  I mean, I understand about the

14   churches, part of a planning; but this, I think I'm going to

15   sustain the objection as to the list that's just a random list

16   of locations in Charleston.  I sustain that objection.

17         MR. RICHARDSON:  Your Honor --

18         THE COURT:  403.

19         MR. RICHARDSON:  I'm not sure the Court is -- I think

20   it's worth taking a look at these just, for example, this list

21   has Slave Mart, library and Emanuel, right?  These are lists

22   that include locations that are directly relevant to his

23   trial.

24         THE COURT:  Okay.  Let me say here it has here

25   Emanuel, 9:00 to 1:00, 2:00 to 4:00 p.m.  I can see the

BRITTANY BURKE - DIRECT EXAMINATION

1     potential relevance of that document.  Slave Mart, you know,

2     the problem is he's got a bunch of things that are clearly not

3     relevant that, you know, and I just don't want to create the

4     impression he was planning to attack them or, you know, you

5     are offering the other documents for the purpose that it was

6     part of the premeditation.  What is the purpose of this

7     document as you understand it?

8              MR. WILLIAMS:  Your Honor, that shows his familiarity

9     with those locations.  He came to Charleston several times, we

10    know that.

11             THE COURT:  I'm going to sustain the objection.  It's

12    cumulative as well.  I sustain the objection.

13             MR. WILLIAMS:  Can we go through the pages of that

14    exhibit?

15             THE COURT:  Yeah, go through, I'll be glad to look at

16    them one by one.

17             MR. RICHARDSON:  I don't think we need that one.

18             MR. WILLIAMS:  That shows plantation locations.

19             MR. RICHARDSON:  This is the important piece of this

20    one, Your Honor.  Because this -- this is the location he did

21    consider attacking this African-American festival.

22             THE COURT:  Then I will overrule the objection as to

23    the --

24             MS. PAAVOLA:  Your Honor, this address does not go

25    with this location.

BRITTANY BURKE - DIRECT EXAMINATION

1        MR. WILLIAMS:  This is more plantations.

2        MR. RICHARDSON:  These are plantations in Charleston,

3   but this is a location he discussed attacking.

4        THE COURT:  I don't have a problem with the bottom,

5   so -- part of the evidence, I just -- it includes something at

6   the top as well.

7        MR. WILLIAMS:  Those are plantations where he took

8   photographs of himself.

9        THE COURT:  And are you going to offer those?

10       MR. WILLIAMS:  Yes.

11       THE COURT:  Okay.  I overrule the objection as to the

12   document with the picnic on it.

13       MR. WILLIAMS:  Those are places he took photographs

14   of himself, Magnolia --

15       MS. PAAVOLA:  Your Honor put the photographs in, we

16   are not objecting to many of those photographs.  I don't see

17   why they need to put a list in and argue it suggests he

18   planned to attack them.

19       THE COURT:  To me it's a 403 issue.  I sustain the

20   document with Boone Hall on it and the price and so forth.

21       MR. RICHARDSON:  Your Honor, these are addresses of

22   the locations that he obtained the gun and the ammunition.

23       THE COURT:  That's fine.  I overrule that objection.

24   Which is to 237.

25       MR. RICHARDSON:  182 is limited to these two pages.

BRITTANY BURKE - DIRECT EXAMINATION

1           THE COURT:  Correct.  Anything further?

2           MS. PAAVOLA:  Yes, Your Honor.  I don't know if this

3     might be a time for a break, there's quite a long list, I just

4     want you to be aware.

5           THE COURT:  Let me tell the jury.

6         (Side bar discussion concluded.)

7           THE COURT:  Ladies and gentlemen, we're going to take

8     up -- we're going to have our morning break, let me take up

9     these evidentiary issues first.  We'll resume as soon as I

10    complete this.

11        (Jury excused.)

12          THE COURT:  Okay.  I've addressed the issues of 182,

13    sustaining objections to all but two documents which I

14    specifically found to be both relevant and did not fail the

15    403 test.

16        What else have you got, Ms. Paavola?

17          MS. PAAVOLA:  Your Honor, Exhibit 218 is a similar

18    stack of variety of papers, and we have objections to those

19    lists as well, for the same reasons that we objected to 182.

20          THE COURT:  I need to examine them.

21          MR. WILLIAMS:  If I could have one minute, Your

22    Honor.  Understanding your ruling on those other matters, I

23    think we're going to go the same on these, so we will not

24    offer them.

25          THE COURT:  Very good.  218 is withdrawn.

BRITTANY BURKE - DIRECT EXAMINATION

1        MS. PAAVOLA:  Okay.  204 is also a series of papers

2   to which we have the same objections that were made with

3   regard to 182.

4        MR. WILLIAMS:  Your Honor, this is a three-page

5   document, actually two pages, one has got a list on both

6   sides, a list of churches, Your Honor.

7        THE COURT:  Let me see it.  What's the Government

8   offering these for?

9        MR. WILLIAMS:  Your Honor, the church lists, I think,

10  are similar reasons.  The other list has a list of ratios that

11  the defendant had mentioned in different places about

12  Charleston having certain ratios of African-Americans to

13  whites.  The case agent in the case will later testify that he

14  traced that information back to a book that it appears the

15  defendant copied from, and is consistent with statements he

16  made about ratios several different times.

17       THE COURT:  Miss Paavola?

18       MS. PAAVOLA:  Our objection to this is it lists a

19  number of irrelevant items.  It has the address for the South

20  Carolina Historical Society, the Statehouse, a list of

21  authors, a location that may be a grave site.  There are many

22  items listed that are not relevant.

23       THE COURT:  The problem is that it lists a number of

24  African-American churches, Hopkins, Columbia and Sumter, et

25  cetera.  I overrule the objection.

BRITTANY BURKE – DIRECT EXAMINATION

1          MS. PAAVOLA:  Your Honor, we would request then that

2     the Government redact those items that are not relevant.

3          THE COURT:  I just don't think they're -- so what --

4     which specific things are you asking be redacted?

5          MS. PAAVOLA:  I understand your ruling with regard to

6     the churches, then I -- and I believe the Government should

7     redact anything that is not a church or a related in that way,

8     because of the --

9          THE COURT:  I overrule it as to the ratios, because

10    that's relevant for another reason.  And for instance, it

11    mentions Trinity, but just says just "to tour."  So I think

12    that document explains it itself.  The only one I would think

13    would fall into that category is Statehouse with a phone

14    number of the State Museum.  I just don't --

15         MR. WILLIAMS:  Your Honor, he took photos.  We have

16    some photos --

17         THE COURT:  I overrule the objection.  That's number

18    204?

19         MR. WILLIAMS:  Yes, Your Honor.

20         MS. PAAVOLA:  We also object to 208.  This is a list

21    of addresses for various Chick-fil-A restaurants.

22         MR. WILLIAMS:  Yes, Your Honor, this is, I think,

23    consistent with your earlier rulings that it lists high

24    schools in areas that I believe you said would not be

25    admissible.

BRITTANY BURKE – DIRECT EXAMINATION

1          THE COURT:  I sustained the objection.

2          MR. WILLIAMS:  We will not offer 208.

3          MS. PAAVOLA:  We also object to Government's 207.

4    This also lists tourist locations, the address for a

5    lighthouse and a school.

6          MR. WILLIAMS:  Based on the earlier rulings, we will

7    not offer 207.

8          THE COURT:  Okay.  207 is withdrawn.

9          MS. PAAVOLA:  We have no objection to 196.  No

10   objections to 201, 226.

11      We also object to 206.  These are lists of addresses in

12   places in Greenville -- excuse me, 226 -- including a museum

13   and some other places, a park.

14         MR. WILLIAMS:  These are locations he took photos of

15   himself, Your Honor, that we believe will be admitted later.

16         THE COURT:  Let me see the list.  I'm going to

17   sustain the objection.

18         MR. WILLIAMS:  Thank you.

19         MS. PAAVOLA:  Nothing further, Your Honor.

20         THE COURT:  Let's make sure we have our signals

21   straight here, because it's a little involved.

22      Government has withdrawn 218, 208 and 207, is that

23   correct?  And I sustained the objection as to 226, and I

24   sustained the objection as to 182, other than the two

25   documents which we specifically referred to.

BRITTANY BURKE - DIRECT EXAMINATION

1      Miss Paavola, does that seem to be correct?

2          MS. PAAVOLA:  Yes, Your Honor, and also 204, was that

3      withdrawn?

4          THE COURT:  I don't see 204 in this list.  I'm sorry,

5      it is in this list.  What's 204?  I overruled that objection.

6          MR. WILLIAMS:  What we'll do on the break is make

7      sure we have them all squared away.

8          THE COURT:  Let me just -- and y'all look over.

9      Government 199, 205, 182, 204, 201 and 196 admitted.  Y'all

10     double check that and make sure I've got that right, but I

11     believe that is correct in accord with my rulings.

12         MS. PAAVOLA:  With the exception of 182 were removed.

13         THE COURT:  Correct, all but two pages of 182 I

14     sustained the objection, and the two remaining, I saw

15     Mr. Richardson holding them back, and you've got those

16     straight, Mr. Richardson?

17         MR. RICHARDSON:  Yes, Your Honor.

18         THE COURT:  Very good.  Show them again to Miss

19     Paavola so we make sure we have our signals straight on that.

20         MR. RICHARDSON:  Your Honor --

21         THE COURT:  This is the two that we agreed would come

22     in.

23         MR. RICHARDSON:  The two pages?

24         THE COURT:  Out of 182 there were two documents which

25     I allowed in.  I want to make sure that you're all on the same

BRITTANY BURKE - DIRECT EXAMINATION

1    page.  Those are the two documents which I overruled the

2    objection.

3              MS. PAAVOLA:  Yes.

4         (Government Exhibits 182, 196, 199, 204, 205 received.)

5              THE COURT:  Okay.  We'll take a ten-minute break.

6         (A recess was held at this time.)

7         (Jury not present.)

8              THE COURT:  Mr. Williams, were y'all able to have a

9    meeting of the minds among counsel regarding where we stand?

10             MR. WILLIAMS:  Yes, I think we're right where we were

11   when we left off.

12             THE COURT:  Bring in the jury.

13        (Jury present.)

14             THE COURT:  Mr. Williams, continue direct

15   examination.

16             MR. WILLIAMS:  Thank you, Your Honor.

17   BY MR. WILLIAMS:

18   Q.  Miss Burke, before the break we were going through

19   paperwork that was located in the car.  I wanted to follow up

20   with that.  You testified earlier about a photo of bank

21   records.  I'm going to put up Government 196.  Are these those

22   same bank records that were found in the car?

23   A.  Yes, they are.

24   Q.  I'm going to publish Government 199.  Can you tell what

25   that is?

BRITTANY BURKE - DIRECT EXAMINATION

1   A.  This is a receipt for a Glock magazine.

2   Q.  Looks like quantity of two?

3   A.  Yes, that's correct.

4   Q.  The date on that is 4/16/15?

5   A.  Yes, it is.

6   Q.  I'm going to put up Government's 205.  Can you tell the

7   jury what that is as well?

8   A.  This is a description for a Glock 41 Gen 4 .45 ACP long

9   slide, lists the serial number as XLS771.  Quantity is one.

10  Q.  Is that consistent with the firearm that was located in

11  the car?

12  A.  Yes.

13  Q.  Looks like it has a 4/16/15 date listed on the receipt as

14  well?

15  A.  Yes, it does.

16  Q.  I'm going to put up Government's 201.  That was an

17  envelope with a birthday card in it?

18  A.  Yes, it is.

19  Q.  It had a hand drawn diagram on the back?

20  A.  Yes.

21  Q.  I'm going to put up Government 182, that's two pages.  The

22  first page appears to be a list of addresses?

23  A.  Yes, it does.

24  Q.  The second page has a note for Good Hope Picnic, Elloree.

25  A.  Yes.

BRITTANY BURKE - DIRECT EXAMINATION

1   Q.  Also had some other addresses listed on it as well?

2   A.  Correct, it does.

3   Q.  Finally I want to go to Government's 204.  The total of

4   two pages, one front and back and one on the front.  Go to the

5   first page.  Could you read that out to the jury?

6   A.  At the top says Kensington Singletons, McCaskill overseer

7   hanging, 1820 three to one Charleston, Beaufort six to one,

8   George -- says Georgetowe -- eight to one, Colleton five to

9   one, Sumter two to one, Denmark Vessex, Georgetown AME, SC

10  Historical Society, the Real dow Brown miscaganation play?

11  Q.  We'll put that over to the other side.  If you could read

12  what's on the top half of that page.

13  A.  New Light Beulah Baptist, 1330 Congaree Road, Hopkins,

14  (803)783-2050.  Wednesday 7:00 p.m. to 8:30 p.m., Thursday

15  7:00 p.m. to 9:30 p.m., Sunday 8:45 a.m. to 9:45 a.m. and

16  10:00 a.m. to 1:00 p.m.

17      Bethel AME, 819 Woodrow Street, Columbia, Sunday 8:00 a.m.

18  and 10:45 a.m., (803)779-0138.  Monday through Friday

19  9:00 a.m. to 6:00 p.m.

20      State House (803)734-2430.

21      State Museum 9:30 a.m. to 3:30 p.m.

22  Q.  Move to the bottom half.

23  A.  Milford Sumter, (803)452-6194.  Beside that says James

24  Wood Davidson, Anne Royall, Henry Lyons.  As individuals we

25  are as a group.  Jack Kenny Williams, MFT branding.

BRITTANY BURKE – DIRECT EXAMINATION

1   Q.  Now we'll go to the single side of the third page.  If you

2   could read that to the jury?

3   A.  It says Friendship Baptist, Sunday 10:00 a.m., Wednesday

4   7:00 p.m., Thursday 6:00 to 8:00 p.m., 1237 House Street,

5   Columbia, (803)7 -- I believe the next number is a nine --

6   8906.

7       Antioch AME Zion, 1136 Antioch AMEZ Church Road, Eastover,

8   (803)353-7143.

9       Salem Black Presbyterian, P-R-E-S-B-Y-T, 1060 Brick Church

10  Road, Mayesville, South Carolina.

11      Trinity, 1100 Sumter Street, Columbia, just a tour,

12  (803)771-7300.

13  Q.  The notation "just a tour" was written under the Trinity

14  Church name?

15  A.  That is correct.

16  Q.  I want to ask you about any other evidence you would have

17  processed in the case.  Any electronic items such as a GPS,

18  computer, thumb drives, where were those sent?

19  A.  Those were sent to the FBI.

20  Q.  Did they process all the electronic evidence in this case?

21  A.  Yes, they did.

22          MR. WILLIAMS:  Thank you.  No further questions, Your

23  Honor.

24          THE COURT:  Cross-examination.

25                      CROSS-EXAMINATION

BRITTANY BURKE - CROSS-EXAMINATION

1  BY MS. PAAVOLA:

2  Q.  Good morning, Agent Burke.

3  A.  Good morning.

4  Q.  You've been here a long time.

5  A.  Yes.

6  Q.  I'm just going to ask you a few more questions about your

7  processing of the defendant's car.

8  A.  Okay.

9  Q.  You processed the defendant's car on June 19, is that

10 right?

11 A.  Yes, ma'am.

12 Q.  And that took place at your office in Columbia?

13 A.  It took place at SLED headquarters in their vehicle bay

14 area.

15 Q.  And the people who participated in processing the car

16 included yourself, Tiffany Hezel -- Is that how you pronounce

17 that?

18 A.  Yes.

19 Q.  And Casey Collier?

20 A.  Yes, that is correct.

21 Q.  And Agent Hezel photographed the items inside the car, is

22 that right?

23 A.  Yes, that is correct.

24 Q.  Did you take any of the photographs yourself?

25 A.  Not that I recall, no, they were -- I believe they were

BRITTANY BURKE - CROSS-EXAMINATION

1    all taken by Agent Hezel.

2    Q.  And then you made a list of the items that you had

3    collected from inside the car?

4    A.  Correct.

5    Q.  Including where they were located and things like that?

6    A.  Yes, ma'am.

7    Q.  And one item that you collected was a toiletry bag, I

8    think you testified?

9    A.  We just collected the thumb drives.  I do not believe I

10   collected the whole bag.

11   Q.  Okay.  But you observed the bag in the car?

12   A.  Yes.

13   Q.  And Agent Hezel photographed it --

14   A.  Yes.

15   Q.  -- during your processing of the car.  I'd like to hand

16   you what's been marked as defendant's proposed exhibit 39, 37

17   and 38.

18           THE COURT:  Any objection?

19           MR. WILLIAMS:  No objection, Your Honor.

20           THE COURT:  You're offering 37, 38 and 39?

21           MS. PAAVOLA:  I would like to see if she can identify

22   them first, yes.

23   A.  These are not pictures that were taken by me that day, no.

24   Q.  Yes, I understand that.  Are those photographs of items

25   that you observed in the defendant's car when you were

BRITTANY BURKE - CROSS-EXAMINATION

1  processing it?

2  A.  They appear to be the same items, yes.

3       MS. PAAVOLA:  We would offer Defendant's 39

4  through --

5       THE COURT:  Wait a minute.  Who took the photographs,

6  what's the --

7       MS. PAAVOLA:  We took the photographs, Your Honor,

8  during our review of the evidence.

9       THE COURT:  And, Agent Burke, you recognize this as

10  the vehicle and the objects, is that correct?

11  A.  They appear to be the same items.  I can not tell where

12  they're from.

13       THE COURT:  Very good.  The Court admits -- No

14  objection from the Government?

15       MR. WILLIAMS:  No objection, Your Honor.

16       THE COURT:  The Court admits Defendant's 37, 38 and

17  39 without objection.

18     (Defendant's Exhibits 37, 38 and 39 received.)

19  BY MS. PAAVOLA:

20  Q.  And before I publish those, Agent Burke, I'd like you to

21  take a look back at the Government's Exhibit 138.

22     Agent Burke, could you take a look at Exhibit 138.  Does

23  this appear to be the same toiletry bag that you located

24  inside the defendant's car?

25  A.  Yes, ma'am, it does.

BRITTANY BURKE - CROSS-EXAMINATION

1   Q.  And there were a number of items with it, including

2   shampoo and some face wash?

3   A.  Yes, ma'am.

4   Q.  And then if you could take a look at Defendant's 39.

5   A.  Yes, ma'am.

6   Q.  This is just an enlargement of that toiletry bag, is that

7   right?

8   A.  Yes, ma'am.

9   Q.  Okay.  If you'd now look at Defendant's 37.  Does this

10  appear to be a photograph of the pillow that you located in

11  the back seat of the defendant's car?

12  A.  Yes, ma'am, it does appear to be that pillow.

13  Q.  And could you now look at Defendant's 38.  This is a

14  photograph of the towel that you also located in the back

15  seat, is that right?

16  A.  Yes, ma'am, it appears to be.

17  Q.  And I think you testified earlier that there was also a

18  blanket somewhere in the car, is that correct?

19  A.  I would have to refer back to my pictures, but I do

20  remember the towel and the pillow being in the back seat, yes,

21  ma'am.

22  Q.  And there were also several items of clothing inside the

23  interior of the car, is that true?

24  A.  Yes, ma'am.

25  Q.  Could you take a look at Government's Exhibit 165.  This

BRITTANY BURKE – CROSS-EXAMINATION

1  appears to be a can of food, is that true?

2  A.  Yes, ma'am, it's a can of Chef Boyardee spaghetti and

3  meatballs.

4  Q.  And there were also some other items of food inside the

5  car?

6  A.  Yes, ma'am, there was wrappers from food as well.

7  Q.  And there was a bag of potato chips?

8  A.  Yes, ma'am.

9  Q.  Some bottled water?

10  A.  Yes.

11  Q.  And a box of sodas?

12  A.  Yes.

13  Q.  I'd like to hand you what's been marked as defendant's

14  proposed exhibit 25.  Do you recognize that document as

15  something that was found inside the defendant's car?

16  A.  Not straight offhand, no.

17  Q.  Do you recall seeing any document like this inside the car

18  when you processed it?

19  A.  I recall seeing multiple pieces of paper.  I do not recall

20  all of them right off the top of my head.

21  Q.  That's fine.  Thank you.  Could you take a look at

22  Government's Exhibit 143, please.

23       MR. WILLIAMS:  Your Honor, I ask she not publish

24  these exhibits until after they've been admitted.

25       MS. PAAVOLA:  Your Honor, I haven't moved to admit

BRITTANY BURKE - CROSS-EXAMINATION

1    it.  I don't believe the witness has identified it.
2           THE COURT:  Very good.
3    BY MS. PAAVOLA:
4    Q.  Agent Burke, you testified previously that you collected
5    this item which was offered into evidence earlier as
6    Government's Exhibit 144.  This is a photograph of that item,
7    is that right?
8    A.  That is correct.
9    Q.  And in the photograph it appears that there is something
10   on one of the shoulders of the shirt.
11   A.  Yes, ma'am.
12   Q.  And you collected this shirt in particular because it was
13   inside the car, but also because it appears to match the shirt
14   that the defendant is wearing in the surveillance video when
15   he exited the church.
16   A.  Yes, ma'am, that is correct.
17   Q.  Can you tell what this substance is on the shirt?
18   A.  No, ma'am, it appeared to just be the design of the shirt,
19   which was consistent with the -- what the shirt -- that the
20   suspect was seen wearing in the video showed, and that's why
21   we collected it.
22   Q.  Right.  And it looked that way both when he went into the
23   church and when he came out of the church?
24   A.  Yes, ma'am.
25   Q.  You also observed a number of items in the defendant's

BRITTANY BURKE – CROSS-EXAMINATION

1  trunk.  Is that true?

2  A.  Yes, ma'am, I did.

3  Q.  I would like to hand you what's been marked as defendant's

4  proposed exhibit 19, 20, 21, 29, 30 and 32.  Could you take a

5  look at those and let us know if they appear to be photographs

6  of items that were located in the trunk of the defendant's

7  car.

8  A.  Yes, they do appear to be that.

9        MS. PAAVOLA:  Your Honor, we would move to admit

10  Defendant's 19, 20, 21, 29, 30 and 32.

11        THE COURT:  Government's view?

12        MR. WILLIAMS:  No objection.

13        THE COURT:  Defendant's 19, 20, 21, 29, 30 and 32

14  admitted without objection.

15    (Defendant's Exhibits 19, 20, 21, 29, 30 and 32 received.)

16  BY MS. PAAVOLA:

17  Q.  Could we look first at Defendant's 19.  Agent Burke, this

18  is a photograph of the opened trunk of the defendant's car,

19  right?

20  A.  Yes, ma'am.

21  Q.  And in the trunk of the car there was a second pillow,

22  which is in here in the photograph.

23  A.  Yes, ma'am.

24  Q.  There was also a red suitcase which is there behind the

25  pillow.

BRITTANY BURKE - CROSS-EXAMINATION

1    A.  Yes, ma'am.

2    Q.  And that suitcase was full of clothing items, is that

3    right?

4    A.  Yes, ma'am.

5    Q.  And there were also other clothing items inside the trunk

6    that were not in the suitcase?

7    A.  Yes, ma'am.

8    Q.  Could we take a look at Exhibit 20.  So there you can see

9    some clothing items in the trunk that are not in the suitcase

10   itself, is that right?

11   A.  Yes, ma'am.

12   Q.  And then if you would look at 21.  This also appears to be

13   just another view of some clothing items in the trunk, is that

14   right?

15   A.  Yes, ma'am.

16   Q.  Now, did you take out all of the clothing items and look

17   at them individually?

18   A.  Yes, ma'am.

19   Q.  Could you look at Defendant's Exhibit 29, please?  Did you

20   happen to notice that many of the shirts in the suitcase were

21   cut off in this way?

22   A.  Yes, ma'am, we did.

23   Q.  And if you look at Exhibit 30, please.  This is a

24   photograph just of another shirt located in the suitcase

25   itself, is that correct?

BRITTANY BURKE - CROSS-EXAMINATION

1    A.  I don't remember that shirt right off the top of the head,
2    but there was a lot of clothing in the suitcase, yes.
3    Q.  Sure.  But it was in the trunk somewhere, whether in the
4    suitcase or in the trunk, is that right?
5    A.  Sure.
6    Q.  And if you look at Defendant's Exhibit 32, this is also an
7    item of clothing that was located in the trunk, is that right?
8    A.  Yes, ma'am.
9    Q.  Now, the suitcase itself was pretty full, wouldn't you
10   say?
11   A.  Yes, it was.
12   Q.  And did you happen to notice that it contained very large
13   amounts of underwear?
14   A.  I did not notice that offhand, no, ma'am.
15   Q.  You didn't inventory each item of clothing?
16   A.  We took photographs and all of them, but we just --
17   itemized them all as miscellaneous clothing items.
18   Q.  Did you notice that the clothing smelled like it had not
19   been washed recently?
20   A.  No, ma'am.
21   Q.  Did you notice that the pillows and the towels inside the
22   car appeared to be dirty?
23   A.  Yes, ma'am.
24   Q.  You testified on direct that the car was messy and it
25   looked like someone had been in the car for awhile or like

BRITTANY BURKE - CROSS-EXAMINATION

1  they were taking things on a trip.

2  A.  Yes, ma'am.

3  Q.  Do you recall that testimony?  Agent Burke, if you were

4  going on a trip, would you dump a bunch of clothes haphazardly

5  into the trunk of your car?

6          MR. WILLIAMS:  Objection to relevance, Your Honor.

7          THE COURT:  I'm not sure, Miss Paavola, relevance?

8          MS. PAAVOLA:  I think it goes to the defendant's

9  state of mind, the nature of the evidence.

10         THE COURT:  Objection sustained.

11         MS. PAAVOLA:  One moment, Your Honor.

12 BY MS. PAAVOLA:

13 Q.  Agent Burke, you testified that the clothing didn't smell

14 dirty.  Did it look to be dirty to you?

15 A.  Some items you were able to see that they looked like they

16 had been worn, but other items it was not readily apparent.

17 Q.  Could we take another look at Defendant's 29.  Do you

18 agree, Agent Burke, that this item of clothing appears to be

19 dirty?

20 A.  Yes, ma'am.

21         MS. PAAVOLA:  Thank you.  No further questions.

22         THE COURT:  Very good.  Anything on redirect?

23         MR. WILLIAMS:  No, Your Honor.

24         THE COURT:  Agent Burke, at last you are finished.

25         MR. RICHARDSON:  Your Honor, the Government calls

RONALD THRILLKILL – DIRECT EXAMINATION

1   Ronald Thrillkill.

2           THE CLERK:  State your full name for the record,

3   please.

4   A.  Ronald Thrillkill.

5       RONALD THRILLKILL, a witness called by the Government,

6   first having been duly sworn, testified as follows:

7                       DIRECT EXAMINATION

8   BY MR. RICHARDSON:

9   Q.  Tell the jury your name and where you live.  Not the

10  address, but just the city you live in.

11  A.  My name is Ronnie Thrillkill, and I reside in Chapin,

12  South Carolina.

13  Q.  And Chapin is a small town just outside of Columbia?

14  A.  That's correct.

15  Q.  And do you work in the Columbia area?

16  A.  I work at West Columbia Shooter's Choice.

17  Q.  Shooter's Choice is what kind of store?

18  A.  It's a full-line firearms indoor shooting range.

19  Q.  So you sell shooting equipment?

20  A.  Yes, sir.

21  Q.  Right?  That includes guns and ammunition and magazines,

22  all those sorts of things?

23  A.  Yes, sir, handguns, hunting guns, accessories.

24  Q.  Hunting guns, shotguns, all different kinds of guns.

25  A.  That's right.

RONALD THRILLKILL – DIRECT EXAMINATION

1  Q.  In addition, in the back of the store there's a firing

2  range.

