**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 17-3**

───────────────

UNITED STATES OF AMERICA,

                Plaintiff – Appellee,

     v.

DYLANN STORM ROOF,

                Defendant – Appellant.

------------------------------

AUTISTIC SELF ADVOCACY NETWORK; AUTISTIC WOMEN & NONBINARY NETWORK,

              Amici Supporting Appellee.

───────────────

Appeal from the United States District Court for the District of South Carolina, at Charleston. Richard Mark Gergel, District Judge. (2:15-cr-00472-RMG-1)

───────────────

Argued: May 25, 2021                      Decided: August 25, 2021

───────────────

Before Duane BENTON, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation, Kent A. JORDAN, Circuit Judge of the United States Court of Appeals for the Third Circuit, sitting by designation, and Ronald Lee GILMAN, Senior Circuit Judge of the United States Court of Appeals for the Sixth Circuit, sitting by designation.[1]

───────────────

[1] Because all members of the United States Court of Appeals for the Fourth Circuit

————————————

Affirmed by published per curiam opinion.

————————————

**ARGUED:** Sapna Mirchandani, Greenbelt, Maryland, Margaret Alice-Anne Farrand, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Los Angeles, California; Alexandra Wallace Yates, Concord, Massachusetts, for Appellant. Ann O'Connell Adams, Bonnie I. Robin-Vergeer, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Amy M. Karlin, Interim Federal Public Defender, Los Angeles, California, James Wyda, Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Baltimore, Maryland, for Appellant. Brian C. Rabbitt, Acting Assistant Attorney General, Robert A. Zink, Acting Principal Deputy Assistant Attorney General, Criminal Division, Eric S. Dreiband, Assistant Attorney General, Alexander V. Maugeri, Deputy Assistant Attorney General, Thomas E. Chandler, Brant S. Levine, Appellate Section, Civil Rights Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Peter M. McCoy, Jr., United States Attorney, Columbia, South Carolina, Nathan S. Williams, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, South Carolina, for Appellee. Samantha A. Crane, Kelly Israel, AUTISTIC SELF ADVOCACY NETWORK, Washington, D.C., for Amicus Autistic Self Advocacy Network. Lydia Brown, AUTISTIC WOMEN AND NONBINARY NETWORK, Lincoln, Nebraska, for Amicus Autistic Women and Nonbinary Network.

————————————

## TABLE OF CONTENTS

I.     Overview ......................................................................................... 5

II.    Background...................................................................................... 6

   A.   The Crime ............................................................................... 6

   B.   Arrest, Confession, and Evidence Collection ....................... 6

   C.   Indictment and Trial............................................................... 8

   D.   Appeal ................................................................................... 10

III.   Issues Related to Competency..................................................... 10

   A.   Competency Background...................................................... 11

     1.   First Competency Hearing............................................. 12

—————

are recused in this case, a panel of judges from outside the Circuit was appointed for this appeal pursuant to 28 U.S.C. §§ 291, 294.

2.  Second Competency Hearing ............................................................ 19

B.  Issue 1: The District Court Did Not Clearly Err in Finding Roof Competent to Stand Trial ............................................................................................ 24

C.  Issue 2: The District Court Did Not Abuse Its Discretion by Granting Only in Part Defense Counsel's Request for a Continuance of the First Competency Hearing .............................................................................. 31

D.  Issue 3: The District Court Did Not Abuse Its Discretion by Limiting Evidence Allowed at the Second Competency Hearing....................................... 33

IV.  Issues Related to Self-Representation ................................................ 36

A.  Self-Representation Background ....................................................... 37

B.  Issue 4: Under *McCoy v. Louisiana*, Preventing the Presentation of Mental Health Evidence Cannot Be the "Objective" of a Defense ................ 43

C.  Issue 5: A Defendant Has a Sixth Amendment Right to Represent Himself During His Capital Sentencing...................................................... 48

D.  Issue 6: Neither the Constitution nor the Federal Death Penalty Act Requires that Mitigation Evidence Be Presented During Capital Sentencing over a Defendant's Objection........................................................... 53

E.  Issue 7: Roof's Waiver of Counsel Was Knowing, Voluntary, and Intelligent .. 58

1.  Legal Standard.................................................................. 58

2.  Roof Was Appropriately Aware of His Role and Responsibilities.................. 59

3.  The District Court Need Not Have Informed Roof of the Ability to Selectively Use Counsel for Different Parts of the Case ........................................ 62

F.  Issue 8: The District Court Did Not Err in Granting Roof's Motion to Waive Counsel ............................................................................................ 63

G.  Issue 9: The District Court Did Not Err in Finding Roof Competent to Self-Represent ........................................................................................ 65

H.  Issue 10: The District Court Did Not Err in Denying Roof Further Assistance from Standby Counsel or Additional Accommodations ................... 68

1.  Standby Counsel.................................................................. 68

2.  Accommodations.................................................................. 69

V.  Issues Related to Death Verdict ........................................................ 70

A.  Death Verdict Background ................................................................ 70

1.  Aggravating and Mitigating Factors................................................ 70

2.  Penalty Phase ................................................................... 73

3.  Jury Deliberations................................................................ 76

   B.    Issue 11: The Court Did Not Improperly Preclude Roof from Presenting Mitigating Evidence ...................................................................... 78

     1.   The Precluded Mitigating Factors and Evidence of Prison Conditions ............ 78

     2.   The Prosecutor's Remarks at Closing Argument ................................. 82

     3.   The Court's Response to Jury Notes .................................................. 85

   C.    Issue 12: Isolated Witness Testimony Describing Roof as "Evil" and Stating that He Would Go to "the Pit of Hell" Did Not Render the Trial Fundamentally Unfair ................................................................... 86

     1.   The Testimony in Question ............................................................. 87

     2.   Standard of Review ...................................................................... 88

     3.   The Merits of Roof's Claims .......................................................... 90

   D.    Issue 13: Neither the Admission of Victim-Impact Evidence nor the Prosecution's Closing Argument Violated Roof's Constitutional Rights.......... 92

     1.   Victim-Impact Evidence ................................................................ 93

   E.    Issue 14:  Roof's Death Sentence Is Not Cruel and Unusual Punishment Under the Eighth Amendment ................................................................. 96

     1.   Age .......................................................................................... 97

     2.   Mental Incapacity ...................................................................... 100

VI.     Issues Related to Guilt Verdict ............................................................ 100

   A.    Issue 15: Roof's Commerce Clause Challenges to the Religious-Obstruction Statute Do Not Require Reversal of Those Convictions .................................. 101

     1.   The Religious-Obstruction Statute Is Facially Valid ........................ 105

     2.   The Religious-Obstruction Statute Is Valid as Applied to Roof .................... 109

     3.   The Jury Instructions Were Proper ................................................ 115

   B.    Issue 16: The Religious-Obstruction Statute Does Not Require Proof of Religious Hostility .................................................................. 119

   C.    Issue 17: Congress Did Not Exceed Its Thirteenth Amendment Authority in Enacting the Hate Crimes Prevention Act, 18 U.S.C. § 249 ........................ 120

     1.   Hate Crimes Background .............................................................. 120

     2.   The HCPA Is Appropriate Legislation Under Controlling Thirteenth Amendment Precedent ................................................................. 122

   D.    Issue 18: The Attorney General Did Not Erroneously Certify Roof's Federal Prosecution ............................................................................ 130

     1.   Certification Background .............................................................. 130

     2.   The AG Did Not Erroneously Certify Roof's Federal Prosecution ................ 131

E.  Issue 19: Roof's 18 U.S.C. § 924(j)(1) Firearm Convictions Are Valid ........... 133

    1.  Firearm Offense Background  ........................................................ 133

    2.  Legal Framework ........................................................................... 134

    3.  "Crime of Violence" Jurisprudence ............................................. 137

    4.  "Death Results" Offenses Under § 249(a)(1) Are Crimes of Violence ........... 139

    5.  "Death Results" Offenses Under § 247(a)(2) Are Crimes of Violence .......... 143

VII.  Conclusion ....................................................................................... 149

PER CURIAM:

## I.  OVERVIEW

In 2015, Dylann Storm Roof, then 21 years old, shot and killed nine members of the historic Emanuel African Methodist Episcopal Church ("Mother Emanuel") in Charleston, South Carolina during a meeting of a Wednesday night Bible-study group.  A jury convicted him on nine counts of racially motivated hate crimes resulting in death, three counts of racially motivated hate crimes involving an attempt to kill, nine counts of obstructing religion resulting in death, three counts of obstructing religion involving an attempt to kill and use of a dangerous weapon, and nine counts of use of a firearm to commit murder during and in relation to a crime of violence.  The jury unanimously recommended a death sentence on the religious-obstruction and firearm counts, and he was sentenced accordingly.  He now appeals the convictions and sentence.  Having jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3595(a), we will affirm.[2]

---

[2] The present panel is sitting by designation, but because we are applying Fourth Circuit law, and for ease of reference, we take the liberty of speaking in the first-person plural.

## II.    BACKGROUND

### A.    The Crime

On June 17, 2015, twelve parishioners and church leaders of Mother Emanuel—all African Americans—gathered in the Fellowship Hall for their weekly Bible-study. Around 8:16 p.m., Roof entered the Fellowship Hall carrying a small bag that concealed a Glock .45 semi-automatic handgun and eight magazines loaded with eleven bullets each. The parishioners welcomed Roof, handing him a Bible and a study sheet.

For the next 45 minutes, Roof worshipped with the parishioners. They stood and shut their eyes for closing prayer. Roof then took out his gun and started shooting. Parishioners dove under tables to hide. Roof continued shooting, reloading multiple times. After firing approximately seventy-four rounds, Roof reached one parishioner who was praying aloud. He told her to "shut up" and then asked if he had shot her yet. (J.A. at 5017.) She said no. Roof responded, "I'm going to leave you here to tell the story." (J.A. at 5017.) Roof left the church around 9:06 p.m. When police arrived, seven of the twelve parishioners were dead. Two others died soon after. Roof killed Reverend Sharonda Coleman-Singleton, Cynthia Hurd, Susie Jackson, Ethel Lee Lance, Reverend Depayne Middleton-Doctor, Reverend Clementa Pinckney, Tywanza Sanders, Reverend Daniel Simmons, Sr., and Reverend Myra Thompson.

### B.    Arrest, Confession, and Evidence Collection

Police began searching for Roof, publicizing photos and setting up a phone bank. Acting on a tip the next morning, officers in Shelby, North Carolina stopped Roof's car. Roof complied with their directions, identified himself, admitted involvement in the

shooting, and said that there was a gun in his backseat.  Officers took Roof to the Shelby police station, where he agreed to speak with FBI agents.

After obtaining a written *Miranda* waiver, two FBI agents interviewed Roof for about two hours.  He confessed: "Well, I did, I killed them."  (J.A. at 4265.)  He also laughingly stated, "I am guilty. We all know I'm guilty."  (J.A. at 4308.)  He explained that he shot the parishioners with a Glock .45 handgun he had bought two months earlier.  Calling himself a "white nationalist," he told agents that he "had to do it" because "black people are killing white people every day" and "rap[ing] white women."  (J.A. at 4269, 4282.)  The agents asked whether he was trying to start a revolution.  Roof responded, "I'm not delusional, I don't think that[,] you know, that something like what I did could start a race war or anything like that."  (J.A. at 4284.)  Later in the interview, however, he agreed that he was trying to "bring . . . attention to this cause" and "agitate race relations" because "[i]t causes friction and then, you know, it could lead to a race war."  (J.A. at 4301, 4329-30.)  Roof explained that he targeted Charleston for his attack because of its historic importance and, after researching African American churches in Charleston on the internet, he chose to attack parishioners at Mother Emanuel because of the church's historic significance.  At one point in the interview, he said, "I regret doing it a little bit" because "I didn't really know what I had, exactly what I've done."  (J.A. at 4302-03.)  But his meticulous planning for the murder spree contradicts that statement.  During his pre-attack planning, in addition to researching Mother Emanuel on the internet, Roof visited Mother Emanuel and learned from a parishioner that a Bible-study group met on Wednesday nights.

He also used the internet to propagate his racist ideology. In a journal that the police found in Roof's home, Roof had written the name of a website he had created. The website was hosted by a foreign internet server, to which Roof made monthly payments. Hours before the shootings, Roof uploaded racist material to the website. The website included hyperlinks to text and photos. The text linked to a document where Roof expressed his virulent racist ideology, claimed white superiority, and called African Americans "stupid and violent." (J.A. at 4623-27.) He discussed black-on-white crime, claiming it was a crisis the media ignored. He issued a call to action, explaining that it was not "too late" to take America back and "by no means should we wait any longer to take drastic action." (J.A. at 4625.) He stated that nobody was "doing anything but talking on the internet," that "someone has to have the bravery to take it to the real world," and "I guess that has to be me." (J.A. at 4627.)

### C.    Indictment and Trial

The day after the shootings, the state of South Carolina charged Roof with nine counts of murder, three counts of attempted murder, and one weapon-possession count. About a month later, Roof was indicted in the United States District Court for the District of South Carolina with the crimes at issue in this case: Counts 1 through 9, racially motivated hate crimes resulting in death, in violation of 18 U.S.C. § 249(a)(1); Counts 10 through 12, racially motivated hate crimes involving an attempt to kill, in violation of 18 U.S.C. § 249(a)(1); Counts 13 through 21, obstructing religious exercise resulting in death, in violation of 18 U.S.C. § 247(a)(2) and (d)(1); Counts 22 through 24, obstructing religious exercise involving an attempt to kill and use of a dangerous weapon, in violation

of 18 U.S.C. § 247(a)(2), (d)(1), and (d)(3); and Counts 25 through 33, use of a firearm to commit murder during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c) and (j). Both the state and the federal governments gave notice of their intention to seek the death penalty.

The district court appointed an attorney with extensive capital-case experience as lead counsel for Roof. Before trial, Roof moved to dismiss the indictment on several grounds. He argued that the religious-obstruction statute, 18 U.S.C. § 247(a)(2), exceeds Congress's Commerce Clause authority, and that the hate-crime statute, 18 U.S.C. § 249(a)(1), exceeds Congress's Thirteenth Amendment power. He also argued that neither is a predicate "crime of violence" under the federal firearm statute, 18 U.S.C. § 924(c), and that the Attorney General had erroneously certified Roof's prosecution under 18 U.S.C. § 249. The court denied the motion and rejected Roof's alternative argument that the religious-obstruction charges were improper because he did not act in interstate commerce.

Roof offered to plead guilty in exchange for a sentence of life without parole. The federal government declined. The court entered a not guilty plea on Roof's behalf and set trial for November 7, 2016.[3] As trial approached, the court ruled on a number of issues,

---

[3] The plea was entered pursuant to this colloquy:

DEFENSE COUNSEL: Mr. Roof has told us that he wishes to plead guilty. However, the Government has not yet decided whether it is going to seek the death penalty. And we understand that that process takes some time, takes some time for the Government to make that determination. Until we know whether the Government will be asking for the death penalty, we are not able

described below.  Trial began on December 7, 2016, and lasted until December 15, 2016, when the jury rendered its verdict, finding Roof guilty on all counts.

### D.    Appeal

Roof now appeals four broad categories of issues: (1) his competency to stand trial and issues relating to his competency hearings; (2) his self-representation; (3) alleged errors in the penalty phase of the trial; and (4) alleged errors in the guilt phase of the trial, including whether the charging statutes are unconstitutional.  We must "address all substantive and procedural issues raised on the appeal of a sentence of death, and shall consider whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor and whether the evidence supports the special finding of the existence of an aggravating factor required to be considered under section 3592."[4]  18 U.S.C. § 3595(c)(1).

## III.    ISSUES RELATED TO COMPETENCY

We first address Roof's challenges to his competency to stand trial and issues relating to his competency hearings.  Specifically, Roof argues: first, that the district court erred in finding him competent to stand trial; second, that the district court abused

---

to advise Mr. Roof to enter a plea of guilty.  And for that reason, we understand that the Court will enter a plea on his behalf.

THE COURT: I'll just direct that a plea of not guilty be entered at this time for the defendant, based on your comment to the Court.

(J.A. at 77.)

[4] The aggravating factors found by the jury are described *infra* note 34 and Section V.A.3.  We agree that the evidence supports the jury's findings.

its discretion by refusing to grant a continuance ahead of the first competency hearing; and third, that the district court abused its discretion by limiting evidence allowed at the second competency hearing. We disagree and discern no merit in Roof's contentions.

## A.    Competency Background

Before trial, defense counsel gave notice of their intent to call an expert on Roof's mental health at the penalty phase. The government then obtained permission to have its own expert, Dr. Park Dietz, examine Roof. During a visit with Dr. Dietz, Roof learned for the first time that his lawyers intended to call an autism expert to say that Roof was on the autism spectrum. The news upset him. He underwent a "substantial mood change" and became "oppositional." (J.A. at 538, 544.) Soon after, he sent a letter to the prosecution, accusing his attorneys of misconduct. He said, "what my lawyers are planning to say in my defense is a lie and will be said without my consent or permission." (J.A. at 587.) He believed that his lawyers were "extremely moralistic about the death penalty" and that they "have been forced to grasp at straws" because he "ha[s] no real defense," or at least "no defense that my lawyers would present or that would be acceptable to the court." (J.A. at 589.)

Learning of the letter shortly before trial, defense counsel requested an ex parte hearing. The next day, defense counsel requested a competency hearing. On November 7, before ruling on competency, the court held the requested hearing and questioned Roof about the letter. Roof explained that he was unwilling to allow mental health mitigation evidence because "if the price is that people think I'm autistic, then it's not worth it" and "[i]t discredits the reason why I did the crime." (J.A. at 629, 632.) Defense counsel stated

that they had considered Roof's perspective but determined, in their professional judgment, that presenting the evidence was in Roof's best interest.

### 1. First Competency Hearing

Following the ex parte hearing, the court delayed the first day of individual voir dire and ordered a competency hearing. To conduct a competency evaluation, it appointed Dr. James C. Ballenger—"one of the nation's most renowned and respected psychiatrists," and the chair of the Department of Psychiatry and Behavioral Sciences at the Medical University of South Carolina for seventeen years. (J.A. at 2068.) Although Dr. Ballenger had extensive experience as a psychiatrist, this was his first pretrial competency examination. Dr. Ballenger submitted his report on November 15. Defense counsel asked that the court postpone the competency hearing, scheduled for November 17, until November 28, for three primary reasons: (1) defense counsel was "utterly unprepared to engage on such short notice the factual, ethical, legal, and forensic science issues raised by 92 pages of psychiatric and psychological reports"; (2) Roof disagreed with defense counsel's mental health mitigation defense, which led to a breakdown in the attorney-client relationship, especially on competency issues; and (3) the mental health experts lacked sufficient time to reliably evaluate Roof's competency. (J.A. at 773.) They also argued that Dr. Ballenger's report failed to address a central issue—autism spectrum disorder ("ASD"). Furthermore, the defense's autism expert, Dr. Rachel Loftin, was out of the country until November 28 and could not finalize her report in time.

To provide adequate time for the defense to prepare, the court rescheduled the competency hearing for November 21. On the first day of the hearing, defense counsel

moved for another week's continuance because they still felt "unprepared to proceed" and several of their witnesses were unavailable to testify in person.  (J.A. at 894-95.)  The court denied the request, finding it "not credible" that they were not prepared.  (J.A. at 895-96.)  It offered to allow the defense experts to appear remotely.

Dr. Ballenger testified first.  He had met with Roof three times for a total of eight hours.  Dr. Ballenger also spoke with the defense team for one hour and forty-five minutes to listen to their experience working with Roof.  He opined that Roof was competent to stand trial, noting that "he does not have difficulty in understanding the procedures that he is involved in" and that "there is evidence that he can" assist counsel.  (J.A. at 908-09.)  He noted that Roof's full-scale IQ of 125 and verbal IQ of 141 placed him in the 96th and 99.7th percentile of the population, respectively.[5]  Dr. Ballenger believed that Roof understood the proceedings better than the average defendant and that it was "very clear" he had the ability to cooperate with his attorneys, should he so desire.  (J.A. at 908-09, 915.)  According to Dr. Ballenger, Roof's unwillingness to cooperate was not the result of "widespread psychosis," but rooted in "a deep seated racial prejudice" that Roof did not want "blurred" by a mental health defense.  (J.A. at 909, 913-15, 1346.)  Dr. Ballenger testified that Roof likely suffers from social anxiety disorder and schizoid personality disorder and that Roof might have some autistic spectrum traits but does not suffer from a psychotic process.  Defense counsel pressed Dr. Ballenger on what the defense perceived to be his failure to fully consider the effects of Roof's alleged ASD.  Dr. Ballenger

---

[5] The record indicates that Roof's full-scale IQ score is in the 95th percentile.

explained that the pertinence of any ASD diagnosis was already captured in his evaluation of Roof's mental state and ability to assist counsel as required under the competency standard.

After Dr. Ballenger, the court heard live testimony from three defense witnesses: an examining forensic psychiatrist, Donna S. Maddox, M.D.; a psychologist, William J. Stejskal, Ph.D.; and an autism expert, Laura Carpenter, Ph.D. The court also accepted affidavits from three other defense witnesses: an autism expert who had examined Roof, Rachel Loftin, Ph.D.; a professor diagnosed with ASD who had met with Roof and defense counsel, Mr. John Elder Robison; and a psychologist who had commented on the limitations of personality testing, John F. Edens, Ph.D.

The forensic psychiatrist, Dr. Maddox, had met with Roof nine times for a total of about twenty-five hours (seven times before Roof complained of his attorneys' supposed misconduct and two times after). Referencing the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition (DSM-5), Dr. Maddox believed that Roof suffers from "autism spectrum disorder," "other specified schizophrenia spectrum disorder and other psychotic disorder," and "other specified anxiety disorder." (J.A. at 1486, 5243.) She based those opinions on her observations that Roof used pedantic speech, which she associated with ASD; that he exhibited "disorganized thinking" and inappropriate/constricted affect; that he lacked "insight that he has a psychotic thought process"; that he has a history of somatic delusions that cause him to believe that his head is lopsided, that his hair is falling out, and that all of his testosterone pooled to the left side of his body; that he exhibited "paranoid beliefs" about defense counsel, such as trying to

discredit him and ultimately have him killed; and that he displayed "transient symptoms of psychosis." (J.A. at 1491, 1497, 1500-01, 1503-06, 1514-15, 1537.) Dr. Maddox stated that she did not believe Roof had the capacity to understand the proceedings or assist counsel because he had stated multiple times that even if he were sentenced to death, he would not be executed. In sum, she concluded that Roof was not competent to stand trial.

Dr. Stejskal, a psychologist, had met with Roof for about one hour and forty-six minutes over two days. He opined that Roof was "in the prodromal phase of an emerging schizophrenic spectrum disorder,"[6] but was "not yet fully possessed of a delusional disorder." (J.A. at 1690-91.) Dr. Stejskal offered no "settled conclusion" as to how that diagnosis affected Roof's competency, stating only "I certainly have concerns." (J.A. at 1668-69, 1690.) Although he did not have firsthand information about Roof's beliefs, Stejskal was concerned that Roof might make decisions based on "potentially delusional beliefs" that he would be liberated from prison. (J.A. at 1698-1700.) He believed that Roof was motivated and intelligent enough to mask his irrational beliefs by telling the court that he believed his chance of liberation was low. Dr. Stejskal testified that Roof was "trying to look bad" by selecting antisocial features during personality testing while also "denying psychopathology." (J.A. at 1701, 1709-10.) But he acknowledged that Roof scored within the normal range on the Positive Impression Management Scale, which detects whether a person is trying to portray themselves in an unrealistically positive way.

---

[6] Prodrome is "[a]n early or premonitory manifestation of impending disease before the specific symptoms begin." *Prodrome*, McGraw-Hill Dictionary of Scientific and Technical Terms (6th ed. 2003).

He did not opine on Roof's competency. He also noted that Roof exhibited reduced processing speed and a low working memory index.

Dr. Carpenter, an autism expert, had not examined Roof and did not opine on his competency. She testified instead about common traits associated with ASD, including how it affects social communication and the ability to form relationships and understand social rules. Dr. Carpenter was unable to offer an opinion on whether ASD would disrupt Roof's ability to assist counsel. Referencing the affidavit of Professor Robison, Dr. Carpenter noted that Roof's supposed belief that he was going to be pardoned was concerning and "those types of irrational beliefs are not necessarily just due to autism and might suggest that something else was going on here as well." (J.A. at 1638.)

Dr. Loftin, an autism expert, had met with Roof three times. Testifying by affidavit, she opined that Roof has ASD. He had told her that he was "not afraid of receiving a death sentence" because he anticipated being "rescued by white nationalists after they take over the government." (J.A. at 1774.) She also noted that Roof had psychiatric symptoms not explained by ASD, including anxiety, depression, suicidal ideation, obsessive-compulsive symptoms, disordered thinking, and, as manifestations of psychosis, delusions of grandeur and somatic delusions. She believed that his symptoms were "consistent with the schizophrenia spectrum" but that it was "too early to predict his psychiatric trajectory." (J.A. at 1774.) Dr. Loftin did not opine directly on Roof's competency.

Professor Robison, a professor who himself has ASD, had met with Roof. By affidavit, he testified that some of Roof's traits are common in people with ASD: inappropriate facial expressions, developmental delay, and unusual preoccupation with

things like clothing. Professor Robison stated that Roof had asked him not to testify, asserting that he was going to be pardoned in four or five years anyway. To Professor Robison, that "seemed delusional," a trait distinct from ASD. (J.A. at 1823-24.) He also listed concerns about Roof's ability to assist in his own defense, including Roof's apparent extreme sensory sensitivities, problems with executive functioning, and possible cognitive overload from the stress of trial.

Dr. Edens, a psychologist and lead author of a personality-assessment test similar to one that Roof took, had not examined Roof, but testified by affidavit about his review of Dr. Ballenger's report. Dr. Edens raised concerns about Dr. Ballenger's interpretation of Roof's personality tests, concluding, "I believe there are significant problems with how the . . . findings have been interpreted in this case, particularly in regards to Dr. Ballenger's claims that they provide 'absolutely no evidence of psychosis.'" (J.A. at 1783.)

The court also heard from Roof. Roof confirmed his understanding that he would likely be executed if sentenced to death. When the court asked whether Roof thought that he would be rescued from the death penalty by white nationalists, he responded that "[a]nything is possible," but he understood that the chance of rescue was "extremely unlikely" and "[l]ess than half a percent." (J.A. at 1729-30.)

Roof also confirmed his ability to communicate with his lawyers, clarifying that he limited communication because he disagreed with their mitigation strategy. He stated that he did not want to introduce mental health evidence because it would discredit his act, which he argued was an attempt to increase racial tension and contribute to a potential white nationalist revolution. Roof also noted his disagreement with parts of Dr. Ballenger's

17

report, stating that he had never claimed that he wanted to be seen as a hero or that he wanted to preserve his reputation as "a perfect specimen." (J.A. at 1733, 1741.) Rather, Roof explained that he wanted to avoid institutionalization and forced medication.

Following the two-day competency hearing, the district court determined that Roof was competent to stand trial. Although the court viewed the defense experts' testimony on ASD as relevant mitigation evidence, it did not believe that the defense experts had shown that Roof's possible ASD would affect his understanding of the proceedings or his ability to assist counsel. The court also noted that Dr. Maddox was the only defense witness who opined on Roof's competency and acknowledged Dr. Maddox's concern that Roof believed white nationalists would save him from a death sentence. But both the court and Dr. Ballenger closely questioned Roof on that issue and Roof confirmed his understanding that a death sentence would likely result in his death. The court disagreed with defense counsel's objections to Dr. Ballenger's experience, stating that Dr. Ballenger's assessment was superior to most competency evaluations in terms of "thoroughness, insight, and analysis." (J.A. at 2068-69 n.2.) It also relied on Roof's confirmation that his dispute with his attorneys was because he opposed their mental health mitigation strategy, as well as his confirmation that he could communicate with them if he so chose. According to the court, Roof's demeanor during the competency hearing "suggested . . . no psychosis or severe mental distress" and "raised not the slightest question or concern regarding his competency to stand trial." (J.A. at 2078.)

### 2. Second Competency Hearing

After the guilt phase of the trial, Roof advised the court that he wished to represent himself during the penalty phase. That reaffirmed a position he took after jury selection, when he switched from self-representation to being represented by counsel but argued for a right to revert to self-representation for the penalty phase of the trial. On December 29, 2015, before the penalty phase began, standby counsel challenged Roof's competency to stand trial or to represent himself during the penalty phase. Standby counsel stated that "facts developed since the [first] competency hearing" supported a finding that Roof was by then incompetent. (J.A. at 5242.) Standby counsel expressed concern that Roof had decided to forego substantial mitigation evidence, and they believed that Roof would not defend himself during the penalty phase because he wanted to prevent the release of his mental health information. They described Roof's preoccupation with his clothing and other odd behavior during trial. Their competency motion included exhibits from four experts, three of whom had testified or submitted affidavits at the first competency hearing but had since completed additional reports. The three who had provided earlier opinions were Dr. Loftin, the examining autism expert; Dr. Maddox, the examining forensic psychiatrist; and Professor Robison, the professor with ASD. Opining for the first time was Dr. Paul J. Moberg, Ph.D., a neuropsychiatrist who had evaluated Roof three times in February 2016. Standby counsel requested consideration of the reports, "which did not yet exist at the time of the competency proceedings in November." (J.A. at 5243-44.)

