UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 2:15-CR-00472-RMG |
| | ) | DEATH PENALTY CASE |
| Plaintiff-Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DYLANN STORM ROOF, | ) | |
| | ) | |
| Defendant-Petitioner. | ) | |
| _____ | ) | |

**Dylann Storm Roof's Motion to Vacate, Set Aside, or Correct
Conviction & Sentence Pursuant to 28 U.S.C. § 2255**

Respectfully submitted,

/s/ Jill E.M. HaLevi
Jill E.M. HaLevi
Mediation and Legal Services
102 Broad Street, Suite C
Charleston, SC 29401
Phone: 843-819-0557
E-Mail: jill@charlestonmediator.com

/s/ Angela S. Elleman
Angela S. Elleman Chief, § 2255 Unit
Indiana Federal Community Defenders
111 Monument Circle, Suite 3200
Indianapolis, IN 46204
Phone: 317-383-3520
E-Mail: angie_elleman@fd.org

Attorneys for Defendant-Petitioner Dylann Storm Roof

TABLE OF CONTENTS

Contents

AUTHORIZATION ............................................................................................ xii

TABLE OF AUTHORITIES ............................................................................... xiii

I. INTRODUCTION ............................................................................................. 1

II. PROCEDURAL HISTORY AND EVIDENCE PRESENTED AT TRIAL ................ 9

    A. Charging ................................................................................................... 9

    B. Pretrial Matters ...................................................................................... 10

    C. First Competency Hearing ...................................................................... 11

    D. Pro Se Jury Selection followed by Counseled Jury Selection ................ 12

    E. Trial with Counsel ................................................................................. 12

    F. Second Competency Hearing ................................................................. 13

    G. Pro Se Penalty Phase ............................................................................ 13

    H. Sentencing, Direct Appeal, and Appointment of § 2255 Counsel ......... 13

    I. Timeliness of This Motion ...................................................................... 14

III. CLAIMS FOR RELIEF .................................................................................. 15

    CLAIM 1: ████████████████████████████
    ██████████████████████████████████ 15

    ████████████████████████████████████ 20

    ██████████████████████████████████ 20

    ███████████████████████████████ 23

    ████████████████████████████████████ 26

    ██████████████████████████████ 27

    ████████████████████████████████████ 27

    ███████████████████████████████ 27

    ██████████████████████████████ 29

    ████████████████████████████████████ 30

    █████████████████████████████████ 32

[REDACTED] .................................................................................... 32

[REDACTED] .................................................................................... 35

[REDACTED] .................................................................................... 36

[REDACTED] .................................................................................... 38

[REDACTED] .................................................................................... 41

CLAIM 3:    The trial court violated Dylann's Fifth and Sixth Amendment rights when it failed to strike prospective jurors for cause under *Morgan v. Illinois*, forcing Dylann to exhaust all his peremptory strikes .................... 42

A. The trial court failed to exclude at least three potential jurors for cause who expressed they would automatically vote for death without considering the evidence presented. ........................................................... 47

i. Voir Dire Procedures in Dylann's case ........................................ 47

ii. The Supplemental Case Questionnaire ....................................... 47

B. Individual questioning of prospective jurors ............................... 49

i. [REDACTED] .................................................................. 50

ii. [REDACTED] ................................................................. 54

iii. [REDACTED] ............................................................... 63

CLAIMS 4-9:   Ineffective assistance that resulted in the jury hearing no mitigating evidence .................................................................... 66

CLAIM 4:    Trial counsel provided ineffective assistance by repeatedly deceiving their client, leading to a total breakdown in the relationship. ........ 69

A. The duty of loyalty is essential to the Sixth Amendment right to counsel and does not permit seriously misleading the client. ...................... 72

B. Dylann's trial counsel seriously misled him, at times even outright lying to him. ................................................................................... 74

C. When Dylann found out about trial counsel's deception, it destroyed their relationship. ....................................................................... 76

CLAIM 5:    Trial counsel was ineffective assistance for failing to withdraw or request conflict counsel after Dylann's discovery of their deception led to a complete breakdown in their relationship. ..................... 81

A. The complete breakdown in the relationship between Dylann and trial counsel mandated trial counsel's withdrawal or the appointment of conflict counsel for Dylann................................................................................. 82

i. The November 2, 2016 ex parte hearing did not appropriately address the increasingly fractured relationship between Dylann and counsel. .............................. 85

ii. Dylann's November 3 letter to the prosecution accusing his attorneys of lying did not prompt them to appropriately address the breakdown. .......................... 86

iii. Trial counsel still did not appropriately address the breakdown at any of the hearings on November 16, November 17, or November 18, 2016, none of which included Dylann. ................................................................................... 89

iv. At the competency hearing, Dylann continued expressing contempt, antagonism, and distrust for his trial counsel, yet the breakdown was not addressed................................................................................................... 91

v. The breakdown in the attorney-client relationship led to Dylann seeking to represent himself................................................................................... 93

vi. The complete breakdown in the attorney-client relationship was still not adequately addressed at Dylann's hearing to proceed pro se on November 28, 2016. ........................................................................................... 94

B. The complete breakdown in the relationship between Dylann and trial counsel gives rise to presumption of ineffective assistance of counsel...................... 96

CLAIM 6:     Trial counsel were ineffective for failing to ensure their client was present at all critical stages of the case, particularly in light of the breakdown in their relationship. ................................................................. 97

A. Dylann did not knowingly and voluntarily waive his presence at these hearings....................................................................................... 97

i. November 17, 2016 hearing ......................................................... 99

ii. November 2, 2016 ex parte hearing ................................................ 101

iii. November 16, 2016 hearings......................................................... 102

iv. November 18, 2016 ex parte hearing .............................................. 103

B. Not being present at these hearings violated Dylann's constitutional rights. ....................................................................................... 103

CLAIM 7:     Trial counsel was ineffective for failing to consult with a Speech Language Pathologist which deprived the court of critical information about Dylann's language and communication disorders that rendered him incompetent to represent himself under Indiana v. Edwards.............. 104

A. Multiple experts recommended consulting with a Speech Language Pathologist because of Dylann's communication and language deficits—

deficits that other experts and the trial team observed. ............................................. 106

i. Dr. Donna Schwartz Maddox and Dr. George Woods recommended consulting with a speech language pathologist............................................ 106

ii. Dr. Rachel Loftin observed Dylann's communication and language deficits........................................................................................................ 110

iii. The trial team observed Dylann's communication and language deficits. .......... 111

B. The trial team failed to follow their experts' advice and failed to investigate the red flags they themselves observed. ................................... 112

C. Had trial counsel consulted with a Speech Language Pathologist, they would have learned that Dylann suffers from an Auditory Processing Disorder and Pragmatic Communication Dysfunction that prevented him from following the trial proceedings and conducting his defense........................... 113

i. Dylann has an Auditory Processing Disorder. ....................................... 114

ii. Dylann has pragmatic communication deficits. .................................... 120

D. Dylann's Auditory Processing Disorder and Pragmatic Communication Dysfunction rendered him incompetent to represent himself...................................... 122

E. Because of his Impairments, Dylann struggled to represent himself during jury selection and the penalty phase. ........................................................ 123

i. Jury Selection ........................................................................................ 123

ii. Penalty Phase........................................................................................ 129

iii. Evidence of Dylann's Impairments at Trial ........................................ 131

iv. Dylann's limited participation during court proceedings was evidence of his impairments, not his capacity. ............................................................ 137

v. Dylann's relative intelligence obscured his significant impairments................... 140

F. Having failed to conduct the necessary investigation, trial counsel did not raise arguments about Dylann Roof's capacity to represent himself under *Indiana v. Edwards* until the second competency hearing. ....................................... 141

i. First competency hearing........................................................................ 141

ii. *Faretta* Hearing ................................................................................... 144

iii. Second competency hearing.................................................................. 146

G. As a result of counsel's failures, the court was deprived of critical information in assessing Dylann's capacity to represent himself and a reasonable probability exists that had the court heard evidence of Dylann's Auditory Processing Disorder and pragmatic communication deficits, it would have found Dylann not competent to self-represent under *Indiana v. Edwards*. ........................................................................................ 148

iv

CLAIM 8:     The complete lack of mitigation evidence during the penalty phase violated Dylann's rights under the Fifth, Sixth, And Eighth Amendments to the United States Constitution ...................................... 151

A. Dylann did not pose a risk of future dangerousness. ..................... 155

B. Many witnesses were available to testify to Dylann's passive demeanor, good behavior, increasing isolation in his youth, and that he was loved by many. ..................................................................................... 157

C. The jury should have heard evidence of Dylann's Auditory Processing Disorder and pragmatic communication problems. ................... 167

D. The jury should have heard evidence of Dylann's Anxiety Disorder. ................. 167

E. Dylann's youth and impact on brain development. ............................... 168

F. Conclusion .............................................................................. 170

CLAIM 9:     Trial Counsel were ineffective for "trying to run a marathon at the speed of a sprint." ...................................................... 171

A. Defense counsel accelerated the time to trial. ..................................... 171

B. Trial counsel's rush led to problems retaining and working with experts. ........... 174

i. Autism expert ......................................................................... 174

ii. Defense-Victim Outreach "DVO" expert ........................................ 174

iii. Jury consultant ..................................................................... 174

iv. Missing experts ..................................................................... 176

C. Trial counsel's rush ultimately resulted in their relationship with Dylann imploding. ............................................................................ 176

D. The rush to trial in this case was unreasonable ................................... 179

PREJUDICE FOR CLAIMS 4-9:   Dylann was prejudiced by trial counsel's deficient performance because the jury did not hear mitigating evidence such as testimony from family members who love him and evidence that he did not present a management problem in the jail. ......................................... 181

A. Jurors not knowing about Dylann's early life, in which he was a quiet and sweet child loved by his family and teachers, prejudiced him. ................................. 183

B. Jurors not knowing about Dylann's increasing challenges in his teen years, suffering from anxiety and isolation, prejudiced him. ................................... 189

C. Jurors not knowing about Dylann's Auditory Processing Disorder, communication impairment and severe anxiety prejudiced him. ............................. 196

D. Jurors not knowing that Dylann was not a management problem in the jail and could be safely housed in prison for the remainder of his life prejudiced him. ................................................................................ 198

v

CLAIM 10:   Trial counsel was ineffective because lead counsel David Bruck, over the team's opposition, cross-examined Felicia Sanders, to disastrous result, and he failed to timely object..........................................................199

A. Asking any questions of Ms. Sanders, let alone asking her to repeat three times her statement that Dylann belonged in hell, was deficient performance.........202

B. Failing to immediately object to Ms. Sanders' statement that Dylann should go to hell was deficient performance. ............................................204

C. The statements Mr. Bruck elicited on cross-examination and failed to object to prejudiced Dylann.......................................................................206

CLAIM 11:   Trial counsel ineffectively disregarded the advice of their jury consultant and tried his case in a venue that was saturated with community bias, in violation of Dylann's right to a fair trial. ......................................208

A. Counsel conducted no venue-related investigation, despite the recommendation of their expert jury consultant...........................................210

B. The investigation counsel should have conducted would have revealed compelling evidence that the trial should be transferred...........................214

C. By failing to even investigate the issue, let alone actually request a transfer, counsel performed deficiently. ................................................218

i. There is no question that reasonable counsel would have conducted the survey their expert recommended....................................................218

ii. Reasonable counsel would have requested a change of venue pursuant to Rule 21 or at least a within-district transfer pursuant to Rule 18. ...........219

iii. At minimum, reasonable counsel would have requested a continuance. ...........223

D. Counsel's failure to even investigate prejudiced Dylann, depriving him of a fair and impartial jury. ..............................................................224

CLAIM 12:   Dylann was denied Sixth Amendment right to effective assistance of counsel by counsel's failure to zealously argue that the federal charges should be dismissed for reasons including lack of federal jurisdiction and unconstitutional vagueness. ..............................................................227

A. Despite having no valid strategic reasons, trial counsel failed to zealously litigate a Motion to Dismiss the Indictment and Motion for New Trial...................227

B. Trial counsel was ineffective for making inadequate arguments that § 247 and § 249 failed to constitute crimes of violence under the elements clause of § 924(c)(3)(b)(i), claims that should have been successful and would have changed the trajectory of this federal prosecution....................................230

i. Background...............................................................................233

ii. Trial counsel's failures ..............................................................237

vi

a. Trial counsel failed to provide examples demonstrating the misfit between the elements clause definition of crimes of violence and the ways the predicate crimes could be committed without running afoul of that definition. ....... 237

b. Trial counsel failed to explain to that offenders could violate 18 U.S.C. § 247 by using force against themselves or their own property, conduct that would not satisfy § 924(c)'s command that the force be directed against "the person or property of another.".................................................................. 238

c. Trial counsel failed to explain to the trial court that offenders could violate § 249 without intending or threatening lethal harm and without using substantial force. ..................................................................................... 241

d. Trial counsel failed to argue that the Supreme Court required a substantial degree of violent force before a predicate statute would satisfy § 924(c). ............... 245

e. Trial counsel was ineffective for failing to argue that the death that might result from the conduct criminalized in § 247 and § 249 could be accidental or negligent and happen to someone other than the intended victim of these crimes.................................................................................................. 247

f. Trial counsel failed to argue a key policy consideration for the district court to consider in its understanding and analysis of whether a predicate crime is a crime of violence. ........................................................................ 249

g. Trial counsel's reliance on *Torres-Miguel* was badly misplaced. ......................... 250

h. Trial counsel was ineffective for failing to argue that § 924(c) was unconstitutionally vague in its entirety...................................................... 253

i. Trial counsel failed to seek a stay in light of *Dimaya*. ........................................... 255

C. Trial counsel was ineffective for failing to argue that § 249 was unconstitutional because it criminalized biases and thoughts, in violation of the First Amendment. ..................................................................... 256

i. Background............................................................................................... 256

ii. Trial counsel failed to challenge 18 U.S.C. § 249 on the basis that by criminalizing thoughts and biases, it violates the First Amendment to the United States Constitution. ........................................................................ 257

D. Trial counsel was ineffective for making inadequate arguments that § 247 and § 249 are unconstitutional, both on their face and as applied here..................... 259

i. Background............................................................................................... 261

ii. Trial counsel failed to make the strongest available arguments that § 247 and § 249 are unconstitutional.................................................................... 263

a. The federal government may exercise authority only as the Constitution delegates to it; police power is a quintessential state power. ..................................... 263

vii

b. The Thirteenth Amendment does not authorize Congress to enact a broad criminal statute authorizing federal prosecution of crimes motivated by bias, and § 249(a)(1) simply allows for federal prosecution of acts that are already criminalized in every state, rather than genuinely creating new protections. ...........264

c. Section 249(a)(1) was intended as a "backstop," to be used when states could not or would not prosecute bias-motivated crimes, not a blanket grant of authority to the federal government to prosecute at will.......................................265

d. The plain language of § 249(a)(1) does not limit it to serving as a mere "backstop."...............................................................................................................267

e. There is no evidence that states fail to prosecute the conduct criminalized by § 249(a)(1)—bodily injury—including when the bodily injury is motivated by bias. ...................................................................................................267

f. Section 249(a)(1) has been used to interfere with state-level prosecutions, not as a "backstop" to prosecute crimes that the state would have ignored. .............269

g. Section 247 is unconstitutional because it criminalizes intrastate non-economic activity that does not have a substantial effect on interstate commerce...........................................................................................................270

h. The indictment does not allege that Dylann's actions targeted the channels or instrumentalities of interstate commerce and there has been no allegation that Dylann used the channels or instrumentalities of interstate commerce to commit the acts of obstruction by force that establish jurisdiction for prosecution under § 247. .........................................................................................273

i. The certifications under § 247(e) and § 249(b)(2) are procedurally and substantively flawed. ......................................................................................275

j. Trial counsel nominally raised constitutional challenges to § 247 and § 249, but their actions undermined their arguments. ................................................275

E. Trial counsel was ineffective for failing to argue that charging Dylann with three different crimes for the same conduct violated the Double Jeopardy Clause of the Constitution.............................................................................276

F. Trial counsel had no valid strategic reasons for failing to zealously litigate the Motion to Dismiss or the Motion for New Trial....................................................277

G. Dylann was prejudiced by trial counsel's failures in litigating the Motion to Dismiss and Motion for a New Trial.......................................................................279

CLAIM 13:    Counsel was ineffective on direct appeal. ........................................282

A. Appellate counsel failed to realize or argue that § 247 could be violated by threat of harm to oneself, which would have exempted § 247 as a predicate crime for § 924(c)(3)(A), and used other inapt examples of harm to one's own property. ...................................................................................................283

B. Appellate counsel failed to provide examples of ways § 249 could be violated in ways that would result in the unintentional death to someone other than intended victims.........................................................................285

C. Appellate counsel failed to argue that requiring a "realistic probability" that the government would prosecute a particular example of conduct made no sense for § 924(c) analysis...................................................................289

D. Appellate counsel failed to argue that prosecuting Dylann for three crimes based on the same set of facts constituted Double Jeopardy....................................290

E. Appellate counsel failed to argue that § 924(c) was unconstitutional in its entirety. ..................................................................................................291

F. 18 U.S.C. § 924(c)(3)(A) requires that the intent to use strong physical force be contained within a single element of An Offense, a factor appellate counsel failed to argue. ...........................................................................294

G. Appellate counsel's failures prejudiced Dylann. ....................................295

CLAIM 14:    18 U.S.C. § 924(c)'s definitions of "crime of violence" are unconstitutionally vague and, as such, §§ 924(c) and (j) cannot serve as the basis for any of Dylann's convictions or death sentences; alternatively, based on intervening Supreme Court cases, Dylann is entitled to relief. ...........................295

A. Confusion over the definition of force has led to inconsistent outcomes and will continue to do so. ..............................................................................299

B. Confusion as to the mens rea necessary to satisfy § 924(c) has led to inconsistent outcomes and will continue to do so. ....................................303

C. Confusion over the need to demonstrate a realistic probability of the "least culpable conduct" that violates the predicate crime has led to inconsistent outcomes and will continue to do so. ........................................................304

D. Confusion over the connection between the use of force and the mens rea necessary for the resultant harm has led to inconsistent results and will continue to do so. ....................................................................................304

E. Confusion over the divisibility of statutes and the modified categorical approach has led to inconsistent outcomes and will continue to do so. ....................306

F. Confusion over attempts to threaten has led to inconsistent outcomes and will continue to do so....................................................................................306

G. Supreme Court justices urge that the categorical approach be dropped because of its difficulty, further underscoring the vagueness of § 924(c)................307

H. For decades, defendants and courts have had no fair notice of what constitutes a crime of violence under 18 U.S.C. § 924(c). ........................................307

I. The vagueness of the statute had direct implications for Dylann's case...............308

CLAIM 15:    Under current law, the statutes under which Dylann was convicted and sentences are unconstitutional, undermining the federal government's jurisdiction. ................................................................................310

A. Under the current state of the law, because neither 18 U.S.C. § 247 nor 18 U.S.C. § 249 Is categorically A crime of violence, Dylann's convictions and sentences for violations of §§ 924(c) and (j) must be vacated. ................................310

i. Current legal landscape ................................................................................310

ii. Section 247(a)(2) is not a crime of violence because of its mismatch to the elements clause. ................................................................................311

iii. Section § 249(a)(2) is not a crime of violence because it can be committed by de minimis force that is intended to cause only fleeting pain, illness, or discomfort, or by the failure to act. ................................................313

iv. Inasmuch as neither § 247 nor § 249 fall within § 924(c)'s remaining definition of "crime of violence," Dylann's convictions and death sentences under § 924(j) must be vacated................................................................316

B. Under current law, § 249 violates the First Amendment and Dylann's convictions and sentences for violations of § 249 must be vacated. ........................317

C. Under current law, charging a defendant under both § 924(j) and the predicate offense violates the protection against Double Jeopardy and Dylann's convictions and sentences under § 924(j) must be vacated. .....................318

CLAIM 16:    The Eighth Amendment prohibits imposing the death penalty on a twenty-one-year-old person with an undeveloped brain. ................................319

A. Modern scientific consensus has dramatically changed the landscape regarding late adolescent brain development. ................................................321

B. There is a national consensus against the execution of twenty-one-year-olds................................................................................329

C. There is little penological purpose for imposition of the death penalty on youth slightly older than eighteen. ................................................331

D. Conclusion ................................................................................332

CLAIM 17:    Uncertainty and lack of necessary safeguards surrounding the method of execution creates an unacceptable risk of severe and unnecessary suffering in violation of the Eighth Amendment; consequently, should the government at some point set an execution date, it should take basic steps to ensure that the execution is humane. ................................................333

A. Attorney General Garland's Review ................................................333

B. Trump Administration Memo ................................................336

C. Problems with lethal injection executions ................................................336

x

D. Conclusion .......................................................................... 338

CLAIM 18:    Judge Gergel presiding over Dylann's case because he "really wants to" violated Dylann's Due Process right to an impartial procedure for assigning a judge, and trial counsel's failure to object violated Dylann's Sixth Amendment right to effective assistance of counsel........................... 338

A. Judge Gergel presiding over Dylann's case because he "really wants to" violated Dylann's due process right to an impartial procedure for assigning a judge. .......................................................................... 339

B. Trial counsel was ineffective for failing to seek Judge Gergel's recusal and for failing to make a record of Judge Gergel's bias........................... 343

V. PRAYER FOR RELIEF ............................................................ 346

**AUTHORIZATION**

AO 243 (Rev. 09/17)

## MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT
## SENTENCE BY A PERSON IN FEDERAL CUSTODY

| United States District Court | District | South Carolina | |
|---|---|---|---|
| Name *(under which you were convicted)*:<br>Dylann Storm Roof | | | Docket or Case No.:<br>2:15-CR-00472-RMG |
| Place of Confinement:<br>USP Terre Haute | | Prisoner No.:<br>28509-171 | |
| UNITED STATES OF AMERICA<br><br>V. | | Movant *(include name under which convicted)*<br>Dylann Storm Roof | |

### MOTION

1. (a) Name and location of court which entered the judgment of conviction you are challenging:

   U.S. District Court for the District of South Carolina, Charleston Division
   85 Broad Street, Charleston, South Carolina 29401

   (b) Criminal docket or case number (if you know):  2:15-CR-00472-RMG

2. (a) Date of the judgment of conviction (if you know):  December 15, 2016

   (b) Date of sentencing:  January 10, 2017

3. Length of sentence:  Death Sentence (plus 15 life without parole sentences)

4. Nature of crime (all counts):

   Use of a firearm during a crime of violence (9 counts), in violation of  USC 18:924C
   Obstruction of Religious Belief Resulting in Death (9 counts), in violation of  USC 18:247(a)(2) and (d)(1) and (d)(3)
   Obstruction of Religious Belief with Attempt to Kill (3 counts), in violation of  USC 18:247(a)(2) and (d)(1) and (d)(3)
   Hate Crime Act Resulting in Death (9 counts), in violation of USC 18:249(a)(1)
   Hate Crime Act Involving an Attempt to Kill (3 counts), in violation of USC 18:249(a)(1)

5. (a) What was your plea?  (Check one)

   (1) Not guilty ☑    (2) Guilty ☐    (3) Nolo contendere (no contest) ☐

6. (b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, what did you plead guilty to and what did you plead not guilty to?

6. If you went to trial, what kind of trial did you have?  (Check one)    Jury ☑    Judge only ☐

7. Did you testify at a pretrial hearing, trial, or post-trial hearing?    Yes ☐    No ☑

AO 243 (Rev. 09/17)

8.  Did you appeal from the judgment of conviction?    Yes ☑    No ☐

9.  If you did appeal, answer the following:

(a) Name of court:  Fourth Circuit Court of Appeals

(b) Docket or case number (if you know):  17-3

(c) Result:  Affirmed

(d) Date of result (if you know):  08/25/2021

(e) Citation to the case (if you know):  United States v Roof 10 F.4th 314 (4th Cir. 2021)

(f) Grounds raised:

Twenty issues were raised on appeal primarily focused on errors in competency finding, competency proceedings, self representation, statutory bases for conviction, and sentencing errors.

(g) Did you file a petition for certiorari in the United States Supreme Court?    Yes ☑    No ☐

If "Yes," answer the following:

(1) Docket or case number (if you know):  21-7234

(2) Result:  Denied

(3) Date of result (if you know):  10/11/2022

(4) Citation to the case (if you know):  21-7234 Roof v. United States 143 S. Ct. 303 (2002)

(5) Grounds raised:

Error to find defense counsel controlled the entirety of mitigation presentation; Unconstitutionality of statutes as violation of commerce clause; and Unconstitutionality of statute under thirteenth Amendment.

10. Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications, concerning this judgment of conviction in any court?
    Yes ☐    No ☑

11. If your answer to Question 10 was "Yes," give the following information:

(a) (1) Name of court:

(2) Docket or case number (if you know):

(3) Date of filing (if you know):

AO 243 (Rev. 09/17)

(4)   Nature of the proceeding: _____

(5)   Grounds raised:

(6)   Did you receive a hearing where evidence was given on your motion, petition, or application?

Yes ☐      No ☐

(7)   Result: _____

(8)   Date of result (if you know): _____

(b)   If you filed any second motion, petition, or application, give the same information:

(1)   Name of court: _____

(2)   Docket of case number (if you know): _____

(3)   Date of filing (if you know): _____

(4)   Nature of the proceeding: _____

(5)   Grounds raised:

(6)   Did you receive a hearing where evidence was given on your motion, petition, or application?

Yes ☐      No ☐

(7)   Result: _____

(8)   Date of result (if you know): _____

(c)   Did you appeal to a federal appellate court having jurisdiction over the action taken on your motion, petition, or application?

(1)   First petition:      Yes ☐      No ☐

(2)   Second petition:   Yes ☐      No ☐

(d)   If you did not appeal from the action on any motion, petition, or application, explain briefly why you did not:

AO 243 (Rev. 09/17)

12. For this motion, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground. Any legal arguments must be submitted in a separate memorandum.

**GROUND ONE:**      See §2255 Motion Claims

    (a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

    (b) **Direct Appeal of Ground One:**

        (1) If you appealed from the judgment of conviction, did you raise this issue?

            Yes ☐      No ☐

        (2) If you did not raise this issue in your direct appeal, explain why:

    (c) **Post-Conviction Proceedings:**

        (1) Did you raise this issue in any post-conviction motion, petition, or application?

            Yes ☐      No ☐

        (2) If you answer to Question (c)(1) is "Yes," state:

        Type of motion or petition:

        Name and location of the court where the motion or petition was filed:

        Docket or case number (if you know):

        Date of the court's decision:

        Result (attach a copy of the court's opinion or order, if available):

        (3) Did you receive a hearing on your motion, petition, or application?

            Yes ☐      No ☐

AO 243 (Rev. 09/17)

(4)  Did you appeal from the denial of your motion, petition, or application?

Yes ☐     No ☐

(5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes ☐     No ☐

(6)  If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

(7)  If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND TWO:**    See §2255 Motion Claims

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

(b)  **Direct Appeal of Ground Two:**

(1)  If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐     No ☐

AO 243 (Rev. 09/17)

    (2)   If you did not raise this issue in your direct appeal, explain why:

**(c) Post-Conviction Proceedings:**

    (1)   Did you raise this issue in any post-conviction motion, petition, or application?

         Yes ☐     No ☐

    (2)   If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

    (3)   Did you receive a hearing on your motion, petition, or application?

         Yes ☐     No ☐

    (4)   Did you appeal from the denial of your motion, petition, or application?

         Yes ☐     No ☐

    (5)   If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

         Yes ☐     No ☐

    (6)   If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

    (7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

AO 243 (Rev. 09/17)

**GROUND THREE:**    See §2255 Motion Claims

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

(b) **Direct Appeal of Ground Three:**

    (1)  If you appealed from the judgment of conviction, did you raise this issue?

        Yes ☐     No ☐

    (2)  If you did not raise this issue in your direct appeal, explain why:

(c) **Post-Conviction Proceedings:**

    (1)  Did you raise this issue in any post-conviction motion, petition, or application?

        Yes ☐     No ☐

    (2)  If you answer to Question (c)(1) is "Yes," state:

    Type of motion or petition:

    Name and location of the court where the motion or petition was filed:

    Docket or case number (if you know):

    Date of the court's decision:

    Result (attach a copy of the court's opinion or order, if available):

    (3)  Did you receive a hearing on your motion, petition, or application?

        Yes ☐     No ☐

    (4)  Did you appeal from the denial of your motion, petition, or application?

        Yes ☐     No ☐

    (5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

        Yes ☐     No ☐

AO 243 (Rev. 09/17)

(6)   If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

(7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND FOUR:**     See §2255 Motion Claims

(a)   Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

(b)   **Direct Appeal of Ground Four:**

(1)   If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐     No ☐

(2)   If you did not raise this issue in your direct appeal, explain why:

(c)   **Post-Conviction Proceedings:**

(1)   Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐     No ☐

(2)   If you answer to Question (c)(1) is "Yes," state:

AO 243 (Rev. 09/17)

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

(3)  Did you receive a hearing on your motion, petition, or application?

Yes ☐    No ☐

(4)  Did you appeal from the denial of your motion, petition, or application?

Yes ☐    No ☐

(5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes ☐    No ☐

(6)  If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

(7)  If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

_____

13.  Is there any ground in this motion that you have <u>not</u> previously presented in some federal court?  If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

No. Similar claims in some instances were raised at trial and on direct Appeal (i.e. claims 12) but they were raised ineffectivley and Petitioner was prejudiced.

AO 243 (Rev. 09/17)

14. Do you have any motion, petition, or appeal now pending (filed and not decided yet) in any court for the you are challenging?    Yes ☑    No ☐

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised.

At the time of signing, a Motion for Recusal and a Motion to filed partially sealed § 2255 and exhibites are pending.

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At the preliminary hearing:

(b) At the arraignment and plea:

(c) At the trial:
David Bruck, Kim Stevens, Sarah Gannett, Emily Paavola

(d) At sentencing:
David Bruck, Kim Stevens, Sarah Gannett, Emily Paavola

(e) On appeal:
Sapna Mirchandani and Alexandra Yates

(f) In any post-conviction proceeding:

(g) On appeal from any ruling against you in a post-conviction proceeding:

16. Were you sentenced on more than one court of an indictment, or on more than one indictment, in the same court and at the same time?    Yes ☐    No ☑

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?    Yes ☑    No ☐

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:

Life sentence in Charleston County, Charleston, S.C.

(b) Give the date the other sentence was imposed:  04/10/2017

(c) Give the length of the other sentence:  Life

(d) Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or sentence to be served in the future?    Yes ☐    No ☑

AO 243 (Rev. 09/17)

18.   TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not bar your motion.*

See §2255 Motion, II. Procedural History, Timeliness

---

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2255, paragraph 6, provides in part that:
   A one-year period of limitation shall apply to a motion under this section.  The limitation period shall run from the latest of –
      (1)   the date on which the judgment of conviction became final;
      (2)   the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making such a motion by such governmental action;
      (3)   the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
      (4)   the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

AO 243 (Rev. 09/17)

Vacating of Death Sentence and Imposition of Sentence of Life Without Possibility of Parole, or in the alternative ordering of a new Trial and/or penalty phase.

or any other relief to which movant may be entitled.

_____
Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion under 28 U.S.C. § 2255 ~~was placed in the prison mailing system on~~ -is to be filed by my lawyers.     *April 14, 2025*_____.
(month, date, year)

Executed (signed) on   *April 14, 2025*_____ (date)

*Dylann Roof*_____
Signature of Movant

If the person signing is not movant, state relationship to movant and explain why movant is not signing this motion.

Print    Save As...    Add Attachment    Reset

# TABLE OF AUTHORITIES

## Cases

*Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007) ........................................................ 177

*Adams v. Texas,* 448 U.S. 38 (1980) ............................................................................... 45

*Allen v. Stephan*, 42 F. 4th 223 (4th Cir. 2022) ............................................................... 161

*Alvarardo-Linares v. United States,* 44 F. 4th 1334 (11th Cir. 2022) ............................. 310

*Atkins v. Virginia*, 536 U.S. 304 (2002) .......................................................................... 339

*Barnes v. Joyner*, 751 F.3d 229 (4th Cir. 2014) ............................................................... 39

*Battle v. United States*, No. 21-5457, 2023 WL 2487342 (6th Cir. Mar. 14, 2023) .................. 317

*Baze v. Rees*, 553 U.S. 35 (2008) .................................................................................... 351

*Bennett v. Stirling*, 170 F. Supp. 3d 851 (D.S.C.), *aff'd*, 842 F.3d 319 (4th Cir. 2016) ............. 218

*Bennett v. Stirling*, 842 F.3d 319 (4th Cir. 2016) ................................................ 216, 217, 218

*Billings v. Polk*, 441 F.3d 238 (4th Cir. 2006) ................................................................. 43

*Booth v. Maryland*, 482 U.S. 496 (1987) ........................................................................ 216

*Borden v. United States*, 593 U.S. 420 (2021) ............................... 247, 267, 307, 309, 319

*Bosse v. Oklahoma*, 580 US. 1 (2016) ............................................................................ 216

*Bracy v. Schomig*, 286 F.3d 406 (7th Cir. 2002) ...................................................... 360, 362

*Brecht v. Abrahamson*, 507 U.S. 619 (1993) ................................................................... 277

*Burch v. Corcoran,* 273 F.3d 577 (4th Cir. 2001) ............................................................ 42

*Caldwell v. Mississippi*, 472 U.S. 320 (1985) ................................................................. 237

*Caro v. Calderon*, 165 F.3d 1223 (9th Cir. 1999) ........................................................... 120

*Cauthern v. Colson*, 736 F.3d 465 (6th Cir. 2013) .......................................................... 215

*Chapman v. California*, 386 U.S. 18 (1967) .................................................................... 361

*Coe v. Bell,* 161 F.3d 320 (6th Cir. 1998) ....................................................................... 41

*Com. v. Baker*, 800 N.E.2d 267 (Mass. 2003) ................................................................. 190

*Conaway v. Polk*, 453 F.3d 567 (4th Cir. 2006) .............................................................. 38

*Connally* v. *General Constr. Co.*, 269 U.S. 385 (1926) ................................................... 312

*Conner v. Polk*, 407 F.3d 198 (4th Cir. 2005) ................................................................. 17

*Cruz v. Abbate*, 812 F.2d 571 (9th Cir. 1987) ................................................................. 359

*Curtis Johnson v. United States,* 559 U.S. 133 (2010) .............. 245, 246, 257, 258, 259, 315, 328

*Daniels v. Woodford*, 428 F.3d 1181 (9th Cir. 2005) ...................................................... 103

*Darden v. Wainwright*, 477 U.S. 168 (1986) ................................................................... 216

*Day v. McDonough,* 547 U.S. 198 (2006) ....................................................................... 14

*Deal v. United States*, 508 U.S. 129 (1993) .................................................................... 314

*Dean v. Arpaio*, No. CV041909PHXSRBMHB, 2007 WL 9697767 (D. Ariz. June 6, 2007), *aff'd*,
    382 F. App'x 585 (9th Cir. 2010) .............................................................................. 255

*Delligatti v. United States*, 145 S. Ct. 787 (2025) .................................................... 247, 257

*Democratic Nat'l Comm. v. Wis. State Legis.*, 141 S. Ct. 28 (2020) .................................. 2

*Dennis v. United States*, 339 U.S. 162 (1950) ................................................................. 20

*Descamps* v. *United States*, 570 U.S. 254 (2013) ....................................... 245, 324, 327

*Dyer v. Calderon*, 151 F.3d 970 (9th Cir. 1998) .............................................................. 44

*Echavarria v. Filson*, 896 F.3d 1118 (9th Cir. 2018) ....................................................... 362

*Eddings v. Oklahoma*, 455 U.S. 104 (1982) ............................................................. 161, 237, 336

*Edwards v. Balisok*, 520 U.S. 641 (1997) ....................................................................... 360

*Engle v. Isaac*, 456 U.S. 107 (1982) ............................................................................... 277

*Enmund v. Florida*, 458 U.S. 782 (1982) ............................................................... 339
*Estes v. Texas*, 381 U.S. 532 (1965) ...................................................................... 225
*Faretta v. California*, 422 U.S. 806 (1975) ....................................................... 111, 156
*Fitzgerald v. Greene*, 150 F.3d 357 (4th Cir. 1998) .................................................. 16
*Ford v. Wainwright*, 477 U.S. 399 (1986) ............................................................. 189
*Franklin v. McCaughtry*, 398 F.3d 955 (7th Cir. 2005) .......................................... 360
*Fullwood v. Lee*, 290 F.3d 663 (4th Cir. 2002) ....................................................... 38
*Furman v. Georgia*, 408 U.S. 238 (1972) ............................................................. 340
*Furnish v. Comm.*, 267 S.W.3d 656 (Ky. 2007) ..................................................... 215
*Gall v. United States*, 552 U.S. 38 (2007) ............................................................. 341
*Gardner v. Florida*, 430 U.S. 349 (1977) .............................................................. 360
*Gibbons v. Ogden*, 9 Wheat. at 1 (1824) ............................................................... 285
*Gideon v. Wainright*, 372 U.S. 335 (1963) .............................................................. 79
*Glossip v. Gross*, 576 U.S. 863 (2015) .................................................................. 352
*Glossip v. State*, 29 P.3d 597 (Okla. Crim. App. 2001) ............................................ 42
*Gonzales v. Duenas–Alvarez,* 549 U.S. 183 (2007) ................................................ 249
*Graham v. Florida*, 560 U.S. 48 (2010) ................................................................. 337
*Griffin v. Breckenridge*, 403 U.S. 88 (1971) .......................................................... 278
*Griffith v. Jennings*, No. 4:18-CV-01658 SEP, 2021 WL 3077657 (E.D. Mo. July 21, 2021) .. 252
*Grooms v. Commonwealth*, 756 S.W.2d 131 (Ky. 1988) ............................................ 42
*Hall v. Florida*, 572 U.S. 701 (2014) ........................................ 338, 340, 348, 349, 350
*Harris v. Pulley*, 885 F.2d 1354 (9th Cir. 1988) ...................................................... 237
*Hinton v. Alabama*, 571 U.S. 264 (2014) ................................. 228, 235, 238, 240, 252, 292
*Humphries v. Ozmint*, 397 F.3d 206 (4th Cir. 2005) (en banc) ................................. 215
*Hurst v. Joyner*, 757 F.3d 389 (4th Cir. 2014) ......................................................... 40
*Illinois v. Allen*, 397 U.S. 337 (1970) .................................................................... 105
*In re Hall*, 979 F.3d 339 (5th Cir. 2020) ................................................................ 321
*In re Murchison*, 349 U.S. 133 (1955) ................................................... 225, 360, 364
*Indiana v. Edwards,* 554 U.S. 164 (2008) ........................ 114, 149, 156, 157, 158, 159
*Irvin v. Dowd*, 366 U.S. 717 (1961) ................................................................ 38, 225
*Johnson v. Texas*, 509 U.S. 350 (1993) ................................................................. 161
*Johnson v. United States*, 576 U.S. 591 (2015) .......................... 242, 246, 297, 311, 325
*Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968) .................................................. 278
*Jones v. Cooper*, 311 F.3d 306 (4th Cir. 2002) ............................................... 15, 16, 18
*Jones v. Kemp*, 706 F. Supp. 1534 (N.D. Ga. 1989) .................................................. 41
*Kennedy v. Louisiana*, 554 U.S. 407 (2008) ..................................................... 339, 347
*Kentucky v. Stincer*, 482 U.S. 730 (1987) .............................................................. 106
*Kimmelman* v. *Morrison*, 477 U.S. 365 (1986) ....................................................... 238
*Lawlor v. Zook*, 909 F. 3d 614 (4th Cir. 2018) ........................................................ 161
*Lenz v. Warden of the Sussex I State Prison*, 593 S.E.2d 292 (Va. 2004) ..................... 42
*Lenz v. Washington*, 444 F.3d 295 (4th Cir. 2006) ................................................... 43
*Leocal v. Ashcroft*, 543 U.S. 1 (2004) ............................................................. 247, 267
*Little v. Keirsey*, 69 F.3d 536 (5th Cir. 1995) ......................................................... 255
*Lockett v. Ohio*, 438 U.S. 586 (1978) ............................................................... 44, 238
*Lynch v. Polk*, 204 Fed. Appx. 167 (4th Cir. 2006) ................................................... 42
*M'Culloch v. Maryland*, 17 U.S. 316 (1819) .......................................................... 276

*Marsh v. Wallace*, 666 F. Supp. 2d 651 (S.D. Miss. 2009) ........................................................ 79
*Martinez v. United States*, 423 F. App'x 650 (8th Cir. 2011)......................................................... 14
*Mathis v. United States*, 579 U.S. 500 (2016) ................................................................. 313, 324
*McCoy v. Louisiana*, 584 U.S. 414 (2018)............................................................................... 179
*McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548 (1984)........................................ 39
*McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 554 (1984)................... 15, 32
*McNair v. Campbell*, 416 F.3d 1291 (11th Cir. 2005).................................................................. 41
*Medina v. California*, 505 U.S. 437 (1992) ............................................................................ 277
*Meeks v. Moore*, 216 F.3d 951 (11th Cir. 2000)....................................................................... 236
*Miller v. Alabama*, 567 U. S. 460 (2012).................................................................... 178, 336
*Moncrieffe* v. *Holder*, 569 U.S. 184 (2013).................................................. 245, 248, 249, 320
*Moore v. Texas*, 581 U.S. 1 (2017)........................................................................................ 338
*Morgan v. Illinois*, 504 U.S. 719 (1992) ......................................... 38, 44, 45, 51, 58, 60, 65, 69
*Murphy v. Florida*, 421 U.S. 794 (1975)................................................................................ 229
*Oliver v. Quarterman*, 541 F.3d 329 (5th Cir. 2008) ................................................................. 41
*Paris Adult Theatre I v. Slaton*, 413 U.S. 49 (1973)........................................................ 271, 335
*People v. Taylor*, No. 166428 (Mich. April 10, 2025) ............................................................. 337
*Person v. Miller*, 854 F.2d 656 (4th Cir. 1988) ........................................................................ 17
*Porter v. McCollum*, 558 U.S. 30 (2009)............................................................................... 120
*Porter v. White*, 23 F.4th 322 (4th Cir. 2002)........................................................................... 15
Porter v. Zook, 898 F.3d 408 (4th Cir. 2018)............................................................... 16, 18, 20
*Powell v. Alabama*, 287 U.S. 45 (1932)................................................................ 79, 89, 189, 190
*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ....................................... 270, 271, 299, 335, 336
*Remmer v. United States,* 347 U.S. 227, 229 (1954) ................................................................. 39
*Rideau v. Louisiana*, 373 U.S. 723 (1963) ........................................................................... 225
*Robinson v. Polk*. 438 F.3d 350 (4th Cir. 2006) ....................................................................... 42
*Rompilla v. Beard*, 545 U.S. 374 (2005).................................................................................. 79
*Roper v. Simmons*, 543 U. S. 551 (2005)................... 178, 337, 343, 344, 345, 346, 347, 348, 350
*Ross v. Oklahoma*, 487 U.S. 81 (1988) ............................................................................. 45, 60
*Sears v. Upton*, 561 U.S. 945 (2010) .................................................................................. 160
*Sessions v. Dimaya*, 584 U.S. 148 (2018)........................................................... 240, 246, 312
*Sheppard v. Maxwell*, 384 U.S. 333 (1966)........................................................ 225, 234, 235
*Sinito v. United States*, 750 F.2d 512 (6th Cir. 1984)............................................................... 359
*Skipper v. South Carolina*, 476 U. S. 1 (1986)...................................................................... 161
*Smith v. Phillips*, 455 U.S. 209 (1982)..................................................................... 17, 18, 20
*Snyder v. Com. of Mass*., 291 U.S. 97 (1934)......................................................................... 111
*Stankewitz v. Wong*, 698 F.3d 1163 (9th Cir. 2012) ............................................................... 160
*Stanley v. Georgia*, 394 U.S. 557 (1969) ....................................................................... 270, 335
*State v. Harrington*, 627 S.W.2d 345 (Tenn. 1981).................................................................. 42
*State v. Simpson*, 551 So. 2d 1303 (La. 1989) ...................................................................... 359
*Stockton v. Virginia*, 852 F.2d 740 (4th Cir. 1988).................................................................. 40
*Stokeling v. United States*, 586 U.S. 73 (2019)..................................... 246, 307, 317, 328
*Strickland v. Washington,* 466 U.S. 668 (1984) ..................... 79, 80, 120, 160, 191, 228, 240, 364
*Tafoya v. Tansy*, No. 00-2049, 2001 WL 557971 (10th Cir. May 24, 2001)............................ 236
*Thomas v. Att'y Gen.*, 992 F.3d 1162 (11th Cir. 2021)............................................................... 79
*Thomas v. Lockhart*, 738 F.2d 304 (8th Cir. 1984) .................................................................. 190

*Tice v. Johnson*, 647 F.3d 87 (4th Cir. 2011) ............................................................. 80

*Torres-Miguel v. United States,* 701 F.3d 165 (4th Cir. 2012) ................................ 254

*Travelers Prop. Cas. v. Chubb Custom Ins.*, 864 F. Supp. 2d 301 (E.D. Pa. 2012) .................. 254

*Trop v. Dulles*, 356 U.S. 86 (1958) ............................................................... 340, 348

*United States v. Abney*, 812 F.3d 1079 (D.C. Cir. 2016).............................................. 190

*United States v. Addonizio*, 313 F. Supp. 486 (D.N.J. 1970) ...................................... 233

*United States v. Allred*, 942 F.3d 641 (4th Cir. 2019) ....................................... 254, 264

*United States v. Armstrong*, 122 F.4th 1278 (11th Cir. 2024) .................................... 323

*United States v. Barefoot*, 754 F.3d 226 (4th Cir. 2014) ......................................... 157

*United States v. Barrett*, 985 F.3d 1203 (10th Cir. 2021)......................................... 192

*United States v. Basham*, 561 F.3d 302 (4th Cir. 2009) ............................................ 40

*United States* v. *Batchelder*, 442 U. S. 114 (1979)................................................ 312

*United States v. Bernard*, 299 F.3d 467 (5th Cir. 2002) ........................................... 215

*United States v. Bernard*, 708 F.3d 583 (4th Cir. 2013) ........................................... 157

*United States v. Blackledge*, 751 F.3d 188 (4th Cir. 2014) ........................................ 90

*United States v. Bolden*, 741 F.Supp.3d 280 (E.D. Pa. 2024)...................................... 323

*United States v. Boney*, 977 F.2d 624 (D.C. Cir. 1992)............................... 18, 32, 35, 37

*United States v. Boone*, 245 F.3d 352 (4th Cir. 2001 ............................................. 163

*United States v. Bowers*, No. CR 18-292-RJC, 2022 WL 17718686 (W.D. Pa. Dec. 15, 2022) 318

*United States v. Burwell*, 122 F.4th 984 (D.C. Cir. 2024)......................................... 322

*United States v. Cannon*, 750 F.3d 492 (5th Cir. 2014)............................................ 284

*United States v. Castleman*, 572 U.S. 157 (2014 ............... 244, 247, 254, 257, 264, 267, 315, 328

*United States v. Cheek*, 94 F.3d 136 (4th Cir. 1996) ............................................... 40

*United States v. Colombo*, 869 F.2d 149 (2d Cir. 1989) ................................... 18, 32, 37

*United States v. Comstock*, 560 U.S. 126 (2010)................................................... 277

*United States v. Cronic*, 466 U.S. 648 (1984...................................... 80, 89, 163

*United States v. Cruikshank*, 92 U.S. 542 (1875) ................................................. 276

*United States v. Davis*, 588 U.S. 445 (2019) ............................... 240, 246, 312, 328

*United States v. Farhane,* 634 F.3d 127 (2d Cir. 2011)............................................. 39

*United States v. Fell,* 224 F. Supp. 3d 327 (D. Vt. 2016)......................................... 350

*United States v. Fulks*, 120 F.4th 146 (4th Cir. 2024) ...................................... 261, 321

*United States v. Gagnon*, 470 U.S. 522 (1985)................................................... 105

*United States v. Gonzales-Flores*, 701 F.3d 112 (4th Cir. 2012).................................. 106

*United States v. Harris*, 68 F.4th 140 (3d Cir. 2023).............................................. 317

*United States v. Jackson*, 736 F.3d 953 (10th Cir. 2013) ......................................... 261

*United States v. Jones*, 608 F.2d 1004 (4th Cir. 1979)............................................. 17

*United States v. Joyce*, Cr. No. 07-31, 2008 WL 2367307 (W.D. Pa. Jun. 10, 2008)................ 233

*United States v. Lara-Ramirez,* 519 U.S. 76 (1st Cir. 2008) ....................................... 41

*United States v. Lawson*, 677 F.3d 629 (4th Cir. 2012)............................................. 40

*United States v. Lopez*, 514 U.S. 549 (1995)....................................... 276, 277, 285, 286, 288

*United States v. Martinez-Rodriguez*, 857 F.3d 282 (5th Cir. 2017)............................... 317

*United States v. Martinez-Salazar*, 528 U.S. 304 (2000)...................................... 45, 60

*United States v. McDuffy*, 890 F.3d 796 (9th Cir. 2018) .......................................... 261

*United States v. McNeal*, 818 F.3d 141 (4th Cir. 2016)............................................ 322

*United States v. Morrison*, 529 U.S. 598 (2000) ..................................... 276, 277, 285, 286, 287

*United States v. Mullen*, 32 F.3d 891 (4th Cir. 1994)............................................. 89

*United States v. Pearson*, 203 F.3d 1243 (10th Cir. 2000).........................................................359
*United States v. Perkins*, 470 F.3d 150 (4th Cir. 2006)..............................................................301
*United States v. Ragin*, 820 F.3d 609 (4th Cir. 2016) ...............................................................163
*United States v. Rojas*, 520 F.3d 876 (8th Cir. 2008) ...............................................................251
*United States v. Rolle*, 204 F.3d 133 (4th Cir. 2000)................................................................105
*United States v. Roof,* 10 F.4th 314 (4th Cir. 2021)..................................................14, 252, 299
*United States v. Ross*, No. 18-2800, 2022 WL 4103064 (8th Cir. Sept. 7, 2022) ....................321
*United States v. Runyon*, 707 F.3d 475 (4th Cir. 2013)............................................................105
*United States v. Sanders*, --F.4th--, 2025 WL 926855 (5th Cir. Mar. 27, 2025) 291, 305, 306, 336
*United States v. Smith*, 640 F.3d 580 (4th Cir. 2011) .......................................................89, 104
*United States v. Taylor*, 596 U.S. 845 (2022)....................................248, 249, 305, 320, 327, 329
*United States v. Toki*, 23 F.4th 1277 (10th Cir. 2022) ..............................................................310
*United States v. Tsarnaev*, 968 F. 3d 24 (1st Cir. 2020)...........................................................313
*United States v. Wainionpa*, No. ARMY 20210436, 2023 WL 355063 (A. Ct. Crim. App. Jan. 20, 2023).............................................................................................................................332
*United States v. Wittig*, No. 03–40142, 2005 WL 758605 (D. Kan. Apr. 4, 2005) ...................233
*United States v. Wood*, 299 U.S. 123 (1936)...............................................................................39
*Wainwright v. Witt*, 469 U.S. 412 (1985) .........................................................45, 58, 65, 69
*Washington v. Recuenco*, 548 U.S. 212 (2006)...........................................................................361
*Wiggins v. Smiths*, 539 U.S. 510 (2003) .......................................................120, 160, 189, 192
*Willey v. Kirkpatrick*, 801 F.3d 51 (2d Cir. 2015) .....................................................................255
*Williams v. Alabama*, 2021 WL 4325693 (N.D. Ala. Sept. 23, 2021)........................................192
*Williams v. Allen*, 542 F.3d 1326 (11th Cir. 2008) ...................................................................192
*Williams v. Taylor*, 529 U.S. 420 (2000).............................................................................18, 80
*Wisconsin v. Mitchell*, 508 U.S. 476 (1993)...............................................................................271
*Withrow v. Larkin*, 421 U.S. 35 (1975) .....................................................................................360
*Woodson v. North Carolina*, 428 U.S. 280 1976) ..............................................................189, 359

## Statutes

18 U.S.C § 249...................................................................................................................passim
18 U.S.C. § 1365.....................................................................................................................314
18 U.S.C. § 247...................................................................................................................passim
18 U.S.C. § 3005.....................................................................................................................155
18 U.S.C. § 924...................................................................................................................passim

## Other Authorities

DSM V .....................................................................................................................................206
Office of Legal Policy, *Review of the Federal Execution Protocol Addendum and Manner of Execution Regulations* (Jan. 2025) ....................................................................................342

## Rules

Fed. R. Crim. P. 12.2.................................................................................................................82
Fed. R. Crim. P. 18.........................................................................................................218, 223
Fed. R. Crim. P. 21.........................................................................................................218, 223
Fed. R. Crim. P. 43..................................................................................................................105

## ABA Guidelines and Standards for Counsel

American Bar Association, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, Commentary to 6.1 (Rev. Ed. 2003)................................................. 188

## Academic Articles and Research

Carrie Mulford, *Explanations for Offending*, Nat'l Inst. Of Justice, U.S. Dep't of Justice (May 2014) ....................................................................................................................... 170

Craig Haney, *Violence and the Capital Jury: Mechanisms of Moral Disengagement and the Impulse to Condemn to Death*, 49 Stan. L. Rev. 1447 (1997)............................................ 46, 54

David Suggs & Bruce D. Sales, *Juror Self-Disclosure in the Voir Dire: A Social Science Analysis*, 56 Ind. L.J. 245 (1981)............................................................................................. 45, 63, 66

Jessica M. Salerno et al., *The Impact of Minimal Versus Extended Voir Dire and Judicial Rehabilitation on Mock Jurors' Decisions in Civil Cases*, 45 Law and Hum. Behav. 336 (2021)........................................................................................................................... 46

John Blume, Theodore Eisenberg, Stephen P. Garvey, *Lessons from the Capital Jury Project*, Chapter 5 in Beyond Repair? America's Death Penalty, Duke University Press, 144-77 (2003) ....................................................................................................................................... 44

Mark W. Bennett, *Unraveling the Gordian Knot of Implicit Bias in Jury Selection: The Problems of Judge-Dominated Voir Dire, the Failed Promise of Batson, and Proposed Solutions*, 4 Harv. L. & Pol'y Rev. 149 (2010)................................................................................. 46, 54, 63, 66

Ronald C. Dillehay & Marla R. Sandys, *Life under Wainwright v. Witt: Juror Dispositions and Death Qualification*, 20 Law & Hum. Behav. 147 (1996)......................................................... 44

Shari Seidman Diamond & Valerie P. Hans, *Fair Juries*, 2023 U. Ill. L. Rev. 879 (2023............ 44

Susan E. Jones, *Judge-Versus Attorney-Conducted Voir Dire: An Empirical Investigation of Juror Candor*, 11 Law & Hum. Behav. 131 (Jun. 1987)............................................................. 45, 66

Theodore Eisenberg, Stephen Garvey & Martin Wells, *The Deadly Paradox of Capital Jurors*, 74 S. Cal. L. Rev. 371 (2001) ............................................................................................. 43

United States Sentencing Commission, *Youthful Offenders in the Federal System* (2017) ....... 321

Valerie P Hans & Alayna Jehle, *Avoid Bald Men and People with Green Socks? Other Ways to Improve the Voir Dire Process in Jury Selection*, 78 Chi.-Kent L. Rev. 1179, 1181-82 (2003) .............................................................................................................................. 45, 54, 63

William J. Bowers, Marla Sandys & Benjamin Steiner, *Foreclosing Impartiality in Capital Sentencing: Jurors' Predispositions, Attitudes and Premature Decision-Making*, 83 Cornell L. Rev. 1476 (1998) ....................................................................................................... 44

## Constitutional Provisions

U.S. Const. amend VIII.................................................................................................. passim
U.S. Const. amend. V.................................................................................................... passim
U.S. Const. amend. VI................................................................................................... passim
U.S. Const. amend. X........................................................................................................ 276
U.S. Const. amend. XIII..................................................................................................... 279

## Congressional Hearings and Reports

*Church Burnings*: *Hearing before the Senate Committee on the Judiciary*, 104th Cong. (June 27, 1996) ................................................................................................................................. 282

*Church Fires in the Southeast: Hearing before the House Committee on the Judiciary*, 104th Cong. (May 21, 1996)..................................................................................................... 282

H.R. Rep. No. 111–86 ................................................................................................ 284

*Local Law Enforcement Hate Crimes Prevention Act of 2007*, H.R.Rep. 110-113 (April 30, 2007) (dissenting views) ........................................................................................... 276

S. Rep. No. 100-324 ................................................................................................... 284

*The Matthew Shepard Hate Crimes Prevention Act*: *Hearing before the Senate Committee on the Judiciary*, 111th Cong. (June 25, 2009) .......................................................... 275, 277, 278

## I. INTRODUCTION

"How do [we] move forward from this point?" Dylann's trial lawyers asked the court-appointed psychiatrist, just as trial was beginning. Dkt. No. 648-2 at 62.[1] Having disregarded the recommendations of their own experts early in the case, they found themselves with no plan. Trial counsel, through their dishonesty, had so destroyed their relationship with Dylann that there was no longer any trust between them—and thus no path forward together. The chaos of the broken attorney-client relationship resulted in Dylann reluctantly and unnecessarily representing himself. Even worse, he did so ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████

Dylann's conviction and death sentence are the result of a trial that was based on errors, oversights, and misstatements of fact, first from Dylann's own lawyers, then from jurors seeking to sit on this case. A new trial must be granted to rectify these errors.[2]

There can be no doubt that this was a challenging case. On the evening of June 17, 2015, 21-year-old Dylann Roof drove to Emanuel African Methodist Episcopal Church ("Emanuel AME") in Charleston and attended a Bible study. Dylann killed nine of the twelve parishioners at Bible study that night: Rev. Sharonda Coleman-Singleton, Ms. Cynthia Hurd, Ms. Susie Jackson, Ms. Ethel Lance, Rev. DePayne Middleton-Doctor, Rev. Clementa Pinckney, Mr. Tywanza Sanders, Rev. Daniel Simmons, and Ms. Myra Thompson. Three Bible study participants were

---

[1] Note about form of citations:  Entries into the docket are cited as Dkt. No.; Transcripts from the proceedings are cited at Tr. followed by the date and page number; our Exhibits are cited as Ex. number followed by a brief description and a page number or paragraph number; and Trial Exhibits are cited as Trial Ex. number followed by a brief description and a page number.

[2] A Motion for Recusal was filed in this Court. Dkt. No. 1049. After the Court denied the motion, undersigned counsel filed a motion for reconsideration and renewed Motion for Recusal based on new grounds which remains pending at this time before the District Court. Dkt. No. 1054. Recusal is necessary for the reasons stated in those motions. Therefore, it is appropriate for a new judge, one outside the District of South Carolina, to be appointed to consider this § 2255 motion.

physically uninjured: Ms. Polly Sheppard, Ms. Felicia Sanders, and Ms. Sanders's eleven-year-old granddaughter. Reverand Pinckney's wife and six-year-old daughter hid in an adjacent office and were physically unharmed.

During the shooting, Dylann had a verbal exchange with Tywanza Sanders in which Mr. Sanders asked, "[w]hy are you doing this?" Tr. 12/07/16 at 84. As recounted by one of the survivors, Dylann responded, "I have to do this because you raping our womens [sic]." *Id.* at 85. Information gleaned from the internet during years of isolation had led Dylann to believe Black men were raping white women at an astounding rate. When Dylann left the church, he expected to be surrounded by the police. Once surrounded, he intended to end his own life. But there were no officers outside the church, so instead, he drove away. When he was stopped the following day in North Carolina, he surrendered.

The impact on Charleston and the nation was profound. The murders generated an outpouring of support for Emanuel AME, the victims, and the city. "Charleston Strong" became a rallying cry. Immense grief and rage engulfed the city.

This was never going to be an easy case for any of the participants. But "[o]ur oath to uphold the Constitution is tested by hard times, not easy ones." *Democratic Nat'l Comm. v. Wis. State Legis.*, 141 S. Ct. 28, 30 (2020) (Gorsuch, J., concurring in denial of application to vacate stay). Not just despite the difficulty of this case, but *because* of it, extraordinary attention to fairness and due process was critical. No matter the crime, Dylann Roof was, and is, entitled to the same constitutional protections and rule of law as every citizen. Unfortunately, serious errors undermined the fairness of the trial and denied Dylann his right to due process. But for these errors, there is a reasonable probability Dylann would have received a life sentence.



Moreover, during individual voir dire at least three prospective jurors gave disqualifying answers to questions about their views on the death penalty, yet were not struck by the trial court for cause. None of these three prospective jurors was able to give serious consideration to any sentence other than the death penalty in this case. Their erroneous qualification meant that they

had to be struck using peremptory challenges, which were exhausted by the defense. Dylann is entitled to a new penalty phase trial with a jury chosen from a pool of jurors that can fairly consider the range of available sentences. *See* Claim 3.

Misconduct by jurors and errors in jury selection, however, were not the only serious problems in this case. In addition, trial counsel made several errors, rendering their representation ineffective, and making the death penalty more likely for their young client. The errors began early in the representation when counsel seized upon Dylann's concern about his thyroid disorder to get him to see mental health experts. Counsel continued a pattern of deceiving their client, even as trial fast approached. They ignored expert advice that it would take time if Dylann were ever to come to terms with a diagnosis of autism, and that they should slowly reveal their penalty-phase strategy to him. Even when Dylann began to directly question counsel about their investigation, lead counsel doubled down on the deception, assuring Dylann that the penalty phase would likely not entail a diagnosis of autism.

Dylann learned the truth only when, just days before jury selection was to begin, the *government's* expert revealed counsel's plan to him—something counsel should have easily anticipated would happen—and the case imploded. The revelation of counsel's plan to frame the penalty phase around Dylann's diagnoses of autism and mental illness destroyed Dylann's trust in his attorneys. Indeed, after a year and a half of dishonesty, how could they possibly "move forward from this point?" Dkt. No. 648-2 (Ballenger report) at 62. This was a problem entirely of their own making, and Dylann was denied the effective assistance of counsel because of it. A new penalty phase is necessary. *See* Claim 4.

Once this breakdown in the attorney-client relationship became apparent and it was clear that Dylann could not trust his lawyers, counsel should have moved to withdraw from the case,

4

or at the very least, requested conflict counsel so that Dylann's interests could be protected. The relationship between Dylann and his lawyers was irretrievably broken, and it was error to not provide any other option for this young man other than to proceed *pro se* or to proceed with lawyers he simply could not trust. *See* Claim 5.

Faced with a broken relationship and a client who did not trust them and was contemplating representing himself in a capital trial, counsel failed to ensure that Dylann even attended court proceedings relevant to his decisions. Dylann was absent from five proceedings in November 2016 with no waiver of his presence. This absence from critical proceedings demands a new penalty phase trial. *See* Claim 6.

After fracturing the relationship with their client through their deceit, trial counsel then alleged that Dylann was incompetent to stand trial. Despite knowing that the relationship was so irretrievably broken that a finding of competency would lead to efforts to fire them as counsel, they made no effort to explore or present to the Court evidence about their client's inability to self-represent. Indeed, despite multiple recommendations, they failed to retain experts who would have discovered Dylann's auditory processing disorder and communication impairment. Due to counsel's ineffectiveness, the November 21 and 22, 2016, competency hearing was devoid of any evidence that Dylann has significant impairments in his speed and ability to process verbal language in real time: a skill necessary to self-representation. Dylann should receive a new penalty phase trial since counsel's ineffectiveness deprived the court of important information with a reasonable probability of changing the determination under *Indiana v. Edwards*. *See* Claim 7.

Despite the fractured relationship between counsel and Dylann, he did not want to self-represent. He simply did not want to be called autistic, a diagnosis with which he vehemently

disagreed. He was open to other diagnoses; in particular, he did not object to defense experts' diagnosis of social anxiety. In fact, there is a plethora of mitigation that Dylann would have permitted counsel to present. Instead, the jury was left with nothing at all in mitigation to balance days and days of aggravating evidence. The jury could have heard about Dylann's early developmental delays and his sweet and shy demeanor in elementary school; his elementary school vice principal voiced that he would have adopted Dylann. The jury could have heard the deep and desperate love his family had for him while seeing the pain in their eyes that would be exacerbated by an execution. The jury could have heard that as Dylann entered adolescence, he was increasingly isolated and unable to meet normal developmental milestones; extreme isolation in his room for years led to him living a life primarily on his computer. Humanizing Dylann, sharing evidence of his serious impairments, and showing that his family members deeply love him, despite his crime, would have created a reasonable likelihood that at least one juror would have chosen a life sentence over a death sentence. *See* Claim 8.

Trial counsel in this case were experienced, but their inexplicable choices created an "impossible" mission for themselves: trying a complex federal capital trial only four months after the trial team was assembled. Ex. 5 (Bruck Dec.) ¶¶ 13-14. While they attempted to "run a marathon at the speed of a sprint," they failed miserably. Ex. 6 (Stevens Dec.) ¶ 5. They failed to understand their client, both in terms of his actual disabilities and in terms of what he wanted the jury to hear about him. Instead, choosing to accelerate the trial date, counsel ignored advice from *three* mental health experts to hire a speech language pathologist, repeatedly ignored advice from their jury consultant, ignored advice from their defense victim outreach specialist, ignored advice about the need to work with their client and slowly reveal their plans to him, and ignored the fact that they were not—and could not be—ready for trial in so short a time. Their ineffectiveness in

6

rushing to trial despite all of this evidence prejudiced Dylann and requires a new penalty phase trial. *See* Claim 9.

Then, at trial, lead counsel was ineffective when he *three times* elicited testimony from Ms. Felicia Sanders, the government's first witness and one of the surviving victims, about Dylann: "He's evil. There's no place on earth for him except the pit of hell." Tr. 12/07/16 at 89. The team's defense victim outreach expert, Tammy Krause, who was the only team member who had ever sat across a table from and conversed with Ms. Sanders, had advised Mr. Bruck not to cross-examine her. Co-counsel Kim Stevens also pleaded with Mr. Bruck not to cross-examine Ms. Sanders. Mr. Bruck was not only ineffectively elicited this devastating testimony, but his failing hearing caused him to amplify his error. This testimony was so prejudicial that reversal is warranted. *See* Claim 10.

Additionally, the rush to trial led trial counsel to unreasonably and ineffectively ignore the advice of their jury consultant regarding venue. The trial had generated significant local and national media attention. The racial tensions brought to bear by this trial were exacerbated by the concurrent trial, at the courthouse across the street, of a white police officer, Michael Slager, who was charged with killing an unarmed Black man. Dylann's trial counsel agreed to try the case in the Charleston Division of the U.S. District Court of South Carolina (Area C) early on and without conducting a community survey. They obtained jury questionnaires so far in advance of trial that they did not adequately capture the complete information and bias saturation within the community. Just before trial, the team received confirmation that the Slager trial was infecting community sentiment about Dylann. Yet, just as they had been doing for months, they ignored their jury consultant's concerns. Conceding venue, given the breadth and depth of community

bias against him, was an egregious error. Counsel was ineffective for not pursuing a change of venue. *See* Claim 11.

Trial counsel's rush also resulted in failure to adequately litigate the constitutionality of the statutes the federal government used to charge him, despite an ongoing state prosecution. Dylann was charged with violations of three federal statutes: 18 U.S.C. § 247, 18 U.S.C § 249, and 18 U.S.C. § 924. Based on the interplay of these statutes with one another and the Constitution, Dylann's indictment should have been dismissed. In particular, 18 U.S.C. § 247 and § 249 do not satisfy the elements clause of a "crime of violence" under 18 U.S.C. § 924(c). Both § 247 and § 249 are unconstitutional incursions of federal power into state authority. Section 249 is unconstitutional for violating the First Amendment, punishing one's thoughts, feelings, or speech. Trial counsel and direct appeal counsel were ineffective for failing to raise and/or adequately litigate these issues. The convictions thus should be vacated. *See* Claims 12-15.

Additionally, Dylann was only 21 years old at the time of his crimes. The Eighth Amendment prohibits executing a person still undergoing significant brain development. Thus, Dylann's sentence should be life. *See* Claim 16.

Finally, botched executions do not comport with the Eighth Amendment. The Court should order discovery and ensure that basic steps are taken to ensure that any execution that might take place is done with medication from a reliable source, tested for potency, not expired, and handled and preserved properly. Only with these assurances should any execution be scheduled. *See* Claim 17.

Moreover, Judge Gergel should not have been presiding over this case. There is some evidence that he sat on this case because of his expression that he "really wanted" the case, so Judge Norton "let him have it." Ex. 8 (O'Connell Dec.) ¶ 6. The judicial assignment plan in the

District of South Carolina is uniquely vulnerable to abuse and manipulation. Dylann's right to a randomly chosen impartial judge was violated and was not protected by his pretrial attorneys. A new trial must be granted before an impartial judge. *See* Claim 18.

Hard cases, such as this, require the same attention to fairness and individual rights as every other case. Trial counsel, as well as the jury, failed Dylann Roof. ██████████████ ████████████████████████████████████████ Indeed, because of multiple errors by counsel throughout representation, when the trial date approached, they could not and did not effectively "move forward from this point." Dkt. No. 648-2 (Ballenger Report) at 62. For all these reasons, individually and collectively, Dylann Roof is entitled to a new trial, a new penalty phase trial, or at the very least discovery and an evidentiary hearing on the claims in this § 2255 motion.

## II. PROCEDURAL HISTORY AND EVIDENCE PRESENTED AT TRIAL
### A. Charging

After Dylann was apprehended in North Carolina, he was interrogated and then immediately waived extradition. He was brought to the Al Canon Detention Center in Charleston, where he remained through trial. State courts in Charleston immediately charged Dylann with nine counts of Murder, three counts of Attempted Murder, and one count of Possession of a Weapon during Violent Crime. His state court bond hearing was broadcast around the country, in part because of the shocking expressions of forgiveness made by several family members of victims. Following the trial in federal court. Dylann pled guilty on April 10, 2017 to all state charges in exchange for the State withdrawing its Notice of Intention to seek the Death Penalty. He was sentenced to life.

Federal Grand Jurors returned an indictment on July 22, 2015. Dylann was charged with nine counts of violating the Hate Crime Act Resulting in Death, 18 U.S.C. § 249(a)(1); three

9

counts of violating the Hate Crime Act Involving an Attempt to Kill, 18 U.S.C. § 249(a)(1); nine counts of Obstruction of Exercise of Religion Resulting in Death, 18 U.S.C. § 247(a)(2) and § 247(d)(1); three counts of Obstruction of Exercise of Religion Involving an Attempt to Kill and Use of a Dangerous Weapon, 18 U.S.C. § 247(a)(2), § 247(d)(1), and § 247(d)(3); nine counts of Use of a Firearm to Commit Murder During and in Relation to a Crime of Violence, 18 U.S.C. § 924(c)(1)(A), § 924(c)(1)(C), and § 924(j)(1); and additionally charged with 18 of these crimes with special circumstances pursuant to 18 U.S.C. § 3591 and § 3592.

## B. Pretrial Matters

Defense counsel were appointed to represent Dylann Roof immediately after charges were filed, but members of the defense team withdrew or were added through July 28, 2016, when the team that would try the case was assembled: David Bruck, Kim Stevens, Sarah Gannett, and Emily Paavola. Dkt. No. 288.

On May 24, 2016, the United States Government announced their Notice of Intent to Seek the Death Penalty. Dkt. No. 164. The very next day counsel for Dylann invoked his speedy trial rights and requested a trial date of November 7, 2016. Defense counsel waived a jury trial, Dkt. No. 181, but the Government requested a jury to hear this case, Dkt. No. 182. A schedule was entered, and occasionally amended, for the filing of pretrial motions and notices. The Defense filed Rule 12.2 notices of expert witnesses on July 11, 2016; September 12, 2016; and October 11, 2016. Dkt. Nos. 245, 246, 367, 471.

Waivers of appearances for pretrial hearings were executed and filed regularly from the outset of the case. Dkt. Nos. 60, 107, 126, 140, 252, 323, 324, 336, 337, and 390. There were five hearings held in which Dylann did not waive his presence, yet he was not brought to Court. Most of these proceedings follow his sending a letter to the prosecution on November 7, 2016,

10

complaining that his attorneys had been dishonest with him and apparently planned to present a

defense he fundamentally disagreed with. Dkt. No. 545.

The relationship between a defendant and his attorneys is often out of the view of the

Court, the prosecution, and the public. Yet, Dylann's letter to the prosecution brought into light

Dylann's sense of betrayal by attorneys he felt had been misleading him for over a year.

## C. First Competency Hearing

After concerns about competency were articulated by Dylann's counsel at a hearing he

was not invited to attend, the court ordered a competency evaluation. Dkt. No. 559. Jury

selection had been scheduled to begin that very day, but it was delayed initially to November 21,

2016, and then to November 28, 2016. Dkt. Nos. 564, 657. A competency hearing was scheduled

for November 16, 2016; rescheduled to November 17, 2016; and then ultimately held November

21-22, 2016. Dkt. Nos. 564, 606, 625. Testimony at the competency hearing included a court-

appointed psychiatrist, Dr. James Ballenger, and three defense experts. Dr. Ballenger diagnosed

Dylann with social anxiety disorder, schizoid personality disorder, possible autism spectrum

disorder, and mixed substance abuse disorder. Dr. Ballenger felt that the anxiety disorder and the

possible autism spectrum disorder could affect Dylann's ability to work with his attorneys, but

believed that his political beliefs were the predominant reason that he had difficulty working

with his attorneys. The defense case for lack of competency primarily relied on the testimony of

psychiatrist Dr. Donna Schwartz Maddox. Dr. Schwartz Maddox diagnosed Dylann with autism

spectrum disorder, other specified schizophrenia spectrum disorder, other psychotic disorder and

specified anxiety disorder. She testified that Dylann was not competent to stand trial, believing

that he suffered from delusions that were driving his attention and decision-making. Tr. 11/22/16

at 24-27. The court found Dylann competent to stand trial on November 25, 2016. Dkt. Nos. 656,

657.

**D. Pro Se Jury Selection followed by Counseled Jury Selection**

On the first day of jury selection, November 28, 2016, Dylann sought to represent himself since he could not trust his attorneys and he wanted to control what diagnoses about him the jury might hear. The court held a *Faretta* hearing and, based on its own observations in the courtroom, found that Dylann had the capacity to self-represent. Tr. 11/28/16 at 9. No testimony was taken about Dylann's capacity to self-represent. The court converted defense counsel to standby counsel and then immediately brought prospective jurors into the courtroom.

Dylann's participation in jury selection was minimal. Most of the times that he objected to a juror's qualifications, it was after the judge voiced his own opinion that the juror should be struck. Dylann indicated at several times that he needed "a minute to figure it out" or asked the court to slow down the proceedings. Tr. 11/29/16 at 108-09; Tr. 11/30/16 at 120-21. Dylann also asked on several occasions if standby counsel could articulate arguments to the court on his behalf. The court routinely rejected his requests. *See, e.g.*, Tr. 11/30/16 at 3-4.

Jury selection was projected to take three weeks, but, with Dylann proceeding pro se, was concluded in five days. After a challenging experience attempting to represent himself, he asked that counsel be reappointed until the penalty phase began. Counsel represented him for the exercise of peremptory strikes on the final day of jury selection.

**E. Trial with Counsel**

The government presented 39 witnesses against Dylann. The testimony included graphic videos, pictures, a confession from Dylann, and emotional testimony from first responders and survivors. Dylann was represented by counsel but presented no testimony during the guilt phase. The jury found Dylann guilty of all 33 counts in the indictment on December 15, 2016.

**F. Second Competency Hearing**

Dylann sought to represent himself again in the penalty phase of his capital trial to prevent his attorneys from presenting evidence of a diagnosis of autism. Counsel again raised his competency to stand trial, this time also raising Dylann's ability to self-represent under *Indiana v. Edwards*. Dkt. No. 841. The second competency hearing was held on January 2, 2017. The court again found Dylann competent to stand trial and represent himself.

**G. Pro Se Penalty Phase**

Dylann rarely made objections during the penalty phase. Some objections were presented after the fact in writing. The court chastised him for not making contemporaneous objections. Tr. 01/04/17 at 159; Tr. 01/06/17 at 335. At several points, standby counsel notified the court that Dylann was unable to stand and object during proceedings. Tr. 01/05/17 at 267; Tr. 01/06/17 at 444-45. Dylann presented no evidence in response to the government's presentation of 25 emotional witnesses. The government's opening and closing arguments span 63 pages; Dylann's spans just three pages.

**H. Sentencing, Direct Appeal, and Appointment of § 2255 Counsel**

Dylann was formally sentenced to death on January 11, 2017. Dkt. No. 885.

The Federal Defender Office for the Central District of California and the Federal Defender Office for the District of Maryland were appointed to represent Dylann on direct appeal. Dkt. No. 964. All members of the Fourth Circuit recused, so the Fourth Circuit decided this case on appeal through a panel of three judges comprised of Judge Duane Benton of the United States Court of Appeals for the Eighth Circuit, Judge Kent A. Jordon of the United States Court of Appeals for the Third Circuit, and Judge Ronald Lee Gilman, Senior Judge of the United States Court of Appeals for the Sixth Circuit, sitting by designation. The Fourth Circuit

13

affirmed Dylann's conviction and sentence, and the Supreme Court denied certiorari. *United States v. Roof*, 10 F.4th 314 (4th Cir. 2021); *Roof v. United States*, 143 S. Ct. 303 (2022).

## I. Timeliness of This Motion

Pursuant to an agreement between the parties, this motion is timely. Under 28 U.S.C. § 2255(f)(1), the initial deadline for filing this motion to vacate, set aside, or correct his sentences was October 11, 2023, one year from the date his judgment of conviction became final. The government agreed to waive any statute of limitations defense so long as the § 2255 motion was filed by April 18, 2025. Dkt. No. 1034-1. As this motion is being filed prior to the agreed upon date of April 18, 2025, it is timely.[3]

Counsel additionally secured an agreement from the government to waive any statute of limitations defense for a §2255 motion filed by July 21, 2025. This agreement was initially made by email on January 10, 2025, and then made in a formal letter on January 24, 2025. Dkt. No. 1039-1. The government has indicated they are attempting to rescind this agreement; however Dylann has detrimentally relied on this additional time. Accordingly, Dylann has separately filed a request asking this Court to allow the filing of a corrected § 2255 motion on or before July 21, 2025.

---

[3] *See Day v. McDonough*, 547 U.S. 198, 205 (2006); *Wood v. Milyard*, 566 U.S. 463, 472-73 (2012); *Martinez v. United States*, 423 F. App'x 650, 650 (8th Cir. 2011) ("While a district court may sua sponte consider the timeliness of a section 2255 motion, the statute-of-limitations defense remains a non-jurisdictional affirmative defense that the government may waive.").

## III. CLAIMS FOR RELIEF

**CLAIM 1:**











































**CLAIM 2:**











**CLAIM 3:    The trial court violated Dylann's Fifth and Sixth Amendment rights when it failed to strike prospective jurors for cause under *Morgan v. Illinois*, forcing Dylann to exhaust all his peremptory strikes.**

The trial court violated Dylann's right to a fair trial and impartial jury under the Fifth and Sixth Amendments by failing to strike three potential jurors who were unable to follow the law because of their views on the death penalty. The trial court's failure to strike the jurors for cause forced Dylann to use all his peremptory strikes to remove these biased jurors. Because Dylann exhausted his peremptory strikes and at least one selected juror was biased, he is entitled to a new sentencing proceeding. If these jurors had been struck for cause, as they should have been, the defense would have used their peremptories to strike other jurors.

The Sixth Amendment and the Due Process Clause of the Fifth Amendment guarantee criminal defendants the right to an impartial jury. *See Morgan v. Illinois*, 504 U.S. 719, 726 (1992). The presence of even one biased juror violates this right. *Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998).

The Eighth Amendment requires that prospective capital jurors must be able to consider mitigating evidence. *See Lockett v. Ohio*, 438 U.S. 586, 608 (1978). To determine whether prospective jurors would consider all such evidence, the defense is entitled to the questioning of prospective jurors about whether they would impose death "regardless of the facts and circumstances of conviction." *Morgan*, 504 U.S. at 735.

*Morgan* made clear that a potential juror's "belief that death should be imposed *ipso facto* upon conviction of a capital offense reflects directly on that individual's inability to follow the law. Any juror who would impose death despite the facts and circumstances of conviction cannot follow the dictates of law." *Id.* (internal citations omitted). Thus, a prospective juror who would automatically impose a sentence of death upon conviction of a capital offense is disqualified from sitting on the jury and should be excused for cause. *Id.* at 729. The proper standard to

42

determine when a prospective juror should be excused under *Morgan* is "whether the juror's views 'would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (quoting *Adams v. Texas,* 448 U.S. 38, 45 (1980)).

If a potential juror has expressed a disqualifying preference in favor of a sentence of death, a concomitant pledge to "follow the law" will not rehabilitate that juror. *Morgan*, 504 U.S. at 735. Indeed, the *Morgan* Court noted that "general inquiries," such as "can you follow the law" questions insufficiently detect jurors with "views preventing or substantially impairing their duties in accordance with their instructions and oath." *Id.* at 735-36. Highlighting the importance of individualized questioning in voir dire, the Court noted "that a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so." *Id.* at 735 (footnote omitted).

The trial court's failure to remove a prospective juror who is unwilling to follow the law is error. *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988); *United States v. Martinez-Salazar*, 528 U.S. 304, 316-17 (2000). The error is reversible if the defendant used all his peremptory strikes to remove jurors who should have been excluded for cause, and nevertheless a biased or incompetent juror was seated. *See Ross*, 487 U.S. at 85 (Sixth Amendment requires reversal where the court's failure to strike a juror who should have been dismissed for cause results in empaneling a biased jury); *Martinez-Salazar*, 528 U.S. at 316 (same).

The concerns that animated *Morgan* have overwhelming empirical support. It is not uncommon for capital jurors to hold "dogmatic" beliefs about the death penalty and how it should be imposed. *See* Theodore Eisenberg, Stephen Garvey & Martin Wells, *The Deadly Paradox of Capital Jurors*, 74 S. Cal. L. Rev. 371, 377-78 (2001) (support for the death penalty tends to be

43

ideological and relatively immune to evidence and argument that run contrary to a respondent's initial position). These beliefs are often persistent. *See* John Blume, Theodore Eisenberg, Stephen P. Garvey, *Lessons from the Capital Jury Project*, Beyond Repair? America's Death Penalty, Duke University Press, 144-77, 169 (2003) (the more strongly a juror believed death was the only acceptable punishment for defendants convicted of murder, the more likely they were to vote for death). And just as the *Morgan* Court noted, jurors may not realize their dogmatic beliefs conflict with the law. *See* Ronald C. Dillehay & Marla R. Sandys, *Life Under Wainwright v. Witt: Juror Dispositions and Death Qualification*, 20 Law & Hum. Behav. 147 (1996) (as many as 30% of persons who serve as capital jurors may not be qualified for such service because they would automatically vote for death).

In fact, even after receiving instruction about the law, jurors often harbor misperceptions or fail to understand—much less correctly apply—it. *See* Blume et al., at 151-52 (14% of South Carolina jurors who sat in capital cases believed that the death penalty was the only acceptable punishment for any murder and 57% believed the death penalty was the only acceptable punishment for a planned, premeditated murder); William J. Bowers, Marla Sandys & Benjamin Steiner, *Foreclosing Impartiality in Capital Sentencing: Jurors' Predispositions, Attitudes and Premature Decision-Making*, 83 Cornell L. Rev. 1476, 1504 (1998) (more than half of the jurors believed death was the only appropriate punishment for premeditated murder and multiple murders).

Moreover, it is also well established that typical voir dire proceedings inadequately identify and root out juror bias. Shari Seidman Diamond & Valerie P. Hans, *Fair Juries*, 2023 U. Ill. L. Rev. 879, 915 (2023); Valerie P. Hans & Alayna Jehle, *Avoid Bald Men and People with Green Socks? Other Ways to Improve the Voir Dire Process in Jury Selection*, 78 Chi.-Kent L.

Rev. 1179, 1181-82 (2003). Jurors are "often likely to be unaware of or underestimate the effects of their own biases." Diamond & Hans, at 916. In fact, jurors tend to worry about appearing biased or prejudiced and thus fail to disclose their honest beliefs fully and accurately. *Id.* Where the judge—rather than counsel—questions jurors, jurors are more disinclined to share their honest beliefs. Susan E. Jones, *Judge-Versus Attorney-Conducted Voir Dire: An Empirical Investigation of Juror Candor*, 11 Law & Hum. Behav. 131, 143 (1987).

Although Rule 24 of the Federal Rules of Criminal Procedure permits judge-led questioning, scholars and commentators agree that limited voir dire—particularly judge-led questioning—is ineffective and inadequate to identify bias in prospective jurors. Diamond & Hans, at 914. Social science research has long shown that people are more willing to disclose information to those whom they perceive as having similar status to themselves than to those of higher status. David Suggs & Bruce D. Sales, *Juror Self-Disclosure in the Voir Dire: A Social Science Analysis*, 56 Ind. L.J. 245, 254 (1981) ("A large status differential between the interactants will most likely reduce perceived similarity and, in turn, the degree of self-disclosure."). Judges sit in an elevated position in the courtroom, wear distinctive attire, and are addressed as "Your Honor"—all of which highlights the difference in status between the judge and all others in the courtroom. The result is that prospective jurors are "considerably more candid in disclosing their attitudes and beliefs about a large number of potentially important topics during an attorney-conducted voir dire." Jones, at 143.

Moreover, empirical research suggests that potential jurors respond more candidly and are less likely to give socially desirable answers to questions from lawyers than from judges. Mark W. Bennett, *Unraveling the Gordian Knot of Implicit Bias in Jury Selection: The Problems of Judge-Dominated Voir Dire, the Failed Promise of Batson, and Proposed Solutions*, 4 Harv. L. &

45

Pol'y Rev. 149, 160 (2010). Judge Bennett, currently on the United States Court of Appeals for the Ninth Circuit, and formerly a district court judge, notes, "As a district court judge for over fifteen years, I cannot help but notice that jurors are all too likely to give me the answer that they think I want, and they almost uniformly answer that they can 'be fair.'" *Id.* Indeed*,* approval by the judge "is important to a lot of prospective jurors and many will alter their responses or hide certain attitudes in order to be perceived favorably." Hans & Jehle, at 1194.

To make matters worse, studies also suggest that judge-led voir dire may lead jurors to believe that following the law requires a sentence of death. Craig Haney, *Violence and the Capital Jury: Mechanisms of Moral Disengagement and the Impulse to Condemn to Death*, 49 Stan. L. Rev. 1447, 1482 (1997) (when jurors are repeatedly asked whether they can "follow the law" and impose a sentence of death, they believe that the law requires them to reach death verdicts).

And a recent study showed that rehabilitation of jurors may backfire and lull jurors— and judges—into believing they could set aside any bias. Jessica M. Salerno et al., *The Impact of Minimal Versus Extended Voir Dire and Judicial Rehabilitation on Mock Jurors' Decisions in Civil Cases*, 45 Law and Hum. Behav. 336, 351 (2021). In that study, although all jurors claimed they were not significantly biased, the jurors who been rehabilitated by judges and agreed to be impartial *thought* they were significantly less biased than the jurors who had not been rehabilitated. *Id.* Thus, judicial rehabilitation of jurors only affected "how biased mock jurors *thought* they had been," but did not cure the underlying bias. *Id.* (emphasis in the original). Importantly, rehabilitation "seems to have given mock jurors a false sense of security that their judgement would no longer be biased by their preexisting attitudes." *Id.*

46

**A. The trial court failed to exclude at least three potential jurors for cause who expressed they would automatically vote for death without considering the evidence presented.**

At least three prospective jurors demonstrated they were unable to be impartial and follow the law and the court's instruction to decide the case based on the evidence presented, in violation of *Morgan* and Dylann's Fifth and Sixth Amendment rights. *Morgan*, 504 U.S. at 729 (a juror whose ability to consider and give effect to relevant mitigating evidence is substantially impaired must be excluded for cause because he "will fail in good faith to consider the evidence . . . as the instructions require him to do").

**i. Voir Dire Procedures in Dylann's case**

On November 27, 2016, Dylann filed Defendant's Motion to Discharge Counsel and Represent Himself. Dkt. No. 666. On November 28, 2016, the court held a *Faretta* hearing, granted Dylann's motion, and appointed previous counsel as standby counsel. Dkt. No. 691. Individual voir dire then began immediately after the court's ruling. Tr. 11/28/16 at 10. Thus, Dylann represented himself during individual voir dire.

**ii. The Supplemental Case Questionnaire**

After a first round of strikes for cause based on prospective jurors' responses to the Standard Juror Questionnaire, all remaining jurors were then instructed to complete the Supplemental Case Questionnaire, which was created with input from both parties. Dkt. No. 254 at 3; Dkt. No. 433.

The Supplemental Case Questionnaire instructed prospective jurors to "answer each question as completely and accurately as you can." Dkt. No. 433 at 2. They were also told, "there are no 'right' or 'wrong' answers to these questions, so long as your answers are truthful." *Id*. Prospective jurors were instructed that they "must swear" that the answers they provided were "true to the best of your knowledge." *Id*.

47

Question 28 of the Supplemental Case Questionnaire asked jurors to describe any views they hold about the death penalty as a punishment for murder. Dkt. No. 433 at 14. Jurors were further asked to indicate their support for the death penalty. Question 30, the "thermometer" question, stated as follows:

> Please circle one number that indicates your opinion about the death penalty. A "1" reflects a belief that the death penalty should never be imposed; a "7" reflects a belief that the death penalty should always be imposed whenever the defendant has been convicted of intentional murder.

Strongly Oppose           Strongly Favor

1    2    3    4    5    6    7

*Id*. at 15.

Question 31 of the questionnaire was designed to reveal prospective jurors' inclination to automatically vote for a sentence of death. It read as follows:

31.    The law requires a jury in a death penalty case to consider and weigh the particular facts of the case, including any aggravating and mitigating factors, before making a decision whether or not to impose the death penalty. Understanding this legal standard, please answer the following questions:

    A.    Should the death penalty always be imposed when someone intentionally murders another person?

                    ____Yes             ____No

    B.    Should the death penalty always be imposed when someone commits multiple intentional murders?

                    ____Yes             ____No

    C.    Should the death penalty always be imposed when someone commits an intentional murder because of the victim's race or color?

                    ____Yes             ____No

D.      Should the death penalty always be imposed when someone
        intentionally murders another person while the victim is freely
        exercising his or her religious beliefs?

                        ____Yes                ___No

If you answered "Yes" to Question Nos. 31(A), (B), (C), and/or D, please
explain your answer(s).

*Id*. at 15-16.

## B. Individual questioning of prospective jurors

After an initial round of strikes for cause based on the supplemental questionnaire
responses, the remaining jurors were divided into 10-member panels to undergo individual voir
dire. Dkt. No. 254 at 7. The court provided each panel with an overview of voir dire and
preliminary instructions. The court then began individual sequestered voir dire. *Id*. at 8.

Although Dylann, through counsel, had requested attorney-led follow-up questioning of
jurors, the court denied this request. Dkt. No. 255 at 4. Instead, each prospective juror was
brought into the courtroom and questioned by the court. Dkt. No. 254 at 8. After the court's
initial round of questioning, the juror was escorted out of the courtroom, and the parties were
free to request additional questioning or to make any motions. *Id*. The juror would then return to
the courtroom and the court asked any additional questions. *Id*. This process was to continue
until 70 prospective jurors were initially qualified. *Id*.

On November 30, 2016, the third day of voir dire, Dylann requested that the court allow
standby counsel to assist him in "proposing more questions to the jurors and making objections
to strike jurors." Tr. 11/30/16 at 3. The court denied Dylann's request. *Id*. That same day, Dylann
requested that the court "slow down." *Id.* at 120. The court denied his request, noting, "If you
have additional questions you would like me to ask, I'm delighted to consider them. But I'm just

49

proceeding, and I'm not going to slow down just for some abstract reason I should slow down." *Id.* at 121.

On December 2, 2016, the last day of voir dire, counsel for Dylann requested "an accommodation" for him. Tr. 12/2/16 at 148. Counsel explained that, "Mr. Roof has demonstrated in the last several jurors that he is unable to register an objection at an appropriate time, because he thinks that he has to be able to justify and explain the objection in response to questioning, that he does not understand." *Id.* at 148-49. The court instructed Dylann that he should "feel free" to object, and "if you don't have any more than an objection, that is fine. You don't need to do any more than that." *Id.* at 149-50.

In total, there were five days of individual voir dire: November 28-30, and December 1-2, 2016.

On December 5, 2016, the court granted Dylann's written motion to reassert his right to counsel during the guilt phase and then to return to self-representation at the penalty phrase. Tr. 12/5/16 at 5-6.

Also on December 5, 2016, the court indicated that it would summon the 67 jurors who were initially qualified to report to court on December 7. *Id.* at 19. On that date, the parties alternatively exercised their peremptory strikes, starting with the prosecution. Thus, although Dylann represented himself during individual questioning, he was represented by counsel when he used his peremptory strikes. Dylann exhausted all his peremptory strikes for both jurors and alternates. Counsel did not request additional peremptory strikes.

i. ██████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████











In fact, three other prospective jurors with identical questionnaire responses were struck, based solely on their questionnaires, later in the proceedings. Tr. 12/02/16 at 2. Sua sponte, the court flagged "three prospective jurors that I think need to be looked at more closely, I think we would have stricken before we came over here." *Id.* One juror "answered yes to 31 (a) through (d) and gave number 7 on [question 30]." *Id.* The second juror had the same responses. The third juror had the same responses and also expressed they had an opinion about the proper sentence for Dylann. *Id.* Based on those responses *alone*—and without any further questioning—the court advocated striking all three jurors, even without any individualized questioning. *Id.* ("[W]e don't need to bring them in if everybody agrees that would not serve any purpose . . . . I just thought

those three might save us some time."). Neither party objected, and the court thus struck all three jurors for cause without bringing them in for individual voir dire. *Id.* ████████

████████████████████████████████████████████

██████████████████████████████

██████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

████████████████

████████████████████████████████

███████████████████████████

████  ████████████████████████████████████
      ████████████████████████████████████
      ████████████████████████████

████  ██████████████████████████████████
      ████████████████████

████  ████████████████████████████████
      ██████████

████  ████████████████

████  ████████████████████

████  ████████████████████████████████

████  ████████████████████████████

















iii.



hum.



███████████████

    ████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

    ████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████ The failures of the court to remove these

jurors for cause meant that peremptory strikes had to be used to remove them. The defense

exhausted all peremptory strikes and would have struck additional jurors that express support for

the death penalty if additional peremptories had been available. Appellate counsel were

ineffective for failing to raise this issue on appeal. Dylann is entitled to a new penalty phase.

**CLAIMS 4-9: Ineffective assistance that resulted in the jury hearing no mitigating evidence.**

    Trial counsel made a series of critical errors that resulted in the jurors hearing no

mitigating evidence about Dylann's life. Trial counsel rushed went to trial woefully unprepared,

which ultimately resulted in the jurors who were to decide Dylann's fate learning nothing about

Dylann that might have persuaded at least one of them to spare his life.

    In early April 2016, counsel decided they would seek an immediate trial if the

Department of Justice (DOJ) authorized the death penalty in the case.[9] On May 24, 2016, the

Attorney General authorized seeking the death penalty. The very next day, trial counsel moved

for a speedy trial. The court was openly skeptical about trial counsel's proposed timeline:

"there's a question in my mind about whether we can do this between now and November 7." Tr.

06/07/16 at 2. Despite the court's concerns, and more, importantly, counsel's own recognition

that such a timeline was "mission impossible," as lead counsel deemed it, Ex. 5 (Bruck Dec.)

¶ 13, counsel plowed forward.

By August 2016, trial counsel knew the November trial date was fast approaching and

they would not be ready. Still "the priority was to keep the train on the track to have the federal

trial according to their compressed schedule, ignoring all evidence that such a decision was

unwise." Ex. 17 (de La Rue Dec.) ¶ 21. With a compressed timeline, the defense team was spread

thin. Among other mistakes, they missed the deadline for filing notice of mitigating factors,

which only came to light when the Government asked if that meant they did not plan to present

any such evidence. Dkt. No. 281 (making filing due August 22, 2016); Dkt. No. 325 (Notice of

Filing of Disclosure of Mitigating Factors Not Directly Related to Mental Health).

When defense counsel filed Rule 12.2 notices, some of which were for autism and mental

health expert testimony, they did so despite not having informed Dylann about their plan to raise

mental health issues and autism as part of his penalty-phase defense. Nor did they tell Dylann

before government expert Dr. Park Dietz examined him. Predictably, in the course of his

evaluation, Dr. Dietz revealed to Dylann what his team had been investigating and planning

---

[9] This decision was based on an untested belief that the state prosecution would proceed if the federal one did not. However, state team members all agree they were not ready for trial and would have made a motion to continue that trial date. If they had been forced to trial, they would have made a record of their lack of preparation.  *See* Ex. 10 (Pennington Dec.) ¶ 10; Ex. 11 (McGuire Dec.) ¶ 24; Ex. 12 (Norris Dec.) ¶ 16.

without his knowledge. Ex. 5 (Bruck Dec.) ¶ 26; Ex. 11 (McGuire Dec.) ¶ 9, Ex. 6 (Stevens Dec.) ¶ 11.

Unsurprisingly, Dylann felt betrayed and furious when he learned of counsel's dishonesty. The relationship completely broke down, setting the stage for numerous problems to follow. However, trial counsel did not seek to withdraw or have conflict counsel appointed.

Ultimately, after the court found Dylann competent (following a competency hearing for which counsel was inadequately prepared), Dylann represented himself rather than proceed to trial with lawyers who had repeatedly deceived him. When Dylann moved to represent himself, trial counsel did not—and could not—why he was incompetent because, in addition to other serious missteps, defense counsel had failed to conduct the necessary investigation, recommended by their own experts, to discover an auditory processing disorder and other disabilities that interfered with their client's ability to represent himself.

Dylann, unprepared and overwhelmed, represented himself at jury selection and at the penalty phase of his capital trial. As a result, the jurors heard nothing at all about him beyond the awful crime he had committed.

There is—and was—a fuller picture of Dylann Roof that could and should have been presented. Although Dylann had made clear that he did not want certain mitigating evidence presented—specifically any evidence about autism—he had not altogether rejected the plan to present mitigating evidence. Nor could counsel have spoken with their client about potential mitigation in an informed manner, as they had not conducted the investigation necessary to explain what was even possible to present.

In fact, the trial team "felt confident" that even if Dylann had not wanted the jury to hear autism and certain mental health evidence "he would have allowed other stuff," such as

68

testimony from family members testifying about their love for him and that he presented no management problems in jail. Ex. 11 (McGuire Dec.) ¶ 12; Ex. 12 (Norris Dec.) ¶ 32.

After finding out about trial counsel's deception, though, "Dylann rejected all that evidence because he wanted to get back at his lawyers." Ex. 11 (McGuire Dec.) ¶ 13. Dylann represented himself during the penalty phase and put on no mitigating evidence. Counsel acknowledges: "If we had not lied to him, we would not have been in that situation." Ex. 11 (McGuire Dec.) ¶ 13.

Discussed below are the distinct but related errors trial counsel made by rushing to trial and grossly mishandling their relationship with their client. Any of these errors alone could have resulted in the jury not hearing mitigating evidence, and trial counsel made all of these errors. In a case that cried out for any helpful information about the defendant, the jury did not hear a single word of mitigation.

**CLAIM 4:    Trial counsel provided ineffective assistance by repeatedly deceiving their client, leading to a total breakdown in the relationship.**

Dylann's trial counsel were dishonest with him. Predictably, when Dylann found out about their deceptions and outright lies, the relationship was irreparably ruptured.

The team knew that Dylann was resistant to the types of mitigating evidence they were investigating. Knowing "Dylann would not be a huge fan of any mental health diagnosis," Ex. 10 (Pennington Dec.) ¶ 12, the team set out to conduct their investigation into his mental health by "being a bit tricky in trying to get Dylann to see experts," Ex. 9 (Vann Dec.) ¶ 13.

At times, trial counsel merely told Dylann partial truths. At other times, they outright "lied to him." Ex. 11 (McGuire Dec.) ¶ 13.[10] This pattern of deception started at the very

---

[10] For example, they told Dylann that mental health experts—a neurologist, a neuropsychologist, a psychiatrist and a psychologist—were visiting him to assist in understanding and treating his thyroid and other physical health problems. While Dylann's

beginning of trial counsel's relationship with Dylann and ended only when a government expert revealed the defense team's plans to Dylann.

The team anticipated that, when they eventually revealed to Dylann what they had been working on, he would simply capitulate. They assumed that they could rely on "Dylann's anxiety," "his quiet passive demeanor," and his "docile nature" to prevent their client from interfering when they presented mental health diagnoses as mitigation. Ex. 10 (Pennington Dec.) ¶ 12.

This was not a viable plan. Indeed, trial counsel's consulting mental health expert knew that they could not just surprise their client with mental health evidence and rely on his passivity. Their expert "began telling the team that they needed to think about and plan for telling Mr. Roof about the defense – particularly mental health evidence – that they intended to put on in the penalty phase of his trial" "[a]s early as March 2016." Ex. 15 (Woods Dec.) ¶ 15.

Trial counsel disregarded this advice. Worse, they managed the situation so poorly that ultimately Dylann found out from a *government expert* that his lawyers had been deceptive.

The defense team continued to mislead their client even after a state defense lawyer[11] mentioned to Benn Roof, Dylann's father that the defense team believed Dylann had autism. Benn shared this information with Dylann. Ex. 5 (Bruck Dec.) ¶ 20. The team responded by telling Dylann that it was unlikely that autism would be presented. This was untrue. Pursuing that misguided plan soon became impossible.

---

thyroid problems were an aspect of their evaluations (such that this was not a completely false statement), they were hardly the primary reason for those expert interviews.

[11] Mr. Young was a defense lawyer on the state trial team, which was working closely with the federal team. Many of the team members explain that the two teams functioned as one, including conducting a single, collaborative mitigation investigation. Mr. Bruck was the leader of this joint team. Ex. 5 (Bruck Dec.) ¶ 5; Ex. 12 (Norris Dec.) ¶ 9.

Just before trial, a government expert who knew that defense counsel was planning to present autism in their mitigation case (because defense counsel had included this information in their Rule 12.2 disclosures) met with Dylann. The expert, Dr. Park Dietz, told Dylann that Dylann's team was planning to present evidence of autism. Ex. 5 (Bruck Dec.) ¶ 25.

With that, Dylann learned not from his own lawyers but from the government that his team had been deceiving him. He also learned that when he had previously confronted Mr. Bruck about this possibility, Mr. Bruck had not been fully honest. The team had told a government expert and his own father about their plans, and they not only did not tell Dylann, but denied it when he asked them directly.

The outcome was predictable. And it was disastrous. Counsel's "relationship with Dylann was really wrecked when he discovered [they] had been dishonest with him." Ex. 11 (McGuire Dec.) ¶ 10. The "relationship broke down and Dylann could not work with" counsel. Ex. 10 (Pennington Dec.) ¶ 12. "Dylann's relationship with the defense team never recovered." Ex. 9 (Vann Dec.) ¶ 14.

Dylann himself wrote about this deception, yet no inquiry was made. Dylann wrote:

> agenda. For example, I was lied to repeatedly in order to get me to speak to mental health experts. I was told that I needed to talk to them in order to get medicine for a thyroid condition. Everything I was told about these experts and why I was being tested was an absolute lie, and I was never told what they actually specialized in.

Dkt. No. 545.

The breakdown led to Dylann representing himself and not presenting any mitigating evidence. Prior to the "bl[o]w up," Ex. 12 (Norris Dec.) ¶ 18, the team "had no reason to think Dylann would not let [them] present general mitigation evidence to tell the story of his life," even if he rejected mental health evidence, Ex. 10 (Pennington Dec.) ¶ 13. The team "felt confident that even if he had not wanted the jury to hear about any diagnosis of autism, he would have allowed other" evidence in mitigation, including testimony from family members testifying about their love for Dylann. Ex. 11 (McGuire Dec.) ¶ 12. Also, he would have allowed testimony about his good behavior in jail. Ex. 12 (Norris Dec.) ¶ 32. After the blow up, "Dylann rejected all that evidence because he wanted to get back at his lawyers." Ex. 11 (McGuire Dec.) ¶ 13. Counsel acknowledges: "If we had not lied to him, we would not have been in that situation." Ex. 11 (McGuire Dec.) ¶ 13.

## A. The duty of loyalty is essential to the Sixth Amendment right to counsel and does not permit seriously misleading the client.

"Lawyers are not supposed to lie to their clients. Ever." Ex. 57 (Lying to Clients) at 661. It is axiomatic that lawyers owe a duty of loyalty to their clients. There can be no greater need for the loyalty of an attorney than when a defendant is facing the power of the United States government seeking to obtain death sentences against him. It is "an obvious truth" that lawyers in criminal cases "are necessities, not luxuries." *Gideon v. Wainright*, 372 U.S. 335, 344 (1963); *see also Powell v. Alabama*, 287 U.S. 45, 68-69 (1932). And the duty of loyalty is "perhaps the most basic of counsel's duties." *Strickland v. Washington,* 466 U.S. 668, 692 (1984).

Lying or misleading clients undermines the trust inherent in the attorney-client relationship. *See Marsh v. Wallace*, 666 F. Supp. 2d 651, 670 (S.D. Miss. 2009) (recognizing that the duty of loyalty includes a fiduciary obligation to inform clients of all matters of reasonable importance); *see also Thomas v. Att'y Gen.*, 992 F.3d 1162 (11th Cir. 2021).

72

Certainly, the law recognizes that counsel in a capital case have an obligation to investigate all potential mitigating evidence, even if the client is resistant to the possibility of presenting mitigation. *See Rompilla v. Beard*, 545 U.S. 374, 381 (2005). This obligation implicitly permits waiting to reveal certain information to clients. But the law does not allow counsel to set out to "trick" the client, tell outright lies, and then surprise him with a mitigation case they assume his anxiety and docility will prevent him from objecting to in the moment.

Counsel's pattern of dishonesty and deception constituted deficient performance, and the predictably disastrous consequences of this pattern of deception prejudiced the client. *Strickland* directs a two-pronged approach to the assessment of ineffective assistance of counsel claims. 466 U.S. at 688, 694. First, it requires a showing that counsel's performance fell below an objective standard of reasonably effective representation. *Id.* at 687-88. Second, it must be shown that prejudice resulted from the ineffectiveness. To prove prejudice, the defendant must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. But the reasonable probability standard under *Strickland* is "*not* a sufficiency of evidence test." *See Tice v. Johnson*, 647 F.3d 87, 111 (4th Cir. 2011) (emphasis added). Instead, a reasonable probability is one that is "sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694. Moreover, the standard is less than a preponderance of the evidence: "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome of the trial." *Strickland*, 466 U.S. at 693; *see also Williams v. Taylor*, 529 U.S. 362, 405-06 (2000) (O'Connor, J., concurring). Where the Sixth Amendment right to effective assistance of counsel is severely compromised, *Strickland* prejudice is presumed. *United States v. Cronic*, 466 U.S. 648, 658-59 (1984).

**B. Dylann's trial counsel seriously misled him, at times even outright lying to him.**

Dylann's lawyers admitted as early as April 7, 2016, to the state court judge that they were misleading their client, Dylann Roof. Ex. 12 (Norris Dec) ¶ 43. The team explained in a motion seeking a continuance from the state court that:

> The ever-present danger is that the defendant will refuse to cooperate in any further efforts to explore his mental condition. His cooperation so far has been based on the understanding that the defense team is seeking to secure treatment for the defendant's Hashimoto's thyroiditis, a condition with which he is obsessed. This obsession has caused  him to tolerate a neurological examination, multiple sessions of neuropsychological testing, multiple blood draws, and magnetic resonance imaging.

*Id.*

Dylann was very concerned about a thyroid issue, so the team told him that experts were there to "understand and diagnose his thyroid problems," even though they were actually mental health experts. Ex. 11 (McGuire Dec.) ¶ 9; *see also* Ex. 10 (Pennington Dec.) ¶ 8; Ex. 13 (Maddox Dec.) ¶¶ 7-8. "We got him to see additional mental health experts under the guise of his thyroid problems, as well as his concerns about his body being uneven." Ex. 10 (Pennington Dec.) ¶ 8. "We told Dylann this about each expert, eventually expanding that to telling him they were there to discuss his thyroid problems, his anxiety and other body problems. Ex. 11 (McGuire Dec.) ¶ 9.

As the mitigation specialist now puts it: "We were definitely being a bit tricky in trying to get Dylann to see experts. We used his concerns about his thyroid to get him to see the mental health experts we wanted him to see." Ex. 9 (Vann Dec.) ¶ 13. The trial team took care not to reveal to Dylann the mental health doctors' true purpose and "never told Dylann that any of the mental health experts were to be used for the trial." Ex. 11 (McGuire Dec.) ¶ 9.

While this deception was going on, team members were uncomfortable with it:

> I was concerned that we were approaching ethical lines by misleading Dylann to some extent. Experts were being brought in to interview Dylann about his thyroid,

74

which Dylann was concerned with and had a medical history related to, though they were primarily gathering mental health information for use in mitigation. Dylann was not fully aware of this fact. I was uncomfortable with the deception.

Ex. 12 (Norris Dec.) ¶ 42.

And despite relying so heavily on deceiving Dylann to put together a mitigation case, the team was so disorganized that a team member told Dylann's father, Benn Roof, the team's belief that Dylann had autism in July 2016. Benn shared this information with Dylann. This "began a process of mistrust for Dylann." Ex. 6 (Stevens Dec.) ¶ 10.

Dylann confronted lead counsel about the conversation with his father. Despite having been told months earlier by their mental health consulting expert that they needed to start talking to Dylann about their plan for a mitigation presentation, Mr. Bruck continued the deception. As he explains:

> At some point in the summer of 2016 state lawyer Boyd Young told Dylann's father, Benn Roof, that we believed he had autism. Benn told Dylann this. Dylann was angry and very upset. He was insistent that he did not have autism and became more suspicious at that point that the doctors we were sending to see him were not there just to treat his medical condition.
>
> I visited Dylann not long after he heard from his father that the team thought he had autism. I told Dylann during that jail visit that I predicted that we would not say that he had autism, but we just had to explore everything. That seemed to satisfy him at the time. My priority at that point was to keep him on board. We had a plan to reveal our diagnoses to Dylann, but we should have done it much earlier.

Ex. 5 (Bruck Dec.) ¶¶ 20-21.

Later, a government expert, Dr. Dietz, was scheduled to evaluate Dylann. Defense counsel had, as they were required to do, submitted Rule 12.2 disclosures informing the government of the mental health mitigation experts they intended to present, which is what

prompted Dr. Dietz's examination.[12] However, despite knowing that Dr. Dietz would evaluate

Dylann, was aware of the mental health diagnoses they were planning to present, and indeed was

interviewing Dylann for the purpose of rebutting these very diagnoses, trial counsel did not come

clean with Dylann before his meeting with Dr. Dietz. *See* Ex. 6 (Stevens Dec.) ¶ 12 ("We should

have known that Dr. Dietz would likely reveal this information in the course of his own

evaluation of Dylann, and we should have prepared for that."); Ex. 5 (Bruck Dec.) ¶ 26 ("We

should have anticipated that Dr. Dietz would disclose to Dylann our mental health diagnosis.").

**C. When Dylann found out about trial counsel's deception, it destroyed their relationship.**

When Dylann found out from the government what his lawyers were planning to do, the

relationship completely broke down. Compounding the fact that the government, not his own

counsel, had revealed the defense's plans to Dylann, Dr. Dietz's disclosure also alerted Dylann to

Mr. Bruck's dishonesty just two months prior, when Dylann had asked him directly about the

team's conversation with his father.

Dylann was so dismayed by his own counsel's treatment of him that he wrote to the

prosecution. The letter, dated November 3, 2016, stated:

---

[12] *See* Fed. R. Crim. P. 12.2(b) ("If a defendant intends to introduce expert evidence relating to a mental disease or defect or any other mental condition of the defendant bearing on . . . (2) the issue of punishment in a capital case, the defendant must—within the time provided for filing a pretrial motion or at any later time the court sets—notify an attorney for the government in writing of this intention and file a copy of the notice with the clerk."); Fed. R. Crim. P. 12.2(c)(1)(B) ("If the defendant provides notice under Rule 12.2(b) the court may, upon the government's motion, order the defendant to be examined under procedures ordered by the court.").

My lawyers have purposely kept me in the dark about my defense until the last minute in order to prevent me from being able to do anything about it, which is why I have been forced to write to you.

others. I want to make it clear that none of these people while they were testing me deviated from the story that they were testing me in order to see if my thyroid had affected my brain. When I asked why such extensive testing was required, I was told that as much material as possible needed to be collected to present to the jail doctor in order to get him to prescribe me medicine. You might wonder why I believed them, but I can assure you that this is the sneakiest group of people I have ever met, and words cant express how slick they are in their lies.

Dkt. No. 545.

After Dylann wrote this letter to the prosecution and the letter was disclosed to defense counsel and the court, defense counsel requested a competency evaluation and hearing.[13] Likely because it sounds so preposterous, Judge Gergel initially seemed skeptical that the government

---

[13] Trial counsel's serious errors in these proceedings, which compounded the errors caused by their deception, are discussed more fully below.

expert was the person to tell Dylann about his counsel's plans for mitigation. But Dylann

confirmed this in his testimony at the competency hearing, saying to the trial court, "I also

wanted to tell you that I actually found out first about the autism from Dr. Dietz, not my

lawyers." Tr. 11/22/2016 at 263. Dylann also recounted his feeling of betrayal when

reconsidering his August conversation with Mr. Bruck, saying "Somebody said something about

a visit in July where my dad told me something about my lawyer saying that I had autism. When

I asked my lawyers about that, they denied it, so I trusted them. I shouldn't have, but I did." Tr.

11/22/2016 at 261. He also said counsel sometimes "just tell me what I want to hear." Tr.

11/07/2016 at 19 (Dkt. No. 556).

When confronted by the court in an *ex parte* hearing, Mr. Bruck acknowledged that they

had failed to inform their client of their plans to tell the jury about his mental health diagnoses:

| The Court: | Does he even know you are going to call him psychotic and delusional? |
|---|---|
| Mr. Bruck: | He knows that we- - I mean, we were going to fully lay out the details. |
| The Court: | So the answer is he doesn't know yet. |
| Mr. Bruck: | He knows that we have concerns about his mental condition. We have not spelled it out in detail. |

*Id*. at 46.

After being found competent to stand trial, Dylann fired his lawyers. He represented

himself during voir dire and during the penalty phase of trial. As members of the trial team now

explain: "Our relationship with Dylann was irreparably damaged by Dr. Dietz's disclosures….[it]

was devastating. . . . We did not have time to work with him to repair the damage to our

relationship. Ex. 5 (Bruck Dec.) ¶ 27. "It was only after Dylann learned of our intentions to put

on evidence that he had autism that our relationship broke down and Dylann could not work with

us. . . . Our relationship never recovered after that." Ex.10 (Pennington Dec.) ¶¶ 12, 17. "Our

relationship with Dylann was really wrecked when he discovered we had been dishonest with him." Ex. 11 (McGuire Dec.) ¶ 10.

Dylann never regained trust in his lawyers. This breakdown in trust permeated every decision made by Dylann after his lawyers' deception was revealed. Prior to the breakdown, the team "fel[t] confident that even if he had not wanted the jury to hear about any diagnosis of autism, he would have allowed other stuff." Ex. 11 (McGuire Dec.) ¶ 12. After the blow up, "Dylann rejected all that evidence *because he wanted to get back at his lawyers*." Ex. 11 (McGuire Dec.) ¶ 13 (emphasis added). And Dylann told the court he did not want to self-represent but that he did not know how he could cooperate with his attorneys after their dishonesty. Tr. 11/22/2016 at 284. As trial counsel acknowledges, "If we had not lied to him, we would not have been in that situation." Ex. 11 (McGuire Dec.) ¶ 13.

Had counsel not engaged in a pattern of deception, a few outcomes were possible. First, Dylann may have agreed that counsel could put on evidence of autism. Second, even if Dylann had not agreed to allow counsel to put on evidence of autism, he would have agreed to allow counsel to present other critical evidence that otherwise humanized him and made an argument for sparing his life. *See* Claim 8. Third, if counsel had not tried to trick Dylann but instead had been forthcoming, Dylann would have refused to see an autism expert but would have seen a neuropsychologist and experts focused on his functional impairments, as he has now done. Counsel then would have had no choice but to seek to present a mitigation defense devoid of an assessment for autism. But they still would have had a mitigation case that would have given the jurors something to consider about Dylann as a human being that might have led even one of them to vote to spare his life.

Dylann would have permitted significant mitigation in his case to be presented by counsel. Mr. Pennington recounts:

> I had spoken with Dylann for months about mitigation evidence generally and stayed away from discussing specific mental health diagnoses. I had no reason to think Dylann would not let us present general mitigation evidence to tell the story of his life. The level of isolation he had in the years leading up to the crime was really shocking and demonstrated something very sad about Dylann's life, regardless of any diagnosis. I felt that he was a confused and vulnerable person who had been misled and seduced by false information. He knew I believed that and that the defense team intended to present it at trial as mitigation. I had no reason to believe that information would not be presented.

Ex. 10 (Pennington Dec.) ¶ 13. Similarly, Ms. Stevens had only begun visiting Dylann in July 2016, but her relationship with Dylann was strengthening and she felt "we were developing a good relationship that would have allowed me to share the team's concerns about Dylann's mental health issues in a way that he could accept." Ex. 6 (Stevens Dec.) ¶ 9. Ms. Norris was developing evidence of his adjustment to incarceration, which is crucial in a capital penalty phase, and had every reason to believe Dylann would have allowed that evidence. Ex. 12 (Norris Dec.) ¶¶ 30-32.

Instead, through their deception, trial counsel blew up their relationship with Dylann. This was ineffective assistance of counsel. Because he could not trust counsel, Dylann felt his only option was to represent himself. The resulting penalty phase was disastrous. There was mitigating evidence that could have been presented to the jury, as discussed further below; the breakdown of the attorney-client relationship meant that this information was not presented, which prejudiced Dylann.

**CLAIM 5:      Trial counsel was ineffective assistance for failing to withdraw or request conflict counsel after Dylann's discovery of their deception led to a complete breakdown in their relationship.**

On November 3, 2016, Dylann wrote to the prosecutors calling his attorneys "liars" who

"tricked" him into seeing their mental health experts and suggested they should be disbarred. His

primary concern was that he had been "lied to repeatedly":

> agenda. For example, I was lied to repeatedly in order to get me to speak to mental health experts. I was told that I needed to talk to them in order to get medicine for a thyroid condition. Everything I was told about these experts and why I was being tested was an absolute lie, and I was never told what they actually specialized in.

Dkt. No. 545.

As discussed above in Claim 4, the team had in fact been dishonest with Dylann:

knowing "Dylann would not be a huge fan of any mental health diagnosis," Ex. 10 (Pennington

Dec.) ¶ 12, the team set out to conduct their investigation into his mental health by "being a bit

tricky in trying to get Dylann to see experts," Ex. 9 (Vann Dec.) ¶ 13. At times, they outright

"lied to him." Ex. 11 (McGuire Dec.) ¶ 13. This pattern of deception ended only when a

government expert revealed the defense team's plans to Dylann. Ex. 11 (McGuire Dec.) ¶ 10; Ex.

10 (Pennington Dec.) ¶ 12. In the months leading up to Dylann's letter, as Dylann began to

realize he was being tricked, it was evident that a breakdown was looming in the attorney-client

relationship. *See, e.g.*, Ex. 5 (Bruck Dec.) ¶ 20; Ex. 6 (Stevens Dec.) ¶ 10. Once a government

expert revealed defense counsel's plans to Dylann, the relationship blew up. Ex. 12 (Norris Dec.) ¶ 18. "Dylann's relationship with the team never recovered." Ex. 9 (Vann Dec.) ¶ 14.

## A. The complete breakdown in the relationship between Dylann and trial counsel mandated trial counsel's withdrawal or the appointment of conflict counsel for Dylann.

Dylann's letter was unambiguous evidence of an irreparable breakdown in the attorney-client relationship. In examining the breakdown of attorney-client communication, the court is to look at whether it is "so great that the principal purpose of the appointment—the mounting of an adequate defense incident to a fair trial—has been frustrated." *United States v. Smith*, 640 F.3d 580, 588 (4th Cir. 2011). Where there is a complete breakdown in communication between a defendant and the defendant's appointed counsel, the defendant's Sixth Amendment right to counsel has been violated. *Id.* at 588-89. "[O]nly when a defendant is 'heard by counsel' can a defendant be heard *through* counsel." *Id.* at 588 (quoting *Powell*, 287 U.S. at 68).

The Fourth Circuit has recognized that "when a breakdown in attorney-client communication is so severe that it 'prevents' even '*the ability* to conduct an adequate defense,'— that is, when the likelihood of defense counsel's providing effective assistance is so small' the court finds it to be virtually nil—the assistance provided by defense counsel is fatally compromised." *Smith*, 640 F.3d at 589 (quoting *United States v. Johnson*, 114 F.3d 435, 443 (4th Cir. 1997). Such a breakdown constitutes a per se Sixth Amendment violation under *United States v. Cronic*, 466 U.S. 648 (1984). *Smith*, 640 F.3d at 589.[14]

---

[14] The trial court failed to conduct an adequate inquiry into the cause of the breakdown in communication, presuming that it arose from Dylann's disagreement with trial counsel's penalty-phase plans. Trial counsel explained Dylann's letter to the government as evidence of his incompetence, and the court appears to have accepted this explanation without inquiring into the truth of Dylann's allegations. *See United States v. Mullen*, 32 F.3d 891, 896 (4th Cir. 1994) ("When a defendant raises a seemingly substantial complaint about counsel, the judge has an obligation to inquire thoroughly into the factual basis of defendant's dissatisfaction.") (citations and internal quotations omitted).

Even if a defendant's counsel is otherwise competent, a serious breakdown in communication can result in an inadequate defense. *United States v. Blackledge*, 751 F.3d 188 (4th Cir. 2014). That is precisely what happened here.

As a result of the breakdown, trial counsel should have moved the court to withdraw and asked that substitute counsel be appointed to represent Dylann. While the court briefly inquired whether substituting counsel was necessary, defense counsel rejected the idea and plowed forward toward competency proceedings, based on their belief that Dylann's assertions were entirely the product of mental illness, not of their own pattern of deception. Even so, defense counsel repeatedly acknowledged that their relationship was all but destroyed and, moreover, that in moving for a competency hearing, they were abandoning any hope of repairing it. *See* Ex. 6 (Stevens Dec.) ¶ 21.

In charging forward toward competency proceedings, trial counsel ignored advice from a highly experienced professional they trusted, respected, and should have listened to. This advice

---

Even the government recognized the need for an inquiry (although the thrust of the government's filing was that Dylann be allowed to self-represent, and the government failed to note that trial counsel presented withdrawal as necessary only if the court did not suppress the letter):

> This Court should also determine whether the defendant has waived any conflict of interest that could arguably exist between himself and counsel. The defendant has made accusations against counsel, including accusing them of lying to him "in order to further their own, not my, agenda" and using "scare tactics, threats, [and] manipulation." (Letter to USAO, Dkt. No. 667 Exh. 1.) Defendant has also repeatedly expressed feelings of deep antagonism and distrust towards counsel. *See, e.g.*, (Competency Hearing Tr., Day 2, at 250, 252, 263-65, 271.) Defense counsel has indicated they strategically withheld information from the defendant regarding potential mental health evidence. Counsel also sought to withdraw their representation, claiming that they believed the defendant's accusations created such a conflict that their continued representation would compromise the defendant's Sixth Amendment right to counsel. *See* (Mot. to Withdraw as Counsel, Dkt. No. 667, at 3-5.)

Dkt. No. 740 at 3-4.

was to not move forward without, at minimum, requesting conflict counsel to represent Dylann in competency proceedings. Ex. 5 (Bruck Dec.) ¶ 28. Substitute counsel not only would have served a critical role in representing Dylann's interests during competency proceedings or to determine whether there was a conflict, but also would have provided Dylann counsel he could trust. Reasonable counsel, consistent with this advice, would have moved to withdraw and requested new counsel when they became aware of Dylann's letter or would have, at minimum, requested conflict counsel to represent Dylann during competency proceedings. Here, counsel failed to do either. Predictably, immediately after the competency hearing, Dylann moved to represent himself rather than proceed with counsel he could no longer trust. *See, e.g.*, Dkt. No. 545; Dkt. No. 666.

Dylann's letter laid bare the breakdown that had occurred in the attorney-client relationship and led to a flurry of filings, hearings, and evaluations that further worsened the relationship. However, the breakdown did not lead to trial counsel actually fulfilling their obligation to their client by withdrawing and requesting substitute counsel or at least requesting conflict counsel be appointed. Because of the irreparable breakdown in Dylann's relationship with trial counsel, which had been precipitated by counsel's dishonesty and anticipated by their own mental health expert,[15] and then counsel's failure to ensure Dylann had lawyers he could trust, Dylann ultimately was left with no choice but to represent himself. He badly botched jury selection; as a result of his auditory processing disorder, he struggled to follow the proceedings, failed to raise timely and appropriate objections, and was unable to process standby counsel's

---

[15] Part of the problem was trial counsel rushing to trial, which meant, among other problems, they did not have sufficient time to build a relationship with their client. This related problem is discussed below, in Claim 9.

advice. *See* Claim 7; Claim 3. Continuing to struggle as his own lawyer at the penalty phase, he presented no mitigating evidence.

Counsel had several opportunities to rectify the situation but took none.

### i. The November 2, 2016 ex parte hearing did not appropriately address the increasingly fractured relationship between Dylann and counsel.

Just a few days after Dylann's meeting with Dr. Dietz, on November 2, 2026, Dylann's counsel attended an *ex parte* hearing with Judge Gergel, at which Dylann was not present. *See* Dkt. No. 528 (notice of hearing); Dkt. No. 629 (transcript).[16] Trial counsel was already well aware the attorney-client relationship was breaking down, if not already destroyed. Lead counsel David Bruck told the court that Dylann may be "sending a letter to the prosecution which will accuse us of misconduct." Tr. 11/02/16 at 9. Dylann had previously told counsel about the letter and had read them an excerpt. Tr. 11/02/16 at 3.

Counsel attributed the letter to Dylann's mental health issues. After describing several mental health related problems as counsel saw them, Mr. Bruck indicated that Dylann did not believe he had any mental health issues or defects. *Id*. at 6. Trial counsel and the court both suggested was "rebelling against the defense [strategy]" and "forming an alliance in his own mind with the prosecution." *Id.* at 7-8. Counsel advised the court that Dylann was "basically complaining" that the team had "mistreated him" and was accusing them of misconduct. Tr. 11/02/16 at 3, 9. Counsel did not disclose to the court that they had been less than forthcoming with their client for the last year and a half.

Because of the clear indication of serious discord in the attorney-client relationship, the Court indicated it was appropriate to have a hearing to ascertain Dylann's thoughts:

---

[16] The implications of this hearing specific to fairness of the proceedings are discussed elsewhere. *See* Claim 6.

Well, here is sort of the scenario. At some point he writes the Government. I would presume the Government would promptly file something with me containing that document. When I have situations arise where a defendant is unhappy with his or her lawyer, I hold a hearing in camera. I send the prosecutor out and I have a hearing, and I allow the defendant to voice concerns, and I hear from counsel, and I make a decision about whether I should remove counsel, if that's his request. You know, he is supposed to be the master of his case, right? It's a little complicated, but that generally is the concept, one is the master of his case. So he could attempt to fire you and try to self-represent. You tell me his social anxiety would probably prevent him from doing that, and I would have to make an evaluation whether he has the competency to self-represent.

Tr. 11/02/16 at 12.

During this discussion, Dylann's counsel never suggested appointing new counsel or even conflict counsel, instead raising only the issue of self-representation. Tr. 11/02/16 at 12. Perhaps more disturbingly, counsel framed the issue as something that could wait, telling the court, "I mean, you know, if we have to sort all of this out in the course of a blowup over our representation, that will be the time to do it. But I really do want to emphasize that we are quite convinced that what are being described as his views are better understood as his symptoms. I mean, they are views. They are things he believes." Tr. 11/02/16 at 13.

### ii. Dylann's November 3 letter to the prosecution accusing his attorneys of lying did not prompt them to appropriately address the breakdown.

The next day, Dylann sent the letter to the government that his counsel had previewed for the court. Dkt. No. 545. The November 3, 2016, letter started by explaining that he and his lawyers had not "worked on and decided" his defense together, and that his lawyers had "purposely kept [him] in the dark about" his defense in order to "prevent [him] from being able to do anything about it." *Id.* Dylann explained that his lawyers had used "scare tactics, threats, manipulation, and outright lies in order to further their own . . . agenda." *Id.*

Dylann informed the government that he was "lied to repeatedly in order to get [him] to speak to mental health experts" and that he was told that he "need[ed] to talk to them in order to

get medicine for a thyroid condition." *Id.* But "everything [he] was told about these experts and why [he] was being tested was an absolute lie . . . ." *Id.*

The letter further accused defense counsel of serious misconduct, namely that the defense team's "experts had not been acting independently and were instead being coached by defense team." *Id.* Dylann wrote that "[t]hese mental health experts have been coached by my lawyers and told to say certain things at my trial" and the experts had "given [trial counsel's] preferred diagnosis." *Id.* Dylann went on to describe his lawyers as "the sneakiest group of people [he had] ever met" and that words couldn't "express how slick they are in their lies." *Id.*

Dylann wrote that he doubted his attorneys were fully communicating with him about their trial plans and that he doubted that he would know "until they actually say it at my trial, because they don't intend to tell me before then." *Id.* Dylann disparaged his defense as "pathetic" and "fraudulent." *Id.*

As to their communication, he wrote that his attorneys, "regularly told me in an aggressive manner that I have no say in my own defense, that my input doesn't matter, and that there is nothing I can do about it." *Id.* Dylann ended his letter by calling for his state and federal attorneys to be disbarred and wrote that although his attorneys were "moralistic" when it came to the death penalty, "when it [came] to lying" they had no "morals at all." *Id.*

Counsel have acknowledged that they did, in fact, deceive Dylann, as explained more fully in Claim 4. For example, when lead counsel, Mr. Bruck, was confronted by Dylann: "I told Dylann . . . that I predicted we would not say that he had autism, but we just had to explore everything." Ex. 5 (Bruck Dec.) ¶ 21. Mr. Bruck's goal at this point was simply to placate Dylann, noting that his explanation "seemed to satisfy him at the time. My priority at that point was to keep him on board." *Id.*

Mr. Bruck also acknowledges:

> Our relationship with Dylann was irreparably damaged by Dr. Dietz's disclosures. Dr. Dietz's revelation that we were pursuing a mitigation case that included Dylann's autism diagnosis was devastating. Dylann became convinced that we were liars who had been tricking him all along. We did not have time to work with him to repair the damage to our relationship.

Ex. 5 (Bruck Dec.) ¶ 27.

Nonetheless, when counsel filed a Motion for *Ex Parte* Hearing about the letter, they framed the issue as merely a "disruption in the attorney-client relationship." Dkt. No. 544. In fact, it was not a disruption—it was a complete breakdown, caused by counsel's deception, and the relationship never recovered.

Dylann's letter also prompted the trial team to consult with the director of the Federal Death Penalty Resource Counsel Project, Judy Clarke. Ms. Clarke recommended that trial counsel withdraw as counsel or at least obtain conflict counsel for Dylann to consult with. Ex. 5 (Bruck Dec.) ¶ 28. They did not follow her advice.

During the November 7 hearing about competency, the trial court spent time questioning Dylann on why he had sent the letter to the government. The court outlined Dylann's positions:

> Defendant expressed his opposition to a mental health defense, and he explained that he had tried to persuade his attorneys to present such a defense, and that, because he was unable to persuade them, he felt his best option was to send a letter to the prosecutors to sabotage any mental health mitigation defense. Defendant was then excused from the hearing, and Defense Counsel expressed concern about his competence to stand trial.

Dkt. No. 691 at 2 (citing Dkt. No. 652 at 15, 17, 24.)

Although the hearing was purportedly about whether there should be a competency hearing, this summary makes abundantly clear that there was a serious breakdown between Dylann and counsel. But—despite having been advised by Ms. Clarke to do so—trial counsel did not use this hearing as an opportunity to request conflict counsel. And when trial counsel filed

their Proposed Procedure for Competency Proceedings on November 10, 2016, the filing did not reference the need for conflict counsel (although it did note that defense counsel had inadvertently provided a transcript of the closed November 7 hearing to the government evaluator). Dkt. No. 578 at 4.

On November 14, defense counsel informed the court that Dylann had indicated "an interest in representing himself at trial." Dkt. No. 586 at 6. While counsel stated this might necessitate inquiry beyond competency and whether Dylann had the mental capacity to represent himself, there was *still* no mention of conflict counsel. *Id.* By this point, a litany of problems had surfaced, including a complete breakdown of the attorney-client relationship and Dylann becoming convinced he was best served by representing himself. Trial counsel informed the Court that their "ability to represent our client with respect to the issue of competency is further complicated by a breakdown in the relationship between counsel and the defendant," Dkt. No. 615 at 1, and noted that "[t]he Court is aware that we have experienced a breakdown in our relationship with the defendant." *Id.* at 5. Yet neither defense counsel nor the court raised the issue of whether counsel could continue representing Dylann or whether conflict counsel was needed.

### iii. Trial counsel still did not appropriately address the breakdown at any of the hearings on November 16, November 17, or November 18, 2016, none of which included Dylann.

The Competency Hearing was originally scheduled for November 17, 2016, at 9:30 a.m. Dkt. No. 608.[17] Prior to that, two separate hearings occurred on November 16, 2016.[18] Dylann was not present at either hearing, but not due to any choice of his. *See* Claim 6.

---

[17] The Court ultimately continued the competency hearing until November 21, 2016. Dkt. No. 624.

[18] Dylann had refused to see trial counsel that morning. Tr. 11/18/16 at 2.

The first hearing was held in chambers with both defense counsel and the government present. *See* Dkt. No. 624; Tr. 11/16/16 (Dkt. No. 686). While the primary issue discussed at the hearing was defense counsel's motion to continue the competency hearing, *see* Tr. 11/16/16 at 1-3 (Dkt. No. 686), the issues surrounding the breakdown of the attorney-client relationship hung over the proceedings. Defense counsel indicated to the court (in front of the government) that "[t]he last issue that we need to alert you to as not news, but we have every reason to believe that the client intends to ask to represent himself and discharge counsel." *Id.* at 13. They again made no mention of withdrawal or conflict counsel.

Next, a separate *ex parte* hearing relating to the prospect of self-representation was held in chambers. Dkt. No. 623; Tr. 11/16/16 (Dkt. No. 687). Even though defense counsel had just minutes before indicated Dylann's intention to represent himself, Dylann was not present. *See* Claim 6. Nor did trial counsel raise the issue of withdrawal or appointing conflict counsel. *See* Tr. 11/16/16 (Dkt. No. 687).

Yet another hearing relating to the closing of the competency hearing was held on the morning of November 17, 2016. S*ee* Dkt. No. 638. Again, Dylann was not present[19]—even though trial counsel and the court understood that Dylann no longer wanted his attorneys to represent him. *See* Tr. 11/16/16 at 13-14 (Dkt. No. 686). Yet again, counsel failed to seek withdrawal or the appointment of conflict counsel.

And yet one final time, on November 18, 2016, another *ex parte* hearing was held regarding procedures and timing of the competency hearing, this time by phone. *See* Dkt. No.

---

[19] While the transcript is silent as to Dylann's presence, the night prior the court indicated it did not intend to bring Dylann to the hearing, Ex. 64 (Email from Court 11-16-16), and comments made the following day confirm counsel had not seen Dylann on November 17. *See* Tr. 11/18/16 at 2.

644. Dylann did not participate in this hearing, either. During the hearing, defense counsel indicated that two days prior (November 16) Dylann had refused to meet with him. Tr. 11/18/16 at 2. The trial court suggested that because defense counsel had "mentioned earlier that perhaps one of the women attorneys may have a better repoire [sic] at this moment with the defendant," one of them could be sent over to try and to meet with Dylann. The court and counsel agreed to have Dylann transported early on the day of the competency hearing so he could read the government examiner's report. Tr. 11/18/16 at 3. There was no request by defense counsel to withdraw due to the breakdown in relationship nor a request that conflict counsel be appointed.

### iv. At the competency hearing, Dylann continued expressing contempt, antagonism, and distrust for his trial counsel, yet the breakdown was not addressed.

The competency hearing was ultimately held on November 21 and 22, 2016. Dkt. Nos. 653, 654. It is unclear exactly how long it had been since Dylann had met and conferred with counsel. It is clear that despite counsel having received advice to request conflict counsel due to Dylann's assertions of misconduct, conflict counsel was never requested. Additionally, counsel did not seek to withdraw because of their complete breakdown in their relationship with Dylann.

Unsurprisingly, Dylann continued to express his distrust of defense counsel. In a colloquy with the court, he referred to counsel as the "enemy," Tr. 11/22/16 at 213 (Dkt. No. 713), and "serial liars," Tr. 11/22/16 at 277-78. Reiterating his letter, he explained to the court that he was upset with his lawyers because they had misled him about the mental health experts he agreed to see and introduced the experts under the pretext of helping him get medicine for his thyroid. Tr. 11/22/16 at 263-64.

Dylann told the court that he was not cooperating with counsel since he felt like his attorneys had taken advantage of him. *Id.* at 262. Dylann also explained that he was "limiting" communication with counsel. *Id.* at 268-69.

91

He explained that he did not see a way he could cooperate with his lawyers, especially

after the competency proceedings:

> Okay. Just one last thing is that I don't know how in the world I'm going to
> cooperate with my lawyers now after today, after all the other things that they have
> said about me. The other allegations of different mental problems, it's just – it's not
> going to happen. I mean, *if I hated them before, I really hate them now*. And its –

Tr. 11/22/16 at 284-85 (emphasis added).

The court interjected that it did not believe "giving [Dylann] another lawyer" was a

solution because "if I were to replace them today and bring another set of lawyers, we would be

in exactly the same position." Tr. 11/22/16 at 285. The court said:

> Any competent lawyer is not going to do what you want Mr. Bruck to do, which is
> simply say, "I have no defense." They just won't do that. That's not the way
> lawyers in capital cases handle these situations. So I don't think giving you
> another lawyer is a solution.

Tr. 11/22/16 at 285. But the court's basis for that assertion was incorrect. The court simply did

not appreciate that the conflict was caused by counsel's dishonesty with Dylann, as defense

counsel had not fully apprised the court of the reasons for or the full extent of the breakdown of

the relationship. Moreover, the issue over the disagreement as to whether to present mental

health evidence notwithstanding, substitute counsel who had not deceived Dylann likely would

have garnered cooperation from Dylann.

Trial counsel did not move for replacement counsel to be appointed, or even request

conflict counsel. Tr. 11/22/16 at 284-85. Following the hearing, on November 25, Dylann was

declared competent. The court and trial counsel had failed to address the cause of the breakdown:

counsel's dishonesty.

92

**v. The breakdown in the attorney-client relationship led to Dylann seeking to represent himself.**

Two days later, on November 27, 2016, Dylann filed a Motion to Discharge Counsel and Represent Himself. Dkt. No. 666. Dylann had never been advised by either the court or trial counsel that conflict counsel or requesting new counsel might be an option. As such, he was left with virtually no understanding of his options other than self-representation.

On November 27, the same day of Dylann's motion to represent himself, trial counsel filed a motion to suppress evidence and statements, or in the alternative, to withdraw. *See* Dkt. No. 667. Trial counsel recognized a "glaring conflict of interest presented on the face of the letter," *id.* at 2, although counsel posited that suppressing the letter would be sufficient to resolve the conflict, *id.* at 3. If the court would not suppress the letter, defense counsel asked that "non-conflicted counsel" be appointed, concluding that Dylann's November 3 letter created a situation where "there is no way to proceed without the appearance that defense counsel may be motivated by divided loyalties." *Id.* However, counsel still failed to recognize that, even if the motion to suppress was granted, the breakdown in attorney-client communication was so severe that they could not continue forward as counsel.[20]

On the same day, counsel moved to strike the death penalty, blaming the government evaluators for interfering with the attorney-client relationship and causing a disruption to the team's planned penalty phase defense. In the alternative, defense counsel requested a continuance of the trial date, so that counsel could endeavor to repair the damage to our relationship with our client" which trial counsel argued was caused "by the government evaluator's interference." Dkt. No. 665 at 1.

---

[20] After the government indicated that it did not intend to offer the letter as evidence at the guilt phase, the court denied the motion as unripe. Dkt. No. 759.

**vi. The complete breakdown in the attorney-client relationship was still not adequately addressed at Dylann's hearing to proceed pro se on November 28, 2016.**

At the November 28, 2016 *Faretta* hearing, instead of addressing whether the breakdown in communication was so complete and the conflict between counsel and client so severe that counsel should be replaced, the court determined that the same lawyers should be appointed as stand-by counsel. *See* Tr. 11/28/16 at 6 (Dkt. No. 919). The court urged Dylann to draw upon the very skilled assistance of his standby counsel. *Id.* at 5. And while the court cautioned Dylann on the dangers of self-representation, there is no mention whatsoever of the issues that actually compelled Dylann to proceed *pro se*: counsel's dishonesty and the breakdown of the attorney-client relationship. *See* Tr. 11/28/16 at 3-10.[21] On November 28, the court granted Dylann's motion to represent himself.[22] Counsel should have requested withdrawal and appointment of counsel that had not been dishonest with Dylann, either to represent him or to serve as standby counsel.

---

[21] In addition, as discussed more fully in Claim 7 below, trial counsel failed to present evidence that Dylann was incompetent to represent himself because of an auditory processing disorder.

[22] The breakdown was only very loosely addressed in the Court's November 30, 2016 memorandum opinion, where "the Court ruled Defendant could not prevent his counsel from presenting mitigation evidence, including mental health mitigation evidence, on his behalf in the capital sentencing proceedings that may occur in this case." Dkt. No. 699 at 6. However, counsel's alleged deception was not addressed; instead, the problem was framed as only a disagreement on strategy: "Immediately before jury selection, Defendant sent a letter to the Government prosecutors indicating, inter alia, that he does not wish to present any mitigating evidence or argument in a capital sentencing proceeding." Dkt. No. 699 at 2 (citing Dkt. No. 545). "Defendant stated that he had only recently learned of the proposed defense because "my attorneys purposely kept me in the dark." Dkt. No 691 (citing Dkt. No. 546). The Court noted defense counsel had "moved to delay jury selection and to conduct an *ex parte* hearing to 'permit the Court and counsel to address the disruption in the attorney-client relationship that the letter reveals'", *id.* at 1-2 (citing Dkt. No. 544 at 1), but it outlined defense counsel's framing of the issue as not one of irreparable conflict but instead that "Defendant's letter 'raises serious questions regarding Defendant's competency,'" *id.* at 2 (citing Dkt. No. 544 at 3).

As a result, Dylann proceeded *pro se* during voir dire with his former counsel as standby counsel. Dylann later asked for his lawyers to represent him in the guilt-innocence phase of trial, with the understanding that he would then represent himself again at the penalty phase.

Because of counsel's deception, Dylann no longer had a relationship built on trust, and a severe breakdown in communications resulted. Counsel acknowledged this breakdown in multiple hearings and proceedings. For example, in its application to the court for a competency hearing, defense counsel acknowledged: "[w]e obviously have as our goal not destroying what is left of the relationship between our client and his defense." Tr. 11/07/16 at 6. Trial counsel explained to the court that although Dylan agreed to meet with them, he was refusing to work with them, and that during the period of the competency evaluation, they had been "unable to rebuild" their relationship with Dylann, and that it would be impossible to repair the relationship sufficiently before proceeding with penalty phase. Dkt. No. 665 at 3, 5. During competency proceedings, Dylann referred to his counsel as "the enemy" and "serial liar[s]" and said that in light of the competency hearings, "I mean, if I hated them before, I really hate them now." Tr. 11/22/16 at 213; 277-78; 284-85.

This was all plain and unmistakable evidence of an irreparable breakdown in communication between Dylann and his attorneys. Faced with either the choice of going to trial with his appointed attorneys or self-representation, Dylann "chose" to represent himself, at times asking for stand-by counsel to be reappointed. The results were predictably disastrous, particularly during the sentencing phase where no mitigation evidence was presented.

Because of the complete breakdown in communication, counsel should have moved to withdraw and substitute counsel should have been appointed. At minimum, trial counsel should have heeded Ms. Clarke's advice and requested conflict counsel for Dylann as the team moved

forward with competency. Conflict counsel would have represented Dylann's interests and been able to meet with Dylann and prepare to litigate the competency issue. This may have helped repair the attorney-client relationship by providing Dylann with a say in his defense—which he lamented that he did not have in his letter to prosecutors, saying "[my attorneys] regularly told me in an aggressive manner that I have no say in my own defense, that my input doesn't matter, and that there is nothing I can do about it." Dkt. No. 545; *see also, e.g.*, *Daniels v. Woodford*, 428 F.3d 1181, 1201-02 (9th Cir. 2005) (recognizing that trial counsel had failed to resolve the communication conflict with his client, rendering them ineffective). Substitute counsel also could have presented the plethora of mitigation available that Dylann would have allowed. *See* Claim 8.

Instead of apprising the court of the cause of the complete breakdown in communication—their own deceit with their client—trial counsel framed Dylann's concerns about their own misconduct as a desire to "undermine" the efforts of his lawyers. Tr. 11/16/16 (Dkt. No. 687) at 2-5.[23] Trial counsel's failure to apprise the Court of the cause or extent of the breakdown in communication, both at the time the letter was sent or the numerous times after where the complete rupture in their relationship remained apparent, was inexcusable.

**B. The complete breakdown in the relationship between Dylann and trial counsel gives rise to presumption of ineffective assistance of counsel.**

Dylann was prejudiced by his counsel's failures, as discussed below. However, the complete breakdown in communication between Dylann and his counsel requires that prejudice be presumed. *See Smith*, 640 F.3d at 589. While the breakdown in communications related to Dylann's disagreement with counsel as to what evidence should be presented at sentencing, the

---

[23] In fact, lead counsel was "relieved" that he was able to speak with the Court outside of Dylann's presence, and after those hearings "I declined to share any information with him." Ex. 5 (Bruck Dec.) ¶ 24.

breakdown stemmed from counsel's deception and Dylann's resultant—and justified—lack of trust.

Indeed, the breakdown in communication was so severe that even during the guilt phase, where Dylann was represented by counsel, Dylann "demanded to know exactly what questions we planned to ask on cross-examination of each of the government's witnesses and whether we planned to offer any exhibits and believed counsel's efforts "were causing him harm" and that counsel were 'trying to kill' him." Dkt. No. 840 at 4.

At minimum, there should finally be a hearing on the actual conflict between Dylann and his counsel, since trial counsel did not raise the issue and the trial court made no substantive inquiry. Because Dylann was deprived of the opportunity to have counsel that had not been forthcoming with him, he is entitled to a new penalty phase.

**CLAIM 6:     Trial counsel were ineffective for failing to ensure their client was present at all critical stages of the case, particularly in light of the breakdown in their relationship.**

Trial counsel failed to protect Dylann's right to be present at critical stage hearings that took place during and after the breakdown in counsel's relationship with Dylann.

**A. Dylann did not knowingly and voluntarily waive his presence at these hearings.**

Dylann was denied his right to be present at certain critical stages of the proceedings against him. Counsel ensured that Dylann's appearance was properly waived at a number of pre-trial conferences by presenting formal, signed waivers of his appearance to the court on his behalf.[24] However, counsel failed to ensure Dylann's right to be present at all critical stages of the proceedings at five hearings where he was not present and he did not waive his appearance.

---

[24] Numerous waivers of appearance were entered on Dylann's behalf through his counsel during the proceedings, but those waivers were specific only to those hearings and did not constitute a blanket waiver. The waivers that were entered, *see, e.g.*, Dkt. Nos. 60, 107, 126, 140, 190, 252, 324, 336, and 390, indicate that, at least from October 2015 until September 2016, both the trial court and Dylann's counsel were aware of the importance of his presence at critical

The Fifth Amendment's Due Process Clause guarantees a defendant the "right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings," *United States v. Runyon*, 707 F.3d 475, 517 (4th Cir. 2013) (quoting *Faretta v. California*, 422 U.S. 806, 819 n.15 (1975)), while Rule 43 enshrines an even broader right to be present, *see United States v. Rolle*, 204 F.3d 133, 136-37 (4th Cir. 2000). The right to be present also has potential implications beyond the Fifth Amendment, as "[t]he constitutional right to presence is rooted to a large extent in the Confrontation Clause of the Sixth Amendment." *United States v. Gagnon*, 470 U.S. 522, 526 (1985) (citing *Illinois v. Allen*, 397 U.S. 337 (1970)). The Court has recognized the right to be present extends beyond "some situations where the defendant is not actually confronting witnesses or evidence against him," however, and has "recognized that this right is ultimately protected by the Due Process Clause," in those situations as well. *Gagnon*, 470 U.S. at 526. Ultimately, "a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987).

Rule 43 identifies certain stages of a criminal prosecution at which a defendant must be present: "(1) the initial appearance, the initial arraignment, and the plea; (2) every trial stage, including jury impanelment and the return of the verdict; and (3) sentencing." Fed. R. Crim. P. 43(a). Rule 43 also exempts specific kinds of proceedings from this requirement. *See* Fed. R. Crim. P. 43(b). As relevant here, Rule 43(b)(3) provides that a defendant need not be present at a "proceeding [that] involves only a conference or hearing on a question of law." "Although the provision leaves the term 'question of law' undefined, the term typically refers to '[a]n issue to

---

stages of the proceedings and understood the necessity that an explicit waiver be recorded should he not attend a critical stage of the proceedings.

be decided by the judge, concerning the application or interpretation of the law.'" *United States v. Gonzales-Flores*, 701 F.3d 112, 116 (4th Cir. 2012) (citing *Black's Law Dictionary* 1366 (9th ed. 2009)).

At these five critical hearings, Dylann was not present, despite not having waived his right to be present:

### i. November 17, 2016 hearing

Most troubling is counsel's failure to secure Dylann's presence at the November 17, 2016 hearing during which the Court, at the government's request, heard directly from witnesses, some of whom later testified at the penalty phase of the trial. Because Dylann represented himself at the penalty phase, the fact that he was not present for this hearing was even more prejudicial to him than it would have been otherwise.

The November 17, 2016 hearing was convened for the Court to address whether to close Dylann's scheduled competency hearing to the public. Tr. 11/17/16 at 3 (Dkt. No. 638 (minute entry); Dkt. No. 988 (transcript)). The record fails to reflect either Dylann's presence or absence at this hearing, but an email from Judge Gergel's clerk the night prior confirms that the court did not intend to bring Dylann to the hearing. Ex. 64 (Email from Court 11/16/16). Additionally, comments made by counsel at a hearing the following day (also outside of Dylann's presence) suggest that they had not interacted with Dylann at all the prior day. *See* Tr. 11/18/16 at 2 (Dkt. No 991 (transcript))

The Court directly heard from several witnesses at this hearing. First to address the Court was Tyrone Sanders, whose son and aunt had been murdered. He explained that "we have lost the greatest portion" and that he would feel slighted by not being at the competency hearing. Tr. 11/17/16 at 5 (Dkt. No. 988). Mr. Sanders later testified at the penalty phase of the trial. Tr. 01/09/17 at 668-78.

99

Next was Reverend Eric Manning, the pastor of Mother Emanuel. Tr. 11/17/16 at 7-10 (Dkt. No. 988). He explained the anxiety experienced by the families and the church and their fears related to the delays. Eliza Simmons next spoke to the Court. Ms. Simmons told the court that the delays weighed heavily on the families and communities, and she expressed her concern about what additional delay would signal to people watching. Tr. 11/17/16 at 10-11 (Dkt. No. 988).

Daniel L. Simmons, Jr., spoke next. Tr. 11/17/16 at 11-15 (Dkt. No. 988). He explained that he had to travel from Virginia each time there was a hearing. Tr. 11/17/16 at 12 (Dkt. No. 988). He told the court that the families were entitled to the same rights as the defendant. Tr. 11/17/16 at 14 (Dkt. No. 988). He also expressed concern about jury selection, including the demographics of the jury pool. Tr. 11/17/16 at 14-15 (Dkt. No. 988). Mr. Simmons, Jr. later testified at the penalty phase. Tr. 01/05/17 at 358-84, 389-95.

Denise Smalls also addressed the court. She explained, "and now with him coming back saying that competency is being evaluated, to me, I'm not really with it because I feel like he did – he took nine lives away. He left survivors. He break [sic] our hearts in so many million pieces." Tr. 11/17/16 at 17. She further noted, with respect to Dylann's competency, that "as far as the competency of him not being able to communicate now, he was able to communicate then, and also in writing." Tr. 11/17/16 at 17. Gail Jackson then explained that the delay in the justice system was "breaking us down." Tr. 11/17/16 at 19. After this, James Shepherd expressed his concern to the court about the shortness of notice for the hearing. Tr. 11/17/16 at 19-20. Finally, Nadine Lance-Carter asked "the Court to have mercy on us." Tr. 11/17/16 at 21. She drew attention to the fact that it was her second year without her mother. Tr. 11/17/16 at 21.

**ii. November 2, 2016 *ex parte* hearing**

On November 2, 2016, just weeks before the start of trial, Dylann's counsel requested and engaged in an *ex parte* hearing with the court. Tr. 11/02/16 at 2 (Dkt. No. 528 (notice of hearing); Dkt. No. 629 (transcript)). At that hearing, Mr. Bruck told the court that there was "substantial mental impairment . . . affecting [Dylann's] behavior." Tr. 11/02/16 at 2.

The court asked, "I take it you are here because you are worried that your client may be rebelling against the defense your team has sought to advance?" and counsel answered in the affirmative. Tr. 11/02/16 at 7. Lead counsel further explained his belief that Dylann was "forming an alliance in his mind with the prosecution." Tr. 11/02/16 at 8. Counsel for Dylann told the court that he contemplated that his client might be "sending a letter to the prosecution which will accuse us of misconduct." Tr. 11/02/16 at 9.

Lead counsel further informed the court that Dylann was intermittently oppositionally defiant after Dr. Dietz's evaluation. Tr. 11/02/16 at 9. The court raised the question of whether Dylann "would ever tolerate a defense you would assert." *Id.*

Even though Dylann had not yet expressed a desire to represent himself because of his conflict with counsel, the court seemed to indicate it was appropriate to have a hearing to ascertain what Dylann thought about the issues: "I have a hearing, and I allow the defendant to voice concerns, and I hear from counsel, and I make a decision about whether I should remove counsel, if that's his request." Tr. 11/02/16 at 12. Defense counsel stated, "I think his *Faretta* right has probably run its course, it's probably too late." *Id.*

In fact, the only discussion of Dylann's presence in court on November 2, 2016, was in relation to "his presence in court caus[ing] extreme anxiety," and the court indicating that perhaps it was wise that Dylann not be present for individual voir dire. Tr. 11/02/16 at 14. Neither his counsel nor the court addressed whether Dylann should have been present for *this*

hearing, for which there was no signed waiver of Dylann's appearance filed. Dylann did not explicitly waive his presence at any time, nor did his behavior constitute any voluntary absence from this hearing.

### iii. November 16, 2016 hearings

The Competency Hearing was originally scheduled for November 17, 2016, at 9:30 a.m., Dkt. No. 608, but prior to that date two separate hearings occurred on November 16, 2016, both without Dylann present, and both without Dylann waiving his right to be present.

First, the court held a hearing in chambers with both defense counsel and the government present. *See* Tr. 11/16/16 (Dkt. No. 686). While the primary issue discussed at the hearing was defense counsel's motion to continue the competency hearing, defense counsel informed both the Court and government that "[t]he last issue that we need to alert you to as not news, but we have every reason to believe that the client intends to ask to represent himself and discharge counsel." *see* Tr. 11/16/16 at 13 (Dkt. No. 686).

Also on November 16, a separate *ex parte* hearing was held in chambers. Dkt. No. 623. Extensive discussion took place on issues surrounding the strategy of the defense team to potentially move forward with mitigation evidence over Dylann's objection, dialogue on potential mental health evidence that might be offered against Dylann's wishes, and the Court framing Dylann's actions as a desire to "undermine" the efforts of his own lawyers as he did not agree with their strategy. Tr. 11/16/16 at 2-5 (Dkt. No. 687). Even though defense counsel had, just minutes before, indicated Dylann's intention to represent himself, again Dylann was not present even though no waiver of his appearance was filed, he had not explicitly waived his appearance, nor had he conducted himself in a way to show a voluntary waiver. Regardless of the clear breakdown in relationship to this point, defense counsel continued to represent Dylann.

102

### iv. November 18, 2016 *ex parte* hearing

On November 18, 2016, another *ex parte* hearing was held, this time by phone. *See* Dkt. No. 644. Much like the previous hearings where Dylann was not present, and particularly the other *ex parte* hearings, there was no discussion of Dylann's presence.

While defense counsel did indicate that two days prior Dylann had refused to meet with him, Tr. 11/18/16 at 2 (Dkt. No. 991 (transcript)), no further inquiry was made by the Court as to why Dylann was not present in the hearing that day or why a waiver to his appearance had not been filed. The Court did suggest that because defense counsel had "mentioned earlier that perhaps one of the women attorneys may have a better repoire [sic] at this moment with the defendant," one of them could be sent over to try and to meet with Dylann. Defense counsel agreed to have him transported early on the day of the competency hearing so he could read the government examiner's report. Tr. 11/18/16 at 3.

### B. Not being present at these hearings violated Dylann's constitutional rights.

By being excluded from the November 17 hearing at which witnesses engaged in a dialogue with the Court, Dylann lost the opportunity to hear what those witnesses said and evaluate their demeanor. By November 17, both counsel and the Court were well aware that Dylann might seek to represent himself. Nonetheless, there was no attempt to secure his presence to allow him to hear from witnesses, many of whom later testified on the government's behalf at the penalty phase, when Dylann was representing himself.

At the other four hearings from which Dylann was excluded, counsel shared information about Dylann's mental health and their interactions with him, which were central to the way events unfolded in this case. Dylann had no opportunity to respond. The last three hearings, two on November 16 and one on November 18, took place after the Court had been informed Dylann had expressed the desire to represent himself. Dylann's presence would have had "a relation,

103

reasonably substantial, to the fullness of his opportunity to defend against the charge[s]" against him. *Snyder v. Com. of Mass.*, 291 U.S. 97, 105-06 (1934), *overruled on other grounds by Malloy v. Hogan*, 378 U.S. 1 (1964). His presence was a "condition of due process to the extent that a fair and just hearing [was] thwarted by his absence, and to that extent only." *Snyder*, 291 U.S. at 107-08; *see also Faretta*, 422 U.S. at 819, n.15.

These hearings without Dylann present occurred just as the relationship between Dylann and his lawyers was in the midst of blowing up. Ex. 12 (Norris Dec.) ¶ 18. The team had already failed to build trust by not giving Dylann accurate or complete information about the defense plan. Ex. 5 (Bruck Dec.) ¶ 47 ("our experts were seeing Dylann under the guise of learning about and treating his thyroid problem"); Ex. 11 (McGuire Dec.) ¶ 9 ("[t]he experts . . . were presented to him as experts that were there to understand and diagnose his thyroid problems."); Ex. 10 (Pennington Dec.) ¶ 8 ("[we] told Dylann the doctor was there to understand about his thyroid problems."); *see also* Claim 4. Even after confronting trial counsel about this, the team doubled down and told him they "predicted" that they would not say he had autism. Ex. 5 (Bruck Dec.) ¶ 21. Once the government's expert revealed the truth about the defense plans, Dylann had lost all trust in his defense team. Excluding him from these hearings without a valid waiver exacerbated that mistrust at a time the team desperately needed to rebuild their client's confidence in them. *See* Claims 4 and 5.

**CLAIM 7:     Trial counsel was ineffective for failing to consult with a Speech Language Pathologist which deprived the court of critical information about Dylann's language and communication disorders that rendered him incompetent to represent himself under *Indiana v. Edwards*.**

Dylann Roof was not competent to represent himself at trial. Dylann suffers from an auditory processing disorder: a neurodevelopmental language disorder which impairs his ability to process and understand spoken language in real time. Dylann also has pragmatic

communication dysfunction, a language disorder that exacerbates the effects of his auditory processing disorder by limiting his ability to use verbal and nonverbal communication for functional purposes.

These disorders left Dylann unable to carry out the basic tasks needed to represent his interests and present his own defense. Dylann was not able to follow what was happening in the courtroom in real time and thus could not make rational decisions for his defense, or, ultimately, represent himself. Jury selection, which required Dylann to listen to juror responses, summarize key elements from their testimony and questionnaires, form follow-up questions in real time, prepare to answer follow-up questions in an adversarial environment, and simultaneously listen to standby counsel's advice, proved too challenging. *See* Claim 3. At the penalty phase, he struggled to make objections in real time, instead filing written motions with the assistance of standby counsel after the fact. He called no witnesses in his defense, even though he would not have opposed certain testimony—for example, that he was quiet and kind and loved by many, but suffered from extreme anxiety and became increasingly isolated in his youth; and that he did not pose a future danger in prison. *See* Claim 8.

Dylann's pragmatic communication dysfunction and severe anxiety further limited his mental capacity to conduct a defense—he was unable to interrupt proceedings to make objections for fear the judge would be mad at him or that he would be unable to answer any follow-up questions; often slumped in his chair looking straight down, unable to maintain appropriate body language; and avoided anything that would draw attention to himself. The highly emotional and chaotic atmosphere in the courtroom added to his difficulties processing the auditory information of the proceedings and participating in his defense.

When the trial judge evaluated Dylann's capacity to represent himself under *Indiana v. Edwards*, he did so without having information about Dylann's language and communication disorders. The court did not have this critical information because trial counsel failed to consult with a speech language pathologist (SLP). Trial counsel failed to do so despite the recommendation of multiple experts urging that they consult with a speech language pathologist on account of Dylann's communication and language deficits—deficits which the trial team itself had observed.

When Dylann sought to discharge counsel and represent himself—for the sole purpose of avoiding the diagnosis of autism that his attorneys had been developing, in large part by deceiving him—trial counsel initially presented no argument that Dylann lacked the capacity to self-represent under *Indiana v. Edwards,* 554 U.S. 164 (2008). When trial counsel attempted to raise the issue at the second competency hearing, arguing that Dylann's autism and mental illness made him incompetent to represent himself, it was too late. Even then, trial counsel could not convey to the court the significance of Dylann's impairments as they related to his capacity to conduct his own defense because they had unreasonably failed to investigate those impairments.

**A. Multiple experts recommended consulting with a Speech Language Pathologist because of Dylann's communication and language deficits—deficits that other experts and the trial team observed.**

**i. Dr. Donna Schwartz Maddox and Dr. George Woods recommended consulting with a speech language pathologist**

In early 2016, the trial team contacted forensic psychiatrist Dr. Donna Schwartz Maddox to work on Dylann's case. Dr. Schwartz Maddox met with Dylann several times, starting in April 2016. Dylann had been preoccupied with concerns about his thyroid and other somatic issues and the trial team had decided to be "tricky" when introducing experts to Dylann. *See* Ex. 9 (Vann

Dec.) ¶ 13. The trial team thus asked Dr. Schwartz Maddox to focus initially on Dylann's thyroid

concerns and any psychiatric manifestations of physical illness. Ex. 13 (Maddox Dec.) ¶¶ 7-8.

Dr. Schwartz Maddox quickly recognized a need for the expertise of a speech language

pathologist:

> As part of my initial work on the case, I reviewed multiple records pertaining to Dylann, including his interrogation video and neuropsychological testing. I noted when watching the interrogation video some features of his speech and communication style that were significant to me. I learned about his mother's advanced maternal age, his cousin's various diagnoses, and I noted Dylann's frenulum repair.

*Id*. ¶ 11.

Dr. Schwartz Maddox conveyed her suspicions of an auditory processing disorder

and recommendation that Dylann be evaluated by a speech language pathologist:

> All these data points led me to suggest to the trial team that Dylann had abnormalities in his communication skills. Because of this, I recommended that the trial team hire a speech language pathologist to conduct a quantitative assessment of his receptive and expressive language deficits. I believed that a speech language pathologist should assess Dylann for, among other things, an auditory processing disorder (APD).

*Id*. ¶ 11.

During the many hours she spent with Dylann, Dr. Schwartz Maddox observed

first-hand many characteristics that indicated cognitive deficits relating to speech and

language dysfunction, corroborating what she'd initially noted in the records. For

example, she says, "When I interviewed Dylann, he often took a long pause to process

before greeting me with a 'thumbs up' motion to signal that I could continue." *Id*. ¶ 9.

This was significant because "Dylann's use of a 'thumbs up' rather than verbalizing his

needs is one obvious sign of a pragmatic language deficit." *Id*. ¶ 15. Dr. Schwartz

Maddox noticed "other ways that his communication was limited and he was unable to process information." *Id.* For example:

> He was slow to respond. He was concrete in his thinking. While he had a big vocabulary, he seemed very young in the way he expressed his thoughts. He found open-ended questions difficult to answer at times. It was much easier to communicate if I asked yes or no questions.

*Id.*

As a psychiatrist, Dr. Schwartz Maddox is not herself qualified to diagnose APD, because "a speech language pathologist and/or audiologist must test a person themselves." *Id.* ¶ 13. However, because Dylann exhibited so many classic signs of the disorder, she recommended the trial team consult with an SLP. *Id.* ¶ 11. Hiring such an expert is consistent with the standard of practice in a capital case and certainly not unusual; Dr. Schwartz Maddox has "worked on other cases where the legal team hired a speech language pathologist upon my recommendation." *Id.* ¶ 13.

Since September 2015, the defense team had also been working closely with neuropsychiatrist Dr. George Woods, who served as a consulting mental health expert on the case. As a consultant, Dr. Woods "advised counsel on the types of experts they might consider using, and the types of issues they might consider exploring." Ex. 15 (Woods Dec.) ¶ 4. Lead counsel Mr. Bruck "greatly respect[ed]" Dr. Woods. Ex. 5 (Bruck Dec.) ¶ 19.

In the spring of 2016, Dr. Woods and Dr. Schwartz Maddox worked together to prepare a list of things that needed to be done on the case, based on their review of records and reports of meetings with Dylann. Dr. Woods agreed with Dr. Schwartz Maddox's recommendation to retain a speech language pathologist and "made the trial team aware that I also thought that Mr. Roof should be evaluated by a Speech Language Pathologist." Ex. 15 (Woods Dec.) ¶ 11. Speech

and language evaluations could reveal cognitive impairments that other mental health testing could not. As Dr. Woods explains:

> Speech and language are affiliated with the left temporal lobe phenomenon. The temporal lobe houses the areas of the brain that everything else goes through – things like vision, hearing, emotional processing, and executive functioning. This means that impairments in speech and language mix things up in the rest of the brain and can cause a variety of problems.

> Neuropsychological testing tests only 8% of the brain, which means that "normal" neuropsychological results don't mean everything is okay in the brain. Speech and language issues are like a trojan horse to see if there are issues deep in the brain. If there are problems in the entryways of the brain, there are more problems spread throughout the brain.

Ex. 15 (Woods Dec.) ¶¶ 11-12.

The list prepared by Drs. Schwartz Maddox and Woods was "intended to be used by the team in seeking a continuance." Ex. 15 (Woods Dec.) ¶ 9. *See* Claim 9. It was also designed to guide the defense team toward developing mitigating evidence and further understanding their client.

In addition to Dr. Schwartz Maddox's observations of Dylann's communication and their review of Dylann's developmental and family history, Drs. Schwartz Maddox and Woods based their SLP recommendation on neuropsychological testing from a third expert, Paul Moberg, who had evaluated Dylann in February 2016.

Dr. Moberg's neuropsychological testing revealed "consistent reductions in processing speed, characterized by poor speed, planning, and error monitoring." Dkt. No. 832-2 at 11. Dr. Moberg opined that neuropsychological testing was consistent with "mild frontal system dysfunction characterized by reduced processing speed, variability in reaction time, poor speed, planning, and error-monitoring, increased proactive interference in memory, perseverative and rigid responding, and relative reductions in semantic fluency." Dkt. No. 832-2 at 11. In other

109

words, Dylann did not have the critical skills he needed to keep up with what was going on around him, especially when more than one thing was happening at a time.

Dr. Schwartz Maddox's impressions of Dylann tracked Dr. Moberg's findings. "While a neuropsychologist would be best able to explain this, it was clear both from interacting with Dylann and from Dr. Moberg's data at the time that Dylann had a processing speed delay, among other abnormal test results. Because I knew of his processing speed delay, I was careful with Dylann to minimize Dylann's anxiety when we communicated. I spent as much time with him as he needed and gave him ample time to respond and communicate. He often asked questions for clarification." Ex. 13 (Maddox Dec.) ¶ 16.

## ii. Dr. Rachel Loftin observed Dylann's communication and language deficits.

Other defense experts observed issues with Dylann's communication that should have raised red flags about potential communication and comprehension impairments. Dr. Rachel Loftin, who was unavailable to testify at the competency hearing, observed "significant communication deficits" in "the video of his interrogation and confession." Ex. 14 (Loftin Dec.) ¶ 17. Dr. Loftin "conducted six separate interviews with Dylann, totaling approximately nineteen hours, between June and October 2016," and observed aspects of Dylann's communication that are consistent with his language disorders. *Id*. ¶ 3.

At the time, Dr. Loftin said "that Dylann possibly had difficulty processing verbal information and formulating responses." *Id*. ¶ 17. The defense filed a proffer of Dr. Loftin's testimony which it intended to raise at the guilt-innocence trial. *Id*.

> The proffer said: "Response latency and difficulty answering open-ended questions were also noted. Mr. Roof takes longer than expected to provide answers to questions that it would be expected he knows the answer to, and, though it appears he is making an earnest effort to provide answers to the questions, he has particular difficulty answering open-ended questions. This may suggest a difficulty with processing verbal information or in formulating oral responses, both of which are common even in intelligent people with Autism Spectrum Disorder (ASD)."

110

*Id*. ¶ 17.

### iii. The trial team observed Dylann's communication and language deficits.

The trial team also observed speech-language-related impairments in their interactions with Dylann, which should have prompted them to follow the recommendations of their experts. Lindsey Vann was brought on to the federal defense team as a mitigation specialist. In addition to gathering records and interviewing life history witnesses, Ms. Vann met with Dylann multiple times at Al Cannon Detention Center where Dylann was incarcerated. The team would initially visit Dylann in the contact visit room. However, Dylann was strip searched before every visit, "which really bothered him." Ex. 9 (Vann Dec.) ¶ 5. The contact visit room was large; it had a window and guard standing by. "Dylann would get very easily distracted by everything going on around him and was unable to overcome the stress caused by his anticipation of the strip search." *Id*. The team decided to switch legal visits to the non-contact room, where he wouldn't be required to undergo a strip search, believing that it "would be detrimental to our relationship" to continue seeing Dylann in the contact room. *Id*.

"The non-contact room was narrower, with one window on each door, but not as much going on outside the windows. It was enclosed on both sides, and there was a glass partition separating Dylann from the team members." With fewer distractions, "Dylann seemed more comfortable and better able to carry on conversations." *Id*. ¶ 6. Ms. Vann also "noticed that Dylann struggled when more than one person was in the visiting booth with him. He followed conversation better when it was just one person." *Id*. ¶ 7.

Lead counsel David Bruck "knew that talking with Dylann was challenging." Ex. 5 (Bruck Dec.) ¶ 39:

> Despite his large vocabulary and his ability to form complex sentences, conversation with him is not the typical give and take exchange. He doesn't begin or end conversations in usual ways. And he takes very long pauses before

> answering simple questions. In short, he has communication and processing impairments. I attributed these to the diagnosis of autism, but failed to explain these limitations to the Court.

*Id*. Second chair Kim Stevens recalled that she "often noticed a delay in Dylann's response when I spoke with him. I sometimes wondered if Dylann understood what I said to him." Ex. 6 (Stevens Dec.) ¶23

**B. The trial team failed to follow their experts' advice and failed to investigate the red flags they themselves observed.**

Despite multiple recommendations from experts and the many red flags from their own observations, trial counsel did not consult with a speech language pathologist. "At some point in our investigation, Dr. Maddox and Dr. George Woods recommended we hire a speech language pathologist (SLP). A third expert . . . also recommended hiring an SLP. We did not follow these recommendations." Ex. 5 (Bruck Dec.) ¶ 41; Ex. 16 (Andrews Dec.) ¶ 6. Second chair Kimberly Stevens stated that "[o]ur team should have followed the recommendation of our experts and hired a speech language pathologist to assist us on Dylann's case. However, given the compressed timeline were faced with due to lead counsel's decision to pursue speedy trial, this was one of several potential issues that fell by the wayside." Ex. 6 (Stevens Dec.) ¶ 28). Third chair Emily Paavola did not have a strategic reason not to seek consultation with an SLP; "we simply ran out of time." Ex. 7 (Paavola Dec.) ¶ 21.

The mainstay of effective assistance of counsel is a reasonable investigation. *See Strickland*, 466 U.S. at 690-91 (1984); *Wiggins v. Smiths*, 539 U.S. 510, 534-35 (2003) (failure to investigate family and social history). In assessing the reasonableness of counsel's investigation, the focus is on "whether the investigation supporting counsel's decisions . . . *was itself reasonable*." *Wiggins*, 539 U.S. at 523 (emphasis in original). Counsel may not "ignore[] pertinent avenues for investigation of which he should have been aware." *Porter v. McCollum*,

558 U.S. 30, 40 (2009). The fact that counsel consulted many other experts does not make their

failure to consult an SLP reasonable. *See Caro v. Calderon*, 165 F.3d 1223, 1226-27 (9th Cir.

1999) (remand for a hearing on ineffectiveness was required where counsel consulted four

different experts who were not the right experts).

Given their experts' recommendations and observations, and their own observations, trial

counsel should have been aware that Dylann had significant impairments that a speech-language

pathologist could evaluate. Such impairments would have been relevant not only for the

mitigation defense, but importantly, to inform the Court's decision on Dylann's capacity to

represent himself.

**C. Had trial counsel consulted with a Speech Language Pathologist, they would have learned that Dylann suffers from an Auditory Processing Disorder and Pragmatic Communication Dysfunction that prevented him from following the trial proceedings and conducting his defense.**

Dylann has since been evaluated by a speech language pathologist and undergone more

targeted neuropsychological testing.[25] A speech language evaluation and auditory processing

assessment revealed that Dylann has a neurodevelopmental language disorder—specifically,

Dylann has an auditory processing disorder, which impairs his ability to process and understand

what is spoken to him in real time. Auditory processing refers to the "internal processes that a

person uses to make sense out of auditory messages taken in." Ex. 3 (Lucker Report) at 2.

---

[25] Based on testing she performed, the speech language pathologist recommended that Dylann "undergo a full audiological assessment in more ideal conditions to rule out the presence of an auditory processing disorder." Ex. 1 (Fritz Report) at 7. The audiologist diagnosed Dylann as having a "significant auditory processing disorder (APD) with lexical integration at both the neurophysiological level as well as within other areas of brain processing." Ex. 3 (Lucker Report at 4). In turn, the audiologist recommended that Dylann "have a linguistic speed of processing evaluation." *Id.* A linguistic speed of processing evaluation by a neuropsychologist confirmed further substantial impairments. Ex. 2 (Ouaou Report) at 14.

While Dylann appears to have typical expressive and receptive language abilities and demonstrates strong language content and verbal comprehension skills, he has "very significant" APD problems, which make it difficult for him to process and understand what is spoken, especially in an environment with other distractions, like a courtroom. *Id* at 4. Neuropsychological testing that examined Dylann's language processing revealed that he also has significant impairments in his ability to process verbal information in an efficient manner.

Compounding Dylann's APD are his deficits in social pragmatic communication, which means he has impairments in the functional use of language for social purposes. Ex. 1 (Fritz Report) at 5-6. For example, Dylann struggles to initiate verbally on any topic and typically only speaks in response to others.

Dylann is intelligent, with an above-average IQ. His strengths mask the serious deficits caused by his auditory processing disorder—deficits that are directly related to his capacity to represent himself.

**i. Dylann has an Auditory Processing Disorder.**

Dr. Amy Fritz conducted a speech language evaluation of Dylann. Dr. Fritz has been a nationally certified speech-language pathologist since 1999, specializing in the evaluation and treatment of adults and children with social communication deficits.[26]

Dr. Fritz's evaluation of Dylann included both record review and direct assessment at USP Terre Haute. Dr. Fritz spent over 90 hours of record review and indirect assessment; and over the course of two days, Dr. Fritz spent a total of 11 hours and 45 minutes with Dylann.

---

[26] Dr. Fritz is the Owner & Founder of Cedar Tree Communication Therapy, a telehealth speech-language therapy practice established in 2019 and based out of Orlando, Florida. Dr. Fritz holds a master's degree in speech-language pathology and a doctorate degree in special education with a cognate area emphasis in speech-language pathology. Ex. 1 (Fritz Report) at 2.

114

Based on the results of various assessment instruments and her review of Dr. Paul

Moberg's prior neuropsychological evaluation, Dr. Fritz concluded that:

> On the surface, [Dylann] effectively understands and produces language presented verbally. That said, functional language use is a complicated system dependent upon several other skills including intact language processing, auditory comprehension, joint attention, and social pragmatics. Mr. Roof demonstrates deficits in these correlated critical components of verbal language.

Ex. 1 (Fritz Report) at 5-6.

Her initial review of records, including Dr. Moberg's neuropsychological assessment, as

well as her direct assessment of Dylann led Dr. Fritz to question Dylann's auditory

comprehension abilities. For example:

> During the current assessment period, Mr. Roof was asked about his response to the communication of others. He asserted that people must often address him by name and speak louder than average to gain his attention. He indicated that he is not always paying attention to the same things as others and replied "maybe" when asked if he regularly stares off into space. Mr. Roof explained that he has difficulties understanding what is being said when "thinking in my own head at the same time that someone is speaking" or there is background noise. He indicated that his language processing abilities may be reduced in certain types of linguistic or social contexts (e.g. when he's feeling anxious or in a chaotic environment).

*Id*. at 6.

Dr. Fritz administered the Test of Auditory Processing Disorders in Adolescents and

Adults (SCAN3 A) to rule out the presence of an auditory processing disorder (APD). Dylann

failed this screening test. Although Dr. Fritz is qualified to administer the test, she is not an

expert in auditory processing disorders and was not able to administer the test in optimal

circumstances.[27] She therefore recommended "Mr. Roof undergo a full audiological assessment

in more ideal conditions to rule out the presence of an auditory processing disorder." *Id*. at 7.

---

[27] "As a speech-language pathologist, she is qualified to administer this instrument. However, further interpretation of these "borderline" results must be completed by an audiologist, as they are the professionals uniquely qualified to make an APD diagnosis. Furthermore, because testing was not conducted in a sound-controlled atmosphere, there were

Based on Dr. Fritz's recommendation that an audiologist evaluate Dylann, Dylann's federal post-conviction counsel contracted audiologist Dr. Jay Lucker to conduct a comprehensive auditory processing evaluation of Dylann "to identify whether he has any specific auditory processing disorders (APD) that could affect his abilities to understand things spoken to him, in conversations with others, and to comprehend verbal input." Ex. 3 (Lucker Report) at 1.[28]

As Dr. Lucker explains, auditory information processing refers to:

> those internal processes that a person uses to make sense out of auditory messages taken in. Auditory processing involves all of the things our brain does to obtain meaning from the information we receive through our auditory systems getting that information from the "outside world" though our ears, up to the auditory centers of the brain, and interacting with other centers of the brain including the language centers, the cognitive centers, the emotional centers, the memory centers, the executive functioning centers, and other sensory centers.

*Id*. at 2.

Auditory information processing consists of "a series of steps or processes beginning after a person hears or 'receives' the auditory signal at the ear and involves the entire central nervous system in the brain. In this approach, there are hypothesized to be different areas of processing that interact with each other and lead to the final comprehension of the message." *Id*. at 2.

---

distractions during the assessment (e.g. doors slamming, guards walking by). The equipment was not professional grade or calibrated for bilateral sound presentation and this evaluator did not strictly adhere to guidelines for test administration. For example, the CD was paused occasionally, and some items were presented more than once. These adjustments were made to provide the client with every opportunity to respond correctly. However, results may be skewed due to these liberties. For these reasons, the current evaluator recommended that Mr. Roof undergo a full audiological assessment in more ideal conditions to rule out the presence of an auditory processing disorder." Ex. 1 (Fritz Report) at 7.

[28] Dr. Lucker is an Indiana state licensed and certified audiologist as well as a Speech Language Pathologist (certified by the national professional American Speech-Language Hearing Association, ASHA). He specializes in auditory processing disorders as well as language processing disorders. Ex. 3 (Lucker Report) at 1.

Dr. Lucker administered an auditory processing assessment on Dylann on October 23, 2024. Dr. Lucker performed hearing tests as well, the results of which were normal, to eliminate Dylann's inability to hear as a cause for his failures to process properly what was said to him. According to Dr. Lucker's analysis of formal standardized objective tests, "Dylann has very significant APD problems," making him unable at times to understand spoken language. *Id*. at 3-4.

Quantitative analysis revealed Dylann "has uneven performance between ears which is a positive indication of what is called an auditory integration processing disorder also known as a disorder in dichotic listening." *Id*. at 3. Dylann's performance on the Ear Difference Analysis was very significant—he scored below -2 standard deviations on four of the eight measures, which indicates an auditory processing disorder.[29] *Id*. at 3.[30] These four abnormal findings "indicat[e] very significant problems with what is called auditory lexical integration at the neurophysiological level. This relates to integration between the different areas of the brain involved in processing what is heard." *Id*. at 4.

As Dr. Lucker explains, an auditory processing disorder could also be present when performance between measures on a particular test is -1 standard deviation below the listener's performance on every other measure evaluated. *Id*. On the Scan-3A test, Dylann performed -1 standard deviation below the mean on the two "competing words" measures, but on all other measures on that test he scored above the mean. This discrepancy demonstrates "a relative

---

[29] As Dr. Lucker explained, "the diagnosis of an auditory processing disorder (APD) occurs when a person fails any two measures of auditory processing below -2 standard deviations (below the 2nd percentile)." Ex. 3 (Lucker Report) at 4.

[30] An auditory processing disorder is diagnosed when "a person fails any two measures of auditory processing below -2 standard deviations." Ex. 3 (Lucker Report) at 4.

abnormality in Dylann's abilities to process linguistic information (lexical integration) functionally." *Id*.

Together, Dylann's performance on both the Ear Difference Analysis and Competing Words measures shows "he has significant APD problems at the neurophysiological level and at the general, overall lexical integration level so that he cannot always 'get' and understand what is spoken." *Id*. Dr. Lucker further explained that this difficulty "can then contribute to frustrations which can lead to negative emotional reactions and misunderstanding of what he hears." *Id*.

Dr. Lucker concluded:

Today's auditory processing evaluation with Dylann Roof supports a conclusion that he has a significant auditory processing disorder (APD) with lexical integration at both the neurophysiological level as well as within other areas of brain processing such as integrating what he hears with interpreting the linguistic meaning as well as the cognitive processes of interpreting the overall meaning of the linguistic messages he hears.

*Id*.

Dr. Lucker noted that the auditory processing evaluation "was completed in a controlled and familiar environment for Dylann" and as a result "he did not display any negative emotional reactions or anxieties so that the test findings purely look at his auditory information processing abilities." *Id*. In circumstances that produce "any other factors, such as negative emotional reactions, frustrations, and anxieties, he likely is significantly less able to process and understand what is spoken to him." *Id*.

Dr. Lucker made several observations during his evaluation of Dylann that prompted him to recommend a linguistic speed of processing evaluation. For example, Dylann "often took longer than expected to respond, even if he responded appropriately. Typically, an adult takes about one second to repeat what he has to repeat on the auditory processing tests. However, Dylann often took two or more seconds to repeat the words or sentences he heard." *Id*. at 3.

118

Combined with Dylann's APD, Dr. Lucker opined "he may have a problem pulling out the appropriate response from his brain as he is taking in information." *Id*. at 4.

Indeed, a linguistic speed of processing evaluation confirmed Dylann's substantial impairments in this area. Neuropsychologist Dr. Robert Ouaou evaluated Dylann in January 2025, with a particular focus on measuring Dylann's linguistic processing abilities in light of his confirmed APD. One of the targeted tests Dr. Ouaou administered was the Speed and Capacity of Language Processing Test (SCOLP), "which measures an individual's rate of information processing and speed of comprehension." Ex. 2 (Ouaou Report) at 13-14. Dylann's "performance was relatively impaired on the majority of processing speed measures, reflecting difficulties with speed and accuracy of decision-making skills, short term memory, and attention/concentration." *Id*. at 15. Dylann's "most significant" impairment was his "exceptionally low" comprehension speed (below the 1st percentile). *Id*. These results show that Dylann has significant deficits "in his ability to process verbal information (reading and aurally presented) in an efficient manner based on speed." *Id*. Dr. Ouaou's testing also confirmed deficits in semantic verbal fluency, which consists of one's "ability to produce words by category under timed conditions," *Id*. In other words, Dr. Ouaou's testing confirmed Dr. Lucker's observation that Dylann has problems "pulling out the appropriate response from his brain as he is taking in information." Ex. 3 (Lucker Report) at 4.

The clinical diagnosis of APD is also supported by the 2016 neuroimaging analysis. Neuropsychologist Dr. Erin Bigler, an expert in neuroimaging, reviewed the neuroimaging studies that were performed on Dylann back in 2016. With the knowledge that Dylann had been

119

diagnosed with APD, Dr. Bigler focused his 2025 review of the imaging on the temporal lobe.[31]

Dr. Bigler's analysis of the temporal lobe regions[32] showed that "the hippocampus, entorhinal

cortex and parahippocampal gyrus that all participate in memory, emotional control and

regulation as well as roles in auditory processing are less than optimal." Ex. 4 (Bigler Letter) at

5. A more detailed analysis of the temporal lobe structures showed "several areas that deviate

outside of the boundaries of what is considered neurotypical," which "have relevance for

understanding the clinical assessments" performed by Drs. Fritz, Lucker and Ouaou. *Id.*

### ii. Dylann has pragmatic communication deficits.

Compounding Dylann's deficits in auditory processing and linguistic processing speed

are Dylann's pragmatic communication deficits. In addition to Dylann's expressive and receptive

language, Dr. Fritz assessed his pragmatic language skills. Pragmatic language refers to the use

of appropriate communication for a variety of functions. During Dr. Fritz's evaluation, Dylann

"demonstrated a profound weakness in all areas of pragmatic social skill performance including

information exchange, following conversational rules/routines and using nonverbal skills

commensurate with his intended message." Ex. 1 (Fritz Report) at 1.

Dr. Fritz interviewed Dylann about his response to the communication of others:

> He asserted that people often have to address him by name and speak louder than
> average to gain his attention. He indicated that he is not always paying attention to
> the same things as others and replied "maybe" when asked if he regularly stares off
> into space. Mr. Roof explained that his mind is "going a mile a minute" and said
> that social interactions drain him for this reason. He tends to hyper-focus on what
> others are thinking of him and said that this is why he avoids looking at their facial
> expressions. He said socializing is like "going out into the sun" for a long time, as

---

[31] "Identifying APD means that any neuroimaging analysis should focus primarily on
temporal lobe structures and their neural networks associated with auditory processing." Ex. 4
(Bigler Letter) at 2. This is because "the known neuroanatomical components of the auditory
system.

[32] Dr. Bigler used NeuroQuant, "an FDA-approved program that provides an overview of
temporal lobe regions-of-interest (ROI) volumetric findings." Ex. 4 (Bigler Letter) at 5. Dr.
Bigler also used VolBrain, which provides a more detailed analysis of brain structures. *Id.*

it leads to fatigue. Mr. Roof explained that he has difficulties understanding what is being said when "thinking in my own head at the same time that someone is speaking" or there is background noise. He indicated that his language processing abilities may be reduced in certain types of linguistic or social contexts (e.g. when he's feeling anxious or in a chaotic environment).

*Id*. at 9.

In assessing Dylann's ability to interact with others conversationally, Dr. Fritz noted that "several of Mr. Roof's former conversation partners indicated that he was not likely to initiate verbally on any topic and would generally only speak in response to others." *Id*. at 10. Dylann himself "indicated that it is difficult for him to manage the back-and-forth of conversation, as his mind is often busy trying to keep up with what has been said while formulating his next response. That said, Mr. Roof believes he demonstrates fluid topic maintenance unless he is under a real- or perceived-time constraint. In that condition, he noted that he will jump quickly from one topic to another." *Id*.

Dr. Fritz asked Dylann: "'When you are chatting with someone, are there things you notice yourself doing which interfere with the flow of the conversation?' Mr. Roof indicated that this is a significant area of relative weakness for him." *Id.* Dr. Fritz asked Dylann about a variety of tendencies that interrupt natural conversation flow and Dylann responded that the following tendencies describe him:

- Taking a long time to say what you want to say.
- Taking a long time to get started on an answer.
- Giving very short replies.
- Interrupting when other people are talking.
- Chattering on without giving the other person a chance.
- Shifting from topic to topic.
- Keep talking about a particular topic.
- Thinking about my own self, imaging myself

*Id*.

121

Additionally:

> When someone asks a question that makes Mr. Roof uncomfortable, he will
> answer with "I can't talk about that". He uses this phrase to indirectly relate that
> he "does not want to talk about" a given topic. To bring a conversation to a close,
> he will simply "stop it abruptly" or "walk off", thereby demonstrating
> inappropriate conversation termination skills.

*Id*. at 11.

Dr. Fritz concluded, "While Mr. Roof undoubtedly has above average semantic knowledge and grammatical skills, his ability to use language functionally and meaningfully in social contexts is profoundly impaired." *Id*. at 18. Dr. Fritz diagnosed Dylann with Symbolic Dysfunction relating to Pragmatic Communication secondary to an organic disorder (DSM R48.9). *Id*. at 19.[33]

### D. Dylann's Auditory Processing Disorder and Pragmatic Communication Dysfunction rendered him incompetent to represent himself.

Speech language evaluations revealed Dylann's profound language and auditory processing impairments. Dylann's inability to process linguistic information functionally was exacerbated in a capital trial courtroom setting and prevented him from carrying out the basic tasks of self-representation. Because of his processing delays, "it is highly unlikely that Mr. Roof could 'keep up' with the communicative demands of the courtroom." *Id*. at 8. Dr. Ouaou agreed that Dylann's impairments—especially his "exceptionally low (below the 1st percentile) deficits in his ability to process verbal information (reading and aurally presented) in an efficient manner based on speed"— would have made it unlikely that he could perform the tasks associated with

---

[33] Dr. Fritz opined that Dylann demonstrates performance deficits related to Social Communication Pragmatic Disorder DSM 315.39 (F80.89). However, because she could not say that Dylann's impairments are not attributable to another medical or neurological condition that he's been diagnosed with (such as social anxiety), her current diagnostic finding is Symbolic Dysfunction relating to Pragmatic Communication secondary to an organic disorder (DSM R48.9). Ex. 1 (Fritz Report) at 19.

representing himself at trial. Ex. 2 (Ouaou Report) at 15. "Given the speed of communication and information being presented in a typical courtroom, Mr. Roof would not be able to meaningfully process that information, provide effective responses or objections, and simultaneously interact with support counsel." *Id*. at 17. Dylann's anxiety disorder "would both compound the auditory processing problems and be compounded by the auditory processing problems." *Id*.

"Based on extensive record review, formal assessment findings and direct observations made by the examiner, Mr. Roof simply does not have the communicative abilities to competently serve as his own trial attorney." Ex. 1 (Fritz Report) at 21.

### E. Because of his Impairments, Dylann struggled to represent himself during jury selection and the penalty phase.

#### i. Jury Selection

On November 28, 2016, the same day he waived his right to counsel, Dylann proceeded to jury selection as his own lawyer. Immediately after the judge announced his decision that Dylann was competent to represent himself, and with no break, prospective jurors filed into the courtroom. Over the course of just five days, during which Dylann represented himself, a panel of seventy prospective jurors was qualified. This pace of jury selection in a capital case is unheard of. Jury selection had been scheduled to last three weeks. *See* Tr. 08/31/16 at 12.

Dylann's participation in jury selection was minimal and reflected his functional limitations. He was unable to form and raise objections or questions in a timely manner. When he did object to a juror's qualifications, he did so after the judge indicated his own feeling that a particular juror should be struck and directly asked Dylann if he wanted to object. Dylann would

follow the judge's lead. *See, e.g.*, Tr. 11/28/16 at 62-63; Tr. 11/29/16 at 29; 11/29/16 Tr. at 148-49; 11/29/16 at 203; Tr. 11/30/16 at 171-74.[34]

On several occasions, standby counsel was compelled to address the court in an attempt to assist Dylann. On the first day of jury selection, soon after Dylann had waived his right to counsel, Mr. Bruck attempted to lodge an objection to a juror's disqualification under *Witherspoon* and *Witt*, stating that he had "discussed this with Mr. Roof and offered to register an objection on his behalf." 11/28/16 Tr. 63-64. The government "vigorously object[ed] to a late objection," and the court said, "It can't function this way." 11/28/16 Tr. at 64.

At several points on the second day of jury selection, standby counsel again addressed the court on Dylann's behalf. In connection with the "wide latitude allowed under *McKaskle vs. Wiggins* concerning assistance that may be provided by standby counsel" without interfering with a defendant's *Faretta* rights, Mr. Bruck relayed to the court early on the second day of jury selection that "Mr. Roof has made requests of us that we as standby counsel represent or advance certain issues." Tr. 11/29/16 at 4-5.

Midway through the day, standby counsel announced that with Dylann's "expressed authorization," they had filed a request for additional voir dire of certain jurors who gave "facially disqualifying answers on question 31 [concerning opinions about the death penalty] or who otherwise have a pro death penalty tenor to their questionnaire responses." Tr. 11/29/16 at

---

[34] One prospective juror knew one of the victims, who was a minister at her church, and the victim's daughter. Tr. 11/30/16 at 155. The juror was questioned extensively about her conflicting views on the death penalty and life without parole. Despite clear evidence that this juror was unqualified, at the end of questioning, Dylann had no follow-up questions. The court then asked Dylann directly, "do you have any objections," at which point Dylann stated, he would move to strike based on the relationship with the victim and inconsistency in answering questions. *Id*. at 171. The court granted Dylann's motion, stating "I just don't put people who have contact with victims on juries." *Id*. at 172-174.

103 (*see* Dkt. No. 684). Mr. Bruck requested that the court probe more deeply and go beyond a juror's statement that they "will consider everything." Tr. 11/29/16 at 103-04. As Mr. Bruck told the court, this is "Mr. Roof's request, and he asked that we make it for him" because "[h]e finds it difficult to advance these objections on his own for reasons that I think the Court may understand." *Id*. at 104.

The court responded that it was complicated "when the defense speaks from two voices," such that in the moment the court is told the defense has no follow-up questions but is later told they in fact do. Tr. 11/29/16 at 104-05. Standby counsel proposed that permitting them to make objections on Dylann's behalf would alleviate the court's concern because Dylann "will simply feel that he can authorize us to do things that he's incapable of doing for himself" and in doing so he "will be speaking with one voice." Tr. 11/29/16 at 106.

Because the court was not presented with the relevant information—that the defendant before him, despite his relatively high IQ, did not process information properly—it was able to opine that, "For now the system seemed to be working just fine, I think. Mr. Roof has a chance to consult with you, and if he wants to ask additional questions, just suggest them to him. He understands English. Just suggest to him. If he thinks it advisable, he can ask me those questions." Tr. 11/29/16 at 108.

In response, Mr. Bruck pressed that Dylann "is very concerned about time. He feels great time pressure." *Id*. at 108. The court then addressed Dylann, directing him to "just let me know" if he needs "a minute to consult with your counsel." Tr. 11/29/16 at 108-09. The court asked if Dylann was able to understand the suggestions his counsel gave him and could then decide whether to ask those questions. *Id*.

> MR. ROOF: Yes, I just -- sometimes it takes me a minute to figure out -- to figure it out.

THE COURT: Well, let's -- what we'll do is if you need that minute, just indicate that to me, and I'm going to afford you the chance to speak further with your counsel at the table there before you have to respond. Does that seem reasonable to you?

Tr. 11/29/16 at 108-09. The court's proposal put the burden on Dylann to affirmatively ask for more time. Instead, Dylann continued to ask if his standby counsel could speak for him instead.

On the third morning of jury selection, before questioning began, Dylann asked the court "if you would let my standby counsel assist me in proposing more questions to the jurors and making objections to strike jurors." Tr. 11/30/16 at 3. The court denied Dylann's request, noting that he had waived his right to counsel, and that "When one self-represents, one obtains certain benefits and acquires certain burdens." The judge reminded Dylann:

I advised you that I thought it was unwise to waive your right to counsel but you had a constitutional right to do that. And I find a system of essentially having your standby counsel become cocounsel to be potentially chaotic and a manipulation of the system, and I'm not going to allow it.

. . .

MR. ROOF: Can-- can I-- can you let David speak?

THE COURT: Well, I'm not trying to-- see, we are now-- we just keep creeping into this role of Mr. Bruck being your cocounsel.

MR. ROOF: But—

THE COURT: He has filed briefs on this. I read them. I've considered it. It's my discretion running this courtroom how-- the procedures we are going to use. I believe these are the proper procedures. And that's my ruling.

MR. ROOF: Thank you.

*Id.* at 3-4.

During a break later that day, Dylann asked the court if they could slow down.

MR. ROOF: Yes, um, *it would be helpful if we could slow down.*

THE COURT: You know, when you say "slow down," it seems -- you know, we've had a general questionnaire and a case-specific questionnaire, collectively, with subparagraphs, over 100 questions, and I don't feel rushed at all. On the other hand, I don't feel a need to waste time. After each juror is initially questioned, I ask counsel, "Do you have additional questions?" I listen carefully, and then I ask those

126

questions. And my view is, Mr. Roof, whatever the time is, it is, I feel, perfectly adequate. If you have additional questions you would like me to ask, I'm delighted to consider them. But I'm just proceeding, and I'm not going to slow down just for some abstract reason I should slow down. If we need to ask additional questions, I am delighted to ask them.

Tr. 11/30/16 at 120-21 (emphasis added). At no point did the court ask Dylann why he was

requesting to slow down.

On the fourth day of jury selection, after preliminary questioning of a prospective juror,

Dylann requested that his standby counsel address the court because he was too embarrassed to

read a Facebook post written by a prospective juror referring to Dylann as "the disgusting man

who committed this crime." Tr. 12/01/16 at 77-78. The court permitted an exception to its rule

that standby counsel could not speak for Dylann, "only for this."

> THE DEFENDANT: Yes. Could my standby counsel explain something for me?
>
> THE COURT: I'm sorry?
>
> THE DEFENDANT: Could my standby counsel explain something to you for me?
>
> THE COURT: No. Take a minute and let them explain it to you, and then you can – we're not rushing, just take a minute.
>
> MS. STEVENS: Your Honor, if I may, it's a rather sensitive issue that he's embarrassed to read the Court, but I can read?
>
> THE COURT: Okay. And let's be very clear. I am doing it only for this. We're not opening the door in the future, but go ahead on this one, a situation where you say he may be embarrassed.
>
> MS. STEVENS: Thank you, Your Honor. This particular juror, we believe, issued a Facebook posting referring directly to Dylann Roof as, quote "the disgusting man who committed this crime." And we thought it bore the court's attention and is worthy of follow up.

*Id*. Dylann's inability to read a fairly innocuous quote about himself, aloud to the court,

displayed his pragmatic communication and processing deficits, including his fear of drawing

attention to himself and being unable to form any responses to follow-up questions from the

court.

On the fifth—and final—day of individual voir dire, after the morning panel concluded, an exasperated standby counsel requested an accommodation for Dylann because he was unable to register objections, believing he had to provide an explanation and "he doesn't understand" :

> It is that Mr. Roof has demonstrated in the last several jurors that he is unable to register an objection at an appropriate time, because he thinks that he has to be able to justify and explain the objection in response to questioning, that he does not understand, and I can not get across to him that he need merely register an objection to the excusal of the juror, and that the Court will not demand an elaborate explanation or cross-examine him about it. And that explains at least some of the recent failures to object, including the juror before this one. He doesn't understand it, and he is blocked from registering an objection.

> All I'm asking for is that the Court explain to Mr. Roof that he can simply stand up and say, I object to the excusing of this juror, and that he will not be questioned further by the Court, and the Court will not demand explanations that he is incapable of giving. Only the Court can get that across. I can't. I've tried and I failed.

Tr. 12/02/16 at 148-49. The court then addressed Dylann, stating that he had "a little bit different observation" from Mr. Bruck because Dylann had "stood up sometimes" and "shared with me whether he had an objection or not." Tr. 12/02/16 at 149. The court reiterated that Dylann should "feel free" to make objections and "if you have an explanation, I welcome it. If you don't have one, that's fine, too." Tr. 12/02/16 at 149-50.[35]

At the conclusion of jury selection, Dylann asked the judge if he would "let me have [my lawyers] back for the guilt phase, and then let me represent myself for the sentencing phase of the trial." Dkt. No. 728-1. The court agreed. Tr. 12/05/16 at 9-10. After a seven-day trial, Dylann was convicted on December 15, 2016, of all 33 counts in his indictment. On that same day, Dylann confirmed, and the judge recognized, his previously asserted right to self-representation. Dkt. No. 818.

---

[35] Dylann allowed counsel to represent him for the exercise of peremptory challenges and the guilt phase of the trial.

**ii. Penalty Phase**

Throughout the five-day penalty phase trial, Dylann rarely participated. He was incapable of making contemporaneous objections, instead filing written motions at standby counsel's urging long after witnesses had concluded their testimony. His opening statement consisted of briefly telling the jury he had no mental illness and that they should forget anything his attorneys had said during the guilt-innocence trial. Tr. 01/04/17 at 49-50.

On the first day of the penalty phase trial, after opening statements and after two witnesses testified, Dylann filed a written motion making several objections relating to the amount of victim impact testimony and the prosecutor's manner of questioning. Dkt. No. 853; Tr. 01/04/17 at 158-59. With respect to Dylann's complaints about the manner of questioning, the court responded:

> Mr. Roof, if you object to the questioning, you stand up and say, 'Objection.' Okay? And I'll take it up. But doing it after the fact is not nearly as important or as effective as doing it on a timely basis. If there is a particular question you object to, simply stand up and say, 'Objection.'

Tr. 01/04/17 at 159.

On the second day of penalty proceedings, the court addressed Dylann, reminding him that he had a right to object. The court had seen Mr. Bruck "giving you advice" on objections and urged Dylann to "listen to that advice." Tr. 01/05/17 at 266.

> Mr. Bruck interjected, once again requesting an accommodation for Dylann:
>
> I have to request an accommodation for the defendant, Your Honor. He is not capable of intervening to object or protect his rights, and I want the Court to appoint me on this -- on these witnesses. I have to be heard on his behalf because he cannot do it. We have -- it is not true that this evidence is not excessive. It has violated every principle of restraining of victim impact testimony under the Eighth Amendment, under Payne vs. Tennessee. This is what the *Payne* court meant when they were referring to denial of due process.
>
> And I have been passing notes and telling the defendant in every way I know how he has to object. He has to object. He can't let this go by. Dream sequences,

> descriptions by a victim impact family member witness of her feelings about the facts of this crime, this is everything that Payne forbids, and it's going by because this man cannot protect his own rights. He can't do it.

*Id*. at 267-68. Mr. Bruck requested that the court "appoint standby counsel for the limited purpose of this testimony, since it has already become a runaway freight train, to allow us to protect his rights by intervening at the appropriate time." *Id*. at 269.

The court, without consulting Dylann, rejected Mr. Bruck's request, because having "observed the defendant repeatedly in the proceedings," it was "fully satisfied he has the capacity to make objections when in his good judgment they are appropriate." Tr. 01/05/17 at 271. The court cited a few objections that Dylann had made, including one that the court had sustained. The court also observed that Dylann may not have been "wrong in not following one of your instructions" because the testimony wasn't improper in the court's view. *Id*. at 271.

Later during a break in the proceedings after several additional witnesses had testified, the court addressed a written motion it "received just moments ago" from Dylann. Tr. 01/05/17 at 332; *see* Dkt. No. 857. The motion requested additional breaks on account of the lengthy emotional testimony affecting the atmosphere in the courtroom. The motion also objected to the prosecutor hugging a witness after her testimony and questioning a witness until "she was crumpled in her seat and sobbing loudly." Dkt. No. 857 at 1. When addressing the motion's arguments, the judge stated that he had not noticed that ("It went right by me"), and "If there is an objection, I need to hear about it, I need to address it and hear it was a problem. No one raised that . . . If there was a problem, someone needs to raise it in realtime." Tr. 01/05/17 at 335. The court also shared its belief that the motion reflected "standby counsel's efforts to mischaracterize the record" and exaggerate the evidence and circumstances in the courtroom. Tr. 01/05/17 at 332. Throughout the penalty phase, Mr. Bruck continued to register concerns about Dylann's ability to object and represent his own interests. *See, e.g.*, Tr. 01/06/17 at 444-45.

130

Dylann presented no witnesses or evidence in mitigation and the jury sentenced him to death.

### iii. Evidence of Dylann's Impairments at Trial

Dylann's participation in trial reflected his functional limitations—he was unable to form and raise objections or questions in a timely manner and demonstrated an inability to follow the court proceedings while simultaneously taking advice from standby counsel.

In urging Dylann to raise an objection, standby counsel would pass notes explaining the reasoning and citing cases that Dylann could recite. But Dylann was unable to process standby counsel's advice—or in turn communicate with them—while the proceedings unfolded in a crowded and chaotic courtroom; as a result, he often did not object. Mr. Bruck observed that "Dylann's anxiety was acute" during jury selection, "as he could not stand being looked at by others" and "was unable to communicate orally or in writing with us while court was in session." Ex. 5 (Bruck Dec.) ¶ 51. Dylann "struggled to speak to us when court was in session. He was unable to answer questions I asked him in court. He asked that we not speak to him while court was ongoing. He had a hard time looking down at the notes we passed to him while court was going on. When he did speak it was halting, full of pauses, and awkward." *Id*. Mr. Bruck now understands that Dylann's difficulties are attributable to disorders he did not know Dylann had:

> At the time I attributed this all to anxiety, but his processing speed problems combined with his auditory processing problems surely contributed to this and demonstrated the problem was even worse than I could understand at the time.

Ex. 5 (Bruck Dec.) ¶ 51.

Like Mr. Bruck, standby counsel Ms. Stevens remembers trying "to get Dylann to object in court, but he often could not." Ex. 6 (Stevens Dec.) ¶ 22. Ms. Stevens recalled that during jury selection:

we'd pass Dylann a post-it note or try to talk with him about why he should object to a certain prospective juror. At first we wrote longer notes with what Dylann could say to Judge Gergel. He would glance at it, but it seemed to be too much information for him to take in, especially with the other noise in the courtroom. He'd simply stare at the table and say no, if he spoke at all. We began to simplify the notes down to just a case name or word. But even that was too much for him. By the time Dylann could think and take in even the two-word note and react, Judge Gergel would have moved on, and Dylann's chance to object was lost. He just couldn't take in the information quickly enough and react. Everything in the courtroom was happening too fast for him to keep up.

Ex. 6 (Stevens Dec.) ¶ 22.

During the competency proceedings, mitigation specialist Lindsay Vann noticed that Dylann "struggled to pay attention when there were two things going on at once. There were times when I saw Dylann getting distracted and look around the room when he heard the stenographer or someone else typing, David shuffling papers, or when his attorneys would whisper to each other about something." Ex. 9 (Vann Dec.) ¶ 16. Ms. Vann's impression was that "Dylann could not keep up with or recognize what was going on. He would not ask questions about what was happening, who was speaking next, or what his role was." Ex. 9 (Vann Dec.) ¶ 8.

The second day of the penalty phase trial includes an example apparent from the record in which Dylann was undoubtedly having difficulty when both the judge and standby counsel were talking to him at the same time. After a lengthy exchange between the prosecutor and the judge about the admission of Dylann's jailhouse statement, the judge asked Dylann for his response to the government's proposal—to which Dylann could only muster "I object to it." Tr. 01/05/17 at 384-87. The judge simultaneously noticed that defense counsel was trying to get Dylann's attention, advising Dylann: "Mr. Bruck wants to say something to you. Maybe you want to listen to him." Tr. 01/05/17 at 387.

132

Dylann's need for extra time to form responses as a result of his auditory and linguistic processing delays also hampered his capacity to mount a defense. As Dr. Lucker observed and Dr. Ouaou's testing confirmed, Dylann struggled to produce words under timed conditions and appeared to "have a problem pulling out the appropriate response from his brain as he is taking in information." Ex. 3 (Lucker Report) at 4; Ex. 2 (Ouaou Report) at 15. Indeed standby counsel Ms. Stevens recalled that "Dylann would take long pauses at the podium when Judge Gergel asked him a question. In one particular instance, Dylann stood at the podium for what seemed like forever when Judge Gergel asked him a question. He twirled his hair, stood quietly for an uncomfortably long time, and finally answered." Ex. 6 (Stevens Dec) ¶ 23. Dylann was "delayed in his responses" and "could not review notes or reports and listen to the judge talking at the same time." Ex. 9 (Vann Dec.) ¶ 16.

Dr. Fritz also noted instances during jury selection in which Dylann appeared unable to fully understand the nuances of discourse around particular issues, which she described as processing impairment. In one example, Dylann did not appear "able to follow the discourse between the Prosecutor and Judge Gergel" concerning a prospective juror who had indicated a fixed position on imposing the death penalty. Ex. 1 (Fritz Report) at 24 (referring to Tr. 11/28/16 at 123). In another example, Dr. Fritz observed that Dylann was "unable to understand the nuanced questioning following an incongruent response by a prospective juror." Ex. 1 (Fritz Report) at 25. After the court had questioned a prospective juror extensively about potentially inconsistent responses to question 31 on his questionnaire, the court asked the parties if they had any follow-up questions. Dylann responded by pointing out the juror's inconsistent responses, which they had just gone over with the juror. Tr. 11/29/16 at 84-85. In response, the court stated

"that is why I asked [the juror] that question. And I was satisfied that he had misread the question, as I had suspected." *Id.*

All of these examples are consistent with Dylann's self-assessment during his evaluation with Dr. Fritz. Dylann explained that "he has difficulties understanding what is being said when 'thinking in my own head at the same time that someone is speaking' or there is background noise. He indicated that his language processing abilities may be reduced in certain types of linguistic or social contexts (e.g. when he's feeling anxious or in a chaotic environment)." Ex. 1 (Fritz Report) at 6, 9. Even to outside observers, Dylann's impairments during trial were apparent. Meredith Childs was an intern with the South Carolina Commission of Indigent Defense Capital Trial Division during the time of Dylann's trial, and she sat through the whole trial. Ex. 20 (Childs Dec.) ¶ 6. Ms. Childs remembers that "when Dylann spoke in the courtroom, there was often a delay or something odd about his presentation. Dylann would pause, looking uncomfortable. He would look to David Bruck for guidance sometimes. He paused before responding to the judge." Ex. 20 (Childs Dec.) ¶¶ 31-32.

During closing arguments, Dylann addressed the jury for barely five minutes. Much of that time was taken up by silence, as "his pauses were longer than his sentences."[36]

Already struggling to keep up as a result of his auditory processing disorder, Dylann's capacity to conduct trial proceedings was severely impaired by his pragmatic communication deficits. Dr. Fritz opined that he was "simply unable to interrupt courtroom proceedings and direct the attention to himself." Ex. 1 (Fritz Report) at 25. This is consistent with the trial team's impressions. As one of the mitigation specialists on the team noticed, "When Dylann spoke, he

---

[36] *See* https://www.washingtonpost.com/opinions/dylann-roofs-last-words/2017/01/10/f90ac5d8-d784-11e6-b8b2-cb5164beba6b_story.html (last visited April 16, 2025).

was very quiet. As a result, the judge would sometimes miss his efforts to engage. The judge would skip over him and move along with the hearing. On several occasion[s], Dylann raised his hand to get the judge's attention, but when the judge did not respond, Dylann would put his hand down." Ex. 9 (Vann Dec.) ¶ 9. Local reporters observed that Dylann was "barely audible" during his brief closing arguments.[37]

Dylann was also afraid of the judge's reaction. Ms. Stevens recalled that Dylann "wanted to be able to say why he was objecting because he thought Judge Gergel would be disappointed in him and angry if he did not." Ex. 6 (Stevens Dec.) ¶ 22. Standby counsel Ms. Paavola similarly recalled that Dylann "told the team he was afraid to object because he didn't want Judge Gergel to get mad at him." Ex. 7 (Paavola Dec.) ¶ 18. Ms. Childs observed "Dylann seemed scared of the judge." Ex. 20 (Childs Dec.) ¶ 31.

Although the court made efforts to ensure that Dylann understood how to object and repeatedly assured him that an objection could stand alone and that he could request additional time if needed, "Mr. Roof did not go on to demonstrate proficient use of this method, as doing so would require the use of pragmatic communication skills he simply does not possess and most definitely cannot learn to use in the unfamiliar and extremely intense environment of a courtroom." Ex. 1 (Fritz Report) at 23. Although he may have wanted to object, he was "simply unable to interrupt courtroom proceedings and direct the attention to himself." Ex. 1 (Fritz Report) at 25.

Dylann's impairments were visible even when he wasn't attempting to participate in court. Dylann spent most of the time at trial staring at the desk and focusing on issues that were

---

[37] *See* https://www.washingtonpost.com/opinions/dylann-roofs-last-words/2017/01/10/f90ac5d8-d784-11e6-b8b2-cb5164beba6b_story.html (last visited April 16, 2025).

not relevant to the proceedings. As his third chair defense counsel Emily Paavola observed,

"During court proceedings, Dylann looked straight down most of the time. We tried telling him

to engage more with what was going on and explained how the jury would perceive him if he

only looked down, but he just didn't seem to be able to." Ex. 7 (Paavola Dec.) ¶ 20. Indeed,

during jury selection one juror noted that she thought Dylann appeared detached because the day

she came to court to report he "gazed down the whole time, and never looked up." Tr. 12/01/16

at 202. In their motion to determine Dylann's competency to proceed to the penalty phase, trial

counsel noted: "The defendant spent the majority of the guilt-innocence phase sitting

still and staring impassively down at the table, even during critical testimony and argument (a

fact on which the press and witnesses commented)." Dkt. No. 832 at 12-14.

> When Dr. Ouaou asked Dylann about the proceedings:

> He admitted that he felt anxious "during all of it" and was focusing on his cold feet. He wanted each day to be done and was "daydreaming constantly" explaining that his thoughts were consumed about having to be stripped searched every day upon returning to jail. He was afraid to make eye contact with people on the stand or during jury selection stating, "I never turned my head because I was afraid to make eye contact and start thinking about what they were thinking." He did not ask questions of jurors or witnesses at times during trial because of his anxiety. Mr. Roof admitted that during trial he was "daydreaming about what's going to happen or what's happened instead of what's going on in the moment and wasn't listening to the outside."

Ex. 2 (Ouaou Report) at 16.

> According to Dr. Ouaou, knowing now that Dylann has a significant impairment in his

ability to process verbal information, especially in a chaotic and stressful environment, this

behavior makes sense. "Daydreaming, anxiety and distractibility are expected responses for a

person unable to process the events occurring in the courtroom in a timely manner." Ex. 2

(Ouaou Report) at 16-17. Dylann's longstanding anxiety disorder would have compounded his

processing deficits. "Anxiety would both compound the auditory processing problems and be compounded by the auditory processing problems." Ex. 2 (Ouaou Report) at 17.

### iv. Dylann's limited participation during court proceedings was evidence of his impairments, not his capacity.

In finding Dylann competent to conduct court proceedings as his own lawyer, the court cited his "effective cross-examination" of Drs. Ballenger and Loftin at the competency hearing. *See* Dkt. No. 881 at 10-13, 17. There are several reasons why Dylann's performance at the competency hearing was not representative of his capacity to self-represent. First, although Dr. Fritz agrees with the court's assessment of Dylann's performance with these two witnesses, which occurred in a sealed courtroom, Dylann's communication skills are more functional in a 1:1 setting. Dr. Fritz cautions that "the skill of questioning a witness 1:1 when there is a clear indication of conversational turn is only one aspect of the interactive communication that must be employed for successful courtroom litigation." Ex. 1 (Fritz Report) at 20. Dr. Fritz identified many of the auditory processing and pragmatic language skills essential to self-representation, which include:

- Listening to juror responses, summarizing key elements, and forming follow-up questions in real time
- Presenting live argument to the Court on motion through incorporation of law, facts, new testimony, and Court rulings
- Maintaining appropriate facial expressions and body language to shape juror perception
- Changing verbal and nonverbal language to reflect adherence to emotional context
- Processing attorney questions and witness testimony in connected speech, determining the need for objections based on the law, interrupting Court proceedings to audibly object and take control of the floor, and answering potential follow-up questions in an adversarial environment.

Ex. 1 (Fritz Report) at 20-21. To the extent these tasks would be difficult for any non-lawyer; they are virtually impossible for someone with Dylann's APD and pragmatic skill impairments.

When it came time to conducting a defense during trial proceedings, he "floundered." Ex. 20 (Childs Dec.) ¶ 32.

Moreover, the competency hearing occurred in a sealed courtroom with fewer distractions. And Dylann had met both experts several times before, when they each evaluated him. As Dylann explained to Dr. Ballenger, "it would be extremely difficult to communicate comfortably in a setting where 20 people were watching (such as a courtroom with the jury present)," let alone a crowded and emotional courtroom during penalty phase proceedings. Ex. 1 (Fritz Report) at 21. "Mr. Roof's social anxiety and pragmatic challenges hinder him from even understanding how others might be comfortable in that setting," as he told Dr. Ballenger, "Of course not. I couldn't do that. Nobody can do that." Ex. 1 (Fritz Report) at 21-22 (quoting Tr. 11/21/16 at 27).[38]

The trial court rejected standby counsel's various attempts to intervene on Dylann's behalf, in part because of the court's perception that Dylann was "actively participating" at trial and capable of making necessary objections, simply because on occasion he had made them. *See, e.g.*, Tr. 11/29/16 at 106 (noting that Dylann appeared to be "actively participating in the voir

---

[38] Dr. Ballenger opined that Dylann's "discomfort" both in the courtroom and working with his attorneys was the result of his social anxiety disorder, but he opined that Dylann's continued experience in the courtroom would serve as a form of exposure therapy. Tr. 11/21/16 at 155. At the second competency hearing, Dr. Ballenger shared his observation that Dylann's anxiety in the courtroom had indeed improved with experience. The court cited Dr. Ballenger's assessment in his opinion denying the challenge to Dylann's competency. *See* Dkt No. 881 at 10. However, Dr. Ballenger did not know about Dylann's pragmatic language deficits or auditory processing disorder—a disorder that does not improve with exposure. Dr. Fritz disagreed with Dr. Ballenger's assessment because "as a speech-language pathologist," she "recogniz[es] that the social anxiety is compounded by severe pragmatic language performance deficits." Ex. 1 (Fritz Report) at 19. Moreover, Dr. Ballenger's view of exposure therapy was erroneous. Dr. Ouaou "would note that exposure therapy involves exposing a patient to very limited aspects of their fears gradually over a period of time in a safe setting, which is not akin to what Mr. Roof would experience in the trial setting." Ex. 2 (Ouaou Report) at 7.

dire process" because "[h]e has made motions," and received assistance from standby counsel prior to making those); Tr. 12/02/16 at 149-50 (disagreeing with Mr. Bruck that Dylann could not stand up and objected because Dylann had "stood up sometimes" and "shared with me whether he had an objection or not.")

Yet, when Dylann did advocate for himself, it was only when the judge asked him leading questions and scripted a simple response; when he became comfortable repeating a formulaic request; or "after his standby counsel initiate[d] the interaction on his behalf." Ex. 1 (Fritz Report) at 22.

In her review of jury selection proceedings, Dr. Fritz observed that Dylann often "demonstrated clear difficulty in formulating his intended question and relied on the Court to suggest a question specific" to the circumstances of a particular juror. *Id*. at 24. When prompted by the court for questions, "Mr. Roof repeatedly asked the same follow-up question to prospective jurors. Namely, he frequently requested that the judge ask whether the juror would be comfortable standing up for their own opinion if it varied from that of the group." *Id*. *See, e.g.*, Dkt. No. 832 at 12-13 (trial counsel observed that "[o]nly after becoming comfortable with a few formulaic requests was the defendant able to repeat them on his own.").

An example of the court scripting a response for Dylann came at the conclusion of the penalty phase, after the government rested. The court confirmed with Dylann that he did not intend to call any witnesses and did not wish to testify. The court then instructed Dylann on what to say: "I'm going to bring the jury in, and I'm going to ask – I'm going to call the defense case, and I think you just simply stand up and say, 'The defense rests.' Okay?" Tr. 01/09/17 at 707-08. Dylann did as he was told.

It is also important to note that although the judge maintained his own impression that Dylann was performing capably in the court room, he admittedly was not observing Dylann on a regular basis. On the second day of the penalty phase trial, the court responded to a defense motion requesting more breaks to account for the emotional nature of the testimony: "I do not watch everybody in this courtroom. I mostly watch the witness and my jurors." 01/05/16 Tr. at 332. In other words, the court, understandably, was not watching Dylann or standby counsel while witnesses were testifying. Indeed, the trial team observed that "the judge would sometimes miss his efforts to engage . . . skip over him and move along with the hearing." Ex. 9 (Vann Dec.) ¶ 9. As a result, the court likely missed much of Dylann's difficulty participating and communicating with standby counsel.

### v. Dylann's relative intelligence obscured his significant impairments.

Dylann's "high IQ" obscured the very real impairments that directly related to his capacity to represent himself. As Dr. Fritz summarized, "Mr. Roof is an intelligent man who simply requires significantly increased processing time to comprehend language, especially when information is presented in connected speech." Ex.1 (Fritz Report) at 8. Dylann's "above average semantic knowledge and grammatical skills" does not account for the fact that "his ability to use language functionally and meaningfully in social contexts is profoundly impaired." Ex. 1 (Fritz Report) at 18.

The court's perception of Dylann's performance at trial was based on incomplete information as a result of trial counsel's failure to adequately investigate Dylann's impairments. Unaware of Dylann's underlying impairments in these critical areas, Mr. Bruck could not adequately inform the court. Mr. Bruck "tried to convey to the Court the ways in which Dylann's delusions, his rigidity, and his anxiety prevented" him from "see[ing], "hear[ing], and digest[ing] the evidence" and "communicat[ing] with counsel." Ex. 5 (Bruck Dec.) ¶ 40.

140

But I failed to explain the neuropsychological impairments that were underlying this. I failed to understand that his processing ability and auditory processing were preventing him from participating in the courtroom proceedings. I knew that Dylann was flailing, but I was unable to convey that to the Court. Dylann's high verbal IQ allowed him to mask many of these problems, but it was clear when we spoke to him after court that he was unable to convey to us even what had happened in the courtroom. It was abundantly clear that Dylann's brain did not work properly; it just jumps out at you. But we never were able to adequately convey that to the Court.

*Id*.

**F. Having failed to conduct the necessary investigation, trial counsel did not raise arguments about Dylann Roof's capacity to represent himself under *Indiana v. Edwards* until the second competency hearing.**

**i. First competency hearing**

Trial Counsel moved for a hearing on Dylann's competency to proceed to trial on November 7, 2016, soon after Dylann sent a letter to the prosecution accusing his defense team of lying to him in order to convince him to see mental health experts. *See* Claim 5. The court held a competency hearing on November 21-22, 2016, directing the parties to focus on the two-part competency standard under *Dusky v. United States*, 362 U.S. 402 (1960): (1) whether Dylann understood the charges and legal proceedings and (2) whether Dylann could rationally assist counsel in his defense.

Counsel were aware of the possibility that Dylann would seek to discharge them and represent himself leading up to the hearing. *See* Dkt. No. 586 at 6. However, they did not ask their experts to address Dylann's skill deficits in the context of *Indiana v. Edwards*, which held that courts may "insist upon representation by counsel for those competent enough to stand trial under *Dusky* but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." 554 U.S. at 178. David Bruck recalls that "[d]uring the November (or "first") competency hearing, we had insisted that Dylann was not competent to stand trial. But I did not present evidence or argue to the court at that point that

141

Dylann was not able to self-represent." Ex. 5 (Bruck Dec.) ¶ 37; *see also* Ex. 13 (Maddox Dec.) ¶ 26 ("[The team] did not focus on Dylann's skill deficits at all.").

      Dylann's trial team was "shocked by how quickly Judge Gergel moved to hold the competency proceedings." Ex. 12 (Norris Dec.) ¶ 19. They were unprepared for the competency hearing, which the court scheduled within two weeks of the filing of the motion.[39] *See* Claim 9. Defense experts who had evaluated Dylann in the context of a penalty phase mitigation case were asked on short notice to opine on his competency to proceed to trial. One of defense counsel's most important penalty phase witnesses, Dr. Rachel Loftin, was out of the country during the competency hearing and unable to testify. In any case she would have been unprepared to testify about the "issue with such little time to prepare." Ex. 14 (Loftin Dec.) ¶ 14.[40] An autism expert that had never testified and never met Dylann testified in her stead, as a very poor substitute, as she knew nothing about Dylann at all. Ex. 19 (Carpenter Dec.). Another critical expert mitigation witness, psychiatrist Dr. Donna Schwartz Maddox, was forced to rush back from the funeral of a close relative in New York to testify at the competency hearing, and she "was inadequately prepared to testify at the hearing." Ex. 13 (Maddox Dec.) ¶¶ 21, 25.

---

[39] As lawyer Kim Stevens explained,

> The competency hearing happened so quickly. . . . It wasn't a hearing for which we had planned and developed evidence. We thought if competency came up, we would have more time to prepare for a hearing. The quick timeline was sprung on us. We weren't ready. We did what we could, but in our rush, we missed issues. We focused on Dylann's psychosis and autism, and we didn't adequately address his deficits that impaired his ability to represent himself.

Ex. 6 (Stevens Dec.) ¶ 14.

[40] Further, Dr. Loftin "had never testified about competency to stand trial or competency to self-represent in any case before this." Ex. 14 (Loftin Dec.) ¶ 14. Dylann's case was one of the first forensic cases she had worked on. *Id.* ¶ 15.

At the hearing, court-appointed psychiatrist Dr. James Ballenger and Dr. Schwartz Maddox confirmed Dylann's longstanding anxiety diagnosis. Dr. Ballenger testified that Dylann exhibited signs of psychosis (including somatic delusions) but concluded that he did not have a "broad" psychotic disorder that rendered him incompetent to stand trial. Tr. 11/21/16 at 138. Dr. Ballenger diagnosed Dylann with schizoid-personality disorder, social-anxiety disorder, mixed-substance abuse disorder, possible depression, and possible autism-spectrum disorder. Tr. 11/21/16 at 23-24; Dkt. No. 648 (Ballenger Report).

Dr. Schwartz Maddox additionally diagnosed Dylann with autism spectrum disorder and testified that he exhibited symptoms of a psychotic spectrum disorder that interfered with his ability to rationally assist counsel. Tr. 11/22/16 at 68.

During her many interactions with Dylann, Dr. Schwartz Maddox observed several cognitive deficits that were directly related to Dylann's functional capacity to conduct trial proceedings on his own. But she was not asked to address these issues at the competency hearing. She now explains:

> While I testified truthfully that I did not think Dylann was competent, the trial team did not ask me whether Dylann's cognitive deficits contributed to his incompetence. They were very focused on psychosis. They did not focus on Dylann's skill deficits at all. While Dr. Moberg probably would have been better equipped to explain this, I understood based on his test results and my own observations that there were cognitive impairments. These impairments were masked by his high verbal intelligence, but they were very clearly present. The team did not discuss the Edwards standard for self-representation with me until after this first competency hearing occurred.

> I was certainly aware that Dylann needed more time to process things than is typical. I understood that Dylann had difficulty with give and take conversational turn taking. He was not able to interject at appropriate times. I understood that Dylann had a tendency to get stuck on small things and not see the bigger picture. I understood that Dylann would be under stress at the time of trial and his ability to stay focused and on task would be more compromised than in the conditions in which I saw him. I was not asked about these things.

Ex.13 (Maddox Dec.) ¶¶ 26-27. Counsel presented no evidence concerning Dylann's language and communication skill deficits that would have been relevant to his capacity for self-representation.

After the two-day hearing, the trial court found Dylann competent to proceed to trial. Less than a week after the competency hearing, on November 27, 2016, Dylann filed a motion to discharge counsel and represent himself. Dkt No. 666. During an in-chambers conference the next day, the trial court reflected on the standard for adjudicating a defendant's motion to self-represent: "my thought about his wisdom, or lack of wisdom, in deciding to self-represent is not the issue, the issue is his capacity to represent under [*Indiana v*.] *Edwards*." Tr. 11/28/16 at 3 (Dkt. No. 756). The court then summarily concluded: "I watched him for two hearings. He has the capacity to represent himself." Tr. 11/28/16 at 3. The court determined that the next step was to have a *Faretta* hearing "and he's going to make his decision." *Id*.

When the court asked for defense counsel's response, Mr. Bruck stated:

It is our duty to advocate for his constitutional right. This is a decision personal to him. Our position, of course, is he is not competent to stand trial.

Tr. 11/28/16 at 4. Defense counsel made no argument that Dylann lacked the capacity to represent himself under *Indiana v. Edwards* even if he were deemed competent to proceed to trial with counsel.

## ii. *Faretta* Hearing

During the *Faretta* hearing, the court advised Dylann of the benefits of having experienced and skilled capital counsel and the possibility that his defense would suffer as a result of any waiver of counsel. The court asked Dylann if he felt he had the capacity to represent himself: "Do you feel you can make as-needed motions or objections, ask questions, make arguments? You feel you have the capacity to do that if you need to do that?" Tr. 11/28/16 at 6-8

144

(Dkt. No. 919). Dylann responded, "Yes." Tr 11/28/16 at 8. Finding Dylann's waiver knowing and voluntary, the court granted Dylann's motion and appointed previous defense counsel as standby counsel. Tr. 11/28/16 at 9 (Dkt. No. 919). Defense counsel did not object. Ex. 5 (Bruck Dec.) ¶ 36.

In an opinion memorializing the decision, the judge noted that he had "inquired into Defendant's mental capacity to represent himself" under *Indiana v. Edwards* and relied on two things in finding him competent for self-representation purposes: (1) Dylann's own belief, in a response to the court's questions at the *Faretta* hearing, that he "has the capacity to represent himself, including the capacity to make motions, objections, and arguments in open court," as well as (2) the judge's "own observations of Defendant's courtroom interactions over several weeks." Dkt. No. 691 at 9; *see also* Dkt. No. 691 at 4-5.[41] The judge cited these observations at the November 22, 2016, competency hearing, in which he described Dylann as "cogent and articulate" when he addressed the court on November 7, 2016, and observed that "[t]his defendant has an extremely high IQ, there is not a cognitive impairment, and I have observed him communicate with his lawyers." Dkt. No. 691 at 9.

In drawing these conclusions about Dylann's competency under *Edwards*, the court did not have before it evidence of Dylann's communication and language disorders because trial counsel had not investigated the issue. The court thus did not know that despite Dylann's relative intelligence, he did have a cognitive impairment rendering him unable to adequately process the verbal information presented at trial. Instead, in finding Dylann competent to self-represent, the

---

[41] The court thus framed its *Faretta* decision around the Supreme Court's "recent[] modifi[cation] of [the *Godinez*] rule" in *Indiana v. Edwards*, even though counsel made no arguments that Dylann was incompetent to represent himself under *Edwards*. Dkt. No. 691 at 4-5.

court relied on an assessment of capacity from the very person whose capacity was at issue as well as its own uninformed observations.

### iii. Second competency hearing

At the conclusion of the guilt phase, standby counsel filed a motion challenging Dylann's current competency to proceed to trial. This time, after having watched Dylann struggle to represent himself during jury selection, standby counsel explicitly argued that Dylann was not capable of representing himself under *Indiana v. Edwards*. *See* Dkt. No. 832. In support of their motion, standby counsel included reports from defense mental health evaluators, Drs. Rachel Loftin, Paul Moberg, and Donna Schwartz Maddox, stating that, "These experts have diagnosed the defendant with autism spectrum disorder, other specified schizophrenia spectrum disorder and other psychotic disorder (attenuated psychosis), and other specified anxiety disorder, as well as other conditions." Dkt. No. 832 at 2.

However, having not obtained a report from a speech language pathologist, they did not include information about Dylann's auditory processing disorder or pragmatic communication deficits, which were exacerbated by his anxiety disorder.

The motion included examples of Dylann's behavior during the trial proceedings which counsel believed represented symptoms of his autism and mental illness that prevented him from participating in his defense and presenting his case. Dkt. No. 832 at 11-14. Trial counsel observed, for example, that "When we wrote him notes, he frequently ignored them or misinterpreted them;" "When we spoke to him outside of court, he sometimes did not remember what had occurred in court;" Dylann's "extreme anxiety, and fear of displeasing the Court or being required to answer the Court's questions, made it impossible for him to follow most of standby counsel's advice and "[o]nly after becoming comfortable with a few formulaic requests" was Dylann "able to repeat them on his own." Dkt. No. 832 at 12-14.

Having not consulted with a speech language pathologist, counsel were unaware that many of their observations reflected the fact that Dylann could not follow the trial proceedings and could not participate in his defense as a result of language and processing disorders. Instead they could share only broad statements about Dylann's behavior without fully understanding his impairments.

On the morning of the competency hearing, standby counsel filed another motion arguing that the court should reappoint counsel "because his developmental disability and mental illness are sufficiently severe as to render him incompetent to conduct trial proceedings by himself." Dkt. No. 841 at 1. The motion further argued that the Eighth Amendment and due process required reappointment of counsel under *Indiana v. Edwards* for a mentally ill or disabled defendant at a capital sentencing trial. Dkt. No. 841. Counsel still raised no arguments concerning Dylann's language and communication skill deficits that prevented him from presenting his own defense.

The court limited the second competency hearing to "any material change" since Dylann was last deemed competent on November 22, 2016. The court instructed the parties that "[n]o witness is going to be talking about something before that date," thus allowing counsel's failures at the first hearing to cripple the second as well. Tr. 01/02/17 at 8-9 (Dkt. No. 880).

Dr. Loftin was now available and standby counsel sought her testimony on the impact of autism on competency; but because she had not testified at the initial competency hearing, the court denied the request. In urging the court to consider allowing Dr. Loftin's testimony, Mr. Bruck told the court, "I also want to flag a new issue, which is the *Indiana vs. Edwards* question," which Dr. Loftin could speak to. The court interjected that it had "considered the Indiana versus Edwards issue at the time I allowed the defendant to self-represent." Tr. 01/02/17

147

at 15 (Dkt. No. 880). But "from the information I have thus far," the court did not believe Dylann

fit within the *Indiana v. Edwards* exception. Tr. 01/02/17 at 16 (Dkt. No. 880).

Because it believed Dr. Loftin "had every opportunity" to testify at the initial competency

hearing,[42] the court would not allow her to testify generally about Dylann's competency at the

second hearing. Tr. 01/02/17 at 16 (Dkt. No. 880). Dr. Loftin's testimony was thus limited to her

impressions of two videos of Dylann visiting with his family, which occurred after the

November 22, 2016, competency ruling. There was no testimony about Dylann's skill deficits as

they related to his competency to self-represent.

The court again found Dylann competent to proceed to trial and competent to represent

himself.

### G. As a result of counsel's failures, the court was deprived of critical information in assessing Dylann's capacity to represent himself and a reasonable probability exists that had the court heard evidence of Dylann's Auditory Processing Disorder and pragmatic communication deficits, it would have found Dylann not competent to self-represent under *Indiana v. Edwards*.

As a corollary to the Sixth Amendment right to the assistance of counsel, the Constitution

also implicitly protects an accused's right to represent himself at trial. *Faretta v. California*, 422

U.S. 806, 807, 814 (1975). The right of self-representation is not unlimited. The Constitution

permits a court to limit a defendant's self-representation right by insisting upon counsel "on the

ground that the defendant lacks the mental capacity to conduct his trial defense unless

represented." *Edwards*, 554 U.S. at 174.

A defendant who might be able to meet the *Dusky* standard for mental competence—"for

he will be able to work with counsel at trial"—may "at the same time . . . be unable to carry out

the basic tasks needed to present his own defense without the help of counsel." *Id*. at 175-76.

---

[42] She had been out of the country when the competency hearing was scheduled. Ex. 14 (Loftin Dec.) ¶ 14; *see* Claim 9.

*Indiana v. Edwards* thus held that courts may "insist upon representation by counsel for those competent enough to stand trial under *Dusky* but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." *Id*. at 178; *see id.* at 177 ("given the different capacities needed to proceed to trial without counsel, there is little reason to believe that *Dusky* alone is sufficient.")

Indeed, "[t]he Supreme Court has disavowed 'the use of a single mental competency standard for deciding both (1) whether a defendant who is represented by counsel can proceed to trial and (2) whether a defendant who goes to trial must be permitted to represent himself.'" *United States v. Barefoot*, 754 F.3d 226, 233-34 (4th Cir. 2014) (quoting *Edwards*, 554 U.S. at 175). Although *Edwards* does not compel a trial court to deny self-representation in certain situations, the Fourth Circuit has confirmed that "after *Edwards*, at least one relevant consideration for a district court in determining" whether to "insist on counsel" is "whether a defendant who is otherwise able to satisfy the competence standard may nevertheless be 'unable to carry out the basic tasks needed to present his own defense without the help of counsel.'" *United States v. Bernard*, 708 F.3d 583, 589-90 (4th Cir. 2013) (quoting *Edwards*, 554 U.S. at 175).

The Supreme Court recognized in *Indiana v. Edwards* that mental illness is severe in the context of capacity to self-represent if symptoms of the mental illness "'impair the defendant's ability to play the significantly expanded role required for self-representation even if he can play the lesser role of represented defendant.'" *Edwards*, 554 U.S. at 176 (quoting Amicus Brief for the American Psychiatric Association at 26). As endorsed by the Supreme Court, the symptoms relevant to the role of self-representation at trial include "'impaired expressive abilities, anxiety, and other common symptoms of severe mental illness.'" *Id*.

In Dylann's case, the court applied *Indiana v. Edwards* to its decisions on Dylann's

motions to represent himself. Even though counsel failed to make any *Edwards* arguments—or

investigate and present available, essential evidence—when Dylann first invoked his right to

self-representation, the court framed its initial decision around that case.[43] After the conclusion

of the guilt phase trial, the court denied standby counsel's late request to appoint counsel under

*Indiana v. Edwards* because "*the evidence before the Court* conclusively established Defendant

had no mental illness *leaving him unable to carry out the basic tasks of self-representation*." Dkt.

No. 881 at 7 (emphasis added).

But the court was deprived of critical information that would have informed its

assessment of Dylann's ability to "carry out the basic tasks of self-representation." *Edwards*, 554

U.S. at 175-76. Having failed to follow their experts' recommendation to consult with a speech

language pathologist, the trial team was unaware of Dylann's profound deficits and were thus

unable to convey this information to the court.

Lead standby counsel David Bruck recognizes that the impairments he saw in Dylann

could very well be explained by the speech-language disorders, which he did not understand at

the time of trial and thus could not convey to the court:

> I understand that the Court made its ruling that Dylann was competent to self-
> represent based on the Court's own observations. But, due to the trial team's
> failures, the Court did not have crucial information about Dylann's impairments
> that impacted his ability to represent himself. Dylann could answer direct questions
> posed to him by the Court in sealed court proceedings. However, this is not the
> same as the ability to stand, interrupt proceedings, and object. This is not the same

---

[43] In response to Dylann's motion to represent himself and in advance of the *Faretta* hearing, the court reflected that the issue was not whether the court thought it a wise choice for Dylann to make, "the issue is his capacity to represent under *Edwards*." Tr. 11/28/16 at 3 (Dkt. No. 756). At the second competency hearing, the trial court noted that it had applied *Indiana v. Edwards* in assessing Dylann's motion to self-represent. Tr. 01/02/17 at 15 (Dkt. No. 880) ("Of course, I considered the Indiana versus Edwards issue at the time I allowed the defendant to self-represent, and I issued an order to that effect.").

as being able to receive advice from standby counsel in the middle of ongoing proceedings, and to understand and relay to the Court the relevant arguments. This is not the same as being able to focus in a courtroom full of jurors, media, and spectators.

Ex. 5 (Bruck Dec.) ¶ 37.

When Dylann made it known to the court that he was unable to keep up with the pace of jury selection process, the court responded, "I'm not going to slow down just for some abstract reason." Tr. 11/30/16 at 121. However, as Dr. Fritz notes, "At the time, His Honor was understandably unaware that Mr. Roof's need for increased processing time was due to an organic auditory processing disorder rather than an abstract preference." Ex. 1 (Fritz Report) at 24. Indeed, the court was also unaware—as a result of counsel's ineffectiveness—that Dylann's auditory processing disorder and pragmatic communication deficits could not be cured by the assurances that Mr. Bruck sought from the court on Dylann's behalf.

Had trial counsel presented expert evidence of Dylann's APD and pragmatic communication deficits, combined with his anxiety disorder, to challenge Dylann's capacity to represent himself under *Indiana v. Edwards*, there is a reasonable probability the court would have insisted that Dylann proceed to trial with counsel. A reasonable probability exists that but for counsel's errors the court would have appreciated that although Dylann has many strengths, his particular impairments, including "impaired expressive abilities," *Edwards*, 554 U.S. at 176, rendered him incompetent to represent himself at a capital trial.

**CLAIM 8:    The complete lack of mitigation evidence during the penalty phase violated Dylann's rights under the Fifth, Sixth, And Eighth Amendments to the United States Constitution.**

Dylann was forced into a false premise: consent to introducing evidence of autism or introduce no mitigation evidence at all, which would essentially ensure a death sentence. While it is true that a diagnosis of autism may be mitigating, it is by no means the only mitigating

151

evidence available. This much was clear to trial counsel, but rather than adjust their representation in order to provide effective assistance of counsel as required by the Sixth Amendment, they forced Dylann into self-representation. Trial counsel's decisions led to the jury not hearing *any* mitigation evidence—concluding in a sentence that surprised no one.

As discussed above, satisfying *Strickland*'s two-part standard for ineffective assistance of counsel requires showing deficient performance and prejudice. *Strickland*, 466 U.S. at 688, 694. Effectively representing a client facing the death penalty requires an extensive investigation and presentation of "*all reasonably available* mitigating evidence." *Wiggins*, 539 U.S. at 524 (quoting 1989 ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4 1(C)). Investigating "all reasonably available mitigating evidence" is incompatible with "abandon[ing] the[] investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Wiggins*, 539 U.S. at 524. "[T]he most basic investigation of [a capital defendant's] background" entails interviewing "teachers, foster parents, psychiatrists, psychologists or anyone else who may have examined or spent time with [the defendant] during his upbringing." *Stankewitz v. Wong*, 698 F.3d 1163, 1166 (9th Cir. 2012); *see also Sears v. Upton*, 561 U. S. 945, 948 & n.3 (2010); *Porter v. McCollum*, 558 U. S. 30, 41 (2009).

The constitutional requirement that a death sentence be only reserved for the "worst of the worst" demands that any sentence imposed in a capital case must be a "reasoned moral response to the defendant's background, character, and crime." *Allen v. Stephan*, 42 F. 4th 223, 247 (4th Cir. 2022) (quotations omitted). Satisfying this obligation means "the decisionmaker *must* be presented with evidence that permits an *informed sentencing choice*—specifically, the evidence must speak to the crime committed and the specific individual who committed it." *Id*.

(emphasis added). It is axiomatic that in a penalty phase proceeding, as the one Dylann underwent, where the jury heard overwhelming aggravating evidence about the crime and no information about the individual who committed it, this requirement has clearly not been met. This was the result of trial counsel's ineffectiveness.

Unsurprisingly, courts have taken a broad view of what is considered mitigating evidence. In addition to those listed in 18 U.S.C. § 3592, the Supreme Court has found several additional mitigating factors relevant to capital sentencing. *See, e.g.*, *Johnson v. Texas*, 509 U.S. 350, 367-68 (1993) (lack of maturity and underdeveloped sense of responsibility); *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982) (youth and susceptibility to influence).

One well established mitigating factor is evidence that a "defendant would not pose a danger" if sentenced to something less than death. *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986); *see also Lawlor v. Zook*, 909 F. 3d 614, 628 (4th Cir. 2018) ("It is . . . clearly established that the sentencing body should be presented with all possible relevant information to enable it to make a prediction about a defendant's probable conduct in prison.").

Dylann did not want a death sentence, but he also did not want evidence of autism placed on full display for the whole world to see. *See* Ex. 10 (Pennington Dec.) ¶ 17 ("Dylann did not want to get the death penalty; he wanted to live"); Ex. 7 (Paavola Dec.) ¶ 9 ("It wasn't that Dylann *wanted* to represent himself; he was just doing it because he didn't want to be labeled as autistic or be labeled as having something wrong with him."). Kim Stevens and other lawyers felt confident from their meetings with Dylann that he was open to some types of mitigation, Ex. 6 (Stevens Dec.) ¶ 31, but no one ever had a discussion with Dylann after the breakdown in the relationship to see if he what he would allow. Instead, the court and Mr. Bruck assumed he would not allow mitigation. Tr. 11/07/16 at 32 (Dkt. No. 556).

153

The court said to counsel outside of the hearing of Dylann, "I don't know if he's aware you also want to talk about depression or psychosis. I mean, he didn't mention it to me. He *probably* won't be crazy about those defenses either." *Id.* (emphasis added). Mr. Bruck responded, "He probably- - he probably won't." *Id.* Probably is not good enough. It was incumbent on counsel to ask Dylann what he would allow. Of course, this was further complicated by the lack of trust that had developed in the relationship due to trial counsel's lack of candor. Unfortunately, because of the ineffectiveness of his trial counsel, Dylann was under the false impression that he had no other option but to accept autism as a defense presentation or to represent himself. The reality is that there was substantial mitigating information available to trial counsel that did not involve autism. Instead of electing to present the alternative mitigating information, which was clearly the only effective route given the circumstances, they backed Dylann into a corner.

The trial team understood what was at stake with this course of action. At least one attorney—Kimberly Stevens—was convinced that the team should have continued to represent Dylann and present mitigation evidence that did not include autism. *See* Ex. 6 (Stevens Dec.) ¶¶ 31-32. Dylann would have accepted this and in fact communicated as much to the trial team. *See id*. Dylann had told Ms. Stevens that he would let her put on evidence about psychosis and let her tell his life story. *Id.* The trial team, however, with "roughly 80 witnesses that could have testified and developed substantial mitigation," decided that no mitigation was a better alternative. *Id*. Incredibly, when the issue of continuing to represent Dylann without presenting mental health mitigation was broached, lead counsel, David Bruck, "refused to consider" it and simply would "not hear of it." Ex. 5 (Bruck Dec.) ¶ 49.

"While a criminal trial is not a game in which the participants are expected to enter the

ring with a near match in skills, neither is it a sacrifice of unarmed prisoners to gladiators."
*Cronic*, 466 U.S. at 657 (quotation and citation omitted). Dylann, a 22-year-old with a General
Education Development (GED) certification and significant communication and language
impairments, including an auditory processing disorder, "was thrown unarmed into the arena to
face the gladiators without benefit of the assistance of counsel." *United States v. Ragin*, 820 F.3d
609, 624 (4th Cir. 2016). Dylann was completely unprepared for the daunting task of
representing himself during the penalty phase. Indeed, many *trained attorneys* who do not have
Dylann's impairments are unequipped to represent an individual charged with capital murder.[44]
Accordingly, because of trial counsel's ineffective assistance, this "was not a confrontation
between adversaries in which any reasonable person can have confidence." *Id*.

## A. Dylann did not pose a risk of future dangerousness.

Prior to trial, Dylann spent 18 months at the Al Cannon Detention Center. Throughout
that time, Dylann was a model inmate. He was never violent or disruptive. *See* Ex. 54 (Complete
Inmate File CDC). Indeed, Lisa Bloodworth, an employee with the detention center reported to
his trial team that Dylann had not been a disciplinary problem at all. Ex. 53 (Memo of
Investigation 09/07/15) at 3. Other employees noted Dylann's friendly and appreciative
demeanor. Ex. 51 (McPherson 302) at 1. When Dylann was in his cell, he was usually sitting and
reading. Ex. 41 (Ireland Dec.) ¶ 4.

Although Dylann was not hostile towards anyone at the jail, he was on the receiving end

---

[44] For example, 18 U.S.C. § 3005 requires the appointment of two attorneys, at least one
of them "learned in the law applicable in capital cases," in capital eligible cases even if the death
penalty is not sought. *United States v. Boone*, 245 F.3d 352 (4th Cir. 2001). Learned counsel
appointed in federal capital cases under 18 U.S.C. § 3005 "should have distinguished prior
experience in the trial, appeal, or post-conviction review of federal death penalty cases, or
distinguished prior experience in state death penalty trials, appeals, or post-conviction review
that, in combination with co-counsel, will assure high-quality representation." 7A Guide to
Judiciary Policy § 620.30(b)(2).

of much hostility. *Id*. ¶ 3. Inmates that walked by Dylann's cell would repeatedly spit on his door. Ex. 93 (Bixby Dec.) ¶ 8; Ex. 50 (Bixby 302) at 2. He was also attacked while at the detention center. A subsequent investigation found the other inmate to be the aggressor. Ex. 105 (Incident Report, 08/18/16). Dylann never sought to retaliate for any of this aggression towards him.

In addition to the witnesses and evidence that could have attested to Dylann's model behavior at the detention center, trial counsel had access to an expert witness, Dr. James Austin, who could explain why Dylann's past behavior in combination with other factors demonstrated that Dylann could indeed be confined safely if sentenced to life without the possibility of release. The expert could have explained to the jury that given Dylann's notoriety, youth, and physical attributes, he would require severely restrictive confinement—largely for his own safety. His interactions with the outside world would also be restricted. Dr. Austin would have told the jury that based on several studies, "people like [Dylann] with [a] limited prior record but serving a lengthy prison term for an exceptionally violent crime typically pose little if any threat to staff and other prisoners." Ex. 21 (Austin Aff.) at 2. This information was critical for the jury to hear.[45] Although Dylann did generally submit his lack of future danger as potential mitigators, there was absolutely no evidence to support any of it. That lack of corroboration allowed the

---

[45] In fact, two mitigating factors related to this type of evidence were presented for the jury's consideration. Not a single juror found that either factor was present:

8.  I/we members of the jury find by a preponderance of the evidence that, given his personal characteristics and record, the Defendant poses no significant risk of violence to other inmates or prison staff if imprisoned for life.

    Number of Jurors who so found:  ____

9.  I/we members of the jury find by a preponderance of the evidence that, given his personal characteristics and record, the Defendant can be safely confined if sentenced to life imprisonment.

    Number of Jurors who so found:  ____

Dkt. No. 871

government to turn his mitigating information into aggravators.

Teresa Norris, an attorney with Dylann's state trial team, interviewed many inmates and staff from the detention center. Ex. 12 (Norris Dec.) ¶ 30. Dylann did not try to prevent Ms. Norris from conducting her investigation. *Id*. One thing was clear from Ms. Norris' interviews: Dylann was "very adaptive to confinement, which is one of the most crucial factors in a capital penalty phase. Adaptability to confinement is essential to making a case for life to the jury." *Id*. ¶ 33. Ms. Norris made sure this information was shared with the federal trial team. *Id*. ¶ 31. Dr. Austin, however, never received this information. Ex. 21 (Austin Dec.) at 2. The jury never heard about Dylann's model behavior in jail—not through the staff, inmates, or expert witness.

Ms. Norris also interviewed Amy Cradock, the mental health supervisor at the jail. Ex. 49 (Cradock Interview, 07/25/16) at 1. Ms. Cradock stated that Dylann was "neat and orderly" and read a lot. *Id*. She also explained that leading up to trial Dylann requested anti-depressant medication. *Id*.

Expert testimony could have shared with the jury that past positive behavior in jail is the best predictor for positive behavior in prison going forward. Ex. 21 (Austin Dec.) at 1. Further, an expert could have testified that based on his prior criminal record and his positive adaption to jail, he was unlikely to pose any significant threat to prison officers or inmates in the future. *Id*. at 2.

Had trial counsel proceeded with effectively discharging their duty in representing Dylann, he would have allowed this important evidence to be presented to the jury.

**B. Many witnesses were available to testify to Dylann's passive demeanor, good behavior, increasing isolation in his youth, and that he was loved by many.**

Not only did trial counsel have evidence of Dylann's good behavior during his pretrial incarceration, they also had access to a wealth of information about who Dylann was as a human

being and what kind of person he was growing up. From family to childhood friends to teachers, there are common themes that run through their memories of Dylann: he was a quiet and kind person who cared about others.

Importantly, trial counsel had access to one of the most important historians of Dylann's life: his mother, Amelia (Amy) Roof. Ms. Roof could have detailed her son's life for the jury and talked about everything that made her proud, happy, or sad about his life. She could have testified about the moment she found out she was pregnant with Dylann and the excitement this brought her. Ex. 38 (Roof Dec.) ¶ 3. Ms. Roof could have told the jury how Dylann, as a child, would say he loved her three times and as a result she had to kiss him three times every night. *Id.* ¶ 4. At just under five feet tall, the jury would have seen this tiny woman and her enormous love for her son. Ms. Roof would have told the jury that although she was not a perfect mother, she absolutely loved Dylann. The jury could have also heard that Dylann loved fishing and, as a child, wanted to be like his father. *Id.* ¶¶ 5, 7. Her love would have been clear when she described how she loved to hear him play the piano despite Dylann never having the benefit of formal lessons. *Id.* ¶ 22.

Ms. Roof would have described Dylann's love for animals, and shared pictures of him with his pets. *Id.* ¶¶ 8, 21. She also would have shared that he loved his grandparents, Joe and Lucy Roof, who played with him and took him to church. *Id.* ¶ 9. The jury could have also learned that Dylann had one very dear friend, Jack Chandler, who tragically died as a teenager. *Id.* ¶¶ 10-11.

Of course, Ms. Roof would have also expressed how much she wants her son to live and her strong belief that he is worthy of life. There is little doubt that a mother's plea for her son's life is powerful testimony that resonates with juries. Even this, Dylann was denied.

Dylann's grandfather, Joe, "would have [also] been an extremely credible witness." Ex. 9 (Vann Dec.) ¶ 21; Ex. 7 (Paavola Dec.) ¶ 10. He was "salt of the earth." Ex. 16 (Andrews Dec.) ¶ 10. Although Joe has, sadly, since passed away, he was alive at the time of Dylann's trial and would have testified in the penalty phase. Ex. 38 (Roof Dec.) ¶ 28. Dylann's grandfather "truly loved Dylann, was thoughtful, and . . . was easy to empathize with." Ex. 7 (Paavola Dec.) ¶ 10. He could have told the jury how much he cared for Dylann and how he loved spending time with him—particularly taking him to one of his favorite restaurants, Mr. Bunky's, for chicken strips. Ex. 9 (Vann Dec.) ¶ 20. Dylann's grandfather was also a respected member of the Columbia, South Carolina Bar and was known as a progressive and friendly attorney. Ex. 5 (Bruck Dec.) ¶ 8; Ex. 39 (Livingston Dec.) ¶ 5. Given "how sincere he was and how much [he] genuinely loved Dylann," Joe could have convinced the jury to spare Dylann's life. Ex. 7 (Paavola Dec.) ¶ 10.

Similarly, Dylann's grandmother, Lucy Roof, "also would have made a compelling penalty phase witness, testifying about her love for him." Ex. 9 (Vann Dec.) ¶ 22. Lucy could have described babysitting Dylann when he was little and playing with playdough with him. Ex. 38 (Roof Dec.) ¶ 9. She could have even shared her scrapbook with the jury:






`

Unfortunately, Lucy Roof is now in very poor health and unable to make a declaration of her own. Ex. 38 (Roof Dec.) ¶ 28; Ex. 16 (Andrews Dec.) ¶ 10. At the time of trial, she would have testified for her beloved grandson in order to save his life. Ex. 38 (Roof Dec.) ¶ 28.

Everyone loved Joe and Lucy—"they were the sweetest people." Ex. 97 (Forsell Dec.) ¶ 4. In turn, their love for Dylann would have carried weight with the jury.

Many others cared for Dylann as well and would have been able to tell the story of his life. The following quotes are but a mere sample of what was available to trial counsel and what could have been presented to the jury about who Dylann Roof was:

Dylann was not a "typical" child. Ex. 100 (Sullivan Dec.) ¶ 9. Three-year-old Dylann sat on the couch a lot but "did not talk" or even push himself to say "momma." *Id*. While other children his age were developing their vocabularies and talking a lot, "Dylann did not ask questions or really talk at all. He was not interactive." *Id*. These same traits followed Dylann for many years.

Given the opportunity to testify, Dylann's early childhood teachers would have described a pleasant, quiet, and friendly child who flew under the radar and was never a behavior problem in school. Ex. 40 (McAteer Dec.) ¶¶ 11, 17, 20; Ex. 28 (Garren Dec.) ¶ 3; Ex. 39 (Livingston Dec.) ¶ 4; Ex. 23 (Burch Dec.) ¶ 4. He followed directions and listened to teachers. Ex. 27 (Brown Dec.) ¶ 3. Dylann's elementary school vice principal found him so sweet and cared so deeply about him that he would have considered adopting him. Ex. 39 (Livingston Dec.) ¶ 4. Teachers saved Dylann's childhood art and pictures of him dressed up for classroom projects— art and pictures that the jury could have seen. Ex. 26 (Able Dec.) ¶¶ 8-9.

 He was also extremely quiet—never speaking a lot, initiating conversations, or raising his hand in class. Ex. 40 (McAteer Dec.) ¶ 15; Ex. 27 (Brown Dec.) ¶ 3; Ex. 23 (Burch Dec.) ¶ 4. Dylann's mom moved frequently, and thus he had to transfer schools frequently. *See* Ex. 40 (McAteer Dec.) ¶ 13; Ex. 34 (Cruea Dec.) ¶ 8; Ex. 25 (Henry Dec.) 10. Despite an above-average IQ, Dylann was not in the "gifted and talented" classes after the fourth grade, which speaks to his ability to perform in a classroom setting. Ex. 2 (Ouaou report) at 15-16 (contrasting high verbal intelligence with poor performance in verbal attention, auditory processing, and processing speed, tasks required for school or court); Ex. 40 (McAteer Dec.) ¶¶ 12, 18. Although this should have been a red flag, he received no special needs services. Ex. 28 (Garren Dec.) ¶ .

Other children found Dylann funny and kind. He was energetic and goofy, but never violent or difficult. He rode bikes and watched wrestling with other boys in the neighborhood. Ex. 29 (McConnell Dec.) ¶¶ 4-6; Ex. 36 (Shockey Dec.) ¶ 8. Dylann was so quiet, however, that he found it difficult to have much of a peer group. Ex. 27 (Brown Dec.) ¶ 4. Adults also found Dylann to be very quiet, describing him as "timid and meek." Ex. 45 (Zurheide Dec.) ¶ 2. His behavior was a big contrast to his sister's: Amber was bouncing around, while Dylann was alone and quiet. Ex. 43 (Richardson Dec.) ¶¶ 4, 6. He looked uncomfortable with others. Ex. 45 (Zurheide Dec.) ¶ 2. His eyes were strange and without engagement. Ex. 43 (Richardson Dec.) ¶ 2. Dylann's personality was a stark contrast to either of his parents. His mother described herself as a "motormouth" compared to Dylann's quiet and shy demeanor. Ex. 38 (Roof Dec.) ¶ 17. His father, Benn Roof, was a heavy drinker and the partying type. Ex. 45 (Zurheide Dec.) ¶ 5.

Dylann showed symptoms of anxiety from a very early age. He was worried about what other children thought of him. Ex. 27 (Brown Dec.) ¶ 5. He also used hand sanitizer frequently—Dylann used it "every time he came back from recess, and he made sure he really rubbed it into his hands and fingers." Ex. 23 (Burch Dec.) ¶ 7. Both were early signs of his anxiety.

By eighth grade, Dylann was placed into the Honors track of classes; however, once there, he was quickly failing. Ex. 34 (Cruea Dec.) ¶¶ 3-4. Although Dylann failed his year-end Algebra exam (receiving the lowest possible grade his teacher could give out), he was simply pushed along without knowing the material. *Id*. ¶ 4. In her twenty-six-year teaching career, Ms. Darce Cruea has only had three students fail the year-end exam; "Dylann was one of [them]." *Id*. Even as he was failing, Dylann sat in the front of the class, polite and respectful—he "didn't give . . . any backtalk." *Id*. ¶ 6. His teachers would have told the jury that they felt responsible for

162

letting Dylann fall "through the cracks" and because he didn't demand attention, he went unnoticed. *Id*. ¶ 10. His teachers felt like they failed Dylann. *Id*.

As a lifelong member of St. Paul's Lutheran Church, Dylann also attended Sunday School there as well. Ex. 25 (Henry Dec.) ¶ 2; Ex. 43 (Richardson Dec.) ¶¶ 2, 8. His Sunday School teacher, Bonnylin Henry, would have told the jury how he was a well-behaved inquisitive child, asking many theological questions. Ex. 25 (Henry Dec.) ¶ 6. She would have also told the jury about Dylann's struggle with loneliness, making friends, and how, as an eighth grader, he even had difficulty attending sleep away camp because he did not want to be around others. *Id*. ¶ 9. When friends did reach out to Dylann, it was difficult for him—"[i]t was like he wanted to have friends and fit in, but he just didn't. He was different." Ex. 101 (Wright Dec.) ¶ 6. Dylann "talked weird," "was not very social," and when he did speak, he wouldn't "make eye contact." *Id.;* Ex. 94 (Wilson Dec.) ¶ 14 ("He couldn't even look other people in the eyes. When he walked around the neighborhood he stared at the ground, and he avoided eye contact with people who passed him.").

As Dylann became a teenager, he continued to be "very, very quiet" and uncomfortable around most people. Ex. 44 (Simmons Dec.) ¶ 2. Even at school, "Dylann was usually alone." Ex. 96 (Brazell Dec.) ¶ 13. In keeping with his extremely solitary nature, he was not violent; rather he was just "quiet and weird." Ex. 44 (Simmons Dec.) ¶ 5; Ex. 99 (Stafford Dec.) ¶ 8 ("Dylann was a weirdo . . . [he] was not confrontational or aggressive). "Dylann wanted to fade into the background . . . [s]ometimes [he] just looked blank." Ex. 37 (Clifford Dec.) ¶¶ 4-5. He carried around a notebook where he drew animated characters. Ex. 44 (Simmons Dec.) ¶ 5. His acquaintances could see that Dylann's home had little or no supervision and rules. He did not get in trouble, but he also did not have to answer to any adult. Ex. 44 (Simmons Dec.) ¶¶ 7-8. Others

163

saw his mother as moody and volatile. Ex. 43 (Richardson Dec.) ¶ 5.

Dylann's ninth-grade teacher found him, like others, to be as quiet as a "little mouse." Ex. 31 (Horton Dec.) ¶ 2. That school year was difficult for Dylann. One semester "[Dylann] failed all of his classes: Algebra I, French Class, Business, and Strategies for Success. Strategies for Success [was] not an academic class, [it was a] class where you write down your goals and the teachers" spend time talking through them. Ex. 47 (Hnat Dec.) ¶ 5. He failed the ninth grade, but had no behavioral issues whatsoever in high school. Ex. 31 (Horton Dec.) ¶ 6. The discrepancy between his performance and his IQ should have alerted the school that there was an issue, but because Dylann was a "wallflower," there was no intervention. *Id.* ¶ 3.

Having failed the ninth grade twice, Dylann stopped attending school and enrolled in online classes. Ex. 35 (DeLeon Dec.) ¶¶ 2-3. His online instructor spoke to him only by phone or through email. *Id.* ¶ 2. Her contacts with Dylann or his mother were limited to once every week or every other week. *Id.* ¶ 6. Dylann had no contact with other students enrolled in the online classes. *Id.* ¶ 7. His teacher found it difficult to connect with him, as she had difficulty with simple communication with him. *Id*. He continued to be isolated and an outcast. He seemed developmentally delayed. *Id.* She could hear the exasperation in Amy's voice because of Dylann's inability to do the work. *Id.* ¶ 10. Even though he was enrolled in online school for three years, he was never able to move past the ninth grade. *Id.* ¶ 13.

No longer in a traditional school, Dylann's isolation only increased as his teenage years progressed. Ex. 95 (Stork Dec.) ¶ 5. Observers "suspected that [he] was agoraphobic" as he was "reluctant to leave his mom's house for any purpose . . . or even his room." *Id*. In his room, Dylann spent hours on his computer, searching the internet, or playing the video game Maplestory, "a game geared to younger children." *Id.* ¶ 17. Dylann playing a video game

designed for younger children was not a surprise: "[Dylann] seemed emotionally and mentally further behind than he should have been." *Id*. ¶ 33. When Dylann did come out of his room, it was mostly to get food. It was around this time that Dylann's father was spending a lot of time in Florida. Ex. 102 (Hastings Dec.) ¶ 7. With his father being away often, "Dylann became even more withdrawn." *Id*. He was a recluse from the age of sixteen until shortly before he was arrested.

Another historian of Dylann's life was his pediatrician, Dr. Philip Mubarak. Dylann was a patient of Dr. Mubarak from the time he was born until he was eighteen years old. Ex. 46 (Mubarak Dec.) ¶ 1. He could speak to most of Dylann's entire medical history—from childhood ailments such as frequent upper respiratory infections that were likely exacerbated by exposure to secondhand smoke to more complicated parts of Dylann's life. With Dr. Mubarak testifying, the jury would have also learned about Dylann's frenectomy—a procedure performed to resolve a tongue tie. *Id*. ¶ 6. The frenectomy is consistent with Dylann's longstanding communication impairments. *See* Claim 7.

Most importantly, Dr. Mubarak could have explained to the jury his observations of Dylann's slow decline as he entered his teenage and young adult years. He saw that "Dylann's social and mental health deteriorated dramatically in his teenage years." Ex. 46 (Mubarak Dec.) ¶ 15. Dylann "was suffering from anxiety, insomnia, [and an] unreasonable or irrational fear of going outside the house." *Id*. Isolated, doing online school, staying in his bedroom, Dylann was "using electronics [eight] hours a day." *Id*.

As a young adult, Dylann worked for a few months with Clark's Termite & Pest Control. Ex. 42 (Pack Dec.) ¶ 2. Dylann worked in the lawn care section, spreading mulch, weeding, and edging. *Id*. ¶ 5. He was given easy tasks because he seemed to have difficulty on the job. *Id*; Ex.

24 (Fanning Dec.) ¶ 3. Every single day he had to be told, explicitly, how to do every single thing, unable to process the needs of the job on his own. Ex. 24 (Fanning Dec.) ¶ 3. Dylann continued to be an isolated person who did not speak much. Ex. 42 (Pack Dec.) ¶ 6. In fact, with one exception, one coworker never heard him speak complete sentences. *Id*. ¶ 12. He zoned out a lot. Ex. 24 (Fanning Dec.) ¶ 6. He struggled with both the work and with interacting with coworkers. *Id*. ¶ 7. It was painful to watch him try to speak, taking a long time to get words out, speaking as little as possible, and suffering from embarrassment all the while. *Id*. ¶ 9. Even his coworkers at work, which he was fired from just a week and a half before the offense, found it shocking that he committed this crime or represented himself. *Id*. ¶¶ 16, 20. He was never violent or harmful, simply a "misfit." *Id*. ¶ 19.

Dylann also had a bank account as a young adult. A bank employee could have testified that Dylann took a very long time to answer questions, that he was easily distracted, and seemed "off" from the first time he met Dylann. Ex. 32 (Hicks Dec.) ¶ 2. Waitresses could have told the jury how "soft spoken" Dylann was and how he needed to repeat his order multiple times before they understood what he was saying. Ex. 98 (Simpson Dec.) ¶ 3.

In 2015, Dylann reconnected with an old childhood friend, Joey Meek, who, at the time, was living in a trailer in Redbank, South Carolina. Ex. 33 (Schultz Dec.) ¶¶ 12, 14. Kimberly Schultz, Mr. Meek's mom, remembers her son telling her that "Dylann seemed different." *Id*. ¶ 15. The trailer park—where Dylann was now spending a lot of his time—was consumed by chaos and police activity. *Id*. ¶ 21. There was theft, guns being pulled out on people, "a lot of drug activity[,] and violence over there." *Id*. Then, in late May 2015, Shane Kimrey, a friend of Mr. Meek and an acquaintance of Dylann, committed suicide. *Id*. ¶ 19. "All of [Mr. Kimrey's] blood and guts were still on the floor" when Mr. Meek arrived at the home. *Id*.

This is all information that Dylann would have allowed his trial counsel to present to the jury if he had known the option was available.

**C. The jury should have heard evidence of Dylann's Auditory Processing Disorder and pragmatic communication problems.**

As detailed more thoroughly in Claim 7, trial counsel had every red flag available and expert recommendations to obtain a Speech Language Pathologist (SLP) to further explore Dylann's communication differences. Had they used an SLP, that would have inevitably led to a recommendation for an audiologist. Ex. 1 (Fritz Report) at 7. An audiologist would have diagnosed Dylann with an auditory processing disorder (APD). *See* Ex. 3 (Lucker Report). The SLP hired by post-conviction counsel additionally found that Dylann has "profound weakness in all areas of pragmatic social school performance," "social anxiety," and a "profound deficit in linguistic processing speed." Ex. 1 (Fritz Report) at 1. These are all diagnoses that target skill areas in which Dylann is deficient. These skill deficits are largely masked because of his high verbal ability, including expressive and receptive language ability. *Id*.

Nonetheless, Dylann struggles to take in verbal information and process information quickly. Dylann would have allowed testimony about these impairments, and the jury should have heard about them.

**D. The jury should have heard evidence of Dylann's Anxiety Disorder.**

Dylann additionally has been diagnosed with an anxiety disorder. Ex. 1 (Fritz Report) at 1; Ex. 2 (Ouaou Report) at 15; Dkt. 648-2 (Redacted Ballenger Report) at 67; Ex. 13 (Maddox Dec.) ¶ 30. Anxiety is a disorder that every doctor that has met and evaluated Dylann agrees with: from his childhood pediatrician to the most recent evaluation by neuropsychologist Robert Ouaou. Ex. 46 (Mubarak Dec) ¶ 17; Ex. 2 (Ouaou Report) at 15. There is no doubt to the truth of Dylann suffering from anxiety, yet the jury heard nothing about this.

167

While there is no requirement that mitigation directly relate to the charged offenses, *see Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007), in this case there is a connection. As Dr. Schwartz Maddox states,

> Dylann was not so much hateful as he was scared. He had a genuine belief that white people were being attacked daily by Black people and were at risk of extinction. He had absorbed so much information on sites like Stormfront and the Daily Stormer that he believed horrible things were happening to white people at the hands of Black people, and the regular media was conspiring not to report it. I watched some of the videos on sites he frequented and they were frightening…I still remember them. They were truly terrifying and sensationalized videos.

Ex. 13 (Maddox Dec.) ¶ 10.

This is entirely consistent with evidence that the jury heard in the first phase of the trial, in which Felicia Sanders described Dylann saying at the shooting, "I have to do this. I have to do this because you raping our womens [sic]." Tr. 12/07/16 (Dkt. No. 893) at 85.

Dylann's anxiety disorder caused him to be in near total isolation for years. After two attempts at the ninth grade, he dropped out of traditional school and enrolled in online classes. Ex. 35 (DeLeon Dec.) ¶ 3. In his online school he had no interaction with other students. He began spending all of his time alone in his room, mostly on his computer, without age-appropriate peer interaction. Ex. 46 (Mubarak Dec.) ¶ 15. Except for a few weeks of work at a lawn care company, he had no employment. *See* Ex. 24 (Fanning Dec.); Ex. 42 (Pack Dec.). His anxiety kept him isolated and alone. Dylann's total immersion in an online world convinced him the world was a dangerous place, especially for white people, and no one was doing anything about it. Dylann's anxiety had a direct link to the crime he committed. The jury heard none of this.

**E. Dylann's youth and impact on brain development.**

Although Dylann's age was submitted to the jury—that was all it was, a coldly stated fact

168

that he had just turned 21 years old at the time of the crime—there were no efforts to contextualize Dylann's age and explain why his youth was an important factor. The jury could have learned so much more about the interplay between youth and brain science, which, of course, did not need to be connected to autism. *See* Claim 16.

By the time Dylann went to trial, the impact of undeveloped brains on decision making was well known. *See* Ex. 2 (Ouaou Rep.) at 17. Trial counsel could have called expert witnesses to explain this in detail, which would have helped the jury understand why Dylann's youth actually mattered and should have factored into their decision making. *Id.* Trial counsel understood that the Supreme Court had recognized developments in psychology and brain science showing that adolescents (1) "have a lack of maturity and underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking"; (2) "are more vulnerable to negative influences and outside pressures, including from their family and peers,"; and (3) possess character traits that are "less fixed" than those of an adult. *Miller v. Alabama*, 567 U. S. 460, 471 (2012) (quotation marks and citations omitted). The Court has concluded that, because of these qualities, adolescents "have diminished culpability and greater prospects for reform." *Id.*; *see also Roper v. Simmons*, 543 U. S. 551, 569-70 (2005). Research shows that "psychosocial capacities that improve decision making and regulate risk taking—such as impulse control, emotion regulation, delay of gratification, and resistance to peer influence—continue to mature well into young adulthood."[46] Thus, "young adults simply do not have the physiological

---

[46] James C. Howell et al., *Bulletin 5: Young Offenders & an Effective Response in the Juvenile & Adult Systems: What Happens, What Should Happen, & What We Need to Know*, Doc. No. 242935, at 17, Papers From the Study Group on Transitions From Juvenile Delinquency to Adult Crime, Nat'l Inst. Of Justice, U.S. Dep't of Justice (July 2013) (unpublished) (citation omitted), available at https://www.ojp.gov/pdffiles1/nij/grants/242935.pdf.

capacity of adults over age 25 to exercise judgment or control impulses,"[47] and it is "difficult to justify applying permanent or long-term sanctions to young offenders," including young adults in their early twenties.[48]

Absent a witness to explain the importance of Dylann's youth, in signing off on his age as a "mitigating factor," the jury simply confirmed that Dylann was born on April 3, 1994. Nothing else. Dylann would have allowed his counsel to offer this evidence.

## F. Conclusion

As the Supreme Court made clear, "[t]he choice is not all or nothing" when it comes to attorney-client representation. *McCoy v. Louisiana*, 584 U.S. 414, 421 (2018). Trial counsel understood what the likely scenario was going to be if Dylann represented himself and still did not course correct. They could have proceeded with representing Dylann in the penalty phase and offered substantial mitigating evidence that did not include a diagnosis of autism. Alternatively, trial counsel could have withdrawn from the case and sought counsel that would have represented Dylann without pressing the issue of his mental health. Had trial counsel been forthcoming with Dylann from the beginning, he likely would have refused an evaluation by an autism expert and trial counsel would have had no choice but to go forward with other mitigation evidence. Trial counsel did none of these, abdicating their constitutional duty to provide effective assistance of counsel.

There is little question that *any* mitigating evidence would have been better than no mitigating evidence at all. Consequently, there is little doubt that Dylann was prejudiced by the actions of trial counsel. Even if the jury only heard Dylann's mother beg for his life, there is a

---

[47] *Id*. at 18.
[48] Carrie Mulford, *Explanations for Offending*, Nat'l Inst. Of Justice, U.S. Dep't of Justice (May 2014) at 2, available at https://www.ojp.gov/pdffiles1/nij/243975.pdf.

reasonable probability of a different outcome.

**CLAIM 9:    Trial Counsel were ineffective for "trying to run a marathon at the speed of a sprint."**

This case would have been difficult in any circumstances. But trial counsel made their task "impossible" by requesting an accelerated timetable. Ex. 5 (Bruck Dec.) ¶ 13. Many of the problems that arose in the case—most notably the complete breakdown in the relationship between trial counsel and their client, and trial counsel's failure to investigate Dylann's auditory processing disorder—were the result of inadequate time. As one of the trial attorneys, who has worked on dozens of capital cases, stated, "[t]he biggest obstacle the team faced was time. We needed more time to perform the necessary work. We were trying to run a marathon at the speed of a sprint." Ex. 6 (Stevens Dec.) ¶ 5.

**A. Defense counsel accelerated the time to trial.**

In early April 2016, trial counsel had not yet obtained the assistance of several key experts—a victim outreach specialist or a jury consultant, to name but two examples. Nor did counsel have any clear understanding of Dylann's life history or impairments that might be at issue. Yet trial counsel[49] decided they would seek an immediate trial if the Department of Justice (DOJ) authorized the death penalty in the case. In early May 2016, trial counsel was struggling to identify possible experts for Dylann's case. Yet trial counsel remained steadfast that they would demand a speedy trial and seek to try the federal case in fall 2016, before the state case.

On May 16, 2016, trial counsel informed the lead AUSA that they would seek a November 7, 2016, trial date. On May 24, 2016, the Attorney General authorized seeking the

---

[49] This decision was made by Dylann's defense counsel in his federal prosecution, though the state team and the federal team decided early on to work together. Ex. 5 (Bruck Dec.) ¶ 5. David Bruck was the *de facto* leader of both teams. Ex. 12 (Norris Dec.) ¶ 9. For purposes of this claim, "trial counsel" generally refers to federal trial counsel, although many resources, including investigators, were being shared between federal and state counsel.

death penalty. The following day, on May 25, 2016, the defense alerted the court of their intent to pursue speedy trial. The court granted the request and generated a slew of pretrial deadlines for the five months remaining before trial. *See* Dkt. No. 180; Tr. 06/07/16 at 2. Although the trial court granted counsel's motion, the court was openly skeptical about the feasibility of their plan: "there's a question in my mind about whether we can do this between now and November 7." Tr. 06/07/16 at 2.

The situation did not improve from there. On July 22, 2016, with less than four months left until trial, second chair Michael O'Connell withdrew from the case. Ex. 5 (Bruck Dec.) ¶ 14. Mr. O'Connell, a long-time friend and former law school classmate of lead counsel David Bruck, had joined the case in the summer of 2015 at Mr. Bruck's request. Ex. 8 (O'Connell Dec.) ¶ 3; Ex. 5 (Bruck Dec.) ¶ 14. As the months progressed, however, Mr. O'Connell realized he was not up to the task. As second chair to Mr. Bruck, Mr. O'Connell was the only Charleston-based member of the federal team, and was responsible for managing the case budget. Still, by his own admission, Mr. O'Connell "was [not] pulling [his] weight." Ex. 8 (O'Connell Dec.) ¶ 5. More was needed than Mr. Bruck's friend could provide. Ex. 5 (Bruck Dec.) ¶ 14.

Following Mr. O'Connell's departure, Kimberly Stevens, an attorney based out of North Carolina who previously had served as resource counsel on the case, was asked to join Mr. Bruck as co-counsel. Ex. 5 (Bruck Dec.) ¶ 15; Ex. 6 (Stevens Dec.) ¶ 3. Emily Paavola, an attorney based in Columbia, South Carolina, who had been serving as a mitigation specialist, assumed responsibilities as an attorney in the case. Ex. 5 (Bruck Dec.) ¶ 15. Ms. Paavola was reluctant to take on this role, partly because she had no trial experience. Ex. 7 (Paavola Dec.) ¶ 2. With substantial investigation remaining, however, Ms. Paavola's pivot created a crucial vacancy.

172

By August 2016, defense counsel recognized that time was running short and much work remained to be done, but they chose to press forward, "ignoring all evidence that such a decision was unwise." Ex. 17 (de La Rue Dec.) ¶ 21. With a compressed timeline, the defense team was spread thin, missing the deadline for filing notice of mitigating factors. *See* Dkt. Nos. 281, 325. When defense counsel finally filed the Rule 12.2 notices, they had yet to discuss the contents of these notices with Dylann, which of course, led to the complete breakdown in their relationship that followed Dylann's meeting with Dr. Park Dietz. Ex. 5 (Bruck Dec.) ¶¶ 26, 27; Ex. 11 (McGuire Dec.) ¶¶ 9,10; *see also* Claim 4.

With everyone attempting to "run a marathon at the speed of a sprint," Ex. 6 (Stevens Dec.) ¶ 5, disagreement grew about how to proceed. Some members of the defense team saw that more time was critical. Ex. 5 (Bruck Dec.) ¶ 11; Ex. 16 (Andrews Dec.) ¶ 11. Teresa Norris was among a group of four attorneys who suggested they were not ready for trial. Ex. 12 (Norris Dec.) ¶¶ 16, 17. When a hurricane forced a last-minute relocation of a team meeting and a cancellation of a focus group the team was unprepared for, this group became more vocal. During the first week of October, these attorneys voiced their concern at a team meeting, insistent that a continuance was necessary. They needed more time to prepare their case and more time to work with their client. Mr. Bruck asked these attorneys to list reasons for a continuance. But with no discussion or even acknowledgement of this list, Mr. Bruck announced that he would not seek a continuance.

Mr. Bruck now admits, "the decision to go to trial in November 2016 was made based on incomplete information and prior to having secured the assistance of critical experts and key members of the defense team." Ex. 5 (Bruck Dec.) ¶ 15.

**B. Trial counsel's rush led to problems retaining and working with experts.**

Unsurprisingly, setting a trial date that was only five months away, without already having lined up key experts, led to serious problems.

### i. Autism expert

The trial team had long suspected that Dylann may have autism. In mid-May of 2016, they were still trying to identify an autism expert and interviewed Dr. Rachel Loftin, a psychologist specializing in neurodevelopmental disorders, as a possibility. Dr. Loftin immediately let the team know that she planned to be out of the country in November of that year, exactly the time when they would be in trial. Ex. 14 (Loftin Dec.) ¶ 14. In June 2016, mere months before trial began, defense counsel hired Dr. Loftin as a primary mental health expert. Ex. 14 (Loftin Dec.) ¶¶ 2-3.

### ii. Defense-Victim Outreach "DVO" expert

The defense team knew that establishing a dialogue with the victims' families and survivors was an exceptionally delicate matter that would take patience and time. Yet not until mid-May 2016 did counsel discuss bringing on a DVO expert. DVO expert Tammy Krause was not retained until June 2016, a full year after the crime and less than five months before trial was set to start. It was not until September 2016 that Krause had her first—and what turned out to be her only—meeting with two of the surviving victims, Polly Sheppard and Felicia Sanders.

### iii. Jury consultant

In June 2016, trial counsel reached out to Denise de La Rue, an experienced jury consultant, to inquire about her availability to work on the case. But by this time, counsel had already decided that the jury pool would be drawn from Area C (the Charleston Division of the South Carolina District Court). Ex. 17 (de La Rue Dec.) ¶ 7; Dkt. No. 196 (Defense Position With Respect to Change of Venue); Tr. 07/18/16 at 11-12. Ms. de La Rue was troubled by the

174

defense's definitive position on venue, noting, "[I]t felt like the team saw this decision as final…I never see a venue decision as final. Given the prevalence of the media coverage and the deep impact of the offenses on the citizens of Charleston, I did not believe it should have been ruled out without conducting the appropriate research." Ex. 17 (de La Rue Dec.) ¶ 7. She explained further:

> Events can occur right up to and sometimes during jury selection which give rise to the need to explore a different trial venue. Several such events did happen before trial in the Roof case that in my opinion created the need to explore a different venue. I recommended to the team that they conduct a public opinion survey to understand the community sentiment in Charleston, but they did not follow my recommendation. A public opinion polling is the only reliable way to determine the effects of pre-trial publicity on a particular community, and is necessary to make an informed decision as to whether [to] seek a change of venue at all. Given the high level of publicity in this case, I was surprised that they did not at least take that first step.

Ex. 17 (de La Rue Dec.) ¶ 7.

Counsel dismissed the jury consultant's advice to conduct a public opinion survey (for purposes of assessing a possible basis for a change of venue); to push back the due date for supplemental juror questionnaires (which were due in August); and to pursue a request for a venue change given the proportion of prospective jurors who indicated that they believed Dylann should receive the death penalty (based on the responses in the supplemental questionnaires). Ex. 17 (de La Rue Dec.) ¶¶ 7, 16; *see also* Ex. 5 (Bruck Dec.) ¶ 22, Ex. 6 (Stevens Dec.) ¶ 30.

On November 2, 2016, a mere five days before jury selection was scheduled to commence, defense counsel held two focus groups. The information gleaned from those focus groups revealed an "intense bias against Mr. Roof,"[50] which should have dispelled any thought

---

[50] Notably, an issue made clear by the focus groups was that the trial of Michael Slager— a white police officer charged with killing an unarmed Black man—which was taking place

that a rush to trial was an advantage. Ex. 17 (de La Rue Dec.) ¶ 20. However, any potential for meaningful consideration of the data obtained through the focus groups was eradicated the very next day, when Dylann sent a letter to the prosecution, totally upending the proceedings and defense counsel's trial plans. *See* Claim 11.

### iv. Missing experts

The rush to trial also meant that the trial team failed to follow up on recommendations for additional experts they needed to explore and additional experts they needed to hire. Dr. Donna Schwartz Maddox, a psychiatrist and defense expert, recommended that trial counsel retain a speech-language pathologist ("SLP") to assess Dylann in light of suspected communication and language deficits. Ex. 13 (Maddox Dec.) ¶ 11. The defense's consulting psychiatrist, Dr. George Woods, supported this recommendation, as did a third expert with whom counsel consulted. Ex. 5 (Bruck Dec.) ¶ 41. Despite multiple calls for the defense to hire an SLP, trial counsel never pursued it. *See* Ex. 6 (Stevens Dec.) ¶ 28. According to Dr. Loftin, lack of time was the only possible reason not to get an SLP. Ex. 14 (Loftin Dec.) ¶ 10.[51]

### C. Trial counsel's rush ultimately resulted in their relationship with Dylann imploding.

As discussed above, *see* Claim 4, trial counsel misled their client about why he was meeting with certain experts. The team suggested that Dr. Loftin, an expert on autism, along with other experts focused on mental health, would ask Dylann about his thyroid, an issue of particular concern to him. Ex. 10 (Pennington Dec.) ¶ 8; *see also* Ex. 7 (Paavola Dec.) ¶ 5; Ex.

---

directly across the street from Dylann's case, was impacting the views of prospective jurors for the Roof case. Although the cases were unrelated, their co-occurrence amplified the racial tensions in the Charleston community from which the jury was to be drawn. Ex. 17 (de La Rue Dec.) ¶¶ 18-19.

[51] The importance of an SLP to this case is discussed more fully above in Claim 7. Dylann has an auditory processing disorder that rendered him incompetent to represent himself under *Indiana v. Edwards*.

13 (Maddox Dec.) ¶ 8. Dr. Woods had advised trial counsel that "due to the dynamic between

defense counsel and Dylann, along with the complexity of the case . . . counsel, and Dylann, by

extension, would benefit from as much preparation time as possible prior to trial commencing."

Ex. 15 (Woods Dec.) ¶ 6. Specifically, Dr. Woods advised the defense that the process of sharing

a mental health penalty phase strategy would "take more time" and had encouraged counsel to

begin that discussion as early. Ex. 15 (Woods Dec.) ¶ 14.

Instead of following this advice, trial counsel was "tricky." And, somehow, they failed to

anticipate that an interview with government expert Dr. Dietz would reveal their deception to

Dylann—even though the purpose of Dr. Dietz's interview was to rebut mental health evidence.

When defense counsel visited Dylann after his meeting with Dr. Dietz, Dylann confronted his

attorneys about what Dr. Dietz had told him. It was clear to defense counsel that the revelation

had "infuriated an already suspicious client." Ex. 5 (Bruck Dec.) ¶ 25.

This egregious error was in part the result of operating on such a compressed timeline. As

attorney Stevens reflected after trial:

> We should have known that Dr. Dietz would likely reveal this information in the
> course of his own evaluation of Dylann, and we should have prepared for that. If
> we'd had more time, we could have had our experts work with Dylann and explain
> things in a way that would not have caused the blow-up that Dr. Dietz revealing
> things to Dylann did.

Ex. 6 (Stevens Dec.) ¶ 12 (emphasis added).

On November 3, 2016, Dylann wrote his letter to prosecutors calling his attorneys "liars"

who "tricked" him into seeing their mental health experts and suggested they should be

disbarred. His primary complaint was that he had been "lied to repeatedly":

177

> agenda. For example, I was lied to repeatedly in order to get me to speak to mental health experts. I was told that I needed to talk to them in order to get medicine for a thyroid condition. Everything I was told about these experts and why I was being tested was an absolute lie, and I was never told what they actually specialized in.

Dkt. No. 545.

> The defense was in freefall:

> Our relationship with Dylann was irreparably damaged by Dr. Dietz's disclosures. Dr. Dietz's revelation that we were pursuing a mitigation case that included Dylann's autism diagnosis was devastating. Dylann became convinced that we were liars who had been tricking him all along. We did not have time to work with him to repair the damage to our relationship.

Ex. 5 (Bruck Dec.) ¶ 27.

On November 6, 2016, trial counsel filed a motion for an *ex parte* hearing, asking to delay jury selection, which was scheduled to begin the next day. Dkt. No. 544. On November 7, counsel moved for a competency evaluation, Tr. 11/07/16 at 34 (Dkt. No. 556), which the court granted by having a local court-appointed expert plan to see Dylann. On November 8, counsel pleaded with the court to reconsider the schedule it had set for Dylann's competency evaluation. *See* Dkt. Nos. 564, 562. At this point, trial counsel revealed that they were never prepared for a November trial date. They admitted that they were "still actively interviewing witnesses and uncovering facts and evidence relevant to both the trial and penalty phases, we receive new discovery on a regular basis, and we plan to file additional motions on many subjects." Dkt. No. 562 at 8. Additionally, because defense counsel had told Dr. Loftin she was not needed during

the month of November, she was out of the country and unavailable to testify in the hastily

scheduled competency proceedings. Ex. 5 (Bruck Dec.) ¶ 33; Ex.14 (Loftin Dec.) ¶¶ 14, 16.

Desperate, on November 14, trial counsel requested that the court force Dylann to meet with a

newly retained expert, Dr. William Stejskal. Dkt. No. 595. Unsurprisingly, the court declined to

do so. Dkt. No. 609. (Dylann did meet briefly with Dr. Stejskal on November 15, 2016, Tr.

11/22/16 at 217, but refused a follow-up session the next day, *id* at 227.)

On the eve of the competency hearing, with no clear plan or path, members of the trial

team were sleeping in shifts so the team could work twenty-four hours a day. *See* Ex. 5 (Bruck

Dec.) ¶ 35; Ex. 6 (Stevens Dec.) ¶ 17. The day before Dylann's competency hearing, defense

counsel filed a motion to continue the hearing, admitting they were "utterly unprepared." Dkt.

No. 615 at 1. Dr. Stejskal, whom the defense retained after competency proceedings were already

underway, conceded that he could not render an opinion regarding Dylann's competency based

on his abbreviated evaluation. Tr. 11/22/2016 at 239. Dr. Schwartz Maddox had not finished her

report at the time the defense called on her to testify at Dylann's competency hearing. She flew

directly from the funeral of her aunt, "who was like a mother," testifying in her funeral suit. Ex.

13 (Maddox Dec.) ¶ 21. Dr. Schwartz Maddox, unprepared and grief-stricken, testified that she

*thought* Dylann was incompetent, though she had not been tasked with undertaking a

competency evaluation. Ex. 13 (Maddox Dec.) ¶ 25; *see also* Ex. 6 (Stevens Dec.) ¶¶ 15-16. The

trial began. Dylann fired his attorneys, ultimately representing himself during jury selection and

the penalty phase.

**D. The rush to trial in this case was unreasonable.**

Death penalty cases require the utmost care and preparation. The Supreme Court has

repeatedly echoed this understanding: "the penalty of death is qualitatively different from a

sentence of imprisonment, however long . . . [and] [b]ecause of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). In simpler terms, "death is different." *Ford v. Wainwright*, 477 U.S. 399, 411 (1986). Accordingly, the Sixth Amendment demands particularly in capital cases that counsel provide the "guiding hand" necessary to adequately prepare and present a defense, and not simply offer the physical presence of one who is licensed to practice law. *Powell*, 287 U.S. at 68-69. To satisfy this requirement, given "the extraordinary time and effort necessary to ensure effective and zealous representation in a capital case," counsel should be extra cautious and meticulous in their preparation for trial—never moving with haste or prioritizing speed over diligence. *See* American Bar Association, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, Commentary to 6.1 (Rev. Ed. 2003). Indeed, only if counsel invests the time in careful investigation, preparation, and consideration of the evidence can decisions be subsequently analyzed for strategy. *See Wiggins*, 539 U.S. at 527-28.

*Powell* made clear that time is a vital resource in criminal cases—certainly when death is on the table. Although prompt disposition is important, this consideration must never "strip[] [the] right [of the accused] to have sufficient time to advise with counsel and prepare his defense. To do that is not to proceed promptly in the calm spirit of regulated justice but to go forward with the haste of the mob." *Powell*, 287 U.S. at 59. In the spirit of *Powell*, many cases have found that more time is in the best interest of the accused, and simply barreling ahead is an affront on the requirement of providing effective assistance of counsel. *See United States v. Abney*, 812 F.3d 1079, 1088 (D.C. Cir. 2016) (counsel's failure "to seek a continuance of sentencing was objectively unreasonable and therefore unconstitutionally deficient"); *Thomas v.*

180

*Lockhart*, 738 F.2d 304, 306 (8th Cir. 1984) (finding ineffective assistance of counsel because, among other reasons, the attorney "could have moved for a continuance or withdrawn from the case where the circumstances suggested an unseemly desire by the state trial judge to rush resolution of the case, yet he did neither"); *Com. v. Baker*, 800 N.E.2d 267, 275 (Mass. 2003) (counsel's failure to request continuance in order to retain an expert who could challenge critical piece of the prosecution's evidence warranted new trial).

The result of this rush was a penalty phase in which Dylann represented himself. It was disastrous. As discussed below, there was mitigating evidence that the jury should have heard, but heard none of—for the sole reason that Dylann was without counsel, or even standby counsel who, he trusted.

**PREJUDICE FOR CLAIMS 4-9:   Dylann was prejudiced by trial counsel's deficient performance because the jury did not hear mitigating evidence such as testimony from family members who love him and evidence that he did not present a management problem in the jail.**

Dylann was prejudiced by trial counsel's many errors. Trial counsel rushed to trial, unprepared and without first assembling the team that would try the case, without laying the groundwork with their experts to understand their client, and without communicating with Dylann and building trust with him. Trial counsel did not obtain the help of a Speech Language Pathologist, despite having had three experts recommend that they retain one to understand Dylann's communication and language deficits. Trial counsel's trickery with their client kept them from developing trust and loyalty with him. Then, when a government expert revealed their mitigation plan—and deceit—to Dylann, they were unable to rebuild or repair the relationship, resulting in a breakdown of attorney/client communication. Despite this breakdown, which was of their own making, they failed to seek to withdraw from the case or request conflict counsel to protect Dylann's interests. Finally, having wrecked their relationship with their client, they

further abandoned him by not even attempting to discuss what mitigation he would have allowed them to present. Dylann was forced to represent himself at the penalty phase. Individually and cumulatively, these errors contributed to his sentences of death. But for these errors, the jury would have heard mitigating evidence demonstrating his impairments, his lonely and isolated existence, his significant anxiety, his path to radicalization, and the fact that he had been a model inmate in the jail. If the jury had heard this evidence, there is a reasonable probability at least one juror would have voted for life and Dylann would not have been sentenced to death.

Prejudice from trial counsel's deficient performance is established if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Many of trial counsel's errors were so egregious that, even standing alone, they prejudiced Dylann. However, the relevant inquiry is not whether any one of these errors prejudiced Dylann but whether, in combination "counsel's unprofessional errors" at the penalty phase prejudiced Dylann. *Id.* The prejudice analysis requires "reweigh[ing] the evidence in aggravation against the totality of available mitigating evidence." *See Wiggins*, 539 U.S. at 534. Here, the jury heard no evidence in mitigation, so any amount of mitigation the jury might have heard could have made a difference. While the court also is to consider the aggravation when reweighing, there is no case so severe that a death sentence is a certainty. *See Williams v. Allen*, 542 F.3d 1326, 1342-43 (11th Cir. 2008); *Williams v. Alabama*, 2021 WL 4325693, at *50 (N.D. Ala. Sept. 23, 2021) (discussing more aggravated crimes where courts found trial counsel's errors to be prejudicial); *see also* cases of Moussaoui, https://www.cnn.com/2023/03/13/us/verdict-trial-saipov-bike-path-attacker/index.html; Saipov, https://www.cnn.com/2023/03/13/us/verdict-trial-saipov-bike-path-attacker/index.html; Cruz,

https://www.cnn.com/2022/11/02/us/parkland-shooter-nikolas-cruz-sentencing-wednesday/index.html.

Presented with mitigating evidence, the "question is whether there is a reasonable probability that, absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *United States v. Barrett*, 985 F.3d 1203, 1221 (10th Cir. 2021) (quotation and citation omitted). "A reasonable probability is less than a preponderance of the evidence, but sufficient to undermine confidence in the outcome." *Id.* "In a system . . . where only a unanimous jury may impose the death penalty, the question is whether it's 'reasonably probable that at least one juror would have struck a different balance.'" *Id.* (quoting *Wiggins*, 539 U.S. at 537). In sum, prejudice exists if it is reasonably probable—a standard lower than preponderance of the evidence—that just *one* juror presented with all of the new mitigating evidence would have voted for a life sentence.

The combination of trial counsel's irrational rush to trial, their failures to understand their client's impairments, their actions that led to a breakdown in their relationship with their client, their failures to request substitute or conflict counsel for their client, their failure to even seek to present mitigation that their client found acceptable, and other errors create a reasonable probability that, but for these errors, Dylann would have been sentenced to life.

**A. Jurors not knowing about Dylann's early life, in which he was a quiet and sweet child loved by his family and teachers, prejudiced him.**

Jurors were deprived of hearing from Dylann's mother, Amy Roof. The very fact that Amy would have come to the trial and testified in a penalty phase for the son she loves so dearly, despite suffering a heart attack in open court at the beginning of trial, would have been a compelling fact. Ex. 38 (Roof Dec.) ¶ 23; Ex. 103 (Amy Roof EMS Records); Ex. 83 NBC news article ("Roof's Mom Had Heart Attack During Trial"). Dylann's grandparents also would have

testified on his behalf. Their love for Dylann would have been apparent in their testimony. *Id.* ¶ 28. Further, his grandfather was a well-known and respected attorney, with a progressive reputation. Ex. 5 (Bruck Dec.) ¶¶ 7-8. His grandfather was heartbroken by Dylann's actions, but would still express his love for him. This love and heartache would have given pause to the jurors' consideration that Dylann must be something more than the pure evil the prosecution witnesses described. *See, e.g.*, Tr. 12/07/16 (Dkt. No. 893) (Testimony of Felicia Sanders).

It is a fundamental tenet of capital litigation that mitigation's purpose is to humanize the client. A mother's love is inherently humanizing for a jury to see. It would also be humanizing for the jury to hear Dylann's grandmother recalling tender moments as she shared the scrapbook she carefully made just for her beloved grandson. Ex. 9 (Vann Dec.) ¶ 22. It would be humanizing for the jury to see a gentle grandfather weeping both for his grandson and the indescribable, unimaginable harm that his grandson wrought. Indeed, trial counsel believed that "[Dylann's grandfather] Joe Roof was the ultimate humanizer." Ex. 9 (Vann Dec.) ¶ 21. The testimony of these three witnesses alone, contrasted with the complete absence of any mitigation the jury heard, is enough to create a reasonable probability that upon experiencing this, at least one juror would have refrained from voting for the death penalty.[52] *See, e.g.*, *Porter v. McCollum*, 558 U.S. 30 (2009) (reversing sentence where there was "almost nothing" tending to humanize the client presented at capital sentencing phase). Yet the jury could have heard so much more.

---

[52] See Ex. 22 (Atkinson Dec.) ¶ 19 in which Juror Danny Atkinson relays that he would have wanted to know about Dylann, particularly any disabilities he had. The jurors did not hear about his Social Anxiety Disorder, his Auditory Processing Disorder, or his Pragmatic Communications deficits.

Amy Roof would have reminisced about her pregnancy and the excitement she had upon taking a home pregnancy test and learning that she was expecting Dylann. Ex. 38 (Roof Dec.) ¶ 3. She would have shared his baby pictures as she told the jury how her little blond boy would say he loved her three times, and she had to kiss him three times every night at bedtime. *Id.* ¶ 4. She also would have sobbed before the jury, questioning whether she could have done something differently as a mother to prevent this tragedy that she simply cannot understand. *Id.* ¶ 24.

The jury could have heard humanizing stories about little Dylann mimicking his father, dressing up at Halloween, and fishing. *Id.* ¶¶ 5-7. It would be clear to jurors that Dylann was loved. Killing him would be devastating for his family members, who cannot understand Dylann's actions, but continue to love him. *Id.* ¶ 25. Hearing the impact his execution would have on those that loved him has a reasonable likelihood of causing at least one juror to vote for life.

Dylann loved animals. He fed pigeons, had a pet dog named Raven. Ex. 38 (Roof Dec.) ¶ 8. Later, he had two cats named Boots and Avery that he loved. *Id.* ¶ 21.

From early on, friends and family noticed differences between Dylann and his peers. Dylann's family loved him, but it was apparent from an early age that Dylann had particular limitations and challenges. Alice Richardson, a member of St. Paul's Church and distant relative on the Roof side, recalls that "Dylann's eyes were strange- they looked like they didn't see anything. Babies are usually happy and wanting things from others, but Dylann didn't have that same engagement with people around him." Ex. 43 (Richardson Dec.) ¶ 3. Not only did Dylann appear different, but he had early developmental delays. Dylann was diagnosed with a speech delay at 20 months and had a tongue tie release to try to improve his language ability. Ex. 46 (Mubarak Dec.) ¶ 6.

He was raised in the church where his grandparents had been lifelong members. St. Paul's Lutheran Church was the location of Dylann's baptism and his confirmation. It was the place where he asked theological questions in his youth. His Sunday school teacher noticed his quiet and reserved demeanor, especially in comparison to his bubbly older sister. But Dylann did not make friends at church like the other children. He was more of a loner. He was not close to anyone but his older sister. He even had to be forced to go to confirmation camp, as being around people he didn't know was extremely uncomfortable for this anxious, shy child. Ex. 25 (Henry Dec.) ¶¶ 3, 9.

The isolation Dylann experienced at home and church was a shadow that followed him to school. During Dylann's time at White Knoll Elementary, he kept largely to himself. Former teachers and administrators described him as being "withdrawn," "agreeable," "remarkably quiet," and someone "who was just there." Ex. 39 (Livingston Dec.) ¶ 3; Ex. 27 (Brown Dec.) ¶¶ 3, 8. He was just a small, shy boy with a bowl cut and a sweet face. Ex. 25 (Henry Dec.) ¶ 3. Dylann was also described by his elementary school teachers as a good student who "followed directions," but struggled to talk and make friends. Ex. 27 (Brown Dec.) ¶¶ 3-4.

A second-grade teacher from White Knoll Elementary wondered if he had anxiety even back then because he moved around slowly and "seemed more concerned with how he came off to the other kids than other kids his age." Ex. 27 (Brown Dec.) ¶ 5. Mr. Livingston recalled that "[o]n occasion, Dylann got this sweet mischievous smile. He reminded me of Dennis the Menace, but in a good way." Mr. Livingston went on to say, "Dylann was the kind of kid I would have adopted." Ex. 39 (Livingston Dec.) ¶¶ 3-4.

Dylann's third grade teacher at White Knoll Elementary School, Karen Able, shared that Dylann was a talented artist and an average student. Ex. 26 (Able Dec.) ¶¶ 3, 7. For teachers,

Dylann was easy to overlook. Ms. Able recalled that Dylann "was a good kid and was not a behavioral problem in school." Ex. 26 (Able Dec.) ¶ 2. Kathy Brown, a second-grade teacher at White Knoll Elementary, shared:

> Dylann was quiet, he was just there. Maybe if he had been shouting and making a scene people would have sensed something was wrong. But we as teachers thought that Dylann was okay. When kids are quiet, it's hard to know they're not okay.

Ex. 27 (Brown Dec.) ¶ 8.

At White Knoll Elementary, the burden often fell on parents to seek additional support for their child. Ex. 27 (Brown Dec.) ¶ 8. Ms. Brown continued, "[a]s far as I know, Dylann's mom and dad did not come to the school and ask that Dylann receive any additional supports or treatments." *Id.* Most of his teachers do not remember meeting Dylann's father Benn, and only a few of them recalled having any interaction with his mother, Amy. Ex. 35 (DeLeon Dec.) ¶¶ 8-11; Ex. 34 (Cruea Dec.) ¶ 9; Ex. 30 (Waldrop Dec.) ¶ 9; Ex. 28 (Garren Dec.) ¶ 4; Ex. 23 (Burch Dec.) ¶ 8; Ex. 40 (McAteer Dec.) ¶ 18. Dylann's second grade teacher, Catherine Garren, shared that if Dylann had looked unhappy, she would have referred him to the school counselor. Ex. 28 (Garren Dec.) ¶ 6. There was also a district-wide school psychologist who would have been available to help Dylann if they had been looped in, but instead, Ms. Brown shared, she still feels "guilty that we as teachers did not get Dylann the help that he needed." Ex. 27 (Brown Dec.) ¶ 8.

Dylann did have one close friend, Jack Chandler, who he met around the first grade. Roof. The boys lived near one another. They went to each other's homes, playing video games together in each other's rooms. Tragically, Jack Chandler died in a car accident as a teenager. Ex. 38 (Roof Dec.) ¶¶ 10-11.

Beyond his friendship with Jack Chandler, Dylann was isolated and struggled to fit in. At school, he was not a popular kid but rather hung out with one or two friends at recess. Ex. 26 (Able Dec.) ¶ 4.

Dylann and his mother moved frequently, which meant he changed schools often. He switched to Rosewood Elementary School for his fifth-grade year, after having attended White Knoll Elementary School previously. Academically, "Dylann was an average student." Ex. 23 (Burch Dec.) ¶ 6. Three teachers, Ali Burch, Kathleen McAteer, and Pat Peter taught Dylann during his fifth-grade year. Ex.40 (McAteer Dec.) ¶ 2. Math and language arts were divided by students' ability, and Dylann was in the bottom tier in those classes, both taught by Pat Peter. Ex. 40 (McAteer Dec.) ¶ 6. Dylann's teachers had little contact with his parents. Ex. 40 (McAteer Dec.) ¶ 18; Ex. 23 (Burch Dec.) ¶ 8. Dylann's timidness impacted him academically; his teacher Kathleen McAteer "[does] not remember him ever raising his hand to contribute to class, not even once." Ex. 40 (McAteer Dec.) ¶ 15.

By fifth grade, most of the kids had already established friend groups throughout elementary school, and Dylann, for whom it was already difficult to make friendships, struggled to find his place at Rosewood Elementary School. Ex. 23 (Burch Dec.) ¶ 5. Dylann "flew under the radar" during his fifth-grade year, a reality reinforced by the belief that there would be "low expectations for a transfer student to have a lot of friends." Ex. 40 (McAteer Dec.) ¶ 22. His fifth-grade teacher, Ali Burch, described him as a "cute kid" but "not a memorable student." Ex. 23 (Burch Dec.) ¶ 4. She added, "he did not act out, and he did not warrant any extra attention. He was not disruptive, nor was he outgoing." *Id.* She believes that "the fact he was new and none of the teachers or students knew him very well, on top of him being a very quiet kid" made Dylann "easier to overlook." *Id.* ¶ 10. Ralph Waldrop, Dylann's fifth-grade art teacher, remembers Dylann sitting in his chair with his arms crossed over his chest, coming off as "distant and unapproachable." Ex. 30 (Waldrop Dec.) ¶ 6.

Ali Burch shared an "unusual" fifth-grade memory of Dylann, that he used hand sanitizer every time he came in from recess, making sure he "really rubbed it into his hands and fingers." Ex. 23 (Burch Dec.) ¶ 7. His art teacher noted another oddity, that Dylann "made eye contact occasionally, but not in a normal way." Ex. 30 (Waldrop Dec.) ¶ 6.

**B. Jurors not knowing about Dylann's increasing challenges in his teen years, suffering from anxiety and isolation, prejudiced him.**

Dylann's social anxiety crystallized during his teenage years, preventing him from reaching developmental milestones or finding any sense of connection with peers his age.

Dylann's pediatrician, Dr. Philip Mubarak, added that he "should have noted that there was some kind of family dysfunction based on Amy's reporting in the social history, since she often noted that Dylann didn't have a definite bedtime, didn't have chores, didn't take part in sports, and that she didn't have a locked medicine cabinet." Ex. 46 (Mubarak Dec.) ¶ 9.

At Dylann's 14-year-old well check on June 28, 2008, Amy also noted that Dylann had started smoking marijuana, did not eat meals with the family, and did not spend time reading. *Id.* Dylann appeared to have nothing positive or constructive in his life. In hindsight, Dr. Mubarak reflected that he "should have picked up on some of that family dysfunction based on those responses… A child who does not spend any time reading or eat even one single meal with their family at that age is a red flag." *Id.* ¶ 11.

Red flags continued to emerge, this time about Dylann's declining academic performance. In 8th grade, Dylann was one of only three students in his teacher's entire 26-year career who failed the Algebra state test at the end of the year. Ex. 34 (Cruea Dec.) ¶¶ 1, 4. Looking back, his teacher Ms. Cruea shared, she feels like she "failed Dylann" by not noticing he needed help, and "letting him slip through the cracks. Ex. 34 (Cruea Dec.) ¶¶ 10-12. But her job, like the other teachers, was to "push students along." *Id.* ¶ 4.

As Dylann began high school, his anxiety continued to deepen. Teachers who remembered Dylann primarily recalled that he was quiet; one of his 9th grade teachers called him a "little mouse," and a "wallflower" with "no peer group of his own." Ex. 31 (Horton Dec.) ¶¶ 2-3. Though he was quiet, he did not exhibit behavioral issues. *Id.* ¶ 6. Dylann's generally understated presence is what allowed him to go undetected as he started failing his classes. Kay Horton reports:

> I did not know that Dylann failed his 9th grade year at White Knoll High School and had to repeat 9th grade again the following year. Individual teachers are not responsible for failing students; whether a student advances to the next grade is all dependent upon the grades that the student gets across all their classes. Each student needs a certain number of credits to advance to the next year.

*Id.* ¶ 5. Dylann was not oppositional in school, even as his grades were slipping. His French teacher "had a hard time getting Dylann to speak. He wasn't defiant about it -- he just didn't speak." Ex. 47 (Hnat Dec.) ¶ 7.

Dylann failed French I simply due to his absences that year. Ex. 47 (Hnat Dec.) ¶ 3. He had simply stopped going to school. Ex. 38 (Roof Dec.) ¶ 15. He repeated ninth grade a second time before transferring to online school. Ex. 35 (DeLeon Dec.) ¶ 3. At the online school, Dylann remained in the 9th grade for the next three years. This began a period of time in which Dylann rarely left his home.

Dylann's sister, Amber, had a close friend, Frederick "Flynn" Stork, who was one of only about four people to see Dylann at all while Dylann was 15-17 years old, along with Dylann's mother Amy, his sister Amber, and Amber's boyfriend. Ex. 95 (Stork Dec.) ¶¶ 6, 14. Though Amy and Amber's relationship was strained, Amber and her boyfriend moved in with Amy and Dylann until they could find another place to live. *Id.* ¶ 3. Amber would have been about twenty years old at the time. Flynn suspected that Dylann was agoraphobic, as he was "reluctant to leave

190

his mom's house for any purpose." *Id.* ¶ 5. Dylann holed himself in his room, rarely, if ever, leaving the room, let alone the house. Dylann "scurried out of his room like a little rat to get food in the kitchen." *Id.* ¶ 6. On multiple occasions, Dylann "spent two or three days in a row in his room." *Id.*

Amy once told Flynn that "she didn't know what to do about Dylann. Amy went on a two-minute tirade about Dylann not leaving his room," and regularly not even opening the door for her anymore. Ex. 95 (Stork Dec.) ¶ 10. Flynn remembered that Amy was "resigned" to Dylann's behavior, and "didn't seem willing to push it" with Dylann, thinking she "just had to accept him for who he was," recalled Flynn. *Id.* Although Flynn was a young man at the time, he remembered feeling for Dylann, and thinking that "Dylann needed some kind of intervention." *Id.* ¶ 12.

Explaining the dynamic between Dylann and Amy, Flynn reported that Amy's inaction enabled Dylann's isolation. She "walked on eggshells around Dylann," and her protective energy is part of what Flynn believes led others to avoid bringing their concerns about Dylann up to Amy. *Id.* ¶ 15. Flynn believed:

> Amy was trying, she was doing the best that she could with Dylann with the knowledge that she had. If she had more access to resources, she could have gotten more help. Amy wanted to help Dylann desperately, but she clearly didn't know how to move forward with him – she was clearly at a loss for what to do with Dylann. I do not think Amy would have known how to seek outside help for Dylann.

*Id.* ¶ 38.

Dylann's parents divorced when he was young. His father remarried, but Dylann continued to live with his mother. Ex.38 (Roof Dec.) ¶ 13; Ex. 25 (Henry Dec.) ¶ 10. Amy was volatile and unpredictable in her moods. A fellow church member noted:

191

> Amy was up and down as a person. I never knew if Amy was going to be happy or sad, and so I had to look to see whether I should speak to her or not. You measure your words carefully around people like that. Amy was a loose cannon.

Ex. 43 (Richardson Dec.) ¶ 5.

Dylann's online schooling at Provost Academy began in the fall of 2010, and he was again—for the third year in a row—classified as a ninth grader while his peers entered eleventh grade. Ex. 35 (DeLeon Dec.) ¶ 3. Allison DeLeon, Dylann's academic advisor at Provost, described the "unstructured" nature of the school: "Students followed along in the textbook and watched some videos if the teacher put them up on their page, but students didn't have class-wide videochats the way that they often do today. Students largely worked alone." *Id.* ¶ 5. Check-ins occurred with busy guidance counselors over the telephone, and office hours with teachers were voluntary. *Id.* ¶¶ 5-6. "There were no group projects at Provost, so Dylann did not engage with other students," his advisor continued. *Id.* ¶ 7.

Ms. DeLeon never met Dylann in person but sensed Dylann's isolation from her brief interactions with him over the phone:

> I tried to find ways to connect with my students, but it was hard to connect with Dylann. Dylann was quiet and meek. I recall trying to understand what Dylann did with his days, so I could build him up and encourage him to do his work by connecting it to something he cared about. I asked him what he did for fun, and he said he did nothing. I would ask him about his weekend, and he would say that he did not do anything. He seemed like an outcast in many ways. As far as I could tell, Dylann was not included in things and did not have many friends. He did not seem to have any hobbies. Dylann seemed developmentally delayed as well. Other students regularly asked me questions when I spoke with them, but Dylann never asked me any questions.

Ex. 35 (DeLeon Dec.) ¶ 7. Ms. DeLeon's "window into Dylann's world was so small," but she "sensed that Dylann was pushed to the side during his life." *Id.* ¶ 8. His timid nature and limited motivation meant he was "not the kind of student who would ask for help in school," and at

Provost, a lack of motivation was "on the student and their parents to fix." *Id.* ¶¶ 12, 14. But Amy was "resigned" and unwilling to push Dylann. Ex. 95 (Stork Dec.) ¶ 10.

At Dylann's 17-year-old well check, Dylann's pediatrician made a referral for Dylann to see a counselor to help develop his social skills and address his reported anxiety, insomnia, and irrational fears. Ex. 46 (Mubarak Dec.) ¶ 15. The counselor, Patricia Tooma, had an office in the same building as Dylann's life-long pediatrician, so Dylann would not have to go to an unfamiliar place. *Id.* Dylann never went to counseling. *Id.* Unsurprisingly, Dylann's isolation and anxiety festered, untreated. At his 18-year-old well check, Dylann was still suffering from anxiety, sleep disturbances, and being oppositional. He continued spending eight hours per day on electronics and still did not go outside the home. *Id.* ¶ 17.

Even once he became an adult, Dylann continued to see his pediatrician. His mother Amy expressed concern to Dylann's pediatrician that Dylann continued to have anxiety and sleep disturbances, was oppositional, and spent at least eight hours a day on his electronics. Ex. 46 (Mubarak Dec.) ¶ 17. Amy also reported problems with his peer groups and was concerned because Dylann did not go outside the home. *Id.* Dr. Mubarak shared Amy's concerns and stressed that "interacting with peers is critical to a teenage boy's development." *Id.*

With his legal adult status, Dylann continued with increased determination to refuse certain types of medical care. *Id.* ¶ 18. Dr. Mubarak referred Dylann to the counselor a second time, "but Dylann again refused." *Id.*. He also rejected Dr. Mubarak's suggestions for a flu shot, a Tdap vaccine, an otolaryngology referral for his deviated septum, and a dermatologist referral to address his acne. *Id.* Because Dylann was legally an adult, there was nothing anyone could do to medically intervene. *Id.*

193

Even though Dylann was at his online school for three years, he never left the ninth grade. Ex. 35 (DeLeon Dec.) ¶ 13. Between his years at White Knoll High School, Dreher High School and online school, Dylann failed the ninth grade six years in a row before finally withdrawing.

With Dylann a young adult, his parents were eager for him to get work and arranged for him to do lawn care work at Clark's Termite & Pest Control. But his stint at Clark's was short-lived. Dylann's supervisor, Brian Fanning, noticed that Dylann "was slow to learn, and had difficulty retaining new information." Ex. 24 (Fanning Dec.) ¶ 3. Employees had to tell Dylann every single piece of equipment that he had to load, as he stood off to the side with a shy, nervous grin. *Id.* His crew leader shared how "one time, Dylann was told to edge on a house, and the next thing we knew, Dylann was edging three houses down from where he was supposed to be." *Id.* ¶ 6. Dylann could not "assess and make decisions about what was needed for a job without someone helping him." *Id.* ¶ 3.

Working at Clark's Pest Control was a disaster for Dylann. In addition to the physical and mental demands of the job, Dylann floundered in the social aspect as well. He struggled to interact with his coworkers in a normal manner. Brian Fanning described Dylann:

> Dylann got embarrassed easily -- just trying to have a conversation would make him embarrassed. If he came to ask me for a day off, he would wring his hands painfully hard. It was hard for him to talk, and it was painful for me to watch him try to talk. You had to pry words out of his mouth when talking to him. Dylann answered questions asked of him with the bare minimum number of words possible. It was like pulling teeth to get him to give more than a one-word answer. He spoke in the shortest sentences possible. Even when he did give us one or two words, it took him a long time to ever give us that kind of answer. Not once did I see him initiate a conversation.

Ex. 24 (Fanning Dec.) ¶ 9. Dylann struggled to look coworkers in the eye. *Id.* ¶ 7.

Dylann's functioning was impaired and his social skills and mannerisms askew on the few occasions he left the house. When he attempted to obtain a debit card with First Citizens

194

Bank in Columbia, the banker was immediately struck by how "off" Dylann seemed. Ex. 32 (Hicks Dec.) ¶ 2. Dylann was "meek, hunched over, and spoke very quietly . . . . It was like he was not there." *Id.* While at the bank, "Dylann also avoided making eye contact, mumbled when he spoke, and struggled to understand simple questions such as his mother's maiden name." *Id.* ¶ 3.

In 2015 Dylann was hired for the second time by Clark's Pest Control, owing to his father Benn's longtime friendship with head of the company, David Clark. Ex. 42 (Pack Dec.) ¶ 11. Like his first brief stint at Clark's, Dylann was unable to engage with his coworkers or complete without instruction the rudimentary landscaping jobs they assigned him. Dylann earnestly told his coworkers that when he wasn't at work, he did "nothing but stare at the wall." *Id.* ¶ 8. Once he was unable to maintain employment at Clark's for a second time, he was fired and his parents were no longer willing to support their son. Instead of understanding their son's impairments, they expected him to grow up and get a job.

In the two months prior to the homicides, having been kicked out of his home, Dylann was living in his car or living at the Meek family trailer with Joey Meek an acquaintance Dylann had not seen since middle school; Joey's two younger brothers, Jacob and Justin; Joey's girlfriend, Lindsey Fry; and Joey's mom, Kim Schultz—a single mother who was scarcely around, owing to her regular double shifts at the Waffle House. Ex. 33 (Schultz Dec.) ¶ 13. Right around that time, a neighbor and peer of Dylann and Joey's committed suicide by shooting himself in the head. Joey said seeing his "blood and guts" on the floor was the "worst thing he'd ever seen." *Id.* ¶ 19. The suicide of their peer demonstrates the difficult living situation in and around the Meek trailer.

**C. Jurors not knowing about Dylann's Auditory Processing Disorder, communication impairment and severe anxiety prejudiced him.**

Dylann has been diagnosed with an Auditory Processing Disorder (APD), which interferes with his ability to process and understand what is spoken to him in real time. Jurors never heard about Dylann's APD, communication impairment, and severe anxiety, and how those disorders impacted his life.

Auditory Processing is the process of what our brains do with the things we hear through our ears. Ex. 3 (Lucker Report) at 2. Dylann's actual hearing is fine, but his processing of that information and placing meaning to it is significantly impaired and significantly delayed. Ex. 3 (Lucker Report) at 4; Ex. 2 (Ouaou Report).

Compounding his APD are his deficits in functional language. He "demonstrate[s] a profound weakness in all areas of pragmatic social skill performance including information exchange, following conversational rules/routines and using nonverbal skills commensurate with his intended message." Ex. 1 (Fritz Report) at 1.

His high IQ and various strengths mask the serious deficits he has, deficits that impact his ability to be successful in school (having spent five years in the 9th grade), his ability to maintain employment, his ability to have an active social life and friendships with peers. The impact on his life from these impairments, discussed above, are corroborated and explained by understanding that this is a brain-based neurophysiological disorder. Ex. 3 (Lucker Report) at 4. *See* Claim 7.

Dylann's APD impairment is especially acute when competing with multiple stimuli at the same time, which helps explain some of the reasons that Dylann stayed in his room for years. His communication deficits are also related to interacting with other humans, further explaining his inability to be successful in work, school, or social domains.

The neuroanatomy of Dylann's brain corroborates these impairments. While many parts of Dylann's brain are volumetrically larger than is typical, various parts of the temporal lobe are "less than optimal." Ex. 4 (Bigler Letter) at 5. The temporal lobes that are abnormal are responsible for memory, emotional control and regulation. *Id.* In particular, Dylann's right parahippocampal gyrus is smaller than 97% of the population. *Id.* This stands in stark contrast to his amygdala, which is larger than 99% of the population, correlating to the anxiety disorder with which he has repeatedly been diagnosed. *Id.* The anxiety disorder, and large amygdala, can account for some of Dylann's social awkwardness, such as his reluctance to make eye contact with others. A large amygdala can actually be associated with better ability to read social situations, so this warrants further exploration. *See, e.g.*, *https://pmc.ncbi.nlm.nih.gov/articles/PMC4631154/*. The parahippocampal gyrus, which is so unusually small in Dylann, is further confirmation of his APD, since this part of the brain is involved in the auditory system.

Dylann's APD and communication deficits were important for the jury to hear. Having heard the information above about Dylann as a friendless loner, it is important for them to understand that this was not just a symptom of him being antisocial, but instead the result of a communication impairment that made making friends difficult.

The jury saw Dylann's FBI interrogation and watched him in the courtroom for weeks. But his communication impairments would help the jury to understand Dylann's lack of a timely appropriate social response, both in the interrogation and in court. Knowing about the disorders would have helped the jury to make sense of the interrogation video in new ways. For example, the long pauses in the interrogation video take on new meaning when understood in this context. (i.e. there is a long pause after Dylann is asked where he is coming from, before he eventually

says "Charlotte"). The jury would have been able to see that Dylann seems less impaired in the video when he is asked yes or no questions, rather than open-ended ones. The jury could have seen Dylann's impaired affect in the video, but understanding his disorders would give an explanation for this. Without explanation, one could assume that he is cold and unfeeling. This is not true, despite his limited range of outward affect.

Further, Dylann's processing speed is quite low. *See* Ex. 2 (Ouaou Report). This helps explain why Dylann always faded into the background at school and in social settings. While he is intelligent, he likely did not have the ability to process his environment quickly enough to keep up and participate.

These disorders are compounded by Dylann's severe anxiety. Every doctor that has evaluated Dylann has found his Anxiety evident. His childhood pediatrician, Dr. Mubarak, recalls that at age seventeen Dylann reportedly had anxiety, insomnia, and an irrational fear of going outside the house. Ex. 46 (Mubarak Dec.) ¶ 15. At age eighteen he continued to have anxiety, sleep disturbances, no interaction with peers, and didn't leave the house. *Id.* ¶ 17.

Dylann's Social Anxiety Disorder is one that causes a "marked, or intense, fear or anxiety of social situations." Diagnostic and Statistical Manual V (2013) at 203. A feature of this disorder is that social situations "almost always provoke fear and anxiety." *Id.* However, the jury heard none of this information. *See also Claim 3.*

**D. Jurors not knowing that Dylann was not a management problem in the jail and could be safely housed in prison for the remainder of his life prejudiced him.**

Dylann had been housed in jail for eighteen months prior to his trial. He did not have a single disciplinary write-up or rule violation in that entire time. *See* Ex. 54 (Complete Inmate File CDC); Ex. 53 (Memo of Investigation 09/07/15) at 3. In fact, he was a model inmate

Dylann thanked officers who transported him for their work. He was friendly and appreciative. Ex. 51 (McPherson 302) at 1. He kept his cell neat and orderly. Ex. 49 (Cradock Interview 7-25-16). He spent his time reading. *Id.*; Ex. 41 (Ireland Dec.) ¶ 5. Although he was on the receiving end of much hostility, with inmates spitting on his door and yelling at him, he did not reciprocate or allow himself to become provoked. Ex. 50 (Bixby 302) at 2; Ex. 93 (Bixby Dec.) ¶ 8.

Prior to his arrest for the instant offenses, Dylann had no history of incarceration. Ex. 21 (Austin Dec.) at 1. He had no history of violence. *Id.* He had a very limited non-violent criminal record. *Id.* If a jury returned a life sentence, he could be safely housed and monitored by the Bureau of Prisons for the remainder of his life. *Id.* at 2. An expert could have shared that because of his non-serious, non-violent record, it is likely Dylann would not commit serious or violent infractions during his incarceration. Ex. 21 (Austin De.) at 1.

Information about Dylann's family's love for him, his life history, his impairments, and his ability to be safely housed in prison are all significant mitigation factors that the jury never heard. These are all facts that Dylann would have permitted counsel to present, if only they had not single mindedly insisted on presenting a diagnosis of autism with which Dylann vehemently disagrees. If the jury had heard this information, there is a reasonable probability that at least one juror would have voted to spare his life. Indeed, any of these factors alone likely would have caused at least one juror to spare Dylann's life.

**CLAIM 10:    Trial counsel was ineffective because lead counsel David Bruck, over the team's opposition, cross-examined Felicia Sanders, to disastrous result, and he failed to timely object.**

Felicia Sanders, a survivor of the shooting, was the government's first witness at the guilt phase of the trial. She gave emotional testimony about the trauma she had experienced. Ms.

Sanders described each murdered parishioner one by one. She described at length how she hid under a table, holding her granddaughter so tightly to her chest to keep her quiet that Ms. Sanders worried she was suffocating her. She and her granddaughter played dead as Ms. Sanders watched her son Tywanza Sanders get shot. Tr. 12/07/16 at 84. Ms. Sanders' testimony concluded:

> I was just waiting on my turn. It was a lot of shots. Seventy-seven shots in that room, from someone who we thought was there before the Lord, but in return, *he just sat there the whole time evil. Evil. Evil as can be.*

*Id.* at 85 (emphasis added).

Understandably, Ms. Sanders became emotional throughout her testimony. The AUSA questioning her reminded her that she could "take [her] time." Tr. 12/07/16 at 72. The audience of supporters and spectators in the courtroom reacted audibly to her testimony. *Id.* at 74.

When the prosecutor asked if she knew when Dylann left the church after the shooting, Ms. Sanders was at this point so overcome by emotion that she was only able to nod in response. *Id.* at 85. Ms. Sanders ended her testimony with a heart-wrenching portrayal of her plea to Ms. Polly Sheppard, another survivor:

> I said, please help my son. Because Miss Polly is a nurse. She grabbed the white tablecloth off the table and she was trying to help him. When he reach Aunt Susie, he grabbed a handful of Aunt Susie hair, and we watched him take his last breath. I watched my son come in this world and I watched my son leave this world.

*Id.* at 86. At this point, the courtroom was in tears, including Ms. Sanders. The prosecution asked for a break. *Id.*

Following a ten-minute recess, as the court prepared to bring in the jury, counsel objected to parts of Ms. Sanders' testimony. *Id.* at 86-87. The court immediately overruled the objection, and the AUSA interjected to add that it was not a timely objection, which the court agreed with. *Id.* at 87. Mr. Bruck attempted to explain why he had not objected immediately at the time Ms.

Sanders was testifying, saying: "may the record reflect that the witness was crying and understandably very upset during parts of her testimony, and it seemed inappropriate to respond." *Id.* at 88.

Mr. Bruck then proceeded to cross-examine Ms. Sanders. The cross examination was brief:

> Q. Good afternoon, Miss Sanders. I only have one question to ask you; I'll be done. Do you remember the man who did this saying something about that he was only 21, and then talking about what he was going to do afterwards?
>
> A. Yes.
>
> Q. Could you tell us what he said?
>
> A. He say he was going to kill himself. And I was counting on that. *He's evil. There's no place on earth for him except the pit of hell.*
>
> Q. He said that he was 21? And then that he was going to kill himself when he was finished?
>
> A. *Send himself back to the pit of hell, I say.*
>
> Q. Did -- he didn't say that though. About hell. He just said he was going to kill himself?
>
> A. *That's where he would go, to hell.*
>
> MR. BRUCK: Yes, ma'am. I'm so sorry. Thank you.

Tr. 12/07/16 at 89-90 (emphases added).

The press widely reported the statements defense counsel elicited from Ms. Sanders on the first day of trial, making clear the impact of these statements in the courtroom and beyond. Ex. 83 (NBC news story); Ex. 81 (Dylann Roof trial); Ex. 84 (We All Know I am Guilty); Ex. 85 (Sack Dylann Roof Trial); Ex. 86 (Berry Haws news article); Ex. 82 (Pit of Hell); Ex. 87 (Smith Dylann Roof Trial); Ex. 80 (P & C Facebook Page post -12-07-16) (comments from the

community, including "OMG Felicia. I am so sorry. There should be a fast train to Hell for people like him.").

Everything about this cross-examination was ineffective. Asking Ms. Sanders a question was ineffective. Continuing to ask the same question two more times, and eliciting the statement that Dylann deserved "hell" three separate times was ineffective. Failure to immediately object, ask to strike the testimony as non-responsive, and ask for a curative instruction was ineffective. This spectacular failure on the very first day of testimony—indeed, with the very first witness—set the tone for the rest of the proceedings.

**A. Asking any questions of Ms. Sanders, let alone asking her to repeat three times her statement that Dylann belonged in hell, was deficient performance.**

Mr. Bruck should not have asked Ms. Sanders any questions. Everyone seemed to understand this, except Mr. Bruck himself.

Co-counsel Kim Stevens, an experienced capital litigator in her own right, saw the clear danger in cross-examining Ms. Sanders. But Ms. Stevens felt that her voice was sometimes "ignored by David." Ex. 6 (Stevens Dec.) ¶ 19. The morning of December 7, 2016, just hours before Ms. Sanders would take the stand, Mr. Bruck and Ms. Stevens went for a walk. *Id.* ¶ 20. Ms. Stevens made clear to Mr. Bruck on that walk that he should not ask Ms. Sanders any questions, saying "Ms. Sanders is angry and you don't know what she's going to say." *Id.* She could see that provoking Ms. Sanders in front of the jury was too big of a risk. And she believed she had convinced Mr. Bruck. *Id.* Attorney Emily Paavola also believed that Mr. Bruck should not cross-examine Ms. Sanders. Ex. 7 (Paavola Dec.) ¶ 14.

When the team had discussed the possibility of cross-examining Ms. Sanders, team members had reached out to Tammy Krause, the defense victim outreach (DVO) expert the team

had retained. Ms. Krause was the only team member who had sat at a table with Ms. Sanders. Ms. Krause unambiguously told trial counsel not to cross examine Ms. Sanders.

Even if Mr. Bruck was still planning to cross-examine Ms. Sanders despite being told he should not do so by the other lawyers and the DVO expert, Ms. Sanders' heart-wrenching direct testimony calling Dylann evil should have been enough to dissuade him. And at that time Ms. Stevens *once again* warned Mr. Bruck and advised him against any cross-examination; she "leaned over to David during direct and told him again not to ask Felicia Sanders any questions." Ex. 6 (Stevens Dec.) ¶ 20.

Mr. Bruck, though, dismissed the advice of his co-counsel Ms. Stevens, his co-counsel Ms. Paavola, and the DVO expert Ms. Krause. Ms. Sanders was angry at their client and devastated by his actions that she just had to relive and recount publicly. She was grieving the murders of her son, her aunt and best friend, her pastor, and a roomful of people she held dear. She was reliving the terror of believing her own life and the life of her young granddaughter were about to end. The risk should have been obvious to Mr. Bruck, as it was to Ms. Stevens, after Ms. Sanders had just called their client "evil as can be."

When Mr. Bruck cross examined Ms. Felicia Sanders, it was as disastrous as everybody—except, apparently, Mr. Bruck—had predicted. Eliciting the statement that his own client was deserving of hell and beyond redemption was, undoubtedly, devastating. And to make matters worse, Mr. Bruck elicited this statement three times.

The error was, in fact, so clearly ineffective that the court presumed Mr. Bruck's actions were calculated to force a mistrial. In responding to Mr. Bruck's motion for a mistrial the next morning, the court said:

> I have the impression when he did it, he was trying to produce a mistrial, and I anticipated a motion this morning. That's frankly how I saw it, he did not make a timely objection, which was -- then it's waived.

Tr. 12/08/16 at 201.

Mr. Bruck denied at the time (and still denies) that he was trying to force a mistrial, but the court did not believe him. Tr. 12/08/16 at 205; Ex. 5 (Bruck Dec.) ¶ 53. The court reiterated: "It looked that way, Mr. Bruck, to me." Tr. 12/08/16 at 205. The trial court also pointed out that Mr. Bruck elicited the damaging information *three times in a row*. The true explanation for Mr. Bruck compounding this harm is not that he wanted to cause a mistrial. Mr. Bruck simply did not hear Ms. Sanders' statements, because his hearing was failing at the time and he had yet to get hearing aids. Ex. 5 (Bruck Dec.) ¶ 53. Ms. Paavola remembers "David's hearing was very bad at the time." Ex. 7 (Paavola Dec.) ¶ 15. When she saw him again after the trial, he was wearing hearing aids. *Id.*

**B. Failing to immediately object to Ms. Sanders' statement that Dylann should go to hell was deficient performance.**

Counsel said nothing at all about Ms. Sanders' statements contemporaneously, and the government simply called their next witness. The trial ended for the day with no further mention of the incident.

The following morning, counsel filed a written motion for a mistrial, arguing that Ms. Sanders' "evil" and "pit of hell" comments incurably tainted the trial. Tr. 12/08/16 at 198, Dkt. Nos. 776; 777. As alternative relief, counsel asked the court to strike the testimony and instruct jurors that "a survivor or victim family member's opinion regarding the appropriate punishment is not a proper consideration" at trial, and should be given no weight at penalty. Dkt. Nos. 776; 777. The court denied the motion. Tr. 12/08/16 at 213.

204

There was no reason for counsel not to have immediately objected to Ms. Sanders'
statements during cross-examination. This is a particularly glaring failure because following her
direct examination, Mr. Bruck's objection to that testimony was overruled in part because it was
untimely. His explanation that he did not want to interrupt her did not apply to cross-
examination, when he was the one asking questions of Ms. Sanders (in other words there would
have been no interruption), and he had just—moments before—been put on notice that
objections that were not immediate would be overruled. Yet counsel said nothing at the time of
cross-examination or even immediately following, and instead filed for a mistrial the following
day. Predictably, the court's ruling on the mistrial motion found that Dylann "waived" his
objection by not raising it sooner, asserting it *could not* consider the objection or request to
strike. Tr. 12/08/16 at 201. The trial court directly admonished counsel about timely objections:
"You know, one of the things I keep saying to y'all is just because it's a capital case, we don't
change our rules. Rule 103 is our rule. Timely objections. You have got to make it." Tr. 12/08/16
at 211; *see also United States v. Parodi*, 703 F.2d 768, 783 (4th Cir. 1983) (Federal Rule of
Evidence 103 requires that evidentiary objections must "be made at the time the evidence is
offered.").

    Ultimately, the trial court ruled:

> I find both objections untimely, and that alone will be the basis in which to deny
> them… but out of an abundance of caution, I'm prepared to tell the jury, without
> referring to it, I'm not going to strike it, because I have trouble striking that the
> defense counsel elicited three times, but I will instruct the jury simply that this- - I
> want to remind them that the sentencing decision is always theirs, and it's not the
> responsibility of any of the parties or any of the witnesses or the Court, it's theirs.

12/08/16 at 213-14.

    The law is clear not only that objections must be raised immediately, but also that Mr.
Bruck should have objected to Ms. Sanders' calls to send Roof to hell and her repeated

description of him as "evil." *See Humphries v. Ozmint*, 397 F.3d 206, 217 (4th Cir. 2005) (en

banc) ("admitting evidence of the victims' opinions of the crime and of the appropriate sentence

for the defendant violates the Eighth Amendment"); *United States v. Bernard*, 299 F.3d 467, 480

(5th Cir. 2002) (finding plain error when victims "characterize[d] the Appellants, and offer[ed]

opinions about the nature of their crime"). There is "no place in a courtroom for such personal

vilification of a defendant [including calling him 'evil'], no matter how vile the charges against

him." *Furnish v. Comm.*, 267 S.W.3d 656, 663 (Ky. 2007); *see also Cauthern v. Colson*, 736

F.3d 465, 474-78 (6th Cir. 2013) (granting habeas relief, in part, for comments calling capital

defendant "evil"). The "admission of a victim's family members' characterizations and opinions

about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment."

*Bosse v. Oklahoma*, 580 U.S. 1, 2 (2016). Such testimony "is irrelevant," "serve[s] no other

purpose than to inflame the jury and divert it from deciding the case on the relevant evidence,"

and "creates a constitutionally unacceptable risk that the jury may impose the death penalty in an

arbitrary and capricious manner." *Booth v. Maryland*, 482 U.S. 496, 502-03, 508 (1987),

overruled on other grounds by *Payne v. Tennessee*, 501 U.S. 808, 810 (1991). Courts have

stressed that dehumanizing comments about a capital defendant may render a trial fundamentally

unfair, in violation of due process. *Darden v. Wainwright*, 477 U.S. 168, 179-81 (1986); *Bennett

v. Stirling*, 842 F.3d 319 (4th Cir. 2016).

      Accordingly, Mr. Bruck's failure to not immediately object to Ms. Sanders' comments

made during cross-examination constituted deficient performance.

## C. The statements Mr. Bruck elicited on cross-examination and failed to object to prejudiced Dylann.

      Courts prohibit testimony like Ms. Sanders' comment (repeated three times) that Dylann

would go to hell, because such comments threaten to overcome jurors with emotion and

discourage them from voting for life, lest they disappoint a grieving victim. Here, those concerns were magnified by Ms. Sanders' obvious distress at the time she delivered her remarks. Their admission, without cure, "so infected the trial with unfairness as to make the resulting sentence a denial of due process." *Bennett v. Stirling*, 842 F.3d 319, 327-28 (4th Cir. 2016) (alteration and quotations omitted). Ms. Sanders was the very first witness. Jurors were unlikely to forget her emotional exhortations.

In fact, the jurors did not forget her statements, which ultimately influenced their deliberations in the case on both the issue of guilt and of whether Dylann should be executed. On April 30, 2018, just over a year after the Roof jury made the determination that Dylann deserved

███████████████████████████████████

█████████████

*Bennett* is instructive. In that case, the prosecutor addressed the defendant in derogatory terms. Though the remarks were arguably ambiguous, their inflammatory, dehumanizing nature "damaged the jury's ability to consider objectively, and individually, whether mercy was warranted," in violation of due process. *Bennett*, 842 F.3d at 325-26. Because the trial judge never instructed jurors to disregard the comments, the court ordered a new penalty hearing even on deferential habeas review. *See generally Bennett v. Stirling*, 170 F. Supp. 3d 851, 867 (D.S.C.), *aff'd*, 842 F.3d 319 (4th Cir. 2016).

The problematic statements in Dylann's case were all the more powerful because they came not from the prosecutor, but from a family member of two of the deceased, herself a survivor of the shooting. Her comments that the defendant would go to hell certainly carried more weight with the jury than if a prosecutor had made them, and the jury foreman confirmed the weight those emotional comments carried with the jury in determining Dylann was both guilty and deserved death. That is precisely why Mr. Bruck should not have cross-examined Ms. Sanders, or at least should have objected to her statements once she made them. And that is precisely why they were so detrimental, and prejudicial, to Dylann. The court should grant Dylann a new trial based on this prejudicial error.

**CLAIM 11:    Trial counsel ineffectively disregarded the advice of their jury consultant and tried his case in a venue that was saturated with community bias, in violation of Dylann's right to a fair trial.**

Trial counsel ignored advice from their jury consultant to conduct a community survey, which would have provided objective data about the overwhelming amount of media prejudicial to Dylann having a fair trial. *See* Ex. 17 (de La Rue Dec.) ¶ 7; Ex. 55 (Edelman Dec.) at 1.

Having failed to conduct the recommended investigation, trial counsel failed to move for a change in venue. As a result, Dylann was tried in a jurisdiction that "was saturated with extensive prejudicial pretrial publicity," creating "explicit and implicit pressure on a jury to reach the 'correct' verdict"—a death sentence—"to help heal the community." Ex. 55 (Edelman Dec.) at 31.

Although the case received national attention, the coverage in the rest of the country was nothing like the coverage immediately around Charleston, South Carolina. In Charleston-area newspapers, in the year leading up to the trial, approximately 1,182 articles were published about the case. Ex. 55 (Edelman Dec.) at 8.[53] The coverage was "emotionally charged." Ex. 55 (Edelman Dec.) at 1. The media linked the crime to broader historical racial struggles in America and South Carolina, "accentuat[ing] intergroup conflict and in-group identification." Ex. 55 (Edelman Dec.) at 12. "When this occurs the media can generate pressure on a jury to render a verdict that will satisfy the community's demand for justice." Ex. 55 (Edelman Dec.) at 12. The media coverage was so extensive that the jury pool in the Charleston community was "exposed to massive prejudicial and sensational publicity." Ex. 55 (Edelman Dec.) at 8.

Trial counsel, having failed to investigate the issue, were unaware of the extent of prejudicial media. Although counsel "checked the box" of retaining a jury consultant, in their rush to get the case to trial, they ignored their expert's advice to conduct a community survey. Jury consultant Denise de La Rue "recommended to the team that they conduct a public opinion survey," Ex. 17 (de La Rue Dec.) ¶ 7, and later "indicated that she believed that the team could make a case for change of venue," Ex. 6 (Stevens Dec.) ¶ 30. However, lead counsel David

---

[53] The search discussed in Dr. Edelman's declaration included the *Post and Courier, The Georgetown Times, Charleston Examiner, Beauford Gazette, Bluffton Today,* and *Hilton Head Island Packet,* with a date range of June 17, 2015, to September 26, 2016.

Bruck "was uninterested in pursuing this issue." Ex. 6 (Stevens Dec.) ¶ 30. The team "deferred to David" and conducted no investigation into whether they should seek a venue change, despite the recommendation of their jury consultant. Ex. 6 (Stevens Dec.) ¶ 30; *see also* Ex. 5 (Bruck Dec.) ¶ 22 (noting that he "did not follow" the advice of the jury consultant he retained and "did not conduct any research related to" or "consider" a transfer).

Data from a community survey would have supported a motion for a change of venue, either a within-division transfer to another division within the District of South Carolina, *see* Fed. R. Crim. P. 18, or an outside the district transfer, *see* Fed. R. Crim. P. 21(a). Because of trial counsel's failure to investigate, Dylann was tried in a jurisdiction where there was "explicit and implicit pressure" to sentence him to death. Ex. 55 (Edelman Dec.) at 2.

## A. Counsel conducted no venue-related investigation, despite the recommendation of their expert jury consultant.

Counsel decided almost immediately, without any investigation, that they would not seek change of venue to another district or even a within-district transfer to another division within the District of South Carolina. Ex. 5 (Bruck Dec.) ¶ 22; Ex. 17 (de La Rue Dec.) ¶ 4, 5. Lead trial counsel advised the court that he believed an impartial jury could be selected from the community—even though, having conducted no investigation, he had no factual basis for this belief. Dkt. No. 255; Ex. 5 (Bruck Dec.) ¶ 22. Consequently, the jurors in this case were drawn from the Charleston Division and the federal trial was held at the at the U.S. District Courthouse in Charleston, South Carolina—a mere mile from where the attack occurred. Dkt. No. 255.

In Ms. de La Rue's view, "in a case with extensive pretrial publicity, certainly when it involves a capital trial, it is imperative to conduct research to know whether a change of venue should be sought." Ex. 17 (de La Rue Dec.) ¶ 6. In fact, even if, following the survey, "ultimately the decision is not to move for a change of venue, the data is valuable in litigating jury selection

procedures" and "may also be useful in informing what areas of questioning are essential to develop in a jury questionnaire and voir dire." Ex. 17 (de La Rue Dec.) ¶ 6. Additionally, "[b]etween July 2016 and November 2016, there certainly would have been enough time to do an opinion survey, both in the trial venue and other potential venues for comparison." Ex. 17 (de La Rue Dec.) ¶ 11. In other words, there was absolutely no reason not to conduct this research: there was sufficient time; the expert jury consultant strongly recommended it; and even if the team ultimately decided not to pursue a change in venue, the information gathered would have been useful.

Despite this, counsel "seemed to hold the view that there was no point in conducting a survey." Ex. 17 (de La Rue Dec.) ¶ 11. As such, trial counsel did not conduct the recommended opinion survey in the trial venue (Area C, or the Charleston Division). Ex. 17 (de La Rue Dec.) ¶ 9. Nor did trial counsel survey other potential venues for comparison. *Id.* Counsel's statistician and demographer provided defense counsel with a list of districts in the Southeast that were similar demographically to Area C. Ex. 18 (Martin Dec.) ¶ 12. He also identified Area D, the Florence Division of the U.S. District Court of South Carolina, as being demographically similar to Area C. Ex. 18 (Martin Dec.) ¶¶ 12-13; Ex. 17 (de La Rue Dec.) ¶¶ 13-14. But counsel did not follow up on this information and conduct surveys. As Ms. de La Rue explains, "[i]t is not possible to make informed decisions without bothering to do the work to become informed" but the trial team "simply didn't do the work." Ex. 17 (de La Rue Dec.) ¶ 12.

Frankly, even beyond Ms. de La Rue's recommendation, the need to investigate venue-related issues was obvious from the beginning. "[E]motionally charged" media coverage "saturated" the jurisdiction "with extensive prejudicial pretrial publicity." Ex. 55 (Edelman Dec.) at 1. Coverage linked the crime to broader historical racial struggles in America and South

211

Carolina, "accentuat[ing] intergroup conflict and in-group identification," and generating "pressure on a jury to render a verdict that will satisfy the community's demand for justice." Ex. 55 (Edelman Dec.) at 12.

The location of the crime, and its importance to the local community in particular, played a role in the media saturation. Emanuel AME Church is a beloved and prominent African-American institution known throughout the United States but with a special resonance in its local community. Emanuel AME is "one of the oldest black congregations in the South and was already culturally significant." Ex. 76 ("Charleston's Oldest Black Church") at 2. Indeed, the church "has survived natural disasters and an antebellum ban on black churches" and "in 1822, Mother Emanuel was burned for its association with Denmark Vesey, a former slave who tried to organize a slave revolt." *Id.* at 2. The church also has a long history of social justice—civil rights marchers gathered in the space, and Booker T. Washington and Martin Luther King Jr. were among those who spoke from the pulpit. *Id.* at 2. In the wake of the murders, the city was filled with visitors and prominent politicians who came to Mother Emanuel to pay homage to the victims, as the site had become "part tourist attraction, part shrine." *Id.* at 3.

But even as people from outside of Charleston filled the church, the impact was felt most of all in Charleston itself. In the wake of the shooting, the Charleston community responded with an outpouring of support for Mother Emanuel and the greater African American community. Prayer vigils and marches filled the streets. The community rallied behind the slogan "Charleston Strong," which became the unofficial motto for Charleston residents. One member of the defense team recounted that "'Charleston Strong' bracelets were visible throughout the courtroom during the trial. Charleston Strong was displayed all over the Charleston area from the time of the offense until the trial. Flags were at houses and businesses and hanging from the light poles

around town and the Emmanuel church. There were also yarn creations hanging on light poles

(with hearts, the date, or other things signifying connection to Charleston Strong) around town."

Ex. 20 (Childs Dec.) ¶ 17; *see also* Ex. 104 (P&C Facebook Comments).

As potential jurors' responses on the Supplemental Case Questionnaire came in, the data

confirmed what Ms. de La Rue had anticipated in recognizing that, "[g]iven the prevalence of the

media coverage and the deep impact of the offenses on the citizens of Charleston, and the media

coverage that continued daily, I did not believe a change of venue should have been ruled out

without conducting the appropriate research." Ex. 17 (de La Rue Dec.) ¶ 7. According to their

responses, a high number of prospective jurors already believed that Dylann should receive a

death sentence. Ex. 17 (de La Rue Dec.) ¶ 16. The responses were sufficiently concerning that an

attorney on Dylann's team thought a motion for a change of venue was appropriate at that point,

even though they had not pursed one previously: "I raised the question then of whether we

should request a change of venue, and our jury consultant indicated that she believed that the

team could make a case for change of venue." Ex. 6 (Stevens Dec.) ¶ 30. However, Mr. Bruck

was "uninterested in pursuing this issue." Ex. 6 (Stevens Dec.) ¶ 30.

As Ms. de La Rue notes, "[e]vents can occur right up to and sometimes during jury

selection which give rise to the need to explore a different venue." Ex. 17 (de La Rue Dec.) ¶ 7.

Indeed, "[s]everal such events did happen before trial in the Roof case." *Id.* ¶¶ 7, 18. In August

2016 (after defense counsel had submitted its agreed-upon supplemental juror questionnaire),

information about inflammatory writings confiscated from Dylann's jail cell and car became

213

public. This created even more of a media frenzy. Dkt. No. 254 at 4; Dkt. 319 at 8; Ex.17 (de La Rue Dec.) ¶ 18.[54]

　　And, as prospective jurors were reporting for individual voir dire, they were met with a heavy presence of media and armed security, including rooftop snipers, because of the Michael Slager trial, which was going on at the same time. Ex. 17 (de La Rue Dec.) ¶ 19; Ex 12 (Norris Dec.) ¶¶ 38-39. Slager, a white Charleston police officer, was facing a jury of his own for killing Walter Scott, an unarmed 50-year-old African American man. He was being tried in a courtroom directly across the street "at the exact time proceedings began in Dylann's case." Ex. 5 (Bruck Dec.) ¶ 16. The case "generated a lot of strong feelings and significant publicity." Ex. 20 (Childs Dec.) ¶ 8. Once a mistrial in the Slager case occurred, Mr. Bruck acknowledges, "the tension in Charleston heightened." Ex. 5 (Bruck Dec.) ¶ 17.

　　Data from a focus group in August of 2016 only underscored the community pressure that would impact a Charleston jury sitting in judgment of Dylann. Ex. 5 (Bruck Dec.) ¶ 23. Specifically, "[p]articipants in the focus groups demonstrated intense bias against Mr. Roof." Ex. 17 (de La Rue Dec.) ¶ 20. Counsel, still, did not move for a change of venue.[55]

## B. The investigation counsel should have conducted would have revealed compelling evidence that the trial should be transferred.

　　While the Constitution generally provides for a trial "by an impartial jury of the state and district wherein the crime shall have been committed," U.S. Const. amend. VI, "[t]he Constitution's place-of-trial prescriptions, however, do not impede transfer of the proceeding to a

---

　　[54] Counsel did not attempt to ascertain the full extent of the negative publicity on the community. Ex. 17 (de La Rue Dec.) ¶ 18. Counsel attempted to suppress the writings, but this request was denied. Dkt. No. 441.
　　[55] Counsel also did not consider seeking more time, even though, "[o]ne remedy for mitigating negative effects of pretrial publicity is delay." Ex. 17 (de La Rue Dec.) ¶ 18. This is discussed more fully in Claim 9.

different district at the defendant's request if extraordinary local prejudice will prevent a fair trial—a 'basic requirement of due process.'" *Skilling v. United States*, 561 U.S. 358, 378 (2010) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)); *see also Sheppard v. Maxwell*, 384 U.S. 333, 362-63 (1966); *Estes v. Texas*, 381 U.S. 532, 550-51 (1965); *Rideau v. Louisiana*, 373 U.S. 723, 726-27 (1963); *Irvin v. Dowd*, 366 U.S. 717, 725-28 (1961). In essence, the Sixth Amendment requirement of an "impartial" jury takes precedence—if an "impartial" jury cannot be drawn from "the state and district wherein the crime shall have been committed," then a change of venue is required. U.S. Const. amend. VI.

Federal Rules of Criminal Procedure effectuates this requirement, providing that "[u]pon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Fed. R. Crim. P. 21(a). A transfer motion may be made at any time. Fed. R. Crim. P. 21(d). If a case is not transferred to a different judicial district, in compelling cases, the court may order trial to be held elsewhere within the district under. Fed. R. Crim. P. 18.

Because of the media saturation in Charleston and the atmosphere around the city, an impartial jury could not be drawn from the Charleston Division (Area C). Dr. Bryan Edelman, a jury expert who has conducted pretrial and post-trial jury research in criminal and civil cases for twenty years, recently undertook a search and analysis of local media in the Charleston community, including the *Post and Courrier, The Georgetown Times, Charleston Examiner, Beauford Gazette, Bluffton Today, and Hilton Head Island Packet,* from June 17, 2015, to September 26, 2016. Dr. Edelman's search revealed at least 1,182 articles published about the attacks on Mother Emanuel Church. The coverage was "emotionally charged and often included

215

powerful statements from the families of victims." The nature and extent of prejudicial media

was excessive—so much so that Dr. Edelman concluded that the jury pool in the Charleston

community was "exposed to massive prejudicial and sensational publicity surrounding the

shooting." Ex. 55 (Edelman Dec.) at 8.

The coverage of the shooting "continued to accentuate intergroup conflict and in-group

identification," which "occurs when the media generates pressure on a jury to render a verdict

that will satisfy the community's demand for justice. Ex. 55 (Edelman Dec.) at 12. The coverage

used "emotionally charged language likely to evoke fear, disgust, and anger." *Id.* at 15.

The articles emphasized the significance of the crime occurring in Charleston. Sometimes

articles suggested the city itself was complicit and must impose the harshest sentence to redeem

itself. Other times, Dylann was portrayed as an outsider: "not from our community." Invariably,

Dylann was portrayed as "a monster" unworthy of redemption, "*very deranged, very demented,

very confused and completely evil young man who will pay for what he has done.*"

Examples include:

- *The fight to bring Roof to justice is part of a larger battle against white supremacy in America.*

- *The Charleston shooting and the killing of Walter Scott are stark reminders of racial injustice in South Carolina*

- *Charleston is forced to ask itself: What role has our city played in fostering a climate where this could happen?*

- *Roof carried out this act of pure evil with cold calculation*

- *He is a monster who showed no mercy to his victims*

- *There can be no justification, no sympathy, no mercy*

- *No punishment could fully atone for the horror of this crime*

- *He wanted infamy, and he got it — as a monster.*

- *This was a very deranged, very demented, very confused and completely evil young man who will pay for what he has done.*

- *Roof is not from our community.*

In contrast to the "dehumanization" of Dylann as a "racist monster which was likely to generate antipathy and anger amongst prospective jurors, the coverage surrounding the victims had the capacity to generate a tremendous empathy." Ex. 55 (Edelman Dec.) at 16-17. Coverage detailed the life stories of the deceased and surviving victims and used emotional language such as "So angelic it could move the very depth of your heart...How do you describe an angel?" *Id.* at 17.

Crucially, Dr. Edelman's analysis determined that the coverage "amplified voices calling for Dylan Roof to receive the death penalty." The coverage "frequently equated justice with execution and rejected a life sentence as a failure of the justice system" and "helped create a moral imperative for retribution." Such coverage included the following:

- *The eyes of the nation are on Charleston to see if our justice system will respond appropriately*

- *Charleston must show that it will not tolerate this kind of hate, and that starts with a death sentence.*

- *Anything less than the death penalty would be an insult to the memory of the victims.*

This kind of reporting "puts implicit pressure on jurors to reach the 'correct' verdict to help heal the community," undermining any possibility of an impartial jury in Charleston. Ex. 55 (Edelman Dec.) at 18.

**C. By failing to even investigate the issue, let alone actually request a transfer, counsel performed deficiently.**

As discussed above, satisfying *Strickland*'s two-part standard for ineffective assistance of counsel requires showing deficient performance and prejudice. *Strickland*, 466 U.S. at 688, 694. "Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Hinton v. Alabama*, 571 U.S. 264, 274 (2014) (quoting *Strickland*, 466 U.S. at 690-91). Here, counsel unreasonably failed to investigate whether their client could have a fair trial in Charleston, despite their expert jury consultant recommending they do so.

**i. There is no question that reasonable counsel would have conducted the survey their expert recommended.**

There was no question that counsel should at least investigate potential bias in the jury pool. Even if it had not been obvious, trial counsel's jury consultant explicitly "recommended to the team that they conduct a public opinion survey," Ex. 17 (de La Rue Dec.) ¶ 7, and later "indicated that she believed that the team could make a case for change of venue," Ex. 6 (Stevens Dec.) ¶ 30.

However, Mr. Bruck decided early on that the trial should take place in Charleston and advised the court that he believed an impartial jury could be selected there. Dkt. No. 255; Ex. 5 (Bruck Dec.) ¶ 22. Although Mr. Bruck had no factual basis for his belief, the rest of the team "deferred to David" and conducted no investigation into whether they should seek a venue change. Ex. 6 (Stevens Dec.) ¶ 30; *see also* Ex. 5 (Bruck Dec.) ¶ 22.

There can be no plausible strategic reason for failing to conduct this investigation, particularly in light of Ms. de La Rue's recommendation, and then certainly once the jury questionnaire bore out Ms. de La Rue's concerns. Indeed, the survey conducted by Dr. Edelman

218

reveals a media environment saturated with prejudicial coverage that pressured the Charleston jury pool to sentence Dylann to death.

### ii. Reasonable counsel would have requested a change of venue pursuant to Rule 21 or at least a within-district transfer pursuant to Rule 18.

Under these circumstances, counsel should have conducted the survey that Ms. de La Rue recommended. Had trial counsel done so, they would have known that a motion for a change of venue under Rule 21(a) was necessary to protect their client's right to a fair trial by an impartial jury. And even if this was denied, they could have mounted a strong argument for a within-district transfer pursuant to Rule 18.

In *Skilling v. United States*, the Supreme Court outlined the factors to consider when deciding whether prejudicial pretrial media necessitated a change of venue because the atmosphere was "utterly corrupted by press coverage." *Skilling,* 561 U.S at 381 (quoting *Murphy v. Florida*, 421 U.S. 794, 798-99 (1975)).[56] First, the Court "emphasized the size and characteristics of the community in which the crime occurred," pointing out that Houston, where the trial took place, was the "fourth most populous city in the Nation" with a "large, diverse pool of potential jurors." *Skilling*, 561 U.S. at 382. Second, the Court reasoned that "although news stories about Skilling were not kind," they contained no "blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Id.* Third, in contrast to "cases in which trial swiftly followed a widely reported crime, over four years elapsed between Enron's bankruptcy and Skilling's trial." *Id.* at 383. "Although reporters covered Enron-related news throughout this period, the decibel level of media attention diminished somewhat in

---

[56] Mr. Skilling was the CEO of Enron, charged with "an elaborate conspiracy to prop up Enron's short-run stock prices by overstating the company's financial well-being." *Skilling*, 561 U.S. at 368. Enron was headquartered in Houston and, after the district court denied a motion to change venue, Mr. Skilling was tried in the Southern District of Texas. *Id.* at 368, 370.

the years following Enron's collapse." *Id.* "Finally, and of prime significance," the Court noted that Mr. Skilling was acquitted of some counts, and "[i]t would be odd . . . to presume prejudice in a case in which jurors' actions run counter to that presumption." *Id.* Weighing these factors, the Court ultimately held the district court had not erred denying a change in venue. *Id.* at 384.

In Dylann's case, each of the factors outlined in *Skilling* favors a change of venue. First, Charlson is a small community. At the time of the trial, Area C, the Charleston Division, had a population of just over one million. Charleston was the most populous county with 400,000 people.[57] *See* Ex. 52 (2016 Area C Demographics). Accordingly, not only was Area C a small jury pool, but data also suggests that most jurors would have been summoned from Charleston.

Moreover, Dr. Edelman's research makes clear that many of the articles drew a connection between the crime and the city itself, with examples of such coverage including: "Charleston is forced to ask itself: What role has our city played in fostering a climate where this could happen?"; "The Charleston shooting and the killing of Walter Scott are stark reminders of racial injustice in South Carolina." Ex. 55 (Edelman Dec.) at 12. More than that, coverage suggested that the proper response would define the city: "Charleston's response to this tragedy will define how seriously America takes the fight against hate"; "Charleston's response to this crime will define its place in history." *Id.*

---

[57] Trial counsel's statistician requested the underlying data for jurors summoned for trial, which would have provided the team with details information for each person, including demographics, however, counsel did not follow the recommendation and did not request this data. Ex. 18 (Martin Dec.) ¶¶ 15-16. As such, it not entirely clear from the underlying record the exact percentage of jurors summoned from Charleston due to counsel's ineffectiveness. Petitioner relies on census data that 2016 estimates the population of Area C at a little over one million individuals. Without additional discovery, Petitioner is not able to provide the court with a precise number.

Second, the coverage of this case was highly inflammatory. Dr. Edelman's analysis revealed saturation of emotionally charged media consisting of "language likely to evoke fear, disgust, and anger" toward Dylann. Ex. 55 (Edelman Dec.) at 15. Coverage referred to Dylann as a remorseless, unredeemable monster and in many instances specifically called for the necessity of a death verdict to heal the community.

Coverage of this type is particularly prejudicial in a death penalty case, where the jurors are asked not just to find facts, but to sit in moral judgment. It may be one thing to ask jurors to put aside emotional, inflammatory news coverage when the jurors are required to assess evidence and determine whether the defendant committed a specific crime. It is another matter to ask jurors to put aside emotional, inflammatory news coverage passing moral judgment on the defendant when they themselves are being asked to pass moral judgment. Here, much of the coverage explicitly said that the only morally proper response was a death sentence: "Roof's crimes are so depraved, so racially charged, that no punishment but death would suffice"; The eyes of the nation are on Charleston to see if our justice system will respond appropriately"; "A death sentence is the only way to ensure that justice is served"; "Charleston must show that it will not tolerate this kind of hate, and that starts with a death sentence"; "The city will not heal until Roof is gone." Ex. 55 (Edelman Dec.) at 18-19.

Third, jurors were summoned to the federal court within eighteen months of the crime, while the Charleston community was still teeming with emotion and "Charleston Strong" banners still covered the streets. Unlike in *Skilling* "the decibel level of media attention" had not diminished. *Skilling*, 561 U.S. at 383. In fact, the decibel level steadily increased because this case proceeded at the same time as the Slager case. While the community awaited the jury's decision in Slager on razor's edge, prospective jurors were arriving to the courthouse across the

221

street for jury selection in this case. In December 2016, the judge in the Slager case declared a mistrial because the jury was unable to reach a unanimous verdict, which only heightened tensions.

Mr. Bruck acknowledges that "[r]esource counsel and our jury consultant expressed their concerns with continuing the trial in Area C in light of the simultaneous prosecutions of Dylann and Michael Slager." Ex. 5 (Bruck Dec.) ¶ 23. In line with the Supreme Court's observation in *Skilling*, the jury consultant advised that, "[o]ne remedy for mitigating negative effects of pretrial publicity is delay. That is, individuals are not as intensely affected by the press that they hear or read after some time has passed. The team did not attempt to ascertain the effects of this negative publicity just before trial or mitigate the presumed negative effects by moving for a continuance." Ex. 17 (de La Rue Dec.) ¶ 18.

Finally, the jurors' actions in this case certainly do not "run counter to th[e] presumption" of prejudice. *Skilling*, 561 U.S. at 383. The jury deliberated for less than three hours before sentencing Dylann to death. The ultimate outcome and short deliberation, if anything, points toward prejudice from media saturation.

Accordingly, a transfer pursuant to Rule 21(a) was more than warranted. Trial counsel should have moved to transfer the case to a different district.

If the trial court did not find that the criteria for mandatory transfer under Rule 21(a) were satisfied, counsel could and should have moved for a within-district transfer pursuant to Rule 18. Rule 18 requires that a jurisdiction "must set the place of trial within the district with due regard for the convenience of the defendant and the witnesses, and the prompt administration of justice." The trial team's statistician identified Area D, the Florence Division of the United States District Court of South Carolina, as being demographically similar to Area C, the Charleston

Division. The Florence Division "was reasonably close, conveniently accessible to witnesses and interested attendees, and could accommodate a trial of this magnitude and public interest." Ex. 5 (Bruck Dec.) ¶ 22; Ex. 18 (Martin Dec.) ¶ 13.

A within-district transfer to Area D, then, was a convenient option that would have easily been supported by the compelling survey data trial counsel should have secured. *See, e.g.*, *United States v. Joyce*, Cr. No. 07-31, 2008 WL 2367307 *4 (W.D. Pa. Jun. 10, 2008) (within-district transfer warranted given "the intense public interest in this case and the media coverage" in the division); *United States v. Wittig*, No. 03-40142, 2005 WL 758605 *1 (D. Kan. Apr. 4, 2005) (within-district transfer was warranted because the "news coverage, particularly highly editorialized coverage, has been more extensive" in the division where the crime occurred than in the division to which it was being transferred.); *United States v. Addonizio*, 313 F. Supp. 486, 494 (D.N.J. 1970) (denying motion to transfer outside the district but *sua sponte* transferring within the district, stating: "in view of the concentration of public interest and news coverage in the Newark area, the court is convinced that the jury selection process will be facilitated by the transfer of these proceedings from the Newark to the Trenton vicinage of the district, and that such a transfer will not unduly burden or inconvenience either the defendants or the witnesses").

**iii. At minimum, reasonable counsel would have requested a continuance.**

At the very least, trial counsel should have recognized that "the decibel level of media attention" justified delaying the case and should have sought a continuance. *Skilling*, 561 U.S. at 383. The Supreme Court has advised that "where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, *the judge should continue the case until the threat abates*, or transfer it to another county not so permeated with publicity." *Sheppard,* 384 U.S. at 363 (emphasis added). Along these lines, the expert jury consultant notes: "One remedy for mitigating negative effects of pretrial publicity is delay. That is, individuals are not as intensely

affected by the press that they hear or read after some time has passed." Ex. 17 (de La Rue Dec.) ¶ 18.

The release of Dylann's manifestos and the simultaneous prosecution of Michael Slager necessitated a continuance, particularly once a mistrial was declared in the Slager case. Indeed, the expert jury consultant advised, "There were several occurrences that, in my opinion, necessitated moving for a continuance" including when the "government released Dylann Roof's 'manifesto' which created a great deal of intense media attention" and "the intensity of the Slager trial, also with allegations of racism, happening at the same time as the Roof trial." Ex. 17 (de La Rue Dec.) ¶¶ 18, 19. Yet the team did not "mitigate the presumed negative effects by moving for a continuance" nor even "attempt to ascertain the effects of this negative publicity just before trial." Ex. 17 (de La Rue Dec.) ¶ 18.

## D. Counsel's failure to even investigate prejudiced Dylann, depriving him of a fair and impartial jury.

Trial counsel simply ignored advice from the team's jury consultant to conduct a community survey, which would have provided data showing the jury pool was tainted by inflammatory media coverage calling for the death penalty as the only means of achieving justice. Even as events around the Slager trial reached a fever pitch in the Charleston community, counsel did not reconsider conducting a survey, nor their plan to rush Dylann's case to trial. The failure to conduct this investigation is particularly unreasonable because, as Ms. de La Rue notes, "[e]ven if ultimately the decision is not to move for a change of venue, the data is valuable" for "litigating jury selection procedures" and "information what areas of questioning are essential to develop in a jury questionnaire." Ex. 17 (de La Rue Dec.) ¶ 6. And of course, "[i]t is not possible to make informed decisions without bothering to do the work to become informed." Ex. 17 (de La Rue Dec.) ¶ 12; *see also Hinton*, 571 U.S at 274.

As the media coverage before the trial presaged, "bedlam reigned at the courthouse during the trial." *Sheppard*, 384 U.S. at 255. ("The courthouse was very chaotic, with reporters, the public trying to get in, tons of family members, lots of church members, political figures, and others." Ex. 20 (Childs Dec.) ¶ 11. "Part of the increased security for the Slager trial" happening across the street "involved snipers on the rooftops by the courthouses. This had nothing whatsoever to do with security concerns for the Roof trial, but the jurors had no way of knowing that." Ex. 17 (de La Rue Dec.) ¶ 19. "'Charleston Strong' bracelets were visible throughout the courtroom during trial" and visible "[w]hen exiting the courthouse." Ex. 20 (Childs Dec.) ¶ 17. In such circumstances, "we can assume that some of this material reached members of the jury." *Sheppard*, 384 U.S. at 357. Because "[d]ue process requires that the accused receive a trial by an impartial jury free from outside influences" and thus requires that a defendant be protected "from the inherently prejudicial publicity which saturated the community," as well as from "disruptive influences in the courtroom." *Sheppard*, 384 U.S. at 362, 363. Dr. Edelman's research demonstrates that pervasive and highly prejudicial media consumed the Charleston community in the wake of the killings.

Dylann was prejudiced by trial counsel's failure to take the essential basic step to conduct a community attitude survey, which would have afforded the defense valuable data and insight into the extent to which media coverage had made finding an impartial jury in Charleston impossible. This data would have at least supported a motion for a change of venue to another division within the District of South Carolina. At the very minimum, it would have made abundantly clear that the publicity at the time was yet another reason why rushing the trial was foolish.

"In order to satisfy the prejudice prong of *Strickland*'s ineffective assistance analysis, [petitioner] must establish that there is a reasonable probability that, but for his counsel's failure to move the court for a change of venue, the result of the proceeding would have been different." *Meeks v. Moore,* 216 F.3d 951, 961 (11th Cir. 2000). This requires a "petitioner must show, at a minimum, that the trial court would have or should have granted a change of venue motion. This, in turn, requires him to show actual or presumed prejudice on the part of jurors." *Tafoya v. Tansy*, No. 00-2049, 2001 WL 557971, *6 (10th Cir. May 24, 2001).

Analysis of the factors laid out in *Skilling*, as discussed above, satisfy the standard for presuming prejudice. Dr. Edelman's analysis of media coverage demonstrates that an irrepressibly hostile attitude pervaded the community. Ex. 55 (Edelman Dec.) at 31. The media coverage in Charleston, much of which discussed the role of the city itself in the crime – not to mention the "Charleston Strong" banners and bracelets everywhere, and the snipers on the roof of the federal courthouse where Dylann's trial was taking place, there because of the Slager trial happening across the street—made it impossible that an impartial jury could be drawn from the Charleston division.

The results of the jury selection process and verdict only confirm what would have been clear from analyzing media coverage before the trial. As such, there is actual prejudice. To establish actual prejudice, rather than merely presumed prejudice, a defendant must show that "the jurors demonstrated actual partiality or hostility that could not be laid aside." *Harris v. Pulley*, 885 F.2d 1354, 1363 (9th Cir. 1988). Here several jurors who were ultimately empaneled lied on their federal jury questionnaires. *See* Claim 1. The simplest explanation for community members lying about information that would exclude them from the jury is that they wanted to be on the jury. They wanted to "*show that [Charleston] will not tolerate this kind of hate, and that starts with a death*

226

*sentence.*" Ex. 55 (Edelman Dec.) at 19. To show that "*[a]nything less than the death penalty would be an insult to the memory of the victims.*" *Id.* Having been told over and over by the local media that the fate of their city and the dignity of the victims depended on a death sentence, community members appear to have lied to get on the jury and issue the "correct" sentence.

Given the absolute finality of the death penalty, there is a heightened need for reliability in capital cases. *See, e.g.*, *Caldwell v. Mississippi*, 472 U.S. 320, 323 (1985); *Eddings*, 455 U.S. at 118-19 (O'Connor, J., concurring); *Lockett*, 438 U.S. at 605. And, given the holistic moral judgment involved in deciding whether to impose a death sentence, there is a greater risk that jurors will be influenced by inflammatory media coverage of the crime and the defendant. Yet here, not only did the trial take place in Charleston, but few safeguards were in place to ensure impartiality. The court did not individually examine jurors about pretrial publicity. Nor did the district court allot the defense extra peremptory challenges. Tr. 12/02/16 at 270-71. With no apparent basis for his belief, lead counsel simply decided that a fair trial could happen in Charleston. He was wrong. And his failures prejudiced Dylann.

**CLAIM 12:   Dylann was denied Sixth Amendment right to effective assistance of counsel by counsel's failure to zealously argue that the federal charges should be dismissed for reasons including lack of federal jurisdiction and unconstitutional vagueness.**

**A. Despite having no valid strategic reasons, trial counsel failed to zealously litigate a Motion to Dismiss the Indictment and Motion for New Trial.**

Each of the federal charges against Dylann is constitutionally infirm. There are persuasive arguments trial counsel should have made for dismissing each count and ultimately the entire federal case. There was no strategic reason for trial counsel not to raise these arguments. Indeed, many of the arguments trial counsel should have been making were being made at that time by other lawyers in courts across the country. Trial counsel simply failed in their most basic job as lawyers: to research and know the law and to use it to support appropriate

defenses for their client. *See Hinton*, 571 U.S at 274 ("An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*.");
*Kimmelman* v. *Morrison*, 477 U.S. 365, 385 (1986) (finding deficient performance where counsel failed to conduct pretrial discovery and that failure "was not based on 'strategy,' but on counsel's mistaken beliefs" about the law).

Dylann was charged in an indictment that alleged violations of three federal statutes: 18 U.S.C. § 247, 18 U.S.C. § 249, and 18 U.S.C. §§ 924(c) and (j). Successfully challenging any one of these would have changed the trajectory of these proceedings. Thus, trial counsel's failures were fourfold:

First, trial counsel failed adequately to research 18 U.S.C. § 247 and § 249, or seemingly even to read them fully, and seem to have given little thought to why they were not crimes of violence under § 924(c), which would have invalidated the § 924(c) charges. They did not know that § 249 explicitly excluded mental impairment from the definition of bodily harm. They did not seem to know that arguing an omission to act was an important and reasonable issue to litigate at the time. They did not know that the threat of harm to oneself or to one's own property was sufficient to satisfy § 247, but not § 924(c)'s elements clause, which required harm to another person or another person's property. They did not know that other cases interpreting a threat of harm without referring to threat of harm to "another" could be violated by threatening to harm oneself. In sum, they seemed unaware of the most basic arguments being made at the time about the application of § 924(c), including the degree of force necessary to satisfy it.

Second, trial counsel failed to make important arguments to explain why § 247 and § 249 were unconstitutional federal overreach, both on their face and as applied to this case. Trial

counsel failed to adequately argue that § 247 and § 249 were unconstitutional incursions of federal power into state authority, when the state was not only perfectly capable of prosecuting Dylann, but actually did prosecute him, albeit after the rushed federal trial.

Third, trial counsel failed to even raise the argument that § 249, which has, as an element, the defendant's perception of the victims, violates the First Amendment because it creates federal jurisdiction based solely on the defendant's biases, thoughts, or feelings.

Fourth, trial counsel failed to request a stay pending a decision by the Supreme Court in *Sessions v. Dimaya*, which ultimately invalidated a nearly identical residual clause (and previewed the Supreme Court's decision in *United States v. Davis*, which invalidated § 924(c)'s residual clause, the residual clause at issue in this case). *See Sessions v. Dimaya*, 584 U.S. 148 (2018); *United States v. Davis*, 588 U.S. 445 (2019).

As discussed above, satisfying *Strickland*'s two-part standard for ineffective assistance of counsel requires showing deficient performance and prejudice. *Strickland*, 466 U.S. at 688, 694. Under *Strickland*, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," but "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Hinton*, 571 U.S at 274 (quoting *Strickland*, 466 U.S. at 690-91). Dylann's trial counsel made decisions without thoroughly investigating the law. Thus, although the *Strickland* standard is deferential to trial counsel's decision-making, the lack of any legitimate basis for Dylann's trial counsel to neglect this research was unreasonable, and constitutes deficient performance.

Perhaps the most glaring example of trial counsel's failures was their decision to include in the Motion to Dismiss the statement—although it was a complete non sequitur—that they

would willingly have their client plead guilty to the very charges the motion was challenging. Nominally, the Motion to Dismiss argued that each count in the indictment was unconstitutional. But this unnecessary statement telegraphed that they did not believe their own arguments. Counsel cannot legally or ethically permit a client to plead guilty to charges that are unconstitutional, nor could the court accept such a plea. There was no conceivable strategic reason for counsel to signal in both the Motion to Dismiss and the Reply in Support that they would have had Dylann plead guilty to all counts in exchange for the withdrawal of the Notice to Seek Death. This assertion was thus objectively unreasonable in that it told the court that counsel was either willing to permit their client to plead guilty to nonexistent crimes or that counsel did not believe in the legal arguments they were making on Dylann's behalf. The weakness of counsel's argument—a weakness that apparently compelled them to signal to the court that they did not even believe their own argument—was not because no good arguments were available. Rather, counsel failed to adequately research the issues to raise the strong arguments that were available to them.

No proffered strategy can remedy the unreasonable decision to include the assertion that their client would plead guilty to the very charges trial counsel was supposedly seeking to dismiss, nor excuse counsel's failure to raise persuasive arguments. Eliminating any of the counts could have fundamentally weakened the entire federal case against Dylann, and there were strong legal arguments for dismissing each of them.

**B. Trial counsel was ineffective for making inadequate arguments that § 247 and § 249 failed to constitute crimes of violence under the elements clause of § 924(c)(3)(b)(i), claims that should have been successful and would have changed the trajectory of this federal prosecution.**

In their pursuit of claims that Dylann should not be prosecuted under 18 U.S.C. §§ 924(c) and (j), counsel misunderstood the law, failed to provide reasonable explanations for critical

230

legal arguments, failed to account for and anticipate the rapidly changing legal landscape of the issues they were litigating, and failed to challenge the overall constitutionality of the statutes in question. As such, counsel undermined Dylann's legal position from the start by asserting in his Motion to Dismiss that it was a mere bargaining chip which he would relinquish in return for taking a death sentence off the table.

In seeking to have the nine § 924(c) counts against Dylann dismissed, trial counsel's task was to demonstrate to the district court that the Church Arson Act, 18 U.S.C. § 247, and the Hate Crimes Prevention Act, 18 U.S.C. § 249, did not constitute crimes of violence. Counsel properly relied on the Supreme Court's holding in *Johnson v. United States*, 576 U.S. 591 (2015), to argue that the residual clause defining crimes of violence[58] was unconstitutionally vague. But the unconstitutionality of § 924(c)'s residual clause would not, on its own, have required dismissal of § 924(c) charges. The unconstitutionality of § 924(c)'s residual clause required dismissal of a § 924(c) charge only if the predicate offense charged with it was not a crime of violence under § 924(c)'s elements clause—because even without the residual clause, a statute can still define a crime of violence pursuant to the elements clause. Following the Supreme Court's decision in *Johnson*, which found that a nearly identical residual clause was void for vagueness, the crucial question about any § 924(c) charge became whether the predicate offense was a crime of violence under § 924(c)'s elements clause. Courts across the country saw a swell of cases challenging whether state and federal criminal statutes defined crimes of violence.

At the time Dylann was indicted, there were several different ways defendants might argue that a predicate statute did not fit within the definition of a crime of violence under the elements clause of § 924(c), depending on what the predicate crimes criminalized:

---

[58] 18 U.S.C. § 924(c)(3)(B).

- The offense could be committed by indirect methods like poisoning. Counsel made this argument.
- The offense required proof the defendant had "caused injury" rather than that the defendant had "used force," the language of § 924(c). Counsel made this argument.
- The offense could be committed by omission like not feeding or medicating someone. Counsel failed to make this argument, though it was succeeding in many jurisdictions.
- The offense could be committed by using force or threatening to use force against oneself or one's own property, rather than against another person or another's property as required by § 924(c)(3)(A). Counsel failed to make this argument.
- The offense could be committed with misdemeanor-level/de minimis force, like the force that satisfied common law battery. Counsel used an inapt example to make this argument that the statute did not cover.
- The resultant harm was caused accidentally or negligently, and far exceeded the minimal harm that was intended. Counsel failed to make this argument.

As the following sections explain, Dylann's trial counsel focused on the first and second of these challenges even though, by the time they filed his Motion to Dismiss the Indictment, the Supreme Court had already invalidated both of these defenses in *United States v. Castleman*, 572 U.S. 157 (2014)[59] and strong arguments were available for the challenges they failed to make.

In this case, properly litigating these issues could have resulted in dismissal of nine of the counts carrying a potential death sentence. Despite the fact that the issue was being vigorously litigated in courts across the country, and despite the possibility of getting these nine death-eligible counts dismissed, counsel failed to mount reasonable arguments demonstrating that § 247 and § 249 could not serve as valid predicate crimes to prosecute under the elements clause's definition of crimes of violence.[60] Moreover, trial counsel was ineffective for failing to

---

[59] In *Castleman*, the Supreme Court expressly held both that indirect methods of killing someone such a poisoning was as much a use of force as shooting someone with a gun. *Id.* at 170-71. The Court also indicated that causing injury or death was the equivalent of using force. *Id.* at 174 (Scalia, J., concurring).

[60] 18 U.S.C. § 924(c)(3)(A).

challenge the constitutionality of § 924(c)—both the residual and the elements clauses—in its entirety, on the grounds of vagueness.

### i. Background

Dylann was charged with nine counts each of violating 18 U.S.C. § 247 and 18 U.S.C. § 249. *See* Dkt. No. 2 (Indictment) at 4-6. He was also charged with nine counts for "use of a firearm to commit murder during and in relation to a crime of violence" in violation of 18 U.S.C. §§ 924(c) and (j)(1). *Id.* at 9. The § 247 and § 249 crimes that resulted in death were identified as the predicate crimes for each of the § 924(c) counts.[61] Proof of a violation of § 924(c) requires an initial judicial determination that a predicate crime fits the statutory definition of a "crime of violence" and that this crime of violence was committed using a firearm. Proof of a violation of § 924(j)(1) requires a finding that a person who has violated § 924(c) caused the death of a person by murder, as defined in 18 U.S.C. § 1111, using a firearm.

In other words, underpinning any determination of guilt for § 924(c) or (j) had to be the initial judicial determination that § 247 and § 249 were felonies that constituted crimes of violence. Underpinning a finding of guilt for § 924(j) had to be an initial finding by the jury that Dylann had committed violations of § 924(c).

The trial court, not the jury, is assigned the task of deciding whether a predicate offense is a crime of violence in the first instance. The court is required to employ a "categorical approach." *Descamps v. United States*, 570 U.S. 254, 257 (2013). That means the court must look not to the specific facts of the underlying conviction, but to the least culpable conduct criminalized by the statute. *Curtis Johnson v. United States,* 559 U.S. 133, 137 (2010); *see also*

---

[61]  The government did not charge Dylann with any violations of §924(c) based on the charges it brought against him for attempts to obstruct any person in the free exercise of religion pursuant to § 247 or for attempts cause bodily harm pursuant to § 249.

*Moncrieffe* v. *Holder*, 569 U.S. 184, 191-92 (2013). Only if there is a categorical match between the elements of the underlying offense and § 924(c)'s definition of "crime of violence" will a prior offense be deemed a violent felony/crime of violence. [62]

In the form in which it was enacted by Congress, § 924(c) contained alternate definitions of "crime of violence." Section 924(c)(3)(B), referred to as the residual clause because it was a broad catch-all provision, provides that a "crime of violence" is a felony that "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." After decades spent trying to interpret and apply the residual clause uniformly, the Supreme Court in 2015 struck down the nearly identical clause from the Armed Career Criminal Act as unconstitutionally vague. *Johnson*, 576 U.S. at 591. In 2018, the Court struck down the residual clause in 18 U.S.C. § 16, an immigration statute that contains the exact language found in § 924(c). *Dimaya*, 584 U.S. at 148. In 2020, the Court explicitly decided that the residual clause in § 924(c) was likewise unconstitutionally vague. *Davis*, 588 U.S. at 447.

The first clause in § 924(c), referred to as the "elements" or "force" clause, seems on first blush to contain a narrower definition of "crime of violence" than that found in the residual clause. It provides that the predicate statute must contain "an element" that requires "the use, attempted use, or threatened use of physical force against the person or property of another." § 924(c)(3)(A). Its spare language is deceptive, though.

---

[62] Dissenting opinions from the Supreme Court as recently as 2022 express disgust over the use of the categorical approach, calling it "absurd," and saying courts should determine the applicability of the elements clause based on what the defendant "actually did." *See Taylor*, 596 U.S. at 861 (Thomas, J., dissenting).

Enacted in 1984, the statute's definition of "force" has been debated over the course of decades. In 2010, after the government had been prosecuting people under the statute for twenty-six years, the Supreme Court defined "physical force" as "*violent* force" or "strong physical force," rejecting the notion that it included de minimis force. *Curtis Johnson*, 559 U.S. at 138-40. But *Curtis Johnson* did not come close to settling the issue, which continues to be debated to this day. For example, in *Stokeling v. United States*, 586 U.S. 73 (2019), the Court announced that, if a predicate offense contains an element that requires overcoming the victim's resistance, de minimis force is sufficient to satisfy the elements clause. *Id.* at 77-78. Lower courts analyzing § 924(c) claims have largely ignored *Stokeling*'s condition that the offense must include a provision about the victim's resistance, and in doing so, have extended the reach of § 924(c).

For years, the circuits were split as to whether, for example, poisoning someone constitutes the use of force under the elements clause because sprinkling poison on someone's food did not appear to require strong physical force. This matter was resolved by the Supreme Court in 2014, when it decided that causing harm could only be accomplished by using force. *Castleman v. United States*, 572 U.S. 157, 169 (2014). For many years, the Circuits were split as to whether the failure or omission to act constituted a "use of force" sufficient to satisfy the elements clause. On March 21, 2025, the Supreme Court said that omission of action constitutes a use of force sufficient to satisfy the elements clause of § 924(c). *Delligatti v. United States*, 145 S. Ct. 787, 805 (2025).

Likewise, the *mens rea* required to satisfy the elements clause is still an open question. In *Leocal v. Ashcroft*, 543 U.S. 1 (2004), the Supreme Court held that to constitute a crime of violence under the identical provisions of 18 U.S.C. § 16, an offense had to require a mental state greater than negligence. *Id.* at 11. It took another seventeen years, however, before the Supreme

235

Court held that the "use of force" clause does not reach crimes with a *mens rea* of recklessness. *Borden v. United States*, 593 U.S. 420 (2021). And the Court in *Borden* reserved for the future the question of whether an offense with a *mens rea* of extreme recklessness can satisfy the elements clause. *Id.* at 429 n.4.

Then, too, the Supreme Court has changed direction regarding what a defendant needs to do to demonstrate the least culpable conduct that will trigger prosecution for the predicate offense. In *Moncrieffe*, the Supreme Court explained that focus on the minimum conduct criminalized by the state statute is not an invitation to apply "legal imagination" to the state offense; there must be "a realistic probability, not a theoretical possibility, that the State would apply its statute" to conduct that did not rise to the level of a violent felony. *Moncrieffe*, 569 U.S. at 191. Almost a decade later, the Supreme Court rejected the idea that the defendant had to show a realistic probability that the government would prosecute for this less culpable conduct, so long as the terms of a federal predicate offense permitted prosecution for such conduct. *United States v. Taylor*, 596 U.S. 845, 857-58 (2022).

Dylann was indicted shortly before *Johnson v. United States*, 576 U.S. 591 (2015), was decided. Several months later, trial counsel filed a Motion to Dismiss the Indictment (hereinafter referred to as Motion to Dismiss or MTD), which included arguments that, based on *Johnson*, the court should dismiss the nine crime-of-violence counts. Dkt. No. 233. Counsel argued that *Johnson* invalidated the residual clause of § 924(c) (along with the ACCA's residual clause) and that neither § 247 nor § 249 qualified as a crime of violence under the elements clause – § 924(c)(3)(A). Dkt. No. 233. The Motion was denied. Dkt. No. 735 at 32. Had the MTD been

effectively argued at this early stage in the proceedings, there is a reasonable probability that the outcome of the proceedings would have been different.[63]

### ii. Trial counsel's failures

**a. Trial counsel failed to provide examples demonstrating the misfit between the elements clause definition of crimes of violence and the ways the predicate crimes could be committed without running afoul of that definition.**

At the time trial counsel was arguing its Motion to Dismiss, it was incumbent on them to provide the court with concrete examples, demonstrating the most innocent ways these two statutes could be violated without the use of violent force. This was not just a persuasive way to make their arguments, but something the Supreme Court required. In *Moncrieffe*, the Supreme Court explained that focus on the minimum conduct criminalized by a predicate offense was not an invitation to apply "legal imagination" to the offense. There must be "a realistic probability, not a theoretical possibility," that people would be prosecuted for engaging in such illegal conduct. *Moncrieffe*, 569 U.S. at 191; *see also, e.g.*, *Gonzales v. Duenas–Alvarez*, 549 U.S. 183, 193 (2007).[64] At minimum, *Moncrieffe* demanded that the defendant provide a plausible scenario for the minimum conduct criminalized by the predicate statute, leaving the government to acknowledge that it would, in fact, prosecute under such a circumstance. Trial counsel failed to supply such examples, and in the one instance counsel provided any details at all, they rested it

---

[63] At this early stage of the proceedings, there were many variables yet in play—in addition to whether the jury would convict Dylann or sentence him to death on these counts—that a strong argument regarding the lack of viability of these § 924(c) and § 924(j) claims would likely have influenced: Should the case be placed back in the hands of the state and prosecuted under settled state law?; Should the government accept a plea to life without possibility of parole to avoid a negative ruling?; If the court granted the MTD, would the government accept a plea?; If the court granted the MTD, would a strong argument by counsel have engendered greater trust from Dylann, leading to his making different choices about counsel's representation of him?

[64] After Dylann was tried, the Supreme Court expressly rejected the idea that a defendant need show that the government had actually prosecuted someone for the most innocent conduct the statute might punish so long as the language of the statute permitted such an interpretation. *Taylor*, 596 U.S. at 850-51.

on a harm—psychological injury—that the statute specifically excludes. 18 U.S.C. § 249(c)(1).

Apt examples counsel could and should have used are provided in the following two subsections,

discussing §§ 247 and 249.

**b. Trial counsel failed to explain to that offenders could violate 18 U.S.C. § 247 by using force against themselves or their own property, conduct that would not satisfy § 924(c)'s command that the force be directed against "the person or property of another."**

       The Church Arson Act, § 247, does not require use or threat of force against another

person or another person's property. Although the statute criminalizes the use of force to obstruct

a person in the enjoyment of that person's free exercise of religion, crucially, the use or threat of

use of force can be against *oneself* or one's *own* property. Because the conduct that § 247

criminalizes does not require the threat of force against another person, § 247 is not a crime of

violence pursuant to § 924(c)'s elements clause.

       Accordingly, the simplest demonstration of the misfit between § 247 and § 924(c) is that

§ 247 could be violated by threatening harm to oneself. Providing a plausible example would not

have been difficult to do: protesters have been setting themselves on fire to bring attention to

issues for more than fifty years.[65] One could easily imagine that a parishioner with strong

feelings about a church's foray into political matters might threaten to self-immolate if

congregants enter their house of worship. By use of this threat of force against himself, he

---

[65] *See, e.g.*, Ellie Silverman, *Outside the Supreme Court, a life of purpose and pain ends in flames*, Wash. Post (Apr. 26, 2022), https://www.washingtonpost.com/dc-md-va/2022/04/26/wynn-bruce-fire-supreme-court-climate-activist (climate activist set himself on fire outside the Supreme Court building to bring attention to the climate crisis); Associated Press, *Protester critically injured after setting self on fire outside Israeli consulate in Atlanta*, AP News (Dec. 2, 2023), https://apnews.com/article/israeli-consulate-self-immolation-atlanta-protester-8f17dd72592f86797a45cda9b60605a5 (protester set himself on fire in front of the Israeli consulate in Atlanta); Joe Hernandez, Why self-immolation has been used by political protesters for decades, Texas Public Radio / NPR (Feb. 27, 2024), https://www.tpr.org/news/2024-02-27/why-self-immolation-has-been-used-by-political-protesters-for-decades (describing the history of self-immolation beginning in 1963).

238

succeeds in obstructing congregants from entering, not because they fear harm to themselves, which the protester has never threatened in any way, but because they don't want to precipitate his suicide. One can also imagine one of the worshippers (perhaps a relative of the protester) having a heart attack—overcome by the emotions evoked by this threatened act of self-destruction—and dying.[66] Or, one of the worshippers, while turning away from the frightening sight, falls, hits her head, and dies.

This scenario fulfills all the elements of § 247: the protestor who threatens self-harm threatens the use of force against himself, and in doing so obstructs worshippers from freely exercising their religion, and someone dies as the result of the protestor's actions. No parishioner construes this as a threat of harm to themselves. As such, this scenario does not fulfill the elements of a crime of violence defined in § 924(c)'s elements clause.

This is legally plausible, as well, which trial counsel would have known with appropriate research. In cases where a statute does not specifically require force to be used against another, courts have held that the threat of self-harm or suicide suffices to satisfy the threat element of the

---

[66] The idea of someone having a stress-induced heart attack is not implausible but realistic. It is similar to something that actually happened during this trial. During the trial, Dylann's mother suffered from a stress-induced heart attack. *See* Ex. 103 (Amy Roof EMS Records). Although she survived, this event is a reminder of the real possibility of death from a stress-induced heart attack, from disorienting and stressful situations, like a child's trial, or a fellow congregant's threat of self-immolation.

crime. *See, e.g.*, *United States v. Rojas*, 520 F.3d 876, 882 (8th Cir. 2008);[67] *Griffith v. Jennings*, No. 4:18-CV-01658 SEP, 2021 WL 3077657, at *6 (E.D. Mo. July 21, 2021).[68]

In a similar vein, § 247 can be violated by the use of force against real property, including one's own property.[69] Again, because the use of force does not have to be against the property of another, the conditions of § 924(c)(3)(A) would not be met.

Trial counsel could have supplied examples for this manner of violating § 247, as well. For instance, a person joins a small religious group that is persecuted by the rest of the local community. She is persuaded to allow the members to use her barn for daily worship services. After two years of permitting this use and engaging with the group, she comes to believe that

---

[67] In *Rojas*, trial testimony revealed that the defendant told the victim he would kill himself if she disclosed that he had sexually abused her. Defendant argued that a threat of suicide did not satisfy the requirements of 18 U.S.C. § 2241(a)(2) under which he had been charged because he had not threatened his victim with harm. Both the district court and the Eighth Circuit found the statutory language to be unambiguous, distinguishing between the use of "another person," "another" and "other person" which identifies an act or threat "directed at persons other than the offender" as compared with the use of "any person," which is "not inherently exclusive of the offender." Thus, his threat to commit suicide sufficed to satisfy the threat element of the offense.

[68] In *Griffith*, the court held that a threat of suicide satisfies the statute's requirement of threat of harm to any person, as opposed to a threat of harm to "another."

[69] As originally enacted, § 247 contained no mention of real property but in 2018, was amended to read, "Whoever intentionally obstructs, by force or threat of force, *including against real property*, obstructs . . . ."

The Fourth Circuit on appeal held that the amendment was one of clarification only:

> "rather than a substantive change," the amendment amounts to a declaration, and "[t]he Supreme Court has long instructed that such declarations—i.e., '[s]ubsequent legislation declaring the intent of an earlier statute'—be accorded 'great weight in statutory construction.'"

*Roof*, 10 F.4th at 403 n.65. The court "therefore consider[ed] the amended version of the religious-obstruction statute." *Id.*

Had trial counsel been constitutionally effective, they would had known the legislative intent of § 247, and should have made this argument to the trial court. Trial counsel is, of course, expected to know the law. *Hinton*, 571 U.S at 274.

they are a cult, and decides she cannot allow them to use the barn any longer. She burns it down, obstructing them in the enjoyment of the free exercise of their religion. Unbeknownst to her, a vagrant—not a member of the group at all—has snuck into the barn to find a warm place to sleep, and he dies of smoke inhalation.

The offender has used force to obstruct people in the enjoyment of their free exercise of religion, but the force was used against her own property, not that of another. Her means of obstructing the congregants has accidentally caused the death of the vagrant, who was not a part of the group and whom she neither threatened nor sought to obstruct from using the barn. She can be prosecuted under § 247 for her acts, but her crime does not fulfill the elements of a crime of violence defined in § 924(c)'s elements clause, because the use of force was directed at her own property, not that of another.

Trial counsel should have, but did not, provide examples like these to the trial court. It was incumbent on trial counsel to demonstrate to the trial court the simplest way one could violate § 247 without implicating § 924(c), particularly in light of the raging debate and great uncertainty as to what constituted "force" sufficient to qualify as a "crime of violence."

**c. Trial counsel failed to explain to the trial court that offenders could violate § 249 without intending or threatening lethal harm and without using substantial force.**

Trial counsel made no effort to supply the trial court with plausible examples to show how someone could violate the Hate Crimes Prevention Act, 18 U.S.C. § 249(a), intending to cause harm, but intending to cause only the minimal amount of harm the statute demanded, which then *un*intentionally resulted in someone's death. (Instead, as discussed below, trial

241

counsel relied almost exclusively on the examples given by the Fourth Circuit in *Torres-Miguel v. United States.*[70]

The one, semi-specific example trial counsel attempted to use to show conduct by an offender that would violate § 249(a) without requiring force was:

> the victim is traumatized (resulting in "mental impairment"), trips and falls in response to the defendant's action (resulting in a "bruise" or "abrasion"), or has a stroke or heart attack.

Reply to MTD at 14. But the definition of bodily harm in the Hate Crimes Prevention Act specifically excludes emotional or psychological harm.[71] So trial counsel's one example was invalid on its face and the subsequent trip, fall and resultant bruise were not willfully caused injuries.

Trial counsel could have supplied plenty of valid examples, demonstrating the use of little or no violent force, that nonetheless unintentionally resulted in someone's death—not even necessarily the death of the person the offender knowingly caused minimal harm. For example, in a willful effort to nauseate the members of a Black congregation, a racist leaves bags of excrement on the threshold of their church while they are in the building. Congregants do indeed experience nausea and one congregant runs from the building, is struck by a car, and dies.[72] Or a

---

[70] *Torres-Miguel v. United States,* 701 F.3d 165 (4th Cir. 2012), *abrogated by United States v. Castleman,* 572 U.S. 157 (2014), *as recognized in United States v. Allred,* 942 F.3d 641 (4th Cir. 2019) ("[T]his Court has confirmed and reaffirmed in several decisions that the direct versus indirect use of force distinction articulated in *Torres-Miguel* has been abrogated by *Castleman*.)

[71] "[T]he term "bodily injury" has the meaning given such term in section 1365(h)(4) of this title, but *does not include solely emotional or psychological harm to the victim*." § 249(c)(1) (emphasis added).

[72] In *Travelers Prop. Cas. Co. of Am. v. Chubb Custom Ins. Co.*, 864 F. Supp. 2d 301, 315 (E.D. Pa. 2012), the court noted that the odors described in the underlying suit were not merely unpleasant, but caused the plaintiffs to experience nausea, vomiting, headaches, breathing difficulties, and irritated eyes, among other physical ailments. *See also Willey v. Kirkpatrick*, 801

congregant has an esophageal disorder which the nausea triggers, and she dies. As another

example: A waiter willfully spits into the food of a person he is serving whom the waiter

perceives to be Middle Eastern. The waiter has a cold which he wants his customer to catch. The

customer does catch it, and while she has no symptoms, the customer transmits it to her immune-

compromised elderly mother, who does get sick, and dies.[73] In both of these instances, the

offender has done something both hateful and willful to cause bodily harm but has not used

violent force. Nor have the offenders intended or willfully caused the serious consequences—

someone's death—that resulted from their actions. Both examples describe conduct that violates

§ 249, but they are not violent crimes under § 924(c)'s elements clause.

---

F.3d 51, 55 (2d Cir. 2015) (collecting cases from all Circuits in which prison officials exposed
prisoners to unsanitary conditions of confinement including exposure to human feces).

Numerous cases prior to 2016 document the effect of non-violent exposure to excrement.
*See, e.g.*, *Little v. Keirsey,* 69 F.3d 536 (5th Cir. 1995); *Dean v. Arpaio*, No.
CV041909PHXSRBMHB, 2007 WL 9697767, at *6 (D. Ariz. June 6, 2007), *aff'd*, 382 F. App'x
585 (9th Cir. 2010) (collecting cases in which conditions of prison confinement included lack of
sanitation and exposure to excrement that caused nausea, vomiting and physical illness).

The Hate Crime Prevention Act could have been used to prosecute someone for exposing
others to human or animal excrement because of the victim's race, willfully to cause them nausea
which in turn could have resulted in death. This was a realistic situation which could have
occurred at a camp or a retreat, rather than a prison, where the defendants had no legal obligation
to protect their victims against harm. Such actions would be vile and inhumane, but would not
have amounted to the use of violent or strong physical force.

[73] Again, case law available to trial counsel at the time of the filing of the MTD provides
examples of how someone could cause illness by the act of merely talking. *See, e.g.*, *DeGidio v.
Pung*, 920 F.2d 525, 527 (8th Cir. 1990), in which the court explained that certain illnesses can
be transmitted "by talking, coughing or sneezing."

Likewise, although Dylann's case was litigated before the COVID pandemic, the
pandemic reminded us that some people willfully tried to infect others—willfully caused them
illness believing it to be an asymptomatic disease for people other than the elderly—by coughing
directly at them. A viral video showed a bus driver asking passengers to wear masks, and an
unmasked passenger coughing at him. The bus driver contracted COVID and died eleven days
later. Michael Levenson, *11 days after fuming about a coughing passenger, a bus driver died
from coronavirus*, New York Times (Apr. 4, 2020),
https://www.nytimes.com/2020/04/04/us/detroit-bus-driver-coronavirus.html.

The penalty provisions of § 249(a) buttress the conclusion that the statute can be violated with no violent force. When death does not result, the punishment imposed can include a fine or a term of imprisonment up to ten years, but not a term of imprisonment that exceeds ten years. 18 U.S.C. § 249(a)(1)(A). Even when death results, the punishment can be *any* term of imprisonment up to and including life, or a fine. 18 U.S.C. § 249(a)(1)(B).[74] While some of the penalties permitted by the statute are clearly designed to punish the most culpable offenders, the statute provides much less harsh penalties, presumably for punishing hate crimes committed with the intent to inflict much less severe or even de minimis bodily harm.

Finally, at the time trial counsel was litigating Dylann's MTD, a debate still raged as to whether the omission to act could constitute physical force by, for example, failing to provide necessary medication to someone, resulting in the person's death. Trial counsel never made this argument in its MTD.[75]

---

[74] *See* 18 U.S.C. § 3571. Sentence of Fine.

[75] As of 2022, the Pennsylvania district court in *United States v. Bowers*, also considering whether § 249 qualified as a crime of violence under § 924(c), held that it did not, because it could be committed by omission. Thus, to its list of examples of affirmative conduct that would violate § 249 but not § 924(c)'s elements clause, counsel should also have offered one of someone failing to act—for example, the willful refusal of a white supremacist doctor to administer measles vaccines to members of the Black community while providing them to the white community, or the refusal of an aid worker to provide food bundles to the Hispanic victims of a natural disaster while providing them to the white victims. Such examples of acts of omission would clearly have violated the Hate Crimes Prevention Act, and could have resulted in death. Given the holding in *United States v. Bowers*, No. 18-292-RJC, 2022 WL 17718686 (W.D. Pa. Dec. 15, 2022), it is noteworthy that the district court never addressed the issue of acts of omission in its opinion denying Dylann's MTD. Had trial counsel described examples of omissions that were reasonable under the Hate Crimes Prevention Act (rather than making the unreasonable decision to rely on the California murder statute in question in *Torres-Miguel*) the court might have been persuaded that § 249(a) was not a crime of violence for purposes of § 924(c)'s elements clause. On March 21, 2025, the Supreme Court rendered a decision in *Delligatti v. United States,* answering the question for the first time whether an act of omission can constitute a crime of violence, resolving a long-standing Circuit split. At the time Dylann was indicted and tried, this was very much an open question.

**d. Trial counsel failed to argue that the Supreme Court required a substantial degree of violent force before a predicate statute would satisfy § 924(c).**

A central feature of § 924(c)(3)(B) (i.e. the elements clause) is that it provides enhanced penalties for felonies, deemed "crimes of violence," committed with a firearm. The elements clause, in turn, requires the "use, threatened use, or attempted use" of "force" against the person or property of another. It goes without saying, then, that the definition of "force" as used in the context of § 924(c) is critical to any analysis of whether a predicate crime constitutes a crime of violence for § 924 purposes.[76]

In its MTD, trial counsel devoted scant argument to this point:

> The Supreme Court defined the term "physical force" under § 924(c)(3)(A) in [*Curtis Johnson v. United States*, 559 U.S. 133, 140 (2010) ("*Curtis Johnson*"): "physical force" means "violent force"; that is, "strong physical force . . . capable of causing physical pain or injury to another person." Thus, in order to qualify as predicate crimes of violence under § 924(j), §§ 249(a)(1) & 247(a)(2) must require the use, attempted use, or threatened use of *violent* physical force.

Dkt. No. 233 (MTD) at 24.

In its Reply to the MTD, trial counsel acknowledges that "the government itself goes to great lengths in its Response to undermine the definition [of force] established by Supreme Court and Circuit precedent." *Id.* Nevertheless, trial counsel merely repeats that force is defined by *Curtis Johnson* as requiring "violent force" without expounding further.

This was a mistake. In *Curtis Johnson*, Justice Scalia, writing for the Court, points out that use of the word "force" must be read in the context of defining *felonies* that are "crimes of *violence*":

> The Government argues that we cannot construe 18 U.S.C. § 924(e)(2)(B)(i) to reach only offenses that have as an element the use of *violent* force, because there is no modifier in §924(e)(2)(B)(i) that specifies the degree of "physical force" required. As we

---

[76] The term "force" does not have a uniform meaning throughout the federal code so it was important to make this argument plainly. Compare *Curtis Johnson v. United States*, 559 U.S. 133 (2010), with *United States v. Castleman*, 572 U.S. 157 (2014).

have discussed, however, the term "physical force" itself normally connotes force strong enough to constitute "power"—and all the more so when it is contained in a definition of "violent felony."

*Curtis Johnson*, 559 U.S. at 142. And, quoting from *Leocal*, which interprets the identical

statutory language from 18 U.S.C. §16:

[W]e cannot forget that we ultimately are determining the meaning of the term 'crime of violence.'

*Id.* at 140. The Court then discussed various definitions of "violent," noting that it "connotes a

substantial degree of force." *Id.* at 140 (quoting Webster's Second 2846 (defining "violent" as

"[m]oving, acting, or characterized, by physical force, esp. by extreme and sudden or by unjust

or improper force; furious; severe; vehement."); 19 Oxford English Dictionary 656 (2d ed. 1989)

("[c]haracterized by the exertion of great physical force or strength"); Black's 1706 ("[o]f,

relating to, or characterized by strong physical force")). The Court emphasizes that defining the

term "force" this way is the only logical meaning that can be assigned to it given the fact that, by

the express terms of the statute, it applies not just to a "crime" of violence, but to a "violent

*felony*."[77] *Curtis Johnson* 559 U.S. at 143 (emphasis added).

The proof of trial counsel's mistake is apparent. After the trial court denied Dylann's

Motion to Dismiss the Indictment, in its subsequent Order Denying the Motion for New Trial, it

took the highly unusual step of amending its earlier Order Denying the Motion to Dismiss. The

---

[77] 18 U.S.C. § 247 also uses the term force, and the district court assumed it, therefore, had to have the same definition as force in § 924(c). But had trial counsel explained the Supreme Court's analysis in *Curtis Johnson*, they could have explained that § 247 clearly contemplates the use of insubstantial force—minor, temporary pain, illness or injury. Counsel also could have pointed out that some violations could be punished by a fine or a sentence "up to" a year—in other words, a misdemeanor. Thus, the definition of force in the context of § 247 encompasses more than its definition in § 924's elements or residual clauses.

court specifically noted that it should have indicated that a higher level of force was necessary to satisfy § 924(c) than the court had originally suggested:

> But requiring the use of force is insufficient to make a statute a crime of violence under § 924(c)(3)(A). To be a crime of violence under § 924(c)(3)(A), the force used must be "violent"-i.e., capable of causing a level of "physical pain or injury" traditionally associated with felonious conduct. *Curtis Johnson,* 559 U.S. at 140-41. For that reason, the Court reconsiders its previous holding that "[t]ogether, *Castleman* and *Curtis Johnson* hold that the knowing or intentional causation of bodily injury necessarily involves the use of violent physical force. Any felony having as an element the intentional infliction of bodily injury on another person is a crime of violence under § 924(c)," The intentional infliction of insubstantial bodily injury does not necessarily involve the use of violent physical force, as that term is defined in *Curtis Johnson.* The Court therefore should have held, "[t]ogether, *Castleman* and *Curtis Johnson* hold that the knowing or intentional causation of *substantial* bodily injury necessarily involves the use of violent physical force. Any felony having as an element the intentional infliction of *substantial* bodily injury on another person is a crime of violence under § 924(c)," *See Curtis Johnson,* 559 U.S. at 140 ("[T]he word 'violent' in § 924(e)(2)(B) connotes a *substantial* degree of force." The Court therefore amends its Order and Opinion on Defendant's motion to dismiss the indictment to reflect that correction.

Dkt. No. 961 at 19 (italicized emphasis in original, bolded emphasis added).

This amendment makes clear that, had trial counsel taken objectively reasonable steps to explain the interplay between these two critical cases—*Curtis Johnson* and *Castleman*—there is virtual certainty that the order denying the motion to dismiss the indictment would have been different.[78]

**e. Trial counsel was ineffective for failing to argue that the death that might result from the conduct criminalized in § 247 and § 249 could be accidental or negligent and happen to someone other than the intended victim of these crimes.**

In the trial court's Order denying the Motion for a New Trial, the court conceded its original order was wrong in suggesting that the fact that an offense has as an element any

---

[78] As noted below, trial counsel also should have explained why the additional element of "death results" should not have altered the analysis, since death can result from accidental or negligent causes. Had trial counsel done so, the trial court's ultimate conclusion is likely to have been different as well.

requirement of force was not sufficient to satisfy the demands of *Curtis Johnson*, amending its earlier pre-trial order. Dkt. No. 961 at 20. With that amendment as its starting point, the trial court proceeded to reason that, if someone dies as a result of the force employed to violate the underlying offense described in the statute, the force used must have been lethal force— substantial and violent.

The court could not have reached this result if trial counsel had provided it with case law or hypotheticals demonstrating that a defendant could willfully or intentionally cause a small degree of bodily harm without intending to cause death, and that the resultant death could in fact have little or no relation to the defendant's intentions. The waiter spitting in his customer's food, discussed above, requires no violent force, and the intent is to cause nothing more than nausea or the common cold to the customer. His actions could nonetheless result in someone's death. One can think of countless nasty pranks, designed to cause someone minor pain, that could result in an injury far beyond what the prankster ever intended such as pinching someone the offender does not know has hemophilia, resulting in lethal internal bleeding.

The point is straightforward and trial counsel should have made it: Willfully causing someone bodily harm as defined by § 249, which includes any amount of pain, illness or injury, can result in someone's death without the offender intentionally using force to cause such substantial injury. Cases, not just plausible examples, make this point clear. *See, e.g.*, *United States v. Jackson*, 736 F.3d 953, 955 (10th Cir. 2013) (a federal crime may be deemed to result in death even though the death is entirely accidental); *United States v. McDuffy*, 890 F.3d 796, 802 (9th Cir. 2018) (there is no *mens rea* attached to the determination that "death resulted" from the commission of a federal offense, even when the killing was accidental); *United States v. Fulks*, 120 F.4th 146, 152 (4th Cir. 2024) (defendants and the government agreed that kidnapping

resulting in death was no longer a crime of violence, where kidnapping simpliciter is not a crime of violence and "resulting in death" does not require a *mens rea* greater than recklessness).[79] Had trial counsel made these arguments, this analysis would have helped the trial court work through these issues and would likely have succeeded.

### f. Trial counsel failed to argue a key policy consideration for the district court to consider in its understanding and analysis of whether a predicate crime is a crime of violence.

In responding to defendants' arguments that a particular predicate crime could be committed without the intentional use of strong physical force, the government, in many instances, including Dylann's, asserted to the courts that the Department of Justice would never prosecute anyone for conduct that involved the less violent, or less intentional, acts the statutes seemed to cover.

But that is problematic for at least two reasons, both of which trial counsel should have explained to the court. First, and most obviously, the Department of Justice could not bind future Attorneys General from prosecuting cases that fulfilled the elements of these statutes.

Second, prosecutors do not get to arbitrarily narrow the range of conduct Congress intended to cover. Congress must be presumed to draft statutes using language to sweep in as many offenders as possible—to enable anyone whose conduct falls within the elements of the offense to be prosecuted for it. Likewise, Courts cannot presume that Congress passed a Hate Crimes Prevention Act that somehow applies to a narrower group of perpetrators than its language plainly covers. And courts certainly cannot make that presumption specifically to ensure that the Act makes a defendant eligible for enhanced sentencing under an entirely separate statute, § 924(c). If Congress had wanted the Hate Crimes Prevention Act to apply to fewer

---

[79] The groundwork for these cases was laid no later than 2013, even for the ones decided later.

offenders, it could have mirrored the language of § 924(c) by saying: "Whoever uses force against the person of another because of that person's race, . . . ." Or Congress could have chosen a different definition of "bodily injury" and said that whoever "acted willfully to cause serious bodily injury" violated the statute. But Congress did not use either of these formulations. By using the language it did, Congress criminalized a broader range of conduct with § 249.

The "causing illness" scenario is a prime example. Given the choices Congress made in crafting § 249—and assuming the Act is otherwise constitutional—the government can prosecute a person who willfully causes his Black or Chinese-American victim to catch his cold by breathing into the person's face. But just because the Hate Crime Prevention Act criminalizes a broad range of conduct, that does not make all conduct it criminalizes a violent felony. As such, prosecution under the Hate Crime Prevention Act does not permit the government to also charge a defendant with violating § 924(c).

This is a straightforward argument that did not require expertise or deep research to put forward. It only required a degree of thought that defense counsel is supposed to put into the issues critical to their client's capital case.

**g. Trial counsel's reliance on *Torres-Miguel* was badly misplaced.**

Instead of making the more persuasive arguments outlined above, in arguing that § 247 and § 249 could be committed in ways that were not violent, trial counsel relied primarily on the language of *Torres-Miguel*. In *Torres-Miguel*, the Fourth Circuit was called upon to determine whether a California statute required, as an element, the use of force, the threatened use of force, or the attempt to use force against another. The question before the court was whether the defendant, who had a prior conviction under the California statute at issue, could receive a Sentencing Guidelines enhancement for having a prior conviction for a crime of violence. The

language of the crime-of-violence Guideline enhancement was almost identical to the elements clause of § 924(c).

The Fourth Circuit held that the California statute, which criminalized making a threat to cause the victim bodily harm, was not a crime of violence because "causing bodily harm" did not necessarily require "using" physical force. The court posited, as an example, that an offender could threaten to sprinkle poison on someone's food. This, the court said, would be a threat to cause bodily harm or even death, but it would not "use" physical force to accomplish that end.

Based on the Fourth Circuit's analysis in *Torres-Miguel*, trial counsel argued that the Fourth Circuit had said that someone could cause death with poison without using strong physical force. By extension, certainly someone could cause bodily harm without using strong physical force. Therefore, because its most innocent violation could involve poisoning someone, § 249 was not a crime of violence pursuant to the elements clause.

There were several problems with this argument. First, courts in other circuits largely disagreed with it. The Ninth Circuit had previously disagreed with the Fourth, as the Fourth Circuit itself noted in the *Torres-Miguel* opinion. Soon after the opinion, other circuits split on the issue, as well.

Of greater concern, *Torres-Miguel* was no longer good law. In *Castleman v. United States*, 572 U.S. 157 (2014)—decided two years before trial counsel filed Dylann's MTD—the Supreme Court abrogated *Torres-Migel*. *See United States v. Allred*, 942 F.3d 641 (4th Cir. 2019) ("[T]his Court has confirmed and reaffirmed in several decisions that the direct versus indirect use of force distinction articulated in *Torres-Miguel* has been abrogated by *Castleman*.").

251

*Castleman* undercut the Fourth Circuit's analysis in at least two critical ways—which were obvious even before the Fourth Circuit explicitly acknowledged *Torres-Migel*'s abrogation in several cases. First, the Supreme Court announced that poisoning someone involved a use of force just as much as shooting someone did. In neither case, the Court reasoned, did the perpetrator touch the victim. Thus, indirect force could still qualify as strong physical force. *Castleman*, 572 U.S. at 170-71. Justice Scalia's concurrence took that a step further. He also dispensed with the idea that intentionally causing someone physical harm was different from using force against someone else. *Id.* at 175 (Scalia, J., concurring).

Moreover, while *Torres-Miguel* might have been broad in the scope of the predicate crimes it seemed to render non-violent, the poisoning example used in it addressed a theoretical predicate crime of murder. In other words, it involved a predicate where the specific intent of the perpetrator was to kill someone. It was completely predictable that courts would find such an example counterintuitive. In many ways, Dylann had a simpler task, and one less likely to be met with as much resistance as the notion that murder was not in all instances a violent felony. Dylann merely had to show that the predicate crimes he was accused of—obstructing religious worship and causing a fleeting bodily harm to someone because of hatred for that person's racial group—could be accomplished with no or minimal violent force, but could nevertheless result in someone's death. In other words, the predicate crimes themselves did not demand that the offender intentionally use lethal force at all, as the *Torres-Miguel* example did.

Thus, trial counsel's reliance solely on *Torres-Miguel*'s reasoning, to the exclusion of other ways of demonstrating that § 247 and § 249 could be violated that didn't implicate the elements clause, was a bad—and unnecessary—idea. Trial counsel should have at least raised other arguments along with pointing to *Torres-Migel*.

Notably, trial counsel did not even mention *Castleman* in the Motion to Dismiss. Even if counsel had strategically chosen to skirt *Castleman* in its initial MTD, the government talked about the case extensively in its Response to the MTD, explaining why the district court should reject Dylann's arguments that you could murder someone with poison and not have committed a crime of violence as described in § 924(c)(2)(A)'s elements clause. Picking up on Justice Scalia's concurring opinion, the government also disputed the idea that intentionally or willfully causing someone bodily harm was different from using physical force against someone. *See* Dkt. No. 279 at 50. Yet in the Reply to the MTD and in its Motion for New Trial, trial counsel doubled-down on the *Torres-Miguel* holding, instead of pivoting to show that Dylann's argument required dropping the § 924(c) counts of the indictment for reasons other than—or at least in addition to—the holding in *Torres-Miguel*. As noted above, there were ways to combat the application of § 924(c) to Dylann's case, without reliance on *Torres-Miguel*.

**h. Trial counsel was ineffective for failing to argue that § 924(c) was unconstitutionally vague in its entirety.**

In the MTD, trial counsel appropriately argued that the residual clause of § 924(c) was unconstitutionally vague for the same reasons the Supreme Court had found the residual clause of the Armed Career Criminal Act ("ACCA") to be unconstitutional (although, of course, trial counsel's argument suffered from the many problems discussed above). However, trial counsel should have asserted that the rest of the statute was likewise too vague to be applied with the uniformity demanded of a criminal statute, but failed to do so. By the time of Dylann's trial, three decades had passed since § 924(c) was enacted, but neither the level of force nor the *mens rea* of the elements clause were clear. Thus, the statute did not give fair notice of the conduct it criminalized and was unconstitutionally vague.

First, in 2016, it was not clear what definition of force was to be used in analyzing the elements clause. Although § 924(c) had been in effect since the late 1980s, the Supreme Court did not define the term "force" until 2010 in *Curtis Johnson,* more than thirty years later. Even then, the language of *Curtis Johnson* did little to resolve the issue of what level of force satisfied § 924(c)'s elements clause. The Court wrote that "the phrase 'physical force' means *violent* force—that is, force capable of causing physical pain or injury to another person." *Id.* at 140. But virtually any amount of force is "capable" of causing physical pain or injury to certain people— the weak, the frail, the infirm. And the *Curtis Johnson* Court did little to explain how much physical pain or injury the force needed to cause. So this explanation left great uncertainty as to what "force" meant. Just four years after *Curtis Johnson*, in *Castleman*, the Court muddied even these murky waters in its attempt to differentiate between common-law force that satisfied a statute penalizing force necessary to convict in misdemeanor domestic violence cases, and the type of force that characterized a violent felony, as *Curtis Johnson* had discussed.[80] As of the date of Dylann's indictment, the Supreme Court had defined force in *Curtis Johnson* as strong physical force but had also said it might only be the amount of force necessary to cause an unspecified amount of physical pain, perhaps enough to put someone in the hospital or perhaps only the amount generated by a paper cut. Other questions persisted as well, such as whether causing harm equated to using force, and whether the failure to act could constitute the "use of force."

---

[80] In *Castleman*, the Court noted, for example, that a "bodily injury" under the Tennessee law in question "must" result from "physical force" where bodily injury included such injuries as, *inter alia*, a cut, an abrasion, a bruise, physical pain, temporary illness or the impairment of the function of a bodily member or organ. The Court then said it was not deciding whether these forms of injuries necessitated the use of "violent force." *Castleman*, 572 U.S. at 166. The overlap of "physical pain" in both cases sewed great confusion.

Second, the degree of *mens rea* necessary to trigger § 924(c) was also a matter of debate. In *Leocal*, the Supreme Court said that the "key phrase" in §16(a)—the elements clause in the Immigration Act that is identical to § 924(c)'s elements clause—"most naturally suggests a higher degree of intent *than negligent or merely accidental conduct*." 543 U.S. at 10 (emphasis added). But although the Supreme Court had made clear that the mens rea must be greater than negligence, at the time of Dylann's trial in 2016, it was an open question whether *reckless* conduct satisfied § 924(c).[81]

Moreover, even with offenses the government conceded were not crimes of violence under § 924(c)'s elements clause, like kidnapping simpliciter and conspiracy, the government still argued in some, but not all, instances that the presence of the "death results" factor converted the offense into a crime of violence, even though no *mens rea* was attached to the death results element, and that the resultant death was never intended by the perpetrator.

With neither the level of force nor the *mens rea* of the elements clause established some thirty years after § 924(c)'s enactment, the statute failed to give fair notice of the conduct it was criminalizing. Trial counsel should have challenged its constitutionality on the grounds of this degree of vagueness. Yet counsel failed to raise this issue at all.

### i. Trial counsel failed to seek a stay in light of *Dimaya*.

In keeping with their pattern of failing to zealously litigate dismissal of the indictment because of the unconstitutionality of the statutes under which Dylann was charged, and, perhaps more notably, in keeping with their rush to try the case, counsel failed to seek a stay in light of *Sessions v. Dimaya*. That case was pending before the Supreme Court during trial proceedings in

---

[81] Eventually, in *Borden v. United States,* the Supreme Court decided that a statute requiring only reckless conduct is insufficient to trigger § 924(c), but has still left open the question whether extreme recklessness will trigger it, or whether the elements of the predicate crime have to require an intentional *mens rea.* 593 U.S. 420 (2021).

this case. (The government filed its petition for cert on June 10, 2016, and the petition was

granted on September 29, 2016. The opinion was issued on April 17, 2018.) Counsel was

certainly aware of *Dimaya*, given that one of them authored an amicus brief for the case. (The

brief for the National Association of Federal Defenders was filed on December 21, 2016.) And

stays in light of *Dimaya*, and later *Davis*, were common in the wake of *Johnson*. There was

absolutely no reason for counsel not to seek such a stay. Other than, of course, the rush to get the

case to trial, the cause of many of this case's most serious problems. *See* Claim 9.

## C. Trial counsel was ineffective for failing to argue that § 249 was unconstitutional because it criminalized biases and thoughts, in violation of the First Amendment.

Trial counsel failed to argue that 18 U.S.C. § 249 violated the First Amendment. The

statute criminalizes the defendant's thoughts, not his actions. Rather than prohibit assault, or

murder, the statute prohibits conduct only if it is perpetrated because of the defendant's biases,

beliefs, or thoughts. This is impermissible under the First Amendment. Yet trial counsel failed to

challenge the statute on this ground.

### i. Background

Section 249(a)(1) states: "Whoever, whether or not acting under color of law, willfully

causes bodily injury to any person or, through the use of fire, a firearm, a dangerous weapon, or

an explosive or incendiary device, attempts to cause bodily injury to any person, *because of the*

*actual or perceived race, color, religion, or national origin of any person*" shall be fined or

imprisoned. § 249(a)(1) (emphasis added).[82] One element of this crime is causing or attempting

---

[82] Section 249(a)(2) is not at issue in Dylann's case, but it demonstrates that the intent of the entire statute is to reach crimes based on thought and personal biases, rather than conduct. It states: "Whoever, whether or not acting under color of law, in any circumstance described in subparagraph (B) or paragraph (3), willfully causes bodily injury to any person or, through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, attempts to cause bodily injury to any person, *because of the actual or perceived religion, national origin,*

to cause bodily injury. It criminalizes the defendant's conduct. But under § 249(a)(1), the conduct is punishable only if it is "because of the actual or perceived race, color, religion, or national origin of any person." This, the key element of § 249, does not criminalize the defendant's conduct, nor the consequences of the defendant's conduct. Rather, it criminalizes the defendant's thoughts and biases, in violation of the First Amendment.

Properly litigating this issue should have resulted in dismissal of the twelve § 249 counts alleged against Dylann. Since nine of these counts were also identified as predicate offenses for the nine § 924(c) and (j) counts, it likely would also have resulted in dismissal of the additional nine § 924(c) and (j) counts.[83]

### ii. Trial counsel failed to challenge 18 U.S.C. § 249 on the basis that by criminalizing thoughts and biases, it violates the First Amendment to the United States Constitution.

Criminalizing thoughts and biases violates the First Amendment. The government "cannot constitutionally premise legislation on the desirability of controlling a person's private thoughts." *Stanley v. Georgia*, 394 U.S. 557, 566 (1969).

The Supreme Court has "long held" that "nonverbal expressive activity can be banned *because of the action* it entails, but *not because of the ideas* it expresses." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 385 (1992) (emphasis added). So while the government may regulate conduct, it may not do so "based on hostility—or favoritism—towards the underlying message expressed." *Id.* at 386.

The rule is simple: The government can regulate conduct. The government cannot, however, regulate conduct because of the biases, thoughts, beliefs, or ideas expressed by the

---

*gender, sexual orientation, gender identity, or disability of any person*" shall be fined or imprisoned.

[83] The § 924 counts identified both the § 247 counts and the § 249 counts as crimes of violence that supported conviction under § 924(c) and (j). As noted, neither § 247 nor § 249 constitute crimes of violence.

conduct. "[B]urning a flag in violation of an ordinance against outdoor fires could be punishable, whereas burning a flag in violation of an ordinance against dishonoring the flag is not." *Id.* at 385. Along the same lines, "government regulation of drug sales is not prohibited by the Constitution," but "the fantasies of a drug addict are his own and beyond the reach of government." *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 67-68 (1973).[84]

Section 249 violated this rule. The statute punishes actions only if they are motivated by certain thoughts. Prohibiting assault does not violate the First Amendment. Prohibiting assault "because of the ideas it expresses" does violate the First Amendment. *R.A.V.*, 505 U.S. at 385.

There was no reason why trial counsel should not have raised this issue. The Supreme Court has never decided whether § 249 violates the First Amendment. And Supreme Court precedents like *R.A.V.* clearly show that statutes like § 249, which regulate conduct only because of the ideas they express, violate the First Amendment. Certainly hate crime legislation has always been controversial, largely because of concerns that it polices thoughts, not acts, and impinges on free speech.[85]

---

[84] When the Supreme Court did uphold a criminal statute that allowed for harsher punishment of bias-motivated crimes, it did so on the basis that "[t]raditionally, sentencing judges have considered a wide variety of factors in addition to evidence bearing on guilt in determining what sentence to impose on a convicted defendant" and so allowing the defendant's motivation to be considered in crafting a sentence was permissible. *Wisconsin v. Mitchell*, 508 U.S. 476, 485 (1993). But here, the defendant's perceptions and thoughts are not just something to be considered at sentencing: they are actually an element of the crime. Thus, *R.A.V.* is the key precedent, and *Mitchell* is distinguishable.

[85] *See, e.g.*, The New York Times, *Room for Debate: Are Hate Crime Laws Necessary?*, N.Y. Times (Mar. 7, 2012), https://www.nytimes.com/roomfordebate/2012/03/07/are-hate-crime-laws-necessary (featuring six debaters offering differing views of anti-hate crime legislation); Michael Bronski, Anni Pellegrini & Michael Amico, *Hate Crime Laws Don't Prevent Violence Against LGBT People*, The Nation (Oct. 2, 2013), https://www.thenation.com/article/archive/hate-crime-laws-dont-prevent-violence-against-lgbt-people/ (offering a liberal critique of hate crime legislation); Gail L. Heriot & Lara Schwartz, *Online Debate: Hate Crimes Legislation*, The Federalist Society (Aug. 17, 2009),

258

In sum, there was no reason for trial counsel to miss the fact that § 249 was an infringement on the First Amendment issues and that they should challenge the constitutionality of § 249 on First Amendment grounds.

**D. Trial counsel was ineffective for making inadequate arguments that § 247 and § 249 are unconstitutional, both on their face and as applied here.**

Rather than mounting a serious challenge to federal jurisdiction in this case, federal trial counsel facilitated the inappropriate extension of federal authority into an issue that could and should have been handled by the State of South Carolina. Although trial counsel nominally challenged federal jurisdiction, they did so while taking steps to ensure that the federal trial happened quickly, before the State had a chance to take Dylann to trial. There are many reasons why this rush to trial constituted ineffective assistance. *See* Claim 9. Among them is that this frenzied rush nullified what should have been compelling arguments that it was inappropriate and unconstitutional for this case to be in federal court rather than tried in a South Carolina court.

Because § 249(a)(1) exceeds Congress' authority under the Thirteenth Amendment, § 249(a)(1) is unconstitutional on its face and as applied to Dylann. Because § 247(a)(2) exceeds Congress' authority under the Commerce Clause, § 247(a)(2) is unconstitutional on its face and as applied to Dylann. These statutes are supposed to serve as a backstop, because federal criminal jurisdiction is limited. Federal hate crime prosecutions are supposed to be reserved for situations where state authorities fail to prosecute, magnifying the harm to victims of bias-motivated crimes. Here, the federal prosecution did not step into a void left by state prosecutors unwilling to bring charges. Rather, the federal prosecution directed enormous

---

https://fedsoc.org/commentary/publications/hate-crimes-legislation (offering a conservative critique of hate crime legislation).

federal resources toward prosecuting a high-profile crime the state was already prosecuting.

Worse, the federal prosecution actually thwarted the state's efforts to hold a trial.[86]

There was no question that South Carolina would prosecute Dylann. South Carolina brought charges within a day and quickly announced plans to seek the death penalty. Indeed, the state prosecutor made clear not only that she wanted to take Dylann to trial and seek a death sentence, but that she preferred to proceed to trial before the federal government. Dkt. No. 68 (letter from state prosecutor stating "I have requested that the State trial proceed first and that is our preference"). She asked the DOJ and federal court to allow the state trial to proceed first and took steps to move the state trial quickly. *Id.* Following the announcement that federal proceedings would be first, the state prosecutor expressed disappointment that the DOJ and federal court ignored her request. Then South Carolina opted not to try to the case to avoid the ordeal of a second trial. *See* Kevin Sack, *Already Facing Death Penalty, Dylann Roof Cuts Deal for Added Life Term*, New York Times (Mar. 31, 2017), https://www.nytimes.com/2017/03/31/us/dylann-roof-charleston-ame-church-guilty-plea.html (in a letter to the victims and families explaining the benefit of a plea agreement, the State prosecutor emphasized: "no more trials!").

Although the trial defense team nominally challenged the federal government's jurisdiction, their actions ensured that the federal case took priority, helping undermine the

---

[86] The federal prosecution did not add anything to the state's response—the federal response did not include addressing root causes or implementing prevention strategies. For example, no federal legislation to prevent racialized violence was passed, although federal lawmakers representing South Carolina, including Rep. Clyburn and Sen. Scott, called for federal legislation to address police brutality. Nor was legislation passed to close the loophole that makes buying guns easier and facilitated the mistake that allowed Dylann to buy a gun even though he should not have passed a background check. Rep. Clyburn has called for federal legislation to close the "Charleston Loophole," but no such legislation has passed.

State's efforts to try the case. Most importantly, trial counsel sought to keep federal proceedings moving at breakneck speed to ensure the federal trial happened first. Additionally, as discussed above, trial counsel included in their Motion to Dismiss the gratuitous statement that they would have Dylann plead guilty to the very charges they argued were unconstitutional. As such, among other errors in challenging the constitutionality of § 247 and § 249, trial counsel undermined their own arguments that these statutes epitomized federal overreach, by rushing to have the federal trial before a state trial and signaling that they were not taking their own arguments seriously.

**i. Background**

Because the crime did not occur on federal land or otherwise within the "special maritime and territorial jurisdiction of the United States," s*ee* § 1111(b), in order to prosecute Dylann, the DOJ needed to find a federal statute they could use. The federal government charged Dylann under the Hate Crimes Act, § 249, and the Church Arson Act, § 247.

Long before the federal trial, it was clear that the State of South Carolina was willing and able to vigorously prosecute Dylann for murder. The crime occurred on June 17, 2015. Local police in North Carolina arrested Dylann following a tip from a citizen, and South Carolina police transported him back to South Carolina. He was held in a South Carolina county jail pretrial. South Carolina brought charges within days and announced it would seek the death penalty less than two months later, on September 3, 2015. Meanwhile, the federal government indicted Dylann a month after the crime, on July 22, 2015, *see* Dkt. No. 2, and announced plans to seek the death penalty on May 24, 2016, *see* Dkt. No. 164.

The U.S. Attorney, William Nettles, objected to the DOJ's decision to prosecute, arguing that "because local prosecutors were already seeking the death penalty for Roof, it was unnecessary for the federal government to do the same." Kevin Sullivan and Matt Zapotosky, *We*

261

*Are Just Looking for Justice: Charleston Prepares for Dylann Roof's Trial*, Wash. Post (Dec. 6, 2016), https://www.washingtonpost.com/national/we-are-just-looking-for-justice-charleston-prepares-for-dylann-roofs-trial/2016/12/06/4396d6a0-bbba-11e6-ac85-094a21c44abc_story.html. He explained, "[m]y view of federalism was that we should be like good dinner guests: We should come when we're invited, help clean up and leave, and that our role was to do what the state was unwilling or unable to do." *Id.* An attorney for the victims' families, Andrew J. Savage III, conveyed a similar sentiment about the DOJ's decision to proceed with a federal capital trial: "It's a political statement as much as anything else, and really unnecessary at this point." *Id.* Indeed, "[m]any people in Charleston thought that Loretta Lynch, the U.S. Attorney General, should have spared the families—and the city—the ordeal of a trial . . ." Jelani Cobb, *Inside the Trial of Dylann Roof*, The New Yorker (Jan. 29, 2017), https://www.newyorker.com/magazine/2017/02/06/inside-the-trial-of-dylann-roof.

After the federal trial, the State accepted a plea of guilty in exchange for a life sentence. Explaining the benefit deal to victims and their families, the State prosecutor emphasized: "no more trials!" *See* Kevin Sack, *Already Facing Death Penalty, Dylann Roof Cuts Deal for Added Life Term*, New York Times (Mar. 31, 2017), https://www.nytimes.com/2017/03/31/us/dylann-roof-charleston-ame-church-guilty-plea.html. Mr. Savage, representing some victims and family members, sounded a similar note, explaining, "There was a sense of relief that this keeps the victims and witnesses from going through another trial, which they really did not want to do." *Id.*

In essence, the DOJ's insistence on prosecuting Dylann and its decision to proceed to trial before the State—combined with the State's recognition that it would be unfair to demand a second grueling trial—undermined the State's effort to try the case in its own courts. This duplication (even usurpation) of the State's efforts to enforce its own criminal laws is not faithful to the

purpose of § 247 and § 249, and it shows that these laws are an unnecessary and inappropriate extension of federal criminal law that violates the Constitution. Although trial counsel made some arguments that these statutes constituted unconstitutional exercises of federal power—primarily based on *United States v. Morrison*, 529 U.S. 598 (2000), and *United States v. Lopez*, 514 U.S. 549 (1995), as to § 247, and the definition of "appropriate legislation" to enforce the Thirteenth Amendment, as to § 249—trial counsel failed to explain the extent to which this federal prosecution was undermining South Carolina's efforts to prosecute this case in its own courts, which is precisely what the constitutional guardrails are supposed to prevent. Indeed, they exacerbated the problem.

**ii. Trial counsel failed to make the strongest available arguments that § 247 and § 249 are unconstitutional.**

**a. The federal government may exercise authority only as the Constitution delegates to it; police power is a quintessential state power.**

The federal government may exercise only the power the Constitution delegates to it. *See* U.S. Const. amend. X; *M'Culloch v. Maryland*, 17 U.S. 316, 405 (1819). "All powers not granted to it by that instrument are reserved to the States or to the people." *United States v. Cruikshank*, 92 U.S. 542, 551 (1875). Crime prevention and criminal prosecution are police powers; as such, they are state powers not to be infringed by the federal government. *See, e.g.*, *Lopez*, 514 U.S. at 561; *United States v. Comstock*, 560 U.S. 126, 135 (2010); *Medina v. California*, 505 U.S. 437, 445 (1992) ("It goes without saying that preventing and dealing with crime is much more the business of the States than it is of the Federal Government."). Indeed, the Supreme Court has said, "we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *Morrison*, 529 U.S. at 618; As such, "[t]he states

263

possess primary authority for defining and enforcing the criminal law." *Brecht v. Abrahamson*,

507 U.S. 619, 635 (1993) (quoting *Engle v. Isaac*, 456 U.S. 107, 128 (1982)).

In light of these principles, it is notable that prior hate crime prosecutions had been left

entirely to state courts. This includes the prosecution of Frazier Glenn Miller in Kansas and

Jacob England and Alvin Watts in Oklahoma.[87]

**b. The Thirteenth Amendment does not authorize Congress to enact a broad criminal statute authorizing federal prosecution of crimes motivated by bias, and § 249(a)(1) simply allows for federal prosecution of acts that are already criminalized in every state, rather than genuinely creating new protections.**

The Thirteenth Amendment was enacted to prohibit slavery and involuntary servitude in

the wake of the Civil War. It was not intended as a broad grant of power to the federal

government to criminalize conduct motivated by bias where a state was willing and able to

enforce its own criminal laws. Section 2 of the Thirteenth Amendment constrains Congress's

power by stating that "Congress shall have power to enforce this article by appropriate

legislation."

The Supreme Court has generally upheld, as appropriate legislation, *civil* anti-

discrimination laws, as opposed to laws authorizing criminal penalties. In the 1800s, the Court

struck down a criminal anti-discrimination statute as overbroad, and the Supreme Court has not

revisited Congress' authority to enact a criminal statute pursuant to the Thirteenth Amendment

since 1906.[88] More recently, the Court on several occasions has addressed Congress' authority to

enact civil rights statutes pursuant to the Thirteenth Amendment. In these more recent decisions,

the Court has generally upheld civil anti-discrimination laws. For example, in *Jones v. Alfred H.*

---

[87] In their MTD, trial counsel raised arguments citing *Morrison* and *Lopez*, but failed to point out that hate crimes are typically prosecuted in state courts, and, importantly, were themselves trying to make sure that the federal trial happened before the state trial.

[88] Trial counsel did not point to the distinction between civil and criminal statutes.

*Mayer Co.*, 392 U.S. 409 (1968), the Court upheld a civil anti-discrimination statute providing

that all citizens "shall have the same right . . . as is enjoyed by white citizens . . . to inherit,

purchase, lease, sell, hold, and convey real and personal property." *Id.* at 413 (upholding 42

U.S.C. § 1982). And in *Griffin v. Breckenridge*, 403 U.S. 88 (1971), the Court held that Congress

was within its authority under the Thirteenth Amendment to enact 42 U.S.C. § 1985(3), which

created a civil remedy for African Americans who had been victims of racially discriminatory

private action. *Id.* at 105.

The civil anti-discrimination statutes at issue in *Jones* and *Griffin*, which provided a

cause of action by one private party against another, are distinct from criminal statutes

authorizing federal prosecution and punishment. Criminal statutes represent a government's

greatest application of power against its own citizens. Indeed, this power includes the federal

government's ability to impose on its citizens "slavery or involuntary servitude"—the very

conditions prohibited by the Thirteenth Amendment—as "punishment for crime." U.S. Const.

amend. XIII.

The application of the immense power of criminal law is generally reserved to the states.

And the criminal laws of every state and the District of Columbia do in fact criminalize the

actions made illegal by § 249(a)(1).

**c. Section 249(a)(1) was intended as a "backstop," to be used when states could not or would not prosecute bias-motivated crimes, not a blanket grant of authority to the federal government to prosecute at will.**

Federal hate crime legislation was proposed as a "backstop."[89] To Congress, Attorney

---

[89] Trial counsel argued that the legislation was supposed to serve as a backstop but in insufficient detail. They did not go into any detail about the legislative history, nor point to examples of states actually prosecuting hate crimes. And trial counsel made this argument while also rushing to try the case in federal court, such that their actions completely undermined any argument they were supposedly making.

General Eric Holder suggested that the federal government would step in only where a state was unable or unwilling to prosecute; lawmakers similarly emphasized this point. *See, e.g.*, *The Matthew Shepard Hate Crimes Prevention Act*: *Hearing before the Senate Committee on the Judiciary*, 111th Cong. (June 25, 2009) (hereafter Sen. Hrg.) at 9 (Sen. Feinstein: "I think this bill presents the caution to States. . . The backstop of the law is that the Federal Attorney General, *if the State refuses to prosecute*, can also look into the case and make a decision, well, this case, in fact, does deserve prosecution. . . . *[I]f there is a State that refuses to prosecute*, that ignores the element of hate in the commission of a felony, the Federal Government can stand up and say, we're going to prosecute."); *id*. at 14 (Attorney General Holder: "I don't think that I can say that there is a trend, that there is a trend among the States or local jurisdictions in failing to go after these kinds of crimes. What we're looking for is an ability in those instances—*those rare instances—where there is an inability or an unwillingness by State or local jurisdiction to proceed, that the Federal Government would be able to stop, would be able to fill that gap*. That's why this legislation, we think, is so necessary. It would *not put the Federal Government in the position to replace our State and local partners*."); *id*. at 16, 18, 20, 69 (describing the legislation as a "backstop" to the states' efforts); *id*. at 67 ("The certification provision in proposed 18 U.S.C. § 249(b) will not provide the Attorney General with unlimited authority and it *will not interfere with the prosecution of crimes that can be handled effectively at the local level*."); *id*. at 68 ("Consistent with our current practice under existing federal hate crimes laws, we would continue to *consult closely with our state, local, and tribal colleagues in all cases*."); *id*. at 68 (referring to the Department's Dual and Successive Prosecution Policy as placing "*strict limits on an dual or subsequent federal prosecutions*," pledging not to bring a federal prosecution unless the matter involves a "'substantial federal interest' that the state prosecution

had left '*demonstrably unvindicated*,'" and asserting that "The Department judiciously exercises its discretion and authority to prosecute" under this policy) (emphasis added).

**d. The plain language of § 249(a)(1) does not limit it to serving as a mere "backstop."**

Yet, while a statute creating a "backstop" would avoid usurping state power, the plain language of § 249(a)(1) in fact allows the Attorney General to press forward with federal prosecutions without regard to the states' interests, as it did in this case. Section 249(a)(1) prohibits both bodily injury and attempted bodily injury motivated by any one of four "actual or perceived" characteristics of the victim: (i) race, (ii) color, (iii) religion, or (iv) national origin. The actual conduct prohibited by § 249(a)(1) is "willfully caus[ing] bodily injury to any person or, through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, attempt[ing] to cause bodily injury to any person."[90] The statute itself contains no serious limitation on federal authority in cases where the state moves forward with prosecution.

**e. There is no evidence that states fail to prosecute the conduct criminalized by § 249(a)(1)—bodily injury—including when the bodily injury is motivated by bias.**

The willful causation of bodily injury or attempted causation of bodily injury is already illegal under state law. *See Local Law Enforcement Hate Crimes Prevention Act of 2007*, H.R.Rep. 110-113 (April 30, 2007) at 45 (dissenting views). States in fact use these laws to prosecute willful violence, including violence motivated by bias. And the DOJ knows that states use these laws to prosecute willful violence motivated by bias. "Some of the most notorious hate

---

[90] The improper certification for federal prosecution pursuant to 18 U.S.C. § 249(b)(1) also establishes that federal law was not actually being used as a backstop. The certification was based on findings that it was in the "public interest and necessary to secure substantial justice," *see* 18 U.S.C. § 249(b)(1)(D), because South Carolina lacked jurisdiction to prosecute hate crimes. However, certification is supposed to turn on whether a state is willing and able to effectively prosecute the crime. South Carolina was willing, able, and in fact did actually prosecute under state statutes criminalizing the actual conduct at issue. South Carolina intended to seek the death penalty.

crimes were prosecuted under state laws, and there is no evidence that States are unable or unwilling to prosecute such crimes." *Id.* As of the 2009 hearings about the proposed hate crime law, the DOJ was *not* concerned that states were failing to prosecute violent crimes, including race-based crimes. Sen. Hrg. at 14. Indeed, the Department of Justice endorsed the "tireless[]" work by state and local law enforcement agencies "to hold all individuals who commit violent crimes accountable for their actions." *Id.* at 63.

Even as he assured Congress that the DOJ would step in only where states were not prosecuting, Attorney General Holder emphasized, "[t]he Department's strong support of this legislation is *not* premised on a belief that other levels of law enforcement are not taking appropriate action to combat these serious crimes." Sen. Hrg. at 69 (emphasis added). He also said, "I think that State and local prosecutors are partners and do a good job." *Id.* at 7. He could not identify any state that was failing to enforce its laws punishing crimes of violence. *Id.* at 14. In written responses, Attorney General Holder wrote: "The Department is unable to provide an exact number of cases in which state, local, or tribal jurisdictions have failed to prosecute hate crimes." *Id.* at 73. He acknowledged, "I don't think I can say that there is a trend, that there is a trend among the States or local jurisdictions in failing to go after these kinds of crimes." *Id.* at 14.

Certainly, the cases involving the two people for whom the HCPA is named, James Byrd, Jr. and Matthew Shepard, do not suggest that states fail to prosecute bias-motivated crimes. In both cases, states sought and obtained murder convictions and even death sentences.[91]

---

[91] The state of Wyoming quickly arrested the perpetrators who killed Matthew Shepard. They charged both with first-degree murder. They sought the death penalty against one. In a deal brokered by the victim's family, the state agreed to a life sentence. Julie Cart, *Killer of Gay Student is Spared Death Penalty*, L.A. Times (Dec. 31, 1999), https://www.latimes.com/archives/la-xpm-1999-dec-31-mn-47273-story.html. The second

This case is yet another example of a state's willingness and ability to prosecute bias-motivated crimes. The State of South Carolina prosecuted Dylann for murder. The State intended to seek the death penalty, citing his motive for the killings as a reason to seek a harsher punishment. And although the rushed federal trial led to a state plea, Dylann still received a harsh punishment from the state: life imprisonment.

**f. Section 249(a)(1) has been used to interfere with state-level prosecutions, not as a "backstop" to prosecute crimes that the state would have ignored.**

This case is also an example showing that, despite Attorney General Holder's insistence that the legislation would "not provide the Attorney General with unlimited authority and it will not interfere with the prosecution of crimes that can be handled effectively at the local level," the legislation has done precisely that. Sen. Hrg. at 67. The federal government has repeatedly stepped in when states could effectively handle prosecution. And since this case, the federal government's tendency to do so has not slowed down.

Section 249(a)(1) provides the federal government unchecked power to prosecute conduct on its own, without regard to any state or local interest in conducting the prosecution and without any obligation whatsoever to fund or assist state or local efforts. Because states are perfectly

---

perpetrator also received a life sentence. Tom Kenworthy, *2nd Man Is Convicted Of Killing Gay Student*, Wash. Post (Nov. 4, 1999), https://www.washingtonpost.com/archive /politics /1999 /11/04/2nd-man-is-convicted-of- killing-gay-student/1d3d6cc2-61b3-4c18-918e-a73bd735de8f/. Indeed, LGBTQ rights groups praised the outcome. Julie Cart, *Killer of Gay Student is Spared Death Penalty*, L.A. Times (Dec. 31, 1999), https://www.latimes.com/archives/la-xpm-1999-dec-31-mn-47273-story.html ("Gay and lesbian Americans can now have renewed faith in our justice system.")

The state of Texas sought and obtained death sentences against the perpetrators who killed James Byrd, Jr. Two have been executed. Campbell Robertson, *Texas Executes White Supremacist for 1998 Dragging Death of James Byrd Jr.,* New York Times (Apr. 24, 2019), https://www.nytimes.com/2019/04/24/us/james-byrd-jr-john-william-king.html. The third received a life sentence. Liz Tietz, *Byrd's family: Don't forget him*, Beaumont Enterprise (June 4, 2018), https://www.beaumontenterprise.com/news/article/Byrd-s-family-Don-t-forget-him-12965531.php.

willing and able to prosecute the conduct criminalized by § 249(a)(1), the statute represents an

unprecedented and exceedingly broad expansion of federal prosecutorial authority. It

criminalizes "vast swaths" of private violence, untethered to any federally protected interest, if

the such violence is motivated by the actual or perceived color, national origin, religion, or race

of another. *United States v. Cannon*, 750 F.3d 492, 512 (5th Cir. 2014) (Elrod, J., concurring).

Prior to 2009, federal authorities could prosecute a violent act motivated by the victim's "race,

color, religion, national origin," but only to protect the victim's right to engage in a wide range

of "federally protected activities" pursuant to 18 U.S.C. § 245(b)(2). In contrast to § 245(b)(2),

§ 249(a)(1) criminalizes private violence without any relationship to a federally protected

interest, if it is motivated by the actual or perceived color, national origin, religion, or race of

another.

In sum, § 249(a)(1) is incompatible with this framework of limited Congressional power.

The statute is unconstitutional on its face. And because the State of South Carolina actually

prosecuted Dylann for murder, it was wholly inappropriate—and unconstitutional—for the federal

government to rely on a statute supposedly designed to serve as a "backstop" when states declined

to bring criminal charges for perpetrators of crimes motivated by bias. As such, the statute is also

unconstitutional as applied here.

**g. Section 247 is unconstitutional because it criminalizes intrastate non-economic activity that does not have a substantial effect on interstate commerce.**

Section 247 of Title 18 is referred to as the "Church Arson Prevention Act." The

statute's first section criminalizes the intentional "defac[ing], damag[ing], or destroy[ing]" of

religious real property because of that property's "religious character." 18 U.S.C. § 247(a)(1).

The second part of § 247(a) makes it a crime to "intentionally obstruct[], by force or threat of

force, including by threat of force against religious real property, any person in the enjoyment

270

of that person's free exercise of religious beliefs, or attempts to do so." 18 U.S.C. § 247(a)(2).

The damage or assault must be "in or affect[] interstate or foreign commerce." 18 U.S.C.

§ 247(b).[92]

Section 247 is an unconstitutional exercise of Congressional power. Like the Gun-Free

School Zones Act at issue in *Lopez* and the provision of the Violence Against Women Act at

issue in *Morrison*, § 247 exceeds the limits of Congress' authority to legislate under the

Commerce Clause. The Commerce Clause grants Congress the power "[t]o regulate Commerce

. . . among the several states." U.S. Const. art. I, § 8. It does not grant plenary police power to

control crime.

"Every law enacted by Congress must be based on one or more of its powers enumerated

in the Constitution." *Morrison*, 529 U.S. at 606. This includes laws that Congress enacts

criminalizing intrastate conduct by private individuals. Indeed, the Constitution "withhold[s]

from Congress a plenary police power." *Lopez*, 514 U.S. at 566. Congressional commerce clause

authority is limited "to that commerce which concerns more States than one." *Lopez*, 514 U.S. at

553 (quoting *Gibbons v. Ogden*, 9 Wheat. at 1, 194-95 (1824)).

Certainly, as interstate commerce and Congressional regulations thereof grew, the

Supreme Court recognized an increasingly expansive commerce power for Congress. *See Lopez*,

514 U.S. at 554-58.[93] But the Court's decisions in *Morrison* and *Lopez* make clear that the

---

[92] Trial counsel did raise a commerce clause challenge but, as with their arguments about § 924(c), discussed above, its arguments missed the mark.

[93] The Court identified "three broad categories of activity that Congress may regulate under its commerce power." *Id.* at 558. The first category is "the use of the channels of interstate commerce." *Id*. Congress' authority to regulate the channels of interstate commerce includes keeping them "free from immoral and injurious use." *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 256 (1964). "Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities." *Lopez*, 514 U.S. at 558. "Finally,

expansion of Congress' commerce power did not grant the federal government plenary police power to address violent crime. *Lopez* involved a challenge to a conviction under 18 U.S.C. § 922(q)(1)(A), which made it a federal offense "knowingly to possess a firearm" in a school zone. The Court held that the statute exceeded Congress' commerce power. Five years later, in *Morrison*, the Court invalidated a section of the Violence Against Women Act that created a civil cause of action for victims of gender-motivated violence. 42 U.S.C. § 13981. The Court found that Congress overreached its Commerce Clause authority because "[g]ender-motivated crimes of violence are not, in any sense of the phrase, economic activity," and the Court had "upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature." *Morrison*, 529 U.S. at 613.

"The Constitution," the Court wrote in *Morrison*, "requires a distinction between what is truly national and what is truly local." *Id*. at 618-19. Regulating and punishing "intrastate violence that is not directed at the instrumentalities of, channels, or goods involved in interstate commerce has always been the province of the States," and there is "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *Id*. at 618.

As explained, § 247 regulates damaging religious real property and religiously

---

Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, *i.e.*, those activities that substantially affect interstate commerce." *Id.* at 558-59 (internal citations omitted). The Court acknowledged in *Lopez* that its prior decisions had not been clear as to whether activity in this third category has to "affect" or "substantially affect" interstate commerce to be within Congress' power to regulate. *Id.* It then held that, "consistent with the great weight of our case law, that the proper test requires an analysis of whether the regulated activity 'substantially affects' interstate commerce." *Id.* at 559. As such, "[w]here economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained." *Id.* at 560.

motivated violence. It criminalizes vandalism and interpersonal violence. It does not regulate

the use of channels or instrumentalities of interstate commerce. These crimes are distinctly

non-economic activities that are within the exclusive jurisdiction of the states. *Morrison*, 529

U.S. at 611.

Moreover, the legislative history of § 247 does not contain any findings that the

proscribed conduct has an effect on interstate commerce—much less a substantial one. *See*

*generally Church Fires in the Southeast: Hearing before the House Committee on the Judiciary*,

104th Cong. (May 21, 1996); *Church Burnings*: *Hearing before the Senate Committee on the*

*Judiciary*, 104th Cong. (June 27, 1996). Congress made *no* finding that the non-economic

conduct proscribed by § 247 substantially affects (or even affects) interstate commerce. As

such, the statute exceeds Congress' authority under the Commerce Clause and is

unconstitutional on its face.

**h. The indictment does not allege that Dylann's actions targeted the channels or instrumentalities of interstate commerce and there has been no allegation that Dylann used the channels or instrumentalities of interstate commerce to commit the acts of obstruction by force that establish jurisdiction for prosecution under § 247.**

Moreover, even if constitutional principles and statutory analysis are twisted to find that

§ 247 represents a lawful exercise of Congressional authority, the statute is unconstitutional as

applied here, where the alleged criminal acts did not occur in or affect interstate commerce.

In *Lopez*, the Supreme Court recognized Congress may regulate, first, the channels and,

second, the instrumentalities of interstate commerce. *Lopez*, 514 U.S. at 558. This power to

regulate the channels includes the power to keep them "free from immoral and injurious uses."

*Id.* Similarly, the power to regulate the instrumentalities of interstate commerce also

encompasses the power to protect them, as well as "persons or things *in* interstate commerce."

*Id*. (emphasis added). This second power includes, for example, regulation of safety

273

mechanisms on vehicles used in interstate commerce, destruction of aircraft, or theft from interstate shipments. *Id.*

Here, the government does not allege that Dylann's acts targeted a channel or any instrumentality of interstate commerce to satisfy § 247(b). The victims are not alleged to have been travelling in interstate commerce. Neither is Dylann alleged to have traveled in interstate commerce. For this reason, the indictment does not allege facts that constitute an offense against the channels or instrumentalities of interstate commerce.

The federal government has also not alleged that Dylann made use of either a channel or instrumentality of interstate commerce in committing the acts that are the "essence" of the charged conduct, though necessary to satisfy the jurisdictional element of § 247. There has been no allegation that Dylann used the channels of interstate commerce in any way that was essential or integral to the charged offenses. The government does not allege that Dylann traveled in a channel of interstate commerce in a way that was essential to acts that violated § 247. The indictment does not indicate that Dylann crossed state lines. Although the proceedings involved discussion of Dylann's internet research and postings, none of those acts were an element of the criminal conduct that violates § 247(a)(2). Dylann's use of firearms is likewise insufficient for purposes of the statute's jurisdictional element. The government never alleged a connection between any guns and interstate commerce that would create a nexus to Dylann's criminal acts.

The government has not alleged that Dylann's criminal conduct had a substantial effect on interstate commerce. Houses of worship and religious congregations are generally not considered business enterprises that operate in interstate commerce. *See United States v. Doggart*, 947 F.3d 879, 885 (6th Cir. 2020) (collecting cases).

274

Moreover, to show any effect on interstate commerce from the obstruction of religious practices would require the same attenuated chain of events that *Lopez* and *Morrison* rejected as a basis for Congress' use of its commerce power.

**i. The certifications under § 247(e) and § 249(b)(2) are procedurally and substantively flawed.**

Before the government can undertake a prosecution under either § 247 or § 249, it must comply with the statutes' certification requirements. *See* 18 U.S.C. §§ 247(e) & 249(b)(1)(D). Section 247's certification requirement was added to "ensure appropriate deference to state or local prosecution in most cases, while allowing Federal prosecution where state or local officials will not assume jurisdiction or for any reason are unable to secure a conviction." S. Rep. No. 100-324, 1988 WL 170000, at *6 (1988). Section 249's certification requirement is "intended to ensure that the Federal Government will assert its new hate crimes jurisdiction only in a principled and properly limited fashion." H.R. Rep. No. 111–86, at 14 (2009).

But, as explained above, South Carolina had jurisdiction to prosecute and in fact obtained a conviction and nine life sentences. As such, the only available basis for certification of the federal prosecution against him under § 247 or § 249 was that "a prosecution by the United States is in the public interest and necessary to secure substantial justice." § 247(e); § 249(b)(1)(D). Given these circumstances here, where the federal government usurped South Carolina's efforts to assert its own jurisdiction to police its own citizens, the Attorney General's certification that its conduct is "in the public interest and necessary to secure substantial justice" is unwarranted.

**j. Trial counsel nominally raised constitutional challenges to § 247 and § 249, but their actions undermined their arguments.**

On July 5, 2016, trial counsel filed a Motion to Dismiss the Indictment arguing that § 247

is an unconstitutional exercise of power under the Commerce Clause and § 249 is an

unconstitutional exercise of power under the Thirteenth Amendment (in addition to inadequately

raising the argument that § 924(c)'s residual clause was unconstitutional, as discussed above).

Dkt. No. 233. But trial counsel lacked either the time or the inclination to seriously pursue these

arguments. Rather than seriously litigating whether the case should be in federal court at all, trial

counsel was barreling toward a federal trial. Once the November 2016 trial date was set, trial

counsel did not ask for any continuances.

Rushing the federal case and seeking to have a federal trial take place before a state trial

undermined trial counsel's arguments that the federal court lacked jurisdiction. Indeed, the trial

court did not rule on the Motion to Dismiss until jury selection was already underway, and more

than a week after the competency hearing. Dkt. No. 735 (Order Denying MTD); Dkt. No.

701(Jury Selection Minute Entry); Dkt. No. 653 (Competency Hearing Minute Entry).

If trial counsel had been seriously contesting the federal court's jurisdiction to hear this

case, they would have sought a continuance, at least to delay a competency hearing and the

commencement of jury selection, if not motion deadlines and expert disclosures. But counsel

were not seriously contesting the federal court's jurisdiction. Indeed, as discussed above, the

Motion to Dismiss included the statement that they would willingly have Dylann plead guilty to

the crimes that, nominally, they were arguing the court lacked jurisdiction over.

**E. Trial counsel was ineffective for failing to argue that charging Dylann with three different crimes for the same conduct violated the Double Jeopardy Clause of the Constitution.**

In 2014, Thomas Sanders was convicted in federal court of kidnapping resulting in death,

pursuant to 18 U.S.C. § 1201, as well as § 924(j), for which the kidnapping served as the

predicate offense. He was sentenced to death on both counts. In 2012, prior to trial, he filed a

Motion to Dismiss his indictment in which he contended *inter alia* that being charged with two

276

offenses for the same conduct constituted a violation of the Double Jeopardy clause. The district

court denied his claim which he then raised again in his direct appeal.

The Fifth Circuit issued its opinion on March 27, 2025. *United States v. Sanders*, --F.4th-

-, 2025 WL 926855 (5th Cir. Mar. 27, 2025). The court, considering the Double Jeopardy claim

*de novo*, agreed with Mr. Sanders that in prosecuting him for two different crimes for the same

conduct, the government had violated his right not to be tried twice for the same conduct.

Accordingly, the court vacated Mr. Sanders' convictions and sentences for the § 924 offenses.[94]

*Id*. at *9-11.

Mr. Sanders' claim was pending before Dylann filed his own Motion to Dismiss his

Indictment, and Dylann's trial counsel had every reason to know about this claim. In fact, one of

the attorneys appointed as trial counsel on Dylann's case served as appellate counsel for Mr.

Sanders. Appellate counsel in Mr. Sanders' case was appointed on January 28, 2016, six months

before filing the Motion to Dismiss the Indictment in Dylann's case. *See* 15-31114 5th Cir. Dkt.

No. 13 (Attorney Appearance in *United States v. Sanders*).

Moreover, counsel had every reason to include this argument in the Motion to Dismiss

filed in Dylann's case; there was no downside to doing so. Eliminating the nine counts of crimes

of violence charges from those the jury was being asked to consider might have convinced at

least a single juror to view the sentencing determination in Dylann's case differently.

**F. Trial counsel had no valid strategic reasons for failing to zealously litigate the Motion to Dismiss or the Motion for New Trial.**

Trial counsel failed in their most basic job as lawyers. They failed to research and know

the law and to use it to support appropriate defenses for their client.

---

[94] Because Mr. Sanders' sentence already had been commuted from death to life without possibility of parole, it was the life sentence that was vacated.

"An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*." *Hinton*, 571 U.S. 274 (citing *Williams v. Taylor*, 529 U.S. 362, 395 (2000); *Kimmelman*, 477 U.S. at 385). Even under *Strickland*'s highly deferential standards to trial counsel's decision-making, then, the lack of any legitimate basis for Dylann's trial counsel to neglect this research was unreasonable.

There also was no conceivable strategic reason to signal in both the Motion to Dismiss and the Reply in Support that they would have Dylann plead guilty to all of the Counts in the Indictment in exchange for the withdrawal of the Notice to Seek Death. Counsel cannot legally or ethically permit a client to plead to charges that are unconstitutional, nor could the court accept such a plea. This, too, was an objectively unreasonable assertion to make in these pleadings—assuming counsel believed in the legal points it was arguing—which no proffered strategy could remedy.

Trial counsel did not cure any of these problems in the Motion for a New Trial. While noting that "[r]ecent decisions by other courts support[ed]" their contention that both § 247 and § 249 could be committed without the use of physical force, they cited to only a single case, one in which a district court in Connecticut had held that an assault statute requiring intentional causation of physical injury did not require violent physical force because the offense could be committed by using emotional force to compel another person to take a cyanide pill, or by distributing anthrax through a building's air conditioning system. Dkt. No. 916 at 6-7. Not only was this not the promised "recent decisions," but the case involved a statute where the examples used were of offenders seeking to kill their victims. What trial counsel needed to do at this point was demonstrate that § 247 and § 249 could be violated without any intent to kill anyone. But

counsel provided no examples in support of that argument. As with the Motion to Dismiss, there could have been no strategic reason for mounting such a weak argument at this critical stage of the proceedings.

## G. Dylann was prejudiced by trial counsel's failures in litigating the Motion to Dismiss and Motion for a New Trial.

*Strickland* prejudice requires a showing that the outcome of the proceedings are not reliable. Here, trial counsel's errors make the outcome of the proceedings unreliable.

Had counsel made the appropriate substantive arguments, there is a reasonable probability the government would have seen the legal flaws in the charges against Dylann and decided it was a safer bet for the state of South Carolina to try Dylann—the State made clear that it wanted to seek death sentences against Dylann—rather than continue pushing for federal convictions and sentences. Or, the government might have at least accepted a sentence of life without possibility of parole. In fact, had counsel made its arguments without first undermining them by noting it would withdraw them and plead Dylann, the government might have taken the challenges more seriously and actually negotiated the case. But by signaling doubt in their own arguments (doubt which was not warranted) trial counsel made the outcome they apparently wanted much less likely.

At the time of Dylann's case, the government was defending against similar claims all over the country, based on challenges to the applicability of the elements clause once *Johnson*—and later *Dimaya* then *Davis*—found the residual clause unconstitutionally vague. Even if the government believed its position was fully justified, it may have wanted to avoid an unfavorable district court opinion on which other litigants could rely, or worse, another unfavorable result in the Fourth Circuit, which had to that point, often rejected the government's arguments. Given that South Carolina was prepared to seek the death penalty against Dylann, there is every reason

279

to think that, if presented with strong § 924(c) challenges, the government would have opted to step back in favor of South Carolina prosecuting the case, rather than risk getting an opinion that would reverse hundreds of federal convictions.

There is a reasonable probability that the court itself would have found in favor of Dylann had these points been properly argued—and not been undermined by trial counsel at the outset—and that the court would have dismissed the § 924(c) and (j) counts to avoid a mistrial.[95] This promised to be an expensive and highly emotional trial that was bound to take a toll on the victims' families—the very type of trial a district court would be loath to have overturned on appeal.[96] If the government had dismissed these charges, the government may have been very open to negotiating, letting South Carolina take the lead in prosecuting Dylann, and avoiding the risk that the Fourth Circuit would affirm the trial court and jeopardize other convictions. Moreover, faced with logical, persuasive arguments, the court might have decided to await the outcomes of other cases pending in the Circuit, in other circuits and at the Supreme Court, before moving forward on these federal charges. At minimum, faced with logical, persuasive arguments, the court might have decided to await the outcomes of other cases pending in the Circuit, in other circuits and at the Supreme Court, before moving forward on these federal charges. That would have strengthened Dylann's bargaining position immensely.

It is, in fact, apparent from the fact that the district court post-trial amended its pre-trial analysis, rendered in the Order denying the MTD, that it was continuing to think through these

---

[95] Had the court dismissed the § 924(c) and (j) counts, the government would have had no basis for seeking death for the nine § 247 hate crimes counts, which carry a maximum sentence of life imprisonment.

[96] This case was deemed so hard on the victims' families, in fact, that South Carolina declined to try Dylann and seek death under state statutes once the federal trial concluded, so as not to have to put them through this ordeal again.

issues and was persuadable. Just as the district court had become convinced by the time of the Motion for New Trial that it had erred in previously finding that any amount of force used to commit the predicate crimes constituted violent force, it is likely the district court would have been persuaded by reasonable examples that the extra element of "death resulting" did not require the intentional use of lethal force. *See* Dkt. No. 961. Had trial counsel made a genuine argument, demonstrating that a resultant death could be caused accidentally or through negligence, and not with the "lethal force" the court thought necessary, there is a reasonable probability that Dylann would have prevailed on these claims and had these 924(c) counts dismissed.

Had counsel properly argued any of these points, Dylann himself might have trusted counsel more, and might have been more willing to talk with them, more willing to help them develop a penalty phase strategy, more willing to let them represent him at penalty phase. As any capital defense attorney will attest, winning a client's trust can turn on the client believing in the lawyer's commitment and abilities. Once won, it can change the entire future of the case. And beyond the possibility of winning the client's trust through skillful and aggressive motion practice, these motions could also have also given counsel more time to try to build trust with their client in other ways.

Trial counsel performed below a reasonably objective level, without any defensible strategy, and Dylann was prejudiced by their failures.

**CLAIM 13:    Counsel was ineffective on direct appeal.**

On direct appeal, appellate counsel's performance lacked reasonable competence.[97] In this area of law which was rapidly evolving, in which different circuits were reaching different results because courts were applying the law inconsistently, and in which grants of relief may at first blush have seemed counter-intuitive to the law-enforcement purpose of 18 U.S.C. § 924(c), reasonably effective counsel would have anticipated arguments it needed to make, done thorough research, and provided much-needed explanations to the court for the points they were making on Dylann's behalf.[98] Reasonable counsel in a capital case would have done this.

Moreover, appellate counsel failed to argue that, as with the residual clause, the courts have faced a "persistent failure" to define the terms the elements clause of § 924 was drafted to address. *See Johnson*, 576 U.S. at 593. By the time of this appeal, the vagueness issues had only gotten worse from where they stood at the time of trial. Courts, including the Supreme Court, kept moving the ball in an attempt to enable the elements clause to take over the work the residual clause had previously done. As a result, the vagueness of the elements clause was revealed. Appellate counsel should have argued this.

Importantly, in discussing why vacating the §§ 924(c) and (j) convictions and accompanying sentences should result in Dylann being resentenced on all of the capital counts of his conviction, appellate counsel argued only that, if the §§ 924(c) and (j) convictions were

---

[97] Appellate counsel's ineffectiveness is due, in part, to the Fourth Circuit's page limits on the appellate briefing, which was significantly reduced compared to other capital cases. U.S. v. Roof, 17-3 (4th Cir.) Doc. 74; *see also* Doc. 68.

[98] This course of action might have been acceptable in a non-capital case at this time, where district courts were considering scores of stand-alone postconviction *Johnson* claims.  On those occasions, when oral argument was granted, counsel could answer the court's questions, of which there were often many.  In the direct appeal of a capital case, by contrast, the likelihood of counsel being given time to explain the intricacies of a *Johnson* claim during oral argument would have been slim. The explanations had to be spelled out in the pleadings, in anticipation of the court's likely questions. The failure to do this was ineffective.

vacated, a re-sentencing might yield a different outcome because conviction—and therefore, sentencing—for nine capital crimes is different from conviction, and the attendant sentencing, for eighteen capital crimes. Appellate counsel left out key arguments about the mitigation that might be presented on a resentencing along with a greatly-reduced set of convictions for crimes no longer designated as "crimes of violence." Competent capital defense lawyers would have brought this to the court's attention in the context of describing how the sentencing determination might be far different if taken together with the predicate crimes, but without the nine additional § 924 enhancements.

Notably, the court of appeals refused to extend the length limits of the brief up to counsel's requested page limit. *See* 4th Cir. Dkt. Nos. 68, 74. Some of these omissions, then, may stem from simply not having the space to make every necessary argument.[99]

Each of these points is explained in more detail below.

## A. Appellate counsel failed to realize or argue that § 247 could be violated by threat of harm to oneself, which would have exempted § 247 as a predicate crime for § 924(c)(3)(A), and used other inapt examples of harm to one's own property.

Appellate counsel failed to argue that, because § 247(a)(2) does not specify that force must be used against someone else, it could be violated by threatening harm to oneself. Because § 924(c)'s elements clause requires use of force against another person or another person's property, § 247 falls outside the ambit of § 924(c). As noted earlier, someone seeking to obstruct others from engaging in the free exercise of their religion could threaten to self-immolate or engage in any form of self-harm, should a congregant enter the religious structure the person is standing in front of. A bystander—congregant or otherwise—watching this transpire, could have

---

[99] The Fourth Circuit's limitation on page limits for Appellant's brief created constructive deficient performance.

a heart attack and die. Or if a large crowd has gathered, someone could get trampled to death as the group tried to disperse quickly.

Appellate counsel, unlike trial counsel, did appropriately argue that § 247 can also be violated by using force or threatening to use for against one's own religious real property, a second way § 247(a)(2) sweeps more broadly than § 924(c)(3)(A).

But the examples appellate counsel provided—burning one's own cross in front of an African-American church or someone burning down a shared prayer room or "house church"—did little to advance Dylann's (valid) argument. In the first place, a cross is not real property.

In the second place, these two examples are presented with so little context that the Fourth Circuit responded to them in a footnote that suggested that taking such actions are necessarily also threats of force against parishioners:

> Even if we assume that a defendant could use force against his own property—as opposed to the property of ["]another" like the elements clause requires—as a means to obstruct another person from exercising his or her religious beliefs, that force would necessarily amount to a threat of force against that person as well, since a threat to property must "cause[] such intimidation to intentionally obstruct an individual's ability to exercise his or her religious beliefs."

*Roof*, 10 F.4th at 405 n.67 (second alteration in original) (quoting H.R. Rep. No. 115-456, at 2 (2017) (explaining that threats covered under § 247(a)(2) "include threats to property, such as bomb threats, so long as the threat causes such intimidation to intentionally obstruct an individual's ability to exercise his or her religious beliefs," which "[i]n practice, . . . would only arise in the case of a threat so serious that it caused someone to feel fear of bodily harm"); S. Rep. No. 115-325, at 2 (2018) ("While the legislation does not specifically define the term, 'threats of force,' the substitute amendment should not be read to encroach on protected speech,"

which "[c]ourts have long distinguished [from] 'true threats.'" (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992)))).

With some detail, though–something more than eleven words–and with the additional suggestion as to how someone could die as a result of the destruction of one's own property, appellate counsel could have presented a more serviceable scenario.

For example, someone offers the use of her barn for religious services to migrant workers she has hired during the growing season. At the end of the season, she decides she will no longer let them use it and burns it down to prevent its further use. She has no intent to physically harm the workers. She just wants to prevent—permanently obstruct—them from worshipping there. Unbeknownst to her, a vagrant has been sleeping under the eaves of the building and he burns to death or dies of smoke inhalation from the fire she has set—a negligent cause of death. Or it has been a dry season and the fire spreads to a nearby home, and someone dies as a result—an accidental cause of death. In either case, the person whose "death results" was not a person the arsonist was trying to obstruct from religious practice.

There has been force used against religious real property, but it is not someone else's property. There has been no force or threat of force used against the people who are now being obstructed from worshipping there. Someone dies as a result. The predicate offense has been committed but the elements of § 924(c)(3)(A) have not been satisfied.

**B. Appellate counsel failed to provide examples of ways § 249 could be violated in ways that would result in the unintentional death to someone other than intended victims.**

Here again, appellate counsel provided a minimalist suggestion as to how someone could violate § 249(a) in a way that results in death but does not run afoul of § 924(c)(3)(A). Section 249(a) makes it an offense for someone to willfully cause bodily injury to another person because of that person's perceived race, religion, skin color or national origin. Bodily injury

285

includes any degree of pain, any type of illness, and any form of injury, whether slight or temporary.[100] Appellate counsel continued to use the example of someone using poison to kill someone else, relying on *Torres-Miguel* even though *Torres-Miguel* had been effectively overruled by this point.

The only other example counsel used was this: "a defendant squeez[es] someone's arm because of her race, causing her to lose her balance and fall to her death." Appellant's Brief at 270. In support of this, appellate counsel asserted, without further explanation, that in order to satisfy § 924(c)(3)(A), the use of force and the *mens rea* requirements had to reside in the same element of the predicate offense. Counsel offered no explanation, though, for why this should be so.[101]

---

[100] For purposes of § 249, the term "bodily injury" is defined by 18 U.S.C. §1365(h)(4) to mean:

(A) a cut, abrasion, bruise, burn, or disfigurement;
(B) physical pain;
(C) illness;
(D) impairment of the function of a bodily member, organ, or mental faculty; or
(E) any other injury to the body, no matter how temporary.

Contrast this with 18 U.S.C. §1365(h)(3), defining "serious bodily injury" to mean:

(A) a substantial risk of death;
(B) extreme physical pain;
(C) protracted and obvious disfigurement; or
(D) protracted loss or impairment of the function of a bodily member, organ, or mental faculty.

Section 249 specifically exempts from its coverage psychological harm.

The Fourth Circuit, interpreting the term bodily injury as defined in § 1365(h)(4) has explained that "[t]he definition of bodily injury; that we adopt today does not require cataclysmic injuries: physical pain alone or any injury to the body, no matter how fleeting, suffices." *United States v. Perkins*, 470 F.3d 150, 161 (4th Cir. 2006).

[101] In fact, appellate counsel clouded the issue by listing five elements necessary to prove a § 249 offense that resulted in death which—based on counsel's argument—seemed to suggest that none of them could be combined. Counsel either needed to explain better what they meant or they were just making sloppy arguments that they themselves hadn't thought through.

A good explanation exists, though, and should have been provided. That is, there are all kinds of ways a racially-biased person can show contempt for others. Some of these are psychological and are specifically excluded by the Hate Crimes Prevention Act. Some of them involve vicious violent conduct that results in terrible injury or death. The Act provides significant penalties, up to and including life imprisonment for these. The Act also covers pernicious conduct where the racist willfully does something that will offend the target of his scorn, only intending to cause minimal bodily injury. This is punishable by any term of years or by a fine. The great flexibility and range of possible sentences in the statute is indicative of the fact that the pernicious conduct may have a wide range of results which, though the result of that conduct may be intended or unintended, foreseeable or unforeseeable. In other words, the initial minor injury may be caused by an intentional offensive touching, but a completely unintended and unforeseen injury—neither knowing nor willful harm—nevertheless occurs.

It was critical for appellate counsel to make this argument, and any reasonable lawyer would have done so. In its opinion denying the Motion for New Trial, the trial court had acknowledged that a crime of violence required the use of substantial force, and then turned to the question—and only the question—of whether killing someone by poison constituted the use of substantial force.[102] The trial court then summed up by saying "that the intentional infliction of physical injury entails the use of injurious force, and deadly force used to cause death is violent force." Dkt. No. 961 at 30. To reach this conclusion, the court relied only on the issue of poisoning someone, the example repeatedly used from *Torres-Miguel*. The trial court believed

---

[102] The trial court devoted nine pages, in fact, to an historical analysis of the debate that had ensued for hundreds of years over the issue of whether killing someone by poison, which didn't require a fatal blow, constituted murder. Dkt. No. 961 at 22-30.

that a person who willfully caused an injury that resulted in death had to have intended to cause the death, as well.

It was, therefore, *only* reasonable for appellate counsel to make an argument, providing a context showing how someone with racial animus can intend de minimis harm—harm no greater than that that would qualify as a common law battery of unwanted touching—that nonetheless results in unintended and unexpected death, and that this is different from performing an act in which death is the intended and expected outcome.

Reasonably effective counsel would have reminded the court of the many ways racists have had over the years of intentionally inflicting indignities on the targets of their racism, willfully causing them small physical injury, without intending either to kill them or to cause them serious bodily injury. These examples would have de-coupled the intent to cause injury from the intent to cause deadly injury and demonstrated these least culpable ways of committing § 249(a):

Such examples include, but are far from being limited to:

- coughing in someone's face to give them a cold, but the susceptible victim winds up getting pneumonia and dies;
- leaving excrement on someone's front porch to cause the people living there to be nauseated, but one person with an esophageal tear winds up dying as a result of vomiting;
- in order to cause someone to get mosquito bites, deceiving that person by telling him clothes he is about to wear on a hike have been treated with bug repellent. The victim is then bitten by a mosquito carrying a deadly disease;
- giving a minor a bottle of wine to get him tipsy which the minor then shares with a friend who drives his car into a pole and gets killed;
- locking people's coats in a cloak room so they will get cold when they have to leave without them, but not realizing one such person has medication in her coat

288

pocket like an epi-pen or nitroglycerin or anti-convulsive medication, and the person dies without it. [103]

These are hate-filled actions designed to cause only unsubstantial harm and for which the lethal result was never intended. For purposes of § 924(c)(3)(A), these are not crimes of violence.

Appellate counsel should also have explained why it is so important the court adopt this (correct) understanding of § 924(c)'s reach, and the limits upon it. That is, if the court denies that certain activities all outside the reach of § 249's language, it limits the ability of the federal government to prosecute the predicate crimes for minor conduct. This would violate Congressional intent which was to create a powerful tool to prosecute those who want to cause even a small degree of harm to others on the basis of their race, religion, or national origin. By insisting on shoehorning the requirements of §249 to also meet the requirements of § 924(c)'s force clause, the courts limit the situations to which § 249 can be applied.

**C. Appellate counsel failed to argue that requiring a "realistic probability" that the government would prosecute a particular example of conduct made no sense for § 924(c) analysis.**

At the time of Dylann's direct appeal, whenever defendants argued that an offense was not a crime of violence based on the least culpable conduct that would violate it, they were required to demonstrate a "realistic probability" that someone had actually been prosecuted for that non-violent conduct. This may have made sense in the context of cases arising under 18 U.S.C. § 16 and § 924(e), because both of those statutes required courts to look primarily at state court offenses and decide whether they meshed properly with requirements for crimes of violence under their respective elements clauses. In those instances, it was considered helpful to

---

[103] The connection between the harm and the resulting death might be even more attenuated, leading, for example, to the death of someone other than the intended victim. Perhaps the targeted person is carrying a prescription drug home to someone who is not a member of the targeted racial group.

show how broadly state and local prosecutors had applied state statutes serving as predicate

offenses, and how state courts had construed those statutes.

There is no such federalism concern, however, when construing federal statutes.[104] In

addition, previous federal prosecutors cannot bind future prosecutors. Moreover, with a recently-

enacted statute, the "history" of its enforcement would be meaningless.

Appellate counsel should have argued this to the Fourth Circuit.

## D. Appellate counsel failed to argue that prosecuting Dylann for three crimes based on the same set of facts constituted Double Jeopardy.

As noted in subsection Claim 12, Section E, above, Thomas Sanders was convicted in

2014 in federal court of kidnapping resulting in death, pursuant to 18 U.S.C. § 1201, as well as

§ 924(j), for which the kidnapping served as the predicate offense. He was sentenced to death on

both counts. In 2012, prior to trial, he filed a Motion to Dismiss his indictment in which he

contended *inter alia* that being charged with two offenses for the same conduct constituted a

violation of the Double Jeopardy clause. The trial court denied his claim which he then raised

again in his direct appeal to the Fifth Circuit Court of Appeals.

The Fifth Circuit issued its opinion on March 27, 2025 agreeing with Mr. Sanders that in

prosecuting him for two different crimes for the same conduct, the government had violated his

right not to be tried twice for the same conduct. Accordingly, the court vacated Mr. Sanders'

convictions and sentences for the § 924 offenses. *Sanders*, 2025 WL 926855, at *10.

In *Sanders*, the Fifth Circuit reasoned: When a charge serves as a predicate crime for a

§ 924(c) offense, the predicate crime must be proven in order for the § 924(c) offense to be

---

[104] The Supreme Court eventually reached this conclusion in *Taylor*, determining that when considering whether a federal statute is a crime of violence, "no such federalism concern is in play here. The statute before us asks only whether the elements of one federal law align with those prescribed in another." *Taylor*, 596 U.S. at 859.

proven. Consequently, the predicate crime does not require proof of a fact that § 924(c) does not. *Sanders*, 2025 WL 926855, at *10. "Accordingly, the offenses fail the elements test under *Blockburger*." *Id.* (citing *Blockburger v. United States*, 284 U.S. 299 (1932)). Even so, if the "legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the 'same' conduct under Blockburger," then "imposition of such sentences does not violate the Constitution." *Missouri v. Hunter*, 459 U.S. 359, 368 (1983) (quoting *Albernaz v. United States*, 450 U.S. 333, 344 (1981)). In such a case, the question becomes whether Congress specifically authorized cumulative sentences for the two crimes. *Id.* Although Congress expressly authorized cumulative sentences for § 924(c) and predicate offenses, "the express authorization of cumulative sentences in § 924(c) is not part of § 924(j)." *Id.* Therefore, punishment for a predicate crime and a § 924(j) offense relying on that predicate crime violates the Double Jeopardy clause. *Id.* at 11.

This was an argument worth pursuing in Dylann's case. If successful, it would have eliminated the nine counts of crimes of violence and their attendant death sentences. Mr. Sanders' claim was pending several years before Dylann filed the direct appeal in his own case. As noted above, Dylann's trial counsel worked on Mr. Sanders' case, so appellate counsel had reason to know that Mr. Sanders had raised this claim.

**E. Appellate counsel failed to argue that § 924(c) was unconstitutional in its entirety.**

By the time of Dylann's direct appeal, the law had become even more unclear than it had been at the time of trial. The same three issues that existed at the time of trial were still open questions: how much force constitutes use of force for purposes of § 924(c)'s elements clause; what *mens rea* is necessary to demonstrate that force has been used against another person or another's property; and how one analyzes cases in which a different *mens rea* applies to the conduct that intentionally causes insubstantial harm versus the *mens rea* that applies to the some

greater harm that nonetheless results. Because these issues persisted, cases continued to be inconsistent and were getting more inconsistent.

In addition to the issues that existed at the time of trial, in 2019, the Supreme Court held:

the force necessary to overcome a victim's physical resistance is inherently "violent" in the sense contemplated by *Johnson*, and "suggest[s] a degree of power that would not be satisfied by the merest touching." This is true because robbery that must overpower a victim's will—even a feeble or weak-willed victim—necessarily involves a physical confrontation and struggle. The altercation need not cause pain or injury or even be prolonged; it is the physical contest between the criminal and the victim that is itself "capable of causing physical pain or injury."

*Stokeling*, 586 U.S. at 74. While the Supreme Court took care to explain that its holding applied only to offenses that required a physical contest between the criminal and the victim, as was the case with robbery as defined by Florida law, the government and many courts around the country were blithely ignoring that aspect of the holding and claiming a much wider coverage to all offenses that could be satisfied by mere offensive touching.

During the pendency of Dylann's appeal, *Borden* was pending before the Supreme Court. Appellate counsel had reason to know the issue of *mens rea* was still in question. Only as his appeal was concluding did the Supreme Court decide that reckless conduct did not meet the demands of § 924(c)'s elements clause. Even in *Borden*, the Supreme Court still left open the question whether the *mens rea* necessary for a predicate offense must be intentional or whether extreme recklessness satisfies the elements clause. *Borden*, 593 U.S. at 429 n.4

During the pendency of Dylann's appeal, the question still persisted as to whether the *mens rea* attached to the conduct the subject of the predicate offense can permissibly be assumed to apply to the result of that conduct, as well. For a predicate offense that requires proof of an intentional *mens rea* to cause minimal harm, the question still remained as to whether the result

of that intent elevates the offense to a crime of violence when the offense would not otherwise have been one.

Each of these open questions was making it impossible for defendants to understand how to defend themselves. The government prosecuted some people for committing crimes of violence and conceded relief in other cases, when the same predicate offense underlay the charges. Courts were granting relief in some cases, while denying them in others, all reviewing the same predicate offenses. In each such case, the confusion was causing courts around the country to issue opinions with no consistency in their analyses. When the predicate offense that supported the § 924(c) claim was a state crime—often the case, for example, with RICO crimes—the courts had to determine the least culpable conduct that state would consider violative of the statute, which in turn required the federal courts to parse through state law.

The appellate sections of federal defender offices all over the country were deeply involved in litigating these issues, at trial, on appeal, and in post-conviction proceedings, so they had every reason to be aware of the vast inconsistencies in the way these cases were being prosecuted and reviewed. The very office that served as Dylann's appellate counsel filed a petition for certiorari in the United States Supreme Court in 2020, asking the Court to review the constitutionality of the elements clause of § 924(e), which is virtually identical to the elements clause of § 924(c). In the petition, counsel describes the bases for widespread confusion, cites to splits in the circuits on numerous points of law, and quotes the Department of Justice itself as recognizing the chaos:

> Even the Department of Justice recognizes this problem, lamenting in a 2018 letter to the U.S. Sentencing Commission the numerous "circuit splits" that have developed, "such that the same state or federal offense qualifies as a predicate crime of violence or controlled substance offense in some circuits but not others."

Petition for Writ of Certiorari, *Martin Johnson v. United States* (filed June 12, 2020) (citing

Letter from David Rybicki, Deputy Assistant Att'y Gen., Criminal Div., U.S. Dep't of Justice, to

the Honorable William H. Pryor, Jr., Acting Chair, U.S. Sentencing Comm'n 9 (Aug. 10, 2018)).

   With such high stakes in Dylann's case, the fact that appellate counsel failed in his case

to challenge the constitutionality of § 924(c)'s elements clause is unreasonable and inexplicable.

**F. 18 U.S.C. § 924(c)(3)(A) requires that the intent to use strong physical force be contained within a single element of An Offense, a factor appellate counsel failed to argue.**

   During the pendency of Dylann's appeal, the Supreme Court granted certiorari in a case

that settled the matter that, in order for a predicate offense to constitute a crime of violence under

§ 924(c)'s definition, the actor's *mens rea* must be greater than mere recklessness. *Borden*, 593

U.S. at 429. As a result, the element commonly found in federal statutes, including both §§ 247

and 249, that "death results," could not make an offense a crime of violence.

   Dylann's counsel argued this point on direct appeal. Appellate counsel also argued

(correctly) that both the requirements that the offense be committed with a *mens rea* greater than

recklessness and the requirement that strong, physical force be used must be contained within a

single element of the offense. Half could not reside in one element, and half in the other, she

said. But appellate counsel provided no compelling rationale for why this must be so—and lost

on this point.

   There is such a rationale. Section 924(c)(3)(A) says that, in order for an offense to be

considered a crime of violence, it must be a felony that "has *as an element* the use, attempted

use, or threatened use of physical force against the person or property of another." § 924(c) could

hardly be more explicit on this point. It does not say the offense, taken as a whole, requires the

intent to commit a harm by use of violence. It says that the offense must contain "*an element*"

that requires the use of physical force against a person or property of another. And the Supreme

294

Court has held that there is the phrase "against the person or property of another" requires a *mens rea* for that use of force greater than recklessness. The language of the statute thus demands that the necessary *mens rea* and the use of force be contained in a single element. Capital counsel, acting competently, would have made this argument.[105]

The Fourth Circuit's holding in this case—considering the *mens rea* component of one element sufficient to satisfy § 924(c)(3)(A) so long as it was combined with a force requirement found in a *different* element—conflicts with precedent in all the other Circuits to have considered the same and equivalent issues, and earlier Fourth Circuit cases. *See, e.g.*, *Alvarardo-Linares v. United States*, 44 F.4th 1334 (11th Cir. 2022); *United States v. Pastore*, 83 F.4th 113 (2d Cir. 2022); *United States v. Toki*, 23 F.4th 1277 (10th Cir. 2022).

## G. Appellate counsel's failures prejudiced Dylann.

In sum, there were persuasive arguments that Dylann's appellate counsel should have made about the invalidity of the statutes under which he was convicted. If appellate counsel had made these arguments, they likely would have succeeded in having at least some of Dylann's convictions vacated, which could have resulted in a new sentencing proceeding—one where Dylann was represented by counsel—and a lesser sentence.

**CLAIM 14:   18 U.S.C. § 924(c)'s definitions of "crime of violence" are unconstitutionally vague and, as such, §§ 924(c) and (j) cannot serve as the basis for any of Dylann's convictions or death sentences; alternatively, based on intervening Supreme Court cases, Dylann is entitled to relief.**

---

[105] It is worth noting on this point that the vast majority of federal offenses that are arguably crimes of violence are committed without a resultant death. Thus, only a handful of lawyers nationwide—most of them capital defense lawyers—have had to grapple with the issue of whether the separate "death results" element can be combined with an otherwise non-qualifying predicate offense to create a crime of violence, as defined by § 924(c)(3)(A). For the same reason, only a very few courts have had to consider the issue. Thus, it was especially incumbent on appellate counsel in Dylann's case to make clear to the court why the statute itself does not permit the outcome the government urged upon it.

In order for a defendant to be found guilty of violations of § 924(c), he must have committed a predicate crime that constitutes a crime of violence.[106] *Both* definitions of "crime of violence" contained in § 924(c) are unconstitutionally vague because they fail to provide defendants with adequate notice of the predicate crimes that constitute crimes of violence and because for almost forty years, these definitions have failed to provide courts with adequate guidance to apply them uniformly.

In 2015, after decades spent trying to interpret and apply § 924(c)'s residual clause uniformly, the Supreme Court struck down the nearly identical residual clause from the Armed Career Criminal Act as being unconstitutionally vague. *See generally Johnson v. United States*, 576 U.S. 591 (2015). The Court explained:

> The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." Our cases establish that the Government violates this guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement. The prohibition of vagueness in criminal statutes "is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law," and a statute that flouts it "violates the first essential of due process." These principles apply not only to statutes defining elements of crimes, but also to statutes fixing sentences.

*Id.* at 595-96 (alterations in original) (quoting *Connally* v. *General Constr. Co.*, 269 U. S. 385, 391 (1926)) (citing *Kolender* v. *Lawson*, 461 U.S. 352-58 (1983); *United States* v. *Batchelder*, 442 U. S. 114, 123 (1979)).

In *Johnson*, the Court acknowledged that the fact that it had failed after "persistent efforts"—i.e., four previous cases—to "craft a principled and objective standard out of the

---

[106] Drug-trafficking crimes committed by use of a gun are also punishable under § 924(c), but are not relevant to the discussion of crimes of violence or subject to the confusion surrounding the definition of crimes of violence.

residual clause" and this failure "confirm[ed] its hopeless indeterminacy." *Id.* at 598. This led the

Court to conclude that:

> the indeterminacy of the wide-ranging inquiry required by the residual clause both denies
> fair notice to defendants and invites arbitrary enforcement by judges. Increasing a
> defendant's sentence under the clause denies due process of law.

*Id.* at 597.

Three years later, in 2018, the Court struck down the residual clause in 18 U.S.C. § 16, an

immigration statute that contains the exact language found in § 924(c). *Sessions v. Dimaya*, 584

U.S. 148 (2018). In 2020, the Court also struck down the residual clause in § 924(c), saying it

was likewise unconstitutionally vague. *United States v. Davis*, 588 U.S. 445 (2019).

During the five-year interim between *Johnson* and *Davis*, some courts extended the

*Johnson* holding to § 924(c); others did not. Thus, some post-conviction petitioners were granted

relief during that period; others were not.

The remaining definitional clause in § 924(c), often referred to as the "elements" or

"force" clause, seems on first blush to contain a narrower definition of "crime of violence" than

that found in the residual clause. It provides that the predicate statute must contain "an element"

that requires "the use, attempted use, or threatened use of physical force against the person or

property of another." § 924(c)(3)(A). Its spare language is deceiving, though, and it too suffers

from the twin infirmities that laid waste to the residual clause: it denies fair notice to defendants

and it invites arbitrary enforcement by the courts.

No clearer statement could be made about these infirmities than the First Circuit's

comment in *United States v. Tsarnaev*, 968 F.3d 24 (1st Cir. 2020), that the § 924(c)(3)(A)

crime-of-violence analysis "is one of the most complex areas of American law, we must say --

which is why even well-meaning judges *and* lawyers sometimes make mistakes." *Id.* at 42.

Justice Alito has been a vocal critic of the categorical (and modified categorical) approach, noting lower courts' difficulties applying it. *Mathis v. United States*, 579 U.S. 500, 538 (2016) (Alito, J., dissenting). Justice Thomas believes that the language of the elements clause does not support the broad reading it has been given since the residual clause was found unconstitutional. *Borden v. United States*, 593 U.S. 420, 447 (2021) (Thomas, J., concurring).

These problems are not theoretical. As a result of the confused state of the law, defendants in identical situations legally have had opposite outcomes in their cases, depending only on where and when their challenges to § 924(c) convictions were litigated. This is quintessential proof a statute is unconstitutionally vague.

The continued uncertainty on this score has had direct implications for Dylann. The tortured history of the application of § 924(c)'s elements clause is described below.[107]

---

[107] Although not touched on here, there have also been years of litigation over the language of § 924(c)(1), to determine what is meant by the various verbs connected to firearms, resulting in these provisions being interpreted and re-interpreted by the Supreme Court on multiple occasions. That section of the statute says:

> any person who, during and in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime—
>
> (i) be sentenced to a term of imprisonment of not less than 5 years;
>
> (ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and
>
> (iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

Each of these terms has caused Circuit splits as the courts worked out the definitions. And the interpretation of the sentencing provisions—in particular, whether the penalties increased dramatically as a result of second and subsequent convictions—was interpreted by courts across the country for almost 20 years to mean a subsequent offense after entry of a conviction and final sentence for a previous offense until a court imposed a 105 year sentence for six offenses committed and tried at the same time—a 5 year sentence for one offense and 25-year enhanced

**A. Confusion over the definition of force has led to inconsistent outcomes and will continue to do so.**

Enacted in its current form in 1986, § 924(c)'s definition of "force" has been debated, and applied inconsistently, over the course of nearly four decades. In 2010, after the government had already prosecuted people under the statute for twenty-four years, the Supreme Court equated "physical force" with "violent force" or "strong physical force," rejecting the notion that it included *de minimis* force. *Curtis Johnson*, 559 U.S. at 138-40. Writing for the Court's majority, Justice Scalia emphasized that the term "force" had to mean strong physical force or violent force, and needed to be read in the context of two facts. First, by the statute's terms, the predicate crime has to be a felony. Second, the word "force" is being used to define a "crime of violence."

As definitive as this may have sounded, *Curtis Johnson* did little to settle the issue of how much force was § 924(c) force. Courts around the country split on the issue of what actually constituted strong physical force. Questions remained: How much force constituted "strong physical force"? Was it force enough to cause substantial injury or force that caused minor injury like a paper cut or any degree of pain, no matter how slight? Did causing physical injury equate with using force?

In *Castleman*, the Supreme Court tried to distinguish the definition of the term "force" as it should be applied in the context of domestic violence cases from the amount of force necessary to constitute a "violent felony" standard. The Court held that "the requirement of 'physical force' is satisfied, for purposes of [the domestic violence statute] by the degree of force that supports a

---

sentences for the each of the others. *Deal v. United States*, 508 U.S. 129, 137 (1993). The dissenting opinion pointed out that the fact that so many courts had read the language differently for almost two decades indicated that—at best—the language was ambiguous and should be subject to the rule of lenity. *Id.* at 143 (Stevens, J., dissenting).

common-law battery conviction." *Castleman*, 572 U.S. at 168. It repeated what the Court had said in *Curtis Johnson*—that this low level of force constituted a "comical misfit" if used in the context of a violent felony. So far, so good. This sounds definitive.

But several paragraphs later, the Court lays out the "broad" definition of bodily harm contained in the Tennessee statute it was examining[108] which included minor and temporary injury, and notes that whether or not these forms of injury necessitate "violent force" is a question the Court "do[es] not decide." *Id.* at 170.[109] So despite calling the common law meaning of force a comical misfit for §924(c) meaning of force, the Court leaves open the question whether the force capable of causing momentary pain nevertheless qualifies as strong physical force.

Prior to *Castleman*, courts also split over whether causing someone harm through indirect means constituted "use of force." In *Torres-Miguel*, for example, the Fourth Circuit said that sprinkling poison on someone's food did not constitute force under *Johnson* because it did not require strong physical force. Some circuits agreed; others did not. 701 F.3d at 168. The Court in *Castleman* announced that force can be applied by indirect, as well as direct means—that just as someone who pulls a trigger uses indirect but violent force, so, too, and to the same degree, does a person who sprinkles poison on his victim's food. 572 U.S. at 170. Not surprisingly, courts around the country, including the Fourth Circuit, did not know what to make of *Castleman*.

---

[108]  Under Tennessee law, "bodily injury" – a "broad term" – "includes a cut, abrasion, bruise, burn or disfigurement; physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." *Id.* at 170 (quoting Tenn. Code Ann. § 39–11–106(a)(2)).

[109] The majority opinion notes that Justice Scalia's concurrence suggests that these forms of injury do indeed necessitate violent force under *Curtis Johnson*'s definition of that term.

These issues became particularly acute when the Supreme Court invalidated the residual clause and the courts had to decide whether previous convictions could rest solely on an elements clause analysis.

Although courts continued to struggle with what degree of force constituted the strong physical force that *Curtis Johnson* demanded, most seemed to agree that it had to be more than *de minimis* force. But after five more years of trying to apply *Curtis Johnson* as modified by *Castleman* with great uncertainty, the Supreme Court held that violent force would now "include[] the amount of force necessary to overcome a victim's resistance," where a statute requires proof of "resistance by the victim that is overcome by the physical force of the offender" rather than "[m]ere 'snatching of property from another.'" *Stokeling*, 586 U.S. at 76, 86, 87. Thus, according to *Stokeling,* grabbing a watch in a manner that breaks its clasp or pulling a diamond pin from a person's hair if some hairs come out with the pin is enough to constitute violent force. *Id.* at 78.

As the lower courts have sought to incorporate *Stokeling* into their analyses, many ignored or forgot the distinction they were required to make: that the offense itself had to require proof that the force employed would overcome the victim's resistance. Instead, *Stokeling* has been used to argue, contrary to *Curtis Johnson,* that even the smallest amount of offensive contact can satisfy the force requirement of § 924(c)(3)(A), whether or not the statute requires overcoming the victim's resistance.

Even with this, the question still remained after 2019 whether the definition of force in the elements clause could also encompass the failure to act. The Third and the Fifth Circuit Courts of Appeals have granted relief in cases where the least culpable way the predicate crime could be committed involved the absence of conduct. *See, e.g.*, *United States v. Harris*, 68 F.4th

140 (3d Cir. 2023); *United States v. Martinez-Rodriguez*, 857 F.3d 282 (5th Cir. 2017). Other circuits had held that even omissions constituted force. *See, e.g.*, *Battle v. United States*, No. 21-5457, 2023 WL 2487342 (6th Cir. Mar. 14, 2023); *United States v. Bowers*, No. CR 18-292-RJC, 2022 WL 17718686, at *7 (W.D. Pa. Dec. 15, 2022) (noting "[a]t least the First, Second, Fourth, Seventh, Eighth, and Eleventh Circuits have held that statutes criminalizing omissions can nonetheless be crimes of violence" and collecting cases).

The district court opinion in *Bowers* is most relevant to Dylann's case. The defendant was—like Dylann—charged with violations of the Church Arson Act, the Hate Crimes Prevention Act, and § 924(c) using §§ 247 and 249 as the predicate offenses, and the court held that § 249 was *not* a crime of violence because it could be committed by omission:

> Nothing in the text of Section 249(a)(1) requires the government to prove that the defendant used force to obtain a conviction. The statute focuses on the willful causation of a result—bodily injury—without reference to how that result is caused. Indeed, the government does not contest that the statute may be satisfied when a defendant causes bodily injury to a person by omission.

*Bowers*, 2022 WL 17718686, at *6.

However, on March 21, 2025, thirty nine years after § 924(c) was enacted, the Supreme Court announced that an omission to act *could* constitute strong physical force, consistent with *Curtis Johnson*. *Delligatti v. United States*, 145 S. Ct. 797 (2025). In response to Mr. Delligatti's argument that § 924(c) requires that the offender "use" force, the Court noted that a car owner may "use" rain to wash his car or that a fugitive may "use" the cover of night to hide, just as a husband who abandons his wife to cause her to die of the cold is "using" exposure to the weather to accomplish his ends. 145 S. Ct. at 808.[110]

---

[110] The majority's analysis met with a scathing response in dissent.

It remains an open question whether someone who has no legal duty to the victim and fails to act still satisfies § 924(c)'s elements clause. If the answer to that question ultimately is that this does not satisfy the elements clause, § 249 would not satisfy the elements clause.[111]

**B. Confusion as to the mens rea necessary to satisfy § 924(c) has led to inconsistent outcomes and will continue to do so.**

Likewise, the *mens rea* required to satisfy the elements clause is still an open and confused question. In *Leocal*, decided eighteen years after the enactment of § 924(c), the Supreme Court held that to constitute a crime of violence an offense had to require a mental state greater than negligence.[112] It took another seventeen years, however, before the Supreme Court held that the "use of force" clause does not reach crimes with a *mens rea* of recklessness, either, because § 924(c) says the use of force must be "against another." *Borden,* 593 U.S. at 429. Now, three years after *Borden* and twenty-one years after *Leocal*, *Delligatti* has reintroduced uncertainty as to the necessary *mens rea* for the use of force. 145 S. Ct. at 808. *Delligatti* says, unhelpfully, that the term "against another" only "*possibly*" means "the *mens rea* with which the object is targeted" must be "knowing[] or intentional[], rather than negligent[] or reckless[]." *Id.* (emphasis added). Whether this means the Court no longer believes the use of force necessary to satisfy § 924(c) requires a *mens rea* greater than negligence or recklessness, or whether it means the Court does believe it requires that heightened *mens rea* but cannot agree on the source of that

---

[111] For example, two strangers become stranded in a snowstorm. One—a person who hates East Indians—has a spare down jacket in her bag. The other—an East Indian—is wearing only a light-weight jacket. The "hater" does not share her warm jacket with the East Indian, because of his national origin. The hater has no legal obligation to take care of the East Indian. If she willfully withholds her coat to cause the East Indian discomfort, it is an open question whether she has violated § 249.

[112] *Leocal* involved the analysis of the identical provisions of a different statute, 18 U.S.C. § 16.

requirement, it reintroduced the uncertainty that existed prior to *Leocal*, with yet more fodder for inconsistent results.

**C. Confusion over the need to demonstrate a realistic probability of the "least culpable conduct" that violates the predicate crime has led to inconsistent outcomes and will continue to do so.**

For many years, the government argued that people challenging their convictions under § 924(c) had to demonstrate "a realistic probability" that the government would actually prosecute someone for the "least culpable conduct" that might violate the predicate crime. Many courts agreed. This idea stemmed largely from Supreme Court cases that said that demonstrating the minimum conduct criminalized by a statute was not an invitation to apply "legal imagination" to the offense; there must be "a realistic probability, not a theoretical possibility, that the State would apply its statute" to conduct that did not rise to the level of a violent felony. *Moncrieffe*, 569 U.S. at 191. Later, the Supreme Court rejected the idea that the defendant had to show a realistic probability that the government would prosecute for this least culpable conduct when the predicate offense is a federal offense. *Taylor*, 596 U.S. at 858. In the intervening years, courts applied different and inconsistent standards, reaching different and inconsistent results.

**D. Confusion over the connection between the use of force and the mens rea necessary for the resultant harm has led to inconsistent results and will continue to do so.**

Another question that has plagued the courts, and remains today, is whether the level of force or *mens rea* that drives the initial conduct necessarily attaches to the level of harm that results. For example, the government has conceded that kidnapping, as defined by 18 U.S.C. § 1201(a)(1), is not a crime of violence because it can be committed by walking the victim into another room without touching them, or by "inveigling." But in cases where kidnapping resulted in death, the results have been completely inconsistent. In *United States v. Fulks*, 120 F.4th 146 (4th Cir. 2024), for example, the appellants and the government agreed that kidnapping, in a case

304

where the charge was kidnapping resulting in death, was no longer a crime of violence. *Id.* at 151-52. But when Orlando Hall made this argument to the Fifth Circuit Court of Appeals in 2020, the government argued that the fact that the kidnapping had resulted in death necessarily meant that the crime required the use of strong physical force. *In re Hall*, 979 F.3d 339, 244 (5th Cir. 2020). The Fifth Circuit agreed with the government and Mr. Hall lost his challenge. *Id.* He was executed on November 18, 2020.

After *Borden* was decided, the government began conceding more uniformly that kidnapping resulting in death was not a crime of violence. For example, in *United States v. Ross,* the government initially and successfully argued that kidnapping resulting in death was a crime of violence but then, after *Borden*, conceded it was not. *United States v. Ross*, No. 18-2800, 2022 WL 4103064, at *1 (8th Cir. Sept. 7, 2022). And, if the fact that death results does not elevate kidnapping to a crime of violence, even though kidnapping must be committed with specific intent, it stands to reason that no offense should be elevated to a crime of violence merely by the added element that death results. This ought to apply to offenses that can be committed by intentional *de minimis* or nonconsensual offensive touching that does not require the victim's resistance to be overcome or by a failure to act that causes bodily harm when no legal obligation to act exists, as it did with the homicide statute in *Delligatti*.[113]

---

[113] For example, suppose as a racist prank during a hike through the woods, a white person sprays his Black victim with water, but tells the victim that it is bug repellent, which the victim has requested. Through his willful silence about what the spray actually is, the prankster, who has no desire to cause any greater injury than his victim getting mosquito bites, the victim gets bitten, has an allergic reaction to the bites and dies before they can get help. The prankster even tries to get help once he realizes actions may cause greater harm than he intended.  In other words, he has willfully caused bodily injury, he did not have to overcome his victim's resistance to spray him with water, and his action resulted in the victim's death but he has not intentionally or knowingly caused the death, and has, in fact, tried to prevent it.

This is yet another instance where there has been no consistency in the courts because § 924(c) says nothing explicit about *mens rea* and each court has had to decide for itself how to interpret a provision that was never intended on its own to cover the universe of violent felonies.

**E. Confusion over the divisibility of statutes and the modified categorical approach has led to inconsistent outcomes and will continue to do so.**

As yet another example of the confusion over a key question in interpreting whether § 924(c) predicates are crimes of violence, in 2024, the D.C. Circuit held that "bank robbery under 18 U.S.C. § 2113(a) is indivisible as to extortion and therefore does not qualify as a 'crime of violence' under 18 U.S.C. § 924(c)." *United States v. Burwell*, 122 F.4th 984, 997 (D.C. Cir. 2024). The Fourth Circuit, and every other circuit that has considered the issue, has held otherwise. *See, e.g.*, *United States v. McNeal*, 818 F.3d 141, 153 (4th Cir. 2016).

**F. Confusion over attempts to threaten has led to inconsistent outcomes and will continue to do so.**

As noted earlier, in *Taylor*, the Supreme Court held that attempted Hobbs Act robbery is not a crime of violence. 596 U.S. at 852. The Court reasoned that someone who had planned a robbery via threat of force could take a substantial step towards its commission, but be stopped before communicating the threat. It remains unclear whether this holding will be applied whenever the defendant is charged generically under a predicate offense that is violated by either the completed action or the attempted action that includes a threat of harm.

Although the analysis should be exactly the same for federal attempted bank robbery, it has not been. In some circuits, the government has argued, even post-*Taylor*, that it is a crime of violence. In other circuits, the government has conceded that it is not a crime of violence. In 2024, on remand from the Supreme Court to consider the case in light of *Taylor*, the Eleventh Circuit held that attempted bank robbery is a crime of violence. *United States v. Armstrong*, 122 F.4th 1278, 1281 (11th Cir. 2024).

306

Moreover, attempted armed bank robbery has also been deemed not to qualify as a crime of violence for a wholly different reason. In *United States v. Bolden*, 741 F. Supp. 3d 280 (E.D. Pa. 2024), the court held that attempted armed bank robbery is not a crime of violence because it can be committed by attempting force against any person – not necessarily against another person. *Id.* at 285-86.[114]

**G. Supreme Court justices urge that the categorical approach be dropped because of its difficulty, further underscoring the vagueness of § 924(c).**

In *Descamps*, the Supreme Court held that courts must use the categorical approach when analyzing whether predicate crimes satisfy 18 U.S.C. § 924(c), 18 U.S.C. § 922, and 18 U.S.C. § 16. Some Supreme Court justices continue to argue the categorical approach is wrong. In Justice Thomas' words: "We have reached this point of absurdity only because this Court applies a narrow categorical approach to §924(c)'s elements clause and has nullified the residual clause that would have captured crimes like Taylor's. It is hard to fathom why this makes sense." 596 U.S. at 863 (Thomas, J., dissenting). He would have the Court reverse course, after almost forty years of § 924(c) jurisprudence. Justice Alito has signaled that he, too, would like to see the method of analysis changed, because it is difficult to apply. *Mathis*, 579 U.S. at 536-44 (Alito, J., dissenting); *Descamps*, 570 U.S. at 281-96 (Alito, J., dissenting).

**H. For decades, defendants and courts have had no fair notice of what constitutes a crime of violence under 18 U.S.C. § 924(c).**

Congress enacted 18 U.S.C. § 924(c) in 1984 to enhance punishments for violent federal felonies committed with the use of a firearm. For twenty-nine years, most predicate crimes were analyzed using § 924(c)(3)(B), the residual clause, which required courts to undertake an assessment of the risk of violence the predicate offenses involved. In 2015, in *Johnson*, the

---

[114] This corresponds to the argument trial and appellate counsel failed to make in Dylann's case that § 247 could be accomplished by threatening harm to oneself.

Supreme Court decided a similar residual clause was unconstitutionally vague. Between 2015 and 2020, when *United States v. Davis* was decided, defendants did not know whether the Court would eventually hold the residual clause of § 924(c) unconstitutional. Different courts reached different results, which meant different outcomes for similarly situated defendants.

Attempts to understand the elements clause have led to inconsistent outcomes for similarly-situated defendants, as well. When deciding the residual clause was unconstitutional, the Supreme Court noted that, "[t]his Court is not the only one that has had trouble making sense of the residual clause. The clause has 'created numerous splits among the lower federal courts,'" and "pervasive disagreement about the nature of the inquiry one is supposed to conduct and the kinds of factors one is supposed to consider." *Johnson*, 576 U.S. at 601 (internal citation omitted)

So, too, with the elements clause. Courts have been split and have applied this statute with great inconsistency. There should never be a situation where a criminal law is so hard to understand and apply that a Court of Appeals feels compelled to announce that it is among the most complex in the American legal system and that well-meaning courts and lawyers are bound to make mistakes, as the First Circuit announced in its opinion in *Tsarnaev.* This court should find that 924(c) is unconstitutionally vague in its entirely.

**I. The vagueness of the statute had direct implications for Dylann's case.**

A defendant's criminal conviction – let alone death sentence – should not depend on interpretations of a statute that has changed so much from year to year during the pendency of his litigation. Yet every single one of the problems outlined above has been implicated in Dylann's case. The analysis of each of them has changed over the years between when he was first indicted and now: whether the level of force that satisfies § 924(c) must be substantial or

308

can be *de minimis*;[115] whether the failure to act constitutes force;[116] whether causing bodily harm equates to using force;[117] whether the *mens rea* that satisfies § 924(c) matters;[118] whether the connection between the simpliciter crime and the crime when death results matters;[119] whether the defendant has the burden to prove the government would actually prosecute for the least culpable conduct is that violates the predicate crime;[120] whether an attempt to threaten the use of force is a crime of violence;[121] whether and under what conditions a court should (or can) use the modified categorical approach to consider what the defendant was actually charged with.[122]

This kaleidoscopic approach to § 924(c)'s analysis may fascinate some, but it poses an unfair and unconstitutional burden on defendants charged with crime. And the approach stems from the demise of the residual clause and courts' furious and inconsistent attempts to stretch the elements clause to cover what the residual clause was designed for but which was ultimately deemed unconstitutional—to be a catch-all for the many cases the elements clause did not reach.

"Fixing" the elements clause through one judicial revision and contortion after another is not the answer. This Court should find § 924(c) unconstitutional vague in its entirely. It should let Congress decide what to do next. And it should order new sentencing proceedings for Dylann,

---

[115] A matter about which the district court acknowledged it had gotten wrong in its Opinion Denying Motion to Dismiss the Indictment, and then "amended" in its Opinion Denying Motion for New Trial, *after* Dylann had just been tried.

[116] Which the *Bowers* court said was reason to find § 249 was *not* a crime of violence.

[117] Which the Fourth Circuit said were different in *Torres-Miguel*, but which the Circuit later overruled.

[118] Which the Supreme Court has not definitively decided.

[119] Which has had direct implications for Dylann because § 249 can be violated with de minimis harm and was only found to be a crime of violence where death resulted.

[120] Which the district and appellate courts demanded of Dylann, requiring him to demonstrate a "realistic probability," a standard no longer recognized by the Supreme Court.

[121] Which was raised by appellate counsel in its reply on direct appeal but which raises the question whether § 247 is actually divisible.

[122] For example, if §247 is divisible.

309

who was sentenced to death based on convicted under an incomprehensible, and

unconstitutionally vague, statute.

**CLAIM 15:    Under current law, the statutes under which Dylann was convicted and sentences are unconstitutional, undermining the federal government's jurisdiction.**

**A. Under the current state of the law, because neither 18 U.S.C. § 247 nor 18 U.S.C. § 249 Is categorically A crime of violence, Dylann's convictions and sentences for violations of §§ 924(c) and (j) must be vacated.**

**i. Current legal landscape**

Dylann was convicted and sentenced to death for nine counts of §§ 924(c) and (j).

Conviction on a count of § 924(c) requires a finding that a defendant has committed a predicate

offense that constitutes a "crime of violence" as defined by § 924(c)(3). Conviction on a count of

§ 924(j) requires that the defendant has committed an offense as defined by § 924(c). Hence, if a

predicate offense is not a "crime of violence," a defendant cannot be convicted of § 924(c). If a

defendant cannot be convicted of § 924(c), there can be no conviction for § 924(j).

The predicate offenses in Dylann's case are § 247(a) and § 249. The trial court, not the

jury, is assigned the task of deciding whether a predicate offense is a crime of violence in the

first instance. The court is required to employ a "categorical approach." *Descamps*, 570 U.S. at

257. That means the court must look not to the specific facts of the underlying conviction, but

only to the least culpable conduct criminalized by the statute. If the predicate offense is a federal

crime, the defendant need not show a realistic probability that the government would prosecute

for such least culpable conduct; it is enough that the elements of the crime permit such a

prosecution. *Taylor*, 596 U.S. at 858.

Section § 924(c) contains alternate definitions of "crime of violence." Section

924(c)(3)(B), referred to as the residual clause because it was considered a broad catch-all

provision, provides that a "crime of violence" is a felony "that by its nature, involves a

substantial risk that physical force against the person or property of another." In 2019, the

Supreme Court found the residual clause in §924(c) to be unconstitutionally vague. *Davis*, 588

U.S. at 448. Accordingly, this definition of a crime of violence can no longer be used to find

§§ 247 or 249 proper predicate offenses under § 924(c).

The first clause, often referred to as the "elements" or "force" clause, provides that the

predicate statute must contain "an element" that requires "the use, attempted use, or threatened

use of physical force against the person or property of another." § 924(c)(3)(A). The use of force

necessary to satisfy the elements clause is substantial, violent force directed against the person or

property of another. *Curtis Johnson*, 559 U.S. at 138-40. The force may be indirect, as in

poisoning, but it cannot consist of an offensive touching, or a squeeze of the arm, *Castleman*,

572 U.S. at 170, unless the predicate statute specifically includes a provision or has been

interpreted (if a state statute) to require overcoming the resistance of the victim, in which case

the force required is only that amount necessary to overcome resistance, like breaking the clasp

off someone's necklace while she is wearing it, *Stokeling,* 586 U.S. at 76. The failure to act when

one has a legal obligation to act may also constitute sufficient force to satisfy § 924(c)(3)(A).

*Delligatti*, 145 S. Ct. at 805.

In addition, the use of force necessary to satisfy § 924(c)(3)(A) must include a *mens rea*

that is greater than recklessness – perhaps even an intentional *mens rea*, an issue the Supreme

Court has to date left open. *Borden*, 593 U.S. at 429. Moreover, attempts to threaten the use of

force are not crimes of violence because offenders might be thwarted from completing their

intended crimes before conveying the threat to anyone else. *Taylor*, 596 U.S. at 851-52.

**ii. Section 247(a)(2) is not a crime of violence because of its mismatch to the elements clause.**

Dylann was charged with nine counts of 18 U.S.C. § 247(a)(2), which says that

311

whoever "intentionally obstructs, by force or threat of force, including by threat of force against religious real property, any person in the enjoyment of that person's free exercise of religious beliefs, or attempts to do so" may be punished. The sentencing provision of the act provides that a person may receive "a fine in accordance with this title and imprisonment for any term of years or for life, or both, or may be sentenced to death" if "death results from acts committed in violation of this section." § 247(d)(1)(a).

In plain English, this means that someone violates § 247(a)(2) if they use force or threat of force, including force against religious real property, or attempts to use force or threat of force, in order to obstruct a person in that person's free exercise of religious belief. Because the statute does not specify against whom or whose property the force might be used, it includes force or threat of force used against oneself or against one's own property.

Thus, there are various ways someone could violate § 247(a)(2) which fail to fit the criteria for a crime of violence under the elements clause. Two examples are offered. First, the offender could obstruct people in the enjoyment of their free exercise of religious beliefs by threat of self-harm. Second, the offender could obstruct people in the enjoyment of their free exercise of religious beliefs by actual force against the offender's own religious real property.

As to the first possibility, a person could threaten to self-immolate if a gathering group goes inside a religious building to worship. The person would not threaten anyone else. The person would just be seeking to obstruct others' entry into the building by hoping the threat of self-harm would be enough to deter members of the crowd from entering. Amongst the people in the congregation awaiting entry, someone might be overcome by emotion and have a heart attack or stress-induced stroke from which they die. So, threat of force would have been employed to

obstruct people from worshipping, and someone has died, but no force or threat of force has been used against anyone else.

Second, someone may have offered the use of their barn or free-standing garage to a small group to conduct their worship services. After several years of allowing the use of her personal property as a center of worship, she becomes disgusted with the group. Believing them to have turned into devil worshippers, the barn-owner burns it down to prevent the group from continuing to worship there. Strong winds cause the fire to spread unexpectedly, throwing sparks from barn to trees, woodpiles, and homes. As a result, a person unrelated to the worshippers is killed. Here, the use of force is against the offender's own religious real property. It is not force used against the property of another, which is a requirement of § 924(c)'s elements clause. Thus, while people have been obstructed in the free exercise of their religion, no force has been used against them or against the religious real property of "another." Moreover, the death that resulted was accidental, or perhaps negligent or reckless, but certainly neither planned nor intentional.

Thus, the least culpable way §§ 247(a)(2) and (d)(1) can be violated is a mismatch with the necessary requirements of the elements clause. While Dylann's actions were violent, that is not the relevant question pursuant to Supreme Court precedent requiring a categorical approach. Section 247(a)(2) does not describe a categorical crime of violence under the strictures of § 924(c)(3)(A).

### iii. Section § 249(a)(2) is not a crime of violence because it can be committed by de minimis force that is intended to cause only fleeting pain, illness, or discomfort, or by the failure to act.

The subsections of the Hate Crimes Prevention Act that Dylann was convicted of provide that "[w]hoever, whether or not acting under color of law, willfully causes **bodily injury** to any person . . . **because of the actual or perceived race, color, religion, or national origin of any**

313

person . . . shall be imprisoned for any term of years or for life, fined in accordance with this title, or both, if . . . death results from the offense." § 249(a)(1). "Bodily injury," as it is used in the statute takes its meaning from 18 U.S.C. § 1365, and means: "(A) a cut, abrasion, bruise, burn, or disfigurement; (B) physical pain; (C) illness; (D) impairment of the function of a bodily member, organ, or mental faculty; or (E) any other injury to the body, no matter how temporary." 18 U.S.C. § 1365(h)(4).[123]

Bodily injury is so broadly defined by § 1365(h)(4) that both de minimis force and offensive touching could cause the degree of pain, illness, or injury sufficient to satisfy this nominal standard. The number and ways a person motivated by racism can willfully cause bodily injury to an intended victim are endless and, although vile, do not necessarily require force sufficient to satisfy § 924(c)'s elements clause.

For example, this fact scenario was reported in 2023 military case:

Appellant was an infantryman assigned to Fort Lewis, Washington. In October of 2019, appellant and a fellow Soldier ("other Soldier") encountered a bird that had flown inside the barracks. Appellant captured and killed the bird. Then, with the other Soldier recording on his cellphone, appellant threw the bird carcass into the barracks room occupied by the victim, a fellow infantryman who was African American. After throwing the bird in the victim's room, appellant held the door shut so that the victim could not exit or dispose of the dead bird.

*United States v. Wainionpa*, No. ARMY 20210436, 2023 WL 355063, at *1 (A. Ct. Crim. App. Jan. 20, 2023).

This was conduct motivated by racism. If Appellant had said on the cellphone recording that he had taken this action to nauseate the African American soldier, he would have violated

---

[123] This stands in contrast to the term "serious bodily injury," which is defined in § 1365(h)(3), and includes a substantial risk of death; extreme physical pain; protracted and obvious disfigurement; or protracted loss or impairment of the function of a bodily member, organ, or mental faculty.

§ 249(a)(1). If the Black soldier had fainted, hit his head and died, the racist soldier's conduct would have violated § 249(a)(1) and resulted in a death, though the death would have been unintentional. The death would have been due to accident, or negligence, or recklessness, not intentional conduct.

In other words, this intentional de minimis conduct, or battery-level offensive behavior, could result in death without there being any intent to cause death. There is nothing in § 249(a)(2) that requires any level of force greater than this.

Moreover, § 249 does not require the victim's resistance to be overborne, so this conduct does not fall within the wider reach created by *Stokeling*. It remains firmly within the confines of *Curtis Johnson*. It adheres to the admonition of *Castleman* that battery-level offensive touching and the harm intended by a squeeze of the arm are comical misfits with the force necessary to satisfy § 924(c)'s requirement of violent physical force.

Finally, although *Taylor* instructs that defendants who contest the fit of federal statutory predicates for § 924(c)'s elements clause need no longer show realistic probabilities of the conduct offered as examples, this example of an offender's racist behavior is drawn directly from the facts of a case. It is not a mere theoretical invention.

Other examples are easy to imagine, as well. The person who locks coats of a Chinese-American family in a cloak room to knowingly cause them to experience the cold on their way to their car, violates the express terms of § 249. Unbeknownst to the offender, a member of the family has life-saving medication in their coat pocket, cannot now get to it, and dies. This, too, is intentional conduct to cause minor—but highly objectionable—physical discomfort, but it results in death. It is a racially-motived hate crime, as envisioned by Congress, but not a § 924(c) crime of violence, as interpreted by decades of Supreme Court rulings.

As noted in earlier sections, there are countless ways people exhibiting racial bias against one group or another have had of showing contempt for their victims—often in a show of dominance, through offensive touching or other indignities, to cause them just a little physical discomfort.

According to the language of § 249, such conduct can be prosecuted when the intent is to cause some low level of harm, as Congress intended. The fact that death could result unintentionally does not meet the standards of *Curtis Johnson* and *Borden*, which require an intentional or knowing act of violent force, however. If the courts decide that only those offenders who intend serious bodily injury or death violate § 249—a level of injury Congress could have chosen, but did not—they will be narrowing the scope of harmful racist conduct the government could prosecute. Consequently, § 249 is not a crime of violence for purposes of § 924(c).

### iv. Inasmuch as neither § 247 nor § 249 fall within § 924(c)'s remaining definition of "crime of violence," Dylann's convictions and death sentences under § 924(j) must be vacated.

Sections 247(a)(2) and 249(a)(1) fail to meet the definition of "crime of violence" found in § 924(c)(3)(A). Dylann's convictions, then, for § 924(c) cannot stand. Because a conviction for § 924(j) must by its terms rest on a violation of § 924(c), the convictions and sentences for § 924(j) must fall, as well.

More than this, Dylann should never have been tried for these nine § 924(c) and (j) crimes because they were never valid charges in the first place. Yet the jury was permitted to hear argument about them and to consider them along with the other counts on which sentences of death were being sought. This doubled the number of counts that jury was told were death-eligible offenses Dylann had committed—a factor that must have carried weight in the jury's

316

decision-making process. If the inclusion of these charges affected the verdict of even a single juror, the results of the entire death-determination are invalid.

The only way to remedy this flaw is to put Dylann back in the position he was in before the jury was told the charges Dylann faced. He is entitled to a new sentencing proceeding, at which the government can seek death sentences only for the charges it can validly prosecute him and sentence him for.

## B. Under current law, § 249 violates the First Amendment and Dylann's convictions and sentences for violations of § 249 must be vacated.

Section 249(a)(1) states: "Whoever, whether or not acting under color of law, willfully causes bodily injury to any person or, through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, attempts to cause bodily injury to any person, *because of the actual or perceived race, color, religion, or national origin of any person*" shall be fined or imprisoned. § 249(a)(1) (emphasis added). One element of this crime is causing or attempting to cause bodily injury. It criminalizes the defendant's conduct. But under § 249(a)(1), the conduct is punishable only if it is "because of the actual or perceived race, color, religion, or national origin of any person." This, the key element of § 249, does not criminalize the defendant's conduct, nor the consequences of the defendant's conduct. Rather, it criminalizes the defendant's thoughts and biases.

Criminalizing thoughts and biases violates the First Amendment. The government "cannot constitutionally premise legislation on the desirability of controlling a person's private thoughts." *Stanley*, 394 U.S. at 566.

The Supreme Court has "long held" that "nonverbal expressive activity can be banned *because of the action* it entails, but *not because of the ideas* it expresses." *R.A.V.*, 505 U.S. at 385

(emphasis added). So while the government may regulate conduct, it may not do so "based on hostility—or favoritism—towards the underlying message expressed." *Id.* at 386.

The rule is simple: The government can regulate conduct. The government cannot, however, regulate conduct because of the biases, thoughts, beliefs, or ideas expressed by the conduct. "[B]urning a flag in violation of an ordinance against outdoor fires could be punishable, whereas burning a flag in violation of an ordinance against dishonoring the flag is not." *R.A.V*, 505 U.S. at 385; *see also Paris Adult Theatre I*, 413 U.S. at 67-68.

Section 249 violated this rule. The statute punishes actions only if they are motivated by certain thoughts. Prohibiting assault does not violate the First Amendment. Prohibiting assault "because of the ideas it expresses" does violate the First Amendment. *R.A.V.*, 505 U.S. at 385.

Dylann should never have been tried under § 249 because the charges were never valid. Yet the jury was permitted to hear argument about them and to consider them along with the other counts on which sentences of death were being sought. If the inclusion of these charges affected the verdict of even a single juror, the results of the entire death-determination are invalid. The only way to remedy this flaw is to put Dylann back in the position he was in before the jury was told the charges Dylann faced. He is entitled to a new sentencing proceeding, at which the government can seek death sentences only for the charges it can validly prosecute him and sentence him for.

## C. Under current law, charging a defendant under both § 924(j) and the predicate offense violates the protection against Double Jeopardy and Dylann's convictions and sentences under § 924(j) must be vacated.

Charging Dylann under both § 924(j), which requires a predicate offense, and predicate offenses, violates the Constitution's protection against Double Jeopardy. *See Sanders*, 2025 WL 926855, at *11. Accordingly, Dylann's convictions and sentences for the § 924 offenses should be vacated, as the Fifth Circuit did in *Sanders*. *Id.*

318

**CLAIM 16:    The Eighth Amendment prohibits imposing the death penalty on a twenty-one-year-old person with an undeveloped brain.**

As the Supreme Court has recognized, "youth is more than a chronological fact." *Miller v. Alabama*, 567 U.S. 460, 476 (2012) (citing *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982)). Breathing life to this fundamental understanding, the Court in *Roper v. Simmons* explained that "[t]he differences between juvenile and adult offenders are too marked and well understood to risk allowing a youthful person to receive the death penalty despite insufficient culpability." 543 U.S. 551, 572-73 (2005). The Court, relying on the available data at the time, based its reasoning on three important concepts: (1) "[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young;" (2) "juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure;" and (3) "the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed." *Id*. at 569-70 (citation, internal quotations omitted). "These differences render suspect any conclusion that a juvenile falls among the worst offenders." *Id*. at 570. The Court thus prohibited imposing the death penalty on anyone who was younger than eighteen at the time of their crime.

Building on the same principles, the Supreme Court, in *Graham v. Florida*, 560 U.S. 48 (2010), recognized that "[t]he Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide"—and in barring mandatory life without parole sentences for all juveniles, the Court, in *Miller*, explained that "[t]he evidence presented to us in these cases indicates that the science and social science supporting *Roper*'s and *Graham*'s conclusions have become even stronger."[124] 567 U.S. at 472 n.5.

---

[124] On April 10, 2025, the Michigan Supreme Court extended the constitutional ban on mandatory life without parole sentences to adolescents who commit offenses at 19 and 20 years old. *People v. Taylor*, No. 166428 (Mich. April 10, 2025). A concurring opinion, based on the

Subsequently, in *Hall v. Florida*, 572 U.S. 701 (2014), and later in *Moore v. Texas*, 581 U.S. 1 (2017), the Court, again concerned with the "unacceptable risk" that a person lacking the requisite culpability might receive a death sentence, *Hall*, 572 U.S. at 704, highlighted the constitutional imperative to afford due weight to the teachings of the scientific community. *Id.* at 712. Where a scientific consensus supports an individual's lesser culpability, "[p]ersons facing that most severe sanction [the death penalty] must have a fair opportunity to show that the Constitution prohibits their execution." *Id.* at 724. *Hall* and *Moore* require significant deference to the consensus of the scientific community when evaluating the Eighth Amendment's bar on cruel and unusual punishments.

In the twenty years since *Roper* held that executing someone under eighteen violated the Eighth Amendment, the science of late-adolescent brain development has markedly advanced. Today's scientific consensus teaches that the same three concepts cited in *Roper* apply to youth in late adolescence and into their early twenties. Scientific and social-scohencience research has revealed that, like sixteen and seventeen-year-olds, youth in their late teens and early twenties do not have fully developed brains, are immature, and are vulnerable to peer pressure and risk-taking behavior. Accordingly, *Roper*'s bright line distinguishing youth under eighteen from youth slightly older than eighteen is not consistent with advancements in science on which it rested. As *Hall* and *Moore* require, it should be updated to afford appropriate weight to the consensus of medical experts.

The United States Sentencing Commission has recognized the advancement in science regarding youthful brain development. In a May 2017 report by the Commission, *Youthful*

---

"thoughtful conclusions of the many scientific studies," argued for extending the protections until the age of 25. *Id*. (Bernstein, J., concurring in part and dissenting in part).

*Offenders in the Federal System* ("Youthful Offenders"), the Commission begins by defining a

youthful offender as a person "age 25 or younger at the time they are sentenced in the federal

system." Ex. 59 (Youthful Offenders) at 1. The Report explains:

> Traditionally, youthful offenders often have been defined as those under the age of
> 18, but for purposes of this study, the Commission has defined youthful offenders
> as a federal offender 25 years old or younger at the time of sentencing. The inclusion
> of young adults in the definition of youthful offenders is informed by recent case
> law and *neuroscience research in which there is a growing recognition that people
> may not gain full reasoning skills and abilities until they reach age 25* on average.

*Id.* at 5 (emphasis added).

Additionally, the use of the death penalty in this country has continued to evolve. The

sparse use of capital punishment generally—and particularly against young adults—shows a

uniform march away from executing youth that committed offenses when they were under the

age of 22.

## A. Modern scientific consensus has dramatically changed the landscape regarding late adolescent brain development.

The Eighth Amendment prohibits "all excessive punishments, as well as cruel and

unusual punishments that may or may not be excessive." *Atkins v. Virginia*, 536 U.S. 304, 311

n.7 (2002); *see also Enmund v. Florida*, 458 U.S. 782, 788 (1982). A punishment's

proportionality is determined by the evolving standards of decency, since "the standard of

extreme cruelty is not merely descriptive, but necessarily embodies a moral judgment. The

standard itself remains the same, but its applicability must change as the basic mores of society

change." *Kennedy v. Louisiana*, 554 U.S. 407, 419 (2008) (citing *Furman v. Georgia*, 408 U.S.

238, 382 (1972) (Burger, J., dissenting)). The Eighth Amendment "must draw its meaning from

the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*,

356 U.S. 86, 101 (1958).

As part of this evolving standards assessment, courts must consider the consensus of the medical community and scientific data in determining where to draw the moral culpability line. For example, in *Hall*, the Court relied heavily on the standards of the scientific community:

> Those professionals use their learning and skills to study and consider the consequences of the classification schemes they devise in the diagnosis of persons with mental or psychiatric disorders or disabilities. Society relies upon medical and professional expertise to define and explain how to diagnose the mental condition at issue.

*Hall*, 572 U.S. at 710. In *Hall*, the Court ruled that the brightline test then used by Florida that precluded anyone with an I.Q. score of over seventy from presenting evidence of intellectual disability ignored the medical consensus that an I.Q. score is not dispositive of a person's intellectual capacity. The Court wrote:

> The death penalty is the gravest sentence our society may impose. Persons facing that most severe sanction must have a fair opportunity to show that the Constitution prohibits their execution. Florida's [brightline cutoff] contravenes our Nation's commitment to dignity and its duty to teach human decency as the mark of a civilized world. The States are laboratories for experimentation, but those experiments may not deny the basic dignity the Constitution protects.

*Id.* at 724. To act in conformity with Eighth Amendment jurisprudence, a court may not ignore the relevant scientific consensus. *Id.*

Today, the effects of brain development in youth twenty-one and under has reached scientific consensus. The medical community has now overwhelmingly determined that adolescents in their late teens and early twenties are more comparable to their younger peers than they are to adults in their late twenties or older with developed brains. For the same reasons *Roper* extended the categorical bar to all adolescents under eighteen, conformity with Eighth Amendment standards now directs this Court to apply the constitutional protection to youths twenty-one and under.

Indeed, this understanding was echoed by the United States Sentencing Commission, which is tasked with scrupulously analyzing federal sentencing practices nationwide and issuing Sentencing Guidelines that are considered "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Gall v. United States*, 552 U.S. 38, 46 (2007).

As discussed above, the Commission has determined that, based on evolving neuroscience research, a "youthful offender" should be defined as a person "age 25 or younger." Ex. 59 (Youthful Offenders) at 1. The Report notes that "researchers caution against the over-generalization of brain science," but summarizes the emerging scientific consensus concerning brain maturation as follows:

> [T]here are a number of points on which researchers in this area generally agree. First, researchers agree that the prefrontal cortex is not complete by the age of 18, which is the legal age of majority in most state jurisdictions and in the federal system. Second, researchers agree that development continues into the 20s. Third, most researchers reference 25 as the average age at which full development has taken place, but note there will be significant variation from person to person.

*Id.* at 7; *see also* Ex. 62 (When does a Juvenile Become an Adult) at 783 (summarizing recent scientific research on brain maturation and noting that "noninvasive brain imaging and postmortem studies have shown continued regional development of the prefrontal cortex, implicated in judgment and self-control beyond the teen years and into the twenties").[125]

---

[125] Other authorities have stated the same conclusions again and again. *See, e.g.*, Ex. 68 (Immature Self-regulation) at 2 ("Self-regulatory capacities may reach adult-like levels at around age 15 in relatively less arousing, 'cool' contexts, but when tasks become more demanding or emotionally arousing, adult-like performance may not be reached until closer to the mid-20s. These findings are consistent with a growing neuroimaging literature showing amplified activation of reward-processing regions (e.g. the ventral striatum and medial prefrontal cortex) in adolescents compared with children and adults, and gradual maturation over the course of adolescence and young adulthood within brain regions that subserve executive function (e.g. lateral prefrontal and parietal cortices and the anterior cingulate"); Ex. 69 (Adulthood Brain Development) at 1-2 (observing "neurodevelopment in EA [early adulthood] involves prominent

One of the most prominent researchers on brain development, Dr. Jay Giedd, explained the physiology this way:

> The most recent studies indicate that the riskiest behaviors (among adolescents) arise from a mismatch between the maturation of networks in the limbic system, which drives emotions and becomes turbo-boosted in puberty, and the maturation of networks in the prefrontal cortex, which occurs later and promotes sound judgment and the control of impulses. Indeed, we now know that the prefrontal cortex continues to change prominently until well into a person's 20s.

Ex. 63 (The Amazing Teen Brain) at 34. The full development of crucial executive functioning—the moral aspect of a person's brain that renders them fully culpable—does not occur until a person's 20s. Indeed, the full development of gray matter "peaks latest in the prefrontal cortex, crucial to executive functioning, a term that encompasses a broad array of abilities, including organization, decision making and planning, along with the regulation of emotion." *Id.* at 35. "The prefrontal cortex functions are not absent in teenagers; they are just not as good as they are going to get. Because they do not fully mature until a person's 20s, teens may have trouble controlling impulses or judging risks and rewards." *Id.* at 36.

Similarly, Dr. Laurence Steinberg, whose research was relied upon by the Supreme Court in *Roper*, 543 U.S. at 569, and in *Miller*, 567 U.S. at 471, details findings that neurological processes that account for the decline in risky behavior do not arrive until the mid-20s:

> [T]he development of self-regulatory capacities . . . occurs over the course of adolescence and during the 20s. Considerable evidence suggests that higher level cognition, including the uniquely human capacities for abstract reasoning and deliberative action, is supported by a recently evolved brain system including the lateral prefrontal and parietal association cortices and parts of the anterior cingulate cortex to which they are highly interconnected.

---

changes in association corticies and the frontolimbic systems involved in executive attention, regard and social processes. In addition, alterations in neurodevelopment trajectories in EA may underlie differences in functioning and new vulnerabilities to psychopathology evident in this developmental window.").

Ex. 67 (Adolescent Risk-Taking) at 93; *see also* Ex. 66 (The Dual Systems Model) at 103 ("We review evidence from both the psychological and neuroimaging literatures that has emerged since 2008, when this perspective was originally articulated. Although there are occasional exceptions to the general trends, studies show that, as predicted, psychological and neural manifestations of reward sensitivity increase between childhood and adolescence, peak sometime during the late teen years, and decline thereafter, whereas psychological and neural reflections of better cognitive control increase gradually and linearly throughout adolescence and into the early 20s.").

As Dr. Steinberg explains in *Should the Science of Adolescent Brain Development Inform Public Policy*:

> There is now incontrovertible evidence that adolescence is a period of significant changes in brain structure and function. Although most of this work has appeared just in the past 15 years, there is already strong consensus among developmental neuroscientists about the nature of this change. And the most important conclusion to emerge from recent research is that important changes in brain anatomy and activity take place far longer into development than had been previously thought.

Ex. 58 (Adolescent Brain Development) at 1.

Dr. Steinberg further noted: "[r]easonable people may disagree about what these findings may mean as society decides how to treat young people, but there is little room for disagreement about the fact that adolescence is a period of substantial brain maturation with respect to both structure and function." *Id.*

The significant changes in brain structure and function that take place during late adolescence underscore that—for the same three reasons discussed in *Roper*—an individual such as Dylann Roof, who committed an offense not long after his twenty-first birthday, "cannot with reliability be classified among the worst offenders." *Roper*, 543 U.S. at 569.

First, "as any parent knows and as the scientific and sociological studies . . . tend to

325

confirm, [a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions . . . . It has been noted that adolescents are overrepresented statistically in virtually every category of reckless behavior." *Id*. (internal quotations omitted).

The recent scientific literature discussed above strongly suggests that "young adulthood is a developmental period when cognitive capacity is still vulnerable to negative emotional influences. This diminished capacity is paralleled by immature engagement of prefrontal regions that are important for overriding emotionally triggered actions." Ex. 62 (When does a Juvenile Become an Adult) at 787. "Around the world, adolescence is a time when individuals are inclined to pursue exciting and novel experiences but have not yet fully developed the capacity to keep impulsive behavior in check." Ex. 68 (Immature Self-regulation) at 12. "Impulsiveness— acting in an unplanned and reactive, or less thought out, fashion—is often considered a quintessential adolescent characteristic that predisposes adolescents to engage in reckless behaviors." Ex.66 (Shulman et al.) at 109.

In fact, older adolescents are especially prone to risky behaviors. *See* Ex. 70 (When is an Adolescent an Adult) at 549. Rather than decreasing at age 18, the desire to seek risk actually *increases* between the ages of 18 and 21 before starting to taper off later. So "individuals in the young adult period (i.e. ages 18-21)" are even more likely to engage in risky behavior than younger adolescents. *See* Ex. 60 (At risk of being risky) at 102 ("[I]t was individuals in the young adult period (i.e. ages 18-21) who were at the greatest risk to be risky"); Ex. 67 (Adolescent Risk-Taking) at 79 ("[A]s a general rule, adolescents and young adults are more likely than adults over 25 to binge drink, smoke cigarettes, have casual sex partners, engage in

326

violent and other criminal behavior, and have fatal or serious automobile accidents, the majority of which are caused by risky driving or driving under the influence of alcohol."). Thus, older adolescents are even more prone than their younger counterparts to act before they think. The National Institute of Medicine reported in 2015 that "young adults (aged eighteen to twenty-four) experience higher rates of morbidity and mortality than either adolescents or older adults from a wide variety of preventable causes, including automobile crashes, physical assaults, gun violence, sexually transmitted diseases, and substance abuse." Ex. 65 (Young Adulthood) at 645-46.

Second, a 21-year-old adolescent is "more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." *Roper*, 543 U.S. at 569. "The scientific research on adolescent development shows heightened sensitivity to rewards, threats, and social influences, which potentially renders adolescents more vulnerable to making poor decisions in these situations." Ex. 62 (When does a Juvenile Become an Adult) at 771. "[C]onnectivity, especially between the prefrontal cortex and brain regions that process rewards and respond to emotional and social stimuli, is not complete until the midtwenties, which is why aspects of social and emotional functioning, such as impulse control and resistance to peer influence, are slower to mature. The bottom line is that brain systems that govern 'cold cognition' (thinking that takes place under ideal conditions) reach adult levels of maturity long before those that govern 'hot cognition' (thinking that takes place under conditions of emotional or social arousal)." Ex. 65 (Young Adulthood) at 651-52. Moreover, while it is well recognized that "[a]dolescence is a transitional period of development characterized by heightened sensitivity to peer influence, social cues, and rewards," in the real world, "social interactions that take place among teenagers involve multiple contextual factors" and thus "[t]o the extent that

327

these influences have synergistic effects, prior research may underestimate the impact of social influences and rewards on adolescent choices and actions." Ex. 61 (Cognitive control in adolescents) at 292-93.

Third, the character of a 21-year-old "is not as well formed as that of an adult. The personality traits of [twenty-one-year-olds] are more transitory, less fixed." *Roper*, 543 U.S. at 570. Personality traits are just as transient in late adolescents as they are in juveniles. Put simply, the personality or character of late adolescents is not yet formed due to the lack of maturity in the developing brain. "[Y]oung adulthood is a developmental period when cognitive capacity is still vulnerable to the emotional influences that affect adolescent behavior, in part due to continued development of prefrontal circuitry involved in self-control." Ex. 62 (When does a Juvenile Become an Adult.) at 771. "Recent evidence suggests that functional connectivity between prefrontal cognitive control and reward circuitry increases from adolescence to adulthood, demonstrating that adolescents may have weaker prefrontal-reward connectivity compared to older age groups and thus diminished control in the presence of potential rewards." Ex. 61 (Breiner et al.) at 293.

In sum, it is clear *Roper*'s reasoning that "[t]hese differences render suspect any conclusion that a juvenile falls among the worst offenders [because their susceptibility] to immature and irresponsible behavior means their irresponsible conduct is not as morally reprehensible as that of an adult" applies with equal strength to twenty-one-year-olds. *Roper*, 543 U.S. at 570. Thus, the research provided by Dr. Steinberg and her colleagues which informed the Court's conclusion in *Miller*, 567 U.S. at 471-472 (citing *Graham*, 455 U.S. at 68), that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds" is still valid.

For Dylann in particular, who committed his offense not long after he turned twenty-one, the differences cited in *Roper* are amplified. As Dr. Ouaou, a neuropsychologist, explains, Dylann's cognitive deficits, which include a neurodevelopmental disorder, were further complicated by the fact that his brain had not reached "full maturation" at the time. Ex. 2 (Ouaou Report) at 17. "There are several critical etiological factors, including neglect, of cognitive, behavioral, and emotional dysfunction that can occur during the developmental period that affect how the brain develops." *Id*. Dylann's age at the time of his offense added "a level of immaturity in reasoning to his [already] compromised abilities for information processing and affective functioning." *Id*.

**B. There is a national consensus against the execution of twenty-one-year-olds.**

Reviewing the "objective indicia of society's standards, as expressed in legislative enactments and state practice with respect to executions," *Kennedy*, 554 U.S. at 407 (citing *Roper*, 543 U.S. at 563, reveals a growing consensus that executing twenty-one year olds is excessive. Objective indicators aid the Supreme Court's effort to determine whether, consistent with the Eighth Amendment, a punishment practice or method is consistent with contemporary standards of decency. In *Roper*, for example, the Court counted 30 states that rejected the death penalty for juvenile offenders—"12 that ha[d] rejected it altogether and 18 that maintain[ed] it but, by express provision or judicial interpretation, exclude[d] juveniles from its reach." *Roper*, 543 U.S. at 564; *see also Kennedy,* 554 U.S. at 422 (noting the consistent approach of measuring the objective indicia of consensus).

Continuing the same trend identified in *Roper*, in thirty-four jurisdictions there is little or no practical possibility of executing a person who was twenty-one years old at the time of the offense. Executing individuals barely old enough to buy a beer, unable to rent a car or serve in Congress, and still in the throes of cognitive development—based upon now-disregarded views

329

of culpability—undermines the Supreme Court's commitment to dignity, and the possibility of rehabilitation and redemption. *See Hall*, 572 U.S. at 708 ("The Eighth Amendment's protection of dignity reflects the Nation we have been, the Nation we are, and the Nation we aspire to be."); *Roper*, 543 U.S. at 560 ("By protecting even those convicted of heinous crimes, the Eighth Amendment reaffirms the duty of the government to respect the dignity of all persons."); *Trop*, 356 U.S. at 100 ("The basic concept underlying the Eighth Amendment is nothing less than the dignity of man").

Six states have exhibited long-term disuse and have little or no prospect of executing 21-year-olds.[126] Most of these jurisdictions have no individual on death row who was 21 years of age and have not in the modern era executed someone who was that young at the time of the offense. A small handful may have a single person on death row who was young at the time of their offense, sentenced decades ago, which reflects the broad trend towards disuse, and the evolving consensus that executing 21-year-olds is excessive:

> 1) Wyoming has executed one person in the last 50 years and has had no one on its death row since 2014, when the last death sentence (for a prisoner who was 43 at the time of the offense) was overturned.

> 2) Montana has two individuals on death row; one was 24 and one was 26 at the time of the offense. In the last 50 years, it has executed three people—all older than 30 at the time of the offense.

> 3) Kansas, as the *Hall* Court noted, "has not had an execution in almost five decades." *Hall*, 572 U.S. at 716. Kansas has nine people under sentence of death, but only one

---

[126] Of the fifty-two jurisdictions in the United States (fifty states, the District of Columbia, and the federal government), twenty-four have removed the death penalty as a possible punishment: Alaska, Colorado, Connecticut, D.C., Delaware, Hawaii, Illinois, Iowa, Maine, Maryland, Massachusetts, Michigan, Minnesota, New Hampshire, New Jersey, New Mexico, New York, North Dakota, Rhode Island, Vermont, Virginia, Washington, West Virginia, and Wisconsin. Four additional jurisdictions have moratoria in place suspending use of the death penalty, several with a long history of disuse: California, Pennsylvania, Oregon, and Ohio. *See* Death Penalty Information Center, *State by State*, https://deathpenaltyinfo.org/state-and-federal-info/state-by-state

individual who was under under the age of 23 at the time of the offense.

4) Idaho has executed two individuals in the last 15 years. Neither was under the age of 25 years old at the time of his offense. Currently, Idaho has nine people on death row—only one was under 22 years old at the time of the offense, and his sentence was imposed nearly 30 years ago.

5) South Dakota has executed 5 persons in the last nearly 50 years. It has one person remaining on its death row; he was under the age of 22 at the time of the offense. South Dakota has not sentenced a young person to death in over 15 years.

6) Kentucky has executed three individuals since 1968. Each was well older than 22 at the time of offense. Kentucky has 26 people on death row. Only two were under the age of 22 at the time of their offenses. One, Ronnie Lee Bowling, was sentenced to death for an offense in 1989; the other, Karu Gene White, was sentenced to death for an offense in 1979.

Even in jurisdictions that continue to execute and sentence individuals to death, there is a strong trend towards exempting those who were young adults at the time of commission of their offenses from execution. The broad trend is reflected in the aggregate numbers. As one court has found, "[o]f the [27] death penalty states, only about half continue to impose the penalty on a regular basis and in these states, the number of death sentences has dropped greatly over the last decade. In 2015, there were 49 death sentences nationally. This number is down from a peak of 315 in 1996." *United States v. Fell,* 224 F. Supp. 3d 327, 350 (D. Vt. 2016). In 2024, there were twenty-five persons executed; out of fifty-two jurisdictions, nine were responsible for all of the executions that took place.[127] "The principal change over the course of the last [30] years has been a marked decrease in death sentences and executions." *Id* at 351.

## C. There is little penological purpose for imposition of the death penalty on youth slightly older than eighteen.

Death sentences imposed on young people have no penological purpose. They do not meet any of the three principal rationales of punishment: "rehabilitation, deterrence, and

---

[127] Death Penalty Information Center, *Execution List 2024,* Dec. 19, 2024, https://deathpenaltyinfo.org/executions/2024

retribution." *Kennedy*, 554 U.S. at 420. "Rehabilitation, it is evident, is not an applicable rationale for the death penalty." *Hall*, 572 U.S. at 708-09. (citation omitted). As for the rationale of deterrence, "it is unclear whether the death penalty has a significant or even measurable deterrent effect on juveniles." *Roper*, 543 U.S. at 571. "The same characteristics that render juveniles less culpable than adults suggest as well that juveniles will be less susceptible to deterrence." *Id.* And "[r]etribution is not proportional if the law's most severe penalty is imposed on one whose culpability or blameworthiness is diminished, to a substantial degree, by reason of youth and immaturity." *Roper*, 543 U.S. at 571. Today, we know that this same understanding about deterrence and retribution must apply to youth slightly older than eighteen.

Youth aged twenty-one and younger have the same impulsivity as youths eighteen and under. They act rashly, without reflection and full consideration of the consequences of their actions. They do not grow out of this behavior until their brains have fully formed. Science now shows that like sixteen- and seventeen- year-olds, young adults in their early twenties lack the self-regulation and executive functioning to appreciate the death penalty as a deterrent.

**D. Conclusion**

The current scientific consensus and the evolving standards of the community point in the same direction: persons in the developmental period into their early 20s should be treated differently than fully developed adults under the Supreme Court's Eighth Amendment death-penalty jurisprudence. Their continuing brain development results in a lesser culpability, recognized in the country's laws and practices.

Given the findings of the medical community and its most recent consensus on brain development in older adolescents, the Court should afford Dylann the opportunity to present evidence that he is constitutionally ineligible for execution. Trial counsel was ineffective for failing to litigate this issue.

**CLAIM 17:   Uncertainty and lack of necessary safeguards surrounding the method of execution creates an unacceptable risk of severe and unnecessary suffering in violation of the Eighth Amendment; consequently, should the government at some point set an execution date, it should take basic steps to ensure that the execution is humane.**

The risk of botched and gruesome executions that do not comport with constitutional principles is all too real. The risk of maladministration of a would-be or otherwise constitutional execution procedure rises to the level of an Eighth Amendment violation. *Baze v. Rees*, 553 U.S. 35, 52 (2008). Dylann asks that, should the federal government execute him, the government take simple steps to ensure that the execution complies with the Eighth Amendment. By asking only that the government follow reasonable and straightforward guidelines—obtaining drugs from a legitimate source, identifying the source of drugs, and using drugs that are potent and unexpired, as demonstrated by Quality Assurance testing near-in-time to the execution—Dylann puts forth a reasonable "alternative that is 'feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain.'" *Glossip v. Gross*, 576 U.S. 863, 877 (2015) (quoting *Baze*, 553 U.S. at 52).

**A. Attorney General Garland's Review**

Important background to this request is that on January 15, 2025, Attorney General Merrick Garland announced that the Department of Justice (DOJ) would rescind the federal government's single drug pentobarbital lethal injection protocol. *See https://www.justice.gov/archives/media/1384571/dl.* In part, the DOJ's review focused on the difficulty of obtaining pentobarbital from a reliable source:

> the primary manufacturer of injectable pentobarbital that has been approved by the FDA, the Danish company Lundbeck, has restricted the use of the drug in capital punishment. As a result, states and the federal government have not purchased injectable pentobarbital from drug manufacturers, but instead have found chemical companies that provide powdered active pharmaceutical ingredient (API) pentobarbital in bulk and then used compounding pharmacies to create an injectable solution. According to the FDA, "[c]ompounded drugs are not

333

FDA approved, which means the agency does not verify their safety, effectiveness or quality before they are marketed."

Office of Legal Policy, *Review of the Federal Execution Protocol Addendum and Manner of Execution Regulations* (Jan. 2025) (internal citations removed) at 7, https://www.justice.gov/archives/ag/media/1384566/dl.

The review also noted that eighty-eight facilities with the capability to compound pentobarbital existed, but thirty-one had never been inspected by the FDA. Of the fifty-seven that had been inspected, the FDA noted "significant objectional conditions" in fifty-five of those. *Id.* at 8. The Office of Legal Policy's comprehensive review of the 2019 Addendum to the Federal Execution Protocol also constituted a vital portion of the DOJ's review. After consulting autopsy data from executions that used pentobarbital, OLP concluded that, "*there remains significant uncertainty about whether pentobarbital can be used in a single-drug execution protocol without causing unnecessary pain and suffering.*" *Id.* (emphasis added).

The DOJ found that while some state lethal injection protocols required administering a sedative prior to execution, significant hurdles existed in attempting to do so due to conflict between medical standards and BOP policy:

> [T]hose states require a physician to prescribe the sedative. On the federal level, the Bureau of Prisons (BOP) has determined that in order to administer a sedative prior to execution, a prescription would be required, which would in turn require the participation of a medical professional. It is internal BOP policy that the BOP medical staff do not administer drugs in connection with the execution process. Moreover, states that involve medical professionals in the execution process rely on those professionals doing so at their own risk, and likely rely on extensive state secrecy statutes. The American Medical Association's code of ethics prohibits physician participation in a legally authorized execution.

*Id.* at 8.

334

The Office of Legal Policy's comprehensive review of the 2019 Addendum to the Federal Execution Protocol also constituted a vital portion of the DOJ's review. OLP consulted with "experts, including academics, medical professionals, drug safety experts, and advocacy groups," and also "conducted a literature review, including legal materials and medical and scientific research specifically related to the use of pentobarbital." *Id.* at 11. This included reviewing "all available documentation related to prior executions using pentobarbital, including autopsy reports and witness accounts," state execution protocols, and consultation with state representatives. *Id.* Last, OLP consulted with relevant DOJ components including BOP, the U.S. Marshals Service, the Criminal Division, the Civil Division, the Office of the Solicitor General, the Drug Enforcement Administration, the Civil Rights Division, the Bureau of Justice Statistics, and the National Institute of Justice, and other federal agencies including the Department of Health and Human Services as well as the Federal Capital Habeas Project, experienced capital counsel, and members of Congress. *Id.*

OLP found "[t]he primary areas of concern related to the use of pentobarbital include the risk of flash pulmonary edema; pain associated with the injection of a highly alkaline solution into the bloodstream; and the lack of clarity as to whether pentobarbital causes individuals to become unconscious, and therefore incapable of feeling pain, or simply unresponsive." *Id.* The DOJ report ultimately concluded by finding that it could not credibly state pentobarbital as an execution drug was humane. Additionally, the DOJ report determined that "if the federal government were required to conduct an execution by a manner other than lethal injection of pentobarbital, the Department should undertake

335

an analysis of that manner like the one engaged in here with regard to pentobarbital

before that other manner may be implemented." *Id.* at 20.

## B. Trump Administration Memo

The Trump administration, however, has "rescinded effective immediately . . . former

Attorney General Garland's January 15, 2025 Memorandum entitled 'Determination Following

Review of the Federal Execution Protocol and the Manner of Execution Regulations.'" *See*

*https://www.justice.gov/ag/media/1388561/dl* (2/5/2025 AG Lifting Moratorium Memo).[128] The

memo also orders a review of the use of pentobarbital:

> In addition, the Office of Legal Policy, in coordination with additional
> components as appropriate, will evaluate whether the Federal Bureau of Prisons should
> readopt the July 2019 addendum to the execution protocol. The review should focus on
> whether the use of pentobarbital as a single-drug lethal injection comports with the
> Eighth Amendment. As part of this review, the Office of Legal Policy will evaluate
> whether the Federal Bureau of Prisons should revise the addendum to include other
> manners of execution in accordance with 18 U.S.C. § 3596(a) and 28 C.F.R. § 26.3.

*Id.*

## C. Problems with lethal injection executions

In 2020 and 2021, the first Trump administration obtained drugs in secret, possibly from

a company not even authorized to produce drugs for human consumption. *See* George Hale,

*Chemical company accused of supplying drugs for executions in Terre Haute ends pentobarbital*

*sales*, Indiana Public Media (June 24, 2024), https://indianapublicmedia.org/news/chemical-

---

[128] This memo directly emanated from President Trump's Executive Order directing the
Department "to modify the Justice Manual based on the policy and purpose set forth" in
Executive Order 14164. See https://www.whitehouse.gov/presidential-actions/2025/01/restoring-
the-death-penalty-and-protecting-public-safety/ (Executive Order 14164, "Restoring the Death
Penalty and Protecting Public Safety"). It went on: "Therefore, all previous Department policies
relating to the death penalty that are inconsistent with the Executive Order and the policies set
forth herein-including former Attorney General Garland's January 15, 2025, Memorandum
entitled 'Determination Following Review of the Federal Execution Protocol and the Manner of
Execution Regulations,' which directed the Federal Bureau of Prisons to rescind the July 25,
2019, addendum to the execution protocol-are rescinded effective immediately." *Id.*

company-accused-of-manufacturing-drugs-for-terre-haute-executions-says-it-stopped-making-pentobarbital.php; Adrian Horton, *John Oliver on lethal injections: 'A protracted nightmare of suffering'*, The Guardian (Apr. 8, 2024).

There is no doubt that serious problems with lethal injection sometimes arise: for instance, six prisoners have *survived* government attempts to kill them by injecting by lethal injection: Romell Broom (Ohio 2009); Alva Campbell (Ohio 2017); Doyle Hamm (Alabama 2018); Alan Miller (Alabama 2022); Kenneth Smith (Alabama 2022); and Thomas Creech (Idaho 2024).[129] Other lethal injections in the last few years have been botched. The April 2014 execution of Clayton Lockett in Oklahoma was described as a "bloody mess" by the prison warden."[130] In July 2022, an autopsy completed after the execution of Joe Nathan James, Jr. in Alabama revealed the failure of a central line placement after a "torturous, hours-long execution process."[131] The autopsy found numerous puncture wounds and bruises over the inmate's arms and knuckles, and on the inside of his left arm was a jagged incision, "likely from a 'cutdown' – a medical procedure in which a deep cut is made to expose a vein." *Id.* Recent federal executions have similarly "alarmed" witnesses. *See, e.g.*, George Hale, *Chemical company accused of supplying drugs for executions in Terre Haute ends pentobarbital sales*, Indiana Public Media (June 24, 2024), https://indianapublicmedia.org/news/chemical-company-accused-of-

---

[129] DPIC, *Botched Executions*, https://deathpenaltyinfo.org/executions/botched-executions.

[130] DPIC, *Oklahoma Warden Called Recent Execution a "Bloody Mess,"* (December 15, 2014), https://deathpenaltyinfo.org/oklahoma-warden-called-recent-execution-a-bloody-mess.

[131] DPIC, *Private Autopsy Documents 'Carnage' Experienced by Alabama Death-Row Prisoner Joe Nathan James During Longest Botched Lethal-Injection Execution in History*, (Aug. 16, 2022), https://deathpenaltyinfo.org/private-autopsy-documents-carnage-experienced-by-alabama-death-row-prisoner-joe-nathan-james-during-longest-botched-lethal-injection-execution-in-history.

manufacturing-drugs-for-terre-haute-executions-says-it-stopped-making-pentobarbital.php; Isaac

Arnsdorf, *Inside Trump and Barr's Last-Minute Killing Spree*, ProPublica (Dec. 23, 2020),

https://www.propublica.org/article/inside-trump-and-barrs-last-minute-killing-spree.

**D. Conclusion**

    To avoid this horrendous spectacle, and ensure compliance with the Eighth Amendment,

Dylann Roof puts forth only the most basic and straightforward requests:

    1. That he be executed using pentobarbital;

    2. That the pentobarbital come from an identified source, not a secret source;

    3. That the manufacturer of the pentobarbital be qualified to make drugs for human
consumption; specifically, the pentobarbital should come from a recognized drug
manufacturer, not a compounding pharmacy; if the pentobarbital does come from a
compounding pharmacy, it should be a compounding pharmacy that has appropriate
certifications and has passed quality control inspections;

    4. That the pentobarbital be within the expiration date, not expired; and

    5. That the pentobarbital be subjected to Quality Assurance Testing, particularly for purity

and potency, shortly before the execution date.

    Discovery should be granted so that the government be required to demonstrate

compliance with these requests, and thus with the Eighth Amendment.

**CLAIM 18:   Judge Gergel presiding over Dylann's case because he "really wants to"
violated Dylann's Due Process right to an impartial procedure for assigning a judge, and
trial counsel's failure to object violated Dylann's Sixth Amendment right to effective
assistance of counsel.**

    In 2015, when the Department of Justice initiated a case against Dylann Roof, Judge

Gergel made known in the District of South Carolina that he wanted to preside over this case.

According to Judge David Norton's contemporaneous account to attorney Michael O'Connell,

who was then defending Dylann, Judge Gergel indicated that he "really wants to" be the judge

for Dylann's case. Ex. 8 (O'Connell Dec.) ¶ 6. Because of Judge Gergel's strong desire to preside

over Dylann's case, Judge Norton "let him have" the case. *Id.*

Judge Gergel handling Dylann's case because he "really wants to" raises at least two

serious constitutional problems. First, this method for selecting the judge violated Dylann's Due

Process right to a fair procedure for judicial assignment. Judge Gergel's statement that he wanted

the case calls into question his ability to preside impartially. Indeed, several witnesses report that

he did not appear impartial. Second, Mr. O'Connell was Dylann's attorney, and his primary duty

was ensuring that his client received a fair trial. As such, Mr. O'Connell's failure to ask Judge

Gergel to recuse himself violated Dylann's right to effective assistance of counsel and prejudiced

him.

## A. Judge Gergel presiding over Dylann's case because he "really wants to" violated Dylann's due process right to an impartial procedure for assigning a judge.

A judge expressing that he "really wants" to preside over a case, and thus being given the

case, is not a typical procedure for case assignment. Nor is it a fair or impartial one. Federal

courts have procedures in place to ensure unbiased case assignments: "By statute, the chief judge

of each district court has the responsibility to enforce the court's rules and orders on case

assignments. Each court has a written plan or system for assigning cases. The majority of courts

use some variation of a random drawing."[132] Nothing could be further from following written

procedures for randomly assigning cases than assigning a judge a high-profile case because he

---

[132] United States Courts, *FAQs: Filing a Case*, https://www.uscourts.gov/faqs-filing-a-case#:~:text=The%20majority%20of%20courts%20use,related%20cases%2C%20or%20prisoner%20cases.

"really wants to do it" and makes this desire known to another judge. Ex. 8 (O'Connell Dec.) ¶ 6.[133, 134]

Nowhere is a judge's impartiality more important than in a criminal case where the government is seeking the death penalty. "The selection of a judge to preside at a criminal trial is a matter of considerable significance to the criminal defendant." *Cruz v. Abbate*, 812 F.2d 571, 573 (9th Cir. 1987); *see also Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). Thus, "[w]hile a defendant has no right to any particular procedure for the selection of the judge . . . he is entitled to have that decision made in a manner free from bias or the desire to influence the outcome of the proceedings." *Cruz*, 812 F.3d at 574.[135] Assigning a case to a particular judge

---

[133] On April 4, 2025, a statement from former Chief Judge and Senior United Stated District Court Judge Terry L. Wooten appeared on the docket in this case. Dkt. No. 1051. This statement confirms that no written assignment plan existed in the District of South Carolina during his tenure. Instead, judges were chosen solely by the Chief Judge's discretion based on caseloads and related cases. No random assignment process was in place, such as a wheel or randomized computer program. The system described by the then-Chief Judge is vulnerable to abuse and bias. Dkt. No. 1051.

[134] The circumstances under which the statements of the former Chief Judge and current Senior Judge Wooten and District Court Judge Norton appeared on the docket are highly unusual and suspect. Dkt. Nos. 1051, 1052. These statements appeared on the docket with the entry initials "ltap", which are the consistent with the initials of Judge Gergel's legal assistant, Lena Tapscott. *See* https://www.scd.uscourts.gov/mdl-2873/contact.asp. It would be highly unusual and suspect for a judge to engage in investigation and fact-finding. *McNeil v. Wisconsin*, 501 U.S. 171, 181, n.2 (1991) ("What makes a system adversarial rather than inquisitorial is . . . the presence of a judge who does not (as an inquisitor does) conduct the factual and legal investigation himself, but instead decides on the basis of facts and arguments pro and con adduced by the parties."). At a minimum, it appears that Judge Gergel had access to the statements prior to their filing on the public docket and made fact-finding absent adversarial testing of the facts. Dkt. No. 1053 (Order denying Recusal appearing on the docket 23 minutes after the filing of Dkt. Nos. 1051, 1052 and quoting extensively from those statements.). A motion for recusal is pending.

[135] Assignment procedures appropriately allow courts to reassign cases to address practical problems, such as judges falling ill or to balance caseloads. *See, e.g.*, *Sinito v. United States*, 750 F.2d 512, 514 n.3 (6th Cir. 1984) (judges may trade cases so cases are heard in the most geographically convenient courthouse); *State v. Simpson*, 551 So. 2d 1303, 1305 n.6 (La. 1989) (courts may reassign cases when a judge falls ill or is incapacitated); Federal Judicial Center, *Ten Steps to Better Case Management* 1 (2d ed. 2014) (noting that assignments for

"for an impermissible reason" is unequivocally prohibited. *Cruz*, 812 F.2d at 574. Such improper manipulation of case assignments "raises not only constitutional issues, but also significant questions regarding the fair administration of justice." *United States v. Pearson*, 203 F.3d 1243, 1255 (10th Cir. 2000).

"Defendants—especially defendants facing death—have a right under the Due Process Clause to a 'fair trial in a fair tribunal.'" *Bracy v. Schomig*, 286 F.3d 406, 419 (7th Cir. 2002) (quoting *Withrow v. Larkin*, 421 U.S. 35, 46 (1975)). "A fair trial in a fair tribunal is a basic requirement of due process"—so much so that "our system of law has always endeavored to prevent even the probability of unfairness." *In re Murchison*, 349 U.S. 133, 136 (1955). "[T]he Supreme Court has decided that both actual bias and the appearance of bias violate due process principles." *Franklin v. McCaughtry*, 398 F.3d 955, 960-61 (7th Cir. 2005). Accordingly, defendants "have a right to a judge who takes seriously his responsibility to conduct fair proceedings, a judge who looks out for the rights of even the most undeserving defendants." *Bracy*, 286 F.3d at 419.

Evidence of bias need not be "a smoking gun," such as a judge's confession that he stacked the deck against a defendant, if "reasonable inferences" of bias "can be drawn." *Bracy*, 286 F.3d at 411-12. This is particularly true in a death penalty case because defendants sentenced to death are "entitled to our painstaking review of their convictions and death sentences because, as the Supreme Court has often recognized, death is different." *Bracy*, 286 F.3d at 412 (citing *Gardner v. Florida*, 430 U.S. 349 (1977)). Additionally, "where there is a structural error, such as judicial bias, harmless error analysis is irrelevant." *Franklin*, 398 F.3d at 961 (citing *Edwards v.*

---

multidistrict litigation (MDL)—complex cases that consume enormous resources—are decided on by an MDL panel and require the consent of the assigned judge).

*Balisok*, 520 U.S. 641, 647 (1997)); *see also Washington v. Recuenco*, 548 U.S. 212, 218-19, 218 n.2 (2006)); *Chapman v. California*, 386 U.S. 18, 23, 23 n.8 (1967).

Dylann personally had no knowledge about the statements in Mr. O'Connell's declaration until 2025. He was *pro se* during much of the trial, including most of jury selection and the entire penalty phase. This claim is timely because he could not have raised it previously.

Multiple witnesses note that Judge Gergel seemed biased against the defense. Meredith Childs, a law student observing the trial, wrote that "Judge Gergel's attitude throughout the trial seemed to be: 'This is my courtroom, my way, my rules.' . . . I felt that there was this air from Judge Gergel that he believed Dylann should be put to death." Ex. 20 (Childs Dec.) ¶ 24. "He seemed to favor the prosecution. He expressed anger towards the defense, always. He didn't have a poker face." *Id.*

Ms. Childs similarly observed that, "[w]hen [Judge Gergel] communicated with the defense or with Dylann when he was self-representing, Judge Gergel spoke to them differently than when speaking with the prosecution." *Id.*¶ 23. Judge Gergel seemed "cold to the defense" and "annoyed by the defense/Dylann." *Id.* Ms. Childs "saw this and . . . was worried the jurors would see that too and read into it." *Id.*

Dylann's state court attorney noted this from the start of the federal trial: "[d]uring jury selection, Judge Gergel seemed overly willing to qualify biased jurors." Ex. 11 (McGuire Dec.) ¶ 14; *See* Claim 3. Lead federal counsel David Bruck wrote that "[a]s Judge Gergel continued to question Dylann at the November 7, 2016, hearing, he essentially talked Dylann into the idea that what Dylann wanted was for nothing at all to be presented at the penalty phase." Ex. 5 (Bruck Dec.) ¶ 46. He further stated

> I was horrified when both the prosecution and the Court thereafter appeared to endorse the view that Dylann would in fact, be headed to hell… The Court and the

> prosecution were making clear a moral declaration that Dylann was beyond redemption. These statements by the prosecution and the court, while made outside the presence of the jury, were made in front of unsequestered witnesses who had not yet taken the stand. This emboldened these witnesses, was widely reported in the press, and changed the mood of the proceedings.

*Id.* ¶ 55.

Judge Gergel even referred to the victims in this case as "my victims," evidencing publicly his strong identification with them. Tr. 11/17/16 at 6; Tr 01/02/17 at 15 (Dkt. No. 989). Judge Gergel referred to the defense as a "two-headed monster," dehumanizing one side of the litigation while criticizing their attempts to advocate. Tr. 12/02/16 at 6. This reference of the defense as a "monster" was picked up by the media and widely reported. *See, e.g.*, https://www.postandcourier.com/church-shooting/roof-trial-to-move-forward-after-jury-pool-of-67-qualified/article_6ad37ffe-b88e-11e6-a7b1-2702ea41dd73.html.

When "circumstances" point to a judge's "disregard for justice," the inference of bias "is a more compelling explanation" for the judge's actions than happenstance, accident, or even negligence. *Bracy*, 286 F.3d at 419. Here, Judge Gergel asking to preside over the case points to a "disregard for justice" and raises the alarm about the indicia of bias against Dylann, which witnesses and media observed. When a defendant's due process rights are undermined by potential judicial bias, the proper remedy is to vacate the conviction, or at least death sentence. *See Echavarria v. Filson*, 896 F.3d 1118, 1132 (9th Cir. 2018); *Bracy*, 286 F.3d at 419.

**B. Trial counsel was ineffective for failing to seek Judge Gergel's recusal and for failing to make a record of Judge Gergel's bias.**

Trial counsel was ineffective for failing to seek Judge Gergel's recusal, even though one of his attorneys learned at the very outset of the federal case that Judge Gergel was presiding over the case because he wanted to do so. *See* Ex. 8 (O'Connell Dec.) ¶ 6. Mr. O'Connell knew about the aberrant "procedure" for assigning Judge Gergel, but states, "I think I told my wife

about this conversation. I don't recall sharing it with anyone else until this month." *Id.* ¶ 7.
Failing to protect Dylann's due process right to an impartial judge constitutes deficient
performance.

Trial counsel was similarly deficient for failing to make a record of the many ways in
which Judge Gergel expressed disdain for the defense. At one point, Ms. Gannett put on the
record that Judge Gergel was rolling his eyes at her, Tr. 11/22/16 at 171, but rather than
acknowledging that she had appropriately sought to make a complete and accurate record of the
trial, other members of the trial team got angry with her for making this record. Because the trial
team made no effort to properly document the judge's bias—to the point of criticizing team
members who did try to make such a record—the transcripts do not reflect how the courtroom
felt. According to Ms. Childs, "It's probably very hard to understand or feel Judge Gergel's tone
just from reading a written transcript." Ex. 20 (Childs Dec.) ¶ 24. But people who were in the
courtroom *did* feel it: "I felt that it was not impartial and I was worried the jury could feel that,
too, and read into it." *Id.*

Trial counsel's deficient performance prejudiced Dylann. Although "harmless error
analysis is irrelevant" to claims of judicial bias, *see Franklin*, 398 F.3d at 961, establishing
prejudice is, of course, necessary to establishing ineffective assistance of counsel, *see Strickland*,
466 U.S. at 687. Here, the clear statements from multiple witnesses establish prejudice.

Because "[a] fair trial in a fair tribunal" is such a basic tenet due process that even the
appearance of bias is intolerable, *In re Murchison*, 349 U.S. at 136, there can be no doubt that
proceeding to trial with even a potentially biased judge, and then not even properly documenting
evidence of bias, harmed Dylann's case. Many of the decisions that were most detrimental to
Dylann were within the judge's discretion.

344

A new trial should be granted because of this violation of Dylann's Fifth and Sixth

Amendment rights.

## V. PRAYER FOR RELIEF

WHEREFORE, Dylann Roof prays that this Court:

1.      Authorize discovery under Rule 6 of the Rules Governing Section 2255 Proceedings, the Federal Rules of Civil Procedure, the Federal Rules of Criminal Procedure, and the practice and principles of law, including, but not limited to:  depositions, requests for production, requests to admit, interrogatories, and subpoenas;

2.      Require the Government to file an Answer to the Motion in the form prescribed by Rule 5 of the Rules Governing Section 2255 Proceedings;

3.      Permit Mr. Roof to file a Reply to the Government's Answer, responding to any affirmative defenses raised by the Answer;

4.      Permit Mr. Roof to amend this Motion to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery, investigation, and litigation of this Motion;

5.      Conduct an evidentiary hearing to resolve any factual disputes raised by the Government's Answer to this Motion, or by Mr. Roof's Reply to any affirmative defenses raised by the Government;

6.      Permit Mr. Roof to file a Memorandum of Law in Support of this Motion in accordance with a briefing schedule established by this Court;

7.      Permit oral argument as appropriate and required;

8.      Stay Mr. Roof's execution pending final disposition of this Motion;

9.      Grant the Motion and vacate Mr. Roof's convictions and/or sentence and order than appropriate retrial and/or sentencing hearings be conducted; and

10.     Grant such further and additional relief as may be just and proper.

Respectfully Submitted,

/s/ Jill E.M. HaLevi
Jill E.M. HaLevi
Mediation and Legal Services 102 Broad Street, Suite C
Charleston, SC 29401
Phone: 843-819-0557
E-Mail: jill@charlestonmediator.com

/s/ Angela S. Elleman Angela S. Elleman
Indiana Federal Community Defenders Capital § 2255 Unit
111 Monument Circle, Suite 3200
Indianapolis, IN 46204
Phone: 317-383-3520
Email: angie_elleman@fd.org