DECLARATION OF DAVID I. BRUCK

I, David I. Bruck, state as follows:

1.     I am over 18 years of age and am competent to make this declaration.

2.     I am a Professor of Law, Emeritus, at the Washington and Lee School of Law in Lexington, Virginia. From 2004 until 2020, I directed Washington and Lee's death penalty defense clinic, the Virginia Capital Case Clearinghouse. Before working in Virginia, I practiced criminal law in South Carolina for twenty-eight years. I specialize in the defense of capital cases at the trial, appellate, and post-conviction stages.

3.     When Judge Richard Gergel contacted me about Dylann Roof's case, I initially declined to represent Dylann. I knew Judge Gergel from early in my career. We had both been lawyers practicing in Columbia, South Carolina for many years.

4.     When I received the call from Judge Gergel, I was still finishing my representation of Dzhokhar Tsarnaev in his federal death penalty trial in Massachusetts. Mr. Tsarnaev had the death penalty formally imposed by Judge O'Toole on June 24, 2015, seven days after Dylann Roof shot and killed nine parishioners at Mother Emanuel A.M.E. Church. With the experience of Tsarnaev's trial so fresh, I was hesitant to take another federal capital case so soon. My co-counsel on the Tsarnaev case, Judy Clarke, advised me not to take on Dylann's case. However, I still had many connections and contacts in South Carolina from my years there. I agreed to try to recruit counsel for Dylann. Recruiting counsel turned out to be harder than I expected, so I ultimately agreed to represent Dylann. On July 23, 2015, Judge Gergel appointed me to represent Dylann Roof on his federal death penalty case filed in Charleston, South Carolina.

5.     As lead counsel for Dylann on his federal charges, I led a team of lawyers, mitigation specialists, paralegals, and law students. Dylann also faced charges in state court, so he had state lawyers working on his case as well. We agreed early on that the two teams would share mitigation specialists and experts. The federal and state teams worked in tandem.

6.     The first time I met Dylann at the Charleston Detention Center, I sat still and quiet for the first few moments. I wanted to be a calm presence for him. Dylann said he hated that and felt he was being observed, which gave me early insight into his personality and how our relationship would develop. Dylann is a unique person, and it was difficult to know exactly how to interact with him.

1

Declaration of David I. Bruck                                    Initials _DIB_

7.     As we began to explore Dylann's life, I found numerous connections between my and Dylann's lives, as we had both lived in Columbia. Dylann's pediatrician was the same pediatrician who had treated my own children. Dylann's sister, Amber, had been to my house once to play with my own daughter when they were young. One of Dylann's teachers had been my neighbor. Joe Roof, Dylan's paternal grandfather, was an attorney in Columbia whom I knew.

8.     With Joe, in particular, I felt a real kinship and affinity. He was a well-known local attorney and leader in the Richland County bar. He had a kind and gentle spirit and a progressive reputation. He had even acted once as a guardian *ad litem* for a capital client of mine who had severe disabilities.

9.     The timing of the federal trial vis-à-vis the state trial was a constant issue as we prepared for trial. The state court prosecutor seemed eager to try Dylann. The state court case seemed like it was going to trial extremely fast. Going to trial too quickly in a death penalty case undermines the fairness and reliability of the process. It takes time to cultivate relationships with witnesses and clients. It takes time to understand the complicated lives of our clients and their families. It takes time to adequately prepare for a capital penalty phase.

10.     In the spring of 2016 the state lawyers got the state court to grant a continuance until January 2017. This was great news. Immediately after this, I decided I wanted to invoke Dylann's speedy trial rights and go to trial on the federal case before the state had a chance to try him. I felt that if the federal trial went forward, then the state case would likely end in a plea bargain. Of course, the contrary was also possible, that the federal case would plead if the case was tried in state court first. The state court attorneys worried that they would be forced to trial quickly if we didn't go first, but we did not test that. In that event they would have made a motion for continuance and tried to make a record about why they were not ready. I did not make a record about why the federal team was not ready, since I was the one asking for the quick trial date.

