DECLARATION OF KIMBERLY STEVENS

I, Kimberly Stevens, state as follows:

1.    I am a lawyer who works as Senior Capital Resource Counsel for the Federal Capital Trial Project. I directly represent individuals charged in federal capital cases and also provide advice and training to other trial teams.

2.    I became involved in Dylann Roof's case in 2015. Initially, I was contacted to be Resource Counsel for his federal team and provide support to attorneys David Bruck and Michael O'Connell.

3.    In July 2016, Michael O'Connell moved to withdraw from Dylann's case. Significantly, in May 2016, the defense requested a speedy trial, with a November 7, 2016, start date. Thus, at the time of Michael's withdrawal from the case, less than four months remained until trial. At this time, I joined the team as co-counsel. Dylann's case was the first time I directly represented a federal defendant during a capital trial. Many decisions had been made before I joined the team as counsel of record, including, most notably, to accelerate the start of trial.

4.    When I got on the case, Emily Paavola and Lindsay Vann were conducting the mitigation investigation. Eventually, Emily pivoted to the role of attorney.

5.    The biggest obstacle the team faced was time. We needed more time to perform the necessary work. We were trying to run a marathon at the speed of a sprint. The case is the most difficult one I've worked on; it was so complex, and the client dynamics were complicated.

6.    When I joined the Roof case as co-counsel in July 2016, it was clear that there remained a tremendous amount of work to be done to be ready for trial.

7.    By the fall of 2016, concerns were mounting over our ability to adequately prepare for trial. There was so much work we still needed to do. Additionally, my relationship with Dylann was strengthening, but it wasn't to the point yet that we felt comfortable broaching the topic of mental health diagnoses. We feared he would reject any diagnosis, especially one of autism, at a penalty phase. Our team desperately needed more time to develop our relationship with Dylann.

8.    As resource counsel, I hadn't been part of the early decisions about what to tell Dylann to get him to see doctors. I also didn't begin meeting regularly with Dylann until July 2016.

1

Declaration of Kimberly Stevens                                    Initials _KCS_

IFCD 004353

9.      I felt like, once I began seeing Dylann regularly, we were developing a good relationship that would have allowed me to share the team's concerns about Dylann's mental health issues in a way that he could accept. However, the tight time frame didn't allow me to reach that point.

10.      Without our having any knowledge that he was going to do so, Boyd Young from the state team told Dylann's father that we were going to say that Dylann was autistic. Benn told Dylann, which began a process of mistrust for Dylann, which we were trying to repair.

11.      Dylann's meeting with Dr. Park Dietz in October 2016 was a disaster for the case. We had planned for Dr. Rachel Loftin to disclose the autism diagnosis to Dylann because she is an expert who has had that conversation with patients and families many times. But Dr. Dietz saw Dylann and revealed our belief he was autistic before we asked Dr. Loftin to tell him that. After the meeting, Dylann saw Dr. Dietz as a friend, because Dr. Dietz reported to Dylann that he could find nothing wrong with him. Dylann no longer trusted us, and he wrote the letter to the court that changed the entire trajectory of the case. In light of these events, our team mishandled our representation and disclosure of an autism diagnosis to Dylann.

12.      We should have known that Dr. Dietz would likely reveal this information in the course of his own evaluation of Dylann, and we should have prepared for that. If we had more time, we could have had our experts work with Dylann and explain things in a way that would not have caused the blow-up that Dr. Dietz revealing things to Dylann did.

13.      Furthermore, the complexity of the case required many experts, but we did not have the time to consider their reports in conjunction with each other and figure out how they all fit together. We also had to work and communicate with Dylann's state lawyers, which added more work than a normal federal trial.

14.      The competency hearing happened so quickly. We had hoped to never have to raise competency, as the legal standards are so difficult, and we knew it would sever our relationship with Dylann. I had never handled a competency hearing in a federal capital case. It wasn't a hearing for which we had planned and developed evidence. We thought if competency came up, we would have more time to prepare for a hearing. The quick timeline was sprung on us. We weren't ready. We did what we could, but in our rush, we missed issues. We focused on Dylann's psychosis and autism, and we didn't adequately address his deficits that impaired his ability to represent himself.

