DECLARATION OF ASHLEY PENNINGTON

I, Ashley Pennington, state as follows:

1. My name is Ashley Pennington. I am an attorney in Charleston, South Carolina. I currently work as Special Counsel at the Burnette, Shutt, McDaniel law firm, where I focus on civil rights cases, particularly those involving allegations of law enforcement misconduct and unconstitutional conditions of pretrial confinement. At the time of Dylann Roof's trial in 2016, I was the Ninth Circuit Public Defender supervising the Charleston and Berkeley County Public Defender offices.

2. I became involved in Dylann's case when he was arrested in June 2015. Initially, Bill McGuire and I were the designated attorneys on the case, and later Teresa Norris was appointed as a third State Court attorney.

3. We learned immediately that Chief Justice Jean Toal wanted to move the State proceedings along quickly. Judge Nicholson, who was assigned to the case in state court, told us he had directives from Chief Justice Toal to get the case tried and resolved within a year, which is unusually short for capital cases.

4. When I first met with Dylann, he was quiet and shut down. This was the day before his state court bond hearing.

5. I thought that Dylann was autistic from the time I first met him. My daughter has Asperger's Syndrome. I could see that Dylann couldn't read me accurately and he obsessed a lot. From the start, the whole team talked about the relevance of the autism spectrum a lot.

6. Dylann was preoccupied with irrelevant matters. He was focused on clothing. He was focused on his jail uniform. He was focused on whether photos of him would be made public. He had significant fears over what others thought of him. Dylann really wanted to be liked.

7. The team jokingly called me "the Dylann Whisperer" because I had such a positive relationship with Dylann. I stayed engaged with Dylann and visited him more than anyone else. I generally saw him weekly when he was in jail at the Al Cannon Detention Center.

8. It was not a hard sell to get Dylann to meet with experts. When Dylann brought up concerns about his thyroid, the team hired an expert and told Dylann the doctor was there to understand his thyroid problems. We got him to see additional mental health experts under the guise of his thyroid problems, as well as his concerns about his body being uneven.

9. The case was really rushed. In April 2016 the state team requested a continuance of a summer 2016 scheduled trial. As part of that filing, Dr. Donna Maddox, our retained psychiatrist, gave us a list of things we still needed to do for our evaluation of Dylann and for the penalty phase. One thing Dr. Maddox recommended was that we hire a Speech Language Pathologist. We never hired a Speech Language Pathologist. I really deferred to David Bruck and his experience to decide what experts to hire.

10. The state team got a continuance, which delayed our trial until early 2017. Once we got that time, the federal team invoked speedy trial rights and got a federal trial scheduled for November 2016. The state prosecutors were initially angry, as they wanted the state case to go first. Once the federal trial was set for November 2016, the defense team's focus shifted to the federal case. We intended to ask for a continuance of the 2017 state court trial date, but were awaiting what

1

                                        IFCD 004194

happened in federal court. We certainly would not have been ready for a state capital trial in this case in early 2017, regardless of what happened in federal court.

11. I was not permitted to observe the federal court competency hearings since they were conducted in a sealed courtroom. Although it appeared to the court that the federal defense team intentionally raised competency just on the eve of trial as manipulation, I am confident that was not the case. We had concerns of competency at various points, but it was not until our relationship with Dylann broke down on the eve of trial that the concerns rose to the level that we needed to officially raise competency. It was only at that point that we realized his impairments would keep him from allowing us to present our case, which made him incompetent in our eyes. It felt like he had a pathological fear of being seen as autistic. He did not want to be seen as handicapped.

12. It was only after Dylann learned of our intentions to put on evidence that he had autism that our relationship broke down and Dylann could not work with us. We genuinely thought that Dylann's anxiety and his quiet passive demeanor meant that he would let us do our job. We were counting on his docile nature. We knew Dylann would not be a huge fan of any mental health diagnosis, but we thought he would let it be presented. He would have allowed us to present other mitigation witnesses, even if he rejected actual mental health diagnoses. It took us all by surprise the level of rejection that Dylann had to the diagnosis of autism.

13. I had spoken with Dylann for months about mitigation evidence generally and stayed away from discussing specific mental health diagnoses. I had no reason to think Dylann would not let us present general mitigation evidence to tell the story of his life. The level of isolation he had in the years leading up to the crime was really shocking and demonstrated something very sad about Dylann's life, regardless of any diagnosis. I felt that he was a confused and vulnerable person who had been misled and seduced by false information. He knew I believed that and that the defense team intended to present it at trial as mitigation. I had no reason to believe that information would not be presented.

14. I attended the federal trial. During the trial, Dylann's impairments became even more apparent. He really wanted David's help at times that he was self-representing. He was angry with David, but still looking for help from him.

15. Dylann was simply unable to object many of the times that he should have. He had a shockingly slow processing speed and was unable to keep up with the pace of trial. He was simply incapable of attending to the demands of a trial. This was not surprising to me based on my meetings with him. Yet, in the courtroom it seemed even worse. His anxiety had been mounting as we moved closer to trial. His ability to focus and discuss matters got worse and worse. It got harder and harder to communicate with Dylann as trial got closer.

16. The defense team thought we would have more time to tell Dylann about the mental health testimony. Because of the lack of time and the compressed schedule, we did not get to tell Dylann about the autism diagnosis before the government's expert told him. After this, David had a one-on-one conversation with Dylann. It did not go well at all. Our relationship with Dylann never recovered after that. He saw us as adverse to his interests.

17. Dylann did not want to get the death penalty; he wanted to live. He had a gross misperception about the likelihood of receiving the death penalty. Once he felt that we had been dishonest with

2

IFCD 004195

him, he discounted all of our advice and began to disregard even the most basic mitigation suggestions. He was too anxious to present the evidence that he needed to present to save his life.

18. Recently, I was provided with a copy of Speech Language Pathologist Dr. Amy Fritz's report, which explains Dylann's limitations in a way that really makes sense to me based on my interactions with him. Unfortunately, we didn't have an expert to really discuss what his impairments were. I wish we had hired a Speech Language Pathologist. A report like this would have been extremely valuable for our team, not only for how we interacted with Dylann, but also for use in court.

19. This declaration is based on my first-hand experiences and observations. I am over 18 years of age and am competent to make this declaration.

I, Ashley Pennington, declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on _____ MArch 26 _____, 2025, in Charleston, S.C.

_____

Ashley Pennington