DECLARATION OF WILLIAM S. MCGUIRE

I, William S. McGuire, state as follows:

1. My name is William ("Bill") S. McGuire. I am an attorney practicing law in South Carolina. In 2015 I worked at the Capital Trial Division of the South Carolina Commission of Indigent Defense. Through this position I was assigned to represent Dylann Roof in the state court proceedings in 2015-2017. The case ultimately resolved with a plea in state court, following a trial in federal court.

2. On the date of the shootings at the Mother Emmanuel Church, I was in Arizona conducting a training. I first met with South Carolina State Court Circuit Judge J.C. Nicholson, Jr. the day of my return from Arizona, with Charleston County Chief Public Defender D. Ashley Pennington, in chambers. At that time Judge Nicholson let us know that this case was on a fast track pursuant to a directive from then South Carolina Supreme Court Chief Justice Jean Toal. It seemed insane to us that the judges wanted this very important case to be tried so quickly. Eventually Judge Nicholson relented to 20 months and a protection order for me, but even that seemed ridiculously and unreasonably fast for a case like this. I fully intended to make motions to get as much time as possible to prepare for trial in the case.

3. My first meeting with Dylann was with either Boyd Young or Ashley Pennington, two other lawyers I worked with on the state case; I can't remember which. My initial impressions were that Dylann was very impaired. Initially, I thought he might be intellectually disabled. Dylann focused on stupid stuff like his jail uniform, which looked 3 sizes too big. Dylann said he liked the uniform.

4. Dylann wasn't a small talk guy. I tried to get him talking, but he wasn't interested and seemed to want to get back to his isolation cell. Dylann had zero interest in sports or other things I would use to try and make conversation. The talks I had with him were exhausting. If I were to say to him "Hey, how are you?" that would be the end of the conversation.

5. Dylann seemed so childish. He looked young and sounded naïve. He had some unusual behavior -- he flipped his jail uniform repetitively, putting his hands in his uniform pockets and flapping them in and out.

6. The results of Dylann's IQ test shocked me. I'd thought the results would be more like 80 or borderline. He had a big vocabulary, but Dylann was still "concrete" in his thoughts and very literal.

7. In our April 2016 State Court continuance motion, we referenced particular tests and examinations that were recommended by Dr. Maddox but we still needed to do. We followed up with genetic testing and some of the other things she recommended. We did not follow up on Dr. Maddox's recommendation to us to get a quantitative assessment by a speech pathologist.

8. I have now seen the report of the post-conviction team's Speech Language Pathologist, Dr. Fritz. This sounds exactly like Dylann. I definitely would have been able to use a report like this had we gone to trial and wish we had gotten it ourselves.

9. The experts that we did have see Dylann were presented to him as experts that were there to understand and diagnose his thyroid problems. We told Dylann this about each expert, eventually expanding that to telling him they were there to discuss his thyroid problems, his

1 WSM

IFCD 004184

anxiety and other body problems. But we never told Dylann that any of the mental health experts were to be used for the trial.

10. Our relationship with Dylann was really wrecked when he discovered we had been dishonest with him. He rejected the autism diagnosis we had. We always knew that he probably would not like the diagnosis, but we should have been the ones to tell him. Instead, we looked even more shady when the government's expert is the one that told him. We simply needed more time to work with him.

11. I felt shock when I learned that Dylann would be self-representing. I took a long pause at that point, feeling stunned.

12. Up until Dylann's discovery of the autism diagnosis, we were working pretty well with him. I feel confident that even if he had not wanted the jury to hear about any diagnosis of autism, he would have allowed other stuff. His grandparents were lovely people that we intended to call as witnesses at the trial. His mother was sort of a mess, but we wanted the jury to hear that. I would have called family and acquaintances of Dylann's at a penalty phase trial.

13. Dylann rejected all that evidence because he wanted to get back at his lawyers. He wanted to exert his control over his case and show us who was in charge. If we had not lied to him, we would not have been in that situation.

14. During jury selection, Judge Gergel seemed overly willing to qualify biased jurors. Dylann was pro se then and wasn't objecting when he should. I wanted objections so many times during jury selection. I watched the trial, sitting with Meredith, my intern.

15. I remember another time during the trial in which Dylann just seemed frozen. It was his turn to speak but there was just silence for a long time.

16. I remember at some point the federal team had a huge blowup. There were tears and crying and yelling at each other. The team was not united in how to approach this case.

17. I remember the entire thing was a disaster – Dylann blew jury selection and torpedoed mitigation (at sentencing) by saying "There's nothing wrong with me psychologically." There is not one moment when I felt that Dylann did anything right, other than being a human and standing on two feet. When Dylann said "I have no questions," he meant "I have no idea what I'm doing."

18. There was often audible crying by victims in the audience during the federal trial, but no breaks were taken because of it. I didn't see jurors swivel to look, but the jury was always looking around, so I'm certain they saw and heard it. There was so much bad stuff during trial – It seemed like the crying was constant. Victims in the audience would get spent after crying, settle down, then start crying again.

19. Many of the women in the audience would audibly sob loudly. They would lean their body over dramatically into the person next to them. It was something you could not miss.

20. Multiple times during the trial someone would get up to walk out, and the entire row of people would stand to let the person out. They would return when composed.

21. The whole trial was emotional and felt like a funeral. It was hard from the start, then hit a plateau, but there was an ongoing high level of emotion. I recall seeing jurors crying.

22. I remember Felicia Sanders testifying in the guilt phase, saying that Dylann could "go to the pit of hell." David Bruck probably regrets cross examining her; it sure was a mistake. When Jennifer

2 WSM

IFCD 004185

Pinckney testified, I remember thinking that her testimony was over-the-top. So much of the testimony was extremely emotional.

23. "Charleston Strong" felt to me like a phrase that meant "we're strong and we're gonna kill this guy." I remember the mural with that phrase and 9 doves that was painted on a wall on Rutledge Avenue in Charleston. I also remember the Charleston Strong bracelets. Some people wore them at the Federal trial. It saturated the city.

24. The push for Federal Court trial was not wise. I know everyone was worried that the State Court was going to trial if the Federal Court had not gone, but we would have asked for more time. I don't know if we would have gotten more time, but we were not ready for trial by any means. Our relationship with Dylann was not ready.

25. As the federal trial became closer in time, the federal team did not ask for a continuance. The timeline was so compressed that we never revealed to Dylann what the trial mitigation would have been. We had planned to reveal that to him, but we just didn't have time to do it before the government expert revealed it to Dylann. There was no recovering our relationship after that.

26. When I spoke with Dylann, I thought he was slow because his affect is detached and there's no quick engagement. His responses were delayed. I'd have to ask "Are you still with me?" It was exhausting talking to him. There were lots of pauses and quiet.

27. In hindsight, I am genuinely disappointed that we didn't follow up with Dr. Maddox's recommendation to get a speech language pathologist. I have no justification for why we didn't do that.

28. This declaration is based on my first-hand experiences and observations. I am over 18 years of age and am competent to make this declaration.

I, William S. McGuire, declare under penalty of perjury under the laws of the United States that the forgoing is true and correct.

Executed on _March 21_, 2025, in _Charleston County, SC_.

William S. McGuire

IFCD 004186