## DECLARATION OF DR. RACHEL LOFTIN

I, Dr. Rachel Loftin, state as follows:

1.      I am over 18 years of age and am competent to make this declaration.

2.      I am licensed as a clinical psychologist in Illinois, Florida and Connecticut. I am also part of PSYPACT. I received my Ph.D. from Indiana University and completed pre- and post-doctoral clinical psychology training at the Yale Child Study Center, where I specialized in neurodevelopmental disorders. I am currently working with a company that does remote assessments and therapy for autistic adults.

3.      Dylann Roof's trial team retained me as a specialist in autism in June 2016. I conducted six separate interviews with Dylann, totaling approximately nineteen hours, between June and October 2016. I also interviewed members of Dylann's family: mother Amy Roof, father Benn Roof, sister Amber Tyo, grandfather Joe Roof, grandmother Lucy Roof, uncle Joe Roof, and aunt Erin Roof. I reviewed records pertaining to Dylann and his life history.

4.      I first met with Dylann in June 2016. I was nervous about being put in a room with him, since I had not done much forensic work before and because I knew about the crimes with which he was charged. However, as soon as he entered the room, I was no longer concerned about being left alone with him, and I asked the officer to leave the room. It instantly came across to me that he was vulnerable. He presented like a much younger person than his chronological age.

5.      I had been told Dylann was reluctant to accept any autism diagnosis I might make. His federal defense attorneys introduced me to him. I never would have allowed myself to be introduced as anything other than a psychologist, but I cannot recall what I said about my role to Dylann directly. If I did not use "psychologist," I would have defined the profession and said I was there to understand how his brain works, how he communicates, and how he interacts with other people.

6.      Autistic people are often funny. I observed a sense of humor in Dylann in my interactions with him as well as in the jokes that he had with his father. Dylann did well on tests that measure verbal association, so it does not surprise me that he made associative jokes.

1

Declaration of Dr. Rachel Loftin                                    Initials _RL_

IFCD 004376

7.      Dylann has a number of strengths. He has a good vocabulary and a high overall IQ. His vocabulary and high IQ mask his deficits.

8.      He had deficits in some skill areas that were quite profound. Many lay people who believe that they have an understanding of autism fail to see the particular deficits that people like Dylann may have. Unless something was said to the judge about those deficits, there would be no reason the judge would necessarily have known of them.

9.      I do not recall any discussions with the team about hiring or consulting with a speech language pathologist (SLP) or audiologist. That said, I would have liked to have had the benefit of an evaluation of an SLP. Different disciplines approach assessment a bit differently, even if we are seeing the same underlying issues. We each have different tools at our disposal that help to further understand what is going on with a client.

10.     I recently reviewed a report from an SLP who saw Dylann in 2024, and the report identified some of the same deficits I saw in him, but from a different angle. If someone had asked me about getting an SLP in preparation for Dylann's trial, I would have supported that type of evaluation, because it would have given me more data. The only reason perhaps not to have gotten an SLP evaluation would have been based on the tight timeline we were under.

11.     The SLP administered the CELF test. She did not use a standard administration, but that is sometimes necessary when doing an evaluation under unusual circumstances, such as with an incarcerated person. When interpreting the data from an nonstandard administration, I would be thoughtful about the weight to given to the test results and whether they seemed consistent with my own observations of the client. In this case, the SLP's results are consistent with my experiences with Dylann.

12.     I am unfamiliar with the *Speed and Capacity of Language Processing* (SCOLP) test, but I like the idea of using a test like this to measure Dylann's speed of processing spoken language, as it is an area I would have liked to have had data on at the time of my evaluation. Upon my current review of the scores on the SCOLP, it fits with the profile that Dylann presented.

13.     I recall the blow up after the government expert told Dylann about his autism diagnosis. There had been a plan for the trial team to disclose to Dylann the fact of this diagnosis, but we did not do it before Dylann learned it from a government expert. I visited

2

Declaration of Dr. Rachel Loftin                                    Initials _____

IFCD 004377

Dylann a few days after it happened, on October 29 and 30, 2016. Dylann was furious with me and he seemed to feel betrayed.

14.    The trial team was in a panic in November 2016 and suddenly asked me to testify about Dylann's competency. I had never testified about competency to stand trial or competency to self-represent in any case before this. I had planned to testify in the penalty phase about my diagnosis. I was unprepared to testify about this issue with such little time to prepare; competency was not on my radar. Additionally, I was out of the country during the scheduled competency hearing in November 2016. I told the trial team when they initially engaged me that I would be in Cyprus at an academic conference in November. I was out of the country from November 16th to November 24th, which turned out to be exactly when the court held competency proceedings in the case.

15.    This was one of the first forensic cases I worked on. I have worked on other forensic cases since the time of Dylann's case. But even now, I work with other experts to assist with any concerns about competency to stand trial.

16.    While I was in Cyprus, the trial team asked me to sign an affidavit for their use. I did not make any conclusions about competency at that time, as it was not something I had considered. I signed this declaration without access to my files and test results on Dylann, so it was difficult for me to even opine about competency at the time.

17.    A proffer of my testimony that the team intended to offer in the guilt phase of the trial was filed on or about December 14, 2016. This proffer focused on aspects of Dylann's communication that were evident in the video of his interrogation and confession. I assisted the attorneys in drafting what I would be able to say about the interrogation video. I saw significant communication deficits in this video. Notably, I said then that Dylann possibly had difficulty processing verbal information and formulating responses. The proffer said: "Response latency and difficulty answering open-ended questions were also noted. Mr. Roof takes longer than expected to provide answers to questions that it would be expected he knows the answer to, and, though it appears he is making an earnest effort to provide answers to the questions, he has particular difficulty answering open-ended questions. This may suggest a difficulty with processing verbal information or in formulating oral responses, both of which are common even in intelligent people with Autism Spectrum Disorder (ASD)."

3

Declaration of Dr. Rachel Loftin                                    Initials _____

                                    IFCD 004378

18.     I then submitted my report on about December 29, 2016, which contains my diagnosis of Dylann with ASD along with other comorbid psychiatric conditions. This report was written anticipating testimony on these matters for the penalty phase portion of the trial. I still did not anticipate that I was a witness to testify about competency to stand trial, though I was now aware that it was an issue of concern.

19.     I testified at Dylann's second competency hearing on January 2, 2017. Consistent with my proffer and report, I testified that I had diagnosed Dylann with ASD and attenuated psychosis. Beyond that I testified about my observations of two jail visit videos that Dylann had with his family in December 2016. My testimony was extremely limited in what I could say, as I was only able to discuss things that had occurred since the November competency hearing when I was in Cyprus. Because of this I was unable to discuss much of my own observations of Dylann, much of my testing, or any analysis of the neuropsychology test results.

20.     There were aspects of Dylann that I wanted to understand better. I never was able to discuss the neuropsychological testing results with the expert who administered those tests. I am not a neuropsychologist. While I have a general understanding of these tests, I rely on neuropsychologists to interpret and explain in more detail their results. The neuropsychologist who had administered tests to Dylann for the team was not available to me at the time I was drafting my report. I understood that he was not readily available to the team. Speaking with him would have been helpful to understanding Dylann's specific impairments.

Pursuant to 28 U.S.C. §1746, I, Dr. Rachel Loftin, declare under penalty of perjury under the laws of the United States that the above is true and correct.

4/8/25     CHICAGO, IL
Date and Place

_____ PhD
Dr. Rachel Loftin

4

Declaration of Dr. Rachel Loftin

Initials _____

IFCD 004379