## AFFIDAVIT

James Austin, Ph.D.
United States v. Dylann Storm Roof
Case No.: 2:15-CR-472

### Background

My name is James Austin. I have been asked by Dylann Storm Roof's defense counsel to comment, based on the defendant's current offense and incarceration history about his ability to be safely housed in the federal or state prison systems.

I would have been available to testify at Mr. Roof's trial in 2017 if so asked.  I would have presented much of the same information and opinions that are contained in this affidavit.

I am an expert in prison classification and risk assessment systems. I am very familiar with the Federal Bureau of Prisons (FBOP) prison classification system. In 2015 I participated in a comprehensive evaluation of the FBOP's use of restricted housing and use of solitary confinement.

Mr. Roof is currently incarcerated at the USP Terre Haute penitentiary having received a death sentence in 2017 Prior to receiving the death penalty, Mr. Roof was detained on June 18, 2015 at the Al Cannon Charleston County Detention Center after being arrested for multiple criminal charges of murder and attempt murder.

### Prior Criminal Record

Mr. Roof has a very limited, non-serious, non-violent criminal record. He was arrested on April 26, 2015 for trespassing.  Two days later he was arrested for a drug possession charge (prescription drug suboxone). There is no known juvenile arrest history. Except for a brief detention for the trespassing and drug possession arrests he has no history of incarceration. Absent the current offenses he has been sentenced there is no history of violence. The recent past history of violence is the best predictor for one's ability to be managed in prison.  Because his criminal history is non-serious and non-violent, this suggests that Mr. Roof is unlikely to commit serious or violent infractions/crimes  during his incarceration.

### Conduct While in Al Cannon Detention Center

While he was detained in the Al Cannon Detention Center (ACDC), and consistent with the ACDC's classification policies he was assigned  to the Special Management Unit A1B which is a highly restricted housing unit.  Other inmates

1

IFCD 004886

assigned to that unit has demonstrated the need to be removed from the general population either due to their need for protection from other inmates or due to their disruptive and/or violent behavior toward other inmates and staff. He was briefly placed on suicide watch in August 2015.

Overall, my review of Dylann's jail records indicate to me that  he was not an assaultive threat to the jail staff or other inmates and was generally well-behaved. For example, in the  Pennington/Beatty Interview it was noted: "Dylann has not been a discipline problem at all."  In the McPherson 302 document it was stated: "In another interaction with Roof, Roof was in an elevator being escorted by McPherson and another officer. The guard was protecting Roof while being transported. Roof said thank you to the guard, you guys are all my friends ."

And in the Norris Declaration, it's clear that information she gathered from Mr. Roof and other inmates who interacted with him would have been helpful to forming my opinions regarding his behavior in the ACDC. That information was never provided to me.

Based on several studies I have conducted on the BOP and other state prison systems, people like Mr. Roof with limited prior record but serving a lengthy prison term for an exceptionally violent crime typically  pose little if any threat to staff and other prisoners. Their behavior becomes increasing better as they age and become institutionalized. Were it not for the crimes Mr. Roof committed he would be classified as minimum custody.

It was reported by Ashley Ireland, who was incarcerated at the same time in the same protective custody unit at the Al Cannon Charleston County Detention Center,  that Mr. Roof was constantly verbally threatened and harassed by other Black inmates solely due to the nature of his crimes.  Such harassment and threats are likely to persist wherever Mr. Roof is incarcerated which demonstrates the need to keep him in a protective custody unit. However, the fact that he did not retaliate or become provoked by this behavior is further indication that he is likely to adjust well to prison.

**Classification and Housing Within the FBOP**

The FBOP maintains a well-established prison classification system that determines how its nearly 156,000 inmates are to be housed on a daily basis (FBOP Program Statement P5100.08). Under this objective system, most prisoners are assigned to what is referred to as general population where they benefit from access to program services, work assignments, regular visitation, structured daily recreation, and considerable out of cell time.

There is another class of prisoners who are not assigned to the general population and whose movement and access to activities and programs listed above. These inmates are either assign to the Special Housing Units (SHU), Special Management Units (SMU) or the ADX (McGinnis et al., 2014) When I conducted the FBOP study

2

IFCD 004887

in 2014, most of the SMU and SHU inmates were double celled while the ADX inmates were all single celled.

The SHUs contain inmates who have been assigned to protective custody, are undergoing an internal FBOP investigation, or are being punished for serious disciplinary infractions and have been sentenced to disciplinary segregation status.

The SMUs generally house inmates who as specified in Program Statement 5217.01, Special Management Units, inmates who have participated in or had a leadership role in geographical group/gang-related activity, and/or present unique security and management concerns.

The ADX facility is located at the Federal Correctional Complex in Florence, Colorado and is the BOPs highest security facility. It only houses a small number of maximum-custody-sentenced inmates in single-occupancy cells. These inmates require an uncommon level of security due to their records of serious institutional misconduct, involvement in violent or escape-related behavior, and/or *who have unusual security needs based on the nature of their offense (emphasis added).* Placement of these inmates at another facility would pose a risk to the safety and security of the institution, staff, and inmates and the public.

