## DECLARATION OF DR. PHILIP MUBARAK

I, Dr. Philip Mubarak, state as follows:

1. My name is Philip Mubarak. I am a pediatrician and have my own practice, Carolina Pediatric and Adolescent Care, in Columbia, South Carolina. Dylann Roof was a patient of mine from when he was born through when he was 18 years old. Most of the information I have about Dylann comes from his medical records.

2. Amy Roof was the primary caregiver for Dylann. Amy brought Dylann in for all of his appointments that I can remember. Amy was a very petite and extremely talkative person. I do not recall his father coming to any appointments.

3. Dylann was a small baby when he was born. He weighed 5 pounds and 11 ounces. Although he was small, he was not small enough to have been in the neonatal intensive care unit. The OBGYN did not note any concerns at the time of Dylann's birth that I saw in his records. Although Dylann was in the lower 5th percentile, he gained weight steadily as a baby, which showed me that he was growing properly, until his 17-year well check, where he showed a 10-pound weight loss from the previous year.

4. Dylann had several allergy and eczema-related issues in early infancy and childhood, as reflected in his records. He also came in for frequent upper respiratory infections. Dylann's mother, Amy, reported a family history of smoking by both paternal and maternal family members. The secondhand smoke likely worsened Dylann's allergies and upper respiratory infections.

5. When I recently reviewed records of Dylann's 11-year-old well check and 13-year-old well check appointments, I saw that Amy reported at both visits a family history of drug and alcohol addiction on both maternal and paternal sides. We should have followed up



1

IFCD 002589

on this and asked Amy more about it, but since there is nothing in the chart indicating follow-up action, we most likely did not.

6. I do not recall Dylann having any significant developmental delays aside from a speech delay that was reported when he was twenty months old. During the same visit, we noted that Dylann had a tongue tie, for which he received a frenectomy. Nothing significant was noted in later wellness checkups regarding his speech, and I do not recall Amy reporting any issues.

7. Our practice typically encourages mothers to breastfeed, though we support mothers with whatever they decide. It is now common practice in maternity wards for lactation consultants to visit with mothers after giving birth. I do not believe that the local hospitals provided lactation consultants for mothers around the time when Dylann was born. In that time, mothers typically had to ask for help to get a referral for a lactation consult. Amy did not mention to us if she struggled to breastfeed Dylann.

8. Dylann was very shy and quiet. He was one of those kids that you had to ask "yes" or "no" questions to get a response. You couldn't ask him a question that required him to give a long explanation. For example, you couldn't ask him something like "how is your summer going?" -- it had to be more like "are you having a good summer?"

9. Amy was not consistent in her responses to the family and social history document over the years. The patient health questions, on the other hand, were probably directed to Dylann; however, they were strictly "yes" or "no" questions. I  should have noted that there was some kind of family dysfunction based on Amy's reporting in the social history, since she often noted that Dylann didn't have a definite bedtime, didn't have chores, didn't take part in sports, and that she didn't have a locked medicine cabinet.



2

IFCD 002590

Additionally, at Dylann's 14-year-old well check on June 28, 2008, Amy also noted that Dylann had started smoking marijuana, did not eat meals with the family, and did not spend time reading.

10. After either Amy or Dylann brought to my attention at the 14-year checkup that Dylann had begun smoking marijuana, I spoke to him about the medical and legal consequences of smoking marijuana. It was a red flag for me that in the following annual appointments, Dylann and Amy indicated that he did not have history of smoking in his social history. We should have intervened and asked Dylann and Amy outright during the appointment, but at the time we went off the social history questionnaire they filled out at each wellness appointment and relied on the parents or patients to tell us if they had any concerns. We now use more screeners to make sure that there is another layer, so parents and patients have another opportunity to report a concern. We should have gone over the questions with both Amy and Dylann to make sure everything they had reported was true.

11. I should have picked up on some of that family dysfunction based on those responses, but because Amy and Dylann did not bring up any additional issues aside from the marijuana, I did not think there was anything more. A child who does not spend any time reading or eat even one single meal with their family at that age is a red flag. Our practice has since moved on from that model of self-reporting after realizing that it was a flawed system. Now we have more screenings, collaborations among other providers, and direct questions that help pull more detailed information from patients and caregivers about their home life.

12. When reviewing Dylann's pediatric records, I noticed that he received his ~~TDAP~~ Tdap vaccine and ~~Menaeta~~ Menactra vaccine a year apart. We usually give both vaccines to kids during the same

3

IFCD 002591

 visit. Dylann must have refused to take both on the same day, so we must have given him the ~~TDAP~~ Tdap during the visit on June 22, 2006, and then the ~~Menacta~~ ·Menactra the following year on  July 9, 2007. Dylann would not have been the only patient to have requested the vaccines be given during separate appointments.

