## <u>DECLARATION OF BRYAN EDELMAN, Ph.D.</u>

I, Bryan Edelman, solemnly, sincerely, and truly declare and affirm as follows:

## I.      INTRODUCTION

I am the co-founder of Trial Innovations, Inc., a national full-service jury research firm. I have worked as a trial consultant for 20 years and have conducted pretrial and post-trial research on both criminal and civil cases across the country. I have been retained as an expert in over 70 high profile cases to assess the impact of pretrial publicity on the fairness of the trial proceedings including the *State of Idaho, v. Bryan Kohberger, State of Tennessee v. Demetrius Haley, et al., United States v. Marilyn Mosby, United States v. Robert Bowers*, *State of Florida v, Nikolas Cruz, United States v. David DePape,* and *United States v. James Cloud*. At the request of the Indiana Federal Community Defenders, I conducted a comprehensive evaluation of the television coverage, newspaper media, and social media surrounding the racially motivated shooting at the Emanuel African Methodist Episcopal Church in Charleston during a Bible study, which resulted in the death of nine people.

Based on this analysis, it is my opinion that the United States District Court for the District of South Carolina (Charleston Division) jury pool was saturated with extensive prejudicial pretrial publicity surrounding the "deadliest hate crime in South Carolina's history." This interracial hate motivated crime sent shockwaves through the community, generated massive media coverage, and sparked an outpouring of support for the victims.

Negative character of the defendant evidence and emotional pretrial publicity have been found to be particularly prejudicial in the social science literature.[1] The coverage in this case was emotionally charged and often included powerful statements from the families of the victims. In addition, the media focused on Dylann Roof's racist motivations for the attack and his decision to target the oldest black church in the Southern United States. This type of coverage has the capacity to generate in-group/out-group identification and elicit bias toward the defendant at a conscious and subconscious level. This cognitive process has been shown to impact how jurors evaluate and weigh mitigating evidence during the sentencing phase.[2] At the time of the mass shooting, racial tensions had already been escalated in Charleston following the April 4, 2015, killing of Walter

---

[1] Otto, A.L., Penrod, S. & Dexter, H.R. (1994). The biasing impact of pretrial publicity on juror judgments. *Law and Human Behavior*, 18(4), 452-469.

[2] Edelman, B. *Racial Prejudice, Juror Empathy, and Sentencing in Death Penalty Cases.* (New York: LFB Scholarly Publishing LLC, 2006).

1

DECLARATION OF BRYAN EDELMAN, PH.D.

Scott, a black man, who was fatally shot in the back by Michael Slager, a white local police officer.

Dylann Roof was facing the ultimate penalty after committing the worst hate crime in South Carolina's history. The community in Charleston was calling for a death sentence as the only way to ensure that justice was served. This created explicit and implicit pressure on a jury to reach the "correct" verdict to help heal the community.

Given the racially and emotionally charged environment present in the Charleston Division, it is my opinion that defense counsel should have retained an expert to evaluate the impact of the pretrial publicity on prospective jurors. Under Rule 18, the court must set the place of trial within the district with "due regard for the convenience of the defendant and the witnesses, and the prompt administration of justice." The defense need only show that the transfer of the trial to another division within the district would promote the prompt administration of justice.[3] This is a lower standard than what is required under Rule 21(a) to transfer to another district. Based on my experience conducting community attitude surveys in similar cases with the degree of prejudicial coverage found in the Charleston Division, it is my opinion that the survey data would have demonstrated the need for an intradistrict transfer or change of venue.

## II.    QUALIFICATIONS

**Education and Experience**: A copy of my curriculum vitae can be found in **Appendix A** to this declaration. Upon completion of my undergraduate education, I received an MA and Ph.D. in Social Psychology from the University of Nevada, Reno, and an LL.M. from the University of Kent in the United Kingdom. My graduate studies have provided me with a broad foundation in both qualitative and quantitative research methodologies as well as statistics

The Social Psychology Program at the University of Nevada is unique in that it is one of the few in the country that has an emphasis on the application of social psychological theory to the legal arena. During my studies I specialized in jury related issues and examined how attitudes, race, stereotypes, pretrial publicity, and other factors influence juror and jury decision-making. In this regard, I took coursework addressing topics associated with change of venue motions, the impact of pretrial publicity on jurors' ability to be fair and impartial, and the steps necessary to conduct a change of venue analysis. The University's association with the National Judicial College and other government agencies also afforded me the opportunity to conduct research with the Public Defender, District Attorney, Court Services, the judiciary, and other institutions in Washoe County, Nevada.

---

[3] *U.S. v. Joyce*, CR. NO. 07-31 Erie, (W.D. Pa. Jun. 10, 2008)

**Research Experience**: While at the University of Nevada, Reno I worked as a Research Assistant and Project Manager at the Grant Sawyer Center for Justice Studies where I assisted with several national surveys, including one that examined the judiciary's understanding and application of the *Daubert* standard. I also explored how jurors "minimize" what they have read, seen, or heard about high profile cases during voir dire. In addition, I oversaw a study of the Washoe County's pretrial release program and assisted with the development of training programs for foreign justices, court administrators, prosecutors, and defense attorneys who were brought to the United States by the Department of State.

Further, I have conducted and published research on the impact of illegitimate factors on juror decision-making. This research included developing and testing a model that attempted to explain how factors such as race and empathy influence pre- and post-deliberation sentencing decisions in capital cases. My research on juror decision-making in capital cases was later published as a book. Since completing my studies, I have also published on the impact of graphic images on jurors, and on methodological issues associated with online survey research.

**Jury Research Experience**: I began working as a trial consultant in 1998 and cofounded Trial Innovations in 2010. Over the years I have worked on hundreds of criminal and civil cases across the country. As a trial consultant I have conducted mock trials, focus groups, surveys, post-trial interviews, and other research exercises. I have consulted in the courtroom and assisted with jury selection on more than 100 cases. I have also served as a presenter at local bar associations, law firms, national meetings, and conferences. In addition, I have been invited to conduct MCLE courses related to jury selection by the Public Defender, Alternate Defender, and District Attorney offices in California, Nevada, and New Mexico. I have also served as a guest lecturer at the University of Santa Cruz, Saint Mary's College, and Stanford Law School.

**Venue Experience**: As a graduate student, I was trained by Dr. Ronald Dillehay and Dr. Edward Bronson, two of the leading experts in the country on venue and pretrial publicity. Over the years I have had the opportunity to work with Dr. Bronson on a number of change of venue studies.

I have worked on change of venue issues in several different capacities. As a researcher I have coded trial transcripts in high profile cases to evaluate how jurors "minimize" their bias and exposure to pretrial publicity during voir dire, and the challenges this phenomenon poses for judges and attorneys. In addition, I examined the effectiveness of voir dire as tool for uncovering the extent of jurors' exposure to pretrial publicity in high profile cases. I have also presented as a

IFCD 004847

panelist on change of venue issues at the American Society of Trial Consultants' annual conference and been a co-author on the chapter in the "California Criminal Law Procedure and Practice" on change of venue since 2011.

I have conducted content analyses of media coverage on a host of topics and have designed more than 50 community attitude surveys over the years. I have been retained as an expert to conduct and evaluate change of venue studies and asked to make recommendations for addressing the prejudicial impact of pretrial publicity on the jury pool when appropriate.

**Expert Witness Experience**: I have been retained as an expert witness on matters including freedom of religion in China (political asylum hearing), eyewitness identification, and change of venue. I have testified as an expert witness in person or by declaration in California, Idaho, Colorado, Texas, Michigan, Florida, Massachusetts, Nevada, Pennsylvania, Tennessee, West Virginia, and Washington in state and federal court. In the majority of cases I have been retained to conduct a change of venue study,[4] I have recommended against a change of venue.

## III.     THE INFLUENCE OF ATTITUDES ON COGNITION[5]

There is a substantial body of literature documenting the impact of attitudes on information processing. Attitudes have been shown to have an impact on selective attention, the evaluation of new information, memory recall, and behavior. This research provides insight into how media coverage may lead to juror bias.

Pretrial publicity can have a prejudicial effect on jurors through its impact on the formation of attitudes and beliefs that they bring into the courtroom. Attitudes are not isolated entities but are often linked to other memories, experiences, attitudes, and beliefs. These links can create large networks of attitudes, which are resistant to change. The links between attitudes strengthen with repeated activation. As these links strengthen, the probability increases that the attitudes and underlying beliefs will be consistent with one another and brought to awareness simultaneously. Attitudes that are strongly linked to one another are more easily accessible in memory and more likely to be automatically activated with exposure to the attitude object. Attitudes can be activated automatically without any conscious, intentional processing. This is more likely to occur when an

---

[4] These exclude instances where I have been hired to review a change of venue survey, assist with addressing media coverage during voir dire, or review trial transcripts and pretrial publicity as part of a post-conviction appeal.

[5] Cognition is a term referring to the mental processes involved in gaining knowledge and comprehension, including thinking, knowing, remembering, judging and problem solving.

4

DECLARATION OF BRYAN EDELMAN, PH.D.

attitude has been repeatedly activated in the past.[6]

When media coverage surrounding a case is broad, extensive, and redundant, strong links between relevant attitudes and beliefs begin to form. If the pretrial publicity creates links between case details, attitudes, and beliefs over the course of a trial, these attitudes are likely to be automatically activated at a subconscious level. As described below, this network of linked attitudes can have an impact on a juror's attention to and evaluation of the evidence and arguments presented in court.

As the network of linked attitudes grows and strengthens, specific attitudes become resistant to change because change requires revisions to other attitudes and beliefs within the network. Resistance to revising well-established attitudes has been shown to lead to biased information processing. When attitudes are strong, there is a tendency to favor arguments and information in support of those attitudes over arguments that may disprove them. The acceptance of a counterargument can create cognitive dissonance.[7] In an effort to avoid cognitive dissonance, information that supports attitudes may be selectively attended to and counterarguments may be distorted or dismissed.[8]

Attitudes can also have an impact on attention and recall. Research has shown that information that supports a preexisting attitude is easier to learn, more accurately retained and easier to recall. The links formed between attitudinally supporting information and preexisting attitudes are stronger than those formed between counterarguments and preexisting attitudes. As a result, the latter is more difficult to retrieve from memory. Further, there is a tendency to produce new beliefs, which support preexisting attitudes and suppress those that run counter to such attitudes.

In sum, when a venue is exposed to prejudicial media coverage surrounding a crime, there is a risk that potential jurors will develop a large network of linked attitudes and beliefs relating to the victim, the defendant, and the crime. These linked attitudes include opinions about the guilt of the defendant, appropriate sentence and evaluations of the evidence presented through the media. When the links between attitudes are strong, they can be activated at a subconscious level and have

---

[6] Eagley, A.H., & Chaiken, S. (1993). *The psychology of attitudes.* Florida: Harcourt Brace College Publishers.

