

## Amy Fritz, EdD, CCC-SLP
407-450-5584
www.cedartreeslp.com
amy@cedartreeslp.com

Cedar Tree
COMMUNICATION THERAPY

# Speech-Language Evaluation Report

Client: Dylann Storm Roof
DOB: 4/3/1994
Dates of Evaluation: 6/6/2024; 6/7/2024
Date of Report: February 25, 2025

**Report Contents:**
1. Brief Summary of Findings
2. Evaluator Background
3. Description of Evaluation
4. Description of Key Findings
   - Cognitive Abilities
   - Expressive/Receptive Language
   - Auditory Processing Skills
   - Social Pragmatic Communication
5. Impact of Findings on Pro Se Litigation
6. Evidence of Communication Challenges During the Trial
7. Concerns of Familiar Others Regarding Self-Representation
8. Summary and Conclusion
9. Sources Reviewed

**Brief Summary of Findings**

Dylann Roof, age 30, has a remarkable social history and a premorbid diagnosis of social anxiety (among other medical conditions). The current evaluation revealed that he is an intelligent man with typical expressive and receptive language abilities and intact social communication skill knowledge. However, Mr. Roof demonstrated a profound weakness in all areas of pragmatic social skill performance including information exchange, following conversational rules/routines and using nonverbal skills commensurate with his intended message. Additionally, Mr. Roof was diagnosed with an auditory processing disorder at the neurophysiological and lexical integration levels and a profound deficit in linguistic processing speed.

Mr. Roof believed he was forced to represent himself in his capital murder trial, as he disagreed firmly with his court appointed legal team's planned defense. The impact of Mr. Roof's impaired social communication skills, auditory processing deficits, and processing speed impairment were determined specific to the demands inherent in a pro se trial of particularly high stakes. Examples of communication challenges in the courtroom were provided, and an argument is made regarding Mr. Roof's incompetence to serve as a pro se litigant.

IFCD 003988

**Evaluator Background**

Dr. Amy Fritz has been a nationally certified speech-language pathologist since 1999. Dr. Fritz is the Owner & Founder of Cedar Tree Communication Therapy, a telehealth speech-language therapy practice established in 2019 and based out of Orlando, Florida. She specializes in the evaluation and treatment of children and adults with social communication deficits, often secondary to the presence of autism spectrum disorder. Dr. Fritz provides specialized treatment in social knowledge and skill development, conversational language use, emotional regulation, and interpersonal relationships.

Dr. Fritz's undergraduate degree is in English and reading education. She holds a master's degree in speech-language pathology and a doctorate degree in special education with a cognate area emphasis in speech-language pathology. Dr. Fritz began her career in the public schools and served as an expert witness in a due process hearing for another school district in the early 2000s. She later spent 7 years as an assistant professor and 5 years as an autism disorder specialist hired through a Florida state discretionary project to provide support for individuals with autism and their families.

In addition to serving her active caseload, Dr. Fritz has been working as a forensic speech-language pathologist since 2022. She has evaluated and/or treated eleven justice-involved individuals and testified in one capital trial and one federal sex offender trial in that time. Dr. Fritz was approached by the defense team in April 2023 to provide consultation and evaluation services relevant to the current case.

**Sources of Information**

See Appendix A for the full list of sources analyzed to inform this report. These sources of information demonstrated the significant connection between Mr. Roof's unstable and socially deprived upbringing and his current social communicative deficits.

**Description of Evaluation**

This evaluation is informed by over 90 hours of record review/indirect assessment and the following direct assessment at USP Terre Haute:

- Total of 11 hours, 45 minutes
  (5 hours, 15 minutes on 6/6/2024; 6 hours, 30 minutes on 6/7/2024)

- The instruments used were as follows:

  *Cognitive Linguistic Quick Test Plus (CLQT+)*
  This tool was administered to rule out any presence of cognitive and neurological impairment. It provides a comprehensive and efficient assessment of an individual's attention, memory, executive functioning, language and visuospatial skills. Scaled scores are derived for each domain and compared to the normative sample. Results are then

2

IFCD 003989

examined to determine whether the client's scores are within normal limits or mildly, moderately or severely impaired.

*Clinical Evaluation of Language Fundamentals- Fifth Edition (CELF-5)*
The *CELF-5* is the hallmark assessment to determine the presence of expressive, receptive, and pragmatic language deficits in individuals ages 5-21. The assessment yields scaled subtest scores, percentile ranks, and index scores for specific language domains when given to individuals within these age limits. However, the technical manual indicates that instrument validity extends to individuals ages 22 and older to determine relative strengths and challenges, age equivalencies and growth scale values. Because there are no other appropriate assessments of total language proficiency for adults in the absence of neurological injury or illness, the evaluator believes it to be valuable to utilize the *CELF-5* according to these guidelines.

*Pragmatic Profile of Everyday Communication for Adults (PPEC-A)*
This interview assessment is used to evaluate a client's ability to understand and use language effectively in everyday social situations. It focuses on their conversational skills, understanding of social context, and ability to adapt or modify communication dependent upon the listener or situation. The format uses open-ended questions and detailed descriptions from the client to provide rich qualitative data. The client's ability to appropriately initiate and maintain topical conversations, interpret and display nonverbal communication, adapt language based on context, and understand implied language meaning is analyzed.

*Clinical Assessment of Pragmatics (CAPs)*
The *CAPs* assessment uses scenes of real people in social situations to determine an examinee's ability to understand and use pragmatic language, including nonverbal cues and dynamics of social context. The videos depict real-life situations, and the client responds to questions posed by the examiner after watching each clip. The norm-referenced measure is sensitive to pragmatic deficits exhibited by students with high-functioning autism, language delays, and social (pragmatic) communication disorders; however, normative information is provided for individuals ages 7-18 only. Therefore, this measure was used to validate findings of the *CELF-5 Pragmatics Profile* and *PPEC-A* through observation and qualitative analysis.

*Test of Auditory Processing Disorders in Adolescents and Adults (SCAN-3:A)*
The *SCAN-3:A* is a battery of tests to detect auditory processing disorders (APDs) in individuals aged 13 through 50. It assesses a client's ability to process sound in various listening contexts, including background noise. The assessment is administered by presenting sounds/words through headphones/ear buds and requiring a behavioral response to determine a client's temporal processing, dichotic listening, and speech perception capabilities in degraded conditions. The tool is used to help differentiate APDs from general auditory comprehension or attention difficulties. Scores are compared to normative data to identify potential auditory processing deficiencies.

.

3

IFCD 003990

**Description of Key Findings**

**Cognitive Abilities**

Record review revealed that Mr. Roof was diagnosed with average cognitive abilities (full scale IQ = 107) by Dr. Paul Moberg in 2016. Dr. Moberg noted that Mr. Roof struggled significantly with complex problem solving and planning. He further noted that Mr. Roof displayed a reduced processing speed, poor planning and error-monitoring typical of frontal system dysfunction. He noted that "real-world implications of these impairments included disruptions of decision-making, coding and tracking new information, weighing options, adjusting to new information and modifying thinking and behavior".

The current evaluator administered the *Cognitive Linguistic Quick Test Plus (CLQT+)* to ensure that no meaningful change in cognitive abilities had occurred since the time of that evaluation. The *CLQT+* is a screening instrument that will reveal the presence of neurological impairment in several domains and resulting linguistic or non-linguistic language loss. Task sections administered included the following: personal information, symbol cancellation, confrontation naming, cock drawing, story retelling, symbol trails (alternating by size and shape), generative naming, design memory, mazes, and design generation.  Task scores from these subtests are then used to determine overall competency in six domains. Score ranges for performance within normal limits, along with ranges for varying level of impairment, are provided for each cognitive domain for individuals ages 18-69 years.

The results are as follows:

| Domain | Client Score | Expected Range |
|---|---|---|
| Attention | 206 | 180-215 |
| Memory | 171 | 155-185 |
| Executive Functions | 33 | 24-40 |
| Language | 33 | 29-37 |
| Visuospatial Skills | 100 | 82-105 |
| Clock Drawing | 13 | 12-13 |

Mr. Roof scored well within normal limits in each of the cognitive domains and exhibited no sign of verbal aphasia. While these scores suggest generally intact abilities in major cognitive domains, results should in no way supersede findings from comprehensive neuropsychological testing. Instead, they suggest that Mr. Roof's cognitive abilities do not disrupt his ability to perform specific structured non-linguistic and linguistic functions.

Recent neuropsychological assessment conducted by Robert Ouaou, PhD validates these and previous findings that Mr. Roof displays above average cognitive skills. In fact, the most recent data suggests that Mr. Roof's intelligence is in the superior range (full-scale IQ = 118; 94th percentile). Therefore, it is reasonable to assume that the results of the current assessment are in no way based on cognitive-communicative skill regression and rather an accurate depiction of his skills at the time of criminal proceedings.

4

IFCD 003991

**Expressive and Receptive Language**

Based on the results of the *Clinical Evaluation of Language Fundamentals- Fifth Edition (CELF-5)* and observational assessment, Mr. Roof demonstrates typical expressive and receptive language abilities. In the interest of time, the *Core Language* portions only of this assessment were administered to Mr. Roof. The subtests included in this index include *Formulated Sentences, Recalling Sentences, Understanding Spoken Paragraphs,* and *Semantic Relationships*. They are defined as follows:

The *Following Directions* test is used to evaluate the client's ability to (a) interpret spoken directions of increasing length and complexity, (b) follow the order of presented objects with varying characteristics such as color, size, or location, and (c) identify target pictured objects in response to oral directions. Mr. Roof received an age equivalency of greater than 21.5 years on this subtest. (This is the highest age equivalency that can be obtained by an examinee for each of the subtests administered).

The *Recalling Sentences* test is used to evaluate the client's ability to recall and reproduce sentences of varying length and syntactic complexity. The client imitates sentences presented by the examiner. Mr. Roof received an age equivalency of greater than 21.5 on this subtest.

The *Understanding Spoken Paragraphs* test is used to evaluate the client's ability to (a) sustain attention and focus while listening to spoken paragraphs, (b) create meaning from oral narratives and text, (c) answer questions about the content of the information given, and (d) use critical thinking strategies for interpreting beyond the given information. The client answers questions about a paragraph presented aurally. The questions probe the client's understanding of the paragraph's main idea, memory for facts and details, recall of event sequences, and ability to make inferences and predictions. Age equivalency could not be determined for this subtest, as normative values were derived for varying age ranges. However, Mr. Roof's raw score of 18 correct out of 20 items indicates generally intact skills in this area. It's relevant to note that both items answered incorrectly were questions dependent on direct recall of specific details rather than questions requiring higher level thinking (e.g. prediction, inferencing).

The *Semantic Relationships* test is used to evaluate the client's ability to interpret sentences that (a) make comparisons, (b) identify locations or directions, (c) specify time relationships, (d) include serial order, or (e) are expressed in passive voice. After listening to a sentence, the client selects the two correct choices from four visually presented options. Mr. Roof received an age equivalency of greater than 21.5 years on this subtest.

