

# Naples Neuropsychology, P.A.

## Robert H. Ouaou, Ph.D.

Neuropsychological Assessment                 Clinical and Forensic Psychology

### CORRECTED FORENSIC NEUROPSYCHOLOGICAL EVALUATION

**NAME:**            DYLANN ROOF
**AGE:**             30
**EDUCATION:**       9 years (GED)
**DATE OF BIRTH:**   04/03/1994

**DATE OF REPORT:**    03/26/2025

**DATE(s) OF EXAM:**     01/22/2025 & 01/23/2025

### SUMMARY OF FINDINGS

Dylann Roof is a 30-year-old, right-handed male who was referred to me by his post-conviction counsel. Mr. Roof was convicted of Capital Murder in federal court in the District of South Carolina. Dylann is currently an inmate in the United States Penitentiary (USP) in Terre Haute, Indiana. I was asked by his post-conviction defense team to perform a neuropsychological evaluation and determine his current neurocognitive functioning and how it may have an effect on his ability to function in court.

It is my professional opinion that Mr. Roof suffers from a neurodevelopmental disorder per the Diagnostic and Statistical Manual Fifth Edition (DSM-5), namely Language Disorder related to a previously undiagnosed Auditory Processing Disorder (explained below). Additionally, he has a documented history of chronic Social Anxiety Disorder, Hashimoto's, and various other risk factors in addition to prior diagnoses.

### PROFESSIONAL QUALIFICATIONS

I am a clinical and forensic neuropsychologist with over 20 years of experience in the field of neuropsychology. I have been a licensed clinician since earning my Ph.D. at Palo Alto University in 1999. Palo Alto University is associated with Stanford University. I have been president of Naples Neuropsychology, P.A., in Santa Fe, New Mexico (formerly in Naples, Florida), since 2008. I have extensive research and clinical experience with various psychiatric and neurological disorders as well as traumatic brain injuries. I have published in the field of intellectual disability and have been a long-standing member of multiple professional organizations, including the American Association on Intellectual and Developmental Disabilities (AAIDD), American Psychological Association (APA), and American Academy of Clinical Neuropsychology (AACN). My complete credentials are set forth in my curriculum vitae, attached as Appendix A.

222 East Marcy Street, Suite 9
Santa Fe, NM 87501
(505) 365-2123      Neuropsych@icloud.com

Roof, Dylan
Neuropsychological Evaluation
Page 2 of 17

## RECORDS
I relied on a variety of records that are listed in Appendix B of this report.

## OVERVIEW OF MR. ROOF'S HISTORY
The following is based on interviews with Mr. Roof and review of relevant records, including voluminous declarations.

### Developmental History
Dylann Roof was born on 04/03/1994 to Amy Roof and Benn Roof in Columbia, South Carolina. He was born into a family with an intergenerational history of mental illness and alcohol abuse. His mother suffered from significant anxiety and panic that required psychiatric treatment. Based on reports, she was the repeated victim of domestic abuse and severe sexual assault. When pregnant with Dylann, Amy was 35 years old and suffered from diabetes, heart murmur, and subacute bacterial endocarditis. Additionally, prenatal genetic testing indicated that the fetus had translocation of the 12th chromosome – a condition associated with developmental delays and neurodevelopmental disorders. When Dylann was born, he weighed 5 pounds 11 ounces, which was in the lower 5th percentile of newborns.

Dylann had developmental delays and reportedly did not speak until age 3, secondary to an abnormal tongue. As a young child he was observed by numerous individuals to be socially isolative, quiet, shy, and behaviorally rigid with obsessive compulsive behaviors. At one point, his mother attempted to address her concerns about his social development with his pediatrician and was told not to worry. His pediatrician, Dr. Mubarak, stated later that his practice did not conduct screenings relevant to his social and communicative behaviors or mental health at that time.

Dylann grew up with his older sister, Amber, in a tumultuous family dynamic. His parents divorced and evidently his mother was quite promiscuous and had multiple partners. The children would split time between his mother's and father's homes. As a child, Dylann was observed by neighbors playing outside his mother's trailer by himself. As he aged and entered into elementary school, he was observed by teachers, family, and friends to have poor eye contact and to be socially withdrawn and immature, quiet, distant, awkward, and usually alone. These descriptions of Dylann's social behavior and communication style appear to be consistently observed throughout his adolescence and into young adulthood.

### Academic History
Mr. Roof stated that he did "o.k." in school academically until 7th grade. He explained that after that time, he had a "different outlook on life" and began to see less practical importance in school. He stated that he began to see schoolwork as a chore and was "easily intimidated by things in school" like math, stating that he may have been experiencing "avoidance anxiety." Again, observations by

Roof, Dylan
Neuropsychological Evaluation
Page 3 of 17

teachers noted his social isolation and diminished communication, as well as difficulty in mathematics. Academic records revealed that he switched schools frequently and that his performance declined during the 8th grade with a general deficit in mathematics-related studies. Dylann repeated 9th grade. Eventually, he received a GED approximately 10 years ago.

**Medical/Psychiatric History**
As stated above, Dylann's birth weight was low, and he exhibited developmental delays. His pediatric records indicated anxiety and insomnia and at age 17 it was recommended that he receive psychological counseling "to help him with his social skills and getting him out of the house more often." The same records noted that he suffered from "unreasonable or irrational fears afraid to go outside the house" and that he had "Problems with one's peer group does not socialize with his peers and spends all his time at home."

On 12/30/1996, Dylann was treated at Palmetto Baptist Medical Center emergency department after his father accidently sprayed paint in his eyes.
He denied history of head trauma. Medical records indicated that he began being seen for enlarged lymph nodes in 2013. Follow-up examination showed abnormal liver function and hyperglycemia. Robert Brennen, M.D., noted on 03/13/2014 that Dylann reported "asymmetry in his body noting that his left side seems a little 'larger', especially in the pectoral area than the right." Additionally, Dr. Brennen stated that Dylann had social anxiety and received workups from numerous physicians for "a variety of things" but had not appeared to have seen a psychologist for "the social disorder." At a follow-up with Dr. Brennen, Dylann was diagnosed with Hashimoto's thyroiditis. Dr. Brennen described him as very anxious multiple times in the records. Mr. Roof currently is prescribed thyroxine for his thyroid disorder. Additional medical history included a deviated nasal septum.

At age 14, Dylann received psychiatric care from 03/05/2009 to 08/19/2009 at the Lexington County Mental Health Center. Psychiatric records indicated that he was experiencing anxiety about being around people and people looking at him. Further, it was reported, "[h]e doesn't like to go anywhere where there is a crowd, and he worries 'all the time' about it. [Client] admits to avoiding social settings/places with crowds because of the anxiety." Records also note that he had told his mother that he was planning to run away and kill him himself, and that he had been smoking marijuana and taking pills. Further assessment indicated that he had no intention of self-harm and that the suicidal statements were related to anger towards his mother. He was noted to be self-medicating his anxiety symptoms and was diagnosed with social phobia, anxiety disorder not otherwise specified, and cannabis dependence. The records from Lexington indicated that he had been prescribed Lexapro and therapy, but his case was closed on 08/19/2009 after Dylann had only completed a few therapy sessions.
Concerning substance abuse, Mr. Roof stated that marijuana was "very bad" and that he would ban the substance if he could. He stated that his first alcoholic drink

Roof, Dylan
Neuropsychological Evaluation
Page 4 of 17

was at age 14 and that after the age of 16, he would binge drink sometimes on weekends. He stated that he used benzodiazepines "here and there" and had tried opioids. Mr. Roof described using "tiny doses" of suboxone (a medication for the treatment of opioid addiction) between the ages of 20 and 21 because it alleviated his anxiety. He explained that he would not get high with suboxone but only feel less anxiety.

## PRIOR CASE-RELATED EVALUATIONS/REPORTS

Neurologist David L. Bachman, M.D., conducted a neurological evaluation of Mr. Roof on 01/20/2016. In addition to examining his neurologic history and the potential effects of Hashimoto's thyroiditis on Mr. Roof's cognition and personality, Dr. Bachman ordered labs and neuroimaging. Imaging was conducted on 03/13/2016 and a NeuroQuant report was generated at Brigham Young University. In sum, significant structural abnormalities were discovered in the anterior and posterior medial temporal lobes, premotor frontal lobe cortex, and amygdala.

