## DECLARATION OF EMILY PAAVOLA

I, Emily Paavola, state as follows:

1. I am an attorney of counsel at Justice 360, a legal non-profit in Columbia, South Carolina. I have worked there since 2008, when I began serving as Executive Director of the organization, a role I held for seven years. From 2015 until mid-2017, I served as the Legal Director for Justice 360. I also work as counsel with the National Habeas Assistance and Training Project. I primarily practice as a post-conviction attorney.

2. I got involved with Dylann Roof's case when David Bruck approached Justice 360 about helping with Dylann's mitigation case. Lindsey Vann and I were the primary mitigation specialists on the case, though we are also both attorneys. I acted as a mitigation specialist on the case until late July 2016, when my role changed, and I was appointed as third chair. I initially had concerns about being appointed because I didn't have trial experience, I had two young children at the time, and I was still working at the nonprofit. I eventually agreed to enter an appearance and took a leave of absence from Justice 360. After I was appointed as counsel, my role changed somewhat, and I oversaw the budget as well.

3. The federal and state defense teams worked very closely together and in many ways functioned as a single team for much of the case. As mitigation specialists, Lindsey and I expected that the results of our investigation would be used by both teams. Naturally, given his experience and reputation, David Bruck became the unofficial leader of the entire group. That David was the leader was understood by everyone on the team.

4. Because I live in Columbia, I was vaguely familiar with the Roof family even before working on Dylann's case. I lived down the street from Dylann's grandparents, Joe and Lucy Roof. Dylann's dad, Benn Roof, lived across the street from me for a time. I spoke with a lot of Dylann's immediate family members, including Joe and Lucy Roof, Amy Roof, Benn Roof, and Amber Roof.

5. The team introduced Dylann to a variety of mental health experts. Dylann asked for doctors to see him related to his thyroid, which he was very concerned about. Dr. Donna Maddox and I introduced Dylann to the idea of seeing an additional psychiatrist, with Dr. Maddox telling Dylann that she wanted that psychiatrist to talk to him more about his body

1__

    IFCD 004320

concerns. The team used Dylann's somatic concerns to get him to meet with experts. I don't remember how we introduced all the experts to him, since that typically fell on other lawyers.

6. Given our role as mitigation specialists, whenever Dylann brought any legal questions or concerns to Lindsey or me, we responded by saying that we would pass the message along to the lawyers. Although Lindsey and I are both lawyers, we made clear to Dylann that our role for his case was that of mitigation specialists.

7. No one was ready when Dylann wrote the letter to the prosecution, and we were forced to raise his competency. We had no evaluations prepared for competency. But we had no other choice but to pursue competency. David made the decision. When I first agreed to come on as third chair, it was made clear to me that my role would be to focus on helping prepare the penalty phase and the mitigation presentation. But when competency came up, I jumped in and did whatever needed to be done. I had never done a competency proceeding for a federal trial before and haven't again since.

8. During the competency proceedings David told us what to do, and we just did it. It wasn't my role to make any decisions related to the competency hearing.

9. I felt very frustrated by being standby counsel after Judge Gergel told us that we couldn't say anything because we were not able to do anything for Dylann, and he was unwilling or unable to advocate for himself. Kim Stevens wanted to tell Dylann that we could continue to represent him and just not offer the mitigation evidence that would make him uncomfortable. It wasn't that Dylann *wanted* to represent himself; he was just doing it because he didn't want to be labeled as autistic or be labeled as having something wrong with him.

10. There are several family members I wish we could have put on the stand during the penalty phase. Joe Roof would have been a strong witness. He truly loved Dylann, was thoughtful, and he was easy to empathize with. He was heartbroken over what Dylann had done but also had this human connection to Dylann that I thought the jurors would see. I really hoped Grandpa Joe would have convinced the jury to spare Dylann's life because of how sincere he was and how much Joe genuinely loved Dylann.

11. The biggest issue we faced as a team was the time frame. We were working under a condensed and compressed time frame and were overwhelmed.

