DECLARATION OF TERESA L. NORRIS

I, Teresa L. Norris, state as follows:

1.    I am over 18 years of age and am competent to make this declaration.

2.    I am an Assistant Federal Defender in the Capital Habeas Unit at the Office of the Federal Defender for the Western District of North Carolina. From November 2016 through 2021, I was a Special Assistant Public Defender in the Ninth Judicial Circuit of South Carolina, primarily assigned to aggravated murder trial cases in both Charleston and Berkeley Counties.

3.    I joined Dylann Roof's state capital defense team in October 2015. I was the third attorney appointed to represent Dylann in his state court proceedings.

4.    My state court appointment order was signed by then Chief Justice of the South Carolina Supreme Court, the Honorable Jean Toal. It was my first, and to-date, only, trial-appointment order signed by a state Supreme Court Justice. The order protected me from appearing in other cases until 90 days after Dylann's case was resolved, so that I could dedicate all my time to his case. Justice Toal was actively involved in managing and directing the state court proceedings.

5.    I met with Dylann when he was in jail at the Al Cannon Detention Center. Sometimes I met him with other team members, and sometimes we were alone.

6.    It was obvious to me that Dylann had issues. His answers were, at times, irrational. I never could figure out exactly what was going on with him, but I knew that something wasn't right.

7.    Of the entire combined (state and federal) defense team, Ashley Pennington had the best relationship with Dylann. I called him the "Dylann Whisperer." Ashley worked in Charleston, which is where Dylann was jailed; this facilitated Ashley's ability to see Dylann frequently.

8.    When David Bruck and the federal team had to have a difficult conversation with Dylann, they would often bring Ashley into the client meeting because he was so good with Dylann. David knew he needed help with his relationship and communication with Dylann.

9.    David Bruck was the *de facto* leader of both the federal and state teams, and we all deferred to his experience, reputation, and status as one of the most experienced capital criminal defense lawyers within not only the state of South Carolina but also the country. I, and

Declaration of Teresa L. Norris

1

Initials _____

IFCD 004324

others, spoke up when we disagreed with David. But every decision in this case—state or federal—landed on David Bruck. Ultimately, we all deferred to David.

10.     I advocated hiring Dr. Donna Schwartz Maddox as an expert. Dr. Maddox and I had worked together on previous cases in South Carolina, and she had a good reputation with state judges. She has worked with both prosecution and defense teams. Jurors also respond well to experts who live in their community and understand their way of life, so hiring a South Carolinian made sense.

11.     I was in contact with Dr. Maddox frequently, so I asked the federal team to keep me apprised of all information relevant to Dr. Maddox so we could all be on the same page.

12.     The teams decided that the federal case should proceed before the state case.

13.     The federal case moved extremely quickly. It was like we were on a speeding train.

14.     There was an overwhelming amount of work and not enough time to do it all. The time crunch resulted in tasks not being performed to the proper standard of care.

15.     It's my understanding that several mitigation witnesses were contacted by phone, which was not how we wanted to do interviews, as in-person interviewing is the standard and highly preferred procedure, especially in capital case investigation and mitigation work.

16.     We certainly were not ready to go forward in state court. If the federal case had not proceeded first, the state team absolutely would have made a record as to how we weren't ready, and we would have tried much harder to get a continuance.

17.     The time crunch was driven, in part, by the desire to keep the federal case first. In the first week of October 2016, we had a team meeting in which some team members expressed concern that the federal team was not ready for trial. I agreed with those team members; I believed that the federal team could not be ready for the November trial date and should make a record as to why they were not ready and ask for a continuance.

18.     We expected Dylann would likely disfavor any mental health diagnosis, and we knew that the government would interview him. After government expert Dr. Park Dietz interviewed Dylann and revealed part of the defense team's mental health diagnoses and the mitigation plan to Dylann, the case blew up, with Dylann writing to the prosecution. The immediate result was a competency hearing.

2

Declaration of Teresa L. Norris

Initials _____

19. We were all shocked by how quickly Judge Gergel moved to hold the competency proceedings.

20. As the federal team litigated their competency issues, the state team was significantly excluded from those discussions. State lawyers were not allowed in the federal competency proceedings, and because the Court had ordered that it be a closed proceeding, our interpretation was that the federal lawyers couldn't even discuss what was said or what evidence was presented. We were not able to see Dylann's demeanor or how he managed the hearing.

21. The federal team's use of Dr. Maddox as a competency expert was problematic. With enough time and preparation, Dr. Maddox could have been the right expert. I have worked with Dr. Maddox when my client's competency has been at issue. She has experience doing these evaluations and does an outstanding job. But here she hadn't been hired for a competency assessment, so she was not prepared to render an opinion on competency when it was needed.

22. When I hire an expert for competency, I bring the expert with me to meetings with my client. I want the expert to assess my client's ability to understand the proceedings and rationally communicate with the attorneys. I also sometimes disclose my client's communications (in letters and writings to me and to his other attorneys and in meeting memos of client discussions) to the expert when I normally would not do so for non-competency assessments. Importantly, the focus of the expert's evaluation of the client is very different when focused on competency than when simply focusing on using mental health for mitigation.

23. The state team felt it was important for the state trial team to be present at the federal trial, so I attended nearly all of the trial. Other than the competency proceedings from which the state team was excluded, the state team tried to have a presence at all the federal proceedings.

24. At trial, I recall the federal lawyers passing notes and trying to get Dylann to object when he represented himself. I was horrified but not surprised when Dylann failed to object.

25. I believe Dylann did not say much in court because he had some awareness that if he talked, it would be clear that he was not keeping up with what was happening. He also did not want to draw more attention to himself or have people look at him.

