## DECLARATION OF DR. DONNA SCHWARTZ MADDOX, M.D.

I, Dr. Donna Schwartz Maddox, M.D.  state as follows:

1. I am over 18 years of age and am competent to make this declaration.

2. I am a physician, general psychiatrist, and forensic psychiatrist licensed to practice in South Carolina. I graduated from Furman University in 1985, with an undergraduate degree in psychology, and the University of South Carolina School of Medicine in 1989, with a doctorate in medicine.

3. In the spring of 2016, Dylann Roof's defense team contacted me to work on his case. He had pending death penalty cases in both state and federal court. I worked with both his state and federal defense teams initially, but as the case moved forward, I worked increasingly with just the federal team. Coincidentally, the state prosecution contacted me to work on Dylann's case just a few days after I had agreed to work with the defense team, but of course I declined.

4. I met with Dylann multiple times, the first being April 22, 2016. Dylann and I had good rapport. I grew up near Columbia, South Carolina, and I was familiar with the part of town where his mother was living.

5. When I visited Dylann at the Charleston Detention Center, I saw him in a quiet, non-contact room, usually at the end of the hallway. He would sit up on the ledge and be right there waiting for me.

6. Dylann presents as much younger than his age. He also has a very naïve, and what I describe as a "Leave it to Beaver," view of how the world should be. Despite having a big vocabulary and ability to form complex sentences, he presents as very childlike.

7. Initially, the trial team informed me that Dylann was very focused on somatic issues and asked me to examine him regarding these issues. I have performed such evaluations in the past, where my expertise is used to qualify psychiatric manifestations of physical illness.

8. Dylann knew I was a psychiatrist, but the defense team wanted me to initially focus on the thyroid concerns and his other physical health issues. Dylann was very anxious about

1

Declaration of Dr. Donna Schwartz Maddox

IFCD 004178

his thyroid and had much somatic preoccupation, so this was easy to do. As I interviewed and examined Dylann, his psychiatric and developmental issues became apparent.

9. When I interviewed Dylann, he often took a long pause to process before greeting me with a "thumbs up" motion to signal that I could continue.

10. Dylann was not so much hateful as he was scared. He had a genuine belief that white people were being attacked daily by Black people and were at risk of extinction. He had absorbed so much information on sites like Stormfront and the Daily Stormer that he believed horrible things were happening to white people at the hands of Black people, and the regular media was conspiring to not report it. I watched some of the videos on sites he frequented, and they were frightening. One of the videos was about a white college cheerleader being violently raped by a series of Black men. It was terrible to watch. Another video was about a flash mob of Black youths in Philadelphia randomly attacking white people near Temple University. I still remember them. They were truly terrifying and sensationalized videos.

11. As part of my initial work on the case, I reviewed multiple records pertaining to Dylann, including his interrogation video and neuropsychological testing. I noted when watching the interrogation video some features of his speech and communication style that were significant to me. I learned about his mother's advanced maternal age, his cousin's various diagnoses, and I noted Dylann's frenulum repair. All these data points led me to suggest to the trial team that Dylann had abnormalities in his communication skills. Because of this, I recommended that the trial team hire a speech language pathologist to conduct a quantitative assessment of his receptive and expressive language deficits. I believed that a speech language pathologist should assess Dylann for, among other things, an auditory processing disorder (APD).

12. I have a family member with APD. When she was young, I thought she was on the autism spectrum. She could not stand to be touched because of sensory issues, and she did not reciprocate socially. I recommended that her mother get some experts involved. After meeting with a developmental pediatrician, a speech language pathologist, and others, she was diagnosed with and treated for APD. In her case, autism was ruled out. She no longer experiences the difficulties she had before treatment.

2

Declaration of Dr. Donna Schwartz Maddox

IFCD 004179

13. I am not qualified to diagnose APD; a speech language pathologist and/or audiologist must test a person themselves. I have worked on other cases where the legal team hired a speech language pathologist upon my recommendation.

14. Upon reviewing recent reports by Dr. Amy Fritz and Dr. Jay Lucker, it is clear to me that I missed Dylann's APD. A speech language pathologist hired at the time of our investigation would have uncovered it.

15. Dylann's use of a "thumbs up" rather than verbalizing his needs is one obvious sign of a pragmatic language deficit. There were other ways that his communication was limited and he was unable to process information. He was slow to respond. He was concrete in his thinking. While he had a big vocabulary, he seemed very young in the way he expressed his thoughts. He found open-ended questions difficult to answer at times. It was much easier to communicate if I asked yes or no questions. With the addition of stress or more distractions, APD would exacerbate all of these problems.

16. Of the testimony I was able to offer in Dylann's case, I was not asked about some things I wanted to share. While a neuropsychologist would be best able to explain this, it was clear both from interacting with Dylann and from Dr. Moberg's data at the time that Dylann had a processing speed delay, among other abnormal test results. Because I knew of his processing speed delay, I was careful with Dylann to minimize Dylann's anxiety when we communicated. I spent as much time with him as he needed and gave him ample time to respond and communicate. He often asked questions for clarification.

17. I continued to visit Dylann throughout the summer of 2016. A person can easily decompensate under stress, and I noticed this in Dylann as the trial date came closer. In August 2016 Dylann started to seem more disorganized and harder to talk with. As we got closer and closer to trial, Dylann seemed more under stress and less able to function well.

18. I had very real concerns about Dylann's competency. But, unfortunately, competency concerns did not really arise until closer to trial, as he was under more pressure.

19. In early November 2016, Dylann wrote a letter to the prosecution about his distrust of the trial team. It was shortly after this that I first learned that the trial team was considering raising the issue of his competency. I met with Dylann, Kim Stevens, and David Bruck at the Charleston County Detention Center. Dylann told Kim and David that he hated them.

