DECLARATION OF DR. GEORGE WOODS

I, George Woods, M.D., state as follows:

1.     I am a neuropsychiatrist based in Oakland, California. I received my medical degree from the University of Utah in 1977, and in 1981 I completed my psychiatry residency. I spent much of my career as a neuropsychiatrist treating patients with psychiatric symptoms caused by medical problems. I have also spent more than 30 years as a forensic psychiatrist, many of those years spent primarily working on capital cases. In more recent years my work has been consulting on capital cases.

2.     The defense team appointed to represent Dylann Roof at his capital trial asked me to join their team as a consulting mental health expert. I worked with the team from September 2015 through the trial, though some months I consulted more than others. As competency issues arose close to the time of trial, I did not have as much contact with the team despite the centrality of mental health issues at that time. I was under the impression that the team would have liked my input but were simply too busy.

3.     I was brought on the trial team as a consultant only, meaning that it was unlikely I would ever testify. I never met with Mr. Roof.

4.     In my capacity as a consulting expert for the federal defense team in the Roof case, I advised counsel on the types of experts they might consider using, and the types of issues they might consider exploring.

5.     In my discussions with defense counsel, it was apparent that their relationship with their client was unusually challenging, and at times, strained.

GL

1

                                                    IFCD 004310

6. Given the dynamic between defense counsel and Mr. Roof, along with the complexity of the case, it was my considered opinion that defense counsel, and Mr. Roof, by extension, would benefit from as much preparation time as possible prior to trial commencing.

7. I encouraged Mr. Roof's counsel to approach the introduction of experts who would meet with Mr. Roof in a gradual and careful manner.

8. I consulted with the trial team's retained psychiatrist, Dr. Donna Maddox.

9. In the spring of 2016, Dr. Maddox was asked to write an update on what work she had done, and what work remained to be done. This update was intended to be used by the team in seeking a continuance. Dr. Maddox and I collaborated on the list of things that needed to be done, demonstrating the need for a continuance.

10. We placed items on the list of things to be done based on our review of records and the reports of meetings with Mr. Roof. I also reviewed Dr. Paul Moberg's neuropsychological data. After carefully reviewing the information available to us, Dr. Maddox included a recommendation that Mr. Roof be evaluated by a Speech Language Pathologist.

11. I concurred with Dr. Maddox's recommendation and made the trial team aware that I also thought that Mr. Roof should be evaluated by a Speech Language Pathologist. Speech and language are affiliated with the left temporal lobe phenomenon. The temporal lobe houses the areas of the brain that everything else goes through – things like vision, hearing, emotional processing, and executive functioning. This means that impairments in speech and language mix things up in the rest of the brain and can cause a variety of problems.

12. Neuropsychological testing tests only 8% of the brain, which means that "normal" neuropsychological results don't mean everything is okay in the brain. Speech and language

     IFCD 004311

issues are like a trojan horse to see if there are issues deep in the brain. If there are problems in the entryways of the brain, there are more problems spread throughout the brain.

13.     I also wanted the team to do Diffusion Tensor Imaging (DTI) on Mr. Roof's brain. The team conducted an MRI of Mr. Roof's brain, but I never saw DTI data. An MRI looks at the volume of various areas of the brain, which can be correlated to or diagnostic of some brain-based problems. A DTI additionally looks at the neural pathways of the brain. The physical structure of the brain can look completely normal, but a DTI can reveal significant problems with the flow of information within the brain.

14.     There is no question that the team was not ready for trial. Mr. Roof's trial occurred too quickly. I am working on a case now that I have been working on for the past five years, and we are still finding out new things about the client. I know every case will not get five years, but part of the reason we need time on these cases is because we experts must educate the team and assist the team and the testifying experts in building a relationship with the client. Mr. Roof was particularly distrustful which means that the team really needed to take more time to understand Mr. Roof and his family.

15.     In March 2016 I was aware that the trial team was introducing their mental health experts to Mr. Roof under the guise of helping him with medical issues. Mr. Roof was concerned about his diagnosis of a thyroid disease called Hashimoto's. As early as March 2016 I began telling the team that they needed to think about and plan for telling Mr. Roof about the defense - particularly mental health evidence- that they intended to put on in the penalty phase of his trial. The team never did tell Mr. Roof about their planned defense, at least not until after the government's expert Park Dietz told him.  At this point Mr. Roof's trial lawyers had been lying

6L

     IFCD 004312

to him and misleading him for the previous year. All trust between Mr. Roof and his lawyers was lost at that point.

16.     Although the lawyers who represented Mr. Roof at trial were and are excellent lawyers, ~~I have never seen better lawyers do a worse job on a case~~. David Bruck was just coming out of the Tsarnaev trial when the Roof trial preparation began. David seemed upset about the turnout of the Tsarnaev case, and did not seem as precise in his work on Mr. Roof's case as a result.

17.     I do not recall being part of any team discussions about how we would introduce to Mr. Roof our mental health defense. I had the sense that the trial team was noodling along and then everything blew up in their face. There simply wasn't time for them to do an effective job at getting the mental health information from the client and then helping the client to consider this defense.

18.     I did not type this declaration. I told this information to a member of Mr. Roof's federal post-conviction team who typed it for me. I have reviewed the contents carefully. I am over the age of 18 and competent to make this declaration.

I, Dr. George Woods, declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on _____March 3_____ , 20_25_, in __Oakland, Co.__ ,
_____.

_____
George Woods, M.D.

     IFCD 004313