DECLARATION OF DENISE DE LA RUE

I, Denise de La Rue, state as follows:

1. I am an attorney and trial consultant, specializing in jury selection, witness preparation, pre-trial research, and trial strategy. I have over thirty years of experience as a jury consultant and have worked on many notable criminal cases, including State of South Carolina v. Susan Smith, United States v. Theodore Kaczynski, State of Georgia v. Ray Lewis, United States v. Eric Rudolph, United States v. Richard Scrushy, and United States vs. Dzhokhar Tsarnaev. In addition to the cases named, I have consulted with the defense on numerous federal capital cases, beginning with U.S. vs. Moore and Wyrick in 1996.

2. I was the jury consultant working with Dylann Roof's defense team. My involvement with Mr. Roof's 's trial team was relatively short. I was brought onto the case in June 2016, only five months before trial began.

3. I had worked with David Bruck on multiple trials before the Roof case, the first being State of South Carolina vs. Susan Smith in 1995, the most recent being U.S. vs. Tsarnaev in 2015.

4. I joined the defense team after the federal team had already invoked speedy trial rights and were intending to go to trial quickly. Because of this, I was not part of the discussions about trial timing.

5. In my capacity as a jury consultant on this case, I was never asked to assist with any research such as a venue study to assess the impact of potentially prejudicial pretrial publicity, and to ascertain whether Mr. Roof could obtain a fair and impartial trial in Area C, the Charleston Division of the U.S. District Court of South Carolina.

1

IFCD 004346

6.  In my experience, in a case with extensive pretrial publicity, certainly when it involves a capital trial, it is imperative to conduct research to know whether a change of venue should be sought. Even if ultimately the decision is not to move for a change of venue, the data is valuable in litigating jury selection procedures and can demonstrate to the Court the reasons that certain conditions are necessary to adequately explore jurors' exposure to pretrial publicity, assess their potential biases and their attitudes toward the death penalty. It may also be useful in informing what areas of questioning are essential to develop in a jury questionnaire and voir dire.

7.  By June 2016, it was already decided that the jury pool would be drawn from Area C, which is the Charleston Division of the South Carolina District Court. It felt like the team saw this decision as final. I was troubled by their certainty, because I never see a venue decision as final until jury selection has concluded. Given the prevalence of the media coverage and the deep impact of the offenses on the citizens of Charleston, and the media coverage that continued daily, I did not believe a change of venue should have been ruled out without conducting the appropriate research.  Events can occur right up to and sometimes during jury selection which give rise to the need to explore a different trial venue.  Several such events did happen before trial in the Roof case that in my opinion created the need to research and explore a different venue. I recommended to the team that they conduct a public opinion survey to understand the community sentiment in Charleston, but they did not follow my recommendation.  A public opinion survey is the only reliable way to determine the effects of pre-trial publicity on a particular community, and is necessary  to make an informed decision as to whether seek a change of venue at all. Given the high level of publicity in this case, I was surprised that they did not at least take that first step.

8.  I was not clear on all the reasons or the intensity of the reasons the federal team wanted to go to trial so quickly. I did not see any advantage in moving quickly to trial, especially if it meant not making informed decisions.

2

IFCD 004347

9. In my experience, it is not normal for a capital trial team to hurry to trial while recognizing that their haste will result in necessary efforts to ensure a fair trial being left undone. In the Roof case, not only did we not conduct a survey within Area C to measure and understand the potential bias there, but we did also not survey other potential venues for comparison. We consulted with a statistician with expertise in jury compositions and he provided us with demographically comparable venues in the Southeast that we could have explored, but we did not. I should have done more to push the venue issue, but it felt like there was no need because we were going to go to trial in a compressed time frame, no matter what.

10. There were other issues regarding the methods used for summoning jurors to court might have resulted in less than a fair cross-section of eligible jurors in the venire, For example, the handling of "nonresponses," (people who do not respond to the summons for jury duty) and "undeliverables," (jury summons that get returned by the post office because the addressee no longer resides at the address) were not raised. Both issues can lead to an underrepresentation of people of color and from lower socio-economic communities, thus skewing the jury pool. It is my understanding that undeliverable rates are a significant factor in contributing to decreased representation of people of color in jury wheels and that undeliverable rates tend to be higher in communities of color.

11. Between July 2016 and November 2016, there certainly would have been enough time to do an opinion survey, both in the trial venue and other potential venues for comparison. That process typically takes three or four weeks to gather data from the required number of respondents via telephone and online. The team seemed to hold the view that there was no point in conducting a survey, because there was no consideration in moving for a change of venue or doing anything to delay the trial. In my opinion, we should have done the survey work regardless to inform ourselves and make decisions based on reliable data rather than what we guessed attitudes about the case were in the trial and other venues. For example, a public opinion survey would demonstrate attitudes of potential jurors such as whether an overwhelming presumption of guilt existed, whether prejudgment as to the

3

IFCD 004348

penalty that should have been imposed existed, whether there were a high number of individuals in the potential jury pool who attended events in support of victims of the Mother Emmanuel shooting, or even who knew victims or survivors personally.

12. It is not possible to make informed decisions without bothering to do the work to become informed. We simply didn't do the work.

13. There are times when what a team believes they "know" is erroneous, and that is only discovered by conducting pretrial research according to social science standards. I honestly do not know why the thought prevailed that Mr. Roof could receive a trial from a fair and impartial jury from Area C. We did not have any data to support that conclusion.

