DECLARATION OF JEFFREY MARTIN

I, Jeffrey Martin, state as follows:

1. I am a statistician. I received my bachelor's degree in Mathematics and Economics from Vanderbilt University and my master's degree in Economics from the University of Chicago. I have worked for the past 28 years as a statistical consultant in civil and criminal cases especially with jury representativeness. I have been retained as an expert witness in over 50 federal capital cases.

2. I am often asked by counsel to (a) look at representation within a jury pool by analyzing data for the Master Jury and Qualified Jury Wheels and (b) determine whether the Court followed the jurisdiction's jury plan and jury selection procedures. I provide legal teams with data that shows the effects of current and proposed procedures on the demographics of the jury pool and venire. I have also worked with jury consultants to determine the demographics of a certain area to make sure the focus group sample is an accurate representation of the community.

3. I was brought into the Dylann Roof case in June 2016. My primary interactions with the team were through Denise de La Rue, the jury consultant. Denise de la Rue often brings me into cases.

4. The Roof team contacted me 5 months before jury selection. If the team had been in touch with me earlier, there were additional analyses I could have done. For example, I could have assisted in understanding whether the Grand Jury was representative

5. In the Dylann Roof case, as I generally do, I looked at the District's jury selection plan and advised the team about the issues I identified. I also requested that the team request specific data from the Clerk's office so that I could further investigate any potential concerns.

6. Using the supplied and attached Form AO-12 (Report on Operation of the Jury Selection Plan Completed Pursuant to 28 U.S.C section 1863(a)) the Qualified Jury Wheel of Area C of the District of South Carolina underrepresented African American persons by five percent on an absolute disparity basis. Five percent absolute disparity underrepresentation would have meant one additional African American juror on the jury if randomly selected.  The underrepresentation is statistically significant. In my experience, that level of underrepresentation is commonly challenged.

7. Concerning the Jury Selection Procedures Order ( the Court's order outlining the jury selection process for the Dylann Roof case) the handling of summons which do not receive a response and juror summons that were undeliverable were of concern. Summons which do not receive a response and undeliverable summons are commonly an issue. Courts send notices via first-class mail and expect responses by mail or online. Compared to current political campaigns

IFCD 004317

and marketing efforts, this process of contacting persons is outdated and unfortunately is slanted away from obtaining representative juries.

8. "Undeliverables" refer to potential jurors who are excluded from service because of a failure of the U.S. Postal Service to deliver a jury summons or qualification questionnaire. If a disproportionate amount of the undeliverables come from African-American neighborhoods, the jury pool is less diverse. A supplemental draw is common to compensate for undeliverables but was not done in this case.

9. "Non-responses" refer to potential jurors who do not respond to the summons for jury duty or potential jurors who never received a summons, even when the summons was not returned as undeliverable but never made it to the intended person. Non-responses can also be disproportionately African-American persons, resulting in a non-representative pool.

10. The jury plan in this case did not include a supplemental draw. Supplemental draws result in more diverse pools. I recommended that the Roof defense team request a supplemental draw including "non-responses" and "undeliverables." "Non-responses" are typically higher in number than "undeliverables" and so have more of an impact on representativeness.

11. I wasn't aware whether the Roof team was thinking about making a motion for a change of venue, but I gave them a short list of districts that were similar demographically to Area C.

12. I pulled the data for the alternative divisions with similar demographics on my own. This list included Area D. Nothing else was requested from me from the trial team for venue purposes.

13. Referring to the District of South Carolina jury map, I identified Area D as being similar to Area C. Area D was reasonably close to Area C, conveniently accessible to witnesses and interested attendees, and could accommodate a trial of this magnitude and public interest.

14. When a decision had to be made in July 2016 as to whether the venire would be drawn from Area C or district-wide, I provided data that showed that the demographics of the voter registration from Area C and district-wide were virtually the same. Without more data, it was impossible to know if an underrepresentation of African-American persons or Hispanic persons actually existed since the South Carolina State Election Commission only represented voter registration demographic data as "Whites and "Non-Whites." The trial counsel did not request that I conduct any additional analysis.

15. In August 2016, I emailed the Roof team with a list of data requests for the Clerk of Court, to determine if there might be issues with the jury wheel. The data requested included the electronic data files from the jury system which detailed each person on the Master Jury Wheel and an identification of those jurors summoned for trial.

IFCD 004318

16. I did not receive the extent of my data requests except for Form AO-12 (attached). Based on my review of Form AO-12, I advised the team that there was a statistically significant under-representation of African American persons in Area C on the Qualified Jury Wheel. I advised the team that the potential systematic causes of this underrepresentation included the exclusive use of registered voters as a source for jurors in the Master Jury Wheel and the effect of summons where a response was not received to the juror questionnaires.

17. I further advised that my analysis of the 3,000 summonses issued for this case showed an overrepresentation of African American persons for whom a response was not received which exacerbated the underrepresentation of African-Americans in the qualified group of jurors. The underrepresentation persisted in the panel from which jurors were selected for the trial, following individual voir dire. I recommended to the team that they preserve Form AO-12 in the record. In my experience, that level of underrepresentation is commonly challenged. The team filed a "Notice," which the court ultimately struck from the record.

18. The Notice reflected the Clerk's analysis of the returned questionnaires in Area C shown on Form AO-12 Part IV. My analysis used the same data but for the Qualified Jury Wheel in Part III.

19. I provided the team with updated information on the demographics of potential jurors as they were summoned and the amount of non-representation.

20. I believe representative jury lists are essential to our society and it is an area where I can use my skills to supply important information and analysis. As with all cases I work on, the Dylann Roof analysis will be important to all cases in the District of South Carolina.

21. My experience is that a challenge to the jury array promotes attention to the representativeness of the jury by the Court, Government, and Defense whether the claim is successful or unsuccessful.

22. I am over 18 years of age and am competent to make this declaration.

23. Pursuant to 28 U.S.C. §1746, I, Jeffrey Martin, declare under penalty of perjury under the laws of the United States that the above is true and correct.

March 31st 2025 Atlanta GA

Date and Place

Jeffrey Martin

IFCD 004319