## DECLARATION OF MEREDITH CHILDS

I, Meredith Childs, state as follows:

1. My name is Meredith Childs. I now live and work as a state court public defender in Richmond, Virginia.

2. At the time of Dylann Roof's trial in 2016, I lived in downtown Charleston, about 6 blocks from the federal courthouse. I was then a third-year law student at Charleston School of Law.

3. I applied for and was offered a position to work with the South Carolina Commission of Indigent Defense Capital Trial Division (SCCID-CTD) as an unpaid intern beginning at the end of my 2L year. Bill McGuire was my supervisor. Bill was one of the attorneys representing Dylann on the state case against him.

4. The Roof case was already pending before I started working as an intern. My role during my time with the SCCID-CTD was to conduct research and write memos and assist the defense team with anything pertinent to the pending cases. I worked hard to stay updated on what was happening in each case.

5. I was originally selected to work at the SCCID-CTD in March 2016 for only one semester, but once I became involved in assisting with the defense of Dylann Roof and other capital cases, I extended my externship to assist through the conclusion of some cases. I continued working with Bill and the defense team until Dylann's state case was concluded, in the spring of 2017. Although the position was unpaid, the SCCID-CTD paid for my travel and lodging when needed. I learned from Bill and received a lot of in-court trial experience.

6. For Dylann's case, Bill wanted me to sit in on some of the joint federal-state court team meetings, but the federal team would not allow me to attend the meetings. It seemed to me that that federal team was very closed off from the state team, as the federal team very much had their own plan for the case. At the time of the federal court trial, the state court Solicitor was still planning to move forward with a state court trial. The worry for Bill was that the state team might not get the voluminous transcripts from the federal court before the state trial started. Because of this, Bill and I were present at the federal trial every single day, taking notes of everything including witness testimony. My assignment was to write down everything that happened during the trial. I did this, filling almost 9 notebooks with contemporaneous notes from the trial, including sentencing. Bill also took notes on the chain of custody, witnesses, and federal team strategy (especially noting what the team did or did not ask questions about).

7. Every day of the federal trial, from jury selection through sentencing, Bill and I were there. We sat in the back of the left side of the courtroom in the last or second-to-last row with a good view of the entire courtroom.

8. The Slager case was also going on at the same time as the Roof trial, so there was a lot going on in downtown Charleston. The Slager case was one in which a white police officer, Michael Slager, was charged with killing an unarmed black man. That case also generated a lot of strong feelings and significant publicity.

9. The entire right side of the courtroom was filled with the victims' family, victims' friends, people that appeared to be from the church, and other supporters. On the left side of the courtroom were overflowing federal team members, two to three rows of reporters, and state team members. There was never an empty seat.

1

IFCD 004188

10. It seemed like the victims and victims immediate family sat in the first several rows of the right side of the courtroom. The rest of the rows were people there in support of the victims. Some I believe had political ties, some were in ministry and some were extended family and friends. The middle and back of the courtroom was quieter. I don't remember the last several rows reacting to the testimony the way the front right rows did. Usually the reaction from the front row moved like a wave back several rows. I paid more attention to the family than to other observers. Usually it was one person reacting, then others consoling them. Other than one big outburst (that happened in the sentencing phase, described below), there were other moments of crying when people would leave the courtroom. When this happened, the entire row would shift to allow the individual to leave the courtroom, because everyone was seated on benches. This was disruptive when it occurred during the trial.

11. The courthouse was very chaotic, with reporters, the public trying to get in, tons of family members, and lots of church members, political figures, and others. Sometimes I would hold Bill's seat while he met with Dylann or the federal team because there was limited seating in the main courtroom.

12. I did not have direct contact with any of the victims' family members. Throughout the trial, the court personnel and others shuffled the family in and out of the courtroom, so there was no opportunity to interact with the families. It appeared as though there was a lot of pre-planning that went into how the court handled all individuals present for the victims. The families and anyone else involved with them, like church people or political figures, entered the courtroom after everyone on the left side of the courtroom was seated. During the breaks, this group left first, then the folks on the left side followed. Most people on the left side did not leave the courtroom during the breaks because it was crowded, and people did not want to lose their seats. It all seemed very coordinated, like seating at a formal wedding.

