# HEINONLINE

Citation: 138 U. Pa. L. Rev. 659 1989-1990



Content downloaded/printed from *HeinOnline*

Mon May  1 16:40:35 2017

-- Your use of this HeinOnline PDF indicates your acceptance
   of HeinOnline's Terms and Conditions of the license
   agreement available at http://heinonline.org/HOL/License

-- The search text of this PDF is generated from
   uncorrected OCR text.

-- To obtain permission to use this article beyond the scope
   of your HeinOnline license, please use:

*Copyright Information*

# ARTICLES

## LYING TO CLIENTS

### LISA G. LERMAN†

### TABLE OF CONTENTS

INTRODUCTION ........................................... 661

I. MODELS OF LAWYER-CLIENT RELATIONSHIPS AND THE LAWYER'S DUTY OF CANDOR ........................... 666

II. SHOULD WE PERMIT LAWYERS TO DECEIVE THEIR CLIENTS? ........................................... 675
   A. *Is It Wrong to Deceive?* ............................ 676
   B. *Harms Caused by Deception* ...................... 679
   C. *Where to Draw the Line* .......................... 684

III. PERMISSIBLE DECEPTION: THE ARTICULATED IDEOLOGY ON CANDOR TOWARD CLIENTS ............................ 687
   A. *Disciplinary Rules* ............................... 687
   B. *Malpractice Law* ................................. 696
   C. *Consumer Law* ................................... 698

IV. WHAT LAWYERS LIE ABOUT ............................ 699
   A. *Empirical Information About Deception of Clients* ........ 699
   B. *The Lawyer Interviews* ............................ 703
      1. Billing ....................................... 705
         a. *Doing Nonessential Work — Running the Meter* .. 706
         b. *Padding Bills and Double Billing* .............. 709
         c. *Meeting Minimum Firm Hours Requirements* ..... 713
         d. *Premium Billing and Itemization* .............. 714
         e. *Estimating Hours—Non-Contemporaneous Records* 716
         f. *Explaining the Bills* .......................... 717

† Assistant Professor of Law, The Catholic University of America, The Columbus School of Law. B.A. 1976, Barnard College, Columbia University. J.D., 1979, New York University School of Law; LL.M., 1984, Georgetown University Law Center. I am grateful to those who shared their stories about deception of clients with me; their experiences are central to this project. I am grateful for their assistance to Philip G. Schrag, Michael Davis, Robert Destro, Joseph Holohan, Claire Lerman, Leonard Lerman, David Luban, Nell Newton, and Nancy Sachitano.

Ex. 57 pg.2 of 103

g. *Charging Clients for Perks, Leisure, and Administrative Time* ........................... 718
h. *The Impact of Client Confrontation* ............. 720
2. Bringing in Business............................ 721
    a. *Exaggeration of Expertise* ...................... 721
    b. *Business Development* .......................... 724
3. Covering Up Mistakes .......................... 725
4. Impressing Clients.............................. 730
    a. *Who Did the Work* ........................... 730
    b. *Making the Work Look Easier or Harder* ........ 732
    c. *Deception About What the Law Is*............... 733
    d. *Deception About the Value of a Case or the Lawyer's Fee* ................................. 734
    e. *Withholding Negative Opinions of Clients* ........ 735
    f. *Strategic Deception* ............................ 736
5. Convenience and Control of Work Time ....... 737
    a. *When a Client Calls* .......................... 738
    b. *Progress Reports on Work* ...................... 739
    c. *Impact of Workload on Advice*.................. 740
6. Deceiving Clients to Impress the Boss.......... 741
7. Law Firm Atmosphere ......................... 743
V. REGULATING DECEPTION............................... 744
  A. *Can Deception Be Regulated?* ......................... 744
  B. *Use of Rules to Regulate Deception* ................... 746
  C. *Recommendations for Change in Regulation of Deception of Clients* ............................................. 749
    1. Fee Questions ............................... 749
    2. Lawyers' Representations Regarding Expertise.. 753
    3. Advising Clients About Possible Additional Work ...................................... 754
    4. Communicating With the Client................ 755
    5. Duty to Confront Lawyers Violating Disciplinary Rules ...................................... 756
Conclusion...................................................... 758

*That lies are necessary in order to live is itself part of the terrifying and questionable character of existence.*

Nietzsche[1]

## INTRODUCTION

Lawyers are not supposed to lie to their clients. Ever.[2] The disciplinary rules prohibit all conduct involving "dishonesty, fraud, deceit or misrepresentation."[3] A lawyer must "keep a client reasonably informed about the status of a matter"[4] and must "render can-

---

[1] F. NIETZSCHE, THE WILL TO POWER 451 (W. Kaufmann ed. 1968). Another perspective is that of the Baker's Wife in *Into the Woods:* "Everyone tells tiny lies. What's important, really, is the size." Sondheim & Lapine, *Maybe They're Magic,* INTO THE WOODS (RCA Victor 1987). Scott Turow suggests that lawyer jokes have replaced ethnic humor, and offers the following example: "How do you know when a lawyer is lying? His lips move." Turow, *Law School v. Reality,* N.Y. Times, Sept. 18, 1988, § 6 (Magazine), at 52.

[2] The ABA Committee on Professional Ethics and Grievances, Formal Opinion 81 (1932), issued long before the Code of Professional Responsibility was written, argues that this proposition is self-evident and therefore specific rules are unnecessary: "Misrepresentation by a lawyer is a cardinal professional sin. Of course, no canon expressly states that a lawyer shall not knowingly make any misrepresentation, but neither does any canon expressly state that a lawyer shall not steal property entrusted to him by a client." *Id.*

The courts make categorical statements about the prohibition on deception. The California Supreme Court, for example, stated in 1975 that "[a] member of the bar should not under any circumstances attempt to deceive another." *In re* Cadwell, 15 Cal. 3d 762, 772, 543 P.2d 257, 262, 125 Cal. Rptr. 889, 894 (1975).

Other commentators emphasize the critical importance of truthfulness as a characteristic of lawyers. Daniel Webster, in a speech to the bar of Charleston, South Carolina, May 10, 1847, said: "[t]ell me a man is dishonest, and I will answer he is no lawyer. He cannot be, because he is careless and reckless of justice; the law is not in his heart, is not the standard and rule of his conduct." Montgomery County Bar Association v. Hecht, 456 Pa. 13, 21 n.9, 317 A.2d 597, 602, n.9 (1974) (quoting Webster).

In 1844, George Sharswood, who is often credited with having started the field of legal ethics in the United States, wrote:

> No man can ever be a truly great lawyer, who is not in every sense of the word, a good man . . . . There is no profession in which moral character is so soon fixed as in that of the law; there is none in which it is subjected to severer scrutiny by the public . . . . From the very commencement of a lawyer's career, let him cultivate, above all things, truth, simplicity and candor; they are the cardinal virtues of a lawyer.

G. SHARSWOOD, PROFESSIONAL ETHICS 168-69 (1844), *quoted in* Maryland State Bar Ass'n v. Agnew, 271 Md. 543, 548-49, 318 A.2d 811, 814 (1974).

[3] MODEL RULES OF PROFESSIONAL CONDUCT Rule 8.4(c) (1989) [hereinafter MODEL RULE]; MODEL CODE OF PROFESSIONAL RESPONSIBILITY DR 1-102(A)(4) (1981) [hereinafter MODEL CODE].

[4] MODEL RULE 1.4(a).

662     *UNIVERSITY OF PENNSYLVANIA LAW REVIEW*     [Vol. 138:659

did advice."[5] Loyalty and zealous representation are paramount values within the bar. These values presume both a close relationship between lawyer and client and total openness in the lawyer's dealings with clients.

Real life is not so simple. Lawyers' professional lives are fraught with conflicting obligations and objectives. Clients demand full and undivided attention. Heavy caseloads with conflicting deadlines constantly threaten to mar the facade of a smooth and orderly legal operation so necessary to successful practice. Within a law firm, an associate may have obligations to numerous senior lawyers whose assignments compete for his or her attention. But to ask for a shift in workload or an extension of time may engender disfavor among those who have authority over salary and promotion decisions.

Impressing prospective clients is a prerequisite to successful private law practice. In most types of practice, lawyers face considerable pressure to bring in new clients. A solo practitioner needs new clients to pay the rent and meet the payroll. In large firms, each lawyer must attract business in order to become a partner and to earn a share of the profits.

After a client has hired a lawyer or a firm, the problem of making a good impression changes. Lawyers must maintain and cultivate their clients' initial positive impressions. They must strive to maintain the pristine appearance of competence, while concealing errors or delays that might cause clients to doubt their loyalty or expertise. In an ideal world, lawyers would accomplish these goals by devoting the time, attention, and resources necessary to do perfect work in every case. In the real world, lawyers often cannot fulfill these aspirations; sometimes they gain or maintain their clients' confidence by creating illusions.

Moral philosopher Sissela Bok defines a lie as "any intentionally deceptive message which is *stated*."[6] She defines deception more broadly, as encompassing "messages meant to mislead [others] . . . through gesture, through disguise, by means of action or inaction, even through silence."[7] This broader category of deception is the

---

[5] MODEL RULE 2.1.

[6] S. BOK, LYING: MORAL CHOICE IN PUBLIC AND PRIVATE LIFE 14 (1979).

[7] *Id.* Thomas Guernsey offers a lawyer's definition of lying as: "a statement made with the intent to deceive which purports to state the existence, in unequivocal terms, of facts or law contrary to the declarant's express knowledge." Guernsey, *Truthfulness in Negotiation*, 17 U. RICH. L. REV. 99, 105 (1982). He urges that Bok's definition is so broad as to "preclude negotiation since inherent in all negotiations is some element of an attempt to mislead the other side." *Id.* at 105 n.34. Guernsey explains that the purpose of his definition is to "provide a convenient means of

subject of study here. This Article will examine overt misstatements and deliberate omissions or failures to disclose information. The determining factor in identifying deception is the lawyer's intent. If the lawyer intends to deceive a client, he or she may accomplish this by telling a lie or by withholding information.[8] Deception by omission and by commission are morally identical: the purpose and the consequences are the same.[9]

Lawyers deceive their clients more than is generally acknowledged by the ethics codes or by the bar.[10] In some cases the deception may be appropriate (if, for example, it is used to protect a client

---

distinguishing various negotiating tactics which a philosopher might regard as involving lies, but which are more crudely distinguished by lawyers on an operational level." *Id.* at 105.

This Article does not seek to excuse or rationalize what happens in practice, but to examine the deception that occurs and to ask whether that deception is justifiable. Bok's definition is useful for this purpose.

[8] *But see* Guernsey, *supra* note 7, at 116 (arguing that deception by silence "would not generally constitute unethical conduct, absent some additional legal obligation").

[9] The ethical codes often distinguish between overt acts and failures to act. For example, Model Rule 3.3(a) prohibits a lawyer from making a false statement of law or fact to a tribunal, but imposes an affirmative duty to disclose material facts only if necessary to prevent the client from engaging in criminal or fraudulent conduct. Under this rule, a lawyer may mislead the court about the facts by omission but not by action, as long as the lawyer does not assist the client in lying to the court. *See* MODEL RULE 3.3(a); *see also* MODEL RULE 1.6 (drawing a similar distinction in the confidential communications context).

This type of analysis is extremely common in the legal profession. The distinction may be based on the lawyer's duty to maintain client confidences. Not wanting to call lawyers liars, the drafters of the ethical rules have drawn lines that allow lawyers to engage in deception that stops short of outright lying. Many criminal lawyers do not object if a client lies on the stand, but some would not use the perjured testimony in closing argument, thereby maintaining the appearance of clean hands. *See generally* Freedman, *Perjury: The Lawyer's Trilemma*, 1 LITIGATION 26, 30 (1975) (arguing that criminal defense attorneys should "examine the perjurious client in the ordinary way and . . . argue to the jury . . . the testimony presented by the defendant"). Ethically, this position treads on thin ice.

One practical argument for maintaining an omission/commission distinction in the ethical codes is that it is too difficult to identify violations that involve omission. Even so, deception by omission should be prohibited if it is morally wrong. The codes are intended as much to offer aspirational guidance as to create a basis for punishing transgressors. *See, e.g.,* MODEL CODE (Preliminary Statement) ("The Code is designed to be adopted by appropriate agencies both as an inspirational guide to the members of the profession and as a basis for disciplinary action when the conduct of a lawyer falls below the required minimum standards stated in the Disciplinary Rules.").

[10] *See infra* text accompanying notes 186-338. Recent research on doctor-patient relationships suggests that lawyers are not alone in their relativistic attitude toward candor. One survey of 211 physicians indicated that most doctors will tell small lies and some will tell large ones if they believe that they or their patients will

from injury); in other situations it is unethical and exploitative. Lawyers often deceive their clients by failing to share information to which the lawyer has exclusive access. The lawyer, though a fiduciary, may be in a dominant position in relation to the client because of his or her greater knowledge of the legal system. The client's relative ignorance creates opportunities for undetected deception.[11]

Most lawyer-client communication occurs in private, off the record. No public official is present. No one keeps a record of the meetings, unless the lawyer or the client takes notes. Consequently, the lawyer's conduct receives less scrutiny than when the lawyer appears before a tribunal or meets with another lawyer. Deception in such circumstances may be more likely to occur and less likely to be apprehended.[12]

For this study of deception[13] of clients I conducted candid, confidential interviews with twenty American lawyers. I asked them to identify instances in which they had deceived clients or had seen others do so, and to discuss whether the conduct in question was justifiable and why. The data collected is anecdotal in nature.[14] The

---

benefit. *See* Novack, *Physicians' Attitudes Toward Using Deception to Resolve Difficult Ethical Problems*, 261 J. A.M.A. 2980 (1989).

[11] Here I am referring primarily to lawyer-client relationships in which the clients are individuals rather than institutions. When the client is a large corporation, the dynamics may be reversed. The lawyer may be dealing directly with in-house counsel who is as sophisticated as the firm lawyer. *See infra* note 302 and accompanying text. Some lawyers are financially dependent on a major client. These situations in which the lawyer is subordinate to the client impose different pressures on the lawyers from those present if the lawyer is in a relatively powerful position. Deception is used to solve problems in both types of situations.

[12] The privacy of such communications also makes it quite difficult to gather information about what happens when lawyers talk to their clients.

[13] Lying and deception recently have become the subject of a great deal of popular attention. *See, e.g.*, McLoughlin, *A Nation of Liars?*, U.S. NEWS & WORLD REP., Feb. 23, 1987, at 54, 56 (suggesting in a cover story that public concern over honesty and standards of behavior has reached its highest level since Watergate); Goleman, *Lies Can Point to Mental Disorders or Signal Normal Growth*, N.Y. Times, May 17, 1988, at C1, col. 4 (reporting a study indicating that adults lie an average of thirteen times per week); Halloran, *Officers and Gentlemen and Situational Lying*, N.Y. Times, Aug. 6, 1987, at A24, col. 1 (suggesting that the "situational ethics" rationale for lying in the military in which protection of national security is offered as an excuse for lying is "a vestige of the corruption that spread through the armed forces during the conflict in Vietnam"); Harrington, *Revenge of the Dupes: Every Lie Demands a Dupe, and Dupes Get Even*, Wash. Post, Dec. 27, 1987 (Magazine), at 17 (discussing in a cover story the public reaction to deception by public figures, including former President Ronald Reagan, Senator Joseph Biden, televangelist Pat Robertson, former Senator Gary Hart, Lieutenant Colonel Oliver North, and others).

[14] This type of study might be described as "casual empiricism," the objective of which is to produce an interesting narrative using specific information from real

Article does not purport to answer the difficult question of how much deception of clients takes place, nor the question of what types of deception are typical.

Nevertheless, some patterns did emerge from the interviews. The lawyers reported pervasive deception relating to client billing, some examples involving large amounts of money.[15] These include stories of padding bills, billing two clients for the same time, doing unnecessary work to run the meter, and failing to disclose the basis of the bill. They offered numerous examples of deception about the type or degree of expertise possessed by the lawyer or the law firm.[16] Most of the lawyers reported deception about mistakes made in the course of representing clients.[17] They reported countless deceptions designed for the lawyer's convenience or to control the flow of work. Many associates reported that they deceive their clients sometimes because they need to create a particular impression on a partner.[18] This limited inquiry suggests, then, that some forms of deception may be widespread,[19] and that this problem requires more comprehensive study.[20]

This Article will analyze both direct deception by lawyers of their clients and deception communicated through a third party. Within this framework, the Article will explore when, if ever, it is morally acceptable to be less than fully candid with a client. It will explore what damage results from deception of clients. The Article also will examine the extent to which ethical codes or other law ade-

---

situations. This Article is an initial inquiry into an area that calls for a larger empirical study.

[15] *See infra* text accompanying notes 196-253.

[16] *See infra* text accompanying notes 254-66.

[17] *See infra* text accompanying notes 271-87.

[18] *See infra* text accompanying notes 315-27.

[19] While I was writing this Article I discussed the topic with many practicing attorneys in addition to those I interviewed. The lawyers most often reacted either by offering additional stories of deception they had seen or perpetuated ("It happens all the time" was a common phrase) or by becoming angry or defensive.

[20] Deceptive behavior may vary by geographic area (e.g., the high pressure of New York City law practice might foster more frequent deception of clients) or by type of practice (e.g., corporate lawyers dealing with in-house counsel as clients might engage in deception that differs from that of personal injury lawyers who have individual, non-lawyer clients). *See* Guernsey, *supra* note 7, at 100-01 (noting that "truthfulness" is a nebulous concept among lawyers and is significantly affected by the legal stratum in which a lawyer serves). Also, the tendency to deceive clients or the type of deception may vary according to the sex of the lawyer. *See generally* C. GILLIGAN, IN A DIFFERENT VOICE (1982) (suggesting that men and women make moral judgments differently, and that women deal with people in a more intimate, less rule-oriented fashion than men do).

666     *UNIVERSITY OF PENNSYLVANIA LAW REVIEW*     [Vol. 138:659

quately addresses issues of candor and deception, and it will propose changes in law and in the practice of law that might discourage some types of deception.

## I.  MODELS OF LAWYER-CLIENT RELATIONSHIPS AND THE LAWYER'S DUTY OF CANDOR

Most of legal ethics has been premised on an idealized model of the lawyer's relationship to the client. The adversary system defines the lawyer's role as one of zealous advocate and intense loyalist.[21] The traditional model posits that lawyers are motivated by altruism,[22] and assumes that the lawyer allows no conflicting interests to interfere with his or her devoted service to the client.[23] The tradi-

---

[21] To his client [the lawyer] owes absolute candor, unswerving fidelity, and undivided allegiance, furthering his cause with entire devotion, warm zeal, and his utmost ability and learning . . . countenancing no form of fraud, trickery, or deceit which, if brought to light, would shame his conscience or bring discredit to his profession.

H. DRINKER, LEGAL ETHICS 6 (1953), *quoted in* Patterson, *An Inquiry into the Nature of Legal Ethics: The Relevance and Role of the Client*, 1 GEO. J. LEGAL ETHICS 43, 44 n.7 (1987). This perspective has been characterized as the "autonomy model." D'Amato & Eberle, *Three Models of Legal Ethics*, 27 ST. LOUIS U.L.J. 761, 764 (1983). Schneyer correctly points out that this model does not accurately depict a great deal of what happens in law practice, and urges that many forces other than clients' interests drive lawyers. *See* Schneyer, *Moral Philosophy's Standard Misconception of Legal Ethics*, 1984 WIS. L. REV. 1529, 1569. In refuting philosophical conceptions of law practice, he argues that "legal ethics has no paradigm, only some fragmentary conceptions of the lawyer's role vying inconclusively for dominance." *Id.* at 1569. Schneyer seems to argue that because the traditional ideology does not match the realities of practice, no dominant ideology exists. The revisionist literature has proliferated new models for lawyer-client relationships, but the traditional model has been the dominant one.

[22] Charles Curtis asserts that "[a] lawyer devotes his life and career to acting for other people." Curtis, *The Ethics of Advocacy*, 4 STAN. L. REV. 3, 3 (1951). Charles Fried defends the traditional conception of a lawyer's role as "a professional devoted to his client's interests," Fried, *The Lawyer as Friend: The Moral Foundations of the Lawyer-Client Relation*, 85 YALE L.J. 1060, 1060 (1976), as does Monroe Freedman. *See* M. FREEDMAN, LAWYERS' ETHICS IN AN ADVERSARY SYSTEM 9 (1975). Similarly, Abraham Blumberg notes that in the *Gideon, Escobedo,* and *Miranda* decisions, the Supreme Court "reiterates the traditional legal conception of a defense lawyer based on the ideological perception of a criminal case as an *adversary, combative* proceeding, in which counsel for the defense assiduously musters all the admittedly limited resources at his command to *defend* the accused." Blumberg, *The Practice of Law as a Confidence Game: Organizational Cooptation of a Profession*, 1 LAW & SOC'Y REV. 15, 18 (1967) (No. 2). Douglas Rosenthal explains that this view of the role of the professional "is that both parties are best served by the professional's assuming broad control over solutions to problems brought by the client." D. ROSENTHAL, LAWYER AND CLIENT: WHO'S IN CHARGE 7 (1974).

[23] Schneyer points out that this model of undivided loyalty is part of a common but misguided view that moral philosophers have of lawyers. *See* Schneyer, *supra* note

tional scholars turn a blind eye to the self-interested aspect of law practice, to the lawyer's concern about income and reputation, and to the impact of those concerns on the lawyer's conduct toward clients.[24]

For adherents of this model, it is unthinkable that lawyers lie to their clients. The literature on truthfulness of lawyers focuses on whether lawyers may deceive others on behalf of clients,[25] whether lawyers must reveal clients' perjuries,[26] and whether lawyers may lie to opposing counsel to gain advantage in negotiating settlements.[27] The question of whether or when a lawyer may lie to a client simply is absent. Neither the *Model Code of Professional Responsibility* ("Model Code") nor the *Model Rules of Professional Conduct* ("Model Rules") address this question, although both devote detailed analysis to deception of adversaries and tribunals.[28]

Scholars who accept the traditional model of the lawyer-client relationship try to justify deception as necessary in order for lawyers to fulfill their duties to their clients.[29] They urge that duties to clients are far more important than duties to the courts or the public. A prominent example is James White's article about lying in negotia-

---

21, at 1546. In refuting this conception, he describes an unpublished study based on interviews with 200 lawyers, which concluded that lawyers are "far from single-minded advocates willing to push to the hilt any and all of a client's legally defensible positions." *Id.* at 1546, (citing D. Landon, Clients, Colleagues and Community: The Shaping of Zealous Advocacy in Country Law Practice (n.d.) (unpublished manuscript)).

[24] Charles Curtis, for example, contends that "[y]ou devote yourself to the interest of another at the peril of yourself. Vicarious action tempts a man too far from himself." Curtis, *supra* note 22, at 6.

[25] For an early articulation of this issue, see *id.* at 6-13.

[26] *See, e.g.,* Wolfram, *Client Perjury,* 50 S. CAL. L. REV. 809, 870 (1977) (arguing that specific new rules are needed on client perjury, including rules that witness testimony may be offered only when the attorney has no reason to believe the testimony in not factually correct, and that attorney disclosure is required when a client declares her intention to commit perjury).

[27] *See* White, *Machiavelli and the Bar: Ethical Limitations on Lying in Negotiation,* 1980 AM. B. FOUND. RES. J. 926 (1980); Guernsey, *supra* note 7, at 99; Dahl, *Ethics on the Table: Stretching the Truth in Negotiations,* 8 REV. OF LITIGATION 173 (1989). *But see* Hazard, *The Lawyer's Obligation to be Trustworthy When Dealing with Opposing Parties,* 33 S.C.L. REV. 181 (1981) (arguing that it is impractical to articulate rules defining standards of trustworthiness for attorneys in their dealings with opposing parties).

[28] *See infra* text accompanying notes 135-39.

[29] Sometimes these scholars use crabbed legalistic definitions. Professor Hazard, for example, defines "trustworthy" as "truthfulness of statements made as representations," to exclude certain types of statements "that are literally false" that social conventions allow. Hazard, *supra* note 27, at 182-83. This type of definition assumes away much questionable conduct. *See supra* notes 6-9 and accompanying text.

Ex. 57 pg.10 of 103

tion.[30] White makes a somewhat circular argument. He urges that most lawyers deceive other lawyers when negotiating settlements,[31] that if the rules prohibited them from doing so the rules would be violated,[32] that because negotiation takes place in private no third party can enforce the rules,[33] and that therefore the rules should allow them to deceive one another.

White urges that standards about deception must be flexible because styles of negotiation vary from place to place and from one type of practice to another. He confuses truthfulness, which depends on the speakers intentions rather than the accuracy of the speaker's statement,[34] with truth, which he urges us to treat as relative rather than absolute.[35] As truth is difficult to determine, he claims that truthfulness cannot be regulated successfully. White's conception of what should be is limited by what is. The boundaries of his moral analysis are set by the norms of contemporary practice. The result is more a rationalization for morally questionable behavior than a critical analysis of what standards are appropriate.

In recent years many scholars have reexamined the nature of the lawyer-client relationship. Much of this literature has rejected the traditional notion of the lawyer's role, and has reconceptualized lawyer-client interaction based on moral analysis and on empirical examination of what actually takes place in interactions between lawyers and clients. I will refer to this group of scholars as "the revisionists."

One of the best-known critics of the traditional model of lawyer-client interaction is Judge Marvin Frankel, who urges that the lawyer owes a greater duty to the court than the conception of exclusive loyalty to the client would allow. Such intense loyalty to the client, he argues, leads to too much deception of tribunals.[36] Other schol-

---

[30] *See* White, *supra* note 27.

[31] In fact he argues that lawyers have a responsibility to their clients to mislead other lawyers in order to be successful in negotiation. *See id.* at 927.

[32] White urges that:

> if the low probability of punishment means that many lawyers will violate the standard [concerning truthfulness in negotiation], the standard becomes even more difficult for the honest lawyer to follow, for by doing so he may be forfeiting a significant advantage for his client to others who do not follow the rules.

*Id.*

[33] *See id.* at 926.

[34] *See* S. Bok, *supra* note 6, at 6.

[35] *See* White, *supra* note 27, at 931.

[36] *See* Frankel, *The Search for Truth: An Umpireal View,* 123 U. Pa. L. Rev. 1031, 1035-41 (1975).

ars have launched a frontal attack on the legal profession, asserting that lawyers lie too much in general.[37]

The most recent literature criticizes the traditional model of lawyer-client relationships as being harmful not only to the courts, but also to the clients for whose benefit the adversary system supposedly exists. This literature criticizes lawyers as paternalistic,[38] manipulative, or exploitative of their clients. Several scholars propose methods of shifting the balance of power between lawyer and client toward the client.[39] This Article is part of that dialogue and looks at situations in which lawyers have been dishonest with their clients.

---

[37] *See, e.g.,* Burke, *"Truth in Lawyering": An Essay on Lying and Deceit in the Practice of Law,* 38 ARK. L. REV. 1, 4 (1984). Burke states:

> For years we have "winked, blinked and nodded" at blatant, if not outrageous, lying and deception in pleading, negotiating, investigating, testifying, and bargaining. In almost every aspect of our professional practice we have come to accept, in fact to expect, a certain amount of lying and deception. . . . Whether predicated on the seemingly sacrosanct grounds of lawyer-client privilege, client confidentiality, or zealous advocacy, or on the less hallowed grounds of "puffing," "bluffing," and accepted conventions, lawyer lying and deception cannot be squared with any principled statement of the purposes and goals of the profession.

*Id.* at 2-3 (citations omitted).

Burke mentions the importance of lawyers being honest with their clients and makes a few conclusory comments, but then moves on to what he seems to regard as a more serious issue of lawyers assisting clients in the deception of others. *See id.* at 5.

[38] Judith Maute describes a paternalist model of lawyer-client interactions in which:

> the lawyer claims exclusive decisionmaking authority, premised on the belief that lay clients cannot make sound legal decisions because law is technical, complex, and esoteric. A paternalist lawyer is morally isolated from the client, acting in ways that she thinks will benefit the client without discourse about what the client wants or needs.

Maute, *Allocation of Decisionmaking Authority Under the Model Rules of Professional Conduct,* 17 U.C. DAVIS L. REV. 1049, 1058 (1984) (citations omitted).

