# Youthful Offenders in the Federal System

**UNITED STATES SENTENCING COMMISSION**



Ex. 59 pg.1 of 71

## United States Sentencing Commission

One Columbus Circle, N.E.
Washington, DC 20002
www.ussc.gov

**William H. Pryor, Jr.**
*Acting Chair*

**Rachel E. Barkow**
*Commissioner*

**Charles R. Breyer**
*Commissioner*

**Danny C. Reeves**
*Commissioner*

**J. Patricia Wilson Smoot**
*Ex Officio*

**Jonathan J. Wroblewski**
*Ex Officio*



**Kenneth P. Cohen**
*Staff Director*

**Glenn R. Schmitt**
*Director*
*Office of Research and Data*

**May 2017**

Ex. 59 pg.3 of 71

# Table of Contents

I.      **Introduction**.................................................................................**1**

        Key Findings.........................................................................2

        Youthful Offenders, Sentencing Guidelines, and Policy...................3

II.     **Background**..................................................................................**5**

        Age, Criminal Culpability and Case Law.......................................5

III.    **Methodology**...............................................................................**9**

        Methodology for Analysis of Career Offenders.............................10

        Methodology for Analysis of Offenses Committed Prior to Age 18. 11

IV.     **Offender Group**........................................................................**13**

        Demographics.....................................................................13

        Youthful Offenders and District Analysis....................................18

V.      **Offense Types**...........................................................................**21**

VI.     **Common Offenses**....................................................................**25**

        Drug Offenses......................................................................25

        Immigration Offenses............................................................26

        Firearms Offenses................................................................28

        Offense Types for Native American Youthful Offenders...................29

VII.    **Sentencing of Youthful Offenders**..............................................**31**

        Criminal History...................................................................32

        Special Coding Project on the Impact of Offenses Committed
        Prior to Age 18 on Criminal History.........................................35

        Sentencing Analysis..............................................................37

VIII.   **Other Sentencing Analysis**.......................................................**43**

        Chapter Three Adjustments....................................................43

        Career Offenders and Armed Career Offenders............................45

        Life Sentences....................................................................48

IX.     **Recidivism**...............................................................................**49**

X.      **Conclusion**..............................................................................**51**

XI.     **Endnotes**................................................................................**53**

XII.    **Appendix**................................................................................**61**

Ex. 59 pg.5 of 71

Ex. 59 pg.6 of 71

# Youthful Offenders in the Federal System

## Introduction

Although youthful offenders account for about 18 percent of all federal offenders sentenced between fiscal years 2010 and 2015, there is little current information published about them.  In this publication, the United States Sentencing Commission ("the Commission") presents information about youthful offenders, who for purposes of this report are defined as persons age 25 or younger at the time they are sentenced in the federal system.

Recent studies on brain development and age, coupled with recent Supreme Court decisions recognizing differences in offender culpability due to age, have led some policymakers to reconsider how youthful offenders should be punished.  This report reviews those studies and provides an overview of youthful federal offenders, including their demographic characteristics, what type of offenses they were sentenced for, how they were sentenced, and the extent of their criminal histories.[1]  The report also discusses the intersection of neuroscience and law, and how this intersection has influenced the treatment of youthful offenders in the criminal justice system.

The Commission is releasing this report as part of its review of the sentencing of youthful offenders.  In June 2016, the Commission's Tribal Issues Advisory Group (TIAG) issued a report that proposed several guideline and policy

**Monica Robbers, Ph.D**
Deputy Director
Office of Research & Data

**Jason Grago, M.A.**
Research Associate
Office of Research & Data

changes relating to youthful offenders, including departure provisions and alternatives to incarceration.[2]  Because many of the TIAG recommendations on this topic apply to all youthful offenders, and not just Native Americans, the Commission voted to study the treatment of youthful offenders as a policy priority for the 2016-2017 amendment cycle.[3]

## Key Findings

The key findings in this report are that:

- There were 86,309 offenders (18.0% of the federal offender population) age 25 or younger sentenced in the federal system between 2010 and 2015.

- The majority (57.8%) of youthful offenders are Hispanic.

- There were very few youthful offenders under the age of 18 sentenced in the federal system (52 between 2010 and 2015).

- Almost 92 percent of offenses committed by youthful offenders were non-violent offenses.

- Similar to the overall federal offender population (or non-youthful offenders group) the most common offenses that youthful offenders committed were drug trafficking (30.9%), immigration (28.6%), and firearms offenses (13.7%).

- The average sentence for youthful offenders was 34.9 months.

- Youthful offenders were more likely to be sentenced within the guidelines range than non-youthful offenders (56.1% compared to 50.1%).

- Youthful offenders recidivated at a much higher rate than their older counterparts—about 67 percent versus 41 percent.

2

## Youthful Offenders, Sentencing Guidelines, and Policy

Consideration of a defendant's youthfulness at sentencing is not new. In 1950, the Youth Corrections Act[4] (YCA) was passed to provide guidance to federal judges when sentencing a "young offender" under the age of 22, and a "young adult offender" between the ages of 22 and 26, that included segregation from adult offenders in prison and alternatives to imprisonment, such as rehabilitation and treatment.[5]

The YCA was repealed when Congress enacted the Sentencing Reform Act in 1984.[6] Opponents asserted that youthful offenders were recidivating at higher levels than expected, and that segregation of offenders by age led to more problems in prisons, not fewer.[7] While the exact number of youthful offenders sentenced under the YCA is unknown, at the time Congress repealed the YCA in 1984, over 750 federal prisoners were serving YCA sentences.[8] The legislation that created the Commission, the Sentencing Reform Act of 1984,[9] included two directives that give context to how youthful offenders are sentenced in the federal system. Congress directed the Commission, in establishing categories of defendants for use in the guidelines and policy statements, to consider whether certain enumerated factors—including a defendant's age—"have any relevance to the nature, extent, place of service, or other incidents of an appropriate sentence, and shall take them into account only to the extent that they do have relevance."[10] Congress also gave the Commission the authority to "study the feasibility of developing guidelines for the disposition of juvenile delinquents."[11]

The Commission implemented those congressional directives in a number of ways that are relevant to youthful offenders. First, the guidelines expressly do not apply to a defendant sentenced under the Federal Juvenile Delinquency Act (18 U.S.C. §§ 5031-5042).[12] Nonetheless, the guidelines are relevant to the sentencing of such offenders because the sentence imposed on a juvenile delinquent generally may not

Ex. 59 pg.9 of 71

exceed the maximum of the guideline range applicable to an otherwise similarly situated adult defendant.[13]

Next, the guidelines treat prior sentences for juvenile offenses differently than prior adult offenses in determining the defendant's Criminal History Category.[14] Specifically, if the defendant was convicted as an adult for an offense committed before age 18 and received a sentence exceeding one year and one month, the sentence is counted so long as it was imposed, or resulted in the defendant being incarcerated, within fifteen years of the defendant's commencement of the instant offense.[15] All other sentences for offenses committed prior to age 18 are counted only if the sentence was imposed within five years of the defendant's commencement of the instant offense or within five years of the defendant's release from incarceration for the offense, if the defendant was incarcerated for at least 60 days.[16] Furthermore, certain offenses, including "juvenile status offenses and truancy," and diversionary dispositions from juvenile court are never counted in a criminal history calculation.[17]

Finally, in a relatively recent change, the Commission has recognized the role youth may have at sentencing. Specifically, §5H1.1 provides that age—including youth—

> "may be relevant in determining whether a departure is warranted, if considerations based on age, either individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines. . . ."[18]

Until 2010, the guidelines had provided that age—including youth—was "not ordinarily relevant" in determining whether a departure from the guidelines was warranted.[19] The Commission adopted this less restrictive departure standard "after reviewing recent federal sentencing data, trial and appellate court case law, scholarly literature, public comment and testimony, and feedback in various forms from federal judges."[20]

<div style="background-color:green; color:white;">

# Background

</div>

## Age, Criminal Culpability, and Case Law

Traditionally, youthful offenders often have been defined as those under the age of 18, but for purposes of this study, the Commission has defined youthful offenders as federal offenders 25 years old or younger at the time of sentencing.[21] The inclusion of young adults in the definition of youthful offenders is informed by recent case law and neuroscience research in which there is a growing recognition that people may not gain full reasoning skills and abilities until they reach age 25 on average.

The Supreme Court first discussed the issue of age and culpability in *Thompson v. Oklahoma*[22] where the Court prohibited the death penalty for youth under the age of 16, under the Eighth Amendment. The Court held that offenders under the age of 16 have decreased criminal culpability due to less education, experience, intelligence, and increased peer pressure than offenders over the age of 16. Later, in *Atkins v. Virginia*,[23] the Court recognized the contributing link between reasoning skills and brain function, and prohibited the death penalty for individuals with mental retardation—even if the defendant knew the difference between right and wrong.

