<u>DECLARATION OF SARAH GANNETT</u>

I, Sarah Gannett, state:

1.       I am over 18 and am competent to make this declaration.

2.       I am an Assistant Federal Defender for the District of Arizona. I received my undergraduate and law degrees from Stanford University. I have worked for the Public Defender Service in Washington D.C., the Federal Public Defender in Maryland, and the Federal Community Defender for the Eastern District of Pennsylvania. I have worked as a trial and appellate lawyer.

3.       I started working with Dylann Roof's defense team in May 2016 and was appointed to represent him on his federal case on June 14, 2016. My role was to litigate pretrial motions and preserve issues that arose during jury selection and trial.

4.       My first interactions with the defense team occurred just as the Attorney General authorized the case for capital prosecution, in May 2016. At that time, the federal team invoked Dylann's speedy trial rights. The intent was to set the federal case for the November 2016 trial calendar. I understood this was so the federal trial would occur before Dylann's state trial, which was scheduled for January 17, 2017. A November 2016 setting would leave only five months until the federal trial. The compressed timeline meant the pace was frenetic the entire time I was on the case. Because I was new, I initially did not question the schedule.

5.       Given the limited time available before trial, the team divided responsibilities. I focused on legal research and writing. I interacted little with Dylann until the trial began. I did not participate in mitigation meetings where the details of social history investigation and expert work were discussed. Even with this narrowed scope of work, there was a lot to learn about the case. Despite the team's support and David Bruck's collaboration, it was a struggle to digest the sweep of the case—including the discovery, the investigation, and the social history

1

IFCD 005456

Ex. 71 pg.1 of 14

work—sufficiently to prepare and execute a litigation plan in the time between my appointment and scheduled deadlines.

6. One of the first pleadings I worked on was a motion to dismiss the indictment filed on July 5, 2016, just three weeks after I was appointed to Dylann's case. The claims in the motion would have eliminated the bases on which the federal government could prosecute Dylann. We hoped some of the challenges in the motion would succeed and put Dylann's case in a better posture.

7. I had worked on issues related to 18 U.S.C. § 924 before, but this is an exceedingly complicated and constantly developing area of the law. With help from a national expert, we correctly identified some problems with § 924's application in Dylann's case, but we missed others that would have strengthened the motion to dismiss.

8. For example, I did not identify that 18 U.S.C. § 247 can be violated by using or threatening the use of harm against oneself, as in threatening suicide or self-immolation, or against one's own property. And I did not identify that both § 247 and 18 U.S.C. § 249 crimes can be committed with unintentional force.

9. We also failed to make the argument that imposing punishment for both the § 924(j)(1) counts and the predicate offenses violates the Double Jeopardy clause, an argument that the Fifth Circuit has since accepted and which would have reduced the number of counts of conviction.

10. There was no strategic reason for failing to raise these claims.

11. I was tasked with drafting the motion for a new trial after Dylann was convicted, which focused on re-raising the issues from the motion to dismiss the indictment, including the § 924 claims, considering the trial evidence. The motion for a new trial wasn't based on a new understanding of these claims, so the errors in the original motion were present here as well.

2

IFCD 005457

12. In addition to the motion to dismiss the indictment, at David's request, I also took primary responsibility for a motion to suppress Dylann's jailhouse writings. During the summer of 2016, I drafted this motion and questioned witnesses at the hearing.

13. I also drafted and filed a motion to strike the death penalty as a possible punishment. This motion incorporated a variety of claims. Some were not specific to Dylann but were about the death penalty generally or about the use of the Hate Crimes Act to pursue the death penalty. Others were about the specific aggravating factors alleged in Dylann's case. A related hearing involving expert presentation of current social science was underway in Vermont, and I invested considerable effort to stay abreast of developments there.

14. I don't recall the team discussing filing a motion arguing that the Hate Crimes Act violates the First Amendment.

15. I don't recall why we filed no motions related to change of venue.

16. I also worked on other legal issues and filings not discussed here.

17. Timing pressures caused us to make mistakes. For example, we missed a deadline for filing non-mental-health mitigating factors in August 2016. We only learned that we missed the deadline when the government asked if this meant that we did not plan to present any such evidence. That wasn't the case; we just had too many things to do and not enough time to do them.

18. As the November trial date approached, I had concerns about the team's ability to be ready for trial. We needed more time to develop the case, more time to work with Dylann, and more time to prepare the courtroom presentation. I understood the goal that the federal trial should proceed before the state trial; however, I struggled with whether it was appropriate for us to proceed, since we were not ready.

