LETTER FROM CHARLESTON

# INSIDE THE TRIAL OF DYLANN ROOF

*The complicated moral calculations that followed a horrific crime.*

**By Jelani Cobb**

January 29, 2017

⬚⁺ **Save this story**



"I realize these people are not criminal," Roof said of the dead. "They're in church."  Illustration by Brian Stauffer

Early on the morning of December 7th, a dozen officers from the Department of Homeland Security were stationed outside the federal courthouse at 85 Broad Street, in Charleston, South Carolina. It was warm out, and the officers looked both relaxed and alert, talking among themselves as they kept watch. The federal building is a bunker, all right angles and gray concrete, completed in 1987. Across the street stands the county courthouse, designed by James Hoban, the architect of the White House, and diagonally opposite is the city hall, built in 1801. The federal building would mar what the American Planning Association calls one of the nation's "great streets," except that it is hidden by a red brick antebellum structure that faces the street—an architectural sleight of hand that says much about the reasons that the Homeland Security officers were on Broad Street that day.

The federal trial of Dylann Roof was commencing, eighteen months after he shot and killed nine African-American congregants at the Emanuel African Methodist Episcopal Church, during evening Bible study, a crime he had confessed to on video in horrific detail and without remorse. The authorities were concerned that Roof, who repeatedly stated that he had committed the murders as a call to action for persecuted whites, had become a cause célèbre for white nationalists. That movement had been exiled to the political fringes after the murders, but it had regained some visibility during the Presidential campaign.

Two days earlier, a jury had deadlocked in the trial of Michael Slager, a North Charleston police officer charged with murder in the death of Walter Scott, an unarmed fifty-year-old black man, whom Slager had shot in the back as he ran from a traffic stop. When the judge declared a mistrial, Scott's mother invoked God's will toward justice, and the state's governor, Nikki Haley, cautioned patience until the state could retry the officer. Now some feared that, despite the confession and the overwhelming forensic evidence, something similar might occur in the Roof trial.

Judge Richard Gergel was presiding. He is an avuncular silver-haired man with a reputation for efficiency and a liberal bent; in 2014, he issued a ruling that same-sex couples have the right to marry in South Carolina, and he was responsible for installing a portrait of Jonathan Jasper Wright, the state's first black Supreme Court justice, in the Court building. The courtroom was solemn as Roof entered, wearing a gray-and-black striped prison jumpsuit. He is now twenty-two, but, with his blond hair in a fresh bowl cut, he appeared younger. He is small to the point of fragility, and his frame swam in the jumpsuit. He was charged with thirty-three felony counts; twelve of them were hate crimes, and eighteen others, including firearm and religious-obstruction charges, were punishable by death.

The family members of the victims, their supporters, the church's new pastor, Eric Manning, and other clergy filled the benches on the right side of the courtroom. Roof's mother and his paternal grandparents sat in the second row on the left. Many people had assumed that Roof was a representative of the disenfranchised white population whose narrative of loss had come to play an unexpectedly central role in the election. Roof dropped out of high school after repeating ninth grade and then dropped out of an online alternative school before later earning his G.E.D., but he did not grow up in poverty. His grandfather is a prominent real-estate attorney in Columbia. His father, who attended the trial sporadically, is a building contractor and owned several properties around the state. At the time of the shooting, Roof lived with his mother in a spacious home in Lexington, across the Congaree River from Columbia.

He had chosen to drive two hours to Charleston to commit his crime, he told the police, because the city is "historic." Mother Emanuel, as the church is known, traces its roots to 1816. It was a center of clandestine anti-slavery activity and, in 1822, when city officials discovered that congregants were planning a slave revolt, they burned the church to the ground. The current building was erected in 1891, on Calhoun Street, named for Vice-President John C. Calhoun, the intellectual progenitor of secession. The Calhoun monument, a column eighty feet high,

topped by a statue of the statesman, is half a block away. The monument and the church, which came to play a central role in the Southern civil-rights movement, stand like a statement and its rebuttal. Roof had drawn up a list of half a dozen churches before settling on Mother Emanuel. "I realize these people are not criminal," he said. "They're in church." He chose them, he explained, because killing a black drug dealer would not have generated the same attention.

