## DECLARATION UNDER PENALTY OF PERJURY

STATE OF NEW YORK      §

COUNTY OF NEW YORK     §

    Mark J. S. Heath, M.D., declares, under penalty of perjury, the following to be true and correct to the best of his information and belief:

### I.   QUALIFICATIONS

   A.   I am an Assistant Professor of Clinical Anesthesiology at Columbia University in New York City. I received my Medical Doctorate degree from the University of North Carolina at Chapel Hill in 1986 and completed residency and fellowship training in Anesthesiology in 1992 at Columbia University Medical Center. I am Board Certified in Anesthesiology, and am licensed to practice medicine in New York State. My work consists of approximately equal parts of performing clinical anesthesiology (specializing in cardiothoracic anesthesiology), teaching residents, fellows, and medical students, and managing a neuroscience laboratory. As a result of my training and research, I am familiar with and proficient in the use and pharmacology of the chemicals used to perform lethal injection. I am qualified to do animal research at Columbia University and am familiar with the American Veterinary Medical Association's guidelines for animal research and animal euthanasia.

   B.   Over the past several years as a result of concerns about the mechanics of lethal injection as practiced in the United States, I have performed many hundreds of hours of research into the techniques that are used during this procedure. I have testified as an expert medical witness regarding lethal injection in courts in California, Missouri, Maryland, Tennessee, Georgia, Kentucky, Virginia, Oklahoma, and Indiana in the following cases: *Morales v. Tilton*, Nos. 06-219-JF-RS, C-06-926-JF-RS (N.D. Cal.); *Taylor v. Crawford*, No. 05-4173-CV-C-FJG (W.D. Mo.); *Patton v. Jones*, No. 06-CV-00591-F (W.D. Okla.); *Evans v. Saar*, 06-CV-00149-BEL (D. Md.); *Baker v. Saar*, No. WDQ-05-3207 (D. Md.); *Reid v. Johnson*, No. 3:03CV1039 (E.D. Va.); *Abdur'Rahman v. Bredesden*, No. 02-2336-III (Davidson County Chancery Ct., Tenn.); *Commonwealth v. Lamb*, CR05032887-00 (Rockingham County Cir. Ct., Va..), *State v. Nathaniel Code*, No. 138860 (1st Judicial District Court of La. for Caddo Parish); and *Timberlake (Intervenor Woods) v. Donahue*, No. 06-cv-01859-KLY-WTL (S.D. Ind.); *State of Georgia v. Dorian Frank O'Kelley*, No. CR01-1281 (Superior Ct. Chatham County Ga. May 11, 2007). I have also filed affidavits or declarations that have been reviewed by courts or commissions in the above states and also in

Roane et al. v. Gonzales et al.,
Civ. No. 05-2337 (D.D.C.)

Pls.' Opp to Mot. J. on the Pleadings
and Mot. to Lift Stays

Exhibit 4 - REDACTED

Decl. of Mark Heath
Page 1 of 32

Pennsylvania, Georgia, New York, Alabama, North Carolina, South Carolina, Ohio, Texas, Missouri, Connecticut, Arkansas, Delaware, Nevada, Montana, and by the United States Supreme Court.

C.    I have reviewed the execution protocols and autopsy data (when available) from each of the above referenced states.  Additionally, I have reviewed execution protocols and/or autopsy data from Florida, Idaho, Oregon, and Arizona.

D.    As a result of the discovery process in other litigation, I have participated in inspections of execution facilities in the States of Maryland, Missouri, California, Delaware, North Carolina, Texas, and Alabama.  As part of my participation in the *Roane* case, I toured the Federal execution facility in Terre Haute, Indiana.

E.    As part of my participation in a lethal injection case in Delaware, I have twice toured the execution chamber at the Delaware Correctional Center in Smyrna. The first tour took place with Plaintiffs' lawyers.  The second tour took place some months later.

F.    During court proceedings, I have heard testimony from prison wardens who are responsible for conducting executions by lethal injection.

G.    I have testified before the Nebraska Senate Judiciary Committee regarding proposed legislation to adopt lethal injection.  I have testified before the Pennsylvania Senate Judiciary Committee regarding proposed legislation to prohibit the use of pancuronium bromide or other neuromuscular blocking agent in Pennsylvania's lethal injection protocol, and have testified before the Maryland House and Senate Judiciary Committees regarding legislation on the administrative procedures that govern the creation of lethal injection protocols.  I have also testified before the South Dakota House Committee on State Affairs regarding proposed legislation to amend the lethal injection statute.  Most recently, I testified before the Florida Governor's Commission on Administration of Lethal Injection as part of the Commission's review of the method in which lethal injection protocols are administered by the Florida Department of Corrections.  Mr. Harley Lappin, Director of the Federal Bureau of Prisons, was a member of the Florida Governor's Commission.

H.    My research regarding lethal injection has involved extensive conversations with recognized experts in the fields of anesthesiology, toxicology and forensic pathology, and correspondence with Drs. Jay Chapman and Stanley Deutsch, the physicians responsible for introducing lethal injection as a method of execution in Oklahoma.

I.    My qualifications are further detailed in my curriculum vitae, a copy of which is attached hereto as **Exhibit A** and incorporated as if fully rewritten herein.

Decl. of Mark Heath<br>Page 2 of 32

II.   **ASSIGNMENT**

    A.    I have been asked by Plaintiffs in the litigation styled *Roane et al. v. Gonzales, et al.*, Civil Action No. 05-2337 (RWR/DAR), filed in the Federal District Court for the District of Columbia, to review the procedures concerning lethal injection that have been disclosed to date by the Federal government to determine the likelihood that those procedures create unacceptable risks of inflicting excruciating pain and suffering on inmates while the lethal injection is administered.

    B.    I am being compensated at a rate of $300.00 an hour for my work.

III.   **SUMMARY OF FACTS ON WHICH THIS OPINION IS BASED**

    A.    I understand the following to be the state of information available about Federal executions by lethal injection:

        1.    **Execution Facility Layout**. A diagram of the execution chamber layout in Terre Haute is attached hereto as **Exhibit B**. The pictures attached hereto as Exhibits were taken from the Plaintiffs' tour of the Terre Haute facility prepared as it would be during an execution. The condemned is restrained on a gurney in the execution room. **Exhibit C**. The execution drugs are administered from the chemical room. There is a one-way mirrored window between the execution room and the chemical room that is covered by mini-blinds. **Exhibit D**. When the lights are illuminated in the chemical room, one can see through the one-way glass into the chemical room. The Intravenous ["IV"] lines and electrocardiogram leads pass from the chemical room into the execution via a port in the wall. **Exhibit E**. The IV lines drop from the port to the floor and are affixed to the floor with tape. **Exhibit F**. The IV system consists of open ends of tubing into which the drugs are apparently injected directly. **Exhibit G**.

        2.    **Visualization of the Condemned**. There is limited line of sight view of the condemned through the one-way mirrored glass from the drug room. An undated execution checklist provides that the inmate be covered by a sheet "up to his shoulders and cover[ing] leads coming from C [chemical] room." This means that sites of intravenous ["IV"] access are covered and, regardless of any ability to see the condemned from the drug room, there is no ability to visualize the sites of IV access. There is a remote camera in the execution chamber which transmits a picture of the condemned to the chemical room. **Exhibit D**.

        3.    **Intravenous Access.** The chemical room is stocked with medical kits entitled "Edwards Lifesciences Intro-Flex Percutaneous Sheath Introducer Kits." *See* **Exhibit H**; **Exhibit I**. These kits are used to establish

intravenous access to a central or other major vessel like the femoral vein. The kits include, among other things:

a.    Scalpel (*see* **Exhibit J**);

b.    Needles and thread for suturing (*see* **Exhibit J**);

c.    Introducer and catheter (*see* **Exhibit K**).

d.    I observed no equipment at the Terre Haute execution facility that could be used to establish an IV line in a peripheral vein. The Defendants have admitted that they used femoral vein intravenous access in each of the three previous federal executions and have recently confirmed that femoral vein access is the "preferred" IV site for Federal executions.

4.    **Other medical supplies.** The chemical room is stocked with other medical supplies including: clamps; scalpels; tweezers; and alcohol swabs, and IV bags and extension kits. *See* **Exhibit L; Exhibit M.** Included with the medical supplies are flashlights. **Exhibit N.**

5.    **Protocol.** The BOP has produced conflicting information about the thiopental amounts administered. Such information as is available has been presented in a chaotic, disarrayed, incoherent, and confusing fashion. It has, thus, been difficult to understand exactly what the BOP has done or is intending to do, but the following is my best attempt to understand the BOP's protocol:

a.    One set of documents, produced in the case *United States v. LeCroy*, No. 2:02-CR-038 (N.D. Ga.) in November 2003, attached hereto as **Exhibit O,** indicates that the Federal government prepares a single 50 cc syringe containing 5 grams of sodium pentothal (or thiopental) and then administers 10ccs, or **1 gram**, of that syringe. This document further provides that the government will use a "HEP lock flush with food color." In total, a 7-syringe set of drugs is prepared.

b.    An undated execution checklist, attached hereto as **Exhibit P,** indicates the following: "First injection commences. Four syringes filled with 1.25 grams each of Sodium Pentothal and sterile water."

c.    Another undated document, attached hereto as **Exhibit Q.** indicates the following: "1. Yellow – Sodium Pentothal" and is

Ex. 178 pg.4 of 40

annotated with the handwritten note saying "10gm." The Sodium Pentothal syringe is one of a 7-syringe set.

d.  The syringes set out for Plaintiffs' tour of the execution facility reflected a single syringe for sodium pentothal (or thiopental) within a 7-syringe set. *See* **Exhibit G.**

e.  An Addendum to BOP Execution Protocol, with an effective date of July 1, 2007, provides new information about the federal execution protocol.  *See* **Exhibit R.**  There are two sets of instructions for drug preparation and delivery depending on whether femoral vein placement or peripheral vein placement is used and femoral vein placement of IVs is considered "preferred."

