## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In the Matter of the Federal Bureau of Prisons' Execution Protocol Cases,<br><br>LEAD CASE: *Roane et al. v. Barr*<br><br>THIS DOCUMENT RELATES TO:<br><br>*Lee v. Barr*, No. 19-cv-2559<br><br>*Purkey v. Barr*, No. 19-cv-3214<br><br>*Nelson v. Barr, et al.*, 20-cv-557 | Case No. 19-mc-0145 (TSC) |

## SUPPLEMENTAL EXPERT DECLARATION OF GAIL A. VAN NORMAN, M.D.

Pursuant to 28 U.S.C. § 1746, Gail Van Norman, M.D. declares as follows

### I.      Introduction

1.      On November 1, 2019, I provided Plaintiffs' counsel with my opinions regarding the Federal Execution Protocol in a declaration that included detailed discussion and cited evidence. Counsel for Plaintiffs provided me with a responsive declaration by Joseph F. Antognini, M.D., and asked me to respond to his declaration by addressing (1) whether flash pulmonary edema observed in autopsy reports of executed prisoners occurred premortem or postmortem and (2) the likelihood that prisoners facing execution by IV administration of 5 grams of pentobarbital would be sensate to experience flash pulmonary edema and, if so, for what period of time.

2.      In addition to the materials listed in my first declaration, I have reviewed and relied upon the following materials in connection with this supplemental declaration:

- Declaration of Joseph F. Antognini M.D., MBA, signed June 25, 2020;

1

- Various authoritative textbooks, peer-reviewed articles, materials from government regulatory agencies such as the FDA, and other publications and materials as included in the references cited throughout this declaration.

If additional documents or materials are provided to me for specific review and analysis, or if I become aware of further scientific or clinical evidence that impacts my opinions, or if in attendance at hearings or trials in this case I learn of relevant evidence, I may choose to modify these opinions accordingly. To aid counsel and the court, I will summarize my previous conclusions in this declaration, in addition to addressing counsels' questions.

## II.     Summary of Opinions

3.     Rapid injection of a massive dose of pentobarbital leads to rapid rise in peak brain levels of the drug within about 2 minutes, followed by a rapid redistribution of the drug out of the brain.

4.     Human clinical cases have demonstrated that both massive overdoses of pentobarbital, as well as smaller subanesthetic doses, cause flash pulmonary edema within seconds of administration. Flash pulmonary edema occurs well before peak brain effects of the drug and outlasts redistribution of the drug out of the brain.

5.     Clinical evidence has found that 100% of prisoners for whom the medical examiner examined the lungs at autopsy had pulmonary edema. Pulmonary edema in the prisoners occurred premortem, as it requires pressure in the pulmonary capillaries (circulation) and/or continued spontaneous respiratory efforts by a live person. Flash pulmonary edema is not a common postmortem finding.

## III.     Discussion

### A.     Pentobarbital

6.     Pentobarbital is an ultra-short-acting barbiturate with a rapid onset of action when administered intravenously, achievement of peak brain effects in approximately 2 minutes, and

rapid termination of action due to redistribution of the drug out of the brain within several minutes of its injection into a vein.

7.    The actions of pentobarbital on the human brain occur solely while the drug levels in the brain persist. Once the drug is redistributed out of the brain, or below its therapeutic threshold in the brain, it ceases to have clinical effects on the brain. Pentobarbital's actions on the brain are not limited to the brief sedation that occurs, but appear also to affect deep brain structures such as the thalamus, which processes sensory input (stimuli) to the brain and selects responses.

8.    A phenomenon called "cortico-thalamic connectivity" has to be intact for consciousness, and studies indicate that barbiturates *enhance* cortico-thalamic activity, rather than suppress it, while reducing responsiveness. A similar neurologic state caused by strokes, called the "locked-in" syndrome leaves patients awake and aware, but unable to move or respond to what is happening to them. Patients experiencing locked-in syndrome describe profound feelings of panic and terror. A more detailed discussion of the brain effects of pentobarbital and other GABA-ergic drugs on thalamic function and responsiveness can be found in my first declaration, along with citations.