3  A.  Yes, sir.

4  Q.  And it's indoors.

5  A.  Yes, sir.

6  Q.  And you can come there and use that firing range to shoot

7  pistols?

8  A.  Yes, sir.

9  Q.  Not long guns?

10  A.  We actually -- shotguns can be fired in there, we do have

11  a hunting side for hunting rifles.

12  Q.  Tell me a little bit about what your job is with Shooter's

13  Choice.

14  A.  I'm the overall general manager, operations manager, been

15  there 23 years.  The store is 25 years old.  Basically

16  day-to-day operation, hiring personnel, maintaining all the

17  documents in your files that are required due to the Federal

18  Firearms License Act.  Buy and sell, handle all the inventory.

19  Basically what goes in, comes out.

20  Q.  You mentioned the Federal Firearms Act.  Being a gun

21  store, you're fairly heavily regulated, isn't that fair?

22  A.  Yes, sir.

23  Q.  I'm going to hand you a number of exhibits that you and I

24  have had a chance to look at this morning.  Have you seen

25  those before?

RONALD THRILLKILL - DIRECT EXAMINATION

1   A.  Yes, sir.

2          MR. RICHARDSON:  And I previously showed a copy of

3   these to Mr. Bruck.

4   Q.  Are these all documents that -- documents or video that

5   are maintained as part of Shooter's Choice's regularly

6   conducted business?

7   A.  Yes, sir.

8   Q.  And each of those that we went through, and you watched

9   the videos this morning, are those fair and accurate copies of

10  those records?

11  A.  Yes, sir.

12         MR. RICHARDSON:  Your Honor, we'd move to admit

13  Government's Exhibit 235, 235A and B, 236, 237, 238, 240, 241,

14  and 242 as business records of Shooter's Choice.

15         MR. BRUCK:  No objection.

16         THE COURT:  Very good.  Government Exhibits 235,

17  235A, 235B, 236, 237, 238, 240, 241 and 242 are admitted

18  without objection.

19     (Government Exhibits 235, 235A, 235B, 236, 237, 238, 240,

20  241 and 242 received.)

21  BY MR. RICHARDSON:

22  Q.  Let me start by talking to you a little bit about what

23  kind of surveillance system Shooter's Choice uses.

24  A.  We maintain 12 cameras internal and external within the

25  building, with outside the building.  Main purpose is

RONALD THRILLKILL – DIRECT EXAMINATION

1  nighttime security, daytime security.  And they run 24/7.  The

2  system is never down.  Shuts down.  At night it's there a 24-

3  hour cycle.

4  Q.  Is it a motion-activated camera?

5  A.  All the cameras internally are motion activated.  Two of

6  the external cameras are motion activated.  The other one runs

7  all the time.

8  Q.  And part of your job is to monitor that video system while

9  you're at work?

10  A.  That is correct.  It is in my office area.

11  Q.  And so in your office there's a flat screen and you can

12  see those cameras as things are happening in your store?

13  A.  Multiple cameras are synchronizing out there, yes, sir.

14  Q.  And does it also include a date on that video system so

15  you can tell what date is being recorded?

16  A.  Yes, sir, it time stamps the day, which starts at

17  12:01 midnight, then again runs through a 24-hour cycle.  You

18  have, depending on the camera in the system that's taking the

19  video, because it may have slept part of the day or might have

20  been on part of the day, you'll have a differentiation between

21  a time stamp of minutes to maybe half hour or whatnot.  But

22  very seldom will you get all 12 to line-up perfectly the same.

23  Q.  The dates are always accurate, but based on the motion

24  sensoring, sometimes the times get off by a few minutes?

25  A.  That is correct.  Yes, sir.

RONALD THRILLKILL – DIRECT EXAMINATION

1  Q.  And subsequent to the shooting down here in Charleston on

2  June the 17th, was your store asked to pull various video

3  related to the defendant's purchase of a firearm from your

4  store?

5  A.  Yes, sir, on the morning of the 18th we were approached by

6  SLED.

7  Q.  And did y'all assist in doing that?

8  A.  Yes, sir, we did.

9  Q.  And you've got there in front of you Government's

10  Exhibit 235.  That's a disk that contains all the video that

11  you provided to the FBI that included Mr. Roof?

12  A.  That is correct.

13  Q.  And which days were those two videos taken from?

14  A.  You would have the actual paperwork.  The purchase

15  selection was on the 11th.  The gun form was -- the 4473 was

16  completed and filled out by the defendant.

17  Q.  And that's April the 11th?

18  A.  On April the 11th of 2015.  And then on the 16th the gun

19  was actually transferred to the defendant.

20  Q.  So those are the two days, and you provided to law

21  enforcement all of the various surveillance cameras --

22  A.  All of them.

23  Q.  -- from those days?

24  A.  We backed up from the time stamp of the hard print

25  receipt, took that time, and we're lucky enough to still, on

RONALD THRILLKILL – DIRECT EXAMINATION

1   those cameras, have that video there, and went back and filmed
2   everything forward to the end of the event.
3   Q.  And you also have there in front of you a CD, 235A and B.
4   Did you have a chance to review that this morning as well?
5   A.  I did.
6   Q.  And those are clips taken from the longer larger video?
7   A.  That is correct.
8   Q.  And those are the clips that include the defendant?
9   A.  That is correct.
10       MR. RICHARDSON:  If we can, Your Honor, we'd like to
11   publish 235A, which is the video from April the 11th, where
12   the defendant came into the store.  And as this plays, the
13   gentleman here on the left in the camouflage shirt, do you
14   recognize him?
15   A.  That would be Mr. Roof.
16   Q.  And he's looking here in your store, this is a gun case?
17   A.  Yes, sir.  That is the first case as you enter the front
18   door.
19   Q.  As he walks off of this screen we then pick him up walking
20   into the main part of the store?
21   A.  That is correct.
22   Q.  And as he's looking at this gun case, when he's speaking
23   with your employee here, what types of guns are kept in that
24   gun case?
25   A.  That case there is -- contains all Glocks, that is a

RONALD THRILLKILL – DIRECT EXAMINATION

1  complete case of different models of Glock firearms.

2  Q.  And is Glock a fairly popular firearm?

3  A.  It's your number one selling firearm in the industry.

4  Q.  Also one used by law enforcement?

5  A.  Yes, that is correct.  That's part of the popularity of

6  it.

7  Q.  Here he's being shown a firearm?

8  A.  Yes, sir.

9  Q.  Though we later figured out, you can't tell from this

10  video exactly which Glock he's being shown right there?

11  A.  Can not.  But it definitely was from the Glock case.

12      MR. RICHARDSON:  Can we pause here for a second,

13  Miss Baker?

14  Q.  We see the defendant here on the left-hand side of the

15  screen filling out paperwork.  Tell me, when someone comes in

16  to buy a firearm, what kind of paperwork are they required by

17  law to figure out?  Fill out.

18  A.  Federal Firearms Act requires all licensed gun dealers to

19  complete a 4473, which is their documentation that -- to have

20  the gun purchaser complete that gun form.  The gun form asks

21  questions that are used to establish whether the purchaser may

22  or may not be able to buy the gun, give us that benefit up

23  front.

24  Q.  Let's stop that for a second and take a half a step back.

25  A.  Okay.

RONALD THRILLKILL – DIRECT EXAMINATION

1  Q.  Under federal law and the work that you do, you understand

2  that some people are permitted to own firearms and some people

3  are not permitted?

4  A.  That is correct.

5  Q.  And part of what this form is designed to do is identify

6  those that are permitted to own firearms?

7  A.  That is correct.

8  Q.  All right?  And separate out those that are not permitted

9  to own firearms.

10  A.  Yes.

11  Q.  On that section 4473, and that's just the number that's

12  written on the right on the top?

13  A.  Yes, sir.

14  Q.  The 4473 form, what's the first way that that form goes

15  about identifying whether a purchaser is permitted to purchase

16  a firearm or not?

17  A.  The first section on the form is filled out, so you have a

18  way of establishing who they say they are, by any picture I.D.

19  You're getting the full name, address, that has to match a

20  Government pictured I.D.

21       MR. RICHARDSON:  Maybe we'll pull it up.  It will

22  help us.  Can we jump over to 238, Miss Baker.

23  Q.  Is this the 4473 we were just talking about?

24  A.  That is correct.  Yes, sir.  Page one.

25  Q.  The first section you talked about, this is that top

RONALD THRILLKILL - DIRECT EXAMINATION

1    section that the purchaser fills out his or her name?

2    A.  Yes, sir.

3    Q.  Address and other information?

4    A.  Yes, sir.

5    Q.  Okay.  And then we go to question 11, if we go sort of

6    halfway down the page, question 11 includes a number of

7    subparts?

8    A.  Yes, sir.

9    Q.  What is question 11(a) eliciting?

10   A.  11(a) through (i), (j), really is there to try to

11   establish the credibility of the purchaser.  Are they a

12   prohibited buyer for one or more of the reasons that are

13   listed there, or are they not prohibited to buy, each one of

14   those questions has to be answered correctly.  If the buyer

15   answers the question wrong, that terminates the sale at that

16   point.  We can no longer go any further than that.

17   Q.  So to use an example, one of the questions is, are you a

18   convicted felon.

19   A.  That is correct.

20   Q.  And that is one of the attributes of a purchaser that

21   would disqualify him?

22   A.  Yes.

23   Q.  And so what this form does is require a purchaser, under

24   oath, to answer whether that person is or is not a felon?

25   A.  Yes.

RONALD THRILLKILL – DIRECT EXAMINATION

1    Q.  If a purchaser lies on this form, is that a separate
2    federal offense?
3    A.  Yes, sir.
4    Q.  And we don't have to turn over to it now, but, in fact, on
5    the second page it includes that --
6    A.  They're required to sign that statement that says the
7    above information, the questions I've answered is the truth
8    and I haven't lied on it.
9    Q.  So this is the first way that under the Federal Firearms
10   Act you, as the gun store, identify who is permitted to buy
11   and who is not permitted to buy.
12   A.  That is correct.
13   Q.  And it goes through a variety of different questions,
14   including whether someone is an unlawful user of marijuana or
15   other narcotics.
16   A.  Yes, sir.
17   Q.  It also asks about mental health.
18   A.  Yes, sir.
19   Q.  All right.  And you indicated here that if someone answers
20   these questions indicating that they have one of these
21   prohibitions, then you do not sell them the gun?
22   A.  By law, we are required to, at that point, end the sale.
23   It's no questions asked, we can't say, or did you answer that
24   right, did you answer it wrong?  That stops the sale at that
25   point.

RONALD THRILLKILL – DIRECT EXAMINATION

1  Q.  And if there's some objection or disagreement by the

2  purchaser, there's an appeals process that doesn't involve

3  you?

4  A.  Right, that goes forward, not backwards.

5  Q.  Right.  So you don't deal with that.  Then some sort of

6  law enforcement would then get involved as to whether they are

7  otherwise qualified for some reason?

8  A.  Like I say, they're unable to buy from us because of that.

9  So --

10       MR. RICHARDSON:  Can we go to the top of the second

11  page, Miss Baker.

12  Q.  And box 16, that's the signature of the purchaser, in this

13  case the defendant.

14  A.  Yes, sir, that's Mr. Roof.

15  Q.  And it also indicates the date there in block 17, as well

16  as the identification that was used to confirm his identity?

17  A.  That is true.

18  Q.  In addition to the statements under oath by the purchaser,

19  is there a back-up or is there a secondary check to further

20  confirm that this person is permitted to buy a firearm?

21  A.  At this point, after you've required -- acquired all the

22  information we just discussed, and you have his driver's

23  license and I.D. in your hand and you visualize that, then you

24  know you are dealing with who your I.D. says you're dealing

25  with.  The Firearms Act provides a check system for your

RONALD THRILLKILL – DIRECT EXAMINATION

1  dealer network, your licensed dealer network, and they refer

2  to it as the NIC system, that's the National Incident Criminal

3  background check system, available to all your FFL dealers.

4  Q.  We'll get into jargon pretty quickly, you and I had this

5  conversation, FFL, federally licensed firearms dealer?

6  A.  Federal license, yes, sir.

7  Q.  So any licensed firearm dealer has access to this NIC, or

8  NICS system?

9  A.  Yes, sir.

10  Q.  When you gather the information from the purchaser, what

11  do you then do with respect to the NICS system?

12  A.  You call, it's a direct line, you call the entity you're

13  dealing with, operator or agent on the phone, you basically go

14  back to the top of the original form that we all looked at

15  here, and they will ask you those questions, and you respond

16  as Mr. Roof or any of the -- whoever the gun purchaser would

17  be, he responds to the question with information that has been

18  provided to you.

19      Once that question, series of questions has been answered,

20  they do the run, and you're going to get one or two or three

21  or four different responses.

22  Q.  And so let's talk about the different possible responses

23  you get back.  When you contact the NICS system, the National

24  Instant Criminal background, the instant part is --

25  A.  They're doing it while we're on the phone instantly.

RONALD THRILLKILL - DIRECT EXAMINATION

1    That's --

2    Q.  So one possible answer that they give you back is a clear?

3    A.  A clear, proceed.

4    Q.  And what does a clear, proceed, mean as the gun seller?

5    A.  It means you can continue with the transaction at that

6    point.

7    Q.  Okay.  Immediately?

8    A.  Immediately.

9    Q.  No delay necessary?

10   A.  That's correct.

11   Q.  Secondarily, they could immediately deny.

12   A.  Denial could be, and that would be immediately we're done.

13   The transaction's over with.

14   Q.  And then there's a third option, and what's that option?

15   A.  The third option would be a delay.  The delay usually

16   follows the -- the comment that you'll have from them, we're

17   going to get you a further review on you, and they'll actually

18   move it over to another operator.  And then it -- that

19   response may end up being that delay.  And the delay is a

20   legal part of the process that allows the NICS system, or the

21   FBI, three additional business days to continue their search,

22   background search and provide an answer from that search.

23        At the end of those three business days --

24   Q.  Let me come back to that.

25   A.  Okay.

RONALD THRILLKILL – DIRECT EXAMINATION

1   Q.  Let's not get too far ahead.  So the delay option is they

2   say we're not telling you to deny it, we're not telling you to

3   sell it, we're saying we're invoking our three days in order

4   to do further work?

5   A.  That is correct.

6   Q.  And sometimes when you get that three-day delay, they call

7   you back rather quickly and indicate that the person's

8   cleared?

9   A.  It could be five minutes, it could be 15 minutes up to two

10  days, one day.  There's no really perfect scenario.

11       MR. RICHARDSON:  And we go down to the next section,

12  Miss Baker?  All right.  Stop here.

13  Q.  On the left-hand side of the screen we see question 21(a)

14  refers to the date that you did what?

15  A.  That's the -- 21(a) is the date that the NICS system was

16  notified and the background check was done.

17  Q.  And then on the 21(b) gives a code, and what's that code

18  refer to?

19  A.  They refer to it as an NTN number, that's the national

20  tracking number, and that is a tracking number for that

21  transaction that we're attempting to make this duplicated by

22  no other number, it's a long number there.

23  Q.  So is it a way of keeping track of this particular

24  attempted purchase?

25  A.  Exactly right.

RONALD THRILLKILL – DIRECT EXAMINATION

1    Q.  And then 21(c) indicates their response, and says here,

2    delay, and provides a date.  Where does that date come from?

3    A.  That does come from the FBI.  They -- on a delay, because

4    if it goes into delay, they will always give you the actual

5    transfer date that you can transfer this gun on this date, or

6    any date after that, by the confines of the law.

7          MR. RICHARDSON:  Can we go back to the video?

8       (Video was played.)

9    BY MR. RICHARDSON:

10   Q.  And you and I have had a chance to watch this, this

11   morning.  We watched this video together this morning?

12   A.  Yes, sir.

13   Q.  And for about the next five minutes or so, the defendant

14   stands and fills out this form that we've been talking about.

15   A.  Yes, sir.  He -- it starts out he's getting instructions

16   from my employee, and then he is left alone really to take his

17   time and complete the form at his leisure.

18   Q.  And he comes back again and asked for more instructions

19   from your employee to finish filling it out?

20   A.  That is correct.

21         MR. RICHARDSON:  Can you move forward to the

22   6:50 mark.

23      (Video was played.)

24   Q.  This shows the defendant again asking further questions

25   before he finishes filling out the form?

RONALD THRILLKILL – DIRECT EXAMINATION

1    A.  Yes, sir.

2    Q.  Then he's providing that form now to your employee, and

3    that's when your employee goes and calls the --

4    A.  Exactly right.

5    Q.  -- NICS system.  Without watching the rest of this, he

6    then meanders about the store before ultimately walking out

7    several minutes later?  Is that right?

8    A.  Yes, sir.  Yes, sir.

9    Q.  If we can, just briefly go back to Government Exhibit 238,

10   and the bottom half of the first page.  On this form that the

11   defendant filled out, in question 11 the defendant indicated

12   that he was not prohibited with respect to each of the

13   questions asked of him on number 11?

14   A.  That is correct.  The question (a), 11(a) is, are you the

15   actual transferee or buyer of the firearm, that would be the

16   yes answer would be a correct answer for that one.  The rest

17   of them are prohibited, and requiring another answer.

18   Q.  The reason (a) is the inverse is because you're not

19   allowed to be a straw buyer for somebody else.

20   A.  That's exactly correct.

21        MR. RICHARDSON:  If we can turn now, Miss Baker, to

22   235B, and this is April the 16th.

23   Q.  We saw on the 4473 form, that April the 16th was the day

24   that the NICS system had indicated the gun could be

25   transferred?

RONALD THRILLKILL – DIRECT EXAMINATION

1   A.  That is correct.

2   Q.  You started telling us about this and I stopped you.  When

3   the three-day period is up, if you've not heard anything back

4   from the NIC system, what does the law allow?

5   A.  The law allows the dealer to transfer that gun to the

6   potential buyer with no questions really asked by them at that

7   point.  Standard practice.

8   Q.  So you rely on the first part, you rely on the purchaser,

9   under oath, having told you he's not prohibited.

10  A.  Right.

11  Q.  In this case, when someone is given that date from the

12  NICS system, do they then tell the purchaser when that three-

13  day period will be up?

14  A.  It's fifty-fifty.  Nine times out of ten I would say most

15  of the guys do, in conversation, we try to acquire a phone

16  number, make sure we have an actual good contact number from

17  them that we can get back in touch with them, let them know

18  when we do get back.

19  Q.  And in your review of the records, did you see that April

20  the 16th the defendant came back into the store?

21  A.  Yes, sir.  He was in there that afternoon.  And completed

22  the transaction.

23  Q.  And because of the way the dates fell, the 11th being a

24  Saturday, the 16th was actually three business days after that

25  form had been filled out?

RONALD THRILLKILL – DIRECT EXAMINATION

1    A.  That is correct.

2    Q.  If we can go to 235B.  Do you recognize the defendant here

3    standing at the counter?

4    A.  That's Mr. Roof again, that would be the date of the

5    transaction being completed, that's what the employee's doing

6    there, he's finishing ringing it up.  That's the receipt that

7    he just handed him.  That was a Glock box.

8    Q.  That's him exiting the store.

9        Let me talk to you just a second about the Glock.  What

10   generation Glock was this .45?

11   A.  That is the new family gun they introduced, referred to

12   them as Gen 4 guns.

13   Q.  Fourth generation Glock?

14   A.  That is correct.

15   Q.  And this particular Glock, these new generations, how many

16   magazines are sold with the firearm when it's initially

17   transferred?

18   A.  The Gen 4 are shipped with three mags.

19   Q.  Three different magazines?

20   A.  Three different magazines.

21   Q.  And how many rounds does each of those magazines hold?

22   A.  Thirteen.

23   Q.  So three magazines with 13 and one in the chamber, you can

24   carry 40 rounds as that firearm is purchased?

25   A.  Yes.

RONALD THRILLKILL – DIRECT EXAMINATION

1          MR. RICHARDSON:  Miss Baker, if we can put up

2    Government Exhibit 240, we just highlight the top half of

3    this.

4    Q.  What is Government Exhibit 240?

5    A.  It is our receipt of the actual gun purchase.

6    Q.  And it includes the date and time, and this is how you

7    were able to identify the video?

8    A.  Yes, sir, we went to our computer system and put --

9    inserted his name for the SLED agent, we got a hit on the

10   name, we got to the name, we backed into the invoice, from the

11   invoice and the time stamp, we backed into the video.

12   Q.  We'll take a look at it in a minute, but after the

13   defendant leaves on the video, what happens next?

14   A.  He appears to go to his car, or make a change of mind and

15   comes back in, not carrying the gun, but he does come back in

16   with cash in his hand and purchases two extra magazines.

17   Q.  I'm going to -- if we can put up 241.  And what is this

18   invoice just a few minutes after the sale of the Glock .45?

19   A.  That's two additional Glock 21 magazines.

20   Q.  And you were able to identify this receipt based on the

21   video that you were watching.

22   A.  Based on the video, and also the time stamp following the

23   original.

24   Q.  And then I also want to show you Government Exhibit 242.

25   Government Exhibit 242, what is the date on this invoice?

RONALD THRILLKILL – DIRECT EXAMINATION

1  A.  This is 4/27/2015.

2  Q.  And you are able to identify this because Mr. Roof used a

3  credit card to make this purchase?

4  A.  Yes, sir, we were contacted by one of the agents and --

5  for us to get back and research our charge cards purchases,

6  and that's how we were able to locate it for them.

7  Q.  And this was for the purchase of three additional Glock

8  magazines?

9  A.  Three of the same magazines again, yes, sir.

10  Q.  So just so we understand, the original purchase came with

11  three magazines?

12  A.  That's correct.

13  Q.  Later that date he purchased an additional two magazines.

14  A.  That's correct.

15  Q.  For a total of five that he purchased on the 16th?

16  A.  That's correct.

17  Q.  And then he comes back on the 27th and purchases three

18  additional magazines?

19  A.  That is correct.

20  Q.  All right.  For eight magazines in total?

21  A.  Yes, sir.

22  Q.  Each holding 13 rounds?

23  A.  Yes, sir.

24        MR. RICHARDSON:  No further questions, Your Honor.

25        THE COURT:  Cross-examination.

RONALD THRILLKILL - CROSS-EXAMINATION

1          MR. BRUCK:  Thank you, Judge.

2                        CROSS-EXAMINATION

3    BY MR. BRUCK:

4    Q.  Good morning.  Good afternoon.

5    A.  Yes, sir.

6    Q.  I just have a few questions for you, if I may.  I just

7    want to be sure we all understand the procedures --

8    A.  Okay.

9    Q.  -- and what happened in this particular case.  Now, you've

10   testified that in order to buy a firearm, an individual buying

11   from a dealer has to fill out this ATF form.

12   A.  That is correct.

13   Q.  And that includes the first person -- the first thing the

14   person has to give is his name?

15   A.  Right.

16   Q.  And the name has to be verified by use of a government

17   I.D.

18   A.  Yes, sir.

19   Q.  And that was done, Mr. Roof did that to the satisfaction

20   of your employee?

21   A.  Yes, sir, he would have had -- they have his driver's

22   license number.  His driver's license number is included on

23   the form, so they would have checked that.

24   Q.  Right, he provided his driver's license.

25   A.  That's correct.

RONALD THRILLKILL – CROSS-EXAMINATION

1   Q.  And that also provided a means for your store to verify

2   that he was over the age of 21.

3   A.  Yes, sir.

4   Q.  And that's a legal requirement, is it not?

5   A.  Yes, has to be 21.

6   Q.  And his driver's license revealed that his date of birth

7   was -- that he had turned 21 on April 3rd.

8   A.  Yes.

9   Q.  Eight days before he came into your store.

10  A.  That's correct.

11  Q.  So if he had come in two weeks before, he would have been

12  too young to buy a gun?

13  A.  That is correct.

14  Q.  And it shows that he was five foot nine, correct?

15  A.  Yes, sir --

16  Q.  Are you looking at the form?

17  A.  I don't have his driver's license in front of me, but I'm

18  looking at the form, the form is five foot nine, yes, sir.

19  Q.  And he weighed 120 pounds?

20  A.  Yes, sir.

21  Q.  Then he also provided his address?

22  A.  That is correct.

23  Q.  And he provided a social security number?

24  A.  That is correct.

25  Q.  And that is all information that you furnished to the FBI,

RONALD THRILLKILL - CROSS-EXAMINATION

1    is it not?

2    A.   To the system, yes.

3    Q.   The NICS?

4    A.   That's right.

5    Q.   Which is a branch of the FBI?

6    A.   That is correct.

7    Q.   And that branch of the FBI does all the gun checks for

8    South Carolina.

9    A.   Yes.

10   Q.   You have no option about having -- doing the -- doing the

11   background check yourself or using any other agency, SLED --

12   A.   The only deviation on a gun purchase from a background

13   standpoint, if you're a CWP, South Carolina concealed weapons

14   holder, you can circumvent going through the NICS system, you

15   can accept that in place of the NICS background check.  But in

16   this case he did not have a CWP, or concealed weapons permit,

17   so the NICS check was provided.

18   Q.   And he provided all of the identifying information, his

19   driver's license, his date of birth, his address, his social

20   security number, that is required by law?

21   A.   Right.

22   Q.   So there is -- and under those circumstances he was

23   certainly not concealing his identity?

24   A.   No, sir.

25   Q.   Correct?

RONALD THRILLKILL - CROSS-EXAMINATION

1   A.  No.  No.  No, sir.

2   Q.  Then I think you've explained to us --

3        MR. BRUCK:  Miss Baker, can you turn to the second

4   page of the exhibit.  All right.

5   Q.  Now, before I ask you about this, you've told

6   Mr. Richardson that there are a series of questions to

7   determine whether or not the person is excluded by law from

8   eligibility --

9   A.  Yes.

10  Q.  -- for purchasing of firearm.

11  A.  That is correct.

12  Q.  That includes a prior criminal record?

13  A.  Yes, sir.

14  Q.  And it also includes, in question 11(e), whether you are

15  an unlawful user or addicted to marijuana or any depressant,

16  narcotic drug or any other controlled substance.  Correct?

17  A.  Yes, sir.

18  Q.  And it does not require that you have been convicted of

19  that, but simply that you are a user of that?

20  A.  That's how it is worded, yes, sir.

21  Q.  All right.  So if law enforcement had information about a

22  person was a user of a narcotic drug, that would be

23  disqualifying?

24  A.  It should have been, yes.

25  Q.  And you've told us that there are -- over to 21(c), which

RONALD THRILLKILL – CROSS-EXAMINATION

1    is on the screen, there are four possible responses that you

2    can initially receive from NICS.  To go ahead and do the sale,

3    to deny the sale.  It is possible that the request to make the

4    purchase will be canceled by the buyer; that's what canceled

5    means, right?  And the last one is that if the agency is not

6    ready to give you an answer, the sale is delayed.

7    A.  That is correct.

8    Q.  But it can only be delayed for three days.  Three business

9    days.

10   A.  That's correct.

11   Q.  And now there are states other than South Carolina which

12   do not have this limitation, correct?  It's possible under

13   state law?

14   A.  I'm speaking out of context here, but normally if state

15   law is stricter than federal law, the state law will precede

16   federal law.

17   Q.  Right.  Exactly.

18   A.  So my feelings would be that the federal law would be the

19   leading law in every state, unless the state was more

20   restrictive.

21   Q.  Federal law is a floor as far as when a person who has

22   applied for a firearm can receive it, but states are free to

23   impose greater restrictions?

24   A.  That's right.

25   Q.  So that a state could, if it wanted, say that if you don't

RONALD THRILLKILL – CROSS-EXAMINATION

1    hear back from NICS --

2              MR. RICHARDSON:  Objection, Your Honor, I think we're

3    getting far afield.