In "an abundance of caution," the district court ordered Dr. Ballenger to re-examine Roof and set a hearing for January 2, 2017. (J.A. at 5463-64.) The court advised the parties

that it would "only hear evidence related to any developments since the November 21-22, 2016 hearing." (J.A. at 5463.) Standby counsel requested a one-week continuance to allow more time for Dr. Ballenger and defense experts to meet with Roof. The court denied the motion, stating that the scope of the hearing was limited; it was not a "redo" of the first hearing. (J.A. at 5470-71.)

At the beginning of the hearing, the court stated that the "law of the case is that as of November 22nd, 2016, the defendant was competent. If there is any material change since then, I want to hear about it. No witness is going to be talking about something before that date because the law of the case is already established." (J.A. at 5519-20.) Standby counsel objected to that limitation, arguing that it would preclude evidence of Roof's history of delusions and other psychotic symptoms evidenced by the now-completed reports of multiple defense experts. The court disagreed.

Dr. Ballenger testified first. The week prior, he had met with Roof for a total of five hours over two days, completed his evaluation, and wrote a second report. He testified that he had read standby counsel's competency motion and exhibits and had "thoroughly" discussed the issues with Roof. (J.A. at 5533; *see also* J.A. at 5978-79.) Dr. Ballenger opined that Roof still understood the issues and could assist counsel if he so desired. However, he explained that Roof was unwilling to assist his attorneys because he "wants the right message to get out and not have it besmirched or muddied by saying that he did it because he was psychotic or had somatic delusions or was autistic, but that it simply be a political act." (J.A. at 5537, 5543, 5979-80, 5992.) Dr. Ballenger testified that mental illness did not control Roof's decision-making; that Roof's decision to reject mental health

20

evidence was instead a logical extension of his political and social beliefs.  In support, Dr. Ballenger noted that Roof compared himself to a terrorist who successfully murdered people as a "purely political act."  (J.A. at 5539-40, 5982, 5985.)

Dr. Ballenger testified that people might project mental illness onto Roof because they cannot comprehend the depth of his racist views.  He also testified that any autistic traits did not affect Roof's competency.  Dr. Ballenger had questioned Roof again on his alleged belief that he would not be executed if sentenced to death, and Roof explained that he thought there was a "greater than 50% chance" he would receive the death penalty.  (J.A. at 5546-47, 5981.)  Although Roof had said that he hoped the death penalty will be abolished, he had laughed when Dr. Ballenger spoke about white nationalists rescuing him from prison.  Dr. Ballenger believed that Roof was "mess[ing] with people" when he said that, and that Roof did not have "a shred of doubt" that he faced a real risk of death.  (J.A. at 5547, 5584, 5598.)  Considering whether Roof's denials of incompetence should influence his competency determination, Dr. Ballenger stated: "[E]very part of my examination beginning to the end was a test of his competency to stand trial.  And . . . I didn't find any significant problem with his competence to stand trial and defend himself."  (J.A. at 5544.)  As the court stated, Dr. Ballenger "systematically [went] through each of those issues that had been raised in the motion" and concluded that "there was no change" in Roof's "capacity to understand the issues and to assist his attorneys."  (J.A. at 5535.)

Defense counsel moved to submit the newly completed reports from their experts, none of whom had examined Roof since the first competency hearing.  The court admitted

the written reports but limited testimony to evidence arising after the first competency hearing.[7]

Dr. Loftin, the autism expert, testified and explained that she had observed (on video) traits consistent with attenuated psychosis and ASD. She said that some of these traits might impair Roof's ability to assist in his defense: Roof fixated on minor details while missing larger, more important ones; he got "stuck" and couldn't transition between topics; and he could not understand others' points of view. (J.A. at 5654-60.)

Appearing for the first time, Father John E. Parker, an Orthodox Christian priest, also testified. He said he had visited Roof weekly beginning about a week after the shootings, spending approximately 100 hours with him. Father Parker testified that he could not reconcile Roof with the crime because Roof seemed neither cold-hearted nor angry, so "[t]he only way I can explain it is mental illness." (J.A. at 5690-92.) Father Parker did not think that Roof was a white nationalist, despite his self-professed beliefs. He noted that Roof was intelligent and could recite facts read years earlier. When Roof

---

[7] Dr. Loftin's report included a detailed description of Roof's social history, including what she identified as early signs of mental illness. She concluded that Roof has ASD and symptoms of psychosis. Dr. Maddox's report reflected her evaluation of Roof over several months. She diagnosed Roof with ASD, attenuated psychosis, and "other specified anxiety disorder," along with other conditions. (J.A. at 5369.) She concluded that "Roof's impairments prevent him from rationally communicating with his attorneys and weighing the risks and benefits of trial-related decisions, and from being able to assist in his own defense." (J.A. at 5381.) Dr. Moberg's report suggested that Roof has "mild frontal system dysfunction" and found that Roof's symptoms and history "are most consistent with a developmental disorder with psychosis spectrum features." (J.A. at 5359-60.) He stated that those impairments could interfere with Roof's ability to weigh options, integrate new information, make decisions, and modify his behavior.

spoke about race, however, Father Parker admitted that he sounded like a "broken record," stuck in a loop of white nationalist rhetoric. (J.A. at 5689-90.)

Three of Roof's attorneys submitted a sworn declaration describing Roof's behavior during jury selection and the guilt phase of trial. They said that Roof demanded they "do nothing" and "stop making objections," saying their efforts were causing him harm and that they were "trying to kill" him. (J.A. at 5475.) According to their declaration, Roof thought that the testimony of a female South Carolina law enforcement agent who read his journal into the record—including incendiary statements about "Blacks," "Jews," and "Homosexual[s]"—was "'great' for him" because she had "a nice voice." (J.A. at 5476; *see* J.A. at 4234-59.) He insisted that he did not have somatic delusions because his head and body are truly deformed. He expressed confidence that the jurors would not sentence him to death because they liked him, and that, if they did impose a death sentence, he could stop the execution by crying before they stuck the needle in his arm. He accused his lawyers of "trying to kill [him]" because the sweater they provided him felt filmy and smelled of detergent. (J.A. at 5476.) And he criticized defense counsel's closing argument because counsel did not tell jurors the statistics of black-on-white crime.

At the end of the competency hearing, the court directly questioned Roof. He again denied believing that he would be saved by white nationalists if he received the death penalty. He acknowledged a high risk that he would be sentenced to death, and ultimately executed, if he presented no mitigation evidence. Roof confirmed once more that, to prevent his lawyers from undermining his message with mental health evidence, he wanted to represent himself.

23

The court found Roof "plainly competent to stand trial." (J.A. at 6956.) In its view, Roof "fully understands that he faces a high risk of a death sentence if he presents no mitigation witnesses, and he understands that he faces a high risk of execution if sentenced to death." (J.A. at 6966.) It again concluded that Roof's resistance to mental health evidence "continues to arise out of his political ideology, rather than any form of mental disease or defect" and that his "social anxiety, possible autism, and other diagnoses or possible diagnoses do not prevent him from understanding the proceedings or assisting counsel with his defense." (J.A. at 6966; *see also* J.A. at 6962.)

## B. Issue 1: The District Court Did Not Clearly Err in Finding Roof Competent to Stand Trial

Roof now argues, through counsel, that the district court incorrectly found him competent to stand trial. The government counters that the district court's finding was not clearly erroneous and that any discrepancies between expert opinions do not warrant reversal. We agree with the government and find no clear error in the district court's competency determination.[8]

"A criminal defendant may not be tried unless he is competent." *Godinez v. Moran*, 509 U.S. 389, 396 (1993) (citing *Pate v. Robinson*, 383 U.S. 375, 378 (1966)). A defendant

---

[8] "We review the district court's competency determination for clear error." *United States v. Robinson*, 404 F.3d 850, 856 (4th Cir. 2005). "[B]ecause district courts are in the best position to make competency determinations, which at bottom rely not only on a defendant's behavioral history and relevant medical opinions, but also on the district court's first-hand interactions with, and observations of, the defendant and the attorneys at bar, we appropriately afford them wide latitude." *United States v. Bernard*, 708 F.3d 583, 593 (4th Cir. 2013).

is competent when "he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and [when] he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960). "Not every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges." *Burket v. Angelone*, 208 F.3d 172, 192 (4th Cir. 2000) (citation omitted). "Likewise, neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial." *Id.* A district court is "only required to ensure that [a defendant] had the *capacity* to understand, the *capacity* to assist, and the *capacity* to communicate with his counsel." *Bell v. Evatt*, 72 F.3d 421, 432 (4th Cir. 1995). "Under federal law the defendant has the burden, 'by a preponderance of the evidence'" to show mental incompetence to stand trial—that is, "that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." *United States v. Robinson*, 404 F.3d 850, 856 (4th Cir. 2005) (quoting 18 U.S.C. § 4241(d)).

Roof raises five potential errors. First, in a reversal of the position that he had taken in the district court and in opposition to his lawyers, he argues that the district court improperly characterized his expectation of a racial revolution as racist, rather than delusional. Citing *United States v. Watson*, Roof claims that psychotic delusions made him incompetent to stand trial. 793 F.3d 416 (4th Cir. 2015). In support of that contention, he points to several defense experts who opined that he was operating under the delusional

belief that he would be rescued from death row by a white nationalist revolution. But that position reflects only one view contained in the record. Dr. Ballenger alternatively opined that Roof's unwillingness to cooperate with defense counsel was not the result of an underlying "widespread psychosis," but was instead rooted in "a deep seated racial prejudice" that Roof did not want "blurred" by a mental health defense. (J.A. at 909, 913-15, 1346.) Dr. Ballenger further noted: "[T]he fanciful notions that he'll be rescued by white nationalists, revolutionaries who have taken over the Government and let him out of jail, he laughs about the humor involved with that . . . [H]e likes to mess with people." (J.A. at 5546-47.) During his evaluation, Roof said that he "has some hope that the death penalty will be abolished and that he won't actually be executed," but he still considered execution likely. (J.A. at 5546.) Dr. Ballenger said that he did not think Roof "has a shred of doubt" about the "real risk that he faces" from trial and sentencing. (J.A. at 5547.)

The district court itself also questioned Roof on whether he thought that white nationalists would rescue him from the death penalty. Roof responded that "[a]nything is possible" and he would like for that to happen, but he understood the chance of his actually being rescued was vanishingly small, quantified as "[l]ess than half a percent." (J.A. at 1729.) Given the conflicting record evidence and expert testimony, the court's decision to accept Dr. Ballenger's account is not "against the great preponderance of the evidence."[9]

---

[9] *United States v. Watson* is also distinguishable because it dealt with a plan of forced medication to *restore* competency after the district court concluded that the defendant was incompetent to stand trial. 793 F.3d 416, 422-25 (4th Cir. 2015). The government, rather than the defendant, bears the burden to prove that forced medication will restore competency. *Id.* at 424. In contrast, Roof bore the burden to demonstrate his

*See United States v. Wooden*, 693 F.3d 440, 456 (4th Cir. 2012) (internal quotation marks and citation omitted); *cf. Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985) ("[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.").

Roof nevertheless argues that *Lafferty v. Cook* compels reversal. 949 F.2d 1546 (10th Cir. 1991). That out-of-circuit case, however, is far afield. *Lafferty* dealt with an incorrect legal standard for determining competency, which tainted the district court's findings of fact. *Id.* at 1551 n.4. Moreover, the defendant in *Lafferty* had a "paranoid delusional system that severely impaired his ability to perceive and interpret reality." *Id.* at 1552. Here, even Roof's experts describe his psychotic symptoms as transitory, still-developing, or otherwise not fully realized. No expert characterizes Roof's beliefs as severely impairing his ability to perceive and interpret reality to the extent described in *Lafferty*. And, even if any of the experts' reports could be read as suggesting that Roof was completely detached from reality, the district court was entitled to give greater weight to Dr. Ballenger's competing, credible expert testimony that Roof was not so detached. *See C.B. Fleet Co. v. SmithKline Beecham Consumer Healthcare, L.P.*, 131 F.3d 430, 438 (4th Cir. 1997) (holding that the district court did not clearly err in crediting one conflicting expert finding over another).

---

incompetence by a preponderance of the evidence. 18 U.S.C. § 4241(d).

Roof's second argument is that the district court relied too heavily on his in-court statement denying his delusional beliefs. That position does not square with the law or the record. "The district court was in the best position to observe [Roof,] and its determinations during trial are entitled to deference. . . ." *United States v. Bernard*, 708 F.3d 583, 593 (4th Cir. 2013). Moreover, the district court did not rely solely on its observations of Roof, instead appointing Dr. Ballenger to examine Roof's "capacity to understand the issues and to assist his attorneys." (J.A. at 5535.) "[E]very part of my examination beginning to the end was a test of [Roof's] competency to stand trial" and Dr. Ballenger "didn't find any significant problem with [Roof's] competence to stand trial and defend himself." (J.A. at 5544.)

Third, Roof argues that the district court ignored his lawyers' affidavits about his failure to communicate with them or assist in his defense. *See United States v. Mason*, 52 F.3d 1286, 1292 (4th Cir. 1995) (holding that the "[o]utright rejection" of counsel's observations in a competency determination was unwarranted). But the court did not reject defense counsel's concerns about the possibility of Roof's incompetence; rather, it ordered a competency hearing and appointed an expert to examine Roof. Ahead of the first competency hearing, Dr. Ballenger spoke with defense counsel for an hour and forty-five minutes, and he addressed their concerns in his first report. Dr. Ballenger's second competency report thoroughly addressed the concerns that standby counsel raised about Roof's behavior since the first hearing. Acknowledging defense counsel's concerns, the court still found Roof competent.

Fourth, Roof claims that the district court conflated *Dusky*'s requirements of "a rational as well as factual understanding of the proceedings against him." 362 U.S. at 402. Roof argues that he needs both cognitive and rational abilities—one cannot substitute for the other. But the court found that Roof had *both* cognitive and rational abilities. Although the court pointed to Roof's high verbal IQ as evidence of cognitive capabilities, it did not rely solely on an IQ test. Instead, the court relied on Dr. Ballenger's opinion that Roof's choices reflected "logical, rational thought" and that he "elected, by his own choice, not to cooperate because he disagrees with [defense counsel's] actions." (J.A. at 5536-37.) The court did not fail to consider the possibility that a cognitively capable person could act irrationally; instead, it reasonably relied on expert testimony that Roof was both cognitively capable *and* acting in a manner that was logically consistent, even if despicable.

Fifth, Roof argues that the district court's reliance on Dr. Ballenger's opinion was clearly erroneous because the report ignored substantial contrary evidence. He complains that Dr. Ballenger was not credible because this was the doctor's first pretrial competency examination. Roof also claims that Dr. Ballenger did not consider childhood evidence, did not remember specific facts about Roof's developmental history, and did not consider the contrary opinions of Roof's experts. We find Roof's position—in effect a dispute over the district court's weighing of the evidence—to be unpersuasive. Beginning with the developmental history, Dr. Ballenger did consider the report that Dr. Loftin "pulled together from many interviews" about Roof's developmental history, as well as "many, many, many pages of records of testimony of people about his childhood, his adolescence." (J.A. at 5555, 5571.) Dr. Ballenger made clear that he read everything provided to him,

except for the voluminous grand jury testimony, which he obtained permission from the court to omit from his review.

Dr. Ballenger also did not disregard Roof's expert evidence that Roof suffers from either schizophrenia or ASD.  Dr. Ballenger instead opined that the presentation of clinical symptoms of schizophrenia was "in remission" and that Roof displayed few symptoms of ASD, none of which would present a "significant problem with his competency."  (J.A. at 5568.)  Dr. Ballenger consistently determined that Roof's beliefs were "not delusions; they are actually just extreme racial views."  (J.A. at 5591.)  He noted that his diagnosis was consistent with an earlier psychologist's report.  Roof himself suggested, and Dr. Ballenger testified, "there is a lot of projection going on here" because of the "incomprehensibility of his racial views lead[ing] people to want to project mental illness on him."  (J.A. at 5594.)

Although Roof's defense team presented expert evidence disagreeing with Dr. Ballenger's findings, that does not warrant reversal.  Roof has failed to demonstrate inconsistencies that leave us "with the definite and firm conviction that a mistake has been committed."  *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (citation omitted).  Every qualified expert has a first case and Dr. Ballenger, an experienced psychologist, had performed numerous similar evaluations in other phases of criminal proceedings.  He was qualified and the district court was well within its discretion to rely upon his testimony.

The district court did not err in determining that Roof was competent to stand trial.[10]

---

[10] The Autistic Self Advocacy Network and the Autistic Women & Nonbinary

### C.    Issue 2: The District Court Did Not Abuse Its Discretion by Granting Only in Part Defense Counsel's Request for a Continuance of the First Competency Hearing

Roof argues that the district court should have granted his motion to continue the first competency hearing for an additional week to allow Dr. Loftin to complete her report and to testify in person. The government counters that the court granted at least two continuances to Roof and made other concessions, so Roof was not prejudiced.[11]

"The denial of a continuance contravenes a defendant's Sixth Amendment right to counsel only when there has been 'an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay.'" *United States v. Hedgepeth*, 418 F.3d 411, 423 (4th Cir. 2005) (quoting *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983)). "[T]he test for whether a trial judge has 'abused his discretion' in denying a continuance is not mechanical; it depends mainly on the reasons presented to the district judge at the time the request is denied." *United States v. LaRouche*, 896 F.2d 815, 823 (4th Cir. 1990) (citing *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)). "[A] broad and deferential standard is to be afforded to district courts in granting or denying continuances: the burdensome task of assembling a trial counsels against continuances," and "the district court alone has the

---

Network provided briefing as *amici curiae*. We are grateful for their submission.

[11] "[A] trial court's denial of a continuance is . . . reviewed for abuse of discretion; even if such an abuse is found, the defendant must show that the error specifically prejudiced [his] case in order to prevail." *United States v. Hedgepeth*, 418 F.3d 411, 419 (4th Cir. 2005).

opportunity to assess the candidness of the movant's request." *Id.* (first citing *Slappy*, 461 U.S. at 11; and then citing *Ungar*, 376 U.S. at 591).

The district court did not err in denying further delay. In *United States v. Clinger*, we found an abuse of discretion where a witness could not be made available without a one-day continuance. 681 F.2d 221, 223 (4th Cir. 1982). But, unlike the district court in *Clinger*, the district court here offered that one of Roof's several experts, Dr. Loftin, could testify telephonically or by video. *Cf. United States v. Ellis*, 263 F. App'x 286, 289-90 (4th Cir. 2008) (holding that a failure to grant a continuance to allow an expert *completely* unavailable to testify as the *sole* expert was an abuse of discretion). As we have long recognized, telephonic and electronic testimony is an acceptable practice. *See United States v. Baker*, 45 F.3d 837, 848 (4th Cir. 1995) (approving the use of video conferencing in a mental competency hearing). Even if the continuance would have allowed Dr. Loftin to finalize her report, she could have proffered through live (telephonic or video) testimony some material from the report. Moreover, the defense had already received two continuances. The court continued the jury selection to assess Roof's competency, and then continued the competency hearing to give Roof more time to review Dr. Ballenger's report. The district court was not single-mindedly fast-tracking the trial, but instead considering each request for a continuance and weighing it against the need for efficiency. *See Hedgepeth*, 418 F.3d at 423-24 (approving the same kind of nonarbitrary process for judging motions to continue). "Here, the trial court balanced the interests of all parties and reached a well-considered decision to proceed." *United States v. Bakker*, 925 F.2d 728, 735 (4th Cir. 1991).

Nor has Roof established prejudice. Roof must show that the denial of a continuance "specifically prejudiced [his] case in order to prevail." *Hedgepeth*, 418 F.3d at 419. That is, Roof must demonstrate that the court's ruling "undermine[d] confidence in the outcome" of the competency hearing. *See LaRouche*, 896 F.2d at 823. Dr. Loftin's expert report, submitted in the second competency hearing, focuses on ASD (not psychosis) and does not address Roof's competency to stand trial. Although Dr. Loftin mentions Roof's possible psychotic symptoms, her opinion largely duplicates Dr. Maddox's and Dr. Stejskal's earlier testimony. Additional corroboration for already-considered evidence and argument would not demonstrate prejudice here. Roof's "speculation and conclusory allegations of prejudice are insufficient to establish abuse of discretion by the trial court in denying a continuance." *United States v. Lorick*, 753 F.2d 1295, 1297 (4th Cir. 1985). Roof has not shown that Dr. Loftin's report would "undermine confidence in the outcome" of the competency hearing, so he fails to show prejudice. *See LaRouche*, 896 F.2d at 823.

**D.    Issue 3: The District Court Did Not Abuse Its Discretion by Limiting Evidence Allowed at the Second Competency Hearing**

Roof argues that the district court should have reconsidered its previous competency determination more fully at the second competency hearing, rather than focusing on whether his competence changed between the two hearings. He further claims that the district court misapplied the law-of-the-case doctrine, excluding evidence from before the

first hearing, which ended on November 22, 2016. We disagree and see no abuse of discretion.[12]

Even after a defendant is deemed competent, "a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." *Drope v. Missouri*, 420 U.S. 162, 181 (1975). "[E]vidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether a further inquiry into competence is required . . . ." *Id.* at 180; *see also Maxwell v. Roe*, 606 F.3d 561, 575 (9th Cir. 2010) ("[A] prior medical opinion on competence to stand trial is relevant in determining whether a further inquiry [into competence] is required." (second alteration in original) (internal quotation marks and citation omitted)).

Under the law-of-the-case doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Carlson v. Bos. Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017) (citation omitted). Findings of fact are, by definition, not rules of law. Nevertheless, although a finding of fact "is perhaps not technically *res judicata*, it is unusual, for efficiency reasons if no other, for

---

[12] We review decisions to exclude evidence under the abuse-of-discretion standard. *United States v. Young*, 248 F.3d 260, 266 (4th Cir. 2001). When the exercise of discretion depends upon the interpretation of underlying legal principles, our overall review is still for abuse of discretion, but our consideration of the legal principles informs our view of what constitutes abuse. *See United States v. Bush*, 944 F.3d 189, 195 (4th Cir. 2019) ("[W]e will identify an abuse of discretion if the court's 'decision [was] guided by erroneous legal principles or rests upon a clearly erroneous factual finding.'" (second alteration in original) (citation omitted)).

trial courts to revisit factual findings." *United States v. Adams*, 104 F.3d 1028, 1030 (8th Cir. 1997).

The district court properly considered that Roof's competency might have changed, ordered a second hearing, and limited the scope of the hearing to facts suggesting that Roof's competency *had* changed. Even if the court erred in referring to its previous competency decision as "the law of the case," which does not govern factual issues, *see Carlson*, 856 F.3d at 325, no reversible error occurred. First, courts are not required to revisit factual findings. *See Adams*, 104 F.3d at 1030. Second, the court did not, as Roof contends "deliberately blind[] itself . . . to material evidence." (Opening Br. at 92.) In discussing the defense's expert reports, the court emphasized: "I read them. I read every one of them." (J.A. at 5529.) The court here properly considered whether the defendant's competence to stand trial had changed, unlike the court in *Maxwell*. 606 F.3d at 575. Contrary to Roof's assertion, the court and Dr. Ballenger both reviewed "the specific instances since November 22nd that [defense counsel] believe indicated that the defendant was not competent." (J.A. at 5533.) As the court noted, Dr. Ballenger "systematically [went] through each of those issues that had been raised in the motion" and concluded that "there was no change" in Roof's "capacity to understand the issues and to assist his attorneys." (J.A. at 5535.) Most importantly, as Roof himself noted at the hearing, the defense experts' "reports consist of nothing but observations before November the 22nd." (J.A. at 5530-31.) The court chose to credit Dr. Ballenger's expert testimony over testimony from defense experts. That was within its discretion. The district court's

decision to limit the scope of the second competency hearing was thus not an abuse of discretion.

Roof next argues that *Drope v. Missouri* compels reversal.  He is incorrect.  The district court in *Drope* "failed to consider and give proper weight to the record evidence," including that "on the Sunday prior to trial [the defendant] tried to choke [his wife] to death," and then he "shot himself to avoid trial."  420 U.S. at 178-79.  Unlike Roof's case, "there was no opinion evidence as to petitioner's competence to stand trial."  *Id.* at 180.  Significantly, the district court's choice to hold a second competency hearing was the remedy endorsed in *Drope*: "to suspend the trial until such an evaluation could be made."  *Id.* at 181.  Unlike the district court in *Drope*, which did not consider expert evidence of competency, the district court here "read every one of" the expert reports and conducted two competency hearings.  (J.A. at 5529.)  It properly followed the Supreme Court's direction in *Drope*, and therefore did not err.

## IV.   ISSUES RELATED TO SELF-REPRESENTATION

Roof argues that the district court erred in allowing him to represent himself during the penalty phase of his trial.  More specifically, he makes the following three arguments: first, that the Sixth Amendment grants him the right to counsel who will honor his desire to forgo the presentation of mental health mitigation evidence; second, that the Sixth Amendment right to self-representation does not extend to sentencing proceedings; and third, that the Eighth Amendment's concern with robust capital sentencing procedures demands that all mitigation evidence be presented, either through defense counsel or independent counsel.  In addition to those constitutional arguments, Roof advances four

claims of error related to the district court allowing his self-representation. He contends that the court erred by not appropriately informing him of the balance of responsibility between himself and his standby counsel; not appreciating the court's own discretionary authority to deny for lack of timeliness his motion to represent himself; not correctly assessing whether he was a "gray-area" defendant, meaning that he was competent to stand trial but not competent to represent himself; and not allowing standby counsel to take a more active role during jury selection. None of his contentions, constitutionally based or otherwise, has persuasive force.

### A.    Self-Representation Background

As discussed above in Section III.A, after learning that his lawyers planned to present evidence of mental illness, Roof sent a letter to the prosecution the night before jury selection, accusing his lawyers of using "scare tactics, threats, manipulation, and outright lies" to push a trial strategy that he did not agree with: namely, presenting him as mentally ill. (J.A. at 587.) He said, "what my lawyers are planning to say in my defense is a lie and will be said without my consent or permission." (J.A. at 587.) Shortly before trial, defense counsel requested an ex parte hearing to discuss Roof's letter. They contended that he "controls only a few major decisions in the case; counsel control the rest," including the decision of whether to present mental health evidence. (J.A. at 579.) The issues Roof controls, counsel wrote, include "whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal," but not "what witnesses should be called or what evidence should be introduced." (J.A. at 579 (quoting *Jones v. Barnes*, 463 U.S. 745, 751 (1983)).)

The district court postponed jury selection and held an ex parte hearing to question Roof about the letter. The court informed Roof that his "lawyers have the right to offer mitigating evidence that they think is best because that is a strategic decision we allow," and it further advised him that if he "offered no mitigation evidence, there would be a high degree of probability that [he] would have the death penalty imposed." (J.A. at 629.) Focusing on just one of the mental health problems at issue, Roof responded, "I get that. But the problem is . . . if the price is that people think I'm autistic, then it's not worth it." (J.A. at 629.) The court probed him on this point at length, asking, for example, "if, in fact, your autism experts are right, . . . wouldn't you want the jury to have that information to make the best decision," to which Roof responded emphatically: "No. No. No." (J.A. at 630.) The court then asked, and Roof confirmed, that he would "rather die than be labeled autistic." (J.A. at 630.) Later, he elaborated that "if people think I have autism, . . . [i]t discredits the reason why I did the crime." (J.A. at 632.) The court responded that "there are many people with autism who are high-functioning, well-adjusted people." (J.A. at 632.) It went on to repeat its question in numerous forms, and Roof continuously affirmed that it was, in his view, better to die than be considered autistic or mentally ill. And because evidence of mental health issues was his lawyers' primary mitigating defense, he wanted to present no such defense.

Following that exchange, defense counsel stated that although they had considered Roof's perspective, they had nevertheless determined that presenting evidence of four mental health issues—psychosis, depression, autism, and severe anxiety—was in Roof's

best interest.[13]  The district court described the stand-off between Roof and his attorneys as having "no solution" because "any competent counsel would insist on asserting a mental health defense" and "Roof is going to oppose any effort to present what I think a competent lawyer should do."  (J.A. at 1563.)  The court then reiterated what it had previously told Roof—a lawyer "is not free to simply say, '[o]kay[,] I won't present that evidence because you don't want me to' because that is not [the defendant's] decision to make."  (J.A. at 1742-43.)  Later, the court memorialized that decision in a written order, saying, "[t]he decision concerning what evidence should be introduced in a capital sentencing is best left in the hands of trial counsel, and reasonable tactical decisions by trial counsel in this regard are binding on the defendant."  (J.A. at 2556 (quoting *Sexton v. French*, 163 F.3d 874, 887 (4th Cir. 1998)).)  Roof nevertheless filed a motion to discharge his lawyers and proceed pro se.  The court responded by explaining Roof's responsibilities, confirming that he understood he would "make as-needed motions or objections, ask questions, make arguments" and "be performing in a courtroom . . . throughout the trial."  (J.A. at 2134-35.)  It also advised him that standby counsel "would be available to assist [him] if [he] desired that assistance."  (J.A. at 2133.)  The court granted his motion and appointed standby counsel.[14]

---

[13] Roof's alleged mental health disorders and the supporting evidence of them are detailed in Section III.A, *supra*.