11.     Members of the team raised with me the possibility of seeking a continuance several times over the summer and fall of 2016. I felt that Judge Gergel would grant us a continuance if we asked, at least with some reasonable notice, but I was committed to the notion of going to trial in the federal case first. The result was that we went to trial before we were ready.

2

Declaration of David I. Bruck                                    Initials _*D/B*_

12.    In the summer of 2016, we had a suppression hearing in Dylann's case. Sarah Gannett, one of the attorneys on my team, was very keen on this issue and spent many hours working on it. The hearing was closed to the public, including the victims' families, out of fear that it would taint the trial. At a pre-closure hearing, some of the victims' families were vehement in expressing their alarm about being excluded from court, with some indicating a fear that something corrupt would occur behind closed doors. From this point forward, it seemed to me that Judge Gergel went out of his way to cater to the victims families, so much so that the defense often felt we were not getting a fair shake. We felt after this point that he was no longer unbiased, but was siding with the prosecution at times without giving adequate consideration to our issues and positions. He referred to the victims as "my victims" and seemed entirely on their side.

13.    When I invoked Dylann's speedy trial rights, I began to refer to this as "mission impossible." I did not think we were ready for trial in November 2016. It was an impossible mission; we were just hoping to do the best we could. At that time, I did not anticipate the disaster that was coming.

14.    As I look back on it, I realize our team was not even assembled until summer of 2016. It was summer of 2016 that Michael O'Connell got off the case. I had asked Michael to be my co-counsel at the very beginning, and he had agreed. I had great respect and affection for Michael and had been a close friend ever since law school. But Michael had moved on from doing mostly criminal defense work to doing more family court work. He did not seem up to the task of being co-counsel on this case. He did more administrative tasks, like managing CJA budget requests and such. At some point Michael and I both came to the conclusion that it would be better for him to step aside, and he did.

15.    When Michael stepped aside, I had recently gotten Sarah Gannett on board to help with motion writing. Kim Stevens joined as co-counsel. Then I asked Emily Paavola to enter an appearance as an attorney as well, instead of the role she had been filling as a mitigation specialist. We only hired Dr. Rachel Loftin, our autism expert, in June 2016. The decision to go to trial in November 2016 was made based on incomplete information and prior to having secured the assistance of critical experts and key members of the defense team.

16.    While Dylann's case was pending in federal court, a police officer named Michael Slager was also awaiting trial for killing Walter Scott in North Charleston, South Carolina.

3

Declaration of David I. Bruck                                Initials _D/B_

Slager is white, and the victim was an unarmed Black man, so the case had heightened racial tensions and was a high-profile event. The trial of that case in state court took place across the street from the federal courthouse at the exact time proceedings began in Dylann's case.

17. A mistrial occurred in the Slager trial, and the tension in Charleston heightened. More security and police officers were present in and around the courthouse. People were concerned about civil unrest and riots.

18. Not only were we not ready for trial, but we did not build in enough time to work with our client and prepare him for trial.

19. Dr. George Woods, our consulting psychiatrist whom I greatly respect, had told us as early as March 2016 that we were going to have to begin the difficult process of sharing our penalty phase mental health defense with Dylann soon. He advised that this would take time. We did not appreciate the need for that time.

20. At some point in the summer of 2016 state lawyer Boyd Young told Dylann's father, Benn Roof, that we believed he had autism. Benn told Dylann this. Dylann was angry and very upset. He was insistent that he did not have autism and became more suspicious at that point that the doctors we were sending to see him were not there just to treat his medical condition.

21. I visited Dylann not long after he heard from his father that the team thought he had autism. I told Dylann during that jail visit that I predicted that we would not say that he had autism, but we just had to explore everything. That seemed to satisfy him at the time. My priority at that point was to keep him on board. We had a plan to reveal our diagnoses to Dylann, but we should have done it much earlier.