2

Declaration of Kimberly Stevens                                        Initials  KCS

15. We had hired Dr. Donna Maddox, a psychiatrist, to be a witness for the penalty phase. But we ended up having to call her at the competency hearing. Dr. Maddox flew into Charleston directly from the funeral of her aunt, who'd been like a mother to her.

16. Because we had planned for her to be a penalty phase witness, Dr. Maddox's report was not finished at the time of the first competency hearing. Further, she had been focusing on issues related to the penalty phase, not competency. We had to pivot quickly without enough time to adequately prepare.

17. By the time the trial began, many of us were sleeping in shifts as we worked around the clock to complete all the tasks required. We'd trade off taking naps during the night. I'd finish editing a pleading and knock on David Bruck's hotel room door at 2 or 3 a.m. to pass it off to him so I could go sleep for a few hours before going to court. This schedule was our norm during the trial.

18. Tension among team members was significant by the time we reached a trial date. Sarah Gannett, an appellate lawyer, had more interest in making objections while the trial lawyers were focusing on trying to secure a life verdict from the jury, which resulted in tension.

19. There were too many voices in the conversation. David wanted to take time and listen to everyone, but it took too much time and kept us from doing the actual work. I felt like my voice, as actual co-counsel, was sometimes ignored by David.

20. On the morning that Felicia Sanders was going to testify, David and I went for a walk along the dock. I told him, do not ask her any questions. I said tell her you're sorry for what she went through. I told David that Ms. Sanders is angry and you don't know what she's going to say. I warned him, do not take that risk. I explained that the risk of provoking her to anger or tears was not worth any potential benefit that could be gained. By the end of our walk, he had agreed that he would not ask her any questions. Tammy Krause, our DVO expert, weighed in and also told David not to ask Felicia Sanders any questions. I even leaned over to David during direct and told him again not to ask Felicia Sanders any questions. On cross, David elicited testimony about Dylann being "evil" and belonging in "the pit of hell." The testimony was devasting. And because David hadn't been able to hear what Ms. Sanders said the first time, he persisted and then she repeated it. And then he didn't contemporaneously object.

21. I remember someone raising the issue of whether we should try to get conflict counsel for Dylann. I was worried that he'd lost trust in us and that our raising his competency

3

Declaration of Kimberly Stevens                                    Initials  KCS

and having the competency hearing would further damage his trust and destroy what was left of our relationship. I was so overwhelmed by all the other tasks I needed to do, including preparing for the competency hearing and jury selection simultaneously, that I didn't have time to really think about whether we should try to get him conflict counsel. I left that issue for David and Sarah and the other members of the team.

22.     After Dylann was ruled competent to represent himself, we had to shift gears to focus on assisting him in that endeavor. I tried to get Dylann to object in court, but he often could not. He wanted to be able to say why he was objecting because he thought Judge Gergel would be disappointed in him and angry if he did not. For example, during jury selection, we'd pass Dylann a post-it note or try to talk with him about why he should object to a certain prospective juror. At first we wrote longer notes with what Dylann could say to Judge Gergel. He would glance at it, but it seemed to be too much information for him to take in, especially with the other noise in the courtroom. He'd simply stare at the table and say no, if he spoke at all. We began to simplify the notes down to just a case name or word. But even that was too much for him. By the time Dylann could think and take in even the two-word note and react, Judge Gergel would have moved on. Dylann simply didn't have the time to process what was going on and respond. We'd try to get him to object, but by the time he could read the note and think, the court had moved on, and Dylann's chance to object was lost. He just couldn't take in the information quickly enough and react. Everything in the courtroom was happening too fast for him to keep up.

23.     I often noticed a long delay in Dylann's response when I spoke with him. I sometimes wondered if Dylann understood what I said to him. His impairments and delays were even more prominent in court. Dylann would take long pauses at the podium when Judge Gergel asked him a question. In one particular instance, Dylann stood at the podium for what seemed like forever when Judge Gergel asked him a question. He twirled his hair, stood quietly for an uncomfortably long time, and finally answered.