**Likely Placement of Dylan Roof Under a Life Without the Possibility of Parole Sentence within the FBOP**

In my opinion, largely due to the nature and notoriety of the crimes committed by Mr. Roof, if he receives a life without the possibility of parole sentence, he will be housed within the ADX facility for the vast majority of his life while incarcerated.

The likely official reason for Mr. Roof to be assigned to the ADX is as follows:

> "The notoriety of the inmate is such that his well-being would be jeopardized if placed in a less secure facility". (McGinnis, et al., 2015:

The operational reasons for his placement in the ADX can be summarized as follows:

1. He will be at high risk to be assaulted by other inmates who will seek to avenge his crimes and perhaps gain their own notoriety as his murderer;

2. He has no prior prison experience. Given his age, physical size, mental health status, and a life without the possibility of parole sentence, he would not be able to function in the FBOP general population and requires protective custody (he will not be assaultive towards staff;

3. Placement in the FBOP general population would allow him to forge

3

IFCD 004888

relationships and/or be manipulated with other inmates who hold similar racist views that could then be used for propaganda and other purposes that will foster hate groups. Hence his interactions with like-minded prisoners needs to be restricted.

4. Similarly, his interactions with outside groups and individuals who also want to exploit any comments by Mr. Roof also will need to be restricted.

It is my opinion that if Mr. Roof receives a life sentence, he will be initially assigned to the ADX SSU (H-Unit). Such a housing assignment would be similar to the ones listed below who also have been convicted of notorious crimes and have been continuously assigned to the ADX and SSU:

- Sayfullo Saipov (8 people killed  - truck through NYC)
- Ramzi Yousef (6 people killed - WTC bombing in 1993)
- Zachariah Moussaoui (9-11 – hundreds of victims)  serving life sentences for connection to mass terrorism events
- Terry Nichols (Oklahoma City bombing); and,
- Eric Rudolph (multiple bombings)

**ADX Conditions of Confinement**

The vast majority of time spent by ADX prisoners is in their cells by themselves. Out of cell movement only occurs for recreation, visits and special situations like acute medical or mental health care.  All meals are delivered to the inmate's cell.

When a prisoner is escorted to and form from his cell, he is always escorted by two officers and in full restraints (Martin chain, with handcuffs attached to the chain, with a black box covering handcuffs).  Such movement only occurs for the allowable recreation of up to 2 hours per day seven days a week. There is no co-mingling of the inmates in the recreation spaces which are all indoors. A television will be issued to him, and he will be allowed to make 1-2 15 minute calls per month unless he is designated as a Special Administrative Measures (SAM) are  applied. All written correspondence and calls are directly monitored by the FBOP.

**Costs of Imprisonment of Dylan Roof within the FBOP**

Although the costs of imprisonment at the Florence ADX facility are extremely expensive, the additional costs of taxpayer money to house Mr. Roof at that facility will be minimal.  The bed capacity of ADX is listed at 623 with a prison population of only 352 (https://www.bop.gov/locations/institutions/flm/).The facility's basic operational costs (staffing, utilities, food, medical and mental health services) are fixed and do not vary with the addition or removal of a single prisoner.  Only if Mr. Roof's medical and mental health situation significantly deteriorates and thus requires

extraordinary medical and mental health services would supplemental funds be required.

I declare under the penalty of perjury under the laws of the United States of American, 28 U.S.C. §1746, that the foregoing is true and correct. Executed this 11th day of April, 2025.

_____     Date: 4/14/2025

James Austin

**Documents Reviewed**

Frost, Natasha A. and   Carlos E. Monteiro. Mach  2016. *Administrative Segregation in U.S. Prisons.* Washington, DC: National Institute of Justice.

McGinnis, K., Austin, J., Becker, K., Fields, L., Lane, M., Mahoney,  (2014). Federal Bureau of Prisons: Special Housing Unit Review and Assessment. Arlington, VA: CNA.

Federal Bureau of Prisons Program Statements

OPI: CPD/CSB, Number: 5270.10, Date: July 29, 2011, Effective Date: August 1, 2011, Subject: Special Housing Units.

OPI: CPD, Number: 5180.05, Date: 12/31/2007, Subject: Central Inmate Monitoring System.

OPI: CPD/CPB, Number: P5100.08, Date: 9/12/2006, Subject: Inmate Security Designation and Custody Classification.

Institution Supplement, OPI:   Unit Management. Number   FLM 5321.07(3)H. Date: August 8, 2103. Special Security Unit (H-Unit).

Sheriff Al Cannon  Detention  Center, Charleston  County  Sheriff's Office  Policies

Policy 4-05.0, Inmate Housing.

Policy 5-03 .3. Administrative Segregation Policy

9-20.2. Inmate Classification.

Affidavit of Ashley Ireland, dated October 23, 2023.

Beatty, Willias Interview by Ashley Pennington 2015.9.17

Al Cannon Detention Records of Dylann Roof

McPherson, Elijah 302, FBI Interview Summary

Teresa Norris signed declaration

Sgt. Tyrone Shaw 302, FBI Interview Summary

IFCD 004891