13. I believe Amy spoke for Dylann during most of his visits, but that is the case with a lot of kids. I didn't observe any unusual behavior between Amy and Dylann or his sister Amber. I did not observe any signs of abuse, trauma, or neglect during any of Dylann's visits. If I had, I would have documented those concerns in Dylann's chart.

14. As Dylann got older, he became noticeably oppositional towards Amy. Amy told me that she had to drag Dylann to come to his annual appointments and that he refused to see any other doctors. Dylann refused to follow up on the referrals I made for him to see a psychiatrist, dermatologist, and ear-nose-throat specialist for his deviated septum despite both Amy and my explaining to him how it could help him with some of his medical and mental health struggles.

15. Dylann's social and mental health deteriorated dramatically in his teenage years. At Dylann's 17-year-old well check, Dylann or Amy reported that he was suffering from anxiety, insomnia, unreasonable or irrational fear or going outside the house, excessive snacking, and using electronics 8 hours a day. Amy told me that Dylann had started homeschooling and was working part time. She also reported that Dylann could not read or do math at grade level. I made a referral for Dylann to see a counselor and to help develop his social skills and address his reported anxiety, insomnia, and irrational fears. The counselor, Patricia Tooma, is located in the same building as us, so Dylann would not have had to go to an unfamiliar place. Dylann was not interested in the counseling,

4



IFCD 002592

and we ended the visit with an agreement that Amy would let me know if Dylann agreed to go. I did not hear back from her.

16. I also noted at his 17-year-old well check that Dylann showed a 10-pound weight loss from the previous year. The weight loss could have been due to a multitude of reasons, but at the time, we typically relied on self-reporting from the patient and primary caregiver to share whatever issues they are experiencing so we know where to start. Amy and Dylann did not share anything with us, and since Amy was a tiny woman herself and Dylann was on the smaller side, we decided to just monitor.

17. At Dylann's 18-year appointment, I followed up with Dylann and Amy about Dylann's anxiety and other reported concerns. Amy reported Dylann's continued anxiety, sleep disturbances, being oppositional, and 8 hours of electronics a day. She also reported problems with his peer groups and said that he did not go outside the home. It concerned me that Dylann didn't leave the house, because interacting with peers is critical to a teenage boy's development. I noticed that Dylann also had some moderate to severe acne, which is typical for a boy his age. Dylann's visits were covered through Medicaid. I remember having to go back and forth with them a couple of times so that they would approve different acne medications for Dylann.

18. At his 18-year-old well check, Dylann began refusing all types of care. I again referred Dylann to the counselor, Patricia Tooma, but Dylann again refused. Dylann also refused

 his flu shot, ~~TDAP~~ Tdap vaccine, ENT referral for his deviated septum, and dermatologist referral during this visit. Dylann refused to see any subspecialist against my and his mother's advice. At that point there was not much we could do, because even if he was forced to go, he could not be forced to talk and comply with treatment.

5

19. Although we are a pediatric office, we do see patients for a couple of years after they turn 18 years old. I believe the last time Dylann came in he was 18 years old.

20. I wish the screening tools that we use now in the practice were available to patients and families back when Dylann was a patient. I recently learned that Dylann has been diagnosed with Autism Spectrum Disorder (ASD) by Dr. Rachel Loftin. I wish we would have screened him back when he was a patient. When Dylann was younger, we didn't typically screen unless the parents expressed concern or unless the child exhibited clear symptoms of ASD.

21. In more recent years, our practice became a certified Patient-Centered Medical Home (PCMH). PCMH is a model of care that centers around the patient. It came about during the Obama administration. Insurances love this model because it focuses a lot on preventative care, so although it takes a lot of resources to implement, it ultimately uses fewer resources, including time and cost, than the traditional model of care over time.

22. Some of the criteria required of PCMH practices include dedicating 20% of daily visits for same day appointments, becoming the communication center for all patient referrals and medical records, and offering additional screens and educational materials for patients and their caregivers. PCMH's are then ranked level 1, 2, or 3 based on the services they provide. To maintain a PCMH certification, the practice must undergo an audit and re-apply every three years. ~~PCMH uses a more holistic approach to care than the traditional model, and~~  I have seen great improvement in overall quality of care in my patients since participating.