[7] Cognitive dissonance is an uncomfortable feeling caused by holding two contradictory ideas simultaneously. People have a motivational drive to reduce dissonance by changing their attitudes, beliefs, and behaviors or by justifying or rationalizing them.

[8] For example, people list more counterarguments for information that refutes preexisting attitudes than information that supports them.

5

DECLARATION OF BRYAN EDELMAN, PH.D.

an impact on jurors' evaluation of the evidence and arguments presented at trial.

Attitudinally supporting arguments will be more closely attended to, evaluated as persuasive, integrated into the existing network of attitudes and beliefs and made easily accessible during deliberations. In contrast, counterarguments and evidence conflicting with well-established attitudes may create cognitive dissonance. As a result, jurors will either ignore this evidence or make cognitive efforts to refute it. This evidence will not establish strong links to preexisting attitudes and will not be easily accessible during deliberations. When a venue has been saturated with pretrial publicity, these psychological processes can put the defendant at a significant disadvantage, undermine the presumption of innocence, and diminish the prosecution's burden of proof.

The prejudicial impact of preexisting attitudes is accentuated by the fact that the media coverage underlying them is often biased in favor of the prosecution. Furthermore, news content is encoded under very different circumstances from those found in the courtroom, because the rules of evidence that are strictly enforced at trial do not apply. As such, the persuasive impact of information presented through the news media becomes more significant and engrained in the juror's mind than the evidence presented at trial.

## IV.    THE PREJUDICIAL IMPACT OF PRETRIAL PUBLICITY

There is a body of research within the social sciences that attempts to address the impact of pretrial publicity on decision-making in the courtroom. This literature suggests that pretrial publicity influences evaluations of the defendant, perceptions of criminality, sympathy toward the defendant, pretrial judgments regarding guilt, and final verdicts.[9]

---

[9] *See* Constantini, E., & King, J. (1980-1981). The partial juror: Correlates and causes of prejudgment. *Law and Society review, 15,* 9-40; DeLuca, A.J. (1979). *Tipping the scales of justice. The effects of pretrial publicity.* Unpublished master's thesis, Iowa State University, Ames; Hvistendahl, J.K. (1979). The effect of placement of biasing information. *Journalism Quarterly, 56,* 863-865; Kline, F.G., & Jess, P.H. (1966). Prejudicial publicity: Its effects on law school mock juries. *Journalism Quarterly, 43,* 113-116; Moran, G. & Cutler, B.L. (1991). The prejudicial impact of pretrial publicity. *Journalism of Applied Social Psychology, 21,* 345-367; Otto, A.L., Penrod, S., & Dexter, H. (1994). The biasing impact of pretrial publicity on juror judgments. *Law and Human Behavior, 18*, 453-470; Padawer-Singer, A. & Barton A.H. (1975). The impact of pretrial publicity on jurors' verdicts. In R.J. Simon (Ed.) *The jury system in America: A critical overview* (pp. 123-139). Beverly Hills, CA: Sage; Simon, R.J., Eimermann, T. (1971). The jury finds not guilty: Another look at media influence on the jury. *Journalism Quarterly, 48,* 343-344; Sue, S., Smith, R.E., & Gilbert, R. (1974). Biasing effect of pretrial publicity on judicial decisions. *Journal of Criminal Justice, 2,* 163-171;Tans, M., & Chaffee, S. (1966). Pretrial publicity and juror prejudice. *Journalism Quarterly, 43,* 647-654.

DECLARATION OF BRYAN EDELMAN, PH.D.

Daftary-Kapur, Penrod, O'Connor, and Wallace (2014) conducted a field study that incorporated real-time evidence into the methodology.[10] Participants included jury-eligible community members who were naturally exposed to pretrial publicity over a 14-month period leading up to the trial. Trial summaries were presented online during six sessions over the course of ten weeks.

The researchers reported a pretrial publicity effect that persisted throughout the actual trial. Despite the admonitions to set-aside prejudicial pretrial publicity, participants were biased by the content of the pretrial publicity. Specifically, those exposed to prosecution-oriented articles were more punitive in their guilty ratings across all six sessions compared to those exposed to pro-defense pretrial publicity. The amount of the pretrial publicity participants were exposed to also had a significant effect. In addition, the biasing effect of pretrial publicity did not disappear over time. Thus, neither delay nor trial evidence eliminated the pretrial publicity effect on judgments of guilt.

Steblay, et al. (1999) conducted a meta-analysis[11] encompassing 44 research studies on pretrial publicity. The authors reported a statistically significant relationship between pretrial publicity and verdicts.[12] Media coverage addressing the defendant's prior record, the existence of confessions, the heinousness of the crime, and negative character of the defendant have all been shown to have an effect on perceptions of guilt and final verdicts. Furthermore, deliberations may not reduce the biasing impact of pretrial publicity.[13] In fact, Kramer, Kerr, and Carroll (1990), found that deliberations actually accentuated the effects of pretrial publicity on final verdicts.[14]

Dexter, Cutler, and Moran (1992) also reported a significant relationship between pretrial publicity and views toward guilt. Participants were given pretrial publicity a week before the study began. Negative pretrial publicity increased conviction rates, even for subjects who underwent

---

[10] Daftary-Kapur, T., Penrod, S.D., O'Connor, M. & Wallace, B. (2014). Examining pretrial publicity in a shadow jury paradigm: Issues of slant, quantity, persistence, and generalizability. *Law and Human Behavior*, 38(5), 462-477.

[11] A meta-analysis is a statistical analysis of several separate but similar experiments or studies in order to test the pooled data for statistical significance.

[12] Steblay, Jasmina Besirevic, Solomon M. Fulero, Belia Jimenez-Lorente. "The Effects of Pretrial Publicity on Juror Verdicts: A Meta-Analytic Review", Law and Human Behavior, vol.23, no.2, pp. 219-235, 1999.

[13] Otto, A.L., Penrod, S. & Dexter, H.R. (1994). The biasing impact of pretrial publicity on juror judgments. *Law and Human Behavior*, 18(4), 452-469.

[14] Kramer, G.P., Kerr, N.L., & Carroll, J.S. (1990). Pretrial publicity, judicial remedies, and jury bias. *Law and Human Behavior,* 14(5), 409-438.

DECLARATION OF BRYAN EDELMAN, PH.D.

IFCD 004851

extensive voir dire addressing pretrial publicity.[15]

As demonstrated by Ruva and McEvoy (2007) exposure to pretrial publicity can influence verdicts by affecting perceptions of defendant credibility, ratings of the prosecuting and defense attorneys, and source attribution errors (i.e., misattributing information learned from the media as evidence presented as trial evidence).[16]

Consistent with the experimental literature on attitudes described above, Hope, Memon, and McGeorge (2004) found that jurors exposed to negative pretrial publicity evaluate pro-prosecution evidence more favorably than its actual probative value, a phenomenon coined "pre-decisional distortion."[17] Thus, attitudes developed from exposure to pretrial publicity serve as a filter through which later trial evidence is evaluated.

In sensational interracial crimes the focus on race can accentuate the salience of in-group and out-group identification among readers. In-group identification can occur at a conscious or subconscious level and makes it more difficult to empathize with members of the out-group. In-group identification is accentuated when there is perceived intergroup conflict. When this occurs, empathy for the in-group can have an influence on how jurors process and weight mitigating evidence.[18]

## V.     EXTENT AND NATURE OF THE MEDIA COVERAGE

There is no threshold for what constitutes excessive pretrial publicity. However, based on my analysis of the newspaper and television coverage, it is my opinion that the jury pool in the United States District Court for the District of South Carolina (Charleston Division) was exposed to massive prejudicial and sensational publicity surrounding the shooting at the Emanuel African Methodist Episcopal Church. Between June 17, 2015, and September 26, 2016, there were approximately **1182** articles published in *The Post and Courier, The Georgetown Times, Charleston Examiner, Beauford Gazette, Bluffton Today, and Hilton Head Island Packet* referencing this crime.

The nature of the coverage is an important factor to consider when weighing the need for

---

[15] Dexter, H., Cutler, B.L., & Moran, G. (1992). A test of voir dire as a remedy for the prejudicial effects of pretrial publicity. *Journal of Applied Social Psychology*, 22, 819-832.
[16] Ruva, C.L., & McEvoy, C. (2008). Negative and positive pretrial publicity affect juror memory and decision-making. *Journal of Experimental Psychology: Applied,* 14(3), 226-235.
[17] Hope, L., Memon, A. & McGeorge, P. (2004). Understanding pretrial publicity: Predecisional distortion of evidence by mock jurors. *Journal of Experimental Psychology: Applied,* 10, 111-119.
[18] Edelman, B. *Racial Prejudice, Juror Empathy, and Sentencing in Death Penalty Cases.* (New York: LFB Scholarly Publishing LLC, 2006).

DECLARATION OF BRYAN EDELMAN, PH.D.

a change of venue. This shooting was described as "one of the worst hate crimes the United States has seen in decades" and the "deadliest hate crime in South Carolina's history." The media continued to accentuate intergroup conflict by focusing on Roof's racist motivation for the attack and putting the shooting of black churchgoers into historical context. There were more than **170** mentions of "racism" and **400** references to the mass shooting as a "hate crime." The AME Church has historical significance in Charleston as a symbol of black resistance, community, and faith. The fact Roof targeted this symbol resulted in additional coverage about the history of racism in South Carolina, the Confederate flag, and the need for change. Examples of this type of coverage include:

- Charleston Police Chief **Greg Mullen** immediately classified the **church massacre** as a **"hate crime,"** a designation echoed by the FBI.

- ...**one of the worst hate crimes** the United States has seen in decades.

- The mass shooting at Emanuel AME – a historic Black church – may have been "**the deadliest hate crime in South Carolina history,"** according to a prominent local historian.

- The persisting **poison of racism** that apparently **sparked [the killer's] barbaric deed**.

- Survivors reported that the gunman "uttered remarks that **betrayed his contempt for blacks**" before opening fire on the prayer group.

- It quickly emerged that **Roof had posed with** "**symbols of white supremacy**" on his jacket – **visual evidence of the racist ideology** behind the attack.

- U.S. **Attorney General Loretta Lynch** declared that **such racist acts** have "no place in a civilized society."

- According to federal court documents, **Roof "was there to kill people because of their race,"** deliberately targeting Emanuel's black congregation.

- A sweeping federal indictment called the church massacre "**one of the deadliest racially motivated hate crimes since the Civil Rights era**," emphasizing that **Roof targeted black worshippers**.

- In announcing federal charges, **Lynch** explained that **Roof sought to "fan racial flames" and "murder African Americans because of their race,"** calling such violence "the original domestic terrorism."