Mr. Roof uses intact vocabulary and syntax. He appears to understand semantic relationships among words well and demonstrates strong language content and form. Mr. Roof was previously diagnosed with superior verbal comprehension skills by Dr. Moberg. His excellent conceptual formation, vocabulary development and general knowledge was evidenced during the current assessment, as well. There is no doubt that Mr. Roof articulately produces grammatically correct sentences with intact word order and choice. On the surface, he effectively understands and produces language presented verbally. That said, functional language use is a complicated system dependent upon several other skills including intact language processing, auditory

5

IFCD 003992

comprehension, joint attention, and social pragmatics. Mr. Roof demonstrates deficits in these correlated critical components of verbal language as described below.

**Auditory Processing Skills**

A review of the records led this evaluator to question the effectiveness of Mr. Roof's auditory comprehension abilities. For example, banker James Grayson Hicks, who interacted a few times with Dylann in 2015, indicated the following in his declaration:

> "It took him a while to answer the questions, and I had to repeat most of them before he would answer. I thought the noise in the background might be too much and close the door to my office. Closing the door was not something I typically did with clients, but it seemed to help him be a little less distracted. Dylann also avoided making direct eye contact, mumbled when he spoke, and struggled to understand simple questions about his mother's maiden name."

Dr. Moberg's neuropsychological assessment revealed "mild but consistent reductions in processing speed, characterized by poor speed, planning, and error-monitoring" (pg. 13). Additionally, Mr. Roof was described by several acquaintances as appearing regularly "zoned out" or "in his own world" during his youth and young adulthood (declarations of David Sprayberry, Brian Fanning, Beth Newnham and Farah Wilson; report of John Elder Robinson). While these descriptions may certainly be used to describe someone with attention deficits or mental health challenges, they are also frequently employed to describe a person with an auditory processing disorder. Based on a systematic review of the literature, individuals with APD are rated by others to display weaker listening skills, "lower attention and memory skills, poorer communication abilities, and greater psychosocial problems" than same-age peers (de Wit et. Al, 2016).

During the current assessment period, Mr. Roof was asked about his response to the communication of others. He asserted that people must often address him by name and speak louder than average to gain his attention. He indicated that he is not always paying attention to the same things as others and replied "maybe" when asked if he regularly stares off into space. Mr. Roof explained that he has difficulties understanding what is being said when "thinking in my own head at the same time that someone is speaking" or there is background noise. He indicated that his language processing abilities may be reduced in certain types of linguistic or social contexts (e.g. when he's feeling anxious or in a chaotic environment).

Given his social history and learning challenges, the current evaluator determined to administer the *Test of Auditory Processing Disorders in Adolescents and Adults (SCAN-3:A)* to rule out the presence of APD. On the first day of assessment, Mr. Roof failed the screening segment of the SCAN-3:A. Results were as follows:

- Gap Detection: Pass
- Auditory Figure- Ground 0: Fail
  Raw Score = 23; Criterion for Passing = ≥27
- Competing Words- Free Recall: Fail

6

IFCD 003993

Raw Score = 25; Criterion for Passing = ≥26

Therefore, the diagnostic and supplementary scores on the SCAN-3:A were administered on day 2 of testing. Results were as follows:

*Diagnostic Score Summary*

| Test | Scaled Score | Percentile Rank |
|---|---|---|
| Auditory Figure-Ground-O dB | 6 | 9 |
| Filtered Words | 7 | 16 |
| Competing Words-Directed Ear | 5 | 5 |
| Competing Sentences | 9 | 37 |
| Auditory Processing Composite | 76 | 5 |

*Supplementary Score Summary*

| Test | | |
|---|---|---|
| Competing Words-Free Recall | 7 | 16 |
| Auditory Figure Ground +8 dB | 9 | 37 |
| Auditory Figure Ground +12 dB | 11 | 63 |
| Time Compressed Sentences | 12 | 75 |

It is important to note that the current evaluator is not an expert on auditory processing disorders. As a speech-language pathologist, she is qualified to administer this instrument. However, further interpretation of these "borderline" results must be completed by an audiologist, as they are the professionals uniquely qualified to make an APD diagnosis. Furthermore, because testing was not conducted in a sound-controlled atmosphere, there were distractions during the assessment (e.g. doors slamming, guards walking by). The equipment was not professional grade or calibrated for bilateral sound presentation and this evaluator did not strictly adhere to guidelines for test administration. For example, the CD was paused occasionally, and some items were presented more than once. These adjustments were made to provide the client with every opportunity to respond correctly. However, results may be skewed due to these liberties. For these reasons, the current evaluator recommended that Mr. Roof undergo a full audiological assessment in more ideal conditions to rule out the presence of an auditory processing disorder.

The defense team followed this recommendation and contracted Jay R. Lucker, EdD, CCC-A/SLP, FAAA to further evaluate Mr. Roof. His testing revealed that Mr. Roof's auditory acuity is normal and confirmed the presence of significant auditory processing disorders at the neurophysiological and lexical integration levels. In other words, while Mr. Roof has very strong vocabulary, he is not always able to process and understand what is spoken in real time. He asserted that this is often frustrating to clients who may not be able to integrate auditorily presented information and respond to it efficiently. To quantify how significant this deficit area

7

IFCD 003994

is, Dr. Lucker recommended that neuropsychological testing be conducted to assess Mr. Roof's speed of verbal processing. It was then determined that Dr. Robert Ouaou, who was already under contract with the defense, could assess Mr. Roof further to inform the impact of Mr. Roof's auditory processing disorder on his linguistic processing speed.

Dr. Ouaou determined that Mr. Roof's processing speed is significantly reduced. His scores on the coding, symbol search, and naming speed quantity tasks of the *Weschler Adult Intelligence Test- Fifth Edition* are all well below average, and his overall processing speed index is at the 23rd percentile. By contrast, he demonstrated strong aptitude in all other areas of intelligence measured (Verbal Comprehension Index = 96th percentile; Visual Spatial Index = 93rd percentile; Fluid Reasoning Index = 70th percentile; Working Memory Index = 89th percentile).

Findings from the *Speed and Capacity of Language Processing Test (SCOLP)* are especially pertinent to the current evaluation. The *SCOLP* is comprised of two subtests that assess the client's lexical knowledge vs. their comprehension speed. Mr. Roof's vocabulary was determined to be $\geq 99$th percentile. His rate of information processing was delayed when simple sentences were presented in two separate contexts (written and presented verbally), and Mr. Roof was asked to determine whether they were true or false. He determined the accuracy of statements presented visually at a speed consistent with the 25th percentile. He scored in the 16th percentile in his ability to discern accuracy of statements presented aurally. Most importantly, the discrepancy in Mr. Roof's comprehension and speed scores were at or below the 1st percentile. In other words, Mr. Roof's processing abilities are profoundly impaired as compared to his vocabulary knowledge.

Succinctly stated, Mr. Roof is an intelligent man who simply requires significantly increased processing time to comprehend language, especially when information is presented in connected speech. Due to the presence of an auditory processing disorder and organic linguistic processing delays, it is highly unlikely that Mr. Roof could "keep up" with the communicative demands of the courtroom. Furthermore, his ability to integrate and respond to testimony in real time to meet the expectations of a pro se trial is grossly complicated by Mr. Roof's profound social communication deficits described below.

### Social Communication/Pragmatics

*The Pragmatics Profile of Everyday Communication in Adults*

This interview was conducted on the second day of the evaluation period. Mr. Roof appeared to be alert and cooperative throughout the assessment. He seemed to appropriately consider each question before answering and most often answered without the need for "example responses." It is important to note that some of Mr. Roof's perceptions of his own communication abilities vary from the perceptions of his communication partners as described in their formal declarations. These contradictions are noted here, and specific information is included in *Table 1: CELF-5 Pragmatic Profile Item Analysis.*

IFCD 003995

The initial section of the interview examines a client's ability to use verbal language for a variety of functions. Mr. Roof appropriately described how he uses language to gain attention from others, reject nonpreferred items, tell people relevant information, and assert himself to indicate that he can manage something independently. When asked what usually happens when he tells people a story or joke, Mr. Roof indicated that they most often "burst out laughing." He indicated that he asks for help and seeks needed information directly as needed. However, this is contrary to the assertions offered by several of Mr. Roof's friends and acquaintances as described below.

When asked about whether he is comfortable using language to express the emotions of pleasure and anger, Mr. Roof asserted that he is. However, he further indicated that, "I don't feel many emotions other than anxiety and worry." He explained that not a lot of things upset him, and he has good anger control. Mr. Roof further explained that he is very "risk adverse" and avoids people who want to become emotionally close to him. Mr. Roof voiced discomfort with allowing himself to feel or express challenging emotions. He said, "My emotions are always on my face" and clearly does not like to feel that level of vulnerability. Therefore, he reportedly makes concerted efforts at not feeling or expressing emotions to others. He considers himself "good at compartmentalizing" and able to avoid thinking about events that might be upsetting (such as his crime and the passing of his father and grandfather). Mr. Roof said, "Sometimes, I feel like a robot." This may be why several informants described him as expressing little to no emotion (Declarations of Bonner, S. Clifford, Goodwin, Henry, Stork).

That said, Mr. Roof did become visibly upset when describing his feelings about his father's rather recent passing. He spoke openly about his opinions surrounding this event and expressed love for his father and regret that he was unable to be with him during his end of life. He did not cry, but his affect displayed sadness and his words were congruent. He also clearly articulated and displayed several other emotions to the evaluator throughout the assessment period (anxiety, pleasure, embarrassment, etc.). Therefore, it is reasonable to assume that Mr. Roof is correct in his assertion that he can express emotions appropriately when he allows himself to think about emotionally heightened occurrences and share his thoughts and feelings with others. However, he reportedly did this much less than is typical throughout most of his life.

The next section of the interview pertained to Mr. Roof's response to the communication of others. He asserted that people often have to address him by name and speak louder than average to gain his attention. He indicated that he is not always paying attention to the same things as others and replied "maybe" when asked if he regularly stares off into space. Mr. Roof explained that his mind is "going a mile a minute" and said that social interactions drain him for this reason. He tends to hyper-focus on what others are thinking of him and said that this is why he avoids looking at their facial expressions. He said socializing is like "going out into the sun" for a long time, as it leads to fatigue. Mr. Roof explained that he has difficulties understanding what is being said when "thinking in my own head at the same time that someone is speaking" or there is background noise. He indicated that his language processing abilities may be reduced in certain types of linguistic or social contexts (e.g. when he's feeling anxious or in a chaotic environment).

9

IFCD 003996

Mr. Roof asserted that he generally has no difficulty responding appropriately to nonliteral and indirect language (hints) or exhibiting amusement when he finds something funny. His response to conflicting views is to "try to convince others" to believe he is correct or accept his ideas. Mr. Roof said he gets distracted when reading and finds himself reading the same sentences repeatedly or having difficulty remembering what was read.