Mr. Roof underwent a comprehensive neuropsychological evaluation by Dr. Paul Moberg on 02/02/2016. He evaluated Dylann at age 21 and administered a battery of standardized neuropsychological tests. In addition, Dr. Moberg conducted a facial morphology assessment. Tests of symptom effort indicated that Mr. Roof was not malingering on cognitive testing. Neuropsychological test results revealed a statistically significant split between the Wechsler Adult Intelligence Scale – 4th Edition (WAIS-IV) Verbal Comprehension Index (VCI) and the WAIS-IV Perceptual Reasoning Index (PRI). Mr. Roof's standard score on the VCI was 127, which placed him in the 98th percentile and in the superior range; the PRI standard score was 107, which placed him in the 68th percentile and in the average range.[1] Mr. Roof's full scale IQ (FSIQ) on the WAIS-IV was 107 and in the average range. Dr. Moberg reported that testing also revealed "consistent reductions in processing speed, characterized by poor speed, planning, and error monitoring." Neuropsychological testing also showed reduced verbal fluency, variability in reaction time, and executive dysfunction. Dr. Moberg opined that neuropsychological testing was consistent with "mild frontal system dysfunction characterized by reduced processing speed, variability in reaction time, poor speed, planning, and error-monitoring, increased proactive interference in memory, perseverative and rigid responding, and relative reductions in semantic fluency." He further stated that real world implications of these deficits would include negatively impacting Mr. Roof's ability for decision-making, tracking new information, weighing options, adjusting to new information, and modifying thinking and behavior. Dr. Moberg opined that Mr. Roof's facial morphology assessment, neuropsychological testing, and clinical findings were consistent with a chronic neurodevelopmental disorder involving the frontal lobes of the brain with psychotic spectrum features.

---

[1] This discrepancy occurs 7.5% of the time in age matched peers and represents a clinical red flag for several diagnostic considerations including neurodevelopmental disorders and right cerebral hemisphere dysfunction.

Roof, Dylan
Neuropsychological Evaluation
Page 5 of 17

Dr. Rachel Loftin evaluated Mr. Roof for autism spectrum disorder (ASD) for approximately nineteen hours on 06/25/2016, 06/26/2016, 07/16/2016, 07/30/2016, 10/29/2016, and 10/30/2016. She also conducted interviews with six family members. Additionally, she administered a battery of psychological tests. Her report included a detailed analysis of Mr. Roof's history as well as aspects of ASD. Dr. Loftin's conclusions included that Mr. Roof was born with a predisposition toward ASD and other psychiatric conditions, did not receive appropriate mental health treatment, experienced environmental factors that exacerbated his disorder(s), and that his unusual thinking and autistic features coupled with an absence of meaningful connection to anything other than internet information gave rise to an irrational belief that he was compelled to commit the crimes.

John Robison was retained as an autism expert by defense counsel and met with Mr. Roof on 10/07/2016 and 11/04/2016. Additionally, he interviewed Amy Roof, his grandparents, and reviewed various records. Mr. Robison submitted a detailed report describing Mr. Roof and his crimes in the context of social, developmental, and diagnostic factors.

Dr. Mark Wagner conducted a psychological evaluation of Mr. Roof on 11/02/2016. Mr. Roof was 22 years old at the time. In a report dated 11/14/2016, Dr. Wagner stated that he was not given any records to review secondary to time constraints and stated that his examination had "…a particular focus on cognitive abilities, malingering and presence of psychosis." He administered a very limited neuropsychological test battery. Because he did not receive Dr. Moberg's report or testing, Dr. Wagner administered the WAIS-IV without being aware that it had been administered by Dr. Moberg nine months prior, thus creating artificially inflated WAIS-IV scores due to the practice effect.[2] Regardless, Dr. Wagner reported the same statistically significant split, albeit higher test scores likely due to practice effect, between verbal IQ (VCI = 141; 99.7TH percentile; Very superior) and non-verbal IQ (PRI = 117; 87TH percentile; High average), replicating prior test findings. Dr. Wagner also administered two memory tests and described Mr. Roof's performance as well above average. The last test that he administered was a personality inventory – The Personality Assessment Inventory (PAI). He opined that Mr. Roof was not malingering and noted that there were no elevations on the clinical scales of the PAI, but that the computer algorithm of the test was consistent with an individual who was socially unconformable and a personality profile that included a rule out for schizoid personality disorder.[3] Dr. Wagner further stated

---

[2] Some research on WAIS scales has indicated that the practice effect is minimized after 1-2 years depending on the subtest.

[3] The essential feature of schizoid personality disorder is a pervasive pattern of detachment from social relationships and a restricted range of expression of emotions and interpersonal settings. It is not diagnosed when better accounted for by other disorders such as psychotic spectrum or neurodevelopmental disorders. DSM-V-TR.

Roof, Dylan
Neuropsychological Evaluation
Page 6 of 17

that he found support for this diagnosis based on clinical impressions and (self-reported) history.

Based on my experience and expertise, there were several fundamental methodological problems with Dr. Wagner's testing and interpretation of Mr. Roof's results. First, and most obviously, he did not have any records, including Dr. Moberg's findings. Second, Dr. Wagner's neuropsychological test battery was unequivocally limited. The combination of no prior records or data and an inadequate test battery limited his ability to make any valid diagnostic considerations. Consequentially, a diagnosis of schizoid personality disorder based on his testing/evaluation could not consider other diagnostic possibilities such as a neurodevelopmental or other disorder. For example, the findings of a significant split between the WAIS-IV VCI and PRI represents a clinical red flag for several diagnostic considerations including autism spectrum disorder, nonverbal learning disorder, and general right cerebral hemispheric dysfunction. Right hemispheric dysfunction has ramifications related to emotional reasoning, insight, and social comportment. Although the pattern on the WAIS-IV replicated Dr. Moberg's findings, Dr. Wagner was unable to explain these findings because of lack of records.

James Ballenger, M.D., evaluated Mr. Roof for competency to stand trial for the court and authored two reports that were dated 11/15/2016 and 01/01/2017. For the first report, Dr. Ballenger reviewed records and consulted with defense counsel. Additionally, he requested the evaluation by Dr. Wagner and also reviewed psychological testing by Dr. Leslie Morey. Dr. Ballenger did not have Dr. Moberg's neuropsychological evaluation at the time of the 11/15/2016 report. Dr. Ballenger conducted interviews related to competency over three days and opined that Mr. Roof did not suffer from psychosis, further stating that a psychotic process, "…would be the only 'mental disease or defect' which would significantly impact his competency to stand trial." He further stated that Mr. Roof met the criteria for social anxiety disorder, probably generalized anxiety disorder, possible autistic (sic) spectrum disorder, a mixed substance abuse disorder, depression by history, and a schizoid personality disorder. He noted that he has "tremendous anxiety" in the courtroom, especially when people are looking at him. Dr. Ballenger concluded in the 11/15/2016 report that Mr. Roof did not have a mental disease or defect that rendered him incompetent. Dr. Ballenger was asked to reevaluate Mr. Roof by the court to determine his competency to stand trial and to represent himself in the penalty phase of his capital trial. He indicated in his 01/01/2017 report that he reviewed the reports of Drs. Loftin, Moberg, and Schwartz-Maddox. Dr. Ballenger and Mr. Roof discussed his defense approach, which revealed that he planned to call no witnesses and likely have no cross-examination. Dr. Ballenger described in his report Mr. Roof's thought process concerning his defense preparation, his critiques of Dr. Ballenger's report and diagnoses, and critiques of the other expert reports. In sum, Dr. Ballenger found no reason to change or amend his report or findings of competency from the initial report.

Roof, Dylan
Neuropsychological Evaluation
Page 7 of 17

Dr. Ballenger opined that Mr. Roof spending time in the courtroom would serve as a sort of "exposure therapy" to reduce anxiety. I would note that exposure therapy involves exposing a patient to very limited aspects of their fears gradually over a period of time in a safe setting, which is not akin to what Mr. Roof would experience in the trial setting.

Mr. Roof underwent a psychiatric evaluation by Dr. Maddox over multiple sessions, spanning approximately 25 hours.  She also interviewed multiple family members. In a 12/26/2016 psychiatric evaluation report, Dr. Maddox diagnosed Mr. Roof with autism spectrum disorder, other specified schizophrenia and other psychotic disorder, other anxiety disorder, alcohol use disorder, and Hashimoto's Thyroiditis.