12. At trial, the courtroom was crowded. The atmosphere was overwhelming, and tensions and emotions were high. I was concerned about the seating arrangements and worried

2_

    IFCD 004321

about how the jury would interpret the defense team sitting at the counsel table with Dylann as he self-represented. We really couldn't do much as standby counsel. I wonder if the jurors would have been more sympathetic towards Dylann if our team was not present.

13.     Parts of the trial were like being at a funeral. At some point, nearly everyone in the courtroom was in tears. I tried to hold it together until the jury was out of the courtroom, but Felicia Sanders's testimony about seeing her son take his first breath and his last breath affected everyone. Judge Gergel came back on the bench later and put on the record that he hadn't been crying, but it looked to me like he had been trying to hold back tears. At the penalty phase, witnesses read poems and played recorded sermons, songs, and prayers.

14.     During David's cross examination of Felicia Sanders, she testified that Dylann should be sent to the pit of hell. This was problematic because the Court accused David of deliberately trying to cause a mistrial. I didn't think he should have crossed her at all. Obviously, David asking questions backfired, and her testimony hurt Dylann's case.

15.     Later Judge Gergel accused David of making up that he couldn't hear Felicia's statement when she said: "go to hell." David's hearing was very bad at the time. He was incapable of whispering. He'd think he was, but it'd be so loud. The prosecutors got mad because they thought that David was trying to have the jury hear him "whisper" things that he really wanted the jurors to hear. That's not what was going on, though; he just couldn't gauge how loud he was. When I saw him at some point after the trial, I saw that he'd gotten hearing aids.

16.     During Bethane Middleton's victim-impact testimony, most of the people in the courtroom, including court staff and opposing counsel, were in tears. Ms. Middleton sobbed uncontrollably, and at some point, Jay Richardson left the podium and hugged her in front of the jury, violating the Court's order that the lawyers stay behind the podium or at counsel table. A lot was happening in the courtroom that should have been curtailed. It was frustrating because Dylann didn't object to any of it, and we could not. It was a farce—it looked like we were functioning as a team, but we weren't permitted to do the things would have done as counsel under ordinary circumstances. These were anything but ordinary. I remember thinking that the witnesses' testimonies exceeded what would be allowed by the law, but as standby counsel, we couldn't object.

3__

IFCD 004322

17. I saw impairments in Dylann that appear to be consistent with the reports written by Dr. Amy Fritz, Dr. Jay Lucker, and Dr. Robert Ouaou in connection with Dylann's post-conviction proceedings. Everything was moving quickly, and he didn't seem to be able to think or react quickly enough.

18. Dylann was unable, and therefore unwilling, to object to nearly anything in court. Dylann felt that he would not know what to say when he objected, even though the team offered to help him articulate his reasoning for objecting. He told the team he was afraid to object because he didn't want Judge Gergel to get mad at him. Judge Gergel's demeanor was very pressured and dominating, which didn't fit well with Dylann's personality. Despite this, Dylann did occasionally object.

19. Sometimes Dylann would focus on something trivial, like pictures from his camera that didn't seem important. The pictures were just of Dylann and didn't seem like a big deal, but Dylann truly couldn't focus on anything else.

20. During the court proceedings, Dylann looked straight down much of the time. We tried telling him to engage more with what was going on and explained how the jury would perceive him if he only looked down, but he just didn't seem to be able to. I don't recall Dylann ever asking the team for advice during the trial.

21. I am not sure why the team didn't follow the recommendation to hire a speech-language pathologist. It is likely that we simply ran out of time. There was no strategic decision to not hire a speech-language pathologist.

22. I am over 18 years of age and am competent to make this declaration.

Pursuant to 28 U.S.C. §1746, I, Emily Paavola, declare under penalty of perjury under the laws of the United States that the above is true and correct.

4/2/2025 Columbia, SC                  Emily C. Paavola
Date and Place                              Emily Paavola

IFCD 004323