26. I do not know why the team did not hire a speech language pathologist. Donna Maddox recommended that we hire a speech language pathologist, as stated in a letter from her

3

Declaration of Teresa L. Norris                                        Initials _____

that we filed in state court. George Woods, the consulting psychiatrist, also recommended that we hire a speech language pathologist, as did a consulting autism expert with whom the team met. Given that our team's experts recommended it, the team should have hired one. The whole reason we hire experts is for their expertise. It doesn't make sense to hire experts and then fail to follow their recommendations without some compelling reason not to.

27.     I reviewed recent reports from Drs. Fritz, Ouaou, and Lucker that post-conviction counsel provided to me. If we had those reports at the time of trial, I certainly think that the federal team would have used them for the competency hearing. These reports helped me understand some of the issues I saw in Dylann.

28.     By the time the federal team was preparing for the penalty phase, the state team was not involved as much in the discussions and their decision-making.

29.     Penalty phase presentations to juries often include facts about how a defendant behaves in prison and whether he can be safely housed and not be a risk to inmates or staff.

30.     I interviewed many jail inmates and staff for the benefit of the federal and state team's mitigation presentations. Dylann had no problem with me interviewing other inmates. He was interested in what I learned from the interviews. Dylann did not want the inmates to think he was suggesting names of who I should interview, which he was not. But he did not try to restrict my interviews with inmates or jail staff.

31.     I have no memory of the team hiring Dr. James Austin to report on Dylann's potential future behavior in jail. My interview reports from the inmates and jail staff were shared with the state and federal teams. I do not know whether the federal team provided the reports to Dr. Austin, and in fact, it appears from looking at his report, that he did not have that information.

32.     Based on my findings and Dylann's receptiveness to my interviewing jail witnesses, I believe he would have allowed mitigation evidence presented to the jury about his behavior in the Al Cannon Detention Center.

33.     Dylann was also very adaptive to confinement, which is one of the most crucial factors in a capital penalty phase. Adaptability to confinement is essential to making a case for life to the jury. Here, the information about Dylann's adaptability was uncontroversial; the prosecution wouldn't have been able to contradict Dylann's adaptability beyond the evidence

4

Declaration of Teresa L. Norris                                         Initials _____

they were already presenting. And I'm fairly confident that Dylann would have been comfortable having this information presented to the jury as mitigation evidence as well.

34.    I attended all but one-half day of the federal trial. Sometimes I sat in the reserved seating toward the back of the courtroom, which was near the reserved seating for the state prosecution team.

35.    Judge Gergel's wife sat near me in the courtroom; she took notes in a spiral notebook during the trial. Jay Richardson's parents also sat near me.

36.    There were three overflow rooms: one for the media, one for the victims and their family members, and one for the public. In the main courtroom, the entire prosecution side of the gallery was filled with victims' family members and friends. State court defense team members were confined to the last few rows on the defense side.

37.    I remember many people crying when Polly Shepherd testified. It was very moving. When she left the witness stand, David stood up, seemingly as a kind of acknowledgment or tribute. Everyone else in the courtroom, except Dylann and Judge Gergel, also stood.

38.    The atmosphere outside of the courthouse was intense. When I parked on the top level of the parking garage connected to the state courthouse, I saw snipers on the corners of the building across the street from the federal courthouse. There were multiple police officers on Broad Street, which is the street on which both the state and federal courthouses are located basically right across from each other.

39.    The fact that the Michael Slager trial was occurring at the same time only added to the chaos. Police and reporters were on Broad Street and surrounding areas.

40.    Tempers got short during the trial proceedings. Federal team members were getting only three to four hours of sleep. I recall Sarah Gannett crying once in the courthouse because she was upset at another federal team member.

41.    As the federal trial approached, the state team was increasingly not included in meetings and team discussions. We were no longer participating in decision making. This was a marked difference from our initial team dynamic, where there was no distinction between state and federal teams. As a result of the shift, I was mostly not involved and therefore had no ability to express my opinions.

5

Declaration of Teresa L. Norris                                             Initials _____

IFCD 004328

42.     I was concerned that we were approaching ethical lines by misleading Dylann to some extent. Experts were being brought in to interview Dylann about his thyroid, which Dylann was concerned with and had a medical history related to, though they were primarily gathering mental health information for use in mitigation. Dylann was not fully aware of this fact. I was uncomfortable with the deception, but David and the majority of the team had decided what we would tell Dylann with regard to our experts.

43.     On April 7, 2016, we filed a sealed, ex parte pleading in state court to seek a continuance in which we acknowledged the fine line we were walking with Dylann:

> the defendant appears to be very fearful that his attorneys will try to offer evidence indicating that the defendant is "crazy" or mentally-deficient in some other way. For this reason, the defense team has had to proceed with great deliberation and care in managing the client's still-unfinished mental health evaluation. The ever-present danger is that the defendant will refuse to cooperate in any further efforts to explore his mental condition. His cooperation so far has been based on the understanding that the defense team is seeking to secure treatment for the defendant's Hashimoto's thyroiditis, a condition with which he is obsessed. This obsession has caused him to tolerate a neurological examination, multiple sessions of neuropsychological testing, multiple blood draws, and magnetic resonance imaging.

44.     In my opinion, lawyers should mostly be up front with clients, even when the news is bad or will be uncomfortable.

Under 28 U.S.C. §1746, I, Teresa L. Norris, declare under penalty of perjury under the laws of the United States that the above is true and correct.


4/2/25 Vilas, NC
Date and Place

_Teresa L. Norris_ (signature)
Teresa L. Norris

Declaration of Teresa L. Norris

6

Initials _____

IFCD 004329