3

Declaration of Dr. Donna Schwartz Maddox

IFCD 004180

Up until this time, it seems that the trial team mistook Dylann's compliance for competence.

20. I should have had that meeting with Dylann alone. My presence with his attorneys compromised the trust I had built with Dylann. My relationship with him never fully recovered from this.

21. A few weeks later, the trial team asked me to testify at Dylann's competency hearing. I was in Westchester County, New York, for my aunt's funeral when I received the call and was asked to return to Charleston as soon as possible to testify. My aunt died on November 18, 2016. I immediately went to New York after her death. Her visitation was held on Sunday, November 20, 2016; her funeral was on Monday, November 21, 2016. I testified in Dylann's case in Charleston on Tuesday, November 22, 2016. My aunt and I were very close. She was like a mother to me and was my godmother. Her death was painful for me, and I was grieving at the time of my testimony.

22. My report was not finished when I testified at the first competency hearing. Because of the trial team's focus and directives to me, any report I might have even started working on would not have been aimed at competency, but at penalty phase mitigation issues.

23. I did not meet with Dr. Paul Moberg to prepare for my testimony. Dr. Moberg was a neuropsychologist who had evaluated Dylann. I had access to his test results, but I would have benefitted from discussing them with Dr. Moberg in order to better understand them before testifying.

24. I have no recollection of my preparation for testifying. I am sure I must have talked at least some with Kim Stevens before my testimony. I would normally meet with counsel before testifying and engage in mock testimony and cross-examination. But there was no time for anything like that. If I spoke with Kim, it must have been while I was in transit from my aunt's funeral to Charleston. I changed my flight to arrive directly in Charleston, rather than returning to my home in Anderson, South Carolina. I testified in my funeral suit.

25. I was inadequately prepared to testify at the hearing, but the trial team needed to put someone on the stand. Up until the hearing, I was focused solely on sentencing, which is a very different referral question from that of competency. I had been thinking more

4

Declaration of Dr. Donna Schwartz Maddox

IFCD 004181

about Dylann's development and path in life. Now I needed to focus on Dylann's recent decompensation.

26. While I testified truthfully that I did not think Dylann was competent, the trial team did not ask me whether Dylann's cognitive deficits contributed to his incompetence. They were very focused on psychosis. They did not focus on Dylann's skill deficits at all. While Dr. Moberg probably would have been better equipped to explain this, I understood based on his test results and my own observations that there were cognitive impairments. These impairments were masked by his high verbal intelligence, but they were very clearly present. The team did not discuss the *Edwards* standard for self-representation with me until after this first competency hearing occurred.

27. I was certainly aware that Dylann needed more time to process things than is typical. I understood that Dylann had difficulty with give and take conversational turn taking. He was not able to interject at appropriate times. I understood that Dylann had a tendency to get stuck on small things and not see the bigger picture. I understood that Dylann would be under stress at the time of trial and his ability to stay focused and on task would be more compromised than in the conditions in which I saw him. I was not asked about these things.

28. Later, the trial team raised with me that there would be a second competency hearing. Only at that time did they raise with me some questions about how Dylann might be limited in his ability to represent himself. I was present for the second competency hearing but was not called as a witness. I was planning to testify at that hearing about skill deficits that I observed in Dylann. I understand those skill deficits even better now based on the APD diagnosis. The APD diagnosis explains so much better what I observed and demonstrates that his impairments are probably even more severe than I realized at the time.

29. Based on my interactions with Dylann, his functional deficits would have been worse in the courtroom. With all the stress of a trial, asking questions, listening to the government's arguments, and being in the spotlight, and having spectators, he would be even more impaired. Even a familiar witness like his spiritual advisor, Father John Parker, would have been overwhelming for Dylann to question on the stand. There is so much more going on in a courtroom, with a jury, a room full of spectators, a judge,

5

Declaration of Dr. Donna Schwartz Maddox

IFCD 004182

various lawyers, staff and security. The inevitable small movements and even relatively quiet sounds in a trial would be distracting and challenging for Dylann. I knew that at the time of trial, but now that there is confirmation that he has an auditory processing disorder, I am even more certain that his ability to take in and process information would be even more compromised under greater stress and with more distractions.

30. I diagnosed Dylann as having autism spectrum disorder, attenuated psychosis, and anxiety disorder. The trial team was prepared to use this information at his penalty phase. Because of the relationship I had built with Dylann, I wanted to be the person to tell him about my conclusions. Instead, Park Dietz first revealed the autism diagnosis to Dylann. Then two experts specializing in autism, Dr. Rachel Loftin and John Elder Robison, came to discuss it with him.

31. The timeline in this case was incredibly compressed. I would have wanted to have a series of conversations with Dylann about my diagnosis before they would have otherwise been revealed. I believe if I could have slowly revealed the diagnoses to him over time, he would not have rejected them so strongly. I never used the word "autism" with Dylann until after he had met with Dr. Park Dietz and learned about the diagnosis from him. Dylann felt so betrayed by the team by the "reveal" of the autism diagnosis that even the things that he would have let people testify about, he would no longer. Even if he had rejected the label of autism, he most certainly would have allowed other evidence in mitigation. He wanted nothing to do with his lawyers after Dr. Dietz told him that his lawyers believed he had autism and planned to use this information during the penalty phase. Dylann lost all trust in his lawyers and believed they were out to harm him.

Pursuant to 28 U.S.C. §1746, I, Dr. Donna Schwartz Maddox, declare under penalty of perjury under the laws of the United States that the above is true and correct.

3/ 21/ 25
Anderson, SC

Date and Place

Donna Schwartz Maddox, M.D.

6

Declaration of Dr. Donna Schwartz Maddox

                                      IFCD 004183