14. Many times courts are more willing to consider a transfer of venue within a federal district, by changing divisions, if they are not open to a transfer between federal districts. Although we knew that Area C and Area D had similar demographics, we did not explore the Area D option.

15. I assisted with developing the supplemental juror questionnaire. In order to properly write a questionnaire that will explore jurors' attitudes about issues that will arise in defense of the case or in the mitigation phase of the trial, it is necessary to have a full understanding of what the defense plans to offer in defense and mitigation. The court wanted to have the juror questionnaire finalized by August. With the trial being set for November, several months later, this was somewhat of an arbitrary deadline. I did not believe that our case was fully developed enough to properly construct a juror questionnaire addressing the issues in the case by the August deadline. I advised the team to push back against that date, but they were reluctant to do so.

16 When we received the juror questionnaires completed by the potential jurors, I was concerned with the proportion of prospective jurors who indicated that they had a present opinion that

4

IFCD 004349

Mr. Roof should receive the death penalty, based only on what they knew from pretrial publicity and talk in the community. This data suggested that a change of venue might have been warranted, and we should have considered making such a motion. I advised the team that I believed we had the data from the actual perspective jurors in the case that could be the basis for a motion to change venue, but there was no real consideration of making such motion.

17. I also was concerned with the fact the defense team did not object to excusals of jurors with transportation issues and those who were teachers. Categorically excusing categories of jurors is troubling to me, as it can result in the systematic exclusion of certain categories of jurors that skews the panel. For example, by definition, teachers are potential jurors with college educations.

18. There were several occurrences that, in my opinion, necessitated moving for a continuance. For example, the government released Dylann Roof's "manifesto" which created a great deal of intense media attention. One remedy for mitigating negative effects of pretrial publicity is delay. That is, individuals are not as intensely affected by the press that they hear or read after some time has passed. The team did not attempt to ascertain the effects of this negative publicity just before trial or mitigate the presumed negative effects by moving for a continuance.

19. The Slager trial (a murder trial which involved the fatal shooting, on video, of black man by white police officer) was a racially incendiary event in the community. The Slager trial was underway when the Roof trial began, and it was being held in a courthouse just across the street from the Federal courthouse where the roof trial was held. Not only did the two racially charged trials occurring at the same time increase the intensity felt by the community, the increased security because of the Slager trial had negative effects on the atmosphere that was forced upon the Roof jurors as they came to court. Part of the increased security for the Slager trial involved snipers on the rooftops by the courthouses. This had nothing whatsoever to do with security concerns for the Roof trial, but the jurors had no way of knowing that. I believe that the intensity of the Slager trial, also with allegations of

5

racism, happening at the same time as Roof trial, was ill-advised and completely avoidable. It gave rise to ample grounds for a continuance motion, and measuring potential effects of the Slager trial might have provided additional support for a change of venue motion as well. There was a media exhibit created by a member of the defense that was compelling in demonstrating the climate in the community created by the Slager case. I do not understand why that was never filed along with a continuance motion, other than, as has been stated, this arbitrary desire by decision makers on the team to move quickly to trial.

20. We conducted two focus groups before trial. Participants in the focus groups demonstrated intense bias against Mr. Roof. Many viewed the Roof and Slager cases in light of each other when, in fact, of course there was no connection. The information that we received from the focus groups should have informed the team how difficult the case was going to be, and given pause to any thought that it would be to Mr. Roof's advantage to move quickly to trial. In my opinion the team did not constructively use this information that we gathered in the focus groups regarding the timing of trial.

21. The team never seemed to seriously consider moving for a change of venue or continuance, even when multiple things strongly suggested that one or both might be needed to ensure that Mr. Roof receive a fair trial. Individually—and certainly collectively—the responses to the Supplemental Juror Questionnaire, the chaos and intensity surrounding the Slager trial, the findings from the focus groups, the media about the Roof case generally, and specifically the media when the manifesto was leaked, all should have been flex points that made the team at least do the necessary research regarding change of venue. I recommended that the team hire an expert in press content analysis to conduct such an analysis on all the media coverage about the case. Routinely, this is a part of a venue study, in addition to community surveys. Even if the survey work was not done, this would have assisted us in understanding what the effects of prejudicial publicity might have been. That recommendation wasn't taken. Instead, the priority was to keep moving rapidly to trial according to a compressed schedule, while ignoring much evidence that such a decision was unwise.

6

IFCD 004351

22. Ultimately, I question whether the team's strategy of getting to trial quickly was the right strategy. I questioned it at the time and should have been more vocal than I was in expressing my grave concerns.

23. I released from my work the Roof case on after the first day of jury selection, when Mr. Roof chose to represent himself and was granted the ability to do so. I had expected that the judge would deny the *Faretta* motion, but of course he did not. I will never forget the attorneys coming into the courtroom and the shock of hearing Judge Gergel asking David Bruck to move down a seat as Mr. Roof would be take the seat of lead counsel. At some point during a break, the judge excused me after telling me there no right, as far as he knew, to a standby jury consultant. I did not attend court after the first day of jury selection.

24. In the ways discussed above, especially the rush to trial on the part of the defense steam, the Roof trial stands in stark contrast to any other capital case that I have been a part of in the 30 years that I have been a jury consultant.

25. I am over 18 years of age and am competent to make this declaration.

26. Pursuant to 28 U.S.C. §1746, I, Denise de La Rue, declare under penalty of perjury under the laws of the United States that the above is true and correct.

April 5, 2025 Decatur, GA

Date and Place

Denise de La Rue

IFCD 004352