13. I remember thinking that the jury was very attentive to the victims' family members throughout the trial. The jury members were looking over at the victims and their family members throughout the trial.

14. It seemed that there were members of the prosecution team who were there assisting with family, mostly between breaks. They had tissues and stuff ready to give out.

15. There seemed to be a lot of people involved in protecting the victims' and victims' family members because it was so chaotic outside of the courthouse and directly outside the courtroom. The family, church members, and family support were kept in other rooms of the courthouse, where they were escorted by the prosecution team and court staff during breaks.

16. I observed many individuals who seemed connected with the victims being approached and questioned by reporters outside of the courtroom, down the stairs, and near the elevator throughout the trial. The media were like vultures; as soon as anyone remotely connected to the trial walked out of the courtroom, they were attacked with many questions from reporters.

17. "Charleston Strong" bracelets were visible throughout the courtroom during the trial. Charleston Strong stuff was displayed all over the Charleston area from the time of the offense until the trial. Flags were at houses and businesses and hanging from the light poles around town and the Emmanuel church. There were also yarn creations hanging on light poles (with hearts, the date, or other things signifying connection to Charleston Strong) around town. When exiting the courthouse, I remember seeing a Charleston Strong banner and Charleston Strong signs hanging in business windows. I lived about 6 blocks away from the courthouse and saw Charleston Strong paraphernalia displayed beginning right after the crime, but the amount of these displays seemed to increase again

2

IFCD 004189

around the time of the trial. I remember thinking it was odd that wearing the Charleston Strong bracelet was permitted in the courtroom in fear that it would inflame the jury. The Charleston Strong bracelets were available everywhere around town.

18. At the time of the trial, people held up Charleston Strong banners outside of the trial, as well as other signs directed at the Roof trial. It seemed like people wanted to be on the news or know what was happening in the trial. The media and the public were consumed with what was going on. There were news vans everywhere around the courthouse. The Michael Slager trial was also going on at that time, across the street in the state courthouse. Nationally, there were people coming in for the trials. There was media but also lots of the general public coming to check things out as well.

19. Downtown the news crews were everywhere—huge vans and antennas everywhere. Every inch of the Four Corners of Law, the main intersection by the courthouse, was covered with media. Twenty, or so, cameras were facing the door as we walked out of the courthouse to try to catch a statement as people came out. And there was media by the church. I lived about six blocks from the federal courthouse, and the news was everywhere along the way between my home and the courthouse.

20. With the amount of media attention displayed in the downtown area, I believe there's no way the jury wouldn't have seen what was going on in the streets as they arrived at the courthouse daily. I had to walk through all the people to grab lunch during the breaks, and passed by vans with camera crews and news anchors, live on tv talking about daily updates of the trial, so people would gather around. I also remember there was hateful stuff displayed on signs on the street about Dylann, but I don't specifically remember what the signs said. I remember it was along the lines of "he deserves what he gets."

21. At first, it felt like the families would have closure with the trial. Then, once the trial began and pictures of the scene and blood and victims were shown to the entire courtroom, it became very emotional. Some victims and their family members were visibly upset and taken aback by the in-court display. It was hard for everyone in the courtroom. Dylann's lack of reaction also triggered some family members. I could see that Dylann was often the focus of the victims and victims' families' attention due to his demeanor and lack of reaction.

22. When emotional testimony or pictures were shown, sometimes a person would need to get up to leave the courtroom. Each person who left the courtroom during the trial caused a disruption because when one person left, other people followed to assist the person, leaving from different courtroom sections. Once, a female got up to leave the courtroom because she was upset, and a man followed to support her. Everyone watched them, including many jurors, as it was clear that people were racing out behind the woman to support her.

23. Judge Gergel was in command throughout the proceedings. He said, "there won't be a show [circus] in my courtroom." When he communicated with the defense or with Dylann when he was self-representing, Judge Gergel spoke to them differently than when speaking with the prosecution. He gave lenience/leeway and professional courtesy to the prosecution and their witnesses, encouraging them to take their time. Judge Gergel seemed cold to the defense. I saw this and I was worried the jurors would see that too and read into it. Judge Gergel seemed annoyed by the defense/Dylann and wanted to move things along. I don't know if Judge Gergel is always like this or if it was special for this case. His tone was more kind to the prosecution and victims both in front of the jury and not. I remember it being like this the whole time, not just regarding defense objections. It appeared to me that there was this disdain for the defendant and defense counsel throughout the trial in Judge Gergel's tone.