Maute compares the paternalists, who make moral decisions without regard for the clients' wishes or views, with the instrumentalists, who give their clients primary decisionmaking authority and abdicate moral responsibility for their own actions, urging that they are hired guns. *See id.* at 1059. These two types of lawyers differ in their attitude toward client decisionmaking, but are similar in their moral isolation from their clients. *See id.*

[39] *See, e.g., id.* at 1052, 1080-1105 (advocating a joint venture model in which the client and attorney share authority); Redmount, *Client Counseling and the Regulation of Professional Conduct,* 26 ST. LOUIS U.L.J. 829, 848 (1982) (proposing that client counseling should stress the undesirability of client overdependence and excessive attorney control); Strauss, *Toward a Revised Model of Attorney-Client Relationship: The Argument for Autonomy,* 65 N.C.L. REV. 315, 336-49 (1987) (advocating a theory of informed consent to promote client autonomy and reallocate decisionmaking authority); Wasserstrom, *Lawyers as Professionals: Some Moral Issues,* 5 HUMAN RIGHTS 1,

Ex. 57 pg.12 of 103

The revisionists suggest that lawyers should give clients a larger voice in decisions that may affect the outcome of representation.[40] They call for lawyers to contract more explicitly about the terms of their employment by clients and to disclose more information to their clients. Some scholars call for an informed consent doctrine in legal malpractice, such as has become a standard in medical malpractice.[41]

The revisionist literature revolves around the principle of client autonomy—the client's right to make choices[42]—and the lawyer's interference with that right. It focuses on the extent to which lawyers allow clients to make the significant decisions in their own legal matters. To this end, clinically-oriented legal educators have developed techniques to sensitize lawyers to the ways that they influence client choices[43] and to encourage lawyers to conduct their practice in a

---

15-24 (1975). Wasserstrom states that the lawyer "typically, and perhaps inevitably, treats the client in both an impersonal and a paternalistic fashion." *Id.* at 1.

[40] Douglas Rosenthal conducted an empirical study that demonstrated that for the most part, clients who were actively involved in litigation and who made demands for information from their lawyers got better case recoveries than did passive clients. *See* D. ROSENTHAL, *supra* note 22, at 56-58.

[41] *See, e.g.,* Andersen, *Informed Decisionmaking in an Office Practice,* 28 B.C.L. REV. 225, 225 (1987) (arguing that clients make intelligent decisions when fully informed of choices); Martyn, *Informed Consent in the Practice of Law,* 48 GEO. WASH. L. REV. 307, 307 (1980) (arguing that informed consent protects client autonomy and benefits the attorney-client relationship); Spiegel, *Lawyering and Client Decisionmaking: Informed Consent and the Legal Profession,* 128 U. PA. L. REV. 41, 41 (1979) (advocating development of the informed consent doctrine to promote the interests of the client, the lawyer, and the public). The informed consent doctrine, already an established part of legal malpractice law, imposes on lawyers some duties of disclosure. Lawyers must disclose conflicts of interest and information material to client decisions. *See* Martyn, *supra,* at 330. Spiegel urges that lawyers should have to disclose "the alternative courses of action . . . [and] to evaluate the likely consequences of each alternative, disclosing as clearly as possible the certainty or uncertainty of his judgments." Spiegel, *supra,* at 134. The informed consent doctrine and the literature discussing it encourage a higher degree of lawyer candor about the substance of legal representation.

The lawyers I interviewed reported more deception about the *process* of practice, about the lawyer's work habits and billing habits than about substantive decisions. Of course, these issues are inextricably intertwined with issues of substance because, for example, if the lawyer is disorganized or has too many other obligations, the client may be poorly represented and lose the case.

The issue of lawyer deception of clients cannot be addressed within the context of the existing legal doctrine of informed consent because the doctrine focuses on the disclosure of information relating to the subject matter and not the process of the representation.

[42] *See* Ellman, *Lawyers and Clients,* 34 UCLA L. REV. 717, 720 (1987).

[43] *See* G. BELLOW & B. MOULTON, THE LAWYERING PROCESS: MATERIALS FOR CLINICAL INSTRUCTION IN ADVOCACY 1040-42 (1978) (discussing counseling techniques that can improve lawyer communication with the client).

"client-centered" fashion.[44] Even these self-conscious efforts to turn some of the lawyer's power over to the client may result in the manipulation of clients.[45]

This Article focuses on the extent of a lawyer's moral or legal duty to be truthful with a client about all matters pertaining to the client's representation, including, but not limited to, decisions about the case.[46] This Article examines, for example, how lawyers abuse their power by preventing their clients from finding out too much about their fees, expertise, and mistakes, and the lawyer's other obligations that interfere with her performance.[47]

What traditionalists overlook and revisionists confront is that a fundamental and pervasive conflict of interest exists between lawyer and client—the lawyer's profit motivation.[48] Many lawyers in private

---

[44] *See generally* D. BINDER & S. PRICE, LEGAL INTERVIEWING AND COUNSELING: A CLIENT-CENTERED APPROACH (1977) (discussing how lawyers can effectively interact with and counsel clients).

[45] *See* Ellmann, *supra* note 42, at 720-21.

[46] One of Steve Ellmann's examples of client manipulation provides a good illustration of this difference in focus. In discussing coercion of client choice, he argues that "the lawyer who announces her intention of withdrawing, in a successful effort to change her client's behavior by making clear that his failure to change will have undesirable consequences, is engaging in coercion *if* her announcement constitutes a threat." *Id.* at 724 (emphasis in original). Ellmann's concern is that lawyers can interfere with the clients' rights "to choose for themselves within the limits of the law and their circumstances." *Id.* at 725 (footnote omitted).

Suppose the lawyer has a good reason for threatening to withdraw, and discloses this to the client? Suppose the client has asked the lawyer to do something illegal? My concern is with manipulation by deception. If a lawyer is candid about her purpose, why is it wrong for her to try to influence her client's choices?

[47] The abundance of literature on client decisionmaking, and relative lack of writing about other aspects of the lawyer-client relationship, may reflect writers' efforts to fit their thinking into existing categories of legal doctrine. Focusing on informed consent, for example, narrows the writers' scope of inquiry to decisions about action on a client's behalf. Similarly, Maute's "joint venture" model of lawyer-client interaction uses existing legal doctrine as a template for her recommendations. Consequently, she focuses on features of the lawyer-client relationship that correspond to the legal definition of a joint venture. *See* Maute, *supra* note 38, at 1066-67.

[48] *See* Burt, *Conflict and Trust Between Attorney and Client,* 69 GEO. L.J. 1015, 1021 (1981) (stating that an attorney's fees often do not depend on winning the client's case, and that long, drawn-out litigation benefits the attorney but does not guarantee financial reward to the client); Kritzer, *The Dimensions of Lawyer-Client Relations: Notes Toward a Theory and A Field Study,* 1984 AM. B. FOUND. RES. J. 409, 410 (reiterating the conclusion of many recent studies that "what is in the lawyer's economic interest may not be in the client's interest"); *see also* Morgan, *The Evolving Concept of Professional Responsibility,* 90 HARV. L. REV. 702, 706 (1977) (arguing that the Code of Professional Responsibility gives priority to lawyers' interests over the interests of clients and the public); *cf.* Anderson, *Conflicts of Interest: Efficiency, Fairness and Corporate Structure,* 25 UCLA L. REV. 738 739-40 (1978) (explaining, in the context of market

practice are primarily motivated by the desire to earn money. Most lawyers also wish to serve the public, to improve the profession, to develop and maintain good professional reputations (which bring income, fame, status, and admiration), and to train young lawyers. Nevertheless, the engine that drives the machine is profit motivation.[49]

The traditional model of lawyer-client relations might be viewed

---

transactions, the need for regulation of the exercise of self-interest by those who deliver specialized services because of the "opportunities to cheat without detection" and the serious consequences of such cheating).

In discussing the economic aspect of the lawyer-client conflict of interest, Burt notes that this conflict is less acute if the lawyer is getting a contingent fee and greater if the lawyer is being paid by the hour, especially because the number of hours may be greater in cases in which the outcome is more uncertain.

This conflict of interest may be primarily economic, but it is not exclusively so. Issues of workload and time management are often present. If the lawyer wants to leave work to go to the movies, this interest competes with the client's interest and the firm's economic interest. *Cf.* Spiegel, *supra* note 41, at 88-89 (noting that a lawyer's and client's interest can diverge on such non-economic issues as choice of forum or choice of legal argument).

[49] Frederick Rosenberg writes:

> The past decade has seen legal costs at large firms skyrocket at nearly three times the rate of inflation. . . . At the core of this development is a profession concentrating itself into massive business organizations focused primarily on profits, personal gain and power.

Rosenberg, *So You Want to Work for a Big Firm*, GEO. L. WEEKLY 2 (August 28, 1989) (adapted from the Washington Post).

Lawyers' desire to earn money does not distinguish them from anyone else in business. The law business is like any other business, except that lawyers are exempt from many of the legal safeguards that are imposed on merchants to deter them from taking advantage of their customers. Consumers are particularly vulnerable when contracting for services or buying products whose reliability they cannot assess. Consequently, the law provides extra legal protection to consumers when dealing with home improvement contractors, used car dealers, door-to-door salespersons, and other business people who might exploit them. *See generally* J. SHELDON, UNFAIR AND DECEPTIVE ACTS AND PRACTICES (1988). When hiring lawyers, clients are purchasing a service whose reliability they usually are not in a position to assess. Although lawyers must observe some restrictions on advertising and solicitation, consumers of legal services do not benefit from many common consumer protections. For example, clients are not entitled to a written estimate or an itemized bill. In fact, most states do not even require that the contract for legal services be in writing; lawyers need only make some disclosures near the beginning of the lawyer-client relationship about the method by which they will determine fees. *See* MODEL RULE 1.5(b) ("When the lawyer has not regularly represented the client, the basis or rate of the fee shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation."); MODEL CODE EC 2-19 ("As soon as feasible after a lawyer has been employed, it is desirable that he reach a clear agreement with his client as to the basis of the fee charge); *cf.* G. HAZARD, ETHICS IN THE PRACTICE OF LAW 153 (1978) (noting the financial motivation of lawyers who pursue careers representing large corporations).

Ex. 57 pg.15 of 103

as a smokescreen that obscures the pecuniary interests of lawyers. The model of lawyer solely devoted to client interests reassures clients that their lawyers are not exploiting them.[50] The smokescreen may be somewhat effective, but a large percentage of clients harbor unspoken mistrust for their lawyers.[51]

The legal profession has changed enormously in the last twenty years. The number of lawyers doubled between the early 1960s and 1980,[52] firm size has drastically increased,[53] and fees have escalated exponentially.[54] The Supreme Court has scaled back restrictions on advertising and solicitation.[55] Lawyers perform an increasingly wide range of functions for corporate clients; the business of law has diversified. Only a fraction of legal services relates to litigation. All these changes in the legal profession have resulted in dramatic increases in the pressure and competitiveness associated with the practice of law.[56]

---

[50] Douglas Rosenthal comments that "[t]he inexorability of the economic conflict of interest between lawyer and client in so many cases, raises a serious question about the appropriateness of the traditional ideal that an ethical and competent lawyer can and will make the client's interest his own." D. ROSENTHAL, *supra* note 22, at 111-12.

[51] *See* Burt, *supra* note 48, at 1019-22. Burt discusses attorney-client mistrust as a mutual phenomenon, but focuses on the client's reasons for mistrusting the lawyer. Some lawyers mistrust their clients because they think the clients are lying to them or they worry that the clients will not pay their bills. Clients' mistrust, on the other hand, is probably more chronic and more serious because lawyers are so often the dominant parties in the lawyer-client relationships and because clients are dependent on their lawyers for services. Burt argues that the legal profession collectively denies the existence of this mistrust, and that this denial harms the ability of lawyers and clients to work together effectively.

[52] *See* B. CURRAN, THE LAWYER STATISTICAL REPORT: A STATISTICAL PROFILE OF THE U.S. LEGAL PROFESSION IN THE 1980's, at 4 (1985), *cited in* Rhode, *The Rhetoric of Professional Reform*, 45 MD. L. REV. 274, 280 (1986).

[53] *See* Velvel, *Was Rehnquist Right—For a Change?*, NAT'L L. J., March 30, 1987, at 13, 13 (summarizing a speech given by Chief Justice Rehnquist regarding the growth of law firms and concomitant stress on profit maximization in many firms). Several law firms have over one thousand attorneys and annual gross revenues of over $250 million. *See* Lehman, *An End to Collegiality: When Law Becomes Big Business*, N.Y. Times, Feb. 5, 1989, § 3, at 3, col. 1.

[54] Leon Mitchell, one of the lawyers interviewed for this Article, reported that in the 1940s, when he first graduated from law school, the standard fee for a court appearance was $25. If the client showed up at court without the money, the lawyer would request a continuance from the judge and explain that a necessary witness named "Mr. Green" was unavailable. The judge, understanding the code and sympathetic to the lawyer's need to earn a living, would postpone the case.

[55] *See* Shapero v. Kentucky Bar Ass'n, 486 U.S. 466 (1988); Zauderer v. Office of Disciplinary Counsel, 471 U.S. 626 (1985); Bates v. State Bar of Ariz., 433 U.S. 350 (1977).

[56] *See* Rhode, *supra* note 52, at 294 ("Attorneys are experiencing heightened

The internal economic arrangements of law firms have changed as well. A much smaller percentage of associates become partners than in the past. Many firms have added tiers of senior associates and junior partners, with control of and profits from the partnership concentrated at the top.[57] Steve Brill, editor of *The American Lawyer*, reports that law firms hire associates and set billing rates not based on the amount of work available, but based on what profit level is sought by the partners.[58] When the firms reach the maximum hourly rates at which clients will pay for associates, they generate dollars by increasing the ratio of partners to associates and/or by increasing the number of hours that each associate must bill annually.[59] If there is not enough work available for an associate to bill legitimately the required number of hours, the associate must choose: (1) to do unnecessary work; (2) to lie about the number of hours worked; or (3) to fail to meet the firm minimum and reduce her chances of becoming a partner.[60]

Lawyers compete for business and recognition with other firms and with the lawyers in their own firms. Medium-sized firms are dissolving and merging into larger firms because of the competitive pressures of law practice.[61] Firms force less productive lawyers to retire early.[62]

These changes in the legal profession have reverberated through the law schools. Law students, burdened by high tuition

---

pressures to expand the market for individual legal services . . . as well as to compete more effectively for corporate business.").

[57] *See* Brill, *The End of Up-Or-Out*, Am. Law., Dec. 1988, at 3, 3, 28, 30; *Is the Process Fair?*, Nat'l L.J., Dec. 5, 1988, at S-8, col. 3 (reporting on a survey in which 82% of managing partners polled indicated that fewer than half of new associates will eventually make partner; that 36% of firms had both equity and nonequity partners; and that over one-third of firms reported having tiered partnerships).

[58] *See* Brill, *The Law Business in the Year 2000*, Am. Law. (supplement), June 1989, at 5, 6-7. In the Soviet Union, where private law practice is in its infancy, profit motivation is evident. In Leningrad, three lawyers left the prosecutor's office to set up a private law firm. One of them, Alexei Sokolov, explained, "We wanted to work less and make more." Their earnings are now twice or three times their government salaries. Yevgeny Nikolski, one of Sokolov's partners, noted another pleasure of private practice. "And now we can just walk out of the office and buy a bottle in the middle of the day if we feel like it." Remnick, *White Nights in a Gray Land*, Wash. Post, July 3, 1989 at A22, col. 1.

[59] *See* Brill, *supra* note 57, at 7.

[60] *See id.*

[61] *See* Dockser, *Midsize Law Firms Struggle to Survive*, Wall St. J., Oct. 19, 1988, at B1, col. 1 (discussing various reasons for the decline of midsize firms, such as rising costs and increasing demands from large corporate clients).

[62] *See* Lehman, *supra* note 53, at 3, col. 1.

and massive loans,[63] are increasingly concerned with credentials—making good grades, joining journal staffs, getting prestigious part-time positions during law school—that will make them desirable in the professional marketplace. Many legal educators feel that this preoccupation with personal financial security has caused a decline in intellectual curiosity.

In light of these developments in the profession. it is not surprising that the lawyers I interviewed described many instances of self-interested deception.[64] The lawyers most frequently deceived clients in an attempt to increase earnings, expand business, or cover up error or neglect—in short, to protect profits and professional reputation. Some of the deception that results from this conflict of interests causes serious harm to clients, some does not. Lawyers appear to vary in how much they allow themselves to pursue self-interest at their clients' expense. At present, this area largely is unregulated because the traditional model of lawyer-client relationships, upon which the regulatory codes are based,[65] fails to acknowledge anything but a unity of interest between lawyer and client.

## II.  SHOULD WE PERMIT LAWYERS TO DECEIVE THEIR CLIENTS?

The lawyer interviews are part of an initial effort to understand some of the types of deception that normally occur in law practice. The stories provide a basis for some reflection on what types of deception the states should permit members of the bar to employ when dealing with their clients, and what types of deception they

---

[63] *See* Marcus, *Gloom at the Top: Why Young Lawyers Bail Out,* Wash. Post, May 31, 1987, at C1, col. 2 (reporting that members of Harvard Law School's 1987 graduating class had average student loans of over $30,000).

[64] Although some lawyers lied to, or concealed information from, their clients for the clients' benefit, *see, e.g., infra* note 314 and accompanying text, most examples of deception involved a conflict between the interests of the lawyer and the client, in which the lawyer acted selfishly.

Frederick Rosenberg notes that the desire for profits leads to deception of clients. For example: "[a] typical retainer agreement. . . is intentionally vague, assures no results, estimates no expenses and promises only to bill the client at a specific rate for however many hours are necessary to get the job done." Rosenberg, *supra* note 49, at 2.

Also, he states that firms tell their clients that using associates will save money when "the truth is that firms use associates because it is more profitable than having a partner do the work." *Id.* at 5.

[65] *See* Patterson, *supra* note 21, at 47-48 (characterizing the Model Code as a "loyalty code" because its governing principle is loyalty to the client, to which it subordinates other duties; and distinguishing a "loyalty code" from an "integrity code" which treats respect for a tribunal and fairness to third parties as seriously as the lawyer's duty to the client).

676    *UNIVERSITY OF PENNSYLVANIA LAW REVIEW*    [Vol. 138:659

should prohibit. In examining these stories, I will answer three kinds of questions. First, does deception offend some fundamental moral principle? Is it always wrong to deceive, regardless of the circumstances?[66] Second, what are the consequences of a particular deception or type of deception? What types of deception are harmful or beneficial?[67] The first mode of analysis evaluates the deceptive conduct apart from its results, while the second judges the conduct by its effects.[68] Both aim to discover whether an act, or category of acts, is morally wrong. Third, what role, if any, should the state assume in attempting to stop lawyers from using deception? What types of deception are impossible or too costly to regulate, or are inevitable?

## A.  *Is It Wrong to Deceive?*

St. Augustine and Immanuel Kant take the position that people have a duty always to be truthful; all lying is wrong regardless of whether a particular lie causes any harm.[69] This position is difficult to defend because it requires that one defend honesty over all other values, even when a truthful statement will cause serious harm.[70]

---

[66] This type of analysis is *deontological* and flows from the ideas of Immanuel Kant. *See* C. WOLFRAM, MODERN LEGAL ETHICS 72, 74-75 (1986) (stating that in a *deontological* theory of moral philosophy, "judges behave by preexisting principles of right and wrong").

[67] This type of analysis is *teleological,* or *consequentialist* reasoning. *See id.* at 72-74 (a *teleological* theory of moral philosophy "regards the outcomes of conduct as pivotal"). The best known teleological theory is *utilitarianism,* which "judge[s] right and wrong by the impact of conduct upon the pleasure, happiness, or welfare of the actor and others." *Id.*

[68] A utilitarian analysis examines the effects of a particular deceptive act of a particular person, or the combined or ordinary consequences of a category of acts, upon the actor and upon all other parties. Acts are moral if they produce the greatest level of intrinsic good. *See id.* at 73.

[69] St. Augustine set up a hierarchy of lies, from the least pardonable (those uttered in the teaching of religion) to the most pardonable (those that harmed no one and helped someone), and urged that while all were wrong, the degree of wrong differed. *See* S. BOK, *supra* note 6, at 35-36.

According to Kant:

> [t]ruthfulness in statements which cannot be avoided is the formal duty of an individual to everyone, however great may be the disadvantage accruing to himself or to another.

> Thus the definition of a lie as merely an intentional untruthful declaration to another person does not require the additional condition that it must harm another . . . For a lie always harms another; if not some other particular man, still it harms mankind generally, for it vitiates the source of law itself.

I. KANT, CRITIQUE OF PRACTICAL REASON AND OTHER WRITINGS IN MORAL PHILOSOPHY 346-50 (L.W. Beck trans. & ed. 1949), *quoted in* S. BOK, *supra* note 6, at 286.

[70] *See* C. WOLFRAM, *supra* note 66, at 74.

Ex. 57 pg.19 of 103

For example, should one tell a battering husband with a gun where one's client, his wife, is hiding? Of course not. Suppose he insists that you tell him whether you know where she is. If you lie and say you know nothing, you protect her, yourself, and the interests of society. If you are honest and say you know where she is but you won't tell him, you invite coercion. Absolutism is not useful in developing standards of conduct for lawyers because there are some situations, such as in negotiations and divorce cases, in which may lawyers need to withhold information to protect their clients' interests.[71]

To answer the question in a fashion that might be useful to lawyers and to their clients, one must balance truthfulness against other values, while still focusing on the deceiver's motives. If the purpose of the deception is to protect someone or to help someone else, then it is more justified than if its purpose is to benefit the deceiver at the expense of another. Although the deceiver could be mistaken about whether or not the deception *actually* protects or benefits another, altruism, like truthfulness, is a positive value which often has positive results. In other words there probably is some correlation between good intentions and good results.[72]

Does the possibility of error in judgment make altruistic deception unacceptable? Many lawyers are quick to conclude that they know better than their clients what is in the clients' best interests.[73] If deception intended to benefit a client is permitted, lawyers may deceive clients as long as they can find an altruistic excuse to justify their primarily selfish deception. Some of the lawyers I interviewed said that their clients did not really understand law practice and would worry too much if they knew the lawyers had made correctable errors.[74] The lawyers seemed unaware that their clients might want

---

[71] Sissela Bok argues that although lying is almost never justifiable, that sometimes deception may be appropriate. *See* S. Bok, *supra* note 6, at 48.

[72] Under this analysis, one might be minimally concerned about domestic-relations lawyers who deceive their clients by withholding information concerning nasty remarks made about the clients by their spouses. Also, this analysis arguably justifies the withholding of a strategy decision not to rehearse a client's testimony so that she would become visibly distressed in front of the jury. Finally, it explains why one might find self-interested deception (such as padding bills, exaggerating expertise, and covering up errors) unacceptable.

[73] *See, e.g.*, McKinnon v. Tibbetts, 440 A.2d 1028, 1029 (Me. 1982) (discussing a lawyer who ceased taking action on a claim he believed to be worthless, but represented to the client that he was pursuing the claim in order to protect the client's feelings because he believed the client enjoyed talking with and visiting him).

[74] *See* Morgan Interview, *infra* text accompanying note 275 ("Very few clients really understand law practice."); *id.* at note 281 ("If I told the client, the client would get hysterical. I am reasonably confident that I will get it straightened out.");

to know about errors as a means of evaluating the lawyer's competence.

Even if a lawyer deceives a client for reasons that are purely altruistic and not mixed with self-interest, one might still condemn the deception for one of two reasons. First, one might believe, as Kant did, that the lawyer has a duty to tell the truth to everyone, or that everyone has a right not to be deceived. Second, if one believes that altruism is a virtue that competes with truthfulness, one might condemn altruistic deception because of the possibility of unintended harm.[75]

This discussion suggests the following analysis in evaluating lawyer deception of clients.[76] First, will the deception benefit the lawyer, the client, a third party, or some combination of people? If persons other than the client will benefit, the lawyer should carefully scrutinize the deception, and avoid it. If the deception will benefit only the client, the lawyer must ask what harm might occur as a result of the deception. What assumptions are implicit in the proposed deception regarding what the client wants? What is the basis of those assumptions? If the withholding of information will benefit the client only, and the benefit is one the lawyer knows the client wants, then it ceases to be deceptive.[77]

If a deceptive statement is necessary to accomplish some legitimate purpose, such as protecting someone from needless harm, one might consider the deception justifiable *unless* the speaker could have accomplished the same purpose without deception. For example, if a lawyer does not have time to speak with a client, she does not need to have the secretary lie to the client. Instead, she could simply ask

---

Copeland Interview, *infra* text accompanying note 280 (stating that non-lawyers tend not to understand that judges rarely throw cases out on technicalities).

[75] For example, if the client who was supposed to break down on the witness stand were unusually sensitive, shy, or private, she might prefer a lower damage amount to the humiliation of public emotionalism. The lawyer could not consult her about this without disclosing the strategy.

[76] This analysis could be used prospectively by a lawyer considering the use of deception or retrospectively to evaluate a deceptive statement. Or it could be used to determine what, if any, deception should be permitted. The rules on deception should be the product of moral scrutiny of the acts in question. But the rules will be ineffectual unless lawyers undertake moral scrutiny of their own behavior.

[77] The domestic relations example is useful here. If the client, in hiring the lawyer, said "My husband is really angry and will say lots of insulting things about me. I don't want to know any of them." An agreement to withhold information makes deception unnecessary. *Cf.* Morgan Interview, *infra* text accompanying note 275.

Ex. 57 pg.21 of 103

the secretary to tell the client the truth, that the lawyer is busy on another matter that has a short deadline.[78]

One might ask whether a deception, if exposed to public view, would be considered justifiable, or whether the deception can be rationalized only by the deceiver, who may be considering only his own interests.[79]

## B. *Harms Caused by Deception*

Other than motivation, the central question in analyzing the morality of a deception is to examine its consequences. Conduct is perceived as wrong in some situations because of improper motives, while in other cases, the conduct is wrong because of harmful consequences. This cost/benefit analysis required to elevate possible or actual consequences of a deception is fraught with difficulties because of the indeterminacy of events and the subjectivity of attempting to predict consequences. Even so, it offers useful insights.

Self-interested lawyer deception of clients causes several types of harm. First, the professional reputation of individual lawyers and of the bar as a whole is damaged by the widespread use of small deceptions. It is widely recognized that people do not trust lawyers. Usually when lawyers lie to their clients, they are not confronted. The client may be entirely unaware of the deception, or may sense that something is amiss but not know exactly what.[80] If large numbers of clients feel that their lawyers do not keep them adequately informed, that they charge too much for their services, and that they do not explain the basis for the amounts charged, the overall effect is a feeling that the lawyers are trying to slip by with the least possible amount of explanation. From this perspective, client mistrust of lawyers is appropriate.

If more lawyers were committed to communicating candidly with their clients, even about issues that might not serve the lawyer's interest, such as errors made or delays encountered, the results might include greater client trust of lawyer honesty, demystification of the practice of law, and reduced abuse of power by lawyers in rela-

---

[78] Sissela Bok discusses the issue of truthful alternatives. *See* S. BOK, *supra* note 6, at 75-76.

[79] *See id.* at 95-108.

[80] *See* Steele & Nimmer, *Lawyers, Clients, and Professional Regulation,* 1976 AM. B. FOUND. RES. J. 917, 951, 957 (noting that the clients interviewed reported general unease with their lawyers' attitudes toward them).

tion to their clients. Perhaps more clients would fire their lawyers or would insist that their bills be reduced, but the level of suppressed client dissatisfaction would drop.

A second type of harm that results from lawyer deception of clients is damage to lawyers' internal standards of integrity. If one accepts the use of small deceptions in one setting, it becomes easier to use deception to solve problems in other settings. The maintenance of high standards of personal integrity in the context of sometimes intense business pressure requires clear individual and institutional values and constant vigilance, because so many problems and complaints could be avoided through the use of deception. Deception allows greater control of the use of time, and sometimes major savings in time. Sissela Bok characterizes this problem as a slippery slope: "[a]fter the first lies, . . . others can come more easily. Psychological barriers wear down; lies seem more necessary, less reprehensible; the ability to make moral distinctions can coarsen; the liar's perception of his chances of being caught may warp."[81]

If, for example, a lawyer asks a secretary to tell a client that the lawyer is out so that the lawyer does not have to explain why the complaint has not yet been drafted, might that lawyer not take the next step and tell the client the complaint was finished when it was not? Once the lawyer has lied to the client about whether the work has been done, what is to prevent the lawyer from rounding up the hours recorded for the piece of work when it finally does get done? If one begins padding hours, then why not occasionally charge two clients for one hour spent on work beneficial to both? (Not splitting the hour, but billing for two hours.) And so on.[82]

---

[81] S. Bok, *supra* note 6, at 27. Bok points out that "[i]n the care of the sick and the dying, in courtroom practice, in every kind of selling and advocacy—wherever the opportunities for deception abound, rewards are high, and time for considering alternatives often short—the danger of the formation of deceptive habits is much greater than in other lines of work." *Id.* at 128-29.

[82] A good example of a situation in which one lie leads to another is *In re Mendell*, 693 S.W.2d 76 (Mo. 1985) (en banc). The respondent attorney in this disciplinary proceeding told his client that her case had been settled for $7500, when in fact the settlement was for $8000. This deception allowed him to collect $336 more than if he revealed the extra $500 recovery and collected his one-third fee. To effectuate this deception, he forged her signature on the release and the draft. When she requested a copy of the settlement documents, he forged false documents. When she requested a copy of her file, he removed all documents making reference to the $8000 total. Then he told a series of lies to the Bar Committee in an effort to explain his previous conduct. What began as the theft of a trivial amount of money ended with the lawyer being disbarred. *See id.* at 76-78.