In *Roper v. Simmons*,[24] the Court abolished the death penalty for juveniles altogether, and it is notable that the defendant's claim of decreased culpability was bolstered by *amicus* briefs filed by the American Psychological Association (APA) and the American Medical Association (AMA). In *Graham v. Florida*,[25] the Court banned the imposition of

sentences of life imprisonment without the possibility of parole (LWOP) for offenses other than murder, citing youths' relative immaturity in higher order brain functioning as contributing to poor impulse control, diminished risk avoidance and underdeveloped moral reasoning.[26]  Two years later in *Miller v. Alabama*,[27] the Court held LWOP was unconstitutional for juveniles regardless of the offense.  In 2016, the Court decided this ruling was substantive, and thus the decision became retroactive, allowing the resentencing of offenders who had been sentenced as juveniles to LWOP prior to *Miller*.[28]

The contribution that neuroscience has made to the study of youthful offending is significant and continues to evolve.  That research has focused on the prefrontal cortex of the brain, which is located at the front of the frontal lobe and is the last part of the brain to fully develop.  The prefrontal cortex is utilized in impulse control, emotional reactions, executive function and decision making.[29]  Development of the prefrontal cortex involves both biology and sociocultural experiences.  Focusing on the biological development of the brain, numerous studies using Magnetic Resonance Imaging (MRI) of the brain show that the brain goes through two major processes during adolescence and into young adulthood: (1) synaptic pruning, which involves the strengthening of important or often-used neural connections, and the discarding of infrequently used synapses; and (2) the myelination of the frontal lobe, which refers to the addition of the myelin sheath to the axiom of neurons that allows for faster and more complex brain functions.  Neuroscientists refer to the former process as the whitening of brain matter; pruning reduces gray brain matter.  People at different stages of these processes have different brain structures and functions compared to people who have fully developed brains.[30]

Ex. 59 pg.12 of 71

Among the landmark studies in brain development is a 2005 meta-analysis of all studies completed through 2004 on frontal lobe development and maturation.[31] The authors established a model of frontal lobe development to suggest that maturation is completed in the mid-20s. Another study compared frontal lobe contributions to cognitive control in children and adults. The results indicated clear differences in the ways and extent to which the frontal lobe was used in decision making.[32] More recent studies also account for the confounding effect of marijuana and alcohol use on the adolescent brain and its development, with results indicating further delays in brain development among youth and young adults with substance use histories.[33]

In light of the science discussed above, there has been significant debate among policymakers regarding the age at which a person should be held responsible for their actions because of different stages of brain development and this debate has also played out in scientific literature. However, there are a number of points on which researchers in this area generally agree. First, researchers agree that the prefrontal cortex is not complete by the age of 18, which is the legal age of majority in most state jurisdictions and in the federal system.[34] Second, researchers agree that development continues into the 20s.[35] Third, most researchers reference 25 as the average age at which full development has taken place, but note there will be significant variation from person to person.[36] Finally, researchers caution against the over-generalization of brain science.

Ex. 59 pg.13 of 71

Ex. 59 pg.14 of 71

Unlawful Offenders in the Federal System: Fiscal Years 2010 to 2015

# Methodology

The Commission collects and analyzes data on federal sentences to support its various activities. As authorized by Congress, the Commission's numerous research responsibilities include: (1) the establishment of a research and development program to serve as a clearinghouse and information center for the collection, preparation, and dissemination of information on federal sentencing practices; (2) the publication of data concerning the sentencing process; (3) the systematic collection and dissemination of information concerning sentences actually imposed and the relationship of such sentences to the factors set forth in section 3553(a) of title 18, United States Code; and (4) the systematic collection and dissemination of information regarding the effectiveness of sentences imposed.[37]

The Commission maintains a comprehensive, computerized data collection system which forms the basis for its clearinghouse of federal sentencing information and which contributes to the agency's research mission. The chief judge of each district is required to ensure that within 30 days of entry of judgment in a criminal case, the sentencing court submits a report of sentence to the Commission that includes: (1) the judgment and commitment order; (2) the written statement of reasons; (3) any plea agreement; (4) the indictment or charging document; (5) the presentence report (PSR); and (6) any other information the Commission requests.[38]

Commission staff then extract and code data from these documents into various databases. It should be noted that this data collection process is dynamic rather than static. When research questions arise, the Commission either analyzes existing data or adds information to its data collection system.

For purposes of this report, the Commission created a study group of all 86,309 youthful offenders sentenced from fiscal year 2010 to fiscal year 2015. The dataset includes demographic variables, statutory information, the sentencing guideline decisions made by the court, the sentences imposed, and the reasons given for any departure or variance from the advisory guideline sentencing range. A "case" is defined as one sentencing event for an individual defendant. More information on the data collection process can be found in the Commission's annual *Sourcebook of Federal Sentencing Statistics*.[39]

## Methodology for Analysis of Career Offenders

To provide a more detailed picture of the 689 youthful career offenders in this study group, a special coding project was undertaken. The criminal histories of all of these offenders were examined and the predicate offenses leading to their designation as career offenders were coded as either: violent offenses, drug offenses, mixed, or missing.[40] If the PSR did not state what the predicates were, the case was coded as missing. Then, the cases were matched with the type of instant offense to determine whether the career offender was a violent offender, a drug offender, or mixed. Results from this analysis appear on page 45 of this report.

## Methodology for Analysis of Offenses Committed Prior to Age 18

To gain a better understanding of how juvenile adjudications influence criminal history calculations under the sentencing guidelines, the Commission undertook a special coding project involving youthful offenders in 2016. As part of that project Commission staff reviewed sentencing data from a 20 percent random sample of youthful offenders who were sentenced in fiscal year 2015 and for whom presentence reports were submitted to the Commission. The demographics of this study group of 1,987 offenders mirrored the demographics of the youthful offender population as a whole. As part of the special coding project, Commission staff collected information about all offenses these persons committed prior to the age of 18. This data included any contacts with law enforcement, all criminal history (whether juvenile adjudications or criminal convictions), and how that criminal history impacted the criminal history categories assigned to these offenders under the sentencing guidelines when they were sentenced for a federal offense.[41] Included in this report on page 35 is a discussion of the results of that special coding project.

<div style="background-color:green;color:white;">

# Offender Group

</div>

## Demographics

This section describes the demographics of the youthful offenders studied in this report.  Between 2010 and 2015, a total of 481,194 offenders were sentenced in federal courts for a felony or class A misdemeanor.[42]  Of these, 393,270 were offenders over the age of 25 and 86,309 were youthful offenders.[43]  There was a steady decline in the number of youthful offenders sentenced each year (see Figure 1), such that from 2010 to 2015 there was a 26.7 percent decrease

Figure 1. Number of Youthful Offenders Sentenced in the Federal System
*Fiscal Years 2010 to 2015*



*SOURCE: U.S. Sentencing Commission, 2010 - 2015 Datafiles, USSCFY10 - USSCFY15.*

Ex. 59 pg.19 of 71

in youthful offenders sentenced.[44]  This reflects a smaller decline in the federal offender population overall.  Youthful offenders consistently made up between 17 and 20 percent of the total federal offender population each year during this time period.

Figure 2. Gender of Offenders Sentenced in the Federal System *Fiscal Years 2010 to 2015*



SOURCE: *U.S. Sentencing Commission, 2010 - 2015 Datafiles, USSCFY10 - USSCFY15.*

The gender makeup of youthful offenders sentenced mirrors that of the federal offender population as a whole. Eighty-six percent of youthful offenders are male (see Figure 2).

Ex. 59 pg.20 of 71

Table 1. Age of Youthful Offenders Sentenced in the Federal System
*Fiscal Years 2010 to 2015*

| Age of Youthful Offenders | Number of Youthful Offenders | Percent of Youthful Offenders |
|---|---|---|
| 16 years | 13 | 0.0% |
| 17 years | 39 | 0.1% |
| 18 years | 2,226 | 2.6% |
| 19 years | 5,800 | 6.7% |
| 20 years | 8,809 | 10.2% |
| 21 years | 10,902 | 12.6% |
| 22 years | 12,699 | 14.7% |
| 23 years | 14,355 | 16.6% |
| 24 years | 15,211 | 17.6% |
| 25 years | 16,255 | 18.8% |
| **Total** | **86,309** | **100.0%** |

*SOURCE: U.S. Sentencing Commission, 2010 - 2015 Datafiles, USSCFY10 - USSCFY15.*

Youthful offenders sentenced in the federal system during this time period ranged in age from 16 to 25, with an average age of 22.4 years. As depicted in Table 1, only 52 offenders aged 16 and 17 were sentenced during this time period.[45] The number of offenders increased as offenders' age increased.

Ex. 59 pg.21 of 71

More than half (57.8%) of these offenders were Hispanic, 21.2 percent were Black, 17.1 percent were White, and 4.0 percent were some Other race (see Figure 3). This racial breakdown reflects that of the offender population as a whole. The citizenship of youthful offenders also reflects that, of the federal offender population as a whole, more than half (54.5%) are U.S. citizens.

**Figure 3. Race of Youthful Offenders Sentenced in the Federal System**
*Fiscal Years 2010 to 2015*



*SOURCE: U.S. Sentencing Commission, 2010 - 2015 Datafiles, USSCFY10 - USSCFY15.*

Ex. 59 pg.22 of 71

In light of the TIAG's recommendation to the Commission to study youthful offenders, the Commission also considered the number of Native American/Alaskan Native offenders in the study group.[46]  These offenders are usually grouped into the "Other race" category in Commission statistical compilations.  Among youthful offenders sentenced in the federal system between 2010 and 2015, 2,219 were Native American or Alaskan Natives, accounting for 2.6 percent of all federal youthful offenders.  They range in age from 17 to 25.[47]  The number of Native American/Alaskan Natives by age compared to Non-Native races appears below in Table 2.

Table 2. Number of Native American/Alaskan Natives & Non-Native Races by Age
*Fiscal Years 2010 to 2015*

| Age of Youthful Offenders | Native American/ Alaskan Natives | Non-Native Races |
|---|---|---|
| 16 years | 0 | 13 |
| 17 years | 9 | 30 |
| 18 years | 41 | 2,185 |
| 19 years | 168 | 5,632 |
| 20 years | 273 | 8,536 |
| 21 years | 349 | 10,553 |
| 22 years | 353 | 12,346 |
| 23 years | 338 | 14,017 |
| 24 years | 326 | 14,885 |
| 25 years | 362 | 15,893 |
| **Total** | **2,219** | **84,090** |

*SOURCE: U.S. Sentencing Commission, 2010 - 2015 Datafiles, USSCFY10 - USSCFY15.*

## Youthful Offenders and District Analysis

The districts with the largest number of youthful offenders in their caseloads were as follows: District of Arizona, Western District of Texas, Southern District of Texas, District of New Mexico, and Southern District of California.  These frequencies are depicted in Table 3.[48]

Table 3. Number of Youthful Offenders Sentenced by District *Fiscal Years 2010 to 2015*



| Top Five Districts Sentencing Youthful Offenders as Number of Cases |
| :---: |
| District of Arizona (N=11,802) |
| Western District of Texas (N=10,596) |
| Southern District of Texas (N=8,004) |
| District of New Mexico (N=5,792) |
| Southern District of California (N=5,582) |

*SOURCE: U.S. Sentencing Commission, 2010 - 2015 Datafiles, USSCFY10 - USSCFY15.*

Ex. 59 pg.24 of 71

The districts with the highest proportion of their overall caseload comprising youthful offenders were: District of Arizona (26.4%), District of New Mexico (25.7%), District of South Dakota (25.5%), Eastern District of Virginia (23.2%), and the District of Puerto Rico (23.0%). Table 4 depicts the proportion of cases and the frequency.