19. I came to believe we needed to ask for a continuance. In early October 2016 we had a team meeting in which I raised this. Teresa Norris, one of the state

3

IFCD 005458

attorneys, and two consulting attorneys agreed with moving for a continuance, and we urged the team to do so. David Bruck asked the four of us to break off from the larger group and prepare a list of reasons supporting a continuance. When the group reconvened, I expected we would discuss this. Instead, when we reconvened, David and Kim Stevens announced that we would not seek a continuance. There was no discussion.

20.     Because of my role as the "appellate" member of the team, I had little involvement with the expert witnesses or their evaluations. I was aware, however, that the government retained Park Dietz, M.D., as a penalty phase expert. Dr. Dietz is a forensic psychiatrist who is well known in the capital defense community. We understood Dr. Dietz would interview Dylann.

21.     The defense team was concerned Dylann would not like our penalty phase mental health experts' opinions—especially the diagnosis of autism. The lawyers working with Dylann had a plan for explaining the autism diagnosis to him, but they ran out of time to implement that plan before Dr. Dietz's interview. Instead of hearing about the defense experts' opinions from his own lawyers, Dylann heard about them—including the autism diagnosis—from Dr. Dietz.

22.     We should have anticipated Dr. Dietz would discuss autism with Dylann. At the time, though, it felt like Dr. Dietz was trying to sow dissention between our client and his attorneys, which it did.

23.     We moved for a hearing on Dr. Dietz's interference with our attorney-client relationship and to strike the death penalty as a possible punishment, which the Court denied.

24.     After Dr. Dietz's revelation to Dylann that the team intended to argue that he had autism, Dylann wrote a letter to the prosecution. This alignment with the government made us concerned that Dylann's mental illness was preventing him from understanding the nature and consequences of the proceedings and assisting properly with his defense. Before this, I had

4

IFCD 005459

heard team members occasionally question one another about whether Dylann might be incompetent to stand trial, but there was no serious effort put into exploring this, either legally or through development of evidence.

25.     Competency litigation is legally challenging and can disrupt the attorney-client relationship, so defense teams generally try to avoid it unless there is no other option. In Dylann's case, the team tried to support Dylann's ability to understand the nature and consequences of the proceedings and assist properly with his defense. With the development of the Dietz evaluation and Dylann's letter to the prosecution, that became impossible, and we were forced to confront competency.

26.     We truly did have concerns about competency. I know the Court suggested that the timing of our competency motion was manipulative or driven simply by Dylann's failure to agree with us. That wasn't the case. Dylann had become more anxious, rigid, paranoid, and perseverative as trial approached, and I understood the team's ability to communicate with him was already strained and barely manageable. His meeting with Dr. Dietz pushed him over the edge, so he was no longer rational about the case or the role of counsel.

27.     The sudden need to focus on competency presented a huge challenge for the team. In one of our motions (Docket 562), I attempted to explain to the Court the crisis we felt we were in and our inability to both effectively engage in the necessary competency litigation and prepare for trial.

28.     At this time, I worried that Dylann would not listen to anything we said—even things he otherwise might have agreed with—because of his paranoia, anger, and distrust. Judy Clarke advised us to seek conflict counsel for Dylann, because of the breakdown in our relationship with him. I agreed with and advocated for this approach. I hoped both that Dylann would listen to the advice of conflict counsel and that conflict counsel could help the court understand the breakdown in our attorney-client relationship and its implications for the case going forward. David rejected the suggestion of conflict counsel.

5

IFCD 005460

29.     As the competency litigation continued, there was a flurry of filings. Among these, we filed a motion proposing particular competency procedures (Docket 578). The motion discussed things like report disclosure protocols. In our reply (Docket 586), we highlighted for the first time in writing that Dylann might choose to self-represent if found competent, a recent development. We identified for the Court that this scenario would require *Faretta* and *Indiana v. Edwards* proceedings. When the Court denied this motion, it did not address our concern about Dylann proceeding *pro se*, *Faretta* issues, or *Indiana v. Edwards* issues.

30.     All the while, the team was trying to keep up with other litigation, including regarding jury selection and witness and evidentiary issues. The focus on competency made it difficult to think ahead, especially toward penalty phase preparation. We were proceeding issue by issue, deadline by deadline.

31.     By this time, our team had begun sleeping in shifts. I would often write, as I would during the trial itself, until the wee hours of the morning. David would set his alarm to be up early to edit my drafts while I got a few hours of rest. I would be up again at daybreak to finalize the pleadings and prepare for court. This pace began in early November and continued most of the time until the trial ended on January 11.