The lead prosecutor was Jay Richardson, an Assistant U.S. Attorney, based in Columbia. He is a small dark-haired man who speaks in a commanding tone. Roof's mother sank down on the bench as he delivered his opening statement, which contained details of the crime that had previously been withheld from the press. At a certain point, she slumped over. It seemed for a moment that she had fainted, but she was taken to a hospital, and it was later learned that she had suffered a heart attack. She survived, but did not return for the remainder of the trial.

Richardson reported that Roof pulled into the church parking lot and sat in his car for some time, "contemplating," before going inside. He had loaded eight clips of hollow-point ammunition for his Glock .45 semiautomatic handgun, because, Richardson implied, he wanted to have eighty-eight bullets; the number is white-nationalist code for "Heil Hitler."

The most well known of Roof's victims was Emanuel's pastor, the Reverend Clementa Pinckney, who also served in the South Carolina State Senate. (He became a member of the state House of Representatives in 1996, when he was twenty-three, the youngest African-American ever elected to the state's legislature.) Pinckney welcomed the newcomer, gave him a Bible, and offered him a chair next to him in the circle where the twelve attendees of the study group sat. Roof's motive was "retaliation for perceived offenses" against the white race, Richardson said. "He also talked about 'the call to arms,' the hope that his attack

would agitate others, worsen race relations, increase racial tensions that would lead to a race war."

Four months before the shooting, the Equal Justice Initiative issued a report on the history of lynching in the United States after Reconstruction. There were a hundred and eighty-four lynchings in South Carolina. The last occurred in 1947, when a mob beat, stabbed, and shot to death Willie Earle, a twenty-four-year-old black man who had been accused of murdering a white cabdriver from Greenville. Strom Thurmond, who was then the governor, pushed for those responsible to be brought to trial, perhaps worried that the incident would undercut efforts to recast the state's brutish image. Thirty-one white men were charged; all were acquitted. Richardson, in his opening, seemed to suggest that lynching had not ceased in South Carolina; it had just been on a sixty-eight-year hiatus. Later in the trial, he made that connection explicit, charging that Roof was guilty of "a modern-day lynching."

Few people in Charleston's legal community expressed interest in handling the defense, so the court appointed David Bruck to represent Roof. Bruck is originally from Montreal but attended law school in South Carolina and worked there for more than twenty years, both as a public defender and in private practice. He now teaches law in Virginia, at Washington and Lee University, where he also directs a death-penalty defense clinic; he almost exclusively takes on cases that involve the death penalty, which he views as both unjust and racist in its application. In 1983, he wrote a groundbreaking article for *The New Republic*, in which he argued that the imposition of capital punishment, a practice that reinforced the value of the lives of white victims over those of black ones, was as troubling as violent crime itself.

In 2015, Bruck served on the defense for Dzhokhar Tsarnaev, during his federal trial for the Boston Marathon bombing. He had previously represented Susan Smith, a white South Carolina woman who, in 1994, drowned her two young sons in a lake and blamed the act on a fictional black carjacker. (Tsarnaev was sentenced to death; Smith was given a life sentence.) His thinking appears to be that if the lives of defendants charged with heinous crimes can be spared, so could the lives of those charged with lesser crimes. If the bar is raised high enough, the death penalty might never be applied.

Bruck's relationship with Roof had been difficult almost from the outset. The defense called for a competency assessment and moved to have Roof declared mentally unfit, which he vigorously resisted. Roof asked Judge Gergel to be allowed to represent himself, which he did, during the jury selection, then asked to have counsel reinstated for the guilt phase of the trial, but not for the penalty phase. That ultimately led to a second competency hearing between the two phases.

In the opening statement for the defense, Bruck, who seems almost congenitally soft-spoken, addressed the jury in such low tones that some family members had to lean forward in their seats in order to hear him. "The story that Mr. Richardson just finished telling you really did occur," he said, referring to the prosecutor's graphic recounting of the murders. Everyone, himself included, Bruck said, expected that the verdict "will be guilty." The jurors may have been wondering why there even was a trial, he said. Roof had offered to plead guilty in exchange for a life sentence but the Justice Department had not allowed it. Many people in Charleston thought that Loretta Lynch, the U.S. Attorney General, should have spared the families—and the city—the ordeal of a trial, but she ruled that the hate-crime elements of the case warranted the harshest sentence at the government's disposal. The federal hate-crime statute that covers racially

motivated crime, however, does not carry the death penalty, which accounts for some of the additional charges. The trial, with its attendant expense and emotional trauma, Bruck intimated, was purely a function of the government's desire to pursue the death penalty.