   (i)  When drug delivery is intended through the femoral vein, a 7-syringe set of drugs will be used.  **Ex. R,** at ¶ H.  Four sets of syringes will be prepared for each execution, two to be used during execution, and two for backup.  **Ex. R,** at ¶ F.  Thus, for femoral vein drug delivery, a total of 28 syringes are prepared.

   (ii)  When peripheral vein drug delivery is intended, a 10-syringe set of drugs will be used.  **Ex. R,** ¶ H.  Four sets of syringes will be prepared for each execution, two to be used during execution, and two for backup.  **Ex R,** at ¶ F.  Thus, for peripheral vein drug delivery, a total of 40 syringes are prepared.

f.  Sodium pentothal drug concentration apparently varies according to whether the intended drug delivery is through a femoral or a peripheral vein.  For femoral vein drug delivery, the sodium pentothal is prepared in one syringe containing "5.0 grams of Sodium Pentothal in 10ccs of diluent." **Ex. R,** ¶ H.  For peripheral vein drug delivery, the sodium pentothal is prepared in four syringes, each containing "1.25 grams of Sodium Pentothal in 50 ccs of diluent." **Ex. R,** ¶ H.

g.  The Defendants apparently intend that two IV lines be used, one connected to the condemned, and the other connected to a disposal container.  The intent appears to be that a "blank" line will be used so that the executioners will not know who actually administers the lethal chemicals.  **Ex. R,** ¶ I.  It is not clear whether, during peripheral line placement (which requires a principal line and a

back-up), the "blank" line is yet a third line, or a diversion of the back-up line.

h.      The Addendum states that IVs will be inserted 30 minutes before execution and that, after inserted, there will be a "slow rate flow of normal saline solution begun." **Ex. R, ¶ G.** Although the Addendum purports to use an IV set-up that will allow for a drip of saline, during Plaintiffs' tour of the Terre Haute execution facility, which was purportedly set up as it would be for execution, the syringes were intended to plunged into an open IV line.

6.      **Rate of Drug Delivery.** Most documents produced do not describe the timing of intended drug delivery, but one document suggests the process of injection of the four syringes filled with 1.25 grams each of sodium pentothal will take 2 minutes and 45 seconds. The times for the three prior federal executions range from 2 to 6 minutes. Electrocardiogram (EKG) logs from the McVeigh and Garza federal executions indicate thiopental delivery took approximately one minute and 20 seconds (McVeigh) and forty seconds (Garza).

7.      **Assessment of Anesthetic Depth.** There are no written directions regarding the assessment of anesthetic depth during an execution. One undated execution checklist provides that the execution team should "wait for drugs to take effect. See if inmate is sleepy." **Exhibit S.** Another undated execution checklist says "[redacted person] waits until Inmate is asleep before he informs [redacted person] to begin phase II." The execution log for Louis Jones provides a direction to wait until he is asleep before beginning phase 2. There is no description of how the "sleepy" assessment is to be made, who performs the assessment, what level of anesthetic depth being "sleepy" corresponds to, or what to do if the inmate is not "sleepy." The July 1, 2007 Addendum provides that, after thiopental renders the condemned's "unconscious as determined by a qualified person" the "BOP supervisory personnel" will direct personnel to administer the remaining lethal substances." There is no description of who can be certified as a person qualified to assess "unconscious[ness]," no description of what level of anesthetic depth "unconscious[ness]" equates to, or how the assessment of "unconscious[ness]" will be made. The Defendants admit that "no employee or agent of the United States . . . has monitored depth of anesthesia of the Condemned Inmate by checking for that Inmate's response to noxious stimuli or other stimuli after sodium thiopental . . . has been administered." The Defendants also admit that administration of Potassium Chloride to an "unanesthetized person" would be a "noxious stimul[us]."

Decl. of Mark Heath
Page 6 of 32

8.    The July 1, 2007 addendum purports to offer procedures for the occurrence of "a situation not contemplated in this procedure" or if the death of the condemned has not occurred "within five minutes after the completion of the administration of the second syringe of Potassium Chloride." **Ex. R, ¶¶ K, L.** There is no description (beyond the absence of death 5 minutes after the completion of potassium chloride injection) of what circumstances would invoke the procedures outlined in paragraph L, or what the analysis of the "situation" would entail other than a "complete assessment of the situation."

9.    **Chain of Drug Custody.** Although there are some purchase orders for drugs included in the production of documents, there are no chain of custody documents reflecting the movement of or control over the execution drugs with in the custody of the Federal Bureau of Prisons.

10.    **Personnel.**

## IV.   SUMMARY OF OPINIONS

A.    I hold all opinions expressed in this declaration to a reasonable degree of medical certainty unless otherwise specifically noted.

B.    Based on my review of this material and my knowledge of and experience in the field of anesthesiology and my studies of lethal injection in other jurisdictions, I have formed several conclusions about the Federal lethal injection protocol. These conclusions arise both from the details disclosed in the materials I have reviewed and from medically relevant, logical inferences drawn from the omission of details in those materials (e.g., details regarding the training of the personnel involved; details of all of the medical equipment used; and details of the precise methods by which the personnel involved use the equipment to carry out an execution by lethal injection).

C.    The Federal execution protocol is shockingly deficient in, at a minimum, the following ways:

1.    Failure to provide a written protocol in the past detailing drug preparation and administration, making it difficult or impossible to ascertain how much thiopental the federal government has given any condemned inmate;

Decl. of Mark Heath<br>Page 7 of 32

2.    The current Addendum, which attempts to fulfill the role of a written protocol for future executions, is riddled with flaws which risk unnecessary harm to the condemned and are illustrative of the Defendants' utter inability to understand the complex process of execution by lethal injection. Those flaws include, but are not limited to:

    a.    Preparing a mix of thiopental at a 50% concentration which is vastly beyond the clinically recommended concentration, for no apparent reason, and which could cause great pain upon administration if there is extravasation[1];

    b.    Failure to ensure that executioners can assess backpressure on the IV lines by using a "blank" line unconnected to the condemned;

    c.    Failure to ensure custody and control over the execution drugs;

    d.    Failure to provide adequate visualization of the IV site(s);

    e.    Failure to adhere to contemporary standards of care by planning to use femoral vein catheterization as a default method of IV access;

    f.    Failure to use qualified/appropriate personnel in the execution process by including ███████████ as part of the process;

    g.    Failure to ensure medical personnel are qualified to participate in execution and simply assuming their skills and judgment comport with contemporary standards of care;

    h.    Failure to make any meaningful assessment of anesthetic depth, while recognizing that it is necessary to know whether an inmate has been adequately anesthetized; and

    i.    Failure to plan appropriately for medical emergencies or adverse events during execution.

D.    It is my opinion that proceeding with an execution under the current BOP procedure creates a substantial risk of violating minimum standards of decency designed to prevent the infliction of excruciating pain and suffering on human beings. It is inevitable that, without major changes, a botch will occur.

---

[1] An extravasation involves the injection or leakage of drug into tissue outside of a vein as occurred, for example, in the Diaz execution in Florida.

Decl. of Mark Heath
Page 8 of 32

E.     The BOP protocol suffers from many of the same kind and character of deficiencies in process that resulted in the botched execution of Mr. Angel Diaz in Florida,[2] which caused the Florida Commission to recommend a revision of Florida's execution protocol to include, among other things, vigilant monitoring of the inmate's IV sites and anesthetic depth during execution. The protocol exhibits the same kind and character of deficiencies which caused United States District Judge Gaitan to halt all executions in Missouri until reasonable processes could be put in place to assure the absence of unnecessary risks of conscious suffering.[3]     The protocol exhibits the same kind and character of deficiencies which caused United States District Judge Fogel to order the State of California devise a new lethal injection protocol.[4]

V.     **SUMMARY OF EVIDENCE REVIEWED**

A.     I have reviewed the following documents:

1.     Defendants' Initial Disclosures;

2.     Defendants' Answers to Plaintiffs' First Set and Second Set of Interrogatories and Defendants' Answers to Plaintiffs First Set of Admissions;

3.     Documents produced by Defendants in conjunction with initial disclosures;

4.     Defendants' Response to Plaintiffs' Request for the Production of Documents and documents produced by Defendants in response;

5.     Defendants' supplemental document productions of April 20, 2007 and May 14, 2007.

6.     Defendants' Response to Plaintiffs' Second Request for the Production of Documents and documents produced by Defendants in response.

---

[2]The report of the Florida Governor's Commission on Lethal Injection is available at: www.law.berkeley.edu/clinics/dpclinic/Lethal%20Injection%20Documents/Florida/lethalinjectionfinalreport.pdf.

[3]*See, e.g., Taylor v. Crawford, et al.,* No. 05-4173, 2006 WL 1779035, at *9 (W.D. Mo. June 26, 2006) (Holding the "State in conjunction with the [doctor] will have discretion to determine the most appropriate location on the inmate's body to inject the drugs" and rejecting automatic use of the femoral vein as a site of injection), *rev'd in part on other grounds, Taylor v. Crawford et al.,* __ F.3d __, No. 06-3651, 2007 WL 1583874 (8th Cir. June 4, 2007).