**B.    Consciousness vs. Responsiveness**

9.    Consciousness and unresponsiveness are distinct phenomena, although many experts erroneously use them synonymously. Dr. Antognini uses these terms synonymously, and, despite decades of evidence to the contrary, appears to believe that unresponsiveness accurately predicts unconsciousness. This is a grave error. The idea that unresponsiveness indicates unconsciousness was invalidated by research in consciousness approximately 30 years ago. But throughout his report, Dr. Antognini insists that the unresponsiveness of the subjects is proof of their "unconsciousness," despite the fact that a large body of the anesthesia literature now demonstrates that this assumption is simply untrue (please refer to my first declaration).

3

10.     *Consciousness* is the ability to perceive the individual's self and environment and to have a subjective experience of what is happening to the self. *Responsiveness* is the ability to react physically to the experiences a person is having. *Unresponsiveness* is a failure to respond to an event, whether due to choice, paralysis by a drug or physical injury, or due to chemical effects in the brain that prevent coordinated responses to an experience even if muscles are not paralyzed. Unresponsiveness neither requires nor indicates unconsciousness. They are two separate characteristics.

11.     While administration of pentobarbital (and thiopental) results in rapid unresponsiveness, the human data regarding loss of *consciousness* (not loss of responsiveness) in humans following pentobarbital intravenous injection show that consciousness persists in patients who have received IV pentobarbital during anesthetics for prolonged periods of time, in one report up to 12 minutes.

12.     The studies that Dr. Antognini cites to support his contention that prisoners will be unconscious throughout the execution examine only *unresponsiveness*. In fact, many even relied on studies of "recall," i.e. whether the patients remembered events. As we all know, not being able to remember an event does not indicate that we didn't experience it. See my first declaration for a detailed discussion of these terms and citations to current research.

13.     The initial, primary effect of barbiturates is *unresponsiveness*. Multiple studies demonstrate that even high doses of many different classes of anesthetic drugs do not reliably produce unconsciousness. Those studies include thiopental, which Dr. Antognini agrees is equivalent to pentobarbital. Details of the molecular actions of pentobarbital, as well as clinical studies showing retained consciousness with thiopental can be found in my first declaration.

4

14. Methods of measuring consciousness that were used 30 years ago have been proven to be unreliable, as our understanding of consciousness and unresponsiveness have evolved. Currently, the only method that approaches reliability in determining consciousness during administration of anesthetic drugs is the isolated forearm technique (IFT), described in my first declaration, and even the IFT is known to miss some cases of consciousness. The IFT is now considered the "gold standard" for testing consciousness during administration of drugs used during anesthesia and for research on consciousness after administration of anesthetic drugs. *No other method of determining consciousness in a setting similar to anesthesia or lethal injection has been shown to be accurate.*

15. This includes methods that rely on EEG monitoring, since hundreds of studies, some of which are detailed in my first declaration, have demonstrated unequivocally that the various methods of EEG monitoring do not correspond to unconsciousness following the administration of anesthetic drugs, either inhaled or injected intravenously. Disconnection of consciousness and responsiveness occurs in patients both in and outside of anesthesia practice. In a recent study, for example, 15% of patients who were judged to be comatose demonstrated a dissociation between consciousness and the ability to move, called "cognitive-motor dysfunction,"[1] meaning that although they were judged to be unconscious, sophisticated medical testing found that they in fact were conscious. In another recent study of "unconscious" patients in the intensive care unit, authors found that many patients were conscious, but that the ability to detect consciousness with EEG versus functional MRI (fMRI--a method of imaging chemical activity in localized parts of the brain), varied depending on what parameter was used: EEG was less accurate than fMRI in detecting consciousness by language stimulus (verbal commands) and

---

[1] Claassen J, Doyle K, Matory A et al. Detection of brain activation in unresponsive patients with acute brain injury. New EngJ Med 2019; 380:2497-505

Ex. 180 pg.5 of 11

motor imagery (asking the patient to visualize moving) than fMRI,[2] underscoring the problem with using EEG interpretation alone to determine unconsciousness. EEG monitoring during cardiopulmonary resuscitation (during full cardiac arrest) has shown that the majority (80%) of patients experience periods of EEG inactivity (burst suppression and voltage suppression),[3] yet a multicenter study by a well-respected group has shown that a significant number of these patients retain consciousness.[4] In other words, EEG suppression does not guarantee unconsciousness in humans. Studies to discover a monitor that can "capture" consciousness currently concentrate on various forms of neuro imaging, such as fMRI or PET scanning, rather than EEG alone, which has been shown to be unreliable in anesthetized patients.