4              MR. BRUCK:  I'll withdraw the question.

5    BY MR. BRUCK:

6    Q.  In South Carolina the rule is the federal -- there is no

7    restriction other than what the minimum federal law requires?

8    A.  Federal law.

9    Q.  And that is that after three business days, if you have

10   not received an answer, the dealer has not received an answer

11   from NICS, then the person, the purchaser is entitled to the

12   gun?

13   A.  That is correct.

14   Q.  And the date on which the three days expired in this

15   particular sale, was April 16th, 2015?

16   A.  Yes, sir, that's the date that, again, the NICS provides

17   you, which clarifies the business day parts of it, there's no

18   misunderstandings there.  So --

19   Q.  And on that day Mr. Roof returned?

20   A.  Yes, sir, that afternoon.

21   Q.  All right.  And at that time you have still not heard

22   back.

23   A.  No, sir.

24   Q.  And didn't know whether there was false information or

25   erroneous information on the form or not?

RONALD THRILLKILL - CROSS-EXAMINATION

1  A.  No.

2  Q.  But as far as your ability to sell the firearm, that no

3  longer mattered?

4  A.  The -- without the response, the package that every dealer

5  in the country is given, that's part of the package, it's

6  legal to transfer the guns; therefore, as most dealers across

7  the country would practice the same principle, and that is do

8  the transfer.

9  Q.  Now, and this is a dealer-by-dealer decision?

10  A.  Yes, sir.

11  Q.  I mean, I'm not implying that your store is unusual, but

12  it's up to you to decide?

13  A.  Sure.

14  Q.  You could have said, we don't hear from NICS, we don't

15  make the sale?

16  A.  Yes.

17  Q.  But you did make the sale.

18  A.  We did.

19  Q.  And then on 21(e) there is a space for what you fill in,

20  if you receive a response after the sale has been made, a

21  response from NICS.

22  A.  That is correct.

23  Q.  And there came a time on June 29th when you filled that in

24  denied, correct?

25  A.  Yes, sir, that was after the incident, but yes, sir.

RONALD THRILLKILL - CROSS-EXAMINATION

1   Q.  All right.  So on June the 29th, 2015, you received a

2   communication from NICS saying that the sale was to be denied.

3   A.  Yes, sir.

4   Q.  Because the agency had uncovered information that showed

5   that Mr. Roof was not eligible to buy a firearm.

6   A.  They don't go into anything other -- they do not go into

7   anything other than it's a denial.  This transaction number is

8   a denial.

9   Q.  And the reason for that denial was that it had come to the

10  attention of the agency that Mr. Roof had admitted to law

11  enforcement that he was a user of a Schedule III narcotic.

12  Correct?

13  A.  I have no idea why they made their decision.  The decision

14  that I received was a denial.

15  Q.  And that's all you're told?

16  A.  That's all I'm told.  That's all they tell anybody.

17  Q.  You are not given the reason?

18  A.  No reasons.  They never give a reason.  This transaction

19  number, which is above that, at 21(b), they refer to it not by

20  Mr. Roof, not by Mr. Smith, not by Mr. Jones, they refer to it

21  as that transaction number on such and such a date is now a

22  denial.  Or is now approved.  And that's all they say.  And

23  they give you their number, operator number and their name,

24  which is recorded below there.

25  Q.  And it is -- now I'm going to -- excuse me.  I'm going to

RONALD THRILLKILL – CROSS-EXAMINATION

1   hand you a document, and ask you if you can tell me what this

2   is.

3   A.  As far as the document?

4   Q.  Yes.

5   A.  It is a 4473.

6   Q.  And this is the same document as Government's Exhibit 238,

7   correct?  Except that it has been completed.  Would you turn

8   to page two, question 21(e), and tell me -- and 21(f) -- and

9   tell me if that is the difference between the document you're

10  holding in your hand and Government 238.

11  A.  The document that you have here is the finalized document.

12  Q.  All right.  And that appears to be the finalized document

13  that is contained in the records that you're --

14  A.  After the incident, yes, sir.  The one that we looked for

15  before was the document before the incident.

16  Q.  Okay.  And on June 30th, did a law enforcement agent come

17  to your store to pick up that finalized document?

18  A.  On June 30th an ATF agent did retrieve the copy of it.

19  Q.  And that's the document --

20  A.  The original, not a copy, but the original.

21          MR. BRUCK:  This is marked as Government's 239, but

22  we would offer it as a Defense exhibit.

23          THE COURT:  239.

24          MR. RICHARDSON:  No -- if its easier, we're happy to

25  offer it.

RONALD THRILLKILL - CROSS-EXAMINATION

1      THE COURT:  Defendant's 239 admitted without

2  objection.

3      MR. BRUCK:  Very well.

4    (Defendant's Exhibit 239 received.)

5  BY MR. BRUCK:

6  Q.  Can you see Government's 239 offered by the defense on

7  your screen?  And if we -- All right.  So you say this is the

8  completed document.  Turning to 21(e), it shows a date of

9  June 29, 2015, and a mark denied.

10 A.  Yes, sir.

11 Q.  And that reflects what happened when you got the call --

12 A.  Yes, sir.

13 Q.  -- from NICS.

14 A.  I took that call.

15 Q.  You personally took that call?

16 A.  I personally took that call.  That's my handwriting.

17 Q.  And the NICS examiner is given -- her name is given as

18 Debbie?

19 A.  Debbie.  They'll give you their first name and they'll

20 give you the I.D. number, which is 4051.

21 Q.  So Debbie informed you personally that the request to

22 purchase the firearm had been denied?

23 A.  On 6/29/2015.

24 Q.  This was well after the three-day waiting period, which is

25 the minimum -- the maximum period in which a gun purchase can

RONALD THRILLKILL – REDIRECT EXAMINATION

1   be denied -- can be delayed under federal law, correct?

2   A.  It's after the three-day delay period, yes, sir.

3   Q.  Yes.  And it was also 12 days after the murders at Emanuel

4   AME Church.

5   A.  Yes, sir.

6           MR. BRUCK:  No further questions.

7           THE COURT:  Any redirect?

8           MR. RICHARDSON:  Just briefly.  Your Honor.

9                       REDIRECT EXAMINATION

10  BY MR. RICHARDSON:

11  Q.  Mr. Thrillkill, where is it that you usually see denials

12  of the sale of a firearm after that firearm has been used to

13  commit a crime?

14  A.  Never.

15  Q.  And if you receive such an after-the-fact denial, do you

16  have any obligation at that juncture to do anything?

17  A.  Other than provide documentation, as we have done in this

18  case, no, sir.

19  Q.  And as of June the 29th, when you got the call that it had

20  been denied, were you aware who was in possession of the

21  firearm at that point?

22  A.  I knew exactly who had the gun.

23  Q.  Who had it?

24  A.  The law enforcement, either ATF or FBI or SLED, one of the

25  three.

MARK KELLY - DIRECT EXAMINATION

1      MR. RICHARDSON:  Nothing further, Your Honor.

2      THE COURT:  Thank you, Mr. Thrillkill, you may step

3  down.

4    Call your next witness.

5      MR. RICHARDSON:  Government calls ATF Agent Mark

6  Kelly.

7      THE CLERK:  State your full name for the record.

8  A.  Mark Charles Kelly.

9    MARK KELLY, a witness called by the Government, first

10  having been duly sworn, testified as follows:

11                    DIRECT EXAMINATION

12  BY MR. RICHARDSON:

13  Q.  Agent Kelly, introduce yourself to the jury and tell them

14  where you work.

15  A.  My name is Mark Kelly, special agent with the Bureau of

16  Alcohol Tobacco, Firearms and Explosives here in the

17  Charleston, South Carolina field office, and I have worked

18  here for 26 years.

19  Q.  I don't want to go through every detail, but give us just

20  a little bit of your background in particular as it relates to

21  your work in determining the firearm nexus.

22  A.  In addition to the training that all ATF agents receive,

23  going through our Academy as the firearms and firearms

24  industry and ammunition, I have attended some additional

25  classes to become capable of testifying as an expert witness

MARK KELLY - DIRECT EXAMINATION

1    in the field of the interstate commerce of firearms.

2    Sometimes we use the term interstate nexus, nexus being a

3    Latin word that means basically in connection to.  And so I

4    attended -- 1994 I attended my first interstate nexus class at

5    ATF headquarters at our firearms technology branch to learn

6    more firearms, firearm markings, firearm industry.  And then

7    the --

8              MR. BRUCK:  Your Honor, I would like to object to

9    this qualification which appears designed to create the

10   impression that the witness can offer an expert opinion about

11   the actual existence of a nexus in interstate commerce.  The

12   testimony is about where the gun came from, it's for the jury

13   to conclude.  So I object to his qualification; it creates a

14   false impression.

15             MR. RICHARDSON:  He's describing his background.

16             THE COURT:  I'm going to overrule the objection,

17   though I think it's important to know that you're not offering

18   this gentleman as an expert.

19             MR. RICHARDSON:  No, we are, Your Honor, he is

20   noticed as an expert on the interstate transfer of firearms

21   and ammunition, and that is exactly what he is an expert in,

22   he's been noticed as such an expert, and we will offer him

23   that way.  This is the background to establish that.

24             THE COURT:  Overruled.

25   BY MR. RICHARDSON:

MARK KELLY – DIRECT EXAMINATION

1  Q.  You can continue, Agent Kelly, describing the training

2  that you have.  I believe you were in 1999 when we stopped.

3  A.  In 1999 I attended an ATF class that consisted of a

4  firearms factory tour of different firearms factories in New

5  England.  And then in 2002 I attended an ammunition factory

6  tour in the Midwest.  In addition to that, I've been --

7  Q.  Let me interrupt you.  You talk about factory tours.  Tell

8  me how that relates to your work with respect to your expert

9  testimony as a firearms nexus expert.

10  A.  It's principally to understand how firearms are

11  manufactured and what takes place, and when a firearm becomes

12  a firearm, because we have to be able to explain to juries

13  like yourself, firearms and ammunition as they are covered by

14  the Gun Control Act of 1968, the standardized federal firearms

15  law that governs almost everything we do to this day in the

16  firearms industry.  What is a firearm, how is it properly

17  marked pursuant to the Gun Control Act, the records that are

18  kept on the transfer of firearms from one licensee to another.

19      And then on the ammunition side of the house it changes,

20  because ammunition is not particularly regulated, there's no

21  standardized markings on ammunition.  And it takes a lot of

22  paying attention and reading about what's going on in the

23  industry to say who is making what and where.

24      And the other thing that the Gun Control Act did is it

25  gave the Federal Government the jurisdiction to regulate

MARK KELLY – DIRECT EXAMINATION

1   firearms through interstate commerce.

2       So my job is to explain to the jury how a firearm or

3   ammunition travels in and affects interstate commerce to have

4   arrived in the State of South Carolina, therefore giving the

5   Federal Government jurisdiction over some of the statutes that

6   are in the Act.

7   Q.  So talk to me a little bit about --

8       MR. BRUCK:  If Your Honor please, I'd like to renew

9   the objection.  It is not a conclusion that a witness should

10  draw as to whether or not the Federal Government has

11  jurisdiction.  That is an element of the crime which is for

12  the jury to decide.

13      MR. RICHARDSON:  Your Honor, this witness is going to

14  testify and offer opinions.  He is now describing his

15  background and training and what leads him to that.  His

16  conclusions, which we have not yet gotten to, will be as they

17  are supposed to be, exactly the issue that's described.  He's

18  describing his background and training.  He's got to allow him

19  to describe how he's doing this, why --

20      THE COURT:  Overruled.

21  BY MR. RICHARDSON:

22  Q.  You can continue, Agent Kelly.  Tell us a little bit about

23  how you have done this type of work, examining firearms and

24  ammunition for purposes of offering expert opinions.

25  A.  Much of it is done through the training I received, and

MARK KELLY - DIRECT EXAMINATION

1    learning about the firearms industry, but it also is

2    supplemented with ATF internal information about firearms

3    manufacturers and markings, and publications, publicly

4    available information such as the Bluebook of Gun Values and

5    other publications that I would commonly refer to, to, you

6    know, corroborate myself and what I believe to be where a

7    firearm is made.

8    Q.  And as part of your arriving at expert opinions, do you

9    take this whole array of background, training and experience

10   to arrive at those conclusions?

11   A.  Yes.

12   Q.  Just if you could even ballpark guess, how many firearms

13   do you believe you have examined for their interstate travel

14   over the course of your career?

15   A.  I wish I knew.

16   Q.  Thousands and thousands?

17   A.  I'll say thousands.  I've -- as part of my qualification

18   before you can be deemed an expert witness, part of my

19   courtroom qualifications is I have actually testified on

20   approximately 54 previous occasions in United States District

21   Court as an expert in the interstate commerce of firearms and

22   ammunition.

23   Q.  So you've actually been qualified and testified as an

24   expert 54 times, and you've prepared opinions in lots of cases

25   in addition to that?

MARK KELLY - DIRECT EXAMINATION

A.  Yes.

        MR. RICHARDSON:  Your Honor, at this time we'd move
to offer Special Agent Kelly as an expert in the manufacture
and transport of firearms and ammunition.

        THE COURT:  Defense?  Any objection?

        MR. BRUCK:  No objection as to that expertise, Your
Honor.

        THE COURT:  Okay.  The witness is qualified as an
expert in the manufacture and transport of firearms.  And
ammunition.

BY MR. RICHARDSON:

Q.  Let's start talking a little bit about firearms.  What
kind of markings are found on firearms that assist you in your
work?

A.   The markings that are there that we rely on are there
because of the 1968 Gun Control Act, which says a manufacturer
of a firearm has to mark it with the name of the manufacturer,
the city and state in which it was manufactured -- unless they
applied for marking variance through ATF -- a model, if it's
designated with a model, and then a caliber designation and a
serial number.  So the combination of those pieces of
information will, the vast majority of the time, requires the
Act of 1968 will identify a firearm to the exclusion of all
others.

Q.  If we can look at Government's Exhibit 1, have you had an

MARK KELLY – DIRECT EXAMINATION

1  opportunity to examine this before?

2  A.  Yes, I have.

3  Q.  And it's a little hard to pick up here, but if I can,

4  where my pinky is here, do you recognize the manufacturer of

5  this gun?

6  A.  Yes, that is the logo for Glock.

7  Q.  And then next to it, the model number there, what's that

8  refer to?

9  A.  That's a model designation that Glock is allowed to create

10  internally, and they decided this firearm would be known as a

11  Model 41.

12  Q.  This is a fourth generation Model 41?

13  A.  Yes.

14  Q.  And then beside that it indicates Austria.  Where is

15  Austria?

16  A.  Austria is a country in Europe.

17  Q.  And then next to -- What significance does Austria have to

18  Glock?

19  A.  All firearms that are imported firearms are also required

20  to be marked with country of origin.  And so that is a

21  requirement for us, for ATF, but it also is something they

22  would probably do anyway, but it's their way of saying Glocks

23  are manufactured in Austria.

24  Q.  And then next to it, it indicates here above the slide

25  lock, the .45 auto.  What does that refer to?

MARK KELLY – DIRECT EXAMINATION

1  A.  That is the caliber designation that is required to be on

2  a firearm.  And so Glock chose to use the designation .45

3  auto.  Some manufacturers refer to it as .45 ACP, which is

4  automatic Colt pistol.  Just another way of referring to the

5  same ammunition.

6  Q.  Why is it referred to as an automatic Colt pistol when

7  it's manufactured by Glock?

8  A.  Caliber designations can be a collaborative effort between

9  a firearms developer and ammunition developer and designer.

10  And sometimes ammunition names take on the name of a firearm

11  manufacturer who is the first one to chamber a firearm in that

12  round.  So automatic Colt pistol refers to the -- Browning

13  designed Colt in 1911, .45 caliber pistol that the U.S.

14  military adopted in 1911, became a standard for that caliber.

15  It's another way of referring to a .45 caliber projectile in a

16  shell casing that's made for a pistol, a rimless pistol

17  ammunition style shell casing.

18  Q.  Turn the gun over here.  This number here, which may be

19  hard for you to read, what does that refer to?

20  A.  That is a serial number that Glock has chosen to put on

21  the slide.  There are actually -- the United States required

22  serial numbers on the frame.  The frame, the receiver of the

23  firearm, which is on the muzzle end of the lower part of the

24  polymer frame.  The Glock, some Glocks have as many as three

25  serial numbers, because they also serialize the chamber.

MARK KELLY – DIRECT EXAMINATION

1   Q.  And the serial number here is XLS771.

2   A.  Okay.  I can't read it on the monitor, but that is the

3   firearm that I identified previously.

4   Q.  Confirm that for us.

5   A.  Yes, XLS771, and it's the same on the -- this metal ink

6   inside the polymer frame, that's the U.S.-required serial

7   number on the receiver.

8   Q.  And you indicated that this Government Exhibit 1, the

9   Glock model 41 .45 caliber pistol is originally manufactured

10  in Austria.

11  A.  Correct.

12  Q.  Tell us how this firearm, like other Glocks, comes to

13  enter the United States.

14  A.  Each importer of firearms is licensed by ATF.  In this

15  particular case Glock has their own importing company in

16  Smyrna, Georgia, called Glock, Incorporated.  And they import

17  all their own firearms from their manufacturing facility in

18  Austria through Smyrna, Georgia, where they're put into the

19  U.S. distribution chain to different wholesalers and

20  retailers.

21  Q.  So this gun, after it was manufactured in Austria, would

22  have been shipped over and warehoused in Smyrna, Georgia?

23  A.  I don't want to say that, because there is a possibility

24  that it could be brought into a port in a container and

25  forwarded to a wholesaler without ever physically going to

MARK KELLY – DIRECT EXAMINATION

1    Smyrna.  But I believe most of them probably do go to Smyrna.

2    Q.  And can you say whether this firearm -- Let me back up a

3    little bit.  Based on what you know of the importation of

4    Glock pistols, can you say -- Back it up one more step.  Were

5    you able to run a trace on this firearm as part of your

6    investigation?

7    A.  Yes.

8    Q.  And were you able to tell where this firearm was

9    purchased?

10   A.  Yes.

11   Q.  And where was it purchased?

12   A.  In West Columbia, South Carolina.

13   Q.  And do you have an opinion as an expert in firearm nexus

14   as to whether this firearm traveled in interstate commerce

15   before arriving at Shooter's Choice in West Columbia?

16   A.  Yes.  And it's based on two things.  My own training,

17   knowledge and experience about Glock is that they all travel

18   in and affect interstate and international commerce, because

19   they're made in Austria and have to be imported into the

20   United States and then shipped to a wholesaler and then to a

21   retailer.

22       So the trace information confirms that or corroborates

23   what I already know, by showing me that this firearm was

24   imported by Glock, Incorporated to Georgia, shipped to Elliott

25   Brothers, which is a wholesale company licensed by ATF in

MARK KELLY – DIRECT EXAMINATION

1    Chapin, South Carolina.  And then from Elliott Brothers it was

2    shipped to the retail gun dealer, Shooter's Choice in West

3    Columbia.

4    Q.  And so the short version of that is before it got to West

5    Columbia, it traveled in interstate commerce?

6    A.  Yes.

7    Q.  Did you also look at ammunition in this case?

8    A.  Yes.

9    Q.  We talked about markings on firearms; tell us a little bit

10   about markings on ammunition.

11   A.  Markings on ammunition are not regulated by the Federal

12   Government.  An ammunition manufacturer can put almost

13   anything they want on ammunition.  And the only place that you

14   can really mark ammunition is what we call the head stamp,

15   which is the base of the cartridge.

16       The evidence in this case, the ammunition in the shell

17   casings in this case say Winchester on the top rocker,

18   12:00 o'clock on the shell casing.  Winchester is the brand

19   name that the ammunition side of the industry is currently

20   owned by the Olin Corporation.  The Olin Corporation's

21   corporate headquarters are in Clayton, Missouri.  Their

22   manufacturing facilities are in East Alton, Illinois and

23   Oxford, Mississippi.

24       Winchester can not -- the Olin Corporation representatives

25   could not tell me which facility this was manufactured at.  It

MARK KELLY – DIRECT EXAMINATION

1  could have been manufactured in East Alton, Illinois or in

2  Oxford, Mississippi, because their head stamps are identical.

3  Q.  And so when we're talking about the head stamp, we're

4  showing the head stamp of one of the rounds from Government

5  Exhibit 1 here?

6  A.  Yes.

7  Q.  And we talk about what you referred to as the top rocker,

8  that's this top portion that indicates Winchester?

9  A.  Yes.

10  Q.  And then the bottom rocker, if we will, that's the one

11  that says .45 auto?

12  A.  Yes.

13  Q.  And you indicated that Winchester uses two different

14  manufacturing facilities.

15  A.  That's correct.

16  Q.  Is that right?  And so while you can't be certain about

17  which of those it is, can you be certain about whether this

18  ammunition traveled in interstate commerce before arriving in

19  South Carolina?

20  A.  Yes.  Because there is no Winchester ammunition

21  manufacturer in the State of South Carolina; therefore, it had

22  to travel in interstate commerce to have arrived here.

23  Q.  In addition to the firearm and ammunition, did you also

24  have the opportunity in this case to look at various Glock

25  magazines?

MARK KELLY – DIRECT EXAMINATION

1   A.  Yes.

2   Q.  And I have as one example here, the magazine that's

3   included as part of Government Exhibit 1.  Do you recognize

4   that?

5   A.  Yes.

6   Q.  And as far as this magazine's travel in interstate

7   commerce, what were you able to determine?

8   A.  I corresponded with somebody at Glock, Incorporated, to

9   ask them if there are any U.S. sources of supply for their

10   magazines; he advised me there is not.  All of their magazines

11   are made in Austria and imported into the United States.  So

12   the magazines also traveled in and affected interstate

13   commerce.

14   Q.  Okay.

15        MR. RICHARDSON:  Thank you, Agent Kelly.  I

16   appreciate it.  If you answer any questions they have, I

17   appreciate it.

18        THE COURT:  Cross-examination.

19        MR. BRUCK:  Thank you.

20              CROSS-EXAMINATION

21   BY MR. BRUCK:

22   Q.  Good afternoon, Agent Kelly.

23   A.  Good afternoon.

24   Q.  There are a lot of firearms in the United States, aren't

25   there?

MARK KELLY - CROSS-EXAMINATION

1   A.  Yes, sir.

2   Q.  Almost as many firearms as there are people.

3   A.  I have heard that said, yes.

4   Q.  Which is to say hundreds of millions --

5   A.  Yes.

6   Q.  -- of firearms.  And there -- but there are not -- most of

7   the firearms in the United States are in states that do not

8   have firearms manufacturers; would that be fair to say?

9   A.  I have never thought about how many states don't have a

10  firearms manufacturer.  There may be a few.

11  Q.  Would it be -- I'm sorry.

12  A.  South Carolina has firearms manufacturing facilities.

13  Q.  South Carolina does.  But let's talk about pistols now.

14  Do you know how many states have companies that manufacture

15  handguns?

16          MR. RICHARDSON:  Objection, Your Honor, relevance.

17          THE COURT:  Sustained.

18  BY MR. BRUCK:

19  Q.  Would it be a fair statement that the vast majority of --

20  vast majority of weapons -- of firearms in the United States

21  have traveled in interstate commerce?

22  A.  I don't want to say vast, but I would think you could

23  safely say that a majority of firearms have traveled in

24  interstate commerce.

25  Q.  There's nothing unusual about that.

MARK KELLY - CROSS-EXAMINATION

1    A.  No.

2    Q.  In fact, it is more usual than not.

3    A.  I would agree with that.

4    Q.  And the same for ammunition?

5    A.  Yes.

6    Q.  And your investigation in this case did not disclose that

7    Mr. Roof was part of the transmission chain that took this

8    handgun into South Carolina, correct?

9    A.  That is correct.

10   Q.  He acquired the handgun, the Glock, in South Carolina.

11   A.  Yes.

12   Q.  He acquired the ammunition in South Carolina?

13   A.  That's what I have been -- yes.  I've been told that he

14   acquired the ammunition in South Carolina.

15   Q.  And he acquired the magazines in South Carolina?

16   A.  Yes.

17            MR. BRUCK:  That's all I have, thank you.

18            THE COURT:  Anything on redirect?

19            MR. RICHARDSON:  Nothing, Your Honor.

20            THE COURT:  You may step down.

21        Ladies and gentlemen, I think this is a good time to break

22   for lunch, so we'll have a one-hour lunch break.

23        (Jury excused.)

24            THE COURT:  We will be on break for an hour.

25        (A recess was held at this time.)

JAMES GREEN – DIRECT EXAMINATION

1          THE COURT:  Bring in the jury.

2      (Jury present.)

3          THE COURT:  Government, call your next witness.

4          MR. WILLIAMS:  Thank you, Your Honor, Government

5  calls James Green.

6          THE CLERK:  State your full name for the record,

7  please.

8  A.  James William Green.

9      JAMES GREEN, a witness called by the Government, first

10  having been duly sworn, testified as follows:

11                  DIRECT EXAMINATION

12  BY MR. WILLIAMS:

13  Q.  Would you repeat your name again for the jury.

14  A.  James Green.

15  Q.  Where do you work, Mr. Green?

16  A.  I'm employed by the South Carolina Law Enforcement

17  Division, also known as SLED.

18  Q.  What do you do at SLED?

19  A.  I'm a forensic firearms examiner in the forensic services

20  laboratory in the firearms department.

21  Q.  What does that entail?

22  A.  Firearms examiner looks at firearms and firearms-related

23  evidence, fired bullets and fired cartridge cases and

24  firearms, in an attempt to determine if they were all fired by

25  a common source or by the firearm.

JAMES GREEN - DIRECT EXAMINATION

1   Q.  What type of background or experience do you have that

2   qualified you for that position?

3   A.  I have a bachelor of arts from Charleston Southern

4   University, where I took many biology courses.  I also have a

5   master's of science and criminal justice degree, also from

6   Charleston Southern University.

7       When I was hired at SLED I started in the firearm and tool

8   mark course instruction, three-and-a-half-year course

9   instruction in an apprentice fashion, qualifying others to do

10  what I do now.

11  Q.  When did you start working at SLED?

12  A.  June 2005.

13  Q.  Was that your first job in law enforcement?

14  A.  No, sir, before that I worked for three and a half years

15  in the Mt. Pleasant police department.

16  Q.  Did you work anywhere before that in law enforcement?

17  A.  No, sir.

18  Q.  You went to Charleston Southern, went to Mt. Pleasant,

19  then went to SLED?

20  A.  Yes, sir.

21  Q.  What year was that you say you started at SLED?

22  A.  It would have been June 2nd, 2005.

23  Q.  Did you go right into firearms identification, or did you

24  have other responsibilities at SLED?

25  A.  No, sir, I've been in the firearms department since I've

JAMES GREEN - DIRECT EXAMINATION

1    been at SLED.

2    Q.  You talked about some of your background.  Do you have any

3    training in that area that qualifies you as an expert or

4    otherwise?

5    A.  Yes, sir, in addition to the firearm and tool mark course

6    instruction, we also have a firearms conference every year,

7    Association of Firearm and Tool Mark Examiners, AFTE, a

8    worldwide organization of firearms instructors that get

9    together every year and have seminars and classes to further

10   our education.  I also take classes through the FBI and

11   through the ATF on serial number restoration and advanced

12   techniques.

13   Q.  You mentioned what sounded like a professional

14   organization.  Are you a member of any professional

15   organizations related to your work?

16   A.  Yes, sir, I'm a member of AFTE.

17   Q.  Have you testified as an expert before?

18   A.  Yes, sir.

19   Q.  What area?

20   A.  Firearms and tool mark identification.

21   Q.  About how many times have you testified as an expert in

22   that area, if you know?