[14] For clarity, we use "defense counsel" to refer to Roof's lawyers when they represented him and "standby counsel" to refer to Roof's lawyers when Roof was acting pro se.

Roof then represented himself during voir dire. Still, standby counsel filed three motions during voir dire seeking to ask potential jurors additional questions. The district court denied the motions because it "would not allow the defense to speak with two voices." (J.A. at 3535.) Standby counsel informed the court that Roof had read *McKaskle v. Wiggins*, 465 U.S. 168 (1984), and "is comforted by the fact that *McKaskle* at least seems to allow—or allow the Court to permit him to ask us to do things that he doesn't know how to do." (J.A. at 2405-06.) The court replied:

> I consider what he has been doing to be actively participating in the voir dire process. He has made motions, some of which have been granted and some have not. And he has received assistance of his standby counsel prior to making those. That is the way I think the system should work. Exactly how beyond that it should work is something I want everybody to brief and let me read the case law before I make a determination. What I can't have, what's confusing, is for—to be told by the lawyer of record who is the defendant "no further questions," and then I'm told we didn't ask the right questions . . . . [W]e are not going to have a situation where you are Mr. Roof's cocounsel.

(J.A. at 2406-07.)

It further explained that the lawyers acting as co-counsel would be "very confusing to the jury" and "it's kind of a play on the system where Mr. Roof, for instance, could avoid cross-examination, but could then speak." (J.A. at 2407.) When standby counsel asked whether Roof could request that they ask a question or raise an objection, the court declined, saying Roof "makes the decision whether he wants follow-up questions and which one[s], not you. You speak to him. He's an intelligent person. He can make that decision. It's his decision because he elected to self-represent." (J.A. at 2407-08.) And when standby counsel argued that the court's rulings were too strict, particularly during

voir dire, the court stood by the limitation it imposed, saying "[i]t's just the proper role of standby counsel." (J.A. at 2408.) The court further explained that standby counsel could suggest questions to Roof, but that he would have to ask them. Roof later asked if the court would allow "standby counsel [to] assist me in proposing more questions to the jurors and making objections to strike jurors." (J.A. at 2561.) The court responded:

> I find a system of essentially having your standby counsel become cocounsel to be potentially chaotic and a manipulation of the system, and I'm not going to allow it. If you need—if your standby counsel wishes to recommend questions to you, they are sitting at your table; they can give you the advice. If they wish to suggest to you bases for objections, I urge you to consider it. . . . And I say that if through this process you wish to reconsider that decision and to relinquish your role in self-representation, I would consider that.

(J.A. at 2561.)

Twice, the court reminded Roof that he could withdraw his request to self-represent. But Roof did not withdraw that request during voir dire. Both standby counsel and the court remarked on Roof's performance. Standby counsel stated that "on average we've done very well." (J.A. at 2289.) And the court, reflecting on Roof's earlier participation during a competency hearing, stated that Roof "demonstrated an aptitude for cross-examination that [was] extraordinary for a *pro se* litigant." (J.A. at 6966; *see also* J.A. at 6961-62.)

Shortly before the start of the guilt phase of trial, however, Roof moved to allow his standby counsel to represent him during the guilt phase, but to return to self-representation for the penalty phase if he were convicted. At the pre-trial conference, the district court explained to Roof what that would mean as a practical matter. The court said that defense

counsel "would control all strategic decisions in the guilt phase of the case, including which witnesses to call, what questions to ask on cross-examination, and what evidence should be introduced in the guilt phase." (J.A. at 3472.) Roof would retain control over only "what pleas to enter, whether to accept a plea agreement, [and] whether to testify," and he "would have to . . . waive [his] right to self-representation for the entirety of the guilt phase." (J.A. at 3472.)

Roof's standby counsel expressed support for the motion, and the prosecution did not take a position. The court granted the motion, including allowing Roof to "retain[] the right to self-representation during the [penalty] phase." (J.A. at 3477-78.) As he had planned, Roof proceeded again to represent himself during the penalty phase and did not present any mental health mitigation evidence.

Roof's counsel moved for courtroom accommodations "to ensure" Roof's "ability to effectively participate in the legal proceedings." (J.A. at 3577.) The accommodations included "short breaks between direct examination and cross-examination, and between each witness"; shorter court days and weeks; advance notice of government witnesses; and as-needed breaks. (J.A. at 3579-80.) The court denied the motion, stating that it "found Defendant mentally competent to stand trial, and, indeed, Defendant was extremely engaged during his two-day competency hearing." (J.A. at 3585.) It also noted that Roof had previously participated in eight-and-a-half hour days with customary breaks and had then addressed the court "at length and in detail." (J.A. at 3585.) Later, after observing Roof deliver opening and closing statements in the penalty phase of the trial, argue against aggravating factors, and challenge the prosecution, the court observed, "if [Roof] were

42

incompetent to represent himself, almost no defendant would be competent to represent himself."  (J.A. at 6956.)

**B.      Issue 4: Under *McCoy v. Louisiana*, Preventing the Presentation of Mental Health Evidence Cannot Be the "Objective" of a Defense**

Roof first argues that, although he preferred not to waive counsel, he went forward with that waiver for one reason alone—"to prevent the presentation of mental health mitigation evidence."  (Opening Br. at 107 (quoting J.A. at 2296).)  He asserts that his decision to represent himself was not made knowingly; that it was instead made under misinformation from the district court because the court told him, if he employed counsel, then counsel would have "exclusive authority over presentation of penalty-phase evidence." (Opening Br. at 107.)  That, he says, was inaccurate and structural error in light of the Supreme Court's ruling in *McCoy v. Louisiana*, 138 S. Ct. 1500 (2018), which was decided after the district court ruled on his motion but which applies retroactively on direct review. *See Griffith v. Kentucky*, 479 U.S. 314, 326-28 (1987); *cf. Smith v. Stein*, 982 F.3d 229, 235 (4th Cir. 2020) (holding that *McCoy* is not retroactively applicable on *collateral* review because "it is an extension of a watershed rule rather than a watershed rule itself"), *cert. denied*, No. 20-7192, 2021 WL 1520899 (Apr. 19, 2021).  We disagree with Roof's argument and conclude that the district court did not err.[15]

The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . have the Assistance of Counsel for his defence."  U.S. Const.

---

[15] We review constitutional questions de novo.  *United States v. Malloy*, 568 F.3d 166, 176 (4th Cir. 2009).

amend. VI.  That right includes the right to waive counsel and to represent oneself.  *Faretta v. California*, 422 U.S. 806, 834-36 (1975).  But the decision to relinquish the right to counsel must be made "knowingly and intelligently."  *Id.* at 835.  The Supreme Court has explained that, under the Sixth Amendment, "the accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal."  *Jones v. Barnes*, 463 U.S. 745, 751 (1983).  On the other hand, "[d]ecisions that may be made without the defendant's consent primarily involve trial strategy and tactics, such as what evidence should be introduced, what stipulations should be made, what objections should be raised, and what pre-trial motions should be filed."  *Sexton v. French*, 163 F.3d 874, 885 (4th Cir. 1998) (internal quotation marks and citation omitted).

In *Florida v. Nixon*, the Supreme Court considered that division of authority when it held that counsel could concede commission of the crime at the guilt phase of a capital case in order to preserve credibility for the defense during the penalty phase, and that counsel could do so even though the defendant "never verbally approved or protested [the] proposed strategy."  543 U.S. 175, 181 (2004).  The Court concluded that "[w]hen counsel informs the defendant of the strategy counsel believes to be in the defendant's best interest and the defendant is unresponsive, counsel's strategic choice is not impeded by any blanket rule demanding the defendant's explicit consent."  *Id.* at 192.

Later, in *McCoy v. Louisiana*, the Court distinguished its decision in *Nixon*.  138 S. Ct. at 1505.  The defense counsel in *McCoy* told the jury multiple times, over the defendant's objection, that his client had committed the three murders at issue.  *Id.* at 1505-

07.  Like defense counsel in *Nixon*, McCoy's counsel believed that the concession of guilt would lower the odds of a death sentence.  *Id.* at 1506-07.  McCoy was nevertheless convicted and sentenced to death.  *Id.* at 1507.  On appeal, he argued that his counsel's guilt-phase concession was a violation of his Sixth Amendment rights.  *Id.*  The Supreme Court agreed, holding that "a defendant has the right to insist that counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty."  *Id.* at 1505.  The Court explained that, "[w]ith individual liberty—and, in capital cases, life—at stake, it is the defendant's prerogative, not counsel's, to decide on the objective of his defense: to admit guilt in the hope of gaining mercy at the sentencing stage, or to maintain his innocence."  *Id.*  It elaborated:

> Trial management is the lawyer's province: Counsel provides his or her assistance by making decisions such as "what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence."  Some decisions, however, are reserved for the client—notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal.

*Id.* at 1508 (quoting *Gonzalez v. United States*, 553 U.S. 242, 248 (2008)).  The Court reserved for the defendant the "[a]utonomy to decide that the objective of the defense is to assert innocence."  *Id.*

Relying on *McCoy*, Roof claims that the district court misadvised him that he could not choose as a primary "objective" of his defense that he not be labeled as mentally ill or autistic.  Defense counsel wished to present evidence that conflicted with Roof's aversion to any suggestion of a diminished mental capacity.  Roof contends that counsel should have

been forced to conform to his objective and that he should have been advised that he could constrain his counsel in that way.

Roof also points to *United States v. Read*, where the Ninth Circuit held that a defendant has the right to prevent an insanity defense under *McCoy* because "[a]n insanity defense is tantamount to a concession of guilt" and "carries grave personal consequences that go beyond the sphere of trial tactics." 918 F.3d 712, 720 (9th Cir. 2019). The court in *Read* said that a defendant "may choose to avoid the stigma of insanity" and "may . . . prefer a remote chance of exoneration to the prospect of indefinite commitment to a state institution." *Id.* at 720-21 (internal quotation marks and citations omitted). In the paragraph most helpful to Roof, the court said:

> [O]ne reason that an insanity defense should not be imposed on a defendant is that it can sometimes directly violate the *McCoy* right to maintain innocence. *However, even where this concern is absent, the defendant's choice to avoid contradicting his own deeply personal belief that he is sane*, as well as to avoid the risk of confinement in a mental institution *and the social stigma associated with an assertion or adjudication of insanity, are still present*.

*Id.* at 721 (emphases added). Roof contends that his deeply held belief that he does not have a mental illness or cognitive deficit should similarly be protected.[16]

---

[16] In addition to *Read*, Roof cites decisions rejecting ineffective-assistance-of-counsel claims against lawyers who complied with a capital defendant's request not to present mitigation or closing argument. *See, e.g.*, *Taylor v. Steele*, 372 F. Supp. 3d 800, 867 (E.D. Mo. 2019) ("Taylor[] argues that his trial counsel was constitutionally ineffective for not disregarding Taylor's express directive forbidding a closing argument at the penalty phase of his trial."). But the fact that counsel could be found not ineffective for conforming to the wishes of a defendant does not mean that counsel must conform to the defendant's wishes. Thus, the cases that Roof cites are of scant relevance. *See United States v. Holloway*, 939 F.3d 1088, 1101 n.8 (10th Cir. 2019) (explaining that claims that counsel

We do not subscribe to Roof's interpretation of *McCoy*. When one "chooses to have a lawyer manage and present his case," he cedes "the power to make binding decisions of trial strategy in many areas." *Faretta*, 422 U.S. at 820. The presentation of mental health mitigation evidence is, in our view, "a classic tactical decision left to counsel . . . even when the client disagrees." *United States v. Chapman*, 593 F.3d 365, 369 (4th Cir. 2010); *see also Sexton*, 163 F.3d at 887 (recognizing that the presentation of evidence or witnesses remains counsel's prerogative during capital sentencing proceedings). *McCoy* does not subvert the long-established distinction between an objective and tactics, which underlies our decisions in *Chapman* and *Sexton*. Roof's interpretation of *McCoy* is flawed because it would leave little remaining in the tactics category by allowing defendants to define their objectives too specifically. In other words, as the government rightly contends, Roof's position would allow a defendant to exercise significant control over most important aspects of his trial—such as the presentation of particular evidence, whether to speak to a specific witness, or whether to lodge an objection—as long as he declares a particular strategy or tactic to be of high priority and labels it an "objective." That cannot be.

*Read* is also distinguishable on the key point that an insanity defense entails an admission of guilt. *See* 18 U.S.C. § 17(a) (allowing an insanity defense when the defendant, despite committing the crime, "was unable to appreciate the nature and quality or the

---

violated a defendant's right to determine the objective of his defense are "[u]nlike ineffective assistance of counsel jurisprudence" because claims concerning the objectives of the defense "are not strategic choices about how best to *achieve* a client's objectives; they are choices about what the client's objectives in fact *are*" (internal quotation marks omitted) (quoting *McCoy v. Louisiana*, 138 S. Ct. 1500, 1510-11 (2018))).

wrongfulness of his acts"); *id.* § 4243(a), (e) (institutionalizing defendants who successfully plead insanity). The Ninth Circuit's suggestion in dicta that avoiding the stigma of mental illness can constitute a trial objective regardless of the admission of guilt is not persuasive. Acknowledging mental health problems, and bearing any associated stigma, is simply not of the same legal magnitude as a confession of guilt. Confessing guilt is of such enormous legal and moral consequence as to properly be reserved to the defendant's sole discretion. By contrast, mental health evidence presented at sentencing as a form of mitigation is far less consequential, even if very important.

Our understanding of the Sixth Amendment finds support in how other circuits have read *McCoy*.[17] Roof was not misled about the scope of his control over his defense counsel.

## C.    Issue 5: A Defendant Has a Sixth Amendment Right to Represent Himself During His Capital Sentencing

Roof next argues that the district court should have denied his motion to dismiss counsel and proceed pro se because he did not have a Sixth Amendment right to represent himself during the penalty phase of his trial. Again, we disagree. He was indeed entitled to represent himself at the penalty phase.[18]

---

[17] *See United States v. Rosemond*, 958 F.3d 111, 123 (2d Cir. 2020) ("[W]e read *McCoy* as limited to a defendant preventing his attorney from admitting he is guilty of the crime with which he is charged."), *cert. denied*, 141 S. Ct. 1057 (2021); *United States v. Wilson*, 960 F.3d 136, 144 (3d Cir. 2020) (distinguishing *McCoy* from the defense counsel's "failure to . . . heed [the defendant's] instruction to contest a jurisdictional element" because *McCoy* was "about conceding factual guilt"), *cert. denied*, 141 S. Ct. 1091 (2021).

[18] We review constitutional questions de novo. *United States v. Malloy*, 568 F.3d 166, 176 (4th Cir. 2009).

In *Faretta v. California*, the Supreme Court traced the history of the right to self-representation at a criminal trial. 422 U.S. 806, 812-18 (1975). Having found the right deeply rooted in English common law, the Court concluded that "the right to self-representation—to make one's own defense personally—is . . . necessarily implied by the structure of the [Sixth] Amendment." *Id.* at 819. It noted that constitutionally significant issues of personal autonomy are at stake. *Id.* at 834. "The right to defend is personal," the Court said, because "[t]he defendant, and not his lawyer or the State, will bear the personal consequences of a conviction." *Id.*

Later, in *Martinez v. Court of Appeal of California, Fourth Appellate District*, the Court again considered the right to self-representation, this time in the context of appeals. 528 U.S. 152, 163-64 (2000). It concluded that "there simply was no long-respected right of self-representation on appeal." *Id.* at 159. Additionally, it reasoned that the structure of the Sixth Amendment does not support an appellate right to self-representation because the Amendment grants "rights that are available in preparation for trial and at the trial itself." *Id.* at 160. The Court further said that no right to appellate self-representation exists under the Due Process Clause because "self-representation is [not] a necessary component of a fair appellate proceeding." *Id.* at 161.

Given those precedents, Roof contends, unpersuasively, that the penalty phase of trial is similar to an appeal and thus falls within the ambit of *Martinez*, so that he had no right to represent himself. He makes several subsidiary arguments, including that the right to a separate penalty phase at a capital trial has little historical precedent, much like appeals-of-right; that no right to self-representation at the penalty phase can be inferred

from the text of the Sixth Amendment; and that the defendant at sentencing is no longer "the accused" under the Sixth Amendment because, at that point, he is convicted. Lastly, he contends that the "unique, individualized, and reasoned moral judgment" (J.A. at 6744 (jury charge)) that occurs during sentencing is consistent with the reasons that courts have declined to impose other Sixth Amendment rights at capital sentencing. *See United States v. Umaña*, 750 F.3d 320, 346-48 (4th Cir. 2014) (finding no confrontation right at the penalty phase); *cf. Betterman v. Montana*, 136 S. Ct. 1609, 1612 (2016) (holding that the speedy trial guarantee "protects the accused from arrest or indictment through trial, but does not apply once a defendant has been found guilty at trial or has pleaded guilty to criminal charges").

Roof does not dispute that a defendant has the right to counsel at the penalty phase. He instead contends that the right to self-representation has less reach than the right to counsel because the right to counsel is based on the Due Process Clause of the Fifth Amendment, while the Sixth Amendment right to counsel is the root of the right to proceed pro se.[19] His argument ignores precedent that suggests there is a Sixth Amendment right

---

[19] The government acknowledges that the right to self-representation does not extend to situations where the right to counsel is predicated only on the Due Process Clause. (Answering Br. at 85-86 ("For phases of a criminal case that are not part of the 'criminal prosecution,' a right to counsel cannot be derived from the Sixth Amendment. . . . Because the self-representation right recognized in *Faretta* was derived from the Sixth Amendment, a defendant does not necessarily have a right to self-represent in proceedings where his right to counsel arises from a different constitutional provision." (citing *Martinez v. Court of Appeal of California, Fourth Appellate District*, 528 U.S. 152, 154 (2000) (no self-representation right on direct appeal); *United States v. Missouri*, 384 F. App'x 252, 252 (4th Cir. 2010) (supervised release revocation proceeding); *United States v. Spangle*, 626

to the effective assistance of counsel at the penalty phase of capital cases. *See United States v. Taylor*, 414 F.3d 528, 535-36 (4th Cir. 2005) (noting that the Sixth Amendment "entitles a criminal defendant to effective assistance of counsel at each critical stage of his prosecution, including sentencing" (citation omitted)); *see also United States v. Haymond*, 139 S. Ct. 2369, 2379 (2019) (plurality opinion) ("[A] 'criminal prosecution' continues and the defendant remains an 'accused' with all the rights provided by the Sixth Amendment, until a final sentence is imposed."); *Jermyn v. Horn*, 266 F.3d 257, 305 (3d Cir. 2001) (finding that counsel violated the Sixth Amendment right to the effective assistance of counsel due to conduct during the penalty phase). The Supreme Court has also previously extended the Sixth Amendment right to counsel to a separate deferred sentencing proceeding following probation revocation. *See Mempa v. Rhay*, 389 U.S. 128, 136-37 (1967) (extending the right to counsel to a "revocation of probation or a deferred sentencing" that does not occur contemporaneously with a guilty plea). If the Sixth Amendment right to counsel extends to revocation proceedings, then the right to self-representation under that Amendment surely extends to the far-higher stakes setting of capital sentencing.[20]

---

F.3d 488, 494 (9th Cir. 2010) (parole revocation proceeding); *United States v. Hodges*, 460 F.3d 646, 650 (5th Cir. 2006) (parole revocation hearing)).)

[20] The Fifth Circuit has directly addressed the question before us, concluding on a mandamus petition that "[n]othing in *Martinez* can be read to push the ending point for the Sixth Amendment right of self-representation in criminal proceedings back to the end of the guilt/innocence phase of a bifurcated trial proceeding." *United States v. Davis* (*Davis I*), No. 01-30656, 2001 WL 34712238, at *2 (5th Cir. July 17, 2001). In dealing with a second petition for mandamus in the same case, the Fifth Circuit reiterated its holding and

That the right to self-representation does not have a long history of being applied to sentencing proceedings is not reason enough to exclude it from the holding in *Faretta*. Respect for the autonomy of the defendant should continue through all phases of trial. *Faretta*, 422 U.S. at 819-20, 832. There is ample reason to apply the same rights as are granted at the guilt phase of trial because penalty decisions were, as a matter of historical practice, made at essentially the same time as the decision on guilt. *See Haymond*, 139 S. Ct. at 2379 ("[F]ounding-era prosecutions traditionally ended at final judgment," and "at that time, . . . questions of guilt and punishment both were resolved in a single proceeding subject to the Fifth and Sixth Amendment's demands." (internal quotation marks and citation omitted)). The relatively recent separation of the guilt and penalty phases of capital trials should not bring about a change in rights.

The autonomy-based right to self-representation, as expressed in *Faretta*, remains equally valid at the penalty phase. Accordingly, we hold that the district court did not err by allowing Roof to represent himself at the penalty phase of his trial.

---

held the district court's imposition of independent counsel during capital sentencing to be unconstitutional, even though the defendant intended to "employ an admittedly risky strategy during the penalty phase" of not "presenting traditional mitigating evidence" and instead "attack[ing] the strength of the government's case as to his guilt." *United States v. Davis* (*Davis II*), 285 F.3d 378, 384 (5th Cir. 2002). Refusing to present mitigation evidence, it said, was a tactical decision, and the defendant's "right to self-representation encompasses the right to direct trial strategy." *Id.* at 384-85. The Seventh Circuit and several state courts have also held that defendants have the right to represent themselves during capital sentencing. *See Silagy v. Peters*, 905 F.2d 986, 1006-08 (7th Cir. 1990); *Sherwood v. State*, 717 N.E.2d 131, 135 (Ind. 1999); *State v. Brewer*, 492 S.E.2d 97, 99 (S.C. 1997); *People v. Coleman*, 660 N.E.2d 919, 937-38 (Ill. 1995); *Bishop v. State*, 597 P.2d 273, 276 (Nev. 1979).

> **D.    Issue 6: Neither the Constitution nor the Federal Death Penalty Act Requires that Mitigation Evidence Be Presented During Capital Sentencing over a Defendant's Objection**

Roof further contends that, even if his Sixth Amendment right to self-representation extends through the penalty phase, that right is outweighed by "the Fifth and Eighth Amendments and Federal Death Penalty Act ('FDPA')[, which] require capital juries to consider mitigation" and prevent Roof from keeping mental health mitigation evidence from the jury by "doing nothing."[21]  (Opening Br. at 121-22.)  The district court rejected that argument, and so do we.[22]  The Sixth Amendment right to self-representation remains firmly in effect through capital sentencing, and the Supreme Court has not indicated that the Eighth Amendment, or any other Amendment, requires mitigation evidence. Additionally, the FDPA does not require the presentation of mitigation evidence; it requires only that defendants be given the opportunity to have such evidence considered.

We have previously said that whether a capital defendant may choose to represent himself and keep an important mitigation circumstance from the jury is an "open question." *See Billings v. Polk*, 441 F.3d 238, 254 (4th Cir. 2006) ("[I]t remains an open question whether the state's important—indeed, constitutionally mandated—interest in structuring its sentencing proceedings so as to reserve the death penalty for those most deserving of it

---

[21] And there is no dispute that mental health mitigation evidence was significant in Roof's case.  As the district court said, "any competent counsel would insist on asserting a mental health defense."  (J.A. at 1563.)

[22] We review constitutional questions de novo.  *United States v. Malloy*, 568 F.3d 166, 176 (4th Cir. 2009).

must give way to any interest the defendant may have in keeping a mitigating circumstance from the jury."). Being squarely presented with the question now, under the specific circumstances of this case, we decline to invoke the Eighth Amendment to dilute the potency of the Sixth. *Cf. Agostini v. Felton*, 521 U.S. 203, 237 (1997) (explaining that if a Supreme Court precedent controls, "yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions" (citation omitted)). The specific circumstances here include the fact that Roof did present several mitigating factors for the jury's consideration.[23]

If Roof's comment is taken at face value—that he self-represented and did "nothing," in derogation of the Eighth Amendment—then the argument has no foundation in the record because he did not do "nothing." (Opening Br. at 121-22.) He submitted nine mitigating factors to the jury, which found six in his favor.[24] More to the point, however, Roof never demonstrates why the Eighth Amendment requires the presentation of mental health mitigation evidence specifically, particularly for a defendant already found competent to stand trial.

---

[23] The proposed mitigating factors were drafted and submitted before trial by defense counsel. But when Roof represented himself at the penalty phase, he proceeded on the basis of those same mitigating factors.

[24] Although Roof did not technically present evidence, six of his mitigating factors were unrebutted and effectively treated as stipulated facts.

As noted earlier, *supra* note 20, the Fifth Circuit in *United States v. Davis* (*Davis II*) rejected the same argument that Roof advances, overturning a decision to appoint independent counsel to fulfill what the district court there viewed as an Eighth Amendment mandate to present mitigation evidence. 285 F.3d 378, 384-85 (5th Cir. 2002); *United States v. Davis*, 180 F. Supp. 2d 797, 798-99 (E.D. La. 2001). The court observed that "[t]he district court provide[d] no federal statutory authority for appointing an independent counsel to present mitigation evidence in the penalty phase of a capital case." *Davis II*, 285 F.3d at 382. It then held that *Faretta* taught otherwise: "*Faretta* teaches us that the right to self-representation is a personal right[] [and] cannot be impinged upon merely because society, or a judge, may have a difference of opinion with the accused as to what type of evidence, if any, should be presented in a penalty trial." *Id.* at 384.

The Fifth Circuit is not alone. The Seventh Circuit has likewise held that the Eighth Amendment does not outweigh the right to self-representation and require the presentation of mitigation evidence. *See Silagy v. Peters*, 905 F.2d 986, 1007-08 (7th Cir. 1990) ("Although it is evident that such a decision [not to present mitigation evidence] on the part of a death-eligible defendant may impact the jury's decision-making process, we do not believe that the right which *Faretta* grants can or should be contingent on this factor."). So have state courts. *See Bishop v. State*, 597 P.2d 273, 276 (Nev. 1979) (holding that the defendant "had a Sixth Amendment right not to have counsel forced upon him" despite declining to present mitigation evidence); *People v. Coleman*, 660 N.E.2d 919, 937 (Ill. 1995) ("We are not persuaded by defendant's argument that the heightened need for

reliability in capital cases justifies forcing the accused to accept representation by counsel.").

We agree with those courts and hold that the Sixth Amendment protects the right to self-representation at capital sentencing even when, as here, the defendant chooses not to present a mitigating factor to the jury. Roof asks that we adopt the reasoning from the dissenting opinion in *Davis II*.[25] His argument is grounded in the idea that, under the Eighth Amendment, a defendant cannot waive procedural safeguards out of a desire to obtain a death sentence. But that position, broadly stated, has been rejected by the Supreme Court. *See Gilmore v. Utah*, 429 U.S. 1012, 1013 (1976) (terminating a stay of execution by permitting the defendant to waive his right to appeal); *id.* at 1015 n.4 (Burger, C.J., concurring) (noting that the defendant "did not care to languish in prison for another day" (internal quotation marks omitted)); *cf. id.* at 1018 (White, J., dissenting) (favoring a

---

[25] According to that dissent (and to Roof), the right to self-representation does not extend to the right to choose death for oneself:

> Davis intends to incur the death penalty by presenting no adversary trial defense whatsoever. The majority errs grievously in interpreting the Supreme Court's cases as holding that a criminal defendant's right of self-representation is absolute and that the trial court is therefore powerless to exercise any significant supervision or regulation of the defendant's use of that right.

*United States v. Davis (Davis II)*, 285 F.3d 378, 385-86 (5th Cir. 2002) (Dennis, J., dissenting) (footnote omitted). And like Roof, that dissent relies on the Supreme Court's plurality opinion in *Woodson v. North Carolina*, which noted a "qualitative difference" between death and life in prison, and therefore "a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." 428 U.S. 280, 305 (1976) (plurality opinion); *see also Gregg v. Georgia*, 428 U.S. 153, 190 (1976) (holding that "accurate sentencing information is an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die").

decision that would have allowed the defendant's mother to act as his "next friend" and challenge the "constitutionality of the Utah death penalty statute" on remand); *Stewart v. LaGrand*, 526 U.S. 115, 119 (1999) ("By declaring his method of execution, picking lethal gas over the State's default form of execution—lethal injection—[the defendant] has waived any objection he might have to it."). It has permitted a capital defendant to forfeit an appeal challenging the constitutionality of a death-penalty statute, *Gilmore*, 429 U.S. at 1013, and we cannot say that the presentation of a particular kind of mitigation evidence (the mental health mitigation evidence that Roof chose not to present) is more important to a rigorous capital punishment process than appellate review of the conviction and sentence.