22. We did not seek a change of venue. I had hired Denise de La Rue as a jury consultant. I informed the Court in June 2016 that I believed a fair and impartial jury could be drawn from Area C, the section of the District of South Carolina that encompasses Charleston. I made this decision without conducting or evaluating a community survey to measure the extent and nature of pretrial publicity. Our jury consultant recommended conducting a poll to understand the community sentiment in Area C, but I did not follow that recommendation. I was concerned about challenging jury selection, given the November trial date. Prior to making decision to conduct the trial in Area C, I did not request that the team's jury consultant conduct any analysis regarding potential prejudicial news coverage in Area C. I did not conduct any

4

Declaration of David I. Bruck                                    Initials _D/B_

research related to making a motion for a within-district transfer pursuant to Federal Rule of Criminal Procedure Rule 18 or ask the team jury consultant to do so. I did not conduct any research related to making a motion for a Rule 21(a) motion to transfer venue outside the District of South Carolina. I did not consider any possible comparators for a change of venue motion, despite being provided with jury divisions in the federal courts that would be most similar demographically to Area C. In particular, Area D (Florence), was reasonably close, conveniently accessible to witnesses and interested attendees, and could accommodate a trial of this magnitude and public interest. On June 3, 2016, we had a recommendation from our jury consultant to request more time to complete the jury questionnaire to have a better understanding of the pool's exposure to media closer in time to the trial. I did not follow this advice.

23.     I had concerns about pretrial publicity and the potential prejudice because of the high-profile incidents in the months leading up to Dylann's trial involving the publicity surrounding his jailhouse writings (his so called "manifesto") which was leaked to the press in August 2016. I also had concerns about the publicity related to the Slager case. I learned information from a focus group in August that evidence of community bias was apparent— there was a strong sentiment that the Roof and Slager cases were connected and there was bias towards Dylann. Resource counsel and our jury consultant expressed their concerns with continuing the trial in Area C in light of the simultaneous prosecutions of Dylann and Michael Slager.

24.     Before November 2016, we waived Dylann's presence at the majority of in-court proceedings. Each time, Judge Gergel had us have Dylann execute a waiver of his presence. Dylann preferred not to come to court for a variety of reasons: due to his social anxiety, because he did not want to be strip searched upon returning to the jail, and because of his attachment to routine. But in November, there were several court proceedings that were held without Dylann's presence and without us executing a waiver of his presence. At the time, I was relieved not to have Dylann present for these proceedings, as it allowed me to speak more freely with the Court about matters that would upset Dylann. I did not talk to Dylann about waiving his presence. In fact, when Dylann asked me on one occasion what had happened when I spoke to the judge outside of his presence, I declined to share any information with him.

25.     Dylann learned from the government's expert, Dr. Park Dietz, that our trial team was pursuing an autism diagnosis as part of the mitigation presentation. This infuriated an

5

Declaration of David I. Bruck                                              Initials _D/B_

already suspicious client, and he sent a letter to the prosecution, which was forwarded to the Court, on November 3, 2016. He expressed distrust of our team and wanted to represent himself.

26.    We had disclosed our belief that Dylann had autism to the Department of Justice in our efforts to convince them not to seek the death penalty and then for deauthorization of the case. The prosecutors were certainly aware that we believed our client had autism. Additionally, Dr. Dietz's very evaluation was prompted by our 12.2 disclosures, which additionally made clear that autism was part of our plan. We should have anticipated that Dr. Dietz would disclose to Dylann our mental health diagnosis.

27.    Our relationship with Dylann was irreparably damaged by Dr. Dietz's disclosures. Dr. Dietz's revelation that we were pursuing a mitigation case that included Dylann's autism diagnosis was devastating. Dylann became convinced that we were liars who had been tricking him all along. We did not have time to work with him to repair the damage to our relationship.

28.    After Dylann sent the letter to the prosecution in November 2016, Federal Death Penalty Resource Counsel Project Director Judy Clarke, with whom we consulted, recommended that, prior to the competency hearing, we withdraw as counsel or at least obtain conflict counsel for Dylann to consult with, represent his interests during the competency proceedings, and assist our team in determining whether our relationship could be repaired in the event he was found competent. She pointed to the breakdown in communication and stated issues of trust. I did not follow Judy's advice. We forged forward.