24.     Dylann had a laptop in front of him with real-time transcription of the trial. Sometimes he tried to follow along with it rather than listening. But he often was unable to keep up. He'd ask me to tell him what had been said. Sometimes he'd ask me while we were still in court. Other times he wouldn't ask what had been said or what had happened in court until after court had ended and we were meeting outside the courtroom.

4

Declaration of Kimberly Stevens                                    Initials KCS

25.     Dylann would also start reading a report or exhibit and completely miss what was going on in court.

26.     I learned a lot more about *Indiana v. Edwards*, the case that addresses a defendant's ability to represent himself, between the first and second competency hearings. However, because Judge Gergel limited testimony at the second competency to events that had occurred after the first, we were never able to present much evidence about Dylann's deficits that impacted his ability to represent himself.

27.     I reviewed reports from the post-conviction team by an audiologist, a speech language pathologist, and a neuropsychologist who examined Dylann. The audiologist diagnosed him with an auditory processing disorder. The findings ring true for me. Dylann seemed so overwhelmed much of the time. He just couldn't keep up with the speed at which things were happening in the courtroom. I could also see his deficits when I spoke with him alone, but they were glaring in the courtroom. At times he'd almost freeze, and he'd often pause for a long time and then stutter when he spoke.

28.     Our team should have followed the recommendations of our experts and hired a speech language pathologist to assist us on Dylann's case. However, given the compressed timeline we were faced with due to lead counsel's decision to pursue speedy trial, this was one of several potential issues that fell by the wayside.

29.     We had several *ex parte* hearings in chambers outside of Dylann's presence in November 2016. I do not recall talking with him about those or asking him to waive his presence. We were discussing substantive case issues, not just procedural matters, during the hearings.

30.     I deferred to David about whether the team should seek a change of venue. He had lived in South Carolina for many years, so I figured he was in the best position to know. In mid-October, we received information from our jury consultant that the responses on the Supplemental Case Questionnaire showed that a high proportion of prospective jurors expressed an opinion that Dylann should receive the death penalty. I raised the question then of whether we should request a change of venue, and our jury consultant indicated that she believed that the team could make a case for change of venue. However, David was uninterested in pursuing this issue.

5

Declaration of Kimberly Stevens                                    Initials *KCS*

                                    IFCD 004357

31.     I believed that we should negotiate with Dylann and put on some evidence at the penalty phase of his trial. At one point Dylann even told me that he would let us put on evidence about psychosis and let us tell his life story. We had roughly 80 witnesses that could have testified and developed substantial mitigation. He was adamantly opposed to any evidence about autism, but I believed that there was important evidence that the jury needed to hear and that Dylann would allow. I thought Dylann would keep us on as lawyers if we agreed not to present evidence of autism.

32.     I was the only team member who believed that we should negotiate with Dylann to present some mitigation evidence. My voice was drowned out, and eventually I stopped arguing in favor of doing so.

33.     I visited Dylann in the holding cell immediately after the death sentence came down. Dylann asked me if I was sad because he just got a death sentence, and I told him I was. This was the first time I saw Dylann recognize and name an emotion. Dylann never believed the jury would sentence him to death. Dylann also believed Judge Gergel liked him because he smiled at him and was not going to sentence him to death.

34.     I have worked on roughly fifty cases where I have directly represented a death eligible defendant, and consulted in over 150 more, and this case was the most extreme and intense I've ever worked on. The timeline was unlike any other I've experienced, especially given the complexity of the issues with client relationship and mental health.

Pursuant to 28 U.S.C. §1746, I, Kimberly Stevens, declare under penalty of perjury under the laws of the United States that the above is true and correct.

APRIL 3, 2025  ASHEVILLE, NC
Date and Place                                         Kimberly Stevens

6

Declaration of Kimberly Stevens                                 Initials _KCS_

IFCD 004358