23. Around the same time that we became a certified PCMH, we also joined the Pediatric Quality Improvement Program (QTIP). The purpose of the program was to bring



6

practices together to collaborate on specific measures and foster quality improvement projects at each practice. There are 31 practices that participate in South Carolina. Each practice picks a goal for their practice and develops concrete steps to achieve that goal. Some examples are: increasing immunization rates, increasing patient access and use of fluoride varnish, and things like that. The 31 practices then get together twice a year to share strategies, core measures, and outcomes with each other. The QTIP program was originally granted a five-year federal grant. The Department of Health and Human Services now funds the program fully because they found that the practices that participated in QTIP showed better health outcomes than those that didn't.

24. In order for practices to successfully participate in these programs, the entire staff must be committed. It takes a lot of time, energy, and resources to comply with all of the guidelines, and if everyone is not on board it will not work. The nurses especially spend a lot of time on the phone following up with patients, tracking referrals, and gathering patient records. Not all practices are willing to commit to that. My staff and I have all committed because we have seen the improvement in our patients' quality of care since implementing these programs, and we have seen it among patients of other practices who participate in the programs as well.

25. When Dylann was a patient, these programs were not around, and our practice wasn't required to conduct as many screenings as we do now. The ~~APA~~ American Academy of Pediatrics (AAP) doesn't require many of the screenings our practice now uses, but we use them in part to comply with the PCMH and QTIP programs and in part because we feel like it is helpful for our patients. The ~~APA~~ AAP is also constantly updating and improving their screens and resources as more empirical data and studies are done.

7

IFCD 002595

26. The screens we use now include but aren't limited to: the Bright Future Development Updates which are given to caregivers at every well visit; the Modified Checklist for Autism in Toddlers screening tool which is given at least twice between the ages of 15 months and 30 months; the Parents' Evaluation of Developmental Status screening tool which is given at least once between 12 months and 2.5 years; The Safe Environment for Every Kid parent questionnaire which we give at 6 months and then give at every well  check afterwards at Carolina Pediatrics we do it up to 6 years the Edinburgh Postnatal Depression Scale given to all mothers at every patient visit starting at two weeks and going through 6 months or however long we deem necessary; and the CRAFFT questionnaire, which screens for substance related risks and problems in adolescents. We conduct the CRAFFT PSC-Y questionnaire starting at age 11 and  then at every wellness visit afterwards. If any of the patient responses indicate that they may also be suffering from depression, ADHD, or some other mental health issue, then we conduct additional screens, including the NICHQ Vanderbilt Assessment for ADHD, the PHQ-9 for depression, and the DAG-7 for anxiety.

27. One of the screenings we do now that we didn't use when Dylann was a patient gauges family dynamics and assesses whether the patient is in a safe environment. The screener asks the caregivers very specific questions about home environment such as who lives in the home, marital status, if anyone smokes, if anyone owns guns, if the guns are locked in a safe place, if they have working smoke detectors, and if they have access to food. If the caregivers say that they are in need of any of these things, the practice can provide them with information on access to food in the area, give them free gun safe locks, and connect them with other community resources that can help them with their particular situation.



8

IFCD 002596

28. Another form of assistance we have since implemented is that if a mother or primary caregiver states that they are experiencing depression or struggling with substance use, we can either call their obstetrician and make sure they are aware so they can handle the situation, or we can refer them to the IMPACTT program. The IMPACTT program's primary goal is to improve access to maternal mental health and substance use disorder care through telemedicine and tele-mentoring. This program was not around when Dylann was a patient.

29. Many practices don't use these screenings or programs because the screenings take extra time, which can ultimately lead to seeing fewer patients in a day. Many practices are also wary of these programs because they don't know how long they will be around for. Most of these start off as temporary, grant-funded programs. New ones are constantly popping up, while others dissolve. I feel that there needs to be more conversations among community practitioners about these things so that we can support the programs that best help our patients.

30. I was completely shocked when I saw Dylann on the news following the crime. I remember going back and looking over my notes at that time, to see if there was something I missed. I thought about what could have driven Dylann to do something so horrible. I wish the tests that are currently readily available were standard practice at that time, as they may have provided a basis for medical or mental health intervention.

31. I spoke with the trial team about my history of serving as Dylann's pediatrician, but at that time my practice was not yet a PCMH. We had not added the many PCMH-recommended screening tools we now use routinely, so I could not have provided this additional information at that time.

9

IFCD 002597

32. I did not type this declaration. I told this information to a member of Dylann's post-conviction legal team who typed it for me. I have reviewed the contents carefully. I am over the age of 18 and competent to make this declaration.

I, Dr. Philip Mubarak, declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on ___April 21___, 20_24_, in _Richland County_, _SC_.

_____

Philip Mubarak

IFCD 002598