- The murder of nine people at Emanuel AME Church was not terrorism or some sort of perverted assault on religious freedom. **It was hate.**

9

DECLARATION OF BRYAN EDELMAN, PH.D.

- "We will seek the death penalty," she [Governor Nikki Haley] said, vowing "You will absolutely pay the price… **This is pure hate**."

- State Rep. Todd Rutherford pointed to Roof's racist inspiration. "That young man had a **flag on his chest of hatred. He had the flag on his car of hatred. He believed in it, acted on it.** And if South Carolina government is serious about it, we have to take that flag down."

- U.S. Sen. Tim Scott underscored that the Charleston massacre was **"born of hatred and racism."**

- On national television, Sen. Tim Scott reinforced the point, calling the nine killings **"obviously a case of racism.**" The shooter, he said, was **"driven by hatred. And that is the clear and dominant reason this happened."**

- Charleston Mayor Joseph Riley acknowledged the racist intent as well, saying the shooter **"had this crazy idea that he would divide us**."

- **Cornell William Brooks**, President and CEO of the NAACP, lamented "**another mass hate crime**." "The NAACP was founded to fight against racial hatred," he said, "**and we are outraged that 106 years later, we are faced today with another mass hate crime**."

- Even a group cited in Roof's own manifesto acknowledged his motives. The **Council of Conservative Citizens** stated, "The **shooter was targeting blacks out of racial hatred...The loss of nine lives is devastating**."

- President Barack Obama noted that the shooting "**stirred up a dark part**" of American history – an era when **racially motivated violence** was far more prevalent.

- Federal prosecutors later alleged that **Roof chose his victims because of their race and in order to interfere with their exercise of their religion.** As one columnist dryly observed, "**Not that the motive had ever been in doubt.**"

- A young white man accused of killing nine black worshippers at Bible study – **fit the profile of a hate-fueled lone wolf extremist, essentially a homegrown racist terrorist.**

- Authorities believe Roof acted alone but grew increasingly violent by immersing himself in **hate-based, racist literature**, highlighting how **white-supremacist propaganda fueled his actions**.

- **The evil one wanted a race war.**

10

DECLARATION OF BRYAN EDELMAN, PH.D.

- Dylann Roof, the white man who **claimed he wanted to start a race war when he killed nine black parishioners** at Emanuel AME Church, was ambushed Thursday by a black inmate.

- The public's first glimpse of Roof after his arrest was him smiling as he was escorted by officers—**a chilling image confirming his lack of remorse**

- Roof, the self-declared **white supremacist** who gunned down **nine black parishioners at Emanuel AME Church.**

- Roof, who has shown **interest in racial segregation and the Confederacy,** was caught during a traffic stop.

- Dylann Roof penned a **handwritten manifesto before his hate-driven attack** on Emanuel AME Church and **drafted another from his jail cell after his arrest.**

- If you have a **CSA [Confederate] tag** on your car, walk into a **black church** and kill nine people, yes, **that might qualify as racist in most people's opinion**.

- If the shooters are motivated by **racial animosity**…an **attack at a black church holds a strong symbolic attraction**.

- Charleston officials said from the beginning that this **horror appeared to be a hate crime.**

- Roof…killed nine **black parishioners because of their race.**

- "Where is our country going?" Donna Lea Needham, 83, of Sanford, Fla., said as she cried. "**How many times is hatred going to cause this kind of sorrow? This has gone on for long enough**."

- You know the shock and **pain of this crime of hate strikes deep**. Nine people—women and men—**cut down at prayer. Murdered in a house of God.** It just broke my heart [Hillary Clinton].

- And quoting a friend of Dylann Roof, the network reported that the **goal was to ignite a race war.** It's just more evidence about **Dylann Roof's deluded world view**.

- Others say the shooting was only the **latest (particularly horrific) act of violence against blacks,** and they are calling for a public discussion, a reckoning that might lead to reconciliation.

- **White people may be able to sustain the fiction that these are isolated incidents. But black people cannot.** Our lives depend on recognizing the truth.

- "Hate crimes **reverberate through the community** because they **attack us along**

11

DECLARATION OF BRYAN EDELMAN, PH.D.

**traditional fault lines** in this country, race in particular," said Southern Poverty Law Center President Richard Cohen.

- **Black churches have been targets because of their symbolism**. Black churches have been a **source of activism** in our country and they have been **targets of those with hate in their hearts** and those trying to turn back the clock.

The media linked the targeting of the oldest African Methodist Episcopal church in the South to broader historical racial struggles in America and South Carolina. The coverage continued to accentuate intergroup conflict and in-group identification. When this occurs the media can generate pressure on a jury to render a verdict that will satisfy the community's demand for justice. Examples of this type of reporting include:

- Dylann Roof's actions should serve as **a wake-up call in the ongoing struggle for racial justice**.
- This tragedy is a **painful reminder that Black lives are still under attack in America.**
- **Charleston** is forced to ask itself**: What role has our city played in fostering a climate where this could happen**?
- The fight to bring Roof to justice is **part of a larger battle against white supremacy in America.**
- We cannot separate the **Charleston church shooting from the protests in Ferguson and Baltimore**.
- As families mourn, **activists call for action—on gun laws, hate crime statutes, and systemic racism.**
- This massacre **has reignited the debate over whether the Confederate flag should fly at the South Carolina Statehouse.**
- **The Charleston shooting and the killing of Walter Scott are stark reminders of racial injustice in South Carolina.**
- **Removing the Confederate flag is just the first step**—real change must follow.
- **Charleston's response** to this tragedy will **define how seriously America takes the fight against hate.**
- **Charleston's response to this crime will define its place in history.**

The government charged Dylann Roof with a hate crime, which requires proof that the

Ex. 55 pg.12 of 41                                                                IFCD 004856

crime was committed because of the victims' race. As such, a key question for the jury to decide would be whether the shooting was motivated by racial animus. However, the media left little doubt as to Dylann Roof's underlying motive. The jury pool was inundated with details surrounding his racist beliefs and statements. It quoted heavily from his internet activity and lengthy online manifesto. By treating Roof's racist motives as an established fact rather than a question for the jury to consider, the media eliminated any ambiguity that might otherwise allow jurors to consider alternative interpretations of his actions. Examples of this type of reporting include:

- Dylann Roof entered Emanuel AME Church with a **singular purpose: to kill Black worshippers** in a **racist rampage.**

- Roof's manifesto leaves **no doubt**—he was **fueled by white supremacist ideology**.

- This attack was premeditated, deliberate, and **explicitly racist.**

- Roof told his victims, "You rape our women, and **you're taking over our country**" before opening fire.

- **Black people are taking over the country.**

- I have to **do something for the white race.**

- I **chose Charleston** because it is the **most historic city in my state, and at one time had the highest ratio of Blacks to Whites** in the country.

- I **chose the Emmanuel Church because it is a historic black church**.

- Everything about this attack, from its location to its victims, was **designed to send a racist message**.

- The suspect is not just a killer—**he is a white supremacist who wanted to start a race war**.

- Roof meticulously planned this massacre **as an act of racial terror**

- Legal experts say his **racist motives are 'beyond question'** and will be central to the prosecution's case.

- Dylann Roof left behind a **chilling manifesto** in which he detailed his **deep hatred for Black Americans**.

- His goal was clear: to **kill as many Black people as possible**.
  "The evidence **overwhelmingly shows** that Roof **wanted to terrorize the Black community**."

- His crime was not random—it was a **carefully calculated act of racial violence**.

13

DECLARATION OF BRYAN EDELMAN, PH.D.

IFCD 004857

- The shooter was **radicalized by racist propaganda** before carrying out his attack.

- Experts say his crime **follows the pattern of past white supremacist attacks**.

- This was not just a crime—it was an **act of racial terrorism**.

- His **statements**, both before and after the attack, leave no doubt that he was **motivated by hate**.

- The **racial component of this crime is inescapable**, say legal analysts.

- Roof's actions **mirrored the attacks of white supremacists** throughout history.

- The evidence against Roof doesn't just show guilt—**it shows intent, hatred, and a deep-seated ideology**.

- **Blacks are the biggest problem for Americans**.

- Jews, Hispanics, and East Asians are also problems, **but blacks are the biggest threat**.

- **Segregation was not a bad thing. It was a good thing**.

- From the very beginning, this was a **hate crime**—there is **no other explanation**.

- "Some people feel as though the South is beyond saving, **that we have too many blacks here,**" the document attributed to Roof states. "To this I say look at history. **The South had a higher ratio of blacks when we were holding them as slaves**."

- A **photo on the home page** shows a scene from the movie "Romper Stomper," which tells the **story of a gang of violent neo-Nazis in Australia**.

- Another photo shows Roof wearing a **T-shirt with the numerals** "88" — **a hate group reference to HH, or Heil Hitler**.

- I **wanted to start a race war.**

- "I hate the sight of the American flag," the website attributed to Roof states. "Modern American patriotism is an absolute joke. **People pretending like they have something to be proud while white people are being murdered daily in the streets**."

- On the website, the author bemoans that, "**We have no skinheads, no real KKK**, no one doing anything but talking on the Internet. **Well someone has to have the bravery** to **take it to the real world**, and I **guess that has to be me**."

- A **vanity plate** on the front says, "**Confederate States of America**."

- "I have no choice. I am not in the position to, alone, **go into the ghetto and fight**. "I **chose Charleston because it is most historic city in my state, and at one time had the highest ratio of blacks to Whites** in the country."

14

DECLARATION OF BRYAN EDELMAN, PH.D.

- **Roof allegedly confessed to police** in an audio recording, saying he **intended to start a race war.**
- In a **haunting conclusion, the manifesto** then says, "**Well** s**omeone has to have the bravery to take it to the real world, and I guess that has to be me**."
- "It is far from being too late for America or Europe," the **manifesto** stated. "**We could take it back completely**."

Edelman (2006) developed and tested a model of juror behavior in capital cases designed to explain race-of-victim effects found in sentencing decisions. The model was built around a victim evaluation process largely influenced by empathy and in-group identification. When a juror exhibits strong empathy toward a victim, they are more likely to see him or her as similar to themselves on important self-relevant attributes.

The model was tested using data derived from interviews with over 300 capital jurors collected by the Capital Jury Project. Empathy was found to have an effect on how jurors used mitigating evidence. Mitigating evidence was more likely to be rejected or used as aggravating evidence when victim empathy was high. The media's focus on the interracial nature of this crime and Roof's motivation to kill black people to start a race war increased the risk that prospective jurors in the Charleston Division would be less likely to seriously consider mitigation evidence or a life sentence.