The next segment of the interview addressed Mr. Roof's ability to interact with others conversationally. He asserted that he is comfortable initiating conversations on topics by making comments or asking personal questions. However, several of Mr. Roof's former conversation partners indicated that he was not likely to initiate verbally on any topic and would generally only speak in response to others (Declarations of Bonner, Fanning, McAteer, Richardson, Walker). He indicated that it is difficult for him to manage the back-and-forth of conversation, as his mind is often busy trying to keep up with what has been said while formulating his next response. That said, Mr. Roof believes he demonstrates fluid topic maintenance unless he is under a real- or perceived-time constraint. In that condition, he noted that he will jump quickly from one topic to another.

Mr. Roof suggested that he can appropriately presume the knowledge of others and explain information in the correct amount of detail with consideration for their background schema. He indicated that he can generally ascertain when someone doesn't understand his message fully and will try to use conversational repair strategies. He states that he will "Give them information which helps them understand. I try to think of another way to say it. I can't always."

The interviewer asked, "When you are chatting with someone, are there things you notice yourself doing which interfere with the flow of the conversation?" Mr. Roof indicated that this is a significant area of relative weakness for him. The interviewer then provided several attributes or behaviors that might have this effect and asked whether each one described him. Mr. Roof indicated that he has the following tendencies that interrupt natural conversation flow:

- Taking a long time to say what you want to say.
- Taking a long time to get started on an answer.
- Giving very short replies.
- Interrupting when other people are talking.
- Chattering on without giving the other person a chance.
- Shifting from topic to topic.
- Keep talking about a particular topic.
- Thinking about my own self, imaging myself

Mr. Roof further explained that his mind is "like a hamster wheel that keeps going even though the hamster may not even be on the wheel anymore." He indicated that he will "power through" to stay in a conversation if there is something interesting to say. He said that others can make it easier for him to stay in a conversation by not talking down to him.

IFCD 003997

Mr. Roof asserted that he has difficulty following social conventions of conversation at times. He was asked, "Do you think you sometimes do things that are different from the things people usually do when they are talking to other people? What are these?" He replied "sure" and indicated that he makes personal remarks, interrupts others, and asks over-personal questions. He also fully recognizes that he does not provide typical eye contact in social interactions. Mr. Roof indicated that it's easier to make eye contact with correctional officers through a barrier than it is if they are sharing the same space. He suggested that it's easier for him to get through a stressful situation (like the current evaluation) if he's not worried about maintaining eye contact.

Mr. Roof's responses regarding joining ongoing conversations were inconsistent. He initially suggested that he would wait for a pause and join the conversation with a relevant comment. However, he then explained that he will try to distance himself from people who are having an ongoing conversation. He becomes frustrated if he tries unsuccessfully to get ideas into conversation and does not like small talk in general. The later assertion is much more consistent with the reports from his associates who most often indicated that Mr. Roof was quiet, would not join interactions and often seemed in his own world (Declarations of Abele, L. Brown, Davis, Livingston, Simmons, Zurheide).

He further expressed difficulties ending conversations appropriately. When someone asks a question that makes Mr. Roof uncomfortable, he will answer with "I can't talk about that". He uses this phrase to indirectly relate that he "does not want to talk about" a given topic. To bring a conversation to a close, he will simply "stop it abruptly" or "walk off", thereby demonstrating inappropriate conversation termination skills. Mr. Roof suspects that he makes others feel uncomfortable when they are having a conversation but truly desires to be accepted. He asserted, "I want people to like me. It's all I want." He explained that others can increase his comfort in a conversational exchange by not talking down to him.

The final section of the interview focused on Mr. Roof's ability to vary language based on context. He indicated that he "absolutely" prefers to be with some people more than others. For example, he doesn't like to be in the presence of loud people or those who "talk without saying anything" (though he has "no problem with pontification" if the speaker is interesting). He said that his legal team, parents, sister, and grandparents are/were his most frequent conversational partners since becoming justice involved. However, he also admitted that he didn't have many peers prior to his crime and was especially socially isolated from the approximate ages of 16 through 21.

When asked where he is most comfortable communicating, Mr. Roof said, "in my own house". He indicated that his preferred topics of conversation vary, but he adamantly denied liking small talk. While he initially said, "I think I talk the same to everyone," he then said, "I become very quiet in certain company" and admitted a long history of social anxiety. When asked if there are situations involving communicating that cause particular difficulty, Mr. Roof shared that he has always felt social anxiety. He indicated that he spent a lot of time in his room because he was

11

IFCD 003998

uncomfortable if there were a lot of people in the house. When asked to compare his comfort in social situations to times when he is alone, Mr. Roof simply replied, "Night and day."

Mr. Roof suggested that there are several communication situations that cause him particular difficulty or anxiety. These are as follows:
- Asking someone to do something for me
- Bringing too much attention to me
- Making somebody go out of their way
- Saying something that will make them not like you
- Saying something they might find offensive
- You know they won't understand
- Talking to someone in authority.
- Talking to people you do not know.

Mr. Roof indicated that he believes he sounds confident and denies any discomfort when communicating over the phone. However, he also indicated that he is comfortable with transactional communication (such as asking for something in a store or buying a ticket). He explained that those situations are not uncomfortable for him because the person he is talking to is paid to be of help. However, in her declaration, Jenna Simpson (clerk at Bucky's market) seemed to refute this assertion by indicating that he often had to repeat his order a few times because he was so quiet and could not be understood.

*Table 1: CELF Pragmatics Profile Item Analysis*

Rating Key:
1= never or almost never
2= sometimes
3= often
4= always or almost always

| Rituals and Conversational Skills | Rating |
|---|---|
| 1. making/responding to greetings to/from others | 2 |
| Evidence:<br>Direct observation*: recorded interviews<br>Declarations: Hagin, Wilson | |
| 2. beginning/ending conversations (face-to-face, phone, etc.)** | 2 |
| Evidence:<br>Direct observation<br>Loftin report<br>Declarations: Walker, McAteer, Fanning, Richardson, Bonner, Gartman | |
| 3. observing turn-taking rules in the classroom or in social interactions | 3 |
| Evidence: | |

IFCD 003999

| Direct observation | |
| --- | --- |
| Declarations: Metze, McAteer, DeLeon, Gartman | |
| 4.  maintaining eye contact/gaze** | 1 |
| Direct observation | |
| Declarations: Simmons, Zurheide, Otero, Simmons, Wrightson, Fanning, Hicks, etc. | |
| 5.  introducing appropriate topics of conversation** | 2 |
| Evidence: <br> Direct observation e.g. "What else do you have to tell me?" (interview with dad 1.25.16 and sister 1.24.16); Awkward topical shifts (from having hepatitis to talking about a historian's commentary in successive comments with grandparents on 2.12.16) <br> Declarations: Walker, McAteer, Fanning, Richardson, Bonner, Gartman | |
| 6.  maintaining topics using typical responses (e.g., nods, responds with "hmmm") | 2 |
| Evidence: <br> Direct observation e.g. Limited comment to comment; repeatedly asking what they have to tell him (sisters 1.24.16); Says "Ok" instead of asking follow-up questions or making comments that match | |
| 7.  making relevant contributions to a topic during conversation/discussion** | 2 |
| Evidence: <br> Direct observation e.g. When grandfather says, "Tell us about you," he says, "Have you ever seen my shoes?" He seemingly can't think of anything in response to being asked about his day, so he starts suggesting he has diseases. (2.12.16) <br> Declarations: Bonnylin, Elders, Lovett, Stork | |
| 8.  avoiding use of repetitive/redundant information** | 2 |
| Evidence: <br> Direct observation e.g. Repeatedly asking sisters for money and books (1.24.16) | |
| 9.  asking for/responding to requests for clarification during conversations** | 3 |
| Evidence: <br> Direct observation e.g. No clarification of needs after asking for money (1.24.16) <br> Decent clarification of message when in conversation when grandad would hear him incorrectly (2.12.16) <br> Declaration: Abele | |
| 10. adjusting/modifying language based on the communication situation (communication partner[s], topic, place)** | 2 |
| Evidence: <br> Direct observation <br> Declarations: several indicating he was unusual/stood out as atypical (Wright, Fannin, DeLeon, etc.) | |
| 11. telling/understanding jokes/stories that are related to the situation | 3 |
| Evidence: | |

13

IFCD 004000

| | |
|---|---|
| Direct observation e.g. Joking about early labor, lethal injection, and abortion with sisters (1.24.16) grossly inappropriate, but relevant<br>Declarations: Pack, Blackstone, Hendrix, Newnham | |
| 12. showing sense of humor during communication situations | 3 |
| Evidence:<br>Direct observation e.g. Dark humor with dad (1.25.16); "Sharia Law should be a country singer" to dad (1.25.16); Thinks it would be funny if mom testified against him (2.3.16)<br>Declarations: Pack, Blackstone, Hendrix, Newnham | |
| 13. joining or leaving an ongoing communicative interaction** | 1 |
| Evidence: Direct observation<br>Declarations: Fanning, Walker, Wrightson, Gartman | |
| 14. participating/interacting in structured group activities** | 1 |
| Evidence:<br>Loftin report<br>Declarations: Fanning, Walker, Metze | |
| 15. participating/interacting in unstructured group activities | 1 |
| Evidence:<br>Loftin report<br>Declarations: Wrightson, Fanning, Zurheide, Walker, B. Clifford | |
| 16. responding to introductions and introducing others | 3 |
| Evidence:<br>Direct observation during *CAPs* (required prompting) | |
| 17. using strategies for getting attention** | 2 |
| Evidence:<br>Direct observation e.g. Acting like he doesn't know his sister (2.3.16) or remember his uncle (1.24.16); Making odd expression and then saying, "Where am I?" when talking to granddad (2.12.16) | |
| 18. using strategies for responding to interruptions and interrupting others** | 2 |
| Evidence:<br>Direct Observation e.g. "I can't talk about it" to interrupt dad's description of his colonoscopies (1.25.16), interview<br>Declaration: Bruck, Paavola, Stevens | |
| **Asks For, Gives, and Responds to Information** | |
| 19. giving/asking for directions** | 4 |
| Evidence:<br>Direct Observation e.g. confession interview | |
| 20. giving/asking for the time of events** | 4 |
| Evidence:<br>Direct Observation e.g. confession interview | |
| 21. giving/asking for reasons and causes for actions/conditions/choices** | 2 |
| Evidence: | |