Mr. Roof underwent a comprehensive, two day, speech language evaluation by Dr. Amy Fritz on 6/06/2024 and 06/07/24.  She administered a battery of cognitive and linguistic instruments.  According to Dr. Fritz, Mr. Roof demonstrated a profound weakness in all areas of pragmatic social skill performance including information exchange, following conversational rules/routines and using nonverbal skills commensurate with his intended message.  She administered the Test of Auditory Processing Disorders in Adolescents and Adults (SCAN-3:A) to rule out APD.  The test revealed deficient scores related to auditory processing and Dr. Fritz, who is a speech language pathologist, recommended a full audiological assessment, which was subsequently completed by Dr. Lucker (see below). Based on a review of the records and testing, Dr. Fritz opined that Mr. Roof's social pragmatic communication deficits and APD negatively affected his ability to represent himself at trial.  She cited compelling examples of how his impairments compromised his ability to competently function throughout all aspects of his pro se trial.

On 10/23/2024,  Mr. Roof underwent an Auditory Processing Assessment by Dr. Jay R. Lucker.  Dr. Lucker specializes in auditory processing disorders as well as language processing disorders.  After reviewing the evaluation reports of multiple examiners, he concluded that there were psychological and neuropsychological test findings that were likely consistent with a potential auditory processing disorder (APD).  In his report, dated 11/04/2024, Dr. Lucker provided a definition of auditory processing  as what:

> **… the entire central nervous system does when it receives information through the auditory system and gets it into the higher cognitive levels of the brain where meaning is placed on that information, so the listener makes sense and comprehends what is heard.**

Dr. Lucker further stated that APD is related to a complex interaction of auditory abilities, language abilities, sensory abilities, cognitive abilities, emotional factors, behavioral factors, and sensory factors.  He conducted a qualitative and quantitative assessment of Mr. Roof's auditory processing and found significant abnormalities in multiple domains that supported a diagnosis of APD.  Dr. Lucker

Roof, Dylan
Neuropsychological Evaluation
Page 8 of 17

opined that Mr. Roof's ability to process and understand what is spoken to him was significantly deficient and could result in Mr. Roof experiencing negative emotional reactions, frustration, and anxiety, further compromising his ability to process auditory information. Further, Dr. Lucker pointed out that Mr. Roof had significant processing speed deficits. This was consistent with Drs. Moberg's and Wagner's evaluations, which revealed that Mr. Roof had relative deficits in processing speed on the WAIS-IV and neuropsychological testing. Additionally, prior neuroimaging of Mr. Roof is consistent with the literature related to APD.

## TESTING CONDITIONS/MENTAL STATUS

As part of my evaluation, I administered a neuropsychological test battery. Mr. Roof was made aware of the nature of this evaluation. He was told that he was waiving his rights to confidentiality and that I have been authorized to provide an evaluation of his cognition, not treatment. He was also made aware that I would be reviewing relevant records and possibly speaking with third-party sources. No pharmacological agents were present in Mr. Roof's system that would have diminished Mr. Roof's performance during the testing battery. He was alert, attentive, and able to fully participate in the testing session, which included breaks. Mr. Roof was evaluated in a room that was free from visual or auditory distractions within USP Terre Haute.

Mr. Roof was pleasant, alert, and engaged in the assessment process. He was, at times, hesitant to talk about personal information during the interview. He described his mood, energy, and sleep as "good", appetite as "ok". At times, Mr. Roof's eye contact was poor and at other times it was appropriate. He did not appear to be responding to internal stimuli or hallucinations.

## SYMPTOM VALIDITY/MALINGERING MEASURES AND RESULTS

When performing neuropsychological testing, there is the possibility that test subjects may try to exaggerate their cognitive impairments. Neuropsychologists are responsible for making determinations about the validity of the data obtained during neuropsychological evaluations. In order to determine if this was the case, I administered tests that are designed to reveal less than genuine performance on the part of the test subject:

- Test of Memory Malingering (TOMM)
- Validity Indicator Profile (VIP)
- Rey 15 Item Test
- Embedded Measures from the Wechsler Adult Intelligence Scale – 5th Edition (WAIS5)
- Advanced Clinical Solutions (ACS)
  - Word Choice

These tests are sensitive to effort put forth on testing and not to actual intellectual or neurological deficits. And as a matter of procedure, these tests were administered to Mr. Roof throughout the testing session to ensure ongoing validity

Roof, Dylan
Neuropsychological Evaluation
Page 9 of 17

of the examination findings. Following standardized testing procedures, Mr. Roof was not notified when I was testing his effort. He performed within normal limits, well above designated cutoffs on all symptom validity measures. Mr. Roof appeared to give significant effort and the current evaluation is considered to be a valid profile of his neuropsychological functioning and not indicative of malingering.

## NEUROPSYCHOLOGICAL ASSESSMENT
On 01/22/2025 and 01/23/2025, I met with Mr. Roof for approximately 10 hours, during which time I administered a battery of neuropsychological tests. The tests I administered are highly accurate, standardized instruments. They are validated by adhering to stringent, objective techniques. These neuropsychological tests provide quantifiable results that indicate the amount of deviation from base-line norms. Through a comparison of examinee responses to established norms, the clinician can determine the scope of intellectual and cognitive strengths and weaknesses.

## INTELLECTUAL FUNCTIONING TESTING AND RESULTS
To assess Mr. Roof's general intelligence, I administered the Wechsler Adult Intelligence Scale – 5th Edition (WAIS5), from which Mr. Roof's IQ scores were derived. The WAIS5 is an individually administered clinical instrument designed to assess intelligence of adolescents and adults ages 16 through 90 years. It was published in 2024 and represents the most recent revision of the WAIS. The WAIS scales, like the Stanford Binet, are grounded in strong theoretical foundations, rigorous test development methods, and a respected tradition of psychological assessment. They are test batteries and not screening instruments (e.g., the GAMA, Shipley, or Weschler Abbreviated Scale of Intelligence), that represent accepted tools for the diagnosis of intellectual disability and related cognitive strengths and weaknesses. Screening instruments are limited in that they lack the ability to provide a comprehensive assessment of the general factor of intelligence as well as multiple broad ability domains. The WAIS-IV provides information about overall level of intellectual functioning and the presence or absence of significant intellectual disability. Mr. Roof's full scale IQ score was as follows:

|  | Scaled Score | Percentile Score |
|---|---|---|
| WAIS5 Full Scale IQ (FSIQ) | 118 | 88 |

The WAIS5 FSIQ is derived from a sum of 7 subtests scaled scores and usually considered the score that is most representative of general intellectual functioning. His full scale IQ score fell in the above average range.

Each subtest from the WAIS5 also contributes to the index scale scores for Verbal Comprehension, Visual Spatial Reasoning, Fluid Reasoning, Working Memory, and Processing Speed, in a manner prescribed by the test.

Roof, Dylan
Neuropsychological Evaluation
Page 10 of 17

Mr. Roof's index scale scores were as follows:

| WAIS5 Indices | Standard Score (Mean = 100) | Percentile Score |
|---|---|---|
| Verbal Comprehension  Index | 127 | 96 |
| Visual Spatial Index | 122 | 93 |
| Fluid Reasoning Index | 108 | 70 |
| Working Memory Index | 115 | 84 |
| Processing Speed Index | 89 | 23 |

The Verbal Comprehension score is a measure of the ability to access and apply acquired word knowledge.  His verbal abilities, as measured by the index, are in the very high range.

The Visual Spatial score indicates an individual's ability to evaluate visual details and to understand visual-spatial relations.  Mr. Roof's spatial reasoning abilities, as measured by the index, are in the very high range.

The Fluid Reasoning score measures the ability to detect the underlying conceptual relations among visual objects and to use reasoning to identify and apply rules.  His fluid reasoning abilities, as measured by the index are in the average range.

The Working Memory score is a measure of an individual's ability to register, maintain and manipulate simple auditory information in conscious awareness.  His working memory abilities, as measured by the index are in the above average range.

The Processing Speed score provides a measure of the examinee's ability to quickly and correctly scan, sequence, or distinguish simple visual information.  This composite also measures decision making and learning.  Mr. Roof's performance on tasks measuring processing speed was in the below average range.