3

IFCD 004190

24. Judge Gergel's attitude throughout the trial seemed to be: " This is my courtroom, my way, my rules." He seemed to feel like the defense was trying to muck things up. He appeared to believe that Dylann didn't have any mental health problems. I felt that there was this air from Judge Gergel that he believed Dylann should be put to death, and that victims and their family members have the right to testify as much as they want and be heard in court. Judge Gergel thanked the victims and families. His tone was over-sanctimonious towards the victims. He seemed to favor the prosecution. He expressed anger towards the defense, always. He didn't have a poker face. It's probably very hard to understand or feel Judge Gergel's tone just from reading a written transcript. I felt that it was not impartial and I was worried the jury could feel that, too, and read into it.

25. David Bruck made objections softly – He's soft-spoken. I remember that sometimes the attorneys approached the bench to object, but most of the time, everything was in the open, so everyone in the courtroom could hear everything. This meant that defense counsel had to be careful and not overly aggressive with their objections, as everyone was cautious of the high emotions in the courtroom. Judge Gergel's vibe throughout the trial was that it was the victims' loved ones' case and they had the right to be heard. The prosecutor matched the energy of the judge, aggressively advocating for the victims and their families in a very showy way. The prosecutors' objections were opposite of David Bruck and seemed very loud and aggressive, because this was the victims' trial.

26. During the trial, Dylann sat in his zone, in his place. At the start of self-representation, Dylann seemed to try his best to engage with the judge, but when there were objections/comments from the judge, Dylann looked more like he knew he was in over his head, and it was a downward spiral in terms of him being able to interact well with the judge. It appeared that Dylann started to shut down and looked for guidance and help from his defense team.

27. The victims' family members were understandably upset and displayed a lot of emotions in the courtroom, crying and reacting to the difficult testimony. During both phases of the trial, there was whimpering, visible crying and victims' family members using tissues. Family members visibly consoled each other.

28. I remember when standby counsel made a motion regarding the courtroom decorum. Judge Gergel said they were trying to paint something in the courtroom that was not true; he said that it was a very emotional case but he did not see staff cry. The defense team said that the news reported seeing the team crying but Judge Gergel didn't think it was true. And he said that he did not shed a tear himself. He said that he hadn't seen "too much." This was the time when family members were testifying, so it did feel very somber. There was a mix of emotions from victims and victims' family members including vibes of love and hate at the same time. Against that was a feeling of vengeance from some as well.

29. During the trial, due to my exclusion from the federal defense team meetings, I often felt that I was seeing the trial unwind as a juror would. Of course, based on the role I had with the state defense team I was able to understand things differently than the jury did, but considering the magnitude of the photos and testimony, even for me it was a long time without breaks, and it was heavy testimony and evidence presented. I remember thinking that the jury should have had more breaks.

30. The families of the victims seemed like they had so much grief, love and anger. It was a roller-coaster of emotions, and you could feel all of those raw emotions in the courtroom, depending on the witness and how the defense handled each witness. I had dreams (including some nightmares) for weeks about the trial and the rollercoaster of emotions in the courtroom.

4

IFCD 004191

31. I remember when Dylann spoke in the courtroom, there was often a delay or something odd about his presentation. Dylann would pause, looking uncomfortable. He would look to David Bruck for guidance sometimes. He paused before responding to the judge. I don't remember Dylann ever standing to speak with confidence. Dylann seemed scared of the judge. Judge Gergel's vibe from the bench was "you're guilty of this, and we all know it. We just need to get this over with. We aren't going to delay. The families deserve justice."

32. While Dylann self-represented, he floundered. He kept looking to David Bruck, and then the judge would not hear from David, so Dylann sort of folded up into a ball. Dylann looked to David for help, and I felt that David was trying to explain to Dylann what he needed to do during jury selection, but Dylann couldn't manage what was being explained to him.