Ex. 57 pg.23 of 103

In the area of billing, the firms represented by the lawyers interviewed appear to have slipped down the slope. Though the lawyers usually tell their clients that they will be billed by the hour, the interviews suggest that, to an alarming extent, the amount that lawyers bill their clients is based on a combination of factors, including the number of hours needed to satisfy firm requirements, the amount the lawyer thinks the client can afford to pay, and the amount the lawyer thinks can be justified for the work in question.

The slippery slope problem is as much an institutional as an individual problem. Most new lawyers realize that there is a wide gulf between what they learn in their ethics classes and what happens in the world of practice. When they begin work at law firms, they watch the more experienced lawyers to see what the real standards of conduct are. Each firm quickly communicates its institutional norms to new associates; many associates are anxious to assimilate themselves into an institution and to be successful within it. Therefore, they are not critical of the norms they are asked to adopt. They redraw their lines to fit into the value systems of their firms. If the senior lawyers are not precise in their billing practices, the junior lawyers will not be. If the senior lawyers exaggerate their credentials or expertise when talking with new clients, the junior lawyers will do the same. Within a law firm, standards of ethical conduct can be raised successfully only by the leadership of the firm because higher ethical standards may reduce profits, and junior lawyers are under intense pressure to contribute to the firm's profit margin.[83]

Another aspect of the slippery slope is that lawyers who deceive their clients may grow increasingly comfortable in using deception to solve problems in other relationships, with colleagues, courts, family members, and even the Internal Revenue Service.[84] It is not that

---

[83] See infra text accompanying notes 212-14. Sissela Bok notes that "[t]he very stress on individualism, on competition, on achieving material success which so marks our society also generates intense pressures to cut corners." S. BOK, supra note 6, at 258.

[84] A shocking indication that lawyers are less honest and law-abiding than one might expect was a New York State tax audit that found that almost ten percent of partners in law firms surveyed had not filed state income tax returns during at least one of three years studied. Almost 4000 law firms were surveyed. Out of 15,745 partners, 1,512 had not filed required state income tax returns. See Kolbert, Nearly 10% of Law Partners Fail to File New York Taxes, N.Y. Times, Mar. 23, 1989, at A1, col. 4.

The tax commissioner suggested this problem was caused by the fact that members of partnerships are not required to pay withholding taxes. About a third of the offending partners live outside of New York State but are obligated to file state tax returns because they work in the state. See id. One may question how many of

682     *UNIVERSITY OF PENNSYLVANIA LAW REVIEW*     [Vol. 138:659

deception of one person causes deception of another, but that a permissive attitude toward the use of deception in one arena may carry over into another.[85]

A third type of damage that results from the use of deception by lawyers is the neglect, error, poor organization, and lack of expertise that may be perpetuated and not corrected because it is hidden.[86] The acceptance of what is perceived as trivial deception of clients allows lawyers to conceal substandard performance. If lawyers know that they can conceal from their clients whether work was done on time or whether they were fully prepared, the lawyers are not accountable for their actual performance, but only for the images that they create. The use of deception becomes a crutch, and the lawyers may then forget to ask themselves whether there exist truthful approaches which would accomplish their purposes.

Clients who do not have accurate information about their lawyers' qualifications or about what the lawyers have or have not done on their behalf are in a poor position to evaluate the services that they are getting or to get better services if their lawyers are incompetent or irresponsible.[87] This lack of information is one reason why

---

these partners were aware of the legal requirement but did not file returns because they did not think they would be caught. Then question how many had performed similar calculations on behalf of clients seeking to evade the law. A final question is how many lawyers had changed the numbers on a client's bill for similar reasons.

[85] A good example of this is a lawyer interviewee's description of the disrespectful attitude of partners toward associates in her law firm, and of the connection between the exploitation of associates and the deception of clients. Both types of behavior are common among lawyers who think that they are more powerful or more important than others. *See* Greenberg Interview, *infra* text accompanying notes 293-94.

[86] An extreme example of the harm that might result from nondisclosure is offered by a recent medical malpractice case in Japan. A doctor decided not to tell a patient about her cancer of the gall bladder, and instead recommended surgery for gallstones. The patient decided against surgery, and by the time she learned of her true condition, the cancer had become terminal. The Japanese court found the doctor not liable because he had followed a Japanese tradition of not informing the patient of a terminal illness. The court indicated that the patient was responsible for her own death because she did not follow the doctor's advice. *See* Hiatt, *Japan Court Ruling Backs Doctors*, Wash. Post, May 30, 1989, at A9, col. 4.

[87] The neglect cases are filled with stories about lawyers who failed to return clients' phone calls in order to conceal that they were not doing the work that they had been hired to do. If the clients had more information earlier, many of these lawyers might have been fired and the clients less harmed by the lawyers' misconduct. *See, e.g.,* Florida Bar v. Peterman, 306 So. 2d 484, 484 (Fla. 1975) (suspending from practice an attorney who refused to keep clients informed as to the progress of their cases, and engaged in other misleading actions that damaged the clients).

market forces are so ineffective in helping to maintain high standards in law practice.[88]

A fourth type of damage that results from the deception of clients is to the lawyer's relationship with the client. If a lawyer is having coffee with a co-worker, and tells the secretary to tell a client who calls that the lawyer is in court, this deception is a distancing statement, a way of asserting superiority in the relationship with the client. By deceiving a client, a lawyer can dehumanize him or her, treating the client as an annoyance. The attitude that may develop as a result of keeping clients at this distance could result in the lawyer according the client's needs and judgment less than adequate respect.

A fifth and related type of harm caused by deception of clients is to the deceptive lawyer's relationship with other lawyers. Some deceptions which may not harm the client at all may be injurious to other lawyers. The lawyers who send out work prepared by junior lawyers under their own names deprive the younger lawyers of the satisfaction and respect of clients that they might derive from being credited with their own work.[89] The lawyer who tells a client that something can easily be done by the next morning and conceals from the client that an associate will stay up all night to do it treats the associate as nonexistent. Question whether the partner, having defined the task as "no problem" will be unappreciative of the sacrifices required to get the work done.[90] In some cases, the cost of deceiving one person is the exploitation of another.

What would be the effects of greater candor? If, for example, lawyers did not exaggerate their expertise, they would have increased difficulty expanding their practices into new fields. Presumably some clients, if informed of a lawyer's actual relative ignorance in a field, would take their business to real experts. Lawyering might become more specialized, but clients would be better able to trust their lawyers and would get better service.

Alternatively, if lawyers were more candid about the extent of their experience and about their own judgment that they could handle work in a new area, the flow of business into the law firms might largely be unaffected. The lawyers might communicate confidence in their own abilities without lying about their expertise. As a result,

---

[88] Mark Spiegel discusses the relative ineffectiveness of market forces in producing high-quality legal services, in part because of clients' lack of information about those services. *See* Spiegel, *supra* note 41, at 79-81.

[89] *See infra* text accompanying notes 288-96.

[90] *See infra* text accompanying note 297.

clients might not decline to hire lawyers based on a lack of specific expertise. A lawyer cannot know in advance how a prospective client will react if the lawyer states she has not done a particular type of work before. Most lawyers therefore would not risk being candid unless they were required to do so.

### C. *Where to Draw the Line*

Some forms of deception are beneficial to lawyers and harmful to others. Other types of deception appear to be intended primarily for the client's benefit. Many would argue that it is appropriate to withhold information from a divorce client about her husband's latest volley of slanderous remarks. The lawyer assumes a somewhat paternalistic role in protecting his or her client, but the situation may warrant such protection. Allowing the lawyer to withhold information means giving the lawyer the power to decide what is legally relevant and what is trivial. Many people hire lawyers to obtain just this sort of protection.

The problem of paternalism disappears if the client contracts with the lawyer to use discretion in deciding what information to disclose to the client. If the client requests that the lawyer withhold some information, there is no abuse of power.[91]

This same analysis can be applied to other deceptions that are intended for the client's benefit, such as the litigation strategy example in which the lawyer elected not to rehearse the client's testimony to obtain a greater emotional impact during the trial. The lawyer might ask permission from the client at the outset of the relationship to withhold some information about strategy if the lawyer believed that doing so would benefit the client. If the client has the opportunity to decline to agree to this arrangement, most possible harm is avoided. If the lawyer makes decisions for the client without the client's knowledge, however, the client has no opportunity to direct the lawyer's judgment as to what types of information to withhold or disclose. The difficulty with contracting to deceive a client for the client's benefit is that it may be impossible to anticipate what information the lawyer might later think is best to withhold.[92]

---

[91] *See generally* Spiegel, *supra* note 41, at 84-85 (discussing the desirability of negotiating over decisionmaking authority early in the lawyer-client relationship, and making adjustments to coordinate expectations).

[92] In a law school clinic in which the author was an instructor, a doctor informed the law students representing a client in a social security disability case that the client was suffering from a terminal illness. The doctor felt the client did not need this information. Neither the students nor their supervisors could have anticipated this

Self-interested deception of clients by lawyers should be prohibited. There is no justification for allowing lawyers to mislead their clients about their experience or expertise, error or delay in work done for the clients, why they are unavailable to a particular client at a particular time, or the method of determining the price of their work. These types of deception make lawyers appear greedy, immature, and unable to manage their time or face up to their mistakes.

Disciplinary rules should permit lawyers to contract with clients to withhold certain types of information. The contract would legitimate the lawyer's screening function, removing it from the realm of deception. Unless lawyers contract with their clients to withhold certain information, the disciplinary rules should not permit lawyers to deceive their clients in the name of helping them. Some lawyers may employ deception with the intent of helping a client and, incidentally, help themselves. For example, several lawyers claimed that they did not tell clients about error or delay to protect them from worrying needlessly. At the same time, the lawyers benefitted from concealing conduct that could have damaged their reputations.[93] Some intended or possible benefit to the client should not justify self-interested deception.

Earlier I defined deception as the intention of the speaker to mislead, and included intentional misleading by statement or silence.[94] What if a lawyer does not believe that a client needs a piece of information? Is withholding that information deceptive? If a reasonable possibility exists that a client would want to know the information, then withholding it is deceptive.[95] This question of

---

situation or made an agreement with the client about whether they should withhold sensitive information from the client.

[93] One lawyer explained that when she told a client that work was nearly finished even though she had not started it, the client benefitted because the lawyer then felt obliged to complete the work quickly. See Morgan Interview, infra note 275 and accompanying text. One may question whether the lawyer's motivation was to spur rapid action or to avoid loss of respect from the client. If the lawyer admitted to the client that she had not started work that she should have finished, she might feel even more pressure to complete the work quickly.

[94] See supra text accompanying notes 6-7.

[95] Spiegel uses the principle of informed consent to define what information a lawyer should communicate to the client. He suggests that, "the lawyer should have an obligation to identify for his client the alternative courses of action," and should "evaluate the likely consequences of each alternative, disclosing as clearly as possible the certainty or uncertainty of his judgments." Spiegel, supra note 41, at 134. This standard is inadequate, however, because it addresses only decisions relating to action in cases. A broader standard based on what the client might reasonably want to know would encompass information about issues such as expertise, error, and billing that appear to be common subjects of deception.

how much a lawyer must disclose has been addressed in malpractice law. One court held that material facts include those "which, if known to the client, might well have caused him, acting as a reasonable man, to alter his proposed course of conduct."[96] This "materiality" standard is satisfactory.[97] The question is whether the information might cause a reasonable client to alter her conduct.

This "materiality" standard of disclosure appears to require additional disclosures in most of the categories of deception that the lawyers I interviewed identified. If a lawyer discloses error, the client might alter her course of conduct by firing the lawyer or refusing to pay for time the lawyer spends correcting the error. If a lawyer reveals that her billing records are not precise, the client might seek to negotiate about the fee.[98] If the lawyer discloses her lack of experience in the area of law in which a client needs service, or if the lawyer discloses the number of other tasks competing for her attention, the client might choose to retain another lawyer. Alternatively, the client might elect to employ the lawyer in question but to negotiate about the lawyer's billing rate or about the priority that the lawyer will assign to the client's work. If the client knows that the lawyer was always in her office when the client called, but consistently refused to accept the client's calls, the client might insist on speaking to the lawyer or might confront the lawyer about her inconsiderate behavior. All of these deceptions are material.

On the other hand, the materiality test is not overinclusive; it exempts lawyers from having to disclose a great deal of nonessential information. For example, if the lawyer experienced a delay in setting up a meeting with another attorney, the test would not require the lawyer to mention that delay to the client *unless* the client felt a particular urgency about the meeting. If a document was accidentally deleted from the computer, the lawyer would not need to tell the client *unless* she wished to bill the client for the time she spent redoing the work (in which case the client might object) or *unless* the delay would cause some problem for the client. A lawyer would not need to consult a client about another attorney's request for a brief

---

[96] Spector v. Mermelstein, 361 F. Supp. 30, 40 (S.D.N.Y. 1972), *modified on other grounds*, 485 F. 2d 474 (2d Cir. 1973), *quoted in* Spiegel, *supra* note 41, at 68-69.

[97] Of course, switching to a reasonable person standard would be an improvement.

[98] Deception about fees is particularly insidious. When a lawyer tells a client that the fee is based on hours, the lawyer is implying that the fee is objectively determined and is non-negotiable. If clients know the various factors that determine the legal fees, they will be in a better position to negotiate.

Ex. 57 pg.29 of 103

extension of time *unless* the lawyer thought that the client reasonably might want to deny the extension.

Under this standard, what qualifies as deceptive would vary from one client to another. Lawyers would have an obligation to consider how much each client would wish to know, and the lawyers would have to err on the side of disclosure.

### III. Permissible Deception: The Articulated Ideology on Candor Toward Clients

One line of inquiry in this investigation of lawyer deception of clients is: How honest do we expect lawyers to be? What types of deception do the disciplinary rules, case law, and other sources of regulatory authority prohibit or permit? This analysis will provide a backdrop against which to examine the examples of deceptive conduct provided by the lawyers interviewed. It will provide information about the articulated values and aspirations of the bar, and will become the baseline for suggestions about changes in law that would require lawyers to be more honest with their clients.

The law requiring lawyers to be truthful is growing. Rule 11 of the Federal Rules of Civil Procedure has greatly increased the requirements that lawyers be honest in their communications with tribunals.[99] The number of malpractice verdicts against lawyers for dishonesty and other misconduct is increasing rapidly. The ethical rules governing the profession, however, do not make it clear under what, if any, circumstances it is permissible for lawyers to deceive their clients.

#### A. *Disciplinary Rules*

Both the Model Code of Professional Responsibility and the Model Rules of Professional Conduct[100] include a general prohibi-

---

[99] *See* FED. R. CIV. P. 11 (requiring an attorney to sign each document filed in court, and stating that the signature constitutes the lawyers' certification that information or requests contained therein are reasonably based on the attorney's good faith understanding of the law and facts).

[100] Both codes were written under the sponsorship of the American Bar Association and were offered to the states as models. The Model Code was approved by the ABA in 1970 and was adopted by all but a few states by 1973. The Model Rules were produced as an alternative to the Model Code, and were approved by the ABA in 1983. At present the Model Rules have been adopted in some form by approximately thirty states. Fewer than twenty states still use some form of the Model Code. *See* S. GILLERS & R. SIMON, REGULATION OF LAWYERS: STATUTES AND STANDARDS 201 (1989). This analysis will draw on both codes.

tion on all deceptive or dishonest behavior, but do not offer specific guidance on the subject of deception of clients. Model Rule 8.4 states that "[i]t is professional misconduct for a lawyer to: . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation. . . ."[101] This language is taken almost verbatim from DR 1-102 of the Model Code of Professional Responsibility.[102] These provisions give the impression that no deception of any kind is permitted. More specific provisions of both codes bar deception in certain circumstances. It is not clear whether deception that is not specifically prohibited is permitted, or whether the provisions above are intended to prohibit all types of deception that are not specifically addressed elsewhere in the codes. The American Bar Association's annotated edition of the Model Rules notes that most of the cases in which this provision has been found to be violated also included violations of other more specific rules,[103] but the author of the annotation takes the position that Rule 8.4 also prohibits deception not otherwise specifically prohibited.[104]

The courts vary in how seriously they treat violations of DR 1-

---

[101] MODEL RULE 8.4(c). Interestingly, the original draft of the Model Rules proposed by the Kutak Commission did not include this language. The Iowa Bar Association proposed to amend the draft to add the language from DR1-102; the amendment was adopted without objection. *See* ABA, THE LEGISLATIVE HISTORY OF THE MODEL RULES OF PROFESSIONAL CONDUCT: THEIR DEVELOPMENT IN THE ABA HOUSE OF DELEGATES 198 (1987) [hereinafter LEGISLATIVE HISTORY]. One wonders whether the original drafters regarded this provision as so unimportant that they overlooked it.

[102] DR 1-102 provides that "[a] lawyer shall not: . . . [e]ngage in conduct involving dishonesty, fraud, deceit or misrepresentation. . . ." MODEL CODE DR 1-102(A)(4).

[103] The cases listed in the annotation that involve deception of clients include five cases involving misuse of client funds, two cases involving deceit of clients as to the status of cases, one case of a lawyer who did not tell a client about suspension from practice, and one attorney's fraudulent fee arrangement. *See* Am. Bar Ass'n, ANNOTATED MODEL RULES OF PROFESSIONAL CONDUCT 355 (1984) [hereinafter ANNOTATED MODEL RULES]. In one case, DR 1-102(A)(4), which prohibits dishonesty, fraud, deceit and misrepresentation, was found to be violated because a lawyer had failed to notify a client of an error and of the client's possible malpractice claim against the lawyer. *See* Tallon v. Committee on Professional Standards, 86 A.D.2d 897, 898, 447 N.Y.S.2d 50, 51 (1982) (holding that "[a]n attorney has a professional duty to promptly notify his client of his failure to act and of the possible claim his client may thus have against him"). This case is unusual in that it reads one of the most general provisions in the code to impose a very specific affirmative duty.

[104] Although most of the cases under the dishonesty provision involve conduct that would be proscribed under other Model Rules, this provision fills any gaps that may exist between these other Rules. For instance, in ABA [Comm. on Ethics and Professional Responsibility] Formal Opinion 337 (Aug. 10, 1974), the Standing Committee on Ethics and Professional Responsibility held that a lawyer's recording of conversations without the

102(A)(4). The District of Columbia Court of Appeals recently rejected a disciplinary board recommendation for a six-month suspension of a lawyer who was found to have violated DR 1-102(A)(4), and instead imposed a thirty-day suspension. The lawyer had altered eight credit card receipts to recover funds that he had advanced for other legitimate expenses on behalf of a client. The attorney placed a "1" before each amount charged, and had collected $800 more than the actual charges on the receipts.[105] The lawyer argued that he intended only to recoup funds he had advanced for other client expenses, and urged that he should not be disciplined because the amount involved was small. The court rejected these arguments, deciding that deliberate alteration of documents relating to client funds is presumptively material and subject to discipline.[106]

An Iowa lawyer who tried to cover up a brokerage firm error by using his client's money for several weeks without permission was found to have violated DR 1-102(A)(4) and was suspended indefinitely with a possibility of reinstatement after three years.[107] The brokerage firm made a stock purchase pursuant to the lawyer's instructions, but credited the purchase to the lawyer's personal account instead of setting up an account for the client. By the time the lawyer discovered the error, the price of the stock had dropped, and correction of the error would have resulted in a $2,000 loss to the client. The lawyer "wanted to avoid losing face with the Glidden legatees concerning what initially appeared to be a poor investment,"[108] so he left the stock in his own account, and reimbursed the trust account using his own funds. The clients were not informed of the lawyer's actions. The stock was later sold, and the lawyer made a profit of $2110 on the transaction.[109]

The Maryland Supreme Court in 1957 disbarred a lawyer for inserting slugs instead of coins into parking meters, and for using a

---

consent of all parties violated the prohibition against dishonesty, fraud, deceit or misrepresentation.
ANNOTATED MODEL RULES, *supra* note 103, at 355-56.

[105] *See In re* Schneider, 553 A.2d 206 (D.C. Ct. App. 1989) *cited in* LEGAL TIMES, Feb. 13, 1989, at 30, col. 2. This deception was reported to the disciplinary authorities only after the lawyer had left the law firm, taking the client with him. *See id.*

[106] *See id.*

[107] *See* Committee on Professional Ethics & Conduct v. Brodsky, 318 N.W.2d 180, 183 (Iowa 1982). The lawyer violated other rules as well. *See id.* at 180.

[108] *See id.* at 183.

[109] *See id.* The lawyer also lied to the Grievance Commission regarding his actions. *See id.*

false name when arrested.[110] The Court stated that "[m]orally, the offense was as great as though he had stolen money deposited by others in the meters, and amounts at least to 'fraud or deceit.'"[111]

It is difficult to find any consistent line of analysis in these or other similar cases; the variation in punishments imposed cannot be explained by any observable difference among the offenses involved.

The Model Rules include some new provisions on lawyer honesty with clients that did not appear in the Model Code, but the language of the Model Rules raises as many questions as it answers. Model Rule 1.4 addresses a lawyer's affirmative duty to provide her client with information about the lawyer's work. It states:

> (a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.
>
> (b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.[112]

Although this provision imposes some affirmative duty of disclosure on lawyers, the comments make clear that the duty varies with the circumstances. The lawyer is supposed to "fulfill reasonable client expectations for information."[113] The comments specifically address the question of when a lawyer may withhold information:

> In some circumstances, a lawyer may be justified in delaying transmission of information when the client would be likely to react imprudently to an immediate communication. Thus, a lawyer might withhold a psychiatric diagnosis of a client when the examining psychiatrist indicates that disclosure would harm the client. A lawyer may not withhold information to serve the lawyer's own interest or convenience.[114]

---

[110] *See* Fellner v. Bar Ass'n, 213 Md 243, 247, 131 A.2d 729, 731-32 (1957). The court also stated that "[i]t is not without significance, as bearing upon his moral fitness, that he has never yet admitted that he did wrong." *Id.* at 247, 131 A.2d at 731.

[111] *Id.* at 247, 131 A.2d at 731.

[112] MODEL RULE 1.4; *see also* Model Code EC 7-8, which provides, similarly, but using only precatory language that "[a] lawyer should exert his best efforts to insure that decisions of his client are made only after the client has been informed of relevant considerations. A lawyer ought to initiate this decision-making process if the client does not do so." *Id.* Model Code EC 9-2 provides that "a lawyer should fully and promptly inform his client of material developments in the matters being handled for the client."

[113] MODEL RULE 1.4 comment.

[114] *Id.* Many of the recommendations contained in the last section of this

The Rule does not articulate how a lawyer should determine reasonable client expectations, nor does it specify any particular types of information which must be disclosed. But even this vague Rule was felt to be too burdensome by some who participated in evaluating the proposed draft of the Model Rules. Their proposals to eliminate the mandatory language were defeated. The legislative history states that:

> [p]roposed amendments, which would have made the rule merely precatory, were defeated. Representatives of the Commission emphasized that a precatory rule would not adequately protect the interest of the client in knowing what was happening. Also, they noted that because a lawyer's failure to keep a client informed was a frequent source of disciplinary complaints, the obligation to keep a client reasonably informed should be made clear.[115]

Whether the Rule accomplishes its purpose of improving lawyer communication with clients remains an open question.

Model Rule 2.1 specifically requires lawyers to be candid when advising their clients. It states: "In representing a client, a lawyer shall exercise independent professional judgment and render candid advice."[116] The comment further emphasizes that clients are entitled to honest assessments of their situations, and encourages lawyers to disclose even unpleasant information.[117] Similarly, the ABA's annotations to these rules interpret the independent advice requirement as prohibiting lawyers from allowing avarice or a desire for professional recognition to affect the advice given to a client.[118]

The ethical codes impose general requirements of honesty and disclosure from lawyers with respect to fees. The Model Code prohibits "clearly excessive fee[s]"[119] and the Model Rules require that

---

Article could be regarded as implementation of this prohibition of self-interested withholding of information. See *infra* text accompanying notes 360-81.

[115] LEGISLATIVE HISTORY, *supra* note 101, at 37.

[116] MODEL RULE 2.1.

[117] *See id.* comment. There is no comparable provision to Model Rule 2.1 in the Model Code.

[118] *See* ANNOTATED MODEL RULES, *supra* note 103, Rule 2.1 ann. at 189, *citing In re* Kali, 116 Ariz. 285, 287, 569 P.2d 227, 229 (1977) (disciplining a lawyer for arranging loans between two clients so that the client could afford the lawyer's services); *In re* General Motors Engine Interchange Litig., 594 F.2d 1106, 1125-26 (7th Cir. 1979) (finding that unauthorized settlement negotiations by attorneys in a class action suit often are stimulated by the desire to gain "the prestige attendant upon negotiating a large settlement against a corporate defendant"), *cert. denied*, 444 U.S. 870 (1979).

[119] MODEL CODE DR 2-106(a).

"[a] lawyer's fee shall be reasonable."[120] Both codes list factors that lawyers may consider in setting fees.[121] The Model Rules, for example, require that "[w]hen the lawyer has not regularly represented the client, the basis or rate of the fee shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation."[122] The Model Code similarly encourages, but does not require, a written fee agreement.[123] The Model Rules' disclosure requirement appears not to apply to long-term relationships with clients (except at their inception). The requirement is so vague that it arguably would be satisfied by an extremely general disclosure. The comments explain: "It is not necessary to recite all the factors that underlie the basis of the fee, but only those that are directly involved in its computation."[124] The Rules require no particular methods of tabulating hours worked and require no particular disclosure in bills sent to clients.[125]

These rules were written in contemplation of a much narrower set of bases for fee computation than have since been developed. The annotated edition of the Model Rules explains that in addition to hourly rate billing and contingent fees, the two most common methods, lawyers may request clients to pay advances or retainers. This discussion fails to mention premium billing or billing multipliers.

Although the rules dealing with private communication between lawyers and clients are scanty, the subject of advertising—public communication with prospective clients—is addressed (particularly in the Model Code) in compulsive detail.[126] DR 2-101(A) prohibits "the use of any form of public communication containing a false, fraudulent, misleading, deceptive, self-laudatory or unfair statement or claim."[127] Model Rule 7.1 reads:

> A lawyer shall not make a false or misleading communication about the lawyer or the lawyer's services. A communication is false or misleading if it:

---

[120] MODEL RULE 1.5(a).
[121] *See* MODEL CODE DR 2-106(b); MODEL RULE 1.5(a).
[122] MODEL RULE 1.5(b).
[123] *See* MODEL CODE EC 2-19.
[124] MODEL RULE 1.5 comment.
[125] The newer methods of billing make it even more necessary to require specific disclosures. *See* ANNOTATED MODEL RULES, *supra* note 103, Rule 1.5 ann., at 54.
[126] *See* MODEL CODE DR 2-101(B), which lists exactly what information lawyers may offer when advertising legal services.
[127] *Id.* at DR 2-101(A).

(a) contains a material misrepresentation of fact or law, or omits a fact necessary to make the statement considered as a whole not materially misleading;

(b) is likely to create an unjustified expectation about results the lawyer can achieve. . . .[128]

The Comment explains that this rule "governs all communications about a lawyer's services, including advertising,"[129] but the annotations to the Model Rules treat this rule as if it concerns only advertising and not individual communication with prospective or present clients.[130]

Model Rule 1.15 requires certain disclosures to clients of information about client funds or property in possession of the lawyer. It requires prompt notification upon receipt, and prompt rendering of a full accounting regarding client funds or property.[131] Both codes also include explicit disclosure requirements if a lawyer is entering into a business transaction with a client.[132]

The bar associations mirror the general unconcern about lawyer honesty with clients that is reflected in the ethical rules. The bar counsels who receive and respond to complaints of ethical violations by lawyers tend to undervalue client complaints and to be biased in favor of the lawyers.[133] To the extent that bar officials show awareness of problems in communication between lawyers and clients, they tend to assume that the lawyer is simply unaware of the client's need for information, rather than that the lawyer is withholding information as a means of control. One bar president said:

> A major source of these complaints is a breakdown in communications between attorney and client. Many [lawyers] simply do not recognize that [they] must keep [their] clients advised, explain any unusual delays, answer letters and telephone calls, and be available when clients want to find out what is happening to their cases.[134]

The codes are more specific in their articulation of lawyers' duties of candor toward opposing counsel and toward tribunals than

---

[128] MODEL RULE 7.1.

[129] *Id.*, comment.

[130] *See* ANNOTATED MODEL RULES, *supra* note 103, Rule 7.1 ann., at 306-12.

[131] *See* MODEL RULE 1.15(b). This provision is very similar to DR 9-102(B) in the Model Code.

[132] *See* MODEL RULE 1.8; MODEL CODE DR 5-104(A).

[133] *See* Steele & Nimmer, *supra* note 80, at 966-67.

[134] Upton, *President's Message,* 13 N.H.B.J. 56 (1971), *quoted in* Steele & Nimmer, *supra* note 80, at 967.