Table 4. Proportion of Youthful Offenders Sentenced by District
*Fiscal Years 2010 to 2015*

| Top Five Districts Sentencing Youthful Offenders as Proportion of Cases |
|---|
| District of Arizona 26.4% (N=11,802) |
| District of New Mexico 25.7% (N=5,792) |
| District of South Dakota 25.5% (N=718) |
| Eastern District of Virginia 23.2% (N=2,518) |
| District of Puerto Rico 23.0% (N=1,836) |

SOURCE: U.S. Sentencing Commission, 2010 - 2015 Datafiles, USSCFY10 - USSCFY15.

Ex. 59 pg.26 of 71

Youthful Offenders in the Federal System Fiscal Years 2010 to 2015

# Offense Types

This section describes the offense types most commonly committed by youthful offenders sentenced in the federal system and compares these offense types to offenses committed by older offenders.

The most common offenses committed by all offenders in the federal system are drug offenses, immigration offenses, firearms offenses, and fraud offenses. That pattern is also seen with youthful offenders. The most common offense types among youthful offenders are drug trafficking (30.9%), followed by immigration (28.6%), firearms (13.7%), fraud (5.4%), and simple drug possession offenses (5.2%). Youthful offenders were also sentenced for more serious crimes such as murder (0.1%), manslaughter (0.1%), kidnapping (0.1%), sexual abuse (0.7%), assault (1.3%), robbery (1.2%), burglary (0.2%), extortion and racketeering (1.3%), and child pornography (1.4%). Figure 4 depicts the main offense categories for youthful offenders. A complete table of offense types for youthful offenders can be found in Table A-2 of the Appendix.

Figure 4. Youthful Offenders in Each Primary Offense Category
*Fiscal Years 2010 to 2015*

*SOURCE: U.S. Sentencing Commission, 2010 - 2015 Datafiles, USSCFY10 - USSCFY15.*

There were some differences found in the top five categories of offense types for youthful offenders compared to all other offenders (26 years of age and older). For example, firearms offenses and simple drug possession offenses were more common among youthful offenders than older offenders.[49] Figure 5 depicts the main offense type comparisons between the two groups.

Figure 5. Offense Type Comparisons for Youthful & All Other Offenders
*Fiscal Years 2010 to 2015*



SOURCE: *U.S. Sentencing Commission, 2010 - 2015 Datafiles, USSCFY10 - USSCFY15.*

The vast majority (91.9%) of the federal offenses committed by youthful offenders in this study were non-violent, which is similar to the rate of non-violent offenses committed by older offenders (95.8%).[50]

Ex. 59 pg.30 of 71

<div style="background-color:#1a9850; color:white; padding:40px;">

# Common Offenses

</div>

The following subsections examine the three most common offenses for youthful offenders in more detail.

## Drug Offenses

As discussed earlier, the most common offenses for youthful offenders sentenced during 2010 to 2015 were drug offenses.[51]  The most common drug involved in these offenses was marijuana (39.6% of cases).  This was followed by methamphetamine, powder cocaine, crack cocaine, and heroin.  Table 5 depicts these frequencies.

### Table 5. Drug Type Among Youthful Offenders
*Fiscal Years 2010 to 2015*

| Drug Type | Number | Percent |
|---|---|---|
| Powder Cocaine | 4,709 | 15.7% |
| Crack Cocaine | 3,577 | 11.9% |
| Heroin | 2,556 | 8.5% |
| Marijuana | 11,929 | 39.6% |
| Methamphetamine | 5,523 | 18.4% |
| Listed Chemicals | 144 | 0.5% |
| Other | 1,658 | 5.5% |

*SOURCE: U.S. Sentencing Commission, 2010 - 2015 Datafiles, USSCFY10 - USSCFY15.*

Ex. 59 pg.31 of 71

Marijuana was the most common drug among youthful offenders, whereas powder cocaine was the most common among older offenders.  The second most common drug among youthful offenders was methamphetamine, while marijuana was second among older offenders.  Powder cocaine was the third most common drug type among youthful offenders and methamphetamine was third among older offenders.  Frequencies for drug type among other offenders is in Table 6.

Table 6. Drug Type Among All Other Offenders
*Fiscal Years 2010 to 2015*

| Drug Type | Number | Percent |
|---|---|---|
| Powder Cocaine | 27,483 | 23.7% |
| Crack Cocaine | 15,622 | 13.5% |
| Heroin | 10,280 | 8.9% |
| Marijuana | 26,854 | 23.2% |
| Methamphetamine | 26,236 | 22.7% |
| Listed Chemicals | 1,113 | 1.0% |
| Other | 8,222 | 7.1% |

*SOURCE: U.S. Sentencing Commission, 2010 - 2015 Datafiles, USSCFY10 - USSCFY15.*

## Immigration Offenses

The second most common offense among youthful offenders was immigration offenses.  The most common immigration offense was illegal reentry (74.3% of immigration cases).[52]  The second most common immigration offense committed by youthful offenders was alien smuggling (19.8%).  Less than one percent of youthful offenders were sentenced for an offense involving the trafficking in immigration documents, and 5.4 percent of youthful offenders were sentenced for an offense involving fraudulently acquiring immigration documents.

Ex. 59 pg.32 of 71

Among older offenders, the most common immigration offense was illegal reentry, accounting for more than 85 percent of all immigration cases for this group. The second most common immigration offense for older offenders was alien smuggling (8.9%), followed by fraudulently acquiring immigration documents (4.9%), and trafficking in immigration documents (less than 1%). The frequencies for both groups appear in Figure 6.

Figure 6. Immigration Offenses for Youthful & All Other Offenders
*Fiscal Years 2010 to 2015*



SOURCE: U.S. Sentencing Commission, 2010 - 2015 Datafiles, USSCFY10 - USSCFY15.

## Firearms Offenses

Approximately 14 percent of youthful offenders were convicted of a firearms offense, including offenses described in Part K of the *Guidelines Manual* or a violation of 18 U.S.C. § 924(c). Of all youthful offenders, 9.6 percent were sentenced under Part K of the *Guidelines Manual.*[53] These offenses ranged from unlawful receipt, possession or transportation of firearms to possession or discharge of a firearm on school property.

Of all youthful offenders, 4.7 percent were convicted of violating 18 U.S.C. § 924(c), which applies to the possession, brandishing, or discharge of a firearm during and in relation to a crime of violence or drug trafficking crime. This is almost double the percentage of section 924(c) offenders among older offenders (2.5%). Offenders convicted under section 924(c) are generally subject to a mandatory minimum penalty of five, seven, or ten years, which must be imposed consecutively to any other punishment imposed for the underlying crime of violence or drug trafficking crime. The vast majority (92.0%) of youthful offenders who received a section 924(c) sentence were convicted of one count of section 924(c). However, there were 325 youthful offenders (0.4% of all youthful offenders) who were convicted of two or more counts. Offenders convicted of second or subsequent counts under section 924(c) are subject to consecutive mandatory minimum penalties of 25 years or longer.

## Offense Types for Native American Youthful Offenders

The federal government has unique jurisdiction over offenses involving Native Americans in Indian Country. Specifically, the federal government has jurisdiction exclusive of the states over crimes committed in Indian Country by or against Native Americans[54] and over major felonies committed in Indian Country by a Native American against another Native American or other person.[55]  In some states (Alaska, California, Minnesota, Nebraska, Oregon, and Wisconsin, and others that opt in), jurisdiction over such crimes has been transferred from the federal government to the state government pursuant to Public Law 83–280 (commonly referred to as "PL 280").[56]  Those PL 280 states have jurisdiction exclusive of the federal government over crimes committed by or against Native Americans in specified areas in Indian Country within their respective state.[57]

In light of these unique jurisdictional provisions regarding crimes that occur in Indian Country, and given the TIAG's recommendation to study youthful offenders, the Commission separately examined the offenses committed by Native American/Alaskan Native youthful offenders.[58] The most common offense type among Native American/Alaskan Native youthful offenders was assault (29.4%), followed by drug trafficking (12.9%), sexual abuse (11.9%), firearms (9.4%), and manslaughter offenses (5.1%).  Among older Native American/Alaskan Native offenders, the most common offense type was drug trafficking (21.5%) followed by assault (19.2%), sexual abuse (10.4%), firearms (9.9%), and administration of justice offenses (6.3%).  Offense type frequencies for Native American/Alaskan Native Youthful offenders appear in Figure 7.

Figure 7. Offense Types for Native American/Alaskan Native Youthful Offenders
*Fiscal Years 2010 to 2015*



*SOURCE: U.S. Sentencing Commission, 2010 - 2015 Datafiles, USSCFY10 - USSCFY15.*

Ex. 59 pg.36 of 71

Youthful Offenders in the Federal System, Fiscal Years 2010 to 2015

# Sentencing of Youthful Offenders

This section of the report examines offender characteristics that help determine sentences, such as criminal history and the assignment of Criminal History Categories.