32.     At the first competency hearing, we hewed closely to the statutory standard (about the defendant's ability to understand the nature and consequences of the proceedings and assist properly in the defense). We believed that Dylann's delusional belief system was driving his decision making. We believed his autism was preventing him from seeing the big picture and causing him to fixate on matters other than the possibility of a death sentence.

33.     I had prepared Sean O'Brien—a respected capital litigator and Professor of Law at the University of Missouri School of Law in Kansas City, Missouri—to testify at the competency hearing about what is required of a

6

IFCD 005461

defendant in a capital trial. Sean was at the courthouse, and I was expecting to put him on the stand as our last witness. Just before Sean's anticipated testimony, David alerted me we would not call Sean because Judge Gergel seemed impatient, and David did not want to upset him by prolonging the proceedings.

34.     We did not address in the first competency hearing Dylann's neuropsychological impairments and how they might impact his ability to assist counsel, function in the courtroom, or represent himself. I now understand there was information in our files that would have been helpful in this regard.

35.     I don't recall why we did not call our neuropsychologist, Dr. Moberg, at the competency hearing.

36.     We did not ask our experts at the competency hearing to address *Indiana v. Edwards* issues. Given Dylann's impairments, I don't think it occurred to us that Judge Gergel would require him to represent himself.

37.     Judge Gergel appeared dismissive of the defense during the competency proceedings. He seemed committed to starting the trial as soon as possible for the benefit of the family members of the victims, whom he at times during the trial referred to as "my victims." He did not appear open to hearing our witnesses on competency and gave the impression he had already made up his mind. At one point during the competency hearing, I put on the record that Judge Gergel was rolling his eyes at me while I was trying to present evidence. The team was angry with me for stating this, but it was true, and I felt the transcript should reflect it.

38.     Ultimately, Judge Gergel found Dylann competent, and Dylann represented himself during voir dire. We served as standby counsel, under strict instructions from the Court not to interfere. This was a disaster. Dylann made few objections, much fewer than we thought he should. He repeated odd behaviors we had seen in the courtroom before this, such as staring straight ahead and chastising the team for talking to him while other people could see him. He did not want us to whisper to him when he should make objections or ask questions and became angry

7

when we did. Dylann's frustration with us wasn't because he did not want to object. Rather, his anxiety made it impossible for him to interact with us in public.

39.     We started writing on sticky notes and passing the notes to him. Sometimes Dylann would look at the notes, but other times, he would just sit there with a blank expression, looking out into the space between him and the bench. During breaks and out of court, the team tried to teach Dylann about voir dire and what might merit an objection. He warned the team he could not object. He was worried about being looked at when he objected and said he would be embarrassed if the Court asked him the reason for his objection and he couldn't give a good answer. I don't remember him ever disagreeing on the merits of a proposed objection.

40.     On December 2, 2016, I emailed the team about Dylann's inability to make important objections during jury selection. I suggested we consider renewing our competency motion or making a motion under *Indiana v. Edwards*. There was no response to this email.

41.     Later the same day, December 2, 2016, I sent a message to the team expressing my concerns about our failure to create a record. I had reviewed the transcript from that day and was stunned at how it read. In court, I could see that Dylann was struggling, but the cold transcript failed to capture how much difficulty he was having. I felt the record should reflect what was happening more clearly.

42.     On December 3, 2016, I expressed additional concern to the team that we were not adequately preserving the record. Dylann appeared virtually paralyzed by his inability to make an objection. When he managed to speak, it was painful to watch. He was stuttering, halting, looking down. I knew the transcript would not reflect this unless the team made an affirmative effort to describe what was happening.

43.     I was sitting at counsel table, and I urged David and Kim to make the objections that Dylann could not make, regardless of our status as

8

IFCD 005463

Ex. 71 pg.8 of 14

standby counsel. I also wanted them to make more of a record in real time about Dylann's behavior (his stuttering, his long pauses, and his inability to keep up with what was happening). The Court was discouraging any efforts to interject, but I am trained that it is important to persist, even under these circumstances. Otherwise, the record will not reflect what is really happening in the courtroom.

44.     There was conflict within the defense team over my sense of urgency about making this record. At some point, the team no longer wanted me to sit at counsel table because of this conflict.

45.     At this point in the trial, we were litigating the scope of our role as standby counsel. We also filed a motion arguing that the Eighth Amendment should prohibit Dylann from waiving mitigation in the penalty phase.