Shortly after one o'clock, Richardson called the first witness: Felicia Sanders, a longtime member of Emanuel. She escaped harm that night, only to witness the death of her son, Tywanza, a twenty-six-year-old poet, barber, and musician, who had planned to start graduate school in the fall. Felicia Sanders is fifty-nine, with deep-brown skin and shoulder-length brown hair, and that day she wore a floral-patterned dress with a purple cardigan. She owned—and, until the shooting, had operated—a local salon, where her son had grown up amid a hive of conversation, jokes, and gossip. She speaks with a pronounced Charleston accent, and when Richardson asked her if she was married she looked at her husband, sitting in the front row, and answered "Yes" so wearily that the courtroom erupted into laughter.

Then Richardson asked her about Roof's behavior in the church. "Most of the time, he hung his head down just the way he's doing right now," she said. Tywanza was an avid social-media user, and he uploaded a video of himself at the church to Snapchat. Roof can be seen in the background, sitting in the Bible circle. "He was there for forty-five minutes to an hour," Sanders continued. "We stood up and shut our eyes to say a prayer." When she heard the first shots, she assumed that the noise stemmed from a problem with a new elevator that was being installed, but then she looked at the defendant. "I screamed, 'He has a gun!' " she said. "By then, he had already shot Reverend Pinckney."

Roof began firing randomly. At one point, he paused to ask Polly Sheppard, a seventy-two-year-old retired nurse, if he had shot her yet. "My son rised up to get the attention off Miss Polly, even though he had already got shot," Sanders told the jury. "He stood up and said, 'Why are you doing this?' " She continued, "The

defendant, over there with his head hanging down, refusing to look at me right now, told my son, 'I have to do this, because you're raping our women and y'all taking over the world.' " She added, "That's when he put about five bullets in my son." Sanders lay on the floor, shielding her eleven-year-old granddaughter, holding the girl so tightly that she worried that she might smother her. She went on, "I said, 'Tywanza, please lay down.' He said, 'I gotta get to Aunt Susie.' " Susie Jackson, who was eighty-seven, was the family matriarch, Tywanza's great-aunt on his father's side. She had been shot, but Tywanza managed to crawl over to her, and reached out to touch her hair, before he died. Sanders began to sob as she recalled her son's final moments. She'd had a difficult pregnancy with him—the doctors warned that she might miscarry—and she had always thought of his birth as a testament to faith. She had come to think of his death in similar terms. Sanders told the court, "I watched my son come into this world and I watched my son leave this world."

The family members sat quietly throughout most of the trial, but Sanders's words left several of them weeping. The sign-language interpreters who relayed the proceedings to Gary Washington, whose mother, Ethel Lance, was among the dead, were crying. The courtroom sketch artist and many of the journalists present paused to wipe away tears. Judge Gergel called a short recess.

When the court reconvened, Bruck, during his cross-examination of Sanders, asked if Roof had said anything as he left the church. "Yes," she re-plied. "He said he was going to kill himself, and I was counting on that. He's evil. There's no place on earth for him except the pit of Hell."

Dylann Roof, in writings found during a search of his prison cell, imagined himself the last stalwart of the Lost Cause of the Confederacy. He wrote that "segregation was not a bad thing. It was mostly defensive." (When investigators asked where he got his information, he said, "It's all there on the Internet." He had found the Council of Conservative Citizens Web site, which

descended from the old White Citizens Councils.) The Civil War began in Charleston. The Ordinance of Secession was signed in Institute Hall, on Meeting Street, in December, 1860; the first shots were fired at Fort Sumter, in the harbor, a few months later. The reaction of many Charlestonians to the extraordinary moment, at a bond hearing the day after Roof's arrest, when, one by one, family members stood and forgave him, was an outgrowth of the city's relationship to that past. Forgiveness was not just an example of how to metabolize hatred directed at you, or just a demonstration of Christian faith, though it was both of those things. It stood for a broader redemption, an exoneration from history itself.

One afternoon during the trial, I visited the Confederate Museum, in Market Hall, on Meeting Street. The hall was built in 1841, and served as the headquarters of a market where, the museum's Web site states, "fruits, meats, vegetables, and fish were sold—no slaves." In 1899, the Daughters of the Confederacy opened the museum in a large room on the second floor. Glass cases display Confederate uniforms, swords, volumes of the military registries of the Confederate States of America, and aged histories of the conflict. Chunks of shrapnel from the Union's assault on the city rest on shelves. A South Carolina secession flag dominates the center of the room.