[4]*Morales v. Tilton,* 465 F. Supp. 2d 972, 979-981 (N.D. Cal. 2006).

B.    I have toured the Federal execution facility in Terre Haute, Indiana. That tour included review of the medical equipment used and intended to be used in Federal executions.

C.    In addition to the foregoing, and the documents, evidence, and testimony in the previously mentioned litigations, I have also reviewed the following:

    1.    Newspaper articles which contain eyewitness accounts of the three Federal executions by lethal injection;

    2.    Documents produced by the Federal government in the case *United States v. William Emmett LeCroy, Jr.*, No. 2:02-CR-38 (N.D. Ga.), including: a one-page document entitled Chemical Substances Preparation (USA ; a one-page untitled document reflecting an intended order of chemical administration; and a 54-page document entitled Bureau of Prisons Execution Protocol;

    3.    Selected documents produced by the State of Tennessee concerning Tennessee's 2007 review of execution protocols;

    4.    State statutes such as Arizona Revised Statute § 11-1021, regarding the proper care, maintenance and destruction of impounded animals and similar statutes pertaining to euthanasia of animals in Florida, Georgia, Maine, Maryland, Massachusetts, New Jersey, New York, Oklahoma, Tennessee, Texas, Connecticut, Delaware, Illinois, Kansas, Kentucky, Louisiana, Missouri, Rhode Island and South Carolina;

    5.    The 2000 Report of the Panel on Euthanasia of the American Veterinary Medical Association; and

    6.    The American Society of Anesthesiologists' Practice Advisory for Intraoperative Awareness and Brain Function Monitoring.

## VI.  DISCUSSION

A.    To understand the grave and utterly unnecessary risks of harm posed by the BOP's protocol for lethal injection, it is important to appreciate some basic properties of the drugs and chemicals used for execution and the accepted standards of care for use of the drugs and chemicals.

B.    It useful to divide the procedure of lethal injection into four stages. The first stage is achieving intravenous access. The second stage is the administration of general anesthesia. The third stage is the administration of a neuromuscular blocking agent that has a paralyzing effect to ensure the execution appears serene and

Decl. of Mark Heath
Page 10 of 32

peaceful. The fourth stage is the execution through the administration of potassium chloride which kills the prisoner by stopping his heart. For purposes of discussion, it is helpful to consider the execution process in reverse order.

**C.    Potassium Chloride, the Killing Agent, Causes Extreme Pain upon Administration.**

1.    I have reviewed execution logs and electrocardiogram ("EKG") strips from executions around the country, including the data available from the federal executions by lethal injection (logs and EKGs from the executions of McVeigh and Garza, and logs from the execution of Jones). These data show that, in the vast majority of cases, condemned inmates are alive until potassium chloride (which disrupts the electrical signals in the heart and paralyzes the cardiac muscle) causes death by cardiac arrest.

2.    Thus, when the Defendants assert that each of the three drugs used in an execution is "lethal" they are misleading the court. Each of the drugs used can be lethal under certain circumstances – but in an execution, it is potassium chloride that causes death. Consequently, an inmate is alive until potassium chloride reaches his heart.

3.    There is no medical dispute that intravenous injection of concentrated potassium chloride solution (at the concentrations administered in an execution by lethal injection) causes excruciating pain. The vessel walls of veins are richly supplied with sensory nerve fibers that are highly sensitive to potassium ions. There exist other chemicals which can be used to stop the heart and which do not cause pain upon administration. The Defendants admit that the administration of potassium chloride to an unanesthetized person would provide a "noxious stimul[us]."

4.    Even though the relevant provisions authorizing the federal government to execute by lethal injection do not specify or require the use of potassium chloride, the BOP has nevertheless selected potassium chloride to cause death. *See* 28 C.F.R. § 26.2(a)(2) ("Federal statutes authorizing execution by lethal injection require that the "sentence shall be executed by intravenous injection of a lethal substance or substances in a quantity sufficient to cause death."). Thus, the BOP has exercised its discretion by choosing a means of causing death that inflicts extreme pain upon administration, instead of selecting readily available, equally effective yet essentially painless medications for stopping the heart. In so doing, the BOP has assumed the responsibility of ensuring, through all reasonable and feasible steps, that the prisoner is sufficiently anesthetized and cannot experience the pain of potassium chloride injection.

Decl. of Mark Heath
Page 11 of 32

5.  A living person who is to be intentionally subjected to the excruciating pain of potassium injection must be provided with adequate anesthesia. This imperative is of the same order as the imperative to provide adequate anesthesia for any person or any prisoner undergoing painful surgery. Given that the injection of potassium is a scheduled and premeditated event that is known without any doubt to be extraordinarily painful, it would be unconscionable and barbaric for potassium injection to take place without the provision of sufficient general anesthesia to ensure that the prisoner is rendered and maintained unconscious throughout the procedure, and it would be unconscionable to allow personnel who are not properly trained in the field of anesthesiology to attempt to provide or supervise this anesthetic care.

6.  Indeed, the need for proper medical anesthetic care before death by potassium chloride is so well understood that standards for animal euthanasia require that euthanization by potassium chloride be performed only by one qualified to assess anesthetic depth:

> It is of utmost importance that personnel performing this technique [euthanasia by potassium chloride injection] are trained and knowledgeable in anesthetic techniques, and *are competent in assessing anesthetic depth* appropriate for administration of potassium chloride intravenously. *Administration of potassium chloride intravenously requires animals to be in a surgical plane of anesthesia characterized by loss of consciousness, loss of reflex muscle response, and loss of response to noxious stimuli.*

*2000 Report of the American Veterinary Medical Association Panel on Euthanasia*, 218 (5) J. AM. VET. MED. ASS'N 669, 681 (2001) (emphasis added).

7.  The Defendants admit, to be humane, an Inmate "must be non-responsive to noxious stimuli" before potassium chloride is administered (Admission 29), but nevertheless confess that "no employee or agent of the United States (including any employees or agents of the Bureau of Prisons) has monitored the 'depth of anesthesia' of the Condemned Inmate by exposing a condemned inmate to 'noxious' stimuli after sodium thiopental (or equivalent anesthetic) has been administered (Admission 32).

D.  **Pancuronium Bromide Is Medically Unnecessary and Causes an Extreme Risk of Suffering.**

1.  The BOP's protocol calls for the administration of pancuronium bromide, one of a class of drugs called neuromuscular blocking agents. Such agents

Decl. of Mark Heath
Page 12 of 32

paralyze all voluntary muscles, but do not affect sensation, consciousness, cognition, or the ability to feel pain and suffocation. The effect of the pancuronium bromide is to render the muscles (including the diaphragm which moves to permit respiration) unable to contract. It does not affect the brain or the nerves. After the onset of pancuronium-evoked paralysis, the recipient cannot move and cannot signal that he or she is in distress or pain. The recipient is utterly helpless, locked in a chemical tomb.

2.     Clinically, the drug is used to ensure that a patient is securely paralyzed so that certain surgical procedures can be performed without muscle contraction. Barring exigent circumstances, pancuronium bromide is never administered until a patient is adequately anesthetized. Anesthetic drugs are administered before neuromuscular blocking agents so that the patient does not consciously experience the process of becoming paralyzed and losing the ability to breathe. Thus, in any clinical setting where a neuromuscular blocker is to be used, a patient is anesthetized and monitored to ensure anesthetic depth throughout the duration of neuromuscular blocker use.

3.     The appropriate procedures for monitoring a patient undergoing anesthesia and who is about to be administered a drug like pancuronium bromide, which masks the ability to convey distress, are detailed in the American Society of Anesthesiology's recently published *Practice Advisory for Intraoperative Awareness and Brain Function Monitoring*, 104 Anesthesiology 847, 850-51 (Apr. 2006) (describing preoperative and intraoperative measures for gauging anesthetic depth, including close monitoring of sites of IV access). *See also ASA Standards for Basic Anesthetic Monitoring* (Oct. 25, 2005). Key to adequate monitoring of anesthetic depth is the presence of a qualified person at the bedside of the person receiving the neuromuscular blocking agent.

4.     The BOP's procedure, to the extent disclosed, indicates that they are aware of the importance of ensuring that an inmate be adequately anesthetized before the administration of pancuronium bromide (by their statements the inmate should be "sleepy" or "unconscious" before proceeding with the administration of pancuronium bromide or potassium chloride). However, contrary to acceptable medical practice, no properly trained individual assesses anesthetic depth prior to the administration of pancuronium bromide or at any other time during the execution procedure.

5.     Pancuronium bromide is an extremely dangerous drug in the hands of an untrained person. Unless adequate ventilation is provided, pancuronium bromide will eventually cause unconsciousness. But it is important to

understand that pancuronium bromide does not cause unconsciousness in the way that an anesthetic drug does; rather, if administered alone, a lethal dose of pancuronium bromide would cause a condemned inmate to lose consciousness only after he or she had endured the excruciating experience of suffocation. It would totally immobilize the inmate by paralyzing all voluntary muscles and the diaphragm, causing the inmate to suffocate to death while experiencing an intense, conscious desire to inhale. Ultimately, consciousness would be lost, but it would not be lost as an immediate and direct result of the pancuronium bromide. Rather, the loss of consciousness would be due to suffocation, which would be preceded by the torment and agony that suffocation inevitably engenders. This period of torturous suffocation would be expected to last at least several minutes and would only be relieved by the onset of suffocation-induced unconsciousness.