16.     Dr. Antognini ignores the considerable body of evidence that EEG monitoring is not a reliable indicator of unconsciousness in humans (as cited in my first declaration) and instead turns to a study of horses, an animal on which no consciousness studies *have ever been performed*. Indeed, they would be difficult to carry out, since we can't ask a horse to answer questions on an IFT. Veterinarians generally rely on unresponsiveness as an "indicator" of unconsciousness, because they simply have no other measure to follow, but Dr. Antognini equates unresponsiveness with unconsciousness in his analysis of the study. He also cites another study using the point of time when horses collapse to the ground after barbiturate induction, apparently unaware that the "collapse to the ground" is an effect of barbiturate ablation of the muscular mechanism that allows horses to stand while lightly asleep, called the "stay apparatus." Horses can sleep standing up, often with one hind foot "cocked" and non-weight bearing. This is due to special pulley and tendon

---

[2] Edlow BL, Chatelle C, Spencer CA, et al. Early detection of consciousness in patients with acute severe traumatic brain injury. Brain 2017; 140:2399-2414
[3] Reagan EM, Nguyen RT, Ravishankare ST, et al. Monitoring the relationship between changes in cerebral oxygenation and electroencephalography patterns during cardiopulmonary resuscitation: a feasibility study. Crit Care Med 2018; 46:757-63
[4] Parnia S, Spearpoint K, de Vos G, et al. AWARE—AWAreness during Resuscitation—a prospective study. Resuscitation 2014; 85:1799-805.

arrangements in the musculature of their limbs that "lock" the animal upright even while they snooze. Injection of barbiturates ablates the "stay apparatus" and the animal falls, but the fall clearly precedes unresponsiveness, evidenced by the horses frequently struggling to keep their heads upright as they go down.[5] Like Dr. Antognini, the authors of that study have mistaken concepts of unconsciousness and unresponsiveness. In addition, different species have highly variable responses to anesthetic drugs, and actions in one species cannot be extrapolated across all species. The horse is not a species that is typically used to test drug actions or toxicity of anesthetics for human use, and it is puzzling to see these references here, since they are irrelevant.

17.     Consciousness is dependent on the strength of the stimulus—the stronger the stimulus, the more likely that consciousness will be demonstrated. IFT studies demonstrate that a majority of subjects who receive a sufficient stimulus under anesthesia will regain consciousness and experience it. These studies include barbiturate anesthetics, in which large percentages of patients were conscious (as measured by the IFT) to even relatively *light* stimuli while under full general anesthesia. Studies indicate that intravenous anesthetic drugs are more likely to be associated with consciousness/awareness than inhalational anesthetics. Pain and terror are both possible and have been reported by patients who are demonstrated to be aware by IFT.

18.     In Dr. Antognini's declaration, he states that the IFT studies I cite used "light" levels of anesthesia—another perplexing assertion. Many of these studies were carried out during major gynecological procedures that require full general anesthesia. These were not "light" anesthetics. And while he asserts that even larger doses of drug will overcome the problem of consciousness that is demonstrated during general anesthesia, he has no study and no data to show that this is the case. In fact, IFT responses have been shown with a wide variety of drugs and doses.

---

[5] In addition to the references regarding the "stay apparatus," this expert is relying additionally on personal experience with her own horses, as well as experience anesthetizing large animals at a major zoo.

### C.     Complications from IV Administration of Pentobarbital

19.     Flash pulmonary edema is a significant complication of intravenous pentobarbital injection that causes excruciating pain and suffering in persons who have experienced it and lived to report it. Dr. Antognini makes several significant errors in discussing this complication. In the first place, he states that pentobarbital injection is accompanied by onset of "unconsciousness" within 20-30 seconds and cites a 1957 article by Dundee that in fact did not test consciousness in any acceptable way (he had patients count backwards). Numerous studies show that these sorts of measurements—counting, eyelash reflex, calling a name—do not accurately determine consciousness (please see details in my first declaration).