23   A.  Fifty-two times state and one time federal.

24   Q.  If you could, briefly tell the jury what firearms

25   identification is.

JAMES GREEN - DIRECT EXAMINATION

1   A.  Firearms identification is a discipline of forensic

2   science dealing with firearms and tool marks and the firearms

3   and firearms-related evidence.

4       When a firearm is produced, tiny microscopic striations

5   are left on the working surfaces of the firearm, of the

6   barrel, of the breechface, parts of the firearm that touch the

7   bullet or the cartridge case.  Those markings on that firearm

8   are individual to that firearm.  And you can differentiate, if

9   you know what you're looking for, between that firearm and the

10  one made immediately before it and the one made immediately

11  after it, based on metal-to-metal contact.  Like if we all

12  went to the beach with one rake and we all raked the same

13  amount of sand, a three-foot section by three-foot section, it

14  would all look the same, but when you look at it

15  microscopically, the grains of sand will fall differently on

16  everybody else's.  That's the same on firearms.  Grains fall

17  differently, based on metal-to-metal contact.

18  Q.  Is that the type of trace evidence what makes firearm

19  identification possible?

20  A.  Yes, sir, that, and the use of a firearm will make it more

21  distinguishable through each shot.

22          MR. WILLIAMS:  Your Honor, I move to qualify him as

23  an expert in firearms identification.

24          THE COURT:  Firearms and --

25          MR. WILLIAMS:  Firearms identification.

JAMES GREEN - DIRECT EXAMINATION

1            MS. STEVENS:  No objection.

2            THE COURT:  The witness is identified as an expert in

3     firearms identification.

4            MR. WILLIAMS:  Thank you, Your Honor.

5     BY MR. WILLIAMS:

6     Q.  Is it special agent or agent?

7     A.  Both.

8     Q.  I'll call you agent.  Agent Green, tell the jury what you

9     were asked to do in this case.

10    A.   In this case originally I was given bullet, bullet

11    fragments, cartridge cases, fired ammunition components from

12    the crime scene, and I was tasked with examining those items

13    to see if they were fired by the same firearm.

14    Q.  And repeat the list of things, bullets --

15    A.  There were cartridge cases, which is just a container.

16    Let me stop.  Unfired cartridge is a complete piece of fired

17    ammunition.  It's made of the cartridge case, the gun powder

18    and the projectile, the bullet.  So when the cartridge is

19    fired, the cartridge case will be left, and a bullet will be

20    expelled from the cartridge case.

21        In this case we had fired bullets and fired bullet

22    jackets.  If you can think of a bullet jacket, it's almost

23    like an M and M.  You've got the chocolate candy center with

24    the hard candy coating.  The hard candy coating in this

25    instance will be the jacket that wraps around the lead core.

JAMES GREEN - DIRECT EXAMINATION

1   Sometimes they'll separate when fired, if they hit something

2   hard, or if they're just not well made.  So you can have

3   bullets, bullet jackets, bullet jacket fragments from when

4   they rip or tear or core, and I was given all of those in this

5   case.

6   Q.  I'm going to bring up Government's Exhibit 49.  When you

7   talk about those components of a bullet, is that what you see

8   in Government's 49 on the monitor in front of you?

9   A.  Yes, sir.  That was a drawing of an unfired cartridge.

10  Q.  And that shows -- can you explain what those parts are

11  again, there's a casing, a jacket and what you called a

12  projectile, is that right?

13  A.  Yes, sir.  The cartridge case is the brass area.  Then you

14  can see the bullet with the copper, like a little -- almost

15  like an oblong U shape, that would be the hollow point cavity.

16  And the green stuff you see down on the bottom is the prime

17  pellet.  And what that does is when the firing pin hits the

18  primer, the prime pellet explodes and sends a flame through

19  that little hole and ignites the gun powder.  When the gun

20  powder burns, it burns at various rates and creates a gas.

21  When that gas reaches the maximum point, the cartridge case

22  mouth slightly opens and expels the bullet down the barrel of

23  the firearm.  So it starts taking the markings of the barrel

24  of the firearm and the bullets going down, and at the same

25  time the cartridge case goes backwards.

JAMES GREEN - DIRECT EXAMINATION

1  Q.  We'll get to that in a minute.  I want to step back to

2  what you were provided in this case.  And I think you said

3  initially you were just given bullets, fragments and jackets,

4  is that right?

5  A.  Yes, sir, and fired cartridge cases.

6  Q.  Were you then provided additional evidence after that

7  initial batch of evidence from the crime scene came in?

8  A.  Yes, sir, I was in -- submitted a pistol, some magazines

9  and some other fired bullets.

10  Q.  I missed that last part.

11  A.  Some other fired bullets as well.

12  Q.  So what type of model and caliber were you given?

13  A.  It was a Glock model 41, Gen 4, .45 auto caliber pistol.

14  Q.  And did that have rounds with it?

15  A.  Yes, sir, it did.

16  Q.  How many?

17  A.  I had 11.

18  Q.  Did it have a magazine as well?

19  A.  Yes, sir.

20  Q.  And how many fired rounds were you provided with?

21  A.  I was given 74 fired cartridge cases.

22  Q.  So that's 74 casings?

23  A.  Yes, sir.

24  Q.  And you also talked about fired bullets and/or jackets;

25  approximately how many of those were you given?

JAMES GREEN – DIRECT EXAMINATION

1    A.  Let me refer to my notes real quick.

2    Q.  If you need to refer to your notes, go ahead.

3    A.  Yes, sir.  I was given roughly 105 fired bullets or

4    pieces.

5    Q.  And you mentioned earlier that a fired round can fragment.

6    Is it possible to get more than one item from a fired bullet?

7    A.  Yes, sir.  If just the jacket and the core separate,

8    you'll get two, the fired bullet jacket and fired lead bullet

9    core.  Or if the jacket fragments, you could get three, four,

10   five, depending how many times the jacket breaks up.

11   Q.  Is it common or is it uncommon for a round of a

12   .45 caliber handgun to fragment, if it hits a hard surface

13   like concrete or a floor?

14   A.  No, sir.  Any caliber is not uncommon for it to break up

15   if it hits a hard and immediate object.

16   Q.  So you were given those casings, those fired rounds and

17   that handgun; what did you do?

18   A.  First thing I did was I looked at all the evidence to

19   almost verify what I had.  When they submit evidence, they'll

20   give us a list of evidence we're supposed to have, so I'll go

21   through and do an inventory, make sure I have everything I'm

22   supposed to.

23       Then what I'll do is I'll look at it microscopically.  And

24   I have a comparison microscope, which is just two microscopes

25   connected by an optical bridge, that lets us look at two

JAMES GREEN - DIRECT EXAMINATION

1    objects simultaneously.  What I'm doing is looking for those

2    tiny microscopic identifiable characteristics.  I'll look at

3    all the cartridge cases with each other to see if they were

4    fired by the same gun.

5        And then I took the firearm in this case and test fired it

6    myself, so that I know that those cartridge cases I test fired

7    came from that gun, because I shot it myself.  I looked at

8    those versus the cartridge cases from the scene, and then I

9    repeated the same process with the bullets, the jackets and

10   the jacket fragments.

11   Q.  So you're trying to determine, I think I heard you say,

12   the first thing is whether these items that you have, these

13   bullets or casings were fired from the known gun?

14   A.  Correct.

15   Q.  And also whether they were fired by the same gun, meaning

16   consistent with each other?

17   A.  Right, I look at the evidence first to see if everything

18   is fired by one gun.  Then if I'm submitted a firearm, I'll

19   compare those with the firearm to see if they are from the gun

20   that was submitted.

21   Q.  So I want to ask you about that gun first.  Did you

22   inspect that gun in order to properly test it?

23   A.  Yes, sir.

24   Q.  If you can, describe that firearm.  And I can -- Would it

25   be helpful for you to handle it?

JAMES GREEN – DIRECT EXAMINATION

1    A.  Yes, sir.

2    Q.  Let me hand you Government's Exhibit 1.  If you could,

3    describe how that gun works and how it works with a magazine,

4    specifically with marks it would leave on a casing or fired

5    round.

6    A.  This is a semiautomatic pistol.  You can see this hole

7    right here, that's the magazine well.  So you take a loaded

8    magazine, insert it into the magazine well, you pull back on

9    the slide, pull back to the rear and let it go, and it will go

10   forward under spring tension.

11       If there's a round in the chamber, the slide will strip

12   that top round off the chamber, off the magazine, put it in

13   the chamber.  When you pull the trigger, you actually defeat

14   the three safeties the Glock has, because -- That's getting

15   too technical for this purpose right now.

16       Then when you pull the trigger, the firing pin, or the

17   strike will come forward and hit the primer.  As I was telling

18   you a second ago, primer sends a flash, a flame through the

19   flash hole, ignites the powder.  The bullet will come out the

20   barrel.  The cartridge case, at the same time, will be coming

21   into position, has equal and opposite reaction, will be

22   pressed back against the breechface of the firing pin, seeing

23   the breechface of the slide.  And all the breechface is, is a

24   vertical wall that the firing pin protrudes from.

25       When the firearm is manufactured, markings are being left

JAMES GREEN – DIRECT EXAMINATION

1   on that breechface.  So when the cartridge is fired, the

2   cartridge case slams up against the breechface, will take

3   those markings.  At the same time as the bullet is traveling

4   down the barrel, there's lands and grooves in the barrel that

5   make up the rifling.  The bullet will engage those and cause

6   it to spin like a quarterback throwing a football, spiral

7   makes it go far, makes it accurate.  When it engages the

8   rifling, it also engages those marks and will leave those

9   identifiable marks on the surface that it touches, in this

10  case the bullet jacket.

11      And that's what we're able to look at is I test fired this

12  firearm, got the markings from the breechface, and the lands

13  and grooves, and compared those with the evidence submitted in

14  this case.

15  Q.  So explain, if you can, how the breechface leaves a unique

16  or identifiable mark on a casing.

17  A.  Glocks, or any firearms that have a dropping barrel, you

18  can see the barrel is slightly tilted up.  When the slide

19  comes back, the way the gun is designed, the barrel drops,

20  comes a little bit -- just so you can help with loading and

21  unloading.  And the markings left on the breechface by a

22  manufacturer when the breech is coming down and cutting the

23  metal and removing the metal, it's also coming in contact with

24  the firing pin aperture.  And that's got two separate working

25  surfaces that almost form a right angle.  And the cartridge

JAMES GREEN – DIRECT EXAMINATION

1    case is being sheered against that.  So those markings are

2    what's being left on the primer of the cartridge case.

3    Q.  So as the casing is ejected, it has, I don't want to say a

4    scratch, but a mark on it that's unique to the firearm?

5    A.  Correct.  There's -- you probably can't see, but there's

6    an ejector inside, a little silver thing that kind of angles

7    out.  When the slide pulls backwards and pulls the cartridge

8    case out of the chamber, it hits that ejector, and it's

9    ejected and extracted from the pistol.  And those markings are

10   also identifiable.

11   Q.  Is that something you can then use to compare the casings

12   found in a crime scene with either a gun or other casings

13   there to see if they have those specific marks?

14   A.  Yes, sir.

15   Q.  You talked about lands and grooves in the barrel.  You

16   mentioned a little bit about how those turns improve accuracy

17   of a fired round.  Can you explain how they leave markings on

18   a fired projectile?

19   A.  Yes, sir.  The lands and grooves are right -- the grooves

20   are raised areas of a barrel.  And the barrel inside the bore.

21   When the bullet is passing through there, it engages those.

22   The bore is actually slightly smaller than the bullet is.  So

23   the gases are forcing that slightly oversized bullet down a

24   slightly undersized barrel, so there's a lot of friction and a

25   lot of contact.  The markings left by the manufacturer, those

JAMES GREEN - DIRECT EXAMINATION

1   tiny individual identifying characteristics will be imparted

2   on the bullet as it's forced, and basically pushed or drug by

3   forces through those barrels.

4   Q.  And does that leave a unique mark as well?

5   A.  Yes, sir, the rifling will leave unique marks.

6   Q.  Why wouldn't every Glock .45 caliber auto leave the same

7   marking?

8   A.  Like I was saying earlier with the rake, the metal-on-

9   metal contact is going to fall differently.  No two pieces of

10  metal are made the exact same.  So even though we're using the

11  same tool to cut consecutive pieces of metal, the grain

12  structure is going to be slightly different from one to the

13  next and the next, leaving the different markings.

14  Q.  You mentioned earlier magazines.  Did you look at the

15  magazines in this case?

16  A.  Yes, sir.

17  Q.  What were the round capacities for those magazines?

18  A.  I believe all of them had 13 round capacities.

19  Q.  And would there be any, at least in your expert opinion,

20  any specific value to loading 11 rounds in a magazine versus

21  13?

22          MS. STEVENS:  Objection.

23          THE COURT:  I'm sorry?  Was there an objection?

24          MS. STEVENS:  Your Honor, he's asking him a question

25  that calls for speculation, whether there might be an

JAMES GREEN - DIRECT EXAMINATION

1    advantage to an unknown person to loading 11 as opposed to 13

2    rounds in a magazine.

3              THE COURT:  If it's within his expertise, he can

4    answer it.  Overruled.

5    BY MR. WILLIAMS:

6    Q.  I can ask it differently.  Would there be any added value

7    or advantage in the operation of the gun to using 11 rounds in

8    a magazine versus 13, which is the capacity?

9    A.  Yes, sir.  There are some trains of thought or schools of

10   thought that think that if you keep magazines fully loaded,

11   like the pistol at issue has a 15-round capacity.  Some people

12   think if you load the magazine with 15 rounds and leave it

13   continuously loaded, that the magazine spring will develop

14   almost a sort of memory and could possibly fail at some time.

15   So their thoughts to that is don't load it fully, and that way

16   you're not putting so much compression on that spring.

17   Q.  Is that actually true?

18   A.  I have never experienced that, but some people will say

19   they have.

20   Q.  I want to ask you about this .45 itself and the ammunition

21   that you looked at.  What is the purpose of a jacketed round

22   as you examined in this case?

23   A.  Jacketed rounds were developed to prevent the build-up of

24   lead in barrels, as more environmentally friendly, there's not

25   a lot of lead in the air, and it also keeps the amount of

JAMES GREEN - DIRECT EXAMINATION

1  fouling or residues deposited in the barrel down to a slight

2  more minimum, because there's not lead contact melting or

3  sloughing off into the lands and grooves.

4  Q.  Let me ask you about a hollow point round.  Did you look

5  at hollow point rounds in this case?

6  A.  Yes, sir.

7  Q.  Explain what a hollow point round is.

8  A.  Hollow point rounds are -- specifically in this case a

9  jacketed hollow point round has a cavity in the nose of the

10  bullet.  And when the bullet hits whatever the target may be,

11  the theory is that fluid like body fluid will come into the

12  hollow point cavity and cause the hollow point cavity to open

13  up or expand, or what they call mushroom, in the firearms

14  business.  And that actually greatens the diameter of the

15  bullet, which would lend more damage to the target.

16  Q.  And is there a type of round, a .45 auto or .45 caliber

17  round that is not a hollow point?

18  A.  Yes, sir.

19  Q.  So there are two types, hollow -- What's the other type

20  called?

21  A.  There's mostly round nose, just a full metal jacket or

22  total metal jacket.

23  Q.  You say that that would have a greater impact or greater

24  kinetic force upon contact?

25  A.  Not necessarily greater kinetic force, but the wound

JAMES GREEN - DIRECT EXAMINATION

1   channel will be bigger because the bullet will grow in size.

2   Q.  I want to ask you about the firearm you have in front of

3   you, Government's Exhibit 1.  Did you test that one for

4   functioning?

5   A.  Yes, sir.

6   Q.  What does that mean?

7   A.  During part of our training we'll go to the Glock armors

8   courses, so we'll see what Glock likes us to do to their

9   firearms to ensure that they're acting properly.  So I did

10  that as well in this case.

11      I like my fingers, I don't want the lose one by firing an

12  unsafe gun.  So the first thing I'll do is, one, after making

13  sure the firearm is unloaded, I'll make sure it's safe to

14  fire.

15  Q.  Did you do that in this case?

16  A.  Yes, sir.

17  Q.  Did you -- what I'm going to call test fire the gun?

18  A.  Yes, sir.

19  Q.  When you test fired the gun, what types of things are you

20  looking for?

21  A.  The first thing we do is when we get a firearm like in

22  this case, we'll try to shoot the ammunition as close as

23  possible.  Sometimes even though fired out of the same

24  firearm, different ammunition companies, the ammunition may

25  mark differently, based on the content of the jacket.  If it

JAMES GREEN - DIRECT EXAMINATION

1   has more copper than brass, it could actually not change the

2   markings, but the way the light reflects off it.  So we'll try

3   to find ammunition that's as close as possible as to what was

4   used in the case.  And then we'll test fire the pistol.

5   Q.  Did you test fire the pistol in this case?

6   A.  Yes, sir.

7   Q.  Did you use ammunition that was provided or located during

8   the -- at the crime scene?

9   A.  Yes, sir.  I shot the closest stuff we had first, and then

10  I did shoot submitted ammunition, yes, sir.

11  Q.  Let me ask you about the actual testing of the gun for

12  functioning.  Was it able to fire first?

13  A.  Yes, sir.

14  Q.  Did you do something called measuring the trigger pull?

15  A.  Yes, sir.

16  Q.  Explain what that is.

17  A.  The trigger pull is a unit of weight expressed in pounds

18  of how much force it takes to pull the trigger.

19  Q.  And how do you measure it?

20  A.  We have a set of standard weights that we do when we -- it

21  has a hook arm, you just put the hook on the trigger to where

22  it will feed the trigger safety, and we gently lift up to

23  simulate pulling the trigger.

24  Q.  What was the weight you measured that was necessary to

25  pull the trigger of Exhibit 1?

JAMES GREEN - DIRECT EXAMINATION

1   A.  If I may refer to my notes, please.  The trigger pull was

2   measured at five and three-quarter pounds.

3   Q.  Five point seven five pounds?

4   A.  Yes, sir.

5   Q.  Do you have a reference point for what that would be?

6   A.  A gallon of water weighs roughly eight pounds, so you're

7   looking at three-quarters of a gallon of water.  It would be

8   like lifting three-quarters of a gallon of water with one

9   finger.

10  Q.  As far as your comparison, then you say you test fired the

11  gun.  Did you use the test-fired casings and fired projectiles

12  or bullets for comparison?

13  A.  Yes, sir.  What we will do the first thing after we test

14  fire the firearm in the case, is we'll look at those tests

15  microscopically to see if the firearm's marking consistently.

16  So once I did that, I used the tests fired from Government

17  Exhibit 1, to look at the fired evidence in this case.

18  Q.  And what is the process of looking at those items?

19  A.  We'll look at them microscopically, look at the land and

20  groove impressions to see if we can find any consistency in

21  markings.  And then once we find something we think is

22  consistent, we'll rotate the bullet around on its axis and

23  look at the next available information, the next lands

24  impression, the next land impression, until we can look at all

25  the available information that's available on the fired

JAMES GREEN - DIRECT EXAMINATION

1    specimen.

2    Q.  Did you do that 74 times in this case?

3    A.  Yes, sir, I did that actually quite a few more times than

4    74, but yes, sir.

5    Q.  As far as the other testing in the case, the fragments and

6    fired bullets, did you compare those to standards or test

7    specimens as well?

8    A.  Yes, sir, I look at those, every single item against each

9    other, so one versus two, one versus three, all the way

10   through.  And then I looked at all those versus the tests.

11   Q.  And that's all done under a microscope?

12   A.  Yes, sir.

13   Q.  Was there any verification done of your testing as well?

14   A.  Yes, sir, part of the SLED firearms department and SLED

15   laboratory is 100 percent microverification.  So what that

16   means, for any information that's given out to the submitting

17   agency, a separate court-qualified examiner comes behind us

18   and independently looks at all this information.  So I went

19   through another examiner, told him I needed them to look at

20   the case, they didn't know what I had, but they knew what case

21   it was, and they came in and looked at everything

22   individually.

23   Q.  And if you could, I know you looked at a lot of items, can

24   you summarize what your findings were for the jurors?

25   A.  Yes, sir.  In this case I had 74 .45 auto caliber

JAMES GREEN - DIRECT EXAMINATION

1    cartridge cases that were fired by Government Exhibit 1.  I

2    had 70 fired bullets, fired bullet jacket or fragments that

3    were fired by Government Exhibit 1.  I had 11 fired bullets

4    jacket fragments or fired jackets that were inconclusive with

5    a pistol.  That means there was just not enough information to

6    render a conclusion.  And then I had 34 items that were

7    unsuitable, meaning they had no marks that I could tie back to

8    any specific firearm.

9    Q.  Let's start with those categories first.  What -- 34

10   unsuitable items?

11   A.  Yes.

12   Q.  What does unsuitable mean?

13   A.  Unsuitable means it has no markings available that I could

14   say it was fired by this firearm or that firearm.  I just can

15   tell you it's a piece of lead or it's a fired lead bullet

16   core.

17   Q.  Is that something like a lead bullet core, for instance,

18   can that be a result of fragmenting?

19   A.  Yes, sir.  And that would be an unsuitable answer as well,

20   would be the result of fragmenting.  And since the jacket

21   touches the bearing surface of the barrel, if the jacket's

22   missing, there's no information left on the core.

23   Q.  So if a jacket is separated from a core, the core would

24   never have gone down the barrel or had any microscopic value

25   that you could test?

JAMES GREEN - DIRECT EXAMINATION

1   A.  Would have gone down the barrel but not touched the
2   barrel, correct.
3   Q.  Then you said there were 11 inconclusive items.  I'm
4   sorry, what do you mean by inconclusive?
5   A.  Inconclusive is a fancy word for I can't tell.  I don't
6   know.  There were some markings there, but there was not
7   enough for me to say it was fired by this gun, or it was not
8   enough for me to say it was not fired by this gun.
9   Q.  So just not enough, unsuitable, there's no evidence
10  whatsoever, inconclusive, just not enough for you to make a
11  comparison?
12  A.  Correct.
13  Q.  So tell us then about the 70 fired bullets or jackets and
14  the 74 fired casings.  Were you able to make any kind of
15  expert conclusion about those items?
16  A.  Yes, sir.  The 74 cartridge cases and the 70 projectiles
17  or fragments or pieces of the projectiles were all fired by
18  the gun, based on sufficient agreement.
19  Q.  And were they all compatible or did they match each other
20  as well?
21  A.  Yes, sir.
22  Q.  So those 74 casings and the seven fired bullets all
23  matched the gun and all matched each other?
24  A.  Correct.
25          MR. WILLIAMS:  No further questions.

KIMBERLY MEARS - DIRECT EXAMINATION

1           THE COURT:  Cross-examination.

2           MS. STEVENS:  No questions, Your Honor, thank you.

3           THE COURT:  You may step down.  Call your next

4    witness.

5           MR. WILLIAMS:  Thank you.  Government calls Kim

6    Mears.

7           THE CLERK:  State your full name for the record,

8    please.

9    A.  Kimberly Mears.

10       KIMBERLY MEARS, a witness called by the Government, first

11   having been duly sworn, testified as follows:

12                       DIRECT EXAMINATION

13   BY MR. WILLIAMS:

14   Q.  Would you repeat your name for the jury.

15   A.  Kimberly Mears.

16   Q.  Miss Mears, where do you work?

17   A.  The South Carolina Law Enforcement Division, which is

18   commonly known as SLED.

19   Q.  What do you do at SLED?

20   A.  I am a forensic scientist in the latent print department.

21   Q.  What is the latent print department?

22   A.  We analyze evidence submitted by local agencies for the

23   presence of fingerprints.  We conduct fingerprint comparisons,

24   and we conduct fingerprint searches on AFIS, which is the

25   Automated Fingerprint Identification System.

KIMBERLY MEARS - DIRECT EXAMINATION

1   Q.  And what is a forensic scientist?

2   A.  We have a college degree in some form of science, and

3   receive specialized training for whichever department we are

4   hired in.

5   Q.  Let me ask you, in order to have that job did you have any

6   specific experience prior to working at SLED?

7   A.  No, I did not.

8   Q.  What did you do before you worked at SLED?

9   A.  I was in college getting a bachelor's degree in biology.

10  Q.  Where did you go to school?

11  A.  Winthrop University.

12  Q.  And what year did you graduate?

13  A.  2006.

14  Q.  So you went from -- right from college to working at SLED?

15  A.  I had a brief period where I was trying to get hired at

16  SLED, and then that was my first job straight out of college.

17  Q.  So when you were hired in SLED, did you have any kind of

18  training to become a forensic scientist or to work with

19  fingerprints?

20  A.  When I was hired in the latent print department, I

21  completed their in-house training program, and then I was

22  accepted into the latent print examiner training program

23  sponsored by the National Institute of Justice, which was a

24  ten-week program with courses covering all aspects of

25  fingerprint work.

KIMBERLY MEARS – DIRECT EXAMINATION

1  Q.  What other specialized training do you have to do
2  fingerprint comparison?
3  A.  The in-house training program and then the external
4  training program.
5  Q.  Did you have any kind of certifications?
6  A.  I am a certified latent print examiner through the
7  International Association for Identification.
8  Q.  Are you a member of any kind of organizations relative to
9  your work?
10  A.  The International Association for Identification is our
11  professional organization.
12  Q.  Let me ask you, what type of equipment do you use in
13  fingerprint comparison?
14  A.  Our equipment can be broken into two categories.  We have
15  processing equipment, which is basically chemicals we apply to
16  evidence to try to develop fingerprints.  On the comparison
17  side, we use your standard magnifying glass and pointers.  And
18  then we also have software, which is essentially a fancy
19  version of the Paint program on your computer, where we can
20  enlarge the prints, look at them screen size and mark what
21  we're looking at on screen.
22  Q.  Have you ever identified individuals using fingerprints?
23  A.  Yes, I have.
24  Q.  Do you know approximately how many times?
25  A.  I've done hundreds of comparisons; I'm not sure exactly

KIMBERLY MEARS - DIRECT EXAMINATION

1    how many identifications.

2    Q.  Have you testified as an expert before?

3    A.  Yes, I have.

4    Q.  In what area?

5    A.  Latent print examination.

6        MR. WILLIAMS:  Your Honor, I'm going --

7    Q.  How many times, do you know?

8    A.  Fifteen.

9        MR. WILLIAMS:  Your Honor, I'm going to move to have

10   her qualified as an expert in the area of latent print

11   examination and comparison.

12       THE COURT:  Any objection?

13       MS. STEVENS:  No objection.

14       THE COURT:  The witness is identified as an expert in

15   latent print examination.

16   BY MR. WILLIAMS:

17   Q.  If you could, Miss Mears -- is it agent or miss?

18   A.  Miss Mears is fine.

19   Q.  Miss Mears, if you could, can you tell the jury what a

20   fingerprint is?

21   A.  If you look closely on the palm side of your hand, you'll

22   see tiny little raised lines on your skin.  Those lines are

23   what we call ridges, and they are lined with sweat pores.

24   Throughout the day you exude sweat, you eat greasy foods or

25   touch your face and hair, and moisture accumulates on those

KIMBERLY MEARS - DIRECT EXAMINATION

1    ridges.  When you go to touch a surface, that moisture is

2    transferred to the surface corresponding to the ridges on your

3    hand.  That is what is known as a latent print.  The word

4    latent being hidden or invisible, and needs some sort of

5    enhancement or development to be seen.

6    Q.  And what is a standard or a known print in a case?

7    A.  A known print is just that, it is the fingerprint taken

8    from a known individual, it's taken deliberately in a

9    controlled environment, either with standard ink and paper

10   like a stamp, or a live scan device, which is similar to a

11   flatbed scanner, which records the moisture on the surface.