In sum, we conclude that Roof's constitutional rights were faithfully considered and enforced when the district court permitted him to represent himself during the penalty phase of trial and to not present mitigation evidence.

Turning briefly to his argument under the FDPA, we conclude that that statute does not require the presentation of mitigation evidence to the sentencing authority.[26] Roof contends that Congress recognized what he calls the Eighth Amendment's mitigation imperative when it included in the FDPA a requirement that juries be given mitigation evidence.[27] But the FDPA describes the presentation of mitigation evidence in permissive

---

[26] The FDPA provides that the jury shall recommend by unanimous vote whether death is appropriate, 18 U.S.C. § 3593(e), and "[u]pon a recommendation . . . the court *shall* sentence the defendant accordingly." *Id.* § 3594 (emphasis added).

[27] Roof cites two sections of the Act that require the factfinder to consider the mitigation evidence that has been presented. *See* 18 U.S.C. § 3592(a)(8) ("In determining whether a sentence of death is to be imposed on a defendant, the finder of fact *shall*

terms, and only then requires that the factfinder consider such evidence. *See* 18 U.S.C. § 3593(c) (instructing that a "defendant *may* present any information relevant to a mitigating factor" at capital sentencing and the prosecution "*may* present any information relevant to an aggravating factor" (emphases added)). There is no ambiguity, and that reading is consistent with the demands of the Sixth Amendment.[28]

### E.    Issue 7: Roof's Waiver of Counsel Was Knowing, Voluntary, and Intelligent

Roof next argues that his waiver of counsel before voir dire was invalid because he was misinformed about the role of standby counsel and because he was not informed that he could "proceed with counsel at jury selection and guilt, and self-represent at penalty." (Opening Br. at 127.) Both arguments lack merit.[29]

#### 1.  Legal Standard

A defendant's "assertion of the right of self-representation . . . must be (1) clear and unequivocal; (2) knowing, intelligent and voluntary; and (3) timely." *United States v. Frazier-El*, 204 F.3d 553, 558 (4th Cir. 2000) (internal citations omitted). The requirement

---

*consider* any mitigating factor, including . . . factors in the defendant's background . . . that mitigate against imposition of the death sentence." (emphasis added)); *id.* § 3593(b), (c) ("[I]nformation may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor permitted *or required* to be considered under section 3592." (emphasis added)).

[28] Even if we viewed the FDPA as ambiguous, we would avoid interpreting it in a manner that violates defendants' autonomy rights under the Sixth Amendment. *United States v. Simms*, 914 F.3d 229, 251 (4th Cir. 2019) (en banc).

[29] "Determination of a waiver of the right to counsel is a question of law, which we review de novo." *United States v. Owen*, 407 F.3d 222, 225 (4th Cir. 2005).

for a clear and unequivocal waiver both protects defendants against an inadvertent waiver by "occasional musings on the benefits of self-representation" and prevents defendants from "taking advantage of and manipulating the mutual exclusivity of the rights to counsel and self-representation." *Id.* at 558-59 (citation omitted). Because the right to counsel is "preeminent and hence, the default position," trial courts must "indulge in every reasonable presumption against [its] relinquishment." *United States v. Ductan*, 800 F.3d 642, 649 (4th Cir. 2015) (internal quotation marks and citations omitted).

The Supreme Court has not "prescribed any formula or script to be read to a defendant who states that he elects to proceed without counsel." *Iowa v. Tovar*, 541 U.S. 77, 88 (2004). But the trial court must nevertheless "assure itself that the defendant knows the charges against him, the possible punishment and the manner in which an attorney can be of assistance," *United States v. King*, 582 F.2d 888, 890 (4th Cir. 1978), as well as "the dangers and disadvantages of self-representation." *Ductan*, 800 F.3d at 649; *see also Tovar*, 541 U.S. at 88-89 (emphasizing that a defendant "must be warned specifically of the hazards ahead"). Such a determination is made "by examining the record as a whole" and "evaluating the complete profile of the defendant and the circumstances of his decision as known to the trial court at the time." *United States v. Singleton*, 107 F.3d 1091, 1097 (4th Cir. 1997).

### 2. *Roof Was Appropriately Aware of His Role and Responsibilities*

The government met its "heavy burden" of proving that Roof's waiver of counsel was valid. *See Brewer v. Williams*, 430 U.S. 387, 402 (1977). First, the district court held a *Faretta* hearing and outlined to Roof the charges and punishment that he faced. It then,

in a series of questions and answers, ensured that Roof knew that self-representation would be hazardous and would render his defense less effective. Next, it outlined Roof's personal responsibilities, confirming with him that he would be the one to "make as-needed motions or objections, ask questions, [and] make arguments." (J.A. at 2134-35.) Roof also confirmed that he understood that he would "be performing in a courtroom . . . throughout the trial." (J.A. at 2135.)

But we do not rely on the *Faretta* colloquy alone in reaching our conclusion. A review of "the record as a whole," *Singleton*, 107 F.3d at 1097, reveals that the *Faretta* hearing was not the district court's first encounter with Roof's desire to self-represent. Roof's confirmation at the *Faretta* hearing that he understood what self-representation entailed was consistent with his prior statements to the court regarding his desire to manage the evidence presented and his understanding of the proceedings, the potential punishment for the charged offenses, and the benefits of counsel. The *Faretta* colloquy in combination with those past statements convinces us that Roof's waiver was properly considered and knowingly entered.

Roof argues that his waiver was neither knowing nor intelligent because the district court told him that standby counsel "would be available to assist [him] if [he] desired that assistance" (J.A. at 2133), without defining what "assist" means. Such a statement, Roof argues, muddied his understanding of his own personal responsibilities and those of his counsel.

If he was confused, though, it was certainly not the district court's fault. The court was not obligated to precisely define the role of standby counsel. And far from misleading

60

Roof about that role, it pinpointed specific ways that standby counsel could help Roof.  The court in fact permitted standby counsel to fully "assist" Roof—to sit at Roof's table, advise him about potential jurors, pass him notes, confer during the proceedings, and provide him with suggested voir dire questions.  Indeed, the court encouraged Roof to take time to consult with standby counsel.  By way of limitation, the court simply asked that standby counsel not serve as co-counsel and that Roof, as his own representative, speak for himself when addressing the court.

Those instructions were consistent with both the district court's assurance that standby counsel could assist Roof and with the court's confirmation that Roof retained the obligation to "make as-needed motions or objections, ask questions, [and] make arguments." (J.A. at 2134-35.)  Those instructions are also consistent with our precedent on self-representation.  *See Frazier-El*, 204 F.3d at 559 ("A defendant who vacillates at trial places the trial court in a difficult position because it 'must traverse . . . a thin line between improperly allowing the defendant to proceed *pro se*, thereby violating his right to counsel, and improperly having the defendant proceed with counsel, thereby violating his right to self-representation.'" (alteration in original) (quoting *Fields v. Murray*, 49 F.3d 1024, 1029 (4th Cir. 1995) (en banc))).

Roof further argues that both his and his counsel's attempts to have counsel step in to make objections and to ask questions during voir dire show Roof's lack of knowledge about his role in self-representation.  But Roof's waiver was knowing and intelligent even if he later wanted to bend the rules and have standby counsel assume the role of co-counsel.  Over the course of the voir dire, as both the personal responsibilities of Roof and the precise

role of standby counsel became more apparent, Roof confirmed that he understood his role by continuing to self-represent despite the district court's offers for him to relinquish that role.

In particular, when Roof faced difficulties with the logistics of self-representation, the district court twice gave Roof the option of withdrawing from self-representation. The court first said to standby counsel:

> I have kept you and your team in place, A, to assist; and, B, should Mr. Roof reconsider his decision that you will be here and ready to assume a different role.

(J.A. at 2407.) At a later point, the court directly addressed Roof and said:

> [Representation] was a challenging and daunting endeavor to do by yourself. And I say that if through this process you wish to reconsider that decision and to relinquish your role in self-representation, I would consider that. That's up to you . . . .

(J.A. at 2561-62.) Roof did not give up his right to self-representation in response to either of those comments. Given the *Faretta* colloquy and Roof's actions before and after the hearing, we conclude that Roof did not base his self-representation decision on a misunderstanding about the role of standby counsel.

### 3. *The District Court Need Not Have Informed Roof of the Ability to Selectively Use Counsel for Different Parts of the Case*

Roof also argues that his waiver was invalid because, during his *Faretta* hearing, he was not "advised that he could proceed with counsel at voir dire and guilt, but self-represent at penalty." (Opening Br. at 130-31.) The district court's failure to provide a timely explanation, Roof contends, "forced Roof into a false choice" and caused him to be "alone for critical voir dire." (Opening Br. at 130-31.)

Although we have permitted defendants to be represented by counsel during specific phases of litigation, *see United States v. Hilton*, 701 F.3d 959, 964-65 (4th Cir. 2012), we have never required district courts to authorize a phase-by-phase approach, much less that the courts must help defendants strategize their self-representation by informing defendants of such a possibility when the defendant requests a *Faretta* waiver. Because we see no basis to impose such a requirement, Roof's argument fails.

## F.    Issue 8: The District Court Did Not Err in Granting Roof's Motion to Waive Counsel

Roof argues that the district court failed to appreciate the extent of its authority to exercise discretion with regard to his untimely *Faretta* motion, and that such misapprehension constitutes an abuse of discretion. We disagree and note the oddity of arguing that the court erred in *granting* Roof the very relief he requested.[30]

Discretion may be abused by a "failure or refusal, either express or implicit, actually to exercise discretion, deciding instead as if by general rule, or even arbitrarily, as if neither by rule nor discretion." *James v. Jacobson*, 6 F.3d 233, 239 (4th Cir. 1993) (citing *Will v. Calvert Fire Ins. Co.*, 437 U.S. 655, 661-62 (1978)). Here, the district court stated that because

> [its] discretion is not boundless—the defendant's constitutional right to represent himself must be respected. The decision whether to allow the defendant to exercise that right is within the Court's discretion in the sense

---

[30] The parties agree that because Roof filed his *Faretta* motion after "meaningful trial proceedings . . . commenced," the decision to grant or deny his untimely motion "rest[ed] within the sound discretion of the trial court." *See United States v. Lawrence*, 605 F.2d 1321, 1325 (4th Cir. 1979). We, in turn, review the trial court's exercise of that discretion under the abuse-of-discretion standard. *Id.*

that the defendant may not exercise his rights abusively and the Court has discretion to decide what is or is not an abuse.

(J.A. at 2298 (citing *United States v. Hilton*, 701 F.3d 959, 965 (4th Cir. 2012)).)

That wording is under-inclusive because although a defendant's abuse of the right to self-representation may be considered by a district court in exercising discretion, it does not limit the court's authority to grant or deny an untimely request. *See generally Hilton*, 701 F.3d at 965 ("[A] defendant's request for self-representation is a matter submitted to the sound discretion of the trial court.").

In any event, the district court did in fact exercise its discretion when it considered whether Roof had invoked his right in order to disrupt or delay the proceedings, and it found that he had not. The court instead concluded that Roof was "motivated by disdain for a defense based on mental health evidence" and he "reacted immediately when he learned Defense Counsel intended to present such evidence." (J.A. at 2298.) That conclusion is fully supported by the record. Roof fails to indicate how the court would have analyzed the issue any differently or reached a different conclusion if it had considered factors others than an abusive invocation of the right to self-representation. The court's reasoning and decision align with our understanding of the purpose of the timeliness requirement—"to minimize disruptions, to avoid inconvenience and delay, to maintain continuity, and to avoid confusing the jury." *United States v. Lawrence*, 605 F.2d 1321, 1324 (4th Cir. 1979) (quoting *United States v. Dunlap*, 577 F.2d 867, 868 (4th Cir. 1978)). The district court therefore did not abuse its discretion in granting Roof's *Faretta* motion to represent himself.

### G.    Issue 9: The District Court Did Not Err in Finding Roof Competent to Self-Represent

Roof next contends that, even if he was competent to stand trial, he was not competent to represent himself because he is what the Supreme Court has called a "gray-area defendant."  *See Indiana v. Edwards*, 554 U.S. 164, 173, 177-78 (2008) ("[T]he Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under *Dusky* [*v. United States*, 362 U.S. 402 (1960),] but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves.").  He correctly points out that the ability to stand trial *without* counsel requires a level of competence that exceeds that required to stand trial *with* counsel. *See United States v. Barefoot*, 754 F.3d 226, 233-34 (4th Cir. 2014) (distinguishing general competency from self-representation competency).  And Roof argues that "capital defendants must be held to a higher standard [than other defendants] to satisfy *Edwards*." (Opening Br. at 149.)  Again, we are unpersuaded that the district court erred.[31]

To be a gray-area defendant, Roof would have to lack the mental capacity to perform the basic tasks of self-representation.  *See United States v. Bernard*, 708 F.3d 583, 589-90 (4th Cir. 2013).  Although a high-IQ defendant could conceivably lack the mental capacity to perform such tasks by, for example, suffering from psychosis and hallucinations, the district court reasonably found that Roof—whose full-scale IQ of 125 places him in the

---

[31] Whether the district court applied the correct standard for gray-area competency is a legal question we review de novo.  *Panetti v. Stephens*, 727 F.3d 398, 409 (5th Cir. 2013).  We review the district court's determination of competency for clear error.  *United States v. Robinson*, 404 F.3d 850, 856 (4th Cir. 2005).

65

95th percentile of the general population, despite average processing speed—was not suffering from any such debilitating illnesses.

Roof instead allegedly suffered from what several of his expert witnesses described as "disorganized thinking, reduced processing speed, memory problems, and difficulty integrating new information," almost all as a result of "mild frontal system dysfunction." (Opening Br. at 141 (citing J.A. at 1500, 1695, 5308, 5359, 5658-59).) As the government correctly points out, however, defendants like Roof can suffer "mental illness while having the intellectual capacity to self-represent." (Answering Br. at 109.) *Cf. United States v. Brugnara*, 856 F.3d 1198, 1214 (9th Cir. 2017) (finding that a defendant with "high-average, nearly superior intellectual ability," bipolar disorder, delusional disorder, and narcissistic personality disorder had the capacity to self-represent); *United States v. McKinney*, 737 F.3d 773, 775, 779 (D.C. Cir. 2013) (finding that a defendant with bipolar disorder, chronic anxiety, and insomnia had the capacity to self-represent).

Perhaps the best evidence that Roof indeed had the mental capacity to perform the basic tasks of self-representation is that he *did* perform them. He participated in jury selection, prompting standby counsel to remark that "on average we've done very well" (J.A. at 2289), and the district court noted that his cross-examinations of Drs. Ballenger and Loftin "demonstrated an aptitude for witness cross-examination that [was] extraordinary for a *pro se* litigant." (J.A. at 6966; *see also* J.A. at 6961-62.) At the penalty phase, he delivered an opening statement, argued against aggravating factors, challenged the prosecution, and made a closing argument.

Witnessing this, the district court noted that "if [Roof] were incompetent to represent himself, almost no defendant would be competent to represent himself." (J.A. at 6956.) That evaluation is significant because "[t]he district court [i]s in the best position to observe [the defendant] and its determinations during trial are entitled to deference." *Bernard*, 708 F.3d at 593. Roof's statement now that "[t]he evidence counsel proffered at the second [competency] hearing . . . established beyond doubt his crippling anxiety, disordered thinking, reduced processing speed, memory problems, difficulty integrating new information, and fixation on trivial details," even if containing some truth, does not mean that he was necessarily incompetent. (Opening Br. at 145 (citing J.A. at 5463, 5977, 5991).) The district court's analysis of Roof's competency was thorough and incorporated both the court's observations and the opinions of the various experts.

Roof argues that the need for heightened reliability in death penalty cases means that the *Edwards* rule protecting gray-area defendants should apply more stringently. Assuming that is correct, however, the district court's findings show Roof to be well outside the gray area. As the court said, "if [he] were incompetent to represent himself, almost no defendant would be competent to represent himself." (J.A. at 6956.) His argument, in effect, is that *all* criminal defendants in death penalty cases should have mandatory appointed counsel. *Cf. Lenhard v. Wolff*, 444 U.S. 807, 807-08 (1979) (denying 7 to 2 a stay of execution on standing grounds for a defendant who waived his right to counsel); *id.* at 811 (Marshall, J., dissenting) ("Society's independent stake in enforcement of the Eighth Amendment's prohibition against cruel and unusual punishment cannot be

67

overridden by a defendant's purported waiver."). That argument is addressed and rejected above. *See supra* Section IV.D.

### H.    Issue 10: The District Court Did Not Err in Denying Roof Further Assistance from Standby Counsel or Additional Accommodations

Roof next argues that even if his *Faretta* waiver were knowing and intelligent, the district court still erred in rejecting his requests for additional assistance. But a district court has wide-ranging discretion to determine the appropriate role of standby counsel and the extent of accommodations for pro se defendants. *United States v. Lawrence*, 161 F.3d 250, 253 (4th Cir. 1998) (noting that "the district court, in keeping with its broad supervisory powers, has . . . broad discretion to guide what, if any, assistance standby, or advisory, counsel may provide to a defendant conducting his own defense"). Roof argues that the court "unreasonably denied [his] requests for necessary accommodations," thereby undermining his "dignity and autonomy" while denying him "a fair chance to present his case." (Opening Br. at 149.) *See McKaskle v. Wiggins*, 465 U.S. 168, 177 (1984). We disagree.[32]

#### 1. Standby Counsel

*Faretta* does not hold that standby counsel's participation must be allowed; only that such participation is permitted. *See Faretta v. California*, 422 U.S. 806, 834 n.46 (1975) (explaining that a trial judge "*may*—even over objection by the accused—appoint

---

[32] We review a district court's determination of the role of standby counsel under the abuse-of-discretion standard. *United States v. Lawrence*, 161 F.3d 250, 253 (4th Cir. 1998).

a 'standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary" (emphasis added)).  The alternate reading of *Faretta* as urged by Roof is meritless.

Roof also mischaracterizes *McKaskle*.  The Supreme Court there held that a district court can constitutionally appoint standby counsel to operate in "hybrid" fashion, meaning in a consultative role and in a more substantial, visible role; it did *not* hold that such hybrid standby assistance for defendants is constitutionally mandated.  *McKaskle*, 465 U.S. at 183.  This court has since reiterated the point.  *See, e.g.*, *United States v. Singleton*, 107 F.3d 1091, 1103 (4th Cir. 1997) (rejecting a "contention that the Constitution requires that [defendants] be provided with a hybrid type of representation"); *Lawrence*, 161 F.3d at 253.

### 2.  *Accommodations*

As discussed, the district court gave Roof several accommodations.  It allowed standby counsel to recommend questions, give advice, and even suggest objections.  Although Roof correctly alleges that the court denied counsel's requests for some additional accommodations, such as shorter trial days, intermittent breaks, and advance-notice of government testimony, those denials were not unreasonable.  Contrary to Roof's conclusory assertions that the court's denials of his requests were arbitrary and irrational, the court explained that it saw he was "extremely engaged," even without such accommodations, at his competency hearing.  (J.A. at 3585.)  We find no abuse of discretion in those rulings by the district court.

## V.     ISSUES RELATED TO DEATH VERDICT

Roof also asserts that "errors fundamentally undermined [the] weighing process" that jurors used to determine whether the death sentence was justified at the penalty phase. (Opening Br. at 158.)   First, Roof argues that the district court erroneously precluded mitigating evidence, that the government capitalized on that error with its improper remarks during closing argument, and that the district court's failure to respond to the jury's clarification requests exacerbated the government's errors, ultimately stripping the jury of the necessary means to meaningfully consider certain mitigating factors.   Second, he contends that a victim's remarks during the guilt phase wrongly influenced the jury's death verdict.   Third, Roof argues that "the government flooded its penalty-phase presentation with improper evidence and argument on the victims' worthiness," impermissibly tying its request for a death sentence with the victims' status as "good and religious people." (Opening Br. at 159.)   And fourth, he asserts that his age and mental capacity rendered him ineligible to receive the death sentence.   We are unpersuaded and find no error.

### A.     **Death Verdict Background**

#### *1. Aggravating and Mitigating Factors*

Several months before trial, the government submitted notice of its intent to seek the death penalty, listing four gateway intent factors, [33] three statutory aggravating

---

[33] If a defendant is convicted of a death-eligible offense, then, at the penalty phase, the government must first establish that the defendant had the mental state described in at least one of the four gateway intent factors enumerated under 18 U.S.C. § 3591(a)(2)(A)-(D).   Specifically, the government must demonstrate that the defendant:

factors,[34] and six non-statutory aggravating factors that it "propose[d] to prove . . . as justifying a sentence of death."  (J.A. at 146.)  *See* 18 U.S.C. § 3593(a)(2).  The non-statutory aggravating factors identified in the government's notice and relevant to Roof's challenges on appeal are: Roof "attempted to incite violent action by others," "caused injury, harm, and loss . . . to the family, friends, and co-workers of those individuals" that he killed, and targeted worshippers at Mother Emanuel "in order to magnify the societal impact of [his] offenses."[35]  (J.A. at 149-50.)

Defense counsel disclosed Roof's intent to offer evidence of mitigating factors, including two non-statutory mitigating factors suggesting that "a sentence of life in prison

---

(A) intentionally killed the victim; (B) intentionally inflicted serious bodily injury that resulted in the death of the victim; (C) intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act; or (D) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act.

18 U.S.C. § 3591(a)(2)(A)-(D).  Here, the government proposed to prove all four gateway intent factors.

[34] The government must establish the existence of at least one statutory aggravating factor enumerated under 18 U.S.C. § 3592(c).  The government proposed to prove three statutory aggravating factors: Roof (1) "intentionally killed or attempted to kill more than one person in a single criminal episode," *id.* § 3592(c)(16); (2) engaged in "substantial planning and premeditation to cause the death of a person," *id.* § 3592(c)(9); and (3) killed three individuals who were "particularly vulnerable due to old age."  *Id.* § 3592(c)(11).

[35] The government also proposed to prove three additional non-statutory aggravating factors: Roof endangered the safety of others, "his animosity towards African Americans played a role in the murders," and he demonstrated no remorse.  (J.A. at 150.)

without the possibility of release will be especially onerous" because: (1) the danger of violence Roof will face from other inmates "[d]ue to his small size, youth, and notoriety . . . will require that he serve his life sentence under isolating conditions of confinement"; and (2) "he will serve his entire life sentence in fear of being targeted by other inmates."[36] (J.A. at 464.) The government moved to exclude both of those mitigating factors, arguing that "information about potential future conditions of confinement is irrelevant as mitigation because it does not relate to the defendant's character, background or record, or to the circumstances of his crimes." (J.A. at 470.) The district court granted the motion to preclude "evidence in support of speculation" about Roof's "future conditions of confinement if sentenced to life imprisonment." (J.A. at 494.) The court reasoned that "[i]t is inappropriate to ask the jury to imagine conditions at some imaginary prison." (J.A. at 493.)

Defense counsel subsequently filed notice of two additional non-statutory mitigating factors: "Dylann Roof poses no significant risk of violence to other inmates or prison staff if imprisoned for life"; and, "[g]iven his personal characteristics and record, Dylann Roof can be safely confined if sentenced to life imprisonment." (J.A. at 496.) We refer to these two collectively as the "lack-of-future-dangerousness" mitigating factors.

---

[36] They also identified one statutory mitigating factor—that Roof had no significant prior criminal history—and six other non-statutory mitigating factors: (1) Roof was 21 at the time of the offense; (2) he offered to plead guilty; (3) he cooperated with arresting authorities; (4) he confessed to his crimes; (5) he had no prior history of violence; and (6) he could be redeemed.

The government did not oppose either factor, which appeared on the verdict form as mitigating factors 8 and 9.

### 2. Penalty Phase

During the penalty phase, the government presented victim-impact testimony from twenty-three witnesses. The district court overruled Roof's objection to the number of witnesses. The government also introduced, among other things, a video of Reverend Pinckney teaching history at Mother Emanuel; an audio clip of Reverend Middleton-Doctor singing a hymn; an audio clip of Reverend Coleman-Singleton praying; a video of a song written about Reverend Coleman-Singleton by her son; photos of Reverend Pinckney preaching; a photo of Reverend Simmons in church; photos of Tywanza Sanders, Reverend Simmons, Reverend Thompson, and Reverend Coleman-Singleton at a baccalaureate ceremony; and an audio clip of a voicemail left by Reverend Pinckney for a sick friend. Roof objected in real time only to the audio clip of Reverend Coleman-Singleton praying, the video of the song about Reverend Coleman-Singleton, and the baccalaureate-ceremony photos. The court overruled the objections. After one of the victim-impact witnesses testified, however, the court reminded the jury that "victim testimony is limited to . . . personal characteristics of the victims and the emotional impact on the family. You should disregard any other comments other than those." (J.A. at 6367.)

Before closing argument, Roof filed a motion in limine, preemptively objecting to the prosecution's "reference[] to the 'particularly good' victims . . . and similar references, especially references that imply or directly suggest a comparison to the defendant" or "to what 'God' told the victims or witnesses, or what witnesses feel the victims 'wanted' the

jury to see." (J.A. at 6519.)  The district court permitted the prosecution to describe the victims as "particularly good individuals," but prohibited the use of comparative worth arguments. (J.A. at 6636-37.)  During closing argument, upon recapping the victim-impact evidence, the prosecution concluded that Roof killed "extraordinarily good" and "great" people of faith, including some of "the best among us." (J.A. at 6668, 6703.)  Roof did not object.  The court still instructed the jury that it "must not consider . . . religious beliefs . . . of either defendant or any victim." (J.A. at 6747 (jury charge).)

In addition to the victim-impact evidence, the jury heard from Charleston County Sheriff's Officer Lauren M. Knapp, who monitored the jail for safety and security, including screening incoming and outgoing mail.  She testified about Roof's prison writings, including an outbound letter that she had intercepted.  Roof wrote: "I realized it was worth it. . . . I did what I thought could make the biggest wave, and now the fate of our race is in the hands of our brothers to continue to live freely." (J.A. at 6196.)  Roof did not cross-examine Knapp and never rebutted her claims about his letter.  In its closing argument, the prosecution referred to those writings as "the jailhouse manifesto," where Roof "attempts to incite violence in others, to agitate race relations." (J.A. at 6686.)

During closing argument, the prosecution told the jury to "consider any facts or factors based on the evidence that you believe mitigate against the imposition of the death penalty," but then claimed that some of the mitigating factors "are simply not true for which no evidence has been presented." (J.A. at 6696-97.)  The prosecution argued that not only is there "no evidence" that Roof "does not pose a risk of violence while incarcerated," but that the evidence is "quite to the contrary." (J.A. at 6697.)  It said that Roof's "experience

being incarcerated indicates there is quite a risk of violence, violence that he incites, violence that he encourages, violence that he sends to others to act. That is the risk of violence from this defendant." (J.A. at 6697.) The prosecution also told the jurors to ask themselves "whether there is evidence that he can be safely confined" when what "you have seen is the defendant sending letters out, writing racist manifestos, continuing what he has done." (J.A. at 6697.) And it reiterated that "there's no evidence to support . . . the lack of a risk of violence, the safety, all of which the evidence suggests to the contrary." (J.A. at 6698.)

The prosecution highlighted the "jailhouse manifesto" in its non-statutory aggravation argument: Roof "is sending a message. He is trying to get others to act. . . . [H]e was certainly doing that in his jailhouse manifesto. He is attempting to incite violence in others, and that weighs heavily." (J.A. at 6702.)

Roof objected to the prosecution's reliance on Roof's mail, arguing that it related to prison conditions, which the court had "refused to allow me to present evidence" on since they "weren't allowed to talk about an imaginary prison." (J.A. at 6710.) The court overruled the objection, explaining that its ruling had addressed whether Roof could argue that he was "unusually vulnerable to danger in prison." (J.A. at 6711.) It explained that the prosecution was discussing what Roof "had written while incarcerated . . . [,] which was motivated to incite violence, and that in prison, you could continue to do the same thing." (J.A. at 6710.) It agreed with the prosecution that the evidence "was fair rebuttal to the mitigators that [you] chose to put in." (J.A. at 6711.) It also reminded Roof that he could "argue to the contrary." (J.A. at 6711.)

### 3. *Jury Deliberations*

During jury deliberations, standby counsel lodged more objections. They asked the court to instruct the jury that Roof was "not permitted to introduce evidence about the conditions of confinement. And, thus, it would not have been possible and was not possible for this defendant to show that he would not be able or that the Federal Bureau of Prisons is capable of preventing him from sending out a manifesto or otherwise communicating with like-minded people on the outside." (J.A. at 6754-55.) The court responded, "[t]hat's not what that goes to," explaining that the prosecution "was addressing the aggravating factors inciting violence and that he was a continued threat of this because he was continuing to write." (J.A. at 6754.) The court determined that the "inciting others aggravating factor is broad enough to allow" evidence of Roof's jailhouse manifesto. (J.A. at 6757.) Standby counsel also requested the court to instruct the jury that "in light of the prosecution's argument that there is no evidence of nondangerousness . . . [,] mitigating factors can in some circumstances be proven by the lack of evidence," such as "the lack of evidence of jail infractions or misconduct." (J.A. at 6763.) The court denied the request.