29.    Our team moved for a competency evaluation of Dylann on November 7, 2016. A hearing was held on November 21-22, 2016, and Judge Gergel ruled Dylann competent on November 25, 2016. Dylann asked to represent himself on November 27, 2016.

30.    The first competency hearing confirmed for Dylann that we had been dishonest with him for months. The doctors did not testify about thyroid disorder, which is what we had led Dylann to believe they were focused on, but rather about his delusions, psychosis, and autism. This is the real reason they had been retained: for the penalty phase.

31.    I know that it may appear that competency was something that we were expecting to come up. But that is truly not the case. While we knew it was a possibility, we were hoping to get through trial, including presenting evidence in the penalty phase. We were relying on Dylann's social anxiety and lack of experience in the courtroom, hoping that would stifle any protests he had to our mental health presentation. This meant that we were truly not prepared for

6

Declaration of David I. Bruck                                    Initials ᗺ/ᗷ

competency proceedings when they came up on the eve of trial. While our team was made up of seasoned capital litigators, none of us had ever worked on a competency proceeding in a federal capital case. This led to errors and the failure to anticipate numerous problems in our chosen strategy.

32. The experts whom we called at the competency hearing had been retained for penalty phase. They had not finished their reports for the penalty phase. They had not gone in asking questions about competency to stand trial or ability to work with counsel, so they were at a significant disadvantage. The hearing was rushed, and we did not have any expert properly prepared for the competency issues.

33. Additionally, Dr. Loftin was abroad in Cyprus and unavailable to us at the time of the competency hearing. We had her write an affidavit from Cyprus stating she had diagnosed Dylann with autism, but she felt uncomfortable opining on competency for the first time while she was away and without access to her data or her notes. We were devastated by this.

34. We used Dr. Donna Maddox, a psychiatrist we hired for penalty phase, to testify at the November competency hearing. Dr. Maddox was likewise unprepared to comment on competency. While she was in New York attending a family funeral, we asked her to come to Charleston to testify in a competency hearing. She was not adequately prepared for this hearing, and it showed in her testimony.

35. It was only after competency issues were raised that we started revealing to the Court the extent to which we were unprepared. We had been counting on having time during voir dire and the guilt phase to finish preparing for a penalty phase. Now we were dealing with unexpected competency issues and working around the clock. We began sleeping in shifts, so that the work was literally taking place twenty-four hours a day.

36. The Court deemed Dylann competent to stand trial by order on November 25, 2016. On November 27, the Court received a motion from Dylann to discharge counsel and represent himself. The Court held a *Faretta* hearing the next day, the first day of jury selection, on November 28, 2016. The Court orally granted Dylann's motion for self-representation and prospective jurors immediately entered the room without even a break. The Court specifically found that Dylann had the capacity to self-represent. I did not object to that, which was a mistake.

7

Declaration of David I. Bruck                                   Initials _DIB_

37.    During the November (or "first") competency hearing, we had insisted that Dylann was not competent to stand trial. But I did not present evidence or argue to the court at that point that Dylann was not able to self-represent. I understand that the Court made its ruling that Dylann was competent to self-represent based on the Court's own observations. But, due to the trial team's failures, the Court did not have crucial information about Dylann's impairments that impacted his ability to represent himself. Dylann could answer direct questions posed to him by the Court in sealed court proceedings. However, this is not the same as the ability to stand, interrupt proceedings, and object. This is not the same as being able to receive advice from standby counsel in the middle of ongoing proceedings, and to understand and relay to the Court the relevant arguments. This is not the same as being able to focus in a courtroom full of jurors, media, and spectators.

38.    I failed to explain to the Court the limitations that Dylann had in this respect. I expressed to the Court that dealing with Dylann was like dealing with an eight-year-old. But I didn't fully understand why, other than that I believed he had a developmental disorder. The reports by experts Dr. Jay Lucker, Dr. Robert Ouaou and Dr. Amy Fritz for postconviction counsel do a much better job at explaining Dylann's functional deficits than I understood or was able to explain to the Court.