The media also amplified public outrage and in-group identification by regularly incorporating negative descriptors of the defendant and emotionally charged language likely to evoke fear, disgust, and anger. This type of reporting—which has been demonstrated in the social science literature to be particularly prejudicial—helps to form a negative cognitive schema of Dylann Roof. When this occurs, jurors are less willing to closely attend to mitigation evidence that justifies a life sentence and is inconsistent with their strongly held impressions of the defendant as an irredeemable killer. Examples of this type of coverage includes:

- Roof carried out this act of **pure evil** with **cold calculation**.
- The massacre at Mother Emanuel AME Church was one of the **most chilling acts of domestic terrorism in modern history**.
- He is a **monster** who showed **no mercy** to his victims.
- The suspect **showed no remorse and smiled after his arrest**.
- His crime was **not just an act of murder**—it was an **attempt to spread terror**.
- Roof's own words reveal a **deep-seated hatred that cannot be excused**.

IFCD 004859

- His manifesto is a **chilling window** into the **mind of a racist killer**.

- The nation watched in **horror** as the details of Roof's **gruesome attack** emerged.

- A calculated, premeditated **bloodbath designed to instill fear**.

- Roof's actions were an **assault on the very fabric of this country**.

- A **horrific, racist slaughter** that **should never be forgiven**.

- There can be **no justification, no sympathy, no mercy**.

- Roof's crime was a **direct attack on the ideals of equality and justice**.

- He carried out his crimes with a **level of cruelty that defies comprehension**.

- A **deliberate execution of innocent people in their place of worship**.

- Roof's plan was **methodical, merciless, and unmistakably racist**.

- The **chilling final words he spoke before killing his victims haunt** the nation.

- This was **not just a hate crime**—this was **an act of war**.

- **No punishment could fully atone for the horror of this crime**.

- **Completely evil young man** who will pay for what he has done.

- He wanted infamy, and he got it — **as a monster.**

- Could we postpone final capitulation [on ending the death penalty] until after we **dispose of the wretched Roof**.

- **This was a very deranged, very demented, very confused and completely evil** young man who will pay for what he has done.

- **The murderous punk** who did this was born and **spoon-fed bigoted beliefs.**

- He is the archetype of the **dangerous right-wing white boy**

- **A diatribe of hatred.**

- **He said he wanted to start a civil war.**

- If any **peckerwood** thought he was better than those fine people, well, perhaps he was mentally ill.

- Roof is the embodiment of a **white supremacist terrorist.**

- He was a **dropout** with **no job**, **no driver's license**, and **stayed in his room** a lot of the time.

- Roof is not from our community.

In contrast to the dehumanization of the defendant as a racist monster which was likely to generate antipathy and anger amongst prospective jurors, the coverage surrounding the victims

had the capacity to generate a tremendous empathy. This type of reporting can have a significant impact on how jurors evaluate aggravating and mitigating evidence. Examples of this type of reporting include:

- You were a **better mother** than I could have ever asked for. **This has truly broken my heart** in every way possible.

- Our eyes connected, and **she could see what I was going through**. She **could see through your pain**.

- **So angelic** it could move the **very depth of your heart**...How do **you describe an angel**?

- She was a **loving person**. She never had **no animosity toward nobody**. **She took in others**. She was just that type of person.

- We all **want to feel like we're so strong**. But if you're going to be real with yourself, we're not. **We're not strong**.

- **You lost your mother**. **She was your world.** How **I wish I could undo your pain**… Each day we live a legacy, **your mother's changed the world**.

- He **was so awesome,** I told him that so much he'd start saying it first just to stop me.

- **His smile gave it away**. That **quality about him that engaged people**

- She was a **bulldog when it came to her kids**… **She cared about her kids**. She was a true team player.

- There are few things in society that **remind us we were all made by the same hand**, and **one of those things is when your heart is hurting**.

- To go to church with your dad and **not be able to leave with him**, **that's different. Out of someone being hateful**.

- She was the **one always standing in the back**, **helping out**, doing the little things nobody notices — **but everybody depends on.**

- She **loved baseball and loved Chris**. She l**oved everyone and always had a positive attitude about everything**.

- He **loved his mother so much he tattooed her name across his chest** as she fought cancer.

- He **was remembered for a majestic and contagious smile** few people have.

- When people say "pray for me," **she would stop and pray right there instead.**

---

17

DECLARATION OF BRYAN EDELMAN, PH.D.

- **She was a mother to so, so many**, this matriarch of the Jackson family.
- Hate is taught**. My aunt was a loving person. She never taught us hate**.
- His **voice was so deep because he was speaking for so many people**.
- His **death leaves a void** no election can fill and **no eulogy can do justice.**
- I'm **going to miss her every fiber, every inch, every molecule of her being**.

The coverage often focused on restoring justice to the community and amplified voices calling for Dylan Roof to receive the death penalty. By emphasizing the victims' loss and emotional pain—coupled with the collective pain this shooting created in the community—the coverage helped create a moral imperative for retribution. The pretrial publicity was replete with details and stories about the victims' lives and families, their contributions to the community, and their funerals. The media also quoted from victim impact statements, some of which called for Roof to receive the death penalty. The coverage frequently equated justice with execution and rejected a life sentence as a failure of the justice system. This type of reporting puts implicit pressure on jurors to reach the "correct" verdict to help heal the community. Examples of this type of coverage include:

- Roof's crimes are so **depraved, so racially charged, that no punishment but death** would suffice.
- There can be no forgiveness without justice, and **justice demands the ultimate penalty.**
- Legal experts agree**:** if ever there **was a case that calls for the death penalty, this is it.**
- The families of the victims **deserve closure,** and that closure **can only come with a death sentence.**
- If the **death penalty is not warranted for Dylann Roof**, then **when would it ever be** appropriate?
- This trial is not just about punishing Roof—**it is about sending a message that this kind of crime will not be tolerated**
- **The eyes of the nation are on Charleston** to see if our justice system **will respond appropriately.**
- **A death sentence** is the only way to **ensure that justice is served.**
- And **if the appalling killing of nine people in a Bible Study** at Charleston's Mother Emanuel AME Church **doesn't qualify for that sentence, what barbaric act could?**

18

DECLARATION OF BRYAN EDELMAN, PH.D.

- **Any juror who chooses life** without parole **over the death penalty would be ignoring the gravity of this crime.**

- **Executions exist for cases like this—justice demands it.**

- **If a jury spares Roof, what does that say about our commitment to justice?**

- **The community will not feel safe knowing that Roof is still alive,** even in prison

- Some crimes are so evil that **mercy is not an option.**

- The **only way to truly honor** the victims is to **ensure Roof never takes another breath.**

- Survivors and families have waited long enough**—justice must be served through execution.**

- **Charleston must show** that it will not tolerate this kind of hate, **and that starts with a death sentence.**

- The city **will not heal** until **Roof is gone.**

- **A death sentence is not just about punishing Roof**—it is about reaffirming our values as a society.

- **Anything less than the death penalty would be an insult to** the memory of the victims.

- This case is about more than one man—**it is about what we as a society will tolerate.**

- **"We will absolutely want him to have the death penalty,"** Governor Haley said in a televised interview, labeling the crime "pure hate".

- **State Representative Chip Limehouse** publicly **expressed hope for the death penalty** in Roof's case, describing the shooter as "completely evil" who "will pay for what he has done."

- Arthur Hurd said he **won't be at peace until Dylan Roof is put to death**…When **Roof's body is cold, sleeping in the ground — that's closure**.

- **The families** of the victims have suffered enough—**now** they **deserve justice.**

- **No parent should ever have to bury their child** because of hate. **Roof deserves no mercy.**

- **The victims' families deserve to know that Roof will never hurt anyone again**

- The courtroom was filled with tears as **families listened to the gruesome details.**

- For **the families** left behind, **anything less than a death sentence would be another**

19

DECLARATION OF BRYAN EDELMAN, PH.D.

IFCD 004863

wound.

- **Justice demands that the families' pain be recognized and their wishes honored.**
- **There is no punishment severe enough to undo their suffering,** but the courts must do what they can.
- **A death sentence** is not just about punishing Roof—**it is about giving these families the closure they deserve.**
- **The weight of the families' grief hangs over this trial**—justice must reflect that.

In conclusion, the extent and nature of the pretrial publicity posed a substantial risk to Mr. Roof's due process rights during the leadup to trial. A June 2016 survey conducted by the University of South Carolina's Institute for Public Policy Research offered some insight into the impact of the coverage on prospective jurors. The survey interviewed 800 people from across the State a year after the mass shooting. According to the report, almost 75% of respondents remembered "a great deal" about the shooting. However, location had an impact on how much survey respondents recalled. Those living Upstate were less likely (67%) to say they remembered "a great deal" about the shooting compared to those from the Midlands (75%) or the Lowcountry (79%) where the shooting occurred. In addition, the majority (55%) reported that Roof should receive the death penalty if convicted.

Given the extent and nature of the coverage, coupled with the available survey data demonstrating that the media had a negative impact on prospective jurors, defense counsel should have retained an expert to conduct a community attitude survey. This basic step would have provided valuable data and insight—in addition to the extensive prejudicial coverage—to support a change of venue or transfer to another division within the District. In almost all cases, it is considered a necessary step to support a change of venue or request for improved voir dire conditions. The failure to do so made it necessary to completely rely on voir dire as a remedy for identifying and ferreting out bias within a community calling for the death penalty to balance the scales of justice.

## VI.    ABILITY TO SELECT A FAIR AND IMPARTIAL JURY IN VENUES SATURATED WITH MEDIA COVERAGE

When a jury pool has been inundated with media coverage, the trial court and parties are faced with unique challenges, which are not present in most cases. In high profile cases, many prospective jurors enter the courtroom with extensive knowledge and attitudes about the case, defendant, and victim. However, it is often difficult for prospective jurors to predict how case-

    IFCD 004864

specific knowledge and opinions may affect them over the course of a trial. Prospective jurors may also unintentionally omit exposure to specific media items during voir dire when asked what they recall hearing about the case. These items, however, may become salient and recalled from memory once witness testimony begins. The research also shows that information learned from media exposure can be misattributed as evidence presented at trial.[19]

Given these factors, it is important to ferret out during voir dire the full extent of exposure to pretrial publicity, case-specific attitudes, impressions of the defendants, and potential motivations to serve. However, the prejudicial effects of preexisting attitudes can occur at both a conscious and subconscious level, meaning jurors who profess impartiality may not be fully aware of their bias or how it may affect them as the trial unfolds. This can make it difficult to identify potential prejudice during the jury selection process. The Supreme Court has recognized the limitations of the voir dire process as a remedy where potentially prejudicial pretrial publicity is an issue. In *Irvin v. Dowd*, the Court concluded:

> No doubt, each juror was sincere when he said that he would be fair and impartial to petitioner, but the psychological impact requiring such a declaration before one's fellows is often its father. Where so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight. As one of the jurors put it, "You can't forget what you hear and see." With his life at stake, it is not requiring too much that petitioner be tried in an atmosphere undisturbed by so huge a wave of public passion and by a jury other than one in which two-thirds of the members admit, before hearing any testimony, to possessing a belief in his guilt.[20]

Research on voir dire shows that these concerns are justified. Jurors are often reluctant to disclose relevant experiences, relationships or opinions that may lead to bias, even when pretrial publicity is not an issue. One study found that while 71% of jurors had a fixed opinion regarding guilt, only 15% admitted so during the voir dire.[21] Marshall obtained questionnaires from 277 former jurors in two counties and found that 18% of those jurors admitted to withholding

---

[19] Ruva, C.L., & McEvoy, C. (2008). Negative and positive pretrial publicity affect juror memory and decision-
making. *Journal of Experimental Psychology: Applied,* 14(3), 226-35.
[20] *Irvin v. Dowd*, 366 U.S. 717, 727-28 (1960).
[21] Fahringer, H.P. (1980). In the valley of the blind: A primer on jury selection in a criminal case. *Law and Contemporary Problems,* 43, 116-36.