14

IFCD 004001

| | |
|---|---|
| Direct Observation e.g. confession interview; did not directly give "race war" motive himself; Doesn't understand why sister is mad at him (1.24.16) <br> Declaration: Bruck, Paavola, Stevens | |
| 22. asking for help from others** | 2 |
| Evidence: <br> Direct Observation e.g. Asking sisters for money (1.24.16), Asking mom for clothes <br> Declarations: K. Brown, Abele, DeLeon | |
| 23. offering to help others | 2 |
| Evidence: <br> Direct Observation <br> Declaration: Fanning | |
| 24. giving/responding to advice or suggestions** | 2 |
| Evidence: <br> Direct Observation <br> Declaration: Bruck, Paavola, Stevens | |
| 25. asking others for permission when required** | 3 |
| Evidence: <br> Direct Observation e.g. confession <br> Declarations: Livingston, Fanning, K. Brown | |
| 26. agreeing and disagreeing** | 3 |
| Evidence: <br> Direct observation: e.g. making arguments about how washing his hair impacts appearance and regarding the quality of his attorney with grandpa (2.12.16) | |
| 27. asking for clarification if he/she is confused or if the situation is unclear** | 2 |
| Evidence: <br> Direct Observation e.g. Doesn't understand inferences regarding why his brother-in-law doesn't like him or request explanation. Just says, "Does he talk bad about me?" (1.24.16) <br> Declarations: C. Brown, Abele, DeLeon | |
| 28. accepting/rejecting invitations | 1 |
| Evidence: <br> Declarations: Fanning, Patton | |
| 29. starting/responding to verbal and nonverbal negotiations** | 2 |
| Evidence: <br> Direct Observation e.g. repeatedly says, "I can't talk about it" when he doesn't know what to say (1.24.16; 1.25.16; etc.) <br> Declaration: Bruck, Paavola, Stevens | |
| 30. reminding others/responding to reminders | 3 |
| Evidence: <br> Direct Observation e.g. repeatedly reminding family to give him money | |
| 31. asking others to change their actions/states (e.g., please move, stop tapping) | 3 |
| Evidence: | |

IFCD 004002

| Direct observation e.g. directing who to put on phone | |
|---|---|
| 32. apologizing/accepting apologies | 2 |
| Evidence:<br>Direct Observation e.g. none for sister cancelling wedding due to him until she directly prompted him (1.24.16) | |
| 33. responding when asked to change his/her actions** | 2 |
| Evidence:<br>Direct Observation e.g. change in behavior following sister voicing disappointment (1.24.16) | |
| 34. responding to teasing, anger, failure, disappointment | 2 |
| Evidence:<br>Direct Observation e.g. laughing and says "Well this isn't a good visit" when sister says she is angry with him. She says he is far too happy for her to feel OK about him. He suggests "I still have 19 minutes to start crying."<br>Declarations: Wrightson, Fanning | |
| 35. offering/responding to expressions of affection, appreciation | 1 |
| Evidence:<br>Direct Observation e.g. responding to dad saying, "I love you" (12.18.16)); says "OK" when Morgan says "I love you" (1.24.16); says "OK" to dad saying "I love you" (1.25.16); "Yeah" and immediate topic change when granddad says they love him (2.12.16)<br>Maddox report | |
| 36. knowing how someone is feeling based on nonverbal cues** | 3 |
| Evidence:<br>Direct observation: e.g. understands sister is mad but doesn't understand why (1.24.16); fine with obvious expressions during CAPs | |
| 37. reading the social situation correctly and behaving/responding to it** | 2 |
| Evidence:<br>Direct observation: e.g. didn't pick up on sister's inference regarding why his granddad didn't visit (1.24.16)<br>Declaration: Stork | |
| 38. understands posted and implied group rules** | 2 |
| Evidence:<br>Direct observation: understands posted e.g. confession video but not implied<br>Declaration: Fanning, McAteer, Cruea | |
| **Nonverbal Communication Skills** | |
| *Reads and interprets the following nonverbal messages accurately:* | |
| 39. facial cues/expressions** | 2 |
| Evidence:<br>Direct Observation<br>Declaration: Walker | |
| 40. making/responding to greetings to/from others | 2 |
| Evidence: | |

IFCD 004003

| | |
|---|---|
| Direct Observation e.g. recorded interviews show he uses verbal greetings but does not establish joint eye contact with Amber and Morgan (1.24.16), Dad (1.25.16) Declarations: Walker, Wilson, Hagin | |
| 41. making/responding to farewells to/from others | 2 |
| Evidence: Direct Observation e.g. "talk to you later or probably not" (Amber; 1.24.16) Declarations: Schultz, Otero | |
| 42. beginning/ending conversations** | 1 |
| Evidence: Loftin report Direct Observation e.g. Awkward with sisters; limited comment to comment (1.24.16) Declarations: Fanning, Pack | |
| 43. tone of voice** | 3 |
| Evidence: Direct Observation Loftin report Declarations: DeLeon, Otero | |
| *Demonstrates culturally appropriate use of the following nonverbal support:* | |
| 44. facial cues/expressions** | 2 |
| Evidence: Direct Observation e.g. recorded interviews Declarations: Fanning, Walker, Stewart | |
| 45. body language/gestures** | 2 |
| Evidence: Direct Observation e.g. recorded interviews Declarations: Stork, Newnham | |
| 46. voice intonation (pitch, inflection, tone, or cadence)** | 3 |
| Evidence: Direct Observation Declaration: Otero | |
| 47. expresses messages by using gestures or facial expressions** | |
| Evidence: Direct Observation | 3 |
| 48. uses gestures and/or facial expressions according to the situation** | |
| Evidence: Direct Observation Loftin report | 2 |
| 49. adjusts body distance (sit/stand) according to the situation** | |
| Evidence: Direct Observation | 3 |
| 50. presents matching gestures/facial expressions and verbal messages** | |
| Evidence: | 1 |

17

IFCD 004004

| | |
|---|---|
| Direct Observation: incongruent facial expressions that appear to match what he is thinking instead of the current conversation (e.g. smiles at illogical times in conversation with grandparents on 2.12.16)<br>Declarations: Fanning | |

*Direct observations were made by the current evaluator during in-person evaluation of Mr. Roof and analysis of jail visit and police confession recorded videos.

** indicates a skill necessary for pro se litigation during pre-trial and sentencing proceedings

Raw Score = 109
Age Equivalency = <3.0

Scores on the *CELF-5 Pragmatics Profile* may at first glance seem absurd given Mr. Roof's strong expressive and receptive language skills and excellent vocabulary. However, it is imperative to note that this profile examines language use rather than form or content. While Mr. Roof undoubtedly has above average semantic knowledge and grammatical skills, his ability to use language functionally and meaningfully in social contexts is profoundly impaired. Mr. Roof clearly communicates in linguistically complex sentences with rich lexical variety. However, he is extremely inconsistent in his use of the pragmatic components of communication. In other words, Mr. Roof employs appropriate use of conversational routines, nonverbal communication and information exchange with the *frequency* that is expected of a young child.

*Clinical Assessment of Pragmatics (CAPs)*

Mr. Roof demonstrated intact knowledge of all aspects assessed during this assessment. He could appropriately decode facial expressions, detect when a listener is not understanding, read prosodic variation, and demonstrate understanding of vocal tone. Mr. Roof easily demonstrated correct use of social conventions such as greetings, polite requests, verbal negotiations, and polite interruptions during this standardized test. He used facial affect to express emotions appropriately and initiated, maintained and end conversations appropriately. Mr. Roof even momentarily demonstrated typical eye contact when called to do so during this portion of the evaluation. He regularly explained what the video "wants me to say" (in order to get full credit) but then go on to explain a more nuanced and complete reading of the social situation.

That said, Mr. Roof explained that he was simply acting, and this was evident to the examiner. Clearly, he does not generally use most of the social constructs he demonstrated during *CAPs* administration. When probed about this incongruency, Mr. Roof explained that he was simply acting. He would use an animated voice and provide the expected answer with intact nonverbal communication. At one point, he began somewhat laughing at his own performance. He was shown a scene in which one girl is trying to get her friends to hurry to get to class in time. He imitated a female voice and laughed while giving the correct answer and then said, but "she should make an indignant face."

IFCD 004005

The evaluator asked Mr. Roof why he doesn't use any of these pragmatic social skills when interacting in everyday life. He replied that he found it embarrassing to use most of these nonverbal cues and social expectations. Mr. Roof also admitted that it takes a lot of his concentration to do things like look at people and that keeps him from focusing on what is "really important" in a social situation. As was explained by Dr. James Ballenger in the competency trial:

> "He does care, as he points out, much more than most people, and he credibly raised the issue that to say he's unaware of social cues is completely wrong. He says he is hypersensitive to facial cues about whether the person is liking him, and he is overly focused on that and said this is part of his anxiety-- his social anxiety disorder that he acknowledges he does have, and that he is overly concerned with that" (1/2/2017 Tr. at 27).

Dr. Ballenger then stated a belief that Mr. Roof's discomfort would not prohibit him from functioning competently in the courtroom. As a speech-language pathologist recognizing that the social anxiety is compounded by severe pragmatic language performance deficits, this evaluator disagrees.


**Diagnostic Findings:**

Mr. Roof demonstrates performance deficits closely related to Social Communication Pragmatic Disorder DSM 315.39 (F80.89). He exhibits consistent and persistent difficulties in social use of verbal and nonverbal communication through profound deficits in using language for social purposes, changing communication based on context or listener considerations, and appropriately following rules for conversation and storytelling. However, Mr. Roof does not demonstrate difficulties in understanding indirect or ambiguous language (inferences, humor, figurative language, homonyms, etc.). Additionally, Mr. Roof's communication deficits significantly limit his social participation, establishment of social relationships, and academic and occupational performance. That said, this evaluator is unable to say with certainty that Mr. Roof's impairments are "not attributable to another medical or neurological condition" since he has been previously diagnosed with social anxiety and autism spectrum disorder, among other conditions. Therefore, the current diagnostic finding is as follows:

*Symbolic Dysfunction relating to Pragmatic Communication secondary to an organic disorder; DSM R48.9 (ICD-10-CM)*


**Impact of Pragmatic Language and Auditory Processing Deficits on Mr. Roof's Ability to Self-Represent**

Mr. Roof's social pragmatic communication deficits and auditory processing disorder negatively affected his ability to meet the demands of a pro se trial. However, Mr. Roof explained to this evaluator that he felt forced to self-represent, as he directly opposed the nature of his legal

IFCD 004006

team's defense. Mr. Roof raised this opposition to the Court pre-trial via a letter to the Prosecution in the hope of having new counsel appointed to his case. The Court found that Mr. Roof's legal team had been providing him appropriate representation and denied this request. The Honorable Richard Mark Gergel explained that Mr. Roof's suggestion to "write a document that would take away all responsibility from my lawyers, but still keep them as my lawyers, and then they could do whatever I say, but they wouldn't have any responsibility" was not feasible. The Court repeatedly explained to Mr. Roof that the American Bar Association directly guides the rights of the accused and the responsibilities of their counsel. (*11.22.2016 Tr at 279-280*). However, this type of specialized procedure may have been essential for Mr. Roof to have effectively managed a pro se trial due to the profound nature of his communication deficits.