The subtests that contribute to each index score are presented below.  Subtests used to derive the FSIQ are bolded.

| Verbal Comprehension Index (VCI) Subtests | Age-Scaled Score (Mean = 10) | Percentile Score |
|---|---|---|
| **Similarities** | 13 | 84 |
| **Vocabulary** | 17 | 99 |
| Information | 16 | 98 |
| Comprehension | 15 | 95 |

Roof, Dylan
Neuropsychological Evaluation
Page 11 of 17

| Visual Spatial Index (VSI) Subtests | Age-Scaled Score (Mean = 10) | Percentile Score |
|---|---|---|
| Block Design | 15 | 95 |
| Visual Puzzles | 13 | 84 |

| Fluid Reasoning Index (FRI) Subtests | Age-Scaled Score (Mean = 10) | Percentile Score |
|---|---|---|
| Matrix Reasoning | 13 | 84 |
| Figure Weights | 10 | 50 |
| Arithmetic | 12 | 75 |

| Working Memory Index (WMI) Subtests | Age-Scaled Score (Mean = 10) | Percentile Score |
|---|---|---|
| Digit Sequencing | 12 | 75 |
| Running Digits | 13 | 84 |
| Digits Forward | 14 | 91 |
| Digits Backward | 15 | 95 |
| Letter-Number Sequencing | 12 | 75 |
| Symbol Span | 12 | 75 |

| Processing Speed Index (PSI) Subtests | Age-Scaled Score (Mean = 10) | Percentile Score |
|---|---|---|
| Coding | 8 | 25 |
| Symbol Search | 8 | 25 |
| Naming Speed Quantity | 7 | 16 |

The WAIS5 also includes several ancillary index scores that provide additional information regarding and examinee's cognitive abilities:

| WAIS5 Ancillary Indices | Standard Score (Mean = 100) | Percentile Score |
|---|---|---|
| Verbal Expanded Crystallized | 131 | 98 |
| Quantitative Reasoning | 105 | 63 |
| Auditory Working Memory-Registration | 119 | 90 |
| Auditory Working Memory-Manipulation | 118 | 88 |
| Expanded Processing Speed | 85 | 16 |
| Motor-Reduced Processing Speed | 85 | 16 |
| Nonverbal | 112 | 79 |
| Nonmotor | 115 | 84 |
| General Ability | 123 | 94 |
| Cognitive Proficiency | 102 | 55 |

Roof, Dylan
Neuropsychological Evaluation
Page 12 of 17

**ESTIMATION OF PRE-MORBID LEVEL OF FUNCTION**
A verbal reading task (TOPF) designed to estimate an individual's premorbid intellectual ability was utilized. Pre-morbid level of ability was estimated by assessing his ability to pronounce irregularly spelled words. Based on his performance, his predicted full-scale WAIS score was 123 (94th percentile).

**COGNITIVE FUNCTIONING TESTING AND RESULTS**
In addition to the WAIS5, symptom validity measures, and the TOPF, I performed additional neuropsychological tests during the 01/22/2025 and 01/23/2025 evaluation:

Wechsler Memory Scale - Fourth Edition (WMS-IV)
        Logical Memory I & II
        Visual Reproduction I & II
        Designs I & II
Delis Kaplan Executive Function System (D-KEFS)
        Verbal Fluency
        Color Word Interference
        Trail Making Tests
        Design Fluency Test
        Proverbs Test
Rey Complex Figure Test (RCFT) Copy
Speed and Capacity of Language Processing Test (SCOLP)
        The Speed of Comprehension Test
        Spot The Word Test
ACS Faces I & II
Beck Depression Inventory-2nd Edition (BDIII)
Beck Anxiety Inventory (BAI)

**Attention/Concentration**
*Immediate Memory Span*: Mr. Roof demonstrated expected performance on measures of immediate memory. His score on the Digit Sequencing subtest of the WAIS5 was high average and at the 75th percentile. Digits Forward on the WAIS5 above average and at the 91st percentile.

*Focused & Flexible Attention*: Completion time for tasks requiring motor speed, sequencing, and visual search (DKEFS Trail Making Tests) ranged from the average to the high average ranges (25th to 75th percentiles) compared to age and education matched peers. When this task was made more complex by requiring that he alternate cognitive sets (Number Letter Sequencing), he performed within the average range (50th percentile).

*Processing Speed*: Mr. Roof's performance on multiple measures of processing speed represented a relative impairment. The Processing Speed Index from the WAISV was below average. His performance on the WAISV Naming Speed

Roof, Dylan
Neuropsychological Evaluation
Page 13 of 17

Quantity Subtest was low average and at the 16th percentile. Motor speed on the DKEFS Trail Making Test was average (63rd percentile).

The Expanded Processing Speed Index (EPSI) from the WAIS5 provides a broad measure of processing speed ability that taps speed and accuracy of visual scanning, decision making skills, and short term memory. Mr. Roof's performance on the EPSI was below average (16th percentile).

The Motor-Reduced Processing Speed Index (MRPSI) from the WAIS5 is designed to measure processing speed ability and require only simple or no motor output to respond. The MRPSI relates to decision speed, visual scanning, and attention/concentration. His performance on this index was below average and at the 16th percentile.

*Working Memory:* Performance on the WAIS5 working memory indices (WMI, AWMI-R, AWMI-M) were all in the above average range.

**Learning/Memory**
**WMS-IV Index Scores**
| | |
|---|---|
| Auditory Memory | 110 (75th percentile) |
| Visual Memory | 112 (79th percentile) |
| Immediate Memory | 108 (70th percentile) |
| Delayed Memory | 118 (88th percentile) |

Story recall from the WMS-IV was high average at short and long delayed recall (75th and 84th percentiles).

Visual recall from the WMS-IV was in the high average range at short delay recall (84th percentile) and in the above average range at delayed recall (91st percentile).

**Recognition**
He was able to adequately discriminate between learned and non-learned information on the WMS-IV.

**Language Abilities**
Semantic verbal fluency was in the average range and at the 25th percentile. Lexical verbal fluency was in the above average range (91st percentile).

The Speed and Capacity of Language Processing Test (SCOLP) measures an individual's rate of information processing and speed of comprehension. The SCOLP is a measure utilized by neurologists, psychologists, speech language pathologists, and occupational therapists to determine whether there is breakdown in language processing. The SCOLP contains two subtests: The Speed of Comprehension Test, which allows the rate of information processing to be measured and The Spot the Word Test, which provides a framework for interpreting the first test as it relates to one's core verbal abilities regardless of

Roof, Dylan
Neuropsychological Evaluation
Page 14 of 17

aural processing. On a reading presentation of the Speed of Comprehension Test, Mr. Roof performed in the average range (25th percentile). His performance on an aural presentation of the same was in the low average range (9th percentile). Mr. Roof's performance on the SCOLP Spot the Word Test placed him in the exceptionally high range and beyond the 99th percentile. Since the Spot the Word Test provides an estimate of verbal intelligence, it can be used to obtain a more fine-tuned estimate of whether a genuine decrement in speed of comprehension is present. This is achieved by subtracting the scaled score on the Speed of Comprehension Test from the scaled score on The Spot the Word Test. When considering Mr. Roof's verbal intelligence, his speed of comprehension was exceptionally low (below the 1st percentile) with both visually and aurally presented verbal information.

**Visual Abilities**
His copy of a complex geometric figure (RCFT) was within expected limits. Mr. Roof's performance on the WAIS5 block design subtest was above average (95th percentile).

**Reasoning/Problem Solving/Executive Function**
On the Dellis Kaplan Executive Function System (DKEFS), his performance was high average on Letter Fluency (91st percentile), average on Categorical Switching Correct (50th percentile) and Categorical Switching Accuracy (37th percentile). DKEFS Design Fluency Switching was high average (75th percentile). Color Word Interference Inhibition was high average (84th percentile). Color Word Interference Inhibition/Switching was average (50th percentile). His performance on the DKEFS Proverbs Test was high average (75th percentile).

**Personality/Mood**
His scores on the BDI-II (6) and BAI (8) were not indicative of current self-reported mood symptoms.

**SUMMARY OF NEUROPSYCHOLOGICAL ASSESSMENT**
Dylann Roof completed a comprehensive neuropsychological test battery. On this examination, he put forth required effort on measures associated with malingering or feigning cognitive impairment (i.e., measures of memory, attention, executive functions, intelligence). He passed all indicators that he was giving genuine effort, and the results are considered to be a valid and comprehensive summary of his cognitive functioning.

Concerning intellectual functioning, Mr. Roof received a full-scale IQ (FSIQ) of 118. This IQ score places Mr. Roof in the above average range. As was seen in previous evaluations, there was a significant difference between verbal and non-verbal IQ. His verbal IQ (VCI) was in the superior range and at the 96th percentile

Roof, Dylan
Neuropsychological Evaluation
Page 15 of 17

as compared to non-verbal IQ (FRI)[4], which was in the average range and at the 70th percentile. In general, neuropsychological testing was consistent with his (FSIQ) in the domains of immediate memory, working memory, learning and recall of visual as well as verbal information, and most executive functions.