33. When it was announced that Dylann would be representing himself, I remember that the reactions across the whole courtroom were of shock. The media seated in front of us seemed to freak out and gasp at the announcement. I felt like people thought Dylann was either crazy and didn't know what he was getting himself into, or that he was just so controlling and evil that he wanted to have control over the trial and what was presented to the jury. Either way, people were upset that Gergel allowed him to represent himself when he had competent attorneys ready to represent him in the courtroom. There was chatter about the decision in the hallway. And in the overflow room I heard chatter among the news media saying they couldn't believe the judge would allow this, given that it's a death penalty case.

34. It seemed to me that most people were like, "What is going on? Why is Dylann allowed to represent himself?" Perhaps there was a fear that he would cross-examine the victims' family members and/or set himself up for an appeal of any convictions.

35. When Felicia Sanders testified at the start of the trial, everyone was paying attention to this captivating testimony. As Felicia testified, it got more and more heated. She was clearly going to be hostile. I remember thinking that David wasn't going to get anything out of her. I don't know why he decided to ask her anything. The line of questioning seemed unhelpful to the defense and only inflamed emotions in the courtroom even more.

36. I remember that the judge was on the bench when Dylann's mother had her heart attack. Something was going on in court at the time. My recollection is that counsel was speaking. I believe that the jury was in the room. Then there was audible distress, and some deputies responded. There was a break, and EMS showed up.

37. At the time, I didn't know what was going on. I remember hearing something and seeing family from the victims' side of the courtroom get up to try to assist someone in the front pew on the left side of the courtroom. Bill and I couldn't see Dylann's mother from the back. The media had the best view, because they sat in front of us. I remember a commotion but not what was said. I can't remember if the judge left the bench, but there was a break and everyone was escorted out of the courtroom. I left the courtroom and sat on the pews during the break, while Bill went to meet with the federal team in the small team room outside the courtroom.

38. After the initial commotion, I recall that EMS went into the courtroom. I couldn't see reactions of Dylann or jurors. I remember deputies walking up to that area. Bill and I had no idea what was happening. I'd never met Dylann's mother. And I don't think that she ever returned to the trial. I remember two other people were with her (a man and woman), but I was not sure who that was. I thought it was her sister/brother plus spouse.

IFCD 004192

39. In one of my notebooks, during Dylann's opening statement of the penalty phase, I wrote about a victim's family member saying "I'm not listening to that crap – This is stupid", and then leaving the courtroom. Two people followed behind him. It was said pretty loud and audible enough for me to hear, so I believe the jury would have heard the comment as well, as they were closer than I was to the disrupting spectator.

40. I remember that moment -- even without referencing my notebooks -- because I thought it was unprofessional. I remember reactions to that moment in the courtroom. Everyone looked shocked and turned in the direction of the person who left. Even the judge stopped. I was in the back left of the courtroom, so I'm not sure if Dylann reacted. The family member was clearly upset with Dylann representing himself and speaking directly to the jury in his opening statement. I remember everything going silent and everyone looking towards the individual had left the courtroom, with two other people following them out of the courtroom. The benches were like church pews, so everyone had to shift and move to allow him to get out. There was a pause in the entire courtroom.

41. When Jennifer Pinckney testified during the penalty phase, Bill wrote on my notepad "Is this too much?" I believe he was referring to the length of her testimony and the depth of her testimony going into very specific stories. I remember learning that Reverend Pinckney was very high-profile politically and in the church. There were lots of people there for Jennifer Pinckney's support, and she went through his entire life. The testimony was long, filled with pictures and a lot of emotions. Bill may have been referring to her emotions and breaks to have to keep gathering herself. Emotions in the courtroom were up and down, back and forth at this point because Dylann had already been found guilty. This was a high-emotion time, starting with the first victim impact testimony.

42. I remember the discussion at sentencing about whether Father Parker would testify, but not the specifics. I remember the judge telling Dylann several times that he would have to ask questions. There was discussion about whether Dylann could call others (like his mom), but I don't remember what they discussed. Judge Gergel reiterated that he wasn't going to allow counsel to help Dylann, and that he wasn't going to waste time.

43. It was painful to watch Dylann's closing argument at sentencing. He was floundering. It was very short.

44. This declaration is based on my first-hand experiences and observations. I am over 18 years of age and am competent to make this declaration.

I, Meredith Childs, declare under penalty of perjury under the laws of the United States that the forgoing is true and correct.

Executed on __March 25__, 2025, in __Richmond, VA__.

Meredith Childs