694     *UNIVERSITY OF PENNSYLVANIA LAW REVIEW*     [Vol. 138:659

in addressing duties of candor to clients. Model Rule 4.1, titled "Truthfulness in Statements to Others," provides that:

> [i]n the course of representing a client a lawyer shall not knowingly:
>
> (a) make a false statement of material fact or law to a third person; or
>
> (b) fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by rule 1.6.[135]

The comment following this rule makes it clear that the drafters did not intend to include clients when they referred to third persons.[136]

The Model Rules acknowledge that in some circumstances it may be acceptable for lawyers to deceive others. Of particular interest is a comment after Model Rule 4.1 which explains that lawyers are allowed to deceive lawyer adversaries under certain circumstances. It explains:

> This Rule refers to statements of fact. Whether a particular statement should be regarded as one of fact can depend on the circumstances. Under generally accepted conventions in negotiation, certain types of statements ordinarily are not taken as statements of material fact. Estimates of price or value placed on the subject of a transaction and a party's intentions as to an acceptable settlement of a claim are in this category, and so is the existence of an undisclosed principal except where nondisclosure of the principal would constitute fraud.[137]

---

[135] MODEL RULE 4.1. Notice that this rule sets a less stringent rule for deception by omission than by commission. Both codes draw this distinction frequently. The comment to Rule 4.1 explains that "a lawyer is required to be truthful when dealing with others on a client's behalf." Clients are excluded by implication from "others." *See* MODEL RULE 4.1 comment.

[136] The Model Code provision parallel to Model Rule 4.1(a) appears to require lawyers to be truthful to third persons and to clients. Model Code DR 7-102(A)(5) states that "[i]n his representation of a client, a lawyer shall not . . . [k]nowingly make a false statement of law or fact." MODEL CODE DR 7-102(A)(5). The narrowing of the provision in the Model Rules to exclude statement to clients probably was unintentional. Since the Model Code is so general in its mandate, the difference between the Model Code and the Model Rules may be insignificant. Neither code looks at false statements to clients or withholding information from clients as a separate issue.

[137] MODEL RULE 4.1 comment. An early draft of Rule 4.1 was similar in content but different in form. The rule required lawyers to "be fair in dealing with other participants." The comment to this proposal stated that "[f]airness in negotiation implies that representations by or on behalf of one party to the other party be truthful. . . . The precise contours of the legal duties concerning disclosure, representation, puffery, overreaching, and other aspects of honesty in negotiations cannot be concisely stated." MODEL RULE 4.2 comment (Discussion Draft 1980),

In essence this comment means that a lawyer may deceive the other lawyer during negotiation about his view of the value of a case or his client's intentions as to settlement.[138] It implicitly acknowledges that there are some exceptions to the blanket prohibition on deception in Model Rule 8.4. Nowhere in either the Model Code or the Model Rules is there any comparable acknowledgement that certain types of deception of clients is acceptable.

In general, the Model Code and the Model Rules are silent on the issue of lawyer deception of clients. The codes are so grounded in the adversary model of legal representation that the language reflects the value placed on absolute loyalty of lawyer to client[139], and except in certain narrow circumstances (such as handling client

---

*quoted in* White, *supra* note 27, at 928, 931 n.15. The language adopted in the final rule reflects a tilt in the direction of requiring truthfulness to third parties, with an explicit acknowledgement that certain types of deception are acceptable.

[138] An interesting question is whether the drafters of the Model Rules chose to draft the rule in a cryptic manner by using a wholly unconventional definition of materiality rather than by acknowledging that they were condoning certain types of deception. *Black's Law Dictionary* defines the word "material" as "important; more or less necessary; having influence or effect; going to the merits; having to do with matter, as distinguished from form. Representation relating to matter which is so substantial and important as to influence party to whom made is 'material.'" BLACK'S LAW DICTIONARY 880 (5th ed. 1979).

A more specific definition of materiality is provided by case law on the lawyer's duty to disclose material facts to her client: "Material facts are those which, if known to the client, might well have caused him, acting as a reasonable man, to alter his proposed course of conduct." Spector v. Mermelstein, 361 F. Supp. 30, 40 (S.D.N.Y. 1972), *modified on other grounds*, 485 F.2d 474 (2d Cir. 1973), *quoted in* Spiegel, *supra* note 41, at 68-69. The value of the transaction at issue and the parties' intentions as to settlement are among the most "material" facts in any litigation.

Guernsey characterizes this commentary in the Model Rules as "schizoid," because it "states that certain misstatements are not misstatements." Guernsey, *supra* note 7, at 126.

[139] For example, Model Code EC 5-1 provides that:

> [t]he professional judgment of a lawyer should be exercised, within the bounds of the law, solely for the benefit of his client and free of compromising influences and loyalties. Neither his personal interests, the interests of other clients, nor the desires of third persons should be permitted to dilute his loyalty to his client.

MODEL CODE EC 5-1.
The provision cites a court decision that states:

> because of his professional responsibility and the confidence and trust which his client may legitimately repose in him, he must adhere to a high standard of honesty, integrity and good faith in dealing with his client. He is not permitted to take advantage of his position or superior knowledge to impose upon the client; nor to conceal facts or law, nor in any way deceive him without being held responsible therefor.

*Id.*, note 1 (quoting Smoot v. Lund, 13 Utah 2d 168, 172, 369 P. 2d 933, 936 (1962)).

funds or engaging in business transactions with clients) the drafters appear to assume that lawyers are always honest with their clients and that regulation is not needed in this area.

## B. *Malpractice Law*

Although the disciplinary codes treat lying to clients as a non-issue, the subject figures prominently in cases on legal malpractice.[140] Cases on intentional harm of clients by lawyers present a catalog of deceptive practices. For instance, lawyers have been accused of deliberately overcharging clients,[141] billing clients at $60 per hour when the original agreement was to bill at $30 per hour,[142] and for making false representations that the lawyer was pursuing a client's claim when in fact she was taking no action.[143] Many of these cases involve lawyers who deceive their clients in order to steal large sums of money.[144]

One court found a lawyer guilty of fraud because he led his clients to believe that he had filed a personal injury lawsuit and that the adversary had made a settlement offer when, in fact, the statute of limitations had run.[145] The lawyer negotiated a malpractice settlement with the insurer of a lawyer with whom he was collaborating,

---

[140] *See, e.g.,* C. WOLFRAM, *supra* note 66, at 719-22 (discussing a number of cases in which lawyers have been found liable for malpractice because they made various misrepresentations to clients).

[141] *See* Coughlin v. SeRine, 154 Ill. App. 3d 510, 514, 507 N.E.2d 505, 508-09 (1987) (finding a cause of action for legal malpractice where a lawyer, unfamiliar with the applicable law, accepted employment and without authorization billed for more hours than should have been necessary to perform the work).

[142] *See* Stinson v. Feminist Women's Health Center, 416 So. 2d 1183, 1184-85 (Fla. Dist. Ct. App. 1982) (awarding compensatory and punitive damages against attorneys who were found to have "obfuscated, manipulated and deceived their clients in a tortious attempt to take all of the settlement money").

[143] *See* McKinnon v. Tibbetts, 440 A.2d 1028, 1031 (Me. 1982) (finding that the evidence was sufficient to hold the attorney liable for fraud because a jury could have found that although the attorney was trying to protect the client's feelings and did not wish to cause him harm, the attorney dissembled about his efforts on behalf of the client).

[144] *See, e.g.,* Husted v. McCloud, 450 N.E.2d 491, 492 (Ind. 1983) (involving a lawyer who converted $18,800 of a client's funds for his own use). In some cases, however, the conduct involves wrong information that the lawyer has given the client for reasons other than personal financial benefit. *See, e.g.,* Boynton v. Lopez, 473 A.2d 375, 377 (D.C. 1984) (holding a lawyer liable for misrepresentation when he led his client to believe that the $10,000 she was to receive was coming from an insurance company in settlement of her claim, when in fact, the insurance company paid only $1451.76, and the remainder came from other sources).

[145] *See* O'Callaghan v. Weitzman, 291 Pa. Super. 471, 475, 436 A.2d 212, 215 (1981).

and represented it to his client as a settlement offer in the personal injury case. The lawyer took his forty percent fee out of the settlement before transferring the remainder to the clients.[146]

In another case, a court held an attorney liable for falsely informing his client that he had obtained a divorce for her when the case actually had been dismissed for want of prosecution. In reliance on the lawyer's representation that she was divorced, the client married another man.[147] Another court found a lawyer to have defrauded his client by inducing him to sign appeal bonds and leading the client to believe that no legal obligations would result from doing so.[148]

The preceding cases establish that lawyers are subject to malpractice liability for intentional misrepresentation that causes damage to a client. In some cases lawyers have had to pay punitive damages to clients for intentional misrepresentation.[149] Many legal malpractice insurance policies include a specific exclusion for an attorney's dishonest or fraudulent conduct.[150] Some courts have upheld these provisions,[151] but others have been reluctant to find

---

[146] See id. The court noted that "[t]he purpose of [the] omission was to induce appellees to accept the settlement offer and unknowingly forego any possible malpractice claim against appellant while still permitting appellant to collect a sizeable fee." Id.

[147] See Hill v. Montgomery, 84 Ill. App. 300, 303 (1899), aff'd, 84 Ill. 220, 56 N.E. 320 (1900).

[148] See Lupo v. Lupo, 475 So. 2d 402, 405 (La. Ct. App. 1985).

[149] See, e.g., Singleton v. Forman, 435 F.2d 962, 971 (5th Cir. 1970) (holding that punitive damages may be awarded against a lawyer for an "intentional wrong, insult, abuse, gross negligence, or oppression"); Hall v. Wright, 261 Iowa 758, 773, 156 N.W.2d 661, 670 (1968) (approving an award of $15,000 in exemplary damages in a case where a lawyer's false representation to a client caused her to lose her home). But see Boynton v. Lopez, 473 A.2d 375, 377-78 (D.C. 1984) (holding that intentional misrepresentation of a settlement offer to a client did not warrant award of punitive damages because the act was not "aggravated by evil motive, actual malice, deliberate violence or oppression"); McKinnon v. Tibbetts, 440 A.2d 1028, 1031 (Me. 1982) (overturning an award for punitive damages because although the attorney's conduct was fraudulent, it did not show wantonness or reckless indifference to the rights of his client). By statute, New York provides for treble damages if an attorney willfully delays the progress of a case for personal gain. See N.Y. JUD. LAW § 487 (McKinney 1983).

[150] One malpractice case quoted a policy which excluded coverage "if and to the extent the claim: (1) arises out of or in connection with any dishonest, fraudulent, criminal or malicious act or omission of any Insured." Perl v. St. Paul Fire & Marine Ins. Co., 345 N.W.2d 209, 212 (Minn. 1984). Another such policy excluded from coverage any claim "that results in a final adjudication that any Insured has committed a dishonest, fraudulent or malicious act, error, omission or personal injury with deliberate purpose and intent." FSLIC v. Mmahat, 97 Bankr. 293, 297 (E.D. La. 1988).

[151] See Battisti v. Continental Casualty Co., 406 F.2d 1318, 1321(5th Cir. 1969);

particular types of deceitful behavior to be encompassed by the exclusion.[152]

The threat of malpractice may deter some lawyer misconduct, but the remedy is not available to most deceived clients. Some are unaware of their lawyers' misconduct,[153] while others have difficulty finding lawyers to represent them in malpractice actions. In some cases the amount involved is too small to warrant litigation.

### C.   Consumer Law

All of the states and the District of Columbia have laws that prohibit sellers of goods and services to engage in unfair and deceptive acts and practices.[154] Most of these laws were enacted between the mid-1960s and mid-1970s. The laws are often the basis of lawsuits against used car dealers, health spas, home improvement companies, and other businesses that engage in consumer fraud.[155] Some of the laws specifically exempt lawyers. During the last decade, however, several courts have held that lawyers may be sued for violating the consumer laws.[156]

One court held that attorney services were covered under a consumer statute because of its regulation of "the conduct of any trade

---

Capital Bank & Trust Co. v. Core, 343 So. 2d 284, 288-89 (La. Ct. App.), *cert. denied,* 345 So. 2d 504 (La. 1977); St. Paul Fire & Marine Ins. Co. v. Aragona, 33 Md. App. 499, 507, 365 A.2d 309, 313 (1976), *aff'd,* 281 Md. 371, 378 A.2d 1346 (1977).

[152] *See, e.g.,* St. Paul Fire & Marine Ins. Co. v. Icard, Merrill, Cullis & Timm, P.A., 196 So. 2d 219, 222 (Fla. Dist. Ct. App.) (holding that even if the policy excluded coverage for some of the attorney's acts, as long as some of the attorney's other acts were less culpable, and were malpractice at most, then the insurer had an obligation to defend and indemnify the insured attorney), *cert. denied,* 201 So. 2d 897 (Fl. 1967); Passanante v. Yormark, 138 N.J. Super. 233, 240, 350 A.2d 497, 501 (1975), (holding that where "the gravamen of plaintiff's complaint" was negligence, the fact that the attorney "may have coated his negligence with deceit designed to disarm his clients" did not bring his actions within the exclusion for fraudulent acts). *cert. denied,* 70 N.J. 144, 358 A.2d 191 (1976); D. MEISELMAN, ATTORNEY MALPRACTICE: LAW AND PROCEDURÉ § 21:6 (1980) (noting that although some courts have upheld the policy exclusions for fraud, the majority and better view is to limit their applicability).

[153] The Supreme Court of California, recognizing the difficulty of discovering legal malpractice, held that the statute of limitations on such actions does not begin to run until the client discovers or should discover the cause of action. *See* Neel v. Magana, Olney, Levy, Cathcart & Gelfand, 6 Cal. 3d 176, 190, 491 P.2d 421, 430, 98 Cal. Rptr. 837, 846 (1971).

[154] *See* J. SHELDON, *supra* note 49, at § 1.1.

[155] *See id.* at §§ 5.4.3, 5.6.1, 5.9.4.

[156] *See id.* at §§ 2.3.9, 5.11; Marcotte, *New Threat to Attorneys?,* A.B.A. J., Dec. 1988, at 17 (noting various cases in which courts have held lawyers liable for violation of consumer fraud statutes and discussing a recent New Jersey case).

or commerce."[157]  In another recent case a court found the president-elect of the New Jersey State Bar Association liable under the state consumer fraud law for concealing from a client that the lawyer had failed to file within the statute of limitations on a federal civil rights case.[158]  Other cases have held that consumer laws cover the entrepreneurial aspects of law practice, such as bringing in clients and determining how to bill them, but do not address issues of professional conduct, such as competence.[159]  Some courts have held that consumer laws do not cover lawyers because state courts exclusively regulate the legal profession.[160]

The consumer laws prevent merchants and sellers of services from cheating their customers.  If lawyers lie to their clients about the amount of time they spend doing the work, or about whether the work they suggest is necessary, why should they be treated differently from an auto repair shop that inflates its bill for labor, or makes unnecessary repairs?

The consumer laws are an unusually powerful tool for deterring undesirable conduct because they prohibit a wide range of conduct and often permit awards of treble damages and attorneys' fees.[161]  Though this area of law has enormous potential to increase the honesty of lawyers, courts have only recently begun to apply consumer law to lawyer misconduct.  If they continue to do so, these laws may offer clients remedies that are more effective than disciplinary proceedings and simpler than legal malpractice cases.

## IV.  What Lawyers Lie About

### A.  Empirical Information about Deception of Clients

No empirical studies have attempted to determine how often

---

[157] Heslin v. Connecticut Law Clinic of Trantolo & Trantolo, 190 Conn. 510, 520-21, 461 A.2d 938, 943 (1983).

[158] See Malench v. Township of Hamilton, No. L-76814-86 (N.J. Super. Ct. 1988), cited in Marcotte, supra note 156, at 17.

[159] See Short v. Demopolis, 103 Wash. 2d 52, 60-62, 691 P.2d 163, 168 (1984) (distinguishing between entrepreneurial aspects and actual practice of law and stating that the claims concerned with the latter were exempt from consumer laws).

[160] See Rousseau v. Eshleman, 128 N.H. 564, 567, 519 A.2d 243, 245 (1986).

[161] See, e.g., D.C. Code Ann. § 28-3905(k)(1) (1981) (providing for "any consumer who suffers damage" an action to recover treble damages, attorneys' fees and any other relief which the court deems proper to remedy violations of the D.C. unfair trade practices statute).

lawyers deceive their clients and what types of deception occur. A few studies have produced some relevant data.[162]

Douglas Rosenthal conducted a major study of lawyer-client relationships in personal injury cases.[163] He found that those clients who actively participated in the litigation process and who were demanding of their lawyers got better service from their lawyers than more passive clients.[164] He suggests that the traditional model of lawyer-client relationships, in which the lawyer dominates the decision-making process and does not apprise the client of the details of the lawyer's work, discourages active client involvement and provides clients with inferior service.

Rosenthal argues that assertive clients get better service because "a quick settlement is often in the lawyer's financial interest, while waiting the insurer out is often in the client's financial interest."[165] Rosenthal suggests that a lawyer who is under financial pressure has four realistic choices about how to generate income:

> (1) He can cut corners in preparing the case. (2) He can build his fee by charging disbursements to the client. (3) He can persuade the client that a discounted early settlement is in his best interest. (4) He can bring the existing interest conflict to the client's attention and negotiate a compromise claims strategy.[166]

Rosenthal urges that the last of the four options is the only candid one. My lawyer interviews suggest that the other three choices are used often. One lawyer Rosenthal interviewed reported a typical method of handling the conflict of interest between lawyer and client in settling cases.

> Theoretically, it's unethical not to report accurately negotiations with an insurer to the client. But you can't, and no lawyer does. You tell him about it in such a way that he is prepared to be satisfied. Say the other side offers $5,000. You tell the client that they offered $3,000. He'll say "That's no good." You agree and say, casually, that you will try to get $4,500 out of them which would be fine. He's still not so happy, but reluctantly agrees. Two days later you call him back with the "good news" that you got him more than he expected, $5,000. Now the client is prepared to be

---

[162] There have been few empirical studies of lawyer-client relationships. *See, e.g.,* Nelson, *Ideology Practice and Professional Autonomy: Social Values and Client Relationships in the Large Law Firm,* 37 STAN. L. REV. 503, 506 (1985).

[163] *See* D. ROSENTHAL, *supra* note 22, at 61.

[164] *See id.*

[165] *Id.* at 96.

[166] *Id.* at 106.

Ex. 57 pg.43 of 103

happy. You know what is a good settlement and what he should take. If it is necessary to lie and cheat him to get him to accept what's good for him you do it.[167]

Rosenthal's findings suggest that lawyers are less likely to deceive active clients, who are closely involved with their cases and frequently demand information from their lawyers, than they are to deceive passive clients. The lawyer is more accountable to the client and less likely to think that he can manipulate the client's view of the situation. Rosenthal proposes to implement his "participatory model" by imposing an informed consent obligation on lawyers.[168]

Eric Steele and Raymond Nimmer published an important study in 1976.[169] They did an analysis of lawyer-client relationships and of possibilities for improving the system that regulates lawyer conduct toward clients. Part of their study involved in-depth interviews with forty-five people who had experienced some problems with their lawyers.[170] The most common source of client discontent was fee disputes.[171] According to the clients interviewed, many attorneys had insisted on making unilateral determinations of what fee was appropriate. Others did not provide bills that itemized their services. Many lawyers charged fees that "substantially exceeded" estimates that they had given the clients. Consequently, many of the clients felt that the lawyers violated their initial agreements about fees.[172]

The second most common subjects of client discontent were the lawyers' delay in completing work and the low quality of work done. Sixteen of the clients felt that the lawyers had neglected their matters; they reported delays ranging from three days to six years. Other complaints included conflicts of interest, failure to keep confidences, and failure to perform tasks the clients requested.[173]

Steele and Nimmer did not focus on the specific question of whether the lawyers had deceived their clients, but many of the clients they interviewed reported that they felt their lawyers had

---

[167] *Id.* at 111.

[168] *See id.* at 154-55. As discussed elsewhere, informed consent may not require sufficient disclosure about the process of law practice. *See supra* note 41.

[169] Steele & Nimmer, *supra* note 80, at 917.

[170] The interviewees consisted of forty-five people from a random sample of 3,874 households in one city, who identified themselves as having had serious problems with their lawyers, and were willing to discuss those problems. *See id.* at 948 n.42.

[171] *See id.* at 953.

[172] *See id.* at 952-54.

[173] *See id.* at 954-58.

deceived them. One client, who complained of delay, clearly felt that his lawyer was lying to him:

> I just kept calling him periodically and telling him that I would like to get this settled. First I spoke to him. He just put me off—"I gotta do this and that." I just felt that he was stringing me along. It got to where he was never there when the secretary answered. She would tell me he would call me back and he never did.[174]

Of the forty-five clients that Steele and Nimmer interviewed, none filed a grievance against the lawyer with the bar disciplinary system, and only one client actually contacted the bar. Thirty-five did not know that the disciplinary system existed.[175] The authors conclude that this finding "suggests that the disciplinary system in fact receives, reviews, and responds to only a small fraction of the potential cases."[176] The clients reacted passively to their problems with their lawyers. They requested explanations from their lawyers and then paid the bills, even if they thought the bills were excessive.[177] The perceived powerlessness of the clients Steele and Nimmer interviewed highlights the inequality of many lawyer-client relationships. Both Rosenthal and Steele and Nimmer find that lawyers are not very accountable to their clients unless the clients are unusually assertive.

The American Bar Association keeps data on those client complaints that result in disciplinary action against lawyers.[178] The ABA does not categorize these statistics according to which offenses involve deceptive conduct, except for a category called "general misrepresentation." One can only speculate about the extent to which other offenses may have involved deception. In 1985, the offense of general misrepresentation accounted for five percent of all disbarments (twenty-two cases), six percent of all suspensions (thirty-eight cases), and four percent of all public reprimands (thirteen cases).[179]

---

[174] *Id.* at 959.

[175] *See id.* at 958.

[176] *Id.* at 957.

[177] About one-third of the forty-five clients took some additional action. Nine clients had third parties assist in resolving the problem. Six attempted to switch lawyers, and one attempted to recover losses from the attorney. *See id.* at 960-62.

[178] The disciplinary agencies dismiss ninety percent of client complaints for failure to state a claim. *See* Telephone interview with Tim McPike of the ABA.

[179] *See id.* The total number of sanctions included 448 disbarments, 627 suspensions, 36 resignations, and 332 public reprimands. The largest number of cases were in the category of general neglect. General neglect accounted for fifteen percent of disbarments, fifteen percent of suspensions, eight point three percent of resignations, and twenty-four percent of public reprimands. *See id.*

These strikingly low figures reveal virtually nothing about the extent to which lawyers deceive their clients. They do show, however, how few lawyers are disciplined by the existing regulatory system.

Lucinda Vandervort's study of lawyer-client relationships includes a 1978 random survey of clients in Ontario about the degree of their satisfaction with legal services.[180] Overall, 36% of the participants complained about the services they received. Of those, 53% "complained that the lawyer did not communicate to them about progress on the case" and thirty-two percent complained "that the lawyer did not consult with them in making decisions."[181] Sixty-three percent said "that the lawyer was slow in handling the case."[182] Although this study does not focus specifically on deception, it suggests that, at least in Canada, there is a high level of client discontent with lawyer communication.

In another Canadian study, Herbert Kritzer explored the nature of the lawyer-client relationship by interviewing sixty lawyers, court officials, corporate executives, and others in Toronto.[183] He found a pervasive conflict between the lawyer's economic interest and the client's interest.[184] Many interviewed by Kritzer "commented on lawyers' reluctance to discuss explicitly with their clients the business aspects of the relationship,"[185] especially issues related to legal fees.

### B.  *The Lawyer Interviews*

I interviewed twenty lawyers[186] to identify examples of lawyers deceiving clients.[187] Most of these attorneys are in private practice, though a few work for the government or for other public service institutions. I spoke with people in various practices, including small firms, large firms, local practice, and national practice. The focus is

---

[180] *See* Vandervort, *The Lawyer-Client Relationship in Ontario: Use and Abuse of the Authority to Act,* 16 OTTAWA L. REV. 526, 531 (1984).

[181] *Id.*

[182] *Id.*

[183] *See* Kritzer, *The Dimensions of Lawyer-Client Relations: Notes Toward a Theory and a Field Study,* 1984 AM. B. FOUND. RES. J. 409.

[184] *See id.* at 410. Kritzer states that "few professionals are selfless actors seeking solely to advance . . . the well-being of humankind; professionals are workers who are engaged in an activity to earn a living." *Id.* at 413.

[185] *Id.* at 418.

[186] In addition to the lawyers, I spoke with three law students who offered examples from their experiences working in law firms, one as a secretary, one as a paralegal, and one as a law clerk.

[187] I make no assertion that these examples are "typical" or "normal," but only that my sources report that these stories are true—that they or others deceived clients in the ways they describe.

on civil practice.[188] The purpose of the study was not to expose egregious deception, but to probe the fabric of daily law practice to identify common types of deception.[189]

The subjects of the interviews are not a random sample. Their numbers are too few to be statistically significant. They do represent a diverse spectrum of educational backgrounds, including national, regional, and local law schools. Very few of those invited to participate declined.[190] None of the lawyers interviewed has ever been disciplined by a bar association.

I conducted the interviews in person when possible or on the telephone if geography made a face to face discussion impractical. Each lawyer talked about specific instances in which she had deceived a client or had seen another lawyer do so.[191] For each example I asked whether the lawyer thought the conduct was justifiable and why.[192]

---

[188] This Article focuses on situations that arise in civil practice. Criminal cases tend to present more dramatic ethical issues as they are much more court-based. In civil cases the problems are more subtle, and often go unnoticed. Nearly all the activity in civil cases occurs outside of the courthouse, in someone's office, behind closed doors. In the federal court system in 1985, for example, only about five percent of civil cases filed were tried. *See* R. COVER, O. FISS & J. RESNIK, PROCEDURE 198 (1988). In criminal cases at least one of the lawyers represents the state, and often both are full-time salaried government employees. The structure of criminal practice eliminates (except in private criminal defense firms) the profit factor that motivates so much of the deception of clients by private practice.

[189] The interviewees tended to describe either their current problems or events that had taken place in the last few weeks. Consequently, most of their stories are not flagrant or unusual examples of deception, but rather are a sampling of their recent experiences.

[190] All but three of the people I asked to participate agreed to be interviewed. One was prohibited by a partner in her law firm from talking with me for "reasons having to do with liability." Another was reluctant to reveal possible unethical conduct because of a concern that the author might be forced to disclose sources. A third declined because she had had a recent experience in which tapes of witness interviews had been subpoenaed and misused in court.

[191] Prior to the interviews, I sent the subjects letters that offered a list of examples of types of deception of clients, to offer a starting point for conversation. The list of examples changed over time as interviewees provided additional examples of deceptions. During the interview, I asked the subjects whether they had engaged in or seen deception similar to the listed examples, and then whether they knew of other types of situations in which lawyers had deceived their clients.

[192] J.L. Austin defined justified conduct as that which is "a good thing, or the right or sensible thing, or a permissible thing to do." Austin, *A Plea for Excuses*, in FREEDOM AND RESPONSIBILITY 6 (H. Morris ed. 1961), *quoted in* Dressler, *Justifications and Excuses: A Brief Review of the Concepts and the Literature*, 33 WAYNE L. REV. 1155, 1161 (1987). Dressler explains that in the context of criminal law, "[t]o say that conduct is justified is to suggest that something which ordinarily would be considered wrong or undesirable—i.e., that would constitute 'social harm,'—is, in

I have reported the stories of deception in detailed narrative form using the lawyers' own words to the extent possible.[193] The intention is to bring the reader closer to the situations described than would be possible through generalization or through the use of hypotheticals.[194]

The interviews suggest that lawyers most frequently deceive their clients for economic reasons. The economic benefit to the lawyer from the deception may be direct, as when the lawyer's intention in deceiving was to obtain income. The benefit also may be indirect, intended to protect or promote the lawyer's professional reputation or that of the lawyer's firm. The interview stories are categorized according to the reason for the deception.[195] These categories are: 1) Billing, 2)Bringing in Business, 3) Covering up Mistakes, 4) Impressing Clients, 5) Convenience and Control of Work Time, and 6) Impressing the Boss.

### 1.  Billing

Nearly all of the lawyers interviewed reported some amount of deception in practices relating to billing clients. In many instances the lawyers often failed to keep a running log of their time and estimated the number of hours they worked for their clients. Some

---

light of the circumstances, socially acceptable or tolerable." *Id.* (footnote omitted). In asking the interviewees whether they thought the conduct they described was justified, I was asking whether they thought the conduct in question was acceptable because of the circumstances, and if so, what those circumstances were.