In the federal system, the federal sentencing guidelines provide a sentencing range in each case based on the severity of the offense and the offender's prior criminal history.  The advisory ranges are listed on a Sentencing Table, found in Chapter Five, Part A of the Commission's *Guidelines Manual*, and are sorted based on numerical offense levels and Criminal History Categories which, in turn, are derived from a score assigned to each offender in light of past sentences. The Sentencing Table is subdivided into four zones (A, B, C, and D) that determine confinement options for each sentencing range.  The four options, in increasing order of severity, are: probation only (*i.e.*, zero months of confinement); probation that includes a condition or combination of conditions, such as home or intermittent confinement; imprisonment followed by a term of supervised release with a condition or combination of conditions that substitute community confinement or home detention (split sentence); and imprisonment only.[59]

## Criminal History

An offender's prior criminal history is one of two key factors that determines the advisory guideline range under the sentencing guidelines.[60] Criminal history is expressed by a Criminal History Category ("CHC") based on the number of criminal history points assigned to an offender's prior sentences.[61]

The number of criminal history points assigned to an offender is determined, in general, by the length of the sentence or sentences imposed for prior convictions in state, local, or federal courts. Additional points are assigned if the defendant committed the instant offense while serving a sentence in another case (*e.g.*, the defendant was on probation or parole at the time of the federal offense).[62] There are some exceptions to these rules, such as prior convictions that fall outside of the prescribed time limits in the guidelines, and convictions for several types of minor offenses.

Particularly relevant to this report is that prior sentences from juvenile jurisdictions are generally excluded unless they occurred within five years of the instant offense.[63]

Because of inherently shorter criminal histories among youthful offenders, there was a larger number of CHC I youthful offenders than CHC I older offenders (57.1% vs. 44.3%). Thirteen percent (13.2%) of youthful offenders were in CHC II, almost the same proportion as older offenders (13.7%). CHC III also had very similar percentages for youthful and older offenders—16.3 percent of youthful offenders were classified in this category and 16.6 percent of older offenders. In CHCs IV and above, some differences between the two groups of offenders was observed.

For example, 7.4 percent of youthful offenders and 9.7 percent of older offenders were classified as CHC IV; 3.2 percent of youthful offenders and 5.8 percent of older offenders were classified as CHC V; and 2.8 percent of youthful offenders and 10.0 percent of older offenders were classified as CHC VI. Table 7 depicts the CHC comparison between youthful and older offenders.

Table 7. Criminal History Category of Youthful & All Other Offenders
*Fiscal Years 2010 to 2015*

|  | Youthful Offenders | | All Other Offenders | |
|---|---|---|---|---|
|  | N | % | N | % |
| **Criminal History Category I** | 47,077 | 57.1% | 170,903 | 44.3% |
| **Criminal History Category II** | 10,928 | 13.2% | 52,746 | 13.7% |
| **Criminal History Category III** | 13,415 | 16.3% | 63,808 | 16.6% |
| **Criminal History Category IV** | 6,137 | 7.4% | 37,402 | 9.7% |
| **Criminal History Category V** | 2,634 | 3.2% | 22,208 | 5.8% |
| **Criminal History Category VI** | 2,334 | 2.8% | 38,443 | 10.0% |

*SOURCE: U.S. Sentencing Commission, 2010 - 2015 Datafiles, USSCFY10 - USSCFY15.*

The number of criminal history points for youthful offenders ranged from zero to 60 (average=3; median=1). Results of Criminal History Category by offense type appear in Table 8.

Table 8 indicates that 67.4 percent of youthful offender drug traffickers were in CHC I.  For immigration offenses, 47.9 percent were in CHC I.  For some of the violent crimes not listed in the table, such as murder, more than half of offenders were in CHC I.  Among those offenders convicted of manslaughter (n=123), 81.3% were CHC I offenders.  Among those offenders convicted of sexual abuse (n=616), 67.9 percent were CHC I offenders.

Overall, 30,666 of the youthful offenders in the study group had zero criminal history points, 17,324 had between one and three criminal history points, 12,737 had between four and six criminal history points, and 10,450 youthful offenders had more than six criminal history points.

Table 8. Top 10 Offense Types by Criminal History Category for Youthful Offenders[64]
*Fiscal Years 2010 to 2015*

| Offense Type | Crim Hist Category I | Crim Hist Category II | Crim Hist Category III | ≥ Crim Hist Category IV | Total |
|---|---|---|---|---|---|
| Drug Trafficking | 17,950 67.4% | 2,994 11.2% | 3,243 12.2% | 2,457 9.2% | 26,644 |
| Immigration | 11,636 47.9% | 4,549 18.7% | 5,228 21.5% | 2,871 11.8% | 24,284 |
| Firearms | 3,347 28.8% | 1,466 12.6% | 2,828 24.4% | 3,975 34.2% | 11,616 |
| Fraud | 3,003 75.1% | 382 9.5% | 370 9.2% | 243 6.1% | 3,998 |
| Other[65] | 2,441 80.3% | 268 8.8% | 222 7.3% | 110 3.6% | 3,041 |
| Simple Drug Possession | 2,425 93.9% | 72 2.8% | 67 2.6% | 20 0.8% | 2,584 |
| Child Pornography | 1,066 85.8% | 87 7.0% | 71 5.7% | 19 1.5% | 1,243 |
| Extortion/Racketeering | 500 43.6% | 173 15.1% | 222 19.3% | 253 22.0% | 1,148 |
| Larceny | 865 75.6% | 109 9.5% | 100 8.7% | 71 6.2% | 1,145 |
| Assault | 646 59.8% | 159 14.7% | 148 13.7% | 128 11.8% | 1,081 |

*SOURCE: U.S. Sentencing Commission, 2010 - 2015 Datafiles, USSCFY10 - USSCFY15.*

Ex. 59 pg.40 of 71

34

## Special Coding Project on the Impact of Offenses Committed Prior to Age 18 on Criminal History

When considering the criminal history of youthful offenders, courts may consider offenses committed prior to the age of 18. In order to determine the impact of these offenses on the criminal history scores of federal youthful offenders, and as discussed more fully in the methodology section, the Commission reviewed the criminal history of a 20 percent random sample of youthful offenders sentenced in the federal courts in fiscal year 2015 in cases with complete sentencing documentation. This section presents the results of that review.

Of the youthful offenders in this sample, 57.3 percent had no contact with law enforcement[66] before the age of 18 noted in the sentencing documents related to their later federal sentence. Of those youthful offenders who did have one or more contacts with law enforcement before age 18 (which was 42.7 percent of all youthful offenders), 18.5 percent had one or more juvenile adjudications, 36.1 percent had one or more criminal convictions, and 26.0 percent had both juvenile adjudications and criminal convictions. The remaining 19.4 percent of the youthful offenders with law enforcement contacts had no criminal convictions or juvenile adjudications as a result of those contacts.

Under the sentencing guidelines, an offender's criminal history score may include points attributed to offenses committed prior to the age of 18, regardless of whether the offense was prosecuted as a criminal conviction (where the defendant was prosecuted as an adult under state law) or as a juvenile adjudication of delinquency. The Commission's review of the sample of youthful offenders also examined what portion of the offenders received criminal history points at the time of their federal sentencing due to a prior offense committed before the age of 18.

Approximately one-third (34.0%) of all youthful offenders

in the sample had contact with law enforcement officers for an offense committed before the age of 18 that resulted in a juvenile adjudication, criminal conviction, or both.  In 76.0 percent of these offenses, the youthful offender received one or more criminal history points in the calculation of the offender's criminal history score.  That is, 25.9 percent of all youthful offenders in the sample committed an offense before the age of 18 that was assigned points under the sentencing guidelines.  Those offenses contributed, on average, 3.0 points to the offender's criminal history score.

Of the 7.8 percent of the youthful offenders in the sample with only juvenile adjudications resulting from contact with law enforcement, 53.5 percent received one or more criminal history points as a result of those adjudications being considered in connection with the offenders' instant federal offense.  That is, 4.2 percent of all youthful offenders in the sample received criminal history points resulting only from juvenile adjudications.  These juvenile adjudications contributed, on average, 2.1 points to the offender's criminal history score.

Of the 15.2 percent of the youthful offenders in the sample with only criminal convictions for offenses committed before the age of 18, 75.9 percent received one or more criminal history points as a result of those convictions being considered in connection with the offenders' instant federal offense. That is, 11.6 percent of all youthful offenders in the sample received criminal history points resulting only from criminal convictions for offenses committed before the age of 18.  Those criminal convictions contributed, on average, 2.3 points to the offender's criminal history score.

Table 9. Average Sentence for Youthful & All Other Offenders
*Fiscal Years 2010 to 2015*

|  | Youthful Offenders | All Other Offenders |
|---|---|---|
| **Overall Sentences** | | |
| Average | 34.9 months | 45.3 months |
| Median | 15.0 months | 24.0 months |
| **Mandatory Minimum Penalty** | | |
| Average | 86.5 months | 107.9 months |
| Median | 60.0 months | 84.0 months |
| **No Mandatory Minimum Penalty** | | |
| Average | 21.2 months | 27.0 months |
| Median | 12.0 months | 15.0 months |

*SOURCE: U.S. Sentencing Commission, 2010 - 2015 Datafiles, USSCFY10 - USSCFY15.*

## Sentencing Analysis

This section examines types and length of sentences for youthful offenders and compares them to sentences of older offenders.[67]  In the federal system, the vast majority of offenders plead guilty.  Consistent with this practice, 98.5 percent of all convicted youthful defendants pled guilty.[68]

As indicated in Table 9, the average and median sentences of youthful offenders are typically lower than sentences for older offenders.  For example, the overall average sentence for youthful offenders from FY 2010 to FY 2015 was 34.9 months (median=15.0 months).  This compares to an overall average for all older offenders during the same period of 45.3 months (median=24.0 months).

In cases where the offender was convicted of an offense carrying a mandatory minimum sentence, the average sentence was 86.5 months (median=60.0 months). For all other offenders who were convicted of such an offense, the average sentence was 107.9 months. In cases where the offense did not carry a mandatory minimum sentence, the average sentence is 21.2 months (median=12.0 months) for youthful offenders and 27.0 months for all other offenders (median=15.0 months).