46.     Dylann let us represent him for the guilt phase of trial. Even he could see that he wasn't up to the task of trying to be a lawyer in that courtroom. When I wasn't engaged in urgent legal research and writing, I attended and observed the guilt phase portion of the trial from the front row of the gallery. I wrote and passed notes to the team when I thought it appropriate to object or otherwise preserve a legal issue.

47.     The government's first witness called our client "evil" and said that he belonged in "the pits of hell." She was visibly upset, and so was most of the courtroom. David did not object until a break in the proceedings was taken. We later filed a motion about this, as well.

48.     The courtroom felt like a funeral in a church. It was so quiet during the proceedings that one could hear the sobs of the grieving victim community in the audience. I recall a particularly disruptive outburst during the penalty phase. But many times, people were crying, including members of the prosecution team, members of the defense team, members of the public, witnesses, and jurors. Although he denied it on the record, I also saw Judge Gergel wipe his eyes at one point. He was looking upward as though he was trying to prevent tears from falling down his face.

9

IFCD 005464

49.     The victim community wore purple to court in solidarity with their lost loved ones. I was raised in the Episcopal church and have been a Sunday School teacher. I know that purple can carry religious significance. I was careful never to wear purple. I was worried that if I did, it would be seen as insensitive or disrespectful.

50.     There was a line to enter the courthouse most mornings. Our team arrived early to try to avoid it. As Dylann's trial began, Michael Slager's state trial was already underway across the street. Slager was a white police officer who killed a Black man. We were concerned about the impact of the Slager trial on our case. In November 2016, I suggested taking some action to address this before Dylann's trial started—for example, filing a motion to continue so we could temporally distance Dylann's case from Slager's. We did not file a motion until our trial was underway and the Slager mistrial occurred in December 2016.

51.     We did not make a contemporaneous record of the courtroom, courthouse, or local atmosphere. Because the team was unwilling to do so in court, I included some information in motions by quoting news accounts. This was intermittent, though, and did not adequately capture the daily experience of attending the trial.

52.     Dylann's mother, Amy Roof, had a heart attack one day while court was in session. I was sitting near her and observed her collapse, treatment by medical personnel, and removal from the courthouse. After this, Amy did not return to the trial. We did not ask for any accommodation regarding this event.

53.      My continued notes to the team about objecting to make a record were largely ignored. After a heated confrontation about objection strategy, I was reduced to tears in our work room at the courthouse. In that instance, David made my suggested objection when court resumed.

54.     Toward the end of the guilt phase, I raised with the defense team preparing mitigation witnesses for the penalty phase. This idea was

10

IFCD 005465

shut down. The other team members acted as if that part of the case was over because Dylann had prospectively refused it. I felt we should be prepared for a possible penalty phase or partial penalty phase if things changed. We could have presented mitigation as Dylann's counsel if he let us. We also could have presented the witnesses to Dylann to put on. He may not have been capable of doing this, but I felt like we had to be prepared to offer options—to try. Any mitigation at all would have been better than what the jury heard, which was nothing.

55.    Earlier, I'd been assigned to contact an expert to present evidence that Dylann could be safely housed in prison. Such an expert did not have to meet Dylann and could opine based on records he reviewed. We contracted with Dr. James Austin, a specialist in the field, and he drafted an affidavit. I now understand that Dr. Austin did not have materials our team had gathered about Dylann's behavior in pretrial detention, which would have supported his testimony. The affidavit Dr. Austin wrote was primarily about classification in the Bureau of Prisons. Information that Dylann had presented no problem in pretrial detention would have made the affidavit stronger.

56.    At the conclusion of the guilt phase arguments but before the guilty verdict, I left Charleston. The team dynamics continued to be strained, and another flare-up occurred. I told David I felt the situation was unproductive for everyone and unhelpful to Dylann. We agreed that I would work remotely, and I continued to draft pleadings for the team.

57.    From home, over the holidays, I prepared the motion for a second competency hearing (Docket 832) that was filed on December 29, 2016. This motion included the first defense reports from three experts: Dr. Maddox, Dr. Loftin, and Dr. Moberg. This motion also argued for the first time that Dylann was incapable of representing himself under *Indiana v. Edwards*.

58.    Although I volunteered to return for the second competency hearing, the team rejected that offer, and I did not attend, nor did I participate in preparing witnesses.

11

59.     The Court ruled that, at the second competency hearing, the team could present only information developed since the first competency hearing. Thus, the failure to present neuropsychological data and information about self-representation at the first hearing was carried over to the second.