One of the docents, a red-haired woman in her forties, introduced herself as Jill. She wore an orange Clemson University sweater, in honor of its football team, which had clinched the national championship the night before. I told her that I was in town for the Roof trial, and she said, "He's just a crazy nut," adding that the jury shouldn't need to deliberate long before passing a death sentence. Another docent, Barbara, who belongs to a Methodist church near Emanuel, said that she'd been deeply moved by the victims' families: "I was blown away by their faith. It was completely unshakable." When I asked the two women if it was possible to interpret Roof's motives as an extension of the Confederate cause, they both demurred. "We can't control how crazy racists use the symbols," Jill said. "What he's doing isn't connected to anything to do with our heritage," Barbara added. A

man visiting the museum agreed, saying that Roof did not understand the Confederacy and had merely retrofitted it to his terrible world view.

During the recent battles over the appropriateness of flying the Confederate flag from public buildings, some Southerners rallied around the phrase "heritage, not hate." At the museum, it occurred to me that this act of distancing was what Roof most fiercely rejected. Charleston today is a testament to the successful paring of hate from heritage. Herb Frazier, a black journalist who grew up in the city and has attended Emanuel since childhood, told me that black Charlestonians have always hated the Calhoun monument. "He looks down with this scowl on his face," he said. Then, in 1999, Charleston's Holocaust Memorial was erected just fifty feet from the base of Calhoun's column. That proximity suggests either a wishful denial of Calhoun's legacy or a level of irony not typically found among municipal planners.

Last year, Frazier collaborated with Marjory Wentworth, South Carolina's poet laureate, and Bernard Powers, a professor of history at the College of Charleston, on "We Are Charleston," a book that puts the church murders in the context of the city's racial history and records the responses to it. A week after the shooting, following a vote in the legislature, Governor Haley called for the removal of the Confederate flag that had flown at the State House since 1961, an act that was widely praised. But Wentworth pointed out that the decision was at least partly pragmatic. "We've been boycotted ever since it went up," she said. "You don't read much about that. There were a lot of business leaders that wanted it down." It was a recognition not altogether distinct from the one that Strom Thurmond may

2:15-cr-00472-RMG          Date Filed 07/17/25     Entry Number 1077-77     Page 12 of 23

have reached sixty-eight years earlier: that racism, at least in its most overt forms, is bad for business.

But for Roof and the fraternity that he sought out on Web sites like Stormfront, where he operated under the user name LilAryan, this paring was a contradictory undertaking. What is the point, he seemed to reason, of commemorating the Confederacy if you ignore the reason that it existed in the first place?

The second day of the trial began with a debate between the defense and the prosecution about the velocity with which Roof's soul might arrive in Hell. Bruck had filed a motion for a mistrial, arguing that the jury might construe Sanders's statement that "there's no place on earth for him" as a plea for the death penalty. Richardson objected. "She was not commenting on the punishment," he said, but rather on where Roof would have gone if he killed himself. He added, "That is also where he's going if he dies of natural causes or the state does it."

For many people in Charleston, being asked to decide whether Roof should be executed amounted to what older Southern blacks refer to as being "put in a trickbag": a circumstance in which there are no good options and one must reconcile with the bad ones. It had been noted that the family members and the congregation were averse to having Roof put to death, but they were not unanimous in their views. Eric Manning, the pastor, told me that the A.M.E. church opposes the death penalty: "We are called to be the light of the world, so life is sacred." Carey Grady, a senior pastor at Reid Chapel A.M.E. Church, in Columbia, had known Pinckney from childhood. The two friends kept in touch regularly, and often texted. Grady showed me the message he sent Pinckney when he first heard about the shooting. "I know you're getting dozens of calls right now," it says. "You and the Emanuel Church family are in our prayers." Pinckney, Grady said, almost to himself, "never replied." The criminal-justice system was unfair to African-Americans, Grady told me, then added, "I hate to say it, but, if the system is unjust, the most just thing to happen in that system is for Roof to

get the death penalty, because otherwise you make the statement that black lives really don't matter."