6.     Based on the information presently available, I believe it is likely conscious or partly conscious asphyxiation has occurred in executions by lethal injection. But before commenting on any specific execution, I think it is important to explain how assessing the degree of consciousness that may have been felt in an execution differs from assessing consciousness in a clinical context. In the clinical context, anesthesiologists closely monitor patients for signs of awareness, and conduct post-operative interviews to assess to what extent a patient may have consciously experienced any part of his or her surgical procedure.     The American Society of Anesthesiologists has recently commented that "[i]ntraoperative awareness cannot be measured during the intraoperative phase of general anesthesia, because the recall component of awareness can only be determined postoperatively by obtaining information directly from the patient." *See Practice Advisory for Intraoperative Awareness and Brain Function Monitoring*, 104 Anesthesiology 847, 850 (Apr. 2006).

7.     Neither monitoring nor post-process interviews take place with an execution; we can therefore never know with absolute certainty the degree of consciousness felt in an execution. But, to the extent we can know, after the fact, we look for signs of intravenous access problems, physical reaction to the process, and postmortem serum levels of anesthetic drugs. Based on the information presently available, this information suggests that terrible problems have occurred during some executions.

8.     For example, ███████████████████████████████, Mr. Angel Diaz was executed by the State of Florida.    Mr. Diaz's execution lasted approximately 34 minutes.    The Florida Governor's Commission concluded that he did not receive the

drugs or chemicals as intended; as a result of the information presented to the Florida Governor's commission, I concluded that Mr. Diaz exhibited behaviors consistent with conscious paralysis and prolonged conscious asphyxiation during his execution.

9.  There is no legitimate reason for including pancuronium bromide in the execution process and assuming the foregoing risks. Because potassium chloride causes death in executions by lethal injection, there is no rational place in the protocol for pancuronium bromide; the drug simply serves no function in the execution process. Its inclusion, therefore, only adds risk of the prolonged conscious asphyxiation such as Mr. Diaz likely experienced, with no medical benefit.

10. Because of the concerns enumerated above, medical practitioners eschew the use of neuromuscular blocking agents in circumstances similar to that of executions, namely end of life care:

> NMBAs [neuromuscular blocking agents] possess no sedative or analgesic activity and can provide no comfort to the patient when they are administered at the time of withdrawal of life support. Clinicians cannot plausibly maintain that their intention in administering these agents in these circumstances is to benefit the patient. Indeed, unless the patient is also treated with adequate sedation and analgesia, the NMBAs may *mask the signs of acute air hunger* associated with ventilator withdrawal, *leaving the patient to endure the agony of suffocation in silence and isolation*. Although it is true that families may be distressed while observing a dying family member, the best way to relieve their suffering is by reassuring them of the patient's comfort through the use of adequate sedation and analgesia.
>
> * * *
>
> As a general rule, therefore, *pharmacologic paralysis should be avoided at the end of life*.

Robert D. Truog et al., *Recommendations for end-of-life care in the intensive care unit: The Ethics Committee of the Society of Critical Care Medicine*, 29(12) Crit. Care Med. 2332, 2345 (2001) (emphasis added).

E.     **Thiopental Is A High Risk, Complex Anesthetic That Requires Skill And Sophisticated Understanding To Administer**.

1.     Thiopental is an ultrashort-acting barbiturate that is intended to be delivered intravenously to induce anesthesia. In typical clinical doses, the drug has both a quick onset and short duration, although its duration of action as an anesthetic is dose dependant.

2.     When anesthesiologists use thiopental, we do so for the purposes of temporarily anesthetizing patients for sufficient time to intubate the trachea and institute mechanical support of ventilation and respiration. Once this has been achieved, additional drugs are administered to maintain a "surgical depth" or "surgical plane" of anesthesia (i.e., a level of anesthesia deep enough to ensure that a surgical patient feels no pain).

3.     The medical utility of thiopental derives from its ultrashort-acting properties: if unanticipated obstacles hinder or prevent successful intubation, patients will likely quickly regain consciousness and resume ventilation and respiration on their own.

4.     The benefits of thiopental in the operating room (quick reawakening) engender serious risks in the execution chamber. The duration of narcosis provided by thiopental is dose-dependent. Generally, the larger the dose, the longer the narcosis. Although BOP documents refer to giving as many as 5 grams of thiopental (**Exhibit P**) there are also documents which indicate as little as 1 gram of thiopental has been used (**Exhibit O**). One gram of thiopental is too small a dose to reliably produce the depth and duration of narcosis during an execution. Since the depth and duration of narcosis created by thiopental is dose dependent, it is absolutely critical that we know exactly how much thiopental the BOP intends to give a condemned inmate. It is not possible to hope for, let alone ensure, a humane execution without knowing how much thiopental the BOP proposes to administer. That past executions have taken place under the supervision and advice of persons who have difficulty in preparing and mixing drugs and there is no documentation or evidence reflecting the drug dosages given in execution is gravely concerning.

5.     But, even if the BOP were to specify the intended dose of thiopental and that dose were sufficient to create a deep and protracted narcosis, thiopental can only work if the intended amount of thiopental actually reaches condemned inmate's brain. If the condemned inmate receives a near-surgical dose of thiopental (through a low intended dose or the failure in delivery of a large intended dose) the duration of narcosis will be brief and the inmate could reawaken during the execution process. Then, a

Decl. of Mark Heath
Page 16 of 32

condemned inmate in Terre Haute would suffer the same fate that apparently befell Mr. Angel Diaz in Florida who was intended to receive a 5 gram intravenous dose of thiopental, but who did not, and then apparently experienced a conscious or semi-conscious response to the execution process.

6.    Many foreseeable situations exist in which human or technical errors could result in the failure to successfully administer the intended dose of thiopental. The BOP's procedure, to the extent that it is a procedure at all, both fosters these potential problems and fails to provide adequate mechanism for recognizing these problems, and it does these things needlessly and without legitimate reason.

a.    **Errors in Drug Preparation.** Thiopental is delivered in powdered form and must be mixed into an aqueous solution prior to administration. This preparation requires the correct application of pharmaceutical knowledge and familiarity with terminology and abbreviations. Calculations are also required, particularly if the protocol requires the use of a concentration of drug that differs from that which is normally used. Recently drug preparation problems were revealed in the State of Missouri, where ▮ ▮ was preparing drugs. *See* Excerpts of Transcript of June 12, 2006 Bench Trial, Heath Testimony, at 20-21, *Taylor v. Crawford*, No. 05-4173-CV-C-FJG (W.D. Mo.) (**Exhibit T**) (noting between five and two and half grams of thiopental may have been given).



The risk of misdosage in federal executions is compounded by the "new" BOP protocol which does not set out the drug amounts in an intelligible fashion. For example, the Addendum suggests that, for femoral vein drug delivery, the BOP will prepare a 5 gram dose of thiopental dissolved in 10ccs of diluent. The BOP protocol is suggesting that it will administer a 50% concentration of the drug thiopental. This is an extraordinarily high concentration. (By way

Decl. of Mark Heath
Page 17 of 32

of example, the highest therapeutic dose described in the thiopental product insert sheets is 5%). This concentration of thiopental would be extremely toxic to tissues and is capable of causing great pain should the drug extravasate. There is no need to administer the drug at these concentrations and to assume risks that are no present at lower, recommended concentrations.

The presentation of this new Addendum, with its clear problems in drug dosage, is particularly troubling in light of the Defendants' reliance

Of note, rather than relying on persons who are not qualified to prepare and mix drugs, as the Defendants apparently do, other states require the use of licensed pharmacists to prepare the execution drugs.

b.    **Error in Labeling of Syringes**. It is of paramount importance that the drugs in an execution be given in the correct order. If the drugs are mislabeled, it greatly increases the chances the drugs will not administered in the correct order. The drugs should be labeled by the pharmacist who prepares them, not by execution team members who are not qualified to distinguish between drugs which are placed in identically sized syringes and which all appear as clear liquid. The Defendants' planned procedure of preparing and using as many as 40 syringes exacerbates this problem.

c.    **Error in Selecting the Correct Syringe**. As shown in the tour of Terre Haute, the BOP procedure uses the serial injection of fluid from as many as ten 50 cc syringes. With that number of similarly sized syringes filled with fluid of similar color, it would be easy to make a mistake in selecting the correct syringe; syringe swap (one of the most common forms of medical error) could easily occur in a Federal execution as it has occurred in other executions in the United States. This risk is heightened in the apparently low light conditions in the chemical room used during executions.

d.    **The IV Tubing May Leak**. An "IV setup" consists of multiple components that are assembled by hand prior to use. Because the

drugs are injected from a different room, it is impossible to maintain visual surveillance of the full extent of IV tubing so that such leaks may be detected. The configuration of the death chamber and the relative positions of the executioners and the inmate may hinder or preclude such surveillance, thereby causing a failure to detect a leak. Leaking IV lines have been noted in Maryland and other executions. The Defendants' practice of covering the condemned with a sheet up to his neck and taping the IV lines to the floor of the execution further prevents any ability to see the full extent of the IV lines and recognize any issue with tubing leaks.

e.   **Incorrect Insertion of the Catheter**. If the catheter is not properly placed in a vein, the thiopental will enter the tissue surrounding the vein. Injection of the drugs into tissue rather than veins means the drugs will not be effectively delivered to the central nervous system and will not render the inmate unconscious. This condition, known as infiltration, occurs with regularity in the clinical setting. Recognition of infiltration or extravasation requires continued surveillance of the IV site during the injection, and that surveillance should be performed so as to permit correlation between visual observation and tactile feedback from the plunger of the syringe. One cannot reliably or meaningfully monitor for the presence of infiltration through a window from another room. As a result of litigation in other jurisdictions, prisons have agreed to place personnel at the bedside for the purpose of monitoring IV sites and tubing.