20.     In a second error, Antognini states, "at this point pulmonary edema, *if it occurs at all* would not set in because it would only result from a much larger dose." Antognini Decl. at ¶8 (emphasis added). Dr. Antognini does not cite any evidence to support this statement, and he can't because it simply isn't true. Flash pulmonary edema has been reported with doses as low a 325 mg *total* of pentobarbital, as cited in my first declaration. In fact, flash pulmonary edema has been reported with subanesthetic doses of the drug. Finally, his reference to "if it occurs at all" is puzzling. In my first declaration I pointed out that 100% of prisoners in whom the lungs were examined post mortem demonstrated pulmonary edema. It not only occurs, but occurs *in virtually all cases*.

21.     Dr. Antognini's statement that the inmate would not feel pain or suffering because he will be unconscious is refuted by the cases I cite in my first declaration that show that patients remain conscious for a prolonged period of time following barbiturate injection, even when they are unresponsive. There is no basis to claim that inmates will be unconscious when pulmonary edema develops, because (1) flash pulmonary edema develops almost instantaneously, and (2)

8

studies of unconsciousness in patients anesthetized with barbiturates indicate that they remain conscious for a significant period of time.

22.     Unlike our understanding of consciousness and unresponsiveness, which has evolved with recent studies and irrefutable data, flash pulmonary edema is a physical phenomenon that has been well-known and well-described for decades, and medical literature has not uncovered much that is new or different in describing it, detecting it or treating it. Flash pulmonary edema in conjunction with injection of phenobarbital is believed to occur via three mechanisms: (1) the caustic effect of the drug in the bloodstream causes immediate damage to the delicate capillaries lining the air-exchanging spaces in the lungs, causing them to leak serum as pressure from the bloodstream push fluid into the air spaces; (2) upper airway obstruction due to pentobarbital sedation causes collapse of the upper airway, so that attempts to inhale are met with resistance, and negative pressure rises in the airspaces of the lungs, sucking more fluid in from the capillaries; and (3) the toxic effect of the barbiturate on the left heart causes it to fail, leading to an acute rise in blood pressure within the leaking capillaries of the lungs, increasing the leakage of fluid into the air spaces. Dr. Antognini admits in his declaration that upper airway obstruction with continued respiratory effort occurs, but dismisses it as "normally occurring" during onset of "unconsciousness," again equating unconsciousness with unresponsiveness.

23.     The occurrence of flash pulmonary edema with barbiturate overdose is not speculative, but has been well described in barbiturate overdoses. We now also know from autopsy examinations of prisoners in which barbiturates are used alone or in combination with other drugs during judicial lethal injection, that flash pulmonary edema is not just common in judicial executions, but that *all of the autopsies in which the medical examiner examined the lungs* (and this included the majority of autopsies) demonstrated that the prisoners had flash pulmonary

9

edema. We also know that this could not have occurred as a postmortem event, because flash pulmonary edema requires a beating heart to produce the pressure in the capillaries, and is facilitated by spontaneous attempts to breathe against an obstructed airway, which also requires a living subject. Flash pulmonary edema is not a routine postmortem finding.

24.     Furthermore, the clinical timing of flash pulmonary edema in living patients is well known and can occur virtually *instantaneously* with injection of even much lower doses of barbiturates, as demonstrated by the Potts study I referenced in my first declaration. I personally have experience with flash pulmonary edema that developed after *a single breath* in a 15-year-old patient during orthopedic surgery, necessitating placement of a breathing tube and transfer to the intensive care unit. Respiratory distress occurred within seconds. The rapid onset of flash pulmonary edema shows that onset of sensations of drowning will precede peak brain levels of the barbiturate, which occur several minutes later.

25.     Flash pulmonary edema increases the work of breathing, decreases blood oxygen levels and causes sensory nerves in the lungs to transmit a sensation of profound shortness of breath and suffocation to the brain, asking the brain to "breathe harder." We know from descriptions of surviving patients that the sensation is identical to that reported in near-drowning and suffocation, one of the most excruciating feelings known to man, and one that is exploited for interrogations during waterboarding, now defined by the European Court of Human Rights as a form of torture. Please see my first declaration for references and a detailed description of the drowning sensations.

## IV.     Conclusion

26.     It is my conclusion, to a reasonable degree of medical certainty, that prisoners executed by lethal injection in accordance with the Federal Protocol remain conscious and able to experience extreme pain and suffering related to the caustic effects of pentobarbital and occurrence of flash pulmonary edema.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Seattle, Washington on June 29, 2020.

Gail A. Van Norman, M.D.