12   Q.  You mentioned a latent print.  Can you explain what a

13   latent print is?

14   A.  The latent print is that moisture corresponding to the

15   ridges on your skin being transferred to a surface that is

16   touched, it can't be seen because it's sweat, and it needs

17   some form of enhancement to be seen.

18   Q.  What type of surfaces are capable of holding a print or

19   having a print left on them?

20   A.  Leaving a print is really just a chance event.  Different

21   types of surfaces are suitable for prints.  Mainly your smooth

22   glass, metal, plastic, things of that nature, treated woods

23   such as this banister.  There are instances on paper,

24   untreated raw wood, cardboard, things of that nature where

25   prints can be left as well.

KIMBERLY MEARS - DIRECT EXAMINATION

1   Q.  Is it possible for something to be touched but a
2   fingerprint not left?
3   A.  Yes.  As I said, it's a chance event, depends on the
4   person touching the surface, the item being touched and the
5   environment that it's in.
6   Q.  So some surfaces may be more conducive to leaving latent
7   prints, is that fair to say?
8   A.  Exactly.
9   Q.  If you can, tell the jury briefly how are prints compared
10  for identification.
11  A.  The ridges on your skin are not running uniformly from one
12  side to the other.  On your palm, the ridges are running in a
13  general path that is specific to that area of the palm.  On
14  your fingerprint -- on your fingers, the ridges are doing one
15  of three patterns, which is an arch, a loop or a whorl.
16  Within those patterns the ridges are doing different things.
17  A ridge will just abruptly stop, which is an ending ridge; one
18  ridge will fork into two, which is a bifurcation; a ridge can
19  just be a dot that resemble a period at the end of a sentence.
20  An examiner looks at these characteristics in relationship to
21  each other, as well as the overall flow of the ridges and
22  shape of the ridges between the unknown print and the known
23  print, looking for agreement or disagreement within the two.
24  Q.  And are those specific parts of a print the factors that
25  go into making identifications?  What are the factors that go

KIMBERLY MEARS - DIRECT EXAMINATION

1    into making an identification?

2    A.  I'm not sure what you mean by factors.

3    Q.  What are the factors that go into identifying an

4    individual to a print or a known print to an unknown print?

5    A.  The -- I believe you mean the fingerprints are permanent

6    and unique, and that is how we can use them to identify a

7    person.

8    Q.  Are fingerprints specific to individuals?

9    A.  Yes.  No two individuals have been found to have the same

10   fingerprint.  And then within one person, in your ten fingers

11   no two fingerprints have been found to be the same.

12   Q.  So with all of that in mind, what did you do in this case?

13   A.  In this case I received evidence to be processed for the

14   presence of fingerprints.  Any prints that I found, I then

15   compared to known standards, and reached my conclusions based

16   on those comparisons.

17   Q.  Let's talk about the processing first.  So you're the one

18   that processes evidence or items that are submitted to you for

19   the actual fingerprints?

20   A.  Yes.

21   Q.  What is that process?

22   A.  It depends on the evidence itself.  Certain pieces of

23   evidence will require certain chemicals, based on the type of

24   evidence that it is.  If it is a nonporous item, which would

25   be glass, plastic, metal, those require certain chemicals to

KIMBERLY MEARS - DIRECT EXAMINATION

1    be applied to them, and that will go down one track, versus

2    porous items, which are paper, cardboard, things of that

3    nature, those require different chemicals that would then go

4    down a different track.  Just depends on the types of

5    evidence.

6    Q.  And what type of evidence were you provided in this case?

7    A.  I received a lot.  You want me to go down --

8    Q.  If you could summarize it.  I don't want you to list each

9    individual item, but --

10   A.  I had seven Glock magazines, three Winchester .45 auto

11   ammunition boxes with the trays and cartridges, I had one

12   Glock handgun, one brown leather journal, two lined pieces of

13   paper, five Glock magazine packages and two handwritten

14   letters.

15   Q.  What did you do with those items?

16   A.  The porous items, which are going to be the letters, the

17   journal, all of the paper items, those were treated with a

18   chemical called ninhydrin.  It is going to react with the

19   amino acids present in your sweat, and develop a purple

20   fingerprint.

21       The nonporous items, which were the gun, the plastic

22   cartridge trays, the magazine package inserts, those were

23   treated with cyanoacrylate, which is the chemical name for

24   super glue.  It is heated to a vapor, and adheres to any

25   moisture present on those items.

KIMBERLY MEARS - DIRECT EXAMINATION

1  Q.  When you use the processing for porous items, does it
2  leave like a purple discoloration on paper?
3  A.  Yes.
4  Q.  So holding up Government's Exhibit 2, is that purple
5  coloring consistent with your processing?
6  A.  Yes, it is.
7  Q.  And there's also stickers on the -- on Exhibit 2.  Is that
8  something consistent with your processing?
9  A.  Yes, that was placed by me.
10 Q.  Why would you place these stickers on an item?
11 A.  In that case there were ridge detail, which is part of a
12 fingerprint that I needed to mark for our photography studio
13 to photo, so that I could then do a comparison.
14 Q.  So when you process the items with those different
15 chemicals, you say there's ridge detail or you can find ridge
16 detail, explain what that means.
17 A.  Ridge detail is what we call the fingerprint.  It is --
18 could be a full fingerprint where you can tell someone
19 obviously touched it.  It could be just a tip or side or just
20 a few of the ridges.  I was explaining where you can tell
21 something was touched, but it's not necessarily comparison
22 quality to look at with known standards.
23 Q.  And did you have comparison prints attributed to this
24 defendant to use for comparison to those unknown prints?
25 A.  Yes, I did.

KIMBERLY MEARS - DIRECT EXAMINATION

1  Q.  So let me ask you, how many -- or did you find any latent
2  prints sufficient for comparison?
3  A.  I had about 23 prints that were compared.
4  Q.  Do you know how many, which items those came from
5  generally?
6  A.  The Glock magazines, the ammunition boxes, the handgun,
7  the journal, and the two lined pieces of paper.
8  Q.  And did you analyze those prints, meaning compare them to
9  the known standards taken from the defendant?
10 A.  Yes, I did.
11 Q.  I want to ask you about one of those prints, I believe
12 it's 135.3.
13 A.  Okay.
14 Q.  Did you create a chart for purposes of trial today that
15 shows the analysis of that one fingerprint?
16 A.  Yes, I did.
17 Q.  I'm going to show you Government's proposed Exhibit 256.
18 Do you recognize that?
19 A.  Yes, I do.
20 Q.  Is that what you created for the purposes of this trial?
21 A.  Yes, it is.
22        MR. WILLIAMS:  I'm going to show this to defendant's
23 counsel.
24        MS. PAAVOLA:  No objection.
25        THE COURT:  Government 256 is admitted without

KIMBERLY MEARS - DIRECT EXAMINATION

1    objection.

2        (Government Exhibit 256 received.)

3            MR. WILLIAMS:  I'm going to publish, Your Honor, on

4    the screen.

5    BY MR. WILLIAMS:

6    Q.  If you could, first of all, tell the jury where the

7    unknown print was located or where it was lifted from.

8    A.  The unknown print is on the trigger of the handgun.  It

9    is -- the gun is turned toward the left, so the trigger is

10   sideways in this photo.  It was developed on the trigger, and

11   then the photography studio -- this is a photo that we were

12   working with on this chart.

13   Q.  So that came off the trigger of this gun.

14   A.  Yes, it did.

15   Q.  And if you could, tell the jury what you did to compare

16   that to the known print, and specifically as it's depicted in

17   the exhibit that's on display.

18   A.  First, when applying the chemicals to the gun itself, I

19   analyzed to see if there was ridge detail present, and if it

20   was comparison quality.  I then sent it to the photography

21   studio to capture this image so that I could later work with

22   it to do a comparison.

23       I analyzed the ridges present and thought about how one

24   would handle a gun as far as what hand I would be looking at,

25   what finger I would be looking at.  And the known print is the

KIMBERLY MEARS - DIRECT EXAMINATION

1    right index finger, and the letters and red lines are pointing

2    to the ridge characteristics that I was explaining, the ridge

3    ending, the bifurcation or the ridge dot, which shows how --

4    it's a visual aid as to how I did my comparison and the

5    agreement I was looking at to form an identification.

6    Q.  And in your expert opinion, there's an agreement between

7    those two prints, meaning that they match?

8    A.  Yes, this print was identified.

9    Q.  And that was the right index finger?

10   A.  Yes.

11   Q.  That matched, too?

12   A.  Yes.

13   Q.  You said that there were several other prints that you

14   lifted.  Did those all match as well to the defendant, whether

15   they be other fingers or palms or parts of his hand?

16   A.  Of the prints that I compared, all but one were

17   identified.

18   Q.  And was the one a partial print that you couldn't

19   identify, or explain what -- if that was something that was

20   capable of being compared.

21   A.  It -- that one print, the result for that was

22   inconclusive, based on the quality of the known print.  It was

23   a tip region.  And you can't tell from this known picture the

24   top of the fingerprint, but if you think about how you just

25   roll your finger from side to side, the tip by the nail is

KIMBERLY MEARS - CROSS-EXAMINATION

1    generally not going to be represented on a fingerprint card.

2    So, therefore, I could not reach a definitive conclusion with

3    that print.

4    Q.  So you -- effectively you didn't have a standard to

5    compare it to, so it's not that it didn't match, it was just

6    inconclusive?

7    A.  Correct.

8           MR. WILLIAMS:  No further question, thank you.

9           THE COURT:  Cross-examination.

10                     CROSS-EXAMINATION

11   BY MS. PAAVOLA:

12   Q.  Good afternoon, Miss Mears.

13       Just so I understand, with regard to the print that you

14   were just discussing where your findings were that item 12 was

15   inadequate or not suitable, that's just because the

16   defendant's major case prints, the prints that you actually

17   look at for comparison, did not have the part of the print

18   that you needed to make that comparison.  Is that your

19   testimony?

20   A.  Correct.

21   Q.  And if I understand it correctly, you did not receive any

22   lifted prints from inside the church to examine, other than on

23   the magazine and the ammunition?

24   A.  Correct.

25   Q.  Is that correct?  You didn't receive any lifted prints

KIMBERLY MEARS - CROSS-EXAMINATION

1  from the walls or the doorknobs or any other part of the

2  building?

3  A.  That is correct.

4  Q.  Did you review or receive for any reason a set of major

5  case prints from the defendant from Lexington County?

6  A.  I worked with a few different sets of major case prints;

7  I'm not sure which agencies they were from.

8  Q.  Okay.  Could you take a look at what's been marked

9  Government's Exhibit 254 and see if you recall examining that.

10  A.  Yes, I did.

11  Q.  You did.  And for what purpose did you examine that

12  document?

13  A.  These are the knowns or either all or some of the known

14  standards I used for comparison.

15       MS. PAAVOLA:  Okay.  Your Honor, we would move to

16  admit Government's Exhibit 254.

17       MR. WILLIAMS:  No objection.

18       THE COURT:  No objection, Government 254 is admitted

19  without objection.

20     (Government Exhibit 254 received.)

21  BY MS. PAAVOLA:

22  Q.  And, Miss Mears, could you take a look at the second page

23  of that document and tell me what it lists there under prior

24  charges.

25  A.  A possession -- well, P-O-S-S -- other controlled

KIMBERLY MEARS - CROSS-EXAMINATION

1  substance in Schedule I.  I believe -- I'm not sure what all
2  the acronyms means.
3  Q.  Possession of a controlled substance, would that be fair?
4  A.  Yes.
5  Q.  And do you have any knowledge of the rules in South
6  Carolina, state or federal law regarding who is exempt from
7  purchasing a handgun?
8  A.  No, I am not sure.
9       MS. PAAVOLA:  Thank you, no further questions.
10      MR. WILLIAMS:  One quick follow-up.
11                    REDIRECT EXAMINATION
12  BY MR. WILLIAMS:
13  Q.  You also don't have a real sure idea what those underlying
14  charges may or may not be, is that fair to say?
15  A.  That's correct.
16      MR. WILLIAMS:  Thank you.
17      THE COURT:  Thank you, you may step down.
18      MR. RICHARDSON:  Your Honor, the Government calls
19  Special Agent Kevin Conroy.
20      THE CLERK:  State your full name for the record,
21  please.
22  A.  Kevin Conroy.
23    KEVIN CONROY, a witness called by the Government, first
24  having been duly sworn, testified as follows:
25                    DIRECT EXAMINATION

KIMBERLY MEARS - CROSS-EXAMINATION

1    BY MR. RICHARDSON:

2    Q.  Agent Conroy, introduce yourself to the jury and tell them

3    where you work.

4    A.  My name is Kevin Conroy, I'm an agent with the FBI here in

5    Columbia, or in Columbia, not Charleston.

6         THE COURT:  We're in Charleston here.

7    A.  Yes, sir.

8    Q.  You drove to Charleston today, right?

9    A.  Correct.

10   Q.  And you work on Squad Five, which is Michael Stansbury's

11   violent crimes and narcotics squad?

12   A.  That's correct.

13   Q.  And without going through your full background, you've

14   been an FBI agent for a while and have fairly extensive

15   training?

16   A.  Yes, sir, over 20 years.

17   Q.  I just want to go straight to your involvement of June the

18   18th, in connection with the defendant's father's house.  Did

19   you respond to that house that morning?

20   A.  Yes, I did.

21   Q.  And you responded as a result of conversations you had

22   with Agent Stansbury?

23   A.  Correct.  I was instructed to go there.

24   Q.  When you got there, was Agent Stansbury still there or had

25   he already left?

KIMBERLY MEARS – CROSS-EXAMINATION

1   A.  He was not there.  I arrived, there were several people
2   there.
3   Q.  Okay.  Including task force officers and SLED agents?
4   A.  Correct.
5   Q.  When you got there, did you have a chance to speak with
6   the defendant's father?
7   A.  Yes, I did.
8   Q.  And without going into names, were there other family
9   members that were there?
10  A.  Yes, there was at least two other family members, and
11  during the time I was there, several other people had stopped
12  by and left.
13  Q.  So two sisters and maybe some grandparents of the
14  defendant?
15  A.  Yes, and I believe maybe an aunt or uncle.
16  Q.  Maybe an aunt and uncle as well?
17  A.  Yes.
18  Q.  And during the process, what was your role, why were you
19  at that location?
20  A.  We were going to do a search of the location.  And
21  basically I was in charge of the search and the other
22  individuals there, basically letting everybody know what their
23  duties were going to be.
24  Q.  And you were doing that search pursuant to the defendant's
25  father's consent?

KIMBERLY MEARS - CROSS-EXAMINATION

1    A.   Correct.  He gave his consent and he signed a consent to

2    search warrant as well.  He gave verbal consent and written

3    consent.

4    Q.   And we think about that, you were really doing two

5    different searches, one was a computer search?

6    A.   Correct.

7    Q.   And that was primarily handled by Amanda Simmons, right?

8    A.   That's correct.

9    Q.   And Miss Simmons, formerly of the FBI, she was part of the

10   computer team at the FBI?

11   A.   Correct.

12   Q.   And then your role and those with you, you were doing a

13   more physical search, looking around different locations in

14   the house?

15   A.   That's correct.

16   Q.   I'm going to hand you what's been marked as Government's

17   Exhibit 300 to 305, having previously shown these to defense

18   counsel.  Do you recognize these photographs?

19   A.   Yes, I do.

20   Q.   And are these copies of photographs that were taken that

21   day that fairly and accurately reflect what you saw and what

22   you found?

23   A.   Yes.

24        MR. RICHARDSON:  Your Honor, we'd move to admit

25   Government Exhibit 300 to 305.

KIMBERLY MEARS – CROSS-EXAMINATION

1          THE COURT:  Any objection?

2          MS. PAAVOLA:  No objection.

3          THE COURT:  Government 300, 301, 302, 303 and 304 and

4   305 admitted without objection.

5       (Government Exhibits 300 through 305 received.)

6          MR. RICHARDSON:  Thank you.  Miss Baker, if we could

7   put up Exhibit 300.

8   BY MR. RICHARDSON:

9   Q.  And where is this?

10  A.  That's the residence from the front, from the street.

11         MR. RICHARDSON:  Can we go to 301?

12  Q.  We talked a little bit about the search of the computer.

13  How, as you were there observing, how was the FBI searching or

14  obtaining the evidence from the defendant's father's computer?

15  A.  Amanda Simmons, who works with CART, the computer forensic

16  team, had actually taken his computer apart and hooked it up

17  to another device.  I'm not a computer technician, so I'm not

18  exactly sure what it was, but she was basically downloading

19  the contents of his computer to another device.

20  Q.  And this photograph, we can see on the left side of this

21  photo the casing of his computer that's been opened up?

22  A.  That's correct.

23  Q.  And wires and other things that Amanda was doing what she

24  does with it.

25  A.  Yes.

KIMBERLY MEARS – CROSS-EXAMINATION

1   Q.  Fair to say that process took a little bit of time?

2   A.  It took several hours.

3   Q.  And during the course of that process, understanding the

4   frustration, the defendant's father and the family continued

5   to be cooperative?

6   A.  Correct.

7   Q.  In addition to the search of the computer, you also

8   searched other locations in the house?

9   A.  Yes.

10          MR. RICHARDSON:  If we go to 302, Miss Baker.

11  Q.  And as far as relevant evidence that you found most

12  significantly was found where?

13  A.  In this filing cabinet in the second and third drawers,

14  the two middle drawers.

15          MR. RICHARDSON:  Okay.  Can we go to Government's

16  Exhibit 303.

17  Q.  And this is one of those drawers that's being opened?

18  A.  Yes, that's the second drawer, there was mostly clothing

19  items found in that drawer.

20  Q.  If we can go to 304.  What do we see here?

21  A.  That was a jacket that was in that second cabinet from the

22  bottom.

23  Q.  Okay.  At the time you saw this jacket, had you seen

24  photographs of the defendant wearing this jacket already?

25  A.  Yes, I had.

KIMBERLY MEARS – CROSS-EXAMINATION

1   Q.  And that was part of the investigation that was going on?

2   A.  Yes.

3   Q.  I'm going to approach with Government's Exhibit 306.  Do

4   you recognize that item?

5   A.  Yes, sir, that's the jacket that we found, that's the

6   jacket pictured.

7           MR. RICHARDSON:  We move admission of Government

8   Exhibit 306.

9           THE COURT:  Any objection?

10          MS. PAAVOLA:  No objection.

11          THE COURT:  Government 306 is admitted without

12   objection.

13      (Government Exhibit 306 received.)

14   BY MR. RICHARDSON:

15   Q.  And Government Exhibit 306, can you just hold it up so we

16   can see what we're looking at?  The jacket, and on the right-

17   hand -- the right-hand breast has the flags of Rhodesia and

18   South Africa when they were apartheid countries?

19   A.  That's correct.

20          MR. RICHARDSON:  Can we then go to Government

21   Exhibit 305.

22   Q.  In this left-hand corner what do we find, what did you

23   find in that drawer?

24   A.  There was a good bit of paperwork, some tax returns, other

25   tax documents, all with the name Dylann Roof on them.

KIMBERLY MEARS – CROSS-EXAMINATION

1    Q.  I'm going to approach with three items, 307, 308 and 309,

2    ask if you recognize these three items.

3    A.  Yes, 307 is some packages from CVS Pharmacy that you would

4    develop film in.  Those were in one of the drawers.  308 are

5    the rolls of film.  There was a couple rolls of film in a box

6    undeveloped.  And then 309 are the documents that I talked

7    about some kind of tax documents.

8            MR. RICHARDSON:  Your Honor, at this time we'd move

9    to admit Government Exhibit 307, 308 and 309.

10           MS. PAAVOLA:  No objection.

11           THE COURT:  Very good.  Government 307, 308 and 309

12   admitted without objection.

13      (Government Exhibits 307 through 309 received.)

14           MR. RICHARDSON:  Agent Conroy, if you just answer any

15   questions that defense counsel might have, we'd appreciate it.

16   A.  Yes.

17           THE COURT:  Cross-examination.

18                    CROSS-EXAMINATION

19   BY MS. PAAVOLA:

20   Q.  Good afternoon, Agent Conroy.

21   A.  Good afternoon.

22   Q.  If I understand it correctly, when you searched the

23   defendant's father's house, the only items in the entire house

24   that belonged to Dylann Roof were located in these two drawers

25   in a filing cabinet, is that right?

KEVIN CONROY - CROSS-EXAMINATION

1  A.  That's correct.

2  Q.  And Mr. Roof's father told you that he placed those items

3  in the drawer himself, is that true?

4  A.  Correct.  He said they were sitting on the floor and he

5  was tired of looking at them so he put them all in the

6  cabinet.

7  Q.  Before he placed them in the drawer they were located on

8  the floor in the dining room, right?

9  A.  Correct.

10  Q.  And as far as you were able to determine, from your search

11  of the house, Mr. Roof did not have a bedroom at his father's

12  house, is that right?

13  A.  I didn't go into the -- Are you talking Dylann Roof did

14  not have a bedroom?

15  Q.  Yes.

16  A.  I don't know if he had a bedroom or not.  I didn't go into

17  all the rooms of the home.  But I'm not sure if he had a room

18  there or not.

19  Q.  You didn't ask the father?

20  A.  All the rooms of the house were searched.  There were

21  other TFOs, task force officers, that did the majority of the

22  search.  As they searched each room, they asked whose room

23  this was.  I don't believe Dylann Roof had a bedroom in that

24  house.

25  Q.  Do you know where he slept?

KEVIN CONROY – CROSS-EXAMINATION

1    A.  I believe when he slept over, he slept on the couch.

2    Q.  And the items that you found in the drawers were things

3    like clothes, toiletries, photographs and some personal

4    papers?

5    A.  Correct.

6    Q.  And in with the personal papers that you just mentioned,

7    it included things like tax forms and other paperwork with

8    Dylann Roof's name on them.  And it also included an

9    uncompleted job application, is that true?

10   A.  I believe there was a job application in there.  If you

11   have it to show me, I could tell you if that's one of the

12   items.

13   Q.  Well, you created a report of some kind documenting your

14   activities at Mr. Roof's father's house?

15   A.  Yes, I wrote a 302.

16   Q.  Would it refresh your recollection to take a look at that?

17   A.  Yes.

18   Q.  If you would just look at the bottom paragraph there.  Do

19   you now recall whether there was a job application contained

20   in Mr. Roof's personal papers?

21   A.  Yes.  According to my 302, there was miscellaneous

22   paperwork, to include an application to Grease Monkey.

23   Q.  And the Government's Exhibit 305 contains a number of

24   photographs, several packets of photographs, is that right?

25   A.  Yes.

KEVIN CONROY - CROSS-EXAMINATION

1  Q.  Could I see that?  Did you review all of these

2  photographs?

3  A.  I have seen them, but it's been quite awhile.

4  Q.  Do you recall the general nature of what's contained in

5  the photographs?

6  A.  It's been a long time.  I don't recall.

7  Q.  Well, there's several photographs of Dylann Roof.  Right?

8  A.  Yes.

9  Q.  But there are also lots of other photographs of things

10 like trees, buildings, things of that nature?

11 A.  I do remember several nature shots, if you will.

12 Q.  And there are also a series of photographs of a cat.  Is

13 that correct?

14 A.  That's possible.  I don't recall.

15 Q.  This is a photograph from Exhibit 307 and that does appear

16 to be a cat, is that true?

17 A.  Looks like a cat to me.

18 Q.  And there are, in fact, approximately ten photographs of

19 this same cat contained in this exhibit, is that right?

20 A.  It's possible.  Again, I don't recall all the photographs.

21 Q.  Do you happen to know, is this cat Dylann Roof's pet?

22 A.  That, I don't know.

23       MS. PAAVOLA:  Thank you.  No further questions.

24       THE COURT:  Anything further?

25       MR. RICHARDSON:  No, Your Honor.

1              THE COURT:  You may step down.

2         Mr. Curran, call your next witness.

3              MR. CURRAN:  Government calls Tracy Sicks, Your

4    Honor.

5              MS. STEVENS:  Before we call the witness may we

6    approach at side bar to raise an issue now, rather than during

7    the testimony?

8         (Following discussion held at side bar.)

9              MS. STEVENS:  We expect Mr. Curran will introduce

10   evidence of 60 photographs in Government's Exhibit 4 that

11   Dylann Roof uploaded to the LastRhodesian website.  We just

12   have a brief objection to two of the photographs.

13             THE COURT:  Yes, ma'am.

14             MS. STEVENS:  We had previously, in docket entry 738,

15   raised a general issue respecting the American flag.

16             THE COURT:  Correct.

17             MS. STEVENS:  And the defendant's desecration of or

18   acts desecrating the American flag.  We'd like to lodge now a

19   403 objection to those.  There are two photos within this

20   series of exhibits that are substantially more prejudicial

21   than they are probative to the issues as they arise.

22             THE COURT:  What's your response?

23             MR. CURRAN:  Your Honor, the evidence has already

24   shown in confession that he'd already made up his mind to

25   commit the offense before he left his home.  He posted to the

1    LastRhodesian website as part of the offense that included

2    text explaining his world view, and included the photos that

3    go along with that world view in the text and in the journal

4    in his car, as a portion that describes his views about

5    patriotism and how he feels about patriotism, in light of his

6    world views and the failure of --

7         THE COURT:  I believe the American flag was in

8    conjunction with the Confederate flag.

9         MR. RICHARDSON:  In the vehicle.

10        MS. STEVENS:  They were rolled up together, I think,

11   according to the testimony.

12        THE COURT:  Did he also upload on the Rhodesian site

13   a Confederate flag?

14        MR. CURRAN:  Yes.

15        THE COURT:  That was what I remembered.

16        MS. STEVENS:  But our specific recollection is Bates

17   No. 12341, and then a photo at 12343 where he actually spits

18   on the American flag.  They're both the American flag, and we

19   really don't feel that they're probative to issues in the

20   case, or their prejudice substantially outweighs what

21   probative value they have.  We're not objecting to the other

22   58 photographs that he uploaded.

23        MR. CURRAN:  He posted them in direct connection to

24   the offense, and both the car journal and in the LastRhodesian

25   text he has explicit references to his views about patriotism

TRACY SICKS - DIRECT EXAMINATION

1   and --

2           THE COURT:  And how that connects to his acts.

3           MR. CURRAN:  Exactly.  And they're race related.  His

4   feelings that America has not done enough to do the things

5   that animate his racial world view.

6           MS. STEVENS:  Your Honor, as the Court is aware, a

7   picture is worth a thousand words, and it's been described in

8   the testimony, but the photographs themselves are particularly

9   inflammatory.

10          THE COURT:  Well, the statements -- the difficulty

11  here is that it's caught up in the act itself.  And I'm

12  looking at these, I mean, because I have, independent of this,

13  sort of showing a burning flag by itself, I would have 403

14  concerns.  But it's in the context of this whole story and

15  narrative, and it all blends together and it is connected, so

16  I overrule that objection.

17          MS. STEVENS:  Thank you, Your Honor.

18      (Discussion at side bar concluded.)

19          THE CLERK:  State your full name for the record,

20  please.

21  A.  Tracey Allen Sicks.  S-I-C-K-S.

22      TRACY SICKS, a witness called by the Government, first

23  having been duly sworn, testified as follows:

24                          DIRECT EXAMINATION

25

TRACY SICKS - DIRECT EXAMINATION

1   BY MR. CURRAN:

2   Q.  Good afternoon, Agent Sicks.  Please state your name,

3   introduce yourself to the jury and tell them where you're

4   from.