The jury sent two questions to the court, both about the lack-of-future-dangerousness mitigating factors. The jury first asked about mitigating factor number eight on the verdict form (Roof posed no significant risk of violence in prison): "Would he personally inflict the violence or would he incite violence, need clarification." (J.A. at 6765.) The court found "the common meaning" of that mitigating factor is "would he commit acts of violence." (J.A. at 6766.) Roof agreed that "it means me not harming anyone" and that "it doesn't mean inciting." (J.A. at 6767.) But, after the prosecution

argued that Roof chose those particular words and the court should not "further redefine" the factor and "narrow the scope," the court declined to clarify the meaning to the jury. (J.A. at 6767.)

The jury also asked about mitigating factor number nine on the verdict form (Roof could be safely confined to life in prison): "Please define safe confinement. Does this include his writing getting out of prison." (J.A. at 6768.) The government claimed that the court should not clarify the factor because "the whole point of mitigation is they are to be read broadly." (J.A. at 6768.) The court blamed the defense for proposing the lack-of-future-dangerousness mitigating factors, noting that the court did not "really have a right to define them more precisely." (J.A. at 6768-69.) Roof's standby counsel asserted that "these are the defendant's mitigating factors" and warned that the "prosecution in effect would like the jury to use these as aggravating factors." (J.A. at 6769.) According to the defense, this interpretation could convert the lack-of-future-dangerousness mitigating factors into aggravating factors. Ultimately, the court informed the jurors, as to both questions, that "you need to simply read the mitigating factor[s] as written and use your common[ ]sense to interpret [them]. It would not be proper to comment further." (J.A. at 6775.)

The jury unanimously found, beyond a reasonable doubt, all gateway intent and aggravating factors. It also found that Roof's mitigating factors existed, with three exceptions: (1) Roof was not capable of redemption; (2) Roof posed a significant risk of dangerousness in prison; and (3) Roof could not be safely confined. The jury found that the aggravating factors sufficiently outweighed the mitigating factors. It unanimously

found Roof death-eligible and sentenced him to death on each capital count. The court entered a sentence of death on Counts 13 through 21 and 25 through 33, and of life imprisonment without the possibility of release on all other counts.

## B.    Issue 11: The Court Did Not Improperly Preclude Roof from Presenting Mitigating Evidence

We now turn to the alleged errors that Roof claims affected the penalty phase of his trial. The first category of those alleged errors relates to mitigating evidence. Roof contends that the district court improperly struck two of his proposed mitigating factors and then precluded him from presenting evidence about his lack of future dangerousness. He next argues that the prosecutor improperly capitalized on that error during his closing argument. Finally, Roof asserts that the court failed to adequately address jury questions about the mitigators that he was allowed to present. We address each in turn below.[37]

### 1. The Precluded Mitigating Factors and Evidence of Prison Conditions

The Eighth Amendment and the Federal Death Penalty Act both require that the finder of fact consider, "*as a mitigating factor*, any aspect of a defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death." *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978)

---

[37] We review de novo preserved constitutional challenges to the mitigating factors, *United States v. Runyon*, 707 F.3d 475, 499 (4th Cir. 2013), evidentiary rulings implicating constitutional claims, *United States v. Williams*, 632 F.3d 129, 132 (4th Cir. 2011), and whether the prosecutor's remarks made during closing argument were improper, *United States v. Collins*, 415 F.3d 304, 307 (4th Cir. 2005). A district court's response to a jury note seeking clarification is ordinarily reviewed under the abuse-of-discretion standard. *United States v. Alvarado*, 816 F.3d 242, 248 (4th Cir. 2016).

(plurality opinion)); *see also* 18 U.S.C. § 3592(a)(8) (describing "[o]ther factors in the defendant's background, record, or character . . . that mitigate against imposition of the death sentence"). Roof contends that the district court erred when it barred him from submitting the following two mitigating factors to the jury:

> Due to his small size, youth, and notoriety, a sentence of life in prison without the possibility of release will be especially onerous for Dylann Roof, because the danger of violence he will face from other inmates will require that he serve his life sentence under isolating conditions of confinement.

> A sentence of life in prison without the possibility of release will be especially onerous for Dylann Roof because he will serve his entire life sentence in fear of being targeted by other inmates.

(J.A. at 464.) The court granted the government's motion in limine to exclude both factors, reasoning that "[i]t is inappropriate to ask the jury to imagine conditions at some imaginary prison." (J.A. at 493.) It also precluded any "evidence in support of speculation about [Roof's] future conditions of confinement if sentenced to life imprisonment." (J.A. at 494.)

The two excluded mitigating factors did not seek to prove, as *Eddings* allows, that something about Roof's personal character warranted a "sentence less than death." 455 U.S. at 110 (citation omitted). Instead, the excluded mitigators sought to prove that a sentence of life imprisonment would be particularly onerous for Roof. We are not aware of—and Roof does not identify—any court that has found this to be proper mitigating evidence. And at least one circuit court has held that the harshness of prison conditions is not an appropriate mitigating factor. *United States v. Johnson*, 223 F.3d 665, 674-75 (7th Cir. 2000). We agree and conclude that the court properly excluded the challenged mitigators.

79

Roof contends, however, that the two factors that he sought to introduce did not relate to generalized conditions of confinement, but were "tailored specifically to him" because they relate to his "small stature, youth, and notoriety." (Opening Br. at 169.) In Roof's view, these characteristics would increase the danger that he faces from other inmates, which would, in turn, require that prison officials take additional security measures to keep him safe. Although these excluded factors involve some consideration of Roof's character, their import hinges on speculation regarding the hypothetical (and wholly unsubstantiated) danger of violence that Roof would presumptively face due to his individual characteristics. The multiple hypotheticals on which the excluded factors rely negate any meaningful consideration of mitigating information specific to Roof.

Roof responds by citing our decision in *Lawlor v. Zook*, 909 F.3d 614 (4th Cir. 2018). In *Lawlor*, we held that the state trial court erred when it excluded from the penalty phase of a murder case the defense expert's testimony regarding Lawlor's low risk of committing acts of violence in prison. *Id.* at 629-33. In so ruling, we observed that evidence of prison conditions "must connect the specific characteristics of the particular defendant to his future adaptability in the prison environment." *Id.* at 631 (quoting *Morva v. Commonwealth*, 683 S.E.2d 553, 565 (Va. 2009)). The specific characteristics in *Lawlor* involved Lawlor's lack of violent activity in prison, his (relatively) advanced age, and his significant contacts with family and friends. *Id.* at 622-23. Lawlor's expert was prepared to opine that these characteristics, specific to Lawlor, demonstrated that he represented a low risk for committing acts of violence while incarcerated.

In contrast, Roof's specific characteristics involve his "small size, youth, and notoriety." (J.A. at 464.) He sought to show that, due to them, he would be in constant danger while in prison and would likely spend his life sentence in isolating conditions, unlike Lawlor, who sought to show that he was not dangerous. For the reasons set forth above, the connection between those individualized characteristics and the proposed mitigators is too tenuous, relying primarily on speculation about conditions at some imaginary prison.

Roof's argument also misunderstands the scope of the district court's evidentiary ruling. In *Lawlor*, the trial court had excluded nearly all expert testimony on the issue of Lawlor's lack of future dangerousness in prison. *Id.* at 621. Here, by contrast, the district court's prohibition against "evidence in support of speculation about Defendant's future conditions of confinement" did not prohibit Roof from introducing evidence tending to prove his lack of future dangerousness. (J.A. at 494.)

Filings by standby counsel further belie Roof's current claim that he was barred from introducing such evidence. In their request for the second competency hearing, standby counsel expressed their concern that Roof had decided to forgo substantial mitigation evidence, including "expert testimony regarding the defendant's good behavior during pretrial detention, his likely future as a nonviolent and compliant life-term prisoner if he is not sentenced to death, and the state and federal governments' ability to safely manage him in the future." (J.A. at 5251.) It is thus clear that the defense understood Roof's lack of dangerousness (as opposed to the supposed dangerousness of the prison) was a matter that could be explored as a mitigator and that the court's earlier ruling about

81

prison conditions was not an obstacle.  The decision to forgo such evidence was made by

Roof, not by the court.  Because Roof was not prohibited from introducing evidence about

his lack of future dangerousness, *Lawlor* is inapposite.

### 2. The Prosecutor's Remarks at Closing Argument

Roof next challenges statements by the prosecutor during closing argument about

the lack-of-future-dangerousness mitigating factors.  Roof had submitted those mitigators

to replace the precluded factors discussed above.  As noted, they appeared on the verdict

form as mitigating factors 8 and 9:

> 8. [T]he Defendant poses no significant risk of violence to other inmates or
> prison staff if imprisoned for life.
>
> 9. [G]iven his personal characteristics and record, the Defendant can be
> safely confined if sentenced to life imprisonment.

(J.A. at 6804.)

During closing argument, the prosecutor repeatedly stated that these mitigating

factors were "simply not true" and that the jurors had heard "no evidence" to support them.

(J.A. at 6697.)  The prosecutor alluded to the testimony of Lauren Knapp, an officer with

the Charleston County Sheriff's Office, who had uncovered Roof's racist and incendiary

writings.  This evidence, the prosecutor argued, demonstrated that Roof posed a risk of

violence and could not be safely confined.

A prosecutor's improper closing argument might "so infect[] the trial with

unfairness as to make the resulting conviction a denial of due process."  *Donnelly v.

DeChristoforo*, 416 U.S. 637, 643 (1974).  Where, as here, "specific guarantees of the Bill

of Rights are involved, [the Supreme] Court has taken special care to assure that

prosecutorial conduct in no way impermissibly infringes them." *Id.* At the same time, we have recognized that "great latitude is accorded counsel in presenting closing arguments to a jury." *United States v. Johnson*, 587 F.3d 625, 632 (4th Cir. 2009) (citation omitted); *see also id.* at 633 ("[T]o parse through a prosecutor's closing statement for minor infelicities loses sight of the function of our adversary system, which is to engage opposing views in a vigorous manner."). "Thus, while courts should not hesitate to condemn those prosecutorial comments that truly offend constitutional norms, neither shall we attach constitutional significance to every verbal fillip, lest we unduly censor the clash of viewpoints that is essential to adversarial proceedings." *United States v. Runyon*, 707 F.3d 475, 507 (4th Cir. 2013).

The prosecutor's comments at closing here were not improper. Roof contends that the references to his racist writings and his access to the mail, in tandem with the prosecutor's "no evidence" comment, misled the jury to believe that Roof would be free to send incendiary writings outside prison and that "nothing could be done to prevent his efforts." (Opening Br. at 173.) But the "no evidence" statement appropriately highlighted Roof's decision to forgo presenting *any* evidence in support of mitigating factors 8 and 9. The prosecutor pointed out that Roof wrote a racist jailhouse manifesto expressing again his racist ideology and that there remained a risk that such writings would incite violence from others. Whether the "others" that the prosecutor was referring to included fellow inmates is ambiguous. To the extent that the prosecutor's comments relate to the outside world, the measures that prison officials have in place to prevent Roof from communicating outside the prison are the type of evidence that Roof could have elicited from Officer

Knapp during cross-examination. But Roof declined to cross-examine Knapp or to introduce such evidence through his own expert witness. Nor did Roof introduce any evidence suggesting that he would not (or could not) share his incendiary writings with other inmates.

Echoing his prior argument, Roof contends that the district court's evidentiary ruling precluded him from presenting such evidence. He therefore argues that the prosecutor's "no evidence" statements "t[ook] advantage of a lack of evidence it had itself secured" through its motion in limine. (Opening Br. at 172.) Once again, however, the record tells a different story. The absence of this evidence was a consequence of Roof's decision to present no mitigation evidence—a decision that, as discussed above, caused standby counsel to question Roof's competency.

Nor did Roof attempt to clarify the scope of the district court's order precluding "evidence in support of speculation about Defendant's future conditions of confinement." (J.A. at 494.) When Roof objected to the prosecutor's statements at closing argument regarding his access to the mail, the court summarized the issue addressed by its previous evidentiary order: "The question [was] if you were unusually vulnerable to danger in prison, that you couldn't be safe, and that is what I ruled on." (J.A. at 6711.) The court then invited Roof to rebut the prosecutor's argument regarding his future dangerousness, saying "[y]ou can argue to the contrary. I mean, that is what it's all about. This is argument." (J.A. at 6711.) But Roof failed to do so.

Roof next contends that the prosecutor improperly vouched for a view of the evidence when twice stating that mitigating factors 8 and 9 were "not true." (J.A. at 6697.)

"Vouching generally occurs when the prosecutor's actions are such that a jury could reasonably believe that the prosecutor was indicating a personal belief in the credibility of the witness." *United States v. Lewis*, 10 F.3d 1086, 1089 (4th Cir. 1993). Here, by contrast, the prosecutor was not addressing the credibility of any witness, but only the truth (or lack thereof) of mitigating factors 8 and 9. Regardless of how Roof's argument is framed, it lacks merit. The prosecutor's statement attempted to contrast "factually accurate" mitigating factors (e.g., Roof's young age, lack of criminal history, and cooperation with law enforcement) with those for which Roof presented no evidentiary support. (J.A. at 6698.) Each statement was made in the context of that lack of evidence. Because Roof presented no evidence about his lack of future dangerousness, the prosecutor's statement that these mitigators were "not true" was, at most, a "minor infelicit[y]." *See Johnson*, 587 F.3d at 633.

### 3. The Court's Response to Jury Notes

Roof's final mitigation argument is that the district court erred when it failed to adequately respond to two jury questions about mitigating factors 8 and 9. Regarding mitigating factor 8 ("Defendant poses no significant risk of violence to other inmates or prison staff" (J.A. at 6804)), the jurors asked: "Would he[, Roof,] personally inflict the violence or would he incite violence, need clarification." (J.A. at 6765.) As to mitigating factor number 9 ("Defendant can be safely confined" (J.A. at 6804)), jurors asked, "Please define safe confinement. Does this include his writing getting out of prison[?]" (J.A. at 6768.)

The district court ultimately instructed the jurors, for both questions, "to simply read the mitigating factor as written and use your common[ ]sense to interpret it.  It would not be proper to comment further."  (J.A. at 6775.)  Roof argues that this response constitutes an abuse of discretion.  He contends that the court's instruction "left the jury free . . . to read the mitigating factors broadly, effectively expanding the defense burden of proof on each."  (Opening Br. at 179.)

Not so.  The record makes clear that Roof had read mitigating factors 8 and 9 more narrowly than the prosecution had, such that "no significant risk of violence" would not include incitement of violence (as to mitigating factor 8) and "safely confined" would mean physical confinement (as to mitigating factor 9).  Standby counsel therefore asked that the district court instruct the jury to adopt that narrower interpretation and to "construe[] [these factors] in favor of the defendant."  (J.A. at 6771.)  Because Roof's broadly worded mitigating factors could reasonably encompass both interpretations, and because the prosecution had already submitted rebuttal evidence that aligned with its broader interpretation, the court did not err in refusing to "pick sides" by narrowing the scope of mitigating factors 8 and 9.

### C. Issue 12: Isolated Witness Testimony Describing Roof as "Evil" and Stating that He Would Go to "the Pit of Hell" Did Not Render the Trial Fundamentally Unfair

Roof asserts that victim-witness Felicia Sanders's unsolicited remarks that he was "evil" and would go to "the pit of hell" violated his Eighth Amendment rights, *see Booth v. Maryland*, 482 U.S. 496, 502-03, 508 (1987), *overruled on other grounds by Payne v. Tennessee*, 501 U.S. 808, 830 (1991), and rendered his trial fundamentally unfair, in

violation of his due process rights, *see Darden v. Wainwright*, 477 U.S. 168, 178-81 (1986). Those remarks, Roof argues, were unduly prejudicial and demand a new penalty hearing.

   *1. The Testimony in Question*

Roof challenges remarks that Sanders made during both direct examination and cross-examination at the guilt phase of the trial. The direct examination testimony at issue consists of the following answer, at the end of a lengthy response, to the prosecution's question: "You could hear the defendant shooting; what could you feel on your legs and arms?"

> And the whole time I'm laying there, I felt the sting up and down my leg. Nothing but sting. I couldn't move. I was just waiting on my turn. Even if I got shot, I didn't want my granddaughter to be shot. I was just waiting on my turn. It was a lot of shots. Seventy-seven shots in that room, from someone who we thought was there before the Lord, but in return, he just sat there the whole time evil. Evil. Evil as can be.

(J.A. at 3700-02.)

After the prosecution asked additional questions, the court took a recess. During the recess, Roof's counsel objected specifically to the portion of Sanders's answer that Roof "sat there the whole time evil. Evil. Evil as can be." (J.A. at 3704.) The district court overruled his objection because the challenged testimony was "her observation" and because the objection was untimely. Defense counsel attempted to justify the delayed objection by noting that "the witness was crying and understandably very upset during parts of her testimony, and it seemed inappropriate to respond." (J.A. at 3705.) The court rejected that justification, explaining that "[c]rime victims frequently weep from the witness stand. . . . It's just the natural result of telling a very tragic story." (J.A. at 3705.)

Later, on cross-examination, the following exchange occurred:

Q.    Good afternoon, Miss Sanders.  I only have one question to ask you; I'll be done.  Do you remember the man who did this saying something about that he was only 21, and then talking about what he was going to do afterwards?

A.    Yes.

Q.    Could you tell us what he said?

A.    He say he was going to kill himself.  And I was counting on that.  He's evil.  There's no place on earth for him except the pit of hell.

Q.    He said that he was 21?  And then that he was going to kill himself when he finished?

A.    Send himself back to the pit of hell, I say.

Q.    Did—he didn't say that though.  About hell.  He just said he was going to kill himself?

A.    That's where he would go, to hell.

Q.    Yes, ma'am.  I'm so sorry. Thank you.

(J.A. at 3706-07.)  That was defense counsel's full cross-examination of Ms. Sanders.  The following morning, Roof moved for a mistrial, arguing that Sanders's "evil" and "pit of hell" comments incurably tainted the trial.  The district court denied the motion.

## 2.  *Standard of Review*

Roof argues that his objections were timely, triggering de novo review.  *See United States v. Hager*, 721 F.3d 167, 204 (4th Cir. 2013) ("We review de novo a constitutional claim that was properly preserved.")*.*  But the government contends that Roof's objections were untimely, calling for review under the plain-error standard.  *See* Fed. R. Crim. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention."); *United States v. Cabrera-Beltran,* 660 F.3d 742, 751 (4th Cir. 2011) (stating that unpreserved evidentiary objections are reviewed under the plain-error standard).

Evidentiary objections, governed by Rule 103 of the Federal Rules of Evidence, must "be made at the time the evidence is offered." *United States v. Parodi*, 703 F.2d 768, 783 (4th Cir. 1983) (citation omitted). We therefore find no reason to disturb the district court's ruling that Roof's objections to Sanders's direct examination testimony, lodged after the questioning had moved on and ten minutes into a jury recess, were untimely despite the emotional nature of Sanders's testimony. And as to Sanders's cross-examination testimony, Roof made no objections at all but waited until the next day to seek a mistrial. Plain-error review is therefore applicable.

To show plain error under Rule 52(b) of the Federal Rules of Criminal Procedure, Roof must demonstrate that "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v. Marcus*, 560 U.S. 258, 262 (2010) (alteration in original) (internal quotation marks and citation omitted).

Because Rule 52(b) "authorizes the Courts of Appeals to correct only particularly egregious errors"—those that "undermine the fundamental fairness of the trial and contribute to a miscarriage of justice"—"the plain-error exception to the contemporaneous-objection rule is to be used sparingly," without "skew[ing] the Rule's careful balancing of our need to encourage all trial participants to seek a fair and accurate trial the first time around against our insistence that obvious injustice be promptly redressed." *United States*

*v. Young*, 470 U.S. 1, 15-16 (1985) (internal quotation marks and citations omitted).  We

therefore review a claim of plain-error "against the entire record."  *Id.* at 16.

Roof also challenges the court's denial of his motion for a mistrial.  We review that

decision under the abuse-of-discretion standard.  *United States v. Brewer*, 1 F.3d 1430,

1437 (4th Cir. 1993).

### 3.  *The Merits of Roof's Claims*

With regard to Roof's Eighth Amendment claim, the Supreme Court has held that,

in a capital case, "the admission of a victim's family members' characterizations and

opinions about the crime, the defendant, and the appropriate sentence violates the Eighth

Amendment."  *Payne*, 501 U.S. at 830 n.2 (describing the holding of *Booth*, 482 U.S. at

502-03); *see also Bosse v. Oklahoma*, 137 S. Ct. 1, 2 (2016) (per curiam) (holding that

*Payne* did not overrule *Booth* entirely and that courts remain "bound by *Booth*'s prohibition

on characterizations and opinions from a victim's family members about the crime, the

defendant, and the appropriate sentence").  Similarly, the Supreme Court has held that

improper comments offend the Constitution if they "so infected the trial with unfairness as

to make the resulting conviction a denial of due process."  *Darden*, 477 U.S. at 181 (citation

omitted).  "Courts must conduct a fact-specific inquiry and examine the challenged

comments in the context of the whole record."  *Bennett v. Stirling*, 842 F.3d 319, 323 (4th

Cir. 2016) (citing *Young*, 470 U.S. at 11-12).

We will assume here that the unsolicited and unresponsive remarks by Sanders that

Roof was "evil" and would go "to the pit of hell" are improper characterizations.  But even

with that assumption, "we must bear in mind that not every improper [remark] amounts to

a denial of due process." *Bennett v. Angelone*, 92 F.3d 1336, 1346 (4th Cir. 1996). Nor does every improper remark affect "the outcome" or "fairness, integrity or public reputation" of the district court proceedings, thus resulting in plain error. *See Marcus*, 560 U.S. at 262 (citation omitted); *cf. Young,* 470 U.S. at 16 ("Viewed in context, the prosecutor's statements, although inappropriate and amounting to error" cannot "be said to rise to the level of plain error.").

Sanders's improper remarks were not so egregious as to "undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." *Young,* 470 U.S. at 16. Given the aggravated and calculated nature of Roof's multiple murders— proven by overwhelming evidence—one victim's characterization of Roof as evil and deserving of hell is unlikely to have had any material effect on the jury's view of the case. *Cf. United States v. Wilson*, 135 F.3d 291, 299 (4th Cir. 1998) ("Murder is a crime regarded by public opinion as involving moral turpitude, which means, in general, shameful wickedness, so extreme a departure from ordinary standards of honesty, good morals, justice or ethics to be shocking to the moral sense of the community." (internal quotation marks and citations omitted)).

Nor did the remarks in question pervade the trial. They totaled just eight transcript lines out of forty-one pages of Sanders's eyewitness testimony, which included powerful descriptions of lying in her aunt's and son's blood, holding and fearing for her terrified granddaughter, and hearing her son say that he loved her before watching him take his last breath. The eight lines are further buried in over 2,300 pages of evidence and arguments presented to the jury during the trial at both the guilt phase and the penalty phase, and

include testimony from two surviving witnesses and twenty-three victim-impact witnesses, each with his or her own emotional statements to share.  In addition, nearly one month separated the disputed remarks, given on the first day of the guilt phase, from the first day of the penalty phase.

The prosecution, moreover, never mentioned the challenged remarks in arguments at either the guilt or penalty phase.  And the district court offered a curative instruction the day after Sanders's testimony:

> I want to remind you that the decisions this jury must make, whether the defendant is guilty or not guilty, and if we come to a sentencing phase, the appropriate sentence, is always your decision to make.  It is not the decision of this Court or the attorneys or the witnesses.  It will always be yours.

(J.A. at 3839-40.)  That instruction—that Roof's sentence was the jury's decision alone—was offered at least twice more at the penalty phase.

In sum, the admission of Sanders's remarks, in the full context of the guilt and penalty phases of the trial, simply does not rise to the level of plain error.  For the same reasons, the district court did not abuse its discretion in denying Roof's motion for a mistrial.

### D.    Issue 13: Neither the Admission of Victim-Impact Evidence nor the Prosecution's Closing Argument Violated Roof's Constitutional Rights

Roof next challenges the admission of certain victim-impact evidence.  In seeking the death penalty, the prosecution provided notice, pursuant to 18 U.S.C. § 3593(a)(2), of non-statutory aggravating factors that it intended to prove, including the impact of Roof's crimes on the parishioners and their families, friends, and coworkers, and Roof's targeting

of Bible-study participants at Mother Emanuel to magnify the societal impact of his offense.

Roof now asserts that the admission of evidence of the victims' religiosity and exemplary qualities, and of the prosecution's statements at closing argument that emphasized that the victims were exceptionally good and devout people, "violated Supreme Court prohibitions on unduly prejudicial evidence and arbitrary and capricious death sentences, in violation of due process and the Eighth Amendment." (Opening Br. at 199.) Specifically, he contends that the prosecution exceeded the permitted purpose of victim-impact evidence, which, according to the Supreme Court in *Payne v. Tennessee*, is to show a victim's "uniqueness as an individual human being." 501 U.S. 808, 823 (1991) (citation omitted). His arguments fail.[38]

### 1. Victim-Impact Evidence

The admission of victim-impact evidence—that is, "evidence of the victim's personal characteristics and the harm inflicted upon the victim's family and community"—is constitutionally permitted. *Humphries v. Ozmint*, 397 F.3d 206, 217 (4th Cir. 2005) (citing *Payne*, 501 U.S. at 829 n.2). Such evidence may be offered to show "*each* victim's

---

[38] Several of Roof's evidentiary challenges are unpreserved (e.g., to a voicemail from Reverend Pinckney to a sick friend and to photos of the victims in church), and we therefore review them under the plain-error standard. *See* Fed. R. Crim. P. 52(b). As for the evidence that Roof did object to—such as the audiotape of Reverend Coleman-Singleton preaching, the song performed by Coleman-Singleton's son, the baccalaureate-ceremony photos, and references in the prosecution's closing argument to the victims being "particularly good" people—we review the evidentiary rulings, which implicate constitutional claims, de novo. *United States v. Williams*, 632 F.3d 129, 132 (4th Cir. 2011).

uniqueness as an individual human being, whatever the jury might think the loss to the community resulting from [the victim's] death might be." *Payne*, 501 U.S. at 823 (internal quotation marks omitted). We have recognized that, in asking the jury "to assess the persuasive force of the defendant's mitigating evidence and the victim-impact evidence," "some comparisons would be made between the defendant and the victim." *Humphries*, 397 F.3d at 225-26.

But not all victim-impact evidence is admissible. As discussed, "evidence of the victims' opinions of the crime and of the appropriate sentence for the defendant violates the Eighth Amendment," *id.* at 217; *see Bosse v. Oklahoma*, 137 S. Ct. 1, 2 (2016), and evidence that is "so unduly prejudicial that it renders the trial fundamentally unfair" violates the Due Process Clause, *Payne*, 501 U.S. at 825; *Humphries*, 397 F.3d at 217. Evidence used to establish "victim impact aggravating factors" violates due process when the error in admitting it is "of sufficient significance that it denies the defendant the right to a fair trial." *United States v. Barnette*, 211 F.3d 803, 818 (4th Cir. 2000) (citing *Greer v. Miller*, 483 U.S. 756, 765 (1987)). Thus, although "[s]ome comparisons, such as those based on race or religion, unquestionably are unconstitutional," "[o]ther comparisons are not." *Humphries*, 397 F.3d at 226. To make that determination, we "must consider the challenged conduct in relation to the proceeding as a whole." *Id.* at 218.

Roof offers no support, and we find none, for his argument that the disputed victim-impact evidence amounts to an opinion on Roof, the crime, or the appropriate sentence sufficient to constitute a violation of the Eighth Amendment. That leaves his

argument that the disputed evidence was unduly prejudicial, in violation of the Due Process Clause.

Contrary to Roof's argument, the victims' exemplary qualities, such as their singing, preaching, and praying, are part of their "uniqueness" that *Payne* allows a jury to consider. *See Payne*, 501 U.S. at 823.  The prosecution is "entitled to ask the jury to look at [the victims'] uniqueness and to ask the jury to consider the consequences of when a person of [the victims'] uniqueness is taken." *Humphries*, 397 F.3d at 222 (internal quotation marks omitted).  And the district court in fact reminded the jury of that, instructing that "victim testimony is limited by law to personal characteristics of the victim and the emotional impact o[n] the family. . . . [D]isregard any other statements outside that."  (J.A. at 6033.)