39.    I knew that talking with Dylann was challenging. The Speech Language Pathologist, Dr. Fritz, explains that Dylann's pragmatic language skills are that of a young child. This is consistent with my experience with Dylann. Despite his large vocabulary and his ability to form complex sentences, conversation with him is not the typical give and take exchange. He doesn't begin or end conversations in usual ways. And he takes very long pauses before answering simple questions. In short, he has communication and processing impairments. I attributed these to the diagnosis of autism, but failed to explain these limitations to the Court. In fact, regardless of the correct diagnosis, the skill deficit is what is important.

40.    We filed a pleading with the Court with an Exhibit noting that: "Competence to stand trial does not consist merely of passively observing the proceedings. Rather, it requires the mental acuity to see, hear and digest the evidence, and the ability to communicate with counsel in helping prepare an effective defense." (Docket 562-1). I tried to convey to the Court the ways in which Dylann's delusions, his rigidity, and his anxiety prevented this. But I failed to explain the neuropsychological impairments that were underlying this. I failed to understand that his

8

Declaration of David I. Bruck                                                Initials *DIB*

processing ability and auditory processing were preventing him from participating in the courtroom proceedings. I knew that Dylann was flailing, but I was unable to convey that to the Court. Dylann's high verbal IQ allowed him to mask many of these problems, but it was clear when we spoke to him after court that he was unable to convey to us even what had happened in the courtroom. It was abundantly clear that Dylann's brain did not work properly; it just jumps out at you. But we never were able to adequately convey that to the Court.

41.     At some point in our investigation, Dr. Maddox and Dr. George Woods recommended we hire a speech language pathologist (SLP). A third expert, someone that Lisa Greenman knew and respected in the autism community, also recommended hiring an SLP. We did not follow these recommendations.

42.     At the time of the trial, I had not worked with SLPs and was unfamiliar with auditory processing disorders. Evidence about Dylann's auditory processing disorder would have been relevant under *Indiana v. Edwards* and for accommodations requests for Dylann at trial. It is something I missed.

43.     The experts' recommendation that we hire a speech language pathologist just fell through the cracks. We were so focused on what we saw as Dylann's delusions and psychosis that we failed to think about the ways his brain was impaired, or ways his cognition was affected. We knew he had a high IQ, and this blinded me to the ways he was still impaired. It seemed to me that it had to be more than psychosis and delusions that were affecting Dylann, but our failure to follow the experts' recommendations kept us from discovering these impairments.

44.     We had a neuropsychologist on the case, Dr. Paul Moberg. I knew of Dr. Moberg before this case, and he was extremely well respected. However, Dr. Moberg was undergoing cancer treatments during the entire pendency of his work on Dylann's case. He had asked me to keep the fact of his cancer diagnosis private. He would disappear from contact with us and be unreachable for months at a time. I remember desperately trying to get in touch with him to be able to file our mandatory 12.2 disclosures. Dr. Moberg's absences may have been part of why I did not have much of an understanding of Dylann's brain impairments. I should have replaced Dr. Moberg with a new neuropsychologist as soon as we started having difficulties getting in touch with him.

45.     Judge Gergel questioned Dylann in an *ex parte* hearing on November 7, 2016, as competency was being raised. Dylann told Judge Gergel at that hearing that the mitigation he

9

Declaration of David I. Bruck     Initials *DIB*

IFCD 004338

objected to was "the mental health stuff." Specifically, Dylann told Judge Gergel that we were going to say he had autism. He insisted that he did not have autism and clearly did not want that to be presented. This was consistent with our conversations with Dylann for months. We knew he was not going to be pleased with any mental health diagnosis, which is why we had avoided talking to him about any diagnosis. Yet, he certainly knew that we planned to call numerous family members, church members, acquaintances, and such at the penalty phase. He had not voiced any objection to this plan, only to the idea of him having a "diagnosis."