21

DECLARATION OF BRYAN EDELMAN, PH.D.

information during voir dire.[22] Seltzer reported that approximately 39% of jurors who were interviewed after trial should have come forward in response to questions regarding crime victimization or knowledge of police officers during jury selection, but failed to do so.[23]

Many aspects of the large group voir dire format deter juror candor. Federal Court Judge Gregory Mize published his findings after experimenting with an expanded voir dire procedure in 30 federal criminal trials over a nine-month period, which included individual interviews with every venire member who failed to respond to his general opening questions. Judge Mize reported that approximately 28% of members of each panel failed to respond to the dozens of questions posed in open court, an average of about 16 people per trial. However, when questioned in private, one in five of these silent jurors disclosed personal information that was relevant to the case. In 90% of the trials, between one and four of these silent jurors expressed bias that led to their removal for cause.[24]

These trends are often found when sensitive or traumatic experiences are an issue in the case. For example, in *State of Nevada v. James Michael Biela*, a panel member did not raise her hand when the group was asked if anyone had ever been the victim of crime. However, she privately raised the issue on the second day of jury selection outside the presence of other jurors. She and her husband had been kidnapped and left in the desert. This was a traumatizing experience that she did not want to discuss in front of the entire panel:[25]

> JUROR: I just wanted to tell you my story. About 15 years ago my husband and I were kidnapped…And if I can be excused for not being in the case. That's all I have to say.
>
> LESLIE: **Did you hear the question yesterday** when the judge asked if anybody had been the **victim of a crime**?
>
> JUROR: **Yes, I heard it. I heard it**, but like I told him, I don't want to—**I didn't want to remember that bad time**, because I forgive – I forget—I forgive but not forget. And I **didn't want to bring it back again**. It's hurting me.

A search of appellate opinions shows that juror disclosure has led to several mistrials by

---

[22] Marshall, L.L. (1983). Juror, judge and counsel perceptions of voir dire. Ph.D. dissertation, Boston University.

[23] Seltzer, R. (1991). Juror honesty during the voir dire. *Journal of Criminal justice*, 19, 451.462.

[24] Mize, G.E. (1999). On better jury selection: Spotting UFO jurors before they enter the jury room, *Connecticut Review Spring,* 33.

[25] 010.05.11, Voir Dire Transcript – Day 2, p. 434(5-24); 437(24)-439(16).

DECLARATION OF BRYAN EDELMAN, PH.D.

undermining a defendant's fair trial rights. For example, in *U.S. v. Colombo*, 869 F.2d 149 (2d Cir. 1989), a juror failed to disclose when asked during voir dire that her brother-in-law was a lawyer for the government. She did not mention this fact because she wanted to sit on the jury for the case. In *Dyer v. Calderon*, 151 F.3d 970 (9th Cir. 1998), a juror answered "no" when the panel was asked if anyone had ever been the victim of a crime. After the guilt phase, the defense learned that her brother had been shot and killed six years earlier. When questioned, she told the judge that she answered "no" because she, "thought the shooting was an accident, not a crime." Her brother had been pistol-whipped four times and shot in the back of the head.

Problems such as these have also been reported in high profile cases. For example, in the 2012 murder trial of Matthew Stebbins, who had been charged in a shooting death at a homeless shelter, a mistrial was declared after a juror announced during deliberations that she had a previous issue with violent crime. One of her children had been shot in the head. She failed to raise her hand during jury selection when asked if anyone had been a victim of a violent crime. According to her, "she did not think it was going to be an issue."[26]

Prospective jurors in cases with extensive media coverage enter the courtroom with case-specific knowledge gleaned from the media, social media, and discussions with friends, family members, and co-workers. Uncovering the full extent of jurors' case-specific knowledge and opinions in high profile cases can be extremely difficult. Jury selection as a judicial remedy to address such bias relies on two factors: 1) that jurors can access their source of bias and 2) are willing to report it. In one study where researchers tested the effectiveness of extended voir dire, participants in the experimental condition were exposed to pretrial publicity a week before the experiment.[27] Prior to viewing a trial, they were subjected to minimal or extended voir dire. The attorney in the extended voir dire condition explained how pretrial publicity may inappropriately impact decision-making, asked jurors to hold each other accountable for not discussing pretrial publicity, obtained public commitments to base their verdict solely on the evidence presented in court, and to ensure that fellow jurors did the same. The researchers ultimately found that educating jurors on the potential impact of pretrial publicity did not eliminate the effects of pretrial publicity.

High profile cases also create a unique challenge during jury selection known as the

---

[26] Villarreal, M. (2012, March 12). Judge declares mistrial in Corpus Christi murder case. *Corpus Christi Caller Times*. Retrieved February 10, 2015, from http://www.caller.com/news/local-news/crime/judge-declares-mistrial-in-corpus-christi-murder.

[27] Dexter, H. R., Cutler, B. L., & Moran, G. (1992). A test of voir dire as a remedy for the prejudicial effects of pretrial publicity. *Journal of Applied Social Psychology*, 22, 819-32.

"minimization effect."[28] This concept refers to prospective jurors' attempts to minimize the full extent of their exposure to pretrial publicity. During voir dire, prospective jurors try to downplay their knowledge of the case using qualifiers such as, "just," "nothing other than," "only," "a little bit," and "that's all." In an archival study that analyzed the jury selection transcripts from five high profile cases, 69% of prospective jurors used minimization language when questioned by the judge or attorneys.[29]

Another challenge in cases with significant media coverage surrounds the difficulty jurors have during voir dire to recall every detail they have read, seen, or heard about a case. These types of open-ended "recall" questions require significant cognitive effort and often result in incomplete recollection. This phenomenon is an inherent limitation in how memory works. For example, if someone is asked to recall everything they know about the movie *Star Wars,* their description would likely miss important details they are familiar with. Memory is much more accurate when answering "recognition" questions: *Have you read, seen or heard if Darth Vader was Luke Skywalker's father?*

This concern is not mere speculation. In a 2017 change of venue hearing in Texas, community residents exposed to detailed pretrial publicity over a number of years were called as witnesses.[30]  During the hearing they were asked to recall everything they knew about the case. Following the "recall" question, they were asked a number of "recognition" questions about specific prejudicial and potentially inadmissible media items they failed to mention.  The hearing demonstrated the limitations in memory [Emphasis added]:

Q. Can you tell the Court the facts that you know about the State of Texas versus John Feit as it relates to Irene Garza?

A. [Description of basic facts]

Q. Is that it?

A. **Let's see. I believe so.**

Q. Now, Ms. Perez, have you read, seen, or heard about John Feit **giving a confession to a priest**?

A. **Yes.**

---

[28] Bronson, E. (1989). The effectiveness of *voir dire* in Discovering Prejudice in High Publicity Cases: An Archival Study of The Minimization Effect.

[29] Edelman, B., Dahir, V.B., & Dillehay, R. (2011). Paper presented at the meeting of the American Society of Trial Consultants.

[30] *State of Texas v. John Feit*, CR-0464-16-A (2017).

IFCD 004868

Q. **And you didn't mention that a few minutes ago?**

A. I'm sorry. **There were two that I remember. They mentioned that there were two confessions that he made to two priests.**

Q. Okay. Have you read, seen, or heard about whether or not Ms. Irene Garza **was alleged to have been raped?**

A. **I read, yes.**

Q. Now having refreshed your memory a few minutes ago, **are there any other facts that you have read, seen, or heard that you haven't told the Court about**?

A. **I don't believe so.**

Q. Okay. Have your read, seen, or heard that **John Feit was transferred to a monastery after this**?

A. **I did read that, yes.**

This limitation in memory recall has been demonstrated in a number of high profile cases around the country. For example, in a change of venue survey in Sonora, California, 95% of survey respondents recognized at least one additional detail reported in the media from the closed-ended recognition questions that they failed to mention in the open-ended recall question. A near identical trend (96%) was found in another high profile case in Nashville, Tennessee.[31] For example, when asked, "What have you read, seen, or heard about the case," one respondent answered, "Bits and pieces on the news. They were just talking about the case." However, he later recognized several media items including that: 1) the shooting was captured on video by surveillance cameras in the area and played on the television news and internet; and 2) the public approved a ballot measure in the last election to create a community oversight board to monitor the Metro Nashville Police Department. Both were prejudicial items widely reported in the media.

A similar pattern was found in *State of Idaho v. Bryan Kohberger*. When asked what they have read, seen, or heard about the case, Latah County survey respondents reported an average of just **1.6** details. However, **96%** of survey respondents later recognized at least one additional media item they failed to mention in their open-ended answer and recognized an average of **4.9** additional media items. Many survey respondents used "minimization language" or incomplete responses when asked what they knew about the case. Most of these prospective jurors later recognized items widely reported in the media and tested in the survey (see table below). For example, just eight

---

[31] *State of Tennessee v. Andrew Delke*, Case No. 2019-A-26 and *People of the State of California v. Diane Anderson*, Case No.: CRF53011.

DECLARATION OF BRYAN EDELMAN, PH.D.

percent (**8%**) of Latah County survey respondents mentioned that police found a knife sheath near one of victims when asked the standard open-ended recall question. However, **81%** later recognized this media item when asked: *Have you read, seen, or heard if police found a knife sheath on the bed next to one of the victims?* This finding is particularly concerning given that **72%** of survey respondents familiar with this media item believe that Bryan Kohberger is guilty of murder, and **55%** reported that he would have a difficult time convincing them otherwise.