Following a Faretta hearing on November 11, 2016, Mr. Roof began the uncomfortable process of self-representation through the jury selection process. He then motioned to have defense counsel reinstated for the culpability phase. His communication challenges with these steps of litigation were outlined in a declaration by defense counsel concerning competency filed January 1, 2017. Namely, while serving pro se during juror voir dire, Mr. Roof rejected counsel's suggestions for follow-up questions and refused to make objections. He neglected to strike a juror that he really did not want seated, seemingly because this act would be difficult for him to initiate. Mr. Roof reportedly became very overwhelmed when passed notes from his attorneys, despite their efforts to limit their advice in both number and complexity. According to the declaration:

> "We wrote the proposed questions in plain, simple English and occasionally included citations to case names for him. The defendant rejected many of these suggestions on the basis that he did not know what to say if the judge asked him why he was objecting and this would embarrass him. He was unwilling to simply say the word "objection" because he feared the judge would be mad at him if he could not explain further" (pg. 2).

A second Competency trial was held, with evidence being limited to new evidence gathered since the first trial. In his order dated January 18, 2017, Judge Gergel characterized Mr. Roof's communicative strengths relating to the cross-examination of witnesses Dr. Rachel Loftin and Dr. James Ballenger. His Honor wrote that the "Defendant's cross-examinations of Dr. Ballenger and Dr. Loftin demonstrated an aptitude for witness cross-examination that is extraordinary for a pro se litigant" (pg. 17). This evaluator firmly agrees with this assessment. However, the skill of questioning a witness 1:1 when there is a clear indication of conversational turn is only one aspect of the interactive communication that must be employed for successful courtroom litigation. This evaluator recognizes that Mr. Roof chose to utilize his defense team during the most communicatively challenging part of the proceedings (the guilt-or-innocence phase). However, the auditory processing and pragmatic language skills essential to self- representation during the jury selection and sentencing components of trial include and are not limited to the following:

- Listening to juror responses, summarizing key elements, and forming follow-up questions in real time
- Presenting live argument to the Court on motion through incorporation of law, facts, new testimony, and Court rulings.
- Maintaining appropriate facial expressions and body language to shape juror perception
- Changing verbal and nonverbal language to reflect adherence to emotional context

20

IFCD 004007

- Processing attorney questions and witness testimony in connected speech, determining the need for objections based on the law, interrupting Court proceedings to audibly object and take control of the floor, and answering potential follow-up questions in an adversarial environment

The evaluator has highlighted pragmatic skills in *Table 1* necessary for pro se litigation during pre-trial and sentencing proceedings. Notice the number of expected behaviors that Mr. Roof would need to employ to effectively serve as his own counsel, and the Likert-scale value relating to his performance development in that area. Based on extensive record review, formal assessment findings and direct observations made by the examiner, Mr. Roof simply does not have the communicative abilities to competently serve as his own trial attorney.

**Evidence of communication challenges displayed or given by expert testimony at trial**

As previously stated, Mr. Roof was unhappy with the strategy his defense team intended to employ. However, he was also grossly uncomfortable with the idea of speaking in open court. Therefore, he asserted a desire to self-represent without actively participating in the proceedings. Judge Gergel voiced concern with this defense strategy, but Mr. Roof was ultimately found competent to serve in this capacity. (*11/22/2016 Tr. at 282*)

> THE DEFENDANT: If you were to represent yourself, are you allowed to not cross-examine witnesses and not do anything?
> THE COURT: Yes. I must say to you that I would have a great deal of concern that if your plan was to do nothing, which you told me is your preferred defense. I would rule you do not have the capacity to self-represent, because that is not, I believe, a proper defense in a situation like this, basically to let the Government present its case and the jury then decide. So that would be very difficult. I'll be glad to hear you out, but I want to forecast to you that that would cause me a deal of concern, that to have no defense. Because, again, I want my jury to have the very best information to make a fair and just decision. And I feel like though you dispute the information, and you are welcome at trial to dispute the information, that the jury should have the benefit of hearing that evidence.

Dr. Ballanger summarized the defense counsel's concerns regarding Mr. Roof's nonverbal communication in the courtroom and implications on juror perception:

> "They also raised more subtle difficulties in their working with him. And that includes that he-- that they feel he often sits in a rigid, inflexible position which would be off-putting to a jury; that he so dislikes being looked at in public that it has prevented them from talking to him in the courtroom, he talking to them, even the passing notes in the courtroom, and at one point he said, 'Don't look at me' in the courtroom." (*11/21/16 Tr. at 26*).

He then goes on to explain that Mr. Roof's communication skills are very functional in 1:1 settings. However, Mr. Roof explained that it would be extremely difficult to communicate comfortably in a setting where 20 people were watching (such as a courtroom with the jury present). Mr. Roof's social anxiety and pragmatic challenges hinder him from even

IFCD 004008

understanding how others might be comfortable in that setting as he states, "Of course not. I couldn't do that. Nobody can do that" (*11/21/16 Tr. at 27*).

This evaluator believes it is just this concern that caused Mr. Roof to tell defense witness William J. Stejskal that "Whatever happens, I can't let there be a trial." Dr. Stejskal explained that Mr. Roof's demeanor as he said that seemed anxious and concerned: "And when I asked him to explain, he paused and indicated that he couldn't talk about that" *(11/22/2016 Tr. at 219)*. As previously indicated, Mr. Roof uses that phrase to indicate that he is not comfortable discussing a topic. It's extremely common that individuals with social communication challenges do not want to discuss these difficulties with others due to associated feelings of embarrassment.

Even so, Mr. Roof advocated for himself more than once during natural breaks in the proceeding but only after his standby counsel initiates the interaction on his behalf. Essentially, Mr. Bruck requested that he be able to serve as Mr. Roof's voice in the courtroom. He explained that Mr. Roof is uncomfortable interjecting and has difficulty processing the proceedings in real time.

> MR. BRUCK: Well, I should simply say that Mr. Roof is very concerned about time. He feels great time pressure. He feels that people are—
> THE COURT: Have a seat. Mr. Roof, could you stand up, sir. Let me start by saying that if you need a minute, when I turn and ask you if there are questions, if you want a minute to consult with your counsel, just let me know that. I will allow you time to do that. You understand?
> MR. ROOF: Yes.
> THE COURT: Are you able-- are they suggesting questions to you? Are you able to understand them?
> MR. ROOF: Yes.
> THE COURT: Okay. And then you have been making a decision whether or not to ask those questions?
> MR. ROOF: Yes, I just-- sometimes it takes me a minute to figure out-- to figure it out.
> THE COURT: Well, let's-- what we'll do is if you need that minute, just indicate that to me, and I'm going to afford you the chance to speak further with your counsel at the table there before you have to respond. Does that seem reasonable to you?
> MR. ROOF: Yes.
> THE COURT: Okay. Very good (*11/29/2016 Tr. at 108-109*).

The next day, Mr. Roof again attempts to use standby counsel as to verbalize his questions and objections to the Court. This examiner assumes that the high stress nature of the courtroom, along with competing demands for real-time language processing were simply overwhelming for Mr. Roof. He recognized this and proposed a solution in which his voice could be meaningfully heard. Unfortunately, any "hybrid" approach to self-representation was not considered by the Court. When His Honor explained his rationale for this, additional evidence of Mr. Roof's inability to process and integrate aurally presented information and formulate a reasonable argument is exhibited, as he simply reiterated the same request:

> THE COURT: Okay. I'm advised that standby counsel wishes to make-- bring a matter to the Court's attention.

22

IFCD 004009

MR. ROOF: Yes. I was going to ask you if you would let my standby counsel assist me in proposing more questions to the jurors and making objections to strike jurors.

THE COURT: Mr. Roof, let me explain to you self-representation involves a waiver of the right to counsel, required to do before. And, one, when one self-represents, one obtains certain benefits and acquires certain burdens. I advised you that I thought it was unwise to waive your right to counsel but you had the constitutional right to do that. And I find a system of essentially having your standby counsel become cocounsel to be potentially chaotic and a manipulation of the system, and I'm not going to allow it. If you need-- if your standby counsel wishes to recommend questions to you, they are sitting at your table; they can give you the advice. If they wish to suggest to you bases for objections, I urge you to consider it, but it's up to you as your own counsel to make that. And so I-- I think you are encountering what I previously told you, that this was a challenging and daunting endeavor to do by yourself. And I say that if through this process you wish to reconsider that decision and to relinquish your role in self-representation, I would consider that. That's up to you, but you have-- you have invoked your right to self-represent. You had to first waive your right to counsel, which you did unequivocally clearly before me. So I deny your motion to have counsel stand up, but I continue to recommend to you that you have standby counsel, you should consider what they tell you and suggest to you, or it's ultimately your decision. Okay?

MR. ROOF: Can-- can I-- can you let David speak?

THE COURT: Well, I'm not trying to-- see, we are now-- we just keep creeping into this role of Mr. Bruck being your cocounsel.

MR. ROOF: But—

THE COURT: He has filed briefs on this. I read them. I've considered it. It's my discretion running this courtroom how-- the procedures we are going to use. I believe these are the proper procedures. And that's my ruling.

MR. ROOF: Thank you. (*11/30/2016 Tr. at 5-6*)

Again, the examiner appreciates that His Honor is attempting to make Mr. Roof comfortable with the process of speaking out in court. However, Mr. Roof did not go on to demonstrate proficient use of this method, as doing so would require the use of pragmatic communication skills he simply does not possess and most definitely cannot learn to use in the unfamiliar and extremely intense environment of a courtroom. The examiner notes that Mr. Roof did at one time ask the Court for "one second" to formulate a question for a prospective juror who had previously served on a capital case. However, Judge Gergel immediately replied with "Take your time. Would you like me to inquire into the circumstances of that case?" This prompt appeared to fluster Mr. Roof and the following discourse resulted:

MR. ROOF: Just there was-- there was a question. I just need one minute. It slipped my mind.

THE COURT: You take your time.

MR. ROOF: Oh, yes, I remember. So I would like you to ask her the same question about-- no. The question is when she was on the jury in that capital case, did she genuinely agree with the other people, or in that case did she just go along to give the person the death penalty.

IFCD 004010

THE COURT: Would you also like me to ask a little bit about the circumstances of that case? (*11/30/2016 Tr. at 180*).

While the result of this exchange was productive, Mr. Roof demonstrated clear difficulty in formulating his intended question and relied on the Court to suggest a question specific to this juror's potential qualification. This inability to formulate specific queries is noted throughout the trial transcripts, as Mr. Roof repeatedly asked the same follow-up question to prospective jurors. Namely, he frequently requested that the judge ask whether the juror would be comfortable standing up for their own opinion if it varied from that of the group (e.g. *11/29/2016 Tr. at 194 & 255, 11/30/2016 Tr. at 44*). When he did attempt to formulate a variant question, the Court most often explained to him that it had already been answered but could be asked again for his sake (e.g. *11/30/2016 Tr. at 26, 11/30/2016 Tr. at 268*).

Mr. Roof made it known the Court that he was unable to keep up with the flow of the jury selection process. First, he directed Mr. Bruck to make a request on his behalf. However, when the judge directly called him to stand and make a request for himself, Mr. Roof says, "Yes, um, it would be helpful if we could slow down." Judge Gergel responded that he doesn't feel they have rushed at all and does not feel the need to waste time. He stated, "I'm not going to slow down just for some abstract reason I should slow down" (*11/30/2016 Tr. at 121*). At the time, His Honor was understandably unaware that Mr. Roof's need for increased processing time was due to an organic auditory processing disorder rather than an abstract preference.