The current neuropsychological assessment did reveal significant deficits related to multiple domains of cognitive functioning. Mr. Roof's performance was relatively impaired on the majority of processing speed measures, reflecting difficulties with speed and accuracy of decision-making skills, short term memory, and attention/concentration. He also demonstrated relative semantic verbal fluency deficits (ability to produce words by category under timed conditions). Most significant was his impairment on a test of comprehension speed, which revealed exceptionally low (below the 1st percentile) deficits in his ability to process verbal information (reading and aurally presented) in an efficient manner based on speed.

Concerning mood symptoms at the time of exam, Mr. Roof did not endorse nor exhibit significant symptoms of anxiety or depression.

**FORMULATION**
Dylann Roof is a 30-year-old male with a lifelong history of childhood neglect, developmental delays in the domains of communication and social development, chronic social anxiety. Additionally, it has become evident that he suffers from a neurodevelopmental disorder, namely Language Disorder (i.e., Auditory Processing Disorder) and Social Anxiety Disorder. The above has been documented in the record and the current neuropsychological assessment. The interaction of the receptive communication disorder, anxiety, and social behavior has been cumulative and led to significant diminished social functioning as a child, adolescent, and young adult. The amalgamation of these disorders was evident in his inability to represent himself in all aspects of the trial proceedings including voir dire, guilt, and penalty phases. A 01/01/2017 declaration by trial counsel described their observations related to Mr. Roof's behavior and thought processes during trial that are consistent with his inability to comprehend information in an efficient manner combined with and exacerbated by anxiety and mental inflexibility. Their experience was consistent with Mr. Roof's distorted social perception related to his deficits and anxiety (e.g., The judge "likes him" because he smiled at him; the jurors liked him so he would not get the death penalty). Trial counsel explained how Mr. Roof spent most time in court staring at the desk and focusing on factors not relevant to the proceedings.

A review of trial transcripts revealed Mr. Roof's constant struggles secondary to the interplay between the cognitive and affective vulnerabilities delineated above that diminished any ability for self-representation. During voir dire, he requested

---

[4] When discussing verbal vs. non-verbal IQ, the WAIS-IV (2008) generated two indices: the Verbal Comprehension Index (VCI) and Perceptual Reasoning Index (PRI). The Fluid Reasoning Index (FRI) measures perceptual reasoning and visual abstract reasoning and thus similar to the PRI for comparison.

Roof, Dylan
Neuropsychological Evaluation
Page 16 of 17

that the court "slow down" but was not provided this accommodation. Since Mr. Roof's Auditory Processing Disorder was unknown at that time, there was no meaningful explanation for his need for additional time, inability to register his objections, or inability to answer the court's questions at an appropriate time or in a meaningful manner.

During jury selection, Mr. Roof's deficits in processing speed became evident when he stated to the court, "…it would be helpful if we could slow down."[5]  The court responded that, "…I don't feel rushed at all."  Further, the court expressed the need not to waste time and that the timing was "perfectly adequate".  Understanding Mr. Roof's deficits now, the timing was certainly not adequate for an individual who suffers from APD, social anxiety, and the processing speed defects found on current neuropsychological testing.

Additionally, during the penalty phase, Mr. Roof failed to raise any objections nor cross examine any of the witnesses.  This was likely secondary to his social anxiety and diminished comprehension speed that has been documented in the record, especially on multiple evaluations including the current neuropsychological evaluation.  For example, the court instructed Mr. Roof:

> **Mr. Roof, if you object to the questioning, you stand up and say, "Objection."  Okay?  And I'll take it up.  But doing it after the fact is not nearly as important or as effective as doing it on a timely basis.[6]**

Clearly there was concern about Mr. Roof's ability for self-representation but with little or no understanding of the cognitive, affective, and linguistic deficits that were present and causative at the time.

When discussing the proceedings with Mr. Roof, he stated that he did not read any records in preparation because it was "a chore."  He admitted that he felt anxious "during all of it" and was focusing on his cold feet.  He wanted each day to be done and was "daydreaming constantly" explaining that his thoughts were consumed about having to be stripped searched every day upon returning to jail.  He was afraid to make eye contact with people on the stand or during jury selection stating, "I never turned my head because I was afraid to make eye contact and start thinking about what they were thinking."  He did not ask questions of jurors or witnesses at times during trial because of his anxiety.  Mr. Roof admitted that during trial he was "daydreaming about what's going to happen or what's happened instead of what's going on in the moment and wasn't listening to the outside."

In fact, we now know that Mr. Roof has a significant impairment in his ability to process verbal information provided to him.   Daydreaming, anxiety and

---

[5] 11/30/2016 *Tr. at 121*
[6] 01/04/2017 *Tr. at 159*

Roof, Dylan
Neuropsychological Evaluation
Page 17 of 17

distractibility are expected responses for a person unable to process the events occurring in the courtroom in a timely manner.   In addition, Mr. Roof has longstanding issues with anxiety, having been isolated in his room for years in advance of his arrest. Anxiety would both compound the auditory processing problems and be compounded by the auditory processing problems.

In sum, based on the current neuropsychological test data relating to verbal comprehension speed and processing speed, interview, and review of records, Dylann Roof was fundamentally unable to represent himself at any point during the proceedings.  Given the speed of communication and information being presented in a typical courtroom, Mr. Roof would not be able to meaningfully process that information, provide effective responses or objections, and simultaneously interact with support counsel.   His overwhelming anxiety, as he described, further compounded his processing deficit resulting in Mr. Roof not being psychologically present during the proceedings.

Further complicating Mr. Roof's functioning at the time is the fact that a healthy human brain does not reach full maturation until approximately ages 23 to 25.  There are several critical etiological factors, including neglect, of cognitive, behavioral, and emotional dysfunction that can occur during the developmental period that affect how the brain develops.  Thus, at the time of the underlying offenses and trial Mr. Roof's brain was not fully developed, adding a level of immaturity in reasoning to his compromised abilities for information processing and affective functioning.

These opinions are given with a reasonable degree of neuropsychological certainty.

_____
Robert H. Ouaou, Ph.D.
Licensed Psychologist
Neuropsychologist

Appendix B

Dylann Roof Social History

Arlene Andres Interview memos of Amber Tyo, Amy Roof, Benn Roof, Cheryl Sauls, Danny Beard, David Sprayberry, Jeff Wyatt, Joe Roof Jr., Joe Roof Sr., Kasey Buntin, Lucy Roof, Melissa Chandler, Paul Roof, Renee Neese, and Susan Hargis

Declaration of Aaron Brazell

Declaration of Ali Burch

Declaration of Alice Richardson

Declaration of Alison DeLeon

Declaration of Arthur Cowles III

Declaration of Ashley Ireland

Declaration of Ashley Sprayberry

Declaration of Austin Brazell

Declaration of Beth Newnham

Declaration of Bonnylin Henry

Declaration of Brandon Clifford

Declaration of Brian Fanning

Declaration of Brittany Simmons

Declaration of Brock Pack

Declaration of Calvin Cowles

Declaration of Cassie Mosteller

Declaration of Catherine Garren

1

Declaration of Challice Elders

Declaration of Darce Cruea

Declaration of David Greider

Declaration of Dequan Golden

Declaration of Dr. Philip Mubarak

Declaration of Dr. Thomas Hiers

Declaration of Erin Shealy

Declaration of Farah Wilson

Declaration of Frederick Flynn Stork III

Declaration of Geoffrey Cade McConnell

Declaration of Gregg Stewart

Declaration of Jack Zurheide

Declaration of James Ames

Declaration of James Grayson Hicks

Declaration of James Randolph Goodwin Jr.

Declaration of Jean Sullivan

Declaration of Jeanna Simpson

Declaration of Jeff Wyatt

Declaration of Jerry Ballard

Declaration of Jhamien Robinson

Declaration of Jill Hnat

Declaration of John Greider

Declaration of John Patton

Declaration of Julie Garnett

Declaration of Justin Meek

Declaration of Karen Able

Declaration of Kathleen McAteer

Declaration of Kathy Brown

Declaration of Kay Horton

Declaration of Kelsey Hargis Hendrix

Declaration of Kimberly Schultz

Declaration of Laura Rene Hagins

Declaration of Leslie Lovett Jr.