[193] Some of the lawyers permitted taping of the interviews, in which case the quotations are from transcripts. (The tapes and transcripts were saved long enough to check quotations and to allow the editors to verify that the data was gathered through interviews. They were then destroyed to protect the identity of the sources.) Some lawyers preferred that I take notes during the interviews. When the notes were not detailed enough to allow quotation, the lawyers' thoughts are paraphrased.

[194] Many authors who have written about lawyer honesty have based their discussion on hypotheticals. James White, for example, in his article on lying in negotiation, uses five paradigms of situations in which a lawyer might deceive another lawyer. *See* White, *supra* note 27, at 931-35. Although White probably developed these examples from someone's practical experience, he presents them in an abstract, decontextualized fashion. By relating examples directly from the words of lawyers who were involved in the situations they describe, I attempt to give a more personalized and immediate view of the way lawyers interact with clients on a daily basis.

Teaching materials in legal ethics still routinely strip the problems studied of most of their context. *See, e.g.,* T. MORGAN & R. ROTUNDA, PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY 61-117, 123-73, 234-337 (3d ed. 1984).

[195] Many of the examples presented involved multiple and often complex reasons for deception. I categorized these based on the most important reason for the deception.

attorneys reported that they were too busy to keep detailed records. As long as any amounts added were trivial, most lawyers felt that there was nothing wrong with making good faith estimates of hours or with rounding off hours. Some believed that keeping accurate track of hours would result in more time billed to the clients. Therefore, they felt that this practice did not harm clients. If there was no harm, the lawyers often concluded that there was nothing wrong.

a.   *Doing Nonessential Work—Running the Meter*

Several lawyers reported performing unnecessary work and then billing for it. This practice is deceptive if the lawyer conceals from the client what work is being done, or if the lawyer informs the client about the work but leads the client to believe that it is essential. Madeline Stein[196] characterized the practice this way:

> [L]egal research can be more or less thorough, depending on the amount of money at stake in the litigation. Where the clients have been willing to pay and where the stakes are high, my experience is that the firm will leave no stone unturned and engage in perhaps unnecessary legal background work.[197]

> She suggests that even if a lawyer only bills for hours that she actually works, she still has a wide range of discretion as to how much work to do. The lawyer may inflate, or cut, the amount of work depending on the client's resources.

> Winston Hall reported similar practices. "The most common [type of deception], by far, is makework that the client pays for but that didn't lead very directly to the result. That describes an enormous percentage of the activity that I think goes on in law firms."[198] He described one conversation with a partner in his law firm, in which the partner explained that "law practice is somewhat supply-side driven. You can decide how heavily you are going to

---

[196] I have assigned fictitious names to the interviewees for purposes of reference. The pseudonyms accurately denote the sex of the speakers. If necessary to protect a speaker's identity, more than one fictitious name has been used.

[197] Letter from Madeline Stein to Lisa Lerman (Sept. 18, 1988) (an associate at a medium size firm) [hereinafter Stein Letter]. Stein further explained that her tendency in small or routine cases was to underbill for work done, because "many individual . . . clients do not understand the value or importance of legal research and believe the lawyer in routine business litigation should know all the answers." She seemed to feel that accurate timekeeping in some matters would lead to questions. In dealing with such clients, Stein reported that time spent on research might be reflected on her time sheets as "draft pleading" or "prepare motion for filing."

[198] Interview with Winston Hall (an associate at a large firm) [hereinafter Hall Interview].

Ex. 57 pg.49 of 103

bill on a matter. There is a wide range of acceptability. If you've got the people, you do more work; if you don't have the people, then you don't." Hall contends that the problem with this phenomenon is twofold. First, the lawyer has too much discretion. "A business acquisition can cost anywhere between $20,000 and $100,000," depending on the lawyer's decisions about how to approach the work. Second, "the client can't even evaluate how [the lawyer] exercised that discretion after the fact."[199]

Hall offered as an example one situation in which a company hired his firm and another firm to work on two very similar matters. His firm "did an exhaustive $100,000 job and produced a two-inch binder filled with memos . . . . [T]he other firm did a fifteen page memo that cost about $5,000." The client was "initially kind of horrified at the difference."[200]

In explaining how this happened, Hall said, "It had something to do with [the fact] that the partner [who] had the matter in our firm felt that he had to get his billings up—thought he had to make a strong impression on the firm at that point in his career. . . . [A]nd he had people around [who] . . . could do the work for him."[201]

Hall described another situation in which the firm was working on a major lobbying matter for a big industry. "We spent half a million dollars tracking this legislation—eight people working on it essentially full-time." The firm billed this time primarily to two clients. The firm hoped to attract additional clients in this area, so part of the work product (reports analyzing the legislation) was sent to three hundred people. The reports covered many issues that would have no impact on the clients who were paying for the work.[202] Hall thinks that "it was all done without the client knowing that it was

---

[199] *Id.*

[200] This is an example of an encouraging development; some clients are getting more sophisticated about evaluating lawyers. In this case, Hall said they split the work between two firms as a way of testing the firms. *See id.*

[201] *Id.* Hall offered another example: one partner asked him to write a memo for a client corporation explaining an accounting concept that the partner did not understand. Hall is certain that the representatives of the corporation understood the concept, did not need the memo, and would have been very angry had they ever seen the memo (which they did not). Hall said that the partner did not want to admit that the purpose of the memo was to educate the partner. If the partner had been more candid, Hall could have explained the matter in half an hour. Instead, he billed the client for the twenty hours spent writing the memo. At $150 per hour, this task cost the client $3,000.

[202] Hall estimated that about 60% of the material in the reports was useful to the clients. *See id.*

being billed to them."[203] Several months into this project, repre-seritatives of the client companies began coming to the law firm to work with the lawyers on preparation of testimony and other tasks. Disaster struck:

> It was like a customer going to the kitchen of a restaurant. They saw eight people running around . . . [who] didn't have carefully defined ends and means. We didn't know all that they expected us to know, didn't have the access that they expected us to have. . . . They just saw what was actually going on and they were utterly hor-rified. The shit hit the fan and there were lots of fights. Ultimately we had a reconciliation, and we kept doing the work. But not too long after that . . . they said enough . . . no more . . . no more time billed to this matter.[204]

If clients understood the broad scope of the lawyer's discretion, they might exercise more control over what work was to be done. Hall elaborates:

> The worst clients from the point of view of a lawyer are the ex-partners from the firm . . . who know damn well . . . [that lawyers do work to run the meter]. One lawyer . . . who [left to become gen-eral counsel of a client bank] would say, "I don't want a single memo written about this". . . because he knew exactly what happens.[205]

A few of the interviewees reported instances in which lawyers' pecuniary interests affected the settlement advice they gave to cli-ents. David Larsen said that many solo practitioners are chronically short on cash and, consequently, have an added incentive to encourage settlement in contingent fee cases.[206] Larsen described one situation in which a lawyer (who was representing his client's adversary) advised a client to settle a personal injury case worth $100,000 for a meager $4,700 to be paid over four years. The law-

---

[203] Hall explained:

> There was always the dilemma of how to bill the tremendous amount of time that we were putting into this publicity effort, and the partner in charge had different schemes for how to do it, because initially we weren't billing the time to these clients. But it was absorbing so much time, and if it was charged to overhead, the associates wouldn't do the work.

*Id.*

[204] *Id.*

[205] *Id.*

[206] Interview with David Larsen (a solo practitioner) [hereinafter Larsen Interview]. Because he practices alone, Larsen has frequent contact with many other solo practitioners.

yer, a solo practitioner, had cash flow problems and needed money immediately.[207]

In contrast, large firms that bill by the hour are more likely to run the meter. Madeline Stein, who worked in two firms in which most of the clients paid on an hourly basis, said: "From my experience it was more likely that a lawyer would attempt to deceive a client into continued litigation, including trial, by inflating the client's chances of success."[208]

### b. *Padding Bills and Double Billing*

One of the most significant types of billing deception reported was inflating or padding the bills of wealthy clients. Several different techniques were reported.

Some attorneys reported that the work performed did not always correspond to the hours billed.    Michael Williams, characterizing a widespread attitude in his firm toward wealthy clients, said "some people in the firm feel like, 'well they are a rich client, they can pay, we can put a couple more hours down than we worked' . . . . Certainly that's deception, to the tune of tens of thousands."[209]

As to his own billing practices, he explained: "my billing is certainly influenced by the size and ability of the client to pay. There's pressure to bill . . . at least eight hours a day and I generally bill as much as I can to the richest client [and underbill] clients who can't afford standard rates. . . . It's rough justice." He also reported that:

> There are rough premiums and discounts that are put into the bills without being disclosed to the client. Not large ones—not like the New York firms. But when I settled a case I threw down another six hours to a small client, thinking that I under-billed them at other times because they didn't have much money, but I got a good settlement for them. That isn't disclosed.

One lawyer described a law firm in which it was common for the

---

[207] *See id.* In another contingent fee case, Larsen reported that his co-counsel had overspent on expenses and then encouraged the client to turn down a reasonable settlement offer because the resulting fee would not cover those expenses. The lawyer never told the client about the fact that the lawyer would take a loss if the client accepted. Larsen felt that the lawyer should have informed the client about the lawyer's own financial interest so that the client would understand that her advice was affected by her financial interest.

[208] Stein Letter, *supra* note 197. Stein did not approve of this practice.

[209] Interview with Michael Williams (an associate in a large firm) [hereinafter Williams Interview]. This lawyer said that he sometimes billed a paying client for the time he worked on a pro bono case, because "it looked better."

710    *UNIVERSITY OF PENNSYLVANIA LAW REVIEW*    [Vol. 138:659]

lawyers to bill twenty hours a day, even if they only worked ten hours.[210] She said that they boasted about having billed two clients for the same work, and about the amount of billing that they could fabricate.

Miles Marcus, an associate at a small litigation firm, reported one instance in which a partner removed $500 remaining in the trust account which belonged to a client, and fabricated a record of hours he alleged that he had worked in order to conceal his conversion. "He just stole the money." Marcus reported the situation to another partner in the firm. He didn't know what happened, because he changed jobs soon after this incident.

Martin Richards, a former paralegal at a large law firm, reported that he had been ordered by a partner in the law firm to double-bill his time:

> In preparation for litigation and anticipated discovery on behalf of Client A, I was sent on a trip . . . to the client's HQ to review document files. . . .
>
> Meanwhile, a matter involving Client B was heating up . . . . The partner handling the Client B matter was also handling Client A. He asked that I take some of the [Client B] depositions with me and digest them while on the road. He also said something to the effect, "Besides, it will give you something to do on the plane." Apprising the partner of the firm policy to bill transportation time to the client (in this case Client A), I asked how I should bill the time I spent digesting the depositions for Client B. He responded that I should bill the total transportation time to Client A and the time spent digesting depositions to Client B. In other words, double bill. . . .
>
> [L]ater, in similar situations, the senior paralegal in charge of assignments let it be known that this is how billing was to be handled.[211]

Richards found this experience somewhat disillusioning, because he had such respect for the integrity of the partner who gave him these instructions.

Mary Helen Murphy described one lawyer in her firm who would write his billing sheets three months after doing the work—without looking at his calendar. She said he did not need to look at his calendar because he only worked an average of two hours a day, but he billed twelve to sixteen hours per day. The hours billed usually were

---

[210] Interview with Angela Alford.

[211] Letter from Martin Richards to Lisa Lerman, (December 12, 1989) [hereinafter Richards Letter].

split between two clients.[212] She reported this problem and numerous others[213] to senior partners in the firm, but nothing was done to correct the problem. She also noted that the lawyer who was making up hours "had been threatened that if he didn't get his billing up, he would be fired."

Murphy spent months trying to get the law firm to pay attention to the incompetence and fraud that this senior associate was perpetrating. At one point he heard that she had been complaining about him. He came into her office and said:

> 'You are not going to get away with this. Don't pull things like that on me.' And he closed the door and he started gesturing . . . his face was splotchy . . . . I said, 'Get out'. . . . I couldn't open the door . . . he had one fist up at me, and the other on the door. . . . I started to scream. One of the senior partners came down and said, 'We'll have to up his dose of lithium again' and then the partner said to me 'Don't leave your scissor on that side of the desk.' That was their response to what this man had done.[214]

Murphy ultimately resigned from the law firm because of the unethical conduct that she observed there.

Winston Hall reported pervasive dishonesty about billing at his firm. "I'm sure people were making up hours, because the totals were so high. . . . Like lots of people [were billing] over 2000 hours. And people weren't at work that often after seven o'clock. . . ."[215] He offered two specific stories about lawyers with whom he worked at two different law firms who were overtly dishonest about billing. One of these, whom Hall calls "the fraud,"

> would brag about how a client asked him a question, and he knew the answer, so he wrote the answer in a letter and billed ten hours for research time. This was a guy who thought the goal was to work less and bill more hours. . . . That is a pure case of lying, cheating and stealing. . . .

---

[212] Interview with Mary Helen Murphy (an associate at a medium-sized firm). Murphy explained that she worked closely with this lawyer and compared his billing sheets with the client's bills because of her concerns.

[213] *See id.* Murphy explained that the firm had taken on a major lawsuit that it was not competent to handle. This same lawyer, who was in charge, did not do any work. Two and one half years after the case had been filed, Murphy's firm, which represented the plaintiff, had filed one set of interrogatories and one request for production of documents. They had eight file cabinets of mostly irrelevant documents. For two years, the client was billed for reading and analyzing these documents, when in fact no one at the firm did the work.

[214] *Id.*

[215] Hall Interview, *supra* note 198.

712    *UNIVERSITY OF PENNSYLVANIA LAW REVIEW*     [Vol. 138:659

He had his own gauge. If he gave an answer that he knew, he would think about how much research time. . . [the answer] represented [having done no actual research] and bill for it.[216]

Hall's second story reinforces the impression that lawyers sometimes overbill rich clients. Hall explains:

> I worked on a project for a very rich [Asian]. . . .to set up a very simple trust. We billed way over the amount that was indicated on the billing sheet. . . . The partner came into my office and said 'This guy, Mr. so and so, is bitching about the bill. I hate when they do that.' And I said, well, what did you bill him?' and he told me the amount,. . . and I said, 'that does sound like a lot for the little bit of work we did on this, It's just a little trust.' And he said, 'yeah, but these people are so rich, and besides, so and so at whatever investment bank wants to send them a big bill too, so I couldn't send them a small bill.'
>
> That's outright fraud. . . .and it's not racism, but. . . [The attitude is] they've got so much money in these countries where there is nothing to buy, they might as well give it to me.[217]

When asked why the lawyer cared about keeping the bills high to avoid a dispute with the bank, Hall explained that it was "Because we wanted that investment bank to send us more business. We couldn't piss them off by charging too little to their clients."[218]

Another lawyer listed several reasons why padding of wealthy clients' bills is so common: (1) they can afford it, (2) one does so much work for them that it is easy to lose track, (3) padding is unlikely to be noticed because the bills are so large, (4) small clients have no money, and to keep hours up lawyers must bill the time to someone (which seems fair from a "Robin Hood" perspective), and (6) eventually the work done for one client is used for another.

David Larsen said he pads his bills to his clients to cover some related pro bono work. He does work for some states and for a nonprofit group to which the state agencies belong. The state agency representatives have agreed (but have not told their superiors) that he should "fluff" his bills to the states to cover the work for the organization, thus subsidizing the organization. The "client" deceived by this practice is not the official who deals directly with the attorney, but the agency that employs the representative. The lawyer thinks that this practice is justifiable both because "the state benefits

---

[216] *Id.*

[217] *Id.*

[218] *Id.*

by it," and because he feels that his "client" is the person he is dealing with rather than the agency.[219]

Most of the lawyers interviewed reported some relationship between the affluence of the client and their billing practices. Some mentioned that they were less scrupulous in recording hours worked for clients who were on retainer,[220] while others reported that they were likely to round up their estimated hours if they knew the client could afford it.[221] Many of the lawyers interviewed mentioned that they often under-billed clients who were friends or who were not in a position to pay large legal fees.[222]

c.  *Meeting Minimum Firm Hours Requirements*

Attorneys in many large, urban law firms are expected to bill up to 2500 hours a year.[223] Consequently, they may bill hours that they have not worked.

Winston Hall said that his firm never established an explicit billing minimum. "The partners would say 1700 hours would be fine, which actually I thought was quite high. . . . The general impression that no partner ever tried to change [, however] was that 2000-2100 was expected."[224]

Deborah Greenberg said that at her firm "the minimum for associates is 1700-1800 per year, or about 35 hours a week, not including administrative time and pro bono time. 1700-1800 used to be a target. Now it is a minimum."[225] Although some lawyers inflated their

---

[219] *See* Larsen Interview, *supra* note 206.

[220] *See, e.g.*, Interview with Beth Forrester [hereinafter Forrester Interview].

[221] *See, e.g.*, Interview with Arthur Katz (an associate at a medium-size firm) [hereinafter Katz Interview]; Interview with Deborah Greenberg (an associate at a large firm) [hereinafter Greenberg Interview].

[222] Beth Forrester reported, for example: "I have occasionally . . . cut my time when I know the client can't afford it, which is not technically mine to do." Forrester Interview, *supra* note 220. Deborah Greenberg also reported this type of practice. *See* Greenberg Interview, *supra* note 221.

[223] At the most demanding firms, lawyers in 1988 averaged 2500 billable hours per year (an increase from 2210 in 1982). In 1987, the median number of hours that associates billed per year at firms with over seventy-five lawyers was 1850. *See* Marcotte, *Hours Way Up*, A.B.A. J., Dec. 1, 1988, at 18.

[224] Hall Interview, *supra* note 198. He also reported that his firm discouraged pro bono time and bar association work "because they didn't get paid for it." When I asked him how the partners communicated this message, he reported a specific discussion with a partner. He told the partner that he expected to spend about ten percent of his own time doing pro bono work, and the partner said "Where did you get that figure? I don't know how you feel about spending time with your family, but it seems to me that you can't do everything."

[225] Greenberg Interview, *supra* note 221. This number of hours, which the

hours to satisfy their firms' unreasonable demands,[226] Alison Price, who works for a smaller firm, reported that she did not have enough work to bill the requisite number of hours. "The problem is that they want these many hours, and you're looking for work to do, and there is no work to do. You have to fudge."[227]

### d. *Premium Billing and Itemization*

Winston Hall[228] explained that although many firms bill their clients by the hour, "premium billing"—adding substantial sums to the bills based on a subjective determination of the value of the work—is the latest innovation.[229] Hall elaborates:

> The trend now in law firms is this concept of premium billing. Lawyers are on a feeding frenzy, and they are trying to figure out new ways to make money. So they pump up the hours of associates. There's got to be a limit to that; somewhere around 3000 hours, people start to die off.
>
> Billing rates are announced, and there are limits to how much you can charge. My guess is that my firm has increased 70-80 percent in 3-4 years, but I'm not sure. . . . When [lawyers] do a specially good job they want to bill extra money. Sometimes they tell clients that, and sometimes they don't. . . . It started in New York; Wachtel and Skadden invented it, and it has caught on in a big way. . . . Our firm tries to do it to the extent that they can. . . .
>
> Because that system [premium billing] has no apparent limits on money, it gets them tremendously excited, . . .[230] this is how the firm is going to average, instead of half a million dollars a year, a million dollars a year per partner, by this premium billing.[231] And

---

associate felt was stressful and demanding, is low to moderate compared to other large firms. *See* Marcotte, *supra* note 223, at 18.

[226] *See, e.g.,* Williams Interview, *supra* note 209; Katz Interview, *supra* note 221; Greenberg Interview, *supra* note 221.

[227] Interview with Alison Price (an associate in a small firm) [hereinafter Price Interview].

[228] Hall Interview, *supra* note 198.

[229] *But see* Ray & Levine, *In House Counsel Reject Value Billing,* NAT'L L. J., Nov. 20, 1989, at S2 (suggesting that value billing "heralded as . . . a new wave in legal economics" has been overrated, and reporting a survey indicating that many corporate clients prefer hourly billing).

[230] *See* Herztberg & Stewart, *Contingency Legal Fee for Merger Breaks Ground, Stirs Controversy,* Wall St. J., Oct. 24, 1986, § 1, at 31, col. 4 (quoting one takeover lawyer explaining the emergence of the performance fee by saying: "We work harder and do more work than the investment bankers, and then they walk away with millions. I think it just got to the point where some lawyers couldn't stand the unfairness of it anymore")

[231] Average incomes of partners in the New York office of Skadden, Arps, Slate,

then they point to investment bankers and say, investment bankers bill this way, why shouldn't we, we are smarter and we work harder. . . .

This is using hours as a minimum, and taking further advantage of the information imbalances. . . . What it is moving toward is a vague notion of taking a larger share of the profits you earn for a client, but it is really taking advantage of the information unfairness.

Lawyers may be less than precise in billing practices with relative confidence that no one will ask too many embarrassing questions because the content of bills sent to clients offers little information on which to base questions. The lawyers know little or nothing about the actual billing, but they know the conventions regarding billing in the firm from other lawyers. They know something about what other lawyers get away with.[232]    In contrast to the lawyers, billing paralegal Gordon Foster[233] spent all his time writing bills to clients. The bills he prepared for major clients (which ranged from $50,000 to $120,000 per month) generally began with the line "For professional services rendered, including . . ." and then included between several paragraphs and three pages of "cryptic narrative" explaining the tasks that lawyers and paralegals performed. The narratives came directly from the lawyers' and paralegals'[234] billing sheets and were separated by semicolons. The narratives concluded with a total charge for legal services. This was followed by an itemized list of charges for copying, word processing, overtime, postage, travel, and production of documents.

The bills usually did not specify who performed each task, how long it took, or at what rate paralegals and attorneys were billing.[235] In addition, Foster explained, the bills concealed the firm's multiplier: the firm multiplied every subtotal (lawyers' hourly rate X

---

Meagher & Flom were reported in 1989 to be $1,100,000. *See The Wages of Law,* N.Y. Times, March 24, 1989, at B6, col. 3. Partners' incomes have risen dramatically in recent years. In 1985, Cravath, Swaine & Moore had profits per partner of $635,000. Three years later, this figure had increased to $1.2 million. *See* Brill, *supra* note 58, at 14.

[232] *See supra* text accompanying note 209.

[233] Interview with Gordon Foster (paralegal) [hereinafter Foster Interview].

[234] Paralegal time was billed at $50 per hour.

[235] Foster even billed for the time he spent preparing the bills, as did other paralegals. Consequently, clients often unknowingly paid $600-700 for the preparation of each bill. A few clients, usually trade associations, requested and received computer printouts showing who billed how much time for what work. The firm provided this information only if a client specifically requested it.

number of hours worked) by about 1.5.[236] The bill did not list this multiplier even though the total reflected it. Foster indicated that clients who asked for explanations of their bills were given the lawyer's rate including the multiplier. As a result, a lawyer whose regular rate was $150 would be reported to be billing at $225.[237]

Foster reported that partners told new lawyers and paralegals to keep complete records of their hours and assured them that if, in reviewing the bills, the partners thought the time was excessive they would cut the bills. Partners, however, "never cut the time. Usually the attorney signed right off on the bill. Often they didn't even look at the daily time sheets, but just made sure that the narrative was correct."[238]

Foster noted that the monthly bills to particular categories of major clients were consistent in amount. Major New York brokerage houses were billed between $80,000 and $120,000 per month, while industrial firms were billed at between $50,000 and $90,000 per month. Given the size of these bills, one might wonder why clients rarely question bills. Winston Hall[239] indicated that most representatives of corporations do not seem to care about size of legal fees; the corporation simply passes the cost on to those who buy its product. The individual approving the bill is unaffected. Foster noted a striking contrast between large corporations and trade associations whose representatives were much more concerned about the amount of the bills. He suggested that in a trade association, the person signing off on the bill is responsible for controlling the association's budget.

e.  *Estimating Hours—Non-Contemporaneous Records*

Failure to keep precise records of work time was perhaps the most prevalent deceptive billing practice among the lawyers whom I interviewed. Only one lawyer reported that he meticulously records his hours as he works, making a note each time he moves from one

---

[236] Sometimes the multiplier was 1.4, or, "if they had a slow month, they would use 1.6." For trade associations, the multiplier was 1.2. Foster did not know what costs this multiplier included.

[237] This is problematic: if the client was informed at the outset of the representation that he or she would be billed at a particular hourly rate, and the multiplier varied from month to month, the lawyer would be billing at different rates from that disclosed initially.

[238] Foster Interview, *supra* note 233. Foster mentioned that one partner carefully checked each of the bills that he was responsible for against the daily time sheets, but said that none of the other partners did that.

[239] Hall Interview, *supra* note 198.

matter to the next.[240] The other lawyers reported varying degrees of imprecision in their billing practices. Andy Baird writes down his hours at the end of each day, estimating the amount of time he devoted to each matter.[241] He thought his estimates might be off by fifteen minutes or so.[242] He felt that devoting more attention to billing would detract from his other work.

Arthur Katz similarly reported that "small amounts of time often get fudged," but he feels less comfortable with his practice of estimating hours. He said "I feel guilty about not keeping much more accurate time . . . . If I were a client I wouldn't like it." Katz said he sometimes forgets the number of hours he worked: "[I]f . . . I can't remember whether that was really ten hours or twelve hours, I would err on the side of twelve hours, if I figure the client can afford it." Michael Williams reported a wider variation in his billing practices: "Now I . . . [record hours] every day or every few days. But there were times I'd do it once a month and I'd say 'Well I spent half this month on [a big client—] . . . one hundred hours.' "[243]

f. *Explaining the Bills*

When a client challenges a bill that is not entirely accurate, the lawyer often buttresses one lie with another. Alison Price[244] said that in her firm, when a client questioned a bill, the lawyer who had billed the hours would review the bill with the client and explain it.[245] She described these conversations as follows:

> The client calls up and . . . ask[s] about [the] bill, and you are saying, "Oh, yeah, on 1/26/88 I spend x amount of time," and you go through as if you had kept to the minute time records when in fact each week you've been fudging on them and padding them because you were required to have eighteen to twenty-two hundred billable hours [per year] . . . . This is so common. I have many friends working in large firms—it is the practice.

Price said that a partner once asked her to attend a meeting in

---

[240] Interview with Frank Copeland (a partner in a small firm with a primarily domestic relations practice) [hereinafter Copeland Interview].

[241] Interview with Andy Baird (an associate at a medium-size firm) [hereinafter Baird Interview].

[242] Arthur Katz made a similar estimate of his margin of error. He believed his time records might be off by between fifteen minutes and half an hour. *See* Katz Interview, *supra* note 221.

[243] Williams Interview, *supra* note 209.

[244] Price Interview, *supra* note 227.

[245] In some firms, all billing questions are handled by the partner in charge of reviewing bills.

which the partner knew that the client was going to inquire about a particular bill. The partner did not give her enough information to answer the questions. She believes that the partner in charge wished to cloak the firm's practices by offering the client incomplete answers:

> I was at a dinner for . . . an association . . . to give them a rundown on a recent filing that we had done . . . . After I finished talking about the filing . . . a treasurer says in front of . . . thirty men [representing the client organization] at this long table, . . . "could you explain this last bill that we received from your firm?" . . . What I didn't realize is that the partner I worked for knew that they were going to ask that question and that was why he had sent me . . . . He [the partner] had sort of given me the rundown: "Well we charged five thousand for this . . ." I had jotted it down but I didn't think it was important . . . so I said "I know that you . . . have been billed for the first two phases [of the project] . . . ." I said I would have to go back to the records.

The client had retained the firm on two different matters. The actual problem with the bill, Price later discovered, was that the firm had exhausted the amount allocated to one project sooner than expected. The firm was billing the excess time on the first project to the second.