The Commission typically categorizes the position of the sentence imposed relative to the guideline range into one of four groups. First, the sentence can fall within the guideline range. Second, the sentence can be above the guideline range, which may occur for a variety of reasons such as aggravating circumstances related to the offense, or the court's determination that the offender's criminal history score underrepresents the seriousness of the offender's criminal history or that the offender is likely to commit a new crime when released. Third, the sentence can be below the guideline range at the request of the government, often because the defendant provided substantial assistance to the government in the investigation or prosecution of another case, or had agreed to have his or her case handled as part of an early disposition program. Last, the sentence can be below the guideline range for other reasons initiated by the court. Courts may take into account mitigating factors in the offender's personal history or instant offense, among other considerations, in deciding to reduce a sentence.

Overall, youthful offenders were sentenced within the guideline range in 56.1 percent of cases, above the guideline range in less than two percent of cases, below the guideline range with government sponsorship in 25.0 percent of cases, and otherwise below the guideline range in 17.0 percent of cases. Table 10 depicts the sentences relative to the guideline range by year.

Table 10. Sentences Relative to the Guideline Range for Youthful Offenders
*Fiscal Years 2010 to 2015*

| Fiscal Year | Within Range | Above Range | Gov't Sponsored Below Range | Non-Gov't Sponsored Below Range |
|---|---|---|---|---|
| **2010** | 59.4% | 1.6% | 22.9% | 16.2% |
| **2011** | 60.2% | 1.3% | 23.4% | 15.1% |
| **2012** | 56.2% | 1.7% | 25.6% | 16.5% |
| **2013** | 55.9% | 2.4% | 24.7% | 17.0% |
| **2014** | 50.9% | 2.4% | 27.4% | 19.3% |
| **2015** | 51.6% | 2.2% | 27.4% | 18.8% |
| **All Years** | **56.1%** | **1.9%** | **25.0%** | **17.0%** |

*SOURCE: U.S. Sentencing Commission, 2010 - 2015 Datafiles, USSCFY10 - USSCFY15.*

Examining the government sponsored below range sentences, 37.9 percent were for substantial assistance (USSG §5K1.1), 43.5 percent were for Early Disposition Program participation (USSG §5K3.1), and the remainder (18.6%) were for some other government sponsored reason.

As previously discussed, the within guideline range rate for youthful offenders was 56.1 percent during the six years studied. By comparison, the within guideline range rate for older offenders was 50.1 percent, six percentage points lower. Youthful offenders are more likely to be sentenced within the range primarily because they are less likely to receive a non-government sponsored downward departure or variance and are less likely receive a substantial assistance departure. Analysis of variances and departures for youthful and older offenders appears in Table 11.

Table 11. Sentences Relative to the Guideline Range for Youthful & All Other Offenders
*Fiscal Years 2010 to 2015*

| Total Number of Cases (% Cases) | Youthful Offenders | All Other Offenders |
|---|---|---|
| **Within Range** | 46,550 (56.1%) | 193,742 (50.1%) |
| **Above Range** | | |
| Departure | 456 (0.5%) | 2,520 (0.7%) |
| Otherwise Above | 1,106 (1.3%) | 5,418 (1.4%) |
| **Gov't Sponsored Below Range** | | |
| USSG §5K1.1 Sub. Assist. | 7,867 (9.5%) | 48,230 (12.5%) |
| USSG §5K3.1 Early Disp. | 9,035 (10.9%) | 39,006 (10.1%) |
| Other | 3,864 (4.7%) | 22,469 (5.8%) |
| **Non-Gov't Sponsored Below Range** | | |
| Departure | 2,466 (3.0%) | 13,075 (3.4%) |
| Otherwise Below | 11,610 (14.0%) | 62,004 (16.0%) |

*SOURCE: U.S. Sentencing Commission, 2010 - 2015 Datafiles, USSCFY10 - USSCFY15.*

One of the reasons for variances cited by sentencing judges in some cases is the offender's age or lack of guidance as a youth. In those cases where the sentence imposed was a downward departure or variance, the court cited the offender's age or lack of guidance as youth as a reason for the sentence in 17.8 percent of the cases. This compares to 6.7 percent of the cases involving older offenders when the sentence imposed was a downward departure or variance.

Another way to analyze sentences relative to the guideline range is to compare sentence length to the applicable guideline minimum (see Table 12). The average sentence for youthful offenders sentenced within the guideline range was 33.4 months (median=12.0 months). The average guideline minimum for this group was 30.8 months (median=10.0 months). For those sentenced above the range, the average

40

Ex. 59 pg.46 of 71

sentence was 86.0 months (median=60.0 months). For those offenders sentenced to a government sponsored below range sentence, the average sentence imposed was 34.4 months, a decrease of 26.9 months or 43.9 percent below the average guideline minimum. For those sentenced to a non-government sponsored below range sentence, the average sentence was 42.2 months, a decrease of 21.4 months or 33.6 percent below the average guideline minimum.

The nature of the sentence that offenders received was also examined in order to determine whether youthful offenders were given alternative sentences, such as home confinement, community confinement or intermittent confinement, more or less often than other offenders. Overall, only about five percent (5.3%) of youthful offenders were given an alternative sentence, which is about the same rate as that for older offenders. The percentage of youthful offenders sentenced to probation also does not suggest much variation between the youthful and older offender groups. Youthful and older offenders received a sentence of probation only in seven percent of cases.

Table 12. Sentences Imposed & Position Relative to the Guideline Range for Youthful Offenders *Fiscal Years 2010 to 2015*

| | Within Range (N=46,550) | Above Range (N=1,562) | Gov't Sponsored Below Range (N=20,766) | Non-Gov't Sponsored Below Range (N=14,076) |
|---|---|---|---|---|
| **Guideline Minimum** | | | | |
| Average | 30.8 months | 49.5 months | 61.3 months | 63.6 months |
| Median | 10.0 months | 24.0 months | 37.0 months | 41.0 months |
| **Sentence Imposed**[69] | | | | |
| Average | 33.4 months | 86.0 months | 34.4 months | 42.2 months |
| Median | 12.0 months | 60.0 months | 21.0 months | 24.0 months |

SOURCE: U.S. Sentencing Commission, 2010 - 2015 Datafiles, USSCFY10 - USSCFY15.

# Other Sentencing Analyses

This section provides analysis of the application of specific guideline provisions, such as adjustments for aggravating and mitigating circumstances, and the designation of some offenders as career offenders.

## Chapter Three Adjustments

The federal sentencing guidelines contain sentencing adjustments for several factors, including any aggravating or mitigating role that defendants played in offenses.[70]  For example, the offense level can be increased by four levels if the defendant was an organizer or leader of a criminal organization that had at least five participants.  Among youthful offenders in this report, 2.1 percent received a sentencing adjustment for playing an aggravated role in an offense.  Among older offenders, 5.1 percent received an adjustment for aggravated role.  The distribution of the adjustment is depicted in Table 13 and indicates that 806 youthful offenders received an increase of two levels for aggravating role, representing just one percent of the population and about half the proportion of older offenders receiving the same adjustment.  Approximately one percent of youthful offenders received an adjustment of three or four levels for aggravating role.

### Table 13. Aggravating Role Offense Adjustments[71]
*Fiscal Years 2010 to 2015*

|  | No Adjustment | +2 | +3 | +4 |
|---|---|---|---|---|
| **Youthful Offenders** | | | | |
| Number | 69,665 | 806 | 410 | 285 |
| Percent | 97.9% | 1.1% | 0.6% | 0.4% |
| **All Other Offenders** | | | | |
| Number | 336,456 | 7,401 | 4,304 | 6,229 |
| Percent | 94.9% | 2.1% | 1.2% | 1.8% |

*SOURCE: U.S. Sentencing Commission, 2010 - 2015 Datafiles, USSCFY10 - USSCFY15.*

A defendant's offense level may also be reduced due to a mitigating role, specifically if the defendant was a minor or minimal participant in the criminal activity. Among youthful offenders, 12.9 percent received a reduction in offense level due to a mitigating role. The distribution of the reductions appears below in Table 14. More than nine percent of youthful offenders received a reduction of two offense levels compared to 4.7 percent of older offenders. Thus proportionally, youthful offenders are more likely to receive a two level reduction in offense level due to mitigating factors such as playing a minor role in the offense. This trend also held for reductions of three and four offense levels.

### Table 14. Mitigating Role Offense Adjustments[72]
*Fiscal Years 2010 to 2015*

|  | No Adjustment | -2 | -3 | -4 |
|---|---|---|---|---|
| **Youthful Offenders** | | | | |
| Number | 61,961 | 6,578 | 574 | 2,051 |
| Percent | 87.1% | 9.2% | 0.8% | 2.9% |
| **All Other Offenders** | | | | |
| Number | 332,059 | 16,578 | 1,556 | 4,191 |
| Percent | 93.7% | 4.7% | 0.4% | 1.2% |

*SOURCE: U.S. Sentencing Commission, 2010 - 2015 Datafiles, USSCFY10 - USSCFY15.*

Ex. 59 pg.50 of 71

## Career Offenders and Armed Career Offenders

Under the federal sentencing guidelines, an offender is designated a career offender if the defendant was at least 18 years old at the time of the instant offense of conviction, if the offense is a felony that involves a controlled substance(s) or is a crime of violence, and if the defendant has at least two prior adult convictions, for either violent crimes or crimes involving controlled substances.[73]

There were 689 youthful offenders in the study group designated as career offenders (see Table 15).  Of these, 17.0 percent committed crimes of violence leading to their designation as career offenders, 30.5 percent committed drug offenses for which they were deemed to be career offenders, and 52.5 percent committed both violent and drug offenses. In just over five percent of cases, the specific offenses that led to the career offender status could not be determined.

Of the 689 career offenders, 25.1 percent were sentenced within the guideline range, and the average sentence for this group was 212.6 months (median=188.0 months).  The average guideline minimum for this group was 206.7 months. Given that there were several offenders who received life sentences in this group, the median sentence of 188 months is a better measure of the sentences imposed in these cases.