60.     I have read the reports written for the post-conviction team by Dr. Lucker, Dr. Fritz, and Dr. Ouaou. These reports explain Dylann's skills deficits in ways that would have been useful for litigating Dylann's competency and capacity to self-represent.

61.     Judge Gergel again found Dylann competent and authorized him to proceed *pro se* for the penalty phase. The team agreed that I should return to Charleston just as the penalty phase began. The conflict on the team wasn't resolved, but we were all determined to do what we could to help Dylann.

62.     On January 6, 2017, I sent a message to the entire team—state and federal—suggesting we ask Dylann's family members to write letters he could offer as evidence in the penalty phase. The letters could have been as simple as, "I love him. I am sorry he did this. I cannot explain it. I will continue to love him and work with him on this." I asked in the message who could help gather such letters. There was no response to my message. I don't know why the team did not pursue this idea.

63.     During the penalty phase, we were standby counsel again and allowed to file only motions Dylann approved and signed. I saw Dylann only in the courtroom. Most afternoons, I would tell him what motions we planned to prepare for him overnight. Most mornings, before court began, I would show him drafts.

64.     Because we ran out of time to file some very important motions, Dylann had to file them *pro se*. These included motions regarding victim impact evidence. The *pro se* motions that Dylann filed were much less sophisticated than the usual motions on this subject. Moreover, because the

12

IFCD 005467

Ex. 71 pg.12 of 14

motions were filed when the penalty phase was underway, Judge Gergel had much less time than usual to consider them.

65.    Serving as standby counsel for Dylann's *pro se* litigation was difficult. In a short amount of time, and in a public place, we had to explain the facts and law behind whatever motion (or motions) we were proposing. I drafted these motions, and I tried to do so in plain language. I tried to explain them in lay terms, breaking things down as much as possible. Sometimes Dylann would agree to file what I wrote. Although he expressed understanding, I wasn't always confident that he did.

66.    When we discussed the motions, Dylann rarely made eye contact with me and became easily flustered. He was prone to blushing attacks and stuttering. Even when not flustered, his speech patterns were unusual. When he spoke, he paused frequently, for long periods, and at unexpected times. Sometimes, I thought he had finished speaking, but he had not, and we would talk over each other. Other times, the conversations were stilted, as we each waited for the other to speak. Often—but not always—if I waited, Dylann could collect and share his thoughts. His tone, volume, and expression often seemed inappropriate, and his speech could be pressured, despite the pauses.

67.    Dylann was anxious about, and distracted by, things going on around him. He rarely maintained attention to the paperwork I was showing him. He kept an ear cocked to hear what people around us were saying and would peer around me to see what else was going on in the courtroom. I learned that communication was more efficient if I spoke to Dylann before too many people arrived in the courtroom.

68.    Dylann would hyper-focus on one less consequential topic to the exclusion of more serious or pressing ones. I recall when he fixated on my having used too much fabric softener when washing his court clothes (team members took turns doing his laundry). He was immovable from this concern despite both being in a federal death penalty trial and my assurance I would not make this mistake again.

13

IFCD 005468

69.     Again during the penalty phase, I felt that the courtroom problems with Dylann were not adequately captured on the record, and I urged the team to make a better record. Dylann continued to be unable to object when standby counsel suggested. I wanted to document every instance of this. I worried it could be pertinent to his competency, *Faretta*, and *Indiana v. Edwards* claims, which were now emerging as appellate concerns. I understand the resistance to objections; lawyers often feel they may interrupt the flow of a trial or annoy jurors or the judge. But the record must reflect goings-on in the courtroom, nonetheless. In this case, it was hard to imagine things getting worse for Dylann.

70.     I recall reviewing Father Parker's testimony from the second competency hearing and feeling he would have made a good penalty phase witness. Dylann rejected calling Father Parker at the penalty phase. He did this because Father Parker could not commit to answering "no" if asked whether Dylann had symptoms of mental illness. Of course, if Dylann had called Father Parker as a witness, he could have declined to ask that question. And it would not have been in the government's interest to ask it. But this was the extent of Dylann's paranoia, fear, and distrust: we could not persuade him it was safe to call even Father Parker.

Under 28 U.S.C. §1746, I, Sarah Gannett, declare under penalty of perjury under the laws of the United States that the above is true and correct.


June 27, 2025 at Baltimore, MD
_____
Date and Place

_____
         Sarah Gannett

14

IFCD 005469

Ex. 71 pg.14 of 14