Malcolm Graham is the youngest brother of Cynthia Hurd, one of the victims. She had worked for more than thirty years as a librarian for the public and the university systems. Graham, a former state senator from North Carolina, recently ran for Congress—something that his sister had encouraged him to do. He concurred with Grady: why have the death penalty if it wasn't used in this instance? Sharon Risher's mother, Ethel Lance, was a lifelong member of the church. She died that night, too, but Risher thought it preferable that Roof live out every day of his natural life in full knowledge of what he had done. Rose Simmons's father, Daniel, an assistant pastor at the church, was shot when he ran to help Clementa Pinckney; he died in the hospital a few hours later. Simmons told me that her own views were irrelevant, because Roof had "sentenced himself to death by his actions."

Those moral calculations, as with everything else associated with the case, were refracted through the lens of race. In a statewide poll, two-thirds of African-Americans favored sentencing Roof to life in prison, while sixty-four per cent of whites believed that the death penalty was warranted. That result mirrored the general division between blacks and whites on the issue of capital punishment, which is driven, at least in part, by the fact that it has disproportionately been used against black defendants. It had to be said that excising Roof's presence from the world would change little about black Charlestonians' perspective on what happened at the church that night. Their white counterparts, meanwhile, were eager to reject Roof's overtures to them. Joe Riley, the city's mayor at the time, emphasized that the suspect was not from Charleston, a point that Riley's successor, John Tecklenburg, reiterated, as did other whites with whom I discussed the trial. If race offered a reluctant commonality between Roof and white Charleston, geography provided at least a literal distancing.

Then, there was the fact that, during the past forty years, eighty-one per cent of those given the death sentence in South Carolina had been convicted of killing white victims. A death sentence for Roof would add a patina of fairness to a practice steeped in the racial disparities of the criminal-justice system. A life sentence, on the other hand, would seem to suggest that, whatever the opaque mathematics of race, a black life is worth less than one-ninth of a white one. For David Bruck, Roof's case represented another chance to address the unjust imposition of the death penalty. At certain moments in the trial, though, his belief that he could diminish a racist practice by saving the life of a white supremacist appeared idealistic to a fault. During his cross-examination of Joseph Hamski, the F.B.I.'s lead investigator in the case, Bruck asked, "What became of Denmark Vesey?" Vesey, a slave who had bought his freedom and become a carpenter, was the lead plotter of the 1822 revolt at the church. "He was hung," Hamski replied. Bruck was suggesting that the death penalty is irrevocably tainted by racism, but he had seemed to equate Vesey, a man who was prepared to kill for the cause of black freedom, with Roof, a man who had killed because he thought that blacks were too free. The families murmured uneasily at the comparison.

The abstract morality of the sentencing contrasted with the concrete particulars of the crime, which were presented on the second day of the trial. Brittany Burke, who had served as an agent with the South Carolina Law Enforcement Division, testified that seventy-four shell casings had been recovered from the scene, and that fifty-four bullets had been removed from the nine bodies. Clementa Pinckney was shot three times; Sharonda Coleman-Singleton, a dynamic young preacher at the church, was shot five times. DePayne Middleton-Doctor, a minister and an admissions coördinator at a local learning center, was shot eight times; Cynthia Hurd, six times. Tywanza Sanders was shot four times; Ethel Lance, seven; Myra Thompson, who had received her preaching certificate that evening and was excited about leading Bible study for the first time, eight

times. Daniel Simmons was shot four times. Susie Jackson, the oldest of the victims, was shot eleven times.

Judge Gergel had suggested that the family members give strong consideration to whether they would return to the courtroom after the morning recess. The prosecution was going to walk the jury through the shooting, with photographs of the crime scene, and there was no shame in wanting to avoid that spectacle. But the families returned, escorted by two court-appointed advocates, who were there to offer support. The photographs showed a spacious room, with a small altar and several round tables and chairs, as if in preparation for a reception. A bulletin board read, in large red letters, "2015 Congrats Grads!" A Bible rested undisturbed on one of the tables, but most of the furniture was riddled with gunfire. The dead lay in an obscene array about the room. Many in the courtroom wept, again, at that sight.

I watched Roof during the prosecution's presentation, and it seemed possible that he had not fully realized the extent of his actions prior to that moment. In his confession, when the police officers asked him how many people he had shot, he said, "If I was gonna guess, five," and he appeared surprised to learn that he had actually killed nine. But, in the courtroom, he sat impassively—as he did throughout the trial—his response to the atrocities as inscrutable as his capacity to have committed them in the first place.