One cannot reliably or meaningfully monitor a catheter site if the inmate is covered to his chin with a sheet (as the BOP does). There have been occasions where departments of correction have failed to recognize infiltrations during executions. In Oklahoma an infiltration in the catheter delivering the anesthetic thiopental occurred followed by condemned inmate convulsions. Another such occurrence has been reported during the Florida execution of Angel Diaz. These occurrences, and the department of corrections' inability to recognize the occurrence of infiltration, appear to have directly contributed to the condemned inmates' conscious experience of the execution process. The Defendants' practice of covering the inmate with a sheet up to his neck insures that they will have no ability to visualize the IV sites and is completely unacceptable.

Decl. of Mark Heath
Page 19 of 32

f.    **Migration of the Catheter/Failure to Secure the Catheter**. Even if properly inserted, the catheter tip may move or migrate, so that at the time of injection it is not within the vein. This would result in infiltration, and therefore a failure to deliver the drug to the inmate's circulation and failure to render the inmate unconscious. To prevent such a migration, it is critical to properly secure the catheter by the use of tape, adhesive material, or suture. Movement by the inmate, even if restrained by straps, or traction on the IV tubing may result in the dislodging of the catheter. If this were to occur under a sheet (as it would be in a federal execution) it would not be detected, and the drug would not enter the inmate's circulation as planned and would not render the inmate unconscious.

g.    **Perforation or Rupture or Leakage of the Vein**. During the insertion of the catheter, the wall of the vein can be perforated or weakened, so that during the injection some or all of the drug leaves the vein and enters the surrounding tissue. The likelihood of rupture occurring is increased if too much pressure is applied to the plunger of the syringe during injection, because a high pressure injection results in a high velocity jet of drug in the vein that can penetrate or tear the vessel wall. Recently, during the Clark execution in Ohio, the Department of Corrections failed to recognize that the venous access had failed, causing the inmate to reawaken during the execution process and plead "Can't you just give me something by mouth to end this." *See* Jim Provance, *Problematic execution draws questions: Correction official to appear before panel*, TOLEDO BLADE (May 17, 2006). Likewise, in the Diaz execution in Florida, the execution team felt resistance to plunging the syringes, but carried on administering the drugs, not able to appreciate that the resistance meant that the IV catheters had perforated Mr. Diaz's veins and the drugs were being forced into the tissue surrounding his veins, rather than into his veins.

h.    **Failure to Properly Loosen or Remove the Tourniquet**. A tourniquet is used to assist in insertion of an IV catheter in a peripheral vein. Failure to remove such tourniquets from the arm or leg after placement of the IV catheter will delay or inhibit the delivery of the drugs by the circulation to the central nervous system. This may cause a failure of the thiopental to render and maintain the inmate in a state of unconsciousness. The BOP

apparently to date has no experience with using peripheral IVs in executions.

i.   **Impaired Delivery Due to Restraining Straps**. Restraining straps may act as tourniquets and thereby impede or inhibit the delivery of drugs by the circulation to the central nervous system. This may cause a failure of the thiopental to render and maintain the inmate in a state of unconsciousness. Even if the IV is checked for "free flow" of the intravenous fluid prior to commencing injection, a small movement within the restraints on the part of the inmate could compress the vein and result in impaired delivery of the drug. It has been noted in at least one execution by lethal injection that the straps hindered the flow of drugs. *See* Editorial, *Witnesses to a Botched Execution*, ST. LOUIS POST-DISPATCH, at 6B (May 8, 1995). The BOP's IV set-up, as shown to Plaintiffs at Terre Haute, has no IV bag and no way to check for a free flow.

7.   These types of drug administration problems are not simply hypothetical adverse occurrences. They are, in fact, common in the practice of medicine. A number of medical publications detail exactly these types of administration issues. For example, the National Academy of Sciences Institute on Medicine has just published the report of the Committee on Identifying and Preventing Medication Errors, which details the rates of drug preparation and administration errors in hospital setting and concludes "[e]rrors in the administration of IV medications appear to be particularly prevalent." PREVENTING MEDICATION ERRORS: QUALITY CHASM SERIES 325-60 (Philip Aspden, Julie Wolcott, J. Lyle Bootman, Linda R. Cronenwett, Eds. 2006); *id.* at 351. Likewise a recent study shows that "drug-related errors occur in one out of five doses given to patients in hospitals." *See* Bowdle, T. A., *Drug Administration Errors from the ASA [Am. Soc. Anesthesiologists] Closed Claims Project*, 67(6) ASA NEWSLETTER, 11-13 (2003). This study recognizes that, as a result of administration errors, neuromuscular blockers have been administered to awake patients and to those who have had inadequate doses of general anesthetic. *Id.*

8.   In the practice of medicine, preventing pain and/or death as a result of these common drug administration problems is achieved by having persons in attendance who have the training and skill to recognize problems when they occur and the training and skill to avert the negative consequences of the problems when they arise. The BOP's protocol does not provide for the participation of qualified persons as part of the execution process.

Decl. of Mark Heath
Page 21 of 32

F.   **The BOPs Protocol Is Dangerously Incomplete and Risks Unnecessary Harm.**

1.   Although it is difficult to capture all of the deficiencies of the BOP's procedures protocol in a short document, some particularly egregious problems are evident and warrant special comment.

2.   **Absence of an Adequate Written Protocol.** Even with the production of a new Addendum to execution procedures, the BOP does not have a comprehensible or coherent document outlining and detailing the procedures for drug preparation or administration. A protocol containing recommended off-label use (like the preparation of 5 grams of thiopental in 10 ccs of diluent) and which leaves to the discretion of the execution personnel many of the crucial factors about drug administration like the rate at which the drugs are administered and related details of the execution process, is fundamentally flawed. Especially since we know that the execution personnel involved in BOP executions, ███████ ████████ are not to be entrusted with exercising their judgment to modify procedures during an execution. The protocol is deficient not just with respect to any acceptable standard, but also deficient with respect to the protocols produced by many states after litigation.

3.   **Incompetent Personnel.**

   a.   **Drug Preparation.** The BOP does not have procedures designed to ensure the proper preparation of the drugs used. I have not seen details regarding the credentials, certification, experience, or proficiency of the personnel who will be responsible for the mixing of the sodium thiopental from powder form, or for the drawing up of the drugs into the syringes. Preparation of drugs, particularly for intravenous use, is a technical task requiring significant training in pharmaceutical concepts and calculations. It is my opinion based on my review of lethal execution procedures in states that have disclosed more detailed information than what I have seen about BOP's procedures, that there exist many risks associated with drug preparation that, if not properly accounted for, further elevate the risk that the drug will not be properly administered and the inmate will consciously will experience excruciating pain during the lethal injection procedures. The fact that the prior BOP procedures indicated as little as 1 gram of thiopental would be given, and now suggest that they will try to dissolve 5 grams into 10ccs of diluent (a concentration vastly higher than that

Decl. of Mark Heath
Page 22 of 32

recommended by the manufacturer and which is toxic to tissues and capable of causing great pain in the event of extravasation) reflects that the BOP has relied on persons unqualified to undertake the task of preparing the execution drugs.

b.   **Timing of Drug Preparation**. The BOP intends to insert IV lines 30 minutes prior to execution. The BOP will not know until IV insertion whether IV access will be by femoral or peripheral vein. Since the number of thiopental syringes the BOP intends to prepare is different for each method of venous access, it appears that the BOP will have to insert the IV lines, then prepare as many as 16 syringes of thiopental in the last 30 minutes before execution. There is no reason to add this level of unnecessary complication or haste in preparation of the most crucial drug. That the BOP presented a new protocol, one that they must have considered an improvement over their prior procedures, without considering the grave difficulties of drug preparation under intense time pressure that the new process would cause, speaks to the BOP's (and their advisor's) inability to appreciate the complexities of the execution process.

c.   **Drug Administration**. The BOP's procedures apparently allow ███████████████████████████ to select the sites of intravenous access and to oversee the administration of the execution drugs. ███████████ is unqualified to administer anesthesia. This practice is, thus, directly contrary to the manufacturer's requirement that thiopental "be administered . . . by individuals experienced in the conduct of intravenous anesthesia." *See Pentothal for Injection*, Abbott Laboratories, Nov. 1993, Reference 06-8 965.

d.   **Failure to Use an IV Bag and Drip.** It is standard medical practice to use an IV bag dripping saline or another solution in conjunction with the IV tubing used to deliver intravenous drugs. Monitoring the rate and steadiness of the drip from the IV bag is one means by which physicians assess whether fluids are properly flowing through the IV tubing. During the Terre Haute tour, I observed that the execution drugs are injected through a length of IV tubing that is not used in conjunction with an IV drip. The only state in the country which utilizes this bizarre and substandard method of drug introduction was the State of Missouri ██████████ ███████████████████████████████ That the BOP Addendum now suggests the use of IV drip line does not cure this

Decl. of Mark Heath
Page 23 of 32

defect; rather it only engenders other concerns. The BOP has no explanation of or procedure for attaching drug syringes to IV lines and managing stopcocks and other equipment to ensure the drugs will be reach to the condemned.

    e.    **Use of a Blank Line**. The BOP apparently, for the first time, plans to use a blank IV line. One can speculate that the purpose of the blank line, which evacuates into a container rather than into the inmate, is to confer a psychological balm that prevents any given executioner from knowing that he or she actually killed the prisoner. I know of no other jurisdiction that does this. Use of the blank line will require preparation of as many as 20 extra drug syringes, exacerbating the already serious problem of syringe confusion and mixing. Moreover, this added layer of complexity (not seen anywhere else in the country) is undertaken for no real benefit. If the executioners are adequately trained, the use of the blank line cannot serve the function of concealing who is delivering drugs to the condemned. Executioners can get a sense of IV site problems by the back pressure on the line as the drugs are administered. There will be no back pressure on the blank line and the executioners will know they are plunging syringes into an empty container. Only if the executioners are inadequately trained will they not be able to tell the difference between emptying syringes into a container and emptying them into a person.