5   A.  Tracy Allen Sicks, Columbia, South Carolina.

6   Q.  And what do you do for a living?

7   A.  I'm a special agent with the FBI.

8   Q.  How long have you been an agent with the FBI?

9   A.  About four years, sir.

10  Q.  And what did you do before you became an agent with the

11  FBI?

12  A.  I was in the Navy, so active duty Navy officer.

13  Q.  And for how long were you an active duty Navy officer?

14  A.  Ten years.

15  Q.  What did you do in the Navy?

16  A.  Surface warfare and weapons development, weapons design.

17  Q.  Surface warfare, is that colloquially what other people

18  might know as the people who are actually operating/driving

19  the ships?

20  A.  Yes, sir.

21  Q.  And what kind of work did that involve, specifically for

22  you?

23  A.  Controlling -- basic controlling the ship, controlling the

24  weapons systems, controlling the computers that were on board.

25  Q.  So you were working mainly on weapons systems and

TRACY SICKS - DIRECT EXAMINATION

1  computers?

2  A.  Yes, sir.

3  Q.  And did that work involve aspects of it that are roughly

4  similar to what, in the civilian world, might be information

5  systems or information technology?

6  A.  Yes, sir, it is.

7  Q.  And what do you -- what is your actual position with the

8  FBI?

9  A.  I'm the special agent on the cybercriminal squad.

10  Q.  And what does your work with the cybercriminal squad

11  involve?

12  A.  We investigate both national security and criminal cases

13  that involve hacking or criminal use of a computer.

14  Q.  And is cybercrimes, is that effectively a specialty area

15  within the FBI?

16  A.  Yes, sir.

17  Q.  And is that what you're trained and experienced in?

18  A.  Yes, sir.

19  Q.  And was that the position that you held in June of last

20  year?

21  A.  Yes, sir, it is.

22  Q.  So let's turn to that, the night, particularly June 17th,

23  the night of the shooting at Emanuel AME Church.  Were you

24  involved at all in response to the shooting that evening?

25  A.  Yes, I was.

TRACY SICKS - DIRECT EXAMINATION

1    Q.  Briefly describe to the jury what you did that evening.

2    A.  I'm a member of the evidence response team, so --

3    Q.  Let me stop you.  Evidence response team, what does that

4    mean?

5    A.  Basically you're crime scene, we process the crime scenes.

6    Q.  All right.  Please continue.

7    A.  So the evidence response team, we responded shortly after

8    getting word of the shooting.  Reported on site and then

9    waited for further direction.

10   Q.  Did you actually get involved in evidence collection that

11   evening?

12   A.  No, sir.

13   Q.  Did you have any direct involvement in processing the site

14   or the scene that evening?

15   A.  No, sir.

16   Q.  Did you later become involved in the investigation again?

17   A.  Yes, sir, I did.

18   Q.  When did you next become involved in the investigation

19   again?

20   A.  On or about the 20th of June.

21   Q.  And would that have been Saturday?

22   A.  Yes, sir, I believe it was.

23   Q.  Describe how you became -- you again became involved in

24   the investigation.

25   A.  I received a call from my supervisor stating that the case

TRACY SICKS - DIRECT EXAMINATION

1    agent needed some assistance with preserving a website

2    associated with this case.

3    Q.  And so that was with your supervisor?

4    A.  Yes, sir.

5    Q.  Who explained that to you?  Did you speak with anybody

6    else about that, about preserving a website?

7    A.  Yes, sir, I did.

8    Q.  With whom?

9    A.  Agent Hamski.

10   Q.  And who is Agent Hamski?

11   A.  The case agent.

12   Q.  The case agent for the case --

13   A.  Yes, sir.

14   Q.  -- right?  And what, if anything, did Agent Hamski ask you

15   to do?

16   A.  He just asked us to preserve any evidence we could

17   associated with the website.

18   Q.  And did he actually give you any information related to

19   the website?

20   A.  Yes, sir, he did.

21   Q.  What information did he give you?

22   A.  He provided the domain name of the website.

23   Q.  And what is a domain name?

24   A.  Every computer has an IP address, or internet protocol

25   address, associated with it.  So to keep people from having to

TRACY SICKS – DIRECT EXAMINATION

1    remember long numbers, you basically equate a name, a domain

2    name to an IP address.

3    Q.  We're going to try keep this as jargon free as possible,

4    but an IP address is essentially a technical address

5    associated with a particular website, correct?

6    A.  Yes, sir.

7    Q.  And domain name is a name that is given to it that's

8    easier for people to plug into their browser and access that,

9    correct?

10   A.  Exactly.

11        MR. CURRAN:  Your Honor, we republish Government's

12   Exhibit 2, and particularly page two.

13        MS. STEVENS:  No objection.

14        THE COURT:  It's already into evidence?

15        MR. CURRAN:  It is already in evidence, Your Honor.

16   BY MR. CURRAN:

17   Q.  What was the domain name that Agent Hamski gave you for

18   the website?

19   A.  LastRhodesian.com.

20   Q.  And I'd ask you to look on your screen, and particularly

21   the part that's highlighted here from this exhibit which comes

22   from a journal that was found in the defendant's car.  What is

23   listed there?

24   A.  LastRhodesian.com.

25   Q.  Is that the same name Agent Hamski gave you?

TRACY SICKS - DIRECT EXAMINATION

1  A.  Yes, it is.

2  Q.  So what, if anything, did you do after you received this

3  information from Agent Hamski?

4  A.  Basically began to preserve the site.

5  Q.  And what -- Let me stop for a second.  Were you working on

6  your own?

7  A.  No, sir, I had assistants.

8  Q.  And who was your assistant?

9  A.  SOS Ryan Ewing.

10  Q.  Is he someone also on your squad?

11  A.  Yes, sir, he is.

12  Q.  Did you work together that day?

13  A.  Yes, sir, we did.

14  Q.  So what did you and SOS Ewing first do after you got the

15  domain name?

16  A.  Basically we went to the site, make sure it was there.

17  Q.  You pulled up the site?

18  A.  Exactly.

19  Q.  You had the domain name, Agent Hamski had given it to you.

20  Did you have to use any specialized equipment to do that?

21  A.  No, sir.  It --

22  Q.  No forensic software?

23  A.  Just a browser, that was it.

24  Q.  And were you able to find the website with that domain

25  name?

TRACY SICKS - DIRECT EXAMINATION

1   A.  Yes, sir, we were.

2   Q.  What did you observe when you pulled it up?

3   A.  The main page had a single image of what looked like a

4   deceased body, and then two hyperlinks.

5   Q.  More technical jargon there.  What is a hyperlink?

6   A.  Just a -- basically something that on a website that you

7   can click on and it will take you somewhere else.

8   Q.  Click on it and it takes you to another page?

9   A.  Yes, sir.

10  Q.  And how many hyperlinks did you see there?

11  A.  There were two visible hyperlinks.

12  Q.  And did they have labels?

13  A.  Yes, sir, they did.

14  Q.  What were the labels?

15  A.  One was labeled photos and the other was labeled text.

16  Q.  And did you eventually click on both of those links?

17  A.  Yes, sir, I did.

18  Q.  What happened when you clicked on the label, one that was

19  labeled text?

20  A.  When you click on the text link, it popped up with basic

21  text.  That was it.

22  Q.  So a text file?

23  A.  Yes, sir.

24  Q.  Also known as a document?

25  A.  Yes, sir.

TRACY SICKS - DIRECT EXAMINATION

1  Q.  All right.  What happened when you clicked on the link for

2  photos?

3  A.  Click on the link, and photos brought up a small box, a

4  dialogue box or window asking if I wanted to save the file or

5  open it.

6  Q.  Dialogue box, is that like a window within a window?

7  A.  Yes, sir.

8  Q.  And did it ask you if you wanted to click on something?

9  A.  That asked you if you wanted to save it.

10  Q.  Did you click on that?

11  A.  I clicked save.

12  Q.  And what did that do?

13  A.  Basically saved the file.  Saved the file into the

14  computer.

15  Q.  And what kind of a file was it that you were saving?

16  A.  It was zip file, which is an archive, basically a

17  compressed file.

18  Q.  So a way of taking a large bunch of information and

19  compressing it into a smaller file?

20  A.  Into a single file, yes, sir.

21  Q.  Did you open the zip file?

22  A.  Yes, sir, I did.

23  Q.  And what did you observe when you opened that zip file?

24  A.  There were approximately 60 -- just images.  Pictures.

25  Q.  So on this web page, the LastRhodesian.com, was there

TRACY SICKS - DIRECT EXAMINATION

1  anything other than -- anything visible other than that main

2  page, the text page you told us about, and then the page you

3  told us about in terms of the photos?

4  A.  No, sir.

5  Q.  So your instructions were to preserve the website,

6  correct?

7  A.  That's correct.

8  Q.  What do you mean, why don't you explain to the jury what

9  you mean by preserve.

10  A.  Basically just to get a copy, make a copy of the

11  information that's on the computer for use at a later time.

12  Q.  And did you attempt to do that?

13  A.  Yes, sir.

14  Q.  And were you successful in doing that?

15  A.  Yes, sir.

16  Q.  How many methods did you use to try and preserve it that

17  day?

18  A.  We used three different methods that day.

19  Q.  Briefly describe for the jury what those three methods

20  were, and then we'll follow up in more detail with the --

21  A.  Okay.  First method is to use a piece of software which

22  has also got a website downloader, basically just goes and

23  downloads the information for you.  We used two different

24  website downloaders.  The second was to just use the basic

25  browser, right click and save.  So every document or link,

TRACY SICKS - DIRECT EXAMINATION

1   right click, save.  And then the third was to take screen

2   shots of whatever we saw.

3   Q.  Let's start with the last one first.  You said you took

4   screen shots.  Very briefly, many people may know, but some

5   may not, what is a screen shot?

6   A.  Basically you're just saving a picture of what you see on

7   the screen to a file.

8   Q.  You're taking an electronic photo of what's on your

9   screen?

10  A.  Yes, sir.

11  Q.  Does that require forensic software?

12  A.  No, sir.

13  Q.  Is that a capability that's built into most modern

14  computer operating systems?

15  A.  Yes, sir, it is.

16  Q.  All right.

17          MR. CURRAN:  Your Honor, I'm approaching with what's

18  been marked for purposes of identification as Government's

19  Exhibit 344.

20  Q.  Please review that.

21  A.  Sure.

22  Q.  Are you familiar with the images depicted on that exhibit?

23  A.  Yes, sir, I am.

24  Q.  What are they?

25  A.  The first is a --

TRACY SICKS – DIRECT EXAMINATION

1  Q.  Let's start more generally.  You mentioned that they were

2  screen shots.  Are those the screen shots you took that day?

3  A.  They are.

4  Q.  Is that an accurate copy of what you actually observed

5  when you looked at the website on your computer?

6  A.  Yes, sir, it is.

7        MR. CURRAN:  Your Honor, we move for admission and

8  publish.

9        MS. STEVENS:  No objection.

10       THE COURT:  Very good.  Government Exhibit 344 is

11  admitted without objection.

12     (Government Exhibit 344 received.)

13       MR. CURRAN:  Miss Baker, if you'd publish the first

14  page of the exhibit.

15  Q.  So let's please describe what is showing on your screen.

16  A.  Basically this is the main page of the website, title at

17  the top, an image of a deceased individual, and then the two

18  links, photos and texts.

19  Q.  So this is the page, is this the page that would come up

20  if you put into your browser LastRhodesian.com?

21  A.  Yes, sir, this is what you would see.

22  Q.  And I think you've answered the next question, which is,

23  the two links you were talking about, those are below the

24  picture, correct?

25  A.  Correct.

TRACY SICKS - DIRECT EXAMINATION

1    Q.  Do you know anything about that photo?

2    A.  I just believe it came from a movie.  But that's it.

3    Q.  You've not seen the file enough to know where that came

4    from?

5    A.  No, sir.

6    Q.  You just know it came from a movie.  Okay.  Let's turn to

7    the second page of the exhibit.  What is depicted on this

8    page?

9    A.  This is the text file that would appear if you clicked on

10   the text link.

11   Q.  And again, is this -- the screen shot, this is how it

12   would actually appear on your computer, correct?

13   A.  If it was set to a single page view, yes.  Yes, sir.

14   Q.  A single page view.  So you could zoom in on this and make

15   it more legible than it happens to be on our screen?

16   A.  Yes, sir.

17   Q.  All right.  Let's turn to the third page, please.  And

18   what is this?

19   A.  This is the dialogue box that would appear if you clicked

20   on the photos link.

21   Q.  So this is what you clicked to either save or open the zip

22   file you were telling us about that had the photos, correct?

23   A.  Yes, sir.

24   Q.  So this exhibit, these are all the screen shots that you

25   took, correct?

TRACY SICKS - DIRECT EXAMINATION

1    A.  Correct.

2    Q.  Which is one of the three ways that you preserved the site

3    that day?

4    A.  Yes, sir, one of the three.

5    Q.  Also mentioned that you manually saved the web pages,

6    correct?

7    A.  Correct.

8    Q.  Please describe how that works.

9    A.  So essentially we would go to the image, for example, the

10   image of the deceased member, we'd right click, and typically

11   the browser provides a pop up menu that would allow you to

12   click save, and that would save the file.

13   Q.  All right.  Does that require a specialized computer?

14   A.  Just a mouse, sir.

15   Q.  Doesn't that require a specialized software?

16   A.  No, sir.

17   Q.  Something that's built into most modern computers and

18   browsers, correct?

19   A.  That's correct.

20   Q.  What did you save using that technique?

21   A.  We saved the text file, we saved the zip file containing

22   the photos.

23        MR. CURRAN:  Your Honor, I'm approaching with what's

24   been marked for purposes of identification as Government's

25   Exhibit 3.

TRACY SICKS - DIRECT EXAMINATION

1   Q.  Please review that.

2   A.  Sure.

3   Q.  Are you familiar with that exhibit?

4   A.  Yes, sir, I am.

5   Q.  What is it?

6   A.  That is the text file that would appear from -- when you

7   click on the text link.

8   Q.  So is this the file that you saved manually?

9   A.  Yes, sir, I did.

10  Q.  Is it an accurate copy of the file that you manually saved

11  from the website that day?

12  A.  Yes, sir, it is.

13  Q.  Has the content been altered in any way?

14  A.  No, sir.

15          MR. CURRAN:  We would move to admit, Your Honor, and

16  also to publish.

17          MS. STEVENS:  No objection.

18          THE COURT:  Government 3 is admitted.  Permission to

19  publish.

20      (Government Exhibit 3 received.)

21  BY MR. CURRAN:

22  Q.  Now, at the top of the page it says RTF88.  What is that?

23  A.  That's the name of the file.

24  Q.  Is that assigned by the computer or is that assigned by

25  the person using the computer?

TRACY SICKS — DIRECT EXAMINATION

1   A.  The individual.  Saving the file.

2         MR. CURRAN:  For the record, Your Honor, for the

3   record, we're going to ask the witness to read into the record

4   what the document actually says.

5         THE COURT:  Okay.

6   BY MR. CURRAN:

7   Q.  As we discussed beforehand, Special Agent Sicks, any slurs

8   that are offensive, please feel free to say them, if you're

9   comfortable, or substitute a description what that word is, so

10  that it's clear for the record what you're doing.

11  A.  Yes, sir.

12  Q.  Again, please read the entire document into the record.

13  A.  "I was not raised in a racist home or environment.  Living

14  in the South, almost every white person has a small amount of

15  racial awareness, simply because of the numbers of negroes in

16  this part of the country.  But it is a superficial awareness.

17  Growing up, in school, the white and black kids would make

18  racial jokes toward each other, but all they were were jokes.

19  Me and white friends would sometimes would watch things that

20  would make us think, that, quote, 'blacks were the real

21  racists,' end quote, and other elementary thoughts like this,

22  but there was no real understanding behind it.

23        "The event that truly awakened me was the Trayvon Martin

24  case.  I kept hearing and seeing his name, and eventually I

25  decided to look him up.  I read the Wikipedia article and

TRACY SICKS - DIRECT EXAMINATION

1  right away I was unable to understand what the big deal was.

2  It was obvious that Zimmerman was in the right.  But more

3  importantly this prompted me to type in the words, quote,

4  'black on white crime,' end quote, in Google, and I have never

5  been the same since that day.  The first website I came to was

6  the Council of Conservative Citizens.  There were pages upon

7  pages of these brutal black on white murders.  I was in

8  disbelief.  At this moment I realized that something was very

9  wrong.  How could the news be blowing up the Trayvon Martin

10  case while hundreds of these black on white murders got

11  ignored?

12      "From this point I researched deeper and found out what

13  was happening in Europe.  I saw that the same things were

14  happening in England and France and in all the other Western

15  European countries.  Again I found myself in disbelief.  As an

16  American we are taught to accept living in the melting pot,

17  and black and other minorities have just as much right to be

18  here as we do, since we are all immigrants.  But Europe is the

19  homeland of white people, and in many ways the situation is

20  even worse there.  From here I found out about the Jewish

21  problem and other issues facing our race, and I can say today

22  that I am completely racially aware.

23      Blacks:  I think it is fitting to start off with the group

24  I have the most real life experience with, and the group that

25  is the biggest problem for Americans.

TRACY SICKS – DIRECT EXAMINATION

1    "The N word are stupid and violent.  At the same time they

2    have the capacity to be very slick.  Black people view

3    everything through a racial lens.  That's what racial

4    awareness is, it's viewing everything that happens through a

5    racial lens.  They're always thinking about the fact that they

6    are black.  This is part of the reason they get offended so

7    easily, and think that some thing are intended to be racist

8    towards them, even when a white person wouldn't be thinking

9    about race.  The other reason is the Jewish agitation of the

10   black race.

11   "Black people are racially aware almost from birth, but

12   white people on average don't think about race in their daily

13   lives.  And this is our problem.  We need to and have to.

14   "Say you were to witness a dog being beaten by a man or --

15   being beat by a man.  You are almost surely going to feel very

16   sorry for that dog.  But then say you were to witness a dog

17   biting a man.  You will most likely not feel the same pity you

18   felt for the dog for the man.  Why?  Because dogs are lower

19   than men.

20   The same analogy applies to black and white relations.

21   Even today, blacks are subconsciously viewed by white people

22   are lower beings.  They are held to a lower standard in

23   general.  This is why they're able to get away with things

24   like obnoxious behavior in public.  Because it is expected of

25   them.

TRACY SICKS – DIRECT EXAMINATION

1    Modern history classes instill a subconscious white

2    superiority complex in whites and inferiority complex in

3    blacks.  This white superiority complex that comes from

4    learning how we dominated other peoples is also part of the

5    problem I just mentioned.  But of course I don't deny that we

6    are in fact superior.

7    "I wish with a passion that the N word were treated

8    terribly throughout history by whites, that every white person

9    had an ancestor that owned slaves, that segregation was an

10   evil and oppressive institution, and so on.  Because if it was

11   all it true, it would make it so much easier for me to accept

12   our current situation.  But it isn't true.  None of it is.  We

13   are told to accept what is happening to us because of

14   ancestors wrongdoing, but it is all based on historical lies,

15   exaggerations and myths.  I have tried endlessly to think of

16   reasons we deserve this, and I have only come back more

17   irritated because there are no reasons.

18   "Only a fourth to a third of people in the South owned

19   even one slave.  Yet every white person is treated as if they

20   had a slave owning ancestor.  This applies in the states where

21   slavery never existed, as well as people whose families

22   immigrated after slavery was abolished.  I've read hundreds of

23   slaves' narratives from my state.  And almost all of them are

24   positive.  One sticks out in my mind where an old ex-slave

25   recounted how the day his mistress died was one of the saddest

TRACY SICKS – DIRECT EXAMINATION

1   days of his life.  And in many of these narratives the slaves

2   told of how their masters didn't even allowing whipping on his

3   plantation.

4        "Segregation was not a bad thing.  It was a defensive

5   measure.  Segregation did not exist to hold back negroes.  It

6   existed to protect us from them.  And I mean that in multiple

7   ways.  Not only did it protect us from having to interact with

8   them, and from being physically harmed by them, but it

9   protected us from being brought down to their level.

10  Integration has done nothing but bring whites down to the

11  level of brute animals.  The best example of this is obviously

12  our school system.

13       "Now white parents are forced to move to the suburbs to

14  send their children to, quote, 'good schools,' end quote.  But

15  what constitute a, quote, 'good school,' end quote?  The fact

16  is that how good a school is considered directly corresponds

17  to how white it is.  I hate with a passion the whole idea of

18  the suburbs.  To me it represents nothing but scared white

19  people running.  Running because they are too weak, scared and

20  brainwashed to fight.  Why should we have to flee the cities

21  we created for the security of the suburbs?  Why are the

22  suburbs secure in the first place?  Because they are white.

23  The pathetic part is that these white people don't even admit

24  to themselves why they are moving.  They tell themselves it is

25  for better schools or simply to live in a nicer neighborhood.

TRACY SICKS - DIRECT EXAMINATION

 1    But it is honestly just a way to escape the N word and other

 2    minorities.

 3        "But what about the white people that are left behind?

 4    What about the white children who, because of school zoning

 5    laws, are forced to go to a school that is 90 percent black?

 6    Do we really think that that white kid will be able to go one

 7    day without being picked on for being white, or called a,

 8    quote, 'white boy,' end quote?  And who is fighting for him?

 9    Who is fighting for these white people forced by economic

10    circumstances to live among negroes?  No one, but someone has

11    to.

12        "Here I would also like to touch on the idea of a

13    Northwest Front.  I think this idea is beyond stupid.  Why

14    should I, for example, give up the beauty and history of my

15    state to go to the Northwest?  To me the whole idea just

16    parallels the concept of white people running to the suburbs.

17    The whole idea is pathetic and just another way to run from

18    the problem without facing it.

19        "Some people feel as though the south is beyond saving,

20    that we have the too many blacks here.  To this I say look at

21    history.  The South had a higher ratio of blacks when we were

22    holding them as slaves.  Look at South Africa, and how such a

23    small minority held the black in apartheid for years and

24    years.  Speaking of South Africa, if anyone thinks that think

25    will eventually just change for the better, consider how in

TRACY SICKS – DIRECT EXAMINATION

1  South Africa they have affirmative action for the black
2  population that makes up 80 percent of the population.

3      "It is far from being too late for America or Europe.  I
4  believe that even if we made up only 30 percent of the
5  population we could take it back completely.  But by no means
6  should we wait any longer to take drastic action.

7      "Anyone who thinks that white and black people look as
8  different as we do on the outside, but are somehow magically
9  the same on the inside, is delusional.  How could our faces,
10  skin, hair and body structure all be different, but our brains
11  be exactly the same?  This is the nonsense we are led to
12  believe.

13      "Negroes have lower IQs, lower impulse control, and higher
14  testosterone levels in general.  These three things alone are
15  a recipe for violent behavior.  If a scientist publishes a
16  paper on the differences between the races in Western Europe
17  or Americans, he can expect to lose his job.  There are
18  personality traits within human families, and within different
19  breeds of cats or dogs, so why not within the races?

20      "A horse and a donkey can breed and make a mule, but they
21  are still two completely different animals.  Just because we
22  can breed with the other races doesn't make us the same.

23      "In a modern history class it is always emphasized that,
24  when talking about, quote, 'bad,' end quote, things whites
25  have done in history, they were white.  But when we learn

TRACY SICKS - DIRECT EXAMINATION

1    about the numerous, almost countless wonderful things whites

2    have done, it is never pointed out that these people were

3    white.  Yet when we learn about anything important done by a

4    black person in history, it is always pointed out repeatedly

5    that they were black.  For example when we learn about how

6    George Washington Carver was the first N word smart enough to

7    open a peanut.

8        "On another subject I want to say this.  Many white people

9    feel as though they don't have a unique culture.  The reason

10   for this is that white culture is world culture.  I don't mean

11   that our culture is made up of other cultures, I mean that our

12   culture has been adopted by everyone in the world.  This makes

13   us feel as though our culture isn't special or unique.  Say

14   for example that every businessman in the world wore a kimono,

15   that every skyscraper was in the shape of a pagoda, that every

16   door was a sliding one, and that everyone ate every meal with

17   chopsticks.  This would probably make a Japanese man feel as

18   though he had no unique traditional culture.

19       "I have noticed a great disdain for race mixing white

20   women within the white nationalist community, bordering on

21   insanity it.  These women are victims and they can be saved.

22   Stop.

23       "Unlike many white nationalists -- Jews is the header of

24   this one.  Unlike many white nationalists, I'm of the opinion

25   that majority of American and European Jews are white.  In my

TRACY SICKS – DIRECT EXAMINATION

1   opinion the issue with Jews is not their blood but their

2   identity.  I think that if we could somehow destroy the Jewish

3   identity, they wouldn't cause much of a problem.  The problem

4   is that Jews look white, and in many cases are white, yet they

5   see themselves as minorities.  Just like the N word, most Jews

6   are always thinking about the fact they are Jewish.  The other

7   issue is that they network.  If we could somehow turn every

8   Jew blue for 24 hours, I think there would be a mass

9   awakening, because people would be able to see plainly what is

10  going on.

11      "I don't pretend to understand why Jews do what they do.

12  They are enigma.

13      "Hispanics:  Hispanics are obviously a huge problem for

14  Americans.  But there are good Hispanics and bad Hispanics.  I

15  remember while watching Hispanic television stations, the

16  shows and even the commercials were more white than our own.

17  They have respect for white beauty, and a good portion of

18  Hispanics are white.  It is well known fact that white

19  Hispanics make up the elite of most Hispanic countries.  There

20  is good white blood worth saving in Uruguay, Argentina, Chile

21  and even Brazil.

22      "But they are still our enemies.

23      "East Asians:  I have great respect for the East Asian

24  races.  Even if we were to go extinct they could carry

25  something on.  They are by nature very racist and could be

TRACY SICKS – DIRECT EXAMINATION

1   great allies of the white race.  I am not opposed at all to

2   allies with the Northeast Asian races.

3       "Patriotism:  I hate the sight of the American flag.

4   Modern American patriotism is an absolute joke.  People

5   pretending like they have something to be proud while white

6   people are being murdered daily in the streets.  Many veterans

7   believe we owe them something for, quote, 'protecting our way

8   of life,' end quote, or 'protecting our freedom,' end quote.

9   But I'm not sure what way of life they are talking about.  How

10  about we protect the white race and stop fighting for the

11  Jews.  I will say this though, I myself would have rather

12  lived in 1940s American than Nazi Germany, and no this is not

13  ignorance speaking, it is just my opinion.  So I don't blame

14  the veterans of any wars up until after Vietnam, because at

15  least they had an American to be proud of and fight for.

16      "An explanation:  To take a saying from a film, quote, 'I

17  see all this stuff going on, and I don't see anyone doing

18  anything about it.  And it pisses me off.'  End quote.  To

19  take a saying from my favorite film, quote, 'Even if my life

20  is worth less than a spec of dirt, I want to use it for the

21  good of society.'  End quote.

22      "I have no choice.  I am not in the position to, alone, go

23  into the ghetto and fight.  I chose Charleston because it is

24  the most historic city in my state, and at one time had the

25  highest ratio of blacks to whites in the country.  We have no

TRACY SICKS - DIRECT EXAMINATION

1   skinheads, no real KKK, no one doing anything but talking on

2   the internet.  Well someone has to have the bravery to take it

3   to the real world, and I guess that has to be me.

4        "Unfortunately at the time of writing I am in a great

5   hurry and some of my best thoughts, actually many of them have

6   been left out and lost forever.  But I believe enough great

7   white minds are out there already.

8        "Please forgive any typos, I didn't have time to check

9   it."

10  Q.   Thank you, Agent Sicks, that's the end of document,

11  correct?