As for the faith-related aspect of the evidence, nothing was said that encouraged the jurors to make a comparison between Roof's religion and that of the victims.  *Cf. Zant v. Stephens*, 462 U.S. 862, 885 (1983) (noting that the state did not attach "the 'aggravating' label to factors that are constitutionally impermissible or totally irrelevant to the sentencing process, such as for example the . . . religion . . . of the defendant").  That some of the victim-impact evidence implicates the victims' devotion and the impact of the victims' deaths on the targeted religious community is to be expected where Roof intentionally targeted a church and selected Mother Emanuel's Bible-study group.  He specifically chose as his victims individuals whose occupations, volunteer work, and daily activities naturally involved their faith and Mother Emanuel.  Also relevant is the district court's instruction that the jury "must not consider . . . religious beliefs . . . of either the defendant or any victim."  (J.A. at 6747.)

Finally, the prosecution's emphasis on the victims' particular worth by reminding the jurors "how extraordinarily good these people were" and that Roof sought out "the best among us" does not, as Roof contends, amount to unconstitutional comparative victim-worth evidence.  (J.A. at 6668, 6703.)  Not only do the prosecution's statements directly support the "selection of victims" aggravating factor, but the "inevitable consequence[] of *Payne*'s comparative framework" is "that a defendant can be put to death for the murder of a person more 'unique' than another."  *Humphries*, 397 F.3d at 222 n.6. We therefore conclude that neither the admission of the disputed evidence nor the prosecution's closing argument about it violated Roof's constitutional rights.

### E.    Issue 14:  Roof's Death Sentence Is Not Cruel and Unusual Punishment Under the Eighth Amendment

Roof next contends that the death penalty is cruel and unusual punishment as applied to himself due to his age and mental capacity.  This argument too is unavailing.[39]

---

[39] The parties dispute whether Roof preserved his constitutional challenges to the death penalty based on his age and mental capacity.  Roof contends the alleged constitutional errors were preserved for de novo review because his challenges were "brought to the court's attention"—and therefore complied with Federal Rule of Criminal Procedure 52—when his "[s]tandby counsel filed a draft motion to preclude the death penalty based on Roof's age and [mental capacity]."  (Opening Br. at 209.)  However, Roof withheld his signature and therefore his consent to file the draft motion for the district court's consideration.  And he expressed his concerns adamantly and directly with the court regarding his disapproval of standby counsel's decision to file that motion.  Thus, the record makes clear that Roof did not want the district court to consider the constitutional challenges he now raises on appeal, so his preservation claim fails under Rule 51(b).  Fed. R. Crim. P. 51(b) ("A party may preserve a claim of error by informing the court—when the court's ruling or order is made or sought—of the action the party wishes the court to take, or the party's objection to the court's action and the grounds for that objection.").  We accordingly review Roof's constitutional challenges for plain error.

96

### 1. Age

Roof argues that the categorical ban on executing juveniles (i.e., offenders under 18 years of age) should be extended to young adults. In support of his argument, he cites *Roper v. Simmons*, 543 U.S. 551 (2005), which held that executing juveniles is unconstitutional. He also cites "legal and scientific advances, including studies showing the brain's continued development into one's early- to-mid-20s," which, he says, "have eroded the justification [relied upon in *Roper*] for drawing the line for capital punishment at 18." (Opening Br. at 210.) According to Roof, those advances have occurred in parallel with an emerging national consensus recognizing that young adults, like juveniles, are not "beyond rehabilitation." (Opening Br. at 211.)

*Roper* stated plainly that "[t]he Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed." 543 U.S. at 578. In rejecting capital punishment for juveniles, the Supreme Court said:

> The prohibition against "cruel and unusual punishments," like other expansive language in the Constitution, must be interpreted according to its text, by considering history, tradition, and precedent, and with due regard for its purpose and function in the constitutional design. To implement this framework, we have established the propriety and affirmed the necessity of referring to "the evolving standards of decency that mark the progress of a maturing society" to determine which punishments are so disproportionate as to be cruel and unusual.

*Id.* at 560-61 (quoting *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958) (plurality opinion)).

The Court determined that, by 2005, a national consensus had developed against executing juveniles, as evidenced by the majority of states having banned their execution, the infrequency of executions in states that had not yet banned their execution, and a consistent trend towards abolishing the practice. *Id.* at 567. Hence, the Court concluded, the Eighth Amendment categorically prohibits the capital punishment of juveniles. *Id.* at 564, 567, 578. Relevant to the second part of Roof's Eighth Amendment claim, the Court observed that "[t]he evidence of national consensus against the death penalty for juveniles is similar, and in some respects parallel, to the evidence *Atkins* [*v. Virginia*, 536 U.S. 304 (2002)] held sufficient to demonstrate a national consensus against the death penalty for the mentally retarded." *Id.* at 564.

Roof argues that we should read *Roper* expansively. But *Roper*'s holding is a *categorical* ban on executing juveniles in the same way that *Atkins* is a *categorical* ban on executing the intellectually disabled. *Id.* at 564, 567; *see also Hall v. Florida*, 572 U.S. 701, 708 (2014) (noting, in reference to *Roper* and *Atkins*, that "[t]he Eighth Amendment prohibits certain punishments as a categorical matter"). And "if a Supreme Court precedent has direct application in a case," as *Roper* clearly does, then "we must follow it." *United States v. Stitt*, 459 F.3d 483, 485 (4th Cir. 2006) (internal quotation marks and citation omitted). The Supreme Court chose to draw a line at the generally accepted age of majority, 18, and did so acknowledging that age and culpability were not perfectly linear. *Roper*, 543 U.S. at 574 ("Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. . . . The age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is, we

conclude, the age at which the line for death eligibility ought to rest."). We have no authority to hold that executing those who are older than 18 violates the Eighth Amendment because, as the First Circuit observed in *United States v. Tsarnaev*, "whether a change [to *Roper*] should occur is for the Supreme Court to say." 968 F.3d 24, 97 (1st Cir. 2020) (rejecting a similar argument advocating for an extension of *Roper*'s execution ban to age 20).

In *Tsarnaev*, the court conducted a detailed analysis of the defendant's constitutional claim that a person accused of having committed death-eligible crimes when he was under 21 (Tsarnaev was 19 when he set off a bomb at the 2013 Boston Marathon) was categorically exempt from the death penalty. *Id.* at 96. Like Roof, Tsarnaev argued that the factors considered in *Roper* "in granting death-penalty immunity to persons under 18—that they lack the maturity we attribute to adults; that they are more vulnerable to peer pressure than are adults; and that their personality traits are less fixed, suggesting a higher likelihood of rehabilitation of juveniles than of adults—apply equally to persons under 21." *Id.* (citation omitted). Addressing that argument, the First Circuit characterized *Roper* as a "square holding that 18 is 'the age at which the line for death eligibility ought to rest.'" *Id.* at 97 (quoting *Roper*, 543 U.S. at 574). The court acknowledged that the science of brain development has indeed progressed since 2005; it even cited the exact American Bar Association resolution "to exclude offenders 21 and younger from capital charges" that Roof cites here. (Opening Br. at 211); *see id.* It nonetheless held that, although the "change [that Tsarnaev] proposes is certainly worthy of careful consideration," "whether a change should occur is for the Supreme Court to say—not us." *Id.* That conclusion holds here.

The Supreme Court granted certiorari in *Tsarnaev* on March 22, 2021 to review whether the First Circuit properly set aside Tsarnaev's death sentence on other grounds. *See United States v. Tsarnaev*, 141 S. Ct. 1683 (2021) (mem.). Given the parallel arguments that Tsarnaev and Roof make, the Court may decide whether to modify *Roper*. Until then, *Roper* is the controlling precedent. *See Stitt*, 459 F.3d at 485.

### 2. *Mental Incapacity*

Roof's arguments on mental capacity are similarly unpersuasive. He has an IQ of 125, which is higher than approximately 94% of the general population. He thus has no plausible argument that he is protected by *Atkins*, which held that the Eighth Amendment prohibits the execution of the intellectually disabled. 536 U.S. at 321.

The *Atkins* Court specifically defined such disability as involving "subaverage intellectual functioning." 536 U.S. at 318. Although "significant limitations in adaptive skills such as communication" are part of the *Atkins* test, *id.*, they are not sufficient by themselves to render a defendant mentally incapacitated. *See Hall*, 572 U.S. at 711-14 (holding that mental incapacity per *Atkins* requires deficits in intellectual functioning *in addition to* deficits in adaptive functioning). Roof is therefore not intellectually disabled under *Atkins*.

## VI.    ISSUES RELATED TO GUILT VERDICT

Finally, we consider the alleged errors made during the guilt phase of Roof's trial. Specifically, Roof argues: first, that his convictions for religious obstruction under 18 U.S.C. § 247 are invalid under the Commerce Clause; second, that a conviction pursuant 18 U.S.C. § 247 requires proof of religious hostility; third, that the Hate Crimes

Prevention Act, 18 U.S.C. § 249, is an unconstitutional exercise of Congress's Thirteenth Amendment authority; fourth, that the Attorney General erroneously certified Roof's federal prosecution; and fifth, that Roof's firearm convictions under 18 U.S.C. § 924(c) are invalid because the predicate offenses are not categorically crimes of violence. We disagree on all points.

### A.    Issue 15: Roof's Commerce Clause Challenges to the Religious-Obstruction Statute Do Not Require Reversal of Those Convictions

Counts 13 through 24 of the Indictment charged Roof with violating 18 U.S.C. § 247(a)(2) and (d)(1) (the "religious-obstruction statute"). Because the religious-obstruction statute requires the government to show a nexus between the alleged crimes and interstate commerce, the district court ordered the government to file a bill of particulars disclosing the nexus and justifying the exercise of jurisdiction to prosecute Roof under that statute. The government did so and, in its bill, asserted that it would introduce evidence establishing the requisite connection between Roof's crimes and interstate commerce, including evidence of Roof's driving on interstate highways; navigating by a GPS device produced out of state; using a gun, magazines, ammunition, and a tactical belt pouch all produced out of state; calling Mother Emanuel on a home phone line; and using the internet to plan his attack and spread the fear that would flow from it. The government also included in the bill of particulars information about Mother Emanuel's commercial activities, including financial interactions with an out-of-state national organization,

paying employees, renting church space, offering tours to out-of-state visitors, and receiving donations.

Roof moved to dismiss Counts 13 through 24. He argued that the religious-obstruction statute was invalid under the Commerce Clause, both facially and as applied to him. The district court held that the requirement of an interstate commerce nexus saved the statute from the facial challenge. It also rejected Roof's as-applied challenge, holding that, based on the representations in the bill of particulars, there was sufficient evidence of an interstate nexus for the indictment to survive a motion to dismiss.

At trial, the government introduced evidence that Roof's actions, in planning and committing the attack on Mother Emanuel's parishioners, occurred in or affected interstate commerce in multiple ways. Roof used the internet to research South Carolina's historic African American churches, including Mother Emanuel. He also paid for a foreign internet server to host his website, LastRhodesian.com, where he spread his violent and racist ideology. On the day that he attacked the parishioners at Mother Emanuel, Roof posted a manifesto on his website foreshadowing his attack and culminating in a section titled "An Explanation," which read, in part, "I chose Charleston because it is the most historic city in my state . . . . We have no skinheads, no real KKK, no one doing anything but talking on the internet. Well someone has to have the bravery to take it to the real world, and I guess that has to be me." (J.A. at 4573-74.)

The government also showed that, on February 23, 2015, Roof used his home telephone in South Carolina to place a call to Mother Emanuel. In addition, he used a GPS device to navigate to the area surrounding Mother Emanuel during six trips from December

2014 to May 2015, as well as on the day of the shooting. On that final day, he drove on an interstate highway from Columbia to Charleston, South Carolina.

The evidence demonstrated that Roof purchased a gun, bullets, a gun pouch, and magazines that had traveled in interstate or foreign commerce before their purchase. He said that he bought those items to carry out his mission to kill African American people. On June 17, 2015, he entered Mother Emanuel carrying the firearm and loaded magazines in the tactical pouch. He used them to kill nine people and attempt to kill three more. During his post-arrest interview, Roof explained to police that, through his attack, he sought to "agitate race relations," potentially leading to a race war or the reinstatement of segregation.[40] (J.A. at 4329-30.)

The jury heard Roof's admission that he chose Mother Emanuel because it is a "historic" African American church and hence a high-profile target. (J.A. at 4131-34, 4271.) Testimony also revealed that Mother Emanuel is in "a tourist area" of Charleston and is itself an important tourist destination. (J.A. at 3759.) The government did not, however, introduce any evidence of Mother Emanuel's commercial activities, contrary to its bill of particulars.

The district court instructed the jury that it could find that Roof's conduct was "in" interstate commerce even if his "use of the channel or instrumentality of commerce

---

[40] Roof initially acknowledged to the FBI that he did not think what he did could start a race war, but he later explained that agitating race relations could "cause[] friction and then, you know, it could lead to a race war." (J.A. at 4329-30.) The manifesto he wrote also explained that he "would love for there to be a race war." (J.A. at 4213.)

occurred entirely within the State of South Carolina." (J.A. at 5142.) It also instructed that Roof's conduct was "in" interstate commerce if, during the offense, he "used a firearm or ammunition" that had "traveled across state lines at any point in its existence, regardless of whether the defendant himself carried the weapon or ammunition across the state line, or whether [the] defendant knew that the weapon or ammunition had traveled across states lines." (J.A. at 5142.) The court told jurors that "[t]he effect of the offense on interstate commerce does not need to be substantial. . . . All that is necessary . . . to prove an effect on interstate commerce is that the natural consequences of the offense potentially caused an impact, positive or negative, on interstate commerce." (J.A. at 5142-43.) The court rejected Roof's alternative instruction about the jurisdictional element, but nothing in the record indicates that Roof objected to the instructions that were given.

In his motions for judgment of acquittal and a new trial, Roof renewed his Commerce Clause challenges to the religious-obstruction statute. He noted that the government had failed to offer proof of Mother Emanuel's commercial activities at trial. The government responded that the district court's denial of the motion to dismiss "correctly concluded that [the proffered] evidence was more than sufficient to demonstrate" a nexus to interstate commerce. (J.A. at 6984.) The court denied Roof's motions.

On appeal, Roof again argues that the religious-obstruction statute is constitutionally invalid under the Commerce Clause, both facially and as applied to him.

He also contends that the district court improperly instructed the jury on the required interstate commerce nexus.  His arguments fail.[41]

### 1.  *The Religious-Obstruction Statute Is Facially Valid*

The religious-obstruction statute, 18 U.S.C. § 247, provides in relevant part:

(a) Whoever, in any of the circumstances referred to in subsection (b) of this section--
 . . .
(2) intentionally obstructs, by force or threat of force, including by threat of force against religious real property, any person in the enjoyment of that person's free exercise of religious beliefs, or attempts to do so;
shall be punished as provided in subsection (d).
 . . .
(b) The circumstances referred to in subsection (a) are that the offense is in or affects interstate or foreign commerce.

Section 247 thus depends for its jurisdictional validity on the Commerce Clause, which permits Congress "[t]o regulate Commerce . . . among the several States."  U.S. Const. art. I, § 8, cl. 3.  According to the Supreme Court in the seminal case of *United States v. Lopez*, the Commerce Clause allows Congress to regulate three categories of activity: (1) "the use of the channels of interstate commerce," such as interstate railroads and highways; (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even

---

[41] We review de novo a district court's holding that a statute is constitutional, whether the constitutional challenge is facial or as-applied.  *See United States v. Hamilton*, 699 F.3d 356, 366 (4th Cir. 2012); *United States v. Fulks*, 454 F.3d 410, 437 (4th Cir. 2006).  We may strike down a statute "only if the lack of constitutional authority to pass [the] act in question is clearly demonstrated."  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012) (alteration in original) (internal quotation marks and citation omitted).  We review an unpreserved objection to jury instructions under the plain-error standard.  Fed. R. Crim. P. 30(d).

though the threat may come only from intrastate activities"; and (3) "those activities having a substantial relation to interstate commerce." 514 U.S. 549, 558-59 (1995).

Roof argues that § 247(a)(2) is facially invalid because the statute does not fall within any of the three broad categories of conduct that Congress can regulate, as set out in *Lopez*. The government responds that the statute's jurisdictional element, that is, its explicit requirement that there be a tie to interstate commerce, along with the possibility of conduct that would satisfy that requirement, saves it from facial invalidity. We agree with the government.

To evaluate Roof's facial challenge under the third *Lopez* category—activities that substantially affect interstate commerce—we consider four principles:[42] (1) whether the regulated activity is inherently commercial or economic; (2) whether the challenged statute contains a jurisdictional element, which helps "ensure, through [a] case-by-case inquiry, that the [regulated conduct] affects interstate commerce"; (3) whether legislative findings discuss the prohibited conduct's effect on interstate commerce; and (4) whether the link between the prohibited conduct and a substantial effect on interstate commerce is attenuated. *Lopez*, 514 U.S. at 561-63; *United States v. Morrison*, 529 U.S. 598, 611-12 (2000).

---

[42] Although the government defends the religious-obstruction statute's facial validity under all three *Lopez* categories, it focuses primarily on the four principles enumerated in *Lopez*, which fall under the "substantially affects" category, the third prong. *See United States v. Lopez*, 514 U.S. 549, 559 (1995). We thus choose to evaluate the facial challenge under that prong.

As to the first two principles, although the regulation of religious obstruction is not inherently economic or commercial in nature—which the government concedes—§ 247 does contain an express jurisdictional element, "limit[ing] its reach to a discrete set of [activities obstructing religion] that additionally have an explicit connection with or effect on interstate commerce." *Lopez*, 514 U.S. at 562; *Morrison*, 529 U.S. at 611-12; *see also* 18 U.S.C. § 247(b). The presence of that jurisdictional element allows application of the statute only where the defendant's conduct falls within the regulatory scope of the Commerce Clause.[43]

The third principle is satisfied because the legislative history of the religious-obstruction statute explicitly discusses the nexus to interstate commerce. Following *Lopez*, Congress in 1996 amended the religious-obstruction statute's jurisdictional element to make plain that the statute's reach is limited to "conduct which can be shown to be in or to affect interstate commerce." H.R. Rep. No. 104-621, at 7 (1996); *see also United States v. Ballinger*, 395 F.3d 1218, 1234-35 (11th Cir. 2005) (en banc) ("[T]he new language was specifically drafted to mirror the Supreme Court's articulation in *Lopez* of the nature and extent of the commerce power." (citing H.R. Rep. No. 104-621, at 7 (1996))). The statute's

---

[43] We recently noted that we have not found any case "in which a federal criminal statute including an interstate commerce jurisdictional element has been held to exceed Congress's authority under the Commerce Clause." *United States v. Hill*, 927 F.3d 188, 204 (4th Cir. 2019). Although we also said that "a jurisdictional hook is not . . . a talisman that wards off [all] constitutional challenges," *id.* at 208 (alterations in original) (citation omitted), the religious-obstruction statute's jurisdictional element requires the government to prove that the conduct of each prosecuted defendant is sufficiently in or affecting interstate commerce to warrant exercise of the federal government's power.

legislative history also demonstrates that Congress intended its jurisdictional nexus to protect against any unconstitutional application: "[I]f in prosecuting a particular case, the government is unable to establish this interstate commerce connection to the act, section 247 will not apply to the offense."  H.R. Rep. No. 104-621, at 7 (1996).

Lastly, as to whether the link between commerce and the prohibited conduct is attenuated, we need not consider here whether the religious function of a house of worship standing alone affects interstate commerce because hypothetical conduct that satisfies the Commerce Clause certainly falls within the religious-obstruction statute's purview.[44]  *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (A party "can only succeed in a facial challenge by establish[ing] that no set of circumstances exists under which the Act would be valid, i.e., that the law is unconstitutional in all of its applications." (alteration in original) (internal quotation marks and citation omitted)).  The government suggests several examples of such conduct.  For example, as recognized by the district court, one could "use the channels or instrumentalities of interstate commerce

---

[44] Roof argues that theoretical effects on commerce are insufficient to defeat a facial challenge.  He contends that one could use an interstate highway to drive guns between schools, but that scenario did not save the Gun-Free School Zone Act in *Lopez* from invalidation.  He likewise argues that in the case of *United States v. Morrison*—where the defendant challenged Congress's authority to provide a civil remedy in the Violence Against Women Act—the fact that one could mail a bomb to a former spouse was not enough to save the operative provision.  529 U.S. 598, 605, 619 (2000).  That argument is unpersuasive, as the statutes in *Lopez* and *Morrison* are easily distinguishable from the religious-obstruction statute because neither contained a jurisdictional element.  Besides that, there is no indication that anyone in *Lopez* and *Morrison* made the sort of argument that Roof is making here, and we are not going to presume what the Court would have said had such an argument been made.

to attack a house of worship . . . by mailing a bomb to a church." (J.A. at 3521 (citing *Ballinger*, 395 F.3d at 1237).) Someone could also obstruct religion by preventing churchgoers from engaging in an activity affecting interstate commerce, such as operating a daycare center. *See United States v. Terry*, 257 F.3d 366, 367 (4th Cir. 2001) (holding that the jurisdictional element of the federal arson statute, 18 U.S.C. § 844(i), reached the arson of a church because the church's daycare center significantly affected interstate commerce).

In short, the statute is not facially unconstitutional. And, as explained in the next section, the statute's appropriate application to Roof serves as a non-hypothetical example that defeats any claim of facial invalidity.

### 2. *The Religious-Obstruction Statute Is Valid as Applied to Roof*

Roof contends that applying the religious-obstruction statute to him is an unconstitutional expansion of Congress's power under the Commerce Clause.[45] He argues that his use of goods sold in interstate commerce and his use of interstate channels to prepare for later conduct are not enough to place his conduct within Congress's regulatory reach. For reasons not apparent to us, the government in its briefing and at oral argument waived any jurisdictional claim under prong three of *Lopez*, "the broadest expression of

---

[45] The government suggests that Roof actually challenges the sufficiency of the evidence establishing the jurisdictional element and does not make an as-applied challenge. We evaluate Roof's challenge in the way he has framed it. In any event, the as-applied and sufficiency-of-the-evidence inquiries overlap because the jurisdictional nexus has "the full jurisdictional reach constitutionally permissible under the Commerce Clause." *United States v. Grossman*, 608 F.2d 534, 537 (4th Cir. 1979).

Congress'[s] commerce power." *Ballinger*, 395 F.3d at 1226. We therefore must determine whether, under *Lopez* prongs one and two, the government's prosecution can be justified. We hold that it can.

Roof's conduct lies within the bounds of federal jurisdiction because he posted a racist manifesto and call to action on the internet, through his website hosted on a foreign server, mere hours before he made a historic house of prayer into a charnel house. His use of the internet, an instrumentality of interstate commerce, was thus not merely a part of the preparations for this attack. It was part of his effort to target Mother Emanuel and other predominantly African American churches, to strike fear in the hearts of worshipers, and to spread his toxic racial views.

Under *Lopez* prong one, Congress may regulate the use of the channels of interstate commerce. 514 U.S. at 558. We have held that channels of interstate commerce can include "navigable rivers . . . ; the interstate railroad track system; the interstate highway system; . . . interstate telephone and telegraph lines; air traffic routes; [and] television and radio broadcast frequencies." *Gibbs v. Babbitt*, 214 F.3d 483, 490-91 (4th Cir. 2000) (second alteration in original) (citation omitted). Just as interstate telephone lines and radio broadcast frequencies allow for interconnectivity and exchange by facilitating commercial undertakings, the internet does so as well and is thus rightly viewed as a channel of interstate commerce. *See United States v. MacEwan*, 445 F.3d 237, 245 (3d Cir. 2006) (holding that the internet qualifies as an instrumentality and channel of interstate commerce, and that the defendant's download of child pornography from the internet fell within the first two prongs of *Lopez*, regardless of whether the images were produced out of state).

That being established, we consider next whether Roof's use of the internet was sufficiently central to his violations of the religious-obstruction statute to permit enforcement of that statute against him. The question is a close one, and we see a distinction between Roof's use of the internet and several of the cases cited by the government for the proposition that internet usage satisfies the religious-obstruction statute's application to Roof. For example, the government points to the prosecution of violators of a federal law prohibiting the receipt of child pornography, noting that defendants typically download the illicit material from the internet, "a system that is inexorably intertwined with interstate commerce." *Id.* The government also cites one of our nonprecedential decisions holding that sufficient evidence supported the defendant's conviction for sex trafficking of a minor where the defendant advertised the minor on the internet and that the internet advertisements placed the defendant's conduct "in or affecting commerce." *United States v. Gray-Sommerville*, 618 F. App'x 165, 168 (4th Cir. 2015). But in those cases, the defendants' use of the internet was a key component of the charged crimes and occurred during the commission of them. The same cannot be said of Roof's attack on Mother Emanuel's parishioners.

Two similar factors, however, support the conclusion that Roof's internet research and postings provide a sufficient tie to the Commerce Clause: first, the importance that Roof himself evidently attached to his internet activity in connection with the murders, and second, the temporal proximity of that internet activity to the crimes. *Cf. Ballinger*, 395 F.3d at 1228 (considering both the "necess[ity] for him to travel across state lines . . . [and] the immediacy with which he set out to destroy churches once he arrived . . . [to]

111

demonstrate that [the defendant] used the channels of interstate commerce for the purpose of committing arson" (citation omitted)). In *United States v. Ballinger*, the Eleventh Circuit upheld a defendant's conviction for destruction of religious property under § 247(a)(1) as a valid expression of Congress's Commerce Clause power. *Id.* at 1227. The defendant there had set fire to eleven churches in four states during an arson spree in which he had no other purpose for entering the states except to commit his crimes. *Id.* The Eleventh Circuit rejected the defendant's argument that the act itself must occur in a channel or instrumentality of interstate commerce and held that his as-applied challenge failed because he "use[d] the channels and instrumentalities of interstate commerce to commit his offenses." *Id.* at 1230.

Just as the defendant in *Ballinger* crossed state lines to commit arson, Roof conducted internet research to pick his church target and to maximize the impact of his attack. He used his foreign-hosted website to spread his racist ideology and advertise, albeit cryptically, the rampage that he would undertake a few hours later. He relied on the ubiquity of that channel of interstate commerce to amplify his actions and to extol his own "bravery" for committing mass murder. (J.A. at 4573-74.) Roof's use of the internet was thus closely linked, both in purpose and temporal proximity, to his violation of the religious-obstruction statute.

It is well-established that Congress has the power to "keep the channels of interstate commerce free from immoral and injurious uses." *United States v. Gould*, 568 F.3d 459, 471 (4th Cir. 2009) (quoting *Caminetti v. United States*, 242 U.S. 470, 491 (1917)); *see Ballinger*, 395 F.3d at 1227 (describing "Congress'[s] well-established power to forbid or

punish the use of the channels and instrumentalities of interstate commerce 'to promote . . . the spread of any evil or harm to the people of other states from the state of origin'" (second alteration in original) (quoting *Brooks v. United States*, 267 U.S. 432, 436 (1925))). That power extends to regulating instrumentalities of interstate commerce even when the threat of their misuse "may come only from intrastate activities." *Lopez*, 514 U.S. at 558. Because "[a]n act that promotes harm, not the harm itself, is all that must occur in commerce to permit congressional regulation," *Ballinger*, 395 F.3d at 1227, we hold that Roof's internet usage rendered his prosecution under the religious-obstruction statute constitutional.

We are not suggesting that a defendant's internet usage before or even while committing a federal offense will always place his conduct within the reach of Congress's Commerce Clause authority. Our holding is simply that Roof's admitted use of the internet to research a historic African American church as a target and to amplify the effect of his planned attack on Mother Emanuel's parishioners—a use that continued until shortly before the attack—is sufficient to establish federal jurisdiction in this case. He freely acknowledged his hope that the attack would "agitate race relations" and lead to a race war or reintroduce racial segregation. (J.A. at 4329-30.) *See Katzenbach v. McClung*, 379 U.S. 294, 301 (1964) ("[R]acial discrimination [i]s not merely a state or regional problem but [i]s one of nationwide scope."); *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 257 (1964) (describing, pre-*Lopez*, "the overwhelming evidence of the disruptive effect that racial discrimination has had on commercial intercourse"). He devoutly wished to have an interstate effect on the life of our nation, including its commerce, and he employed

the internet as a means to achieve that end. Thus, our holding does not eviscerate the "distinction between what is truly national and what is truly local," as Roof warns.[46] (Opening Br. at 233 (quoting *Morrison*, 529 U.S. at 617-18).)

Even if we thought that Roof's use of the internet did not alone provide a sufficient nexus to interstate commerce, he had multiple other connections to the means of commerce that, taken together, would serve to defeat his as-applied constitutional challenge. The government contends that Roof's use of a phone to call Mother Emanuel, a GPS device to provide navigation to Mother Emanuel, and an interstate highway within South Carolina to visit Mother Emanuel leading up to and on the day of the attack place his offense "in interstate commerce." (Answering Br. at 174.) Alone, each of those activities might be insufficient to satisfy the Commerce Clause. But, viewed in conjunction with Roof's significant internet usage to plan and prepare for the attack and to maximize its effects, those additional intersections with interstate commerce would be sufficient. *See Ballinger*, 395 F.3d at 1228 (combining multiple aspects of the defendant's conduct, such as "travel in a van (an instrumentality of commerce) along interstate highways (a channel of commerce)" to conclude that the nexus to the Commerce Clause was satisfied). His as-

---

[46] In passing the religious-obstruction statute, Congress intended to criminalize precisely the type of conduct at issue in this case. Concerned by attacks on African American churches in the South, Congress amended the jurisdictional nexus in the statute to facilitate the prosecution of such racially motivated violence. H.R. Rep. No. 104-621, at 2-3 (1996).