46.    As Judge Gergel continued to question Dylann at the November 7, 2016 hearing, he essentially talked Dylann into the idea that what Dylann wanted was for nothing at all to be presented at a penalty phase. But until that point, that was not what Dylann had ever articulated.

47.    Because we knew that Dylann would possibly have concerns about any mental health diagnosis, up until the Dr. Dietz disclosure, our experts were seeing Dylann under the guise of learning about and treating his thyroid problem. Early on, Dylann had expressed his anxiety that he had a thyroid problem. He was not being medicated for this at the jail. He also expressed concerns that his body was not symmetrical and his face was malformed. We told him that doctors were coming to evaluate him to be able to advocate for the proper medication for him in the jail. We told him that's why we took his blood when we did genetic testing. We told him when he got a brain scan that was to look at his thyroid. The team had many discussions about how to get these experts in to see Dylann. We introduced each additional expert as someone the prior expert had asked to assist them. Up until the Dr. Dietz disclosure, our experts were seeing Dylann under the guise of evaluating his medical conditions. I felt that was the best way to get Dylann to see the experts, as he was concerned about his thyroid. However, I wanted these experts to later be able to discuss Dylann's potential mental health and mitigation issues.

48.    Once Dylann was found competent, he immediately waived counsel. Our relationship with Dylann was so fractured he could no longer trust us. He clearly did not want to represent himself, but he did not trust us. We were in a difficult position.

49.    Judge Gergel asked me at some point about whether I would reconsider my strategy regarding presenting mental health evidence in light of Dylann's opposition to that plan. I refused to consider this. I felt that Dylann was incompetent and therefore I felt that I could not let him control the presentation of evidence. It was proposed in a team discussion that we negotiate with Dylann. I would not hear of it.

10

Declaration of David I. Bruck                                    Initials _*Ɖłß*_

50.    I witnessed Dylann struggle through voir dire. He was anxious and unable to ask questions. He clearly wanted help from us, and the judge would not allow it.

51.    During jury selection it appeared to me that Dylann's anxiety was acute, as he could not stand being looked at by others. He often was unable to communicate orally or in writing with us while court was in session. He struggled to speak to us when court was in session. He was unable to answer questions I asked him in court. He asked that we not speak to him while court was ongoing. He had a hard time looking down at the notes we passed to him while court was going on. When he did speak it was halting, full of pauses, and awkward. At the time I attributed this all to anxiety, but his processing speed problems combined with his auditory processing problems surely contributed to this and demonstrated the problem was even worse than I could understand at the time.

52.    When we met with Dylann after court had ended for the day, Dylann couldn't relay to us what had happened in court that very day. We were in a weird relationship with Dylann at this time in which he had no trust at all in us, yet he did not want to self-represent. He wanted our help at the same time that he wanted nothing to do with us. We were in an impossible position. And so was Dylann.

53.    Dylann had some awareness that he was floundering during jury selection, so he allowed us to represent him during the guilt phase of trial. Upon the very first witness, I made major errors. I elicited damaging testimony from Felicia Sanders on cross examination. It was awful. I was genuinely not trying to force a mistrial. Honestly, I was trying to get Ms. Sanders to testify to a statement she had previously given under oath: that the defendant stated when he was in the church that he intended to commit suicide. Instead, I elicited inflammatory and damaging testimony about my client being "evil" and belonging in "the pit of hell." I initially didn't hear what Ms. Sanders said, so I asked my question again. She repeated the harmful statements a second time. Judge Gergel interpreted my questions as intended to elicit a mistrial, in part because they so clearly were questions that were likely to produce this deeply damaging testimony based on Ms. Sanders' demeanor on the day in question. In fact, she had already, during her direct testimony, commented with anger about the defendant's demeanor in the courtroom. It was an incredibly poor choice of me to ask Ms. Sanders any questions. I regret my decision deeply and I think it did have an impact on the rest of the trial, making the death sentence for Dylann significantly more likely.