A similar pattern was found with other prejudicial media items, some of which were inaccurately reported by the press. For example, only three percent (**3%**) of Latah County survey respondents mentioned that Bryan Kohberger had stalked one of the victims when asked what they knew about the case. However, **45%** later recognized this media item when asked: *Have you read, seen, or heard if Bryan Kohberger stalked one of the victims?* The failure to recall this detail from memory when responding to an open-ended question is concerning given that it is significantly related to bias. Approximately **81%** of survey respondents who later recognized this media item believe that Kohberger is guilty.

| What have you read, seen, or heard about these events? [recognized the case] | Number of media items recognized | Have you read, seen, or heard if Bryan Kohberger stalked one of the victims? |
|---|---|---|
| Nothing that I can think of at the moment. | 9 of 9 | Yes |
| Just what has been on the TV and the papers. | 9 of 9 | Yes |
| He has been arrested and the house has been torn down. | 9 of 9 | Yes |
| That he was arrested so far and they are still working on the trial. | 9 of 9 | Yes |
| Just what I have read and seen on the news and newspapers. | 9 of 9 | Yes |
| The trial will not be until next year. | 9 of 9 | Yes |
| Just the basics of what happened that he killed four students. | 8 of 9 | Yes |
| Read articles about the case. | 8 of 9 | Yes |
| The things that come up online. | 8 of 9 | No |
| The case has been getting delayed. | 8 of 9 | Yes |
| On television | 8 of 9 | Yes |
| Mostly what's been on the news and social media. | 7 of 9 | No |
| That he murdered four people | 7 of 9 | Yes |
| I remember the general details that are being reported in the news. | 7 of 9 | No |
| Basically, I know that particulars and some of the various things that have happened around the way. I have avoided a lot of talk about it. | 7 of 9 | Yes |
| Just what I read in the paper, same as everyone else. | 7 of 9 | No |
| I am aware of the murders. | 7 of 9 | Yes |
| I saw all the reports about this case on the news and in the local newspapers. I just saw and heard the basics. | 6 of 9 | No |
| What I heard on the radio. | 6 of 9 | Yes |

26

DECLARATION OF BRYAN EDELMAN, PH.D.

IFCD 004870

| | | |
|---|---|---|
| What was in the newspaper. | 6 of 9 | No |
| I haven't heard anything new, just what I've heard and seen on the news. The rest is just rumors and speculation. | 6 of 9 | No |
| Just the basics from what I saw and heard on our local news. | 6 of 9 | No |
| They arrested him for murder. | 6 of 9 | No |
| Just what was on the news, and YouTube. Just followed along. | 6 of 9 | No |
| Just evidence in the media. | 6 of 9 | Yes |
| Not a whole lot, only what has been on the news. | 6 of 9 | Yes |
| Just what has been on the news. | 5 of 9 | No |
| **AVERAGE** | **4.9** | - |

The inability to provide a full account of everything a juror knows about a case puts the defendant in an untenable position. Counsel must choose to either rely on an open-ended question—known to generate incomplete recall—or ask media specific recognition questions, which are more diagnostic but risk exposing prospective jurors to extrajudicial information they may not be familiar with.

Prospective jurors' inability to recall the full extent of their exposure to pretrial publicity can undermine the value of voir dire as a corrective measure for identifying and ferreting out bias in high-profile cases. If jurors are unable to fully recall from memory their detailed knowledge about a case when asked an open-ended question, it makes it difficult for counsel to effectively exercise challenges. This problem is exacerbated when there is extensive reporting around inadmissible content or disputed facts. Incomplete recall also poses a problem for the trial court when exercising its discretion to weigh prospective jurors' self-reports about their ability to be fair and impartial and rule on cause challenges.

This predicament is compounded by research, which suggests that professions of impartiality should not always be taken at face value. Part of the challenge media coverage presents surrounds jurors' efforts to guess how exposure to pretrial publicity may affect their evaluations of the evidence. Given the difficulties that such a guess poses, it is not surprising that claims of impartiality in high-profile cases have been shown to be unreliable. A study on the prejudicial impact of pretrial publicity found that 62% of jury-eligible residents said they could be fair and impartial and decide the case solely on the basis of the evidence presented. However, only 39% said they could put knowledge of the media out of his or her mind.[32]

_____

[32] Moran, C., & Cutler, B.L. (1991). The prejudicial impact of pretrial publicity. *Journal of Applied Social Psychology*, 21(5), 345-67.

DECLARATION OF BRYAN EDELMAN, PH.D.

Another obstacle is the well-documented tendency for individuals to respond in a manner that will be viewed favorably by others, which has been coined the "social desirability" effect. This phenomenon has been researched and found in a multitude of disciplinary settings, including the courtroom. Socially desirable responses are more likely to occur when individuals become focused on the public aspects of themselves. Public awareness of oneself can become particularly salient in a courtroom setting where prospective jurors are asked questions by an authority figure in front of a public audience. Jones, for example, reported that participants appeared to alter their answers to reflect what they thought a judge wanted to hear rather than what they actually thought.[33] When potential jurors learn through the jury selection process that the law requires them to be fair and impartial, there is a risk that they will overstate their ability to set aside their knowledge and beliefs in order to create a favorable public impression.

Also referred to as response bias and demand characteristics, the effect causes the juror (interviewee) to pick up the subtle and overt clues as to what a lawyer or judge (interviewer) wants to hear. During voir dire a clear, strong message is often sent to prospective jurors: good jurors are not supposed to have prejudicial information or biases about the case. If they do, then they should set them aside and decide the case solely on the law and the evidence presented in court.[34] When this is established, many prospective jurors will adjust their public statements to meet to these courtroom norms.

The social desirability effect is found even in instances when the jury pool has been exposed to extreme forms of prejudicial media coverage. In *Rideau*, the jury pool was exposed to a taped 20-minute interview in the jail between the defendant and Sheriff.[35] In the interrogation, the defendant confessed to the murder of three people during a bank robbery. A soundtrack was added to the recording and the interview aired three times on television within a few months leading up

---

[33] Jones, S. (1987). Judge versus attorney conducted voir dire: An empirical investigation of juror candor. *Law and Human Behavior,* 11(2), 131-46. Responses were inconsistent with what had been reported earlier in a questionnaire.

[34] The same "good citizen" impulse leads a number of respondents in telephone surveys to claim that they are registered to vote when in fact they are not. Silver, B., et al., "Who Overreports Voting?" 80 American Political Science Review 613 (1986). Book publishers have long said that if survey respondents had actually read all the books they reported having read recently when they are surveyed, the book publishing business would be the most profitable business in the country. These effects, in response to an anonymous telephone pollster, are amplified in the presence of real authority figures in the courtroom and makes it difficult to assess problematic attitudes in prospective jurors.

[35] *Rideau v. Louisiana*, 373 U.S. 723 (1963).

28
DECLARATION OF BRYAN EDELMAN, PH.D.

to trial. Three of the 12 seated jurors had seen the televised interrogation. Despite the highly prejudicial nature of such a sensational televised confession, all three jurors told the court during voir dire that they could "lay aside any opinion, give the defendant the presumption of innocence as provided by law, base their decision solely upon the evidence, and apply the law as given by the court."[36] Chief Justice Hughes offered this honest view of the world nearly ninety years ago in *United States v. Wood*:[37]

> "[i]mpartiality is not a technical conception. It is a state of mind." A trial court's decision whether a juror possessed "this mental attitude of appropriate indifference" must be reviewed in the totality of circumstances. It is not limited to the juror's response to a "magic question."

In *Irvin v. Dowd*, the Court ruled:

> No doubt, each juror was sincere when he said that he would be fair and impartial to petitioner, but the psychological impact requiring such a declaration before one's fellows is often its father. Where so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight. As one of the jurors put it, "You can't forget what you hear and see." With his life at stake, it is not requiring too much that petitioner be tried in an atmosphere undisturbed by so huge a wave of public passion and by a jury other than one in which two-thirds of the members admit, before hearing any testimony, to possessing a belief in his guilt.[38]

The set-aside question has also been shown in the social science literature to be leading, increases socially desirable responses, and lacks validity (i.e., not correlated with other measures of bias). Research has demonstrated that answers to the set-aside question often conflict with responses to other measures of bias. For example, Moran and Cutler (1991) found that 62% of jury-eligible residents in a high-profile case said they could be fair and impartial and decide the case solely on the basis of the evidence presented. However, only 39% said they could put knowledge of the media out of his or her mind.[39] They also found that subjective estimates of the ability to be fair and impartial was <u>not</u> related to case knowledge. Sue, Smith, and Pedrozza (1975) found that participants who had been exposed to negative pretrial publicity and reported that they

---

[36] *Id*. at 732.
[37] *United States v. Wood,* 299 U.S. 123, 146, 57 S.Ct. 177, 185, 81 L.Ed. 78 (1936), *718
[38] *Irvin v. Dowd*, 366 U.S. 717, 727-28 (1960).
[39] Moran, C., & Cutler, B.L. (1991). The prejudicial impact of pretrial publicity. *Journal of Applied Social Psychology*, 21(5), 345-67.

could render a fair and impartial verdict were just as likely to convict compared to their counterparts in a control group who had read neutral pretrial publicity and also reported that they could be fair and impartial.[40]

My own research also demonstrates the unreliability of the set-aside question. A 2020 study presented at the *American Psychology Law and Society* annual conference found that prospective jurors profess that they can be fair and impartial, even in the most extreme of circumstances.[41] Participants were recruited from a Facebook Page dedicated to a popular miniseries called "The Jinx." The documentary is about Robert Durst, a real estate mogul in New York, who had been associated with a string of murders. Durst was arrested and charged with murder shortly after the documentary aired on Max, formerly known as HBO Max. The miniseries included many highly prejudicial and potentially inadmissible allegations and details. The documentary also captured a confession that was unintentionally recorded while Durst was in the bathroom. People who publicly posted highly prejudicial opinions on the Facebook page were recruited for the study. For example, one participant posted: "This is the true vision of a sociopath. I am physically ill over the conclusion. I am beside myself. I was overjoyed at the news that he was arrested." Approximately 92% of participants reported that Durst was guilty, and 77% reported that he would have a difficult time convincing them that he was not guilty in his upcoming murder trial. In addition, participants were familiar with multiple prejudicial media items from the documentary including that Durst: 1) was a suspect in his wife's disappearance (96%), was a suspect in several murders (92%), had been tried in Texas for murder (92%), and had allegedly confessed (100%).

Participants were read an instruction drafted from the transcript from a high-profile case. The introduction mentioned that Durst was entitled to a fair and impartial trial. The burden of proof was on the prosecution to prove that he was guilty "beyond a reasonable doubt." Participants were also told that the law requires them to set aside any biases and opinions they had and decide the case solely based on the evidence in the courtroom.

Participants were then asked if they "could be a fair and impartial juror and decide the case solely on the basis of the evidence as the law required." Even though these participants had been exposed to a prejudicial miniseries with multiple inadmissible prejudicial details, made negative comment about the defendant publicly, believed that Durst was guilty, and indicated that he would

---

[40] Sue, S., Smith, R. E., & Pedroza, G. (1975). Authoritarianism, pretrial publicity, and awareness of bias in simulated jurors. *Psychological Reports, 37*(3, Pt 2), 1299–1302.