However, this examiner also notes that Mr. Roof might not always fully understand the implications of the testimony or how to respond to the Court in his own best interest. For example, this exchange from jury selection on November 28, 2016, suggests that Mr. Roof is not able to follow the discourse between the Prosecutor and Judge Gergel to substantiate the need to strike a potential juror for cause. This examiner suspects this is a processing issue, as Mr. Roof voiced a desire to avoid the death penalty during assessment:

> MR. RICHARDSON: (…) "in some context and against it in other context, leave the firm impression that it would prevent or at least substantially impair her ability to follow the Court's instruction and perform her duties as required.
> THE COURT: Specifically regarding 31B, we went into this—
> MR. RICHARDSON: I think as a totality, I think you can take into account the number of those different things, and I think you put those altogether, and it's very difficult to come away with any other impression.
> THE COURT: Mr. Roof, do you object to strike for cause?
> MR. ROOF: Yes. Um, she, I think that-- I think that the same thing shows that she can consider everything, that she can consider giving the death penalty and not giving it.
> THE COURT: Well, I appreciate that. I just-- simply because of her statement that she would always impose the death penalty for multiple murders, I just can't-- that's a fixed position in which she is not willing to weigh the evidence. She's simply not qualified to serve. So I grant the strike for cause, the motion of the Government (pg. 123).

Additionally, Mr. Roof does assert himself at times during the trial when directly call upon by the Court to do so. Individuals with social communication challenges are often much more

24

IFCD 004011

skilled at responding than initiating. Even so, the following exchange exemplifies another processing challenge, as Mr. Roof is unable to understand the nuanced questioning following an incongruent response by a prospective juror.

> THE COURT: Any follow-up questions from the Government?
> MR. RICHARDSON: No questions, no motion, Your Honor. motions?
> THE COURT: Mr. Roof? Any follow-up questions or
>  MR. ROOF: I would just point out that in 31, he marked "yes" to every single one of them, A, B, C, and D, and then he told you no.
> THE COURT: Correct.
> MR. ROOF: So I think he should be struck.
> THE COURT: Do you have any follow-up questions?
> MR. ROOF: No questions.
> THE COURT: I will state that his question 31 appeared to be an incongruity because he stated in the comment of 31 that he would weigh the aggravating and mitigating factors, and it occurred to me in reading that and his other responses that he had not carefully read question 31, and that is why I asked him that question. And I was satisfied that he had misread the question, as I had suspected, frankly, and I watched his demeanor and judged it, and I found him credible, and based upon that, I find Juror Number 160 qualified (*11/29/2016 Tr. at 84-85*).

On December 2, 2016, counsel for Mr. Roof requested "an accommodation" for Mr. Roof, explaining that, "Mr. Roof has demonstrated in the last several jurors that he is unable to register an objection at an appropriate time, because he thinks that he has to be able to justify and explain the objection in response to questioning, that he does not understand" (pg. 148). His Honor makes diligent efforts to ensure Mr. Roof understands how to object and the fact that the word "objection" may stand alone for his consideration (e.g. *11/28/16 Tr. at 64, 11/29/2016 Tr at 14, 12/2/16 Tr. at 150, 1/4/2017 Tr. at 159*). However, Mr. Roof's deficits are performance (rather than skill) based. Yes, he certainly understands how to object and may be able to follow along with witness testimony well enough at times to desire to do so, but he is simply unable to interrupt courtroom proceedings and direct the attention to himself.

**Additional thoughts regarding Mr. Roof's pro se litigation from familiar others**

Communication deficits such as those Mr. Roof demonstrates are lifelong in nature. This examiner considered the declarations of several individuals who knew him well throughout his life to ensure the organic nature of his communication disorder. This information was instrumental in completing the *CELF-5 Pragmatic Profile*. Additionally, it is worth noting that several of Mr. Roof's acquaintances voiced surprise that he had chosen to self-represent and/or allowed to do so (DeLeon, McAteer, Metze, Pack, Patton, Stork, Wilson). Brian Fanning worked with Mr. Roof until very shortly before the crime. He voiced these concerns:

> "I was surprised to find out that Dylann represented himself at trial. I can't imagine that Dylann had the confidence to make arguments in his defense. He couldn't look people that he worked with for months on end in the eyes so I don't know how he could look at the jurors or talk to them in a way that made sense".

IFCD 004012

A close friend of Mr. Roof's sister Amber, Frederick Flynn Stork III, echoed these sentiments. He explained that he spent a great deal of time at the Roof home and estimated that Mr. Roof was isolated in his room about 90% of the time, usually coming out only briefly to eat or watch others play video games. He never injected himself into a conversation or joined the game and would retreat to his room again without "saying a word". Mr. Stork wrote the following in his declaration:

> "I remember watching the news and seeing that Dylan represented himself. I couldn't believe this. I can't imagine Dylan having the ability to interact with people in a courtroom, ask questions, or make an argument. He could barely leave his room to talk to his own family, so I couldn't imagine him being able to represent himself".

His friend Trey Bonner shed further light on why self-representation would have been so difficult for Mr. Roof. He explained that he kept his head down and was extremely embarrassed any time that attention was drawn to him in class. In fact, he explained the depth of this discomfort in his declaration:

> "When Dylan got called on in class, he got red in the face and visibly uncomfortable. The teachers later knew not to call on him to answer questions so that he wouldn't get so uncomfortable".

## Summary/Conclusion

Dylann Roof, age 30, was raised by divorced parents in two unstable households. Multi-generational mental health issues in his mother's family were well-documented, and his father led a lifestyle of frequent drug/alcohol abuse and partying. Mr. Roof most often lived with his mother who relocated several times during Mr. Roof's formative years. Both homes lacked parental supervision, and Mr. Roof was not regularly exposed to prosocial communicative norms.

Mr. Roof was first diagnosed with a speech-language delay at 20 months old. He had a tongue tie released but received no other interventions despite being described as a shy boy with no friends who lacked eye contact. By middle school, he began abusing alcohol and drugs and spent his free time on the periphery of a neighborhood friend group. Academic challenges began to escalate. In 2009, he was diagnosed with social anxiety and OCD after voicing suicidal ideation. He failed 9th grade for the first time and was enrolled in home school, leading to extreme social isolation during his teen years. By age 17, Mr. Roof reported anxiety, insomnia, symptoms of agoraphobia, and excessive electronics use. His BMI was in the 1st percentile, and Mr. Roof was diagnosed with Hashimoto's Disease shortly thereafter.

During this period of extreme isolation and following a national news story with related themes, Mr. Roof became very focused on the concept of "reverse racism". He began reading and voicing extreme racist thoughts through online forums. Mr. Roof made some unsuccessful attempts to meet in-person with individuals that frequented a "white pride" website but was not

26

able to make meaningful friendships even among those sharing this interest. Mr. Roof dropped out of online school, and his father eventually secured him a job with a landscaping company. However, his attendance and work performance were both extremely poor and he was let go twice from this position.

Because he was kicked out of both of his parents' homes, Mr. Roof moved in with a group of young adults in a crowded and chaotic house trailer. In addition to escalating his substance abuse, Mr. Roof began formulating a plan to kill black parishioners in a historically significant church. On June 17, 2015, at Mother Emanuel AME Church in Charleston, Mr. Roof tragically took the life of nine people in a horrific act of racial violence. He was taken into custody and eventually found guilty of both state and federal crimes after a pro se trial.

The purpose of this evaluation was to determine what impact Mr. Roof's social communication skills had on his ability to effectively represent himself in a capital murder trial. Record review and additional assessment revealed that Mr. Roof is an intelligent man with typical expressive and receptive language skills. He uses intact grammar and vocabulary skills and can often effectively send messages in 1:1 interactions when knowledge of turn is well-defined. However, the quality of Mr. Roof's functional language is characterized by challenges in auditory processing and social language pragmatics. While Mr. Roof's auditory acuity is normal, he displays a significant auditory processing disorder at the neurophysiological and lexical integration levels. The discrepancy in Mr. Roof's comprehension and linguistic processing speed scores was at or below the 1st percentile. In other words, Mr. Roof's verbal comprehension speed is profoundly impaired as compared to his vocabulary knowledge. Due to the presence of an auditory processing disorder and organic linguistic processing delays, it is highly unlikely that Mr. Roof could "keep up" with the communicative demands of the courtroom. Furthermore, his ability to integrate and respond to testimony in real time to meet the expectations of a pro se trial was grossly complicated by Mr. Roof's profound social communication deficits.

During the interview assessment, Mr. Roof admitted to a long history of social anxiety. He voiced discomfort when using verbal language in variety of expected contexts such as: asking someone for help, bringing attention to self, saying something that might offend someone or give them a adverse feeling about him, and talking to unfamiliar others and/or someone in authority. He recognized that his attention is not always on the same thing as others with whom he is in proximity and often hyper-focuses on the perceptions others are making of him rather than on the content of their communication. He explained that his own thoughts and language processing abilities may be reduced when he's feeling anxious or in a stressful environment.

Mr. Roof indicated that he has several tendencies that interrupt the natural conversation flow (e.g. taking a long time to answer, unusual topic shifts, eye contact avoidance, monologuing). Because he gets frustrated when trying to get ideas into conversation, he distances himself from ongoing interactions. Contrary to the reports of several of his former conversation partners, Mr. Roof believes he can initiate and maintain conversations appropriately unless he is under a time constraint. He agrees with assertions that he demonstrates inappropriate conversation termination skills.

IFCD 004014

Administration of the *CELF-5 Pragmatics Profile* revealed that Mr. Roof displays deficits in all three categories of functional language use: use of conversational rules/routines, use of nonverbal communication, and information exchange. While he can interpret and demonstrate prosocial language conventions during a structured task in a closed environment (e.g. during *CAPs* testing), he is not able to generalize skill use to naturalistic contexts. Mr. Roof has a profound pragmatic performance deficit characterized by weaknesses such as the following:

- Difficulty initiating, maintaining, and ending conversations appropriately
- Challenges with adding novel information to a conversation (avoiding redundancies)
- Trouble joining and leaving group interactions
- Deficits in adapting language to context or conversation partner
- Inability to participate in structured or unstructured groups when knowledge of turn is not directly provided
- Difficulty demonstrating nonverbal communication skills commensurate with his verbal message/mood of the environment

Mr. Roof demonstrates performance deficits closely related to Social Communication Pragmatic Disorder DSM 315.39 (F80.89). His deficits significantly limit his social participation, establishment of friendships, and academic/occupational performance. However, because these deficits may be partially attributable to a medical or neurological condition, this evaluator diagnosed Mr. Roof with the following: Symbolic Dysfunction relating to Pragmatic Communication secondary to an organic disorder; DSM R48.9 (ICD-10-CM)

Mr. Roof's significant pragmatic language and auditory processing deficits had an observable adverse impact on his ability to self-represent in this capital murder trial. Mr. Roof explained that he felt forced to self-represent, as he directly opposed the nature of his legal team's defense and was denied the provision of new counsel. However, he proved unable to process court proceedings (aurally presented information) in real time and eventually requested a reduced speed of proceedings. He also repeatedly requested that his standby counsel be able to serve as his voice. Both motions were denied, and this examiner provided several examples of the negative impact of these decisions. Without the provision of specialized procedures to accommodate for deficits such as use of standby counsel to verbalize his questions and objections, Mr. Roof simply could not effectively serve as a pro-se litigant.