Declaration of Linda Brown

Declaration of Marsha Brown

Declaration of Michael Braun

Declaration of Michael Robert Bixby

Declaration of Milton Wiseman

Declaration of Nichole Stafford

Declaration of Patricia Hastings

Declaration of Payne Blackstone

Declaration of Ralph Waldrop

3

Declaration of Rob Davis

Declaration of Robert Gartman

Declaration of Robert Wright

Declaration of Ryan Nash

Declaration of Sonya Clifford

Declaration of Ted Wachter

Declaration of Teresa Walker

Declaration of Tim Livingston

Declaration of Timothy Wrightson

Declaration of Tony Metze

Declaration of Tracy Wilbur

Declaration of Treyon Bonner

Declaration of Tyrone Alfred

Declaration of Vanessa Otero

Declaration of William Bennett

Declaration of William Caleb Brown

Declaration of William Shockey

Dr. Castillo's Preliminary Witness Report of Carson Cowles

Dr. Castillo's Preliminary Witness Report of Randall Lee Daniels

Dr. Castillo's Preliminary Witness Report of Tamara Shaw

FBI Interview of Amber Roof

4

FBI Interview of Amy Roof

FBI Interview of Benn Roof 2015.06.18

FBI Interview of Benn Roof 2015.07.07

FBI Interview of Christon Scriven

FBI Interview of Christopher Salas

FBI Interview of Danny Beard

FBI Interview of David Sprayberry

FBI Interview of Eric Mann

FBI Interview of Joe Roof Jr.

FBI Interview of Joe Roof Sr.

FBI Interview of Joey Meek 2015.06.18

FBI Interview of Justin Meek

FBI Interview of Kevin Areheart

FBI Interview of Nolan Byrd

FBI Interview of Paige Mann

FBI Interview of Paul Roof

FBI Interview of Zachary Vernon Carroll

Transcript of Joey Meek FBI Interview

Grand Jury Testimony of Amber Roof

Grand Jury Testimony of Amy Roof

Grand Jury Testimony of Benn Roof

5

Grand Jury Testimony of Carson Cowles

Grand Jury Testimony of Danny Beard

Grand Jury Testimony of Jacob Meek

Grand Jury Testimony of Joe Roof Jr.

Grand Jury Testimony of Joe Roof Sr.

Grand Jury Testimony of Laura Plexico

Grand Jury Testimony of Lindsey Fry

Grand Jury Testimony of Lucy Roof

Grand Jury Testimony of Nolan Byrd

Grand Jury Testimony of Paul Roof

1996.05.30 Randy Goodwin Crim DV and Breach of Peace - North Myrtle Beach

2003.01.12 Brett Easton Disorderly Conduct - Richland Co. Sheriff

2009.12.03 Teresa Walker Fraud - Columbia PD

2011.03.25 Paige Mann Assault - Chapin PD

ABC - Woman Died of Dehydration While in Police Custody, Family Says

Andrew Walker IEP

Andrew Walker Medical Records - Sandhills Pediatrics

Bennett Construction, LLC Records - SC Secretary of State

Brett Easton Court Records - Lexington County

Brett Easton Court Records - Richland County

C. Joseph Roof Obituary

6

Carson Cowles and Teresa Walker - Multiple Incident Reports

Carson Cowles and Teresa Walker Child Custody Incident - Lexington PD

Carson Cowles and Teresa Walker Custody Records

Carson Cowles Letter to Judge Strom

FBI - Statement by FBI Director James Comey Regarding Dylann Roof Gun Purchase

Helen Sellers Obituary

Joey Meek Records - South Carolina Department of Probation, Parole and Pardon Services

KKK Rally Photo from 1964.07.18 in Irmo, SC

KKK vs. Town of Pelion

Lee Bennett DUI - Monroe Co.

Marriage Record of Benn Roof and Paige Hastings

NPR - Joey Meek, Who Knew of Dylann Roof's Plan, Sentenced to 27 Months In Prison

Randy Goodwin Incident Reports - Florence PD

Randy Goodwin SLED Report

Robin Stulley in re Cody Stulley vs. Susan Buntin and Amy Roof

Sacramento Bee - Dylann Roof, charged in Charleston church massacre, attacked in jail, sheriff says

Shane Kimrey Multiple Reports  - Lexington Co. Sheriff

Teresa Walker vs. Carson Cowles - Lexington Co. Court Records

7

The New York Times - A Friend Lied About Dylann Roof's Massacre Plan. Now He'll Go to Prison

The New York Times - Dylann Roof's Sister Arrested After Bringing Weapons to School Walkout

The New York Times - Friend of Dylann Roof Pleads Not Guilty to Charges in Charleston Shooting

The Washington Post - An American Void

The Washington Post - Former inmate brags about attacking Dylann Roof in jail

WIS10 - Friend says shooting suspect Dylann Roof supported segregation

Photos of Dylann at 3 years old

Photos of Dylann as a teenager

Various family photos

2015.10.30 Interview of Benn Roof

2015.10.30 Interview of Benn Roof

2016.09.23 Deborah Barbier Memo re Joey Meek Debriefing with Government

Arlene Andrews Social History Chronology

1992.01.26 Brett Easton Domestic Abuse - Lexington Co. Sheriff

1992.06.22 Brett Easton Domestic Abuse - Lexington Co. Sheriff

1993.11.18 Brett Easton Hit and Run - Lexington Co. Sheriff

1998.10.16 Brett Easton Larceny - Lexington Co. Sheriff

2001.09.05 Amy Roof and Brett Easton Domestic Incident - Lexington Co. Sheriff

2004.04.18 Amy Roof and Paige Roof Simple Assault - Lexington Co. Sheriff

8

2004.04.18 Amy Roof and Paige Roof Threatening Calls - Lexington Co. Sheriff

2005.04.13 Carson Cowles CDV - Lexington Co. Sheriff

2010.05.07 David Sprayberry Drunkenness, Mal. Inj. to Property - Columbia PD

2010.12.03 DR and Jack Chandler Drunk and Disorderly - Columbia PD

2015.02.28 DR Columbiana Mall Arrest Record

2015.02.28 DR Incident Report - Columbia PD

2015.03.13 DR Incident Report - Columbia PD

2015.04.26 DR Columbiana Mall Arrest Record

Amber Roof Birth Certificate

Amber Roof Diary July - September 1999

Amber Roof Medicaid Records

Amy Roof Birth Certificate

Amy Roof Incident Reports - Lexington Co. Sheriff

Amy Roof Medicaid Records

Amy Roof Medical Records - Dutch Fork Family Practice

Amy Roof Medical Records - Eau Claire Cooperative Health

Amy Roof Medical Records - Lexington Medical Center

Amy Roof Medical Records - Palmetto Health Richland

Amy Roof Medical Records - Providence Northeast Family Care

Amy Roof Medical Records - USC Infectious Disease

Amy Roof Medical Records, DR Birth Records - Palmetto Baptist

9

Amy Roof Pharmacy Records - Columbia CVS

Amy Roof Pharmacy Records - Lexington CVS

Amy Roof School Records - Richland County District One

Amy Roof SSA Itemized Statement of Earnings

Benn Roof Attorney File - Kenneth Matthews

Benn Roof Birth Certificate

Brett Easton SLED Report

Child Support Records of Benn Roof and Amy Roof

Divorce Records - Benn Roof vs. Paige Roof

Divorce Records - Paige Roof vs. Benn Roof

Divorce Records of Amelia Brown and Charles Brown

Divorce Records of Benn Roof and Amy Roof

DR Bank Statement - First Citizens

DR Birth Certificate

DR Birth Records - Palmetto Baptist

DR Employment Records - Clarks Termite and Pest Control

DR Final Research Paper - Provost Academy

DR GED Diploma - SC Dept of Education

DR GED Transcript

DR Lexington County Jail Call 03.01.2015.wav

DR Library Records - Richland County Library

10

DR Medicaid Records

DR Medical Records - CENTA Group

DR Medical Records - Eau Claire Cooperative

DR Medical Records - Laurel Endocrine & Thyroid

DR Medical Records - Palmetto Richland

DR Mental Health Records - Lexington Mental Health

DR Pediatric Medical Records - Dr. Mubarak

DR Pending Drug Charge - Lexington County Court Records

DR School Records - Lexington County Part 1

DR School Records - Lexington County Part 2

DR School Records - Provost Academy

DR School Records - Richland County District One Part 1

DR School Records - Richland County District One Part 2

Stormfront Records

Estate of Andrew Cowles

Internet Records - Hughes Network

Jack Chandler Death Certificate

Jack Chandler Funeral Notice

Joe Roof School Records USC

Last Rhodesian Manifesto

Marriage License of Amy Roof and Brett Easton

11

Marriage Record of Amelia Cowles and Charles Brown

Marriage Record Order Form of Amy Roof and Brett Easton

Paige Roof Monroe County FL Clerk of Court Records

Sara Cowles Death Certificate

State v. Sprayberry - Lexington Co. Criminal Domestic Violence

State v. Sprayberry - Lexington Co. Drug Charge

Wells Fargo v. Bennett Construction (2012-CP-40-6288)