Aside from the duplicitous interaction with the client, this incident suggests that when this firm deceived this client it manipulated an associate as well:

> It was lack of candor to me and lack of candor to the client . . . . If you are going to try and slip something by someone, a lot of times it is easier to have someone else do it than to do it yourself . . . . And I am blond-haired, blue-eyed, freckles, sound competent and honest when I speak [so was an obvious choice for the job].

g. *Charging Clients for Perks, Leisure, and Administrative Time*

Some lawyers indicated that they billed clients for time spent on nonlegal activities, or for expenses that were not necessary to the particular client's matter. The attorneys interviewed knew little about their clients' expectations or understanding of these billing practices. Generally, each attorney resolved doubts about what to bill alone, without consulting supervisors or clients. Arthur Katz described one recurring dilemma:

> I [often went] to New York for a big institution up there, and I never really knew, should I really bill them for the time on the air-

plane, you know if I was reading a book or something like that. I billed them anyway. I'd say, "heck, these guys can afford it."[246]

Alison Price reported that while working for a firm, "I took a cab home every night and it was charged to the client. If I worked a minute after eight, they bought me dinner . . . . I don't think the clients were advised of [this practice]."[247]

Marginally justifiable activities raise two vexing issues: whether lawyers legitimately can bill for such activities and, if so, how to describe them to the client. Madeline Stein explained:

> After days of working nearly non-stop on a large case for a large corporate client, the . . . entire office becomes inundated with documents, drafts of pleadings, xeroxed cases, and notes. Cleaning up becomes imperative, and most of it involves sorting, filing and throwing away, with no more thought involved than the discretion of one who is intimately involved with the case. An hour passes, and the job is done. Where did the hour go? Is it billable? If so, does one write "straighten office" on the billing sheet?
>
> I would most normally bill the time, perhaps discounting it a bit for sorting other client's papers and for the nature of the work. But I would not let the client or the billing partner know I was billing for cleaning my office—it just doesn't sound right. And besides, it is necessary work that must be done for proper case management . . . by the person who created the mess . . . . So I bill it to "case management" or "legal research" or "draft pleadings," depending on the occupation that created the mess in the first place . . . . If billing in this way is either padding or deceptive, I never thought of it as such.[248]

Winston Hall confessed that he did not spend all of the time he billed performing identifiable legal tasks:

> At the beginning I tried to correct for inefficiency, and then I realized it wasn't helping me, it wasn't helping anybody, and it probably wasn't consistent with industry practice. . . . In an eight-hour day there'd be a lot of daydreaming. Or walking in the halls, or getting coffee. I billed a lot of that time, because otherwise I'd either get divorced or get fired because I'd come in with two hours billed. . . .
>
> I think that was in the range of legitimate real world problems,

---

[246] Katz Interview, *supra* note 221.
[247] Price Interview, *supra* note 227.
[248] Stein Letter, *supra* note 197.

how to define work, it's never going to be actual reading and writing time.[249]

### h.    *The Impact of Client Confrontation*

Most clients do not ask for detailed explanations of their bills; if a bill appears reasonable clients usually pay without question, even though they are unhappy that legal fees are so high.[250] Clients who do ask lawyers to go over their bills might be deterred from suggesting that the lawyers did not actually work all of the hours billed because the clients probably have little or no information to substantiate such claims and because such a challenge would amount to accusing the lawyers of lying.

Lawyer billing practices might be more precise if clients scrutinized bills and questioned them more frequently. Arthur Katz recalled one instance in which the client was a lawyer who inquired about billing practices more freely than did most non-lawyer clients:

> I went to a client's office at 8:30 this morning . . . . I had lunch with [a client's] in-house counsel and he asked, "By the way, what are your billing rates?", and I told him [$125 per hour] and he said "Oh my God— you better not bill me for this lunch" . . . . I said "I won't bill you for lunch and I won't even bill you for the ride home" and he said "Oh you can bill me for the drive home. . . ." He was saying it jokingly . . . [but] I'm sure he doesn't want me to.[251]

Katz implied that if the client had not asked, he would have billed him for all the time he spent with the client, including lunch and transportation time.[252] He suggested that direct confrontation about his rate and about whether he would bill for lunch caused him to promise the client that the bill would include only time spent doing legal work.[253]

---

[249] Hall Interview, *supra* note 198.

[250] *See, e.g.*, Steele & Nimmer, *supra* note 80, at 957-60 (discussing clients' general inaction when displeased with fees charged and other aspects of attorney behavior).

[251] Katz Interview, *supra* note 221.

[252] As Katz was telling the story, he remembered that he had spent fifteen minutes while at this client's office on the telephone with another client, and he said "so if I'm careful about it, now that I'm sitting here talking to you . . . tomorrow I'll calculate fifteen minutes there." His participation in the interview (as with many of the other lawyers interviewed) seemed to bring to the surface practices about which he ordinarily would not think twice, and to cause him to resolve to be more careful in keeping track of time.

[253] This example illustrates what Rosenthal observed to be the overall positive

### 2.  Bringing in Business

#### a.  *Exaggeration of Expertise*

Several interviewees reported instances in which they or others overstated the experience or expertise of the firm in a particular area of law. Many lawyers do not consider what they characterize as "puffing" to be lying; they espouse a "macho philosophy" that they "can learn anything in a week,"[254] and therefore, that any representations they make about expertise will be true in a negligible amount of time. Puffing does not harm clients, they argue, because usually they do not bill clients for time spent learning new law, or "study time."[255]

Whether a lawyer actually bills the client for study time, however, often "depends on the file."[256] Claude Adams explained that, "[for a] big client, we would [bill for study time]. [For] other clients we would write it off for a while, and maybe if it expands into a bigger client, bill it progressively later on."[257]

Lawyers also engage in puffing by being intentionally vague about their actual experience. Adams explained:

> I would regard [it] as routine practice of business development, if you have . . . any experience in an area, to call it expertise . . . . I tend to think that standards have broken down a lot in that area. When we talk to a client [about a particular area of law] we tell them we *know* . . . [the area], meaning I have now gone to two meetings.

Andy Baird reported that lawyers in his firm sometimes tell clients that they have done work in the general area in which the clients

---

impact of clients' active participation in their representation. *See* D. ROSENTHAL, *supra* note 22, at 168-77.

If client scrutiny can chill lawyer deception, then the Disciplinary Rules should provide for scrutiny of lawyer conduct in areas such as billing in which deception is common. The rules cannot require clients to scrutinize their attorneys, but can require lawyers to make specific disclosures, to scrutinize each other, *see infra* text accompanying notes 360-85, or could provide that regulatory officials must scrutinize lawyers. The last approach could include an audit requirement such as that imposed on British solicitors, who must submit a certificate from an accountant each year showing that they have taken proper care of their clients' funds. *See* Morgan, *supra* note 48, at 731.

[254] Interview with Claude Adams (an associate at a large law firm) [hereinafter Adams Interview]. Adams explained that this philosophy was prevalent among his colleagues; he was critical of this view.

[255] Larsen Interview, *supra* note 206.

[256] Adams Interview, *supra* note 254.

[257] *Id.*

Ex. 57 pg.64 of 103

need service, but do not fully disclose the limits of their experience. They might fail to mention, for example, that the firm has never been involved in the type of hearing that a client is facing.[258] David Larsen said he occasionally presents some limited previous experience as "significant" work in that area, but that he would never invent a particular number of cases that he had handled in an area.[259] He justified this practice of overstating his past experience, stating "I have to make a living . . . . I can learn to do anything."

Some lawyers deceive clients about the extent of their professional contacts or access to influential people. Claude Adams, for example, said:

> I have exaggerated and other . . . [administrative] lawyers have exaggerated . . . the extent to which we know certain . . . heads of agencies. I talked once or maybe twice to the head of . . . [one branch of a federal agency], but as far as any client knows, he is my best friend and nobody [would] dare call him directly without going through me.[260]

Some lawyers reported that they failed to offer clients complete information about their expertise, or failed to correct incorrect impressions that the clients had developed about the lawyers' experience. This is deception by inaction or omission.

One associate I interviewed expressed the opinion that partners frequently puff their own experience because they have "an inflated sense of [their] own importance."[261] Andy Baird described certain partners as revelling "in the image that they are [experts] in this area."[262] In contrast, George Brenner said he was much more prone

---

[258] *See* Baird Interview, *supra* note 241.

[259] *See* Larsen Interview, *supra* note 206.

[260] Adams Interview, *supra* note 254. In evaluating this practice, Adams was critical of his own conduct and of the professional community in which he works.

> That is deceptive and that bothers me. On the other hand, it really seems like standard operating practice . . . to boast about . . . contacts. I guess where I draw the line is between a complete lie and an exaggeration . . . . If you have met them once then . . . he or she can be your best friend.

*Id.*

[261] Forrester Interview, *supra* note 220. Forrester was commenting on a situation in which a partner told a client that he personally knew a sub-specialty that he did not know but that others in the firm did know. She speculated that he might have thought that the client would only come to the firm if he personally represented them, and therefore found it necessary to exaggerate his personal knowledge of the law.

[262] Baird Interview, *supra* note 241. Baird made this remark about a partner who walked into a meeting with a prospective client who was seeking services in the area of computer piracy, about which the partner knew very little. Nevertheless, the

to exaggerate his knowledge when he first started practice, because he "didn't know much about any area." He said that as he gained competency in some areas, he felt more comfortable admitting ignorance in others.[263] Alison Price suggested that lawyers exaggerate their knowledge most frequently in areas that call for technical expertise in nonlegal areas, such as antitrust or economics.[264]

David Larsen stated that one of his clients thinks he is an experienced trial lawyer, when in fact he has never taken a case to trial. Larsen is unsure how the client got this impression. "I've never said so, but I've never said I haven't." He does not believe the client would fire him if he learned that his impression was incorrect, but Larsen feels that the client would lose confidence in him.[265]

Arthur Katz said that he feels uneasy knowing that "any matter I handle for a client could be much better handled by somebody with five years more experience than . . . [I have]." He felt, however, that ultimately, the problem was not his:

> I don't usually make a point of saying . . . to clients . . . "Look, we could have a seventh-year associate handle this . . . [who] will do a better job than . . . [I can]." That's not puffing—they get what they pay for, basically . . . . My assignments come from the senior partners . . . . I'm not going to second guess the partner's judgment.[266]

Most of the lawyers who admitted that they exaggerate their expertise were comfortable with the practice, as long as their representations were not flagrantly deceptive. Many viewed the salient issue as whether the lawyer would provide quality service. The lawyers did not feel compelled to advertise their lack of specialized experience as long as they could do the work. No one expressed the view that the client should be the one to judge the adequacy of the lawyer's experience.

---

partner gave an "off-the-cuff" opinion, without any caveat that more research was needed. Baird felt this degree of puffery was unnecessary: "The partner was too concerned about wanting to make sure that there was no indication that we were amateurs . . . . But I can't see practicing without creating an image of competence." *Id.*

[263] Interview with George Brenner (a former partner in a small firm) [hereinafter Brenner Interview].

[264] *See* Price Interview, *supra* note 227.

[265] *See* Larsen Interview, *supra* note 206.

[266] Katz Interview, *supra* note 221.

b.  *Business Development*

Numerous examples of deception emerged in the area of business development, specifically, in situations in which lawyers were giving advice about what additional legal work their clients needed, and inviting their clients to hire them for new matters.[267] The attorneys interviewed reported that lawyers sometimes recommend work that will benefit clients only marginally, but which promises significant pecuniary gains for the lawyers.

Alison Price, for example, recounted that other lawyers in her firm were often heard saying to clients: "Listen, I think you ought to get involved with this." (Suggesting that the client hire the firm to intervene in a case or file comments in an administrative proceeding.) Price thought that this was good advice about half of the time.

Explaining that her firm represents numerous clients with similar interests, she reported one incident in which an agency had requested comments on a proposed rule. One lawyer in the firm said "Let's see if we can get [them all] . . . involved in this. We can charge them each $1000, we can file one comment, and everybody concurs." She noted one recent proceeding in which 5000 comments were filed, and speculated that much of what is filed is never even read by any government officials.[268]

Claude Adams discussed pressures within his firm to encourage clients to authorize the firm to file comments on proposed agency rules, even when client interest was tenuous. As to one such incident, he explained:

It seemed a waste of my client's time [to file comments on this

---

[267] In general, one cannot approach prospective clients in person or by telephone and suggest legal work if a significant motivation is financial gain. (If the work is for a public purpose, or if the communication is in writing, the restrictions are fewer.) *See* MODEL RULE 7.3 and comment; S.GILLERS & R.SIMON, *supra* note 100, at 168. Model Rule 7.3 was amended by the ABA in February, 1989 after the Supreme Court found some of the restrictions in the old rule to violate the first amendment. *See* Shapero v. Kentucky Bar Ass'n, 486 U.S. 466 (1988). Once a client has retained a lawyer for one purpose, however, the lawyer may advise the client of other work that the lawyer could do for the client. Model Rule 7.3 exempts from its prohibition on solicitation any prospective client with whom the lawyer has a "prior professional relationship." MODEL RULE 7.3 and comment 4; *see also* MODEL RULES, Preamble (stating that "as advisor, a lawyer provides a client with an informed understanding of the client's legal rights and obligations and explains their practical implications," and also that "a lawyer acts as evaluator by examining a client's legal affairs and reporting about them to the client or to others"); MODEL RULE 2.1 comment, *Offering Advice* (stating that "a lawyer may initiate advice to a client when doing so appears to be in the client's interest").

[268] *See* Price Interview, *supra* note 227.

rule] . . . but I had enormous pressure from the partner to put together a letter to them [proposing that we do the work] . . . . It is unlikely that . . . a neutral letter would be approved by our firm . . . . If you could find a glimmer of interest, you would state that . . . the future of the corporation depended on it.[269]

Adams acknowledged that the practice was deceptive, but urged that it was "fair business development that everybody understands." He pointed out that most of his firm's clients are corporations, and therefore the contact person is usually the client's general counsel. He felt that in-house counsel are quite sophisticated and realize that firms are always trying to get more business. Therefore, although the intent of this practice is deceptive (in that the firm attempts to convince clients that certain work will benefit them, when in fact it may not), Adams argued that the practice is justifiable because letters of suggestion usually do not actually deceive clients.[270]

### 3. Covering Up Mistakes

One of the most common reasons that lawyers deceive clients is to avoid having to disclose their mistakes. Once a lawyer has gained a client's respect and confidence, disclosure of an error becomes less likely to sour future business with the client or to taint the client's opinion of the lawyer. However, many lawyer-client relationships are tenuous; if the relationship is new, and the client learns that the lawyer made a mistake, the client may lose faith in the lawyer.

The lawyers I interviewed offered a wide range of errors that they or other lawyers had concealed. Many of the errors that the interviewees covered up fall into the category of general neglect. They include such conduct as failing to contact the client in a timely fashion, procrastinating in finishing work, or doing mediocre work. Even though these do not involve a specific legal error, clients would find such conduct troubling.

Many lawyers do not return phone calls to clients quickly. At one end of the spectrum, some lawyers have huge caseloads and stacks of unanswered messages on their desks, and constantly make

---

[269] Adams Interview, *supra* note 254.

[270] *See id.* This justification is similar to that often offered for deception in negotiation. Lawyers often misrepresent to one another their clients' willingness to settle, or their bottom lines. Many argue that this practice is not really deceptive because all the lawyers know that other lawyers do this, and therefore, do not take the deceptive factual assertions as factual, but as statements of present position. *See* White, *supra* note 27, at 926-27; MODEL RULE 4.1 comment 2, *Statements of fact; supra* text accompanying note 98.

excuses for not getting in touch with their clients.[271] Even the most conscientious lawyers occasionally fail to respond to calls in a timely fashion, but they often feel distressed about neglecting to do so.[272] The lawyers I interviewed tended to avoid telling their clients about delay or neglect, and to blame these problems on someone else if the clients did find out.[273]

Many lawyers felt that it is all right to deceive clients about their progress on work as long as they finish in a timely fashion and the clients do not suffer any harm.[274]

Carol Morgan voiced the commonly expressed opinion that if you assure a client that you are almost finished with a task "then you will do it." She qualified her statement, however, by saying, "I won't make that representation unless I can deliver in a short time."[275] In this context, a small misrepresentation benefits the client, urged Morgan, because, having told the client the work is almost finished, the lawyer must complete it right away. She asserted that the client feels better if deceived than if he or she knew that the piece of work was at the bottom of the in-box, saying:

> All clients think that their problem is the most important. They don't want to know that they are not top priority. But that is reality; things that have court deadlines come first. You wouldn't keep

---

[271] Interview with Heather Thomas (a law clerk in a two lawyer firm) (describing the conduct of one of the lawyers) [hereinafter Thomas Interview].

[272] Andy Baird reported that "Once I got stuck in a spot where I should have gotten a hold of a client sooner . . . We spoke to opposing counsel and then didn't get back to the client the next day and they called me before I got to them, and I think I told them I tried calling." Baird Interview, *supra* note 241. The client blamed his own message system. In evaluating his own conduct, Baird was disapproving. "It's a lie. I was on the spot and I didn't think quick enough . . . . They were upset that they hadn't gotten the call, and my reaction was improper." He felt that had he taken a moment to think, he would have dealt with the client's distress in a non-deceptive manner. *See Id.*

[273] *See, e.g.*, Katz Interview, *supra* note 221. He said he always tried to cover up errors. If his failure to order a title report soon enough delayed a transaction, he said he would blame it on someone else. He commented that he felt that with more experience, he would have less need for deception and he noted that the partners in his firm were more comfortable admitting their mistakes.

[274] Alison Price explained that "to make clients feel more satisfied that something's almost completed, I have been told to say, . . . 'you can expect an answer in a week and a half,' when in fact we haven't done anything." Price Interview, *supra* note 227. She feels that other lawyers in her firm use her as an intermediary because "the person doesn't know me on the other end. They are not going to ask me a lot more questions . . . . They will just say 'okay fine.'" *Id.*

[275] Interview with Carol Morgan (a partner in a very small firm) [hereinafter Morgan Interview].

your clients if you told them [that their work was not given top priority]. Very few clients really understand law practice.

Claude Adams recalled one instance in which he withheld documents from a client so that they would not realize that his work had been mediocre:

> I wrote comments for an . . . [administrative] proceeding that weren't great. I never really had the time . . . . I was sending things on to clients that were submitted by other parties . . . and there were three or four people that just did an outstanding job . . . . I didn't send those to the client.[276]

The more serious the error or oversight, the greater the incentive to conceal it. Andrew Carpenter, who was in-house counsel to a corporation, had to review some advertising prior to publication. One of the ads stated the results of empirical research in a manner that arguably was deceptive.[277] The lawyer explained: "They were in my in-box and I looked at them and I said, 'Oh shit, I can't do this, I can't approve it, I can't deal with it.' . . . I never approved it or disapproved it. When somebody asked had I reviewed it, I said 'no.' " The lawyer was seriously troubled by the whole situation, and by his own response to it:

> It just seems normal in a corporation that when the shit hits the fan everybody ducks . . . . When something goes wrong, nobody ever saw the document and nobody ever approved it.
>
> I think it was wrong because it was not assuming responsibility. What I am having trouble with is would I do it again under those circumstances? . . . Maybe yes.[278]

Other errors that the interviewees discussed include missing deadlines in litigation, sending memoranda to clients that contain errors in law or fact, sending a client a document that should have gone to someone else, and revealing client confidences. Some lawyers believe that if the errors can be fixed they need not tell the client about them. Frank Copeland told a story about one instance in

---

[276] Adams Interview, *supra* note 254. In this proceeding many parties with similar interests had filed comments, so that the client might have compared Adams' submission with those of other parties.

[277] Interview with Andrew Carpenter (in-house counsel to a corporation) [hereinafter Carpenter Interview].

[278] *Id.* Note that this is deception by omission rather than by commission. *See* text accompanying notes 8-9 for a discussion of this issue. Carpenter explained that in the corporation there was a great deal of pressure on the lawyers to say yes to business proposals, and that he risked losing the trust and appreciation of his employer if he were too much of a policeman.

which he missed a deadline on an answer to a motion. He filed and argued a motion for extension of time and won, but did not report any of those events to the client. He felt that this nondisclosure was appropriate and necessary in this situation. "If you tell the client, the client will panic, and might fire you . . . . In a divorce case, the client might go off the deep end . . . . Half of the job is keeping [an] agitated clientele happy."[279] He explained that non-lawyers tend not to understand that judges rarely throw cases out on technicalities. He seemed to feel that he had an affirmative duty to protect his clients from worrying about matters that were not worrisome. Copeland also pointed out that if he makes an error, he never bills the client for time spent correcting the error.[280]

Occasionally, a judge does dismiss a case on technical grounds. Carol Morgan found herself in one of these exceptional cases. She was late to a status conference scheduled for a Monday morning at ten-thirty. She left her office keys at home; by the time she went home, returned to the office and checked her calendar, it was after ten-thirty. She thought the status conference was set for Tuesday, and the judge thought the scheduled time on Monday was at ten. By the time Morgan reached the judge's office, the judge had dismissed the case. She wrote a letter to the judge apologizing, and at the time of the interview planned to file a motion to vacate the dismissal. So far, she has not reported any of these events to the client and will do so only if she loses the motion. Morgan explained: "If I told the client, the client would get hysterical. I am reasonably confident that I will get it straightened out."[281]

Beth Forrester told of one incident. Before she began working at her law firm, the firm did a statistical analysis for a client of its equal employment opportunity status and used the wrong statistics, "with the result that the client looked to be in a better position than the client was in." She discovered this problem and went to one of the partners to suggest that they inform the client. This partner, who had not done the original work but had reviewed it, "didn't catch it and he probably should have," commented Forrester. The partner told her "in so many words" not to tell the client about the error, but to send them a correct analysis of this year's statistics.[282]

Forrester was not pleased with this resolution, but deferred to

[279] Copeland Interview, *supra* note 240.
[280] *See id.*
[281] Morgan Interview, *supra* note 275.
[282] Forrester Interview, *supra* note 220.

the partner's judgment. She did tell him that "[i]f they ask why [the new statistics] look so much worse I will tell them." Her unease with the situation was mitigated by her refusal to make false statements about the error, and by her knowledge that "they have ample opportunity to discover it on their own."[283]

Alison Price told of another lawyer in her firm who mistakenly revealed a client confidence and then lied when the client confronted her about it. The client had called the lawyer to inquire about a piece of property that was for sale, and the lawyer called the broker to get information for the client.

> He says, being the salesman that he is, "Well, who wants to know this information?" She reveals the client's name, and then he gives her the information. She calls back the client and [gives him the information] . . . . The client says, "where'd you get this information," and she says, "well I talked to the broker." The client says "YOU DID WHAT? Well, I certainly hope you didn't give them my name!" She panics, being young, new, and says, "No I didn't," and then lives in fear that the broker is going to call the client and then [the client will] call her and tell her, "You're a liar, and I want to talk to the senior partner."[284]

In evaluating this lawyer's conduct, Price said that it was "[v]irtually harmless, but maybe it would have been better to be honest, just for sanity's sake." When asked whether what the lawyer did was wrong, she said, "No, not as long as she didn't get caught. I mean, nobody was really hurt." She explained that the client did not want the broker to get his name only because he "didn't want the broker bothering him."[285]

Arthur Katz described a common occurrence: a lawyer sends a package to a client, and the package turns out to contain a document for someone else. On one occasion, he reported, the client called and said: "Did you really want to send me this?" He would respond

---

[283] Id. Andy Baird recounted a similar incident in which he sent a memo on a trade bill to a client. The memo turned out to reflect an incorrect interpretation of one provision of the bill. Baird dealt with this problem by sending a second "clarifying memo" which did not acknowledge the error but provided "more detail." Apparently, upon careful analysis the client might have noticed the conflict in the information contained in the two memos; Baird's strategy succeeded, however, in correcting the information without the client noticing the initial error. Baird felt that this was an acceptable resolution of the problem, and that he had no obligation to acknowledge the error because no harm to the client resulted. See Baird Interview, supra note 241.

[284] Price Interview, supra note 227.

[285] Id.

730    *UNIVERSITY OF PENNSYLVANIA LAW REVIEW*    [Vol. 138:659

with words to the effect of: "It's so hard to get good help these days."[286]

Madeline Stein remarked that "[b]laming the secretary happens all the time. Every lawyer I have ever worked with does it. It's obnoxious, undermines the relationship with the support staff, and is lame. Who directs the secretary? Who is ultimately responsible?"[287]

### 4. Impressing Clients

Lawyers' efforts to cover up mistakes are partly motivated by their desire to gain clients' respect, confidence, and admiration. This goal leads some lawyers to exaggerate what they have done for their clients, or what they think they can do for future clients.

#### a. *Who Did the Work*

In law firms, partners usually bring in most of the business. Many clients feel that they have hired the partner with whom they had their first contact, rather than a firm of lawyers. Many partners, in turn, feel they must give each client the impression that they, the partners, have personally attended to every aspect of the client's matter, even if associates actually did most or all of the work.

As an example of this phenomenon, Deborah Greenberg, an associate at a large firm, reported listening to calls over a speaker phone with four others; only two of those listening were identified to the client on the other end. The silent participants needed the information in order to do their part of the work.[288]

The most common way that law firms deceive clients about who does work is by precluding associates who did the work from signing documents sent to clients. Beth Forrester said that her memos to a partner often become memos from the partner to the client.[289] Andy Baird reported that for "every pleading that I worked on with a partner, the partner usually signs . . . and I don't . . . . The argument

---

[286] Katz Interview, *supra* note 221.

[287] Stein Letter, *supra* note 197.

[288] *See* Greenberg Interview, *supra* note 221. Ms. Greenberg said that the partners seemed concerned not only about overwhelming the client with a ratio of 5 to 1, but also about appearing to have five people billing for one meeting. In fact, those who were not identified on the phone were not billing for their time. This deception involves the omission to inform a client rather than the act of giving a client incorrect information.

[289] *See* Forrester Interview, *supra* note 220.

they make is that the partnership is ultimately liable [and therefore a member of the partnership should sign]."[290]

Alison Price said that her firm sends many opinion letters to clients that associates write but only partners sign. She thought this deceptive practice went too far:

> You know how you put initials in the left hand corner so you know who did the actual letter in case someone else is signing? I've had those changed to the partner who signs, because he doesn't want people to know [that I wrote the letter] . . . . He doesn't like his clients talking to me.[291]

Andy Baird reported an incident in which an associate at his firm investigated a situation, talked to a law enforcement official, and reported the relevant information to the partner for whom he was working. The partner then wrote a letter reporting this information to the client, and stated that *he* (the partner) had spoken to the law enforcement official. Baird said that the associate was "very upset" by the situation. He pointed out that the client could be injured by this deception. If the client, at a meeting, asked the partner to elaborate on the facts stated in the letter, the partner would have to lie again because he did not have the conversation with the law enforcement official and would not know the answer. Consequently, the partner might give the client incomplete or wrong information in an effort to cover up the first lie.[292]

Deborah Greenberg told of one document that a female associate wrote and four male partners edited. Initially, only the four partners signed it. Later, the name of one of the partners was removed, because "[i]t looked as if too many lawyers had worked on the mat-

---

[290] Baird Interview, *supra* note 241.

[291] Price Interview, *supra* note 227.

[292] Baird also said that an associate in his firm wrote a law review article which was published under the name of the partner, and the associate got a little dagger at the bottom of the page acknowledging his assistance. This deceives the reader, who might be a client or a prospective client, by giving the false impression that that partner wrote the article. A client who read the article would probably get better advice from the associate who wrote it, but would mistakenly attribute the expertise to the partner. Baird thought this was inappropriate: "I think the partners do it more than they need to because of how they want to be seen. They're selling themselves and they look at associates as their employees . . . . I think it really hurts the firms . . . . I think it's incredibly harmful." Baird Interview, *supra* note 241.

Baird felt that associates are the ones most harmed by this practice. The associate is demeaned by doing a great deal of work and not getting credit for it. Moreover, the associate is deprived of the professional advancement that would accrue from having her expertise recognized. Consequently, her ability to advance within the firm is also diminished. *See id.*

ter."[293] Greenberg pointed out that, aside from the issue of harm to the client, this practice harms the lawyer who did the work, and in turn, harms the law firm:

> If the lawyer who writes the document is not identified, it hurts the lawyer more than the client, because she feels disrespected, and doesn't perform as well. If the junior lawyer is invisible to the client, the senior lawyer is less likely to listen to the junior lawyer's advice.[294]

Alison Price talked about the deception that occurs when a partner decides to try a case in which an associate has done all of the pretrial work and the partner has had relatively little involvement. The partner

> speaks to the client . . . . [and] says "it may be wise, since he [the lawyer who actually researched the case] is an associate, for me to try the case" . . . . but he doesn't tell the client that he doesn't know anything about the case, that somebody else has been working on the case for the last year . . . . If you were more honest with your clients and gave them an opportunity to make a decision based on the work that's been done, they would choose the associate.[295]

Price acknowledged that having the partner try the case might be in the client's best interest if, for example, the associate is "someone who belongs in the library," or the partner is a very experienced trial lawyer. She felt, however, that the client was entitled to have the relevant information and to make an informed choice.[296]

b.  *Making the Work Look Easier or Harder*

Some lawyers deceive their clients about their availability or about the amount of work required to accomplish certain tasks. Deborah Greenberg reported that sometimes she would tell a client she was not too busy to take on another matter when in fact she was swamped. "To flatter the client I put on the appearance of always being available."

She mentioned that she saw partners in her law firm giving clients the impression that any work could be done almost instantly: "If a client asks a partner for something to be done by the next

---

[293] Greenberg Interview, *supra* note 221.

[294] *Id.* This practice may result in detriment to the client because in many situations the junior lawyer is more intimately acquainted with both the facts and the law of the matter.

[295] Price Interview, *supra* note 227.