There were also nine youthful career offenders in this group who were sentenced above the range.  The average sentence for this group was 231.2 months (median=204.0 months), while the guideline minimum for this group was 177.9 months.  There were a total of 507 youthful career offenders that received a sentence below the guideline range —127 received a reduction in sentence due to substantial assistance, 120 received another type of government sponsored below range sentence, and 260 received a

non-government sponsored below range sentence.[74]  Table 15 also depicts average and median sentences in months for these groups.  Note that the length of sentences imposed are substantially lower than the guideline minimums, thus the number of months the sentence departs from the guideline minimums are high in both government and non-government sponsored below range sentences (97.9 and 68.5 months on average, respectively).

**Table 15. Sentences Relative to the Guideline Range for Youthful Career Offenders**
*Fiscal Years 2010 to 2015*

|  | Within Range (N=173) | Above Range (N=9) | Gov't Sponsored Below Range (N=247) | Non-Gov't Sponsored Below Range (N=260) |
|---|---|---|---|---|
| **Guideline Minimum** | | | | |
| Average | 206.7 months | 177.9 months | 220.6 months | 196.5 months |
| Median | 188.0 months | 151.0 months | 235.0 months | 188.0 months |
| **Sentence Imposed** | | | | |
| Average | 212.6 months | 231.2 months | 122.7 months | 128.0 months |
| Median | 188.0 months | 204.0 months | 120.0 months | 120.0 months |

SOURCE: U.S. Sentencing Commission, 2010 - 2015 Datafiles, USSCFY10 - USSCFY15.

Offenders who are sentenced under the Armed Career Criminal Act (ACCA)[75] are subject to a mandatory minimum sentence of 15 years if they are convicted under 18 U.S.C. § 922(g) with at least three prior felony convictions for serious drug offenses or violent crimes.  In this group, there were 215 youthful offenders sentenced under ACCA.  Of these, 64.2 percent were sentenced within the guideline range, and received an average sentence of 201.4 months (median=180.0 months).  None were sentenced above the

Ex. 59 pg.52 of 71

range.  There were 29 youthful offenders who received a reduction in sentence for substantial assistance, 17 received another type of government sponsored below range sentence, and 31 received a non-government sponsored below range sentence.  The sentence detail for these offenders appears in Table 16.

**Table 16. Sentences Relative to the Guideline Range for Youthful Armed Career Criminal Act Offenders**
*Fiscal Years 2010 to 2015*

| | Within Range (N=138) | Gov't Sponsored Below Range (N=46) | Non-Gov't Sponsored Below Range (N=31) |
|---|---|---|---|
| **Guideline Minimum** | | | |
| Average | 195.8 months | 201.0 months | 209.9 months |
| Median | 180.0 months | 188.0 months | 188.0 months |
| **Sentence Imposed** | | | |
| Average | 201.4 months | 129.1 months | 185.3 months |
| Median | 180.0 months | 120.0 months | 180.0 months |

*SOURCE: U.S. Sentencing Commission, 2010 - 2015 Datafiles, USSCFY10 - USSCFY15.*

   The average sentence for youthful ACCA offenders who received a government sponsored below range sentence was 129.1 months (median=120.0 months).  These offenders had an average reduction in sentence of 71.9 months or a 35.8 percent reduction in sentence from the guideline minimum.

Ex. 59 pg.53 of 71

## Life Sentences

Among the study group of youthful offenders, 96 received life imprisonment sentences when sentenced for their federal conviction. Five of these offenders were younger than 20 at the time of sentencing. These 96 offenders represent just one-tenth of one percent of all youthful offenders. The youngest of these offenders (one offender) was 18 at the time of sentencing. Eighty-five of these offenders were 21 or older at the time of sentencing.

Of these offenders, 29 received life sentences for firearms offenses, 25 for extortion and/or racketeering, 17 for drug trafficking, ten for murder, three for auto-theft, and two for kidnapping. The remaining defendants received life sentences for a variety of offenses ranging from national defense[76] to fraud offenses. More than 70 percent of these youthful offenders were sentenced under USSG §2A1.1, the sentencing guideline for first degree murder.[77]

# Recidivism

Youthful offenders have the highest recidivism rate of all federal offenders.  As discussed more fully in the Commission's overview report on recidivism among offenders sentenced in the federal system,[78] when measuring recidivism by rearrest after release into the community, offenders who are sentenced prior to age 21 have higher levels of recidivism (71.1%) than any other age group.  Those sentenced at age 21 to 25 have the second highest recidivism rate (65.6%).  Taken together, youthful offenders have an average recidivism rate of 67 percent, compared to an average recidivism rate of 41.6 percent for older offenders.

The most common offenses for which youthful offenders were re-arrested were: assault (26.7%), drug trafficking (13.2%), and public order offenses (12.7%).  When youthful offenders were reconvicted, the most common offenses of reconviction were public order offenses (16.3%), assault (15.0%), and drug trafficking (14.1%).  Among youthful offenders who were reincarcerated, the most common offenses leading to the reincarceration were: public order offenses (19.5%), drug trafficking (15.1%), and assault (12.7%).

Figure 8. Rearrest Rates for Ex-Offenders by Age at Sentencing & Release
*Recidivism Study Release Cohort*



*U.S. Sentencing Commission's 2005 Recidivism Release Cohort Datafile, RECID05.*

It should be noted that the offenders represented in Figure 8 are not the same group that are used in the analyses throughout the remainder of this report. The offenders discussed in Figure 8 were released into the community in calendar year 2005 and were examined as part of the Commission's on-going study of the recidivism of federal offenders.[79]

Ex. 59 pg.56 of 71

# Conclusion

This report examined offenders who were sentenced in the federal system while age 25 or younger during fiscal years 2010 through 2015.  There were 86,309 youthful offenders sentenced during this time frame, representing 18 percent of all federal offenders sentenced during that time.  More than three quarters (86.0%) of youthful offenders are male, more than half (54.5%) are U.S. citizens, and more than half (57.8%) are Hispanic.  Less than three percent of youthful offenders sentenced during this time frame were Native American or Alaskan Natives.  Only 52 of all youthful offenders sentenced between 2010 and 2015 were juveniles at the time of sentencing.

Youthful offenders had a very similar pattern of offense types as older offenders.  The most common offense type among youthful offenders was drug trafficking, followed by immigration, firearms, fraud offenses, and simple possession offenses.  The most common drug among drug offenses for youthful offenders was marijuana.

About 57 percent of the youthful offenders in this study were classified as CHC I offenders.  In fact, 43.1 percent of all youthful offenders in this study received no criminal history points or had no countable criminal history.  About 13 percent were classified as CHC II offenders, 16 percent as CHC III offenders, and the remainder were classified as CHC IV or above.

For all youthful offenders in this study, the average sentence was 34.9 months.  In only a few cases (5.3%) was an alternative sentence imposed on youthful offenders in the study group.  The median sentence for youthful offenders where a mandatory minimum sentence applied was 60 months.  More than half (56.1%) of youthful offenders during this time frame were sentenced within the guideline range, and one quarter were sentenced below the range with government sponsorship.

# Endnotes

1        Percentages reported throughout this paper may not add to 100% due to rounding.  Analyses on guideline application exclude cases with incomplete guideline application information.  Sentences and guideline minimums in excess of 470 months are set at 470 months for the purposes of the analyses discussed in this report.  For further information on the analysis of sentence lengths, *see* U.S. Sentencing Comm'n, 2015 Annual Report and Sourcebook of Federal Sentencing Statistics S-170 (2016) [hereinafter Sourcebook].

2        U.S. Sentencing Comm'n, Report of the Tribal Issues Advisory Group (2016) [hereinafter TIAG Report].

3        U.S. Sentencing Comm'n, "Final Priorities for Amendment Cycle," 81 FR 58004 (Aug. 24, 2016).

4        18 U.S.C. §§ 5005. *et seq.* (repealed by Pub. L. 98–473, 98 Stat. 2027, Title II, § 218(a)(8) (Oct. 12, 1984)).

5        *Id.*

6        Title II, Comprehensive Crime Control Act of 1984, Pub. L. No. 98–473, 98 Stat. 1976 (1984).

7        Catherine A. Foddai, *Appellate Review of Federal Youth Corrections Act Sentences in the Aftermath of Dorszynski v. United States*, 45 Fordham L. Rev. 110 (1976); Cynthia A. Kelly, *Sentencing Under the Federal Youth Corrections Act: When May a Youth Be Treated as an Adult?* 13 Loy. U. Chi. L.J. 849 (1982).

8        *See* Thomas R. Kane, Federal Bureau of Prisons, Research Review: Impact of the Youth Corrections Act (1985),  https://www.ncjrs.gov/App/Publications/abstract.aspx?ID=104851.

9        *See supra* note 6.

10        *See* 28 U.S.C. § 994(d).

11  *See* 28 U.S.C. § 995(a)(19).

12  *See* U.S. Sentencing Comm'n, Guidelines Manual §1B1.12 (Persons Sentenced Under the Federal Juvenile Delinquency Act (Policy Statement)) (2016) [hereinafter USSG].

13  *See id*. The Commission initially exempted juvenile delinquents from the guidelines in 1991 by amending USSG §5H1.1 (Age (Policy Statement)) to add a policy statement that the guidelines do not apply to persons sentenced as juvenile delinquents. In 1993, the Commission deleted the policy statement from §5H1.1 and added a new policy statement at §1B1.12 exempting juvenile delinquents from the guidelines and establishing the maximum sentence that may be imposed on a juvenile delinquent in response to *United States v. R.L.C.,* 112 S. Ct. 1329 (1992) (requiring calculation of the guideline range to determine the maximum sentence imposable on a juvenile delinquent). *See* USSG App. C, amend. 475 (effective Nov. 1, 1993).

14  *See* USSG §4A1.2 (Definitions and Instructions for Computing Criminal History).