On December 15th, when it was time for Bruck to present his closing argument, he stood facing the jury with his hands clasped behind his back. He described Roof as "really a boy, who gives his whole life over to a belief that there is raging in our society a fight to the death between black people and white people that is being concealed and covered up by some sort of vast conspiracy." Bruck added, "He doesn't seem to think that anybody but him really understands this."

Bruck pointed out that Roof had no escape plan. He used seven clips of ammunition during the attack, but kept the eighth with him as he departed, planning, as he said in the church and also during his confession, to kill himself if escape proved impossible. When he was arrested, the day after the shooting, in Shelby, North Carolina, he had been driving toward Nashville. When the police asked him why, he replied, "Why not? I've never been to Nashville." Because Roof had refused to have his mental-health history discussed, Bruck was left to portray him as an alienated young man, not fully capable of distinguishing between the real world and the hyperbolic paranoid clamor that he found on the Internet.

Bruck's emphasis on Roof's age wasn't entirely lost on the court. Andy Savage, the lawyer who represented several of the families in a separate lawsuit against the federal government, for allowing Roof to purchase a firearm despite a drug arrest —and who had also, incidentally, represented Officer Michael Slager in his trial— told me that the families initially suspected that Roof hadn't acted alone. "That changed after watching the confession," Savage said. Roof was not the product of sinister manipulation: his biggest complaint was his inability to find like-minded patriots—he dismissed other white nationalists as being all talk. He was, instead, a prodigy of hate.

The jurors withdrew just after one o'clock. That afternoon, Roof was convicted of all thirty-three charges. Felicia Sanders nodded silently each time Judge Gergel uttered the word "guilty."

The court recessed until the new year, when the penalty phase of the trial started. Roof was representing himself again, and, as his defense sat nearby, he offered a disjointed opening statement, in which he told the jurors that he would not lie to them, reiterating that "there was nothing wrong with me psychologically," and asked them to ignore everything that they had previously heard from the defense. He spoke for barely three minutes. He called no witnesses and offered no evidence.

During the next few days, Richardson called twenty-three witnesses to attest to the character of the victims and to the impact of their deaths. The first of them, Jennifer Pinckney, the widow of the pastor, spoke for nearly three hours about the life they had shared since meeting as college students. Anthony Thompson talked about the strength of the bond between him and his wife, Myra; he sighed as he looked at their wedding photograph, still awed by her beauty. "She was the one I prayed for," he told the court. At Judge Gergel's prodding, Richardson had the subsequent witnesses testify for shorter periods. But nearly all of them brought photographs of their loved ones, each of which had to be approved by the defense, which, in this case, was the defendant. The testimonies became a surreal processional, in which Roof became privy to the personal achievements and intimate family moments of the deceased. Killing the nine people was one crime. Being allowed to posthumously get to know them seemed an altogether different one.

On the afternoon of January 10th, the prosecution rested, and Roof made a brief closing statement, in which he said, "I felt like I had to do it. I still feel like I had to do it." The jurors withdrew to deliberate. They did not, in fact, need long. When the court reconvened, just three hours later, they recommended the death penalty for Roof. Gergel thanked the jurors for their service and dismissed them. The next day, he allowed those family members who had not yet had a chance to deliver their statements to address the court; most of the jurors returned to hear them. Gary Washington, through his sign-language interpreters, told of a sense of

foreboding that had hung over him on the day of the shooting, and how he had anxiously tried to reach his mother that night. The news of her death hit him so hard that he had to be hospitalized. "You don't know anything about us," he said to Roof. "You don't know anything about who we are."

Cynthia Hurd's brother Melvin Graham, a retired laboratory technician, also spoke. He is taller and thinner than Malcolm Graham, but he has the same features and the same note of sadness in his eyes. In the tone of a man who had marshalled the entirety of his will toward self-control, Melvin told Roof, "You tried to kill my sister, but you failed." Instead, Roof had immortalized her. As a librarian, she had helped generations of students and readers, and her death had spurred an outpouring of recognition for that work: "the Cynthia Graham Hurd Fellowship, University of South Carolina; the Cynthia Graham Hurd St. Andrews Regional Library, Charleston, South Carolina; the Cynthia Graham Hurd Memorial Scholarship, College of Charleston." Graham named nearly a dozen such tributes. "And that's just what I could remember off the top of my head," he said. The stories served to remind the court of what had been lost, but they also must have reassured Roof that these were indeed the type of blameless, decent people whom he said he had set out to hurt.