4.    **Failure of Any Person to Monitor Anesthetic Depth.** The BOP appears to understand that it is critical that a condemned inmate be "asleep" or "unconscious" prior to the administration of drugs which cause extreme pain and/or suffering. Instead of monitoring anesthetic depth, the BOP apparently relies on non-medical persons in the execution chamber, and perhaps persons in the chemical room (via camera) to ascertain whether the inmate appears "sleepy." There are a number of problems with the BOP process. First, being "sleepy" or appearing "unconscious" does not represent an adequate depth of anesthesia for the administration of potassium. Depth of anesthesia ranges from being slightly sleepy to being so deeply asleep that one is non-responsive to noxious stimuli. An inmate about to experience the pain of potassium chloride injection must be non-responsive to extremely noxious stimuli, not just "sleepy." Second, no one, not even a qualified person, can ascertain how deeply anesthetized an individual is simply by looking at him. Instead, a qualified person uses multiple clinical modalities which include the ability to make physical contact. *See Practice Advisory for Intraoperative Awareness and Brain Function Monitoring*, 104 Anesthesiology 847, 859 Appendix 1 (Apr.

2006) (recommending the use of "multiple modalities to monitor depth of anesthesia'). Third, there is no evidence at all that a qualified person makes or even attempts to make an assessment of anesthetic depth.

5.  **Absence of Qualified Persons to Monitor Anesthetic Depth**. Accepted medical practice dictates that, not only must one monitor anesthetic depth at the bedside using multiple clinical modalities, the monitoring must be provided by trained personnel. Because of the above mentioned foreseeable problems in administering anesthesia, the provision of anesthetic care in the United States is performed only by personnel with advanced training in the medical subspecialty of Anesthesiology. This includes physicians who have completed residency training in the specialty of Anesthesiology and nurses who have undergone the requisite training to become CRNAs. The absence of any qualified personnel present in the chamber during the execution thwarts the BOP execution personnel from taking the standard and necessary measures to reasonably ensure that the sodium thiopental is properly flowing into the inmate and that he is properly anesthetized prior to the administration of the pancuronium bromide and potassium chloride.

6.  **Covering IV Sites**. The BOP protocol requires that the inmate is covered to his chin with a sheet and the IV lines coming from the chemical room and also covered. Without being able to visualize potential IV catheter failure, the execution team will have no reason to depart from a simple rote serial administration of drugs, without regard to the adequacy of anesthetic depth. An execution team's failure to appreciate an infiltration directly led to the torturous death experienced in Florida by Mr. Angel Diaz.

7.  **Failure to Plan for Foreseeable Contingencies**. Prior to the July 1, 2007 Addendum, the BOP made no provision whatsoever for the foreseeable contingency of IV access failure. As the Florida Commission reports, the failure to devise an adequate plan for IV access failure and the failure of the IV team to follow reasonable procedures in the event of IV access failure led directly to Mr. Diaz's botched execution. With the July 1, 2007 Addendum, the BOP attempts to remedy this defect, but in fact only further illustrates that they, and "qualified persons" on whom they rely for advice, fundamentally misunderstand the risks of the execution process. The BOP apparently intends to resort to the procedures in Paragraph L of the Addendum in two circumstances. First, if the condemned is not dead within 5 minutes after the administration of the second syringe of potassium chloride. The BOP apparently does not understand that, if the IV lines are working, and the potassium chloride is delivered as intended,

the condemned will be dead within about one minute after the administration of the first syringe of potassium chloride. If that eventuality does not occur, waiting 5 minutes until after the administration of the second syringe of potassium chloride to evaluate the problem means that the BOP will likely have waited until the condemned has died by some other means, like asphyxiation. Any problem with drug administration in an execution presents a medical emergency which should be addressed as soon as it has been noticed – and with vigilant monitoring it should be notice immediately. The BOP should not wait until the elapse of some arbitrary period of time to address problems, time during which the condemned may be suffering.

8.    Second, the procedures in paragraph L of the Addendum highlight the problem that no one is in charge of the execution process. The procedures call for a consultation between the Director's on-site designee, the United States Marshall and the "on-site medical personnel" any time "a member of the execution team becomes aware of a situation not contemplated in this procedure." There is no clear indication of whose advice should be accepted, in the event of conflicting advice. Moreover, there is no clear description of what constitutes a situation not contemplated by the procedures. That seems particularly problematic since the procedures do not address any of the contingencies that might be expected to occur in an execution. As Mr. Singletary, who served on the Florida Governor's Commission said, the problems with executions are completely foreseeable: "we know for sure that this is going to happen again." Tr. Comments of Singletary, at 111 (Feb. 24, 2007), The Governor's Commission on Administration of Lethal Injection, attached hereto as **Exhibit U**. Problems with executions will occur. Having a comprehensive plan to deal with those problems is necessary and the BOP's paragraph L in no way meets the standards of preparing for problems. It is particularly concerning that the BOP omits preparing specifically for medically related execution problems when it is clear they prepare for other types of problems. For example, their trainings routinely provide practice for scenarios like when an inmate resists strap down, or an execution witness becomes distraught. I am forced to conclude that the only reason the BOP has failed to properly prepare for other kinds of execution problems is that other problems are simply beyond their ken.

9.    **Failure to Plan for Resuscitation**. There are no apparently no procedures in the BOP protocols for the resuscitation of the inmate once the sodium thiopental is administered. This would foreclose the possibility of altering the course of an execution in the event of legal relief. Any time up until the potassium chloride is administered, the prisoner could be readily

resuscitated given the appropriately trained personnel and routine resuscitation medication and equipment. If this were to occur after the potassium chloride was administered, resuscitation would be more challenging but still possible. Resuscitation would therefore require equipment close-by, and properly credentialed personnel, neither of which is specified by the BOP. Other Departments of Correction have provided for the presence of resuscitation equipment and appropriate personnel to use that equipment.

10.    **Unnecessary Pain and Risk Caused by the Use of a Femoral Line**. When I toured the Terre Haute execution facility, which was set up as it would be for an execution, the only equipment I saw for the insertion of IV catheters were kits for the use in creating femoral line access. ████████ ████████████████

    a.    The insertion of a catheter into the femoral vein (located in the groin area and at a depth anywhere from about half an inch to several inches beneath the skin) is a needlessly invasive procedure that can be expected to cause significant pain even with the use of local anesthesia. For this reason, and because of the invasive nature of the procedure, it is my practice and the practice of other physicians to first administer intravenous sedation and analgesia whenever possible before inserting femoral lines. ████████

    b.    Many complications can arise as a result of attempts to place a femoral line. It appears from the photographs of executed inmates in Missouri that one such complication, a hematoma, occurred in at least one of the previous six executions supervised by ████ ████ that of Timothy Johnston. *See* Photographs of Timothy Johnston catheter site, attached as **Exhibit V**. A hematoma is caused by blood leaking from a puncture or laceration of a blood vessel, collecting under pressure and distending surrounding tissue, and is extremely painful. Hematomas caused by femoral catheterization can be large and painful. Because such a hematoma may form deep within the tissue, it may be difficult to discern, purely from reviewing photographs taken of the skin surrounding the catheter, the size of any particular hematoma. A patient or prisoner can exsanguinate either from internal or external bleeding as a result of attempted femoral venous access. Other

complications of femoral vein access include painful nerve injury, arterial laceration, and perforation of the bowel or bladder.

c. The chemical room at Terre Haute does not contain the equipment and supplies that would be necessary to address the many complications that can occur during femoral catheterization. ████████ ████████████████████████████████████████████ This is not correct.

d. Because the placement of a femoral line is a surgical procedure, it should be done in as sterile a fashion as possible. During the Terre Haute tour, it appeared that the execution chamber is not a sterile environment. This greatly increases the risk of infection resulting from the femoral catheter, which is already much higher than the risk of infection arising from a peripheral IV. Although the risk of infection may not be a significant concern if the inmate is executed shortly after the femoral line is placed, the risk of infection does need to be considered in the execution context because of the possibility that a stay of execution will be granted after the femoral catheter is inserted. ████████████████████████████████ ████████████████ the danger of infection becomes a concern when the execution does not take place as planned and the catheter is removed. (Of note, Mr. Hill in Florida had catheters in place in preparation for his execution, before certiorari was granted.).

e. ████████████████████████████████████████████ indicate that he has an indifferent and careless attitude regarding femoral catheterization. The following is a non-exhaustive list of concerns that are raised ████████████████████████ ████████

(i) ████████████████ that a hematoma is not possible because he uses the Seldinger method of catheterization. This is not correct. A hematoma is caused by puncturing or lacerating a blood vessel with the needle used to reach the femoral vein. The Seldinger technique necessarily involves using a needle to probe blindly into the groin, and therefore the risk of arterial or venous puncture is always present and is unavoidable.