12  A.   That's correct.

13            MR. CURRAN:  Your Honor, I'm approaching with what's

14  been marked --

15            THE COURT:  It's about time for our afternoon break;

16  why don't we take it now.

17            MR. CURRAN:  Absolutely, Your Honor.

18            THE COURT:  Very good.  Ladies and gentlemen, return

19  to the jury room.

20       (Jury excused.)

21            THE COURT:  We'll break for about ten minutes.

22       (A recess was held at this time.)

23            THE COURT:  Bring in the jury.

24       (Jury present.)

25            THE COURT:  Mr. Curran, please continue the

TRACY SICKS – DIRECT EXAMINATION

1    Government's direct.

2              MR. CURRAN:  Thank you, Your Honor.  Your Honor, at

3    this time I'm approaching with what's been previously provided

4    to defense counsel and marked as Government's Exhibit 4 for

5    purposes of identification at this point.

6    BY MR. CURRAN:

7    Q.  Special Agent Sicks, please review that exhibit.  And have

8    you, in fact, actually reviewed that exhibit prior to your

9    testimony today?

10   A.  Yes, sir, I have.

11   Q.  Please review it again briefly.

12   A.  Yes, sir.

13   Q.  Are you familiar with this exhibit?

14   A.  Yes, sir, I am.

15   Q.  What is it?

16   A.  These are the pictures that were contained in the zip

17   file.

18   Q.  Is this a copy of the photos that you manually saved from

19   the zip file that was on the LastRhodesian website?

20   A.  Yes, sir, it is.

21   Q.  Are these photos accurate copies?

22   A.  They are.

23             MR. CURRAN:  Your Honor, we'd move to admit and

24   publish at this point.

25             MS. STEVENS:  Other than our prior objection, no new

TRACY SICKS – DIRECT EXAMINATION

1   objection, Your Honor.

2           THE COURT:  Very good.  Government 4 is admitted.

3       (Government Exhibit 4 received.)

4           THE COURT:  You have permission to publish.

5           MR. CURRAN:  Thank you.  May I publish them

6   electronically?  And there's 60 photos in the exhibit, and it

7   should take approximately eight minutes for them to play

8   through.  They're on an automated timer, so they'll all get

9   the same amount of time.

10      (Exhibit published.)

11  BY MR. CURRAN:

12  Q.  Special Agent Sicks, when you finished preserving the

13  website, what did you do with the data that you had generated?

14  A.  I saved that data onto an external flash drive and entered

15  that into evidence.

16  Q.  And did you provide it to any other analysts at the FBI?

17  A.  I believe to Amanda Simmons.

18  Q.  And what function did Miss Simmons provide at that time?

19  A.  She was the forensic analyst.  For CART.

20  Q.  Have you visited the LastRhodesian website since that

21  date?

22  A.  Yes, sir, I have.

23  Q.  Since that --

24  A.  Well, I attempted to.

25  Q.  You attempted to?  Were you successful?

TRACY SICKS – CROSS-EXAMINATION

1    A.  No, sir.

2    Q.  Why not?

3    A.  It was no longer active.

4    Q.  It has been taken down?

5    A.  Yes, sir.

6         MR. CURRAN:  Thank you.  No further questions at this

7    time, Your Honor.

8         THE COURT:  Cross-examination.

9         MS. STEVENS:  Thank you, Your Honor.

10                        CROSS-EXAMINATION

11   BY MS. STEVENS:

12   Q.  Afternoon, Agent Sicks.

13   A.  How are you, ma'am.

14   Q.  You have spent four years with the FBI, correct?

15   A.  Correct.

16   Q.  Before that, you were with the United States Navy on

17   active duty?

18   A.  Correct.

19   Q.  You currently monitor cybercrimes as part of your job

20   duties?

21   A.  Yes.

22   Q.  And in monitoring cybercrimes, do you monitor hate-based

23   propaganda, racist websites such as the Council of

24   Conservative Citizens?

25        MR. CURRAN:  Objection, Your Honor.

TRACY SICKS - CROSS-EXAMINATION

1          THE COURT:  Basis?

2          MR. CURRAN:  Beyond the scope.

3          MS. STEVENS:  Your Honor, the Council of Conservative

4     Citizens was specifically referenced in the text read to the

5     jury.

6          THE COURT:  Overruled.

7     BY MS. STEVENS:

8     Q.  Do you monitor hate-based racist websites like the Council

9     of Conservative Citizens?

10    A.  Only if it is relevant to our case at hand.

11    Q.  And are you familiar with the website Storm Front?

12    A.  Relatively, yes, ma'am.

13    Q.  And the Daily Stormer?

14    A.  Yes, ma'am.

15    Q.  And those are notorious racial hatred websites that exist

16    on the internet today, aren't they?

17    A.  I have not checked them, but I would assume so.

18    Q.  Is it part of the FBI's duties, perhaps not within your

19    department, but part of the FBI's duties to monitor such

20    websites for activity that may flow from them?

21    A.  I would not feel comfortable answering that.

22    Q.  Following your reading of the text, your original reading

23    of the text and the reference to the Council of Conservative

24    Citizens, did you visit that web page?

25    A.  No, ma'am.

TRACY SICKS - CROSS-EXAMINATION

1  Q.  And are you familiar with, at all with the content of the

2  Council of Conservatives website?

3  A.  No, ma'am.

4  Q.  You had mentioned in Exhibit 344 we saw the photograph

5  there on Dylann Roof's uploaded LastRhodesian website.  That

6  background came from a movie, correct?

7  A.  I believe so, yes, ma'am.

8  Q.  So that was not original to Dylann Roof, he didn't create

9  that.

10  A.  I don't believe so.

11  Q.  He took it from some clip from some movie and then

12  uploaded it with the other contents that you have read?

13  A.  It would appear so, yes.

14  Q.  Okay.  Now, some of the photographs went by so fast for

15  anybody to read the text.  But I would like you to read the

16  text of one of the signs that went by.

17  A.  Okay.

18  Q.  And it's at page 46 out of the 60 photos.  It's a bit

19  blurry.

20       MS. STEVENS:  Can we blow it up bigger?

21  Q.  Agent, are you able to read that?

22  A.  Yes, ma'am, I am.

23  Q.  Okay.  So without regard to whatever the motivation for

24  uploading this photograph, I would like you to read the

25  contents of this photograph here for us all today.

TRACY SICKS - CROSS-EXAMINATION

1    A.  Yes, ma'am.  "This is Sullivan's Island, a place where

2    Africans were brought to this country under extreme conditions

3    of human bondage and degradation."

4    Q.  If you could slow down, Agent.

5    A.  Do you want me to restart?

6    Q.  Yes, and take your time.

7    A.  "This is Sullivan's Island, a place where...Africans were

8    brought to this country under extreme conditions of human

9    bondage and degradation.  Tens of thousands of captives

10   arrived on Sullivan's Island from the West African shores

11   between 1700 and 1775.  Those who remained in the Charleston

12   community and those who passed through this site account for a

13   significant number of the African-Americans now residing in

14   these United States.  Only through God's blessings, a burning

15   desire for justice, and persistent will to succeed against

16   monumental odds, have African-Americans created a place for

17   themselves in the American mosaic.

18       "A place where...We commemorate this site as the entry of

19   Africans who came and contributed to the greatness of our

20   country.  The Africans who entered through this port have

21   moved on to meet the challenges created by injustices, racial

22   and economic discrimination, and withheld opportunities.

23   Africans and African-Americans, through the sweat of their

24   brow, have distinguished themselves in the arts, education,

25   medicine, politics, religion, law, athletics, research,

TRACY SICKS - CROSS-EXAMINATION

1    artisans and trades, business, industry, economics, science,

2    technology, and community and social services.

3        A place where...This memory rekindles the memory of a

4    dismal time in American history, but it also serves as a

5    reminder of a people who, despite injustice and intolerance,

6    past and present, have retained the unique values, strengths

7    and potential that flow from our West African culture which

8    came to this nation through the middle passage."

9    Q.  Agent, if a young person were to Google such a deplorable

10   term as black on white crime, would Google turn them to an

11   uplifting message like this?

12   A.  I can't answer that.

13           MS. STEVENS:  That's all.

14           THE COURT:  Any redirect?  You may step down.  Thank

15   you, Agent.

16       Call your next witness.

17           MR. WILLIAMS:  Thank you, Your Honor, Government

18   calls Amanda Simmons.

19           THE CLERK:  State your full name for the record,

20   please.

21   A.  Amanda Simmons.  Amanda Faith Simmons.

22       AMANDA SIMMONS, a witness called by the Government, first

23   having been duly sworn, testified as follows:

24                       DIRECT EXAMINATION

25   BY MR. WILLIAMS:

AMANDA SIMMONS – DIRECT EXAMINATION

1   Q.  Good afternoon.

2   A.  Good afternoon.

3   Q.  Repeat your name for the jury.

4   A.  Amanda Faith Simmons.

5   Q.  And Miss Simmons, where do you currently work?

6   A.  I currently work for SCANA Corporation in Columbia, South

7   Carolina, or Cayce, South Carolina.

8   Q.  How long have you worked for SCANA?

9   A.  Six months.

10  Q.  Where did you work before you worked for SCANA?

11  A.  Federal Bureau of Investigation.

12  Q.  How long did you work at the FBI?

13  A.  A little over seven years.

14  Q.  And what did you do at the FBI?

15  A.  I was a forensic examiner, information technology

16  specialist forensics examiner.

17  Q.  What is a forensic examiner?

18  A.  The duties of a forensic examiner at the FBI consist of

19  cell phone analysis, computer analysis, GPS analysis, other

20  types of electronic devices like USB and so forth.

21  Q.  Did you have any particular education or background that

22  qualified you for that position with the FBI?

23  A.  Yes, I did.  Prior to my employment at the FBI, I was a

24  supervisory special agent in charge of the computer forensics

25  lab at the State Law Enforcement Division.

AMANDA SIMMONS - DIRECT EXAMINATION

1  Q.  How long were you at SLED?

2  A.  That's SLED.

3  Q.  How long were you at SLED?

4  A.  I was at SLED approximately 12 years, a little over 12

5  years, and prior to that I worked for Lexington County

6  sheriff's office as a police officer there as well.

7  Q.  How long were you a police officer?

8  A.  Total 20 -- approximately 23 years.

9  Q.  That includes SLED, FBI and Lexington County?

10  A.  My time at Lexington County and SLED were sworn law

11  enforcement.  My time at the FBI, the last seven years was as

12  a support role.  I was a task force officer at the FBI prior

13  to coming on board with the support employee.

14  Q.  If you could, explain what type of specific training or

15  qualifications you have to be a -- or at least when you were a

16  computer forensic examiner.

17  A.  Okay.  The forensic examiner program at the Bureau, and I

18  start with that and then kind of trail back to SLED, consists

19  of many many many classes.  The classes consist of classes by

20  Search, which was an organization that taught forensic

21  classes, basic data recovery, advanced data recovery.  Other

22  classes that I attended were through the specific software

23  company, such as Access Data, FTK, again, your basic data

24  recovery classes through them, your advanced data recovery

25  classes, N Case, the same thing, several tiers of classes

AMANDA SIMMONS – DIRECT EXAMINATION

1  through them.  As well as cell phone forensics analysis

2  through the Bureau, included GPS forensics in that same class,

3  and cell phone forensic classes at the state level as well.

4  Q.  Have you testified as an expert before?

5  A.  Yes, I have.

6  Q.  In what areas?

7  A.  In computer forensics and underwater search and recovery

8  diving when I was at the sheriff's office.

9  Q.  Have you testified as an expert in computer forensics in

10  Federal Court?

11  A.  Yes, I have.

12  Q.  Approximately how many times total have you testified as

13  an expert witness?

14  A.  I would have to go back and research it a little bit, but

15  multiple times, at least five to six in computer forensics,

16  and several times in the law enforcement diving arena.

17          MR. WILLIAMS:  Your Honor, I'll move to qualify

18  Miss Simmons as an expert in the area of computer forensics.

19          MR. BRUCK:  No objection.

20          MS. STEVENS:  The witness is recognized as an expert

21  in computer forensics.

22  BY MR. WILLIAMS:

23  Q.  What do you do at SCANA now?

24  A.  I work in the network security side of the house, assigned

25  to the cyberthreat intelligence.  Part of my duties are

AMANDA SIMMONS - DIRECT EXAMINATION

1    forensics there to remediate any types of threats that may

2    come in on a computer that may have malware or otherwise

3    something that needs analysis on.

4    Q.  So I want to go back to your time at the FBI.  Explain

5    what you did sort of on a daily basis as a computer forensic

6    examiner or forensic examiner.

7    A.  Okay.  On a daily basis what we would do is we would

8    receive evidence from our evidence custodian, primarily Robert

9    Green.  We would process that evidence.  Most of that evidence

10   would be computers, cell phones, USB drives, micro SD cards,

11   SD cards, anything that had the electronic components, such as

12   a tablet.  If it was considered a computer in any form, most

13   of those we would handle.  If it was something that had

14   built-in memory, we may send that to Quantico to an electronic

15   engineer.  But if it had a hard drive, if it had a USB drive,

16   solid state memory, those sorts of devices, we would take

17   those, we would image them, we would process them, as per the

18   case agent's request, and conduct analysis on those items.

19   Q.  All right.  You said a bunch there.  I want to go back to

20   the type of items you would review.  Obviously computers?

21   A.  Obviously computers.

22   Q.  I think you said jump drives or thumb drives?

23   A.  Yes.

24   Q.  How about like old floppy disks or CDs, those type of

25   things?

AMANDA SIMMONS - DIRECT EXAMINATION

1   A.  CDs, floppy diskettes, we did process those as well, and

2   those were done in a forensic setting.

3   Q.  So pretty much any type of data storage or electronic

4   device?

5   A.  Correct.

6   Q.  I want to ask you, you mentioned somebody brings you

7   items, then you process them.  How do you know what to look

8   for or how to -- what to do in processing an item when it's

9   brought to you?

10  A.  We work with the case agents, and case agent obtains some

11  sort of search warrant document or either a consent to search.

12  So we work with that case agent.  He establishes what he's

13  looking for in those legal documents requesting that we look

14  for certain items.

15  Q.  Do you have an expertise that generally extends beyond

16  what the typical case agent is capable of, at least for

17  examining these items?

18  A.  Can you repeat the question?

19  Q.  Do they usually need your help, the case agents?

20  A.  In some instances, because of the technical aspects, I do

21  provide additional assistance if they're looking for something

22  unique.

23  Q.  So do you work, is it fair to say you work with the case

24  agent in analyzing items of value?

25  A.  That is correct.

AMANDA SIMMONS - DIRECT EXAMINATION

1   Q.  So something comes in to you as a piece of evidence, do

2   you do the same thing with it every time?  I think you said

3   you image items.  Can you explain what that means?

4   A.  Okay.  When we image a computer, what we're looking at is

5   taking -- and I'm going to use these two boxes as an analogy,

6   or this box.  If we image a computer, we'll take the hard

7   drive, which is where the data is stored on it, we'll do

8   bit-by-bit copy, in other words, we'll get every bit of data.

9   And the computer writes zeros and ones on that hard drive.  So

10  we'll copy each of those items.  And then once we copy that

11  with the forensic software, it does a verification hash or an

12  MD5 hash.  So we verify the MD5 hash on the original.  Once we

13  make the forensic image, we verify the hash, which is a

14  mathematical algorithm saying that both are exactly alike, so

15  all the zeros and ones on this drive exactly match the zeros

16  and ones on this drive.

17  Q.  So an image, without getting into hash values and things,

18  an image is an exact copy?

19  A.  An image is a bit-by-bit exact copy.

20  Q.  Why do you make an exact copy of an item?

21  A.  Well, we want to protect the integrity of the original,

22  and in doing so, we put the original item behind a write block

23  so we don't damage that integrity.  We work off of that

24  working copy at that point, that image.  And then the original

25  is put back in evidence or is secured so that we're working

AMANDA SIMMONS – DIRECT EXAMINATION

1   off the working copy of the first image set.

2   Q.   So the image is what you would then, I think you used the

3   word process, that's what you would process?

4   A.   That is correct.

5   Q.   What goes into processing an item?

6   A.   Well, again, we work with the case agent.  In this

7   particular case it was Special Agent Joe Hamski and Special

8   Agent Chris Quick.  They established through their court

9   documentation what specific items they're looking for.  And in

10  communication with them, if they're looking for certain key

11  words, if they're looking for certain images, if they're

12  looking for certain documents, whatever the case may be,

13  e-mail, we work with them to establish what's the way that we

14  can facilitate their ability to view that.

15       On many computers you have hundreds of thousands of

16  images.  So we don't want to just give them a copy and they

17  have several hundred thousand images to go through or several

18  hundred thousand documents to go through, and work with them

19  to narrow down the scope of what they're specifically looking

20  at.

21  Q.   And do the case agents have access to the image itself, so

22  if they want to search through it, they can do that?

23  A.   They do.  So what we do is we make a copy, and then we put

24  a copy of that on a server.  And then in this particular case

25  Joe was here in Charleston, so again, we verify through an MD5

AMANDA SIMMONS – DIRECT EXAMINATION

1    hash that the copy of the copy is a good copy, bit by bit,
2    everything is exactly like it was on the original.  And then
3    we make it available, once we index it, so that the case agent
4    can start reviewing it.  If we have -- say in this particular
5    case there was Joe and Chris, Special Agent Chris Quick and
6    Special Agent Joe Hamski that would both at some point have a
7    need to look at it.  So it was made available so that they
8    could start looking at it and start reviewing that data and
9    finding what was pertinent to their case.
10   Q.  And how do they identify, for purposes of extraction or
11   reporting, relevant material?
12   A.  Okay.  So if the case agent decides that a certain
13   document is relevant or certain picture is relevant, they can
14   actually go through and bookmark.  Be similar to you taking
15   your notebook and putting a little sticky in there, and they
16   would bookmark those specific items.  Then when they got
17   through reviewing the content of that particular hard drive or
18   thumb drive, we would generate a record from their bookmarks.
19   So only their bookmarks, instead of all the other data that
20   might be Windows data that is irrelevant that comes on every
21   computer.  So we want to eliminate the data such as the
22   Windows files and things that aren't relevant to the case,
23   because they're on every computer.
24   Q.  And so those bookmarked, or what is determine to be
25   relevant by the case agents, can then be put into a report

AMANDA SIMMONS - DIRECT EXAMINATION

1     that's, I guess, readable by you or other people?

2     A.  That's correct.  So the software that we utilize in this

3     particular case was Forensic Tool Kit.  It has a report-

4     generating ability.  And what we can do with those bookmarks

5     is we can say export out these bookmarks so that we can

6     generate a report specific to this case and the findings of

7     that case agent.

8     Q.  But you don't make necessarily independent decisions about

9     what's relevant, at least not without input from the case

10    agents, is that right?

11    A.  That's correct.

12    Q.  So you image it, discuss with the case agent what's

13    relevant, then report out what they request to be reported

14    out?

15    A.  That's correct.  Working with the case agent, the report

16    is what's relevant in his view.

17    Q.  And in this case approximately how many items did you

18    review?

19    A.  Bear with me one second.  Approximately 27.

20    Q.  I want to ask you first of all, you testified earlier

21    about obtaining items from other people that were seized.  Do

22    you sometimes go out in the field as well?

23    A.  Yes, I do.

24    Q.  How does that occur?

25    A.  In this particular case I got a phone call from special

AMANDA SIMMONS - DIRECT EXAMINATION

1   agent -- Supervisory Special Agent Ryan Jones.  He instructed

2   me that there was a computer in the field that needed imaging,

3   that the owner of the computer had given verbal consent to

4   image that computer, and instructed me to meet at a particular

5   location.  So that I could image that computer.

6   Q.  So instead of imaging it in the lab, you can actually go

7   on site and image computers as well?

8   A.  That's correct.

9   Q.  Did you do that in this case?

10  A.  I did.  First Supervisory Special Agent Jones instruction

11  I went --

12  Q.  Without giving us any addresses, just give us the general

13  area.

14  A.  Okay.  I went to an area in Columbia and imaged a

15  computer.

16  Q.  And do you know who the owner of that computer was or who

17  gave consent to search it?

18  A.  I do.  Mr. Bennett Roof.

19  Q.  And if you can, explain to the jury what process you used

20  to image that computer on site.

21  A.  Okay.  Initially when I arrived there, as I said, there

22  was verbal consent.  So do we want to cover that?

23  Q.  Yeah, you were given consent to --

24  A.  Okay.

25  Q.  You were given consent to search the computer.

AMANDA SIMMONS - DIRECT EXAMINATION

1   A.  I was given a consent to search, and that was written in

2   format.  And so essentially from there, I pulled a hard drive

3   out of the computer and placed it in a talon, which is a

4   duplication device, it's -- allows for the forensic image to

5   take place.  And you place one hard drive, actually on the

6   exterior, one hard drive on the interior.  The hard drive on

7   the interior had been forensically wiped.  So it had been

8   basically cleaned of any data that was previously on there,

9   overwritten with zeros so that I know it was cleaned.  And

10  through that process I was able to make a forensic image of

11  that particular computer at the residence.

12  Q.  So how long did you have to stay to have that process

13  complete?

14  A.  Approximately five and a half hours.

15  Q.  So you sat on site for five and a half hours to get the

16  image off of that computer?

17  A.  That is correct.

18  Q.  I want to ask you just briefly, are you familiar with a QC

19  number?

20  A.  That particular computer was dubbed QCO1.  The Q stands

21  for the first questioned items, the CO stands for Columbia

22  division, that's the description of the Columbia division of

23  the FBI, CO.  And then the one was the first item in this

24  particular case that was being processed.

25  Q.  So you assigned a QCO number to the items as an internal

AMANDA SIMMONS – DIRECT EXAMINATION

1   way to track them?

2   A.  Correct.

3   Q.  So I want to ask you about QCO1.  That was the -- so that

4   would be the image of that computer hard drive?

5   A.  That's correct.  So if I was able to take that particular

6   computer to our headquarters and keep that particular computer

7   as an item of evidence, then it would have gotten the Q label

8   on it.  But because I was unable to take that, and gave us

9   consent to image the computer but not take the computer, so I

10  made a forensic image on site and the original computer was

11  left at the house.  The item that I copied it to was labeled

12  QCO1, and it took on the best evidence for that particular

13  item.

14  Q.  Were you able to go through that item and analyze it along

15  with case agents?

16  A.  I was.  But before I did that, I actually made a second

17  copy.  Because when we don't have the original there at our

18  office, we make a second copy, because we want to ensure the

19  integrity of what we have, the best copy stays intact.  So I

20  made a secondary copy, which in turn I labeled it DEC04, which

21  is the derivative evidence of that.  And by that time it got

22  moniker four, because we were in line with processing other

23  items.

24  Q.  And you were able to, I think you testified earlier that

25  to go through the item and find relevant files or I guess

AMANDA SIMMONS – DIRECT EXAMINATION

1  evidence on the drive along with on the image along with case

2  agents?

3  A.  That is correct.  Through that we MD5 hashed it, verified

4  that it was good copy.  And per the case agent's request, we

5  were able to go through and find pertinent data on that hard

6  drive.

7  Q.  I'm going to show you Government's proposed Exhibits 331,

8  332, 333, 335 and 336.  Take a look at those.  While you look

9  at those others, I'm going to show these to defense counsel.

10      Did you go through all those?

11 A.  I have.

12 Q.  Are these documents you have been involved in producing

13 from that computer image?

14 A.  They are.

15     MR. WILLIAMS:  I'm showing these to defense counsel.

16   At this time I move to admit Government's 331, 332, 333,

17 335 and 336.

18     THE COURT:  Any objection?

19     MR. BRUCK:  No objection, except those previously

20 noted at side bar.

21     THE COURT:  Very good.  331, 332, 333, 335 and 336

22 are admitted.

23    (Government Exhibits 331, 332, 333, 335 and 336 received.)

24     MR. BRUCK:  I should say the items referred to at the

25 side bar conference are repeated in several different places,

AMANDA SIMMONS – DIRECT EXAMINATION

1    but it's the same objection to each one.

2         THE COURT:  Thank you, Mr. Bruck.

3    BY MR. WILLIAMS:

4    Q.  Miss Simmons, I want to ask you first about Government's

5    Exhibit 331.  I'm going to bring that up, the first page.

6    Explain to the jury, what is the column on the left-hand side,

7    what is that indicative of?

8    A.  As previously mentioned, the exam of this particular item

9    that was analyzed at the house was used a FTK, or Forensic

10   Tool Kit, that's the side bar of the Forensic Tool Kit case

11   reporting tool, and it actually generates that in an HTML

12   format, which is a web page format.

13   Q.  That's the example of the type of report that is generated

14   by your software?

15   A.  That's correct.

16   Q.  The first, second and third page of the document, was that

17   document located on the computer?

18   A.  That document was located on the computer.

19   Q.  I'll go briefly through the -- just the second page of

20   this just for reference so we can see what it looks like.  And

21   then the third page.  And at the time you were conducting this

22   analysis, did you have any awareness or knowledge about the

23   LastRhodesian.com website that had been discovered by other

24   agents?

25   A.  I did not.  When I discovered that document, I telephoned

AMANDA SIMMONS - DIRECT EXAMINATION

1    Special Agent Joe Hamski in the Charleston office and made him

2    aware of that particular document.

3    Q.  I want to go to the, I believe, the fourth page.  If you

4    could, tell the jury just generally what this page reflects.

5    Looks like it has the same left-hand side, FTK case report,

6    but it also has some bookmark and files listed.  Can you

7    explain in general what these depict?

8    A.  Okay.  In the column noted files, below bookmark manifesto

9    document, there's specific things that were bookmarked as

10   previously mentioned, the case agent has the ability to flag

11   certain items and say I think these are relevant.  In this

12   particular case these items, these particular files were

13   bookmarked.  In the particular case of the manifesto, there

14   was several documents on there relating to it.

15   Q.  I want to go to the bottom of the page, looks like there's

16   two files there named one RTF88, second RTF88.text, is that

17   what you're referring to?

18   A.  That's exactly what I'm referring to.  The RTF88, the

19   bottom one is the actual document, or the text file.  It would

20   be as if you created the particular document in Word Pad or

21   Note Pad or something along those lines and gave it a text

22   extension.

23       The document -- the particular file right above that, any

24   time we create or open a document on our computer, it creates

25   a link and puts it in a recent folder.  So that particular

AMANDA SIMMONS - DIRECT EXAMINATION

1   item there is not the actual document, but it's the link to

2   the actual document.  So that's indicative of that LNK at the

3   end of the extension there.  But it also lets us know that the

4   file name is the same.

5   Q.  So for the file that was labeled RTF88.TXT, that was the

6   actual earlier pages, meaning the text document that you also

7   loaded off of the image?

8   A.  That is correct.

9   Q.  And tell the jury, if you can, can we focus on the RTF.

10  Where it has RTF88.TXT, we're going to zoom in on that.  Tell

11  the jury what those create date, modified date, access date,

12  say with relation to that file.

13  A.  Okay.  It appeared in this particular situation here there

14  may have been some Open Office software used to create the

15  document.  And with Open Office, it creates a different file

16  extension, which was also found on this particular computer

17  and one of these other files that we'll probably go over

18  shortly.  The time dates associate when the actual file was

19  put in that particular location.  So with all three of these

20  time dates being the same, it would be most likely in time

21  dates are -- do activity things in different situations, but

22  most likely situation in this particular case is it was placed

23  in this location.  So you have three time dates that are the

24  same.

25  Q.  So but that's an indication, at the very least, when there

AMANDA SIMMONS – DIRECT EXAMINATION

1   was activity involving that RTF88.TXT file?