The government also argues that Roof's use of a gun, ammunition, and a pouch that had moved in interstate commerce prior to him gaining possession of them satisfies the required Commerce Clause nexus. We need not comment on those arguments, given the ruling that we have already expressed.

applied Commerce Clause challenge to his convictions under the religious-obstruction statute therefore fails.

### 3. *The Jury Instructions Were Proper*

To round out his challenges under the Commerce Clause, Roof contends that the district court incorrectly and prejudicially instructed jurors on the jurisdictional element of § 247. Because he failed to object to the instructions in the district court, he must demonstrate plain error on appeal.[47] Fed. R. Crim. P. 30(d); Fed. R. Crim. P. 52(b).

Roof first takes issue with the district court's instruction that the jurors could find his conduct to be "in" interstate commerce if his "use of the channel or instrumentality of commerce occurred entirely within the State of South Carolina." (J.A. at 5142.) He argues that the instruction was wrong because Congress may only proscribe conduct "directed at" interstate commerce's instrumentalities, channels, or goods. (Opening Br. at 235 (quoting *Morrison*, 529 U.S. at 618).) The government disagrees, contending that Roof's use of channels and instrumentalities of interstate commerce in planning, preparing for, and committing his crimes satisfies the Commerce Clause, even if his interactions with channels and instrumentalities occurred entirely intrastate. The government is correct

---

[47] "A party who objects to any portion of the instructions or to a failure to give a requested instruction must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate. An opportunity must be given to object out of the jury's hearing and, on request, out of the jury's presence. Failure to object in accordance with this rule precludes appellate review, except as permitted under Rule 52(b)." Fed. R. Crim. P. 30(d). Where, as here, a party submits a proposed instruction on the same legal principle but fails to object contemporaneously to the jury instructions, the party does not preserve the issue for appeal. *United States v. Cowden*, 882 F.3d 464, 475 (4th Cir. 2018). Accordingly, we review Roof's challenge under the plain-error standard. *See supra* Section V.C.2 (articulating the plain-error standard).

because prong two of *Lopez* may be satisfied "even though the threat may come only from intrastate activities." *Lopez*, 514 U.S. at 558. Thus, as long as the use of the channel or instrumentality is sufficiently central—in importance and temporal proximity—to the conduct that Congress seeks to proscribe, regulation of that conduct falls within the limits of the power granted by the Commerce Clause. *See Ballinger*, 395 F.3d at 1228 (considering the defendant's travel across state lines in the context of its necessity and temporal proximity to his crimes). The court's instruction was not plainly erroneous.

Next, Roof contends that the district court erred in instructing the jury that his conduct could be considered to be in interstate commerce if he "used a firearm or ammunition during the offense" that had "traveled across state lines at any point in its existence, regardless of whether the defendant himself carried the weapon or ammunition across the state line, or whether defendant knew that the weapon or ammunition had traveled across state[] lines." (J.A. at 5142.) That instruction does not constitute plain error because "[a]n error can be 'plain' only on the basis of settled law." *United States v. Carthorne*, 878 F.3d 458, 464 (4th Cir. 2017) (citation omitted). Although we have explained that an object's movement across state lines does not mark something forever as "a 'thing' in interstate commerce" under *Lopez* prong two, our discussion arose in dicta and in the context of an entirely different statute—one regulating the taking of red wolves. *Gibbs*, 214 F.3d at 491 (citing *Lopez* to demonstrate that prong two was not satisfied "despite the fact that the regulated guns likely traveled through interstate commerce"). In addition, although the religious-obstruction statute is distinct from felon-in-possession

statutes,[48] the Supreme Court has not overruled *Scarborough v. United States*, 431 U.S. 563, 577 (1977), which interpreted a felon-in-possession statute's jurisdictional nexus as requiring only that the firearm at some point traveled in interstate commerce. *See United States v. Patton*, 451 F.3d 615, 636 (10th Cir. 2006) (noting "considerable tension" between *Scarborough* and *Lopez*, but concluding that "[a]ny doctrinal inconsistency between *Scarborough* and the Supreme Court's more recent decisions is not for this Court to remedy"). Any error, then, if there were one, was not plain.

Finally, Roof argues that the district court erred in instructing jurors that "[t]he effect of the offense on interstate commerce does not need to be substantial. . . . All that is necessary . . . to prove an effect on interstate commerce is that the natural consequences of the offense potentially caused an impact, positive or negative, on interstate commerce." (J.A. at 5142-43.) He contends that the court was required to instruct the jury that they had to find a substantial effect on interstate commerce because the religious-obstruction statute does not regulate economic activity, nor does it constitute a class of economic activities. We recently said, when considering conduct affecting commercial activity, that "the Supreme Court and this Court repeatedly have clarified that Congress may regulate

---

[48] Felon-in-possession statutes necessarily proscribe possession of an item—a gun—and that item is the object that must move through interstate commerce under *Scarborough v. United States*. 431 U.S. 563, 577 (1977). In contrast, the religious-obstruction statute does not focus on the possession of an item, but rather the offense of obstructing religion itself. *See United States v. Singletary,* 268 F.3d 196, 204 (3d Cir. 2001) (noting that the felon-in-possession statute "addresses items sent in interstate commerce and the channels of commerce themselves, delineating that the latter be kept clear of firearms"). It is not Roof's possession of a firearm that requires our current focus; it is his obstruction of religion.

interference with commerce, even if the effect of the interference on interstate commerce in an individual case is 'minimal.'" *United States v. Hill*, 927 F.3d 188, 202 (4th Cir. 2019) (citation omitted), *cert. denied*, 141 S. Ct. 272 (2020). We need not decide now whether that rule carries over to interference with activity that is not plainly commercial or economic in character because, even if the district court's jury instructions were erroneous, they were not plainly so. *See United States v. Grassie*, 237 F.3d 1199, 1206 n.5, 1209 (10th Cir. 2001) (upholding jury instructions saying that "any effect at all" on interstate commerce satisfied § 247(b)); *see also Carthorne*, 878 F.3d at 464 (explaining that "the absence of binding precedent in conjunction with disagreement among circuits" precludes us from finding plain error).

Thus, Roof's challenges to the jury instructions fail because the district court did not plainly err. We also note that Roof was not seriously prejudiced by the alleged errors because the evidence of his extensive internet usage sufficiently tied his conduct to interstate commerce, as already explained. *See United States v. Miltier*, 882 F.3d 81, 89 (4th Cir. 2018) ("Even if a jury was erroneously instructed, however, we will not set aside a resulting verdict unless the erroneous instruction *seriously* prejudiced the challenging party's case." (citation omitted)).

## B.    Issue 16: The Religious-Obstruction Statute Does Not Require Proof of Religious Hostility

Roof argues that the government had to prove that he was "motivated by hostility to religion" as an essential element under the religious-obstruction statute, 18 U.S.C. § 247(a)(2).[49]  (Opening Br. at 242.)  He is mistaken.[50]

To determine the meaning of a statutory provision, we rely first and foremost on its text.  *United States v. Wills*, 234 F.3d 174, 178 (4th Cir. 2000).  Section 247(a)(2) allows for conviction if the defendant intentionally obstructs another's enjoyment of the free exercise of religion.  "Intentionally" is a legal term of art, meaning "deliberately and not by accident."  *United States v. Fuller*, 162 F.3d 256, 260 (4th Cir. 1998).  In § 247(a)(2), the word modifies the subsequent phrase "obstructs, by force or threat of force" and serves as the only mens rea requirement for that section of the statute.  There is no argument that Roof's acts were accidental rather than deliberate, and his novel interpretation of the statute, which seeks to insert a new mens rea element of "hostility," finds no support in the text.

That might be why Roof centers his argument on legislative history.  He cites a Senate Report indicating that the statute was promulgated with the aim to "make violence motivated by hostility to religion a Federal offense."  S. Rep. No. 100-324, at 2 (1988).

---

[49] Again, the statute prohibits "intentionally obstruct[ing], by force or threat of force, including by threat of force against religious real property, any person in the enjoyment of that person's free exercise of religious beliefs, or attempts to do so."  18 U.S.C. § 247(a)(2).

[50] Questions of statutory interpretation are reviewed de novo.  *United States v. Savage*, 737 F.3d 304, 306-07 (4th Cir. 2013).

Even assuming, however, that the quotation were an expression of the sole intent of all who voted to pass the statute, that concept did not make it into the legislation as passed. The text of a statute necessarily takes precedence over unenacted congressional intent. *See Wills*, 234 F.3d at 178. And because we take it as a given that Congress knows how to say something when it wants to, its silence controls when it chooses to stay silent. *Discover Bank v. Vaden*, 396 F.3d 366, 370 (4th Cir. 2005). Accordingly, proof of religious hostility is not required for a conviction under § 247(a)(2).

Roof's arguments concerning the evidence of religious hostility—or the lack of such evidence—thus do not prevail.

### C. Issue 17: Congress Did Not Exceed Its Thirteenth Amendment Authority in Enacting the Hate Crimes Prevention Act, 18 U.S.C. § 249

#### 1. Hate Crimes Background

In 2009, Congress enacted the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act ("HCPA"), 18 U.S.C. § 249, pursuant to its constitutional authority under the Thirteenth Amendment. U.S. Const. amend. XIII, § 2. The HCPA authorizes federal prosecution of whoever "willfully causes bodily injury to any person or . . . attempts to cause bodily injury to any person, because of the actual or perceived race, color, religion, or national origin of any person." 18 U.S.C. § 249(a)(1).

In enacting the HCPA, Congress found that "[s]lavery and involuntary servitude were enforced, both prior to and after the adoption of the 13th [A]mendment . . . , through widespread public and private violence directed at persons because of their race, color, or ancestry, or perceived race, color, or ancestry," and that "eliminating racially motivated

violence is an important means of eliminating, to the extent possible, the badges, incidents, and relics of slavery and involuntary servitude."  34 U.S.C. § 30501(7).  Congress also made clear that the HCPA was intended to assist states' efforts to combat hate crimes, saying:

> State and local authorities are now and will continue to be responsible for prosecuting the overwhelming majority of violent crimes in the United States, including violent crimes motivated by bias.  These authorities can carry out their responsibilities more effectively with greater Federal assistance.
> . . .
> Federal jurisdiction over certain violent crimes motivated by bias enables Federal, State, and local authorities to work together as partners in the investigation and prosecution of such crimes.
>
> The problem of crimes motivated by bias is sufficiently serious, widespread, and interstate in nature as to warrant Federal assistance to States, local jurisdictions, and Indian tribes.

*Id.* § 30501(3), (9)-(10).

Counts 1 through 12 of the indictment charge Roof with violations of the HCPA. He moved to dismiss them, arguing that the HCPA is unconstitutional because it is not "appropriate legislation" to enforce the Thirteenth Amendment.  He further argued that the statute does not meet the Supreme Court's tests for evaluating the limits of congressional power under the Thirteenth, Fourteenth, and Fifteenth Amendments to the Constitution.  In particular, he said that those Amendments authorize legislation only if it meets the "congruence and proportionality" test set forth in *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997), and the "current needs" test of *Northwest Austin Municipal Utility District Number One v. Holder*, 557 U.S. 193, 203 (2009).  The district court rejected those arguments, and the jury convicted Roof on all the HCPA counts of the Indictment.

2. *The HCPA Is Appropriate Legislation Under Controlling Thirteenth Amendment Precedent*

On appeal, Roof again argues that the HCPA is not "appropriate legislation," is not justified by "current needs," and is not a "congruent and proportional" response to slavery or a badge of slavery, and is thus facially unconstitutional. (Opening Br. at 245.) That position, in essence, asks us to extend Fourteenth and Fifteenth Amendment caselaw to the Thirteenth Amendment. We decline to do so and will affirm Roof's convictions under prevailing Thirteenth Amendment standards.[51]

a) The HCPA is appropriate legislation under *Jones v. Alfred H. Mayer Co.*

Ratified during the reconstruction era after the Civil War, the Thirteenth Amendment provides that "[n]either slavery nor involuntary servitude . . . shall exist within the United States." U.S. Const. amend. XIII, § 1. This profoundly important constitutional provision was intended

> to abolish slavery of whatever name and form and all its badges and incidents; to render impossible any state of bondage; to make labor free, by prohibiting that control by which the personal service of one man is disposed of or coerced for another's benefit, which is the essence of involuntary servitude.

*Bailey v. Alabama*, 219 U.S. 219, 241 (1911). The Amendment, in its § 2, grants Congress the "power to enforce [it] by appropriate legislation." U.S. Const., amend XIII, § 2.

After striking down multiple pieces of civil rights legislation under a restrictive interpretation of § 2's enforcement power, the Supreme Court in 1968 "adopted a more

---

[51] We review a defendant's preserved challenge to a statute's constitutionality de novo. *See United States v. Hager*, 721 F.3d 167, 182 (4th Cir. 2013); *see also supra* note 41.

generous approach . . . , giving Congress relatively wide latitude both to determine what qualifies as a badge or incident of slavery and how to legislate against it." *United States v. Hatch*, 722 F.3d 1193, 1198-99 (10th Cir. 2013) (explaining the history of the Thirteenth Amendment and noting that pre-1968 caselaw narrowly defined the badges and incidents of slavery). Specifically, in *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968), the Supreme Court held that the Thirteenth Amendment empowers Congress to prohibit racial discrimination in the public or private sale or rental of real estate. *Id.* at 437-39. The Court explained that § 2 gave Congress not only the authority to abolish slavery, but also the "power to pass all laws necessary and proper for abolishing all badges and incidents of slavery in the United States." *Id.* at 439 (citing *Civil Rights Cases*, 109 U.S. 3, 20 (1883)). Rather than itself define the "badges and incidents of slavery," the Court wrote that, "[s]urely Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and the incidents of slavery, and the authority to translate that determination into effective legislation." *Id.* at 440. It went on to reason that the legislation at issue was an appropriate exercise of congressional authority (that is, it was rational legislation aimed at eliminating the badges and incidents of slavery), because "whatever else they may have encompassed, the badges and incidents of slavery—its 'burdens and disabilities'—included restraints upon [property rights]." *Id.* at 441 (citation omitted).

Today, *Jones* remains the seminal Supreme Court case on Congress's enforcement power under § 2 of the Thirteenth Amendment, providing the governing standard for Roof's challenge. *See, e.g.*, *Runyon v. McCrary*, 427 U.S. 160, 168, 179 (1976) (relying on *Jones* to uphold 42 U.S.C. § 1981's prohibition of racial discrimination in making and

123

enforcing private contracts); *Griffin v. Breckenridge*, 403 U.S. 88, 105 (1971) (reaffirming that Congress is empowered to "rationally . . . determine what are the badges and the incidents of slavery" and "translate that determination into effective legislation" (citation omitted)); *Hatch*, 722 F.3d at 1201 (applying *Jones* to determine the constitutionality of the HCPA).

In light of *Jones*, it is abundantly clear that the HCPA is appropriate legislation. To prove otherwise, Roof would need to show that Congress acted irrationally in deeming racially motivated violence a badge or incident of slavery, but over a century of sad history puts the lie to any such effort. Congress had ample grounds for finding that "[s]lavery and involuntary servitude were enforced . . . through widespread public and private violence directed at persons because of their race, color, or ancestry." 34 U.S.C. § 30501(7). Congress also concluded that "eliminating racially motivated violence is an important means of eliminating, to the extent possible, the badges, incidents, and relics of slavery and involuntary servitude." *Id.* Those findings are universally accepted by courts analyzing hate-crimes legislation.[52] If the point were not already obvious, we state here emphatically that concluding there is a relationship between slavery and racial violence "is not merely rational, but inescapable." *See United States v. Beebe*, 807 F. Supp. 2d 1045, 1052 (D.N.M.

---

[52] Indeed, every court to address the constitutionality of 18 U.S.C. § 249(a)(1) has upheld it. *See, e.g.*, *United States v. Metcalf*, 881 F.3d 641, 645 (8th Cir. 2018); *United States v. Cannon*, 750 F.3d 492, 502 (5th Cir. 2014); *United States v. Hatch*, 722 F.3d 1193, 1206 (10th Cir. 2013); *United States v. Bowers*, 495 F. Supp. 3d 362, 365-68 (W.D. Pa. 2020); *United States v. Diggins*, 435 F. Supp. 3d 268, 274 (D. Me. 2019); *United States v. Henery*, 60 F. Supp. 3d 1126, 1130 (D. Idaho 2014).

2011) (discussing the history of racially motivated violence and its status as a badge or incident of slavery), *aff'd sub nom. Hatch*, 722 F.3d 1193. (*See also* J.A. at 3512-15 (analyzing the history of racially motived violence).) The HCPA is thus "appropriate" in exactly the manner envisioned in *Jones*.

> b) *City of Boerne* and *Shelby County* are not applicable to Thirteenth Amendment legislation, absent clear direction from the Supreme Court[53]

No doubt recognizing the impossible task of establishing that Congress irrationally declared racially motivated violence to be a badge and incident of slavery, Roof contends that the "congruence and proportionality" test from *City of Boerne v. Flores*, 521 U.S. at 520, and the "current needs" test from *Shelby County v. Holder*, 570 U.S. 529, 542 (2013), apply to Thirteenth Amendment legislation. Specifically, he contends that those tests— created in the context of the Fourteenth and Fifteenth Amendments, respectively—clarify the governing standards for the reconstruction era Amendments and therefore apply to the HCPA. Roof emphasizes similarities among the Amendments. Having been ratified in relatively rapid succession after the Civil War, the Thirteenth, Fourteenth, and Fifteenth Amendments formed a trilogy aimed at eliminating legal impediments to freed slaves' full enjoyment of the rights of citizenship. The Amendments all have similarly worded enforcement clauses: § 2 of the Thirteenth Amendment states that "Congress shall have power to enforce this article by appropriate legislation"; § 5 of the Fourteenth Amendment

---

[53] Roof's "current needs" argument before the district court focused on *Northwest Austin Municipal Utility District Number One v. Holder*, 557 U.S. 193 (2009). On appeal, Roof shifts his attention to the Supreme Court's more recent Fifteenth Amendment case, *Shelby County v. Holder*, 570 U.S. 529 (2013).

states that "Congress shall have power to enforce, by appropriate legislation, the provisions of this article"; and § 2 of the Fifteenth Amendment states that "Congress shall have power to enforce this article by appropriate legislation."  Roof thus asserts that any precedent limiting enforcement of one Amendment must limit the others as well.

Accordingly, with no support for his attack on the HCPA in Thirteenth Amendment precedents, Roof turns to Supreme Court cases discussing legislation passed pursuant to the Fourteenth and Fifteenth Amendments.  In *City of Boerne*, 521 U.S. at 512, the Court evaluated the constitutionality of the Religious Freedom Restoration Act ("RFRA"), which was Congress's attempt to legislatively overrule *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990).  *Smith* had abrogated much of the Supreme Court's earlier jurisprudence regarding how to assess whether a statute was an unconstitutional burden on a person's First Amendment right to the free exercise of religion.  *City of Boerne*, 521 U.S. at 513-15.  Before *Smith*, laws that burdened religious exercise were subject to strict scrutiny.  *See, e.g.*, *Sherbert v. Verner*, 374 U.S. 398, 406 (1963) (considering whether a compelling state interest justified a South Carolina law infringing the free exercise of religion by Seventh-day Adventists).  *Smith* overturned that jurisprudence and substituted for it a regime of rational-basis review.  494 U.S. at 884-86. Congress responded to *Smith* by enacting RFRA, reimposing a stricter standard on the states, in effect returning to the pre-*Smith* understanding of the First and Fourteenth Amendments.  *City of Boerne*, 521 U.S. at 515-16.  Congress sought to justify RFRA as "appropriate legislation" under § 5 of the Fourteenth Amendment.  *Id.* at 517.

The Supreme Court disagreed, holding that Congress had actually attempted to amend the Constitution legislatively. *Id.* at 532. The Court acknowledged that § 5 of the Fourteenth Amendment gives Congress important powers, but said that "[i]f Congress could define its own powers by altering the Fourteenth Amendment's meaning, no longer would the Constitution be 'superior paramount law, unchangeable by ordinary means.'" *Id.* at 529 (quoting *Marbury v. Madison*, 5 U.S. 137, 177 (1803)). Consistent with that limitation, the Court insisted on "a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id.* at 520. The *City of Boerne* Court ultimately struck down RFRA as unconstitutional because it was "so out of proportion to [its] supposed remedial or preventive object" that it could not "be understood as responsive to, or designed to prevent, unconstitutional behavior."[54] *Id.* at 532. As relevant here, nowhere does *City of Boerne* mention the Thirteenth Amendment or *Jones*.

In *Shelby County*, 570 U.S. at 557, a Fifteenth Amendment case, the Supreme Court invalidated § 4(b) of the Voting Rights Act of 1965, 42 U.S.C. § 1973, *transferred to* 52 U.S.C. § 10303. That Act prescribed a formula to identify jurisdictions that had to obtain federal permission before enacting any law related to voting. *Shelby County*, 570 U.S. at 537. The Act as reauthorized by legislation in 2006 was challenged in *Shelby County*. *Id.* at 540-41. At the outset of its opinion, the Court characterized the assertion of

---

[54] *Smith* remains the governing case in free-exercise jurisprudence and is still controversial. *See Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876-77 (2021) ("[Plaintiff] urges us to overrule *Smith*, and the concurrences in the judgment argue in favor of doing so. But we need not revisit that decision here." (citation omitted)).

congressional power in the Voting Rights Act as "a drastic departure from basic principles of federalism," justified by the "insidious and pervasive evil" of entrenched racial discrimination in the regulation of elections. *Id.* at 535 (citation omitted). Under those facts, the Court addressed the scope of Congress's power to pass "appropriate legislation" enforcing the Fifteenth Amendment's protections of the right to vote, and explained that Congress should have justified the reauthorization based on conditions then, not conditions that prevailed when the legislation was first enacted. *See id.* at 557. It found that Congress's reliance on "decades-old data and eradicated practices" could not justify reenacting provisions designed for the 1960s. *Id.* at 551. The Court concluded that "Congress must ensure that the legislation it passes to remedy [racial discrimination in the regulation of elections] speaks to current conditions." *Id.* at 557. Like *City of Boerne*, *Shelby County* nowhere mentions the Thirteenth Amendment or *Jones*.

In this appeal, Roof asks us to incorporate the limitations from *City of Boerne* and *Shelby County* into the analysis of Thirteenth Amendment cases. We decline to do so, absent clear direction from the Supreme Court. *Cf. Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000) ("[The] Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio*."). As noted, neither case mentions the Thirteenth Amendment, neither cites *Jones*, and neither discusses Congress's power to identify and legislate against the badges and incidents of slavery. Accordingly, we leave it to the Supreme Court to make adjustments, if any, to well-established Thirteenth Amendment jurisprudence. *See United States v. Cannon*, 750 F.3d 492, 505 (5th Cir. 2014) (recognizing that *City of Boerne* "never mentioned the Thirteenth Amendment or *Jones*,

and did not hold that the 'congruence and proportionality' standard was applicable beyond the Fourteenth Amendment"); *United States v. Metcalf*, 881 F.3d 641, 645 (8th Cir. 2018) ("[N]either *Shelby County* nor [*City of Boerne*] addressed Congress's power to legislate under the Thirteenth Amendment," and "*Jones* constitutes binding precedent."); *Hatch*, 722 F.3d at 1204 ("[T]he Supreme Court has never revisited the rational determination test it established in *Jones*.").

Roof's arguments to the contrary are unpersuasive.  He asserts that failing to extend *City of Boerne* or *Shelby County* to Thirteenth Amendment legislation conflicts with our rule that we "do[] not have license to reject the generally applicable reasoning set forth in a Supreme Court opinion."  *United States v. Hill*, 927 F.3d 188, 199 n.3 (4th Cir. 2019). That argument, however, suffers from at least two flaws.  First, it presupposes that the reasoning in *City of Boerne* and *Shelby County* should be considered generally applicable to the Thirteenth Amendment.  Second, it ignores Supreme Court precedent unambiguously stating that, "[i]f a precedent of [the] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions."  *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989); *see also Hohn v. United States*, 524 U.S. 236, 252-53 (1998) (The Supreme Court's "decisions remain binding precedent until [it] see[s] fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality.").

In sum, we will affirm Roof's convictions under the HCPA because the HCPA is appropriate legislation under § 2 of the Thirteenth Amendment and *Jones*.  It was not

irrational for Congress to deem racially motivated violence a badge and incident of slavery, and the "congruence and proportionality" test from *City of Boerne* and the "current needs" test from *Shelby County* need not be applied to legislation enacted under the Thirteenth Amendment, absent clear direction to that effect from the Supreme Court.[55]

### D.    Issue 18: The Attorney General Did Not Erroneously Certify Roof's Federal Prosecution

#### 1.    Certification Background

The HCPA requires the Attorney General, or a designee, to certify that at least one of four conditions exists before a case may be federally prosecuted: (1) the state does not have jurisdiction; (2) the state requested the federal government to assume jurisdiction; (3) the verdict or sentence obtained under state charges left a federal interest in eradicating bias-motivated violence demonstrably unvindicated; or (4) a federal prosecution is "in the public interest and necessary to secure substantial justice."  18 U.S.C. § 249(b)(1)(A)-(D). To prosecute violations of the religious-obstruction statute, the Attorney General must certify that, "in his judgment a prosecution by the United States is in the public interest and necessary to secure substantial justice."  18 U.S.C. § 247(e).

For the HCPA charges against Roof under § 249(a)(1), the Attorney General certified that South Carolina "lacks jurisdiction to bring a hate crime prosecution" and that Roof's prosecution "is in the public interest and is necessary to secure substantial justice."

---

[55] Roof also argues that the certification process (*see infra* Section VI.D) does not save the HCPA from unconstitutionality because it does not provide any meaningful limits on federal jurisdiction.  Because we uphold the HCPA on its own terms, we need not reach that argument.

(J.A. at 62.)  For the religious-obstruction charges under § 247(a)(2), the Attorney General certified that Roof's prosecution "is in the public interest and is necessary to secure substantial justice."  (J.A. at 63.)  In the district court, Roof unsuccessfully challenged the § 249(a)(1) certification, [56] arguing that the Court should look beyond § 249's facial certification requirements and review whether—in light of the parallel state proceeding— the state actually lacked jurisdiction to prosecute a hate crime and whether his prosecution truly was in the public interest.  Roof mounted no challenge to the § 247(a)(2) certification. [57]

### 2.  *The Attorney General Did Not Erroneously Certify Roof's Federal Prosecution*

On appeal, Roof argues that given South Carolina's efforts to prosecute him— including seeking the death penalty—the Attorney General had no basis for certifying the charges against him and therefore we should reverse his convictions on Counts 1 through 24.  According to Roof, "[t]here was no additional public interest that the federal prosecution could have vindicated," and the lack of a separate hate-crimes statute is irrelevant.  (Opening Br. at 259.)  The government responds that the Attorney General's

---

[56] To be more precise, the certification is under § 249(b), but is made with respect to the § 249(a)(1) charges.  Likewise, the certification with respect to the § 247(a)(2) charges is made pursuant to § 247(e).

[57] Accordingly, if reviewable at all, Roof's unpreserved challenge to the § 247(a)(2) certification is reviewed under the plain-error standard.  *See supra* Section V.C.2 (articulating the plain-error standard).  As explained further herein, whether a standard exists to review the Attorney General's certifications is contested.

discretionary certifications are not subject to judicial review and, even if they were, the

Attorney General properly certified the prosecution.

Beginning with the justiciability challenge, the government does not argue that the

alleged nonreviewability of the Attorney General's certifications is jurisdictional, i.e., that

we lack authority under Article III of the Constitution to review the certifications. (Oral

Arg. at 2:36:45-2:38:40.) As a result, we may assume without deciding that Roof's claims

are reviewable. *Cf. Trump v. Hawaii*, 138 S. Ct. 2392, 2407 (2018) (assuming

reviewability without deciding it, where the government did not argue that justiciability

issues were jurisdictional); *see also United States v. F.S.J.*, 265 F.3d 764, 768 (9th Cir.

2001) (collecting cases and noting that "[o]nly the Fourth Circuit has held that the

government's certification of a substantial federal interest [in a juvenile prosecution under

18 U.S.C. § 5032] is subject to judicial review"); *United States v. Bowers*, 495 F. Supp. 3d

362, 375 (W.D. Pa. 2020) (holding that certifications under § 247(e) and § 249 are not

reviewable); *United States v. Diggins*, 435 F. Supp. 3d 268, 276 (D. Me. 2019) (collecting

cases and finding that, like certifications under § 5032, § 249 certifications are

unreviewable acts of prosecutorial discretion).