11

Declaration of David I. Bruck                                    Initials _𝒟𝐼𝐵_

54. I will note that I did not yet have hearing aids at the time of Dylann's trial. I now wear hearing aids. I can see that I needed them at the time of Dylann's trial. My impaired hearing is probably why I didn't hear Ms. Sanders the first time she said her damaging statements about Dylann. At other times, other people would complain that I was not whispering quietly enough when talking to our team or Dylann in the Courtroom. The prosecution at one point assumed I was doing that intentionally so that the jury would hear my statements. This was another result of my impaired hearing.

55. I was horrified when both the prosecution and the Court thereafter appeared to endorse the view that Dylann would in fact, be headed to hell. Obviously, the notion of Hell itself is a religious view of life after death. But religion also provides opportunities for redemption. The Court and the prosecution were making clear a moral declaration that Dylann was beyond redemption. These statements by the prosecution and the court, while made outside the presence of the jury, were made in front of unsequestered witnesses who had not yet taken the stand. This emboldened these witnesses, was widely reported in the press, and changed the mood of the proceedings. I believe that these caused harm to the trial and increased the likelihood that Dylann would get the death penalty.

56. After the guilty verdicts, Dylann again asserted he wanted to waive counsel. He did this exclusively so that he could prevent the jury from hearing testimony that he had been diagnosed with autism.

57. We then raised competency again. But this time we also raised *Indiana v. Edwards*, suggesting that he was incompetent to self-represent. (Docket 837). However the judge ruled that we could only present evidence at the second competency hearing that had occurred or been learned since the first competency hearing. By this time, Dr. Moberg had emerged and was prepared to testify, but he had not seen Dylann since prior to the first competency hearing, so he had nothing to add that the Court would hear. Due to Judge Gergel's restrictions, the neuropsychologist, who had found significant processing speed problems and executive functioning problems, was not able to testify as to the deficits he'd found.

58. In the same vein, Judge Gergel severely limited Dr. Loftin's testimony in the second competency hearing. She had not seen Dylann since the first competency hearing, so she was limited to facts that had emerged since the first hearing. I had not anticipated that Judge Gergel would so significantly limit the testimony at the second hearing. Because she was

12

Declaration of David I. Bruck                                    Initials _D/B_

unavailable to testify at the first competency hearing, the Court was never able to hear and understand her full testimony, particularly with regard to Dylann's ability to represent himself. Instead, she had to base all of her testimony about Dylann's inability to self-represent on what she could say from some videos she had watched of Dylann's visits with his family.

59.    Dr. Ballenger testified at second competency hearing that Dylann planned to put on a defense. Of course, Dylann did not present any evidence or even argue his cause to the jury. He could not. He was incapable of doing so.

60.    After the death penalty verdict was delivered, I met with Dylann. He was shocked by the verdict. He said, "I'm just a kid. I thought they liked me" (referring to the jury). Representing Dylann felt like representing an eight-year-old child. He was the only person in the courtroom who was shocked by the jury's death verdict, though of course our team was devastated.

61.    We had unreasonably relied on our belief that Dylann's social anxiety and non-confrontational nature during our visits would lead him to be compliant during the trial. We had hoped that he would tolerate the presentation of evidence, even if he opposed it. As I told the Court, I thought he did not have "the capacity to be defiant in court or to in some way try to disrupt the proceedings." I failed to understand my client. This failure was borne, at least in part, by my rush to trial and my failure to heed the advice of my co-counsel and our experts.

62.    I am aware that I can be oblivious to team dynamics. I was so focused on what I was doing in the Roof case that I was caught off guard by how much anger and dissension was present among the team. I knew there was conflict, but I mostly avoided getting involved.

Pursuant to 28 U.S.C. §1746, I, David I. Bruck, declare under penalty of perjury under the laws of the United States that the above is true and correct.

April 6, 2025
Date and Place
Lexington, Virginia

David I. Bruck

Declaration of David I. Bruck

13

Initials *DIB*

IFCD 004342