[41] Gordan, N. & Edelman, B. (2020). Self-Assessments About Fairness in the Robert Durst Case. Presented at the American Psychology Law Society Annual Conference, New Orleans, LA.

DECLARATION OF BRYAN EDELMAN, PH.D.

IFCD 004874

have a difficult time convincing them otherwise, **81%** reported that they could be fair and impartial. When asked an open-ended question, their responses mirrored what they had heard from the introduction. For example, the participant who described the defendant as a "true vision of a sociopath" reported that he could "definitely" be fair and impartial and explained: "I could start from the beginning and listen to the information presented and follow the directions and wipe out everything that I know. I would need to be convinced beyond a shadow of a doubt."

These findings are consistent with the body of social science literature on the efficacy of the set-aside question. Even in the most extreme of circumstances, prospective jurors provide the socially desirable response.

Accordingly, a juror's professed ability to be fair and impartial should not be taken at face value in cases where there is substantial prejudicial pretrial publicity. This is less of an issue when dealing with the tangential experiences, limited case knowledge, and general attitudes jurors typically bring with them into the courtroom in most cases (e.g., medical malpractice, DUI). There is little evidence, however, to suggest that individuals can forget or dissociate themselves from specific attitudes, emotions, and beliefs about the defendant and case developed from exposure to media coverage.

## VII.    CONCLUSION

It is my opinion that the United States District Court for the District of South Carolina (Charleston Division) jury pool was saturated with extensive prejudicial pretrial publicity surrounding this mass shooting. This interracial hate motivated crime sent shockwaves through the community, generated massive media coverage, and sparked an outpouring of support for the victims. The coverage enhanced the salience of race and racial conflict with repeated references to Dylann Roof's desire to kill black people and calls for him to receive the death penalty. The pretrial publicity dehumanized the defendant often describing him as a "racist" "monster." These conditions are likely to generate in-group identification which can have an impact on how jurors perceive the defendant, evaluate mitigation evidence, and consider alternative sentences to the death penalty.

Dylann Roof was facing the ultimate penalty after committing the worst hate crime in South Carolina's history. The community and prominent figures in Charleston were publicly calling for the death penalty as the only way to restore justice. This created explicit and implicit pressure on a jury to reach the "correct" verdict to help heal the community.

Given the racially and emotionally charged environment present in the Charleston

DECLARATION OF BRYAN EDELMAN, PH.D.

IFCD 004875

Division, it is my opinion that defense counsel should have retained an expert to evaluate the impact of the pretrial publicity on prospective jurors. Under Rule 18 the defendant need only show that the transfer of the trial to another division within the district would promote the prompt administration of justice.[42] This is a lower standard than what is required under Rule 21(a). Based on my experience conducting community attitude surveys in similar cases with the degree of prejudicial coverage found in the Charleston Division, it is my opinion that the survey data would have provided additional support—in combination with the extensive prejudicial coverage in this case—for an intradistrict transfer or change of venue.

---

[42] *U.S. v. Joyce*, CR. NO. 07-31 Erie, (W.D. Pa. Jun. 10, 2008)

32

DECLARATION OF BRYAN EDELMAN, PH.D.

I declare under penalty of perjury under the laws of the State of California that the foregoing facts are true and correct, except as to facts stated upon information and belief, which facts I believe to be true.


Executed on April 10, 2025

_____
Bryan Edelman

DECLARATION OF BRYAN EDELMAN, PH.D.

Ex. 55 pg.33 of 41                                                                          IFCD 004877

# APPENDIX A: CURRICULUM VITA

## BRYAN EDELMAN, PH.D.

6257 Westover Dr. • Oakland, California  94611
(415) 944-9989 • bryan@trialinnovations.com

## PROFESSIONAL EXPERIENCE

**Trial Innovations,** Oakland and Los Angeles, California                    **2011-Current**
Co-founder
- Design and implement jury research
- Conduct community survey research on jury issues
- Serve as expert witness on venue, survey jury issues, and eyewitness identification
- Assist with jury selection, juror questionnaire design, etc.
- Provide trial consulting services
- Provide in-house legal education
- Conduct post-trial juror interviews
- Conduct consumer insight research for fortune 500 companies (e.g., Facebook, Google)

**The Jury Research Institute,** Alamo, California                    **2005-2010**
Senior Trial Consultant
- Conducted multi-stage qualitative and quantitative research (e.g., focus groups, mock trials, shadow juries)
- Served as expert witness (e.g., change of venue motions)
- Designed and conducted telephone and online survey research
- Conducted post-trial juror interviews
- Provided trial consulting services
- Analyzed qualitative and quantitative data
- Served as speaker and visiting lecturer at conferences, universities, law firms, and Bar Associations

**The National Jury Project,** Oakland, California                    **2005**
Associate Trial Consultant
- Conducted qualitative and quantitative research
- Analyzed quantitative and qualitative data from prospective juror questionnaires
- Interpreted research results and developed strategy recommendations
- Assisted with crafting opening statements and closing arguments

**Trial Science, Inc.,** Reno, Nevada                    **1999-2003**
Associate Trial Consultant
- Conducted focus groups and mock trials
- Analyzed quantitative and qualitative data
- Presented findings and recommendations to trial team
- Developed jury selection profiles

**Grant Sawyer Center for Justice Studies,** Reno, Nevada                    **2000-2003**
Project Manager, "Predicting Failure in Pre-trial Release Programs in Washoe County"
- Designed and implemented an evaluation of the Washoe County pre-trial release program
- Oversaw data collection (over 40,000 cases) and analyzed data
- Served as an ombudsman between trial courts, police departments, Court Services, and the judicial sub-committee
- Presented findings to the Court Services Sub-Committee and at international conferences

DECLARATION OF BRYAN EDELMAN, PH.D.

IFCD 004878

Research Associate, "Minimization of Pre-Trial Publicity Knowledge during Voir Dire"
- Co-developed research methodology
- Performed content analysis of trial transcripts from high profile cases
- Analyzed data

Research Associate, "Science in the Courtroom"
- Co-developed survey codebook
- Completed content analysis of judges' responses regarding the Daubert standard

Research Associate, "Judicial Workload Pilot Project"
- Completed telephone interviews with judges
- Conducted content analysis of qualitative data from interviews

## EXPERT WITNESS & VENUE EXPERIENCE[43]

*State of Utah v. Kouri Richins,* (2025). Conducted community attitude survey and content analysis of media coverage. Testified at change of venue hearing. Recommended change of venue.

*State of Tennessee v. Haley, et al.* (2025). Conducted community attitude survey and content analysis of media coverage. Testified at change of venue hearing. Recommended change of venue.

*State of Texas v. Tanner Horner* (2024). Conducted community attitude survey and content analysis of media coverage. Testified at change of venue hearing. Recommended change of venue.

*State of Idaho v. Bryan Kohberger* (2024). Conducted community attitude survey and content analysis of media coverage. Testified at change of venue hearing. Recommended change of venue.

*State of California v. Chunli Zhao* (2024). Conducted content analysis of media coverage and grand jury transcript. Testified via declaration. Recommended grand jury transcript remain sealed.

*United States v. Jairo Saenz* (2024). Conducted community attitude survey and content analysis of media coverage. Testified at change of venue hearing. Recommended change of venue.

*State of California v. Erika Sandoval* (2024). Conducted content analysis of media coverage. Testified via declaration. Recommended improved voir dire conditions.

*Kupfner et al. v. Xcel Energy* (2024). Conducted community attitude survey. Testified via declaration. Recommended change of venue.

*State of Florida v. Patrick McDowell* (2024). Conducted community attitude survey and content analysis of media coverage. Testified at change of venue hearing. Recommended change of venue.

*Jaxon Baker, et al. v. State of California* (2023). Conducted community attitude survey. Testified via declaration. Recommended change of venue.

*United States v. Marilyn Mosby* (2023). Conducted community attitude survey and content analysis of media coverage. Testified at change of venue hearing. Recommended change of venue.

---

[43] This is not an exhaustive list and does not include some current cases which are still pending.

IFCD 004879

*State of California v. Joseph Maloney* (2023).  Conducted community attitude survey and content analysis of media coverage.  Testified at change of venue hearing.  Recommended change of venue.

*State of Ohio v. Bennie Adams* (2023).  Conducted content analysis of media coverage and reviewed jury selection transcripts.  Testified at post-conviction hearing.

*State of California v. David DePape* (2032).  Conducted community attitude survey. Recommended change of venue. Testified via declaration.

*State of Tennessee v. Lemaricus Davidson* (2023).  Conducted content analysis of media coverage and reviewed jury selection transcripts.  Testified via declaration.

*United States v. Aaron Zahn* (2022).  Conducted community attitude survey. Recommended change of venue.

*State of California v. Robert Somerville* (2022).  Conducted preliminary media analysis.  Recommended against moving forward with venue study.

*State of California v. Joshua Rodriquez* (2022. Conducted preliminary media analysis.  Recommended against moving forward with venue study.

*State of Tennessee v. Michael Gray* (2022).  Conducted community attitude survey. Recommended change of venue.

*State of West Virginia v. Joshua Phillips* (2022).  Conducted community attitude survey and testified in change of venue hearing. Recommended change of venue.

*State of Colorado v. Barry Morphew* (2022).  Conducted community attitude survey. Recommended change of venue.

*United States v. Robert Bowers* (2022).  Conducted community attitude survey. Recommended change of venue.

*State of Washington v. David Nickels* (2021).  Conducted community attitude survey. Recommended change of venue.

*United States v. James Cloud* (2021).  Conducted community attitude survey. Recommended change of venue.

*State of Florida v. Nikolas Cruz* (2021).  Analysis of media coverage and testified in closure hearing.

*State of Nevada v. James Biela* (2021).  Conducted post-conviction analysis (media coverage, defense motions, and reviewed jury selection transcripts).

*State of Minnesota v. Alex Kueng (2021*).  Conducted community attitude survey.  Pending.

*United States v. Robert Bowers* (2021).  Conducted community attitude survey.  Pending.

*People v. Nikolas Cruz* (2020).  Conducted community attitude survey.  Testified in closure hearing.

*Timaero Ireland Limited v. The Boeing Company* (2020).  Conducted community attitude survey.  Pending.

*State of Tennessee v. Andrew Delke* (2019).  Conducted community attitude survey and content analysis of media coverage.  Testified at change of venue hearing.  Recommended change of venue.

DECLARATION OF BRYAN EDELMAN, PH.D.

IFCD 004880

*People v. Diane Anderson* (2019).  Conducted community attitude survey and content analysis of media coverage.  Testified at change of venue hearing.  Recommended change of venue.

*State of Tennessee v. Nikolaus Johnson* (2019).  Conducted content analysis of media coverage and reviewed jury selection transcripts.  Testified at post-conviction hearing.