It was my pleasure to evaluate Mr. Roof. Please feel free to reach out if there are any additional questions or concerns.

Best Regards,

Dr. Amy J. Fritz, EdD, CCC-SLP
Owner & Founder, Cedar Tree Communication Therapy

28

IFCD 004015

*Appendix A*

| Source Reviewed | Description |
|---|---|
| Ballenger_Final First Report_11.21.2016.pdf | First competency report by court's expert, Dr. James Ballenger, filed November 21, 2016. |
| Ballenger_Final Second Report_1.5.2017.pdf | Second competency report by court's expert, Dr. James Ballenger, filed January 5, 2017. |
| Declaration of David Bruck Emily Paavola and Kimberly Stevens_2017.1.1.pdf | Declaration of defense counsel concerning Roof competency, filed January 1, 2017. |
| DR Writings Comparison.xlsx | Document showing Roof's various writings in prison. |
| Loftin Expert Disclosure_11.19.2016.pdf | Expert disclosure letter re Dr. Loftin containing her raw scores for a variety of tests, including the CASL on page 36. |
| Loftin Final Report_12.29.2016.pdf | Competency report from defense autism expert, Dr. Rachel Loftin, filed December 29, 2016. |
| Lucker Final Report_11.4.2024.pdf | Expert report of defense audiologist Dr. Jay R. Lucker, received January 21, 2025 |
| Maddox Statement_4.6.2016.pdf | Filing by defense psychiatrist, Donna Maddox, concerning necessary testing for Roof, filed April 6, 2016. |
| Maddox_Final Report_12.29.2016.pdf | Competency report from defense psychiatrist, Dr. Donna Maddox, filed December 29, 2016. |
| Moberg_Final Report_12.29.2016.pdf | Expert report of defense neuropsychologist Dr. Paul Moberg, filed December 29, 2016. |
| Neuropsychological Assessment Summary Sheet_2.2.2016.pdf | Raw data from Dr. Moberg testing |
| Robison_Final Report_2016.12.29.pdf | Competency report from defense autism expert, John Elder Robison, filed December 29, 2016. |
| Roof Manifesto_1.8.2017.pdf | Roof's prison manifesto from January 8, 2017. |
| Wagner_Final Report_11.21.2016.pdf | Expert report of court expert, Dr. Mark Wagner, filed November 21, 2016. |
| D-VID-010 2015.12.11 Missy Richards.mp4, | Jail visit video |
| D-VID-011 2015.12.12 Missy Richards.mp4 | Jail visit video |
| D-VID-012 2016.01.24 Amber Tyo and Morgan Roof.mp4 | Jail visit video with sisters |
| D-VID-013 2016.01.25 Benn Roof.mp4 | Jail visit video with father |
| D-VID-014 2016.02.03 Amy Roof.mp4 | Jail visit video with mother |
| D-VID-015 2016.02.12 Joe and Lucy Roofmp4, | Jail visit video with paternal grandparents |

29

IFCD 004016

| | |
|---|---|
| D-VID-016 2016.02.14 Zaharati K. Morfesis.mp4 | Jail visit video |
| D-VID-017 2016.02.24 Roderick K. Webber.mp4 | Jail visit video |
| D-VID-018 2016.02.28 Amy and Benn Roof.mp4 | Jail visit video with parents |
| D-VID-019 2016.02.28 Amy and Benn Roof.mp4 | Jail visit video with parents |
| D-VID-020 2016.03.30 Joe and Lucy Roof.mp4 | Jail visit video with paternal grandparents |
| D-VID-021 2016.04.03 Benn Roof.mp4 | Jail visit video with father |
| D-VID-022 2016.04.14 Amy Roof and Danny Beard.mp4 | Jail visit video with mother and her partner |
| D-VID-023 2016.05.02 Missy Richards.mp4 | Jail visit video |
| D-VID-024 2016.05.22 Joe and Benn Roof.mp4 | Jail visit video father and paternal grandfather |
| D-VID-025 2016.06.09 Amy Roof and Danny Beard.mp4 | Jail visit video with mother and her partner |
| D-VID-026 2016.06.09 Amy Roof and Danny Beard.mp4 | Jail visit video with mother and her partner |
| D-VID-027 2016.07.02 Amy and Benn Roof.mp4 | Jail visit video with parents |
| D-VID-028 2016.07.02 Benn and Morgan Roof.mp4 | Jail visit video father and sister |
| D-VID-029 2016.07.17 Ani M. Devore.mp4 | Jail visit video |
| D-VID-030 2016.07.21 Joe and Lucy Roof.mp4 | Jail visit video |
| D-VID-033 2016.07.21 Joe and Lucy Roof.mp4 | Jail visit video with paternal grandparents |
| D-VID-034 2016.08.21 Amy and Benn Roof.mp4 | Jail visit video with paternal grandparents |
| D-VID-035 2016.08.24 Joe and Lucy Roof.mp4 | Jail visit video with parents |
| "D-VID-036 2016.09.25 Joe, Benn, and Amy Roof.mp4 | Jail visit video with parents and paternal grandfather |
| D-VID-037 2016.09.25 Amy Roof.mp4 | Jail visit video mother |
| D-VID-046 2016.11.03 Joe and Lucy Roof.mp4 | Jail visit video paternal gradnparents |
| D-VID-047 2016.11.19 Benn and Amy Roof.mp4 | Jail visit video with parents |
| D-VID-048 2016.11.19 Benn and Amy Roof.mp4 | Jail visit video with parents |

IFCD 004017

| | |
|---|---|
| D-VID-049 2016.12.18 Benn and Morgan Roof.mp4 | Jail visit video father and half-sister |
| D-VID-050 2016.12.27 Amy Roof and Danny Beard.mp4 | Jail visit video with mother and her partner |
| VTS_01_1.VOB | Police confession video volume 1 |
| VTS_01_2.VOB | Police confession video volume 2 |
| VTS_01_3.VOB | Police confession video volume 3 |
| VTS_01_4.VOB | Police confession video volume 4 |
| VTS_01_5.VOB | Police confession video volume 5 |
| SC-VID-027 Dylann Roof Confession 1.mpg | Part 1 of DSR's 6/18/2015 FBI Interview |
| SC-VID-028 Dylann Roof Confession 2.mpg | FBI Interview Cont'd |
| SC-VID-029 Dylann Roof Confession 3.mpg | FBI Interview Cont'd |
| SC-VID-029(a) Dylann Roof Confession 4.VOB | FBI Interview Cont'd |
| SC-VID-030 Dylann Roof Confession 5.mpg | FBI Interview Cont'd |
| SC-VID-031 Dylann Roof Confession 6.mpg | FBI Interview Cont'd |
| SC-VID-032 Dylann Roof Confession 7.mpg | FBI Interview Cont'd |
| SC-VID-033 Dylann Roof Confession 8.mpg | FBI Interview Cont'd |
| SC-VID-034 Dylann Roof Confession 9.mpg | FBI Interview Cont'd |
| SC-VID-034(a) Dylann Roof Confession 10.mpg | FBI Interview Cont'd |
| SC-VID-034(b) Dylann Roof Confession 11.mpg | FBI Interview Cont'd |
| SC-VID-034(c) Dylann Roof Confession 12.mpg | FBI Interview Cont'd |
| US016752 Transcript, Dylann ROOF, 2015.06.18.pdf | Transcript of DSR's 6/18/2015 FBI Interview |
| 2016.011.03_DSR Letter to Prosecution | DSR Letter to Prosecution regarding his defense attorneys |
| D11248 2016.05.28 DR Letter to Amy Roof | DSR Birthday and Mother's Day Letter to Amy |
| D11295 2016.06 DR Letter to Benn Roof | DSR Father's Day Letter to Bennett |
| 2016.11.21 Competency Hearing (no ECF stamp - #882-1).pdf | First Competency Hearing Pt. 1 |
| 2016.11.22 Competency Hearing (#707).pdf | First Competency Hearing Pt. 2 |

31

IFCD 004018

| 2016.11.28 B Faretta Hrg & Jury Selection (#919).pdf | Faretta Hearing & Jury Selection |
|---|---|
| 2016.11.29 Jury Selection (#920).pdf | Jury Selection Pt. 1 |
| 2016.11.30 Jury Selection (#921).pdf | Jury Selection Pt. 2 |
| 2016.12.01 Jury Selection (no ECF stamp - #973).pdf | Jury Selection Pt. 3 |
| 2016.12.02 Jury Selection (no ECF stamp - #974).pdf | Jury Selection Pt. 4 |
| 2016.12.05 Motions Hearing (#911).pdf | Hearing re Representation |
| 2017.01.02 B Competency Hearing (no ECF stamp - #880).pdf | Second Competency Hearing |
| 2017.01.18 Memo on Court Order of Competency | Judge Gergel Order following Second Competency Hearing |
| 2017.01.04 Jury Trial Sentencing Vol. I (#944).pdf | Penalty Phase Pt. 1 |
| 2017.01.05 Jury Trial Sentencing Vol. II (#945).pdf | Penalty Phase Pt. 2 |
| 2017.01.06 Jury Trial Sentencing Vol. III (#946).pdf | Penalty Phase Pt. 3 |
| 2017.01.09 Jury Trial Sentencing Vol. IV (#947).pdf | Penalty Phase Pt. 4 |
| 2017.01.10 Jury Trial Sentencing Vol. V (#948).pdf | Penalty Phase Pt. 5 |
| 2017.01.11 Sentencing Hearing (#949).pdf | Sentencing Hearing |
| *Indiana v. Edwards*, 554 U.S. 164, 165 (2002) | Decision on pro se trial proceedings |
| Self-Representation Skills.docx | List of essential knowledge and skills for trial phases |
| IFCD 000917- 000927 - 2023.08.04_Cowles, Carson - Richland One School Records | Carson Cowles' School Records - Speech Therapy Progress Report on IFCD 000923 |
| IFCD001040-001042 - Atkinson, Danny - Signed Declaration - 2023.06.27.pdf | Signed Declaration of Danny Atkinson |
| IFCD001043 - Davis, Tammy - Signed Declaration - 2023.06.24.pdf | Signed Declaration of Tammy Davis |
| IFCD001044-001049 - McAteer, Kathleen - Signed Declaration - 2023.09.06.pdf | Signed Declaration of Kathleen McAteer |
| IFCD001050-001053 - Burch, Ali - Signed Declaration - 2023.08.24.pdf | Signed Declaration of Ali Burch |
| IFCD001054-001056 - Wrightson, Timothy - Signed Declaration - 2023.07.18.pdf | Signed Declaration of Timothy Wrightson |
| IFCD001057-001059 - Fanning, Brian Signed Declaration - 2023.09.14.pdf | Signed Declaration of Brian Signed Declaration Fanning |
| IFCD001060-001062 - Hagin, Laura Signed Declaration - 2023.09.14.pdf | Signed Declaration of Laura Signed Declaration Hagin |