Wells Fargo v. Bennett Construction (FQ238)

List_of_Mental_Health_Experts_&_Tests_Performed_-_2016.07.12

Ballenger_Final Report 11.21.2016

Ballenger_Final Report 1.5.2017

Robison report

Declaration of David Bruck Emily Paavola and Kimberly Stevens  2017.01.01

DR Facial Measurement Data 2.5.2016

List of Mental Health Experts & Tests Performed - 2016.07.12

Loftin Expert Disclosure 11.19.2016

Loftin_Final Report 12.29.2016

Maddox Statement 4.6.2016

Maddox_Final Report 12.29.2016

Memo from call with Moberg, Bachman  Woods 2016.02.28

Moberg_Final Report 12.29.2016

12

Neuropsychological Assessment Summary Sheet 2.2.2016

Wagner_Final Report 11.21.2016

Moberg Raw Data 2.2.2016

Wagner Raw Data 11.18.2016

2015.08.12_WaPo_An American Void - Meek Family

Last Rhodesian Manifesto

Dylann Roof Richland One School Records

DR Lexington I School Records

DR School Records (Additional from Lexington)

Benn Roof School Records - USC

DR School Records - Richland One Responsive to Subpoena

Benn Roof School Records - Irmo High School

Amy_Roof_School_Records_-_Richland_District_One

D-VID-047 2016.11.19 Benn and Amy Roof

D-VID-048 2016.11.19 Benn and Amy Roof

Shane Kimrey Records

Transcript, Dylann ROOF, 2015.06.18

DR Rap Sheet

Incident Report - DR Trespassing 2015.04.26

Incident Report - DR Suboxone 2015.02.28

Incident Report - DR Paraphernalia 2015.05.07

13

SC-VID-027 Dylann Roof Confession 1

SC-VID-028 Dylann Roof Confession 2

SC-VID-029 Dylann Roof Confession 3

SC-VID-029(a) Dylann Roof Confession 4

SC-VID-030 Dylann Roof Confession 5

SC-VID-031 Dylann Roof Confession 6

SC-VID-032 Dylann Roof Confession 7

SC-VID-033 Dylann Roof Confession 8

SC-VID-034 Dylann Roof Confession 9

SC-VID-034(a) Dylann Roof Confession 10

SC-VID-034(b) Dylann Roof Confession 11

SC-VID-034(c) Dylann Roof Confession 12

Incident Report, Columbia PD, Dylann ROOF Arrest, 2015.02.28 (Possession of Drugs)

Brain Scans

2016.11.18 Carpenter Report

2016.11.20 Edens Report

2016.11.25 Findings of Fact

2016.11.07 A-C Chambers Conference Ex Parte Hearing (#977)

2016.11.07 D Ex Parte Hearing (#556)

2016.11.07 E Telephone Conference (no ECF stamp - #978)

2016.11.08 Telephone Conference (no ECF stamp - #993)

14

2016.11.16 A Status Conference Dkt (#686)

2016.11.16 B Ex Parte Conference (#687)

2016.11.17 Hearing (no ECF stamp - #988)

2016.11.18 Ex Parte Hearing (no ECF stamp - #991)

2016.11.18 Ex Parte Hearing

2016.11.21 Competency Hearing (no ECF stamp - #882-1)

2016.11.22 Competency Hearing (#707)

2016.11.22 Competency Hearing (redacted) (#713)

2016.11.28 A In Chambers Conference (#756)

2016.11.28 B Faretta Hearing & Jury Selection (#919)

2016.11.28 C Ex Parte Chambers Conf. (no ECF stamp - 979)

2017.01.02 A Hearing re Closed Comp. Hearing. (no ECF stamp - #989)

2017.01.02 B Competency Hearing (no ECF stamp - #880)

Various trial counsel memos

2017.01.01 Lawyer Declaration

15

**ROBERT H. OUAOU, Ph.D.**

Naples Neuropsychology, P.A.
2180 Immokalee Rd., Suite 305
Naples, Florida 34110
Phone: (239) 262-3007
Fax: (239) 294-3665
neuropsych@icloud.com

## EDUCATION AND TRAINING

Ph.D., Clinical Psychology    Palo Alto University (APA Accredited), August 1999
Specialization Program in Neuropsychological Assessment
Dissertation Chair: William Froming, Ph.D.
Stanford University – Palo Alto University Consortium
Dissertation: Development of Prosocial Reasoning

Predoctoral Internship    VA Maryland Health Care System (APA Approved), August 1999
Department of Veteran Affairs Medical Center, Baltimore, MD.

Postdoctoral Fellowship    Clinical Neuropsychology, September 2001
VA Maryland Health Care System
Supervisor: Robert Kane, Ph.D., ABPP-CN
University of Maryland Medical Center, Baltimore, MD

B.A., Psychology    Temple University, Philadelphia, August 1990

M.S., Psychology    Palo Alto University, Palo Alto, August 1996

Other Training Includes:    Florida Forensic Examiners Training, Forensic Evaluation and Juvenile Justice
Guardianship Evaluations
The Department of Mental Health Law and Policy of the Louis de La Parte
Florida Mental Health Institute, University of South Florida

Member, Association of State and Provincial Boards (ASPPB)

Licensed Psychologist in Florida, South Carolina, Texas

## PROFESSIONAL AFFILIATIONS
National Academy of Neuropsychology (NAN)
The International Neuropsychological Society (INS)
American Academy of Clinical Neuropsychology (AACN)
American Psychological Association (APA)
        Division 40 – Society for Clinical Neuropsychology
        Division 41 – American Psychology-Law Society
        Division 56 – Trauma Psychology
American Association on Intellectual and Developmental Disabilities (AAIDD)

Robert H. Ouaou, Ph.D.
CV
Page 2 of 5
**PROFESSIONAL**

2008 – Present    **President,** Naples Neuropsychology, P.A., Naples, FL, which provides clinical and adult services.  Provide diagnosis, disease staging, treatment planning, cognitive rehabilitation, and behavior management for various etiologies of cognitive dysfunction.  Provide diagnostic workups for traumatic brain injuries, sports related concussion, intellectual disability, learning disabilities and other neurodevelopmental disorders, psychiatric disorders, and malingering in adults and adolescents.  Expert testimony includes psychological and neuropsychological evaluations in adult and juvenile cases, competency and insanity examinations, and capital case mitigation, in state and federal criminal and civil court.  Provide evaluations for workers compensation and guardianship evaluation.  Contracted with the National Football League (NFL) to perform neuropsychological evaluations.

2009 – 2012    **Board of Directors**, Vice Chair, Medical Advisory Committee, Alzheimer's Association

2006 – 2008    **Neuropsychologist**, Neuropsychiatric Associates of Southwest Florida, Fort Myers, FL.  Evaluate brain functioning by providing brief and detailed assessments of neurocognitive functioning in adolescent through geriatric patients.  Supervised training in forensic neuropsychology with a board certified forensic psychiatrist, Fredrick W. Schaerf, M.D.  Co-investigator on several clinical research trials in Alzheimer's disease, bipolar disorder, ADHD, and other psychiatric syndromes.

2004 – 2006    **Neuropsychologist** Collier Neurologic Specialists, Naples, FL.

2004 – 2006    **Medical Staff, Clinical Neuropsychologist, Naples Community Hospital and North Collier Hospital, Naples, Fl.**  Inpatient neuropsychological service provided to all units of hospital including stoke rehabilitation, psychiatry, and others.  Served on Institutional Review Board of medical center reviewing proposed research.

2001 – Present    **Neuropsychologist, Private Practice.**

1999 – 2003    **Staff Psychologist**, **Neuropsychology Service**, **VA Maryland Health Care System, Department of Veteran Affairs Medical Center, University of Maryland School of Medicine.**  Provided inpatient and outpatient services throughout the medical centers to neurology, psychiatry, primary care, and substance abuse populations.  Both traditional and computerized based testing is employed to assess presence, lateralization, etiology, and prognosis of cerebral dysfunction and psychiatric disturbance in patients. Supervised and coordinated clinical and research functions in Geriatric Medicine/Dementia Clinic.