[296] *See id.*

morning, the partner might say 'Oh, sure, no problem.' And he would not tell the client that an associate would have to stay up all night to get it out the next day."[297]

On the other hand, attorneys sometimes try to impress a client by making the work look harder than it is. Many of the lawyers interviewed reported that, when telling clients about settlement negotiations, they exaggerate their achievements or the level of effort required. In some instances the lawyer is merely trying to look good; in other cases the lawyer intends to make the settlement look advantageous to persuade the client to accept it. One lawyer noted that in describing to a client his dealings with opposing counsel, he might say, "I had to do some fast talking," when he really did not.[298] Another lawyer indicated that he might say to a client that in dealing with his adversary, "we've gone round and round on this," when in fact they had not.[299]

Michael Williams admitted: "I am not sure I always accurately portray the negotiations [with opposing counsel] to the client. I always portray that I had to fight for it. I have never called a client and said, 'My God, he just gave in—I didn't have to do anything.' "[300]

c.  *Deception About What the Law Is*

If a lawyer lies to a client about what the law says, one ordinarily would assume that the lawyer has deceived the client. But what if the client knows what the law really says and wants the lawyer to misinterpret the law so that the client can do something that is illegal? In such circumstances, the lawyer may have lied, but the client is not deceived.[301] Madeline Stein offered a good example of this type of situation:

> I think misstatements of the intent of the law is [*sic*] one of the most prevalent and odious forms of deception in the legal business. There are certain corporate practices perceived by certain industries to be necessary to survival, and many of them are clearly illegal . . . . Clients will shop around until they find a law firm that will sanction in an "opinion letter" the doing of an illegal act. The letters are usually written with a thousand escape hatches: "if the facts

---

[297] Greenberg Interview, *supra* note 221.
[298] *See* Katz Interview, *supra* note 221.
[299] *See* Larsen Interview, *supra* note 206.
[300] Williams Interview, *supra* note 209.
[301] The only possible deception would be that the client receives the impression that it is ethically permissible knowingly to adopt a wrong interpretation of the law.

are as you have presented them, blah, blah," but the bottom line message is, "yes you can do it even though the law is intended not to permit it." The firm writes the letter to keep the faith of the large client and to keep the business coming.[302]

### d. *Deception About the Value of a Case or the Lawyer's Fee*

One common technique among personal injury lawyers is "lowballing": underestimating the value of the case so that the eventual settlement, compared to the original prediction, looks favorable to the client. David Larsen explained what he does and why:

> In evaluating the value of a case I always lowball. Clients have misconceptions from the newspapers. They think they won the lottery when they get hurt . . . . I understate what is likely. Sometimes they get a lawyer who gives a higher number . . . . If I tell them [honestly] what I think the case is worth, then they think they got what was coming to them.[303]

If the lawyer undervalues a case, the client probably will think the lawyer obtained a good settlement and worked hard to get it.

In some areas of practice, there are standard amounts normally billed for certain pieces of work. In such instances, it is not unusual for the lawyer to quote a price for the job, even if his work will be billed by the hour. One lawyer said that in talking with new clients,

> I definitely feel pressure to try to keep the prices down, to let them know it's going to cost less, and to not have them go away because . . . [I quoted] a more realistic sum . . . . Anybody in business does that. You want a customer, you give them a better rate at first, and after they gain confidence in you, you increase your prices.[304]

Some of the lawyers interviewed expressed reservations about giving estimates of the value of a case or of projected attorneys' fees.[305] One lawyer reported that in talking with a new client about a

---

[302] Stein Letter, *supra* note 197.

[303] Larsen Interview, *supra* note 206. George Brenner echoed the same approach: "You may be conservative initially with a person so that they don't get their expectations up." Brenner Interview, *supra* note 263.

[304] Katz Interview, *supra* note 221. He explained that once he quotes a particular price for a job, if the hours spent would exceed that price, he bills the client for a number of hours consistent with the price quoted. This practice is deceptive because it represents that the work took less time than it did. Most clients would not object to this sort of deception because the client is undercharged rather than overcharged and is not harmed. This consequentialist analysis overlooks the possibility that the lawyer's intent is to lure the client into a position of dependency and then raise the price of services.

[305] If the lawyer bills by the hour, no necessary connection exists between the

Ex. 57 pg.77 of 103

case, he almost never puts an estimate in writing because of the difficulty of making an accurate estimate.[306] Madeline Stein agreed that it was "nearly impossible" to give accurate estimates, unless one used broad ranges. She said that in giving an estimate, one risked losing the client if the estimate was either too high or too low.[307]

It might be argued that avoiding specific estimates is an honest strategy because the lawyer does not know how much the work will cost. However, the lawyer could disclose what she knows about the value of the case and about the uncertainty of the outcome. If the lawyer withholds any information, then the conduct is deceptive.

### e. *Withholding Negative Opinions of Clients*

Lawyers do not like all of their clients, nor do they always approve of what their clients have done. In the interest of maintaining business and keeping clients satisfied, many lawyers keep these opinions to themselves and flatter their clients.

A lawyer may avoid telling a client what the lawyer thinks of him as a person. Arthur Katz made this point cogently: "You might have a client who is a very unpleasant person, who is difficult to deal with, and you certainly don't tell him to his face, 'I think you're an idiot, you're a jerk and I hate working for you.'" . . . You don't bite the hand that feeds you."[308]

A lawyer may also avoid telling a client what someone else has told the lawyer about the client. Carol Morgan, for example, will not tell a divorce client the nasty comments the client's husband has made about the client unless it is important to the case. "I filter out as much as possible. I won't withhold materially relevant allegations."[309]

Arthur Katz said that he sometimes shares an opinion about his own client with the opposing counsel behind the client's back.

> A lot of times someone will say something to me about my client and I might even say something to this other lawyer. . . agree with him that he was a jerk, overly demanding and unreasonable,

---

value of the case and the price of the lawyer's services. If the lawyer has a contingent fee arrangement with the client, then the lawyer's estimate of the value of the case includes an estimate of the fee.

[306] Interview with Ed Sanders (a partner in a small firm) [hereinafter Sanders Interview].

[307] *See* Stein Letter, *supra* note 197.

[308] Katz Interview, *supra* note 221.

[309] Morgan Interview, *supra* note 275.

but I'm not going to pass that on to [the client]. I'm a member of [the client's] development team.[310]

David Larsen described a case in which the client had assaulted his wife and the wife had sued for damages. In preparing the client for court he said, "If we go to trial the jury won't believe you unless you curb your temper and lose eighty pounds."[311] But Larsen did not tell the client that *he* did not believe the client's story. Larsen simply felt that he had no reason to confront the client and risk offending him.[312]

George Brenner echoed the opinion that lawyers sometimes must protect a client from the lawyer's opinion of the client or the situation.

> Where a client has a really weak case . . . and I know it's going to be an issue, instead of saying to the client, well I think you really fucked up here, I'll say . . . I know this is going to be an issue. How would you respond if you are asked this . . . without . . . accusing them of misconduct. . . . It's important for most clients that their lawyer believe that what they did was right.[313]

### f.  *Strategic Deception*

In some cases lawyers withhold information from their clients as part of the strategy of a courtroom presentation. George Brenner described a personal injury case in which a woman had been severely injured by a piece of machinery at the factory where she worked:

> When she talked about this thing she got very upset. . . . We [her lawyers] made a conscious decision that we were not going to have

---

[310] Katz Interview, *supra* note 221.

[311] Larsen Interview, *supra* note 206.

[312] Larsen said that if he had confronted the client, the client might have fired him, but that he would not have minded losing this particular client.

Larsen did not mention that by not confronting his client he also avoided the question of whether the client would lie when he told his story in court. Lawyers frequently gloss over difficult questions with their clients to allow their clients to testify to facts that the lawyers do not believe. *See* M. FRANKEL, THE SEARCH FOR TRUTH: AN UMPIREAL VIEW 15 (1975) (asserting that the trial attorney's primary goal is to advance the client's interests rather than to fully disclose the truth, and urging reevaluation of these priorities). If Larsen had been more candid with his client, he could not have given the client such broad leeway in making representations in court.

[313] Brenner Interview, *supra* note 263. Brenner suggests that if a client wants to believe that the lawyer condones his conduct, then the lawyer is justified in deceiving the client to give that impression. An alternative analysis is that the client is entitled to have the lawyer's honest reaction to the conduct in question because the client might wish to be represented by a lawyer who genuinely condones the client's conduct.

> her talk about it any more . . . . we wanted the same thing to happen in front of the jury . . . . She broke down on the stand . . . . [T]here were members of the jury who were openly crying.

The lawyers did not explain to their client that they wanted her to emote in the courtroom and therefore had decided to avoid rehearsal of the testimony. Brenner said he felt uncomfortable with this strategy, even though "very clearly this was to her advantage." He pointed out that this approach was to the lawyers' advantage also, because of the contingent fee arrangement.

Questions of procedure and tactics are ordinarily within the lawyer's discretion;[314] Brenner's decision did not violate any ethical rules. On the other hand, if the client was a very sensitive or private person, perhaps she would have elected to risk a lower judgment in favor of avoiding public embarrassment. Did the lawyers know her well enough to make that decision?

### 5. Convenience and Control of Work Time

Most of the interviewees reported telling white lies to prevent clients from interrupting their work. Many deceive their clients about the reasons why they often do not accept their clients' phone calls. They lie about where they are or what they are doing when a client calls. They lie to their clients about the status of pending work. They withhold information about ongoing work for other clients that is delaying progress on the work for the client making the inquiry. Many of the lawyers interviewed also failed to report to their clients minor action taken on cases, thereby preserving greater control over certain aspects of the work.

Lawyers often used their secretaries to relay these white lies. This indirect communication seemed to reduce the lawyers' perceived obligation to be candid. Some of the lawyers even seemed amused by deceiving their clients about where they were or what they were doing. Only one of the lawyers interviewed reported that he was consistently candid with his clients about his availability to talk with them.[315]

The lawyers justified these lies as trivial, harmless, and necessary. Many lawyers explained that they are so busy they could not possibly take all client calls or do all the work on a schedule that accorded with client expectations. Some felt that client expectations

---

[314] See, e.g., infra note 326, MODEL CODE EC 7-7 (1981).
[315] See Copeland Interview, supra note 240.

are unrealistic, that clients do not understand what happens in law practice, and therefore that candid communication is not possible.

One puzzling aspect of this area is that lawyers often deceive clients in situations in which the truth would work just as well. In other words, a lawyer uses deception to solve a problem even though there are truthful solutions to many of these problems. For example, the secretary could tell the client that the lawyer could not take a call, rather than saying she is out of the office. One lawyer postulated that lawyers enjoy the power that they have and exercise this power by blatant dishonesty.[316] This suggests that some lawyers gain ego satisfaction from deceiving others. Some lawyers fail to evaluate whether there are truthful alternatives to the lies they tell, while others may have become so accustomed to lying about small matters that they do not even notice what they are doing.

### a.   *When a Client Calls*

I asked the lawyers what they say or what they tell their secretaries to say to clients who call at inconvenient times. Andy Baird reported that he often tells clients who have been pestering him that he is in a meeting when he is not.[317] This formulation was the most common, along with having the secretary untruthfully report that the lawyer was out of the office.[318]

David Larsen said that when he left his office to play racquetball he instructed his secretary to inform all callers that he was in court, rather than on the court.[319] Ed Sanders said that he did not feel obligated to accept calls from his clients even if he was in the office, especially if he was busy or not ready to speak to them. He said he found the telephone intrusive and that the constant interruptions made it difficult to do research.[320]

The lawyers interviewed said they did call their clients back, but

---

[316] *See* Williams Interview, *supra* note 209.

[317] *See* Baird Interview, *supra* note 241.

[318] Carol Morgan said that she prefers to have someone else tell the client that she is unavailable. *See* Morgan Interview, *supra* note 275. According to Madeline Stein, "Telling the client one is in a meeting, even when one is meeting with one's secretary, or with one's sandwich, happens all the time." Stein Letter, *supra* note 197. Deborah Greenberg said that if a client reached her on the phone and she did not wish to speak to the client, she would say that she was "about to go into a meeting; something that sounds legitimate so the client won't get pissed off." Greenberg Interview, *supra* note 221.

[319] *See* Larsen Interview, *supra* note 206.

[320] *See* Sanders Interview, *supra* note 306.

some knew lawyers who did not.[321] Michael Williams explained that he thought some deception occurs because of the

> pressure to be on top of . . . so much work. But . . . there is some-thing else. Some sense of power. When [I] . . . was fourteen years old and somebody called you, you didn't say "I'm in a meeting" . . . . You didn't think you could get away with that . . . . [but as a lawyer] you could say "I was in court all day" when you were there for an hour. You use those excuses to increase self-importance, . . . to impress a client . . . [It makes you feel that you] can control things.[322]

He noted that lawyers in large law firms actually have little control over their work lives, and wondered whether, as a result, they tend to exercise fully whatever control they do have.

### b. *Progress Reports on Work*

Many lawyers have to respond daily to calls from clients inquir-ing about the lawyers' progress on a piece of work. Arthur Katz offered an example of a very typical response to this type of inquiry.

> There are times when a client will call and say, "have you done such and such?", and I'll say "Oh, it's just in word processing," when in fact it hasn't been done. I've just been too busy to get to it and I don't want him to call me again that evening. . . . Other times I'll say I'm in a meeting and I'll talk to them later . . . .
>
> Morally it's . . . telling a lie and it's wrong to lie; at the same time I justify it . . . . The reason I do it is because I want to keep the client satisfied and I figure I'll keep them more satisfied if they think that their work is being paid attention to.[323]

David Larsen similarly reported telling clients that a piece of work is "in the computer" or that "I went to the library and someone was using the books" (when he never left the office). He echoed Katz's sentiments that this type of deception is "wrong because it is dishonest, but there's no harm, so it's no big deal." Larsen explained that he does not tell clients that he is busy doing work for

---

[321] Heather Thomas worked for one lawyer who always had a thick stack of phone messages on her desk. Thomas said that this lawyer did not feel any particular obligation to return phone calls, and that it was common for clients to call over and over again in the hope of getting through. *See* Thomas Interview, *supra* note 271. Carolyn Harris recalled egregious examples of an attorney who made visiting clients wait hours to see him. *See* Memo from Carolyn Harris (a former paralegal in a large firm) (Oct. 1988).

[322] Williams Interview, *supra* note 209.

[323] Katz Interview, *supra* note 221.

Ex. 57 pg.82 of 103

other clients because the clients are paying $150 per hour, and "they should feel entitled to terrific service."[324]

Larsen pointed out that "[c]lients have different concepts of immediacy than lawyers. Lawyers know better; they need to reassure clients. The client feels better if he thinks the problem is being addressed, even if it doesn't need to be addressed right away."[325]

Some lawyers resolve this tension between client expectations and lawyer performance by not reporting to their clients certain aspects of their work. Beth Forrester, for example, would not call a client to consult about the opposing counsel's request for a short extension of time if she is confident that the judge will eventually reach the merits of the case, and she thinks she might need such an extension from her adversary at some time. "I draw the line between substance and procedure."[326]

### c. *Impact of Workload on Advice*

Some lawyers reported that their need to control their workloads affected the substance of the legal advice they gave. The classic example is the lawyer who presents a settlement offer in a manner designed to induce the client to accept it because the lawyer, for one reason or another, does not want to litigate the case.

Alison Price described a situation in which an attorney suggested that a client not file comments in an administrative proceeding—because he did not have time to do the work. The lawyer did not ask the client: "Do you want to file comments? These are the issues and this is how it affects you." Instead, he said, "Well, that issue is sort of pertinent to your line of business, but I don't think you need to file initial comments. Why don't we just wait and file replies?"[327] He did not tell the client about his time problem.

---

[324] Larsen Interview, *supra* note 206.

[325] *Id.* On this point, Larsen and Katz agreed again. Katz said that "some clients are abrasive and demanding. You make judgment calls" about when their worries are justified." Katz Interview, *supra* note 221.

[326] Forrester Interview, *supra* note 220. The Model Code draws a similar line. For example, EC 7-7 states:

> In certain areas of legal representation not affecting the merits of the cause or substantially prejudicing the rights of a client, a lawyer is entitled to make decisions on his own. But otherwise the authority to make decisions is exclusively that of the client and, if made within the framework of the law, such decisions are binding on his lawyer.

MODEL CODE, EC 7-7.

[327] Price Interview, *supra* note 227. Beth Forrester talked about a similar situation in which she did not tell a client about comments that had been requested in

### 6.  Deceiving Clients to Impress the Boss

Some of the lawyers I interviewed reported deceiving clients to make a good impression in the law firm, to increase their chances for promotion, to avoid disapproval, or to avoid conflict. The most dramatic examples of this pressure came from Andrew Carpenter. He described the dynamics within the General Counsel's office of the corporation where he works:

> Saying an absolute "no" to a business concept is a bad thing to do, but often you have to. . . . Your job is eighty percent policeman. . . . This is a tension that produces lying. They are begging you to give them some type of direction but . . . to succeed as a lawyer you have to be perceived as someone who does not say no.[328]

He mentioned an incident in which one of the officers of the corporation came to consult him about a proposal which he thought was of questionable legality: "I was tired late one night and somebody came up and said 'can we do it?' I was just fed up with how many possible violations of the law I had approved that day. . . . I said 'No. That's it. No more.' " Carpenter later had to defend his position to the General Counsel, his immediate supervisor. Realizing that the corporation did not want to take "no" for an answer, Carpenter "very rationally explained the risks and benefits [to the General Counsel] . . . and said there is no actual legal prohibition." What he had said the night before (and what he believed to be accurate advice) was, "No, don't do it, it is probably illegal."[329]

Carpenter also talked about an attorney who had recently joined the office who "hasn't been sleeping nights because of the tension of being told to say 'yes'—to be pro-business, regardless."

None of the lawyers I interviewed reported this degree of pressure in their law firms, but some reported a correlation between their desire to succeed at work and their willingness to be less than fully candid with their clients. Deborah Greenberg admitted that she slightly exaggerated her own expertise in one area of law when she came to the firm:

---

an administrative proceeding because she felt the matter had only marginal relevance and "the client . . . just loves . . . commission work that isn't necessary." She did not give the client the choice because she did not have time to do the work. Forrester pointed out that "[w]here something . . . will have a substantive impact on the client's case, then . . . [I] will be as forthcoming as I can be." Forrester Interview, *supra* note 220.

[328] Carpenter Interview, *supra* note 277.
[329] *Id.*

One or two cases becomes two or three cases. Then you don't want to say one thing to the firm and another to the client, so you have to repeat the misinformation when the client asks you what experience you have had in the area in which you are working.[330]

This type of deception is replicated within the firm itself. Associates often work for more than one partner, and in some firms the partners compete for the associates' time. To please the partner, the associate has to give the impression that he or she is spending all available hours on work for the one partner, or risk poor evaluations from all. Michael Williams said that "a partner is almost like a client—they [both] want to think you're working one hundred percent [for them] . . . . No one knows what you're [really] doing." He felt that these expectations create a work atmosphere in which "nobody tells the truth."[331]

Claude Adams described a situation in which he used deception to mediate the conflict between his superiors' expectations and his client's interests. In an administrative proceeding, Adams' adversary filed for an extension, raising some substantive issues, and the administrative agency invited the other parties to respond to this request. Adams did not think it was worth his client's time and money to file a response, so he sent the original filing to the client, but did not send the client the agency's request for comments, or the comments that other parties filed. Adams thought it was wrong for him to substitute his judgment for his client's, but did so anyway. He explained:

> Part of the reason I didn't send the request for comments to the client with a recommendation not to file a response was the fear of what would happen when I sent a copy of that [the communication to the client] to the head of my department . . . . He would think that I was not doing aggressive business development. . . . The philosophy is that you take a client and you expand the work.[332]

Andy Baird was frustrated when, on the day before a trial for a pro bono case, a partner in his firm ordered him to spend the day working on a big project for a paying client. As a result of this instruction, he lost eight hours of essential preparation time on the pro bono case. He was poorly prepared for the pro bono trial, but did his best not to let the client know that. Baird commented that

---

[330] Greenberg Interview, *supra* note 221.

[331] Williams Interview, *supra* note 209.

[332] Adams Interview, *supra* note 254.

"the demands of a paying client came before the ethical demands of the profession."[333]

### 7.  Law Firm Atmosphere

Many of the lawyers I interviewed suggested that the very structure of law firms fosters deception of clients.  The firms indoctrinate lawyers to accept and to engage in some deceptive behavior.  The basic structure of most law firms is bi-level: partners run the firm and share the profits; associates are salaried employees.  In general, partners neither invite associates to meetings at which they discuss management issues, nor inform the associates about what goes on at those meetings.  Consequently, associates may have little information about their own performance, the economics of the firm, their colleagues' earnings, or the firm's plans to expand or merge with another firm.[334]

This administrative structure leads many associates to feel alienated and anxious about what goes on behind closed doors.

Beth Forrester noted the general lack of communication between partners and associates in her firm. "Members of the cabal," she explained, "do not speak to the peons . . . . They become accustomed to being very careful what they say to people." She said there is "a habit of secrecy [which] extends to everyone . . . . Part of it, too, is that there is a lot of uncertainty about how people will react to things."[335]

On the relationship between the power structure of the law firm and the problem of deception of clients, Forrester said "As an associate you are fortunate if your partners treat you well but if they treat you badly all you can do is leave.  I think unfortunately the ability to wield that kind of power tends to convince people that they have a right to hold more back from clients than they should."

Forrester suggested that if law firm partners deceive their employees, they may feel free to deceive to their clients.  Alison Price echoed this notion, reporting that partners were abusive toward associates. She said: "I have had personal mail opened" by one senior partner.  As to another partner, she mentioned, "I oftentimes

---

[333] Baird Interview, *supra* note 241.

[334] In some firms, the atmosphere is more open and meetings include all the employees in the firm, but in many firms the only administrative meetings are for partners only. *But cf.* Marcus, *The Little Law Firm That Could,* Wash. Post, April 22, 1986, at C5, col. 3 (discussing Onek, Klein & Farr as a firm that defies many of these conventions).

[335] Forrester Interview, *supra* note 220.

heard him literally screaming" at associates. "I have watched them drive lawyers out. There is high turnover."[336] Beth Forrester suggested that abuses of power by partners might be less acute if there were a better gender balance among the partners (all the partners in her firm are men). She noted that "male associates are less forthcoming because they are trying to emulate the partners . . . . Women have to find their own way." She felt that men tend more than women to think they have a right to make decisions without consulting clients, and that men are less willing than women to admit mistakes.[337]

One lawyer offered a perspective on the relationship between law firm atmosphere, lawyers' treatment of their families, and their behavior toward their clients. He observed that lawyers' schedules, often necessitating late-night work, have the potential to compromise relationships with spouses and children. These personal shortcuts, in his mind, are rationalized sometimes as being inevitable byproducts of a successful law practice. Once people begin to take these shortcuts with their families, it is a small step for them to begin using shortcuts in dealing with clients.

Michael Williams expressed the concern that the law firm's atmosphere erodes lawyers' moral standards about honesty and other values:

> I think law firms have stretched or redrawn many lines, and it's hard to think of something that one can't justify doing . . . . It is a different world than it was twenty years ago. I don't think some things that are generally accepted [now] would have been accepted then.[338]

Perhaps the lawyers who articulated these structural concerns are more critical than most of private law practice. Undoubtedly it is possible to maintain high standards of candor and personal integrity while practicing law. But not everyone has that choice.

## V. REGULATING DECEPTION

### A. *Can Deception Be Regulated?*

Lawyers and moral philosophers tend to disagree about how to control lawyers' unethical conduct. The lawyers often suggest

---

[336] Price Interview, *supra* note 227.

[337] Forrester Interview, *supra* note 220. *Cf.* C. GILLIGAN, supra note 20, at 67 (suggesting that women evaluate moral issues differently from men).

[338] Williams Interview, *supra* note 209.

increasingly specific statutory regulation of conduct regarded as inappropriate. In legal ethics the rules, which used to be regarded as advisory quasi-law, are acquiring the status of full-fledged enforceable law.[339] Some philosophers, on the other hand, view statutory directives as a poor substitute for individual reflection on what conduct is morally right, and they worry that the use of codes will lead lawyers not to think about ethical issues, but merely to attempt to comply with rules.[340]

Ted Schneyer, criticizing the philosophers, points out that a great deal of client-oriented unethical conduct, such as encouraging a client to lie on the stand, violates the ethics codes. He urges that "the prevailing rules of legal ethics not only protect the integrity of the judicial process but help lawyers withstand the pressure to do things in practice, such as advise people to lie, that conscience tells them would be wrong to do outside of practice."[341]

Schneyer explains that the philosophers would prefer that lawyers' ethical choices be treated as a matter of "individual lawyer discretion" rather than as a subject for legislation.[342] He suggests that by giving lawyers more choice about how to respond to ethical dilemmas, one would give them more permission to act unethically.[343]

In discussing whether their conduct was justifiable, many of the lawyers voice two levels of judgment. They often disapprove of their deceptive conduct as morally reprehensible, and then they explain the realities of the situations that lead them to diverge from what they would regard as morally proper behavior.[344] Often they seem to balance their moral judgment of a situation against whatever benefits might be gained or harms avoided by deception. They offer justifications for deception in situations in which the moral judgment is less troubling than the possible consequences. In reflecting on their conduct, the lawyers seem to check their behavior against their own moral standards.[345] The educational and regulatory systems should encourage this reflective behavior. Nevertheless, some of the harms

---

[339] *See* Patterson, *supra* note 21, at 49, 60.

[340] *See* Schneyer, *supra* note 21, at 1538.

[341] *Id.* at 1553.

[342] *Id.* at 1557.

[343] *See id.*

[344] A good example is Andrew Carpenter's avoidance of responsibility for his client's potentially false advertising. *See supra* text accompanying notes 277-78. He said that it was wrong, but that faced with the same situation, he might again choose self-interest over moral rectitude. *See id.*

[345] The interviews probably evidence a higher degree of reflection than occurs

caused by deception are too great to leave this area to the discretion of individuals. Regulation may stimulate needed reflection.

State enforcement of rules requiring lawyers to be honest with their clients is too expensive, except when the harm prevented is significant. Some types of regulation are drastically more expensive than others, but the difficulty of enforcement should not dampen efforts to write principled standards of conduct. All prosecutors set priorities as to which violations of law merit expenditure of resources for enforcement. Similarly, rules on deception may cover some conduct that is unlikely to be identified or punished. In approaching the problem of increasing lawyer candor, one must ask:

1) What types of deception are most harmful and in need of attention?

2) What types of regulation are available to affect lawyer behavior, and which are most likely to be effective in increasing the level of candor in the bar?

The data from the interviews is an initial inquiry into the first question. The remainder of the Article will offer some thoughts on the second question and will set forth some proposals for change in the ethical rules that govern lawyers.

### B.  *Use of Rules to Regulate Deception*

In regulating behavior it is better to make a specific rule than to rely on the judgment of the individual members of the group. Rules give people notice of the conduct that society expects. They set standards against which to measure conduct. They allow the development of consensus about what conduct is appropriate and help to foster uniformity of practice. They put pressure on those governed to comply with their mandates. Rules may provide remedies to those aggrieved by their violation. Statutory rules are better than common law rules because they are well organized and easy to locate.

The absence of specific rules concerning deception of clients[346] amounts to tacit permission for lawyers to continue to use deception. The general prohibition on deceit and misrepresentation may lead to discipline in some chronic or egregious cases, but seems to have little impact on the areas discussed by the lawyers interviewed.[347]

---

in most lawyers' practices. The occurrence of the interviews seemed to trigger many observations that might not have emerged otherwise.

[346] *See supra* notes 100-39 and accompanying text.

[347] One study indicated that the average adult admits to lying thirteen times per week. *See* Goleman, *supra* note 13, at C1, col. 4.

Some types of deception are more harmful or more wrong than others, and some may actually benefit clients.[348] Therefore, specific guidelines are needed.

Rules prohibiting deception of clients could amend criminal law or could expand the coverage of consumer fraud or other relevant statutes. However, the rules most logically belong in the state ethics codes. State bar associations initiate disciplinary action against lawyers who violate the state ethics codes. Law students study the codes during law school; placing them in the codes would help to get them included in law school curricula. Also, legal malpractice cases often rely on the codes as evidence of standards of conduct, so including these regulations in the codes might assist clients in attempting to recover damages for their lawyers' deceptive practices.

The most serious problem in proposing changes in the state ethics codes is that they will probably share the poor enforcement record of the rest of the codes.[349]

The legal ethics codes and policies on their enforcement have been premised on the traditional model of lawyer-client relations, which assumes that most clients get good service most of the time and that the only real need for rules is to control occasional deviance.[350] Many grievance committees that hear disciplinary cases are staffed by part-time volunteer lawyers and have only a few full-time lawyers to investigate and prosecute the cases.[351] The agencies have not succeeded in informing the public of their existence and functions. Most clients who have complaints do not bring them to lawyer disciplinary agencies. The traditional model premise, the thin griev-

---

[348] *See, e.g.,* Morgan Interview, *supra* note 275 (arguing that assuring clients that unfinished tasks are nearly completed may encourage the attorneys to do the work sooner).

[349] The underenforcement of the legal ethics codes is well-documented. *See, e.g.,* Steele & Nimmer, *supra* note 80, at 979.

> In all disciplinary agencies there are few complaints that result in agency prosecution. Still fewer end in the imposition of sanctions. For example, in 17 contemporary jurisdictions for which data are available none imposed disciplinary sanctions at a rate of more than 13 percent of the complaints received; only 4 imposed sanctions at a rate of 8 percent or more of the complaint rate.