15  *See* USSG §4A1.2(d), (e).

16  *See* USSG §4A1.2(d).

17  *See* USSG §4A1.2(c)(2) (listing prior offenses that are never counted in a criminal history calculation); *see also* USSG §4A1.2(f) (providing that "diversionary dispositions resulting from a finding of guilt or a plea of *nolo contendere* are counted" even if a conviction is not formally entered, except that diversion from juvenile court is not counted.).

18  *See* USSG §5H1.1 (Age (Policy Statement)). After the decision in *United States v. Booker,* 543 U.S. 220 (2005), under 18 U.S.C. § 3553(a), sentencing courts may also consider age in determining whether and to what extent a variance is warranted. *See* United States v. Chase, 560 F.3d 828, 830–31 (8th Cir. 2009) (After *Booker* "factors such as a defendant's age, medical condition, prior military service, family obligations, entrepreneurial spirit, etc., can form the bases for a variance even though they would not justify a departure"); *see also* United States v. Feemster, 572 F.3d 455, 463–64 (8th Cir. 2009) (120-month sentence based in part on defendant's age (26 years) at time of the instant offense was substantively reasonable where district

court determined that a downward variance from 360-month to life guidelines range was warranted); *but see* United States v. Omole, 523 F.3d 691, 698–700 (7th Cir. 2008) (defendant's 12-month sentence was substantively unreasonable where defendant's young age (20 years) and "lack of understanding that people of his age seem to reflect" were not a "compelling justification" for the substantially lenient sentence).

19      *See* USSG §5H1.1 (effective Nov. 1, 1987) ("Age is not ordinarily relevant in determining whether a sentence should be outside the guidelines.  Neither is it ordinarily relevant in determining the type of sentence to be imposed when the guidelines provide sentencing options. . . .").

20      *See* USSG App. C, amend. 739 (effective Nov. 1, 2010).

21      Age of the offender at the time of sentencing is used as a proxy for age at the time of offense in this study given that the Commission does not collect data on age at the time of the offense.

22      487 U.S. 815 (1988).

23      536 U.S. 304 (2002).

24      543 U.S. 551 (2005).

25      560 U.S. 48 (2010).

26      *See also* L. Steinberg, *The influence of neuroscience on US Supreme Court decisions about adolescents' criminal culpability,* 14 Nature 513–18 (2013).

27      132 S.Ct. 2455 (2012).

28      Montgomery v. Louisiana, No. 14–280 (Jan. 25, 2016).

29      Cassandra B. Romine & Cecil R. Reynolds, *A Model of the Development of Frontal Lobe Functioning: Findings From a Meta-Analysis*, 12(4) Applied Neuropsychology 190–201 (2005).

30      *Id.*

31      *Id.*

Ex. 59 pg.61 of 71

32      Silvia A. Bunge et al., *Immature Frontal Lobe Contributions to Cognitive Control in Children: Evidence from fMRI*, 33(2) NEURON 301–11 (2002).

33      Jane E. Anderson, *Brain Development in Adolescents: New Research—Implications for Physicians and Parents in Regard to Medical Decision Making*, 30(2) ISSUES IN LAW AND MEDICINE 193–96 (2015); Joanna Jacobus et al., *Cortical Thickness in Adolescent Marijuana and Alcohol Users: A Three-year Prospective Study from Adolescence to Young Adulthood*, 16 DEVELOPMENTAL COGNITIVE NEUROSCIENCE 101–09 (2015).

34      Sara B. Johnson, Robert W. Blum, & Jay N. Giedd, *Adolescent Maturity and the Brain: The Promise and Pitfalls of Neuroscience Research in Adolescent Health Policy*, 45(3) JOURNAL OF ADOLESCENT HEALTH, 216–21 (2009).

35      *Id.*; Mary Beckman, *Crime, Culpability, and the Adolescent Brain*, 305 SCIENCE 596–99 (2004); Ronald E. Dahl, *Adolescent Brain development: A Period of Vulnerabilities and Opportunities*, 1021 ANNALS OF THE N.Y. ACAD. OF SCI. 1–22 (2004); K. Rubia et al., *Functional Frontalisation with Age: Mapping Neurodevelopmental Trajectories with fMRI*, 24 NEUROSCIENCE & BIOBEHAVIORAL REVIEWS 13-19 (2000); National Institute of Mental Health, *The Teen Brain: Still Under Construction* (2011), http://www.nimh.nih.gov/health/publications/the-teen-brain-still-under-construction/index.shtml.

36      B.J. Casey et al., *A Developmental Functional MRI Study of Prefrontal Activation During Performance of a GO-NO-GO Task*, 9 JOURNAL OF COGNITIVE NEUROSCIENCE 835–47 (1997); Robert Sapolsky, *Dude, Where's My Frontal Cortex?* 15 NAUTILUS (2014), http://nautil.us/issue/15/turbulence/dude-wheres-my-frontal-cortex. For example, many researchers cite rental car company policies as hitting the mark with the age that most people are expected to be mature enough to make responsible decisions—a person must be 25 to rent a vehicle. *See, e.g.*, A. Rae Simpson, MIT Young Adult Development Project (2008), http://hrweb.mit.edu/worklife/youngadult/brain.html; Alan Greenblatt, *What is the Age of Responsibility?*, GOVERNING (Sep. 30, 2009), http://www.governing.com/topics/public-justice-safety/What-is-the-Age.html.

37      28 U.S.C. § 995(a)(12), (14)–(16).

38      28 U.S.C. § 994(w).

39      SOURCEBOOK, *supra* note 1, at A-5, A-6. *See also* CHRISTINE KITCHENS, U.S. SENTENCING COMM'N, INTRODUCTION TO THE COLLECTION OF INDIVIDUAL OFFENDER DATA BY THE UNITED STATES SENTENCING COMMISSION (2009).

40      For purposes of this report, a violent offense was any one of the following offenses: murder, non-negligent manslaughter, kidnapping, rape, fondling, sexual assault, robbery, sodomy, assault, intimidation, blackmail/extortion, child abuse, arson, and rioting.

41      Prior law enforcement contact could be arrests, or other types of school or community-based interactions with law enforcement officials.

42      Data on petty offenses are not reported to the Commission because the sentencing guidelines do not apply in those cases. *See* USSG §1B1.9 (Class B or C Misdemeanors and Infractions).

43      There were 1,615 offenders with missing age data during this time period that were excluded from analysis.

44      Much of this change can be attributed to decreases in offenders sentenced for immigration violations and drug trafficking.

45      This group of 52 are considered juveniles under federal law.

46      Native Americans/Alaskan Natives who are non-U.S. citizens were excluded from this analysis.

47      *See* TIAG REPORT (discussing how Native American youth are processed in the federal system), *supra* note 2.

48      A complete list of districts appears in Appendix, Table A-1.

49      For additional analysis of cases involving simple drug possession, see MELISSA REIMER, U.S. SENTENCING COMM'N, WEIGHING THE CHARGES: SIMPLE POSSESSION OF DRUGS IN THE FEDERAL CRIMINAL JUSTICE SYSTEM (2016).

50      Violent offenses include those sentenced under the following guidelines: All Chapter Two, Part A guidelines, except §§2A3.5 and 2A3.6; §§2B3.1, 2B3.2, 2B3.3, 2E1.3, 2E1.4, 2E2.1, and all Chapter Two, Part K guidelines except §2K2.1.

51      *See* USSG Chapter Two, Part D for a description of these offenses.  These cases include trafficking, possession, and communication facility offenses.

52      The immigration guidelines are: USSG §§2L1.1 (Smuggling, Transporting, or Harboring an Unlawful Alien); 2L1.2 (Unlawfully Entering or Remaining in the United States); 2L2.1 (Trafficking in a Document Relating to Naturalization); and 2L2.2 (Fraudulently Acquiring Documents Relating to Naturalization). This portion of the analysis is by guideline.

53      *See* USSG Chapter Two, Part K for a description of these offenses.  This group of offenders does not include offenders who were convicted under 18 U.S.C. § 924(c).

54      *See* 18 U.S.C. § 1152 (General Crimes Act).

55      *See* 18 U.S.C. § 1153 (Major Crimes Act).

56      *See* 18 U.S.C. § 1162 (listing states that shall have jurisdiction over offenses committed by or against Indians that occur within the enumerated area of Indian Country within the listed state).

57      *See id.*

58      *See supra* note 46.

59      For more information on sentencing zones, see Courtney Semisch, U.S. Sentencing Comm'n, Alternative Sentences in the Federal Criminal Justice System (2015).

60      *See* USSG Chapter Five, Part A (Sentencing Table).

61      *See generally* USSG, Chapter Four.

62      *See* USSG §4A1.1.  Points are assigned as follows: three points are assigned for each previous conviction that resulted in a sentence of more than 13 months; two points are assigned for each previous conviction resulting in a sentence of more than 60 days; and one point is assigned to previous convictions not counted in the previous two categories.  The total number of criminal history points an offender received determines the Criminal History Category (CHC).  Thus, an offender with zero or one point is assigned to CHC I; an offender with

Ex. 59 pg.64 of 71

two or three points is assigned to CHC II; an offender with four, five, or six points is assigned to CHC III; an offender with seven, eight, or nine points is assigned to CHC IV; an offender with 10, 11, or 12 points is assigned to CHC V; and offenders with 13 or more points are assigned to CHC VI.

63      *See* USSG §§4A1.1(b) and (c); 4A1.2(d). Adult convictions for offenses committed prior to age 18 are treated similarly.  If a juvenile record has been expunged, even if the qualifying offense would have received criminal history points, the offense does not receive criminal history points.  Similarly, a juvenile record could be sealed, and thus not be available for a probation officer to include in criminal history calculations.

64      Row percentages are indicated in this table.

65      *See* SOURCEBOOK, *supra* note 1, at Appendix A for a description of "Other" offenses.

66      *See supra* note 41.

67      *See supra* note 1.

68      *See* SOURCEBOOK, *supra* note 1, at Table 10.