Judge Gergel then turned to the final sentencing. "This trial has produced no winners, only losers," he said. "This proceeding cannot give the families what they truly want, the return of their loved ones." He sentenced Roof to death eighteen times, and handed down an additional fifteen life sentences, for the hate crimes and other charges. It took Gergel ten minutes to read the entire sentence. Roof then stood and requested new counsel to handle an appeal. When Gergel asked him on what basis he was making the request, Roof smirked and said of Bruck, "I just don't trust him." The request was denied.

The State of South Carolina is also due to try Roof, but that trial has been postponed indefinitely. Last summer, Scarlett Wilson, the local State Solicitor, balked at the federal trial's taking precedence over the state prosecution, noting

that the federal government hadn't carried out an execution since 2003. The fate of Dylann Roof will likely wind through thickets of legal appeals and an equally onerous state trial before it is ultimately resolved.

The day after the sentencing, I flew to San Francisco. As I checked into a hotel, I made small talk with the bellman, Aaron Thames, an African-American in his early forties. I asked if he was a native of the Bay Area, and he replied, "No, I'm originally from Charleston, South Carolina." When I told him that I'd just come from the Roof trial, he looked stricken. He said, "My family knew Reverend Pinckney and Cynthia Hurd since I was a child. Miss Cynthia is one of my mother's oldest friends, and when we would visit the library she would always have books set aside for me and my brother to read."

I had flown almost as far from South Carolina as I could get without leaving the continental United States, but had encountered the consequences of Roof's crime in the transparent grief of the first person I'd spoken with in a new city. The immensity of the pain that Roof has inflicted upon Charleston is not contained by geography. It conforms perfectly to the contours of the nation that produced him. ♦

*Published in the print edition of the February 6, 2017, issue, with the headline "Prodigy of Hate."*



*Jelani Cobb, a staff writer at The New Yorker and the dean of the Columbia Journalism School, is an editor, with David Remnick, of "The Matter of Black Lives," an anthology on race in America.*

More:   Racism    Trials

## READ MORE

THE POLITICAL SCENE

## The Matter of Black Lives

A new kind of movement found its moment. What will its future be?

**By Jelani Cobb**

ANNALS OF EDUCATION

## Class Notes

**By Jelani Cobb**

MINI CROSSWORD

## The Mini Crossword: Thursday, March 27, 2025

A koala's mostly consists of eucalyptus leaves: four letters.

**By Mollie Cowger**

Ad

CRITICS AT LARGE

## Joe Rogan, Hasan Piker, and the Art of the Hang

New forms of media that invite intense parasociality are capturing the attention of young men. What does it portend for our politics?

THE POLITICAL SCENE PODCAST

## Will Trump's Obsession with Space Save NASA?

"NASA is going to be politicized in a way that it's never been politicized before," the reporter David W. Brown says. "And I'm afraid there's no way to undo that once it's happened."

THE FRONT ROW

## The Cinematic Glories of Manoel de Oliveira's Endless Youth

The Portuguese director, who made twenty-two features after the age of eighty, rejuvenated the art of movies by linking personal experience to the arc of history.

**By Richard Brody**

COMMENT

## The Greater Scandal of Signalgate

The spectacle of incompetence and the attempts to smear a reporter are a misery; even worse is the encroaching threat of autocracy that cannot be concealed or encrypted.

**By David Remnick**

POETRY PODCAST

## Edward Hirsch Reads Gerald Stern

The poet joins Kevin Young to read and discuss "96 Vandam," by Gerald Stern, and his own poem "Man on a Fire Escape."

BOOK CURRENTS

## Women Who Made Amanda Seyfried Feel Less Alone

The Emmy- and Golden Globe-winning actress discusses four books that examine some of the struggles that come with being a daughter, wife, and mother.

UNDER REVIEW

## "Airless Spaces" Captures the Nadir of the Second Wave

If Shulamith Firestone's last work haunts the feminist movement, it may be because it suggests something disturbing about feminism itself.

**By Moira Donegan**

BOOKS

## The Best Books We Read This Week

Our editors and critics review notable new fiction, nonfiction, and poetry.

3/27/25, 2:56 PM

2:15-cr-00472-RMG          Date Filed 07/17/25     Inside the Trial of Dylann Roof | The New Yorker     Entry Number 1077-77          Page 23 of 23

**By The New Yorker**



 Privacy Configurations