Decl. of Mark Heath
Page 28 of 32

(ii) ▮▮▮▮▮▮▮▮▮▮confidence that a hematoma cannot ever occur, the photographs of Timothy Johnston indicate that a hematoma formed.

(iii) ▮▮▮▮▮▮ stated that if a massive hematoma occurred, he would "drain the hematoma by use of equipment available in the catheter tray." I do not understand why he believes that he would have the equipment necessary to address the hemorrhage when the hematoma is explored. Repair of a lacerated femoral vein or artery would require equipment and supplies that are not present in the kit.

(iv) ▮▮▮▮▮▮stated that bladder perforation cannot possibly occur as a result of the catheterization procedure. This is incorrect.

(v) ▮▮▮▮▮▮stated that the local anesthesia injected for purposes of the procedure would be sufficient to ensure that the inmate will not suffer pain even if the doctor hits the femoral nerve. I doubt that this is the case. In order to anesthetize the nerve, the doctor would have to inject a larger quantity of anesthetic into the correct location. We do not know that ▮▮▮▮▮▮separately anesthetizes the femoral nerve; thus, I believe that ▮▮▮▮▮▮ statement that the inmate will not suffer pain as a result of hitting the femoral nerve is incorrect.

f.  I am very disturbed by ▮▮▮▮▮▮ apparent lack of knowledge (or cavalier dismissal) of the potential serious complications of the femoral catheterization procedure. It is my understanding that ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ o obtain venous access, and it is reasonable to infer he did so for the Federal government. As with any medical procedure, overconfidence in one's ability to perform a procedure successfully renders that procedure much less safe and more risky. Likewise, a doctor's failure to understand the risks of a procedure makes those risks more likely to be realized.

9.  In light of the significant pain inherent in the catheterization procedure as performed by the BOP, the apparent failure to provide for adequate management of that pain, the complications that have in fact occurred in at least one previous execution, and the fact that femoral catheterization is unnecessary to achieve venous access in most inmates, I conclude that the

Decl. of Mark Heath
Page 29 of 32

use of a femoral line in all inmates is inhumane. ████████████

**G.    The BOP Procedures Fall Below Minimum Standards Mandated for Veterinary Euthanasia.**

a.    The 2000 Report of the Panel on Euthanasia of the American Veterinary Medical Association states that, when potassium chloride is to be used as a euthanasia agent, the animals must be under a surgical plane of anesthesia and the personnel performing the euthanasia must be properly trained to assess the depth of anesthesia. The AVMA panel specifically states that the animal must be in a surgical plane of anesthesia characterized not simply by loss of consciousness, but also by "loss of reflex muscle response and loss of response to noxious stimuli." Additionally, the AVMA recommends that sodium pentobarbital be used as an anesthetic, which is much longer lasting and more stable than thiopental. It is difficult to understand why the BOP would choose, at its discretion, to use potassium to execute prisoners and would then fail to adhere to the basic requirements set forth by the AVMA which demand that a person "trained and knowledgeable in anesthetic techniques" care present and able to assess anesthetic depth to ensure that animals do experience the excruciating pain of potassium injection during euthanasia.

b.    Nineteen states have enacted statutes that, like the AVMA Report, "mandate the exclusive use of a sedative or expressly prohibit the use of a neuromuscular blocking agent in the euthanasia of animals." *See Beardslee v. Woodford*, 395 F.3d 1064, 1070 & n.9 (9th Cir. 2005) (citing state laws). Thus, the BOP's protocol, to the extent it is a protocol at all, fails to provide the same protections for condemned inmates that are routinely provided for animals.

**VII.    CONCLUSIONS**

A.    Based on my research into methods of lethal injection used by various states, and based on my training and experience as a medical doctor specializing in anesthesiology, it is my opinion stated to a reasonable degree of medical certainty that, given the apparent absence of a central role for a properly trained professional in the BOP's execution procedure, the characteristics of the drugs or chemicals used, the failure to understand how the drugs in question act in the body, the failure to properly account for foreseeable risks, the design of a drug delivery system that exacerbates rather than ameliorates the risks of error, the BOP's lethal injection procedure creates medically unacceptable risks of inflicting excruciating pain and suffering on inmates during the lethal injection procedure.

B.    Further, the BOP's plan for achieving IV access by use of femoral vein catheterization as a default procedure should not be countenanced.

C.    All of the problems with execution by lethal injection could easily be addressed, and indeed have been addressed by the veterinary profession for the euthanasia of dogs and cats. It is difficult to understand why the BOP has failed to address these problems and has failed to meet the minimum standards set forth for veterinary euthanasia or indeed the practices observed by most state departments of corrections in executions.

D.    I believe it is reasonable and appropriate to be very concerned that a "behind the scene" look at the procedures and practices of BOPs lethal injection executions that could emerge through depositions would demonstrate a similar and comparable set of systematic problems that have surfaced during discovery and litigation in other jurisdictions, including Missouri, California, and Maryland. Judge Jeremy Fogel, who personally visited California's lethal injection facility and who heard and reviewed an enormous amount of testimony about the practice of lethal injection in California, commented that:

> Given that the State is taking a human life, the pervasive lack of professionalism in the implementation of [California's lethal injection protocol] at the very least is deeply disturbing. Coupled with the fact that the use of pancuronium bromide masks any outward signs of consciousness, the systemic flaws in the implementation of the protocol make it impossible to determine with any degree of certainty whether one or more inmates may have been conscious during previous executions or whether there is any reasonable assurance going forward that a given inmate will be adequately anesthetized. The responsibility for this uncertainty falls squarely upon Defendants, and the circumstances clearly implicate the Eighth Amendment.

*Morales v. Tilton*, Nos. C 06 219 JF RS, C 06 926 JF RS, __ F. Supp. 2d __, 2006 WL 3699493 at *7 (N.D. Cal. Dec. 15, 2006).

E.    It is my usual practice to prepare a declaration after full documentary discovery and after attending depositions or reviewing deposition transcripts. Because discovery has not concluded in this case, I reserve the right to modify my opinion based on further evidence.

Decl. of Mark Heath
Page 31 of 32

       I declare under penalty of perjury that the foregoing is true to the best of my information and belief.

EXECUTED on this 9th day of July, 2007.

                                     _____
                                       Mark J. S. Heath, M.D.



Roane, et al. v. Gonzales, et al.,
No. 05-2337 (D.D.C.)

Decl. Mark Heath

Ex. 178 pg.33 of 40



Case 1:05-cv-02337-TSC    Document 123-9    Filed 09/07/07    Page 1 of 1

Roane, et al. v. Gonzales, et al.,
No. 05-2337 (D.D.C.)

Decl. Mark Heath

Ex. 178 pg.34 of 40

<u>Curriculum Vitae</u>

Roane, et al. v. Gonzales, et al.,
No. 05-2337 (D.D.C.)

Decl. Mark Heath
Exhibit A

1)      Date of preparation:   December 19, 2004

2)      Name:                  Mark J. S. Heath

        Birth date:            March 28, 1960
        Birthplace:            New York, NY
        Citizenship:           United States, United Kingdom

3)      Academic Training:

                 Harvard University                      B.A., Biology, 1983

                 University of North Carolina, Chapel Hill    M.D., 1987

                 Medical License                         New York:  177101-1

4)      Traineeship:

        1987 – 1988   Internship, Internal Medicine, George Washington University Hospital, Washington, DC.

        1988 – 1991   Residency, Anesthesiology, Columbia College of Physicians and Surgeons, New York, NY

        1991 – 1993   Fellowship, Anesthesiology, Columbia College of Physicians and Surgeons, New York, NY

5)      Board Qualification:

                 Diplomate, American Board of Anesthesiology, October 1991.
                 Testamur, Examination of Special Competence in Perioperative Transesophageal Echocardiography (PTEeXAM), 2001.

6)      Military Service:         None

7)      Professional Organizations:

                 International Anesthesia Research Society
                 Society of Cardiovascular Anesthesiology

8)      Academic Appointments:

                 1993 – 2002        Assistant Professor of Anesthesiology, Columbia University, New York, NY

                 2002 - present     Assistant Professor of Clinical Anesthesiology, Columbia University, New York, NY

9) Hospital/Clinical Appointments:

        1993 – present        Assistant Attending Anesthesiologist, Presbyterian Hospital, New York, NY.

10) Honors:

        Magna cum laude, Harvard University
        Alpha Omega Alpha, University of North Carolina at Chapel Hill
        First Prize, New York State Society of Anesthesiologists Resident Presentations, 1991

11) Fellowship and Grant Support:

        Foundation for Anesthesia Education and Research, Research Starter Grant Award, Principal Investigator, funding 7/92 - 7/93, $15,000.

        Foundation for Anesthesia Education and Research Young Investigator Award, Principal Investigator, funding 7/93 - 7/96, $70,000.