2   A.  That's correct.

3   Q.  And that time was almost 4:45 on June 17th, 2015?

4   A.  That's correct.

5   Q.  And you know that to be the date of the shootings at

6   Emanuel?

7   A.  That's correct.

8   Q.  I want to ask you next about Exhibit 335 and 333.  I'm

9   going to put up 335 first, just the front page.  I'll zoom in

10  on the top of it.  I want to ask you about, first of all, this

11  is the same type of FTK case report?

12  A.  That is correct.

13  Q.  And looks like there's 106 individual files within that

14  document?

15  A.  The items that were bookmarked in this particular document

16  would be 106.

17  Q.  Can you explain to the jury what those items are?

18  Generally.

19  A.  Generally they're photographs, or JPG, as the extension

20  indicates.  That's the type of graphic that's used on

21  computers.  And then this particular case I think all these

22  were found in the recycle bin.

23  Q.  What is the recycle bin?

24  A.  The computer generally thinks of the recycle bin as a

25  separate folder.  When we take a particular file, say from our

AMANDA SIMMONS - DIRECT EXAMINATION

1    C drive or from our local partition and we say, okay, we want

2    to delete it, in many cases, depending on what we do in our

3    actions, in most cases our actions indicate we want to delete

4    it, it will go to the recycle bin.  In the particular

5    operating system it did go to the recycle bin, versus the

6    recycler bin on some other computers.

7    Q.  If something goes in the recycle bin, it's not deleted?

8    A.  It's not technically deleted, it's just in another subset

9    of the computer so that you could go to that recycle bin,

10   right click on it and say restore, and it would basically

11   restore it back to that location.

12   Q.  And it looks like at least on this first image there's a

13   created date, modified date, access date.  Is that consistent

14   with the other information you had testified to earlier would

15   show accessing of that item?

16   A.  That is consistent with that particular file having

17   activity on that particular date.

18   Q.  And that's, again, June 17th of 2015 at around 2:57 a

19   created date?

20   A.  That's correct.

21   Q.  What is the difference between a created date, modified

22   date and access date, if you know?

23   A.  Well, the created date in what I surmise in this

24   particular situation is this particular file was copied from

25   another form of media to this particular computer.  And that

AMANDA SIMMONS – DIRECT EXAMINATION

1  date is the date that it actually was placed on this

2  particular media.

3  Q.  I'm going to go to page 14.  And if you could just zoom in

4  on the -- that's fine.  If you look at the second image there,

5  thumbnail 48, can you explain what a carved image is?

6  A.  Best analogy I can give you for a carved image, imagine

7  you were going to the library and wanted to look at a

8  particular book such as Great Gatsby or another book in the

9  library, and you had a card index that said this book is

10  located on this shelf and this floor, but for some reason

11  someone had taken that card out of the card index.  So you

12  know the book is still in the library, but you don't know

13  exactly where it's at.  So in a particular situation with a

14  carved image, the Great Gatsby is still written on the front

15  of the book.  In this particular situation with the JPG image

16  it still has a JPG or a JFIF header in that particular image.

17  So we know that if we go look for the JFIF, the header of that

18  particular file, just as if we searched the library from top

19  to bottom, we wouldn't be able to find files that have certain

20  headers in them, and we would be able to go back and see that

21  image.

22  Q.  So is the image actually there or is this just a

23  representation of that image?

24  A.  The image is actually there.  The pointer system, such as

25  the card, or the file entry in the master file table is gone.

AMANDA SIMMONS - DIRECT EXAMINATION

1   So in this particular case there may not be an entry into

2   what's known as a master file table, but the data is still

3   there.

4   Q.   Just not a title for it?

5   A.   Just not a title for it.

6   Q.   I want to ask you finally in the file comments the first

7   line is thumbnail.   What is a thumbnail?

8   A.   So when we open a particular folder on our computer and we

9   say we want to look at large copies of all the images that are

10  in a particular folder, it creates something called a

11  thumbnail folder.   Okay?   And that particular situation it

12  actually creates the smaller images, or the thumbnail images.

13  And that is what I would surmise happened in this particular

14  situation.   This smaller image is actually embedded in the

15  larger image, if you were to go back and look for the one that

16  was not carved, but the same file name, you would see the same

17  image.

18  Q.   I'm going to bring up Government's Exhibit 333 next.   I'll

19  zoom in on the -- if you can, explain, looks like these are

20  more thumbnails, but they do not have the sort of created

21  modified access date.   How are these images different than the

22  ones that you just reviewed?

23  A.   So again, we're talking about a thumbs.DB folder, for

24  database.   When we open up a folder and say we want to see not

25  just the file names but we want to see small images of the

AMANDA SIMMONS – DIRECT EXAMINATION

1    files, it creates this thumbs.DB.  In this particular

2    situation here, oftentimes the smaller image or the thumbnail

3    associates back to the bigger image.  So if the bigger image

4    is no longer there, or it's been placed in a recycle bin or

5    been deleted or whatever the case may be, the -- the

6    associated metadata, which is data about data, is no longer

7    available.  So that's why we don't have time dates on many of

8    these.

9    Q.  I believe there was a series of 69 separate thumbnails in

10   this series, these all would have come off the computer as

11   well, but not as the accessed or modified dates included with

12   them?

13   A.  That's correct.

14   Q.  Next I want to ask you about Government Exhibit 332.

15   Bring that up.  This is also an FTK report.  Can you explain

16   what this is showing?

17   A.  Well, a PNG is a different type of graphic, it's a --

18   basically a portable type graphic.  And it's reflective of a

19   particular file that is in the orphan file.  And then the one

20   below it is a log file.  So a text type file.  So again, a

21   small graphic image that you can see below that.

22   Q.  I'm going to go to Exhibit 336 as well.  Is that a blown

23   up version of that graphic?

24   A.  That is correct.

25   Q.  And did that relate somehow to LastRhodesian.com?

AMANDA SIMMONS – DIRECT EXAMINATION

1    A.  So shortly after the manifesto was located, a website was

2    discovered, and it was housed in another country, which would

3    be indicative of that.

4    Q.  And so this reg.ru.com is consistent with the

5    LastRhodesian.com web post?

6    A.  That is correct.

7    Q.  If I could go back to 332 and the top file.  And the

8    indication of the access to that image or at least that

9    orphaned image would have been June 17, 2015 -- sorry -- at

10   4:45 p.m.?

11   A.  That is correct.  And again, the path, if you note below,

12   is the Charleston 01 which is the DV image of the hard drive

13   that I forensically processed at Bennett Roof's house.

14   Q.  Would an image like that be consistent with accessing a

15   website that would be hosted by that same reg.ru?

16   A.  That's correct.

17   Q.  So as far as the computer, that QC01, it would have been

18   available to the agents to find as many things as they thought

19   were pertinent, and you would have provided that to them?

20   A.  That is correct.

21   Q.  I want to ask you then about other items that you

22   processed.  And as a summary though, first, is it fair to say

23   that some items were -- had some value and others didn't?

24   A.  That is correct.

25   Q.  And is it also fair to say that a lot of the information

AMANDA SIMMONS - DIRECT EXAMINATION

1    on those items is something that the agent can review, and

2    that you're not necessarily needed for, like a CD or a jump

3    drive, the agents can often review those without your

4    assistance?

5    A.  That is correct.

6    Q.  So I want to ask you next about QCO2.  What was that?

7    A.  That was an LGBK810 tablet, serial number --

8    Q.  Just give me the name of it.

9    A.  Okay.  It's an LGBK810 tablet.

10   Q.  Great.  So an LG tablet?

11   A.  Yes.

12   Q.  Was that something that you examined?

13   A.  I did.

14   Q.  And you imaged it?

15   A.  I forensically imaged it.

16   Q.  And that was made available to the agents for them to

17   review, if needed?

18   A.  That is correct.

19   Q.  I want to ask you about QCO4, five and six.  What were

20   those items?

21   A.  Those three items were USB drives, and more specifics are

22   available if needed.

23   Q.  We don't need the long list.  Do you have a description of

24   them as color or brand?

25   A.  Okay.  Labeled QCO4 was a USB drive, yellow and black in

AMANDA SIMMONS – DIRECT EXAMINATION

1    color.  QCO5, again, sequential order questioned item and out

2    of the Columbia division, was item 1B-11, one USB drive, black

3    in color.  And QCO6, 1B-12, one data USB drive black in color.

4    Q.  I want to ask you briefly about QCO6.  You don't have any

5    understanding of where that was located?  Or how it was

6    obtained?

7    A.  When I checked the item out of the evidence control there

8    is some limited data on that evidence control sheet.

9    Q.  What was the limited data about it?

10   A.  QCO6?

11   Q.  Yes, ma'am.

12   A.  In this particular case it was checked out from evidence

13   custodian Robert Green, it indicates the same description as

14   previously given, other than a 64 gig USB drive.  It also

15   indicates that it was collected by Erin Hawkins and Casey

16   Collier.  Having retired from SLED, I recognize Casey's name

17   as one of the case agents that assisted in processing the

18   vehicle.

19   Q.  I'm going to ask you about that file and a couple of

20   specific items located there.  First of all, were there some

21   movie clips located on there?

22   A.  There was.

23   Q.  Did they have specific titles?

24   A.  They did.

25   Q.  Can you tell us what the titles were?

AMANDA SIMMONS - DIRECT EXAMINATION

1   A.  Do you have that document available?

2   Q.  Let's go at it this way.  Did you provide the data to the

3   case agent to review so that he could analyze on what those

4   files were?

5   A.  I did.

6   Q.  Okay.  I'm going to hand you Government's 340.  343.  Do

7   you recognize those, first of all?

8   A.  I do.

9   Q.  And do you need to go through every page of 343?

10  A.  Absolutely not.  If this is the book.

11  Q.  Take a look at it.

12  A.  Yeah.  I do recognize that.

13  Q.  Thank you.  Those came off of that thumb drive?

14  A.  That is correct.

15        MR. WILLIAMS:  I'm going to show these to defense

16  counsel.

17        MR. BRUCK:  May we approach?

18     (Following discussion held at side bar.)

19        MR. BRUCK:  This is a book called the Invisible

20  Empire, which is a many hundred page history of the Ku Klux

21  Klan.  We object to 343 as just an enormous -- excessive

22  injection of material, which is way more prejudicial than

23  probative.  The fact that such a book was found, like such

24  movies were found, but the book itself we object to.

25        THE COURT:  Why don't you do the cover page; why do

AMANDA SIMMONS - DIRECT EXAMINATION

1    you need more than that?

2           MR. WILLIAMS:  I feel like a paper book like the

3    catechism found in his car, we wouldn't have this discussion.

4    I think it's fair to enter the entire item to show he had the

5    entire book.  I don't know why it's electronic that it should

6    be treated differently.

7           MR. BRUCK:  We wouldn't be treating it differently,

8    or we would have objected to it.

9           THE COURT:  You would have objected regardless of its

10   format.

11          MR. BRUCK:  Of course.

12          THE COURT:  So now let's analyze the issue.  Why is

13   the book, the issue of the Klan relevant?

14          MR. WILLIAMS:  Judge, he obviously said a statement

15   there's no KKK any longer, and I have to do what they were

16   doing before.  This shows he knows about the KKK, goes

17   directly to his intent, not his stated mission to replicate

18   their activities.

19          MR. BRUCK:  This is the title page.  And we would not

20   object to admission of that, which shows -- and nor the

21   testimony that this was the title page of the book.

22          THE COURT:  Would you stipulate that he had the whole

23   book?

24          MR. BRUCK:  Yes.

25          THE COURT:  Let's say we're going to admit the cover

AMANDA SIMMONS - DIRECT EXAMINATION

1    page, stipulate that he had the entire book.

2            MR. WILLIAMS:  I wasn't going to read it to them.

3            THE COURT:  I know that.

4        (Side bar discussion concluded.)

5            MR. WILLIAMS:  Your Honor, I move to admit

6    Government's 340, and for 343, just the first couple of

7    representative pages in the exhibit.

8            THE COURT:  Is there a stipulation that the entire

9    book was in the -- made available to Mr. Bruck?

10           MR. BRUCK:  Yes.

11           THE COURT:  Was on the USB drive, is that correct?

12           MR. BRUCK:  Yes.

13           THE COURT:  So we offer -- You object to 340,

14   Government 340?

15           MR. BRUCK:  No.

16           THE COURT:  And 343, the first four or five pages,

17   Mr. Williams, is that correct?

18           MR. WILLIAMS:  Just the cover page, page five and

19   six, and I'll take those out later, Your Honor.  They're

20   bound.

21           THE COURT:  Very good.  Then we will, in the

22   stipulation, that the entire book was on the USB drive,

23   correct?

24           MR. BRUCK:  That's fine.

25           MR. WILLIAMS:  Yes, sir.

AMANDA SIMMONS – DIRECT EXAMINATION

1          THE COURT:  Admitted on that basis.

2       (Government Exhibits 340 and 343 received.)

3          MR. WILLIAMS:  Thank you, Your Honor.

4    BY MR. WILLIAMS:

5    Q.  I'm going to go to 340 first.  Now, Miss Simmons, these

6    were images that were located on the thumb drive?

7    A.  Yes, that is correct.

8          MR. WILLIAMS:  I'll go to the second page of those

9    images, looks like a duplication there.  Go to the third page.

10   Go to the fourth page.  Go to the fifth page.  Finally, go to

11   the sixth page.

12   Q.  You said that there were also movie and clips or movies on

13   the drive; those would have been provided to the agent to

14   analyze?

15   A.  That is correct.

16   Q.  I'm going to use the ELMO for page five.  Is this the

17   printed image of the file that was located on the thumb drive

18   as well?

19   A.  That is correct.

20   Q.  And I believe the stipulation was that the whole book was

21   there, but you located an entire book in a PDF format?

22   A.  That is correct.

23   Q.  The title of that was Invisible Empire, the Story of the

24   Ku Klux Klan 1866 to 1871.

25         MR. WILLIAMS:  That's on page five, Your Honor.

AMANDA SIMMONS - DIRECT EXAMINATION

1   Q.  Page six is just a copyright of 1939.  Is that right?

2   A.  That is correct.

3   Q.  So that was -- those were three thumb drives that you

4   would have analyzed, QCO4 and QCO5 and QCO6.  There was

5   another set of QCOs you examined, eight to 13.  Tell the jury

6   what those were.

7   A.  QCO8 to 13 were six CD/DVDs.

8   Q.  And you testified earlier that those could be pretty

9   readily accessed, or at least the images or copies accessed by

10  the case agents?

11  A.  That is correct.

12  Q.  Those could be played just like a regular CD in their

13  computer or wherever?

14  A.  In this particular situation we did make copies and place

15  those on the server so that they could access those.  So that

16  they weren't actually using the original evidence to look at

17  them.

18  Q.  Okay.  QCO17, I believe, was a Dell computer.

19  A.  QCO17 was a Dell Dimension 2350 with a Hitachi Desk Star

20  hard drive.

21  Q.  I believe that had files dating back to or sometime around

22  2009?

23  A.  It had older files on it, that is correct.

24  Q.  I want to ask you about QCO18 to 27, I believe those were

25  eight floppy disks.

AMANDA SIMMONS - DIRECT EXAMINATION

1  A.  QCO18 and 19 were floppy diskettes.  QCO20 through 27 were

2  also eight floppy diskettes.  So a total of ten.

3  Q.  When were floppy disks generally used, about how long ago?

4  A.  Many many years ago.  These particular floppy diskettes

5  were three-and-a-half-inch floppy diskettes.  They're

6  difficult to find now for sure.

7  Q.  Fair to say those were pretty old, maybe just collected by

8  agents in their normal course of conducting a search?

9  A.  That would be correct.

10  Q.  I want to ask you about QCO28.  Can you tell the jury what

11  the general name of that device is?

12  A.  The particular item here was labeled 1B-61 by the evidence

13  control, and it was a Kyocera cell phone.

14  Q.  Was that an older cell phone?

15  A.  It's a flip type cell phone, yes.

16  Q.  Were you able to access it?

17  A.  The ability to access it remotely through the USB port,

18  after researching it and consulting with engineers at

19  Quantico, all indications were that it did not have an export

20  ability.  So in this particular situation I photographed the

21  screen of that particular Kyocera.

22  Q.  How many photographs did you take of the screen?

23  A.  Many.  It was quite a few, I think approximately 500 --

24  you might be able to give me some guidance here.

25  Q.  Over 500?

AMANDA SIMMONS - DIRECT EXAMINATION

1    A.   Over 500.

2    Q.   So you couldn't access it, so instead of accessing it, you

3    just brought up items on the screen and photographed the

4    screen?

5    A.   That's correct.

6    Q.   I want to ask you about QCO29 and 30.  Those are both CDs

7    as well?

8    A.   Correct.  Those are CD/DVDs.

9    Q.   And consistent with the other CDs, the agents would have

10   been able to access those and determine whether they had any

11   evidentiary value?

12   A.   That is correct.

13   Q.   I'm going to ask you about QCO32.

14   A.   Okay.

15   Q.   Tell the jury what QCO32 was.

16   A.   Bear with me one second.  QCO32 is a laptop.

17   Q.   What was the brand?

18   A.   Let me get the -- a Dell Latitude laptop E-5400.

19   Q.   I'm going to hand you Government Exhibit 192.  Does that

20   have the label on it from your department?

21   A.   It does.

22   Q.   Is that the same item, the Dell Latitude?

23   A.   There's usually a chain of custody that goes with it.  The

24   serial number noted on the outside of this is 5LXX5L1.  And

25   that is the same noted serial number I have on my

AMANDA SIMMONS – DIRECT EXAMINATION

1    documentation.

2    Q.  And did you do a visual inspection of this laptop?

3    A.  I did a visual inspection.  The hard drive had been

4    removed.

5    Q.  Explain to the jury what a hard drive is.

6    A.  The hard drive is actually where the data is stored on a

7    computer.  In that particular situation there it's a

8    two-and-a-half-inch drive.  In other words, it's about two and

9    a half inches wide, or at least the platter on it is.  It fits

10   internally into the machine.  And in that particular situation

11   the hard drive had been removed.

12   Q.  How is a hard drive accessed, at least in this specific

13   device?  How is the hard drive accessed?

14   A.   In that particular situation there, obviously was not able

15   to access that hard drive because it had been removed and was

16   missing.  But the computer reaches out to it through a master

17   boot table.

18   Q.  Let me ask it differently.

19   A.  Okay.

20   Q.  How do you open up the computer to get to where the hard

21   drive should have been?

22   A.  Okay.  Much easier question.  Basically there are screws

23   on the bottom of the computer, on the side of the computer.

24   You remove those screws, if the screws are intact, and you

25   slip the plate off and you'll see where the hard drive is

AMANDA SIMMONS – DIRECT EXAMINATION

1   internally.

2   Q.  Did it appear, at least from your visual inspection, that

3   it had just been taken out of the computer, it wasn't

4   dislodged or anything inside the computer?

5   A.  The hard drive was not with the computer at all.

6   Q.  What does that mean regarding your ability to obtain

7   information off of the computer?

8   A.  In that particular situation we weren't able to obtain any

9   information off of that computer other than some general Bios

10  time dates, which is the basic operating input/output system

11  of that particular computer.  So I wasn't able to get any

12  specific data such as photographs, documents or any other data

13  off that particular device.

14  Q.  Did you try multiple approaches to getting even small

15  amounts of information off of it?

16  A.  I did.  Because a computer did have ram in it, but most

17  ram loses its memory when the computer is turned off.  But in

18  due diligence, we wanted to at least attempt to see if we

19  could get any ram capture off of that particular device.

20  Q.  So although you had this laptop, because it was missing a

21  hard drive, you couldn't obtain any information off of it?

22  A.  I did not, but I did take photographs of the particular

23  screen and so forth.

24  Q.  Okay.  And finally, I think the last thing you looked at

25  was QCO33, that was a Gateway desktop computer?

AMANDA SIMMONS - CROSS-EXAMINATION

1   A.  That particular item was labeled 1B-48 by evidence

2   control, it is a Gateway desktop computer, and the serial

3   number on that particular device is 0016364427.  It had a

4   Quantum hard drive contained in it with a serial number of

5   13392 --

6   Q.  I think just say a Gateway is enough.  That was something

7   also you would have provided the image to agents so they could

8   inspect it for relevant evidence?

9   A.  That is correct.

10  Q.  I believe that is the total of the items you would have

11  analyzed in this case?

12  A.  That is correct.  Approximately 27.

13          MR. WILLIAMS:  Thank you.  No further questions.

14          THE COURT:  Cross-examination.

15                       CROSS-EXAMINATION

16  BY MR. BRUCK:

17  Q.  Good afternoon.

18  A.  Good afternoon.

19  Q.  I just have one thing to ask about.  The files, the

20  photographs that we've seen were -- that you found in the

21  recycling bin, the thumbnails, that suggests that those files

22  had been stored on the hard drive at some point on that

23  computer, at least for some short period of time?  Right?  And

24  then deleted?

25  A.  So what the thumbnail, if the computer opens a folder that

AMANDA SIMMONS - CROSS-EXAMINATION

1    has images in it, it creates a thumbs.DB folder on that
2    particular computer.  And through that, it creates a smaller
3    images in that particular folder.
4    Q.  Right.  So at some point those images were created on that
5    computer or were opened on that computer from some data
6    service, correct?
7    A.  That would be correct.  Or at least they were in a folder
8    that some of those files could have been opened, some of them
9    might not have.
10   Q.  Right.  And then they -- whoever was doing that, if we
11   were to assume for the purposes of my question that Dylann
12   Roof was doing that, at some -- there came a time when he
13   either deleted those images or closed them out or left them so
14   that no one else in the house who had access to that computer
15   would see them, in the normal course, having access to that
16   computer, correct?
17   A.  I can't make the assumption that he did it.  I can tell
18   you that the files were in the recycle bin.
19   Q.  I'm sorry?
20   A.  The files were in the recycle bin.
21   Q.  Right.
22   A.  Files were in other locations, as noted in those reports.
23   Q.  Right.  I guess all I'm asking is those files weren't left
24   where anyone else in the house would have easily seen them by
25   looking at that computer.

AMANDA SIMMONS - CROSS-EXAMINATION

1   A.   They were in the recycle bin.  So when it goes into the

2   recycle bin, they could have seen them.

3   Q.   Right.  And it's very common for people not to get that

4   when you delete something, it goes into the recycle bin and

5   can be retrieved, it doesn't mean that it's gone.  Right?

6   A.   That's correct.  It doesn't mean it's gone.  But they were

7   in the recycle bin.

8           MR. BRUCK:  That's all.  Thank you.

9           THE COURT:  Anything on redirect?

10          MR. WILLIAMS:  No, Your Honor.

11          THE COURT:  You may step down.  Ladies and gentlemen,

12  it's 5:00 o'clock.  I think we've had a full day today; what

13  do you think?

14      I want to remind you of a few things.  First of all, that

15  you are not to discuss this case with anyone.  That you're not

16  to access any media of any type, TV, newspapers, et cetera.

17  And that you are not to access any social media.

18      Be safe.  I'll see you 9:30 tomorrow morning.  Thank you.

19      (Jury excused.)

20          THE COURT:  Mr. Richardson, do you want to give me a

21  little forecast for tomorrow?

22          MR. RICHARDSON:  Beg the Court's indulgence, Your

23  Honor.  Tomorrow morning we will follow up Miss Simmons with

24  her colleague who did some additional evaluation, not quite as

25  much, so I think it will be a little bit quicker.

1      THE COURT:  We don't need, by the way, the serial

2  numbers of every hard drive.

3      MR. RICHARDSON:  I understand that; however, these

4  are witnesses that are very detail oriented.

5      THE COURT:  I get that.

6      MR. RICHARDSON:  I can assure you that we are not

7  eliciting that information, but when you have --

8      THE COURT:  I saw Mr. Williams trying to stop her

9  several times.

10      MR. RICHARDSON:  That is the benefit, but also that

11  comes with who they are.

12    We then will learn a little bit from Mr. Krull about GPS

13  technology as it relates to the Garmin device.  We will hear

14  from a couple of records custodians from AT&T and First

15  Citizens.  And then we will hear from four-ish law enforcement

16  officers who were involved in searches and captures of other

17  information and data.  We then have two additional -- the

18  order may change a little -- two additional records custodians

19  who will address those issues.  At that point we'll sort of be

20  through this portion of the case.  We will then get into

21  special Agent Hamski who will have some time, as you can tell,

22  tying a few of these pieces together and putting one with the

23  next.  And then we'll have the medical examiner who will

24  testify, and then we'll close with Miss Polly Sheppard.

25      THE COURT:  Now, is it possible that some of these

 1    records custodians we can get stipulations on those, or is

 2    there a particular need to have live witnesses?

 3           MR. RICHARDSON:  We provided stipulations to the

 4    defense some time ago; we've been informed that they will not

 5    stipulate to any of that information.

 6           THE COURT:  That's their right.

 7           MR. RICHARDSON:  Absolutely.

 8           THE COURT:  9:30 tomorrow morning.

 9           MR. RICHARDSON:  Thank you, Your Honor.

10           MR. BRUCK:  If Your Honor please, if we could

11    approach about a couple of privacy-related issues, get them

12    squared away.

13           THE COURT:  I'll be glad to.  You can approach.

14      (Following discussion held at side bar.)

15           MR. BRUCK:  A couple of things.  We've reached an

16    agreement with the Government to delete some identifying

17    information that was raised the other day.  The first of those

18    are the address of Ben Roof from the transcript before it's

19    finalized.

20           MR. RICHARDSON:  We agree to redact it.  Typically we

21    do that with transcripts; we're happy to agree to redact that.

22           THE COURT:  Okay.  Good.

23           MR. BRUCK:  Also the name of Mr. Roof's -- Ben Roof's

24    minor child that was mentioned in the --

25           MR. RICHARDSON:  Happy to redact that.

1          MR. BRUCK:  A similar thing arose today in the -- in

2    GX238 and 239 includes the home address of Mr. Roof's mother.

3    It's his home address, but it's also his mother's home

4    address, that is, and if those exhibits --

5          THE COURT:  Will y'all work on that?

6          MR. RICHARDSON:  I believe, and I'll confirm that,

7    but I've been told by Miss Baker, and Miss Baker says it's

8    true, then I believe it, that those addresses have already

9    been redacted in the copies that were provided to the Court

10   for upload.

11         MR. BRUCK:  239 as well as the one I put in?

12         MR. RICHARDSON:  I believe 238 and 239, the copies we

13   provided to you, we went ahead and redacted addresses off them

14   for that purpose.  This was a week ago when we provided them.

15   If you don't mind checking that.  I believe it to be true, but

16   if not, we can get you a new copy of those.

17         MR. BRUCK:  That takes care of it.

18         THE COURT:  Mr. Bruck, again, you've got every right

19   to put them to their proof, but just review, to the extent

20   it's of no prejudice to your client.

21         MR. RICHARDSON:  At this point, Your Honor, these

22   individuals have literally flown, one is on a red eye flight

23   tonight from Hawaii to be here at 10:00 a.m. in the morning.

24   I think it would be a difficult situation for us to tell them,

25   despite their heroic efforts to be here, that now we're going

1    to not call them.

2              THE COURT:  We'll put them up.

3         (Side bar discussion concluded.)

4              THE COURT:  Hearing's adjourned.

5

6         (Court adjourned at 5:05 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      REPORTER'S CERTIFICATION

2

3          I, Debra L. Potocki, RMR, RDR, CRR, Official Court

4    Reporter for the United States District Court for the District

5    of South Carolina, hereby certify that the foregoing is a true

6    and correct transcript of the stenographically recorded above

7    proceedings.

8

9

10

   S/Debra L. Potocki

11   _____

12   Debra L. Potocki, RMR, RDR, CRR

13

14

15

16

17

18

19

20

21

22

23

24

25