Having assumed justiciability, our scope of review is limited because the Attorney

General's certifications must be afforded substantial deference. *See United States v. T.M.*,

413 F.3d 420, 425 (4th Cir. 2005) ("Whether a 'substantial Federal interest' exists is similar

to the 'sort of discretionary decision more commonly thought of as the type of prosecutorial

decisions that are immune from judicial review,' so we give the government's decision in

that regard more deference." (quoting *United States v. Juv. Male No. 1*, 86 F.3d 1314, 1319

(4th Cir. 1996))).  Applying that standard, we are unpersuaded that the government improperly certified Roof's prosecution under the HCPA.  Because South Carolina does not have a hate-crimes statute, it was unable to charge Roof for a crime that considers his alleged discriminatory intent as an element of the offense.  That statutory difference, along with the highly aggravated nature of Roof's crimes (aptly described by the district court as "a mass murder at a historic African-American church for the avowed purpose of reestablishing the white supremacy that was the foremost badge of slavery in America"), clearly implicated a substantial federal interest in eradicating the badges and incidents of slavery.  (J.A. at 3518.)  We accordingly will not second guess the Attorney General's determination that prosecution under § 249(a)(1) was in the public interest and necessary to secure substantial justice.  And for similar reasons, it certainly does not constitute plain error for the district court to have foregone any questioning of the § 247(a)(2) certification.

In short, although there might be federal certifications that raise close questions, this case is not one of them, given the character of the crimes and the confessed motives behind them.   We therefore decline to vacate Roof's convictions on Counts 1 through 24 on the basis of improper certifications.

### E.    Issue 19: Roof's 18 U.S.C. § 924(j)(1) Firearm Convictions Are Valid

#### 1.  *Firearm Offense Background*

Counts 25 through 33 of the indictment charged Roof with firearm offenses, in violation of 18 U.S.C. § 924(j)(1).  The jury found him guilty on all nine counts, which served as the basis for nine of his death sentences, one death sentence for each firearm offense that resulted in murder.  Section 924 proscribes the use of a firearm "during and in

relation to any crime of violence" resulting in murder, and it authorizes the imposition of the death penalty. 18 U.S.C. § 924(c)(1)(A), (j)(1) (incorporating 18 U.S.C. § 924(c) and § 1111(a) by reference). [58] On appeal, Roof challenges the validity of those firearm convictions, contending that neither of the alternative predicate crimes underlying them— the HCPA and religious-obstruction offenses—are crimes of violence under the provisions of § 924. [59] He therefore requests vacatur of the convictions and corresponding death sentences. We see no merit in his contentions.

### 2. Legal Framework

To qualify as a crime of violence under 18 U.S.C. § 924(c)(3), which is the controlling definition for purposes of § 924(j)(1), a predicate offense must have "as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 924(c)(3)(A); *see also United States v. Robinson*, 275 F.3d 371, 378 (4th Cir. 2001) (explaining that proof of a § 924(j) violation requires "the commission of a § 924(c) violation"). We commonly refer to § 924(c)(3)(A) as the "force

---

[58] *See* 18 U.S.C. § 924(j)(1) ("A person who, in the course of a violation of subsection (c), causes the death of a person through the use of a firearm shall[,] if the killing is a murder (as defined in section 1111), be punished by death or by imprisonment for any term of years or for life."); *id.* § 924(c)(1)(A) (penalizing "any person who, during and in relation to any crime of violence . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm"); *id.* § 1111(a) (defining "murder" as "the unlawful killing of a human being with malice aforethought").

[59] "[W]hether a particular criminal offense qualifies as a crime of violence under Section 924(c) presents a legal question, which we review de novo." *United States v. Evans*, 848 F.3d 242, 245 (4th Cir. 2017).

clause" or the "elements clause" of the statute. *United States v. Mathis*, 932 F.3d 242, 263 (4th Cir. 2017); *United States v. Allred*, 942 F.3d 641, 646 (4th Cir. 2019).[60] To determine whether a charged offense is a "crime of violence" under the elements clause, we apply the categorical approach, which requires us to "ask whether the most innocent conduct that the law criminalizes requires proof of the use, attempted use, or threatened use of force sufficient to satisfy the [elements] clause." *Allred*, 942 F.3d at 648 (internal quotation marks and citation omitted) (interpreting the definition of "violent felony" in the elements clause of the Armed Career Criminal Act ("ACCA")).[61] If the answer is yes, then the offense categorically qualifies as a crime of violence. *Id.* But if the "statute defines an offense in a way that allows for both violent and nonviolent means of commission," then that predicate "offense is not 'categorically' a crime of violence under the [elements] clause." *United States v. Simms*, 914 F.3d 229, 233 (4th Cir. 2019) (en banc). "Importantly,

---

[60] Section 924(c)(3)(B) also defines a crime of violence as a felony offense "that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 924(c)(3)(B). That subsection, commonly known as the "residual clause," *United States v. Mathis*, 932 F.3d 242, 263 (4th Cir. 2017), was deemed unconstitutionally vague in *United States v. Davis*, 139 S. Ct. 2319, 2336 (2019). Our analysis is accordingly limited to determining whether Roof's predicate offenses qualify as crimes of violence under the elements clause. *Mathis*, 932 F.3d at 263-64.

[61] Because the definition of "crime of violence" is almost identical to the definition of "violent felony" in the ACCA, our "decisions interpreting one such definition are persuasive as to the meaning of the others." *United States v. McNeal*, 818 F.3d 141, 153 n.9 (4th Cir. 2016); *compare* 18 U.S.C. § 924(e)(2)(B)(i) (defining "violent felony" as having "as an element the use, attempted use, or threatened use of physical force against the person of another"), *with id.* § 924(c)(3)(A) (defining "crime of violence" as having "as an element the use, attempted use, or threatened use of physical force against the person or property of another").

in undertaking this inquiry, 'there must be a realistic probability, not a theoretical possibility,' that the minimum conduct would actually be punished under the statute." *Allred*, 942 F.3d at 648 (citation omitted).

Because the categorical approach requires us to "analyze only the elements of the offense in question, rather than the specific means by which the defendant committed the crime," *United States v. Evans*, 848 F.3d 242, 245-46 (4th Cir. 2017), our analysis must vary when the statute at issue is divisible; that is, when it "lists potential offense *elements* in the alternative, and thus includes multiple, alternative versions of the crime." *United States v. Bryant*, 949 F.3d 168, 173 (4th Cir. 2020) (internal quotation marks and citation omitted). A divisible statute "renders opaque which element played a part in the defendant's conviction," and thus we "cannot tell, simply by looking at a divisible statute, which version of the offense a defendant was convicted of." *Descamps v. United States*, 570 U.S. 254, 255, 260 (2013). So, "as a tool for implementing the categorical approach," *id.* at 262, we are permitted, under what is called the modified categorical approach, "to consult a limited set of record documents (such as the indictment, jury instructions, or plea agreement) for the sole purpose of determining what crime, with what elements, a defendant was convicted of." *Allred*, 942 F.3d at 648 (internal quotation marks and citation omitted).

With that in mind, we address what conduct amounts to a crime of violence under the elements clause of § 924(c)(3), and then turn to a consideration of the statutory language for each predicate offense and whether each predicate offense satisfies the elements clause.

### 3. *"Crime of Violence" Jurisprudence*

The Supreme Court has discussed, and so have we, the meaning of the elements clause in ways pertinent to this appeal. First, as described by the Supreme Court in *Johnson v. United States*, the term "physical force" indicates that the degree of force employed must be "capable of causing physical pain or injury to another person." 559 U.S. 133, 140 (2010) (interpreting the definition of "violent felony" in the elements clause of the ACCA). Physical force does not, however, "require any particular degree of likelihood or probability that the force used will cause physical pain or injury; only potentiality." *Stokeling v. United States*, 139 S. Ct. 544, 554 (2019). Thus, "instead of relying solely on the quantum of force required under the [predicate offense statute]," *United States v. Dinkins*, 928 F.3d 349, 355 (4th Cir. 2019), the Court has concluded that "the force used . . . to overcome a victim's resistance, 'however slight,' 'is inherently violent in the sense contemplated by . . . *Johnson*.'" *United States v. Rumley*, 952 F.3d 538, 549 (4th Cir. 2020) (quoting *Stokeling*, 139 S. Ct. at 550, 553). That is so "because overpowering even a weak-willed victim necessarily involves a physical confrontation and struggle." *Dinkins*, 928 F.3d at 354 (internal quotation marks and citation omitted). "The altercation need not cause pain or injury or even be prolonged; it is the physical contest between the criminal and the victim that is itself 'capable of causing physical pain or injury.'"[62] *Stokeling*, 139 S. Ct. at 553 (citation omitted).

---

[62] "[D]ifferent in kind from the violent force necessary to overcome resistance by a victim" is the "nominal contact" that will sustain a battery at common law, since that "does not require resistance or even physical aversion on the part of the victim." *Stokeling v.*

Second, "[t]he phrase 'against another,' when modifying the 'use of force,' demands that the perpetrator direct his action at, or target, another individual." *Borden v. United States*, 141 S. Ct. 1817, 1825 (2021). That means the "use of force" requires a higher degree of intent than reckless, negligent, or merely accidental conduct. *Id.* at 1824; *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004). Consequently, "an offense will not have as an element the 'use' of force sufficient to qualify as a [crime of violence] if it does not have the requisite level of mens rea." *Allred*, 942 F.3d at 652 (considering the definition of "violent felony" under the ACCA). Thus, even if the statute governing the predicate offense requires that the proscribed conduct result in death, it must also indicate a higher degree of intent than reckless, negligent, or merely accidental conduct in order to satisfy the elements clause. *Borden*, 141 S. Ct. at 1824; *United States v. Runyon*, 994 F.3d 192, 200 (4th Cir. 2021).

Third, "regardless of whether an injury resulted from direct or indirect means," *United States v. Battle*, 927 F.3d 160, 165 (4th Cir. 2019), an offense "that has as an element the intentional or knowing causation of bodily injury categorically requires the use of 'force capable of causing physical pain or injury to another person.'" *Allred*, 942 F.3d at 654 (citation omitted); *see also United States v. Reid*, 861 F.3d 523, 527-29 (4th Cir. 2017) (concluding that an offense that "requires that the defendant 'knowingly and

---

*United States*, 139 S. Ct. 544, 553 (2019). "[T]he 'unwanted' nature of the physical contact itself suffices to render [a battery] unlawful." *Id.* Such "mere 'offensive touching'" does not, however, satisfy the elements clause. *United States v. Rumley*, 952 F.3d 538, 549 (4th Cir. 2020) (citation omitted).

willfully inflict bodily injury'" falls within the ACCA's "violent felony" definition "and therefore serves as a predicate offense under § 924(e)(1)" (citation omitted)).

### 4. *"Death Results" Offenses Under § 249(a)(1) Are Crimes of Violence*

#### a) Section 249(a)(1) is divisible

Section 249(a)(1) of Title 18—part of the HCPA—criminalizes conduct that "willfully causes bodily injury to any person or, through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, attempts to cause bodily injury to any person, because of the actual or perceived race, color, religion, or national origin of any person." If "death results from the offense," the maximum sentence of imprisonment increases from ten years to life. 18 U.S.C. § 249(a)(1)(A)-(B). The "death results" element "imposes . . . a requirement of actual causality, i.e., but-for causation." *United States v. Simmons*, 999 F.3d 199, 217 (4th Cir. 2021) (alteration in original) (internal quotation marks and citation omitted). And "[w]hen a crime requires 'not merely conduct but also a specified result of conduct,' a defendant generally may not be convicted unless" that causal element is satisfied. *Burrage v. United States*, 571 U.S. 204, 210 (2014) (citation omitted). Thus, § 249(a)(1) is a divisible statute, with one version of the offense having as an element that death resulted from the crime's commission and carrying a maximum sentence of life imprisonment, and the other version excluding the death-results element and carrying a ten-year maximum sentence.

In assessing the § 249(a)(1) convictions as predicate offenses for the § 924(j)(1) convictions, then, the modified categorical approach is applicable, but "only to determine which statutory phrase was the basis for the conviction." *United States v. Hemingway*, 734

F.3d 323, 331 (4th Cir. 2013) (internal quotation marks and citation omitted).  In other words, we may consult the record "for the sole purpose of determining 'what crime, with what elements, a defendant was convicted of.'"  *Allred*, 942 F.3d at 648 (citation omitted). And we need look no further than the indictment to determine that Roof was charged with the "death results" version of the HCPA offense.  Our "crime of violence" determination with respect to § 249(a)(1) is therefore limited to the "death results" version of the offense.

b)  The "death results" offense under § 249(a)(1) requires the use of physical force

To convict a defendant of a "death results" offense under § 249(a)(1), the government must establish, beyond a reasonable doubt, that the defendant: (1) "willfully cause[d] bodily injury to any person"[63]; (2) because of that person's "actual or perceived race, color, religion, or national origin"; and (3) the injury resulted in the person's death. 18 U.S.C. § 249(a)(1).  That offense, according to Roof, is not a crime of violence because

---

[63] A defendant may commit a crime under § 249(a)(1) by "attempt[ing] to cause bodily injury" *or* "willfully caus[ing] bodily injury."  *See United States v. Cannon*, 750 F.3d 492, 506 (5th Cir. 2014) (holding that a jury could rationally conclude that a defendant committed a crime under § 249(a)(1) just by attempting to willfully cause bodily injury). Those two methods represent alternative means as opposed to alternative elements.  *Cf. United States v. Drummond*, 925 F.3d 681, 689 (4th Cir. 2019) (applying the ACCA to a state domestic-violence offense and stating that "[r]ather than effectively creating several different crimes, the statute addresses a single crime . . . , which can be committed by any one of three means—an offer, attempt, or actual causation of physical harm or injury."); *see also infra* Section VI.E.5.a & note 66.  Nevertheless, under the "death results" version of the offense, we need consider only actual causation.  If one "attempts to cause bodily injury" and "death results" from that attempt, then the offender has clearly caused bodily injury.  *See Burrage v. United States*, 571 U.S. 204, 210-11 (2014) (explaining that the causation element must be satisfied for a crime requiring a specific result, which "requires proof that the harm would not have occurred in the absence of—that is, but for—the defendant's conduct" (internal quotation marks and citation omitted)).

one can violate § 249(a)(1) using de minimis force, no force, or unintentional force.  We disagree.  Our precedent makes clear that a statute having "as an element the intentional or knowing causation of bodily injury categorically requires the use of 'force capable of causing physical pain or injury to another person.'"  *Allred*, 942 F.3d at 654 (citation omitted); *see Battle*, 927 F.3d at 166 ("[A] crime requiring the 'intentional causation' of injury requires the use of physical force" within the meaning of the ACCA. (citation omitted)).  So, when a defendant "willfully causes bodily injury" and "death results" from the defendant's conduct, that offense satisfies the "use of physical force" requirement and of course constitutes a crime of violence under the elements clause.  *See RSM, Inc. v. Herbert*, 466 F.3d 316, 320-21 (4th Cir. 2006) (defining the term "willful" as intentional and purposeful, noting that the term "'willfully' has been held to denote a mental state of greater culpability than the closely related term, 'knowingly'" (citation omitted)).

Rather than follow that straightforward reasoning, Roof would have us consider each element in isolation.  He divorces the "willfully causes bodily injury" element from the "death results" element, and then points to the broad statutory definition of "bodily injury" as a basis for claiming that § 249(a)(1) "only requires intentional use of de minimis force or no force."  (Opening Br. at 267-69 (emphasis omitted).)  Specifically, because the statutory definition of "bodily injury" includes anything from "a bruise" to "any other injury to the body, no matter how temporary," Roof contends that bodily injury encompasses squeezing an arm or "touching a bruise" and, therefore, § 249(a)(1) proscribes a broader range of conduct than the "physical force" requirement.  (Opening Br. at 268.)  *See* 18 U.S.C. § 249(c)(1) (defining, by reference, "bodily injury" to include cuts,

abrasions, bruises, burns, or disfigurements; physical pain; illness; impairment of the function of a bodily member, organ, or mental faculty; or any other injury to the body, no matter how temporary; but excluding "solely emotional or psychological harm to the victim").

He also argues that the "'willfulness' (intentional) mens rea . . . does not attach to the 'death results' element." (Opening Br. at 269.)  And without the mens rea attached, the "death results" element "requires violent physical force" only, not "*intentional* use of violent physical force." (Opening Br. at 269-70.)  On that basis, and because "intentional infliction of 'bodily injury' . . . only requires intentional use of de minimis force or an intentional act of omission," Roof contends that, "at most, the 'bodily injury' and 'death results' elements each come halfway toward satisfying the [elements] clause, though neither contains both requirements at the same time." (Opening Br. at 269-70.)

But we do not view each element of the crime in isolation.  *See Runyon*, 994 F.3d at 204; *In re Irby*, 858 F.3d 231, 236 & n.2 (4th Cir. 2017).  Roof's rigid division of the elements ignores the interrelated character that elements of a crime can share, and his far-fetched examples of potential § 249(a)(1) violations illustrate the absurd results that arise from analyzing each element in the way that he wants.  For example, he asserts that "a defendant squeezing someone's arm because of her race, causing her to lose her balance and fall to her death" constitutes a "death results" offense under § 249(a)(1).  (Opening Br. at 270.)  But that hypothetical does not represent "a realistic probability" of "the minimum conduct [that] would actually be punished under the statute."  *Allred*, 942 F.3d at 648.  And contrary to Roof's position, we often look at the elements of an offense as a whole when

deciding if that offense meets the requirements of the elements clause.[64]  Doing so here, "[w]e find it difficult to imagine a realistic scenario" where a defendant could engage in conduct with the specific intent to cause bodily injury to a person, could then kill the victim, and yet do so "without knowing or intending to inflict upon that person far more than a mere touch or scratch."  *Id.* at 654-55.

Put simply, even if Roof's emphasis on the broad definition of "bodily injury" had any merit when considered in isolation, it has none when considered in conjunction with the "death results" element.  Accordingly, we conclude that a "death results" offense under § 249(a)(1) is categorically a crime of violence.

### 5.  *"Death Results" Offenses Under § 247(a)(2) Are Crimes of Violence*

#### a)  Section 247(a) is divisible

Section 247(a) of Title 18—part of the religious-obstruction statute—criminalizes conduct that "(1) intentionally defaces, damages, or destroys any religious real property,

---

[64] *See United States v. Runyon*, 994 F.3d 192, 202-03 (4th Cir. 2021) (considering conspiracy in the context of an offense that "has heightened mens rea elements, as well as the element that 'death results'"—i.e., "conspiracy to use facilities of commerce with the intent that a murder be committed for hire where death results"—and deciding that, "in any realistic case," those mens rea elements, though "not explicitly tied to the resulting-in-death element, . . . must nonetheless carry forward to the resulting-in-death element"); *United States v. Allred*, 942 F.3d 641, 654 (4th Cir. 2019) ("Although there is no mens rea specified for the element of causation, the statute contains not one, but *two* heightened mens rea requirements. . . . We find it difficult to imagine a realistic scenario in which a defendant would knowingly engage in conduct with the specific intent to retaliate against a witness and thereby only recklessly or negligently cause bodily injury."); *see also Stokeling*, 139 S. Ct. at 553 (considering robbery as a whole and concluding that "the force necessary to overcome a victim's physical resistance [in a robbery] is inherently 'violent'" because "overpower[ing] . . . even a feeble or weak-willed victim . . . necessarily involves a physical confrontation and struggle").

because of the religious character of that property, or attempts to do so; or (2) intentionally obstructs, by force or threat of force, including by threat of force against religious real property, any person in the enjoyment of that person's free exercise of religious beliefs, or attempts to do so."[65]  Again, when "faced with an alternatively phrased statute," we must determine whether the disjunctive language represents alternative means or alternative elements.  *Allred*, 942 F.3d at 649.

Beginning with the disjunctive statutory subsections, § 247(a)(1) and § 247(a)(2), we conclude that those subsections are divisible.  When analyzing a statute's divisibility, "[t]he nature of the behavior that likely underlies a statutory phrase matters."  *Id.* at 650 (alteration in original) (citation omitted).  Where the behavior typically "underlying damage to property" "differs so significantly from" the obstruction of a person using force or threat of force (resulting in death), we "must treat the two as different crimes."  *Id.* (citations omitted).  The former deals solely with damage to religious real property, while

---

[65] The religious-obstruction statute we recite here is an amended version that had not yet been enacted at the time of Roof's conviction.  Nevertheless, "when an amendment alters, even 'significantly alters,' the original statutory language, this does 'not necessarily' indicate that the amendment institutes a change in the law."  *Brown v. Thompson*, 374 F.3d 253, 259 (4th Cir. 2004) (citation omitted).  To determine "whether an amendment clarifies or changes an existing law, a court, of course, looks to statements of intent made by the legislature that enacted the amendment."  *Id.*  Here, the legislative history expressly stated that "[t]he changes adopted . . . are intended to *clarify* that a 'threat of force' under subparagraph (a)(2) includes 'threats of force' made against religious real property." S. Rep. No. 115-325, at 2 (2018) (emphasis added).  "As a clarification rather than a substantive change," the amendment amounts to a declaration, and "[t]he Supreme Court has long instructed that such declarations—i.e., '[s]ubsequent legislation declaring the intent of an earlier statute'—be accorded 'great weight in statutory construction.'"  *Brown*, 374 F.3d at 260 (second alteration in original) (citation omitted).  We therefore consider the amended version of the religious-obstruction statute.

the latter is concerned with conduct that, at a minimum, causes "fear of bodily harm" so as to "obstruct an individual's ability to exercise his or her religious beliefs." H.R. Rep. No. 115-456, at 2 (2017). Accordingly, those statutory phrases are alternative elements, not alternative means.

In addition, because § 247(a)(2) criminalizes both obstruction of the free exercise of religion and "attempts to do so," it sets out multiple elements in the alternative and thus creates multiple versions of the crime, the statute being divisible along the lines separating completed and attempted versions of the crime.[66] *Descamps*, 570 U.S. at 262. Furthermore, and of highest importance, the "death results" offense under § 247(a)(2) is divisible for the same reasons described when discussing § 249(a)(1)—namely that death is an added element. *See supra* Section VI.E.4.a & notes 63, 66; *see also* 18 U.S.C. § 247(d) (authorizing the imposition of the death penalty "if death results from acts committed in violation of" § 247(a)(2)). Therefore, applying the modified categorical approach, we consider whether the "death results" offense under § 247(a)(2) satisfies the "use of physical force" requirement.

    b) <u>The "death results" offense under § 247(a)(2) requires the use of physical force</u>

To convict a defendant for a "death results" offense under § 247(a)(2), the government must establish, beyond a reasonable doubt, that the defendant: (1) intentionally obstructed "any person in the enjoyment of that person's free exercise of religious beliefs";

---

[66] We need not further concern ourselves with the divisibility of § 247(a)(2) between inchoate and completed crimes because this case deals only with the latter. The multiple murders at issue here represent the ultimate obstruction of religious practice.

(2) did so "by force or threat of force, including by threat of force against religious real property"; (3) resulting in that person's death.  18 U.S.C. § 247(a)(2), (d)(1).  (*See* J.A. at 5139-40.)    Additionally, the religious-obstruction offense must be in or must affect interstate or foreign commerce.  18 U.S.C. § 247(a)(2), (b).

According to Roof, § 247(a)(2) is not a crime of violence because although it "requires either intentional attempted threat of force or intentional use of de minimis force against one's own property," it does not require the intentional infliction of death.  (Reply Br. at 135.)    More specifically, Roof contends that the "force" element criminalizes "intentional de minimis (not violent) force or attempted (not actual) threat of force against one's own property (not another's), while the 'death results' element requires only unintentional force."  (Reply Br. at 129-35.)  In other words, the least culpable conduct that will amount to a "death results" offense under § 247(a)(2) does not satisfy both the mens rea requirement and the physical-force requirement under the elements clause.  Isolating the "force" element from the "death results" element, Roof argues that the "force" element cannot satisfy the elements clause because it criminalizes conduct that meets the mens rea requirement but not the physical-force requirement.  Conversely, he asserts that the "death results" element fails to satisfy the elements clause because it criminalizes conduct that meets the physical-force requirement but not the mens rea requirement.

If all of this sounds strained, that is because it is, and we reject it for the same reason that we rejected Roof's effort to rigidly separate each element of the § 249(a)(1) offenses.  *See Runyon*, 994 F.3d at 204 ("[The] mens rea elements [of the statute in question] cannot be limited to their individual clauses.  If a defendant *willingly* agrees to enter into a

146

conspiracy *with the specific intent* that a murder be committed for money and death results from that agreement, it follows that the defendant acted with *specific intent* to bring about the death of the conspiracy's victim.").

In short, when a defendant has the specific intent to obstruct one or more persons from exercising their religious beliefs and he uses force or threatens the use of force as the means to achieve his intention, it follows that the defendant has acted with the specific intent to use or threaten the use of force. And intentional use or threatened use of force resulting in the victim's death necessitates the use of violent force. *See id.*; *Allred*, 942 F.3d at 654-55. Thus, a "death results" offense under § 247(a)(2) satisfies the elements clause and constitutes a crime of violence.

Roof would have us describe the least culpable conduct as the "intentional attempted threat of force" (Reply Br. at 135), and then rely on *United States v. Taylor*, where we held that "an attempt to *threaten* force does not constitute an attempt to *use* force," to conclude that a "death results" offense under § 247(a)(2) is not a crime of violence. 979 F.3d 203, 209 (4th Cir. 2020). But we concluded in *Taylor* that the least culpable conduct necessary to commit attempted Hobbs Act robbery is "an attempt to threaten force." *Id.* That is not so with the predicate offense here. We are not reviewing an attempt crime; we are reviewing a death-results § 247(a)(2) crime, which by definition is a completed rather than inchoate crime. *See supra* notes 63, 66. Our categorical analysis thus better parallels *United States v. Mathis*, which held that completed Hobbs Act robbery categorically qualifies as a crime of violence. 932 F.3d at 265-66. As in *Mathis*, we consider the

147

completed crime and conclude that religious obstruction, committed by "force or threatened use of force," constitutes a crime of violence. *Id.* at 266.

Roof also contends that the intentional use of de minimis force against one's own property is all that is required to commit a "death results" offense under § 247(a)(2). But that contention cannot plausibly survive without isolating each element, which, again, we do not do.[67] *See supra* Section VI.E.4.b. We therefore reject Roof's contention that only de minimis force is required,[68] and we conclude that a "death results" offense under § 247(a)(2) is categorically a crime of violence.

The consequence of all this is that Roof's firearms convictions stand.

---

[67] Even if we assume that a defendant could use force against his own property—as opposed to the property of another" like the elements clause requires, 18 U.S.C. § 924(c)(3)(A)—as a means to obstruct another person from exercising his or her religious beliefs, that force would necessarily amount to a threat of force against that person as well, since a threat to property must "cause[] such intimidation to intentionally obstruct an individual's ability to exercise his or her religious beliefs." *See* H.R. Rep. No. 115-456, at 2 (2017) (explaining that threats covered under § 247(a)(2) "include threats to property, such as bomb threats, so long as the threat causes such intimidation to intentionally obstruct an individual's ability to exercise his or her religious beliefs," which "[i]n practice, . . . would only arise in the case of a threat so serious that it caused someone to feel fear of bodily harm"); S. Rep. No. 115-325, at 2 (2018) ("While the legislation does not specifically define the term, 'threats of force,' the substitute amendment should not be read to encroach on protected speech," which "[c]ourts have long distinguished [from] 'true threats.'" (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992))); *cf. Stokeling*, 139 S. Ct. at 553.

[68] In addition, Roof wrongly asserts that the term "force" is "a term of art that includes de minimis force" because "legislative history demonstrates the statute was intended to cover 'simple vandalism,' including 'defacing the walls of a synagogue with a swastika' and 'anti-Semitic graffiti.'" (Opening Br. at 271 (citing legislative history); Reply Br. at 132.) But the term "de minimis force" is found nowhere in the statute, and we cannot read it in. *See Borden v. United States*, 141 S. Ct. 1817, 1828 (2021) ("The first precondition of any term-of-art reading is that the term be present in the disputed statute.").

## VII. CONCLUSION

Dylann Roof murdered African Americans at their church, during their Bible-study and worship. They had welcomed him. He slaughtered them. He did so with the express intent of terrorizing not just his immediate victims at the historically important Mother Emanuel Church, but as many similar people as would hear of the mass murder. He used the internet to plan his attack and, using his crimes as a catalyst, intended to foment racial division and strife across America. He wanted the widest possible publicity for his atrocities, and, to that end, he purposefully left one person alive in the church "to tell the story." (J.A. at 5017.) When apprehended, he frankly confessed, with barely a hint of remorse.

No cold record or careful parsing of statutes and precedents can capture the full horror of what Roof did. His crimes qualify him for the harshest penalty that a just society can impose. We have reached that conclusion not as a product of emotion but through a thorough analytical process, which we have endeavored to detail here. In this, we have followed the example of the trial judge, who managed this difficult case with skill and compassion for all concerned, including Roof himself. For the reasons given, we will affirm.

AFFIRMED

149