*People v. Jason Van Dyke* (2018).  Conducted community attitude survey and content analysis of media coverage.  Testified at change of venue hearing.  Recommended change of venue.

*People v. Brian Cooks* (2017).  Conducted community attitude survey and content analysis of media coverage.  Testified at change of venue hearing.  Recommended remedial measures during jury selection [Case settled].

*People v. Johnathan Feit* (2017).  Conducted community attitude survey.  Conducted community attitude survey.  Conducted community attitude survey and content analysis of media coverage.  Testified at change of venue hearing.  Recommended change of venue.

*People v. Jonathan Renfro* (2017).  Conducted community attitude survey.  Did not make recommendations regarding remedial measures.

*People v. Kenneth Rossy* (2017).   Conducted preliminary media analysis.  Recommended moving forward with community attitude survey.

*Angelo Harmon et al. v. The Salvation Army, et al* (2017).  Conducted community attitude survey.  Did not make any recommendations.

*United States v. Charles Banks* (2016).  Conducted community attitude survey.  Recommended change of venue.

*United States v. Jessie Con-ui* (2016).  Conducted community attitude survey.  Recommended remedial measures during jury selection.

*People v. Lubrin, et al.* (2016).  Conducted community attitude survey.  Recommended remedial measures during jury selection.

*Melissa Mays, et al., v. Rick Snyder, et al.* (2016).  Conducted community attitude survey.  Recommended change of venue.

People v. Balser and Robinson (2016).  Conducted preliminary media analysis.  Recommended against moving forward with venue study.

United States v. Dredd (2016).  Conducted community attitude survey.  Recommended remedial measures during jury selection.

People v. Romero (2016): Conducted preliminary media analysis.  Recommended against moving forward with venue study.

People v. Morales (2016). Conducted community attitude survey and content analysis of media coverage.  Testified at change of venue hearing.  Recommended remedial measures during jury selection [Granted].

People v Williams (2015). Conducted community attitude survey.  Recommended against a change of venue.

Commonwealth v. Chism (2015). Approved by Court to assist with crafting juror questionnaire to address pretrial publicity.

37
DECLARATION OF BRYAN EDELMAN, PH.D.

IFCD 004881

U.S. v. Blankenship (2015). Conducted community attitude survey for the DOJ.

U.S. v. Sablan (2014). Conducted community attitude story and submitted a declaration. Recommended a change of venue [Granted].

People v. Bealer (2014). Conducted community attitude survey and content analysis of media coverage. Testified at change of venue hearing and transfer hearing. Recommended a change of venue [Granted].

People v. Ware, et al. (2014). Conducted content analysis of media coverage and grand jury transcript. Submitted a declaration recommending that the grand jury transcript remain sealed [Granted].

People v. Castillo (2014). Conducted community attitude survey [Venue hearing denied].

People v. Shirakawa (2014). Conducted community attitude survey Recommended against a change of venue.

People v. Holmes (2014): Conducted content analysis of media coverage. Recommended a change of venue [Denied].

People v. Tree (2014): Conducted preliminary media analysis. Recommended against moving forward with venue study.

People v. Hoyt (2014): Reviewed pretrial publicity, juror questionnaires, and voir dire transcript. Recommended that trial counsel should have pursued change of venue.

People v. Duran (2014). Conducted preliminary media analysis. Recommended against moving forward with venue study.

People v. White (2013): Conducted preliminary media analysis. Recommended against moving forward with venue study.

People v. Vega (2013): Conducted preliminary media analysis. Recommended against moving forward with venue study.

People v. Ayers (2013): Conducted community attitude survey. Recommended against a change of venue.

People v. Lucero (2013): Conducted community attitude survey. Recommended against a change of venue.

People v. Bennett (2013): Conducted media analysis. Recommended against a change of venue.

People v. Deloney (2012): Testified as expert witness regarding literature on the accuracy of eyewitness identification, memory, cognition, and suggestive questioning.

People v. Ortega, et al. (2012): Conducted community attitude survey and content analysis of pretrial publicity. Testified as expert witness about results, the impact of pretrial publicity on attitudes, memory, jury selection, and jury-decision making.

People v. Bey (2011): Conducted community attitude survey and content analysis of pretrial publicity. Testified as expert witness about results, the impact of pretrial publicity on attitudes, memory, jury selection, and jury-decision making.

Johnson, et al. v. BART, et al. (2011). Conducted community attitude survey. Recommended against filing a change of venue motion.

     IFCD 004882

People v. Fowler (2011): Conducted community attitude survey. Recommended certain communities be excluded from the venue [Granted]

People v. Sanchez, et al (2011): Conducted preliminary media analysis. Recommended against moving forward with venue study.

People v. Loughner (2011): Conducted media analysis.

Huang Xiu Mei, New York (2007): Expert witness in political asylum hearing.

Weather Shield v. Bostik (2005): Evaluated plaintiff's change of venue motion.

Olympic Pipeline Company v. Washington (2002). Assisted with content analysis of media coverage.

## PUBLICATIONS AND PRESENTATIONS

Bronson, E. Edelman, B., & Philipsborn, J.T. (2022). Change of Venue. In N. Yuenger (Ed.), *California criminal law procedure and practice*. Oakland: Continuing Education of the Bar.

Gordan, N. & Edelman, B. (2020). Self-Assessments About Fairness in the Robert Durst Case. Presented at the American Psychology Law Society Annual Conference, New Orleans, LA.

Edelman, B. (2018). *Psychology of the Jury.* Presented at the American Board of Trial Advocates MIT Program, Sacramento, CA.

Edelman, B. (2018). *Preventing Runaway Juries*. Presented at the Michigan Defense Trial Counsel's Annual Meeting, MT Pleasant, MI.

Edelman, B. (2018). *Trial Consulting 101*. Presented at the American Psychological Association, Division 41, Memphis, TN.

Edelman, B. (2018). *Trial Consulting 101*. Presented at American Society of Trial Consultants Conference, Ft Worth, TX.

Edelman, B. (2016). *Conducting an Effective Jury Selection*. Presented at Santa Barbara Bar Association Bench and Bar Conference, Santa Barbara, CA.

Edelman, B. (2015). *Trial Consulting 101*. Presented at American Society of Trial Consultants Conference, Nashville, TN.

Edelman, B. (2015). *Effective Jury Selection Lunch and Learn*. Sponsored by Thomas Reuters (Oakland).

Edelman, B. (2015). *The Social Psychology of Jurors and Juries*. Presented at Washoe County Alternate Defender, Reno, NV.

Edelman, B. (2013). *The Social Psychology of Jurors and Juries*. Presented at Washoe County Alternate Defender, Reno, NV.

Edelman, B. (2013). *Police Liability.* Presented at the Lorman Education Services Seminar in Santa Rosa.

Edelman, B., & Canon, D. (2012). *The Social Psychology of Jurors and Juries*. Presented at Office of the Public Defender, Albuquerque, NM.

    IFCD 004883

Edelman, B. (2013).  *Police Liability.* Presented at the Lorman Education Services Seminar in Sacramento.

Edelman, B., & Canon, D. (2012). *The Social Psychology of Jurors and Juries*. Presented at Office of the Public Defender, Albuquerque, NM.

Edelman, B. (2011). Using online surveys to conduct jury research. *The Jury Expert,* 23(6), 51-54.

Edelman, B. (2011). Juror race and capital sentencing. *The Jury Expert,* 23(4), 47-49.

Bronson, E., Dillehay, R. Edelman, B., & Rountree, W. (2011). *Analyzing Pretrial Publicity in the New-Media Universe.* Presented at the American Society of Trial Consultants Conference.

Edelman, B. (2010). *CLE: Selecting your Jury*.  Presented at White and Williams, LLP, Philadelphia, PA.

Edelman, B. (2010). *Trial Consulting 101*. Presented at the University of Nevada, Reno.

Edelman, B. (2009). The impact of graphic injury photographs on liability verdicts and non-economic damage awards. *The Jury Expert,* 21(5), 1-4.

Edelman, B. (2009) *Online Research Tools to Evaluate Cases.* Presented at the Santa Clara County Bar Association.

Edelman, B. (2009).   *Psychology in the Courtroom: Selecting Your Jury.* Presented at the Monterey County Bar Association.

Edelman, B. (2008).  *Striking the Jury.* Visiting lecturer at Stanford Law School.

Edelman (2008).  *Communicating with the Jury.* Presented at the International Symposium on Life Care Planning, Phoenix.

Edelman (2007).  *Race, Empathy, and Capital Punishment.*  Visiting lecturer at the University of California, Santa Cruz.

Edelman, B. *Racial Prejudice, Juror Empathy, and Sentencing in Death Penalty Cases.* (New York: LFB Scholarly Publishing LLC, 2006).

Edelman, B. & J.T. Richardson, (2005). Imposed limitations on freedom of religion in China and the margin of appreciation doctrine: A legal analysis of the crackdown on the Falun Gong and other "evil cults." *The Journal of Church and State,* 47(2), 243-267.

Richardson, J.T., & Edelman, B., Cult controversies and legal developments concerning new religions in Japan and China. In D.H. Davis & G. Besier (Eds.), *International Perspectives on Freedom and Equality of Religious Belief*, Waco: (Dawson Institute of Church-State Studies, Baylor University, 2002), reprinted in J.T. Richardson (Ed), *Regulating Religion Case Studies from Around the World*. (United States: Kluwer Academic/Plenum Publishers, 2004), pp. 359-380.

Edelman, B. & Richardson, J.T. (2003).  Falun Gong and the law: Development of legal social control in China. *Nova Religio*, 6(2), pp. 312-331.

Edelman, B., Dillehay, R.C., Bennett, D., & Hinxman, C. (2002). *The difficulties of collecting data in a local justice system*. Presented at the annual meeting of the Pacific Sociological Association, Vancouver, Canada.

Edelman, B. & Richardson, J.T. (2002). *Falun Gong and the law*.  Presented at the annual meeting of the Society for the Study of Religion, Houston, TX.

40
DECLARATION OF BRYAN EDELMAN, PH.D.

IFCD 004884

Edelman, B. & Richardson, J.T. (2002). *The crackdown on the Falun Gong: Western influence and the development of the anti-cult movement in China*. Presented at the Society for the Scientific Study of Religion annual conference, Salt Lake City, Utah.

Richardson, J.T. & Edelman, B. (2001). *Cult controversies and legal developments in Japan and China*. Presented at the annual conference on "New Religions," Heidelberg, Germany.

## EDUCATION

**LL.M.,** International Law, with Distinction, University of Kent, Canterbury, United Kingdom      **2004**

**Ph.D.,** Interdisciplinary Social Psychology, University of Nevada, Reno, Nevada      **2003**

**B.S.,** Magna Cum Laude, Psychology, Florida State University, Tallahassee, Florida      **1997**

IFCD 004885