32

IFCD 004019

| | |
|---|---|
| IFCD001063-001064 - Pack, Brock - Signed Declaration - 2023.09.13.pdf | Signed Declaration of Brock Pack |
| IFCD001065-001066 - Patton, John Signed Declaration - 2023.09.12.pdf | Signed Declaration of John Signed Declaration Patton |
| IFCD001067-001069 - Wilson, Farah - Signed Declaration - 2023.09.13.pdf | Signed Declaration of Farah Wilson |
| IFCD001125-001127 - Garren, Catherine Signed Declaration | Signed Witness Statement - 2nd Grade Teacher |
| IFCD001128-1130 - Brown, Kathy - Signed Declaration | Signed Witness Statement - 2nd Grade Teacher |
| IFCD001131-001133 - Able, Karen - Signed Declaration | Signed Witness Statement - 3rd Grade Teacher |
| IFCD001134-001136 - Ireland, Ashley Signed Declaration | Signed Witness Statement - Incarcerated witness |
| IFCD001179-001180 - SIMMONS, Brittany Signed Declaration - 2023.11.17.pdf | Signed Witness Statement - Neighbor |
| IFCD001181-001187 - WALKER, Teresa - Signed Declaration - 2023.11.17.pdf | Signed Witness Statement - Neighbor |
| IFCD001188-001191 - Shockey, William - Signed Declaration - 2023.11.16.pdf | Signed Witness Statement - Amy Roof Ex-boyfriend |
| IFCD001192-001197 - Stewart, Gregg - Signed Declaration - 2023.11.16.pdf | Signed Witness Statement - Amy Roof Ex-boyfriend's Roommate |
| IFCD001198-001202 - Goodwin Jr., James - Signed Declaration - 2023.11.14.pdf | Signed Witness Statement - Amy Roof Ex-boyfriend |
| IFCD001203-001205 - Hastings, Patricia - Signed Declaration - 2023.11.15.pdf | Signed Witness Statement - Paige Roof's mother |
| IFCD001206-001209 - Mostellar, Cassie - Signed Declaration - 2023.11.16.pdf | Signed Witness Statement - Meek trailer friend |
| IFCD001210-001213 - Wyatt, Jeff - Signed Declaration - 2023.11.18.pdf | Signed Witness Statement - Amy Roof ex-boyfriend |
| IFCD001214-001218 - Wright, Robbie - Signed Declaration - 2023.11.19.pdf | Signed Witness Statement - MS Friend |
| IFCD001319-001322 - Alford, Tyrone Signed Dec.pdf | Signed Witness Statement - MS/HS Friend |
| IFCD001323-001328 - Brown, Caleb Signed Dec.pdf | Signed Witness Statement - Childhood Neighbor/Friend |
| IFCD001329-001334 - Davis, Gregg Signed Dec.pdf | Signed Witness Statement - HS Friend |
| IFCD001335-001339 - Goodwin, Randy Signed Dec.pdf | Signed Witness Statement - Amy Roof Ex-boyfriend |
| IFCD001343-001344 - McConnell, Geoffrey Signed Dec.pdf | Signed Witness Statement - Neighbor |
| IFCD001345-001349 - Sullivan, Jean Signed Declaration.pdf | Signed Witness Statement - Neighbor |

IFCD 004020

| | |
|---|---|
| IFCD001350-001351 - Waldrop, Ralph Signed Dec.pdf | Signed Witness Statement - 5th grade Art Teacher |
| IFCD 001352 - Horton, Kay - Signed Declaration | Signed Witness Statement - WKHS Teacher |
| IFCD 001417-001419 - Cowles, Arthur - Signed Declaration | Signed Witness Statement - Amy Roof's Cousin |
| IFCD 001420-001424 - Livingston, Tim - Signed Declaration.pdf | Signed Witness Statement - WKES Assistant Principal |
| IFCD 001425-001429 - Wright, Robert - Signed Declaration | Signed Witness Statement - Friend |
| IFCD 001588-001591 - Davis, Rob - Signed Declaration | Signed Witness Statement - Oceana Band Member |
| IFCD 001592-001598 - Hiers, Thomas - Signed Declaration | Signed Witness Statement - Corresponded with DSR on Craigslist |
| IFCD 001666-001667 - Zurheide, Jack Signed Declaration.pdf | Signed Witness Statement - Key West Neighbor |
| IFCD 001942-001952 - Walker, Andrew - IEP.pdf | Andrew Walker's IEP (Record given from Carson) |
| IFCD 001969 - Walker, Andrew_Lexington Cty Mental Health Record.pdf | Andrew Walker's medical record - notes dx of ADHD, learning d/o, speech/language expressive delay; and note stating "child requires psychoeducational testing" - 2009 (Record given from Carson) |
| IFCD 002027-002086 - Walker (Cowles) Andrew_Lexington School District Records.pdf | Andrew Walker's Educational Records (Record given from Carson) |
| IFCD 001985-001988 - Walker, Andrew_Lexington Elementary School Records.pdf | Andrew Walker's school attendance at Lexington Elementary School (Record given from Carson) |
| IFCD 000917-000927 - 2023.08.04_Cowles, Carson - Richland One School Records | Carson Cowles' Richland One School Records |
| IFCD 002561-002565 - Schultz, Kimberly (Konzny) - Signed Declaration.pdf | Signed Witness Statement - Joey Meek's Mother |
| IFCD 002566-002574 - Blackstone, Payne - Signed Declaration.pdf | Signed Witness Statement - Dylann's Childhood Neighbor |
| IFCD 002575-002577 - Golden, Dequan - Signed Declaration.pdf | Signed Witness Statement - Neighbor at Joey Meek's Trailer |
| IFCD 002578-002580 - Elders, Challice - Signed Declaration.pdf | Signed Witness Statement - Girlfriend to Dylann's close friend Jack Chandlers |
| IFCD 002581-002586 - Lovett Jr., Leslie - Signed Declaration.pdf | Signed Witness Statement - Dylann's High School Friend |
| IFCD 002589-002598 - Mubarak, Philip - Signed Declaration.pdf | Signed Witness Statement - Dylann's Pediatrian |

34

IFCD 004021

| | |
|---|---|
| IFCD 002558-002560 - Hicks, James - Signed Declaration | Signed Witness Statement - Bank Teller |
| IFCD 001123-001124 - Henry, Bonnylin - Signed Declaration - 2023.10.17.pdf | Signed Witness Statement - Dylann's Religious Education Teacher |
| IFCD002599-002607 - Frederick Stork III Signed Declaration | Signed Witness Statement - Friend of Amber's |
| IFCD002608-002609 - Alice Richardson - Signed Declaration | Signed Witness Statement - Receptionist at Saint Paul's |
| IFCD002610-002616 - Tony Metze - Signed Declaration | Signed Witness Statement - Saint Paul's pastor |
| IFCD002617-002620 - John Greider - Signed Declaration | Signed Witness Statement - Childhood Neighbor to Cowles family |
| IFCD002650-002652 - Jill Hnat - Signed Declaration | Signed Witness Statement - French Teacher at White Knoll High School |
| IFCD002832-002835 - Darce Cruea - Signed Declaration | Signed Witness Statement - Teacher from Carolina Springs Middle School Algenbra I Honors Class |
| IFCD002836-002839 - Alison DeLeon - Signed Declaration | Signed Witness Statement - Dylann's academic advisor from Provost Academy |
| IFCD002840-002844 - Tracy Wilber - Signed Declaration | Signed Witness Statement - bought Cowles family home at 611 Elm Street |
| IFCD003141-003143 - Nicole Stafford - Signed Declaration | Signed Witness Statement - Joey Meek's Brother |
| IFCD003144-003147 - Justin Meeks - Signed Declaration | Signed Witness Statement - Joey Meek's Brother |
| #205234.1 | Handwritten trial team notes of courtroom dynamics andCom DR observations |
| DSR courtroom sticky notes | sticky notes passed between trial team and DSR during court |
| DSR Penalty Phase notes (1) | Handwritten notes from court |
| getPDF | trial team email |
| IFCD003257-003260 - Treyon Bonner - Signed Declaration | Signed declaration of Treyon Bonner |
| IFCD003254-003256 - David Greider - Signed Declaration | Signed declaration of David Greider |
| IFCD003253 - Jenna Simpson - Signed Declaration | Signed declaration of Jenna Simpson |
| IFCD003251-003252 - Ryan Nash - Signed Declaration | Signed declaration of Ryan Nash |
| IFCD003248-003250 - Ted Wachter - Signed Declaration | Signed declaration of Ted Wachter |
| IFCD003244-003247 - Vanessa Otero - Signed Declaration | Signed declaration of Vanessa Otero |
| IFCD003241-003243 - Brandon Clifford - Signed Declaration | Signed declaration of Brandon Clifford |

35

IFCD 004022

| | |
|---|---|
| IFCD003239-003240 - Sonya Clifford - Signed Declaration | Signed declaration of Sonya Clifford |
| IFCD003232-003238 - Milton Wiseman - Signed Declaration | Signed declaration of Milton Wiseman |
| IFCD003228-003231 - Robert Gartman - Signed Declaration | Signed declaration of Robert Gartman |
| IFCD003222-003227 - William Bennett - Signed Declaration | Signed declaration of William Bennett |
| IFCD003220-003221 - Julie Garnett - Signed Declaration | Signed declaration of Julie Garnett |
| IFCD003217-003219 - Beth Newnham - Signed Declaration | Signed declaration of Beth Newnham |
| IFCD003261-003267 - Hendrix, Kelsey - Signed Declaration | Signed declaration of Kelsey Hendrix |
| IFCD003268-003269 - Erin Shealy - Signed Declaration | Signed declaration of Erin Shealy |
| IFCD003274-003280 - Michael Braun - Signed Declaration | Signed declaration of Michael Braun |
| IFCD003270-003273 Linda Brown, Signed Declaration | Signed declaration of Linda Brown |
| de Wit, Visser-Bochane, Steenbergen, van Dijk, van der Schans & Luinge (2016). Characteristics of Auditory Processing Disorders: A Systematic Review. Journal of Speech, Language & Hearing Research, 59, 384-413. | Evidence-Based Systematic Review on auditory processing disorders |
| American Psychiatric Association (2022). Diagnostic and statistical manual of mental disorders. (5th edition) | Diagnostic and statistical manual |
| Comprehensive Social History of Dylann Storm Roof | Compiled by defense team |

36

IFCD 004023

Ex. 1 pg.36 of 36