1999 – 2001    **Postdoctoral Fellow in Clinical Neuropsychology and Faculty, Veteran Affairs Maryland Health Care System, Baltimore VA Medical Center, University of Maryland Medical School.**  Supervisor: Robert L. Kane, Ph.D., ABPP. neuropsychological consultation to patients and professionals throughout all areas of the hospitals.  Conducted research that included a Department of Defense project examining the effects of depleted uranium on Gulf War era soldiers.  Managed operations of Dementia Clinic.  Advanced training in neuroanatomy, neuropathology, & neurosciences.

Robert H. Ouaou, Ph.D.
CV
Page 3 of 5

1997 – 1998      **Sub-investigator, Wyeth-Ayerst Pharmaceutical Corporation, San Francisco**. Coordinated and administered neuropsychological assessments in multi-site clinical trial at University of California at San Francisco.  The study examined the effects of pharmacological treatment of hyponatremia on cognitive functioning.

1995-1998      **Research Assistant**, **University of California at San Francisco**, Department of Psychiatry, Langley Porter Psychiatric Institute, San Francisco Treatment Research Center. Assistant on NIDA-funded project developing an anger management group treatment protocol.

**Anger Management Group Treatment Co-Leader**, **Department of Veterans Affairs Medical Center, San Francisco**.  The group consists of a 12-week cognitive-behavioral structured intervention aimed at preventing aggressive behaviors and substance use.

1996 – 1997      **Adjunct Instructor in Psychology**, **Department of Psychology, Holy Names College**, Oakland, CA.  Taught two semester-long undergraduate courses in Research Methods in Psychology and Statistical Methods.

1992      **Counselor, Gladman Psychiatric Facility, Oakland, CA.** Provided treatment in a locked inpatient psychiatric hospital.  Provided treatment on violent men's unit including crisis intervention and management of aggressive behavior.

1987-1988      **Technician, Department of Cognitive Remediation, Mediplex Rehab-Camden, Traumatic Brain Injury Rehabilitation Facility, Cooper Hospital/University Medical Center, the clinical campus of the University of Medicine and Dentistry of New Jersey/Robert Wood Johnson Medical School at Camden**.  Assisted inpatient and outpatient clients in improving skills in orientation, mnemonics, problem solving, academics, and social/interpersonal behavior.  Collected and analyzed patient data.

1988-1990      **Training Assistant**, **The Institute of Brain Injury Research and Training, Mediplex Rehab-Camden, Cooper Hospital/University Medical Center, the clinical campus of the University of Medicine and Dentistry of New Jersey/Robert Wood Johnson Medical School at Camden**.  Assisted in the planning and development of professional training programs including fellowships, internships and continuing education activities.

## CLINICAL EXPERIENCE

1998 – 1999      **Predoctoral Internship (APA Approved)**, **Psychology Department, Baltimore VA Medical Center**.  Completed rotations in Neuropsychology, Primary Care, and Geriatrics.  Conducted individual and group psychotherapy, as well as groups in pain management and anger management.  Attended rounds in geriatric medicine, neuroradiology, inpatient psychiatry, and neurology.

1994 - 1995      **Clinical Practicum**, **Neuropsychology Unit, Department of Medicine and Surgery, Veterans Affairs Medical Center, San Francisco, CA**.

1993-1994      **Clinical Practicum, Psychotherapy, Haight Ashbury Clinic, San Francisco, CA.**

Ex. 2 pg.35 of 37

Robert H. Ouaou, Ph.D.
CV
Page 4 of 5

## OTHER

2017    **Behavioral and Cognitive Neurology**,  Gregory P. Lee, Ph.D.
Professor of Neuropsychology & Director of Training Barrow Neurological Institute
Phoenix, AZ (National Academy of Neuropsychology Distance Learning)

1993 – 1994    **Graduate Teaching Assistant**, **Pacific Graduate School of Psychology, Research and Statistical Methods Sequence**, William J. Froming, Ph.D., Professor.

1989-1990    **Teaching Assistant**, **Widener University, Chester, PA**,  Neuropsychotherapy & Neuropsychological Assessment Sequence, David W. Ellis, Ph.D., Associate Professor.

1987 - 1988    **Assistant to Program Director**, **Mediplex Rehab-Camden, Brain Injury Rehabilitation Hospital.**

## PUBLICATIONS

Li, J. L., Wu, J., & **Ouaou, R. H.** (2023). The Utility of PET and Neurological Testing for Demonstrating CTE as a Mitigating Factor During Sentencing for Capital Murder.  Journal of the American Academy of Psychiatry and the Law.  Submitted

Russell, M. S., & **Ouaou, R. H.** (2022).  Dementia and Criminal Practice. ABA Book Publishing.

Russell, M. S., Miller, A., & **Ouaou, R. H.** (2020).  Intellectual Disability and the Death Penalty: Florida's Wrongs Should be Made Right.  Nova Law Review, 45(1), 1-34.

Shopshire, M.S., Reilly, P.M., & **Ouaou, R.H**. (1997).  Anger management strategies associated with decreased anger in substance abuse patients. In L.S. Harris (Ed.), Problems of Drug Dependence; 1996:  Proceedings of the 58th Annual Scientific Meeting of the College on Problems of Drug Dependence, Inc.  NIDA: Washington, DC.

Reilly, P.M., Shopshire, M.S., Clark, H.W., Campbell, T.A., **Ouaou, R.H**., & Llanes, S.J. (1997).  Substance use associated with decreased anger across a 12-week cognitive-behavioral anger-management treatment.  In L.S. Harris (Ed.), *Problems of Drug Dependence; 1996:  Proceedings of the 58th Annual Scientific Meeting of the College on Problems of Drug Dependence, Inc*.  NIDA: Washington, DC.

## GRANTS FUNDED AND RESEARCH PROGRAMS

Co-PI and coordinator, Neurocognitive & Functional Abilities in Geriatric Patients, University of Maryland protocol #0400232

Co-investigator, Remote Neuropsychological Assessment, University of Maryland protocol #0300231

## OTHER

Lasher, E. E., **Ouaou, R. H.**, Cernich, A.N., Kabat, M.H., Lonser, K.A., & Kane, R.L. (November, 2005).  Cognitive Predictors of Functional Status in Dementia Clinic Outpatients, presented at the 2005 Annual Conference of the National Academy of Neuropsychology, Tampa.

Robert H. Ouaou, Ph.D.
CV
Page 5 of 5


**Ouaou, R**., Short, P., Cernich, A, & Kane, R.  (November, 2002).  Understanding Neurocognitive and Functional Impairment in a Dementia Clinic Sample, Presented to the 2002 Annual Conference of NAN

**Ouaou, R**., Kabat, M., Kane, R., Johnson, J.  (November, 2000).  Predicting functional independence in dementia patients, Poster presented at the 2000 Annual Conference of the National Academy of Neuropsychology, Orlando.

Kane, R., Kabat, M, **Ouaou, R**., Wilken, J. (June, 2002). Assessing history, mood, and intellectual functioning over the intranet. The Annual Meeting of the American Telemedicine Association, Los Angeles.

Insore, A., Kabat, M., Kane, R., Short, P., **Ouaou, R**., Hauser, P., Kling, M.  (February, 2002). Neurocognitive sequelea of interferon-alpha treatment in patients with hepatitis C, Paper presented at the 2000 Annual Conference of the International Neuropsychological Society, Toronto.

Short, P., Kabat, M., Kane, R., **Ouaou, R**., Inscore, A.  (November, 2001).  Comparative efficiency of clinical estimates of baseline neurocognitive functioning, Poster presented at the 2001 Annual Conference of the National Academy of Neuropsychology, San Francisco.

Froming, W. J., **Ouaou, R. H**., Baugnon, M.  (August, 1995).  Accessibility of prosocial reasoning and the development of self-schematic self-regulation, Poster presented at the 1995 Annual Convention of the American Psychological Association, New York City.

Froming, W. J., Baugnon, M. **Ouaou, R. H**, & Schwartz, K.  (March, 1995).  Self-schemata, self-awareness, and prosocial reasoning, Poster presented at the Annual Meeting of the Society for Research in Child Development, Indianapolis.

Froming, W. J., **Ouaou, R. H**., & Baugnon, M, & Schwartz, K. (August, 1994).  Donating behaviors of schematic and non-schematic Children, Poster presented at the 1994 Annual Convention of the American Psychological Association, Los Angeles.

Froming, W. J., Schwartz, K., Baugnon, M, & **Ouaou, R. H**. (August, 1994).  The development of self-schema and affect regulation, Poster presented at the 1994 Annual Convention of the American Psychological Association, Los Angeles.