*Id.*

[350] *See* D.ROSENTHAL, *supra* note 22, at 16, 23-24; Steele & Nimmer, *supra* note 80, at 101-03; *see also supra* notes 21-35 and accompanying text (describing the traditional model).

[351] The disciplinary agencies of 35 states employed six or fewer full-time lawyers in 1987. *See* ABA CENTER FOR PROFESSIONAL RESPONSIBILITY & STANDING COMM. ON PROFESSIONAL DISCIPLINE, SURVEY ON LAWYER DISCIPLINE SYSTEMS 23-27 (1987) (Chart IV).

ance committee staffs, and the lack of public information combine to prevent state bars from punishing any more than a tiny percentage of lawyer misconduct.[352] Disciplinary agencies tell over ninety percent of the clients who complain that their complaints are meritless.[353] Furthermore, the disciplinary agencies act only to punish or deter the conduct in question. They sometimes order restitution, but they do not award other damages such as the client might be able to obtain through a malpractice or consumer fraud action.[354]

It is beyond the scope of this article to address the variety of enforcement problems that exist in the lawyer disciplinary system. These problems are so serious that I am reluctant to suggest additional rules for the ethics codes. On the other hand, the ethics codes are treated with increasing seriousness. The distinctions between standards for disciplinary proceedings and malpractice proceedings are diminishing; the Model Rules are substantively more similar than the Model Code to the standards defined by common law. Although the authors of ethics codes did not intend to provide a basis for legal malpractice actions,[355] judges are relying increasingly on the codes in malpractice cases.[356]

This coalescence of malpractice law and disciplinary law is a positive development. Discipline should be available regardless of whether the misconduct in question caused economic harm to the

---

[352] California, for example, which in 1986 had almost 100,000 active members of the bar (more lawyers than in any other state), received 8,574 complaints during that year. Of those, the California bar formally charged only 192 lawyers with disciplinary violations, and sanctioned only 185. No state imposed a larger number of sanctions that year, except for New York, in which over 400 sanctions were imposed. *See id.* at 1-7 (Chart I).

[353] *See id.*

[354] Most of the disciplinary systems do not provide for compensation of victims of ethical violations. A few have funds to repay clients for money that their lawyers stole. *See* C. WOLFRAM, *supra* note 66, at 137-38 ("Courts have, however, generally refused to order disciplined lawyers to make payments that are nonrestitutionary and, thus, more in the nature of fines."); Andersen, *supra* note 41, at 248-49 & n.106 (citing CAL. BUS. & PROF. CODE, § 6140.5 (West 1974); MASS. SUP. JUD. CT. REP. 4:03-:06).

[355] *See* Hoover, *The Model Rules of Professional Conduct and Lawyer Malpractice Actions: The Gap Between Code and Common Law Narrows*, 22 NEW ENG. L. REV. 595, 596 (1988) (quoting MODEL RULES Scope, which states that "[v]iolation of a Rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached").

[356] *See id.* at 615-16. Hoover suggests that this is an appropriate direction for malpractice law because the ethical codes give lawyers good notice of what conduct the state expects, because reliance on the codes would not seriously disrupt malpractice law, and because the ethics codes set appropriate standards of conduct for attorneys.

client, to deter subsequent similar conduct.[357] Likewise, conduct that causes actionable damage to a client is an appropriate basis for discipline.[358] The following section focuses on what the standards should be, not on how to get people to comply with them.[359]

### D.  *Recommendations for Change in Regulation of Deception of Clients*

This section will suggest some specific changes in the disciplinary rules to correct some of the most common and most serious types of deception that were identified in the lawyer interviews.

### 1.  Fee Questions

Although both the Model Code and the Model Rules contain substantial provisions concerning fees, they fail to address a number of issues, including specific billing practices. As the interviews suggest, lawyers' timekeeping practices vary a great deal, and many lawyers' billing records are rough approximations at best. These problems contribute to the numerous fee disputes between lawyers and clients.[360]

Although hourly rate billing offers a greater degree of potential accountability than other methods of billing (e.g., contingent fees,

---

[357] For example, one might wish to discipline lawyers who lied to their clients about errors they made in litigation, even if the lawyers ultimately corrected those errors and prevented any harm from resulting. This policy would safeguard the lawyer-client relationship, lawyers' reputations, and the legal profession by preventing the harm that results from such conduct, quite apart from economic harm to clients.

Some consumer laws allow consumers to sue for fraudulent conduct regardless of whether the conduct injured them. *See, e.g.,* D.C. CODE ANN. §§ 28-3904, 28-3813 (1981) (outlining unlawful trade practices and consumers' remedies).

[358] Ideally, lawyer discipline should be handled in one forum that would address the public interest in protection from substandard services and the injured client's interest in one proceeding. This would result in more frequent attention to the issue of client compensation, and clients could petition for disciplinary action in what would otherwise have to be malpractice actions. Many difficult questions remain about how to do this, whether to move disciplinary actions into court or malpractice cases into administrative hearings, whether administrative agencies could award damages, and so on.

[359] In addition to changing the lawyer disciplinary codes, lawmakers should amend the consumer laws to allow clients to file complaints for consumer fraud in the delivery of legal services.

[360] The Maine Supreme Court, upholding a rule requiring binding arbitration for fee disputes, noted that in the view of many observers, attorney "fee disputes are the principal source of public dissatisfaction with the judicial system." Anderson v. Elliott, 555 A.2d 1042, 1049 (Me.), *petition for cert. filed,* 58 U.S.L.W. 3306 (Aug. 24, 1989) (No. 89-620).

premium billing), the lawyer interviews suggest that small and large deceptions in billing practices are pervasive regardless of the method used to determine fees.[361] The rules could be amended to discourage lawyers from fabricating hours or padding bills by including specific guidance as to hourly billing practices. Lawyers who bill clients on an hourly basis should be required to record their hours contemporaneously with the work completed, and to provide their clients with itemized bills showing exactly how many hours were spent on each task. A new disciplinary rule on this subject would help to standardize these practices. A proposed amendment to Rule 1.5 follows:

> RULE 1.5 Fees[362]
>
> (f) *Billing*
>
> 1) *Hourly Billing Requirements.* If a lawyer agrees to bill a client on an hourly basis, the written fee agreement and each bill sent to the client shall specify:
>
> > a) each lawyer's hourly rate;
> >
> > b) the hourly rates of paralegals, secretaries, or other staff whose time will be billed to the client on an hourly basis;
> >
> > c) all other charges that will be billed to the client, such as court costs, telephone, photocopy, postage, messengers, etc.; and
> >
> > d) a detailed statement of any other factors that will affect the amount of the bill.
>
> 2) *Estimates.* If a lawyer has provided a client with an estimate of the likely total charges, that estimate should be recorded in writing.[363]

---

[361] In large firms there is a pronounced trend away from straight hourly billing and toward "value billing" or "premium billing," in which the bill consists of a fee computed using the hourly rate plus a performance fee related to the value of the work to the client. *See, e.g.,* Cobb, *Competitive Pricing Along the Value Curve; or The Folly of Hourly Rate Pricing,* LEGAL ECON., Sept. 1988, at 29, 30 (concluding that a billing structure that attempts to bill clients for the value of legal services performed is better than one based on hourly rates); Marcotte, *Designer Billing,* ABA J., Nov. 1989 at 38, 38. Winston Hall maintains that the purpose of this new billing practice is to generate larger fees than can be claimed pursuant to hourly rate billing. *See supra* text accompanying note 231. Value billing, however, removes the opportunities for accountability that are available to clients who are billed on the basis of hours worked. It allows lawyers to bill whatever the market will bear regardless of the amount of work involved. Although value billing poses potential hazards for clients (especially to the consumers to whom corporations pass the rising cost of legal services), if adequate disclosure is made concerning the basis of a bill, the system could be administered without deception.

[362] Sections (a) through (e) of Model Rule 1.5 would remain as currently stated.

[363] *See supra* notes 303-07 and accompanying text (regarding current practices as to fee estimates).

3) *Contemporaneous Recording of Time.* If a lawyer or other firm employees are billing on an hourly basis, those billing for their time must keep contemporaneous time records, recording their time at least twice each day. If work is performed for more than one client during each day, billing time must be recorded each time the person billing begins a task for a different client.[364]

4) *Accuracy.* Records shall be accurate within one quarter of an hour. Rounding is permitted if the actual time worked is half or more of the number of minutes in the billing unit. (A task which takes nine minutes may be recorded as one quarter of an hour; a task which takes six minutes may not.)

5) *Recording Requirements.* Time records shall include precise and accurate records of the work done during each time block. The records must be included with each bill sent to a client, and must note:

a) the client for whom the work is done, and the person doing the work; and

b) the specific task in which the person billing is engaged, such as legal research, drafting a document, making a telephone call, meeting with identified individuals, or review of discovery documents. Each of these tasks must be described with particularity. For example, it is not sufficient merely to record "legal research;" the question being researched must be noted. If a particular task benefits two or more clients, the records kept must indicate the percentage of the total time for the task that is being billed to each client.

6) *Explaining Bills.*[365] Each bill sent to a client shall include the following notice, printed on the front page of the bill in type the same size as the numerals used to communicate charges:

You are entitled by law to precise and accurate records of the time for which you are being billed and the work done during that time. If you have questions about the information provided in this bill, please call ——————— at ———————. If, after discussing the bill with him/her, you still have concerns about this bill, you may call the (State Bar Grievance Committee) at ———————. If you dispute the amount of a bill, your lawyer may not withdraw the disputed amount from a client trust account until the dispute is resolved.

7) *Billable activities.* Unless parties contract otherwise in writing,

---

[364] *See supra* notes 240-43 and accompanying text (regarding current practices as to non-contemporaneous time records).

[365] *See supra* notes 244-45 and accompanying text (regarding current practices as to the explanation of bills).

a) Lawyers may bill clients for time spent:

(1) on work that calls for the professional judgment of a lawyer;

(2) conferring with other lawyers about a matter;

(3) traveling to and from a meeting or proceeding;

(4) administrative tasks such as filing which require familiarity with the legal issues in a case.

b) Lawyers shall not bill clients for time spent:

(1) taking breaks from work, eating meals, or sleeping;[366]

(2) socializing with a client in person or on the telephone;[367]

(3) keeping time records or explaining a bill to a client;[368]

(4) correcting errors made by firm personnel;[369]

(5) soliciting new business from existing clients or advising existing clients of new areas of possible work, unless or until the lawyer is retained to do work on the matter discussed;[370]

8) *Splitting time between two clients.* If a piece of work is done which benefits more than one client, the time shall be allocated between the clients' bills based on the degree of benefit to each, unless the clients have agreed to some other method of allocating time. If a task is to be billed to more than one client, that fact, and the percentage billed to each client, shall be explained in each bill.

Many lawyers will object that these rules are too onerous, that the record keeping would be too time consuming, and that they have good memories of how they spend their time and do not need to keep such detailed records. Even granting those arguments, however, lawyers' hourly rates are so high that clients are entitled to a detailed accounting. Given that the technology is available to allow efficient and detailed time records to be kept, sloppy timekeeping is inexcusable.

Some lawyers might object that greater disclosure will multiply

---

[366] *See supra* text accompanying note 249 (regarding the practice of billing for non-productive time).

[367] *See supra* text accompanying notes 251-53 (concerning one lawyer's implication that he would have billed a client for a social lunch had the client not jokingly warned him not to bill for that time).

[368] *See supra* note 235 (regarding the billing of clients for time spent preparing bills).

[369] *See supra* text accompanying notes 279-83 (giving examples of work needed to correct lawyer errors).

[370] *See supra* text accompanying notes 267-70 (giving examples of instances in which lawyers advised existing clients of new areas of possible work).

the number of questions and objections to bills made by clients. That assertion is probably correct, and is part of the purpose of these rules. The fee charged should not be determined unilaterally by a lawyer without any opportunity for client review. Some clients may be in a poor position to evaluate how much work is necessary to accomplish a particular objective. For this reason, lawyers who expect their clients to pay for the time it takes to do a piece of work should be prepared to explain to them what work was done and why it was necessary.

### 2.  Lawyers' Representations Regarding Expertise

The lawyers interviewed reported frequent deceit of clients about the lawyers' expertise in a field. Again, the rules in this area include only general prohibitions.[371] Some states have imposed certification requirements for lawyers who wish to hold themselves out as specialists in particular fields.[372] These rules do not explicitly require lawyers to be accurate in telling clients about their knowledge and experience; much of the puffing that lawyers do would not rise to the level of holding oneself out as an expert.

The inclination to puff is certainly predictable in any profit-oriented business. Many lawyers argue that puffing is harmless as long as clients do not have to pay for the extra time the lawyer takes to acquire expertise. Other lawyers note that many lawyers do bill for study time, regardless of the representations they have made to clients about their expertise. Moreover, because lawyers are fiduciaries, and expensive ones at that, clients are entitled to know the extent of their lawyers' expertise.

Some clients, if they were to receive accurate information, might choose to seek other legal representation; others might accept that the lawyer has some background work to do. Once the client knows the extent of the lawyer's knowledge, the lawyer and client can negotiate whether or not the client should pay for the lawyer's acquisition of new knowledge. Lawyers should have an affirmative duty to dis-

---

[371] *See* MODEL CODE DR 2-105 ("A lawyer shall not hold himself out *publicly* as a specialist" except in certain specified situations (emphasis added)); MODEL RULE 7.4. The Model Rules appear to apply to both public and private communication concerning specialization or expertise; however, like the Model Code, Rule 7.4 deals with which specialties may be advertised, and not with the accuracy of particular information offered with regard to specialization.

[372] *See* Morgan, *supra* note 48, at 718 (criticizing these rules as merely reducing the number of people holding themselves out to do particular work which in turn will reduce a potential client's "range of choice"). .

close accurately the extent of their expertise. To create such an explicit duty the Model Rules could be amended as follows:

> RULE 7.4 Communication of Fields of Practice[373]
>
> (b) *Expertise*
>
> 1) *Disclosure.* In discussing prospective work, a lawyer shall inform each client of the precise extent of his or her expertise in the area in which the work is to be performed. The lawyer shall offer information regarding the extent of his or her knowledge, or the knowledge of others in his or her firm, of the laws and regulations that bear on the issue, of the procedural rules that govern the proposed action, and of any technical knowledge (e.g., medical, scientific, or economic) required. The lawyer shall provide accurate information concerning the number and type of related cases that the individual lawyer has handled, and that the firm has handled. If known, the lawyer shall provide information about whether other firms have had more experience in the area in question.
>
> 2) *Acquisition of expertise.* A lawyer shall explain to each client what aspects of the relevant law are familiar to the lawyer and what aspects must be researched. A lawyer shall explain at the outset that clients will be billed for any research required.

### 3. Advising Clients About Possible Additional Work

Many of the lawyers interviewed reported that they have deceived present clients while trying to solicit new business from them. Successful solicitation is extremely profitable for firms that represent large corporate clients because there is almost no limit to the number and variety of activities that could be undertaken on behalf of such clients.

One lawyer argued that corporate clients who already pay exorbitant legal fees and who use in-house counsel to deal with outside lawyers fully understand that lawyers have a financial interest in expanding the relationship.[374] On the other hand, many clients trust their lawyer's judgment and do not understand their legal problems as well as their lawyers do. Even if the client's representative is an in-house attorney, outside counsel may ultimately control the legal activities the client pursues because the client gives weight to outside counsel's expertise in specific areas of law.

In addition, judgments about the necessity of certain legal serv-

---

[373] The existing Model Rule 7.4 would be redesignated as subsection (a), parts (1), (2), (3).

[374] *See supra* notes 269-70 and accompanying text.

Ex. 57 pg.97 of 103

ices are extremely subjective. Assessing the potential benefit of a piece of work to a client is complex and often requires a grasp of information known only by the lawyer. In the case of comments on a proposed agency rule, one obvious consequence of a client's decision to file such comments is the thousands of dollars of fees that the lawyer will earn. To reduce lawyers' profit motivation, and to enable clients to rely on the candor of their lawyers' advice, the legal system should prohibit lawyers from recommending action unless they are convinced that such action would benefit the client.[375] A proposed formulation of such a rule follows:

> RULE 7.35 Solicitation of New Business From Existing Clients[376]
>
> a) A lawyer shall not suggest to a present client legal action additional to that already undertaken unless the lawyer is personally convinced that retaining the lawyer to undertake such additional action would be so beneficial that the cost of the services would be an appropriate investment. The lawyer must disclose all factors that might reduce the benefit of the proposed work to the client.
>
> b) In making compensation and promotion decisions, a law firm may not sanction a lawyer for advising a client that a particular action probably will not be beneficial.

### 4.   Communicating With the Client

Lawyers often avoid speaking with their clients if they have not accomplished work they promised to do, or if they have made errors they do not wish to disclose. Patterns of avoidance behavior appear in the disciplinary cases,[377] as well as in the interviews for this Arti-

---

[375] Another possible method of eliminating deception in this area would be to prohibit lawyers from soliciting business from present clients unless the work recommended was directly relevant to the objectives for which the client has retained the lawyer. Indeed, most regulation of solicitation is designed to protect clients from their lawyer's avaricious motivations. The main drawback to this alternative is that many clients rely on their attorneys to notify them of matters that might be of interest to them.

[376] Proposed Rule 7.35 would be a new rule with no current analogue in the Model Rules. It would follow Rule 7.3, which concerns solicitation of prospective clients.

[377] *See, e.g.,* Spindell v. State Bar, 13 Cal. 3d 253, 260, 530 P.2d 168, 173, 118 Cal. Rptr. 480, 485 (1975) (stating that "[f]ailure to communicate with, and inattention to the needs of, a client are proper grounds for discipline"); Florida Bar v. Peterman, 306 So. 2d 484, 486 (Fla. 1975) (suspending a lawyer for refusing to update clients on their case and to return phone calls); *In re* Disciplinary Action Against Kolbinger, 417 N.W.2d 615, 616 (Minn. 1988) (holding that an attorney

cle.[378] Although many lawyers perceive this type of deception as trivial, avoiding clients may deprive them of adequate service. If the client knew about the deception, he or she might demand better service or might fire the lawyer and look for a better one. Deception to cover delays is unnecessary; in most cases, the lawyer could be candid with a client about a delay in completion of work and not suffer adverse consequences.

Even when lawyers do not avoid their clients, they often fail to provide information that the client might want to know. If the lawyer knows that a client wants certain information relating to a case, and that the information might affect the client's conduct, then the withholding of that information is deceptive. Model Rule 1.4 might be amended as follows to deal with both of these problems:

> RULE 1.4 Communication[379]
>
> (c) A lawyer shall respond to a client call within two business days after receiving it, or shall make arrangements for a partner or an employee to respond to the call within that time period.
>
> (d) A lawyer shall inform a client of all matters relating to representation which, if known to the client, might cause the client to alter his or her course of conduct.[380]
>
> (e) In discussing progress on a matter with a client, a lawyer shall disclose any errors made by the law firm or the lawyer, and shall disclose any failure to progress on work and the reasons for the delay. A lawyer shall not represent to a client that the lawyer has done work that the lawyer has in fact not done.
>
> (f) A lawyer shall not withhold information from a client to serve the lawyer's own interest or convenience.[381]

### 5.  Duty to Confront Lawyers Violating Disciplinary Rules

The current disciplinary rules in most states attempt to enforce

---

who, among other things, failed to adequately communicate with his client and also failed to respond to the client's request that he return the client's file, should be placed on probation); *In re* Gill, 114 N.J. 246, 252, 553 A.2d 1337, 1340 (1989) (holding that a lawyer violated the Model Code when he avoided all communication with his client because he had failed to pursue the client's interests diligently.

[378] *See supra* notes 323-24 and accompanying text.

[379] The addition of these subsections would require the deletion of that part of subsection (a) of present Rule 1.4 dealing with prompt responses to requests for information. The remainder of subsection (a), however, would remain unaltered.

[380] This language is adopted from Spector v. Mermelstein, 361 F. Supp. 30, 40 (S.D.N.Y. 1972), *modified on other grounds*, 485 F.2d 474 (2d Cir. 1973).

[381] This language is drawn from the comments to current MR 4.1, but makes self-interested withholding of information a disciplinable offense.

Ex. 57 pg.99 of 103

the rules by making lawyers assume the role of private attorneys general. Specifically, the rules require lawyers to report other lawyers to the bar grievance committee.[382] These rules are notoriously ineffective.[383] Lawyers do not wish to jeopardize the careers of other lawyers, the reputations of other law firms, or their relationships with colleagues. To report a fellow lawyer, even when these constraints are absent and the violation in question is serious, is a violation of a professional norm that frustrates effective enforcement of the disciplinary rules.

The disciplinary system cannot rely on clients as the sole source of reports of ethical violations. The people most likely to know of violations of ethical rules are other lawyers.

Instead of requiring lawyers to report violations to the bar grievance committee, the Model Rules should require a lawyer who learns of an ethical violation to confront the violator. The Rules should require a lawyer to report a violator to the bar only if the violator fails to take adequate corrective measures. A similar duty of confrontation is part of the ethical code used in the field of clinical psychology.[384] A draft of such a provision follows:

> RULE 8.3 Confronting and Reporting Professional Misconduct[385]

---

[382] *See* MODEL CODE DR 1-103; MODEL RULE 8.4. *But see* D.C. CODE OF PROFESSIONAL RESPONSIBILITY DR 1-103 (1989) (requiring an attorney with knowledge of misconduct on the part of another lawyer to disclose it only upon the request of a court or other authorized authority).

[383] For example, at a 1985 continuing legal education class on ethics in West Virginia, I polled an audience of about one hundred lawyers with regard to the number of violations of disciplinary rules that they had witnessed, and the number that they had reported to the bar grievance committee. Most of the lawyers present reported that they had witnessed many violations of the disciplinary rules. Not one of the lawyers in the room had ever reported any violation of a disciplinary rule to the bar grievance committee.

[384] The psychologists' ethical code is written in non-mandatory language, but encourages psychologists to confront their colleagues when they notice problems:

> When psychologists know of an ethical violation by another psychologist, and it seems appropriate, they informally attempt to resolve the issue by bringing the behavior to the attention of the psychologist. If the misconduct is of a minor nature and/or appears to be due to lack of sensitivity, knowledge, or experience, such an informal solution is usually appropriate. Such informal corrective efforts are sensitive to any rights to confidentiality involved. If the violation does not seem amenable to an informal solution, or is of a more serious nature, psychologists bring it to the attention of the appropriate local, state, and/or national committee on professional ethics and conduct.

AM. PSYCHOLOGICAL ASS'N, ETHICAL PRINCIPLES OF PSYCHOLOGISTS 8 (1981).

[385] This proposal would replace subsection (a) of the present Model Rule 8.3.

(a) A lawyer who becomes aware of a violation of a disciplinary rule by another lawyer shall confront the other lawyer, inform her of the alleged violation, and suggest measures that might correct or mitigate the violation. If the lawyer in violation is in a supervisory position over the confronting lawyer, the latter may elect to inform another senior lawyer in the firm of the violation. In this case, the reporting lawyer may pass the duty of confrontation to the more senior lawyer. If the violator fails to take adequate steps to correct or mitigate the damage that the violation of the disciplinary rule has caused, the confronting lawyer shall report the violation to the bar grievance committee.

## CONCLUSION

Having said that I did not set out to find out how much of what kind of deception is perpetrated by lawyers against their clients, I must, in concluding, articulate a tentative opinion that is the product of my conversations. Almost every time I talk with a practicing lawyer or a law student about this Article, the person tells me another story about lawyer deception of clients.[386] Occasionally I talk with a lawyer who reacts instead by getting angry with me for writing this Article. Most recently, I talked with two lawyers who upon learning of my topic, inquired anxiously whether I had spoken to anyone at either of their law firms. This experience leaves me feeling that I have told only the beginning of a longer story.

On the other hand, I look back over my notes from the interviews and see many stories that I did not include because they were almost identical to stories already in the text. When I asked the lawyers I interviewed about padding bills, doing unnecessary work, concealing errors, or any number of other issues, the responses became predictable. Most of the lawyers had done these things, sometimes often. Most were at least somewhat worried about the deception, but didn't feel they had good alternatives.

The lawyers' problems tended to be grouped according to firm size, with the solos and small firm lawyers working to make ends meet, and the large firm lawyers struggling to produce time sheets that would generate enough dollars to satisfy their supervisors.

Many of the lawyers I talked with told me stories about other lawyers that were truly outrageous. Most of the large firm lawyers I talked to were associates; the most frightening stories are the ones of

---

[386] Any reader who wishes to share a story or two may write me at The Catholic University of America, Columbus School of Law, Washington, DC 20064.

Ex. 57 pg.101 of 103

major fraud and conversion perpetrated by partners in large firms,[387] and the stories of pervasive overbilling in an effort to meet the firm minimums.[388] Premium billing is part of this picture as well—the firms are experimenting with abandoning the limited accountability that is provided to clients by hourly billing.[389]

It is possible that I talked with atypical lawyers from atypical firms, and that another set of interviews would produce a different picture. I have no doubt that there are lawyers whose standards of integrity would not allow them to deceive their clients, even if others around them were doing so. But in the contemporary world of law practice, there is pressure on those standards. Most of the stories I was told are partly a response to that pressure.

A tentative set of recommendations for changes in the code of professional ethics that governs lawyers is a necessary part of the solution to what appears to be a serious and pervasive problem in the profession, but it is not enough. The legal profession is becoming increasingly competitive and intense.[390] This makes it more difficult for lawyers to be honest with their clients or their colleagues. They must work outrageous hours in order to produce work more quickly than ever before. In addition, lawyers face intense pressure to bring in business. The subculture of the law firm does not put much emphasis on truthfulness as a value. In large firms, earning money is valued above all else. Lawyers give up their private lives, consoling themselves with lavish salaries, perks, and fringe benefits. The pressure and the isolation combine to compel lawyers to accept deception to whatever extent it is accepted in the firm, so that lawyers come to believe, in Nietzsche's words, that "lies are necessary in order to live." The structure of the work in large law firms places large firms on an institutional collision course with many humanistic values such as truthfulness and altruism.[391] What would it take to

---

[387] *See, e.g., supra* note 216 (Winston Hall's story about "the fraud," who chronically billed large numbers of hours he had not worked).

[388] *See, e.g., supra* note 209 (Michael Williams' description of the cavalier attitude in his firm toward hourly billing of wealthy clients).

[389] *See supra* notes 229-30 and 361 and accompanying text.

[390] *See* text accompanying notes 52-62.

[391] One study of 270 Maryland lawyers reported that *one third* of the lawyers were uncertain about continuing in law practice for the rest of their careers. The most common problems mentioned were the negative public image of lawyers, the high cost of services, case overloads, insufficient time for a personal life, and the excessive business orientation of law firms. *See Survey Reveals Disturbing Truth: Lawyers Unhappy with Profession,* B. LEADER, Mar.-Apr. 1989, at 22-23. Others may leave their firms because they dislike the pressure, or because they do not like being ordered around. One lawyer interviewed for the Maryland study stated that, "the pressure of

make the law firms change their deceptive practices? Part of the answer is client demands for change. In some of the most blatant cases of overbilling, clients are contesting lawyer's bills.[392] When these cases are publicized, other firms undoubtedly become more careful.

Another part of the answer must lie in the justice system. Disciplinary action may provide a deterrent to some types of ethical misconduct, but some lawyers who steal from their clients should go to jail. Others should be relieved of some of their ill-gotten gains in malpractice actions. As clients become more alert to and more skeptical of some of the things their lawyers tell them, some misconduct will be exposed, and some will be deterred. Many lawyers, however, will continue to deceive their clients, and many clients will continue to mistrust their lawyers.

New disciplinary rules alone will not correct the institutional problems that erode lawyers' ability to value truthfulness, but they can initiate the process and set the standards. Law firms need to reevaluate the work environments that they create for their lawyers, and to decide how much deception they wish to tolerate or tacitly encourage. In a field in which the touchstone is self-regulation, externally imposed rules can solve only some of the problems.

---

getting and keeping clients, marketing, collecting fees . . . are great. I don't want to be under this kind of pressure for the rest of my life." *Id.* at 22. These pressures are apparently taking their toll on lawyers, as 40,000 currently leave the profession each year. *See* Margolick, *Alienated Lawyers Seeking—and Getting—Counsel in Making the Transition to Other Careers,* N.Y. Times, Feb. 10, 1989, at B7, col. 1. The number of new lawyers entering the profession is, coincidentally, also 40,000. *See id.* Many of those who stay are unhappy, and would prefer a different type of work environment.

[392] Recently, for example, Kirkland & Ellis tried to charge $957,099.05 for representing the estate of the owner of a football team. Seventy-seven people worked on the case. The judge thought that was too many and too much, and cut the fee in half. Sidley & Austin tried to charge $2.6 million to an insurance company for work that had been estimated at $496,000 to $628,000. The firm settled for a lesser amount. *See* Margolick, *At the Bar,* N.Y. Times, July 7, 1989, at B5, col. 1.