69      The total sentence, in months, plus alternatives.

70      *See* USSG §§3B1.1, 3B1.2.

71      There were 10 older offenders excluded from this table due to errors in adjustment calculations.

72      There were two youthful offenders and 16 older offenders excluded from this table due to errors in mitigating role calculations.

73      USSG §4B1.1.  For the purpose of that guideline, the term "controlled substance offense" has been defined as a drug trafficking offense.  USSG §4B1.2(b).  For more information on career offenders in the federal system see U.S. SENTENCING COMM'N, REPORT TO THE CONGRESS: CAREER OFFENDER SENTENCING ENHANCEMENTS (2016).

74      After the Supreme Court decision in *Booker, supra* note 18, the sentencing guidelines became advisory; however, courts are still required

to calculate a defendant's guideline range, consider whether there is basis to depart from that range, and then consider the factors in 18 U.S.C. § 3553(a) when contemplating the sentence to impose.  For more information on federal sentencing and guideline application see U.S. Sentencing Comm'n, Federal Sentencing: The Basics (2015).

75      18 U.S.C. § 924(e); USSG §4B1.4.  For the purpose of that guideline, the term "serious drug offense" has been defined as a drug trafficking offense.  USSG §4B1.2(b).

76      This case was terrorism related.

77      The offense of conviction for offenders sentenced under this guideline may not necessarily be first degree murder, however, some guidelines contain a cross reference to section 2A1.1 when a victim was killed under circumstances that would constitute murder.  *See,* e.g., USSG §§2D1.1, 2A4.1.

78      Kim Steven Hunt and Robert Dumville, U.S. Sentencing Comm'n, Recidivism Among Federal Offenders: A Comprehensive Overview (2016). This study uses a different population than the current study.

79      The recidivism study examined 25,431 federal offenders who were released into the community in 2005 after discharging a sentence of incarceration or by commencing a term of probation.

# Appendix

**Table A-1. Youthful Offenders in Each Circuit and District**

*Fiscal Years 2010 to 2015*

**Table A-2. Offense Types for Youthful Offenders**

*Fiscal Years 2010 to 2015*

Youthful Offenders in the Federal System, Fiscal Years 2010 to 2015

**Appendix Table A-1**

## YOUTHFUL OFFENDERS IN EACH CIRCUIT AND DISTRICT[1]
### Fiscal Years 2010-2015

| District | N | % | District | N | % |
|---|---|---|---|---|---|
| **TOTAL** | | | | | |
| | | | **FIFTH CIRCUIT** | **21,360** | |
| **D.C. CIRCUIT** | **189** | | Louisiana | | |
| District of Columbia | 189 | 0.2 | Eastern | 287 | 0.3 |
| | | | Middle | 147 | 0.2 |
| **FIRST CIRCUIT** | **2,721** | | Western | 282 | 0.3 |
| Maine | 211 | 0.2 | Mississippi | | |
| Massachusetts | 351 | 0.4 | Northern | 120 | 0.1 |
| New Hampshire | 178 | 0.2 | Southern | 234 | 0.3 |
| Puerto Rico | 1,836 | 2.1 | Texas | | |
| Rhode Island | 145 | 0.2 | Eastern | 740 | 0.9 |
| | | | Northern | 950 | 1.1 |
| **SECOND CIRCUIT** | **3,411** | | Southern | 8,004 | 9.3 |
| Connecticut | 279 | 0.3 | Western | 10,596 | 12.3 |
| New York | | | | | |
| Eastern | 694 | 0.8 | **SIXTH CIRCUIT** | **4,739** | |
| Northern | 475 | 0.6 | Kentucky | | |
| Southern | 1,168 | 1.4 | Eastern | 411 | 0.5 |
| Western | 596 | 0.7 | Western | 457 | 0.5 |
| Vermont | 199 | 0.2 | Michigan | | |
| | | | Eastern | 694 | 0.8 |
| **THIRD CIRCUIT** | **2,165** | | Western | 431 | 0.5 |
| Delaware | 90 | 0.1 | Ohio | | |
| New Jersey | 497 | 0.6 | Northern | 661 | 0.8 |
| Pennsylvania | | | Southern | 540 | 0.6 |
| Eastern | 659 | 0.8 | Tennessee | | |
| Middle | 391 | 0.5 | Eastern | 721 | 0.8 |
| Western | 446 | 0.5 | Middle | 327 | 0.4 |
| Virgin Islands | 82 | 0.1 | Western | 497 | 0.6 |
| | | | | | |
| **FOURTH CIRCUIT** | **7,157** | | **SEVENTH CIRCUIT** | **2,338** | |
| Maryland | 740 | 0.9 | Illinois | | |
| North Carolina | | | Central | 371 | 0.4 |
| Eastern | 939 | 1.1 | Northern | 369 | 0.4 |
| Middle | 586 | 0.7 | Southern | 334 | 0.4 |
| Western | 530 | 0.6 | Indiana | | |
| South Carolina | 868 | 1.0 | Northern | 410 | 0.5 |
| Virginia | | | Southern | 228 | 0.3 |
| Eastern | 2,518 | 2.9 | Wisconsin | | |
| Western | 334 | 0.4 | Eastern | 476 | 0.6 |
| West Virginia | | | Western | 150 | 0.2 |
| Northern | 407 | 0.5 | | | |
| Southern | 235 | 0.3 | | | |

Ex. 59 pg.69 of 71

## Appendix Table A-1 (cont.)

| CIRCUIT District | N | % | CIRCUIT District | N | % |
|---|---|---|---|---|---|
| **EIGHTH CIRCUIT** | **4,598** | | **TENTH CIRCUIT** | **8,918** | |
| Arkansas | | | Colorado | 470 | 0.5 |
| Eastern | 281 | 0.3 | Kansas | 706 | 0.8 |
| Western | 257 | 0.3 | New Mexico | 5,792 | 6.7 |
| Iowa | | | Oklahoma | | |
| Northern | 446 | 0.5 | Eastern | 89 | 0.1 |
| Southern | 296 | 0.3 | Northern | 205 | 0.2 |
| Minnesota | 318 | 0.4 | Western | 472 | 0.6 |
| Missouri | | | Utah | 807 | 0.9 |
| Eastern | 604 | 0.7 | Wyoming | 377 | 0.4 |
| Western | 612 | 0.7 | | | |
| Nebraska | 657 | 0.8 | **ELEVENTH CIRCUIT** | **6,050** | |
| North Dakota | 409 | 0.5 | Alabama | | |
| South Dakota | 718 | 0.8 | Middle | 159 | 0.2 |
| | | | Northern | 378 | 0.4 |
| **NINTH CIRCUIT** | **22,663** | | Southern | 280 | 0.3 |
| Alaska | 176 | 0.2 | Florida | | |
| Arizona | 11,802 | 13.7 | Middle | 1,319 | 1.5 |
| California | | | Northern | 328 | 0.4 |
| Central | 978 | 1.1 | Southern | 1,768 | 2.1 |
| Eastern | 634 | 0.7 | Georgia | | |
| Northern | 585 | 0.7 | Middle | 513 | 0.6 |
| Southern | 5,582 | 6.5 | Northern | 503 | 0.6 |
| Guam | 65 | 0.1 | Southern | 802 | 0.9 |
| Hawaii | 133 | 0.2 | | | |
| Idaho | 274 | 0.3 | | | |
| Montana | 372 | 0.4 | | | |
| Nevada | 466 | 0.5 | | | |
| Northern Mariana Islands | 4 | 0.0 | | | |
| Oregon | 484 | 0.6 | | | |
| Washington | | | | | |
| Eastern | 368 | 0.4 | | | |
| Western | 740 | 0.9 | | | |

SOURCE: U.S. Sentencing Commission, 2010 - 2015 Datafiles, USSCFY10 - USSCFY15.

Ex. 59 pg.70 of 71

**Appendix Table A-2**

**Offense Types for Youthful Offenders
FY 2010 to FY 2015**

| PRIMARY OFFENSE | N | % |
|---|---|---|
| **TOTAL** | **86,309** | |
| **Murder** | 95 | 0.1 |
| **Manslaughter** | 123 | 0.1 |
| **Kidnapping/Hostage Taking** | 72 | 0.1 |
| **Sexual Abuse** | 616 | 0.7 |
| **Assault** | 1,136 | 1.3 |
| **Robbery** | 1,042 | 1.2 |
| **Arson** | 95 | 0.1 |
| **Drugs - Trafficking** | 26,663 | 30.9 |
| **Drugs - Communication Facility** | 347 | 0.4 |
| **Drugs - Simple Possession** | 4,444 | 5.2 |
| **Firearms** | 11,840 | 13.7 |
| **Burglary/B&E** | 129 | 0.2 |
| **Auto Theft** | 112 | 0.1 |
| **Larceny** | 1,249 | 1.5 |
| **Fraud** | 4,651 | 5.4 |
| **Embezzlement** | 113 | 0.1 |
| **Forgery/Counterfeiting** | 984 | 1.1 |
| **Bribery** | 40 | 0.1 |
| **Tax** | 61 | 0.1 |
| **Money Laundering** | 348 | 0.4 |
| **Racketeering/Extortion** | 1,149 | 1.3 |
| **Gambling/Lottery** | 6 | 0.0 |
| **Civil Rights** | 61 | 0.1 |
| **Immigration** | 24,709 | 28.6 |
| **Child Pornography** | 1,246 | 1.4 |
| **Prison Offenses** | 391 | 0.5 |
| **Administration of Justice Offenses** | 935 | 1.1 |
| **Environmental/Wildlife** | 69 | 0.1 |
| **National Defense** | 123 | 0.1 |
| **Antitrust** | 2 | 0.0 |
| **Food & Drug** | 36 | 0.0 |
| **Other Miscellaneous Offenses** | 3,422 | 4.0 |

SOURCE: U.S. Sentencing Commission, 2010 - 2015 Datafiles, USSCFY10 - USSCFY15.