        NIH    KO8 "Inducible knockout of the NK1 receptor"
                     Principal Investigator, KO8 funding 12/98 - 11/02,
                     $431,947 over three years
                     (no-cost extension to continue through 11/30/2002)

        NIH    RO1 "Tachykinin regulation of anxiety and stress responses"
                     Principal Investigator, funding 9/1/2002 – 8/30/2007
                     $1,287,000 over 5 years

12) Departmental and University Committees:

        Research Allocation Panel (1996 – 2001)
        Institutional Review Board (Alternate Boards 1-2, full member Board 3) (2003 - present)

13) Teaching:

        Lecturer and clinical teacher: Anesthesiology Residency Program, Columbia University and Presbyterian Hospital, New York, NY

        Advanced Cardiac Life Support Training

        *Anesthetic considerations of LVAD implantation*. Recurrent lecture at Columbia University LVAD implantation course.

        <u>Invited Lecturer</u>:

        *NK1 receptor functions in pain and neural development*, Cornell University December 1994

*Anxiety, stress, and the NK1 receptor*, University of Chicago, Department of Anesthesia and Critical Care, July 2000

*Anesthetic Considerations of LVAD Implantation*, University of Chicago, Department of Anesthesia and Critical Care, July 2000

*NK1 receptor function in stress and anxiety*, St. John's University Department of Medicinal Chemistry, March 2002

*Making a brave mouse (and making a mouse brave),* Mt.Sinai School of Medicine, May 2002

*Problems with anesthesia during lethal injection procedures*, Geneva, Switzerland.  Duke University School of Law Conference, "International Law, Human Rights, and the Death Penalty: Towards an International Understanding of the Fundamental Principles of Just Punishment", July 2002.

*NK1 receptor function in stress and anxiety*, Visiting Professor, NYU School of Medicine, New York, New York.  October 2002.

*Anesthetic Depth, Paralysis, and other medical problems with lethal injecton protocols: evidence and concerns*, Federal Capital Habeas Unit Annual Conference, Jacksonville, Florida.  May 2004.

*Medical Scrutinyof Lethal Injection Procedures.* National Association for the Advancement of Colored People Capital Defender Conference, Airlie Conference Center, Warrenton, Virginia.  July 2004.

*Anesthetic considerations of LVAD implantation*.  Recurrent lecture at Columbia University LVAD implantation course.


14)    Grant Review Committees:    None

15) Publications:

**<u>Original peer reviewed articles</u>**
\*      Santarelli, L., Gobbi, G., Debs, P.C., Sibille, E. L., Blier, P., Hen, R., **Heath, M.J.S.** (2001). Genetic and pharmacological disruption of neurokinin 1 receptor function decreases anxiety-related behaviors and increases serotonergic function. **<u>Proc. Nat. Acad. Sci</u>**., 98(4), 1912 – 1917.

\*      King, T.E. [δ], **Heath M. J. S**[δ]**.**, Debs, P, Davis, MB, Hen, R, Barr, G. (2000). The development of nociceptive responses in neurokinin-1 receptor knockout mice. Neuroreport.;11(3), 587-91    **δ** authors contributed equally to this work

\*      **Heath, M. J. S.**, Lints, T., Lee, C. J., Dodd, J.  (1995).  Functional expression of the tachykinin $NK_1$ receptor by floor plate cells in the embryonic rat spinal cord and brainstem.  **<u>Journal of Physiology</u>** 486.1, 139 -148.

\*      **Heath, M. J. S.**, Womack M. D., MacDermott, A. B. (1994).  Subsance P elevates intracellular calcium in both neurons and glial cells from the dorsal horn of the spinal cord.  **<u>Journal of Neurophysiology</u>** 72(3), 1192 - 1197.

McGehee, D. S., **Heath, M. J. S**., Gelber, S., DeVay, P., Role, L.W.  (1995) Nicotine enhancement of fast excitatory synaptic transmission in the CNS by presynaptic receptors. **<u>Science</u>** 269, 1692 - 1696.

Morales D, Madigan J, Cullinane S, Chen J, **Heath, M. J. S**., Oz M, Oliver JA, Landry DW. (1999). Reversal by vasopressin of intractable hypotension in the late phase of hemorrhagic shock. Circulation. Jul 20;100(3):226-9.

LoTurco, J. J., Owens, D. F., **Heath, M. J. S**., Davis, M. B. E., Krigstein, A. R. (1995). GABA and glutamate depolarize cortical progenitor cells and inhibit DNA synthesis. **<u>Neuron</u>** 15, 1287 - 1298.

Kyrozis A., Goldstein P. A., **Heath, M. J. S.**, MacDermott, A. B. (1995).  Calcium entry through a subpopulation of AMPA receptors desensitized neighboring NMDA receptors in rat dorsal horn neurons.  **<u>Journal of Physiology</u>** 485.2, 373 - 381.

McGehee, D.S., Aldersberg, M. , Liu, K.-P., Hsuing, S., **Heath, M.J.S.** , Tamir, H.  (1997). Mechanism of extracellular $Ca^{2+}$-receptor stimulated hormone release from sheep thyroid parafolicular cells. **<u>Journal of Physiology</u>**:  502,1, 31 - 44.

Kao, J., Houck, K., Fan, Y., Haehnel, I., Ligutti, S. K., Kayton, M. L., Grikscheit, T., Chabot, J., Nowygrod, R., Greenberg, S., Kuang, W.J., Leung, D. W., Hayward, J. R., Kisiel, W., **Heath, M. J. S**., Brett, J., Stern, D. (1994).  Characterization of a novel tumor-derived cytokine.  **<u>Journal of Biological Chemistry</u>** 269, 25106 - 25119.

Dodd, J., Jahr, C.E., Hamilton, P.N., **Heath, M.J.S.**, Matthew, W.D., Jessell, T.M.  (1983). Cytochemical and physiological properties of sensory and dorsal horn neurons that transmit cutaneous sensation. **<u>Cold Spring Harbor Symposia of Quantitative Biology</u>** 48, 685 -695.

Pinsky, D.J., Naka, Y., Liao, H., Oz, M. O., Wagner, D. D., Mayadas, T. N., Johnson, R. C., Hynes, R. O., **Heath, M.J.S**., Lawson, C.A., Stern, D.M. Hypoxia-induced exocytosis of endothelial cell Weibel-Palade bodies. **Journal of Clinical Investigation** 97(2), 493 - 500.

**Case reports**                    none

**Review, chapters, editorials**

*        **Heath, M. J. S**., Dickstein,  M. L. (2000).  Perioperative management of the left ventricular assist device recipient. Prog Cardiovasc Dis.;43(1):47-54.

*        Dickstein, M.L., Mets B, **Heath M.J.S**. (2000).  Anesthetic considerations during left ventricular assist device implantation.  Cardiac Assist Devices pp 63 – 74.

*        **Heath, M. J. S**. and Hen, R. (1995). Genetic insights into serotonin function. **Current Biology** 5.9, 997 -999.

*        **Heath, M.J.S**., Mathews D. (1990).  Care of the Organ Donor.  **Anesthesiology Report** 3, 344-348.

*        **Heath, M. J. S.,**  Basic physiology and pharmacology of the central synapse. (1998) **Anesthesiology Clinics of North America** 15(3), 473 - 485.

**Abstracts**

**Heath, M.J.S.,** Davis, M., Santarelli L., Hen H. (2002).  Gene targeting of the NK1 receptor blocks stress-evoked induction of c-Fos in the murine locus coeruleus.  IARS American-Japan Congress A-15.

**Heath, M.J.S.,** Davis, M., Santarelli L., Hen H. (2002).  Gene targeting of the NK1 receptor blocks stress-evoked induction of c-Fos in the murine locus coeruleus.  Anesthesiology 95:A-811.

**Heath, M.J.S.,** Davis, M., Santarelli L., Hen H.  (2002). Expression of Substance P and NK1 Receptor in the Murine Locus Coeruleus and Dorsal Raphe Nucleus. Anesthesia and Analgesia 93; S-212

**Heath, M.J.S.,** Davis, M., Santarelli L., Hen H.  (2002). Expression of Substance P and NK1 Receptor in the Murine Locus Coeruleus and Dorsal Raphe Nucleus. Anesthesia and Analgesia 93; S-212.

**Heath, M.J.S.,** Santarelli L, Hen H. (2001)  The NK1 receptor is necessary for the stress-evoked expression of c-Fos in the paraventricular nucleus of the hypothalamus.  Anesthesia and Analgesia 92; S233.

**Heath, M.J.S.,** Santarelli L, Debs P, Hen H. (2000).  Reduced anxiety and stress responses in mice lacking the NK1 receptor.  Anesthesiology 93: 3A A-755.

**Heath, M.J.S.,** King, T., Debs, P.C., Davis M., Hen R., Barr G. (2000).  NK1 receptor gene disruption alters the development of nociception.  Anesthesia and Analgesia; 90; S315.

**Heath, M.J.S.,** Lee, J.H., Debs, P.C., Davis, M. (1997). Delineation of spinal cord glial subpopulations expressing the NK1 receptor. Anesthesiology; 87; 3A; A639.

**Heath, M.J.S.,** MacDermott A.B. (1992). Substance P elevates intracellular calcium in dorsal horn cells with neuronal and glial properties. Society for Neuroscience Abstracts; 18; 123.1.

**Heath, M.J.S.,** Lee C.J., Dodd J. (1994). Ontogeny of NK1 receptor-like immunoreactivity in the rat spinal cord. Society for Neuroscience Abstracts; 20; 115.16.

**Heath, M.J.S.,** Berman M.F. (1991) Isoflurane modulation of calcium channel currents in spinal cord dorsal horn neurons. Anesthesiology 75; 3A; A1037.